IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JAYLA ALLEN, DAMON JOHNSON, JOSHUA MUHAMMAD, RAUL SANCHEZ, AND TREASURE SMITH, *Plaintiffs*, <br><br> V. <br><br> WALLER COUNTY TEXAS; THE WALLER COUNTY COMMISSIONERS COURT; JUDGE CARBETT "TREY" J. DUHON III, in his official capacity as the Waller County Judge; and CHRISTY A. EASON, in her official capacity as the Waller County Elections Administrator, *Defendants*. | § § § § § § § § § § § § § § § § Civil Action No. 4:18-CV-3985 |

**REPLY IN SUPPORT OF RULE 12(b)(6) MOTION TO DISMISS PLAINTIFFS' ORIGINAL COMPLAINT**

Respectfully submitted,

BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 South MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
512-472-8021 (Telephone)
512-320-5638 (Facsimile)

By: _____
Gunnar P. Seaquist
Texas State Bar No. 24043358
Southern District No: 1140733
gseaquist@bickerstaff.com
C. Robert Heath
Texas State Bar No. 09347500
Southern District No. 13381
bheath@bickerstaff.com

**ATTORNEYS FOR ALL DEFENDANTS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................ iii

   I.   Plaintiffs fail to allege a discriminatory "effect" claim under Section 2 of the Voting Rights Act. ................................................................................................................. 1

      A.   The allocation of early voting hours in Waller County did not abridge the rights of Black voters in the County. ................................................................................. 2

      B.   The fact that the City of Prairie View had fewer early voting hours than the City of Waller is insufficient, as a matter of fact and law, to sustain Plaintiffs' claim under Section 2 of the Voting Rights Act ................................................................ 5

      C.   Plaintiffs' allegations of socioeconomic disparities fail to plausibly suggest a diminution in the ability to cast an early ballot. ....................................................... 8

   II.   Plaintiffs' allegations negate a plausible claim that Defendants' adoption of an early voting plan was intentionally discriminatory. ........................................................... 10

      A.   Plaintiffs plead no facts to plausibly suggest a sequence of events suggestive of intentional discrimination. ...................................................................................... 10

      B.   The contemporaneous statements and "coded statements" alleged by Plaintiffs also bear no indicia of discriminatory intent. ......................................................... 13

      C.   Defendants' stated concerns are not tenuous. ........................................................ 14

Conclusion ............................................................................................................................ 15

CERTIFICATE OF SERVICE ............................................................................................. 16

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Common Cause Ind v. Marion Cty. Election Bd.*,
   311 F.Supp. 3d 949 968-69 (S.D. Ind. 2018) .................................................................................6

*Democratic National Committee v. Reagan*,
   329 F.Supp. 3d 824, 865 (D. Ariz. 2018) ......................................................................................5

*Frank v. Walker*,
   768 F.3d 744 (7th Cir 2014) ...........................................................................................................5

*Johnson v. De Grandy*,
   512 U.S. 997 (1994) ....................................................................................................................3, 4

*League of Women Voters of Fla v. Detzner*,
   314 F.Supp 3d 1205, 1216-19 (S.D. Fla. 2018) .............................................................................6

*Lee v. Virginia State Board of Elections*,
   843 F.3d 592 (4th Cir. 2016) ......................................................................................................5, 8

*LULAC v. Perry*,
   548 U.S. 399 (2006) ....................................................................................................................3, 4

*Miss. State Chapter, Operation PUSH v. Mabus*,
   932 F.2d 400 (5th Cir. 1991) ..........................................................................................................6

*Miss. State Chapter, Operation PUSH v. Allain*,
   674 F.Supp. 1245 (N.D. Miss. 1987) ............................................................................................9

*Obama for America v. Husted*,
   697 F.3d 423 (6th Cir. 2012) ..........................................................................................................6

*Ohio Democratic Party v. Husted*,
   834 F.3d 620 (6th Cir. 2016) ......................................................................................................5, 8

*One Wisconsin Inst., Inc. v. Thomsen*,
   198 F.Supp. 3d 896, 931-33 (W.D. Wis. 2016) .............................................................................6

*Republican Party of Ark v. Faulkner Cty.*,
   49 F.3d 1298-99 (8th Cir. 1995) ....................................................................................................6

*Sanchez v. Cegavske*,
   214 F.Supp. 3d 961 (D. Nev. 2018) ...........................................................................................7, 9

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) ....................................................................................... *passim*

**Statutes and Rules**

52 U.S.C. § 10301 ...............................................................................................................1, 4

52 U.S.C. § 10301(a) ................................................................................................................2

Fed. R. Civ. P. 12(b)(6) ..........................................................................................................15

Section 2 of the Voting Rights Act. ................................................................................ *passim*

Tex. Elec. Code § 84.065(c) ..................................................................................................12

Texas Open Meetings Act ......................................................................................................12

**Other Authorities**

U.S. Constitution ............................................................................................................ *passim*

U.S. Const. amend. XV ..........................................................................................................6

**DEFENDANTS' REPLY BRIEF IN SUPPORT
OF THEIR MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

**I.   Plaintiffs fail to allege a discriminatory "effect" claim under Section 2 of the Voting Rights Act.**

The reach of a vote denial or abridgment claim under Section 2 of the Voting Rights Act ("VRA") extends only to prohibiting the State from imposing burdens on minority voters that would disproportionately abridge their ability to participate in the political process. *Veasey v. Abbott*, 830 F.3d 216, 253 (5th Cir. 2016); 52 U.S.C.A. § 10301. Thus, notwithstanding Plaintiffs' assertion to the contrary, Defendants have never suggested that Plaintiffs needed to show that they had been completely denied the right to vote in order to sufficiently allege a vote-abridgement claim.[1] But they *were required* to allege a discriminatory burden that disproportionately abridged their right to vote on account of their race or color. They have not done so. Instead, Plaintiffs' allegations establish that Waller County's early voting plan in the 2018 general election imposed, at most, a greater inconvenience to voters in certain geographic areas—with both Anglo and Black majorities—but did not abridge the right of any Waller County voter to cast a ballot on account of race or color. As a result, Defendants' motion established that Plaintiffs' claims under the VRA fail to state a claim for which relief may be granted. (Doc. 34, pp. 21-27).

Plaintiffs respond that their "Complaint alleges a clear disparate impact insofar as, under Defendants' early voting plan, Black student voters in Prairie View—the only city in Waller County with a majority-Black student population—had *no* early voting on campus during the first week, and significantly fewer early voting hours overall than other cities in Waller County with significantly lower concentrations of Black student voters." (Doc. 39, p. 22) (italics in original). In addition, Plaintiffs point to their allegations regarding certain socioeconomic disparities in the

---

[1] Plaintiffs cite pp. 8 and 26 of Defendants Motion for this supposed argument; those pages contain no such statement. *Compare*, Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss, Doc. 39, ¶ 22.

1

City of Prairie View as further support for their claim that the 2018 early voting schedule disproportionately abridged their right to vote. (Doc. 39, pp. 23 and 36). However, the mere fact that Prairie View had different or fewer early voting hours than the City of Waller does not equate to less opportunity to participate in the political process and is legally insufficient to sustain a claim of vote abridgement under Section 2. Likewise, Plaintiffs' allegations regarding their access to transportation and work circumstances do not plausibly suggest a discriminatory burden on the right to vote where, as here, the County's early voting plan provided the City of Prairie View the *greatest* number of extended early voting days in the County at polling locations on campus or at the immediately adjacent Waller County Community Center, a short walking distance away. Plaintiffs' Response therefore does nothing to redress their failure to plead sufficient facts to state a plausible claim of abridgement under Section 2, and dismissal is appropriate.

### A. The allocation of early voting hours in Waller County did not abridge the rights of Black voters in the County.

As an initial matter, Section 2 prohibits denial or abridgement of the right to vote only on account of race, color, or membership in a language minority group; it does not encompass claims of discrimination on the basis of age or status as a student. 52 U.S.C.A. § 10301(a). Thus, to the extent Plaintiffs seek to maintain their section 2 claim on a blended basis of age or status as a student combined with race, that effort is at odds with the plain language of the statute and must be rejected. *Id.* Furthermore, Plaintiffs' allegations of "the significant inequities in early voting" amount to nothing more than the fact that the City of Waller[2], which Plaintiffs allege to have a

---

[2] Plaintiffs continue to characterize the City of Waller as having had "two early voting sites during the first week of early voting," (Doc. 39, p. 22), but that characterization is misleading at best. As shown in Defendants' motion, there was one polling location at the Waller ISD Administrative building and one at the Fields Store County building. (Doc. 34, p. 13). Although both bear a postal code indicating the City of Waller, Fields Store is approximately 8 miles away from the Waller ISD Administrative Building, whereas PVAMU is only 5.4 miles away from the City of Waller polling location. *Id.* Thus, if it is accurate to say, as Plaintiffs do, that Fields Store is a second polling location for the City of Waller, it would be equally accurate to say that the City of Waller is a second polling location for Prairie View.

majority-Anglo CVAP, received a greater total number of early voting hours than did Prairie View, which Plaintiffs allege to have a majority-Black CVAP. Plaintiffs do not dispute, however, that the County's early voting plan allocated the greatest number of early voting hours to the BVAP-majority cities of Hempstead and Brookshire. (*See* Doc. 1, ¶ 28, Figure 1; Doc. 34, pp. 13-19). Nor do they challenge the conclusion that the City of Prairie View received a substantially greater number of early voting hours—including extended and/or weekend hours—than every Anglo-majority area in the County besides the City of Waller, including Katy, Monaville, Fields Store, and Hockley (which despite significant early voting usage[3], had no polling locations during early voting). *Id.*

Instead, Plaintiffs incorrectly argue that the Court should ignore the racially-neutral allocation of early voting hours throughout the County and focus myopically on the comparison of hours between the City of Prairie View and the City of Waller. As support, Plaintiffs cite to language in *LULAC v. Perry*, 548 U.S. 399, 436 (2006) and *Johnson v. De Grandy*, 512 U.S. 997, 1019 (1994) stating that the rights of some Black voters may not be traded off against the rights of other members of the same minority class. (*See* Doc. 39, p. 37). Defendants do not disagree with the Supreme Court's statement, but no such tradeoff has taken place here. Indeed, Plaintiffs misunderstand the import and context of *LULAC* and *De Grandy*, both of which addressed

---

[3] Although Plaintiffs quibble with Defendants' use of early voting turnout rates, that criticism misses the mark. (*See* Doc. 39, p. 25, n. 10). Defendants have never argued that Plaintiffs are required to show decreased voter turnout to state a plausible claim of vote abridgement; the motion to dismiss simply stated an objective fact: the undisputed turnout numbers for early voting in Waller County belie any plausible suggestion that voters in Prairie View use early voting at higher rates than other voters in Waller County. (Compare Doc. 1, ¶ 64, with Doc. 34, pp. 9-12). Plaintiffs' argument that the ratio of early ballots to votes cast on election day is a better representation of early voting usage is also incorrect. Voting resources must be allocated where they are most needed. It is the number of early voters that best demonstrates the need for polling locations and hours in a given location. It would be inaccurate to say, for example, that a polling location in which a higher percentage of the total votes cast were early ballots but the actual number of early voters at the polls was relatively small, had a greater need for early voting resources than a polling place with much greater early voting traffic, notwithstanding the fact that the early votes, though significantly greater in number, were a smaller proportion of the total ballots cast.

proportionality in the vote-dilution context and are therefore inapposite to an abridgment case such as this one. Specifically, in evaluating the adequacy of single-member districts in a vote-dilution claim, the proportionality of the percentage of total districts that are minority-opportunity districts with the minority share of the citizen-voting-age population is a relevant factor in determining whether a given electoral map dilutes minority-voting strength. *LULAC*, 548 U.S. at 436; *DeGrandy*, 512 U.S. at 1000. However, the Supreme Court explained that proportionality is not necessarily a "safe harbor" because electoral districts could be drawn proportionally and still crack or pack minority voters into other districts so as to dilute their voting strengths—thus unacceptably trading the voting rights of one group of minority voters (those in an effective majority-minority district) for another (those whose voting strength was diluted by being drawn into a neighboring district). *De Grandy*, 512 U.S. at 1019.

By contrast, in the vote-abridgement context, the issue is not whether a given electoral system, despite being proportional, nevertheless has the effect of diluting minority voting power due to a racial gerrymander. The issue is whether the challenged early voting schedule disproportionately abridged the ability of minorities to participate in the political process in comparison to other members of the electorate. *Veasey*, 830 F.3d at 253; 52 U.S.C.A. § 10301. This requires a county-wide comparison of the early voting opportunities available to all the voters in Waller County. Here, Plaintiffs' allegations affirmatively establish that Prairie View had fewer total early voting hours than Waller (WVAP), Hempstead (BVAP), and Brookshire (BVAP), but received a greater number of hours than the Anglo-majority areas of Fields Store (WVAP), Monaville (WVAP), Katy (WVAP), and Hockley (WVAP). (Doc. 1, ¶ 28 (c) and (d); p. 11, Figure 1). Therefore, contrary to Plaintiffs' suggestion, this is not a case in which the rights of some Black voters have been traded off against others, but a case in which Black voters, both in Prairie View

4

and in the County as a whole, were not disproportionately burdened by the 2018 early voting schedule in comparison to other voters throughout Waller County. (Doc. 1, ¶ 28, Figure 1; Doc. 34, pp. 13-19).

### B. The fact that the City of Prairie View had fewer early voting hours than the City of Waller is insufficient, as a matter of fact and law, to sustain Plaintiffs' claim under Section 2 of the Voting Rights Act.

Furthermore, even if the Court were to consider Prairie View and the City of Waller in isolation, Plaintiffs' allegations fail to plausibly suggest that there was a reduction in their ability to cast an early ballot based on the County's plan. Importantly, no Court has held that a disparity in early voting hours between areas with differing racial majorities constitutes an abridgment of the right to participate in the political process. To the contrary, courts have made clear that Section 2 does not condemn a voting practice just because it has some disparate effect on minorities. *Frank v. Walker*, 768 F.3d 744, 753 (7th Cir 2014); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 637-38 (6th Cir. 2016). And courts have explained that because local decisions, such as the location of polling places (or the hours of operation for each location), will inherently inconvenience some voters more than others, mere disparities in the convenience of voting do not offend the prohibitions of Section 2. *Lee v. Virginia State Board of Elections*, 843 F.3d 592, 600-01 (4th Cir. 2016); *Democratic National Committee v. Reagan*, 329 F.Supp. 3d 824, 865 (D. Ariz. 2018). Thus, "it cannot be that states must forever tip-toe around certain voting provisions that would have more effect on the voting patterns of one group than another." *Lee*, 843 F.3d at 601, citing *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016). Rather, Section 2 asks only whether a voting standard, practice, or procedure has diminished the opportunity of the protected class to participate in the electoral process. *Id.*

Plaintiffs' cited authorities are not to the contrary, and indeed, only prove the distinction between an actionable burden on the right to vote and the disparate convenience of geographic

disparities in early voting hours. For example, Plaintiffs contend that the Fifth Circuit has found voting rights violations where Black voters were given less access than white voters to satellite voter registration or absentee voting. (Doc. 39, p. 19). However, in *Miss. State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400 (5th Cir. 1991), the Fifth Circuit did not find a Section 2 violation based on disparate locations or hours of satellite voter registration, but on a state law effecting a prohibition of satellite registration, which under prior law had previously been available to Black voters, who would now have to travel to the county courthouse to register to vote. *Id.* at 403-04. Similarly, *Toney v. White* did not involve disparate hours for either voting or registration, but the discriminatory purging of Black voters from voter rolls without notice or an opportunity for re-registration, as required by Louisiana law. 488 F.2d 310, 312 (5th Cir. 1973). Finally, in *Brown v. Post*, the district court in Louisiana found a violation of the VRA and the Fifteenth Amendment based on the solicitation and procurement of absentee votes from white voters in violation of Louisiana law, without a corresponding solicitation of absentee votes from Black voters. 279 F. Supp. 60, 62 (W.D. La. 1968). None of these cases[4], in which the challenged election practice had the effect of barring or substantially impairing the ability of Black voters to cast a ballot, are even remotely analogous to Plaintiffs' allegations in this case.

---

[4] The other cases cited by Plaintiffs are either wholly inapplicable or further demonstrate the distinction between an actionable burden on the right to vote and the disparate inconvenience occasioned by not having greater early voting hours. *See e.g., Obama for America v. Husted,* 697 F.3d 423, 440-41 (6th Cir. 2012) (Non-VRA case finding that state law *eliminating* early voting days for all non-military voters violated equal protection clause); *Republican Party of Ark v. Faulkner Cty.*, 49 F.3d 1298-99 (8th Cir. 1995) (Non-VRA case finding that Arkansas's requirements that political parties both conduct and pay for primary elections *as a condition of access to the general election ballot* violated equal protection); *League of Women Voters of Fla v. Detzner*, 314 F.Supp 3d 1205, 1216-19 (S.D. Fla. 2018) (Non-VRA case in which the court found an opinion of the Florida Secretary of State that *barred any early voting on the campus* of a state-owned university or junior college violated equal protection and the Twenty-Sixth Amendment); *Common Cause Ind v. Marion Cty. Election Bd.*, 311 F.Supp. 3d 949 968-69 (S.D. Ind. 2018) (Finding that *elimination of satellite voting locations* disproportionately used by Black voters violated VRA and U.S. Constitution); *One Wisconsin Inst., Inc. v. Thomsen*, 198 F.Supp. 3d 896, 931-33 (W.D. Wis. 2016) (Enjoining statute implementing *requirement of ID* disproportionately lacked by Black voters and *reducing from 30 to 12* the days a municipality could offer early in-person voting).

In fact, the only case cited by Plaintiffs that actually addresses the disparate availability of early voting is the Nevada District Court's decision in *Sanchez v. Cegavske*, 214 F.Supp. 3d 961 (D. Nev. 2018), but that case actually supports Defendants' position. The plaintiffs in *Cegavske* were Native-American residents of two different Paiute reservations in Nevada. Although the State of Nevada provided for early voting, neither reservation had an early voting polling place, and the closest polls at which to cast an early ballot were in majority Anglo areas that were 32 and 34 miles away, respectively. Thus, although early voting was easily available to white voters in the same county, Native Americans living on the reservations could not cast an early ballot without making a 64- or 68-mile roundtrip. Under those circumstances, the court had little trouble concluding that the long distance Paiute voters were required to travel to cast a ballot was a material burden that fell disproportionately on the plaintiffs.

Unlike *Cegavske*, Plaintiffs in this case faced no such burden on their ability to participate in early voting. Early voting in Waller County was not allocated so as to benefit only Anglo voters or burden only minority voters. Rather, Black and Anglo voters in Waller County shared in the benefit of an opportunity to vote early. Plaintiffs did not have to travel great distances or overcome any other material hurdle to cast an early ballot. To the contrary, it is undisputed that Prairie View received five 12-hour days of weekday early voting and five hours of early voting on Sunday, all either on or within a short distance of the PVAMU campus. And Plaintiffs make no plausible allegation that either the Initial Plan or the Extended Plan reduced early voting hours, imposed unnecessary impediments to accessing early voting, or otherwise diminished the ability of Prairie View voters to cast an early ballot.

Instead, Plaintiffs simply allege that having *more* early voting hours on campus could have made voting more convenient. For example, Plaintiff Jayla Allen avers that "[i]f Waller County

7

provided Prairie View with early voting the first week she would vote then because *it is more convenient and quicker* than voting on election day." (Doc. 1, ¶ 13) (italics added). She makes no allegation, however, that voting during the early voting hours provided in Prairie View under either the Initial or Extended Plans in anyway prevented or burdened her ability to cast an early ballot. Similarly, Plaintiff Damon Johnson avers that "The Memorial Student Center on PVAMU's campus is significantly *more convenient* for Mr. Johnson than off-campus locations because he is often on-campus for classes and extracurricular activities and does not have a reliable or practical means of traveling to off-campus early voting locations." (Doc. 1 ¶ 14) (italics added). Perhaps so, but Mr. Johnson makes no allegation to permit a reasonable inference that the early voting hours provided under the County's plan, both at the Memorial Student Center and a quarter mile away at the Waller County Community Center, subjected him to greater burdens in casting an early ballot than those faced by other voters in Waller County.

Plaintiffs' allegations of a disproportionate burden on the right to vote therefore boil down to their dissatisfaction that Prairie View received fewer total early voting hours than the City of Waller and their belief that additional hours on campus would have been more convenient. (Doc. 1, ¶¶ 38, 41, 52). Neither of these complaints states a plausible abridgement of the right to vote under Section 2. *Lee*, 843 F.3d at 600-601 (Section 2 does not sweep away election rules that merely result in a disparity in the convenience of voting); *See also Husted*, 834 F.3d at 623 ("The issue is not whether some voters would benefit from additional days of early voting but whether the challenge law results in a cognizable injury.").

### C. Plaintiffs' allegations of socioeconomic disparities fail to plausibly suggest a diminution in the ability to cast an early ballot.

Nor do Plaintiffs' allegations of socioeconomic disparities in the City of Prairie View plausibly suggest that the County's early voting plan abridged their right to vote. Plaintiffs allege

8

that Black voters in Prairie View 1) are disproportionately poorer, 2) disproportionately lack access to transportation, and 3) are more likely to work in service industry jobs, in comparison to their white counterparts. (Doc. 39, p. 18, citing Doc. 1, ¶¶ 29-33). Even if true, such allegations might be suggestive of a discriminatory burden in a case like *Cegavske*, 214 F.Supp. 3d at 974, where the only polling locations for minority voters to vote early is a prohibitive distance away; or in a case like *Veasey,* 830 F.3d at 216, where the plaintiffs faced the prospect of paying hefty fees to obtain the documents necessary to acquire the necessary identification required to vote; or in a case like *Mississippi State Chapter, Operation PUSH v. Allain*, 674 F.Supp. 1245, 1264 (N.D. Miss. 1987) in which minority voters had to travel to the county courthouse, which was only open during working hours, just *to register* to vote. Yet allegations of disparate socioeconomic circumstances provide no reasonable basis to infer an abridgment of the right to vote where, as here, Plaintiffs were able to avail themselves of five 12-hour weekdays (and five hours on a Sunday) to vote early on—or immediately adjacent to—the campus at which they attend class, eat their meals, engage in extracurricular activities, and socialize with their friends. (Doc. 1, ¶¶ 13, 14, 16, and 17; *see also* Doc. 34, pp. 13-19).

Therefore, far from a diminution of the opportunity to vote, the early voting hours at Prairie View—which included more early morning and evening hours than any other polling location in the County—provided a unique advantage to PVAMU students who were afforded a concentrated opportunity to cast a vote at the very place where they already spent much of their day. That same opportunity was not available to voters elsewhere in the County who, in order to cast a ballot, had to leave their place of employment and perhaps travel to a neighboring city to cast their vote. As such, Plaintiffs' allegations simply do not plausibly suggest that the County's early voting schedule burdened minority voters in a way that disproportionately abridged their ability to participate in

9

the political process. *Veasey*, 830 F.3d at 253. Their claims under Section 2 of the VRA should therefore be dismissed.

**II.    Plaintiffs' allegations negate a plausible claim that Defendants' adoption of an early voting plan was intentionally discriminatory.**

Beyond their inability to plausibly plead a disproportionate burden on their right to vote, Plaintiffs' attempt to salvage their claims of discriminatory intent, whether under Section 2 of the VRA or the Fourteenth, Fifteenth, or Twenty-Sixth Amendments to the U.S. Constitution, also comes up short. Although Plaintiffs continue to stress their allegations of historical discrimination in the State of Texas and Waller County, instances of past discrimination do not provide a basis for invalidating current governmental action that is not itself unlawful. (Doc. 34, p. 28). When it comes to the County's adoption of the 2018 plan, Plaintiffs' Response make no plausible showing that Defendants' actions were—in any way—motivated by racial discrimination.

**A.    Plaintiffs plead no facts to plausibly suggest a sequence of events suggestive of intentional discrimination.**

Plaintiffs' complaint affirmatively establishes that Defendants' adoption of the early voting plan was based on the neutral, non-discriminatory acceptance of an agreed proposal submitted by the chairs of the local Democratic and Republican parties. (Doc. 1, ¶ 35). While Plaintiffs may not agree with the County's use of the party chairs' proposal, they plead no facts from which to reasonably infer that the reliance on the mutual agreement of the chairs of the two major political parties in the County amounts to intentional discrimination on the basis of either race or age, as, of course, it does not. Instead, Plaintiffs complain that the "County chairs' process for developing the early voting schedule agreement is structured to prioritize Democratic or Republican candidates," and "excludes input from voters who are not affiliated with a party." In addition to being speculative and conclusory, those complaints are generally applicable to the two-party-system of American politics but are in no way suggestive of prohibited discrimination. Moreover,

10

*any* resident of Waller County had the opportunity to provide input or voice objections regarding the party chairs' proposal at the time it was publicly adopted by the Waller County Commissioners Court in September of 2018. (Doc. 1, ¶ 35).

Plaintiffs' invocation of partisan vote-suppression is similarly off base. Specifically, Plaintiffs argue that it is meaningless that the chairs' proposal was bipartisan because intentions to achieve partisan gain and to racially discriminate are not mutually exclusive. (Doc. 39, p. 27). But unlike *Veasey,* where the court found the Voter ID bill was passed in the wake of a seismic demographic shift such that the party in control was facing a declining voter base and could gain a partisan advantage through a strict voter ID law, *Veasey*, 830 F.3d at 241, there is no basis to infer that the proposal of the County chairs was for partisan gain. Thus, while Defendants do not disagree that partisan efforts at vote suppression have not been limited to one party or the other, there is no reasonable basis to infer *any* partisan suppression in this case*,* much less some shared bipartisan incentive for the Republican and Democratic county chairs to devise an agreed plan to suppress the votes of Black student voters in Prairie View.[5] To the contrary, it was entirely reasonable for Defendants to rely on the agreed proposal of the party chairs as a non-discriminatory schedule that would serve the needs of all voters in the County.

Finally, Plaintiffs fail to show any procedural irregularity in the adoption of the early voting plan that would support a reasonable inference of intentional discrimination. Although they make empty protestations of a "non-transparent, undemocratic process," every action by Defendants in regard to the 2018 early voting schedule was taken in an open meeting pursuant to the Texas Open Meetings Act, with notice and the opportunity for public comment. (Doc. 1, ¶¶ 35, 43, *see also*,

---

[5] It is particularly unlikely that the Democratic County Chair would have agreed to such a proposal, as in the 2016 general election, of 1,433 total voters from the Prairie View Memorial Student Center, 1,214 cast a straight Democratic ticket ballot, and 1,368 voted for the Democratic candidate for President.
http://www.co.waller.tx.us/page/open/1260/0/11.08.2016%20General%20Canvass

Doc. 39, p. 28). Plaintiffs do not allege there were any objections to the early voting plan at the time it was adopted in September of 2018. Indeed, the only ostensible "procedural irregularities" identified in Plaintiffs' Response are 1) that the Commissioners Court did not vote to amend the early voting schedule based on a handful of public statements at the public meeting on October 17, 2018, and 2) that the Commissioners Court did subsequently modify the schedule after the lawsuit was filed.

But the mere fact that a legislative body does not take action in response to some opposition from members of the public is not a procedural irregularity; if it were, few, if any, city council or commissioners court meetings would be safe from a procedural attack. It is particularly significant in this case that Plaintiffs made no effort to comment or object to the proposed schedule at the time it was adopted, but instead waited until the week before early voting was to begin before seeking changes to the schedule. Even then, Plaintiffs do not allege that any of the individuals who spoke at the October 17th meeting complained that the early voting plan was discriminatory on the basis of age or race. Rather, "[t]he majority of the people who commented on the issue asked for 'parity' for students at PVAMU and 'consistency throughout the County.'" (Doc. 1, ¶ 43). But Texas law does not require uniform voting hours among early voting locations, and the Defendant Commissioners clearly voiced legitimate, non-discriminatory reasons for not changing the early voting schedule the week before early voting was scheduled to begin. Tex. Elec. Code § 84.065(c); *see also* Doc. 34, pp. 29-30). As such the fact that Defendants did not modify the early voting schedule on October 17 is neither a procedural irregularity nor any evidence of discriminatory intent.

Nor may Plaintiffs show discrimination based on Defendants' response to a procedural irregularity that Plaintiffs created by filing a lawsuit. As Defendant Duhon made clear in his

statement at the emergency meeting on October 24th, the County has always maintained that it had complied with the law and been open and transparent in setting early voting hours throughout the County. (Doc. 34, p. 20, n. 11). And as shown in Defendants' motion to dismiss and this reply, neither the Initial nor the Extended early voting plans unlawfully abridged the rights of any voter in Waller County. Nevertheless, to avoid the threat, no matter how remote, of having to implement a temporary restraining order after early voting had already begun and in the hope of avoiding needless (and baseless) litigation, the Commissioners Court adopted the Extended Plan as a show of good faith. That it did so is no suggestion that the earlier plan was the result of intentional discrimination.

### B. The contemporaneous statements and "coded statements" alleged by Plaintiffs also bear no indicia of discriminatory intent.

Plaintiffs also continue to suggest that statements by Defendants Duhon and Eason acknowledging that Prairie View, like Fields Store, Monaville, and Katy, received fewer total early voting hours than Hempstead, Brookshire, and Waller are somehow indicative of intentional discrimination. That contention is wrong for two reasons. First, the statements on which Plaintiffs rely do not plausibly identify or signal any disparity or discrimination on the basis of race or age. Second, even if those statements could be considered an acknowledgement of a disparity on the basis of a protected category, which they cannot, showing mere awareness of a disparate impact on a protected group is not enough: the law must be passed because of that disparate impact. *Veasey*, 830 F.3d at 231, *citing Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Plaintiffs identify no statements to indicate that any member of the Waller County Commissioners Court adopted the early voting plan for the purpose of abridging the ability of Prairie View voters to cast an early ballot—as indeed the early voting plan had neither that effect nor intent.

Next, Plaintiffs make the incredible argument that Defendants' concerns about the ability of non-student residents of Prairie View to vote on campus amounts to an "unmistakable suggestion" that PVAMU students are not part of the 'community' [and is] powerful evidence that bias against Black students at PVAMU was a motivating factor for the early voting plan." This argument, like this lawsuit as a whole, merely speculates at the existence of discrimination without any plausible basis to infer that it actually exists. It should go without saying that acknowledging the objective existence of voters in Prairie View who are not students at PVAMU is no suggestion of bias against Black students at PVAMU. Moreover, Defendant Eason expressly stated to the Commissioners Court that the concerns about voting on PVAMU campus were not that the residents of Prairie View were afraid or did not like to go there, but that it was difficult to park, get around, and gain access to the polls. (Doc 1, ¶ 50; October 17, 2018 Meeting Video, Item 5 at 25:30-27:18 and 4:28-4:57). Ultimately, then, there is no merit to the suggestion that any comment alleged by Plaintiffs to have been made by Defendants in this case bore even a hint of age or race-based discrimination.

### C. Defendants' stated concerns are not tenuous.

In their final parry, Plaintiffs attempt to show that Defendants' stated concerns regarding the allocation of early voting hours in Prairie View were tenuous or pretextual. Notably, Defendants anticipated these arguments in their motion to dismiss, and, as Plaintiffs have failed to meaningfully join issue, need not repeat that analysis here. (*See* Doc. 34, p. 29-30 (identifying the legitimate, non-discriminatory nature of Defendants' concerns regarding the early voting schedule); *Id.* at 29 (addressing why Eason's and Duhon's suggestion for more early voting hours at Prairie View was not suggestive of discriminatory animus); *Id.* at 30 (addressing why the mere feasibility of adding additional hours at Prairie View did not address the concerns of broadening the disparity between other Waller County communities that already had fewer or no early voting

14

hours). Defendants have been consistent and steadfast in explaining their reasoning for adopting and maintaining the Initial and Extended Plans, and Plaintiffs' response fails to show that Defendants' proffered justifications were a pretext for discrimination on the basis of age or race.

## Conclusion

Plaintiffs' allegations fail to show that Waller County's 2018 early voting calendar abridged their right to vote on account of their race, age, or status as students, much less that the plan was adopted with that intent. The Court should therefore grant Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiffs' Original Complaint and dismiss Plaintiffs' suit in its entirety.

Respectfully submitted,

BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 South MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
512-472-8021 (Telephone)
512-320-5638 (Facsimile)

By: _____
Gunnar P. Seaquist
Texas State Bar No. 24043358
Southern District No: 1140733
gseaquist@bickerstaff.com
C. Robert Heath
Texas State Bar No. 09347500
Southern District No. 13381
bheath@bickerstaff.com

**ATTORNEYS FOR ALL DEFENDANTS**

## CERTIFICATE OF SERVICE

This is to certify that on February 7, 2019, a true and correct copy of the foregoing document was served on all counsel of record via the electronic case filing system of the United States District Court for the Southern District of Texas.

_____
Gunnar P. Seaquist