**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| JAYLA ALLEN, DAMON JOHNSON, RAUL SANCHEZ, TREASURE SMITH, and THE PANTHER PARTY, <br><br> *Plaintiffs*, <br><br> v. <br><br> WALLER COUNTY, TEXAS; THE WALLER COUNTY COMMISSIONERS COURT; JUDGE CARBETT "TREY" J. DUHON III, in his official capacity as the Waller County Judge; CHRISTY A. EASON, in her official capacity as the Waller County Elections Administrator, <br><br> *Defendants*. | Civil Case No. 4:18-cv-3985 |

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS
<u>PLAINTIFFS' FIRST AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

I.     STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ................... 1

II.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS................. 3

   A.     DEMOGRAPHICS OF WALLER COUNTY ................................................. 3

   B.     RECORD OF DISCRIMINATION IN WALLER COUNTY ........................................ 5

   C.     WALLER COUNTY'S NOVEMBER 2018 EARLY VOTING PLAN ........................ 6

   D.     THE PRESENT LITIGATION ................................................. 10

III.   SUMMARY OF THE ARGUMENT ............................................... 12

IV.    DISCUSSION ................................................................. 14

   A.     THE AMENDED COMPLAINT PLEADS A COGNIZABLE CONSTITUTIONAL
       CLAIM OF DISCRIMINATION BASED ON BOTH AGE AND RACE. ................. 14

     1.   Plaintiffs Allege Facts Consistent with *Arlington Heights* ........................................... 15

   B.     THE AMENDED COMPLAINT PLEADS A COGNIZABLE CLAIM UNDER THE
       TWENTY-SIXTH AMENDMENT FOR DISCRIMINATION BASED ON AGE. .... 28

   C.     THE AMENDED COMPLAINT PLEADS A COGNIZABLE VOTING RIGHTS ACT
       CLAIM BASED ON RACIALLY DISCRIMINATORY INTENT AND RESULTS.  30

     1.   Discriminatory Burden ................................................. 32

     2.   Totality of Circumstances ............................................. 34

CONCLUSION ................................................................. 36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baird v. Consolidated City of Indianapolis,*
    976 F. 2d 357 (7th Cir. 1992) ...................................................................................33

*Brown v. Post,*
    279 F. Supp. 60 (W.D. La. 1968) ..............................................................................20

*Bush v. Gore,*
    531 U.S. 98 (2000) (per curiam) ...............................................................................20

*Causey v. Sewell Cadillac-Chevrolet, Inc.,*
    394 F.3d 285 (5th Cir. 2004) ......................................................................................2

*Chisom v. Roemer,*
    501 U.S. 380 (1991)..................................................................................................30

*Collins v. Morgan Stanley Dean Witter,*
    224 F.3d 496 (5th Cir. 2000) ......................................................................................2

*Common Cause Ind. v. Marion Cty. Election Bd.,*
    311 F. Supp. 3d 949 (S.D. Ind. 2018) .......................................................................21

*De La Cruz v. Tormey,*
    582 F.2d 45 (9th Cir. 1978) .......................................................................................33

*Frazier v. Callicutt,*
    383 F. Supp. 15 (N.D. Miss. 1974)...........................................................................15

*Harper v. Va. Bd. of Elections,*
    383 U.S. 663 (1966)..................................................................................................20

*Jefferies v. Harris Cty. Cmty. Action Ass'n,*
    615 F.2d 1025 (5th Cir. 1980) ...................................................................................15

*Johnson v. De Grandy,*
    512 U.S. 997 (1994)..................................................................................................33

*Latham v. Chandler,*
    406 F. Supp. 754 (N.D. Miss. 1976).........................................................................15

*League of Women Voters of Fla., Inc., v. Detzner,*
    314 F. Supp. 3d 1205 (N.D. Fla. 2018).........................................................21, 28, 29

*League of Women Voters of Fla. v. Detzner*,
No. 4:18-cv-00251 (N.D. Fla. July 24, 2018), ECF No. 64...................................................29

*LULAC v. Perry*,
548 US 399 (2006)............................................................................................................33

*Matrixx Initiatives, Inc v. Siracusano*,
131 S. Ct. 1309 (2011)........................................................................................................2

*Miss. State Chapter, Operation PUSH v. Allain*,
674 F. Supp. 1245 (N.D. Miss. 1987), *aff'd sub. nom. Miss. State Chapter,*
*Operation PUSH v. Mabus*, 932 F.2d 400 (5th Cir. 1991) .....................................................19

*Miss. State Chapter, Operation PUSH v. Mabus*,
932 F.2d 400 (5th Cir. 1991) ..............................................................................................20

*N.C. State Conf. NAACP v. McCrory*,
831 F. 3d 204 (4th Cir. 2016) .............................................................................................18

*Obama for America v. Husted*,
697 F.3d 423 (6th Cir. 2012) ..............................................................................................20

*One Wisconsin Inst., Inc. v. Thomsen*,
198 F. Supp. 3d 896 (W.D. Wis. 2016) ...............................................................................21

*Patino v. City of Pasadena*,
230 F. Supp. 3d 667 (S.D. Tex. 2017) .................................................................................35

*Prairie View Chapter of NAACP v. Kitzman*,
No. 04-459 (S.D. Tex. Feb. 24, 2004), ECF No. 11 ..............................................................6

*Republican Party of Ark. v. Faulkner Cty.*,
49 F.3d 1289 (8th Cir. 1995) ..............................................................................................21

*Rogers v. Lodge*,
458 U.S. 613 (1982)..............................................................................................14, 22, 35

*Sanchez v. Cegavske*,
214 F. Supp. 3d 961 (D. Nev. 2016) ....................................................................................21

*Thornburg v. Gingles*,
478 U.S. 30 (1986).........................................................................................31, 33, 34, 36

*Toney v. White*,
488 F.2d 310 (5th Cir. 1973) ..............................................................................................20

*United States v. Brown*,
561 F.3d 420 (5th Cir. 2008) ..................................................................................16, 24, 30-31

*United States v. Texas*,
445 F. Supp. 1245 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States*,
439 U.S. 1105 (1979) ...............................................................................................15

*United States v. Waller Cty.*,
No. 4:08-cv-03022 (S.D. Tex. Oct. 17, 2008), ECF No. 8 ......................................5

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) (en banc), *cert. denied*, 137 S. Ct. 612 (2017) ................ *passim*

*Veasey v. Perry*,
71 F. Supp. 3d 627 (S.D. Tex. 2014) ...............................................................5, 35

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*,
429 U.S. 252 (1977) ......................................................................................... *passim*

*Walgren v. Howes*,
482 F.2d 95 (1st Cir. 1973) ...............................................................................14, 28

*Worden v. Mercer Cty. Bd. of Elections*,
294 A.2d 233 (N.J. 1972) ........................................................................................29

**Rules and Statutes**

52 U.S.C. § 10301(a) ....................................................................................................30

52 U.S.C. § 10301(b) ..............................................................................................30, 31

Fed. R. Civ. P. 12(b)(6) .................................................................................................1

Fed. R. Evid. 407 .........................................................................................................27

Tex. Elec. Code § 85.001(a) ..........................................................................................6

Voting Rights Act Section 2, 52 U.S.C. § 10301 ................................................ *passim*

Voting Rights Act Section 5 .....................................................................................5, 22

**Other Authorities**

U.S. CONST. amend. XIV ......................................................................................... *passim*

U.S. CONST. amend. XV ........................................................................................... *passim*

U.S. CONST. amend. XXVI ........................................................................................ *passim*

*Abridgement,* BLACK'S LAW DICTIONARY (10th ed. 2014) ...........................................17

I.      **STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT**

Plaintiffs Jayla Allen, Damon Johnson, Raul Sanchez, Treasure Smith, and the Panther Party (collectively, "Plaintiffs,") respectfully submit this Memorandum of Law in Opposition to Defendants' Rule 12(b)(6) Motion to Dismiss Plaintiffs' First Amended Complaint ("Motion"), Doc. 51.[1] Defendants are Waller County, Texas; the Waller County Commissioners Court; and Judge Carbett Duhon III and Elections Administrator Christy A. Eason, both sued in their official capacities (collectively, "Defendants"). As set forth below, Plaintiffs' First Amended Complaint ("Amended Complaint") sufficiently pleads facts to state four claims for declaratory and injunctive relief under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments to the U.S. Constitution and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 ("Section 2"). Doc. 49. Accordingly, Plaintiffs request that the Court deny Defendants' Motion in its entirety.

As Defendants concede, once Defendants make the decision to establish an opportunity to vote through early voting, the U.S. Constitution and Section 2 then prohibit Defendants from administering early voting in arbitrary or discriminatory manners. Defendants, however, established early voting opportunities arbitrarily and discriminatorily in violation of this prohibition during the 2018 general election. Defendants' adoption and maintenance of the 2018 early voting plan made voting significantly more difficult for Black students at the historically-Black Prairie View A&M University ("PVAMU"). PVAMU is the *only* place in the County with a high concentration of Black student voters who are among the County's most frequent users of early voting. Plaintiffs' lawsuit represents the latest in a well-documented pattern of discrimination by Defendants against Black students at PVAMU. Black students at PVAMU have had to endure

---

[1]     Prior to the filing of Plaintiffs' Amended Complaint, this Court granted Plaintiffs' Unopposed Motion to Withdraw Plaintiff Joshua Muhammad. Doc. 43.

1

discriminatory treatment by the officials of Waller County at least since the 1971 passage of the Twenty-Sixth Amendment extended the right to vote to citizens over 18 years old.

At this stage of the case, the sole issue before this Court is whether Plaintiffs have alleged sufficient facts to state a claim for relief that is "plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1322 n.12 (2011). When reviewing a 12(b)(6) motion, a court must accept all of Plaintiffs' factual allegations as true and liberally construe the complaint "with all reasonable inferences drawn in the light most favorable to the plaintiff." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). This Court must also "limit itself to the content of the pleadings." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

Here, Plaintiffs sufficiently allege that Defendants violated the Fourteenth, Fifteenth, and Twenty-Sixth Amendment and Section 2's prohibitions on racial and age-based discrimination because Defendants intentionally imposed disparate burdens on Black student voters. The Amended Complaint describes the ways in which the challenged early voting plan placed disproportionate and substantial barriers on Black students in seeking to exercise their fundamental right to vote. Defendants' attempts to recast these harms as mere "inconveniences" or "unsatisfied preferences" are unavailing. They are violations of Plaintiffs' rights under the Constitution and Section 2 to be free from discrimination.

Where Plaintiffs, as here, have adequately pled factual allegations establishing four plausible constitutional and statutory claims, the Court should deny Defendants' Motion in its entirety and allow this case to proceed.

## II.  STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs are individual Black and Latinx voters who are undergraduate students at PVAMU and residents of the City of Prairie View ("Prairie View") and a PVAMU student and alumni organization. Am. Compl. ¶¶ 13-17.

On April 26, 2019, Plaintiffs filed their Amended Complaint, alleging that the actions of Defendants in adopting and maintaining a discriminatory early voting plan for the November 2018 election abridged or denied their right to vote in violation of the Fourteenth, Fifteenth, and Twenty-Sixth Amendments to the U.S. Constitution and Section 2. Am. Compl. ¶¶ 85-87, 89-91, 93-96, 98-100.[2]

### A.  DEMOGRAPHICS OF WALLER COUNTY

PVAMU is a historically-Black University and the *only* university in Waller County. *Id*. ¶ 23. More than 80% of the more than 8,000 enrolled students at PVAMU are Black. *Id.* PVAMU is located in Prairie View. *Id.*

This concentration of predominantly young, Black residents makes Prairie View demographically unique in Waller County. Almost 80% of Prairie View's citizen voting-age population ("CVAP") is Black, and 66% of Prairie View's voting-age population ("VAP") is between the ages of 18 and 21. *Id*. ¶¶ 28, 29. In Waller County as a whole, however, 51% of the CVAP is white,[3] and only 17% of the VAP is aged 18-20. *Id*. ¶¶ 27, 30.

Prairie View is also the only city in Waller County where the majority of voters are both Black *and* students. *Id*. ¶¶ 23, 28, 29. No other city or unincorporated area has more than 12% of voters that are between 18-21 years old. *Id.* ¶ 29. In the City of Waller, 10.1% of the VAP is

---

[2]      Plaintiffs filed their initial complaint on October 22, 2018.
[3]      The Amended Complaint refers to non-Hispanic white people as "Anglo" or "white" interchangeably. Am. Compl. ¶ 24.

between 18-21 years old; in Katy, only 7.4% of the VAP is between 18-21 years old; in Brookshire, 9.4% of the VAP is between 18-21 years old; and, in Hempstead, 11.8% of the VAP is between 18-21 years old. In Waller County as a whole (including Prairie View), a total of just 17.3% of the VAP is between 18-21 years old. *Id.*

The Black population in Prairie View is also socioeconomically disadvantaged as compared to the white population in Prairie View. For example, 49.1% of the Black population in Prairie View lived below the poverty line in the last 12 months, as compared to 23.4% of the white population; the median household income for Black residents was $24,125, as compared to $46,250 for white residents; 22.9% of the Black population between 16-64 years of age were unemployed, as compared to 2.9% of the white population; and 15.8% of the Black population over 25 years old had less than a high school diploma, compared to 0% of the white population. *Id*. ¶ 31.

Black people in Prairie View, including PVAMU students, disproportionately lack access to transportation as compared to white people. For example, 24.6% of Black people in Waller County, as compared to only 11.9% of white people, commute to work by walking, biking, or via carpool, taxi, or public transit. *Id*. ¶ 29. In Prairie View, 51.7% of Black people, as compared to only 41.8% of white people, commute to work by walking, biking, or via carpool or taxi. *Id*. ¶ 31.

Plaintiffs Damon Johnson, Raul Sanchez, and Treasure Smith do not have their own cars. *Id*. ¶¶ 14, 15, 16. Plaintiff Panther Party's membership includes Black and Latinx student voters between the ages of 18 and 21, including individuals who do not own cars. *Id.* ¶ 17. Plaintiff Johnson walks to campus, *id.* ¶ 14, and Plaintiffs Sanchez and Smith use the PVAMU shuttle to travel to and from school, *id. ¶¶* 15-16. The Memorial Student Center on PVAMU's campus is the

most accessible early voting location for Plaintiffs and for other Black and Latinx PVAMU students. *Id.* ¶ 14.

**B. RECORD OF DISCRIMINATION IN WALLER COUNTY**

The State of Texas, where Waller County is located, has a long and continuing history of using poll taxes, literacy tests, all-white primaries, or gerrymandered voting districts to disenfranchise Black voters entirely or minimize their political influence. *Veasey v. Perry*, 71 F. Supp. 3d 627, 636, 666-67 (S.D. Tex. 2014); Am. Compl. ¶ 74.

Among Texas counties, Waller County stands out for its particularly shameful history of discrimination against Black voters and students in Prairie View. Am. Compl. ¶¶ 71-75. PVAMU students, like other students 18-20 years old, gained the right to vote in 1971. *Id*. ¶ 4. Since then, Waller County has attempted to prevent PVAMU students from exercising their fundamental right to vote by repeatedly erecting discriminatory burdens and barriers to their access to the franchise. *Id*. ¶¶ 5, 71-73. For example, in past decades, Defendants have burdened PVAMU students' right to vote and participate in the political process by trying to prevent PVAMU students from registering to vote, voting, running for office, or having an early voting site on-campus. *Id*. ¶¶ 72-73.

Because of this history of discrimination, Waller County and the State of Texas were subject to preclearance under Section 5 of the Voting Rights Act from 1975 until 2013. *Id*. ¶ 75. Between 1982 and 2002, the U.S. Department of Justice issued three objections against Waller County, blocking discriminatory voting changes. *Id.* Waller County officials, Defendants or their predecessors, also admitted to violating the Voting Rights Act in consent decrees in both 2004 and 2008. *See*, *e.g.*, Consent Decree, *United States v. Waller Cty.*, No. 4:08-cv-03022 (S.D. Tex. Oct.

17, 2008), ECF No. 8; Consent Order, *Prairie View Chapter of NAACP v. Kitzman*, No. 04-459 (S.D. Tex. Feb. 24, 2004), ECF No. 11; *see also* Appendix at APP1.

In 2015, Defendants returned to their longstanding practice of seeking to limit voting opportunities for Black PVAMU students. Am. Compl. ¶ 73. For the 2016 primaries, Defendants intended to cut the number of early voting locations in Waller County from eight to two, neither of which would be within walking distance or even in the same precinct as PVAMU or Prairie View. *Id.* That plan, like the one challenged in this case, was approved by the local chairs of both the Republican and Democratic parties, as discussed *infra*. *Id.* Facing the threat of litigation, however, Defendants ultimately reversed course and adopted a plan that included six early voting locations, including one in Prairie View. *Id.*

### C. WALLER COUNTY'S NOVEMBER 2018 EARLY VOTING PLAN

Texas permits two weeks of early voting. Mot. to Dismiss Am. Compl. at 10 (referencing Tex. Elec. Code § 85.001(a)).[4] The Commissioners Court adopted its initial early voting plan for the November 2018 election ("initial plan") on September 22, 2018. Am. Compl. ¶ 35. That plan provided *no* early voting on campus at PVAMU during the first week of early voting. *Id.* ¶ 37. It also provided *no* early voting off-campus elsewhere in Prairie View during that first week. *Id.*

Moreover, the initial plan provided just three days of on-campus voting at the Memorial Student Center at PVAMU (from 8:00 a.m. to 5:00 p.m.) during the second week and two days of off-campus voting at the Community Center in the City of Prairie View (from 7:00 a.m. to 7:00 p.m.). *Id.* ¶ 38. Prairie View was the *only* city in Waller County where voters were denied the opportunity to vote during the first week of early voting. *Id.* ¶¶ 37, 41-42; Mot. to Dismiss Am. Compl. at 11, 14.

---

[4]     All citations to pages in Defendants' Motion refer to the ECF file-stamped page numbers.

In comparison, under the initial plan for the November 2018 election, the Commissioners Court provided the City of Waller ("Waller") with two early voting sites during the first week of early voting; the first site had nearly the entire first week (*i.e.*, with six days or 50 hours) and the second site with three days (or 23 hours) of early voting. Am. Compl. ¶ 41. Both sites had Saturday hours. *Id.* During the second week, Waller also had nearly a full week of early voting (*i.e.*, five days or 51 hours) of early voting at one site, including two days of evening hours. *Id.* The City of Waller is majority-white and has half of the CVAP of Prairie View. *Id.* In contrast to Prairie View, *only* 10% of Waller's VAP is under age 21. *Id.*

In the City of Katy, which has the largest population in the County and like Waller is majority-white, the Commissioners Court provided voters with three days (27 hours total) of early voting during the first week. *Id.* ¶¶ 26, 42. In contrast to Prairie View, less than 10% of Katy's VAP is under the age of 21. *Id.*

The initial plan disproportionately limited early voting opportunities for PVAMU students, even though PVAMU students depend on early voting to exercise their fundamental right to vote and use it at high rates. *Id.* ¶¶ 69, 94. For example, the canvass results for the March 2018 primary election show that in Precinct 309, on the PVAMU campus, 64% of the total votes cast by all methods of voting were cast via early voting.[5] By contrast, in Waller County as a whole, only 43% of the total votes cast during the March 2018 election were cast via early voting. *Id.*

The initial early voting plan approved by the Commissioners Court on September 22, 2018, was borne out of a proposal submitted to the Commissioners Court for approval by the Waller

---

[5]     Defendants cite these canvass results, Mot. to Dismiss Am. Compl. at 15-17, and they are available on Waller County's official website. *03.06.2018 Democratic Primary Canvass*, WALLER COUNTY, http://www.co.waller.tx.us/page/open/2110/0/03.06.2018%20%20Democratic%20Primary%20Canvass; *03.06.2018 Republican Primary Canvass*, WALLER COUNTY, http://www.co.waller.tx.us/page/open/2110/0/03.06.2018%20Republican%20Primary%20Canvass.

County Democratic and Republican party chairs. *Id.* ¶¶ 35, 49, 51, 73, 79. At a subsequent October 17, 2018, meeting regarding this plan, the County Republican chair, Mr. David Luther, stressed that the party chairs decide the early voting schedule. *Id.* ¶ 49. He explained that the party chairs "look at the [early voting] schedule and determine if" there are enough days.[6] During that meeting, Defendant Judge Duhon conceded that he had spoken to Democratic candidates who, in a departure from past procedures, did not have an opportunity to speak with the Democratic chair before the early voting scheduled was submitted to the Commissioners Court for approval.[7] Nor did these party representatives solicit the feedback of community members, like PVAMU administrators and students. *Id.* ¶ 35.

During the hearing on October 17, the Commissioners Court heard objections from PVAMU students and Prairie View residents about the inequities of this plan. A Black student and Prairie View city councilmember, Xante' Wallis, expressed frustration that PVAMU had "zero [early voting hours or days in the first week] after all of the issues [that PVAMU students] have had over the decades," referring to Waller County's record of obstructing PVAMU students' ability to register and vote in Waller County. *Id.* ¶ 47. This student informed the Commissioners Court that "it is a grave injustice that we have zero days" during the first week of early voting. *Id.* Another PVAMU student who spoke at the meeting, Joshua Muhammad, highlighted the fact that Black PVAMU students "ke[pt] getting the short end of the stick." *Id.* ¶ 44. The majority of those who spoke at the meeting asked for "parity" and "consistency" between voting opportunities provided to the predominantly young, Black voters at PVAMU and voting opportunities provided to predominantly older, white voters elsewhere in the County. *Id.* ¶ 43.

---

[6]      *Oct. 17 Video, Public Comment, Item 2*, at 25:45-26:33.
[7]      *Oct. 17 Video, Elections, Item 5*, at 10:45.

Defendant Eason acknowledged that the early voting plan "is not equal representation," particularly as between four cities in the County: Waller, Hempstead, Brookshire, and Prairie View. *Id.* ¶ 48. Defendant Judge Duhon also admitted "that there's an inequity" in the early voting opportunities available to Prairie View as compared to other cities like Waller that had eleven total days of early voting. *Id.* In addition, he acknowledged Defendant Commissioners Court's responsibility to "give them [PVAMU students] equal access." *Id.*

The Commissioners Court heard public comments that the process for choosing early voting sites was "broken." *Id.* ¶ 49. Members of the Commissioners Court also were told that many students are not members of either the Democratic or Republican party. *Id.* ¶ 51. Defendant Duhon acknowledged that "a lot of students" were entirely unrepresented by the party officials because they "don't identify as Democrat or Republican." *Id.* The Commissioners Court also heard statements from PVAMU students that the off-campus Community Center voting site in Prairie View, which is located near the Post Office, is not accessible to PVAMU students, because many do not have cars, money to pay for gas, and generally receive their mail on campus. *Id.* ¶¶ 38, 45-46, 56.

Members of the Defendant Commissioners Court attempted to justify the early voting plan during the October 17 meeting by asserting that: the initial plan should not be reconsidered because it had been proposed by members of both major political parties, *id.* ¶ 50; early voting at PVAMU was not included for the first week because it would conflict with PVAMU's homecoming, *id.*; the "community," particularly senior citizens, did not want or like to go onto campus at the historically-Black PVAMU, *id.*; it was difficult to park at PVAMU, *id.*; and it was too late or unfeasible to add early voting sites, *id.* ¶ 54. But each of these purported justifications was refuted,

uncorroborated by community members, or not supported by any evidence at the October 17 meeting. *Id.* ¶¶ 50-59.

During that meeting, Defendant Eason and members of the Commissioners Court also proposed and considered providing more early voting opportunities on-campus at PVAMU and elsewhere in Prairie View, as well as other cities and unincorporated areas selected by the Commissioners Court on an ad hoc and arbitrary basis. *Id.* ¶¶ 55-59. These proposals included adding several days of early voting at Monaville, which Defendant Eason remarked would be unwise given Monaville's small population. *Id.* ¶ 58. Indeed, Defendant Eason explained that during the 2018 primaries, there were days when no more than about 18 voters voted daily in Monaville and, thus, there lacked a need for early voting. *Id.*

Before the October 17 meeting concluded, however, Defendants voted to make no changes—thus maintaining the early voting schedule after hearing abundant testimony about its negative impact on Black Prairie View voters and after Defendants Judge Duhon and Ms. Eason had acknowledged its fundamental unfairness to Black PVAMU students in particular. *Id.* ¶ 60.

### D.  THE PRESENT LITIGATION

Plaintiffs filed their Original Complaint seeking declaratory and injunctive relief on October 22, 2018. Am. Compl. ¶ 62; *see generally* Pls.' Orig. Compl., Doc. 1. Two days later, the Commissioners Court modified the early voting schedule ("modified plan") during an "emergency session."[8] Am. Compl. ¶ 62. Only three members of the Defendant Commissioners Court and Defendant Judge Duhon were present for that emergency session. *Id.* The meeting's agenda revealed that its purpose was to "[d]iscuss and take action on pursuing, defending, settling, or

---

[8]     The Public Agenda and Meeting Video of the October 24, 2018 Emergency Session are available on Waller County's official website: http://wallercountytx.swagit.com/play/10242018-1502.

otherwise taking action on" the present litigation.[9] *Id*. ¶ 63. During this irregular meeting, after spending more than four hours in executive session, the short-handed Commissioners Court abruptly voted to increase early voting hours at the on-campus Memorial Student Center by three hours on Monday, Tuesday, and Wednesday of the second week, and to provide five hours of early voting off-campus at Prairie View City Hall on Sunday, October 28, 2018, the last day of the first week of early voting. *Id.* ¶ 64. The Commissioners Court did not appear to have consulted with any PVAMU student or resident of Prairie View, and, according to the meeting video and agenda, the Commissioners Court neither solicited nor received public comments.[10] *Id.* ¶ 65. The Commissioners Court made no other changes to the early voting opportunities in the rest of the County. *Id.*

The Commissioners Court adopted this modified plan while early voting in the first week was already under way. *See id*. ¶ 66; Mot. to Dismiss Am. Compl. at 19. Even under the modified early voting plan, PVAMU students received *no* on-campus voting opportunities during the first week, and *no* on-campus weekend hours, and *no* additional on-campus early voting days during the second week. *See* Am. Compl. ¶ 66. Mot. to Dismiss Am. Compl. at 19.

Following these minimal changes, and with the first week of early voting nearing its end, Plaintiffs moved on October 26, 2018, to withdraw the request for a temporary restraining order that they initially sought as relief in this litigation. *See* ECF Nos. 16, 16-1, 17, 22. Plaintiffs did so with the hope of encouraging Defendants to engage in good-faith settlement negotiations. Such negotiations, however, failed to materialize. Thereafter, on January 7, 2019, Defendants filed their original motion to dismiss and accompanying memorandum. Docs. 34 & 34-1.. Plaintiffs filed

---

[9]      Agenda at 1, http://wallercountytx.swagit.com/play/10242018-1502.
[10]     *Id*.; *see generally* http://wallercountytx.swagit.com/play/10242018-1502.

11

their First Amended Complaint on April 26, 2019, and Defendants filed their renewed Motion on May 10, 2019. Docs. 49 & 51.

## III.   <u>SUMMARY OF THE ARGUMENT</u>

Plaintiffs plead plausible violations of their voting rights. The Amended Complaint alleges that Defendants violated the Constitution and Voting Rights Act by discriminating against Plaintiffs on the intersecting bases of race and age, as Black student voters, and as students, by providing them with unequal and inadequate early voting opportunities during the November 2018 election.

Prairie View is the only city in the County with a majority-Black student population, and PVAMU students, including Plaintiffs, are the only group of voters who Defendants chose to deny the opportunity to vote early during the first week of early voting in the 2018 general election. Defendants' decision to limit the hours for early voting in the second week likewise severely burdened the rights of PVAMU students.

In their Motion, Defendants largely ignore the manner in which the Amended Complaint tracks the well-established *Arlington Heights* framework for establishing intentional discrimination claims. Contrary to Defendants' mischaracterization, Plaintiffs' constitutional claims are based on substantially more than Defendants' oft repeated history of discrimination against PVAMU students. While this uncontested history is significant under *Arlington Heights*, the Amended Complaint alleges much more than that.

The Amended Complaint also alleges that: members of the Commissioners Court knew, and Plaintiffs, Black students, and others reiterated to Defendants, that PVAMU students and administrators had not been consulted before the adoption of the early voting plan, and that the partisan officials who recommended the plan did not represent the interests of all Black student

voters. Once students became aware of the plan, Black students and others warned Defendants about how they would be harmed. Indeed, Black students made clear that the plan denied only Black students in Prairie View access to early voting during the first week of voting when other white or non-student voters in the County would have that opportunity. Black students also made clear that on-campus early voting opportunities at PVAMU were particularly important to them because many younger students lacked access to transportation or were otherwise unfamiliar with the off-campus early voting sites since undergraduate student life centers around campus.

Defendants' attempt to confuse the issues by focusing on areas of the County with majority-Black, but non-student voting populations with more total early voting hours than Prairie View (like Brookshire and Hempstead) *or* areas that are majority-white with less total early voting hours than Prairie View (like Katy and Fieldstore) is unavailing. None of those areas, nor any other areas that Defendants can identify, have a concentrated majority of Black student voters, as Prairie View does. No representatives of those areas told Defendants, as Black students did and as Defendants Judge Duhon and Ms. Eason admitted, *before* the Commissioners Court adopted the plan that Black students were getting the "short end of the stick" and being treated unequally.

Moreover, the denial of equal voting opportunities constitutes a severe burden on Black student voters in Prairie View, in particular. Unlike voters elsewhere in the County, they must rely more heavily on early voting on-campus for socioeconomic and other reasons, including lack of transportation. White and non-student voters elsewhere in places like Katy and Fieldstore are more likely to have personal transportation, and simply do not face this burden with the same severity or at the same rates as Black students in Prairie View. Thus, even if some white voters in Katy received inadequate early voting opportunities—or some Black *non-student* voters in places like

Brookshire and Hempstead received *adequate* early voting opportunities—the burden on Plaintiffs and other Black student voters in Prairie View remains severe and disproportionate.

Defendants, having been warned of the harms to Black student voters, admitted having enacted a plan that caused disparities. Defendants even considered significant additions to the early voting plan, though they ultimately adopted only minimal ones and only *after* this lawsuit was filed. By so doing, Defendants chose to maintain the discrimination against Black student voters.

For these reasons, the Amended Complaint's well-pled facts state constitutional and statutory violations of the Fourteenth, Fifteenth, and Twenty-Sixth Amendments to the Constitution and Section 2 of the Voting Rights Act. Defendants' groundless Motion must be denied in its entirety.

## IV.   DISCUSSION

### A. THE AMENDED COMPLAINT PLEADS A COGNIZABLE CONSTITUTIONAL CLAIM OF DISCRIMINATION BASED ON BOTH AGE AND RACE.

The Constitution bars discrimination against either Black and Latinx voters *or* 18- to 21-year-old student voters.

The Fourteenth and Fifteenth Amendments forbid the denial or abridgment of the right to vote on account of race or ethnicity. U.S. CONST. amend. XIV; U.S. CONST. amend. XV; *see also Veasey v. Abbott*, 830 F.3d 216, 253 (5th Cir. 2016) (en banc), *cert. denied*, 137 S. Ct. 612 (2017). Voting devices enacted *or maintained* for discriminatory purposes violate the Constitution. *Rogers v. Lodge*, 458 U.S. 613, 625 (1982).

In addition, the Twenty-Sixth Amendment forbids denying or abridging the right to vote on account of age. U.S. CONST. amend. XXVI. The Twenty-Sixth Amendment has "particular relevance for the college youth who comprise approximately 50 per cent of all who were enfranchised by this amendment." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973).

14

The Fourteenth, Fifteenth, and Twenty-Sixth Amendments, read together, prohibit discrimination that is unique to Black student voters. *See, e.g.*, *United States v. Texas*, 445 F. Supp. 1245, 1257 (S.D. Tex. 1978) (three-judge court), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979) (holding that Waller County violated the Constitution by imposing special requirements on Black students at PVAMU, even where those requirements did not affect Black non-students); *Latham v. Chandler,* 406 F. Supp. 754, 755 (N.D. Miss. 1976) (enjoining practices that treated voter-registration applications tendered by Black students differently from the applications of non-students of any race); *Frazier v. Callicutt,* 383 F. Supp. 15, 19-20 (N.D. Miss. 1974) (same). Thus, unconstitutional discrimination enacted or maintained against Black students can exist even in the absence of discrimination against Black non-students. *Cf. Jefferies v. Harris Cty. Cmty. Action Ass'n*, 615 F.2d 1025, 1033-35 (5th Cir. 1980).

Defendants' actions in: (1) adopting the initial early voting plan on September 22, 2018; (2) maintaining that plan; and (3) adopting the modified plan on October 24, 2018, constitute three acts of unconstitutional discrimination alleged by Plaintiffs. All three actions denied Black and Latinx PVAMU students the same (or even similar) opportunities to vote early, particularly in the first week or on weekends, as other non-student or non-Black voters.

### 1.  Plaintiffs Allege Facts Consistent with *Arlington Heights*

In *Arlington Heights*, the Supreme Court established a framework whereby Plaintiffs can rely on direct or circumstantial evidence to demonstrate such intentional discrimination based on race. *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265-68 (1977). Because the focus of the framework is to determine whether the legislature acted with discriminatory intent, it is equally applicable when, as here, Plaintiffs' claims are based on a combination of race and age discrimination.

15

Under the *Arlington Heights* framework, evidence of discrimination includes, but is not limited to: (1) evidence that Defendants' decision bears more heavily on one group than another; (2) the historical background of the decision; (3) the specific sequence of events leading up to the decision; (4) departures from the normal procedural sequence; (5) substantive departures; and (6) legislative history, including "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id*. Plaintiffs can also rely on "the normal inferences to be drawn from the foreseeability of defendant's actions." *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2008) (internal citation and quotation marks omitted).

Demonstrating intentional discrimination "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 262. Plaintiffs need only show, by a preponderance of the evidence, that the unconstitutional discrimination was one factor rather than the primary or sole purpose. *Id.* at 265-66. "An official action taken for the purpose of discriminating on account of race has no legitimacy at all." *Veasey*, 830 F.3d at 231 (internal citation, alterations, and quotation marks omitted).

Defendants acknowledge that *Arlington Heights* provides the appropriate framework for evaluating Plaintiffs' intentional race and age discrimination claims. Mot. to Dismiss Am. Compl. at 28, 32. Nonetheless, Defendants inexplicably argue that Plaintiffs' claim is sustained "largely through . . . allegations of the historical background in the State of Texas and Waller County." *Id*. at 29.

The Amended Complaint does plead the historical background—facts that Defendants do not and cannot contest—as one relevant factor. Am. Compl. ¶¶ 71-84; Mot. to Dismiss Am. Compl. at 29. But, the Amended Complaint also alleges numerous other *Arlington Heights* factors demonstrating that the initial and amended plans violated the Constitution because: (1) Defendants

16

singled out Prairie View, a community unlike any of the other communities in the County in that it is overwhelmingly made up of young, Black student voters, for unequal treatment as compared to smaller cities with older and/or whiter populations *and lower early voting utilization rates*, and that community was discriminatorily impacted in their right to vote in November 2018, Am. Compl. ¶¶ 9, 23-29, 37-42, 69, 94; (2) the sequence of events and procedural irregularities leading up to the early voting decision excluded the Prairie View community of which Black PVAMU students compose a significant part, *id*. ¶¶ 23, 35; (3) Defendants lack any rational or non-discriminatory bases for the early voting plan, *id*. ¶¶ 83, 89-90, 94, 96, 99; (4) the October 17, 2018, Commissioners Court meeting included overt and subtle comments revealing unconstitutional biases, *see id*. ¶ 50; and (5) Defendants knew that the foreseeable result of their decision was to disparately impact Black student voters, *id*. ¶¶ 37-48, 51.

<u>*Disparate Impact of Defendants' Decisions*</u>

In evaluating Plaintiffs' constitutional claims under the *Arlington Heights* framework, the discriminatory impact of Defendants' early voting plan is an "important starting point." *Arlington Heights*, 429 U.S. at 266.

To show disparate impact under *Arlington Heights*, Plaintiffs need only show that the actions of Defendants "bear[ ] more heavily on" young Black voters like Plaintiffs than on other voters in the County. *Id.* Plaintiffs also do not need to show that Defendants completely prevented them from voting or denied them early voting entirely, as Defendants suggest. *See* Mot. to Dismiss Am. Compl. at 9, 27. Rather, the Fifteenth and Twenty-Sixth Amendments use identical language in prohibiting voting rights from being "denied or abridged." U.S. Const. amends. XV, XXVI. "Abridgement is defined as '[t]he reduction or diminution of something.'" *Veasey*, 830 F.3d at 259 (quoting *Abridgement,* Black's Law Dictionary (10th ed. 2014)).

Defendants' argument "conflates abridgement and denial: in previous times, some people paid the poll tax or passed the literacy test and therefore voted, but their rights were still abridged." *Id*. at 260 n.58. A finding that Defendants' various early voting plans "abridge" the right to vote by causing an age or racial disparity in early voting access or usage "falls comfortably within this definition." *Id*. at 260. "Showing disproportionate impact, even if not overwhelming impact, suffices to establish one of the circumstances evidencing discriminatory intent." *N.C. State Conf. NAACP v. McCrory*, 831 F. 3d 204, 231 (4th Cir. 2016).

Here, the Amended Complaint alleges a clear disparate impact insofar as, under Defendants' early voting plan, Black student voters in Prairie View—the *only* city in Waller County with a majority-Black student population—had *no* early voting on-campus during the first week, and significantly fewer early voting hours overall than other cities in Waller County with significantly lower concentrations of Black student voters.[11] Am. Compl. ¶¶ 9, 36-42; *see also supra* at 6-7. For example, Waller, a majority-white city, with almost no student voters and half of the voters overall as Prairie View, had two early voting sites during the first week of early voting; the first site had nearly the entire first week for voting and both sites had weekend voting. Am. Compl. ¶ 41. Overall, Waller had eleven total days of early voting as compared to Prairie View's six. *Id*.

This plan bore more heavily on Black PVAMU student voters who are more likely to be poor and face transportation barriers than white or older voters in Waller County. *Id*. ¶¶ 29-33; *see also supra* at 4, 12-14. For example, in Prairie View, 30.8% of Black workers, as compared to

---

[11]     Even *after* Defendants minimally modified their initial plan in response to this lawsuit, Prairie View voters still had only *one* day of early voting off-campus on the last day of the first week of early voting. *See supra* at 11. Moreover, PVAMU students in Prairie View still had *no* days of early voting on-campus during that first week, and *no* additional days of early voting on-campus during the second week.

23.6% of white workers, are in service occupations. Am. Compl. ¶¶ 29-33. Black workers in service occupations "are likely to be working for an hourly wage and are less likely to be able to take off from work" to vote early during the weekday business hours. *Miss. State Chapter, Operation PUSH v. Allain*, 674 F. Supp. 1245, 1256 (N.D. Miss. 1987), *aff'd sub. nom*. *Miss. State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400 (5th Cir. 1991). These and other socioeconomic disparities make it more difficult for young Black students to vote on Election Day or to travel off-campus to vote. *See Veasey*, 830 F.3d at 250-51, 258-60.

Accordingly, as Plaintiffs allege, on-campus voting is often the only viable option for PVAMU students who are more likely than non-student and white voters in the County to lack access to cars, to have inflexible work schedules, and to be unable to use alternatives like absentee voting. Am. Compl. ¶¶ 9, 14, 15-16, 68, 81. "PVAMU students both rely on early voting more than other Waller County voters and utilize it at higher rates." *Id*. ¶ 94. The Amended Complaint also alleges that "Defendants' actions, which effectively treat Plaintiffs and other Black voters as second-class citizens who do not deserve an equal opportunity to participate in our democracy, also inflict dignitary and stigmatic harms on Plaintiffs and other Black voters." *Id*. ¶¶ 43-44, 47, 91. As the Amended Complaint alleges, Defendants also were aware of these realities *before* they implemented the early voting plan in November 2018. *See*, *e.g*., *id*. ¶¶ 43-47.

Defendants try to complicate the issue of disparate impact by stating that "[n]either the United States Constitution nor the Voting Rights Act guarantees any right to in-person early voting." Mot. to Dismiss Am. Compl. at 8. But the absence of a constitutional right to early voting does not give Defendants free rein to deny Black students equal access to the early voting opportunities afforded to them by state law. The hallmarks of the Amendments guaranteeing the franchise are fairness and a prohibition against arbitrary or disparate treatment. "The right to vote

is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (per curiam) (citing *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966)).

Indeed, while there is no constitutional right to either satellite voter registration or absentee voting, the Fifth Circuit has found voting rights violations where Black voters were given less access than white voters to these opportunities. *See*, *e.g.*, *Miss. State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400, 405 (5th Cir. 1991) (affirming that limitations on satellite voter registration burdened Black registrants in violation of Section 2); *Toney v. White,* 488 F.2d 310, 311-12 (5th Cir. 1973) (affirming that the disproportionate purging of Black voters from the absentee voter rolls violated Section 2); *Brown v. Post,* 279 F. Supp. 60, 64-65 (W.D. La. 1968) (holding that the defendant election officials violated Section 2 by not offering Black voters the same chance as white voters to vote absentee).

It is the essence of discrimination to provide significantly more early voting opportunities to white or non-student voters than their Black student counterparts—particularly where, as here, Black students are more likely to need and use those opportunities.[12] *See*, *e.g.*, *Obama for America*

---

[12]     Defendants' reliance on early voting turnout rates is misplaced. *See* Mot. to Dismiss Am. Compl. at 15-17. The Fifth Circuit has held that evidence of decreased turnout "is not required to prove a Section 2 claim of vote denial or abridgement." *Veasey*, 830 F.3d at 260-61. Defendants also misstate the significance of the data in three ways. *First*, they overlook Plaintiffs' allegations about *why* Black students rely more on early voting. *See, e.g.*, Am. Compl. ¶¶ 6, 9, 14, 15-16, 38, 46, 68, 81, 94. *Second*, in comparing Prairie View's early voting turnout rates in past elections to those of majority-white cities, Mot. to Dismiss Am. Compl. at 15-17, Defendants fail to acknowledge that their own actions in denying or limiting voting opportunities might contribute to lower early vote rates for Black students. Am. Compl. ¶¶ 5, 72-73. *Third*, Defendants misapprehend the nature of an early voting *rate*. Defendants discuss the *number* of votes cast in each precinct. Mot. to Dismiss Am. Compl. at 15-17-. But, logically, the number of votes cast per precinct reveals more about the number of voters in each precinct than it does about how much those voters rely on early voting. A more meaningful way to represent how often various precincts rely on early voting is to

v. *Husted*, 697 F.3d 423, 440-41 (6th Cir. 2012); *Republican Party of Ark. v. Faulkner Cty.*, 49

F.3d 1289, 1298-99 (8th Cir. 1995); *League of Women Voters of Fla., Inc., v. Detzner*, 314 F.

Supp. 3d 1205, 1216-19 (N.D. Fla. 2018); *Common Cause Ind. v. Marion Cty. Election Bd.*, 311

F. Supp. 3d 949, 968-69 (S.D. Ind. 2018); *One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d

896, 931-33 (W.D. Wis. 2016); *Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 973-74 (D. Nev. 2016).

Thus, Defendants' misguided argument that Plaintiffs have not sufficiently alleged any

burden or abridgement on their voting rights cannot be credited. If Defendants wish instead to

dispute the *severity* of the burdens that Plaintiffs have indisputably alleged, that is an issue for the

merits. Evaluating the severity of a burden on Plaintiffs' voting rights and determining whether

that burden is or is not justified by legitimate state interests are not questions for a 12(b)(6) motion.

All the Court must decide at this stage is whether Plaintiffs have or have not alleged a

discriminatory *burden or abridgment* on the voting rights of Black student voters between the ages

of 18-21 sufficient to maintain their Fourteenth, Fifteenth, and Twenty-Sixth Amendment claims.

As the Amended Complaint makes abundantly clear, Plaintiffs have done so. *See* Am. Compl. ¶¶

9, 13-17, 67-68, 86, 89-91, 93-95, 98-99.

<u>Historical Background of Defendants' Decisions</u>

Defendants' discriminatory early voting plans must be viewed in the context of a long,

well-documented and judicially-recognized history of discrimination in Waller County.

Defendants do not contest this record. Mot. to Dismiss Am. Compl. at 29.

---

compare the number of ballots cast in a precinct via early voting to the total number of votes cast in the
precinct. Applying this analysis to the canvass results for Waller County makes clear that voters in Prairie
View used early voting at a higher rate than other voters in the County during the November 2016 and
March 2018 elections. Am. Compl. ¶¶ 69, 94.

21

Among Texas counties, Waller County stands out for its particularly shameful record of discrimination against Black student voters in Prairie View. Am. Compl. ¶¶ 4-6, 71-75. For instance, in the last 15 years, Defendants have twice admitted to violating the Voting Rights Act, and, since 1982, the U.S. Department of Justice issued three Section 5 objections blocking Waller County from implementing discriminatory voting changes. *Id.* ¶¶ 71, 75; *see also supra* at 5-6. In 2015, the present Defendants also tried to limit voting opportunities for PVAMU students. Am. Compl. ¶ 73.

This pattern of historical discrimination is particularly relevant to drawing an inference of present day intentional discrimination where, as here, "the evidence shows that discriminatory practices were commonly utilized, that they were abandoned when enjoined by courts or made illegal by civil rights legislation, and that they were replaced by laws and practices which, though neutral on their face, serve to maintain the status quo." *Rogers*, 458 U.S. at 625.

*Sequence of Events and Procedural Departures Regarding the Early Voting Schedule*

The specific sequence of events and procedural departures leading up to Defendant Commissioner Court's enactment and maintenance of the initial early voting schedule (and, by extension, their subsequent decision to minimally modify that schedule) also supports a finding of intentional discrimination. Am. Compl. ¶¶ 35, 43-61; *see also supra* at 7-11.

The sequence of events surrounding the development, approval, maintenance, and eleventh-hour modification of the plans indicate key departures from normal procedural sequences. The County chairs' process for developing the early voting schedule agreement is structured to prioritize Democratic or Republican candidates, which Defendants acknowledge excludes input from voters who are not affiliated with a party. *See* Am. Compl. ¶¶ 35, 49, 51, 73, 79. This process also lacks structures for soliciting community input. *Id.* ¶ 35.

22

Despite Defendants' contentions, it is meaningless whether the original early voting plan was or was not "bipartisan." Mot. to Dismiss Am. Compl. at 6, 8, 9, 29. While "[i]ntentions to achieve partisan gain and to racially discriminate are not mutually exclusive," the "partisan motive to suppress votes is not based on which party is in the majority."[13] *Veasey*, 830 F. 3d at 231, n.30. Even if the party chairs *had* sought adequate input from local politicians and community members—which Defendants knew that they did not—public comments made clear that such a process was insufficient, particularly for students who did not identify with either of the two major political parties. Am. Compl. ¶¶ 49-51. Plaintiffs are seeking to vindicate their rights as Black student voters, not to protect the interests of the Republican or Democratic parties.

In addition, community members, as well as Defendants Eason and Judge Duhon, expressed concerns about, or acknowledged the unequal-distribution of, early voting days in Prairie View. *Id*. ¶¶ 43-48. Yet the Commissioners Court did not rectify these concerns during the October 17 or October 24 meetings. Even once the members of the Commissioners Court had heard abundant testimony about the early voting plan's negative community impact and had been urged to add *even just one* early voting day on-campus at PVAMU during the first week at the Commissioners Court's October 17 meeting, they failed to do anything. *Id*. ¶ 60. Moreover, during the October 24 "emergency session," the Commissioners Court also appears not to have consulted

---

[13]     As the Fifth Circuit has acknowledged, "'it does not matter who is in charge of State politics or the political parties in power in Texas, whether they're Republicans, Democrats[,] or Martians, every time that African-Americans have, in fact, been perceived to be increasing their ability to vote and participate in the process there has been State legislation to either deny them the vote or at least dilute the vote or make it much more difficult for them to participate on an equal basis as Whites in the State of Texas.'" *Veasey*, 830 F. 3d at 231 n.30 (quoting plaintiffs' expert testimony in that case).

23

with any PVAMU student or resident of Prairie View, and no public comments were solicited or received.[14] *Id.* ¶ 65.

This sequence of events and procedural departures show that PVAMU students had no meaningful opportunity to contribute or make recommendations to the development of either plan. Defendants' decision to substantially maintain the initial early voting schedule into the first week and make only superficial changes in the second week despite the plan's demonstrably discriminatory impacts, community opposition, and procedural departures and irregularities indicates that unconstitutional discrimination played an improper role in the development and maintenance of these plans.

*The Foreseeability of the Impact and Contemporaneous Statements by Decision-Makers*

Defendants repeatedly heard and acknowledged the disparate impact of the plan on Black voters and students in Prairie View. *See*, *e.g.*, Am. Compl. ¶¶ 43-47; *see also id.* ¶ 48 (Defendant Eason acknowledging that the early voting plan "is not equal representation"; Defendant Judge Duhon admitting "that there's an inequity" in the early voting opportunities available to Prairie View and it is Defendants' Court's responsibility to "give them[,] [PVAMU students,] equal access"). Admissions from Defendants and other decisionmakers that the challenged action has a disparate impact are powerful evidence of discrimination. *See Veasey*, 830 F.3d at 236-37 (finding that the admissions of proponents that the challenged decision had a disparate impact were strong evidence of discrimination).

In addition, coded statements that suggest or reveal unconstitutional biases also can be strong evidence of discrimination. *Brown*, 561 F.3d at 433-34, n.10. Here, Defendants at the

---

[14]     The Public Agenda and Meeting Video of the October 24, 2018 Emergency Session are available on Waller County's official website: http://wallercountytx.swagit.com/play/10242018-1502.

October 17 meeting attempted to justify the lack of early voting opportunities at PVAMU by baselessly asserting that the "community," particularly senior citizens, did not want or like to go onto campus at the historically-Black PVAMU. *See* Am. Compl. ¶¶ 50, 53. The unmistakable suggestion that PVAMU students are not part of the "community," and that the "community" does not like PVAMU, is powerful evidence that bias against Black students at PVAMU was a motivating factor for the early voting plan.

*The Tenuousness of Defendants' Justifications*

The tenuousness of the stated justifications for the actions of Defendants can support an inference of unconstitutional discrimination. *Veasey*, 830 F.3d at 237. Here, the Amended Complaint alleges that the inequities reflected in the existing early voting plan have no non-tenuous basis. *See*, *e.g.*, Am. Compl. ¶¶ 50-59, 79. Indeed, Defendants' actions appear inexplicable except as "tenuous pretexts for racial discrimination against Black voters in Prairie View, including Black PVAMU students age 18-20." *Id.* ¶ 83.

During its October 17 meeting, the Commissioners Court had a choice to ensure early voting days were distributed fairly throughout the County, as well as to reduce burdens on Black and Latinx students. Instead, the Commissioners Court voted against a motion to consider any changes, based on Defendant Eason's recommendations, that could have increased distribution of early voting days for Prairie View citizens. *Id.* ¶ 36. As the County's election administrator, Defendant Eason was best positioned to opine on the adequacy of early voting opportunities. The implausibility of several of Defendants' proffered justifications for not adding additional early voting days on campus at PVAMU strongly supports the inference that they were a pretext for an impermissible motive. *See*, *e.g.*, *id.* ¶¶ 58, 80; *see also Veasey*, 830 F.3d at 240-41 ("It is also

25

probative [of discriminatory intent] that many rationales were given . . . which shifted as they were challenged or disproven by opponents.").

The party chairs' agreement did not include community members' input and cannot represent the views of non-party affiliated voters. Indeed, as PVAMU students informed Defendant Commissioners Court, many PVAMU students do not affiliate with either political party. Am. Compl. ¶¶ 51, 79. The party chairs do not and have not adequately represented the PVAMU student voters' interests. *Id.* Yet, when presented with these concerns, the Commissioners Court relied on the fact that it was a joint agreement between the party chairs as indicative of a deliberative process—an error Defendants repeated before this Court by characterizing the initial plan as "bipartisan." Mot. to Dismiss Am. Compl. at 6, 8, 9, 29.

Yet, the record is devoid of evidence that the Commissioners Court considered the concerns or sought out the advice of PVAMU students or school administrators. Indeed, during the October 17 meeting, Defendant Judge Duhon and Defendant Eason acknowledged that a plan for setting early voting going forward should involve representatives from different areas of the County, like Prairie View, because the issue of the adequacy of early voting for PVAMU students keeps coming up.[15] Am. Compl. ¶ 61.

Members of the Defendant Commissioners Court also suggested at the October 17 meeting that it was not feasible to change the early voting plan in time for the November 6 election, and that the County might not have enough voting machines. But at that same meeting, several Commissioners Court members proposed adding two or more early voting days or hours in various locations outside of Prairie View, apparently without concern for any supposed logistical or timing impediments. *See*, *e.g.*, *id.* ¶¶ 55, 57-59. For example, Defendant Judge Duhon proposed extending

---

[15]     *Oct. 17 Video, Elections, Item 5*, at 6:40, 56:00, and 58:00.

the early voting hours on Thursday and Friday of the first week at the Monaville County Building in Hempstead. *Id.* ¶ 55. Commissioners Barnett and Beckendorff discussed adding up to three days of early voting in a combination of locations including Monaville and Katy. *Id.* ¶ 57. Defendant Duhon then proposed providing additional days of early voting for Monaville so that it would have a full week of early voting during the first week, despite Defendant Eason's admonition that Monaville has nowhere near enough residents to warrant so much advanced voting. *Id.* ¶ 58. Commissioner Beckendorff proposed additional evening hours in Katy to accommodate commuters returning from work. *Id.* ¶ 59.

Moreover, as Defendants acknowledge, Waller County ultimately "marshal[ed] its resources to afford additional hours of early voting for Prairie View." Mot. to Dismiss Am. Compl. at 20; *see also id.* at 2, 19. The fact that Defendants ultimately (though minimally) modified their early voting plan to provide more hours to Prairie View before the November 6 election clearly demonstrates that it was feasible to do so, and that any assertions to the contrary were pretextual and tenuous.[16]

\* \* \*

Plaintiffs have more than adequately stated a claim that Defendants' early voting plan for the November 2018 election is intentionally discriminatory, because the plan: (1) created a discernable and disparate impact on young Black voters protected by the Fourteenth, Fifteenth, and Twenty-Sixth Amendments by abridging and burdening their right to vote; (2) are part of a historical continuum of Waller County's efforts to target and suppress Black student voter strength; (3) were precipitated by a non-transparent, procedurally irregular, and undemocratic process; and

---

[16]     Under Rule 407 of the Federal Rules of Evidence, evidence of subsequent remedial measures is admissible for the purpose of proving, as here, "the feasibility of . . . [the] measures." F. R. Evid. 407.

(4) serve no discernable purpose, as the sequence of events leading to their enactment and maintenance, as well as their legislative history demonstrates, other than to suppress the Black student vote.

**B. THE AMENDED COMPLAINT PLEADS A COGNIZABLE CLAIM UNDER THE TWENTY-SIXTH AMENDMENT FOR DISCRIMINATION BASED ON AGE.**

The Amended Complaint also sufficiently states an independent claim that Defendants' early voting plan intentionally discriminates against Plaintiffs *solely* as young voters on account of age in violation of the Twenty-Sixth Amendment.

Plaintiffs can prevail on their Twenty-Sixth Amendment claim even if there were no allegations of racial discrimination. *See Detzner*, 314 F. Supp. 3d at 1221 (holding that Florida's decision to prevent early voting sites on university campuses "violate[d] Plaintiffs' Twenty-Sixth Amendment rights because it is intentionally discriminatory on account of age," independently of race).

Defendants concede that intentional discrimination under the Twenty-Sixth Amendment can be proven through the *Arlington Heights* framework's "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266; Mot. to Dismiss Am. Compl. at 32. Defendants err, however, when they suggest that a cognizable Twenty-Sixth Amendment claim must allege that students have been completely denied early voting opportunities. *See* Mot. to Dismiss Am. Compl. at 32-33. The Twenty-Sixth Amendment, by its plain language, provides for a violation when voting rights are "abridged." *See supra* at 17-21.

"Without attempting to define the boundaries of 'abridgement,'" courts have recognized allegations of a Twenty-Sixth Amendment violation if a challenged "condition, not insignificant, disproportionately affects the voting rights of citizens specially protected by a constitutional amendment." *Walgren*, 482 F. 2d at 102. The rule that alleging a burden on youth voting is

28

sufficient to state a claim under the Twenty-Sixth Amendment is consistent with that Amendment's "purpose not only of extending the voting right to younger voters but also of encouraging their participation by the elimination of all unnecessary burdens and barriers." *Worden v. Mercer Cty. Bd. of Elections*, 294 A.2d 233, 243 (N.J. 1972). The Twenty-Sixth Amendment protects against both "blatant and 'unnecessary burdens and barriers' on young voters' rights." *Detzner*, 314 F. Supp. 3d at 1223 (internal citations omitted).

Here, it is "sufficient" that Plaintiffs, as young voters, have alleged that Defendants' misallocation of early voting sites, and denial of on-campus early voting has intentionally "burdened their voting rights." Order Denying Defendants' Mot. to Dismiss at 15, *League of Women Voters of Fla. v. Detzner*, No. 4:18-cv-00251 (N.D. Fla. July 24, 2018), ECF No. 64; *see also* Appendix at APP39.

Here, the harm caused by Defendants' early voting plan "is unexplainable on grounds other than age because it bears so heavily on younger voters than all other voters." *Detzner*, 314 F. Supp. 3d at 1222. "PVAMU is the only university in Waller County." Am. Compl. ¶ 23. Thus, the PVAMU campus and the surrounding area of Prairie View has a significantly higher concentration of college student voters and other voters between the ages of 18-21 than any other city or neighborhood of Waller County. *Id.* at ¶ 29 ("[N]o other city in the County has a comparable percentage of young voters."). Moreover, student voters at PVAMU, including Plaintiffs Allen, Johnson, and Sanchez and members of Plaintiff Panther Party, lack cars and, thus, they are burdened in having to vote off-campus without transportation, gas money, and flexible class and work schedules. *Id.* ¶¶ 14-17, 31-33, 45-46.

In addition, as detailed above, *see* Section IV-A-1, Plaintiffs have alleged that Defendants' initial and modified plans: admittedly had an unequal and disparate impact on PVAMU students;

29

are part of a continuum of Waller County's efforts to suppress PVAMU student voter strength; were precipitated by a non-transparent, undemocratic process; and served no discernable purpose, other than to suppress the youth vote.

Accordingly, Plaintiffs have stated a cognizable claim by pleading that Defendants' early voting plan intentionally "abridges" their right to vote under the Twenty-Sixth Amendment by causing a disparity in early voting access or usage by young voters. *See*, *e.g.*, Am. Compl. ¶¶ 93-96.

### C. THE AMENDED COMPLAINT PLEADS A COGNIZABLE VOTING RIGHTS ACT CLAIM BASED ON RACIALLY DISCRIMINATORY INTENT AND RESULTS.

Congress enacted the Voting Rights Act "for the broad remedial purpose of ridding the county of racial discrimination in voting." *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (internal citations and quotation marks omitted). Section 2 prohibits any "standard, practice, or procedure . . . in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Section 2 is violated if "under the totality of the circumstances, it is shown that the political processes leading to nomination or election . . . are not equally open to participation by members of a class of citizens." *Id.* § 10301(b).

Episodic practices, such as the use of the initial or modified early voting plans, constitute a "practice" under Section 2. *See Brown,* 561 F.3d at 432. To violate the statute, Plaintiffs can

demonstrate that these practices either were undertaken with an intent to discriminate or produced discriminatory results. *Id.* at 433.

For the reasons stated in Section IV-A-1, the Amended Complaint adequately alleges that Defendants violated Section 2 in engaging in intentional discrimination against Black voters in Prairie View.

Plaintiffs also sufficiently pled facts to state claims under Section 2's results standard. Section 2 violations under the results test can be "proved by showing discriminatory effect alone" without proof of discriminatory intent. *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986); *see also* 52 U.S.C. § 10301(b).

Section 2 covers "vote-denial" claims involving challenges to practices that deny or abridge the rights of Black people to vote on an equal basis with other voters. *Veasey*, 830 F.3d at 244. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with the social and historical conditions to cause an inequality in the opportunities enjoyed by black and [nonblack] voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47.

Defendants acknowledge that Section 2 vote-denial claims have two elements. *Veasey*, 830 F.3d at 244.; Mot. to Dismiss Am. Compl. at 22-23. *First*, a court determines whether the "challenged standard, practice, or procedure . . . impose[s] a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Veasey*, 830 F.3d at 244 (citation omitted). *Second*, a court analyzes whether the "burden affects minorities disparately because it interacts with social and historical conditions that have produced discrimination against minorities currently, in the past, or both." *Id.* at 245 (citation omitted).

### 1.   Discriminatory Burden

In the present case, the first element in this two-part framework draws on analysis of statistics, demographics, and other factors to determine "the nature of the burden imposed and whether it creates a disparate effect" on Black voters in Prairie View. *Id.* As detailed above in Section IV-A-1, the Amended Complaint is replete with evidence demonstrating the disparate impact of the decision and the disparate treatment of Black voters in Prairie View as compared to other non-majority-Black cities and areas in Waller County. For example, the Amended Complaint alleges that Defendants' actions had a disparate impact on Black voters. Am. Compl. ¶¶ 9, 13-17, 23, 28-29, 43-47, 70, 77. The Amended Complaint also explains that voting off-campus is especially difficult and expensive for Black voters in Prairie View because they are more likely to lack access to transportation and are socioeconomically less-resourced than white residents of the County. *Id.* ¶¶ 14-17, 30-33, 45-46, 56.

Defendants advance two primary arguments for dismissing Plaintiffs' Section 2 results claim—each of which the Court should reject. *First*, Defendants assert that "Plaintiffs have not cited . . . any case in which a federal court has found that a simple disparity in the number of early voting hours between polling locations, constitutes an actionable burden sufficient to show an abridgment of the right to vote." Mot. to Dismiss Am. Compl. at 23. But this claim mischaracterizes the well-pled harms. The Amended Complaint explains the significant inequities in early voting hours and how and why this burden results in Black voters in Prairie View having less opportunity to participate in the political process in Waller County. *See supra* at 6-11, 17-20, 24.

*Second*, Defendants claim that "Plaintiffs' complaint makes clear that the differences in allocated hours did not fall along racial lines or disproportionately burden minority voters." Mot.

to Dismiss Am. Compl. at 25. But as explained in greater detail in Section IV-A-1, Defendants ignore and fail to address the numerous disparate impact and disparate treatment factual allegations. *See*, *e.g.*, Am. Compl. ¶¶ 28-29. Black voters make up a greater proportion of the electorate in Prairie View than in any other city or unincorporated are in Waller County. *Id.* Further, Black voters in Prairie View are more likely to be poor and face socioeconomic barriers that other voters in Waller County do not face. *Id.* ¶¶ 32-33. Moreover, as discussed *supra*, the fact that some white voters elsewhere in the County received inadequate early voting opportunities, or that some Black voters elsewhere in the County received *adequate* early voting opportunities, does not invalidate Plaintiffs' Section 2 discriminatory results claim with respect to *Black voters in Prairie View*.

Section 2 claims require "an intensely local appraisal of the design and impact of the contested electoral mechanisms." *Gingles*, 478 U.S. at 79 (citation omitted). Defendants cannot point to their fair treatment of Black voters in another part of the County to escape liability for their discriminatory actions against Black voters in Prairie View. The rights of some Black voters under Section 2 cannot be "traded off against the rights of other members of the same minority class." *LULAC v. Perry*, 548 U.S. 399, 436 (2006) (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1019 (1994)); *see also Baird v. Consolidated City of Indianapolis*, 976 F.2d 357, 359 (7th Cir. 1992) ("A balanced bottom line does not foreclose proof of discrimination along the way"). Claims under Section 2 and other disparate impact statutes "inevitably will involve consequences which are not restricted in their operation to one group or another. The essence of this sort of legal attack is imbalance and disproportionality. The lack of pure [racial] specificity is no bar . . . ." *De La Cruz v. Tormey*, 582 F.2d 45, 57 (9th Cir. 1978).

Based on the factual allegations in the Amended Complaint, Defendants enacted and maintained an early voting plan that disproportionately disadvantaged Black voters in Prairie View. Because of the disparate impact and burdens, Plaintiffs had significantly fewer opportunities to vote early in the first week and on the weekends than white voters elsewhere in Waller County.

### 2. Totality of Circumstances

The second element of a Section 2's vote denial or abridgment claim analyzes "the totality of the circumstances," including the congressionally delineated Senate Factors to "determine whether there is a sufficient causal link between the disparate burden imposed and social and historical conditions that have produced discrimination" against minorities currently, in the past, or both.[17] *Veasey*, 830 F.2d at 245.

These factors serve as a non-exhaustive list, and "not every factor will be relevant in every case." *Id*. at 246 (quoting *Gingles*, 478 U.S. at 45). Indeed, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* But those Senate Factors that *are* relevant in this case "provide salient guidance from Congress and the Supreme Court on how to examine the current effects of past and current discrimination and how those effects interact with a challenged law." *Id.*

---

[17]    The Senate Factors are: (1) the extent of any history of official discrimination related to voting in the County; (2) the extent to which voting is racially polarized; (3) the extent to which Waller County uses voting practices or procedures that may enhance the opportunity for discrimination; (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; (5) the extent to which minority voters bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Gingles*, 478 U.S. at 43-45 (citation omitted).

34

Under the totality of circumstances analysis, the Amended Complaint sufficiently pleads facts satisfying Senate Factors 1, 2, 5, 7, 8, and 9. None of these factors are contested by Defendants. Instead, because Defendants fail to recognize the disparate impact alleged here, they incorrectly contend there is no need to address the Senate Factors at all. Mot. to Dismiss Am. Compl. at 23.

Senate Factor 1 (the history of voter discrimination), Senate Factor 5 (socioeconomic disparities), and Senate Factor 9 (tenuousness of the policy justification) are met here for the reasons stated above *supra* at 16-22 and 24-27.

Concerning Senate Factor 2, "[m]any courts, including the United States Supreme Court, have confirmed that Texas suffers from racially polarized voting." *Veasey v. Perry*, 71 F. Supp. 3d 627, 635-36 (cataloging and summarizing cases). Further, voting in Waller County is racially polarized. Am. Compl. ¶ 76. Racially polarized voting is relevant in this case because "[v]oting along racial lines allows those elected to ignore Black interest without fear of political consequences." *Rogers*, 458 U.S. at 623.

Indeed, under Senate Factor 8, the majority-white members of the Defendant Commissioners Court have been unresponsive to the particularized needs of Black PVAMU students, including in the adoption and maintenance of the early voting plans for the November 2018 election, *see supra* at 7-10, and the assignment of addresses and the delivery system. Am. Compl. ¶¶ 80-82. Defendants were unresponsive to public comments from Black PVAMU students and other Black voters in Prairie View who objected to the initial early voting plan as discriminatory during the October 17 meeting. *Id.* ¶¶ 43-48. "Ignoring clear and supported objections about the racially disparate impact of a proposed law is probative of a lack of responsiveness to minority concerns." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 717 (S.D.

Tex. 2017). In addition, Waller County's current use of the U.S. Postal Service's "rural addressing system" to assign addresses to locations in Prairie View based on zip code alone creates confusion and delays during elections by erroneously describing residences in Prairie View as being located either in Waller or Hempstead. Am. Compl. ¶ 81. Despite concerns raised by Black Prairie View residents, officials, and students, Defendants ignored the problem and continue to over rely on the rural addressing system as recently as this year. Equally important, Defendants consistently ignore demands for on-campus early voting at PVAMU in Prairie View. *See supra*; *see also* Am. Compl. ¶ 80.

* * *

In sum, Plaintiffs' Amended Complaint sufficiently pleads both elements of the Fifth Circuit's two-part framework for establishing a Section 2 "results" violation. Defendants' early voting plan had a significant disparate impact on Black voters in Prairie View. This burden was linked to social and historical conditions that have produced, and continue to produce, racial disparities in transportation and other socioeconomic statuses for Black voters in Prairie View. Under the totality of circumstances,  Defendants' early voting plan "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47. For these reasons, the factual allegations in the Amended Complaint, which must be accepted as true, state a Section 2 discriminatory results claim.

## CONCLUSION

For the reasons stated above, this Court should deny Defendants' Motion to Dismiss in its entirety.

Respectfully submitted on May 31, 2019,

**Of Counsel:**

/s/ Leah C. Aden
Leah C. Aden*
Deuel Ross*
Kristen A. Johnson*
John S. Cusick*
**NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.**
40 Rector Street, 5th Floor
New York, NY 10006
Phone: (212) 965-2200
Fax: (212) 226-7592
laden@naacpldf.org
dross@naacpldf.org
kjohnson@naacpldf.org
jcusick@naacpldf.org

Catherine Meza*
**NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.**
700 14th Street NW, Suite 600
Washington, DC 20005
Phone: (202) 682-1300
Fax: (212) 226-7592
cmeza@naacpldf.org

*Pro Hac Vice*

Adam T. Schramek (SDTX 31913)
State Bar No. 24033045
Attorney-in-Charge
**Norton Rose Fulbright US LLP**
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone: (512) 474-5201
Facsimile: (512) 536-4598
adam.schramek@nortonrosefulbright.com

Julie Goodrich Harrison (SDTX 3017799)
  State Bar No. 24092434
Nicole Lynn (SDTX 3041738)
  State Bar No. 24095526
**NORTON ROSE FULBRIGHT US LLP**
1301 McKinney Street, Suite 5100
Houston, Texas 77010
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
julie.harrison@nortonrosefulbright.com
nicole.lynn@nortonrosefulbright.com

William F. Calve (SDTX 3206298)
  State Bar No.  24096505
**NORTON ROSE FULBRIGHT US LLP**
300 Convent Street, Suite 2100
San Antonio, Texas 78205-3792
Telephone: (210) 270-7132
Facsimile: (210) 270-7205
william.calve@nortonrosefulbright.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

This is to certify that on May 31, 2019, a true and correct copy of the foregoing document was served on all counsel of record via the electronic case filing system of the United States District Court for the Southern District of Texas.

/s/ Leah C. Aden
Leah C. Aden