# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| JAYLA ALLEN, DAMON JOHNSON, TREASURE SMITH, and THE PANTHER PARTY, <br><br> *Plaintiffs*, <br><br> v. <br><br> WALLER COUNTY, TEXAS; THE WALLER COUNTY COMMISSIONERS COURT; JUDGE CARBETT "TREY" J. DUHON III, in his official capacity as the Waller County Judge; CHRISTY A. EASON, in her official capacity as the Waller County Elections Administrator, <br><br> *Defendants*. | Civil Case No. 4:18-cv-3985-CRE |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

CLAIMS, PROCEEDINGS, AND MATERIAL FACTS ......................................... 2

    Plaintiffs' and WC's Demographics .................................................................. 2

    WC's Record of Discrimination and November 2018 Early-Voting Plan......................... 3

SUMMARY JUDGMENT STANDARD..................................................................... 7

ARGUMENT SUMMARY ....................................................................................... 8

ARGUMENT AND AUTHORITIES ........................................................................ 9

    A.    There is a triable factual issue about whether Defendants intentionally discriminated in violation of the Fourteenth, Fifteenth, and/or Twenty-Sixth Amendments. ............................................................................................. 9

        1.    Discriminatory Impact ................................................................. 10

        2.    Historical Background ................................................................. 13

        3.    Sequence of Events and Departures from Ordinary Decision-making Process .................................................................. 14

        4.    Contemporaneous Statements ...................................................... 15

        5.    Tenuous Justifications ................................................................. 16

    B.    There is a triable factual issue about whether Defendants intentionally discriminated in violation of the Twenty-Sixth Amendment. .......... 17

    C.    There is a triable factual issue about whether Defendants violated VRA §2 (Discriminatory Results). ....................................................................... 17

        1.    Defendants Mischaracterize *Veasey*'s Two-Part Test................ 18

        2.    Triable Issues Exist with Regard to Both *Veasey* Prongs. ......... 19

    D.    Plaintiffs Are Entitled to Relief. ............................................................. 21

CONCLUSION ..................................................................................................... 23

CERTIFICATE OF WORD COUNT ..................................................................... 25

CERTIFICATE OF SERVICE .............................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bethune-Hill v. Va. State Bd. of Elections,*
   137 S. Ct. 788 (2017)....................................................................................16

*Ga. State Conference of NAACP v. Fayette Cty. Bd. of Com'rs,*
   775 F.3d 1136 (11th Cir. 2015) .......................................................................8

*Honig v. Doe,*
   484 U.S. 305 (1988)......................................................................................22

*Hood ex rel. Mississippi v. City of Memphis, Tenn.,*
   570 F.3d 625 (5th Cir. 2009) ........................................................................23

*Johnson v. De Grandy,*
   512 U.S. 997 (1994)........................................................................................8

*Kentucky v. Graham,*
   473 U.S. 159 (1985)......................................................................................13

*Knox v. Serv. Emps. Int'l Union, Local 1000,*
   567 U.S. 298 (2012)......................................................................................21

*Latham v. Chandler,*
   406 F. Supp. 754 (N.D. Miss. 1976) ............................................................10

*League of Women Voters of N.C. v. North Carolina,*
   769 F.3d 224 (4th Cir. 2014) ........................................................................19

*LULAC v. Perry,*
   548 U.S. 399 (2006)......................................................................................20

*Monroe v. City of Woodville, Miss.,*
   819 F.2d 507 (5th Cir. 1987) ..........................................................................8

*NAACP v. McCrory,*
   831 F. 3d 204 (4th Cir. 2016) .......................................................................11

*Ohio State Conference of N.A.A.C.P. v. Husted,*
   768 F.3d 524 (6th Cir. 2014), *vacated,* No. 14-3877, 2014 WL 10384647 (6th
   Cir. Oct. 1, 2014) ..........................................................................................19

*Patino v. City of Pasadena,*
   230 F. Supp. 3d 667 (S.D. Tex. 2017) ..........................................................21

*States v. Texas,*
   445 F. Supp. 1245 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States,*
   439 U.S. 1105 (1979).....................................................................................10

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*,
   429 U.S. 252 (1977)....................................................................................10, 11, 17

*Walgren v. Howes*,
   482 F.2d 95 (1st Cir.1973) ........................................................................17

*Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*,
   920 F.3d 958 (5th Cir. 2019) .....................................................................8

*United States v. Brown*,
   561 F.3d 420 (5th Cir. 2008) ............................................................10, 11, 15

*Broussard v. KLLM, Inc.*,
   No. 1:07-CV-902-TH, 2008WL11348036 (E.D. Tex. July 3, 2008)....................23

*League of Women Voters of Fla. v. Detzner*,
   No. 4:18-cv-00251 (N.D. Fla. July 24, 2018) .......................................17

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) ......................................................... *passim*

*Rogers v. Lodge*,
   458 U.S. 613 (1982)....................................................................................13, 21

*Thornburg v. Gingles*,
   478 U.S. 30 (1986)......................................................................................18, 21

**Rules and Statutes**

52 U.S.C. § 10301, Voting Rights Act ................................................. *passim*

U.S. Const. amend. XIV .....................................................................................9

U.S. Const. amend. XV.......................................................................................9

U.S. Const. amend. XXVI ................................................................................10

Fed. R. Civ. P. 19.............................................................................................23

Fed. R. Civ. P. 56.............................................................................................8

iii

# INTRODUCTION

For decades, students at the historically-Black Prairie View A&M University ("PVAMU") and Black residents in the City of Prairie View ("PV") have fought to secure their voting rights in Waller County ("WC"). As recently as 2016, students fought to bring early-voting to PVAMU's on-campus Memorial Student Center ("MSC"). But, in 2018, Defendants discriminatorily restricted on-campus early-voting, eliminating it during the first week and restricting it during the second; areas of WC with almost no students and substantially more white voters received abundant early-voting over both weeks.

Before the 2018 election, PVAMU students publicly warned Defendants that, because students lack transportation to off-campus early-voting locations like the County Courthouse or Waller County Community Center ("WCCC"), the only reliable location for ensuring student access to early-voting was the on-campus MSC. Defendants concede that students "already spend almost all of their time" there. ECF-73 at 6. Defendants knew most WC voters vote early, and PVAMU students are among the highest users of early-voting. Defendants also knew Black students are a third of WC's registered voters, live in its most populous precinct, and are among the most reliant on early-voting, factors Defendants' expert concedes weighed in favor of *more* on-campus early-voting in 2018. Defendants knew their restrictive early-voting schedule would make it significantly harder for Black PVAMU students to vote. Yet Defendants maintained it, burdening WC's *only* concentrated group of young, Black voters.

Once Defendants provided early-voting, the Constitution required them to offer it in a nondiscriminatory manner. Yet, Defendants admit the 2018 schedule did "not

[provide] equal representation" and created "an inequity" for PVAMU students. P-Ex-2 at 21-22.[1] These admissions and additional facts establish triable issues about whether Defendants discriminated against Plaintiffs, violating the Constitution and Voting Rights Act ("VRA"). Thus, Defendants' Motion must fail; moreover, this case is not moot.

## CLAIMS, PROCEEDINGS, AND
## MATERIAL FACTS

### *Plaintiffs' and WC's Demographics*

Plaintiffs are Black PVAMU students and a PVAMU-student/alumni organization. PVAMU is a historically-Black University founded in 1876 and the only university in WC. Over 80% of PVAMU's 8,000-plus students are Black. P-Ex-7 at 9. Eighty percent of PV's citizen-voting-age population ("CVAP") is Black, and 54% of PV's voting-age population ("VAP") is 18-20. *Id.* at 8-9.

PV is the *only* city in WC where a majority of voters are both Black *and* students, *id.* at 6-8, and no city has a comparably-high percentage of Black voters, P-Ex-6 at 8. Nowhere else do voters aged 18-20 constitute more than 8%. *Id.* at 9. Including PV, 51.6% of WC's CVAP is white, and only 13.6% of its VAP is 18-20. *Id.* at 8-9.

Black people in PV are socioeconomically disadvantaged, as compared to white people in WC *and* PV, in poverty rates, income, employment rates, transportation access, and educational attainment. *Id.* at 12-15. Black PV residents, as compared to white people, disproportionately lack access to transportation. P-Ex-6 at 32-33, 86-87, 127-28. Defendants admit PV's high poverty rates are largely "due to the student population of

---

[1]     Plaintiffs' exhibits are short-cited as, *e.g.*, "P-Ex-1."

PVAMU." ECF-73-2 at 108, 131:9-133:1. PVAMU dorm students' per-capita annual income is $3,562. P-Ex-6 at 15.

PV has no public transportation. P-Ex-6 at 127-28. As of the November 2018 election, Plaintiffs Damon Johnson and Treasure Smith did not own cars; Mr. Johnson walked to campus, and Ms. Smith used the PVAMU-shuttle to travel to/from school. ECF-73-2 at 226, 33:2-20, 36:22-24; *id.* at 266, 54:8-55:3. Plaintiff Panther Party's membership includes Black students aged 18-20 who do not own cars. *Id.* at 342, 173:20-22.

Designating an early-voting location at the off-campus WCCC does not address Black students' accessibility issues. For example, Johnson and Smith have never been to the WCCC and do not know where it is. *Id.* at 230-31, 52:24-53:3; *id.* at 273, 81:18-82:3. PVAMU's shuttle does not stop there. *Id.* at 232, 58:24-59:3.

PVAMU's on-campus MSC is the most accessible early-voting location for Plaintiffs and other PVAMU students. ECF-73-2 at 191-92, 196:17-197:5; *id.* at 344, 182:2-183:14. Students regularly eat, study, socialize, and use the PVAMU shuttle that stops there. *Id.*

### *WC's Record of Discrimination and November 2018 Early-Voting Plan*

WC has a long history of using many practices, including poll taxes and gerrymandered voting districts, to disenfranchise Black voters. P-Ex-1 at 8-34. Defendants have targeted Black PVAMU students by trying to prevent them from registering to vote, voting, running for office, or, until 2016, having *any* on-campus early-voting.

Before the 2016 primaries, Defendants cut the total early-voting locations in WC from eight to two, leaving PV voters with no location in walking distance or even in their precinct. *Id.* at 31-32. Facing litigation, Defendants reversed course and opened six early-voting locations, including one on PVAMU's campus for the first time. *Id.*

Defendants adopted their fall 2018 initial early-voting plan on September 5, 2018, shortly after students arrived on campus. P-Ex-2 at 12; P-Ex-3 at 26-28. That plan provided *no* early-voting on PVAMU's campus—or anywhere in PV—during the first week of early-voting. P-Ex-4 at 5. It provided just three-days of on-campus voting at the MSC (8am-5pm) and two days of off-campus voting at the WCCC (7am-7pm) during the second week. *Id.* at 5-6. PV was therefore the *only* city in WC where voters had *no* early-voting during the first week. P-Ex-4 at 20-21.

PVAMU students depend on early-voting to vote and use early-voting at high rates. P-Ex-4 at 18. Plaintiffs' expert Robert Stein's examination of the March 2018 primary-election-canvass results showed that, at the MSC, 64% of the total votes cast were during early-voting. ECF-53 at 12. In WC, only 43% of the total votes cast in March 2018 were via early-voting. *Id.* Defendants' expert, James Gimpel, agreed the 2016 and 2018 usage-rates at the MSC "seem to show high demand for early voting." P-Ex-8 at 138:10-13. Aware that PVAMU students used early-voting at high rates, Defendants assigned the MSC more voting *machines* than other early-voting locations—while assigning it fewer *days* and *hours*. P-Ex-4 at 10.

The initial early-voting plan was proposed to Defendants by the County Democratic and Republican party chairs. P-Ex-2 at 16. These party chairs did not solicit input from PVAMU administrators or students. ECF-73-2 at 166:11-169:5; *id.* at 28, 99:24-101:22.

At the October 17, 2018 Commissioners Court meeting ("October 17 meeting"), Defendant Duhon conceded that this process departed from past procedures because the Democratic party chair did not speak to Democratic candidates before submitting the early-voting schedule to Commissioners. P-Ex-2 at 32.

During this meeting, PV students and residents objected to the initial plan's inequities. A Black student and PV city councilmember expressed frustration that PVAMU had "zero days [or hours] on the first week of Early Voting after all the issues we've had over the years and decades." P-Ex-2 at 23. Most speakers at the meeting asked for "parity" and "consistency" between the early-voting provided to PVAMU students and the predominantly older, white voters elsewhere in WC. P-Ex-2 at 21-24.

Defendant Eason acknowledged the early-voting plan "is not equal representation" between the County's other cities and PV. ECF-73-2 at 42-43, 157:13-159:21. Duhon admitted "there's an inequity" in the early-voting available to PV compared to places like the City of Waller that had eleven early-voting days. *Id.* at 127, 207:10-208-25. He acknowledged Defendants' duty to "give [PVAMU students] equal access." *Id.*

Defendants attempted to justify the plan by asserting:

- it reflected a deliberative process because officials from two political parties proposed it, P-Ex-2 at 46;

- on-campus early-voting during the first week conflicted with PVAMU's homecoming, *id.* at 47;

- the "community," particularly senior citizens, did not want to visit PVAMU's campus, *id.*;

- parking at PVAMU was difficult, *id.*;

- WCCC was a good alternative location, *id.* at 33; and,

- it was too late or unfeasible to add early-voting sites, *id.* at 32.

Each of these justifications was uncorroborated or unsupported by public comments, which illuminated that:

- the process for choosing early-voting sites was "broken," *id.* at 24;

- many PVAMU students are not affiliated with major parties, P-Ex-2 at 24, 31, 46-47, with Duhon acknowledging "a lot of students" were entirely unrepresented by party officials because they "don't identify as Democrat or Republican," P-Ex-2 at 31;

- homecoming would be ideal for early-voting because many people are on campus, P-Ex-2 at 47-49;

- PVAMU often hosts public events, ECF-73-2 at 186, 174:9-175:22;

- the off-campus WCCC is inaccessible to PVAMU students because many do not have cars or money for gas, P-Ex-2 at 23-24; indeed, the WCCC "is . . . 1.4 to 1.6 miles away from" large PVAMU dorms, five times the distance research shows can deter voters, P-Ex-4 at 7-8;

- no sidewalk leads to the WCCC and the school shuttle does not stop there, ECF-73-2 at 54, 203:19-204:11; and,

- purported feasibility concerns did not prevent Defendants from proposing their own schedule changes. Eason, who is best-positioned to opine on feasibility, repeatedly affirmed Defendants had resources to add more on-campus early-voting, P-Ex-2 at 24-26.

During this meeting, Defendants considered providing more early-voting opportunities on PVAMU's campus, but ultimately made no changes. P-Ex-2 at 25-26. After claiming feasibility and timing concerns precluded changes, two days *after* Plaintiffs filed this lawsuit, on October 24, Defendants modified the early-voting schedule ("modified-plan") during an "emergency session." *Id.* at 26-27. During this irregular meeting, Defendants voted to increase early-voting by three hours on the three days of on-campus early-voting at the MSC during the second week. They also provided five hours of off-campus early-voting at PV City Hall on Sunday, the first week's final day of early-voting. P-Ex-2 at 36. Defendants neither consulted with PV voters nor solicited input for this modification. ECF-53 at 16. They made no other changes. P-Ex-2 at 35-36.

Even under the modified-plan, PVAMU students received *no* on-campus voting opportunities during the first week, *no* on-campus weekend hours, and *no* additional on-campus early-voting *days* during the second week. P-Ex-4 at 20-21.

## SUMMARY JUDGMENT STANDARD

Summary judgment is unwarranted unless "there is no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). This court must view the non-movant's evidence "in the light most favorable" to the non-movant and accept such evidence as true. *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019).

Summary judgment is rarely appropriate in voting-rights cases, where "ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts." *Johnson v. De Grandy*, 512 U.S. 997, 1012 (1994); *Ga. State Conference of NAACP v. Fayette Cty. Bd. of Com'rs*, 775 F.3d 1136, 1348 (11th Cir. 2015); *Monroe v. City of Woodville, Miss.*, 819 F.2d 507, 511 (5th Cir. 1987).

## ARGUMENT SUMMARY

Defendants failed to carry their summary judgment burden. Defendants concede, fail to contest, or ignore material factual and expert evidence. Plaintiffs establish that Defendants' adoption and maintenance of the early-voting plan: (1) singled out PV, a community with the largest Black and student populations in WC, for unequal treatment; (2) cannot be detached from WC's record of discrimination against Black students; (3) departed from best practices and Defendants' guidelines; (4) relied on coded statements revealing unconstitutional biases against young and/or Black voters; and (5) lacked any basis. This overwhelming record demonstrates a triable dispute over whether Defendants acted, at least in part, with discriminatory intent based on age and/or race.

The record also establishes a triable issue as to whether the plan caused discriminatory results, violating the VRA. Defendants do not—and cannot—contest the disparate impact and treatment Plaintiffs endured. Nor do they contest the causal link

between that discriminatory burden and the social and historical conditions in WC and Texas. Defendants respond by mischaracterizing Fifth Circuit law and inviting this Court to adopt an out-of-circuit, unsupported test.

Ultimately, Defendants' adoption and maintenance of the 2018 early-voting schedule violates the Fourteenth, Fifteenth, and Twenty-Sixth Amendments of the Constitution and VRA Section 2 ("§2").

Moreover, Texas House Bill 1888 ("HB1888"), effective September 2019 and subject to two pending legal challenges, does not moot this case. Plaintiffs are entitled to injunctive, declaratory, and prophylactic relief for Defendants' actions. Plaintiffs seek prophylactic relief through VRA §3's bail-in provision because of Defendants' constitutional violations and judicially-recognized record of discriminating against Black PVAMU students and other Black voters. As complete relief can be accorded with existing parties, PVAMU is not a necessary or indispensable party.

## ARGUMENT AND AUTHORITIES

**A.    There is a triable factual issue about whether Defendants intentionally discriminated in violation of the Fourteenth, Fifteenth, and/or Twenty-Sixth Amendments.**

The Fourteenth and Fifteenth Amendments forbid denial or abridgment of voting rights because of race or ethnicity. U.S. Const. amend. XIV; U.S. Const. amend. XV; *see also Veasey v. Abbott*, 830 F.3d 216, 253 (5th Cir. 2016). The Twenty-Sixth Amendment

forbids the denial or abridgment of the right to vote because of a person's status as a voter younger than 21. U.S. Const. amend. XXVI.

Together these Amendments prohibit discrimination against Black students. *States v. Texas*, 445 F. Supp. 1245, 1257 (S.D. Tex. 1978) (three-judge court), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979) (holding WC's onerous requirements for Black PVAMU-student voters unconstitutional even though they did not affect Black non-students); *Latham v. Chandler*, 406 F. Supp. 754, 755 (N.D. Miss. 1976) (similar).

Because discriminatory motives may hide behind a government action that "appears neutral on its face," the Supreme Court has articulated several non-exhaustive factors to inform trial courts' analyses of discriminatory intent. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*, 429 U.S. 252, 266 (1977); *see* ECF-73 ("SJM") at 21-22 (conceding the *Arlington-Height*s framework applies to Plaintiffs' Twenty-Sixth Amendment claim). Plaintiffs' burden is to show *only* that *a* discriminatory purpose was "a motivating factor." *Arlington Heights*, 429 U.S. at 262, 265-66.

Applying *Arlington Heights* to these facts establishes triable issues of unconstitutional discrimination based on race and/or age.

### 1. Discriminatory Impact

Evaluating Defendants' early-voting plan's discriminatory impact is an "important starting point," *Arlington Heights*, 429 U.S. at 266, because Plaintiffs may rely on "normal inferences to be drawn from the foreseeability of defendant's actions." *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2008).

For disparate impact under *Arlington Heights*, Plaintiffs need only show Defendants' actions "bear[] more heavily on" young and/or Black college-age voters than other WC voters. *Id.* Defendants' argument that Plaintiffs must show "a positive effect on the actual incidence of voting," (*i.e.*, turnout reduction), *see* SJM at 18-19, "conflates abridgement and denial: in previous times, some people paid the poll tax or passed the literacy test and therefore voted, but their rights were still abridged," *Veasey*, 830 F.3d at 260 n.58. A finding that Defendants' plan "abridge[d]" Plaintiffs' voting rights, resulting in an age and/or racial disparity in early-voting *access*, "falls comfortably within this definition." *Id*. at 260. "Showing disproportionate impact, even if not overwhelming impact, suffices to establish one of the circumstances evidencing discriminatory intent." *NAACP v. McCrory*, 831 F. 3d 204, 231 (4th Cir. 2016).

The "early voting plan for 2018 disproportionately impacted voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View because they were not afforded the same or similar opportunities to vote early as other registered voters in the County." P-Ex-4 at 13-14. There is no dispute that 81% of PVAMU-student voters voted early in fall 2018, which "suggests that PVAMU students were more dependent on early voting than other voters in Waller County." P-Ex-4 at 12. Dr. Gimpel admits the 2016 and 2018 canvass results for PVAMU's campus "seem to show high demand for early voting." P-Ex-8 at 138:10-13.

Plaintiffs' expert, Henry Flores, provides unrebutted testimony that Defendants' early-voting plan interacted with "socioeconomic disadvantages for Black voters in Prairie

View" to bear more heavily on Black-student voters and Black-PV voters. P-Ex-2 at 41. Within PV, PVAMU's voting precinct has Black VAP of 94%, and 73% of its VAP is aged 18-20. P-Ex-7 at 3-4. Plaintiffs' expert, William Cooper, establishes that PVAMU students and other Black people in PV face poverty and transportation barriers at higher rates than white, older WC voters. P-Ex-6 at 12-15. Drs. Stein and Flores show that PVAMU students' socioeconomic disadvantages made traveling to early-voting locations off campus during limited time windows uniquely difficult for Black PVAMU-student voters and Black PV voters. P-Ex-2 at 39-41; P-Ex-4 at 10-15. Duhon concedes Black PVAMU students are uniquely disadvantaged socioeconomically and face poverty at higher rates than PV's non-student residents. ECF-73-2 at 108, 132:6-133:1.

Plaintiffs' evidence shows on-campus voting is often the only option for PVAMU students, who are more likely than WC's non-college-student voters or white voters to lack transportation, have inflexible work schedules, and cannot use absentee voting. P-Ex-6 at 14; ECF-73-2 at 256, 14:3-16:24, 60:7-65:5.

Defendants were aware of these early-voting usage rates and socioeconomic realities *before* they implemented their plan. P-Ex-2 at 7; ECF-73-2 at 100, 98:15-19; 106,124:6-17; *infra*, §A(5). Eason and Dr. Gimpel concede that the registered voter population and early voting use at PVAMU are among WC's highest. ECF-73-2 at 127:18-128:8; P-Ex-8 at 130:6-15, 138:4-13.

### 2. Historical Background

Defendants agree that a decision's historical background is relevant to showing discriminatory intent. However, they fail to contest Plaintiffs' expert and factual evidence establishing how the early-voting plan is a continuation of the judicially-recognized history of discrimination in WC. *Compare* SJM at 20-26, *with* ECF-53 at 10, 26-27, P-Ex-1 at 12-33, *and* P-Ex-2 at 8-12.

Defendants attempt to bypass this record by claiming "there is no evidence of intentional discrimination by the current Defendants." SJM at 20. But Defendants are sued in their *official* capacities; their *personal* responsibility for historical discrimination is irrelevant. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Discriminatory intent focuses on the legislative body's motivations, not any single official or named defendant, and considers the jurisdiction's historical discrimination. *Veasey*, 830 F.3d at 231-32. This evidence is particularly relevant to supporting an inference of present-day intentional discrimination, where, as here, "the evidence shows that discriminatory practices were commonly utilized, that they were abandoned when enjoined by courts or made illegal by civil rights legislation, and that they were replaced by laws and practices which, though neutral on their face, serve to maintain the status quo." *Rogers v. Lodge*, 458 U.S. 613, 625 (1982).

Defendants identify a single act—providing on-campus early-voting for the 2016 primary—to try to distance themselves from the undisputed historical-discrimination record. SMJ at 20. Defendants ignore that "these sites were not allocated *until* after students

had protested, marched, risked retaliation and prosecutions by Waller County officials, and petitioned the County to have a polling site on campus." P-Ex-3 at 3; P-Ex-1 at 31-32.

### 3. Sequence of Events and Departures from the Ordinary Decision-making Process

Contrary to Defendants' conclusory assertions, SJM at 20, Plaintiffs have detailed procedural irregularities and substantive departures in the early-voting plan's adoption and maintenance, supporting an inference of discrimination.

Defendants do not contest Plaintiffs' evidence establishing the early-voting schedule's adoption and maintenance (1) was non-transparent, (2) departed from best practices and Defendants' purported guidelines, and (3) was inequitable. First, Defendants developed and adopted the early-voting schedule *before* students were on campus for PVAMU's semester and solely relied on political-party chairs, unrepresentative of PVAMU students. P-Ex-2 at 12-18, 32. Defendants did not consider student-voters' concerns or seek their input. ECF-73-2 at 25, 88:8-11. Second, Defendants departed from early-voting-allocation best practices, P-Ex-4 at 9-10, and their guidelines, *id.*, P-Ex-3 at 26-28. Although Defendants listed "population of registered voters" as one of seven equally-considered factors, "that factor does not appear to have been seriously considered," as PVAMU's voting precinct holds the most registered voters in the County. P-Ex-4 at 12-13; *see* P-Ex-3 at 24-25. Third, Defendants maintained the schedule despite acknowledging the inequitable distribution of early-voting hours and locations. *Id.* at 21-22 (Duhon and Eason stating there "is an inequity" and "not equal representation" for PVAMU students).

Defendants emphasize that Eason allocated more voting *equipment* at the MSC than any other polling location; that only amplifies Defendants' awareness that Black-PVAMU students were particularly reliant on early-voting.  P-Ex-2 at 6-7; P-Ex-4 at 10.

### 4.      Contemporaneous Statements

While considering the early-voting schedule, Defendants repeatedly acknowledged its discriminatory impact on Black-PVAMU students. P-Ex-2 at 21-22 (Duhon and Eason publicly stating there "is an inequity" and "not equal representation" for PVAMU students). The Fifth Circuit has held admissions by Defendants and other decision-makers that the challenged action has a discriminatory impact are powerful evidence of discrimination. *Veasey*, 830 F.3d at 236-37.

At the October 17 meeting, Defendants attempted to justify denying PVAMU students equal early-voting opportunities by asserting the "community," particularly senior-citizens, did not want or like to go onto the historically-Black PVAMU campus. ECF-53 at 24-25. Defendants present no admissible, non-hearsay evidence that senior citizens dislike going on campus. Distinguishing PVAMU students from the "community," and suggesting the "community" dislikes traveling to PVAMU's campus, reflects bias against them as a motivating factor for the plan. Far from crediting Defendants' assertions that these statements were "race-neutral," a reasonable factfinder could determine they were coded statements and evidence of unconstitutional biases. *Brown*, 561 F.3d at 433-34, n.10; *see Veasey*, 830 F.3d at 235-36.

### 5. Tenuous Justifications

Another factor probative of discriminatory intent is Defendants' offering "many rationales . . . which shifted as they were challenged or disproven by opponents." *Veasey*, 830 F.3d at 240-41. First, Defendants asserted that early-voting at PVAMU was not offered during the first week because a party chair said it would conflict with PVAMU's homecoming activities. P-Ex-2 at 47. But the chair neither consulted with nor represents PVAMU students and administrators, and PVAMU students publicly commented that homecoming would facilitate early-voting. *Id.* at 46-48. Second, Defendants hypothesized that the "community," particularly senior-citizens, disliked going on campus and parking was difficult. *Id.* at 48-49. These baseless claims were unsupported. *Id*; P-Ex-9 at 4-5. Third, Defendants claimed October 17 was too late to change the schedule, though Eason repeatedly affirmed Defendants had the resources to adopt changes and add on-campus early-voting. P-Ex-2 at 32. Defendants ultimately adopted changes a week later, proving changes were feasible. *Id.* at 32-33.

Defendants now raise yet another unsupported justification for denying equitable early-voting opportunities to PVAMU students: "historical turnout." This "post-hoc justification[]" was never advanced before the November 2018 election and should be rejected. *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017).

Regardless, Dr. Flores testified that "historical turnout" was another factor supporting more on-campus early-voting. P-Ex-3 at 24-25. Unable to directly rebut this conclusion, Defendants inaccurately claim Dr. Stein concedes that the early-voting scheduled "aligned with historical turnout." SJM at 21. Not so. *Compare* SJM at 21, *with*

P-Ex-4 at 12-13. Describing possible explanations for his findings, he never points to historical turnout. P-Ex-4 at 12-13.

**B.    There is a triable factual issue about whether Defendants intentionally discriminated in violation of the Twenty-Sixth Amendment.**

Beyond the triable issues of discriminatory intent based on race and the intersection of race and age, there are triable issues of discriminatory intent based solely on age.

Contrary to Defendants' unsupported assertion, SJM at 22, Plaintiffs have adduced evidence that the plan unconstitutionally abridged the voting rights of the County's only concentration of students, *supra* §A(1). A reasonable factfinder could conclude that age-based discrimination was at least one motivating factor in creating that burden.

As detailed above, Plaintiffs established age discrimination under the *Arlington Heights* framework because Defendants' plan: (1) discriminatorily impacted PVAMU students; (2) continues Defendants' targeted suppression of students' voting rights; (3) stemmed from a non-transparent process that excluded students' voices; and (4) served no nondiscriminatory purpose. *Supra* §A. The Twenty-Sixth Amendment was designed to eliminate these types of "blatant and 'unnecessary burdens and barriers' on young voters' rights." *Walgren v. Howes*, 482 F.2d 95 (1st Cir.1973); *League of Women Voters of Fla. v. Detzner*, No. 4:18-cv-00251 (N.D. Fla. July 24, 2018).

**C.    There is a triable factual issue about whether Defendants violated VRA §2 (Discriminatory Results).**

A triable issue exists about whether the early-voting plan disproportionately disadvantaged Black voters in PV by providing them less early voting than white voters in WC.

To establish a §2 violation, Plaintiffs can demonstrate either discriminatory intent (*see* §A, *supra*) or results. 52 U.S.C. § 10301; *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986). Fifth Circuit courts evaluate discriminatory-result claims, as here, under a two-part test. *Veasey*, 830 F.3d at 244. Courts first determine whether the "challenged standard, practice, or procedure . . . impose[s] a discriminatory burden on members of a protected class." Second, courts analyze whether the "burden affects minorities disparately because it interacts with social and historical conditions that have produced discrimination against minorities currently, in the past, or both." *Id.* at 245.

### 1.  Defendants Mischaracterize *Veasey*'s Two-Part Test.

Defendants concede this Court must apply *Veasey*'s two-part test. SJM at 13. Yet Defendants mischaracterize that test, inviting the Court to ignore binding Fifth-Circuit precedent.

Defendants erroneously suggest that plaintiffs alleging vote-abridgment claims must show a "positive effect on the actual incidence of voting" to satisfy the two-part test's first element. SJM at 19. That is contrary to this Circuit's law. *Veasey*, 830 F.3d at 260 ("No authority supports requiring a showing of lower turnout, since *abridgement* of the right to vote is prohibited along with denial."). Dr. Gimpel concedes turnout cannot support any inference about whether voters had equal *access* to early-voting hours or locations. P-Ex-9 at 249:6-8.

Moreover, *Veasey* requires courts to consider the Senate Factors ("SF") under *both* elements of the two-part test. *Veasey* expressly adopted the two-part test set forth in *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014), and *Ohio*

*State Conference of N.A.A.C.P. v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014), *vacated*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014)). 830 F.3d at 244. Both cases hold that "the totality of the circumstances," including relevant Senate Factors, should be considered not only in the test's second part, but also in its *first* part, to assess burden. *League*, 769 F.3d at 240 ("In assessing both elements, courts should consider 'the totality of circumstances.'"); *Husted*, 768 F.3d at 554 (same); *accord Veasey*, 830 F.3d at 244-45 n.35. Dr. Gimpel agrees that socioeconomic and educational inequalities (SF5) are relevant in assessing voting practices' discriminatory impact. P-Ex-8 at 42:9-21, 48:10-49:14, 213:1-18.

Nor may this Court decline to reach the test's second prong. SJM at 13. *Veasey* instructs courts to consider Senate Factors under "both elements of the two-part test," *Veasey*, 830 F.3d at 245 n.35, and rejected an alternative to the two-part test in which the first element would act as gatekeeper for the second, *id.* at 311 (Jones, J., dissenting) (such a test "fundamentally differs" from the standard adopted).

## 2. Triable Issues Exist with Regard to Both *Veasey* Prongs.

The first element in *Veasey*'s framework analyzes statistics, demographics, and relevant Senate Factors to determine "the nature of the burden imposed and whether it creates a disparate effect" on Black voters in PV. *Veasey*, 830 F.3d at 244. As detailed in §A(1), the record is replete with evidence demonstrating the early-voting plan's discriminatory impact and discriminatory treatment of Black voters in PV. Especially when this racially-discriminatory impact is via Plaintiffs' uncontested evidence under the Senate

Factors, *infra*, the existence of a triable issue about burden is clear. P-Ex-6 at 12-15; P-Ex-2 at 39-41; P-Ex-4 at 10-15.

Defendants cannot use the treatment of Black voters elsewhere to escape liability for their discriminatory actions against Black voters in PV. The rights of some Black voters under §2 cannot be "traded off against the rights of other members of the same minority class." *LULAC v. Perry*, 548 U.S. 399, 436 (2006). Moreover, Hempstead and Brookshire, which Defendants contend their early-voting plan served adequately, SJM at 15, contain far fewer Black voters and far more white voters than PV, P-Ex-6 at 6. The majority-white communities where Defendants offered little or no early-voting, SJM at 11-15, are inapt comparators. Unlike PV, they are mostly or entirely outside of WC (Katy and Hockley), ECF-73-2 at 102, 106:11-16; are unincorporated (Monaville and Fields Store), *id.* at 118, 170:7-13; *id.* at 40, 146:18-24; or contain far few voters than PV (Monaville, Pattison, and Katy), *id* at 102, 106:11-16 (Monaville); P-Ex-6 at 7 (Pattison has 381 voting-age-residents, and only 870 of Katy's voting-age-residents live in WC).

*Veasey*'s second element analyzes "the totality of the circumstances," including Senate Factors, to "determine whether there is a sufficient causal link between the disparate-burden imposed and social and historical conditions that have produced discrimination" currently, in the past, or both. *Veasey*, 830 F.2d at 245. These factors are non-exhaustive, and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id*. at 246 (quoting *Gingles*, 478 U.S. at 45).

Plaintiffs have established at least Senate Factors 1, 2, 5, 7, 8, and 9. Defendants do not—and cannot—contest this evidence. Triable questions under SF1 (voting-discrimination history), SF5 (socioeconomic disparities), and SF9 (tenuousness) are established for the reasons stated *supra,* §§A(1), A(2), A(5), and D(1)(b).

Plaintiffs have also established racially-polarized voting (SF2), which is relevant because "[v]oting along racial lines allows those elected to ignore Black interest without fear of political consequences." *Rogers*, 458 U.S. at 623. "Texas has conceded that racially polarized voting exists in 252 of its 254 counties," including Waller. *Veasey*, 830 F.3d at 258; P-Ex-2 at 38-29. For responsiveness (SF8), Plaintiffs have established a triable question that the majority-white Defendant Commissioners Court has been unresponsive to the particularized needs of Black PV residents. For example, a triable issue of fact exists that Defendants were unresponsive to public comments from Black PVAMU students and other Black voters who objected to the initial early-voting plan as discriminatory. P-Ex-2 at 21-24. "Ignoring clear and supported objections about the racially disparate impact of a proposed law is probative of a lack of responsiveness to minority concerns." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 717 (S.D. Tex. 2017).

## D.     Plaintiffs Are Entitled to Relief.

Defendants misperceive both the nature of mootness and Plaintiffs' requested relief. "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012). Here, this Court may grant relief under *all* of Plaintiffs' demands because *none* are adequately addressed by HB1888. ECF-49 at 28; ECF-68 at 1-5.

HB1888's narrow scope merely establishes the *minimum* hours and days for early-voting locations *after* such locations have been selected. HB1888 says nothing about the maximum early-voting hours counties may provide, which locations counties may select, how counties select them, or whose voices must be included in the location-selection process. HB1888's floor still affords Defendants discretion to open or close early-voting locations—and to do so discriminatorily.

Defendants have carried forward their discrimination with HB1888 and yet again abridged Black students' voting rights by offering *no* on-campus early-voting at PVAMU in *any* election since HB1888 became effective. Defendants offered no on-campus early-voting for the fall 2019 elections. ECF-68 at 4. Defendants additionally denied on-campus early-voting for the 2020 primaries. *2020 Joint Primary Election Schedule*, Waller County, https://www.co.waller.tx.us/upload/page/0172/2020/Primary/2020%20PRIMARY%20E V%20AND%20ED%20Locations.pdf. Plaintiffs face a substantial likelihood of continued harm them despite HB1888, disproving mootness. *See Honig v. Doe*, 484 U.S. 305, 323 (1988).

HB1888 also has no bearing on Plaintiffs' requested prophylactic relief, including: <u>*first*</u>, a declaratory judgment of intentional discrimination, which provides a remedial function as a predicate to VRA §3(c) preclearance; <u>*second*</u>, an injunction "[o]rdering Defendants to ensure that . . . a representative of PVAMU students is involved in the process for setting an early voting schedule," including selecting locations; and, <u>*third*</u>, requiring preclearance under §3(c). Plaintiffs have live, concrete interests in pursuing relief from Defendants' constitutional and statutory violations.

Finally, Defendants' characterization of PVAMU as an "indispensable party" fails. Defendants have not minimally shown that PVAMU is a *necessary* party. *See Broussard v. KLLM, Inc.*, No. 1:07-CV-902-TH, 2008WL11348036, at *2 (E.D. Tex. July 3, 2008) ("the Court does not need to engage in the 'indispensable party' analysis" unless a party is found *necessary*). As the "party advocating joinder," Defendants have the "initial burden of demonstrating that a missing party is necessary." *Hood ex rel. Mississippi v. City of Memphis, Tenn.*, 570 F.3d 625, 628 (5th Cir. 2009). Defendants assert they lack direct control over PVAMU's MSC, but that is true of many of Defendants' early-voting locations. ECF-73-2 at 129, 216:11-14. Moreover, Defendants successfully designated MSC as an early-voting facility in 2016 and 2018, and PVAMU is eagerly willing to host on-campus early-voting. P-Ex-2 at 48; ECF-17-2 at 2. Without PVAMU, the Court can "accord complete relief among existing parties," which means PVAMU is not necessary—and cannot be indispensable. Fed. R. Civ. P. 19(a)(1)(A).

## CONCLUSION

Defendants have not shown there is no genuine issue of material fact for Plaintiffs' four claims, and are not entitled to summary judgment. Defendants' Motion should be denied.

Respectfully submitted on February 14, 2020,

**Of Counsel:**

*/s/ Leah C. Aden*

Leah C. Aden*
Deuel Ross*
Kristen A. Johnson*
John S. Cusick*
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Phone: (212) 965-2200
Fax: (212) 226-7592
laden@naacpldf.org
dross@naacpldf.org
kjohnson@naacpldf.org
jcusick@naacpldf.org

Catherine Meza*
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
Phone: (202) 682-1300
Fax: (212) 226-7592
cmeza@naacpldf.org

Adam T. Schramek (SDTX 31913)
State Bar No. 24033045
Attorney-in-Charge
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone: (512) 474-5201
Facsimile: (512) 536-4598
adam.schramek@nortonrosefulbright.com

Julie Goodrich Harrison (SDTX 3017799)
  State Bar No. 24092434
Nicole Lynn (SDTX 3041738)
  State Bar No. 24095526
Tyler E. Ames (SDTX 3486420)
  State Bar No. 24116028
NORTON ROSE FULBRIGHT US LLP
1301 McKinney Street, Suite 5100
Houston, Texas 77010
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
julie.harrison@nortonrosefulbright.com
nicole.lynn@nortonrosefulbright.com

*Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

## CERTIFICATE OF WORD COUNT

Pursuant to S.D. Tex., Hon. Charles R. Eskridge III, Court Procedures, Rule 18, I hereby certify that this Response has been prepared in a conventional typeface no smaller than 13-point font for text and 12-point font for footnotes. I also certify that this Response complies with the word-court limitations contained in Rule 18, as amended by the February 11, 2020 Order in this case (ECF 75), because, excluding the case caption, table of contents, table of authorities, signature block, and certificates, it contains 5,493 words. I relied on the computer-generated word count of Microsoft Word 2017, which is the software used to prepare this Response.

/s/ Leah C. Aden
Leah C. Aden

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2020, a true and correct copy of the foregoing document was served on all counsel of record through the Court's Electronic Case Filing (ECF) system.

/s/ Leah C. Aden
Leah C. Aden