**EXHIBIT LIST**

1. Expert Report of Peniel Joseph, Ph.D.

2. Expert Report of Henry Flores, Ph.D.

3. Expert Rebuttal Report of Henry Flores, Ph.D.

4. Expert Report of Robert Stein, Ph.D.

5. Expert Rebuttal Report of Robert Stein, Ph.D.

6. Declaration of William S. Cooper

7. Supplemental Declaration of William S. Cooper

8. Deposition of James Gimpel, Ph.D.

9. Declaration of Frank Jackson

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

**JAYLA ALLEN, et al.,**

**PLAINTIFFS**

**v.**                                    **Civil Case No. 4:18-cv-3985**

**WALLER COUNTY, et al.,**

**DEFENDANTS**

**EXPERT REPORT**
**OF**
**Peniel Joseph, Ph.D.**

**ON BEHALF OF PLAINTIFFS**
**JAYLA ALLEN, DAMON JOHNSON, RAUL SANCHEZ, TREASURE SMITH,**
**AND THE PANTHER PARTY**

# TABLE OF CONTENTS

I.   Statement of Purpose

II.   Evidence and Methodology

III.   Qualifications

IV.   Historical Background of Waller County's 2018 Early Voting Decision

   A.   Historical Background of Voting Discrimination Against African Americans in the United States

   B.   Historical Background of Voting Discrimination Against African Americans in Texas

   C.   Historical Background of Voting Discrimination Against African Americans in Waller County, Texas

V.   Conclusion

# I.  Statement of Purpose

Plaintiffs in *Allen v. Waller County* asked me to consider the history of voting discrimination against African Americans in Texas, generally, and Waller County, specifically. My report focuses on the history of Black voter disenfranchisement in Waller County from 1971 to the present. The report places Waller County's discriminatory voting policies toward Black college students within a wider historic and contemporaneous voting rights context in the State of Texas and nationally.

This history is relevant to whether Waller County's action in adopting and maintaining its early voting plan for the November 2018 is part of the continuum of Waller County's longstanding acts of official discrimination in voting, particularly against students at Prairie View A&M University ("PVAMU"). I understand that my findings will be relied upon by other Plaintiffs' experts, including to determine whether this history and ongoing record supports an inference of discriminatory intent. My findings also will be used by Plaintiffs' experts, to determine, among other things, whether under a "totality of circumstances" analysis under Section 2 of the Voting Rights Act ("Section 2"), Waller County's actions in adopting and maintaining the early voting plan in October 2018 interact with social and historical factors to have the purpose and effect of causing an inequality of opportunity in the political process for Black and Latinx voters in Prairie View.

I am being compensated in the amount of $250 per hour and reasonable expenses for my services. Attached, as an **Appendix**, is a copy of my curriculum vitae.

## II.    Evidence and Methodology

This report draws upon standard sources in historical and social scientific analysis, including, but not limited to: scholarly books, articles, and reports; newspaper and other journalistic articles; judicial opinions; oral histories; U.S. Congressional records; legislative history; and federal and state government documents. I pay special attention to efforts by local residents, civil rights activists, and students at PVAMU to access voting rights in the aftermath of the 1965 Voting Rights Act.

To assess intentional discrimination, experts follow the methodological guidelines set forth by the United States Supreme Court's ruling in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, which are similar to procedures followed by historians in making such assessments. Under this *Arlington Heights* framework, the Court focuses on five distinct factors that are relevant to ascertaining intentional discrimination: (1) discriminatory impact, (2) historical background of discrimination, (3) the sequence of events leading up to the decision, (4) procedural or substantive deviations from the normal decision-making process, and (5) contemporaneous viewpoints expressed by the decision-makers. Under this framework, I analyzed the second factor: historical background of discrimination. This report focuses only on this factor as part of the assessment of intentional discrimination in Waller County's decision to adopt and maintain its November 2018 early plan.

Concerning Section 2's results test, as referenced above, this report considers one relevant Senate Factor discussed as part of the "totality of circumstances" in the United States Supreme Court case of *Thornburg v. Gingles*, 478 U.S. 30 (1986). I analyzed the following factor: the extent of any history of official discrimination in the state or political

subdivision (i.e., Waller County and Texas) that touched upon the rights of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.

### III.    Qualifications

This study draws on my extensive experience in political history, political analysis, and historical and statistical methodology. I am the Barbara Jordan Chair in Political Values and Ethics at the University of Texas at Austin's LBJ School of Public Affairs, where I serve as Founding Director of the Center for the Study of Race and Democracy, a research and policy-based center that explores the relationship between race and democracy in public policy through research, conferences, and symposia, and engages in civic and public conversations about a wide range of issues, including voting rights and the criminal justice system. I am also a Professor of History at the University of Texas at Austin. I have taught American history for over twenty years with an expertise on the Civil Rights Movement, social movements of the 1960s, race and the American presidency, and American and African American political history in the postwar era. I have taught courses on Civil Rights and Public Policy, American Race Relations, the African American Urban History, and Black Politics.

I have edited or written six books, the most recent of which will be published next year. I have been recognized by my peers as an elected member of the Society of American Historians and serve as a Distinguished Lecturer for the Organization of American Historians. I am a frequent national commentator on issues of race, civil rights, and democracy, whose work has appeared in both leading academic journals such as The Journal of American History, the American Historical Review, and the Journal of Urban

History, as well as The New York Times, The Washington Post, and The New Republic. I serve as a contributing opinion writer for CNN.com and have appeared frequently on National Public Radio, C-SPAN, MSNBC, CNN, and other outlets discussing contemporary race relations, social justice movements, and civil rights issues.

### IV. Historical Background of Waller County's 2018 Early Voting Decision

#### A. Historical Background of Voting Discrimination Against African Americans in the United States

The United States has a long, complex, and painful history with respect to guaranteeing voting rights to African Americans.[1] This history has been well-documented and judicially recognized.

During the period of racial slavery in the United States from 1789-1865, Black Americans were not considered citizens and did not enjoy voting rights. After the Civil War and the ratification of the 15th Amendment to the U.S. Constitution provided voting rights for Black men, southern states erected a series of laws, statutes, and codes, such as poll taxes, literacy tests, and other means, including extralegal violence, to effectively disfranchise Black voters. The promise of American Reconstruction between 1865-1877, where Black men gained the right to vote and were elected to local, statewide, and national office, gave way to the historical perils of the "Redeemer South," the continued rise of white supremacy, and the elimination of Black political power through the convict-lease system, sharecropping, and physical and economic reprisals that barred African Americans from voting. For a century after the Civil War, African Americans, the majority of whom resided in the south, as they do today, were systematically denied the right to vote. The loss of the vote effectively meant the end of citizenship rights for Black Americans, who,

---

[1] Throughout this report, I use the terms "African American" and "Black American" interchangeably.

without political power, were relegated to racially segregated and economically deprived communities, neighborhoods, towns, and parts of cities.[2]

The Modern Civil Rights Movement represents America's second Reconstruction, much of which occurred during the years between the May 17, 1954 *Brown v. Board of Education of Topeka, Kansas* U.S. Supreme Court decision that effectively outlawed state-sponsored racial segregation in public schools and collaterally other areas of public life, and August 6, 1965 when Congress passed voting rights legislation. The *Brown* decision came on the heels of the 1950 *Sweatt v. Painter* decision that integrated the University of Texas Law School. Heman Sweatt, who became the first African American student to enroll in the University of Texas Law School, grew up in a family that prized education. His father, James Leonard Sweatt Sr., was a graduate of Prairie View College.[3] Despite Sweatt's admission to the University of Texas, Black students faced a decades-long struggle for true equality and socio-political access that paralleled the circumstances that would be faced by PVAMU students in their pursuit of the vote.[4]

The passage of the 1965 Voting Rights Act (VRA) into federal law transformed the historic and contemporaneous era of Black disenfranchisement. The VRA facilitated the registration of millions of African Americans nation-wide, especially in the parts of the Deep South that constituted the old Confederacy. The VRA's most effective mechanism of enforcement proved, over time, to be Section 5, which covered parts or all of sixteen states, including Texas, with long histories of past voting rights discrimination, requiring

---

[2] Eric Foner, "Reconstruction: America's Unfinished Revolution 1863-1877" (New York: Harper & Row, 1989).
[3] Gregory J. Vincent, Virginia A. Cumberbatch, and Leslie A. Blair, eds., "As We Saw It: The Story of Integration at the University of Texas at Austin" (Austin: University of Texas Press, 2016), 10.
[4] Dwonna Goldstone, "Integrating the 40 Acres: The 50-Year Struggle for Racial Equality at the University of Texas" (Athens: University of Georgia Press, 2006).

them to receive federal approval before adopting electoral changes designed to dilute, restrict, or otherwise hamper minority voters.[5] During and through this time, Section 2 of the VRA also served as a tool for African Americans and other racial minority voters to challenge racially discriminatory voting laws.

Still, the VRA did not, ultimately, offer a permanent solution to voting rights for African Americans. The Supreme Court's 2013 *Shelby County, Alabama v. Holder* decision, which nullified Section 5 of the legislation, has since removed one of the core protections to racially disenfranchised voters. In the ensuing years since *Shelby*, voters continue to rely on Section 2 and other laws to challenge a new generation of efforts unleashed by states and local jurisdictions to limit, suppress, and disenfranchise African American voters, including changes to early voting opportunities (at issue in this case), polling places, and redistricting plans, as well as the enactment of restrictive ID laws.

### A. Historical Background of Voting Discrimination Against African Americans in Texas

The state of Texas' relationship with the Voting Rights Act remains historically star-crossed. For much of the 20th century, African Americans were denied the right to vote in Texas through the "white primary" system and subsequent policies that unconstitutionally excluded Black Americans from the franchise. This history has been well-documented and judicially recognized.[6]

Among many examples of Texas's history of racial discrimination in voting is the 1923 Terrell Law, passed by the legislature, that explicitly forbade African Americans from

---

[5] Ari Berman, "Give Us the Ballot: The Modern Struggle for Voting Rights in America" (New York: Picador, 2016), 7.
[6] E.g., *Veasey v. Perry*, 71 F. Supp. 3d 627, 633-637 (S.D. Tex. 2014) (summarizing Texas' history of using "various election devices to suppress minority voting from the early days of Texas through today").

participating in voting in the Democratic Primary at a time when Texas stood out as virtually a one-party state. The explicit notification that "in no event shall a Negro be eligible to participate in a Democratic primary" contest in Texas sparked protest from the NAACP, which spent the next two decades challenging what became known as the "white primary."[7] The NAACP filed suit against the Terrell Law the year after its passage, sparking a legal challenge that traveled all the way to the U.S. Supreme Court in 1927. In *Nixon vs. Herndon*, the Supreme Court ruled against the Terrell Act and the constitutionality of the white primary system, but more legal struggle lay ahead.[8]

Civil rights activists pressed on until 1944, when the Supreme Court's *Smith v. Allwright* decision began the process of eliminating the white primary once and for all.[9] Yet further obstacles, from poll taxes to violent intimidation in Texas and nationally, prevented Black citizens from being able to express the full measure of their voting rights. After the passage of the VRA in 1965, the state's poll tax was eliminated, but the legislature responded with an annual voter registration requirement that stood in place until 1971.

Texas state and local officials then played a shell game wherein they purposely erected new and innovative forms of voter suppression at the very instance when an old one managed to be removed.[10] The 1975 extension of the VRA, co-sponsored in the House of Representatives by former Texas Congresswoman Barbara Jordan, attached the preclearance requirement to Texas, since the state had adopted onerous rules on voter

---

[7] Darlene Clark Hine, William C. Hine, Stanley Harrold, "The African American Odyssey" (New Jersey: Prentice Hall, 2000), 433.

[8] Ibid., 399.

[9] Ibid., 433.

[10] Nina Perales, Luis Figueroa, and Criselda G. Rivas, "Voting Rights in Texas: 1982-2006," 721-722 (2008); *Veasey v. Perry*, 71 F. Supp. 3d 627 (S.D. Tex. 2014); Consent Order, *Prairie View Chapter of NAACP v. Kitzman*, No. 04-459 (S.D. Tex. Feb. 24, 2004), ECF No. 11; Consent Decree, *United States v. Waller City*, No. 4:08-cv-03022 (S.D. Tex. Oct. 17, 2008), ECF No. 8.

registration that disproportionately impacted Black voters and passed a series of redistricting efforts found to be in violation of the VRA by federal courts.[11] Representative Jordan began her political career as a voting rights activist in Harris County, a position that imbued in her an intimate ground-level view of both the importance of the vote and the many obstacles placed in the way of African Americans locally.[12]

Texas, especially after the passage of the VRA, sought to maintain white political power in elections through policy measures aimed at diminishing the Black vote. Between 1975 and 2006, the Department of Justice (DOJ or Justice Department) issued 201 objections to proposed Texas election changes under Section 5 of the VRA. Beginning in 1982, the DOJ successfully objected to proposed changes that would have impacted 30% of the state's 254 counties, comprising 71.8% of non-white voting age residents.[13]

Central to this story has been Texas's persistent recent attempts to enact discriminatory redistricting plans to maintain the political power of white Texans. A three-judge federal court recently found that "in every decade since 1970 Texas has passed one or more redistricting plans after the census that have been declared either unconstitutional or violations of the VRA."[14] What emerges from these efforts is a pattern of systematic voter discrimination efforts to dilute and discriminate against racial minorities in Texas. Indeed, federal courts have routinely found Texas' redistricting plans to violate statutory and constitutional limits on redistricting. *White v. Weiser*, 412 U.S. 783 (1973); *White v.*

---

[11] Expert Report of Orville Vernon Burton, "On Behalf of Plaintiff-Intervenors The Texas League of Young Voters Education Fund and Imani Clark," 15-16, *Veasey v. Perry* (obtained from: Plaintiffs' attorneys).

[12] Max Krochmal, "Blue Texas: The Making of a Multiracial Democratic Coalition in the Civil Rights Era" (Chapel Hill: University of North Carolina Press, 2016), 370-372.

[13] Nina Perales, Luis Figueroa, and Criselda G. Rivas, "Voting Rights in Texas: 1982-2006," 730 (2008).

[14] *Perez v. Perry*, No. SA-11-CV-360, 2017 WL 962686, at *177 (W.D. Tex. Mar. 10, 2017).

*Regester*, 412 U.S. 755 (1973); *McDaniel v. Sanchez*, 452 U.S. 130 (1981); *Terrazas v. Clements*, 537 F. Supp. 514 (N.D. Tex. 1982); *Upham v. Seamon*, 456 U.S. 37 (1982); *LULAC v. Perry*, 548 U. S. 399 (2006).

Most recently, following the 2010 Census, Texas failed to gain approval to enact state house and congressional redistricting plans under Section 5, requiring the State—with guidance from the U.S. Supreme Court in *Perry v. Perez*, 656 U.S. 388 (2012)—to implement remedial plans based on a three-judge federal courts' preliminary findings that those plans violated the U.S. Constitution and VRA.[15] Federal oversight and pre-enforcement review under Section 5 of the VRA were yet again necessary to prevent systemic racial discrimination in legislative and congressional redistricting plans created by the Texas Legislature.

Without federal oversight and comprehension protections, however, Texas repealed its 2011 plans and made modifications in 2013, which were never subject to pre-enforcement review following the *Shelby County v. Holder* invalidation of Section 4 of the VRA's coverage provision. Community members, therefore, bore the costly and time-consuming efforts to challenge Texas' next effort at racially discriminatory redistricting plans. On June 25, 2018, the U.S. Supreme Court affirmed a federal three-judge court's decision that the Texas Legislature intentionally discriminated by racially gerrymandering a Latino majority State House district in Fort Worth.[16]

Equally illustrative of the well-founded concerns about future discriminatory governmental action, the City of Pasadena, a local jurisdiction in Texas, is the only

---

[15] *Perez v. Perry*, No. SA-11-CV-360, 2012 WL 13124278, at *23 (W.D. Tex. Mar. 19, 2012); *id.* 250 F.Supp.3d 123 (W.D. Tex. 2017); *id.* 253 F.Supp.3d 864 (W.D. Tex. 2017); *Perez v. Abbott*, 138 S. Ct. 2305, 2317 & n.8 (2018).
[16] *Abbott v. Perez*, 138 S. Ct. 2305 (2018).

jurisdiction since *Shelby* to have been bailed into the Section 5 preclearance process by a court via the 2017 *Patino v. City of Pasadena* decision. The court found that Pasadena's "change from an eight single-member district map and plan to a six single-member district and two at-large position map and plan for electing its City Council dilutes the votes of Latinos" and violated section 2 of the VRA and the Fourteenth Amendment to the Constitution.[17] The court's remedy placed Pasadena under a six-year preclearance review, until 2023, to protect Latino voters and prevent the city from intentionally diluting their voting power.

## B. Historical Background of Voting Discrimination Against African Americans in Waller County, Texas

Waller County, Texas offers perhaps the most troubling and illuminating case study of the extensive and ongoing efforts by local officials to curtail, suppress, and disenfranchise Black voters. Simply put, Waller County is the most difficult county in Texas for African American college students to vote. This is not by accident. Waller County is home to the majority-Black city of Prairie View and the state's oldest historically Black university, PVAMU.

The city of Prairie View stands on parts of the former Alta Vista slave plantation operated by Colonel Jared Ellison Kirby, a direct descendent of Jared Ellison Groce, one of the original 300 settlers in the state alongside Stephen F. Austin. Founded by an act of the state legislature on August 14, 1876, PVAMU enrolled its inaugural class of eight Black students two years later.[18] Over the course of the next 75 years, Waller County would be

---

[17] *Patino v. City of Pasadena*, No. CV H-14-3241, 2017 WL 10242075, at *1 (S.D. Tex. Jan. 16, 2017).
[18] Frank D. Jackson, A Brief History of the City of Prairie View, Texas, 14-20.

the site of among the highest numbers of lynchings of all of the counties in the State of Texas.[19]

Today, Waller County continues to make national headlines for divisive racial politics connected to race, democracy, and citizenship. As of 2007, the City of Hempstead in Waller County still had separate cemeteries for Black and white residents—and, according to plaintiffs in a federal lawsuit, the city neglected the upkeep of the historically Black cemeteries.[20]

The 2015 death of Sandra Bland, a PVAMU alumna who was pulled over and incarcerated after a routine traffic stop turned combative, has made Waller County synonymous with racial intolerance and has associated it with some of the worst chapters of the nation's history.[21] Waller County's deeply entrenched history of racial division provides the context for Bland's death.[22] Sheriff Glenn Smith, who was the highest law enforcement officer in Waller County at the time of Bland's death, was elected to his post as sheriff in Waller County after being fired from his position as police chief in the City of Hempstead, following accusations that he was racially prejudiced and engaged in police brutality against Black residents, including children.[23] For example, Smith was accused of

---

[19] Equal Justice Initiative, "Lynching in America: Confronting the Legacy of Racial Terror" (3d Ed., 2017) (retrieved from: https://lynchinginamerica.eji.org/report/).

[20] Tom Dart, "The Texas county where Sandra Bland died: there's 'racism from cradle to grave,'" *The Guardian*, July 17, 2015 (retrieved from: https://www.theguardian.com/us-news/2015/jul/17/sandra-bland-alleged-suicide-waller-county-texas-racism).

[21] "The Interview: Frank Jackson," *The Texas Observer*, June 20, 2016 (retrieved from: https://www.texasobserver.org/prairie-view-mayor-frank-jackson-interview/).

[22] Natasha Korgaonkar, "Sleepy county's history of discrimination," *CNN.com*, August 4, 2015 (retrieved from: https://edition.cnn.com/2015/08/03/opinions/korgaonkar-waller-county-history/index.html); "Texas County's Racial Past Is Seen as Prelude to Sandra Bland's Death," *The New York Times*, July 27, 2015, 1, 12 (retrieved from: https://www.nytimes.com/2015/07/27/us/racial-divide-persists-in-texas-county-where-sandra-bland-died.html).

[23] Helen Eriksen, "Hempstead police chief disciplined in racially charged arrest," *Houston Chronicle*, February 21, 2007 (retrieved from: https://www.chron.com/news/houston-texas/article/Hempstead-police-chief-disciplined-in-racially-1794136.php).

humiliating and mistreating a group of young black men by conducting a strip search during a drug raid that yielded no evidence, among a number of other accusations. Despite these allegations of racial discrimination and police brutality, the majority of voters in Waller County embraced Smith and elected him sheriff in 2008 and 2012. Just a year after Sandra Bland died in jail under Smith's tenure as sheriff, Waller County voters turned out in high numbers to re-elect Smith in 2016. He won with 65 percent of the vote.[24] He remains sheriff to this day.

In the face of this ongoing history, PVAMU is a vibrant engine of economic opportunity, democracy, and citizenship for the State of Texas, serving a diverse group of predominantly African American students, faculty, and staff with a commitment to racial equality, justice, and opportunity through higher education. Yet still, or perhaps because of this success, PVAMU students continue to face illegal barriers to voting in Waller County.[25] Since 1971, when the passage of the Twenty-Sixth Amendment lowered the voting age to 18, Waller County has viewed Black voters as a threat to the racial status quo and sought to marginalize the political power of African American residents through the use of racially discriminatory voter suppression policies.

Between 1971 and 1979, African American students at PVAMU launched a successful legal challenge to stave off pernicious residency requirements designed to prevent them from voting if they could not prove they planned to reside in the county after

---

[24] Neena Satija and Nicole Cobler, "In county where Sandra Bland died, sheriff is re-elected," *Texas Tribune*, November 9, 2016 (retrieved from: https://www.texastribune.org/2016/11/09/waller-county-sheriffs-race/).

[25] Katherine Haenschen, "Black Students Facing Barriers to Voting in the County Where Sandra Bland Died," *Burnt Orange Report*, January 22, 2016 (retrieved from: http://www.burntorangereport.com/diary/31700/black-students-facing-barriers-to-voting-in-the-county-where-sandra-bland-died).

graduation. Paul Ragsdale, a Black state representative from Dallas, sounded the alarm during the mid-1970s, publicly calling on Secretary of State Mark White to halt the practices of Waller County officials denying PVAMU students the right to register to vote.[26] Texas State Senator Paul B. Ragsdale, one of the first Black Americans elected to state legislature in the twentieth century, emerged as an outspoken proponent for Texas to be covered under the VRA in 1975. "This state's record in the field of voting rights," noted the state representative, "has been dismal." He identified PVAMU undergraduates as "the only students in Texas who are not allowed to register to vote where they attend school."[27] As the only majority Black county in the state at that time, the denial of PVAMU students' voting rights represented a clear violation of the spirit and letter of the VRA. In 1975, as the U.S. Congress debated extending the VRA to include Texas, PVAMU students actively protested for the right to be recognized as legal residents who could be registered to vote.[28] As Ragsdale and other activists took pains to point out, PVAMU students were being denied the right to vote out of fear from predominantly white Waller County officials that their votes could reorganize the county's balance of power in a way that resulted in a vast increase of Black political power.[29] The fear of Black power in Waller County drove local officials, with the support of state elected officials, to consistently deploy policy and bureaucratic measures designed to stifle, diminish, and suppress Black voter access, participation, and turnout.

Barbara Jordan, the first Black woman elected to the House of Representatives from the South in American history in 1972, testified at Congressional hearings to extend the

---

[26] "Black students denied voting rights in Texas," *Atlanta Daily World*, April 20, 1974, 10.
[27] "Black legislator urges voting act," *The Austin American Statesman*, July 8, 1975, 33.
[28] "Labor Group urges extension of voting act," *The Austin American Statesman*, July 22, 1975, 6.
[29] Paul Ragsdale letter to the editor, *The Austin American Statesman*, August 8, 1975, 5.

VRA in 1975, a bill she co-sponsored. "The same discriminatory practices which moved the Congress to pass the Voting Rights Act in 1965, and renew it in 1970, are practiced in Texas today."[30] Representative Jordan introduced legislation, passed in 1975 during the VRA extension, that offered language minorities bilingual election materials and triggered the state of Texas' coverage under Section 5, since less than 50% of eligible voters had been registered or voted as of the 1972 election.[31] Texas became covered by Section 5 with most of its elected officials kicking and screaming in opposition to a measure designed to broaden democracy but which they saw as a possible threat to their entrenched political power.[32]

PVAMU students were unable, even after the passage of the VRA, to vote in the 1972 presidential elections, the 1974 midterm elections, and the bicentennial election of 1976. This would, unfortunately, prove to be just the tip of the proverbial iceberg. In Waller County, these practices would continue, grow, and evolve with a vengeance over the next several decades.

The inclusion of Texas into the reauthorized VRA offered political leverage for Black Texans and other racial minorities historically excluded from voting in the state. Throughout the 1970s, legal challenges on behalf of PVAMU students failed to allow them to vote in local and national elections. In 1976, after filling out a questionnaire not required by students attending the predominantly white University of Texas campus, only 27 out of 738 PVAMU students were allowed to register to vote, thus effectively denying students the opportunity to vote in a presidential election year. Despite the Justice Department's

---

[30] Ari Berman, "Give Us the Ballot: The Modern Struggle for Voting Rights in America" (New York: Picador, 2016), 109.
[31] Ibid., 108.
[32] Ibid., 110.

efforts to gain a temporary restraining order prohibiting the use of the questionnaire, a three-panel federal court panel denied the DOJ's request.[33]

Even after the U.S. Supreme Court upheld students' voting rights in a 1979 decision,[34] nineteen PVAMU students faced prosecution from local officials in 1992 for "illegally voting."[35] Such charges were only dropped after intervention by the U.S. Justice Department[36] and an organized effort by PVAMU students and local civil rights activists. That same year, State Representative Rodney Ellis, who is Black, penned an opinion essay in the New York Times documenting the long struggle for racial justice organized by PVAMU students. Representative Ellis's essay, "Jim Crow Goes to College," offered a capsule history of the myriad ways Waller County officials weaponized electoral policies against Black students at PVAMU.

When one policy effort to neutralize Black voting power failed, another quickly replaced it. After PVAMU students were allowed to register as voters, statewide redistricting efforts carved students into various precincts in an effort to dilute their voting power. By 1990, with the aid of DOJ intervention, PVAMU students were represented in one precinct—and, two years later, when two students ran for local office, the county unleashed a spate of indictments, fourteen of which targeted PVAMU students. Representative Ellis, while condemning the racist practices of Waller County officials, compared the students under indictment to some of the icons of the civil rights movement. "I told them the indictments were nothing to be ashamed of, just as Rosa Parks and the

---

[33] "Voter registration bias upheld by court in Texas," *Atlanta Daily World*, November 12, 1976, 9; "U.S. court bars challenge to bias in Texas vote rule," *Atlanta Daily World*, March 29, 1977, 5.
[34] *Symm v. United States*, 439 U.S. 1105 (1979).
[35] Expert Report of Orville Vernon Burton, "On Behalf of Plaintiff-Intervenors The Texas League of Young Voters Education Fund and Imani Clark," 17 (retrieved from Plaintiffs' attorneys).
[36] Ibid.

Rev. Martin Luther King Jr. had nothing to be ashamed of in their legal battles for justice."[37]

If Waller County's history of voting rights, race, and democracy ended in 1992, the same year as the Los Angeles riots in response to the Rodney King verdict, we could examine the county as an unusual outlier in the story of civil rights in America, a place where Black citizenship and racial equality took perhaps an extra quarter of a century to be achieved from the usual historical markers we celebrate. Unfortunately, this has been far from the case. In fact, judged by Waller County's history, the past two decades have seen an increase, rather than a diminution, of coordinated, intense, and sophisticated efforts to disenfranchise African American students at PVAMU. Over the past two decades and continuing to the present, Waller County's efforts to disenfranchise Black voters have evolved from blatant discriminatory policies to quieter but still lethal voter suppression tactics.[38]

Waller County officials continued to practice a policy of voter intimidation directed against PVAMU students into the 21st century. In 2002, the DOJ objected to a redistricting plan proposed by Waller County officials, citing census data and statistical analyses to demonstrate how the plan seemed purposefully designed to undermine the effectiveness of racial minority voters. "Within the context of electoral behavior in Waller County," stated the DOJ, "the county has not established that implementation of this plan will not result in a retrogression in the ability of minority voters to effectively exercise their electoral

---

[37] Rodney Ellis, "Jim Crow Goes to College," *The New York Times*, April 27, 1992 (retrieved from: https://www.nytimes.com/1992/04/27/opinion/jim-crow-goes-to-college.html).
[38] Carol Anderson, "One Person, No Vote: How Voter Suppression is Destroying Our Democracy" (New York: Bloomsbury Press, 2018).

franchise."[39] Waller County elected officials have, over the course of the new century, sought to enact a series of proposals designed to disenfranchise the predominantly Black voting base made up largely of PVAMU students. The DOJ objection in 2002 successfully thwarted these efforts, but these proposals still serve as evidence of a systematic pattern of voter suppression targeting Black voters in Waller County. Unfortunately, generations of PVAMU students, alumni, and local Black citizens have come to understand the battle to exercise fundamental citizenship rights through the vote as a most disturbing rite of passage that echoes the political struggles waged by African Americans during the Civil Rights Movement's heroic period.

Former Prairie View Mayor and PVAMU alumnus Frank Jackson exemplifies the long history of Black voters in Waller County fighting to exercise the franchise. From his early days as an undergraduate student from 1969-1973, to his efforts on the City Council in the 1990s, and through a fourteen-year stint as mayor, Jackson led community-wide efforts to protect and expand voting rights and equal opportunity for African Americans in Waller County.[40] "Each time the district attorney, the election administrator, would come up with some way to block these kids," explains Jackson, "we would speak up and say, 'No, we're training citizens for the world.' Voting rights is part of that."[41]

In 2003, Waller County District Attorney Oliver Kitzman publicly threatened to prosecute PVAMU students who did not meet his definition of being residents. This threat ran counter to settled law from the Supreme Court's 1979 decision and prompted PVAMU

[39] Nina Perales, Luis Figueroa, and Criselda G. Rivas, "Voting Rights in Texas: 1982-2006," 721-733 (2008).
[40] "The Interview: Frank Jackson," *The Texas Observer*, June 20, 2016 (retrieved from: https://www.texasobserver.org/prairie-view-mayor-frank-jackson-interview/).
[41] Ibid.

students to sue Waller County to prevent the district attorney from making such threats and to file a second lawsuit in Houston federal court to block county officials from restricting early voting days.[42] DA Kitzman's efforts were particularly chilling to PVAMU students' political participation since they came on the heels of an announcement by two PVAMU students that they intended to run for county office at a time where students made up 20% of the voting age population. DA Kitzman's tactics, which some in the community had identified as "crude intimidation techniques," represented an updating of historic and racially discriminatory efforts to bar African Americans from voting.[43] These methods tapped into a long and ugly racial history in Waller County and the larger state of Texas that found white elected officials utilizing overt and covert tactics of harassment, threats, and intimidation to block Black citizens from even attempting to register to vote.

Black Texas Congressional Representatives Sheila Jackson Lee and Eddie Bernice Johnson, alongside Congressional Black Caucus Chair Representative Elijah Cummings of Florida, sounded the alarm about events in Waller County in a letter to Attorney General John Ashcroft on December 30, 2003. "Considering that the tradition of Prairie View student involvement in local elections withstood a challenge in Federal Court nearly 25 years ago," they wrote, "we are particularly concerned that this hostile action is being directed at the student body in order to undermine their voting rights."[44] Yolanda Smith,

[42] "Prairie View students file another voting rights suit," *My Plainview*, February 16, 2004 (retrieved from: https://www.myplainview.com/news/article/Prairie-View-students-file-another-voting-rights-8814873.php).
[43] Julia Craven, "6 Things You Should Know About The County Where Sandra Bland Died," *Huffington Post*, July 21, 2015 (retrieved from: https://www.huffpost.com/entry/sandra-bland-waller-county-texas_n_55ae7aa6e4b0a9b948529e30?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAAhBgXOBlgG8NsOncPqlfElJGnIakX2zrqqrp5jTkzG3iFPZ9d9rZs0V-tQiTyf9lZUW7C0-hdgdbIe9RTXWO8CJbslUopNi34AmQLryT4kWzHmUszuB-7wNyZPK1QvhTcwxpNbmT-1W37lx9vmiFiR3Cy1NLFulyfFTrnz03i-e).
[44] "U.S. Department of Justice called to intervene on behalf of the Prairie View A&M University Student Body," *Westside Gazette*, January 14, 2004, 6.

then executive director of the Houston NAACP, likened the situation in Prairie View to past struggles for racial justice and voting rights. "It's a situation very reminiscent of the '60s that unfortunately we're having to deal with in 2004."[45]

Although the Attorney General blocked DA Kitzman's actions, 5,000 PVAMU students organized a powerful rally in support of voting rights on Martin Luther King Day in 2004 and four students sued DA Kitzman, fearing that he might still prosecute them for voting.[46] The efforts at voter suppression backfired in the immediate instance, as Waller County received 2,000 new voter applications after DA Kitzman's threats.[47] The threats also energized the local Prairie View chapter of the NAACP, which helped to organize students seeking to register to vote and become more aware of the responsibilities and joys of civic activism.[48]

After the lawsuit brought by PVAMU students and the NAACP, and statements in support of students' voting rights by Texas Attorney General Gregg Abbott, DA Kitzman backed down. However, county officials still attempted to thwart Black voting power by dramatically reducing early voting access—the subject of this lawsuit— from 17 hours to 6 hours during a primary election that was scheduled to take place during PVAMU's spring break. These actions prompted a second lawsuit and more protests just one month before the primary election. Officials sought to enact these changes without seeking preclearance under Section 5, which caused further anxiety and outrage, eventually resulting in a

[45] "D.A. Challenge of Student Voters Is a Civil Rights Lesson," *Los Angeles Times*, February 15, 2004, 37 (retrieved from: https://www.latimes.com/archives/la-xpm-2004-feb-15-na-prairie15-story.html).
[46] "Prairie View A&M Students Lead Charge Against Voter Suppression and Intimidation," *Los Angeles Sentinel*, Sep. 30-Oct. 26, 2004, 3.
[47] "Attorney General Settles Voting Rights Flap at Prairie View A&M," *Black Issues in Higher Education*, March 11, 2004, 9.
[48] "Prairie View Branch Makes Right to Vote a Priority," *The Crisis*, November/December 2004, 55.

restoration of early voting and a narrow electoral victory by one of the PVAMU students running for election to the County Commission.[49] This instance, just one of many efforts to prevent PVAMU students from exercising their voting rights, underscores Waller County's active and ongoing efforts to suppress voting by Black PVAMU students who make up 20% of voting age residents in the county.

In the summer of 2004,Kitzman announced his plans to resign from his office as district attorney. Black community leaders embraced this decision, characterizing DA Kitzman as a "symbol of deep-seated racism" and his time in office as a "reign of terror" that targeted the African American community for abuse, humiliation, and harassment.[50] In response, Kitzman's office identified the disproportionate number of Black residents who received charges, warrants, and indictments against them as civil rights agitators. Black Waller County Judge DeWayne Charleston faced a series of ethics charges that he claimed were designed to intimidate him. "The objective is not to get a conviction," claimed Charleston. "The objective is to hit you in your wallet, to discredit you, to disenfranchise you."[51]

During 2004, a presidential election year, Waller County once again made national news as a symbol of anti-Black racism, voter suppression, and the face of the new Jim Crow in American democracy. "The Long Shadow of Jim Crow," a report on voter intimidation published by the NAACP and People For the American Way, cited Waller

---

[49] Nina Perales, Luis Figueroa, and Criselda G. Rivas, "Voting Rights in Texas: 1982-2006," 721-742-743 (2008); "Weil, Gotshal & Manges achieves pro bono victory in students' civil rights case at historically African-American Texas university," PR Newswire, March 2012).

[50] "In Texas County, Blacks Breathe Easier," *Los Angeles Times*, September 5, 2004, 20 (retrieved from: https://www.latimes.com/archives/la-xpm-2004-sep-05-na-waller5-story.html).

[51] "In Texas County, Blacks Breathe Easier," *Los Angeles Times*, September 5, 2004. 20 (retrieved from: https://www.latimes.com/archives/la-xpm-2004-sep-05-na-waller5-story.html).

County as an example of the vital necessity of rigorous enforcement and protections of voting rights through the continued support and expansion of the VRA.[52] *The Crisis Magazine*, the official publication of the NAACP, cited Waller County as a threat to voting rights nationally.[53] Civil rights activist Jesse Jackson, in an op-ed on "Jim Crow Revival," pointed to Waller County as an example of the resurgence of racist tactics thought to have ended with the 1960s.[54] Julian Bond, former Georgia state representative and Chairman of the NAACP Board of Directors, similarly cited Waller County as part of a wide-scale attempt across the nation to curtail voting rights for African Americans.[55] In 2005, as portions of the VRA were set to expire in two years, Georgia Congressman, March On Washington speaker, and Bloody Sunday survivor, John Lewis, wrote about the importance of Section 5 as a protector of voting rights in the present. Lewis also wrote about Waller County's history of trying to prevent Black PVAMU students from voting.[56]

In short, by the early 2000s, Waller County became a focal point in a national conversation about the evolution and continuation of voting rights abuses in the state of Texas and the city of Prairie View and the campus of PVAMU. Numerous civil rights activists, elected officials, journalists, lawyers, policy experts, and PVAMU students documented systemic and illegal patterns of harassment, voter intimidation, and deliberate efforts to preclude African Americans from voting in Waller County.

---

[52] NAACP and People For the American Way, "The Long Shadow of Jim Crow: Voter Intimidation and Suppression in America Today" (2004), 6.
[53] *The Crisis*, Sep/Oct 2004, 15; Damien Cave, "Mock the Vote," *Rolling Stone,* (May 27, 2004), 47-48 (retrieved from: https://www.rollingstone.com/politics/politics-news/mock-the-vote-178939/); Mathis, G., "Voter suppression efforts must end," *Call & Post* (October 2004).
[54] Jesse L. Jackson, "Jim Crow Revival," *Los Angeles Sentinel*, October 7, 2004, 6.
[55] Julian Bond, "Georgia's Fraudulent Anti-Fraud Legislation," *Washington Informer*, November 24, 2005, 20, 32, 39.
[56] John L. Lewis, "The Voting Rights Act: Ensuring Dignity and Democracy," Human Rights, Vol. 32, Iss, 2 (Spring 2005), 2-3, 7.

Even against the backdrop of vigorously enforced Section 5 preclearance, Waller County officials routinely attempted to threaten, harass, and intimidate Black students from voting, creating an environment where PVAMU students felt unable to fully and freely enjoy their democratic and constitutional rights as citizens. Rather than encouraging, welcoming, and nurturing the civic and electoral participation and contributions of PVAMU students, Waller County officials engaged in a campaign of legal, verbal, and political bullying designed to effectively suppress Black student turnout, interest, and participation in the political process. When that failed, officials fell back on calculated efforts to block voter access by ensuring that PVAMU students would be underserved and underrepresented at the polls. Discrimination by Waller County officials ran the gamut from verbal threats of prosecution against student residents able to vote as a matter of settled law to deliberate attempts to end early voter access by PVAMU students and in the process nullify local Black electoral power and clout.

By the next presidential election cycle in 2008, the first election to feature a major Black candidate in Barack Obama, PVAMU students were forced to organize a demonstration of 1,000 students to protest county officials' plan to cut the number of early voting locations—again the subject of this lawsuit—down from six to one. The plan left the county courthouse as the sole polling place, which would have required students who lacked access to a motor vehicle to travel as many as 30 miles away to vote. Under intense pressure from PVAMU students, local civil rights leaders, and local elected officials,

including then Prairie View Mayor Frank Jackson, county officials reversed course and opened three extra polling venues, with one located a mile from campus.[57]

In 2008, Judge DeWayne Charleston, a Black justice of the peace and voting rights activist, led efforts to prevent Waller County officials from reducing early voting and polling locations. Charleston also alleged that county officials refused to allow hundreds of local residents, many of whom he personally registered, to vote in the 2006 elections. By this time, then-Attorney General and now Governor Abbott, who supported PVAMU students' right to vote in 2004, became viewed as a staunch opponent of PVAMU students' voting rights. Attorney General Abbott found himself listed as a defendant in a voting rights suit filed in 2006[58] that sought to protect voting rights activists from harassment and intimidation from anti-voting fraud groups that specifically targeted Black voters and those trying to help them register and vote.[59] The Prairie View Polling Station found more than 700 votes challenged and many voter registration cards unprocessed in the Election Office after Election Day, resulting in a joint U.S. DOJ and Texas Attorney General investigation.[60] "The cold war's not over," said Charleston, "they just moved the fence

---

[57] "The Walk of Political Engagement at PVAMU," *1876* (March 31, 2017) (retrieved from: https://www.pvamu.edu/1876/2017/03/31/the-walk-of-political-engagement-at-pvamu/); Elizabeth Summers, "One Texas School's Long Walk of Political Engagement," *PBS.org* (November 5, 2012) (retrieved from: https://www.pbs.org/newshour/politics/picture-this-more-than-1000).

[58] In 2006, Waller County was listed as one of the eleven most difficult places to vote by a national periodical. Sasha Abramsky, "Just Try Voting Here: 11 of America's Worst Places to Cast a Ballot (or Try)," *Mother Jones* (September/October 2006), 55 (retrieved from: https://www.motherjones.com/politics/2006/09/just-try-voting-here-11-americas-worst-places-cast-ballot-or-try/).

[59] Ronald D. Server, "Prairie View A&M Students Walk the Walk of Political Engagement," *Washington Peer Review* Vol. 10, Iss. 2/3 (Spring 2008), 25-27 (retrieved from: https://www.aacu.org/publications-research/periodicals/prairie-view-am-students-walk-walk-political-engagement).

[60] Ibid., 25-27.

from Berlin to the Texas border."[61] Over one thousand PVAMU students holding signs and banners declaring "We Shall Overcome" and "No Justice, No Peace" marched in front of the Waller County Courthouse in February 2008 to demonstrate against efforts to curtail early voting access yet again. Under pressure from the Black community, Waller County officials agreed to open three more polling locations, with the nearest one located one mile off campus.

On October 10, 2008, the DOJ announced a consent decree with Waller County officials who agreed to halt "implementation of the unprecleared registration practices, reprocess those applications which were wrongly rejected and initiate voter registration programs" at PVAMU.[62] In accordance with the consent decree, Waller County agreed to halt changes in voter registration practices that they had begun to implement without DOJ approval. Specific changes to the county's volunteer deputy registration program, notice requirements, and standard for accepting voter registration applicants were now halted. As part of the agreement, Waller County also agreed to reprocess applications from Black residents that had been improperly rejected and implement voting registration programs at PVAMU.[63]

Despite the consent decree, in 2008, the DOJ designated Waller County as one of the sites across twenty three states to receive elector monitoring by the Civil Rights Division, one of 55 elections that would be closely watched by 415 federal observers.[64]

---

[61] "2 Voter Rights Cases, One Gripping a College Town, Stir Texas," The New York Times, May 28, 2008, 15 (retrieved from: https://www.nytimes.com/2008/05/28/us/28texas.html).
[62] Justice Department Announces Agreement with Waller County, Texas to Remedy Alleged Violations of Voting Rights Statutes, October 10, 2008 (retrieved from: https://www.justice.gov/archive/opa/pr/2008/October/08-crt-917.html).
[63] Ibid.
[64] "Department of Justice to Monitor Polls in 23 States Across the Nation on Election Day," Department of Justice Documents, October 30, 2008.

Waller County's place on that list in a year where America elected its first Black president in Barack Obama attested to the complex relationship between racial progress and racial injustice in the post-civil rights landscape.

What is truly extraordinary about this history and ongoing record of voter suppression, intimidation, and disenfranchisement in Waller County is its stubborn persistence. Voter suppression tactics directed against PVAMU students became so egregious as to earn a place yet again in the unfolding national dialogue on renewed assaults on Black voting rights.[65] When the VRA was reauthorized in 2007, Texas stood as the second worst offender, just behind the state of Mississippi, with 105 DOJ challenges to discriminatory voter changes.[66] Despite clear evidence of progress thanks to the increased numbers of Black elected officials at the local, state, and national levels, legislative efforts aimed at blocking the voting rights of African Americans and other racial minorities continued.

On this score, several PVAMU students and other individuals and organizations intervened in a suit in 2012 to challenge Texas's voter ID law, which disallowed them from using student identification to vote. PVAMU students represented a handful of the estimated 600,000-800,000 registered voters and approximately one million eligible voters in Texas who lacked one of Texas's required government-issued IDs under the law. Attorney General Eric Holder disavowed the Texas voter ID law as unconstitutional and

---

[65] "How America Doesn't Vote," *The New York Times*, February 15, 2004, 10 (retrieved from: https://www.nytimes.com/2004/02/15/opinion/how-america-doesn-t-vote.html); "Barriers to Student Voting," *The New York Times*, September 28, 2004, 24 (retrieved from: https://www.nytimes.com/2004/09/28/opinion/barriers-to-student-voting.html); Bob Herbert, "Protect the Vote," *The New York Times*, September 13, 2004, 23 (retrieved from: https://www.nytimes.com/2004/09/13/opinion/protect-the-vote.html).
[66] Ari Berman, "Give Us the Ballot: The Modern Struggle for Voting Rights in America" (New York: Picador, 2016), 242.

discriminatory during a December 2011 appearance at the Lyndon Baines Johnson School of Public Affairs at the University of Texas in Austin. Texas' interest in strict voter ID laws served to target its increasingly diverse electorate of Black and Hispanic voters by making it harder for them to vote. By accepting gun licenses over student identifications, conservative legislators intended to limit the rising political influence of Black and brown voters, including students, in the state. They sought to hide their discriminatory actions by spreading false and unsubstantiated rumors of non-existent and widespread voter fraud as a pretext for new ID laws that would effectively muffle voters of color.[67]

A district court in Washington ruled in 2012 that Texas's voter ID law discriminated against Black and Latinx voters under Section 5 of the VRA, a provision which was immobilized the next year, thus allowing voter ID, in addition to polling access, discussed throughout this report, to be the latest tool to be used by local and state officials in the ever-expanding arsenal of voter disenfranchisement. Texas officials embraced this new barrier that impacted PVAMU students' access to voting. Where some Texas students could vote in 2012 with a college ID, in subsequent elections they proved unable to do so.[68]

PVAMU students and others continued to challenge Texas' strict voter ID law through trial in 2014, after which a federal court found that the law had a discriminatory impact on Black and Hispanic voters in Texas and was enacted for that purpose. Subsequent appellate court decisions upheld that the law had a discriminatory impact on Black Texans. PVAMU students' advocacy for their voting rights once again cast a searchlight on the politics of racial injustice in Waller County, showing again how the right

---

[67] Ibid. 254-260, 265-267.
[68] Ibid., 266-267.

to vote had been weaponized against African Americans and other racial and ethnic groups in Texas.[69]

In 2016, a full panel of judges of the Fifth Circuit Court of Appeals affirmed the Texas district court's ruling that the Texas voter ID law was racially discriminatory. The *en banc* federal appellate court observed that the restrictive voter ID bill was passed "'in the wake of a "seismic demographic shift,' as minority populations rapidly increased in Texas, such that . . . the party currently in power [wa]s 'facing a declining voter base and c[ould] gain partisan advantage' through a strict voter ID law."[70] The historical background of this demographic shift and the state's response to it provided credible evidence that discriminatory intent motivated the voter ID law.

An analogous demographic shift underlies this case. As documented in the declaration of Plaintiffs' expert, William S. Cooper, the proportion of Waller County's citizen voting-age population (CVAP) that consists of Black citizens of voting age has increased by more than two percentage points since the 2010 Census, while the non-Hispanic white or "Anglo" proportion of Waller County's CVAP has decreased by more than two percentage points.[71] Waller County officials appear to have responded to this increase in Black residents' relative voting strength in much the same way that Texas officials responded to the "seismic demographic shift" noted by the Fifth Circuit, and in much the same way that County officials responded to growing Black voting strength in the 1970s, after the ratification of the Twenty-Sixth Amendment—by seeking to make it more difficult for Black voters to access and exercise the franchise.

---

[69] "2 Sides Cite Discrimination as Battle on Texas Voting Law Heads to Court," *The New York Times*, September 2, 2014, 9, 13.
[70] *Veasey v. Abbott*, 830 F.3d 216, 241 (5th Cir. 2016) (en banc).
[71] Bill Cooper's report has been provided to me by Plaintiffs' attorneys.

In 2013, in the aftermath of the Supreme Court's *Shelby* decision, Vermont Senator Patrick Leahy narrated aspects of Waller County's brutal racial history into the congressional record. Leahy cited Waller County as a prime example of the long road to freedom that lay ahead for the nation even as commemoration of the 50th anniversary of the history March On Washington took place. "If you did not know the long and tortured history of the schemes to block Prairie View A&M voters from their constitutionally protected rights, *moving a polling place may seem like merely a matter of administrative convenience, but in voting, both history and context matter,*" observed Leahy. "The Prairie View A&M story illustrates that sometimes discrimination starts early, and that some officials are surprisingly persistent in their efforts to erect barriers in the path of our youngest voters."[72] PVAMU student have waged, like the mythological Sisyphus, an uphill and seemingly endless struggle to raise the boulder of voter suppression off their shoulders and high up on a hill only to have this stone roll back downhill, blocking their path to full and free citizenship.

That same year PVAMU students achieved a great victory in their long fight for voting rights when the Waller County Commissioners Court approved a polling site on campus at the Memorial Student Center—a focal point of this lawsuit. Priscilla Barbour, PVAMU Student Government President, expressed conflicting feelings upon hearing the news, a decision her letter to the election commissioners helped to precipitate. "I didn't

---

[72] Statement of Senator Patrick Leahy (D-Vt.), Chairman, Senate Judiciary Committee, On Commemorating the 1963 16th Street Church Bombing in Birmingham, Congressional Documents and Publications, September 10, 2013 (emphasis added) (retrieved from: https://www.leahy.senate.gov/press/statement-of-senator-patrick-leahy-d-vt-chairman-senate-judiciary-committee-on-commemorating-the-16th-street-church-bombing-in-birmingham-september-10-2013).

know if I wanted to jump up for joy or cry," said Barbour. "This has been a long journey."[73] One that continues until this day. Despite PVAMU students representing 8,300 of the county's 43,205 residents, the school did not achieve an on-campus polling location until 2013.[74] This victory proved bittersweet. As PVAMU President George C. Wright stated: "I found it a little frustrating though, that our students have had to work so long on something like this." [75] What Senator Leahy called the "Prairie View A&M disenfranchisement playbook"[76] continues.

Having won an on-campus voting site in 2013, PVAMU students continue to battle to have opportunities to use that on-campus site. In 2016, PVAMU students protested so that county officials would not remove the on-campus polling site recently won. Waller County officials were considering a new plan that would require PVAMU students to vote either at the County Courthouse in Hempstead, located five miles from the school with no public transit access, or in Brookshire, twenty-five miles away. The end of the VRA's preclearance process in 2013 made it more difficult to protect Black student voters at PVAMU from proposed changes like these. But with the help of local voting rights attorneys and election reform experts, students were able to persuade officials that the county's primary plan, which called for reducing the number of early polling places from 8 to 2 and eliminating the hard-won polling site on-campus, would potentially expose it to

---

[73] Renee C. Lee, "Prairie View students will finally be able to vote on campus," *My San Antonio*, September 25, 2013 (retrieved from: https://www.mysanantonio.com/news/politics/article/Prairie-View-students-will-finally-be-able-to-4843888.php).
[74] Ibid.
[75] Reeve Hamilton, "A Polling Place of Their Own: Students Win a Long Battle," *The New York Times*, September 28, 2013 (retrieved from: https://www.nytimes.com/2013/09/29/us/a-polling-place-of-their-own-students-win-a-long-battle.html?_r=0).
[76] Ibid.

another lawsuit under Section 2 of the VRA or other laws because the proposed change threatened to deny voting rights "on account of race or color."[77]

On October 10, 2018, Jacob Aronowitz, a field director for the congressional campaign of candidate Mike Siegel, was arrested in Waller County after delivering a letter to County Judge Carbett Duhon and Elections Administrator Christy Eason. Aronowitz's letter demanded that the county allow thousands of students, whose local PVAMU addresses were being questioned by authorities, to vote. PVAMU student addresses continue to be a source of controversy, since the university does not offer them the opportunity for individual addresses. School officials instead offered them the use of two different addresses for voter registration, one of which turned out to be considered outside of the campus voting precinct.[78] After Eason claimed that students would be required to fill out change of address forms before the November election to have their votes counted, Aronowitz delivered his protest letter and took a picture of the clerk as proof of delivery. He was promptly arrested for his efforts. The arrest made national news and offered the latest shameful display of Waller County's resistance to the citizenship rights of PVAMU students.

On October 12, 2018, Representative Sheila Jackson Lee, then senior member of the House Committees on Judiciary, Homeland Security, and Budget, released a powerful statement documenting the abuses in Waller County and demanding that the DOJ launch

---

[77] Samantha Lachman, "Voter Suppression Is Happening Everywhere. This Institute Is Trying To Stop It," *Huffington Post*, March 18, 2016 (retrieved from: https://www.huffpost.com/entry/voting-rights-institute_n_56eb145ae4b03a640a69fe56).

[78] Brianna Stone, "Why one political activist felt changing Prairie View A&M's voting procedure was worth going to jail," *Dallas News*, October 11, 2018 (retrieved from: https://www.dallasnews.com/news/2018-elections/2018/10/11/campaign-worker-arrested-after-standing-prairie-view-am-students-voting-rights).

an investigation. Lee's statement was inspired by Waller County's efforts, even in the aftermath of DA Kitzman's resignation, to limit the number of polling locations and early voting access in Black communities in and around PVAMU. "What is happening in Waller County, Texas appears to be part of an ongoing campaign of abusing state law to disenfranchise minority voters, which is why I am calling upon the U.S. Department of Justice to take appropriate action immediately and enjoin elections administration officials for Waller County, Texas from implementing their announced plan to impose additional and unreasonable burdens" on PVAMU students.[79]

Thereafter, the instant suit was filed on behalf of PVAMU students in October 2018, alleging violations of the VRA and U.S. Constitution based on plans once again to restrict access to early voting opportunities in Waller County.[80] At the time, nineteen-year-old PVAMU sophomore Damon Johnson, a plaintiff in this lawsuit, explained: "I don't want this to be the reason, but it looks like we're PVAMU in a predominantly white area and they don't really want us to vote."[81]

Congresswoman's Lee's aggressive defense of PVAMU students' voting rights was followed with vigorous support by Texas Representative Lloyd Doggett, who pushed for maintaining early voting polling places on university campuses across the state.[82] By

---

[79] "Congresswoman Sheila Jackson Lee Calls Upon Department of Justice to Take Action to Prevent 'Waller County Outrage,'" Congressional Documents and Publications, October 11, 2018 (retrieved from: https://jacksonlee.house.gov/media-center/press-releases/congresswoman-sheila-jackson-lee-calls-upon-department-of-justice-to).
[80] "Students sue Texas county, allege voting rights violations," The Louisiana Weekly, October 29, 2018, 13.
[81] Danny Hakim and Michael Wines, "'They Don't Really Want Us to Vote': How Republicans Made It Harder," The New York Times, November 3, 2018 (retrieved from: https://www.nytimes.com/2018/11/03/us/politics/voting-suppression-elections.html).
[82] Alexa Ura, "Student Voting Rights Fight Erupts at Texas State University," Texas Tribune, October 25, 2018 (retrieved from: https://www.texastribune.org/2018/10/25/student-voting-rights-fight-erupts-texas-state-university/).

2018, Waller County's long running shenanigans continued to be cited by numerous newspapers as a case study in the nation's long history of preventing Black Americans from voting.[83] Once again, these stories confirmed the ugliness of the situation – a predominantly-white Waller County maintaining its decades-long policy vendetta against the county's sole majority-Black precinct comprised of African American student voters of PVAMU. Thus, in 2018, Waller County found itself once again a federally monitored polling site, identified by the DOJ as worthy of close watch for compliance with voting rights laws.[84]

Waller County's efforts in 2018 to limit early voting for PVAMU students, the largest group of Black voters in the county, garnered national attention that yet again invoked the long history of racial tension, voter suppression, and institutional racism structured in Waller County.[85]

\*\*\*

Before and after the passage of the VRA in 1965, generations of PVAMU students have found themselves living in a time machine, including in an era when Jim Crow ruled much of the American South and African Americans were systematically denied the right to vote. Where some localities and states begrudging embraced the racial progress

---

[83] Mary Anne Marsh, "Stop making it hard to vote -- midterm elections are too important for such shenanigans," *Fox News*, October 29, 2018 (retrieved from: https://www.foxnews.com/opinion/mary-anne-marsh-stop-making-it-hard-to-vote-midterm-elections-are-too-important-for-such-shenanigans).

[84] "Justice Department to Monitor Compliance with Federal Voting Rights Laws on Election Day," Department of Justice Documents, November 5, 2018 (retrieved from: https://www.justice.gov/opa/pr/justice-department-monitor-compliance-federal-voting-rights-laws-election-day).

[85] Vann R. Newkirk II and Adam Harris, "Fighting for the Right to Vote in a Tiny Texas County, *The Atlantic*, November 1, 2018 (retrieved from: https://www.theatlantic.com/politics/archive/2018/11/prairie-view-m-students-file-suit-over-voting-hours/574600/); Sam Levine, "Black Students Sue Texas County Over Limited Early Voting Locations," *Huffington Post*, October 23, 2018 (retrieved from: https://www.huffpost.com/entry/waller-county-texas-early-voting-black-students_n_5bcf746ee4b055bc9485b30c?guccounter=1).

symbolized by the VRA, others did not. Texas emerged as one of the states that enacted a full-throated defense of the pre-civil rights racial status quo and consistently sought ways to circumvent the VRA and the U.S. Constitution by denying Black citizens voting rights. Waller County has become, over the past 48 years, perhaps the most difficult place for a Black student to vote in Texas. It is vitally important to note that this is not simply a past history of discrimination – these issues continue to this day. The lessons of Waller County are depressingly immense and panoramic, highlighting the way in which racial justice struggles thought to have been won generations ago continue to be played out in the present. Waller County's pattern of discrimination against PVAMU students, played out against the national backdrop of social justice movements such as Black Lives Matter, represents an insidious example of institutional racism that has produced great anxiety, anger, and confusion among students and the larger African American community there.

PVAMU students have been forced to become voting rights activists and legal and policy analysts in an effort to uphold their personal dignity and defend the very idea that American democracy values their efforts to emerge as active, educated, and intellectually engaged citizens. The story of Waller County and African American voting rights is not finished; it remains incomplete. The latest suit filed by PVAMU students is a continuum of a history of racial discrimination, both in intent and outcomes, that has never ended. Contemporary PVAMU students are engaged, right now, in the same struggle for voting rights that propelled Dr. Martin Luther King Jr. to Selma, Alabama in 1965 and that inspired President Lyndon Johnson to embrace voting rights during a March 15 joint session of Congress. President Johnson described his support for Black voting rights as

part of an "unending search for freedom."[86] For PVAMU students, that journey for freedom remains incomplete and continues in Waller County to this day.

## V. Conclusion

Based on the totality of the evidence, I have documented both a historic and contemporaneous pattern of voting rights abuses in Texas and Waller County specifically, including an evolving but consistent effort to undermine PVAMU students from exercising their right to vote as American citizens and legal residents of the State of Texas. At least four major themes emerge from this report.

1. Any decision by Waller County to enact and maintain its early voting plan cannot be detached from, and indeed must be analyzed within, the context of a long, well-documented history in Texas, generally, and Waller County, specifically. That history exemplifies a steady, evolving, but unmistakable pattern of voter suppression enacted by Waller County officials against PVAMU students with respect to their voting rights. Before the passage of the Twenty-Sixth Amendment in 1971, Waller County had almost no Black voters. Since that time, Waller County officials have systematically deployed illegal and unconstitutional voter suppression methods against PVAMU students. Barriers ranging from illegal voter registration challenges, to property and residency requirements, to the denial and then the reduction or elimination of early voting access and polling places—all of which were only removed after litigation or other advocacy demands launched by or on behalf of PVAMU students. The Constitution and/or the VRA have made

---

[86] Taylor Branch, *At Canaan's Edge: America in the King Years 1965-1968* (New York: Simon & Schuster, 2006), 112.

these tactics individually and cumulatively illegal, since they result in Black voters' being denied or limited from accessing their citizenship rights.

2. Waller County, which from 1975-2013 was subject to preclearance under Section 5 of the VRA, has a deep history of racially marginalizing Black residents of Prairie View and PVAMU students as illustrated in a series of consent decrees and court orders.[87] Waller County has continued its voter suppression tactics after the *Shelby* decision in 2013. For example, in 2016, Waller County officials attempted to reduce the number of early voting sites during the primary election season from 8 to 2 and only increased the numbers back up to 6 after being threatened with litigation.

3. Waller County's enactment and maintenance of the 2018 early voting plan is part of the continuum of longstanding acts of official discrimination in voting. In every decade following the passage of the VRA, both during the forty-eight years under Section 5 and afterward, PVAMU students have faced an uphill battle to be recognized as legal residents of the state of Texas; to receive free and unfiltered access and information to register to vote; to register themselves and other residents without fear of reprisal; to gain access to voting on campus; and to gain equal and fair access to early voter mechanisms. In 2018, Waller County's initial early voting plans provided no early voting days for PVAMU students and no polling location on-campus during the first week of early voting, making Prairie View the lone major city in the county with no early voting days. This plan was only amended after PVAMU students sought litigation. The revised plan offered PVAMU

---

[87] Consent Order, *Prairie View Chapter of NAACP v. Kitzman*, No. 04-459 (S.D. Tex. Feb. 24. 2004), ECF No. 11; Consent Decree, *United States v. Waller Cty.*, No. 4:08-cv-03022 (S.D. Tex. Oct. 17, 2008), ECF No. 8;

students and Prairie View residents only one day of early voting off-campus during the first week and additional voting hours during the second week, actions that notwithstanding curtailed the voting rights of Black students and Prairie View residents.[88]

4. This voter suppression pattern, documented in detail in the above report, is relevant to drawing inferences of present-day discrimination. It is no accident or exception that PVAMU students consistently must overcome barriers to voting that are continuously erected by Waller County officials long after such hurdles have been popularly thought to have been eradicated.

5. This documented history, which is persistent and ongoing, impacts Black students and Black Prairie View voters from participating in the democratic process, which affects PVAMU students' life chances during their tenure on campus and long after they have graduated. The failure of Waller County to neither encourage nor allow Black Prairie View voters and Black students from voting and becoming a more integral and fully integrated members of the civic and political community undermines the very fabric of democracy here in the state of Texas and the wider United States of America.

---

[88] Plaintiffs' Memorandum of Law In Opposition to Defendants' Rule 12 (b)(6)Motion to Dismiss Plaintiffs' First Amended Complaint, Civil Case No. 4:18-cv-3985, 4-6, 21-22.

I reserve the right to continue to supplement my declarations in light of additional facts, testimony and/or materials that may come to light.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Executed on: _June 30, 2019_

**Peniel E. Joseph, PhD**

# APPENDIX

# Peniel E. Joseph, Ph.D.
### Peniel.Joseph@austin.utexas.edu
**(401) 497-6110**

| | |
|---|---|
| LBJ School of Public Affairs | Department of History |
| Barbara Jordan Chair of Ethics & Political Values | 128 Inner Campus Drive, B7000 |
| Director, Center for the Study of Race and Democracy | The University of Texas at Austin |
| 2300 Red River Street, E2700, SRH 3.231 | Austin, Texas 78712 |
| The University of Texas at Austin | 512-475-7241 (office) |
| Austin, Texas 78712 | 512-475-7222 (fax) |
| 512-471-4263 (office) | |
| 512-471-4697 (fax) | |

## EDUCATION

Ph.D.   American History
      Temple University        Philadelphia, PA
            *Dissertation Title: "Waiting 'til the Midnight Hour: Black Political and Intellectual Radicalism, 1960-1975"*

B. A.   Africana Studies and European History
      Stony Brook University       Stony Brook, New York

## PROFESSIONAL EXPERIENCE

### ACADEMIC APPOINTMENTS

2015-Present    *Founding Director, Center for the Study of Race and Democracy, Lyndon B. Johnson School of Public Affairs*
           *Barbara Jordan Chair in Ethics and Political Values, Lyndon B. Johnson School of Public Affairs*
           *Professor, Department of History*
           The University of Texas at Austin, Lyndon B. Johnson School of Public Affairs
           The University of Texas at Austin, Department of History

2012-2015    *Founding Director, Center for the Study of Race and Democracy in the School of Arts and Sciences, Department of History*
           Tufts University, School of Arts and Sciences

2014-2015    *Fellow, Center for Humanities, The School of Arts and Sciences*
           *Fellow, Tisch College of Active Citizenship*
           Tufts University, Center for the Humanities
           Tufts University, Jonathan M. Tisch College of Civic Life

2009-2015    *Professor (with Tenure)*
           Tufts University, School of Arts and Sciences

| 2007-2009 | *Associate Professor (with Tenure), Joint Appointment, African and Afro-American Studies and Department of History* |
| | Brandeis University, College of Arts and Sciences |

| 2005-2007 | *Assistant Professor* |
| | Stony Brook University – SUNY, College of Arts and Sciences |

| 2000-2005 | *Assistant Professor* |
| | University of Rhode Island, College of Arts and Sciences |

## FELLOWSHIPS, AWARDS, AND HONORS

*Fellowships*

| 2012-13 | Caperton Fellow, W.E.B. Du Bois Institute, Harvard University |
| 2008-09 | Fellowship, Charles Warren Center for Studies in American History, Harvard University |
| 2002-03 | Fellowship, Woodrow Wilson Center for International Scholars Residential Fellowship, Washington, D.C. |
| 2002-03 | Postdoctoral Fellowship, Ford Foundation, Dept. of Africana Studies, Brown University |

*Awards*

| 2017 | Ally Award Empowering Women/Eliminating Racism YWCA Greater Austin |
| 2016 | Benjamin Hooks Institute for Social Justice National Book Award, University of Memphis for *Stokely: A Life* |
| 2015 | Hidden Heroes Award, Andrew Goodman Memorial Foundation |
| 2014 | Next Generation Leadership Award, Boston NAACP |
| 2008 | Norman Award for Faculty Research and Creative Projects, Brandeis University |
| 2007 | W.E.B. Du Bois Book Prize, Northeast Black Studies Alliance, Fairfield University |
| 2007 | Finalist, Mark Lynton History Prize, Lukas Prize Project (Co-sponsored by Columbia and Harvard Universities) |
| 2007 | Tubman-Wells-Hamer Social Justice Award, Schomburg Center for Research in Black Culture, New York City |

*Honors*

| 2007-Present | Distinguished Lecturer, Organization of American Historians |
| 2015 | Invited Member, Society of American Historians |
| 2014 | The Root 100 Class of 2014, honoring the top African American Influencers and Thought Leaders 45 and Under |
| 2011 | Emerging Academic Leader, *Ebony Magazine*, Power 100 Issue |
| 2007 | Emerging Scholar, *DIVERSE: Issues in Higher Education* |
| 2006 | Best Nonfiction 2006 Pick, *Washington Post Book World* for *Waiting 'Til the Midnight Hour: A Narrative History of Black Power in America* |
| 2006 | Top Young Historian, George Mason University History News Network |

# PUBLICATIONS

**BOOKS**

*Stokely: A Life.* New York: Basic Books, 2014; Paperback, 2016.

*Dark Days, Bright Nights: From Black Power to Barack Obama.* New York: Basic Books, 2010; Paperback, 2013.

*Waiting 'Til the Midnight Hour: A Narrative History of Black Power in America.* New York: Henry Holt, 2006; Paperback, 2007; Audio Book, 2007.

**BOOKS IN PROGRESS**

*The Sword and the Shield: The Political Worlds of Malcolm X and Martin Luther King, Jr.*

**EDITED BOOK SERIES**

Founding Series Co-Editor (with Manning Marable and Yohuru Williams). *Contemporary Black History*. New York: Palgrave Macmillan, 2008-2017

Editor. *Neighborhood Rebels: Black Power at the Local Level*. New York: Palgrave Macmillan, 2010.

Editor and Introduction. *The Black Power Movement: Rethinking the Civil Rights and Black Power Era*. New York: Routledge, 2006. In 4th Printing. Reviewed in *The Journal of American History*.

**BOOK CHAPTERS**

"Barack Obama and the Movement for Black Live: Race, Democracy, and Criminal Justice in t he Age of Ferguson." In Julian Zelizer, ed., *The Presidency of Barack Obama: A First Historical Assessment* (Princeton, NJ: Princeton University Press, 2018), pp. 127-143.

"The Black Power Movement," in Sylviane A. Diouf and Komozi Woodard, eds., *Black Power 50* (New York: The New Press, 2016), pp. 1-27.

"The Modern Black Freedom Struggle: From Black Power to Black Lives Matter," in Kinshasha Holman Conwill, ed., *Dream A World Anew: The African American Experience and the Shaping of America* (Washington, D.C.: Smithsonian Books, 2016).

"Introduction: The Black Panthers and Black Power," in Bryan Shih and Yohuru Williams, eds., *The Black Panthers: Portraits From An Unfinished Revolution* (New York: Nation Books: 2016).

 "Revolution in Babylon: Stokely Carmichael and America in the 1960s." In *The New Black History: Revisiting the Second Reconstruction,* edited by Manning Marable and Elizabeth Kai Hinton, 169-193. New York: Palgrave Macmillan, 2011.

"Waiting Till the Midnight Hour: Reconceptualizing the Heroic Period of the Civil Rights Movement, 1954-1965." In *The New Black History: Revisiting the Second*

*Reconstruction*, edited by Manning Marable and Elizabeth Kai Hinton, 157-168. New York: Palgrave Macmillan, 2011.

"Malcolm X's Harlem and Early Black Power Activism." In *Neighborhood Rebels: Black Power at the Local Level*, edited by Peniel E. Joseph, 21-43. New York: Palgrave Macmillan, 2010.

"Introduction: Community Organizing, Grassroots Politics, and Neighborhood Rebels: Local Struggles for Black Power in America." In *Neighborhood Rebels: Black Power at the Local Level*, edited by Peniel E. Joseph, 1-19. New York: Palgrave Macmillan, 2010.

"Preface." and "Introduction: Toward a Historiography of the Black Power Movement." In *The Black Power Movement: Rethinking the Civil Rights-Black Power Era*, edited by Peniel E. Joseph, xi-xii and 1-25. New York: Routledge, 2006.

"An Emerging Mosaic: Rewriting Postwar African American History." In *A Companion to African-American Studies*, edited by Lewis R. Gordon and Jane Anna Gordon, 400-416. Malden, MA: Basil Blackwell, 2006.

"Rethinking Harold Cruse and the Crisis of the Negro Intellectual." In *Harold Cruse and the Crisis of the Negro Intellectual Reconsidered,* edited by Jerry G. Watts, 241-260. London: Routledge, 2004.

"At the Crossroads: Black Radicalism's Global Vision During the Age of Civil Rights." In *Marvels of the African World: Africa, New World Connections, and Identities*, edited by Niyi Afolabi, 425-450. Trenton, NJ: Africa World Press, 2003.

"All Power to the People! Teaching Black Nationalism in the Post-Civil Rights Era." In *Teaching the American Civil Rights Movement: Freedom's Bittersweet Song,* edited by Julie Buckner Armstrong, et al, 147-158. New York: Routledge, 2002.

"'It's Dark and Hell is Hot': Cornel West, the Crisis of African-American Intellectuals, and the Cultural Politics of Race." In *Cornel West: A Critical Reader*, edited by George Yancy, 295-311. Oxford: Basil Blackwell, 2001.


**JOURNAL ARTICLES**

*The American Historical Review*
"The Black Power Movement, Democracy, and America in the King Years." *The American Historical Review* 114, no. 4 (October 2009): 1001-1016.

*The Black Scholar*
"Black Liberation Without Apology: Rethinking the Black Power Movement," *The Black Scholar* 31, no. 3-4 (Fall/Winter 2001): 2-17.

"'Black' Reconstructed: White Supremacy in Post Civil Rights America." *The Black Scholar* 25, no. 4 (Fall 1995): 52.

"Race & Racism in the Last Quarter of '95: The OJ & Post-OJ Trial & The Million Man March—A Symposium." Co-authored with Lewis R. Gordon, Lisa M. Anderson, T.

Denean Sharpley-Whiting, James B. Stewart, Jr., Stanley O. Gaines, Floyd W. Hayes III, Renée T. White, & Jennifer Berlinda Thompson. *The Black Scholar* 25, no. 4 (1995): 37.

*Journal of African American History*
"Dashikis and Democracy: Black Studies, Student Activism, and the Black Power Movement." *Journal of African American History* 88, no. 2 (Spring 2003): 182-203. Reprinted as "Black Studies, Student Activism, and the Black Power Movement." In *The Black Power Movement: Rethinking the Civil Rights-Black Power Era* edited by Peniel E. Joseph, 251-277. New York: Routledge, 2006.

*The Journal of American History*
"The Black Power Movement: A State of the Field." *The Journal of American History* 96, no. 3 (December 2009): 751-776.

*The Journal of Southern History*
"Rethinking the Black Power Era." *The Journal of Southern History* 75, no. 3 (August 2009): 707-716.

*The OAH Magazine of History*
"Civil Rights, Black Power, and American Democracy." *The OAH Magazine of History* 22, no. 3 (July 2008): 30-33.
"Historians and the Black Power Movement." *The OAH Magazine of History* 22, no. 3 (July 2008): 8-15.
"Reinterpreting the Black Power Movement." *The OAH Magazine of History* 22, no. 3 (July 2008): 4-6.

*New Formations*
"Where Blackness is Bright? Cuba, Africa, and Black Liberation During the Age of Civil Rights." *New Formations* 45 (Winter 2001): 111-124.

*SOULS*
"Revolution in Babylon: Stokely Carmichael and America in the 1960s." *SOULS* 9, no. 4 (October-December 2007): 281-301.
"Waiting Till the Midnight Hour: Reconceptualizing the Heroic Period of The Civil Rights Movement, 1954-1965." *SOULS* 2, no. 2 (Spring 2000): 6-17.

**EDITED ISSUES OF JOURNALS AND MAGAZINES**
Guest Editor and Introduction. "Black Power Studies: A New Scholarship," *The Black Scholar: Journal of Black Studies and Research* 31, no. 3-4 (April 2015): 1.

Guest Editor and Foreword. "Black Power," *Organization of American Historians Magazine of History* 22, no. 3 (July 2008): 48.

Guest Editor and Introduction. "The New Black Power History," *SOULS: A Critical Journal of Black Politics, Culture, and Society* 9, no. 4 (October-December 2007): 98.

Guest Editor and Introduction. "Black Power Studies II," *The Black Scholar* 32, no. 1, (Spring 2002): 66.

Guest Editor. "Black Power Studies I," *The Black Scholar* 31, no. 3-4, (Fall/Winter 2001): 66.

**MAGAZINE, RADIO, NEWSPAPER, AND ONLINE PUBLICATIONS**

*KUT Austin Public Radio,* " 'We need to create safe spaces where people can say the wrong thing about race,' scholar says." April 8, 2019.

*KUT Austin Public Radio,* "Morning Edition." April 1, 2018.

*American Public Media*, "Campaign '68: The politics of race." October 9, 2018. Accessible via https://itunes.apple.com/us/podcast/campaign-68/id1437315028?mt=2

*This is Democracy*, Podcast guest. Hosted by Dr. Jeremi Suri, UT History Professor, September 19, 2018. Accessible via iTunes.

*The Brian Lehrer Show*, July 24, 2018. Accessible from https://www.wnyc.org/story/the-brian-lehrer-show-2018-07-24/

KUT.org, April 11, 2018. Accessible from http://www.kut.org/post/50th-anniversary-fair-housing-act-law-has-mixed-bag-legacy

NPR guest, "Report updates landmark 1968 racism study, finds more poverty and segregation." https://www.npr.org/templates/transcript/transcript.php?storyId=589351779 (February 27, 2018)

https://www.washingtonpost.com/news/post-nation/wp/2018/01/15/kings-assassination-shaped-americas-identity-50-years-ago-and-continues-to-shape-it-today/?utm_term=.ee537b597877

https://www.wnyc.org/story/shifting-mission-naacp/ (May 2017)

http://www.wbur.org/hereandnow/2017/04/05/peniel-joseph-black-lives-matter (April 2017)

https://www.cnn.com/2017/01/10/opinions/obama-sessions-peniel-joseph-opinion/index.html (January 2017)

https://www.cnn.com/2017/01/11/opinions/obama-still-offers-hope-joseph-opinion/index.html (January 2017)

https://www.theguardian.com/commentisfree/2017/jan/07/barack-obama-forever-changed-black-america (January 2017)

https://www.cnn.com/2017/01/15/opinions/mlk-trump-lewis-lynch-joseph-opinion/index.html (January 2017)

http://www.wbur.org/hereandnow/2017/01/16/mlk-obama-legacies (January 2017)

[https://www.cnn.com/2017/02/02/opinions/we-need-black-history-month-now-more-than-ever-opinion/index.html](https://www.cnn.com/2017/02/02/opinions/we-need-black-history-month-now-more-than-ever-opinion/index.html)

"This speech made Martin Luther King Jr. a revolutionary," CNN.com April 3, 2017
"Why Black Lives Matter Still Matters," **Cover Essay**, The New Republic, April 6, 2017
"Why the 1992 L.A. Riots Matter Today," CNN.com, April 28, 2017
"LeBron James' master class on race," CNN.com, June 1, 2017
"A presidency built on racial divisions," The Boston Globe, August 13, 2017
"Charlottesville spotlights Trump toxic failure to lead," CNN.com, August 13, 2017
"Can I have Dream help us heal after Charlottesville?" August 26, 2017
"Protesting Made these athletes Patriots," CNN.com, September 29, 2017

"Manson's Infamy, like his violence, did lasting harm," CNN.com, November 20, 2017
"If Trump can change his mind on hunting, why not on Haiti," CNN.com, November 22, 2017
"Coates vs. West: Feud has long roots in black intellectual tradition,"CNN.com, December 21, 2017

## OPINION PIECES AND EDITORIALS

*The Atlanta Voice*

"Celebrate Black History Month: One of today's 'wokest' moments happened in 1968, courtesy of the Kerner Report." *The Atlanta Voice*, February 22, 2018. [https://www.theatlantavoice.com/articles/celebrate-black-history-month-one-of-todays-wokest-moments-happened-in-1968-courtesy-of-the-kerner-report/](https://www.theatlantavoice.com/articles/celebrate-black-history-month-one-of-todays-wokest-moments-happened-in-1968-courtesy-of-the-kerner-report/)

*Austin American Statesman*

"Joseph: Muhammad Ali Helped Make Black Power into a Global Brand." *Austin American Statesman*, June 9, 2016. Accessed October 4, 2016. [http://www.mystatesman.com/news/news/opinion/joseph-muhammad-ali-helped-make-black-power-into-a/nrcPz/](http://www.mystatesman.com/news/news/opinion/joseph-muhammad-ali-helped-make-black-power-into-a/nrcPz/).

*The Boston Globe*

"A presidency built on racial divisions." *The Boston Globe*, August 13, 2017. [https://www.bostonglobe.com/opinion/columns/2017/08/12/presidency-built-racial-divisions/8KMaTGooXCk9gWe8Rfq2UL/story.html](https://www.bostonglobe.com/opinion/columns/2017/08/12/presidency-built-racial-divisions/8KMaTGooXCk9gWe8Rfq2UL/story.html)

"We Need Much More Than Soul Searching." *The Boston Globe*, July 8, 2016. Accessed October 4, 2016. [https://www.bostonglobe.com/opinion/2016/07/08/need-much-more-than-soul-searching/Bv2fbeJgt8PPA5KljUdVlM/story.html](https://www.bostonglobe.com/opinion/2016/07/08/need-much-more-than-soul-searching/Bv2fbeJgt8PPA5KljUdVlM/story.html).

"Muhammad Ali's Fights Outside the Ring." *The Boston Globe*, June 4, 2016. Accessed October 4, 2016. [https://www.bostonglobe.com/opinion/2016/06/04/muhammad-ali-fights-outside-ring/10KHDdcahN9cZilxsI6BJK/story.html](https://www.bostonglobe.com/opinion/2016/06/04/muhammad-ali-fights-outside-ring/10KHDdcahN9cZilxsI6BJK/story.html).

*The Chronicle of Higher Education*

"The Many Meanings of a Fist." *The Chronicle of Higher Education* 62, no. 37 (May 18, 2016): B4.

"Our Long Walk to Freedom." *The Chronicle of Higher Education* 59, no. 45 (August 13, 2013): B10-B12.

"Still Reinventing Malcolm." *The Chronicle of Higher Education* 57, no. 35 (May 6, 2011): B6-B9. Cover Essay.

"Rescuing Malcolm X from His Calculated Myths." *The Chronicle of Higher Education* (2011). Accessed from https://www.chronicle.com/article/Rescuing-Malcolm-X-From-His/127272

"Obama Cannot Be Our Racial Healer-in-Chief." *The Chronicle of Higher Education* 56, no. 20 (January 29, 2010): B10-B11.

"Obama and the Enduring Divisions of Race." *The Chronicle of Higher Education,* January 24, 2010. Accessed February 23, 2017. http://www.chronicle.com/article/Obamathe-Enduring/63656?cid=rclink.

"Our National Postracial Hangover: With the Gates Fiasco, the Rosy Glow Has Faded." *The Chronicle of Higher Education*, July 27, 2009. Accessed February 23, 2017. http://www.chronicle.com/article/Our-National-Postracial/47462.

"Black Power's Powerful Legacy." *The Chronicle of Higher Education* 52, no. 46 *(*July 21, 2006): B6-B8. Cover Essay.

*CNN*

"Beto O'Rourke made things personal in his CNN town hall." CNN, May 22, 2019. Accessed https://www.cnn.com/2019/05/22/opinions/beto-orourke-cnn-town-hall-joseph/index.html.

"One of America's proudest moments is being sabotaged." CNN, May 16, 2019. Accessed https://www.cnn.com/2019/05/16/opinions/brown-v-board-of-education-anniversary-joseph/index.html.

"John Singleton's virtuoso vision of black life." CNN, April 29, 2019. Accessed https://www.cnn.com/2019/04/29/opinions/john-singleton-legacy-boyz-n-the-hood-matters-joseph/index.html.

"Cory Booker's blend of personal and political could catch fire." CNN, March 28, 2019. Accessed https://www.cnn.com/2019/03/28/opinions/cory-booker-presidential-town-hall-joseph/index.html.

"We've never had a Black History Month like this before." CNN, February 28, 2019. Accessed https://www.cnn.com/2019/02/28/opinions/black-history-month-blackface-cotton-oscars-cohen-joseph/index.html

"Why this Year's Black History Month is Pivotal." CNN, February 9, 2019. Accessed https://www.cnn.com/2019/02/09/opinions/black-history-month-jamestown-400th-anniversary-joseph/index.html

"How Liam Neeson's Shame Could Do Some Good." CNN, February 5, 2019. Accessed https://www.cnn.com/2019/02/05/opinions/liam-neeson-interview-racism-courage-joseph/index.html

"Ralph Northam's Yearbook Page Reveals Much More than a Young Man's Mistake." CNN, February 2, 2019. Accessed https://www.cnn.com/2019/02/01/opinions/ralph-northam-yearbook-page-more-than-mistake-joseph/index.html

"America Love to Praise Martin Luther King Jr. But We Ignore His Message." CNN, January 15, 2019. Accessed https://www.cnn.com/2019/01/15/opinions/martin-luther-king-jr-90th-birthday-legacy-joseph/index.html

"JFK's Death Wasn't Just an End- It Was Also a Crucial Beginning." CNN, November 21, 2018. Accessed https://www.cnn.com/2018/11/21/opinions/jfk-assassination-anniversary-what-it-means-today-peniel-joseph/index.html

"This is How the Democrats Can Win in 2020." *CNN*, November 8, 2018. Accessed https://www.cnn.com/2018/11/07/opinions/the-future-of-the-democrats-joseph-opinion-intl/index.html

"We're Way Past Willie Horton Now." *CNN*, November 2, 2018. Accessed https://www.cnn.com/2018/11/02/opinions/trump-immigration-ad-willie-horton-joseph/index.html

"The 50-year Lessons America Still Hasn't Learned." *CNN*, August 28, 2018. Accessed September 14, 2018. https://www.cnn.com/2018/08/27/opinions/1968-chicago-dnc-violence-50-years-later-joseph/index.html

"How 'BlacKkKlansman' Could Help American Write a New Chapter." *CNN*, August, 9, 2018. https://www-m.cnn.com/2018/08/09/opinions/blackkklamsman-charlottesville-one-year-later-joseph-opinion/index.html

"Frances's World Cup Win is a Victory for Immigrants Everywhere." *CNN*, July 15, 2018. https://www-m.cnn.com/2018/07/15/opinions/france-world-cup-win-immigration-diversity-joseph/index.html

"The Hypocrisy at the Heart of Trump's Rancher Pardon." *CNN*, July 10, 2018.

https://www-m.cnn.com/2018/07/10/opinions/trump-hammond-pardon-race-and-justice-joseph-opinion/index.html

"America's racism has long been Russia's secret weapon." CNN, July 2, 2018. https://www.cnn.com/2018/07/02/opinions/philando-castile-russia-history-of-infiltration-joseph-opinion/index.html

"Manson's infamy, like his violence, did lasting harm." *CNN*, July 2, 2018. https://www.cnn.com/2017/11/20/opinions/charles-manson-the-real-1960s-peniel-joseph-opinion/index.html

"RFK's Legacy is Still Alive Today." *CNN*, June 5, 2018. https://www.cnn.com/2018/06/05/opinions/robert-kennedy-assassination-50-years-later-joseph-opinion/index.html

"The stunning—and pivotal—decision by Lyndon Johnson." *CNN*, March 30, 2018. https://www.cnn.com/2018/03/30/opinions/the-stunning-decision-by-president-lyndon-johnson-joseph/index.html

"Seeing your world—and your love—on screen matters." *CNN*, March 2, 2018. https://www.cnn.com/2018/03/02/opinions/black-panther-call-me-by-your-name-peniel-joseph-opinion/index.html

"We wouldn't be America without student activists." *CNN*, February 22, 2018. https://www.cnn.com/2018/02/21/opinions/florida-students-long-activist-tradition-joseph-opinion/index.html

"One of America's 'wokest' moments happened in 1968." *CNN*, February 2, 2018. https://www.cnn.com/2018/02/02/opinions/kerner-commission-report-still-relevant-joseph-opinion/index.html

"Donald Trump's enmity for Haiti." *CNN*, January 12, 2018. https://www.cnn.com/2018/01/12/opinions/trump-personal-enmity-for-haiti-opinion-joseph/index.html

"If Trump can change his mind on hunting, why not on Haiti?" *CNN*, December 23, 2017. https://www.cnn.com/2017/11/22/opinions/haiti-president-trump-temporary-status-joseph-opinion/index.html

"Coates vs. West: Feud has its roots in long tradition of black intellectuals." *CNN*, December 21, 2017. https://www.cnn.com/2017/12/21/opinions/west-coates-feud-black-intellectual-tradition-joseph-opinion/index.html


"Charlottesville spotlights Trump's toxic failure to lead." *CNN*, August 13, 2017. https://www.cnn.com/2017/08/13/opinions/charlottesville-trump-race-moral-leadership-joseph-opinion/index.html

"The lessons to learn from Trump voters." *CNN*, November 7, 2016. https://www.cnn.com/2016/11/07/opinions/lessons-of-trump-voters-peniel-joseph/index.html

"The Struggle for Black Dignity Continues." *CNN*, August 12, 2016. Accessed October 4, 2016. http://www.cnn.com/2016/08/12/opinions/department-justice-report-baltimore-joseph/index.html.

"Black Lives Matter's big step." *CNN*, August 3, 2016. Accessed October 4, 2016. http://www.cnn.com/2016/08/03/opinions/black-lives-matter-movement-report-joseph/.

"The Voters Clinton Needs to Win Over." *CNN*, July 30, 2016. Accessed October 4, 2016. http://www.cnn.com/2016/07/30/opinions/clinton-win-over-voters-opinion-joseph/.

"What's Fueling the Republican Fury." *CNN*, July 23, 2016. Accessed October 4, 2016. http://www.cnn.com/2016/07/23/opinions/race-and-the-rnc-opinion-peniel-joseph/index.html.

*Democracy: A Journal of Ideas*

"Will Democrats Finally Align With Racial Justice?" *Democracy: A Journal of Ideas*, August 19, 2016. Accessed October 4, 2016. http://democracyjournal.org/arguments/will-democrats-finally-align-with-racial-justice/

*Diverse: Issues in Higher Education*

"Remembering U.N. Secretary General Kofi Annan." *Diverse: Issues in Higher Education,* August 20, 2018. https://diverseeducation.com/article/123322/


*The Globe and Mail*

"For Change to Happen, Americans Must Confront the Pain of Black History." *The Globe and Mail*, July 9, 2016. Accessed October 4, 2016. http://www.theglobeandmail.com/opinion/for-change-to-happen-americans-must-confront-the-pain-of-black-history/article30831352/

*The Guardian*

"Barack Obama forever changed black America." The Guardian, January 7, 2017. https://www.theguardian.com/commentisfree/2017/jan/07/barack-obama-forever-changed-black-america

"'White Lives Matter', Now a Hate Group, is Part of a Long Arc of White Supremacy." *The Guardian*, August 31, 2016. Accessed October 4, 2016. https://www.theguardian.com/commentisfree/2016/aug/31/white-lives-matter-hate-group-white-supremacy

"Dallas Shootings: The Latest Chapter in a Painful Racial History." *The Guardian*, July 9, 2016. Accessed October 4, 2016. https://www.theguardian.com/commentisfree/2016/jul/09/police-killings-dallas-shooting-racism-american-history

"Obama is Chipping Away at the 'New Jim Crow'. But More Needs to be Done." *The Guardian*, April 27, 2016. Accessed October 4, 2016. https://www.theguardian.com/commentisfree/2016/apr/27/barack-obama-new-jim-crow-progress-mass-incarceration

*Huffington Post*

"What Made Muhammad Ali Unapologetically Black." *Huffington Post*, June 6, 2016. Accessed October 4, 2016. http://www.huffingtonpost.com/entry/muhammad-ali-unapologetically-black_us_57556af5e4b0c3752dce06a3.


*The New Republic*

"Why Black Lives Matter still matters." *The New Republic*, April 6, 2017. https://newrepublic.com/article/141700/black-lives-matter-still-matters-new-form-civil-rights-activism


*New York Times*

"Clinton Continues to Take Voters of Color for Granted." *The New York Times*, July 22, 2016. Accessed October 4, 2016. http://www.nytimes.com/roomfordebate/2016/07/22/is-tim-kaine-the-right-running-mate-for-hillary-clinton/clinton-continues-to-take-voters-of-color-for-granted?smid=tw-share.

*Newsweek*

"The Martin Luther King That America and Obama Ignore." *Newsweek*, January 18, 2016. Accessed October 4, 2016. http://www.newsweek.com/martin-luther-king-obama-state-union-ignore-417108.

"Scalia Comments Shine Light on U.S. Institutional Racism." *Newsweek*, December 10, 2015. Accessed October 4, 2016. http://www.newsweek.com/scalia-comments-shine-light-us-institutional-racism-403823.

*Reuters*

"Commentary: The America He Knows – Obama on the Nation's Fractured Racial Landscape." *Reuters*, July 13, 2016. Accessed October 4, 2016. http://www.reuters.com/article/us-race-obama-dallas-commentary-idUSKCN0ZT08R.

"Commentary: A Day of Horrors and Martyrs." *Reuters*, July 7, 2016. Accessed October 4, 2016. http://www.reuters.com/article/us-race-police-shootings-commentary-idUSKCN0ZN2GI.

"Commentary: From the Civil-Rights Struggle to Black Lives Matter, John Lewis Blazes the Trail." *Reuters*, June 30, 2016. Accessed October 4, 2016. http://www.reuters.com/article/us-congress-guns-race-commentary-idUSKCN0ZG0CH.

"Commentary: 'Black and Proud:' From Black Power to Black Lives Matter." *Reuters*, June 21, 2016. Accessed October 4, 2016. http://www.reuters.com/article/us-social-race-blackpower-commentary-idUSKCN0Z7329.

"Commentary: What Made Muhammad Ali 'Unforgivably Black.'" *Reuters*, June 6, 2016. Accessed October 4, 2016. http://www.reuters.com/article/us-race-ali-commentary-idUSKCN0YQ0TZ.

"The Elephant in the Supreme Court." *Reuters*, February 29, 2016. Accessed October 4, 2016. http://blogs.reuters.com/great-debate/2016/02/29/the-elephant-in-the-supreme-court/.

*The Root*

"As Summer Ends, Tensions Remain High Between Black Community and Police." *The Root*, August 25, 2016. Accessed October 4, 2016. http://www.theroot.com/articles/culture/2016/08/as-summer-ends-tensions-remain-high-between-black-community-and-police/?utm_medium=social&utm_source=email&utm_campaign=socialshare.

"President Obama Defends Phrase 'Black Lives Matter' in Unprecedented Town Hall." *The Root*, July 15, 2016. Accessed October 4, 2016. http://www.theroot.com/articles/politics/2016/07/president-obama-defends-phrase-black-lives-matter-in-unprecedented-town-hall/.

"Hillary Clinton's Speech May Finally Start That Long-Overdue Conversation on Race." *The Root*, July 13, 2016. Accessed October 4, 2016. http://www.theroot.com/articles/politics/2016/07/hillary-clintons-speech-may-finally-start-that-long-overdue-conversation-on-race/.

"50 Years Ago Stokely Carmichael Called for 'Black Power,' Galvanizing a Movement." *The Root*, June 16, 2016. Accessed October 4, 2016. http://www.theroot.com/articles/culture/2016/06/50-years-ago-stokely-carmichael-called-for-black-power-galvanizing-a-movement/.

"Bill Clinton Speaking at Muhammad Ali's Funeral is the Corporate Co-Optation of an Icon." *The Root*, June 10, 2016. Accessed October 4, 2016. http://www.theroot.com/articles/politics/2016/06/bill-clinton-speaking-at-muhammad-alis-funeral-is-the-corporate-co-optation-of-an-icon/.

"Donald Trump's Anti-Muslim Comments Cross a Moral Line." *The Root*, December 8, 2015. Accessed October 4, 2016. http://www.theroot.com/articles/politics/2015/12/donald_trump_s_anti_muslim_comments_cross_a_moral_line/.

"Black Student Activists Stand Against Racist Cultures on Campus." *The Root*, November 9, 2015. Accessed October 4, 2016. http://www.theroot.com/articles/culture/2015/11/black_student_activists_stand_against_racist_cultures_on_campus/.

"Hip-Hop's Nas Joins Eric Holder as W.E. B. Du Bois Honoree." *The Root*, October 1, 2015. Accessed October 4, 2016. http://www.theroot.com/articles/culture/2015/10/hip_hop_s_nas_joins_eric_holder_as_w_e_b_du_bois_honoree_at_harvard_university/.

"Elizabeth Warren's Embrace of Black Lives Matter Is an Example of Moral Leadership." *The Root*, September 29, 2015. Accessed October 4, 2016. http://www.theroot.com/articles/politics/2015/09/elizabeth_warren_s_embrace_of_black_lives_matter_is_an_example_of_moral/.

"Jeb Bush's Claim That Blacks Want 'Free Stuff' for Votes Insults Our Dignity and History of Struggle." *The Root*, September 28, 2015. Accessed October 4, 2016. http://www.theroot.com/articles/politics/2015/09/jeb_bush_saying_blacks_want_free_stuff_for_votes_insults_our_dignity_and/.

*The Undefeated*

"Stokely Carmichael's Call for 'Black Power' Spoke Real Truth to a Flawed Nation." *The Undefeated*, June 16, 2016. Accessed October 4, 2016. http://theundefeated.com/features/stokely-carmichaels-call-for-black-power-spoke-real-truth-to-a-flawed-nation/.

*The Washington Post*

"On Martin Luther King's 90th Birthday, a Reminder of How Far We Have Come and How Far We Still Have to Go." *The Washington Post*, January 15, 2019. https://www.washingtonpost.com/nation/2019/01/15/martin-luther-kings-th-birthday-reminder-how-far-we-have-come-how-far-we-still-have-go/?utm_term=.3c1a528b10b7

"America's Long and Painful History of Domestic Terrorism Against Racial and Religious Minorities." *The Washington Post*, November 9, 2018. https://www.washingtonpost.com/nation/2018/11/09/americas-long-painful-history-domestic-terrorism-against-racial-religious-minorities/?utm_term=.61c1bbf53d36

"On the 55th Anniversary of the March on Washington, still work to do to 'make the promise of democracy real'." *The Washington Post*, August 28, 2018. https://www.washingtonpost.com/news/post-nation/wp/2018/08/28/on-the-55th-anniversary-of-the-march-on-washington-still-work-to-do-to-make-the-promise-of-democracy-real/?noredirect=on&utm_term=.581c5573a4f1

"America's Nonviolence Civil Rights Movement was Considered Uncivil by Critics at the Time." *The Washington Post*, July 4, 2018. https://www.washingtonpost.com/news/post-nation/wp/2018/07/04/the-civil-rights-movement-might-have-been-nonviolent-but-to-critics-it-was-considered-uncivil/?utm_term=.d58375cfd852

"'Black Panther' is a milestone in African Americans' search for home." *The Washington Post,* February 16, 2018. https://www.washingtonpost.com/news/post-nation/wp/2018/02/16/black-panther-is-a-milepost-in-african-americans-search-for-home/?utm_term=.7c9fa099093d

"How Martin Luther King Jr.'s assassination change American 50 years ago and still affects us today." *The Washington Post*, January 15, 2018. https://www.washingtonpost.com/news/post-nation/wp/2018/01/15/kings-assassination-shaped-americas-identity-50-years-ago-and-continues-to-shape-it-today/?utm_term=.29fe7350e091

"Obama's Legacy: Some Initially Heralded His Victory as the Arrival of a 'Post-Racial' America." *The Washington Post*, April 22, 2016. Accessed October 4, 2016. https://www.washingtonpost.com/graphics/national/obama-legacy/racism-during-presidency.html.


## PROFESSIONAL PRESENTATIONS/CONFERENCES/SYMPOSIA

UT Austin (Select)
**SPRING 2017**

### JANUARY
**Jan 25th**, **Peniel Joseph and Jeremi Suri,** *Injustice Anywhere***:** *Dr. King's Legacy 50 Years After Vietnam***,** 12:15-1:30pm , Rm 3.122                               48 attended


**Jan 13-14th, Peniel Joseph,** *What Does Racial Justice Mean in the 21st Century?*, Texas Tribune Symposium on Race and Public Policy, Huston-Tillotson University


### FEBRUARY

**Barbara Jordan Forum Feb 20 thru Feb 24**

**Feb 15th**, **Dr. Madeline Y Hsu**, *The Good Immigrants: How the Yellow Peril Became the Model Minority*, 12:15-1:30pm, RM 3.122                                    45 attended

### MARCH
### Spring Break March 13th thru 18th

**Mar 8th**, **GRA Robert Arjet**, *New Jim Crow,* 12:15-1:30PM, RM 3.214/3.220        34 attended

**Mar 28TH**, **Dr. Max Krochmal**, *Blue Texas: The Making of a Multiracial Democratic Coalition in the Civil Rights Era (Justice, Power, and Politics),* 12;15pm – 1:30PM, Rm 3.122        29 attended

### APRIL

**Apr 4th**, **Dr. James Galbraith and Dr. Peniel Joseph**, *"Vietnam, MLK and Civil Rights: 50th Anniversary of King's April 4, 1967, Riverside Address"*, 12:15 – 1:30PM, RM 3.122     32 attended

**Apr 12th, Coach Shaka Smart and Dr. Peniel Joseph, "***A Conversation: Race, Sports and Citizenship"***,** 6:00-7:30pm**, BLH                                        87 attended
NOTE:  Music Lab Fee = $700 (reduced to $650)

### MAY
### Last Class Day May 5th

**May 1st, Dr. Richard Rothstein,** The Myth of *De Facto* Segregation and How We Can Correct It**, 12:15-1:30pm, RM 3.124      (co-sponsored)

- This is a book tour for Mr. Rothstein.  Dr. Galbraith's assistant will leave for vacation on April 21st.  Event will then be managed by Alice Rentz.  Book sales by UT Co-op will be held immediately following the talk.

**FALL 2017**

## SEPTEMBER

**Sep 20th,  Dr. Jeremi Suri,** *Race, Democracy, and the Impossible Presidency,* 12:15-1:30PM, Room 3.122                                                                                            72 Attended

* Dr. Joseph will comment on the book, leading into conversation with Dr. Suri
* Buy a box of Dr. Suri's book, *The Impossible Presidency*    Books Confirmed


## OCTOBER

**Oct 24th,** *Slavery's Capitalism and Black Lives Matters*, 12:15 – 5:30pm  BLH & BLH Foyer are confirmed

### SESSION 1                                                                                            126 Attended
*Racial Capitalism and Human Rights: Reimagining Slavery in the Age of Black Lives Matter*
- Daina R. Berry
- Peniel Joseph
- Manisha Sinha

### SESSION II                                                                                          79 Attended
*Black Lives, Democratic Matters: The World that Slavery Made*
- Kendra Field
- Steve Hahn
- Walter Johnson
- Peniel Joseph


## NOVEMBER

**Nov 7th, Black Policy Symposium – Part III,** Black Policy Symposium III: A Discussion on Black Political Power  (co-sponsored)
12:00 – 1:30pm, Utopia Theatre, Steve Hicks School of Social Work


**Nov 28th, Screening:** *The History of Lynching,* 12:15 – 1:30pm, BLH & Foyer                71 Attended


**ACADEMIC CONFERENCES (select)**
*American Historical Association*
2015, Jan. 2-5        Invited Panelist, "Being a Public Intellectual: Historians and the Public"
                      American Historical Association 129th Annual Meeting: History and the Other
                      Disciplines. Broadcast on C-SPAN.

2015, Jan. 2-5       Chair, "The Black 1980s: Politics, Culture, and New Historiographies"
                     American Historical Association 129th Annual Meeting: History and the Other
                     Disciplines.
2012, Jan. 5-6       Plenary Speaker, "Historians and the Obama Narrative" and Panelist, "Stokely
                     Carmichael and America in the 1960s," American Historical Association,
                     Chicago, IL.
2011, Jan. 8         Chair, "Imagining Black Power in the Global Sixties for Berlin to Beijing,"
                     American Historical Association Conference, Boston.
2007, Jan. 4         Invited Panelist, Roundtable on 40th anniversary of *Black Power* by Kwame
                     Ture (Stokely Carmichael) and Charles Hamilton, American Historical
                     Association, Atlanta, GA.

*Association for the Study of Afro-American Life and History*
2008, Oct. 3         Plenary Organizer and Presenter, "The New Black Power History,"
                     Association for the Study of Afro-American Life and History, Birmingham,
                     Alabama.
2006, Sep. 27-30 Organizer and Presenter, Association for the Study of Afro-American Life and
                     History, Atlanta, GA.: "The Black Power Movement: Rethinking the Civil
                     Rights Black Power Era"

*German Historical Institute*
2013, Sep. 19-21  Invited Panelist, Malcolm X, the March on Washington, and Reimagining
                     American Democracy, Conference: The Dream and Its Untold Stories: The
                     March on Washington and Its Legacy, German Historical Institute.
2012, Sep. 19-21  Invited Panelist, March on Washington Conference, German Historical
Institute.

*Organization of American Historians*
2008, Mar. 28        Plenary Organizer and Moderator, "Storm Warnings: Rethinking 1968: The
                     Year that Shook the World," Organization of American Historians
                     Conference, New York City.
2003, Apr. 5         Panel Organizer and Presenter, Organization of American Historians Annual
                     Conference, Memphis, TN. Paper: "Rethinking the Black Liberation
                     Movement"

*Smithsonian National Museum of African American History and Culture*
2016, May 19-21   Invited Panelist, The Future of the African American Past, Smithsonian
                     National Museum of African American History and Culture and the
                     Organization of American Historians.
2009, Mar. 30-31  Lead Historical Consultant and Keynote Speaker, "1968 and Beyond: A
                     Symposium on the Impact of the Black Power Movement on America,"
                     Smithsonian National Museum of African American History and Culture.
                     Washington, D.C.

*Tufts University*

| 2012, Mar. 1-3 | Organizer and Speaker, Barack Obama and American Democracy III, Tufts University, Boston, MA. |
| 2010, Mar. 5-6 | Organizer and Speaker, Barack Obama and American Democracy Conference, Tufts University. |

*Other*

| 2014, Nov. 18 | Invited Panelist, Civil Rights and the Black Power Movement, John F. Kennedy Presidential Library: Kennedy Library Forum." |
| 2014, Apr. 16-18 | Conference Organizer, Barack Obama and American Democracy V, Tufts University Center for the Study of Race and Democracy. |
| 2013, May 18 | Panelist, Biographers Conference, New York City. |
| 2013, Mar. | Keynote Speaker, Barack Obama and American Democracy IV, Arizona State University. |
| 2010, Mar. | Invited Panelist, Left Forum Conference, New York City. |
| 2009, Nov. 12-14 | Invited Speaker, Expanding the Civil Rights Movement in Time and Space Conference, University of New Hampshire. |
| 2009, Apr. 2-4 | Invited Speaker, The Long Civil Rights Movement Conference, UNC-Chapel Hill. |
| 2007, Aug. 13 | Invited Panelist, "Dialogue on the Future of Black Liberation," American Sociological Association Meeting. |
| 2006, Apr. 1 | Panel Organizer and Presenter, Race, Roots, and Resistance: Revisiting the Legacies of Black Power Conference, University of Illinois Urbana-Champagne. Paper: "Toward a Historiography of the Black Power Movement" |
| 2006, Jan. 11 | Invited Panelist, International Humanities Conference, Honolulu, Hawaii. Paper: "New Perspectives on the Black Power Movement" |
| 2005, Nov. 5 | Invited Panelist, American Studies Association Conference, Washington, D.C. Paper: "Re-imaging the Black Power Era." |
| 2003, Nov. 13-14 | Invited Panelist, The Black Power Movement in Historical Perspective, University of Connecticut. Paper: "Redefining the Black Power Movement." |
| 2003, Jun. 12 | Invited Panelist, The Black Panther Party in Historical Perspective, Wheelock College. Comment: "The Black Panther Party in Historical Time" |

## INVITED LECTURES/PANELS (select)

### 2019

| 4/9/2019 | Invited panelist, "Social Justice and the Search for the Beloved Community," LBJ Foundation-Summit on Race in America. |
| 2/20/19 | Invited moderator, "Her Voice Shaped the Nation," Barbara Jordan Week, LBJ School of Public Affairs, Austin, TX |
| 2/15/19 | Invited speaker, LASA Cultural Day (Liberal Arts and Sciences Academy high school), Austin, TX |
| 1/17/19 | Invited keynote speaker, UT Black Faculty and Staff Association |
| 1/17/19 | Invited speaker, Austin Forum at UT LBJ School |

| | |
|---|---|
| 1/15/19 | Invited speaker, Cultural Competency Assembly, St. Andrew's Episcopal School, Austin, Texas. |

**2018**

| | |
|---|---|
| 10/29/18 | Invited speaker to African American Male Research Initiative (AAMRI), Division of Diversity and Community Engagement, UT-Austin. |
| 10/16/18 | Keynote speaker, "Ready for Revolution: Stokely Carmichael and Global 1968." University de Poitiers, Poitiers, France. |
| 10/23/18 | **"**Future of Work in Texas" Conference, Keynote Speaker. |
| 10/10/18 | Austin Presbyterian Theological Seminary, Keynote Speaker. |
| 9/21/18 | Georgetown University, From Civil Rights to Black Lives Matter: The Struggle for Black Dignity in the Age of Trump, Keynote Speaker. |
| 9/14/18 | Precursor's Program at UT Black Alumni Homecoming Weekend, Keynote Speaker, theme: A Retrospective of 1968 |
| 8/29/18 | LBJ Student Orientation, Invited Speaker, "Policymaking through the Lens of Equity." |
| 4/16/18 | Keynote Speaker, MLK Remembrance, University of St. Thomas Law School, Minneapolis, MN |
| 4/6/18 | Invited symposium speaker, Martin Luther King, Jr.: Life, Loss, Legacy-Hutchins Center Symposium, Harvard Kennedy School, Harvard University |
| 4/1/18 | C-SPAN *Civil Rights Race Relations 1968* |
| 3/28/18 | Race and Law Course, Guest Speaker, theme: Voting rights and how voter suppression has been used to maintain racial inequality |
| 3/5/18 | *Kerner at 50 Evening Event*, Panelist and Host Director. |
| 2/2018 | Speaker, Barbara Jordan State Capitol Exhibit Speaker, Media Event |
| 2/26/18 | MLK Day Event – Poverty and Social Justice: Then and Now, Moderator |

| | |
|---|---|
| **1/13/18** | Speaker, Austin Forum on Diplomacy and State Craft |
| **1/4/18** | UT Austin 3rd Annual Black Student Athlete Conference, Keynote Speaker, Theme: *The Black Student Athlete in the Age of Black Lives Matter* |
| **2018, Jan.** | Keynote Speaker, UT Law School, Mass Incarceration Conference |
| **11/4/17** | C-SPAN BOOK TV  *Author Discussion, Texas Book Festival, Race, Crime and Law in Black America, Moderator* |
| **10/22/17** | C-SPAN  Host: Steve Scully/Guest: Dr. Peniel Joseph on the Effectiveness of NFL Protests |
| **10/20/17** | Lyndon, Lunch & Lecture Event, Keynote Speaker |
| **10/19/17** | Black Lives Mattered Talk w/ students at the Malcolm X Lounge |
| **10/2017** | Slavery's Capitalism, Featured Speaker. |
| **8/31/17** | UT Austin History Department, The Confederate Statues at UT, Panelist |
| **8/25/17** | PBS Newshour, The Confederate Statue Controversy |
| **6/24/17** | 11th Annual Austin African American Book Festival |
| **4/26/17** | OLLI/LAMP Presentation |
| **4/22/17** | On-Air Interview with Kimberly Atkins from the Washington Journal to discuss "Why Black Lives Matter Still Matters" from the May issue of the New Republic. |
| **3/23/17** | Keynote – John Wood Professorship UMASS Boston McCormack Graduate School of Global Studies and Public Policy |
| **2/24/17** | BARBARA JORDAN WEEK, Keynote speaker at the Barbara Jordan Early |
| 2017, Jan. | MLK Keynote Speaker, City of Austin School District, Austin Texas |
| 2017, Jan. | Panelist, Austin Forum on Diplomacy and State Craft, the Lyndon B. Johnson School of Public Affairs, The University of Texas at Austin |
| 2017, Jan. | Panelist, Opportunity Forum Roundtable Lunch, School of Architecture, The University of Texas at Austin |
| 2016, Dec. | Keynote, Diversity Forum at McCombs Business School, The University of Texas at Austin |

| | |
|---|---|
| 2016, April | Keynote, "Race and the Politics of Access: 1950-Present", Heman Sweatt Symposium on Civil Rights, The University of Texas at Austin Division of Diversity and Community Engagement |
| 2016, April | Panelist, "How Smart Managers Make Diversity Work", Department of Management, McCombs School of Business, The University of Texas at Austin |
| 2016, April | Panelist, "Smart Decarceration: Transforming Criminal Justice in America", School of Social Work, The University of Texas at Austin |
| 2016, March | Panelist, "Confederate Symbols in Public Spaces", Graduate Public Affairs Council, The Lyndon B. Johnson School of Public Affairs, The University of Texas at Austin |
| 2016, Feb. | Lecture, National Book Award Winner Lecture, "Stokely: A Life", Benjamin L. Hooks Institute for Social Change, University of Memphis |
| 2016, Feb. | Keynote, Barbara Jordan Week event at Barbara Jordan Elementary School, the Lyndon B. Johnson School of Public Affairs, The University of Texas at Austin |
| 2015, Dec. | Keynote, State of Black Massachusetts, Urban League |
| 2015, Nov. | Keynote, Macalester College, St. Paul, MN |
| 2015, Nov. | Keynote, Museum of African American History |
| 2015, Oct. | Keynote, Navin Lecture, Harvard University |
| 2015, Sep. | Keynote, Costa Lecture, Ohio University, Athens, OH |
| 2015, Jun. | Keynote, Georgia State University, TRIO Program |
| 2015, Apr. | Keynote, Media and Civil Rights Movement Symposium, University of South Carolina |
| 2015, Apr. | Keynote, Annual Humanities Festival, University of Rhode Island |
| 2015, Apr. | Keynote, Keene State College, New Hampshire |
| 2015, Jan. | Keynote, Emerson College, Boston, MA |
| 2015, Jan. | Martin Luther King Jr. Keynote, Bates College, ME |
| 2015, Jan. | Martin Luther King Jr. Keynote, City of Melrose, MA |
| 2015, Jan. | Keynote, Commonwealth School, Boston |
| 2014, Nov. | Keynote, Medgar Evers College, Brooklyn, NY |
| 2014, Oct. | Keynote, Association for Black Cultural Centers, University of Illinois Urbana Champagne |
| 2014, Sep. | Keynote Speaker, Quinsigamond Community College, Worcester, MA |
| 2014, Feb. | Keynote Speaker, "How Far to the Promised Land?" Northeastern University |
| 2013, Feb. | Keynote Speaker, Black History Month, Boston City Council |
| 2013, Feb. | Keynote Speaker, Black History Month, Babson College |
| 2013, Feb. | Keynote Speaker, Black History Month, Division of Capital Asset Management and Maintenance (MA State) |
| 2013, Jan. | Speaker, Stokely Carmichael and American Democracy in the 1960s, Harvard University W.E.B. Du Bois Institute |
| 2012, Oct. | Keynote Speaker, Strategic National Conference on Mass Incarceration and Reentry, Boston University School of Law |
| 2012, Oct. | Keynote Speaker, Harvard University Institute for Learning in Retirement |
| 2012, Feb. | Keynote Speaker, Stetson University |
| 2012, Feb. | Keynote Speaker, University of Connecticut |
| 2012, Jan. | Keynote Speaker, University of Louisville |
| 2011, Nov. | Keynote Speaker, University of Memphis |

| 2011, Jul. | Keynote Speaker, Harvard University NEH Teaching the Civil Rights Movement Summer Seminar |
|---|---|
| 2011, Jun. | Keynote Speaker, "Stokely Carmichael and Kwame Ture in Historical Context," Sorbonne Nouvelle, Paris, France |
| 2011, Mar. | Keynote Luncheon Speaker, Jackie Robinson Foundation |
| 2011, Feb. | Black History Keynote Speaker, Cambridge Rindge and Latin High School |
| 2011, Feb. | Keynote Lecture, Hunter College |
| 2011, Jan. | Keynote Speaker, City of Brookline, MA MLK Celebration |
| 2010, Oct. | Keynote Speaker, LaGuardia Community College |
| 2010, Apr. | Keynote Lecture, Framingham State College |
| 2010, Apr. | Keynote Lecture, North Carolina A & T |
| 2010, Feb. | Keynote Lecture, Reed College |
| 2010, Feb. | Keynote Lecture, Southern University Law Center |
| 2010, Feb. | Keynote Lecture, Colby College |
| 2010, Jan. | Keynote Speaker, Tufts University (MLK) |
| 2010, Jan. | Keynote Speaker, Boston University |
| 2010, Jan. | Keynote Speaker, Belmont MLK Breakfast |
| 2009, Nov. | Keynote Lecture, University of Georgia |
| 2009, Mar. | Keynote Speaker, Smithsonian National Museum of African American History and Culture |
| 2009, Feb. | Keynote Speaker, University of Rhode Island |
| 2009, Feb. | Keynote Speaker, Central Connecticut State University |
| 2008, Apr. | Invited Keynote Littlefield Lectures, University of Texas-Austin |
| 2008, Apr. | Keynote Lecture, Norfolk State University |
| 2008, Apr. | Keynote Lecture, Anne Braden Institute, University of Louisville |
| 2008, Mar. | Keynote Lecture, Lesley University |
| 2008, Mar. | Keynote Lecture, Central Connecticut State University |
| 2008, Feb. | Keynote Lecture, Earlham College |
| 2008, Feb. | Keynote Lecture, University of North Texas |
| 2008, Feb. | Keynote Lecture, Morgan State University |
| 2007, Sep. | Keynote Lecture: "Waiting 'Til the Midnight Hour: A Narrative History of Black Power in America," Clark University. (Featured Broadcast on C-SPAN's Booknotes, October 21 and 22, 2007.) |
| 2007, Apr. | Keynote: "Revisiting An Epoch: Black Power in American and World History," St. John's University. |
| 2007, Apr. | Keynote: "Waging War Amid Shadows: Black Power's Hidden History," Arizona State University. |
| 2007, Mar. | Keynote: "Rethinking the 1960s: Black Power, Race, and Democracy," City University of New York, Graduate Center. |

*Speaker/Guest Lecturer*

| 2014, Jan. | Speaker, Dreams for NYC Inspired by MLK, New York, NY |
|---|---|
| 2014, Jan. | Speaker, America in the Age of MLK: Teaching the Civil Rights Movement in Schools, Boston, MA |
| 2013, Sep. | Speaker, Boston NAACP's Annual Freedom Fund Dinner, Boston, MA |
| 2011, Nov. | Guest Lecture, "Martin Luther King and Social Justice," Occupy Boston |

| | |
|---|---|
| 2010, Apr. | Invited Speaker, New School University |
| 2010, Apr. | Lecture, Board of Overseers, Tufts Medical University School |
| 2010, Apr. | Invited Speaker, Cambridge Club |
| 2010, Mar. | Speaker, Temple University |
| 2010, Jan. | Speaker, Bus Boys and Poets Bookstore, Washington, DC |
| 2010, Jan. | Speaker, Brecht Forum New York City |
| 2009, Nov. | Black Solidarity Day Speaker, Tufts University |
| 2009, Oct. | Speaker, Voices of a Tufts Diversity Experience, Tufts University |
| 2009, Sep. | After Hours Conversation, Guest Speaker, Tufts University |
| 2009, Jan. | Martin Luther King Lecture, Case Western Reserve University |
| 2009, Jan. | Martin Luther King Lecture, Berea College |
| 2008, Nov. | Letitia Woods Brown Keynote Lecture, DC Historical Society |
| 2008, Nov. | Fellows Lecture, Charles Warren Center, Harvard University |
| 2008, Jul. | Invited Speaker, NEH "The Long Civil Rights Movement" Seminar, Harvard University |
| 2007, Oct. | Lecture "Black Power Studies," Kings College, London |
| 2007, Oct. | Lecture "The Civil Rights and Black Power Movement," Cambridge University |
| 2007, Mar. | Lecture: "The Black Power Movement: A Reassessment," Fordham University |
| 2007, Feb. | Lecture: "Black Power and Civil Rights: A Reassessment," Martin Luther King Public Library, Black Studies Division, Washington, D.C. |

*Panelist/Moderator*

| | |
|---|---|
| 2017, Jan. | Interview, WBUR (Boston, MA), "Martin Luther King, Jr. and President Obama: A Look At Their Legacies", http://www.wbur.org/hereandnow/2017/01/16/mlk-obama-legacies |
| 2015, Jun. | Invited Panelist, JFK Presidential Library, "James Baldwin Forum" |
| 2015, Feb. | Invited Panel, New York University |
| 2014, Nov. | Panelist, "Civil Rights and the Black Power Movement," Plenary, JFK Presidential Library,   Boston, MA |
| 2013, Sep. | Panelist, "All the Way" play analysis, American Repertory Theatre, Cambridge, MA |
| 2013, Aug. | Panelist, John F. Kennedy Library, "The 50th Anniversary of the March On Washington-A Conversation with John Lewis" |
| 2013, Jan. | Panelist, "Songs of a Movement," Central Square Theater |
| 2012, Dec. | Speaker, Black Cultural Program, MCI Concord Prison |
| 2012, Nov. | Speaker, The Windsor School, Boston |
| 2012, Jul. | Organizer and Moderator, "Decision 2012: Race, Democracy, and the New Jim Crow" |
| 2012, Jan. | Panelist, "Stokely Carmicael and American Democracy in the 1960s," Popular Protests in Global Perspective Panel, American Historical Association |
| 2012, Jan. | Panelist, Historians and the Obama Narrative Roundtable, American Historical Association |
| 2011, Sep. | Panelist, "Black Power Mixtape, 1967-1975," Screening, Roxbury Community Center |
| 2011, Jul. | Organizer and Panelist, "Malcolm X: A Life of Reinvention," Harlem Book Fair, Broadcast on C-SPAN Book TV. |

| 2011, Jun. | Panelist, "Rethinking the Black Power Movement in the United States," University of Nantes, France |
| 2011, Feb. | Panelist, Harvard University, Kennedy School |
| 2011, Feb. | Invited Panelist, Mount Holyoke College |
| 2011, Jan. | Invited Panelist, MLK Brooklyn Museum/WNYC Radio Panel |
| 2011, Jan. | Panelist, City of Cambridge, MA "Untold History of Haiti" |
| 2010, Dec. | Panelist, Boston College, Mass Humanities Plenary |
| 2010, Jun. | Graduate Institute For Teaching, Panel on Excellence, Tufts University |
| 2010, Apr. | Panelist, Shaw University-SNCC 50th Anniversary Reunion |
| 2010, Apr. | Panelist, Haiti Forum, Institute for Global Leadership, Tufts University |
| 2010, Nov. | Invited Panelist, Northeastern University, "In Memory and Legacy: The Interdisciplinary of Civil Rights" |
| 2009, Oct. | Moderator, Northeastern University, Lincoln Forum |
| 2008, Nov. | Invited Panelist, MLK Roundtable, D.C. Humanities Council |
| 2007, Oct. | Invited Participant, Internationalizing Black Power Conference, Institute for the Study of the Americas, University of London |
| 2007, Mar. | Invited Panelist, Shabazz Conversations Lecture: "Fannie Lou Hamer, Black Radicalism, and the Search for American Democracy," Schomburg Research Center |
| 2007, Feb. | Provost's Lecture, Stony Brook University, "Dark Days, Bright Nights: Black Power and American Democracy." |

# TEACHING AND RESEARCH INTERESTS

## FIELDS OF MAJOR RESEARCH INTEREST

- Civil Rights/Black Power Movements
- Race and Public Policy
- African American History
- African American Intellectual History
- Black Political Thought
- Black Feminism
- Black Urban History
- Comparative Black Nationalism
- Twentieth Century American Political and Social History
- African Diaspora
- Pan-Africanism
- Barack Obama
- Race and Democracy
- Malcolm X
- Stokely Carmichael/Kwame Ture
- Martin Luther King, Jr.

## COURSES
- The Civil Rights Movement
- The Black Power Movement
- Black Political Thought in the 20th Century
- Black Nationalism in America
- Recent African American History
- The Black Panther Party
- The Post Civil Rights Era
- American Attitudes Toward Race
- Blacks in the Urban City
- The Black Radical Tradition
- Seminar on Civil Rights and Black Power

# ACADEMIC SERVICE

**STUDENT-RELATED SERVICE**
*Dissertation Committees (Outside Reader)*

Ashley Farmer, Harvard University, "Black Women in the Black Power Movement," 2013.

Donald Tibbs, School of Justice Studies, Arizona State University "The North Carolina Prisoners Union," 2006.

*Master's Theses*

Nicole Cedillo, Tufts University "Feminism and the Chicana Movement During the 1960s," 2013.

Spenser Schwerdtfeger, Tufts University "White Grassroots Conservativism during the Civil Rights Era," 2013.

*Senior Honors Theses*

Adam Cooper Barnes, UT-Austin, anticipated 2019.

Duncan MacLaury, Tufts University, "The Black Panther Party in Boston," 2013.

Benji Cohen, Tufts University, "C.L.R. James," 2011.


**UNIVERSITY SERVICE AND COMMITTEE WORK**

**The University of Texas at Austin**
*Program Administration*

2018- 2019      Co-Chair, Diversity and Inclusion Committee, LBJ School of Public Affairs

2017-2018      Member, Diversity and Inclusion Committee, LBJ School of Public Affairs

2016, Spring – present      Director, Center for the Study of Race and Democracy

2016-Spring 2018-Member, Executive Committee, History Department

2016-present, member, Budget Council, LBJ School of Public Affairs


*Events*

Invited Judge, Roddenberry Foundation Fellowship for academic year, 2017-2018.

Robert Arjet, "The New Jim Crow Project: Race and Justice in Austin Travis County", March 8, 2017

Keramet Reiter, "The Rise of Long-Term Solitary Confinement", February 2, 2017 [co-sponsored event with the Center for Health and Social Policy (CHASP)]

Panel discussion, "Injustice Anywhere: Dr. King's Legacy 50 Years After Vietnam", January 25, 2017 [panelist]

Panel discussion, "Black Policy Symposium: Analyzing and Interrogating the Movement for Black Lives Policy Agenda", November 10, 2016. [in collaboration with the Institute for Urban Policy Research and Analysis and the School of Social Work, panelist]

Panel discussion, "Race, Democracy and the 2016 Election" [co-sponsored by Opportunity Forum], October 26, 2016 [panelist]

Conference, "The Black Power Movement and American Political Culture 1966-2016", October 12, 2016 [panelist]

Dr. Ibram Kendi, "Stamped From the Beginning", September 26, 2016

Panel discussion, "Black Lives, American Justice: From Ferguson to Dallas: Part 2", September 21, 2016 [panelist]

Panel discussion, "Black Lives, American Justice: From Ferguson to Dallas: Part 1", September 15, 2016 [panelist]

Dr. Michael Eric Dyson, "The Black Presidency and the 2016 Election", September 8, 2016

Conference, "Race, Democracy, and Public Policy in America: From LBJ'S Great Society to Barack Obama and Black Lives Matter", February 8-9, 2016 [panelist]

*Board and Committee Member*
Committee member, Plutarch Award Committee (Spring 2019)
Executive Committee, Lyndon B. Johnson School of Public Affairs
Budget Council, Lyndon B. Johnson School of Public Affairs
Center for Leadership and Innovation Committee
Executive Committee, Department of History
(Austin) Mayor's Task Force on Institutional Racism and Systemic Inequities
Justice, Power, and Politics Book Series (University of North Carolina Press)


**Tufts University**
*Program Administration*
2013, Fall-2016, Spring          Founding Director, Center for the Study of Race and Democracy

*Events*
2013, Fall-Spring 2015                    Organizer, National Dialogue on Race Day Initiative
2011-2012                    Organizer, Barack Obama and American Democracy Conference
2009-2012                    Coordinator, Gerald Gill Lecture Series, 2009-2012
2010, Spring                    Coordinator, Symposium on President Barack Obama

*Board and Committee Member*
2012, Spring-Soriun 2015          Board Member, BRAND Haiti
2011, Fall-2012, Spring          Co-Chair of Race and Ethnicity Task Force
2011, Fall                    Committee Member, Martin Luther King Jr. Essay Contest
2011, Spring                    Committee Member, Africana Studies Task Force

*Search Committees*
2014, Fall                        Member, Dean of School of Arts and Sciences Search Committee
2011, Spring-2012, Spring         Member, Provost Search Committee
2010, Spring                      Member, Dean of Arts and Science Search Committee

*Mentoring and Supervision*
2011-2012                         Advisor, Freshman Advising
2011, Fall                        Supervisor, Tisch Scholars: Annie Sloane and Libby Schrobe
2010, Fall – Spring 2015          Mentor, RESPE Ayiti Group

*Other*
2010-2011                         Department IT Liaison
2010-Spring 2011                  Department Public Relations Liaison


# LOCAL AND NATIONAL SERVICE

**COMMUNITY ADVOCACY**
2015, Jan. 18         Keynote Speaker, Attleboro, MA Food Shelter and Drive, MLK
                      Celebration
2014, Jan. 21         Keynote Speaker, 26th Annual Rev. Dr. Martin Luther King, Jr. Arlington
                      Birthday Celebration
2013, Sep. 12         Founding Organizer, National Dialogue on Race Day, Tufts University
2013, Sep. 10         Moderator and Speaker, Boston Mayoral Forum
2013, Aug. 16         Speaker, MLK Summer Scholars Program, Boston University
2013, Apr. 8          Guest Speaker, Brooke Mattapan Charter School
2013, Feb. 20         Speaker, Black History Panel, Harvard University
2012, Mar.            Speaker, Timilty Middle School, Dorchester, Boston
2012, Feb. 25         Panelist, Haitian Celebration, University of Massachusetts-Boston


# PROFESSIONAL AFFILIATIONS AND ACTIVITIES

**PROFESSIONAL ACTVITIES**

Advisor, PBS produced film "Black America Since MLK: And Still I Rise", premiered
November 15, 2016

Promotion and Tenure Letter Writer: University of Chicago, University of Minnesota, Saint
Louis University, York College, City University of New York, Duke University, University of
Connecticut, Drexel University Law School, Northwestern University, Rutgers-Newark
Program Committee, 2008 Association for the Study of Afro-American Life and History
          Conference On a rolling, continuous basis over the last ten years.

Chair, Liberty Legacy 2017 and 2008 Book Award Committee (Best Book on Civil Rights),
          Organization of American History.

Panel Member, NAACP Image Awards, Nonfiction Committee, 2007

Organization of American History Membership Committee, 2002-2007 (Co-chair of New York State Committee, 2005-2007)

Co-Chair, New York Chapter, Membership Committee, Organization of American Historians, Spring 2006-

Participant, "Surviving the Job Market" Workshop, American Studies Association Meeting, Washington, D.C., November 5, 2005

Book Reviewer: *Journal of African American History*, *Journal of American History*, 2003-, Manuscript Reviewer: *Journal of American History*; *Journal of Southern History*; *Journal of Social History*; *Journal of Urban History*; *Journal of Women's History*; *Journal of Law and Society*; Cornell University Press; University of Georgia Press

Scholar-in-Residence, Brown University, 2002-2003

Organization of American History Committee on the Status of Minority Historians and Minority History, 2000-2002


**EDITORIAL BOARDS**
*The Sixties Journal* (2008-)
*Transformations in Higher Education: The Engaged Scholar* (2008-)
*SOULS: A Critical Journal of Black Politics, Culture, and Society* (2006-2008)

**PROFESSIONAL AFFILIATIONS**
American Historical Association
Association for the Study of Afro-American History and Life
Association for the Study of the World Wide African Diaspora
Organization of American Historians
Southern Historical Association
PEN American Center
Authors Guild

**FOREIGN LANGUAGES**
Fluent in Haitian Kreyol

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

JAYLA ALLEN, et al.,

PLAINTIFFS

v.                              Civil Case No. 4:18-cv-3985

WALLER COUNTY, et al.,

DEFENDANTS

EXPERT REPORT
OF
Henry Flores, Ph.D.

ON BEHALF OF PLAINTIFFS
JAYLA ALLEN, DAMON JOHNSON, RAUL SANCHEZ, TREASURE SMITH, AND
THE PANTHER PARTY

# TABLE OF CONTENTS

I. **Statement of Purpose**

II. **Evidence and Methodology**

III. **Qualifications**

IV. ***Arlington Heights***

    **A.** Discriminatory Impact
    **B.** Historical Background of Discrimination
    **C.** Sequence of Events
    **D.** Procedural or Substantive Deviations
    **E.** Contemporaneous Viewpoints Expressed by the Decision-Makers

V. **Senate Factors**

**Factor 1**: The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process

**Factor 2**: The extent to which voting in the elections of the state or political subdivision is racially polarized

**Factor 5**: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process

**Factor 7**: The extent to which members of the minority group have been elected to public office in the jurisdiction

**Factor 8**: Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group

**Factor 9**: Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous

**Summary of Senate Factors**

VI. **Conclusions**

**Appendix**

## I.    Statement of Purpose

Plaintiffs in this matter have asked me to consider whether Waller County officials intentionally discriminated against Black and Latinx voters in Prairie View, particularly students at Prairie View A&M University ("PVAMU"), through Waller County's actions in adopting and maintaining an early voting plan for the November 2018 election.[1] I also have been asked to consider whether certain factors, identified by Congress, considered in a "totality of circumstances" analysis under Section 2 of the Voting Rights Act ("Section 2"), interacted with social and historical factors to have the purpose or effect of causing an inequality of political opportunity, particularly with respect to Waller County's early voting plans for the November 2018 election, for Black and Latinx voters in Prairie View.

I am being compensated in the amount of $150 per hour and reasonable expenses for my services. Attached, as an **Appendix,** is a copy of my curriculum vitae, which includes a list of cases in which I have provided written or oral testimony.

## II.    Evidence and Methodology

This report draws upon sources standard in historical and scientific analysis, including: public documents from the Waller County website, such as video recordings of Commissioners Court hearings from January 2018 through May 2019, as well as the Texas Legislative Counsel's Redistricting website and the Texas Secretary of State's website; other government documents; and newspaper and journalistic articles. Additionally, I reviewed demographic information of Waller County and the cities of Waller, Prairie View, Hempstead, Brookshire, Monaville, Igloo, and Hockley, as well as other smaller communities within the county. I also reviewed election

---

[1]"Black" and "African-American" are used interchangeably herein. Both refer to people who identify as Black only or Black in combination with other racial groups, including Black-Hispanic. "Latinx" and "Hispanic" are used interchangeably herein. Both refer to people who identify as Latinx or Hispanic only.

returns for the county for the years 2016 and 2018, court opinions, briefs, memoranda, and correspondence from this case, scholarly articles, and books on the topics of my research.

In assessing intentional discrimination, this report follows the methodological guidelines set forth in the United States Supreme Court's opinion in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), which are similar to procedures followed by historians in making such assessments. In *Arlington Heights*, the Court focused on five distinct factors that are relevant to ascertaining intentional discrimination: (1) discriminatory impact, (2) historical background of discrimination, (3) the sequence of events leading up to the decision, (4) procedural or substantive deviations from the normal decision-making process, and (5) contemporaneous viewpoints expressed by the decision-makers. I analyzed the latter three of those factors: the sequence of events leading up to the decision, procedural or substantive deviations from the normal decision-making process, and contemporaneous viewpoints expressed by the decision-makers. I also reviewed, considered, and incorporated into this report the analyses by other experts for Plaintiffs related to discriminatory impact and the historical background of discrimination. The report uses these factors methodologically only to assess intentional discrimination in Waller County's decision to adopt and maintain the November 2018 early voting plan, not to reach any legal conclusions.

Regarding Section 2's results test, this report will consider, as part of the "totality of circumstances," certain relevant Senate factors, as discussed in *Thornburg v. Gingles*, 478 U.S. 30 (1986). I analyzed the following factors: the responsiveness of Waller County officials to the specific needs of PVAMU students specifically and Prairie View residents generally, and whether the rationales advanced by Waller County for its November 2018 early voting plan are tenuous. I reviewed, considered, and incorporated into this report the analyses by other experts for Plaintiffs

related to the history of official discrimination in Texas generally and Waller County specifically. I also considered the extent to which Black people in Waller County continue to bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process.

## III.    Qualifications

This analysis draws on my extensive experience in voting rights litigation and expertise in political history, political analysis, and historical and statistical methodology.

I am the principal and owner of FloreStat, LLC, a consulting firm. I am also the Distinguished University Research Professor Emeritus of St. Mary's University, where I have been employed for over 35 years.

I have worked as a consultant or expert witness for both plaintiffs and defendants in more than 40 voting and civil rights cases, including several Texas voting rights and reapportionment cases, where I have prepared expert reports, testified in depositions or hearings, or consulted on issues including the history of voting discrimination in Texas; the "totality of the circumstances" inquiry under Section 2 of the Voting Rights Act, including racially polarized voting and other Senate Factors; and the discriminatory racial intent motivating a specific action or series of official actions. Recently, the Southern District of Texas cited my testimony in *Lopez v. Abbott*, a judicial redistricting case, regarding the State of Texas's history of official racial discrimination in voting as part of the court's findings related to the "totality of the circumstances." 339 F. Supp. 3d 589, 611 (S.D. Tex. 2018). I have also performed work for a defendant in a voting rights case in *Arizona Minority Coal. for Fair Redistricting v. Arizona Indep. Redistricting Comm'n*, No. 2002-004380, 2003 WL 25550388 (Ariz. Super. Nov. 10, 2003).

## A. Discriminatory Impact

As discussed in greater detail in the expert report of plaintiffs' expert Dr. Robert Stein, it appears that Waller County's November 2018 early voting plan disproportionately impacted voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View.

As documented in the declaration of plaintiffs' expert William S. Cooper, Prairie View is the only city in Waller County where the majority of voting-age residents are both Black and aged 18 through 20. No other Waller County city or area has more than 8% of voters that are aged 18 through 20. According to the U.S. Bureau of Census' 2010 Census, 54% of the Prairie View voting-age population ("VAP") is 18, 19, or 20 years old. In Waller County as a whole (including Prairie View), a total of 13.6% of the VAP is aged 18 through 20. Further, the City of Prairie View has the highest Voting Age Population ("VAP") in Waller County.

In addition, PVAMU students used early voting at one of the highest rates in Waller County. According to Dr. Stein's expert, during the 2018 election, a greater percentage of PVAMU student voters voted early than non-PVAMU student voters in Waller County (81%, 10% more than voters who were not PVAMU students). Moreover, for the 2018 election, Dr. Stein also found that early voters who live in Waller County neighborhoods that are majority-Black comprised 72% of the early votes cast at the PVAMU Student Center, 47% cast at the Waller County Community Center (located in the City of Prairie View, adjacent to the southmost portions of the PVAMU campus), and 47% cast at Prairie View City Hall

This use of early voting likely stems from a combination of factors, including, but not limited to, the unique lack of transportation and disadvantaged socioeconomic circumstances that Black voters experience in Waller County.[2] Based on the American Community Survey ("ACS")

---

[2] These socioeconomic disparities are detailed in Mr. Cooper's report and also discussed under Senate Factor 5 in this report.

five-year estimates cited in William Cooper's declaration, Black Prairie View voters are also more likely to commute to work by walking, biking, or via carpool (i.e., riding in another person's vehicle), taxicab, or public transit as compared to white Waller County voters. As documented in Dr. Peniel Joseph's expert report, Waller County officials have been aware of the disparities in transportation access that negatively impact PVAMU students' ability to vote off-campus since at least 2008, when these disparities were raised in a federal lawsuit.[3] Along the same lines, Black Waller County voters are more likely to have lived below the poverty line in the last 12 months, as well as lack health insurance, as compared to white Waller County voters. As such, Black voters, particularly those who live in Prairie View, rely on access to early voting.

Despite these realities, including dependence on and frequency rate of early voting, combined with community members' repeated demands for early voting, including on-campus at PVAMU, as detailed below, the County provided Black voters in Prairie View significantly fewer early voting days and hours as compared to white and/or older voters in Waller County, as Dr. Stein's expert report documents.[4] Waller County's decision to offer fewer hours and days of operation of early voting locations in the City of Prairie View—which has the largest concentration of Black voters and Black voters aged 18 through 20 in the County—created a discriminatory impact, which was foreseeable. Moreover, as Dr. Joseph described in greater detail in his report, this decision must be viewed within a wider and contemporaneous voting rights context of an

---

[3] Report of Dr. Joseph at pages 24 through 25; *see also* "The Walk of Political Engagement at PVAMU," *PVAMU* (March 31, 2017) (retrieved from: https://www.pvamu.edu/1876/2017/03/31/the-walk-of-political-engagement-at-pvamu/). In addition, students also protested the County's proposed placement of early voting locations in 2016 due to their inaccessibility to students, who disproportionately lacked access to private vehicles as compared to other voters in Waller County. *See* Samantha Lachman, "Voter Suppression Is Happening Everywhere. This Institute Is Trying To Stop It," *Huffington Post*, March 18, 2016 (retrieved from: https://www.huffpost.com/entry/voting-rights-institute_n_56eb145ae4b03a640a69fe56.
[4] Report of Dr. Stein at page 15 and Exhibit A.

ongoing record of Texas and Waller County, specifically, discriminating against PVAMU students with regard to their right to vote.

### B. Historical Background of Discrimination

Waller County, specifically, and Texas, generally, has a long, intense, and judicially-recognized history of discriminating against Black voters. Over decades, and continuing to the present, the County has repeatedly denied or abridged their right to vote. This undisputed history, which has directly impacted the opportunity for Black people in Waller County to participate fully in the political process and elect candidates of their choice, is detailed in the expert report of Dr. Peniel Joseph. I reviewed this history and incorporate it by reference into this report.

This history shows a repeated and continuous pattern of attempts by Waller County officials to curtail, suppress, and disenfranchise Black voters, especially PVAMU students. Prior to the enfranchisement of Americans over 18 years old in 1971, Waller County had almost no Black voters. Since then, officials have employed practices like restrictive or unnecessary voter registration, property requirements and selective prosecutions, and voter and candidate challenges that have discriminated against PVAMU students and other Black voters in Waller County.

While the modern era of voter suppression against PVAMU dates back to 1971, recent examples underscore Waller County's "stubborn persistence" to disenfranchise Black PVAMU students. Beginning in 1971, the Waller County Tax Assessor-Collector responsible for registering voters denied 45 PVAMU students' registration based on their failure to respond appropriately to the then-residency requirements. The Supreme Court struck down these requirements in 1979.[5]

Then, in 1992, Waller County charged and indicted, by a grand jury, 19 PVAMU students with "illegally voting." The students had not received their voter registration cards in the mail, but

---

[5] *Symm v United States,* 439 U.S. 1105 (1979).

were subsequently allowed to vote after signing affidavits attesting that they were registered to vote. They were then charged with illegal voting. The charges were dropped after intervention by the U.S. Department of Justice.

In 2003, the Waller County District Attorney publicly threatened again to prosecute PVAMU students if they attempted to register without proving that they qualified under his definition of domicile, even though requiring students to meet a higher burden than other county voters to establish residency had long been ruled unconstitutional by the U.S. Supreme Court. This threat ran counter to settled law from the Supreme Court's 1979 decision and prompted PVAMU students to sue Waller County to prevent the District Attorney from making such threats and to file a second lawsuit in Houston federal court to block county officials from restricting early voting days. In court, PVAMU argued that the District Attorney's actions violated the Fourteenth and Fifteenth Amendments to the U.S. Constitution and the Voting Rights Act. Only in response to the litigation—and after the Texas Secretary of State, the Texas Attorney General's Office, and the U.S. Department of Justice intervened—did Waller County District Attorney decline to take further prosecutorial action. Ultimately, the U.S. District Court for the Southern District of Texas in Houston approved a settlement agreement and order in the federal lawsuit in which the Waller County District Attorney acknowledged that his actions and statements wrongly and unconstitutionally "left the impression that students in Waller County should not enjoy the same presumption of domicile for voting purposes as nonstudent residents of the County."[6]

In February 2004, PVAMU students filed a lawsuit against Waller County seeking to expand their access to early voting after Waller County reduced the number of days of voting at a

---

[6] Consent Order at 11, *Prairie View Chapter of NAACP v. Kitzman*, No. 4:04-cv-00459 (S.D. Tex. Feb. 24, 2004), ECF No. 11.

City of Prairie View early voting location from two to one, claiming that there were not enough voters to justify more than one site.[7]

In 2007, the U.S. District Court for the Southern District of Texas in Houston was called upon once again to oversee a federal lawsuit regarding Waller County's violation of federal voting rights statutes. This time, the U.S. Department of Justice under then-President George W. Bush had filed suit arguing that Waller County was in violation of Section 5 of the Voting Rights Act (VRA). Waller County had implemented new voter registration procedures that negatively—and selectively—impacted PVAMU students, without obtaining Section 5 preclearance.[8] This time, the Southern District of Texas in Houston entered a consent decree in which Waller County admitted that its actions violated both Section 5 of the Voting Rights Act and Title I of the Civil Rights Act of 1964.[9]

In 2008, Waller County entered into a consent decree with the U.S. Department of Justice to ensure that the County would halt registration practices that had not been precleared, as required under law through Section 5 of the Voting Rights Act.

PVAMU students have had to constantly protest and fight to gain access to an on-campus voting site. In 2008, PVAMU students organized a demonstration to obtain an early voting site on campus to participate in the General Election. Despite the PVAMU campus's large and growing voter population, discussed in more detail in this report and Mr. Cooper's report, the County continued to refuse for five more years to allow an early voting site on campus. Only in 2013, after appeals from the PVAMU president, the president of the PVAMU Student Government Association, the Texas Secretary of State, and True the Vote, a national group focused on voter

---

[7] "Prairie View Students File another Voting Rights Suit," February 16, 2004, https://www.myplainview.com/news/article/Prairie-View-students-file-another-voting-rights-8814873.php.
[8] Consent Decree at 3, *United States v. Waller Cty.*, No. 4:08-cv-03022 (S.D. Tex. Oct. 17, 2008), ECF No. 8.
[9] Ibid. at 4-5.

fraud, did Waller County finally relent and provide early voting on the PVAMU campus. Following the change, PVAMU continued to organize to ensure the use of that site as recently as 2016 and, as evident by this case, 2018.

As documented in Dr. Joseph's report, federal courts have found that some discriminatory voting laws and practices in Texas have been a response to demographic change in the state, which some elected officials apparently see as a threat to their ability to win elections. In 2016, for example, a full panel of judges of the Fifth Circuit Court of Appeals affirmed the Texas district court's ruling that the Texas voter ID law was racially discriminatory. The *en banc* federal appellate court observed that the restrictive voter ID bill was passed "in the wake of a 'seismic demographic shift,' as minority populations rapidly increased in Texas, such that . . . the party currently in power [wa]s 'facing a declining voter base and c[ould] gain partisan advantage' through a strict voter ID law."[10] The historical background of this demographic shift and the state's response to it provided credible evidence that discriminatory intent motivated the voter ID law.

As Dr. Joseph discusses, the same kind of response to demographic changes can also be observed in this case. As documented in the declaration of plaintiffs' expert, William S. Cooper, the proportion of Waller County's citizen voting-age population ("CVAP") that consists of Black citizens of voting age has increased by more than two percentage points since the 2010 Census, while the non-Hispanic white or "Anglo" proportion of Waller County's CVAP has decreased by more than two percentage points. Waller County officials appear to have responded to this increase in Black residents' relative voting strength by seeking to make it more difficult for Black voters and Black PVAMU students to vote.

---

[10] *Veasey v. Abbott*, 830 F.3d 216, 241 (5th Cir. 2016) (en banc).

It is clear from this extensive list of occurrences that there is a pattern of Waller County acting to discriminate against the students at PVAMU in their attempts at obtaining their voting rights. This well-understood and judicially recognized history of extensive and ongoing efforts to suppress PVAMU students' voting informs and provides context for the Commissioners Court actions surrounding the early voting schedule for the 2018 November election.

## C. Sequence of Events

### *Process of Adoption of the Original (Pre-Filing of the Present Litigation) Early Voting Plan*

The sequence of events leading to the adoption and maintenance of the original early voting plan for the 2018 general election began on August 22, 2018. This coincided with when PVAMU students were just returning to campus for the Fall 2018 semester.[11] The students were not consulted during this early and essential part of the process, nor was it convenient for the students to participate because at this time they were just returning to campus for the beginning of the Fall semester. Moreover, as discussed in more detail below, the Commissioners Court's actions with respect to approving the early voting hours appear to have been taken outside of the public hearing process, so that public participation by PVAMU students—and by anyone other than two partisan officials—was limited, if not effectively impossible. The Commissioners also appear to have made no attempts to consult with PVAMU students in the development of the plan; in fact, their actions suggest an inappropriate tendency to shield their deliberations from public scrutiny until the last minute.

These actions were taken by the Commissioners Court despite being aware of the predictable pressures experienced by students at the beginning of the school year, such as moving

---

[11]According to PVAMU's website, an event titled "Fall 2018 Move-in" was scheduled for August 19, 2018. Prairie View A&M University, http://www.pvamu.edu/event/fall-2018-move-in/. The first day of classes was August 27, 2018.

into dormitories, participating in academic advising processes, and scheduling and enrolling in classes. Although no doubt aware that these typical student activities made it difficult for students to advocate for a fair early voting plan in August and September, the county exacerbated that difficulty by approving the <u>days</u> and <u>hours</u> of early voting in a closed and unpublicized process that barred PVAMU students from having a voice in the formation of the plan.[12] The predictable coincidence of the early voting plan's non-public development and approval with the arrival of students to campus was likely particularly deleterious to first-year students, who were newly registered to vote and unfamiliar with their new surroundings. The students, new and returning, did not have time to inform themselves of the process—even as they were simultaneously kept out of the conversation by the county government officials during the planning for early voting.

Waller County officials could have accommodated these well-known inconveniences to PVAMU students but chose not to do so. Waller County officials should have provided opportunities for PVAMU students to learn about the early voting plans, as legitimate residents who were eligible to vote and participate in county affairs, such as the decisions surrounding the scheduling of the early voting hours and locations. For example, the Commissioners could have participated in PVAMU's "back-to-school" or registration activities, distributing literature to campus representatives about the process by which the Commissioners Court planned to develop and approve early voting plans, actively soliciting input from students, or even taking the minimal and common-sense step of publicizing the dates on which they planned to approve early voting <u>hours</u> and <u>days</u>. Based on my review of the record, however, the county took none of these actions.

---

[12] Ultimately, as the report of plaintiffs' expert, Dr. Stein, documents, which also is discussed more below, the county appears to have taken advantage of that closed and unpublicized process to develop an early voting schedule that specifically and disproportionately denied PVAMU students' access to voting opportunities.

As a result, it appears that the students' interests were not simply ignored but actively avoided by Waller County officials during the planning process.

Specifically, on August 22, 2018, the four members in attendance at a regularly scheduled meeting of the five-member Waller County Commissioners Court unanimously approved only the early voting <u>locations</u> for the November 2018 General Election.[13] During the public comment portion of the August 22 meeting, a member of the public, Dr. Denise Mattox, informed the Commissioners that she had reviewed the proposed list of locations to be approved at the meeting and noted with concern "that it doesn't have the early voting <u>times</u>."[14] She further stated: "I guess you'll do that at a later date, and hopefully I can have some input into that."[15] However, she said, because the Commissioners had not yet publicized or discussed the proposed hours and dates of early voting, there was at that time "not enough information to have input on the early voting, which is what [she was] mostly concerned about."[16]

Precinct 4 Commissioner Justin Beckendorff then stated: "On this it says 7 a.m. to 7 p.m."[17] But County Judge Carbett Duhon corrected him, explaining that those times referred only to the voting hours on Election Day. "It doesn't have the early voting times," Judge Duhon stated.[18] Judge Duhon then confirmed that the Commissioners were "just voting on locations, according to the agenda item."[19]

Ms. Christy Eason, Waller County's elections administrator, was not in attendance; however, County Judge Duhon read into the record an email from Ms. Eason stating that "[e]arly

---

[13] *See* Waller County, Tex., *August 22, 2018 Commissioners Court* at 3:51, http://wallercountytx.swagit.com/play/08222018-816.
[14] Ibid. at 21:55 (emphasis added).
[15] Ibid. at 22:09.
[16] Ibid. at 22:36.
[17] Ibid. at 22:48.
[18] Ibid. at 22:54.
[19] Ibid. at 23:01.

voting <u>dates</u> and <u>times</u> in each early voting polling location will be set after our training on the new equipment."[20] Judge Duhon then recounted a subsequent telephone conversation he claimed to have had with Ms. Eason in which he had asked Ms. Eason "if the party chairs, if everybody was on the same page, in agreement with the schedule, and she said they were."[21] Prior to the vote, Commissioner Beckendorff confirmed that "right now we're just voting on the locations, and the times, I guess, will be discussed at a later date."[22]

The discussion of proposed <u>hours</u> or <u>dates</u> for early voting for the November 2018 election does not appear in any public records I reviewed. Additionally, based on the records I reviewed, the date on which <u>hours</u> or <u>dates</u> of early voting would ultimately be considered or approved by the Commissioners Court was not made public in advance.

At that time, before the Commissioners Court's change in composition following the November 2018 election, the five members of the Commissioners Court included: County Judge Carbett "Trey" Duhon III, Precinct 1 Commissioner John A. Amsler, Precinct 2 Commissioner Russell Klecka, Precinct 3 Commissioner Jeron Barnett, and Precinct 4 Commissioner Justin Beckendorff.

At the time of the early voting deliberations, all five members of the Commissioners Court were Republican.[23] Four of the five members of the Commissioners Court were white. The fifth

---

[20] Ibid. at 2:58.
[21] Ibid. at 3:20.
[22] Ibid. at 3:32.
[23] *See* Waller County, Tex., *Cumulative Report – Official* at 6 (Mar. 11, 2014, 10:11 AM), http://www.co.waller.tx.us/page/open/1265/0/03.04.2014%20Primary%20Cumulative%20-%20Rep (County Judge Duhon running as Republican); Waller County, Tex., *Republican Party Canvass Report – Total Votes – Official* at 23 (Mar. 9, 2016, 3:27 PM), http://www.co.waller.tx.us/page/open/1260/0/03.01.2016%20Primary%20Canvass%20-%20Rep (Prec. 1 Comm'r Amsler running as Republican); Waller County, Tex., *Cumulative Report – Official* at 6 (Mar.11, 2014, 10:11AM), http://www.co.waller.tx.us/page/open/1265/0/03.04.2014%20Primary%20Cumulative%20-%20Rep (Prec. 2 Comm'r Klecka running as Republican); Republican Party of Tex., *Chairman Dickey's Update – 3.19.2018*, (Mar. 19, 2018), https://www.texasgop.org/8292-2/ (announcing Prec. 3 Comm'r Barnett's switch to Republican Party in early 2018); Waller County, Tex., *Cumulative Report – Official* at 7 (Mar. 11, 2014, 10:11

15

member, Mr. Jeron Barnett, is Black and was elected from a district in which the majority of citizen voting-age people are Black. Mr. Barnett switched from the Democratic Party to the Republican Party in March 2018 and was not in attendance at the August 22, 2018 meeting.

Subsequently, at some point in late August or early September 2018, but apparently not during a public meeting, the Commissioners Court approved an early voting plan based upon a proposal by chairs of the Democratic and Republic parties. Each of the two major political parties in Waller County had a local chair. David W. Luther, who is white, was the Republican Chair. Rosa Harris, who is Latina, was the Democratic chair.

In the October 17, 2018 Commissioners Court meeting, Judge Duhon stated that the Commissioners had "approved the early voting schedule back on September 22."[24] He then reiterated this point, stating that, on "September 22nd, this court approved the schedule and at that time we had the locations, the times," and further indicating that "[t]here was no discussion, there was nobody that showed up, nobody gave any comment at all."[25] Later in the same meeting, in response to a question from a PVAMU student, Judge Duhon stated that the early voting schedule was "usually approved about a month ahead of the early voting."[26] The student then asked Judge Duhon: "So around, like, September 22nd?"[27] Judge Duhon responded in the affirmative, thus seeming to state for the second time that the early voting hours and dates were approved on September 22, 2018.

---

AM), http://www.co.waller.tx.us/page/open/1265/0/03.04.2014%20Primary%20Cumulative%20-%20Rep (Prec. 4 Comm'r Beckendorff running as Republican).

[24] *See* Waller County, Tex., *October 17, 2018 Commissioners Court* at 47:54, http://wallercountytx.swagit.com/play/10172018-1225.

[25] Ibid.

[26] Ibid. at 86:32.

[27] Ibid. at 86:37.

But Judge Duhon's repeated insistence during the October 17 meeting that the early voting plan was approved on September 22 is contradicted by the public record and his own later statements. September 22, 2018 was a Saturday, and there is no record of a Commissioners Court meeting on that date. More recently, in response to an interrogatory in this lawsuit, Judge Duhon stated that the early voting hours and dates were "approved/adopted by Commissioners Court on September 5, 2018 as part of a comprehensive order calling the eneral election."[28] However, my review of the meeting agenda, minutes, and video for the September 5, 2018 Commissioners Court meeting substantiates only part of this statement. During the September 5 meeting, Judge Duhon indeed made a motion, which was approved, to order the General Election on November 6, 2018. However, there was no discussion or even identification of early voting hours or dates during that motion or approval process.[29]

The meeting agenda,[30] minutes,[31] and agenda backup[32] for the September 5 meeting also fail to identify the proposed hours or dates of early voting that the Commissioners would purportedly be approving in that meeting. Additionally, a review of previous Waller County Commissioners Court hearings did not reveal any public hearings on proposed early voting hours or dates from Ms. Eason or from the party chairs, or any public discussion or dissemination of any proposed early voting hours or dates. Nor did any meetings held after September 5 but before October 17, 2018 reflect such a consideration. Thus, the date and process by which the original

---

[28] *Defendant Judge Trey Duhon's Response and Objections to Plaintiffs' First Set of Interrogatories* at 3 (provided by Plaintiffs' attorneys).

[29] *See* Waller County, Tex., *September 5, 2018 Commissioners Court,* http://wallercountytx.swagit.com/play/09052018-654.

[30] *See* Notice of Meeting of Commissioners Court of Waller County, Texas, Wednesday September 5, 2018, http://www.co.waller.tx.us/upload/template/0461/docs/2018CC/Agenda%20090518.pdf

[31] *See* Minutes, Waller County Commissioners Court Regular Session — September 5, 2018, http://www.co.waller.tx.us/page/download/431/0/09.05.18 Regular.pdf.

[32] *See* Agenda Backup, Waller County Commissioners Court Regular Session (Sept. 5, 2018), http://www.co.waller.tx.us/upload/template/0461/docs/2018CC/Number%20Backup%20090518.pdf

early voting <u>hours</u> and <u>dates</u> were considered and approved is not substantiated in the public record.[33]

Based on these circumstances, my opinion is that the procedural sequence of events by which the early voting plan for the November 2018 General Election was developed and adopted was insufficiently open and transparent. Based on a review of Dr. Stein's report, in addition to my conversation with the Bexar County Elections Administrator, it also appears that this process was inconsistent with and departed from best practices.

*Substantive Effect of the Original Early Voting Plan*

At some point after the Original Early Voting Plan was adopted through the non-transparent and irregular process described above, it was posted on the Waller County website with <u>dates</u>, <u>locations</u>, and <u>times</u> identified for both weeks of early voting.[34]

Texas provides up to two weeks of early voting. Tex. Elec. Code § 85.001(a). Generally, the last day of early voting must be the Friday before the Tuesday General Election Day. *Ibid.*

In Waller County, during the first week of the two-week early voting period in 2018, there were no early voting sites or opportunities anywhere in Prairie View. Only three days of early voting (Monday-Wednesday, from 8:00 a.m. to 5:00 p.m.) were scheduled to take place at the on-campus polling site at PVAMU Memorial Student Center during the second week of early voting for a total of 27 hours, under the early voting plan that the Commissioners developed and approved

---

[33] During the September 19, 2018 meeting, the Commissioners Court unanimously approved a notice of general election. Again, there was no discussion or identification of the <u>hours</u> or <u>days</u> during the meeting. Waller County, Tex., *September 19, 2018 Commissioners Court*, http://wallercountytx.swagit.com/play/09192018-1049. During the October 10, 2018 meeting, Christy Eason requested a motion, which was approved, to add "additional hours to the early voting hours that you've already approved" in Brookshire and at the Waller courthouse. Waller County, Tex., *October 10, 2018 Commissioners Court*, http://wallercountytx.swagit.com/play/10102018-554g. Based on this comment, the county's early voting hours were already approved by at least October 10, 2018. But none of the meetings from August 22, 2018 to October 10, 2018 included discussion or agenda items related to approving early voting <u>hours</u>.

[34] Waller County Elections, October 2018, http://www.co.waller.tx.us/page/Elections.Calendar?date=10-22-2018.

without public input in August and September of 2018. Based on publicly available documents and the information provided by the Defendants during this litigation, these hours and days were approved without any consultation with the students at PVAMU.

In this original plan, the Commissioners also scheduled only two days of early voting at the Prairie View Community Center for a total of 24 hours, also exclusively in the second week of early voting. Prairie View A&M University is 83% Black among its student body,[35] while the City of Prairie View is 90.21% Black with a voting-age population of 91.99% Black.[36] Initially, the Commissioners did not allocate any early voting hours for any Prairie View polling location during the first week of early voting. Additionally, the Commissioners initially did not allocate any evening or weekend early voting hours allotted to any location in Prairie View—on or off PVAMU's campus—between the first and second weeks of early voting.

This contrasts with the early voting hours and days scheduled for the City of Waller, which has a majority white voting-age population (VAP) and where less than 8% of the VAP is under the age of 21.[37] The Commissioners allocated two early voting locations to the City of Waller. The first location, Waller Independent School District, had six days of early voting for a total of 50 hours, while the second location, Fieldstone, had three days for a total of 23 hours. Both locations in Waller had Saturday early voting hours, as well. During the second week, the Commissioners provided Waller with five days of early voting, totaling 51 hours, including two days of extended evening hours up until 7:00 p.m. As a result, the Commissioners afforded the City of Waller voters eleven days of early voting, for a grand total of 124 hours, between Waller ISD and the Fieldstore

---

[35] Prairie View A&M University Enrollment Snapshots: Fall 2018 at 6 (last visited June 29, 2019), http://www.pvamu.edu/ir/wp-content/uploads/sites/98/FA18_Enrollment-Snapshots.pdf.
[36] Declaration of William S. Cooper at pages 6 and 7.
[37] Ibid. at pages 7 and 9.

voting locations. Below is a summary of the total number of early voting hours per week for each early voting location in Waller County during the 2018 general glection under the initial plan.[38]

| | | | |
|---|---|---|---|
| **2018 General Election Early Voting Hours and Locations** | | | |
| | **Week 1** | **Week 2** | **Total** |
| **Waller County Court House (Hempstead)** | 55 | 51 | 106 |
| **Waller ISD (Waller)** | 50 | 51 | 101 |
| **Waller County Library (Brookshire)** | 55 | 51 | 106 |
| **Fieldstore (Waller)** | 23 | 0 | 23 |
| **JP # 3 Monaville** | 23 | 0 | 23 |
| **Katy VFW** | 27 | 0 | 27 |
| **PVAMU Memorial Student Center** | 0 | 27 | 27 |
| **Waller County Community Center (Prairie View)** | 0 | 24 | 24 |

**SOURCE:** ECF Document No. 49

As the data in the above table demonstrate, under the initial early voting plan, the Commissioners provided PVAMU and the Waller County Community Center, which is located off-campus of PVAMU in Prairie View, with far fewer hours and hours only during the second week of early voting as compared to what they provided in other urban areas of Waller County like Waller and Brookshire. Notably, as discussed in Dr. Stein's expert report, Precinct 309, the PVAMU campus voting precinct is home to the largest number of registered voters of any precinct in Waller County.[39] As a result, it does not appear that the number of early voting hours allocated to PVAMU specifically and Prairie View City generally are on equitable footing with other areas of Waller County.

---

[38] *See* Report of Dr. Stein at Exhibit A.
[39] Report of Dr. Stein at page 10.

*Proposed but Unsuccessful Modification of the Original Early Voting Plan on October 17, 2018*

Apparently in response to this stark disparity, the agenda for the Commissioners Court's October 17, 2018 hearing included discussion of modifications to the early voting plan proposed by the county's election administrator, Christy Eason. During the October 17, 2018 hearing, several Black persons, students, community leaders, and elected members of the Prairie View City Council testified and objected to the proposed early voting plan. The testimony, referenced in more detail below, noted the disparate treatment in the plan and the negative impact on the PVAMU students.

During discussion of the corresponding agenda item during the October 17 Commissioners Court meeting, Election Administrator Christy Eason proposed changes to the early voting hours. Ms. Eason began her presentation noting that she was proposing her changes to the early voting schedule because she had determined that the original early voting schedule did not provide "equal representation" to the PVAMU students.[40] As a result, Ms. Eason proposed adding additional days of early voting at the student center on the PVAMU campus and Prairie View City Hall during the first week. She also proposed extending the voting hours from 8:00 a.m. to 5:00 p.m. to 7:00 a.m. to 7:00 p.m. During the presentation of her proposal, Ms. Eason noted that the "hubs" of Waller County were Prairie View, Waller, Brookshire, and Hempstead, and that *only* Prairie View lacked early voting on every day of the early voting period. "[W]e have to give them equal representation," Ms. Eason stated. Judge Duhon similarly agreed that "we have to give [students] equal access."[41] So, according to Ms. Eason, it was in the spirit of equal representation that Prairie View should have the same number of early voting hours as the other three hubs (i.e., Waller,

---

[40] *See* Waller County Tex., *October 17, 2018, Commissioners Court,* http://wallercountytx.swagit.com/play/10172018-1225 at 41:18.
[41] Ibid. at 58:32.

Brookshire, and Hempstead). Ms. Eason concluded her remarks by stating that she felt the process for choosing hours and locations needed to be standardized and be more inclusive so that citizens from every part of the county could have a voice in the process. Standardization, she expressed, would avoid the last-minute chaos surrounding the decision.

After hearing Ms. Eason's proposal, Judge Duhon acknowledged: "I do think there is an inequity" with respect to the limited number of early voting days and hours provided to Prairie View under the Original Early Voting Plan.[42]

Precinct 1 Commissioner John Amsler noted in commentary that the conversation about unfairness to PVAMU students was "beginning to sound like a broken record." "Ever since I've been on this court," he added, "when it comes to election time, *this same issue comes up every time*."[43]

Dr. Denise Mattox, an African American pediatrician and a former candidate for public office, who testified at the October 17 meeting referenced above, requested that the Commissioners Court grant PVAMU students additional early voting hours, noting that "*every year*" she had "*ask[ed] that the students of Prairie View be allowed parity*" with respect to early voting on campus. She noted that other universities, such as the University of Texas at Austin and Texas A&M University, have early voting for their students on campus for the entire early voting period and said that she could not understand why the PVAMU students were treated differently. Dr. Mattox also pointed out that Prairie View was one of the "metropolitan" areas of Waller County yet only had a limited number of early voting hours, while the other three "metro" areas—likely

---

[42] Ibid. at 60:52.
[43] Ibid. at 74:45 (emphasis added).

those also referenced above by Ms. Eason—had early voting every day of the period. This did not appear to be fair, she said.[44]

Five Prairie View A&M University students, who are Black, also presented their testimony on October 17. Mr. Kendric Jones, the Student Government Association President and a member of the Prairie View City Council, requested that early voting be established on campus, even if only for one or two days during the first week. Mr. Jones said: "I feel like we should have the same right … to be able to [vote] within our County."[45] Judge Duhon asked him if adding several days at the Waller County Community Center was acceptable to students; in response, Mr. Jones explained that students did not frequently visit the post office next to the community center because they received their mail on campus.[46] As a result, Mr. Jones said, offering early voting at the community center would not be an effective substitute for early voting at the on-campus Memorial Student Center, which, in contrast to the community center, was a center of campus life for PVAMU students.

Mr. Jones was followed by Ms. Kirsten Budwine, a certified student voter registrar, who pointed out that the issue of not placing sufficient number of hours of early voting on the PVAMU campus is a recurring issue that occurred "last year [and] the year before."

Ms. Budwine was followed by Mr. Xante' Wallace, a PVAMU graduate student and elected Prairie View City Council member, who substantiated Ms. Budwine's statement of the recurring problem of not having enough early voting hours for the student body.[47] According to Mr. Wallace, "for it to be zero days on the first week of Early Voting after all of the issues we've had over the years and decades, that should never even become an issue … And I feel like this is a grave

---

[44] Ibid. at 77:06 (emphasis added).
[45] Ibid. at 82:10.
[46] Ibid. at 83:32.
[47] Ibid. at 88:46.

injustice that we have zero days." He also spoke in support of Ms. Eason's recommendations for amending the early voting hours.

Mr. Joshua Muhammad, then a PVAMU student, urged the Commissioners to provide early voting on-campus during the first week.[48]

Mr. Antonious Brown, another PVAMU student and an employee of the United States Army, testified that there were approximately 3,000 potential registered voters on the campus who were members of the Waller County community and would not be served if the early voting hours on the campus were not expanded. He urged the Commissioners to consult with a PVAMU representative when deciding on an early voting schedule, rather than relying on party chairs who do not represent students like him who are not affiliated with a political party.[49] Mr. Brown also echoed the sentiment of Mr. Jones that PVAMU students desired on-campus voting because "that's how student life just works. I mean, most of them are young, they don't have cars…so like having gas…it's a long time they have to scrape enough money to go do that."[50]

Finally, Ms. Shari Griswold, a white woman, pointed out that it was apparent that the process through which early voting hours and locations was chosen was broken and needed to be repaired to standardize it and avoid the chaos surrounding the selection of dates and hours. She also spoke in support of Ms. Eason's proposal. Ms. Griswold stated that she "would strongly recommend to the Commissioners and to the Judge that you acknowledge and honor what our own Elections Administrator has requested."[51]

After hearing these comments, Judge Duhon asked if there were three votes among the Commissioners in support of Ms. Eason's proposal and he was met by silence from Commissioner

[48] Ibid. at 92:42.
[49] Ibid. at 93:37.
[50] Ibid. at 93:24.
[51] Ibid. at 99:25.

Klecka and refusals from Commissioners Barnett, Amsler, and Beckendorff. Commissioner Barnett stated that he would not support Ms. Easons's proposal to add days of early voting in Prairie View unless additional days were also provided to Monaville.[52] Commissioner Amsler said that he "vote[d] nay."[53] Commissioner Beckendorff said simply: "No."[54]

Referring to Commissioner Barnett's objection to the proposal because it did not add early voting days in Monaville, Ms. Eason stated: "Can I be very honest with you? Mr. Barnett, Monaville just does not vote that heavy there, I mean not for five days."[55]

After the Commissioners had rejected the proposed modifications suggested by the Elections Administrator, Ms. Eason, Judge Duhon then proposed an alternative plan that would have provided three additional days of early voting during the first week at the Waller County Community Center in the City of Prairie View, while extending the hours of early voting in Monaville by three hours each day during the first week of early voting. During an exchange with Commissioner Beckendorff, Ms. Eason confirmed that the county's existing inventory of voting machines was adequate to support such a change:

> Commissioner Beckendorff: "Do you have the equipment to do that?"
>
> Ms. Eason: "Yeah, I can do that."
>
> Commissioner Beckendorff: "You can add another location the first week?"
>
> Ms. Eason: "Yeah, because I can move it from there down to the next week."[56]

However, Judge Duhon's proposal did not receive a second.

---

[52] Ibid. at 101:37.
[53] Ibid. at 101:40.
[54] Ibid. at 101:42.
[55] Ibid. at 103:09.
[56] Ibid. at 107:04.

At other points during the October 17 meeting, several Commissioners made informal proposals that were not put to a vote but would have revised or supplemented the <u>days</u> and <u>hours</u> of early voting at various locations in the county. For example, Commissioner Beckendorff proposed moving three days of early voting at the Memorial Student Center on PVAMU's campus from the second week to the first week.[57] Judge Duhon proposed adding three additional days of early voting during the first week in Monaville, so that early voting would be available there throughout the first week.[58] Judge Duhon, Commissioner Beckendorff, and Ms. Eason discussed extending the hours of early voting in Monaville, Katy, and Fieldstore from nine hours each day to twelve each day.[59] Ms. Eason once again indicated that Monaville's population was too small to necessitate five days of early voting.[60] Once again, Ms. Eason, the Elections Administrator, made the Commissioners aware that the county *did* have sufficient resources to add additional days of early voting at Monaville or another location, if the days were consecutive "so we can use the same machine."[61]

Ultimately, however, Commissioner Amsler moved to <u>not</u> modify the original early voting schedule and his motion was passed 3-2 with County Judge Duhon and Commissioner Barnett being voted down by Commissioners Beckendorff, Amsler, and Smith.

On October 22, 2018, Plaintiffs' filed this lawsuit.

---

[57] Ibid. at 105:24 (Commissioner Beckendorff: "Why can't we just, if they want voting at the MSC, why can't we just put the original back MSC the first week? And make it simple? The first week is the MSC, and the second week it's at the Community Center. That was the original plan.").
[58] Ibid. at 104:07 (Judge Duhon: "Could we add Monday, Tuesday, Wednesday of the first week in Monaville? And so Monaville would be the entire week?").
[59] Ibid. at 104:17-105:23.
[60] Ibid. at 103:09.
[61] Ibid. at 103:45-104:06.

*Waller County's Modified (Post-Filing of the Present Litigation) Early Voting Plan*

On October 24, 2018, explicitly in response to the filing of the present lawsuit, the Commissioners Court held an emergency meeting that covered two issues. The first was to announce this lawsuit, *Allen, et al. v. Waller County, et al.,* and the second was to pass a motion amending the early voting hours. The meeting opened with Judge Duhon announcing that the Commissioners Court was going to adjourn into Executive Session to discuss a possible settlement to the lawsuit. After the court returned several hours later, Judge Duhon announced that no settlement had been reached. Judge Duhon then announced a motion extending the early voting hours at PVAMU by one hour in the morning and two hours in the evening, so that the amended hours would be 7:00 a.m. to 7:00 p.m. (rather than 8:00 a.m. to 5:00 p.m.) on Monday through Wednesday of the second week of early voting, and adding Sunday afternoon voting at Prairie View City Hall, from 12:00 p.m. to 5:00 p.m. The motion passed unanimously with one Commissioner absent (Commissioner Klecka) and no discussion. Although the meeting apparently occupied much of the workday, the public portions of the proceedings lasted just a few minutes. Judge Duhon then read a statement in response to the lawsuit, which is discussed in more detail below.

### D.  Procedural or Substantive Deviations from the Normal Procedural Sequence

A review of all Commissioners Court hearings where the early voting process for the November 2018 elections in Waller County was discussed did not reveal any insight into how the hours and locations were chosen. The record only revealed the Commissioners Court's initial refusal to modify the early voting plan to provide "equal representation" on October 17, and then the Commissioners Courts' contradictory action of unanimously approving the modified schedule on October 24, together with the testimonies at those meetings that have been discussed above.

This lack of transparency and public input is a substantive and procedural departure from the normal procedural sequences employed in other Texas counties. For instance, if any decision regarding the early voting schedule was made behind closed doors or at an unannounced executive session, this chosen process would seem to run afoul of the State's open meeting law. *See* Tex. Gov't Code Ann. §§ 551.001-40.

In addition, the October 17, 2018 Commissioners Court meeting included several procedural departures. For example, Dr. Denise Mattox, a Black woman referenced above, pointed out to the Commissioners that every year the Commissioners are forced to amend the early voting or election day schedules to allow equal access to the PVAMU students. She further pointed out that the Commissioners, in the recent past, had only acted after the United States Department of Justice or actions in the federal courts intervened to force the County officials to amend early voting dates, hours, and locations and election day locations. At that same meeting, Election Administrator Eason pointed out that the County needed to standardize the process for choosing early voting hours and locations and the deliberative process leading to these decisions.

Similarly, Ms. Eason pointed out that the PVAMU students require equal representation in both the process and outcome of the early voting decisions. After acknowledging Election Administrator Eason's statement on the record that the proposed early voting plan was "not equal representation" for PVAMU students, the Commissioners Court refused to amend the plan in line with Ms. Eason's suggestions. Members of the Commissioners Court refused to provide a second for any proposal to adjust or amend the original early voting hours as proposed by Judge Duhon, Commissioner Barnett, or Elections Administrator Eason on October 17, 2018.

Also, during the October 17 hearing, the Waller County Commissioners Court did not officially resolve or commit themselves to creating a standardized decisional process, ignoring

Elections Administrator Eason's recommendation and PVAMU students' requests to determine early voting hours and locations to accommodate the PVAMU student body specifically and the Prairie View community generally.

These statements suggest that Waller County regularly disparately treats PVAMU students as compared to other Waller County residents, as standardized early voting practices are available to the county, as Election Administrator Eason and residents seem to believe and request; yet, the County in 2018 decided to reject standardization. Regardless, based on my review, the current process lacks transparency and opportunity for meaningful public participation before a decision is made, which likely accounts, in part, for the inequality.

The Waller County Commissioners Court heard appeals by several PVAMU students and one Prairie View community member, Ms. Griswold, to repair the decisional process ensuring "equity" or "parity" with regard to the opportunity to participate in both the decisional process for the determination of early voting hours and for the allocation of early voting opportunities. Several of the students supported Election Administrator Eason's proposal to amend the original early voting schedule; yet the Commissioners refused to entertain the proposal and, in the end of that meeting, voted to not amend the schedule. There was no discussion concerning a revision to the decisional process for determining early voting hours and locations. This, on its face, is an example of the lack of responsiveness by the Commissioners to the concerns of a large segment of the Waller County community, the students at PVAMU, that is discussed in more detail below.

During the October 17 meeting, the Commissioners Court failed to modify the November early voting hours and dates after a great deal of debate with one Commissioner, Mr. Amsler, noting that the existing process had already been completed and a decision had already been reached. Mr. Amsler stated that he did not feel it appropriate that students complained after the

decision was made and at such a late hour.[62] Mr. Amsler responded as if students earlier had been provided a role in the decision-making process—a position at odds with the fact that decisions were made behind closed doors in August and September, as demonstrated above. Commissioner Amsler stated that students were provided the opportunity to speak earlier in the process, yet they did not provide input. But this is not accurate. Based on a review of all earlier Commissioner Courts' video transcripts after August 22, 2018, there is no evidence that any public discussions of early voting hours occurred. Instead, it appears that only the political parties were consulted in any decisions concerning early voting. The Commissioners' statements during the October 17, 2018 meeting suggest that the political parties were the sole or primary architects of the early voting plan. For example, Precinct 3 Commissioner Jeron Barnett indicated in commentary in the October 17, 2018 meeting that the Commissioners Court was not meaningfully involved in the process of determining early voting hours or dates. "Going to where I feel is one of the roots of this thing is going back to the Party Chairs," he said.[63] He further commented: "You know, this Court, we don't get a say in selecting any of that—when it comes to us, it's already been selected."[64] Precinct 1 Commissioner John Amsler similarly stated: "We have a process that we've already been through. Both committee chairmen of both parties agreed on this schedule weeks ago! They brought it to us, we approved it."[65] Later, in response to a comment by Dr. Denise Mattox, whom he suggested was a member of the Democratic Party, Commissioner Barnett stated: "We didn't make these choices, you all made these choices."[66]

---

[62] County Judge Duhon expressed a similar contention. Waller County, Tex., *October 17, 2018 Commissioners Court* at 47:55, http://wallercountytx.swagit.com/play/10172018-1225.
[63] Ibid. at 64:32.
[64] Ibid.
[65] Ibid. at 75:02.
[66] Ibid. at 79:32.

However, PVAMU student Kirsten Budwine informed the Commissioners that: "I'm not with the Democratic-Republican fight; it's about fairness and the students."[67] Similarly, PVAMU student Antonious Brown commented: "I am not registered under any party, and I am a student . . . ." The party chairs did not represent him, Mr. Brown explained, "because I'm not registered as a Democrat or a Republican."[68] In response to these comments, Judge Duhon stated: "I think it's a true statement to say that there's a lot of students who do not identify as a Democrat or a Republican. They consider themselves to be Independent."[69] As a result, at one point, Judge Duhon indicated to Ms. Eason specifically that it would be advisable "moving forward . . . in addition to the Party Chairs, to have someone from the University who also is a part of the process when we go about setting the Early Voting schedule."[70]

Moreover, the only reference to early voting on the public record was when the Commissioners voted for locations only, without identifying, discussing, or approving hours on August 22, 2018. As stated above, Judge Duhon made it clear during that meeting that the Commissioners Court would vote on the hours at a later date, after staff received training on the new machines recently purchased by the county. No opportunity for PVAMU students to have participated in the Commissioners Court's deliberations prior to the adoption of the Original Early Voting Plan is reflected in the public record. Judge Duhon also acknowledged that there was no opportunity for students to participate in those deliberations when he, Judge Duhon, mentioned during the October 17 meeting that, "moving forward . . . maybe it is a good idea, in addition to

[67] Ibid. at 86:37.
[68] Ibid. at 93:45.
[69] Ibid. at 96:26.
[70] Ibid.

the party chairs, to have someone from the university who also is a part of the process when we go about setting the early voting schedule."[71]

Judge Duhon also conceded that he had heard even from candidates for public office from the Democratic Party that they had not been consulted by their party chair. Initially, Judge Duhon stated: "This is a process, and that process is the Chairs work together, they are supposed to communicate with their candidates, to go over these Early Voting schedules and make sure that everybody is okay with those schedules."[72] But seconds later, he acknowledged that he was aware that the process did not function properly. "Now, I've talked to some folks and some Democratic candidates that said that did not happen—that they did not get the opportunity from their Party Chair," he said. However, he added, "That's between them and their Party Chair, okay?"[73]

Further, Commissioner Amsler suggested that the October 17 meeting was too late in time for the early voting plan to be modified, stating: "It's a little bit late in the game to be coming back and wanting to change at this point in time."[74] However, this date was in fact not prohibitively late in the Commissioners' own estimations, as was demonstrated the following week when the Commissioners Court made modifications to the early voting schedule at the October 24 emergency meeting after this lawsuit was filed with the unanimous approval of all present Commissioners.

During the regularly scheduled Commissioners Court meeting of October 24 (prior to the emergency meeting held later in the day), the only reference to the early voting issue was made during the public comment section of the meeting, during which any interested member of the public was able to make public comments in front of the Commissioners and before the regularly

---

[71] Ibid. at 96:51.
[72] Ibid. at 50:05.
[73] Ibid.
[74] Ibid. at 49:49.

scheduled agenda items were discussed. The only person making a comment during the regularly scheduled October 24 meeting was Mr. David Luther who, as mentioned above, is white and serves as chair of the Waller County Republican Party. Mr. Luther argued that the lawsuit was about the students' interests only; he claimed that, in speaking against the students' interests, he was going to speak on behalf of all other Waller County residents. Mr. Luther was emphatic in declaring that he opposed the lawsuit and alleged that the lawsuit had nothing to do with denying the votes of PVAMU students. He alleged that a local Democratic politician who was intent on running against Commissioner Barnett was using the students. Mr. Luther stated, while pointing at Commissioner Barnett, that "they have their sights on you, because they hold you, they are going to hold you responsible." He was not clear as to what Commissioner Barnett was responsible for. Neither Commissioner Barnett nor any other Commissioner openly rejected or expressed any disagreement with what Mr. Luther argued.

Mr. Luther then stated that the students did not care for the interests of the other residents of Waller County and urged the Commissioners to consider the "long lasting implications of allowing yourselves to be black-mailed by the federal courts, allow yourselves to be used by the Democrats, to be black-mailed by the Democratic Party as they use the courts to get what they want." He went on to say students only care about one thing: "their commodity, their vote." No Commissioner openly rejected or expressed any disagreement with what Mr. Luther argued.

The subtext of Mr. Luther's outburst was clearly that the students, by virtue of being young and/or Black and/or Democrats, were outsiders and represented a threat to what he apparently perceived as interests shared by himself and the predominantly white, older, and Republican Commissioners Court, a demographic that also reflects the majority of residents in Waller County. In so doing, Mr. Luther also misrepresented the students' political party affiliation, having been

present at the October 17 meeting when students, who spoke before the Commissioners (and Judge Duhon himself), clearly indicated that many students were independents and not affiliated with any party in the October 17 meeting.[75] No Commissioner openly rejected what Mr. Luther argued regarding the students' party affiliation or corrected his misrepresentation of it.

Mr. Luther went on: "And why do they want voting in the student center? *Because every student has to pass through the center*. And, they're easy pickins for the political vultures out there."[76] In so speaking, Mr. Luther apparently intended to communicate that the Commissioners should take care not to provide voting in a location that was easily accessible by young, Black, and/or Democratic voters. Instead, he suggested, the Commissioners should do their best to prevent PVAMU students, most of whom are Black and young, from voting. No Commissioner openly rejected or expressed any disagreement with Mr. Luther's contentions.

Mr. Luther then said that "vultures" would "drive them [Black PVAMU students] into the voting place."[77] "When driven into the polling place," he continued, the predominantly young, Black student voters at PVAMU, would "push one button."[78] "And that's what this is about," Mr. Luther alleged, "It's about Democrat politics, Democrat relevance, and Democrat influence in this county. It's not about race, it's not about disenfranchisement, and I disavow everything in this lawsuit."[79] Mr. Luther concluded his comments by urging the Commissioners to fight the lawsuit and show that Waller County is "not racist or vote suppressors."[80] None of the Commissioners openly rejected or expressed any disagreement with any of the comments made by Mr. Luther.

---

[75] *See* Waller County Tex., *Commissioners Court Meeting, October 17, 2018* at 96:26, http://wallercountytx.swagit.com/play/10172018-1225.
[76] *See* Waller County Tex., *Commissioners Court Meeting, October 24, 2018* at 6:39, http://wallercountytx.swagit.com/play/10242018-1459 (emphasis added).
[77] Ibid.
[78] Ibid.
[79] Ibid. at 7:18.
[80] Ibid. at 5:25.

At the October 24, 2018 <u>emergency</u> meeting later the same day, there was no public discussion over the hours or days for early voting. During this meeting, after initially stating that there was a possible settlement agreement, four of the Commissioners spent several hours in executive session only to return and abruptly announced that "there is no settlement."[81] The present Commissioners then unanimously modified the early voting plan, even though early voting was already under way and despite their statements only one week prior that it was too late, unfair to Waller County voters, or too resource-intensive to modify the plan. Mr. Amsler was among the members of the Commissioners Court in attendance who voted in favor of the modified early voting plan, despite his particularly emphatic assertions one week before (referenced above) that he would <u>not</u> do so.[82]

After voting to modify the early voting plan, Judge Duhon made several notable statements, including that: the Commissioners had been "open and transparent in setting the Early Voting locations and times throughout the County"; the "current Court has a record of actively engaging the [PVAMU] community and its students, including placing a polling location for students on campus"; that the early voting plan is a consequence of the County having "analyzed [its] resources" in light of "the limited resources of a small county"; and PVAMU students had somehow failed to "timely participate" in the process for adopting early voting in 2018.[83] However, for the reasons detailed above, the process for adopting the early voting plan dates and times for 2018 was anything but "open and transparent." The ongoing record reflects PVAMU students fought for early voting on campus and won it in 2013, after which the County attempted

[81] *See* Waller County, Tex., *October 24, 2018 Special Commissioners Court* at 1:56, http://wallercountytx.swagit.com/play/10242018-1502.
[82] *See* Waller County, Tex., *October 17, 2018 Commissioners Court Meeting* at 75:02, http://wallercountytx.swagit.com/play/10172018-1225.
[83] *See* Waller County, Tex., *October 24, 2018 Special Commissioners Court* at 2:55, http://wallercountytx.swagit.com/play/10242018-1502.

to limit its use in 2016 and 2018 or resolve the addressing system, discussed in more detail below. Moreover, the Commissioners did not invoke the County's limited resources when they proposed adding days of early voting to Monaville, despite the very low population of registered voters in that area of the County.[84] Finally, as detailed above, the early voting schedule was developed and adopted outside of public view, and, furthermore, at a time when students were just arriving on campus in Fall 2018. Once PVAMU students became aware of the plan in mid-October 2018, they voiced strenuous objections to the plan, yet the Commissioners did not change their decision.

At the conclusion of the October 24 meeting, the Commissioners still had not modified the early voting plan for November to include any additional days of voting on campus-at PVAMU. Following the filing of this lawsuit, the Commissioners added one day of weekend voting in Prairie View and additional hours (from 8:00 a.m. – 5:00 p.m. to 7:00 a.m. – 7:00 p.m.) to early voting days already scheduled on-campus at PVAMU.

Overall, as Dr. Stein's report documents, PVAMU students and Prairie View voters were still provided fewer hours and less opportunity to participate in the early voting process than voters in other areas of Waller County.

## IV. Senate Factors

In a report that accompanied the 1982 renewal of the Voting Rights Act, the Senate Committee on the Judiciary set forth several "Senate factors" for federal trial courts to consider in assessing whether, under the totality of circumstances, an electoral system interacts with social and historical conditions to cause inequality in the political process.[85]

---

[84] *See* Waller County, Tex., *October 17, 2018 Commissioner's Court Meeting* at 101:43, 103:09, http://wallercountytx.swagit.com/play/10172018-1225 (Ms. Eason explaining that in "the last election even in the Primary, [Monaville] went days [when] they voted 18.").
[85] These Senate factors are: (1) the extent of any history of official discrimination related to voting in the County; (2) the extent to which voting is racially polarized; (3) the extent to which Waller County uses voting practices or procedures that may enhance the opportunity for discrimination; (4) if there is a candidate slating process,

Here, an examination of these factors demonstrates that Waller County's original and modified 2018 early voting plans interact with these factors to weaken the ability of Black voters to participate equally in the political process. The analysis of these factors also provides additional context for the finding that Waller adopted and maintained the 2018 early voting plan for a discriminatory purpose. Accordingly, I find that Senate factors 1, 2, 5, 7, and 9 weigh in plaintiffs' favor.

**Factor 1**: **The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process.**

As documented in greater detail in the expert report of Dr. Joseph, Waller County, specifically, and Texas, generally, has an extensive history of discrimination against Black people that affects their ability to participate in the democratic process in Waller County. Although this extensive history in Waller County dates back decades, it is persistent and ongoing through 2018. For these reasons, it is clear from this extensive list of occurrences that there is a systemic pattern of Waller County acting to discriminate against the students at PVAMU to prevent them from obtaining and exercising their voting rights. As discussed below, this pattern on the part of Waller County interacts with other social and historical factors to inhibit Black and Latinx students from voting in that jurisdiction.

---

whether the members of the minority group have been denied access to that process; (5) the extent to which minority voters bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Gingles*, 478 U.S. at 43- 45 (internal citation omitted).

**Factor 2: The extent to which voting in the elections of the state or political subdivision is racially polarized.**

Texas possesses an extensive record of court-documented racially polarized voting.

In *LULAC Council No. 4434 v. Clements*,[86] the court found that, in every county under consideration, all elections were racially polarized as evidenced by the statistical analyses offered by the plaintiff's experts.

In *Vera v. Richards*,[87] the court found that "elections in the areas in which the state created majority-minority districts are characterized by racially polarized voting" and agreed with the opinion of the plaintiff's expert who "concluded that Anglos usually bloc voted against African-American candidates."[88]

In *LULAC v. Perry*,[89] the U.S. Supreme court noted that "[t]he District Court had found "racially polarized voting" in south and west Texas, and indeed "throughout the State."

In 2014, the Fifth Circuit Court of Appeals in *Veasey v. Perry*[90] noted that "[t]he district court . . . conclud[ed] that racially polarized voting exists throughout Texas."

In 2016, the Fifth Circuit reiterated the degree and extensiveness of racially polarized voting in Texas in their opinion in *Veasey v Abbott*,[91] stating that "the Supreme Court has previously acknowledged the existence of racially polarized voting in Texas, and that in other litigation, Texas has conceded that racially polarized voting exists in 252 of its 254 counties." The Fifth Circuit observed that "[t]he State did not contest these findings before the district court."

---

[86] 986 F.2d 728 (5th Cir) (1993).
[87] 861 F. Supp. 1304 (S.D. Tex. 1994) (1996).
[88] Ibid. at 1329, 1330.
[89] 548 U.S. 399, 427 (2006).
[90] 71 F. Supp. 3d 627, 637 (S.D. Tex. 2014).
[91] 830 F. Supp. 3d 216 (5th Cir. 2016) (en banc).

In 2017, the Western District of Texas found "the existence of racially polarized voting throughout Texas" when it rendered its decision in *Perez v Abbott*.[92]

In short, federal courts at all levels, from at least 1993 through the present, have noted that racially polarized voting exists throughout the State of Texas and in all regions of the state. One opinion even noted that racially polarized voting exists in 252 of the 254 counties of the state.

**Factor 5: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process.**

The history of discrimination against Black people in Texas, generally, and Waller, specifically, extends beyond voting rights to virtually every aspect of economic and social life in the State. As detailed in Mr. Cooper's expert report, Black voters in Prairie View face socioeconomic hurdles due to the effects of discrimination that make reaching early voting locations in other cities more difficult than for white voters or other older voters in neighboring cities.

As previously noted, Prairie View A&M University is the only university in Waller County. Founded in 1876, PVAMU is the second-oldest institution of higher learning in the State. Further, PVAMU is a historically Black university with approximately 9,516 full- and part-time students based on enrollment data from Fall 2018.[93] Roughly 83% of PVAMU students identify as Black.

The PVAMU campus is located entirely in Prairie View. According to the 2010 Census, the total population of the City of Prairie View is 5,576, of whom 90.2% (5,030) are Black and 2.6% (147) are Anglo. Prairie View has a VAP of 5,168, of whom 91.9% (4,754) are Black.

---

[92] 253 F. Supp. 3d 864 (W.D. Tex. 2017).
[93] Prairie View A&M University Enrollment Snapshots: Fall 2018 at 2 (last visited June 29, 2019), http://www.pvamu.edu/ir/wp-content/uploads/sites/98/FA18_Enrollment-Snapshots.pdf.

Moreover, based on U.S. Census Bureau's 2013-2017 American Community Survey ("ACS") five-year estimates, the Waller County Black Citizen Voting Age Population is 32.1%, Anglo CVAP is 51.6%, and Latinx CVAP is 14.1%. And 80% of Prairie View's citizen voting-age population is Black, and 54.3% of Prairie View's voting-age population ("VAP") is aged 18 through 20. As compared to other cities in Waller County, Prairie View is the only city where the majority of voters are both Black *and* students.

The historical and ongoing racial discrimination, which is described in Dr. Joseph's report in more detail, are substantially demonstrated in the deficient socioeconomic position of Black Prairie View voters in Waller County. According to the data provided by Mr. Cooper, in Prairie View, the majority Black and majority student population also more likely to be poor and face other socioeconomic barriers that white voters or other voters in the County do not face, including, but not limited to, income, poverty, unemployment, education, dependence on government assistance, home ownership, and the availability of vehicles. For example, in Prairie View, 32.1% of Black workers, as compared to 15.76% of white workers, are in service occupations. Black workers in service occupations are likely to be working for an hourly wage and are less likely to be able to take off from work to vote early during weekday business hours.

Moreover, 58.3% of the Black population in Prairie View lived below the poverty line in the last 12 months, as compared to 7.3% of the countywide white population; the median household income for Black residents was $21,179, as compared to $74,132 for countywide white residents; 19.2% of the Black population between 16-64 years of age were unemployed, as compared to 4.1% of the countywide white population; and 17.9% of the Black population over 25 years old had less than a high school diploma, compared to 9.3% of the countywide white population.

Along the same lines, Black people in Prairie View, including PVAMU students, disproportionately lack access to transportation as compared to white people. For example, 23.2% of Black people in Waller County, as compared to only 12.6% of white people, commute to work by walking, biking, or via carpool, taxi, or public transit.

The following is an overview of key and selected socioeconomic indicators of socioeconomic disparities in Waller County.

| Comparison of Selected Socioeconomic Indicators: Waller County & Prairie View Residents | | | | |
|---|---|---|---|---|
| **Indicator** | | **Waller County** | | **Prairie View** |
| | | **Black** | **White, non-Hispanic** | **Black** |
| **Econ.** | **Lived in Poverty in Past 12 Months** | 26.7% | 5.8% | 31.3% |
| | **Median Family Income in Past 12 Months** | $51,345 | $90,746 | $31,071 |
| | **Unemployed (age 16-64)** | 18.0% | 4.1% | 19.2% |
| **Education** | **Less than High School Diploma (age 25+)** | 18.3% | 9.3% | 17.9% |
| | **High School Grad. or Equivalent (age 25+)** | 39.1% | 30.5% | 16.9% |
| | **Some College or Assoc. Degree (age 25+)** | 27.5% | 34.0% | 32.0% |
| **Transportation (16+ employed)** | **Drive Alone in Vehicle** | 74.4% | 81.0% | 46.8% |
| | **Walk, Carpool, Taxi, Public Bus, or Other** | 23.0% | 12.6% | 46.5% |
| | - Walk to Work | 8.5% | 2.0% | 26.7% |
| | - Carpool to Work | 11.5% | 8.1% | 14.2% |
| | - Taxi, Motorcycle, Bicycle, or Related Means | 2.6% | 1.0% | 5.6% |

These socioeconomic disadvantages for Black voters in Prairie View adversely enhance the impact of their inability to effectively participate in the political process in Waller County.

**Factor 7: The extent to which members of the minority group have been elected to public office in the jurisdiction.**

The Senate Report noted that, in addition to the existence of racially polarized voting, the lack of Black representatives in the challenged jurisdiction (here, Waller County) is one of the two most significant factors that a federal court should consider in evaluating whether Black voters have less opportunity than other voters to participate in the political process in violation of Section 2.

Racially polarized voting is well established and judicially recognized in Waller County, as discussed above. As the above discussion shows, Black candidates have had very little electoral success in elections contested at the countywide level in Waller County. Historically, it has been rare for a Black representative to be elected from Waller County as a whole (or from any portion of the county that is not majority-minority). Presently, there are none.

No Black candidate has been elected to the U.S. House of Representatives from U.S. Congressional District 10, in which Waller County is situated, since the district's creation in 1883. Further, based on publicly available records and information provided by a local contact via plaintiffs' attorneys, only one Black candidate has been elected to a countywide office in Waller County since the Reconstruction period ended in the 19th century.

**Factor 8: Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.**

As discussed above, the members of the Waller County Commissioners Court, a supermajority of whom are white, have been unresponsive to the particularized needs of Black PVAMU students, including in the adoption and maintenance of the early voting plans for the November 2018 elections.

The County also has been unresponsive to other issues impacting Black PVAMU students and other Black voters in Prairie View. Specifically, the County Commissioners have failed to address the continuing issues that confront residents of the City of Prairie View, where PVAMU students live. People who reside in Prairie View are disadvantaged—particularly in voting and registration—by the county's overreliance on the U.S. Postal Service's rural addressing system for uses that are unrelated to the delivery of mail.

The Waller County Commissioners Court has been made aware of the problems caused by the County's reliance on the U.S. Postal Service's rural addressing system that affect the students residing on the PVAMU campus and off-campus in the City of Prairie View.[94] These problems manifest themselves with particular severity, as some Waller County officials have acknowledged, during elections—including by creating long lines and making the use of absentee ballots, which depend on reliable mail delivery, effectively unavailable for PVAMU students due to mail delivery issues.[95] As a result, PVAMU students without access to personal transportation are still more dependent on on-campus early voting.

The County Elections Administrator, Ms. Eason, conducted research into this matter and raised with the Commissioners Court that this addressing issue led to the unequal treatment of PVAMU students.[96] The Commissioners have recently provided only a temporary "fix" to the

---

[94] *See, e.g.*, Waller County, Tex., *October 17, 2018 Commissioners Court* at 58:26, http://wallercountytx.swagit.com/play/10172018-1225; Waller County, Tex., *September 26, 2018 Commissioners Court* at 24:19-73:14, http://wallercountytx.swagit.com/play/10172018-1225; Dug Begley, *Prairie View Asking State to Stamp Out Zip Code Snub*, *Houston Chronicle* (Apr. 8, 2013), https://www.houstonchronicle.com/news/houston-texas/houston/article/Prairie-View-asking-state-to-stamp-out-ZIP-code-4419286.php.
[95] *See* Waller County Tex., *October 17, 2018 Commissioners Court Hearing* at 54:00, 55:07, 58:26, http://wallercountytx.swagit.com/play/10172018-1225.
[96] *See* Waller County Tex., *September 26, 2018 Commissioners Court Hearing*, Item 16: "Elections," at 0:30. http://wallercountytx.swagit.com/play/09262018-675.

registration issues, even though the Elections Administrator pointed out that a permanent solution was necessary.[97] The Commissioners did not entertain this latter recommendation.

Additionally, the County has failed to adequately address the internal issues surrounding the death in the county jail of Ms. Sandra Bland, a PVAMU alumna, as discussed in the report of Dr. Joseph. For example, in 2016, Ms. Bland's family reached a settlement with Waller County, which called for several changes to the jail's procedures, including using automated electronic sensors to ensure timely cell checks.[98] Yet the jail still has frequently failed to meet certain standards for frequency of observation of prisoners, a similar deficiency identified in Ms. Bland's death.[99]

**Factor 9**: **Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.**

As discussed above, the rationales advanced for adopting, maintaining, and modestly improving the November 2018 early voting plan were tenuous, changing, and ultimately largely contradicted by the Commissioners' own actions in adopting revisions to the early voting plan on October 24, one week after arguing that it was too late to do so. They also show a lack of good faith and an irrationality that is inappropriate for government action, insofar as the Commissioners cited arbitrary and shifting rationales while failing to make an effort to address the concerns of PVAMU students who requested parity and equity during the early voting planning process.

---

[97] *See* Waller County Tex., *October 10, 2018 Commissioners Court Hearing* at 78:18, http://wallercountytx.swagit.com/play/10102018-554; Waller County Tex., *October 17, 2018 Commissioners Court Hearing* at 47:45, 50:05, 80:27, http://wallercountytx.swagit.com/play/10172018-1225.

[98] "Sandra Bland's Family Settles for $1.9 Million in Wrongful Death Suit," September 15, 2016, https://www.cnn.com/2016/09/15/us/sandra-bland-wrongful-death-settlement/index.html.

[99] "Inmate's Death at Waller County Jail Follows Inspection Raising Issues Similar to Sandra Bland Case," January, 30, 2019, https://www.chron.com/news/houston-texas/houston/article/Inmate-s-death-in-Waller-County-jail-follows-13575534.php.

Although the Commissioners made some modest improvements to the early voting plan for 2018, they did so only after a lawsuit was filed—and, in fact, the speed and unanimity with which they made these modifications suggest a preexisting awareness and acknowledgement that the plan was strikingly unfair to PVAMU students before modification. The Commissioners Court did not make an attempt to undertake any steps in pursuing permanent changes to the process—or making the process more inclusive of stakeholders such as PVAMU student voters—even after the Elections Administrator, Ms. Eason, recommended that they do so. The unfairness of the 2018 early voting plans to Prairie View students and the Prairie View community reveal the tenuous manner in which the Waller County Commissioners reached their decision concerning early voting for the 2018 General Election.

For example, during the October 17, 2018 meeting, Commissioner Amsler suggested that it was already too late to change the early voting schedule: "These decisions have already been made," he said. "It's a little bit late in the game to be coming back and wanting to change at this point in time."[100] Similarly, Commissioner Beckendorff stated: "if we change it now . . . it's going to be more confusing."[101] Also, during the October 17 meeting, Judge Duhon suggested that the County's limited resources made it difficult to propose changes to the early voting plan.[102]

However, as discussed above, Ms. Eason, Commissioner Beckendorff, and Judge Duhon all proposed changes during the October 17 meeting. In response to one of these proposals, Ms. Eason, the Elections Administrator, made the Commissioners aware that the county *did* have sufficient resources to add additional days of early voting.[103] And the following week, at the

---

[100] *See* Waller County Tex., October 17, 2018 Commissioners Court Hearing at 49:49, http://wallercountytx.swagit.com/play/10172018-1225.
[101] Ibid. at 75:31.
[102] Ibid. at 101:43.
[103] Ibid. at 103:45-104:06.

Commissioners Court's October 24 emergency meeting, the Commissioners unanimously modified the early voting schedule to include an additional day at the Prairie View City Hall and extended hours at the PVAMU campus on a motion by Judge Duhon.

Several Commissioners also suggested during the October 17 meeting that the process by which Waller County's early voting plan was developed with input only from the party chairs was appropriate and should not be disturbed, either because it was bipartisan and thus supposedly representative of two interest groups or because it provided an adequate opportunity for members of the public to participate in the deliberative process before the decision was made. For example, Commissioner Amsler stated that he planned to vote against Ms. Eason's proposed modifications because "both committee chairmen of both parties agreed on this schedule weeks ago."[104] And Judge Duhon expressed discontent that objections were not raised in an alleged meeting that purportedly took place on September 22, 2018—a Saturday—and which included "no discussion" and during which "nobody showed up" and "nobody gave any comment at all."[105] But based on the sequence of events of the early voting plan's adoption described above, both of these justifications are tenuous and contradicted by the record.

First, with respect to the irregular process in which the political party chairs determined the early voting schedule, the Commissioners heard testimony making clear that neither party chair had consulted with students, many of whom, as Judge Duhon acknowledged, were not members of any political party. In addition, based on my knowledge of the electoral practices of other Texas counties, it does not appear to be a common practice for counties to outsource the development of early voting plans to private individuals representing nongovernmental, partisan interests. I am similarly unaware of any other county that develops or approves its early voting plans behind

---

[104] Ibid. 75:02.
[105] Ibid. at 48:28.

closed doors, avoiding public input from voters such as PVAMU students. This process indeed appears to be ineffective and "broken," as several witnesses at the October 17 meeting represented to the Commissioners Court. In my expert opinion, it is tenuous to rely on such an irrational and dysfunctional process as a justification to refuse to make requested changes to an early voting plan in the interest of fairness.

Second, as discussed above, it appears from the public record that the process by which the early voting plan was adopted was closed to the public and offered no opportunity for anyone to participate other than Ms. Eason, the county's two partisan officials, and the Commissioners themselves. Thus, if Judge Duhon was correct in stating "[t]here was no discussion, there was nobody that showed up, [and] nobody gave any comment at all" when the Commissioners approved or adopted the early voting plan, that appears to be explainable by the fact that (1) no notice or opportunity to participate in these deliberations was provided to members the public, and/or that (2) the hours and days in the Original Early Voting Plan were never discussed, debated, or disclosed in a public meeting prior to the plan's adoption by the Commissioners Court.

Another tenuous justification advanced by various Commissioners during the October 17, 2018 meeting for refusing to provide early voting on PVAMU's campus during the first week of early voting was that the Democratic Party chair had asked that there be no early voting that week because of PVAMU's homecoming activities. This justification is unsupported by the record because, as discussed above, the Commissioners were aware that the Democratic Party chair does not represent and did not consult with PVAMU or its students and that many students are members of no political party. Moreover, logically, the Homecoming week on PVAMU's campus would be an opportune time for on-campus voting because many students and members of the Prairie View community are already on campus. This logical conclusion is also supported by the record before

the Commissioners Court and the record in this lawsuit. At the October 17, 2018 Waller County Commissioners Court meeting, PVAMU students Xante' Wallace[106] and Joshua Muhammad[107] both asked the Commissioners Court to provide early voting during the first week when homecoming would take place.[108]

In addition, ECF No. 17-4 on the Court's docket in this lawsuit provides further evidence that the Homecoming justification was tenuous. That document is a declaration by Frank Jackson, an administrator at PVAMU. In this filing, Mr. Jackson states that "the assertion that students would be discouraged from early voting if the scheduled early voting days on campus coincided with homecoming week is inaccurate."[109] He further states: "Indeed, homecoming week is an ideal time for early voting. Alumni, for example, would encourage students to exercise their right to vote. Moreover, the concentration of students near the Memorial Student Center would provide ample opportunities for students to cast a ballot."[110] The document filed on this Court's docket as ECF No. 17-2, a declaration by Valerie Gibson, an administrative assistant at PVAMU, also casts doubt on the Commissioners' justifications regarding a supposed conflict between homecoming and early voting. Ms. Gibson states emphatically that "[t]he facilities at the Memorial Student Center at PVAMU would be available and could easily accommodate increases to early voting days and hours on any day from Monday, October 22 through Friday, November 2."[111]

An additional argument mentioned by Elections Administrator Eason and Commissioner Barnett during the October 17 meeting as a justification for limiting the availability of early voting on the PVAMU campus was that voting on campus is not comfortable or convenient for non-

---

[106] See ibid. at 88:46.
[107] See ibid. at 92:42
[108] See ibid. at 87:28, 92:31.
[109] Declaration of Frank Jackson, ECF No. 17-4, at 4, *Allen v. Waller County*, 4:18-cv-3985 (S.D. Tex.).
[110] Ibid.
[111] Declaration of Valerie Gibson, ECF No. 17-2 , at 2, *Allen v. Waller County*, 4:18-cv-3985 (S.D. Tex.).

student members of the Prairie View community due to a lack of parking or other concerns. This justification is demonstrated as tenuous by, among other sources, the record in the current litigation. In the declaration filed as ECF No. 17-4 on this lawsuit's docket, Mr. Frank Jackson of PVAMU explained in Paragraphs 13-15 specifically why Ms. Eason and Commissioner Barnett were incorrect:

> 13. At the October 17 public hearing, one or more Commissioners also indicated in my presence that residents of Monaville and non-student residents of Prairie View would not feel comfortable traveling to the PVAMU campus to vote, or that they would not find our parking and other facilities adequate for their needs. Based on my personal and professional knowledge and experience, these suggestions mischaracterize the nature of the relationship between the PVAMU community and residents of Prairie View and do PVAMU a disservice. In fact, many of our students are involved with volunteering activities and internships in Prairie View. . . .

> 14. In addition, we at PVAMU pride ourselves on being welcoming hosts for our nonstudent visitors who come to PVAMU's campus to vote during early voting. We reserve a number of parking spots specifically for these voters and remind our students that these spots are not available. We also post signage pointing voters to the polling place, which is wheelchair-accessible.

> 15. In short, I respectfully disagree with the Commissioners' concern that non-student residents of Prairie View, Monaville, and other areas would be uncomfortable traveling to the PVAMU campus to vote, or that PVAMU is not prepared to accommodate them during early voting. In fact, we are prepared to accommodate all voters who are eligible to participate in early voting on campus, including during the homecoming week.[112]

**Conclusions: Expert Opinion**

Based on my analysis and informed by my experience, I have reached the following expert opinions:

The Waller County Commissioners Court acted with an intention to discriminate against the PVAMU student body and the majority-Black Prairie View community, of which PVAMU students are a part, when allocating the early voting hours for the 2018 General Election.

---

[112] Declaration of Frank Jackson, ECF No. 17-4, at 4-5, ¶¶ 13-15, *Allen v. Waller County*, 4:18-cv-3985 (S.D. Tex.).

The Waller County Commissioners Court discriminated against the Black student body of PVAMU, against young, college-age voters at PVAMU in general, and against the Black community of Prairie View, Texas.

These conclusions are based on an evaluation of the *Arlington Heights Factors* and Senate Factors as listed below:

(1) evidence that Defendants' decision bears more heavily on one group than another as identified in the table at Section IV(C) in this report (as demonstrated by the disparate burdens shown in Dr. Robert Stein's report);

(2) the historical background of the decision (as discussed in detail in Dr. Peniel Joseph's report) and outlined above in this report in Section IV, "Senate Factors";

(3) the specific sequence of events leading up to the decision (Outlined in Section IV(C) of this report);

(4) departures from the normal procedural sequence (Discussed in Section IV(D) of this report); and

(5) legislative history, including "contemporary statements by members of the decision-making body, minutes of its meetings, or reports" (Cited in Section IV(E) of this report).

In addition, these conclusions are based on the following:

- Complaints on the public record by the Prairie View community and PVAMU students specifically that Waller County has continuously failed to include them in determining the early voting hours for primary and general elections, and evidence that Waller County indeed failed to do so in 2018;

- Complaints on the public record that the Prairie View community and PVAMU students are continuously singled out for unfair treatment when it comes to

opportunities to vote, as exemplified most recently in the allocation of early voting opportunities in recent elections, and evidence that Waller County indeed did so in 2018;

- Waller County Commissioners Court's refusal to amend the early voting hours for the 2018 General Election after considering proposals to do so, and then making changes that were modest and inadequate only after being confronted by this lawsuit;

- Waller County Commissioners Court's reluctance and hostility to entertain various proposals during the October 17 meeting, including those coming from their own election administrator and from their own body, to amend or adjust the early voting hours and locations for the 2018 General Election; and

- That the early voting hour and location schedule as published by the Waller County Elections Administrator indicate that there is a disparate distribution of voting hours between those polling places in Waller, Hempstead, and Brookshire and PVAMU and Prairie View for the 2018 General Election.

I reserve the right to continue to supplement my declarations in light of additional facts, testimony, and/or materials that may come to light.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Executed on: July 1, 2019

Henry Flores
Henry Flores, PhD

# APPENDIX

**HENRY FLORES, Ph.D.**

**Distinguished University Research Professor Emeritus**
**Institute for Public Administration, Politics and Public Policy**
**and**
**Professor Emeritus, Political Science and International Relations**
**St. Mary's University**
(May, 2019)

Address:            3111 Alamo Creek Circle
                    San Antonio, TX 78230

Phone:              (210) 436-3214 (O)
                    (210) 525-1330 (H)

Place of Birth:     San Antonio, TX

## EDUCATION

B.A.; St. Mary's University; San Antonio, TX;
        May 1974.
        Major:  Political Science
        Minor:  English

M.A.; University of California, Santa Barbara; Santa Barbara, CA;
        December 1975.
        Major:  Political Science

Ph.D.; University of California, Santa Barbara; Santa Barbara, CA; December 1981.
        Major:  Political Science
        Examination Fields:         Public Administration,
                                    American Politics,
                                    Political Philosophy,
                                    Multivariate Statistical Analysis.

## DISSERTATION

"The Politics of Urban Land Use Decisions Underlying Industrial Development in
        Los Angeles, California: An Exegesis of Systemic Weakness."

## AWARDS AND DISTINCTIONS

- Chancellor's Fellow, University of California at Santa Barbara, Santa Barbara, California, 1974 – 1977.
- Ford Foundation Dissertation Fellow, 1977 – 1979.
- "Best Paper in Chicano Politics," Western Political Science Association, 1986.
- Fulbright Fellow, Argentina, *La Universidad Católica de Buenos Aires,* 1992.
- Distinguished Faculty Award, St. Mary's University Alumni Association, 2000 – 2001.
- Civil Rights Lifetime Achievement Award, St. Mary's University, 2010.
- Distinguished University Research Professor Emeritus, 2018.

## PROFESSIONAL ASSOCIATIONS

Conference of Southern Graduate Schools, 2004 – 2013.

Texas Association of Graduate School Deans, 2004 – 2013, President, 2012-2013.

American Political Science Association - September 1975 - present.

  Chair, Dissertation Award Committee, Section on Race and Ethnicity, 2000-2001.
  Nominations Committee, Member, Section on Urban Politics, 1998-1999.
  Nominations Committee, member, Section of Representation and Electoral Systems, 1999-2000.
  Program Committee, Head, Section on Representation and Electoral Systems, 1997-1998.
  Committee for the Status of Latinos in the Profession - January 1994 - December 1996.
  Governing Council, Pi Sigma Alpha - September 1994 - August 1997.
  Editor, Urban Politics Section Newsletter - January 1996 – June 2000.
  Book Review Editor, Representation and Electoral Systems Newsletter, 2000-2002.
  Member, Byran O. Jackson Memorial Award Committee - 1996.
  Chair, Hallet Award Committee - 1996-1997.
  Member, Ralph Bunche Memorial Award Committee-2000, 2004.
  Member, Dissertation Award Committee-2000.
  Member, Committee on Best Book on Race-2014.

Southwestern Political Science Association - March 1985 - present.

  Executive Committee – March 2013 – present.
  Executive Committee - March 1986 - April 1988.
  Nominations Committee - March 1995 - April 1998. March 1999 – April 2002
  Section Head, Mass Political Behavior - March 1995 - February 1996

Western Political Science Association - March 1976 - present.

  Chair, Dissertation Award Committee, 1997-1998.
  Committee for the Status of Chicanos in the Profession - March 1984 - February 1987.
  Committee for Ethics in the Profession - March 1990 - February 1991.
  Executive Committee - March 1987 - February 1991.
  Pi Sigma Alpha Committee - March 1995 - February 1998.

Program Committee – 2002 – 2003.
Dissertation Award Committee – 2002 – 2003.
Best Paper Award Committee – 2003 - 2004.

Associate Editor, Urban Affairs Review, 1995-1998.
Associate Editor, American Review of Politics, 1996-Present.
Editorial Board, Texas Journal of Political Studies, 1996-1999.
Book Series Editor, Lexington Press, Rowman and Littlefield, *Latinos and American Politics,*
    2015-Present.

## COMMUNITY - PUBLIC SERVICE ACTIVITIES
Member, City of San Antonio, Charter Revision Commission, 2018-Present.
Member, City of San Antonio's Correct Count Census Committee, 2019.
Member, Board of Governors, Institute Mexican American Institute of Civil Rights, 2019.
Participant, National Committee for a 50 Year Blueprint for Chicanos, 2018-Present.
Member, Organizing Committee for the National High School Walkout Conference, 2019.
Presenter, Texas Gerrymandering and Voter Suppression, UTSA Social Work Advanced Policy
    Graduate Students, Our Lady of the Lake University, San Antonio, TX. Nov. 29, 2017.
Moderator, Gerrymandering: What's in the Secret Sauce?  On the Bar.  San Antonio Bar
    Association.  June, 2016.
Presenter, "Evolution of Voting Rights for Mexican Americans in South Texas," San Antonio
    Historical Association, San Antonio, Texas, September 27, 2016.
Panel Participant, "Implications of the Voter ID Law," League of Women Voters, San Antonio,
    Texas, September 20, 2016.
Presentation, *Camara de Comercia Argentino* (Argentine Chamber of Commerce),
    *"Camino a la Casa Blanca:  Hillary contra Trump y sus Implicancias,"*
    ("Path to the White House:  Hillary versus Trump Implications), June, 2016.
    Presentation in Spanish.
Presenter, 100th Birthday Symposium on Congressman Henry B. Gonzalez, 2016.
Convener/Moderator, 50th Anniversary Symposium on Voting Rights Act, "What is the Future
    Of the VRA," St. Mary's University School of Law, 2016
Presenter, 50th Anniversary Conference on Voting Rights Act, "Latinos, the Voting Rights Act
    And Political Engagement," 2015.
Presenter, "The New Latino Electorate of the United States in the 2012 Elections and Beyond,"
    *Consejo Argentino para las Relaciones Internacionales,* Buenos Aires, Argentina,
    March 23, 2011.
Testified, Joint House Committee:  Justice and Redistricting, State of Texas, McAllen, Texas,
    July 21, 2010.
Member, Board, Design Committee, University Heath Systems, Bexar County, San Antonio,
    Texas, 2009-2013.
Member, Board, The National Center for Behavioral Health Solutions, San Antonio, Texas,
    2008-2014.
Member, Correct Count Census Committee, Bexar County and San Antonio, Texas, 2009-
    2011 (Chairperson of Subcommittee on Under-Represented Communities).
Member, Westside Creeks Oversight Committee, San Antonio River Authority, 2008-2010.
Member, Westside Development Corporation, San Antonio, Texas, 2007-2011.

Member, Educational Affairs Advisory Committee, San Antonio Manufacturer's Association, 2006-2009.

Member, National Latino Advisory Committee, Nielsen Media Company, 2007 – 2013.

Member, St. Mary's University, Neighborhood Revitalization Committee, 2006 – 2014.

University Representative, City of San Antonio, Westside Development Corporation, 2006-2013.

Presenter, "The Latino Electorate, Poverty and Education," David and Lucille Packard Foundation, Sonoma, CA, 2006.

Presenter, "The VRA, Poverty, and Education," William C. Velasquez Institute, San Antonio, Texas, 2005.

Opinion Columnist, *La Prensa*, San Antonio, Texas, 2003 – 2007.

Commentary Writer, *NewsTaco,* online news service, 2007 – present.

Presenter, Stormont Lectures, Victoria College, Victoria, Texas, Feb. 2003, Feb. 2009.

Presenter, Latino Academy, Southwest Voter Registration and Education Project, San Antonio, TX, Aug. 9, 2002.

Presenter, US House Committee Hearings on Irregularities in the Voting Process, San Antonio, Texas.  Apr. 2001.

Presenter, The Texas Forum on Civil Liberties and Civil Rights and The Hispanic Journal of Law and Policy of the University of Texas School of Law's Symposium "Drawing Line in the Sand:  The Texas Latino Community and Redistricting 2001." Apr. 2001.

Presenter, Joint Senate-House Redistricting Committee, State of Texas, Apr. 2001.

Presenter, Texas Senate Redistricting Committee, Mar. 2001.

Presenter, Texas House Redistricting Committee, Mar. 2001.

Presenter, Redistricting Symposium, Willie C. Velasquez Institute, League of United Latin American Citizens, Mexican American Legal Defense and Educational Fund, and National Association of Latino Elected Officials, Feb. 2001, Austin, TX.

Presenter, Summit of the States, Center for Policy Alternatives, Dec. 2000, Washington, D.C.

Presenter, Latino Issues Conference, Willie C. Velasquez Institute, Nov. 2000, Menger Hotel, San Antonio, Texas.

Presenter, Latino Academy, Willie C. Velasquez Institute, Oct. 2000, Kerrville, TX.

Presenter, Willie C. Velasquez Institute Redistricting Conference, Aug. 2000, Houston, Texas.

Presenter, Southwest Voter Registration and Educational Project Conference, Feb. 2000, Palm Springs, CA.

Member, Henry B. Gonzalez Congressional Library Fundraising Committee, 1997.

Member, San Antonio/Bexar County, City/County Consolidation Committee, 1996. Chair, Subcommittee on Voting Rights.

Presenter, Hispanic Chamber of Commerce, 1995.

Member, Board of Directors, Hemispheric Institute for Public Service (HIPS), San Antonio, Texas, January 1988 - present.

Member, Advisory Committee, Mexican American Legal Defense and Educational Fund's (MALDEF) Leadership Development Program, 1987-1988.

## ACADEMIC ACTIVITIES

Professor Emeritus, May, 2018

Professor of Political Science, Departments of Political Science and International Relations, Fall, 2013 – May, 2018.

Distinguished University Research Professor, Institute for Public Administration, Politics and Public Policy, St. Mary's university, San Antonio, Texas, June 2013 – Present.

Sabbatical Leave, Fall-2013

Dean, Graduate School, June 2004 – May 2013.

Sabbatical Leave, Willie C. Velasquez Research Institute, San Antonio, TX, Fall – 2001.

Professor, Department of Political Science, St. Mary's University, Spring 1993 – May, 2018.

Acting Graduate Director, Masters in Public Administration, St. Mary's University, San Antonio, Texas, Fall, 1997.

Chair, Department of Political Science, St. Mary's University, San Antonio, Texas, June 1991 - May 1995, Acting Chair January – August 1998.

Fulbright Scholar, *Universidad Católica de Argentina,* Buenos Aires, Argentina, 1991 -1992.

Director, Graduate Program in Political Science, St. Mary's University, San Antonio, Texas, Fall 1989 - May 1991; January 1996 – May 1999; June 2003.

Director, Masters in Public Administration, St. Mary's University, San Antonio, Texas, Fall 1983 - May 1991; Fall 2000 – Spring 2004; Spring 2014 – May, 2018.

Associate Professor, Political Science, St. Mary's University, San Antonio, Texas, Spring 1986 – Spring, 1993.

Assistant Professor, Political Science, St. Mary's University, San Antonio, Texas, Fall 1983 - Spring 1986.

## INTERNATIONAL RELATIONS

Fulbright Scholar, Argentina, *La Universidad de Mendoza, La Universidad de Empresas de Buenos Aires, y La Universidad Católica de Buenos Aires,* 1992.

Presentation, *La Camara Argentina de Comercio* (Argentine Chamber of Commerce), *"Camino a la Casa Blanca: Hillary contra Trump y sus Implicancias,"* ("Path to the White House: Hillary versus Trump Implications), June, 2016. Presentation in Spanish.

Presenter, "The New Latino Electorate of the United States in the 2012 Elections and Beyond," *Consejo Argentino para las Relaciones Internacionales,* Buenos Aires, Argentina, March, 2011. Presentation in Spanish.

Presenter, "The Voting Rights of Latinos as a Violation of the Declaration of Human Rights," *FORO Ecumenico,* Buenos Aires, March, 2013. Presentation in Spanish.

Presenter, "The US Latino Electorate: A Sleeping Giant," *Fundacíon Internacíonal Jorge Luis Borges,* Buenos Aires, March, 2013. Presentation in Spanish.

On behalf of St. Mary's I participated on the team to negotiate Memoranda of Understanding with *Shanghai Lixin University of Commerce, Wuxi South Coast College, East China University of Science and Technology* and *Shanghai University of Finance and Economics.* China.

On behalf of St. Mary's I led the team to negotiate Memoranda of Understanding with *Universidad Abierta Interamericana, Universidad Nacional de Tres de Febrero, FORO Ecuménico, Fundación Internacional Jorge Luis Borges,* and *IDEAR (Instituto de Estudios Argentinos en Politicas Publicas.* Argentina.

Currently negotiating a Memorandum of Agreement with *La Fundación Jóvenes por los Derechos Humanos* in Argentina.

## COURSES DESIGNED AND TAUGHT AT ST. MARY'S

Have designed and taught 20 different undergraduate courses during more than 30 years of teaching at St. Mary's. Below are some of the graduate classes I have taught.

PA/PO 6300 – Political Science Research Methods (Graduate Statistics Seminar)
PA/PO 6301 - Public Administration (Graduate Seminar)
PO 6302      - Public Policy Analysis (Graduate Seminar)
PO 6302      - Political Economics (Graduate Seminar)
PA/PO 6303 - Urban Political Institutions and Processes (Graduate Seminar)
PO 6304      - Urban Politics (Graduate Seminar)
PA/PO 6305 - American Political Institutions (Graduate Seminar)
PO 6310 - Comparative Politics (Graduate Seminar)
PO 6352 - U.S. Latino Communities (Graduate Seminar)
PO 6353 - Urban Issues in the Americas (Graduate Seminar)
PA/PO 6354 – Campaign Management (Graduate Seminar)

## ACADEMIC SERVICE ACTIVITIES
Member, Search Committee Dean of School of Humanities and Social Sciences, 2016.
Member, Committee on Faculty Evaluations, 2013-Present.
Chair, Search Committee for VPAA, 2009-2010.
Chair, Search Committee for Director of Institutional Research, 2009-2010.
Representative of Independent Colleges and Universities of Texas (ICUT), The Texas
      Higher Education Coordinating Board, Advisory Council on Doctoral Education
      in the State of Texas, 2006 – 2013.
Member, Task Force on Mission and Identity, 2005.
Member, Academic Council, Fall 2004 – Present.
Member, St. Mary's Contingent to Marianist Universities Meetings,
      Chaminade University, Honolulu, Hawaii, June, 2003; University of Dayton,
      Dayton, OH, June, 2005; Chaminade University, Honolulu, Hawaii, June 2006;
      San Antonio, TX, June 2007.
Member, Search Committee, Vice President for Enrollment Management – 2003.
Advisor, Young Democrats [St. Mary's University Chapter]-2000 - 2002.
Advisor, LULAC (League of United Latin American Citizens [St. Mary's Student
      Chapter]-1999-2004.
Advisor, MEChA (Movemiento Estudientil Chicano de Aztlan)-1997-1998.
Member, University-Wide Strategic Planning Coordinating Committee, 1994 -1996.

Member, Strategic Planning Committee for Planning and Information Management, 1994 - 1996.
Member, University Board of Trustees, Academic Affairs Subcommittee, 1993 -1995.
Chairperson, University Task Force on Scholarship and Change, 1994.
President, Faculty Senate, 1993 - 1995.
Member, Alumni Association Board of Trustees, Ex-Officio, 1993-1994, 1994 - 1995.
    Subcommittee on Strategic Planning.
    Subcommittee on Fund Raising.
    Subcommittee on Awards.
Member, Committee on Facilities Management, 1993 -1995.
Member, University Tenure Review Committee, Spring 1993.
Member, University Committee on Writing Evaluation, 1992 -1994.
Member, University Pre-Law Advisory Committee, 1991 -1992.
Chair, Academic Affairs Committee, Faculty Senate, 1988 -1989.
Member, Graduate Council, 1983 -1991; 2000 – Present.
Chair, Faculty Budgetary Committee, 1987 -1989.
Member, Committee on Graduate Education, 1987 -1989.
Member, Search Committee, Dean, School of Humanities and Social Sciences, 1986 - 1987.
Member, Search Committee, Dean of Graduate School, 1985 - 1986.
Member, Humanities and Social Sciences Committee on Faculty Evaluations, 1987 - 1988.
Member, Faculty Senate Committee for the Status of Faculty, 1985 - 1987.
Member, Honor's Council, 1984 –1987; 2000 - 2004.
Chair, Committee on the Philosophy of the Liberal Arts, 1983 -1984.
Member, President's Peace Commission, 1983 -1984.

## BOOKS

Racism, Latinos, and the Public Policy Process. (Lexington Books, 2019). Forthcoming June 15, 2019.

Latinos and the Voting Rights Act: The Search for Racial Purpose. (Lexington Books, 2015).

The Evolution of the Liberal Democratic State With a Case Study of Latinos in San Antonio,Texas. (Edwin Mellon Press, 2003).

Mexican Americans and the Law. Co-authored with Sonia Garcia, Roberto Juarez, and Rey Valencia. (University of Arizona Press, 2004).

## ARTICLES AND CHAPTERS IN BOOKS

"The Meaning of One-Person, One-Vote or Let's Split the Baby in Half: Evenwel v Abbott." Social Science Quarterly, (forthcoming Summer, 2019).

"Latinos in American Politics".  Encyclopedia of Immigration and Minority Studies.
Sage Publications, (Spring, 2011).

"The 2008 Texas Vote in a Transitional Election." Journal of South Texas Studies.
2009.

"The 2004 WCVI National Latino Election Day Exit Poll."  William C. Velasquez
Institute.  San Antonio, TX, 2004.

"Contemporary San Antonio Politics:  1900 – 2003." In San Antonio Politics.
Edited by Richard Gambitta.  NY:  McGraw-Hill Publishing, Co, 2004.

"Are Latinos Becoming More Republican?"  Journal of South Texas Studies,
Summer, 2003.

"Between a Rock and a Hard Place:  Texas Latinos and Redistricting 2001," The
Texas Hispanic Journal of Law and Policy, Austin, TX:  The University of
Texas School of Law, 2001.

"Political Rhetoric for the 1990s" in The '94 Election (Non) Voters Companion, edited
by Dean Harris (Claremont, CA: 1996).

"Man A Mexican Doesn't Have A Chance:  An Assessment of Congressman Henry B.
Gonzalez's Leadership," Texas Journal of Political Studies, (June, 1993).

"East Los Angeles:  A Field of Dreams" in City of Angels, edited by Gerry Riposa and
Carolyn Dersch (Dubuque, IA:  Kendall/Hunt Publishing Co., 1992).

"The Texas Hispanic Voter:  Prospects and Trends," with Robert Brischetto in From
Rhetoric to Reality:  Latino Politics in the 1988 Elections edited by Rodolfo De
LaGarza and Louis De Sipio (San Francisco:  Westview Press, 1992).

"Deconstruction and Chicano Politics," in Latinos and Political Coalitions:  Political
Empowerment for the 1990s, edited by Robert Villarreal and Norma Hernandez
(New York:  Greenwood Press, 1991).

"The Selectivity of the Capitalist State:  Chicanos and Economic Development,"
Western Political Quarterly, Summer, 1989.

"Structural Barriers to Chicano Empowerment," in Latino Empowerment: Progress,
Problems, and Prospects, edited by Roberto Villarreal, Howard Neighbors and
Norma Hernandez (New York:  Greenwood Press, 1988).

"La Ecología y medio Ambiente en la Zona Frontera del sur de Texas," Mexico - E.U.A.:
Cooperación y Conflicto, Memoria del Foro Efctuado en Mexico, D.F.,
Diciembre, 1986

"The Urban Land Use Decision making Process: An Exegesis of Systemic Weakness,"
Proceedings of the National Association for Chicano Studies, 1979.

"Some Different Thoughts Concerning *Machismo*," Comadre, Fall, 1978.

**Book Reviews**
Reviewed approximately 40 different volumes for various scholarly journals.

**RESEARCH AND WORK IN PROGRESS**
Gathering preliminary data on "The Denial of Voting Rights in the United States as a Violation
Of the Universal Declaration of Human Rights."
Beginning work on a coauthored volume concerning the Bail In provisions of Section 3 of the
Voting Rights Act with Professors Dan McCool, University of Utah and Richard Engstrom, Duke
University.
Gathering data for the official biography of Congressman Henry B. Gonzalez.

**PAPERS DELIVERED & SCHOLARLY PRESENTATIONS**

"Bail In Under Section 3 of the Voting Rights Act: The Case of Texas." 11th International
Conference on Interdisciplinary Social Sciences," Hiroshima, Japan, July, 2017.

"Pockets of Discrimination: The Voting Rights Act and the Role of 'Bail-In' After
*Shelby v Holder."* March, 2016, Midwest Political Science Association, Chicago, IL.

"The Meaning of 'One-Person, One-Vote' or Let's Split the Baby in Half: Some Preliminary
Comments and Observations." January, 2016, Southern Political Science Association,
San Juan, Puerto Rico.

"The Proof of Racism When Racism is Non-existent: A Mixed Methods Approach to
Public Policy Analysis." July 30 – August 1, 2013, 8th International Conference
On Interdisciplinary Social Sciences, Charles University, Prague, Czech Republic.

"Invisible Racism in the Texas Voter ID Law." April, 2013, Midwest Political Science
Annual Meeting, Chicago, IL.

"Wither Section 5 of the Voting Rights Act." March, 2013, Western Political Science
Association, Hollywood, CA.

"The Latino Electorate, The Electoral College, and Realigning Elections." June, 2010, Atiner
Symposium, Athens, Greece.

"The Changing Face of the American Electorate and the Possible Effects on USA Immigration
Policy." April, 2010, Midwest Political Science Annual Meeting. Chicago, IL.

"The Political Maturation of Latinos or What Needs to be Done to Get a Seat at the Table?:

Some Comments on a Much Larger Project." April, 2009, Midwest Political Science Annual Meeting.  Chicago, IL.

"Latino Public Opinion and Public Policy:  the 2006 Exit Polls."  September, 2006, American Political Science Association.  Philadelphia, PA.

"Latino Political Participation and Power:  2004 National Latino Exit Poll." April, 2006, Midwest Political Science Association.  Chicago, IL.

"Latino Political Participation and Power:  2004 National Latino Exit Poll." March 18, 2006.  Western Political Science Association.  Albuquerque, New Mexico.

"The Negative Legacies of the Voting Rights Act for the State of Texas." April 21-23, 2005.  Invited Paper.  Yale University.  Center for the Study of American Politics. "Lessons From the Past, Prospects for the Future:  Honoring the Fortieth Anniversary of the Voting Rights Act of 1965."  New Haven, CN.

"Can Critical Realigning Elections Be Artificially Constructed:  A Case Study of the 2001 - 2004 Texas Redistricting Debacle." 2004, Western Political Science Association, Portland, OR.

"Some Methodological Barriers to be Overcome Attempting to Utilize Census Data in Longitudinal Studies." 2004. Midwest Political Science Annual Meeting, Chicago, 2004.

Mayor Ed Garza of San Antonio, TX:  A Cisneros Legacy." 2001, Western Political Science Association, Long Beach, CA.

"Competitiveness and Electoral Systems:  Are Districted Elections More Competitive Than At-Large Systems?"  2000, The American Political Science Association, Washing, D.C.

"The Effects of Single Member Districts on Latino Political Participation or Is the Baby Being Thrown Out With the Bath Water?" 1999, The American Political Science Association, Atlanta, GA.

Roundtable on Morning Glories:  the Politics of Southwestern Cities by Amy Bridges, 1999, Western Political Science Association, Seattle, WA.

"Term Limits and the Voting Rights Act:  The Case of San Antonio, Texas," 1998, The American Political Science Association, Boston, MA.

"Voter Turnout and Majority-Minority Districts:  The Effect on Municipal Districts," 1997, The American Political Science Association, Washington, D.C.

" 'No Room!  No Room!'  They Cried Out When They Saw Alice Coming: The Recent Gerrymandering Decisions of the South," 1995, <u>Southwestern Social Science Association</u>, Dallas, TX.

Roundtable, "The Selma March and the Voting Rights Act After Thirty Years:  A Commemoration, Assessment of the Past, and Preview of the Future," (Thematic Session), 1995, <u>Southwestern Social Science Association</u>, Dallas TX.

Roundtable, "An Assessment of Latino Political Influence in the Southwest," 1995, <u>Southwestern Social Science Association</u>, Dallas, TX.

"Chaos and the City," 1994, <u>Western Political Science Association</u>, Albuquerque, NM.

"The Voting Rights Act of 1965 and the Delivery of Municipal Services," 1993, <u>Western Political Science Association</u>, Pasadena, CA.

"The Voting Rights Act and the Equitable Distribution of Municipal Services," 1992, <u>American Political Science Association</u>, Chicago, IL.

"An Evolution of City Typologies," 1991, <u>Western Political Science Association</u>, Seattle, WA.

"Post Modernism and Chicano Politics," 1990, <u>Western Political Science Association</u>, Newport Beach, CA.

"Water Policy in South Central Texas:  An Impossible Dream," 1989, <u>Southwestern Political Science Association</u>, Little Rock, AK.

"Deconstruction and Chicano Politics," 1988, <u>Southwestern Political Science Association</u>, Houston, TX

"Growth and Justice in Local Politics:  The Issues for the Coming Decade," 1988, <u>Western Political Science Association</u>, San Francisco, CA.

"Playing Power Politics the American Way," 1987, <u>Western Political Science Association</u>, Anaheim, CA. Award for Best Paper on Chicano Politics.

"The Ecology and Environment of the South Texas Border Region," 1986, <u>Mexico – E.U.A.:  Cooperación y Conflicto, Colegio Nacional de Ciencias Politicas y Administración Publica, A.C.</u>, Mexico City, D.F.

"Structural Barriers to Chicano Empowerment," 1986, <u>Symposium on Chicano Empowerment, University of Texas at El Paso</u>, El Paso, TX.

Panel Chair, "The Status of Hispanics in the United States in the 1980's" 1986, <u>Southwestern Political Science Association</u>, San Antonio, TX.

"The Cohesiveness of the Congressional Hispanic Caucus," 1985, <u>Southern Political Science Association</u>, Nashville, TN.

"The Cohesiveness and Representativeness of the Congressional Hispanic Caucus: Some Preliminary Considerations," 1985, <u>Southwest Social Science Association</u>, Houston, TX.

"The Bourgeoisification of Chicano Youth: What Is To Be Done?" 1984, <u>National Association of Chicano Studies</u>, Austin, TX.

"Chicanos and Politics in the 1980's," 1984, <u>Western Political Science Association</u>, Sacramento, CA.

"An Inherently Discriminatory Cobweb: Some Considerations Concerning the American Political System," 1983, <u>National Association of Chicano Studies</u>, Ypsilanti, MI.

## LITIGATION RESEARCH AND EXPERT LEGAL TESTIMONY

<u>Leal and League of United Latin American Citizens v San Antonio River Authority</u> (SA-85-CA-2988/1986) - Racial Polarization, History of Racial Discrimination in San Antonio, TX. Testified in TRO hearing.

<u>Villarreal v Mosbacher</u>, 1992 - Racial Discrimination in Delivery of Food Stamps. Produced expert report and testified in deposition.

<u>Rodriguez and Reyes v Rocksprings Independent School District</u> (DR-89-CA-29) – Racial Polarization, History of Discrimination in Texas, 1991 - 1992. Produced expert report and testified in deposition.

<u>Gonzalez v Mission Hospital</u> (C-3566-88-B) - Age and Racial Discrimination in Employment, 1992. Expert Report.

<u>Vinalay v Coca Cola Bottling Company of the Valley</u> - Age and Racial Discrimination in Employment, 1992. Expert Report.

Voting Rights Act, Sec. 2, submission on the part of Congressman Joe Barton, R-Ennis, TX before Honorable William Dunn, United States, Assistant Attorney General for Civil Rights, 1992. Expert Report and testimony

<u>Terrazas v. Slagle</u>, 789 F. Supp. 828 (W.D. Tex. 1991) - 1990 Texas Reapportionment, Racial Polarization in Texas, 1992. Expert report, deposition and trial testimony.

<u>Ruth Sanchez v Sears, Roebuck and Co.</u> (CA-M-91-110) - Gender and Racial Discrimination in Employment, 1992. Expert report.

<u>LULAC and FOCUS v Midland Community College District</u> - Voting Rights, Racial Polarization, History of Discrimination in West Texas, 1993. Expert report

and deposition.

Norma Elizondo Garza v Texas Department of Human Services (CA-C-2679-89-C) – Gender Employment and Promotion Discrimination, 1993. Expert report and testimony during mediation.

Willie J. Rollins, Ervin O. Grice and League of United Latin American Citizens, #188 v Fort Bend Independent School District, et al (CA-H-92-3399) – Racial Polarization and History of Discrimination in East Texas, 1993. Expert witness deposition and trial testimony.

LULAC of Texas and Alfred Lucero v The State of Texas (L-93-26) - Voting Rights, Racial Polarization and the History of Racial Discrimination in Texas, 1993. Preliminary expert report.

LULAC and Dr. Harold Jones v North East Independent School District - Voting Rights, Racial Polarization and the History of Racial Discrimination in San Antonio, Texas, 1993-1995. Expert report, deposition and trial testimony.

Larencene Lespreance v Schreiner College (CA-SA-93-CA-1084) - Employment Discrimination, ADA, 1994. Expert report.

LULAC v Northside Independent School District - Voting Rights, Racial Polarization and the History of Discrimination in Texas, 1994. Expert report and deposition.

Guerra, et al v Celanese Corp, et al, C.A. No. C-80-115 (USDC, Southern District, Corpus Christi) Mireles et al v. Celanese Corp. et al, C.A. No. C-76-134 (USDC, Southern District, Corpus Christi) - Employment Discrimination. 1995 – 2000. Expert report.

Perez, et al v Pasadena Independent School District, et al C.A. No. H-92-3578 - Voting Rights, Racial Polarization, 1995 - 2001. Expert report, deposition and trial testimony.

LULAC v Roscoe Independent School District - Voting Rights, Racial Polarization, 1995. Expert report, deposition and trial testimony.

Milwaukee Branch of NAACP, et al and Ramon Valdez v Governor Tommy Thompson, et al, and Wisconsin Association of Trial Judges, et al CA No. 94-C-1245 - Voting Rights and Racial Polarization, 1996. Expert report.

Helen Dutmer v The City of San Antonio, TX CA No. SA-95-CA-764 – Voting Rights, Racial Polarization, and Term Limits for City Council Members, 1996. Expert report and deposition.

Efrain Gomez v Hygeia Dairy Company, CA No. C-95-447 - Age Discrimination, 1996.

Expert report and mediation testimony.

Armando Longoria v Hygeia Dairy Company, CA No. 1994-CCL-00727-B
        Workman's Compensation, 1996.  Mediation scheduled for Oct 24, 1996.
        Expert report and mediation testimony.

Terry Stanford v Hygeia Dairy Company, CA 95-6035-C - Workman's Compensation, 1996.
        Expert report and mediation testimony.

Blanchard v Pecos County Bank, CA P-96-CA-82 - Racial discrimination in
        promotion, 1996-98.  Expert Report.

Aguilar v Gonzalez - Racial Polarization in elections State of New Mexico, 1996-97.
        Expert report and testimony.

Valero, et al v City of Kerrville, et al, CA No. SA-96-CA-413-FB, 1997 - present –
        Racial Polarization and Political Cohesiveness of African American and Hispanic
        Voters In City of Kerrville.  Expert report and deposition.

Harris v City of Houston - Racial Polarization in City of Houston and Harris County
        General and City Council Elections, 1996-97.  Expert report, deposition, TRO
        Testimony.

Sharyland LULAC and Mario Hernandez v Sharyland ISD-Racial Polarization in school
        district elections, 1997.  Expert report.

Casarez v Val Verde County - Racial Polarization in the use of Federal Post Card
        Application Ballots, 1997.  Expert report, deposition, trial testimony.

Garza v HCA Health Services of Texas, Inc. D/B/A HCA Grande Regional Hospital-
        Workmen's Compensation, 1997.  Expert report.

Graham v City of San Antonio, Texas, and Robert Ojeda, Fire Chief – Promotion
        Discrimination, 1997.  Expert report and fact hearing testimony.

Richard Reynosa, et al v Amarillo Independent School District, et al – Racial Polarization
        And Political Cohesiveness of African American and Hispanic Voters in Amarillo
        ISD, 1998.  Expert report and deposition.

Rothe Development Corp vs USDOD and USAF – Minority Contracting, 1999.  Expert
        report and deposition.

Aguilar v Titan Tire Company – Workmen's Compensation Retaliation, 2001.  Expert
        report.

Balderas, Roman, and Torres v State of Texas, et al  (CA 6:010v158) – State Senate,

House and US Congressional Redistricting, 2001.  Consulting Expert.

State of Texas v Mr. Patrick McCarty (No. 01-03-2829) – Change of venue, race relations in South Texas, 2002.  Expert Report and hearing testimony.

NAACP, et al v Katherine Harris, Secretary of State of Florida, et al (01-01210-CIV-GOLD/SIMONTON) – Sec. 2, VRA, 2002.  Expert Reports and deposition testimony.

Arvizu , et al v Arizona Independent Redistricting Commission, et al. (CV2002-004380 anCV2002-004882) – Arizona US Congressional Redistricting Racial Polarization, 2002 – 2003.  Expert Reports, deposition and trial testimony.

Leyva, et al. v Republican Party of Bexar County, et al. – Sec. 5, Republican Party Primary Challenge, 2002.  Expert report and deposition testimony.

Latino Voting Rights Committee of Rhode Island, et al v Edward Inman III, Secretary of State, Rhode Island, et al. (CA No 02-296-T) – Sec. 2 Racial Polarized Voting, 2002 - 2003.  Consulting expert.

Rodriguez, et al, v Bexar County, Texas, et al, (CA SA-01-CA-1049 WWJ) – Sec. 2 Racial Polarized Voting, 2003.  Expert report, deposition and trial testimony.

G. I Forum, et al v Perry, - Sec 2, Racial Polarized Voting, 2003.  Expert report, deposition and trial testimony.

Texas Latino Redistricting Task Force, et al v. Perry, et al., 2011.  Expert report, deposition and trial testimony (discriminatory racial intent).

Texas v Holder, et al, 2012.  Expert report, direct testimony submitted during trial (discriminatory racial intent).

Gomez, et al v Commissioner of Department of State Health Services, State of Texas, et al, 2016. Expert report, direct testimony being prepared for trial (discriminatory racial intent).

La Union Del Pueblo Entero, Inc., et al v Greg Abbott, et al, 2017.  Expert report, direct testimony ("Totality of circumstances," Senate Factors).

Exhibit 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

**JAYLA ALLEN, et al.,**

**PLAINTIFFS,**

**v.**                                    **Civil Case No. 4:18-cv-3985**

**WALLER COUNTY, et al.,**

**DEFENDANTS.**

**EXPERT REBUTTAL REPORT**
**OF**
**Henry Flores, Ph.D.**

**ON BEHALF OF PLAINTIFFS**
**JAYLA ALLEN, DAMON JOHNSON, TREASURE SMITH,**
**AND THE PANTHER PARTY**

# TABLE OF CONTENTS

**Introduction**

**I.**     **General Observations and Comments on Dr. Gimpel's Report**

**II.**     **Specific Comments on Dr. Gimpel's Report**

**III.**     <u>**Arlington Heights**</u> **and Senate Factors**

**IV.**     **Correcting and Contextualizing a Discussion in My Initial Report**

**V.**     **Observations and Conclusions**

**Introduction**

This report includes five sections. The first provides general observations and comments on the Defendants' expert report by Dr. Gimpel. The second addresses specific comments on Dr. Gimpel's methodology, observations, and conclusions. The third section reiterates my initial findings under the <u>Arlington Heights</u> factors and the Senate Factors, and notes that Dr. Gimpel does not specifically address or seek to rebut any of these findings. The fourth corrects a factual error in my initial report. To conclude, the fifth section offers my own general observations and conclusions concerning Dr. Gimpel's report.

**I. General Observations and Comments about Dr. Gimpel's Report**

- Both distance analyses employed by Dr. Gimpel, based on proximity to actual voters and the location-allocation model, were inappropriately abstract in nature and failed to account for the unique demographics and economic and historical conditions of young and Black student voters aged 18-20 at Prairie View A&M University (PVAMU).

- Dr. Gimpel's conclusions concerning the purported benevolence of Waller County officials in allocating early voting <u>sites</u> to the PVAMU campus fail to recognize that these sites were not allocated until after students had protested, marched, risked retaliatory and pretextual prosecutions by Waller County officials, and petitioned the County to have a polling location sited on campus.

- To the extent that Dr. Gimpel credits Waller County for selecting the <u>Memorial Student Center</u> (MSC) on the PVAMU campus as an appropriate <u>location</u> for early voting, I agree that it is an excellent location, and that it should continue to be used. However, Dr. Gimpel fails to acknowledge, as Plaintiffs' Expert Report of Dr. Peniel Joseph makes clear, that it

was PVAMU students, not County officials, who first identified this location. PVAMU students struggled for years before the County consented to site a voting location there.

- Similarly, the <u>hours</u> at the PVAMU MSC on which Dr. Gimpel largely bases his analysis were extended in direct response to the filing of this lawsuit—as such, it is the students who deserve the credit for the final allocation of hours, not Waller County officials.

- Despite the failure to consider these factors in his analysis, Dr. Gimpel reaches an ultimate conclusion that PVAMU students were not disadvantaged by the administration of early voting in the 2018 November election.

## II. Specific Comments on Dr. Gimpel's Report

***Comparison of PVAMU to Other Campuses***

Dr. Gimpel compared Waller County to eight other Texas counties, Table 6, p. 21, without any consideration of the differences, including in demographics, geographical locations, social conditions, or historical experiences, among the college or university campuses in these counties.

*Demographics and geographical locations*

The eight colleges and universities in Texas to which he compared PVAMU do not have comparable student demographic populations: that is, none are a historically Black or currently majority-Black university or college (HBCU); one is a Hispanic Serving Institution (HSI); and all of these Texas institutions have historically served different student-age groups and have unique missions. None of these eight institutions also is a HBCU in Texas situated amid a largely white, non-student, older population.

The data in **Table 1** below depicts the general student demographics of each Texas campus represented by Dr. Gimpel in Table 6, p. 21 of his report. The data displayed in Table 1 below were taken from the Common Data Set for the Fall Semester, 2019, with the exception of Sam

Houston State University whose most recent report was dated Fall, 2015. These data are also available on the Texas Higher Education Coordinating Board's website. The race and ethnicity percentages represent the undergraduate enrollment figures only as these are not reported for the graduate population. Total enrollment figures are for the combined undergraduate and graduate populations of each university.

**Table 1**
**Colleges and Universities Compared to PVAMU**

| Name of School | Fall 2018 Enrollment | % White | % Black | % Hispanic |
|---|---|---|---|---|
| **Tarleton State University** | 13,118 | 64.3 | 8 | 16.8 |
| **Texas A & M Commerce** | 12,072 | 46.9 | 20.1 | 16.8 |
| **Texas A & M Kingsville** | 8,541 | 14.5 | 5.2 | 74.3 |
| **Stephen F. Austin** | 13,058 | 58.5 | 15.4 | 19.1 |
| **West Texas A & M** | 10,030 | 56.7 | 5.3 | 27.4 |
| **Angelo State** | 10,242 | 50.4 | 5.8 | 36 |
| **Univ. of Houston Victoria** | 4,381 | 32 | 17 | 38 |
| **Sam Houston State** | 21,025 | 52.5 | 18.5 | 20.4 |
| **PVAMU** | 9,516 | 1.8 | 82.3 | 8.8 |

**SOURCES:** Texas Higher Education Coordinating Board. Data Center. Common Data Sets from Offices of Institutional Research at Tarleton State University, Texas A & M Commerce, Texas A & M Kingsville, Stephen F. Austin, West Texas A&M University, Angelo State University, University of Houston, Victoria, Sam Houston State University, and Prairie View A&M University. Ethnicity data from Fall 2019 enrollment undergraduate enrollment figures.

As the data in Table 1 reveal, only two campuses are considered majority-minority schools: Texas A&M Kingsville, which is an HSI having an undergraduate student population that is more than 74% Hispanic; and PVAMU, a HBCU that has an undergraduate population that is more than 80% Black. The demographics of both these institutions are markedly different from the remainder of the campuses in Table 1. The other campuses in Table 1 are majority-white campuses with substantially smaller African American student populations.

Moreover, PVAMU also stands apart from the other institutions in Texas selected by Dr. Gimpel as purported comparators to PVAMU due to the notable difference between the demographics of PVAMU's student body and the demographics of the county where those students reside. **Table 2** below contextualizes the data in Table 1 by comparing each institution's

demographics with the overall demographics of the counties where they are located, as recorded by the 2010 Census.

**Table 2**
**Colleges and Universities and County Demographics Compared to PVAMU**

| Name of School / *County* | Fall 2018 Enrollment / *2010 Pop.* | % White | % Black | % Hispanic |
|---|---|---|---|---|
| **Tarleton State University** | 13,118 | 64.3 | 8 | 16.8 |
| *Erath County* | *37,890* | *77.5* | *1.1* | *19.2* |
| **Texas A & M Commerce** | 12,072 | 46.9 | 20.1 | 16.8 |
| *Hunt County* | *86,129* | *74.8* | *8.1* | *13.6* |
| **Texas A & M Kingsville** | 8,541 | 14.5 | 5.2 | 74.3 |
| *Kleberg County* | *32,061* | *23.3* | *0.4* | *70.2* |
| **Stephen F. Austin** | 13,058 | 58.5 | 15.4 | 19.1 |
| *Nacogdoches County* | *64,524* | *61.5* | *17.9* | *17.6* |
| **West Texas A & M** | 10,030 | 56.7 | 5.3 | 27.4 |
| *Randall County* | *120,725* | *78.2* | *2.2* | *16.4* |
| **Angelo State** | 10,242 | 50.4 | 5.8 | 36 |
| *Tom Green County* | *110,224* | *57.9* | *3.6* | *35.7* |
| **Univ. of Houston Victoria** | 4,381 | 32 | 17 | 38 |
| *Victoria County* | *86,793* | *47.9* | *6.0* | *43.9* |
| **Sam Houston State** | 21,025 | 52.5 | 18.5 | 20.4 |
| *Walker County* | *67,861* | *58.5* | *22.2* | *16.8* |
| **PVAMU** | 9,516 | 1.8 | 82.3 | 8.8 |
| *Waller County* | *43,205* | *44.6* | *24.4* | *29.0* |

SOURCES: Texas Higher Education Coordinating Board. Data Center. Common Data Sets from Offices of Institutional Research at Tarleton State University, Texas A & M Commerce, Texas A & M Kingsville, Stephen F. Austin, West Texas A&M University, Angelo State University, University of Houston, Victoria, Sam Houston State University, and Prairie View A&M University. Ethnicity data from Fall 2019 enrollment undergraduate enrollment figures. County population and demographics from 2010 Census American Factfinder. For county populations, "White" means non-Hispanic white; "Black" means non-Hispanic Black, and "Hispanic" means Hispanic or Latino (of any race).

As the data in Table 2 reveal, none of the eight institutions selected by Dr. Gimpel as purported comparators to PVAMU show anything close to being comparable to the difference between PVAMU's campus and Waller County's demographics. Among PVAMU students, the predominant racial/ethnic identification is Black—82.3% of PVAMU students identify as Black. Meanwhile, in Waller County as a whole, only 24.4% of residents identify as Black. Thus, there is a difference of <u>57.9</u> percentage points between the proportion of Black students in PVAMU's student body and the proportion of Black residents in Waller County as a whole.

No other campus and county pairing described in Dr. Gimpel's analysis is comparable in this respect. Perhaps the closest analogue among Dr. Gimpel's purported comparator institutions is Texas A&M Commerce University (TAMCU), located in Hunt County. Among TAMCU students, the predominant racial/ethnic identification is white—74.8% of TAMCU students identify as white. In Hunt County as a whole, a somewhat smaller proportion of residents— 46.9%—identify as white. Thus, there is a difference of <u>27.9</u> percentage points between the proportion of white students in TAMCU's student body and the proportion of white residents in Hunt County as a whole. However, this difference is less than half the difference described above at PVAMU. More significantly, "white" is the most common racial/ethnic identification among Hunt County residents in general, as it is among TAMCU's students—meaning that the TAMCU campus's demographics track Hunt County's demographics much more closely than PVAMU's demographics track those of Waller County.

Indeed, only one of Dr. Gimpel's comparator institutions in Texas, University of Houston-Victoria (UHV), has a student body whose predominant racial/ethnic identification is not the same as the predominant racial/ethnic identification of the county where it is located—and the difference in that single case is only a matter of a few percentage points. Among UHV students, the predominant racial/ethnic identification is Hispanic—38% of UHV students identify as Hispanic, as compared to 32% who identify as white. In Victoria County as a whole, a somewhat greater proportion of residents identify as white than Hispanic (47.9% identify as white, compared to 43.9% who identify as Hispanic). However, this amounts to a difference of only 4.1 percentage points between the proportion of Hispanic students in UHV's student body and the proportion of Hispanic residents in Victoria County as a whole. In this case, as in the other Texas institutions

that Dr. Gimpel selects, the UHV campus's demographics track Victoria County's demographics much more closely than PVAMU's demographics track Waller County's.

It is also worth noting that none of the Texas colleges or universities selected by Dr. Gimpel as purported comparator institutions to PVAMU has a student body consisting of more than 18.5% Black students. In fact, the average proportion of Black students at the eight Texas institutions identified by Dr. Gimpel is 11.9%. This means that the difference between the proportion of Black students at PVAMU (82.3%) and the average proportion of Black students at the Texas institutions discussed by Dr. Gimpel (11.9%) is a difference of over <u>70</u> percentage points. The issues in this case are hardly illuminated by such dissimilar comparisons.

In addition, the colleges and universities in Dr. Gimpel's Table 6 represent different higher educational systems and are located in different areas in Texas. Five of the universities are part of the Texas A&M system, one is part of the Texas Tech system, three are part of the Texas State University system, and one is part of the University of Houston system. Five of the ten are in what can be considered East Texas, one on the Mexican border, one in North Central Texas and two in West Texas.

Finally, the universities selected by Dr. Gimpel reflect another bias by the exclusion of a discussion of campuses in Texas where there have been polling places located for a number of years. He could have considered in his report universities such as the University of Texas, Austin, University of Texas, San Antonio, Austin and San Antonio Community College Districts, among others. County officials in the jurisdictions where these schools are located have offered early voting and election day polling sites to accommodate large groups of potential student voters. This exclusion leads one to a false conclusion that placing polling places on campus is a unique decision and not normally performed by Texas county officials.

In sum, it is not entirely clear why Gimpel selected these eight schools given the various key reasons why they are not comparable, particularly as relates to the differing demographics of these institutions. Dr. Gimpel also did not explain his methodology in choosing these universities or account for why they were appropriate comparators to PVAMU.

### PVAMU's Unique History

Each of the universities that Dr. Gimpel included in his report at Table 6 and that are in Table 1 of this rebuttal report also were founded in different years and for different missions. None have a persistent, documented history of voting discrimination directed at Black 18-20 year old students like at PVAMU.

Five of the universities were created between 1876 and 1917 as part of the normal school movement designed to train high school graduates as teachers to uplift the young people in the various outlying parts of the state. Two of the universities selected by Dr. Gimpel, Angelo State and the University of Houston, Victoria, were not established until the latter part of the 20th century as community colleges. Two more, Tarleton State and Stephen F. Austin, began as private institutions endowed by private individuals, becoming public later in their existences.

PVAMU is the *only* university established within the body of the state constitution—in Article 7 of the 1876 Texas State Constitution—as a university for "colored people" under the racially discriminatory segregation laws of the state during that historical era. It was not until after World War II that its curriculum began to mirror that of the University of Texas. It is now a comprehensive liberal arts university offering degrees at all levels from Bachelor to Doctoral. It is nationally recognized as an HBCU by all measures and is even evaluated separately by US News and World Report when they release their annual academic rankings. US News evaluates PVAMU

against other HBCUs rather than against all other schools in the United States. It is currently ranked 21 of 80 HBCUs by US New and World Report.

Further, none of the eight institutions that Dr. Gimpel selects have experienced the well-documented voting discrimination that PVAMU students have faced or, if any have, Dr. Gimpel has not acknowledged any of this history. At PVAMU, the persistent attempts to enact discriminatory voting changes, combined with the ongoing racial disparities in access to basic necessities, see generally Plaintiffs' expert William Cooper's report, inform and shape students' experiences unlike the other institutions identified by Dr. Gimpel. As detailed in Plaintiffs' expert Dr. Joseph's report (p. 12), Waller County is the most difficult county in Texas for Black college students to vote based on the extensive and ongoing efforts by Texas officials to curtail, suppress, and disenfranchise Black voters.

Between 1972 through 2018, Waller County officials have continuously attempted to thwart PVAMU students from voting to the extent that students have been charged with illegal registering, illegal voting, have been denied access to polling places, and more. PVAMU students have petitioned the local government, marched, demonstrated, spoken before county government, and appealed to the state and national government for relief, often to no avail. Finally, the students together with other residents of the City of Prairie View have filed several lawsuits to gain access to the vote. With respect to the very topic of this lawsuit—access to early voting—Dr. Gimpel fails to consider the unique history of PVAMU students requesting, demanding, and advocating for polling places on campus when considering the manner in which Waller County officials determine the locations of early and election day polling places. Regardless of how often Waller County has been admonished by the judicial system and other governments, or their actions illuminated in the media, they still persist in making it difficult for students at PVAMU to have

access to voting, including to a polling place. This record of Waller County government's treatment of PVAMU students has become an essential element in PVAMU's identity, enshrined on its website, https://www.pvamu.edu/1876/2017/03/31/the-walk-of-political-engagement-at-pvamu/.

Dr. Gimpel fails to account for the particular history of PVAMU students in Waller County, discussed in detail in Dr. Joseph's report at Part B and incorporated into my initial report, even though he states "the placement of polling locations is not reducible to a mechanistic formula, *but must consider tradition, local history and changing electoral circumstances . . . .*" (p. 40) (emphasis added). This historical record cannot be detached from PVAMU, nor ignored or minimized when comparing it to various campuses as Dr. Gimpel has done. Accordingly, for Dr. Gimpel to conclude that he can compare the on-campus political and social environment of PVAMU to the other schools in his Table 6—without actually doing such a comparison—is methodologically flawed.

In conclusion, a comparison of PVAMU to the other campuses in Table 6 of Dr. Gimpel's report is incomplete and, therefore, flawed without a consideration of the unique demographics of PVAMU and PVAMU in relation to Waller County, as well as the special circumstances of PVAMU students' struggles for the right to vote. None of the other Texas institutions discussed by Dr. Gimpel have comparable demographics or a history of racial discrimination and student-led activism or, if any do, he failed to discuss this issue. Additionally, Dr. Gimpel did not explain his methodology in choosing the campuses in his Table 6. Why no schools were chosen from other parts of Texas or with a comparable political history as PVAMU—if that exists—is never explained. What campus characteristics that made those institutions comparable are not fully

explained. This failure on Dr. Gimpel's part contradicts his own above-mentioned cautionary statement.

### *Proximity to Polling Places and Total Turnout*

Dr. Gimpel's proximity analysis places the onus on voters rather than Waller County officials for not siting early voting locations on PVAMU's campus. This leads one to conclude incorrectly that it is the fault of the voters for not voting rather than the decisions of the officials for the lack of access to voting on PVAMU's campus. Thus, Dr. Gimpel fails to consider the role discrimination plays in the poll siting process.

His analysis is based on turnout rather than whether the opportunity of access is the point of contention. Lack of access and the county's continuous efforts to thwart access are the questions at hand. As a result, proximity to voters that participate is not a relevant issue to investigate in this matter.

Dr. Gimpel also appears to contradict himself in that he claims that "[m]otivation and interest are much larger barriers to voter turnout than convenience." (pp. 6-7). If this is so, why did he not define, operationalize, and measure these supposedly significant variables? Also, if his observation concerning motivation and interest is correct, then why did he perform his analysis in the manner that he did, without including either of these factors in his analytical model?

His admission in footnote 2, page 9, concerning the difficulty of geocoding addresses "that are post office boxes" may have resulted in his inability to thoroughly account for PVAMU students living and having to vote off-campus in Precinct 310 in the City of Prairie View. Relatedly, Dr. Gimpel also failed to consider the mis-registration of PVAMU students, detailed in my initial report and that of Dr. Joseph, who were forced—through no fault of their own—to vote in Precinct 310 although they lived in Precinct 309. And Dr. Gimpel's allusion to adequate parking

on campus is mitigated by the administration's offer to arrange for available parking for voters during elections.

Placing an early voting location at the Memorial Student Center allows PVAMU students more flexibility to vote given their complicated class, extracurricular, and daily movement schedules. Traditionally, on any college or university campus, the student center is just what its name implies: the center of student life on campus. As a result, placing a polling place on campus serves two purposes: it makes voting more accessible and it also creates an environment where students become socialized—i.e., motivated—to the importance of voting. This latter situation speaks to the factor Dr. Gimpel alludes to without defining or properly operationalizing, and which he suggests is missing among young voters: motivation. Young voters are more easily socialized to vote if voting appears to become a regular occurrence in their lives. By siting a polling place in the MSC, and providing that location adequate hours and days of early voting, Waller County would assist in the creation of young voters who are motivated to vote in future elections.

Dr. Gimpel's assumption (pp. 14-15) that "Motivated voters living a few blocks from a polling place may still appreciate the opportunity to cast their vote early, and acquire the habit of doing so, but all other things being equal, it is the voters further away from these sites that one would expect to cast more early ballots because they are more motivated by the need to overcome the costs of distance" is problematic for four reasons. First, young, Black, college-student voters— many of whom are exercising their right to vote for the first time in their lives—may not yet have acquired the habit of voting. So the extent to which Dr. Gimpel's nebulous and generic concept of "motivation" applies to these voters is unclear. Second, Dr. Gimpel provides no credible basis on which to believe that his assumption regarding motivated voters holds true for *any* voters, including older, white, or suburban voters. Third, he did not account for these assumptions in his

model, nor did he speak to them in his report. Fourth, Dr. Gimpel fails entirely to consider the unique transportation difficulties university students have that were identified in several of Plaintiffs' expert reports.

Dr. Gimpel admits that "[d]ifferent voters face different inconveniences" but does not specify these differences nor does he include them in any of his models (p. 15).

## III. Arlington Heights and Senate Factors

In my initial report, I analyzed the factual background of Waller County's early voting schedule for the 2018 general election in light of the factors set forth by the United States Supreme Court as a methodological framework for assessing intentional discrimination in the case of Village of Arlington Heights v. Metropolitan Housing Development Corporation, 429 U.S. 252 (1977) (Flores Report pp. 6-36). I also discussed the Congressionally delineated Senate factors 1, 2, 5, 7, 8 and 9 that are a guide for federal courts to consider in assessing whether, under the totality of circumstances, an electoral system interacts with social and historical conditions to cause inequality in the political process in violation of Section 2 of the Voting Rights Act. On pages 49 and 50 of my Report, I stated the following two conclusions that were based upon my review of the evidence in light of these factors:

- First, that "[t]he Waller County Commissioners Court acted with an intention to discriminate against the PVAMU student body and the majority-Black Prairie View community, of which PVAMU students are a part, when allocating the early voting hours for the 2018 General Election";[1] and

---

[1] Expert Report of Henry Flores, Ph.D. ("Flores Report"), pp. 49.

- Second, that "[t]he Waller County Commissioners Court discriminated against the Black student body of PVAMU, against young, college-age voters at PVAMU in general, and against the Black community of Prairie View, Texas."[2]

In this section of my Rebuttal Report, here, I revisit my analysis and conclusions under each of the relevant <u>Arlington Heights</u> and Senate factors and evaluate the extent to which Dr. Gimpel's report addresses these factors or counters my conclusion that Waller County's adoption and maintenance of the November 2018 early voting plan was motivated by discriminatory intent. I conclude that Dr. Gimpel's report fails to meaningfully counter my opinion. Thus, even if Dr. Gimpel's claims were taken at face value—which, as detailed elsewhere in this report, they should not be—the facts, analysis, and conclusions presented by my report and those of the Plaintiffs' other experts would still point to intentional discrimination under the <u>Arlington Heights</u> framework and discriminatory results under the totality of circumstances.

### A. <u>Arlington Heights</u> Factors

#### 1. <u>Discriminatory Impact</u>

My initial report, on pages 6-8, discusses the discriminatory impact of Waller County's November 2018 early voting plan on younger voters and voters of color. My conclusion, as stated in the report, is that "Waller County's November 2018 early voting plan disproportionately impacted voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View."[3] In reaching this conclusion, I rely in part on the analysis conducted by Plaintiffs' expert Dr. Robert Stein, who, in his own report, concludes that "Waller County's early voting plan for 2018 disproportionately impacted voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View because they were not afforded the same or similar opportunities

---

[2] <u>Ibid.</u>, p. 50.
[3] Flores Report, p. 6.

to vote early as other registered voters in the County."[4] Thus, my opinion relevant to the first Arlington Heights factor is that the 2018 early voting plan produced a discriminatory impact on Black voters, voters aged 18 through 20, and Black voters aged 18 through 20.

Dr. Gimpel's report does not seriously contest this conclusion; nor does it take any issue with the substance of Dr. Stein's analysis. In fact, Dr. Gimpel's report completely avoids the question of whether Black voters or young voters were provided unequal access to early voting under Waller County's 2018 early voting plan. Indeed, Dr. Gimpel takes this approach to such an extreme that he never even *mentions* Black voters or voters aged 18 through 20 anywhere in his report. Yet the early voting plan's differential impact on these identifiable groups of voters is the heart of the controversy in this lawsuit, and a relevant factor under the Arlington Heights analysis.

At the end of his report, Dr. Gimpel states flatly—without articulating any evidence or analysis that would support such a conclusion—that "[a] a study of the hours made available for early voting across the county shows no discrimination against the Prairie View area."[5] The "Prairie View area" is nowhere defined, however, and the report shows no indication that Dr. Gimpel actually conducted a "study" of the nature he describes. Nor would a study of "the Prairie View area," if it had been conducted, shed light on the relevant Arlington Heights factors, because discrimination against a geographic area is not what is being alleged in this lawsuit. Although he purports to disagree with the opinions offered by Dr. Stein and myself, Dr. Gimpel never actually rebuts our findings regarding the impact of the 2018 early voting plan on individual voters, and he does not engage in any analysis that takes into account a voter's race or age. Therefore, I reiterate the conclusion, supported by Dr. Stein's analysis, that Waller County's November 2018 early

---

[4] Stein Report, p. 14.
[5] Gimpel Report, p. 49.

voting plan produced a discriminatory impact on voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View.

2. <u>Historical Background of Discrimination</u>

Pages 7-11 of my initial report, drawing on Dr. Peniel Joseph's historical discussion, consider the historical background of discrimination and how it informs my analysis of Waller County's actions in 2018. My report concludes that "there is a pattern of Waller County acting to discriminate against the students at PVAMU in their attempts at obtaining their voting rights," and that this history helps to explain the discriminatory early voting plan adopted and maintained by Waller County officials in 2018. As before, Dr. Gimpel does not challenge any of this history. Thus, this portion of my report—and the entirety of Dr. Joseph's report—are uncontested.

3. <u>Sequence of Events</u>

My initial report discusses at length the sequence of events leading up to Waller County's decisions to adopt and substantially maintain its 2018 general election voting plan.[6] This portion of the report is the basis for my expert opinion "that the procedural sequence of events by which the early voting plan for the November 2018 General Election was developed and adopted was insufficiently open and transparent," and that the process "was inconsistent with and departed from best practices," and that both of these indications support a finding of intentional discrimination.[7] Dr. Gimpel does not challenge any aspect of these facts, or my expert opinion regarding the process's lack of transparency. Thus, this section of my report and the analysis therein presented are uncontested.

In addition, one additional factor has come to my attention as a result of Mr. William Cooper's supplemental declaration. My report, at pages 25-26 and 36, recounts the Commissioners

---

[6] Flores Report, pp. 12-27.
[7] <u>Ibid.</u>, p.18.

Court's peculiar interest in providing additional hours of early voting in Monaville, an unincorporated area in the southern portion of Commissioner Precinct 3 where the polling places for electoral precincts 311, 312, and 313 are often located. As my initial report explained, the interest in Monaville appeared irrational—and seemed to confuse the County's own elections administrator, Ms. Eason, during the October 17 Commissioners Court meeting—because Monaville and its surrounding areas are very small in population. However, Mr. Cooper's supplemental declaration points to a possible reason for the interest on the part of some commissioners for adding early voting hours in Monaville, and not in the City of Prairie View, which is served by electoral Precinct 310, or the PVAMU campus, which is served by electoral Precinct 309.

Notably, the voting-age populations (VAP) of electoral Precincts 309 and 310 are both majority-Black and include significantly higher numbers of voters aged 18 through 20. Precinct 309's VAP is 94% Black, and Precinct 310's VAP is 70% Black. By contrast, Precinct 311's VAP is only 11% Black. Precinct 312's VAP is only 3% Black. And Precinct 313's VAP is only 6% Black. The combined average percentage of Black residents among the voting-age residents of Precincts 309 and 310 is more than a supermajority: 87%. By contrast, the combined average percentage of Black residents among the voting-age residents of Precincts 311, 312, and 313 is only 6%.

Similar trends are revealed in the statistics on the age of voting-age residents reported by Mr. Cooper in these precincts. Among the voting-age residents of Precincts 309 and 310, a majority are aged 18 through 20 years old. People aged 18 through 20 make up 73% of Precinct 309's VAP and 15% of Precinct 310's VAP. By contrast, Precinct 311's VAP is only 5% 18- through 20-year-olds. Precinct 312's VAP is only 6% 18- through 20-year-olds. Precinct 313's VAP is only 6%

18- through 20-year-olds. The combined average percentage of residents aged 18 through 20 among the voting-age residents of Precincts 309 and 310 is a majority: 52%. By contrast, the combined average percentage of residents aged 18 through 20 among the voting-age residents of Precincts 311, 312, and 313 is only 6%.

The stark demographic divides between Precincts 309 and 310 as compared to Precincts 311, 312, and 313, in my expert opinion, support a conclusion that discriminatory intent also motivated the commissioners' stated desire to provide additional voting hours for the predominantly white, older voters served by polling places in Monaville, either instead of or as a condition for providing additional voting hours for the predominantly Black, younger voters served by the MSC polling place on the PVAMU campus.

4.  Procedural or Substantive Deviations from the Normal Procedural Sequence

Pages 26-37 of my initial report detail my findings and opinions regarding the many deviations from the normal procedural sequence that were present in Waller County's process of adopting and maintaining its 2018 general election early voting plan. Dr. Gimpel's report does not address my findings; nor does he attempt to argue that the County's process was functional, transparent, or rational. Thus, these portions of my report, and the analysis therein expressed, are uncontested.

In addition, testimony during Defendant Elections Administrator Christy Eason's deposition bolsters my conclusions. As an initial point, Defendant Eason confirmed that there is no written policy memorializing the criteria used by her office to choose early voting hours and locations.[8] But even if the criteria was written and easily available to the public, Defendant Eason also conceded that Waller County does not take any affirmative steps to provide information to

---

[8] Eason Deposition Transcript, pp. 104:1-4, 133:12-24; 134:21-23 ("Eason Tr.").

residents about how the early voting schedule is initially considered and adopted or how the factors are weighed. These portions of her testimony reinforce the lack of transparency surrounding the creation of the early voting schedule.

## B. Senate Factors

1. Factor 1: The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process.

Page 37 of my initial report states my conclusion, supported by Dr. Peniel Joseph's historical account, that "Waller County, specifically, and Texas, generally, has an extensive history of discrimination against Black people that affects their ability to participate in the democratic process in Waller County."[9] As noted above, Dr. Gimpel does not contest any of this history. Thus, this opinion from my initial report—and the entirely of Dr. Joseph's report—are uncontested.

2. Factor 2: The extent to which voting in the elections of the state or political subdivision is racially polarized.

On pages 38-39, my initial report recites some of the numerous judicial findings to the effect that voting throughout Texas is racially polarized. Dr. Gimpel does not challenge any of these judicial findings or their factual bases. Thus, my conclusion that voting in Waller County is racially polarized is uncontested.

3. Factor 5: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process.

Pages 39-41 of my initial report adopt and contextualize the demographic information provided in the declaration and supplemental declaration of Plaintiffs' expert Mr. William Cooper. My conclusion under Senate Factor 7 is that "Black voters in Prairie View face socioeconomic hurdles due to the effects of discrimination that make reaching early voting locations in other cities

---

[9] Flores Report at 37.

more difficult than for white voters or other older voters in neighboring cities."[10] Dr. Gimpel, Defendants' sole expert witness, does not contest or address these disparities. Thus, these sections of my report—and the entirely of Mr. Cooper's initial declaration—are uncontested.

Moreover, Dr. Gimpel's analysis relies on a methodology that specifically ignores the effects of discrimination, as discussed previously. As one example, Dr. Gimpel's, relies on a location-analysis model to determine early voting sites based on demand.[11] Under this model, Dr. Gimpel treats "every voter equally as a point of demand," asserting that it "makes sense" and "avoids the complexity and controversy of weighing some handicaps more than others."[12] These choices mean that unrebutted burdens that PVAMU students have related to access to transportation or their lower socioeconomic status as compared to other Waller County residents that continue to effect Black Prairie View residents are completely ignored in Dr. Gimpel's analysis.

4. Factor 7: The extent to which members of the minority group have been elected to public office in the jurisdiction.

My initial report, at page 42, also considers the extent to which Black candidates in Waller County have been successful in attaining elected office. I conclude that, as a result of racially polarized voting by the county's larger white electorate, "Black candidates have had very little electoral success in elections contested at the countywide level in Waller County."[13] Dr. Gimpel leaves this well-documented fact uncontested.

---

[10] Flores Report, p. 39.
[11] Gimpel Report, pp. 32-40.
[12] Ibid., p. 39.
[13] Flores Report, p. 42.

5. Factor 8: Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

Under Senate Factor 8, I conclude, in a discussion on pages 42-44 of my initial report, that "the members of the Waller County Commissioners Court . . . have been unresponsive to the particularized needs of Black PVAMU students, including in the adoption and maintenance of the early voting plan for the November 2018 election." Dr. Gimpel, Defendants' sole expert witness, does not contest my appraisal of Defendants' lack of responsiveness. Thus, this conclusion in my initial report and the corresponding discussion are unrebutted.

In addition, Defendant Eason's deposition testimony bolsters my conclusions:

- Waller County continues to be unresponsive to problems caused by the County's reliance on the U.S. Postal Service's rural addressing system that affect the students residing on the PVAMU campus and off-campus in the City of Prairie View.[14] Despite acknowledging the harms PVAMU students face, which may include being placed on a suspended voter list through no fault of their own, the County conceded that these issues were not resolved for the 2019 November elections and ongoing.[15] In fact, Waller County did not offer any solutions on Election Day for the November 2019 elections.[16]

- For the 2019 November election, Waller County did not provide any on-campus early voting location. Instead, the County chose the Waller County Community Center as an early voting location, which Plaintiffs and other PVAMU student have repeatedly declared is inaccessible to students.

- During the October 17, 2018 Commissioners Court meeting, and through this litigation, PVAMU students and some Plaintiffs expressed that they are not affiliated with the

---

[14] Ibid., pp. 43-44.
[15] Eason Tr., pp. 43:21-22, 47:12-17, 49:2-12.
[16] Ibid., p. 48:4-10.

Republican or Democratic Parties, and therefore are not adequately represented by either the Waller County Republican or Democratic chairs in the creation of the early voting schedule. With this awareness and expressed concerns, Defendant Eason has not taken *any* steps to follow up with PVAMU students on this issue or taken any affirmative steps to ensure unaffiliated voters in Waller County have input in the initial recommendation of early voting hours and location.[17] Indeed, Defendant Eason conceded that there is no mechanism for unaffiliated voters to provide input into the initial early voting schedule proposals.[18]

6. <u>Factor 9: Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.</u>

Finally, on pages 44-49, I analyze the tenuousness of the stated policy rationales claimed by Waller County to support their decisions to adopt and maintain the 2018 general election early voting plan. This portion of my initial report concludes that "the rationales advanced for adopting, maintaining, and modestly improving the November 2018 early voting plan were tenuous, changing, and ultimately largely contradicted by the Commissioners' own actions . . . ."[19] I further concluded that the rationales advanced in support of the County's early voting plan "show a lack of good faith and an irrationality that is inappropriate for government action, insofar as the Commissioners cited arbitrary and shifting rationales while failing to make an effort to address the concerns of PVAMU students who requested parity and equity during the early voting planning process."[20] Dr. Gimpel's report fails to address the commissioners' stated rationales for adopting and failing to substantially modify the allocation of early voting hours and days. Rather than

---

[17] <u>Ibid.</u>, pp. 101:9-25, 102:1-12.
[18] <u>Ibid.</u>, pp. 103:17-25, 104:1-4.
[19] <u>Ibid.</u>, p. 44.
[20] <u>Ibid.</u>

defending the actual, contemporaneous justifications stated on the record by members of the Waller County Commissioners Court, Dr. Gimpel invokes platitudes, lacking in any analysis, such as that "[c]hoices have to be made, priorities set."[21] He appears to speculate that county officials in general may allocate early voting sites and hours "according to some combination of historical tradition, familiarity, and demand."[22] But nowhere does Dr. Gimpel's report express disagreement with my conclusion that the contemporaneous rationales *actually advanced* by Waller County for adopting, maintaining, and modestly improving their 2018 early voting plan were tenuous, inconsistent, contradictory, irrational and inappropriate insofar as they appear in certain instances to have been made in bad faith. As a result, the conclusions of my initial report at pages 44-49 are unrebutted.

In addition, Defendant Eason, who reaffirmed that she has the most familiarity with setting the early voting schedule and the logistics for allocating hours and machine,[23] provided testimony that bolsters my conclusions:

- Defendant Eason admitted that PVAMU students use early voting at high rates, Precinct 309 had the most registered voters in 2018, and PVAMU students are one of the largest voting groups in Waller County.[24] These facts would, under the County's purported early voting schedule criteria, weigh in favor of providing more hours on campus.

- Defendant Eason admitted that past voter turnout is taken into consideration when choosing early voting hours and location for a general election, which, again, would weigh in favor of providing more hours on campus.[25]

---

[21] Gimpel Report, p. 49.
[22] Ibid., pp. 48-49.
[23] Eason Tr., pp. 95:25, 96:1-5, 97:16-22.
[24] Ibid., pp. 70:10-24, 71:1-7, 138:23-25, 139:1-20, 140:17-24, 141:12-24, 142:1-3.
[25] Ibid., pp. 86:20-23, 92:11-23, 93:1-4.

- Defendant Eason reaffirmed that her proposal during the October 17, 2018 Commissioners Court meeting to add early voting hours and days at the MSC was to make the voting locations equal and that it would be in the interests and beneficial to the County as a whole.[26] Yet Defendant Commissioners Court voted down this recommendation. During the discussion, a few commissioners contended that Defendant Eason's plan would cause voter confusion or make it harder for people to vote, which Defendant Eason rebutted by asserting she would not propose a plan that does either.[27]

Defendant Eason also rebutted a justification offered by Waller County in support of its decision to not expand the number of hours at the MSC. As background, based on her proposal, Defendant Eason reaffirmed, as she did during the October 17, 2018 Commissioners Court meeting, that she had the necessary resources to add early voting on campus during the first week of early voting.[28] A week later, on October 24, 2018, Judge Duhon read a statement, which in part, reads, "We have analyzed our resources in attempt to extend additional hours and times and done so . . . ."[29] Contrary to this assertion, however, Defendant Eason testified that the County still had the resources necessary to add early voting on campus during the first week, asserting that her same statements on October 17, 2018 were still correct on October 24, 2018.[30] This contrast with Defendant Duhon's public statements casts further doubt on the resource-based justifications offered by Waller County.

---

[26] Ibid., pp. 162:20-22, 180:21-24, 181:1-10.
[27] Ibid., pp. 195:14-25, 196:1-25, 197:1-7, 13-23.
[28] Ibid., pp. 169:10-15, 170:24-25, 171:1-6.
[29] Ibid., pp. 189:24-25, 190:1-4.
[30] Ibid., pp. 169:10-15, 170:24-25, 171:1-6, 190:6-22, 191:11-11.

## IV. Correcting and Contextualizing a Discussion in My Initial Report

In my initial report, I stated that "[t]he meeting agenda, minutes, and agenda backup for the September 5 meeting . . . fail to identify the proposed hours or dates of early voting that the Commissioners would purportedly be approving in that meeting."[31] As a result, I concluded that "the date and process by which the original early voting hours and dates were considered and approved is not substantiated in the public record."[32]

At the time my report was disclosed, these statements reflected my knowledge on the subject. However, on re-reviewing the relevant pages on Wallers County's website, I have identified a link that I had previously overlooked on the "Event Details" sub-page for the September 5, 2018 meeting on the Commissioners Court's Public Notices calendar. The link is titled "Item 8," which corresponds to the number of the agenda item for the September 5 meeting related to ordering the general election. By clicking on "Item 8," I was able at last to find a PDF of the proposed order for the general election, which included dates and hours for early voting. As a result, I wish to amend my initial recitation of the sequence of events to reflect the accuracy of Defendants' statement that the early voting hours and dates for the November 2018 election were indeed "approved/adopted by Commissioners Court on September 5, 2018 as part of a comprehensive order calling the general election."[33]

However, I reiterate my concerns with the transparency of the process by which those hours and dates were approved. I was able to access this posted proposal of early voting days and hours only by navigating to the Waller County homepage and then navigating to the Commissioners Court page, opening the Public Notices calendar, clicking on the date of the September 5 meeting,

---

[31] See Flores Report, p. 17.
[32] Ibid., p. 17-18.
[33] *Defendant Judge Trey Duhon's Response and Objections to Plaintiffs' First Set of Interrogatories*, p. 3 (provided by Plaintiffs' attorneys).

and then clicking on a link the title of which in no way made clear that it would include a proposal for hours or days or early voting.  In other words, even knowing what I was looking for and where it should have been located, it was almost impossible for me to find the document.  It remains true, as I stated in my initial report, that "there was no discussion or even identification of early voting hours or dates during [the September 5, 2018 meeting] motion or approval process."[34]  It also remains true that "Judge Duhon's repeated insistence during the October 17 meeting that the early voting plan was approved on September 22 is contradicted by the public record and his own later statements."[35] It is perhaps indicative of the County's non-transparent process that even the Waller County Judge was at one point unable to discern when early voting hours had been offered for the Commissioners Court's consideration or approval.  When notice of such an important deliberation fails to meaningfully reach the County Judge and can hardly be located by an academic such as myself, with more experience navigating local government websites than most, it strains credulity to imagine that the notice offered by the PDF at the "Item 8" link was somehow "reasonably calculated, under all the circumstances, to apprise interested parties [such as PVAMU students] of the pendency of [a significant decision affecting their right to vote] and afford them an opportunity to present their objections."[36]

Furthermore, I understand from the testimony of Judge Duhon in a deposition in this lawsuit, as relayed to me by Plaintiffs' counsel, that Waller County's general practice is to post agendas and agenda backup materials for Commissioners Court meetings on its website (in the labyrinthine location described above) on the Friday before a meeting is to take place—and these meetings generally are held on Wednesdays, as was the meeting on Wednesday, September 5,

---

[34] See Flores Report, p. 17.
[35] Ibid.
[36] See Mullane v. Central Hanover Bank & Trust Company, 339 U.S. 306, 314 (1950).

2018.  This is even more troubling, given that Monday, September 3, 2018, was Labor Day. That means that most of the narrow time window during which this severely inadequate notice was available before the meeting was a holiday weekend, a time when students and indeed residents of any age are unlikely to spend their hours browsing a difficult-to-navigate municipal website in search of PDF documents they have no reason to know are there.

Similarly, as described above, Defendant Eason conceded that Waller County does not conduct any outreach to PVAMU students about early voting locations or hours.

Based on all of these considerations, I repeat and stand by my conclusion from the relevant portion of my initial report:

> [M]y opinion is that the procedural sequence of events by which the early voting plan for the November 2018 General Election was developed and adopted was insufficiently open and transparent. Based on a review of Dr. Stein's report, in addition to my conversation with the Bexar County Elections Administrator, it also appears that this process was inconsistent with and departed from best practices.[37]

**Observations and Conclusions**

Dr. Gimpel's methodology is flawed on at least three levels.  The first is that his model places the onus on the voter's behavior.  This ignores the discriminatory behavior of the Waller County officials which is the question at hand in this matter.

Secondly, Dr. Gimpel's methodology does not include or consider in any manner the social and political conditions surrounding the denial of voting access to PVAMU students.  Essentially, he excludes the fact that the students have had to petition, demonstrate, march, and risk retaliation from county officials since 1972 for their right to have equal access to voting opportunities.  The intensity of this history alone is an important mitigating circumstance and needs to be included in any analytical consideration.

---

[37] Ibid., p. 18.

The final major flaw in Dr. Gimpel's technique is the method, or lack thereof, in how he chose the campuses he compared to PVAMU.  He gave no explanation of why he selected his purported comparator institutions, other than a crude similarity of size; and, in fact, the selected institutions are different in key ways from PVAMU.

***

I reserve the right to continue to supplement my declarations in light of additional facts, testimony, and/or materials that may come to light.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Executed on: December 3, 2019

_____
**Henry Flores, PhD**

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

**JAYLA ALLEN, et al.,**

**PLAINTIFFS**

**v.** **Civil Case No. 4:18-cv-3985**

**WALLER COUNTY, et al.,**

**DEFENDANTS**

**EXPERT REPORT
OF
Robert Stein, Ph.D.**


**ON BEHALF OF PLAINTIFFS**

**JAYLA ALLEN, DAMON JOHNSON, RAUL SANCHEZ, TREASURE SMITH, AND
THE PANTHER PARTY**

### I.        Introduction

At the request of the Plaintiffs in JAYLA ALLEN, DAMON JOHNSON, RAUL SANCHEZ, TREASURE SMITH, and THE PANTHER PARTY v. WALLER COUNTY, TEXAS, *et al*., we have undertaken to analyze the Plaintiffs' claims that voters aged 18 through 20 and Black voters aged 18 through 20—which Plaintiffs contend are each concentrated groups of student voters at Prairie View A&M University (PVAMU)—as well as Black voters in Prairie View—in Waller County were not afforded the same or similar opportunities to vote early as all other registered voters in Waller County, which Plaintiffs contend encompass older and non-Black voters (ECF Document No. 49, page 3).

This report proceeds in the following manner. In Section II we outline the evidence we relied on and our methodology. In Section III we describe our qualifications. In Section IV we: (a) detail the original and modified plans for early voting in Waller County for the 2018 election; (b) identify the best practices for conducting early voting by reviewing the peer-reviewed, scholarly literature on this topic; and (c) consider whether and to what degree Waller County conformed to those best practices and present our assessment of the Plaintiffs' claims that voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View in Waller County were not afforded the same or similar opportunities to vote early as all other registered voters in Waller County (ECF Document No. 49, page 3).

### II.        Evidence and Methodology

We use the best practices identified in the extant literature to assess whether Waller County's original and modified plans for early voting in the 2018 election provided the same or similar opportunities for all registered voters to cast early votes. Were specific groups of registered voters more burdened than others in casting an early vote? The Plaintiffs' claims are that voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View in Waller County were not afforded the same or similar opportunities to vote early as all other registered voters in Waller County (ECF Document No. 49, page 3).

To conduct this assessment, we geocoded the residences of every registered voter eligible to vote in Waller County for the 2018 election. We used that data to identify likely (a) 18 to 20 year-old students at PVAMU who registered to vote in Waller County in the 2018 election, and (b) Black 18 to 20 year-old students at PVAMU who registered to vote in Waller County in the

2018 election, based on those registered voters whose official residence is on the PVAMU campus or in off-campus housing reportedly[1] occupied by PVAMU students. Using this method, we identified 2,588 persons registered to vote on the PVAMU campus and 63 persons registered to vote who reside in off-campus student housing for a total of 2,651 PVAMU students (1,833 of whom are aged 18 through 20) who were registered to vote in the 2018 election in Waller County.

Our estimate of PVAMU 18 to 20-year old students registered to vote in Waller County is necessarily low, and certainly misses many more such PVAMU students who live near campus or elsewhere in Waller County, but whom we have thus far been unable to identify as students.[2]

Using the date of birth of each registered voter in Waller County, we calculated the proportion of all registered voters who were aged 18 through 20. We determined that 1,977 (5.9%) registered voters were aged 18 through 20 at the time of the November 2018 election. Using the methodology described above, we identified 2,651 PVAMU students (of all ages) who were registered to vote in Waller County during the 2018 election. By our calculation, 178 (6.7%) of those PVAMU students registered to vote in November 2018 were aged 18 through 20.

As of this report and with the data available, we were not able to determine the race and/or ethnicity of individual registered voters in Waller County. At this time, the best estimate of the race and/or ethnicity of registered voters in Waller County is provided by the U.S. Bureau of the Census' *2010 Census*, which reports the number of persons by race and ethnicity for individual census blocks in each county. With this information, we are able to identify whether a registered voter lives in a neighborhood (i.e., census block) which is comprised of a majority of persons who self-identify as Black. However, these data do not differentiate between persons who are or are not registered to vote. Thus, the census data can be used to determine the general racial and ethnic makeup of a census block, but not whether any individual living in that census block was registered to vote. PVAMU's Office of Institutional Research reported that in the Fall 2018 semester, 7,906 of 9,516 PVAMU students (of all ages) identified as Black.[3]

---

[1] Information provided by a senior administrator at PVAMU via Plaintiffs' attorneys.
[2] We identified an additional 389 persons who voted at the PVAMU Memorial Student Center during early voting, were under the age of 21, and live within one mile of the Memorial Student Center, but whom we could not verify as students at PVAMU.
[3] Prairie View A&M University, *Prairie View A&M University Enrollment Snapshots: Fall 2018* at 6 (last visited July 1, 2019), http://www.pvamu.edu/ir/wp-content/uploads/sites/98/FA18_Enrollment-Snapshots.pdf.

Once we had identified as many registered voters as possible, based on the data available, by age, race, PVAMU student status, and location of residence, we then determined the relative access that each of the groups identified as harmed in the Plaintiffs' complaint had to early voting in Waller County during the 2018 election.

### III.        Qualifications

I am Robert Marc Stein, the Lena Gohlman Fox Professor of Political Science at Rice University in Houston, Texas, where I am also a Fellow at the James A. Baker III Institute for Public Policy. I graduated from Ohio Wesleyan University in 1972 with B.A. in Government and Politics. I received an M.A. and Ph.D. in Political Science from the University of Wisconsin-Milwaukee in 1974 and 1977 respectively.

I have conducted research and published on the topics of elections, election administration, specifically pertaining to alternative methods of voting and their impact on voter participation and costs of administering elections and voter performance. My research has been supported by the National Science Foundation, The Pew Charitable Trust, the Kinder Institute, the James A. Baker III Institute for Public Policy, and the Arnold Foundation. I have conducted research for the two Presidential Commissions studying elections in 2009 and 2016. I have been a consultant on election administration for several state and local governments, including the State of Colorado, El Paso County, Colorado; Bernalillo County, New Mexico; Collin County, Texas; Lubbock County, Texas; and Harris County; Texas.

I was an expert witness in the 2015 South Dakota case, *Thomas Poor Bear, et al. vs The County of Jackson*, pertaining to the establishment of satellite offices for voter registration and in-person absentee voting in the Town of Wanblee on the Pine Ridge Reservation. In 2018, I was an expert witness in the case *Martin Cowen, et al. vs Brian Kemp* pertaining to the ballot access requirements in the state of Georgia.

An **Appendix** to this report contains a copy of my current curriculum vitae that includes a complete list of my publications and research grants.

I am being compensated for my work at a rate of $250 per hour plus expenses.

IV.     **Assessment of Waller County's Early Voting Practices in the 2018 Election**

A.  *Waller County Plans for Early Voting in the 2018 Election*

In preparation for the 2018 midterm election, the Waller County Commissioners Court made decisions about the number, location, staffing, equipment, days, and hours of operation for the period of early voting in Waller County from Monday, October 22 through Friday, November 2. We understand that state law provides counties with populations under 100,000 some discretion in making the above choices. (Tex. Elec. Code § 85.062(a)).

We understand from ECF Document No. 49 that the original plans made by the Waller County Commissioners Court regarding the conduct of early voting for the 2018 election were as follows:

There were to be to be two weeks of early voting beginning on Monday, October 22 and ending on Friday, November 2.

During the first week, early voting was to take place each day, Monday, October 22 through Sunday, October 28, at a total of six polling locations. During that first week, two early voting polling locations were to be located in the City of Waller, two in the City of Hempstead, one in the City of Brookshire, and one in the City of Katy. No early voting location was scheduled to be open in the City of Prairie View, where the PVAMU campus is located, during the first week.

During the weekdays (Monday, October 22 through Friday, October 26), any of the six above mentioned locations were to operate for nine hours (8am-5pm) per day, though some locations were only open a few days during that week.[4] During the first weekend of early voting (Saturday, October 27 and Sunday, October 28), there were to be five polling locations in operation in the County: two in the City of Waller, two in the City of Hempstead, and one in the City of Brookshire. One location in the City of Waller and one location in the City of Brookshire were to operate both Saturday, October 27 and Sunday, October 28. The remaining three locations were to operate on Saturday, October 27, but not on Sunday, October 28.

During the second week, early voting was to take place each day, Monday, October 29 through Friday, November 2, at a total of five polling locations. One of these locations was to be

---

[4] For example, Katy was open Monday-Wednesday; Monaville Co. Building in Hempstead was open Thursday-Friday; and Fieldstore Co. Building in Waller was open Thursday-Friday.

in the City of Waller, one in the City of Hempstead, one in the City of Brookshire, and two in the City of Prairie View.

From Monday, October 29 through Wednesday, October 31, there were to be four early voting locations in operation, each open for nine hours per day (8am-5pm). One of these locations was to be in the City of Hempstead, one in the City of Waller, one in the City of Brookshire, and one in the City of Prairie View on the campus of PVAMU.

Between Thursday, November 1 and Friday, November 2 there were to be four early voting locations, each open for 12 hours per day (7am-7pm). One of these locations was to be in the City of Hempstead, one in the City of Waller, one in the City of Brookshire, and one in the City of Prairie View, but not on the campus of PVAMU.

We understand from ECF Document No. 49 that changes were made to the 2018 early voting schedule in Waller County by the Waller County Commissioners Court. According to ECF Document No. 49, the Commissioners Court modified its early voting plan for the 2018 election during an emergency session on October 24, 2018, in response to complaints made by County residents at the October 17, 2018 Commissioners Court meeting. According to ECF Document No. 49, the Commissioners Court originally voted against modifying the plan at the October 17, 2018 meeting, and did so only after the Plaintiffs' original complaint was filed on October 22, 2018, the first scheduled day of early voting.

Specifically, the Commissioners Court "voted to increase early voting hours at the on-campus Memorial Student Center by three hours per day on Monday, Tuesday, and Wednesday of the second week (Monday, October 29 through Wednesday, October 31), and to provide five hours (from 12pm-5pm) of early voting off-campus at Prairie View City Hall on Sunday, October 28, 2018, the last day of the first week of early voting." (ECF Document No. 49, page 18). This modified plan was adopted during the first week of early voting, while voters were casting their ballots.

**Exhibit A** to this report includes a chart of the early voting allocation for 2018.

Additionally, based on a review of discovery provided by the Defendants, it appears that the County of Waller did little to notify voters in the City of Prairie View generally or on the PVAMU campus specifically, the only locations where modifications to the early voting schedule

were made on October 24, 2018, of the additional location, day, and hours available to them to vote.

### B. Best Practices for Conducting Early Voting

Scholarly research has identified a number of factors that determine whether or not all voters have equal access to polling places during an election. We detail below how each of these factors has been shown to impact voter access to the ballot.

#### 1. The number and location of polling places

Polling place operations include the number of polling places available to a voter to choose from and whether polling place locations remain accessible across elections. Thirty-seven states—including Texas, where Waller County is located—and the District of Columbia, afford their voters the opportunity to choose where and when they can cast a ballot in-person before Election Day. States with in-person early voting provide multiple locations at which to vote, enabling voters to avoid long lines and waiting times by choosing from alternative locations. However, the placement of those locations is also essential to voter access; placing early polling sites at locations near where voters prefer to vote (e.g., near their residences or where they go to school) is integral to that accessibility (Stein et al. 2019). These features of polling place operations have been shown to have a significant positive effect on accessibility to polling places (Stein and Vonnahme 2008; 2011; 2012; Fullmer 2015).

#### 2. Distance and travel time to the polling place

Several researchers (Dyck and Gimpel 2005; Gibson, et al. 2013; Gimpel and Schuknecht 2003; Cantoni 2016) have shown that the distance and travel time between a voter's residence and their designated and/or available polling location has a significant and negative effect on ballot access. Cantoni (2016) reports that a 0.25-mile increase in the distance to a polling place reduces the number of ballots cast by 2%-5% over Presidential, mid-term Congressional, and municipal elections. Moreover, "the negative impact of distance to the polling place is concentrated disproportionately in high-minority areas" (Cantoni 2016: 4).

The closest early voting location to the PVAMU campus—apart from the on-campus early voting location at the Memorial Student Center (MSC)—was the off-campus early voting location at the Waller County Community Center. However, the Community Center is located to the south of the PVAMU campus, 1.4 to 1.6 miles away from two large student residential housing facilities

on the PVAMU campus (i.e., University Square, located at 502 Anne Preston Street, and University College, located at 505 Anne Preston Street). This distance is five to six times further than the minimum distance beyond which Cantoni observed reduced voter turnout.

### 3. Transportation to the polls

Access to the polls requires adequate, reliable, and affordable public or private transportation (Barretto, Cohen-Marks and Woods 2009). Haspel and Knotts (2005) find that distances to polling places are less burdensome when "automobiles are universally available" to voters (2005: 267). Gibson et al. (2013) compute a distance measure with an imputed wage measure for each voter to estimate the opportunity costs of voting and find it is highly predictive of voting. The authors report that "small increases in the opportunity costs of voting can have large effects in reducing ballot access (2013: 517)." There is evidence to suggest that younger voters, such as college students, find polling locations difficult to access due to limited transportation options (Shino and Smith 2019).

### 4. Hours of polling place operation

Fullmer (2015) shows that hours and number of locations affect access to early voting. Small changes in the hours of polling place operations across elections have an effect on voter turnout (Garmann 2017, Stein et al. 2019). Garmann (2017) reports that reducing the hours of polling station operations and the opening hours significantly reduces voter turnout by 2.1%. Reducing the number of evening and/or early morning hours at polling places can also limit accessibility (Garmann 2017; Stein et al. 2019).

### 5. Number of days and days of week of polling place operations

Fullmer (2018) reports that increasing the number of days of early voting increases the number of early votes cast. Weekends are among the most popular days to vote early (Herron and Smith 2014; Walker, Herron and Smith 2018), when voters do not have to attend work, school, or other weekday commitments.

### 6. Informing the public about polling place opportunities and changes to those opportunities.

Brady and McNulty (2011) report that consolidating voting locations in Los Angeles, California, reduced voter turnout by 3%, due in part to voters who were not informed about the change or relocation of their Election Day polling place. Similarly, Haspel and Knotts (2005: 569)

find that the confusion to voters that results from modifying polling place operations and locations can be offset by a strong public information campaign informing them of those changes.

In summary, the literature on early voting shows that accessibility to the polls increases the use of early voting. Practices that enable voter accessibility include:

- Adequate numbers and appropriate locations of polling places relative to the size and residential location of the electorate.
- Minimal distance and voter access to necessary transportation to and from polling locations.
- Sufficient and varied (e.g., evening) hours of polling place operation.
- Sufficient and varied (e.g., weekend) days during which polling places are open.
- Effective communication of election plans and any changes to election plans to the voting public.

From my personal experience working with election officials in Lubbock, Collin, and Harris Counties, I found these standards to be uniform. The application of these standards may not have always been uniformly practiced.

In the Defendant Waller County's response to the Plaintiffs' Interrogatory No. 4, it listed seven "factors" the County used in the determination of early voting locations and hours for the 2018 election: 1) population of registered voters; 2) historical turnout; 3) how heavily contested an election is; 4) number of available poll workers; 5) time required to train poll workers; 6) number of controller and voting units and their distribution; and 7) accessibility, ease of use, parking, and security for various locations.

In Defendants' responses to Interrogatory No. 4, the Defendants do not provide enough detail about how they used the factors to determine the location and hours of early voting to enable us to make a determination about whether population of registered votes was or was not a primary factor in their decision making. For example, did the County allocate early voting opportunities on a per registered voter basis, or was population used to determine prior voting history? We can, however, observe that the distribution of early voting locations did not provide equal access (as we have defined access in this report) to the three populations that are the focus of this litigation.

According to records provided by the Defendants in this lawsuit through discovery,[5] Precinct 309, the PVAMU campus precinct, had 4,834 registered voters as of November 6, 2018—by far the largest population of registered voters out of any precinct in the County, and almost 1,400 more than the second most populous precinct in the County. Waller County officials also appear to have anticipated, accurately, that a large number of student voters would vote early at the on-campus polling location in Precinct 309, because the County's records from the November 2018 election show that it assigned that location the largest number of voting machines during the early voting period.[6] However, if the distribution of voting machines by precinct during early voting was based on registered-voter population and anticipated voter interest, the same cannot be said of the assignment of early voting hours and days. The MSC on the PVAMU campus was the sole early voting location in Precinct 309, the County's most populous voting precinct. Instead of providing the MSC with more early voting hours and days than other early voting locations in less populous precincts, County officials provided it with *fewer*. Waller County's 2018 early voting plans provided Precinct 309 only a fraction of the hours and days that were granted to early voting locations in precincts with far smaller populations of registered voters. This discrepancy is significant because, as stated above, best practices in the academic literature on early voting and the County's own stated guidelines call for the population size and residential location of the electorate to be given substantial weight in allocating early voting opportunities.

### C. Analysis and Conclusion

Based on the evidence and methodology described above, we list below our assessment and conclusions.

**Table 1** reports for each early voting location the number of weeks, total days, hours, and weekend days that the polling site was open for early voting during the 2018 election. In addition, the last three columns of **Table 1** report the number of votes cast at each early voting location, the share of voters at each location aged 18 through 20, and the share of votes cast by persons who reside in majority-Black neighborhoods.

As **Table 1** shows, locations that had more <u>hours</u> of operation during early voting also had higher shares of the total early vote. Both Waller ISD Administrative Building and the Brookshire

---

[5] Specifically, I refer here to the PDF titled "DEFENDANTS000003 - VERITY EQUIPMENT ASSIGNMENT (01172322x7A30F)."
[6] Here again I refer to "DEFENDANTS000003 - VERITY EQUIPMENT ASSIGNMENT (01172322x7A30F)."

Library had over 100 hours of operation during early voting. They were followed by Waller County Court House, with 96 hours of operation. No other early voting polling place in Waller County had more than 36 hours of operation; Prairie View City Hall had the least, with only five hours of operation. Seventy percent of all early votes in Waller County were cast at the three early voting locations with 90 or more hours of operation (i.e., Waller ISD Administrative Building, Brookshire Library, and Waller County Court House). The remaining 30% of early votes were cast at the other six early voting locations.

The three locations with the greatest number of hours of operation also had the most <u>days</u> of operation. Three locations (Waller ISD Administrative Building, Waller County Courthouse and Brookshire Library) operated during both weeks of early voting. All three of these locations were open on the weekend of early voting, and two (Waller County Courthouse and Brookshire Library) operated on both days of that weekend to provide Saturday and Sunday early voting. Each of the other six early voting locations operated during only one of the two weeks of early voting, and most were open a total of 2-3 of the 12 days of early voting.

When we look at early voters aged 18 through 20, (**Table 1**), we observe that 61% of them cast their ballots at the PVAMU Student Center. This location ranked fourth in total number of hours of operation. It was not open at all during the first week of early voting or on the one weekend of early voting, and operated for a total of three out of 12 days of early voting. The PVAMU MSC location was originally scheduled to have 27 hours of operation; that number was changed to 36 hours on October 24, 2018, following the filing of this lawsuit and two days after the start of early voting.

When we look at where Black voters in Waller County voted early in the 2018 election (**Table 1**), we observe that they cast their ballots at early polling locations with the fewest hours and days of operation. Specifically, early voters who live in Waller County neighborhoods that are majority-Black comprised 72% of the early votes cast at the PVAMU Student Center, 47% cast at the Waller County Community Center (located in the City of Prairie View, adjacent to the southmost portions of the PVAMU campus), and 47% cast at Prairie View City Hall. Black voters cast between 1% and 22% of the early votes at the six other early voting locations in Waller County. The three locations where most Black voters cast their votes are located in the City of Prairie View, which has the largest concentration of Black voters in the County. All three of these

locations were open during only one week of early voting, for totals of 1-3 days, and for totals of 5-36 hours of operation. Only one location—Prairie View City Hall—offered weekend hours of operation, and that location was open for a total of five hours on only one day during the entire two-week early voting period. Waller County provided the three early voting locations in the City of Prairie View the least early voting accessibility of any early voting location based on the hours and days of operation allocated to them during the 2018 election in Waller County.

The overwhelming majority of PVAMU students[7] who voted early in the 2018 Waller County election (N=200, 75.9%) voted at the MSC on the PVAMU campus. Only 63 (24.1%) of PVAMU students who voted early cast their ballots at an off-campus location. As discussed above, the PVAMU MSC early voting location was among the sites provided the least early voting access (i.e., in terms of fewest hours, days and weekend operations) of the early voting locations in the County.

Though the majority of Waller County voters chose to vote early in 2018 (71%), an even greater percentage of PVAMU students (81%, 10% more than voters who were not PVAMU students), voted early in the 2018 election. This suggests that PVAMU students were more dependent on early voting than other voters in Waller County.

A review of the PVAMU Office of Institutional Research report of shuttle bus services for the students on the PVAMU campus to offsite locations near the 2018 early voting locations in Waller County shows that such services were limited or not available during the days and hours of early voting at these offsite locations, including during the entire first weekdays of early voting—when there were no early voting locations anywhere in Prairie View—and on the only Saturday and Sunday of early voting.

The above findings have two possible explanations. First, County election officials may have distributed the hours and days of operations and other resources to those locations where they anticipated early voters would choose to vote. Defendant Waller County's response to Plaintiffs' Interrogatory No. 4 did list historical turnout (# 2) as one of seven factors that is considered in

---

[7] The category of voters defined here as "PVAMU students" consists of those registered voters in Waller County who can be identified as PVAMU students based on the address provided in their voter registration records. Although this category likely overlaps significantly with the category of voters who are aged 18 through 20, we derive the "PVAMU students" category using a different methodology to shed light on the early voting plan's effects specifically on voters who are identifiable as PVAMU students from registration records—and thus could also be so identified by Waller County officials.

making decisions about the allocation of early voting in the 2018 election. However, Waller County's response to that same interrogatory also listed population of registered voters (# 1) as another such factor, but that factor does not appear to have been seriously considered—which may cast doubt on the extent to which the seven enumerated factors truly motivated the development of the early voting plan.

A second, and not necessarily contradictory explanation, is that the different rates of voting at each early voting location were a *result* of the different number of hours, days, and other resources allocated to each location. That is, early voters chose to vote at locations where accessibility to early voting was greater; i.e., where hours, days, weekends, and other resources for early voting were more abundant. The fact that these locations were not where significant populations of voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View chose to vote may have been coincidental, but the effect of this decision by the Waller County Commissioners Court was to deny voters aged 18 through 20, Black voters aged 18 to 20, and Black voters in Prairie View equal or even similar access to early voting opportunities afforded other registered voters in Waller County. If the County had intended to make it more difficult for Black and younger voters in Prairie View to access early voting than other voters in Waller County, our analysis indicates that designing an early voting plan similar to the one they designed for the 2018 election would have been an effective way to do so. Moreover, the distribution of the days and hours of early voting locations was not proximate to where registered voters aged 18 through 20 and Black registered voters aged 18 through 20, as well as Black registered voters in Prairie View, live or chose to vote early.

The literature on best practices suggests that access to greater quantities of early voting locations, hours, and days (Fullmer 2015) significantly enhances the likelihood that voters will cast their ballots at early voting locations. Thus, historical early voting returns that show more early votes being cast in certain locations as compared to others may reveal, in part, a persistent history of unequal distribution of early voting hours in Waller County to the disadvantage of locations that are accessible by more Black voters or younger voters. If this is the case, Waller County should probably not continue to allocate more early voting opportunities solely to early voting locations with historically higher early voting turnout, unless the County wishes to perpetuate past unfairness. In other words, if Waller County allocates early voting (days and hours)

to those locations where the largest total number of voters cast their ballots in the past, they may be limiting the opportunities to vote early for voters aged 18 through 20 and Black voters 18 through 20, and Black voters in Prairie View who reside in, go to school in, or have walking access or transportation access to locations in Prairie View, including the MSC on PVAMU's campus. Further, the County's decision to offer fewer hours and days of operation of early voting at locations in the City of Prairie View, where the largest concentration of Black voters in Waller County live—and go to school on the PVAMU campus, which houses and serves the largest concentration of voters 18 through 20 and Black voters aged 18 through 20 in the County—may have had the effect of suppressing early voting in the 2018 election among Prairie View residents of Waller County aged 18 through 20, Black and aged 18 through 20, and Black persons who live in Prairie View.

For these reasons, it appears that Waller County's early voting plan for 2018 disproportionately impacted voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View because they were not afforded the same or similar opportunities to vote early as other registered voters in the County.

Table 1
Accessibility of Early Voting in 2018 Waller County Election by Location
(Under 10/24/18 Modified Plan)

| Location | Weeks | Days | Weekend Days | Hours | % 18-20[1] | % Black[2] | Early Votes |
|---|---|---|---|---|---|---|---|
| Brookshire Library | 2 | 12 | 2 | 106 | 2 | 11 | 2,657 |
| JP #3 Monaville | 1 | 3 | 1 | 23 | 2 | 14 | 150 |
| JP #2 Fieldstore | 1 | 3 | 1 | 23 | 1 | 2 | 834 |
| Katy VFW Hall | 1 | 3 | 0 | 27 | 2 | 1 | 636 |
| Waller County Court House | 2 | 12 | 2 | 106 | 3 | 22 | 3,393 |
| PV City Hall | 1 | 1 | 1 | 5 | 5 | 47 | 77 |
| Waller County Comm. Center (in PV) | 1 | 2 | 0 | 24 | 5 | 47 | 144 |
| PVAMU MSC | 1 | 3 | 0 | 36 | 28 | 72 | 1,417 |
| Waller ISD Admin | 2 | 11 | 1 | 101 | 3 | 15 | 1,588 |

1 Percent of persons 18-20 years of age
2 Percent of persons who live in a majority-Black community

**References**

Brady, Henry E. and John E. McNulty. 2011. "Turning Out to Vote: The Costs of Finding and Getting to the Polling Place." *The American Political Science Review* 105:115-134.

Barretto, Matt A., Mara Cohen-Marks and Nathan D. Woods. 2009. "Are All Precincts Created Equal? The Prevalence of Low-Quality Precincts in Low-Income and Minority Communities." *Political Research Quarterly* 62:445-458.

Cantoni, Enrico. 2015. "A precinct too far: Turnout and voting costs." http://economics.mit.edu/files/1193.

Dyck, Joshua J. and James G. Gimpel. 2005. "Distance, Turnout, and the Convenience of Voting." *Social Science Quarterly* 8(3):531-548.

Fullmer, Elliott. 2015. "Early voting: Do more sites lead to higher turnout?" *Election Law Journal* 12:81-96.

Garmann, Sebastian. 2017. "The effect of a reduction in the opening hours of polling stations on turnout." *Public Choice* 171: 99-117.

Gibson, John, Bonggeun Kim, Steven Stillman and Geua Boe-Gibson. 2013. "Time to vote?" *Public Choice*. 156:517-536.

Gimpel, J.G., and J.E. Schuknecht. 2003." Political participation and the accessibility of the ballot box." *Political Geography* 22: 471-488.

Haspel, Moshe and H. Gibbs Knotts. 2005. "Location, Location, Location: Precinct Placement and the Costs of Voting." *The Journal of Politics* 67:560-573.

Herron, Michael C. and Daniel A. Smith 2014. "Race, Party and the Consequences of Restricting Early Voting in Florida in the 2012 General Election." *Political Research Quarterly* 67:646-665.

Prairie View A&M University Office of Institutional Research. Prairie View A&M University Enrollment Statistics, Fall 2018. http://www.pvamu.edu/ir/wp-content/uploads/sites/98/Fall-2018.pdf.

_____. Spring 2018. *Prairie View A&M University Fast Facts, Spring 2018.*

Shino, Enrijeta and Daniel A. Smith. 2019. "Mobilizing the Youth Vote? Early Voting on College Campuses in Florida." Paper prepared for presentation at the State Politics and Policy Conference, University of Maryland, May 30- June 1, 2019.

Stein, Robert M. Charles Stewart III, Christopher Mann and others. 2019. "Waiting to vote in the 2016 Presidential Election: Evidence from a multi-jurisdiction Study," *Political Research Quarterly.* DOI: 10.1177/1065912919832374

Stein, Robert M. and Greg Vonnahme 2008 "Engaging the unengaged voter: Voter centers and voter turnout," *Journal of Politics.*70:487-497.

Stein, Robert M. and Greg Vonnahme. 2011. "Voting at non-precinct polling places: A review and research agenda," *Election Law Journal*, 10:307-11

Stein. Robert M. and Greg Vonnahme 2012 "The effect of election day vote centers on voter participation," *Election Law Journal*, 11:291-301.

Walker, Hannah L, Michael C. Herron, Daniel A. Smith. 2018. Early Voting Changes and Voter Turnout: North Carolina in the 2016 General Election. *Political Behavior* https://doi.org/10.1007/s11109-018-9473-5

U.S. Bureau of the Census. 2010. *Geography Program* https://www.census.gov/programs-surveys/geography.html

I reserve the right to continue to supplement my declarations in light of additional facts, testimony and/or materials that may come to light.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Executed on: _____, 2019

**Robert M. Stein, PhD**

# EXHIBIT A

| | **WEEK ONE (INCLUDES SUNDAY)** | | | | |
|---|---|---|---|---|---|
| | **Prairie View**<br>54% 18-20 VAP[1]<br>80% Black CVAP<br>7.6% white CVAP | **Waller**<br>7% 18-20 VAP<br>11% Black CVAP[2]<br>72% white CVAP | **Hempstead**<br>8% 18-20 VAP<br>66% Black CVAP<br>20% white CVAP | **Katy**<br>6% 18-20 VAP<br>7.7% Black CVAP[3]<br>80% white CVAP | **Brookshire**<br>7% 18-20 VAP<br>55% Black CVAP<br>23% white CVAP |
| **Mon. Oct. 22** | | Waller ISD<br>8am-5pm<br>(9 hours) | Co. Courthouse<br>8am-5pm<br>(9 hours) | Katy VFW<br>8am-5pm<br>(9 hours) | Co. Library<br>8am-5pm<br>(9 hours) |
| **Tues. Oct. 23** | | Waller ISD<br>8am-5pm<br>(9 hours) | Co. Courthouse<br>8am-5pm<br>(9 hours) | Katy VFW<br>8am-5pm<br>(9 hours) | Co. Library<br>8am-5pm<br>(9 hours) |
| **Wed. Oct. 24** | | Waller ISD<br>8am-5pm<br>(9 hours) | Co. Courthouse<br>8am-5pm<br>(9 hours) | Katy VFW<br>8am-5pm<br>(9 hours) | Co. Library<br>8am-5pm<br>(9 hours) |
| **Thurs. Oct. 25** | | Waller ISD<br>8am-5pm<br>(9 hours)<br><br>Fieldstore Bldg<br>8am-5pm<br>(9 hours) | Co. Courthouse<br>8am-5pm<br>(9 hours)<br><br>Monaville Bldg.<br>8am-5pm<br>(9 hours) | | Co. Library<br>8am-5pm<br>(9 hours) |
| **Fri. Oct. 26** | | Waller ISD<br>8am-5pm<br>(9 hours)<br><br>Fieldstore Bldg<br>8am-5pm<br>(9 hours) | Co. Courthouse<br>8am-5pm<br>(9 hours)<br><br>Monaville Bldg.<br>8am-5pm<br>(9 hours) | | Co. Library<br>8am-5pm<br>(9 hours) |
| **Sat. Oct. 27** | | Waller ISD<br>9am-2pm<br>(5 hours)<br><br>Fieldstore Bldg<br>9am-2pm<br>(5 hours) | Co. Courthouse<br>9am-2pm<br>(5 hours)<br><br>Monaville Bldg.<br>9am-2pm<br>(5 hours) | | Co. Library<br>9am-2pm<br>(5 hours) |
| **Sun. Oct. 28** | <span style="color:green">PV City Hall<br>12pm-5pm<br>(5 hours)</span> | | Co. Courthouse<br>12pm-5pm<br>(5 hours) | | Co. Library<br>12am-5pm<br>(5 hours) |
| **TOTAL HOURS** | <span style="color:green">5 hours</span><br><span style="color:red">0 hours</span> | **73 hours** | **78 hours** | **27 hours** | **55 hours** |

*For Prairie View, hours in <span style="color:green">green were added post-litigation</span>, and hours in <span style="color:red">red are pre-litigation</span>.

---

[1] VAP means "voting-age population" aged 18 through 20, which is based on 2010 Census data.

[2] As described in the Declaration of William S. Cooper, post-2010 population data is not available for the cities of Waller and Katy. Accordingly, the "citizen voting-age population" is based on disaggregated estimated based on Waller County split block groups.

[3] Ibid.

| WEEK TWO | | | | | |
|---|---|---|---|---|---|
| | **Prairie View**<br>54% 18-20 VAP<br>80% Black CVAP<br>7.6% white CVAP | **Waller**<br>7% 18-20 VAP<br>19% Black CVAP<br>69% white CVAP | **Hempstead**<br>8% 18-20 VAP<br>66% Black CVAP<br>20% white CVAP | **Katy**<br>6% 18-20 VAP<br>3.5% Black CVAP<br>77% white CVAP | **Brookshire**<br>7% 18-20 VAP<br>55% Black CVAP<br>23% white CVAP |
| **Mon.<br>Oct. 29** | MSC at PVAMU<br><span style="color:green">7am-7pm</span><br><span style="color:green">(12 hours)</span><br><span style="color:red">(8am-5pm)</span><br><span style="color:red">(9 hours)</span> | Waller ISD<br>8am-5pm<br>(9 hours) | Co. Courthouse<br>8am-5pm<br>(9 hours) | | Co. Library<br>8am-5pm<br>(9 hours) |
| **Tues.<br>Oct. 30** | MSC at PVAMU<br><span style="color:green">7am-7pm</span><br><span style="color:green">(12 hours)</span><br><span style="color:red">(8am-5pm)</span><br><span style="color:red">(9 hours)</span> | Waller ISD<br>8am-5pm<br>(9 hours) | Co. Courthouse<br>8am-5pm<br>(9 hours) | | Co. Library<br>8am-5pm<br>(9 hours) |
| **Wed.<br>Oct. 31** | MSC at PVAMU<br><span style="color:green">7am-7pm</span><br><span style="color:green">(12 hours)</span><br><span style="color:red">(8am-5pm)</span><br><span style="color:red">(9 hours)</span> | Waller ISD<br>8am-5pm<br>(9 hours) | Co. Courthouse<br>8am-5pm<br>(9 hours) | | Co. Library<br>8am-5pm<br>(9 hours) |
| **Thurs.<br>Nov. 1** | Community Ctr.<br>7am-7pm<br>(12 hours) | Waller ISD<br>7am-7pm<br>(12 hours) | Co. Courthouse<br>7am-7pm<br>(12 hours) | | Co. Library<br>7am-7pm<br>(12 hours) |
| **Fri.<br>Nov. 2** | Community Ctr.<br>7am-7pm<br>(12 hours) | Waller ISD<br>7am-7pm<br>(12 hours) | Co. Courthouse<br>7am-7pm<br>(12 hours) | | Co. Library<br>7am-7pm<br>(12 hours) |
| **TOTAL<br>HOURS** | <span style="color:green">**60 hours**</span><br><span style="color:red">**51 hours**</span> | **51 hours** | **51 hours** | **0 hours** | **51 hours** |

*For Prairie View, hours in <span style="color:green">green were added post-litigation</span>, and hours in <span style="color:red">red are pre-litigation.</span>

# APPENDIX

CURRICULUM VITAE
May, 2019

ROBERT M. STEIN
Lena Gohlman Fox Professor of Political Science
Rice University
Houston, Texas 77251
713-348-2795
Email: Stein@rice.edu

Place of birth:
New York, N.Y.

Married, two children

## Education

B.A., Ohio Wesleyan University, Delaware, Ohio, 1972.

M.A., University of Wisconsin-Milwaukee, Milw., Wisc., 1974

Ph.D., University of Wisconsin-Milwaukee, Milw.,Wisc., 1977

## Fields of Specialization

Elections and election administration, Federalism and intergovernmental relations, state and local government, urban politics and public policy.

## Teaching Positions

Lena Gohlman Fox Professor of Political Science, 1996

Fellow, James A. Baker III Institute for Public Policy, 2006

Professor, Department of Political Science, Rice University, 1989-1996.

Visiting Associate Professor and research scientist, Workshop in Political Theory-Public Policy and Department of Political Science, Indiana University, 1987-1988.

Associate Professor, Department of Political Science, Rice University, 1983-1989.

Assistant Professor, Department of Political Science, Rice University, 1979-1983.

Assistant Professor, University of Georgia, 1977-1978.

**Administrative positions**

Faculty Director, Center for Civic Engagement, Rice University 2007- present

Dean, School of Social Sciences, Rice University, 1996 - 2006

Interim Dean, School of Social Sciences, Rice University, 1995 - 1996

Chair, Department of Political Science, Rice University, 1994 - 1995

Director, Policy Studies Program (undergraduate major), Rice University, 1987- 1995

Director, Graduate Studies, Department of Political Science, Rice University, 1987- 1991.

Chair, Department of Political Science, Rice University, 1984-86

Director, Rice Institute of Policy Analysis Public Opinion Poll, 1983-present.

Political analyst, KHOU-TV, Houston, Tx. 1983- present

**Fellowships, awards, and offices**

Outstanding reviewer award, Political Research Quarterly 2010.

Best paper award on Federalism and Intergovernmental Relations for "Inter-Local Cooperation and the Distribution of Federal Grants," by The section on Federalism and Intergovernmental Relations, American Political Science Association, 2004 (with Kenneth Bickers)

President, Urban Politics Subsection, American Political Science Association, 1999-2000.

Recipient, George R. Brown Award for Superior Teaching, Rice University, 1998.

President, Southwestern Political Science Association, 1998.

Recipient, Outstanding Mentor of Women in Political Science Award, Women's Caucus for Political Science, American Political Science Association, 1996.

Special book award from the Urban Politics and Policy Section of the American Political Science Association for, Urban Alternatives: Private and Public Markets in the Provision of Local Services, 1991.

Research fellowship, Indiana University, Workshop in Political Theory and Public Policy, 1987-1988.

Recipient, George R. Brown Award for Superior Teaching, Rice University, 1987.

Fellowship, U.S. Advisory Commission on Intergovernmental Relations, 1978-1979.

**Research Grants and Contracts**

Election Day Vote Centers in Harris County, Texas. Funded by the Arnold Foundation, May 2019 – December 2020, $100,000.

Hurricane Harvey: Longitudinal Survey, Funded by the National Science Foundation, January 2018 – December 2021, SBER1760292, $200,000. Co-PI

Urban Flooding: Identifying where it floods and evaluating remedies.  May 2018-September 2019.  Kinder Institute, Ken Kennedy Institute and Office or Research, Rice University, $74,450 Co-PI

2016 City of Houston Citizen Survey, September 2016-January 2017, City of Houston, $23,500

Vote by mail, September 2014-September 2015, Pew Charitable Trusts, $48,000.

Saturday Run-off Election Exit Poll Survey, City of Houston, October-November, 2013. $4,000.

Prioritizing and selecting bridge management actions for heightened truck loads and natural hazards in light of funding allocation patterns, National Science Foundation, September 2012 - August, 2015. co-PI ($1.2 million)

Phase 2 Development and enhancement of online storm risk calculator tool for public usage , City of Houston, Office of Public Safety and Homeland Security,  November, 2012 - June 2013. co-PI ($189,000)

NetSE: Large Urban-Scale Polymorphic Wireless Networks: Community-Driven Assessment, Design and Access, National Science Foundation, September 2010-2013, co-PI ($1.9 million)

Development and enhancement of online storm risk calculator tool for public usage , City of Houston, Office of Public Safety and Homeland Security,  January, 2011 - June 2011. co-PI ($309,000)

Increasing turnout among the less engaged: A study of Election Day vote centers, Pew Charitable Trusts, September, 2007 – May, 2009, PI ($260,000)

Independent Response of Complex Urban Infrastructures Subjected to Multiple Hazards, National Science Foundation, October 2007 – October 2010, co-PI ($20,000)

Program evaluation, City of Houston, SAFEclear, traffic incident management program, July 2006-January 2008. PI ($20,000)

Program evaluation, City of Houston, SAFEclear, traffic incident management program, February 2005-December 2005. PI ($20,000)

Program Utilization Among Households Eligible for Head Start Enrollment, funded by the Harris County Department of Education, June, 2001. PI ($15,000)R

The Changing Structure of Federal Aid and the Politics of the Electoral Connection.  Funded by the National Science Foundation 2001-2002.  SES0095997 Co-PI, January 2001-January 2003. PI ($230,000)

Greater Harris County 9-1-1 Emergency Network Data Archive and Analysis January, 2000- January 2001. PI ($15,000)

Evaluation of Greater Harris County Emergency Network: Round II, funded by the Greater Harris. PI County Emergency Network, September, 1993 - January, 1994. ($5,000)

Evaluation of Greater Harris County 9-1-1 Emergency Network, funded by the Greater Harris County Emergency Network, January, 1992-July, 1993. PI ($5,000)

Selective Universalization of Domestic Public Policy. Funded by the National Science Foundation

(SES8921109) 1990-1992.  PI ($185,000)

Contracting for Municipal Services.   Funded by the U.S. Advisory Commission on Intergovernmental Relations. January, 1986-1990.PI

The Fiscal Austerity and Urban Innovation.  Funded by the U.S. Department of Housing and Urban Development. September, 1983-1985. PI

Research Associate, Field Network Evaluation Study of the Reagan Domestic Program.  Princeton Urban and Regional Center, Princeton University.  Funded by the Ford Foundation.  1982-1984. PI

Research Associate, Field Network Evaluation Study of the Community Development Block Grant: Round 8.  Funded by the U.S. Department of Housing and Urban Development.  Summer, 1982. PI

The Structural Character of Federal Grants-in-Aid.  Funded by the U.S. Department of Housing and Urban Development.  1982-83. PI

The Allocation of Federal Grants-in-Aid.  Funded by the U.S. Advisory Commission on Intergovernmental Relations.  1979-1981. PI

The Allocation of State-Local Aid:  An Examination of Within State Variation.  Funded by the U.S. Advisory Commission on Intergovernmental Relations.  1979-1981. PI

## Editorial Positions

editorial board member, *Journal of Election Technology and Systems*, 2013-2016

editorial board member, *American Political Science Review*, 2001- 2007

　　　Executive Committee, American Politics, *American Political Science Review*, 2004-2007

editorial board member, *American Journal of Political Science*, 1994-1998

editorial board member, *Journal of Politics,* 1994-1998

editorial board member, *Social Science Quarterly*. 1993-present

editorial board member, *State and Local Government Review.* 1987-1992.

editorial board member, *Urban Affairs Review* (formerly, *Urban Affairs Quarterly*) 1996- 2000.

referee, *American Political Science Review, American Politics Quarterly,  Journal of Urban Affairs, Urban Affairs Quarterly, Publius,* National Science Foundation.

## Books

Perpetuating the Pork Barrel: Policy Subsystems and American Democracy, Cambridge University Press, 1995, with Kenneth N. Bickers.

Federal Domestic Outlays, 1983-1990. M.E. Sharp, 1991, with Kenneth N. Bickers

Urban Alternatives: Public and Private Markets in the Provision of Local Services,  Pittsburgh Press, 1990.

**Articles**

"Waiting to vote in the 2016 Presidential Election: Evidence from a multi-jurisdiction Study," forthcoming, Political Research Quarterly.  With Charles Stewart, Christopher Mann and others.

"This Way Out," Scientific American., October 2018. Pp. 76-79. With Leonardo Duenas-Osorio and Devika Subramanian.

"Pedagogical Value of Polling-Place Observation by Students." PS: Political Science & Politics, 51:831-837 (October 2018). With Mann, Christopher B., Gayle A. Alberda, Nathaniel A. Birkhead, Yu Ouyang, Chloe Singer, Charles Stewart, Michael C. Herron, et al. https://doi.org/10.1017/S1049096518000550.

"Reducing the undervote with vote by mail," American Politics Research. 46(6):1039-1064 (September 2018). With Andrew Menger and Greg Vonnahme.

"Enlisting the public in facilitating election administration: A field experiment," Public Administration Review, 78(6):892-903 (December 2018), with Andrew Menger.

"Survey Experiments with Google Consumer Surveys: Promise and Pitfalls for Academic Research in Social Science."  Political Analysis 24(3):256-373 (September 2016), with Philip Santaso and Randolph Stevenson.

"Election Administration During National Disasters and Emergencies: Hurricane Sandy and the 2012 Election." Election Law Journal 14:1-8 (January 2016).

"The social and private benefits of preparing for natural disasters," International Journal of Mass Emergencies and Disasters. 32:459-483 (August 2014), with Birnur Buzcu-Guven, Leonardo Dueñas-Osorio, Devika Subramanian.

"Building and validating geographically refined hurricane wind risk models for residential structures," Natural Hazards Review, 15(3):1-10 (November 2014), with Devika Subramanian, Leonardo Dueñas-Osorio, Josue Salazar

"How risk perceptions influence evacuations from hurricanes and compliance with government directives," Policy Studies Journal, 41(2):319-341 (April 2013), with  Birnur Buzcu-Guven, Leonardo Dueñas-Osorio, Devika Subramanian, and David Kahle

"Early voting and campaign news coverage," Political Communication, 30:278-396 (April 2013), with Johanna Dunaway

"The effect of election day vote centers on voter participation," Election Law Journal, 11(4):291-301 (September 2012) with Greg Vonnahme.

"Where, when and how we vote: Does it matter?" Social Science Quarterly.93(3):693-712.. (September 2012) with Greg Vonnahme.

"Prospectus for the Future Administration of Elections," Baker Center Journal of Applied Public Policy 4(1):45-57. (Spring, 2012)

"Engineering-based hurricane risk estimates and comparison to perceived risks in storm-prone areas," Natural Hazards Review, 13(1):1-12 (Spring 2012). with Leonardo Duenas-Osorio, Devika Subramanian and Birnur Girnur.

"Voting at non-precinct polling places: A review and research agenda," Election Law Journal, 10:307-11 (October 2011)  with Greg Vonnahme.

"Interface network models for complex urban infrastructure systems." <u>Journal of Infrastructure Systems</u>, 17(4): 138-150 (2011), with Winkler, J., L. Dueñas-Osorio, R. Stein, and D. Subramanian.

"Performance assessment of topological diverse power systems subjected to hurricane events," <u>Reliability Engineering and System Safety</u>, 95:323-336. (April 2010). with James Winkler, Leonardo Duenas-Osorio and Devika Subramanian.

"Who evacuates when hurricanes approach? The role of risk, information and location," <u>Social Science Quarterly.</u> 91:816-834.(September 2010). With Leonardo Duenas-Osorio and Devika Subramanian

"Crunching collisions," <u>Roads and Bridges</u> 13:2 (April 2009), with Robert Dahnke, Ben Stevenson, and Tim Lomax.

"Voting technology, election administration and voter performance," <u>Election Law Journal,</u> 7:123-135 (April 2008) with Greg Vonnahme, Michael Byrne and Daniel Wallach.

"Engaging the unengaged voter: Voter centers and voter turnout," <u>Journal of Politics.</u> 70:487-497 (April 2008) with Greg Vonnahme.

"Assessing the Micro-Foundations of the Tiebout Model," <u>Urban Affairs Review</u>, 42:57-80 (September 2006), with Kenneth Bickers and Lapo Salucci.

"Who is Held Responsible When Disaster Strikes? The Attribution of Responsibility for a Natural Disaster in an Urban Election," <u>Journal of Urban Affairs</u>, 28:43-54 (2006) with Kevin Arceneaux.

"Voting for Minority Candidates in Multi-Racial/Ethnic Communities," <u>Urban Affairs Review</u>, 41:157-181 (November 2005) with Stacy Ulbig and Stephanie Post.

"Inter-Local Cooperation and the Distribution of Federal Grant Awards," <u>Journal of Politics</u>, 66:800-22 (August 2004) with Kenneth Bickers.

"Language Choice, Residential Stability, and Voting among Latino-Americans," <u>Social Science Quarterly</u>, 84:412-24, (June 2003), with Martin Johnson and Robert Wrinkle.

"Public Support for Term Limits: Another Look at Conventional Thinking." <u>Legislative Studies Quarterly</u>, 27:459-480. (August 2002) with Martin Johnson and Stephanie Shirley Post.

"Contextual Data and the Study of Elections and Voting Behavior: Connecting Individuals to Environments." <u>Electoral Studies</u>, 21:63-77 (March 2002), with Martin Johnson, W. Phillips Shively.  Also appearing in *The Future of Electoral Studies.* Mark N. Franklin and Christopher Wlezien, eds. Oxford: Elsevier Press (2003).

"The Congressional Pork Barrel in a Republican Era," <u>Journal of Politics</u>, 62:1070-1086 (November, 2000) with Kenneth Bickers.

"State Economies, Regional Governance, and Urban-Suburban Economic Dependence," <u>Urban Affairs Review</u>, 36:46-60 (Spring, 2000) with Stephanie Shirley Post.

"Reconciling Context and Contact Effects on Racial Attitudes," <u>Political Research Quarterly</u>. 53:285-303 (June, 2000), with Stephanie Shirley Post and Allison Rinden.

"The Micro Foundations of the Tiebout Model," <u>Urban Affairs Review</u> 34:76-93 (September, 1998) with Kenneth Bickers.

"Early Voting," Public Opinion Quarterly. 62:57-70 (Spring, 1998).

"Voting Early, But Not Often," Social Science Quarterly 78:657-677 (September, 1997) with Patricia Garcia-Monet.

"Building Majority Coalitions for Sub-majority Benefit Distributions," Public Choice 91:229-249 (June, 1997). with Kenneth Bickers.

"The Electoral Dynamics of the Federal Pork Barrel," American Journal of Political Science, 40:1300-1326 (November, 1996) with Kenneth Bickers.

"Privatization and the Arrangement of City Services," Estudios De Economia, 23:323 (August, 1996)

"A Portfolio Theory of Policy Subsystems," Administration and Society, 26:158-184 (August, 1994). with Kenneth Bickers

"Congressional Elections and the Pork Barrel," Journal of Politics , 56:377-399 (November 1994)

"Explaining State Aid Allocations: Targeting Within Universalism," Social Science Quarterly, 75:524-540 (September, 1994) with Keith E. Hamm

"Universalism and the Electoral Connection:  A Test and Some Doubts," Political Research Quarterly, 47:295-318 (June, 1994)  with Kenneth N. Bickers.

"Response to Weingast's 'Reflections on Distributive Politics and Universalism,'" Political Research Quarterly: 47:329-334 (June, 1994) with Kenneth N. Bickers.

 "Arranging City Services," Journal of Public Administration: Research and Theory 3:66-93 (January, 1993).

 "Alternative Means of Delivering Municipal Services: 1982-1988,"  Intergovernmental Perspective. 19:27-30 (Winter, 1993).

 "A Federalist Explanation of Municipal Elections," The Midsouth Political Science Journal. 13:211-229 (June, 1992) with Cheryl Young.

"The Budgetary Effects of Municipal Service Contracting:  A Principal-Agent Explanation," American Journal of Political Science. 34:471-502 (May, 1990).

"Economic Voting for Governor and U.S. Senator:  The Electoral Consequences of Federalism," Journal of Politics  52:29-54 (February, 1990).

"Market Maximization of Individual Preferences and Metropolitan Municipal Service Responsibility," Urban Affairs Quarterly  24:86-116 (September, 1989).

"A Comparative Analysis of the Targeting Capacity of State and Federal Intergovernmental Aid Allocations: 1977-1982," Social Science Quarterly  68:447-466 (Sept., 1987).  With K. Hamm.

"Tiebout's Sorting Hypothesis," Urban Affairs Quarterly, 22:199-225 (Sept., 1987).

"Federal Aid and The Mobilization of Black Political Influence."  Research in Urban Policy, 2:97-117.   (1986) with K. Hamm.

"The Fiscal Impact of U.S. Military Assistance Programs, 1967-1976."  The Western Political Quarterly, 38:27-43 (March, 1985).  with R. Stoll and M. Ishimatsu.

"Municipal Public Employment:  An Examination of Intergovernmental Influences."  American Journal of Political Science,  28:636-653 (November, 1984).

"State Regulation and the Political Consequences of Municipal Fiscal Stress."  Publius, 14:41-54 (Spring, 1984).

"Implementation of Federal Policy: An Extension of the 'Differentiated Theory of Federalism'," Research in Urban Policy,  3:341-348 (1984)

"The Structural Character of Federal Aid:  An Examination of Fiscal Impact," Research in Urban Economics, 4:167-186 (Fall, 1984).

"Trends and Prospects in State and Local Finance," Journal of Urban Economics, 14:224-241 (September, 1983) with P. Mieszkowski.

"An Analysis of  Support for Tax Limitation Referenda," Public Choice, 40:187-194 (Winter, 1983) with K. Hamm and P. Freeman.

"The Political Economy of Municipal Functional Responsibility," Social Science Quarterly, 63:530-549 (September, 1982).

"The Effects of Reagan Domestic Budget Cuts:  The Case of Houston," Texas Business Review, 13:11-18.  (Oct.-Nov., 1982 ) with S.A. MacManus.

"The Targeting of State Aid:  A Comparison of Grant Delivery Mechanisms," Urban Interest, 2:47-59 (Spring, 1981).

"The Allocation of Federal Aid Monies:  The Synthesis of Demand-Side and Supply-Side Explanations," American Political Science Review,  75:334-343 (June, 1981).

"Functional Integration at the Substate Level:  A Policy Perspective," Urban Affairs Quarterly, 16:211-233 (December, 1980).

"Federally Mandated Substate Regional Government:  The Maintenance of Governmental Structures," Urban Interest, 1:74-82 (Spring, 1980).

"Federal Categorical Aid:  Equalization and the Application Process," Western Political Quarterly, 32: 396-408 (December, 1979)

"The Electability of Women Candidates:  The Effects of Sex Role Stereotyping, "Journal of Politics, 41:513-524 (May, 1979)  With R. Hedlund, K. Hamm, and P. Freeman.

"Regional Planning Assistance:  Its Distribution to Local Governments and its Relationship to Local Grant Getting," The Journal of the American Institute of Planners, 43:871-891 (July, 1977)  With B. Hawkins.

## Chapters in edited volumes

"Polling Place Quality," in Kathleen Hale and Bridgett A. King, eds., *The Future of Election Administration,* Palgrave.

"Help America Vote Act of 2002" in *Voting and Political Representation in America: Issues and Trends* Edited by Mark P. Jones. Forthcoming, 2019 Santa Barbara, CA: ABC-CLIO

"Convenience models of voting" in *Voting and Political Representation in America: Issues and Trends* Edited by Mark P. Jones Forthcoming, 2019 Santa Barbara, CA: ABC-CLIO

"Polling Place Practices,", in *Electoral Performance,* Charles Stewart III and Barry Burden, eds. Cambridge University Press, 2014:166-187. With Greg Vonnahme

"Early, Absentee, and Mail-in Voting," in *Handbook of American Elections and Political Behavior*, ed. Jan Leighley, Oxford University Press, 2010:182-199. with Greg Vonnahme.

"The Political Market for Intergovernmental Cooperation," in *Self-Organizing Federalism: Collaborative Mechanisms to Mitigate Institutional Collective Action Dilemmas,* eds., Richard C. Feiock and John T. Scholz. Cambridge University Press.  2010:161-178.. With Kenneth N. Bickers and Stephanie Post

"Local Services, Provision and Production," in Encyclopedia of Public Administration and Public Policy, New York, Marcel Dekker, 2003: 734-748.

"The Politics of Revenue and Spending Policies," in John Pelissero, ed. Cities, Politics,and Policy. Washington, D.C.: CQ Press. 2002:217-236.

 "Implications for Citizen Participation," in Paul Schumacher and Burdette Loomis eds. Choosing a President The Electoral College and Beyond. New York, Catham House, 2002 with Paul Johnson, Daron Shaw and, Robert Weissberg.  Pp. 125-142

"Devolution and the Challenge for Local Governance,",  in Ronald E. Weber and Paul Brace, eds. Change and Continuity in American State and Local Politics New York, Catham House. 2000:21-33

"Contracting for Municipal Services," in P. Seidenstat, S. Hakim and G. Bowman eds. Privatization of the Justice System, McFarland and Co. Publishers. 1992: 82-107, with Delores Martin.

"Urban Public Policy Under Fiscal Stress:  A Comparison of Spending and Employment Decisions," pp. 111-144, in Mark Gottdiner (ed.) Cities Under Fiscal Stress,  Sage, 1986 with M. Neiman and E. Sinclair.

"The Texas Response to Reagan's New Federalism Programs:  The Early Years,"   pp. 124-159 in,  L. Bender and J. Stever, (eds.) Managing the New Federalism, Denver: Westview Press, 1986   with S.A. MacManus.

"Implementation of federal policy: An extension of the 'differentiated theory of federalism.' " pp. 341-348. in Terry Nichols Clark (ed). Research in Urban Policy Chicago: JAI Press, 1985

"Policy Implementation in the Federal Aid System:  The Case of Grant Policy,"  pp. 125-155 in, G. Edwards (ed.) Public Policy Implementation, JAI Press, 1984.

"The Allocation of State Aid to Local Governments:  An Examination of Interstate Variations," pp. 202-225. in, U.S. Advisory Commission on Intergovernmental Relations, The Federal Influence on State and Local Roles in the Federal System,  U.S. Government Printing Office, 1982.

"The Impact of Federal Grant Programs on Municipal Functions: An Empirical Analysis," pp. 65-122 in, U.S. Advisory Commission on Intergovernmental Relations, The Federal Influence on State and Local Roles in the Federal System, U.S. Government Printing Office, 1981

"The Impact of Socio-Economic Environment on Revenue Policies," pp. 133-172. in, R. Bingham, B. Hawkins, and F. Hebert, The Politics of Raising State and Local Revenues, Praeger, 1978 with R. Bingham, B. Hawkins, and R. Robertson.

"Grant Seeking and the Allocation of Federal Grant-in-Aid Monies:  The Case of Southeastern Wisconsin," pp. 199-219 in,  John P. Blair and Ronald S. Edari, (eds.), Milwaukee's Economy:  Federal Programs, Local Resources and Community Action, Federal Reserve Bank of Chicago, 1978

"Substate Regionalism:  Another View From the States," pp. 69-102 in,  Charles Tyer (ed.)  Substate Regionalism in the United States: Perspectives and Issues, University of South Carolina Press, 1978

## Recent papers, completed manuscripts, conference papers and invited presentations

"Vote fraud and errant voting," Invited presentation at Department of Political Science, University of Nebraska, Lincoln, NE. April 25, 2013.

"Polling place practices," Prepared for presentation at the Measure of Elections Conference, June 18-19, 2012, Massachusetts Institute of Technology, Boston, MA

"Where, when and how we vote: Does it matter?" presented at the Scottish National Election Commission, Strathclyde University, Glasgow, Scotland. November 12-15, 2010.

"The future of elections," presented at the *Future of Governance Conference*, Howard Baker Institute of Government, University of Tennessee, Knoxville, Tx. October 14-15, 2010.

"Cost of elections," Presented at the 2010 Meeting of the Midwest Political Science Association, Chicago, Ill. April 3-5, 2000 with Greg Vonnahme.

"Early voting and campaign news coverage," 2010 Meeting of the American Political Science Association, Washington, D.C., Sept 1-3.

"The cost of elections." Report prepared for the Pew Charitable Trusts, 2009. With Greg Vonnahme.

"The effects of early voting on congressional campaign expenditures." Presented at the 2009 Meeting of the Midwest Political Science Association, Chicago, Ill. April 13-15, 2000 With Marvin McNeese

"The effects of Election Day vote centers on voter experiences." Presented at the 2008 Meeting of the Midwest Political Science Association, Chicago, Ill. April 3-5, 2008. With Greg Vonnahme

Whither the Challenger: Congressional Elections in Metropolitan America, Presented at the 2005 Meetings of the American Political Science Association, Washington, D.C., September 1-3, with Kenneth Bickers.

Assessing the Micro-Foundations of the Tiebout Model  Presented at the 2005 Meetings of the Midwest Political Science Meetings, Chicago, Ill. April 2-5, with Kenneth Bickers and Lapo Salucci.

Electoral Reform, Party Mobilization and Voter Turnout Presented at the 2004 Meetings of the Midwest Political Science Meetings, Chicago, Ill. April 21-23, with Jan Leighley, Chris Owens.

The Role of Candidates and Parties in Linking Electoral Reforms with Voter Participation**.**  Presented at the 2003 Meetings of the Midwest Political Science Meetings, Chicago, Ill. April 21-23, with Jan Leighley, Chris Owens.

Voting for Minority Candidates in Multi-Racial/Ethnic Communities. Presented at the 2003 Meetings of the Midwest Political Science Meetings, Chicago, Ill. April 21-23, with Stacy Ulbig and Stephan Post.

The within congressional district electoral connection.  Presented at the 2002 Meetings of the American Political Science Association, Boston, MA August 28-September 2, with Kenneth Bickers.

Who Will Vote? The Accessibility of Intention to Vote and Validated Behavior at the Ballot Box, Presented at the 2001 Meetings of the American Political Science Association, San Franciso, CA., August 28-September 2, with Martin Johnson

Contextual Explanations of Presidential Vote Choice, Presented at the 2001 Meeting of the Midwest Political Science Association, Chicago, Illinois, April 13-15, with W.Philps Shivley and Martin Johnson.

The Changing Structure of Federal Aid and the Politics of the Electoral Connection Coalitions. Presented at the 2000 Meetings of the American Political Science Association, Washington, D.C., September 1-4.  With Kenneth Bickers.

Accessibility and Contextual Explanations of White Racial Attitudes. Presented at the 2000 Meetings of the American Political Science Association, Washington, D.C., September 1-4.  With W.Philps Shivley and Martin Johnson

Information, Persuasion and Orphaned Voters. Presented at the 1999 Meeting of the American Political Science Association, Atlanta, GA., September 1-4. With Martin Johnson

The Federal Pork Barrel and the Formation of Intergovernmental Grant-Seeking Coalitions Presented at the 1999 Meeting of the American Political Science Association, Atlanta, GA., September 1-4.  With Kenneth Bickers.

The Congressional Pork Barrel in a Republican Era. Presented at the 1999 Meeting of the Midwest Political Science Association, Chicago, Illinois, April 13-15.  With Kenneth Bickers

The Local Public Goods Market: A Definition, Measure, and Test, Presented at the 1998 Meeting of the American Political Science Association, Boston, MA, Sept. 3-6 10-12.  With Stephanie Shirley Post.

The Ties that Bind: Urban and Suburban Dependency. Presented at the 1998 Meeting of the Midwest Political Science Association, Chicago, Illinois, April 10-12.  With Stephanie Shirley Post


## Professional Associations

President, Urban Subsection, American Political Science Association, 1999-2000
President, Southwest Political Science Association, 1997-1998
Chair, Nominations committee, Southern Political Science Association, 1995
Nomination committee, Southern Political Science Association, 1993-94
Executive Council, Southwest Political Science Association, 1992-1994
Chair, nominations committee, 1993-94, Southwest Political Science Association.
Section Head, State and Local Government, 1993, Southern Political Science Association Meetings.
Section Head, State and Intergovernmental Relations, 1992 Midwest Political Science Association  .
Executive Board, Urban Politics Section, American Political Science Association,  1990-1992
Executive Board, Southwestern Political Science Association, 1985-1991, 1993-1994
Program Chair, Southwestern Political Science Association Annual Meetings, 1983
Section Head, Intergovernmental Relations, Southern Political Science Association Meetings. 1983

## Ph. D. Thesis advisees

Albert Ellis, Ph.D. 1989, Associate Professor (deceased), University of Texas, Corpus Christi
Stephanie Post, Ph.D. 1998, Director, Center for Civic Engagement, Rice University
Martin Johnson, Ph.D. 2002. Professor and Chair, University of California-Riverside
Gavin Dillingham, Ph.D. 2004. Research Scientist, Houston Advanced  Research  Center
Johanna Dunaway, Ph.D. 2006. Associate Professor, Louisiana State University
Gregory Vonnahme, Ph.D. 2009. Assistant Professor, University of Missouri-Kansas City
Marvin McNeese, Ph.D. 2015
Andrew Menger, Ph.D. expected  2017

**<u>Teaching</u>**

Urban Politics (undergraduate)
Public Policy (graduate and undergraduate)
Bureaucracy and Public Policy
Policy Implementation
Federalism
Political Behavior

Recent expert testimony

Expert Report in the case of Mark Wandering Medicine et al. v. Linda McCulloch et al. [voting rights case in the state of Montana] February-June, 2014.

Exhibit 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

**JAYLA ALLEN, et al.,**

**PLAINTIFFS**

**v.**                                         **Civil Case No. 4:18-cv-3985**

**WALLER COUNTY, et al.,**

**DEFENDANTS**

**EXPERT REBUTTAL REPORT**
**OF**
**Robert Stein, Ph.D.**

**ON BEHALF OF PLAINTIFFS**
**JAYLA ALLEN, DAMON JOHNSON, TREASURE SMITH,**
**AND THE PANTHER PARTY**

At the request of the Plaintiffs in JAYLA ALLEN, DAMON JOHNSON, TREASURE SMITH, and THE PANTHER PARTY v. WALLER COUNTY, TEXAS, *et al*., I have analyzed Professor James Gimpel's expert witness report for the Defendants. My report is divided into three sections. The first section provides general comments about Dr. Gimpel's methodology, observations, and conclusions relating to turnout. The second section addresses concerns about Professor Gimpel's comparison of Prairie View A&M (PVAMU) to other campuses. The third section provides general comments about Professor Gimpel's methodology, observations, and conclusions relating to the allocation of early voting hours and sites.

## I.     Comments about Turnout in Dr. Gimpel's Report

Professor Gimpel's expert report (pages 1-20; 41-47) alleges that the Plaintiffs were not disadvantaged by Waller County's administration of early voting in the 2018 general election because there is no evidence that Waller County's administration of the early vote schedule (focusing on placement and movement of precinct places) had an impact on early voting turnout. His empirical work in these sections of the report attempts to show that the variability in voter turnout is *not* attributed to the "availability and placement of polling sites in general and of early voting sites in particular." As one piece of supporting evidence, Dr. Gimpel argues that "this is evident by consideration of the plain fact that the county has used almost the same polling places . . . since 2002 (5)." Professor Gimpel then turns to the academic literature on the relationship between early voting and turnout, noting that the extant literature supports his findings about Waller County—in other words, that there is consensus that early voting generally, not just in Waller County, does not have a consistent or appreciable effect on voter turnout. Professor Gimpel apparently assumes that whether early voting increases or decreases turnout is relevant to the present dispute.

But Professor Gimpel is mistaken. In this case, the relevant issue is not whether early voting is a wise policy, but whether Waller County has discriminated against legally-protected classes of voters (i.e., Black voters and Black voters ages 18-20) in the way it provides access to early voting opportunities. What is relevant is not whether the County's early voting schedule caused more or fewer people to vote early, but whether the *opportunity to vote early* was equally accessible to Black and white voters and younger and older voters. Turnout, in a dispute about *access*, misses the mark. The approach that Professor Gimpel takes would be like trying to defend a preschool that refuses to admit Black students by arguing that preschool does not have a measurable impact on later academic success. The issue is access, not outcomes.

It appears that Professor Gimpel has incorrectly assumed that the Plaintiffs' claims are that they were *prevented from voting* because of how Waller County operated early voting. This assumption is a critical misconception that inappropriately prompts Professor Gimpel to focus on voter turnout, which is  irrelevant to the Plaintiffs' claims, legal theory, or expert reports. As such, Professor Gimpel's analysis of the relationship between opportunities to vote early and voter turnout ignores the heart of Plaintiffs' claims: that they did not have *equal access to the opportunity to vote early* as compared to other residents in Waller County during the 2018 general election. Access is not limited to only the placement of an early voting location; access also includes the number of days and hours at that location.  These concerns underscore a significant limitation with Professor Gimpel's analysis.

Still, even if Professor Gimpel's argument is accepted as the test for determining discriminatory intent and effect (i.e., that only an early voting plan that reduced turnout and completely prevented voters from participating could be discriminatory), his analysis of voter turnout does not examine voter turnout among voters who are Black, under the age of 21, or

students on the PVAMU campus—the very Plaintiffs in this case.  Instead, Professor Gimpel addresses only an undefined geographical area—"the Prairie View area"—and seeks to prove that this "area" has not been disadvantaged.

Professor Gimpel's argument, in short, is that Waller County's administration of early voting in the 2018 election could not have disadvantaged the Plaintiffs if early voting had no effect on the likelihood that an eligible voter voted in the 2018 election.  Notwithstanding the failure of this argument to respond to the Plaintiffs' actual claims (i.e., equal access to early voting should not be confused with actually voting), there might be another problem with Professor Gimpel's analysis.  Cross-sectional (one year) analysis of voter turnout is a weak, if not inappropriate, method for determining the causal effect of early voting opportunities (days, hours, and locations of early voting) on the likelihood a person will vote.  As Professor Gimpel points out, there are myriad reasons why persons vote or do not vote.  His research design does not actually help to determine if early voting affects turnout.  The best way to determine whether early voting has a causal effect on voter turnout is to study the same voters *over time*, before and after the adoption of early voting, or before and after changes in the administration of early voting (i.e., number of days, hours of early voting, and location of early voting sites).  An analysis of the same voters over time allows us to best measure whether changes in early voting opportunities affect an individual voter's likelihood of voting, independent of other determinants of voting.  This same design could be applied to subpopulations of voters, such as voters who are Black, under the age of 21, and PVAMU students.[1]  A single election cannot be the basis for a causal determination as sweeping as Professor Gimpel seeks to make. In other words, even if we accept, as Professor Gimpel

---

[1] However, a time-series/panel study of voting among PVAMU students would also be problematic. We are only able to study the voting behavior of PVAMU students during their limited tenure at the University— i.e., four years.

proposes, that the Plaintiffs' claims are best tested by the relationship between early voting opportunities and voter participation, then his methodology for testing this relationship is inadequate and at best inconclusive.[2]

As noted above, Professor Gimpel suggests that Waller County has not significantly varied its early voting operations since first using early voting in 2002. This condition might explain the non-finding between early voting and turnout. It is difficult to demonstrate a relationship between two variables when one of those variables varies over time (i.e., turnout) and the other does not (i.e., early voting opportunities). However, there is an alternative explanation for this non-relationship, one that Professor Gimpel is not able to detect with his cross-sectional design. This alternative explanation suggests that early voting opportunities set in place since 2002 were not sufficient to increase turnout and that turnout remained largely if not exclusively a function of the 'surge/decline' factors mentioned in Professor Gimpel's report. Had other practices for early voting been adopted—for example, if the placement of early voting sites had more appropriately responded to demand—then voters, especially voters like PVAMU students who had a greater need for the increased access to the franchise that early voting can provide, might have responded with higher voter turnout. In fact, in 2018 as well as in previous elections, students on the PVAMU campus requested modifications to the number of early voting sites on campus. Had these requested changes been adopted, we might have been able to assess the effect of early voting on voter turnout among PVAMU students. This condition, however, cannot be detected with the cross-sectional research design used by Professor Gimpel, leaving the turnout effect of early voting in Waller inconclusive.

---

[2] The same methodology employed by Professor Gimpel in testing the relationship between turnout and early voting is widely used in published research on this topic.

To summarize, Professor Gimpel's report includes two fundamental flaws. First, he incorrectly asserts, and then bases his analysis upon, the proposition that voter turnout is the test to determine a discriminatory intent and effect in *access* to voting opportunities. Second, even if one were to accept Professor Gimpel's theory as the correct test, the cross-sectional research design actually employed by Professor Gimpel is inappropriate and incapable of yielding the result he purports to obtain for the reasons described above.

## II.    Comments about Dr. Gimpel's Comparison Analysis

Section 2 of Professor Gimpel's expert report (pages 20-32) compares Waller County's early voting operations with those of purportedly comparable counties in Texas, i.e., 8 counties with similar population size and a medium-size college campus within the county.  Professor Gimpel claims that his analysis shows that Waller County administered early voting in a manner that was similar and in several instances superior to these supposedly comparable counties.  He further asserts that no other county in his sample located either an early voting or Election Day polling place on the campus of the colleges in their respective counties.  Professor Gimpel also claims that he could not find any historically Black colleges or universities in Texas where early voting or Election Day polling places were located on those respective campuses.

For several reasons, as described below, Professor Gimpel's analysis does not appear to be relevant or germane to the Plaintiffs' claim:

- Professor Gimpel does not include any analysis of the number or proportion of students on each of the college campuses that are registered to vote in each county.  This information is a key part of the Plaintiffs' claim that Waller County did not provide equal access to PVAMU students registered to vote in the county.

- His report does not include any analysis about whether students on any of these campuses complained about inadequate early voting opportunities on their campuses. As outlined in Dr. Joseph's expert report and Dr. Flores' initial and rebuttal expert reports for Plaintiffs, the unique history of voting discrimination and student activism to request, demand, and advocate for polling places on PVAMU's campus must be factored into any comparison.

- Professor Gimpel's report does not include any analysis of the number of registered voters under 21 years of age or who are Black in these counties, despite the fact that differential treatment on the basis of race and age is integral to the Plaintiffs' claims.

- Professor Gimpel's report does not include any analysis of the number, location, days, and hours of operation of early voting locations proximate to voters who are between the ages of 18 and 20 or who identify as Black in these counties.

- Professor Gimpel's report does not conduct the same analysis he conducted for Waller County for this sample of counties (i.e., he does not analyze whether early voting is related to voter turnout in those counties).

- Professor Gimpel's report does not assess whether students on any or all of these campuses have access to either private or public transportation to the polls, a condition not available to many PVAMU students.

The claim in this section of Professor Gimpel's report is that Waller County's administration of early voting in 2018 was equal or superior to that of other, supposedly comparable counties in Texas. This conclusion, however, is not convincing, since Professor Gimpel did not study early voting in these counties in the same manner that he did for Waller County and did not demonstrate that Waller County is comparable to those other selected counties.

### III.        Comments about Dr. Gimpel's Analysis of Early Voting Sites and Hours

Section 3 of Professor Gimpel's report (pages 32-47) examines the access voters in Waller County had to early voting locations. This analysis claims to show that the county provided an equitable and efficient allocation of polling places, both in terms of their locations and of their days and hours of operation during the 2018 election. Using distance of early voting locations from the residences of registered voters in Waller County, Professor Gimpel concludes that there were no disparities by geographical area of the county. He also reaches this conclusion about days and hours of voting, but again, he limits his unit of comparison to geographical areas of the county rather than actual voters.

Professor Gimpel's core argument is that Waller County's administration of early voting in the 2018 general election had an insignificant effect on the likelihood that an eligible voter in Waller County voted in the 2018 election. He goes on to argue empirically that the location, hours, and days of operation of early voting in the 2018 Waller County election were unrelated to the likelihood a person voted. He further seeks to demonstrate that this condition is true for voters in Prairie View, which is confusing, since he does not address the racial or other demographics of voters in this geography.

Professor Gimpel's definition of what constitutes fair and convenient opportunities to vote early is narrower than what the literature suggests might be 'best practices' for the operation of early voting operations. The best practices supported by the literature include:

- Proximity to where a voter travels during the day, including work, shopping, and school.

- Availability of transportation, either private or public, to the polling location.

- Days and hours available/convenient to vote.

- Available travel time, in part a function of access to transportation.

In fact, Professor Gimpel has contributed to the literature on best practices for locating polling places and early voting locations. For example, in "Political Participation and the Accessibility of the Ballot Box," Professor Gimpel and J.E. Schuknecht recommend that "policymakers may want to investigate the placement of polling sites along public transit lines, making the precinct places available to those who do not have flexible transportation modes." (2003, p. 486). Yet Professor Gimpel limits his discussion of location solely to the proximity of polling locations to voters' residences and does not consider the above criteria, which I outline in my first report, and which Professor Gimpel's past research has acknowledged.

Still, even if we rely on Dr. Gimpel's limited list of historical tradition, familiarity, and demand, a combination of these factors would weigh in favor of increasing early voting opportunities on the PVAMU campus. As an initial point, there is always concern about historical tradition being used as a factor (i.e., using previous sites as a factor for future sites) because it would not take into consideration a historical "tradition" of discrimination, such as the history that is detailed in the report of Plaintiffs' expert Dr. Joseph. Indeed, as detailed in Dr. Joseph's report, there is a deep historical tradition of PVAMU students advocating for on-campus voting and challenging attempts by Waller County to restrict their right to vote. At best, deference to historical tradition could support on-campus voting with PVAMU's Memorial Student Center as a site. And, at worst, it would fail to take into consideration the history of discrimination and how that has impacted the limited availability of voting on-campus.

As for familiarity, as evident in Plaintiffs' claims, voting on-campus would be most familiar to PVAMU students. Moreover, based on representation of evidence submitted by Plaintiffs, PVAMU is a center of life in Prairie View, where public events often occur. According to Plaintiffs' claims in their filings, PVAMU students, including some Plaintiffs, said they were

unfamiliar with off-campus early voting sites like the Waller County Community Center or lacked transportation to this site and other off-campus early voting sites.

      Concerning demand, Precinct 309 includes the highest numbers of registered voters of any precinct in Waller County—and many of Precinct 309's registered voters are PVAMU students. As I found in my initial report, African American voters in Waller County in general voted in the 2018 general election at the early voting locations that had been provided the fewest hours and days of operation.  Similarly, the PVAMU Memorial Student Center early voting location was among the sites that Waller County provided with the least early voting access (i.e., in terms of fewest hours, days, and weekend operations) of the early voting locations in the County, despite the facts that PVAMU students use early voting at higher rates than other voters in Waller County and that Precinct 309 has the highest number of registered voters of any precinct.  These factors would thus suggest having an early voting location on the PVAMU campus with equal or greater hours to other sites.

***

I reserve the right to continue to supplement my declarations in light of additional facts, testimony, and/or materials that may come to light.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Executed on: December 3, 2019

**Robert Stein, PhD**

Exhibit 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| JAYLA ALLEN, et al., | |
| *Plaintiffs*, | |
| v. | Civil Case No. 4:18-cv-3985 |
| WALLER COUNTY, TEXAS, et al., | |
| *Defendants*. | |

## DECLARATION OF WILLIAM S. COOPER

In accordance with 28 U.S.C. § 1746, Rules 26(a)(2)(B) and 26(e) of the Federal Rules of Civil Procedure, and Rules 702 and 703 of the Federal Rules of Evidence:

### I. BACKGROUND, QUALIFICATIONS, AND METHODOLOGY

1. My name is William S. Cooper. I serve as a demographic expert for Plaintiffs. I previously filed a declaration in this matter on October 24, 2018.[1]

2. Since 1986, I have prepared proposed redistricting maps of approximately 750 jurisdictions for Section 2 of the Voting Rights Act litigation, Section 5 of the Voting Rights Act comment letters, and for use in other efforts to promote compliance with the Voting Rights Act of 1965. I have analyzed and prepared election plans in over 100 of these jurisdictions for two or more of the decennial censuses – either as part of concurrent legislative reapportionments or, retrospectively, in relation to litigation involving many of the cases listed below. I routinely use and analyze census data for my redistricting work and other non-voting projects.

---

[1]     ECF No. 17-3.

3.   From 1986 to 2018, I prepared election plans for Section 2 litigation in Alabama, Connecticut, Florida, Georgia, Louisiana, Maryland, Mississippi, Missouri, Montana, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming.

4.   During the 2010 redistricting cycle, five plans that I developed for local government clients were adopted – Bolivar County, Mississippi; Claiborne County, Mississippi; the City of Grenada, Mississippi; Sussex County, Virginia; and Wenatchee, Washington.

5.   I served as a redistricting consultant in 2011 to the Miami-Dade County Commission and Board of Education. I currently serve as a consultant and expert witness for the City of Decatur, Alabama defendants in *Voketz v. City of Decatur.*

6.   Since 2011, based in part on my testimony, five federal courts have found a Section 2 violation based on the first prerequisite (*Gingles* 1) and totality of circumstances information pursuant to *Thornburg v. Gingles*, 478 U.S. 30 (1986): *Montes v. City of Yakima*, *Washington* (E.D. Wash. Aug. 22, 2014); *Pope v. Albany County, New York* (N.D.N.Y. Jan. 28, 2014; N.D.N.Y. Mar. 24, 2015); *Missouri State Conference NAACP, et al. v. Ferguson-Florissant School District, et al.* (E. D. Mo. Aug. 22, 2016); *Terrebonne Parish Branch NAACP et al. v. Jindal et al. (*M.D. La. Aug. 27, 2017); and *Thomas v. Bryan*t (S.D. Ms. Feb. 16, 2019).

7.   In 2016, two redistricting plans that I developed on behalf of the plaintiffs for consent decrees in Section 2 lawsuits in Georgia were adopted – *Georgia State Conference of the NAACP, et al. v. Fayette County Bd. of Commissioners, et al., Georgia* and *Georgia State Conference NAACP, et al. v. Emanuel County Bd. of Commissioners, Georgia.*

8. In addition to voting-related projects, throughout this decade, I have provided demographic and GIS consulting services to national, state, and local organizations on issues

relating to environmental justice, housing, school desegregation, and site qualifications for the Summer Food Program and Child and Adult Care Food Program.

9. For additional historical information on my testimony as an expert witness and experience, attached as an **Appendix** is a copy of my curriculum vitae.

10. In this case, Plaintiffs requested that I analyze and provide information on Waller County demographics and incorporated places therein based on U.S. Census Bureau reports.

11. I am being compensated in the amount of $150 per hour and reasonable expenses for my service. My compensation is not contingent on or affected by the substance of my opinions or the outcome of this litigation.

12. In the preparation of this declaration, I analyzed data from the 2010 U.S. Census and American Community Survey ("ACS") conducted by the Census Bureau – specifically, the 5-year 2013-2017 ACS. I also examined 2018 population estimates for Waller County and municipalities within Waller County, as reported on June 20, 2019 by the Census Bureau.

13. I used a geographic information system ("GIS") software package called *Maptitude for Redistricting*, developed by the Caliper Corporation. This software is deployed by many local and state governing bodies across the country for redistricting and other types of demographic analysis.

14. The geographic boundary files that I used with *Maptitude* are created from the U.S. Census 2010 TIGER (Topologically Integrated Geographic Encoding and Referencing) files.

15. I used population data from the U.S. Census 2010 PL 94-171 data files and the 2010 SF-1 File.

16. The PL 94-171 dataset is published in electronic format and is the complete count population file designed by the Census Bureau for use in legislative redistricting. The file contains

basic race and ethnicity data on the total population and voting-age population found in units of Census geography such as states, counties, municipalities, townships, reservations, school districts, legislative districts, census tracts, census block groups, precincts (called voting districts or "VTDs" by the Census Bureau), and census blocks.

17.    The *Maptitude for Redistricting* software processes the TIGER files to produce a map for display on a computer screen. The software also merges demographic data from the PL 94-171 files to match the relevant decennial Census geography.

18.    I obtained a GIS shapefile depicting 2017 precincts for Waller County via https://tlc.texas.gov/redist/data/data.html.

## II.  GEOGRAPHY AND POPULATION ESTIMATES

19.    Waller County sits on the northwest border of Harris County and within 55 miles of the City of Houston.

20.    According to the 2010 Census, Waller County has a <u>total population</u> of 43,205, of whom 44.58% (19,260) are Anglo (non-Hispanic White), 24.39% (10,537) are non-Hispanic Black ("NH Black"), 25.70% (11,103) are Any Part Black ("AP Black"), and 29.02% (12,536) are Latino (of any race).

21.    The table in **Figure 1** (on the next page) includes 2010 Census counts by race and ethnicity and 2018 total population estimates for Waller County.

**Figure 1**

**Waller County, TX – 2010 Census and 2018 Estimates**
**Population by Race and Ethnicity**

| All Ages | 2010 Census | Percent | 2018 Estimates | Percent | 2010 to 2018 Change | Percent Change |
|---|---|---|---|---|---|---|
| Total Population | 43,205 | 100.00% | 53,126 | 100.00% | 9,921 | 22.96% |
| NH White | 19,260 | 44.58% | 22,875 | 43.06% | 3,615 | 18.77% |
| Total Minority Pop. | 23,945 | 55.42% | 30,251 | 56.94% | 6,306 | 26.34% |
| Latino | 12,536 | 29.02% | 16,364 | 30.80% | 3,828 | 30.54% |
| NH Black | 10,537 | 24.39% | 12,521 | 23.57% | 1,984 | 18.83% |
| NH Asian | 213 | 0.49% | 599 | 1.13% | 386 | 181.22% |
| NH Hawaiian and PI | 9 | 0.02% | 19 | 0.04% | 10 | 111.11% |
| NH American Indian and Alaska Native | 141 | 0.33% | 178 | 0.34% | 37 | 26.24% |
| NH Other[2] | 54 | 0.12% | | | | |
| NH Two or More | 455 | 1.05% | 570 | 1.07% | 115 | 25.27% |
| SR Black (Single-Race Black)[3] | 10,739 | 24.86% | 12,972 | 24.42% | 2,233 | 20.79% |
| AP Black (Any Part Black)[4] | 11,103 | 25.70% | 13,449 | 25.32% | 2,346 | 21.13% |

22.     As shown in **Figure 1,** Waller County has experienced significant population growth this decade–increasing by 9,921 persons (22.96%) from 43,205 in 2010 to a 2018 estimate of 53,126.[5] As the columns shaded yellow in **Figure 1** indicate, while population growth has been recorded across all racial and ethnic categories since 2010, this growth has been higher among

---

[2]     In 2018 estimates, the Census Bureau combines the "Other" category with 2+ races.
[3]     The SR Black classification includes persons who self-identify as Black only, including those who identify as Hispanic Black.
[4]     The AP Black classification includes all persons who self-identified in the 2010 Census as single-race Black or some part Black, including Hispanic Black.
[5]     The methodology for Census Bureau annual estimates is explained in documentation at the link below:
        https://www.census.gov/programs-surveys/popest/technical-documentation/methodology.html.

minority residents than among Anglo residents, with a resulting decrease in the Anglo proportion of the County's population.

23.     According to the 2010 Census, the total population of the City of Prairie View ("Prairie View") is 5,576, of whom 90.21% (5,030) are AP Black and 2.6% (147) are Anglo. The table in **Figure 2** shows total population by race/ethnicity for the five incorporated places in Waller County, with a breakout for the Waller County portions of Katy and Waller City.

**Figure 2**

**Waller County Incorporated Places**
**Population by Race and Ethnicity (2010 Census)**

| Jurisdiction | Total | NH White | % NH White | Latino | % Latino | NH Black | SR Black | AP Black | % AP Black |
|---|---|---|---|---|---|---|---|---|---|
| Brookshire | 4,702 | 774 | 16.46% | 2,223 | 47.28% | 1,622 | 1,672 | 1,723 | 36.64% |
| Hempstead | 5,770 | 1,299 | 22.51% | 2,158 | 37.40% | 2,195 | 2,242 | 2,297 | 39.81% |
| Katy* | 1,156 | 917 | 79.33% | 202 | 17.47% | 7 | 7 | 15 | 1.30% |
| Pattison | 472 | 298 | 63.14% | 137 | 29.03% | 23 | 23 | 29 | 6.14% |
| Pine Island | 988 | 490 | 49.60% | 363 | 36.74% | 118 | 118 | 120 | 12.15% |
| Prairie View | 5,576 | 147 | 2.64% | 427 | 7.66% | 4,884 | 4,938 | 5,030 | 90.21% |
| Waller City* | 1,880 | 904 | 48.09% | 501 | 26.65% | 422 | 441 | 463 | 24.63% |

*Waller County portion only

24.     Mirroring countywide trends, the five municipalities that are entirely within Waller County have experienced population growth since 2010. The Census Bureau Population Estimates Program does not report annual estimates by race and ethnicity at the sub-county level. The table in **Figure 3** (on the next page) shows 2018 estimates for the five incorporated places that are entirely within Waller County, with changes in population since the 2010 Census.[6]

---

[6]     As Katy and Waller City are not entirely within Waller County, post-2010 population estimates are not available.

**Figure 3**

**Waller County -- Incorporated Places
2010 Census and 2018 Estimates**

| City | 2010 Population | 2018 Estimates | 2010 to 2018 Change | Percent Change |
|---|---|---|---|---|
| Brookshire | 4,702 | 5,489 | 787 | 14.34% |
| Hempstead | 5,770 | 8,084 | 2,314 | 28.62% |
| Pattison | 472 | 607 | 135 | 22.24% |
| Pine Island | 988 | 1,130 | 142 | 12.57% |
| Prairie View | 5,576 | 6,428 | 852 | 13.25% |

25.     The table in **Figure 4** reports the 2010 voting-age and percentages for incorporated places, including the Waller County portions of Katy and Waller City, with corresponding countywide totals. Post-2010 voting-age population estimates are not available at the county or sub-county levels from the Population Estimates Program.

**Figure 4**

**Waller County by Voting Age (2010 Census)**

| Jurisdiction | Total VAP | NH White | % NH White | Latino | % Latino | NH Black | SR Black | AP Black | % AP Black |
|---|---|---|---|---|---|---|---|---|---|
| Brookshire | 3,123 | 639 | 20.46% | 1,337 | 42.8% | 1,095 | 1,116 | 1,139 | 36.47% |
| Hempstead | 4,002 | 1,054 | 26.34% | 1,296 | 32.4% | 1,570 | 1,593 | 1,615 | 40.35% |
| Katy* | 870 | 707 | 81.26% | 138 | 15.9% | 5 | 5 | 8 | 0.92% |
| Pattison | 381 | 263 | 69.03% | 86 | 22.6% | 23 | 23 | 24 | 6.30% |
| Pine Island | 746 | 417 | 55.90% | 228 | 30.6% | 90 | 90 | 92 | 12.33% |
| Prairie View | 5,168 | 132 | 2.55% | 308 | 6.0% | 4,627 | 4,674 | 4,754 | 91.99% |
| Waller City* | 1,332 | 696 | 52.25% | 304 | 22.8% | 301 | 312 | 319 | 23.95% |
| **Waller County**[7] | 32,549 | 15,455 | 47.48% | 7,755 | 23.8% | 8,737 | 8,852 | 9,038 | 27.77% |

*Waller County portion only

_____

[7]     The numbers for individual jurisdictions in Figure 4 do not add up to the numbers for Waller County as a whole because the figure does not include rows for the populations of rural areas in the County.

26.     As of the 2010 Census, Waller County's <u>voting age population</u> ("VAP") is 32,549, of whom 27.77% (9,038) are AP Black, 47.48% (15,455) are Anglo, and 23.8% (7,755) are Latino. The City of Prairie View has a VAP of 5,168, of whom 91.99% (4,754) are AP Black.

27.     County-level and municipal-level sample survey percentage estimates for the citizen voting-age population ("CVAP") are available from a Special Tabulation of the ACS prepared by the Census Bureau.[8] The rightmost columns (shaded yellow) in the table in **Figure 5** break out the citizenship estimates for Waller County and the incorporated municipalities that are wholly within Waller County, based on the 2013-2017 ACS.[9] The leftmost columns show percentages from the 2008-2012 ACS, with a survey midpoint of July 2010, which is roughly coincident with the 2010 Census.

**Figure 5**
**Waller County – 2008-2012 CVAP and 2013-2017 CVAP**

| Jurisdiction | 2008-2012 % NH Black CVAP | 2008-2012 % Latino CVAP | 2008-2012 % NH White CVAP | 2013-2017 % NH Black CVAP | 2013-2017 % Latino CVAP | 2013-2017 % NH White CVAP |
|---|---|---|---|---|---|---|
| Brookshire | 49.2% | 32.7% | 17.2% | 55.4% | 20.5% | 23.2% |
| Hempstead | 52.9% | 13.2% | 32.8% | 66.2% | 12.2% | 20.3% |
| Pattison | 3.3% | 23.3% | 73.3% | 6.8% | 25.7% | 66.2% |
| Pine Island* | 19.2% | 18.6% | 59.3% | 15.4% | 22.3% | 61.5% |
| Prairie View | 86.6% | 6.2% | 4.5% | 80.0% | 8.6% | 7.6% |
| **Waller County**[10] | 29.94% | 13.9% | 54.15% | 32.1% | 14.1% | 51.6% |

*Town Status

[8]     Data source: https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html.
        The midpoint of the 2013-2017 survey period is July 1, 2015. Thus, estimates reported in the 5-year ACS are nearly four years behind current 2019 citizenship rates.
        The Special Tabulation does not provide an "any part" estimate, so the single-race NH Black CVAP slightly understates the AP Black CVAP.                    .
[9]     As Katy and Waller City are not entirely within Waller County, post-2010 population estimates are not available.
[10]    The numbers for individual jurisdictions in Figure 5 do not add up to the numbers for Waller County as a whole because the figure does not include rows for the populations of rural areas in the County.

28.     **Figure 5** reveals that, since the 2010 Census, both NH Black CVAP and Latino CVAP have increased countywide by about two percentage points at mid-decade, while NH White CVAP slipped by slightly more than two percentage points, from 54.15% to 51.6%.

29.     The City of Prairie View remains overwhelmingly comprised of Black residents, but by mid-decade NH Black CVAP had dropped from 86% to 80%, as both Latino CVAP and NH White CVAP increased by a couple of percentage points.

30.     Prairie View A&M ("PVAMU") is a historically Black university located entirely within the City of Prairie View and serves as the only university in Waller County. More than 80% of the more than 9,000 enrolled students at the University identify as Black.[11]

31.     As revealed in **Figure 6**, this concentration of predominantly young, college-age Black residents makes Prairie View demographically unique as compared to other areas within Waller County.

**Figure 6**

**Waller County – 18-20 year-old Population (2010 Census)**

| Jurisdiction | Ages 18-20 | Total 18+ | % 18-20 of 18+ | SR Black Ages 18-20 | SR Black 18+ | % 18-20 of SR Black 18+ |
|---|---|---|---|---|---|---|
| Brookshire | 220 | 3,123 | 7.04% | 91 | 1,116 | 8.2% |
| Hempstead | 316 | 4,002 | 7.90% | 142 | 1,593 | 8.9% |
| Katy* | 53 | 870 | 6.09% | 0 | 5 | 0.0% |
| Pattison | 12 | 381 | 3.15% | 0 | 23 | 0.0% |
| Pine Island | 42 | 746 | 5.63% | 10 | 90 | 11.1% |
| Prairie View | 2,808 | 5,168 | 54.33% | 2,628 | 4,674 | 56.2% |
| Waller City* | 98 | 1,332 | 7.36% | 25 | 312 | 8.0% |
| **Waller County**[12] | **4,422** | **32,549** | **13.59%** | **2,954** | **8,852** | **33.4%** |

*Waller County portion only

---

[11]     Prairie View A&M University, *Prairie View A&M University Enrollment Snapshots: Fall 2018* at 6, http://www.pvamu.edu/ir/wp-content/uploads/sites/98/FA18_Enrollment-Snapshots.pdf.

[12]     The numbers for individual jurisdictions in Figure 6 do not add up to the numbers for Waller County as a whole because the figure does not include rows for the populations of rural areas in the County.

32.     As of the 2010 Census, 91.99% of Prairie View's VAP is AP Black, and 54.33% of Prairie View's VAP is aged 18 through 20. By contrast, in Waller County as a whole, 27.77% of the VAP is AP Black, and just 13.59% of the VAP is aged 18 through 20. Prairie View also is unique in that it is the only municipality in Waller County that is *both* majority-Black CVAP (80.0%), according to the 2013-2017 ACS *and* majority-Black 18-20 as a percentage of VAP (50.85%), according to the 2010 Census – 2,628 divided by 5,168).

33.     The table in **Figure 7** shows Waller County's CVAP among Latino, non-Hispanic Black, and Anglo residents by commission district.

**Figure 7**

### 2013-2017 CVAP by Commission District

| District | NH BCVAP | LCVAP | NH WCVAP | NH BCVAP + LCVAP |
|----------|----------|-------|----------|------------------|
| 1 | 44.30% | 14.75% | 40.22% | 59.05% |
| 2 | 3.40% | 8.14% | 85.35% | 11.54% |
| 3 | 53.33% | 14.63% | 29.23% | 67.96% |
| 4 | 24.80% | 18.77% | 54.65% | 43.57% |

34.     The map in **Figure 8** (on the next page) shows the 2013-2017 percent NH Black plus Latino CVAP by census block group in Waller County, with an overlay of the four current commission districts (thick black lines). A census block group is a combination of census blocks and may reflect a neighborhood or other geographic area. Census block groups are combined to form census tracts.

**Figure 8**

**Percent NH Black + Latino CVAP by Block Group – 2013-2017 ACS**



# III. SOCIOECONOMIC PROFILES

35. Non-Hispanic White (or "Anglo") people in Waller County outpace Black and Latino people across a broad range of socioeconomic measures, as reported in the 5-year 2013-2017 ACS.[13]

## (a) Waller County

### (1) Mobility

- Nearly 9 in 10 (87.9%) of Anglo householders live in the same house as in the prior year, compared to just 73.4% of Black householders. 85.1% of Latino householders live in the same house as in the prior year. (**Exhibit A at pp. 13-14**)

- Of employed persons 16 and over, 81% of Anglo residents drive to work alone, compared to 74.4% of Black residents and 79.7% of Latino residents. By contrast, 23.0% of Black residents in Waller County, as compared to only 12.6% of Anglo residents, commute to work by walking, biking, or via carpool (i.e., riding in another person's vehicle), taxi, or public transit. (**Exhibit A at pp. 15-16**)

### (2) Income

- The poverty rate for Anglo residents is 7.3%. More than one-third of Black residents (35.7%) live in poverty, as do 22.1% of Latino residents. (**Exhibit A at pp. 28-29**)

- Anglo median household income is $74,132 – more than twice the Black median household income ($34,159) and over three-fourths higher (77%) than Latino median household income ($41,924). (**Exhibit A at pp. 32-33**)

- Anglo median family income is $90,746, compared to a median of $51,345 for Black families, and $42,386 for Latino families. (**Exhibit A at pp. 36-37**)

- Per capita income disparities in Waller County are even more pronounced than the disparities seen in median household income. At $37,458, Anglo per capita income is nearly three times Black per capita income ($12,795) and two and a half times higher than Latino per capita income ($14,029). (**Exhibit A at pp. 40-41**)

- 8.4% of Anglo households rely on food stamps, compared to more than one-third (35.6%) of Black households and 19.7% of Latino households. (**Exhibit A at pp. 49-50**)

---

[13] In this section, "Black" or "African American" refers to single-race Black. The 5-year ACS does not report socioeconomic data for the Any Part Black or NH Black categories.

*(3) Education*

• Of persons 25 years of age and over, 9.3% of Anglo residents have not finished high school – half the 18.3% rate of Black residents. By contrast, more than half (51.9%) of Latino residents are without a high school diploma. (**Exhibit A at pp. 21-22**)

• At the other end of the educational scale, for ages 25 and over, 26.2% of Anglo residents have a bachelor's degree or higher, compared to 15.0% of Black residents. Just 4.9% of Latino residents have a bachelor's degree or higher. (**Exhibit A at pp. 21-22**)

*(4) Employment*

• The Anglo unemployment rate (for the working-age population ages 16-64, expressed as a percent of the civilian labor force) is 4.1% compared to 18.0% of Black working-age residents and 5.5% of Latino working-age residents. (**Exhibit A at pp. 51-54**)

• About one-third (34.3%) of Anglo workers are in management or professional occupations, compared to 23.0% of Black workers and 15.7% of Latino workers. (**Exhibit A at pp. 55-56**)

• 15.7% of Anglo workers are in service occupations, compared to about one-third (32.1%) of Black workers and 22.4% of Latino workers. (**Exhibit A at pp. 55-56**)

*(5) Housing*

• Over three-fourths (78.5%) of Anglo householders in Waller County are homeowners. Less than half of Black householders (40.0%) are homeowners, while 71.3% of Latino householders are homeowners. (**Exhibit A at pp. 57-58**)

• 2.6% of Anglo households live under crowded conditions (defined as more than one person per room), compared to 9.2% of Black households and 14.1% of Latino households. (**Exhibit A at pp. 59-60**)

**(b) Prairie View**

36.     There is an even starker socioeconomic disparity between Black people who reside in Prairie View and Anglo people countywide.[14] The Black population in Prairie View (5,030 in 2010) represents about 45% of the countywide Black population (11,103 in 2010).

---

[14]     For reference, **Exhibit C** presents socioeconomic characteristics for the Anglo, Latino, and Black populations in Prairie View in a format that is identical to the Waller County statistics reported in **Exhibit A**.

*(1) Mobility*

- In Prairie View, 65.0% of Black residents live in the same house as in the prior year, compared to 87.9% of Anglo residents countywide. (**Exhibit B at p. 4**)

- In Prairie View, of employed persons 16 and over, 46.8% of employed Black residents drive to work alone, compared to 81% of employed Anglo residents countywide. (**Exhibit B at p. 5**)

- In Prairie View, 46.5% of employed Black people commute to work by walking, biking, or via carpool (i.e., riding in another person's vehicle) or taxi, compared to 12.6% of employed Anglo people countywide. (**Exhibit B at p. 5**)

*(2) Income*

- In Prairie View, 58.3% of Black residents live in poverty, compared to 7.3% of Anglo residents countywide. (**Exhibit B at p. 12**)

- In Prairie View, Black median household income is $21,179, compared to a countywide Anglo median household income of $74,132. (**Exhibit B at p. 14**)

- In Prairie View, Black per capita income is $5,979 versus countywide Anglo per capita income of $37,458. (**Exhibit B at p. 18**)

- In Prairie View, 17.5% of Black households participate in SNAP, compared to 8.4% of Anglo households countywide. (**Exhibit B at p. 22**)

*(3) Education*

- In Prairie View, of persons 25 years of age and over, 17.9% of Black residents have not finished high school, compared to 9.3% of Anglo persons countywide. (**Exhibit B at p. 8**)

*(4) Employment*

- In Prairie View, the Black unemployment rate (for the working-age population ages 16-64, expressed as a percent of the civilian labor force) is 19.2%, compared to a countywide Anglo unemployment rate of 4.1%. (**Exhibit B at p. 24**)

- In Prairie View, 17.0% of employed Black residents are in management or professional occupations, compared to 34.3% of employed Anglo workers countywide. (**Exhibit B at p. 25**)

- In Prairie View, over one-third (35.7%) of Black workers are in service occupations, as compared to 15.7% of Anglo workers countywide. (**Exhibit B at p. 25**)

*(5) Housing*

- In Prairie View, 23.3% of Black households are homeowners, compared to 78.5% of Anglo households countywide. **(Exhibit B at p. 26)**

**(c) Prairie View A&M Student Dormitories**

37.     Many of the socio-economic statistics reported in the 5-year 2013-2017 ACS are not reported for the students living in dormitories at PVAMU.

38.     The PVAMU dormitories are in 2010 census block group 484736804001. There is no non-dormitory population in this block group. According to the 2010 Census, there are 3,191 students (96.55% Black) living in the dormitories.

39.     Below are a few socioeconomic statistics that are available from the 2013-2017 ACS for the PVAMU dormitories.

- Of the estimated 3,269 Black dorm students, 121 have a disability.

- Of the estimated 888 Black dorm students who are employed, 425 (48%) walked to work.

- The per capita income for Black dorm students is $3,562.

**(d) Summary**

40.     Based on all of the above socioeconomic data, I reach the following two conclusions:

(1)     **Black residents in Waller County are socioeconomically disadvantaged, as compared to Anglo residents**.

(2)     **Black residents in Prairie View, particularly PVAMU students, are extremely socioeconomically disadvantaged, as compared to Anglo residents countywide**.


# # #

I reserve the right to continue to supplement my declarations in light of additional facts, testimony, and/or materials that may come to light.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Executed on **July 1, 2019**


_____
WILLIAM S. COOPER

# EXHIBIT A

# Selected Socio-Economic Data

## Waller County, Texas

### Single-Race African Americans and Latinos vis-à-vis Non-Hispanic Whites

### Data Set: 2013-2017 American Community Survey 5-Year Estimates

14-Jun-19

**C02003.DETAILED RACE - Universe: TOTAL POPULATION**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | |
|---|---|---|---|
| | Population | Margin of Error (+/-) | % of Total |
| **Total:** | **48,443** | ***** | **100.0%** |
| Population of one race: | 47,128 | 419 | 97.3% |
| White | 31,306 | 944 | 64.6% |
| Black or African American | 12,241 | 362 | 25.3% |
| American Indian and Alaska Native | 165 | 108 | 0.3% |
| Asian alone | 409 | 94 | 0.8% |
| Native Hawaiian and Other Pacific Islander | 20 | 27 | 0.0% |
| Some other race | 2,987 | 894 | 6.2% |
| Population of two or more races: | 1,315 | 419 | 2.7% |
| Two races including Some other race | 277 | 231 | 0.6% |
| Two races excluding Some other race, and three or more races | 1,038 | 356 | 2.1% |
| Population of two races: | 1,236 | 402 | 2.6% |
| White; Black or African American | 428 | 271 | 0.9% |
| White; American Indian and Alaska Native | 399 | 172 | 0.8% |
| White; Asian | 99 | 72 | 0.2% |
| Black or African American; American Indian and Alaska Native | 2 | 6 | 0.0% |
| All other two race combinations | 308 | 238 | 0.6% |
| Population of three races | 79 | 62 | 0.2% |
| Population of four or more races | 0 | 28 | 0.0% |

Note: Hispanics may be of any race. See Table B03002 and chart.

Source: U.S. Census Bureau, 2013-2017 American Community Survey

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

# Population by Race

## Waller County, Texas



Source: C02003.DETAILED RACE - Universe: TOTAL POPULATION
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B03002. HISPANIC OR LATINO ORIGIN BY RACE - Universe: TOTAL POPULATION**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | |
|---|---|---|---|
| | Population | Margin of Error (+/-) | % of Total |
| **Total:** | 48,443 | ***** | **100.0%** |
| Not Hispanic or Latino: | 34,213 | ***** | 70.6% |
| White alone | 20,853 | 64 | 43.0% |
| Black or African American alone | 12,041 | 311 | 24.9% |
| American Indian and Alaska Native alone | 36 | 46 | 0.1% |
| Asian alone | 351 | 64 | 0.7% |
| Native Hawaiian and Other Pacific Islander alone | 20 | 27 | 0.0% |
| Some other race alone | 66 | 75 | 0.1% |
| Two or more races: | 846 | 304 | 1.7% |
| Two races including Some other race | 13 | 21 | 0.0% |
| Two races excluding Some other race, and three or more races | 833 | 303 | 1.7% |
| Hispanic or Latino | 14,230 | ***** | 29.4% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Non-Hispanic by Race and Hispanic Population

## Waller County, Texas



Source: B03002. HISPANIC OR LATINO ORIGIN BY RACE - Universe: TOTAL POPULATION
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B03002. HISPANIC OR LATINO ORIGIN BY RACE**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | |
|---|---|---|---|
| | Population | Margin of Error (+/-) | % of Total |
| Hispanic or Latino: | 14,230 | ***** | **100.0%** |
| White alone | 10,453 | 936 | 73.5% |
| Black or African American alone | 200 | 170 | 1.4% |
| American Indian and Alaska Native alone | 129 | 96 | 0.9% |
| Asian alone | 58 | 68 | 0.4% |
| Native Hawaiian and Other Pacific Islander alone | 0 | 28 | 0.0% |
| Some other race alone | 2,921 | 885 | 20.5% |
| Two or more races: | 469 | 281 | 3.3% |
| Two races including Some other race | 264 | 232 | 1.9% |
| Two races excluding Some other race, and three or more races | 205 | 158 | 1.4% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

# Hispanic or Latino Origin by Race

## Waller County, Texas



Source:   B03002. HISPANIC OR LATINO ORIGIN BY RACE
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B01001. SEX BY AGE**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **12,241** | **100.0%** | **14,230** | **100.0%** | **20,853** | **100.0%** |
| Under 18 years | 1,632 | 13.3% | 5,491 | 38.6% | 4,144 | 19.9% |
| 18 to 64 years | 9,653 | 78.9% | 8,091 | 56.9% | 12,851 | 61.6% |
| 65 years and over | 956 | 7.8% | 648 | 4.6% | 3,858 | 18.5% |
| Male: | 6,005 | 49.1% | 7,359 | 51.7% | 10,233 | 49.1% |
| Under 18 years | 968 | 7.9% | 2807 | 19.7% | 2,075 | 10.0% |
| 18 to 64 years | 4,637 | 37.9% | 4,221 | 29.7% | 6,321 | 30.3% |
| 65 years and over | 400 | 3.3% | 331 | 2.3% | 1,837 | 8.8% |
| Female: | 6,236 | 50.9% | 6,871 | 48.3% | 10,620 | 50.9% |
| Under 18 years | 664 | 5.4% | 2,684 | 18.9% | 2,069 | 9.9% |
| 18 to 64 years | 5,016 | 41.0% | 3,870 | 27.2% | 6,530 | 31.3% |
| 65 years and over | 556 | 4.5% | 317 | 2.2% | 2,021 | 9.7% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

## Population by Age

## Waller County, Texas



Source:   B01001. SEX BY AGE
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B05003. SEX BY AGE BY CITIZENSHIP STATUS**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | African American | % of AA Total by Age | Latino | % of Latino Total by Age | White, Not Hispanic | % of NHW Total by Age |
|---|---|---|---|---|---|---|
| | | | **Waller County, Texas** | | | |
| Total: | **12,241** | **100.0%** | **14,230** | **100.0%** | **20,853** | **100.0%** |
| **Under 18 years:** | **1,632** | **100.0%** | **5,491** | **100.0%** | **4,144** | **100.0%** |
| Native | 1,618 | 99.1% | 4,847 | 88.3% | 4,144 | 100.0% |
| Foreign born: | 14 | 0.9% | 644 | 11.7% | 0 | 0.0% |
| Naturalized U.S. citizen | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Not a U.S. citizen | 14 | 0.9% | 644 | 11.7% | 0 | 0.0% |
| **18 years and over:** | **10,609** | **100.0%** | **8,739** | **100.0%** | **16,709** | **100.0%** |
| Native | 10,351 | 97.6% | 3,011 | 34.5% | 16,433 | 98.3% |
| Foreign born: | 258 | 2.4% | 5,728 | 65.5% | 276 | 1.7% |
| Naturalized U.S. citizen | 47 | 0.4% | 1,518 | 17.4% | 105 | 0.6% |
| Not a U.S. citizen | 211 | 2.0% | 4,210 | 48.2% | 171 | 1.0% |
| **Male:** | 6,005 | 49.1% | 7,359 | 51.7% | 10,233 | 49.1% |
| **Under 18 years:** | 968 | **100.0%** | 2807 | **100.0%** | 2075 | **100.0%** |
| Native | 960 | 99.2% | 2,500 | 89.1% | 2,075 | 100.0% |
| Foreign born: | 8 | 0.8% | 307 | 10.9% | 0 | 0.0% |
| Naturalized U.S. citizen | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Not a U.S. citizen | 8 | 0.8% | 307 | 10.9% | 0 | 0.0% |
| **18 years and over:** | **5,037** | **100.0%** | **4,552** | **100.0%** | **8,158** | **100.0%** |
| Native | 4,950 | 98.3% | 1,423 | 31.3% | 7,991 | 98.0% |
| Foreign born: | 87 | 1.7% | 3,129 | 68.7% | 167 | 2.0% |
| Naturalized U.S. citizen | 23 | 0.5% | 858 | 18.8% | 47 | 0.6% |
| Not a U.S. citizen | 64 | 1.3% | 2,271 | 49.9% | 120 | 1.5% |

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA by Age | Latino | % of Latino by Age | White, Not Hispanic | % of NHW by Age |
| **Female:** | 6,236 | 50.9% | 6,871 | 48.3% | 10,620 | 50.9% |
| **Under 18 years:** | **664** | **100.0%** | **2,684** | **100.0%** | **2,069** | **100.0%** |
| Native | 658 | 99.1% | 2,347 | 87.4% | 2,069 | 100.0% |
| Foreign born: | 6 | 0.9% | 337 | 12.6% | 0 | 0.0% |
| Naturalized U.S. citizen | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Not a U.S. citizen | 6 | 0.9% | 337 | 12.6% | 0 | 0.0% |
| **18 years and over:** | **5,572** | **100.0%** | **4,187** | **100.0%** | **8,551** | **100.0%** |
| Native | 5,401 | 96.9% | 1,588 | 37.9% | 8,442 | 98.7% |
| Foreign born: | 171 | 3.1% | 2,599 | 62.1% | 109 | 1.3% |
| Naturalized U.S. citizen | 24 | 0.4% | 660 | 15.8% | 58 | 0.7% |
| Not a U.S. citizen | 147 | 2.6% | 1,939 | 46.3% | 51 | 0.6% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

## Citizenship Status of Voting Age Population (18 and Over)

## Waller County, Texas



Source:   B05003. SEX BY AGE BY CITIZENSHIP STATUS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B07004. GEOGRAPHICAL MOBILITY IN THE PAST YEAR BY RACE FOR CURRENT RESIDENCE IN THE
UNITED STATES - Universe: POPULATION 1 YEAR AND OVER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| Total: | **12,160** | **100.0%** | **13,929** | **100.0%** | **20,677** | **100.0%** |
| Same house 1 year ago | 8,929 | 73.4% | 11,858 | 85.1% | 18,171 | 87.9% |
| Moved within same county | 1,467 | 12.1% | 949 | 6.8% | 979 | 4.7% |
| Moved from different county within same state | 1,562 | 12.8% | 960 | 6.9% | 1,280 | 6.2% |
| Moved from different state | 177 | 1.5% | 102 | 0.7% | 214 | 1.0% |
| Moved from abroad | 25 | 0.2% | 60 | 0.4% | 33 | 0.2% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Geographical Mobility in the Past Year (Population 1 Year and Over)

## Waller County, Texas



Source: B07004. GEOGRAPHICAL MOBILITY IN THE PAST YEAR BY RACE FOR CURRENT RESIDENCE IN
THE UNITED STATES - Universe: POPULATION 1 YEAR AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B08105. MEANS OF TRANSPORTATION TO WORK - Universe: WORKERS 16 YEARS AND OVER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | 5,024 | **100.0%** | 5,718 | **100.0%** | 10,199 | **100.0%** |
| Car, truck, or van - drove alone | 3,738 | 74.4% | 4,559 | 79.7% | 8,261 | 81.0% |
| Car, truck, or van - carpooled | 579 | 11.5% | 840 | 14.7% | 826 | 8.1% |
| Public transportation (excluding taxicab) | 22 | 0.4% | 5 | 0.1% | 158 | 1.5% |
| Walked | 425 | 8.5% | 146 | 2.6% | 207 | 2.0% |
| Taxicab, motorcycle, bicycle,  or other means | 130 | 2.6% | 60 | 1.0% | 100 | 1.0% |
| Worked at home | 130 | 2.6% | 108 | 1.9% | 647 | 6.3% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey
http://www.census.gov/acs/www/UseData/index.htm

## Means of Transportation to Work (Workers 16 Years and Over)

## Waller County, Texas



Source:   B08105. MEANS OF TRANSPORTATION TO WORK - Universe: WORKERS 16 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B11002. HOUSEHOLD TYPE BY RELATIVES AND NONRELATIVES FOR POPULATION IN HOUSEHOLDS**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

|  | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
|  | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | 8,968 | **100.0%** | 13,273 | **100.0%** | 20539 | **100.0%** |
| In family households | 6,461 | 72.0% | 12,434 | 93.7% | 18015 | 87.7% |
| In nonfamily households | 2,507 | 28.0% | 839 | 6.3% | 2524 | 12.3% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Household Type for Population in Households

## Waller County, Texas



Source:   B11002. HOUSEHOLD TYPE BY RELATIVES AND NONRELATIVES FOR POPULATION IN HOUSEHOLDS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B12002. MARITAL STATUS FOR THE POPULATION 15 YEARS AND OVER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **10,855** | **100.0%** | **9,563** | **100.0%** | **17,430** | **100.0%** |
| Never married | 7,629 | 70.3% | 3,390 | 35.4% | 3,933 | 22.6% |
| Now married (except separated) | 2,033 | 18.7% | 5,300 | 55.4% | 9,972 | 57.2% |
| Separated | 211 | 1.9% | 165 | 1.7% | 427 | 2.4% |
| Widowed | 329 | 3.0% | 307 | 3.2% | 1,183 | 6.8% |
| Divorced | 653 | 6.0% | 401 | 4.2% | 1,915 | 11.0% |
| **Male:** | 5,216 | 48.1% | 4,980 | 52.1% | 8,513 | 48.8% |
| Never married | 3,802 | 35.0% | 1,959 | 20.5% | 2,067 | 11.9% |
| Now married (except separated) | 968 | 8.9% | 2,687 | 28.1% | 5,033 | 28.9% |
| Separated | 150 | 1.4% | 51 | 0.5% | 218 | 1.3% |
| Widowed | 37 | 0.3% | 60 | 0.6% | 268 | 1.5% |
| Divorced | 259 | 2.4% | 223 | 2.3% | 927 | 5.3% |
| **Female:** | 5,639 | 51.9% | 4,583 | 47.9% | 8,917 | 51.2% |
| Never married | 3,827 | 35.3% | 1,431 | 15.0% | 1,866 | 10.7% |
| Now married (except separated) | 1,065 | 9.8% | 2,613 | 27.3% | 4,939 | 28.3% |
| Separated | 61 | 0.6% | 114 | 1.2% | 209 | 1.2% |
| Widowed | 292 | 2.7% | 247 | 2.6% | 915 | 5.2% |
| Divorced | 394 | 3.6% | 178 | 1.9% | 988 | 5.7% |

Source: U.S. Census Bureau, 2013-2017 American Community

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

## Marital Status for the Population 15 Years and Over

## Waller County, Texas



Source:   B12002. MARITAL STATUS FOR THE POPULATION 15 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**C15002. SEX BY EDUCATIONAL ATTAINMENT FOR THE POPULATION 25 YEARS AND OVER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **4,104** | **100.0%** | **6,765** | **100.0%** | **14,745** | **100.0%** |
| Less than high school diploma | 753 | 18.3% | 3,514 | 51.9% | 1,373 | 9.3% |
| High school graduate, GED, or alternative | 1,604 | 39.1% | 1,942 | 28.7% | 4,493 | 30.5% |
| Some college or associate's degree | 1,130 | 27.5% | 979 | 14.5% | 5,012 | 34.0% |
| Bachelor's degree or higher | 617 | 15.0% | 330 | 4.9% | 3,867 | 26.2% |
| Male: | 1,937 | 47.2% | 3,544 | 52.4% | 7,217 | 48.9% |
| Less than high school diploma | 342 | 8.3% | 1,760 | 26.0% | 787 | 5.3% |
| High school graduate, GED, or alternative | 672 | 16.4% | 905 | 13.4% | 2,176 | 14.8% |
| Some college or associate's degree | 612 | 14.9% | 659 | 9.7% | 2,331 | 15.8% |
| Bachelor's degree or higher | 311 | 7.6% | 220 | 3.3% | 1,923 | 13.0% |
| Female: | 2,167 | 52.8% | 3,221 | 47.6% | 7,528 | 51.1% |
| Less than high school diploma | 411 | 10.0% | 1,754 | 25.9% | 586 | 4.0% |
| High school graduate, GED, or alternative | 932 | 22.7% | 1,037 | 15.3% | 2,317 | 15.7% |
| Some college or associate's degree | 518 | 12.6% | 320 | 4.7% | 2,681 | 18.2% |
| Bachelor's degree or higher | 306 | 7.5% | 110 | 1.6% | 1,944 | 13.2% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

## Educational Attainment for the Population 25 Years and Older

## Waller County, Texas



Source:   C15002. SEX BY EDUCATIONAL ATTAINMENT FOR THE POPULATION 25 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B16005. NATIVITY BY LANGUAGE SPOKEN AT HOME BY ABILITY TO SPEAK ENGLISH FOR THE POPULATION 5 YEARS AND OVER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **11,773** | **100.0%** | **12,690** | **100.0%** | **19,797** | **100.0%** |
| Speak only English | 11,565 | 98.2% | 2,024 | 15.9% | 19,221 | 97.1% |
| Speak another language | 208 | 1.8% | 10,666 | 84.1% | 576 | 2.9% |
| Speak English "very well" | 199 | 1.7% | 4,953 | 39.0% | 521 | 2.6% |
| Speak English "less than very well" | 9 | 0.1% | 5,713 | 45.0% | 55 | 0.3% |
| Native: | 11,505 | 97.7% | 6,353 | 50.1% | 19,521 | 98.6% |
| Speak only English | 11,372 | 96.6% | 1,725 | 13.6% | 19,047 | 96.2% |
| Speak another language | 133 | 1.1% | 4,628 | 36.5% | 474 | 2.4% |
| Speak English "very well" | 126 | 1.1% | 3,314 | 26.1% | 439 | 2.2% |
| Speak English "less than very well" | 7 | 0.1% | 1,314 | 10.4% | 35 | 0.2% |
| Foreign born: | 268 | 2.3% | 6,337 | 49.9% | 276 | 1.4% |
| Speak only English | 193 | 1.6% | 299 | 2.4% | 174 | 0.9% |
| Speak another language | 75 | 0.6% | 6,038 | 47.6% | 102 | 0.5% |
| Speak English "very well" | 73 | 0.6% | 1,639 | 12.9% | 82 | 0.4% |
| Speak English "less than very well" | 2 | 0.0% | 4,399 | 34.7% | 20 | 0.1% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

## Speak English "Less than Very Well" (Population 5 Years and Over)

## Waller County, Texas



Source:   B16005. NATIVITY BY LANGUAGE SPOKEN AT HOME BY ABILITY TO SPEAK ENGLISH FOR THE POPULATION 5 YEARS AND OVER

Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B17010. POVERTY STATUS IN THE PAST 12 MONTHS OF FAMILIES BY FAMILY TYPE BY PRESENCE OF RELATED CHILDREN UNDER 18 YEARS**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **1,761** | **100.0%** | **2,901** | **100.0%** | **5,898** | **100.0%** |
| Income in the past 12 months below poverty level: | 470 | 26.7% | 499 | 17.2% | 341 | 5.8% |
| Married-couple family: | 209 | 11.9% | 293 | 10.1% | 177 | 3.0% |
| With related children under 18 years | 181 | 10.3% | 255 | 8.8% | 46 | 0.8% |
| Other family: | 261 | 14.8% | 206 | 7.1% | 164 | 2.8% |
| Male householder, no wife present | 22 | 1.2% | 0 | 0.0% | 34 | 0.6% |
| With related children under 18 years | 22 | 1.2% | 0 | 0.0% | 34 | 0.6% |
| Female householder, no husband present | 239 | 13.6% | 206 | 7.1% | 130 | 2.2% |
| With related children under 18 years | 192 | 10.9% | 206 | 7.1% | 130 | 2.2% |
| level: | 1,291 | 73.3% | 2,402 | 82.8% | 5,557 | 94.2% |
| Married-couple family: | 648 | 36.8% | 1,860 | 64.1% | 4,587 | 77.8% |
| With related children under 18 years | 234 | 13.3% | 1,181 | 40.7% | 1,489 | 25.2% |
| Other family: | 643 | 36.5% | 542 | 18.7% | 970 | 16.4% |
| Male householder, no wife present | 187 | 10.6% | 321 | 11.1% | 375 | 6.4% |
| With related children under 18 years | 5 | 0.3% | 92 | 3.2% | 219 | 3.7% |
| Female householder, no husband present | 456 | 25.9% | 221 | 7.6% | 595 | 10.1% |
| With related children under 18 years | 177 | 10.1% | 165 | 5.7% | 394 | 6.7% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

## Family Households Below Poverty in the Past 12 Months

## Waller County, Texas



Source:   B17010. POVERTY STATUS IN THE PAST 12 MONTHS OF FAMILIES BY FAMILY TYPE BY PRESENCE
OF RELATED CHILDREN UNDER 18 YEARS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Female-headed Households with Related Children Below Poverty in the Past 12 Months

## Waller County, Texas



Source: B17010. POVERTY STATUS IN THE PAST 12 MONTHS OF FAMILIES BY FAMILY TYPE BY PRESENCE
OF RELATED CHILDREN UNDER 18 YEARS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B17020 POVERTY STATUS IN THE PAST 12 MONTHS BY AGE - Universe: POPULATION FOR WHOM POVERTY STATUS IS DETERMINED**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA By Age | Latino | % of Latino Total | White, Not Hispanic | % of NHW By Age |
| **Total:** | **8,948** | **100.0%** | **13,635** | **100.0%** | **20,147** | **100.0%** |
| Income in the past 12 months below poverty level: | 3,196 | 35.7% | 3,009 | 22.1% | 1,463 | 7.3% |
| **Under 18 years** | 809 | 50.5% | 1,535 | 28.3% | 371 | 9.3% |
| **18 to 59 years** | 2,164 | 36.5% | 1,416 | 19.7% | 884 | 8.1% |
| **60 years and over** | 223 | 15.8% | 58 | 5.7% | 208 | 4.0% |
| Income in the past 12 months at or above poverty | 5,752 | 64.3% | 10,626 | 77.9% | 18,684 | 92.7% |
| **Under 18 years** | 793 | 49.5% | 3,886 | 71.7% | 3,623 | 90.7% |
| **18 to 59 years** | 3,767 | 63.5% | 5,782 | 80.3% | 10,056 | 91.9% |
| **60 years and over** | 1,192 | 84.2% | 958 | 94.3% | 5,005 | 96.0% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

## Population Below Poverty in the Past 12 Months

## Waller County, Texas



Source:   B17020 POVERTY STATUS IN THE PAST 12 MONTHS BY AGE - Universe: POPULATION FOR WHOM POVERTY STATUS IS DETERMIN
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B19001. HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **3,190** | **100.0%** | **3,282** | **100.0%** | **7,924** | **100.0%** |
| Less than $ 10,000 | 416 | 13.0% | 159 | 4.8% | 242 | 3.1% |
| $ 10,000 to $ 14,999 | 165 | 5.2% | 204 | 6.2% | 397 | 5.0% |
| **$ 15,000 to $ 24,999** | 795 | 24.9% | 263 | 8.0% | 591 | 7.5% |
| **$ 25,000 to $ 34,999** | 289 | 9.1% | 610 | 18.6% | 585 | 7.4% |
| **$ 35,000 to $ 49,999** | 472 | 14.8% | 728 | 22.2% | 915 | 11.5% |
| **$ 50,000 to $ 74,999** | 606 | 19.0% | 580 | 17.7% | 1,290 | 16.3% |
| $ 75,000 to $ 99,999 | 234 | 7.3% | 350 | 10.7% | 1,170 | 14.8% |
| **$ 100,000 to $ 149,999** | 160 | 5.0% | 263 | 8.0% | 1,477 | 18.6% |
| $ 150,000 to $ 199,999 | 31 | 1.0% | 43 | 1.3% | 540 | 6.8% |
| $ 200,000 or more | 22 | 0.7% | 82 | 2.5% | 717 | 9.0% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Household Income in the Past 12 Months

## Waller County, Texas



Source:   B19001. HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B19013. MEDIAN HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

|  | Waller County, Texas | | |
|---|---|---|---|
|  | African American | Latino | White, Not Hispanic |
| Median household income in the past 12 months (in 201 | $ 34,159 | $ 41,924 | $ 74,132 |

Source: U.S. Census Bureau, 2013-2017 American
Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Median Household Income in the Past 12 Months

## Waller County, Texas



Source:   B19013. MEDIAN HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B19101. FAMILY INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **1,761** | **100.0%** | **2,901** | **100.0%** | **5,898** | **100.0%** |
| Less than $ 10,000 | 109 | 6.2% | 82 | 2.8% | 175 | 3.0% |
| $ 10,000 to $ 14,999 | 36 | 2.0% | 161 | 5.5% | 52 | 0.9% |
| **$ 15,000 to $ 24,999** | **444** | **25.2%** | **291** | **10.0%** | **416** | **7.1%** |
| **$ 25,000 to $ 34,999** | **87** | **4.9%** | **523** | **18.0%** | **270** | **4.6%** |
| **$ 35,000 to $ 49,999** | **162** | **9.2%** | **575** | **19.8%** | **428** | **7.3%** |
| **$ 50,000 to $ 74,999** | **519** | **29.5%** | **580** | **20.0%** | **1,121** | **19.0%** |
| **$ 100,000 to $ 149,999** | **139** | **7.9%** | **254** | **8.8%** | **1,301** | **22.1%** |
| $ 150,000 to $ 199,999 | 8 | 0.5% | 35 | 1.2% | 484 | 8.2% |
| $ 200,000 or more | 22 | 1.2% | 50 | 1.7% | 637 | 10.8% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Family Income in the Past 12 Months

## Waller County, Texas



Source:  B19101. FAMILY INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B19113. MEDIAN FAMILY INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | |
|---|---|---|---|
| | African American | Latino | White, Not Hispanic |
| Median family income in the past 12 months (in 2017 inflation-adjusted dollars) | $ 51,345 | $ 42,386 | $ 90,746 |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Median Family Income in the Past 12 Months

## Waller County, Texas



Source: B19113. MEDIAN FAMILY INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B19202. MEDIAN NONFAMILY HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | |
| --- | --- | --- | --- |
| | African American | Latino | White, Not Hispanic |
| Median nonfamily household income in the past 12 months (in 2017 inflation-adjusted dollars) | $ 19,987 | $ 28,750 | $ 38,297 |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Median Non-Family Income in the Past 12 Months

## Waller County, Texas



Source:   B19202. MEDIAN NONFAMILY HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B19301. PER CAPITA INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | |
|---|---|---|---|
| | African American | Latino | White, Not Hispanic |
| Per capita income in the past 12 months (in 2017 inflation-adjusted dollars) | $ 12,795 | $ 14,029 | $ 37,458 |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Per capita Income in the Past 12 Months

## Waller County, Texas



**Legend:** ■ African American  ■ Latino  ■ Non-Hiispanc-White

- $37,458 (Non-Hiispanc-White)
- $12,795 (African American)
- $14,029 (Latino)

Per capita income in the past 12 months (in 2017 inflation-adjusted dollars)

Source:   B19301. PER CAPITA INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B20017. MEDIAN EARNINGS IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS) BY SEX BY WORK EXPERIENCE IN THE PAST 12 MONTHS FOR THE POPULATION 16 YEARS AND OVER WITH EARNINGS IN THE PAST 12 MONTHS**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | |
| --- | --- | --- | --- |
| | African American | Latino | White, Not Hispanic |
| inflation-adjusted dollars) -- | | | |
| Total: | $ 10,672 | $ 21,119 | $ 39,888 |
| Male -- | | | |
| Total | $ 12,444 | $ 28,197 | $ 53,110 |
| Worked full-time, year-round in the past 12 months | $ 31,966 | $ 34,296 | $ 66,412 |
| Other | $ 4,997 | $ 9,339 | $ 17,920 |
| Female -- | | | |
| Total | $ 7,601 | $ 12,967 | $ 31,648 |
| Worked full-time, year-round in the past 12 months | $ 24,908 | $ 19,119 | $ 41,178 |
| Other | $ 4,678 | $ 6,736 | $ 11,327 |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

## Median earnings in the Past 12 Months (16 Years and Over with Earnings)

## Waller County, Texas



Source:   B20017. MEDIAN EARNINGS IN THE PAST 12 MONTHS (IN 2017
INFLATION-ADJUSTED DOLLARS) BY SEX BY WORK EXPERIENCE IN THE PAST
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B20005. SEX BY WORK EXPERIENCE IN THE PAST 12 MONTHS BY EARNINGS IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS) FOR THE POPULATION 16 YEARS AND OVER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **10,840** | **100.0%** | **9,348** | **100.0%** | **17,241** | **100.0%** |
| Worked full-time, year-round in the past 12 months: | 2,653 | 24.5% | 4,323 | 46.2% | 7,786 | 45.2% |
| No earnings | 0 | 0.0% | 0 | 0.0% | 35 | 0.2% |
| With earnings: | 2,653 | 24.5% | 4,323 | 46.2% | 7,751 | 45.0% |
| $ 1 to $ 9,999 or loss | 142 | 1.3% | 268 | 2.9% | 81 | 0.5% |
| $ 10,000 to $ 19,999 | 452 | 4.2% | 910 | 9.7% | 606 | 3.5% |
| $ 20,000 to $ 29,999 | 605 | 5.6% | 951 | 10.2% | 882 | 5.1% |
| $ 30,000 to $ 49,999 | 1,095 | 10.1% | 1,322 | 14.1% | 1,748 | 10.1% |
| $ 50,000 to $ 74,999 | 308 | 2.8% | 490 | 5.2% | 2,152 | 12.5% |
| $ 75,000 or more | 51 | 0.5% | 382 | 4.1% | 2,282 | 13.2% |
| Other: | 8,187 | 75.5% | 5,025 | 53.8% | 9,455 | 54.8% |
| No earnings | 3,776 | 34.8% | 2,723 | 29.1% | 5,846 | 33.9% |
| With earnings: less than full time, year-round | 4,411 | 40.7% | 2,302 | 24.6% | 3,609 | 20.9% |
| Male: | 5,216 | 48.1% | 4,835 | 51.7% | 8,413 | 48.8% |
| Worked full-time, year-round in the past 12 months: | 1,528 | 14.1% | 2,987 | 32.0% | 4,556 | 26.4% |
| No earnings | 0 | 0.0% | 0 | 0.0% | 35 | 0.2% |
| With earnings: | 1,528 | 14.1% | 2,987 | 32.0% | 4,521 | 26.2% |
| $ 1 to $ 9,999 or loss | 59 | 0.5% | 67 | 0.7% | 21 | 0.1% |
| $ 10,000 to $ 19,999 | 236 | 2.2% | 394 | 4.2% | 174 | 1.0% |
| $ 20,000 to $ 29,999 | 193 | 1.8% | 669 | 7.2% | 406 | 2.4% |
| $ 30,000 to $ 49,999 | 805 | 7.4% | 1,081 | 11.6% | 835 | 4.8% |
| $ 50,000 to $ 74,999 | 184 | 1.7% | 459 | 4.9% | 1,100 | 6.4% |
| $ 75,000 or more | 51 | 0.5% | 317 | 3.4% | 1,985 | 11.5% |

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| Other: | 3,688 | 34.0% | 1,848 | 19.8% | 3,857 | 22.4% |
| No earnings | 1,525 | 14.1% | 674 | 7.2% | 2,247 | 13.0% |
| With earnings: | 2,163 | 20.0% | 1,174 | 12.6% | 1,610 | 9.3% |
| Female: | 5,624 | 51.9% | 4,513 | 48.3% | 8,828 | 51.2% |
| Worked full-time, year-round in the past 12 months: | 1,125 | 10.4% | 1,336 | 14.3% | 3,230 | 18.7% |
| No earnings | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| With earnings: | 1,125 | 10.4% | 1,336 | 14.3% | 3,230 | 18.7% |
| $ 1 to $ 9,999 or loss | 83 | 0.8% | 201 | 2.2% | 60 | 0.3% |
| $ 10,000 to $ 19,999 | 216 | 2.0% | 516 | 5.5% | 432 | 2.5% |
| $ 20,000 to $ 29,999 | 412 | 3.8% | 282 | 3.0% | 476 | 2.8% |
| $ 30,000 to $ 49,999 | 290 | 2.7% | 241 | 2.6% | 913 | 5.3% |
| $ 50,000 to $ 74,999 | 124 | 1.1% | 31 | 0.3% | 1,052 | 6.1% |
| $ 75,000 or more | 0 | 0.0% | 65 | 0.7% | 297 | 1.7% |
| Other: | 4,499 | 41.5% | 3,177 | 34.0% | 5,598 | 32.5% |
| No earnings | 2,251 | 20.8% | 2,049 | 21.9% | 3,599 | 20.9% |
| With earnings: | 2,248 | 20.7% | 1,128 | 12.1% | 1,999 | 11.6% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey
http://www.census.gov/acs/www/UseData/index.htm

## Employment and Earnings in in the Past 12 Months (16 Years and Over)

## Waller County, Texas



Source: B20005. SEX BY WORK EXPERIENCE IN THE PAST 12 MONTHS BY EARNINGS IN THE PAST 12 MONTHS
(IN 2017 INFLATION-ADJUSTED DOLLARS) FOR THE POPULATION 16 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**C21001. SEX BY AGE BY VETERAN STATUS FOR THE CIVILIAN POPULATION 18 YEARS AND OVER**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **10,609** | **100.0%** | **8,736** | **100.0%** | **16,709** | **100.0%** |
| Veteran | 279 | 2.6% | 173 | 2.0% | 1,430 | 8.6% |
| Nonveteran | 10,330 | 97.4% | 8,563 | 98.0% | 15,279 | 91.4% |
| Male: | 5,037 | 47.5% | 4,549 | 52.1% | 8,158 | 48.8% |
| 18 to 64 years: | 4,637 | 43.7% | 4,218 | 48.3% | 6,321 | 37.8% |
| Veteran | 137 | 1.3% | 104 | 1.2% | 563 | 3.4% |
| Nonveteran | 4,500 | 42.4% | 4,114 | 47.1% | 5,758 | 34.5% |
| 65 years and over: | 400 | 3.8% | 331 | 3.8% | 1,837 | 11.0% |
| Veteran | 89 | 0.8% | 59 | 0.7% | 731 | 4.4% |
| Nonveteran | 311 | 2.9% | 272 | 3.1% | 1,106 | 6.6% |
| Female: | 5,572 | 52.5% | 4,187 | 47.9% | 8,551 | 51.2% |
| 18 to 64 years: | 5,016 | 47.3% | 3,870 | 44.3% | 6,530 | 39.1% |
| Veteran | 50 | 0.5% | 10 | 0.1% | 91 | 0.5% |
| Nonveteran | 4,966 | 46.8% | 3,860 | 44.2% | 6,439 | 38.5% |
| 65 years and over: | 556 | 5.2% | 317 | 3.6% | 2,021 | 12.1% |
| Veteran | 3 | 0.0% | 0 | 0.0% | 45 | 0.3% |
| Nonveteran | 553 | 5.2% | 317 | 3.6% | 1,976 | 11.8% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

## Veterans in the Civilian Population 18 Years and Over

## Waller County, Texas



Source:   C21001. SEX BY AGE BY VETERAN STATUS FOR THE CIVILIAN POPULATION 18 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B22005. RECEIPT OF FOOD STAMPS/SNAP IN THE PAST 12 MONTHS BY RACE OF HOUSEHOLDER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **3,190** | **100.0%** | **3,282** | **100.0%** | **7,924** | **100.0%** |
| HH received Food Stamps/SNAP in the past 12 months | 1,135 | 35.6% | 646 | 19.7% | 666 | 8.4% |
| HH did not receive Food Stamps/SNAP in the past 12 months | 2,055 | 64.4% | 2,636 | 80.3% | 7,258 | 91.6% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey
http://www.census.gov/acs/www/UseData/index.htm

## Receipt of Food Stamps/SNAP in the Past 12 Months by Household

## Waller County, Texas



Source:  B22005. RECEIPT OF FOOD STAMPS/SNAP IN THE PAST 12 MONTHS BY RACE OF HOUSEHOLDER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**C23002. SEX BY AGE BY EMPLOYMENT STATUS FOR THE POPULATION 16 YEARS AND OVER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **10,840** | **100.0%** | **9,348** | **100.0%** | **17,241** | **100.0%** |
| In labor force: | 6,229 | 57.5% | 6,188 | 66.2% | 10,854 | 63.0% |
| In Armed Forces | 0 | 0.0% | 3 | 0.0% | 0 | 0.0% |
| Civilian: | 6,114 | 56.4% | 6,071 | 64.9% | 9,832 | 57.0% |
| Employed | 5,130 | 47.3% | 5,850 | 62.6% | 10,447 | 60.6% |
| Unemployed | 1,099 | 10.1% | 335 | 3.6% | 407 | 2.4% |
| Not in labor force | 4,611 | 42.5% | 3,160 | 33.8% | 6,387 | 37.0% |
| Male: | 5,216 | 48.1% | 4,835 | 51.7% | 8,413 | 48.8% |
| 16 to 64 years: | 4,816 | 44.4% | 4,504 | 48.2% | 6,576 | 38.1% |
| In labor force: | 3,218 | 29.7% | 3,890 | 41.6% | 5,440 | 31.6% |
| In Armed Forces | 0 | 0.0% | 3 | 0.0% | 0 | 0.0% |
| Civilian: | 3,218 | 29.7% | 3,887 | 41.6% | 5,440 | 31.6% |
| Employed | 2643 | 24.4% | 3711 | 39.7% | 5162 | 29.9% |
| Unemployed | 575 | 5.3% | 176 | 1.9% | 278 | 1.6% |
| Not in labor force | 1,598 | 14.7% | 614 | 6.6% | 1,136 | 6.6% |
| 65 years and over: | 400 | 3.7% | 331 | 3.5% | 1,837 | 10.7% |
| In labor force: | 51 | 0.5% | 85 | 0.9% | 630 | 3.7% |
| Employed | 51 | 0.5% | 85 | 0.9% | 630 | 3.7% |
| Unemployed | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Not in labor force | 349 | 3.2% | 246 | 2.6% | 1,207 | 7.0% |

|  | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
|  | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| Female: | 5,624 | 51.9% | 4,513 | 48.3% | 8,828 | 51.2% |
| 16 to 64 years: | 5,068 | 46.8% | 4,196 | 44.9% | 6,807 | 39.5% |
| In labor force: | 2,896 | 26.7% | 2,184 | 23.4% | 4,392 | 25.5% |
| In Armed Forces | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Civilian: | 2,896 | 26.7% | 2,184 | 23.4% | 4,392 | 25.5% |
| Employed | 2,372 | 21.9% | 2,025 | 21.7% | 4,293 | 24.9% |
| Unemployed | 524 | 4.8% | 159 | 1.7% | 99 | 0.6% |
| Not in labor force | 2,172 | 20.0% | 2,012 | 21.5% | 2,415 | 14.0% |
| 65 years and over: | 556 | 5.1% | 317 | 3.4% | 2,021 | 11.7% |
| In labor force: | 64 | 0.6% | 29 | 0.3% | 392 | 2.3% |
| Employed | 64 | 0.6% | 29 | 0.3% | 362 | 2.1% |
| Unemployed | 0 | 0.0% | 0 | 0.0% | 30 | 0.2% |
| Not in labor force | 492 | 4.5% | 288 | 3.1% | 1,629 | 9.4% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Employment Status for the Population 16 years and over

## Waller County, Texas



Source:   C23002. SEX BY AGE BY EMPLOYMENT STATUS FOR THE POPULATION 16 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Unemployment of Working Age Population  (Ages 16 to 64)
## (As a Percent of 16-64 Civilian Labor Force)

## Waller County, Texas



Source:   C23002. SEX BY AGE BY EMPLOYMENT STATUS FOR THE POPULATION 16 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**C24010. SEX BY OCCUPATION FOR THE CIVILIAN EMPLOYED POPULATION 16 YEARS AND OVER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **5,130** | **100.0%** | **5,850** | **100.0%** | **10,447** | **100.0%** |
| Management, professional, and related occupations | 1,179 | 23.0% | 918 | 15.7% | 3,581 | 34.3% |
| Service occupations | 1,647 | 32.1% | 1,313 | 22.4% | 1,642 | 15.7% |
| Sales and office occupations | 1,330 | 25.9% | 1,349 | 23.1% | 2,594 | 24.8% |
| Natural resources, construction, and maintenance occupations: | 319 | 6.2% | 1,131 | 19.3% | 1,564 | 15.0% |
| Production, transportation, and material moving occupations | 655 | 12.8% | 1,139 | 19.5% | 1,066 | 10.2% |
| Male: | 2,694 | 52.5% | 3,796 | 64.9% | 5,792 | 55.4% |
| Management, business, science, and arts occupations: | 653 | 12.7% | 516 | 8.8% | 1,931 | 18.5% |
| Service occupations | 503 | 9.8% | 748 | 12.8% | 702 | 6.7% |
| Sales and office occupations | 698 | 13.6% | 454 | 7.8% | 953 | 9.1% |
| Natural resources, construction, and maintenance occupations: | 305 | 5.9% | 1,063 | 18.2% | 1,385 | 13.3% |
| Production, transportation, and material moving occupations | 535 | 10.4% | 1,015 | 17.4% | 821 | 7.9% |
| Female: | 2,436 | 47.5% | 2,054 | 35.1% | 4,655 | 44.6% |
| Management, professional, and related occupations | 526 | 10.3% | 402 | 6.9% | 1,650 | 15.8% |
| Service occupations | 1,144 | 22.3% | 565 | 9.7% | 940 | 9.0% |
| Sales and office occupations | 632 | 12.3% | 895 | 15.3% | 1,641 | 15.7% |
| Natural resources, construction, and maintenance occupations: | 14 | 0.3% | 68 | 1.2% | 179 | 1.7% |
| Production, transportation, and material moving occupations | 120 | 2.3% | 124 | 2.1% | 245 | 2.3% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey
http://www.census.gov/acs/www/UseData/index.htm

## Occupation for the Civilian Employed 16 Years and Over Population

## Waller County, Texas



Source:   C24010. SEX BY OCCUPATION FOR THE CIVILIAN EMPLOYED POPULATION 16 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B25003. TENURE - Universe: OCCUPIED HOUSING UNITS**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **3,190** | **100.0%** | **3,282** | **100.0%** | **7,924** | **100.0%** |
| Owner occupied | 1,277 | 40.0% | 2,341 | 71.3% | 6,217 | 78.5% |
| Renter occupied | 1,913 | 60.0% | 941 | 28.7% | 1,707 | 21.5% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions,
http://www.census.gov/acs/www/UseData/index.h

## Home Owners and Renters by Household

## Waller County, Texas



Legend: African American, Latino, Non-Hispanic White

Owner occupied: 40.0%, 71.3%, 78.5%
Renter occupied: 60.0%, 28.7%, 21.5%

Source:   B25003. TENURE - Universe: OCCUPIED HOUSING UNITS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B25014. OCCUPANTS PER ROOM  -  Universe: OCCUPIED HOUSING UNITS**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **3,190** | **100.0%** | **3,282** | **100.0%** | **7,924** | **100.0%** |
| 1.00 or less occupants per room | 2,896 | 90.8% | 2,820 | 85.9% | 7,717 | 97.4% |
| 1.01 or more occupants per room | 294 | 9.2% | 462 | 14.1% | 207 | 2.6% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions,
http://www.census.gov/acs/www/UseData/index.ht

## More than One Person per Room (Crowding) by Household
## Waller County, Texas



Source:   B25014. OCCUPANTS PER ROOM  -   Universe: OCCUPIED HOUSING UNITS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B18101. AGE BY DISABILITY STATUS**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **12,215** | **100.0%** | **14,193** | **100.0%** | **20,672** | **100.0%** |
| Under 18 years: | 1,632 | 13.4% | 5,491 | 38.7% | 4,128 | 20.0% |
| With a disability | 40 | 0.3% | 146 | 1.0% | 99 | 0.5% |
| No disability | 1,592 | 13.0% | 5,345 | 37.7% | 4,029 | 19.5% |
| 18 to 64 years: | 9,627 | 78.8% | 8,054 | 56.7% | 12,810 | 62.0% |
| With a disability | 854 | 7.0% | 614 | 4.3% | 1,752 | 8.5% |
| No disability | 8,773 | 71.8% | 7,440 | 52.4% | 11,058 | 53.5% |
| 65 years and over: | 956 | 7.8% | 648 | 4.6% | 3,734 | 18.1% |
| With a disability | 492 | 4.0% | 330 | 2.3% | 1,620 | 7.8% |
| No disability | 464 | 3.8% | 318 | 2.2% | 2,114 | 10.2% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Disability by Age

## Waller County, Texas



Source: B18101. AGE BY DISABILITY STATUS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**C27001B. HEALTH INSURANCE COVERAGE STATUS BY AGE**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Waller County, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| Total: | **12,215** | **100.0%** | **14,193** | **100.0%** | **20,672** | **100.0%** |
| Under 18 years: | 2,885 | 23.6% | 5,827 | 41.1% | 4,536 | 21.9% |
| With health insurance coverage | 2,619 | 21.4% | 4,860 | 34.2% | 4,327 | 20.9% |
| No health insurance coverage | 266 | 2.2% | 967 | 6.8% | 209 | 1.0% |
| 18 to 64 years: | 8,374 | 68.6% | 7,718 | 54.4% | 12,402 | 60.0% |
| With health insurance coverage | 5,993 | 49.1% | 4,081 | 28.8% | 10,107 | 48.9% |
| No health insurance coverage | 2,381 | 19.5% | 3,637 | 25.6% | 2,295 | 11.1% |
| 65 years and over: | 956 | 7.8% | 648 | 4.6% | 3,734 | 18.1% |
| With health insurance coverage | 925 | 7.6% | 608 | 4.3% | 3,734 | 18.1% |
| No health insurance coverage | 31 | 0.3% | 40 | 0.3% | 0 | 0.0% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey


For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Lack of Health Insurance Coverage by Age

## Waller County, Texas



Source:   C27001B. HEALTH INSURANCE COVERAGE STATUS BY AGE
Data Set: 2013-2017 American Community Survey 5-Year Estimates

# EXHIBIT B

# Selected Socio-Economic Data

## Prairie View African Americans vis-a-vis Waller County Anglos

## African American and White, Not Hispanic

## Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Population by Age

### Prairie View African Americans vis-a-vis Waller County Anglos



Source:   B01001. SEX BY AGE
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Citizenship Status of Voting Age Population (18 and Over)

## Prairie View African Americans vis-a-vis Waller County Anglos



Source:   B05003. SEX BY AGE BY CITIZENSHIP STATUS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Geographical Mobility in the Past Year (Population 1 Year and Over)

## Prairie View African Americans vis-a-vis Waller County Anglos



Source:   B07004. GEOGRAPHICAL MOBILITY IN THE PAST YEAR BY RACE FOR CURRENT RESIDENCE IN THE UNITED STATES - Universe:
POPULATION 1 YEAR AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

# Means of Transportation to Work (Workers 16 Years and Over)

## Prairie View African Americans vis-a-vis Waller County Anglos



Source:  B08105. MEANS OF TRANSPORTATION TO WORK - Universe: WORKERS 16 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Household Type for Population in Households

## Prairie View African Americans vis-a-vis Waller County Anglos



Source:   B11002. HOUSEHOLD TYPE BY RELATIVES AND NONRELATIVES FOR POPULATION IN HOUSEHOLDS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Marital Status for the Population 15 Years and Over

## Prairie View African Americans vis-a-vis Waller County Anglos



Source: B12002. MARITAL STATUS FOR THE POPULATION 15 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Educational Attainment for the Population 25 Years and Older

## Prairie View African Americans vis-a-vis Waller County Anglos



Source: C15002. SEX BY EDUCATIONAL ATTAINMENT FOR THE POPULATION 25 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Speak English "Less than Very Well" (Population 5 Years and Over)

## Prairie View African Americans vis-a-vis Waller County Anglos



Source:  B16005. NATIVITY BY LANGUAGE SPOKEN AT HOME BY ABILITY TO SPEAK ENGLISH FOR THE POPULATION 5 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Family Households Below Poverty in the Past 12 Months

## Prairie View African Americans vis-a-vis Waller County Anglos



Source:   B17010. POVERTY STATUS IN THE PAST 12 MONTHS OF FAMILIES BY FAMILY TYPE BY PRESENCE OF RELATED CHILDREN UNDER 18 YEARS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**Female-headed Households with Related Children Below Poverty in the Past 12 Months**

**Prairie View African Americans vis-a-vis Waller County Anglos**



Source:   B17010. POVERTY STATUS IN THE PAST 12 MONTHS OF FAMILIES BY FAMILY TYPE BY PRESENCE OF RELATED CHILDREN UNDER 18 YEARS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**Population Below Poverty in the Past 12 Months**

**Prairie View African Americans vis-a-vis Waller County Anglos**



Source: B17020 POVERTY STATUS IN THE PAST 12 MONTHS BY AGE - Universe: POPULATION FOR WHOM POVERTY STATUS IS DETERMINED
Data Set: 2013-2017 American Community Survey 5-Year Estimates

# Household Income in the Past 12 Months

## Prairie View African Americans vis-a-vis Waller County Anglos



Source: B19001. HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Median Household Income in the Past 12 Months

## Prairie View African Americans vis-a-vis Waller County Anglos



Source: B19013. MEDIAN HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Family Income in the Past 12 Months

## Prairie View African Americans vis-a-vis Waller County Anglos



Source:   B19101. FAMILY INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Median Family Income in the Past 12 Months

## Prairie View African Americans vis-a-vis Waller County Anglos



Source:   B19113. MEDIAN FAMILY INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Median Non-Family Income in the Past 12 Months

## Prairie View African Americans vis-a-vis Waller County Anglos



Source:   B19202. MEDIAN NONFAMILY HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Per capita Income in the Past 12 Months

## Prairie View African Americans vis-a-vis Waller County Anglos



Source:   B19301. PER CAPITA INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Median earnings in the Past 12 Months (16 Years and Over with Earnings)

## Prairie View African Americans vis-a-vis Waller County Anglos



Source: B20017. MEDIAN EARNINGS IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS) BY SEX BY WORK EXPERIENCE IN THE PAST 12 MONTHS FOR THE POPULATION 16 YEARS AND OVER WITH EARNINGS IN THE PAST 12 MONTHS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Veterans in the Civilian Population 18 Years and Over

## Prairie View African Americans vis-a-vis Waller County Anglos



Source: C21001. SEX BY AGE BY VETERAN STATUS FOR THE CIVILIAN POPULATION 18 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Employment and Earnings in in the Past 12 Months (16 Years and Over)

## Prairie View African Americans vis-a-vis Waller County Anglos



Source: B20005. SEX BY WORK EXPERIENCE IN THE PAST 12 MONTHS BY EARNINGS IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS) FOR THE POPULATION 16 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Receipt of Food Stamps/SNAP in the Past 12 Months by Household

## Prairie View African Americans vis-a-vis Waller County Anglos



Source: B22005. RECEIPT OF FOOD STAMPS/SNAP IN THE PAST 12 MONTHS BY RACE OF HOUSEHOLDER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Employment Status for the Population 16 years and over

## Prairie View African Americans vis-a-vis Waller County Anglos



Source:   C23002. SEX BY AGE BY EMPLOYMENT STATUS FOR THE POPULATION 16 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Unemployment of Working Age Population (Ages 16 to 64)
## (As a Percent of 16-64 Civilian Labor Force)

### Prairie View African Americans vis-a-vis Waller County Anglos



Source:   C23002. SEX BY AGE BY EMPLOYMENT STATUS FOR THE POPULATION 16 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

# Occupation for the Civilian Employed 16 Years and Over Population

## Prairie View African Americans vis-a-vis Waller County Anglos



Source: C24010. SEX BY OCCUPATION FOR THE CIVILIAN EMPLOYED POPULATION 16 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Home Owners and Renters by Household

## Prairie View African Americans vis-a-vis Waller County Anglos



Source:   B25003. TENURE - Universe: OCCUPIED HOUSING UNITS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## More than One Person per Room (Crowding) by Household

## Prairie View African Americans vis-a-vis Waller County Anglos



Source:   B25014. OCCUPANTS PER ROOM  -   Universe: OCCUPIED HOUSING UNITS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Disability by Age

## Prairie View African Americans vis-a-vis Waller County Anglos



Source:   B18101. AGE BY DISABILITY STATUS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Lack of Health Insurance Coverage by Age

## Prairie View African Americans vis-a-vis Waller County Anglos



Source: C27001B. HEALTH INSURANCE COVERAGE STATUS BY AGE
Data Set: 2013-2017 American Community Survey 5-Year Estimates

# EXHIBIT C

# Selected Socio-Economic Data

## Prairie View city, Texas

### Single-Race African Americans and Latinos vis-à-vis Non-Hispanic Whites

### Data Set: 2013-2017 American Community Survey 5-Year Estimates

14-Jun-19

**C02003.DETAILED RACE - Universe: TOTAL POPULATION**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | |
|---|---|---|---|
| | Population | Margin of Error (+/-) | % of Total |
| **Total:** | **6,286** | **16** | **100.0%** |
| Population of one race: | 6,122 | 112 | 97.4% |
| White | 868 | 842 | 13.8% |
| Black or African American | 5,034 | 1,026 | 80.1% |
| American Indian and Alaska Native | 0 | 19 | 0.0% |
| Asian alone | 96 | 75 | 1.5% |
| Native Hawaiian and Other Pacific Islander | 20 | 27 | 0.3% |
| Some other race | 104 | 63 | 1.7% |
| Population of two or more races: | 164 | 109 | 2.6% |
| Two races including Some other race | 1 | 3 | 0.0% |
| Two races excluding Some other race, and three or more races | 163 | 109 | 2.6% |
| Population of two races: | 113 | 79 | 1.8% |
| White; Black or African American | 67 | 55 | 1.1% |
| White; American Indian and Alaska Native | 24 | 34 | 0.4% |
| White; Asian | 2 | 5 | 0.0% |
| Black or African American; American Indian and Alaska Native | 2 | 6 | 0.0% |
| All other two race combinations | 18 | 36 | 0.3% |
| Population of three races | 51 | 41 | 0.8% |
| Population of four or more races | 0 | 19 | 0.0% |

Note: Hispanics may be of any race. See Table B03002 and chart.

Source: U.S. Census Bureau, 2013-2017 American Community Survey

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

# Population by Race

## Prairie View city, Texas



Source:   C02003.DETAILED RACE - Universe:  TOTAL POPULATION
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B03002. HISPANIC OR LATINO ORIGIN BY RACE - Universe: TOTAL POPULATION**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | |
|---|---|---|---|
| | Population | Margin of Error (+/-) | % of Total |
| **Total:** | 6,286 | 16 | **100.0%** |
| Not Hispanic or Latino: | 5,674 | 323 | 90.3% |
| White alone | 448 | 569 | 7.1% |
| Black or African American alone | 4,944 | 1,006 | 78.7% |
| American Indian and Alaska Native alone | 0 | 19 | 0.0% |
| Asian alone | 96 | 75 | 1.5% |
| Native Hawaiian and Other Pacific Islander alone | 20 | 27 | 0.3% |
| Some other race alone | 22 | 48 | 0.3% |
| Two or more races: | 144 | 111 | 2.3% |
| Two races including Some other race | 1 | 3 | 0.0% |
| Two races excluding Some other race, and three or more races | 143 | 111 | 2.3% |
| Hispanic or Latino | 612 | 320 | 9.7% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Non-Hispanic by Race and Hispanic Population

## Prairie View city, Texas



Source:   B03002. HISPANIC OR LATINO ORIGIN BY RACE - Universe: TOTAL POPULATION
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B03002. HISPANIC OR LATINO ORIGIN BY RACE**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | |
|---|---|---|---|
| | Population | Margin of Error (+/-) | % of Total |
| Hispanic or Latino: | 612 | 320 | **100.0%** |
| White alone | 420 | 289 | 68.6% |
| Black or African American alone | 90 | 49 | 14.7% |
| American Indian and Alaska Native alone | 0 | 19 | 0.0% |
| Asian alone | 0 | 19 | 0.0% |
| Native Hawaiian and Other Pacific Islander alone | 0 | 19 | 0.0% |
| Some other race alone | 82 | 70 | 13.4% |
| Two or more races: | 20 | 21 | 3.3% |
| Two races including Some other race | 0 | 19 | 0.0% |
| Two races excluding Some other race, and three or more races | 20 | 21 | 3.3% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.
http://www.census.gov/acs/www/UseData/index.htm

## Hispanic or Latino Origin by Race

## Prairie View city, Texas



Source:   B03002. HISPANIC OR LATINO ORIGIN BY RACE
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B01001. SEX BY AGE**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
|---|---|---|---|---|---|---|
| | \multicolumn spanning: **Prairie View city, Texas** | | | | | |
| **Total:** | **5,034** | **100.0%** | **612** | **100.0%** | **448** | **100.0%** |
| Under 18 years | 248 | 4.9% | 43 | 7.0% | 28 | 6.3% |
| 18 to 64 years | 4,672 | 92.8% | 560 | 91.5% | 418 | 93.3% |
| 65 years and over | 114 | 2.3% | 9 | 1.5% | 2 | 0.4% |
| Male: | 1,990 | 39.5% | 207 | 33.8% | 42 | 9.4% |
| Under 18 years | 138 | 2.7% | 14 | 2.3% | 5 | 1.1% |
| 18 to 64 years | 1,797 | 35.7% | 184 | 30.1% | 37 | 8.3% |
| 65 years and over | 55 | 1.1% | 9 | 1.5% | 0 | 0.0% |
| Female: | 3,044 | 60.5% | 405 | 66.2% | 406 | 90.6% |
| Under 18 years | 110 | 2.2% | 29 | 4.7% | 23 | 5.1% |
| 18 to 64 years | 2,875 | 57.1% | 376 | 61.4% | 381 | 85.0% |
| 65 years and over | 59 | 1.2% | 0 | 0.0% | 2 | 0.4% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see http://www.census.gov/acs/www/UseData/index.htm

## Population by Age

## Prairie View city, Texas



Source:   B01001. SEX BY AGE
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B05003. SEX BY AGE BY CITIZENSHIP STATUS**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total by Age | Latino | % of Latino Total by Age | White, Not Hispanic | % of NHW Total by Age |
| Total: | **5,034** | **100.0%** | **612** | **100.0%** | **448** | **100.0%** |
| **Under 18 years:** | **248** | **100.0%** | **43** | **100.0%** | **28** | **100.0%** |
| Native | 234 | 94.4% | 43 | 100.0% | 28 | 100.0% |
| Foreign born: | 14 | 5.6% | 0 | 0.0% | 0 | 0.0% |
| Naturalized U.S. citizen | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Not a U.S. citizen | 14 | 5.6% | 0 | 0.0% | 0 | 0.0% |
| **18 years and over:** | **4,786** | **100.0%** | **569** | **100.0%** | **420** | **100.0%** |
| Native | 4,596 | 96.0% | 477 | 83.8% | 409 | 97.4% |
| Foreign born: | 190 | 4.0% | 92 | 16.2% | 11 | 2.6% |
| Naturalized U.S. citizen | 37 | 0.8% | 15 | 2.6% | 2 | 0.5% |
| Not a U.S. citizen | 153 | 3.2% | 77 | 13.5% | 9 | 2.1% |
| **Male:** | 1,990 | 39.5% | 207 | 33.8% | 42 | 9.4% |
| **Under 18 years:** | 138 | **100.0%** | 14 | **100.0%** | 5 | **100.0%** |
| Native | 130 | 94.2% | 14 | 100.0% | 5 | 100.0% |
| Foreign born: | 8 | 5.8% | 0 | 0.0% | 0 | 0.0% |
| Naturalized U.S. citizen | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Not a U.S. citizen | 8 | 5.8% | 0 | 0.0% | 0 | 0.0% |
| **18 years and over:** | **1,852** | **100.0%** | **193** | **100.0%** | **37** | **100.0%** |
| Native | 1,783 | 96.3% | 147 | 76.2% | 28 | 75.7% |
| Foreign born: | 69 | 3.7% | 46 | 23.8% | 9 | 24.3% |
| Naturalized U.S. citizen | 13 | 0.7% | 9 | 4.7% | 0 | 0.0% |
| Not a U.S. citizen | 56 | 3.0% | 37 | 19.2% | 9 | 24.3% |

| | Prairie View city, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA by Age | Latino | % of Latino by Age | White, Not Hispanic | % of NHW by Age |
| **Female:** | 3,044 | 60.5% | 405 | 66.2% | 406 | 90.6% |
| **Under 18 years:** | **110** | **100.0%** | **29** | **100.0%** | **23** | **100.0%** |
| Native | 104 | 94.5% | 29 | 100.0% | 23 | 100.0% |
| Foreign born: | 6 | 5.5% | 0 | 0.0% | 0 | 0.0% |
| Naturalized U.S. citizen | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Not a U.S. citizen | 6 | 5.5% | 0 | 0.0% | 0 | 0.0% |
| **18 years and over:** | **2,934** | **100.0%** | **376** | **100.0%** | **383** | **100.0%** |
| Native | 2,813 | 95.9% | 330 | 87.8% | 381 | 99.5% |
| Foreign born: | 121 | 4.1% | 46 | 12.2% | 2 | 0.5% |
| Naturalized U.S. citizen | 24 | 0.8% | 6 | 1.6% | 2 | 0.5% |
| Not a U.S. citizen | 97 | 3.3% | 40 | 10.6% | 0 | 0.0% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Citizenship Status of Voting Age Population (18 and Over)

## Prairie View city, Texas



Source: B05003. SEX BY AGE BY CITIZENSHIP STATUS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B07004. GEOGRAPHICAL MOBILITY IN THE PAST YEAR BY RACE FOR CURRENT RESIDENCE IN THE UNITED STATES - Universe: POPULATION 1 YEAR AND OVER**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| Total: | **5,027** | **100.0%** | **608** | **100.0%** | **448** | **100.0%** |
| Same house 1 year ago | 3,266 | 65.0% | 339 | 55.8% | 211 | 47.1% |
| Moved within same county | 298 | 5.9% | 61 | 10.0% | 81 | 18.1% |
| Moved from different county within same state | 1,311 | 26.1% | 164 | 27.0% | 94 | 21.0% |
| Moved from different state | 127 | 2.5% | 44 | 7.2% | 53 | 11.8% |
| Moved from abroad | 25 | 0.5% | 0 | 0.0% | 9 | 2.0% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

## Geographical Mobility in the Past Year (Population 1 Year and Over)

## Prairie View city, Texas



Source:   B07004. GEOGRAPHICAL MOBILITY IN THE PAST YEAR BY RACE FOR CURRENT RESIDENCE IN
THE UNITED STATES - Universe:  POPULATION 1 YEAR AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B08105. MEANS OF TRANSPORTATION TO WORK - Universe: WORKERS 16 YEARS AND OVER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | 1,593 | **100.0%** | 105 | **100.0%** | 172 | **100.0%** |
| Car, truck, or van - drove alone | 745 | 46.8% | 53 | 50.5% | 91 | 52.9% |
| Car, truck, or van - carpooled | 227 | 14.2% | 0 | 0.0% | 19 | 11.0% |
| Public transportation (excluding taxicab) | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Walked | 425 | 26.7% | 52 | 49.5% | 57 | 33.1% |
| Taxicab, motorcycle, bicycle,  or other means | 89 | 5.6% | 0 | 0.0% | 0 | 0.0% |
| Worked at home | 107 | 6.7% | 0 | 0.0% | 5 | 2.9% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey
http://www.census.gov/acs/www/UseData/index.htm

## Means of Transportation to Work (Workers 16 Years and Over)

## Prairie View city, Texas



Source:  B08105. MEANS OF TRANSPORTATION TO WORK - Universe: WORKERS 16 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B11002. HOUSEHOLD TYPE BY RELATIVES AND NONRELATIVES FOR POPULATION IN HOUSEHOLDS**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | 1,726 | **100.0%** | 243 | **100.0%** | 28 | **100.0%** |
| In family households | 756 | 43.8% | 77 | 31.7% | 23 | 82.1% |
| In nonfamily households | 970 | 56.2% | 166 | 68.3% | 5 | 17.9% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

## Household Type for Population in Households

## Prairie View city, Texas



Source:   B11002. HOUSEHOLD TYPE BY RELATIVES AND NONRELATIVES FOR POPULATION IN HOUSEHOLDS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B12002. MARITAL STATUS FOR THE POPULATION 15 YEARS AND OVER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | **Prairie View city, Texas** | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **4,875** | **100.0%** | **590** | **100.0%** | **439** | **100.0%** |
| Never married | 4,533 | 93.0% | 552 | 93.6% | 423 | 96.4% |
| Now married (except separated) | 180 | 3.7% | 38 | 6.4% | 7 | 1.6% |
| Separated | 24 | 0.5% | 0 | 0.0% | 4 | 0.9% |
| Widowed | 64 | 1.3% | 0 | 0.0% | 0 | 0.0% |
| Divorced | 74 | 1.5% | 0 | 0.0% | 5 | 1.1% |
| **Male:** | 1,884 | 38.6% | 193 | 32.7% | 37 | 8.4% |
| Never married | 1,750 | 35.9% | 173 | 29.3% | 31 | 7.1% |
| Now married (except separated) | 75 | 1.5% | 20 | 3.4% | 2 | 0.5% |
| Separated | 0 | 0.0% | 0 | 0.0% | 4 | 0.9% |
| Widowed | 25 | 0.5% | 0 | 0.0% | 0 | 0.0% |
| Divorced | 34 | 0.7% | 0 | 0.0% | 0 | 0.0% |
| **Female:** | 2,991 | 61.4% | 397 | 67.3% | 402 | 91.6% |
| Never married | 2,783 | 57.1% | 379 | 64.2% | 392 | 89.3% |
| Now married (except separated) | 105 | 2.2% | 18 | 3.1% | 5 | 1.1% |
| Separated | 24 | 0.5% | 0 | 0.0% | 0 | 0.0% |
| Widowed | 39 | 0.8% | 0 | 0.0% | 0 | 0.0% |
| Divorced | 40 | 0.8% | 0 | 0.0% | 5 | 1.1% |

Source: U.S. Census Bureau, 2013-2017 American Community

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Marital Status for the Population 15 Years and Over

## Prairie View city, Texas



Source: B12002. MARITAL STATUS FOR THE POPULATION 15 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**C15002. SEX BY EDUCATIONAL ATTAINMENT FOR THE POPULATION 25 YEARS AND OVER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **497** | **100.0%** | **49** | **100.0%** | **25** | **100.0%** |
| Less than high school diploma | 89 | 17.9% | 31 | 63.3% | 0 | 0.0% |
| High school graduate, GED, or alternative | 84 | 16.9% | 18 | 36.7% | 6 | 24.0% |
| Some college or associate's degree | 159 | 32.0% | 0 | 0.0% | 15 | 60.0% |
| Bachelor's degree or higher | 165 | 33.2% | 0 | 0.0% | 4 | 16.0% |
| Male: | 249 | 50.1% | 23 | 46.9% | 15 | 60.0% |
| Less than high school diploma | 43 | 8.7% | 19 | 38.8% | 0 | 0.0% |
| High school graduate, GED, or alternative | 44 | 8.9% | 4 | 8.2% | 4 | 16.0% |
| Some college or associate's degree | 84 | 16.9% | 0 | 0.0% | 9 | 36.0% |
| Bachelor's degree or higher | 78 | 15.7% | 0 | 0.0% | 2 | 8.0% |
| Female: | 248 | 49.9% | 26 | 53.1% | 10 | 40.0% |
| Less than high school diploma | 46 | 9.3% | 12 | 24.5% | 0 | 0.0% |
| High school graduate, GED, or alternative | 40 | 8.0% | 14 | 28.6% | 2 | 8.0% |
| Some college or associate's degree | 75 | 15.1% | 0 | 0.0% | 6 | 24.0% |
| Bachelor's degree or higher | 87 | 17.5% | 0 | 0.0% | 2 | 8.0% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Educational Attainment for the Population 25 Years and Older

## Prairie View city, Texas



Source: C15002. SEX BY EDUCATIONAL ATTAINMENT FOR THE POPULATION 25 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B16005. NATIVITY BY LANGUAGE SPOKEN AT HOME BY ABILITY TO SPEAK ENGLISH FOR THE POPULATION 5 YEARS AND OVER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **5,006** | **100.0%** | **600** | **100.0%** | **448** | **100.0%** |
| Speak only English | 4,893 | 97.7% | 223 | 37.2% | 435 | 97.1% |
| Speak another language | 113 | 2.3% | 377 | 62.8% | 13 | 2.9% |
| Speak English "very well" | 104 | 2.1% | 290 | 48.3% | 13 | 2.9% |
| Speak English "less than very well" | 9 | 0.2% | 87 | 14.5% | 0 | 0.0% |
| Native: | 4,806 | 96.0% | 508 | 84.7% | 437 | 97.5% |
| Speak only English | 4,718 | 94.2% | 223 | 37.2% | 433 | 96.7% |
| Speak another language | 88 | 1.8% | 285 | 47.5% | 4 | 0.9% |
| Speak English "very well" | 81 | 1.6% | 244 | 40.7% | 4 | 0.9% |
| Speak English "less than very well" | 7 | 0.1% | 41 | 6.8% | 0 | 0.0% |
| Foreign born: | 200 | 4.0% | 92 | 15.3% | 11 | 2.5% |
| Speak only English | 175 | 3.5% | 0 | 0.0% | 2 | 0.4% |
| Speak another language | 25 | 0.5% | 92 | 15.3% | 9 | 2.0% |
| Speak English "very well" | 23 | 0.5% | 46 | 7.7% | 9 | 2.0% |
| Speak English "less than very well" | 2 | 0.0% | 46 | 7.7% | 0 | 0.0% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Speak English "Less than Very Well" (Population 5 Years and Over)

## Prairie View city, Texas



**Legend:** ■ African American  ■ Latino  ■ Non-Hispanic White

- African American: 0.2%
- Latino: 14.5%
- Non-Hispanic White: 0.0%

Speak English "less than very well"

Source:  B16005. NATIVITY BY LANGUAGE SPOKEN AT HOME BY ABILITY TO SPEAK ENGLISH FOR THE POPULATION 5 YEARS AND OVER

Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B17010. POVERTY STATUS IN THE PAST 12 MONTHS OF FAMILIES BY FAMILY TYPE BY PRESENCE OF RELATED CHILDREN UNDER 18 YEARS**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **208** | **100.0%** | **14** | **100.0%** | **9** | **100.0%** |
| Income in the past 12 months below poverty level: | 65 | 31.3% | 0 | 0.0% | 4 | 44.4% |
| Married-couple family: | 2 | 1.0% | 0 | 0.0% | 0 | 0.0% |
| With related children under 18 years | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Other family: | 63 | 30.3% | 0 | 0.0% | 4 | 44.4% |
| Male householder, no wife present | 22 | 10.6% | 0 | 0.0% | 4 | 44.4% |
| With related children under 18 years | 22 | 10.6% | 0 | 0.0% | 4 | 44.4% |
| Female householder, no husband present | 41 | 19.7% | 0 | 0.0% | 0 | 0.0% |
| With related children under 18 years | 33 | 15.9% | 0 | 0.0% | 0 | 0.0% |
| level: | 143 | 68.8% | 14 | 100.0% | 5 | 55.6% |
| Married-couple family: | 65 | 31.3% | 11 | 78.6% | 2 | 22.2% |
| With related children under 18 years | 34 | 16.3% | 7 | 50.0% | 0 | 0.0% |
| Other family: | 78 | 37.5% | 3 | 21.4% | 3 | 33.3% |
| Male householder, no wife present | 42 | 20.2% | 3 | 21.4% | 0 | 0.0% |
| With related children under 18 years | 5 | 2.4% | 3 | 21.4% | 0 | 0.0% |
| Female householder, no husband present | 36 | 17.3% | 0 | 0.0% | 3 | 33.3% |
| With related children under 18 years | 13 | 6.3% | 0 | 0.0% | 0 | 0.0% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Family Households Below Poverty in the Past 12 Months

## Prairie View city, Texas



Source: B17010. POVERTY STATUS IN THE PAST 12 MONTHS OF FAMILIES BY FAMILY TYPE BY PRESENCE
OF RELATED CHILDREN UNDER 18 YEARS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Female-headed Households with Related Children Below Poverty in the Past 12 Months

## Prairie View city, Texas



Source:  B17010. POVERTY STATUS IN THE PAST 12 MONTHS OF FAMILIES BY FAMILY TYPE BY PRESENCE
OF RELATED CHILDREN UNDER 18 YEARS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B17020 POVERTY STATUS IN THE PAST 12 MONTHS BY AGE - Universe: POPULATION FOR WHOM POVERTY STATUS IS DETERMINED**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | African American | % of AA By Age | Latino | % of Latino Total | White, Not Hispanic | % of NHW By Age |
| **Total:** | **1,757** | **100.0%** | **102** | **100.0%** | **38** | **100.0%** |
| Income in the past 12 months below poverty level: | 1,025 | 58.3% | 29 | 28.4% | 17 | 44.7% |
| **Under 18 years** | 101 | 46.3% | 0 | 0.0% | 9 | 100.0% |
| **18 to 59 years** | 918 | 66.3% | 29 | 42.0% | 8 | 32.0% |
| **60 years and over** | 6 | 3.9% | 0 | 0.0% | 0 | 0.0% |
| Income in the past 12 months at or above poverty | 732 | 41.7% | 73 | 71.6% | 21 | 55.3% |
| **Under 18 years** | 117 | 53.7% | 24 | 100.0% | 0 | 0.0% |
| **18 to 59 years** | 467 | 33.7% | 40 | 58.0% | 17 | 68.0% |
| **60 years and over** | 148 | 96.1% | 9 | 100.0% | 4 | 100.0% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

## Population Below Poverty in the Past 12 Months

## Prairie View city, Texas



Source:   B17020 POVERTY STATUS IN THE PAST 12 MONTHS BY AGE - Universe: POPULATION FOR WHOM POVERTY STATUS IS DETERMI
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B19001. HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | | | Prairie View city, Texas | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **587** | **100.0%** | **35** | **100.0%** | **14** | **100.0%** |
| Less than $ 10,000 | 188 | 32.0% | 21 | 60.0% | 4 | 28.6% |
| $ 10,000 to $ 14,999 | 41 | 7.0% | 0 | 0.0% | 2 | 14.3% |
| **$ 15,000 to $ 24,999** | 100 | 17.0% | 0 | 0.0% | 0 | 0.0% |
| **$ 25,000 to $ 34,999** | 97 | 16.5% | 4 | 11.4% | 0 | 0.0% |
| **$ 35,000 to $ 49,999** | 67 | 11.4% | 6 | 17.1% | 3 | 21.4% |
| **$ 50,000 to $ 74,999** | 36 | 6.1% | 0 | 0.0% | 3 | 21.4% |
| $ 75,000 to $ 99,999 | 36 | 6.1% | 4 | 11.4% | 0 | 0.0% |
| **$ 100,000 to $ 149,999** | 14 | 2.4% | 0 | 0.0% | 2 | 14.3% |
| $ 150,000 to $ 199,999 | 8 | 1.4% | 0 | 0.0% | 0 | 0.0% |
| $ 200,000 or more | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Household Income in the Past 12 Months

## Prairie View city, Texas



Source: B19001. HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B19013. MEDIAN HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | |
| --- | --- | --- | --- |
| | African American | Latino | White, Not Hispanic |
| Median household income in the past 12 months (in 201 | $ 21,179 | -- | -- |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see http://www.census.gov/acs/www/UseData/index.htm

## Median Household Income in the Past 12 Months

## Prairie View city, Texas



Source:   B19013. MEDIAN HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B19101. FAMILY INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **208** | **100.0%** | **14** | **100.0%** | **9** | **100.0%** |
| Less than $ 10,000 | 10 | 4.8% | 0 | 0.0% | 4 | 44.4% |
| $ 10,000 to $ 14,999 | 26 | 12.5% | 0 | 0.0% | 0 | 0.0% |
| **$ 15,000 to $ 24,999** | **51** | **24.5%** | **0** | **0.0%** | **0** | **0.0%** |
| **$ 25,000 to $ 34,999** | **37** | **17.8%** | **4** | **28.6%** | **0** | **0.0%** |
| **$ 35,000 to $ 49,999** | **10** | **4.8%** | **6** | **42.9%** | **3** | **33.3%** |
| **$ 50,000 to $ 74,999** | **23** | **11.1%** | **0** | **0.0%** | **0** | **0.0%** |
| **$ 100,000 to $ 149,999** | **7** | **3.4%** | **-** | **0.0%** | **2** | **22.2%** |
| $ 150,000 to $ 199,999 | 8 | 3.8% | 0 | 0.0% | 0 | 0.0% |
| $ 200,000 or more | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Family Income in the Past 12 Months

## Prairie View city, Texas



Source:   B19101. FAMILY INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B19113. MEDIAN FAMILY INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | |
|---|---|---|---|
| | African American | Latino | White, Not Hispanic |
| Median family income in the past 12 months (in 2017 inflation-adjusted dollars) | $  31,071 | $  41,250 | -- |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Median Family Income in the Past 12 Months

## Prairie View city, Texas



Source: B19113. MEDIAN FAMILY INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B19202. MEDIAN NONFAMILY HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | **Prairie View city, Texas** | | |
| --- | --- | --- | --- |
| | African American | Latino | White, Not Hispanic |
| Median nonfamily household income in the past 12 months (in 2017 inflation-adjusted dollars) | $    12,396 | -- | -- |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Median Non-Family Income in the Past 12 Months

## Prairie View city, Texas



| ■ African American | ■ Latino | ■ Non-Hispanic White |

$14,000 — $12,396

Median nonfamily household income in the past 12 months (in 2017 inflation-adjusted dollars)

Source:   B19202. MEDIAN NONFAMILY HOUSEHOLD INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B19301. PER CAPITA INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | |
| --- | --- | --- | --- |
| | African American | Latino | White, Not Hispanic |
| Per capita income in the past 12 months (in 2017 inflation-adjusted dollars) | $ 5,979 | $ 3,264 | $ 5,678 |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Per capita Income in the Past 12 Months

## Prairie View city, Texas



Source:   B19301. PER CAPITA INCOME IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS)
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B20017. MEDIAN EARNINGS IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS) BY SEX BY WORK EXPERIENCE IN THE PAST 12 MONTHS FOR THE POPULATION 16 YEARS AND OVER WITH EARNINGS IN THE PAST 12 MONTHS**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | |
|---|---|---|---|
| | African American | Latino | White, Not Hispanic |
| inflation-adjusted dollars) -- | | | |
| Total: | $ 4,608 | $ 4,884 | $ 3,583 |
| Male -- | | | |
| Total | $ 5,059 | -- | -- |
| Worked full-time, year-round in the past 12 months | $ 17,083 | $ 30,694 | -- |
| Other | $ 4,373 | $ 4,125 | -- |
| Female -- | | | |
| Total | $ 4,299 | $ 4,853 | $ 3,500 |
| Worked full-time, year-round in the past 12 months | $ 20,990 | -- | $ 41,250 |
| Other | $ 3,633 | $ 4,706 | $ 3,417 |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

**Median earnings in the Past 12 Months (16 Years and Over with Earnings)**

**Prairie View city, Texas**



Source: B20017. MEDIAN EARNINGS IN THE PAST 12 MONTHS (IN 2017
INFLATION-ADJUSTED DOLLARS) BY SEX BY WORK EXPERIENCE IN THE PAST
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B20005. SEX BY WORK EXPERIENCE IN THE PAST 12 MONTHS BY EARNINGS IN THE PAST 12 MONTHS (IN 2017 INFLATION-ADJUSTED DOLLARS) FOR THE POPULATION 16 YEARS AND OVER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **4,860** | **100.0%** | **588** | **100.0%** | **439** | **100.0%** |
| Worked full-time, year-round in the past 12 months: | 459 | 9.4% | 17 | 2.9% | 10 | 2.3% |
| No earnings | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| With earnings: | 459 | 9.4% | 17 | 2.9% | 10 | 2.3% |
| $ 1 to $ 9,999 or loss | 97 | 2.0% | 0 | 0.0% | 0 | 0.0% |
| $ 10,000 to $ 19,999 | 117 | 2.4% | 0 | 0.0% | 0 | 0.0% |
| $ 20,000 to $ 29,999 | 124 | 2.6% | 4 | 0.7% | 0 | 0.0% |
| $ 30,000 to $ 49,999 | 76 | 1.6% | 13 | 2.2% | 8 | 1.8% |
| $ 50,000 to $ 74,999 | 34 | 0.7% | 0 | 0.0% | 2 | 0.5% |
| $ 75,000 or more | 11 | 0.2% | 0 | 0.0% | 0 | 0.0% |
| Other: | 4,401 | 90.6% | 571 | 97.1% | 429 | 97.7% |
| No earnings | 1,919 | 39.5% | 293 | 49.8% | 139 | 31.7% |
| With earnings: less than full time, year-round | 2,482 | 51.1% | 278 | 47.3% | 290 | 66.1% |
| Male: | 1,884 | 38.8% | 193 | 32.8% | 37 | 8.4% |
| Worked full-time, year-round in the past 12 months: | 215 | 4.4% | 13 | 2.2% | 2 | 0.5% |
| No earnings | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| With earnings: | 215 | 4.4% | 13 | 2.2% | 2 | 0.5% |
| $ 1 to $ 9,999 or loss | 59 | 1.2% | 0 | 0.0% | 0 | 0.0% |
| $ 10,000 to $ 19,999 | 52 | 1.1% | 0 | 0.0% | 0 | 0.0% |
| $ 20,000 to $ 29,999 | 45 | 0.9% | 4 | 0.7% | 0 | 0.0% |
| $ 30,000 to $ 49,999 | 26 | 0.5% | 9 | 1.5% | 0 | 0.0% |
| $ 50,000 to $ 74,999 | 22 | 0.5% | 0 | 0.0% | 2 | 0.5% |
| $ 75,000 or more | 11 | 0.2% | 0 | 0.0% | 0 | 0.0% |

|  | Prairie View city, Texas | | | | | |
|  | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
|---|---|---|---|---|---|---|
| Other: | 1,669 | 34.3% | 180 | 30.6% | 35 | 8.0% |
| No earnings | 760 | 15.6% | 62 | 10.5% | 29 | 6.6% |
| With earnings: | 909 | 18.7% | 118 | 20.1% | 6 | 1.4% |
| Female: | 2,976 | 61.2% | 395 | 67.2% | 402 | 91.6% |
| Worked full-time, year-round in the past 12 months: | 244 | 5.0% | 4 | 0.7% | 8 | 1.8% |
| No earnings | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| With earnings: | 244 | 5.0% | 4 | 0.7% | 8 | 1.8% |
| $ 1 to $ 9,999 or loss | 38 | 0.8% | 0 | 0.0% | 0 | 0.0% |
| $ 10,000 to $ 19,999 | 65 | 1.3% | 0 | 0.0% | 0 | 0.0% |
| $ 20,000 to $ 29,999 | 79 | 1.6% | 0 | 0.0% | 0 | 0.0% |
| $ 30,000 to $ 49,999 | 50 | 1.0% | 4 | 0.7% | 8 | 1.8% |
| $ 50,000 to $ 74,999 | 12 | 0.2% | 0 | 0.0% | 0 | 0.0% |
| $ 75,000 or more | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Other: | 2,732 | 56.2% | 391 | 66.5% | 394 | 89.7% |
| No earnings | 1,159 | 23.8% | 231 | 39.3% | 110 | 25.1% |
| With earnings: | 1,573 | 32.4% | 160 | 27.2% | 284 | 64.7% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey
http://www.census.gov/acs/www/UseData/index.htm

# Employment and Earnings in in the Past 12 Months (16 Years and Over)

## Prairie View city, Texas



Source:   B20005. SEX BY WORK EXPERIENCE IN THE PAST 12 MONTHS BY EARNINGS IN THE PAST 12 MONTHS
(IN 2017 INFLATION-ADJUSTED DOLLARS) FOR THE POPULATION 16 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**C21001. SEX BY AGE BY VETERAN STATUS FOR THE CIVILIAN POPULATION 18 YEARS AND OVER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **4,786** | **100.0%** | **569** | **100.0%** | **420** | **100.0%** |
| Veteran | 22 | 0.5% | 0 | 0.0% | 5 | 1.2% |
| Nonveteran | 4,764 | 99.5% | 569 | 100.0% | 415 | 98.8% |
| Male: | 1,852 | 38.7% | 193 | 33.9% | 37 | 8.8% |
| 18 to 64 years: | 1,797 | 37.5% | 184 | 32.3% | 37 | 8.8% |
| Veteran | 5 | 0.1% | 0 | 0.0% | 2 | 0.5% |
| Nonveteran | 1,792 | 37.4% | 184 | 32.3% | 35 | 8.3% |
| 65 years and over: | 55 | 1.1% | 9 | 1.6% | 0 | 0.0% |
| Veteran | 10 | 0.2% | 0 | 0.0% | 0 | 0.0% |
| Nonveteran | 45 | 0.9% | 9 | 1.6% | 0 | 0.0% |
| Female: | 2,934 | 61.3% | 376 | 66.1% | 383 | 91.2% |
| 18 to 64 years: | 2,875 | 60.1% | 376 | 66.1% | 381 | 90.7% |
| Veteran | 4 | 0.1% | 0 | 0.0% | 3 | 0.7% |
| Nonveteran | 2,871 | 60.0% | 376 | 66.1% | 378 | 90.0% |
| 65 years and over: | 59 | 1.2% | 0 | 0.0% | 2 | 0.5% |
| Veteran | 3 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| Nonveteran | 56 | 1.2% | 0 | 0.0% | 2 | 0.5% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

## Veterans in the Civilian Population 18 Years and Over

## Prairie View city, Texas



Source: C21001. SEX BY AGE BY VETERAN STATUS FOR THE CIVILIAN POPULATION 18 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B22005. RECEIPT OF FOOD STAMPS/SNAP IN THE PAST 12 MONTHS BY RACE OF HOUSEHOLDER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | | | | |
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
|---|---|---|---|---|---|---|
| **Total:** | **587** | **100.0%** | **35** | **100.0%** | **14** | **100.0%** |
| HH received Food Stamps/SNAP in the past 12 months | 103 | 17.5% | 13 | 37.1% | 9 | 64.3% |
| HH did not receive Food Stamps/SNAP in the past 12 months | 484 | 82.5% | 22 | 62.9% | 5 | 35.7% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey
http://www.census.gov/acs/www/UseData/index.htm

## Receipt of Food Stamps/SNAP in the Past 12 Months by Household

## Prairie View city, Texas



Source: B22005. RECEIPT OF FOOD STAMPS/SNAP IN THE PAST 12 MONTHS BY RACE OF HOUSEHOLDER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**C23002. SEX BY AGE BY EMPLOYMENT STATUS FOR THE POPULATION 16 YEARS AND OVER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **4,860** | **100.0%** | **588** | **100.0%** | **439** | **100.0%** |
| In labor force: | 2,095 | 43.1% | 142 | 24.1% | 176 | 40.1% |
| In Armed Forces | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Civilian: | 2,061 | 42.4% | 142 | 24.1% | 176 | 40.1% |
| Employed | 1,699 | 35.0% | 105 | 17.9% | 172 | 39.2% |
| Unemployed | 396 | 8.1% | 37 | 6.3% | 4 | 0.9% |
| Not in labor force | 2,765 | 56.9% | 446 | 75.9% | 263 | 59.9% |
| Male: | 1,884 | 38.8% | 193 | 32.8% | 37 | 8.4% |
| 16 to 64 years: | 1,829 | 37.6% | 184 | 31.3% | 37 | 8.4% |
| In labor force: | 701 | 14.4% | 24 | 4.1% | 6 | 1.4% |
| In Armed Forces | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Civilian: | 701 | 14.4% | 24 | 4.1% | 6 | 1.4% |
| Employed | 632 | 13.0% | 24 | 4.1% | 2 | 0.5% |
| Unemployed | 69 | 1.4% | 0 | 0.0% | 4 | 0.9% |
| Not in labor force | 1,128 | 23.2% | 160 | 27.2% | 31 | 7.1% |
| 65 years and over: | 55 | 1.1% | 9 | 1.5% | 0 | 0.0% |
| In labor force: | 20 | 0.4% | 0 | 0.0% | 0 | 0.0% |
| Employed | 20 | 0.4% | 0 | 0.0% | 0 | 0.0% |
| Unemployed | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Not in labor force | 35 | 0.7% | 9 | 1.5% | 0 | 0.0% |

| | Prairie View city, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| Female: | 2,976 | 61.2% | 395 | 67.2% | 402 | 91.6% |
| 16 to 64 years: | 2,917 | 60.0% | 395 | 67.2% | 400 | 91.1% |
| In labor force: | 1,360 | 28.0% | 118 | 20.1% | 170 | 38.7% |
| In Armed Forces | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Civilian: | 1,360 | 28.0% | 118 | 20.1% | 170 | 38.7% |
| Employed | 1,033 | 21.3% | 81 | 13.8% | 170 | 38.7% |
| Unemployed | 327 | 6.7% | 37 | 6.3% | 0 | 0.0% |
| Not in labor force | 1,557 | 32.0% | 277 | 47.1% | 230 | 52.4% |
| 65 years and over: | 59 | 1.2% | 0 | 0.0% | 2 | 0.5% |
| In labor force: | 14 | 0.3% | 0 | 0.0% | 0 | 0.0% |
| Employed | 14 | 0.3% | 0 | 0.0% | 0 | 0.0% |
| Unemployed | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Not in labor force | 45 | 0.9% | 0 | 0.0% | 2 | 0.5% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

## Employment Status for the Population 16 years and over

## Prairie View city, Texas



Source:   C23002. SEX BY AGE BY EMPLOYMENT STATUS FOR THE POPULATION 16 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

## Unemployment of Working Age Population  (Ages 16 to 64)
## (As a Percent of 16-64 Civilian Labor Force)

### Prairie View city, Texas



Source:   C23002. SEX BY AGE BY EMPLOYMENT STATUS FOR THE POPULATION 16 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**C24010. SEX BY OCCUPATION FOR THE CIVILIAN EMPLOYED POPULATION 16 YEARS AND OVER**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **1,699** | **100.0%** | **105** | **100.0%** | **172** | **100.0%** |
| Management, professional, and related occupations | 289 | 17.0% | 4 | 3.8% | 59 | 34.3% |
| Service occupations | 607 | 35.7% | 25 | 23.8% | 43 | 25.0% |
| Sales and office occupations | 700 | 41.2% | 66 | 62.9% | 70 | 40.7% |
| Natural resources, construction, and maintenance occupations: | 44 | 2.6% | 3 | 2.9% | 0 | 0.0% |
| Production, transportation, and material moving occupations | 59 | 3.5% | 7 | 6.7% | 0 | 0.0% |
| Male: | 652 | 38.4% | 24 | 22.9% | 2 | 1.2% |
| Management, business, science, and arts occupations: | 138 | 8.1% | 4 | 3.8% | 2 | 1.2% |
| Service occupations | 146 | 8.6% | 8 | 7.6% | 0 | 0.0% |
| Sales and office occupations | 283 | 16.7% | 2 | 1.9% | 0 | 0.0% |
| Natural resources, construction, and maintenance occupations: | 30 | 1.8% | 3 | 2.9% | 0 | 0.0% |
| Production, transportation, and material moving occupations | 55 | 3.2% | 7 | 6.7% | 0 | 0.0% |
| Female: | 1,047 | 61.6% | 81 | 77.1% | 170 | 98.8% |
| Management, professional, and related occupations | 151 | 8.9% | 0 | 0.0% | 57 | 33.1% |
| Service occupations | 461 | 27.1% | 17 | 16.2% | 43 | 25.0% |
| Sales and office occupations | 417 | 24.5% | 64 | 61.0% | 70 | 40.7% |
| Natural resources, construction, and maintenance occupations: | 14 | 0.8% | 0 | 0.0% | 0 | 0.0% |
| Production, transportation, and material moving occupations | 4 | 0.2% | 0 | 0.0% | 0 | 0.0% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey
http://www.census.gov/acs/www/UseData/index.htm

## Occupation for the Civilian Employed 16 Years and Over Population

## Prairie View city, Texas



Source:   C24010. SEX BY OCCUPATION FOR THE CIVILIAN EMPLOYED POPULATION 16 YEARS AND OVER
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B25003. TENURE - Universe: OCCUPIED HOUSING UNITS**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **587** | **100.0%** | **35** | **100.0%** | **14** | **100.0%** |
| Owner occupied | 137 | 23.3% | 7 | 20.0% | 5 | 35.7% |
| Renter occupied | 450 | 76.7% | 28 | 80.0% | 9 | 64.3% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions,
http://www.census.gov/acs/www/UseData/index.h

## Home Owners and Renters by Household

## Prairie View city, Texas



Source: B25003. TENURE - Universe: OCCUPIED HOUSING UNITS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B25014. OCCUPANTS PER ROOM  -  Universe: OCCUPIED HOUSING UNITS**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | Prairie View city, Texas | | | | | |
|---|---|---|---|---|---|---|
| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
| **Total:** | **587** | **100.0%** | **35** | **100.0%** | **14** | **100.0%** |
| 1.00 or less occupants per room | 552 | 94.0% | 34 | 97.1% | 14 | 100.0% |
| 1.01 or more occupants per room | 35 | 6.0% | 1 | 2.9% | 0 | 0.0% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions,
http://www.census.gov/acs/www/UseData/index.ht

## More than One Person per Room (Crowding) by Household
## Prairie View city, Texas



■ African American  ■ Latino  ■ Non-Hispanic White

6.0%

2.9%

0.0%

1.01 or more occupants per room

Source:  B25014. OCCUPANTS PER ROOM  -  Universe: OCCUPIED HOUSING UNITS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**B18101. AGE BY DISABILITY STATUS**
Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
|---|---|---|---|---|---|---|
| | **Prairie View city, Texas** | | | | | |
| **Total:** | **5,024** | **100.0%** | **612** | **100.0%** | **448** | **100.0%** |
| Under 18 years: | 248 | 4.9% | 43 | 7.0% | 28 | 6.3% |
| With a disability | 20 | 0.4% | 0 | 0.0% | 0 | 0.0% |
| No disability | 228 | 4.5% | 43 | 7.0% | 28 | 6.3% |
| 18 to 64 years: | 4,662 | 92.8% | 560 | 91.5% | 418 | 93.3% |
| With a disability | 190 | 3.8% | 10 | 1.6% | 19 | 4.2% |
| No disability | 4,472 | 89.0% | 550 | 89.9% | 399 | 89.1% |
| 65 years and over: | 114 | 2.3% | 9 | 1.5% | 2 | 0.4% |
| With a disability | 23 | 0.5% | 0 | 0.0% | 2 | 0.4% |
| No disability | 91 | 1.8% | 9 | 1.5% | 0 | 0.0% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

## Disability by Age

## Prairie View city, Texas



Source:   B18101. AGE BY DISABILITY STATUS
Data Set: 2013-2017 American Community Survey 5-Year Estimates

**C27001B. HEALTH INSURANCE COVERAGE STATUS BY AGE**

Data Set: 2013-2017 American Community Survey 5-Year Estimates

| | African American | % of AA Total | Latino | % of Latino Total | White, Not Hispanic | % of NHW Total |
|---|---|---|---|---|---|---|
| | **Prairie View city, Texas** | | | | | |
| Total: | **5,024** | **100.0%** | **612** | **100.0%** | **448** | **100.0%** |
| Under 18 years: | 1,358 | 27.0% | 235 | 38.4% | 94 | 21.0% |
| With health insurance coverage | 1,184 | 23.6% | 168 | 27.5% | 94 | 21.0% |
| No health insurance coverage | 174 | 3.5% | 67 | 10.9% | 0 | 0.0% |
| 18 to 64 years: | 3,552 | 70.7% | 368 | 60.1% | 352 | 78.6% |
| With health insurance coverage | 2,639 | 52.5% | 213 | 34.8% | 260 | 58.0% |
| No health insurance coverage | 913 | 18.2% | 155 | 25.3% | 92 | 20.5% |
| 65 years and over: | 114 | 2.3% | 9 | 1.5% | 2 | 0.4% |
| With health insurance coverage | 114 | 2.3% | 9 | 1.5% | 2 | 0.4% |
| No health insurance coverage | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |

Source: U.S. Census Bureau, 2013-2017 American Community Survey

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see
http://www.census.gov/acs/www/UseData/index.htm

# Lack of Health Insurance Coverage by Age

## Prairie View city, Texas



Source:   C27001B. HEALTH INSURANCE COVERAGE STATUS BY AGE
Data Set: 2013-2017 American Community Survey 5-Year Estimates

# APPENDIX

*William S. Cooper*
*P.O. Box 16066*
*Bristol, VA 24209*
*276-669-8567*
*bcooper@msn.com*

## Summary of Redistricting Work

I have a B.A. in Economics from Davidson College in Davidson, North Carolina.

Since 1986, I have prepared proposed redistricting maps of approximately 750 jurisdictions for Section 2 litigation, Section 5 comment letters, and for use in other efforts to promote compliance with the Voting Rights Act of 1965. I have analyzed and prepared election plans in over 100 of these jurisdictions for two or more of the decennial censuses – either as part of concurrent legislative reapportionments or, retrospectively, in relation to litigation involving many of the cases listed below.

From 1986 to 2018, I have prepared election plans for Section 2 litigation in Alabama, Connecticut, Florida, Georgia, Louisiana, Maryland, Mississippi, Missouri, Montana, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, South Dakota, Tennessee, Utah, Virginia, Washington, and Wyoming.

## Post-2010 Redistricting Experience

Since the release of the 2010 Census in February 2011, I have developed statewide legislative plans on behalf of clients in eight states (Alabama, Connecticut, Florida, Georgia, Kentucky, South Carolina, Texas, and Virginia), as well as over 150 local redistricting plans in approximately 30 states – primarily for groups working to protect minority voting rights. In addition, I have prepared congressional plans for clients in eight states (Alabama, Florida, Georgia, Louisiana, Maryland, Ohio, Pennsylvania, South Carolina, and Virginia).

In March 2011, I was retained by the Sussex County, Virginia Board of

Supervisors and the Bolivar County, Mississippi Board of Supervisors to draft new district plans based on the 2010 Census. In the summer of 2011, both counties received Section 5 preclearance from the U.S. Department of Justice (DOJ).

Also in 2011, I was retained by way of a subcontract with Olmedillo X5 LLC to assist with redistricting for the Miami-Dade County, Florida Board of Commissioners and the Miami-Dade, Florida School Board. Final plans were adopted in late 2011 following public hearings.

In the fall of 2011, I was retained by the City of Grenada, Mississippi to provide redistricting services. The ward plan I developed received DOJ preclearance in March 2012.

In 2012 and 2013, I served as a redistricting consultant to the Tunica County, Mississippi Board of Supervisors and the Claiborne County, Mississippi Board of Supervisors.

In *Montes v. City of Yakima* (E.D. Wash. Feb. 17, 2015) the court adopted, as a remedy for the Voting Rights Act Section 2 violation, a seven single-member district plan that I developed for the Latino plaintiffs. I served as the expert for the Plaintiffs in the liability and remedy phases of the case.

In *Pope v. Albany County* (N.D.N.Y. Mar. 24, 2015), the court approved, as a remedy for a Section 2 violation, a plan drawn by the defendants, creating a new Black-majority district. I served as the expert for the Plaintiffs in the liability and remedy phases of the case.

In 2016, two redistricting plans that I developed on behalf of the plaintiffs for consent decrees in Section 2 lawsuits in Georgia were adopted (*NAACP v. Fayette County, Georgia* and *NAACP v. Emanuel County, Georgia)*.

In 2016, two federal courts granted summary judgment to the plaintiffs based in part on my *Gingles 1* testimony: *Navajo Nation v. San Juan County, Utah* (C.D. Utah 2016) and NAACP v. *Ferguson-Florissant School District, Missouri* (E. D. Mo. August 22, 2016).

Also in 2016, based in part on my analysis, the City of Pasco, Washington admitted to a Section 2 violation. As a result, in *Glatt v. City of Pasco* (E.D. Wash. Jan. 27, 2017), the court ordered a plan that created three Latino majority single-member districts in a 6 district, 1 at-large plan.

In 2017, a federal court ruled in favor of the plaintiffs in a Section 2 case regarding the 32nd Judicial District in Louisiana, based in part on my *Gingles* 1 testimony in *Terrebonne Parish Branch NAACP et al. v. Jindal et al* (M.D La. August 17, 2017).

In August 2018, the Wenatchee City Council adopted a hybrid election plan that I developed – five single-member districts with two members at-large. The Wenatchee election plan is the first plan adopted under the Washington Voting Rights Acts of 2018.

In February 2019, a federal court ruled in favor of the plaintiffs in a Section 2 case regarding Senate District 22 in Mississippi, based in part on my *Gingles* 1 testimony in *Thomas v. Bryant (S.D. Ms. Feb 16, 2019).*

I currently serve as a redistricting consultant and expert to the City of Decatur, Alabama (V*oketz v. City of Decatur*) and to the State of Maryland (*Benisek v. Lamone).*

I am currently a redistricting consultant and expert for the plaintiffs in ten voting cases –*Navajo Nation v. San Juan County, Utah*; *Terrebonne Parish Branch NAACP et al. v. Jindal et al.*; *Dwight v. Kemp; NAACP v. East Ramapo Central School District; Ohio A. Philip Randolph Institute, et al. v. Ryan; Thomas v. Bryant; Jayla Allen et al. v. Waller County, Texas; Chestnut v. Merrill*; *Alabama State Conference of the NAACP v. State of Alabama;* and *Alabama State Conference of the NAACP v. City of Pleasant Grove*.

Since 2011, I have served as a redistricting and demographic consultant to the Massachusetts-based Prison Policy Initiative and to Demos for a nationwide project to end prison-based gerrymandering. I have analyzed proposed and adopted election plans in about 25 states as part of my work with these two organizations.

**Post-2010 Demographics Experience**

My trial testimony in Section 2 lawsuits usually includes presentations of U.S. Census data with charts, tables, and/or maps to demonstrate socioeconomic disparities between non-Hispanic Whites and racial or ethnic minorities.

I have also served as an expert witness on demographics in non-voting trials. For example, in an April 2017 opinion in *Stout v. Jefferson County Board of Education* (Case no.2:65-cv-00396-MHH), a school desegregation case involving the City of Gardendale, Ala., the court made extensive reference to my testimony.

I provide technical demographic and mapping assistance to the Food Research and Action Center (FRAC) in Washington D.C and their constituent organizations around the country. Most of my work with FRAC involves the Summer Food Program and Child and Adult Care Food Program. Both programs provide nutritional assistance to school-age children who are eligible for free and reduced price meals. As part of this project, I developed an online interactive map to determine site eligibility for the two programs that has been in continuous use by community organizations and school districts around the country since 2003. The map is updated annually with new data from a Special Tabulation of the American Community Survey prepared by the U.S. Census Bureau for the Food and Nutrition Service of the U.S. Department of Agriculture.

**Historical Redistricting Experience**

In the 1980s and 1990s, I developed voting plans in about 400 state and local

jurisdictions – primarily in the South and Rocky Mountain West.  During the 2000s, I prepared draft election plans involving about 300 state and local jurisdictions in 25 states. Most of these plans were prepared at the request of local citizens' groups, national organizations such as the NAACP, tribal governments, and for Section 2 or Section 5 litigation.

Election plans I developed for governments in two counties – Sussex County, Virginia and Webster County, Mississippi –  were adopted and precleared in 2002 by the U.S. Department of Justice. A ward plan I prepared for the City of Grenada, Mississippi was precleared in August 2005. A county supervisors' plan I produced for Bolivar County, Mississippi was precleared in January 2006.

In August 2005, a federal court ordered the State of South Dakota to remedy a Section 2 voting rights violation and adopt a state legislative plan I developed (Bone Shirt v. Hazeltine).

 A county council plan I developed for Native American plaintiffs in a Section 2 lawsuit (*Blackmoon v. Charles Mix County*) was adopted by Charles Mix County, South Dakota in November 2005. A plan I drafted for Latino plaintiffs in Bethlehem, Pennsylvania (*Pennsylvania Statewide Latino Coalition v. Bethlehem Area School District*) was adopted in March 2009. Plans I developed for minority plaintiffs in Columbus County, North Carolina and Cortez-Montezuma School District in Colorado were adopted in 2009.

Since 1986, I have testified at trial as an expert witness on redistricting and demographics in federal courts in the following voting rights cases (approximate most recent testimony dates are in parentheses). I also filed declarations and was deposed in most of these cases.

**Alabama**
*Alabama Legislative Black Caucus et al. v. Alabama et al. (2013)*
*Alabama State Conference of the NAACP v. Alabama (2018)*

**Colorado**
*Cuthair v. Montezuma-Cortez School Board (1997)*

**Georgia**
*Cofield v. City of LaGrange (1996)*
*Love v. Deal (1995)*
*Askew v. City of Rome (1995)*
*Woodard v. Lumber City (1989)*

**Louisiana**
*Knight v. McKeithen (1994)*
*Reno v. Bossier Parish (1995)*
*Wilson v. Town of St. Francisville (1996)*
*Terrebonne Parish NAACP v. Jindal, et al. (2017)*

**Maryland**
*Cane v. Worcester County (1994)*

**Mississippi**
*Addy v Newton County (1995)*
*Boddie v. Cleveland  (2003)*
*Boddie v. Cleveland School District (2010)*
*Ewing v. Monroe County(1995)*
*Fairley v. Hattiesburg (2014)*
*Fairley v. Hattiesburg (2008)*
*Jamison v. City of Tupelo (2006)*
*Gunn v. Chickasaw County   (1995)*
*NAACP v. Fordice (1999)*
*Nichols v. Okolona (1995)*
*Smith v. Clark (2002)*
*Thomas v. Bryant (2019)*

**Montana**
*Old Person v. Cooney (1998)*
*Old Person v. Brown (on remand) (2001)*

**Missouri**
*Missouri NAACP v. Ferguson-Florissant School District (2016)*

**Nebraska**
*Stabler v. Thurston County (1995)*

*New York*
*Arbor Hills Concerned Citizens v. Albany County (2003*
*Pope v. County of Albany (2015)*

**Ohio**
*Ohio A. Philip Randolph Institute, et al. v. Ryan (2019)*

**South Carolina**
*Smith v. Beasley (1996)*

**South Dakota**
*Bone Shirt v. Hazeltine (2004)*
*Cottier v. City of Martin (2004)*

**Tennessee**
*Cousins v. McWherter (1994)*
*Rural West Tennessee  African American Affairs Council v. McWherter (1993)*

**Virginia**
*Henderson v. Richmond County (1988)*
*McDaniel v. Mehfoud (1988)*
*White* v. *Daniel (1989)*
*Smith v. Brunswick County (1991)*

*Wyoming*
*Large v. Fremont County (2007)*

In addition, I have filed expert declarations or been deposed in the following cases that did not require trial testimony. The dates listed indicate the deposition date or date of last declaration or supplemental declaration:

**Alabama**
*Voketz v. City of Decatur (2019)*
*Alabama State NAACP v. City of Pleasant Grove (2019)*
*Chestnut v  Merrill (2019)*

**Florida**
*Calvin v. Jefferson County (2016)*
*Thompson v. Glades County (2001)*
*Johnson v. DeSoto County (1999)*
*Burton v. City of Belle Glade (1997)*

**Georgia**
*Dwight v. Kemp (2018)*
*Georgia NAACP et al. v. Gwinnett County, GA (2018*
*Georgia State Conference NAACP et al v. Georgia (2018)*
*Georgia State Conference NAACP, et al. v. Fayette County (2015)*
*Knighton v. Dougherty County (2002)*
*Johnson v. Miller (1998)*
*Jones v. Cook County (1993)*

**Kentucky**
*Herbert v. Kentucky State Board of Elections (2013)*

**Louisiana**
*NAACP v. St. Landry Parish Council (2005)*
*Rodney v. McKeithen (1993)*
*Prejean v. Foster (1998)*

**Maryland**
*Fletcher  v. Lamone (2011)*
*Benisek v. Lamone (2017)*

**Mississippi**
*Partee v. Coahoma County (2015)*
*Figgs v. Quitman County (2015)*
*West v. Natchez (2015)*
*Williams v. Bolivar County (2005)*
*Clark v. Calhoun County (on remand)(1993)*
*Houston v. Lafayette County (2002)*
*Wilson v. Clarksdale (1992)*
*Stanfield v. Lee County(1991)*
*Teague v. Attala County (on remand)(1993)*

**Montana**
*Alden v. Rosebud County (2000)*

**New York**
*NAACP v. East Ramapo Central School District (2018)*

**North Carolina**
*Lewis v. Alamance County (1991)*
*Gause v. Brunswick County (1992)*
*Webster v. Person County (1992)*

**Rhode Island**
*Davidson v. City of Cranston (2015)*

**South Carolina**
*Vander Linden v. Campbell (1996)*

**South Dakota**
*Emery v. Hunt (1999)*
*Kirkie v. Buffalo County (2004*

**Tennessee**
*NAACP v. Frost, et al. (2003)*

**Texas**
*Jayla Allen et al. v. Waller County (2018)*

**Utah**
*Navajo Nation v. San Juan County (2018)*

**Virginia**
*Moon v. Beyer (1990)*

***Washington***
*Montes v. City of Yakima (2014*
*Glatt v. City of Pasco (2016)*

### # # #

# Exhibit 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

JAYLA ALLEN, et al.,

*Plaintiffs*,

v.

WALLER COUNTY, TEXAS, et al.,

*Defendants*.

Civil Case No. 4:18-cv-3985

## SUPPLEMENTAL DECLARATION OF WILLIAM S. COOPER

In accordance with 28 U.S.C. § 1746, Rules 26(a)(2)(B) and 26(e) of the Federal Rules of Civil Procedure, and Rules 702 and 703 of the Federal Rules of Evidence:

### I.   BACKGROUND, QUALIFICATIONS, AND METHODOLOGY

1. My name is William S. Cooper. I serve as a demographic expert for Plaintiffs. I previously filed declarations in this matter on October 24, 2018,[1] and July 1, 2019.[2]

2. My July 1, 2019 declaration details my methodology. Historical information on my testimony as an expert witness and experience is included in a copy of my curriculum vitae that is attached as an Appendix to my July 1 declaration.

3. For this Supplemental Declaration, Plaintiffs requested that I analyze and provide information on the demographics of specific electoral precincts within Waller County Commissioner Precinct 3 based on U.S. Census Bureau reports.

---

[1]   ECF No. 17-3.
[2]   Declaration of William S. Cooper.

## II. SUPPLEMENTAL GEOGRAPHY AND POPULATION ESTIMATES

4. Although Precinct 3, based on its overall population, is a majority Black electoral district, the Black population within Precinct 3 is not distributed evenly. Precinct 3 includes five electoral precincts: 309, 310, 311, 312, and 313. For purposes of demographical analysis, it is useful to think of these precincts as constituting two distinct areas: Precincts 309 and 310 to the north, which for ease of reference I will refer to as "the Prairie View precincts," and Precincts 311, 312, and 313 to the south, which I will refer to as "the Monaville precincts." Although they constitute one Commissioner Precinct (3), the Prairie View precincts (309 and 310) and the Monaville precincts (311, 312, and 313) are unlike each other in terms of their racial and age-related demographics.

5. Of Commissioner Precinct 3's five electoral precincts, only Precincts 309 and 310 have sizeable Black populations. Precinct 309 is centered around the Prairie View A&M University (PVAMU) campus. Precinct 310 is adjacent to 309 and includes most of the off-campus areas of the City of Prairie View. Precincts 309 and 310, combined, comprise approximately 55% of Precinct 3's overall residents and approximately 60% of Precinct 3's residents of voting age. During elections, these two electoral precincts appear to be generally served by polling locations in the City of Prairie View, including on the PVAMU campus.

6. Precincts 311, 312, and 313 are relatively distant from the City of Prairie View or the PVAMU campus, and generally appear to be served during elections by polling locations in or around Monaville, an unincorporated area. In contrast to the populations of 309 and 310, the populations of Precincts 311, 312, and 313 are predominantly white and, on average, older. **Figures 1** and **2** illustrate these differences.

**Figure 1**

**Waller County, TX − Commissioner Precinct 3**
**Racial Demographics of Precinct 3's Electoral Precincts**

| Precinct | Total Pop. | SR Black | % SR Black | Latino | % Latino | NH White | % NH White |
|---|---|---|---|---|---|---|---|
| 309 | 3524 | 3328 | 94% | 117 | 3% | 48 | 1% |
| 310 | 2343 | 1642 | 70% | 383 | 16% | 282 | 12% |
| **Subtotal** | **5867** | **4970** | **85%** | **500** | **9%** | **330** | **6%** |
| 311 | 1266 | 128 | 10% | 496 | 39% | 633 | 50% |
| 312 | 2368 | 71 | 3% | 739 | 31% | 1528 | 65% |
| 313 | 1217 | 61 | 5% | 687 | 56% | 445 | 37% |
| **Subtotal** | **4851** | **260** | **5%** | **1922** | **40%** | **2606** | **54%** |

**Figure 2**

**Waller County, TX − Commissioner Precinct 3**
**Racial Demographics of Precinct 3's Electoral Precincts (Residents Aged 18+)**

| Precinct | 18+ Pop. | SR Black 18+ | % SR Black 18+ | Latino 18+ | % Latino 18+ | NH White 18+ | % NH White 18+ |
|---|---|---|---|---|---|---|---|
| 309 | 3485 | 3293 | 94% | 116 | 3% | 46 | 1% |
| 310 | 1908 | 1409 | 74% | 244 | 13% | 230 | 12% |
| **Subtotal** | **5393** | **4702** | **87%** | **360** | **7%** | **276** | **5%** |
| 311 | 961 | 109 | 11% | 306 | 32% | 539 | 56% |
| 312 | 1758 | 53 | 3% | 456 | 26% | 1233 | 70% |
| 313 | 857 | 49 | 6% | 423 | 49% | 369 | 43% |
| **Subtotal** | **3576** | **211** | **6%** | **1185** | **33%** | **2141** | **60%** |

7. As shown in **Figures 1** and **2,** the populations of Precincts 309 and 310 are overwhelmingly Black. As shown in **Figure 2**, the voting-age population (that is, the subset of residents who are 18 or older) in Precinct 309 is 94% Black. The voting-age population of Precinct 310 is 74% Black. In aggregate, the voting-age populations of Precincts 309 and 310, the Prairie View precincts, are <u>87% Black</u> and <u>5% white</u>.

8. Precincts 311, 312, and 313, the Monaville precincts, are dissimilar in their demographics from the Prairie View precincts. The voting-age population of Precinct 311 is 11% Black, while the voting-age populations of Precincts 312 and 313 are 3% and 6% Black, respectively. In aggregate, the voting-age populations of Precincts 311, 312, and 313, the Monaville precincts, are 6% Black and 60% white.

9. Similarly, while Precinct 3 overall has a relatively high percentage of residents who are aged 18, 19, and 20, these younger residents of voting age are not evenly distributed geographically within the district. Of Precinct 3's five electoral precincts, only Precincts 309 and 310 have sizeable populations of residents aged 18 through 20—and Precinct 309 stands apart in this respect. In contrast, the populations of the Monaville precincts, Precincts 311, 312, and 313, include far fewer voting-age residents who are younger than 21. **Figure 3** illustrates these differences.

**Figure 3**

**Waller County, TX – Commissioner Precinct 3**
**Age Demographics of Precinct 3's Electoral Precincts (Residents Aged 18+)**

| Precinct | 18+ Pop | 18-20 Pop | % 18-20 of 18+ | 21+ Pop | % 21+ of 18+ |
|---|---|---|---|---|---|
| 309 | 3485 | 2534 | 73% | 951 | 27% |
| 310 | 1908 | 286 | 15% | 1622 | 85% |
| **Subtotal** | **5393** | **2820** | **52%** | **2573** | **48%** |
| 311 | 961 | 45 | 5% | 916 | 95% |
| 312 | 1758 | 108 | 6% | 1650 | 94% |
| 313 | 857 | 55 | 6% | 802 | 94% |
| **Subtotal** | **3576** | **208** | **6%** | **3368** | **94%** |

10. As shown in **Figure 3,** the voting-age populations of Precincts 309 and 310 are more than half made up of individuals under the age of 21. Nearly three-fourths of Precinct 309's voting-age residents are under the age of 21. Approximately 15% of Precinct 310's voting-age

residents are under 21—but even this lower proportion in Precinct 310 is more than double the proportion of voting-age residents who are under 21 in Precincts 311, 312, or 313. In aggregate, the voting-age populations of Precincts 309 and 310 are <u>52% aged 18-20</u> and <u>48% aged 21 or older</u>.

11.     Precincts 311, 312, and 313 do not share these age-related demographic features with Precincts 309 and 310. Only 5% of Precinct 311's voting-age residents are under the age of 21. Only 6% of Precinct 312's voting-age residents are younger than 21, and only 6% of Precinct 313's voting-age residents are younger than 21. In aggregate, the voting-age populations of Precincts 311, 312, and 313 are <u>6% aged 18-20</u> and <u>94% aged 21 or older</u>.

12.     Thus, Waller County Commissioner Precinct 3 can be seen as comprising two demographically dissimilar parts. The district's northern portion, consisting of Precincts 309 and 310, is home to a voting-age population that is majority Black. More than half of the voting-age residents of these two "Prairie View precincts" are aged 18, 19, or 20. The district's southern portion, consisting of Precincts 311, 312, and 313, is home to a voting-age population that is majority white. Only a small fraction of the voting-age residents of these three "Monaville precincts" are aged 18, 19, or 20.

\* \* \*

I reserve the right to continue to supplement my declarations in light of additional facts, testimony, and/or materials that may come to light.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Executed on **December 3, 2019**

_William S. Cooper_
WILLIAM S. COOPER

# Exhibit 8

# In The Matter Of:

*Allen v.*
*Waller County, Texas*

---

*James Gimpel, Ph.D.*
*December 12, 2019*

---



*Min-U-Script® with Word Index*

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4   JAYLA ALLEN, DAMON JOHNSON,

5   TREASURE SMITH, and THE PANTHER

6   PARTY,

7                Plaintiffs,

8   vs.                              Civil Case No.

9   WALLER COUNTY, TEXAS; THE WALLER   4:18-cv-3985

10  COUNTY COMMISSIONERS COURT;

11  JUDGE CARBETT "TREY" J. DUHON, III

12  in his official capacity as the

13  Waller County Judge; CHRISTY A.

14  EASON, in her official capacity

15  as the Waller County Elections

16  Administrator,

17                Defendants.

18  _____/

19              The deposition of JAMES G. GIMPEL, Ph.D.,

20  was held on Thursday, December 12, 2019, commencing at

21  10:01 a.m., at the Law Offices of Littler Mendelson,

22  P.C., 815 Connecticut Avenue, N.W., Suite 400,

23  Washington, D.C., before Steven Poulakos, Notary

24  Public.

25  REPORTED BY:  Steven Poulakos, RPR

```
 1    APPEARANCES:

 2

 3         ON BEHALF OF THE PLAINTIFFS:

 4         GUNNAR P. SEAQUIST, ESQUIRE

 5             Bickerstaff Heath Delgado Acosta, LLP

 6             3711 S. MoPac Expressway

 7             Building One

 8             Suite 300

 9             Austin, Texas  78746

10             Telephone:  512.472.8021

11             Email:  gseaquist@bickerstaff.com

12

13         ON BEHALF OF THE DEFENDANTS:

14         LEAH ADEN, ESQUIRE

15         JOHN CUSICK, ESQUIRE

16         STEVEN LANCE, ESQUIRE

17             NAACP Legal Defense and Educational Fund

18             40 Rector Street

19             5th Floor

20             New York, New York  10006

21             Telephone:  212.965.7715

22             Email:  laden@naacpldf.org

23

24

25
```

**INDEX**

Deposition of JAMES G. GIMPEL, Ph.D.

December 12, 2019

Examination by:                                         Page

Ms. Aden                                                   4


Exhibit No.                                             Marked

Exhibit 1     Notice of deposition                        13

Exhibit 2     Defendants' disclosure of expert        25
              report

Exhibit 3     Decision and order on motion for        64
              preliminary injunction

Exhibit 4     An opinion                               77

Exhibit 5     An article entitled, political          211
              participation and the accessibility
              of the ballot box by Gimpel and
              Shupnick

Exhibit 6     An article                              214

Exhibit 7     Declaration of William S. Cooper        224

Exhibit 8     Expert rebuttal report of Robert        240
              Stein, Ph.D.

1                    P R O C E E D I N G S

2                           - - -

3

4    Whereupon,

5                    JAMES G. GIMPEL, Ph.D.,

6    as a witness, having been first duly sworn to tell the

7    truth, the whole truth, and nothing but the truth, was

8    examined and testified as follows:

9                    EXAMINATION BY MS. ADEN

10       Q       Good morning.

11       A       Good morning.

12       Q       I am Leah Aden.  I'm an attorney with the

13   NAACP Legal Defense and Educational Fund, one of the

14   counsel representing the plaintiffs in Allen versus

15   Waller County.

16              Can you please state your full name for the

17   record?

18       A       James Gimpel, and yes.

19       Q       And you are a doctor?

20       A       Professor at the University of Maryland.

21              MS. ADEN:  Before we get too engulfed in

22   today's questions, in previous depositions, the parties

23   have been stipulating that all objections except as to

24   the form of the question will be waived and

25   additionally we have been stipulating to the

1   requirements under the federal rules of 30(b)5 which

2   will allow us to skip over some of the things that

3   might distract us from the meat on the questioning

4   today.  And I wanted to direct that to counsel whether

5   or not you will be agreeable to waiving those today?

6           MR. SEAQUIST:  We are agreeable to waiving

7   the 30(b)5 requirements.  Let me just clarify.  I think

8   the agreement has been that an objection to form is

9   sufficient to preserve any objections to the question.

10          MS. ADEN:  Yes, that's correct.

11          MR. SEAQUIST:  Okay.  Yes, we agree to

12  that.

13  BY MS. ADEN:

14      Q       I believe that you're familiar with

15  depositions and deposition rules, but I wanted to go

16  over very briefly some ground rules so that we make

17  sure we're operating on the same playing field today.

18          I'm going to be asking you questions today

19  about the facts and your opinions related to this

20  lawsuit and you have been sworn into oath; is that

21  correct?

22      A       Um-hmm.

23      Q       Which means that you have sworn to answer

24  questions today with the same duty to answer questions

25  truthfully as if you were before a judge in a

1    courtroom; is that correct?

2        A      Yes.

3        Q      And the court reporter, Mr. Poulakos, is

4    transcribing this deposition.  So with that in mind, it

5    will be great if both of us try to speak up and speak

6    audibly and refrain from nodding as much as possible,

7    but answering audibly on the record.

8               Does that make sense?

9        A      Yes.

10       Q      I may have to remind myself or you from

11   time to time.

12       A      Yes.

13       Q      But let's at least start out thinking that

14   way.  Additionally it's very easy to nod your head in

15   agreement, but, again, we need all affirmations or

16   opposition to anything to be stated audibly on the

17   record.

18               Is that agreeable?

19       A      Yes.

20       Q      I'm going to ask that you do not guess or

21   assume when answering, that you state what you know.

22               Does that make sense?

23       A      Yes.

24       Q      If I don't ask a question clearly or you

25   don't understand my question, please feel free to let

1  me know and I will try to rephrase.

2          Is that agreeable?

3      A    Yes.

4      Q    We talked about objections briefly and for

5  the most part, it's going to be you and me talking.

6  From time to time, there may be objections.  Unless

7  you're specifically instructed not to answer a question

8  from your counsel, I'm going to ask a question and the

9  objection can be stated for the record.  And then again

10  unless you're specifically asked not to answer a

11  question, please do try to answer.

12          Is that agreeable?

13      A    Yes.

14      Q    Is there any reason why you would be unable

15  to answer or understand any of my questions today?

16      A    No.

17      Q    Are you taking any medications that might

18  impair your ability to answer or understand any

19  questions today?

20      A    No.

21      Q    Have you had any alcoholic beverages in the

22  last 12 hours?

23      A    No.

24          MR. SEAQUIST:  Try to speak up a little.

25  BY MS. ADEN:

1      Q     At any time you need to take a break,

2  please allow me to finish answering my question.  You

3  answer that question and then we can take a break.  And

4  just let me know if you would like one.

5           Does that make sense?

6     A     Okay.  Yes.

7     Q     Any questions so far?

8     A     No.

9     Q     Have you been deposed before?

10    A     Yes.

11    Q     How many times?

12    A     Five.

13    Q     And were those all in a professional

14  capacity?

15    A     Yes.

16    Q     Have you ever been deposed in a personal

17  capacity?

18    A     No.

19    Q     When were you most recently deposed?

20    A     I want to say July of 2019.

21    Q     What type of case was that?

22    A     That was the second round of litigation

23  associated with Whitford V Gill, a redistricting case

24  in Wisconsin.

25    Q     What was your role in that case?

1        A       Just I wrote an expert report representing
2    work.  I was employed by the attorneys representing the
3    state legislature of Wisconsin.
4        Q       Have you testified at trial in that case?
5    You mentioned it was your second round.  Have you
6    testified at trial?
7        A       That case ultimately did not go to trial.
8        Q       Did you testify at any hearings related to
9    that case?
10       A       No.
11       Q       Were you qualified as an expert in that
12   case?
13       A       By a judge.  That didn't happen.  We didn't
14   actually get into court where that could happen.
15       Q       So you did -- more or less the contribution
16   to the case was doing the deposition and writing a
17   report?
18       A       In reverse order.  So I wrote a report and
19   I wrote a second report and then came the deposition.
20   And I said July, but I think I need to back that up.
21   I'm pretty sure it was June.
22       Q       But still of this year?
23       A       Yes, of 2019.
24       Q       And before that, when you were last
25   deposed?

1      A      Well, let's see.  There was a -- do you
2  mind if I consult?  Do I have a CV?
3      Q      Let's get to that.  So as of now --
4      A      Yeah.  I'm trying to remember.  There were
5  some cases where we got that far and other cases where
6  we didn't.  There was one case where there wasn't a
7  deposition involved.  There was a Pennsylvania case and
8  then Pennsylvania -- in the State of Pennsylvania, they
9  don't do depositions.  So it's not as easy to answer as
10 right off the top of my head as I'd like it to be.
11     Q      I'm going to show you your CV in a bit and
12 maybe that will help jog your memory.
13     A      There was a deposition in the North
14 Carolina case, but I don't think that was the most
15 recent one.  There was a deposition in the North
16 Carolina redistricting case, the Rucho case.
17     Q      R-U-C-H-O; is that correct?
18     A      Yes, R-U-C-H-O.
19     Q      You mentioned Wisconsin.  You mentioned
20 North Carolina.  You mentioned Pennsylvania.  Was that
21 also a redistricting case?
22     A      Yes.  And I don't quite understand the
23 legal procedures and rules, but in neither the Agre
24 case or the League of Women Voters case were any
25 depositions taken.

1       Q       So the Agre?

2       A       Agre is A-G-R-E.

3       Q       And is that the Pennsylvania case that you

4   were working on?

5       A       That is a Pennsylvania federal

6   redistricting case and then there was League of Women

7   Voters versus Commonwealth which was the state level

8   Pennsylvania redistricting case.  So those two cases

9   were moving through on parallel courses at two levels

10  of the court system and in neither case were

11  depositions taken.  My understanding was that that had

12  something to do with Pennsylvania.

13      Q       And then in North Carolina, were you

14  deposed in that case?

15      A       Yes.  That was the Rucho case.  So that

16  would go back to 2017.

17      Q       Then do you recall being deposed in any

18  other cases outside of Pennsylvania, North Carolina,

19  and Wisconsin?

20      A       I want to say there was another one in

21  there, but maybe my CV would refresh me on that.

22      Q       Yes.

23      A       I believe there was another one in there

24  where a deposition was taken.  So I want to say the

25  answer to your question is yes, but I think looking at

1  my CV could help me recall exactly.

2      Q      Perfect.  So we'll definitely get to that

3  and dive in.  One other thing is if at any time you

4  answer a question at a moment and then you later recall

5  that you want to supplement or correct --

6      A      Correct the record.

7      Q      -- happy for you to do that as well.

8      A      Okay.

9      Q      So we'll dive down into this a little bit

10  more.  Have you ever been a party to a lawsuit of any

11  kind?

12      A      No.

13      Q      Not in a professional capacity?

14      A      No.

15      Q      And not in a personal capacity?

16      A      No.

17      Q      With respect to today's deposition, how did

18  you learn about it?

19      A      Learn about the case?

20      Q      Learn about the deposition.  How did you

21  learn that it was happening?

22      A      Counsel, Mr. Seaquist, informed me of the

23  deposition by phone several weeks ago.

24      Q      I'm going to show you what I am marking as

25  Exhibit 1, plaintiffs' notice of deposition of

1  Dr. James G. Gimpel, and hand that to Dr. Gimpel and

2  also hand a copy to his counsel.

3          (Gimpel Exhibit 1 was marked for purposes

4  of identification.)

5  BY MS. ADEN:

6      Q     And you can take a few moments to look at

7  this.  I'm not going to ask you many questions about

8  it, but do you recognize this document?

9      A     I probably received this by email.  So I

10 get a lot of things via email.  So I'll say this.  I

11 vaguely recall this appearing in my email.  I think the

12 concern at that time was for time and date of this

13 event, this deposition.  So I probably didn't read it

14 in great detail.

15     Q     Okay.  What did you do to prepare for

16 today's deposition?

17     A     Well, I reviewed the report that I had

18 submitted back in September.  I prepared some notes and

19 I guess what you might call some highlights of the

20 report and shared them with Mr. Seaquist.  There were a

21 couple of phone calls with Mr. Seaquist about

22 highlights of the report and how the deposition would

23 proceed.

24          We also -- Mr. Seaquist and I had

25 discussions yesterday for about two hours I would say

1    from 1:00 p.m. to about 3:00 p.m. here in the hotel

2    about highlights of the report and likely questions

3    that might come up during the deposition.

4         Q       Was anyone else present besides you and Mr.

5    Seaquist?

6         A       No.

7         Q       On any of the calls that you had with Mr.

8    Seaquist, was anyone else present?

9         A       No.

10        Q       And you said you talked a couple of -- you

11   had a couple of phone calls with Mr. Seaquist.  About

12   less than five, more than five?

13        A       Two I would say.  When I emailed him some

14   notes and points, I did copy Mr. Heath, but I didn't

15   talk or communicate with Mr. Heath in email or by phone

16   or in person.  I just copied him.

17        Q       And Mr. Heath is?

18        A       Co-counsel of -- I guess colleague,

19   co-counsel of Mr. Seaquist.

20        Q       Did you -- outside of your report and the

21   notes that you mentioned, did you review any other

22   documents in preparation for today's deposition?

23        A       Well, I was sent the second reports of

24   Professor Flores and Professor Stein several weeks ago.

25   Those were sent to me when they were completed.  So I

1    read through those and in the notes and points that I

2    shared with Mr. Seaquist, I shared some of my thoughts

3    about --

4              MR. SEAQUIST:  Jim, she's not asking you

5    about your conversations with me.  Those are

6    privileged.  So she's asking you what you reviewed.

7              THE WITNESS:  Okay.  So those were the --

8    BY MS. ADEN:

9        Q      To prepare for today's deposition, you

10   reviewed your report and you agree that you only

11   submitted one report in this case so far?

12       A      Yes.

13       Q      And then you reviewed supplemental or

14   second reports of Dr. Flores and Dr. Stein?

15       A      Correct.

16       Q      Did you review anything else?

17       A      No.

18       Q      And the -- any documents -- did you bring

19   any with you today?

20       A      I --

21       Q      You could just tell me.

22       A      Yes.  I have -- the most convenient form

23   that I could bring them in was in a flash drive which

24   I'd rather not give up entirely, but if you could just

25   copy the files from -- on to one of the laptops, that

1   would be fine.

2       Q       Can you generally tell me what -- what's in

3   that flash drive?

4       A       Well, it would be copies of my report, a

5   lot of the tables and figures therein.  There are some

6   data files associated with my research for my report.

7   You know, there are some -- in various formats.  So

8   there's some Excel files.  There are some SPSS files.

9   That is a statistical program that's very commonly used

10  and then some GIS files.  So these are all files that

11  are associated with the writing of the report.

12      Q       Your original report?

13      A       My original report.

14      Q       Do you know whether or not those underlying

15  files were disclosed to us through your plaintiffs'

16  counsel?

17      A       Some of them were as I understand it back

18  in September, you know, the ones that were associated

19  with the filing of the report.  So there will be some

20  duplication there, but other files were not sent at

21  that time.  So they will be new now.

22      Q       So have you created reports or data sets

23  subsequent to your original report that are related to

24  this case?

25      A       No.

1     Q    Did you discuss today's deposition with

2  anyone else besides Mr. Seaquist and Mr. Heath?

3     A    No.

4     Q    When did you first learn about this

5  lawsuit?

6     A    Pretty sure the first time I heard about it

7  was when Mr. Seaquist called me about the middle of

8  July of 2019, probably the third week of July and

9  described the rough outline of the case.

10     Q    And have you discussed this lawsuit with

11  anyone besides Mr. Seaquist or any of his co-counsel or

12  colleagues?

13     A    No.  I've only interacted with Mr. Seaquist

14  and Mr. Heath.

15     Q    When were you retained in this case?

16     A    Approximately third week of July.

17     Q    And that was by Mr. Seaquist?

18     A    Yes.

19     Q    And do you have a copy of that retainer?

20     A    I probably do.  That I did not include with

21  the material on the flash drive, but I do have a copy

22  of it.

23     Q    And is it correct that your rate of

24  compensation in this case is $300?

25     A    Yes.

1      Q      Is that a flat rate for all of your work on
2  the case?

3      A      $300 an hour, yes.

4      Q      Do you know how much you have billed so
5  far?

6      A      I can estimate the number of hours.  Maybe
7  130.

8      Q      A hundred and thirty thousand?

9      A      No, 130 hours.

10      Q      And when is the last time you billed that
11  set of hours or that estimate of hours?

12      A      It would have been when the final report
13  was handed in in early September, so it might have been
14  around September 7th or 9th.

15      Q      Do you expect to supplement or do you
16  expect to bill for another set of hours?

17      A      So far, the only thing that I would bill
18  for would be the hours maybe yesterday and today.  And
19  I have no other hours to bill for in between and I
20  don't know if there will be any hours going forward.  I
21  don't know the answer to that.  Right now there are no
22  plans to write a second report or a supplementary
23  report.

24      Q      Now --

25      A      So the answer is I don't know.  I don't

1    know at this time whether there will be any more hours.

2    As far as I know, yesterday and today is the sum total.

3         Q        So you mentioned earlier also that you

4    reviewed the second reports of Dr. Flores and Dr.

5    Stein.  Do you expect to bill for the time you spent

6    reviewing those?

7         A        Yeah.  I suppose so.  I suppose that when I

8    send in a bill for yesterday and today, there will be

9    probably an hour that I'll bill associated with the

10   review of those materials.

11        Q        And the phone calls you had with Mr.

12   Seaquist and Mr. Heath before yesterday and/or today,

13   do you expect to bill for those?

14        A        Well, these were not long calls, but

15   perhaps 30 minutes.  That's what I would ballpark it

16   at.

17        Q        Is the rate that you charged in this case

18   consistent with the rate that you charged for the

19   approximately five other depositions that you recall

20   participating in?

21        A        Yes.  It's been the same.  I believe it's

22   been the same since 2017.  I did a case way back in

23   2012 at the California state level and I might have

24   charged 250 an hour for that, but I'd have to review.

25   I'm not entirely certain, so --

1      Q      I'm going to turn to another subject which
2  is your background qualifications and employment
3  history.  Can you briefly describe your educational
4  background since high school?

5      A      Okay.  So undergraduate degree was
6  completed at Iowa Drake University in Des Moines and
7  then from there, I went to the University of Toronto
8  for advanced training in political science, took a
9  master's degree there.  Then from there, I went to the
10  University of Chicago and completed my Ph.D. there
11  focusing on American politics, elections, voting, the
12  subjects that I've worked on throughout my career.

13      Q      And what would you consider your areas of
14  specialization?

15      A      So voting, elections, political geography.
16  I've written some on public opinion, immigration.  So
17  those are political behavior, political geography,
18  elections, voting, political participation.  That goes
19  with voting.

20      Q      What about geographic information systems,
21  does that term ring familiar to you?

22      A      Sure.  I didn't do that so much in graduate
23  school.  I picked that up mostly as a faculty member
24  because it's somewhat new.  I mean, it's developed
25  largely in the last 30 years particularly in the social

1   sciences.

2           So, yes, that's something I've been

3   studying and also teaching for probably 15 years now.

4   Well, I've been studying it for probably 20, but I've

5   been teaching courses in that area now for about 15

6   years.

7       Q       Your knowledge of election law, voting,

8   political participation, does that extend to federal

9   election law or would you say it extends also to state

10  election law?

11      A       I know some about state election law, but,

12  of course, states vary.  And so, you know, I would not

13  have an off the top of the head familiarity with every

14  state.  When I go into my classes and teach about

15  elections and election law, I mainly focus on federal

16  elections because I don't have to cover the patch work

17  of all 50 states.

18          It's just easier for me to talk about

19  federal election law and then suggest to the students

20  some places they would go, for instance, to learn about

21  maybe state campaign finance rules that might be

22  germane to a particular state or placement of polling

23  places, whether a state has an early voting option,

24  these kind of questions.

25      Q       So tell me where you're currently employed.

1    A    The University of Maryland College Park.

2    Q    And what is the current title that you

3    hold?

4    A    Professor.

5    Q    And is this in the political science

6    department?

7    A    It's called government, but it's the same

8    thing.  And that particular university, it's called the

9    department of government, but it's political science.

10    Q    And is this a full-time professorship?

11    A    Yes.

12    Q    How long have you been employed there?

13    A    Twenty-eight years.

14    Q    Have you ever been employed at another

15    academic institution?

16    A    Part-time at George Washington University.

17    I taught as an adjunct part-time.  That's all.

18    Q    And that was simultaneous with also

19    teaching at Maryland?

20    A    It was just before.

21    Q    So this was earlier in your career?

22    A    Yes, quite early.

23    Q    So besides teaching at GW and the

24    University of Maryland, those are the two academic

25    institutions you've been associated with?

1    A    Yes.

2    Q    And is it fair to say -- strike that.

3         Do you have any professional appointments?

4    A    Like can you say more about what you mean?

5    Q    Meaning to any boards, to any associations.

6    A    I was a past editor of a journal, so I

7    think I'm kind of ex officio as an editorial board

8    member for that academic journal.  American Politics

9    Research it's called.  But I'm not the editor anymore.

10   I stepped out in 2011.

11   Q    Are you a member of any other associations?

12   A    Well, just kind of the standard academic

13   associations like the American Political Science

14   Association.  The ones that professional political

15   scientists would belong to.  There's also one that

16   covers the midwest simply called the Midwest Political

17   Science Association.

18   Q    Has your work been published?

19   A    Yes.

20   Q    And about how many publications would you

21   say?

22   A    Well, in peer reviewed journals, I would

23   ballpark it at about 50 and then there are other

24   publications in non-peer reviewed outlets.  So that

25   would be like magazine or a non-refereed journal or

1    someone's edited book, a collection of chapters.  It's

2    not the same peer review process.  So there's some

3    publications there, perhaps 12, 13.  And then an

4    assortment of other publications that would be again

5    like magazine articles, book reviews, op eds, a few of

6    those.

7         Q        With your academic appointment, are you

8    required to do any publishing or writing?

9         A        Well, yes.  At a place like the University

10   of Maryland, it's considered research one institution.

11   And so there is -- understanding that if you're hired

12   there, you need to be producing research and that's

13   because the teaching load is not as heavy there as it

14   would be at a small college.  So I should be using that

15   time to do something, right, that I'm not teaching,

16   using that time that I'm not teaching to be producing

17   research.  So that's the understanding.

18        Q        Correct me for my ignorance of academia.

19   Does your professorship mean that you're a tenured

20   professor?

21        A        Yes.  I was tenured initially in 2000, the

22   year 2000.  I started in '92.  I was tenured in 2000.

23        Q        You mentioned your CV before and we're

24   going to get to that now.

25        A        Okay.

1     Q    I'm going to mark as Exhibit 2 a document

2  titled defendants' disclosure of expert report and I'm

3  going to hand that to Dr. Gimpel and also share a copy

4  with his counsel.

5            (Gimpel Exhibit 2 was marked for purposes

6  of identification.)

7  BY MS. ADEN:

8     Q    Do you recognize this document?

9     A    This looks like the report that I sent in

10  in September, yes.

11     Q    So if you look at it, the first page says

12  defendants' disclosure of expert report, is that

13  correct, that it's titled?

14     A    Yes.

15     Q    And on the third page, and these are

16  double-sided pages, there is a section one entitled

17  designation of expert.  Do you see that?  It's the

18  third page.

19     A    Yes.  Yes.

20     Q    And then there's a section two which is

21  titled expert report and resumes?

22     A    Right.

23     Q    And then there's an Exhibit 1 to this

24  packet.  Does that encompass your CV?

25     A    Yes.

1      Q      And then attached to this packet, there's

2  an Exhibit 2 and that encompasses the report that

3  you've been referencing that you disclosed in September

4  of 2019; is that correct?

5      A      Yes.

6      Q      So I want to focus you on the CV portions

7  of it which are between -- behind Exhibit 1.

8      A      Okay.

9      Q      Does this CV accurately represent and

10  summarize your professional background?

11      A      Yes.

12      Q      Are there any updates to it since you

13  provided it?

14      A      Yes.  There's a new paper that recently

15  came out in a non-peer reviewed journal.  So it would

16  not be on page 2.  It would belong probably on page 6.

17  So it will go on the top of page 6 as a non-peer

18  reviewed journal, a paper on opinion on immigration.

19      Q      Do you mind telling me briefly what is the

20  difference between peer reviewed and non-peer reviewed

21  work?

22      A      Sure.  I think the peer reviewed

23  publications are sent through the blind review process

24  to a panel of researchers who are considered peers,

25  right, by virtue of their training and expertise.  And

 1   these peers review the submission and make

 2   recommendations for publication or rejection first of

 3   all.  And then if they think that it is suitable for

 4   publication in the journal, that is they don't just out

 5   of hand reject it, then they make suggestions for how

 6   to revise it and those suggestions can be quite

 7   extensive or less extensive depending on their

 8   judgment.

 9            So that's the big difference between the

10   peer review process and the non-peer review.  The

11   non-peer review papers are accepted maybe with the

12   editor looking at it, you know, or the book author

13   taking a look through it and perhaps requesting some

14   changes, but sometimes not.  Sometimes there's just a

15   round of copy editing and so it isn't as rigorous a

16   process.  You're expected at a place like the

17   University of Maryland or at major research

18   institutions to primarily produce papers in peer

19   reviewed journals.

20            If you publish work in other outlets,

21   that's acceptable.  It won't count against you, but the

22   peer reviewed journals are really where it counts for

23   promotion and tenure.

24        Q     For purposes of your -- strike that.

25            You mentioned also doing a specialization

1  in immigration and writing on immigration.  Can you

2  briefly summarize what that means?

3      A      Sure.  Sure.  So a couple of strains of

4  research.  One is public opinion about immigration.

5  There was a book that I wrote with a co-author in 1999

6  on -- called the Congressional Politics of Immigration

7  Reform and that dealt with immigration policy in

8  Congress as it was unfolding at that time.  So the book

9  is dated now.

10              But inside there, there was a chapter on

11  public opinion about immigration.  And I've sort of

12  taken that chapter and kind of followed public opinion

13  trends and patterns on the immigration issues, so legal

14  and illegal, and so that's one strand.  It's just where

15  is the public on questions of immigration control,

16  restriction, border security, common issues of this

17  kind that come up in this debate.

18              Then the second strand is probably about

19  2002.  The Republicans in town, you know, were talking

20  about -- a lot of the consultants in particular were

21  talking about how they thought with appropriate

22  attention and care they could realign the Hispanic vote

23  and in large the Republican vote share among Hispanic

24  population.  And I had some doubts about that based on

25  my training.

1            My understanding of how durable party

2    identification can be and how difficult it is to

3    persuade people to change their mind and partly that's

4    because people are not that attentive.  And so I wrote

5    a couple of initial papers where I sort of challenged

6    that kind of consultant orthodoxy saying, you know,

7    this population is not going to be so easy to change.

8    Putting out a few Spanish language ads is not going to

9    do it.

10            And, you know, changing a few of your

11    immigration policy positions, sorry, you know, that's

12    not going to realign this population either because in

13    many ways party identification is like an identity.

14    Party identification is -- I mean, there are -- I got

15    to nuance that a little bit because there are a sizable

16    number of people who don't have any party

17    identification at all.

18            But for those who do, you know, this is not

19    an opinion that's going to whimsically change from one

20    day to the next, you know, opinion about a political

21    party or who should run the country.  That's not going

22    to change from one day to the next.  These are pretty

23    well anchored viewpoints more akin to identity than

24    they are to your favorite flavor ice cream.

25            So my point in the series of papers was

1  directed to -- well, anyone who was reading don't

2  believe these consultants who think that by sending out

3  a mailer in Spanish or by getting the candidate to

4  speak a few Spanish words that all of these Latinos are

5  going to suddenly rush across the aisle and start

6  voting Republican.

7           That's been the thrust of the number of

8  papers that I've written since 2002 because, you know,

9  with every new election, I look at the data and I see

10  that, you know, Hispanic population is about where it

11  was the last time, right, and that's completely

12  consistent with the history of political science on

13  this subject that, you know, when you look at

14  population trends for just about any group, you know,

15  there's partisanship.  There are expressed opinions

16  when they answer surveys.  They don't change that much.

17  There's very little fluctuation.  It's much more

18  durable and static than it is fluctuating.

19           So partly this was -- I'm rambling on here

20  just so you can understand.  There is a tension between

21  the way political science looks at political behavior

22  and the knowledge that we've accumulated and the

23  consultant community, okay, and there's a longstanding

24  tension between the two.  And, you know, partly these

25  papers have been an effort, you know, a shot across the

1  bow of the consultant community saying this is a con

2  job.  You're selling these politicians on services and

3  outreach techniques that are ultimately going to fail.

4        Q      Have you looked at the role of race or

5  racism or racial campaign appeals in influencing

6  people's allegiance to political parties?

7                MR. SEAQUIST:  Object to form.

8                THE WITNESS:  I'm somewhat familiar with

9  that.  I've not addressed that directly myself, but I'm

10  somewhat familiar with that research.

11  BY MS. ADEN:

12        Q      Have you looked at whether race would

13  influence Hispanic voters towards joining or not

14  joining the Republican party?

15                MR. SEAQUIST:  Object to form.

16                THE WITNESS:  There are a couple of

17  instances in California.  There's not a lot of research

18  on the subject, but there are a couple of papers

19  written about California elections where fielding a

20  Latino candidate as a Republican didn't make a

21  difference.

22                There was a particular paper from a

23  professor at Menlo College who was looking at some

24  Southern California races at this specific question.

25  And so, you know, I think there's room to question, you

1 know, whether someone like Marco Rubio is going to

2 attract vastly more Latinos than another candidate

3 would.  So I think there's room to doubt.

4 BY MS. ADEN:

5     Q     You mentioned your belief that party

6 identification is -- doesn't fluctuate so much, is more

7 durable.  Are you familiar with the history of black

8 voter allegiance with the former Republican party prior

9 to the 1960s?

10     A     Yes.  I am aware that that transition

11 occurred.  The transition in black voter allegiance

12 mainly occurred between the thirties and the sixties is

13 my understanding.  I think the new deal was very

14 influential in moving some black voters into the

15 Democratic party from the Republican side.

16     Q     Are you aware of any other motivations that

17 might have influenced that shift?

18     A     Well, I think in 1964, there was some

19 realignment that everyone's pretty familiar with.  When

20 Lyndon Johnson campaigned pretty hard on civil rights

21 and Barry Goldwater came out and took a -- well, not

22 exactly an opposing position, but we'll say he took

23 more of a go-slow kind of states' rights approach to

24 the subject and, you know, I think that that election

25 everybody understands to be pretty pivotal in that

1   history.

2         But these are gradual.  These are gradual

3   over time trends and, you know, you can't -- I think

4   it's misleading when consultants come to candidates and

5   say, hey, we've got an outreach technique that's going

6   to bring a massive number of people over from one day

7   to the next.  That's just fundamentally misleading and

8   I think that's where the tension is say between the

9   consultant class which, you know, has an economic

10  interest in vending campaign services, okay, and

11  political scientists who see public opinion and

12  political behavior as much stickier as a product of

13  much lower changes, gradual changes.

14       Q     You also mentioned that there's a sizable

15  number of people who don't have party affiliation?

16       A     This is true.

17       Q     Are those people persuadable to one party

18  or another in your opinion?

19       A     I think they are.  The -- here's the

20  paradox.  It's a pretty familiar paradox.  I don't know

21  if that's exactly the right word, but here's the

22  problem.  The people who are not firm party identifiers

23  tend to have less interest in politics and elections

24  and a large number of them are nonvoters.  They don't

25  vote at all, okay, or they're very irregular voters.

1          And so this is kind of a problem that

2     campaigns tend to face is that there are large blocks

3     in the electorate whose views are decided before the

4     campaign starts.  These folks know how they're going to

5     vote before the convention in a presidential year.  But

6     then the remaining say 30 percent, these folks are less

7     interested in politics and government and some are

8     nonvoters.  Some of them are very irregular voters and

9     campaigns have to figure out how to reach them.

10          And that's challenging precisely because

11    they don't have a lot of interest.  They are

12    inattentive, and this is more precisely what the

13    campaign to persuade people really face is can you come

14    up with, you know, outreach techniques or tools

15    directed toward people who aren't paying very much

16    attention or paying very intermittent attention.  And

17    that's very challenging and so, you know, campaigns,

18    you know, have two fundamental tasks.

19          You know, one is to persuade, but the other

20    one is to mobilize, to mobilize voters they know to be

21    faithful.  So, you know, a campaign is always trying to

22    figure out the appropriate balance between those two.

23    I think mobilization tends to be easier.  There's a lot

24    of persuasion we don't really understand yet in the

25    field.  That's my sense.

1    Q    So as -- from your experience, do you think

2  that this is a jurisdiction specific question or do you

3  think that these are principles that apply regardless

4  of what community or jurisdiction you're looking at?

5    A    Yeah, there's some variation.  It's a

6  really, really interesting question.  And there's

7  probably some disagreement about it within the field

8  because there are people who think, you know, these

9  rules of political behavior affiliation opinion

10  formation, you know, are pretty general across the

11  nation.  And then there are others who say, well, wait

12  a second.  There's some substantial variability from

13  place to place as you move around the country.

14          Traditionally I've favored the view that

15  there's substantial variability as you move from place

16  to place, that, you know, that there are local context

17  and settings, okay, that can make a difference.  So,

18  you know, that's the position that I take, but there's

19  some writing that suggests, for instance, that that

20  local variability is fading or that it's exaggerated.

21  So there's some disagreement in the field about that.

22    Q    I can tell this is a subject you love, but

23  I'm going to try to get back to this case.

24    A    Sorry.  You can get me rambling on.

25          MR. SEAQUIST:  Before you do, I know we

1  haven't been going that long, but I've had too many

2  cups of coffee.  Can we take a break?

3           MS. ADEN:  That's fine.

4           (There was a brief recess taken.)

5  BY MS. ADEN:

6      Q      So before the break, we had been looking

7  very briefly -- strike that.

8           Before the break, we had introduced your CV

9  and started looking at it briefly.

10     A      Right.

11     Q      I want to return to that and ask whether or

12 not in any of your work as an expert witness or

13 academic generally have you ever reached a conclusion

14 that touches upon the issues that you explored in this

15 case?

16          MR. SEAQUIST:  Form.

17          THE WITNESS:  I have.  There are a couple

18 of papers that touch on locations of voting sites and

19 the question of turnout and early voting.  So those go

20 back to -- those go back a ways more than ten years,

21 but there are a number of papers that touch on that

22 subject, yes.

23 BY MS. ADEN:

24     Q      Do you mind looking at your CV and using

25 this blue pen and walking me through those marking each

1     one with a blue -- an X where you think it touches upon

2     those topics that you just identified?

3         A       Okay.   So there's a 2003 paper indicated as

4     item 35 in the list called -- it's a 2003 paper item on

5     the CV number 35 political participation and the

6     accessibility of the ballot box.

7                 And then there are two other papers, 2005

8     item 31, distance turnout and the convenience of

9     voting, and item 30, 2006 location, knowledge, and time

10    pressures in the spacial structure of convenience

11    voting.  So those would be the three that would be most

12    germane to questions of early voting, siting of polling

13    places.

14        Q       And your work as an expert witness or as an

15    academic generally, have you reached a conclusion that

16    you believe is inconsistent with any of your findings

17    in this case?

18        A       I would say no.  I would say that -- that

19    there really is no -- really is no contribution.  So I

20    don't think that the conclusions I reached in this case

21    contradict what's in the papers that I've written.

22        Q       And limiting it to those three that you

23    identified on your CV, 30, 31, and 35?

24        A       Yes.

25        Q       Have any of your publications reported,

1    commented on, or used race data?

2              MR. SEAQUIST:  Form.

3              THE WITNESS:  Well, yes.

4    BY MS. ADEN:

5        Q      Do you mind -- first of all, before we do

6    any markings related to the race data, could you circle

7    with a blue pen items 30 through 31 and 35?

8        A      Yes.  (Witness complying.)

9        Q      And then maybe with this yellow

10   highlighter, do you mind walking through your CV and

11   marking the publications -- you can even just mark the

12   numbers in the highlighting where you believe that you

13   reported, commented on, or used race data?

14       A      Well, bear in mind that race is a pretty

15   standard control variable or a social science variable

16   in political research.  So when you ask me to do that,

17   I would say it's going to be present in most of these

18   articles.  You know, it might not be the main focus of

19   the paper, but it is often included as a control

20   variable because we know that political behavior and

21   public opinion does differ by race.  So --

22       Q      How about we do it this way?  What about

23   you telling me the articles in here -- step back.  So

24   what -- is it accurate that you -- to say that you

25   believe that every article except for -- and you can

1　point out the ones that don't meet this criteria.

2　Every article in here uses race data except for the

3　ones that you may go on to tell me?

4　　　　A　　A lot of them do.  I will certainly say

5　that.  You know, even if race is not necessarily the

6　main thrust or point or focus of the paper when you're

7　trying to explain an outcome like, for instance,

8　participation or like opinion on a policy, there are

9　very frequently racial differences that are going to

10　matter.  So you need to account for those in any

11　complete model of that behavior or that opinion.

12　　　　　　　So, you know, race is going to be present

13　in a lot of the published social scientific work even

14　if race is not the main point or thrust of the author's

15　work or a major part of the argument.  We could go

16　through some issues of some current political science

17　journals and there's going to be a lot of racial data

18　included and that would be true of a lot of my papers.

19　　　　Q　　So let me ask you this.

20　　　　A　　It's a tricky or a difficult question to

21　answer.

22　　　　Q　　So if someone, though -- if that is true

23　and race is underlying if I'm interpreting what you're

24　saying correctly most of the work, would you expect to

25　see the word black or African-American or Hispanic or

1    Asian American identified in the narrative or in the

2    text of that article?

3        A       That's a good point.  I've never given it a

4    lot of thought.  So this is kind of coming off the top

5    of my head, but I think you're right.  If I were really

6    searching for papers where the focus or the thrust was

7    race, I would look in the title and I would look in the

8    abstract.  I think that's a good point.

9                I will tell you that probably the most

10   recent paper that I've written where race is very

11   central is the 2019 paper by myself, item number 3.  I

12   can highlight that in yellow.

13       Q       Okay.

14       A       By myself and James Glen who my co-author

15   is black and that's right out there.  It's in the title

16   and it has to do with who gives campaign contributions

17   and the impact of race.

18                You know, I can go through probably with

19   some time and, you know, say, you know, okay, race

20   plays a little more predominant role here and it's just

21   kind of a control variable here.

22       Q       But in that article, that is an example of

23   an article where your focus was on looking at in

24   particular the racial impact on a particular group?

25       A       Behavior, right.

1      Q      And that was the focus of the research?

2      A      Sure, absolutely.

3      Q      And that's a distinct question than whether

4   or not race is underlying in a more general way the

5   data?

6      A      I think that's a fair way to describe the

7   difference.  There is -- there are papers in which race

8   is included, but it's not the main thrust of the

9   article.  And then there are papers where, you know,

10  talking about racial conflict or race relations is the

11  main point of the article.  So, you know -- but, you

12  know, if you just ask a very general question about did

13  you use race data, that's going to appear in many, many

14  social science papers.

15     Q      What about age, the impact of a particular

16  policy practice, voting practice, election law on age,

17  is that something that also runs through every or most

18  analyses in this area or is it something that can also

19  be specifically focused on and highlighted?

20     A      You know, I have maybe one paper that deals

21  specifically with age, the 2004 paper, item number 34,

22  turnout and the local age distribution where age is a

23  major focus of that particular paper, but not as often

24  as race, but age will commonly be included, you know,

25  as an explanatory variable, you know, even though it's

1    not the main focus of the author's paper.  Okay.

2              They will want to include -- they will

3    note, for example, oh, you know, there are likely to be

4    generational differences and opinion here and I need to

5    account for those even though the thrust of my paper is

6    to focus on, you know, some other aspect.  Okay.  I do

7    need to at least account for the differences between

8    say elderly people and younger people.

9       Q      And what about socioeconomic indicators or

10   disparity?  If you wanted to look at, for example, how

11   a particular law impacted people of lower socioeconomic

12   backgrounds or different educational attainments, is

13   that something that similarly runs through most

14   analyses, but may be a particular focus of a piece of a

15   work?

16      A      I think that's true.  I think that's true,

17   and there are -- with socioeconomic status, education,

18   there seem to be some really interesting changes and

19   there's where the local variations can also make a

20   difference.  It seems like there are place to place

21   differences in the way socioeconomic status operates.

22             One very handy example here is that in the

23   State of Maryland, we have very, very affluent people

24   who are entrenched Democratic identifiers.  And in a

25   lot of states, more affluent people would be Republican

1    identifiers.  But as -- and this is also changing,

2    right, with some changes that seem to be happening as

3    populism grips the Republican party.  More and more

4    affluent people seem to be turning to the Democratic

5    side, lower and moderate income people.  At least

6    whites tend to be turning toward the Republican side.

7    So there are some changes, but the answer to your

8    question is, yes, these variables are included and

9    important perhaps because these changes are occurring.

10        Q      So would it be fair to say that you know

11   how to analyze voting practices that impact different

12   racial groups?

13        A      I think I'm qualified to do that.

14        Q      Would it be fair to say that you know how

15   to analyze different voting practices that impact

16   different age groups?

17        A      Yes.

18        Q      And would it be fair to say that you know

19   how to analyze different voting practices that impact

20   people of different socioeconomic status?

21        A      I think it's statuses, yes.

22        Q      If you were hired in a lawsuit alleging

23   racial discrimination against black voters, would you

24   be able to specifically analyze the impact of that

25   challenge law or practice on black voters?

1          MR. SEAQUIST:  Form.

2          THE WITNESS:  Well, yes.  Obviously this

3  presumes that the data are available for this purpose.

4  BY MS. ADEN:

5     Q     So if a complaint alleges racial

6  discrimination, do you think it would be appropriate to

7  look at the impact of that challenge practice on

8  different racial groups?

9     A     Yes.

10    Q     Similarly if a case alleged age

11 discrimination, do you think it would be appropriate

12 for an expert to look at how that particular practice

13 has a differential impact on different age groups?

14    A     That makes sense that that would be

15 something you would want to do.

16    Q     Again, assuming the data was available?

17    A     Right.

18    Q     Similarly if a lawsuit was alleging that a

19 voting practice had a differential impact on people

20 whether they were poor or had more economic resources,

21 it would be appropriate to look at those indicators to

22 analyze its impact?

23    A     Yes.

24    Q     Have you looked at the complaint in this

25 lawsuit?

1      A       It's been some time ago.  I haven't looked
2  at it recently, but I did read it in July when it was
3  sent to me.
4      Q       And what do you understand the lawsuit to
5  allege?
6      A       Well, my understanding is that the students
7  at Prairie View A&M, a historically black institution,
8  are complaining that Waller County did not allocate
9  polling places and particularly early voting sites and
10  hours evenly or equitably across the county.
11      Q       Do you think this lawsuit has something to
12  do with racial impact?
13      A       Well, I gather that that's what the
14  complaint lays out.  I mean, I could see that that was
15  the claim that was being made that, you know, Prairie
16  View is somehow being treated differently because the
17  student body is black.  So I gather that that -- I
18  mean, that was a conclusion I drew from reading the
19  complaint.
20      Q       Is it also your understanding that the City
21  of Prairie View may be treated differently because of
22  the population of black people within that area of the
23  county?
24      A       I gather that from my study of the terrain
25  and the distribution of the population that -- that the

1  population and the town of Prairie View is heavily

2  African-American as well as the campus itself, yes.

3       Q       And did you after reading the complaint

4  have an understanding of whether or not the complaint

5  alleged age discrimination?

6       A       Well, I saw that claim being made in the

7  report -- in the original complaint that there was

8  something about the concentration of 18 to 24-year-olds

9  on the campus that made that population stand out, you

10 know, in the county.

11      Q       And did you have an understanding after

12 reading the complaint that there was an allegation that

13 the combination of Prairie View students being black

14 and 18 to 20-year-olds or young voters that that was a

15 basis for an allegation of discrimination as well?

16      A       I understood that to be the case from

17 reading the complaint, yes.

18      Q       Had you ever looked at those issues before

19 in any of the works that are identified in your CV?

20              MR. SEAQUIST:  Form.

21              THE WITNESS:  I -- first it's pretty

22 well-known that there are turnout deficits among

23 certain subgroups and it's pretty well-known in the

24 literature that turnout is low among black voters and

25 turnout is also low among young voters.  And there are

1    reasons set forth for that in the political science

2    literature.  It's pretty well-known and widely accepted

3    that that's the case.

4           And that's one of those things that

5    probably isn't going to vary a whole lot across

6    locations.  It might some.  It might be some

7    variability, but particularly with age, it seems like

8    because people are not in the habit of voting when they

9    turn 18, 19, 20.  It takes them a while to develop

10   regular participation habits.

11   BY MS. ADEN:

12       Q     Did you test whether or not that general

13   acceptance commonly known belief about low turnout

14   amongst black voters or youth voters was true in Waller

15   County in particular?

16       A     I believe my report suggests that certainly

17   in the precincts, you know, in the Prairie View area

18   and I know on the rebuttal reports, they took offense

19   at me using that description of the Prairie View area,

20   but I think you understand what I mean by that as the

21   Prairie View campus, but also the town of Prairie View

22   and that's what I mean by the Prairie View area that

23   they took offense to in the rebuttal reports.  And I

24   take offense to their offense.

25           But anyway, the point is that, you know, in

1  those couple of precincts that we know to be majority

2  African-American, there are turnout deficits, you know,

3  over time compared to other locations around the county

4  and other locations in Texas.

5      Q      You mention that there tend to be various

6  reasons for that.  What are the reasons that you're

7  referring to?

8      A      Well, you know, so there's a -- that's one

9  where I can ramble a while.

10     Q      If you could give me like the top three

11  reasons.

12     A      For young people, there's a question again

13  of not being habituated to voting and it's also lack of

14  knowledge and inexperience.  So those are really

15  important.  I think for African-Americans, there are

16  some significant issues, you know, going to their

17  feelings of efficacy, whether they can trust the

18  system, whether they believe the system works for them.

19  And I think there are questions about knowledge levels.

20          Part of what has to be sorted out when you

21  look at African-American political participation is

22  again socioeconomic status because, you know, there are

23  a lot of African-Americans who are lower income.  So is

24  that black or is that they're low income or lack of

25  education?  And I think the truth is that when you

1    control for SES, you know, black voters who are middle

2    class vote about the same rate as white voters, that

3    the deficits that we see most severe in the black

4    population are places where the black population also

5    happens to be pretty poor, you know, and lower incomes.

6    Those would be like inner city locations, also places

7    like the Mississippi Delta, locations where the black

8    population is especially low income and lacking in

9    education.

10              Where those other deficits are not present

11   like, for example, out in suburban Maryland, I think

12   the turnout rates among black voters in Montgomery

13   County, for instance, or Howard or Anne Arundel are

14   pretty high and comparable.

15        Q     So does that suggest that there is -- it

16   goes back to your point about local -- the context

17   matters, jurisdictions matter?

18        A     I think so.  I think that that's fair.  I

19   think that that's fair.  There is some variability

20   across context and how these populations participate

21   and there are some other things.  There's a line of

22   research in political science that suggest that having

23   black office holders can make a difference and I think

24   that goes back to the other point if you see black

25   office holders elected on a regular basis, it might

1  encourage you to vote or to participate or to

2  contribute because you can see a member of your own

3  race occasionally get elected.

4        So this plays into the creation, for

5  example, and rationale behind the majority minority

6  districts in certain places, and, you know, I believe

7  it goes back to the nineties.  You know, there was a

8  literature in political science that looked at the

9  participation levels of cities where there were black

10  mayors, you know, like Tom Bradley, for instance, and

11  saw that black participation rates were augmented in

12  areas where there were black office holders.

13        So there's something to that, but that I

14  think probably goes back to the point I made five

15  minutes ago about efficacy being an issue and the idea

16  that you can trust the system, that the system might

17  work for you, that if you were to petition the

18  government, you know, would it respond.  Is there

19  someone like me who actually holds office, someone who

20  would listen to me, this kind of thing.

21     Q     When we started out, you mentioned having

22  looked at the reports of Dr. Flores and Dr. Stein?

23     A     Um-hmm.

24     Q     Did you review the reports of Dr. Joseph or

25  the report of Dr. Joseph in this case?

1       A       I read over his report.  Again, it's been
2   some time.
3       Q       What about Mr. Cooper?
4       A       I also read that report.
5       Q       One report or more than one?
6       A       I read the report I was sent.  If there was
7   a second report, it was not sent to me.
8       Q       So the first one, though, was a while back?
9       A       Yes.  This would have been back in July.
10      Q       We're going to drill down on some of what
11  you said in a bit, but to just close the loop on your
12  CV for a moment, are you a member of any community
13  groups?
14      A       I attend a church.  I attend a church.  I'm
15  also a level 2 certified field hockey coach.  So, you
16  know, I got a -- I even make a little money at that,
17  not major, but it's not on my CV, so --
18      Q       In Maryland, are you required as -- when
19  you register to vote to identify your party
20  affiliation?
21      A       Yes, we do.
22      Q       And did you identify your party
23  affiliation?  Let me step back.  Are you registered to
24  vote?
25      A       Yes, I'm registered to vote.

1      Q      Did you identify your party?

2      A      Yes.

3      Q      What is your party?

4      A      I'm registered as a Republican.  I grew up

5   originally in Nebraska and a county that was probably

6   about 65/35 red blue, so 65 red, 35 blue, Republican

7   and Democrat.  So it's pretty common for people to grow

8   up in an environment like that, a small town to absorb

9   those values pretty early on.

10             And, again, I think it's, you know, I would

11  say my students ask me this.  It's more of an identity

12  than an opinion.  A lot of people as they're

13  politically socialized growing up kind of absorb it

14  like a religion and it's not even all that policy

15  relevant.  It's not like you consider all of these

16  public policies and sort of weigh them in the balance,

17  okay, and then decide.  There's some people who might

18  view it that way, but that's not what our empirical

19  research shows.  Empirical research shows you sort of

20  absorb it from your family and your environment.

21     Q      So you agree that there's literature that

22  suggests that learning to vote early, as early as

23  possible has an impact on your -- how you sustain

24  political participation throughout your life?

25             MR. SEAQUIST:  Object to the form.

1           THE WITNESS:  I think that there's

2    literature that supports that.  I mean, it's modeling,

3    right.  It's modeling.  It's imitation.  So you grew up

4    in an area where people express particular opinions.

5    You're more likely to adopt those opinions.  If they

6    engage in certain behaviors, you're likely to engage in

7    those behaviors yourself.  It's sort of parent to child

8    transmission of values that a human development

9    specialist can tell you about in great detail.

10   BY MS. ADEN:

11       Q       And that includes political participation?

12       A       I think so, yes.

13       Q       Did you look at whether in Texas you --

14   when you register to vote, you are required to identify

15   your party affiliation?

16       A       You're not.  You're not.

17       Q       And so in Waller County, for example, when

18   you register to vote, you may or may not identify your

19   party affiliation; is that correct?

20       A       I actually don't think that it appears on

21   the voter file.

22       Q       Let's go back a little bit.  We're going to

23   be moving in and out of topics this afternoon, but

24   let's go back just briefly to your work as an expert in

25   some of the federal voting rights cases that you

1    mentioned.

2         A       Okay.

3         Q       You mentioned being deposed in about five

4    cases and you mentioned Wisconsin, Pennsylvania,

5    California, and North Carolina.  Have you worked in

6    Texas besides this case?

7         A       No.

8         Q       Now, you talked about the Pennsylvania and

9    Wisconsin and North Carolina cases being redistricting

10   cases; is that correct?

11        A       Yes.

12        Q       Is it accurate to say that those are

13   redistricting cases that are challenging what is

14   referred to as partisan gerrymandering?

15        A       That's what those are about, yes.  That's

16   the core issue.

17        Q       Besides those three states, have you done

18   work on any other partisan gerrymandering cases?

19        A       No.

20        Q       What was the party affiliation of the

21   individual -- let me step back.

22                I believe you mentioned that you were

23   retained by the state in at least one of those cases.

24   Can you tell me in the Pennsylvania, Wisconsin, and

25   North Carolina cases who specifically retained you, the

1 plaintiffs or the defendants?

2     A    Okay.  So in the North Carolina case, Rucho

3 is a member of -- Mr. Rucho is a member of the state

4 senate and that was in Republican hands.  So the answer

5 to your question is it was the Republican senate that

6 was party to that case in North Carolina.

7     Q    And that person was being sued?

8     A    Yes.

9     Q    So it was a defendant?  You were being

10 retained by the defendant?

11     A    Yes.

12     Q    Okay.

13     A    In Agre V Wolf -- I'm looking at page 10 of

14 the CV.

15     Q    Okay.

16     A    Agre V Wolf, Wolf is the Democratic

17 governor and Agre is a citizen.  And I was retained by

18 the State of Pennsylvania as represented by Governor

19 Wolf.

20     Q    And that's Pennsylvania?

21     A    Yes.

22     Q    And then Wisconsin?

23     A    Then the other case in Pennsylvania was

24 League of Women Voters versus Commonwealth of

25 Pennsylvania and I believe both the governor and the

1  legislature are parties to that case on the defendant

2  side.  And then in Wisconsin, yes.  Wisconsin -- I'm

3  confusing them and I believe that they're both

4  citizens.  And one is obviously challenging the drawing

5  of the districts and the other one is defending those.

6      Q      You were hired on behalf of the state there

7  as well?

8      A      The state legislature.

9      Q      And the state legislature --

10      A      Republican.

11      Q      And the Pennsylvania legislature is also

12  Republican or majority Republican?

13      A      Yes.  The governor not, but, yes, the state

14  legislature, yes.

15      Q      So besides -- tell me a little bit more

16  about the Baber versus Dunlap case, what the nature of

17  that case was --

18      A      Right.  So --

19      Q      -- and who retained you.

20      A      This didn't really get to a trial.  This

21  was -- I was retained as an expert on a hearing for a

22  preliminary injunction.  And this was approximately a

23  year ago and Baber is a citizen and seeking to void the

24  state's adoption and use of ranked-choice voting.  And

25  Dunlap is the defendant, the secretary of state, who in

1  his role as secretary of state administers elections in

2  Maine.  So the hearing was before a judge and so I did

3  testify in court about a year ago in that case before

4  the judge in this hearing.

5      Q      And you were hired on behalf of Dunlap, the

6  secretary of state?

7      A      No.  This would be the citizen, Baber.

8  Baber was trying to overturn ranked-choice voting as it

9  was adopted in the State of Maine.

10     Q      And the California case --

11     A      This is a very interesting local case.

12 Really weren't partisan sides since local governments

13 are nonpartisan, but it involved the question of

14 whether city counselors or aldermen or city counselors

15 in the City of Palmdale should be elected on an at

16 large basis as was the present practice at the time or

17 whether they should be elected on a district by

18 district basis.  So this was a redistricting case of a

19 different kind about the manner in which City

20 Councilmen should be elected in the City of Palmdale.

21     Q      And what was your role in that case?

22     A      I defended the City of Palmdale in my

23 report suggesting that -- the essence of my report is,

24 and I'm sure it's online somewhere, the essence of my

25 report is that at this point in the state's development

1 and history, the Latino population is so large and so

2 well embedded in the state throughout that, you know,

3 whether there were at large elections or district based

4 elections did not really make any difference to Latino

5 representation.

6 Now, if we were looking at the case in 1953

7 rather than in 2013, you know, it might be a different

8 story, but, you know, the State of California is a very

9 large, you know, many multigenerational Latino

10 population by now.

11 So you can see that regardless of whether

12 cities in the state, and I have tables on this, elect

13 on the basis of at large elections or district

14 elections, you have the same Latino representation on

15 the council.

16 Q Did you look at race or age data in

17 providing your opinions in that case?

18 A I don't think I looked at anything related

19 to age, but I believe race was important and so I did

20 look at race.

21 Q Would you have had to look at age data in

22 order to determine the voting age population in that

23 case?

24 A Okay. Sure. I gather that that's kind of

25 an understood denominator for lots of calculations, you

1  know, the voting age population.  So, okay.  If you

2  mean age in that sense, yes, then that would be there.

3      Q      What about socioeconomic indicators, did

4  you have to look at those to form an opinion in that

5  case such as poverty rates, access to education, or

6  educational attainment, access to housing or

7  employment?

8      A      Right.  Not so much there because when

9  you're down to the town or municipal level and you're

10  looking at areas, you know, within the town -- the size

11  of Palmdale, it's not Los Angeles.  Palmdale is not a

12  very big town.  There isn't a great deal of variation

13  in those indicators from location to location.

14      Q      Okay.  So you mentioned depositions.  It

15  seems like you took depositions in five of your six

16  cases.  Is that fair to say?

17      A      No.  I have to --

18      Q      So you did not take depositions in all of

19  your cases?

20      A      No.  I have to go back and --

21          MR. SEAQUIST:  One at a time.

22          THE WITNESS:  I have to go back.  I have to

23  go back and say that there was a deposition in the

24  California case.  There's a deposition in the Rucho

25  case.  There was not in Agre V Wolf.  There was not in

1    League of Women Voters, not in Baber V Dunlap.  There

2    was in Whitford V Gill.  So there were three, not five.

3    BY MS. ADEN:

4         Q       And in each of those cases, you submitted

5    expert reports?

6         A       In each of those cases, there's an expert

7    report.

8         Q       And in each of these cases, you testified

9    in court whether at a preliminary injunction hearing or

10   trial?

11        A       So the answer is no.  In the Common Cause

12   versus Rucho case, that did go to trial, but they did

13   not call me as a witness.  In Agre V Wolf, I did

14   testify, but then that same month in League of Women

15   Voters versus Commonwealth of Pennsylvania, they did

16   not call me.  Yes, I did testify in Baber V Dunlap and

17   Whitford V Gill that never went to trial.

18        Q       What about the California case?

19        A       Yes, I testified at trial there.

20        Q       Have you ever been retained by a plaintiff

21   who is a racial minority and/or by a group that

22   represents racial minorities?

23        A       No.

24        Q       Have you ever served as an expert on behalf

25   of plaintiffs alleging racial discrimination?

1     A     No.

2     Q     Would it be fair to say that the California

3 case involving the California Voting Rights Act is the

4 only case where you served on the -- on behalf of a

5 party in a case alleging racial discrimination?  Let me

6 strike that.

7          Is the California case the only case that

8 you've been involved in alleging racial discrimination?

9     A     Yes.

10     Q     And in that case --

11     A     Well, I need to back up for a second

12 because, you know, there's ambiguity about whether the

13 Hispanic or Latino population is a race.  I mean, you

14 know, bear in mind that there's some ambiguity about

15 that.  So, you know, ethnic discrimination, perhaps.

16 It's not quite the same as race and you know why that

17 is, of course.  Everyone does who has some exposure to

18 social science research.  We know that Hispanic people

19 can be of any race.  And so ethnic discrimination, I

20 guess, is what was at stake as a claim in that case.

21 It's not quite the same as racial discrimination.

22     Q     Fair.

23     A     Maybe it's splitting hairs.

24     Q     So the answer is either depending upon

25 whether or not you consider people of Hispanic or

1    Latino descent a racial group, the answer is either

2    zero or one?

3         A    Yes.

4         Q    And in that case, you were however

5    appearing as an expert on behalf of the governmental

6    entity, not that racial ethnic group?

7         A    Yes.

8         Q    Is it fair to say that you've never

9    testified in a case where you found evidence of racial

10   discrimination?

11        A    I have not.

12        Q    And similarly you've never testified in a

13   case where you have found racial disparities in the

14   racial impact of a challenge practice?

15             MR. SEAQUIST:  Form.

16   BY MS. ADEN:

17        Q    I can re-ask it.

18        A    I have not.  I have not.

19        Q    To be clear, you have not testified in a

20   case where you --

21        A    Where I have found --

22        Q    -- have formed an opinion or found racial

23   impact?

24        A    Right.  I would say the answer is yes.

25        Q    In any of the cases where you have served

1  as an expert that we've discussed or any others, have

2  any of them found that you were not qualified to serve

3  as an expert witness?

4      A      No.

5      Q      Did any of the cases in which we've

6  discussed or others reject your reports, your expert

7  report?

8      A      No.

9      Q      In any of the cases that we've discussed or

10  any others reject your testimony?

11      A      No.  If you're trying to ask more pointedly

12  why I wasn't called in a couple of these, I think it

13  went to the time allotted and the number of witnesses

14  they had.  That's the only explanation the attorneys

15  ever gave me.  That's all I can tell you.  They're

16  given a small amount of time and sometimes they have

17  more witnesses than they can put forth and so maybe

18  some people get bounced out.  That's all I can tell you

19  about that.

20      Q      When I asked about whether or not any court

21  has rejected your testimony, that's in whole or in

22  part.  So are you aware whether a court has in whole or

23  in part rejected any of your testimony?

24      A      No.  I can't say that I've gone back and

25  thoroughly digested all of the opinions once they're

1  issued, right, but to my knowledge, the answer is no.

2      Q    I'm going to show you what I am marking as

3  Exhibit 3 which is the decision and order on motion for

4  preliminary injunction in the Baber versus Dunlap and

5  this is document 64 in Case Number 1:18-CV-456-LEW.

6  And I'm handing a copy of that to Dr. Gimpel and a copy

7  to his counsel.

8          (Gimpel Exhibit 3 was marked for purposes

9  of identification.)

10  BY MS. ADEN:

11      Q    And you talked about before testifying at

12  the preliminary injunction in this case pretty

13  recently, right, in the past year or so?

14      A    Probably about a year.

15      Q    Have you seen this document before?

16      A    It's possible that the attorney that was

17  retaining me sent this to me and that I saw it, but I

18  can't say that I remember reading it.  You know, by

19  this point, it was clear that the Court had gone in a

20  different direction and that they weren't going to

21  grant the injunction, so, you know, I sort of moved on.

22      Q    I'd love to turn your attention to page 14

23  of this document.

24      A    Yes.

25      Q    And I have taken the liberty because it is

1  a 30-page document to highlight some sentences on page

2  14 that I would like for you to read into the record.

3  Do you mind beginning with plaintiffs contend and

4  reading aloud?

5       A       You want me to read?

6       Q       The highlighted section, yes.

7       A       "The plaintiffs contend that ranked-choice

8  voting -- that's RCV -- is too exotic to fit within the

9  meaning of article 1.  Plaintiffs argue that over 100

10  years of widespread acceptance of plurality elections

11  should not be undone by new ideas concerning the manner

12  of holding elections.

13              "Plaintiffs attempt to prove the point

14  through scholarly debate about the disadvantages of

15  RCV.  In my view, these arguments are policy

16  considerations that the people and their

17  representatives should weigh and assess when devising

18  the best manner for holding elections.

19              "It is precisely why I find Dr. Gimpel's

20  testimony to be unpersuasive in its entirety, at least

21  as bearing on problems of constitutional magnitude."

22       Q       Do you recall reading this language before?

23       A       I don't recall reading this specific

24  language, but, I mean, I got the gist of it.  I mean,

25  believe me, we got the point when he announced that he

1   was going the other direction on this, and, you know,

2   quite honestly counsel and I had discussed this as

3   being pretty much a long shot.

4           You know, it's very difficult for courts to

5   set aside the way states and localities decide to run

6   their elections.  This particular judge, I believe, was

7   a Trump appointee and I think courts regardless of the

8   partisanship of the jurists involved have a very hard

9   time justifying overturning or changing the way a state

10  or locality would choose to run its elections.  So I

11  can't say that we were particularly surprised.

12      Q    Do you have any reason to disagree with

13  this court's treatment of your opinion in this case?

14              MR. SEAQUIST:  Form.

15              THE WITNESS:  Well, I mean, I obviously

16  disagree in this particular case.  I stand by my

17  opinion like I said.  To say that I'm not surprised

18  that it went the way it did is not to say I was wrong.

19  I think that the people in Maine maybe not immediately

20  but will live to regret ranked-choice voting and it

21  might take a while, you know, for them to ultimately

22  turn back to the more traditional option, but when they

23  get one of these very strange or unusual outcomes,

24  there will be an outcry for change as there was in

25  Vermont and they switched back.

1  BY MS. ADEN:

2       Q       Regardless of whether or not you stand by

3  your opinion, the Court is it fair to say disagreed

4  with your opinion?

5       A       Oh, sure, yes.  That's fair.

6       Q       I would turn -- ask you to turn very

7  quickly to page 26 of this document and there is

8  another sentence that is highlighted in yellow.  If you

9  could read that aloud into the record.

10      A       "There was no evidence produced to support

11 the argument other than the conclusory testimony of Dr.

12 Gimpel which I have summarized and discount entirely."

13      Q       Why do you recall did the Court say that

14 your testimony was, quote, conclusory?

15              MR. SEAQUIST:  Form.

16              THE WITNESS:  I'm not quite sure I know how

17 that word is being used there.

18 BY MS. ADEN:

19      Q       Do you have an understanding of what it

20 means to testify in a, quote, conclusory manner?

21      A       I don't think that I quite understand the

22 meaning of the word as it's used in this context.

23      Q       Do you have an opinion about whether or not

24 the -- you agree with the Court's conclusion that your

25 testimony was conclusory?

1     A     Well, I don't quite know what he means,

2  what the judge means by that term.  So I don't have an

3  opinion on it.

4     Q     And finally if you could turn to page 27,

5  the next page.  There are two groups of sentences

6  highlighted.  If we could take them in two different

7  turns, the first beginning with -- the first full

8  paragraph that begins with further, do you mind reading

9  those highlighted sentences aloud?

10     A     "Further I'm not persuaded by Dr. Gimpel's

11  testimony which attributes an error in virtue in the

12  force simplicity of two-party access to the ballot

13  thereby making easier the voters' choice.  He testified

14  to what he perceived as a troubling reality that Maine

15  has a low threshold for nonparty candidates to gain

16  access to the ballot.

17          "It ceases as I understand it is that by

18  allowing for choices among several non-major party

19  candidates, voter turnout is likely to be comprised of

20  greater percentage of low information voters which

21  apparently makes more likely these voters are

22  cognitively unable to fill out and RCV ballot.

23          "In addition to being cynical, these

24  conclusions are not grounded in anything approaching

25  reliable standard that may be informative of the

1  constitutional questions."

2      Q      So do you have or -- strike that.

3             Do you agree with the assessment of your

4  testimony and expert opinions by the Court?

5      A      No.  No.  I obviously don't agree, but you

6  know what do you do, right?  He didn't find -- he

7  didn't find the case we sent forward persuasive.  I

8  think, you know, one of the problems here is that this

9  case was very difficult from the standpoint of the

10  challenge, the Court challenge being filed immediately

11  after the November 6th election, the attorney not

12  taking the case up until about the third week of

13  November just before the Thanksgiving holiday and the

14  hearing taking place about the second week of December,

15  right?

16             So, you know, the amount of time to prepare

17  here, you know, was very truncated, very short and you

18  prepare the best case you can on the timetable that

19  you're given, right, and we prepared a reasonable case

20  based upon the two-and-a-half weeks really that we had

21  to pull it together.  And, I mean, you can look at that

22  report, you know, for yourself.  It's probably online

23  somewhere.  And I think given the two-and-a-half weeks

24  we had to consider this pretty complicated question, we

25  did the best job we could and it's very clear that, you

1  know, it was not persuasive.  I think that that's

2  obvious from any reading here.  The amount of time that

3  we had to prepare was very short, very brief.

4      Q      Do you have any thoughts about why the

5  judge however called your conclusions, quote, cynical?

6              MR. SEAQUIST:  Form.

7              THE WITNESS:  Well, I think he in this

8  particular -- I'm not sure, but I'll speculate that he

9  thinks that the very common finding, you know, in

10  survey research that, you know, there is a very large

11  cadre of less motivated and less interested voters.  He

12  finds that fact to be offensive in some way, but, you

13  know, it's not really my conclusion, right, but there's

14  a large component of the electorate that is less

15  interested and less motivated and less informed.

16              You know, there are 50 years of political

17  behavior research showing that there is a distribution

18  of information in the electorate with a very large

19  share of the voters who are not as motivated, not as

20  interested, not as informed.  That's -- you know, if he

21  wants to talk that fact cynical or offensive, that's

22  fine, but he happens to be, you know, wrong if he's

23  going to deny the reality of that very large block and

24  you know something.  This is something where the

25  campaign consulting community and the political

1  behavior social science community completely agree.

2  BY MS. ADEN:

3      Q      But if you are a low information voter in

4  past practice, does that mean you don't have a right to

5  cast your ballot to change the system that's in place?

6      A      I think what the -- what's at stake here,

7  you know, was the complexity of the ranked-choice

8  voting ballot and the idea here was that -- that there

9  are a large share of people who actually did wind up

10  voting incorrectly because they did not understand the

11  ballot, okay, and some of those votes were disqualified

12  and tossed out because they filled out the ballot

13  incorrectly.

14          And what the attorney was trying to show is

15  that the votes that were tossed out because of spoilage

16  could have easily made up the margin between

17  Mr. Baldwin and the winner of the election, the

18  declared winner of the election.

19      Q      Is part of your analysis, though, that low

20  information voters can't understand how to effectuate

21  ranked-choice voting?

22      A      I think that there's very good evidence to

23  quote Governor Brown from California that ranked-choice

24  voting is too complex.  It's just too complex and there

25  are voters who will not vote as a result of it and

1  voters whose ballots with be spoiled and that, you

2  know, we have an obligation to make the ballot easy to

3  understand.

4       Q       Who is we?

5       A       We, I think, as citizens and as election

6  administration people concerned with election

7  administration in carrying out elections and then

8  citizens, you know, we should make our ballot simple to

9  understand and not make it overly complex and this was

10  the thrust that -- of our argument.

11       Q       Were your conclusions, in fact, quote,

12  grounded in a reliable standard, end quote?

13       A       Well, I'm not quite sure what that means.

14  Look, if we had had more time, we could have

15  commissioned a survey of Maine voters and, you know,

16  shown that, for instance, according to one of the

17  newspapers, 25 percent of the Maine voting population

18  complained about ranked-choice voting.

19              Now, the other side said, see, only

20  25 percent, only 25 percent.  That's a trivial share,

21  but how many people would have complained about simple

22  plurality voting.  So by that standard, 25 percent is a

23  huge amount.  One out of every four people in Maine

24  thought ranked-choice voting was confusing, but a

25  simple plurality voting, not a problem.  That was the

1   issue that they ignored here.

2        Q       Ultimately would you say that the Court

3   would have come out differently with respect to how he

4   treated your opinions if you had more time?  Is that

5   the thrust?

6        A       I think that was huge, but, you know, it's

7   the case with all of these cases I've ever worked on.

8   It's like particularly on the defense side.  You're

9   given two weeks to respond when the other side has had

10  like five months.  It's constantly a challenge.  This

11  was especially bad because I guess we were the -- in

12  this case on the complaint's side and not given really

13  any time.

14       Q       And finally on this same page, can you read

15  the last sentence of that first full paragraph that's

16  highlighted in yellow to his credit?

17       A       "Dr. Gimpel can see that he's not discussed

18  the RCV experience with a single Maine voter, but would

19  like to conduct such a study."  Sure.  It would

20  absolutely be very valuable and, you know something, in

21  a few years, you know, we will see if people are still

22  enamored with ranked-choice voting that it's still

23  75/25.  So let's see.

24               "In the meantime, I simply am unable to

25  credit his testimony in any way on the constitutional

1    issues before the Court."

2            So, look, as I said going in, we knew this

3    was a long shot.  I don't think it's easy to get courts

4    to step in and tell states and localities how to run

5    their elections.  I don't think that's an easy thing to

6    do at all.

7        Q      So just to be clear for the record, the two

8    sentences because you did put some of your own opinion

9    into reading those last two sentences, I just want to

10   be clear for the record, the last two sentences read:

11   "To his credit, Dr. Gimpel conceded that he had not

12   discussed the RCV experience with a single Maine voter,

13   but would like to conduct such a study.  In the

14   meantime, I simply am unable to credit his testimony

15   any way on the constitutional issues before the Court."

16       A      Right.

17       Q      And that's on page 27 of this opinion?

18       A      Yes.

19       Q      Outside of the time issue, did anything

20   about what the Court said in its opinion about your

21   analysis cause you to rethink the questions that you

22   were asked or the methodology that you employed in this

23   case?

24       A      No.  Ranked-choice voting is still a mess

25   and that's why it won't be adopted in most places.

1    Q       One last question to that.  The Court
2    seemed to indicate that you would have talked to a
3    Maine voter if you had had the opportunity to do so.
4    Is that part of the methodology?
5    A       But the first question I asked the attorney
6    when he retained me is do we have a survey of Maine
7    voters on the recent election.  Do we have a survey.
8    And he said no.  Okay.  And so I said, well, you know,
9    have any of the newspapers in Maine conducted a survey
10   on it and he said no.  Okay.
11           So, you know, when I'm sitting there in the
12   hearing, the fourth question that comes out of the
13   mouth of the defense attorney is, oh, well, we have
14   this survey from the Bangor newspaper that shows, you
15   know, the 75/25 margin.  Well, you know, I'd like to
16   have known about that in advance, but I can tell you
17   that 25 percent complaining about the ballot form is a
18   huge number.  It's very alarming.  Okay.  So they read
19   that as being a trivial number.  I read it exactly the
20   reverse because if they would have stayed with the same
21   ballot that they had always used, the one that's
22   familiar to every citizen, nobody would have complained
23   when they asked that question.
24   Q       And so the survey would have been a part of
25   the methodology that you would have done had you had

1    more time?

2        A        Yes.

3        Q        We can move on from this document and I

4    want to --

5                MR. SEAQUIST:  I'm sorry to interrupt.  If

6    we are shifting gears, it's about noon right now.  I

7    don't know if you guys want to take a lunch break.

8                MS. ADEN:  Can I do about five or ten more

9    minutes and then -- so I don't need a lunch break, but

10   if the witness does, we're happy to take a break.  But

11   I wanted to finish one line of questioning that may

12   take five to ten minutes and then we can decide what to

13   do.

14               MR. SEAQUIST:  Okay.

15   BY MS. ADEN:

16       Q        So I'm going to mark as Exhibit 4 a opinion

17   in Agre -- is that the correct way to pronounce that

18   case?

19       A        Agre, I think, but, you know, I'll know

20   what you're talking about.

21       Q        Agre versus Wolf.  That's A-G-R-E versus

22   Wolf, W-O-L-F.  It is cited as 284 F.Supp 3d 951.  It's

23   a 2018 decision.  I'm handing a copy of that to Dr.

24   Gimpel and another copy to his counsel.

25                   (Gimpel Exhibit 4 was marked for purposes

1  of identification.)

2  BY MS. ADEN:

3      Q      This is a very long court opinion.  I'm not

4  going to ask you about everything in it because it's

5  quite extensive.  This was a opinion I just mentioned

6  that was entered in the last year, so you're pretty

7  familiar with it?

8      A      You know, again, this was probably sent to

9  me post trial and I did not read it.

10     Q      So you haven't seen this decision?

11     A      I haven't read through it, no.  So I'll be

12  as surprised as I was by the last one.

13     Q      I want to direct your attention to page 55

14  of this packet.  Again, it's quite long.  I think all

15  total there are 107 pages in it, but if you could turn

16  to page 55.  I've again highlighted some information

17  that I'd like you to read aloud into the record.  It

18  begins with as to defendants.

19     A      Can I ask who is writing here?

20     Q      Yes.  So this is the dissenting opinion by

21  Judge Baylson.

22             Do you recall that?

23     A      Okay.  It was 2 to 1, as I recall.  "So as

24  to defendants' expert, Professor James Gimpel, he also

25  brought to the Court significant expertise in

1   districting practices, significant publications and

2   prior experience testifying as an expert.  Nonetheless,

3   his criticism of the plaintiffs' factual evidence and

4   particularly his testimony regarding Ms. Hanna and Mr.

5   McGlone has failed to persuade me that the weight which

6   I ascribe to those witnesses should be changed.

7   Professor Gimpel was very general in a lot of his

8   answers.

9              "Further, as the recorded testimony will

10  show, but the written testimony will not, he raised his

11  voice and started shouting on a number of occasions

12  when his conclusions were under attack during cross

13  examination.  This is highly unusual behavior by an

14  experienced expert, and warrants the Court's giving low

15  weight to all of his testimony."  Okay.  Okay.

16     Q     So do you agree with Judge Baylson's

17  overall assessment of your testimony and credibility?

18              MR. SEAQUIST:  Form.

19              THE WITNESS:  No.

20  BY MS. ADEN:

21     Q     Why not?

22     A     Because I don't think I was particularly

23  general and, you know, if I, you know, raised my voice

24  a couple of times, it was mainly for emphasis and, you

25  know, probably displayed some measure of enthusiasm,

 1   but I didn't think that -- you know, I don't know.  You

 2   know, I don't know if it was unusual or not.  People

 3   have different styles, I guess.

 4        Q        So you -- is it fair to say you don't agree

 5   with Judge Baylson's assessment that you repeatedly

 6   shouted while testifying and that's highly unusual

 7   behavior by an experienced expert?

 8        A        I don't think so.  I have a loud voice and,

 9   you know, there are a couple of times when I emphasized

10   a couple of points in response to cross examination or

11   maybe even direct, you know, when I had a couple of

12   points I wanted to emphasize, you know, but did the

13   others complain about it.  You've got one guy here,

14   right?  Did the other two complain about it?  Is there

15   anything in there about that?

16        Q        The other two judges?

17        A        Yeah.  Did they complain about it?

18        Q        I'm only aware of this Judge Baylson

19   highlighting your testimony and decorum.

20        A        Okay.  The other two didn't have a problem

21   with it, I guess.

22        Q        Do you know who appointed Judge Baylson?

23        A        I have no idea.

24        Q        Would it surprise you if he was appointed

25   by former President George Bush?

1      A      Which George Bush?

2      Q      George W. Bush.

3      A      Okay.  No, I had no idea.

4      Q      So between what the Court said in the

5 Dunlap case and in this case, is your opinion that

6 those judges were wrong and you were right with respect

7 to your testimony?

8      A      Yes.

9      Q      And is it your opinion --

10     A      The Court actually agreed with me in the

11 Agre case, agreed with my position against Judge

12 Baylson.

13     Q      The majority opinion?

14     A      The majority opinion was against Judge

15 Baylson.

16     Q      But you are notwithstanding saying that you

17 disagree with the judge in the Dunlap case who I think

18 you indicated was a Trump appointee and in this case,

19 you are disagreeing with Judge Baylson who is a

20 dissenting judge appointed by George W. Bush?

21            MR. SEAQUIST:  Object to form.

22            THE WITNESS:  I can certainly understand

23 why a Court would be extremely reluctant to tell states

24 and localities how to run their elections.  By the way,

25 that's what's partly going on in this case.  Okay?  So

1   I can certainly understand why in Maine there would be

2   reluctance by a jurist to say, hey, you know, scrap

3   this election system that was subject to popular

4   referendum and go back to the old way.  I can certainly

5   understand the decision.  I still think it was the

6   wrong decision.

7   BY MS. ADEN:

8      Q      Is that true of Federal Courts only or also

9   of state courts?

10                  MR. SEAQUIST:  Object to the form.

11  BY MS. ADEN:

12     Q      Let me strike that and rephrase it.  Is it

13  your opinion that states are reluctant to change their

14  election laws when Federal Courts get involved or

15  federal and state courts?

16                  MR. SEAQUIST:  Object to the form.

17                  THE WITNESS:  I don't quite understand the

18  question exactly, but what I am saying --

19                  MR. SEAQUIST:  If you don't understand, let

20  her clarify.

21  BY MS. ADEN:

22     Q      Let me try to rephrase.

23     A      Okay.

24     Q      Is it your opinion that states are

25  reluctant to change their election laws when Federal

1    Courts gets involved?

2                    MR. SEAQUIST:  Object to the form.

3                    THE WITNESS:  No, I would not say that.  My

4    point is that judges and the Courts in general are

5    reluctant to force states and localities to change the

6    way they run their elections.

7    BY MS. ADEN:

8        Q       Is that federal judges that you're

9    referring to?

10       A       I have not made a detailed study of

11   decisions on this at the state level, but I would say

12   probably judges in general federal and state, you know,

13   are reluctant to step in and tell states and localities

14   how to run their elections.

15       Q       Is that true whether or not judges are

16   appointed as compared to elected?

17       A       This is a question that's excellent and

18   someone in political science should answer it.  I don't

19   know the answer.

20       Q       And is that true of judges -- so correct me

21   if I'm wrong.  Help me understand.  If voters go to the

22   ballot to change their election law, is it your

23   position that that should be respected in all instances

24   or that courts have a role or don't have a role in

25   ensuring that those initiatives notwithstanding comply

1  with the law?

2      A      Right.  So I can understand why in Baber V

3  Dunlap the judge ruled the way he did.  I can

4  understand that.  I think courts in general are very

5  reluctant to step in and tell states and localities how

6  to run their elections.  They don't believe that it's

7  within the providence of their expertise to do that.

8              As for my own opinion, sure.  I mean, I

9  think there may be some cases, you know, where very

10  possibly states, localities may make a wrong decision.

11  So you can't say never, right.  You can't say never,

12  that there's never ever a circumstance where, you know,

13  a state or a locality does something that they should

14  not do.

15              But I do understand that courts in general

16  take the position that they're not going to routinely

17  step in and meddle with the decisions that states and

18  localities make on how they run their elections.

19      Q      When states are running elections that have

20  racially discriminatory results, should courts step in?

21              MR. SEAQUIST:  Form.

22  BY MS. ADEN:

23      Q      Courts or judges.

24              MR. SEAQUIST:  Form.

25              THE WITNESS:  That's a really general

1    question.  I'm just not prepared to answer such a

2    general question.  I need -- you need to look at

3    particular circumstances sort of like in this Maine

4    case.

5    BY MS. ADEN:

6        Q      Do you need to look at the impact of a

7    particular law on different racial groups to answer

8    that question?

9        A      I think that that evidence would be

10   germane.

11       Q      Similar with respect to age discrimination,

12   do you think that courts or judges should step in to

13   state election laws when there is age discrimination

14   occurring?

15             MR. SEAQUIST:  Object to the form.

16             THE WITNESS:  You know, I think that

17   there's -- that that evidence, you know, should be

18   considered alongside all the rest.  I mean, there's --

19   that's germane.

20   BY MS. ADEN:

21       Q      By that evidence, you're referring to

22   disparities in how a law might impact different age

23   groups?

24       A      Sure.  In all of these cases, there are

25   multiple things going on and particularly in the social

1  science research, people are not, for instance, simply

2  members of one identity group, right.  They have both

3  an age and a gender and a race and a socioeconomic

4  status and these other characteristics.  So it's --

5  these are very involved inquiries.

6      Q      Is it your understanding that if a voting

7  practice has a multiple reason -- strike that.

8             Is it your understanding that if a voting

9  practice has various reasons for -- strike that.

10             Is it your understanding that if a voting

11  practice has various results -- results on people

12  different of age groups or people with different

13  political identities that -- strike that.

14             I'm going to get back to this.

15      A      Okay.

16      Q      What other cases besides this case are you

17  currently working on?

18      A      I don't know if I'm currently working on

19  any cases.  I recently wrote a report in a North

20  Carolina case relating to voter ID, but after I filed

21  the report, I have not heard anything since.

22      Q      Is that a state case or a federal case?

23      A      That's a federal case.

24      Q      And is that -- who has retained you to

25  author the report?

1       A       Well, the firm is Cooper V Ellis -- no.

2  Cooper and Ellis.

3       Q       It's a law firm?

4       A       Yes.  I was thinking about names of court

5  cases.

6       Q       Do you know --

7       A       So I think that they -- I think that they

8  represent the state legislature of North Carolina or

9  the North Carolina state government.

10      Q       Are you aware of whether North Carolina's

11  photo ID law has been challenged previously?

12      A       Yes.  There have been a number of

13  challenges to it.

14      Q       Do you know whether or not those cases have

15  alleged racial discrimination?

16      A       I think that's the core claim.

17      Q       And do you know whether your report has

18  been filed publicly in that case or disclosed publicly?

19      A       You know, I think it probably has.  I think

20  it probably has.  You know, like I said, I file these

21  reports and then I don't hear from the attorneys and I

22  tend to move on to other things.

23      Q       We hear that often.

24              MS. ADEN:  I'm getting to the end of this.

25              MR. SEAQUIST:  Can I clarify one point?

1  When you say file a report, can you explain what you

2  mean because to the lawyers sitting around the table,

3  file means something very different?

4  BY MS. ADEN:

5      Q      Did you disclose it only to the attorneys?

6      A      I sent it back to them.  I don't know what

7  they've done with it.

8              MR. SEAQUIST:  There you go.

9  BY MS. ADEN:

10     Q      Okay.

11     A      So I don't know the answer.

12     Q      Do you know whether you're at liberty to

13  say if the cases involving racial discrimination, are

14  you opining on whether or not that law has racial

15  impact?

16     A      Yes, that's part of the complaint.  So I

17  need to address that.

18     Q      And are you -- have you opined on whether

19  or not that law has a racial impact?

20     A      Yes.  And the evidence that I was able to

21  muster suggested no impact.

22     Q      Have you ever served as a fact witness in a

23  voting case, so not as an expert, but as a fact witness

24  if you know what that means?

25     A      Yeah, maybe you can say more about what

1    that means.

2          Q       Someone who is not being asked to offer an

3    opinion in an expert capacity, but based upon just like

4    a general lay witness just like any other person, they

5    don't have a particular expertise, but they're offering

6    facts that are not based upon particular

7    qualifications, particular expertise, particular

8    analysis.

9          A       No, I've never been involved in that.

10         Q       Okay.  So that is that question and then --

11                 MS. ADEN:  Can we go off the record for a

12   second?

13                 (A discussion was held off the record.)

14                 (Recessed at 12:13 p.m. for lunch.)

15

16

17

18

19

20

21

22

23

24

25

```
 1              A F T E R N O O N   S E S S I O N
 2                  (Reconvened at 12:54 p.m.)
 3   BY MS. ADEN:
 4        Q       Are you ready to proceed, Dr. Gimpel?
 5        A       Yes.
 6        Q       So we are going to turn to another subject
 7   which is to delve more deeply into this case and try to
 8   move us through the afternoon.
 9                Prior to working on this case, had you
10   spent time in Waller County?
11        A       No.
12        Q       And since being involved in this case, have
13   you been to Waller County?
14        A       I have not been.
15        Q       Have you met any of the plaintiffs in this
16   litigation and by plaintiffs, I'm referring to Jayla
17   Allen, J-A-Y-L-A and Allen with an E, A-L-L-E-N,
18   Treasure Smith, Damon Johnson or the Panther Party, the
19   other representative Joshua Muhammad and Muhammad is
20   spelled M-U-H-A-M-M-A-D?
21        A       I have not.
22        Q       Have you previously met any of the
23   defendants in this litigation and by defendants, I'm
24   referring to Judge Trey Duhon who is being sued in his
25   official capacity as the judge of the Commissioner's
```

1  Court of Waller County, elections administrator Christy

2  Eason, E-A-S-O-N, V Waller County?  Have you --

3      A      So Christy Eason I have communicated with

4  by telephone two times.

5      Q      About this case?

6      A      Yes, about the case.

7      Q      What was the nature of those conversations?

8      A      Those conversations simply went to

9  assistance with data collection.

10     Q      Meaning questions you had about data that

11 you needed or data that you had received?

12     A      Some of both actually.  So there were

13 questions about data that I was asking them to gather

14 and also questions about the data that they had

15 provided.

16     Q      About how long were each of those

17 conversations?

18     A      Fifteen minutes each.

19     Q      And did you share the documentation between

20 you directly and Ms. Eason?

21     A      Yes.

22     Q      And vice versa?

23     A      Yes.  She sent some documents and

24 information relating to placement of polling sites.

25     Q      And did you use that information to form

1    the opinions in your report?

2        A        Yes.

3        Q        And that was information that was separate

4    and apart from any of the information relied upon

5    explicitly or is underlying information in the expert

6    reports of plaintiffs' experts?

7        A        Well, I can tell you specifically that the

8    bulk of the communication was about the assembling of

9    the history of polling place siting that I discuss in

10   my report in passing, but was also included in a

11   separate file that my understanding was sent to the

12   plaintiffs, you know, with my report, you know, as a

13   relevant appendix.

14              So, you know, there was an effort to try to

15   go back through the record and identify the past

16   polling site placements some distance in time, you

17   know, into the late nineties, I think.

18       Q        And besides that topic, what other topic

19   did you talk about?

20       A        That -- that was the -- that was the

21   subject that I recall discussing.

22       Q        And then Judge Duhon, you haven't talk to

23   him?

24       A        No.

25       Q        What about any current or former members of

1  Waller County Commissioner's Court as far as you're

2  aware?

3      A      No.

4      Q      Have you spoken to any residents of Waller

5  County?

6      A      No.

7      Q      So I'm going to turn your attention back to

8  what I believe is Exhibit 2 which is the bundle of

9  documents that includes your CV but also your report as

10  an attachment.  Do you have that?  So you have talked

11  about you produced one report in this case; is that

12  correct?

13      A      Yes.

14      Q      So I want to make sure that we're on the

15  same page about the scope of your work in this case.

16  If you turn to page 1 of it, it reads under the topic

17  focus of research and overview on July 15, I was asked

18  by the defendants in this case to evaluate the

19  plaintiffs' claims and respond to expert reports

20  presented by the plaintiffs on Waller County election

21  officials siting of early voting locations and

22  allocation of early voting hours for the 2018 election.

23          Is that accurate?

24      A      Yes.

25      Q      Is that the only work that you were asked

1    to do in this case?

2        A      Yes.

3        Q      In that sentence, you refer to expert

4    reports presented by the plaintiffs.  Which expert

5    reports were you specifically asked to respond to?

6        A      I was sent reports by Joseph and Cooper and

7    Stein and Flores.  So I think in -- I don't think I was

8    given any -- recall any specific direction.  You know,

9    I gathered that the idea was to have the expert decide

10   which direction they should take based on their reading

11   and it was based on my reading that I focused primarily

12   on the reports of Flores and Stein.  Those are the --

13   those are the ones that I read most carefully.

14              You know, I didn't inquire about other

15   experts, but, you know, I probably made the assumption

16   that there might be other experts involved in the case

17   and, you know, that possibly there was some kind of

18   division of labor as is commonly the case.  So I

19   decided to focus on Stein and Flores.

20       Q      So is it fair to say that while you

21   reviewed the -- and at this point, this is July 15.

22   You were asked to do this.  So at this point, you were

23   only looking at the initial reports of experts; is that

24   accurate?

25       A      Yes.

1     Q     And at that point while you may have

2  reviewed the reports of Joseph and Cooper, the initial

3  reports of theirs, you -- in your mind, you were only

4  responding in your -- the report that we're about to

5  look at in detail to Flores's and Stein's specific

6  report?

7     A     Well, I thought that's where my expertise

8  was most pertinent I suppose you could say, that I had

9  pertinent expert that could bear on questions raised

10  and issues raised in those reports.

11     Q     The issue -- here you write in the same

12  paragraph in your expert report that in addition to

13  evaluating the plaintiffs' claims and responding to the

14  expert reports -- strike that.

15          On this page, it says that your task was to

16  evaluate the plaintiffs' claims and respond to expert

17  reports presented by the plaintiffs on Waller County

18  election officials siting of early voting locations and

19  allocation of early voting hours for the 2018 election.

20  So were there specific questions you were being asked

21  to do or what did you understand was your task?  What

22  did you understand was your task?

23     A     My task was to, you know, collect available

24  evidence on placement of Waller County's voting

25  locations and the county's patterns of election day and

1    early voting turnout in those locations to evaluate

2    whether these claims in the reports were correct that

3    there was some kind inequity or unfairness in the way

4    that the hours and locations had been distributed for

5    2018 across the county.

6         Q     And did you understand that to evaluate any

7    quality in the distribution of these sites or early

8    voting generally that that meant that you had to

9    evaluate turnout?

10        A     I think turnout is pretty important here.

11   You know, first of all, the whole point of early voting

12   as a reform is as an instrument for augmenting and

13   elevating turnout by allowing people who are

14   disadvantaged or handicapped by having voting just on a

15   single day, having them provided with an option to vote

16   at a time that is more convenient or also at a place

17   perhaps that's more convenient.

18              So I think that the turnout question is

19   quite important, you know, as the whole object, right,

20   and it's certainly an important measure that the county

21   relies on, you know, for evaluating where these sites

22   should be placed.  You have to have some measure of

23   demand and, you know, turnout is, you know, a very

24   reliable, you know, measure of how much a particular

25   site or location is utilized.  So, yes, I think the

1  question of turnout I think has to be central to the

2  whole assessment of impact.

3      Q      Is that central requirement in your

4  estimation required by law, required by the research?

5  What requires that?

6      A      Well, first of all, I gathered that, you

7  know, one of the points, you know, of holding an

8  election is to get people out to vote and, you know,

9  it's all about -- election is all about people going to

10  the polls to express their political preference to

11  elect someone.

12              So if there are differences, you know, in

13  the propensity to turnout, those should be taken note

14  of, you know, across a region or place.  And as I said,

15  it seems to me that, you know, assessment of, you know,

16  turnout, you know, across the county and variations of

17  the turnout is core, you know, to the whole inquiry and

18  to the claims that are being made.

19      Q      Are there other reasons for early voting

20  besides providing an opportunity for people with

21  disabilities or I can't remember what the other reason

22  that you stated, but are there other reasons besides

23  the two that you articulated for early voting?

24      A      Well, I think that we could go back and

25  look at the legislative record in the states that have

1  adopted these measures and see, you know, what is said
2  in the debates to justify these measures, but it's
3  certainly plausible that someone could say even for
4  people who vote regularly, we think that confining them
5  just to one day is taxing.
6          And so, you know, even if these -- even if
7  there are regular voters, you know, who -- whose
8  behavior would not change much through the addition of
9  early voting, it's -- it might be an argument to, you
10 know, give them the convenience or the option of it.
11         So I think that that's probably an argument
12 that's made in favor of early voting that is, you know,
13 someone who has a constituency that turns out at high
14 rates, what would their justification be for having
15 early voting?  Well, you can imagine them saying, well,
16 my voters are also inconvenienced even though they
17 might have a history or propensity to turn out on
18 election day, this is kind of taxing and difficult for
19 some of them.  And so if we're going with early voting,
20 let's extend it to everybody.  So --
21     Q     Have you heard that early voting can help
22 reduce long lines that may form on election day?
23     A     I think that that's probably plausible.  It
24 must be the case that whenever you add sites that it's
25 going to reduce the burden on any particular site, you

1    know, probably also as you add machines, right.  So,

2    you know, there are some things that could be done

3    along those lines to reduce the wait time, if there is

4    a wait time.

5        Q     Have you heard that early voting provides

6    an opportunity for people who have limited hours to

7    vote during a workday to have flexibility when they go

8    to vote?

9        A     I gather that that's a reason.  You know, I

10   can gather that there are people in many walks of life

11   who, you know, again feel maybe inconvenienced or taxed

12   by having it only on one day, you know, on a Tuesday.

13   So, you know, they might appreciate having the

14   opportunity to vote on a different day.

15       Q     Do you subscribe to the belief that people

16   have the right to vote just as much as they have the

17   right not to vote?

18       A     Well, I believe it's a -- abstention is a

19   choice.  There are some people who as a protest

20   abstain.  I have not written any papers on that, but

21   there's probably some literature on that.  So we don't

22   have compulsory voting in the United States.  I think

23   there might be a couple of western democracies,

24   possibly Australia where it's compulsory.  So we don't

25   have a tradition of compulsory voting in the United

1    States.

2              And I don't know of any states or

3    localities that have moved in that direction.  So I

4    gather that, you know, the predominant culture in

5    American political history is to allow people to choose

6    to abstain if they want to.

7         Q       So can people abstain from voting and there

8    be thus lower turnout and at the same time there be

9    inequality of opportunity and access to early voting?

10        A       It's a difficult question.  You know,

11   there's -- it's very possible that you can have low

12   turnout in a location for various reasons and one of

13   those reasons could be people deliberately choosing not

14   to vote.  They're just not interested or if they're not

15   interested, if that's not it, they might actually be,

16   you know, hostile to the regime in some sense and

17   abstaining out of protest.  There could be a variety of

18   reasons for not voting.

19        Q       Can turnout be impacted by weather?

20        A       Yes.

21        Q       Access to transportation?

22        A       Yes.

23        Q       An employer who doesn't provide you time

24   off to go and vote?

25        A       That could be an impediment.

1    Q    Would you agree that there's a myriad of

2  reasons that go into turnout?

3    A    Yes, I think that's true.

4    Q    So have you worked with any of the experts

5  whose reports you reviewed in this case?  So that would

6  be Mr. Cooper, Dr. Stein, Dr. Flores, or Dr. Joseph.

7    A    No.

8    Q    And in the course of --

9    A    Work, can you tell me what you mean by work

10  with?

11    Q    Have you co-authored any reports with them?

12  Have you served on a case as an expert where they have

13  also served as an expert?

14    A    No.  I have a glimmer of a memory of

15  briefly being on a dissertation committee that

16  Professor Stein also served on, but it was rather

17  shortly lived and I'm not sure the student ever

18  finished.  So that was all I remember.  So I didn't

19  want that to escape notice.

20    Q    You mentioned you had -- I'm going to come

21  back to that.

22         I'm going to turn to your methodology for

23  ascertaining the answers to the question that you were

24  asked to provide in this case, but to clarify just to

25  make it very plain for me, you were sent those four

1  expert reports and you weren't given a particular

2  question to ask.  Your job was to based upon your

3  experience come up with how you would respond to one or

4  more of those expert reports.  Is that a fair --

5       A       Right.  I think that's right.  Sometimes --

6  I mean, I can't get into counsel's head as to what he

7  was thinking, you know, but I think that it's pretty

8  common for, you know, teams of attorneys to handle

9  their experts differently.  So there's variation.

10              I haven't done that much expert witness

11  testimony, but I've done enough to know that each team

12  is a little bit different in the way that they manage

13  or handle their experts, right.  And so, you know, some

14  will have, you know, maybe more pointed suggestions

15  again as how they've divided the labor among the

16  various experts they have working for them.  Others,

17  you know, maybe don't have particularly poignant advice

18  or questions.  They're like read the reports and let's

19  see what kind of outline you come up with.

20              And, you know, so there are various ways,

21  right, that legal teams handle or manage their experts

22  and I think my mandate was to read the reports and come

23  up with an outline as to how I might respond, how I

24  might assess these questions, and, you know, that's

25  what I returned to counsel.

1    Q      So in your report, there are different

2  subject headings throughout the report and I'm going to

3  go through each of them.  There are about seven of them

4  as far as I know.  I'll tell you which page numbers

5  they're on, so you can turn to them as I read them.

6  And I guess I would like for you to tell me whether

7  there was a specific question that you set out to

8  answer in each of those sections.

9    A      Okay.

10    Q      So the first is were you asked to answer a

11  question about turnout motivation and convenience which

12  is -- begins a discussion on page 2 of your report?

13    A      I don't think I was explicitly asked, but

14  here's the issue there, that in the history of the

15  literature on political participation, there has been a

16  longstanding, long running debate about the role of

17  voters' motivation or impetus to vote and the role of

18  convenience factors, things like early voting and

19  convenience voting reforms and increased hours and so

20  forth.  This is central to the history of the political

21  science literature, this very debate, and so it seemed

22  like that was a no brainer to me.

23          Here we are talking about convenience

24  voting and, you know, we might want to ask just how

25  much convenience voting really matters, right, because

1  in the end, convenience voting trivially contributes to
2  turnout or not at all.  Then why have it?  It kind of
3  reduces the argument, undercuts the argument for
4  convenience voting if we implement it.
5           And over the course of a number of years,
6  turnout doesn't change because then all you do is you
7  have these kind of subsidiary arguments, well, at least
8  we're making it easier for the people who do vote.
9  Okay.  Maybe that's an argument, but that's less
10  compelling than the hope, right, that by extending
11  convenience voting, we're actually going to increase
12  turnout by 8, 12, 15 points.
13           The motor voter law, right, that was
14  adopted what, in the nineties, the great hope for the
15  proponents of motor voter -- you know, Ray Wolfinger
16  out at UC Berkeley, his great hope was that adopting
17  motor voter as a convenience where we could finally
18  register at the DMV, we would see the registration
19  rolls flooded with new voters and we'd see a revolution
20  in the level of turnout as a result.  And sadly for him
21  because that was his life long goal and sadly for the
22  rest of the people that were with him in that hope,
23  that didn't happen.
24           It didn't happen and it doesn't mean that
25  maybe we should do away with convenience voting, but

1  of -- you know, a registration of the DMV, but it does

2  take away quite a bit of the argument.  It just didn't

3  have the impact that we thought it was going to have

4  and it was very disappointing.

5      Q      Is it fair to say that the devil is in the

6  details, so there's a different question about whether

7  or not you offer access to opportunities to register to

8  vote and it's a separate question about where you offer

9  those opportunities?  So is it possible that

10  establishing registration opportunities at the DMV site

11  was that may be a failure which is different than

12  establishing opportunities to register where people are

13  whether that is at social services, whether that's at

14  public schools, whether that's at libraries?  Aren't

15  those two separate questions?

16      A      Again, here is where people have wound up

17  on the convenience side of this very different because

18  time and time again what we've found is that you can

19  free up access, okay, and extend some of these

20  opportunities and the motivation just isn't there.

21  Okay.

22              This is, you know, I think germane to the

23  front part of the report.  We see that there are people

24  who live, you know, very close, you know, to an

25  election day or an early voting site and still don't

1    turn out.  Okay?  And this is like a convenience voting
2    reform that is for naught.  And it shows that there's
3    something else going on, that people are not voting --
4    sorry.  People are not abstaining or failing to show up
5    because it's inconvenient.  My goodness, it's across
6    the street, you know.  It couldn't be easier.
7              They're not voting because there are
8    motivational issues, you know, related to maybe their
9    information or maybe the ineffectiveness of campaigns
10   to reach them, you know, or some other, you know,
11   motivational force, you know, that would drive them to
12   the polls.  And political science has now decided that
13   it isn't even a question anymore really.
14             The evidence is so heavily on the side of
15   motivation.  Motivation can make a 10, 12, 15 point
16   difference.  Convenience not even close, not even
17   close.  This -- folks, this is settled.  This isn't
18   even a question anymore.
19       Q     Is it possible that people skip over a
20   polling site that is across the street to access a
21   polling site where they work?
22       A     It's certainly possible that, you know,
23   someone who is motivated to vote will choose among
24   available sites, but the motivation needs to be there.
25   That's the critical thing.  And Adam Berinsky's work at

1   MIT is like so clear on this that when you weigh the

2   two, there's no question that it's motivation that

3   matters.  Okay.

4            You can make all of these reforms you want

5   to.  Okay.  You can do same day registration like some

6   states are doing.  You can go the way Oregon has done

7   and go with mail in voting and, folks, it doesn't help.

8   It doesn't appreciably help.  Why is that?  Why is

9   that?  It's because abstention is not the result of

10  inconvenience.  Okay.  Abstention is the result of

11  again lack of interest, you know, possibly weak

12  campaigns that aren't motivating people, some

13  motivational factor related to the individual or that

14  person's environment, okay, and so, you know --

15       Q       How do you define motivation?

16       A       Motivation is really associated with having

17  interest, you know, and the desired will to actually go

18  and cast a ballot.

19       Q       Did you do a systematic analysis of

20  motivation in the context of Waller County?

21       A       Well, I think that there are only -- there

22  are only a couple of things that you can conclude,

23  right.  I mean, if you take a look at the surgeon

24  decline figure one, okay, across this sea saw of

25  turnout levels, okay, you know, we have substantially

1   the same polling locations and hours and yet we have

2   vary jagged peaks and troughs, steep peaks and troughs

3   in the level of turnout.  So that itself casts a lot of

4   doubt on any convenience related explanations.

5           If election after election after election

6   we have substantially the same level of convenience and

7   yet the turnout fluctuations are up and down by 10 and

8   20, 30 points, folks, no social scientist in their

9   right mind could conclude that convenience is making a

10  difference there.  No one would say that.  It's just

11  false to -- the clear evidence presented by the facts.

12      Q     I want to get back to that and there are a

13  lot of things to unpack in a couple of things you said.

14  Going back to the questions you were asked, there was

15  another section of your report that's labeled proximity

16  to polling places and total turnout in 2016 and 2018.

17  That's on page 9.  Was there a specific question that

18  you were seeking to answer in that section?

19      A     Again, here's the question, right.  If

20  distance makes a difference, right, if distance makes a

21  difference, then the places -- sorry -- the people that

22  live closest to the polling places, okay, should have

23  higher levels of turnout.  Okay.  If distance is a

24  critical factor, right, then if you live across the

25  street on average from a polling place, you should vote

1 at a higher rate than someone who lives 5 or 6 or 8

2 miles distance. Okay. That's the simple comparison

3 that's being made here. And we do it at different

4 distance ranges, the quarter mile, the half mile, and

5 the one mile.

6          So the question we're addressing here is,

7 you know, if distance actually is a critical factor

8 with respect to turnout in Waller County, then the

9 people that live further away, okay, ought to be

10 showing lower levels of turnout and the people that

11 live closer should be showing higher levels of turnout

12 and that's not the pattern.

13     Q     Who told you that distance was a critical

14 factor?

15          MR. SEAQUIST: Form.

16          THE WITNESS: Well, the idea was that in

17 the report, you know, there was a lot of attention

18 called to the fact that certain voters on the Prairie

19 View campus lived certain distances from -- and the

20 Stein report was especially pronounced in this respect

21 and emphatic that certain voters living certain

22 distances from the polling places disadvantaged them in

23 some way and the clear implication of that report was

24 that that distance was clearly an issue or problem for

25 them.

1  BY MS. ADEN:

2  Q  Was that at all related to transportation

3  access?

4  A  That might have been one possible cause.

5  Q  On page 14 of your report, there's a

6  section called proximity and early voting.  Are you --

7  is that any different, that analysis any different than

8  the one that you began on page 9?

9  A  Well, sure.  Here the issue is not so much

10 turnout itself, but the actual use of early voting as a

11 mechanism to cast your ballot.

12 Q  And then on page 20, you look at Waller

13 County alongside other communities.  What were you

14 trying to answer in that section?

15 A  This is pretty interesting, you know.  One

16 of the first questions I had was so what is the

17 administrative culture in Texas among county officials?

18 What is the administrative culture like because these

19 county officials don't operate in a vacuum as if

20 they're only within their own county.  They are part of

21 larger associations and groupings that communicate with

22 each other.  So what is the administrative culture in

23 Texas?  How is it that county election officials in

24 general, people like Christy Eason treat the college

25 campuses in their midst?  What is the common practice

1    and the administrative culture of the state?

2              These are election administrators we are

3    talking about here.  They're charged with organizing

4    and situating these polling place sites.  That's a big

5    responsibility and they're supposed to do it in

6    conscientious way making them accessible to the entire

7    population of the county.

8              That is again operated within a community.

9    They make these decisions and operate within a

10   community of administrative practice.  So the whole

11   idea here is let's find counties that have college

12   campuses around the state of various sizes, but the

13   counties are, I don't know, within proximity to the

14   size of Waller and are not like -- as you know, Texas

15   law treats the large counties separately and distinctly

16   from smaller counties.  Actually different rules apply

17   in Texas law in the administration of elections.  So

18   that was one thing.

19             The second consideration was, well, some of

20   these locations are going to have huge budgets for

21   operating their elections.  You know, we can't really

22   compare Waller to Harris.  We can't really compare

23   Waller to Travis.  We can't really compare Waller to

24   Dallas.  These are completely different operations in

25   terms of their scale and the amount of money they have

1  to work with.

2          So what we're dealing with here is a search

3  for some locations that might be similar to Waller with

4  respect to the, you know, amount that they have to work

5  with and size of the population they have to serve and

6  the fact that they also happen by the way to have a

7  campus in their midst, right.

8          So the campus in their midst was an

9  important consideration.  There are 254 counties in

10 Texas.  We could have found some that were probably

11 exactly 51,000 or closer, but they wouldn't have had a

12 college in their midst.

13         So what is the administrative practice

14 statewide?  What have the habits been with respect to

15 these college campuses?  And that was really the

16 question we were trying to address or I was trying to

17 address here.

18   Q     Did you do an analysis of budgets among

19 these various counties that you examined when you --

20   A     Yes.

21   Q     -- did your analysis?

22   A     So I queried a couple of counties as well

23 as Waller about the cost associated with running an

24 election and -- but that analysis was not completed.

25 So I started into that analysis, but was unable to

1    complete it.  The clock was ticking and this involved,

2    you know, going to county clerks and asking for some

3    pretty detailed information.  So it was just a little

4    bit too heavy of a lift.

5        Q      So you're not opining on the resources that

6    Waller County has as compared to other counties in this

7    analysis?

8        A      My suggestion is that counties about the

9    same size would be similarly resourced.  That's my

10   suggestion.  Now, look, we have Randall in here on

11   table 6 on page 21 which is quite a bit larger, more

12   than double the size.

13            So we would expect Randall to have more

14   money to run the elections, yes.  Tom Green is also

15   larger.  And, again, you're also trying to find places

16   that have college campuses and so, you know, I'm open

17   to suggestions, right.  I'm open to suggestions as to

18   what the comparable locations should be, but we're

19   trying to get -- the question is, you know, what is the

20   standard or customary administrative practice across

21   Texas counties of similar size who also have college

22   campuses.  That's exactly why these places were

23   selected and why I didn't choose like Denton or Harris

24   or Travis.

25       Q      Did you find there was a standard practice

1  amongst all of these counties?

2      A      You know, one thing is for sure is that

3  there's a pretty standard practice of not placing

4  polling places on college campuses and Waller County is

5  kind of out there alone in doing so.  You know, there

6  were a couple of cases I think I found in Marshall,

7  Texas that the authorities there placed a campus.  It

8  was a -- Wiley College placed a site there at that

9  location.  It's a very small college.

10              So, you know, but I think the -- if there

11  was a standard practice, it was not to actually place a

12  polling place, either election day polling place or an

13  early voting site on the college campus.

14      Q      So there's -- on page 28, you have another

15  section placement and movement of sites in Waller

16  County across time?

17      A      Yes.

18      Q      What question were you trying to answer

19  there?

20      A      So here, you know, I think, you know,

21  Mr. Flores in -- Dr. Flores in particular was concerned

22  about the county's history and so my effort was to try

23  to plunge into that history as vigorously as I could to

24  see where the sites had been placed and what the recent

25  history of early voting in the county had been.  So,

1  you know, that was a response to his criticisms, you

2  know, on the recent history of the Waller County

3  Commissioner's Court.

4          There was also some suggestion, I believe,

5  in the Joseph report -- I'm a little foggy on it right

6  now, but there was some suggestion in the Joseph report

7  that the Waller community center, the site known as the

8  Waller community center was somehow unfamiliar or

9  unusual as a site for purposes of Prairie View A&M

10 voting.

11         And my understanding after having read the

12 research and gathered the data is that that location is

13 not only not unusual, it's been a very customary

14 location going back quite some distance in time.  It's

15 true that, you know, one of the buildings that was at

16 that location was torn down and a new building erected

17 and, you know, the name apparently has changed, but

18 it's the same location.  It's a customer polling site.

19 It's familiar to residents.  It's been used repeatedly

20 as far back as the 2000 general election.  So the idea

21 that this variously named location is somehow a problem

22 or unusual or an irregular site, that's just false to

23 the facts.

24    Q     And then there's a section on page 32

25 allocation of early voting sites based on demand.  What

 1    were you trying to do in this section?

 2         A       Here what we're trying to do is use some

 3    GIS software tools to do some actual location

 4    allocation analysis.  So this is a GIS tool that's

 5    developed to assist in the siting of facilities.  And,

 6    you know, common applications include a police and fire

 7    stations, other kinds of public facilities.  It could

 8    be clinics, hospitals.  It could be parks and

 9    recreation related.  A whole range of public facilities

10    can be sited optimally according to the population

11    settlement of the location.

12              And, you know, the software makes these

13    calculations based again on minimizing the distance

14    between the number of facilities to be located and the

15    locations where the residents actually live.

16              So, you know, in order to conduct this

17    analysis, you have to go to the demand points, okay,

18    which would be the voters, okay, the voters in the

19    county and then you have to decide how many sides you

20    want to allocate, okay, and, you know, that could be

21    eight or it could be 10 or it could be 12 or four or

22    one, so -- and then the other bit of information that

23    is very helpful, you know, to have, of course, is

24    the -- the candidate sites that actually meet the

25    criteria for being a polling place, either an early

1    voting polling place or an election day polling place.

2            And, of course, this is specified in Texas

3    law.  Unlike in California, you can't actually put a

4    polling place in someone's garage which I understand is

5    the case there.  You know, there are actually

6    facilities -- there are actually facilities that --

7    facility requirements.  One of them is parking

8    actually.  That's not trivial.  There has to be

9    adequate parking.  There has to be spaces for the

10   machines, spaces for the people to stand and wait in

11   line out in the weather, room, right, and, of course,

12   if things need to be plugged in, you need a number of

13   electrical outlets.  It's a reasonably detailed list of

14   things that you need for a candidate site.

15       Q      And then the final section, I believe, is

16   do hours of early voting influence turnout and this is

17   on page 40.

18       A      Yes.

19       Q      And if you haven't already addressed what

20   question you were answering here, can you briefly

21   describe what you were trying to do here?

22       A      Sure.  You know, again, the object being,

23   you know, augmenting participation.  The idea is, you

24   know, hey, across a span of time where we have

25   observations, you know, can we show, you know, that

1    hours of early voting as they move up actually increase

2    the level of participation, level of turnout.  And, you

3    know, the figures in this section show that isn't the

4    case, that there's no relationship between the total

5    number of voting hours and the voters that turn out.

6               So, you know, it's -- it seems to me again

7    to go back to the point I make at the beginning of the

8    report as shown in so much of the political science

9    evidence to date and that is this is not convenience.

10   You know, this is really a motivational, you know,

11   issue here.  It's also once again possible that, you

12   know, there's an absence of campaign outreach and there

13   are some defects in the political system in a state

14   that might make for say a lack of political competitive

15   elections and again a failure of political parties or

16   political candidates to do the outreach to motivate

17   people.

18              But there are other explanations, you know,

19   for turnout than the number of hours.  And this is

20   shown by the fact that as the number of hours varied

21   across these plots and I think number of hours vary in

22   the locations across these plots, the line for turnout

23   is just really flat.  And I think I mention in here

24   that it's kind of -- it's kind of particularly

25   interesting I would say.

1            Case in point that, you know, over in

2     Hempstead, you know, by virtue of the fact that the

3     county headquarters is there, you got these very

4     generous early voting hours and it isn't doing anything

5     for turnout, right.  So, you know, I mean, they're in

6     Hempstead by virtue of the fact that the county

7     headquarters is there and that place has to be opened,

8     right, by law.  And you have other sites that are in

9     that location.  I don't remember how many now.  You

10    don't have any elevation in turnout.

11            So even in a place like Hempstead, you

12    reach the ceiling on motivation and added convenience

13    ain't going to do anything.  It doesn't do anything and

14    this is like so plain, right, and it's plain in the

15    literature, right, that you can only do so much

16    convenience wise, okay, and then it depends on people,

17    right, and how interested they are.  And so, you know,

18    that's why you got all these people who are living

19    right across the street who aren't going to show up,

20    right.  You know, convenience will only get you so far.

21    Q      So I'm going to ask you briefly.  So you

22    mention that you have some way to measure demand for

23    early voting and you said turnout was one measure.

24    A      Yes.  Well, it's one of the more reliable

25    ones and the -- what else do you have as an

1  administrator of an election system than the past

2  turnout records and the past early voting records to go

3  by.  You look across the locations in the recent

4  elections and you say, wow, we have a lot of demand for

5  early voting here, you know, both in the on year and

6  the off year.  And we have very little demand for early

7  voting over here.  You know, it's pretty clear, okay,

8  that, you know, we need to meet this demand and, you

9  know, this is for very straightforward reasons, right.

10  You mentioned them a few minutes ago.

11          There's concern about lines and so, you

12  know, if there are people in one part of the county who

13  are showing up in droves and you don't have adequate

14  resources, they might have to stand in line.  So you

15  look at past patterns of turnout and early vote use as

16  a guide to the future.  Is it always a perfect guide,

17  no.  I say in the report, of course, it isn't a perfect

18  guide.

19          And we know that in particularly hotly

20  contested elections that pop up unpredicted and, you

21  know, in retrospect you sort of wish maybe you'd

22  allocated things a little differently.  That's a pretty

23  normal human reaction, isn't it, to uncertainty?  You

24  have to make the decision on allocating the resources

25  in like August and September and lo and behold, the

1    race takes an especially hot turn in October and

2    November and a lot more people wind up showing up than

3    were true in the past.

4              So there -- the past is not a perfect

5    predictor of the future.  Once again, that's the best

6    guide you've got.  I don't know what other guide you'd

7    use.  I'm open to suggestions, okay, but these are

8    administrators here trying to make these decisions, you

9    know, with limited resources and limited information

10   and what do you expect them to do?

11             Of course, they're going to look back at

12   the past patterns of turnout and early vote use as a

13   guide to the future and, you know, hope that the future

14   isn't like super weird or unusual.  But, again, they're

15   making a good faith effort here.

16       Q      Is the total number of early votes cast at

17   each early voting location also a good measure of

18   demand?

19       A      I think that total number of early votes

20   cast -- well, sure, I think that that's relevant.

21       Q      What about the proportion of votes at each

22   precinct that were early votes cast, is that a good

23   measure of demand?

24       A      I suppose so because that would suggest

25   that -- that lots of people avail themselves of the

1    early voting option even if they could well have voted

2    on election day.  They want to actually utilize the

3    option to vote early.

4         Q     Do you know what precinct 309 is?

5         A     Yes.

6         Q     Which precinct is that?

7         A     That's the one that Prairie View A&M is

8    located.

9         Q     Do you know any reason to dispute that

10   precinct 309 was the highest precinct under either of

11   the metrics that you just -- we just discussed whether

12   that be total number of early votes cast or the

13   proportion of early votes cast during early voting?

14             MR. SEAQUIST:  Which election, counsel?

15             MS. ADEN:  In November of 2018.

16             THE WITNESS:  I don't have any reason right

17   now to contest that.  You know, let me remind you, and

18   the report is very clear about this, there are places

19   where there were lots of early votes cast that got no

20   early voting locations and no early voting hours at

21   all.  That's relevant.  The reports by the plaintiffs

22   here completely ignore the locations around the county

23   where there was demand, but absolutely no sites, okay,

24   and, you know, this is like half of the evidence they

25   just waved away completely unjustifiably.

1          I don't know why they did that except to
2   bias the case they're making.  But, again, you know,
3   this is, you know, disservice, you know, to the science
4   of this research to ignore half of the relevant cases
5   and say, oh, we're not going to consider the places
6   that got no sites at all, the places that got no hours
7   at all, but there was demand in those locations and
8   they got nothing.
9   BY MS. ADEN:
10       Q      Did those sites serve 18 to 20-year-olds?
11       A      I bet a lot of them did.
12       Q      Do you know whether they served 18 to
13   20-year-olds?
14       A      We can look on the voter file and we can
15   determine how many 18 to 20-year-olds are on there.
16       Q      But you haven't opined on that?
17       A      I don't have the data at hand on that.
18       Q      Do those precincts serve black registered
19   voters?
20       A      There might be some of them that do, but,
21   of course, black and voters and 18 to 24-year-old
22   voters or 18 to 20, either one, are not the only voters
23   whose demand counts and not to an administrator.  Why
24   would we only count the demand for the people in
25   precinct 309?  And maybe that's really why we're here

1  and what this dispute is about.  It could well be.

2  This is really the central question why the two sides

3  are so far apart.

4           There is no reason that the administrators

5  in Waller County should count only the demand of 18 to

6  20-year-olds or the black voters.  There's no reason

7  that an -- by the way, it's contrary to the culture,

8  you know, of administrating elections for them to think

9  that only the demand of 18 to 20-year-olds or only the

10 demand of black voters should matter.

11          And so there are other voters in the

12 county, okay, across the county, the north and the

13 south and various places, okay, they have no sites at

14 all and their demand doesn't count.

15     Q     Do you know what the 26th amendment is?

16     A     How equal is that?

17     Q     Do you know what is 26th amendment is?

18     A     Go ahead.

19     Q     Do you know what it is?

20     A     Off the top of my head, go ahead.  No, I

21 don't know off the top of my head.  I don't remember

22 them in order.

23          MR. SEAQUIST:  Let her ask her whole

24 question and then you can give an answer to the extent

25 you have one.

1   BY MS. ADEN:

2      Q    Do you know whether the 26th amendment

3   applies to all voters in Waller County?

4      A    I don't know the answer.  As I said, I

5   don't have the amendments memorized.  I'm not a

6   constitutional lawyer.

7      Q    What about the 14th and 15th amendment, do

8   you know what those amendments apply for?

9      A    I know that those amendments are relevant

10   to voting rights.

11      Q    Do they -- are they relevant to racial

12   discrimination?

13      A    I gather that they are.  Certainly the

14   Court has said so.

15      Q    Do they apply to all voters in Waller

16   County?

17      A    I would -- I imagine that they do.

18      Q    Do you know what section 2 of the Voting

19   Rights Act is?

20      A    No.  Go ahead.  I'm not a constitutional

21   lawyer.  That's not my specialty and that is not my

22   expertise.

23      Q    So what did you understand then to be the

24   central dispute in this case then?

25      A    I think clearly there's a problem here and

1  the one side thinking that for some reason

2  administration of elections should only serve, you

3  know, a single precinct and its voters when that's not

4  the practice.  You know, administers have to serve

5  everyone in the county and they have to serve them

6  equitably and fairly.  They can't just serve one set of

7  voters regardless of their age or their race.

8              Isn't that what, you know, the tradition of

9  equity and law is all about is that you treat people

10  equally?  I guess maybe that's where the two sides are

11  really far apart because one side is saying election

12  administration needs to serve all voters in the county

13  fairly and the other side seems to be saying, no, we

14  should only really be serving the folks in 309.

15      Q      Where did you see that claim?

16      A      Well, that seems to be what you're

17  suggesting.

18      Q      Where do you see that?  Can you point me to

19  something that says that the county is only -- that

20  we're asking -- the plaintiffs are only asking --

21      A      You're making a --

22      Q      Can I finish my question?

23      A      Okay.

24      Q      That the counties are only being -- are

25  being asked to serve only one precinct, precinct 309,

1    where is that?

2        A       You're making a discrimination claim that

3    somehow 309 has been treated unfairly.  Okay.  And I'm

4    saying that that's -- that that can't be supported by

5    the facts.  It's not been treated unfairly.

6        Q       Do you have -- have you reviewed any

7    evidence in this case that suggests that voters in

8    other precincts of Waller County have requested more

9    early voting opportunities particularly around the

10   November 2018 election?

11       A       We have their early voting turnout records.

12       Q       So the only evidence that you have in

13   support of that other precincts in Waller County

14   requested specifically to the Commissioner's Court more

15   early voting was turnout results?

16       A       We have early voting patterns and for those

17   locations.  They're on the voter file.

18       Q       Could demand for early voting also come

19   from people articulating at Commissioner's Court's

20   meetings or to Ms. Eason that they want and desire more

21   early voting?

22               MR. SEAQUIST:  Form.

23               THE WITNESS:  The nice thing about actually

24   looking at the past results, okay, is that you actually

25   get a sense for the demand among a substantial number,

1   right, a substantial number, a large number, you know,

2   of voters.  Okay.  You know, I think it does matter.

3   People's participation in the Commissioner's Court

4   meetings makes a difference.  I think it does matter,

5   but, you know, three or four people showing up, you

6   know, and demanding something is not necessarily the

7   best indication of demand.  It's one indicator and I

8   think that participation, you know, does matter and,

9   you know, it's important that people show up and that's

10   why the meetings are public.

11   BY MS. ADEN:

12       Q     And it's your position in this case that

13   only three or four people showed up to Commissioner's

14   Court's meetings to ask for more early voting around

15   the November 2018 election?

16       A     I didn't look at the minutes, you know, to

17   specifically see what attendance was at the meetings,

18   but I think that, you know, there are variety of

19   indicators, you know, of demand.  I think the best one

20   is the one that shows very -- the previous years as a

21   guide to the future interest, that previous years is a

22   guide to the future interest in early voting.

23       Q     And -- but you concede that you reviewed

24   the reports of Dr. Flores and Dr. Joseph, that's

25   correct?

1      A      I don't know if I concede that.  I think I
2  admitted that I reviewed them.  I don't consider that a
3  concession.  I thought they were interesting.
4      Q      Would you agree that those reports reported
5  on what happened, who spoke at not only the October
6  Commissioner's Court meetings in advance, but previous
7  Commissioner's Court's meetings and previous demands
8  for early voting in Waller County?
9              MR. SEAQUIST:  Form.
10             THE WITNESS:  I recall there was
11  discussion of -- now that you mention it, I recall
12  there was a discussion of that in the Joseph report and
13  in the Flores report.  I do recall there being a
14  discussion of that.
15  BY MS. ADEN:
16     Q      Do you have any reason to dispute that in
17  2018 precinct 309 had the highest number of early votes
18  cast of all 20 precincts of Waller County?
19     A      I don't.  I don't have reason to dispute
20  that fact right now.  What I have reason to dispute and
21  this should be clear from what I said about 20 minutes
22  ago is that it would not have been easy for anyone no
23  matter how much foresight they had to anticipate what
24  happened in 2018 with the incredible increase in
25  turnout and surge that we saw there.  Okay.

1            And so there is a context in which these

2    administrative decisions are made.  Okay.  And, you

3    know, they don't have perfect foresight.  They don't

4    have perfect information.  They're making these

5    administrative decisions faced with a lot of

6    uncertainty.  I don't know.  I haven't talked to any of

7    the Commissioner's Court members, but, you know, maybe

8    in retrospect looking back, they'd say, you know, there

9    are a number of places we should have changed the

10   hours.

11            I don't know the answer to that, you know,

12   but you don't have the luxury -- what I'm trying to say

13   is you don't have the luxury of knowing what future

14   demand is.  You only have the limited information of

15   what's happened in the past, right, and the past does

16   tend to be pretty sticky.

17            Look, how -- I guess I need to do this

18   analysis next.  How many -- over the last 30 years, how

19   many hotly contested statewide elections have we seen

20   in the State of Texas of the kind that we saw with Cruz

21   versus O'Rourke?  How many over the last 30 years hotly

22   contested statewide elections have we seen like that?

23   I don't think you'll see very many.

24            Most of the elections in Texas, statewide

25   elections recently have been pretty one-sided affairs.

1 So, you know, what do you want these people to do, look

2 into a crystal ball and be able to perfectly see the

3 future and, you know, what turnout is going to be?  It

4 seems just really burdensome and unreasonable.

5 BY MS. ADEN:

6     Q     If you don't have any reason to dispute

7 that figure about 2018 and the precincts cast at 309,

8 would that be a basis for reflecting that there's a

9 demand in precinct 309 for early voting?

10     A     I think so.  Look, going forward, what are

11 we going to see in 2020?  I suspect, you know, that

12 this will be taken down, you know, that this will be

13 something that is noted, right, and, you know, we'll

14 see, but I think that we need to look at this, you

15 know, again in 2020 and see what decisions are made.

16               MR. SEAQUIST:  Counsel, we've been going a

17 little over an hour since our last break.  Can I ask

18 for a break when we get to it?

19               MS. ADEN:  Yes.  I'll be in a stopping

20 point in a second.

21               MR. SEAQUIST:  Okay.

22 BY MS. ADEN:

23     Q     In 2016, do you have any reason to dispute

24 that precinct 309 was the fourth highest out of all 20

25 precincts to cast early voting votes?

1    A    Yes.  I'd like to look at the others,

2  right.  You know, I'd like to look at all 20 of them,

3  right, and see, you know, what those figures look like.

4  So --

5    Q    If in 2016 and then in 2018 precinct 309

6  performed in terms of early voting which you have

7  conceded seems to be the case or you have no basis to

8  dispute that those -- that that precinct performed in

9  2016 and 2018 in terms of casting early voting, do you

10  have any basis to dispute that?

11           MR. SEAQUIST:  Form.

12           THE WITNESS:  Like I said, at this point, I

13  sort of reserve the right to change my view, you know,

14  but I'd need to look at the figures.

15  BY MS. ADEN:

16    Q    But if you have no basis to dispute that at

17  this time, do you think there's anything -- strike

18  that.

19           If you have no basis to dispute those --

20  that data point from 2016 and 2018, nothing about that

21  suggests that there's demand for early vote in precinct

22  309?

23           MR. SEAQUIST:  Form.

24           THE WITNESS:  As I said, I think that

25  there's -- that that's a relevant consideration.  I've

1    suggested that demand as measured by the early voting

2    use and turnout, you know, is a gauge.  I suspect,

3    right, that there is probably some inclination to see

4    if this is a real trend or aberration, right, and we

5    don't know exactly what 2014 looked like with respect

6    to this.  It would certainly add weight to have, you

7    know -- this kind of evidence, you know, would add

8    weight to the case for it.

9    BY MS. ADEN:

10       Q       Sorry to interrupt you.  You surveyed

11   between the 1990s and the present where early voting

12   was sited in Waller County in your report, correct?

13       A       Yes.  This was with the help of the Waller

14   County officials that kind of helped me kind of pull

15   this information together.  That's in the middle part

16   of the report.

17       Q       Ms. Eason in particular?

18       A       Yes.  She had a couple of staff.

19       Q       So you're aware then that before 2016,

20   there was no early voting at precinct 309 -- strike

21   that.

22               You're aware that there was no early voting

23   at the memorial student center before 2016?

24       A       So, yeah, I guess that's right.  It was

25   located in other -- it was located in other areas --

1    Q    So --

2    A    -- other places.

3    Q    So you have no basis to dispute that in

4  November 2016 or prior to November 2016 the Waller

5  County Commissioner's Court had the capacity to look at

6  the 2016 early voting use on -- at the memorial student

7  center at Prairie View; is that correct?

8             MR. SEAQUIST:  Object to the form.

9             THE WITNESS:  That's something they could

10  have looked at.

11  BY MS. ADEN:

12    Q    In 2018, they had the capacity based upon

13  the data of 2018, they had the capacity to consider

14  what happened in 2016 and 2018 as they look to placing

15  early voting sites in future elections; is that

16  correct?

17    A    I think they have that.  That's something

18  that would be a consideration certainly for me if I

19  were making the decision.

20    Q    You testified about turnout.  Are you

21  suggesting that turnout caused problems at early voting

22  sites in the November 2018 election?

23    A    I don't think so.  I don't think I

24  suggested that.

25    Q    If not, why then is turnout an issue here?

1      A      Well, I think turnout is important because,

2  again, it goes back to the issue of whether the degree

3  of inconvenience is something that should be factored

4  in.  I mean, if people are voting at very high rates,

5  you know, then it suggests to me that the impediments

6  are weak at best, that the impediments are -- the

7  impediments argument or the inconvenience argument is

8  pretty weak.

9              People are highly motivated.  Back to

10  convenience and motivation is how far are we going to

11  go on these convenience reforms, right, before we learn

12  what the limitations are.  Are we going to actually,

13  for instance, go around and canvas people and solicit

14  their votes door to door?  That doesn't even require a

15  stamp or a walk to the post box to drop your ballot in.

16              So we go around and canvas people in their

17  votes and somehow record them on some kind of app to

18  take the convenience issues out of it.  And the sad

19  thing is do that and you're going to learn there's

20  still people who don't have an interest, right, and are

21  not motivated to vote, right.  So how about this?  How

22  about actually paying people?  You know, that would --

23  you know, might motivate them.

24              But I guess what I'm saying is, you know,

25  these convenience measures can go further and further

1 and further, but as Adam Berinsky has shown in his

2 research and the field largely agrees the convenience

3 arguments are limited because the main reason for

4 nonparticipation is motivation.  It's not

5 inconvenience, right.  And so, you know, you see how

6 turnout in some of these locations and, you know, kind

7 of undercuts this notion that, you know, inconvenience

8 an issue.

9      Q     I think we'll turn to motivation after the

10 break, but I wanted to ask one final question which is

11 assuming turnout matters and I'm not conceding that it

12 necessarily does, doesn't the trend suggest a rising

13 turnout in precinct 309?

14           MR. SEAQUIST:  Form.

15           THE WITNESS:  I'm not --

16 BY MS. ADEN:

17      Q     Please answer yes or no and tell me the

18 expansion if possible.

19      A     No, I'm not sure there's a trend there yet.

20 That's my question.  I'm not sure that we can see a

21 trend.  I definitely -- I do agree that '16 and '18 are

22 relevant considerations, '14 not so good, but -- you

23 know, but I think, you know, it's -- you know, that

24 that -- so the answer is no, I'm not sure that a trend

25 has appeared.

1          You know, we have to see just how

2     idiosyncratic 2018 was and it would be a shame to

3     discover, right, that 2018 turned out to be a very

4     strange aberration, okay, and that 2020 drops back to

5     really low levels or 2022, you know, conventionally low

6     levels and these places have gone largely unutilized

7     while there are other places in the county that have

8     gotten none.

9          Q     But 2014, there was no voting at the

10    memorial student center; is that correct?  2014.

11         A     I'm not sure what I -- okay.  So that's the

12    election day.  Early voting locations were at the

13    alumni building and at the Episcopal Church.

14         Q     Not at the memorial student center?

15         A     Right.

16         Q     And the field of social science that would

17    be accepted by your peers, what would constitute a

18    trend?

19         A     Well, that's a good question.  There are

20    probably some people within the field that would

21    quarrel with me about, you know, the two elections

22    being a trend, but, you know, maybe three, five.  You

23    know, here's the issue.  We have off year elections and

24    we have on year elections.  And what I mean by that is

25    we have elections that are high stimulus on a

1    presidential year and then typically low stimulus

2    elections on the off year.

3              So if we got to another midterm, okay, and

4    saw, you know, the kind of record busting turnout, you

5    know, that we saw with the O'Rourke, Cruz race, that

6    would definitely be something to take notice of.  My

7    prediction would be that if that's the kind of turnout

8    we're looking at as a kind of new norm for Texas, then

9    probably a lot of election administrators will be

10   looking to expand voting in a lot of locations.

11             I mean, in other words, across the board,

12   there will be a reassessment, right, of opportunities

13   to vote and the burden is placed on particular

14   locations.  And the evenness, you know, if there's

15   another midterm that breaks all records in the way the

16   2018 did, that strikes me as pretty noteworthy.

17   Q       And next year is a 2020 presidential

18   election.  Would you consider that a high stimulus

19   election?

20   A       That's a high stimulus election, so we can

21   expect turnout to be pretty high.  If you can look at

22   the differences in the -- in figure one, you know, we

23   could expect it to be up in the 50s again.

24   Q       And high for precinct 309?

25             MR. SEAQUIST:  Form.

1                THE WITNESS:  I would suspect so.  That's

2       next in here.

3       BY MS. ADEN:

4            Q       So finally you agree that the only two

5       November elections conducted with early voting on

6       campus at precinct 309 show high demand for early

7       voting?

8            A       I didn't look at the numbers.  I took your

9       word for it.

10           Q       Assuming those numbers are correct, you can

11      agree that --

12           A       They seem to show high demand for early

13      voting.

14                MS. ADEN:  I think we can take a break.

15                (There was a brief recess taken.)

16      BY MS. ADEN:

17           Q       Based on the conversation that we were

18      having before the break about the use of rates of early

19      voting by precinct 309 which encompasses Prairie View's

20      campus, would you still stand by the position that

21      those voters are highly motivated voters in Waller

22      County?

23           A       I think that it's fair to judge the Prairie

24      View students in the same way that college students and

25      young people and much of the rest of the country are

1   judged and that is of being marginal attentiveness and

2   motivation.  The fact that there was a surge in turnout

3   in 2018, unusually high surge in turnout in 2018 does

4   not mean that somehow this population has changed.

5            You know, there is a body of social

6   scientific evidence about young voters and that is they

7   tend to be lower in interest and lower in turnout

8   partly because they haven't established the habit of

9   voting at their young age.  And, of course, a lot of

10  them aren't even registered to vote in the first place.

11           In addition, there's some other things that

12  burden the turnout of people, you know, in the 18 to

13  even 29 age bracket.  And one of them is their high

14  mobility.  You're getting your career started and

15  you're changing addresses a lot.  Sometimes that will

16  tax registration and turnout for, you know, much of

17  that population unless the motivation is there, you

18  know, to overcome the challenges that, you know, come

19  with, you know, changing addresses and having to

20  reregister and moving around.

21           So, you know, I think there are very good

22  reasons actually for suspecting that the future in that

23  precinct will look like most of the past and that, you

24  know, look more like, you know, maybe the turnout level

25  that we see in 2014 and 2010 and 2006 and 2002 as

1  opposed to this very unusually high turnout level we

2  saw in 2018.

3       Q       And 2016?

4       A       Well, I have --

5       Q       Not turnout.  By rate of usage, rate of

6  usage, so assuming my definition of rate of usage in

7  2016 and 2018.

8       A       Of early voting, okay.  Yeah, it wasn't --

9  2016, it was actually compared to other presidential

10 elections recently.  Turnout was not especially high

11 overall.

12      Q       So not looking at turnout, but looking at

13 rate of usage which is a different measure, right, so

14 when you're talking about turnout, you're looking at --

15 let's just be clear you're looking at the amount of

16 registered voters who cast a ballot?

17      A       Yes.

18      Q       Whether it be early voting or on election

19 day?

20      A       Yes.

21      Q       And when I'm talking about use of early

22 voting, I'm talking about the rate of votes cast during

23 that period, time period and --

24      A       I get that.

25      Q       And based upon my definition of the usage

1  of early voting and your acknowledgments at least that

2  you don't have data to dispute what occurred in 2016

3  and 2018, I guess my question to you is based upon my

4  definition on the use of early voting, would you

5  therefore say that Prairie View students are not

6  motivated voters?

7       A       They were certainly motivated in 2018

8  and -- and voted in impressively high numbers compared

9  to past midterms.  I mean, this is patently clear in my

10 own data.  So they managed interestingly enough, you

11 know, to, you know, overcome, you know, whatever issues

12 of inconvenience might have been present there.

13            But it seems to suggest that if you do have

14 a hotly contested election and the parties really are

15 involved in mobilizing people in every corner of the

16 state, but that is really the best way to overcome

17 these turnout deficits.

18            You know, it's not so much by manipulating

19 hours or polling places or anything of that sort that,

20 you know, the story of 2018, you know -- and even

21 Professor Stein admits that people got out and voted in

22 high numbers.  The story of 2018 seems to suggest to me

23 that, you know, motivation totally trumps convenience,

24 you know, and we had a lot of people who were very

25 motivated in 2018 in Waller County and other places in

1  Texas because all kinds of records for midterm

2  elections were shattered.  So you have regularly

3  contested elections.  You nominate someone who is a

4  real contender and it's going to make a difference to

5  getting people out to vote.

6      Q      Is it possible for someone to be harmed in

7  voting but still overcome the harm and vote in your

8  opinion?

9      A      I don't know.

10      Q      Is there research on that point, do you

11  know?

12      A      I don't know.

13      Q      Is it possible for someone to be negatively

14  impacted in voting but not outwardly denied the right

15  to vote?

16      A      Well, so I suppose that it has to be true

17  that some people, you know, are required to make more

18  effort than others that that must be the case.  You

19  know, we know, for instance, that people have different

20  work a day schedules and some are long distance

21  commuters and have to drive into Houston and others are

22  working right near where they live.

23             So election day turnout for the long

24  distance commuter has to be more of an effort than for

25  the person who can bike to work talking about bicycles.

1    So it must be the case that some people are required to

2    make more effort that that is -- seems obvious to me.

3         Q        Is it possible for Waller County to impact

4    black voters without totally denying them early voting?

5                   MR. SEAQUIST:  Form.

6                   THE WITNESS:  Well, I don't know.

7    BY MS. ADEN:

8         Q        Is it possible for Waller County to harm

9    black student voters without totally denying them early

10   voting?

11        A        I don't know the answer to that either.

12        Q        Is it possible for Waller County to harm

13   black student voters without totally denying them early

14   voting on Prairie View's campus?

15        A        Again, some of this seems to wander from

16   the scope of my report, but I guess what I would say is

17   that it's reasonable for county officials in Waller

18   County or anywhere else to expect voters to make some

19   effort to cast their vote.

20                  We again haven't gone to the point where

21   we've extended the convenience argument to the point

22   where we're actually hiring people like we do in the

23   U.S. Census to go door to door with an app to record

24   people's vote so they don't have to leave their house.

25   So we haven't gotten to that point.  So, you know, it

1    seems obvious to me that administrative officials

2    nationwide have a reasonable expectation that voters

3    make some effort.

4        Q     I just want to close the loop on something

5    that we started talking about and I think you answered

6    this question in different pieces, but I just want to

7    be clear for the record.  We went through your report

8    and I pointed out different subheadings within your

9    report and you talked to me a little bit about what

10   questions you were seeking to answer.  And a few of

11   them I think you told me how you went about answering

12   the question, but I just want to be clear and maybe you

13   can do it very briefly and just describe what

14   analytical --

15       A     I apologize.  I have not excelled at that.

16       Q     I'm a talker too.  But what analytical

17   model you used to answer the questions that you sought

18   to address in your report.

19       A     I don't exactly know what you mean by

20   analytical model.

21       Q     Can I do something differently which is

22   when -- on page 2, you were talking about motivation

23   and convenience.  I think you referenced looking at the

24   history of literature.  Is that -- looking at the

25   literature and applying it to the facts that you

1  thought were present, is that how you went about trying

2  to answer this question about motivation and

3  convenience?

4      A      Well, sure, that was a large part of it.

5  There is a literature about convenience and motivation

6  and that's very germane to these discussions since

7  we're talking about convenience reforms.

8      Q      And then on page 9 and 14 where you're

9  talking about proximity in different respects, how did

10  you test that?  How did you go about --

11      A      So in the flash drive that I have that I

12  need to be reminded to give you, there are files that

13  contain information about which voters live within a

14  quarter mile, half mile, and one mile radius of each of

15  the election day and early voting sites.  And there is

16  the designation of voters that live outside those

17  ranges.

18          So these tables in this section of the

19  reports that you just referenced like pages 15 and 16

20  and so forth simply reflect the percentage of voters

21  that turn out to vote, either turn out at all or turn

22  out in early voting according to the distance from the

23  site.

24      Q      In those intervals?

25      A      Yes.  So there are files that should

1    indicate that.

2         Q       And then looking at the -- is that true of

3    also 14 or similar?  That's just what you were

4    describing?

5         A       Yes.

6         Q       On page 20 when you're looking at Waller

7    County alongside other communities, how are you -- what

8    is your test for that?  What is your model of testing

9    that?

10        A       This was very much in the dirt kind of

11   research in the sense that you can't do 30,000 feet.

12   You've got to actually call up these places and get the

13   information from them.  So one of -- first of all --

14   and there are files on this too.  First of all, I found

15   the list -- I think Mr. Flores indicates this.  I found

16   the list of the universities in Texas and where they

17   were located and found the counties that were, you

18   know, roughly similar size range of Waller and the

19   counties that also had universities plus a couple of

20   others that I wanted to check out like the one in

21   Marshall, for instance.  And I think I even have some

22   information about Grambling State in Louisiana.

23              But the goal here, you know, was simply to

24   go county by county and, you know, look at the polling

25   sites for 2018 and, you know, exactly place them.  And

1   largely what I did here talking about being in the

2   weeds is use Google maps to look at these particular

3   counties and where these polling places were, how close

4   they were and so forth.

5             So, you know, this was very tedious, you

6   know, kind of like I said down in the dirt kind of

7   research going case-by-case and it would have been time

8   permitting useful to do other locations too, all the

9   HBCUs.  Why not?  Let's look at all the HBCUs that was

10  on the list, not something that was practically

11  manageable given the time limits.

12      Q       On the placement and movement of sites in

13  the Waller County across time on page 28, is it fair to

14  say that that was -- your analysis was tested by

15  talking to Ms. Eason and recounting placement --

16      A       What I had to do is I -- I was not really

17  in a position to access their archives because, you

18  know, even though the counties made great strides in

19  its technical sophistication, the truth is that you go

20  back in most counties in Texas very far and you're

21  talking about paper records, right, in boxes.  And

22  these could be, you know, stored in kind of obscure

23  places, out of the way places.

24             So I wasn't in a position to look through

25  that myself.  I had to rely on them to report to me on

1  these placements.  And as I said, I think there's an

2  Excel file, substantial Excel file that was sent in

3  connection with these reports that details the results

4  of that research.

5      Q      And then on 32 with the allocation of early

6  voting sites based on demand, you talked about the GIS

7  work that you did?

8      A      Yes.

9      Q      Is that more or less --

10     A      This is a GIS, yes, location allocation

11  model that's used.  And, again, these models are used

12  to site a wide range of public facilities.  It's not

13  just something that you would use only for precinct

14  polling sites, but it's commonly used for emergency

15  medical service, for instance, and police and so forth.

16     Q      And then the last section page 40, do hours

17  of early voting influence turnout, how was your test

18  for this?

19     A      These are -- this is regression analysis,

20  regression analysis, linear regression in the case of

21  the scattered plots and just straightforward multiple

22  linear aggression for table 7, table 8.  This is going

23  to be maybe unfamiliar as a research tool in the legal

24  community, but in social science research, it's a

25  pretty common tool that's widely recognized and used.

1    Q    Did you base the various tests that you

2  just identified on one of the plaintiffs' expert's

3  reports in particular, one or more?

4    A    I would say not.  As I told you probably

5  more than an hour ago, I think my emphasis was more on

6  Professor Stein and Professor Flores and less on Joseph

7  and Cooper, but I'm not sure I can give you

8  particularly good reason for that.  Just seemed like

9  those reports were within -- I think I told you,

10  testified earlier in the day that the issues raised in

11  those reports seemed within the scope of my expertise

12  to respond to.  And, you know, I'm not like a historian

13  of race.  So me going back and having something to say

14  about Waller County in the 1950s, it's just not my

15  area.

16    Q    But you talked about Waller County in the

17  1990s?

18    A    Yes, that's a little more recent, but I

19  just -- I didn't have any resources to be able to study

20  what happened to Waller County or with Waller County,

21  you know, in these previous time periods which I think

22  everyone acknowledges were troubled, right.  Even the

23  Commissioner's Court, Mr. Duhon, you know, admits that,

24  you know, there's historical legacy that no one is

25  proud of.  And I think Mr. Joseph made quite a bit of

1    this.

2         Q      And you're not a historian, a trained

3    historian?

4         A      No.  I mean, like archival records in

5    Waller County, I'd probably need to be in Texas at the

6    very least, so --

7         Q      And did you -- with respect to Stein and

8    Flores in particular, were there -- did you go about

9    testing any of their analyses and coming up with

10   different results?  Did you set about doing that?

11                  MR. SEAQUIST:  Form.

12                  THE WITNESS:  Well, you know, I think the

13   whole question about hours is directly tested in the

14   back of the report that the hours across locations

15   don't seem to influence turnout and so I think that

16   that certainly goes to the argument about hours.

17   BY MS. ADEN:

18        Q      Hours in --

19        A      Differences in hours.

20        Q      Let's talk to you about your findings on

21   page 48 if you can flip to that.  It says that on the

22   first sentence of that page under summary of

23   conclusions and summary, this report has used data and

24   evidence to show that Waller County's recent decisions

25   about to allocate early voting sites and how many hours

1    to devote them have not been unfair to the Prairie View

2    community in precincts 309 and 310 or in any way

3    abridged the rights of those voters to participate in

4    the political process.

5              Is that one of your findings?

6    A     Yes.  And I think that the 2018 election

7    and the extraordinarily high turnout suggests that

8    there is motivation to vote from the stimulus of a

9    competitive race.  You know, turnout is going to be

10   really high.  People are going to be exercising their

11   right to vote.

12             You know, the previous elections where, you

13   know, turnout doesn't look anything like 2018 suggests

14   to me that, you know, the interest was just really low

15   because it's not like the differences in the

16   convenience factors were that great.  So, you know, if

17   people are interested and stimulated by a close

18   election, they're going to get out to vote in 309 and

19   they did and good for them.

20   Q     So to be clear, your position is that

21   Prairie View students voting has fluctuated or been as

22   high as it was in 2018 not due to early voting

23   allocation but because of the type of elections, the

24   candidates that were on the ballot?

25   A     I think that has a lot to do with it.  I

1    think that there's certain resources that and interest

2    that people bring to the political process, right, but,

3    you know, there's also the stimulus of particularly

4    engaging an effective campaign and we know, for

5    instance, that in statewide elections in Texas, the

6    campaigns have often been one sided.  And typically in

7    recent years, they've been one sided in the Republican

8    direction.

9              And so what's remarkable and impressive

10   about 2018 is that we had a very well financed, well

11   funded incredible Democratic candidate nominated who

12   wound up mobilizing unbelievable numbers of people

13   compared to the past.  It's a remarkable feat and he

14   came within a very close range of taking out the

15   incumbent.  It was only a couple of percentage points.

16             It was a very impressive showing and, you

17   know, there's a reason why people -- I guess each

18   presidential campaign hasn't gone so well and there's a

19   reason why people are talking about Beto O'Rourke as

20   having a future.  I think he does have a future.

21        Q      Do Prairie View students only vote for

22   candidates who belong to the Democratic party?

23        A      I think that the evidence from, you know,

24   surveys of African-Americans both in Texas and

25   elsewhere suggest a pretty heavy Democratic leaning,

1  not exclusively, though.  I wouldn't say that it's

2  entirely one sided, but it is -- all of our evidence

3  suggests that it's, you know, like 85/15, 90/10.  It's

4  pretty one sided.

5      Q      But you didn't test that with respect to

6  Prairie View student --

7      A      I don't actually have a survey of the

8  Prairie View students and there are specific political

9  preferences and, of course, who you voted for is not

10  revealed on the voter file.

11      Q      And you saw the expert reports of Dr.

12  Flores in particular who recounted testimony by some

13  Prairie View students and other community members

14  saying they were not affiliated with any of the major

15  political parties.  Do you recall seeing that?

16      A      Right.  Like on most college campuses,

17  there's significant independent and third-party

18  presence.

19      Q      That's commonly known?

20      A      I think among young people, there's an

21  attraction to third parties and to independent

22  candidates again in part because their preferences have

23  not been fully and completely formed.  You know,

24  it's -- the political socialization is looked at as a

25  developmental process through adolescence, early

1  adulthood.

2           And so I guess human development is kind of

3  a subfield of psychology.  And this is where political

4  scientists borrow their understanding of political

5  socialization.  The idea is that as you move through

6  adolescence and/or adulthood, you form up and

7  crystalize clear opinions as you go.

8      Q      The next sentence on page 48 reads:  "It is

9  questionable from examining turnout in 2018 that living

10  close to a polling place or to an early voting site is

11  especially relevant to participation in the first

12  place."

13           Is that another of your findings?

14      A      Yes.  And that's particularly germane to --

15  I was a little surprised.  You know, I thought that,

16  you know, maybe it'd at least be even, but the actual

17  data show that the people living close vote less than

18  the people living further away.  And we could probe for

19  why that is, but at least what it shows as a minimum is

20  that, you know, there hasn't been a positive

21  association between distance and turnout.

22      Q      And is another one of your findings that

23  there's some evidence that those living further away

24  from an early voting site are more likely to vote early

25  suggesting that these votes may be especially

1  appreciative of the convenience of casting a ballot on

2  a day other than election day?

3      A      I think that that's right.  There is a

4  table in there that suggests that the turnout in early

5  voting was higher among those who live further away.

6      Q      And then do you also conclude that there is

7  no basis or find -- strike that.

8          Do you also find that there is no basis to

9  conclude that the distance faced by voters in Prairie

10 View are more burdensome than those faced by the

11 majority of other voters in Waller County?

12     A      I gather that that's true that the

13 distances are not greater, that there is a

14 concentration of sites and locations in the couple of

15 precincts there in Prairie View that actually make the

16 voting sites pretty accessible to the population.

17     Q      And is another one of your findings that

18 the students at Prairie View A&M are almost unique

19 among Waller County voters in the fact that they have

20 early and election day polling places very close to the

21 campus where they spend a significant part of their

22 time?

23     A      Yes, that's true.  That's what I concluded.

24     Q      And is another one of your findings in that

25 next paragraph that Waller County is unique among Texas

1    counties of its size in providing a polling place on a
2    college campus?
3        A       Almost unique.  I did indicate, right, that
4    my research found that, you know, in Marshall, Texas,
5    there is a polling place on the campus of Wiley I
6    believe it is which is an HBCU, but, you know, I would
7    say it's almost unique.
8        Q       So you're qualifying that statement to say
9    almost unique and not unique?
10       A       Yes.
11       Q       And then there is another sentence.  Is it
12   also your position, and this is a finding I think that
13   runs between page 48 and 49, that officials allocate
14   sites based on historical tradition, familiarity, and
15   demand?
16       A       That's what they have to go on, yes.  It's
17   what they have to go on.  They have to use what's in
18   front of them, you know, and what's in front of them
19   is, you know, the past practice as well as the -- you
20   know, these practices can change as the demand
21   fluctuates.  I think that's clear.
22       Q       And almost finally would you agree that one
23   of your findings on page 49 is that there was no
24   discrimination against the, quote, Prairie View area?
25       A       I would say I didn't find any

1  discrimination in the placement of the polling sites

2  there.

3      Q      And it's your finding that some sites have

4  more early voting and some have less in Waller County?

5      A      Yes.  Yes, that's true.

6      Q      And it's your position that the county has

7  to consider, quote, everyone?

8      A      I think the county needs to consider

9  everyone.  I believe that they think of it that way,

10  right.  I mean, in some ways, it doesn't matter too

11  much what I think.  As administrators of elections,

12  they think of their obligation as to the entire county.

13      Q      How do you know that?

14      A      Well, just based on my understanding, past

15  understanding of election administration.

16      Q      But you didn't review any Commissioner's

17  Court's meeting minutes is my understanding?

18      A      I might have looked at the minutes, but I

19  don't have something that I can point to at hand.

20      Q      You don't have a policy that says that

21  Waller County officials have to consider everyone

22  necessarily?

23      A      I don't have something I can point to in

24  hand on that, no.

25      Q      And one of your other findings is that

1  there's no evidence that early voting has an impact on

2  turnout; is that correct?

3      A      This is again a disappointment to a lot of

4  the early voting proponents and reformers along these

5  lines, but, yes, that is the case in more places than

6  Waller County that what is happening in Waller County

7  and many other locations is that early voting is simply

8  making voters who would have turned out on election day

9  cast their votes early.

10              So there's no real augmentation and turnout

11  in the end.  It's just kind of a redistribution of

12  election day voters to the early voting period, but no

13  net increase and that's -- it's -- again, it comes back

14  to the, you know, the limits of convenience.

15              You know, you have to get people out by

16  motivating them with a stimulating campaign or some

17  aggressive outreach and just simply making the act more

18  convenient is going to be very limited.

19      Q      And that finding on turnout again is based

20  on your definition of turnout as measured by the amount

21  or percentage of votes actually cast?

22      A      Yes.

23      Q      Not how they are used whether through early

24  voting or through election day?

25      A      Right.

1      Q      And that's also true regardless of whether

2    people vote by absentee ballot or by some other means

3    besides election day or early voting?

4                MR. SEAQUIST:  Form.

5                THE WITNESS:  Yes.  I didn't address

6    particularly the use of absentee votes in the report,

7    but it would -- that particular reform has been very

8    limited in its capacity to elevate turnout.

9    BY MS. ADEN:

10     Q      Do you know what a cross sectional analysis

11   is?

12     A      Yes.

13     Q      What is it?

14     A      So you have a single point in time, you

15   know, where you're looking at a cross section of

16   voters.  So the variation is across say your units of

17   analysis.  Could be voters.  I guess that's what we're

18   talking about here, but they're at one point in time in

19   a particular election.

20     Q      So you're looking at one voter and how they

21   experience voting at a --

22     A      That's a group of voters at one particular

23   time, you know, on one particular election.

24     Q      Okay.  We talked before that there are many

25   reasons why a group of voters may vote at one

1  particular time, is that correct, many reasons?

2          A        Yeah, that's true.

3          Q        More than ten reasons?

4          A        I'm not sure.  But, again, there's a

5  political science literature on political

6  participation.  It goes back quite some distance, but,

7  yes, I would maybe say there's many -- ten reasons out

8  there.

9          Q        Do you know what a time series panel study

10  is?

11         A        Yes.

12         Q        What is it?

13         A        So that's where you would have your units

14  of analysis across, you know, multiple periods of time.

15  So instead of just having a single cross section of

16  voters, you would have multiple cross sections of

17  voters, but the panel component requires that you also

18  look at the very same people.  So that's an additional

19  requirement for the panel study in particular.  You

20  can't just look at, for instance, Waller County in

21  2014, '16, '18, '20, '22, '24.  You would have to look

22  at the very same Waller County voters across each of

23  those individual election years.

24         Q        Would you agree that this method, this time

25  series panel study would have allowed you to measure

1   whether any changes over time to early voting in Waller

2   County, that is whether it increased, decreased, stayed

3   the same, how that impacted turnout under your

4   definition of turnout?

5       A      Yes.  These are important designs and they

6   may not be especially practical under the circumstances

7   of time and resources, but these are -- these would be

8   very useful tools to deploy.

9       Q      And you did not deploy that analysis here?

10      A      There's no panel study.  Once again, this

11  was something that probably any social scientist would

12  consider, but, you know, you have to judge what it is

13  you can accomplish in the amount of time that you're

14  given.  So you can't do everything.

15      Q      So is this like the Maine ranked-choice

16  voting case where you were given a little amount of

17  time to --

18      A      Better than that.  We had a little more

19  leeway than, you know, than two-and-a-half weeks.  And

20  the other thing, of course, is that -- about this case

21  is that this subject matter is a little more

22  conventional in the sense that it comes up more often

23  and it's subject to a much greater study, you know,

24  when you get into something like ranked-choice voting

25  while there's very little to go on.

1    Q       It's new.  It's an emerging practice.  And

2    I appreciate that you recognize the limitations of the

3    time series panel study.  I guess my question about

4    that is that even though there's limitations to that

5    study which those in your field use, would you agree

6    there's a way to account for the fact that students,

7    for example, graduate over time, right?  So you can

8    only follow one student for ostensibly four years

9    assuming they're in college for four years, but is

10   there a way that those in your field might address

11   that?  So, for example, imputing someone in for someone

12   who has graduated out in order to try to model what

13   their behavior might be over time?

14   A       Well, I'm not sure about imputation, but I

15   think what I would do is I would try to track them, and

16   this is getting easier to do, track them as they

17   relocate.  It's possible now to find people who have

18   relocated from one location to another.  Of course,

19   they have to reregister.

20           But when you see someone who leaves Prairie

21   View and goes back to Houston or goes back to go

22   wherever they're from, east Texas, it's possible to

23   follow them up by finding them at their new location,

24   okay, and, you know, looking at their voting record and

25   seeing, for instance, what their, you know, vote habits

1    are in the new location.

2              So, you know, this is becoming possible.

3    One thing that secretaries of state and state boards of

4    elections are doing is including a ID code that will

5    travel with the voter when they move which is

6    incredibly helpful because that will facilitate a

7    match.  If they move from Prairie View to Tyler, we can

8    find them there because they're coded with the same ID

9    code.

10             Short of that, what we can do is match them

11   by first name, last name and month, day and year of

12   birth because even though there might be lots of Jayla

13   Allens out there, there probably aren't many Jayla

14   Allens who are born May 8, 2003, or May 8, 1998.  And

15   so even if we don't have an ID code, if we have a first

16   and last name and a birthday, we can find her providing

17   that she reregisters.

18   Q        That would answer a different question than

19   how that particular voter responded to changes in a

20   particular jurisdiction and the choices that particular

21   jurisdiction made in terms of providing early voting?

22   A        Yes.  That's tough.  I hear you on the

23   term, right.  I know there's churn in any college age

24   population for the reasons we mentioned, getting their

25   careers off the ground and moving around.  It's -- it's

1 very difficult to study that over time.

2     Q    And similarly -- and now I'm trying to

3 connect a lot of pieces that we talked about today and

4 maybe that will move us along.  In your report, you do

5 walk through what you learn from Ms. Eason and about

6 how the choices at Waller County has made in terms of

7 early voting between the nineties and the present.

8 That's what we've discussed today.

9         And you've reported that it hasn't changed

10 much.  Is that a fair assessment?

11     A    I don't think it has.  There's a lot of

12 continuity in where the sites are located and the

13 tendency to try to find suitable locations in proximity

14 to the campus.  If not right on the campus -- even the

15 ones that are located off campus like the church, for

16 instance, I've looked at where that is.  I even did

17 some research on where the -- one of the sites was torn

18 down.  And I did some research on just where that was

19 located.  And it was off campus, but about half a

20 block.

21         And so the county authorities I can see are

22 being mindful of the available sites in the Prairie

23 View area and placing those sites within pretty close

24 proximity to the campus.  And as I said, it was

25 very common to me as -- sorry.  I'm getting tired, but

1  it was very commonly the case that when I looked at the

2  other counties, the nearest site was often a couple of

3  blocks or a quarter of mile or, you know, a couple of

4  thousand feet from the border of campus whether it's

5  the south border, the east border, the north border

6  kind of thing.

7          So based on that, it would seem reasonable

8  for Waller County officials to choose something like

9  the church or a couple of these other sites.  One was

10  the alumni center.  The alumni center is still there or

11  this site that has since been turned into something

12  else.

13      Q      Is that the Waller County community center

14  that you're referring to?

15      A      The Waller County community center, that

16  was one where an old building was torn down and the new

17  building put up, but they use the same place.

18      Q      The Templeton center?

19      A      No.  I think that's the -- more the student

20  union.  No.  There's another location that was off

21  campus, but like maybe a half block, you know, down the

22  street.

23      Q      St. Francis of Assisi?

24      A      Maybe I didn't mention it, but -- well, so

25  it's possible that I didn't mention it, but there

1  was -- yes, this site called the Newman Center, this is

2  it.

3      Q       What page are you on?

4      A       This is on page 28.  The Newman Center was

5  once the Catholic student center near campus and I say

6  near campus because the nearest I can discern this

7  location was where I indicate, Thompson Drive and FM

8  1098.  And from what I was able to discern, this

9  building maybe hasn't been torn down, but it has been

10  abandoned or it's not used anymore for purposes of

11  being a student gathering place.  But it was used as an

12  election day polling place, you know, very early on.

13  So we're going back into the nineties here.  That goes

14  back a ways.

15      Q       So if early voting hasn't changed that much

16  in Waller County since 2002 which I believe is what you

17  reported in your report on page 5, how do we know then

18  whether changes to early voting have impacted turnout?

19  How can we study that?

20      A       I think here's the thing.  You know, to

21  establish, you know, causality, you know, X needs to

22  come before Y, you know, X needs to change, Y needs to

23  change and then you have to rule out alternative

24  explanations.  So those are the three necessary

25  conditions to establish causality.

1          The problem with all cross sectional

2   research is that it's sort of hard to establish the

3   temporal priority, the X coming before the Y since you

4   have observations that are in a similar point in time

5   and you're not watching them unfold over time.  So, you

6   know, about the best you can do with cross sectional

7   research is, you know, at least see if there's a

8   relationship, you know.  Is there a covariance between

9   X and Y.  X has to change and Y has to change.  So if X

10  goes up, Y goes down or if Y goes up, X goes down.

11          So that's the minimum necessary condition,

12  not sufficient, but it needs to be there.  And if

13  that's not there, then you can be sure the causality is

14  out the window.  So if any of these necessary

15  conditions aren't met, you can toss causality out the

16  window.

17          And in the case of my findings on the

18  hours, you know, this is exactly the problem is that

19  the hours here in 2018, it's true you're only dealing

20  with cross sectional variation, but there isn't really

21  even any covariance to speak of.  As you move up in

22  early voting hours, in fact, the turnout of registered

23  voters actually drops.

24          It's really flat and statistically

25  insignificant, you know, in figure 4 on page 44, but

1    you don't even have the necessary, you know, variation,

2    the minimum necessary variation X and Y to establish

3    any causal claim.  So it's much more serious, much more

4    serious than just not having time series.  You don't

5    even have relationship between the X and Y variables

6    here to speak of.  So --

7         Q      Is it possible that since early voting has

8    been the same more or less since 2002 that it may not

9    have been sufficient to increase it?

10        A      I think that that's always plausible,

11   right, because, you know, there are some research

12   studies out there that suggest that, you know, a great

13   multiplication of early voting sites, you know, can

14   make, you know, at least a marginal difference.  And

15   Professor Stein cites a couple of studies along these

16   lines, but I think always the question from an

17   administrative standpoint is, okay, but what's

18   practical?  I mean, what can be practically managed?

19             We have a finding here from a study carried

20   out in Minnesota, one of the studies that he cites that

21   shows that if you greatly multiply, you know, the

22   number of sites, you can get a tiny impact in a

23   positive direction on turnout, but the number of sites

24   that you'd have to add is -- it's ludicrously

25   impractical from an administrative resource standpoint.

1           I mean, I just don't see how the county

2   could go from say, you know, eight sites, you know, to

3   36 sites, you know, over the course of an election, you

4   know, without some kind of major infusion of support

5   from the state or from the federal government or

6   somewhere.

7       Q       But given the rates of usage of early

8   voting at the memorial student center, it's possible it

9   could provide more access to voting hours at that

10  location and the rates of early voting could continue

11  to grow?  Is that possible?

12      A       Well, I've said, you know, several times

13  here that it seems like there is a test, right, and,

14  you know, it would not be reasonable for me to sit here

15  and say that an addition would be never in the cards,

16  never appropriate.  There has to be a test and what

17  I've suggested is I don't believe that test has been

18  met with just the one election which seems to be really

19  high stimulus election and which I've also said that

20  county officials really have no way of anticipating,

21  you know, from where they stood, you know, in

22  September.  So --

23      Q       Okay.  You -- we talked about the several

24  reasons for the low youth voter turnout and on your

25  report, you talk about habit of voting, the change of

1  address frequently, the failure to experience

2  politically competitive campaigns, poor socialization

3  from family background to parent resources.  My

4  question is whether you've analyzed those reasons as it

5  relates to Prairie View students.  Yes or no and tell

6  me why.

7      A      No.  And I didn't have a survey to draw on

8  that would include a lot of those details.  You don't

9  on the voter file have unfortunately a lot of those

10  details you'd like to have.

11     Q      How did you consider turnout as you define

12  it during early voting by different racial groups in

13  Waller County?

14     A      Well, we don't have race on the voter file

15  in Texas.  There are some southern states where we do

16  have race on the voter file.  It's not the case in

17  Texas.  So about the best you can do is sort of the way

18  the other experts went about it and that is take a look

19  at the, you know, proportions or concentrations of

20  African-American voters in the particular areas of the

21  county where they settled.

22            So there's no question that there are

23  African-American voters probably scattered throughout

24  Waller County and there are white voters that probably

25  live in and among the African-American concentrations

1   in Prairie View, but about the best you can do is look

2   at kind of the underlying population concentrations.

3   Undoubtedly the Prairie View student population is not

4   a hundred percent black.  It's largely black, but, you

5   know, there may be some Asian and Latino and white

6   students among them.

7            So too with the town Prairie View, we can

8   see from census data that it's largely a majority

9   black, but, you know, they could probably be captured

10  in that voting population of any analysis some nonblack

11  voters as well as some older voters.

12       Q       But you don't dispute that the method to

13  impute and understand racial turnout by different

14  racial groups that was employed by Dr. Stein, for

15  example?  Yes or no and then tell me why.

16       A       No.  I think he was using reasonable means.

17  You'll notice in my report, you know, I don't, you

18  know, like do anything like contest him line-by-line.

19       Q       Okay.  That's fair.

20       A       So, I mean, I didn't have, you know, major

21  objections to what he was doing along those lines,

22  along those lines.

23       Q       And is the method that he used, would you

24  agree that that is what others in your profession used

25  when -- in a case like Texas, the voter files do not

1  provide the race data?

2      A      He's trying to make some reasonable

3  guesses, right, and I think that there are only a

4  couple ways that you can do that.  And so acknowledging

5  that there's error with those tools, I think that

6  they're reasonable.  I just think that you have to be

7  appropriately circumspect about the limitations which

8  that all gets figured into like a peer review journal

9  article.

10     Q      How did you consider the turnout during

11 early voting according to your definition of turnout by

12 different age groups in Waller County?

13     A      I didn't focus too much on the question of

14 age.  So that's really outside of my report.

15     Q      How did you consider how students -- strike

16 that.

17            Did you consider how students use the

18 memorial student center in a different way than they

19 may use other early voting sites in Waller County?

20            MR. SEAQUIST:  Form.

21            THE WITNESS:  How did I use it?  Well, no.

22 BY MS. ADEN:

23     Q      For example, how did you consider that the

24 memorial student center is used for work, study, food,

25 the center of life for Prairie View students?

1    A    Well, it strikes me as a reasonable place
2  for an election day site, you know, given how much
3  activity goes on there.  You know, like other student
4  centers on other campuses, it's a meeting place and,
5  you know, it's not always located specifically at the
6  center of campus, but sometimes known as the campus
7  center.
8    Q    When you say reasonable place for an
9  election day site, that also means early voting?
10    A    Early voting site, yes.
11    Q    So while it may not be where students live
12  or as close to where they may live, do you agree that
13  it's where they spend a lot of their time?
14    A    Yes.
15    Q    You also identify inconvenient parking and
16  space for voting machines, election judges, and to
17  accommodate voters as potential issues of voting at the
18  memorial student center on page 12 of your report.  Do
19  you recall that?
20    A    Yes.  And I do recall that and there are
21  apparently reports from members of the community in
22  particular who wind up voting at that location, that
23  it's in some ways not the most convenient or optimal
24  location for them.  In other words, 309, the site is
25  not only serving the students that reside on the

1   campus, but there is a scattering of residents in 309

2   that also vote there.

3          And there are some reservations expressed

4   by citizens and I'm not sure if this is in the minutes,

5   but anyway, there are reservations expressed by people

6   in 309 who are not actually on the campus to having to

7   go to the student center as their voting place.

8      Q     Did you physically view any reports of

9   these concerns?

10      A     I didn't see any reports.  So some of this

11   was discussed in the presence of counsel and so --

12      Q     So you -- did you systemically analyze or

13   systematically analyze each of these issues

14   individually or collectively with respect to the

15   memorial student center, that is issues with parking,

16   issues with election judges, and space for machines?

17   Did you systematically analyze whether those issues, in

18   fact, were impacting --

19      A     No.

20      Q     Okay.

21      A     No.  And the information about the people

22   in the community expressing reservations about the

23   inconveniences of having to go on campus are entirely

24   anecdotal, but anecdotes happen to be important as

25   we've said earlier.  And they mount up and people begin

1   to take note of them.

2      Q    As an expert, how many of these anecdotes

3   are you aware exist?

4      A    Well, I know there were a couple of people

5   who were actually named, so I don't think they were

6   made up out of whole cloth. And discussions about this

7   issue, there was actually citizens whose names were

8   mentioned. And it was like in a John Doe kind of way.

9   They had specific names of people who voiced complaints

10   about having to go on campus and vote at this

11   particular site.

12      Q    How many citizens?

13      A    I believe I remember at least two who were

14   named.

15      Q    What were their names?

16      A    I don't recall now.

17      Q    Were one of the names Barnett? Is that

18   familiar to you?

19      A    It's not, no. I don't recall.

20      Q    Do you know whether those same complaints

21   have been made at other early voting sites in Waller

22   County?

23           MR. SEAQUIST: Form.

24           THE WITNESS: I don't know.

25   BY MS. ADEN:

1      Q      Have you looked into them?

2      A      No.

3      Q      Have you done an assessment about whether

4   those same complaints or issues might be present at the

5   Waller County community center?

6             MR. SEAQUIST:  Form.

7             THE WITNESS:  I have not looked at that.

8   BY MS. ADEN:

9      Q      Do you know what the capacity of

10  individuals who are allowed to be inside of the Waller

11  County community center at any given time is?

12     A      I don't know that.  I don't know the total

13  capacity.

14     Q      Do you have any reason to believe that the

15  capacity is bigger than at the memorial student center?

16     A      I would suspect that it would be smaller,

17  but I don't know.

18     Q      You comment that one of the purposes of

19  early voting is to provide voting outside of Tuesday

20  election day because of obstacles that voters may face

21  on the actual election day.  Is it possible that

22  cramming early voting in one site from Monday through

23  Wednesday could create an obstacle for students who

24  have to be away for school activities on those three

25  days?

1     A     I mean, that's possible.  I think that

2    again the question is compared to who or to what.  And

3    I guess that's always the question is what kind of

4    opportunity is being provided here compared to

5    opportunities elsewhere.  And as I said, it seemed to

6    me that in my review of this body of evidence that the

7    students at Prairie View are being provided with the

8    opportunity.  You know, not every particular time and

9    place will be convenient for any one individual person,

10   but, you know, there's still a range of options and

11   alternatives.

12     Q     I'm going to be skipping around a little

13   bit, so I apologize in advance.

14            In your field of expertise or what you're

15   aware of more generally in political science, is it

16   possible to project turnout in elections?

17     A     Again, it's a pretty complicated question.

18   Individual turnout, yes.  You know, we can look, for

19   example, and see that, you know, in a voter file if a

20   person has turned out in, you know, eight or nine of

21   the last ten elections, they're going to have higher

22   chance of turning out at the next one than someone who

23   has turned out only two or three of the last ten

24   elections.

25            So that's pretty obvious and consultants

1    and political scientists use this methodology.  They

2    look at a number of past elections and then forecast

3    who will be a high frequency voter and who won't.

4         Q      Where do you mention race in your report?

5         A      Off the top of my head, I don't know.  I

6    mean, I don't know if it's in there.

7         Q      Where --

8         A      I don't know.

9         Q      Do you believe it's mentioned at all?

10        A      Again, I don't know.  Off the top of my

11   head, I'd have to go through and comb through.

12        Q      And you told me that you didn't look at age

13   in this case; is that correct?

14               MR. SEAQUIST:  Form.

15               THE WITNESS:  No.

16   BY MS. ADEN:

17        Q      And at the beginning of this deposition, we

18   looked at, in fact, a peer reviewed piece where you, in

19   fact, looked in particular at how racial groups,

20   particular racial groups responded to campaigning or

21   campaign finance; is that correct?

22        A      Yes.  There's a recent paper that looks at,

23   you know, whether living proximate to a population of

24   color might trigger campaign contributions because

25   there's a very old theory of threat, you know, racial

1    threat.

2         Q        Okay.  We're moving.  I'm going to turn to

3    a different subject.  Is that okay or does anyone need

4    a break?

5                  MR. SEAQUIST:  Let's go.

6    BY MS. ADEN:

7         Q        What about you, Dr. Gimpel?

8         A        We're okay.

9         Q        You're the most important besides our

10   trusted reporter.

11        A        Is there a horizon soon?

12        Q        There is horizons.  There's always hope.

13   That's the profession we're in.

14                 MR. SEAQUIST:  Famous last words.

15                 MS. ADEN:  I'm moving.

16   BY MS. ADEN:

17        Q        So you compare Waller County's early voting

18   operations with other counties.  There are eight of

19   them; is that correct?

20        A        I can look at the table here.

21        Q        Around page 20 or so.

22        A        Yes.

23        Q        So eight counties?

24        A        Um-hmm.

25        Q        And you talked about why you selected

1  your -- these counties.  In particular, they're

2  comparable according to you comparableness in size and

3  having medium size colleges within them on page 20; is

4  that accurate?

5      A      Yes.

6      Q      Was there any other methodology that you

7  used to identify these institutions?

8      A      Not particularly, no.  These -- again, I

9  looked at the list of the public institutions primarily

10 and from the Texas State Board of Education, I believe

11 that data came from, and looked at enrollment and I

12 looked also then at the county population size.

13     Q      Did you consider how those campuses may be

14 different from each other or different from Prairie

15 View's campus?

16     A      I was hoping that they were.  We would want

17 a variation because the point is to examine the

18 administrative culture here, right, you know, of

19 election administrators across the state.  We wouldn't

20 want them to be all the same.  We would want there to

21 be variability because if we see largely the same

22 response in reaction to variation, we know that we have

23 a habit or a real practice here that's entrenched.

24            And what I found in these locations is

25 there are no voting sites on the campus and a lot of

1  times the voting sites are some distance away, right.

2  And so I think we want actually variability in them and

3  their nature because if the response is uniform to that

4  variability, we actually do a have a standard practice

5  here going on.

6      Q      Did you look at the demographics of each of

7  these counties?

8      A      No.  I am aware generally of the

9  variability and some of this was discussed also with

10  counsel.

11      Q      Did you look at the demographics of the

12  institutions that you identified within these counties?

13      A      Yes.  I'm aware.  Again, just because I

14  don't report on it or I don't include it in the table

15  doesn't mean that I wasn't aware of it.  You know, the

16  table that Professor Flores added in his supplemental

17  report was not news to me.  I wasn't born yesterday.

18  It was clear to me from the very beginning that the

19  counties hosting these campuses and the campuses

20  themselves were variable.

21          That was precisely the point.  You don't

22  want them to be all the same because, you know, that

23  way, you can see that there is a standard practice here

24  and it's not to place a polling site on the campus.

25      Q      So you were aware of the race and age

1  demographics of both the counties and the universities

2  before you included them into this report?

3      A      Sure, absolutely.

4      Q      But did you not report them?

5      A      No, they weren't reported.  No.

6      Q      I apologize.  Did you have something else

7  to say?

8      A      No.  Go ahead.

9      Q      Did you not think that was relevant to a

10  case that is alleging racial and age discrimination?

11      A      I think the point here is to show that

12  Prairie View A&M is to some extent alone in its habit

13  or practice going back some distance now of, you know,

14  providing any kind of voting site election day or early

15  on the campus of Prairie View A&M, that Waller County

16  is not among the counties that have the standard

17  practice of denying these sites to these campuses, but

18  is actually out there by itself in providing locations.

19  I think that's something that needs to be considered.

20      Q      I'll get to that.  With respect to

21  socioeconomic indicators like poverty rates or vehicle

22  ownership for these counties, did you examine that

23  before or after you provided this report?

24      A      No.  Students at these places, you know,

25  are -- these are public institutions and these are

1    students who are probably not especially affluent.

2    We're not talking about private schools here.  These

3    campuses draw, you know, on, you know, middle income

4    and lower middle income populations from largely across

5    the State in Texas.  And I don't think that it's going

6    to make a huge amount of difference, you know, some of

7    these, you know, these findings.

8              For one thing we're talking about walking

9    distance at Prairie View for goodness sakes.  Arguably

10   in some of these very large campuses like Sam Houston

11   State, you could say that there is a real distance

12   issue.  And there are some others that are kind of

13   scattered and spread out, but Prairie View we're

14   talking about very short distances.  So I don't see how

15   commuting could be relevant at all or car ownership.

16       Q     So you haven't been to Waller County,

17   correct?  You stated that you haven't?

18       A     No, I have not.

19       Q     So you haven't walked the campus?

20       A     No.

21       Q     And you haven't seen whether there are

22   sidewalks on the campus or not?

23       A     No, I have not -- I have not actually been

24   on the campus.

25       Q     And you don't know whether or not accessing

1  buildings or all the -- strike that.

2          And you don't have any indication from

3  personal knowledge or otherwise of whether or not

4  walking is something that can be easily done by people

5  with disabilities or with a broken foot or anything

6  like that?  You have no comment on that or have not

7  analyzed that?

8          MR. SEAQUIST:  Form.

9          THE WITNESS:  I have not analyzed that.

10  That's going to be from potential consideration just

11  about everywhere.

12  BY MS. ADEN:

13      Q      With respect to vehicle ownership, would

14  that be relevant depending on whether a school is a

15  commuter school or whether or not students again

16  primarily live and study and work in one place?

17      A      I think that would be worth considering if

18  I were an administrator and were trying to figure out

19  where to place sites.  You know, that might be a

20  consideration.

21      Q      Did you look at the percentage of students

22  at the institutions in the eight counties that you

23  looked at that were registered to vote in those

24  counties where the institutions were located?

25      A      I don't have that information.  I did not

1    have that handy.  Useful piece of information.

2    Couldn't find it and I don't believe it's there.

3         Q       For all you know, the institutions you

4    choose could be places where every single student who

5    attends them is registered to vote outside of the

6    county or in a different state?

7         A       Well, it's probably the case, right, that

8    it's a mix and, you know, some of these places are

9    drawing students from very close by and others from

10   further away.  That would be the case as in most

11   college campuses.

12              The question is what comparisons are you

13   going to use?  The question is what comparisons would

14   you use?  What comparisons are relevant?  And, you

15   know, I'm saying that there's an administrative

16   practice here of not placing sites on college campuses.

17   It's clearly established and a precedent on these other

18   campuses.  And Prairie View actually stands out in

19   great relief compared to these others.

20        Q       But you thought it was relevant to look at

21   the percentage of registered voters in Waller County

22   including on the Prairie View's campus who turned out

23   to vote.  So my question is:  Why wasn't the percentage

24   of registered student voters in the counties where you

25   looked at part of your consideration in making a

1    comparison in this case?

2        A      I think those are relevant considerations.

3    That's something that certainly could be done, you

4    know, in a supplemental report.  The -- you know,

5    again, I think you're right.  I think there are

6    questions about, you know, exactly where people live

7    relative to some of these campuses.  So in some cases,

8    it might be a little easier than others.

9              Again, the simple point here is that there

10   is an administrative practice among the class of

11   counties in Texas similar to Waller County that differ

12   substantially from Waller County's practice.  And that

13   is none of these places regardless of what they look

14   like or what their complexion is provide locations on

15   campus.  That is a plain fact, okay, and Waller is very

16   distinctive in that respect.

17       Q      You've mentioned that Wiley does have on

18   campus voting; is that correct?

19       A      There is that one exception and up in

20   Marshall.

21       Q      What about Texas Southern?

22       A      So Texas Southern is in Houston and my

23   impression was that there wasn't a site on campus, that

24   it was some distance way.  The nearest site was some

25   distance away.

1    Q       Texas Southern is an historically black

2    institution?

3    A       Yes.

4    Q       Would it surprise you if I told you that a

5    substantial number of Prairie View students are

6    registered to vote in Waller County?

7            MR. SEAQUIST:  Form.

8            THE WITNESS:  That would not surprise me.

9    BY MS. ADEN:

10   Q       Did you look at in your view of these eight

11   counties in the -- strike that.

12           In your review of these eight counties and

13   the schools within them, did you do an analysis of the

14   frequency that students at those schools use early

15   voting as compared to election day voting?

16   A       No.

17   Q       Would it have made sense to you to do a

18   comparison -- strike that.

19           Given your acknowledgment and the many

20   discussions that we've had today about the high

21   frequency of use of early voting by Prairie View

22   students, do you think it would have made sense to do

23   an analysis of the frequency of their use of early

24   voting as compared to other students in other -- in at

25   least the counties that you analyzed or in other parts

1    of the state?

2              MR. SEAQUIST:  Object to the form.

3              THE WITNESS:  Relevant consideration, I

4    think.  You know, the truth is that the O'Rourke, Cruz

5    race as I understand it elevated turnout and interest

6    pretty uniformly across the entire state, you know,

7    certainly not just in Prairie View.  So my expectation

8    would be that in these other locations, we would see

9    somewhat of a surge as well.

10             You know, I don't think that it's only -- I

11   don't think it's only the Prairie View students in

12   other words who were stimulated to extraordinarily high

13   numbers, you know, by the interest in this particular

14   election.

15   BY MS. ADEN:

16       Q      So you keep mentioning this 2018 election.

17   I guess my question is -- and I'm not conceding that I

18   accept this point that students are only motivated to

19   vote when there's a candidate like Beto O'Rourke or

20   someone on the ballot particularly since not everyone

21   voted for Beto O'Rourke.  But what about someone like

22   President Obama in 2018 and 2012, one would think

23   assuming that people do want to elect candidates who

24   look like them and who they identify with that those

25   would have been other elections that would have

1   motivated Prairie View students to vote and, in fact,

2   they did.  But according to your analysis, the county

3   still didn't change its voting practices.  They've been

4   practice stagnant over that time.  Explain to me how

5   all of that makes sense.

6               MR. SEAQUIST:  Form.

7               THE WITNESS:  First of all, part of what's

8   driving people to the polls in a competitive election

9   is an augmented or increased sense that their vote

10  could count or be decisive.  And so in the Obama

11  election of 2008 or the reelection of 2012, we do see

12  increased turnout, you know, because it's a high

13  stimulus election.

14              Still, you know, we do know that Texas as

15  far as presidential elections go is not an especially

16  competitive state.  So it may well be, right, that a

17  presidential election in a lopsidedly red state even

18  though the presidential election itself is competitive

19  nationwide, if it's not competitive in a particular

20  state, you know, people might reason, you know, maybe

21  it's not going to count.  You know, he's either going

22  to get reelected without me or he's going to go down

23  without me, but my vote isn't going to make a

24  difference as to how Texas goes in the presidential

25  election.

1    BY MS. ADEN:

2        Q       If I represent to you because I'm looking

3    at the November 4th, 2008, election returns from Waller

4    County and I'm looking at precinct 309, I'll represent

5    to you that early voting's ballots cast, there were

6    about 1,772 cast early at the precinct 309 and which

7    would have served Prairie View students even if it

8    wasn't located on campus, would you agree?

9        A       Yes, 309.  Yes.

10       Q       And then on election day, only 798 cast

11   ballots.  Even though early voting wasn't on campus,

12   doesn't it once again reflect these data available to

13   Waller County officials that those same student body

14   was using early voting at double the rate that they

15   were on election day?

16               MR. SEAQUIST:  Object to form.

17               THE WITNESS:  Well, it seems like early

18   voting opportunities were available and that they used

19   them.

20   BY MS. ADEN:

21       Q       Is it reasonable that those numbers could

22   have increased if they had access to on campus early

23   voting?

24       A       That's I think the real question, you know,

25   and I don't think the evidence is there for that.  I

1  don't think the evidence is there for that, you know,

2  because so many people who would have been election day

3  voters are early voters, right.  Early voting just

4  cannibalizes election day voting.  That's pretty much

5  what the evidence would suggest.

6       Q       What about if I represented that there was

7  a similar trend in 2012 with precinct 309 voters using

8  early voting rates at a substantially high number as

9  compared to election day votes?

10      A       Again, it suggests that they've been

11 provided with the opportunity to vote early and they're

12 using it.  So --

13      Q       But you don't know one way or the other

14 whether if changes to early voting allocation have been

15 made whether those numbers would increase or not?

16      A       Again, I think that's what's open to doubt.

17      Q       So you mentioned reviewing the expert

18 reports of Bill Cooper and you're aware that he

19 reported a lot of demographic information in his

20 report?

21      A       I vaguely recall his report.

22      Q       And you don't have any basis to dispute

23 then that 51 percent -- strike that.

24              You don't have any basis to dispute that

25 51.6 percent of the citizen voting age population in

1  Waller County is white while 32.1 percent of the

2  citizen voting age population is black?  So basically

3  51 to 32 CVAP that are white to CVAP black.  Do you

4  have any basis to dispute that?

5      A      I don't dispute it.

6      Q      Do you have any basis to dispute that

7  7.6 percent of the CVAP in Prairie View is white while

8  80 percent of the CVAP is black?  That's Prairie View

9  in particular?

10     A      Of the town of Prairie View.

11     Q      Of the City of Prairie View, 70 to

12  80 percent white to black.

13     A      Right.  I don't dispute that.

14     Q      Do you have any basis to dispute that

15  according to the census, the 2010 census, the

16  percentage of 18 to 20-year-olds in Prairie View is

17  about 54.33 percent and the percentage of 18 to

18  20-year-olds in Waller County overall is 13.59 percent?

19  So that's 54 to 13 18 to 20 in Prairie View as compared

20  to 18 to 20 in Waller county.  No basis?

21     A      I don't have a basis for disputing that.

22     Q      Do you have any basis to dispute that the

23  Prairie View student body is large enough to constitute

24  more than 27 percent of the Waller County's voting age

25  population?

1       A       No, I don't have any basis.

2       Q       Would you consider that an insignificant

3  population in the county?

4       A       You said 27?

5       Q       Twenty-seven percent.

6       A       It's a substantial population.

7       Q       It's over a quarter of the size of the

8  county?

9       A       Yes, it's a substantial population.

10      Q       How long has Prairie View been in

11 existence, do you know?

12      A       I don't know the answer to that.  I recall

13 reading that information.  I just don't recall it off

14 the top of my head.

15      Q       Do you have any basis to dispute that it's

16 been in Waller County since at least 1876?

17      A       That seems perfectly reasonable and

18 plausible.

19      Q       Do any of the eight counties and the

20 universities within them that you considered have

21 demographics similar to Waller County's as it relates

22 to the City of Prairie View or the Prairie View A&M

23 campus?

24              MR. SEAQUIST:  Form.

25              THE WITNESS:  I think the answer is no and

1    that's exactly what makes Waller County's decision so

2    remarkable that Waller County would actually do this,

3    put sites available and on campus.  It makes it

4    incredibly remarkable that they would be up front on

5    this like this.  You know, it's amazing because you're

6    right.  You know, none of the other places do and it

7    makes Waller County really stand out.

8    BY MS. ADEN:

9         Q      Do you --

10        A      In fact, in the face of the population

11   composition that you just cited, it makes it stand out

12   even more.

13        Q      So the disparity -- strike that.

14               You have no reason to dispute that some of

15   the counties that you compared Waller County to have

16   less than 5 percent of black residents according to Dr.

17   Flores?

18        A      I think that could well be right.  But,

19   again, I didn't choose them because they were going to

20   match up on the basis of their ethnic or racial

21   composition.  That wasn't the point.

22        Q      And that's also because you didn't consider

23   race in your analyses in this expert report?

24               MR. SEAQUIST:  Form.

25               THE WITNESS:  Well, you know, when we're

1  talking about -- think about this.  You've said this

2  yourself a couple of times, probably more than a couple

3  of times.  When we're talking about the Prairie View

4  A&M campus and we're talking about the town of Prairie

5  View, the very numbers you just gave me two minutes ago

6  suggest that we're talking about a largely

7  African-American population.  So that seems to me we're

8  talking about race.

9  BY MS. ADEN:

10      Q      You didn't report those numbers in your

11  report?

12      A      Not the particular numbers that you

13  indicated.

14      Q      They're underlined, but they're not --

15      A      There's a lot of information here about

16  those particular precincts.  And the fact that we are

17  talking about the racial composition of those precincts

18  points directly to discussion of race.  So, you know,

19  it's maybe kind of an indirect kind of evidence that we

20  use to talk about race here in looking at the precincts

21  and their composition, but the experts on the other

22  side do the very same thing.

23          You know, they're reasoning about race

24  using aggregate data as well.  They're using deploying

25  aggregate data throughout their reports and the reason

1  for that is simple.  We don't have race on the voter

2  file.  We have to make inferences.

3      Q      Would you agree that none of the colleges

4  and universities within these eight counties that you

5  looked at were historically black colleges or

6  universities?

7      A      In table 6, that's true.

8      Q      In fact, none of the schools have more than

9  18.5 percent black student population according to Dr.

10  Flores?

11      A      Okay.

12      Q      And you have no reason to dispute that

13  82 percent of Prairie View students are black according

14  to Mr. Cooper and other experts in this case?

15      A      I don't have any reason, no, to dispute

16  that.

17      Q      Were any of the Texas colleges in the eight

18  counties that you claim were comparable in size and

19  HBCU situated amidst a majority white county?

20      A      No.  Again, it makes Waller County all the

21  more stunning.  It's amazing.

22      Q      But the answer is no, but it makes -- in

23  your estimation, it makes --

24      A      It makes Waller County all the more

25  stunning.

1      Q      I understand.  And, for example, you have
2  no -- strike that.
3            You also have no reason to dispute that
4  Waller County's black population is roughly 24 percent?
5      A      It seems, you know, like a reasonable
6  estimate.  I don't have any reason to dispute that.
7      Q      And that Prairie View's student body is
8  about 82 percent black?
9      A      Okay.
10     Q      Consistent with your estimation
11  overwhelmingly black but not entirely black?
12     A      Okay.
13     Q      So no other Texas county college of the
14  eight counties in the colleges within them that you
15  looked at had that gap between --
16     A      Yes.
17     Q      Were any of the Texas colleges or
18  universities in the eight counties that you considered
19  an HBCU situated amidst a majority white and older
20  population?
21     A      I don't know the answer to that.  It's --
22  some of these are pretty rural, you know.  So -- but I
23  don't know the answer, but since some of these are
24  pretty rural, one might imagine that.
25     Q      But you don't know?

1      A      I don't know.

2      Q      You have no reason to dispute that the

3  Prairie View student body consists roughly of 82 black

4  students; is that correct?

5              MR. SEAQUIST:  Say that again.

6              THE WITNESS:  Eighty two percent?

7  BY MS. ADEN:

8      Q      You have no reason to dispute that the

9  Prairie View student body consists roughly of

10  82 percent black students?

11              MR. SEAQUIST:  Okay.  You said 82 black

12  students the first time.

13              MS. ADEN:  I'm also moving.

14              MR. SEAQUIST:  I'm no demographer, but --

15  BY MS. ADEN:

16      Q      No college you identified as a comparator

17  has more than 18.5 percent black students; is that

18  correct?

19      A      I think you asked me that already and I

20  don't have any reason to dispute that.

21      Q      You talk about Prairie View being an

22  outlier in terms of providing this early voting on

23  campus or election day early voting.  What about UT

24  Austin?

25      A      I think there's some very large campuses

1  that, you know, have moved forward.  Again, you know,

2  the larger campuses and indeed the larger counties are

3  governed by -- the larger counties are governed by

4  different rules than Texas state law and, you know,

5  they're subject to rather different pressures in Texas

6  state law and requirements.  In general, they're more

7  constrained I would say.

8           They aren't given as much leeway and

9  flexibility that the counties and so I guess I'm not

10 surprised that given their populations and

11 circumstances, you know, in places as big as Austin,

12 you know, and Travis County that, you know, there would

13 be locations, you know, placed on the campus.

14      Q    Is that true also of UT San Antonio?

15      A    Good question.  I didn't get around to

16 looking at every single campus.  I know that the north

17 Texas campus in Denton has taken steps now to move in

18 the direction of providing polling places on campus.

19 You know, it seems to be something that is emerging

20 perhaps and maybe we will see, you know, the rest of

21 these locations eventually catch up with Waller, but I

22 think it's very notable that Waller is on the leading

23 edge.

24      Q    What about San Antonio Community College?

25      A    I don't know the answer to that.  I didn't

1    look at the community colleges.

2        Q       Briefly we talked about your walk through

3    Waller County's adoption of early voting and to the

4    present and you talk about how unique it is and how

5    they are a leader.  But you reviewed Dr. Joseph's

6    report; is that accurate?

7        A       Yes.

8        Q       And you reviewed Dr. Flores's report which

9    incorporated some of Dr. Joseph's analysis; is that

10   correct?

11       A       Yes.

12       Q       Why didn't you acknowledge anywhere in your

13   report at minimum that there have been a fight to get

14   early voting in Prairie View and on Prairie View's

15   campus during at least some of that time?

16               MR. SEAQUIST:  Object to the form.

17               THE WITNESS:  Well, I mean, would we

18   characterize it as a fight?  I'm not sure that I would

19   characterize it as a fight.  The -- there was pretty

20   vigorous discussion, you know, as would -- one would

21   expect, you know, on any controversial subject coming

22   before a county board like this, but in the end, the

23   commissioners complied with the request and there were

24   instances in the past where requests were made and

25   Waller County responded affirmatively.

1          So it's not as if the history in Waller
2    County is uniformly ugly.  It seems like in recent
3    times in particular, there is an effort, you know, to
4    accommodate the campus and its population.  And, you
5    know, there were instances in the past where requests
6    were made and indeed they were granted.  More hours,
7    for instance, or site change, so forth.
8          So, you know, you know, I think that there
9    are a lot of residents in the county now, you know, who
10   have moved in who have no ancestral connection to the
11   slavery period.  You know, there are people present in
12   the county now, you know, who don't really know
13   anything about the past circumstances.
14         There are no doubt some longstanding
15   residents who have multiple generations in the place,
16   you know, and, you know, have more of a connection to
17   that history, but with more and more people moving in
18   from up on the Montgomery border in the north part of
19   the county and the south part of the county, you have
20   more and more people who are moving in who don't have
21   any knowledge of the past and don't have any
22   inclination to see it -- see that past continue or to
23   have it entrenched.
24         So I don't think that the constituency that
25   Professor Joseph and Professor Flores point to that

1  existed in 1950 or existed in 1870 is the same

2  constituency that you have in Waller County today.

3  These are not the same people.  And it seems quite

4  unfair and unreasonable to tar them, you know, these

5  new residents with, you know, the guilt, you know, of

6  this past that, you know, they have no tie to.

7  BY MS. ADEN:

8      Q      And the past is slavery?

9      A      Well, we know, for instance, that, you

10  know, there was a slave plantation, you know, in Waller

11  County.  You know, there's no question about that.  I

12  don't think that the two sides are at odds on that one

13  question.

14      Q      It's Prairie View campus?

15      A      Yes, it was situated there.

16      Q      And there are other plantations around

17  Prairie View's campus that also were enslaved people?

18      A      I don't think the two sides are far apart

19  on that at all.

20      Q      The only discrimination that is relevant or

21  could be a relevant consideration is slavery or 1950?

22      A      No.  What I'm suggesting is is that the

23  practices of -- the practices of 1850 or the practices

24  of 1950 don't automatically indict the Court of

25  Commissioners or the election administrators today.  I

1     just don't think that that's a case you can sustain.

2     No one would believe that.

3         Q      Are you aware that in 2015 the

4     commissioners proposed going from 8 to 2 early voting

5     locations, none of which would have been on Prairie

6     View's campus or on the City of Prairie View?

7         A      I was not aware of that, but in 2015, we

8     know that turnout drops considerably.  And so, you

9     know, the odd year -- these kind of odd year elections

10     2015, you know, have such low turnout, you know,

11     compared to the -- even the midterm election that

12     they're going to be considering, you know, a move like

13     that, you know, just in light of the demand.  That can

14     be entirely explained by the drop in demand.

15         Q      Very, very quickly, what is your basis for

16     these conclusions, these statements about guilt and

17     tarring and indictment?  What's your basis for knowing

18     about that?

19             MR. SEAQUIST:  Object to form.

20             THE WITNESS:  The Flores report and the

21     Joseph report do all of that.  Very clear implication

22     of the Flores report is that these past practices

23     completely indict the people that live there today.

24     There is a clear implication and it's clearly what he

25     believes.

1    BY MS. ADEN:

2         Q       And the only way that you can be

3    responsible for discrimination is if you had a direct

4    connection to slavery or lived in the 1950s?

5         A       Well, here is the issue.  You know, how do

6    we -- you know, this is a philosophical issue, way

7    outside of my report.  And it's -- you know, it goes to

8    individual moral responsibility, okay, individual moral

9    responsibility.  And, you know, I don't think that any

10   court would convict someone of discrimination on the

11   basis of what someone did who happened to live in their

12   house a hundred years ago, right.  This isn't even

13   talking about a relative now.

14              We have a home that's stood for a hundred

15   years.  People have moved in and people have moved out.

16   So you're telling me that a court is going to convict a

17   resident of that house for some act of discrimination

18   committed by a resident from a hundred years previous

19   who wasn't even a relative.  That's just pathetic.  No

20   court would buy that, you know.  And even if the person

21   was an ancestor, they probably wouldn't go along with

22   that.  I think, you know, this again is way outside of

23   my report.

24        Q       One last question on this.  Did you look at

25   with respect to any of the eight counties that you

1  examined whether or not they have a capable history of

2  documented voting discrimination by Federal Courts, the

3  Department of Justice, historians and otherwise as

4  compared to black students at Prairie View and Waller

5  County?

6          MR. SEAQUIST:  Object to the form.

7          THE WITNESS:  No.

8          MS. ADEN:  Let's take a break.

9          (There was a brief recess taken.)

10 BY MS. ADEN:

11     Q     Dr. Gimpel, would you say that in any of

12 the eight counties that you looked at -- strike that.

13          Dr. Gimpel, would you say that any of the

14 eight counties that you looked at has a comparable

15 history of voting discrimination against black student

16 voters as Waller County?

17          MR. SEAQUIST:  Object to the form.

18          THE WITNESS:  I don't know the answer to

19 that, but none of these are HBCUs obviously at least in

20 table 6.  So now up in Marshall, you know, or places

21 like Tyler or in Houston with Texas Southern, those are

22 all mentioned in the report and, you know, there may be

23 issues there.  But, you know, these in table 6, no, I

24 don't know the answer.

25 BY MS. ADEN:

1      Q      Okay.  Do you know about public

2  transportation options in the eight counties that you

3  examined?

4      A      I don't know.

5      Q      Did you factor transportation access to

6  early voting in the eight counties that you considered?

7      A      My main concern --

8      Q      Yes or no and then tell me what you mean.

9      A      No.  My main concern was was there a site

10  on campus and how close were the proximate sites off

11  campus.

12      Q      In looking at the siting of early voting

13  locations in relation to registered voters on page 40

14  of your report -- I'm skipping around and this is

15  because I've cut, so I apologize.  I'll try to do

16  better.  On page 40, you are reporting about the early

17  voting locations in relation to registered voters.  And

18  my question is whether or not you accounted for other

19  factors like differences racially and age or otherwise

20  in registered voter populations in so doing.

21      A      Like with respect to figure 3 on page 40?

22      Q      Yes.

23      A      No.  This is just bivariant relationship.

24  We're doing a precinct analysis here and so the amount

25  of additional data going to some of these other

1  variables is limited.

2       Q       Also on page 40, you contend that

3  historical tradition familiarity demand and a

4  combination of these factors impact early voting

5  decisions.  That's accurate?

6       A       Yes.

7       Q       What did you mean by historical tradition?

8       A       I just mean the past practice, you know,

9  that -- for all of us in everything we do.  You know,

10  our present and our future isn't born by our past.  So

11  that's kind of a no brainer.  And we shouldn't be

12  surprised that when administrators make decisions like

13  this just as they do with, for instance, spending and

14  budget decisions, appropriations and so forth, you

15  know, their guide is what they did last time and so --

16       Q       If a jurisdiction has a history of limiting

17  early voting sites to a particular community baked into

18  their past practice, could that impact decisions about

19  future placement of sites?

20       A       Sure.  I think it does.  I think it does.

21  And I just indicated to you with the answer to the

22  previous question that that plays a role.

23       Q       What did you mean by familiarity?

24       A       Well, I think I mean familiarity not that

25  the administrators know the sites, but that the sites

1   be familiar to the underlying populations.  I think

2   this is why it's -- schools are very popular as

3   precinct site locations, why firehouses are often used.

4   These are like community landmarks and they're familiar

5   as landmarks.

6           And people may not even need like a number

7   address when you say Longfellow Elementary School or

8   the, you know, Pattison Fire Department.  People will

9   know exactly where that location is.  So that's what I

10  mean by familiarity.

11      Q       And you don't have any basis to dispute

12  that Prairie View students including plaintiffs are

13  familiar with the memorial student center?

14      A       I think it's pretty obvious they would be

15  familiar with that I would think.

16      Q       And you have no reason to dispute that

17  students are not familiar with the Waller County

18  community center?

19              MR. SEAQUIST:  Object to the form.

20              THE WITNESS:  So that's -- I think that

21  that's a location that is probably quite familiar.  It

22  may not have the familiarity of the campus center, the

23  memorial student center, but there are going to be

24  other sites in proximity, you know, of that area that

25  will be familiar to people and certainly not obscure.

1  They'll be known.  I mean, the church is probably
2  well-known.  People will know where that church is and
3  have probably driven by it many, many times.
4  BY MS. ADEN:
5      Q      What's your basis for your position, your
6  contention that the community center is familiar to
7  Prairie View students?
8      A      Well, its proximity and past history that I
9  recounted actually in the report talking about how
10 frequently that location has been used in the past.
11     Q      But you didn't ask any students in relation
12 to this case?
13     A      No.
14     Q      And you didn't review the October 17th
15 Commissioner's Court meeting minutes?
16     A      I can't recall that.  I don't have a
17 photographic memory, so I don't recall that off the top
18 of my head.
19     Q      You don't have any basis to dispute in Dr.
20 Flores's report him recounting -- strike that.
21             You don't have any basis to dispute in our
22 amended complaint or original complaint and in Dr.
23 Flores's initial report him recounting statements at
24 least during the October 17th Commissioner's Court
25 meeting that students were not familiar with the

1   community center in part because they don't get mail

2   there as it's next door to the post office or go there

3   for any other sort of public events?

4              MR. SEAQUIST:  Object to the form.

5              THE WITNESS:  So I don't know.  I know that

6   the -- in part this community center is selected

7   because, you know, there are voters living off campus

8   who vote at this site and, you know, who have

9   apparently complained that the student union site is

10  not the ideal site for them if they had a choice.

11             So bear in mind that administrators are

12  trying to balance input from a variety of sources.  So

13  when they're making these selections, they're trying to

14  balance input, you know, and demand from a variety of

15  sources.  There may be people in the community who have

16  become quite familiar with the location of the Waller

17  community center and quite like voting there.

18  BY MS. ADEN:

19     Q     I'm going to show you what's being marked

20  as Exhibit 5 which is an article entitled, Political

21  Participation and the Accessibility of the ballot box

22  by you and Shupnick?

23     A     Yes, Shupnick.

24             (Gimpel Exhibit 5 was marked for purposes

25  of identification.)

1  BY MS. ADEN:

2      Q      I'm handing you a copy as well as a copy to

3  Mr. Seaquist.

4      A      Okay.

5      Q      And this once again I've highlighted some

6  language for ease of reference.  This is a 2003 article

7  that's on your CV that we discussed or at least you

8  pointed out earlier today?

9      A      Yes.  I'm very familiar with it or familiar

10  enough.  It's been a while.

11      Q      I'm going to ask you to turn to page 3 of

12  this document which I believe is actually 473 of the

13  journal piece which runs between 471 and 488, but page

14  3 of the actual printout that we have.  Do you recall

15  citing Dr. Stein's work on the impact of siting voting

16  at nontraditional locations like supermarkets as having

17  a positive impact on voting?

18      A      Yes, I think that makes sense.  I think

19  that there's at least one paper by -- maybe more than

20  one that I've cited by him.

21      Q      And do you recall on this page at the very

22  top of 473 making a statement that we believe there are

23  good reasons to believe that accessibility may make a

24  significant difference --

25      A      Yes.

1     Q      -- to turnout?

2     A      Yes.

3     Q      Is accessibility here defined as -- how are

4  you defining accessibility here?

5     A       In this case, it's pretty narrowly the

6  distance.  This is the first time I think in a journal

7  that this question was addressed and we looked at at

8  least for the locations that we were able to collect

9  data for in Maryland.

10     Q      And on page 1 of this same document I think

11  consistent with page 3, you make a similar statement

12  that you find that accessibility does make a

13  significant difference in turnout?

14     A      Yes.

15     Q      You also report -- I'm sorry to be jumping

16  around back and forth -- on page 3 that at least in the

17  first full paragraph on that page, you report that if

18  polling places were more accessible at least some of

19  those voters of marginal interest in motivation would

20  turn out to vote upon realizing that they might not

21  have to fight the usual meddlesome obstacles on their

22  way?

23     A      Sure.

24     Q      You don't dispute that?

25     A      No.  That's there.  I wrote it.

1    Q    And you further report on page 5 which is

2  475 of this article and the last sentence of the

3  paragraph right above the section that begins the

4  concept of accessibility, quote, some lack private

5  transportation.  Others have inordinately long

6  commutes.  Some live in severely congested areas and

7  others have physical handicaps.  For all of these

8  citizens increasingly the accessibility of polling

9  locations may enable them to fulfill their civic

10  obligation.

11    A    Right.  That's, you know, what we're

12  positing.  That's what we're trying to test.  We're

13  pointing to the fact that, you know, people do have

14  these limitations and live very busy lives.

15    Q    In this study, you recognize generally that

16  socioeconomic status, age, education levels could be

17  useful factors in a voting analysis?

18    A    Yes.

19    Q    Do you have any reason to dispute these

20  theories that use of data today?

21    A    No.

22    Q    I'm going to turn to another article that

23  you wrote and mark that as Exhibit 6.

24        (Gimpel Exhibit 6 was marked for purposes

25  of identification.)

1    BY MS. ADEN:

2         Q      This is another article cited in your CV

3    distance turnout and the convenience of voting from

4    2005.  I'm handing you a copy and also to Mr. Seaquist.

5    And I'm going to ask you to look at page 8 of that

6    article which is page 537 of it.  There's one sentence

7    highlighted on that page age is included because it is

8    well-known that older voters participate more and are

9    more likely to use convenience voting methods than our

10   younger voters.

11        A      Yes.

12        Q      Is that true in Waller County?

13        A      I didn't carry out exactly the same

14   analysis in Waller County.  So I can't -- I can't say

15   exactly what's true of Waller County.  I can say that

16   in general the reason why older voters might be

17   inclined to use early voting more is because it's

18   something that they're familiar with, you know, because

19   they have been in the habit of voting for a long time.

20   They might be more aware of the option in many places

21   to vote early, but I don't know if that's the case

22   specifically in Waller County.

23        Q      Because you didn't look at it?

24        A      I didn't see -- I didn't do that analysis.

25        Q      On this page 537, for example, in the next

1    paragraph which isn't highlighted unfortunately, but

2    also on the next page 538 and on page 542, is it fair

3    to say that in this article you specifically reference

4    socioeconomic status?

5         A       Yes.

6         Q       Can you explain to me -- strike that.

7                 In addition to socioeconomic status, is it

8    also true in this article that you considered age?

9         A       Yes, age.

10        Q       Can you explain to me why you so

11   affirmatively identify socioeconomic status, age, and

12   discuss them so explicitly and directly in the last two

13   articles that we pointed out?  What made it necessary

14   to do so there and not in the report that you provided

15   in this case?

16        A       Well, what's -- I think the -- I'm trying

17   to remember because it was some time ago.  I think the

18   main issue seemed to me was, you know, can we look

19   specifically at this question of convenience in Waller

20   County, okay, and assess whether it's doing everything

21   that plaintiffs think that it's doing.  Okay.

22                And so, you know, the report that I wrote

23   focuses more narrowly on the issue of distance because,

24   you know, that's very specifically the question of --

25   and hours, distance and hours because I wasn't really

1    being called upon to account for, you know, precinct

2    voting, absentee voting, early voting and nonvoting.  I

3    was tasked as I understood it to focus more

4    specifically on the question of access.

5              You know, these papers here, you know,

6    you're trying to do something more ambitious which is

7    to, you know, explain across large multiple county

8    jurisdictions in one case and entire states in another

9    what's going on with respect to turnout and these

10   different forms.

11             So the task in producing a piece of

12   research for a peer reviewed journal is rather

13   different than, you know, what you're being tasked to

14   do more narrowly for a report.  I don't see a

15   contradiction between what I've written in the report

16   and what appears in these two papers.

17             There are a couple of things to note.

18   First of all, these are about particular locations, one

19   in Maryland and the one in -- mainly in Nevada,

20   although I think in a second paper, we also look at New

21   Mexico.  So there's that.  But there's also this other

22   point that I made eight times, and I'll be brief, that

23   convenience can matter to a point.  Okay.  Convenience

24   can matter to a point.

25             It's just that, you know, compared to the

1  motivational factors, it's much smaller, okay, and, you

2  know, this is exactly, you know, where Adam Berinsky

3  went with his very authoritative work in comparing

4  these two, that the kind of bump up that you can

5  possibly get from convenience voting reforms is modest

6  like on the order that we find here, a couple of

7  points.  Okay.

8          It's -- on the other hand, when you look at

9  things like election factors and interest and

10  motivation variables, those results on turnout are much

11  greater.  Don Green and Alan Gerber, for instance, in

12  their experimental research have found that campaign

13  canvasing in an area can boost turnout by 12 points.

14  That's extraordinary the impact that a campaign can

15  have.  Nothing we have seen in any of the convenience

16  voting literature comes even close to that.

17          So, you know, there isn't a contradiction.

18  What convenience reforms can do is quite limited and,

19  you know, will often disappoint compared to the impact

20  of election outreach and motivation.

21      Q      But just for a couple clarification points

22  because I think this is all crystalizing for me.  So

23  convenience in your mind is distance; is that accurate?

24      A      It could be distance.  It could be also the

25  extension, you know, of hours as indicated in the

1    report or some combination of the two.

2         Q      If I --

3         A      I am looking specifically at travel costs.

4    By the way, if I were to redo these papers, the

5    technology and the data for redoing them is much better

6    now.  And, in fact, other scholars have come along and

7    written better papers than these since then, since

8    these were written because we make progress in the

9    field.  And so there's some advances that have been

10   made, but I don't think there's a necessary

11   contradiction.

12            Are there some places where convenience can

13   get you a couple of points bump?  Yeah.  I don't think

14   anybody is denying that and that's suggested in these

15   papers, but you can't expect convenience to get you

16   very much.  And in a lot of places, it's not going to

17   get you anywhere.  And I was suggesting in Waller

18   County it's not helping and that's because the

19   fundamental obstacle in Waller County in particular is

20   not a convenience obstacle.

21            The other point that I would make, by the

22   way, going to what's written here is that there are a

23   variety of inconveniences that people face that are

24   mentioned, you know, that will affect people other than

25   those living in the -- on the Prairie View campus and

1    the immediate vicinity.  You know, we have many as they

2    say here long distance commuters in the county, people

3    where the distance between work and home is long and

4    burdensome.  They're fighting traffic.

5              There are a variety of things that burden

6    other voters in the county that merit considering them,

7    you know, and their demand for early voting as well.

8    So I think there's also that point that is relevant to

9    the discussion.

10        Q    But can convenience also be defined as

11   siting an early voting location according to Dr. Stein

12   in a nontraditional place like a student center or a

13   supermarket where people actually go to vote?

14        A    I didn't address the mobile voting sites

15   and I know that's an area of interest that he has.  And

16   I don't think anyone here on this side of the table --

17   I've never heard in any of our discussions anyone

18   voicing opposition to the deployment of mobile voting

19   sites.

20             I don't exactly know where Texas is on

21   this.  I understand there might be some new legislation

22   being considered in the State of Texas on the subject,

23   but I was not really asked to provide an opinion on

24   moving sites around or putting them in a kind of

25   construction trailer type of operation and moving them

1   around.

2       Q       I guess I meant differently that

3   convenience could also be defined as for Prairie View

4   students or people in Prairie View siting a location in

5   a place that they actually use, not necessarily related

6   to distance to where they live, but here where they

7   work, where they socialize, where they eat.  Isn't that

8   another way to define convenience?

9       A       I think that's reasonable.  I think that

10  would be a reasonable consideration.

11      Q       And couldn't motivation -- you have a

12  definition of motivation, but couldn't motivation also

13  be defined as where people have demanded it, asked for

14  it because of their high rates of use?

15      A       I think we revisited that.  I'm sorry.  I

16  think we're revisiting that question.  It's come up

17  before.  And I think that this is why the meetings are

18  public and, you know, I gathered that, you know, when

19  these requests are made, you know, of the county

20  commissioners, it's their duty as elected officials to

21  give that some consideration.

22              And I don't think that they've uniformly

23  been negative, you know, in considering these requests.

24  I don't think the record shows that they've turned down

25  every request and there might be some discussion and

1    debate, you know, maybe some resistance, but that's

2    politics for goodness sake.  And people do have to kind

3    of accustom themselves to ideas and it takes a while

4    for that to sink in and for people to be persuaded that

5    this is the right thing to do.

6              So, anyway, I guess what I'm saying is I

7    don't read the record as being as uniformly hostile to

8    Prairie View A&M as apparently the plaintiffs do.

9         Q      But in light of the record that you know,

10   though, are you aware whether the demand according to

11   how I'm defining the demand request has been made by

12   other members of the community in the places where you

13   said, for example, they got nothing or they got less

14   than Prairie View or have you known the record to

15   reflect that community members from there have

16   requested, demanded it from Commissioner's Court?

17        A      You have people from Katy, for instance,

18   show up?

19        Q      Yes.

20        A      And the answer is I don't know the answer

21   to that and I don't know whose actually shown up at the

22   meetings.

23        Q      With respect to this literature, you also

24   said something about, you know, the type of analysis

25   you did here wasn't one that you were asked to do in

1  this case; is that correct?

2      A      Well, you know, I wasn't tasked to explain,

3  to come out with a full blown sort of model of turnout

4  with all of the effects.  I mean, partly, you know, you

5  are dealing with social science problem of small

6  numeracy.  There are only 20 precincts in the county

7  and going back, there are fewer, but there are I don't

8  think ever more.  So that kind of limits -- that kind

9  of limits what you can do, you know, from a more

10  orthodox social science viewpoint.

11      Q      My understanding is you came up with your

12  own research design.

13      A      That's true.  What I'm saying is that it's

14  always a process of negotiation.  You come back with an

15  outline and, you know, you get some feedback from the

16  legal team.  And they're like, okay, let's try this and

17  then there's this point.  I'm sure you're familiar with

18  this.  And you sort of work out, you know, what is

19  feasible in terms of data collection and analysis.

20          I think from a social science standpoint,

21  there is a limitation of only having 20 precincts, so

22  it's hard to include a full blown account of all the

23  various factors, you know.  We have ten of them perhaps

24  say when you only have 20 precincts.  That actually

25  creates problems.

1     Q     You also said that, you know, to

2 distinguish these two studies that you did that they

3 were a part of a local jurisdiction; is that accurate?

4 Did you focus in on the very particular place?

5     A     I'm saying that there's going to be

6 variability in these effects as you move from location

7 to location.  So, you know, the kind of positive --

8 modest positive impact that you get in one location

9 might not be replicated in another.  I do think that by

10 now however we have a mounting number of these studies

11 that suggest that the effect of the convenience forms

12 is always very limited.  It's rather small kind of on

13 the order of these papers.

14           And, you know, that compared to other

15 factors, you know, convenience is very limited and

16 that's because as I said for about the tenth time you

17 can have somebody coming to your door and asking you to

18 vote on an app and there are a certain number of people

19 that are not going to go along.  They're just not

20 interested.  And that's about as convenient as it can

21 get and that's -- I don't know how you get around that.

22     Q     You looked at Mr. Cooper's original report.

23 Quickly -- I'm going to show it to you very quickly

24 page 12 of Mr. Cooper's report as Exhibit 7.

25           (Gimpel Exhibit 7 was marked for purposes

1   of identification.)

2   BY MS. ADEN:

3        Q        This is his initial report.  I'll hand you

4   a copy and Mr. Seaquist a copy.

5              On page 12, if you can go there under

6   mobility, Mr. Cooper reports that of employed persons

7   16 and over, 81 percent of anglo residents drive to

8   work alone compared to 74.4 percent of black residents

9   and 79.7 percent of Latino residents.  By contrast, 23

10  percent of black residents in Waller County as compared

11  to only 12.6 percent of anglo residents commute to work

12  by walking, biking, or via carpool, i.e., that is

13  riding in another person's vehicle, taxi, or public

14  transit.  Do you have any basis to dispute those

15  numbers?

16       A        No, I don't have any basis.

17       Q        On page 14 of that same report if you go

18  further.

19       A        Okay.

20       Q        Under mobility again, it says in Prairie

21  View of employed persons 16 and over, 46.8 percent of

22  unemployed black residents drive to work alone compared

23  to 81 percent of employed anglo residents countywide.

24  Do you have any reason to dispute that?

25       A        No.

1      Q      On the bullet -- in the bullet below, it
2   reads in Prairie View, 46.5 percent of employed black
3   people commute to work by walking, biking, or via
4   carpool, that is riding in another person's vehicle or
5   taxi compared to 12.6 percent of employed anglo people
6   countywide.  Any reason to dispute that?
7      A      No.
8      Q      In light of the statements that you made in
9   your publications about transportation access and how
10  it relates to access to early voting, why did you not
11  consider that here?
12     A      Well, I think first of all we're talking
13  about distances.  I did consider the issue of distance,
14  okay, and I drew buffers that were very, very small.
15  Okay.  You know, a quarter mile is a little more than a
16  thousand feet, okay, and, you know, we still don't have
17  very high turnout within the people living that short
18  of distance.  Okay.  A half mile is not very far
19  either.
20            So I am considering distance.  That's what
21  those buffers are all about.  And what I'm seeing in
22  Waller County is that the people who are living further
23  away are the ones that are actually doing the voting.
24  So it seems to me like this distance argument in the
25  case of Waller County is really specious because we

1  have all of these people as I said living within a

2  stone's throw of a precinct site and they're still not

3  showing up to vote.

4      Q      How did you consider with these numbers

5  that were reported transportation of Prairie View

6  students were they to have to access the county

7  courthouse or another precinct off campus, did you do

8  an analysis of how their vehicle ownership or access to

9  vehicle ownership may impact their access to voting

10  under your definition or mine in light of your earlier

11  research?

12      A      Well, does -- so part of the reason why I

13  chose a quarter mile buffer is because transportation

14  shouldn't really be an issue there.  Transportation for

15  goodness sake ought to be an issue for people who maybe

16  have to travel, you know, a mile or more, but when

17  we're talking about a thousand feet, slightly more, you

18  know, or maybe 2,000 feet, you know, are we really

19  talking about something that's going to appreciably

20  change with the availability of a car?

21          These are very short distances we're

22  talking about here.  These are very walkable distances

23  particularly by able bodied young people.  It's strange

24  credulity for me to do -- to think, okay, that, you

25  know, having a car is going to make a difference for a

1    distance of three blocks or four blocks.

2        Q        Okay.

3        A        I would say further with respect to this

4    mobility question, we have no information in this

5    district about how far these people are traveling.

6    That's the kind of distance that I talked about in this

7    paper.  You know, if you are carpooling with someone

8    and your commute is 3 miles, okay, that's -- that's

9    still very, very different than driving alone and

10   having an hour or more to drive into Houston.

11            So without knowing something about the

12   actual distance being traversed, I don't think that

13   these figures that are cited in this report are very

14   informative at all.

15       Q        By buffer zones, you were talking about the

16   buffer zones you created to do your two articles?

17       A        No.  I was talking about in the report the

18   radii.

19       Q        You talked about reading Dr. Flores's

20   initial and rebuttal reports.  I'm going to skip around

21   so I can move this along.  Will you be opining on Dr.

22   Flores's reports or the information and expert opinions

23   presented if we go to trial in this case?

24       A        You know, I have no idea.  We have no -- we

25   have engaged in no discussion of that on the legal

1    team.  Trial seems at this point a long way off.  So

2    the answer is I don't know.

3        Q      Do you recall that Dr. Flores's report

4    draws on the Arlington Heights framework and senate

5    factors?  Does that sound familiar to you?

6        A      I remember that in the rebuttal report,

7    there's a section on that.

8        Q      Are you familiar with the Arlington Heights

9    factors?

10       A      I'm not and I didn't address that in --

11   well, I didn't intend to address that here or anywhere

12   else.  It's not been discussed.  Put it that way.

13       Q      Are you familiar with the senate factors

14   that he discussed in his report?

15       A      I'm not.

16       Q      So between the Arlington Heights factors

17   and senate factors that Dr. Flores discussed in his

18   report, you are not providing a specific opinion on

19   those one way or the other?

20       A      Not at this point.  Not at this time.

21       Q      So just to be clear, you did not do an

22   analysis of the impact of access as we define access,

23   not turnout, but access in terms of the rates of use of

24   early voting on black voters in Waller County?

25              MR. SEAQUIST:  I'm going to object to form.

1  How do you define access?

2        MS. ADEN:  Rates, usage, the rates of the

3  use of early voting.

4        MR. SEAQUIST:  You're saying just so it's

5  clear for the witness the proportion of early voting as

6  to election day voting?

7        MS. ADEN:  Yes.

8        MR. SEAQUIST:  Okay.

9        THE WITNESS:  I think that part of what

10 separates the sides are the varied definitions that

11 we're talking about here.

12        So I'm suggesting that turnout is essential

13 consideration, you know, when we're considering

14 convenience measures and I gather that that's different

15 on -- as far as plaintiffs are concerned.

16 BY MS. ADEN:

17    Q     So I'm going to ask my question again.  So

18 based upon Dr. Stein's analysis of access which you

19 agree is different than your definition of access; is

20 that correct?

21    A     I think I -- I think so.  I think so.

22 Things are beginning to break down here.

23    Q     We're tired.

24    A     I think things are beginning to break down.

25 The questions are confusing to me and I'm less and less

1    confident that I can answer coherently.

2        Q        We're getting to the end.  I have about

3    three to four more pages and these will be hopefully

4    yes or no answers.

5                I'm defining access in the following

6    questions as Dr. Stein did which is the proportion of

7    votes cast for early voting as compared to election day

8    voting.  So based upon that definition, you are not

9    providing an analysis of the impact of access on

10   early -- of access to early voting on black voters in

11   Waller County?

12               MR. SEAQUIST:  Object to the form and just

13   state for the record that defendant don't concede that

14   that's the way Dr. Stein defined access.

15               MS. ADEN:  Give me one second.

16   BY MS. ADEN:

17       Q        I'm going to skip that question for a

18   second.  You did not do an analysis of the history of

19   voting discrimination in Waller County?

20       A        Well, what is that?  So I've covered a lot

21   of ground on the history of the administrative

22   practices of the county as regards the population of

23   these precincts that both sides agree are heavily

24   African-American.  So I don't know what that is.  I

25   don't know what you're talking about.  So I'm saying

1 things are breaking down here.  You are becoming less

2 coherent or perception is.  I'm just not grasping where

3 you're heading.

4       Q       We can either take a break or --

5       A       We want to get this done.

6               MR. SEAQUIST:  Hold on.

7 BY MS. ADEN:

8       Q       So one thing the record should reflect is

9 that under the federal rules as far as I understand it,

10 we have seven hours to conduct a deposition.  Are we

11 operating on the same page?

12      A       Bring it, but I did not understand that

13 question.  I didn't get it at all.

14      Q       When we started the deposition, I made

15 clear that if there becomes a time when I ask a

16 question that is confusing because I'm human just like

17 you and you don't understand the question that you can

18 ask me to rephrase.  Is that fair?

19      A       Yes.  We're having a lot of those right

20 about now.

21      Q       And if you would like me to rephrase, you

22 could ask me to do that; is that correct?

23      A       Correct.

24      Q       If you need a break, you could also ask me

25 to do that.

1      A       No breaks.  Let's do it.

2      Q       Do you recall reading in Dr. Flores's

3   report him commenting on the existence of racially

4   polarized voting in Waller County?

5      A       I don't recall that specifically.

6      Q       So does that mean that you are not opining

7   one way or the other on the existence of racially

8   polarized voting in Waller County?

9      A       No.  You denied the existence of racially

10  polarized voting a few minutes ago when you indicated

11  that not all African-Americans there probably vote

12  Democratic.

13     Q       What is your definition of racially

14  polarized voting then?

15     A       It's the notion that the population of one

16  race votes heavily for one party and the population of

17  the other race votes heavily for the other, but you

18  indicated earlier today that you didn't think that that

19  was true.

20     Q       So if I dispute that definition of racially

21  polarized voting because I don't think that's accurate,

22  then maybe that is also a cause for breakdown, but the

23  point is you are not forming an opinion on racially

24  polarized voting in this case?

25     A       I wasn't asked to address that.  That might

1    be germane to redistricting, but that doesn't seem

2    germane here.

3        Q     Dr. Flores recounts a sequence of events

4    that led up to the decision and the adoption of an

5    early voting schedule for the 2018 election.  Do you

6    recall reviewing that?

7        A     There was an early schedule and then some

8    changes.

9        Q     Are you opining one way or the other on the

10    record of the sequence of events that Dr. Flores

11    reported in his report?

12        A     No.

13        Q     Dr. Flores reported on the record of

14    discrimination in education, employment -- strike that.

15            Dr. Flores and Mr. Cooper reported

16    disparities in education access, employment, and other

17    socioeconomic indicators in their reports.  Do you

18    recall that?

19        A     Yes.

20        Q     Are you --

21        A     We just looked at some for goodness sake,

22    right.

23        Q     Are you in any way disputing the

24    disparities that are reflected in their reports?

25        A     No.

1    Q    Dr. Flores reports on the extent to which
2    black people have been elected to public office on a
3    countywide basis in Waller County.  Do you remember
4    reviewing that?
5    A    No.
6    Q    Are you providing an opinion on the extent
7    to which black people have been elected to public
8    office on a countywide basis in Waller County?
9    A    No, no opinion.
10   Q    Dr. Flores reported on the issue of -- I'm
11   going to shorthand use rule addressing, the use of or
12   the issue that has come up with how students' addresses
13   when they register to vote have been used and how it
14   impacts voting and other issues in Prairie View.  Are
15   you generally familiar with what I'm talking about in
16   referring to it as rule addressing issues?
17   A    Yes.
18        MR. SEAQUIST:  Object to the form.
19   BY MS. ADEN:
20   Q    Did you analyze that issue in your report?
21   A    No.
22   Q    And are you forming an opinion or otherwise
23   disputing Dr. Flores's reporting of that issue in his
24   report?
25        MR. SEAQUIST:  Form.

1           THE WITNESS:  Well, first of all, I don't

2    recall exactly what he said about it, but first of all,

3    it was the county that discovered that issue and has

4    been working to rectify it.

5    BY MS. ADEN:

6        Q      How do you know that?

7        A      Because this was relayed to me as

8    information shared with counsel.

9        Q      And are you -- have you included that

10   dispute in the report that you disclosed to plaintiffs?

11       A      Well, clearly not.  It's not in there.

12       Q      So are you --

13       A      So, no.  The answer is no.

14       Q      So are you intending to offer an opinion

15   about that if we go to trial?

16       A      If I'm asked, I will.

17       Q      What is the basis of your opinion?  What

18   are you disputing?  What information are you providing?

19   And I'm asking that --

20       A      I will --

21       Q      Let me finish my question.  I'm asking that

22   because we are entitled to know -- the point of this

23   deposition is what you might say at trial.  So to the

24   extent you haven't reported it or commented upon it on

25   your report, we would like to discuss it now so we know

1    what you might say later.

2        A       I'm informed that -- that the county

3    discovered this issue providing we're even talking

4    about the same thing and that it has been working to

5    rectify it, taking a pretty proactive action to make

6    the adjustments to ensure that people are addressed in

7    their correct precinct.

8        Q       Dr. Flores provides an opinion about the

9    actual and contemporaneous rationales advanced by

10   Waller County officials in adopting and maintaining the

11   November early voting plan and whether they were

12   tenuous or pre-textual.  Are you forming an -- strike

13   that.

14             Dr. Flores provides an opinion about the

15   actual and contemporaneous rationales advanced by

16   Waller County officials in adopting and maintaining the

17   November early voting plan and whether they were

18   tenuous or pre-textual.  Do you recall reviewing that

19   in his report?

20       A       I don't.

21       Q       So you are not providing an opinion on

22   those alleged tenuous or pre-textual reasons for the

23   adoption and maintenance of the early voting plan?

24             MR. SEAQUIST:  Form.

25             THE WITNESS:  No.

1  BY MS. ADEN:

2      Q     Generally with respect to Dr. Joseph's

3  report, we already established that you're not a

4  historian.  Do you -- can you either -- either -- with

5  respect to Dr. Flores's report, do you wish to contest

6  the accuracy of anything in his report?

7              MR. SEAQUIST:  Form.

8              THE WITNESS:  That's a very broad question.

9  I will say I don't know.  Certainly I'll reserve the

10 right to contest the accuracy of things in his report.

11 I absolutely will, but it was a substantial report, so

12 there's a lot there.

13 BY MS. ADEN:

14     Q     You had that report available to you at the

15 time you provided the report in this case?

16     A     Yes.

17     Q     So if there were factual inaccuracies in

18 that report, you had the opportunity to identity them

19 in the report that you disclosed to plaintiffs?

20     A     Okay.

21     Q     Yes or no?

22     A     Well, you just suggested that that was

23 true.

24     Q     I'm asking you a question which is that you

25 had Dr. Joseph's report available to you before you

1    provided -- disclosed the report --

2         A       Well, I didn't address --

3         Q       Excuse me.  Let me finish my question.

4         A       Okay.

5         Q       My question is two part.  You had Dr.

6    Flores's report before you disclosed your report to us?

7         A       Wait a second.  First you're talking about

8    Flores and then you switched to Joseph.

9         Q       Thank you for correcting me.

10        A       You are very incoherent at this point.

11        Q       And you're being very rude to me and I'm

12   trying to be respectful.

13                MR. SEAQUIST:  Can we take a minute?  Is

14   that okay, counsel?

15                MS. ADEN:  That's fine with me.

16                MR. SEAQUIST:  Let's take a quick couple of

17   minutes.

18                (There was a brief recess taken.)

19   BY MS. ADEN:

20        Q       Before you stepped out, I wanted to

21   clear -- make clear for the record that you had

22   Dr. Joseph's report available to you before you

23   disclosed your report in this case?

24        A       Yes.

25        Q       And having seen it, are you -- you

1    therefore had the opportunity to contest the accuracy

2    of representations that he made in that report; is that

3    correct?

4         A       Yes.

5         Q       And are you disputing the accuracy of

6    anything that he has represented in that report?

7                 MR. SEAQUIST:  Object to form.

8                 THE WITNESS:  Not in my report.

9    BY MS. ADEN:

10        Q       Where do you expect to dispute the accuracy

11   of it if we are to go to trial?

12        A       I don't know.  Trial seems a long way off.

13        Q       At this time, do you have any basis to

14   dispute the accuracy of any of the representations that

15   he made in his report?

16                MR. SEAQUIST:  Object to the form.

17                THE WITNESS:  At this point, I don't.

18   BY MS. ADEN:

19        Q       Similarly you had Mr. Cooper's at least

20   initial report available to you at the time that you

21   provided your report?

22        A       Yes.

23        Q       And you had the opportunity to correct any

24   inaccuracies that he would have made in that report in

25   providing your report in this case; is that correct?

1      A      Yes.

2      Q      And with respect to his supplemental

3 report, let's just to be clear, you did not receive

4 that; is that accurate?

5      A      I don't recall receiving that report.

6      Q      So at this time, you have no basis because

7 you haven't seen his report to dispute anything with

8 respect to it?

9      A      No.

10            (Gimpel Exhibit 8 was marked for purposes

11 of identification.)

12 BY MS. ADEN:

13     Q      So for Exhibit 8, I'm going to hand you Dr.

14 Stein's expert rebuttal report and share a copy with

15 Mr. Seaquist as well.

16            MR. SEAQUIST:  Thank you.

17 BY MS. ADEN:

18     Q      I'm going to ask you to look at page 3 of

19 Dr. Stein's rebuttal report and read the paragraph

20 starting with but Professor Gimpel.

21     A      "But Professor Gimpel is mistaken.  In this

22 case, the relevant issue is not whether early voting is

23 a wise policy, but whether Waller County has

24 discriminated against legally protected classes of

25 voters in the way it provides access to early voting

1  opportunities.

2          "What is relevant is not whether the

3  county's early voting schedule caused more or fewer

4  people to vote early, but whether the opportunity to

5  vote early was equally accessible to black and white

6  voters and young or older voters.  Turnout dispute

7  about access misses the mark.  The approach that

8  Professor Gimpel takes would be like trying to defend a

9  preschool that refuses to admit black students by

10  arguing that preschool does not have a measurable

11  impact on later academic success.  The issue is access,

12  not outcomes."

13      Q      Based upon that paragraph, do you think

14  it's fair to say at the end of the day that you and Dr.

15  Stein are responding to different questions with your

16  reports?

17      A      Well, we certainly view the measures

18  differently, you know, and the concepts differently.  I

19  think that that must be true.  That must be true.

20      Q      And in the next paragraph, I'm going to

21  read it.  It -- this rebuttal report of Dr. Stein, it

22  reads:  "It appears that Professor Gimpel has

23  incorrectly assumed that the plaintiffs' claims are

24  that they were prevented from voting because of how

25  Waller County operated early voting.  This assumption

1   is a critical misconception that inappropriately

2   prompts Professor Gimpel to focus on voter turnout

3   which is irrelevant to the plaintiffs' claims, legal

4   theory, or expert reports.

5                "As such, Professor Gimpel's analysis of

6   the relationship between opportunities to vote early

7   and voter turnout ignores the heart of plaintiffs'

8   claims that they did not have equal access to the

9   opportunity to vote early as compared to other

10  residents in Waller County during the 2018 general

11  election.

12               "Access is not limited to only the

13  placement of an early voting location.  Access also

14  includes the number of days and hours at the location.

15  These concerns underscore significant limitation with

16  Professor Gimpel's analysis."

17               Do you understand Dr. Stein's criticism of

18  your report in this paragraph or the other?

19       A     Well, he's trying to say that, you know,

20  that a turnout doesn't matter and, you know, I think

21  the whole point of access to early voting is to promote

22  turnout.  And so I think that there's, you know, just a

23  very fundamental difference there.

24       Q     Despite having that fundamental difference,

25  based upon having reviewed Dr. Stein's initial report

1  and his rebuttal report, do you have -- what's your

2  basis for disagreeing if at all with his ultimate

3  conclusion that Waller County's early voting plan for

4  2018 disproportionately impacted voters age 18 through

5  20, black voters age 18 to 20, and black voters in

6  Prairie View?

7           MR. SEAQUIST:  Object to the form.

8           THE WITNESS:  Well, once again, there were

9  places in Waller County that got no hours and that got

10 no sites and still had demand for early voting based on

11 rates of early voting.  And, you know, the fact that

12 Waller County got sites and hours should not be

13 neglected and ignored to the exclusion of the evidence

14 showing that other locations in the county received no

15 hours and no sites either on election day or in the

16 early voting period at all.

17 BY MS. ADEN:

18      Q      Exhibit 7 is a separate document, Dr.

19 Gimpel, that I provided to you which is Mr. Cooper's

20 report.

21      A      Um-hmm.

22      Q      Would you agree that within that report,

23 Mr. Cooper relies upon census and ACS data?

24      A      Yes.

25      Q      Is that appropriate data or -- strike that.

1          Do you have any basis to dispute or

2   question the use of his census and ACS data?

3      A     No, I don't think so.  The ACS data have

4   error, you know.  The ACS data are estimates and

5   there's a five-year survey and a three-year survey, a

6   one-year survey.  It looks like he's using mostly ACS

7   data from a five year, '13 to '17.  So, you know,

8   there's error around these estimates that, you know, is

9   not reported in the tables.

10          Having said that, I don't particularly have

11  a problem with the way it's presented.  He probably

12  lopped the error off because it cluttered up the

13  tables.  So, you know, I will say for the record that,

14  you know, the ACS is a survey and so, you know, some of

15  these estimates have pretty substantial errors around

16  them that go unreported, but I would also say that for

17  the sake of a clean presentation, it's not surprising

18  that he left those errors out.

19      Q     Do you consider yourself a professional

20  demographer?

21      A     It's not really my field.  Demography is a

22  branch of sociology.  I have worked with a lot of

23  demographic data, but that I'm not a -- no, I would say

24  I'm not a professional demographer.

25      Q     Has any court ever qualified you as an

1  expert on demography or mapping?

2      A      I don't know the answer to that.  I'm not

3  quite sure what the answer to that is.  I don't know

4  what the courts have said as far as qualifications go.

5      Q      Do you think you're qualified to evaluate

6  demographer or map maker -- strike that.

7             Do you think you're qualified to evaluate a

8  demographer, an expert demographer's methodology and

9  conclusions?

10     A      Yes.

11     Q      Based upon?

12     A      Well, I've done quite a bit of work in the

13  area.  I'm not a professional demographer, but I've

14  certainly worked with a lot of demographic data and

15  continue to do so.  And I actually published in

16  sociology journals.

17     Q      You testified earlier that the literature

18  generally shows that there is no evidence that early

19  voting increases turnout, correct?

20     A      Yes.

21     Q      And that conclusion is also in your report,

22  correct?

23     A      Yes.

24     Q      So you write in your report on page 45

25  that, quote:  "There is no basis in the evidence to

1    conclude that allocating additional hours of early

2    voted in Prairie View would have a substantial effect

3    on turnout."

4         A       That's correct.

5         Q       So is it fair to say that according to your

6    testimony today and your report that there is no causal

7    relationship between greater access to early voting and

8    higher turnout?

9         A       In these particular data, I'm suggesting

10   that there's lack of evidence of any association

11   between the two.  And that's death to causality, right.

12   Once again, there are three conditions.  One of them is

13   as X changes, Y has to change.  So, you know, if you

14   don't have that, if there's no co-variation, you're not

15   going to find causality even if the other conditions

16   are present, right.

17              So I think that that's really the problem,

18   you know, with the relationship between hours and

19   turnout is that it's flat.  And, you know, we can see

20   that in the plot where we have precincts like 101 with

21   ample hours that are turning out at around 50 percent,

22   okay, and there are precincts like 207 with no hours at

23   all that are turning out at about the same level.

24        Q       Is it fair to say -- strike that.

25              Is it fair to say that if a specific group

1    of voters has high access to early voting, it doesn't

2    automatically follow that they will have high turnout?

3        A      I think that that's true.  You can provide

4    a lot of access to early voting and not push turnout

5    up.  I think that's one of the problems that's

6    indicting these convenience reforms as ineffective is

7    the people who vote on election day are being

8    convenienced by now voting in the early voting period,

9    but it's not doing anything to push turnout up which,

10    of course, is the original intent.

11             That's the original intent of adopting

12    these convenience reforms just like motor voter is to

13    produce, you know, more active and participatory

14    electorate.  And often that's not happening very

15    frequently in tests like the ones here.  You can find,

16    you know, in some cases and in some elections modest

17    bump up, but it has to do with there being this

18    ceiling, you know, on the effects of convenience and

19    ultimately there are going to be people who can have

20    all the conveniences in the world at their doorstep and

21    they're just not interested and mobilized to vote.

22        Q      To that point, if a specific group of

23    voters has low access to early voting, it doesn't

24    automatically follow that they will have low turnout?

25             MR. SEAQUIST:  Form.

1          THE WITNESS:  It doesn't necessarily mean

2    that because there is that election day option and we

3    actually know, right, of states that have either been

4    very slow to adopt early voting or not adopt it at all

5    and there are places in those states that have very

6    high turnout.

7    BY MS. ADEN:

8        Q      So putting that together, if in a given

9    election a group of voters has low turnout based on

10   your testimony in the literature you cite, we can't

11   necessarily conclude that those voters had low access

12   to early voting; isn't that accurate?

13       A      I think the two are independent in the way

14   that I just described.

15       Q      And similarly if a group of voters has high

16   turnout in a given election, you can't necessarily

17   conclude that those voters had high access to early

18   voting, correct?

19       A      Well, clearly you can't because as I said,

20   there are many states that were slow to adopt early

21   voting or don't have it at all and their turnout is

22   high.

23       Q      If Prairie View students were given greater

24   access to early voting based upon your testimony today,

25   we can't automatically conclude that they would have

1    lower turnout; is that right?

2                    MR. SEAQUIST:  Form.

3                    THE WITNESS:  Either way, we're not sure

4    that the turnout would be lower or higher.

5    BY MS. ADEN:

6        Q       So flipping that, if Prairie View voters

7    were given less access to early voting based upon your

8    testimony, we can't conclude that they would have lower

9    turnout?

10       A       Not necessarily.  It's sufficiently

11   independent relationship that, you know, we have these

12   election day -- you know, we have -- we have these --

13   this election day option still.  That's not been taken

14   away.

15       Q       So wrapping this all up and I'm winding

16   down, in a different election, if Prairie View voters

17   had high turnout just based upon that data point, we

18   don't necessarily know if they had high or low access

19   to early voting in that election; is that correct?

20                    MR. SEAQUIST:  Form.

21                    THE WITNESS:  Sure, right.  And we don't go

22   back far enough in these reports in this with respect

23   in any of the reports, but you could go back.  Early

24   voting is relatively recent phenomenon in the history

25   of Texas.  It started in the early and mid-nineties.

1  So naturally we can go back before the period of early

2  voting if we had the data and see that across the

3  Waller County precincts, we had high turnout and low

4  turnout for all of the various reasons we've discussed

5  today in a period where early voting didn't exist,

6  right.  So early voting is separate from -- is

7  independent of, you know, the question of

8  participation.

9  BY MS. ADEN:

10      Q      Based upon the fact that there's not a

11  causal relationship that you can demonstrate, how can

12  we conclude that high turnout is evidence of high early

13  voting access?

14      A      I don't think that you can because as I

15  said, there are all these other reasons that we've

16  discussed throughout the day that drive participation.

17  And many of them are interested in mobilization and

18  campaign related and have nothing to do with

19  convenience.  And, in fact, that's what I'm saying

20  happened in Prairie View A&M in 2018.

21      Q      So for this matter then, if early voting

22  doesn't affect turnout or we can't link the causal

23  relationship to them, how can you tell us that turnout

24  has anything to do with the adequacy of early voting in

25  Waller County?

1      A       Because what you can show is that there's
2 no relationship, right, that there's no relationship
3 between availability of hours and the level of turnout,
4 that there's no relationship at all.  And so when
5 there's no relationship at all, that's death to the
6 causality.  Remember, folks, these three things are
7 necessary.  Okay.  They're not sufficient, but they're
8 necessary.  They're necessary conditions, right.
9 They're necessary.  Okay.
10             So the correlation has to be there either
11 inverse or positive, okay, or it's death to causality,
12 okay, because that second condition isn't met.  And
13 that's what we've got here.  We've got, you know,
14 levels of turnout that range all over the place with
15 all kinds of hours none and some.
16      Q       You read plaintiffs' complaint, yes or no?
17      A       Yes.
18      Q       And in your report on the first page, it
19 says that you were hired to evaluate plaintiffs' claims
20 and respond to expert reports presented by the
21 plaintiffs?
22      A       Yes.
23      Q       If you didn't analyze the impact of the
24 early voting plan in terms of age or race explicitly,
25 how could you have possibly, quote, evaluated the

1    plaintiffs' claims?

2        A        Because what we're dealing with as we've

3    said a number of times throughout the day when you're

4    looking at Prairie View and you're looking at Prairie

5    View A&M, you are largely talking about race.  And the

6    plaintiffs understand that in their reports.  And we

7    certainly understand it over on our side.  Those things

8    wind up being proxies for race particularly in the

9    absence of more detailed information.  It's present in

10   their plaintiffs' report and it's present in our

11   reports.

12       Q        So by Prairie View A&M area, does that mean

13   race?

14       A        That largely means race for very good

15   reason.  The statistics you yourself cited.  You gave

16   me the data actually from one of the reports about the

17   composition of 309 and 310, the precincts in that area.

18   So that's race.

19       Q        So Prairie View area which you describe as

20   the Prairie View campus and the City of Prairie View?

21       A        Yes.

22       Q        In your mind, the definition is race?

23                MR. SEAQUIST:  Form.

24                THE WITNESS:  That's -- that's the lens

25   that we have and that's central to the complaint.  And

1    that's well understood by both the plaintiffs and their

2    experts and on this side that that's really a

3    discussion about race.

4    BY MS. ADEN:

5         Q        Is that a scientific definition?

6         A        That's the definition that's being used by

7    all sides in this.

8         Q        Is that a definition based upon -- strike

9    that.

10              Why then in the other articles that you put

11   out into the universe as peer reviewed publications do

12   you go about then specifically and directly identifying

13   socioeconomic status, age, race and studying those in

14   an explicit manner and here you use the term Prairie

15   View area to talk about black human beings?

16              MR. SEAQUIST:  Form.

17              THE WITNESS:  You know, it's -- the actual

18   approaches aren't that different.  You know, when you

19   take a look at what we're looking at in political

20   participation and accessibility of the ballot box,

21   we're not looking at anything other than precincts.  We

22   don't have individuals here.  These are precincts.

23   Okay.

24              And so when I look at a race and

25   socioeconomic status and measure those, I'm measuring

1    them exactly the same way as we do in the Waller County

2    report.  These are -- when we talk about black

3    precincts, we are talking about preponderance or

4    percentage black.  When we're measuring income, we're

5    looking at, you know, median income figure or, you

6    know, the percentage that might be above a certain

7    threshold.  These are precincts.

8              Same thing actually -- well, no.  Here --

9    well, here is slightly different.  Here we actually are

10   using the Clark County voter file, but, again, we have

11   the disadvantage of the Clark County voter file not

12   providing race and economic information actually on the

13   file.  So what do we do?  We actually substitute in for

14   race and economic composition.  We actually substitute

15   in the census track share, okay, where they live, okay,

16   which is a second best.

17             But, you know, if you don't have individual

18   level information on race or income or the percent

19   moving from a different state or the percent who are in

20   college, if you don't actually have individual level

21   information on that, you're stuck using aggregate data.

22   We use that here and we use that in the Waller County

23   report.

24   BY MS. ADEN:

25        Q    And Dr. Stein uses that as well?

1      A        The -- for instance, throughout the Cooper

2   report, you know, we're relying on -- well, maybe not

3   so much the Cooper report.  This is actual individual

4   survey level data.  But when we rely on a lot of the

5   census information in the reports, a lot of times we

6   are drawing on aggregates.

7            So this would be like a track level, block

8   groups.  I saw block groups in several of the reports

9   which is the next level down and precincts which would

10  be slightly more granular.  It's possible to use ZIP

11  codes which are probably between like a precinct and a

12  block group, you know, in terms of size.  You know,

13  that's unfortunate, I suppose, but we don't have

14  individual level on the voter file, you know, going to

15  race and socioeconomic status and that's a limitation.

16     Q        Excuse me.  I'm sorry.  We do have it with

17  respect to age, though?  We can determine age?

18     A        We do.

19     Q        And so it was possible -- it's possible to

20  differentiate between within your definition of the

21  Prairie View area, the difference between people who

22  are 18 to 20 versus not 18 to 20 in the Prairie View

23  area?

24     A        But once --

25     Q        Yes or no?

1    A    Yes.  And those data are -- the age

2  variables and birth date is available on the Texas

3  voter file, but I don't think, you know, that anybody's

4  disputing the preponderance or the high percentage of

5  18 to 24 or 18 to 20-year-olds in 309.  I don't think

6  anyone is really disputing that.  That's a college

7  campus for goodness sake.  What else are we going to

8  find there?  We're not going to find 85-year-olds.

9         I don't think anybody is disputing that,

10  right.  We know that this is going to be a location in

11  a county where there's a very large share of 18 to 24

12  or 18 to 20-year-olds.  I don't see any way of

13  challenging that or any purpose for challenging that.

14    Q    And there's no basis for inversely

15  disputing the age range for the other residents in

16  Waller County outside of the Prairie View area as

17  you've defined it?

18    A    The mean age would have to be larger

19  because we have such a concentration of young people on

20  the Prairie View campus.  It would almost have to be

21  older, you know.  As you get into the rest of the

22  county, you've got family age people and more of a mix.

23         MS. ADEN:  I don't have any other

24  questions.

25         MR. SEAQUIST:  We will reserve the right to

1   read and sign.  Please, if you'll direct that to my

2   attention.  Defendants will reserve their questions for

3   the time of trial.

4            (Deposition was concluded at 5:48 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF DEPONENT

2             I hereby certify that I have read and

3    examined the foregoing transcript, and the same is a

4    true and accurate record of the testimony given by me.

5

6             Any additions or corrections that I feel

7    are necessary will be made on the Errata Sheet.

8

9

10                    _____

11                    James G. Gimpel, Ph.D.

12

13

14                    _____

15                    Date

16

17   (If needed, make additional copies of the Errata Sheet

18   on the next page or use a blank piece of paper.)

19

20

21

22

23

24

25

1                       **ERRATA SHEET**

2   Case:  Jayla Allen, et al. v. Waller County, et al.

3   Witness:  James G. Gimpel, Ph.D.      Date:  12/12/2019

4   PAGE/LINE              SHOULD READ              REASON FOR CHANGE

5   _____

6   _____

7   _____

8   _____

9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2              I, Steven Poulakos, registered

3    Professional Reporter, the officer before whom the

4    foregoing proceedings were taken, do hereby certify

5    that the foregoing transcript is a true and correct

6    record of the proceedings; that said proceedings were

7    taken by me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am neither

9    counsel for, related to, nor employed by any of the

10   parties to this case and have no interest, financial or

11   otherwise, in its outcome.

12             IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 31st day of

14   December 2019.

15   My commission expires:

16   May 31, 2021

17

18

19

20   --------------------------

21   NOTARY PUBLIC IN AND FOR

22   THE DISTRICT OF COLUMBIA

23

24

25

## $

**$300 (2)**
17:24;18:3

## A

**A&M (12)**
45:7;114:9;121:7;155:18;
182:12,15;193:22;195:4;
221:8;250:20;252:5,12

**abandoned (1)**
166:10

**aberration (2)**
132:4;136:4

**ability (1)**
7:18

**able (7)**
43:24;87:20;130:2;
149:19;166:8;212:8;226:23

**about (250)**
5:19;7:4;12:18,19,20;
13:7,21,25;14:1,2,11;15:3,
5;17:4,6,7;20:20;21:5,11,
14,18,20;23:4,20,23;28:4,
11,18,20,21,24;29:20;
30:10,14;31:19;35:7,21;
38:22,22;41:10,12,15;42:9;
46:8;47:13;48:19;49:2,16;
50:15;51:3;52:6;53:9;54:3,
8,15;56:16;57:3,19;59:3;
60:18;61:12,14;63:19,20;
64:11,14;65:14;67:23;
69:12,14;70:4;72:18,21;
74:20,20;75:16,17;76:6,8,
20;77:4;79:13,14,15,17;
86:4;87:25;90:5,6,10,13,14,
16;91:8,19,25;92:11,15;
93:14;94:4;96:9,9;102:3,11,

16,23;104:6,8;110:3;
111:23;112:8;113:22;
119:11;120:21;121:18;
123:1;124:7;125:9;126:23;
128:21;130:7;131:20;
133:20;134:21,22;136:21;
138:18;139:6;140:14,21,22;
142:25;144:5,9,11,22;
145:1,2,5,7,9,10,13;146:22;
147:1,21;148:6;149:14,16;
150:8,10,13,16,20,25;
152:10,19;159:18;161:20;
162:3,14;164:3,5,19;167:6;
169:23,25;170:17,18;171:1;
172:7;174:21,22;175:6,10;
176:3;179:7,25;183:2,8,14;
184:11;186:6,21;187:20;
188:21;190:6;191:6;
192:17;195:1,1,3,4,6,8,15,
17,20,23;197:8;198:21,23;
199:24;200:2,4;201:13;
202:11;203:16,18;204:13;
206:1,16;207:18;209:9;
216:18;221:24;223:16,20;
225:9,13,21;226:17,19,22;
227:5,6,11,15,17,19;
229:11;230:2,25;231:20;
234:15;235:2,15;236:4,8,
14;238:7;241:7;246:23;
252:5,16;253:3,12,15;
254:2,3

**above (2)**
213:3;254:6

**abridged (1)**
151:3

**absence (2)**
117:12;252:9

**absentee (3)**
159:2,6;216:2

**absolutely (5)**

41:2;73:20;121:23;182:3;
237:11

**absorb (3)**
52:8,13,20

**abstain (3)**
98:20;99:6,7

**abstaining (2)**
99:17;105:4

**abstention (3)**
98:18;106:9,10

**abstract (1)**
40:8

**academia (1)**
24:18

**academic (8)**
22:15,24;23:8,12;24:7;
36:13;37:15;241:11

**accept (1)**
188:18

**acceptable (1)**
27:21

**acceptance (2)**
47:13;65:10

**accepted (3)**
27:11;47:2;136:17

**access (48)**
59:5,6;68:12,16;99:9,21;
104:7,19;105:20;109:3;
147:17;169:9;190:22;
206:5;216:4;225:9,10;
226:6,8,9;228:22,22,23;
229:1,18,19;230:5,9,10,14;
233:16;240:25;241:7,11;
242:8,12,13,21;246:7;
247:1,4,23;248:11,17,24;
249:7,18;250:13

**accessibility (9)**
37:6;210:21;211:23;
212:3,4,12;213:4,8;253:20

**accessible (4)**

110:6;155:16;212:18;
241:5

**accessing (1)**
183:25

**accommodate (2)**
173:17;201:4

**accomplish (1)**
161:13

**according (13)**
72:16;115:10;145:22;
172:11;180:2;189:2;
192:15;194:16;196:9,13;
219:11;221:10;246:5

**account (6)**
39:10;42:5,7;162:6;
216:1;222:22

**accounted (1)**
206:18

**accumulated (1)**
30:22

**accuracy (6)**
237:6,10;239:1,5,10,14

**accurate (13)**
38:24;54:12;92:23;93:24;
180:4;200:6;207:5;217:23;
223:3;232:21;240:4;
248:12;258:4

**accurately (1)**
26:9

**accustom (1)**
221:3

**acknowledge (1)**
200:12

**acknowledges (1)**
149:22

**acknowledging (1)**
172:4

**acknowledgment (1)**
187:19

**acknowledgments (1)**

141:1

**across (32)**
30:5,25;35:10;45:10;
47:5;49:20;95:5;96:14,16;
105:5,20;106:24;107:24;
112:20;113:16;116:24;
117:21,22;118:19;119:3;
123:12;137:11;147:13;
150:14;159:16;160:14,22;
180:19;183:4;188:6;216:7;
250:2

**ACS (6)**
243:23;244:2,3,4,6,14

**Act (4)**
61:3;124:19;158:17;
204:17

**action (1)**
236:5

**active (1)**
247:13

**activities (1)**
176:24

**activity (1)**
173:3

**actual (10)**
109:10;115:3;154:16;
176:21;211:14;227:12;
236:9,15;253:17;255:3

**actually (57)**
9:14;50:19;53:20;71:9;
80:10;90:12;99:15;103:11;
106:17;108:7;110:16;
113:11;115:15,24;116:3,5,
6,8;117:1;121:2;126:23,24;
134:12,22;139:22;140:9;
143:22;146:12;153:7;
155:15;158:21;167:23;
174:6;175:5,7;181:2,4;
182:18;183:23;185:18;
194:2;209:9;211:12;

219:13;220:5;221:21;
222:24;225:23;245:15;
248:3;252:16;254:8,9,12,
13,14,20

**Adam (3)**
105:25;135:1;217:2

**add (5)**
97:24;98:1;132:6,7;
168:24

**added (2)**
118:12;181:16

**addition (6)**
68:23;94:12;97:8;139:11;
169:15;215:7

**additional (4)**
160:18;206:25;246:1;
258:17

**additionally (2)**
4:25;6:14

**additions (1)**
258:6

**address (13)**
87:17;111:16,17;144:18;
159:5;162:10;170:1;208:7;
219:14;228:10,11;232:25;
238:2

**addressed (4)**
31:9;116:19;212:7;236:6

**addresses (3)**
139:15,19;234:12

**addressing (3)**
108:6;234:11,16

**ADEN (109)**
4:9,12,21;5:10,13;7:25;
13:5;15:8;25:7;31:11;32:4;
36:3,5,23;38:4;44:4;47:11;
53:10;60:3;62:16;64:10;
67:1,18;71:2;76:8,15;77:2;
78:20;81:7,11,21;82:7;
83:22;84:5,20;86:24;87:4,

9;88:11;89:3;109:1;121:15;
122:9;124:1;127:11;
128:15;130:5,19,22;131:15;
132:9;133:11;135:16;
138:3,14,16;143:7;150:17;
159:9;172:22;175:25;
176:8;178:16;179:6,15,16;
184:12;187:9;188:15;
190:1,20;194:8;195:9;
198:7,13,15;202:7;204:1;
205:8,10,25;209:4;210:18;
211:1;214:1;224:2;229:2,7,
16;230:15,16;231:7;
234:19;235:5;237:1,13;
238:15,19;239:9,18;240:12,
17;243:17;248:7;249:5;
250:9;253:4;254:24;256:23

**adequacy (1)**
250:24

**adequate (2)**
116:9;119:13

**adjunct (1)**
22:17

**adjustments (1)**
236:6

**administers (2)**
57:1;125:4

**administrating (1)**
123:8

**administration (6)**
72:6,7;110:17;125:2,12;
157:15

**administrative (16)**
109:17,18,22;110:1,10;
111:13;112:20;129:2,5;
144:1;168:17,25;180:18;
185:15;186:10;230:21

**administrator (4)**
90:1;119:1;122:23;
184:18

**administrators (10)**
110:2;120:8;123:4;137:9;
157:11;180:19;202:25;
207:12,25;210:11

**admit (1)**
241:9

**admits (2)**
141:21;149:23

**admitted (1)**
128:2

**adolescence (2)**
153:25;154:6

**adopt (4)**
53:5;248:4,4,20

**adopted (4)**
57:9;74:25;97:1;103:14

**adopting (4)**
103:16;236:10,16;247:11

**adoption (4)**
56:24;200:3;233:4;
236:23

**ads (1)**
29:8

**adulthood (2)**
154:1,6

**advance (3)**
75:16;128:6;177:13

**advanced (3)**
20:8;236:9,15

**advances (1)**
218:9

**advice (1)**
101:17

**affairs (1)**
129:25

**affect (2)**
218:24;250:22

**affiliated (1)**
153:14

**affiliation (7)**

33:15;35:9;51:20,23;
53:15,19;54:20

**affirmations (1)**
6:15

**affirmatively (2)**
200:25;215:11

**affluent (4)**
42:23,25;43:4;183:1

**African-American (9)**
39:25;46:2;48:2,21;
170:20,23,25;195:7;230:24

**African-Americans (4)**
48:15,23;152:24;232:11

**after (9)**
46:3,11;69:11;85:20;
107:5,5;114:11;135:9;
182:23

**afternoon (2)**
53:23;89:8

**again (61)**
6:15;7:9;24:4;44:16;
48:12,22;51:1;52:10;77:8,
14,16;98:11;101:15;104:16,
18;106:11;107:19;110:8;
112:15;115:13;116:22;
117:6,11,15;120:5,14;
122:2;130:15;134:2;
137:23;143:15,20;148:11;
153:22;158:3,13,19;160:4;
161:10;177:2,17;178:10;
180:8;181:13;184:15;
186:5,9;190:12;191:10,16;
194:19;196:20;198:5;
199:1;204:22;211:5;
224:20;229:17;243:8;
246:12;254:10

**against (7)**
27:21;43:23;80:11,14;
156:24;205:15;240:24

**age (50)**

41:15,16,21,22,22,24;
43:16;44:10,13;46:5;47:7;
58:16,19,21,22;59:1,2;
84:11,13,22;85:3,12;125:7;
139:9,13;163:23;172:12,14;
178:12;181:25;182:10;
191:25;192:2,24;206:19;
213:16;214:7;215:8,9,11;
243:4,5;251:24;253:13;
255:17,17;256:1,15,18,22

**aggregate (3)**
195:24,25;254:21

**aggregates (1)**
255:6

**aggression (1)**
148:22

**aggressive (1)**
158:17

**ago (13)**
12:23;14:24;45:1;50:15;
56:23;57:3;119:10;128:22;
149:5;195:5;204:12;
215:17;232:10

**Agre (12)**
10:23;11:1,2;55:13,16,
17;59:25;60:13;76:17,19,
21;80:11

**A-G-R-E (2)**
11:2;76:21

**agree (24)**
5:11;15:10;52:21;67:24;
69:3,5;71:1;78:16;79:4;
100:1;128:4;135:21;138:4,
11;156:22;160:24;162:5;
171:24;173:12;190:8;
196:3;229:19;230:23;
243:22

**agreeable (5)**
5:5,6;6:18;7:2,12

**agreed (2)**

80:10,11

**agreement (2)**
5:8;6:15

**agrees (1)**
135:2

**ahead (4)**
123:18,20;124:20;182:8

**ain't (1)**
118:13

**aisle (1)**
30:5

**akin (1)**
29:23

**Alan (1)**
217:11

**alarming (1)**
75:18

**alcoholic (1)**
7:21

**aldermen (1)**
57:14

**allegation (2)**
46:12,15

**allege (1)**
45:5

**alleged (4)**
44:10;46:5;86:15;236:22

**alleges (1)**
44:5

**allegiance (3)**
31:6;32:8,11

**alleging (6)**
43:22;44:18;60:25;61:5,
8;182:10

**Allen (3)**
4:14;89:17,17

**A-L-L-E-N (1)**
89:17

**Allens (2)**
163:13,14

**allocate (4)**
45:8;115:20;150:25;
156:13

**allocated (1)**
119:22

**allocating (2)**
119:24;246:1

**allocation (8)**
92:22;94:19;114:25;
115:4;148:5,10;151:23;
191:14

**allotted (1)**
63:13

**allow (3)**
5:2;8:2;99:5

**allowed (2)**
160:25;176:10

**allowing (2)**
68:18;95:13

**almost (6)**
155:18;156:3,7,9,22;
256:20

**alone (5)**
113:5;182:12;224:8,22;
227:9

**along (10)**
98:3;158:4;164:4;168:15;
171:21,22;204:21;218:6;
223:19;227:21

**alongside (3)**
84:18;109:13;146:7

**aloud (4)**
65:4;67:9;68:9;77:17

**already (3)**
116:19;198:19;237:3

**also (80)**
10:21;13:2,24;19:3;21:3,
9;22:18;23:15;25:3;27:25;
33:14;41:17,18;42:19;43:1;
45:20;46:25;47:21;48:13;

49:4,6;51:4,15;56:11;
77:24;81:8;90:14;91:10;
92:9;95:16;97:16;98:1;
100:13,16;111:6;112:14,15,
21;114:4;117:11;120:17;
126:18;146:3,19;152:3;
155:6,8;156:12;159:1;
160:17;169:19;173:9,15;
174:2;180:12;181:9;
194:22;197:3;198:13;
199:14;202:17;207:2;
212:15;214:4;215:2,8;
216:20,21;217:24;219:8,10;
220:3,12;221:23;223:1;
231:24;232:22;242:13;
244:16;245:21

**alternative (1)**
166:23

**alternatives (1)**
177:11

**although (1)**
216:20

**alumni (3)**
136:13;165:10,10

**always (10)**
34:21;75:21;119:16;
168:10,16;173:5;177:3;
179:12;222:14;223:12

**amazing (2)**
194:5;196:21

**ambiguity (2)**
61:12,14

**ambitious (1)**
216:6

**amended (1)**
209:22

**amendment (4)**
123:15,17;124:2,7

**amendments (3)**
124:5,8,9

**American (5)**
20:11;23:8,13;40:1;99:5

**amidst (2)**
196:19;197:19

**among (19)**
28:23;46:22,24,25;49:12;
68:18;101:15;105:23;
109:17;111:18;126:25;
153:20;155:5,19,25;170:25;
171:6;182:16;186:10

**amongst (2)**
47:14;113:1

**amount (12)**
63:16;69:16;70:2;72:23;
110:25;111:4;140:15;
158:20;161:13,16;183:6;
206:24

**ample (1)**
246:21

**analyses (4)**
41:18;42:14;150:9;
194:23

**analysis (38)**
71:19;74:21;88:8;106:19;
109:7;111:18,21,24,25;
112:7;115:4,17;129:18;
147:14;148:19,20;159:10,
17;160:14;161:9;171:10;
187:13,23;189:2;200:9;
206:24;213:17;214:14,24;
221:24;222:19;226:8;
228:22;229:18;230:9,18;
242:5,16

**analytical (3)**
144:14,16,20

**analyze (10)**
43:11,15,19,24;44:22;
174:12,13,17;234:20;
251:23

**analyzed (4)**

170:4;184:7,9;187:25

**ancestor (1)**
204:21

**ancestral (1)**
201:10

**anchored (1)**
29:23

**and/or (3)**
19:12;60:21;154:6

**anecdotal (1)**
174:24

**anecdotes (2)**
174:24;175:2

**Angeles (1)**
59:11

**anglo (4)**
224:7,11,23;225:5

**Anne (1)**
49:13

**announced (1)**
65:25

**another (29)**
11:20,23;18:16;20:1;
22:14;32:2;33:18;67:8;
76:24;89:6;107:15;113:14;
137:3,15;154:13,22;155:17,
24;156:11;162:18;165:20;
213:22;214:2;216:8;220:8;
223:9;224:13;225:4;226:7

**answer (58)**
5:23,24;7:7,10,11,15,18;
8:3;10:9;11:25;12:4;18:21,
25;30:16;39:21;43:7;55:4;
60:11;61:24;62:1,24;64:1;
82:18,19;84:1,7;87:11;
102:8,10;107:18;109:14;
113:18;123:24;124:4;
129:11;135:17,24;143:11;
144:10,17;145:2;163:18;
193:12,25;196:22;197:21,

23;199:25;205:18,24;
207:21;221:20,20;228:2;
230:1;235:13;245:2,3

**answered (1)**
144:5

**answering (5)**
6:7,21;8:2;116:20;144:11

**answers (3)**
78:8;100:23;230:4

**anticipate (1)**
128:23

**anticipating (1)**
169:20

**Antonio (2)**
199:14,24

**anybody (2)**
218:14;256:9

**anybody's (1)**
256:3

**anymore (4)**
23:9;105:13,18;166:10

**anyone (10)**
14:4,8;17:2,11;30:1;
128:22;179:3;219:16,17;
256:6

**anything (22)**
6:16;15:16;58:18;68:24;
74:19;79:15;85:21;118:4,
13,13;131:17;141:19;
151:13;171:18;184:5;
201:13;237:6;239:6;240:7;
247:9;250:24;253:21

**anyway (3)**
47:25;174:5;221:6

**anywhere (4)**
143:18;200:12;218:17;
228:11

**apart (4)**
91:4;123:3;125:11;
202:18

**apologize (4)**
144:15;177:13;182:6;
206:15

**app (3)**
134:17;143:23;223:18

**apparently (5)**
68:21;114:17;173:21;
210:9;221:8

**appeals (1)**
31:5

**appear (1)**
41:13

**appeared (1)**
135:25

**appearing (2)**
13:11;62:5

**appears (3)**
53:20;216:16;241:22

**appendix (1)**
91:13

**applications (1)**
115:6

**applies (1)**
124:3

**apply (4)**
35:3;110:16;124:8,15

**applying (1)**
144:25

**appointed (4)**
79:22,24;80:20;82:16

**appointee (2)**
66:7;80:18

**appointment (1)**
24:7

**appointments (1)**
23:3

**appreciably (2)**
106:8;226:19

**appreciate (2)**
98:13;162:2

**appreciative (1)**
155:1

**approach (2)**
32:23;241:7

**approaches (1)**
253:18

**approaching (1)**
68:24

**appropriate (7)**
28:21;34:22;44:6,11,21;
169:16;243:25

**appropriately (1)**
172:7

**appropriations (1)**
207:14

**Approximately (3)**
17:16;19:19;56:22

**archival (1)**
150:4

**archives (1)**
147:17

**area (21)**
21:5;41:18;45:22;47:17,
19,22;53:4;149:15;156:24;
164:23;208:24;217:13;
219:15;245:13;252:12,17,
19;253:15;255:21,23;
256:16

**areas (6)**
20:13;50:12;59:10;
132:25;170:20;213:6

**aren't (9)**
34:15;104:14;106:12;
118:19;139:10;163:13;
167:15;199:8;253:18

**Arguably (1)**
183:9

**argue (1)**
65:9

**arguing (1)**

241:10

**argument (14)**
39:15;67:11;72:10;97:9,
11;103:3,3,9;104:2;134:7,7;
143:21;150:16;225:24

**arguments (3)**
65:15;103:7;135:3

**Arlington (3)**
228:4,8,16

**around (25)**
18:14;35:13;48:3;87:2;
110:12;121:22;126:9;
127:14;134:13,16;139:20;
163:25;177:12;179:21;
199:15;202:16;206:14;
212:16;219:24;220:1;
223:21;227:20;244:8,15;
246:21

**article (17)**
38:25;39:2;40:2,22,23;
41:9,11;65:9;172:9;210:20;
211:6;213:2,22;214:2,6;
215:3,8

**articles (6)**
24:5;38:18,23;215:13;
227:16;253:10

**articulated (1)**
96:23

**articulating (1)**
126:19

**Arundel (1)**
49:13

**ascertaining (1)**
100:23

**ascribe (1)**
78:6

**Asian (2)**
40:1;171:5

**aside (1)**
66:5

**asked (22)**
7:10;63:20;74:22;75:5,
23;88:2;92:17,25;93:5,22;
94:20;100:24;102:10,13;
107:14;125:25;198:19;
219:23;220:13;221:25;
232:25;235:16

**asking (11)**
5:18;15:4,6;90:13;112:2;
125:20,20;223:17;235:19,
21;237:24

**aspect (1)**
42:6

**assembling (1)**
91:8

**assess (3)**
65:17;101:24;215:20

**assessment (7)**
69:3;78:17;79:5;96:2,15;
164:10;176:3

**Assisi (1)**
165:23

**assist (1)**
115:5

**assistance (1)**
90:9

**associated (8)**
8:23;16:6,11,18;19:9;
22:25;106:16;111:23

**Association (4)**
23:14,17;154:21;246:10

**associations (4)**
23:5,11,13;109:21

**assortment (1)**
24:4

**assume (1)**
6:21

**assumed (1)**
241:23

**assuming (6)**

44:16;135:11;138:10;
140:6;162:9;188:23

**assumption (2)**
93:15;241:25

**attached (1)**
26:1

**attachment (1)**
92:10

**attack (1)**
78:12

**attainment (1)**
59:6

**attainments (1)**
42:12

**attempt (1)**
65:13

**attend (2)**
51:14,14

**attendance (1)**
127:17

**attends (1)**
185:5

**attention (8)**
28:22;34:16,16;64:22;
77:13;92:7;108:17;257:2

**attentive (1)**
29:4

**attentiveness (1)**
139:1

**attorney (6)**
4:12;64:16;69:11;71:14;
75:5,13

**attorneys (5)**
9:2;63:14;86:21;87:5;
101:8

**attract (1)**
32:2

**attraction (1)**
153:21

**attributes (1)**

68:11

**audibly (3)**
6:6,7,16

**augmentation (1)**
158:10

**augmented (2)**
50:11;189:9

**augmenting (2)**
95:12;116:23

**August (1)**
119:25

**Austin (2)**
198:24;199:11

**Australia (1)**
98:24

**author (2)**
27:12;85:25

**authoritative (1)**
217:3

**authorities (2)**
113:7;164:21

**author's (2)**
39:14;42:1

**automatically (4)**
202:24;247:2,24;248:25

**avail (1)**
120:25

**availability (2)**
226:20;251:3

**available (13)**
44:3,16;94:23;105:24;
164:22;190:12,18;194:3;
237:14,25;238:22;239:20;
256:2

**average (1)**
107:25

**aware (19)**
32:10,16;63:22;79:18;
86:10;92:2;132:19,22;
175:3;177:15;181:8,13,15,

25;191:18;203:3,7;214:20;
221:10

**away (13)**
103:25;104:2;108:9;
121:25;154:18,23;155:5;
176:24;181:1;185:10;
186:25;225:23;249:14

---

# B

**Baber (8)**
56:16,23;57:7,8;60:1,16;
64:4;83:2

**back (59)**
9:20;11:16;13:18;16:17;
19:22;35:23;36:20,20;
38:23;49:16,24;50:7,14;
51:8,9,23;53:22,24;54:21;
59:20,22,23;61:11;63:24;
66:22,25;81:4;85:14;87:6;
91:15;92:7;96:24;100:21;
107:12,14;114:14,20;117:7;
120:11;129:8;134:2,9;
136:4;147:20;149:13;
150:14;158:13;160:6;
162:21,21;166:13,14;
182:13;212:16;222:7,14;
249:22,23;250:1

**background (4)**
20:2,4;26:10;170:3

**backgrounds (1)**
42:12

**bad (1)**
73:11

**baked (1)**
207:17

**balance (4)**
34:22;52:16;210:12,14

**Baldwin (1)**
71:17

**ball (1)**
130:2

**ballot (23)**
37:6;68:12,16,22;71:5,8,
11,12;72:2,8;75:17,21;
82:22;106:18;109:11;
134:15;140:16;151:24;
155:1;159:2;188:20;
210:21;253:20

**ballots (3)**
72:1;190:5,11

**ballpark (2)**
19:15;23:23

**Bangor (1)**
75:14

**Barnett (1)**
175:17

**Barry (1)**
32:21

**base (1)**
149:1

**based (31)**
28:24;58:3;69:20;88:3,6;
93:10,11;101:2;114:25;
115:13;133:12;138:17;
140:25;141:3;148:6;
156:14;157:14;158:19;
165:7;229:18;230:8;
241:13;242:25;243:10;
245:11;248:9,24;249:7,17;
250:10;253:8

**basically (1)**
192:2

**basis (42)**
46:15;49:25;57:16,18;
58:13;130:8;131:7,10,16,
19;133:3;155:7,8;191:22,
24;192:4,6,14,20,21,22;
193:1,15;194:20;203:15,17;
204:11;208:11;209:5,19,21;

224:14,16;234:3,8;235:17;
239:13;240:6;243:2;244:1;
245:25;256:14

**Baylson (6)**
77:21;79:18,22;80:12,15,
19

**Baylson's (2)**
78:16;79:5

**bear (4)**
38:14;61:14;94:9;210:11

**bearing (1)**
65:21

**because (95)**
20:24;21:16;24:13;29:4,
12,15;30:8;34:10;35:8;
38:20;43:9;45:16,21;47:8;
48:22;50:2;59:8;61:12;
64:25;71:10,12,15;73:11;
74:8;75:20;77:4;78:22;
87:2;102:25;103:6,21;
104:17;105:5,7;106:9;
109:18;120:24;125:11;
134:1;135:3;139:8;142:1;
147:17;151:15,23;153:22;
163:6,8,12;166:6;168:11;
176:20;178:24;180:17,21;
181:3,13,22;189:12;190:2;
191:2;194:5,19,22;206:15;
210:1,7;214:7,17,18,23;
215:17,23,25;217:22;218:8,
18;220:14;223:16;225:25;
226:13;231:16;232:21;
235:7,22;240:6;241:24;
244:12;248:2,19;250:14;
251:1,12;252:2;256:19

**become (1)**
210:16

**becomes (1)**
231:15

**becoming (2)**

163:2;231:1

**been (90)**
4:6,23,25;5:8,20;8:9,16;
12:10;18:12,13;19:21,22;
21:2,4,5;22:12,14,25;23:18;
26:3;30:7,25;36:1,6;45:1;
51:1,9;60:20;61:8;75:24;
86:11,12,18;88:9;89:13,14;
95:4;102:15;109:4;111:14;
113:24,25;114:13,19;126:3,
5;128:22;129:25;130:16;
141:12;147:7;151:1,21;
152:6,7;153:23;154:20;
159:7;165:11;166:9,9;
168:8,9;169:17;175:21;
183:16,23;188:25;189:3;
191:2,10,14;193:10,16;
200:13;203:5;209:10;
211:10;214:19;218:9;
220:23;221:11;228:12;
234:2,7,13;235:4;236:4;
248:3;249:13

**Before (38)**
4:21;5:25;8:9;9:24;
19:12;22:20;24:23;34:3,5;
35:25;36:6,8;38:5;46:18;
57:2,3;64:11,15;65:22;
69:13;74:1,15;132:19,23;
134:11;138:18;159:24;
166:22;167:3;182:2,23;
200:22;220:17;237:25;
238:6,20,22;250:1

**began (1)**
109:8

**begin (1)**
174:25

**beginning (7)**
65:3;68:7;117:7;178:17;
181:18;229:22,24

**begins (4)**

68:8;77:18;102:12;213:3

**behalf (5)**
56:6;57:5;60:24;61:4;
62:5

**behavior (13)**
20:17;30:21;33:12;35:9;
38:20;39:11;40:25;70:17;
71:1;78:13;79:7;97:8;
162:13

**behaviors (2)**
53:6,7

**behind (2)**
26:7;50:5

**behold (1)**
119:25

**being (47)**
11:17;45:15,16;46:6,13;
48:13;50:15;54:3,9;55:7,9;
66:3;67:17;68:23;69:10;
75:19;88:2;89:12,24;94:20;
96:18;100:15;108:3;
115:25;116:22;125:24,25;
128:13;136:22;139:1;
147:1;164:22;166:11;
177:4,7;198:21;210:19;
216:1,13;219:22;221:7;
227:12;238:11;247:7,17;
252:8;253:6

**beings (1)**
253:15

**belief (3)**
32:5;47:13;98:15

**believe (34)**
5:14;11:23;19:21;30:2;
37:16;38:12,25;47:16;
48:18;50:6;54:22;55:25;
56:3;58:19;65:25;66:6;
83:6;92:8;98:18;114:4;
116:15;156:6;157:9;
166:16;169:17;175:13;

176:14;178:9;180:10;
185:2;203:2;211:12,22,23

**believes (1)**
203:25

**belong (3)**
23:15;26:16;152:22

**below (1)**
225:1

**Berinsky (2)**
135:1;217:2

**Berinsky's (1)**
105:25

**Berkeley (1)**
103:16

**besides (13)**
14:4;17:2,11;22:23;54:6,
17;56:15;85:16;91:18;
96:20,22;159:3;179:9

**best (12)**
65:18;69:18,25;120:5;
127:7,19;134:6;141:16;
167:6;170:17;171:1;254:16

**bet (1)**
122:11

**Beto (3)**
152:19;188:19,21

**Better (4)**
161:18;206:16;218:5,7

**between (34)**
18:19;26:7,20;27:9;
30:20,24;32:12;33:8;34:22;
42:7;71:16;80:4;90:19;
115:14;117:4;132:11;
154:21;156:13;164:7;
167:8;168:5;197:15;
211:13;216:15;219:3;
228:16;242:6;246:7,11,18;
251:3;255:11,20,21

**beverages (1)**
7:21

**bias (1)**
122:2

**bicycles (1)**
142:25

**big (4)**
27:9;59:12;110:4;199:11

**bigger (1)**
176:15

**bike (1)**
142:25

**biking (2)**
224:12;225:3

**bill (8)**
18:16,17,19;19:5,8,9,13;
191:18

**billed (2)**
18:4,10

**birth (2)**
163:12;256:2

**birthday (1)**
163:16

**bit (15)**
10:11;12:9;29:15;51:11;
53:22;56:15;101:12;104:2;
112:4,11;115:22;144:9;
149:25;177:13;245:12

**bivariant (1)**
206:23

**black (68)**
32:7,11,14;39:25;40:15;
43:23,25;45:7,17,22;46:13,
24;47:14;48:24;49:1,3,4,7,
12,23,24;50:9,11,12;
122:18,21;123:6,10;143:4,
9,13;171:4,4,9;187:1;192:2,
3,8,12;194:16;196:5,9,13;
197:4,8,11,11;198:3,10,11,
17;205:4,15;224:8,10,22;
225:2;228:24;230:10;
234:2,7;241:5,9;243:5,5;

**blank (1)**
258:18

**blind (1)**
26:23

**block (6)**
70:23;164:20;165:21;
255:7,8,12

**blocks (4)**
34:2;165:3;227:1,1

**blown (2)**
222:3,22

**blue (5)**
36:25;37:1;38:7;52:6,6

**board (4)**
23:7;137:11;180:10;
200:22

**boards (2)**
23:5;163:3

**bodied (1)**
226:23

**body (8)**
45:17;139:5;177:6;
190:13;192:23;197:7;
198:3,9

**book (5)**
24:1,5;27:12;28:5,8

**boost (1)**
217:13

**border (6)**
28:16;165:4,5,5,5;201:18

**born (3)**
163:14;181:17;207:10

**borrow (1)**
154:4

**both (10)**
6:5;55:25;56:3;85:2;
90:12;119:5;152:24;182:1;
230:23;253:1

**bounced (1)**

253:15;254:2,4

**bow (1)**
31:1

**box (4)**
37:6;134:15;210:21;
253:20

**boxes (1)**
147:21

**bracket (1)**
139:13

**Bradley (1)**
50:10

**brainer (2)**
102:22;207:11

**branch (1)**
244:22

**break (19)**
8:1,3;36:2,6,8;76:7,9,10;
130:17,18;135:10;138:14,
18;179:4;205:8;229:22,24;
231:4,24

**breakdown (1)**
232:22

**breaking (1)**
231:1

**breaks (2)**
137:15;232:1

**brief (6)**
36:4;70:3;138:15;205:9;
216:22;238:18

**briefly (13)**
5:16;7:4;20:3;26:19;
28:2;36:7,9;53:24;100:15;
116:20;118:21;144:13;
200:2

**bring (5)**
15:18,23;33:6;152:2;
231:12

**broad (1)**
237:8

**broken (1)**
184:5

**brought (1)**
77:25

**Brown (1)**
71:23

**budget (1)**
207:14

**budgets (2)**
110:20;111:18

**buffer (3)**
226:13;227:15,16

**buffers (2)**
225:14,21

**building (5)**
114:16;136:13;165:16,
17;166:9

**buildings (2)**
114:15;184:1

**bulk (1)**
91:8

**bullet (2)**
225:1,1

**bump (3)**
217:4;218:13;247:17

**bundle (1)**
92:8

**burden (4)**
97:25;137:13;139:12;
219:5

**burdensome (3)**
130:4;155:10;219:4

**Bush (4)**
79:25;80:1,2,20

**busting (1)**
137:4

**busy (1)**
213:14

**buy (1)**
204:20

# C

**cadre (1)**
70:11

**calculations (2)**
58:25;115:13

**California (14)**
19:23;31:17,19,24;54:5;
57:10;58:8;59:24;60:18;
61:2,3,7;71:23;116:3

**call (4)**
13:19;60:13,16;146:12

**called (13)**
17:7;22:7,8;23:9,16;28:6;
37:4;63:12;70:5;108:18;
109:6;166:1;216:1

**calls (5)**
13:21;14:7,11;19:11,14

**came (6)**
9:19;26:15;32:21;152:14;
180:11;222:11

**campaign (17)**
21:21;31:5;33:10;34:4,
13,21;40:16;70:25;117:12;
152:4,18;158:16;178:21,24;
217:12,14;250:18

**campaigned (1)**
32:20

**campaigning (1)**
178:20

**campaigns (7)**
34:2,9,17;105:9;106:12;
152:6;170:2

**campus (65)**
46:2,9;47:21;108:19;
111:7,8;113:7,13;138:6,20;
143:14;155:21;156:2,5;
164:14,14,15,19,24;165:4,
21;166:5,6;173:6,6;174:1,6,

23;175:10;180:15,25;
181:24;182:15;183:19,22,
24;185:22;186:15,18,23;
190:8,11,22;193:23;194:3;
195:4;198:23;199:13,16,17,
18;200:15;201:4;202:14,
17;203:6;206:10,11;
208:22;210:7;218:25;
226:7;252:20;256:7,20

**campuses (20)**
109:25;110:12;111:15;
112:16,22;113:4;153:16;
173:4;180:13;181:19,19;
182:17;183:3,10;185:11,16,
18;186:7;198:25;199:2

**Can (151)**
4:16;7:9;8:3;13:6;16:2;
18:6;20:3;23:4;27:6;28:1;
29:2;30:20;34:13;35:17,22,
24;36:2;38:11,25;40:12,18;
41:18;42:19;48:9,17;49:23;
50:2,16;53:9;54:24;58:11;
61:19;62:17;63:15,17,18;
69:18,21;73:14,17;75:16;
76:3,8,12;77:19;80:22;81:1,
4;83:2,3;86:25;87:1,25;
88:11;91:7;97:15,21;98:10;
99:7,11,19;100:9;102:5;
104:18;105:15;106:4,5,6,
22;115:10;116:20,25;
118:15;122:14,14;123:24;
125:18,22;130:17;134:25;
135:20;137:20,21;138:10,
14;142:25;144:13,21;
149:7;150:21;156:20;
157:19,23;161:13;162:7;
163:7,10,16;164:21;166:6,
19;167:6,13,15;168:13,18,
22;170:17;171:1,7;172:4;
177:18;179:20;181:23;

184:4;203:1,13;204:2;
214:15;215:6,10,18;216:23,
24;217:4,13,14,18;218:12;
219:10;222:9;223:17,20;
224:5;227:21;230:1;231:4,
17;237:4;238:13;246:19;
247:3,15,19;250:1,11,11,14,
23;251:1;255:17

**candidate (7)**
30:3;31:20;32:2;115:24;
116:14;152:11;188:19

**candidates (8)**
33:4;68:15,19;117:16;
151:24;152:22;153:22;
188:23

**cannibalizes (1)**
191:4

**can't (28)**
33:3;63:24;64:18;66:11;
71:20;83:11,11;96:21;
101:6;110:21,22,23;116:3;
125:6;126:4;146:11;
160:20;161:14;209:16;
214:14,14;218:15;248:10,
16,19,25;249:8;250:22

**canvas (2)**
134:13,16

**canvasing (1)**
217:13

**capable (1)**
205:1

**capacity (13)**
8:14,17;12:13,15;88:3;
89:25;133:5,12,13;159:8;
176:9,13,15

**captured (1)**
171:9

**car (3)**
183:15;226:20,25

**cards (1)**

169:15

**care (1)**
28:22

**career (3)**
20:12;22:21;139:14

**careers (1)**
163:25

**carefully (1)**
93:13

**Carolina (13)**
10:14,16,20;11:13,18;
54:5,9,25;55:2,6;85:20;
86:8,9

**Carolina's (1)**
86:10

**carpool (2)**
224:12;225:4

**carpooling (1)**
227:7

**carried (1)**
168:19

**carry (1)**
214:13

**carrying (1)**
72:7

**case (151)**
8:21,23,25;9:4,7,9,12,16;
10:6,7,14,16,16,21,24,24;
11:3,6,8,10,14,15;12:19;
15:11;16:24;17:9,15,24;
18:2;19:17,22;35:23;36:15;
37:17,20;44:10;46:16;47:3;
50:25;54:6;55:2,6,23;56:1,
16,17;57:3,10,11,18,21;
58:6,17,23;59:5,24,25;
60:12,18;61:3,4,5,7,7,10,20;
62:4,9,13,20;64:5,12;66:13,
16;69:7,9,12,18,19;73:7,12;
74:23;76:18;80:5,5,11,17,
18,25;84:5;85:16,20,22,22,

23;86:18;87:23;89:7,9,12;
90:5,6;92:11,15,18;93:1,16,
18;97:24;100:5,12,24;
116:5;117:4;118:1;122:2;
124:24;126:7;127:12;
131:7;132:8;142:18;143:1;
148:20;158:5;161:16,20;
165:1;167:17;170:16;
171:25;178:13;182:10;
185:7,10;186:1;196:14;
203:1;209:12;212:5;
214:21;215:15;216:8;
222:1;225:25;227:23;
232:24;237:15;238:23;
239:25;240:22

**case-by-case (1)**
147:7

**cases (32)**
10:5,5;11:8,18;53:25;
54:4,9,10,13,18,23,25;
59:16,19;60:4,6,8;62:25;
63:5,9;73:7;83:9;84:24;
85:16,19;86:5,14;87:13;
113:6;122:4;186:7;247:16

**cast (21)**
71:5;106:18;109:11;
120:16,20,22;121:12,13,19;
128:18;130:7,25;140:16,22;
143:19;158:9,21;190:5,6,
10;230:7

**casting (2)**
131:9;155:1

**casts (1)**
107:3

**catch (1)**
199:21

**Catholic (1)**
166:5

**causal (4)**
168:3;246:6;250:11,22

**causality (8)**
166:21,25;167:13,15;
246:11,15;251:6,11

**Cause (4)**
60:11;74:21;109:4;
232:22

**caused (2)**
133:21;241:3

**ceases (1)**
68:17

**ceiling (2)**
118:12;247:18

**Census (8)**
143:23;171:8;192:15,15;
243:23;244:2;254:15;255:5

**center (35)**
114:7,8;132:23;133:7;
136:10,14;165:10,10,13,15,
18;166:1,4,5;169:8;172:18,
24,25;173:6,7,18;174:7,15;
176:5,11,15;208:13,18,22,
23;209:6;210:1,6,17;219:12

**centers (1)**
173:4

**central (7)**
40:11;96:1,3;102:20;
123:2;124:24;252:25

**certain (11)**
19:25;46:23;50:6;53:6;
108:18,19,21,21;152:1;
223:18;254:6

**certainly (20)**
39:4;47:16;80:22;81:1,4;
95:20;97:3;105:22;124:13;
132:6;133:18;141:7;
150:16;186:3;188:7;
208:25;237:9;241:17;
245:14;252:7

**CERTIFICATE (1)**
258:1

**certified (1)**
51:15

**certify (1)**
258:2

**challenge (6)**
43:25;44:7;62:14;69:10,
10;73:10

**challenged (2)**
29:5;86:11

**challenges (2)**
86:13;139:18

**challenging (6)**
34:10,17;54:13;56:4;
256:13,13

**chance (1)**
177:22

**change (24)**
29:3,7,19,22;30:16;
66:24;71:5;81:13,25;82:5,
22;97:8;103:6;131:13;
156:20;166:22,23;167:9,9;
169:25;189:3;201:7;
226:20;246:13

**changed (6)**
78:6;114:17;129:9;139:4;
164:9;166:15

**changes (13)**
27:14;33:13,13;42:18;
43:2,7,9;161:1;163:19;
166:18;191:14;233:8;
246:13

**changing (5)**
29:10;43:1;66:9;139:15,
19

**chapter (2)**
28:10,12

**chapters (1)**
24:1

**characteristics (1)**
85:4

**characterize (2)**
200:18,19

**charged (4)**
19:17,18,24;110:3

**check (1)**
146:20

**Chicago (1)**
20:10

**child (1)**
53:7

**choice (3)**
68:13;98:19;210:10

**choices (3)**
68:18;163:20;164:6

**choose (7)**
66:10;99:5;105:23;
112:23;165:8;185:4;194:19

**choosing (1)**
99:13

**chose (1)**
226:13

**Christy (3)**
90:1,3;109:24

**church (7)**
51:14,14;136:13;164:15;
165:9;209:1,2

**churn (1)**
163:23

**circle (1)**
38:6

**circumspect (1)**
172:7

**circumstance (1)**
83:12

**circumstances (4)**
84:3;161:6;199:11;
201:13

**cite (1)**
248:10

**cited (6)**

76:22;194:11;211:20;
214:2;227:13;252:15

**cites (2)**
168:15,20

**cities (2)**
50:9;58:12

**citing (1)**
211:15

**citizen (6)**
55:17;56:23;57:7;75:22;
191:25;192:2

**citizens (7)**
56:4;72:5,8;174:4;175:7,
12;213:8

**City (12)**
45:20;49:6;57:14,14,15,
19,20,22;192:11;193:22;
203:6;252:20

**civic (1)**
213:9

**civil (1)**
32:20

**claim (8)**
45:15;46:6;61:20;86:16;
125:15;126:2;168:3;196:18

**claims (10)**
92:19;94:13,16;95:2;
96:18;241:23;242:3,8;
251:19;252:1

**clarification (1)**
217:21

**clarify (4)**
5:7;81:20;86:25;100:24

**Clark (2)**
254:10,11

**class (3)**
33:9;49:2;186:10

**classes (2)**
21:14;240:24

**clean (1)**

244:17

**clear (27)**
62:19;64:19;69:25;74:7,
10;106:1;107:11;108:23;
119:7;121:18;128:21;
140:15;141:9;144:7,12;
151:20;154:7;156:21;
181:18;203:21,24;228:21;
229:5;231:15;238:21,21;
240:3

**clearly (7)**
6:24;108:24;124:25;
185:17;203:24;235:11;
248:19

**clerks (1)**
112:2

**clinics (1)**
115:8

**clock (1)**
112:1

**close (16)**
51:11;104:24;105:16,17;
144:4;147:3;151:17;
152:14;154:10,17;155:20;
164:23;173:12;185:9;
206:10;217:16

**closer (2)**
108:11;111:11

**closest (1)**
107:22

**cloth (1)**
175:6

**cluttered (1)**
244:12

**coach (1)**
51:15

**co-author (2)**
28:5;40:14

**co-authored (1)**
100:11

**Co-counsel (3)**
14:18,19;17:11

**code (3)**
163:4,9,15

**coded (1)**
163:8

**codes (1)**
255:11

**coffee (1)**
36:2

**cognitively (1)**
68:22

**coherent (1)**
231:2

**coherently (1)**
230:1

**colleague (1)**
14:18

**colleagues (1)**
17:12

**collect (2)**
94:23;212:8

**collection (3)**
24:1;90:9;222:19

**collectively (1)**
174:14

**College (25)**
22:1;24:14;31:23;109:24;
110:11;111:12,15;112:16,
21;113:4,8,9,13;138:24;
153:16;156:2;162:9;
163:23;185:11,16;197:13;
198:16;199:24;254:20;
256:6

**colleges (7)**
180:3;196:3,5,17;197:14,
17;200:1

**color (1)**
178:24

**comb (1)**

178:11

**combination (3)**
46:13;207:4;218:1

**come (17)**
14:3;28:17;33:4;34:13;
73:3;100:20;101:3,19,22;
126:18;139:18;166:22;
218:6;220:16;222:3,14;
234:12

**comes (4)**
75:12;158:13;161:22;
217:16

**coming (5)**
40:4;150:9;167:3;200:21;
223:17

**comment (2)**
176:18;184:6

**commented (3)**
38:1,13;235:24

**commenting (1)**
232:3

**commissioned (1)**
72:15

**commissioners (4)**
200:23;202:25;203:4;
220:20

**Commissioner's (16)**
89:25;92:1;114:3;126:14,
19;127:3,13;128:6,7;129:7;
133:5;149:23;157:16;
209:15,24;221:16

**committed (1)**
204:18

**committee (1)**
100:15

**common (9)**
28:16;52:7;60:11;70:9;
101:8;109:25;115:6;
148:25;164:25

**commonly (7)**

16:9;41:24;47:13;93:18;
148:14;153:19;165:1

**Commonwealth (3)**
11:7;55:24;60:15

**communicate (2)**
14:15;109:21

**communicated (1)**
90:3

**communication (1)**
91:8

**communities (2)**
109:13;146:7

**community (31)**
30:23;31:1;35:4;51:12;
70:25;71:1;110:8,10;114:7,
8;148:24;151:2;153:13;
165:13,15;173:21;174:22;
176:5,11;199:24;200:1;
207:17;208:4,18;209:6;
210:1,6,15,17;221:12,15

**commute (3)**
224:11;225:3;227:8

**commuter (2)**
142:24;184:15

**commuters (2)**
142:21;219:2

**commutes (1)**
213:6

**commuting (1)**
183:15

**comparable (5)**
49:14;112:18;180:2;
196:18;205:14

**comparableness (1)**
180:2

**comparator (1)**
198:16

**compare (4)**
110:22,22,23;179:17

**compared (25)**

48:3;82:16;112:6;140:9;
141:8;152:13;177:2,4;
185:19;187:15,24;191:9;
192:19;194:15;203:11;
205:4;216:25;217:19;
223:14;224:8,10,22;225:5;
230:7;242:9

**comparing (1)**
217:3

**comparison (3)**
108:2;186:1;187:18

**comparisons (3)**
185:12,13,14

**compelling (1)**
103:10

**compensation (1)**
17:24

**competitive (7)**
117:14;151:9;170:2;
189:8,16,18,19

**complain (3)**
79:13,14,17

**complained (4)**
72:18,21;75:22;210:9

**complaining (2)**
45:8;75:17

**complaint (14)**
44:5,24;45:14,19;46:3,4,
7,12,17;87:16;209:22,22;
251:16;252:25

**complaints (3)**
175:9,20;176:4

**complaint's (1)**
73:12

**complete (2)**
39:11;112:1

**completed (4)**
14:25;20:6,10;111:24

**completely (7)**
30:11;71:1;110:24;

121:22,25;153:23;203:23

**complex (3)**
71:24,24;72:9

**complexion (1)**
186:14

**complexity (1)**
71:7

**complicated (2)**
69:24;177:17

**complied (1)**
200:23

**comply (1)**
82:25

**complying (1)**
38:8

**component (2)**
70:14;160:17

**composition (6)**
194:11,21;195:17,21;
252:17;254:14

**comprised (1)**
68:19

**compulsory (3)**
98:22,24,25

**con (1)**
31:1

**concede (3)**
127:23;128:1;230:13

**conceded (2)**
74:11;131:7

**conceding (2)**
135:11;188:17

**concentration (3)**
46:8;155:14;256:19

**concentrations (3)**
170:19,25;171:2

**concept (1)**
213:4

**concepts (1)**
241:18

**concern (4)**
13:12;119:11;206:7,9

**concerned (3)**
72:6;113:21;229:15

**concerning (1)**
65:11

**concerns (2)**
174:9;242:15

**concession (1)**
128:3

**conclude (10)**
106:22;107:9;155:6,9;
246:1;248:11,17,25;249:8;
250:12

**concluded (2)**
155:23;257:4

**conclusion (7)**
36:13;37:15;45:18;67:24;
70:13;243:3;245:21

**conclusions (8)**
37:20;68:24;70:5;72:11;
78:12;150:23;203:16;245:9

**conclusory (4)**
67:11,14,20,25

**condition (2)**
167:11;251:12

**conditions (5)**
166:25;167:15;246:12,
15;251:8

**conduct (4)**
73:19;74:13;115:16;
231:10

**conducted (2)**
75:9;138:5

**confident (1)**
230:1

**confining (1)**
97:4

**conflict (1)**
41:10

**confusing (4)**
56:3;72:24;229:25;
231:16

**congested (1)**
213:6

**Congress (1)**
28:8

**Congressional (1)**
28:6

**connect (1)**
164:3

**connection (4)**
148:3;201:10,16;204:4

**conscientious (1)**
110:6

**consider (24)**
20:13;52:15;61:25;69:24;
122:5;128:2;133:13;
137:18;157:7,8,21;161:12;
170:11;172:10,15,17,23;
180:13;193:2;194:22;
225:11,13;226:4;244:19

**considerably (1)**
203:8

**consideration (12)**
110:19;111:9;131:25;
133:18;184:10,20;185:25;
188:3;202:21;220:10,21;
229:13

**considerations (3)**
65:16;135:22;186:2

**considered (9)**
24:10;26:24;84:18;
182:19;193:20;197:18;
206:6;215:8;219:22

**considering (6)**
184:17;203:12;219:6;
220:23;225:20;229:13

**consistent (4)**
19:18;30:12;197:10;

212:11

**consists (2)**
198:3,9

**constantly (1)**
73:10

**constituency (3)**
97:13;201:24;202:2

**constitute (2)**
136:17;192:23

**constitutional (6)**
65:21;69:1;73:25;74:15;
124:6,20

**constrained (1)**
199:7

**construction (1)**
219:25

**consult (1)**
10:2

**consultant (4)**
29:6;30:23;31:1;33:9

**consultants (4)**
28:20;30:2;33:4;177:25

**consulting (1)**
70:25

**contain (1)**
145:13

**contemporaneous (2)**
236:9,15

**contend (3)**
65:3,7;207:2

**contender (1)**
142:4

**contention (1)**
209:6

**contest (5)**
121:17;171:18;237:5,10;
239:1

**contested (5)**
119:20;129:19,22;
141:14;142:3

**context (6)**
35:16;49:16,20;67:22;
106:20;129:1

**continue (3)**
169:10;201:22;245:15

**continuity (1)**
164:12

**contradict (1)**
37:21

**contradiction (3)**
216:15;217:17;218:11

**contrary (1)**
123:7

**contrast (1)**
224:9

**contribute (1)**
50:2

**contributes (1)**
103:1

**contribution (2)**
9:15;37:19

**contributions (2)**
40:16;178:24

**control (5)**
28:15;38:15,19;40:21;
49:1

**controversial (1)**
200:21

**convenience (59)**
37:8,10;97:10;102:11,18,
19,23,25;103:1,4,11,17,25;
104:17;105:1,16;107:4,6,9;
117:9;118:12,16,20;134:10,
11,18,25;135:2;141:23;
143:21;144:23;145:3,5,7;
151:16;155:1;158:14;
214:3,9;215:19;216:23,23;
217:5,15,18,23;218:12,15,
20;219:10;220:3,8;223:11,
15;229:14;247:6,12,18;

250:19

**convenienced (1)**
247:8

**conveniences (1)**
247:20

**convenient (7)**
15:22;95:16,17;158:18;
173:23;177:9;223:20

**convention (1)**
34:5

**conventional (1)**
161:22

**conventionally (1)**
136:5

**conversation (1)**
138:17

**conversations (4)**
15:5;90:7,8,17

**convict (2)**
204:10,16

**Cooper (14)**
51:3;86:1,2;93:6;94:2;
100:6;149:7;191:18;
196:14;224:6;233:15;
243:23;255:1,3

**Cooper's (4)**
223:22,24;239:19;243:19

**copied (1)**
14:16

**copies (2)**
16:4;258:17

**copy (17)**
13:2;14:14;15:25;17:19,
21;25:3;27:15;64:6,6;
76:23,24;211:2,2;214:4;
224:4,4;240:14

**core (3)**
54:16;86:16;96:17

**corner (1)**
141:15

**correct (46)**
5:10,21;6:1;10:17;12:5,6;
15:15;17:23;24:18;25:13;
26:4;53:19;54:10;76:17;
82:20;92:12;95:2;127:25;
132:12;133:7,16;136:10;
138:10;158:2;160:1;
178:13,21;179:19;183:17;
186:18;198:4,18;200:10;
222:1;229:20;231:22,23;
236:7;239:3,23,25;245:19,
22;246:4;248:18;249:19

**correcting (1)**
238:9

**corrections (1)**
258:6

**correctly (1)**
39:24

**correlation (1)**
251:10

**cost (1)**
111:23

**costs (1)**
218:3

**could (64)**
9:14;12:1;15:21,23,24;
28:22;38:6;39:15;45:14;
48:10;67:9;68:4,6;69:25;
71:16;72:14;77:15;94:8,9;
96:24;97:3;98:2;99:13,17,
25;103:17;107:9;111:10;
113:23;115:7,8,20,21,21;
121:1;123:1;126:18;133:9;
137:23;147:22;154:18;
159:17;169:2,9,10;171:9;
176:23;183:11,15;185:4;
186:3;189:10;190:21;
194:18;202:21;207:18;
213:16;217:24,24;220:3;
231:22,24;249:23;251:25

**couldn't (4)**
105:6;185:2;220:11,12

**council (1)**
58:15

**Councilmen (1)**
57:20

**counsel (17)**
4:14;5:4;7:8;12:22;13:2;
16:16;25:4;64:7;66:2;
76:24;101:25;121:14;
130:16;174:11;181:10;
235:8;238:14

**counselors (2)**
57:14,14

**counsel's (1)**
101:6

**count (6)**
27:21;122:24;123:5,14;
189:10,21

**counties (49)**
110:11,13,15,16;111:9,
19,22;112:6,8,21;113:1;
125:24;146:17,19;147:3,18,
20;156:1;165:2;179:18,23;
180:1;181:7,12,19;182:1,
16,22;184:22,24;185:24;
186:11;187:11,12,25;
193:19;194:15;196:4,18;
197:14,18;199:2,3,9;
204:25;205:12,14;206:2,6

**country (3)**
29:21;35:13;138:25

**counts (2)**
27:22;122:23

**County (180)**
4:15;45:8,10,23;46:10;
47:15;48:3;49:13;52:5;
53:17;89:10,13;90:1,2;92:1,
5,20;94:17;95:5,20;96:16;
106:20;108:8;109:13,17,19,

20,23;110:7;112:2,6;113:4,
16,25;114:2;115:19;118:3,
6;119:12;121:22;123:5,12,
12;124:3,16;125:5,12,19;
126:8,13;128:8,18;132:12,
14;133:5;136:7;138:22;
141:25;143:3,8,12,17,18;
146:7,24,24;147:13;149:14,
16,20,20;150:5;155:11,19,
25;157:4,6,8,12,21;158:6,6;
160:20,22;161:2;164:6,21;
165:8,13,15;166:16;169:1,
20;170:13,21,24;172:12,19;
175:22;176:5,11;180:12;
182:15;183:16;185:6,21;
186:11;187:6;189:2;190:4,
13;192:1,18,20;193:3,8,16;
194:2,7,15;196:19,20,24;
197:13;199:12;200:22,25;
201:2,9,12,19,19;202:2,11;
205:5,16;208:17;214:12,14,
15,22;215:20;216:7;218:18,
19;219:2,6;220:19;222:6;
224:10;225:22,25;226:6;
228:24;230:11,19,22;232:4,
8;234:3,8;235:3;236:2,10,
16;240:23;241:25;242:10;
243:9,12,14;250:3,25;
254:1,10,11,22;256:11,16,
22

**County's (13)**
94:24,25;113:22;150:24;
179:17;186:12;192:24;
193:21;194:1;197:4;200:3;
241:3;243:3

**countywide (4)**
224:23;225:6;234:3,8

**couple (36)**
13:21;14:10,11;28:3;
29:5;31:16,18;36:17;48:1;

63:12;78:24;79:9,10,11;
98:23;106:22;107:13;
111:22;113:6;132:18;
146:19;152:15;155:14;
165:2,3,9;168:15;172:4;
175:4;195:2,2;216:17;
217:6,21;218:13;238:16

**course (16)**
21:12;61:17;100:8;103:5;
115:23;116:2,11;119:17;
120:11;122:21;139:9;
153:9;161:20;162:18;
169:3;247:10

**courses (2)**
11:9;21:5

**court (41)**
6:3;9:14;11:10;57:3;
60:9;63:20,22;64:19;67:3,
13;69:4,10;73:2;74:1,15,20;
75:1;77:3,25;80:4,10,23;
86:4;90:1;92:1;114:3;
124:14;126:14;127:3;
128:6;129:7;133:5;149:23;
202:24;204:10,16,20;
209:15,24;221:16;244:25

**courthouse (1)**
226:7

**courtroom (1)**
6:1

**courts (17)**
66:4,7;74:3;81:8,9,14,15;
82:1,4,24;83:4,15,20,23;
84:12;205:2;245:4

**court's (7)**
66:13;67:24;78:14;
126:19;127:14;128:7;
157:17

**covariance (2)**
167:8,21

**co-variation (1)**

246:14

**cover (1)**
21:16

**covered (1)**
230:20

**covers (1)**
23:16

**cramming (1)**
176:22

**cream (1)**
29:24

**create (1)**
176:23

**created (2)**
16:22;227:16

**creates (1)**
222:25

**creation (1)**
50:4

**credibility (1)**
78:17

**credit (4)**
73:16,25;74:11,14

**credulity (1)**
226:24

**criteria (2)**
39:1;115:25

**critical (5)**
105:25;107:24;108:7,13;
242:1

**criticism (2)**
78:3;242:17

**criticisms (1)**
114:1

**cross (9)**
78:12;79:10;159:10,15;
160:15,16;167:1,6,20

**Cruz (3)**
129:20;137:5;188:4

**crystal (1)**

130:2

**crystalize (1)**
154:7

**crystalizing (1)**
217:22

**culture (7)**
99:4;109:17,18,22;110:1;
123:7;180:18

**cups (1)**
36:2

**current (3)**
22:2;39:16;91:25

**currently (3)**
21:25;85:17,18

**customary (2)**
112:20;114:13

**customer (1)**
114:18

**cut (1)**
206:15

**CV (20)**
10:2,11;11:21;12:1;
24:23;25:24;26:6,9;36:8,
24;37:5,23;38:10;46:19;
51:12,17;55:14;92:9;211:7;
214:2

**CVAP (4)**
192:3,7,8

**cynical (3)**
68:23;70:5,21

## D

**Dallas (1)**
110:24

**Damon (1)**
89:18

**data (53)**
16:6,22;30:9;38:1,6,13;
39:2,17;41:5,13;44:3,16;

58:16,21;90:9,10,11,13,14;
114:12;122:17;131:20;
133:13;141:2,10;150:23;
154:17;171:8;172:1;
180:11;190:12;195:24,25;
206:25;212:9;213:20;
218:5;222:19;243:23,25;
244:2,3,4,7,23;245:14;
246:9;249:17;250:2;
252:16;254:21;255:4;256:1

**date (4)**
13:12;117:9;256:2;
258:15

**dated (1)**
28:9

**day (52)**
29:20,22;33:6;94:25;
95:15;97:5,18,22;98:12,14;
104:25;106:5;113:12;
116:1;121:2;136:12;
140:19;142:20,23;145:15;
149:10;155:2,2,20;158:8,
12,24;159:3;163:11;
166:12;173:2,9;176:20,21;
182:14;187:15;190:10,15;
191:2,4,9;198:23;229:6;
230:7;241:14;243:15;
247:7;248:2;249:12,13;
250:16;252:3

**days (2)**
176:25;242:14

**deal (2)**
32:13;59:12

**dealing (4)**
111:2;167:19;222:5;
252:2

**deals (1)**
41:20

**dealt (1)**
28:7

**death (3)**
246:11;251:5,11

**debate (5)**
28:17;65:14;102:16,21;
221:1

**debates (1)**
97:2

**December (1)**
69:14

**decide (5)**
52:17;66:5;76:12;93:9;
115:19

**decided (3)**
34:3;93:19;105:12

**decision (10)**
64:3;76:23;77:10;81:5,6;
83:10;119:24;133:19;
194:1;233:4

**decisions (12)**
82:11;83:17;110:9;120:8;
129:2,5;130:15;150:24;
207:5,12,14,18

**decisive (1)**
189:10

**declared (1)**
71:18

**decline (1)**
106:24

**decorum (1)**
79:19

**decreased (1)**
161:2

**deeply (1)**
89:7

**defects (1)**
117:13

**defend (1)**
241:8

**defendant (5)**
55:9,10;56:1,25;230:13

**defendants (6)**
55:1;77:18;89:23,23;
92:18;257:2
**defendants' (3)**
25:2,12;77:24
**defended (1)**
57:22
**defending (1)**
56:5
**Defense (3)**
4:13;73:8;75:13
**deficits (5)**
46:22;48:2;49:3,10;
141:17
**define (5)**
106:15;170:11;220:8;
228:22;229:1
**defined (6)**
212:3;219:10;220:3,13;
230:14;256:17
**defining (3)**
212:4;221:11;230:5
**definitely (3)**
12:2;135:21;137:6
**definition (17)**
140:6,25;141:4;158:20;
161:4;172:11;220:12;
226:10;229:19;230:8;
232:13,20;252:22;253:5,6,
8;255:20
**definitions (1)**
229:10
**degree (3)**
20:5,9;134:2
**deliberately (1)**
99:13
**Delta (1)**
49:7
**delve (1)**
89:7

**demand (38)**
95:23;114:25;115:17;
118:22;119:4,6,8;120:18,
23;121:23;122:7,23,24;
123:5,9,10,14;126:18,25;
127:7,19;129:14;130:9;
131:21;132:1;138:6,12;
148:6;156:15,20;203:13,14;
207:3;210:14;219:7;
221:10,11;243:10
**demanded (2)**
220:13;221:16
**demanding (1)**
127:6
**demands (1)**
128:7
**democracies (1)**
98:23
**Democrat (1)**
52:7
**Democratic (8)**
32:15;42:24;43:4;55:16;
152:11,22,25;232:12
**demographer (6)**
198:14;244:20,24;245:6,
8,13
**demographer's (1)**
245:8
**demographic (3)**
191:19;244:23;245:14
**demographics (4)**
181:6,11;182:1;193:21
**Demography (2)**
244:21;245:1
**demonstrate (1)**
250:11
**denied (2)**
142:14;232:9
**denominator (1)**
58:25

**Denton (2)**
112:23;199:17
**deny (1)**
70:23
**denying (5)**
143:4,9,13;182:17;
218:14
**department (4)**
22:6,9;205:3;208:8
**depending (3)**
27:7;61:24;184:14
**depends (1)**
118:16
**deploy (2)**
161:8,9
**deploying (1)**
195:24
**deployment (1)**
219:18
**DEPONENT (1)**
258:1
**deposed (7)**
8:9,16,19;9:25;11:14,17;
54:3
**deposition (26)**
5:15;6:4;9:16,19;10:7,13,
15;11:24;12:17,20,23,25;
13:13,16,22;14:3,22;15:9;
17:1;59:23,24;178:17;
231:10,14;235:23;257:4
**depositions (9)**
4:22;5:15;10:9,25;11:11;
19:19;59:14,15,18
**Des (1)**
20:6
**descent (1)**
62:1
**describe (5)**
20:3;41:6;116:21;144:13;
252:19

**described (2)**
17:9;248:14
**describing (1)**
146:4
**description (1)**
47:19
**design (1)**
222:12
**designation (2)**
25:17;145:16
**designs (1)**
161:5
**desire (1)**
126:20
**desired (1)**
106:17
**Despite (1)**
242:24
**detail (3)**
13:14;53:9;94:5
**detailed (4)**
82:10;112:3;116:13;
252:9
**details (4)**
104:6;148:3;170:8,10
**determine (3)**
58:22;122:15;255:17
**develop (1)**
47:9
**developed (2)**
20:24;115:5
**development (3)**
53:8;57:25;154:2
**developmental (1)**
153:25
**devil (1)**
104:5
**devising (1)**
65:17
**devote (1)**

151:1

**didn't (53)**
9:13,13;10:6;13:13;
14:14;20:22;31:20;56:20;
69:6,7;79:1,20;93:14;
100:18;103:23,24;104:2;
112:23;127:16;138:8;
149:19;153:5;156:25;
157:16;159:5;165:24,25;
170:7;171:20;172:13;
174:10;178:12;189:3;
194:19,22;195:10;199:15,
25;200:12;209:11,14;
214:13,23,24,24;219:14;
228:10,11;231:13;232:18;
238:2;250:5;251:23

**differ (2)**
38:21;186:11

**difference (23)**
26:20;27:9;31:21;35:17;
41:7;42:20;49:23;58:4;
105:16;107:10,20,21;127:4;
142:4;168:14;183:6;
189:24;211:24;212:13;
226:25;242:23,24;255:21

**differences (9)**
39:9;42:4,7,21;96:12;
137:22;150:19;151:15;
206:19

**different (56)**
42:12;43:11,15,16,19,20;
44:8,13;57:19;58:7;64:20;
68:6;79:3;84:7,22;85:12,
12;87:3;98:14;101:12;
102:1;104:6,11,17;108:3;
109:7,7;110:16,24;140:13;
142:19;144:6,8;145:9;
150:10;163:18;170:12;
171:13;172:12,18;179:3;
180:14,14;185:6;199:4,5;

216:10,13;227:9;229:14,19;
241:15;249:16;253:18;
254:9,19

**differential (2)**
44:13,19

**differentiate (1)**
255:20

**differently (9)**
45:16,21;73:3;101:9;
119:22;144:21;220:2;
241:18,18

**difficult (7)**
29:2;39:20;66:4;69:9;
97:18;99:10;164:1

**digested (1)**
63:25

**direct (5)**
5:4;77:13;79:11;204:3;
257:1

**directed (2)**
30:1;34:15

**direction (8)**
64:20;66:1;93:8,10;99:3;
152:8;168:23;199:18

**directly (6)**
31:9;90:20;150:13;
195:18;215:12;253:12

**dirt (2)**
146:10;147:6

**disabilities (2)**
96:21;184:5

**disadvantage (1)**
254:11

**disadvantaged (2)**
95:14;108:22

**disadvantages (1)**
65:14

**disagree (3)**
66:12,16;80:17

**disagreed (1)**

67:3

**disagreeing (2)**
80:19;243:2

**disagreement (2)**
35:7,21

**disappoint (1)**
217:19

**disappointing (1)**
104:4

**disappointment (1)**
158:3

**discern (2)**
166:6,8

**disclose (1)**
87:5

**disclosed (8)**
16:15;26:3;86:18;235:10;
237:19;238:1,6,23

**disclosure (2)**
25:2,12

**discount (1)**
67:12

**discover (1)**
136:3

**discovered (2)**
235:3;236:3

**discriminated (1)**
240:24

**discrimination (29)**
43:23;44:6,11;46:5,15;
60:25;61:5,8,15,19,21;
62:10;84:11,13;86:15;
87:13;124:12;126:2;
156:24;157:1;182:10;
202:20;204:3,10,17;205:2,
15;230:19;233:14

**discriminatory (1)**
83:20

**discuss (4)**
17:1;91:9;215:12;235:25

**discussed (17)**
17:10;63:1,6,9;66:2;
73:17;74:12;121:11;164:8;
174:11;181:9;211:7;
228:12,14,17;250:4,16

**discussing (1)**
91:21

**discussion (11)**
88:13;102:12;128:11,12,
14;195:18;200:20;219:9;
220:25;227:25;253:3

**discussions (5)**
13:25;145:6;175:6;
187:20;219:17

**disparities (4)**
62:13;84:22;233:16,24

**disparity (2)**
42:10;194:13

**displayed (1)**
78:25

**disproportionately (1)**
243:4

**dispute (48)**
121:9;123:1;124:24;
128:16,19,20;130:6,23;
131:8,10,16,19;133:3;
141:2;171:12;191:22,24;
192:4,5,6,13,14,22;193:15;
194:14;196:12,15;197:3,6;
198:2,8,20;208:11,16;
209:19,21;212:24;213:19;
224:14,24;225:6;232:20;
235:10;239:10,14;240:7;
241:6;244:1

**disputing (9)**
192:21;233:23;234:23;
235:18;239:5;256:4,6,9,15

**disqualified (1)**
71:11

**dissenting (2)**

77:20;80:20

**dissertation (1)**
100:15

**disservice (1)**
122:3

**distance (40)**
37:8;91:16;107:20,20,23;
108:2,4,7,13,24;114:14;
115:13;142:20,24;145:22;
154:21;155:9;160:6;181:1;
182:13;183:9,11;186:24,25;
212:6;214:3;215:23,25;
217:23,24;219:2,3;220:6;
225:13,18,20,24;227:1,6,12

**distances (7)**
108:19,22;155:13;
183:14;225:13;226:21,22

**distinct (1)**
41:3

**distinctive (1)**
186:16

**distinctly (1)**
110:15

**distinguish (1)**
223:2

**distract (1)**
5:3

**distributed (1)**
95:4

**distribution (4)**
41:22;45:25;70:17;95:7

**district (5)**
57:17,18;58:3,13;227:5

**districting (1)**
78:1

**districts (2)**
50:6;56:5

**dive (2)**
12:3,9

**divided (1)**

101:15

**division (1)**
93:18

**DMV (3)**
103:18;104:1,10

**doctor (1)**
4:19

**document (12)**
13:8;25:1,8;64:5,15,23;
65:1;67:7;76:3;211:12;
212:10;243:18

**documentation (1)**
90:19

**documented (1)**
205:2

**documents (4)**
14:22;15:18;90:23;92:9

**Doe (1)**
175:8

**doesn't (20)**
32:6;99:23;103:6,24;
106:7,8;118:13;123:14;
134:14;135:12;151:13;
157:10;181:15;190:12;
233:1;242:20;247:1,23;
248:1;250:22

**doing (14)**
9:16;27:25;106:6;113:5;
118:4;150:10;163:4;
171:21;206:20,24;215:20,
21;225:23;247:9

**Don (1)**
217:11

**done (12)**
54:17;75:25;87:7;98:2;
101:10,11;106:6;176:3;
184:4;186:3;231:5;245:12

**don't (215)**
6:24,25;10:9,14,22;18:20,
21,25,25;21:16;27:4;29:16;

30:1,16;33:15,20,24;34:11,
24;37:20;39:1;53:20;58:18;
65:23;67:21;68:1,2;69:5;
71:4;74:3,5;76:7,9;78:22;
79:1,2,4,8;81:17,19;82:18,
24;83:6;85:18;86:21;87:6,
11;88:5;93:7;98:21,24;
99:2;101:17;102:13;
104:25;109:19;110:13;
118:9,10;119:13;120:6;
121:16;122:1,17;123:21,21;
124:4,5;128:1,2,19,19;
129:3,3,6,11,12,13,23;
130:6;132:5;133:23,23;
134:20;141:2;142:9,12;
143:6,11,24;144:19;150:15;
153:7;157:19,20,23;163:15;
164:11;168:1,4;169:1,17;
170:8,14;171:12,17;175:5,
16,19,24;176:12,12,17;
178:5,6,8,10;181:14,14,21;
183:5,14,25;184:2,25;
185:2;188:10,11;190:25;
191:1,13,22,24;192:5,13,
21;193:1,12,13;196:1,15;
197:6,21,23,25;198:1,20;
199:25;201:12,20,21,24;
202:12,18,24;203:1;204:9;
205:18,24;206:4;208:11;
209:16,17,19,21;210:1,5;
212:24;214:21;216:14;
218:10,13;219:16,20;
220:22,24;221:7,20,21;
222:7;223:21;224:16;
225:16;227:12;228:2;
230:13,24,25;231:17;232:5,
21;235:1;236:20;237:9;
239:12,17;240:5;244:3,10;
245:2,3;246:14;248:21;
249:18,21;250:14;253:22;

254:17,20;255:13;256:3,5,
9,12,23

**door (6)**
134:14,14;143:23,23;
210:2;223:17

**doorstep (1)**
247:20

**double (2)**
112:12;190:14

**double-sided (1)**
25:16

**doubt (4)**
32:3;107:4;191:16;
201:14

**doubts (1)**
28:24

**down (20)**
12:9;51:10;59:9;107:7;
114:16;130:12;147:6;
164:18;165:16,21;166:9;
167:10,10;189:22;220:24;
229:22,24;231:1;249:16;
255:9

**Dr (69)**
13:1,1;15:14,14;19:4,4;
25:3;50:22,22,24,25;64:6;
65:19;67:11;68:10;73:17;
74:11;76:23;89:4;100:6,6,
6;113:21;127:24,24;
153:11;171:14;179:7;
194:16;196:9;200:5,8,9;
205:11,13;209:19,22;
211:15;219:11;227:19,21;
228:3,17;229:18;230:6,14;
232:2;233:3,10,13,15;
234:1,10,23;236:8,14;
237:2,5,25;238:5,22;
240:13,19;241:14,21;
242:17,25;243:18;254:25

**Drake (1)**

**20**:6

**draw (2)**
170:7;183:3

**drawing (3)**
56:4;185:9;255:6

**draws (1)**
228:4

**drew (2)**
45:18;225:14

**drill (1)**
51:10

**drive (11)**
15:23;16:3;17:21;105:11;
142:21;145:11;166:7;
224:7,22;227:10;250:16

**driven (1)**
209:3

**driving (2)**
189:8;227:9

**drop (2)**
134:15;203:14

**drops (3)**
136:4;167:23;203:8

**droves (1)**
119:13

**due (1)**
151:22

**Duhon (3)**
89:24;91:22;149:23

**duly (1)**
4:6

**Dunlap (9)**
56:16,25;57:5;60:1,16;
64:4;80:5,17;83:3

**duplication (1)**
16:20

**durable (3)**
29:1;30:18;32:7

**during (10)**
14:3;78:12;98:7;121:13;

140:22;170:12;172:10;
200:15;209:24;242:10

**duty (2)**
5:24;220:20

---

# E

**each (18)**
36:25;60:4,6,8;90:16,18;
101:11;102:3,8;109:22;
120:17,21;145:14;152:17;
160:22;174:13;180:14;
181:6

**earlier (8)**
19:3;22:21;149:10;
174:25;211:8;226:10;
232:18;245:17

**early (208)**
18:13;21:23;22:22;36:19;
37:12;45:9;52:9,22,22;
92:21,22;94:18,19;95:1,7,
11;96:19,23;97:9,12,15,19,
21;98:5;99:9;102:18;
104:25;109:6,10;113:13,25;
114:25;115:25;116:16;
117:1;118:4,23;119:2,5,6,
15;120:12,16,17,19,22;
121:1,3,12,13,13,19,20,20;
126:9,11,15,16,18,21;
127:14,22;128:8,17;130:9,
25;131:6,9,21;132:1,11,20,
22;133:6,15,21;136:12;
138:5,6,12,18;140:8,18,21;
141:1,4;143:4,9,13;145:15,
22;148:5,17;150:25;
151:22;153:25;154:10,24,
24;155:4,20;157:4;158:1,4,
7,9,12,23;159:3;161:1;
163:21;164:7;166:12,15,18;
167:22;168:7,13;169:7,10;

170:12;172:11,19;173:9,10;
175:21;176:19,22;179:17;
182:14;187:14,21,23;190:5,
6,11,14,17,22;191:3,3,8,11,
14;198:22,23;200:3,14;
203:4;206:6,12,16;207:4,
17;214:17,21;216:2;219:7,
11;225:10;228:24;229:3,5;
230:7,10,10;233:5,7;
236:11,17,23;240:22,25;
241:3,4,5,25;242:6,9,13,21;
243:3,10,11,16;245:18;
246:1,7;247:1,4,8,23;248:4,
12,17,20,24;249:7,19,23,25;
250:1,5,6,12,21,24;251:24

**ease (1)**
211:6

**easier (7)**
21:18;34:23;68:13;103:8;
105:6;162:16;186:8

**easily (2)**
71:16;184:4

**Eason (8)**
90:2,3,20;109:24;126:20;
132:17;147:15;164:5

**E-A-S-O-N (1)**
90:2

**east (2)**
162:22;165:5

**easy (7)**
6:14;10:9;29:7;72:2;74:3,
5;128:22

**eat (1)**
220:7

**economic (4)**
33:9;44:20;254:12,14

**edge (1)**
199:23

**edited (1)**
24:1

**editing (1)**
27:15

**editor (3)**
23:6,9;27:12

**editorial (1)**
23:7

**eds (1)**
24:5

**education (8)**
42:17;48:25;49:9;59:5;
180:10;213:16;233:14,16

**Educational (4)**
4:13;20:3;42:12;59:6

**effect (2)**
223:11;246:2

**effective (1)**
152:4

**effects (3)**
222:4;223:6;247:18

**effectuate (1)**
71:20

**efficacy (2)**
48:17;50:15

**effort (10)**
30:25;91:14;113:22;
120:15;142:18,24;143:2,19;
144:3;201:3

**eight (19)**
115:21;169:2;177:20;
179:18,23;184:22;187:10,
12;193:19;196:4,17;197:14,
18;204:25;205:12,14;206:2,
6;216:22

**Eighty (1)**
198:6

**either (18)**
29:12;61:24;62:1;113:12;
115:25;121:10;122:22;
143:11;145:21;189:21;
225:19;231:4;237:4,4;

243:15;248:3;249:3;251:10

**elderly (1)**
42:8

**elect (3)**
58:12;96:11;188:23

**elected (9)**
49:25;50:3;57:15,17,20;
82:16;220:20;234:2,7

**election (112)**
21:7,9,10,11,15,19;30:9;
32:24;41:16;69:11;71:17,
18;72:5,6;75:7;81:3,14,25;
82:22;84:13;92:20,22;
94:18,19,25;96:8,9;97:18,
22;104:25;107:5,5,5;
109:23;110:2;111:24;
113:12;114:20;116:1;
119:1;121:2,14;125:11;
126:10;127:15;133:22;
136:12;137:9,18,19,20;
140:18;141:14;142:23;
145:15;151:6,18;155:2,20;
157:15;158:8,12,24;159:3,
19,23;160:23;166:12;169:3,
18,19;173:2,9,16;174:16;
176:20,21;180:19;182:14;
187:15;188:14,16;189:8,11,
13,17,18,25;190:3,10,15;
191:2,4,9;198:23;202:25;
203:11;217:9,20;229:6;
230:7;233:5;242:11;
243:15;247:7;248:2,9,16;
249:12,13,16,19

**elections (61)**
20:11,15,18;21:15,16;
31:19;33:23;57:1;58:3,4,13,
14;65:10,12,18;66:6,10;
72:7;74:5;80:24;82:6,14;
83:6,18,19;90:1;110:17,21;
112:14;117:15;119:4,20;

123:8;125:2;129:19,22,24,
25;133:15;136:21,23,24,25;
137:2;138:5;140:10;142:2,
3;151:12,23;152:5;157:11;
163:4;177:16,21,24;178:2;
188:25;189:15;203:9;
247:16

**electorate (4)**
34:3;70:14,18;247:14

**electrical (1)**
116:13

**Elementary (1)**
208:7

**elevate (1)**
159:8

**elevated (1)**
188:5

**elevating (1)**
95:13

**elevation (1)**
118:10

**Ellis (2)**
86:1,2

**else (11)**
14:4,8;15:16;17:2;105:3;
118:25;143:18;165:12;
182:6;228:12;256:7

**elsewhere (2)**
152:25;177:5

**email (4)**
13:9,10,11;14:15

**emailed (1)**
14:13

**embedded (1)**
58:2

**emergency (1)**
148:14

**emerging (2)**
162:1;199:19

**emphasis (2)**

78:24;149:5

**emphasize (1)**
79:12

**emphasized (1)**
79:9

**emphatic (1)**
108:21

**empirical (2)**
52:18,19

**employed (11)**
9:2;21:25;22:12,14;
74:22;171:14;224:6,21,23;
225:2,5

**employer (1)**
99:23

**employment (4)**
20:2;59:7;233:14,16

**enable (1)**
213:9

**enamored (1)**
73:22

**encompass (1)**
25:24

**encompasses (2)**
26:2;138:19

**encourage (1)**
50:1

**end (7)**
72:12;86:24;103:1;
158:11;200:22;230:2;
241:14

**engage (2)**
53:6,6

**engaged (1)**
227:25

**engaging (1)**
152:4

**engulfed (1)**
4:21

**enough (5)**

101:11;141:10;192:23;
211:10;249:22

**enrollment (1)**
180:11

**enslaved (1)**
202:17

**ensure (1)**
236:6

**ensuring (1)**
82:25

**entered (1)**
77:6

**enthusiasm (1)**
78:25

**entire (4)**
110:6;157:12;188:6;
216:8

**entirely (7)**
15:24;19:25;67:12;153:2;
174:23;197:11;203:14

**entirety (1)**
65:20

**entitled (3)**
25:16;210:20;235:22

**entity (1)**
62:6

**entrenched (3)**
42:24;180:23;201:23

**environment (3)**
52:8,20;106:14

**Episcopal (1)**
136:13

**equal (2)**
123:16;242:8

**equally (2)**
125:10;241:5

**equitably (2)**
45:10;125:6

**equity (1)**
125:9

**erected (1)**
114:16

**Errata (2)**
258:7,17

**error (5)**
68:11;172:5;244:4,8,12

**errors (2)**
244:15,18

**escape (1)**
100:19

**especially (10)**
49:8;73:11;108:20;120:1;
140:10;154:11,25;161:6;
183:1;189:15

**essence (2)**
57:23,24

**essential (1)**
229:12

**establish (4)**
166:21,25;167:2;168:2

**established (3)**
139:8;185:17;237:3

**establishing (2)**
104:10,12

**estimate (3)**
18:6,11;197:6

**estimates (3)**
244:4,8,15

**estimation (3)**
96:4;196:23;197:10

**ethnic (4)**
61:15,19;62:6;194:20

**evaluate (8)**
92:18;94:16;95:1,6,9;
245:5,7;251:19

**evaluated (1)**
251:25

**evaluating (2)**
94:13;95:21

**even (46)**

38:11;39:5,13;41:25;
42:5;51:16;52:14;79:11;
97:3,6,6,16;105:13,16,16,
18;118:11;121:1;134:14;
139:10,13;141:20;146:21;
147:18;149:22;154:16;
162:4;163:12,15;164:14,16;
167:21;168:1,5;189:17;
190:7,11;194:12;203:11;
204:12,19,20;208:6;217:16;
236:3;246:15

**evenly (1)**
45:10

**evenness (1)**
137:14

**event (1)**
13:13

**events (3)**
210:3;233:3,10

**eventually (1)**
199:21

**ever (14)**
8:16;12:10;22:14;36:13;
46:18;60:20,24;63:15;73:7;
83:12;87:22;100:17;222:8;
244:25

**every (12)**
21:13;30:9;38:25;39:2;
41:17;72:23;75:22;141:15;
177:8;185:4;199:16;220:25

**everybody (2)**
32:25;97:20

**Everyone (7)**
61:17;125:5;149:22;
157:7,9,21;188:20

**everyone's (1)**
32:19

**everything (4)**
77:4;161:14;207:9;
215:20

**everywhere (1)**
184:11

**evidence (32)**
62:9;67:10;71:22;78:3;
84:9,17,21;87:20;94:24;
105:14;107:11;117:9;
121:24;126:7,12;132:7;
139:6;150:24;152:23;
153:2;154:23;158:1;177:6;
190:25;191:1,5;195:19;
243:13;245:18,25;246:10;
250:12

**ex (1)**
23:7

**exactly (20)**
12:1;32:22;33:21;75:19;
81:18;111:11;112:22;
132:5;144:19;146:25;
167:18;186:6;194:1;208:9;
214:13,15;217:2;219:20;
235:2;254:1

**exaggerated (1)**
35:20

**EXAMINATION (3)**
4:9;78:13;79:10

**examine (2)**
180:17;182:22

**examined (5)**
4:8;111:19;205:1;206:3;
258:3

**examining (1)**
154:9

**example (15)**
40:22;42:3,10,22;49:11;
50:5;53:17;162:7,11;
171:15;172:23;177:19;
197:1;214:25;221:13

**Excel (3)**
16:8;148:2,2

**excelled (1)**

144:15

**excellent (1)**
82:17

**except (4)**
4:23;38:25;39:2;122:1

**exception (1)**
186:19

**exclusion (1)**
243:13

**exclusively (1)**
153:1

**Excuse (2)**
238:3;255:16

**exercising (1)**
151:10

**Exhibit (21)**
12:25;13:3;25:1,5,23;
26:2,7;64:3,8;76:16,25;
92:8;210:20,24;213:23,24;
223:24,25;240:10,13;
243:18

**exist (2)**
175:3;250:5

**existed (2)**
202:1,1

**existence (4)**
193:11;232:3,7,9

**exotic (1)**
65:8

**expand (1)**
137:10

**expansion (1)**
135:18

**expect (13)**
18:15,16;19:5,13;39:24;
112:13;120:10;137:21,23;
143:18;200:21;218:15;
239:10

**expectation (2)**
144:2;188:7

**expected (1)**
27:16

**experience (7)**
35:1;73:18;74:12;78:2;
101:3;159:21;170:1

**experienced (2)**
78:14;79:7

**experimental (1)**
217:12

**expert (49)**
9:1,11;25:2,12,17,21;
36:12;37:14;44:12;53:24;
56:21;60:5,6,24;62:5;63:1,
3,6;69:4;77:24;78:2,14;
79:7;87:23;88:3;91:5;
92:19;93:3,4,9;94:9,12,14,
16;100:12,13;101:1,4,10;
153:11;175:2;191:17;
194:23;227:22;240:14;
242:4;245:1,8;251:20

**expertise (9)**
26:25;77:25;83:7;88:5,7;
94:7;124:22;149:11;177:14

**experts (13)**
91:6;93:15,16,23;100:4;
101:9,13,16,21;170:18;
195:21;196:14;253:2

**expert's (1)**
149:2

**explain (7)**
39:7;87:1;189:4;215:6,
10;216:7;222:2

**explained (1)**
203:14

**explanation (1)**
63:14

**explanations (3)**
107:4;117:18;166:24

**explanatory (1)**
41:25

**explicit (1)**
253:14

**explicitly (4)**
91:5;102:13;215:12;
251:24

**explored (1)**
36:14

**exposure (1)**
61:17

**express (2)**
53:4;96:10

**expressed (3)**
30:15;174:3,5

**expressing (1)**
174:22

**extend (3)**
21:8;97:20;104:19

**extended (1)**
143:21

**extending (1)**
103:10

**extends (1)**
21:9

**extension (1)**
217:25

**extensive (3)**
27:7,7;77:5

**extent (5)**
123:24;182:12;234:1,6;
235:24

**extraordinarily (2)**
151:7;188:12

**extraordinary (1)**
217:14

**extremely (1)**
80:23

## F

**face (5)**

34:2,13;176:20;194:10;
218:23

**faced (3)**
129:5;155:9,10

**facilitate (1)**
163:6

**facilities (7)**
115:5,7,9,14;116:6,6;
148:12

**facility (1)**
116:7

**fact (28)**
70:12,21;72:11;87:22,23;
108:18;111:6;117:20;
118:2,6;128:20;139:2;
155:19;162:6;167:22;
174:18;178:18,19;186:15;
189:1;194:10;195:16;
196:8;213:13;218:6;
243:11;250:10,19

**factor (5)**
106:13;107:24;108:7,14;
206:5

**factored (1)**
134:3

**factors (14)**
102:18;151:16;206:19;
207:4;213:17;217:1,9;
222:23;223:15;228:5,9,13,
16,17

**facts (6)**
5:19;88:6;107:11;114:23;
126:5;144:25

**factual (2)**
78:3;237:17

**faculty (1)**
20:23

**fading (1)**
35:20

**fail (1)**

31:3

**failed (1)**
78:5

**failing (1)**
105:4

**failure (3)**
104:11;117:15;170:1

**fair (27)**
23:2;41:6;43:10,14,18;
49:18,19;59:16;61:2,22;
62:8;67:3,5;79:4;93:20;
101:4;104:5;138:23;
147:13;164:10;171:19;
215:2;231:18;241:14;
246:5,24,25

**fairly (2)**
125:6,13

**faith (1)**
120:15

**faithful (1)**
34:21

**false (2)**
107:11;114:22

**familiar (29)**
5:14;20:21;31:8,10;32:7,
19;33:20;75:22;77:7;
114:19;175:18;208:1,4,13,
15,17,21,25;209:6,25;
210:16;211:9,9;214:18;
222:17;228:5,8,13;234:15

**familiarity (7)**
21:13;156:14;207:3,23,
24;208:10,22

**family (3)**
52:20;170:3;256:22

**Famous (1)**
179:14

**far (22)**
8:7;10:5;15:11;18:5,17;
19:2;92:1;102:4;114:20;

118:20;123:3;125:11;
134:10;147:20;189:15;
202:18;225:18;227:5;
229:15;231:9;245:4;249:22

**favor (1)**
97:12

**favored (1)**
35:14

**favorite (1)**
29:24

**feasible (1)**
222:19

**feat (1)**
152:13

**federal (17)**
5:1;11:5;21:8,15,19;
53:25;81:8,14,15,25;82:8,
12;85:22,23;169:5;205:2;
231:9

**feedback (1)**
222:15

**feel (3)**
6:25;98:11;258:6

**feelings (1)**
48:17

**feet (5)**
146:11;165:4;225:16;
226:17,18

**few (9)**
13:6;24:5;29:8,10;30:4;
73:21;119:10;144:10;
232:10

**fewer (2)**
222:7;241:3

**field (13)**
5:17;34:25;35:7,21;
51:15;135:2;136:16,20;
162:5,10;177:14;218:9;
244:21

**fielding (1)**

31:19

**Fifteen (1)**
90:18

**fight (4)**
200:13,18,19;212:21

**fighting (1)**
219:4

**figure (9)**
34:9,22;106:24;130:7;
137:22;167:25;184:18;
206:21;254:5

**figured (1)**
172:8

**figures (5)**
16:5;117:3;131:3,14;
227:13

**file (20)**
53:21;86:20;87:1,3;
91:11;122:14;126:17;
148:2,2;153:10;170:9,14,
16;177:19;196:2;254:10,11,
13;255:14;256:3

**filed (3)**
69:10;85:20;86:18

**files (12)**
15:25;16:6,8,8,10,10,15,
20;145:12,25;146:14;
171:25

**filing (1)**
16:19

**fill (1)**
68:22

**filled (1)**
71:12

**final (3)**
18:12;116:15;135:10

**finally (5)**
68:4;73:14;103:17;138:4;
156:22

**finance (2)**

21:21;178:21

**financed (1)**
152:10

**find (20)**
65:19;69:6,7;110:11;
112:15,25;155:7,8;156:25;
162:17;163:8,16;164:13;
185:2;212:12;217:6;
246:15;247:15;256:8,8

**finding (6)**
70:9;156:12;157:3;
158:19;162:23;168:19

**findings (11)**
37:16;150:20;151:5;
154:13,22;155:17,24;
156:23;157:25;167:17;
183:7

**finds (1)**
70:12

**fine (4)**
16:1;36:3;70:22;238:15

**finish (5)**
8:2;76:11;125:22;235:21;
238:3

**finished (1)**
100:18

**fire (2)**
115:6;208:8

**firehouses (1)**
208:3

**firm (3)**
33:22;86:1,3

**first (33)**
4:6;17:4,6;25:11;27:2;
38:5;46:21;51:8;68:7,7;
73:15;75:5;95:11;96:6;
102:10;109:16;139:10;
146:13,14;150:22;154:11;
163:11,15;189:7;198:12;
212:6,17;216:18;225:12;

235:1,2;238:7;251:18

**fit (1)**
65:8

**Five (13)**
8:12;14:12,12;19:19;
50:14;54:3;59:15;60:2;
73:10;76:8,12;136:22;
244:7

**five-year (1)**
244:5

**flash (4)**
15:23;16:3;17:21;145:11

**flat (4)**
18:1;117:23;167:24;
246:19

**flavor (1)**
29:24

**flexibility (2)**
98:7;199:9

**flip (1)**
150:21

**flipping (1)**
249:6

**flooded (1)**
103:19

**Flores (32)**
14:24;15:14;19:4;50:22;
93:7,12,19;100:6;113:21,
21;127:24;128:13;146:15;
149:6;150:8;153:12;
181:16;194:17;196:10;
201:25;203:20,22;228:17;
233:3,10,13,15;234:1,10;
236:8,14;238:8

**Flores's (11)**
94:5;200:8;209:20,23;
227:19,22;228:3;232:2;
234:23;237:5;238:6

**fluctuate (1)**
32:6

**fluctuated (1)**
  151:21
**fluctuates (1)**
  156:21
**fluctuating (1)**
  30:18
**fluctuation (1)**
  30:17
**fluctuations (1)**
  107:7
**FM (1)**
  166:7
**focus (17)**
  21:15;26:6;38:18;39:6;
  40:6,23;41:1,23;42:1,6,14;
  92:17;93:19;172:13;216:3;
  223:4;242:2
**focused (2)**
  41:19;93:11
**focuses (1)**
  215:23
**focusing (1)**
  20:11
**foggy (1)**
  114:5
**folks (7)**
  34:4,6;105:17;106:7;
  107:8;125:14;251:6
**follow (4)**
  162:8,23;247:2,24
**followed (1)**
  28:12
**following (1)**
  230:5
**follows (1)**
  4:8
**food (1)**
  172:24
**foot (1)**
  184:5

**force (3)**
  68:12;82:5;105:11
**forecast (1)**
  178:2
**foregoing (1)**
  258:3
**foresight (2)**
  128:23;129:3
**form (69)**
  4:24;5:8;15:22;31:7,15;
  36:16;38:2;44:1;46:20;
  52:25;59:4;62:15;66:14;
  67:15;70:6;75:17;78:18;
  80:21;81:10,16;82:2;83:21,
  24;84:15;90:25;97:22;
  108:15;126:22;128:9;
  131:11,23;133:8;135:14;
  137:25;143:5;150:11;
  154:6;159:4;172:20;
  175:23;176:6;178:14;
  184:8;187:7;188:2;189:6;
  190:16;193:24;194:24;
  200:16;203:19;205:6,17;
  208:19;210:4;228:25;
  230:12;234:18,25;236:24;
  237:7;239:7,16;243:7;
  247:25;249:2,20;252:23;
  253:16
**formation (1)**
  35:10
**formats (1)**
  16:7
**formed (2)**
  62:22;153:23
**former (3)**
  32:8;79:25;91:25
**forming (3)**
  232:23;234:22;236:12
**forms (2)**
  216:10;223:11

**forth (9)**
  47:1;63:17;102:20;
  145:20;147:4;148:15;
  201:7;207:14;212:16
**forward (4)**
  18:20;69:7;130:10;199:1
**found (14)**
  62:9,13,21,22;63:2;
  104:18;111:10;113:6;
  146:14,15,17;156:4;180:24;
  217:12
**four (9)**
  72:23;100:25;115:21;
  127:5,13;162:8,9;227:1;
  230:3
**fourth (2)**
  75:12;130:24
**framework (1)**
  228:4
**Francis (1)**
  165:23
**free (2)**
  6:25;104:19
**frequency (4)**
  178:3;187:14,21,23
**frequently (4)**
  39:9;170:1;209:10;
  247:15
**from (92)**
  5:3;6:6,10;7:6,8;14:1;
  15:25;20:7,9;29:19,22;
  31:22;32:15;33:6;35:1,12,
  15;45:18,24;46:16;52:20;
  59:13;69:9;70:2;71:23;
  75:14;76:3;86:21;91:4;
  99:7;107:25;108:19,22;
  110:16;126:19;128:21;
  131:20;143:15;145:22;
  146:13;151:8;152:23;
  154:9,24;162:18,22;163:7;

  164:5;165:4;166:8;168:16,
  19,25;169:2,5,5,21;170:3;
  171:8;173:21;176:22;
  180:10,11,14,14;181:18;
  183:4;184:2,10;185:9,9;
  186:12;190:3;201:18;
  203:4;204:18;210:12,14;
  214:3;217:5;221:15,16,17;
  222:9,15,20;223:6;241:24;
  244:7;250:6;252:16;254:19
**front (4)**
  104:23;156:18,18;194:4
**FSupp (1)**
  76:22
**fulfill (1)**
  213:9
**full (6)**
  4:16;68:7;73:15;212:17;
  222:3,22
**full-time (1)**
  22:10
**fully (1)**
  153:23
**Fund (1)**
  4:13
**fundamental (4)**
  34:18;218:19;242:23,24
**fundamentally (1)**
  33:7
**funded (1)**
  152:11
**further (15)**
  68:8,10;78:9;108:9;
  134:25,25;135:1;154:18,23;
  155:5;185:10;213:1;
  224:18;225:22;227:3
**future (14)**
  119:16;120:5,13,13;
  127:21,22;129:13;130:3;
  133:15;139:22;152:20,20;

207:10,19

# G

**gain (1)**
68:15

**gap (1)**
197:15

**garage (1)**
116:4

**gather (11)**
45:13,17,24;58:24;90:13;
98:9,10;99:4;124:13;
155:12;229:14

**gathered (4)**
93:9;96:6;114:12;220:18

**gathering (1)**
166:11

**gauge (1)**
132:2

**gave (3)**
63:15;195:5;252:15

**gears (1)**
76:6

**gender (1)**
85:3

**general (18)**
35:10;41:4,12;47:12;
78:7,23;82:4,12;83:4,15,25;
84:2;88:4;109:24;114:20;
199:6;214:16;242:10

**generally (10)**
16:2;36:13;37:15;95:8;
177:15;181:8;213:15;
234:15;237:2;245:18

**generational (1)**
42:4

**generations (1)**
201:15

**generous (1)**

118:4

**geographic (1)**
20:20

**geography (2)**
20:15,17

**George (5)**
22:16;79:25;80:1,2,20

**Gerber (1)**
217:11

**germane (9)**
21:22;37:12;84:10,19;
104:22;145:6;154:14;
233:1,2

**gerrymandering (2)**
54:14,18

**gets (2)**
82:1;172:8

**getting (8)**
30:3;86:24;139:14;142:5;
162:16;163:24;164:25;
230:2

**Gill (3)**
8:23;60:2,17

**GIMPEL (31)**
4:5,18;13:1,1,3;25:3,5;
64:6,8;67:12;73:17;74:11;
76:24,25;77:24;78:7;89:4;
179:7;205:11,13;210:24;
213:24;223:25;240:10,20,
21;241:8,22;242:2;243:19;
258:11

**Gimpel's (4)**
65:19;68:10;242:5,16

**GIS (5)**
16:10;115:3,4;148:6,10

**gist (1)**
65:24

**give (8)**
15:24;48:10;97:10;
123:24;145:12;149:7;

220:21;230:15

**given (22)**
40:3;63:16;69:19,23;
73:9,12;93:8;101:1;147:11;
161:14,16;169:7;173:2;
176:11;187:19;199:8,10;
248:8,16,23;249:7;258:4

**gives (1)**
40:16

**giving (1)**
78:14

**Glen (1)**
40:14

**glimmer (1)**
100:14

**goal (2)**
103:21;146:23

**goes (18)**
20:18;49:16,24;50:7,14;
134:2;150:16;160:6;
162:21,21;166:13;167:10,
10,10,10;173:3;189:24;
204:7

**going (125)**
5:18;6:20;7:5,8;10:11;
12:24;13:7;18:20;20:1;
24:24;25:1,3;29:7,8,12,19,
21;30:5;31:3;32:1;33:5;
34:4;35:23;36:1;38:17;
39:9,12,17;41:13;47:5;
48:16;51:10;53:22;64:2,20;
66:1;70:23;74:2;76:16;
77:4;80:25;83:16;84:25;
85:14;89:6;92:7;96:9;
97:19,25;100:20,22;102:2;
103:11;104:3;105:3;
107:14;110:20;112:2;
114:14;118:13,19,21;
120:11;122:5;130:3,10,11,
16;134:10,12,19;142:4;

147:7;148:22;149:13;
151:9,10,18;158:18;166:13;
177:12,21;179:2;181:5;
182:13;183:5;184:10;
185:13;189:21,21,22,23;
194:19;203:4,12;204:16;
206:25;208:23;210:19;
211:11;213:22;214:5;
216:9;218:16,22;222:7;
223:5,19,23;226:19,25;
227:20;228:25;229:17;
230:17;234:11;240:13,18;
241:20;246:15;247:19;
255:14;256:7,8,10

**Goldwater (1)**
32:21

**gone (5)**
63:24;64:19;136:6;
143:20;152:18

**Good (16)**
4:10,11;40:3,8;71:22;
120:15,17,22;135:22;
136:19;139:21;149:8;
151:19;199:15;211:23;
252:14

**goodness (6)**
105:5;183:9;221:2;
226:15;233:21;256:7

**Google (1)**
147:2

**go-slow (1)**
32:23

**gotten (2)**
136:8;143:25

**governed (2)**
199:3,3

**government (6)**
22:7,9;34:7;50:18;86:9;
169:5

**governmental (1)**

62:5

**governments (1)**
57:12

**governor (5)**
55:17,18,25;56:13;71:23

**gradual (3)**
33:2,2,13

**graduate (2)**
20:22;162:7

**graduated (1)**
162:12

**Grambling (1)**
146:22

**grant (1)**
64:21

**granted (1)**
201:6

**granular (1)**
255:10

**grasping (1)**
231:2

**great (10)**
6:5;13:14;53:9;59:12;
103:14,16;147:18;151:16;
168:12;185:19

**greater (6)**
68:20;155:13;161:23;
217:11;246:7;248:23

**greatly (1)**
168:21

**Green (2)**
112:14;217:11

**grew (2)**
52:4;53:3

**grips (1)**
43:3

**ground (3)**
5:16;163:25;230:21

**grounded (2)**
68:24;72:12

**group (13)**
30:14;40:24;60:21;62:1,
6;85:2;159:22,25;246:25;
247:22;248:9,15;255:12

**groupings (1)**
109:21

**groups (16)**
43:12,16;44:8,13;51:13;
68:5;84:7,23;85:12;170:12;
171:14;172:12;178:19,20;
255:8,8

**grow (2)**
52:7;169:11

**growing (1)**
52:13

**guess (23)**
6:20;13:19;14:18;61:20;
73:11;79:3,21;102:6;
125:10;129:17;132:24;
134:24;141:3;143:16;
152:17;154:2;159:17;
162:3;177:3;188:17;199:9;
220:2;221:6

**guesses (1)**
172:3

**guide (9)**
119:16,16,18;120:6,6,13;
127:21,22;207:15

**guilt (2)**
202:5;203:16

**guy (1)**
79:13

**guys (1)**
76:7

**GW (1)**
22:23

---

# H

**habit (6)**

47:8;139:8;169:25;
180:23;182:12;214:19

**habits (3)**
47:10;111:14;162:25

**habituated (1)**
48:13

**hairs (1)**
61:23

**half (7)**
108:4;121:24;122:4;
145:14;164:19;165:21;
225:18

**hand (10)**
13:1,2;25:3;27:5;122:17;
157:19,24;217:8;224:3;
240:13

**handed (1)**
18:13

**handicapped (1)**
95:14

**handicaps (1)**
213:7

**handing (4)**
64:6;76:23;211:2;214:4

**handle (3)**
101:8,13,21

**hands (1)**
55:4

**handy (2)**
42:22;185:1

**Hanna (1)**
78:4

**happen (6)**
9:13,14;103:23,24;111:6;
174:24

**happened (7)**
128:5;24;129:15;133:14;
149:20;204:11;250:20

**happening (4)**
12:21;43:2;158:6;247:14

**happens (2)**
49:5;70:22

**happy (2)**
12:7;76:10

**hard (4)**
32:20;66:8;167:2;222:22

**harm (3)**
142:7;143:8,12

**harmed (1)**
142:6

**Harris (2)**
110:22;112:23

**having (29)**
4:6;49:22;50:21;95:14,
15;97:14;98:12,13;106:16;
114:11;138:18;139:19;
149:13;152:20;160:15;
168:4;174:6,23;175:10;
180:3;211:16;222:21;
226:25;227:10;231:19;
238:25;242:24,25;244:10

**HBCU (3)**
156:6;196:19;197:19

**HBCUs (3)**
147:9,9;205:19

**head (11)**
6:14;10:10;21:13;40:5;
101:6;123:20,21;178:5,11;
193:14;209:18

**heading (1)**
231:3

**headings (1)**
102:2

**headquarters (2)**
118:3,7

**hear (3)**
86:21,23;163:22

**heard (5)**
17:6;85:21;97:21;98:5;
219:17

**hearing (6)**
56:21;57:2,4;60:9;69:14;
75:12

**hearings (1)**
9:8

**heart (1)**
242:7

**Heath (6)**
14:14,15,17;17:2,14;
19:12

**heavily (5)**
46:1;105:14;230:23;
232:16,17

**heavy (3)**
24:13;112:4;152:25

**Heights (3)**
228:4,8,16

**held (1)**
88:13

**help (7)**
10:12;12:1;82:21;97:21;
106:7,8;132:13

**helped (1)**
132:14

**helpful (2)**
115:23;163:6

**helping (1)**
218:18

**Hempstead (3)**
118:2,6,11

**hereby (1)**
258:2

**here's (6)**
33:19,21;102:14;107:19;
136:23;166:20

**hey (3)**
33:5;81:2;116:24

**high (40)**
20:4;49:14;97:13;134:4;
136:25;137:18,20,21,24;

138:6,12;139:3,13;140:1,
10;141:8,22;151:7,10,22;
169:19;178:3;187:20;
188:12;189:12;191:8;
220:14;225:17;247:1,2;
248:6,15,17,22;249:17,18;
250:3,12,12;256:4

**higher (7)**
107:23;108:1,11;155:5;
177:21;246:8;249:4

**highest (3)**
121:10;128:17;130:24

**highlight (2)**
40:12;65:1

**highlighted (10)**
41:19;65:6;67:8;68:6,9;
73:16;77:16;211:5;214:7;
215:1

**highlighter (1)**
38:10

**highlighting (2)**
38:12;79:19

**highlights (3)**
13:19,22;14:2

**highly (4)**
78:13;79:6;134:9;138:21

**hired (5)**
24:11;43:22;56:6;57:5;
251:19

**hiring (1)**
143:22

**Hispanic (8)**
28:22,23;30:10;31:13;
39:25;61:13,18,25

**historian (4)**
149:12;150:2,3;237:4

**historians (1)**
205:3

**historical (4)**
149:24;156:14;207:3,7

**historically (3)**
45:7;187:1;196:5

**history (24)**
20:3;30:12;32:7;33:1;
58:1;91:9;97:17;99:5;
102:14,20;113:22,23,25;
114:2;144:24;201:1,17;
205:1,15;207:16;209:8;
230:18,21;249:24

**hockey (1)**
51:15

**hold (2)**
22:3;231:6

**holders (3)**
49:23,25;50:12

**holding (3)**
65:12,18;96:7

**holds (1)**
50:19

**holiday (1)**
69:13

**home (2)**
204:14;219:3

**honestly (1)**
66:2

**hope (6)**
103:10,14,16,22;120:13;
179:12

**hopefully (1)**
230:3

**hoping (1)**
180:16

**horizon (1)**
179:11

**horizons (1)**
179:12

**hospitals (1)**
115:8

**hostile (2)**
99:16;221:7

**hosting (1)**
181:19

**hot (1)**
120:1

**hotel (1)**
14:1

**hotly (4)**
119:19;129:19,21;141:14

**hour (6)**
18:3;19:9,24;130:17;
149:5;227:10

**hours (55)**
7:22;13:25;18:6,9,11,11,
16,18,19,20;19:1;45:10;
92:22;94:19;95:4;98:6;
102:19;107:1;116:16;
117:1,5,19,20,21;118:4;
121:20;122:6;129:10;
141:19;148:16;150:13,14,
16,18,19,25;167:18,19,22;
169:9;201:6;215:25,25;
217:25;231:10;242:14;
243:9,12,15;246:1,18,21,
22;251:3,15

**house (3)**
143:24;204:12,17

**housing (1)**
59:6

**Houston (6)**
142:21;162:21;183:10;
186:22;205:21;227:10

**Howard (1)**
49:13

**however (3)**
62:4;70:5;223:10

**huge (5)**
72:23;73:6;75:18;110:20;
183:6

**human (5)**
53:8;119:23;154:2;

231:16;253:15

**hundred (5)**
18:8;171:4;204:12,14,18

# I

**ice (1)**
29:24

**ID (5)**
85:20;86:11;163:4,8,15

**idea (11)**
50:15;71:8;79:23;80:3;
93:9;108:16;110:11;
114:20;116:23;154:5;
227:24

**ideal (1)**
210:10

**ideas (2)**
65:11;221:3

**identification (13)**
13:4;25:6;29:2,13,14,17;
32:6;64:9;77:1;210:25;
213:25;224:1;240:11

**identified (7)**
37:2,23;40:1;46:19;
149:2;181:12;198:16

**identifiers (3)**
33:22;42:24;43:1

**identify (10)**
51:19,22;52:1;53:14,18;
91:15;173:15;180:7;
188:24;215:11

**identifying (1)**
253:12

**identities (1)**
85:13

**identity (5)**
29:13,23;52:11;85:2;
237:18

**idiosyncratic (1)**

136:2

**ie (1)**
224:12

**ignorance (1)**
24:18

**ignore (2)**
121:22;122:4

**ignored (2)**
73:1;243:13

**ignores (1)**
242:7

**illegal (1)**
28:14

**imagine (3)**
97:15;124:17;197:24

**imitation (1)**
53:3

**immediate (1)**
219:1

**immediately (2)**
66:19;69:10

**immigration (11)**
20:16;26:18;28:1,1,4,6,7,
11,13,15;29:11

**impact (37)**
40:17,24;41:15;43:11,15,
19,24;44:7,13,19,22;45:12;
52:23;62:14,23;84:6,22;
87:15,19,21;96:2;104:3;
143:3;158:1;168:22;207:4,
18;211:15,17;217:14,19;
223:8;226:9;228:22;230:9;
241:11;251:23

**impacted (6)**
42:11;99:19;142:14;
161:3;166:18;243:4

**impacting (1)**
174:18

**impacts (1)**
234:14

**impair (1)**
7:18

**impediment (1)**
99:25

**impediments (3)**
134:5,6,7

**impetus (1)**
102:17

**implement (1)**
103:4

**implication (3)**
108:23;203:21,24

**important (12)**
43:9;48:15;58:19;95:10,
19,20;111:9;127:9;134:1;
161:5;174:24;179:9

**impractical (1)**
168:25

**impression (1)**
186:23

**impressive (2)**
152:9,16

**impressively (1)**
141:8

**imputation (1)**
162:14

**impute (1)**
171:13

**imputing (1)**
162:11

**inaccuracies (2)**
237:17;239:24

**inappropriately (1)**
242:1

**inattentive (1)**
34:12

**inclination (2)**
132:3;201:22

**inclined (1)**
214:17

**include (6)**
17:20;42:2;115:6;170:8;
181:14;222:22

**included (9)**
38:19;39:18;41:8,24;
43:8;91:10;182:2;214:7;
235:9

**includes (3)**
53:11;92:9;242:14

**including (3)**
163:4;185:22;208:12

**incoherent (1)**
238:10

**income (9)**
43:5;48:23,24;49:8;
183:3,4;254:4,5,18

**incomes (1)**
49:5

**inconsistent (1)**
37:16

**inconvenience (6)**
106:10;134:3,7;135:5,7;
141:12

**inconvenienced (2)**
97:16;98:11

**inconveniences (2)**
174:23;218:23

**inconvenient (2)**
105:5;173:15

**incorporated (1)**
200:9

**incorrectly (3)**
71:10,13;241:23

**increase (6)**
103:11;117:1;128:24;
158:13;168:9;191:15

**increased (5)**
102:19;161:2;189:9,12;
190:22

**increases (1)**

245:19

**increasingly (1)**
213:8

**incredible (2)**
128:24;152:11

**incredibly (2)**
163:6;194:4

**incumbent (1)**
152:15

**indeed (2)**
199:2;201:6

**independent (5)**
153:17,21;248:13;
249:11;250:7

**indicate (4)**
75:2;146:1;156:3;166:7

**indicated (7)**
37:3;80:18;195:13;
207:21;217:25;232:10,18

**indicates (1)**
146:15

**indication (2)**
127:7;184:2

**indicator (1)**
127:7

**indicators (7)**
42:9;44:21;59:3,13;
127:19;182:21;233:17

**indict (2)**
202:24;203:23

**indicting (1)**
247:6

**indictment (1)**
203:17

**indirect (1)**
195:19

**individual (11)**
54:21;106:13;160:23;
177:9,18;204:8,8;254:17,
20;255:3,14

**individually (1)**
174:14

**individuals (2)**
176:10;253:22

**ineffective (1)**
247:6

**ineffectiveness (1)**
105:9

**inequality (1)**
99:9

**inequity (1)**
95:3

**inexperience (1)**
48:14

**inferences (1)**
196:2

**influence (4)**
31:13;116:16;148:17;
150:15

**influenced (1)**
32:17

**influencing (1)**
31:5

**influential (1)**
32:14

**information (36)**
20:20;68:20;70:18;71:3,
20;77:16;90:24,25;91:3,4,5;
105:9;112:3;115:22;120:9;
129:4,14;132:15;145:13;
146:13,22;174:21;184:25;
185:1;191:19;193:13;
195:15;227:4,22;235:8,18;
252:9;254:12,18,21;255:5

**informative (2)**
68:25;227:14

**informed (4)**
12:22;70:15,20;236:2

**infusion (1)**
169:4

**initial (8)**
29:5;93:23;94:2;209:23;
224:3;227:20;239:20;
242:25

**initially (1)**
24:21

**initiatives (1)**
82:25

**injunction (5)**
56:22;60:9;64:4,12,21

**inner (1)**
49:6

**inordinately (1)**
213:5

**input (2)**
210:12,14

**inquire (1)**
93:14

**inquiries (1)**
85:5

**inquiry (1)**
96:17

**inside (2)**
28:10;176:10

**insignificant (2)**
167:25;193:2

**instance (21)**
21:20;35:19;39:7;49:13;
50:10;72:16;85:1;134:13;
142:19;146:21;148:15;
152:5;160:20;162:25;
164:16;201:7;202:9;
207:13;217:11;221:17;
255:1

**instances (4)**
31:17;82:23;200:24;
201:5

**instead (1)**
160:15

**institution (4)**

**22:15;24:10;45:7;187:2**

**institutions (9)**
22:25;27:18;180:7,9;
181:12;182:25;184:22,24;
185:3

**instructed (1)**
7:7

**instrument (1)**
95:12

**intend (1)**
228:11

**intending (1)**
235:14

**intent (2)**
247:10,11

**interacted (1)**
17:13

**interest (16)**
33:10,23;34:11;106:11,
17;127:21,22;134:20;
139:7;151:14;152:1;188:5,
13;212:19;217:9;219:15

**interested (11)**
34:7;70:11,15,20;99:14,
15;118:17;151:17;223:20;
247:21;250:17

**interesting (6)**
35:6;42:18;57:11;109:15;
117:25;128:3

**interestingly (1)**
141:10

**intermittent (1)**
34:16

**interpreting (1)**
39:23

**interrupt (2)**
76:5;132:10

**intervals (1)**
145:24

**into (28)**

5:20;9:14;12:9;21:14;
32:14;50:4;65:2;67:9;74:9;
77:17;89:7;91:17;100:2;
101:6;111:25;113:23;
130:2;142:21;161:24;
165:11;166:13;172:8;
176:1;182:2;207:17;
227:10;253:11;256:21

**introduced (1)**
36:8

**inverse (1)**
251:11

**inversely (1)**
256:14

**involved (12)**
10:7;57:13;61:8;66:8;
81:14;82:1;85:5;88:9;
89:12;93:16;112:1;141:15

**involving (2)**
61:3;87:13

**Iowa (1)**
20:6

**irregular (3)**
33:25;34:8;114:22

**irrelevant (1)**
242:3

**issue (30)**
50:15;54:16;73:1;74:19;
94:11;102:14;108:24;
109:9;117:11;133:25;
134:2;135:8;136:23;175:7;
183:12;204:5,6;215:18,23;
225:13;226:14,15;234:10,
12,20,23;235:3;236:3;
240:22;241:11

**issued (1)**
64:1

**issues (22)**
28:13,16;36:14;39:16;
46:18;48:16;74:1,15;94:10;

105:8;134:18;141:11;
149:10;173:17;174:13,15,
16,17;176:4;205:23;234:14,
16

**item (6)**
37:4,4,8,9;40:11;41:21

**items (1)**
38:7

**itself (5)**
46:2;107:3;109:10;
182:18;189:18

## J

**jagged (1)**
107:2

**JAMES (6)**
4:5,18;13:1;40:14;77:24;
258:11

**Jayla (3)**
89:16;163:12,13

**J-A-Y-L-A (1)**
89:17

**Jim (1)**
15:4

**job (3)**
31:2;69:25;101:2

**jog (1)**
10:12

**John (1)**
175:8

**Johnson (2)**
32:20;89:18

**joining (2)**
31:13,14

**Joseph (14)**
50:24,25;93:6;94:2;
100:6;114:5,6;127:24;
128:12;149:6,25;201:25;
203:21;238:8

**Joseph's (5)**
200:5,9;237:2,25;238:22

**Joshua (1)**
89:19

**journal (10)**
23:6,8,25;26:15,18;27:4;
172:8;211:13;212:6;216:12

**journals (5)**
23:22;27:19,22;39:17;
245:16

**judge (23)**
5:25;9:13;57:2,4;66:6;
68:2;70:5;77:21;78:16;
79:5,18,22;80:11,14,17,19,
20;83:3;89:24,25;91:22;
138:23;161:12

**judged (1)**
139:1

**judges (11)**
79:16;80:6;82:4,8,12,15,
20;83:23;84:12;173:16;
174:16

**judgment (1)**
27:8

**July (9)**
8:20;9:20;17:8,8,16;45:2;
51:9;92:17;93:21

**jumping (1)**
212:15

**June (1)**
9:21

**jurisdiction (6)**
35:2,4;163:20,21;207:16;
223:3

**jurisdictions (2)**
49:17;216:8

**jurist (1)**
81:2

**jurists (1)**
66:8

**just (101)**
5:7;8:4;9:1;14:16;15:21,
24;21:18;22:20;23:12;27:4,
14;28:14;30:14,20;33:7;
37:2;38:11;40:20;41:12;
51:11;53:24;69:13;71:24;
74:7,9;77:5;84:1;88:3,4;
95:14;97:5;98:16;99:14;
100:24;102:24;104:2,20;
107:10;112:3;114:22;
117:23;121:11,11,25;125:6;
130:4;136:1;140:15;144:4,
6,12,13;145:19;146:3;
148:13,21;149:2,8,14,19;
151:14;157:14;158:11,17;
160:15,20;164:18;168:4;
169:1,18;172:6;181:13;
184:10;188:7;191:3;
193:13;194:11;195:5;
203:1,13;204:19;206:23;
207:8,13,21;216:25;217:21;
223:19;228:21;229:4;
230:12;231:2,16;233:21;
237:22;240:3;242:22;
247:12,21;248:14;249:17

**Justice (1)**
205:3

**justification (1)**
97:14

**justify (1)**
97:2

**justifying (1)**
66:9

## K

**Katy (1)**
221:17

**keep (1)**
188:16

**kind (58)**

12:11;21:24;23:7,12;
28:12,17;29:6;32:23;34:1;
40:4,21;50:20;52:13;57:19;
58:24;93:17;95:3;97:18;
101:19;103:2,7;113:5;
117:24,24;129:20;132:7,14,
14;134:17;135:6;137:4,7,8;
146:10;147:6,6,22;154:2;
158:11;165:6;169:4;171:2;
175:8;177:3;182:14;
183:12;195:19,19;203:9;
207:11;217:4;219:24;
221:2;222:8,8;223:7,12;
227:6

**kinds (3)**

115:7;142:1;251:15

**knew (1)**

74:2

**know (672)**

6:21;7:1;8:4;16:7,14,18;
18:4,20,21,25;19:1,2;21:11,
12;27:12;28:19;29:6,10,11,
18,20;30:8,10,13,14,24,25;
31:25;32:1,24;33:3,9,20;
34:4,14,17,18,19,20,21;
35:8,10,16,18,25;38:18,20;
39:5,12;40:18,19,19;41:9,
11,12,20,24,25;42:3,6;
43:10,14,18;45:15;46:10;
47:17,18,25;48:1,2,8,16,22;
49:1,5;50:6,7,10,18;51:16;
52:10;58:2,7,8,9;59:1,10;
61:12,14,15,16,18;64:18,
21;66:1,4,21;67:16;68:1;
69:6,8,16,17,22;70:1,9,10,
13,16,20,22,24;71:7;72:2,8,
15;73:6,20,21;75:8,11,15,
15;76:7,19,19;77:8;78:23,
23,25;79:1,1,2,2,9,11,12,22;
81:2;82:12,19;83:9,12;
84:16,17;85:18;86:6,14,17,
19,20;87:6,11,12,24;91:12,
12,14,17;93:8,14,15,17;
94:23;95:11,19,21,23,23,
24;96:7,7,8,12,14,15,15,16,
17;97:1,6,7,10,12;98:1,2,9,
11,12,13;99:2,4,10,16;
101:7,8,11,13,14,17,20,24;
102:4,24;103:15;104:1,22,
24,24;105:6,8,10,10,11,22;
106:11,14,17,25;108:7,17;
109:15;110:13,14,21;111:4;
112:2,16,19;113:2,5,10,20,
20;114:1,2,15,17;115:6,12,
16,20,23;116:5,22,23,24,25,
25;117:3,6,10,10,12,18;
118:1,2,5,17,20;119:5,7,8,9,
12,19,21;120:6,9,13;121:4,
9,17,24;122:1,2,3,3,12;
123:8,15,17,19,21;124:2,4,
8,9,18;125:3,4,8;127:1,2,5,
6,8,9,16,18,19;128:1;129:3,
6,7,8,11,11;130:1,3,11,12,
13,15;131:2,3,13;132:2,5,7,
7;134:5,22,23,24;135:5,6,7,
23,23,23;136:1,5,21,22,23;
137:4,5,14,22;139:5,12,16,
18,18,19,21,24,24;141:11,
11,11,18,20,20,23,24;142:9,
11,12,17,19,19;143:6,11,25;
144:19;146:18,23,24,25;
147:5,6,18,22;149:12,21,23,
24;150:12;151:9,12,13,14,
16;152:3,4,17,23;153:3,23;
154:15,16,20;156:4,6,18,19,
20;157:13;158:14,15;
159:10,15,23;160:9,14;
161:12,19,23;162:24,25;
163:2,23;165:3,21;166:12,
17,20,21,21,22;167:6,7,8,
18,25;168:1,11,12,13,14,21;
169:2,2,3,4,12,14,21,21;
170:19;171:5,9,17,18,20;
173:2,3,5;175:4,20,24;
176:9,12,12,17;177:8,10,18,
19,20;178:5,6,8,10,23,25;
180:18,22;181:15,22;
182:13,24;183:3,3,6,7,25;
184:19;185:3,8,15;186:4,4,
6;188:4,6,10,13;189:12,14,
14,20,20,21;190:24;191:1,
13;193:11,12;194:5,6,25;
195:18,23;197:5,21,22,23,
25;198:1;199:1,1,4,11,12,
12,13,16,19,20,25;200:20,
21;201:3,5,8,8,9,11,12,12,
16,16;202:4,5,5,6,9,10,10,
11;203:8,9,10,10,12,13;
204:5,6,7,9,20,22;205:18,
20,22,23,24;206:1,4;207:8,
9,15,25;208:8,9,24;209:2;
210:5,5,7,8,14;213:11,13;
214:18,21;215:18,22,24;
216:1,5,5,7,13,25;217:2,2,
17,19,25;218:24;219:1,7,
15,20;220:18,18,19,23;
221:1,9,20,21,24;222:2,4,9,
15,18,23;223:1,7,14,15,21;
225:15,16;226:16,18,18,25;
227:7,24;228:2;229:13;
230:24,25;235:6,22,25;
237:9;239:12;241:18;
242:19,20,22;243:11;244:4,
7,8,13,14,14;245:2,3;
246:13,18,19;247:13,16,18;
248:3;249:11,12,18;250:7;
251:13;253:17,18;254:5,6,
17;255:2,12,12,14;256:3,
10,21

**knowing (3)**

129:13;203:17;227:11

**knowledge (8)**

21:7;30:22;37:9;48:14,
19;64:1;184:3;201:21

**known (7)**

47:13;75:16;114:7;
153:19;173:6;209:1;221:14

# L

**labeled (1)**

107:15

**labor (2)**

93:18;101:15

**lack (6)**

48:13,24;106:11;117:14;
213:4;246:10

**lacking (1)**

49:8

**landmarks (2)**

208:4,5

**language (4)**

29:8;65:22,24;211:6

**laptops (1)**

15:25

**large (21)**

28:23;33:24;34:2;57:16;
58:1,3,9,13;70:10,14,18,23;
71:9;110:15;127:1;145:4;
183:10;192:23;198:25;
216:7;256:11

**largely (11)**

20:25;135:2;136:6;147:1;
171:4,8;180:21;183:4;
195:6;252:5,14

**larger (7)**

109:21;112:11,15;199:2,
2,3;256:18

**last (24)**

7:22;9:24;18:10;20:25;
30:11;73:15;74:9,10;75:1;
77:6,12;129:18,21;130:17;
148:16;163:11,16;177:21,
23;179:14;204:24;207:15;
213:2;215:12

**late (1)**
91:17

**later (3)**
12:4;236:1;241:11

**Latino (9)**
31:20;58:1,4,9,14;61:13;
62:1;171:5;224:9

**Latinos (2)**
30:4;32:2

**law (26)**
21:7,9,10,11,15,19;41:16;
42:11;43:25;82:22;83:1;
84:7,22;86:3,11;87:14,19;
96:4;103:13;110:15,17;
116:3;118:8;125:9;199:4,6

**laws (3)**
81:14,25;84:13

**lawsuit (9)**
5:20;12:10;17:5,10;
43:22;44:18,25;45:4,11

**lawyer (2)**
124:6,21

**lawyers (1)**
87:2

**lay (1)**
88:4

**lays (1)**
45:14

**leader (1)**
200:5

**leading (1)**
199:22

**League (5)**
10:24;11:6;55:24;60:1,14

**Leah (1)**
4:12

**leaning (1)**
152:25

**learn (9)**
12:18,19,20,21;17:4;
21:20;134:11,19;164:5

**learning (1)**
52:22

**least (24)**
6:13;42:7;43:5;54:23;
65:20;103:7;141:1;150:6;
154:16,19;167:7;168:14;
175:13;187:25;193:16;
200:15;205:19;209:24;
211:7,19;212:8,16,18;
239:19

**leave (1)**
143:24

**leaves (1)**
162:20

**led (1)**
233:4

**leeway (2)**
161:19;199:8

**left (1)**
244:18

**legacy (1)**
149:24

**Legal (8)**
4:13;10:23;28:13;101:21;
148:23;222:16;227:25;
242:3

**legally (1)**
240:24

**legislation (1)**
219:21

**legislative (1)**
96:25

**legislature (7)**

9:3;56:1,8,9,11,14;86:8

**lens (1)**
252:24

**less (22)**
9:15;14:12;27:7;33:23;
34:6;70:11,11,14,15,15;
103:9;148:9;149:6;154:17;
157:4;168:8;194:16;
221:13;229:25,25;231:1;
249:7

**level (20)**
11:7;19:23;51:15;59:9;
82:11;103:20;107:3,6;
117:2,2;139:24;140:1;
246:23;251:3;254:18,20;
255:4,7,9,14

**levels (11)**
11:9;48:19;50:9;106:25;
107:23;108:10,11;136:5,6;
213:16;251:14

**liberty (1)**
64:25;87:12

**libraries (1)**
104:14

**life (4)**
52:24;98:10;103:21;
172:25

**lift (1)**
112:4

**light (4)**
203:13;221:9;225:8;
226:10

**likely (8)**
14:2;42:3;53:5,6;68:19,
21;154:24;214:9

**limitation (3)**
222:21;242:15;255:15

**limitations (5)**
134:12;162:2,4;172:7;
213:14

**limited (12)**
98:6;120:9,9;129:14;
135:3;158:18;159:8;207:1;
217:18;223:12,15;242:12

**limiting (2)**
37:22;207:16

**limits (4)**
147:11;158:14;222:8,9

**line (5)**
49:21;76:11;116:11;
117:22;119:14

**linear (2)**
148:20,22

**line-by-line (1)**
171:18

**lines (7)**
97:22;98:3;119:11;158:5;
168:16;171:21,22

**link (1)**
250:22

**list (6)**
37:4;116:13;146:15,16;
147:10;180:9

**listen (1)**
50:20

**literature (17)**
46:24;47:2;50:8;52:21;
53:2;98:21;102:15,21;
118:15;144:24,25;145:5;
160:5;217:16;221:23;
245:17;248:10

**litigation (3)**
8:22;89:16,23

**little (24)**
7:24;12:9;29:15;30:17;
40:20;51:16;53:22;56:15;
101:12;112:3;114:5;119:6,
22;130:17;144:9;149:18;
154:15;161:16,18,21,25;
177:12;186:8;225:15

**live (22)**
66:20;104:24;107:22,24;
108:9,11;115:15;142:22;
145:13,16;155:5;170:25;
173:11,12;184:16;186:6;
203:23;204:11;213:6,14;
220:6;254:15

**lived (3)**
100:17;108:19;204:4

**lives (2)**
108:1;213:14

**living (12)**
108:21;118:18;154:9,17,
18,23;178:23;210:7;
218:25;225:17,22;226:1

**lo (1)**
119:25

**load (1)**
24:13

**local (8)**
35:16,20;41:22;42:19;
49:16;57:11,12;223:3

**localities (9)**
66:5;74:4;80:24;82:5,13;
83:5,10,18;99:3

**locality (2)**
66:10;83:13

**located (11)**
115:14;121:8;132:25,25;
146:17;164:12,15,19;173:5;
184:24;190:8

**location (36)**
37:9;59:13,13;95:25;
99:12;113:9;114:12,14,16,
18,21;115:3,11;118:9;
120:17;148:10;162:18,23;
163:1;165:20;166:7;
169:10;173:22,24;208:9,21;
209:10;210:16;219:11;
220:4;223:6,7,8;242:13,14;

256:10

**locations (46)**
36:18;47:6;48:3,4;49:6,7;
92:21;94:18,25;95:1,4;
107:1;110:20;111:3;
112:18;115:15;117:22;
119:3;121:20,22;122:7;
126:17;135:6;136:12;
137:10,14;147:8;150:14;
155:14;158:7;164:13;
180:24;182:18;186:14;
188:8;199:13,21;203:5;
206:13,17;208:3;211:16;
212:8;213:9;216:18;243:14

**long (20)**
19:14;22:12;36:1;66:3;
74:3;77:3,14;90:16;97:22;
102:16;103:21;142:20,23;
193:10;213:5;214:19;
219:2,3;228:1;239:12

**Longfellow (1)**
208:7

**longstanding (3)**
30:23;102:16;201:14

**look (77)**
13:6;25:11;27:13;30:9,
13;40:7,7;42:10;44:7,12,21;
48:21;53:13;58:16,20,21;
59:4;69:21;72:14;74:2;
84:2,6;94:5;96:25;106:23;
109:12;112:10;119:3,15;
120:11;122:14;127:16;
129:17;130:1,10,14;131:1,
2,3,14;133:5,14;137:21;
138:8;139:23,24;146:24;
147:2,9,24;151:13;160:18,
20,21;170:18;171:1;
177:18;178:2,12;179:20;
181:6,11;184:21;185:20;
186:13;187:10;188:24;

200:1;204:24;214:5,23;
215:18;216:20;217:8;
240:18;253:19,24

**looked (30)**
31:4,12;44:24;45:1;
46:18;50:8,22;58:18;132:5;
133:10;153:24;157:18;
164:16;165:1;176:1,7;
178:18,19;180:9,11,12;
184:23;185:25;196:5;
197:15;205:12,14;212:7;
223:22;233:21

**looking (38)**
11:25;27:12;31:23;35:4;
36:6,9,24;40:23;55:13;
58:6;59:10;93:23;126:24;
129:8;137:8,10;140:12,12,
14,15;144:23,24;146:2,6;
159:15,20;162:24;190:2,4;
195:20;199:16;206:12;
218:3;252:4,4;253:19,21;
254:5

**looks (4)**
25:9;30:21;178:22;244:6

**loop (2)**
51:11;144:4

**lopped (1)**
244:12

**lopsidedly (1)**
189:17

**Los (1)**
59:11

**lot (48)**
13:10;16:5;28:20;31:17;
34:11,23;39:4,13,17,18;
40:4;42:25;47:5;48:23;
52:12;78:7;107:3,13;
108:17;119:4;120:2;
122:11;129:5;137:9,10;
139:9,15;141:24;151:25;

158:3;164:3,11;170:8,9;
173:13;180:25;191:19;
195:15;201:9;218:16;
230:20;231:19;237:12;
244:22;245:14;247:4;
255:4,5

**lots (4)**
58:25;120:25;121:19;
163:12

**loud (1)**
79:8

**Louisiana (1)**
146:22

**love (2)**
35:22;64:22

**low (23)**
46:24,25;47:13;48:24;
49:8;68:15,20;71:3,19;
78:14;99:11;136:5,5;137:1;
151:14;169:24;203:10;
247:23,24;248:9,11;249:18;
250:3

**lower (13)**
33:13;42:11;43:5;48:23;
49:5;99:8;108:10;139:7,7;
183:4;249:1,4,8

**ludicrously (1)**
168:24

**lunch (3)**
76:7,9;88:14

**luxury (2)**
129:12,13

**Lyndon (1)**
32:20

# M

**machines (4)**
98:1;116:10;173:16;
174:16

**made (34)**
45:15;46:6,9;50:14;
71:16;82:10;93:15;96:18;
97:12;108:3;129:2;130:15;
147:18;149:25;163:21;
164:6;175:6,21;187:17,22;
191:15;200:24;201:6;
215:13;216:22;218:10;
220:19;221:11;225:8;
231:14;239:2,15,24;258:7

**magazine (2)**
23:25;24:5

**magnitude (1)**
65:21

**mail (2)**
106:7;210:1

**mailer (1)**
30:3

**main (10)**
38:18;39:6,14;41:8,11;
42:1;135:3;206:7,9;215:18

**Maine (15)**
57:2,9;66:19;68:14;
72:15,17,23;73:18;74:12;
75:3,6,9;81:1;84:3;161:15

**mainly (4)**
21:15;32:12;78:24;
216:19

**maintaining (2)**
236:10,16

**maintenance (1)**
236:23

**major (7)**
27:17;39:15;41:23;51:17;
153:14;169:4;171:20

**majority (9)**
48:1;50:5;56:12;80:13,
14;155:11;171:8;196:19;
197:19

**make (47)**

5:16;6:8,22;8:5;27:1,5;
31:20;35:17;42:19;49:23;
51:16;58:4;72:2,8,9;83:10,
18;92:14;100:25;105:15;
106:4;110:9;117:7,14;
119:24;120:8;142:4,17;
143:2,18;144:3;155:15;
168:14;172:2;183:6;
189:23;196:2;207:12;
211:23;212:11,12;218:8,21;
226:25;236:5;238:21;
258:17

**maker (1)**
245:6

**makes (16)**
44:14;68:21;107:20,20;
115:12;127:4;189:5;194:1,
3,7,11;196:20,22,23,24;
211:18

**making (15)**
68:13;103:8;107:9;110:6;
120:15;122:2;125:21;
126:2;129:4;133:19;158:8,
17;185:25;210:13;211:22

**manage (2)**
101:12,21

**manageable (1)**
147:11

**managed (2)**
141:10;168:18

**mandate (1)**
101:22

**manipulating (1)**
141:18

**manner (5)**
57:19;65:11,18;67:20;
253:14

**many (33)**
8:11;13:7;23:20;29:13;
36:1;41:13,13;58:9;72:21;

98:10;115:19;118:9;
122:15;129:18,19,21,23;
150:25;158:7;159:24;
160:1,7;163:13;175:2,12;
187:19;191:2;209:3,3;
214:20;219:1;248:20;
250:17

**map (1)**
245:6

**mapping (1)**
245:1

**maps (1)**
147:2

**Marco (1)**
32:1

**margin (2)**
71:16;75:15

**marginal (3)**
139:1;168:14;212:19

**mark (5)**
25:1;38:11;76:16;213:23;
241:7

**marked (9)**
13:3;25:5;64:8;76:25;
210:19,24;213:24;223:25;
240:10

**marking (4)**
12:24;36:25;38:11;64:2

**markings (1)**
38:6

**Marshall (5)**
113:6;146:21;156:4;
186:20;205:20

**Maryland (11)**
4:20;22:1,19,24;24:10;
27:17;42:23;49:11;51:18;
212:9;216:19

**massive (1)**
33:6

**master's (1)**

20:9

**match (3)**
163:7,10;194:20

**material (1)**
17:21

**materials (1)**
19:10

**matter (13)**
39:10;49:17;123:10;
127:2,4,8;128:23;157:10;
161:21;216:23,24;242:20;
250:21

**matters (4)**
49:17;102:25;106:3;
135:11

**may (34)**
6:10;7:6;39:3;42:14;
45:21;53:18,18;68:25;
76:11;83:9,10;94:1;97:22;
104:11;154:25;159:25;
161:6;163:14,14;168:8;
171:5;172:19;173:11,12;
176:20;180:13;189:16;
205:22;208:6,22;210:15;
211:23;213:9;226:9

**maybe (43)**
10:12;11:21;18:6,18;
21:21;27:11;38:9;41:20;
61:23;63:17;66:19;79:11;
87:25;98:11;101:14,17;
103:9,25;105:8,9;119:21;
122:25;125:10;129:7;
136:22;139:24;144:12;
148:23;154:16;160:7;
164:4;165:21,24;166:9;
189:20;195:19;199:20;
211:19;221:1;226:15,18;
232:22;255:2

**mayors (1)**
50:10

**McGlone (1)**
78:5

**mean (51)**
20:24;23:4;24:19;29:14;
45:14,18;47:20,22;53:2;
59:2;61:13;65:24,24;66:15;
69:21;71:4;83:8;84:18;
87:2;100:9;101:6;103:24;
106:23;118:5;134:4;
136:24;137:11;139:4;
141:9;144:19;150:4;
157:10;168:18;169:1;
171:20;177:1;178:6;
181:15;200:17;206:8;
207:7,8,23,24;208:10;
209:1;222:4;232:6;248:1;
252:12;256:18

**Meaning (4)**
23:5;65:9;67:22;90:10

**means (13)**
5:23;28:2;67:20;68:1,2;
72:13;87:3,24;88:1;159:2;
171:16;173:9;252:14

**meant (2)**
95:8;220:2

**meantime (2)**
73:24;74:14

**measurable (1)**
241:10

**measure (11)**
78:25;95:20,22,24;
118:22,23;120:17,23;
140:13;160:25;253:25

**measured (2)**
132:1;158:20

**measures (5)**
97:1,2;134:25;229:14;
241:17

**measuring (2)**
253:25;254:4

**meat (1)**
5:3

**mechanism (1)**
109:11

**meddle (1)**
83:17

**meddlesome (1)**
212:21

**median (1)**
254:5

**medical (1)**
148:15

**medications (1)**
7:17

**medium (1)**
180:3

**meet (3)**
39:1;115:24;119:8

**meeting (4)**
157:17;173:4;209:15,25

**meetings (9)**
126:20;127:4,10,14,17;
128:6,7;220:17;221:22

**member (7)**
20:23;23:8,11;50:2;
51:12;55:3,3

**members (7)**
85:2;91:25;129:7;153:13;
173:21;221:12,15

**memorial (12)**
132:23;133:6;136:10,14;
169:8;172:18,24;173:18;
174:15;176:15;208:13,23

**memorized (1)**
124:5

**memory (3)**
10:12;100:14;209:17

**Menlo (1)**
31:23

**mention (7)**

48:5;117:23;118:22;
128:11;165:24,25;178:4

**mentioned (26)**
9:5;10:19,19,20;14:21;
19:3;24:23;27:25;32:5;
33:14;50:21;54:1,3,4,22;
59:14;77:5;100:20;119:10;
163:24;175:8;178:9;
186:17;191:17;205:22;
218:24

**mentioning (1)**
188:16

**merit (1)**
219:6

**mess (1)**
74:24

**met (5)**
89:15,22;167:15;169:18;
251:12

**method (3)**
160:24;171:12,23

**methodology (7)**
74:22;75:4,25;100:22;
178:1;180:6;245:8

**methods (1)**
214:9

**metrics (1)**
121:11

**Mexico (1)**
216:21

**middle (5)**
17:7;49:1;132:15;183:3,4

**mid-nineties (1)**
249:25

**midst (4)**
109:25;111:7,8,12

**midterm (4)**
137:3,15;142:1;203:11

**midterms (1)**
141:9

**midwest (2)**
23:16,16

**might (53)**
5:3;7:17;13:19;14:3;
18:13;19:23;21:21;32:17;
38:18;47:6,6;49:25;50:16;
52:17;58:7;66:21;84:22;
93:16;97:9,17;98:13,23;
99:15;101:23,24;102:24;
109:4;111:3;117:14;
119:14;122:20;134:23;
141:12;157:18;162:10,13;
163:12;176:4;178:24;
184:19;186:8;189:20;
197:24;212:20;214:16,20;
219:21;220:25;223:9;
232:25;235:23;236:1;254:6

**mile (11)**
108:4,4,5;145:14,14,14;
165:3;225:15,18;226:13,16

**miles (2)**
108:2;227:8

**mind (16)**
6:4;10:2;26:19;29:3;
36:24;38:5,10,14;61:14;
65:3;68:8;94:3;107:9;
210:11;217:23;252:22

**mindful (1)**
164:22

**mine (1)**
226:10

**minimizing (1)**
115:13

**minimum (4)**
154:19;167:11;168:2;
200:13

**Minnesota (1)**
168:20

**minorities (1)**
60:22

**minority (2)**
50:5;60:21

**minute (1)**
238:13

**minutes (15)**
19:15;50:15;76:9,12;
90:18;119:10;127:16;
128:21;157:17,18;174:4;
195:5;209:15;232:10;
238:17

**misconception (1)**
242:1

**misleading (2)**
33:4,7

**misses (1)**
241:7

**Mississippi (1)**
49:7

**mistaken (1)**
240:21

**MIT (1)**
106:1

**mix (2)**
185:8;256:22

**mobile (2)**
219:14,18

**mobility (4)**
139:14;224:6,20;227:4

**mobilization (2)**
34:23;250:17

**mobilize (2)**
34:20,20

**mobilized (1)**
247:21

**mobilizing (2)**
141:15;152:12

**model (7)**
39:11;144:17,20;146:8;
148:11;162:12;222:3

**modeling (2)**

53:2,3

**models (1)**
148:11

**moderate (1)**
43:5

**modest (3)**
217:5;223:8;247:16

**Moines (1)**
20:6

**moment (2)**
12:4;51:12

**moments (1)**
13:6

**Monday (1)**
176:22

**money (3)**
51:16;110:25;112:14

**Montgomery (2)**
49:12;201:18

**month (2)**
60:14;163:11

**months (1)**
73:10

**moral (2)**
204:8,8

**more (104)**
9:15;12:10;14:12;19:1;
23:4;29:23;30:17;32:2,6,
23;34:12;36:20;40:20;41:4;
42:25;43:3,3;44:20;51:5;
52:11;53:5;56:15;63:11,17;
66:22;68:21;72:14;73:4;
76:1,8;87:25;89:7;95:16,
17;101:4,14;112:11,13;
118:24;120:2;126:8,14,20;
127:14;139:24;142:17,24;
143:2;148:9;149:3,5,5,18;
154:24;155:10;157:4;
158:5,17;160:3;161:18,21,
22;165:19;168:3,3,8;169:9;

177:15;192:24;194:12;
195:2;196:8,21,24;198:17;
199:6;201:6,16,17,20,
20;211:19;212:18;214:8,9,
17,20;215:23;216:3,6,14;
222:8,9;225:15;226:16,17;
227:10;230:3;241:3;
247:13;252:9;255:10;
256:22

**morning (2)**
4:10,11

**most (21)**
7:5;8:19;10:14;15:22;
37:11;38:17;39:24;40:9;
41:17;42:13;49:3;74:25;
93:13;94:8;129:24;139:23;
147:20;153:16;173:23;
179:9;185:10

**mostly (2)**
20:23;244:6

**motion (1)**
64:3

**motivate (2)**
117:16;134:23

**motivated (12)**
70:11,15,19;105:23;
134:9,21;138:21;141:6,7,
25;188:18;189:1

**motivating (2)**
106:12;158:16

**motivation (27)**
102:11,17;104:20;
105:15,15,24;106:2,15,16,
20;118:12;134:10;135:4,9;
139:2,17;141:23;144:22;
145:2,5;151:8;212:19;
217:10,20;220:11,12,12

**motivational (5)**
105:8,11;106:13;117:10;
217:1

**motivations (1)**
32:16

**motor (4)**
103:13,15,17;247:12

**mount (1)**
174:25

**mounting (1)**
223:10

**mouth (1)**
75:13

**move (15)**
35:13,15;76:3;86:22;
89:8;117:1;154:5;163:5,7;
164:4;167:21;199:17;
203:12;223:6;227:21

**moved (6)**
64:21;99:3;199:1;201:10;
204:15,15

**movement (2)**
113:15;147:12

**moving (13)**
11:9;32:14;53:23;139:20;
163:25;179:2,15;198:13;
201:17,20;219:24,25;
254:19

**much (39)**
6:6;18:4;20:22;30:16,17;
32:6;33:12,13;34:15;59:8;
66:3;95:24;97:8;98:16;
101:10;102:25;109:9;
117:8;118:15;128:23;
138:25;139:16;141:18;
146:10;157:11;161:23;
164:10;166:15;168:3,3,
172:13;173:2;191:4;199:8;
217:1,10;218:5,16;255:3

**Muhammad (2)**
89:19,19

**M-U-H-A-M-M-A-D (1)**
89:20

**multigenerational (1)**
58:9

**multiple (7)**
84:25;85:7;148:21;
160:14,16;201:15;216:7

**multiplication (1)**
168:13

**multiply (1)**
168:21

**municipal (1)**
59:9

**must (5)**
97:24;142:18;143:1;
241:19,19

**muster (1)**
87:21

**myriad (1)**
100:1

**myself (5)**
6:10;31:9;40:11,14;
147:25

## N

**NAACP (1)**
4:13

**name (5)**
4:16;114:17;163:11,11,
16

**named (3)**
114:21;175:5,14

**names (5)**
86:4;175:7,9,15,17

**narrative (1)**
40:1

**narrowly (3)**
212:5;215:23;216:14

**nation (1)**
35:11

**nationwide (2)**

144:2;189:19

**naturally (1)**
250:1

**nature (3)**
56:16;90:7;181:3

**naught (1)**
105:2

**near (3)**
142:22;166:5,6

**nearest (3)**
165:2;166:6;186:24

**Nebraska (1)**
52:5

**necessarily (10)**
39:5;127:6;135:12;
157:22;220:5;248:1,11,16;
249:10,18

**necessary (12)**
166:24;167:11,14;168:1,
2;215:13;218:10;251:7,8,8,
9;258:7

**need (25)**
6:15;8:1;9:20;24:12;
39:10;42:4,7;61:11;76:9;
84:2,2,6;87:17;116:12,12,
14;119:8;129:17;130:14;
131:14;145:12;150:5;
179:3;208:6;231:24

**needed (2)**
90:11;258:17

**needs (8)**
105:24;125:12;157:8;
166:21,22,22;167:12;
182:19

**negative (1)**
220:23

**negatively (1)**
142:13

**neglected (1)**
243:13

**negotiation (1)**
222:14

**neither (2)**
10:23;11:10

**net (1)**
158:13

**Nevada (1)**
216:19

**never (11)**
40:3;60:17;62:8,12;
83:11,11,12;88:9;169:15,
16;219:17

**new (16)**
16:21;20:24;26:14;30:9;
32:13;65:11;103:19;
114:16;137:8;162:1,23;
163:1;165:16;202:5;
216:20;219:21

**Newman (2)**
166:1,4

**news (1)**
181:17

**newspaper (1)**
75:14

**newspapers (2)**
72:17;75:9

**next (16)**
29:20,22;33:7;68:5;
129:18;137:17;138:2;
154:8;155:25;177:22;
210:2;214:25;215:2;
241:20;255:9;258:18

**nice (1)**
126:23

**nine (1)**
177:20

**nineties (5)**
50:7;91:17;103:14;164:7;
166:13

**nobody (1)**

75:22

**nod (1)**
6:14

**nodding (1)**
6:6

**nominate (1)**
142:3

**nominated (1)**
152:11

**nonblack (1)**
171:10

**none (8)**
136:8;186:13;194:6;
196:3,8;203:5;205:19;
251:15

**Nonetheless (1)**
78:2

**non-major (1)**
68:18

**nonparticipation (1)**
135:4

**nonpartisan (1)**
57:13

**nonparty (1)**
68:15

**non-peer (6)**
23:24;26:15,17,20;27:10,
11

**non-refereed (1)**
23:25

**nontraditional (2)**
211:16;219:12

**nonvoters (2)**
33:24;34:8

**nonvoting (1)**
216:2

**noon (1)**
76:6

**norm (1)**
137:8

**normal (1)**
119:23

**North (18)**
10:13,15,20;11:13,18;
54:5,9,25;55:2,6;85:19;
86:8,9,10;123:12;165:5;
199:16;201:18

**notable (1)**
199:22

**note (4)**
42:3;96:13;175:1;216:17

**noted (1)**
130:13

**notes (4)**
13:18;14:14,21;15:1

**noteworthy (1)**
137:16

**nothing (6)**
4:7;122:8;131:20;217:15;
221:13;250:18

**notice (4)**
12:25;100:19;137:6;
171:17

**notion (2)**
135:7;232:15

**notwithstanding (2)**
80:16;82:25

**November (13)**
69:11,13;120:2;121:15;
126:10;127:15;133:4,4,22;
138:5;190:3;236:11,17

**nuance (1)**
29:15

**number (41)**
18:6;29:16;30:7;33:6,15,
24;36:21;37:5;40:11;41:21;
63:13;64:5;75:18,19;78:11;
86:12;103:5;115:14;
116:12;117:5,19,20,21;
120:16,19;121:12;126:25;

127:1,1;128:17;129:9;
168:22,23;178:2;187:5;
191:8;208:6;223:10,18;
242:14;252:3

**numbers (15)**
38:12;102:4;138:8,10;
141:8,22;152:12;188:13;
190:21;191:15;195:5,10,12;
224:15;226:4

**numeracy (1)**
222:6

# O

**oath (1)**
5:20

**Obama (2)**
188:22;189:10

**Object (25)**
31:7,15;52:25;80:21;
81:10,16;82:2;84:15;95:19;
116:22;133:8;188:2;
190:16;200:16;203:19;
205:6,17;208:19;210:4;
228:25;230:12;234:18;
239:7,16;243:7

**objection (2)**
5:8;7:9

**objections (5)**
4:23;5:9;7:4,6;171:21

**obligation (3)**
72:2;157:12;213:10

**obscure (2)**
147:22;208:25

**observations (2)**
116:25;167:4

**obstacle (3)**
176:23;218:19,20

**obstacles (2)**
176:20;212:21

**obvious (5)**
70:2;143:2;144:1;177:25;
208:14

**Obviously (5)**
44:2;56:4;66:15;69:5;
205:19

**occasionally (1)**
50:3

**occasions (1)**
78:11

**occurred (3)**
32:11,12;141:2

**occurring (2)**
43:9;84:14

**October (4)**
120:1;128:5;209:14,24

**odd (2)**
203:9,9

**odds (1)**
202:12

**off (25)**
10:10;21:13;40:4;88:11,
13;99:24;119:6;123:20,21;
136:23;137:2;163:25;
164:15,19;165:20;178:5,10;
193:13;206:10;209:17;
210:7;226:7;228:1;239:12;
244:12

**offense (4)**
47:18,23,24,24

**offensive (2)**
70:12,21

**offer (4)**
88:2;104:7,8;235:14

**offering (1)**
88:5

**office (7)**
49:23,25;50:12,19;210:2;
234:2,8

**official (1)**

89:25

**officials (16)**
92:21;94:18;109:17,19,
23;132:14;143:17;144:1;
156:13;157:21;165:8;
169:20;190:13;220:20;
236:10,16

**officio (1)**
23:7

**often (9)**
38:19;41:23;86:23;152:6;
161:22;165:2;208:3;
217:19;247:14

**oh (4)**
42:3;67:5;75:13;122:5

**Okay (118)**
5:11;8:6;12:8;13:15;
15:7;20:5;24:25;26:8;
30:23;33:10,25;35:17;37:3;
40:13,19;42:1,6;52:17;
54:2;55:2,12,15;58:24;59:1,
14;71:11;75:8,10,18;76:14;
77:23;78:15,15;79:20;80:3,
25;81:23;85:15;87:10;
88:10;102:9;103:9;104:19,
21;105:1;106:3,5,10,14,24,
25;107:22,23;108:2,9;
115:17,18,20;118:16;119:7;
120:7;121:23;123:12,13;
125:23;126:3,24;127:2;
128:25;129:2;130:21;
136:4,11;137:3;140:8;
159:24;162:24;168:17;
169:23;171:19;174:20;
179:2,3,8;186:15;196:11;
197:9,12;198:11;204:8;
206:1;211:4;215:20,21;
216:23;217:1,7;222:16;
224:19;225:14,15,16,18;
226:24;227:2,8;229:8;

237:20;238:4,14;246:22;
251:7,9,11,12;253:23;
254:15,15

**old (3)**
81:4;165:16;178:25

**older (6)**
171:11;197:19;214:8,16;
241:6;256:21

**on (367)**
5:3,17;6:7,16;11:4,9,21;
14:7;15:25;17:21;18:1;
20:11,12,16;21:15;25:15;
26:6,16,16,17,18,18;27:7;
28:1,6,10,13,15,24;30:12,
19;31:2,18;32:20;35:24;
36:18,21;37:4,23;38:1,13;
39:3,8;40:23,24;41:16,19;
42:6;43:25;44:7,13,19;
46:9;47:18;49:25;51:10,11,
17;52:9,23;53:20;54:18;
56:1,6,21;57:5,15,17;58:12,
13,14;60:24;61:4,4;62:5;
64:3,21;65:1,21;66:1;68:3;
69:18;73:7,8,12,14,25;
74:15,17;75:7,10;76:3;
78:11;80:25;82:11;83:18;
84:7,25;85:11,17,18;86:22;
87:14,18;89:9;92:14,17,20;
93:10,11,12,19;94:9,15,17,
24;95:14,21;97:17,22,25;
98:12,12,14,20,21;100:12,
15,16;102:5,12,15;104:17;
105:3,14;106:1;107:4,17,
25;108:18;109:5,8,12;
112:5,10,11;113:4,13,14;
114:2,5,24,25;115:13;
116:17;118:12,16;119:5,24;
121:2;122:14,15,16,17;
126:17;128:5;133:6;
134:11,17;136:24,25;137:2,

13;138:5,17;140:18;141:4;
142:10;143:14;144:4,22;
145:8;146:6,14;147:10,12,
13,25,25;148:5,6;149:2,5,6;
150:20,21;151:24;153:10,
16;154:8;155:1;156:1,5,14,
16,17,23;157:14,24;158:1,
8,19,20;159:23;160:5;
161:25;163:22;164:14,17,
18;165:7;166:3,4,12,17;
167:17,25;168:23;169:24;
170:7,9,14,16;172:13;
173:3,4,18,25;174:6,23;
175:10;176:21,24;180:3,25;
181:5,14,24;182:15;183:3,
22,24;184:6,14;185:16,17,
22;186:14,17,23;188:20;
190:8,10,11,15,22;194:3,4,
20;195:21;196:1;198:22;
199:13,18,22;200:14,21;
201:18;202:12,19;203:5,6;
204:10,24;206:10,13,16,21;
207:2;211:7,15,17,21;
212:10,16,17,21;213:1;
214:7,25;215:2,2,23;216:4,
9;217:6,8,10;218:25;
219:16,20,22,23;223:4,12,
18;224:5,17;225:1;227:21,
25;228:4,7,18,24;229:15;
230:9,10,21;231:6,11;
232:3,7,23;233:9,13;234:1,
2,6,8,10;235:24;236:21;
241:11;242:2;243:10,15;
245:1,24;246:3;247:7,18;
248:9;251:18;252:7;253:2;
254:12,18,21;255:2,4,6,14;
256:2,19;258:7,18

**once (10)**
63:25;117:11;120:5;
161:10;166:5;190:12;

211:5;243:8;246:12;255:24

**one (139)**
4:13;8:4;10:6,15;11:20,
23;12:3;15:11,25;23:15;
24:10;25:16;28:4,14;29:19,
22;33:6,17;34:19,20;37:1;
41:20;42:22;47:4;48:8;
51:5,5,8;54:23;56:4,5;
59:21;62:2;66:23;69:8;
72:16,23;75:1,21;76:11;
77:12;79:13;85:2;86:25;
92:11;96:7;97:5;98:12;
99:12;101:3;106:24;
107:10;108:5;109:4,8,15;
110:18;113:2;114:15;
115:22;116:7;118:23,24;
119:12;121:7;122:22;
123:25;125:1,6,11,25;
127:7,19,20;135:10;137:22;
139:13;145:14;146:13,20;
149:2,3,24;151:5;152:6,7;
153:2,4;154:22;155:17,24;
156:22;157:25;159:18,20,
22,23,25;162:8,18;163:3;
164:17;165:9,16;168:20;
169:18;175:17;176:18,22;
177:9,22;183:8;184:16;
186:19;188:22;191:13;
197:24;200:20;202:12;
203:2;204:24;211:19,20;
214:6;216:8,18,19;221:25;
223:8;228:19;230:15;
231:8;232:7,15,16;233:9;
246:12;247:5;252:16

**ones (9)**
16:18;23:14;39:1,3;
93:13;118:25;164:15;
225:23;247:15

**one-sided (1)**
129:25

**one-year (1)**
244:6

**online (2)**
57:24;69:22

**only (56)**
15:10;17:13;18:17;61:4,
7;63:14;72:19,20;79:18;
81:8;87:5;92:25;93:23;
94:3;98:12;106:21,22;
109:20;114:13;118:15,20;
122:22,24;123:5,9,9;125:2,
14,19,20,24,25;126:12;
127:13;128:5;129:14;
138:4;148:13;152:15,21;
162:8;167:19;172:3;
173:25;177:23;188:10,11,
18;190:10;202:20;204:2;
222:6,21,24;224:11;242:12

**op (1)**
24:5

**open (4)**
112:16,17;120:7;191:16

**opened (1)**
118:7

**operate (2)**
109:19;110:9

**operated (2)**
110:8;241:25

**operates (1)**
42:21

**operating (3)**
5:17;110:21;231:11

**operation (1)**
219:25

**operations (2)**
110:24;179:18

**opined (2)**
87:18;122:16

**opining (5)**
87:14;112:5;227:21;

232:6;233:9

**opinion (50)**
20:16;26:18;28:4,11,12;
29:19,20;33:11,18;35:9;
38:21;39:8,11;42:4;52:12;
59:4;62:22;66:13,17;67:3,4,
23;68:3;74:8,17,20;76:16;
77:3,5,20;80:5,9,13,14;
81:13,24;83:8;88:3;142:8;
219:23;228:18;232:23;
234:6,9,22;235:14,17;
236:8,14,21

**opinions (11)**
5:19;30:15;53:4,5;58:17;
63:25;69:4;73:4;91:1;
154:7;227:22

**opportunities (11)**
104:7,9,10,12,20;126:9;
137:12;177:5;190:18;
241:1;242:6

**opportunity (13)**
75:3;96:20;98:6,14;99:9;
177:4,8;191:11;237:18;
239:1,23;241:4;242:9

**opposed (1)**
140:1

**opposing (1)**
32:22

**opposition (2)**
6:16;219:18

**optimal (1)**
173:23

**optimally (1)**
115:10

**option (9)**
21:23;66:22;95:15;97:10;
121:1,3;214:20;248:2;
249:13

**options (2)**
177:10;206:2

**order (8)**
9:18;58:22;64:3;115:16;
123:22;162:12;217:6;
223:13

**Oregon (1)**
106:6

**organizing (1)**
110:3

**original (8)**
16:12,13,23;46:7;209:22;
223:22;247:10,11

**originally (1)**
52:5

**O'Rourke (6)**
129:21;137:5;152:19;
188:4,19,21

**orthodox (1)**
222:10

**orthodoxy (1)**
29:6

**ostensibly (1)**
162:8

**other (123)**
10:5;11:18;12:3;14:21;
16:20;18:19;19:19;23:11,
23;24:4;27:20;32:16;34:19;
37:7;42:6;48:3,4;49:10,21,
24;54:18;55:23;56:5;66:1;
67:11;72:19;73:9;79:14,16,
20;85:4,16;86:22;88:4;
89:19;91:18;93:14,16;
96:19,21,22;105:10;109:13,
22;112:6;115:7,22;117:18;
118:8;120:6;123:11;
125:13;126:8,13;132:25,25;
133:2;136:7;137:11;
139:11;140:9;141:25;
146:7;147:8;153:13;155:2,
11;157:25;158:7;159:2;
161:20;165:2,9;170:18;

172:19;173:3,4,24;175:21;
179:18;180:6,14;185:17;
187:24,24,25;188:8,12,25;
191:13;194:6;195:21;
196:14;197:13;202:16;
206:18,25;208:24;210:3;
216:21;217:8;218:6,21,24;
219:6;221:12;223:14;
228:19;232:7,17,17;233:9,
16;234:14;242:9,18;
243:14;246:15;250:15;
253:10,21;256:15,23

**others (17)**
35:11;63:1,6,10;79:13;
101:16;131:1;142:18,21;
146:20;171:24;183:12;
185:9,19;186:8;213:5,7

**otherwise (4)**
184:3;205:3;206:19;
234:22

**ought (2)**
108:9;226:15

**out (82)**
6:13;23:10;26:15;27:4;
29:8;30:2;32:21;34:9,22;
39:1;40:15;45:14;46:9;
48:20;49:11;50:21;53:23;
63:18;68:22;71:12,12,15;
72:7,23;73:3;75:12;96:8;
97:13,17;99:17;102:7;
103:16;105:1;113:5;
116:11;117:5;130:24;
134:18;136:3;141:21;
142:5;144:8;145:21,21,22;
146:20;147:23;151:18;
152:14;158:8,15;160:7;
162:12;163:13;166:23;
167:14,15;168:12,20;175:6;
177:20,22,23;182:18;
183:13;184:18;185:18,22;

194:7,11;204:15;211:8;
212:20;214:13;215:13;
222:3,18;238:20;244:18;
246:21,23;253:11

**outcome (1)**
39:7

**outcomes (2)**
66:23;241:12

**outcry (1)**
66:24

**outlets (3)**
23:24;27:20;116:13

**outlier (1)**
198:22

**outline (4)**
17:9;101:19,23;222:15

**outreach (7)**
31:3;33:5;34:14;117:12,
16;158:17;217:20

**outside (10)**
11:18;14:20;74:19;
145:16;172:14;176:19;
185:5;204:7,22;256:16

**outwardly (1)**
142:14

**over (26)**
5:2,16;33:3,6;48:3;51:1;
65:9;103:5;105:19;118:1;
119:7;129:18,21;130:17;
161:1;162:7,13;164:1;
167:5;169:3;189:4;193:7;
224:7,21;251:14;252:7

**overall (3)**
78:17;140:11;192:18

**overcome (4)**
139:18;141:11,16;142:7

**overly (1)**
72:9

**overturn (1)**
57:8

**overturning (1)**
  66:9

**overview (1)**
  92:17

**overwhelmingly (1)**
  197:11

**own (6)**
  50:2;74:8;83:8;109:20;
  141:10;222:12

**ownership (5)**
  182:22;183:15;184:13;
  226:8,9

## P

**packet (3)**
  25:24;26:1;77:14

**page (72)**
  25:11,15,18;26:16,16,17;
  55:13;64:22;65:1;67:7;
  68:4,5;73:14;74:17;77:13,
  16;92:15,16;94:15;102:4,
  12;107:17;109:5,8,12;
  112:11;113:14;114:24;
  116:17;144:22;145:8;
  146:6;147:13;148:16;
  150:21,22;154:8;156:13,23;
  166:3,4,17;167:25;173:18;
  179:21;180:3;206:13,16,21;
  207:2;211:11,13,21;212:10,
  11,16,17;213:1;214:5,6,7,
  25;215:2,2;223:24;224:5,
  17;231:11;240:18;245:24;
  251:18;258:18

**pages (4)**
  25:16;77:15;145:19;
  230:3

**Palmdale (5)**
  57:15,20,22;59:11,11

**panel (7)**

  26:24;160:9,17,19,25;
  161:10;162:3

**Panther (1)**
  89:18

**paper (20)**
  26:14,18;31:22;37:3,4;
  38:19;39:6;40:10,11;41:20,
  21,23;42:1,5;147:21;
  178:22;211:19;216:20;
  227:7;258:18

**papers (23)**
  27:11,18;29:5,25;30:8,
  25;31:18;36:18,21;37:7,21;
  39:18;40:6;41:7,9,14;
  98:20;216:5,16;218:4,7,15;
  223:13

**paradox (2)**
  33:20,20

**paragraph (11)**
  68:8;73:15;94:12;155:25;
  212:17;213:3;215:1;
  240:19;241:13,20;242:18

**parallel (1)**
  11:9

**parent (2)**
  53:7;170:3

**Park (1)**
  22:1

**parking (4)**
  116:7,9;173:15;174:15

**parks (1)**
  115:8

**part (26)**
  7:5;39:15;48:20;63:22,
  23;71:19;75:4,24;87:16;
  104:23;109:20;119:12;
  132:15;145:4;153:22;
  155:21;185:25;189:7;
  201:18,19;210:1,6;223:3;
  226:12;229:9;238:5

**participate (4)**
  49:20;50:1;151:3;214:8

**participating (1)**
  19:20

**participation (21)**
  20:18;21:8;37:5;39:8;
  47:10;48:21;50:9,11;52:24;
  53:11;102:15;116:23;
  117:2;127:3,8;154:11;
  160:6;210:21;250:8,16;
  253:20

**participatory (1)**
  247:13

**particular (59)**
  21:22;22:8;28:20;31:22;
  40:24,24;41:15,23;42:11,
  14;44:12;47:15;53:4;66:6,
  16;70:8;84:3,7;88:5,6,7,7;
  95:24;97:25;101:1;113:21;
  132:17;137:13;147:2;
  149:3;150:8;153:12;159:7,
  19,22,23;160:1,19;163:19,
  20,20;170:20;173:22;
  175:11;177:8;178:19,20;
  180:1;188:13;189:19;
  192:9;195:12,16;201:3;
  207:17;216:18;218:19;
  223:4;246:9

**particularly (21)**
  20:25;45:9;47:7;66:11;
  73:8;78:4,22;84:25;101:17;
  117:24;119:19;126:9;
  149:8;152:3;154:14;159:6;
  180:8;188:20;226:23;
  244:10;252:8

**parties (7)**
  4:22;31:6;56:1;117:15;
  141:14;153:15,21

**partisan (3)**
  54:14,18;57:12

**partisanship (2)**
  30:15;66:8

**partly (6)**
  29:3;30:19,24;80:25;
  139:8;222:4

**parts (1)**
  187:25

**Part-time (2)**
  22:16,17

**party (27)**
  12:10;29:1,13,14,16,21;
  31:14;32:5,8,15;33:15,17,
  22;43:3;51:19,22;52:1,3;
  53:15,19;54:20;55:6;61:5;
  68:18;89:18;152:22;232:16

**passing (1)**
  91:10

**past (32)**
  23:6;64:13;71:4;91:15;
  119:1,2,15;120:3,4,12;
  126:24;129:15,15;139:23;
  141:9;152:13;156:19;
  157:14;178:2;200:24;
  201:5,13,21,22;202:6,8;
  203:22;207:8,10,18;209:8,
  10

**patch (1)**
  21:16

**patently (1)**
  141:9

**pathetic (1)**
  204:19

**pattern (1)**
  108:12

**patterns (5)**
  28:13;94:25;119:15;
  120:12;126:16

**Pattison (1)**
  208:8

**paying (3)**

34:15,16;134:22

**peaks (2)**
107:2,2

**peer (11)**
23:22;24:2;26:20,22;
27:10,18,22;172:8;178:18;
216:12;253:11

**peers (3)**
26:24;27:1;136:17

**pen (2)**
36:25;38:7

**Pennsylvania (18)**
10:7,8,8,20;11:3,5,8,12,
18;54:4,8,24;55:18,20,23,
25;56:11;60:15

**people (161)**
29:3,4,16;33:6,15,17,22;
34:13,15;35:8;42:8,8,11,23,
25;43:4,5,20;44:19;45:22;
47:8;48:12;52:7,12,17;
53:4;61:18,25;63:18;65:16;
66:19;71:9;72:6,21,23;
73:21;79:2;85:1,11,12;
95:13;96:8,9,20;97:4;98:6,
10,15,19;99:5,7,13;103:8,
22;104:12,16,23;105:3,4,
19;106:12;107:21;108:9,
10;109:24;116:10;117:17;
118:16,18;119:12;120:2,25;
122:24;125:9;126:19;
127:5,9,13;130:1;134:4,9,
13,16,20,22;136:20;138:25;
139:12;141:15,21,24;142:5,
17,19;143:1,22;151:10,17;
152:2,12,17,19;153:20;
154:17,18;158:15;159:2;
160:18;162:17;174:5,21,25;
175:4,9;184:4;186:6;
188:23;189:8,20;191:2;
201:11,17,20;202:3,17;

203:23;204:15,15;208:6,8,
25;209:2;210:15;213:13;
218:23,24;219:2,13;220:4,
13;221:2,4,17;223:18;
225:3,5,17,22;226:1,15,23;
227:5;234:2,7;236:6;241:4;
247:7,19;255:21;256:19,22

**people's (3)**
31:6;127:3;143:24

**perceived (1)**
68:14

**percent (37)**
34:6;72:17,20,20,22;
75:17;171:4;191:23,25;
192:1,7,8,12,17,18,24;
193:5;194:16;196:9,13;
197:4,8;198:6,10,17;224:7,
8,9,10,11,21,23;225:2,5;
246:21;254:18,19

**percentage (12)**
68:20;145:20;152:15;
158:21;184:21;185:21,23;
192:16,17;254:4,6;256:4

**perception (1)**
231:2

**Perfect (6)**
12:2;119:16,17;120:4;
129:3,4

**perfectly (2)**
130:2;193:17

**performed (2)**
131:6,8

**perhaps (8)**
19:15;24:3;27:13;43:9;
61:15;95:17;199:20;222:23

**period (8)**
140:23,23;158:12;
201:11;243:16;247:8;
250:1,5

**periods (2)**

149:21;160:14

**permitting (1)**
147:8

**person (7)**
14:16;55:7;88:4;142:25;
177:9,20;204:20

**personal (3)**
8:16;12:15;184:3

**persons (2)**
224:6,21

**person's (3)**
106:14;224:13;225:4

**persuadable (1)**
33:17

**persuade (4)**
29:3;34:13,19;78:5

**persuaded (2)**
68:10;221:4

**persuasion (1)**
34:24

**persuasive (2)**
69:7;70:1

**pertinent (2)**
94:8,9

**petition (1)**
50:17

**PhD (3)**
4:5;20:10;258:11

**phenomenon (1)**
249:24

**philosophical (1)**
204:6

**phone (5)**
12:23;13:21;14:11,15;
19:11

**photo (1)**
86:11

**photographic (1)**
209:17

**physical (1)**

213:7

**physically (1)**
174:8

**picked (1)**
20:23

**piece (6)**
42:14;178:18;185:1;
211:13;216:11;258:18

**pieces (2)**
144:6;164:3

**pivotal (1)**
32:25

**place (46)**
24:9;27:16;35:13,13,15,
16;42:20,20;69:14;71:5;
91:9;95:16;96:14;107:25;
110:4;113:11,12,12;115:25;
116:1,1,4;118:7,11;139:10;
146:25;154:10,12;156:1,5;
165:17;166:11,12;173:1,4,
8;174:7;177:9;181:24;
184:16,19;201:15;219:12;
220:5;223:4;251:14

**placed (6)**
95:22;113:7,8,24;137:13;
199:13

**placement (9)**
21:22;90:24;94:24;
113:15;147:12,15;157:1;
207:19;242:13

**placements (2)**
91:16;148:1

**places (46)**
21:20,23;37:13;45:9;
49:4,6;50:6;74:25;107:16,
21,22;108:22;112:15,22;
113:4;121:18;122:5,6;
123:13;129:9;133:2;136:6,
7;141:19,25;146:12;147:3,
23,23;155:20;158:5;

182:24;185:4,8;186:13;
194:6;199:11,18;205:20;
212:18;214:20;218:12,16;
221:12;243:9;248:5

**placing (4)**
113:3;133:14;164:23;
185:16

**plain (4)**
100:25;118:14,14;186:15

**plaintiff (1)**
60:20

**plaintiffs (24)**
4:14;55:1;60:25;65:3,7,9,
13;89:15,16;91:12;92:20;
93:4;94:17;121:21;125:20;
208:12;215:21;221:8;
229:15;235:10;237:19;
251:21;252:6;253:1

**plaintiffs' (15)**
12:25;16:15;78:3;91:6;
92:19;94:13,16;149:2;
241:23;242:3,7;251:16,19;
252:1,10

**plan (5)**
236:11,17,23;243:3;
251:24

**plans (1)**
18:22

**plantation (1)**
202:10

**plantations (1)**
202:16

**plausible (4)**
97:3,23;168:10;193:18

**playing (1)**
5:17

**plays (3)**
40:20;50:4;207:22

**please (6)**
4:16;6:25;7:11;8:2;

135:17;257:1

**plot (1)**
246:20

**plots (3)**
117:21,22;148:21

**plugged (1)**
116:12

**plunge (1)**
113:23

**plurality (3)**
65:10;72:22,25

**plus (1)**
146:19

**pm (5)**
14:1,1;88:14;89:2;257:4

**poignant (1)**
101:17

**point (59)**
29:25;39:1,6,14;40:3,8;
41:11;47:25;49:16,24;
50:14;57:25;64:19;65:13,
25;82:4;86:25;93:21,22;
94:1;95:11;105:15;117:7;
118:1;125:18;130:20;
131:12,20;142:10;143:20,
21,25;157:19,23;159:14,18;
167:4;180:17;181:21;
182:11;186:9;188:18;
194:21;201:25;216:22,23,
24;218:21;219:8;222:17;
228:1,20;232:23;235:22;
238:10;239:17;242:21;
247:22;249:17

**pointed (4)**
101:14;144:8;211:8;
215:13

**pointedly (1)**
63:11

**pointing (1)**
213:13

**points (14)**
14:14;15:1;79:10,12;
96:7;103:12;107:8;115:17;
152:15;195:18;217:7,13,21;
218:13

**polarized (6)**
232:4,8,10,14,21,24

**police (2)**
115:6;148:15

**policies (1)**
52:16

**policy (8)**
28:7;29:11;39:8;41:16;
52:14;65:15;157:20;240:23

**political (56)**
20:8,15,17,18;21:8;
22:5,9;23:13,14,16;29:20;
30:12,21,21;31:6;33:11,12;
35:9;37:5;38:16,20;39:16;
47:1;48:21;49:22;50:8;
52:24;53:11;70:16,25;
82:18;85:13;96:10;99:5;
102:15,20;105:12;117:8,13,
14,15,16;151:4;152:2;
153:8,15,24;154:3,4;160:5,
5;177:15;178:1;210:20;
253:19

**politically (2)**
52:13;170:2

**politicians (1)**
31:2

**politics (6)**
20:11;23:8;28:6;33:23;
34:7;221:2

**polling (36)**
21:22;37:12;45:9;90:24;
91:9,16;105:20,21;107:1,
16,22,25;108:22;110:4;
113:4,12,12;114:18;115:25;
116:1,1,4;141:19;146:24;

147:3;148:14;154:10;
155:20;156:1,5;157:1;
166:12;181:24;199:18;
212:18;213:8

**polls (3)**
96:10;105:12;189:8

**poor (3)**
44:20;49:5;170:2

**pop (1)**
119:20

**popular (2)**
81:3;208:2

**population (45)**
28:24;29:7,12;30:10,14;
45:22,25;46:1,9;49:4,4,8;
58:1,10,22;59:1;61:13;
72:17;110:7;111:5;115:10;
139:4,17;155:16;163:24;
171:2,3,10;178:23;180:12;
191:25;192:2,25;193:3,6,9;
194:10;195:7;196:9;197:4,
20;201:4;230:22;232:15,16

**populations (5)**
49:20;183:4;199:10;
206:20;208:1

**populism (1)**
43:3

**portions (1)**
26:6

**positing (1)**
213:12

**position (13)**
32:22;35:18;80:11;82:23;
83:16;127:12;138:20;
147:17,24;151:20;156:12;
157:6;209:5

**positions (1)**
29:11

**positive (6)**
154:20;168:23;211:17;

223:7,8;251:11

**possible (28)**
6:6;52:23;64:16;99:11;
104:9;105:19,22;109:4;
117:11;135:18;142:6,13;
143:3,8,12;162:17,22;
163:2;165:25;168:7;169:8,
11;176:21;177:1,16;255:10,
19,19

**possibly (6)**
83:10;93:17;98:24;
106:11;217:5;251:25

**post (3)**
77:9;134:15;210:2

**potential (2)**
173:17;184:10

**Poulakos (1)**
6:3

**poverty (2)**
59:5;182:21

**practical (2)**
161:6;168:18

**practically (2)**
147:10;168:18

**practice (33)**
41:16,16;43:25;44:7,12,
19;57:16;62:14;71:4;85:7,
9,11;109:25;110:10;
111:13;112:20,25;113:3,11;
125:4;156:19;162:1;
180:23;181:4,23;182:13,17;
185:16;186:10,12;189:4;
207:8,18

**practices (11)**
43:11,15,19;78:1;156:20;
189:3;202:23,23,23;203:22;
230:22

**Prairie (102)**
45:7,15,21;46:1,13;47:17,
19,21,21,22;108:18;114:9;

121:7;133:7;138:19,23;
141:5;143:14;151:1,21;
152:21;153:6,8,13;155:9,
15,18;156:24;162:20;
163:7;164:22;170:5;171:1,
3,7;172:25;177:7;180:14;
182:12,15;183:9,13;185:18,
22;187:5,21;188:7,11;
189:1;190:7;192:7,8,10,11,
16,19,23;193:10,22,22;
195:3,4;196:13;197:7;
198:3,9,21;200:14,14;
202:14,17;203:5,6;205:4;
208:12;209:7;218:25;
220:3,4;221:8,14;224:20;
225:2;226:5;234:14;243:6;
246:2;248:23;249:6,16;
250:20;252:4,4,12,19,20,
20;253:14;255:21,22;
256:16,20

**precedent (1)**
185:17

**precinct (32)**
120:22;121:4,6,10,10;
122:25;125:3,25,25;128:17;
130:9,24;131:5,8,21;
132:20;135:13;137:24;
138:6,19;139:23;148:13;
190:4,6;191:7;206:24;
208:3;216:1;226:2,7;236:7;
255:11

**precincts (26)**
47:17;48:1;122:18;126:8,
13;128:18;130:7,25;151:2;
155:15;195:16,17,20;222:6,
21,24;230:23;246:20,22;
250:3;252:17;253:21,22;
254:3,7;255:9

**precisely (4)**
34:10,12;65:19;181:21

**prediction (1)**
137:7

**predictor (1)**
120:5

**predominant (2)**
40:20;99:4

**preference (1)**
96:10

**preferences (2)**
153:9,22

**preliminary (4)**
56:22;60:9;64:4,12

**preparation (1)**
14:22

**prepare (5)**
13:15;15:9;69:16,18;70:3

**prepared (3)**
13:18;69:19;84:1

**preponderance (2)**
254:3;256:4

**preschool (2)**
241:9,10

**presence (2)**
153:18;174:11

**present (17)**
14:4,8;38:17;39:12;
49:10;57:16;132:11;
141:12;145:1;164:7;176:4;
200:4;201:11;207:10;
246:16;252:9,10

**presentation (1)**
244:17

**presented (7)**
92:20;93:4;94:17;107:11;
227:23;244:11;251:20

**preserve (1)**
5:9

**President (2)**
79:25;188:22

**presidential (9)**

34:5;137:1,17;140:9;
152:18;189:15,17,18,24

**pressures (2)**
37:10;199:5

**presumes (1)**
44:3

**pre-textual (3)**
236:12,18,22

**pretty (48)**
9:21;17:6;29:22;32:19,
20,25;33:20;35:10;38:14;
46:21,23;47:2;49:5,14;52:7,
9;64:12;66:3;69:24;77:6;
95:10;101:7;109:15;112:3;
113:3;119:7,22;129:16,25;
134:8;137:16,21;148:25;
152:25;153:4;155:16;
164:23;177:17,25;188:6;
191:4;197:22,24;200:19;
208:14;212:5;236:5;244:15

**prevented (1)**
241:24

**previous (9)**
4:22;127:20,21;128:6,7;
149:21;151:12;204:18;
207:22

**previously (2)**
86:11;89:22

**primarily (4)**
27:18;93:11;180:9;
184:16

**principles (1)**
35:3

**printout (1)**
211:14

**prior (4)**
32:8;78:2;89:9;133:4

**priority (1)**
167:3

**private (2)**

183:2;213:4

**privileged (1)**
15:6

**proactive (1)**
236:5

**probably (48)**
13:9,13;17:8,20;19:9;
21:3,4;26:16;28:18;35:7;
40:9,18;47:5;50:14;52:5;
64:14;69:22;77:8;78:25;
82:12;86:19,20;93:15;
97:11,23;98:1,21;111:10;
132:3;136:20;137:9;149:4;
150:5;161:11;163:13;
170:23,24;171:9;183:1;
185:7;195:2;204:21;
208:21;209:1,3;232:11;
244:11;255:11

**probe (1)**
154:18

**problem (12)**
33:22;34:1;72:25;79:20;
108:24;114:21;124:25;
167:1,18;222:5;244:11;
246:17

**problems (5)**
65:21;69:8;133:21;
222:25;247:5

**procedures (1)**
10:23

**proceed (2)**
13:23;89:4

**process (8)**
24:2;26:23;27:10,16;
151:4;152:2;153:25;222:14

**produce (2)**
27:18;247:13

**produced (2)**
67:10;92:11

**producing (3)**

24:12,16;216:11

**product (1)**
33:12

**profession (2)**
171:24;179:13

**professional (8)**
8:13;12:13;23:3,14;
26:10;244:19,24;245:13

**Professor (23)**
4:20;14:24,24;22:4;
24:20;31:23;77:24;78:7;
100:16;141:21;149:6,6;
168:15;181:16;201:25,25;
240:20,21;241:8,22;242:2,
5,16

**professorship (2)**
22:10;24:19

**program (1)**
16:9

**progress (1)**
218:8

**project (1)**
177:16

**promote (1)**
242:21

**promotion (1)**
27:23

**prompts (1)**
242:2

**pronounce (1)**
76:17

**pronounced (1)**
108:20

**propensity (2)**
96:13;97:17

**proponents (2)**
103:15;158:4

**proportion (4)**
120:21;121:13;229:5;
230:6

**proportions (1)**
170:19

**proposed (1)**
203:4

**protected (1)**
240:24

**protest (2)**
98:19;99:17

**proud (1)**
149:25

**prove (1)**
65:13

**provide (8)**
99:23;100:24;169:9;
172:1;176:19;186:14;
219:23;247:3

**provided (12)**
26:13;90:15;95:15;177:4,
7;182:23;191:11;215:14;
237:15;238:1;239:21;
243:19

**providence (1)**
83:7

**provides (4)**
98:5;236:8,14;240:25

**providing (17)**
58:17;96:20;156:1;
163:16,21;182:14,18;
198:22;199:18;228:18;
230:9;234:6;235:18;236:3,
21;239:25;254:12

**proxies (1)**
252:8

**proximate (2)**
178:23;206:10

**proximity (8)**
107:15;109:6;110:13;
145:9;164:13,24;208:24;
209:8

**psychology (1)**

154:3

**public (21)**
20:16;28:4,11,12,15;
33:11;38:21;52:16;104:14;
115:7,9;127:10;148:12;
180:9;182:25;206:1;210:3;
220:18;224:13;234:2,7

**publication (2)**
27:2,4

**publications (10)**
23:20;24:24;3,4;26:23;
37:25;38:11;78:1;225:9;
253:11

**publicly (2)**
86:18,18

**publish (1)**
27:20

**published (3)**
23:18;39:13;245:15

**publishing (1)**
24:8

**pull (2)**
69:21;132:14

**purpose (2)**
44:3;256:13

**purposes (12)**
13:3;25:5;27:24;64:8;
76:25;114:9;166:10;
176:18;210:24;213:24;
223:25;240:10

**push (2)**
247:4,9

**put (7)**
63:17;74:8;116:3;165:17;
194:3;228:12;253:10

**Putting (3)**
29:8;219:24;248:8

# Q

**qualifications (3)**
20:2;88:7;245:4

**qualified (6)**
9:11;43:13;63:2;244:25;
245:5,7

**qualifying (1)**
156:8

**quality (1)**
95:7

**quarrel (1)**
136:21

**quarter (6)**
108:4;145:14;165:3;
193:7;225:15;226:13

**queried (1)**
111:22

**question (102)**
4:24;5:9;6:24,25;7:7,8,
11;8:2,3;11:25;12:4;31:24,
25;35:2,6;36:19;39:20;
41:3,12;43:8;48:12;55:5;
57:13;69:24;75:1,5,12,23;
81:18;82:17;84:1,2,8;
88:10;95:18;96:1;99:10;
100:23;101:2;102:7,11;
104:6,8;105:13,18;106:2;
107:17,19;108:6;111:16;
112:19;113:18;116:20;
123:2,24;125:22;135:10,20;
136:19;141:3;144:6,12;
145:2;150:13;162:3;
163:18;168:16;170:4,22;
172:13;177:2,3,17;185:12,
13,23;188:17;190:24;
199:15;202:11,13;204:24;
206:18;207:22;212:7;
215:19,24;216:4;220:16;
227:4;229:17;230:17;
231:13,16,17;235:21;237:8,
24;238:3,5;244:2;250:7

**questionable (1)**
154:9

**questioning (2)**
5:3;76:11

**questions (33)**
4:22;5:18,24,24;7:15,19;
8:7;13:7;14:2;21:24;28:15;
37:12;48:19;69:1;74:21;
90:10,13,14;94:9,20;
101:18,24;104:15;107:14;
109:16;144:10,17;186:6;
229:25;230:6;241:15;
256:24;257:2

**quick (1)**
238:16

**quickly (4)**
67:7;203:15;223:23,23

**quite (26)**
10:22;22:22;27:6;61:16,
21;66:2;67:16,21;68:1;
72:13;77:5,14;81:17;95:19;
104:2;112:11;114:14;
149:25;160:6;202:3;
208:21;210:16,17;217:18;
245:3,12

**quote (11)**
67:14,20;70:5;71:23;
72:11,12;156:24;157:7;
213:4;245:25;251:25

# R

**race (62)**
31:4,12;38:1,6,13,14,21;
39:2,5,12,14,23;40:7,10,17,
19;41:4,7,10,13,24;50:3;
58:16,19,20;61:13,16,19;
85:3;120:1;125:7;137:5;
149:13;151:9;170:14,16;
172:1;178:4;181:25;188:5;

194:23;195:8,18,20,23;
196:1;232:16,17;251:24;
252:5,8,13,14,18,22;253:3,
13,24;254:12,14,18;255:15

**races (1)**
31:24

**racial (37)**
31:5;39:9,17;40:24;
41:10;43:12,23;44:5,8;
45:12;60:21,22,25;61:5,8,
21;62:1,6,9,13,14,22;84:7;
86:15;87:13,14,19;124:11;
170:12;171:13,14;178:19,
20,25;182:10;194:20;
195:17

**racially (8)**
83:20;206:19;232:3,7,9,
13,20,23

**racism (1)**
31:5

**radii (1)**
227:18

**radius (1)**
145:14

**raised (5)**
78:10,23;94:9,10;149:10

**ramble (1)**
48:9

**rambling (2)**
30:19;35:24

**Randall (2)**
112:10,13

**range (7)**
115:9;146:18;148:12;
152:14;177:10;251:14;
256:15

**ranges (2)**
108:4;145:17

**ranked-choice (13)**
56:24;57:8;65:7;66:20;

71:7,21,23;72:18,24;73:22;
74:24;161:15,24

**rate (12)**
17:23;18:1;19:17,18;
49:2;108:1;140:5,5,6,13,22;
190:14

**rates (15)**
49:12;50:11;59:5;97:14;
134:4;138:18;169:7,10;
182:21;191:8;220:14;
228:23;229:2,2;243:11

**rather (6)**
15:24;58:7;100:16;199:5;
216:12;223:12

**rationale (1)**
50:5

**rationales (2)**
236:9,15

**Ray (1)**
103:15

**RCV (5)**
65:8,15;68:22;73:18;
74:12

**reach (3)**
34:9;105:10;118:12

**reached (3)**
36:13;37:15,20

**reaction (2)**
119:23;180:22

**read (27)**
13:13;15:1;45:2;51:1,4,6;
65:2,5;67:9;73:14;74:10;
75:18,19;77:9,11,17;93:13;
101:18,22;102:5;114:11;
221:7;240:19;241:21;
251:16;257:1;258:2

**reading (17)**
30:1;45:18;46:3,12,17;
64:18;65:4,22,23;68:8;
70:2;74:9;93:10,11;193:13;

227:19;232:2

**reads (4)**
92:16;154:8;225:2;
241:22

**ready (1)**
89:4

**real (6)**
132:4;142:4;158:10;
180:23;183:11;190:24

**realign (2)**
28:22;29:12

**realignment (1)**
32:19

**reality (2)**
68:14;70:23

**realizing (1)**
212:20

**really (53)**
27:22;34:13,24;35:6,6;
37:19,19;40:5;42:18;48:14;
56:20;57:12;58:4;69:20;
70:13;73:12;83:25;102:25;
105:13;106:16;110:21,22,
23;111:15;117:10,23;
122:25;123:2;125:11,14;
130:4;136:5;141:14,16;
147:16;151:10,14;167:20,
24;169:18,20;172:14;
194:7;201:12;215:25;
219:23;225:25;226:14,18;
244:21;246:17;253:2;256:6

**re-ask (1)**
62:17

**reason (37)**
7:14;66:12;85:7;96:21;
98:9;121:9,16;123:4,6;
125:1;128:16,19,20;130:6,
23;135:3;149:8;152:17,19;
176:14;189:20;194:14;
195:25;196:12,15;197:3,6;

198:2,8,20;208:16;213:19;
214:16;224:24;225:6;
226:12;252:15

**reasonable (15)**
69:19;143:17;144:2;
165:7;169:14;171:16;
172:2,6;173:1,8;190:21;
193:17;197:5;220:9,10

**reasonably (1)**
116:13

**reasoning (1)**
195:23

**reasons (24)**
47:1;48:6,6,11;85:9;
96:19,22;99:12,13,18;
100:2;119:9;139:22;
159:25;160:1,3,7;163:24;
169:24;170:4;211:23;
236:22;250:4,15

**reassessment (1)**
137:12

**rebuttal (8)**
47:18,23;227:20;228:6;
240:14,19;241:21;243:1

**recall (35)**
11:17;12:1,4;13:11;
19:19;65:22,23;67:13;
77:22,23;91:21;93:8;
128:10,11,13;153:15;
173:19,20;175:16,19;
191:21;193:12,13;209:16,
17;211:14,21;228:3;232:2,
5;233:6,18;235:2;236:18;
240:5

**receive (1)**
240:3

**received (3)**
13:9;90:11;243:14

**receiving (1)**
240:5

**recent (12)**
10:15;40:10;75:7;113:24;
114:2;119:3;149:18;
150:24;152:7;178:22;
201:2;249:24

**recently (7)**
8:19;26:14;45:2;64:13;
85:19;129:25;140:10

**recess (4)**
36:4;138:15;205:9;
238:18

**Recessed (1)**
88:14

**recognize (4)**
13:8;25:8;162:2;213:15

**recognized (1)**
148:25

**recommendations (1)**
27:2

**Reconvened (1)**
89:2

**record (30)**
4:17;6:7,17;7:9;12:6;
65:2;67:9;74:7,10;77:17;
88:11,13;91:15;96:25;
134:17;137:4;143:23;
144:7;162:24;220:24;
221:7,9,14;230:13;231:8;
233:10,13;238:21;244:13;
258:4

**recorded (1)**
78:9

**records (7)**
119:2,2;126:11;137:15;
142:1;147:21;150:4

**recounted (2)**
153:12;209:9

**recounting (3)**
147:15;209:20,23

**recounts (1)**

233:3

**recreation (1)**
115:9

**rectify (2)**
235:4;236:5

**red (3)**
52:6,6;189:17

**redistribution (1)**
158:11

**redistricting (9)**
8:23;10:16,21;11:6,8;
54:9,13;57:18;233:1

**redo (1)**
218:4

**redoing (1)**
218:5

**reduce (3)**
97:22,25;98:3

**reduces (1)**
103:3

**reelected (1)**
189:22

**reelection (1)**
189:11

**refer (1)**
93:3

**reference (2)**
211:6;215:3

**referenced (2)**
144:23;145:19

**referencing (1)**
26:3

**referendum (1)**
81:4

**referred (1)**
54:14

**referring (7)**
48:7;82:9;84:21;89:16,
24;165:14;234:16

**reflect (4)**

145:20;190:12;221:15;
231:8

**reflected (1)**
233:24

**reflecting (1)**
130:8

**Reform (4)**
28:7;95:12;105:2;159:7

**reformers (1)**
158:4

**reforms (8)**
102:19;106:4;134:11;
145:7;217:5,18;247:6,12

**refrain (1)**
6:6

**refresh (1)**
11:21

**refuses (1)**
241:9

**regarding (1)**
78:4

**regardless (7)**
35:3;58:11;66:7;67:2;
125:7;159:1;186:13

**regards (1)**
230:22

**regime (1)**
99:16

**region (1)**
96:14

**register (7)**
51:19;53:14,18;103:18;
104:7,12;234:13

**registered (15)**
51:23,25;52:4;122:18;
139:10;140:16;167:22;
184:23;185:5,21,24;187:6;
206:13,17,20

**registration (5)**
103:18;104:1,10;106:5;

139:16

**regression (3)**
148:19,20,20

**regret (1)**
66:20

**regular (3)**
47:10;49:25;97:7

**regularly (2)**
97:4;142:2

**reject (3)**
27:5;63:6,10

**rejected (2)**
63:21,23

**rejection (1)**
27:2

**related (12)**
5:19;9:8;16:23;38:6;
58:18;105:8;106:13;107:4;
109:2;115:9;220:5;250:18

**relates (3)**
170:5;193:21;225:10

**relating (2)**
85:20;90:24

**relation (3)**
206:13,17;209:11

**relations (1)**
41:10

**relationship (14)**
117:4;167:8;168:5;
206:23;242:6;246:7,18;
249:11;250:11,23;251:2,2,
4,5

**relative (3)**
186:7;204:13,19

**relatively (1)**
249:24

**relayed (1)**
235:7

**relevant (22)**
52:15;91:13;120:20;

121:21;122:4;124:9,11;
131:25;135:22;154:11;
182:9;183:15;184:14;
185:14,20;186:2;188:3;
202:20,21;219:8;240:22;
241:2

**reliable (4)**
68:25;72:12;95:24;
118:24

**relied (1)**
91:4

**relief (1)**
185:19

**relies (2)**
95:21;243:23

**religion (1)**
52:14

**relocate (1)**
162:17

**relocated (1)**
162:18

**reluctance (1)**
81:2

**reluctant (6)**
80:23;81:13,25;82:5,13;
83:5

**rely (2)**
147:25;255:4

**relying (1)**
255:2

**remaining (1)**
34:6

**remarkable (4)**
152:9,13;194:2,4

**remember (11)**
10:4;64:18;96:21;100:18;
118:9;123:21;175:13;
215:17;228:6;234:3;251:6

**remind (2)**
6:10;121:17

**reminded (1)**
145:12

**repeatedly (2)**
79:5;114:19

**rephrase (5)**
7:1;81:12,22;231:18,21

**replicated (1)**
223:9

**report (178)**
9:1,17,18,19;13:17,20,22;
14:2,20;15:10,11;16:4,6,11,
12,13,19,23;18:12,22,23;
25:2,9,12,21;26:2;46:7;
47:16;50:25;51:1,4,5,6,7;
57:23,23,25;60:7;63:7;
69:22;85:19,21,25;86:17;
87:1;91:1,10,12;92:9,11;
94:4,6,12;102:1,2,12;
104:23;107:15;108:17,20,
23;109:5;114:5,6;117:8;
119:17;121:18;128:12,13;
132:12,16;143:16;144:7,9,
18;147:25;150:14,23;
159:6;164:4;166:17;
169:25;171:17;172:14;
173:18;178:4;181:14,17;
182:2,4,23;186:4;191:20,
21;194:23;195:10,11;200:6,
8,13;203:20,21,22;204:7,
23;205:22;206:14;209:9,20,
23;212:15,17;213:1;215:14,
22;216:14,15;218:1;223:22,
24;224:3,17;227:13,17;
228:3,6,14,18;232:3;
233:11;234:20,24;235:10,
25;236:19;237:3,5,6,10,11,
14,15,18,19,25;238:1,6,6,
22,23;239:2,6,8,15,20,21,
24,25;240:3,5,7,14,19;
241:21;242:18,25;243:1,20,

22;245:21,24;246:6;
251:18;252:10;254:2,23;
255:2,3
**reported (14)**
37:25;38:13;128:4;164:9;
166:17;182:5;191:19;
226:5;233:11,13,15;234:10;
235:24;244:9
**reporter (2)**
6:3;179:10
**reporting (2)**
206:16;234:23
**reports (60)**
14:23;15:14;16:22;19:4;
47:18,23;50:22,24;60:5;
63:6;86:21;91:6;92:19;
93:4,5,6,12,23;94:2,3,10,14,
17;95:2;100:5,11;101:1,4,
18,22;121:21;127:24;
128:4;145:19;148:3;149:3,
9,11;153:11;173:21;174:8,
10;191:18;195:25;224:6;
227:20,22;233:17,24;234:1;
241:16;242:4;249:22,23;
251:20;252:6,11,16;255:5,8
**represent (4)**
26:9;86:8;190:2,4
**representation (2)**
58:5,14
**representations (2)**
239:2,14
**representative (1)**
89:19
**representatives (1)**
65:17
**represented (3)**
55:18;191:6;239:6
**representing (3)**
4:14;9:1,2
**represents (1)**

60:22
**Republican (17)**
28:23;30:6;31:14,20;
32:8,15;42:25;43:3,6;52:4,
6;55:4,5;56:10,12,12;152:7
**Republicans (1)**
28:19
**request (3)**
200:23;220:25;221:11
**requested (3)**
126:8,14;221:16
**requesting (1)**
27:13
**requests (4)**
200:24;201:5;220:19,23
**require (1)**
134:14
**required (7)**
24:8;51:18;53:14;96:4,4;
142:17;143:1
**requirement (2)**
96:3;160:19
**requirements (4)**
5:1,7;116:7;199:6
**requires (2)**
96:5;160:17
**reregister (2)**
139:20;162:19
**reregisters (1)**
163:17
**research (39)**
16:6;23:9;24:10,12,17;
27:17;28:4;31:10,17;38:16;
41:1;49:22;52:19,19;61:18;
70:10,17;85:1;92:17;96:4;
114:12;122:4;135:2;
142:10;146:11;147:7;
148:4,23,24;156:4;164:17,
18;167:2,7;168:11;216:12;
217:12;222:12;226:11

**researchers (1)**
26:24
**reservations (3)**
174:3,5,22
**reserve (4)**
131:13;237:9;256:25;
257:2
**reside (1)**
173:25
**resident (2)**
204:17,18
**residents (17)**
92:4;114:19;115:15;
174:1;194:16;201:9,15;
202:5;224:7,8,9,10,11,22,
23;242:10;256:15
**resistance (1)**
221:1
**resource (1)**
168:25
**resourced (1)**
112:9
**resources (9)**
44:20;112:5;119:14,24;
120:9;149:19;152:1;161:7;
170:3
**respect (26)**
12:17;73:3;80:6;84:11;
108:8,20;111:4,14;132:5;
150:7;153:5;174:14;
182:20;184:13;186:16;
204:25;206:21;216:9;
221:23;227:3;237:2,5;
240:2,8;249:22;255:17
**respected (1)**
82:23
**respectful (1)**
238:12
**respects (1)**
145:9

**respond (9)**
50:18;73:9;92:19;93:5;
94:16;101:3,23;149:12;
251:20
**responded (3)**
163:19;178:20;200:25
**responding (3)**
94:4,13;241:15
**response (4)**
79:10;114:1;180:22;
181:3
**responsibility (3)**
110:5;204:8,9
**responsible (1)**
204:3
**rest (5)**
84:18;103:22;138:25;
199:20;256:21
**restriction (1)**
28:16
**result (4)**
71:25;103:20;106:9,10
**results (8)**
83:20;85:11,11;126:15,
24;148:3;150:10;217:10
**resumes (1)**
25:21
**retained (10)**
17:15;54:23,25;55:10,17;
56:19,21;60:20;75:6;85:24
**retainer (1)**
17:19
**retaining (1)**
64:17
**rethink (1)**
74:21
**retrospect (2)**
119:21;129:8
**return (1)**
36:11

**returned (1)**
101:25

**returns (1)**
190:3

**revealed (1)**
153:10

**reverse (2)**
9:18;75:20

**review (16)**
14:21;15:16;19:10,24;
24:2;26:23;27:1,10,10,11;
50:24;157:16;172:8;177:6;
187:12;209:14

**reviewed (26)**
13:17;15:6,10,13;19:4;
23:22,24;26:15,18,20,20,
22;27:19,22;93:21;94:2;
100:5;126:6;127:23;128:2;
178:18;200:5,8;216:12;
242:25;253:11

**reviewing (5)**
19:6;191:17;233:6;234:4;
236:18

**reviews (1)**
24:5

**revise (1)**
27:6

**revisited (1)**
220:15

**revisiting (1)**
220:16

**revolution (1)**
103:19

**riding (2)**
224:13;225:4

**right (121)**
10:10;18:21;24:15;25:22;
26:25;30:11;33:21;36:10;
40:5,15,25;43:2;44:17;
53:3;56:18;59:8;62:24;

64:1,13;69:6,15,19;70:13;
71:4;74:16;76:6;79:14;
80:6;83:2,11;85:2;95:19;
98:1,16,17;101:5,5,13,21;
102:25;103:10,13;106:23;
107:9,19,20,24;111:7;
112:17;114:5;116:11;
118:5,8,14,15,17,19,20;
119:9;121:16;127:1;
128:20;129:15;130:13;
131:2,3,13;132:3,4,24;
134:11,20,21;135:5;136:3,
15;137:12;140:13;142:14,
22;147:21;149:22;151:11;
152:2;153:16;155:3;156:3;
157:10;158:25;162:7;
163:23;164:14;168:11;
169:13;172:3;180:18;
181:1;185:7;186:5;189:16;
191:3;192:13;194:6,18;
204:12;213:3,11;221:5;
231:19;233:22;237:10;
246:11,16;248:3;249:1,21;
250:6;251:2,8;256:10,25

**rights (7)**
32:20,23;53:25;61:3;
124:10,19;151:3

**rigorous (1)**
27:15

**ring (1)**
20:21

**rising (1)**
135:12

**role (10)**
8:25;31:4;40:20;57:1,21;
82:24,24;102:16,17;207:22

**rolls (1)**
103:19

**room (3)**
31:25;32:3;116:11

**rough (1)**
17:9

**roughly (4)**
146:18;197:4;198:3,9

**round (3)**
8:22;9:5;27:15

**routinely (1)**
83:16

**Rubio (1)**
32:1

**Rucho (6)**
10:16;11:15;55:2,3;
59:24;60:12

**R-U-C-H-O (2)**
10:17,18

**rude (1)**
238:11

**rule (3)**
166:23;234:11,16

**ruled (1)**
83:3

**rules (9)**
5:1,15,16;10:23;21:21;
35:9;110:16;199:4;231:9

**run (10)**
29:21;66:5,10;74:4;
80:24;82:6,14;83:6,18;
112:14

**running (3)**
83:19;102:16;111:23

**runs (4)**
41:17;42:13;156:13;
211:13

**rural (2)**
197:22,24

**rush (1)**
30:5

## S

**sad (1)**
134:18

**sadly (2)**
103:20,21

**sake (5)**
221:2;226:15;233:21;
244:17;256:7

**sakes (1)**
183:9

**Sam (1)**
183:10

**same (46)**
5:17,24;19:21,22;22:7;
24:2;49:2;58:14;60:14;
61:16,21;73:14;75:20;
92:15;94:11;99:8;106:5;
107:1,6;112:9;114:18;
138:24;160:18,22;161:3;
163:8;165:17;168:8;
175:20;176:4;180:20,21;
181:22;190:13;195:22;
202:1,3;212:10;214:13;
224:17;231:11;236:4;
246:23;254:1,8;258:3

**San (2)**
199:14,24

**saw (11)**
46:6;50:11;64:17;106:24;
128:25;129:20;137:4,5;
140:2;153:11;255:8

**saying (18)**
29:6;31:1;39:24;80:16;
81:18;97:15;125:11,13;
126:4;134:24;153:14;
185:15;221:6;222:13;
223:5;229:4;230:25;250:19

**scale (1)**
110:25

**scattered (3)**
148:21;170:23;183:13

**scattering (1)**
174:1

**schedule (3)**
233:5,7;241:3

**schedules (1)**
142:20

**scholarly (1)**
65:14

**scholars (1)**
218:6

**school (6)**
20:4,23;176:24;184:14,
15;208:7

**schools (6)**
104:14;183:2;187:13,14;
196:8;208:2

**science (28)**
20:8;22:5,9;23:13,17;
30:12,21;38:15;39:16;
41:14;47:1;49:22;50:8;
61:18;71:1;82:18;85:1;
102:21;105:12;117:8;
122:3;136:16;148:24;
160:5;177:15;222:5,10,20

**sciences (1)**
21:1

**scientific (3)**
39:13;139:6;253:5

**scientist (2)**
107:8;161:11

**scientists (4)**
23:15;33:11;154:4;178:1

**scope (3)**
92:15;143:16;149:11

**scrap (1)**
81:2

**sea (1)**
106:24

**SEAQUIST (107)**
5:6,11;7:24;12:22;13:20,

21,24;14:5,8,11,19;15:2,4;
17:2,7,11,13,17;19:12;31:7,
15;35:25;36:16;38:2;44:1;
46:20;52:25;59:21;62:15;
66:14;67:15;70:6;76:5,14;
78:18;80:21;81:10,16,19;
82:2;83:21,24;84:15;86:25;
87:8;108:15;121:14;
123:23;126:22;128:9;
130:16,21;131:11,23;133:8;
135:14;137:25;143:5;
150:11;159:4;172:20;
175:23;176:6;178:14;
179:5,14;184:8;187:7;
188:2;189:6;190:16;
193:24;194:24;198:5,11,14;
200:16;203:19;205:6,17;
208:19;210:4;211:3;214:4;
224:4;228:25;229:4,8;
230:12;231:6;234:18,25;
236:24;237:7;238:13,16;
239:7,16;240:15,16;243:7;
247:25;249:2,20;252:23;
253:16;256:25

**search (1)**
111:2

**searching (1)**
40:6

**second (21)**
8:22;9:5,19;14:23;15:14;
18:22;19:4;28:18;35:12;
51:7;61:11;69:14;88:12;
110:19;130:20;216:20;
230:15,18;238:7;251:12;
254:16

**secretaries (1)**
163:3

**secretary (3)**
56:25;57:1,6

**section (19)**

25:16,20;65:6;107:15,18;
109:6,14;113:15;114:24;
115:1;116:15;117:3;
124:18;145:18;148:16;
159:15;160:15;213:3;228:7

**sectional (4)**
159:10;167:1,6,20

**sections (2)**
102:8;160:16

**security (1)**
28:16

**seeing (3)**
153:15;162:25;225:21

**seeking (3)**
56:23;107:18;144:10

**seem (7)**
42:18;43:2,4;138:12;
150:15;165:7;233:1

**seemed (6)**
75:2;102:21;149:8,11;
177:5;215:18

**seems (26)**
42:20;47:7;59:15;96:15;
117:6;125:13,16;130:4;
131:7;141:13,22;143:2,15;
144:1;169:13,18;190:17;
193:17;195:7;197:5;
199:19;201:2;202:3;
225:24;228:1;239:12

**selected (3)**
112:23;179:25;210:6

**selections (1)**
210:13

**selling (1)**
31:2

**senate (5)**
55:4,5;228:4,13,17

**send (1)**
19:8

**sending (1)**

30:2

**sense (15)**
6:8,22;8:5;34:25;44:14;
59:2;99:16;126:25;146:11;
161:22;187:17,22;189:5,9;
211:18

**sent (17)**
14:23,25;16:20;25:9;
26:23;45:3;51:6,7;64:17;
69:7;77:8;87:6;90:23;
91:11;93:6;100:25;148:2

**sentence (8)**
67:8;73:15;93:3;150:22;
154:8;156:11;213:2;214:6

**sentences (6)**
65:1;68:5,9;74:8,9,10

**separate (6)**
91:3,11;104:8,15;243:18;
250:6

**separately (1)**
110:15

**separates (1)**
229:10

**September (8)**
13:18;16:18;18:13,14;
25:10;26:3;119:25;169:22

**sequence (2)**
233:3,10

**series (5)**
29:25;160:9,25;162:3;
168:4

**serious (2)**
168:3,4

**serve (10)**
63:2;111:5;122:10,18;
125:2,4,5,6,12,25

**served (9)**
60:24;61:4;62:25;87:22;
100:12,13,16;122:12;190:7

**service (1)**

148:15

**services (3)**
31:2;33:10;104:13

**serving (2)**
125:14;173:25

**SES (1)**
49:1

**set (7)**
18:11,16;47:1;66:5;
102:7;125:6;150:10

**sets (1)**
16:22

**settings (1)**
35:17

**settled (2)**
105:17;170:21

**settlement (1)**
115:11

**seven (2)**
102:3;231:10

**several (6)**
12:23;14:24;68:18;
169:12,23;255:8

**severe (1)**
49:3

**severely (1)**
213:6

**shame (1)**
136:2

**share (9)**
25:3;28:23;70:19;71:9;
72:20;90:19;240:14;
254:15;256:11

**shared (4)**
13:20;15:2,2;235:8

**shattered (1)**
142:2

**Sheet (2)**
258:7,17

**shift (1)**

32:17

**shifting (1)**
76:6

**short (6)**
69:17;70:3;163:10;
183:14;225:17;226:21

**shorthand (1)**
234:11

**shortly (1)**
100:17

**shot (3)**
30:25;66:3;74:3

**shouted (1)**
79:6

**shouting (1)**
78:11

**show (19)**
10:11;12:24;64:2;71:14;
78:10;105:4;116:25;117:3;
118:19;127:9;138:6,12;
150:24;154:17;182:11;
210:19;221:18;223:23;
251:1

**showed (1)**
127:13

**showing (9)**
70:17;108:10,11;119:13;
120:2;127:5;152:16;226:3;
243:14

**shown (5)**
72:16;117:8,20;135:1;
221:21

**shows (9)**
52:19,19;75:14;105:2;
127:20;154:19;168:21;
220:24;245:18

**Shupnick (2)**
210:22,23

**side (17)**
32:15;43:5,6;56:2;72:19;

73:8,9,12;104:17;105:14;
125:1,11,13;195:22;219:16;
252:7;253:2

**sided (4)**
152:6,7;153:2,4

**sides (9)**
57:12;115:19;123:2;
125:10;202:12,18;229:10;
230:23;253:7

**sidewalks (1)**
183:22

**sign (1)**
257:1

**significant (8)**
48:16;77:25;78:1;153:17;
155:21;211:24;212:13;
242:15

**Similar (10)**
84:11;111:3;112:21;
146:3,18;167:4;186:11;
191:7;193:21;212:11

**similarly (8)**
42:13;44:10,18;62:12;
112:9;164:2;239:19;248:15

**simple (6)**
72:8,21,25;108:2;186:9;
196:1

**simplicity (1)**
68:12

**simply (9)**
23:16;73:24;74:14;85:1;
90:8;145:20;146:23;158:7,
17

**simultaneous (1)**
22:18

**single (8)**
73:18;74:12;95:15;125:3;
159:14;160:15;185:4;
199:16

**sink (1)**

221:4

**sit (1)**
169:14

**site (38)**
91:16;95:25;97:25;
104:10,25;105:20,21;113:8,
13;114:7,9,18,22;116:14;
145:23;148:12;154:10,24;
165:2,11;166:1;173:2,9,10,
24;175:11;176:22;181:24;
182:14;186:23,24;201:7;
206:9;208:3;210:8,9,10;
226:2

**sited (2)**
115:10;132:12

**sites (60)**
36:18;45:9;90:24;95:7,
21;97:24;105:24;110:4;
113:15,24;114:25;115:24;
118:8;121:23;122:6,10;
123:13;133:15,22;145:15;
146:25;147:12;148:6,14;
150:25;155:14,16;156:14;
157:1,3;164:12,17,22,23;
165:9;168:13,22,23;169:2,
3;172:19;175:21;180:25;
181:1;182:17;184:19;
185:16;194:3;206:10;
207:17,19,25,25;208:24;
219:14,19,24;243:10,12,15

**siting (9)**
37:12;91:9;92:21;94:18;
115:5;206:12;211:15;
219:11;220:4

**sitting (2)**
75:11;87:2

**situated (3)**
196:19;197:19;202:15

**situating (1)**
110:4

**six (1)**
59:15

**sixties (1)**
32:12

**sizable (2)**
29:15;33:14

**size (14)**
59:10;110:14;111:5;
112:9,12,21;146:18;156:1;
180:2,3,12;193:7;196:18;
255:12

**sizes (1)**
110:12

**skip (4)**
5:2;105:19;227:20;
230:17

**skipping (2)**
177:12;206:14

**slave (1)**
202:10

**slavery (4)**
201:11;202:8,21;204:4

**slightly (3)**
226:17;254:9;255:10

**slow (2)**
248:4,20

**small (7)**
24:14;52:8;63:16;113:9;
222:5;223:12;225:14

**smaller (3)**
110:16;176:16;217:1

**Smith (1)**
89:18

**social (16)**
20:25;38:15;39:13;41:14;
61:18;71:1;84:25;104:13;
107:8;136:16;139:5;
148:24;161:11;222:5,10,20

**socialization (3)**
153:24;154:5;170:2

**socialize (1)**
220:7

**socialized (1)**
52:13

**socioeconomic (17)**
42:9,11,17,21;43:20;
48:22;59:3;85:3;182:21;
213:16;215:4,7,11;233:17;
253:13,25;255:15

**sociology (2)**
244:22;245:16

**software (2)**
115:3,12

**solicit (1)**
134:13

**somebody (1)**
223:17

**somehow (6)**
45:16;114:8,21;126:3;
134:17;139:4

**someone (23)**
32:1;39:22;50:19,19;
82:18;88:2;96:11;97:3,13;
105:23;108:1;142:3,6,13;
162:11,11,20;177:22;
188:20,21;204:10,11;227:7

**someone's (2)**
24:1;116:4

**something (44)**
11:12;21:2;24:15;41:17,
18;42:13;44:15;45:11;46:8;
50:13;70:24,24;73:20;
83:13;87:3;105:3;125:19;
127:6;130:13;133:9,17;
134:3;137:6;144:4,21;
147:10;148:13;149:13;
157:19,23;161:11,24;165:8,
11;182:6,19;184:4;186:3;
199:19;214:18;216:6;
221:24;226:19;227:11

**sometimes (6)**
27:14,14;63:16;101:5;
139:15;173:6

**somewhat (4)**
20:24;31:8,10;188:9

**somewhere (3)**
57:24;69:23;169:6

**soon (1)**
179:11

**sophistication (1)**
147:19

**sorry (10)**
29:11;35:24;76:5;105:4;
107:21;132:10;164:25;
212:15;220:15;255:16

**sort (15)**
28:11;29:5;52:16,19;
53:7;64:21;84:3;119:21;
131:13;141:19;167:2;
170:17;210:3;222:3,18

**sorted (1)**
48:20

**sought (1)**
144:17

**sound (1)**
228:5

**sources (2)**
210:12,15

**south (3)**
123:13;165:5;201:19

**Southern (6)**
31:24;170:15;186:21,22;
187:1;205:21

**space (2)**
173:16;174:16

**spaces (2)**
116:9,10

**spacial (1)**
37:10

**span (1)**

116:24

**Spanish (3)**
29:8;30:3,4

**speak (6)**
6:5,5;7:24;30:4;167:21;
168:6

**specialist (1)**
53:9

**specialization (2)**
20:14;27:25

**specialty (1)**
124:21

**specific (13)**
31:24;35:2;65:23;93:8;
94:5,20;102:7;107:17;
153:8;175:9;228:18;
246:25;247:22

**specifically (19)**
7:7,10;41:19,21;43:24;
54:25;91:7;93:5;126:14;
127:17;173:5;214:22;
215:3,19,24;216:4;218:3;
232:5;253:12

**specified (1)**
116:2

**specious (1)**
225:25

**speculate (1)**
70:8

**spelled (1)**
89:20

**spend (2)**
155:21;173:13

**spending (1)**
207:13

**spent (2)**
19:5;89:10

**splitting (1)**
61:23

**spoilage (1)**

71:15

**spoiled (1)**
72:1

**spoke (1)**
128:5

**spoken (1)**
92:4

**spread (1)**
183:13

**SPSS (1)**
16:8

**St (1)**
165:23

**staff (1)**
132:18

**stagnant (1)**
189:4

**stake (2)**
61:20;71:6

**stamp (1)**
134:15

**stand (8)**
46:9;66:16;67:2;116:10;
119:14;138:20;194:7,11

**standard (12)**
23:12;38:15;68:25;72:12,
22;112:20,25;113:3,11;
181:4,23;182:16

**standpoint (4)**
69:9;168:17,25;222:20

**stands (1)**
185:18

**start (2)**
6:13;30:5

**started (9)**
24:22;36:9;50:21;78:11;
111:25;139:14;144:5;
231:14;249:25

**starting (1)**
240:20

**starts (1)**
34:4

**state (61)**
4:16;6:21;9:3;10:8;11:7;
19:23;21:9,11,14,21,22,23;
42:23;54:23;55:3,18;56:6,8,
9,13,25;57:1,6,9;58:2,8,12;
66:9;81:9,15;82:11,12;
83:13;84:13;85:22;86:8,9;
110:1,12;117:13;129:20;
141:16;146:22;163:3,3;
169:5;180:10,19;183:5,11;
185:6;188:1,6;189:16,17,
20;199:4,6;219:22;230:13;
254:19

**stated (4)**
6:16;7:9;96:22;183:17

**statement (3)**
156:8;211:22;212:11

**statements (3)**
203:16;209:23;225:8

**states (25)**
21:12,17;42:25;54:17;
66:5;74:4;80:23;81:13,24;
82:5,13;83:5,10,17,19;
96:25;98:22;99:1,2;106:6;
170:15;216:8;248:3,5,20

**states' (1)**
32:23

**state's (2)**
56:24;57:25

**statewide (5)**
111:14;129:19,22,24;
152:5

**static (1)**
30:18

**stations (1)**
115:7

**statistical (1)**
16:9

**statistically (1)**
167:24

**statistics (1)**
252:15

**status (12)**
42:17,21;43:20;48:22;
85:4;213:16;215:4,7,11;
253:13,25;255:15

**statuses (1)**
43:21

**stayed (2)**
75:20;161:2

**steep (1)**
107:2

**Stein (21)**
14:24;15:14;19:5;50:22;
93:7,12,19;100:6,16;
108:20;141:21;149:6;
150:7;168:15;171:14;
219:11;230:6,14;241:15,21;
254:25

**Stein's (7)**
94:5;211:15;229:18;
240:14,19;242:17,25

**step (9)**
38:23;51:23;54:21;74:4;
82:13;83:5,17,20;84:12

**stepped (2)**
23:10;238:20

**steps (1)**
199:17

**stickier (1)**
33:12

**sticky (1)**
129:16

**still (18)**
9:22;73:21,22;74:24;
81:5;104:25;134:20;
138:20;142:7;165:10;
177:10;189:3,14;225:16;

226:2;227:9;243:10;249:13

**stimulated (2)**
151:17;188:12

**stimulating (1)**
158:16

**stimulus (8)**
136:25;137:1,18,20;
151:8;152:3;169:19;189:13

**stipulating (2)**
4:23,25

**stone's (1)**
226:2

**stood (2)**
169:21;204:14

**stopping (1)**
130:19

**stored (1)**
147:22

**story (3)**
58:8;141:20,22

**straightforward (2)**
119:9;148:21

**strains (1)**
28:3

**strand (2)**
28:14,18

**strange (3)**
66:23;136:4;226:23

**street (5)**
105:6,20;107:25;118:19;
165:22

**strides (1)**
147:18

**strike (29)**
23:2;27:24;36:7;61:6;
69:2;81:12;85:7,9,13;
94:14;131:17;132:20;
155:7;172:15;184:1;
187:11,18;191:23;194:13;
197:2;205:12;209:20;

215:6;233:14;236:12;
243:25;245:6;246:24;253:8

**strikes (2)**
137:16;173:1

**structure (1)**
37:10

**stuck (1)**
254:21

**student (35)**
45:17;100:17;132:23;
133:6;136:10,14;143:9,13;
153:6;162:8;165:19;166:5,
11;169:8;171:3;172:18,24;
173:3,18;174:7,15;176:15;
185:4,24;190:13;192:23;
196:9;197:7;198:3,9;
205:15;208:13,23;210:9;
219:12

**students (50)**
21:19;45:6;46:13;52:11;
138:24,24;141:5;151:21;
152:21;153:8,13;155:18;
162:6;170:5;171:6;172:15,
17,25;173:11,25;176:23;
177:7;182:24;183:1;
184:15,21;185:9;187:5,14,
22,24;188:11,18;189:1;
190:7;196:13;198:4,10,12,
17;205:4;208:12,17;209:7,
11,25;220:4;226:6;241:9;
248:23

**students' (1)**
234:12

**studies (5)**
168:12,15,20;223:2,10

**study (18)**
45:24;73:19;74:13;82:10;
149:19;160:9,19,25;161:10,
23;162:3,5;164:1;166:19;
168:19;172:24;184:16;

213:15

**studying (3)**
21:3,4;253:13

**stunning (2)**
196:21,25

**styles (1)**
79:3

**subfield (1)**
154:3

**subgroups (1)**
46:23

**subheadings (1)**
144:8

**subject (16)**
20:1;30:13;31:18;32:24;
35:22;36:22;81:3;89:6;
91:21;102:2;161:21,23;
179:3;199:5;200:21;219:22

**subjects (1)**
20:12

**submission (1)**
27:1

**submitted (3)**
13:18;15:11;60:4

**subscribe (1)**
98:15

**subsequent (1)**
16:23

**subsidiary (1)**
103:7

**substantial (11)**
35:12,15;126:25;127:1;
148:2;187:5;193:6,9;
237:11;244:15;246:2

**substantially (4)**
106:25;107:6;186:12;
191:8

**substitute (2)**
254:13,14

**suburban (1)**

49:11

**success (1)**
241:11

**suddenly (1)**
30:5

**sued (2)**
55:7;89:24

**sufficient (4)**
5:9;167:12;168:9;251:7

**sufficiently (1)**
249:10

**suggest (12)**
21:19;49:15,22;120:24;
135:12;141:13,22;152:25;
168:12;191:5;195:6;223:11

**suggested (6)**
87:21;132:1;133:24;
169:17;218:14;237:22

**suggesting (8)**
57:23;125:17;133:21;
154:25;202:22;218:17;
229:12;246:9

**suggestion (4)**
112:8,10;114:4,6

**suggestions (6)**
27:5,6;101:14;112:17,17;
120:7

**suggests (11)**
35:19;47:16;52:22;126:7;
131:21;134:5;151:7,13;
153:3;155:4;191:10

**suitable (2)**
27:3;164:13

**sum (1)**
19:2

**summarize (2)**
26:10;28:2

**summarized (1)**
67:12

**summary (2)**

150:22,23

**super (1)**
120:14

**supermarket (1)**
219:13

**supermarkets (1)**
211:16

**supplement (2)**
12:5;18:15

**supplemental (4)**
15:13;181:16;186:4;
240:2

**supplementary (1)**
18:22

**support (3)**
67:10;126:13;169:4

**supported (1)**
126:4

**supports (1)**
53:2

**suppose (6)**
19:7,7;94:8;120:24;
142:16;255:13

**supposed (1)**
110:5

**sure (41)**
5:17;9:21;17:6;20:22;
26:22;28:3,3;41:2;57:24;
58:24;67:5,16;70:8;72:13;
73:19;83:8;84:24;92:14;
100:17;109:9;113:2;
116:22;120:20;135:19,20,
24;136:11;145:4;149:7;
160:4;162:14;167:13;
174:4;182:3;200:18;
207:20;212:23;222:17;
245:3;249:3,21

**surge (4)**
128:25;139:2,3;188:9

**surgeon (1)**

106:23

**surprise (3)**
79:24;187:4,8

**surprised (6)**
66:11,17;77:12;154:15;
199:10;207:12

**surprising (1)**
244:17

**survey (14)**
70:10;72:15;75:6,7,9,14,
24;153:7;170:7;244:5,5,6,
14;255:4

**surveyed (1)**
132:10

**surveys (2)**
30:16;152:24

**suspect (4)**
130:11;132:2;138:1;
176:16

**suspecting (1)**
139:22

**sustain (2)**
52:23;203:1

**switched (2)**
66:25;238:8

**sworn (3)**
4:6;5:20,23

**system (9)**
11:10;48:18,18;50:16,16;
71:5;81:3;117:13;119:1

**systematic (1)**
106:19

**systematically (2)**
174:13,17

**systemically (1)**
174:12

**systems (1)**
20:20

# T

**table (12)**
87:2;112:11;148:22,22;
155:4;179:20;181:14,16;
196:7;205:20,23;219:16

**tables (5)**
16:5;58:12;145:18;244:9,
13

**taking (6)**
7:17;27:13;69:12,14;
152:14;236:5

**talk (12)**
14:15;21:18;70:21;91:19,
22;150:20;169:25;195:20;
198:21;200:4;253:15;254:2

**talked (17)**
7:4;14:10;54:8;64:11;
75:2;92:10;129:6;144:9;
148:6;149:16;159:24;
164:3;169:23;179:25;
200:2;227:6,19

**talker (1)**
144:16

**talking (44)**
7:5;28:19,21;41:10;
76:20;102:23;110:3;
140:14,21,22;142:25;144:5,
22;145:7,9;147:1,15,21;
152:19;159:18;183:2,8,14;
195:1,3,4,6,8,17;204:13;
209:9;225:12;226:17,19,22;
227:15,17;229:11;230:25;
234:15;236:3;238:7;252:5;
254:3

**tar (1)**
202:4

**tarring (1)**
203:17

**task (5)**
94:15,21,22,23;216:11

**tasked (3)**
216:3,13;222:2

**tasks (1)**
34:18

**taught (1)**
22:17

**tax (1)**
139:16

**taxed (1)**
98:11

**taxi (2)**
224:13;225:5

**taxing (2)**
97:5,18

**teach (1)**
21:14

**teaching (7)**
21:3,5;22:19,23;24:13,15,
16

**team (3)**
101:11;222:16;228:1

**teams (2)**
101:8,21

**technical (1)**
147:19

**technique (1)**
33:5

**techniques (2)**
31:3;34:14

**technology (1)**
218:5

**tedious (1)**
147:5

**telephone (1)**
90:4

**telling (3)**
26:19;38:23;204:16

**Templeton (1)**

165:18

**temporal (1)**
167:3

**ten (8)**
36:20;76:8,12;160:3,7;
177:21,23;222:23

**tend (7)**
33:23;34:2;43:6;48:5;
86:22;129:16;139:7

**tendency (1)**
164:13

**tends (1)**
34:23

**tension (3)**
30:20,24;33:8

**tenth (1)**
223:16

**tenuous (3)**
236:12,18,22

**tenure (1)**
27:23

**tenured (3)**
24:19,21,22

**term (4)**
20:21;68:2;163:23;
253:14

**terms (10)**
110:25;131:6,9;163:21;
164:6;198:22;222:19;
228:23;251:24;255:12

**terrain (1)**
45:24

**test (9)**
47:12;145:10;146:8;
148:17;153:5;169:13,16,17;
213:12

**tested (2)**
147:14;150:13

**testified (12)**
4:8;9:4,6;60:8,19;62:9,

12,19;68:13;133:20;
149:10;245:17

**testify (5)**
9:8;57:3;60:14,16;67:20

**testifying (3)**
64:11;78:2;79:6

**testimony (25)**
63:10,21,23;65:20;67:11,
14,25;68:11;69:4;73:25;
74:14;78:4,9,10,15,17;
79:19;80:7;101:11;153:12;
246:6;248:10,24;249:8;
258:4

**testing (2)**
146:8;150:9

**tests (2)**
149:1;247:15

**Texas (45)**
48:4;53:13;54:6;109:17,
23;110:14,17;111:10;
112:21;113:7;116:2;
129:20,24;137:8;142:1;
146:16;147:20;150:5;
152:5,24;155:25;156:4;
162:22;170:15,17;171:25;
180:10;183:5;186:11,21,22;
187:1;189:14,24;196:17;
197:13,17;199:4,5,17;
205:21;219:20,22;249:25;
256:2

**text (1)**
40:2

**Thanksgiving (1)**
69:13

**theirs (1)**
94:3

**themselves (3)**
120:25;181:20;221:3

**theories (1)**
213:20

**theory (2)**
178:25;242:4

**thereby (1)**
68:13

**therefore (2)**
141:5;239:1

**therein (1)**
16:5

**thing (20)**
12:3;18:17;22:8;50:20;
74:5;105:25;110:18;113:2;
126:23;134:19;161:20;
163:3;165:6;166:20;183:8;
195:22;221:5;231:8;236:4;
254:8

**things (24)**
5:2;13:10;47:4;49:21;
84:25;86:22;98:2;102:18;
106:22;107:13,13;116:12,
14;119:22;139:11;216:17;
217:9;219:5;229:22,24;
231:1;237:10;251:6;252:7

**think (250)**
5:7;9:20;10:14;11:25;
13:11;23:7;26:22;27:3;
30:2;31:25;32:3,13,18,24;
33:3,8,19;34:23;35:1,3,8;
37:1,20;40:5,8;41:6;42:16,
16;43:13,21;44:6,11;45:11;
47:20;48:15,19,25;49:11,
18,18,19,23;50:14;52:10;
53:1,12,20;58:18;63:12;
66:7,19;67:21;69:8,23;70:1,
7;71:6,22;72:5;73:6;74:3,5;
76:19;77:14;78:22;79:1,8;
80:17;81:5;83:4,9;84:9,12,
16;86:7,7,16,19,19;91:17;
93:7,7;95:10,18,25;96:1,24;
97:4,11,23;98:22;100:3;
101:5,7,22;102:13;104:22;

106:21;113:6,10,20;117:21,
23;120:19,20;123:8;
124:25;127:2,4,8,18,19;
128:1;129:23;130:10,14;
131:17,24;133:17,23,23;
134:1;135:9,23;138:14,23;
139:21;144:5,11,23;146:15,
21;148:1;149:5,9,21,25;
150:12,15;151:6,25;152:1,
20,23;153:20;155:3;156:12,
21;157:8,9,11,12;162:15;
164:11;165:19;166:20;
168:10,16;171:16;172:3,5,
6;175:5;177:1;181:2;182:9,
11,19;183:5;184:17;186:2,
5,5;187:22;188:4,10,11,22;
190:24,25;191:1,16;193:25;
194:18;195:1;198:19,25;
199:22;201:8,24;202:12,18;
203:1;204:9,22;207:20,20,
24;208:1,14,15,20;211:18,
18;212:6,10;215:16,17,21;
216:20;217:22;218:10,13;
219:8,16;220:9,9,15,16,17,
22,24;222:8,20;223:9;
225:12;226:24;227:12;
229:9,21,21,21,24;232:18,
21;241:13,19;242:20,22;
244:3;245:5,7;246:17;
247:3,5;248:13;250:14;
256:3,5,9

**thinking (4)**
6:13;86:4;101:7;125:1

**thinks (1)**
70:9

**third (6)**
17:8,16;25:15,18;69:12;
153:21

**third-party (1)**
153:17

**thirties (1)**
32:12

**thirty (1)**
18:8

**Thompson (1)**
166:7

**thoroughly (1)**
63:25

**those (130)**
5:5;8:13;11:8;14:25;15:1,
5,7;16:14;19:6,10,13;20:17;
22:24;24:6;27:6;29:18;
33:17;34:22;36:19,20,25;
37:2,11,22;39:10;42:5;
44:21;46:18;47:4;48:1,14;
49:6,10;52:9;53:5,7;54:12,
15,17,23;56:5;59:4,13;60:4,
6;68:9;71:11;74:9;78:6;
80:6;82:25;86:14;90:7,8,
16;93:12,13;94:10;95:1;
96:13;98:3;99:13;100:25;
101:4;102:8;104:9,15;
122:7,10,18;124:8,9;
126:16;128:4;131:3,8,19;
138:10,21;145:16,24;149:9,
11;151:3;154:23;155:5,10;
160:23;162:5,10;164:23;
166:24;170:4,8,9;171:21,
22;172:5;174:17;175:20;
176:4,24;180:13;184:23;
186:2;187:14;188:24;
190:13,21;191:15;195:10,
16,17;205:21;212:19;
217:10;218:25;224:14;
225:21;228:19;231:19;
236:22;244:18;248:5,11,17;
252:7;253:13,25;256:1

**though (14)**
39:22;41:25;42:5;51:8;
71:19;97:16;147:18;153:1;

162:4;163:12;189:18;
190:11;221:10;255:17

**thought (9)**
28:21;40:4;72:24;94:7;
104:3;128:3;145:1;154:15;
185:20

**thoughts (2)**
15:2;70:4

**thousand (4)**
18:8;165:4;225:16;
226:17

**threat (2)**
178:25;179:1

**three (15)**
37:11,22;48:10;54:17;
60:2;127:5,13;136:22;
166:24;176:24;177:23;
227:1;230:3;246:12;251:6

**three-year (1)**
244:5

**threshold (2)**
68:15;254:7

**through (30)**
11:9;15:1;16:15;26:23;
27:13;36:25;38:7,10;39:16;
40:18;41:17;42:13;65:14;
77:11;89:8;91:15;97:8;
102:3;144:7;147:24;
153:25;154:5;158:23,24;
164:5;176:22;178:11,11;
200:2;243:4

**throughout (9)**
20:12;52:24;58:2;102:2;
170:23;195:25;250:16;
252:3;255:1

**throw (1)**
226:2

**thrust (8)**
30:7;39:6,14;40:6;41:8;
42:5;72:10;73:5

**thus (1)**
99:8

**ticking (1)**
112:1

**tie (1)**
202:6

**times (13)**
8:11;78:24;79:9;90:4;
169:12;181:1;195:2,3;
201:3;209:3;216:22;252:3;
255:5

**timetable (1)**
69:18

**tiny (1)**
168:22

**tired (2)**
164:25;229:23

**title (3)**
22:2;40:7,15

**titled (3)**
25:2,13,21

**today (24)**
5:4,5,17,18,24;7:15,19;
15:19;18:18;19:2,8,12;
164:3,8;187:20;202:2,25;
203:23;211:8;213:20;
232:18;246:6;248:24;250:5

**today's (6)**
4:22;12:17;13:16;14:22;
15:9;17:1

**together (3)**
69:21;132:15;248:8

**told (6)**
108:13;144:11;149:4,9;
178:12;187:4

**Tom (2)**
50:10;112:14

**took (7)**
20:8;32:21,22;47:18,23;
59:15;138:8

**tool (3)**
115:4;148:23,25

**tools (4)**
34:14;115:3;161:8;172:5

**top (12)**
10:10;21:13;26:17;40:4;
48:10;123:20,21;178:5,10;
193:14;209:17;211:22

**topic (3)**
91:18,18;92:16

**topics (2)**
37:2;53:23

**torn (4)**
114:16;164:17;165:16;
166:9

**Toronto (1)**
20:7

**toss (1)**
167:15

**tossed (2)**
71:12,15

**total (8)**
19:2;77:15;107:16;117:4;
120:16,19;121:12;176:12

**totally (4)**
141:23;143:4,9,13

**touch (2)**
36:18,21

**touches (2)**
36:14;37:1

**tough (1)**
163:22

**toward (2)**
34:15;43:6

**towards (1)**
31:13

**town (10)**
28:19;46:1;47:21;52:8;
59:9,10,12;171:7;192:10;
195:4

**track (4)**
162:15,16;254:15;255:7

**tradition (5)**
98:25;125:8;156:14;
207:3,7

**traditional (1)**
66:22

**Traditionally (1)**
35:14

**traffic (1)**
219:4

**trailer (1)**
219:25

**trained (1)**
150:2

**training (3)**
20:8;26:25;28:25

**transcribing (1)**
6:4

**transcript (1)**
258:3

**transit (1)**
224:14

**transition (2)**
32:10,11

**transmission (1)**
53:8

**transportation (9)**
99:21;109:2;206:2,5;
213:5;225:9;226:5,13,14

**travel (3)**
163:5;218:3;226:16

**traveling (1)**
227:5

**traversed (1)**
227:12

**Travis (3)**
110:23;112:24;199:12

**Treasure (1)**
89:18

**treat (2)**
109:24;125:9

**treated (5)**
45:16,21;73:4;126:3,5

**treatment (1)**
66:13

**treats (1)**
110:15

**trend (8)**
132:4;135:12,19,21,24;
136:18,22;191:7

**trends (3)**
28:13;30:14;33:3

**Trey (1)**
89:24

**trial (16)**
9:4,6,7;56:20;60:10,12,
17,19;77:9;227:23;228:1;
235:15,23;239:11,12;257:3

**tricky (1)**
39:20

**trigger (1)**
178:24

**trivial (3)**
72:20;75:19;116:8

**trivially (1)**
103:1

**troubled (1)**
149:22

**troubling (1)**
68:14

**troughs (2)**
107:2,2

**true (32)**
33:16;39:18,22;42:16,16;
47:14;81:8;82:15,20;100:3;
114:15;120:3;142:16;
146:2;155:12,23;157:5;
159:1;160:2;167:19;196:7;
199:14;214:12,15;215:8;

**222:13;232:19;237:23;**
241:19,19;247:3;258:4

**Trump (2)**
66:7;80:18

**trumps (1)**
141:23

**truncated (1)**
69:17

**trust (2)**
48:17;50:16

**trusted (1)**
179:10

**truth (6)**
4:7,7,7;48:25;147:19;
188:4

**truthfully (1)**
5:25

**try (14)**
6:5;7:1,11,24;35:23;
81:22;89:7;91:14;113:22;
162:12,15;164:13;206:15;
222:16

**trying (29)**
10:4;34:21;39:7;57:8;
63:11;71:14;109:14;
111:16,16;112:15,19;
113:18;115:1,2;116:21;
120:8;129:12;145:1;164:2;
172:2;184:18;210:12,13;
213:12;215:16;216:6;
238:12;241:8;242:19

**Tuesday (2)**
98:12;176:19

**turn (25)**
20:1;47:9;64:22;66:22;
67:6,6;68:4;77:15;89:6;
92:7,16;97:17;100:22;
102:5;105:1;117:5;120:1;
135:9;145:21,21,21;179:2;
211:11;212:20;213:22

**turned (7)**
136:3;158:8;165:11;
177:20,23;185:22;220:24

**turning (5)**
43:4,6;177:22;246:21,23

**turnout (143)**
36:19;37:8;41:22;46:22,
24,25;47:13;48:2;49:12;
68:19;95:1,9,10,13,18,23;
96:1,13,16,17;99:8,12,19;
100:2;102:11;103:2,6,12,
20;106:25;107:3,7,16,23;
108:8,10,11;109:10;116:16;
117:2,19,22;118:5,10,23;
119:2,15;120:12;126:11,15;
128:25;130:3;132:2;
133:20,21,25;134:1;135:6,
11,13;137:4,7,21;139:2,3,7,
12,16,24;140:1,5,10,12,14;
141:17;142:23;148:17;
150:15;151:7,9,13;154:9,
21;155:4;158:2,10,19,20;
159:8;161:3,4;166:18;
167:22;168:23;169:24;
170:11;171:13;172:10,11;
177:16,18;188:5;189:12;
203:8,10;212:1,13;214:3;
216:9;217:10,13;222:3;
225:17;228:23;229:12;
241:6;242:2,7,20,22;
245:19;246:3,8,19;247:2,4,
9,24;248:6,9,16,21;249:1,4,
9,17;250:3,4,12,22,23;
251:3,14

**turns (2)**
68:7;97:13

**Twenty-eight (1)**
22:13

**Twenty-seven (1)**
193:5

**two (42)**
11:8,9;13:25;14:13;
22:24;25:20;30:24;34:18,
22;37:7;68:5,6;73:9;74:7,9,
10;79:14,16,20;90:4;96:23;
104:15;106:2;123:2;
125:10;136:21;138:4;
175:13;177:23;195:5;
198:6;202:12,18;215:12;
216:16;217:4;218:1;223:2;
227:16;238:5;246:11;
248:13

**two-and-a-half (3)**
69:20,23;161:19

**two-party (1)**
68:12

**Tyler (2)**
163:7;205:21

**type (4)**
8:21;151:23;219:25;
221:24

**typically (2)**
137:1;152:6

---

# U

**UC (1)**
103:16

**ugly (1)**
201:2

**ultimate (1)**
243:2

**ultimately (5)**
9:7;31:3;66:21;73:2;
247:19

**Um-hmm (4)**
5:22;50:23;179:24;
243:21

**unable (5)**
7:14;68:22;73:24;74:14;

111:25

**unbelievable (1)**
152:12

**uncertainty (2)**
119:23;129:6

**under (11)**
5:1;78:12;92:16;121:10;
150:22;161:3,6;224:5,20;
226:10;231:9

**undercuts (2)**
103:3;135:7

**undergraduate (1)**
20:5

**underlined (1)**
195:14

**underlying (6)**
16:14;39:23;41:4;91:5;
171:2;208:1

**underscore (1)**
242:15

**understand (39)**
6:25;7:15,18;10:22;
16:17;30:20;34:24;45:4;
47:20;67:21;68:17;71:10,
20;72:3,9;80:22;81:1,5,17,
19;82:21;83:2,4,15;94:21,
22;95:6;116:4;124:23;
171:13;188:5;197:1;
219:21;231:9,12,17;242:17;
252:6,7

**understanding (20)**
11:11;24:11,17;29:1;
32:13;45:6,20;46:4,11;
67:19;85:6,8,10;91:11;
114:11;154:4;157:14,15,17;
222:11

**understands (1)**
32:25

**understood (4)**
46:16;58:25;216:3;253:1

**undone (1)**
65:11

**Undoubtedly (1)**
171:3

**unemployed (1)**
224:22

**unfair (2)**
151:1;202:4

**unfairly (2)**
126:3,5

**unfairness (1)**
95:3

**unfamiliar (2)**
114:8;148:23

**unfold (1)**
167:5

**unfolding (1)**
28:8

**unfortunate (1)**
255:13

**unfortunately (2)**
170:9;215:1

**uniform (1)**
181:3

**uniformly (4)**
188:6;201:2;220:22;
221:7

**union (2)**
165:20;210:9

**unique (7)**
155:18,25;156:3,7,9,9;
200:4

**United (2)**
98:22,25

**units (2)**
159:16;160:13

**universe (1)**
253:11

**universities (7)**
146:16,19;182:1;193:20;

196:4,6;197:18

**University (10)**
4:20;20:6,7,10;22:1,8,16,
24;24:9;27:17

**unjustifiably (1)**
121:25

**Unless (3)**
7:6,10;139:17

**Unlike (1)**
116:3

**unpack (1)**
107:13

**unpersuasive (1)**
65:20

**unpredicted (1)**
119:20

**unreasonable (2)**
130:4;202:4

**unreported (1)**
244:16

**until (1)**
69:12

**unusual (8)**
66:23;78:13;79:2,6;
114:9,13,22;120:14

**unusually (2)**
139:3;140:1

**unutilized (1)**
136:6

**up (66)**
6:5;7:24;9:20;14:3;
15:24;20:23;28:17;34:14;
52:4,8,13;53:3;61:11;
69:12;71:9,16;101:3,19,23;
104:16,19;105:4;107:7;
117:1;118:19;119:13,20;
120:2,2;127:5,9,13;137:23;
146:12;150:9;152:12;
154:6;161:22;162:23;
165:17;167:10,10,21;

173:22;174:25;175:6;
186:19;194:4,20;199:21;
201:18;205:20;217:4;
220:16;221:18,21;222:11;
226:3;233:4;234:12;
244:12;247:5,9,17;249:15;
252:8

**updates (1)**
26:12

**upon (25)**
36:14;37:1;61:24;69:20;
88:3,6;91:4;101:2;133:12;
140:25;141:3;212:20;
216:1;229:18;230:8;
235:24;241:13;242:25;
243:23;245:11;248:24;
249:7,17;250:10;253:8

**usage (7)**
140:5,6,6,13,25;169:7;
229:2

**use (44)**
41:13;56:24;90:25;
109:10;115:2;119:15;
120:7,12;132:2;133:6;
138:18;140:21;141:4;
147:2;148:13;156:17;
159:6;162:5;165:17;
172:17,19,21;178:1;185:13,
14;187:14,21,23;195:20;
213:20;214:9,17;220:5,14;
228:23;229:3;234:11,11;
244:2;253:14;254:22,22;
255:10;258:18

**used (25)**
16:9;38:1,13;67:17,22;
75:21;114:19;144:17;
148:11,11,14,25;150:23;
158:23;166:10,11;171:23,
24;172:24;180:7;190:18;
208:3;209:10;234:13;253:6

**useful (4)**
147:8;161:8;185:1;
213:17

**uses (2)**
39:2;254:25

**using (13)**
24:14,16;36:24;47:19;
171:16;190:14;191:7,12;
195:24,24;244:6;254:10,21

**usual (1)**
212:21

**UT (2)**
198:23;199:14

**utilize (1)**
121:2

**utilized (1)**
95:25

## V

**vacuum (1)**
109:19

**vaguely (2)**
13:11;191:21

**valuable (1)**
73:20

**values (2)**
52:9;53:8

**variability (10)**
35:12,15,20;47:7;49:19;
180:21;181:2,4,9;223:6

**variable (6)**
38:15,15,20;40:21;41:25;
181:20

**variables (5)**
43:8;168:5;207:1;217:10;
256:2

**variation (9)**
35:5;59:12;101:9;159:16;
167:20;168:1,2;180:17,22

**variations (2)**
42:19;96:16

**varied (2)**
117:20;229:10

**variety (6)**
99:17;127:18;210:12,14;
218:23;219:5

**various (13)**
16:7;48:5;85:9,11;99:12;
101:16,20;110:12;111:19;
123:13;149:1;222:23;250:4

**variously (1)**
114:21

**vary (4)**
21:12;47:5;107:2;117:21

**vastly (1)**
32:2

**vehicle (6)**
182:21;184:13;224:13;
225:4;226:8,9

**vending (1)**
33:10

**Vermont (1)**
66:25

**versa (1)**
90:22

**versus (11)**
4:14;11:7;55:24;56:16;
60:12,15;64:4;76:21,21;
129:21;255:22

**via (3)**
13:10;224:12;225:3

**vice (1)**
90:22

**vicinity (1)**
219:1

**view (101)**
35:14;45:7,16,21;46:1,
13;47:17,19,21,21,22;
52:18;65:15;108:19;114:9;

121:7;131:13;133:7;
138:24;141:5;151:1,21;
152:21;153:6,8,13;155:10,
15,18;156:24;162:21;
163:7;164:23;170:5;171:1,
3,7;172:25;174:8;177:7;
182:12,15;183:9,13;185:18;
187:5,10,21;188:7,11;
189:1;190:7;192:7,8,10,11,
16,19,23;193:10,22,22;
195:3,5;196:13;198:3,9,21;
200:14;202:14;203:6;
205:4;208:12;209:7;
218:25;220:3,4;221:8,14;
224:21;225:2;226:5;
234:14;241:17;243:6;
246:2;248:23;249:6,16;
250:20;252:4,5,12,19,20,
20;253:15;255:21,22;
256:16,20

**viewpoint (1)**
222:10

**viewpoints (1)**
29:23

**views (1)**
34:3

**View's (8)**
138:19;143:14;180:15;
185:22;197:7;200:14;
202:17;203:6

**vigorous (1)**
200:20

**vigorously (1)**
113:23

**virtue (4)**
26:25;68:11;118:2,6

**voice (3)**
78:11,23;79:8

**voiced (1)**
175:9

**voicing (1)**
219:18

**void (1)**
56:23

**vote (75)**
28:22,23;33:25;34:5;
49:2;50:1;51:19,24,25;
52:22;53:14,18;71:25;
95:15;96:8;97:4;98:7,8,14,
16,17;99:14,24;102:17;
103:8;104:8;105:23;
107:25;119:15;120:12;
121:3;131:21;134:21;
137:13;139:10;142:5,7,15;
143:19,24;145:21;151:8,11,
18;152:21;154:17,24;159:2,
25;162:25;174:2;175:10;
184:23;185:5,23;187:6;
188:19;189:1,9,23;191:11;
210:8;212:20;214:21;
219:13;223:18;226:3;
232:11;234:13;241:4,5;
242:6,9;247:7,21

**voted (6)**
121:1;141:8,21;153:9;
188:21;246:2

**voter (34)**
32:8,11;53:21;68:19;
71:3;73:18;74:12;75:3;
85:20;103:13,15,17;122:14;
126:17;153:10;159:20;
163:5,19;169:24;170:9,14,
16;171:25;177:19;178:3;
196:1;206:20;242:2,7;
247:12;254:10,11;255:14;
256:3

**Voters (116)**
10:24;11:7;31:13;32:14;
33:25;34:8,20;43:23,25;
46:14,24,25;47:14,14;49:1,

2,12;55:24;60:1,15;68:20,
21;70:11,19;71:20,25;72:1,
15;75:7;82:21;97:7,16;
103:19;108:18,21;115:18,
18;117:5;122:19,21,22,22;
123:6,10,11;124:3,15;
125:3,7,12;126:7;127:2;
138:21,21;139:6;140:16;
141:6;143:4,9,13,18;144:2;
145:13,16,20;151:3;155:9,
11,19;158:8,12;159:16,17,
22,25;160:16,17,22;167:23;
170:20,23,24;171:11,11;
173:17;176:20;185:21,24;
191:3,3,7;205:16;206:13,
17;210:7;212:19;214:8,10,
16;219:6;228:24;230:10;
240:25;241:6,6;243:4,5,5;
247:1,23;248:9,11,15,17;
249:6,16

**voters' (2)**
68:13;102:17

**votes (22)**
71:11,15;120:16,19,21,
22;121:12,13,19;128:17;
130:25;134:14,17;140:22;
154:25;158:9,21;159:6;
191:9;230:7;232:16,17

**voting (292)**
20:11,15,18,19;21:7,23;
30:6;36:18,19;37:9,11,12;
41:16;43:11,15,19;44:19;
45:9;47:8;48:13;53:25;
56:24;57:8;58:22;59:1;
61:3;65:8;66:20;71:8,10,21,
24;72:17,18,22,24,25;
73:22;74:24;85:6,8,10;
87:23;92:21,22;94:18,19,
24;95:1,8,11,14;96:19,23;
97:9,12,15,19,21;98:5,22,

25;99:7,9,18;102:18,19,24,
25;103:1,4,11,25;104:25;
105:1,3,7;106:7;109:6,10;
113:13,25;114:10,25;116:1,
16;117:1,5;118:4,23;119:2,
5,7;120:17;121:1,13,20,20;
124:10,18;126:9,11,15,16,
18,21;127:14,22;128:8;
130:9,25;131:6,9;132:1,11,
20,22;133:6,15,21;134:4;
136:9,12;137:10;138:5,7,
13,19;139:9;140:8,18,22;
141:1,4;142:7,14;143:4,10,
14;145:15,22;148:6,17;
150:25;151:21,22;154:10,
24;155:5,16;157:4;158:1,4,
7,12,24;159:3,21;161:1,16,
24;162:24;163:21;164:7;
166:15,18;167:22;168:7,13;
169:8,9,10,25;170:12;
171:10;172:11,19;173:9,10,
16,17,22;174:7;175:21;
176:19,19,22;179:17;
180:25;181:1;182:14;
186:18;187:15,15,21,24;
189:3;190:11,14,18,23;
191:3,4,8,14,25;192:2,24;
198:22,23;200:3,14;203:4;
205:2,15;206:6,12,17;
207:4,17;210:17;211:15,17;
213:17;214:3,9,17,19;
216:2,2,2;217:5,16;219:7,
11,14,18;225:10,23;226:9;
228:24;229:3,5,6;230:7,8,
10,19;232:4,8,10,14,21,24;
233:5;234:14;236:11,17,23;
240:22,25;241:3,24,25;
242:13,21;243:3,10,11,16;
245:19;246:7;247:1,4,8,8,
23;248:4,12,18,21,24;

249:7,19,24;250:2,5,6,13,
21,24;251:24

**voting's (1)**
190:5

# W

**wait (5)**
35:11;98:3,4;116:10;
238:7

**waived (1)**
4:24

**waiving (2)**
5:5,6

**walk (3)**
134:15;164:5;200:2

**walkable (1)**
226:22

**walked (1)**
183:19

**walking (6)**
36:25;38:10;183:8;184:4;
224:12;225:3

**walks (1)**
98:10

**Waller (139)**
4:15;45:8;47:14;53:17;
89:10,13;90:1,2;92:1,4,20;
94:17,24;106:20;108:8;
109:12;110:14,22,23,23;
111:3,23;112:6;113:4,15;
114:2,7,8;123:5;124:3,15;
126:8,13;128:8,18;132:12,
13;133:4;138:21;141:25;
143:3,8,12,17;146:6,18;
147:13;149:14,16,20,20;
150:5,24;155:11,19,25;
157:4,21;158:6,6;160:20,
22;161:1;164:6;165:8,13,
15;166:16;170:13,24;

172:12,19;175:21;176:5,10;
179:17;182:15;183:16;
185:21;186:11,12,15;187:6;
190:3,13;192:1,18,20,24;
193:16,21;194:1,2,7,15;
196:20,24;197:4;199:21,22;
200:3,25;201:1;202:2,10;
205:4,16;208:17;210:16;
214:12,14,15,22;215:19;
218:17,19;224:10;225:22,
25;228:24;230:11,19;232:4,
8;234:3,8;236:10,16;
240:23;241:25;242:10;
243:3,9,12;250:3,25;254:1,
22;256:16

**wander (1)**
143:15

**wanted (8)**
5:4,15;42:10;76:11;
79:12;135:10;146:20;
238:20

**wants (1)**
70:21

**warrants (1)**
78:14

**Washington (1)**
22:16

**watching (1)**
167:5

**waved (1)**
121:25

**way (63)**
6:14;19:22;30:21;38:22;
41:4,6;42:21;52:18;66:5,9,
18;70:12;73:25;74:15;
76:17;80:24;81:4;82:6;
83:3;95:3;101:12;106:6;
108:23;110:6;111:6;
118:22;123:7;137:15;
138:24;141:16;147:23;

151:2;157:9;162:6,10;
169:20;170:17;172:18;
175:8;181:23;186:24;
191:13;204:2,6,22;212:22;
218:4,22;220:8;228:1,12,
19;230:14;232:7;233:9,23;
239:12;240:25;244:11;
248:13;249:3;254:1;256:12

**ways (7)**
29:13;36:20;101:20;
157:10;166:14;172:4;
173:23

**weak (3)**
106:11;134:6,8

**weather (2)**
99:19;116:11

**Wednesday (1)**
176:23

**weeds (1)**
147:2

**week (4)**
17:8,16;69:12,14

**weeks (6)**
12:23;14:24;69:20,23;
73:9;161:19

**weigh (3)**
52:16;65:17;106:1

**weight (4)**
78:5,15;132:6,8

**weird (1)**
120:14

**well-known (5)**
46:22,23;47:2;209:2;
214:8

**weren't (4)**
57:12;64:20;101:1;182:5

**western (1)**
98:23

**whatever (1)**
141:11

**what's (19)**
16:2;37:21;71:6;80:25;
129:15;152:9;156:17,18;
168:17;189:7;191:16;
203:17;209:5;210:19;
214:15;215:16;216:9;
218:22;243:1

**whenever (1)**
97:24

**Whereupon (1)**
4:4

**wherever (1)**
162:22

**whether (71)**
5:4;16:14;19:1;21:23;
31:12;32:1;36:11;41:3;
44:20;46:4;47:12;48:17,18;
53:13;57:14,17;58:3,11;
60:9;61:12,25;63:20,22;
67:2,23;82:15;86:10,14,17;
87:12,14,18;95:2;102:6;
104:6,13,13,14;121:11;
122:12;124:2;134:2;
140:18;158:23;159:1;
161:1,2;165:4;166:18;
170:4;174:17;175:20;
176:3;178:23;183:21,25;
184:3,14,15;191:14,15;
205:1;206:18;215:20;
221:10;236:11,17;240:22,
23;241:2,4

**whimsically (1)**
29:19

**white (10)**
49:2;170:24;171:5;192:1,
3,7,12;196:19;197:19;241:5

**whites (1)**
43:6

**Whitford (3)**
8:23;60:2,17

**whole (14)**
4:7;47:5;63:21,22;95:11,
19;96:2,17;110:10;115:9;
123:23;150:13;175:6;
242:21

**whose (7)**
34:3;72:1;97:7;100:5;
122:23;175:7;221:21

**wide (1)**
148:12

**widely (2)**
47:2;148:25

**widespread (1)**
65:10

**Wiley (3)**
113:8;156:5;186:17

**wind (4)**
71:9;120:2;173:22;252:8

**winding (1)**
249:15

**window (2)**
167:14,16

**winner (2)**
71:17,18

**Wisconsin (10)**
8:24;9:3;10:19;11:19;
54:4,9,24;55:22;56:2,2

**wise (2)**
118:16;240:23

**wish (2)**
119:21;237:5

**within (26)**
35:7;45:22;59:10;65:8;
83:7;109:20;110:8,9,13;
136:20;144:8;145:13;
149:9,11;152:14;164:23;
180:3;181:12;187:13;
193:20;196:4;197:14;
225:17;226:1;243:22;
255:20

**without (7)**
143:4,9,13;169:4;189:22,
23;227:11

**witness (72)**
4:6;15:7;31:8,16;36:12,
17;37:14;38:3,8;44:2;
46:21;53:1;59:22;60:13;
63:3;66:15;67:16;70:7;
76:10;78:19;80:22;81:17;
82:3;83:25;84:16;87:22,23;
88:4;101:10;108:16;
121:16;126:23;128:10;
131:12,24;133:9;135:15;
138:1;143:6;150:12;159:5;
172:21;175:24;176:7;
178:15;184:9;187:8;188:3;
189:7;190:17;193:25;
194:25;198:6;200:17;
203:20;205:7,18;208:20;
210:5;229:5,9;235:1;
236:25;237:8;239:8,17;
243:8;248:1;249:3,21;
252:24;253:17

**witnesses (3)**
63:13,17;78:6

**Wolf (8)**
55:13,16,16,19;59:25;
60:13;76:21,22

**W-O-L-F (1)**
76:22

**Wolfinger (1)**
103:15

**Women (5)**
10:24;11:6;55:24;60:1,14

**word (5)**
33:21;39:25;67:17,22;
138:9

**words (5)**
30:4;137:11;173:24;
179:14;188:12

**work (38)**
9:2;18:1;21:16;23:18;
26:21;27:20;36:12;37:14;
39:13,15,24;42:15;50:17;
53:24;54:18;92:15,25;
100:9,9;105:21,25;111:1,4;
142:20,25;148:7;172:24;
184:16;211:15;217:3;
219:3;220:7;222:18;224:8,
11,22;225:3;245:12

**workday (1)**
98:7

**worked (6)**
20:12;54:5;73:7;100:4;
244:22;245:14

**working (8)**
11:4;85:17,18;89:9;
101:16;142:22;235:4;236:4

**works (2)**
46:19;48:18

**world (1)**
247:20

**worth (1)**
184:17

**wound (2)**
104:16;152:12

**wow (1)**
119:4

**wrapping (1)**
249:15

**write (3)**
18:22;94:11;245:24

**writing (6)**
9:16;16:11;24:8;28:1;
35:19;77:19

**written (11)**
20:16;30:8;31:19;37:21;
40:10;78:10;98:20;216:15;
218:7,8,22

**wrong (6)**
66:18;70:22;80:6;81:6;
82:21;83:10

**wrote (9)**
9:1,18,19;28:5;29:4;
85:19;212:25;213:23;
215:22

## Y

**year (19)**
9:22;24:22;34:5;56:23;
57:3;64:13,14;77:6;119:5,
6;136:23,24;137:1,2,17;
163:11;203:9,9;244:7

**years (20)**
20:25;21:3,6;22:13;
36:20;65:10;70:16;73:21;
103:5;127:20,21;129:18,21;
152:7;160:23;162:8,9;
204:12,15,18

**yellow (4)**
38:9;40:12;67:8;73:16

**yesterday (6)**
13:25;18:18;19:2,8,12;
181:17

**young (10)**
46:14,25;48:12;138:25;
139:6,9;153:20;226:23;
241:6;256:19

**younger (2)**
42:8;214:10

**yourself (5)**
53:7;69:22;195:2;244:19;
252:15

**youth (2)**
47:14;169:24

## Z

**zero (1)**
62:2

**ZIP (1)**
255:10

**zones (2)**
227:15,16

## 1

**1 (8)**
12:25;13:3;25:23;26:7;
65:9;77:23;92:16;212:10

**1,772 (1)**
190:6

**1:00 (1)**
14:1

**1:18-CV-456-LEW (1)**
64:5

**10 (4)**
55:13;105:15;107:7;
115:21

**100 (1)**
65:9

**101 (1)**
246:20

**107 (1)**
77:15

**1098 (1)**
166:8

**12 (9)**
7:22;24:3;103:12;105:15;
115:21;173:18;217:13;
223:24;224:5

**12.6 (2)**
224:11;225:5

**12:13 (1)**
88:14

**12:54 (1)**
89:2

**13 (3)**
24:3;192:19;244:7

**13.59 (1)**
192:18

**130 (2)**
18:7,9

**14 (7)**
64:22;65:2;109:5;135:22;
145:8;146:3;224:17

**14th (1)**
124:7

**15 (7)**
21:3,5;92:17;93:21;
103:12;105:15;145:19

**15th (1)**
124:7

**16 (5)**
135:21;145:19;160:21;
224:7,21

**17 (1)**
244:7

**17th (2)**
209:14,24

**18 (25)**
46:8,14;47:9;122:10,12,
15,21,22;123:5,9;135:21;
139:12;160:21;192:16,17,
19,20;243:4,5;255:22,22;
256:5,5,11,12

**18.5 (2)**
196:9;198:17

**1850 (1)**
202:23

**1870 (1)**
202:1

**1876 (1)**
193:16

**19 (1)**
47:9

**1950 (3)**
202:1,21,24

**1950s (2)**

149:14;204:4

**1953 (1)**
58:6

**1960s (1)**
32:9

**1964 (1)**
32:18

**1990s (2)**
132:11;149:17

**1998 (1)**
163:14

**1999 (1)**
28:5

---

**2**

---

**2 (11)**
25:1,5;26:2,16;51:15;
77:23;92:8;102:12;124:18;
144:22;203:4

**2,000 (1)**
226:18

**20 (22)**
21:4;47:9;107:8;109:12;
122:22;128:18,21;130:24;
131:2;146:6;160:21;
179:21;180:3;192:19,20;
222:6,21,24;243:5,5;
255:22,22

**2000 (4)**
24:21,22,22;114:20

**2002 (5)**
28:19;30:8;139:25;
166:16;168:8

**2003 (4)**
37:3,4;163:14;211:6

**2004 (1)**
41:21

**2005 (2)**
37:7;214:4

**2006 (2)**
37:9;139:25

**2008 (2)**
189:11;190:3

**2010 (2)**
139:25;192:15

**2011 (1)**
23:10

**2012 (4)**
19:23;188:22;189:11;
191:7

**2013 (1)**
58:7

**2014 (5)**
132:5;136:9,10;139:25;
160:21

**2015 (3)**
203:3,7,10

**2016 (15)**
107:16;130:23;131:5,9,
20;132:19,23;133:4,4,6,14;
140:3,7,9;141:2

**2017 (2)**
11:16;19:22

**2018 (43)**
76:23;92:22;94:19;95:5;
107:16;121:15;126:10;
127:15;128:17,24;130:7;
131:5,9,20;133:12,13,14,
22;136:2,3;137:16;139:3,3;
140:2,7;141:3,7,20,22,25;
146:25;151:6,13,22;152:10;
154:9;167:19;188:16,22;
233:5;242:10;243:4;250:20

**2019 (5)**
8:20;9:23;17:8;26:4;
40:11

**2020 (4)**
130:11,15;136:4;137:17

**2022 (1)**

136:5

**207 (1)**
246:22

**20-year-olds (10)**
46:14;122:10,13,15;
123:6,9;192:16,18;256:5,12

**21 (1)**
112:11

**22 (1)**
160:21

**23 (1)**
224:9

**24 (4)**
160:21;197:4;256:5,11

**24-year-old (1)**
122:21

**24-year-olds (1)**
46:8

**25 (5)**
72:17,20,20,22;75:17

**250 (1)**
19:24

**254 (1)**
111:9

**26 (1)**
67:7

**26th (3)**
123:15,17;124:2

**27 (4)**
68:4;74:17;192:24;193:4

**28 (3)**
113:14;147:13;166:4

**284 (1)**
76:22

**29 (1)**
139:13

---

**3**

---

**3 (10)**

40:11;64:3,8;206:21;
211:11,14;212:11,16;227:8;
240:18

**3:00 (1)**
14:1

**30 (9)**
19:15;20:25;34:6;37:9,
23;38:7;107:8;129:18,21

**30,000 (1)**
146:11

**309 (28)**
121:4,10;122:25;125:14,
25;126:3;128:17;130:7,9,
24;131:5,22;132:20;
135:13;137:24;138:6,19;
151:2,18;173:24;174:1,6;
190:4,6,9;191:7;252:17;
256:5

**30b5 (2)**
5:1,7

**30-page (1)**
65:1

**31 (3)**
37:8,23;38:7

**310 (2)**
151:2;252:17

**32 (3)**
114:24;148:5;192:3

**32.1 (1)**
192:1

**34 (1)**
41:21

**35 (5)**
37:4,5,23;38:7;52:6

**36 (1)**
169:3

**3d (1)**
76:22

## 4

**4 (3)**
76:16,25;167:25

**40 (6)**
116:17;148:16;206:13,
16,21;207:2

**44 (1)**
167:25

**45 (1)**
245:24

**46.5 (1)**
225:2

**46.8 (1)**
224:21

**471 (1)**
211:13

**473 (2)**
211:12,22

**475 (1)**
213:2

**48 (3)**
150:21;154:8;156:13

**488 (1)**
211:13

**49 (2)**
156:13,23

**4th (1)**
190:3

## 5

**5 (6)**
108:1;166:17;194:16;
210:20,24;213:1

**5:48 (1)**
257:4

**50 (4)**
21:17;23:23;70:16;

246:21

**50s (1)**
137:23

**51 (2)**
191:23;192:3

**51,000 (1)**
111:11

**51.6 (1)**
191:25

**537 (2)**
214:6,25

**538 (1)**
215:2

**54 (1)**
192:19

**54.33 (1)**
192:17

**542 (1)**
215:2

**55 (2)**
77:13,16

## 6

**6 (9)**
26:16,17;108:1;112:11;
196:7;205:20,23;213:23,24

**64 (1)**
64:5

**65 (1)**
52:6

**65/35 (1)**
52:6

**6th (1)**
69:11

## 7

**7 (4)**
148:22;223:24,25;243:18

**7.6 (1)**
192:7

**70 (1)**
192:11

**74.4 (1)**
224:8

**75/25 (2)**
73:23;75:15

**79.7 (1)**
224:9

**798 (1)**
190:10

**7th (1)**
18:14

## 8

**8 (9)**
103:12;108:1;148:22;
163:14,14;203:4;214:5;
240:10,13

**80 (2)**
192:8,12

**81 (2)**
224:7,23

**82 (5)**
196:13;197:8;198:3,10,
11

**85/15 (1)**
153:3

**85-year-olds (1)**
256:8

## 9

**9 (3)**
107:17;109:8;145:8

**90/10 (1)**
153:3

**92 (1)**

24:22

**951 (1)**
76:22

**9th (1)**
18:14

# Exhibit 9

# DECLARATION OF FRANK JACKSON

My name is Frank D. Jackson. I am over the age of 18 and fully competent to make this declaration. Under penalty of perjury, I declare the following:

1. I am a resident of the City of Prairie View ("Prairie View").

2. I am the Assistant Vice Chancellor in the Governmental Relations Office at Prairie View A&M University ("PVAMU"). I am also a PVAMU alumnus.

3. Previously, I served as a member of the Commissioners Court in Waller County for eight (8) years, and as a member of the Prairie View City Council for twelve (12) years. I also served five terms as Prairie View's mayor.

4. At PVAMU, I am responsible for staying abreast of laws and legislative issues on a local, state, and federal basis that impact PVAMU students and the campus community.

5. Given my long service in local politics and my strong personal and professional connections to PVAMU, I am familiar with the workings of the Commissioners Court, the roles of the local Democratic and Republican Party chairs, and the ongoing struggle of PVAMU students for full voting rights, including fair early voting opportunities, in Waller County.

6. My professional responsibilities involve regularly consulting with PVAMU students, faculty, and other administrators, as well as Waller County elected officials, about matters that affect the campus community, such as early voting.

7. Based on my personal knowledge, consultation with relevant parties, and engagement with these issues, the Waller County Republican Party Chair David W. Luther and the Waller County Democratic Party Chair Rosa Harris did not consult

with PVAMU administrators, PVAMU students, or Prairie View City Council members before submitting their early voting agreement to the Commissioners Court for approval, or acquiescing to an early voting plan prepared by Waller County, as the case may be, in September of 2018.

8. I attended the Waller County Commissioners' Court public hearing on October 17, 2018 to observe the proceedings and testify in favor of a proposed amendment to the County's early voting plan for the 2018 general election that would provide more early voting opportunities at PVAMU.

9. A video recording of my testimony and of full hearing on October 17, 2018, which is true and correct based on my personal knowledge and experience, can be viewed online on the Commissioners Court page of Waller County's website at http://wallercountytx.swagit.com/play/10172018-1225.

10. During the October 17 public hearing, in my presence and under my observation, several commissioners attempted to justify the current early voting plan based on alleged comments attributed to Ms. Rosa Harris. These commissioners indicated that early voting on PVAMU's campus at the Memorial Student Center ("MSC") had been moved from the first week to the second week of the early voting based on the supposition, attributed to Ms. Harris that it would coincide—and therefore, supposedly conflict—with homecoming.

11. I strongly disagree with the supposition that the homecoming week is an inappropriate time for early voting.

12. Based on my personal knowledge, gained as a proud PVAMU alumnus and current PVAMU administrator, our homecoming week began on October 22, 2018, and the

major activities did not begin until later in the week. Based on my personal knowledge and consultation with students and alumni, the assertion that students would be discouraged from early voting if the scheduled early voting days on campus coincided with homecoming week is inaccurate. Indeed, homecoming week is an ideal time for early voting. Alumni, for example, would encourage students to exercise their right to vote, particularly because alumni are acutely aware of the importance of that right in part because of the historical record of voting discrimination directed against PVAMU students by Texas officials and Waller County officials in particular. Moreover, the concentration of students near the MSC because that is where many homecoming activities took place would have provided ample opportunities for students to cast a ballot.

13. At the October 17 public hearing, one or more commissioners also indicated in my presence that non-student residents of Prairie View would not feel comfortable traveling to the PVAMU campus to vote, or that they would not find our parking and other facilities adequate for their needs. Based on my personal and professional knowledge and experience, these suggestions mischaracterize the nature of the relationship between the PVAMU community and residents of Prairie View and do PVAMU a disservice. In fact, many of our students are involved with volunteering activities and internships in Prairie View. Our ties with neighboring cities are much stronger than the commissioners appear to understand.

14. In addition, we at PVAMU pride ourselves on being welcoming hosts for our non-student visitors who come to PVAMU's campus to vote during early voting. We reserve a number of parking spots specifically for these voters and remind our

students that these spots are not available to them during voting periods. We also post signage pointing voters to the polling place, which is wheelchair-accessible.

15. During elections in the last decade, we have seen a handful of isolated incidents where, due to a miscommunication or confusion on the part of our staff, voters have received parking tickets while coming to campus to cast their ballots. We take these unfortunate incidents very seriously and work to resolve them as quickly as possible. I have personally reached out to voters and PVAMU staff to ensure that these mistakes are not repeated, and that every such ticket brought to my attention has been canceled. Because of increased clarity among PVAMU staff about our policy of reserving dedicated parking spaces for voters, we do not expect to see any similar issues in future elections. Ultimately, it is my strong opinion that any parking concerns are a logistical issue that can be addressed and resolved and, therefore, do not outweigh the importance of PVAMU students and Prairie View residents more generally having fair access to early voting, including on PVAMU's campus.

16. The MSC is ADA-compliant, including its above-mentioned access ramp and parking facilities. However, we understand that some voters with mobility issues may find it challenging to navigate nonetheless, and we take these concerns seriously. In response, during the early-voting and Election Day periods for recent elections, we have organized student volunteer mobility escorts to assist voters with

mobility issues who come to the MSC to cast their ballots. We plan to continue to provide this service for the 2020 elections and other elections going forward.

17. It should also be noted that the PVAMU campus hosts numerous public events throughout the year—from cultural events and musical performances to veterans' appreciation days and conferences—that draw non-student attendees who reside in Prairie View, elsewhere in Waller County, and beyond. The MSC is a particularly popular location for public events, due to its large capacity, modern amenities, ADA-compliant design, ample parking, and the fact that it is well-known to students and visitors alike as a hub of activity.

18. In short, I respectfully disagree with concern expressed by some commissioners during deliberations regarding the early voting plan for the 2018 general election that non-student residents of Prairie View, Monaville, or other areas would be uncomfortable traveling to the PVAMU campus to vote, or that PVAMU is not prepared to accommodate them during early voting. Speaking as a former mayor of Prairie View—and a resident of this city for more than 50 years—the suggestion that non-student Prairie View voters would be unwelcome, uncomfortable, or unaccommodated on our campus is absurd. In fact, we are prepared to accommodate all voters who are eligible to participate in early voting on campus, including during the homecoming week.

19. I have also learned of concerns on the part of some Waller County officials about election security at the MSC. My understanding is that these concerns stem entirely from a single incident during the 2018 early voting period when a group of students entered the MSC auditorium to practice for a performance through a door that was

inadvertently left unlocked while the voting machines were in the room. We took this incident seriously and have worked to make sure it does not happen again. At the same time, this was an innocent mistake and was quickly corrected. We do not foresee any security issues at the MSC in future elections. Ultimately, it is my strong opinion that any security concerns at the MSC are based on an isolated incident in 2018 that does not reflect a pattern showing that MSC is an unsecure voting location. Moreover, such a concern can be addressed and, therefore, does not outweigh the importance of PVAMU students and Prairie View residents more generally having fair access to early voting, including on PVAMU's campus.

20.    Ultimately, as a Prairie View resident, former Waller County elected official, and current PVAMU administrator, I strongly believe that early voting at the MSC is necessary to ensure political participation by PVAMU students and other voters. I am aware that Prairie View residents and PVAMU students lack access to vehicles. Moreover, Waller County does not have public transportation. For this reason, it is extremely critical for Waller County to offer on-campus voting for PVAMU students. It simply is a barrier to them being able to have to scrape together a ride, the time, and other resources to travel off-campus to vote.

21.    As a Prairie View resident, former Waller County elected official, and current PVAMU administrator, I am aware of the where the Waller County Community Center ("WCC") is located and that it has been renovated in recent years, including that finally some paved parking is available outside of it. Still, the WCC is an inferior location for voting than the MSC because there is no sidewalk that leads from PVAMU's campus to it, its capacity for people is much smaller than the MSC,

its parking lot is substantially smaller than those that surround the MSC, and the WCC is used infrequently by PVAMU students as compared to the MSC which is the center of life for PVAMU's students. PVAMU students eat, meet for extracurricular activities, study, socialize, go to the bookstore, and more at the MSC.

22. In addition to my work on issues related directly to elections, I have been actively involved in advocating for Waller County officials to stop using the U.S. Post Office's ZIP Codes when assigning addresses to residents Prairie View, including in my testimony at the October 17, 2018 public hearing. My opinion is that this system is inappropriate and creates difficulties for Prairie View residents and PVAMU students.

23. Based on my personal knowledge, consultation with relevant parties, and engagement with these issues, the "rural addressing system" used by Waller County is at the heart of many complications that make it hard for residents of Prairie View, including PVAMU students, to vote on election day. This system makes it necessary and critical for Prairie View residents an PVAMU students to have equal access to early voting.

24. Based on my personal knowledge, consultation with relevant parties, and engagement with these issues, I understand that Waller County's Rural Addressing System uses the U.S. Postal Service's ZIP Codes to assign Rural Addresses to the Residents of Prairie View. Since Prairie View does not have home delivery of mail, the Rural Mail Route ("RFD") method is used.

25.     Based on my personal knowledge, consultation with relevant parties, and engagement with these issues, I understand that rural delivery of mail in Prairie View has been assigned in part to the U.S. Post Office in the City of Waller and in part to the U.S. Post Office in the City of Hempstead. The street that Prairie View officially designates Sandra Bland Parkway, and which many county officials persist in calling by its old name, University Drive (FM 1098), is the artificial dividing line used by these respective U.S. Post Offices for Rural Delivery of mail. The following description is based on my personal knowledge, consultation with relevant parties, and engagement with advocacy around ZIP Codes in Prairie View and on the PVAMU campus:

a.      Residences and buildings east of Sandra Bland Parkway are assigned to the Waller Post Office and are assigned Waller's ZIP Code (77484).

b.      Residences and other buildings west of Sandra Bland Parkway are assigned to the Hempstead Post Office and are assigned Hempstead's ZIP Code (77445).

c.      The only building in the City of Prairie View that uses the Prairie View ZIP Code (77446) is the U. S. Post Office in Prairie View.

d.      Businesses, homes, and apartments within the Prairie View city limits are shown under Waller County's rural addressing system as being located in either Waller or Hempstead. This includes university buildings on the PVAMU campus.

e.      The Prairie View City Hall has a Waller Address.

f. Residential subdivisions in Prairie View are given Hempstead or Waller addresses.

26. I believe the City of Prairie View is losing its identity as an incorporated city as a result of the system maintained by Waller County officials.

27. Based on my personal knowledge, consultation with relevant parties, and engagement with these issues, the confusion caused by Waller County's rural addressing system creates complications with UPS and FedEx delivery, as well as GPS systems.

28. I believe the City of Prairie View may be losing sales tax revenue because of the address system as well.

29. Based on my personal knowledge, consultation with PVAMU students and members of the Prairie View community, and engagement with these issues, the zip code confusion causes voting to become particularly challenging for students and newer residents of Prairie View, because every address in Prairie View, other than the U.S. Post Office in Prairie View, is misrepresented as being located in another city.

30. I am aware of students and others who have been confused into believing that that they live in Hempstead or Waller because of the addresses they have been assigned by Waller County. I have become aware that many students are unsure of which precinct is appropriate for them to vote in on Election Day.

31. I am aware of students who have gone to the wrong polling precinct, under the misapprehension that they live in either Waller or Hempstead rather than Prairie View, and have been turned away.

32. Based on my personal knowledge, consultation with PVAMU students and members of the Prairie View community, and engagement with these issues, has dissuaded some students from voting on Election Day. This is one of the reasons of which I am aware that students rely heavily on early voting to exercise their fundamental right to vote. I have also heard of fear among students that registering with an incorrect address as a result of the ZIP Code issue could lead their registrations to be canceled.

33. I believe that Waller County should stop using the U.S. Post Office's ZIP Codes when assigning addresses to locations in Prairie View. To the best of my knowledge, ZIP Codes are used by the Post Office to sort mail, and are not needed to dispatch Fire, Police or EMS to an address.

34. Based on my knowledge of the importance of early voting for PVAMU students, I believe that Waller County should continue to provide PVAMU students an early voting location on campus at the MSC in the interest of fairness, practicality, and democratic justice. The County should also engage with PVAMU students when they are considering possible polling locations and making other important decisions that affect PVAMU students' ability to participate in the political process and exercise their right to vote. In the recent 2019 elections, Waller County failed to do either of these things, claiming that H.B. 1888 made it impractical to provide an early voting location on campus.

35. One of our most sacred duties as past or present civic leaders is to help train the younger generation in the responsibilities and privileges of citizenship. Waller County should embrace this duty by making it easier, not harder, for PVAMU

students to vote. These students are bright, independent, wise, and excited about participating in our democracy. After all they and their predecessors have overcome to obtain and exercise their right to vote in this county, providing a polling place on-campus is the least that the commissioners court can do—it will help to remedy past and ongoing harms and foster a new generation of voters who are passionately prepared to carrying out the sacred duties of citizenship.

I declare under penalty of perjury that the forgoing is true and correct.

_Frank D. Jackson_
Frank D. Jackson

12/9/19
Date