United States District Court
Southern District of Texas
**ENTERED**
July 15, 2020
David J. Bradley, Clerk

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| JAYLA ALLEN, *et al.*, | § | CIVIL ACTION NO. |
| Plaintiffs, | § | 4:18-cv-03985 |
| | § | |
| | § | |
| vs. | § | JUDGE CHARLES ESKRIDGE |
| | § | |
| | § | |
| WALLER COUNTY, | § | |
| TEXAS, *et al.*, | § | |
| Defendants. | § | |

### MEMORANDUM AND ORDER
### DENYING MOTION FOR SUMMARY JUDGMENT

Plaintiffs are minority students and a student and alumni organization at Prairie View A&M University. Waller County assigned fewer hours of early voting in the October 2018 election to PVAMU than those received by some other areas in the County. Plaintiffs assert that this violated their rights under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments of the United States Constitution and the Voting Rights Act.

Defendants are Waller County and several of its county officials and entities. They have moved for summary judgment after the conclusion of discovery, generally asserting that no discriminatory intent or effect underlay decisions as to early-voting locations and times. Dkt 73.

The Court heard extensive oral argument on the motion and found disputes of material fact to exist. This Memorandum and Order further sets forth the reasons for denial of summary judgment at the conclusion of the hearing.

1.   Background

The following presents a general description of this case. This summary in no way constitutes findings of fact or in any way

constrains the ability of all parties to fully develop the factual record at trial.

Plaintiffs include both individuals and an entity. The individuals are Jayla Allen, Damon Johnson, and Treasure Smith. They are Black students at PVAMU, registered voters, and residents in Waller County. The entity is the Panther Party. It is a student and alumni organization at PVAMU dedicated to addressing and improving the social, political, economic, and historical landscape at PVAMU and the City of Prairie View.

Defendants also include both individuals and entities. The entities are Waller County, Texas, and its governing body of the Waller County Commissioners Court. The individuals are Christy Eason and Carbett Duhon in their respective official capacities as the Waller County Elections Administrator and Waller County Judge.

Waller County abuts the northwest border of Harris County, roughly fifty miles from Houston. PVAMU is the only university in the County. It is a historically Black university of around 8,000 students. Eighty percent of the students are Black. This corresponds to the demographics of the City of Prairie View, where eighty percent of the voting-age population is Black and fifty-four percent are aged eighteen to twenty. This stands in contrast with the population of the County as a whole, where fifty-two percent are White and fourteen percent are aged eighteen to twenty. Dkt 77-1 Ex 2 at 77 (expert report of Henry Flores, Ph.D.). Numerous other statistical and demographic comparisons are set out in the amended complaint. See Dkt 49 at ¶¶ 23–33.

PVAMU students disproportionately engage in early voting. The voting results published by Waller County for the March 2018 primary indicate that sixty-four percent of PVAMU students voted early as compared to forty-three percent countywide.

The City of Prairie View has no public transportation. The individual Plaintiffs and many PVAMU students don't own cars. Plaintiffs argue that this makes travel throughout Waller County uniquely difficult for PVAMU students. PVAMU does have a shuttle. It stops at the on-campus Memorial Student Center at

PVAMU. But it doesn't appear to go to the Waller County Community Center a short distance off campus. Dkt 73-2 at 420 (PVAMU campus map); Dkt 77 at 7, 11.

The two main political parties active in Waller County are the Democratic and Republican parties. Eason consulted with the local chairs of both parties in planning for the 2018 election in her role as the County Elections Administrator. She created a plan of early voting and presented it to the local chairs for consideration, both of whom ultimately approved it after changes. Dkt 73-2 Ex 1 at 87:23–88:05 (deposition of Eason). Neither Eason nor the party chairs consulted any student or administrator representative from PVAMU. Dkt 77-1 Ex 2 (expert report of Henry Flores).

The initial proposal was for early voting to take place at the PVAMU Memorial Student Center from Wednesday to Friday, October 24th through 26th, with additional voting at the Waller County Community Center the following Monday and Tuesday, October 29th and 30th. The Democratic Party chair requested this be changed to avoid any conflicts with homecoming celebrations at PVAMU. Eason then revised the early-voting plan to move all early voting at PVAMU from the first to the second week. Id at 164:20–165:9.

The Commissioners Court adopted this revised voting plan on September 5, 2018. Dkt 73-2 at 547. The amended complaint includes a chart of the early-voting plan as posted to the Waller County website. Dkt 49 at 12. It is attached here as Appendix A and indicates the early-voting locations and times at what are the five largest communities in Waller County—including Brookshire, Hempstead, Katy, and Waller, in addition to the City of Prairie View. This plan made Prairie View the only one of these with no early voting during the first week. As points of comparison, Katy had early-voting only in the first and not the second week. Brookshire, Hempstead, and Waller had early-voting days available in both the first and second weeks, although some of the locations varied. Many smaller towns had no designated early-voting locations at all.

Concern also arose that Prairie View had fewer early-voting hours than the other large communities in Waller County. The

Commissioners Court held a public meeting on October 17, 2018 to address possible changes. Eason recommended adding additional hours at PVAMU and the Prairie View City Hall. This would have included a new on-campus location at the University Square. Disagreement abounded. One commissioner worried that the number of different polling stations open in the Prairie View area on different days over the two-week period would be confusing to voters. The commissioner representing the precinct including Prairie View expressed concern that area residents who weren't students may not wish to vote on campus, and so the additional proposed voting hours would be unfair to them. Another pointed out that smaller communities such as Hockley and Pattinson had no early voting at all. And another supported simply deferring to the political party chairs who had already weighed in.

The Commissioners Court ultimately made no changes to the voting plan. See Dkt 73 at 10–11, citing Dkt 73-2 Ex 9 (video recording of meeting). Plaintiffs filed suit five days later—on October 22, 2018, the date on which early voting began. The Commissioners Court in response met two days later in emergency session on October 24, 2018. Dkt 73-2 at 552. It adopted and implemented additional early-voting hours for the City of Prairie View. This included expanded voting hours from 7:00 am to 7:00 pm on the days already designated at the PVAMU Memorial Student Center during the second week. And it included voting at the additional location of Prairie View City Hall between noon and 5:00 pm on Sunday, October 28th. Id at 11–12, citing Dkt 73-2 Ex 9 (video recording of meeting); see also Dkt 73-2 Ex 3 (deposition transcript of Jayla Allen).

Plaintiffs argue that PVAMU students still received no on-campus voting opportunities during the first week, no on-campus weekend hours, and no additional on-campus early-voting days during the second week. They allege that this establishes a discriminatory effect under the Voting Rights Act, intentional discrimination under the Voting Rights Act and under the Fourteenth and Fifteenth Amendments, and intentional discrimination under the Twenty-Sixth Amendment. They also assert a hybrid claim under the Fourteenth, Fifteenth, and

Twenty-Sixth Amendments specific to Black students aged eighteen to twenty. Dkt 49 at 27.

Defendants moved for summary judgment in January 2020. Dkt 73. Hearing was delayed due to the intervening COVID-19 pandemic. The Court heard extensive argument by videoconference on June 5, 2020. The motion was denied at conclusion of the hearing upon finding that disputes of material fact do exist. The Court directed the parties to begin preparing for trial and advised that this Memorandum and Order would follow to set out the Court's reasoning as an aid to trial preparations.

2.   Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure requires a court to enter summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See *Trent v Wade*, 776 F3d 368, 376 (5th Cir 2015). The Fifth Circuit holds that a fact is *material* "if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v Lone Star State of Texas*, 560 F3d 316, 326 (5th Cir 2009) (quotations omitted). And the Fifth Circuit holds that a *genuine dispute of material fact* exists "when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs LLC v Haydel Enterprises Inc*, 783 F3d 527, 536 (5th Cir 2015), quoting *Anderson v Liberty Lobby*, 477 US 242, 248 (1986).

On motion for summary judgment, the court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Connors v Graves*, 538 F3d 373, 376 (5th Cir 2008). The moving party typically bears the entire burden to demonstrate the absence of a genuine issue of material fact. *Nola Spice*, 783 F3d at 536 (citation omitted); see also *Celotex Corp v Catrett*, 477 US 317, 323 (1986). But when a motion for summary judgment presents a question on which the nonmovant bears the burden of proof at trial, then the burden shifts to plaintiff to demonstrate "by competent summary judgment proof that there is an issue of material fact warranting trial." *Nola Spice*, 783 F3d at 536 (quotations omitted).

3. Analysis

Defendants assert that no right of PVAMU students to vote was denied or abridged by the decision to limit early-voting hours at PVAMU. This may well prove to be true. But the record before the Court is inadequate to reach that conclusion as a matter of law. Plaintiffs will have their day in court to fully develop a factual record at trial of these important claims.

a. Discriminatory racial effect

Plaintiffs bring a claim for discriminatory effect on Black student voters due to the failure of Waller County to provide adequate on-campus early voting in the 2018 election. The exact boundary between their first and second pleaded causes of action is unclear. But the Court understands that they claim a violation of their rights under the Fifteenth Amendment as enforced by Section 2 of the Voting Rights Act.

The Fifteenth Amendment was ratified in the wake of the Civil War, amidst the struggles of Reconstruction to fully guarantee rights of voting to newly freed slaves. Section 1 provides, "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." Section 2 expressly vested Congress with "power to enforce this article by appropriate legislation." It did so by passage of the Voting Rights Act of 1964. See *Veasey v Abbott*, 830 F3d 216, 243 (5th Cir 2016).

Section 2 of the Voting Rights Act is codified at 52 USC § 10301. It protects against the discriminatory effect of a policy on a protected class of voters as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

6

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

The Fifth Circuit in *Veasey v Abbott* adopted a two-part test by which to evaluate a discriminatory-effect claim:

o *First,* "the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice"; and

o *Second,* "that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class."

830 F3d at 244, quoting *League of Women Voters of NC v NC*, 769 F3d 224, 240 (4th Cir 2014). A showing of discriminatory intent quite obviously isn't required to show discriminatory effect. *Veasey*, 830 F3d at 243, citing *Thornburg v Gingles*, 478 US 30, 35 (1986).

The second *Veasey* prong requires a district court to examine a series of factors set out by the Supreme Court in *Gingles*. These include:

- o *First,* "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process";

- o *Second,* "the extent to which voting in the elections of the state or political subdivision is racially polarized";

- o *Third,* "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group";

- o *Fourth,* "if there is a candidate slating process, whether the members of the minority group have been denied access to that process";

- o *Fifth,* "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process";

- o *Sixth,* "whether political campaigns have been characterized by overt or subtle racial appeals";

- o *Seventh,* "the extent to which members of the minority group have been elected to public office in the jurisdiction";

- o *Eighth,* "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group"; and

- o *Ninth,* "whether the policy underlying the state or political subdivision's use of such voting

> qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

*Veasey*, 830 F3d at 245–46, citing *Gingles*, 478 US at 36–37, in turn citing S Rep No 97-417 at 28–29 (1982).

The Fifth Circuit notes that these factors "provide salient guidance from Congress and the Supreme Court on how to examine the current effects of past and current discrimination and how those effects interact with a challenged law." *Veasey*, 830 F3d at 246 (citations omitted). The factors aren't exclusive; none are dispositive; not every factor is relevant in every case; and there is no requirement that any particular number (or even a majority of them) point one way or the other. Ibid. In short, these factors simply suggest a framework for the evidence to be presented at trial which is likely to aid a court's later consideration towards legal conclusions.

The Fifth Circuit bounded its adoption of this two-part framework and attendant analysis of the *Gingles* factors with some cautionary language about use of this test in relation to facially neutral election laws. It stated in preface:

> To prove that a law has a discriminatory effect under Section 2, Plaintiffs must show not only that the challenged law imposes a burden on minorities, but also that "a certain electoral law, practice, or structure interacts with social and historical conditions *to cause* an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."

Id at 244–45 (emphasis in original), quoting *Gingles*, 478 US at 47.

And upon determining to adopt the test, the Fifth Circuit noted argument that under it "all manner of neutral election laws may be struck down." Id at 246. The Fifth Circuit rejected the concern, stating, "Use of the two-factor test and the *Gingles* factors limits Section 2 challenges to those that *properly link* the effects of past and current discrimination with the racially disparate effects of the challenged law." Ibid (emphasis added). The Court must bear this admonition in mind when considering the evidence at trial so that the test isn't "dangerously limitless in application." Id at 247.

A discriminatory burden isn't shown when a voting practice results in a mere disparity of convenience. *Lee v Virginia State Board of Elections*, 843 F3d 592, 600–601 (4th Cir 2016). Defendants try to make the most of this, asserting that students were easily able to walk to the early-voting center located at the Waller County Community Center on the edge of campus. Plaintiffs dispute this, pointing to testimony from their expert on election administration and voter participation that the community center is one and a half miles away from two large residential dormitories. Dkt 77 at 10. The expert claims that this distance is five to six times that at which reduced voter turnout can be observed. Dkt 77-1 at 178–79. Regardless, Defendants also don't account for the additional argument by Plaintiffs about the entire lack of early-voting availability in the Prairie View area during the first week, except by comparison to certain locations in Hempstead, Katy, and Waller that only had early voting the first week but not the second. Dkt 73 at 15; see also Appendix A.

The ability of students to access the community center and exercise their right to vote is a material dispute of fact, as is the adequacy of the overall hours, dates, and locations allocated. The distances don't appear to be very far, but comparative convenience isn't something readily apparent from a cold record. The parties jointly acknowledged at hearing that trial will be to the bench. Dkt 98 at 59 (hearing transcript). The Court intends to visit all pertinent sites during trial so that proper findings of fact as to actual accessibility can be made.

The Court also noted at hearing that Defendants provided no argument on any of the *Gingles* factors. Counsel made clear that they in no way conceded any of these factors. Evidence regarding these factors is material and will also be necessary at trial. The Fifth Circuit has quite plainly determined that these factors must be analyzed towards a proper decision. An entire lack of evidence on these factors precludes summary judgment.

The Court in this regard is concerned about a passage in *Veasey* that is of some pertinence to the first *Gingles* factor concerning the extent of any history of official discrimination as to voting in a political subdivision. The Fifth Circuit there was considering evidence purporting to establish discriminatory

intent by the Texas Legislature with respect to a recent voter-identification law. Analysis observed, "For example, in a state with 254 counties, we do not find the reprehensible actions of county officials in one county (Waller County) to make voting more difficult for minorities to be probative of the intent of legislators in the Texas Legislature, which consists of representatives and senators from across a geographically vast, highly populous, and very diverse state." *Veasey*, 830 F3d at 232. Defendants at hearing were unprepared to explain this reference in any way—not as to the timeframe, not as to the practice involved, and not as to the persons impacted. This is surprising, as it plainly related to a passage in the Plaintiffs' amended complaint, which excerpts from the underlying opinion in *Veasey*. See Dkt 49 at ¶ 72, quoting *Veasey v Perry*, 71 F Supp 3d 627, 635–36 (SD Tex 2014), affd in part, revd in part on other grounds, 830 F3d 216 (5th Cir 2016) (en banc).

The Fifth Circuit expressly noted in *Veasey* that long-past practices may have considerably less probative value than those of recent vintage. 830 F3d at 232. The extent to which any of the referenced practices count as *long in the past* or otherwise unrelated to the policy under review will surely be a subject of contention at trial. But regardless of the distance of time, these practices still must be candidly acknowledged and taken into account in the present. The parties must be prepared to address this history at trial.

Both the disputes of material fact and the lack of clarity as to other facts necessary to the analysis preclude summary judgment on all claims brought by Plaintiffs. The Court briefly addresses those other claims below to set further expectations for trial.

b.   Intentional race discrimination

Aspects of the first cause of action and the entirety of the second state a claim for intentional discrimination to abridge the voting rights of Plaintiffs on account of their race through adoption of the early-voting plan. Dkt 49 at 25. Plaintiffs assert a violation under the Fourteenth and Fifteenth Amendments, as implemented by both Section 2 of the Voting Rights Act and 42 USC § 1983.

Section 2 of the Voting Rights Act covers claims asserting discriminatory purpose. See 52 USC § 10301; see also *Veasey*, 830 F3d at 229. The Fifth Circuit follows the test for violations of the Equal Protection Clause of the Fourteenth Amendment stated by the Supreme Court in *Village of Arlington Heights v Metropolitan Housing Development Corp*, 429 US 252 (1977). Id at 230; see also *Overton v City of Austin*, 871 F2d 529, 540 (5th Cir 1989) (per curiam). As such, "the rights and remedies are intertwined" insofar as Plaintiffs assert a claim based on discriminatory purpose under both § 1983 and § 2 of the Voting Rights Act. *Veasey*, 830 F3d at 265; see also *Ketchum v Byrne*, 740 F2d 1398, 1409–10 (7th Cir 1984).

The test under *Arlington Heights* examines five nonexclusive factors:

o    The historical background of the decision;

o    The specific sequence of events leading up to the decision;

o    Any departures from the normal procedural sequence;

o    Substantive departures; and

o    The legislative history, especially where there are contemporary statements by members of the decision-making body.

*Overton*, 871 F2d at 540, citing *Arlington Heights*, 429 US at 267–68.

As with a discriminatory-effect claim, this is a fact-intensive inquiry. The Supreme Court holds that intentional discrimination isn't shown simply because a policy disproportionately affects members of a certain race. *Rogers v Lodge*, 458 US 613, 618 (1982), citing *Arlington Heights*, 429 US at 265. A discriminatory intent must itself be shown. Ibid. And it has described the inquiry of proving the motivation behind official action as both "a problematic undertaking" and "a hazardous matter." *Hunter v Underwood*, 471 US 222, 228 (1985), and *United States v O'Brien*, 391 US 367, 383 (1968), respectively.

"Legislators' awareness of a disparate impact on a protected group is not enough: the law must be passed *because of* that

disparate impact." *Veasey*, 830 F3d at 231 (emphasis in original), citing *Personnel Administrator of Massachusetts v Feeney*, 442 US 256, 279 (1979). Nevertheless, "[u]nder this intent-based approach, '[r]acial discrimination need only be one purpose, and not even a primary purpose, of an official act' for a violation to occur." *Fusilier v Landry*, __ F3d __, 2020 WL 3496856, *9 (5th Cir), quoting *Velasquez v City of Abilene*, 725 F2d 1017, 1022 (5th Cir 1984).

Plaintiffs thus "bear the burden to show that racial discrimination was a 'substantial or motivating factor behind enactment of the law'; if they meet that burden, 'the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor.'" *Veasey*, 830 F3d at 231, quoting *Hunter*, 471 US at 228.

Plaintiffs describe a history of discrimination in Waller County under Voting Rights Act litigation in the Southern District of Texas. See Dkt 77-1 at 79–82. Defendants don't attempt to dispute that history, instead simply stating that it is only "one factor that may be relevant to discriminatory intent." Dkt 73 at 15.

Likewise, neither party appears to dispute the facts underlying the sequence of events leading up to the decision by the Commissioners Court. But there is intense disagreement over whether those events evince intentional discrimination and whether the officials actually followed their own guidelines. See Dkt 77 at 18. The primary dispute is over what weight should be given to the legislative history and contemporary statements by the Commissioners Court. Plaintiffs assert that a factfinder could conclude that numerous statements provide evidence of bias and intentional discrimination—including that "the 'community' dislikes traveling to PVAMU's campus." Dkt 77 at 19. Defendants assert that other contemporary statements support the opposite inference. Dkt 82 at 10.

This is a dispute of material fact that will likely feature heavily at trial. It requires discernment of facts and weighing of credibility. And it precludes resolution on summary judgment.

c.   Intentional age discrimination

The third cause of action brings a claim for violations of the Twenty-Sixth Amendment under 42 USC § 1983. Plaintiffs assert that the limitation of early voting on the PVAMU campus neither served nor was rationally related to any compelling state interest, and that as such Defendants intentionally discriminated against Plaintiffs based on their age. Dkt 77 at 21. Defendants dispute this, arguing that no burden was placed on Plaintiffs. They additionally dispute whether any evidence even supports a conclusion of discriminatory intent by the Commissioners Court in the setting of early-voting hours to disadvantage Plaintiffs on account of their age. Dkt 82 at 9.

Determination of voter eligibility is largely a matter devoted to state or local control under the United States Constitution as originally proposed and ratified. For instance, Section 4 of Article I gives Congress the power to regulate the "Times, Places and Manner of holding Elections"—but not the power to fix qualifications for voting in elections. And so, a series of amendments have steadily recognized specific rights of voting while at the same time allocating federal legislative power to ensure protection of those rights. See US Const Amend XV, § 2 (congressional power to enforce prohibition against abridgement or denial of voting rights on account of race); US Const Amend XIX, § 2 (congressional power to enforce prohibition against abridgement or denial of voting rights on account of sex); US Const Amend XXVI, § 2 (congressional power to enforce prohibition against abridgement or denial of voting rights to those eighteen years or older on account of age).

Federal law in the midst of the Vietnam War set the age for the military draft at eighteen, while some states limited the vote only to citizens twenty-one or older. Congress sought to correct this disconnect by lowering the voting age to eighteen with passage of Title III of the Voting Rights Act of 1970. But a plurality of the Supreme Court in *Oregon v Mitchell* held this to exceed congressional legislative power. 400 US 112, 118 (1970).

The Twenty-Sixth Amendment provided the necessary grant of federal legislative power with relative speed, being both sent to the states for ratification and becoming effective in 1971.

Section 1 states, "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." Section 2 expressly vested Congress with "power to enforce this article by appropriate legislation."

The Twenty-Sixth Amendment has received nowhere near the amount of judicial attention as other voting-rights causes of action. Academic comment observes that it has been applied in only one Supreme Court case. See Eric S. Fish, Note, *The Twenty-Sixth Amendment Enforcement Power*, 121 YALE LJ 1168, 1170 (2012). But that Supreme Court case happens to be another action involving PVAMU decided shortly after ratification of the amendment. See *Symm v United States*, 439 US 1105 (1979).

*Symm* marked the culmination of several different, but related, cases brought by PVAMU students beginning in 1972 to vindicate their right to vote, concluding with *United States v State of Texas*, 445 F Supp 1245 (SD Tex 1978). The challenge was to a voting-registration requirement in Texas that prohibited college dormitory residents from voting unless they could overcome a statutory presumption of nonresidency. PVAMU students lost their challenges in *Ballas v Symm,* 351 F Supp 876 (SD Tex 1972), affd, 494 F2d 1167 (5th Cir 1974), and *Wilson v Symm*, 341 F Supp 8 (SD Tex 1972). But in another case brought by students at North Texas State University, the Fifth Circuit in *Whatley v Clark* subsequently held the Texas presumption unconstitutional under the Fourteenth Amendment as unnecessary to promote any compelling state interest—and without addressing the Twenty-Sixth Amendment. 482 F2d 1230, 1234 (5th Cir 1973). Even so, the state voting registrar for the area including PVAMU required students (but not other Waller County residents) to fill out a questionnaire establishing intent to remain in the County after graduation. In action brought by the Attorney General, a three-judge district court panel held this to violate the Twenty-Sixth Amendment as enforced by Title III of the Voting Rights Act. *United States v State of Texas*, 445 F Supp at 1261. Direct appeal was taken to the Supreme Court, which simply and summarily affirmed under the name *Symm v United States*, 439 US 1105 (1979).

Only a handful of lower federal court cases have otherwise addressed the Twenty-Sixth Amendment. Most have applied the *Arlington Heights* factors, at least insofar as it pertains to claims of intentional discrimination against the youth vote. For example, in *League of Women Voters of Florida Inc v Detsner*, the court preliminarily enjoined Florida's Secretary of State from prohibiting county supervisors of elections from placing early-voting sites on college campuses, finding this to evince intentional age discrimination. 314 F Supp 3d 1205, 1221–23, 1225 (ND Fla 2018). At least two other cases have declined to find intentional age discrimination due to changes in state law prohibiting or limiting students from using college IDs to meet voter-ID requirements. See *One Wisconsin Institute Inc v Thomsen*, 198 F Supp 3d 896, 926 (WD Wis 2016) (expressly applying *Arlington Heights* factors), affd in part, revd in part on other grounds, *Luft v Evers*, __ F3d __, 2020 WL 3496860 (7th Cir); *NC State Conference of the NAACP v McCrory*, 182 F Supp 3d 320, 522 (MD NC 2016) (implicitly undertaking same analysis applicable to Fifteenth Amendment claims), revd on other grounds, 831 F3d 204 (4th Cir 2016).

The Fourth Circuit has expressed some skepticism in this regard. In *Lee v Virginia State Board of Elections*, the Eastern District of Virginia considered the *Arlington Heights* factors and held that a change to the voter-ID law to require valid photo identification didn't evince intentional age discrimination. 188 F Supp 3d 577, 609–10 (ED Va 2016), affd, 843 F3d 592 (4th Cir 2016). The Fourth Circuit affirmed the determination that the plaintiffs had failed to show intent to discriminate on the basis of age. 843 F3d at 607. But at the same time it cautioned that it is "far from clear that the Twenty-Sixth Amendment should be read to create a cause of action that imports principles from Fifteenth-Amendment jurisprudence." *Lee*, 843 F3d at 607. Indeed, in yet another student-ID exclusion case, the court avoided the need even to reach the question whether the *Arlington Heights* factors pertain to the analysis upon finding such exclusion to impose no burden on students' right to vote. See *Nashville Student Organizing Committee v Hargett*, 155 F Supp 3d 749, 757 (MD Tenn 2015).

The parties have argued this claim on assumption that the *Arlington Heights* factors will apply here. That may be so, and the Court intends to take evidence and make findings under those factors to allow consideration on any appeal. But the briefing of the parties concluded before the Fifth Circuit itself recently addressed the Twenty-Sixth Amendment in *Texas Democratic Party v Abbott*, 961 F3d 389 (5th Cir 2020). It there stayed a preliminary injunction mandating mail-in voting for all voters due to circumstances arising from the COVID-19 pandemic. The underlying Texas law had long provided voters aged sixty-five years and older with the option to vote by mail. Id at 402, citing Texas Election Code § 82.003. This ran into claims brought under the Equal Protection Clause of the Fourteenth Amendment and the Twenty-Sixth Amendment.

Even given a statutory dividing point set by reference to age, the Fifth Circuit concluded that rational-basis review applied. Id at 409. In doing so, it addressed the summary affirmance in *Symm v United States*, noting as to the underlying district court decision that it "nowhere stated that strict scrutiny applies anytime a voting-procedure rule—no matter the context—makes an age distinction." Id at 409. The Fifth Circuit didn't need to reach the *Arlington Heights* factors or even decide whether they applied. It instead found the decision of the Supreme Court in *McDonald v Board of Election Commissioners of Chicago*, 394 US 802, 807–08 (1969), to control the analysis of the challenged law. Ibid. As to the Twenty-Sixth Amendment, the Fifth Circuit described its "immediate purpose" as simply lowering the voting age from twenty-one to eighteen. Id at 408 (citations omitted). But a footnote clarified that this did "not necessarily imply that the Twenty-Sixth Amendment is toothless to do anything beyond lowering the voting age"—while otherwise declining to weigh in on the "historical debate." Id at 408 n 46.

The Court thus has under advisement the appropriate legal standard and any additional findings necessary in this regard. The parties are directed to more concretely brief with pretrial submissions the standard for analyzing the claim of violation of the Twenty-Sixth Amendment at issue here.

As noted at the outset of this section, the parties disagree whether the early-voting plan evinces discrimination by abridgement of the voting rights of the only concentration of students in Waller County between the ages of eighteen and twenty. Much of this follows in line with their arguments regarding racial discrimination. As there, genuine disputes of material fact exist. And the extent and credibility of any evidence of illicit intent again precludes summary judgment and must be evaluated at trial.

### d.   Hybrid claim under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments

The fourth cause of action states a claim for intent to discriminate against the specific class of Black voters aged eighteen to twenty. Plaintiffs assert what they characterize as a blended right protected under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments read together. They phrase this claim in the amended complaint as discrimination "on the intersecting bases of age and race." Dkt 49 at ¶ 98.

Plaintiffs direct attention to two district cases they say addressed a race/age hybrid claim. One is again *United States v State of Texas*, 445 F Supp 1245 (SD Tex 1978), summarily affd sub nom *Symm v United States*, 439 US 1105 (1979). The other is *Latham v Chandler*, 406 F Supp 754 (ND Miss 1976). Both originated in the Fifth Circuit, but neither received attention there. And neither court appears to have actually recognized the hybrid constitutional claim forwarded here by Plaintiffs.

For instance, the Northern District of Mississippi in *Latham* addressed whether attorney fees could be recovered in a class action brought to ensure equal treatment of voter-registration applications by Black students attending Mississippi Valley State University. The defendants sought no appeal, instead immediately complying with the district court's preliminary injunction mandating equal treatment. The action proceeded on claims under the First, Fourteenth, Fifteenth, and Twenty-Sixth Amendments. But the opinion by the district court doesn't address whether this involved a hybrid constitutional claim of the sort alleged here. 406 F Supp at 755.

And as stated above, the Supreme Court summarily affirmed the decision of the Southern District of Texas in *Symm v United States*, 439 US 1105 (1979). The three-judge panel below had found the complained-of conduct to violate the Twenty-Sixth Amendment without addressing the Fifteenth Amendment in its analysis. See generally *United States v State of Texas*, 445 F Supp at 1253–59. The court in one of the earlier related cases, *Wilson v Symm*, commented that "this is not a racial discrimination case. It is a student voting case," with the fact that the plaintiffs were Black being "no more than a fortuitous consequence of the fact that the only aggregation of college students in Waller County happens to be at Prairie View." 341 F Supp at 12. And *Whatley v Clark* did specifically refer to students when holding the state's presumption of nonresidency for students to be unconstitutional. 482 F2d at 1233. But it decided the case purely on Fourteenth Amendment grounds for lack of state interest, without reference to either the Fifteenth or Twenty-Sixth Amendments.

Plaintiffs thus largely seek recognition of a new constitutional claim of uncertain dimensions and standards. Yet it is difficult to conceive of a hybrid action combining the Fourteenth, Fifteenth, and Twenty-Sixth Amendments where independent action under each wouldn't redress the grievance. For instance, if Waller County didn't discriminate against *all* student voters but only against *Black* student voters, a claim would clearly sound under the Fifteenth Amendment. Likewise, if Waller County didn't discriminate against *all* Black voters but only against Black *student* voters, a claim would clearly sound under the Twenty-Sixth Amendment.

This is not to suggest that constitutional litigation is a logic puzzle or a matter of semantics. Indeed, the Court will allow this claim to go forward for evidentiary development at trial. But the parties are directed to brief the legal aspects of this claim more concretely with their pretrial submissions. And Plaintiffs should pay particular attention to developing facts—along with rights and remedies—that distinguish this hybrid claim from each of its constituent components.

The Fifth Circuit teaches in *Veasey* that a federal court shouldn't decide a constitutional question if some other ground

exists upon which to dispose of the case. *Veasey*, 830 F 3d at 265 (declining to reach combined claim under First and Fourteenth Amendments). The Court reserves judgment on whether it will need to reach this claim and, if reached, whether such hybrid claim is cognizable.

      4.   Conclusion

This motion for summary judgment by Defendants is DENIED.

SO ORDERED.

Signed on July 15, 2020, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge

20

**Appendix A**
**Initial Early-Voting Plan, Waller County, 2018 Election**
**Dkt 49 at 12**

| 2018 GENERAL ELECTION WALLER COUNTY AND ROYAL ISD | EARLY VOTING LOCATIONS | |
|---|---|---|
| DURING EARLY VOTING ALL PRECINCTS AND ENTITIES CAN VOTE AT ANY LOCATION | | |
| **WEEK ONE** | | |
| MONDAY – FRIDAY October 22 – 26, 2018 | Waller County Courthouse 836 Austin St, Hempstead, Tx | 8am – 5pm |
| SATURDAY October 27, 2018 | | 9am – 2pm |
| SUNDAY October 28, 2018 | | 12pm – 5 pm |
| MONDAY – FRIDAY October 22 – 26, 2018 | Waller ISD Admin Bldg 2214 Waller St., Waller, Tx | 8am – 5pm |
| SATURDAY October 27, 2018 | | 9am – 2pm |
| MONDAY – FRIDAY October 22 – 26, 2018 | Waller Co Library Brookshire 3815 6th St., Brookshire, Tx | 8am – 5pm |
| SATURDAY October 27, 2018 | | 9am – 2pm |
| SUNDAY October 28, 2018 | | 12pm – 5 pm |
| THURSDAY – FRIDAY October 25 – 26, 2018 | Fieldstore County Bldg, JP 2 27388 Fieldstore Rd., Waller, Tx | 8am – 5pm |
| SATURDAY October 27, 2018 | | 9am – 2pm |
| THURSDAY – FRIDAY October 25 – 26, 2018 | Monaville County Bldg., JP 3 12620 FM 1887, Hempstead, Tx | 8am – 5pm |
| SATURDAY October 27, 2018 | | 9am – 2pm |
| MONDAY – WEDNESDAY October 22 – 24, 2018 | Katy VFW 6206 George Bush Dr., Katy, Tx | 8am – 5pm |
| **WEEK TWO** | | |
| MONDAY – WEDNESDAY October 29 – 31, 2018 | Waller Co Courthouse 836 Austin St, Hempstead, Tx | 8am – 5pm |
| THURSDAY - FRIDAY November 1 – 2, 2018 | | 7am – 7pm |
| MONDAY – WEDNESDAY October 29 – 31, 2018 | Waller ISD Admin Bldg 2214 Waller St., Waller, Tx | 8am – 5pm |
| THURSDAY - FRIDAY November 1 – 2, 2018 | | 7am – 7pm |
| MONDAY – WEDNESDAY October 29 – 31, 2018 | Waller Co Library Brookshire 3815 6th St., Brookshire, Tx | 8am – 5pm |
| THURSDAY - FRIDAY November 1 – 2, 2018 | | 7am – 7pm |
| MONDAY – WEDNESDAY October 29 – 31, 2018 | Memorial Student Center PVAMU , Prairie View, Tx | 8am – 5pm |
| THURSDAY – FRIDAY November 1 – 2, 2018 | WC Community Center – PV FM 1098, Prairie View, Tx | 7am – 7pm |