# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| DAMON JOHNSON, TREASURE SMITH, and THE PANTHER PARTY,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>WALLER COUNTY, TEXAS; THE WALLER COUNTY COMMISSIONERS COURT; JUDGE CARBETT "TREY" J. DUHON III, in his official capacity as the Waller County Judge; CHRISTY A. EASON, in her official capacity as the Waller County Elections Administrator,<br><br>     *Defendants*. | Civil Case No. 4:18-cv-03985-CRE |

## PLAINTIFFS' MEMORANDUM OF LAW

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................ii

TABLE OF AUTHORITIES...........................................................................................vi

SUMMARY OF THE ARGUMENT ............................................................................... 1

ARGUMENT.................................................................................................................... 5

I.    Waller County's 2018 Early Voting Plan Violated the U.S. Constitution's Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act (Discriminatory Purpose) ................................................................. 5

    A.    The U.S. Constitution and VRA Forbid Officials from Acting with a Discriminatory Purpose on the Basis of Race.................................................... 5

    B.    Defendants' Adoption and Maintenance of the 2018 Early Voting Plan Was, at Least in Part, Motivated by an Intent to Minimize Black Voters' Political Participation .......................................................................... 9

        i.    The 2018 Early Voting Plan Had a Discriminatory Impact on Black Prairie View Voters.................................................................................................... 9

        ii.    Defendants Knew or Should Have Known the Foreseeable Racial Impact of the 2018 Early Voting Plan .................................................................................... 15

        iii.    The Sequence of Events Reveals Defendants Failed to Adopt Ameliorative Changes to Lessen the 2018 Early Voting Plan's Anticipated Discriminatory Impact ................................................................................................................. 18

        iv.    Defendants' Departures from the Ordinary Decision-making Process Reveal an Impermissible Motive.................................................................................... 24

        v.    Defendants Hid Their Effort to Suppress Black Political Participation Behind Tenuous Justifications ..................................................................................... 27

        vi.    Defendants' Contemporaneous and Coded Statements Reveal Unconstitutional Biases Against Black Voters ...................................................... 32

        vii.    The 2018 Early Voting Schedule is a Continuation of Waller County's History of Voting Discrimination.......................................................................... 34

II.    Waller County's 2018 Early Voting Schedule Violated the Twenty-Sixth Amendment....................................................................................................... 40

    A.    The U.S. Constitution Forbids Officials from Acting with a Discriminatory Purpose on the Basis of Age .................................................. 40

    B.    *Arlington Heights* is the Appropriate Standard to Analyze the Twenty-Sixth Amendment Claim in this Case ............................................................ 41

C.     Defendants' Adoption and Maintenance of the 2018 Early Voting Schedule, at Least in Part, Was to Minimize the Political Participation of Students Aged 18-20 .................................................................................... 42

i.    The 2018 Early Voting Plan's Disproportionate Impact on PVAMU Student Voters ................................................................................................................. 43

ii.    Defendants Knew the Early Voting Plan Would Disproportionately Deny or Abridge PVAMU Student Voting Rights ............................................................ 47

iii.    The Sequence of Events Also Reveals Defendants Failed to Lessen the Early Voting Plan's Known Discriminatory Impact ....................................................... 48

iv.    Defendants' Departures from the Ordinary Decision-making Process Reveal an Impermissible Motive ...................................................................................... 50

v.    Defendants Hid Their Effort to Suppress PVAMU Students' Political Participation Behind Tenuous Justifications ........................................................ 51

vi.    Defendants' Contemporaneous and Coded Statements Reveal Unconstitutional Biases Against Student Voters .................................................... 53

vii.    The Early Voting Plan is a Continuation of Waller County's History of Voting Discrimination Against Young Voters ....................................................... 54

III.    Waller County's 2018 Early Voting Schedule Discriminated on the Intersecting Bases of Race and Age in Violation of the Fourteenth, Fifteenth, and Twenty-Sixth Amendments ......................................................... 54

A.    The U.S. Constitution Forbids Officials from Acting with a Discriminatory Purpose on the Intersecting Bases of Age and Race ............... 54

B.    *Arlington Heights* is the Appropriate Standard to Analyze the Intersecting Basis Claim in this Case ............................................................... 56

C.    The Adoption and Maintenance of the 2018 Early Voting Schedule, at Least in Part, Was to Minimize the Political Participation of Students on the Intersecting Bases of Age and Race ................................................... 56

i.    The 2018 Early Voting Plan Disproportionately Impacted Black PVAMU Student Voters ................................................................................................... 56

ii.    Defendants Knew the 2018 Early Voting Plan Would Disproportionately Harm Black PVAMU Student Voters' Rights ...................................................... 57

iii.    The Sequence of Events Also Reveals Defendants Failed to Lessen the 2018 Early Voting Plan's Known Discriminatory Impact on Black PVAMU Students 58

iv.    Defendants' Departures from the Ordinary Decision-making Process Reveal an Impermissible Motive ...................................................................................... 59

v.    Defendants Hid Their Effort to Suppress Black PVAMU Students' Political Participation Behind Tenuous Justifications ........................................................ 60

vi. Defendants' Contemporaneous and Coded Statements Reveal Unconstitutional Biases Against Black PVAMU Students ................................... 60

vii. The Early Voting Plan is a Continuation of Waller County's History of Voting Discrimination Against Black PVAMU Students ..................................... 61

IV. Waller County's 2018 Early Voting Schedule Violated Section 2 of the VRA (Discriminatory Results) ....................................................... 62

A. Legal Standard .................................................................. 62

B. Under *Veasey*'s First Step, Defendants' 2018 Early Voting Plan Imposed a Discriminatory Burden on Black Voters in Waller County. ......... 68

C. Under *Veasey*'s Second Step, the Early Voting Plan's Burden is Caused by or Linked to Social and Historical Conditions that Produce Discrimination against Black Voters, Violating Section 2. ............................ 72

i. The burden is caused by or linked to Waller County's history of official discrimination in voting, registration, and political participation under Senate Factor 1. .............................................................................. 73

ii. The burden is caused by or linked to racially polarized voting in Waller County under Senate Factor 2. ................................................................ 74

iii. The burden is caused by or linked to the ongoing effects of state-sponsored discrimination in areas as education, employment and health, which hinder Black people's ability to participate effectively in the political process in Waller County under Senate Factor 5. ...................................................... 75

iv. The burden is caused by or linked to Black candidates' lack of success in running for countywide offices in Waller County under Senate Factor 7. ............ 77

v. The 2018 early voting plan's burden is caused by or linked to Waller County officials' lack of responsiveness to the particularized needs of Black residents under Senate Factor 8. ............................................................. 79

vi. The burden is caused by or linked to Waller County officials' reliance on tenuous policy rationales to justify their early voting plan under Senate Factor 9. 80

V. Plaintiffs Are Entitled to Their Requested Relief .............................................. 82

A. This Court Has Broad Equitable Discretion to Order Each of Plaintiffs' Requested Remedies ............................................................. 82

B. HB 1888 Does Not Moot Plaintiffs' Claims .................................... 86

C. PVAMU is Neither a Necessary nor Indispensable Party to this Lawsuit ........................................................................ 92

D. Even if PVAMU Were Indispensable, Sovereign Immunity Is No Bar to Joinder ....................................................................... 95

E.      This Court Needs to Reach Both Constitutional and Statutory Claims To Grant Plaintiffs' Requested Relief ............................................................. 97

CONCLUSION ......................................................................................................... 99

CERTIFICATE OF SERVICE ............................................................................... 101

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*,
    851 F.3d 507 (5th Cir. 2017) ....................................................... 96

*Allen v. City of Evergreen*,
    No. 13-0107-CG-M, 2014 WL 12607819 (S.D. Ala. Jan. 13, 2014) .......... 85

*Antoine v. Winner Sch. Dist.*
    59-2, No. 06-cv-3007-CBK (D.S.D. Dec. 10, 2007) ............................. 84

*Bauer v. Texas*,
    341 F.3d 352 (5th Cir. 2003) ................................................... 90, 91

*Berry v. Sch. Dist. of Benton Harbor*,
    515 F. Supp. 344 (W.D. Mich. 1981), *aff'd and remanded*, 698 F.2d 813
    (6th Cir. 1983) .................................................................... 83-84

*Bethune-Hill v. Va. State Bd. of Elections*,
    137 S. Ct. 788 (2017) .......................................................... 30, 31

*Brown v. Bd. of Educ. of Topeka*,
    349 U.S. 294 (1955) ............................................................ 82, 98

*Brown v. Board of Education*,
    347 U.S. 483 (1954) .................................................................. 76

*Brown v. Dean*,
    555 F. Supp. 502 (D.R.I. 1982) ................................................... 83

*Brown v. Post*,
    279 F. Supp. 60 (W.D. La. 1968) .................................................. 6

*Campbell-Ewald Co. v. Gomez*,
    136 S. Ct. 663 (2016) ............................................................... 91

*Chisom v. Roemer*,
    501 U.S. 380 (1991) ............................................................. 5, 62

*City of Austin v. Paxton*,
    943 F.3d 993 (5th Cir. 2019) ..................................................... 96

*City of Richmond v. United States*,
    422 U.S. 358 (1975) ................................................................... 9, 54

*Evanston Ins. Co. v. Kinsale Ins. Co.*,
    No. 7:17-CV-327, 2018 WL 4103031 (S.D. Tex. July 12, 2018) ............................... 93

*Floyd v. City of New York*,
    959 F.Supp.2d 668 (S.D.N.Y. 2013) .......................................................... 83

*Foster v. Chatman*,
    136 S. Ct. 1737 (2016) ........................................................................ 8

*Goodloe v. Madison Cty. Bd. of Election Comm'rs*,
    610 F. Supp. 240 (S.D. Miss. 1985) ............................................................. 5

*Haitian Refugee Ctr. v. Smith*,
    676 F.2d 1023 (5th Cir. 1982) ................................................................. 82

*Harper v. Va. Bd. of Elections*,
    383 U.S. 663 (1966) ........................................................................... 6

*Honig v. Doe*,
    484 U.S. 305 (1988) .......................................................................... 90

*Hunter v. Underwood*,
    471 U.S. 222 (1985) ......................................................................... 8, 9

*Jefferies v. Harris Cty. Cmty. Action Ass'n*,
    615 F.2d 1025 (5th Cir. 1980) ................................................................ 55

*Jones v. Jefferson Cty. Bd. of Educ.*,
    No. 2:19-CV-01821-MHH, 2019 WL 7500528 (N.D. Ala. Dec. 16,
    2019) ....................................................................................... 85

*Kelley v. Metro. Cty. Bd. Of Educ.*,
    479 F. Supp. 120 (M.D. Tenn. 1979) .......................................................... 84

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
    567 U.S. 298 (2012) .......................................................................... 87

*Latham v. Chandler*,
    406 F. Supp. 754 (N.D. Miss. 1976) ........................................................... 55

*League of United Latin Am. Citizens Council No. 4434 v. Clements*,
    986 F.2d 728 (5th Cir) (1993), *on reh'g*, 999 F.2d 831 (5th Cir. 1993). .................... 81

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006) ....................................................... 8, 34, 71, 89

*League of Women Voters of Fla., Inc., v. Detzner*,
  314 F. Supp. 3d 1205 (N.D. Fla. 2018) ........................................ 41

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ........................................ 65, 67, 71

*Lemon v. Kurtzman*,
  411 U.S. 192 (1973) ........................................ 82, 86, 98

*Luft v. Evers*,
  963 F.3d 665 (7th Cir. 2020) ........................................ 41

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
  485 U.S. 439 (1988) ........................................ 97

*McMillan v. Escambia Cnty., Fl.*,
  748 F.2d 1037 (5th Cir. 1984) ........................................ 7

*Miss. State Chapter, Operation PUSH v. Mabus*,
  932 F.2d 400 (5th Cir. 1991) ........................................ 6

*Hood ex rel. Miss. v. City of Memphis*,
  570 F.3d 625 (5th Cir. 2009) ........................................ 94

*N.C. State Conference of the NAACP v. McCrory*,
  182 F. Supp. 3d 320 (M.D.N.C. 2016) *rev'd on other grounds*, 831 F.3d
  204 (4th Cir. 2016) ........................................ 41

*N.C. State Conference of NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) ........................................ 8, 10, 26

*Nashville Student Org. Comm. v. Hargett*,
  155 F.Supp.3d 749 (M.D. Tenn. 2015) ........................................ 41, 42

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
  557 U.S. 193 (2009) ........................................ 85

*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ........................................ 34, 95, 96

*Ohio State Conference of N.A.A.C.P. v. Husted*,
  768 F.3d 524 (6th Cir. 2014), *vacated*, No. 14-3877, 2014 WL
  10384647 (6th Cir. Oct. 1, 2014) ........................................ 65

*One Wis. Inst., Inc. v. Thomsen*,
    198 F. Supp. 3d 896, 926 (W.D. Wis. 2016), *order enforced*, 351 F.
    Supp. 3d 1160 (W.D. Wis. 2019), and *aff'd in part*, *vacated in part*,
    *rev'd in part sub nom. Luft v. Evers,* 963 F.3d 665 (7th Cir. 2020) ............................ 41

*Patino v. City of Pasadena*,
    230 F. Supp. 3d 667 (S.D. Tex. 2017) ................................................................. 80, 98

*Patino v. City of Pasadena*,
    No. H-14-3241, 2017 WL 10242075 (S.D. Tex. Jan. 16, 2017) ........................... 85, 86

*Perez v. Abbott*,
    253 F. Supp. 3d 864 (W.D. Tex. 2017) ...................................................................... 8

*Perez v. Abbott*,
    390 F. Supp. 3d 803 (W.D. Tex. 2019) ................................................................. 85, 97

*Perez v. Perry*,
    26 F. Supp. 3d 612 (W.D. Tex. 2014) ....................................................................... 34

*Prairie View Chapter of NAACP v. Kitzman*,
    No. 4:04-cv-00459 (S.D. Tex. Feb. 24, 2004) .......................................................... 35

*Pulitzer-Polster v. Pulitzer*,
    784 F.2d 1305 (5th Cir. 1986) ............................................................................. 94, 95

*Quern v. Jordan*,
    440 U.S. 332 (1979) ................................................................................................ 96

*Reno v. Bossier Par. Sch. Bd.*,
    520 U.S. 471 (1997) ....................................................................................... 5, 10, 43

*Rogers v. Lodge*,
    458 U.S. 613 (1982) ........................................................................................ *passim*

*Spirit Lake Tribe v. Benson Cty.*,
    No. 2:10-cv-095, 2010 WL 4226614 (D.N.D. Oct. 21, 2010) .................................... 83

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
    402 U.S. 1 (1971) .................................................................................................... 82

*Texas Democratic Party v. Abbott*,
    961 F.3d 389 (5th Cir. 2020) ........................................................................... 2, 3, 41

*Thornburg v. Gingles*,
    478 US 30 (1986) .............................................................................................. *passim*

*Toney v. White,*
    488 F.2d 310 (5th Cir. 1973) (en banc) ....................................................... 6

*Tyehimba v. City of Cincinnati,*
    No. C-1-99-317, 2001 WL 1842470 (S.D. Ohio May 3, 2001).................................. 83

*United States v. Brown,*
    561 F.3d 420 (5th Cir. 2009) ....................................................*passim*

*United States v. Marengo Cty. Comm'n,*
    731 F.2d 1546 (11th Cir. 1984) ........................................................ 81, 82

*United States v. Palmer,*
    356 F.2d 951 (5th Cir. 1966) ........................................................ 83

*United States v. Texas,*
    445 F. Supp. 1245 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United*
    *States,* 439 U.S. 1105 (1979) .................................................. 36, 37, 41, 55

*United States v. Texas Ed. Agency,*
    564 F.2d 162 (5th Cir. 1977) .................................................. 10, 15, 47

*United States v. Texas Ed. Agency,*
    600 F.2d 518 (5th Cir. 1979) ........................................................ 7

*Va. Office for Prot. and Advocacy v. Stewart,*
    563 U.S. 247 (2011) ........................................................ 96

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) (en banc) ....................................................*passim*

*Veasey v. Abbott,*
    888 F.3d 792 (5th Cir. 2018) ........................................................ 82

*Veasey v. Perry,*
    71 F. Supp. 3d 627 (S.D. Tex. 2014), *aff'd in part, and rev'd in part on*
    *other grounds sub nom. Veasey v. Abbott,* 830 F. 3d 216 (5th Cir. 2016)
    (en banc), *cert. denied,* 137 S. Ct. 612 (2017) .................................................. 36, 80

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977)........................................................*passim*

*Walgren v. Howes,*
    482 F.2d 95 (1st Cir. 1973)........................................................ 55

**Statutes and Other Authorities**

52 U.S.C. § 10301(a) ........................................................................ 5, 62, 67, 97

52 U.S.C. § 10301(b) ..................................................................................... 63

52 U.S.C. § 10302(c) ............................................................................... 85, 97

Fed. R. Civ P. 19 ................................................................................. 93, 94, 95

S. Rep. No. 97-417 (1982), reprinted in 1982 U.S.C.C.A.N. 177 .............................. 63, 77

U.S. Const. amend. XIV ............................................................................ 5, 55

U.S. Const. amend. XV ............................................................................. 5, 55

U.S. Const. amend. XXVI ....................................................................... 40, 55

U.S. Envtl. Protection Agency, *Smart Location Mapping: Interactive maps
and data for measuring location efficiency and the built environment* ...................... 46

Waller County, *Canvass Report, Democratic Primary, March 04, 2008* ........................ 79

Waller County, *Canvass Report, General Elections, November 04, 2008* ...................... 79

Waller County officials evaded theirs constitutional and statutory obligations during the 2018 general election early voting cycle. They did so by allocating early voting access in a discriminatory manner that abridged the voting rights of Black, young voters, and Black student voters in Waller County. To achieve this purpose, Defendants ignored the repeated requests by Black voters in Waller County and departed from their own early voting criteria. Although Defendants publicly recognized the inequities in their early voting plan, they failed to lessen its foreseeable, discriminatory impact despite having the authority, community support, recommendations, and resources to do so. They defended their actions by offering pretextual and tenuous rationales that were uncorroborated and unsupported by the record in the fall of 2018. Because of these and the ongoing harms discussed below, Black Waller County voters, once again, seek validation of their constitutional and statutory rights through the federal courts.

No party disputes that the *Arlington Heights* framework is the appropriate standard for reviewing Plaintiffs' claims on the basis of race under the Fourteenth and Fifteenth Amendments of the U.S. Constitution and Section 2 of the Voting Rights Act ("Section 2"). *See* Defs.' Mot. for Summ. J., ECF 71 at 29.[1] Under *Arlington Heights*, the evidence at trial will show that *a* discriminatory purpose motivated Defendants' decision to adopt and maintain their 2018 early voting plan for the general election to discriminate against

---

[1]     ECF page numbers refer to the file-stamped page numbers.

Black voters, the largest concentration of whom is in the City of Prairie View in Waller County. As community members protested at the time, and Defendants themselves admitted, the total hours that Black voters in Prairie View received in early voting access— 65, almost exclusively during the second of two weeks of early voting—stand in stark contrast to the total hours (124) that cities like Waller, with significantly larger populations of white voters, and far fewer Black voters, enjoyed over two weeks of early voting.

Nor did any party dispute, as of the summary judgment briefing in this case, that the Fifth Circuit has not articulated a clear standard for reviewing a claim of discrimination on the basis of age under the Twenty-Sixth Amendment. Plaintiffs have urged this Court to apply the *Arlington Heights* framework to their Twenty-Sixth Amendment claim based on the facts in this case and the nature of their claim. Consistent with that, at summary judgment, Defendants recognized that "courts in other jurisdictions have applied the *Arlington Heights* analysis to such claims," *id*. at 34. Since then, the Fifth Circuit in *Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020), has applied rational basis review to a Twenty-Sixth Amendment challenge to a Texas vote-by-mail statute that permits all persons over the age of 65 to use vote by mail, but does not provide that same automatic right to those under 65.

But that case, a facial challenge premised on a suspect classification, is not instructive here. Plaintiffs' Twenty-Sixth Amendment claim is that Defendants purposefully created an inequity in early voting access to the detriment of the only concentrated group of 18- through 20-year-old voters in Waller County. Moreover, Defendants did so in full awareness of the high use, demonstrated demand, and, indeed,

dependence on early voting among these young voters, students attending Prairie View A&M University ("PVAMU"). As Plaintiffs' expert Dr. Robert Stein found, 81% of student voters at PVAMU who voted in 2018 did so via early voting (as compared to 71% of Waller County voters overall), and over 75% of PVAMU-student early voters cast their ballots at the on-campus Memorial Student Center ("MSC"). As explained below, on-campus early voting is often the only option for student voters seeking to exercise the franchise in Waller County, given the unique socioeconomic and transportation barriers they face; their busy and often-inflexible school, work, and activities schedules; the nature of student life at a residential campus in a rural county; the history of discrimination that continues to shape their experience; and PVAMU students' long fight for voting access in the County where the university has been since 1876. Given these unique factual and legal realities, *Abbott* should not control the outcome of this case; *Arlington Heights* remains applicable as the governing standard here.

The *Arlington Heights* framework is also the appropriate lens for this Court to review Plaintiffs' claims that Defendants purposefully discriminated against Black student voters at PVAMU on the intersecting bases of age and race. Black PVAMU students are the majority of Prairie View's electorate and one of the largest voting groups in Waller County. Both before and after the Voting Rights Act of 1965 enforced the Fourteenth and Fifteenth Amendments and prohibited racial discrimination in voting—and even after the U.S. Supreme Court, in a case arising in Waller County, ensured that students could register and vote where they go to school under the Twenty-Sixth Amendment—Waller County has attempted stratagem after stratagem to abridge PVAMU students' access to the ballot

and opportunities for meaningful political participation. The November 2018 early voting schedule is one recent incarnation of that stratagem, designed to limit access to voting for Black students who lack socioeconomic resources, including cars to travel off-campus to vote.

Defendants' actions have produced distinct constitutional violations that can be remedied individually or in combination and are not dependent on one another. Their discrimination against PVAMU students—the only concentrated group of young, Black voters in the County—sounds in the Fourteenth, Fifteenth, and Twenty-Sixth Amendments, because it violates the right to be free from official racial discrimination, to be free from abridgement or denial of voting rights on the basis of race, and the right to be free from such abridgement or denial on the basis of age. *See Veasey v. Abbott*, 830 F.3d 216, 265 (5th Cir. 2016) (en banc) (recognizing that differing constitutional claims must be reached unless "the rights and remedies are intertwined").

Finally, as discussed in Plaintiffs' supplemental briefing, ECF 100, following the Court's denial of Defendants' summary judgment motion on all counts, *see* ECF 104, and for other reasons explained herein, Plaintiffs' claims are not moot because of Texas's implementation of H.B. 1888 of 2019. Regardless of that bill's provisions, Defendants retain substantial discretion that allows them to discriminate in setting early voting schedules, including in the placement of early voting locations. They have used that discretion in recent elections—in fact, *all* post-2018 elections—to perpetuate constitutional and statutory voting-rights harms to Plaintiffs by denying on-campus early voting at

PVAMU and continuing to employ a broken, non-transparent, and non-inclusive process for setting early voting schedules.

## ARGUMENT

**I. Waller County's 2018 Early Voting Plan Violated the U.S. Constitution's Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act (Discriminatory Purpose)**

### A. The U.S. Constitution and VRA Forbid Officials from Acting with a Discriminatory Purpose on the Basis of Race

The Fourteenth and Fifteenth Amendments to the Constitution prohibit voting practices enacted or maintained with a racially discriminatory purpose. U.S. Const. amend. XIV; U.S. Const. amend. XV; *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481–82 (1997); *Rogers v. Lodge*, 458 U.S. 613, 617, 625 (1982); *see also Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016) (en banc), *cert. denied*, 137 S. Ct. 612 (2017).

Section 2 of the VRA prohibits any "standard, practice, or procedure" from being "imposed or applied . . . in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Congress enacted the VRA "for the broad remedial purpose of ridding the county of racial discrimination in voting." *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (internal citations and quotation marks omitted). Section 2 is also violated if a challenged law or practice is shown to have been adopted with a racially discriminatory purpose. *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009). Episodic practices, such as the use of the initial or modified early voting plans, constitute a "practice" under Section 2. *See id.* at 432; *see Goodloe v. Madison Cty. Bd. of Election Comm'rs*, 610 F. Supp. 240, 243 (S.D. Miss.

5

1985) ("Section 2 on its face is broad enough to cover practices which are not permanent structures of the electoral system but nevertheless operate to dilute or diminish the vote of blacks."); *Brown v. Post*, 279 F. Supp. 60, 64-65 (W.D. La. 1968) (holding that electoral officials violated Section 2 by soliciting absentee ballots from white voters without making the same opportunity available to Black voters). As discussed *infra*, Section 2's prohibition on practices with a racially discriminatory purpose is in addition to and apart from its prohibition on practices with discriminatory results.

Evidence that voters have been totally prevented from voting (for example, evidence of a reduction in turnout) is not required to establish vote abridgment. *Veasey*, 830 F.3d at 259-260. Courts should take care not to "conflate[] abridgment and denial," each of which is explicitly—and separately—prohibited by the text of the Constitution and Section 2. *Id.* at 260 n.58; *see id.* at 253 (citing U.S. Const. amend. XV; 52 U.S.C. § 10301(a)).

If governmental officials provide early voting, the Constitution requires them to do so in a nondiscriminatory manner. *See*, *e.g.*, *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966); *Miss. State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400, 405 (5th Cir. 1991) (affirming that limitations on satellite voter registration burdened Black registrants in violation of Section 2 even though there is no constitutional right to satellite voting); *Toney v. White*, 488 F.2d 310, 311-12 (5th Cir. 1973) (en banc) (affirming that the disproportionate purging of Black voters from the absentee voter rolls violated Section 2 even though there is no constitutional right to absentee voting). An early voting plan "conceived or operated as [a] purposeful device[] to further racial discrimination,"

therefore, violates the Fourteenth and Fifteenth Amendments and Section 2. *Rogers*, 458 U.S. at 617 (internal quotations omitted).

In analyzing whether a government action was motivated by a discriminatory purpose under the Fourteenth and Fifteenth Amendments, as well as Section 2, courts apply the framework articulated in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–268 (1977) ("*Arlington Heights*"); *McMillan v. Escambia Cnty., Fl.*, 748 F.2d 1037, 1046 (5th Cir. 1984) ("Congress intended that fulfilling *either* the more restrictive intent test or the results test would be sufficient to show a violation of section 2.") (emphasis in original). *Arlington Heights* specifies that "an important starting point" for assessing discriminatory purpose is "the impact of the official action"—that is, "whether it bears more heavily on one race than another." *Id.* at 266 (quotation marks omitted). Additional evidentiary sources include, but are not limited to: (1) historical background of the decision; (2) the specific sequence of events leading up to the challenged decision; (3) departures from the normal procedural sequence, as well as substantive departures; (4) legislative or administrative history, including contemporary statements; (5) foreseeability of discriminatory impact; (6) knowledge of discriminatory impact; and (7) the availability of less discriminatory alternatives. *Veasey*, 830 F.3d at 231; *United States v. Texas Ed. Agency*, 600 F.2d 518, 528–29 (5th Cir. 1979); *Arlington Heights*, 429 U.S. at 268.

To prevail on a claim of racially discriminatory purpose at trial, the evidence must demonstrate that discriminatory purpose was a motivating factor for the government action. Plaintiffs "do[] not have to prove that racial discrimination was a 'dominant' or 'primary'

motive, only that it was a motive." *Arlington Heights*, 429 U.S. at 265–66; *Brown*, 561 F.2d at 433. Nor does discriminatory purpose require a showing of ill-will or animus toward minorities. *Arlington Heights*, 429 U.S. at 265–66; *Perez v. Abbott*, 253 F. Supp. 3d 864, 948 (W.D. Tex. 2017).

An intent to disadvantage minority citizens to gain a perceived political or partisan benefit qualifies as discriminatory intent. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) ("*LULAC*") (stating that taking away a political opportunity just as minority voters were about to exercise it "bears the mark of intentional discrimination"); *Hunter v. Underwood*, 471 U.S. 222, 233 (1985) (finding intentional discrimination where a state enacted a law to harm Black and poor white voters for partisan purposes); *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 226–27 (4th Cir. 2016) (similar).

Discriminatory purpose may be proved by direct or circumstantial evidence. *Rogers*, 458 U.S. at 618. As the Fifth Circuit has recognized, "[t]o require direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions." *Veasey*, 830 F.3d at 235–36. An approach that required overt statements of discriminatory purpose "would ignore the reality that neutral reasons can and do mask racial intent." *Id.* at 236.

Courts consider the strength, quality, and quantity of the evidence and the reasonableness of the inferences that can be drawn from the evidence. Courts must consider "all of the circumstances that bear upon the issue of [discriminatory intent]," *Foster v. Chatman*, 136 S. Ct. 1737, 1748 (2016), "including the normal inferences to be drawn from

the foreseeability of defendant's actions," *Brown*, 561 F.3d at 433. Expert evidence is also highly relevant. *See Hunter*, 471 U.S. at 229–30 (relying on experts to find discriminatory intent). And all evidence must not be viewed in isolation; it must instead be part of the "circumstantial totality of evidence." *Veasey*, 830 F.3d at 237.

Official actions motivated by a discriminatory purpose have "no legitimacy at all under our Constitution." *City of Richmond v. United States*, 422 U.S. 358, 378–79 (1975). Once racial discrimination is shown to have been a motivating factor behind the enactment of a challenged practice, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Veasey*, 830 F.3d at 231 (quoting *Hunter*, 471 U.S. at 228).

### B. Defendants' Adoption and Maintenance of the 2018 Early Voting Plan Was, at Least in Part, Motivated by an Intent to Minimize Black Voters' Political Participation

Plaintiffs' evidence under the *Arlington Heights* framework establishes that the 2018 early voting plan was motivated, at least in part, by an intent to minimize the opportunity of Black voters to participate in the political process in violation of the Fourteenth and Fifteenth Amendments and Section 2.

### i. The 2018 Early Voting Plan Had a Discriminatory Impact on Black Prairie View Voters

Evaluating the discriminatory impact of Defendants' early voting plan is an "important starting point" for this Court's intentional racial discrimination analysis. *Arlington Heights*, 429 U.S. at 266. "[T]he impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural

consequences of their actions." *Bossier Parish Sch. Bd.*, 520 U.S. at 487. As "objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor," impact can be "the most probative evidence of intent[.]" *United States v. Texas Ed. Agency*, 564 F.2d 162, 167, n.6 (5th Cir. 1977).

For disparate impact under *Arlington Heights*, Plaintiffs need only show Defendants' actions "bear[] more heavily on" Black voters than other Waller County voters. *Arlington Heights*, 429 U.S. at 266. Plaintiffs do not need to show a positive effect on the actual incidence of voting—that is, turnout reduction. Instead, a finding that Defendants' early voting plan "abridge[d]" Plaintiffs' voting rights, resulting in a racial disparity in early voting *access*, "falls comfortably within" the definition of abridgement. *Veasey*, 830 F.3d at 260. "Showing disproportionate impact, even if not overwhelming impact, suffices to establish one of the circumstances evidencing discriminatory intent." *McCrory*, 831 F. 3d at 231 (4th Cir. 2016).

Here, there is abundant and uncontested evidence in the record—which Plaintiffs' trial evidence will further bolster—that the 2018 early voting plan disproportionately impacted and harmed Black voters. With a 91.99% Black voting-age population ("VAP"), Prairie View has the largest concentration of Black voters in Waller County. Plaintiffs' Proposed Findings of Fact ("Pls.' FoF") ¶ 91. Black PVAMU students are one of the largest voting groups in the City and Waller County, Pls.' FoF ¶ 244, as well as a group of voters that is especially reliant on early voting access, Pls.' FoF ¶¶ 283–85. In fact, Precinct 309, which is the PVAMU campus precinct, had 4,834 registered voters as of November 6, 2018, which was the largest population of registered voters out of any County precinct and

over 1,400 more registered voters than the second-largest precinct. Pls.' FoF ¶¶ 98, 244, 279. And in 2018, Prairie View's early voting sites were used by Black voters at rates more than twice as high as any other early voting location in Waller County. Pls.' FoF ¶ 306; Stein Rep., ECF 77-1 at 182. Under the early voting plan, Defendants did not afford Black voters the same or similar opportunities to vote early as other registered voters in Waller County. Pls.' FoF ¶¶ 302, 307–12.

Even after Defendants modestly amended their plan, following the filing of this lawsuit and request for temporary restraining order, Black voters had *no* early voting access in Prairie View during the first week, Monday through Friday, and only part of the day on Sunday. Pls.' FoF ¶¶ 291–92. By contrast, cities like Waller, with a majority-white VAP, had as many as double the number of hours—totaling more than 124 hours as compared to 65 hours in Prairie View—and enjoyed early voting during the full two weeks of early voting. Pls.' FoF ¶¶ 298–99. Along the same lines, the Waller County Courthouse and Waller Independent School District ("ISD") early voting locations had 106 and 101 hours over two weeks, respectively, whereas the Memorial Student Center ("MSC") on PVAMU's campus in Precinct 309 had only 36 hours during just the second week. Pls.' FoF ¶ 230.

| 2018 General Election Early Voting Hours and Locations | | | |
|---|---|---|---|
| | **Week 1** | **Week 2** | **Total** |
| **Waller County Court House (Hempstead)** | 55 | 51 | 106 |
| **Waller ISD (Waller)** | 50 | 51 | 101 |
| **Waller County Library (Brookshire)** | 55 | 51 | 106 |
| **Fieldstore (Waller)** | 23 | 0 | 23 |
| **JP # 3 Monaville** | 23 | 0 | 23 |
| **Katy VFW** | 27 | 0 | 27 |
| **PVAMU Memorial Student Center** | 0 | 27 (+9) | ~~27~~ 36 |
| **Waller County Community Center (Prairie View)** | 0 | 24 | 24 |
| **Prairie View City Hall** | 0 | 5 | 5 |

Flores Rep., ECF 77-1 at 91 (based in part on the chart included in Plaintiffs' Amended Complaint, ECF 49 at 12).[2]

Dr. Stein will testify Defendants' plan forced Black voters in Prairie View to "cast their ballots at early polling locations with the fewest hours and days of operation." Stein Rep., ECF 77-1 at 182.

Plaintiffs' experts' unrebutted testimony also establishes Defendants' early voting plan interacted with socioeconomic and transportation disadvantages that bear more heavily on Black voters in Prairie View. Pls.' FoF ¶ 311. These voters face higher rates of

---

[2]     The red text reflects the modifications that the Commissioners Court made to the initial early voting plan after Plaintiffs filed this lawsuit, as discussed in further detail below.

experiencing poverty and transportation barriers than white voters in Waller County. Pls.' FoF ¶¶ 106–127. Waller County has no regular public transportation, and Black residents disproportionately lack access to private transportation. Pls.' FoF ¶¶ 120–24, 126; Cooper Decl., ECF 77-1 at 232. Plaintiff Smith is among those lacking access to transportation. She has relied on the PVAMU shuttle bus, Smith Dep. Tr., ECF 73-2 at 266, 54:8–55:3, which has limited stops and goes only to the MSC and no other early voting locations in Prairie View or elsewhere in Waller County, Johnson Dep. Tr., *id.* at 232, 58:24–59:3.

Black voters' limited mobility and transportation barriers made traveling to early voting locations outside of Prairie View or off campus during limited time windows uniquely difficult for them. Pls.' FoF ¶¶ 116–17, 125; Flores Rep., ECF 77-1 at 110-12; Stein Rep., id. at 181-86; *see also Veasey*, 830 F.3d at 258–60 (recounting evidence credited by the district court and not challenged on appeal about socioeconomic disadvantages hindering the ability of racial minority voters to effectively participate in the political process as compared to white voters). Without public or private transportation, Black voters in Prairie View had limited early voting access when Defendants provided only five hours of early voting during the first week. As one attempt to address these concerns, The Panther Party expended resources working with PVAMU to publicize and coordinate a charter bus, which provided rides to Black voters who lacked transportation to travel to early voting locations during the first week of early voting, when there was no voting anywhere in Prairie View. Muhammad Dep. Tr., ECF 73-2 at 107:1–114:1; Allen Dep. Tr., *id.* at 173, 122:1–124:9; Pls.' Ex. 164, TPP Twitter Feed (PLS000272). Plaintiffs'

evidence thus reveals why limiting or restricting early voting access disproportionately impacts Black voters' ability to vote. Pls.' FoF ¶¶ 106–28, 286–88, 302, 308–09, 311.

Black voters' reliance on early voting access is also confirmed by Defendants' data. Black voters in Prairie View are more dependent on early voting and use it at higher rates than white voters in Waller County. Pls.' FoF ¶¶ 284–86. Defendants' expert agreed Waller County's 2016 and 2018 usage-rates for early voting in Prairie View "show high demand for early voting," Pls.' FoF ¶ 342; Gimpel Dep. Tr., ECF 77-1 at 551, 138:10–13. Consistent with 2016, Defendant Eason anticipated high usage of early voting in Prairie View in the fall 2018 and allocated the MSC more voting machines than any other early voting location in the County. Pls.' FoF ¶ 246; Eason Dep. Tr., ECF 73-2 at 26, 92:4–18; *id.* at 34, 122:21–123:8, 123:20–124:25; Pls' Ex. 16, Verity Equipment Assignment 2018 General Election.

Notably, Defendants also conceded the early voting plan created a discriminatory impact. Pls.' FoF ¶¶ 200–05. During the October 17 Commissioners Court meeting, Defendants Duhon and Eason admitted the early voting plan did "not [provide] equal representation" and created "an inequity" for Prairie View voters as compared to cities like Waller that had eleven early voting days. Pls.' FoF ¶¶ 201, 205.

In response to Plaintiffs' factual and expert evidence, Defendants have offered two primary counter-argument—both of which fail. First, through Defendants' expert, they contend Black voters did not experience a burden because the early voting plan did not decrease turnout. *See* Pls.' Ex., 161, Dr. Gimpel Rep. at 1-20, 41-47. But the Fifth Circuit has rejected reduced turnout to establish a vote-abridgment claim, *Veasey*, 830 F.3d at 260,

and Defendants' expert even conceded turnout cannot support any inference about whether voters had equal access to early voting hours and locations, Pls.' Ex. 39, Gimpel Dep. Tr., ECF 77-1 at 662, 249:6–8. Second, Defendants claim Plaintiffs' evidence can be distilled to, at best, only disparate hours or inconvenience. Defs.' Mot. for Summ. J., ECF 73 at 13–14. But disparate hours for early voting is itself discriminatory—it is not something to be lightly dismissed. As Dr. Stein found and will testify, the result of early voting plan "was to deny . . . Black voters in Prairie View equal or similar access to early voting opportunities afforded other registered voters in Waller County." Dr. Stein Rep., ECF 77-1 at 184. This is so, as Drs. Flores and Stein found and will testify, because the limited early voting access interacted with socioeconomic and transportation disparities among the predominantly Black Prairie View residents that created and aggravated burdens that uniquely reduced their ability to effectively participate in the political process. Pls.' FoF ¶ 303–12; *infra* § I(B)(ii). Defendants' expert analysis, for example, failed to account for Black Prairie View resident's unique demographics, economic, and historical conditions when assessing burdens. Flores Rebuttal Rep., ECF 77-1 at 143. For reasons herein and below, Plaintiffs' unrebutted evidence shows Defendants' early voting plan disproportionately impacted Black voters in Prairie View, the largest concentration of Black voters in Waller County.

ii. *Defendants Knew or Should Have Known the Foreseeable Racial Impact of the 2018 Early Voting Plan*

Along with other evidence under *Arlington Heights*, "discriminatory intent may be inferred from the fact that [] acts had foreseeable discriminatory consequences." *Tex. Ed. Agency I*, 564 F.2d at 168; *see Brown*, 561 F.3d at 433 ("To find discriminatory intent,

direct or indirect circumstantial evidence, including the normal inferences to be *drawn from the foreseeability of defendant's actions may be considered*.") (emphasis added and internal quotation marks omitted). The record and evidence at trial will show Defendants knew or should have known that adopting and maintaining the early voting plan would disproportionately impact and harm Black voters. Pls.' FoF ¶ 302. Yet they ignored these well-documented concerns and the repeated warnings, both before and during 2018, that the plan they adopted and maintained would interact with the documented socioeconomic and other disadvantages faced by Black voters in Prairie View. *See Veasey*, 830 F.3d at 261–62.

The record is replete with evidence establishing Defendants knew limiting early voting opportunities in Prairie View, including on PVAMU's campus, would disproportionately impact Black voters. As early as 2008 and repeatedly throughout the years leading up to 2018 in multiple public fora, Black voters warned Waller County Commissioners Court members and other officials about how cuts and restrictions to early voting access in Prairie View would negatively impact their ability to vote and, for some who lack any transportation, make it impossible. Pls.' FoF ¶ 146–60. (detailing multiple demands and requests by Prairie View residents for early voting access in Prairie View); Pls.' FoF ¶¶ 44–49, 55–72. (outlining how Black Prairie View residents have challenged discriminatory barriers, including restrictions on early voting access, to vote in Waller County). As one recent example in 2015, the Campaign Legal Center wrote to oppose cuts to early voting locations in Prairie View, explaining how these cuts would make early voting access difficult for Black residents who lacks access to public and private

transportation. Pls' Ex.71, 12/22/15 Ltr. from Campaign Legal Center, ECF 17-5 (DEFENDANTS001422-1425). These same concerns were repeatedly raised by Prairie View residents during the October 17, 2018 Commissioners Court meeting. *Infra* § I(B)(iii). Defendants therefore understood how restrictions to early voting access in Prairie View would disproportionately impact Black voters before they adopted the 2018 early voting plan.

Moreover, as of 2018, Defendants knew (1) most Waller County residents rely on early voting access; (2) Black voters in Prairie View are among the highest users of early voting in the County; (3) Prairie View has the largest concentration of Black voters in the County; and (4) Black PVAMU student voters in Prairie View are one of the largest voting groups in the County. Pls' FoF ¶¶ 273–312. And, based on Census and other information, Defendants knew Black voters experience unique socioeconomic and transportation hurdles, which compounds the discriminatory harms. Pls' FoF ¶¶ 106, 113–128, 147–52, 154–55. Black residents, for example, are socioeconomically disadvantaged, as compared to white people in both Prairie View and Waller County overall, in poverty rates, income, employment rates, transportation access, and educational attainment. Pls' FoF ¶¶ 106–28. Almost 47% of employed Black residents in Prairie View, for example, commute to work by walking, biking, or via carpool—that is, riding in another person's vehicle—or taxi, compared to 12.6% of employed white residents countywide, who are far more likely to commute alone in their own vehicles. Cooper Decl., ECF 77-1 at 232.

All of these facts, whether individually or in combination, illuminate why limitations and restrictions to early voting access in Prairie View would make it

significantly harder for Black voters to participate politically, which Black voters warned Defendants about directly during the October 17 Commissioners court meeting. Any discussion about the early voting plan could, therefore, not be detached from how these known racial disparities, socioeconomic hardships, and transportation burdens, would foreseeably interact with such a plan. As discussed *infra,* Defendants have refused to respond to these well-documented concerns about early voting access by proposing to or succeeding in limiting it ever since Black voters in Prairie View initially obtained it. When contextualized within Waller County's history, this evidence supports the conclusion that Waller County intended this discriminatory impact.

### iii. The Sequence of Events Reveals Defendants Failed to Adopt Ameliorative Changes to Lessen the 2018 Early Voting Plan's Anticipated Discriminatory Impact

"The specific sequence of events leading up to" the passage of the 2018 early voting plan "also may shed some light on the decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267. It is also probative of intent when officials and decision-makers failed to adopt changes that would have ameliorated an expected discriminatory impact—particularly where, as here, they did so without providing answers or while offering tenuous justifications. *Veasey*, 830 F. 3d. at 240-41, 263.

At some point before August 22, 2018, Defendant Eason created a proposed early voting plan. Pls.' FoF ¶ 170; Eason Dep. Tr., ECF 73-2 at 11, 33:3–14. Defendant Eason then exclusively shared the proposal with the Waller County Democratic and Republican chairs for input and agreement. Pls.' FoF ¶ 170. Neither the party chairs nor Defendant Eason sought input from Waller County residents, even though Defendant Eason contends

doing so would have been beneficial. Pls.' FoF ¶¶ 170–76, 371; Eason Dep. Tr., ECF 73-2 at 25, 88:8–11.

It is noteworthy that because the process excluded Waller County residents, the only option to provide input into a proposed early voting plan was to attend a Defendant Commissioners Court meeting in person. Pls.' FoF ¶¶ 170–188. But these meetings are held in the morning during weekdays when Waller County residents would otherwise be at school or working, several miles from Prairie View. Pls.' FoF ¶ 375. And, as of Defendant Eason's deposition in September 2019, Defendants had not provided a mechanism—such as an online portal option or comment process prior to the meeting—for residents unable to attend the meeting in person to make their voices heard. Pls.' FoF ¶ 375.

After input from the party chairs in late August 2018, Defendant Eason shared the proposal with Defendant Commissioners Court for final approval for the first time. Pls.' FoF ¶¶ 170–77. On September 5, 2018, Defendant Commissioners Court unanimously approved the recommended early voting plan with no discussion or comment from any commissioner. Pls.' FoF ¶¶ 184–89; *see also* Eason Dep. Tr., ECF 73-2 at 53, 198:5–24 (explaining that Defendants adopt the proposal ninety-nine percent of the time). Indeed, by the time a plan is presented in Commissioners Court, it has already been substantively approved by the relevant decisionmakers. Pls.' FoF ¶¶ 170, 175, 181, 184–88.

Then on October 10, 2018, Defendant Commissioners Court approved a partial change to the early voting plan after Defendant Eason proposed additional early voting locations at the Waller County Courthouse in the City of Waller and at the Brookshire

Library in the City of Brookshire. Pls.' FoF ¶ 197. Under this plan, Black voters in Prairie View were not afforded the same or similar opportunities as compared to white Waller County voters. Pls.' FoF ¶ 310. As compared to other locations with more than 100 hours each, the early voting locations in Prairie View were provided, in total, only 51 hours of early voting under this original plan. There was not early anywhere in Prairie View during the first week. Twenty-seven of the total hours of early voting in Prairie View were spread over three days at the MSC. Pls.' FoF ¶ 98. The remaining 24 hours were at the off-campus WCCC in Precinct 310. *Id.*

In response to these inequities with the early voting plan, Defendants added an agenda item to their October 17, 2018 meeting to discussion modifications proposed by Defendant Eason. Pls.' FoF ¶ 200. Defendant Eason began the discussion about modifications by explaining that she was proposing changes to the early voting schedule because she determined the original plan did not provide "equal representation" to PVAMU students, Black voters in Prairie View. Pls.' FoF ¶ 201. She proposed adding additional early voting days at the PVAMU campus, explaining "we have to give [Prairie View] equal representation" as compared to other hubs of Waller County like Waller, Brookshire, and Hempstead. Pls.' FoF ¶ 202; Eason Dep. Tr., ECF 73-2 at 44, 162:20–22. Defendant Duhon agreed that Prairie View had unequal early voting access under the early voting plan, stating: "So when I looked at the precincts . . . I do think there's an inequity." Pls.' FoF ¶ 205.

Following these admissions about the early voting plan's inequities, several Black Prairie View residents and elected officials, as well as Black PVAMU students, objected

to the early voting plan, warned about its discriminatory impact and harms on Black voters, and either supported Defendant Eason's recommendation or offered additional proposals for adding early voting access in Prairie View. Pls.' FoF ¶ 208. As just one example, Kendric Jones, who in 2018 was the PVAMU Student Government Association President and a Prairie View City Council member, requested that Prairie View voters be provided "the same right . . . to be able to [vote]" as other Waller County voters. Pls.' FoF ¶ 211.

The public discussion also revealed concerns about the lack of transparency surrounding the initial development and subsequent approval of the early voting plan Pls.' FoF ¶¶ 215–16. Defendants agreed this process had consistently resulted in early voting allocation problems: "there's always a problem with the procedures that we use" for setting the early voting plan," Eason Dep. Tr., ECF 73-2 at 46-47. 173:21–174:8; problems due to reliance on the party chairs "seem[] to become a regular occurrence" and the process "continues to be a breakdown," Pls.' FoF ¶ 157; Duhon Dep. Tr., ECF 73-2 at 120, 179:7–16. Prairie View voters, especially PVAMU students, repeatedly warned Defendants that the party chairs do not adequately represent them. Pls.' FoF ¶ 215. Shari Griswold, a white Waller County voter, pointed out the process for setting the early voting plan was broken and needed to be repaired to avoid chaos surrounding the selection of dates and hours. Pls.' FoF ¶ 216.

Following this discussion, several Commissioners also proposed informal plans to add early voting access in Prairie View and elsewhere. Pls.' FoF ¶¶ 219–20. In response to questions about feasibility, Defendant Eason repeatedly affirmed that Defendants had the

resources to implement her plan, Pls.' FoF ¶¶ 219–20, which was in the best interest of all Waller County voters, Pls.' FoF ¶ 269; Eason Dep. Tr., ECF 73-2 at 49, 182:21–183:3].

Moreover, as described above, Waller County's data, which Defendants had access to and purportedly relied on for setting the early voting plan, established (1) most Waller County residents rely on early voting access; (2) Black voters in Prairie View are among the highest users of early voting in the County; and (3) Prairie View has the largest concentration of Black voters in the County. Pls.' FoF ¶¶ 273–312. And based on Waller County data, and testimony from members of the public, Defendants were repeatedly warned how the early voting plan would interact with socioeconomic and transportation barriers that would disadvantage Black Prairie View voters. Pls.' FoF ¶ 208.

Taken together, the evidence at trial will support the following facts and inferences:

(1) The process surrounding the development and adoption of the early voting plan was non-transparent;

(2) Defendants knew about the early voting plan's foreseeable racial impact on Black voters;

(3) Defendants admitted the early voting plan created inequities and did not provide Prairie View voters with equal representation;

(4) Defendant Eason, who is best positioned to opine on the feasibility of a plan, recommended adding early voting access in Prairie View to address the inequities and unequal representation;

(5) Black residents proposed and supported recommendations to add early voting access in Prairie View;

(6) Defendants had the resources to adopt Defendant Eason's recommendation and other proposals;

(7) Black residents repeatedly warned Defendants that failing to adopt changes to the early voting plan would disproportionately impact Black voters in Prairie View; and

(8) It is not prohibitive to make election changes in late October, Pls.' FoF ¶¶ 219–20, 269; Duhon Dep. Tr., ECF 73-2 at 125, 198:25–199:3.

Yet Defendants failed to take any action. As discussed in detail below, Defendants offered many and shifting pretext rationale to reject these recommendations and maintain the early voting plan. *Infra* § I(B)(v)

One week later, on October 24, 2018, in response to this lawsuit, Defendants held an emergency meeting to consider settlement and discuss amending the early voting schedule. During this meeting, Defendants had another opportunity to amend the early voting plan to lessen the discriminatory impact. As Defendant Eason conceded, Defendants still had the resources to add more early voting access in Prairie View on an equal basis with other cities, Pls.' FoF ¶¶ 219–20; Eason Dep. Tr., ECF 73-2 at 45, 169:10–15; *id.* at 46, 170:24–25; 171:1–6; *id.* at 51, 190:6–22;191:1–11, and as mentioned above, such changes would not have been prohibitive, Pls.' FoF ¶ 269; Duhon Dep. Tr., ECF 73-2 at 125. 198:25–199:3. Instead, Defendants provided modest changes to extend early voting hours at the MSC without any additional days. Pls.' FoF ¶¶ 229–30. These changes were not responsive to Defendant Eason's and Black voters' requests. Black voters in Prairie View had only a single day of early voting access during the end of the first week for five hours on a Sunday. Pls.' FoF ¶¶ 229–30. And under the modified early voting plan, Black voters in Prairie View were still provided less early voting access than white voters in other areas of Waller County. Pls.' FoF ¶ 290.

This sequence of events leading to the adoption and maintenance of the early voting plan establishes that Defendants had the authority, capacity, community support, time, and resources to expand early voting opportunities in Prairie View, thereby mitigating the plan's known discriminatory impact on Black voters. But on at least two occasions, Defendants failed to adopt recommendations that would have ameliorated the racially discriminatory impact. Pls.' FoF ¶¶ 221, 229–33.

### iv. Defendants' Departures from the Ordinary Decision-making Process Reveal an Impermissible Motive

A "legislative or administrative history may be highly relevant" to assessing a discriminatory purpose. *Arlington Heights*, 429 U.S. at 268. In addition, "[s]ubstantive departures too may be relevant, particularly if the factors usually considered important by the decisionmakers strongly favor a decision contrary to the one reached." *Id.* at 267. The record and additional evidence at trial will show how Defendants substantively departed from ordinary decision-making process of consulting their self-proclaimed guidelines to adopt and maintain the early voting plan, supporting an inference of discrimination.

The uncontested facts here would have supported more early voting access in Prairie View under the Defendants' purported guidelines, if they were applied in a non-discriminatory manner. Pls.' FoF ¶¶ 244, 50. Although Defendant Eason has no written policy memorializing the early voting plan criteria—meaning the public lacks access to any written criteria—the factors she purports to use concerning the total registered voters in a polling precinct, historical turnout, demand, and accessibility—all weighed in favor of adding more early voting access in Prairie View. *Id.*

Black voters in Prairie View are the largest concentration of registered voters in Waller County and are a group of voters that are especially reliant on early voting Pls.' FoF ¶¶ 244, 285. In fact, Precinct 309, the PVAMU campus precinct in Prairie View, had 4,834 registered voters of November 6, 2018—the largest population of registered voters of any County precinct and approximately 1,400 more registered voters than the second-largest precinct. Pls.' FoF ¶ 279. Defendants anticipated high turnout from Black voters in Prairie View given their high usage in past elections. Pls.' FoF ¶ 246. As discussed *infra*, Defendants were aware of the demand for early voting by Black voters in Prairie View given the socioeconomic and transportation hurdles making voting difficult for Black voters and voting off campus difficult—if not impossible—for Black PVAMU student voters in Prairie View. Pls.' FoF ¶ 311.

Defendants' expert offered a narrower definition of early voting-allocation best practices—historical tradition, familiarity, and demand. Pls.' FoF ¶252. But even under this narrower list, which does not align with factors Defendants claim to have considered, more early voting access in Prairie View would be appropriate. *Id.* Relying on historical tradition—that is, using previous sites as a factor for future sites—can carry over a historical "tradition" of discriminating in the allocation of early voting. Stein Rebuttal Rep., ECF 77-1 at 215. There is a deep historical tradition of Prairie View voters, especially Black PVAMU students, advocating for on-campus early voting and challenging attempts to restrict their voting rights. *See, e.g.*, Pls.' FoF ¶¶ 50–72. Concerning familiarity, the sites considered for additional early voting access, particularly the MSC, would have been familiar to Black voters in Prairie View, as those sites had been used in past elections,

either during early voting or on Election Day, or were in use during early voting in 2018 (although in a limited manner), and are frequently used for other public events. *See, e.g.*, Stein Rebuttal Rep., ECF 77-1 at 215–16; Jackson Decl., ECF 77-1 at 745 ¶ 17. For demand, as discussed above, Black Prairie View voters are among the most reliant on early voting, Precinct 309 has the highest number of registered in the County, and Defendants anticipated high turnout from these voters. Pls.' FoF ¶¶ 282–85. Based on a review of Commissioners Court meeting minutes, the only residents consistently and repeatedly demanding more early voting in Waller County are Black voters in Prairie View. Stein Rebuttal Rep., ECF 77-1 at 150.

Even if Defendants did not depart from their guidelines—which they did—adhering to same procedures as prior years is not dispositive. ECF 81 at 4. As described *supra*, Defendants' process for creating early voting plans is broken and designed to be non-transparent. Moreover, heavily relying on early voting criteria like historical turnout risks perpetuation of past unfairness. Stein Rep., ECF 77-1 at 184. Waller County therefore "need not break its own rules to engage in unusual procedures" or outcomes, *McCrory*, 831 F.3d at 228; strict adherence guarantees it and the predictable inequities that result from it.

Defendants departed from ordinary decision-making processes and their guidelines to adopt and then maintain the early voting plan. To do so, they ignored "factors usually considered important" by Defendants that would "strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 267. Multiple departures, as occurred here, first during the plan's adoption and then during the October 17 and 24 meetings, are even

more indicative of discriminatory intent because they constitute "a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. These departures enabled Defendants to design, adopt, and maintain an early voting plan that was an effective way to limit Black voters' ability to participate. Stein Rep., ECF 77-1 at 184.

>    v. *Defendants Hid Their Effort to Suppress Black Political Participation Behind Tenuous Justifications*

Another factor probative of discriminatory intent under *Arlington Heights* is the tenuousness of Defendants' policy interests for adopting the maintaining the early voting plan. The disconnect between the early voting plan and the policy justifications Defendants claimed for adopting and maintaining it further supports an inference of an impermissible motive. Proffering "seemingly neutral reason[s]" cannot mask a racially discriminatory purpose. *Veasey*, 830 F.3d at 236. Defendants' many shifting rationales are probative of discriminatory intent because they "fail to correspond in any meaningful way" to the facts actually relevant to the adoption and maintenance of the 2018 early voting plan. *Id.* at 263.

First, Defendants attempted to justify the early voting plan because on-campus early voting during the first week purportedly conflicted with PVAMU's homecoming. Pls.' FoF ¶ 254. But homecoming would not have prevented Defendants from selecting another location for early voting access in Prairie View during the first week, as they eventually did under the modified plan by allocating five hours at the Prairie View City Hall on Sunday during the first week. Pls.' FoF ¶¶ 255–62. Moreover, during the October 17 meeting, PVAMU students explained the purported conflict with homecoming was an inaccurate representation. Pls.' FoF ¶ 262. The opposite was—and remains—true:

homecoming is ideal for early voting because many students and non-students from Prairie View are on campus and promoting civic engagement. Pls.' FoF ¶ 255. But again neither Defendants nor the chairs consulted any Prairie View residents or PVAMU students and administrators to set the early voting plan. *See* Pls.' FoF ¶¶ 176, 257.

Second, without homecoming as a legitimate concern justifying the denial of early voting during the first week, Defendants then attempted to justify the early voting plan as purportedly reflecting a deliberative process because officials from the two major parties proposed it. But even Defendant Duhon admitted and other Commissioners heard at the October 17 meeting that many Black PVAMU students—who comprise the largest group of registered voters in Prairie View—do not affiliate with either party. *See, e.g.*, Pls.' FoF ¶ 226. Defendants' expert does not contest Plaintiffs' factual and expert evidence establishing that the process for adopting and maintaining the early voting plan was non-transparent and departed from Defendants' purported guidelines. Pls.' FoF ¶¶ 321–22. Defendants Duhon and Eason admitted the process produced inequities and led to recurring problems every election, Pls.' FoF ¶¶ 201, 205, 358–59.

Third, Defendants hypothesized that the "community," particularly senior citizens, disliked going on campus and parking was difficult. These claims are baseless and unsupported. Pls.' FoF ¶ 264. Concerning parking, in advance of 2018, Defendant Eason worked with PVAMU to secure reserved parking spots during elections. Pls.' FoF ¶ 248; *see also*, *e.g.*, Pls.' Exs. 88, 3/18 Email Chain (DEFENDANTS001300-1303).

Fourth, Defendants claimed October 17 was too late to change the plan. Pls.' FoF ¶ 268. But that, too, is easily revealed as pretextual. These purported feasibility concerns

did not prevent Defendants, including several Commissioners, from proposing changes to the early voting plan during the October 17 meeting. *Id.* In fact, the opposite was true; Defendants had the resources to add more early voting opportunities. *Id.* Defendant Eason, who, as the Elections Administrator, is best positioned to opine on feasibility, repeatedly reaffirmed that Defendants had the resources to adopt her recommendation. Pls.' FoF ¶ 270. Nor did the purported feasibility concerns prevent Defendants from actually—though insufficiently—*changing* the plan a week later on October 24—*during* early voting. Pls.' FoF ¶ 268.

Fifth, and related, by October 24, Defendants claimed they did not have the resources to add more early voting opportunities on campus. But Defendant Eason contradicted this claim, explaining that Defendants still had sufficient resources to add on-campus early voting opportunities. Pls.' FoF ¶ 270.

Sixth, during the October 17 meeting, Defendant Duhon asked Mr. Jones, PVAMU's SGA president and a Prairie View city councilperson, whether adding additional early voting access at the Waller County Community Center was acceptable to PVAMU students. Pls.' FoF ¶ 211. In response, Mr. Jones stated that change would not be an effective substitute for early voting access on campus in Prairie View. *Id*. The WCCC, Mr. Jones explained, was not accessible to or frequently visited by PVAMU students. By contrast, the MSC is a center of campus life for PVAMU students. *Id.* This common understanding is also confirmed by on-campus early voting location analysis conducted by former Elections Administrator Dan Teed. Pls.' Ex. 80, 1/26/16 Email (DEFENDANTS001481-1486). Based on Mr. Teed's findings, "[t]housands of students

use the MSC, especially around lunch time, and it is within easy walking distance" for PVAMU students. *Id.* at DEFENDANTS001482.

Seventh, Commissioner Beckendorff hypothesized during Defendant Eason's proposal that to provide equitable early voting would create "confusion." Pls.' FoF ¶ 269. But that claim is unsupported by the record because Waller County residents and Defendant Eason on October 17 repeatedly requested more early voting access in Prairie View. Pls.' FoF ¶ 208. Relying on Defendant Duhon's reasoning, Commissioner Beckendorff rejected Defendant Eason's proposed changes to the early voting plan because, according to him, adopting it would *make it harder to vote*. Pls.' FoF ¶ 269. Yet again, however, that claim is unsupported by the Waller County residents who requested more early voting on campus, as well as by Defendant Eason's on-the-record statements. Pls.' FoF ¶¶, 208, 269.

After the filing of this lawsuit, Defendants raised another uncorroborated and unsupported justification to defend inequitable early voting in 2018: "historical turnout within a county." Defs.' Mot. for Summ. J., ECF 73 at 10. The historical-turnout-within-a-county rationale should be rejected as a "*post hoc* justification[]" because Defendants never advanced that as "the actual consideration[]" before the November 2018 election. *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017). And as the Fifth Circuit has explained, *post hoc* justifications are "routinely disregard[ed] as unreliable" and given "little weight," if any. *Veasey*, 830 F.3d at 234. Regardless, as discussed *supra*, Dr. Flores testified "historical turnout" was another factor supporting more on-campus early voting. Pls.' FoF ¶ 271. Unable to directly rebut this conclusion, Defendants inaccurately claimed Dr. Stein conceded the early voting plan "aligned with historical turnout." Defs.'

Mot. for Summ. J., ECF 73 at 21. Describing possible explanations for his findings, Dr. Stein never points to historical turnout as a legitimate or actual justification for the 2018 plan. Stein Rep., ECF 77-1 at 183–84.

Any purported "security concern" should also be rejected as a *post hoc* justification never advanced by Defendants. *Bethune-Hill*, 137 S. Ct. at 799. During Defendant Eason's deposition, she hinted that security of the election machines may have informed Defendants' adoption and maintenance of the early voting plan. Eason Dep. Tr., ECF 73-2 at 63, 239:4–12. But Defendants admitted security was not a justification offered to adopt and maintain the early voting plan before October 24. Duhon Dep. Tr., ECF 73-2 at 137, 248:15–19; Eason Dep. Tr., *id.* at 63, 241:3–25].

Indeed, according to Defendants and PVAMU's Assistant Vice Chancellor in the Governmental Relations Office, an isolated incident occurred after early voting started when a group of students entered the university auditorium because the door was inadvertently left unlocked while voting machines were in the room, and a group of students entered the auditorium to practice for a performance. Pls.' FoF ¶¶ 272. However, there was no indication that the voting machines were in danger of being tampered with—or, indeed, that they were *capable* of being tampered with. *Id.*; *see also* Pls. Ex. 76, 1/19/16 Email Chain (DEFENDANTS001457) (former elections administrator Dan Teed writing "[t]he elections equipment itself, when properly used, is secure against tampering, and has 2 or 3 safety nets in place for almost every conceivable form that tampering could take"). As soon as Defendants raised this inadvertent mistake, PVAMU quickly worked with them to quickly resolve it and assured Defendants there would be no more security concerns.

Eason Dep. Tr., ECF 73-2 at 63, 241:3–25, 242:6–8; Jackson Decl., ECF 77-1 at 745-46. And Defendants conceded there were no more reported issues after this resolution and PVAMU's assurance. Eason Dep. Tr., ECF 73-2 at 63, 241:21–25, 242:6–8. Defendant Eason also conceded security concerns or patterns were never raised before the single incident in 2018. Pls.' FoF ¶ 272. In fact, Defendants entered into agreements with PVAMU in 2016 and 2018 to host early voting at the MSC. Pls.' Exs. 1 & 2 (PLS000341-342); (PLS000343-345).

The "many rationales" that "shifted as they were challenged or disproven" by Waller County data and public comments are probative of a racially discriminatory purpose. *Veasey*, 830 F.3d at 240–241. As the record shows and Plaintiffs' evidence as trial will further bolster, once these justifications are properly disregarded as pretextual and tenuous, only one rationale remains: Defendants adopted the 2018 early voting plan, because of, and not simply in spite of, its racially discriminatory impact on Black Prairie View voters.

### vi. *Defendants' Contemporaneous and Coded Statements Reveal Unconstitutional Biases Against Black Voters*

Admissions by defendants and other decision-makers that a challenged action has a discriminatory impact are powerful evidence of discrimination. *Id.* at 236–37 (explaining proponents' admissions that a challenged decision had a disparate impact were strong evidence of discrimination). As detailed above, while considering the early voting plan, Defendants repeatedly acknowledged and admitted the plan's discriminatory impact on Black voters. Pls.' FoF ¶¶ 201, 205. (admissions with inequity and unequal representation).

Defendant Duhon admitted Defendants' duty to "give [PVAMU students] equal access." Pls.' FoF ¶ 203.

Defendants also conceded the process for developing the early voting plan was not inclusive and led to recurring breakdowns. During the October 17 meeting, Commissioner Amsler asserted that concerns about a lack of equitable early voting access in Prairie View "come[] up every time," Pls.' FoF ¶ 206; Flores Rep., ECF 77-1 at 22, and Defendant Duhon characterized the regular disagreements about inequitable early voting in Prairie View as reflecting a continuing "breakdown" during his deposition. Pls.' FoF ¶ 207; Duhon Dep. Tr. ECF 73-2 at 120, 179:7–19. Defendant Eason acknowledged these concerns, and during the meeting, she recommended the need to develop an inclusive process for setting the early voting plan. Pls.' FoF ¶ 348. Seeking input from voters throughout Waller County, Eason explained, would benefit Waller County. *Id.* More concretely for Defendant Eason, an inclusive process would stop the reoccurring problems that always occur through Defendants' sole reliance on "going through the party chairmen" for "the process of picking early voting locations." Eason Dep. Tr., ECF 73-2 at 47, 174:1–7. And as discussed *infra* and *supra*, equity and transparency are repeated concerns Black Waller County residents have raised.

Coded statements that suggest or reveal unconstitutional biases can also be probative as strong evidence of discrimination. *Brown*, 561 F.3d at 433–34. As discussed in detail below, public statements during the October 24 meeting by Republican Party Chair David Luther reveal unconstitutional bias against Black voters. *See* Pls.' FoF ¶¶ 224-28. As the Republican Party chair, Chair Luther has been entrusted by Waller County as a

decision-maker for setting the early voting plan each year, a plan that is approved by him and the Democratic Party Chair and adopted "ninety-nine percent of the time" by Defendant Commissioners Court. Eason Dep. Tr., ECF 73-2 at 53, 198:5–24.

### vii. The 2018 Early Voting Schedule is a Continuation of Waller County's History of Voting Discrimination

As Defendants agree, a decision's historical background is relevant to showing discriminatory intent. *Arlington Heights*, 429 U.S. at 267; *see also* Mem. Order Den. Mot. for Summ. J., ECF 104 at 11 (explaining that the parties must be ready to address Waller County's history and how it is taken into account in the present). As of this filing, however, Defendants have failed to meaningfully contest—let alone rebut—Plaintiffs' expert and factual evidence establishing how the early voting plain is a continuation of Waller County's judicially recognized history of discrimination against Black Prairie View voters. *See Rogers*, 458 U.S. at 625–26.

The unrebutted evidence establishes the early voting plan builds upon Texas's history, generally, and Waller County's history, specifically, of voting-related discrimination. Texas's history of discrimination in voting is well-documented. *See LULAC*, 548 U.S. at 439–40. Even in recent years, Texas's repeated use of discriminatory voting schemes has necessitated federal intervention. *See, e.g.*, *OCA-Greater Houston v. Texas*, 867 F.3d 604, 615 (5th Cir. 2017) (holding illegal restrictions on voter assistance as violative of Section 208 of the VRA); *Veasey*, 830 F.3d at 264–65 (holding Texas's voter photo ID requirement, which disallowed IDs held by Black Texans like student and federal and state employee IDs, had racially discriminatory results); *Perez v. Perry*, 26 F. Supp.

3d 612, 614 (W.D. Tex. 2014) (three-judge court) (noting that an interim plan was adopted to address concerns that Texas's redistricting plans violated the Constitution and Section 2 of the VRA).

Because of this history, Waller County and the State of Texas were subject to preclearance under Section 5 of the VRA from 1975 until 2013. Between 1982 and 2013, the U.S. Department of Justice objected to dozens of proposed voting changes in Texas, including three objections against Waller County with one such objection coming as recently as 2002. Pls.' FoF ¶ 65; *see also* Pls.' Exs. 91-93, 1976, 1978, and 2002 objection letters, ECF 17-12, ECF 17-13, ECF 17-4.

Among Texas counties, Waller County stands out for its particularly shameful history of discrimination against Black voters in Prairie View. *See, e.g.*, Consent Decree, *United States v. Waller Cty.*, No. 4:08-cv-03022 (S.D. Tex. Oct. 17, 2008), ECF 8; Consent Order, *Prairie View Chapter of NAACP v. Kitzman*, No. 4:04-cv-00459 (S.D. Tex. Feb. 24, 2004), ECF 11. In 2014, this Court singled out Waller County's abhorrent history of discrimination from 1971-2008 as an example of Texas's overall "penchant for discrimination" and "a recalcitrance that has persisted over generations despite the repeated intervention of the federal government":

> In 1971, after the 26th Amendment extended the vote to those 18 years old and older, Waller County which was home to Prairie View A & M University (PVAMU), a historically Black university, became troubled with race issues. Waller County's tax assessor and voter registrar prohibited students from voting unless they or their families owned property in the county. This practice was ended by a three-judge court in 1979.
>
> In 1992, a county prosecutor indicted PVAMU students for illegally voting, but dropped the charges after receiving a protest from the DOJ.

In 2003, a PVAMU student ran for the commissioner's court. The local district attorney and county attorney threatened to prosecute students for voter fraud — for not meeting the old domicile test. These threatened prosecutions were enjoined, but Waller County then reduced early voting hours, which was particularly harmful to students because the election day was during their spring break. After the NAACP filed suit, Waller County reversed the changes to early voting and the student narrowly won the election.

In 2007-08, during then Senator Barack Obama's campaign for president, Waller County made several voting changes without seeking preclearance. The county rejected "incomplete" voter registrations and required volunteer deputy registrars (VDRs) to personally find and notify the voters of the rejection. The county also limited the number of new registrations any VDR could submit, thus limiting the success of voter registration drives. These practices were eventually prohibited by a consent decree.

*Veasey v. Perry*, 71 F. Supp. 3d 627, 635-36 (S.D. Tex. 2014), *aff'd in part, and rev'd in part on other grounds sub nom. Veasey v. Abbott,* 830 F. 3d 216 (5th Cir. 2016) (en banc), *cert. denied*, 137 S. Ct. 612 (2017).

Despite constitutional and federal statutory protections, Black Prairie View voters were unable to vote in the 1972 presidential elections and the 1974 midterm elections following legal challenges on behalf of Black PVAMU students. Joseph Rep., ECF 77-1 at 18. Then, for the 1976 presidential election, only 27 out of 738 eligible PVAMU students who attempted to register to vote were allowed to register, after filling out a questionnaire not required for students who attended the predominantly white University of Texas campus. Joseph Rep. ECF 77-1 at 18. In 1979, the U.S. Supreme Court upheld a three-judge panel's ruling that Waller County's residency requirement for PVAMU students violated the Twenty-Sixth Amendment. *United States v. Texas*, 445 F. Supp. 1245, 1257

(S.D. Tex. 1978) (three-judge court), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979) ("*Symm*").

While Black Prairie View voters endured onerous registration requirements, Waller County also sought to dilute Black Prairie View voters' political strength through redistricting efforts. Pls.' Ex. 91, Letter from J. Stanley Pottinger, Assistant Attorney General, Civil Rights Division, U.S. Dept. of Justice, to Hayden Burns, Attorney, Butler, Binion, Rice, Cook & Knapp Attorneys at Law (July 27, 1976), ECF 17-12 (objecting to Waller County's request for preclearance to implement a redistricting plan of commissioner and justice precincts and election precincts because Waller County could not show the plan had the purpose or effect of not abridging the right to vote of Black Waller County voters). With federal intervention again by the DOJ, Black Prairie View residents were finally represented in one Commissioners Court precinct by 1990. Joseph Rep., ECF 77-1 at 19.

Notwithstanding, Waller County's voter suppression efforts continued, as its tactics shifted to engaging in voter intimidation. In 1992, for example, nineteen Black PVAMU students faced prosecution in Waller County for purportedly voting illegally; these prosecutions were dropped following federal intervention by the DOJ. Joseph Rep., ECF 77-1 at 19. Waller County officials continued to engage in voter intimidation directed against PVAMU students as recently as the 2000s. In 2003, the Waller County District Attorney threatened to prosecute PVAMU student voters who did not meet his definition of being a Waller County resident, Pls.' FoF ¶ 66; Joseph Rep., ECF 77-1 at 21, which directly contravened *Symm*. At that time in 2003, PVAMU students comprised 20% of the

VAP in the County. Joseph Rep., ECF 77-1 at 22. The Texas Attorney General ultimately blocked the Waller County District Attorney's threatened prosecution. Joseph Rep., ECF 77-1 at 23.

Four years later during the 2008 presidential election, Waller County replaced voter intimidation with a proposal to cut early voting locations down from six to one, meaning the sole early voting polling location would force Black Prairie View residents to travel as many as thirty miles away. Joseph Rep., ECF 77-1 at 26; Pls.' Exs. 129-133 & 135-151 (collecting news articles). Only after the filing of a lawsuit, organizing by Black Prairie View residents, and intense pressure from Prairie View officials, did Waller County reverse course and open three additional early voting locations, with one located closer to campus. Joseph Rep., ECF 77-1 at 26-27. Also in 2008, the DOJ announced a consent decree with Waller County officials who agreed to halt "implementation of the unprecleared registration practices, reprocess those applications which were wrongly rejected and initiate voter registration programs" at PVAMU." Joseph Rep., ECF 77-1 at 28.

In the fall of 2015, Waller County officials returned to their longstanding practice of seeking to limit voting opportunities for Black Prairie View residents. For the 2016 primaries, Waller County intended to cut the number of early voting locations in Waller County from eight to two, neither of which would be in the same precinct as Prairie View or walking distance of PVAMU. Joseph Rep., ECF 77-1 at 33; *see also* Pls.' Ex. 107, 1/20/16 Minutes Commissioner's Court Regular Session; Pls.' Ex. 71, 12/22/15 CLC Ltr. (DEFENDANTS001422). Consistent with similar years, the plan was approved by the two party chairs. Duhon Dep. Tr., ECF 73-2 at 105–06, 121:13–12:18. Pls.' FoF ¶ 348. The

threat of litigation and massive organizing by Black Prairie View residents, however, ultimately persuaded Defendants to reverse the proposed changes. Joseph Rep., ECF 77-1 at 33–34.

Defendants' attempt to bypass this uncontested record by offering two arguments—both of which fail on the law and facts. First, Defendants claim "there is no evidence of intentional discrimination by the current Defendants." Defs.' Mot. for Summ. J., ECF 73 at 20. But the evidence of past and more recent history is particularly relevant to supporting an inference of present-day intentional discrimination, where, as here, "the evidence shows that discriminatory practices were commonly utilized, that they were abandoned when enjoined by courts or made illegal by civil rights legislation, and that they were replaced by laws and practices which, though neutral on their face, serve to maintain the status quo." *Rogers*, 458 U.S. at 625.

Second, Defendants identify only a single act—providing on-campus early voting for the 2016 primary—to attempt to distance themselves from the uncontested evidence of historical discrimination in Waller County. Defs.' Mot. for Summ. J., ECF 73 at 20. But Defendants ignore that "these sites were not allocated until *after* students had protested, marched, risked retaliation and prosecutions by Waller County officials, and petitioned the County to have a polling site on campus." Joseph Rep., ECF 77-1 at 33-34. Moreover, Defendants have refused to provide any early voting on campus in Prairie View in any election following the 2018 general election. Pls.' FoF ¶¶ 404–06, 417–22.

The record of history here is clear: Waller County has undertaken to eliminate and minimize Black political power in Prairie View over decades using various strategies.

Joseph Rep., ECF 77-1 at 20. When Waller County was forced to abandon specific methods of racially discriminatory voter suppression because they were "enjoined by courts or made illegal by civil rights legislation" or other interventions, County officials recalibrated and replaced those tactics with new tactics of voter suppression that are "neutral on their face" but "serve to maintain the status quo." *Rogers*, 458 U.S. at 625. This history cannot be detached from Waller County's adoption and maintenance of the 2018 early voting plan. It informs and contextualizes how the plan is a continuation of the well-established and judicially recognized history of racial discrimination against Black voters in Waller County.

\* \* \*

In sum, the evidence demonstrates that Defendants' 2018 early voting plan was adopted and maintained with a discriminatory purpose, and Defendants adopted this legislation because of, and not simply in spite of, its discriminatory impact on Black voters. Defendants have failed to show the early voting plan would have been enacted without racial discrimination as a motivating factor.

## II. Waller County's 2018 Early Voting Schedule Violated the Twenty-Sixth Amendment

### A. The U.S. Constitution Forbids Officials from Acting with a Discriminatory Purpose on the Basis of Age

The Twenty-Sixth Amendment to the U.S. Constitution forbids the denial or abridgment of the right to vote because of a person's status as a voter between 18-and 21 years old. U.S. Const. amend. XXVI.

**B. *Arlington Heights* is the Appropriate Standard to Analyze the Twenty-Sixth Amendment Claim in this Case**

"[T]here is no controlling caselaw" from the U.S. Supreme Court "regarding the proper interpretation of the Twenty-Sixth Amendment or the standard to be used in deciding claims for Twenty-Sixth Amendment violations based on an alleged abridgment or denial of the right to vote." *Nashville Student Org. Comm. v. Hargett*, 155 F.Supp.3d 749, 757 (M.D. Tenn. 2015).

When, as here, Plaintiffs' theory is that a jurisdiction has targeted young voters for disfavored treatment, the law is clearly invalid. *See Symm*, 445 F. Supp. at 1262. And if a law is facially neutral, *Arlington Heights* is the appropriate framework to assess whether the law is nonetheless targeted at young voters. *See League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1221 (N.D. Fla. 2018); *see One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 926 (W.D. Wis. 2016), *order enforced*, 351 F. Supp. 3d 1160 (W.D. Wis. 2019), and *aff'd in part*, *vacated in part*, *rev'd in part sub nom. Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020) ("*Thomsen*"); *N.C. State Conference of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 322 (M.D.N.C. 2016) (explaining that *Arlington Heights* would apply if plaintiffs' theory of the Twenty-Sixth Amendment encompasses a discriminatory purpose claim) *rev'd on other grounds*, 831 F.3d 204 (4th Cir. 2016).

Other cases have applied rational basis or *Anderson-Burdick*, but only in different contexts. *See*, *e.g.*, *Tex. Democratic Party*, 961 F.3d at 408-09 (5th Cir. 2020) (analyzing plaintiffs' Twenty-Sixth Amendment as-applied claim, alleging defendants' actions burdened the right of people below the age of 65 to vote solely based on their age, under

rational basis review); *Nashville Student Org. Comm.*, 155 F. Supp. 3d at 757-58 (applying

the *Anderson-Burdick* framework to analyze whether a change to a voter-ID law imposed

a burden on students' right to vote under the Twenty-Sixth Amendment). Not every effort

by the State to provide accommodations to older youngers, for example, is likely to be

subject to heightened scrutiny standards.

Plaintiffs have alleged that Defendants' 2018 early voting plan was adopted and

maintained with an intent to discriminate against the only concentrated group of voters

aged 18 through 20 years old in Waller County, who attend PVAMU. Accordingly, based

on the record, Plaintiffs' briefings, and caselaw governing intentional discrimination

claims in the voting context, *Arlington Heights* is the appropriate standard to assess

Plaintiffs' intentional discrimination claim under the Twenty-Sixth Amendment in this

case. In cases alleging intentional age discrimination, *Arlington Heights* provides the

appropriate framework to evaluate "such circumstantial and direct evidence of intent as

may be available" in order to "[d]etermin[e] whether invidious discriminatory purpose was

a motivating factor[.]" *Id.* at 266. Plaintiffs incorporate by reference here the foregoing

discussion of the *Arlington Heights* legal framework from Section I(A).

### C. Defendants' Adoption and Maintenance of the 2018 Early Voting Schedule, at Least in Part, Was to Minimize the Political Participation of Students Aged 18-20

As of this filing, Defendants have not meaningfully contested—let alone rebutted—

any of Plaintiffs' evidence in support of their intentional discrimination under the Twenty-

Sixth Amendment. Defendants have offered only a single conclusory defense: Plaintiffs'

"Twenty-Sixth Amendment claims would still fall . . . as with their claim of intentional

race discrimination" because "Plaintiffs have failed to establish intentional discrimination on the basis of age." Defs.' Mot. for Summ. J., ECF 73 at 22. But, as explained below, Plaintiffs' evidence establishes the early voting plan was motivated, at least in part, by an intent to minimize the opportunity of the only concentrated group of student voters, who attend PVAMU, to participate in the political process in violation of the Twenty-Sixth Amendment.

i. *The 2018 Early Voting Plan's Disproportionate Impact on PVAMU Student Voters*

As discussed above, under the *Arlington Heights* framework, evaluating the discriminatory impact of Defendants' early voting plan on voters aged 18 through 20 years old is an "important starting point" for this Court's intentional age discrimination analysis. *Arlington Heights*, 429 U.S. at 266. "[T]he impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Bossier Parish Sch. Bd.*, 520 U.S. at 487

Here, as discussed *supra*, Defendants' early voting plan provided far fewer hours and days of early voting to locations in Prairie View, including the location at the MSC on PVAMU's campus, than other areas in the county with older populations. The MSC— where 61% of early voters aged 18 through 20 cast their ballots, Stein Rep., ECF 77-1 at 182—received only 36 hours of early voting, as compared to three other locations in Waller County that received over 100 hours each. *Id.* at 186. The unequal allocation of early voting hours "b[ore] more heavily on" PVAMU-student voters aged 18 through 20 ("young voters") for several reason. *See Arlington Heights*, 429 U.S. at 266.

First, Prairie View is demographically unique in Waller County because it has a predominantly young VAP. Cooper Decl., ECF 77-1 at 227. Among residents of Prairie View who are at least 18 years old and thus old enough to vote, 54% are aged 18 through 20. *Id.* No other city in Waller County has an 18- 20-year-old population that is more than 8% of its overall VAP. *Id.* And Precinct 309, centered on the PVAMU campus in Prairie View, stands apart in this respect. Among voting-age residents of Precinct 309, 73% are aged 18 through 20. Suppl. Cooper Decl., ECF 77-1 at 409, fig. 3. By contrast, in Precinct 310, which contains most of the off-campus areas of Prairie View, only 15% of the VAP is aged 18 through 20. *Id.* Elsewhere in the county, voters aged 18 through 20 make up only a small fraction of the VAP. Cooper Decl., ECF 77-1 at 227.

Second, PVAMU student voters are also uniquely socioeconomically disadvantaged as compared to other residents of Waller County—and as compared to other residents of Prairie View. Jayla Allen, an alumna member of organizational Plaintiff, The Panther Party, testified that "[a] lot of [PVAMU students] don't have the financial means for cars or other extra activities outside of paying for school." Allen Dep. Tr., ECF 73-2 at 185, 170:5–25. Many PVAMU students "are struggling financially" and "don't have enough to cover the cost of school let alone a vehicle or anything else outside of the cost." *Id.* For these reasons, PVAMU has opened a food pantry to assist the significant number of students who are struggling to afford enough food to eat. *Id.* at 185, 171:22–172:7. Defendant Duhon acknowledges that PVAMU students disproportionately live in poverty. Duhon Dep. Tr., ECF 73-2 at 108, 131:9 –133:1. Dr. Gimpel concedes that PVAMU students are "not especially affluent," and that public universities like PVAMU draws their

students from "middle income and lower income populations." Gimpel Dep Tr., ECF 77-1 at 595-96, 182:20–183:7.

Third, the daily life and access to transportation of PVAMU student voters differs markedly from that of other residents of Waller County. Mr. Frank Jackson, a PVAMU administrator, alumnus, and former Prairie View mayor, has declared and will testify that "PVAMU students lack access to vehicles." Jackson Decl., ECF 77-1 at 746 ¶ 20. For example, Plaintiffs Damon Johnson and Treasure Smith did not own or have access to cars as of 2018. Johnson Dep. Tr., ECF 73-2 at 226, 33:2-20. Mr. Johnson walked to school, and Ms. Smith relied on the PVAMU shuttle. *Id.* at 226, 36:22-24; Smith Dep. Tr., *id.* at 266, 54:8-55:3. Both had busy schedules of on-campus activities, jobs, and classes, including travel for extracurricular activities in university-provided transportation that departed from campus. Johnson Dep. Tr., *id.* at 226–29, 36:3–45:24; *id.* at 232-33, 60:11–64:3; Smith Dep. Tr., *id.* at 256, 14:3–16:24; *id.* at 267-69, 58:23–66:4. Members of Plaintiff organization The Panther Party also did not own cars or have access to transportation. Muhammad Dep. Tr., *id.* at 342, 173:20-22.

By contrast, Defendant Duhon testified that "the majority of people" in Waller County own cars. Duhon Dep. Tr., *id.* at 100, 98:5–9. Unlike PVAMU students, many Waller County residents drive long distances on a daily basis. For example, during his deposition, Defendant Duhon testified that he lived in Cypress, which is over 25 miles from

his place of business at the Waller County Courthouse. *Id.* at 85, 41:7–8.[3] Defendant Eason

testified that she lived in Brenham, which is over 20 miles from her office. Eason Dep. Tr.,

*id.* at 9, 22:20–22.[4] Reflecting the reality that most residents of Waller County must drive

significant distances to go about their lives, the census block groups located in Waller

County are rated in the two lowest categories, by the U.S. Environmental Protection

Agency's National Walkability Index, as less walkable than the national average.[5]

   As a result of these disparities and the unique nature of student life, contrasted with

the car-dependent daily routines of other residents in Waller County, young voters at

PVAMU are uniquely dependent on early voting to access the franchise. *See* Stein Rep.,

ECF 77–1 at 183. Dr. Stein found, accordingly, that 81% of PVAMU students who voted

in 2018 did so via early voting (as compared to 71% of Waller County voters overall), and

that over 75% of PVAMU-student early voters cast their ballots at the on-campus MSC.

*Id.* Outside of Prairie View, there was *no* early voting location where young voters made

up more than 3% early voters overall. *Id.* at 186.

--------------------------------

[3] The Waller County Courthouse is located at 836 Austin Street, Hempstead, Texas 77445. *See* 836 Austin St.,  Hempstead, Texas 77445.
[4] Defendant Eason's office is located at 816 Wilkins Street, Hempstead, TX 77445, adjacent to the Waller County Courthouse. *See* https://www.co.waller.tx.us/page/Front%20Page.
[5] *See* U.S. Envtl. Protection Agency, *Smart Location Mapping: Interactive maps and data for measuring location efficiency and the built environment*, https://www.arcgis.com/home/webmap/viewer.html?url=https%3A%2F%2Fgeodata.epa.gov%2Farcgis%2Frest%2Fservices%2FOA%2FWalkabilityIndex%2FMapServer&source=sd. (enter "Waller County" in the search bar at upper right).

In light of these facts, Defendants' decision to grant only 36 hours of early voting to the MSC—and only 65 hours of early voting to the City of Prairie View overall—imposed a discriminatory impact on young voters.

ii. *Defendants Knew the Early Voting Plan Would Disproportionately Deny or Abridge PVAMU Student Voting Rights*

Discriminatory intent may also be inferred, under *Arlington Heights*, "from the fact that [] acts had foreseeable discriminatory consequences." *Tex. Ed. Agency I*, 564 F.2d at 168. As discussed above, the record is replete with evidence supporting the conclusion that Defendants knew or should have known that limiting early voting opportunities in Prairie View, and especially on-campus at PVAMU, would disproportionately impact young voters. Pls.' FoF ¶¶ 283–88, 299–305. Defendants knew that the on-campus voting precinct, Precinct 309, was home to the largest population of registered voters in the county at the time of the 2018 election. Stein Rep., ECF 77-1 at 181; Eason Dep. Tr., ECF 73-2 at 34-35, 125:10–128:8. And Defendants also knew PVAMU student voters are among the highest users of early voting. They also anticipated high turnout from PVAMU student voters during early voting. Eason Dep. Tr., ECF 73-2 at 35-36, 129:15–130:5.

Further, Defendants knew PVAMU students experience unique socioeconomic and transportation hurdles, which compounded the discriminatory harms, as compared to other Waller County and Prairie View residents. Pls.' FoF ¶¶ 106, 113–128, 147–52, 154–55. Duhon Dep. Tr., ECF 73-2 at 108, 131:9 –133:1. For years before the 2018 early voting plan was approved, PVAMU students and others—including Mayor David Allen of Prairie View—have notified Defendants that PVAMU students lack transportation to access off-

campus voting opportunities. Pls.' Ex. 94, 7/25/13 Barbour Ltr. (PVAMU SGA President Priscilla Barbour warning Waller County officials in 2013 that without an on-campus polling place "[s]tudents have to walk over a mile from housing areas to vote at the nearest location"); Duhon Dep. Tr., ECF No. 73-2 at 96, 83:10–85:9 (same); Pls.' Ex. 71, 12/22/15 CLC Ltr. (DEFENDANTS001422-1425) (civil rights organization expressing concern in a 2015 letter to Defendant Duhon that an off-campus early voting site would be inaccessible "for students on the A&M campus, many of whom lack access to transportation"); Duhon Dep. Tr., ECF No. 73-2 at 104-05, 115:13–120:4 (same); *id.* at 107-08, 129:11–130:7 (Prairie View Mayor David Allen testifying in a 2016 Commissioners Court meeting that "most students do not have cars" and "that's why the MSC and the campus voting is so important"); Eason Dep. Tr., *id*. at 60–61, 229:19–230:25 (Dr. Denise Mattox explaining in a 2017 Commissioners Court meeting that, in order for PVAMU students to have access to a polling place, "it has to be walkable" and "that's why we use the student center"); Flores Rep., ECF No. 77-1 at 95 (Dr. Flores reporting testimony from then-PVAMU student Antonious Brown at the October 17, 2018 Commissioners Court meeting that PVAMU students needed on-campus voting because most students "don't have cars" or gas money).

### iii. The Sequence of Events Also Reveals Defendants Failed to Lessen the Early Voting Plan's Known Discriminatory Impact

"The specific sequence of events leading up to" the adoption, maintenance, and amendment of the 2018 early voting plan also "may shed some light on a decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267. Further, it is probative of discriminatory

intent when officials and decision-makers failed to adopt changes that would have ameliorated an expected discriminatory impact—particularly where, as here, they did so without providing answers or while offering tenuous justifications. *Veasey*, 830 F. 3d at 241, 263.

Taken together, the evidence at trial will support the following facts and inferences, as discussed in detail above. As of mid-October 2018:

(1) The process surrounding the development and adoption of the early voting plan was non-transparent and unrepresentative for PVAMU student voters, including that Defendants: initially began developing the plan when students were not yet or had just arrived on campus; met exclusively during the day, when PVAMU students are in class or at work; did not engage in any affirmative outreach to PVAMU students, including new voters, to explain how an early voting plan was adopted; and knew that many PVAMU students are not represented by either political party chairs because they are unaffiliated. Pls.' FoF ¶¶ 215, 262, 353, 369.; s*ee also* Flores Rep.*,* ECF 77-1 at 83–84, 95;

(2) Defendants knew about the early voting plan's foreseeable impact on PVAMU student voters, *e.g.*, Pls.' FoF ¶ 302;

(3) Defendants admitted the early voting created inequities and did not provide PVAMU student voters with equal representation, Pls.' FoF ¶¶ 201, 205;

(4) Defendants acknowledged and were warned how the early voting plan would make early voting difficult for PVAMU student voters who disproportionately lack access to transportation, Pls.' FoF ¶¶ 152, 154–55;

(5) Defendant Eason, who is best positioned to opine on the feasibility of a plan, recommended adding early voting access in Prairie View to address the inequities and unequal representation of PVAMU student voters, Pls.' FoF ¶¶ 201–04, 267;

(6) PVAMU student voters proposed and supported recommendations to add early voting access in Prairie View, Pls.' FoF ¶¶ 208, 210–15;

(7) Defendants had the resources to adopt Defendant Eason's recommendation and other proposals, Pls.' FoF ¶ 220;

(8) PVAMU students repeatedly warned Defendants that failing to adopt changes to the early voting plan would disproportionately impact student voters, Pls.' FoF ¶ 396; and

(9) It is not prohibitive to make election changes as late as October, Pls.' FoF ¶ 328.

This sequence of events leading to the adoption, maintenance and modest amendment of the early voting plan, described in more detail above, shows Defendants had the authority, capacity, community support, and resources to expand early voting opportunities on the PVAMU campus and thereby mitigate the plan's known discriminatory impact before its initial adoption and then again on October 17. But Defendants failed to adopt any of the proposals that would have ameliorated these discriminatory impacts, citing various tenuous justifications, before ultimately contradicting themselves by adopting modest changes to the plan on October 24, after early voting had started. Pls.' FoF ¶¶ 221, 229–33.

### iv. *Defendants' Departures from the Ordinary Decision-making Process Reveal an Impermissible Motive*

As discussed above in the context of Plaintiffs' Fourteenth and Fifteenth Amendment claim, Defendants' "[s]ubstantive departures" from an ordinary decision-making progress are also relevant in assessing intentional age discrimination, particularly because "the factors usually considered important by the decisionmakers strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 at 267. Plaintiffs incorporate by reference the foregoing discussion in Section I(B)(iv), explaining Defendants' criteria for determining early voting allocation, if applied in a non-discriminatory manner, weighed in favor of more, not less early voting access on-campus at MSC, given: young voters at

PVAMU are one the largest concentration of registered voters countywide; Precinct 309, the PVAMU campus precinct in Prairie View, had the highest number of registered voters as of November 6, 2018; young voters use early voting at high rates and Defendants expected high turnout from PVAMU students; younger voters demanded more early voting access on campus; and the MSC is accessible to them because it is where they eat, study, work, engage in extracurricular activities, and pass through on their way to class, in light of their unique socioeconomic and transportation realities that either individually or combined make traveling to off-campus early voting locations difficult, and for some, impossible.

> ### v. Defendants Hid Their Effort to Suppress PVAMU Students' Political Participation Behind Tenuous Justifications

Under *Arlington Heights*, the many shifting rationales Defendants advanced in support of adopting, maintaining, and insufficiently amending their 2018 early voting plan are probative of discriminatory intent because they "fail to correspond in any meaningful way" to the relevant facts. *Id.* at 263. These tenuous justifications are set forth in detail *supra* § I(B)(v), and Plaintiffs incorporate that discussion by reference.

Of particular relevance to discrimination against PVAMU student voters on the basis of age are the tenuous claim that the homecoming week was inappropriate for voting, *supra*, and the unfounded claim that the off-campus WCCC was an adequate substitute for sufficient voting on campus. This justification fails for two primary reasons.

First, the WCCC was provided only 24 hours of early voting during the end of the second week of early voting. Stein Rep., ECF 77-1 at 191. According to Dr. Stein's

analysis, indeed, all three early voting locations in Prairie View, including the WCCC, were underserved as compared to locations in other cities with older populations. *Id.* at 183-84, 191-92.

Second, the WCCC is distant enough from large on-campus dormitories to significantly deter voting, largely unknown to PVAMU students, not in fact utilized by students for voting, and situated on a highway in a location where the PVAMU shuttle does not stop. *See, e.g.*, Flores Rebuttal Rep., ECF 77-1 at 162 (Dr. Flores reporting that "Plaintiffs and other PVAMU students have repeatedly declared" that the WCCC "is inaccessible to students"); Duhon Dep. Tr., ECF 73-2 at 97, 89:20–24 (Defendant Duhon testifying that he is not aware of a shuttle that stops at the WCCC); Allen Dep. Tr., *id.* at 178, 141:19–21, Smith Dep. Tr., *id.* at 273, 84:10–12 (Organizational plaintiff member Jayla Allen and Plaintiff Treasure Smith testifying that they do not know anyone who has ever voted at the WCCC); Stein Rep., ECF 77-1 at 183, 186 tbl.1 (Dr. Stein reporting that 76% of PVAMU-student early voters cast their ballots at the MSC, and that only 5% of early voters at the WCCC were aged 18-20, as compared to 28% at the MSC); Pls.' Ex. 160, Dr. Stein Errata Decl. (finding, for example, the distance from the two largest residential housing facilities on the PVAMU campus from WCCC is approximately four times further than the minimum distance beyond which Cantoni observed reduced voter turnout); Johnson Dep. Tr., ECF 73-2 at 232, 58:13–59:3; Muhammad Dep. Tr., *id*. at 332, 136:1–10); *id* at 345, 187:6–9 (Organizational plaintiff member Joshua Muhammad and Plaintiff Damon Johnson testifying that the PVAMU shuttle does not allow egress or ingress outside of scheduled stops and comes inconsistently); Allen Dep. Tr., *id.* at 192,

197:24–198:4 (Organizational plaintiff member Jayla Allen testifying that the WCCC sits on State Loop 1098, a "highway"); Johnson Dep. Tr., *id. at* 230-31, 52:24-53:3; Smith Dep. Tr., *id.* at 273, 81:18-82:3 (Plaintiffs Smith and Johnson testifying that they have never been to the WCCC and do not know where it is).

All these reasons, in addition to those discussed *supra*, § I(B)(v), underscore the tenuousness of Defendants' justifications for denying equal early voting opportunities for young voters on the PVAMU campus.

> *vi. Defendants' Contemporaneous and Coded Statements Reveal Unconstitutional Biases Against Student Voters*

As discussed *supra* § I(B)(vi), Defendants' statements seeking to differentiate between PVAMU student voters and "the community," supports a finding that intent to discriminate against young voters on the PVAMU campus was a motivating factor for the 2018 early voting plan's adoption and maintenance. David W. Luther, the Chair of the Republican Party of Waller County and a decisionmaker in the development of the 2018 early voting plan made several coded statements during a Defendant Commissioners Court hearing on October 24, 2018 that reveal bias against young voters. Pls.' FoF ¶¶ 224-28. Specifically, Mr. Luther:

> (1) Claimed that PVAMU students' advocacy for equal early voting hours was an attempt to set "their sights" on Commissioner Barnett;

> (2) Asserted that PVAMU students did not care for other residents of Waller County;

> (3) Claimed that any changes to the early voting plan would mean Defendants were allowing themselves to be "blackmailed by the federal courts" and Democratic Party;

(4) Contended that students only care about "their commodity, their vote"; and

(5) Claimed that PVAMU students were "easy pickins for the political vultures out there."

Flores Rep., ECF 77-1 at 104-06; *see* Pls.' FoF ¶¶ 224-28. Plaintiffs also incorporate by reference the discussion of such statements *infra* Section III(B)(vi).

> ### vii.  The Early Voting Plan is a Continuation of Waller County's History of Voting Discrimination Against Young Voters

For the reasons set forth *supra*, § I(B)(vii), which Plaintiffs incorporate herein by reference, Waller County's ongoing record of discriminating against student voters also supports at PVAMU a finding that the early voting plan was adopted as a continuation of that history and to deter young voters from participating. Plaintiffs have also introduced evidence that Defendants' predecessors in office have attempted to further abridge student voters by moving local election dates from April to August, which would "have the effect of conducting the election during a period when most . . . [PVAMU] student voters [we]re away from the area on summer school vacation." *See* Pls.' Ex. 92, 3/10/78 Ltr. from Drew S. Days III, Assistant Attorney General, U.S. Dep't of Justice, Civil Rights Div., to Counsel for the Commissioners of Waller County, Texas, ECF 17-13 at 3.

## III.  Waller County's 2018 Early Voting Schedule Discriminated on the Intersecting Bases of Race and Age in Violation of the Fourteenth, Fifteenth, and Twenty-Sixth Amendments

### A. The U.S. Constitution Forbids Officials from Acting with a Discriminatory Purpose on the Intersecting Bases of Age and Race

Black PVAMU students represent two protected classes that the U.S. Constitution and the Supreme Court have granted strong constitutional protections. *See, e.g.*, *City of*

*Richmond*, 422 U.S. at 378–79 (race); *Symm*, 445 F. Supp at 1246 (age). The Fourteenth and Fifteenth Amendments forbid denial or abridgment of voting rights because of race or ethnicity. U.S. Const. amend. XIV; U.S. Const. amend. XV; *see also Veasey*, 830 F.3d at 253. The Twenty-Sixth Amendment forbids the denial or abridgment of the right to vote because of a person's status as a voter younger than 21. U.S. Const. amend. XXVI. The Twenty-Sixth Amendment has "particular relevance for the college youth who comprise approximately 50 percent of all who were enfranchised by this amendment." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973).

Taken together, these Amendments prohibit discrimination against Black students on the intersecting bases of age and race. The Fourteenth, Fifteenth, and Twenty-Sixth Amendments have been read together to prohibit discrimination that is unique to Black student voters. *See, e.g., U.S. v. Texas*, 445 F. Supp. at 1257, 1261 (holding Waller County officials violated the Fourteenth, Fifteenth, and Twenty-Sixth Amendments in imposing special requirements on Black students at PVAMU, even where those requirements did not affect Black non-students); *Latham v. Chandler*, 406 F. Supp. 754 (N.D. Miss. 1976) (preliminarily enjoining, under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments, practices that treated registration applications tendered by Black students at a historically Black college differently from applications tendered by non-students of any race). Unconstitutional discrimination against Black students can therefore exist even in the absence of discrimination against Black non-students. *Cf. Jefferies v. Harris Cty. Cmty. Action Ass'n*, 615 F.2d 1025, 1033–34 (5th Cir. 1980).

## B. *Arlington Heights* is the Appropriate Standard to Analyze the Intersecting Basis Claim in this Case

Based on the record, Plaintiffs' briefings, and caselaw governing intentional discrimination claims in the voting context, *Arlington Heights* is the appropriate standard to assess Plaintiffs' claims that Defendants targeted them by limiting their access to early voting on the intersecting bases of age and race under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments in this case. Plaintiffs incorporate by reference here their arguments why *Arlington Heights* is the proper legal framework to assess their Twenty-Sixth Amendment claim. Plaintiffs also incorporate by reference here the foregoing discussion of the *Arlington Heights* legal framework from Section I(A).

## C. The Adoption and Maintenance of the 2018 Early Voting Schedule, at Least in Part, Was to Minimize the Political Participation of Students on the Intersecting Bases of Age and Race

### i. *The 2018 Early Voting Plan Disproportionately Impacted Black PVAMU Student Voters*

Sections I(B)(i) and II(C)(i) *supra*, which Plaintiffs incorporate herein by reference, document and contextualize the disproportionate impact imposed by Waller County's early voting plan against both Black voters in Prairie View and young voters aged 18 through 20 in Waller County. *See also* Stein Rep., ECF 77-1 at 182–83 (Dr. Stein reporting that the early voting locations that disproportionately served Black voters and young voters were provided "with the fewest hours and days of operation"). Black student voters at PVAMU—both due to their race and their age—face unique burdens related to intersecting patterns of discrimination that aggravate their inability to participate in the political process by traveling off-campus to vote. *See* Pls.' FoF ¶¶ 121–27; Cooper Decl., ECF 77-1 at 233

¶¶ 37-40 (Mr. Cooper reporting that the annual "per capita income for Black dorm students [at PVAMU] is $3,562" and that PVAMU students in particular are "extremely socioeconomically disadvantaged, as compared to Anglo residents countywide"). As both predominantly young and Black voters, PVAMU students are simultaneously members of two protected classes which Waller County officials, for decades, have sought to suppress as a perceived threat to their power. Pls.' FoF ¶¶ 57–79. This ongoing history of discrimination continues to produce unequal socioeconomic outcomes and "life changes during their tenure on campus and long after they have graduated." Joseph Rep., ECF 77-1 at 40. It is also an essential lens for understanding contemporary socioeconomic and political realities in Waller County for Black PVAMU students. Duhon Dep. Tr., ECF 73-2 at 135, 239:10–240:6 (Defendant Duhon describing a fear among older, white Waller County residents that students voting at high numbers "could take over the county"). For all of these reasons, the abridging effects of the 2018 early voting fell most heavily on the class of Prairie View voters who were both young and Black.

### ii. Defendants Knew the 2018 Early Voting Plan Would Disproportionately Harm Black PVAMU Student Voters' Rights

The unique socioeconomic and transportation barriers faced by Black students, as set forth in §§ I(B)(ii) and II(C)(ii), *supra*, which Plaintiffs incorporate herein by reference, were both foreseeable, based on Defendants' own data, and well-documented in past testimony and correspondence from Black PVAMU students to Waller County officials, including Defendants. *See* Pls.' FoF ¶¶ 121–27; 146–50; Pls.' Ex. 94, 7/25/13 Barbour Ltr.

This evidence further supports a finding of discriminatory intent on the intersecting bases of race and age.

       *iii.*   *The Sequence of Events Also Reveals Defendants Failed to Lessen the 2018 Early Voting Plan's Known Discriminatory Impact on Black PVAMU Students*

The "specific sequence of events leading up to" the adoption, maintenance, and amendment of the 2018 early voting plan also "may shed some light on a decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267. Further, it is probative of discriminatory intent when officials and decision-makers failed to adopt changes that would have ameliorated an expected disparate impact—particularly where, as here, they did so without providing answers or while offering tenuous justifications. *Veasey*, 830 F. 3d at 241, 263.

Plaintiffs incorporate by reference the foregoing discussion in Sections I(B)(iii), explaining how Defendants failed to lessen known discriminatory impacts as well as the facts that were available to Defendants as of mid-October 2018 and the inferences that can be drawn from them. This sequence of events described previously shows Defendants had the authority, capacity, community support, and resources to expand early voting opportunities on in Prairie View, generally, and PVAMU's campus, specifically, thereby mitigating the plan's known discriminatory impact before its initial adoption and then again on October 17. But Defendants failed to adopt any of the proposals that would have ameliorated these discriminatory impacts, citing various tenuous justifications, before ultimately contradicting themselves by adopting modest changes to the plan on October 24, after early voting had started. Pls.' FoF ¶¶ 229–30.

As discussed above, § I(B)(iii), explaining that Defendants met exclusively during the day, when Black PVAMU students are in class and/or at work, did not engage in any affirmative outreach to Black PVAMU students, including new voters, to explain how an early voting plan was adopted, and relied on the party to set the early voting plan, knowing that many Black PVAMU students are not represented by either chair of the parties. *See* Pls.' FoF ¶ 375; Flores Rep., ECF 77-1 at 83–84, 95.

Even if the party chairs sought adequate input from local politicians and community members—which they did not—public comments made clear that such a process was insufficient, particularly for Black PVAMU students who are unaffiliated. Pls.' FoF ¶¶ 212, 226, 259, 352. Plaintiffs, like those students, are seeking to vindicate their rights as Black student voters, not to protect the interests of the Waller County Republican or Democratic parties. As the Fifth Circuit has acknowledged, "'it does not matter who is in charge of State politics or the political parties in power in Texas, whether they're Republicans, Democrats[,] or Martians, every time that African-Americans have, in fact, been perceived to be increasing their ability to vote and participate in the process there has been State legislation to either deny them the vote or at least dilute the vote or make it much more difficult for them to participate on an equal basis as Whites in the State of Texas.'" *Veasey*, 830 F. 3d at 241, n.30 (quoting plaintiffs' expert testimony in that case).

iv. *Defendants' Departures from the Ordinary Decision-making Process Reveal an Impermissible Motive*

Plaintiffs also incorporate by reference the foregoing discussion in Section I(B)(iv), explaining how whether applying Defendants' early voting allocation criteria and their

expert's narrower definition of early voting allocation best practices, each supported providing more—not less-early voting access in Prairie View, generally, and on campus at the MSC, specifically.

### v. Defendants Hid Their Effort to Suppress Black PVAMU Students' Political Participation Behind Tenuous Justifications

Under *Arlington Heights*, the many shifting rationales Defendants advanced in support of adopting, maintaining, and insufficiently amending their early voting plan are probative of discriminatory intent because they "fail to correspond in any meaningful way" to the relevant facts. *Veasey*, 830 F.3d at 263. These tenuous justifications are set forth in detail *supra* Section I(B)(v), and Plaintiffs incorporate that discussion by reference.

### vi. Defendants' Contemporaneous and Coded Statements Reveal Unconstitutional Biases Against Black PVAMU Students

As set forth *supra* in Sections §§ I(B)(vi) and II(C)(vi), Defendants' statements seeking to differentiate between Black PVAMU student voters and  "the community," support a finding that intent to discriminate against Black PVAMU students was a motivating factor for the 2018 early voting plan's adoption and maintenance.

As a decisionmaker in the development of the early voting plan, Chair Luther's many coded statements are revealing of discriminatory biases. *See supra* §§ I(B)(vi) and II(C)(vi). Chair Luther repeatedly declared PVAMU students, the majority of whom are Black, will vote as Democrats, tapping into unfounded assumptions that were directly refuted by Black PVAMU students during the October 17 meeting that Chair Luther attended. While pointing at Commissioner Barnett, who at this time is a Republican, he exclaimed "they have their sights on you, because they hold you, they are going to hold

you responsible." Pls.' FoF ¶ 225; Flores Rep., ECF 77-1 at 104. Adding early voting on campus, Chair Luther declared, would mean "every students has to pass through the [MSC]," thereby implying having access to early voting. Flores Rep., ECF 77-1 at 104. According to Chair Luther, these equitable early voting changes for Black PVAMU students would also allow Defendants "to be used by the Democrats, to be black-mailed by the Democratic," as well as "black-mailed by the federal courts." Pls.' FoF ¶ 228; Flores Rep., ECF 77-1 at 104. And to support these claims, Chair Luther harkened back to discriminatory stereotypes that Black PVAMU students are not part of the "community" and did not care about other Waller County residents. Flores Rep., ECF 77-1 at 104.

When situated within Waller County's history of discrimination against Black PVAMU student voters, Chair Luther's subtext is clear: by virtue of being young and Black—a combination he assumed meant affiliation with the Democratic party—Black PVAMU students were outsiders and represented a threat to the perceived interested as shared by Chair Luther and the predominantly white, older population that he purported to represent. Flores Rep., ECF 77-1 at 104. Or to put it a different way as Defendant Duhon asserted: "I think there's always been this fear that if all the students voted and they voted in a certain [way], they could take over the county." Pls.' FoF ¶ 79.

### vii. The Early Voting Plan is a Continuation of Waller County's History of Voting Discrimination Against Black PVAMU Students

For the reasons set forth *supra*, §§ I(B)(vii) and II(C)(vii), which Plaintiffs incorporate herein by reference, Waller County's ongoing record of discriminating against PVAMU Black student voters—both due to their race and their age—also supports a

finding that the early voting plan was adopted as a continuation of that history. No other university in Texas has a comparable history of such intersectional discrimination by county or state officials. *See* Pls.' FoF ¶¶ 104–05. "Simply put," as Dr. Joseph explains, "Waller County is the most difficult county in Texas for African American college students to vote." Joseph Rep., ECF 77-1 at 14.

## IV. Waller County's 2018 Early Voting Schedule Violated Section 2 of the VRA (Discriminatory Results)

### A. Legal Standard

In addition to prohibiting decisions motivated by a discriminatory purpose, Section 2 prohibits Defendants from imposing, applying, or maintaining any "qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a); *Chisom*, 501 U.S. at 394 & n.21 (1991) (citation omitted) (to prevail on a Section 2 claim, Plaintiffs can "either prove [discriminatory] intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process"); *see also Brown*, 561 F. 3d at 432 (quoting *McMillan,* 748 F.2d at 1046) ("Congress intended that fulfilling *either* the more restrictive intent test or the results test would be sufficient to show a violation of section 2.") (emphasis in original).

Section 2 covers "vote denial" claims involving challenges to practices that deny or abridge the rights of Black voters to participate in the political process on an equal basis with other voters. *Veasey*, 830 F.3d at 244. "The essence of a § 2 claim is that a certain

electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and [nonblack] voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 US 30, 47 (1986). As "the major statutory prohibition of all voting rights discrimination," Section 2 prohibits not only "permanent structural barriers," but also practices or schemes that "result in the denial of access to any phase of the electoral process for minority group members." S. Rep. No. 97-417, at 30 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 207. [6] Section 2 is violated whenever, based on the totality of circumstances, the political process is "not equally open to participation by members of [a racial, ethnic, or language minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.;* 52 U.S.C § 10301(b).

The Supreme Court has instructed, citing the Senate Judiciary Committee Report accompanying the 1982 amendments to Section 2, "that the question whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." *Gingles*, 478 U.S. at 45 (citation and internal quotation marks omitted). Accordingly, Supreme Court and Fifth Circuit precedent requires courts to consider nine factors set forth in the Senate Report as part of the "searching practical evaluation" that Section 2 demands. *Veasey*, 830 F.3d at

---

[6]     The Supreme Court in *Gingles* recognized this Senate Report as the "the authoritative source for legislative intent" on the Voting Rights Act. *Gingles*, 478 U.S. at 43 n.7.

257 (quoting *Gingles*, 478 U.S. at 45); *see also id.* at 253-54 (approving of a district court's findings that "rest on far more than a statistical disparity"). These "Senate Factors" (also referred to in *Veasey* as "*Gingles* factors") are:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction. . . .

[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]

[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36-37 (citation omitted).

When, as here, a vote-denial or vote-abridgement claim is based on Section 2's discriminatory results standard, courts in the Fifth Circuit apply a two-part test set forth in *Veasey*, 830 F.3d at 244. *First*, "[t]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id. Second*, "[t]hat burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Id.*

*Veasey* expressly adopted this two-part test as it was set forth in *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014), and *Ohio State Conference of N.A.A.C.P. v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014), *vacated*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014)). *Veasey*, 830 F.3d at 244. ("We now adopt the two-part framework employed by the Fourth and Sixth Circuits to evaluate Section 2 'results claims.") (citing *League of Women Voters of N.C.*, 769 F.3d at 240, and *Husted*, 768 F.3d at 554). Both cases whose framework *Veasey* adopted hold that "the totality of the circumstances," including relevant Senate Factors, should be considered not only in the test's second part, but also in its *first* part, to assess the nature of the burden imposed. *League*, 769 F.3d at 240 ("In assessing both elements, courts should consider 'the totality of circumstances.'"); *Husted*, 768 F.3d at 554 (same); *accord Veasey*, 830 F.3d at 244; *id.* at 245 n.35.

Nor may this Court decline—despite Defendants' erroneous suggestions, *see* ECF 73 at 13—to reach the test's second prong. *Veasey* instructs courts to consider Senate

Factors under "both elements of the two-part test," *Veasey*, 830 F.3d at 245 n. 35, and expressly rejected an alternative to the two-part test in which the first element would act as gatekeeper for the second*, id.* at 311 (Jones, J., dissenting) (such a test "fundamentally differs" from the standard adopted). As this Court correctly observed, "[e]vidence regarding [the Senate Factors] is material and will also be necessary at trial. The Fifth Circuit has quite plainly determined that these factors must be analyzed towards a proper decision." ECF 104 at 10. At trial, Defendants' invitation to abandon *Veasey*'s controlling standards for out-of-circuit alternatives must be rejected—as it was at summary judgment. *See id.* Thus, the first element in *Veasey*'s framework analyzes statistical evidence, demographics, and relevant Senate Factors to determine "the nature of the burden imposed and whether it creates a disparate effect" on Black voters in Prairie View. *Veasey*, 830 F.3d at 244. *Veasey*'s second element analyzes "the totality of the circumstances," including the Senate Factors, to "determine whether there is a sufficient causal link between the disparate-burden imposed and social and historical conditions [that have] produced [ ] discrimination" currently, in the past, or both. *Id.* at 245. These factors are non-exhaustive, and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id*. at 246 (quoting *Gingles*, 478 U.S. at 45).

The Section 2 inquiry is "an intensely local appraisal" that must be conducted "in the light of past and present reality." *Gingles*, 478 U.S. at 78 (quoting *White v. Regester*, 412 U.S. 755, 769-770 (1973)). Accordingly, this Court's evaluation of "the *nature* of the burden imposed" under the *Veasey* test's first prong should consider not only the disparity in access established by Dr. Stein, but also, *inter alia*, Waller County's history of state-

sponsored discrimination in voting and registration and the continuing effects of that history in the form of socioeconomic disparities and inequities in transportation, educational attainment, and unemployment outcomes, as reported by Mr. Cooper and contextualized by Drs. Joseph, Flores, and Stein—all of which interacted with the 2018 early voting plan to prevent Black votes in Prairie View from participating in the political process on an equal basis with white voters elsewhere in Waller County.

In addition, this Courts should take care not to "conflate[] abridgement and denial," each of which is explicitly—and independently—prohibited by Section 2. *Veasey*, 830 F.3d at 260 n.58; *id.* at 253 (citing U.S. Const. amend. XV; 52 U.S.C. § 10301(a). Evidence of vote *denial* is not required to establish vote *abridgment*. As the Fifth Circuit has observed, "in previous times, some people paid the poll tax or passed the literacy test and therefore voted, but their rights were still abridged." *Id.*, 830 F.3d at 260 n.58. As here, evidence that Defendants' plan interacted with social and historical conditions to "abridge" Plaintiffs' voting rights, resulting in a inequality in early voting access along racial lines, "falls comfortably within this definition." *Id.* at 260; *see also League of Women Voters of N.C.*, 769 F.3d at 243 ("[N]othing in Section 2 requires a showing that voters cannot register or vote under any circumstance. Instead, it requires 'that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.'"); Stein Rebuttal Rep., ECF 77-1 at 209 (Dr. Stein explaining that the issue in this case is "whether Waller County has discriminated against legally-protected classes of voters . . .

in the way it provides access to early voting opportunities," and, therefore, that discussing "[t]urnout, in a dispute about *access*, misses the mark").

Under these guiding standards, Plaintiffs will establish at trial that Defendants' early voting plan for the 2018 general election imposed a burden and abridgment of the right to vote of Black voters in Prairie View by providing far fewer hours at the only locations that disproportionately served Black voters, *see supra* § I(B)(i). In addition, as discussed below, expert reports and testimony by Plaintiffs' experts Drs. Joseph, Stein, and Flores, and Mr. Cooper will make clear that this burden on Plaintiffs' voting rights is "a product of current or historical conditions of discrimination such that it violates Section 2." *See Gingles*, 478 U.S. at 44-45.

### B. Under *Veasey*'s First Step, Defendants' 2018 Early Voting Plan Imposed a Discriminatory Burden on Black Voters in Waller County.

As described above, Dr. Stein's expert report and testimony demonstrating the disproportionate impact of the decision and the disparate treatment of Prairie View as compared to other non-majority-Black cities in the County offer sufficient evidence to meet the first element of the Section 2 vote-denial analysis, because the early voting plan burdened Black voters by denying them an equal opportunity to participate in the political process in Waller County and elect representatives of their choice. *Supra* § I(B)(i).

As Dr. Stein reported and will testify, the three early voting locations in Prairie View—the MSC, the WCCC, and the Prairie View City Hall—were disproportionately used by Black voters during the 2018 general election. At the MSC, Black voters accounted for 72% of all early votes cast. Stein Rep., ECF 77-1 at 182. At both the WCCC and Prairie

View City Hall, Black voters accounted for 47% of all early votes cast. *Id.* Outside of Prairie View, there was no location where Black voters accounted for more than 22% of early votes. *Id.*

Dr. Flores reported and will testify that Defendants had information in their possession sufficient to be aware that these locations would primarily serve Black voters, given Prairie View's demographics. Flores Rep, *id.* at 78. As Mr. Cooper reported and will testify, Prairie View is unique among cities or populated areas in Waller County in that its VAP is overwhelmingly Black. Cooper Decl., *id.* at 227 ¶ 31 and fig. 6; Pls.' FoF ¶ 93. Among the residents of Prairie View who are at least 18 years old and thus old enough to vote, 92% are Black. *Id.* at 225.

Mr. Cooper also reported and will testify that the on-campus Precinct 309, which relies on the MSC as its early voting location and is located entirely within Prairie View, stands in especially sharp contrast to the rest of Waller County. Cooper Suppl. Decl., ECF 77-1 at 408. Among the residents of Precinct 309 who are at least 18 years old and thus old enough to vote, 94% are Black. *Id.* at fig. 2.

By way of comparison, in Precinct 310, located off-campus in the City of Prairie View, the VAP is 74% Black. *Id.* Outside of Prairie View, no other city or area in Waller County has a VAP that is more than 41% Black. Cooper Decl., *id.* at 225 fig. 4.

As discussed above, Defendants provided the three Prairie View locations a total of 65 hours of early voting under the modified early voting plan. That is, five hours were added in the eleventh hour on Sunday at the Prairie View City Hall; thirty-six hours were

spread over three days at the MSC; and the remaining 24 hours were at the off-campus WCCC in Precinct 310.

After geocoding the residence address and Census block of every voter in Waller County, as well as the early voting locations offered in the 2018 general election, Dr. Stein arrived at a reliable ascertainment of each Black voter's race and relative access to early voting. Stein Rep., ECF 77-1 at 173–75.

Analyzing this data regarding race and relative access to early voting, Dr. Stein reached the following expert opinion and observation: "When we look at where Black voters in Waller County voted early in the 2018 election, we observe that they cast their ballots at early polling locations with the fewest hours and days of operation." Stein Rep., ECF 77-1 at 182.

As a result, as Dr. Stein concluded and will testify, the result of Defendants' 2018 early voting plans "was to deny . . .  Black voters in Prairie View equal or even similar access to early voting opportunities afforded other registered voters in Waller County." *Id.* at 184.

As discussed above, Defendants have sought to avoid liability under Section 2 in part by arguing—tenuously—that the WCCC is an adequate early voting location for Black voters in Prairie View. This is inaccurate, as discussed *supra* §§ I(B)(v), II(C)(v). However, for purposes of determining Defendants' liability under Section 2 (or the Constitution) for their actions in the 2018 election, the adequacy of the WCCC is wholly irrelevant: whether it was a good location or a bad one, the WCCC was provided *only* 24 hours of early voting during the end of the second week of early voting. Stein Rep., ECF 77-1 at 191. Thus,

voters who sought to vote at the WCCC were burdened similarly to voters who sought to vote at the MSC. According to Dr. Stein's analysis, all three early voting locations in Prairie View, including the WCCC, were disproportionately used by Black voters at rates far beyond any other early voting locations in the County—and all three were underserved as compared to locations in other cities with larger white populations and fewer Black residents, imposing a discriminatory burden or abridgement on all Black voters in Prairie View. *Id.* at 183–84, 191–92.

Nor should this Court credit Defendants' attempts to use the purportedly fairer treatment of some Black voters elsewhere in Waller County to escape liability for their discriminatory actions against Black voters in Prairie View. The rights of some Black voters under Section 2 cannot be "traded off against the rights of other members of the same minority class." *LULAC*, 548 U.S. at 436. Moreover, no other city or populated area in Waller County has a comparable history or demographic makeup to that of Prairie View. *See* Pls.' Opp'n to Defs.' Mot. for Summ. J., ECF 77 at 24. Further, as the Fourth Circuit explained in a case the *Veasey* court relied on, plaintiffs in a Section 2 case need not establish that *all* Black voters in a given jurisdiction are harmed: "what matters for purposes of Section 2 is not how many minority voters are being denied equal electoral opportunities but simply that 'any' minority voter is being denied equal electoral opportunities." *League of Women Voters of N.C.*, 769 F.3d at 244 (quoting 52 U.S.C. § 10301(a)).

Here, the 2018 early voting plan's discriminatory impact, as Dr. Flores and Dr. Stein reported and will testify, was caused by and linked to by historical and contemporary

socioeconomic disparities among the predominantly Black residents of Prairie View, including PVAMU students, that reduce their ability to effectively participate in the political process in Waller County, increase their reliance on early voting, and aggravate the severity of the burden or abridgement inflicted by a denial of equal access to early voting. Flores Rep., ECF 77-1 at 77-79, 112; Stein Rep., *id.* at 183; Cooper Decl., *id.* at 301-329.

In addition, the early voting plan's impact must be understood within Waller County's well-documented history of discrimination against PVAMU students with regard to their right to vote. *See, e.g.*, Joseph Rep., ECF 77-1 at 14-40; Flores Rep., *id.* at 78-79.

For these reasons, Plaintiffs will establish at trial that Defendants' decisions to limit access to early voting imposed a significant burden or abridgement on the ability of Black voters in Prairie View to participate in the political process on an equal basis with white voters elsewhere in Waller County. This showing satisfies *Veasey*'s first prong.

### C. Under *Veasey*'s Second Step, the Early Voting Plan's Burden is Caused by or Linked to Social and Historical Conditions that Produce Discrimination against Black Voters, Violating Section 2.

Under *Veasey*'s second step, this Court will analyze the Senate Factors to determine whether, under the totality of the circumstances, the abridgement of Plaintiffs' voting rights "is linked to social and historical conditions of discrimination such that the abridgement has occurred 'on account of race.'" *Veasey*, 830 F.3d at 253. "The Fifth Circuit has quite plainly determined that these factors must be analyzed towards a proper decision." Mem. Order Den. Mot. for Summ. J., ECF 104 at 10.

> i. *The burden is caused by or linked to Waller County's history of official discrimination in voting, registration, and political participation under Senate Factor 1.*

Senate Factor 1, "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process," is an important component of the totality-of-circumstances analysis. *Gingles*, 478 U.S. at 36–37. History matters in voting cases, the Supreme Court has explained, because the "accumulation of discrimination" within a state or political subdivision acts as a barrier to effective participation by Black voters in the electoral process. *Id.* at 44 n.9. Moreover, "voting practices and procedures that have discriminatory results perpetuate the effects of past purposeful discrimination." *Id.*

As discussed above, Plaintiffs have introduced unrebutted evidence regarding the history of official discrimination in voting in Waller County and in the State of Texas overall. Plaintiffs' expert, Dr. Joseph, details this continuing history in his expert report. Joseph Rep., ECF 77-1 at 3-41; Pls.' FoF ¶¶ 44–81. Plaintiffs incorporate herein by reference the discussion of official racial discrimination in voting, both in Waller County and in Texas overall, as set forth *supra* at § I(B)(vii) above.

Under Section 2, in addition to the recent examples cited by Dr. Joseph, "regardless of the distance of time, [past discriminatory] practices still must be candidly acknowledged and taken into account in the present." Mem. Order Den. Mot. for Summ. J., ECF 104 at 11; *see Veasey*, 830 F. 3d at 257 & n. 53 (holding that "even long-ago acts of official discrimination give context to the analysis" and "cannot be ignored in the discriminatory

effect analysis, because even these seemingly remote instances of State-sponsored discrimination continue to produce socioeconomic conditions" that are relevant both to assessing burden and to analyzing Senate Factor 5).

In their filings and representations before this Court to date, Defendants have not disputed the history of official discrimination in Texas or in Waller County. Mem. Order Den. Mot. for Summ. J., ECF 104 at 13.

Accordingly, Senate Factor 1 weighs in Plaintiffs' favor.

> ii. *The burden is caused by or linked to racially polarized voting in Waller County under Senate Factor 2.*

Senate Factor 2, racially polarized voting, is probative under the totality of the circumstances as an element of identifying discriminatory results because "[v]oting along racial lines," where it is present, "allows those elected to ignore [B]lack interest without fear of political consequences." *Rogers*, 458 U.S. at 623.

Plaintiffs' expert Dr. Flores has cited several recent court decisions finding racially polarized voting throughout Texas, including in Waller County. *See* Flores Rep., ECF 77-1 at 109-10 (citing *League of United Latin Am. Citizens Council No. 4434 v. Clements*, 986 F.2d 728 (5th Cir) (1993), *on reh'g*, 999 F.2d 831 (5th Cir. 1993).; *Vera v. Richards*, 861 F. Supp. 1304, 1329-30 (S.D. Tex. 1994); *LULAC*, 548 U.S. at 427 (2006); *Veasey v. Perry*, 71 F. Supp. 3d 627, 637 (S.D. Tex. 2014); *Veasey v Abbott*, 830 F. 3d 216 (5th Cir. 2016) (en banc); *Perez v Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017)); Pls.' FoF ¶¶ 311. Plaintiffs have also introduced evidence that the U.S. Department of Justice found racially polarized voting in Waller County as of 2002. Pls.' Ex. 93, 6/21/02 Ltr. from J. Michael

Wiggins, Acting Assistant Attorney General, U.S. Dep't of Justice, Civil Rights Div., to Counsel for the Commissioners of Waller County, Texas, ECF 17-14 at 3 ("Our statistical analysis . . . shows that white voters [in Waller County] do not provide significant support to candidates sponsored by the minority community, and that interracial elections are closely contested.").

Here, the presence of racially polarized voting also interacts with the perception and reality of demographic change in Waller County to animate concerns among white, older residents and decision-makers that Black student voters "could take over the county." *See* Duhon Dep. Tr., ECF 73-2 at 135, 239:10–240:6; Joseph Rep., ECF 77-1 at 31; Flores Rep., *id.* at 82; Cooper Decl., *id.* at 226-27 Fig. 5 & ¶28.

Accordingly, Senate Factor 2 weighs in Plaintiffs' favor.

> iii. *The burden is caused by or linked to the ongoing effects of state-sponsored discrimination in areas as education, employment and health, which hinder Black people's ability to participate effectively in the political process in Waller County under Senate Factor 5.*

As part of the "searching practical evaluation of the 'past and present reality'" that Section 2 demands, the Supreme Court has held that courts should consider "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 45. In *Gingles*, the Supreme Court explained that a central purpose of Section 2's results test was "to eradicate inequalities in political opportunities that exist due to the vestigial effects of past purposeful discrimination." *Id.* at 69. Where Black voters "suffer effects of prior discrimination such as inferior education,

poor employment opportunities, and low incomes," such effects impede political participation on an equal basis with white voters and may interact with voting laws or practices to produce discriminatory results. *Id.*

In *Veasey*, the Fifth Circuit noted that Texas maintained segregated schools well after *Brown v. Board of Education*, 347 U.S. 483 (1954)—and affirmed the district court's finding that "past State-sponsored employment discrimination and Texas's maintenance of a 'separate but equal' education system both contributed to the unequal outcomes that presently exist" for white and Black people throughout the state. 830 F.3d at 259.

Here, Census data reported by Mr. Cooper and contextualized by Plaintiffs' experts Drs. Flores and Joseph establish that PVAMU students and other Black residents of Prairie View—as a direct result of past state-sponsored discrimination—face economic, educational, and transportation, and other socioeconomic disadvantages that adversely impact their ability to participate in the political process at higher rates than white voters in Waller County overall. Pls.' FoF ¶ 106. As one example, despite the presence of PVAMU, an HBCU, as the only university in Waller County—there are significant disparities in educational attainment between Black people in Prairie View and white people in Waller County. Among residents over 25 years old, 17.9% of Black people in Prairie View have less than a high school diploma, as compared to only 9.3% of white people countywide. Pls.' FoF ¶ 119.

At trial, Dr. Flores and Dr. Joseph will testify that these continuing socioeconomic disadvantages for Black residents of Prairie View and Black PVAMU students are directly caused by a long standing and recent history of racial discrimination both in Waller County

and in Texas overall, as detailed by Dr. Joseph. Dr. Flores's report and testimony, combined with Dr. Stein's analysis of voting behavior in the 2018 general election in Waller County and testimony, will also establish that these continuing effects of past discrimination adversely impact the ability of PVAMU students and other Black voters in Prairie View "to effectively participate in the political process in Waller County." Flores Rep., ECF 77-1 at 112.

Accordingly, Senate Factor 5 weighs in Plaintiffs' favor.

> iv. *The burden is caused by or linked to Black candidates' lack of success in running for countywide offices in Waller County under Senate Factor 7.*

Supreme Court and Fifth Circuit precedent and the Senate Report all instruct that a lack of success on the part of Black candidates, or other candidates of color, in running for office in a jurisdiction is probative of discriminatory results under Section 2. *Gingles*, 478 U.S. at 75; *Veasey*, 830 F.3d at 261; S. Rep. No. 97-417, at 29 n.115 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 207 n.115). ("The fact that no members of a minority group have been elected to office over an extended period of time is probative.").

"The extent to which minority candidates are elected to public office also contextualizes the degree to which vestiges of discrimination continue to reduce minority participation in the political process." *Veasey*, 830 F.3d at 261. Nonetheless, "proof that some minority candidates have been elected does not foreclose a § 2 claim." *Gingles*, 478 U.S. at 75.

Only one Black candidate has been elected to a countywide office in Waller County since the Reconstruction period ended in the 19th century, and no Black candidate has been

elected to countywide office in Waller County in recent memory. Flores Rep., ECF No. 77-1 at 113. Defendant Duhon testified that, to his knowledge, a Black person has never been elected to tax collector or sheriff, two positions that are elected countywide. Duhon Dep. Tr., ECF 73-2 at 90, 58:19–59:7. Indeed, the only Black candidates to have been elected to any positions in Waller County, to Defendants Duhon's knowledge, ran in races in which solely the voters of the majority-Black Precinct 3 were eligible to vote. *Id.* at 90, 58:19–59:23.

In recent elections, Black candidates for countywide office have been uniformly defeated. In 2016, despite support from Black voters and PVAMU students, a Black candidate for Waller County Sheriff was defeated by a white candidate. Pls.' Ex. 144 (news article), ECF 17-17 at 4. In 2018, a Black candidate for Waller County Judge, Dr. Denise Mattox, was defeated by Defendant Duhon, who is white. *See* Duhon Dep. Tr., ECF 73-2 at 133–34, 233:25–234:5; Flores. Rep., ECF 77-1 at 93 (Dr. Flores describing Dr. Mattox as "an African American pediatrician and a former candidate for public office").

Testimony at trial and records available on Defendants' official website and appropriate for judicial notice will also demonstrate that Precinct 3 Commissioner Jeron Barnett, who is Black, was an unsuccessful candidate for the countywide position of Waller

County Sheriff in 2008, before running for his current office from a majority-Black district.[7] *See* Pls.' Ex. 131 (news article).

Accordingly, Senate Factor 7 weighs in Plaintiffs' favor.

> *v.   The 2018 early voting plan's burden is caused by or linked to Waller County officials' lack of responsiveness to the particularized needs of Black residents under Senate Factor 8.*

The Supreme Court has instructed that "evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group" is also probative under Section 2's totality of the circumstances analysis for discriminatory results. *Gingles*, 478 U.S. at 45.

Here, Plaintiffs have established that the majority-white Defendant Waller County Commissioners Court has been unresponsive to the particularized needs of Black Prairie View residents, including in adopting, maintaining, and superficially modifying the 2018 general election early voting plan through a non-transparent and non-inclusive process and refusing to amend that process despite requests from Black voters. Pls.' FoF ¶¶ 346–56. For example, Defendants were unresponsive to public comments from Black PVAMU students and other Black Prairie View voters who objected to the initial early voting plan as discriminatory. Flores Rep., ECF 77-1 at 92-95 ("Ignoring clear and supported objections about the racially disparate impact of a proposed law is probative of a lack of

---

[7]     *See* Waller County, *Canvass Report, Democratic Primary, March 04, 2008*, at 18, https://www.co.waller.tx.us/page/open/1257/0/03.04.2008%20Dem.%20Canvass; Waller County, *Canvass Report, General Elections, November 04, 2008*, at 21, https://www.co.waller.tx.us/page/open/1257/0/11.04.2008%20Canvass.

responsiveness to minority concerns."); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 717 (S.D. Tex. 2017); *Veasey*, 830 F.3d at 261-62 (holding that a decision-making body's rejection of requests to ameliorate a disparate impact "supports a conclusion of lack of responsiveness.").

Waller County has also been unresponsive to concerns about the County's reliance on the United States Postal Service's rural addressing system to assign addresses based on ZIP Code, which impacts Black Prairie View residents both during elections and at other times. Flores Rep., ECF 77-1 at 114 ; Jackson Decl., *id.* at 747-50 ¶¶ 22–33; *see* Pls.' Ex. 68, 8/28/19 Ltr. from Leah Aden, NAACP LDF to District Manager David Camp, USPS re: Requesting Zip Code Boundary Review for Prairie View, Texas. In addition, this Court has held that a jurisdiction such as Waller County's "long history of state-mandated discrimination" is itself a "strong indicator[] of a significant lack of responsiveness to the needs of . . . minority voters." *Veasey*, 71 F. Supp. 3d at 698. Here, Waller County's history of official discrimination against Black people in Prairie View, *supra* §I(B)(vii), is uncontested.

Accordingly, Senate Factor 8 weighs in Plaintiffs' favor.

> vi. *The burden is caused by or linked to Waller County officials' reliance on tenuous policy rationales to justify their early voting plan under Senate Factor 9.*

The Supreme Court and the Fifth Circuit have held that the presence of a tenuous policy underlying an early voting plan or other electoral practice, Senate Factor 9, can also be probative in identifying discriminatory results of. *See Gingles*, 478 U.S. at 45; *see also Veasey*, 830 F.3d at 262. As the Fifth Circuit explained in *Veasey*, "a tenuous fit between

the expressed policy and the provisions of the law bolsters the conclusion that minorities are not able to equally participate in the political process," because, without past or present discrimination, "a law not meaningfully related to its expressed purpose would be abandoned or ameliorated to avoid imposing a disparate impact, given the preexisting socioeconomic and political disadvantages caused by past and present discrimination." *Veasey*, 830 F.3d at 262-63. A tenuous justification also "may indicate that the policy is unfair" to Black voters. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 753 (5th Cir.), *on reh'g*, 999 F.2d 831 (5th Cir. 1993).

Tenuousness, thus, is probative both of discriminatory intent under the *Arlington Heights* framework and of discriminatory results under the Senate Factors. *Id.*, 986 F.2d at 753; *see supra* § I(B)(v). That is so because "evidence that a voting device was intended to discriminate is [also] circumstantial evidence that the device has a discriminatory result." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984).

Here, as set forth fully above, *supra* § I(B)(v), Dr. Flores's analysis and the record before this Court shows that the policy rationales advanced by Defendants for adopting and maintaining the early voting plan for the 2018 general election were "tenuous, changing, and ultimately largely contradicted by the Commissioners' own actions in adopting revisions to the early voting plan on October 24, one week after arguing that it was too late to do so." Flores Rep., ECF 77-1 at 115. Moreover, as Dr. Flores's report establishes, Defendants' policy tenuous rationales "also show a lack of good faith and an irrationality that is inappropriate for government action, insofar as the Commissioners cited arbitrary

and shifting rationales while failing to make an effort to address the concerns of PVAMU students who requested parity and equity during the early voting planning process." *Id.*

Accordingly, Senate Factor 9 weighs in Plaintiffs' favor as well.

## V.    Plaintiffs Are Entitled to Their Requested Relief

### A.  This Court Has Broad Equitable Discretion to Order Each of Plaintiffs' Requested Remedies

Remedies for violating voting rights are governed by traditional equitable standards. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971); *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1041 (5th Cir. 1982). When, as here, "a right and violation have been shown, the scope of the district court's equitable powers to remedy *past wrongs* is broad, for breadth and flexibility are inherent in equitable remedies." *Swann*, 402 U.S. at 15 (emphasis added). This Court thus has broad, flexible discretion when shaping equitable remedies for constitutional and statutory voting rights violations. *Id.*; *Brown*, 561 F.3d at 435.

To exercise this discretion, this Court should "eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding that those interests have constitutional roots." *Lemon v. Kurtzman*, 411 U.S. 192, 201 (1973) (plurality opinion). Although not unlimited, *see Veasey v. Abbott*, 888 F.3d 792, 800 (5th Cir. 2018), this Court's powers in equity are "characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Brown v. Bd. of Educ. of Topeka,* 349

U.S. 294, 300 (1955). In application, the remedy must be tailored to fit the nature and extent of the particular constitutional or statutory violation.

Applying these principles, this Court's equitable powers extend to remedial orders governing polling locations placement. *See*, *e.g.*, *United States v. Palmer*, 356 F.2d 951, 952–53 (5th Cir. 1966) (requiring a jurisdiction to not close voting registration offices where a disproportionate number of Black voters remained unregistered as a result of past discriminatory practices); *Brown v. Dean*, 555 F. Supp. 502, 506 (D.R.I. 1982) (requiring election officials to designate a particular location as a polling place); *Spirit Lake Tribe v. Benson Cty.*, No. 2:10-cv-095, 2010 WL 4226614, at *6 (D.N.D. Oct. 21, 2010) (same).

Plaintiffs' requested relief—for Defendants to select at least one early voting location on PVAMU's campus—is limited and narrowly tailored. Defendants currently anticipate selecting only one early voting location in each of Waller County's four commissioner precincts, with the WCCC being the designated site for Precinct 3 (Prairie View). Pls.' Ex. 165, Tr. 6/5/20 Hearing on Defs.' Mot. for Summary Judgment at 12:8–16. But, for the reasons discussed above about departures from Defendants' own criteria, designating an on-campus early voting location instead of the off-campus WCCC would cause no undue interference; doing so aligns with early Defendants' own criteria.

This Court's equitable powers also extend to remedial orders requiring community input in actions such as setting an early voting plan. *See Floyd v. City of New York*, 959 F.Supp.2d 668, 686 (S.D.N.Y. 2013) (ordering remedial community input as a "vital part of a sustainable remedy" to remedy plaintiffs' harm); *Tyehimba v. City of Cincinnati*, No. C-1-99-317, 2001 WL 1842470, at *1 (S.D. Ohio May 3, 2001) (same); *Berry v. Sch. Dist.*

*of Benton Harbor*, 515 F. Supp. 344, 379–80 (W.D. Mich. 1981), *aff'd and remanded*, 698 F.2d 813 (6th Cir. 1983) (ordering the appointment of a twenty-one person committee comprising administrators, teachers, parents, and students to create a new code of student discipline for districts undergoing desegregation to prevent arbitrary enforcement); *Kelley v. Metro. Cty. Bd. Of Educ.*, 479 F. Supp. 120, 123 (M.D. Tenn. 1979) (explaining that "input from the many well-motivated, thoughtful citizens of the community [] should be sought and received" to resolve the problem of school desegregation); *see also Consent Decree* at ¶¶ 30-34, *Antoine v. Winner Sch. Dist.* 59-2, No. 06-cv-3007-CBK (D.S.D. Dec. 10, 2007) ECF 64 (entering a consent decree that included the creation of a committee comprising Native American community members and school officials to review disciplinary incidents every quarter for racial disparities).

Here, ordering Defendants to ensure that at least one PVAMU student representative is involved in the process for setting an early voting schedule is limited and narrowly tailored. Defendants have acknowledged and repeatedly reaffirmed that seeking input from Waller County residents is critical to fostering transparency and resolving the recurring issues that arise when Defendants set the early voting plan. Pls.' FoF ¶¶ 207, 212 Defendants' admissions and recommendations mitigate any concerns that this remedy would create undue interference with the development of the early voting schedule. Pls.' FoF ¶ 160 (testifying she believes there should be on-campus early voting access).

Further, this Court may order Plaintiffs' requested prophylactic relief through the bail-in provision of Section 3 of the VRA. Am. Compl., ECF 49 at 28. Section 3(c) authorizes courts to order prophylactic relief by imposing preclearance remedies for

constitutional violations. 52 U.S.C. § 10302(c); *see, e.g.*, *Perez v. Abbott*, 390 F. Supp. 3d 803, 807 (W.D. Tex. 2019). Consistent with courts' broad equitable powers, courts have imposed Section 3's provisions on local jurisdictions. This Court's remedy required Pasadena, Texas, to comply with a six-year preclearance review until 2023 to protect Latino voters and prevent the city from intentionally diluting their voting power. *Patino v. City of Pasadena*, No. H-14-3241, 2017 WL 10242075, at *2–3, n.4 (S.D. Tex. Jan. 16, 2017); *see also Jones v. Jefferson Cty. Bd. of Educ.*, No. 2:19-CV-01821-MHH, 2019 WL 7500528, at *5 (N.D. Ala. Dec. 16, 2019) (entering a consent decree that included Section 3(c) relief, requiring preclearance for changes to voting standards, practices, or procedures to the county's method of election for the Jefferson County Board of Education and other changes until December 31, 2020); *Allen v. City of Evergreen*, No. 13-0107-CG-M, 2014 WL 12607819, at *2 (S.D. Ala. Jan. 13, 2014) (entering a consent decree that included Section 3(c) relief, requiring preclearance for changes to the city's method of election for city council elections and standards for determining voter eligibility until December 21, 2020).

Based on the record and evidence at trial, bail-in relief is both appropriate and necessary. As preclearance is a form of "equitable relief," 52 U.S.C. § 10302(c), this Court has broad flexibility to craft a preclearance remedy for specific, proven constitutional violations. Rather than "suspending all changes to [the county's] election law," *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009), this Court can interpret Section 3(c) to require preclearance for only certain changes to election practices or procedures in Waller County, such as the development and adoption of early voting plans.

Placing Waller County under Section 3's preclearance requirement for a time period is necessary to prevent Defendants from enacting discriminatory voting changes relating to early voting procedures. Because the relief is narrowly tailored and designed to specifically remedy constitutional violation, bail-in relief is also appropriate "without extending so far as to punish the [County] with excessive federal oversight." *Patino*, 2017 WL 10242075, at *2 n.4. This Court, therefore, has the authority to grant this relief under its equitable powers.

For the reasons above, Plaintiffs' requested relief is fair, necessary, and workable because it is limited and narrowly tailored to prevent recurrence of the constitutional and statutory violations. *See Lemon*, 411 U.S. at 200. As a result, this Court has the authority to: (1) issue a declaratory judgment on all of Plaintiffs' claims, which serves a prophylactic function; (2) order Defendants to select at least one early voting location on PVAMU's campus, which for the fall 2020 election should be the MSC, especially with students returning to campus for the first time in five months, and to accommodate necessary precautions to account for the COVID-19 pandemic; (3) order Defendants to ensure that at least one PVAMU student representative is involved in the process for setting an early voting schedule; and (4) order prophylactic relief through Section 3(c) of the VRA.

### B. HB 1888 Does Not Moot Plaintiffs' Claims

Plaintiffs incorporate by reference here the discussion of the legal framework for assessing mootness from the Proposed Conclusions of Law. Conclusions of Law Section ¶ V(B). Based on this framework, Defendants' claim that HB 1888 moots Plaintiffs' requested relief is easily defeated. ECF No. 73 at 22–23. Defendants misperceive both the

nature of mootness and Plaintiffs' requested relief. A case becomes "moot only when it is impossible for a court to grant . . . any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012). There are no mootness concerns here, because HB1888 does not fully address Plaintiffs' claims. Three points highlight this.

*First*, injunctive relief requiring Defendants to establish early voting locations that are accessible to Plaintiffs remains necessary. Defendants concede that HB 1888's narrow scope merely establishes the *minimum* number of hours and requires uniformity at early voting locations on weekdays only *after* such locations have been selected. *See* Defs.' Mot. for Summ. J., ECF 73 at 22–23. HB 1888 does not provide any guidance or constraint about the substantive criteria or processes that counties should use to select their early voting locations. Under HB 1888, Defendants thus retain the same unfettered discretion to set early voting locations discriminatorily as they did in the fall of 2018.

Defendants have exercised this discretion by repeatedly ignoring and being unresponsive to Black PVAMU students' concerns about the need for adequate and nondiscriminatory early voting access, including students' requests for early voting at on-campus locations such as the MSC. *Supra* Section § IV(C)(v). Based on Plaintiffs' factual and expert evidence, Black PVAMU students face unique socioeconomic disadvantages and lack access to transportation as compared to white, older voters elsewhere in Waller County. Cooper Decl., ECF 77-1 at 230–33; *supra* Section § IV(C)(iii). These disadvantages make traveling to early voting locations off-campus, like the WCCC, uniquely difficult for Black PVAMU student voters and Black voters in the City of Prairie

View. Joseph Rep., ECF 77-1 at 39–41; Stein Rep., ECF 77-1 at 181–86. Defendants have been aware of these well-documented barriers for years. *See, e.g.*, Joseph Rep., ECF 77-1 at 33–34; Flores Rep., ECF 77-1 at 78.

Yet Defendants failed to address these concerns and mitigate the discriminatory allocation of early voting access—despite having enough resources to provide additional early voting on-campus at the MSC for the fall 2018 general election. As discussed *supra*, Defendants have tried to conceal their discriminatory actions by offering tenuous, shifting, and unsubstantiated rationales. As discussed *supra*, Defendants relied on these pretextual justifications to deny any proposed changes that would have addressed the lack of equitable early voting access for Black voters in Prairie View, young students in Prairie View, and Black PVAMU student voters as compared to what was provided to white, older voters elsewhere in Waller County.

And Defendants have carried forward their discrimination against Black PVAMU students and other Black voters since the November 2018 election. Pls.' FoF ¶¶ 417–20. Following HB1888's enactment in September 2019, Defendants have refused to provide on-campus early voting during any election in Waller County, including for the November 2019 general and March 2020 primary elections. *Id.* They also refused to provide on-campus early voting for the recent July 20 primary runoff election. *See* Pls.' Ex. 15, 2020 Joint Primary Runoff Election.

*Second*, Plaintiffs seek a declaratory judgment that Defendants violated Plaintiffs' constitutional and statutory rights by allocating early voting access in a discriminatory manner for the fall 2018 general election. Defendants Duhon and Eason admitted that their

schedule did not provide "equal representation" and created "an inequity." Pls.' FoF ¶¶ 201, 205. A declaratory judgment here serves as a prophylactic remedy against future discrimination because it is an important factor in the adjudication of future discrimination claims. *LULAC*, 548 U.S. at 426 (identifying "the history of voting-related discrimination in the State" as one potential factor that a plaintiff may show in the totality of circumstances analysis to prove a Section 2 claim).

*Third*, HB 1888 is silent about the process for developing an early voting schedule. Defendants admit that they solely rely on the Waller County Democratic and Republican Party chairs—an uncommon practice not required by Texas election law—for establishing their early voting plans, and that the party chairs are given exclusive access to provide input and review in a non-public process before the plan is submitted to Defendant Commissioners Court for approval. *See, e.g.*, Pls.' FoF ¶¶ 170, 360. This process is broken, non-transparent, and unresponsive to the needs of all Waller County residents, including the protected classes of young, Black student voters, and other Black voters. As Plaintiffs' factual and expert evidence establishes: (1) the party chairs do not consider or solicit input from any Waller County residents, Pls.' FoF ¶¶ 176, 361, 365; (2) the party chairs create the schedule before students are on campus to participate in the selection process, Pls.' FoF ¶¶ 170, 270; and (3) Defendant Duhon admitted that "a lot of students" were unrepresented by party officials because they "do not identify as a Democrat or a Republican," Pls.' FoF ¶¶ 355, 369; *Supra* Section § IV(C)(v).

Despite these concerns being repeatedly raised in public fora with Defendants since at least 2015, Defendants refuse to consult with PVAMU students and other Waller County

residents in the development of their early voting plans. *See, e.g.*, Pls.' FoF ¶¶ 148–53, 213–15. And they have refused to consult with PVAMU students and other Waller County residents despite acknowledging that doing so would be more inclusive and would address recurring problems. Pls.' FoF ¶¶ 204–05. Defendants have also acted irrespective of Waller County's past election data that they claim to rely on, which shows that PVAMU students (a) rely on early voting and use it at high rates, and (b) account for a third of Waller County's registered voters and live in the most populous precinct. *Supra* Section § I(B)(iv). These failures begin to explain why Commissioner Amsler publicly stated that a conversation about PVAMU being treated unfairly "comes up every time" during preparation for elections, Pls.' FoF ¶ 165, and why Defendant Eason publicly recommended a more standardized and inclusive process that enables residents throughout the County to participate and give input that is meaningfully considered, Pls.' FoF ¶ 204. Defendants continue to rely on this broken process for setting early voting schedules rather than work transparently with Plaintiffs and other PVAMU students to establish nondiscriminatory plans.

Plaintiffs requested relief is necessary to remedy these longstanding and ongoing harms. Without declaratory and injunctive relief, Plaintiffs continue to face a substantial—and predictable—likelihood of continued harm because Defendants have shown themselves to be capable of repeatedly setting discriminatory early voting schedules, including locations, and evading any meaningful review through reliance on a broken process under which they persistently fail to select an early voting location on campus. *Honig v. Doe*, 484 U.S. 305, 318 (1988) (holding that claims are not moot if a defendant's

actions are "capable of repetition, yet evading review"); *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003) ("To obtain equitable relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future.").

As a final point, Defendants have misrepresented Plaintiffs' arguments and representations before this Court. Defendants inaccurately claim, in their supplemental briefing following the Court's summary judgment hearing, that "Plaintiffs appeared to concede" that HB 1888 "did implement an adequate, standardized early voting schedule." Defs.' Suppl. Br. in Supp. of Mot. for Summ. J., ECF 101 at 2. They also inaccurately claim that Plaintiffs "acknowledged at the hearing that an off-campus location could be sufficient" without a location on campus. *Id.* Tellingly, however, Defendants do not identify transcript citations to support either allegation. Nor could they: Plaintiffs made no such statements.

For these reasons, Plaintiffs have live, concrete interests in obtaining relief from Defendants' constitutional and statutory violations, none of which are fully addressed by HB 1888. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) ("As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.") (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)). And Plaintiffs' requested relief is necessary to address discriminatory harms, provide prophylactic relief, and prevent Defendants from adopting and maintaining early voting plans that perpetuate discrimination against Black voters in Prairie View, young voters in Prairie View, and Black PVAMU student voters.

### C. PVAMU is Neither a Necessary nor Indispensable Party to this Lawsuit

Plaintiffs incorporate by reference here the discussion of the legal framework for assessing joinder from the Proposed Conclusion of Law. Conclusions of Law Section ¶ V(C). Defendants claim that injunctive relief ordering an early voting location on campus against existing Defendants would be insufficient. Defs.' Suppl. Br. in Supp. of Mot. for Summ. J., ECF 101 at 6-7. Because Defendants assert that PVAMU controls its property and facilities, they contend PVAMU is an indispensable party for any relief concerning on-campus early voting and must be joined. *Id.*

But Defendants fail to carry their burden to prove that PVAMU is a necessary—let alone indispensable—party to this case. Under the first step of the joinder analysis, they have not shown PVAMU is a necessary party for this Court to order on-campus early voting. Defendants claim this Court cannot issue relief over the siting of a future early voting location because Defendants do not control PVAMU's property and facilities. *Id*. But that is a non sequitur for two reasons.

First, Defendant Duhon admitted in his deposition that Waller County does not control or own most early voting location sites, including the Waller ISD. Duhon Dep., ECF 73-2 at 116, 165:7–9; *id.* at 129, 216:11–14. Yet Defendants have selected early voting at these locations, including on campus at the MSC, with no need for a court order against the owner of the facilities. Pls.' FoF ¶ 153, 198. There is no nondiscriminatory reason for Defendants to subject proposed early voting facilities on the PVAMU campus to a more demanding standard than other early voting facilities.

Second, Defendants have introduced no evidence suggesting that PVAMU would refuse to host early voting without a court order. They hypothesize the absence of PVAMU would impair "its property interests" and do not provide any supporting evidence. Defs.' Suppl. Br. in Supp. of Mot. for Summ. J., ECF 101 at 7. This Court has rejected such "theoretical impact" as "not sufficient to render a party necessary under Rule 19(a)." *Evanston Ins. Co. v. Kinsale Ins. Co.*, No. 7:17-CV-327, 2018 WL 4103031, at *8 (S.D. Tex. July 12, 2018).

In contrast, for years PVAMU administrators and students have consistently advocated to host an on-campus early voting site. *See, e.g.*, Pls.' FoF ¶¶ 147, 151, 153. As the record and trial evidence will show, the on-campus MSC has consistently serve as an election day voting location for years and an early voting location in 2016 and 208; PVAMU has willingly entered into licensee agreements for the MSC to serve as an early voting location; PVAMU administrators and staff submitted declarations in 2018 and 2019 welcoming an on-campus early voting location for those years and beyond; and a PVAMU administrators plans to testify at trial in favor of early voting at the MSC. *See, e.g.*, Pls.' FoF ¶¶ 147, 151, 153, 272. Simply put, there is no indication PVAMU is now unwilling and unable to provide expanded early voting opportunities in 2020 and beyond. Jackson Decl., ECF No. 77-1 at 745 ("In fact, we are prepared to accommodate all voters who are eligible to participate in early voting on-campus, including during the homecoming week."). Nor is there a risk PVAMU would not comply with an order from this Court granting Plaintiffs' requested relief. Through the existing evidentiary record and evidence

at trial, PVAMU has thus shown that it is willing and able to comply with an order by this Court to locate an early voting site on-campus for the full voting period under Texas law.

Under Rule 19(a), Defendants have therefore not carried their burden to demonstrate that PVAMU is a necessary party for this Court to order on-campus early voting, because (1) this Court can grant complete relief among existing parties, (2) PVAMU's property rights will not be impaired or impeded by order requiring Defendants to an early voting location on campus, and (3) neither PVAMU nor Defendants would be subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because PVAMU is willing and able to host on-campus early voting. *See Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1310 (5th Cir. 1986). This Court, therefore, need not engage in the second step of the Rule 19 analysis, under which courts assess four factors to determine the indispensability of necessary parties. *See Hood ex rel. Miss. v. City of Memphis*, 570 F.3d 625, 628–29 (5th Cir. 2009).

Even so, if this Court considers PVAMU a necessary party, Defendants have failed to show that any of the four factors in Rule 19(b) support their claim that PVAMU is an indispensable party for injunctive relief requiring early voting on campus. Under Rule 19(b)'s first factor, PVAMU would not suffer any prejudice because PVAMU has repeatedly confirmed it is willing and able to provide expanded early voting opportunities in 2020 and beyond. *See, e.g.*, Pls.' FoF ¶ 272; Jackson Decl., ECF No. 77-1 at 745–47. Because PVAMU would not suffer any prejudice, as discussed above, there is no need to consider reducing or eliminating prejudice under the second factor. Under the third factor, complete relief to remedy Defendants' constitutional and statutory violations can be

accorded without PVAMU, because PVAMU has shown its willingness to comply with an order from the Court. *Id.* Defendants' claimed remedial inadequacy is therefore only theoretical. As for the fourth factor, Plaintiffs will not have an adequate remedy for an on-campus early voting location if this Court dismisses the present action for non-joinder.

Thus, PVAMU is neither a necessary nor an indispensable party for requiring on-campus early voting. PVAMU's non-joinder tracks Rule 19's purpose because this case "can be fairly and completely disposed of" with existing parties. *Pulitzer*, 784 F.2d at 1308. But if this Court decides PVAMU is indispensable, dismissing any of Plaintiffs' claims is not warranted. Instead, this Court can join PVAMU's President in her official capacity.

### D. Even if PVAMU Were Indispensable, Sovereign Immunity Is No Bar to Joinder

Plaintiffs incorporate by reference here the discussion of the legal framework for assessing sovereign immunity from the Proposed Conclusions of Law. Conclusions of Law Section ¶ V(D). Defendants assert that joining PVAMU, if necessary, would not be feasible because PVAMU is an entity of the state and, therefore, it "possesses immunity under the Eleventh Amendment." Defs.' Suppl. Br. in Supp. of Mot. for Summ. J., ECF 101 at 9. But that argument deviates from binding precedent.

The Fifth Circuit has held that Congress's passage of the VRA "validly abrogated state sovereign immunity." *OCA-Greater Houston*, 867 F.3d at 614. The Fifth Circuit rejected a sovereign immunity defense proffered by Texas and state elections officials, holding that "[s]overeign immunity has no role to play" in a VRA suit seeking declaratory

and injunctive relief. *Id.* Here, at minimum, precedent establishes that Texas and its sub-jurisdictions are not immune from suit under the VRA.

Moreover, all four of Plaintiffs' claims fit squarely within the *Ex parte Young* exception to Eleventh Amendment sovereign immunity, which allows a federal court to "enjoin state officials to conform their future conduct to the requirements of federal law." *Quern v. Jordan*, 440 U.S. 332, 337 (1979). Under the *Ex parte Young* exception, a party may "sue a state official, in his [or her] official capacity," when the official has "some connection to the state law's enforcement." *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 515, 517 (5th Cir. 2017) (internal quotation marks omitted). The official's connection to the challenged law's enforcement need not be direct. *City of Austin v. Paxton*, 943 F.3d 993, 1001 (5th Cir. 2019). Here, injunctive relief requiring Defendants to provide on-campus early voting would remedy "an ongoing violation of federal law" that is "properly characterized as prospective." *Va. Office for Prot. and Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted). And this Court could find that PVAMU has "some connection" on this injunctive relief because it has control over on-campus locations, such as the MSC, that are suitable for early voting. Thus, if PVAMU is deemed an indispensable party, this Court should not dismiss the lawsuit. Instead, it should join PVAMU's President in her official capacity, as a state official and a party not immune from suit under *Ex parte Young*.

### E. This Court Needs to Reach Both Constitutional and Statutory Claims To Grant Plaintiffs' Requested Relief

As this Court has noted, federal courts generally "shouldn't decide a constitutional question if some other ground exists upon which to dispose of the case." Mem. Order Den. Mot. for Summ. J., ECF 104 at 20–21 (citing *Veasey*, 830 F.3d at 265). However, in cases when prevailing on a constitutional claim would entitle plaintiffs "to relief beyond that to which they were entitled on their statutory claims," it is both necessary and appropriate for courts to reach constitutional questions. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445–46 (1988). The present litigation is such a case for two reasons.

*First*, a ruling only on Plaintiffs' Section 2 claims would not entitle them to the full relief necessary. Plaintiffs seek relief in the form of a declaratory judgment that Defendants intentionally discriminated against PVAMU students and other Prairie View voters not only on the basis of race, as Black voters, but also on the basis of age, as young voters who are predominantly aged 18, 19, or 20. Am. Compl., ECF 49 at 28 ¶ 101(a). The VRA does not provide a vehicle for this relief in full because, unlike the Twenty-Sixth Amendment, it does not protect against intentional discrimination against young voters on the basis of age. *See* 52 U.S.C § 10301(a); *Perez*, 390 F. Supp. 3d at 814.

Nor would a ruling in Plaintiffs' favor under Section 2 alone satisfy the statutory prerequisite for Section 3(c) bail-in, another form of relief sought by Plaintiffs. *See* 52 U.S.C. § 10302(c) (conditioning bail-in on "violations of the fourteenth or fifteenth amendment"). Because a finding of a constitutional violation is necessary for Section 3(c) relief, this Court should reach Plaintiffs' intentional discrimination claims based on race

and the intersecting bases of age and race. A court cannot "avoid ruling on [a] discriminatory intent claim [if]…the remedy to which Plaintiffs would be entitled for a discriminatory intent violation is potentially broader than the remedy the district court may fashion for the discriminatory impact violation." *Veasey*, 830 F.3d at 230 n.11; *see also Patino*, 230 F.Supp.3d at 718-19. Because a finding of discriminatory results under Section 2 cannot provide this prophylactic remedy, the Court should address Plaintiffs' discriminatory intent claims.

*Second*, unlike in *Veasey*, the rights and remedies at issue would not be intertwined based on this Court's favorable ruling on only Plaintiffs' intentional age or racial discrimination claims. Under the *Arlington Heights* framework, the record and Plaintiffs' trial evidence establishes multiple intentional discrimination violations under the Constitution. *Supra* Section §§ II–III. A declaratory judgment of intentional discrimination on the basis of race or the intersecting bases of age and race is necessary to remedy the longstanding and ongoing discriminatory harms. Declaratory relief is particularly necessary for Plaintiffs' intentional discrimination claim under the intersecting bases of age and race given the unique pattern of discrimination that Defendants have exacted on Plaintiffs and others similarly situated for decades. Without it, this Court's equitable powers may be limited in shaping fair and workable remedies that address the practical and unique realities that Black PVAMU students face. *See Lemon*, 411 U.S. at 200; *Brown v. Board of Ed.*, 349 U.S. at 300; *supra* Section § I(B)(vii).

## CONCLUSION

For the foregoing reasons, based on the evidence presented herein, and based on the evidence to be presented at trial, Plaintiffs respectfully request that the Court enter final judgment in their favor and against Defendants on all claims.

Respectfully submitted on August 17, 2020,

**Of Counsel:**

/s/ Leah C. Aden
Leah C. Aden*
Deuel Ross*
Kristen A. Johnson*
John S. Cusick*
Steven C. Lance*
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Phone: (212) 965-2200
Fax: (212) 226-7592
laden@naacpldf.org
dross@naacpldf.org
kjohnson@naacpldf.org
jcusick@naacpldf.org
slance@naacpldf.org

Catherine Meza*
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
Phone: (202) 682-1300
Fax: (212) 226-7592
cmeza@naacpldf.org

Adam T. Schramek (SDTX 31913)
State Bar No. 24033045
Attorney-in-Charge
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone: (512) 474-5201
Facsimile: (512) 536-4598
adam.schramek@nortonrosefulbright.com

Julie Goodrich Harrison (SDTX 3017799)
  State Bar No. 24092434
Nicole Lynn (SDTX 3041738)
  State Bar No. 24095526
Tyler E. Ames (SDTX 3486420)
  State Bar No. 24116028
NORTON ROSE FULBRIGHT US LLP
1301 McKinney Street, Suite 5100
Houston, Texas 77010
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
julie.harrison@nortonrosefulbright.com
nicole.lynn@nortonrosefulbright.com
tyler.ames@nortonrosefulbright.com

*Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2020, I served a true and correct copy of the foregoing document via electronic notice by the CM/ECF system on all counsel or parties of record.

/s/ Leah Aden
Leah C. Aden

*Counsel for Plaintiffs*