PLAINTIFF'S
EXHIBIT

30
_____

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JAYLA ALLEN, DAMON            )
JOHNSON, TREASURE SMITH,      )
and THE PANTHER PARTY,        )
    Plaintiffs,           )
                       )
VS.                           ) CIVIL ACTION NO.:
                       ) 4:18-CV-3985
WALLER COUNTY TEXAS; THE      )
WALLER COUNTY                 )
COMMISSIONERS COURT;          )
JUDGE CARBETT "TREY" J.       )
DUHON III, in his             )
official capacity as the      )
Waller County Judge; and      )
CHRISTY A. EASON, in her      )
official capacity as the      )
Waller County Elections       )
Administrator,                )
    Defendants.           )

*******************************************

ORAL DEPOSITION OF

PENIEL JOSEPH, PH.D.

VOLUME 1

DECEMBER 16, 2019

*******************************************

1          ORAL DEPOSITION OF PENIEL JOSEPH, PH.D.,

2   produced as a witness at the instance of the Defendants

3   and duly sworn, was taken in the above-styled and

4   numbered cause on DECEMBER 16, 2019, from 11:03 a.m. to

5   1:30 p.m., before JAMIE COOLEY, Certified Shorthand

6   Reporter in and for the State of Texas, reported by

7   machine shorthand, at the law offices of Norton Rose

8   Fulbright US, LLP, 98 San Jacinto Boulevard, Suite 1100,

9   Austin, Texas 78701, pursuant to the Federal Rules of

10  Civil Procedure and the provisions stated on the record

11  or attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jayla Allen, et al. vs. Waller County, Texas, et al.
Peniel Joseph Ph.D. - 12/16/2019

```
 1                      APPEARANCES

 2

 3  FOR THE PLAINTIFFS:

 4          MR. JOHN S. CUSICK
            MS. LEAH C. ADEN
 5          NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
            40 Rector Street
 6          5th Floor
            New York, New York 10006
 7          212-965-2200/212-226-7592 (fax)
            jcusick@naacpldf.org
 8          laden@naacpldf.org

 9
    FOR THE DEFENDANTS, WALLER COUNTY TEXAS; THE WALLER
10  COUNTY COMMISSIONERS COURT; JUDGE CARBETT "TREY" J.
    DUHON III, in his official capacity as the Waller County
11  Judge; and CHRISTY A. EASON, in her official capacity as
    the Waller County Elections Administrator:
12
            MR. C. ROBERT HEATH
13          BICKERSTAFF HEATH DELGADO ACOSTA, LLP
            3711 South MoPac Expressway
14          Building One, Suite 300
            Austin, Texas 78746
15          512-472-5021/512-320-5638 (fax)
            bheath@bickerstaff.com
16

17  ALSO PRESENT:

18          Ms. Elizabeth Dorsey, Waller County District
    Attorney's Office
19          Mr. Steven Lance

20

21

22

23

24

25
```

Page 4

Jayla Allen, et al. vs. Waller County, Texas, et al.
Peniel Joseph Ph.D. - 12/16/2019

STIPULATIONS

     The attorneys for all parties present stipulate and
agree to the following items:

     The deposition of PENIEL JOSEPH, PH.D. is taken
pursuant to Notice;

     That all objections will be made pursuant to the
Federal Rules of Civil Procedure;

     That pursuant to FRCP Rule 30(e)(f), the signature
of the deponent was requested by the deponent or a party
before the completion of the deposition.  The original
transcript will be submitted electronically for
signature to the witness' attorney, MR. JOHN S. CUSICK,
and that the witness or the witness' attorney will
return the signed jurat and errata pages to Cooley
Reporting within 30 days of the date the transcript is
provided to the witness' attorney.  If not returned, the
witness may be deemed to have waived the right to make
the changes, and an unsigned copy may be used as though
signed.

```
 1                          INDEX

 2                                              PAGE

 3   Appearances                                  3

 4   Stipulations                                 4

 5

 6

 7   PENIEL JOSEPH, PH.D. - VOLUME 1

 8        Examination by MR. HEATH...................  6
          Examination by MR. CUSICK..................  87
 9

10

11   Reporter's Certification......................  94

12   Changes and Corrections.......................  97

13   Signature.....................................  98

14

15

16                        EXHIBITS
17
     NO.    DESCRIPTION                    PAGE    LINE
18
     1      Expert Report of Peniel Joseph,    7     25
19          Ph.D.

20   2      Printout of a Google Map          39     18

21

22

23

24

25
```

1          (Federal Rule 30(b)(5)(A)(B)(C) waived.)

2                PENIEL JOSEPH, PH.D.,

3    having been first duly sworn, testified as follows:

4                      EXAMINATION

5  QUESTIONS BY MR. HEATH:

6      Q.    What's your name, please?

7      A.    Peniel E. Joseph.

8      Q.    Okay.  And where do you reside?

9      A.    Austin, Texas.

10     Q.    And what's your profession?

11     A.    I'm a historian, and I'm a professor at the LBJ

12 School of Public Affairs as well.

13     Q.    Okay.  Have you ever been deposed before?

14     A.    No.

15     Q.    Well, just a few things here.  One of the

16 things is that -- and your lawyer has probably already

17 told you this, but listen to the question.  Let me

18 finish before you answer.  I will do my best to let you

19 finish before I answer because the court reporter can

20 just take down one of us at a time.

21          And is there any reason that you can't be

22 deposed today?  You're not under any sort of drugs or

23 had a head injury or anything like that that would keep

24 you from testifying?

25     A.    No.

1    Q.   Okay.  And if you don't understand my question,

2   would you ask me to clarify it?

3    A.   Yes.

4    Q.   Okay.  So I can assume as you answer that you

5   have understood the question and are answering it

6   correctly?

7    A.   Yes.

8    Q.   Okay.  Did you prepare --

9        MR. CUSICK:  Just one second, Mr. Heath.

10   Could we just have two stipulations, that Dr. Joseph

11   will read and sign afterwards, and that we've normally

12   been doing all object- -- objections except for form are

13   preserved --

14        MR. HEATH:  Sure.

15        MR. CUSICK:  -- as consistent with

16   30(b)(5)?  Is that okay?

17        MR. HEATH:  Yes.

18        MR. CUSICK:  Great.  Thank you.

19    Q.   (BY MR. HEATH)  And did you prepare a report

20   for this proceeding?

21    A.   Yes.

22    Q.   Okay.  And I've just handed you what I'm going

23   to ask the court reporter to mark as Exhibit No. 1.  And

24   ask if you have -- if this is the report you prepared?

25        (EXHIBIT NO. 1 MARKED)

Page 8

Jayla Allen, et al. vs. Waller County, Texas, et al.
Peniel Joseph Ph.D. - 12/16/2019

1          MR. HEATH:  Do you need one?

2          MR. CUSICK:  If you have an extra...

3          MR. HEATH:  Sure.

4          Do you want one?

5          MS. DORSEY:  Sure.

6     Q.   (BY MR. HEATH)  The first question I'm going to

7  ask you involves page 11.  You indicate that in 2012

8  Texas failed to gain approval of the state house and

9  congressional plans under Section 5 and thus had to

10  implement remedial plans.  Do you recognize that?

11     A.   Let me take a look.  In -- yeah.  You're

12  speaking about the last full paragraph there?

13     Q.   I think that's probably correct.

14     A.   Yes.

15     Q.   Okay.  And just so the record is straight, is

16  it correct to say that the decision to use remedial

17  plans was not because the Section 5 court had rejected

18  the plans but because the District of Columbia court had

19  never ruled on them at that time?

20          MR. CUSICK:  This is the paragraph.

21          THE WITNESS:  Oh, this is the paragraph?

22          MR. CUSICK:  Yes.

23          Objection to form.

24          THE WITNESS:  Let me take a look.  And can

25  you -- can you restate -- repeat your question, please?

1    Q.    (BY MR. HEATH)    Is the reason that remedial

2    plans were adopted for the 2012 election not because

3    they had been rejected under Section 5 but rather was

4    because the district court in the District of Columbia

5    had not yet completed its trial and ruling on it, or do

6    you know?

7    A.    Yeah.    I'm not -- I'm not sure.

8    Q.    Okay.    You mentioned -- and I think it is on

9    the same page -- that the district court with guidance

10   from the Supreme Court adopted remedial plans.    Do you

11   know what the Supreme Court's guidance was?

12   A.    Well, you're speaking about the -- the Supreme

13   Court's affirmation of the federal three-judge court's

14   decision that the Texas Leg. intentionally discriminated

15   by racially gerrymandering a Latino majority State House

16   district in Fort Worth?

17   Q.    No.    I'm talking about what happened in -- I

18   think it was late 2011, perhaps early 2012 before there

19   was ever a Section 5 ruling or a final Section 2

20   ruling -- the Section 5 ruling, of course, would be by

21   the D.C. three-judge court.    Section 2 by the Texas

22   three-judge court.

23   A.    And your question is?

24   Q.    Do you know what guidance the Supreme Court --

25   you said -- and -- in the first full paragraph --

1     A.    Yeah.

2     Q.    -- you say, (as read) "With guidance from the

3  U.S. Supreme Court in Perry v. Perez" that -- "to

4  implement remedial plans based on the three-judge

5  federal courts' preliminary findings" --

6     A.    Oh.  I see what you're saying.  Okay.

7     Q.    So --

8     A.    I'm not -- right now, I'm not exactly sure what

9  that guidance was.

10     Q.    Okay.

11     A.    Yeah.

12     Q.    So as far as you know, the guidance may have

13  been that the three-judge court went too far in revising

14  the legislatively adopted plans?  Is that a possibility?

15     A.    I'm -- I'm just not sure.  So I -- yeah.

16     Q.    Okay.

17     A.    Yeah.

18     Q.    While the D.C. district court subsequently said

19  that parts of the 2011 plan were invalid, wasn't that

20  decision vacated by the Supreme Court and never became

21  final?

22     A.    I'm not sure in that specific instance.

23     Q.    Okay.  Now, also on page 11, you say, "On

24  June 25, 2018" -- and this is in the last full paragraph

25  down near the bottom -- "the U.S. Supreme Court affirmed

1  a federal three-judge court's decision that the Texas

2  Legislature intentionally discriminated by racially

3  gerrymandering a Latino majority State House district in

4  Fort Worth."  Do you see that?

5      A.   Yes.

6      Q.   Although you say that the Supreme Court

7  affirmed the lower court decision at least for that one

8  district, isn't it correct to say that the Supreme Court

9  reversed the lower court's decision insofar as it found

10 a Voting Rights violation, or do you know?

11     A.   Yeah.  Unless I -- do you have -- are you going

12 to read something?

13     Q.   As a matter of fact, I do.

14     A.   Okay.  Thank you.

15          MS. ADEN:  When you say "Voting Rights,"

16 do you mean Voting Rights Act or --

17          MR. HEATH:  Yes.  Voting Rights Act.

18     Q.   (BY MR. HEATH)  And you might look to satisfy

19 yourself, this is the Supreme Court decision that you

20 were talking about.

21     A.   Okay.

22     Q.   And on page 22, which is the page that I --

23     A.   Yes.

24     Q.   -- opened it to -- let's see.  Near the end --

25 at the end of the first column, did it say that the

1   lower court erred in enjoining the State plan except for

2   that Fort Worth district?

3        A.   Yes.   That's what it says.   Uh-huh.

4        Q.   Okay.   So then is it fair to say that the

5   Supreme Court did not affirm the lower court's decision

6   of a finding of a violation of the Voting Rights Act and

7   that the only thing that stood involved the one district

8   in Fort Worth?

9        A.   Well, I think, based on reading this, they're

10  saying, "Except with respect to one Texas House

11  district," which is the -- Fort Worth.   So I -- I think

12  this -- that statement -- that sentence still reads

13  true.

14       Q.   Okay.   But can we agree that the Supreme Court

15  determined that the lower court had gone too far, and

16  they reversed it, any injunction of the State plan,

17  except in regard to the one Fort Worth district?   That's

18  the only thing they were concerned about.

19       A.   Yes.

20       Q.   All right.   In regard to the Fort Worth

21  district, wasn't that -- wasn't the finding of the

22  Supreme Court that the State went too far in trying to

23  ensure that the district did comply with the Voting

24  Rights Act?

25       A.    I'm not sure because I'd have to read this

1  again, because I know there's a --

2      Q.   Well, is that something that would -- oh, I'm

3  sorry.  You're reading further.  If you're going to read

4  further in that, I would suggest you look at page 21,

5  the preceding page.  And in particular, if you see

6  headnote 30, which is the top of the second column on

7  that page, the second paragraph.

8          If this might speed things up, doesn't the

9  Supreme Court decision indicate that the legislature

10  responded to the request of the predominantly

11  African-American citizens of the Como district to put

12  Como, the predominantly black area, back into

13  District 90 --

14      A.   Uh-huh.

15      Q.   -- and then responded to the request of MALC,

16  the Mexican-American Legislative Conference, I think it

17  is, to add Hispanic votes because this was a

18  predominantly Hispanic district?  So that it was adding

19  minority voters at the request of both the

20  African-American community and the Hispanic community.

21  Is that what it says?

22      A.   Yes; that's what it says.

23      Q.   Okay.  Are you familiar with the Shaw vs. Reno

24  line of cases?

25      A.   No.

1    Q.   Okay.  Do you know if there is a line of

2  cases -- and just not to hide the ball, it's what I

3  refer to as the Shaw vs. Reno line --

4    A.   Yeah.

5    Q.   -- that talks about racial gerrymandering or

6  using race to a predominant factor in redistricting,

7  which in some respects is the opposite of what is re- --

8  governments are required to do under the Voting Rights

9  Act?  Are you -- have you ever heard of those cases?

10              MR. CUSICK:  Just objection:  Outside the

11  scope of a legal opinion.

12              But go ahead.

13    Q.   (BY MR. HEATH)  Go ahead.

14    A.   I probably have read about them --

15    Q.   Okay.

16    A.   -- a little bit vis-a-via Ari Burman and some

17  other histories of the Voting Rights Act.

18    Q.   Okay.  On page 12 of your report, you say that

19  "Waller County is the most difficult county in Texas for

20  African American college students to vote."  Did you do

21  some study of the other counties?

22    A.   No, I didn't do a study of the other counties.

23  That was based on the -- the pattern of historic

24  discrimination against the PVAMU students --

25    Q.   Okay.

Page 15

Jayla Allen, et al. vs. Waller County, Texas, et al.
Peniel Joseph Ph.D. - 12/16/2019

1    A.    -- that Waller County has exhibited since the
2  passage of the VRA.
3    Q.    But you didn't look at any other counties?
4    A.    No, but, I mean, when it comes to counties like
5  Travis County and -- and the University of Texas
6  students, students have a much easier time of voting on
7  campus if you're at a predominantly white institution
8  like the University of Texas at Austin.  It's right at
9  the center.  Students aren't having to protest.  You can
10 vote at the Flawn Academic Center right at UT, right on
11 the 40 acres.  Right?  And no one would put a voting
12 site off campus at the University of Texas.  Like, no
13 one would even consider it because it doesn't make any
14 sense.  So there's a long history at PVAMU, which is,
15 you know, a historically black school that's been around
16 since the 1860s, of -- of just denying the vote to those
17 students even after the Voting Rights Act.
18    Q.    Would it be fair to say then that based on the
19 study and experience you have, that, in your view, it is
20 harder -- more difficult for African-American college
21 students to vote in Waller County than in Travis County
22 but not necessarily in the other 252 counties in the
23 state?
24    A.    Well, no.  I would say that PVAMU is -- is
25 going to be the most difficult place to vote, because

1  even after -- if you think about it historically, after

2  the VRA, PVAMU students couldn't vote because Waller

3  County officials claimed that they weren't residents,

4  and it took -- it took another 14 years, until 1979, for

5  the Supreme Court to say, "No.  They could vote," but

6  then even after that, in 1992 and after, Waller County

7  officials have -- have threatened to -- to prosecute

8  PVAMU students who are -- who are trying to vote or even

9  run for office.

10      Q.   Is it fair --

11      A.   So --

12      Q.   I'm sorry.

13      A.   So -- and even after that -- and we can discuss

14  this over the course of the morning and afternoon --

15  there's just been systemic efforts to disfranchise black

16  student- -- black students at PVAMU continuing up until

17  today.

18      Q.   Is it fair then to say that your observation

19  that Prairie View -- or that Waller County is the most

20  difficult place in the state for African-American

21  college students to vote, based on your observation of

22  Prairie View in Waller County and your observation of

23  maybe some other counties like Travis County with which

24  you're generally familiar -- but that you didn't look at

25  all the other counties?

1    A.    I didn't do a systemic investigation of all the

2  other counties, but Prairie View and Waller County is

3  the county in Texas that has made national news for

4  decades as a county that is authoritatively bent on

5  preventing African-Americans in Prairie View, especially

6  PVAMU students, from exercising the franchise and their

7  citizenship rights.  So Waller County is infamous

8  nationally because of what Waller County officials have

9  consistently tried to deploy against PVAMU students.  So

10  they've made a national reputation for themselves that's

11  infamous but that is well earned when you investigate

12  the history and the contemporaneous efforts at voter

13  suppression.

14    Q.    Back to Travis County.  You mentioned that

15  there is on-campus early voting for UT students at the

16  Flawn Academic Center.  Is the student enrollment at the

17  University of Texas larger than the entire population of

18  Waller County?

19    A.    Student enrollment at UT is going to be over

20  40,000.  I mean, with grad students, it might even be

21  50-.  So it could be larger.

22    Q.    Okay.

23    A.    It could be larger.

24    Q.    And, in fact, if you look at the number of

25  people who are present on campus, when they add faculty

1  and staff and so forth, have you heard that there are

2  typically like 70,000 people on the campus?

3      A.    Well, I mean, if there's a football game, yes,

4  there's going to be that many people on campus --

5      Q.    Okay.

6      A.    -- especially if the Longhorns are winning and

7  going to bowl games.

8      Q.    Right.

9      A.    So last year was one of those years.

10      Q.    Okay.  On page 17, you say, "By 1990, with the

11  aid of DOJ intervention, PVAMU students were represented

12  in one precinct."  What sort of precinct are you talking

13  about?  And specifically what I'm wondering is, is -- is

14  what you're saying --

15      A.    Page 17?

16      Q.    It's Page 17, I think --

17      A.    Okay.

18      Q.    -- I said.  And specifically what I'm wondering

19  is, are you talking about a county commissioner --

20  perhaps county commissioner and justice precincts?

21              MR. HEATH:  Are the commissioner and JP

22  precincts identical?

23              MS. DORSEY:  Yes.

24              MR. HEATH:  Okay.  That's what I thought.

25              THE WITNESS:  Yeah, I'm not sure here,

1  because it says, "In 1990" -- yeah.  I'm not sure

2  exactly what -- what precincts.

3      Q.   (BY MR. HEATH)  Okay.

4      A.   Is that a voting -- I'm not sure exactly.

5      Q.   Okay.  You say that this was "with the aid of

6  DOJ intervention."  What was the DOJ intervention?

7      A.   I think the DOJ intervention -- and I'm not

8  quite sure -- I think was based on trying to -- trying

9  to push back against redistricting efforts that spread

10  out PVAMU students across precincts that were going to

11  dilute their voting power.

12      Q.   Do you know if any Department of Justice

13  personnel or any communication from the Department of

14  Justice to the County officials stated that prior to

15  the -- it would have been the 1991 redistricting?

16      A.   You know, I'm not sure, but I would say

17  probably, because one thing about the DOJ -- and over

18  here in -- there's a 2002, on page 18, DOJ objection.

19  Certainly the -- the Waller County officials have been

20  in -- in correspondence with DOJ officials since the VRA

21  and throughout the 1970s and -- and '80s because of all

22  the challenges that were -- were happening and all the

23  litigation that was happening.  And so many -- both

24  residents and PVAMU students were appealing to the DOJ

25  to help them with the voter suppression that was

Page 20

Jayla Allen, et al. vs. Waller County, Texas, et al.
Peniel Joseph Ph.D. - 12/16/2019

1  happening in Waller County.

2      Q.   Okay.  So would it be fair to say that it's

3  your assumption that the DOJ intervened but you're not

4  really sure?

5      A.   Well, no.  I think this is based on the sources

6  that I was using.  I just can't pinpoint them here,

7  because just on the next page, it says, "In 2002, the

8  DOJ objected to a redistricting plan proposed by Waller

9  County officials, citing census data and statistical

10  analyses to demonstrate how the plan seemed

11  purposefully" -- "purposefully designed to undermine the

12  effectiveness of racial minority voters.  'Within the

13  context'" -- this is a quote.  "'Within the context of

14  electoral behavior in Waller County,' stated the

15  Department of Justice, 'the county has not established

16  that implementation of this plan will not result in a

17  retrogression in the ability of minority voters to

18  effectively exercise their electoral franchise,'" close

19  quote.  And that's from Nina Perales and Luis Figueroa

20  and Criselda Rivas, "Voting Rights in Texas: 1982-2006."

21  So I would say that there -- there most likely was a DOJ

22  assist because there's a long history with the DOJ

23  trying to assist PVAMU students in -- in breaking down

24  voter suppression barriers that are erected by -- by

25  Waller County.

Page 21

Jayla Allen, et al. vs. Waller County, Texas, et al.
Peniel Joseph Ph.D. - 12/16/2019

1    Q.    All right.  And what you just talked about was

2  something that happened in 2002, which is essentially

3  ten years after the redistricting that I was questioning

4  you about, the -- you refer to it by 1990, but, in fact,

5  redistricting happens after the decennial census, which

6  is a year later.  So that would be '91; correct?

7    A.    Yes.

8    Q.    All right.  And I think that's how people

9  typically refer to redistricting, by the decade, but it

10  actually happens the -- later after the census is

11  published.

12            But what happened in 2002 doesn't tell us

13  what happened in '90, does it?

14    A.    Well, no.  I would disagree with that.  So when

15  you think about what happens with Waller County and --

16  and here are just some snapshots, and I can -- I can --

17  I'd like to read off -- "In 1971, after the 26th

18  Amendment extended the vote to those 18 years and older,

19  Waller County, which is home to PVAMU, became troubled

20  with" -- "with race issues.  Waller County's tax

21  assessor and voter registrar" -- "registrar prohibited

22  students from voting unless they or their families owned

23  property in the county.  This practice was ended by a

24  three-judge court in 1979."

25            "In 1992, a county prosecutor indicted 19

1  PVAMU students for illegally voting but dropped the
2  charges after receiving a protest from the DOJ."
3            "In 2003, a PVAMU student ran for the
4  commissioners court.  The local district court" --
5  excuse me, "the local district attorney and county
6  attorney threatened to prosecute students for voter
7  fraud for not meeting the old domicile test."  And
8  that's the domicile test that had been ended in 1979
9  by -- by a three-judge court.  So this is a pure
10  invention for voter suppression.  "Those threatened
11  prosecutions were enjoined, but Waller County then
12  reduced early voting hours, which was particularly
13  harmful to students because the election day was during
14  their spring break.  After the NAACP filed suit, Waller
15  County reversed the charges, the changes to early
16  voting, and the student narrowly won the election."
17            "In 2007-2008, during then Senator Barack
18  Obama's campaign for president, Waller County made
19  several voting changes without seeking preclearance.
20  The county rejected," quote/unquote, "'incomplete voter
21  registrations' and required volunteer deputy registrars,
22  VDRs, to personally find and notify the voters of the
23  rejection.  The county also limited the number of new
24  registrations any VDR could submit, thus limiting the
25  success of voter registration drives.  These practices

1  were eventually prohibited by a consent decree."

2              But then it continues.  When -- when we go

3  to the -- "by 2008, Judge DeWayne Charleston, a black

4  Justice of the Peace and voting rights activist, led

5  efforts to prevent Waller County officials from reducing

6  early voting and polling stations.  Charleston also

7  alleged that county officials refused to allow hundreds

8  of local residents, many of whom he personally

9  registered, to vote in the 2006 elections.  By this

10  time, then Attorney General and now Governor Abbott, who

11  supported PVAMU students' rights to vote in 2004" -- "he

12  opposed PVAMU students' voting rights by 2006.  He found

13  himself listed as a defendant."

14              When we think about 2008 -- "On

15  October 10, 2008, the Department of Justice announced a

16  consent decree with Waller County officials who agreed

17  to halt 'implementation of the unprecleared registration

18  practices reprocessed those applications which were

19  wrongly rejected and initiate voter registration

20  programs' at PVAMU.  In accordance with the consent

21  decree, Waller County agreed to halt changes in voter

22  registration practices that they had begun to implement

23  without DOJ approval.  Specific changes to the county's

24  volunteer deputy registration program, notice

25  requirements, and standards for accepting voter

1   registration applicants were now halted.  As part of the

2   agreement, Waller County also agreed to reprocess

3   applications from black residents that had been

4   improperly rejected and implement voter registration

5   programs at PVAMU."

6               "Despite the consent decree in 2008, the

7   DOJ designated Waller County as one of the sites across

8   23 states to receive elector monitoring by the Civil

9   Rights Division, one of 55 elections that would be

10  closely watched by 415 federal" -- "federal observers."

11              And this continues.  When we think --

12  "several PVAMU students and other individual

13  organizations intervened in a" -- "in a suit in 2012

14  that challenged Texas" -- "Texas's voter ID law.  And by

15  2014, after a federal court found that the law had a

16  discriminatory impact on black and Hispanic voters in

17  Texas and was enacted for that purpose, subsequent

18  appellate court decisions upheld that the law had a

19  discriminatory impact on blacks" -- "black Texans."  So

20  PVAMU students were at the forefront there.

21              "In 2016, a full panel of judges of the

22  Fifth Court" -- "Fifth Circuit Court of Appeals affirmed

23  that Texas" -- "Texas district court's rulings that the

24  Texas voter ID law was racially discriminatory.  The en

25  banc federal appellate court observed that the

1  restricted voter ID bill was passed in the wake of a

2  seismic demographic shift as minority populations

3  rapidly increased in Texas such that the party currently

4  in power was facing a declining voter base and could

5  gain partisan advantage through a strict voter ID law."

6              "In 2016, that same year, PVAMU students

7  protested so their county officials would not remove the

8  on-campus polling site recently won."

9              "In 2018, in October, PVAMU students

10 alleged violations of the VRA and the U.S. Constitution

11 based on plans, once again, to restrict access to early

12 voting opportunities in Waller County.  And at the time,

13 19-year-old PVAMU student, Sophomore Damon Johnson, a

14 plaintiff in this lawsuit, explained, 'I don't want this

15 to be the reason, but it looks like we're PVAMU in a

16 predominantly white area and they don't really want us

17 to vote.'"

18              So all those things -- what's interesting

19 about being a historian is that -- what you do as a

20 historian is you follow the evidence.  So you're

21 interested in really, especially a day-to-day account,

22 if you can, of why are we in a specific historical

23 moment, and when you think about Waller County, when you

24 follow the evidence, there's been panoramic versions of

25 institutional racism and systemic discrimination against

1  PVAMU students who are trying to vote for decades, and

2  it doesn't -- it doesn't ever desist.  And so what we

3  see is an evolution of different efforts to prevent

4  black students in Prairie View from voting, and it's --

5  decade after decade, you can get your greatest hits of

6  what's the most malicious and mendacious effort to

7  prevent black citizenship, but it's very, very

8  consistent throughout.

9       Q.   All right.

10      A.   I'd like to go to the restroom.

11                MS. ADEN:  Do you mind?

12                MR. HEATH:  Okay.

13                (RECESS FROM 11:37 a.m. - 11:41 a.m.)

14      Q.   (BY MR. HEATH)  Dr. Joseph, you gave me a very

15  long answer talking about various instances from, I

16  believe, 1971 to 2018, a total of 47 years, and from

17  that -- going back to my original question that I had

18  asked you there, is your answer that you conclude from

19  all of these various instances of over 47 years that the

20  Department of Justice intervened in 1990 to direct

21  Waller County in its redistricting of the commissioner

22  precincts?

23      A.   I'm not sure if the Department of Justice

24  intervened.  I think they did intervene based on just

25  reading this --

1    Q.    Okay.

2    A.    -- deadline, but I'm not --

3    Q.    So in your report where you say -- talk about

4  the Department of Justice intervention, it might be --

5    A.    Well, I mean --

6    Q.    -- better --

7    A.    -- I think -- I think there -- there is.  I

8  just don't see the specific -- I don't have the specific

9  details, but I'd say yes, they did intervene because

10  it's -- it's right there.  So there's -- there's --

11    Q.    It's right there because you said it?

12    A.    Well -- but I wouldn't say -- I wouldn't say

13  something that wasn't -- that wasn't in -- in the -- in

14  the sources, in -- in the archives.

15    Q.    Okay.  And --

16    A.    It's just in that instance, unlike the 2002

17  instance, maybe for brevity, I don't take a full quote

18  from the DOJ corresponding or issuing a public statement

19  about what Waller County was doing vis-a-vis voter

20  suppression, but in 2002, I do quote -- so you can see

21  that's a quote that is drawn from the Perales and

22  Figueroa and Rivas law -- the article, "Voting Rights in

23  Texas: 1982-2006."

24    Q.    Okay.  On page 18, you talk about the county

25  officials continuing "to practice a policy of voter

Page 28

Jayla Allen, et al. vs. Waller County, Texas, et al.
Peniel Joseph Ph.D. - 12/16/2019

1   intimation against PVAMU students into the 21st

2   century," and note that a 2002 DOJ objection to the

3   redistricting plan found purposeful design to undermine

4   the effectiveness of racial minority voters.  What sort

5   of research did you do about the details of that

6   objection?

7        A.   I think I read -- I read the aspects of the DOJ

8   objection that were in the -- the voting rights in Texas

9   essay.  I don't know if I read the full DOJ objection.

10  I might have, but it's not cited here.

11       Q.   But is it your testimony that it reflected an

12  effort on the part of the county officials to

13  disenfranchise or otherwise diminish the electoral

14  effectiveness of Prairie View students?

15       A.   Oh, yes.  They have a -- they have a huge

16  history of this.  I mean, they should be -- you should

17  either be very -- Waller County should be either very

18  proud or ashamed of this history because it's so, so

19  consistent in terms of trying to diminish and undermine

20  citizenship rights for African-Americans at PVAMU.

21       Q.   If, in fact, the Department of Justice

22  objection was based -- or trying to get the county to

23  move African-American voters out of Precinct --

24  Commissioner Precinct 3, which is the one that contains

25  Prairie View, and into Precinct 1, the one that contains

1  Hempstead, to boost the African-American percentage in
2  that precinct rather than the Prairie View precinct,
3  would that be consistent with trying to disenfranchise
4  Prairie View students?
5      A.   Yes.  It could be if you're gerrymandering in a
6  way that's going to provide partisan -- both partisan
7  and racial advantage in terms of voting outcomes.  Yes.
8      Q.   What if the objection says -- if the result of
9  the objection was to end up splitting the town of
10  Prairie View so that part of that previously put
11  together in 1990 went up to Precinct 1 to take those
12  votes away from the Prairie View commissioner precinct,
13  those African-American votes, and put them into
14  Hempstead to boost the African-American percentages up
15  there, would that be something that was designed to
16  disenfranchise Prairie View students?
17      A.   Well, it's going to be yes, if it disallows
18  Prairie View students from having political power in the
19  precinct that is representative of the voters of where
20  they actually live, because they're not -- they're not
21  in Hempstead.  They're in Prairie View.
22      Q.   But do you know if it did that?
23      A.   No, I don't know if it did that.
24      Q.   Okay.  On page 20 and 21, you discuss the
25  efforts by District Attorney Kitzman to challenge the

1   residency of Prairie View students, and you mention that

2   Kitzman backed down in light of opposition from the

3   Texas Attorney General.  Also, did the Texas Secretary

4   of State object to Kitzman's actions and try to resolve

5   those?

6       A.   And your question?  I didn't hear the question.

7       Q.   Did the Secretary of State as well as the Texas

8   Attorney General essentially intervene on behalf of the

9   students?

10      A.   In that case, yes, they do --

11      Q.   Okay.

12      A.   -- intervene on behalf of the students.

13      Q.   Now, you mention that the efforts had the

14  opposite effect of what Mr. Kitzman apparently intended

15  since there were 2,000 new reg- -- voter registration

16  requests; is that correct?

17      A.   Yes.  It said it had -- it had the opposite

18  effect of -- of what Kitzman intended, but one thing

19  that's important to note and get on record is that these

20  students should not in 2004, let alone now, have been

21  fighting for voting rights in the United States of

22  America.  So one of the things that I'd -- I'd like to

23  say that -- like right here, "DA Kitzman's efforts were

24  particularly chilling to PVAMU students' political

25  participation since they came on the heels of an

1    announcement by two PVAMU students that they intended to
2    run for a county office at a time where students made up
3    20 percent of the voting age population."  So this is --
4    this is intimidation when you are an American citizen
5    and you are disallowed from -- from -- from voting.
6    It's huge intimidation.  It's huge trauma.  I mean, I --
7    I vote at the -- sometimes at the University of Texas
8    just on campus.  I mean, I couldn't imagine people
9    saying that, one, I couldn't vote.  I know I have the
10   right to vote, but this idea of indictments or -- and I
11   couldn't imagine actually, truthfully, right now in 2019
12   having to protest for my right to vote or really anybody
13   else's right to vote who are American citizens.
14   That's -- that's what's the huge -- the huge outrage
15   here.
16        Q.    And is it correct that the result of this was
17   so chilling, the 2,000 went out and registered?
18        A.    Well, people went out and registered because
19   they were trying to push back against that kind of --
20        Q.    Okay.
21        A.    -- chilling effect.  Right?  But -- but, you
22   know, part of -- part of what you see here is the very
23   fact that each new generation of PVAMU students are
24   forced to have to organize, are forced to have to file
25   legal suits, are forced to have to become voting rights

1  experts to defend their -- their own voting rights is

2  something that's hugely unfortunate, and it has a really

3  big impact.  So even though in this instance, yes, you

4  get thousands of people who come out in protest, I think

5  overall the fact that citizens, PVAMU black residents,

6  and students have to be so vigilant to protect their own

7  voting rights is -- is something that's hugely

8  unfortunate, and it's burdensome.  Because most of us --

9  I don't think anybody else in this room thinks of the

10  vote like that.  I mean, we -- we -- we're -- I think

11  we're all active citizens.  I would hope we are and that

12  we vote and we engage, but we don't have to protest for

13  our very right to vote.

14      Q.    And when faced with what they perceived to be

15  efforts to prevent students from voting, have Prairie

16  View students redoubled their efforts to be sure they do

17  vote?

18      A.    I think, yes, they -- they have year after

19  year.  The -- the unfortunate -- the unfortunate reality

20  is that year after year Waller County officials try to

21  make it more difficult for Prairie View students to

22  vote.  So it becomes this -- this shell game, and one of

23  the -- at some point in the report, I talk about

24  Sisyphus and -- you know, Sisyphus, the legend, the

25  Greeks, and, you know, Sisyphus is doomed to roll that

1  big boulder up the hill, and right when he gets to the

2  apex, it comes back down.  It's a really horrifying, you

3  know -- you know, circumstance, and that's what our

4  students -- our PVAMU students, they're constantly

5  lifting that boulder -- they're lifting that right up to

6  the hill, and it keeps coming down back on their heads.

7  Right?  So this is a hugely unfortunate situation.  So

8  on one level, the students are heroic, but on another

9  level, they shouldn't be put in this situation where

10  across generations they have to become voting rights

11  experts.  We're -- we're better than this as a county

12  and as a nation, and Waller County should be better than

13  this too.

14  Q.   Okay.  You talk about an effort by students

15  that year -- whatever the year the Kitzman thing was --

16  A.   2004.

17  Q.   -- to increase voting hours at the early voting

18  site near campus.  Where was that site?

19  A.   That site was not on campus yet.  I'm not sure

20  exactly where that site was.

21  Q.   Okay.  Do you think it might be the community

22  center?

23  A.   Maybe, but I'm not sure.

24  Q.   Okay.

25  A.   That's not on campus yet.

1    Q.    And you mentioned a protest regarding the

2  number of hours.  Was there any protest or issue

3  regarding the location?

4    A.    There's always been protests around the

5  location.  And students going back -- and I don't --

6  some of this, I think, is cited early in the report --

7  were -- were -- students have wanted a polling site on

8  campus for decades.  They received the polling site by

9  2016.  By 2016 or is it 20- -- certainly by the 2016

10  election, there was a polling site on campus.  It could

11  be even before that, but students have been talking

12  about wanting a polling site on campus for -- for

13  decades and certainly way before it was actually

14  provided by Waller County officials.  And even -- one of

15  the things we see in the record too, school

16  administrators had been receptive to a polling site on

17  campus way before Waller County officials acceded to

18  having a voting site on campus.

19    Q.    On page 24, you talk about how students

20  organized to protest the plan to cut the number of early

21  voting sites to one, which was the county courthouse.

22  Do you know if there are -- any other comparably sized

23  counties offered early voting only at the main polling

24  site?

25    A.    No, I don't.

1    Q.   Are you saying that the plan in Waller County
2   was intended uniquely to adversely affect Prairie View
3   students?
4    A.   Yes.  I would say that, because PVAMU students
5   make up the largest African-American voting cohort in
6   the city of Prairie View.  There's over 8,000 students
7   there.  82 percent are black as of 2010, and reducing
8   the number of early voting sites uniquely affects that
9   population.
10    Q.   And you say "uniquely affects" them.  Does it
11   affect other people in the county, maybe white citizens,
12   say, down in Brookshire in the southern part of the
13   county?  They're farther away from Hempstead than
14   Prairie View is, aren't they?
15    A.   Yeah.  I would say it's going to impact -- it
16   would -- it would have disparate impact on PVAMU
17   students, but it could have impact on other -- other
18   groups as well.
19    Q.   And those other groups may have to go further
20   to vote than -- early than the Prairie View students
21   would, might they not?
22    A.   Perhaps, depending on if it's just one polling
23   site.
24    Q.   Okay.  Now, in that year, Prairie View students
25   and others protested, and then the county responded by

Page 36

Jayla Allen, et al. vs. Waller County, Texas, et al.
Peniel Joseph Ph.D. - 12/16/2019

1  opening additional polling places, didn't they?

2      A.    Yes.

3      Q.    Okay.  Is that a sign of responsiveness on the

4  part of the county?

5      A.    Well, I'd say it's -- it's complex.  It's a

6  sign of responsiveness after efforts at voter

7  suppression.  So what -- what would be more beneficial

8  is if the county not only was not embarking on a

9  campaign of voter suppression but the county was

10 actually interested in having more students vote and

11 having more access for all the residents of Waller

12 County.

13     Q.    Are there legitimate reasons that the county

14 might have to have one -- or one number of polling

15 locations versus another?  You know, maybe one rather

16 than three or one -- or three rather than five or

17 something like that?

18     A.    No, not inasmuch as those reasons conform with

19 historic patterns of voter discrimination and voter

20 suppression.  So no.

21     Q.    Now, you mention on page 25 that one of the

22 three additional polling places was located a mile from

23 campus.

24     A.    Uh-huh.

25     Q.    What was that polling place?

Page 37

Jayla Allen, et al. vs. Waller County, Texas, et al.
Peniel Joseph Ph.D. - 12/16/2019

1     A.    That might be the county -- I'm not certain.
2  That might be the community center.

3     Q.    Okay.

4     A.    That might be the community center.

5     Q.    And if I tell you that if we go back to that
6  year and look at where the polling site was, that it was
7  at the community center, would you at least
8  hypothetically accept that?

9     A.    Yes, I would hypothetically accept that.

10    Q.    Okay.  What is your source for the distance
11 between the polling place and the campus?

12    A.    The source is going to be -- let's see the
13 endnote.  Endnote 57.  So it's -- it's from -- it's from
14 PBS, "The Walk of Political Engagement at PVAMU."  "One
15 Texas School's Long Walk of Political Engagement."  So
16 it's from a PBS news hour segment on Prairie View.

17    Q.    Okay.  And actually there are two cites I think
18 there in footnote 57.

19    A.    One is from PVAMU itself.  So it's the
20 campus --

21    Q.    Right.

22    A.    Yeah.  The campus and the PBS news hour.

23    Q.    And I'm going to tell you, and you can go back
24 and look at it if you want --

25    A.    Yeah.

1    Q.    -- but that in footnote 25, you have the Burnt

2  Orange Report, and it says the same thing.

3    A.    Okay.

4    Q.    Have you ever been to Prairie View?

5    A.    Yes.

6    Q.    When did you go?

7    A.    I went this past late spring --

8    Q.    Okay.

9    A.    -- and spent, you know --

10    Q.    Was that in preparation for writing this

11  report?

12    A.    No.  I was there to give a talk and give a

13  lecture, and at the same time, because of the report, I

14  was deeply interested and invested in the campus, and so

15  I really -- I talked to people, did not disclose any of

16  this, and -- and talked to them about their -- you know,

17  their campus and, you know, just the whole -- you know,

18  higher education and just the whole history of the

19  place.  So it was a very, very interesting visit, a

20  beautiful campus, and it was -- it was -- it was

21  definitely a great -- a great place to be and to see.

22    Q.    Did you go by the community center?

23    A.    I drove around campus, and I think I -- I

24  probably passed the community center because I drove --

25  I really in the car went through the entire campus --

1    Q.    Okay.

2    A.    -- because I wanted to -- I didn't walk the

3  entire campus, but I drove around the entire campus to

4  get a feel of -- to get a feel of it.

5    Q.    Now, you talk about how the polling place, the

6  off -- or the early voting polling place was more than a

7  mile off campus -- more than a mile off campus I think

8  is what it says.

9    A.    Well, it said, I think, "Located one mile."

10    Q.    Okay.

11    A.    But I think the campus -- the polling -- the

12  community center is about a half a mile away.  So I'm

13  not sure if this -- the one that they're saying is

14  located one mile, if that was the community center from

15  2004.

16    Q.    I'm going to hand you this -- and let the court

17  reporter keep one -- what I've marked as Exhibit 2.

18                    (EXHIBIT NO. 2 MARKED)

19    Q.    (BY MR. HEATH)  Do you recognize that as an

20  aerial photo of the Prairie View -- of a portion of the

21  Prairie View campus?

22    A.    Yes.

23    Q.    Okay.

24                    MR. CUSICK:  And, sorry, just -- is

25  this -- I just want to note for the record -- is this

1  from 2019, this image?

2           MR. HEATH:  It -- I think it's probably

3  from Google Maps.  It's a satellite but...

4           MS. DORSEY:  It's from 2018 because

5  there's a building here now --

6           MR. HEATH:  Okay.

7           MS. DORSEY:  -- or before.

8           MR. HEATH:  It's probably from 2018 or so,

9  but I think the buildings are all in the same place.

10     Q.   (BY MR. HEATH)  And does that indicate where

11  the -- do you see the area where the community center

12  is?

13     A.   Yes.

14     Q.   All right.  And also where the student --

15  memorial student center is?

16     A.   Yes.

17     Q.   Okay.  And the distance between those is

18  significantly less than a mile, isn't it?

19     A.   Yes, it is.

20     Q.   All right.  And, in fact, is it fair to say

21  that the community center is adjacent to the campus,

22  essentially on the edge of the campus?

23     A.   Yeah.  I would say it was on the edge of -- of

24  the campus.

25     Q.   All right.  Do you think there's any part of

1 the campus that is more than a mile or a mile from the

2 community center?

3     A.   You know, I'm not -- I'm not sure.

4     Q.   Okay.  You talked about -- now, occasionally

5 over the years there may have been another instance or

6 two where perhaps because of the unavailability of the

7 community center, which I think was rebuilt, early

8 voting sites were at other spots --

9     A.   Uh-huh.

10     Q.   -- essentially across the street from the

11 campus, perhaps a block away.  Is it fair to say that

12 those are reasonably convenient to the campus?

13     A.   No, I wouldn't say it's fair to say that,

14 because when you go around the campus, one, there's --

15 there's a kind of -- there's that -- there's that state

16 loop, and I don't know what they're calling -- there's

17 something I think the students are calling the Sandra

18 Bland Highway, but there -- there are parts of the

19 campus that are much less accessible than -- than others

20 in a way when you're -- when you're coming into the

21 campus, and there's more of -- I don't know if it's --

22 is it a two-lane -- when you come through the -- and I'm

23 not seeing it here.  When you come through the -- come

24 off the highway to get there -- because I just was

25 there.  And so there's a part of it that -- if something

1  was there, it actually -- it would be sort of very

2  inconvenient when you're -- when you're just coming off

3  of the -- to get to Prairie View.  So I don't -- it

4  really depends on where, because I was just there, and I

5  definitely noticed before you come into the campus,

6  there are other parts where it would be -- it wouldn't

7  be -- it wouldn't be very accessible.

8       Q.    But looking at the aerial photo, the community

9  center is not across any road from the campus, is it?

10      A.    No.  It's -- the community center is just not

11 centrally located.

12      Q.    Okay.

13      A.    Yeah.

14      Q.    You mention on page 25 that more than 700 votes

15 were challenged at the Prairie View polling location.

16      A.    Uh-huh.

17      Q.    Who did those challenges?

18      A.    You know, I'm not sure if that's Waller County.

19 I would probably think that's Waller County officials or

20 maybe -- I don't know if it's voter deputies because of

21 how Texas works, but I know that they -- they were --

22 they were challenged, and part of the consent decree

23 after, with Waller County, was that those were going to

24 be reprocessed because most of those who were challenged

25 were -- were black voters.

1      Q.    Do you know -- but you don't know that any of

2   the challenges were made by the county itself or county

3   officials?  Do you know one way or the other?

4      A.    I'm not -- I'm not certain.

5      Q.    Do you know if perhaps True the Vote

6   representatives may have challenged?

7      A.    It -- that could -- that could be.  I'm not

8   certain --

9      Q.    Okay.

10     A.    -- who were doing the challenges.

11     Q.    And do you know, for example, that they often

12  make a practice of that, True the Vote?

13     A.    Yeah.  You know, one thing I'll say is that one

14  of the things we get from Judge Charleston is -- is the

15  fact that the county had also -- and this is county

16  officials -- improperly not processed hundreds of

17  ballots from -- from black voters who were trying to

18  register during -- during that period as well.

19     Q.    Do you know the details on that?

20     A.    The details are -- are from the Washington Peer

21  Review.  There's some New York Times and other stories.

22  Part of it is that -- is that intimidation from the

23  antivoting fraud groups that -- like True the Vote that

24  you're -- you're mentioning, but part of it was the

25  number of, you know, voter registration cards

1  unprocessed in the election office after election day,

2  and that's -- that is in Waller County.  And from

3  here -- from that Washington Peer Review article, you

4  get that there was a joint U.S. Department of Justice

5  and Texas Attorney General investigation of those

6  unprocessed voter registration cards.

7      Q.   Okay.  But you don't know the details of it, do

8  you?

9      A.   I know the details through -- I don't know the

10 exact, yeah, minutia, but generally I've got the gist.

11     Q.   Okay.  You note on page 26 that Waller County

12 was one of the locations where the Department of Justice

13 sent election observers to monitor the election?

14     A.   Yes.

15     Q.   Has the Department of Justice sent monitors to

16 other counties, including, for example, Harris County?

17     A.   Yes.  The DOJ has sent federal observers to

18 other counties as well, including Harris County, but

19 that's not anything to be proud of because it means that

20 there's -- there's real concern there where observers

21 are sent.

22     Q.   Do you know if the county fully cooperated with

23 the monitors?

24     A.   I'm not sure if the county fully cooperated

25 with the monitors.

1    Q.   Do you know if the monitors found any problems?

2    A.   I'm not sure if the monitors found problems.

3    Q.   If they had, don't you think you would know

4  about it from the sources that you had looked at?

5    A.   On some levels, it really depends on how do you

6  define "problems," because certainly this lawsuit is

7  symptomatic that there's still problems but...

8    Q.   Do you know if the monitors made a report

9  saying, "Here are election problems in Waller County

10  that we observed"?

11    A.   I would assume that they did make a report, but

12  I don't know if they -- I don't know the details of --

13    Q.   Okay.  But if they had made one that said

14  "These were the particular problems we found," isn't

15  that something you would be likely to have cited in your

16  report?

17    A.   Yes, I would have cited it if it came up, but

18  the fact that it didn't come up does not necessarily

19  mean definitively that there were no problems.

20    Q.   Okay.  You mentioned that Texas -- not talking

21  about Waller County here, but Texas over time has been

22  the recipient of the second largest number of Section 5

23  objections, behind only Mississippi.  How does Texas

24  compare in size to the other Section 5 states?

25    A.   Well, it depends.  I mean, Texas was the

1  largest Section 5 state.  So it's bigger than, in terms

2  of geographic size, all the other Section 5 states.

3      Q.   Well, in population, would you be surprised if

4  it's roughly the size of Louisiana, Mississippi,

5  Alabama, Georgia, and South Carolina combined?

6      A.   No, I wouldn't be surprised at that.

7      Q.   All right.  And wouldn't you expect simply

8  because it is tremendously larger in population and in

9  number of jurisdictions and so forth than all of the

10 other states, that it's going to have a higher number of

11 objections simply because of the number of jurisdictions

12 involved?

13     A.   Well, no.  I mean, I would expect Texas to do

14 the right thing.  They -- they -- they didn't, but

15 that's what I would expect.  I would expect everybody to

16 do the right thing.

17     Q.   Do you have any idea what percentage of Texas

18 submissions draw an objection or what the percentages

19 are of the other Section 5 states?

20     A.   No.

21     Q.   Okay.  On page 28, you discuss the Texas voter

22 ID law, which you indicate was found by a D.C. district

23 court to be objectionable under Section 5.  Was part of

24 the objection to the voter ID bill that it didn't

25 recognize student IDs as being acceptable?

1    A.    I believe that was part of the objection, or at

2    least that was part of the objection that Plaintiffs

3    were making in the sense of those who were filing --

4    those who were protesting against it are making that

5    claim, especially -- and I think I cite also Attorney

6    General Eric Holder, who says that it was

7    unconstitutional in 2011.  He said it at the LBJ School

8    because they were taking gun licenses as -- as

9    identification but not taking student identification.

10   So certainly it's fine to take gun licenses but to take

11   gun licenses and not students -- it's pretty incredible

12   to say that both don't count as valid ID.

13   Q.    Did the voter ID law by, for example, not

14   recognizing student IDs affect Prairie View students

15   differently than it affected other college students --

16   A.    Yes.

17   Q.    -- who might have had a student ID?

18   A.    Well, yes, because I think black -- I don't --

19   I don't have a -- a cite for this, but I know I -- it's

20   there.  Black college students in general are less

21   likely to be registered gun owners and have a gun

22   license than -- than their white -- white counterparts.

23   So disproportionately that would actually impact them in

24   the state of Texas more than white -- white college

25   students.

1    Q.    Do you think very many college students have

2  concealed handgun licenses I think is the ID that --

3    A.    There's going to be --

4    Q.    -- a concealed carrying license?

5    A.    There's going to be many more white college

6  students that have that than African-American college

7  students.

8    Q.    Do you think very many college students have

9  concealed carry permits?

10    A.    Well, it depends.  You'd have to go state by

11  state.  So I'd say it really just depends.

12    Q.    In Texas?

13    A.    I'd say in Texas there's probably a good amount

14  that -- that do.  You know, I don't know what the

15  numbers are, but certainly African-American students

16  would be a real small minority within that -- within

17  that group.

18    Q.    If they -- if the percentages are comparable or

19  even if the percentages for both are minute, would it --

20  would the bill have a similar effect -- the voter ID

21  bill have a similar effect on Prairie View students as

22  it does on college students generally?

23              MR. CUSICK:  Objection.  Just outside the

24  scope of his report and calls for a legal conclusion.

25              But you can answer.

1      Q.    (BY MR. HEATH)   Go ahead and answer.

2      A.    Yeah.   I would say that it's not going to have

3   the same -- it would have disparate impact on Prairie

4   View students because Prairie View students would be

5   less likely to have the -- one of the official forms of

6   ID that these voter ID laws were saying were acceptable

7   and more likely to have a student ID, which by saying

8   that that wasn't an acceptable form of ID actually

9   disproportionately targets not just college students but

10  specifically black college students who are more likely

11  to have their college ID as their main form of ID than

12  some kind of Texas State ID.

13     Q.    On page 29, you indicate that in the 2016 en

14  banc Fifth Circuit -- in 2016, the en banc Fifth Circuit

15  affirmed the lower court decision that the voter ID law

16  is racially discriminatory, and in the last sentence of

17  that paragraph, you say, "There was credible evidence

18  that discriminatory intent voted" -- "motivated the

19  voter ID law."   Is that a correct reading of your

20  report?

21     A.    Yeah.   That's a quote from the Veasey v. Abbott

22  case.

23     Q.    Okay.   In fact, if we look at the Fifth Circuit

24  opinion, did they reverse the lower court finding of

25  discriminatory intent and discriminatory effect?

1          A.    And this is the discriminatory --

2          Q.    That's the --

3          A.    -- effect claim?

4          Q.    I'm handing you the en banc Fifth Circuit

5     opinion.  Turn to page 35.

6          A.    Uh-huh.

7          Q.    Or actually that they reversed the

8     discriminatory purpose or intent claim and remanded it

9     for reconsideration of that.

10               THE WITNESS:  So this right here?

11               MR. CUSICK:   (Nods head.)

12         Q.    (BY MR. HEATH)  And if you look, it says, "We

13    reverse the district court's judgment that SB 14 was

14    passed with a racially discriminatory purpose and remand

15    for the district court to consider this claim in light

16    of the guidance we provided in this opinion."

17         A.    Well, they're asking for a reevaluation.

18         Q.    Okay.  But they reversed the finding and they

19    remand it for further consideration --

20         A.    Uh-huh.

21         Q.    -- is that correct?

22         A.    Yes.

23         Q.    Okay.

24               MS. ADEN:  And for clarification, you're

25    talking about discriminatory purpose only because I

1  think you rephrased your question?

2            MR. HEATH:  Right.

3            MS. ADEN:  Okay.

4    Q.   (BY MR. HEATH)  Now, on page 31, you talk about

5  a 2016 effort to preserve the on-campus polling place

6  that had been achieved --

7    A.   In 20- --

8    Q.   -- in 2013.

9    A.   Yeah.  Uh-huh.

10   Q.   Here, are we talking about the election day

11 polling place rather than the early voting polling

12 place?

13   A.   I think I'm talking about both, because you can

14 vote early on the main -- on the -- in the student union

15 too.  That was one of the sites where you could vote

16 early.

17   Q.   Well, wasn't 2013 when election day voting was

18 moved -- or located at the memorial student center?

19   A.   Yes.

20   Q.   Okay.  When there were conversations in 2016

21 about moving it from the student center, wasn't the

22 conversation -- or do you know if the conversation was

23 merely about moving it to another on-campus location --

24   A.   No.

25   Q.   -- not off campus but another on-campus --

1       A.      They were saying county -- the conversation was

2    moving it to the county courthouse in Hempstead, which

3    is five miles away, or in Brookshire, which is 25 miles

4    away, and that's the -- that was the effort by Waller

5    County officials to eliminate six early voting polling

6    places.

7       Q.      So is it your testimony and that you are

8    relying on the fact that in 2013, early voting was

9    occurring at the student center?

10      A.      I'm not sure if early voting was occurring at

11   the student center, and I wasn't -- I'm not sure.  I

12   believe -- I'm not sure.  I'm not sure.  I can't...

13      Q.      Well, you talk about having won an on-campus

14   voting site in 2013, and then in 2016, students

15   protested so the county officials would not remove --

16      A.      Yeah.  So it must be --

17      Q.      -- the on-campus polling site recently won.

18      A.      Yeah.  Yeah.

19      Q.      So that was the 2013 --

20      A.      Yes.

21      Q.      -- site?

22      A.      Yes.

23      Q.      And if that site was the election day site, not

24   the early voting site, are we talking about --

25      A.      I'm not -- I'm not sure if it was both or if it

1  just was one.  I'm not sure right here.

2      Q.   Okay.

3      A.   It seems to me like it would be both, but I'm

4  not sure.

5      Q.   Okay.  And if it wasn't, then this may not be

6  correct.  What you say in the report may not be correct

7  if the 2013 polling site was not both election day and

8  early voting; correct?

9      A.   Yeah.  I'm -- I'm not sure.  I think it was

10  based on how I'm reading this, but I'm not -- I'm not

11  sure.

12      Q.   Okay.  In 2016, was there early -- or, I'm

13  sorry, election day voting at the student center and

14  early voting at the student center and at St. Francis

15  Episcopal Church, which is located one block from the

16  campus?

17      A.   I'm not sure about St. Francis Episcopal

18  Church.  I think from now reading this that the student

19  center was the site of early voting and November voting.

20      Q.   Okay.

21      A.   And initially in 2016, what they're trying to

22  do is eliminate the student center as one of the early

23  voting sites as well.

24      Q.   For early voting, not for election day --

25      A.   Yeah.  It seems like --

Page 54

Jayla Allen, et al. vs. Waller County, Texas, et al.
Peniel Joseph Ph.D. - 12/16/2019

1    Q.    -- is your testimony?

2    A.    Yeah.  I think it's early based on this.

3    Q.    And is it your testimony that the effort was

4  not only to eliminate it but -- from the student center

5  but to move it off campus?

6    A.    Yes.  Based on what this report says, yes.

7    Q.    Okay.  You talk on page 32 about a controversy

8  involving student addresses where one of the two

9  potential addresses assigned to Prairie View students

10  was off campus and not in the campus precinct.

11    A.    Yes.

12    Q.    Did the county assign that address?

13    A.    No.  The school assigned the address.

14    Q.    Okay.

15    A.    But the county knowing that the students are

16  residents and knowing that there's been such a long and

17  pernicious history about the residential status of

18  students really utilized the fact that the school

19  provided two residents -- two addresses, one which was

20  in county and one which was out of county by ZIP code --

21  that they utilized that in a way to really subject the

22  students to just further precarity and further

23  intimidation about their vote in a way that based on

24  that -- that long history should never have been

25  something that was up for dispute, even though the

1  county is not the ones who -- who provided the ZIP code.

2  But the administrators at PVAMU, from their perspective,

3  they have no way of providing each of the over 8,000

4  students on campus with an individual address that can

5  show that that dorm, that residence hall is their

6  individual address.  So county officials were not just,

7  you know, obtuse and negligent in that context; they

8  were definitely targeting PVAMU students once again in a

9  way that utilizes the fact that they have these -- this

10  address kerfuffle as a pretext to harm their access

11  to -- to voting -- voting rights and citizenship.  Yeah.

12      Q.   When the address kerfuffle was discovered, did

13  the county take action, along with the Secretary of

14  State, to find a way that the -- the students could vote

15  at the on-campus precinct, which I think is Precinct

16  309, and not in the other precinct, 310?

17      A.   Well, those things happened -- and I have it

18  where, you know, Jacob Aronowitz was arrested, who was

19  the field director for Mike Siegel, congressional

20  candidate, after delivering a letter to Judge Duhon and

21  Christy Eason demanding that students be allowed to

22  vote.  It was after Representative Sheila Jackson Lee,

23  who was then senior member of the House Committees on

24  Judiciary Homeland Security and Budget -- she released a

25  statement documenting the abuses in Waller County and

1    demanding that the DOJ launch an investigation.  She

2    said, "What is happening in Waller County, Texas,

3    appears to be part of an ongoing campaign of abusing

4    state law to disenfranchise minority voters, which is

5    why I'm calling on the U.S. Department of Justice to

6    take appropriate action immediately and enjoin elections

7    administration officials for Waller County, Texas, from

8    implementing their announced plan to impose additional

9    and unreasonable burdens on PVAMU students."  So --

10       Q.    Was the --

11       A.    So then you've got -- you know, you've got

12   different action, and there's a different spotlight that

13   comes on because of that.

14       Q.    Was the announced plan that Congresswoman

15   Jackson Lee was talking about having the students fill

16   out a change of address form when they came to vote?

17       A.    Well, I'm not sure if that was the announced --

18   announced plan.

19       Q.    Well, do you know what the announced plan was

20   then that she's talking about?

21       A.    I think she's talking about -- she's talking

22   about efforts by Waller County officials, one, to -- to

23   limit the number of early -- early voting locations and

24   polling locations, but I think it's definitely, yes,

25   connected to the address of the students too at that

1  time.

2       Q.   Do you know if the county arranged to have the

3  students who were faced with that address issue show up,

4  vote, fill out a change of address card so that -- or

5  form so that the issue doesn't arise again, and cast a

6  vote, which was a direct vote, not a provisional vote?

7  Do you think -- do you understand that happened?

8       A.   Yes, I think that that did happen.

9       Q.   Do you know of a better way to solve the

10  problem where the students are registered under a

11  particular address and you need to change that address

12  than having the students fill out a form to say, "Change

13  it to the proper one"?

14       A.   Well, I think the --

15                 MR. CUSICK:  Objection.  Outside the

16  scope.

17                 THE WITNESS:  Yeah.  I think the county

18  could just understand that all PVAMU students are -- are

19  residents of Prairie View.  So they don't -- they don't

20  need a change of address form for their -- to have their

21  votes counted because they're -- just being a student

22  there, they're in Prairie View, Texas, and they are

23  residents, and that -- that is something that is

24  established law from 1979, that they are residents.  So

25  just by virtue of being students on campus, the county

1  should probably have that the students can have just --

2  just one address where the school doesn't have to give

3  them two ZIP codes, and they -- really the students

4  should be grandfathered into this because of this long,

5  vicious history.  That's kind of -- one of the

6  interesting parts of this is how Waller County continues

7  to target these students in the worst way, and you would

8  think that their -- their behavior would be the exact

9  opposite.  Knowing this kind of rough history, you would

10 make it easier for these students to vote and want them

11 to participate in the process.  We're not seeing that,

12 unfortunately, but that's what I think would be the --

13 you know, the ethical and the moral thing to do would be

14 that given this long history.

15      Q.   (BY MR. HEATH)  So you're saying that every

16 student -- if you're a Prairie View student, you should

17 be registered at the university in Precinct 309,

18 which -- that's the campus precinct -- or the one that

19 includes the campus -- and not -- so that if, for

20 example, that student lives in Hempstead and drives down

21 to Prairie View every day to go to school, that he or

22 she should be registered in 309 and not in whatever

23 precinct Hempstead is?

24      A.   No.  I'm not --

25                MR. CUSICK:  Objection again.  Outside the

1  scope.

2            THE WITNESS:  Yeah.  No.  No.  I'm not

3  saying that.  I'm just saying that Prairie View -- PVAMU

4  students, the residency has been established that they

5  can vote in Prairie View, that they are residents of

6  Prairie View, Texas.  So I think that once they're

7  registered, the campus address should be enough for

8  their residency requirement, even if the school for

9  whatever reason was giving them these two different --

10  these two different addresses.

11      Q.    (BY MR. HEATH)  You do mention about

12  Congresswoman Jackson Lee's statement and -- followed by

13  vigorous support by Congressman Lloyd Doggett, who

14  pushed for maintaining early voting places on university

15  campuses across the state, and cite to a Texas Tribune

16  article.  Do you see that?

17      A.    Yes.

18      Q.    I'm just going to show you -- I'm not going to

19  mark this as an exhibit, but it's -- is this the Texas

20  Tribune article that --

21      A.    Yeah.

22      Q.    -- you cite to in your report?  Dr. Joseph --

23      A.    Yes.

24      Q.    -- is this the one?

25      A.    Yes.

1     Q.    Okay.

2     A.    Yeah.

3     Q.    And I have highlighted the part that talks

4  about Congressman Doggett, which I think is on about the

5  third page.

6     A.    Yes.

7     Q.    Does Congressman Doggett talk at all about

8  Prairie View or any campus other than the Texas State

9  campus?

10     A.    Right here he's talking about -- yeah.  I

11  mean -- I mean, it depends.  I mean, you can -- I mean,

12  you can read this as him talking about just Texas State

13  or really campuses just across the -- the state.

14     Q.    It's -- does it say that he and other local

15  Democratic candidates asked the Commissioners to extend

16  hours on campus saying they were concerned the extended

17  wait times were suppressing the vote and talking about

18  the Commissioners, that being the Hays County

19  Commissioners?

20     A.    Uh-huh.

21     Q.    Okay.  So that doesn't have anything to do with

22  Prairie View, does it?

23     A.    Well, no, I think it does in the sense that --

24  and that's why I cited it -- is that this idea of voter

25  suppression in higher education on college campuses and

1  really even the residency requirement of students on

2  higher -- on campuses is -- is national.  I mean, Texas

3  has these challenges, and we have them nationally as

4  well.  So certainly the -- the diminution of early

5  voting hours that we saw Waller County officials try to

6  do has been replicated not just in the state of Texas.

7  It's not just isolated, but it's national, and part of

8  this has to do with this idea of both racial

9  discrimination but also partisan advantage of what are

10 you going to do with, you know, these students and --

11 and their votes and if -- if they're going to upend

12 existing power relations in local -- in local counties

13 and states.

14     Q.   Was this Texas Tribune article about a push to

15 have more than 24 hours of early voting spread over

16 three days at an on-campus location at Texas State?

17     A.   Yeah.  Texas State, but also it talks about --

18 let's see.  It talks about UT and the LBJ -- LBJ

19 School -- well, no.  This is the LBJ student center.  It

20 talks about -- it talks about Austin here at the last

21 paragraph.  "Access to early voting on college campuses

22 varies across state" -- "students at UT have access to

23 two on-campus polling places.  Tarrant County is

24 splitting up its early voting between several

25 universities, offering three days of early voting at

1  both UT Arlington and Texas Christian."  So it's kind of

2  using Texas State as sort of a case study to look at

3  early voting at universities really statewide and what

4  that -- what that entails.

5      Q.   Okay.  And Texas State is much larger than

6  Prairie View A&M, isn't it?

7      A.   I'm not sure how -- what the size of Texas

8  State is.

9      Q.   Okay.  Does the article say that there is no

10  on-campus early voting at the University of Houston, at

11  Rice, or at the University of North Texas?

12      A.   Yes.

13      Q.   Okay.  And are all of those schools

14  predominantly white?

15      A.   The University of Houston -- well, the

16  University of Houston has definitely a robust black

17  population.

18      Q.   Uh-huh.

19      A.   Rice University and the University of North

20  Texas in Denton are PWI, predominantly white

21  institutions, but at the same time, the University of

22  Texas is a predominantly white institution that -- that

23  does have early voting, and so does Texas Christian and

24  UT Arlington.  So...

25      Q.   And does it indicate that Texas Christian and

1  UT Arlington are limited amounts of early voting?

2      A.   It says, "Offering three days of early voting."

3      Q.   Okay.  Essentially what was offered on campus

4  at Prairie View A&M; correct?

5      A.   Yes.  That's what was offered on campus.

6      Q.   And then at Prairie View A&M, additionally

7  there were a couple of days adjacent to the campus?

8      A.   Yes.

9      Q.   Okay.  So can we say that Prairie View's -- and

10 by Prairie View, I'm meaning Prairie View A&M.

11     A.   Yeah.  PVAMU.  Yes.

12     Q.   Early voting opportunity was less than afforded

13 to college students generally around the state?

14     A.   Well, it --

15     Q.   Maybe some that have better but college

16 students generally --

17     A.   Yeah.

18              MR. CUSICK:  Objection.  Outside the

19 scope.

20              You can answer.

21              THE WITNESS:  Yeah.  It really depends

22 because, I mean, there's -- there's equity and there's

23 equality.  Right?  So in terms of equity and the number

24 of hours that PVAMU students deserved access to for

25 early voting doesn't necessarily mean it's going to

1  correspond with what is happening statewide, especially

2  because they've been such robust participants, but also

3  given the specific history of PVAMU and Waller County

4  with regards to voting rights.

5      Q.   (BY MR. HEATH)  On page 34, you note that

6  Waller County was again assigned for observation by

7  federal election monitors.  Again, did they observe any

8  problems?

9      A.   I'm not aware that they observed any problems.

10     Q.   Okay.  Much of your report focuses on the past

11  failure to have early voting on the campus rather than

12  at a site adjacent to the campus or across the street or

13  perhaps a block away from the campus; is that correct?

14     A.   I'd say the report also focuses on the efforts

15  by Waller County officials to reduce the number of early

16  voting sites during the primary election seasons, and in

17  terms of the early voting, even in 2018 -- and how in

18  2018 the -- the county's initial voting plan -- early

19  voting provided no early voting days for PVAMU during

20  the first week of early voting, and this plan was only

21  amended after students sought litigation.  So I think

22  it's -- it's -- it's a few -- it's a few different

23  areas.  That's one of the areas.

24     Q.   Okay.  Is it important to have convenient early

25  voting opportunities for nonstudent residents of Prairie

1  View as well as for students?

2      A.   Yes, it is important; although PVAMU students

3  comprise, you know, the -- a major portion of...

4      Q.   Do you think it's important for the county to

5  accommodate the needs of what I'm going to refer to as

6  the townspeople, the nonstudent folks --

7      A.   Yeah.  Uh-huh.

8      Q.   -- as well as the students?

9      A.   Yes.  It's important for them to recognize the

10  rights of both, but since PVAMU is -- is where really a

11  large portion of -- of Prairie View voters and voters

12  who are active voters and energized voters are, it

13  becomes a natural central sort of site for polling and

14  for early voting and just voting in general.

15      Q.   Is it possible that going onto the campus may

16  be difficult for townspeople?

17      A.   Well, I'd say anything is possible.  So, yes, I

18  would say for some, it could be difficult.  For others,

19  it could be just a central location and really a source

20  of major pride.

21      Q.   Now, you work at the University of Texas?

22      A.   Yes.

23      Q.   Maybe not so much for the LBJ School where

24  they've got the LBJ and Townsend Center parking lots --

25      A.   Yeah.  Yeah.

1    Q.    -- right there, but for the campus generally --

2    A.    Yeah.

3    Q.    -- is it fair to say that it's pretty hard for

4  folks like me to come onto the campus and go to a

5  location on the campus?

6    A.    I don't know about that.  Now that I've been

7  there for -- for five years, I'd say that there's campus

8  parking for visitors.  They're in parking garage --

9  parking garages, they actually are walkable to campus,

10  you know.

11    Q.    Do you know how convenient it is for people in

12  Prairie View?

13    A.    I don't know how convenient it is.  I drove

14  around the campus, but I can't say I have a knowledge of

15  exactly where all the parking garages and spaces to park

16  if you're an off campus resident are.

17    Q.    Is the student center a particularly good

18  location for students?

19    A.    I passed the student center.  It seemed great,

20  and it seemed central.  It seems to me like it's -- I

21  think all student centers -- I mean, you know, you

22  talked about UT Austin.  I think where the students

23  congregate, besides game day at the Darrell Royal

24  Stadium, is the student center.  I mean, I think we call

25  it the SAC.  I think we call it the student activities

1    center.  And so in a lot of ways, that's probably -- at

2    most universities, the most well-known building on

3    campus is the student activities center.

4         Q.   And, in fact -- and I'm thinking this is

5    probably this case at Prairie View much more so than,

6    say, at UT --

7         A.   Yeah.

8         Q.   -- that it's a place where students will

9    congregate most every day and that those that have meal

10   plans, for example, eat there.

11        A.   Yeah.  Yes.

12        Q.   So they will visit it routinely?

13        A.   Absolutely.  Yes.

14        Q.   Okay.  Does having early voting and election

15   day voting for that matter at the student center

16   essentially bring the polling place to the students

17   rather than using a location the students would have to

18   travel to because it's not a place where they normally

19   go?

20             MR. CUSICK:  Just objection.  Outside the

21   scope.

22             But you can answer.

23             THE WITNESS:  Can you repeat that

24   question?

25        Q.   (BY MR. HEATH)  Okay.  Is having early voting

Page 68

Jayla Allen, et al. vs. Waller County, Texas, et al.
Peniel Joseph Ph.D. - 12/16/2019

1   and even election day voting at the student center

2   essentially bringing the polling place to the students

3   because they're there every day rather than using a

4   location where the students are going to have to travel

5   to the location because it's a place they don't normally

6   go -- the secondary location is a place they don't

7   normally go?

8              MR. CUSICK:  Same objection.  Outside the

9   scope.

10             THE WITNESS:  Well, I'd say that the

11  polling -- having the polling site on campus has become

12  an increasingly sort of normalized and routinized part

13  of elections because campuses are now recognized as just

14  cities in and of themselves that are a lot of times

15  central corridors and hubs of -- of residential

16  neighborhoods and communities and towns.  So that...

17     Q.   (BY MR. HEATH)  So let me approach this from a

18  little different way and looking not so much at the

19  student center voting but the early -- the other early

20  voting sites around the county.  So that -- places like

21  the county courthouse, a VFW hall, JP courts.  I think

22  there was one library.  Are those places that people

23  tend to show up at and go to every day like they do to

24  the student center?

25     A.   Yes.

1                    MR. CUSICK:  Objection:  Outside the scope

2    but --

3                    THE WITNESS:  Yes.  They are places that

4    people show up to.

5        Q.   (BY MR. HEATH)  So you think that while people

6    in Waller County may go to the county courthouse to

7    conduct business every so often or whatever, that

8    they're likely to be there every day?

9        A.    In the county courthouse?

10       Q.    Yes.

11       A.    In contrast to?

12       Q.    The student center.

13       A.    The student center.  I'd say the student center

14   would be more highly trafficked than -- than just --

15   really just about anyplace.

16       Q.    And JP court, you're probably not going to go

17   there unless you have a traffic ticket, are you?

18                    MR. CUSICK:  Objection:  Outside the

19   scope.

20                    But go ahead.

21                    THE WITNESS:  Yes.  I would say that's

22   correct.

23       Q.   (BY MR. HEATH)  All right.  And unless you're a

24   member of the VFW and then only on certain days, you're

25   probably not going to be going there every day, are you?

1          MR. CUSICK:  Objection:  Outside the

2  scope.

3          But you --

4          THE WITNESS:  Yeah, I would probably say

5  that that's true.

6     Q.   (BY MR. HEATH)  Okay.  If rather than being

7  located on campus, the early voting site were located

8  adjacent to the campus, would the inconvenience to

9  students be any greater than the inconvenience faced by

10 other people in the county who might have to travel to

11 the courthouse or JP court or the VFW hall or someplace

12 like that to vote?

13         MR. CUSICK:  Objection:  Outside the

14 scope.

15         THE WITNESS:  Well, I think it's -- it

16 is -- it is an inconvenience, and I think that the very

17 fact that the polling place has already been opened in

18 the student activities center and had great success

19 there shows that it's not just even an inconvenience,

20 it's sort of targeting those students because success

21 breeds success.  So you've got the early polling site at

22 the student activities center, so there's really no --

23 there's no just cause, except for trying to suppress

24 turnout and enthusiasm, for putting it in a much smaller

25 place that's adjacent to campus when you've had such

1 success since 2013 with -- with placing it in the -- in

2 the student activities center.

3 　　　　Q.　　(BY MR. HEATH)　And to go back to my original

4 question.　Is the in- -- if people have to go to the

5 county courthouse to vote --

6 　　　　A.　　Uh-huh.

7 　　　　Q.　　-- or to the JP court where they do not

8 normally go every day --

9 　　　　A.　　Yes.

10 　　　　Q.　　-- is there some inconvenience to them going to

11 the place where the polling place is rather than the

12 polling place essentially coming to where they are?

13 　　　　　　　　　　MR. CUSICK:　Objection:　Outside the

14 scope.

15 　　　　　　　　　　THE WITNESS:　I'd say yes, but when we

16 think about students at Prairie View, because of the

17 specific history of PVAMU with Waller County officials,

18 it is a greater inconvenience because they're continuing

19 to be targeted and they're continuing to be the -- the

20 victims of voter suppression, you know, by -- by doing

21 several things.　I mean, students at PVAMU weren't

22 allowed to vote in the 1976 presidential election.　They

23 weren't allowed to vote in the 1972 presidential

24 election or state elections.　When you think about what

25 they've experienced, they've experienced voter

1  marginalization and disenfranchisement even after the

2  heroic period of the civil rights movement.  So the idea

3  of disallowing them from having a central location on

4  campus where it has worked for them since 2013 and to

5  constantly put that in a state of precarity by at times

6  not allowing -- or disallowing both early voting and

7  disallowing polling on campus or threatening to end

8  that, it taps into that very specific particular history

9  of racial discrimination and voting rights

10  discrimination in Waller County that all these students

11  continue to face because the county has refused to

12  behave and act in good faith consistently by trying to

13  not only end this history of voting suppression but by

14  trying to really do all that it can in its power to

15  allow and invite and encourage voting access and

16  citizenship by PVAMU students.

17      Q.   (BY MR. HEATH)  So to summarize what you're

18  saying, is it that it's important to have this

19  particularly convenient opportunity for Prairie View

20  students because of what happened in the past?

21            MR. CUSICK:  Objection:  Outside the

22  scope.

23            THE WITNESS:  I think it's --

24      Q.   (BY MR. HEATH)  Is that what you're saying?

25      A.   No.  I think it's important because of the

1  continuing efforts to marginalize, to suppress, to

2  dilute their votes, but I think that it's important for

3  all of us to know that the continuing efforts -- there's

4  a reason why these efforts continue.  Because on the

5  face of it, you say, "Well, why is this happening in

6  2019 in" -- "in Waller County in a way that, say, it's

7  not happening in other parts of Texas?"  The reason it's

8  happening is because Waller County has a very specific

9  history of voting rights suppression and discrimination

10 against PVAMU students who are trying to exercise their

11 right to vote.  So it's not saying that this should

12 happen only because of the past.  It's saying it's

13 contemporaneous, but it's all of us.

14               Like, you're here and I'm here today.  We

15 have an origin story.  You were born once or you

16 wouldn't be here.  So today is connected to whenever you

17 were born.  My mother was born in 1939.  She's going to

18 be 81 -- God bless her -- on May 3rd of next year.  My

19 mom tells me all the time about what it was like to be

20 five, six, seven years old in 1945, 1946 in a way that

21 I'll never have an understanding because I was born in

22 1972, but part of what shapes our contemporary reality

23 is that origin story, which is why I think I chose the

24 best discipline in the world, which is history.  You

25 know, and I think being an American is the best thing in

1  the world too, being an American historian, and

2  certainly African-American history is part of American

3  history.

4            So Waller County, that history, is

5  connected -- and what's interesting for all of us --

6  those students, they might be getting a cheeseburger in

7  Prairie View.  They might not understand the history of

8  eating that cheeseburger, and maybe it's in an

9  interracially, you know, restaurant where blacks and

10 whites -- where in another historical context, they

11 couldn't eat the cheeseburger in Prairie -- Prairie

12 View.  They couldn't, not with, you know, Steven or John

13 or -- you know, or you in the same room with them.

14 Right?  But that history matters.  Right?  That history

15 matters, and sometimes that history shapes the present

16 for good and real positive benefits and sometimes it's

17 shaping the president -- present in ways that echo the

18 past in ways that we -- we -- like I said before, we're

19 better than that.  I think we're all better than that.

20 So the -- the positive of the students protesting at

21 Prairie View is that we are better than that.  That's

22 why they're protesting.  They want and they believe in

23 democracy and they believe in American citizenship and

24 voting rights.

25       Q.   You talked about this as something that -- or

1  happens in Prairie View.  It's not happening across the

2  state.  Actually, the early voting opportunities for

3  students at Prairie View may be better than other

4  places -- other colleges in the state, might they not?

5      A.   Well, I think --

6              MR. CUSICK:  That's outside the scope.

7              THE WITNESS:  I think that if -- if they

8  are, Waller County should not congratulate itself

9  because of all these other efforts contemporaneously and

10 historically to disallow PVAMU students from exercising

11 their franchise.

12     Q.   (BY MR. HEATH)  And you mentioned about the

13 students eating the cheeseburger --

14     A.   Yes.

15     Q.   -- and not understanding.

16     A.   But they've been forced to understand a lot

17 too.

18     Q.   The things that happened in 1972, for example,

19 which is where you start your narrative, that was

20 probably before these students' parents were even

21 students, wasn't it?

22     A.   Well, don't make us too old because I've got

23 kids, and they're still in -- you know, so no.

24 That's -- I start in '71, but what's so interesting is

25 that, you know, the VRA is passed in '65.  So students

1  at PVAMU should have been voting since the passage of

2  the VRA.  The VRA is passed August 6, 1965, by Lyndon

3  Johnson and Congress.  Right?  So they should have been

4  allowed to vote starting in those -- those elections.

5  Right?  And so PVAMU students are denied voting rights

6  for really upwards of 15 years after the Voting Rights,

7  and it's not settled that they're residents and they can

8  vote there until 1979.  And then the story continues of

9  different efforts by Waller County officials to -- to

10  challenge and intimidate and curtail the exercise of --

11  of the franchise.  So it's really an incredible --

12  incredible story that continues well into the 21st

13  century, well after what we think of in terms of voting

14  rights as being something that's national -- that's

15  nationally a set of laws.  Well after that, we have

16  students who are really year after year, new

17  generation -- because we know every four or six years

18  there's a whole group of college students who graduate,

19  leave UT, leave Rice, leave PVAMU, but each

20  generation -- subsequent generation of post VRA of PVAMU

21  students, they become voting rights experts, and they --

22  they are -- they are litigants, and they have to do what

23  we think of as the work of an earlier generation of

24  Civil Rights activists, including what you were

25  discussing, their -- their grandparents.  We're thinking

1  of them -- they're having to do that, and that's what is
2  so bizarre about all of this because it's almost like
3  we've caught ourselves in a little time machine, a time
4  warp, you know.
5              I'm sure you grew up and you watched the
6  Twilight Zone episodes.  I love the -- and I'm talking
7  about the original, Rod Serling.  And when you look at
8  those episodes, sometimes he takes you back to the old
9  west, and it's the 19th century, and he's doing an
10  allegory between sort of Cold War America and the old
11  west, and they're really terrific -- terrific.  It's
12  brilliant.  And this is how this is.  This is almost
13  like you -- you find out about Prairie View, and you're
14  almost like -- well, I mean, you're almost ready to read
15  the paper and Jack Kennedy is still alive and Martin
16  Luther King Jr. is still alive and all these people from
17  the epic is still -- Eisenhower might be president, and
18  you've got these students, well, they want the right to
19  vote.  You know, it's very poignant.
20              But here's the problem.  It's 2019, and
21  we've got cell phones and, you know, computers and
22  students can't vote.  I mean, this is a real -- it's a
23  real time warp.  Right?  But not in a positive way.
24  Because I love history, and on some levels, I'd love to
25  go back to some of those times to just be there and

1  see -- you know, I'd love to see an Edsel car and see

2  different -- because, yeah, I'm a history geek or buff,

3  whatever you want to call it, but not in terms of

4  people's civil rights and their citizenship.

5      Q.    You specifically mentioned at one point in your

6  report and you mentioned it in your discussion a little

7  while ago about the fact that initially there are no

8  early voting days in the first week of early voting.

9      A.    Yeah.

10     Q.    Why is it important to have early voting on

11  campus in the first week rather than the second week?

12              MR. CUSICK:  Objection:  Outside the

13  scope.

14              THE WITNESS:  I think it's important

15  for -- for a couple of reasons.  I think, one, there was

16  early voting in other parts of the county, but then also

17  the first week was homecoming, and the county said they

18  didn't want to put it during homecoming because it would

19  be a distraction, but during homecoming is when so many

20  people are on campuses, including UT's homecoming, where

21  you're going to get even more access and excitement.

22  Those are the type of -- it's the exact wrong reasoning.

23  You -- you would want early voting when you're going to

24  have the most people on campus.  You're going to have

25  parents visiting students and their children who are

1  wanting their children to be active citizens and

2  reminding -- seeing a polling site right on campus would

3  invigorate the process and really invigorate the

4  Democratic process in Waller County.

5      Q.   (BY MR. HEATH)  Are you aware that there was

6  initially a plan to have early voting on the campus

7  during the first week but that the Democratic chairman

8  asked to change it to the second week once he discovered

9  that it was homecoming week?

10     A.   I am aware of that, and I'm aware that PVAMU

11 students were not consulted and PVAMU administrators

12 were not consulted.  So that is an official just really

13 making a decision by fiat in a way that's not

14 consultative or collaborative with both students and

15 officials who are right down the street, who that

16 official could have absolutely contacted and said, "Hey,

17 is this a good idea?"  And what they would have found is

18 that, no, it was not a good idea.  And PVAMU students --

19 the interesting part about this history is that they are

20 thirsty for citizenship and for higher education for

21 their rights.  They are -- they are fully invested in

22 America and in voting rights, and so these are the exact

23 kind of students that we want.  We want -- again, we

24 want people to vote.  That's the whole thing.  We want

25 citizens to vote.  The whole process of our democracy is

1    predicated on active citizenship.  So that's -- what's
2    so sad here is that there are these thousands of
3    students who want to vote.  Some of them even run for
4    local office.  So it even shows us the numbers who want
5    to be civically engaged and active, and, yet, they're
6    being systematically denied that right or having that
7    right curtailed for -- for -- for long-standing
8    historical reasons but also now contemporaneous reasons
9    as well.
10       Q.   A couple of things.  Do you know if generally
11   the African-American community is more likely to support
12   the Democratic candidate?
13               MR. CUSICK:  Objection:  Outside the
14   scope.
15               THE WITNESS:  Yeah.  It depends.  Over
16   time, that's change.  So we can -- as a historian, I'm
17   going to have to give you a long view.  So when you
18   think about --
19               MS. ADEN:  That's your fault.
20               THE WITNESS:  -- when you think about --
21   but let me finish answering the question.  So when we
22   think about this, historically African-Americans have
23   been Republicans historically.
24       Q.   (BY MR. HEATH)  Uh-huh.
25       A.   For most of the history of the Republican

1  party, African-Americans -- and we're thinking about

2  people like Frederick Douglass.  We're thinking about W.

3  E. B. Du Bois.  We're thinking about so many -- Ida B.

4  Wells.  They were Republicans.  Republicans -- when we

5  think about Abraham Lincoln and the party that grows out

6  of really the combination of the wigs and the

7  no-nothings and others of -- of the mid 19th century

8  becomes a party of antislavery.  And so when we think

9  about African-Americans and the Republican party,

10  that -- that connection is really a deep, enduring, and

11  long connection.

12              In fact, the African-Americans'

13  relationships with the Democratic party historically has

14  been very, very fraught.  Until very, very recently, the

15  Democratic party was perceived as the party of racial

16  slavery.  It was the party of Jim Eastland and racial

17  segregation.  It was the party that was considered very

18  inhospitable to -- to African-Americans.  So in a way

19  that relationship only begins to change at the national

20  level in the 1960s with the election of John F. Kennedy,

21  and John F. Kennedy in 1960 -- he was instrumental in

22  helping Martin Luther King Jr. get released from prison

23  after being incarcerated in -- in October of 1960 in

24  Atlanta, Georgia, and then the Kennedy -- the Kennedy

25  campaign releases a pamphlet that says that Kennedy is a

1 candidate with a heart who helped Dr. King get released

2 in contrast to "No comment Nixon."  Richard Nixon was

3 Vice President of the United States at the time and

4 running and loses a very, very close election to John F.

5 Kennedy.  Certainly Lyndon Johnson and Lyndon Johnson's

6 very vociferous, eloquent support for civil rights,

7 voting rights with the Civil Rights Act of '64,

8 July 2nd, the Voting Rights Act of '65, August 6th.  The

9 great society war on poverty really helped to transform

10 the relationship between African-Americans and the

11 Democratic party.

12           Now, at the local level, many black remain

13 Republicans.  You know, Martin Luther King Jr.'s father,

14 Martin Luther King Sr., always remained a registered

15 Republican, refused to do anything different, even

16 though he supports Jack Kennedy in '60 because he got

17 his son out of prison.

18           So right now, yeah, the -- the -- we're in

19 2019.  You'd say that a majority of African-Americans

20 are -- are registered more as Democrats than

21 Republicans, and in -- when you think about presidential

22 elections, they vote that way, but essentially more so

23 black women than black men.  I think the current

24 president got maybe 10 or 12 percent support of black

25 men in the -- in the 2016 election.  So that --

1  historically black voters have been identified strongly

2  with the Republican party.  Of late, they've been more

3  identified with the Democratic party.  Yes.

4      Q.   And, in fact, the -- some of the people you

5  cited as making special efforts to be sure that students

6  had maximum opportunity to vote at Prairie View were

7  Democratic officials or candidates such as Mr. Siegel

8  and Congresswoman Jackson Lee; is that correct?

9      A.   Well, yes, but I also cite -- I say that and

10 give him his due that now Governor Greg Abbott was

11 actually on the side of students in 2004 and very, very

12 strong in terms of defending their -- their voting

13 rights.  I mean, you know, political situations change,

14 but people deserve credit when they're doing the right

15 thing.  So there have been Republican officials in the

16 state who are supportive of voting rights for all

17 people.  Absolutely.

18     Q.   Do you think that the Democratic chairman when

19 he suggested that having early voting other than

20 homecoming week would be more convenient for students

21 would have had the idea that -- or it's in his interests

22 to be sure that Prairie View students have the

23 opportunity to vote because they are much more likely to

24 be Democratic voters than Republican voters?

25              MR. CUSICK:  Objection:  Outside the

1  scope.  And just for clarification, you said the

2  Democratic chair?

3              MR. HEATH:  Yeah.  The Democratic chair.

4              MR. CUSICK:  And you said, "He"?

5              MR. HEATH:  Or whoever the --

6              MS. DORSEY:  It's a she.

7              MR. HEATH:  Oh, I'm sorry.

8              MR. CUSICK:  Just for the record's

9  purpose, I just wanted to make sure.  But objection:

10 Outside the scope of the evidence.

11             THE WITNESS:  You know, I can't infer why

12 she -- she made that decision or not.  So I -- I would

13 say I can't infer why.

14    Q.   (BY MR. HEATH)  Do you think it would be in her

15 interests or her party's interest to make sure that

16 the -- that the Prairie View students had maximum

17 opportunity to vote?

18             MR. CUSICK:  Objection:  Outside the

19 scope.

20             THE WITNESS:  Not necessarily.  It

21 depends, because a party's interests could be disrupted

22 by a voting block even within that party -- right? --

23 specific interests.  So not necessarily.

24    Q.   (BY MR. HEATH)  And we're talking here -- and

25 my question is in the context of the November 2018

1  election, not the primary.

2      A.   Not the primary but the election.

3      Q.   But the November election.

4              MR. CUSICK:  Objection:  Outside the

5  scope.

6              THE WITNESS:  Yeah, I understand your

7  question, but I'd still answer it the same.

8      Q.   (BY MR. HEATH)  Okay.  I noticed that about

9  roughly 50 of your citations were to newspapers,

10 magazine articles --

11     A.   Yep.

12     Q.   -- website articles, that sort of thing.  There

13 are also some citations to politicians who are making

14 statements in the middle of an election season or

15 statements from persons who are advancing particular

16 positions or causes.  While I think we can all agree

17 there's value in these, do we run the risk of sometimes

18 getting an exaggerated view or a nondispassionate

19 analysis by looking to sources where people are

20 advancing a cause or maybe a newspaper article that may

21 not be as heavily sourced as, say, an academic journal?

22     A.   No.  No, I don't think so.  I think what --

23 what the report tries to do is create a mosaic and use

24 different citations.  I think there's maybe a hundred

25 or -- you know, close to a hundred citations in there.

Page 86

Jayla Allen, et al. vs. Waller County, Texas, et al.
Peniel Joseph Ph.D. - 12/16/2019

1  So there's 88.  So you're using, you know, definitely

2  scholarly articles, referee journals.  You're reading

3  books that have been published by academic publishers,

4  law review articles, but then also different newspaper

5  and other accounts as well and trying to get a holistic

6  picture.  So I would say the process I was after was

7  trying to get a holistic picture of this -- of this

8  story.

9      Q.   Is it true that sometimes these articles, for

10 example -- and sometimes they rely on each other -- so

11 that we have things such as the distance to --

12     A.   Yeah.

13     Q.   -- the community center or early --

14     A.   Yeah.

15     Q.   -- voting site -- which I think we can agree is

16 not accurately reflected in the articles, and, yet, it's

17 repeated again and again and again as one article relies

18 on another?

19     A.   Well, I don't know about the distance, and

20 certainly there's going to be -- when you think about

21 sources, you know, any source, whether it's a newspaper

22 article, even a Supreme Court opinion, can have an error

23 in the source.  So if there's an error in the source,

24 there can be an error in whatever is coming out of that

25 reading of that source.  So that -- anything is liable

1  to have some -- some degree of error in it, whether it's

2  a congressional record.  You know, so I think that's a

3  truism about -- about all of our sources.

4      Q.   I think --

5           MR. HEATH:  I was going to ask the county

6  attorney if she had anything, but as she just stepped

7  out -- so I'm about to pass.  Do you want to take just a

8  minute for -- do y'all think -- and when she gets back,

9  I'll ask to make sure she doesn't have anything.

10          MR. CUSICK:  Okay.

11          (RECESS FROM 1:13 p.m. - 1:23 p.m.)

12          MR. HEATH:  We will pass the witness.

13                    EXAMINATION

14  QUESTIONS BY MR. CUSICK:

15      Q.   So, Dr. Joseph, you offered a nonexpert opinion

16  that as your opinion as a layperson on a resolution to

17  address the rural addressing issue in Prairie View and

18  how it might affect Prairie View A&M students.  Do you

19  think Waller County should take the responsibility to do

20  that, to study it, to come up with a resolution moving

21  forward past 2018?

22      A.   Yes.  Absolutely.  The county should be the

23  architect of that resolution.

24      Q.   And is it your understand that the county could

25  work with the United States Postal Service to come up

1  with some type of resolution?

2      A.   Yes.  They could work with the post office to

3  provide just a single address that allows the students

4  to vote in an unfettered fashion in perpetuity.

5      Q.   And just to be clear, for the purposes of your

6  report, you were not asked to opine on this; correct?

7      A.   Correct.

8      Q.   And you weren't retained as an expert the way

9  as a consultant might be to study the addressing issues

10 or to develop some type of resolution to this?

11     A.   Yes.  That's correct.

12     Q.   You testified about the frequency at which

13 Waller County residents travel to the county courthouse

14 or Justice of the Peace, the VAW.  When you responded to

15 those empirical questions, were you offering an expert

16 opinion or a nonexpert opinion?

17     A.   A nonexpert opinion.

18     Q.   So in other words, you didn't study this?

19     A.   No, I did not study this.

20     Q.   Your testimony also touched on inconveniences

21 that might occasion visits to other locations by Waller

22 County residents.  In general, based on your visit to

23 Waller County, would you say that people in Waller

24 County generally drive to various locations around the

25 county during the course of their daily life?

1    A.    Yes.

2    Q.    That is to say even that -- that even if they

3  don't drive specifically to the courthouse or another

4  location, they do drive in various places throughout the

5  county as a matter of course?

6    A.    Yes.

7    Q.    And how does that compare for students in terms

8  of driving around the county?

9    A.    Well, students have virtually no public

10  transportation access, and they don't generally own

11  cars.  So students are much less mobile than other

12  residents.

13    Q.    Would you say that Prairie View A&M students

14  travel around the county to off -- to locations off

15  campus on a daily basis in the same way that county

16  residents do?

17    A.    No.

18    Q.    And is it your understanding that Prairie View

19  A&M students face transportation difficulties that other

20  residents in the county might not face?

21    A.    Yes.

22    Q.    And why is that?

23    A.    The Burton Report talks about mobility.  It

24  talks about poverty and income, transportation in

25  Prairie View and how really even nonPVAMU students have

1  less access to mobility than -- than PVAMU -- excuse me,

2  nonPVAMU students have more access to mobility than

3  PVAMU students, and African-American nonPVAMU students

4  are more likely to be ride -- ride sharers than own a

5  single vehicle.  The highest ownership is among white

6  residents in Waller County of -- of a vehicle.  So, yes,

7  PVAMU students have a mobility issue.

8      Q.    And just for the record, you're referring to

9  Bill Cooper's expert report?

10     A.    Yes.

11     Q.    You testified generally about the convenience

12 that students faced to early voting.  And, again, this

13 is based not on your expert opinion but on your

14 experience with being at UT Austin; correct?

15     A.    Yes.

16     Q.    And is it your understanding that Prairie View

17 A&M students for a variety of reasons might rely on

18 early voting in greater reliance than other college

19 students throughout -- throughout the state?

20     A.    Yes.

21     Q.    And what are some of the reasons might that be?

22     A.    Well, I think that in Prairie View because of

23 the lack of mobility, there really isn't the same

24 ability to use a car or to have public transportation

25 that would give you access to early voting sites.  So I

1 think in a lot of ways PVAMU students are stuck right --

2 right on the campus.

3     Q.    And you testified about this shared experience

4 at Prairie View A&M students for -- that they might

5 experience where their parents might have attended the

6 college.  When you were at Prairie View A&M this past

7 year, did you get the impression that students were

8 familiar with the history of voting discrimination in

9 Waller County?

10    A.    Yes.  I got the -- I got the sense that the

11 school is very proud of its history and as a

12 historically black college university that's been in

13 Texas for over 150 years and has also shared that

14 history with its students, and that students both from

15 their parents -- but these struggles for voting rights

16 have a shared history and understanding of both the

17 history that they have faced but also their ability to

18 try to bend the ark of history towards justice and

19 fairness.

20    Q.    You testified earlier that for black American

21 voters, that they should have been able to vote in 1965,

22 and then you referenced and testified about some of the

23 experiences in Waller County.  But shouldn't that have

24 been the case true for all black voters throughout the

25 United States in 1965?

1    A.    Yes.    After the passage of the Voting Rights

2   Act, there should be no barriers to voting as long as

3   you're an American citizen.

4    Q.    And before -- again, you testified about the

5   historical allegiance of black voters and black

6   communities first to Republicans or the Republican party

7   and then to Democrats.    Do you know whether Prairie View

8   A&M students universally think of themselves as

9   Democrats?

10    A.    No.

11    Q.    Would you be surprised that Prairie View A&M

12   students testified at the Commissioners Court meetings

13   that they were not Democrats or Republicans?

14    A.    I wouldn't be surprised because college

15   students a lot of times don't have a real party

16   allegiance or partisan allegiance.    A lot of them are

17   interested in just very specific issues.

18    Q.    And you testified about DOJ objection letters

19   under Section 5 preclearance, and you cited to the ones

20   that occurred.    I think around 201 in Texas.    Is it your

21   understanding that these objections occurred over

22   multiple presidencies?

23    A.    Yes.

24    Q.    Both Republican presidents and Democratic

25   presidents?

1        A.    Yes.

2        Q.    And then towards the end, you testified about

3   news articles, website articles that you cite.  Are

4   newspaper articles generally used by historians?

5        A.    Yes.  They're their primary sources.  Yes.

6        Q.    And then you also testified about court

7   decisions as well as -- for a more holistic picture; is

8   that correct?

9        A.    Yes.

10       Q.    Do you believe that the sources you referenced

11  in your report here and discussed today are commonly

12  used by historians?

13       A.    Yes.

14                   MR. CUSICK:  Pass it back.

15                   MR. HEATH:  No questions.

16                   (Deposition concluded at 1:30 p.m.)

17

18

19

20

21

22

23

24

25

Page 94

Jayla Allen, et al. vs. Waller County, Texas, et al.
Peniel Joseph Ph.D. - 12/16/2019

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION

 3   JAYLA ALLEN, DAMON          )
     JOHNSON, TREASURE SMITH,    )
 4   and THE PANTHER PARTY,      )
          Plaintiffs,           )
 5                               )
     VS.                         )  CIVIL ACTION NO.:
 6                               )  4:18-CV-3985
     WALLER COUNTY TEXAS; THE    )
 7   WALLER COUNTY               )
     COMMISSIONERS COURT;        )
 8   JUDGE CARBETT "TREY" J.     )
     DUHON III, in his           )
 9   official capacity as the    )
     Waller County Judge; and    )
10   CHRISTY A. EASON, in her    )
     official capacity as the    )
11   Waller County Elections     )
     Administrator,              )
12        Defendants.           )
```

13        ********************************************
                    REPORTER'S CERTIFICATION
14        ORAL DEPOSITION OF PENIEL JOSEPH, PH.D.
                         VOLUME 1
15                   DECEMBER 16, 2019
          ********************************************

16

17        I, JAMIE COOLEY, Certified Shorthand Reporter in and
     for the State of Texas, hereby certify to the following:

18        That the witness, PENIEL JOSEPH, PH.D., was duly
     sworn by the officer and that the transcript of the oral
19   deposition is a true record of the testimony given by
     the witness;

20

21        That pursuant to FRCP Rule 30(e)(f), the signature
     of the deponent was requested by the deponent or a party
     before the completion of the deposition;

22

23        That the deposition transcript was submitted on
     December 21, 2019, to the witness c/o MR. JOHN S. CUSICK
24   at the request of the deponent or a party before the
     completion of the deposition for examination, signature,
25   and return to Cooley Reporting by January 19, 2020;

1     That the amount of time used by each party at the
deposition is as follows:
2     MR. JOHN S. CUSICK - 00:07
      MR. C. ROBERT HEATH - 02:06;
3
      That pursuant to information given to the deposition
4 officer at the time said testimony was taken, the
following includes counsel for all parties of record:
5     FOR THE PLAINTIFFS:
          MR. JOHN S. CUSICK
6         MS. LEAH C. ADEN
          NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
7         40 Rector Street
          5th Floor
8         New York, New York 10006
          212-965-2200/212-226-7592 (fax)
9         jcusick@naacpldf.org
          laden@naacpldf.orgs
10
      FOR THE DEFENDANTS, WALLER COUNTY TEXAS; THE WALLER
11 COUNTY COMMISSIONERS COURT; JUDGE CARBETT "TREY" J.
DUHON III, in his official capacity as the Waller County
12 Judge; and CHRISTY A. EASON, in her official capacity as
the Waller County Elections Administrator:
13        MR. C. ROBERT HEATH
          BICKERSTAFF HEATH DELGADO ACOSTA, LLP
14        3711 South MoPac Expressway
          Building One, Suite 300
15        Austin, Texas 78746
          512-472-5021/512-320-5638 (fax)
16        bheath@bickerstaff.com

17     That $_____ is the deposition officer's charges
to MR. C. ROBERT HEATH, counsel for the Defendants, for
18 preparing the original deposition transcript and any
copies of exhibits;
19
      That the deposition was delivered in accordance with
20 Rule 30(e)(f) FRCP, and that a copy of this certificate
was served on all parties shown herein.
21
      I further certify that I am neither counsel for,
22 related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
23 taken, and further that I am not financially or
otherwise interested in the outcome of the action.
24

25

Jayla Allen, et al. vs. Waller County, Texas, et al.
Peniel Joseph Ph.D. - 12/16/2019

1    Certified to by me on the 21st of December, 2019.

2

3

4    _____
     JAMIE COOLEY, Texas CSR 7274
5    CSR Expiration:  1/31/21
     COOLEY REPORTING, Firm No. 702
6    8407 Fathom Circle #B
     Austin, Texas 78750
7    512-743-5867/512-410-3012 (fax)
     jcooleycsr@gmail.com
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jayla Allen, et al. vs. Waller County, Texas, et al.
Peniel Joseph Ph.D. - 12/16/2019

```
 1                    CHANGES AND CORRECTIONS
         WITNESS NAME:  PENIEL JOSEPH, PH.D. - VOLUME 1
 2                  DATE:  DECEMBER 16, 2019

 3  Reason Codes:  (1) to clarify the record; (2) to conform
    to the facts; (3) to correct a transcription error; (4)
 4  other (please explain).

 5  PAGE/LINE   CHANGE                        REASON CODE

 6  _____

 7  _____

 8  _____

 9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____
```

1                          SIGNATURE

2

3      I, PENIEL JOSEPH, PH.D., have read the foregoing

4   deposition and hereby affix my signature, that the same

5   is true and correct, except as noted on the previous

6   page.

7                        _____

8                        PENIEL JOSEPH, PH.D.

9   THE STATE OF _____)

10  COUNTY OF _____)

11     Before me, _____, on this day

12  personally appeared PENIEL JOSEPH, PH.D., known to me

13  (or proved to me under oath or through

14  _____) (description of identity card or

15  other document) to be the person whose name is

16  subscribed to the foregoing instrument and acknowledged

17  to me that they executed the same for the purposes and

18  consideration therein expressed.

19     Given under my hand and seal of office this _____

20  day of _____, 20___.

21

22                        _____

23                        NOTARY PUBLIC IN AND FOR

24                        THE STATE OF _____

25                        COMMISSION EXPIRES: _____