Deposition of Robert Stein, Ph.D.
12/10/2019

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 470 of 677

Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**PLAINTIFF'S EXHIBIT**

**32**

JAYLA ALLEN, DAMON JOHNSON, &
TREASURE SMITH, and THE &
PANTHER PARTY, &
          Plaintiffs, &
 &
V. &          Civil Action No.
 &          4:18-CV-3985
WALLER COUNTY TEXAS; THE &
WALLER COUNTY COMMISSIONERS &
COURT; JUDGE CARBETT "TREY" &
J. DUHON III, in his &
official capacity as the &
Waller County Judge; and &
CHRISTY A. EASON, in her &
official capacity as the &
Waller County Elections &
Administrator, &
          Defendants. &

*************************************

ORAL DEPOSITION OF
ROBERT STEIN, Ph.D.
DECEMBER 10, 2019

*************************************

     ORAL DEPOSITION OF ROBERT STEIN, Ph.D., produced as

a witness at the instance of the DEFENDANTS, and duly

sworn, was taken in the above-styled and numbered cause

on DECEMBER 10, 2019, from 9:08 a.m. to 12:33 p.m.,

before Aubrea Hobbs, CSR, RPR, in and for the State of

Texas, reported by computerized machine shorthand, at

Rice University, 6100 Main Street, Room 202, Herzstein

Hall, Houston, Texas, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record

or attached hereto.

Deposition of Rebecca Spring-Palm
12/10/2019
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 471 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

```
1                  A P P E A R A N C E S

2

3   FOR THE PLAINTIFFS:
          Ms. Leah Aden, Esq.
4              -and-
          Mr. John Cusick, Esq.
5              -and-
          Mr. Steven Lance, Esq.
6   NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.:
          40 Rector Street, 5th Floor
7   New York, New York 10006-1738
          E-mail:  laden@naacpldf.org
8         E-mail:  jcusick@naacpldf.org
          E-mail:  slance@naacpldf.org
9

10

11  FOR THE DEFENDANTS:
          Mr. Gunnar P. Seaquist, Esq.
12        BICKERSTAFF HEATH DELGADO ACOSTA, LLP
          3711 S. MoPac Expressway, Building One, Suite 300
13        Austin, Texas 78746
          E-mail:  gseaquist@bickerstaff.com

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Robert Stein, Ph.D.
12/10/2019

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 472 of 677

Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

```
 1                           INDEX

 2                                                    PAGE

 3   Appearances ....................................    2

 4   Stipulations ...................................    4

 5
     Witness:  ROBERT STEIN, Ph.D.
 6
          Examination by Mr. Seaquist ...............    4
 7        Examination by Ms. Aden ..................  123
          Examination by Mr. Seaquist ..............  133
 8        Examination by Ms. Aden ..................  135

 9
     Signature and Changes .........................  137
10
     Reporter's Certificate ........................  139
11

12                         EXHIBITS

13   NUMBER          DESCRIPTION                       PAGE

14   Exhibit 1       Expert Report of Robert Stein, Ph.D.   11

15   Exhibit 2       Expert Report of James G. Gimpel,     12
                     Ph.D.
16
     Exhibit 3       Expert Rebuttal Report of Robert      12
17                   Stein, Ph.D.

18   Exhibit 4       Map                                   60

19   Exhibit 5       Complaint                             82

20   Exhibit 6       Excerpts from Deposition of Robert    85
                     Stein, April 2, 2014
21

22

23

24

25
```

Deposition of Robert Stein, Ph.D.
12/10/2019
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 473 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 4

1    P R O C E E D I N G S
2        MR. SEAQUIST:  I guess on the front end,
3    a couple of statements for the record.  First, in the
4    depositions in this case we have been waiving the
5    reading requirement on 30(b)(2).
6        MS. ADEN:  I think so.
7        MR. SEAQUIST:  Precise rule to be checked
8    at a later date and confirmed.  And then also, we have
9    agreed among counsel that objection to form is
10   sufficient to preserve objections for the record as to
11   the form of all questions in the deposition.
12       Counsel, have I stated that correctly?
13       MS. ADEN:  That's correct.
14       MR. SEAQUIST:  Okay.
15       ROBERT STEIN, Ph.D.,
16   Having been first duly sworn, testifies as follows:
17       DIRECT EXAMINATION
18   BY MR. SEAQUIST:
19   Q.   Good morning, Dr. Stein.
20   A.   Morning.
21   Q.   My name is Gunnar Seaquist and I represent the
22   defendants in this case.  You have not -- you and I have
23   not met before this morning, correct?
24   A.   I don't think -- no, no.
25   Q.   Okay.  We had a little bit of a chance to meet

Page 5

1    and talk before the deposition this morning.  You do
2    understand that I represent the defendants, Waller
3    County, the Waller County Commissioners Court, Trey
4    Duhon, in his official capacity as the county judge, and
5    Christy Eason, in her official capacity as the Waller
6    County Elections Administrator, all of whom are
7    defendants in this lawsuit?
8    A.   Yes.
9    Q.   Do you understand that?  And you have been
10   designated as a testifying expert by the plaintiffs in
11   this case, who I think at present are Jayla Allen,
12   Treasure Smith, Damon Johnson and The Panther Party; is
13   that correct?
14   A.   Yes.
15   Q.   Who specifically engaged you as an expert in
16   this case?
17   A.   Ms. Aden.
18       MS. ADEN:  Aden.
19       THE WITNESS:  Aden, I'm sorry.
20   Q.   (BY MR. SEAQUIST)  And that's Leah Aden with
21   the NAACP?
22   A.   Leah, NAACP legal defense firm.
23   Q.   You've given a deposition before?
24   A.   Yes.
25   Q.   So I won't go through all of the ground rules

Page 6

1    with you.  Obviously you've sworn to tell the truth, the
2    same as if you were testifying under oath in court or in
3    front of a jury?
4    A.   Yes.
5    Q.   You understand?  Also, as we go through today,
6    it may be kind of conversational, but we have to be
7    careful to not talk over each other so the court
8    reporter can take down what we're saying.  So I'm going
9    to do my very best to let you finish whatever answer
10   you're giving before I ask my next question.  If you
11   would, please just make sure you let me ask my full
12   question before you start to answer, okay?
13   A.   Yes.
14   Q.   Okay.  If you need a break at any point, just
15   let me know.  We can do that.
16       You're being paid for your time in this case?
17   A.   Yes.
18   Q.   250 an hour?
19   A.   Yes.
20   Q.   And who or what entity is specifically paying
21   those fees?
22   A.   NAACP Legal Defense.
23   Q.   Okay.  Prior to sitting down for the
24   deposition this morning, do you know roughly how many
25   hours you've billed in the case?

Page 7

1    A.   I don't know the number of hours.  I can do
2    the math, but maximum of $20,000 and I billed more than
3    that and was paid I think on $26,000 if total was
4    correct, yes, roughly.
5    Q.   To date?
6    A.   To date, yes.  I haven't billed anything since
7    the first billing.
8    Q.   Other than your time on the file, have you had
9    anyone else working on this case with you?
10   A.   Yes.  I've had several graduate students and
11   undergraduates assist in doing work, mostly with GIS
12   ArcInfo measuring distances and geographically
13   locating -- geographical information system and the
14   students assisted in identifying the residential
15   locations of each voter in the county.
16   Q.   And how many students would you say have
17   helped with this project?
18   A.   Two -- three, let me correct that.  Three.
19   Q.   And what are their names?
20   A.   Nile Dixon, D-i-x-o-n, Mason Reese, R-e-e-s-e,
21   and Elizabeth Vann, V-a-n-n.
22   Q.   Are they being compensated at all for their
23   time?
24   A.   Yes, yes.
25   Q.   And are you billing the NAACP for their time?

Deposition of Robert Stein, Ph.D.
12/10/2019
Case 4:18-cv-03985    Document 73-2    Filed on 01/24/20 in TXSD    Page 474 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 8

A. No, I was charging -- I was paying them from my charges.

Q. Okay. For Mr. Dixon, is he an undergrad or a graduate student?

A. He is actually not a student at Rice. He is a student at the Houston Community College and he is an undergraduate.

Q. Okay. What about Mr. Reese?

A. Reese is a sophomore. At the time he was a freshman at Rice.

Q. And Elizabeth, what was Elizabeth's last name?

A. Elizabeth Vann, V-a-n-n, and she is actually a colleague, she's not a student. She works at the Center for Civic Leadership and we have collaborated on research before of this sort.

Q. Is she a Ph.D.?

A. She is a Ph.D. in anthropology.

Q. And does she teach?

A. Yes. Yeah, she teaches.

Q. I assume she conducts research as well?

A. Yes.

Q. In forming any of the opinions you are offering in this case, did you rely on any of Dr. Vann's research?

A. No, I did not.

Page 9

Q. Have you reviewed any materials in preparation for your deposition testimony this morning?

A. Yes. I've read over my own report, my rebuttal report, report of Dr. Gimpel and many articles that I cited in my report and in Jim's -- Dr. Gimpel cited in his report, and material that was provided to me by the attorneys from the NAACP, which included the plaintiffs' pleading, the -- and then the deposition order and several papers that they brought to my attention that I had not seen before that they gave me to read.

Q. Okay. And were any of those papers cited in your opinions?

A. Yes.

MS. ADEN: And for the record, not to interrupt, Gimpel is G-i-m-p-e-l.

THE WITNESS: Gimpel. We call him Jim.

Q. (BY MR. SEAQUIST) When were you hired as an expert in this case, if you remember?

A. I'd have to check my dates. I want to say less than a year ago. Last spring I think I was contacted by Leah. I think I filled out, you know, a form late spring, early summer.

Q. Prior to being contacted by Ms. Aden, had you worked previously with the NAACP Legal Defense Fund?

Page 10

A. No, I have not.

Q. When Ms. Aden contacted you, let me ask that a different way.

What specifically were you asked to do in this case?

A. The question -- I read the pleadings and the attorneys explained to me that they wanted me to assess whether or not the plaintiffs had equal access to early voting in Waller County during the 2018 election.

Q. And was that the only question you were asked to opine on?

A. Yes.

Q. What material -- other than what you've just told me that you reviewed this morning, were there any other materials that you were provided by the plaintiffs in order to conduct your analysis?

A. I think they gave me some information about transportation availability on the campus of Prairie View A&M. Information about -- what do you call it? Student parking permits issued on the Prairie View A&M campus.

They did provide me information about early voting practices in Prairie View, in Waller County, days, hours, weeks of operation, machines, Ebooks, poll workers. They -- and that's it.

Page 11

Q. Okay. At some point in time did the plaintiffs also provide you with any list of voters?

A. Yes. Yes. I'm trying to remember. I don't think -- to be absolutely clear I think your office of Bickerstaff Heath firm gave me access to a Dropbox that I was able to download voter files from.

Q. Okay.

A. And voter history files.

Q. Other than the items that we have discussed and the papers that you reviewed, any other materials you used or reviewed in reaching the conclusions that we're here to talk about today?

A. No, not that I can recall.

Q. Okay. You did prepare an expert report in this case; is that right?

A. Yes.

Q. I'll hand you what I've marked as Exhibit 1 to the deposition.

(Exhibit No. 1 marked.)

Q. (BY MR. SEAQUIST) If you'll look at that for a moment, and just confirm that that is a true and correct copy of your expert report?

A. Yes, it -- yes, this is my report.

MR. SEAQUIST: Do you want one more?

MR. CUSICK: Sure, thank you.

Deposition of Rebecca Stein, Ph.D.
12/10/2019
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 475 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 12

Q.   (BY MR. SEAQUIST)  Now you had mentioned earlier that you had also reviewed a report from Dr. James Gimpel?

A.   Yes.

Q.   And you understand that Dr. Gimpel is an expert who's been engaged by the defendants in this case?

A.   Yes.

Q.   I'll hand you what I have marked as Exhibit 2.

(Exhibit No. 2 marked.)

Q.   (BY MR. SEAQUIST)  Which is the report by Dr. Gimpel, and I'll just ask you to confirm that that is the report that you reviewed and to which you ultimately drafted a rebuttal?

A.   Yes.

Q.   And then finally I will hand you -- well, first of all, you did prepare a rebuttal report to Dr. Gimpel's expert report?

A.   Yes.

Q.   I will hand you what I have marked as Exhibit 3.

(Exhibit No. 3 marked.)

Q.   (BY MR. SEAQUIST)  And ask that you confirm that that is a true and correct copy of your rebuttal report?

Page 13

A.   Yes.

MS. ADEN:  Gunnar, do you have extra copies of that or no?

MR. SEAQUIST:  They're coming.

MS. ADEN:  Okay.  Thank you.

Q.   (BY MR. SEAQUIST)  Now, Dr. Stein, do Exhibits 1 and 3 that is your initial report and your rebuttal report, contain all of the opinions that you're offering in this case?

A.   Yes.

Q.   And so to the extent that there's a conclusion or opinion that's not included in those two reports, it's fair for me to assume that you're not going to be testifying about that in our case, correct?

A.   Correct.

Q.   Okay.  As the appendix to Exhibit 1 which is your initial report, I believe you included a curriculum vitae?

A.   Yes.

Q.   Is that curriculum vitae current?

A.   No, it's not.

Q.   What would need to be updated on that form to be current?

A.   I told the attorneys with the NAACP that in the last three months, less than that, I've had three

Page 14

papers that have been accepted and are online and another one in a book and they are probably relevant, you know, to the work I have been doing on this case.

Q.   Do any of the three papers you have published specifically relate to early voting?

A.   Give me a second.  Yes, they do.

Q.   Okay.  Which ones -- let's just go through them one by one and tell me about the first one.

A.   The first one's called Waiting to Vote.  It was just accepted and put online in the Political Research Quarterly, and it addresses this issue of lines and how long people wait in lines.

It is principally on election day voting, but I talked extensively, as do my other coauthors, about how this would pertain to early voting, and it specifically asks what are the consequences of waiting in line on everything from voter convenience and satisfaction to what we would call reneging, people who walk out of line.

Q.   In being accepted, has this article been peer reviewed?

A.   Yes.

Q.   And you said it was in Political Research Quarterly?

A.   Yes.

Page 15

Q.   And that's available online?

A.   Yeah.  You just...

Q.   I think I have seen an early -- earlier article that you did that dealt with the same subject.  Is this new article an update to that one or is it a totally different piece?

A.   If it's called Waiting to Vote, it's probably the same article.  It was listed on my vitae as a conference paper --

Q.   I see.

A.   -- and as a -- I think I presented it at two conferences and it is -- yes, it is substantially obviously revised but the paper that you probably are referencing is an earlier version.

Q.   Okay.

A.   That's it.

Q.   This one (Indicating).

A.   Yep.

Q.   Okay.  All right.  So we know about Waiting to Vote.  What is the second paper that would need to be updated on your vitae as it relates to or that relates to early voting?

A.   It's a paper in a book and I did a volume -- it's right up there and I cannot remember the name of it.

Deposition of Robert Stein, PhD
12/10/2019
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 476 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 16

1  Q.  Would you like to check?

2  A.  Would you mind?

3  Q.  Not at all.

4  A.  Not that -- a humble brag -- where is my
chapter?  Polling Place Quality and Access.  And it's in
an edited volume.  Help me here, polling place.  And
it's with the same 38 other authors and it's an edited
volume by Mitchell Brown, Kathleen Hall.

9  Q.  May I?

10  A.  Yes, please.

11  Q.  And when was this book published?

12  A.  Just came out this fall.  I think I got a copy
of it in October.

14  Q.  And can you give me sort of the abstract
summary review of what this article is?

16  A.  Sure.  There's been a big debate in the field
in whether or not polling place practices and polling
place access has a discriminatory or limited access for
people of color and underrepresented voters.  And this
is the first study that attempts to test that hypothesis
across jurisdictions.

22      It I wouldn't say rebuts but takes on a piece
of research that was done by Matthew Barreto, and what
we show is that there is no significant disparity by
race and ethnicity across 28 jurisdictions.  Convenience

Page 17

1  sample, it is based on the same data that we collected
for the Waiting to Vote study.

3  Q.  And then the third paper that you had
referenced, sir?

5  A.  It's a paper called Choosing the Less
Convenient Way to Vote, and it is about vote by mail and
lots of references in that paper to early voting.  And
it asks the question why do people who get mailed a
ballot, a convenient way to get a ballot, two thirds of
them walk the ballot in, Oregon, Washington and
Colorado, and it attempts to explain that phenomena.

12  Q.  And what do you conclude?

13  A.  We conclude that the reasons which are varied
are conditioned by the frequency of voting.  So a
frequent voter walks their ballot in for reasons that
have to do with a social -- they want to be seen and see
others voting.

18      Infrequent voters don't have that experience
from prior voting and they mail their ballot back in,
largely because it's convenient.  They don't like to
change their routine, and because they like to see the
campaign end before they cast a ballot.

23      What's real interesting is it has nothing to
do with the postal service.  Everybody loves the postal
service, including millennials, which always surprised

Page 18

1  me.  And there are applications there to early voting as
well.

3  Q.  In terms of the mail-in voting, did you look
at data from Texas or other states?

5  A.  That paper was based on only data from
Colorado.  There are only three states that have vote by
mail.

8  Q.  That's what I suspected but I wanted to make
sure.  Okay.  Other than those three publications, is
the recent of your publication list current on the CV in
your report?

12  A.  Yes.  I am working on papers that I have not
listed on my resume based on that study.  I'm now
looking at another piece of research with the same
database from this and from the Waiting to Vote that
looks at turnout effects.

17      Do people over time who have a bad experience
at one polling place come back in the time series.  So
I'm looking at the same people in 216 and asking if they
had a bad experience, did they go back.  If you didn't
like the restaurant, did you go back.  If you didn't
like the polling place or did you chose another polling
place.  And so we're working on that right now.

24  Q.  Are you conducting any research that overlaps
with or is done in reference to this lawsuit?

Page 19

1  A.  I was -- I've just completed -- the Harris
County, county we're in now, just adopted election day
vote centers.  As a requirement for that the secretary
of state requires that the county clerk do a series of
reports, and I was a recipient of a grant from the
Arnold Foundation on behalf of the county to conduct
those studies.

8      I've done two of them so far and just
submitted my second report based on the November 2018
election December 5th.

11  Q.  Do you -- in that research or in any of the
papers coming out of it, do you cite this lawsuit in any
way?

14  A.  No.

15  Q.  And I guess that was my question.

16  A.  Oh, I'm sorry.

17  Q.  Are you doing any research in which you would
cite this lawsuit as evidence or support?

19  A.  I don't plan -- I have not done.  I hope to.

20  Q.  You do hope to?

21  A.  I hope I will have permission to be able to
write on this one, the suits.

23  Q.  Okay.  Is that one of the benefits to
participating as an expert witness is it also gives you
some material to work with as a scholar?

Deposition of Robert Stein, Ph.D.
12/10/2019
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 477 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 20

1    A.  Yes, for me, yes.  And working with people who
2  are really smart, I mean that's how I learn.
3    Q.  I concur.
4         MS. ADEN:  Gunnar didn't elicit that
5  comment for the record.
6         (Laughter.)
7         MR. SEAQUIST:  That was clearly well
8  programmed.
9         THE WITNESS:  I mean I read your book as
10  well as yourself.
11    Q.  (BY MR. SEAQUIST)  So you are currently
12  employed here at Rice University?
13    A.  Yes.
14    Q.  And you're a professor of political science?
15    A.  Yes.
16    Q.  Do you teach any courses?
17    A.  Yes.
18    Q.  What courses do you teach?
19    A.  This semester -- well, I generally teach
20  public policy courses, elections and election sciences,
21  and more specifically courses on what you would call
22  policy evaluation causal analysis.
23    Q.  And do you also conduct -- well, you've told
24  us, you also conduct research?
25    A.  Yes.

Page 21

1    Q.  What is the breakdown in terms of your
2  professional time on teaching versus research?
3    A.  That's a very good question, but I'd say the
4  two dominate.  I don't see a fine line, but if -- I
5  think I'm supposed to be one third service, one third
6  teaching, one third research.  But I don't see that
7  distinction in this.
8    Q.  The three legs of the stool way?
9    A.  The stool, yeah.
10    Q.  What percentage of your work would you say
11  involves consulting or testifying in relation to a
12  lawsuit?
13    A.  I have done one, two, three cases, depositions
14  I guess you would call it, expert witnesses, in the last
15  five years.
16    Q.  You list a couple of those cases in your
17  qualifications section to your report.  One of them is
18  Thomas Poorbera, I think, et al versus the county in
19  Jackson?
20    A.  Yes.
21    Q.  That case was out of South Dakota?
22    A.  Yes.
23    Q.  And were you hired by the plaintiff or the
24  defense in that?
25    A.  Defense.

Page 22

1    Q.  Did you prepare a report?
2    A.  Yes.
3    Q.  Do you still have copies of the reports you
4  prepared?
5    A.  Yes, I do.
6    Q.  How many reports did you prepare in that case?
7    A.  Two.  My report for the court and then a
8  rebuttal report to their expert.
9    Q.  Did you -- you said you've given some
10  depositions.  Did you give a deposition in the Poorbera
11  case?
12    A.  Yes, I did.
13    Q.  Do you remember roughly when that would have
14  been?
15    A.  I'd have to check, but I'd say two and a half
16  years ago, and we did it here in Houston because there
17  was a snowstorm.  We couldn't get to South Dakota.
18  Everybody came here.
19    Q.  I don't blame ya.  Did you testify at any
20  hearing or trial in that case?
21    A.  No, I did not.  I was scheduled to.  I want to
22  be clear.  The judge asked me to come to -- I can't
23  remember where the federal court is in South Dakota.
24  And then he -- I couldn't tell you the name of the
25  judge, and then he called me, asked me a lot of

Page 23

1  questions and then said we're done.  I don't know if
2  that was testifying or not, but...
3    Q.  Well, testifying is if you are sitting in a
4  courtroom and raise your hand.
5    A.  Yeah.
6    Q.  Swear to tell the truth.
7    A.  He did tell me on the phone that it was a
8  continuation of my deposition and he felt I was -- he
9  said you are under oath still, and I said I'm not going
10  to lie, and he asked me a bunch of questions about my
11  report.
12    Q.  And he -- did you say "he," being the judge in
13  that case?
14    A.  Yeah, judge, a Federal judge.
15    Q.  Okay.  And what were the -- what was the
16  nature of the Thomas Poorbera case?
17    A.  The Lakota Indian tribe and the reservation
18  claimed that they didn't have access to early voting
19  locations on the reservation and were -- what's the
20  right word here?  Disadvantaged in having to travel
21  greater distances off the reservation in order to vote
22  early in person.
23    Q.  So the Lakota tribe or at least the
24  plaintiffs, were alleging they did not have equal access
25  to early voting?

Deposition of Robert Stein, PhD
12/10/2019

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 478 of 677

Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 24

1   A.   That's correct.

2   Q.   And do you know what specifically the relief,
3   the plaintiffs, the tribe members were seeking in that
4   case?

5   A.   They wanted certain early voting locations on
6   the reservation.

7   Q.   Do you know or do you recall how far away from
8   the reservation the existing early voting locations were
9   in that matter?

10   A.   I'd have to review my report but they were
11   considerable, double digits, eight to ten miles was my
12   recollection.

13   Q.   One way?

14   A.   Yes, one way.

15   Q.   And do you remember -- well, do you remember
16   what the hours for early voting were that were available
17   at the early voting locations?

18   A.   I do not.  I mean my report would have that.

19   Q.   Okay.  Do you remember how many days were
20   available for early voting at the early voting locations
21   in Jackson County?

22   A.   I know South Dakota has an early voting law
23   but I just do not recall.

24   Q.   Obviously there were no hours or days on the
25   reservation?

Page 25

1   A.   To the best of my recollection, none.

2   Q.   Do you recall -- also you're doing a very good
3   job, but I'll just remind you to try to let me get my
4   whole question out.  There were a couple of times there
5   where we might have talked over each other a little bit.

6        Were there any allegations in the Thomas
7   Poorbera case about the socioeconomic status of the
8   residents of the reservation?

9   A.   Yes.

10   Q.   And what specifically were those allegations?

11   A.   That they lacked vehicles, they were of lower
12   socioeconomic status and they didn't have access to
13   roadways that had direct routes to the county seat where
14   early voting was taking place.

15   Q.   And what were you asked to do in the Thomas
16   Poorbera case?

17   A.   I was asked to do -- again, I have to remember
18   my question, but I think it was about whether or not
19   there was equal access and I was asked to assess that,
20   and I conducted analyses to measure distances, time
21   travel and then eventually was asked to identify what
22   might be remedies for the problem.

23   Q.   Okay.  Let's start on the first question.
24   What was your conclusion as to whether there was equal
25   access?

Page 26

1   A.   There was -- well, there was no evidence that
2   distances, as the plaintiff had claimed, were an
3   obstacle to voting.

4   Q.   And in determining whether there was evidence
5   of an obstacle to voting, did you measure effects on
6   voter turnout?

7   A.   Yes, I did.

8   Q.   Do you remember the allegations as to what the
9   racial or ethnic breakdown was for the residents of
10   Jackson County versus those who lived on the
11   reservation?

12   A.   Yes.  The plaintiff claimed that residents of
13   the reservation were, if not exclusively, overwhelming
14   Native American, and as a consequence of their location
15   and their status as members of the Lakota tribe, they
16   were unable to have access to these opportunities that
17   people who lived in the county seat of Jackson did have.

18   Q.   And conversely, did they allege that the
19   people who did live in the county seat of Jackson were
20   overwhelmingly white?

21   A.   Yes.

22   Q.   And ultimately you found there was no evidence
23   of unequal access?

24   A.   Yes.

25   Q.   All right.

Page 27

1   A.   Yeah.

2   Q.   And that is true even though the Native
3   American voters on the reservation had no hours in
4   comparison to the white voters in the county seat?

5   A.   That was my recollection, yes.

6   Q.   Okay.  And that was true even though the
7   distance was at least eight to ten miles one way from
8   the reservation into town for early voting?

9   A.   That's correct.

10   Q.   Okay.  Now you've also, in your qualifications
11   section of your report, you mention your work as an
12   expert witness in Martin Cowen, et al. vs Brian Kemp.
13   Do you recall that case?

14   A.   Yes.

15   Q.   Can you tell us a little about that, please?

16   A.   Yeah, the State of Georgia was being sued by
17   the tea party of Georgia and two other -- what do you
18   call them, plaintiffs, who were being candidates and
19   claimed that they had been denied access to the ballot
20   as candidates in the Republican primary because of
21   exceedingly high requirements of signature, petition
22   signatures and campaign filing fees.

23   Q.   Were early voting hour -- ask that a better
24   way.  Was early voting an issue at all in that case?

25   A.   No, not to my recollection, no.

Deposition of Robert Stein, Ph.D.
12/10/2019
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 479 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 28

Q. So is it fair to say that your work in that case is not pertinent to what we're here to discuss today?

A. No -- yes, I'm sorry. Yes, it's fine.

Q. No, that's fine. All right. We'll look at Exhibit 1 which is your report. I'd like to just kind of go through your methodology with you first. You set out a section, Section II, I believe it starts on page 2, Discussing Evidence and Methodology.

This section of your report, is that a true and correct recounting of the methodologies you've used in this case?

A. Yes.

Q. And is it a complete description of the analyses that you've undertaken?

A. Yes.

Q. Okay. Now, you said you set out to answer the specific question of whether specific groups of registered voters are more burdened than others in casting an early vote. That's what you say in the report. Have I read that correctly?

A. I believe so, yes.

Q. And earlier I think you had actually mentioned it as you were examining whether there was equal access to early voting?

Page 29

A. Yes.

Q. Is equal access and whether specific voters are burdened in casting a ballot, is that -- are those synonymous in your mind?

A. I'd say they're not the same but they're -- yes, they're synonymous. That's how I treat them.

Q. Okay. So when you talk about equal access versus burden, you're talking about the same thing in this definition?

A. That's correct, yes.

Q. In your language, can you tell me what is your definition of being more burdened?

A. Is an individual in this case compared to some other individual, spending more resources to engage in this activity, in our case, of course, early voting, than another person who's no otherwise different.

Q. Okay. And if I ask you what you understand or what your definition of equal access would be, would it be the same thing?

A. Yes.

Q. And where do you derive that definition or understanding of either burden or equal access from?

A. I think of it as just a common, you know, dictionary definition, but more specifically in this case, from the extensive literature that I'm familiar

Page 30

with at research.

Q. Is there a particular piece of literature that comes to mind in terms of setting forth the definition or standard for equal access?

A. That's a good question. I can't think of any one article that stands out as -- what's the word, better, but I think of Fullmer's, F-u-l-l -- and I spelled his name wrong in the report. It's F-u-l-l-m-e-r, Fullmer's article in the election law journal, but of course Jim Gimpel and virtually all, not say virtually but many of the articles I cited and authors are where I draw my understanding of access.

Q. So although, is it fair to say that none of those articles may specifically say here is what equal access means, you have drawn your understanding of equal access from some of the principals identified in those articles?

A. Yeah. I mean several of the articles make specific reference to things that people should consider when designing early voting locations, early voting -- and for that matter any type of election day early voting operations. I think Fullmer comes the closest to that issue, but I would say the earliest work laid out. Some of those tenants and over time they have been added to so that if I looked at Jim Gimpel's or my own work

Page 31

and then I looked at Mr. Fullmer's work, I think it was 2018, you get a sense of the totality of characteristics of early voting that should be looked at as making it accessible or equal for all people.

Q. Okay. Prior to seeing the report from Dr. Gimpel in this case or learning that he was an expert engaged by the defendants, were you familiar with his work before that?

A. Oh, yes.

Q. And had you cited his papers in prior work of your own?

A. Yes.

Q. Okay. Looking at your methodology, the first thing it says you did was geocode the residents of every voter eligible to vote in Waller County. Can you just kind of for the record tell us what that means?

A. Let me be clear. I took every registered voter from the current list of circa 2018. The people who were eligible to vote in 2018, I want to be very clear, these are the only registered voters, not citizen voting age population that might have been eligible but were not registered the 30 days.

I then with, I think it was Nile Dixon, acquired from Texas A&M something called an API, which is just a fancy word for an algorithm that would

Deposition of Robert Stein, Ph.D.
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 480 of 677
12/10/2019                                                    Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 32

1 identify the Latin longitude of every voter on that
2 list.
3       I then entered that into a data file which was
4 eventually used for calculating distances from the
5 registered voters residence as it appeared on the voter
6 list, to each of the opportunities to vote early.
7    Q.   Okay.  And you produced your geocoded file to
8 the attorneys for the plaintiffs in this case?
9    A.   Yes.
10   Q.   And do you have an understanding as to whether
11 or not they have produced that to us?
12   A.   I assume -- yes, it was my understanding, yes.
13   Q.   And do you have an understanding whether
14 Dr. Gimpel was able to review your geocoded list and use
15 it in his analysis?
16   A.   That's my understanding.
17   Q.   Okay.  You testified that you got the API from
18 Texas A&M.  Is there a particular department over there
19 that you go to for that?
20   A.   That's a fairly good question.  I'd have to
21 look it up.  The answer is I don't know.  You go to the
22 website.  Everybody pays a fee, and I want to say it's
23 probably from their geographic information system
24 library, but I'm not positive so I'd have to double
25 check.

Page 33

1    Q.   Is there a subscription access to that that
2 you have or --
3    A.   Yes, through the Fondren Library.
4    Q.   Through the what library?
5    A.   Fondren, the library here at Rice.
6    Q.   And you testified that Mr. Dixon worked on
7 that with you.  Any other students help you in the
8 geocoding process?
9    A.   Yeah, Matt Mason, Reese and Libby, more
10 about -- what's the right word here?  Checking, you
11 know, we do checks to see if everything looks within
12 range.
13   Q.   And what -- do you use any special computers
14 or other equipment to perform your geocode?
15   A.   Yeah, I use my computer at home, to be more
16 specific.
17   Q.   Do you use a specific software program?
18   A.   Yes, Arc, A-r-c, GIS.  ArcGIS.  It's an Esri,
19 E-s-r-i product.  You have to -- you buy it.
20   Q.   Okay.  You testified that you had used a list
21 of registered voter circa the 2018 general election.
22 Did that list identify for you active versus suspense
23 voters?
24   A.   Yes, it did.
25   Q.   Did you remove suspense voters prior to doing

Page 34

1 your geocoding?
2    A.   I kept everybody in and then did my analysis
3 on the active voters.
4    Q.   And how were -- how did you go about arriving
5 at what you believe to be registered voters who were
6 Prairie View A&M students?
7    A.   In the report I talk about the residential
8 address that was on the voter registration list.  I then
9 took a shape file.  Now a shape file is just simply the
10 geographical boundaries of the Prairie View A&M campus,
11 and then I located any registered voter who lived in
12 that shape or in that geography.
13   Q.   And when you came up with the number of
14 students, did you remove suspense voters from that list?
15   A.   I did not look at any suspense voters in the
16 list at the time I was doing -- after I geocoded, I then
17 removed the suspense voters.
18   Q.   Okay.  So in terms of the number of student --
19 of likely students that you came up with, that would not
20 include suspense voters?
21   A.   That's correct, to the best of my knowledge,
22 and that was based on the list.
23   Q.   All right.  Now by matching addresses from the
24 voter registration file that you had geocoded to
25 on-housing or known off-campus student housing, you came

Page 35

1 up with 2,651 Prairie View A&M students?
2    A.   Yeah, what page are you on?
3    Q.   I am on page 3.
4    A.   Yep, that's it.
5    Q.   Okay.  And you have in parentheses, it's the
6 first paragraph or the top paragraph on the page there
7 in parentheses you say:  (1,833 of whom are aged 18
8 through 20).
9       How did you come up with that number?
10   A.   The voter registration list gives me the birth
11 date of every registered voter for that 2018 election.
12   Q.   So you took your student list and then just
13 referenced by the birth date on the registered voter
14 data to identify those whose birth dates fell between 18
15 and 20 at the time?
16   A.   Yes.
17   Q.   You say that:  The estimate of 18 to
18 20-year-old students registered to vote in Waller County
19 is necessarily low, and certainly misses many more such
20 PVAMU students who live near campus or elsewhere in
21 Waller County.
22       Can you explain that?
23   A.   Well, to my knowledge there were more students
24 registered at the university than were living in the --
25 that we geocoded, and so I had surmised that there might

Deposition of Robert Stein, PhD
12/10/2019

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 481 of 677

Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 36

1  be more students.  I don't know how many more who -- in
2  fact, I think I mentioned that there was 389 students
3  who lived within one mile and they may be students on
4  the campus.
5       But I did not have knowledge of those persons
6  being students, other than I was told by the attorneys
7  and I've been to Prairie View many, many times that
8  there are off-campus apartments where students live and
9  attend Prairie View A&M campus.
10      Q.  And you included those off-campus addresses
11 that the attorneys had informed you about in your number
12 of likely Prairie View A&M students, right?
13      A.  I included them and then look at them
14 separately, both ways, because I couldn't be certain
15 that they lived on the campus and they technically did
16 not live in that shade file.
17      Q.  Now, a moment ago when you said you knew there
18 were more students registered at Prairie View A&M, when
19 you say "registered," did you mean registered as
20 students?
21      A.  Yes, I knew there was more students on the
22 campus than there were registered voters on the campus,
23 and I -- yes, that's all I knew.  I made an assumption
24 that there might be more students at Prairie View A&M
25 campus who are registered to vote in Waller County but

Page 37

1  do not live physically on the campus but nearby.
2       Q.  Is it also possible that your number caught
3  some students who although no longer are at Prairie View
4  A&M, hadn't made the suspense list yet?
5       A.  It's possible, yes, yes, sure.
6       Q.  Let me look, I have a question about one of
7  your numbers here.  In that next paragraph where you
8  say:  Using the date of birth of each registered voter
9  in Waller County.  You say:  We determined that 1,977
10 (5.9%) of registered voters were age 18 through 20 at
11 the time of the November 2018 election.
12      That's a countywide number; is that right?
13      A.  Yes.
14      Q.  And then you say:  Using the methodology
15 described above, we identified 2,651 Prairie View A&M
16 students (of all ages) who were registered to vote in
17 Waller County.
18      And that's what we've just talked about?
19      A.  Yes.
20      Q.  The next sentence says:  By our calculation,
21 178 (6.7%) of those PVAMU students registered to vote in
22 November of 2018 were aged 18 through 20.
23      How did you get that number?
24      A.  Well, it was the students who lived on the
25 campus that identified from their residential address

Page 38

1  and then, of course, had their age and simply figured
2  out how many of the students who had residents on the
3  campus were between 18 and 20.
4       Q.  Okay.  So of all the students registered to
5  vote on campus, your calculation showed that 178 of them
6  or roughly seven percent were 18 to 20?
7       A.  That's correct.
8       Q.  You say in your report that you are not able
9  to determine the race or ethnicity of individual voters
10 in Waller County; is that true?
11      A.  That's correct.
12      Q.  And why is that?
13      A.  I have in the past used a technique in which
14 you use the residential location and the racial ethnic
15 make-up of that residential location, county, block,
16 census, track, and the surname of the voter from the
17 Center for Disease Control that identifies common
18 African American, Asian, Hispanic, Anglo surnames.
19      A program that has been written by a professor
20 named Imai, I-m-a-i, at Princeton, he graciously shared
21 his software with me and it gives you a probability
22 estimate for individual voters.  I attempted -- I ran
23 the program, I was not satisfied with the results.
24      Specifically, I did not believe that the
25 probability estimates met what I considered to be an

Page 39

1  acceptable threshold for making a statement about the
2  race and ethnicity of voters, all the voters, the 31,000
3  in Waller County.
4       Q.  Do you have the information or the report that
5  was produced but that you were dissatisfied with?
6       A.  You know, I have to check.  As a work product
7  I think I may have discarded it when I finished my
8  analysis, told the attorneys I cannot give you an
9  individual level estimate, but I'm sure I can
10 reconstruct it somehow.
11      Q.  What was your dissatisfaction with the result
12 of that analysis?  Did you feel like it overstated or
13 understated African American population or is that it
14 wasn't sufficiently reliable?
15      A.  I don't think it was sufficiently reliable.  I
16 would want a criteria of at least .7.  It gives you a
17 probability that you've identified this person
18 accurately as African American, Hispanic, Asian or
19 Anglo, and I want to be clear, they're overlapping.
20 Lots of Hispanics are African Americans.
21      Q.  Sure.
22      A.  So in this model I was looking for African
23 American only, but I have to recognize that there will
24 be Hispanics who will identify themselves from the
25 census and I wanted at least, not least, I would have

Deposition of Robert Stein, PhD
12/10/2019

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 482 of 677

Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 40

1 accepted a .7 probability. I don't think I -- again, my
2 recollection was it just wasn't there.
3        Obviously higher is better but .7 I think is a
4 standard in which peer review journals would have said,
5 and I have published with this before, the vote by mail
6 paper uses it and the .7 was where I wanted to be.
7    Q.   And so I guess the -- one of the underlying
8 things we should make clear just for the record is that
9 in terms of registered voter data, the registered voter
10 lists don't contain race or ethnicity data, right?
11   A.   That's correct.
12   Q.   That's not something that voters in Texas are
13 required to report when they register to vote?
14   A.   That's correct.
15   Q.   Or when they cast a ballot?
16   A.   Correct.
17   Q.   Okay.  Now, you had testified earlier that you
18 had used census block data.  Let me ask you a question
19 about the use of census, either the 2010 decennial
20 census or the American community surveys as it relates
21 to college students.  Is it problematic in any way --
22 scratch that.
23        Are the -- some of the categories of
24 information that are collected, for example, education
25 level, employment level, those are not intended to be

Page 41

1 applied to people who are under 25 years of age,
2 correct?
3    A.   I'm not that familiar with the census.  It's
4 my understanding, yes, but I'm not certain of that.  It
5 is my understanding that that is true, yes.
6    Q.   Do you know whether the census for college
7 students who live on a campus, whether the census counts
8 those students as living on the campus or as living with
9 their parents?
10   A.   My understanding is living on campus.
11   Q.   And that's even in-student housing?
12   A.   My understanding is at the time the census
13 conducted it's institutions, like prisons and
14 universities count the populations at the time the
15 census is conducted as in residence of where they were
16 filling out that survey.
17   Q.   Okay.  And so to try to arrive at the
18 proportion of the population, I think both in Prairie
19 View and Waller County, that was -- or that is African
20 American, you had said in your report that you went back
21 and used 2010 census block data.  Just for the record,
22 what is a census block?
23   A.   Geographical designation by the census bureau.
24 There are designations as large as counties and states,
25 of course, and general municipal governments, and then

Page 42

1 they start breaking it down by census blocks and block
2 groups and census tracks.  Blocks are the smallest unit.
3 Block groups are aggregations or groups of blocks and
4 tracks are made up of block groups.
5    Q.   Does census blocks -- does census block data
6 give you the individual ethnicity or race of the
7 residents in that census block?
8    A.   Yes.
9    Q.   Is that -- were you able to -- let me ask this
10 a better way.
11        You say in your report that you looked at
12 whether individuals lived in a census block that --
13 where the block was comprised of a majority of persons
14 that self identify as black.  Is that true?
15   A.   Yes.
16   Q.   Why were you not able to identify the specific
17 number of persons or based on your geocoding, identify a
18 specific race of individuals living in a particular
19 household?
20   A.   I'm not certain I understand the question.
21   Q.   That was a bad question.
22   A.   I'm sorry.
23   Q.   Why did you have to look to census blocks that
24 were majority African American to try to determine --
25 determine the proportion of the population was African

Page 43

1 American?
2    A.   Because my other methodology that I had used
3 was not satisfactory.
4    Q.   Okay.  Now a census block is -- how many
5 people typically live in a census block?
6    A.   There is no standard.  It could be as
7 little -- the census -- it could be as little as 10 or
8 12 or even one or two people, depending on the
9 geographical area or rural areas, and it could be as
10 many as several thousand including ten.  Tens of
11 thousands would be wrong but several thousands.
12   Q.   Okay.  I think I've seen somewhere that an
13 optimum number for a census block is around 1,500.  Does
14 that sound right?
15   A.   Yeah, in urban areas and metropolitan areas.
16 I think in rural areas that number could be smaller.
17   Q.   Okay.  And in your analysis, in taking a
18 census block that was majority African American, you
19 treated the entire population in the census block as
20 being African American, correct?
21   A.   That's -- yes.
22   Q.   Okay.  And so by way of example, if you had a
23 block of 1,500 people, if 751 people were African
24 American and 749 were white, all 1,500 in your analysis
25 would have been considered African American?

Deposition of Robert Stein, PhD
12/10/2019
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 483 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 44

1  A.  No.
2  Q.  Okay.
3  A.  Let me explain.
4  Q.  Please do.
5  A.  If I can explain.  First I would determine
6  whether or not the proportion of the population in the
7  census track, what that proportion was African American.
8  Any track that was 50 percent plus one was in my pool,
9  in my dataset, as potentially a majority African
10  American census block.
11  Q.  Okay.
12  A.  I then looked at those blocks that were 50
13  percent plus one and analyzed them the same standard I
14  use for doing the Imai analysis, which was were I
15  confident that were I too sample randomly a person from
16  that track with replacement.
17  So I took Leah out and put her back in, then
18  took out somebody else.  What were the probability that
19  I would be looking at an African American person, and I
20  wanted that probability to be at the level of
21  satisfaction I could not get with the Imai .7.
22  I then looked at the census blocks throughout
23  the county of Waller that were 50 percent plus one and
24  asked the next question, what proportion of African
25  Americans are there in those blocks.  That's called

Page 45

1  tri-black in the dataset that Jim and you shared.  And
2  the lowest percentage in that category, the third
3  category of tri-black, was .7, .71 to be exact, my
4  recollection.  The highest was just a tad over .95.
5  Q.  Okay.  So it wouldn't -- so if you had a
6  census block where the tri-black that you had just
7  referenced was .7, then you would have approximately .7
8  or 70 percent African American in that census block, 30
9  percent white, how did you treat the 30 percent for
10  purposes of your analysis, did you take them out or did
11  you treat them as part of that population as African
12  American?
13  A.  I'm not quite certain I understand your
14  question but let me -- could you repeat it?
15  Q.  Yes.
16  A.  I know -- I want to be clear.
17  Q.  Well, you know what?  Maybe I am
18  misunderstanding what you did.  Did you assume in
19  calculating the number of -- let me ask it this way.
20  In calculating the number of African American
21  voters in Waller County, is it possible that your use of
22  the census block also caught some voters who were not
23  African American but who identify as white?
24  A.  That's correct, yes.
25  Q.  Okay.

Page 46

1  A.  Yes, that's possible.
2  Q.  And how would that happen as part of your
3  analysis?
4  A.  If you look at -- if I can.
5  Q.  Of course.
6  A.  If you look at table 1, what I was trying to
7  do is ask a different question.  I hope my report was
8  clear, and I'm not going to be pedantic and read it.
9  What I was trying to ask is, is the percent of black in
10  which a voter lives.
11  So I have a voter, he or she lives in a census
12  block.  Does she or he live with predominantly .7 or
13  above other African Americans, such that I can make a
14  generalization that their probability of being African
15  American is at point -- in this case .7 to .95.
16  Q.  Right.
17  A.  And that's the way in which I'd say this
18  person, this voter, Bob Stein, lives in this block.  He
19  is -- has a .7 to .95 probability, depending on what
20  that block percentage is, that he is African American.
21  Q.  Okay.  And then conversely you would have a .3
22  to .05 percent of being not African American?
23  A.  That's correct.  And that included everybody
24  who might be Asian, Hispanic, other.
25  Q.  Perfect.  Thank you for explaining that to me.

Page 47

1  Okay.  Now the census block data is not broken down by
2  registered voters, correct?
3  A.  That's correct.
4  Q.  So to try to identify who were the registered
5  voters, your report says you got some information from
6  PV or from Prairie View A&M's Office of Institutional
7  Research?
8  A.  Repeat -- could you repeat that?
9  Q.  Yes.
10  A.  I got data from --
11  Q.  From the university, as to the demographics of
12  the university?
13  A.  Oh, yes, yes.
14  Q.  And how did you use that in reaching your
15  opinions?
16  A.  What I wanted to know is what -- I think there
17  were 7,906 students on the campus of 9,516 who were
18  identified as black.
19  Q.  And why was that important to have that data
20  point?
21  A.  Well, it was, of course, to see whether or not
22  the population, this plaintiff, was African American.
23  Q.  Okay.
24  A.  That's 83 percent if I'm not mistaken.
25  Q.  Do you know how the university gathers that

Deposition of Rebecca Klein, Ph.D
Case 4:18-cv-03985    Document 73-2    Filed on 01/24/20 in TXSD    Page 484 of 677
12/10/2019                                        Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 48

1 information?

2    A.   No, I do not.

3    Q.   Okay.  So once you had gathered this geocoded

4 data and done the census block analysis that we have

5 discussed, you say in your report that you:  Then

6 determined the relative access that each of the groups

7 identified as harmed in Plaintiffs' complaint had to

8 early voting in Waller County during the 2018 election?

9    A.   That's correct.

10   Q.   And what did you do to determine relative

11 access?

12   A.   I, as I stipulated in my report, identified

13 what I considered to be best practices for conducting

14 early voting, number and location of polling places --

15   Q.   Okay.

16   A.   -- distance and travel time to the polling

17 places, transportation to the polls, hours of operation,

18 numbers and days of hours of week of voting operations,

19 information given to the public about these locations

20 and hours of operation.  And I then used measures that I

21 had from the county to assess whether or not the target

22 populations had equal access on those dimensions.

23   Q.   And we'll talk about your best practices list

24 in a moment, but if I understand your testimony, you for

25 each of your best practices, you compared how those best

Page 49

1 practices were applied to Prairie View versus other

2 areas in the county?

3    A.   And other voters who populated the areas, 18

4 to 20, African American, and of course, students on the

5 Prairie View A&M campus.

6    Q.   Before we get into those best practices, let's

7 just look for it a moment.  You have a section here in

8 your report that talks about the Waller County's early

9 voting practices in the 2018 election?

10   A.   Yes.

11   Q.   And for your report you looked only at the

12 2018 general election?

13   A.   That is correct.

14   Q.   What did you do -- well --

15   A.   Can I amend that?

16   Q.   Yes.

17   A.   It's not that I didn't look at other years and

18 practices.  I did.  But for the analysis that I

19 conducted to establish this question of access, I

20 focused solely on 2018, but I was well aware of their

21 practices prior.

22   Q.   Okay.  And when you say "their practices

23 prior," what are you referencing?

24   A.   I'm referencing specifically in my report that

25 it appeared that until 2018, for comparable midterm

Page 50

1 elections, Waller County had pretty much followed the

2 same procedures.  In 2018 I would guess you would call

3 it midcourse, I was informed that the plaintiffs made

4 requests to the county commissioners to change the

5 practices of early voting, specifically on the Prairie

6 View A&M campus.

7       So when I was informed that they made a change

8 in both hours and I think days of operation on the

9 campus, I went back and looked back at whether or not

10 this had happened before in comparable elections.

11      Obviously they changed early voting practices

12 and different types, but for midterm elections it looked

13 like the county had followed the same practices almost

14 since inception of early voting.

15   Q.   Okay.  You had testified earlier that the

16 counsel for the plaintiffs in this case had given you

17 some information about the county's early voting

18 practices.  Am I right about that?

19   A.   Yes.

20   Q.   Was there anything else you did or undertook

21 to learn about early voting practices in Waller County?

22   A.   I inspected the website and the historical

23 websites of the county.

24   Q.   What did you look at on the website?

25   A.   I went to -- in the 2018 election, which was

Page 51

1 still available to me.  I looked at the locations, days

2 and hours of operations.  The number of -- no, and

3 that's it.  Stop there.  The other information was given

4 to me by the attorneys.

5    Q.   Okay.  You looked at location, days and hours

6 of operation on the website?

7    A.   Yes.

8    Q.   Okay.  Anything else that you did to better

9 understand early voting practices in Waller County?

10   A.   Nothing other than the materials I was given

11 by the attorneys to read.

12   Q.   There have been some other expert reports in

13 this case.  Were those provided to you prior to your

14 drafting your report?

15   A.   Just one, and I wish I could remember the name

16 of the -- they gave me some demographic background

17 information on the county.

18   Q.   Would that have been from the expert William

19 Cooper?

20   A.   Yes, Mr. Cooper, thank you.

21   Q.   You have an Exhibit A here where you

22 have summarized the early voting schedule for the

23 general election in 2018 for Waller County, correct?

24   A.   That's correct.

25   Q.   Now during the first week you have identified

Deposition of Rebecca Stein, Ph.D.
12/10/2019
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 485 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 52

1  I think a total of six early polling locations?
2      A.  Yes, I think that's correct.
3      Q.  All right.  Now in your report you say:  There
4  were two locations in the City of Waller.
5          Do you see that?
6      A.  Yes.
7      Q.  Looking at your Exhibit A-1 to Exhibit 1 of
8  the deposition, can you tell me what the two Waller
9  locations were?
10     A.  The Waller ISD and the Fieldstone [sic]
11 building.
12     Q.  Is it Fieldstore?
13     A.  I'm sorry, Fieldstore.
14     Q.  No problem.  Did you look on a map at all to
15 determine the geographical distance between Waller and
16 Fieldstore?
17     A.  No.  I actually used the GIS calculations that
18 I had from the lat and longitude of the two locations.
19     Q.  Did those lat -- did the GIS data, does that
20 tell you whether Fieldstore was actually located within
21 the territorial municipal limits of the City of Waller?
22     A.  I believe it is but I honestly don't recall
23 exactly, but I believe that is true.
24     Q.  That's not something you confirmed one way or
25 the other?

Page 53

1      A.  Not at this time.
2      Q.  Okay.  Is it possible that the City of
3  Fieldstore or that the unincorporated area of Fieldstore
4  is not part of the City of Waller?
5      A.  It's possible.
6      Q.  Okay.
7      A.  My recollection.
8      Q.  Do you recall based on the GIS data, how far
9  Fieldstore is in the City of Waller?
10     A.  No, I do not recall.
11     Q.  Okay.  You also say in your report that there
12 are two early voting locations in the City of Hempstead.
13 Can you tell from your Exhibit A-1 what those two were?
14     A.  The county courthouse and the Monaville
15 building.
16     Q.  And I will submit to you, just because I've
17 spent a little time on this case, that it is Monaville.
18     A.  Monaville.  Thank you.
19     Q.  Same questions as to Monaville.  Did you
20 happen to look on a map or use GIS data to determine
21 where it is located?
22     A.  I did GIS locations, yes.
23     Q.  And do you recall how far from the City of
24 Hempstead Monaville is?
25     A.  No, I do not recall.

Page 54

1      Q.  All right.  Did you happen to look or try to
2  determine whether Monaville is within the territorial
3  municipal city limits of the City of Hempstead?
4      A.  That is my recollection, but I, you know,
5  would not be absolutely positive of that at this time.
6      Q.  Okay.  Again, leave room for the possibility
7  that it's not?
8      A.  Yes.
9      Q.  All right.  In talking about early voting, the
10 second week, which I believe is A-2 of your report, you
11 identify one early voting location in the City of
12 Waller, correct?
13     A.  Yes.
14     Q.  And that is at the Waller ISD building?
15     A.  That's correct.
16     Q.  And one location in the City of Hempstead?
17     A.  Yes.
18     Q.  Which was the county courthouse; is that
19 correct?
20     A.  That's correct.
21     Q.  Do you -- what do you understand or do you
22 have an understanding as to the term main polling
23 location as it's used by the Texas Election Code?
24     A.  I don't have an understanding.
25     Q.  Do you have an understanding whether the Texas

Page 55

1  Election Code sets required hours for the main polling
2  locations?
3      A.  Yes, I do.
4      Q.  And what is your understanding as to the hours
5  set by the election code for the main polling locations?
6      A.  I am not familiar with the minimum.  I'll
7  simply say I can't say with certainly what those are.
8      Q.  That's fine.  You also identified one polling
9  location in the City of Brookshire?
10     A.  Yes.
11     Q.  And then two polling locations the second week
12 of early voting in the City of Prairie View; is that
13 right?
14     A.  That is correct.
15     Q.  All right.  Now, the second week of early
16 voting there were no early voting hours in the City of
17 Katy, correct?
18     A.  That's correct.
19     Q.  None in Fieldstore?
20     A.  Oh, yeah, I'm sorry, yes.
21     Q.  And none in Monaville?
22     A.  That's correct.
23     Q.  All right.  For the early voting in the City
24 of Prairie View, under the original schedule, and you
25 had talked earlier about there had been some changes to

Deposition of Robert Stein, Ph.D.
12/10/2019
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 486 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 56

1  that, and we'll talk about that in a minute, but under
2  the original schedule, there was early voting at the
3  Memorial Student Center from Monday through Wednesday?
4     A.  That is correct.
5     Q.  And that's October 29th through October 31st?
6     A.  That is correct.
7     Q.  And your review showed that the original hours
8  were 8:00 to 5:00, so nine hours a day, Monday through
9  Wednesday?
10    A.  I think it was 7:00 to 7:00 on the 29th of
11 that -- I'm sorry, yeah, I got the red and green mixed
12 up.  I'm sorry, you're correct, yes.
13    Q.  Okay.  Now you say in a couple of spots in
14 your report that Prairie View A&M got the least number
15 of early voting hours; is that right?
16    A.  I believe that's correct, yes.
17    Q.  Can you tell by comparing or reviewing your
18 Exhibit A, whether or not Prairie View A&M, the
19 on-campus location at the Memorial Student Center
20 actually had more hours than at the polling location in
21 Fieldstore?
22    A.  Over the two-week period or over the period
23 during which there was early voting at those locations?
24    Q.  Over the two-week period.
25    A.  Let's take a look.  It would appear Monaville

Page 57

1  had more hours.  Maybe I'm adding it up wrong.  I have
2  Monaville.
3     Q.  Uh-huh (Affirmative.)
4     A.  October 25th, 8:00 to 5:00, nine hours.
5     Q.  Okay.
6     A.  October 26, 8:00 to 5:00, another nine hours,
7  that's 18.  And then on October 27, 9:00 to 2:00, that's
8  five, so that's 23 hours.
9        In the pre-litigation, what was scheduled was
10 8:00 to 5:00 in Prairie View on Monday the 29th, and
11 8:00 to 5:00 on the 30th, and then 8:00 to 5:00 on the
12 31st, so nine times -- 27, you're right.  23 versus 27.
13    Q.  So as originally scheduled, the student center
14 had more early voting hours than both Fieldstore and
15 Monaville, correct?
16    A.  I'd have to go back to Fieldstore and I'd have
17 to check.  Five, ten, 19, 19, excuse me, I got another
18 nine, nine, 18, 27 Fieldstore, Fieldstore.  That is
19 correct.
20    Q.  Okay.
21    A.  18 and 5 is 23.
22    Q.  And then if we look at Katy, Katy had three
23 nine-hour early voting days the first week of early
24 voting, correct?
25    A.  That's correct.

Page 58

1     Q.  Which is the same number of hours that the
2  student center at Prairie View had the second week of
3  early voting, three nine-hour days?
4     A.  In the --
5     Q.  Comparing Katy to the MSC?
6     A.  For the first three days, yes.
7     Q.  Okay.  All right.  And then on Thursday and
8  Friday, the second week of early voting in the City of
9  Prairie View, the county allocated, initially allocated
10 two full days of early voting at the Waller County
11 Community Center?
12    A.  Yes.
13    Q.  And that was from 7:00 to 7:00?
14    A.  Yes.
15    Q.  Do you have any familiarity or have you
16 reviewed any materials as to the historical use of the
17 Waller County Community Center location as a polling
18 location in the City of Prairie View?
19    A.  Yes.
20    Q.  And what is your understanding of how
21 historically --
22    A.  It's just been --
23    Q.  Go ahead.
24    A.  It's been used before.
25    Q.  And has it been used for a long period?

Page 59

1     A.  For -- I've looked at I think three comparable
2  elections, yes.  I don't know if that's long, but yes,
3  three prior midterm elections.
4     Q.  And do you have any understanding as to
5  whether prior to the current Waller County Community
6  Center building that is there, whether there was
7  formerly a different building or a different community
8  center building in that location before the current one
9  was built?
10    A.  I'm not familiar, no.
11    Q.  Do you know roughly how far -- have you looked
12 how far the community center is from the Memorial
13 Student Center?
14    A.  I think my report indicated about a mile and a
15 half.
16    Q.  Well, in looking at your report I think a mile
17 and a half number, and correct me if I'm wrong, actually
18 relates to the community center from a student housing
19 building.  My question's a little different than that.
20    A.  I'm sorry.
21    Q.  Which is:  Did you look at the distance to the
22 community center from the student center?
23    A.  No, I don't recall doing that, no.
24    Q.  I'm handing you what I've marked as Deposition
25 Exhibit No. 4.

Deposition of Robert Stein, PhD
12/10/2019

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 487 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 60

1    (Exhibit No. 4 marked.)
2    MS. ADEN:  And do you mind if I direct
3  Dr. Stein to page 7, which is where he's -- the
4  reference testimony about his distance from the housing
5  to the community center?
6    MR. SEAQUIST:  No, I don't mind a bit.
7  Let's clear that up for the record.
8    A.  The closest early voting location to the
9  Prairie View A&M campus, apart from the on-campus early
10 voting location at the Memorial Student Center, was an
11 off-campus early voting location at the Waller County
12 Community Center.
13    However, the community center is located to
14 the south of the Prairie View A&M campus 1.4 to 1.6
15 miles away from two large residential housing facilities
16 on the campus.
17    Q.  (BY MR. SEAQUIST)  Okay.  So that's consistent
18 with what we talked about which was the measurement that
19 you took was to the community center from the housing,
20 one of the housing buildings.  You understand there are
21 other housing locations on the campus; is that right?
22    A.  Yes.
23    Q.  And they'll be varying distances, different
24 housing units will be a varying distance from other set
25 points on campus?

Page 61

1    A.  Yes.
2    Q.  In looking at the picture I marked as
3  Exhibit 4, are you able to identify this as an aerial or
4  satellite photograph of the Prairie View A&M campus?
5    Q.  You're familiar enough with what the campus
6  looks like to make that determination?
7    A.  Not from the air but I've been there many
8  times.
9    Q.  Okay.  Well --
10    A.  Yes.
11    Q.  Looks correct.  I'll represent to you that
12 that is what it is.  And based on a as the crow flies
13 distance is -- we have calculated a distance of 1,495
14 feet or .283 miles.  Do you have any reason to dispute
15 that distance?
16    A.  No.
17    Q.  Have you walked the distance between the
18 Memorial Student Center and the Waller County Community
19 Center?
20    A.  No, I have not.
21    Q.  Have you been out to visit the campus as part
22 of this litigation?
23    A.  Not part of this litigation.  I actually go up
24 there maybe once a month to go bicycling.

Page 62

1    Q.  Okay.  But as part of your work in this case,
2  you didn't go do any investigation of the campus itself?
3    A.  I was there about a month and a half ago and I
4  actually rode around the campus and I visited all the
5  sites that I reported about in my report.  I didn't -- I
6  didn't charge for the time because I was there, but I
7  actually was at the student center and I went to the
8  community center where the early voting location was,
9  but I didn't walk it.  I biked it.
10    Q.  Okay.
11    A.  I mean it's familiar to me, yes.
12    Q.  Understood.  How long did it take you to bike
13 from the Memorial Student Center -- did you go directly
14 from the student center to the --
15    A.  No, I was riding around the campus.
16    Q.  Understood.
17    A.  I wanted to see.
18    Q.  All right.  Now you had testified earlier that
19 you had an understanding or that you had learned from
20 the materials that the plaintiffs have given you, that
21 the Waller County Commissioners Court did modify the
22 early voting hours as it relates to the City of Prairie
23 View, correct?
24    A.  That's correct.
25    Q.  And specifically you have outlined that in

Page 63

1  your Exhibit A-2 in green, I believe -- no, excuse me,
2  yes, in green?
3    A.  Green, yeah.
4    Q.  Okay.  And so those changes were to extend the
5  existing early voting hours from 8:00 to 5:00 to 7:00 to
6  7:00?
7    A.  That's correct.
8    Q.  And then they added one early voting --
9  additional early voting location at the Prairie View
10 City Hall on Sunday for five hours; is that right?
11    A.  At the Prairie -- yeah, at the city hall, yes.
12    Q.  Okay.
13    MR. SEAQUIST:  Are you good on a break?
14    THE REPORTER:  I could use a break.
15    MR. SEAQUIST:  Yes, we'll take a break.
16    (Off the record from 10:24 to 10:31.)
17    MR. SEAQUIST:  Okay.  Back on the record?
18    Q.  (BY MR. SEAQUIST)  Dr. Stein, we are back on
19 the record.  Anything you need to correct from earlier
20 or are we good to go forward?
21    A.  If I could, you had asked about the distance
22 from the Student Memorial Center to the Waller County
23 Community Center, which on your map is .823 miles.  I
24 would just reference the paragraph on page 7, third
25 paragraph, where several researchers, Jim Gimpel and

Deposition of Rebecca Stein, Ph.D.
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 488 of 677
12/10/2019                                          Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 64

specifically Mr. Cantoni, talk about what are the
distance increases that might have a depressing effect
on early voting.  And .25 mile increase has a two and a
half to five percent negative effect on comparable early
voting and comparable elections.

So not to split hairs, .28 is just outside
that, but it's within that range.  It's a piece of
information and, of course, it's something I would want
to report, which I did in my written report, is that
students tend to travel from where they live rather than
where they may attend classes or the student center, so
that that distance from the student center where another
early voting location was, to the off-campus one right
on the edge of the campus, admittedly, might not be as
relevant as to looking where a student might travel
during the day to and from classes.

Q.   Okay.  That's not so much a clarification of
your earlier testimony as to the addition of some new
testimony, but we will revisit that as soon as I get
into the discussions of your best practices, okay?

A.   Sure.

Q.   All right.  Which would make this a good time
to transition to those best practices.  You have a
section, Section B starting on page 7 of your report
where it is captioned:  Best Practices for Conducting

Page 65

Early Voting.

Now, is there anywhere -- if I am an election
administrator of a county, is there anywhere I can go to
find the best practices that you identify here?

A.   Oh, sure.  I mean Kathleen Hale is one of the
coauthors of the edited volume, is a former election
official and the president of the National Association
of Election Officials, who have a website.  And although
I can't give you the location, I have looked at that
site and they have other measures or best practices and
these.

Q.   So if I look at that site, I will see
something that tells me the best practices for the
number of hours to allocate for early voting?

A.   I can't be certain.  I think they will talk
about -- I don't know, no.

Q.   And if I go look at that site, do you know
whether I'll see a best practice for general distances
for polling locations?

A.   Yes, you'll see that.

Q.   And what is the best practice for a distance
for a polling location?

A.   Well, I mean the literature that's cited on
page 7 I think lays that out.  The optimal distances
from where people live or shop or work will vary, but

Page 66

the citations I have there and I think Cantoni's work,
which is also cited along with Jim Gimpel's and Dyck's
and Schuknecht, would suggest that that distance as it
gets greater, as it increases, diminishes the likelihood
of ballots cast at that location.

Q.   Okay.  Well, understanding the effect of
increases distance, I guess my question is:  Are you
aware of any promulgated best practice or standard for
an acceptable distance?

A.   No, I am not.

Q.   And I think as you said, the distance that
people are going to have to travel to a polling location
is going to vary?

A.   Yes.

Q.   So in terms of where -- we had talked about
this a little bit earlier, the areas where you derive
your best practices from.  Is it fair to say that you
have cited the papers for which you are drawing those
best practices?

A.   That's correct, yes.

Q.   Okay.  So if I want to find out how Dr. Stein
came up with his best practices, I would be able to
determine that by looking at each of the papers that are
cited herein?

A.   Yes.

Page 67

Q.   Okay.  And I don't have to go outside of the
resources or this report, the resource that's cited in
your report?

A.   No, not from my report.

Q.   Okay.  Do any of the articles that you have --
well, I think we talked about this, so I don't mean to
re-cover territory, but just to clarify since we're
talking about best practices now, do any of these, the
articles that you cite, actually say or use the words
"best practices" to your recollection?

A.   Not to my recollection, no.  I think Jim's
does.  Jim's says it would be wise -- not best
practices.  I'll clarify that.  I can't recall.

Q.   Is it fair to say that each of these articles
that you cite, measures the effect of one of these
particular practices in relation to voter turnout?

A.   Yes, most.  Some others talk about the effect
on voting early.  Fullmer in particular looks at not
only turnout, as does Jim, as does Cantoni, but also on
casting a ballot early.

Q.   And so that is a question of whether someone
decides -- chooses to vote early or chooses to cast
their ballot on election day?

A.   Correct.

Q.   Either way, we're talking about someone who

Deposition of Robert Stein, Ph.D.
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 489 of 677
12/10/2019                                    Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 68

1  was going to cast a ballot, correct?
2      A.  Not necessarily.  I think that's a big issue,
3  if I can clarify.  What I've done here is review a body
4  of literature that shows a relationship between a
5  practice and the likelihood of casting a ballot, both
6  casting a ballot and casting a ballot early, to the
7  extent that these relationships signal and alert us to
8  things that matter, they're important as best practices.
9  As to a specific point estimate, is one mile better than
10 two miles for a voter who travels from home to work as
11 opposed to somebody who has no access to let's say who
12 doesn't work or doesn't have access, it will vary.
13     Q.  Okay.  But for example, in Cantoni's paper, he
14 measures the effect of distance on turnout, correct?
15     A.  That's correct.
16     Q.  Okay.  You stated in your report that the
17 placement of early voting polling sites is essential to
18 voter access, placing early polling sites at locations
19 near where voters prefer to vote, for example, near
20 their residences or where they go to school is integral
21 to accessibility?
22     A.  Yes.
23     Q.  Now a moment ago you testified to me that
24 people travel from their home to go vote.  Isn't it true
25 that your research has actually shown that people will

Page 69

1  travel to polls that are further from their home if it
2  is more convenient to their daily activities?
3      A.  That's correct.
4      Q.  So the measurement of distance from the home
5  is not always the most appropriate measurement, correct?
6      A.  That's correct.
7      Q.  If you have a location that is particularly
8  close to where someone works or goes to school, then
9  that may well serve as a better measurement for the
10 distance as we evaluate it?
11     A.  That's correct.
12     Q.  For the first best practice, No. 1, which has
13 to do with the number and location of polling places
14 available to a voter, you cite an article which is
15 Stein, et al, 2019.  Will you look -- it's just in
16 paragraph 1 on page 7 so that we're talking about the
17 same thing.  Yeah, that's it.  Can you look at your
18 reference list, please?
19     A.  Excuse me.  I'm terribly sorry.  I omitted.
20 That should be the Waiting to Vote article.
21     Q.  Okay.  And that was just what I wanted to
22 clarify, because if you look --
23     A.  I omitted it.
24     Q.  Well, I don't know that you did.  I just
25 wanted to make sure I had it correctly.

Page 70

1      A.  Oh, no, there it is, there it is.
2      Q.  On page 16 at the bottom --
3      A.  Yeah, I'm sorry.
4      Q.  I just want to make sure that 2019 reference
5  is also to the 2016 article?
6      A.  Yeah.  There were 38 other authors, so it's
7  usually Stein et al and then I put the Chris and
8  Charles.
9      Q.  Now, so the 2019 article is the Waiting to
10 Vote article.  What does that article discuss as it
11 relates to placement of polling locations?
12     A.  There were efforts to, in that particular
13 study, look at where people had chosen to vote on
14 election day when they had choices.  And we review a
15 body of literature in there.  I think that the general
16 finding was that, what I've said before, which is that
17 some people prefer to vote at a location closest to
18 their home.  Still other people prefer to vote at a
19 location closer to work and shop.  And then that paper,
20 my recollection is that we differentiated people by age.
21     Q.  Okay.
22     A.  So older and older over 65-year-old voters
23 might prefer to vote near their home because they are
24 not working during the day.  Others who work during the
25 day or shop or go to school, still others are captured

Page 71

1  by this virtue of not having a vehicle, access to public
2  transportation.
3      Q.  What does your 2019 article, Waiting to Vote,
4  identify in terms of best practices for the number and
5  placement of early voting locations?
6      A.  I don't think it directly addresses that
7  question, except to say that more locations which give
8  voters more choices, enhances both their satisfaction
9  and likelihood of -- the measure we really looked at
10 were people who walked away from a polling place or
11 didn't attend to that polling place because it was
12 further from their home or in a neighborhood that they
13 were not familiar with.
14     Q.  What did you find was the most significant
15 determinant or factor that caused someone to walk away
16 from a polling location?
17     A.  Long lines, waiting times, and in that
18 particular paper the presence of a state requirement for
19 photographic voter IDs in minority communities.
20     Q.  Did I read that you determined that sort of
21 the greatest contributors to voter satisfaction or in
22 preventing that situation, which I think you called
23 reneging, had to do with a well-equipped, well-staffed
24 polling location?
25     A.  Yes.  I have to review the paper.  My

Deposition of Robert Stein, PhD
12/10/2019

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 490 of 677

Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 72

1 recollection was number of poll workers was a
2 significant factor in reducing or reneging and how it
3 affected wait times.
4    Q.   Is there -- on some level I guess is it easy
5 to say that more polling locations always results in
6 greater convenience; is that fair?
7    A.   I think that's a fair statement, yes.
8    Q.   I mean if anybody -- if we had enough polling
9 locations to where everyone had one across the street,
10 you have an ideal situation where convenience is somehow
11 maximized, correct?
12    A.   Yes, I think, yeah.
13    Q.   But there are limiting factors on how many
14 polling locations you can have?
15    A.   Absolutely.
16    Q.   Cost is one, but as you just mentioned, the
17 availability of poll workers, correct?
18    A.   That's correct.
19    Q.   Because for every polling location you add,
20 you have to have polling workers to work it; true?
21    A.   That's correct.
22    Q.   You also have to have machines for voting to
23 take place there, right?
24    A.   (Nods affirmatively.)
25    Q.   You also have to have an available site that

Page 73

1 the county can access to and can use; true?
2    A.   That's correct.
3    Q.   So you cite I think -- well, let me ask you
4 this.  So the Waiting to Vote paper was specifically
5 addressing election day voting, correct?
6    A.   That's correct.
7    Q.   And in particular, election day vote centers?
8    A.   Specifically precinct-based voting where
9 they're -- yes, and some election day vote centers, yes.
10   Q.   Will you clarify for the record, just for the
11 court and jury knows, but what an election day vote
12 center is?
13   A.   Election day vote center is very much like
14 early voting except that on election day you're allowed
15 to vote in any polling location operating in that
16 jurisdiction.
17   Q.   And as an academic, do you distinguish between
18 election -- an election day voter and an early voter?
19   A.   Oh, yes.
20   Q.   All right.  What are some of the differences
21 between people who tend to vote on election day versus
22 people who tend to vote early?
23   A.   Well, it's changed over time.  Originally it
24 seemed to be that people who voted early were older,
25 frequent voters, strong partisans.  Over time that

Page 74

1 difference has lessened and increasingly we find that
2 early voters look very much like election day voters.
3    Q.   Okay.  Are election day voters often late
4 deciders?
5    A.   They were in the earlier period.  I've not
6 seen any research that suggests that that difference
7 is -- what's the right word here -- has persisted.
8    Q.   When you say "the earlier period," can you
9 give me kind of a year timeframe?
10   A.   The earliest papers written on in-person early
11 voting at satellite sites were probably in the late
12 '90s.  If you know, Texas was probably the first state
13 to adopt in-person early voting satellite voting, and
14 the very first paper may have been my own called Early
15 Voting and Introduction, but since then the research has
16 suggested that that difference -- and there are some
17 other differences among early and election day voters,
18 one of which was early on that people didn't -- were
19 late deciders.  They didn't know who to vote for.  So
20 they didn't vote early.  They waited until election day.
21        Still other evidence in that paper called
22 Voting in a Less Convenient Way, was that some people
23 just wanted to wait until election day, not because they
24 hadn't decided but they wanted to make certain they had
25 all the information that might transpire.  And there

Page 75

1 were still other reasons as I pointed out.  Some people
2 like to be seen and see other people in their
3 neighborhood or they know voting.
4    Q.   You also cite 2008 and 2011 and 2012 articles
5 that you did with a gentleman -- I'm going to bumble his
6 name.
7    A.   Vonnahme.
8    Q.   Vonnahme.
9        THE REPORTER:  Could you spell it?
10       MR. SEAQUIST:  V-o-n-n --
11       THE WITNESS:  A-h-m-e.
12       MR. SEAQUIST:  Team effort.
13   Q.   (BY MR. SEAQUIST)  The 2011 and 2012 articles
14 also measure the effect of election day vote centers on
15 turnout, correct?
16   A.   That's correct.
17   Q.   And neither of those articulates or purports
18 to state any best practices for early voting, correct?
19   A.   No, they don't make any specific reference to
20 early voting.
21   Q.   Okay.  You -- in the paper you find that to
22 date, the evidence to support increased turnout has been
23 scant and modest at best.  Few researchers have found
24 that any form of non-precinct voting has had a
25 significant or a large effect on voter turnout?

Deposition of Robert Stein, Ph.D.
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 491 of 677
12/10/2019                                    Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 76

A. Yes, with one exception.

Q. And what was that one exception?

A. That would be election day vote centers.

Q. But the research has generally shown that early day voting doesn't have any appreciable increase in turnout, correct?

A. That is correct.

Q. And in fact, Burden, et al had found that early voting, the presence of early voting, can actually decrease overall turnout?

A. That is correct. Others have as well.

Q. You have talked a couple of times today about Fullmer, F-u-l-l-m-e-r?

A. Yes, I dropped the N.

Q. And he wrote an article in 2015, and it is one that you have also cited in relation to a best practice for the number and location of polling places. Do you see that?

A. Yes.

Q. Now, Fullmer also -- well, Fullmer was trying to measure the efficacy of early voting locations based on increased turnout, right?

A. That's correct.

Q. And he also cited the research showing no increase in turnout from early voting; true?

Page 77

A. That's correct.

Q. But he was trying to identify there was some amount of density of voting locations that might produce a different result?

A. That's correct.

Q. And he did find with sufficient number of early voting locations there could be a modest increase in turnout?

A. It was a significant increase and I wouldn't characterize it as modest.

Q. Okay. If I looked at his results I think what he said was that he found that a county with 10,000 voting age residents, not registered voters but voting age residents, would have to add ten early voting sites or the equivalent of one site per 1,000 residents just to get a two percent increase in turnout; is that right?

A. That is correct.

Q. And so does that mean that a county of Waller's size would have to add one voting location for every thousand --

A. Yes.

Q. And so if we -- I don't have --

A. I think there are -- you're trying to remember how many registered voters? I shouldn't be doing this.

Q. No, that's fine.

Page 78

A. There are 31,000 registered voters and that would probably be about -- well, you do your math.

Q. Sure, but that's registered voters and here is actually -- it's -- there are 31,000 registered voters but what Dr. Fullmer looked at was actually one polling location per 1,000 voting age residents. So I don't know -- what I was saying is I don't know what the voting age residents numbers is. Is that something that you ever looked at?

A. Yeah, I did. It's in my report and -- it's not in my report, it's in Mr. Cooper's report, citizen voting age population. So I was trying to remember from Cooper's report but I can't.

Q. Okay. But -- so assuming if we just use registered voters, which is a subset of voting age population, then one per 1,000 we would be to, what, about 31 polling locations in the county, but if we used actually voting age residents it would be more than that?

A. That's correct.

Q. And that's what it would take just to sustain a two percent increase in turnout, correct?

A. Based on Mr. Fullmer's review, yes. Of course, I should -- if I can, Fullmer's was based on a national study and, of course, we'd have to ask what

Page 79

would it take to do that in Waller County.

Q. And as part of your research in this case, you haven't undertaken any analysis to determine that as it relates to Waller County?

A. No, I have not.

Q. In any event, access as you defined it, as we have looked at the practices in these papers, is measured by the effect on actual voting, correct?

A. No.

Q. Go ahead.

A. As I've been asked and as I've attempted to answer, I was not looking at the relationship between availability, best practices or incidents of early voting on turnout. I was only asked to look at was there equal access to early voting, and so I drew on literatures that look at many of the questions about relationship being overloading and turnout, to understand what might be best practices about early voting.

But the only question that I tried to address in my research, in my report, was did the voters in the three populations, the plaintiffs, have equal access to early voting in Waller County.

Q. Well, doesn't access have to be measured in relation to its impact on turnout?

Deposition of Rebecca Stein, Ph.D.
12/10/2019
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 492 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 80

1  A. No.

2  Q. All of the research that we have looked at
3 today measures the effect of these various variables by
4 changes in turnout, correct?

5  A. Yes.

6  Q. And I guess that's one of your criticisms of
7 Dr. Gimpel's report in your rebuttal is, you actually
8 say that whether voting or whether a voting practice
9 increases or decreases turnout, is irrelevant to this
10 case. Is that your opinion in this case?

11  A. Yes. It was not the question -- I should be
12 very clear. I'm going to clarify. The question I was
13 asked to study was whether there was equal access to
14 early voting. I was not asked to look at whether or not
15 early voting increases voter turnout.

16  I'm not a lawyer and I don't know the law, but
17 as an empirical question I drew from the literature that
18 was available to me, I think to anyone who reads it, to
19 ask -- to answer the question were the plaintiffs in
20 this case denied equal access to the opportunity to vote
21 early.

22  Q. Okay.

23  A. I will note that in my report I came across a
24 finding that was somewhat surprising, and that was the
25 fact that a vast majority of voters both in the county

Page 81

1 and in the case of the Prairie View A&M population,
2 student population, voted early. That is to say 81
3 percent, if I recall correctly, of votes cast among
4 registered voters in the Prairie View A&M campus, was
5 early voting.

6  In the county, overall, it was 66 percent, and
7 if you were to take out the Prairie View A&M voters and
8 recalculate, so what share of the vote was cast early,
9 that number rises.

10  So my question would be or my observation
11 would be, maybe early voting is voting. Again, I've
12 opined in the report, but it was not what I was
13 asked to establish.

14  Q. Okay. You have given an expert opinion before
15 in a voting rights case that equal access in your
16 language is determined by whether a person could vote
17 and were there any impediments under the current voting
18 system, correct?

19  A. That's correct.

20  Q. Now you served as an expert in the matter of
21 Mark Wandering Medicine et al. versus McCulloch?

22  A. That's correct.

23  Q. You were an expert for the defense in that
24 case?

25  A. Yes.

Page 82

1  Q. And that case was not cited in your
2 qualifications section, I don't believe. Was it just
3 left out?

4  A. No, isn't that the same case? I hope I cited
5 it properly. That's the South Dakota case, the Lakota
6 Indian.

7  Q. No, this was a case in Montana.

8  A. Oh, you're absolutely right. I did omit that.
9 I had forgotten it. I apologize. Yes.

10  Q. That was a case, I believe it was the same
11 attorney that you worked with --

12  A. Yes.

13  Q. -- from the Thomas Poorbera case, correct?

14  A. Yes.

15  MS. ADEN: May I correct for the record?
16 If you look at Dr. Stein's CV that's attached to his
17 first report, he has it at the very end.

18  MR. SEAQUIST: Okay. Well, the record
19 question was whether or not he omitted it from the
20 qualifications section of his report.

21  MS. ADEN: Gotcha. Okay.

22  A. Yeah, I did.

23  Q. (BY MR. SEAQUIST) Let's see here.

24  (Exhibit No. 5 marked.)

25  Q. (BY MR. SEAQUIST) I'll give you what I've

Page 83

1 marked Exhibit 5.

2  MS. ADEN: Thank you.

3  Q. (BY MR. SEAQUIST) And I'll ask you if you --
4 take the time to look at it, but I'll ask you if you
5 recognize this as the complaint from the Mark Wandering
6 Medicine case?

7  A. Yes.

8  Q. Okay. Now this was a case that also involved
9 equal access to early voting on a Native American
10 reservation?

11  A. That's correct.

12  Q. And this case actually involved three
13 reservations in three separate counties in Montana; is
14 that true?

15  A. That's true.

16  Q. And the allegation in this case was also that
17 the plaintiffs had been denied equal access to the
18 ballot because there was not a satellite early voting
19 location on the respective reservations, right?

20  A. That's correct.

21  Q. Now -- and again, the allegations were that
22 there were early voting locations in majority white
23 areas but the residents of the reservation had to drive
24 significant distances to cast an early ballot. Is that
25 right?

Deposition of Robert Stein, PhD
12/10/2019
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 493 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 84

1    A.   That's correct.

2    Q.   Okay.  And in my review of the complaint there

3  were three reservations, the Crow, Fort Belknap and

4  Northern Cheyenne?

5    A.   That's correct.

6    Q.   And just in reviewing the allegations from the

7  complaint, it was alleged that the Crow reservation was

8  a 27-mile round trip from the early voting location?

9  Does that sound about right?

10    A.   Oh, yes.  My recollection is that's correct.

11    Q.   Fort Belknap was a 43-mile round trip distance

12  from the reservation, correct?

13    A.   That's correct.

14    Q.   And the Northern Cheyenne was 113.8, they

15  stress that, .8 miles round trip; is that true?

16    A.   I recall that to being correct.

17    Q.   Okay.  I'm sorry, did you say incorrect or

18  correct?

19    A.   No, correct, correct, I'm sorry.

20    Q.   And once again, the relief the plaintiffs were

21  seeking in that case was to have an early voting

22  location on the reservation; is that right?

23    A.   That is correct.

24    Q.   All right.  Now you gave a deposition in that

25  case as well; true?

Page 85

1    A.   Yes.

2    Q.   Okay.  I'll hand you what I've marked as

3  Exhibit 6 to your deposition.

4         (Exhibit No. 6 marked.)

5         MS. ADEN:  Thank you.

6    Q.   (BY MR. SEAQUIST)  Now, I will represent to

7  you, Dr. Stein, that what I have handed you is not a

8  complete deposition.  It is a set of excerpts that was

9  filed in support of a motion for summary judgment by the

10  defendants in that case.  Do you recall that taking

11  place?

12    A.   Yes.

13    Q.   All right.  However, I'd like to talk to you

14  about some of these excerpts today.  This is from the

15  deposition of Robert Stein, April 2nd, 2014.  Does that

16  sound right?

17    A.   Yes.

18    Q.   And you gave this deposition here in Houston,

19  Texas?

20    A.   Yes.

21    Q.   And the gentleman who took the deposition was

22  a lawyer by the name of Steven Sandven?

23    A.   Yes.

24    Q.   All right.  And you were, I won't say

25  represented, but joined by counsel -- that's a good name

Page 86

1  for a lawyer, Ms. Frankenstein?

2    A.   Sara Frankenstein.

3    Q.   Okay.

4    A.   Ms. South Dakota of 2006, by the way.

5    Q.   All right.

6    A.   Just for the record.

7    Q.   That's a good name for a Ms. South Dakota too.

8  Okay.  All right.  Now you affirmatively testified in

9  this deposition in the Mark Wandering Medicine case,

10  that equal access was determined by whether there were

11  any impediments to somebody voting in the three counties

12  in which the reservations were located; is that right?

13    A.   If I recall, and I have my expert report that

14  I submitted, I was asked the question of whether or not

15  the plaintiffs' claim that lack of early voting

16  opportunities on the reservation impeded voter turnout.

17    Q.   If we look at page -- the way these

18  depositions were -- and by the way, the highlighting in

19  this exhibit was highlighting that was done prior to the

20  filing of the motion for summary judgement.  So what you

21  have here is a copy of the court filed document.  I did

22  not make any of that highlighting.  That was in the

23  document beforehand.  I just want to make that clear for

24  the record.

25         On page 16 of the deposition, can you see the

Page 87

1  deposition pages in the top corner there?  You were

2  asked, it says:  Do you know what the legal issue the

3  court is being asked to decide?

4         And you said:  I read the -- I don't know if

5  it's called the judge's order, a document that

6  Ms. Frankenstein presented to me about a week ago, maybe

7  10 days ago.  I'd have to look at.  I understand from

8  reading the judge's order in this case that the issue

9  here was, of course, as you've described, equal access,

10  or in my language could a person vote and were there any

11  impediments to someone voting under the current

12  arrangements in the three counties.

13         Have I read that correctly?

14    A.   Yes.

15    Q.   And you understand that as being what you were

16  asked to opine on?

17    A.   That's correct.

18    Q.   And you were asked on page -- the depositions

19  skip around, but if you look to deposition page 65.

20    A.   Got it.

21    Q.   You were asked how you are defining impeded.

22    A.   Were you --

23    Q.   Line 21 on page 65.  How are you defining

24  impeded?

25         Do you see that?

Deposition of Rebecca Stein, PhD
12/10/2019

Case 4:18-cv-03985    Document 73-2    Filed on 01/24/20 in TXSD    Page 494 of 677

Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 88

1    A.   Yes.

2    Q.   And can you read me your answer there?

3    A.   Impeded in this case is a statistical -- it's
4  a probabilistic estimate.  The best I can do with the
5  data I have available is to ask a simple question, and
6  the simple question is this:  Given what happened in
7  in-person absentee voting -- excuse me -- given what
8  happened in 2012, were persons who lived further from
9  the county seat and on a reservation less likely to vote
10 relative to voting by mail, voting in-person absentee or
11 on Election Day?  My statistical analysis sets up our
12 criteria for making conclusion.

13   Q.   Okay.  And so you -- the specific analysis
14 that you undertook in the Wandering Medicine case, was
15 to determine whether the early voting in the 2012
16 election resulted in anyone not voting -- or excuse me,
17 the availability of early voting resulted in anybody not
18 being able to cast a ballot in the 2012 election; is
19 that right?

20   A.   Not quite.  And again, I'd have to review my
21 expert report and my testimony here, but what I was
22 asked was given all the options that were available to a
23 voter on the reservation and given the distance they
24 were from the county courthouse, did it have an effect
25 on their likelihood of voting.

Page 89

1    Q.   Okay.  And your determination was that it did
2  not, correct?

3    A.   That is correct.

4    Q.   That the absence of early voting on the
5  reservation did not have an effect on whether they cast
6  a ballot or not?

7    A.   That is correct.

8    Q.   Now you've also drafted -- you've testified a
9  couple of times that you drafted an expert report?

10   A.   Yes.

11   Q.   Do you know how many expert reports you
12 drafted in the Wandering Medicine case?

13   A.   I think there were two as well, but I know
14 definitely one where I did this analysis and then I had
15 a rebuttal to their expert.

16   Q.   And do you still have those reports today?

17   A.   Yes, I do.

18   Q.   All right.  Now in your report, if we look
19 back to page 19 of the deposition.  Starting with the
20 highlighted portion there.  1 A, paragraph 2.  And if
21 you need to read kind of the preceding portion of that
22 for context, is this you identifying what you addressed
23 in the report that you prepared in the Wandering
24 Medicine case?

25   A.   I'm just going to read it.

Page 90

1    Q.   Of course.

2    A.   Yes.

3    Q.   Okay.  Will you read that into the record,
4  please?

5    A.   In this report I address the veracity of this
6  claim and offer an opinion on whether access to any use
7  of in-person absentee voting is significantly related to
8  the incidence of voting among Indians and non-Indians
9  citizens in the Montana counties of Big Horn, Blaine and
10 Rosebud.

11   Q.   And as part of your analysis you found that it
12 was not, correct?

13   A.   That is correct.

14   Q.   And so in testing what we saw as a question of
15 equal access, your specific methodology was to opine as
16 to whether access to and use of in-person absentee
17 voting is related to the incidence of voting among the
18 citizens?

19   A.   That's correct.

20   Q.   On page 26 of the deposition in the Mark
21 Wandering Medicine case, starting at line 2 in the
22 highlighted area, do you see that?

23   A.   Yes.

24   Q.   You were asked:  Did you draw that opinion in
25 any way, that Indians have equal access to the political

Page 91

1  process, in any of your three reports?

2         And can you read your response, please?

3    A.   I drew the inference and the conclusion that
4  the plaintiff's position that distance from the county
5  seat for residents of an Indian reservation is not an
6  impediment, obstacle to voting in-person absentee or in
7  any other manner in the 2012 election over not voting.

8    Q.   My apologies.  Does that accurately reflect
9  your findings in the Mark Wandering Medicine case?

10   A.   Yes, it does.

11   Q.   There was also a portion of the testimony in
12 your deposition where you were asked some questions
13 about causation for purposes of a voting rights claim.
14 Do you remember any discussion about causal
15 probabilities and causation?

16   A.   I vaguely remember it.

17   Q.   Okay.  Let's look at that.  If we look at page
18 166 of the deposition.

19        MS. ADEN:  Gunnar, for the record, so you
20 mentioned that the highlighting is from how this was
21 filed in court.  Are the excerpts that are included as
22 this exhibit also just what was filed with the court or
23 you excerpted out the ones that you wanted?

24        MR. SEAQUIST:  No, this is the entire
25 document 204-2 from Pacer.

Deposition of Robert Stein, Ph.D
12/10/2019

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 495 of 677

Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 92

1   MS. ADEN: Got you.
2   Q. (BY MR. SEAQUIST) Okay. Now, this
3   discussion -- was there a competing expert or an expert
4   on the other side of you by the name of Ms. Schroedel?
5   THE REPORTER: Will you spell that,
6   please?
7   MR. SEAQUIST: Yes, I will.
8   S-c-h-r-o-e-d-e-l.
9   THE REPORTER: Thank you.
10   Q. (BY MR. SEAQUIST) Who is Professor Schroedel?
11   A. I think she's a professor at Claremont
12   University in California.
13   Q. And you were asked on page 166 at 12: What do
14   you think the judge is asking for on causality? And I
15   don't -- well, can you just read your response?
16   A. What I said was: Was there a -- when I read
17   the order he defined causality, he said a causal or he
18   didn't define it. He said a causal relationship. Of
19   course, in my -- what do I call it -- Exhibit 69 I talk
20   about what -- how I think about causality and how my
21   thinking of causality influence how I chose variables.
22   I have a clear idea of what causality means. I won't
23   read the thing to you again but I have a -- I have a
24   clear idea of what the standard is for that. We both --
25   the two experts, Ms. Schroedel and I, Professor

Page 93

1   Schroedel and I, I assume attempted that causality.
2   Q. And the next paragraph?
3   A. I believe I came closer to the notion. I
4   don't know, I really don't. I heard that phrase used in
5   textbooks a lot -- oh, I'm sorry.
6   Q. No, no, no.
7   A. I missed it.
8   Q. Yeah, I know, I'm sorry, it goes to the top of
9   the page.
10   A. A causal, probabilistic relationship. I don't
11   think --
12   Q. I'm going to stop you for a second.
13   A. I'm sorry.
14   Q. I'm sorry. That just came out a little
15   strange on the record. Will you start with I believe I
16   came much closer at the bottom?
17   A. I believe I came much closer to the notion of
18   a causal, probabilistic relationship. I don't think
19   that Professor Schroedel attempted to answer that
20   question. She gave us evidence that there are people
21   who -- Native Americans who are disproportionately poor,
22   less educated. I believe that's true. My data would
23   show the same. What she has not attempted to test is
24   that the relationship to the incidence of voting on the
25   central question of distance and residence on a

Page 94

1   reservation. I attempted to do that.
2   Q. So in trying to determine whether the
3   availability of early voting for a causal relationship
4   to equal access, you tried to determine the relationship
5   of incidence of voting on the central question of
6   distance and residence on the reservation. Is that a
7   fair statement of what you're saying there?
8   A. I don't believe so. And again, I want to be
9   very clear. I'd have to reread my report here, but what
10   I wrote here, my recollection goes back to the core
11   question. Was there a relationship between voting and
12   distance from early voting locations, mail in voting or
13   any other type of voting against just voting.
14   Q. Okay.
15   A. So again, as I said earlier, what I was asked
16   in this case is extremely different than what I was
17   asked in this case, Waller County. In the Waller County
18   case I was simply asked, is there a disparity in the
19   access to early voting among the plaintiffs in the case.
20   In the Mark Wandering case, I was asked a very
21   different question, very much what Mr. Gimpel, Professor
22   Gimpel asked, which is, if there were more better
23   practices of early voting, would more people vote. I
24   think my research demonstrates, and I have written in my
25   report, that I am not familiar with any research that

Page 95

1   shows that early voting has an appreciable effect on
2   voter turnout, and I cited evidence that would suggest
3   that early voting has a depressing effect on voter
4   turnout.
5   However, as I wrote in my report, the right to
6   vote is the right not to vote. So the issue of voting
7   or not voting, as Jim Gimpel points out, is due to a
8   myriad of factors. In my expert in the Wandering case,
9   I talked about much of the same literature.
10   Q. Okay.
11   A. To the extent that some election procedures
12   affect turnout, that was not what I studied in the
13   Waller case. Again, what I studied in the Waller case
14   was simply whether there was disparity in the access of
15   plaintiffs to early voting. Nor, I should say, did I
16   attempt to explain why that disparity might exist as to
17   the intention or causality of behavior, and I think on
18   page 13 of my report I specifically say I don't know why
19   this access and lack of it for the plaintiffs exists.
20   I opine about two possible explanations but I
21   don't attempt to offer a causal explanation. So the
22   Mark Wandering case, the other case in South Dakota with
23   both with Ms. Frankenstein, addressed the same question.
24   Did opportunities to vote early in person on election
25   day or by mail, have any effect on the likelihood that

Page 96

1 somebody voted. Question. Question in the case of
2 Waller and the plaintiffs was entirely different. Was
3 there an opportunity, an equal opportunity for the
4 plaintiffs to vote early.
5     Q. Wasn't the issue in both cases whether there
6 was equal access to early voting?
7     A. I would not believe so. That would be not my
8 recollection of the case.
9     Q. Wasn't that the claim of the plaintiffs in
10 both the Poorbera and the Wandering Medicine case, was
11 that they did not have equal access to early voting
12 because as a majority or effectively entire Native
13 American population, they had no early voting polling
14 location, whereas the white majority area in the county
15 did have an early polling location?
16     A. In the -- let me say in the Mark Wandering
17 case, there was a charge that the lack of access had an
18 effect on voting. I could not show that.
19     Q. Okay.
20     A. In the poor -- help me here. In the other
21 case, poor -- in Thomas Poorbera, you probably haven't
22 found my expert report because it wasn't filed. I do
23 have a copy of it.
24     Q. Yes.
25     A. Guess what I found.

Page 97

1     Q. What did you find?
2     A. The exact opposite, that there was an
3 impediment to voter turnout. That is to say there was a
4 significant and large negative relationship between
5 access to early voting and the incidence of voting. Or
6 to put it bluntly, it all depends on where -- that is to
7 say, as Jim Gimpel has aptly pointed out, there are a
8 myriad of factors that intervene between the election
9 administration, early election day, absentee and the
10 voter's choice of voting.
11     That's a very complicated question.
12 Ms. Frankenstein said thank you for your time and that
13 was the end of my engagement for the plaintiff -- excuse
14 me, for the defense. I could not offer the evidence
15 that they were hoping to have.
16     My point, it all depends on where you're
17 sitting, but those are entirely different questions and
18 what -- I want to be very clear, in my mind, because I'm
19 not a lawyer as to whether or not equal access to voting
20 early is tantamount to voting.
21     Intellectually, I make a very big distinction
22 that the person's decision to vote may or may not pinge
23 on whether or not the opportunity to cast their ballot
24 early, election day, or by mail, is available to them.
25 I readily acknowledge that the literature in the field,

Page 98

1 including Jim's expert report, shows generally,
2 generally, there is no relationship and, in fact,
3 negative.
4     But as I said in the -- Thomas Poorbera, every
5 once in a while, in a single case, in a single year, in
6 a single election, you'll find that.
7     Q. You've not done any analysis to determine
8 whether there was any relationship between the early
9 voting schedules in Waller County and the incidence of
10 voting at Prairie View, correct?
11     A. No, I have not.
12     Q. And you're not offering any opinion as it
13 relates to that?
14     A. No, I am not.
15     Q. You're not offering any opinion that the early
16 voting hours as they were adopted had any effect on the
17 incidence of early voting, correct?
18     A. No, I'm not.
19     Q. Is it fair to say, then, that your analysis of
20 access is really just a comparison of the number of
21 hours?
22     A. Days, hours, location, some notion of
23 convenience for certain groups of people who might not
24 have access to private vehicles, public transportation,
25 and the other criteria, the best practices I had laid

Page 99

1 out -- in my report.
2     Q. All right. Now if we look at No. 2, Distance
3 and travel time to the polling place. You state that:
4 Several researchers (Dyck and Gimpel, Gibson et al,
5 Gimpel and Schuknecht and Cantoni) have shown that the
6 distance and travel between a voter's residence and
7 their designated and/or available polling location, has
8 a significant and negative effect on ballot access.
9     When you say "ballot access" there, you are
10 specifically relating to turnout, correct?
11     A. Yes, yes, yes.
12     Q. So when we say "access" there, you're talking
13 about turnout, right?
14     A. That's correct.
15     Q. Which is incidence of voting?
16     A. That's correct.
17     Q. Now in the Mark Wandering Medicine case, you
18 found that a distance of 113.8 miles did not have any
19 effect on the incidence of voting, correct?
20     A. That's correct. I should say that that was
21 calculated for each voter so that was on average, that's
22 correct.
23     Q. Now, in Dyck and Gimpel's paper, they don't
24 find that distance affects overall turnout, correct?
25     A. No, they find it -- Dyck and Jim found it on

Deposition of Robert Stein Ph.D.
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 497 of 677
12/10/2019                                                      Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 100

1 early voting.
2    Q.   Right.  And what they found specifically is
3 distance has an effect on whether somebody votes early
4 or on election day but not whether they vote at all?
5    A.   That's correct.
6    Q.   Okay.
7    A.   It's one of the few papers that actually is on
8 point on that issue.
9    Q.   Okay.  Have you analyzed -- other than student
10 voters at Prairie View A&M, have you analyzed the
11 distances traveled by other voters in Waller County to
12 get to polls?
13    A.   I believe I reported on distances for all
14 voters, but that's a very good question.  I'd have to go
15 back and double check.  In table 1 -- no, I do not.  I
16 do not.  The answer to that question is I do not.  I did
17 not.
18    Q.   So you can't make any comparison between the
19 distances faced by Prairie View A&M students to vote
20 either at the Memorial Student Center or the community
21 center versus a voter in other locations?
22    A.   No, I did not.
23    Q.   What did you find in terms of best practices
24 as it relates to transportation to the polls?
25    A.   Well, I found that Prairie View A&M students

Page 101

1 did not have what I would call reliable or convenient
2 means to get to a voting location off the campus, that
3 is to say other than the Memorial Student Center.
4    Q.   Is it fair to say that transportation becomes
5 more necessary the further away a voting location is?
6    A.   I think that's true but not exclusively,
7 because again, as I said, transportation's about
8 convenience.  If I can give you an example that would
9 come to mind and would be very prominent in Waller
10 County, I might live as you depicted here as a bird
11 flies, .28 miles from my house to let's say a voting
12 place, but that .28 miles traverses Highway 59, and so
13 obviously I have to go down Highway 59 some distance,
14 find a turnaround or an exit and come back around.
15        So in urban and particularly in rural areas
16 where distances become a matter of convenience, is there
17 some impediment of getting across the freeway or a
18 field, and that clearly was in this case.  These
19 distances that you refer to in the Wandering and the
20 other cases in Montana were enormous distances because
21 there were no roadways.
22        They didn't have a network of roads that would
23 interconnect the reservations to the distances.  So yes,
24 I'm not disagreeing but I think we've got to take into
25 consideration that Waller isn't an urbanized county and

Page 102

1 so distances may not necessarily be the best measure.
2    Q.   Okay.
3    A.   Or the only measure, I should say.
4    Q.   And again, a single polling location is going
5 to have to serve a multitude of voters in an area?
6    A.   That is correct.
7    Q.   And so for any placement where you put a
8 polling place, you are going to have some voters who are
9 inherently closer to it and some who are inherently
10 farther away?
11    A.   Both in terms of distance and travel time,
12 yes.
13    Q.   And even on the -- for example, if you were to
14 move the polling location on campus from the student
15 center to another location on campus, it may be closer
16 to -- it may move further away from one of the
17 resident's houses and move closer to another resident's
18 house, correct?
19    A.   That is correct.
20    Q.   And so even a move on campus may inconvenience
21 some students while conveniencing others, correct?
22    A.   Yes.
23    Q.   And that's true of any location in the
24 community as well?
25    A.   That is correct.

Page 103

1    Q.   All right.  Let's talk about the hours of the
2 polling place.  You cite a piece from Fullmer, talks
3 about hours.  All right.  None of the articles that
4 you've cited give a best practice for the number of
5 early hours to hold early voting; is that true?
6    A.   That's correct.
7    Q.   Okay.  Now you cite the Garmann case.  It's
8 not a case.  It is an article by Sebastian Garmann, and
9 I am sure there's a better German pronunciation for
10 that, but that was actually a study that was conducted
11 in Germany; is that correct?
12    A.   That's correct.
13    Q.   And it was specific to two local elections in
14 Germany, and it related only to election day voting;
15 true?
16    A.   That is correct.
17    Q.   And specifically, it related to the reduction
18 of voting hours on election day in those elections?
19    A.   That is correct.
20    Q.   And I want to say -- you can correct me if I'm
21 wrong, it was like a three-hour overall reduction on
22 election day?
23    A.   Yes.
24    Q.   Okay.
25    A.   That's my recollection.

Deposition of Robert Stein, Ph.D.
12/10/2019
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 498 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 104

1    Q.   And Garmann measured the effect of that
2  reduction on election day?
3    A.   Right.
4    Q.   Okay.  You understand in this case that Waller
5  County did not reduce in any way the early voting hours
6  available on the Prairie View A&M campus from prior
7  years?
8    A.   Yes, that's my understanding.
9    Q.   Okay.  Do you have an understanding as to
10 whether, in fact, the hours were increased over prior
11 years?
12    A.   Yes.  Not over prior years but my
13 understanding was they were increased in this election
14 by the second week.
15    Q.   Okay.  But as originally adopted, do you have
16 an understanding as to whether the amount of hours
17 allocated were actually greater than had been allocated
18 in the past?
19    A.   They had been, yes.  My recollection is that
20 over time more early voting was provided throughout the
21 county over time from the period I was looking at the
22 beginning of the -- of this last century.
23        I can't -- yes, the answer to your question is
24 yes, Prairie View A&M campus had more early voting
25 hours, as did over the entire county as demand for early

Page 105

1  voting increased significantly in the county over that
2  period of time.
3    Q.   Okay.  As it relates to the number of days and
4  the days of the week for the polling place, none of the
5  articles that you cite actually articulate a best
6  practice for the number of days for early voting; is
7  that correct?
8    A.   That's correct.
9    Q.   And you understand that throughout Texas,
10 early voting days are widely variable?
11    A.   I understand the law has what we call a lower
12 floor, but it doesn't have a ceiling until just recently
13 a new bill was passed by the legislature.  So there was
14 a range and there were requirements that if you did the
15 early voting at a particular location, you were -- I use
16 the word -- not best practices, required practices.
17    Q.   Okay.  The election code sets out specific
18 days that certain polling locations have to be open,
19 correct?
20    A.   Sets out days, hours, number of per -- help me
21 here, state legislative office, I think assembly
22 districts and state senate districts, so there's a
23 constraint on if you -- you have to have an equal number
24 or a minimum number of in each of these legislative
25 districts for a certain number of days and a certain

Page 106

1  number of hours, and there's some flexibility, yes.
2    Q.   And you're not offering any opinion in this
3  case -- do you need some water?
4        (Off the record from 11:33 to 11:33.)
5        (Requested material read.)
6    Q.   (BY MR. SEAQUIST)  That the early voting
7  schedule adopted by Waller County for the 2018 general
8  election violated any provisions of the Texas
9  Election --
10    A.   No.
11    Q.   -- Code?
12    A.   No.
13        THE REPORTER:  The Texas what?
14        THE WITNESS:  Sorry.
15        MR. SEAQUIST:  Election Code.
16    A.   And my answer is no.
17    Q.   (BY MR. SEAQUIST)  Now Fullmer is what we
18 talked about earlier in terms of citing density.
19 Fullmer also looked at the potential effect on turnout
20 of adding additional voting days in his article; is that
21 right?
22    A.   Yes.  I do remember that, yeah.
23    Q.   All right.  And I believe what he said is
24 there can be some increase in turnout if you add
25 additional days but it's very small.  Does that sound

Page 107

1  right?
2    A.   That's -- yes, and it was conditioned on the
3  density of the population of voters.
4    Q.   Yeah, and I'm going to read his numbers.  It's
5  in the paper but I think I've got it right, you tell me
6  if you think I'm wrong.  That you would need an
7  additional 14 and 21.5 days respectively for the 2008
8  and 2012 elections just to garner one extra point of
9  turnout.  Does that sound right?
10    A.   That's correct, yes.  Those were presidential
11 elections which were already very high so I would
12 imagine that if you were to use his estimates and
13 recalculate for a midterm, that number would be larger
14 but not, you know, ten times larger.  It would be
15 larger.
16    Q.   Okay.  And of course, there is a total early
17 voting period of two weeks in Texas, right?
18    A.   I think it's 12 days to be exact and it varies
19 by type of election.  We're having one right now here in
20 Harris County in the state and I think it's eight days.
21    Q.   Got it.
22    A.   If I could just add one other piece of
23 information, as I'm sure you are familiar with this.
24 There are 34 states that have in-person early voting of
25 some form, and some of them have a month of early

Deposition of Rebecca Stein, Ph.D.
12/10/2019
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 499 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 108

1  voting.  Ohio, and they're not inconsequential states,
2  and South Dakota, we have a maximum of 12 days in
3  presidential and midterm congressional elections, but
4  much, much shorter days of early voting without as
5  many -- usually our early voting in a presidential and
6  midterm is 12 days with weekends on both ends, Saturday,
7  Sunday.  But in this municipal election, which we're
8  having now, runoff election, it's only eight days.
9      Q.  And then conversely, of course, there are many
10  states that don't allow early in-person voting at all?
11     A.  That's correct.  Fewer, I might add, with
12  California and New York adopting.
13     Q.  Do you contend that the number of early voting
14  hours and days were not adequate to accommodate the
15  number of early voters in Prairie View?
16     A.  I would say that they were not comparable to
17  what was being provided throughout the county and that
18  it didn't respond to the obvious demand that was there
19  in two ways.
20         First, the county, although it had increased
21  opportunities for early voting throughout the county, I
22  would call it an intercept, that everybody was seeing
23  more hours and days of early voting.  On the Prairie
24  View A&M campus, the students had repeatedly asked for
25  more opportunities, hours and days, and to the best of

Page 109

1  my knowledge, it was not until the 2018 election that
2  the county responded in that regard.
3         And yet, as I pointed out I think on page 13,
4  the demand on the campus as measured, demand would be
5  who did vote early as opposed to election day or by
6  mail.  Mail voting wouldn't necessarily count here
7  because you have to be over 65 and be out of the -- or
8  be out of the jurisdiction.
9         But it seemed as if when you're talking 80
10  percent plus votes cast only early voting, I counted the
11  number in my report of how many people vote on election
12  day, that would indicate to me a demand that was not
13  being met.
14         And then the students had petitioned, I think
15  that would be the proper word, requested the
16  Commissioners Court and my reading of the newspaper,
17  stories they had made these request in the past, and not
18  until the middle of -- I think that would be the right
19  way to put it, the beginning or middle of early voting
20  that the Commissioners Court decide yes, we'll extend
21  the hours and days of early voting on the campus.
22         So I call that a supply demand in the sense
23  that the students make demands.  They had shown their
24  actions in the past, in the present, and the
25  Commissioners Court responded.

Page 110

1      Q.  Okay.
2         MR. SEAQUIST:  Respectfully I'm going to
3  object nonresponsive because that wasn't quite the
4  question I asked you.
5         THE WITNESS:  I'm sorry.
6      Q.  (BY MR. SEAQUIST)  Happens all the time.  And
7  I like hearing experts talk.  Don't get me wrong, I just
8  want to go back.  My question is:  Do you have evidence
9  that the numbers of early voting hours and days on the
10  Prairie View campus were not adequate, adequate to
11  accommodate the number of voters that voted?
12     A.  No, I do not.
13     Q.  You talk about the issue of notice of polling
14  place opportunities and changes to opportunities.
15  Changes to opportunities.  What research or analysis did
16  you do to determine what the county did to inform voters
17  of the early voting schedule?
18     A.  I merely read what was on their website and
19  what was in the newspapers and the information that the
20  plaintiffs' attorneys shared with me.  I undertook no
21  independent study of that.  I did cite in my report
22  Brady and McNulty and Haspel and Knotts, who point out
23  that when you make changes in the where, the when and
24  how, people might vote, that you lead to some confusion
25  and it has a depressing of vote.

Page 111

1         In the Brady and McNulty study of Los Angeles
2  County, they found that when they changed voting
3  locations consolidated them, that voters -- there was a
4  depressed voter turnout, although there was also some
5  increased, too, and that was depressed.
6         In the Haspel and Knotts research they found
7  that confusion to voters results from modifying
8  operations even, such as little things like having a
9  voter ID requirement, had a negative effect on voter
10  turnout, but to be responsive to your question, I've
11  only done it once.  I did not undertake any independent
12  study as to whether voters had knowledge.  I have in
13  other instances, most recently in Harris County.
14     Q.  Did you look at the social media accounts of
15  the county?
16     A.  I went to their website if that's -- yes.
17     Q.  Will they also have, for example, like a
18  Facebook page?
19     A.  Yeah.
20     Q.  Okay.
21     A.  Yes.
22     Q.  So you were talking about Brady and McNulty.
23  No precincts were consolidated here?
24     A.  No.
25     Q.  And the student center was an early voting

Deposition of Rebecca Stein, Ph.D.
12/10/2019

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 500 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 112

1  location both before and after the changes the county
2  made?
3      A.  That's correct.
4      Q.  The only effect the county made as it relates
5  to after the original adoption of early voting hours,
6  was to extend the hours at the student center?
7      A.  You know -- yes, and I believe they did -- am
8  I wrong in saying that they added another machine at
9  that location?
10     Q.  That is probably right.
11     A.  There was one and they brought another machine
12  in.  I didn't say -- I was confused, I thought it was
13  another polling location, because when you look at the
14  official voter list, it shows somebody voting on a
15  different machine at a different location.  It was
16  another machine at a -- at the same location.
17     Q.  Okay.  So I will clarify for you, that
18  decision -- and I'm representing this -- was
19  actually made before the hours were changed.  But you're
20  correct, the county had allocated two machines for the
21  student center location.
22          What in your estimation would be effective
23  having a second machine -- well, based on the research
24  that you have done on the operations of the polling
25  location, what effect would having a second machine have

Page 113

1  on the ability to process voters?
2      A.  It would shorten lines and wait times, make
3  voters -- make it more convenient for the voters, which
4  is what I find in my Waiting to Vote article in the
5  Brown book.
6      Q.  Okay.  You are somewhat critical of the
7  county's use of registered voters as a criteria for --
8  as one of the criteria for allocating early voting hours
9  in the 2018 general election; is that right?
10     A.  Yes.
11     Q.  And --
12     A.  Can I --
13     Q.  Please.
14     A.  The historical incidence of registered voters,
15  and the other part was how -- who voted early and when
16  over time.
17     Q.  One of the things is that you say that
18  Precinct 309 of the student center had 4,834 registered
19  voters?
20     A.  That's correct, yes.
21     Q.  All right.  Do you know whether you included
22  suspense voters in that number?
23     A.  I believe I did not, no.
24     Q.  Are you sure?
25     A.  I'm not absolutely positive right now.  I'd

Page 114

1  have to check.  But I'm relatively certain that we
2  cleaned out suspense voters.
3      Q.  If suspense voters were included here, would
4  it be appropriate to remove them?
5      A.  It's a debate.  I made that -- I talked to my
6  colleagues about it, because suspense voters can vote,
7  so I took the more conservative approach.  There were
8  not that many.  My recollection was, so that when I did
9  the analysis both ways the numbers changed but the
10  ratios and my conclusions would not have changed.
11     Q.  Can you tell us sitting here what your
12  recollection of how many suspense voters there were in
13  Precinct 309?
14     A.  I'd have to go back and look.
15     Q.  Okay.
16     A.  I should clarify that suspense voters are
17  eligible to vote.
18     Q.  Would you agree with me that in a university
19  context, the most likely suspense voter is a student
20  who's graduated and moved on?
21     A.  I have no knowledge of that.  I think it would
22  be a reasonable hypothesis, but I'd have no knowledge of
23  that and I was under the understanding that the county
24  kept accurate voter lists.
25     Q.  Did you look at -- you compared the number of

Page 115

1  registered voters in Precinct 309 to some of the other
2  precincts -- the number of registered voters specific to
3  some of the other precincts where early voting was
4  available, correct?
5      A.  That's correct.
6      Q.  Did you take into account in calculating the
7  registered voters of those precincts the number of
8  registered voters in the surrounding precincts who due
9  to the rural nature of Waller County would also be
10  dependent on that particular polling location?
11     A.  No, I did not.
12     Q.  In your opinion, do the best practices for
13  early voting make any kind of allowances for the cost of
14  operating and opening a polling place?
15     A.  I think they should, but that was not the
16  scope of the question I was asked.
17     Q.  Okay.  Fair to say that government offices and
18  operations are expected to be mindful of costs?
19     A.  Yes, of course.
20     Q.  You are somewhat critical of the county's
21  consideration of historical turnout in allocating -- as
22  a factor in allocating early voting locations.  Isn't it
23  fair, though, to consider the actual demand and number
24  of voters in allocating what kind of capacity you need
25  in a location?

Deposition of Robert Stein, Ph.D.
12/10/2019
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 501 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 116

1    A.   Absolutely, yes.  And if I can clarify?
2    Q.   Sure.
3    A.   I would expect that Waller County would
4   consider that every time they hold an election and they
5   would update and make adjustments and corrections.  And
6   as I pointed out, when you see over 80 percent of the
7   vote cast on the Prairie View A&M campus early, that
8   would signal to you that there was demand.
9        Now is that excessive demand?  Is that demand
10  that's not being met?  I don't know, but I think what --
11  as I said in my report, what seemed to be the behavior
12  of the county was to look at what had happened and not
13  what may have changed over time and didn't adjust
14  accordingly.
15       The share of vote in the county early was
16  going up but going up at a much higher rate on the
17  Prairie View A&M campus.  And I would have thought they
18  would have made necessarily adjustments to that
19  independent of what the students on the campus may have
20  requested as further evidence of demand.
21   Q.   Okay.  So what you are talking about in that
22  80 percent number is the proportion of the votes cast on
23  campus that were cast early?
24   A.   That's correct.
25   Q.   That is a different measurement entirely than

Page 117

1   the number of voters who actually cast a ballot,
2   correct?
3    A.   That is correct.
4    Q.   If I am a county and I need to make sure that
5   there is a machine available, it is important for me to
6   know the number of voters who are going to be there to
7   cast a ballot, correct?
8    A.   That is correct.
9    Q.   And if I am a county and I need to know how
10  many poll workers I have to handle the voters, it is
11  more important for me to know the number of voters that
12  I need to have capacity for, correct?
13   A.   That is correct.  Might I add an addendum to
14  that?  The law requires, as I understand it from my
15  attorneys, so I'm not purporting to be an expert on the
16  law, that there be equal opportunity for everyone to
17  vote and vote any way the county may make available.
18       An analogy might be that if you're
19  other-abled, sight, hearing impaired, there must be
20  adequate, by Federal law, opportunities for those
21  impaired individuals to cast a ballot, and an adequate
22  number of hearing assisted voting, or even in some
23  cases, bringing the voting machine to the voter.
24       I believe that the population of voters that I
25  was asked to study, the plaintiffs, had no access to

Page 118

1   these locations off campus.  And if I were to opine,
2   you're absolutely correct, the turnout rates on the
3   college campus were considerably lower than the turnout
4   rates in the county in general.  I think it was 36
5   percent.
6        So the question arises, was the opportunity to
7   cast a ballot early tantamount to casting a ballot in
8   the election.  It's a reasonable observation that anyone
9   who voted on the campus voted early.
10       Were there an adequate amount of early voting
11  locations for all the people who wanted to vote?  I
12  don't know.  I didn't ask that question, nor was I asked
13  to study it.
14       But it strikes me that if you start seeing a
15  very high proportion of people who vote on the campus
16  early, and I might note here, as I'm sure you're aware
17  of, the turnout rates on the campus have been going up
18  but they haven't approached the turnout rates that were
19  in the county.
20       I would have thought that you would have seen
21  demand not being responded to.  That's my conclusion in
22  the report.
23   Q.   Is it typically true that turnout of college
24  students is lower than that of the population at large?
25   A.   Yes, it is.

Page 119

1    Q.   That's something you'd expect to see over any
2   college campus, correct?
3    A.   I would but that's not been the trend
4   currently.  Turnout rates in college campuses have been
5   going up.
6    Q.   Sure.  But they haven't approached the --
7    A.   No, they have not, except in the 2018.  I
8   should be very clear about that.  In the 2018 midterm
9   election, college campus turnout rates began to approach
10  an equal general population turnouts for the first time
11  in my career of studying this.
12       They have been going up and -- defense
13  attorney is absolutely right.  There's been a gap, but
14  that gap got -- now as to why, I don't know.  I wouldn't
15  even begin to suggest.  That would be a research
16  question.
17       But again, my report makes, I hope clearly,
18  that if I saw a demand for something, an election
19  official saw our students doing something and doing it
20  increasingly and asking for more opportunities to do it,
21  I would have thought, and in fact, I guess I would agree
22  with the county commissioner.  So at least in 2018 they
23  responded by increasing the number of hours.
24   Q.   This is an obvious statement, but in terms of
25  setting the hours for 2018, obviously they didn't have

Deposition of Rebecca Stein, Ph.D.
12/10/2019
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 502 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 120

1  the benefit of what the result of that election and
2  turnout, et cetera, would be, correct?
3      A.   That is absolutely correct.
4      Q.   So for any election when you are a government
5  setting an election schedule, you are looking backwards
6  in time to analyze what's happened in the past rather
7  than having the benefit of foresight as to what's going
8  to happen in the future?
9      A.   That is absolutely correct, but as my report
10 points out, I have worked for other counties on this
11 issue, as well as election day vote centers, and one of
12 the practices that I strongly urge them to do and many
13 follow it, is to use models to predict what the likely
14 turnout would have been.
15      I didn't do that here.  Let me be clear and I
16 don't know if the county did, but I take it -- what's
17 the right word here -- it seems like they must have in
18 the middle of the election, because they made a decision
19 to increase hours, had some reason for doing that.
20      And I can only opine, as I did in my report,
21 one reason was they actually started seeing this high
22 proportion of vote cast early.  The share of vote cast
23 that was cast early, or as we know from the record, the
24 students and the campus officials asked for these
25 changes.

Page 121

1      Q.   You testified earlier that it was your opinion
2  that the students had no access to off-campus polling
3  locations.  Is it your testimony that no students were
4  able to vote outside the campus?
5      A.   I hope I didn't say that.  If I did I
6  misspoke.  They had by virtue of what they did, their --
7  the number, and I think it was a small number of
8  students who voted from the campus, who voted off
9  campus.  It's in the report, was I think double digits.
10 36 or something like that.  Might have been 136.  I
11 didn't say they didn't have no access.  They had limited
12 access by virtue of the fact that they chose not to.
13 And I can only assume some of that was unlimited access.
14 Some of it may have been choice for other convenience
15 reasons.
16      But I want to be clear, I didn't mean to
17 suggest they couldn't physically get off that campus and
18 vote at any of the other locations, early voting
19 locations.
20      Q.   Can you tell me any other college campuses the
21 size by student population or the similar student
22 population at Prairie View A&M, that offered a greater
23 number of early -- or a greater number of early voting
24 hours?
25      A.   In the 2018 election or since?

Page 122

1      Q.   2018 election.
2      A.   No, I cannot.
3      Q.   Can you tell me any historically black college
4  of a size similar to Prairie View A&M, that offered more
5  early voting hours than the Prairie View A&M?
6      A.   No, I cannot.
7      Q.   Out of curiosity, so not to ask a question you
8  don't know the answer to, but I'm going to break the
9  rule, was there early voting on Rice's campus?
10      A.   Not in 2018.  In 2019 there was.
11      Q.   What's the student population of Rice?
12      A.   Undergrad is 3,200 to 3,300 and another almost
13 5,000 graduate students.
14      Q.   You had mentioned in your report that you had
15 done some work with other counties.  The three you
16 specifically reference was Lubbock County?
17      A.   Yes.
18      Q.   Do you know the population of Lubbock County?
19      A.   No, I don't.  Not offhand.
20      Q.   Would you say that it is significantly larger
21 than Waller County?
22      A.   With or without the university, I'd say
23 probably not more than twice the size.
24      Q.   You also mentioned I think Collin County?
25      A.   Collin County, north of Dallas.

Page 123

1      Q.   Do you know what the population of Collin
2  County is?
3      A.   Oh, yeah, I think it's the fifth or sixth
4  largest, so I would say it's several hundred thousand.
5      Q.   And you also mentioned Harris County, which --
6      A.   Is the largest.
7      Q.   -- is the largest in Texas and maybe the
8  nation --
9      A.   Fourth largest in the nation.
10      Q.   Yeah.
11      A.   For the record, I've done several others in
12 Colorado, of course, as you know, Montana, South Dakota,
13 and Arizona -- excuse me, New Mexico.
14      MR. SEAQUIST:  Take a break.
15      (Off the record from 11:55 to 12:16.)
16      MR. SEAQUIST:  Back on?
17      THE REPORTER:  Yes.
18      MR. SEAQUIST:  Okay.  I'll pass.
19      MS. ADEN:  I think we have very quick
20 follow-up questions.
21          EXAMINATION
22 BY MS. ADEN:
23      Q.   So Dr. Stein, I wanted to direct you to
24 Exhibit 1, which is your initial report, and in
25 particular, page 3.

Deposition of Rebecca Stein, Ph.D.
12/10/2019

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 503 of 677

Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 124

1    A. Uh-huh (Affirmative.)

2    Q. This is Exhibit 1 from today. There's a
3 sentence that begins with: Using this method, we
4 identified 25 -- 2,588 persons registered to vote on the
5 PVAMU campus and 63 persons registered to vote who
6 reside in off-campus student housing for a total of
7 2,651 PVAM students (1,833 of whom are age 18 through
8 20) who are registered to vote in the 2018 election in
9 Waller County.

10    And then if you move to the second full
11 paragraph on that same page, the last two sentences of
12 it begin: Using the methodology described above, we
13 identified again 2,651 PVAMU students (of all ages) who
14 are registered to vote in Waller County during the 2018
15 election. By our calculation, 178 or (6.7%) of those
16 PVAMU students registered to vote in November 2018 were
17 aged 18 through 20.

18    And you talked about those two sentences
19 today. Do you --

20    A. Something's wrong there. I think there's a
21 word missing called students who register to vote in the
22 November, I think I'm missing the statement students
23 registered to vote who voted, who voted in the November
24 2018 were age 18. I think I just dropped -- I have to
25 check. That's just a terrible mistake on my part, but

Page 125

1 there's no way that number adds up, right.

2    So if you look at that 178 and you look at the
3 paragraph above, something's wrong. And my guess, my
4 guess at this point is when I get the data, I will make
5 a change, but I think when I was editing this and I had
6 my friend -- I must have dropped of those PVA students
7 registered to vote in November 2018 and who voted in
8 the -- voted in November 2018 election.

9    So that number is the actual number of
10 students between the ages of 18 and 20 who voted in the
11 2018 election and are between the ages of 18 and 20, but
12 I want to --

13    Q. And in Waller County as a whole?

14    A. In Waller County as a whole. And I have to
15 check that.

16    Q. Okay. You also spent some time with
17 Mr. Seaquist talking about the work you did with Native
18 American populations in two separate cases; is that
19 correct?

20    A. Yes.

21    Q. Okay. Can you -- or do you have any
22 observations about whether or not the populations in
23 those two cases, particularly the Native American
24 populations, how they may or may not be comparable to
25 the population that you were asked to examine in this

Page 126

1 case?

2    A. I think they're obviously very different.
3 Native Americans are older, Native Americans live on a
4 reservation, in these two cases in Montana and South
5 Dakota are huge. Access to the county is extremely
6 limited because there's just simply no roadways. And
7 we're not talking about a network of roads that you
8 might have in a metropolitan area like Waller County or
9 comparable, the population of voters are very different.

10    They are older, they are exceedingly poor and
11 in many instances have no history of voting to speak of.
12 And my sense is I wouldn't say that the nature of those
13 two cases are in any way, shape or form similar to the
14 Waller case. The biggest difference being there, I was
15 asked to opine on whether or not opportunities to vote
16 early or any other way had an effect on turnout.

17    In this case I was only asked to discern
18 whether or not the access to early voting was available
19 to the population of plaintiffs.

20    Q. And do you know what the resolution was,
21 excuse me, in the Wandering Medicine case?

22    A. Yeah, it was kind of interesting. As I
23 mentioned, the judge after a long and contentious --
24 when you read the -- it was a difficult deposition. I
25 forgot the attorney's name here said to me well, why do

Page 127

1 you think the vote centers are a better solution. And
2 he eventually negotiated with the State of South Dakota
3 over the issue of establishing election day vote centers
4 on the reservation. And they had the same concerns at
5 the time, the state did, oh, it's going to cost too much
6 money and there was inoperability problems.

7    And it turns out, of course, as might be able
8 to attest to, I've done research on the cost of voting.
9 It actually drives the cost down, because if you think
10 about it, if you increase voter turnout by increasing
11 opportunities, your numerator goes up slower than your
12 denominator.

13    You with me on that? That is, the number of
14 votes cast is your numerator -- denominator, excuse me,
15 think at the bottom, and your numerator are your costs.
16 And if you have relatively slow increasing cost but more
17 voters, you've reduced your cost, and the county and the
18 state adopted vote centers.

19    Q. Do you also have any observations about how
20 the number of registered student voters on PVAMU's
21 campus, how that compares to the number of registered
22 student voters on other campuses that you are familiar
23 with in Texas?

24    A. The only ones I'm familiar with are here in
25 Harris County, TSU, St. Thomas and Rice. And all three

Deposition of Robert Stein, Ph.D
12/10/2019

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 504 of 677

Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 128

1 which since 2018, starting in 2019 because the county
2 adopted vote centers, have seen significant increases,
3 significant increases.
4        Elizabeth Vann, the woman that I collaborate
5 with, is in charge of a program that registered voters,
6 but to my knowledge TSU, I don't know about St. Thomas,
7 but Rice have a fraction, a fraction of the registered
8 voters on campus, most of our students in their home
9 states, if they vote at all.
10      Q.   A fraction as compared to Prairie View A&M?
11      A.   Compared to the numbers.  We're not the same
12 size obviously.  Prairie View is much larger, but among
13 an undergraduate specifically, a much smaller share of
14 voters.  And I know that because you can go down and
15 look at the number of students who voted on election day
16 and early at the student center, which is just behind
17 us.
18      Q.   Does the number of registered voters on
19 PVAMU's campus a high number, does that tell you
20 anything based upon your experience about -- in relation
21 to this case?
22      A.   Yeah.
23      Q.   How that might interact with this case?
24      A.   I'm assuming that's why this is a case.  I've
25 never -- I have no experience, even reading Jim's report

Page 129

1 about the few historical black campuses, none of which
2 he ever reported registered voters in.  I don't know of
3 any other campus in this region where such a large
4 number of on-resident students are registered and
5 active.
6        I do know, reading the history, going back
7 years, that the students and Prairie View A&M students
8 and the county, have always been in this kind of
9 conversation, if not debate, about why we don't have
10 more early voting.
11      Q.   You testified earlier about early voting hours
12 at Fieldstore and Monaville and how they compare to the
13 hours at the Memorial Student Center on Prairie View's
14 campus.
15        Do you have any opinion, observations, about
16 whether or not the registered voter populations in those
17 areas, Fieldstore and Monaville, how they compare to the
18 students who vote at the Memorial Student Center?
19        MR. SEAQUIST:  Form.  Go ahead.
20      A.   My table 1 seems to suggest that there was a
21 disparity there, that the few difference in hours,
22 notwithstanding the county's decision later to institute
23 I think up to 36 hours at the student memorial center
24 but before, it just didn't seem to be consistent with
25 the number of registered voters.

Page 130

1      Q.   (BY MS. ADEN)  And what about the racial
2 make-up of Monaville, for example, as it compares to the
3 Memorial Student Center?
4      A.   I think the two communities are, as best I can
5 figure, non-majority black, and the campus is what I
6 would guess, I guess you'd call protected population of
7 students under the age of 20 or people under the age of
8 20, 26th Amendment, as you've schooled me, and African
9 American.  And more importantly, they have limited
10 access, you know, off campus, both in terms of public
11 transportation and private vehicle.
12        So it struck me that I do not know if there
13 are more private vehicles and more access to
14 transportation in these two other areas, Monaville and
15 Fieldstore, but it struck me that the campus and the
16 voters on the campus had extremely limited access to
17 off-campus voting locations.
18      Q.   And then you testified about machines and, in
19 fact, the double nature of machines that have been
20 provided to Prairie View's Memorial Student Center.  Do
21 you have any observations about what that might signify?
22      A.   Yeah, I mean you could claim that, you know,
23 buying more machines is expensive but allocating more
24 machines doesn't in any way, in fact, drive up your
25 cost.  And if you increase the hours with which you use

Page 131

1 the equipment, you simply drive up the opportunities to
2 vote without necessarily driving up your cost.
3        You pay a poll worker a fixed amount per day.
4 Electricity is important but there seemed to be some
5 things here that a machine should not have been the
6 impediment to providing more opportunities and hours.
7 Once you have those machines, why not allow them to
8 operate for more days and more hours.
9      Q.   One second.  What does the doubling of the
10 machines tell you, if anything, about how the county
11 might have anticipated a demand for early voting at the
12 MSC?
13      A.   I assumed that they were responding to the
14 demand, and the demand came in two forms.  One, over
15 time you saw not only a steady increase in the share of
16 vote cast early but in the number of voters eligible to
17 vote that voted.
18        And the fact that the students had in this
19 election, and as I understand it a lawsuit was filed,
20 there was real evidence of demand, both in the form of
21 the behavior and in the formal what I call on my public
22 information campaigns.  And I could only assume that the
23 county responded to that accordingly.
24        Now they may have responded because of a
25 lawsuit, but my sense is they have been increasing and

Deposition of Robert Stein, Ph.D.
12/10/2019

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 505 of 677

Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 132

1 seeing increased early voting over time, why didn't they
2 respond that way in the Prairie View A&M campus until
3 the 2018 election. I conclude, they thought that at
4 that point there was real reason to do so.
5     Q. And one last question. You were asked a
6 question about whether or not you had an opinion or
7 observation about the adequacy of the accommodation of
8 Prairie View voters with respect to early voting.
9     Do you understand what it means to accommodate
10 voters or what -- what -- how did you interpret that
11 question and what is your answer to it, if any?
12     MR. SEAQUIST: Form.
13     Q. (BY MS. ADEN) Go ahead.
14     A. Accommodate means that they have special
15 needs. My example earlier about people who might be
16 other-abled in terms of hearing or sight, and it seems
17 as if the students and the registered voters on that
18 campus had special needs. They did not have access to
19 transportation off the campus and as a consequence they
20 had greater needs to have more early voting locations on
21 their campus.
22     MS. ADEN: I will pass back to
23 Mr. Seaquist.
24     MR. SEAQUIST: I will be quick.
25     FURTHER EXAMINATION

Page 133

1 BY MR. SEAQUIST:
2     Q. Dr. Stein, you talked about the population on
3 the Native American reservations, and one of the
4 comments you made was that there was not much of a
5 voting history there. Is it also true that students 18
6 to 20 years old do not have much of a voting history?
7     A. In the past, yes. That has changed over time.
8     Q. Okay. Well, an 18-year-old by definition is
9 not going to have much of a voting history, correct?
10     A. I apologize. I didn't hear your -- yes.
11 Obviously not having been able to vote before the age of
12 18 will not have much of a chance.
13     Q. And even after you've turned 18 from the time
14 you were in college, you're not going to have much in
15 the way of electoral history, due to your age?
16     A. The opportunities are limited, yes.
17     Q. Okay. There was some discussion about early
18 voting -- excuse me, registered voters on Prairie View
19 A&M. Are you familiar with the county's efforts to
20 conduct voter outreach, deputy registrar training on the
21 Prairie View A&M campus?
22     A. I am not.
23     Q. Would increased number of registered voters be
24 at least one indicator that the county was successful in
25 its efforts to reach -- reach out to voters at the

Page 134

1 university?
2     A. It would be a reasonable hypothesis. Yes.
3     Q. Okay.
4     A. One would want to know what the relationship
5 is.
6     Q. You've talked a couple of times about a
7 request for more hours, that the students have made,
8 ongoing requests for more hours. What is your
9 understanding of the first time the students at Prairie
10 View made a request for more hours?
11     A. My understanding is, and again, I simply would
12 have to refresh my memory, but I remember several years
13 ago reading newspaper stories in preparation for this
14 case. And I remember reading them several years ago,
15 that Waller County had been -- what's the right word
16 here? Petitioned by students on the campus for more
17 opportunities to vote early.
18     Q. And do you know specifically whether that was
19 early voting versus an election day precinct on campus?
20     A. I do not. My recollection was it was for
21 early voting. It might have been for both, but my
22 memory here would have to be refreshed.
23     Q. There was a question about accommodation. My
24 question is: Do you have any evidence to suggest that
25 there was insufficient capacity for the number of voters

Page 135

1 at Prairie View A&M?
2     A. No, I do not.
3     Q. Okay. In --
4     A. If I can, other than their demand.
5     Q. Right.
6     A. Other than their request and the evidence that
7 there was increasing numbers of students in both voting,
8 but more importantly, voting by early.
9     Q. Right.
10     A. But I had no other independent, like, evidence
11 that there was sort of inadequacy of long lines, waiting
12 times, I did not study that.
13     Q. Are you aware of any other polling location in
14 the county that offered such concentrated access of
15 early voting to a population that spent its time going
16 to school, eating, socializing with friends within a
17 quarter mile of the polling location?
18     A. No, I am not.
19     MR. SEAQUIST: Nothing further.
20     FURTHER EXAMINATION
21 BY MS. ADEN:
22     Q. Do you know of another population in Waller
23 County -- do you know of another -- strike that.
24     Do you know of another concentrated population
25 of black 18 to 20-year-old student voters in Waller

Deposition of Robert Stein, Ph.D.
12/10/2019
Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 506 of 677
Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 136

County?

A.   No, I do not.

Q.   Or for that matter, any other racial group or age group that is concentrated in -- strike that. Strike that.

MS. ADEN:  We're done.

MR. SEAQUIST:  Okay.  Thank you for your time, sir.

(Proceedings concluded at 12:33 p.m.)

---

Page 137

CHANGES AND SIGNATURE

WITNESS NAME:  ROBERT STEIN, Ph.D.

DATE:  DECEMBER 10, 2019

PAGE LINE    CHANGE        REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

---

Page 138

I, ROBERT STEIN, Ph.D., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____

ROBERT STEIN, Ph.D.

THE STATE OF _____)

COUNTY OF _____)

Before me, _____, on this day personally appeared ROBERT STEIN, Ph.D., known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2019.

_____

NOTARY PUBLIC IN AND FOR

THE STATE OF _____

COMMISSION EXPIRES:_____

---

Page 139

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JAYLA ALLEN, DAMON JOHNSON, &
TREASURE SMITH, and THE          &
PANTHER PARTY,                   &
        Plaintiffs,              &
                                 &
V.                               &    Civil Action No.
                                 &    4:18-CV-3985
WALLER COUNTY TEXAS; THE         &
WALLER COUNTY COMMISSIONERS      &
COURT; JUDGE CARBETT "TREY"      &
J. DUHON III, in his             &
official capacity as the         &
Waller County Judge; and         &
CHRISTY A. EASON, in her         &
official capacity as the         &
Waller County Elections          &
Administrator,                   &
        Defendants.              &

REPORTER'S CERTIFICATION
DEPOSITION OF ROBERT STEIN, Ph.D.
DECEMBER 10, 2019

I, Aubrea Hobbs, Certified Shorthand Reporter and Registered Professional Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ROBERT STEIN, Ph.D., was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness to the best of my ability;

That the deposition transcript was submitted on _____ to the witness or to the attorney for the witness for examination, signature and return to me by _____;

Deposition of Rebecca Jarvis - 12/10/2019

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 507 of 677

Jayla Allen, Damon Johnson, Treasure Smith, and The Panther Party vs. Waller Cty

Page 140

1    That the amount of time used by each party at the

2    deposition is as follows:

3        MR. GUNNAR P. SEAQUIST:  2 hours, 40 minutes

4        MS. LEAH ADEN:  14 minutes

5        That pursuant to information given to the

6    deposition officer at the time said testimony was taken,

7    the following includes counsel for all parties of

8    record:

9    FOR THE PLAINTIFFS:
         Ms. Leah Aden, Esq.
10           -and-
         Mr. John Cusick, Esq.
11           -and-
         Mr. Steven Lance, Esq.
12       NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.:
         40 Rector Street, 5th Floor
13       New York, New York 10006-1738
         E-mail:  laden@naacpldf.org
14       E-mail:  jcusick@naacpldf.org
         E-mail:  slance@naacpldf.org
15

16
     FOR THE DEFENDANTS:
17       Mr. Gunnar P. Seaquist, Esq.
         BICKERSTAFF HEATH DELGADO ACOSTA, LLP
18       3711 S. MoPac Expressway, Building One, Suite 300
         Austin, Texas 78746
19       E-mail:  gseaquist@bickerstaff.com

20

21

22

23

24

25

Page 141

1        That $_____ is the deposition officer's

2    charges to the Defendants for preparing the original

3    deposition transcript and any copies of exhibits;

4        I further certify that I am neither counsel for,

5    related to, nor employed by any of the parties or

6    attorneys in the action in which this proceeding was

7    taken, and further that I am not financially or

8    otherwise interested in the outcome of the action.

9        Certified to by me this _____ of

10   _____, 2019.

11

12

13       Aubrea Hobbs, TX CSR # 7143
         Expiration Date:  1/31/21
14       Firm No. 810
         Encase Legal (The Document Group)
15       1010 Lamar Street, Suite 120
         Houston, Texas 77002
16       800-538-3745
         www.encaselegal.com
17       courtreporting@encaselegal.com

18

19

20

21

22

23

24

25

1 | P a g e



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

JAYLA ALLEN, et al.,

### PLAINTIFFS

v.                                    Civil Case No. 4:18-cv-3985

WALLER COUNTY, et al.,

### DEFENDANTS

### EXPERT REPORT
### OF
### Robert Stein, Ph.D.

### ON BEHALF OF PLAINTIFFS

JAYLA ALLEN, DAMON JOHNSON, RAUL SANCHEZ, TREASURE SMITH, AND
THE PANTHER PARTY

## I.    Introduction

At the request of the Plaintiffs in JAYLA ALLEN, DAMON JOHNSON, RAUL SANCHEZ, TREASURE SMITH, and THE PANTHER PARTY v. WALLER COUNTY, TEXAS, *et al.*, we have undertaken to analyze the Plaintiffs' claims that voters aged 18 through 20 and Black voters aged 18 through 20—which Plaintiffs contend are each concentrated groups of student voters at Prairie View A&M University (PVAMU)—as well as Black voters in Prairie View—in Waller County were not afforded the same or similar opportunities to vote early as all other registered voters in Waller County, which Plaintiffs contend encompass older and non-Black voters (ECF Document No. 49, page 3).

This report proceeds in the following manner. In Section II we outline the evidence we relied on and our methodology. In Section III we describe our qualifications. In Section IV we: (a) detail the original and modified plans for early voting in Waller County for the 2018 election; (b) identify the best practices for conducting early voting by reviewing the peer-reviewed, scholarly literature on this topic; and (c) consider whether and to what degree Waller County conformed to those best practices and present our assessment of the Plaintiffs' claims that voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View in Waller County were not afforded the same or similar opportunities to vote early as all other registered voters in Waller County (ECF Document No. 49, page 3).

## II.    Evidence and Methodology

We use the best practices identified in the extant literature to assess whether Waller County's original and modified plans for early voting in the 2018 election provided the same or similar opportunities for all registered voters to cast early votes. Were specific groups of registered voters more burdened than others in casting an early vote? The Plaintiffs' claims are that voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View in Waller County were not afforded the same or similar opportunities to vote early as all other registered voters in Waller County (ECF Document No. 49, page 3).

To conduct this assessment, we geocoded the residences of every registered voter eligible to vote in Waller County for the 2018 election. We used that data to identify likely (a) 18 to 20 year-old students at PVAMU who registered to vote in Waller County in the 2018 election, and (b) Black 18 to 20 year-old students at PVAMU who registered to vote in Waller County in the

2018 election, based on those registered voters whose official residence is on the PVAMU campus or in off-campus housing reportedly[1] occupied by PVAMU students. Using this method, we identified 2,588 persons registered to vote on the PVAMU campus and 63 persons registered to vote who reside in off-campus student housing for a total of 2,651 PVAMU students (1,833 of whom are aged 18 through 20) who were registered to vote in the 2018 election in Waller County.

Our estimate of PVAMU 18 to 20-year old students registered to vote in Waller County is necessarily low, and certainly misses many more such PVAMU students who live near campus or elsewhere in Waller County, but whom we have thus far been unable to identify as students.[2]

Using the date of birth of each registered voter in Waller County, we calculated the proportion of all registered voters who were aged 18 through 20. We determined that 1,977 (5.9%) registered voters were aged 18 through 20 at the time of the November 2018 election. Using the methodology described above, we identified 2,651 PVAMU students (of all ages) who were registered to vote in Waller County during the 2018 election. By our calculation, 178 (6.7%) of those PVAMU students registered to vote in November 2018 were aged 18 through 20.

As of this report and with the data available, we were not able to determine the race and/or ethnicity of individual registered voters in Waller County. At this time, the best estimate of the race and/or ethnicity of registered voters in Waller County is provided by the U.S. Bureau of the Census' *2010 Census*, which reports the number of persons by race and ethnicity for individual census blocks in each county. With this information, we are able to identify whether a registered voter lives in a neighborhood (i.e., census block) which is comprised of a majority of persons who self-identify as Black. However, these data do not differentiate between persons who are or are not registered to vote. Thus, the census data can be used to determine the general racial and ethnic makeup of a census block, but not whether any individual living in that census block was registered to vote. PVAMU's Office of Institutional Research reported that in the Fall 2018 semester, 7,906 of 9,516 PVAMU students (of all ages) identified as Black.[3]

---

[1] Information provided by a senior administrator at PVAMU via Plaintiffs' attorneys.
[2] We identified an additional 389 persons who voted at the PVAMU Memorial Student Center during early voting, were under the age of 21, and live within one mile of the Memorial Student Center, but whom we could not verify as students at PVAMU.
[3] Prairie View A&M University, *Prairie View A&M University Enrollment Snapshots: Fall 2018* at 6 (last visited July 1, 2019), http://www.pvamu.edu/ir/wp-content/uploads/sites/98/FA18_Enrollment-Snapshots.pdf.

Once we had identified as many registered voters as possible, based on the data available, by age, race, PVAMU student status, and location of residence, we then determined the relative access that each of the groups identified as harmed in the Plaintiffs' complaint had to early voting in Waller County during the 2018 election.

### III.     Qualifications

I am Robert Marc Stein, the Lena Gohlman Fox Professor of Political Science at Rice University in Houston, Texas, where I am also a Fellow at the James A. Baker III Institute for Public Policy. I graduated from Ohio Wesleyan University in 1972 with B.A. in Government and Politics. I received an M.A. and Ph.D. in Political Science from the University of Wisconsin-Milwaukee in 1974 and 1977 respectively.

I have conducted research and published on the topics of elections, election administration, specifically pertaining to alternative methods of voting and their impact on voter participation and costs of administering elections and voter performance. My research has been supported by the National Science Foundation, The Pew Charitable Trust, the Kinder Institute, the James A. Baker III Institute for Public Policy, and the Arnold Foundation. I have conducted research for the two Presidential Commissions studying elections in 2009 and 2016. I have been a consultant on election administration for several state and local governments, including the State of Colorado, El Paso County, Colorado; Bernalillo County, New Mexico; Collin County, Texas; Lubbock County, Texas; and Harris County; Texas.

I was an expert witness in the 2015 South Dakota case, *Thomas Poor Bear, et al. vs The County of Jackson*, pertaining to the establishment of satellite offices for voter registration and in-person absentee voting in the Town of Wanblee on the Pine Ridge Reservation. In 2018, I was an expert witness in the case *Martin Cowen, et al. vs Brian Kemp* pertaining to the ballot access requirements in the state of Georgia.

An **Appendix** to this report contains a copy of my current curriculum vitae that includes a complete list of my publications and research grants.

I am being compensated for my work at a rate of $250 per hour plus expenses.

### IV.    Assessment of Waller County's Early Voting Practices in the 2018 Election

#### A. *Waller County Plans for Early Voting in the 2018 Election*

In preparation for the 2018 midterm election, the Waller County Commissioners Court made decisions about the number, location, staffing, equipment, days, and hours of operation for the period of early voting in Waller County from Monday, October 22 through Friday, November 2. We understand that state law provides counties with populations under 100,000 some discretion in making the above choices. (Tex. Elec. Code § 85.062(a)).

We understand from ECF Document No. 49 that the original plans made by the Waller County Commissioners Court regarding the conduct of early voting for the 2018 election were as follows:

There were to be to be two weeks of early voting beginning on Monday, October 22 and ending on Friday, November 2.

During the first week, early voting was to take place each day, Monday, October 22 through Sunday, October 28, at a total of six polling locations. During that first week, two early voting polling locations were to be located in the City of Waller, two in the City of Hempstead, one in the City of Brookshire, and one in the City of Katy. No early voting location was scheduled to be open in the City of Prairie View, where the PVAMU campus is located, during the first week.

During the weekdays (Monday, October 22 through Friday, October 26), any of the six above mentioned locations were to operate for nine hours (8am-5pm) per day, though some locations were only open a few days during that week.[4] During the first weekend of early voting (Saturday, October 27 and Sunday, October 28), there were to be five polling locations in operation in the County: two in the City of Waller, two in the City of Hempstead, and one in the City of Brookshire. One location in the City of Waller and one location in the City of Brookshire were to operate both Saturday, October 27 and Sunday, October 28. The remaining three locations were to operate on Saturday, October 27, but not on Sunday, October 28.

During the second week, early voting was to take place each day, Monday, October 29 through Friday, November 2, at a total of five polling locations. One of these locations was to be

---

[4] For example, Katy was open Monday-Wednesday; Monaville Co. Building in Hempstead was open Thursday-Friday; and Fieldstore Co. Building in Waller was open Thursday-Friday.

in the City of Waller, one in the City of Hempstead, one in the City of Brookshire, and two in the City of Prairie View.

From Monday, October 29 through Wednesday, October 31, there were to be four early voting locations in operation, each open for nine hours per day (8am-5pm). One of these locations was to be in the City of Hempstead, one in the City of Waller, one in the City of Brookshire, and one in the City of Prairie View on the campus of PVAMU.

Between Thursday, November 1 and Friday, November 2 there were to be four early voting locations, each open for 12 hours per day (7am-7pm). One of these locations was to be in the City of Hempstead, one in the City of Waller, one in the City of Brookshire, and one in the City of Prairie View, but not on the campus of PVAMU.

We understand from ECF Document No. 49 that changes were made to the 2018 early voting schedule in Waller County by the Waller County Commissioners Court. According to ECF Document No. 49, the Commissioners Court modified its early voting plan for the 2018 election during an emergency session on October 24, 2018, in response to complaints made by County residents at the October 17, 2018 Commissioners Court meeting. According to ECF Document No. 49, the Commissioners Court originally voted against modifying the plan at the October 17, 2018 meeting, and did so only after the Plaintiffs' original complaint was filed on October 22, 2018, the first scheduled day of early voting.

Specifically, the Commissioners Court "voted to increase early voting hours at the on-campus Memorial Student Center by three hours per day on Monday, Tuesday, and Wednesday of the second week (Monday, October 29 through Wednesday, October 31), and to provide five hours (from 12pm-5pm) of early voting off-campus at Prairie View City Hall on Sunday, October 28, 2018, the last day of the first week of early voting." (ECF Document No. 49, page 18). This modified plan was adopted during the first week of early voting, while voters were casting their ballots.

**Exhibit A** to this report includes a chart of the early voting allocation for 2018.

Additionally, based on a review of discovery provided by the Defendants, it appears that the County of Waller did little to notify voters in the City of Prairie View generally or on the PVAMU campus specifically, the only locations where modifications to the early voting schedule

7 | P a g e

were made on October 24, 2018, of the additional location, day, and hours available to them to vote.

### B. Best Practices for Conducting Early Voting

Scholarly research has identified a number of factors that determine whether or not all voters have equal access to polling places during an election. We detail below how each of these factors has been shown to impact voter access to the ballot.

#### 1. The number and location of polling places

Polling place operations include the number of polling places available to a voter to choose from and whether polling place locations remain accessible across elections. Thirty-seven states—including Texas, where Waller County is located—and the District of Columbia, afford their voters the opportunity to choose where and when they can cast a ballot in-person before Election Day. States with in-person early voting provide multiple locations at which to vote, enabling voters to avoid long lines and waiting times by choosing from alternative locations. However, the placement of those locations is also essential to voter access; placing early polling sites at locations near where voters prefer to vote (e.g., near their residences or where they go to school) is integral to that accessibility (Stein et al. 2019). These features of polling place operations have been shown to have a significant positive effect on accessibility to polling places (Stein and Vonnahme 2008; 2011; 2012; Fullmer 2015).

#### 2. Distance and travel time to the polling place

Several researchers (Dyck and Gimpel 2005; Gibson, et al. 2013; Gimpel and Schuknecht 2003; Cantoni 2016) have shown that the distance and travel time between a voter's residence and their designated and/or available polling location has a significant and negative effect on ballot access. Cantoni (2016) reports that a 0.25-mile increase in the distance to a polling place reduces the number of ballots cast by 2%-5% over Presidential, mid-term Congressional, and municipal elections. Moreover, "the negative impact of distance to the polling place is concentrated disproportionately in high-minority areas" (Cantoni 2016: 4).

The closest early voting location to the PVAMU campus—apart from the on-campus early voting location at the Memorial Student Center (MSC)—was the off-campus early voting location at the Waller County Community Center. However, the Community Center is located to the south of the PVAMU campus, 1.4 to 1.6 miles away from two large student residential housing facilities

on the PVAMU campus (i.e., University Square, located at 502 Anne Preston Street, and University College, located at 505 Anne Preston Street). This distance is five to six times further than the minimum distance beyond which Cantoni observed reduced voter turnout.

### 3.  Transportation to the polls

Access to the polls requires adequate, reliable, and affordable public or private transportation (Barretto, Cohen-Marks and Woods 2009). Haspel and Knotts (2005) find that distances to polling places are less burdensome when "automobiles are universally available" to voters (2005: 267). Gibson et al. (2013) compute a distance measure with an imputed wage measure for each voter to estimate the opportunity costs of voting and find it is highly predictive of voting. The authors report that "small increases in the opportunity costs of voting can have large effects in reducing ballot access (2013: 517)." There is evidence to suggest that younger voters, such as college students, find polling locations difficult to access due to limited transportation options (Shino and Smith 2019).

### 4.  Hours of polling place operation

Fullmer (2015) shows that hours and number of locations affect access to early voting. Small changes in the hours of polling place operations across elections have an effect on voter turnout (Garmann 2017, Stein et al. 2019). Garmann (2017) reports that reducing the hours of polling station operations and the opening hours significantly reduces voter turnout by 2.1%. Reducing the number of evening and/or early morning hours at polling places can also limit accessibility (Garmann 2017; Stein et al. 2019).

### 5.  Number of days and days of week of polling place operations

Fullmer (2018) reports that increasing the number of days of early voting increases the number of early votes cast. Weekends are among the most popular days to vote early (Herron and Smith 2014; Walker, Herron and Smith 2018), when voters do not have to attend work, school, or other weekday commitments.

### 6.  Informing the public about polling place opportunities and changes to those opportunities.

Brady and McNulty (2011) report that consolidating voting locations in Los Angeles, California, reduced voter turnout by 3%, due in part to voters who were not informed about the change or relocation of their Election Day polling place. Similarly, Haspel and Knotts (2005: 569)

find that the confusion to voters that results from modifying polling place operations and locations can be offset by a strong public information campaign informing them of those changes.

In summary, the literature on early voting shows that accessibility to the polls increases the use of early voting. Practices that enable voter accessibility include:

- Adequate numbers and appropriate locations of polling places relative to the size and residential location of the electorate.
- Minimal distance and voter access to necessary transportation to and from polling locations.
- Sufficient and varied (e.g., evening) hours of polling place operation.
- Sufficient and varied (e.g., weekend) days during which polling places are open.
- Effective communication of election plans and any changes to election plans to the voting public.

From my personal experience working with election officials in Lubbock, Collin, and Harris Counties, I found these standards to be uniform. The application of these standards may not have always been uniformly practiced.

In the Defendant Waller County's response to the Plaintiffs' Interrogatory No. 4, it listed seven "factors" the County used in the determination of early voting locations and hours for the 2018 election: 1) population of registered voters; 2) historical turnout; 3) how heavily contested an election is; 4) number of available poll workers; 5) time required to train poll workers; 6) number of controller and voting units and their distribution; and 7) accessibility, ease of use, parking, and security for various locations.

In Defendants' responses to Interrogatory No. 4, the Defendants do not provide enough detail about how they used the factors to determine the location and hours of early voting to enable us to make a determination about whether population of registered votes was or was not a primary factor in their decision making. For example, did the County allocate early voting opportunities on a per registered voter basis, or was population used to determine prior voting history? We can, however, observe that the distribution of early voting locations did not provide equal access (as we have defined access in this report) to the three populations that are the focus of this litigation.

According to records provided by the Defendants in this lawsuit through discovery,[5] Precinct 309, the PVAMU campus precinct, had 4,834 registered voters as of November 6, 2018—by far the largest population of registered voters out of any precinct in the County, and almost 1,400 more than the second most populous precinct in the County. Waller County officials also appear to have anticipated, accurately, that a large number of student voters would vote early at the on-campus polling location in Precinct 309, because the County's records from the November 2018 election show that it assigned that location the largest number of voting machines during the early voting period.[6] However, if the distribution of voting machines by precinct during early voting was based on registered-voter population and anticipated voter interest, the same cannot be said of the assignment of early voting hours and days. The MSC on the PVAMU campus was the sole early voting location in Precinct 309, the County's most populous voting precinct. Instead of providing the MSC with more early voting hours and days than other early voting locations in less populous precincts, County officials provided it with *fewer*. Waller County's 2018 early voting plans provided Precinct 309 only a fraction of the hours and days that were granted to early voting locations in precincts with far smaller populations of registered voters. This discrepancy is significant because, as stated above, best practices in the academic literature on early voting and the County's own stated guidelines call for the population size and residential location of the electorate to be given substantial weight in allocating early voting opportunities.

### C. Analysis and Conclusion

Based on the evidence and methodology described above, we list below our assessment and conclusions.

**Table 1** reports for each early voting location the number of weeks, total days, hours, and weekend days that the polling site was open for early voting during the 2018 election. In addition, the last three columns of **Table 1** report the number of votes cast at each early voting location, the share of voters at each location aged 18 through 20, and the share of votes cast by persons who reside in majority-Black neighborhoods.

As **Table 1** shows, locations that had more <u>hours</u> of operation during early voting also had higher shares of the total early vote. Both Waller ISD Administrative Building and the Brookshire

---

[5] Specifically, I refer here to the PDF titled "DEFENDANTS000003 - VERITY EQUIPMENT ASSIGNMENT (01172322x7A30F)."

[6] Here again I refer to "DEFENDANTS000003 - VERITY EQUIPMENT ASSIGNMENT (01172322x7A30F)."

Library had over 100 hours of operation during early voting. They were followed by Waller County Court House, with 96 hours of operation. No other early voting polling place in Waller County had more than 36 hours of operation; Prairie View City Hall had the least, with only five hours of operation. Seventy percent of all early votes in Waller County were cast at the three early voting locations with 90 or more hours of operation (i.e., Waller ISD Administrative Building, Brookshire Library, and Waller County Court House). The remaining 30% of early votes were cast at the other six early voting locations.

The three locations with the greatest number of hours of operation also had the most days of operation. Three locations (Waller ISD Administrative Building, Waller County Courthouse and Brookshire Library) operated during both weeks of early voting. All three of these locations were open on the weekend of early voting, and two (Waller County Courthouse and Brookshire Library) operated on both days of that weekend to provide Saturday and Sunday early voting. Each of the other six early voting locations operated during only one of the two weeks of early voting, and most were open a total of 2-3 of the 12 days of early voting.

When we look at early voters aged 18 through 20, (**Table 1**), we observe that 61% of them cast their ballots at the PVAMU Student Center. This location ranked fourth in total number of hours of operation. It was not open at all during the first week of early voting or on the one weekend of early voting, and operated for a total of three out of 12 days of early voting. The PVAMU MSC location was originally scheduled to have 27 hours of operation; that number was changed to 36 hours on October 24, 2018, following the filing of this lawsuit and two days after the start of early voting.

When we look at where Black voters in Waller County voted early in the 2018 election (**Table 1**), we observe that they cast their ballots at early polling locations with the fewest hours and days of operation. Specifically, early voters who live in Waller County neighborhoods that are majority-Black comprised 72% of the early votes cast at the PVAMU Student Center, 47% cast at the Waller County Community Center (located in the City of Prairie View, adjacent to the southmost portions of the PVAMU campus), and 47% cast at Prairie View City Hall. Black voters cast between 1% and 22% of the early votes at the six other early voting locations in Waller County. The three locations where most Black voters cast their votes are located in the City of Prairie View, which has the largest concentration of Black voters in the County. All three of these

locations were open during only one week of early voting, for totals of 1-3 days, and for totals of 5-36 hours of operation. Only one location—Prairie View City Hall—offered weekend hours of operation, and that location was open for a total of five hours on only one day during the entire two-week early voting period. Waller County provided the three early voting locations in the City of Prairie View the least early voting accessibility of any early voting location based on the hours and days of operation allocated to them during the 2018 election in Waller County.

The overwhelming majority of PVAMU students[7] who voted early in the 2018 Waller County election (N=200, 75.9%) voted at the MSC on the PVAMU campus. Only 63 (24.1%) of PVAMU students who voted early cast their ballots at an off-campus location. As discussed above, the PVAMU MSC early voting location was among the sites provided the least early voting access (i.e., in terms of fewest hours, days and weekend operations) of the early voting locations in the County.

Though the majority of Waller County voters chose to vote early in 2018 (71%), an even greater percentage of PVAMU students (81%, 10% more than voters who were not PVAMU students), voted early in the 2018 election. This suggests that PVAMU students were more dependent on early voting than other voters in Waller County.

A review of the PVAMU Office of Institutional Research report of shuttle bus services for the students on the PVAMU campus to offsite locations near the 2018 early voting locations in Waller County shows that such services were limited or not available during the days and hours of early voting at these offsite locations, including during the entire first weekdays of early voting—when there were no early voting locations anywhere in Prairie View—and on the only Saturday and Sunday of early voting.

The above findings have two possible explanations. First, County election officials may have distributed the hours and days of operations and other resources to those locations where they anticipated early voters would choose to vote. Defendant Waller County's response to Plaintiffs' Interrogatory No. 4 did list historical turnout (# 2) as one of seven factors that is considered in

---

[7] The category of voters defined here as "PVAMU students" consists of those registered voters in Waller County who can be identified as PVAMU students based on the address provided in their voter registration records. Although this category likely overlaps significantly with the category of voters who are aged 18 through 20, we derive the "PVAMU students" category using a different methodology to shed light on the early voting plan's effects specifically on voters who are identifiable as PVAMU students from registration records—and thus could also be so identified by Waller County officials.

making decisions about the allocation of early voting in the 2018 election. However, Waller County's response to that same interrogatory also listed population of registered voters (# 1) as another such factor, but that factor does not appear to have been seriously considered—which may cast doubt on the extent to which the seven enumerated factors truly motivated the development of the early voting plan.

A second, and not necessarily contradictory explanation, is that the different rates of voting at each early voting location were a *result* of the different number of hours, days, and other resources allocated to each location. That is, early voters chose to vote at locations where accessibility to early voting was greater; i.e., where hours, days, weekends, and other resources for early voting were more abundant. The fact that these locations were not where significant populations of voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View chose to vote may have been coincidental, but the effect of this decision by the Waller County Commissioners Court was to deny voters aged 18 through 20, Black voters aged 18 to 20, and Black voters in Prairie View equal or even similar access to early voting opportunities afforded other registered voters in Waller County. If the County had intended to make it more difficult for Black and younger voters in Prairie View to access early voting than other voters in Waller County, our analysis indicates that designing an early voting plan similar to the one they designed for the 2018 election would have been an effective way to do so. Moreover, the distribution of the days and hours of early voting locations was not proximate to where registered voters aged 18 through 20 and Black registered voters aged 18 through 20, as well as Black registered voters in Prairie View, live or chose to vote early.

The literature on best practices suggests that access to greater quantities of early voting locations, hours, and days (Fullmer 2015) significantly enhances the likelihood that voters will cast their ballots at early voting locations. Thus, historical early voting returns that show more early votes being cast in certain locations as compared to others may reveal, in part, a persistent history of unequal distribution of early voting hours in Waller County to the disadvantage of locations that are accessible by more Black voters or younger voters. If this is the case, Waller County should probably not continue to allocate more early voting opportunities solely to early voting locations with historically higher early voting turnout, unless the County wishes to perpetuate past unfairness. In other words, if Waller County allocates early voting (days and hours)

to those locations where the largest total number of voters cast their ballots in the past, they may be limiting the opportunities to vote early for voters aged 18 through 20 and Black voters 18 through 20, and Black voters in Prairie View who reside in, go to school in, or have walking access or transportation access to locations in Prairie View, including the MSC on PVAMU's campus. Further, the County's decision to offer fewer hours and days of operation of early voting at locations in the City of Prairie View, where the largest concentration of Black voters in Waller County live—and go to school on the PVAMU campus, which houses and serves the largest concentration of voters 18 through 20 and Black voters aged 18 through 20 in the County—may have had the effect of suppressing early voting in the 2018 election among Prairie View residents of Waller County aged 18 through 20, Black and aged 18 through 20, and Black persons who live in Prairie View.

For these reasons, it appears that Waller County's early voting plan for 2018 disproportionately impacted voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View because they were not afforded the same or similar opportunities to vote early as other registered voters in the County.

**15** | P a g e

Table 1
Accessibility of Early Voting in 2018 Waller County Election by Location
(Under 10/24/18 Modified Plan)

| Location | Weeks | Days | Weekend Days | Hours | % 18-20[1] | % Black[2] | Early Votes |
|---|---|---|---|---|---|---|---|
| Brookshire Library | 2 | 12 | 2 | 106 | 2 | 11 | 2,657 |
| JP #3 Monaville | 1 | 3 | 1 | 23 | 2 | 14 | 150 |
| JP #2 Fieldstore | 1 | 3 | 1 | 23 | 1 | 2 | 834 |
| Katy VFW Hall | 1 | 3 | 0 | 27 | 2 | 1 | 636 |
| Waller County Court House | 2 | 12 | 2 | 106 | 3 | 22 | 3,393 |
| PV City Hall | 1 | 1 | 1 | 5 | 5 | 47 | 77 |
| Waller County Comm. Center (in PV) | 1 | 2 | 0 | 24 | 5 | 47 | 144 |
| PVAMU MSC | 1 | 3 | 0 | 36 | 28 | 72 | 1,417 |
| Waller ISD Admin | 2 | 11 | 1 | 101 | 3 | 15 | 1,588 |

1 Percent of persons 18-20 years of age
2 Percent of persons who live in a majority-Black community

16 | P a g e

## References

Brady, Henry E. and John E. McNulty. 2011. "Turning Out to Vote: The Costs of Finding and Getting to the Polling Place." *The American Political Science Review* 105:115-134.

Barretto, Matt A., Mara Cohen-Marks and Nathan D. Woods. 2009. "Are All Precincts Created Equal? The Prevalence of Low-Quality Precincts in Low-Income and Minority Communities." *Political Research Quarterly* 62:445-458.

Cantoni,    Enrico.    2015.    "A    precinct    too    far:    Turnout    and    voting    costs." http://economics.mit.edu/files/1193.

Dyck, Joshua J. and James G. Gimpel. 2005. "Distance, Turnout, and the Convenience of Voting." *Social Science Quarterly* 8(3):531-548.

Fullmer, Elliott. 2015. "Early voting: Do more sites lead to higher turnout?" *Election Law Journal* 12:81-96.

Garmann, Sebastian. 2017. "The effect of a reduction in the opening hours of polling stations on turnout." *Public Choice* 171: 99-117.

Gibson, John, Bonggeun Kim, Steven Stillman and Geua Boe-Gibson. 2013. "Time to vote?" *Public Choice*. 156:517-536.

Gimpel, J.G., and J.E. Schuknecht. 2003." Political participation and the accessibility of the ballot box." *Political Geography* 22: 471-488.

Haspel, Moshe and H. Gibbs Knotts. 2005. "Location, Location, Location: Precinct Placement and the Costs of Voting." *The Journal of Politics* 67:560-573.

Herron, Michael C. and Daniel A. Smith 2014. "Race, Party and the Consequences of Restricting Early Voting in Florida in the 2012 General Election." *Political Research Quarterly* 67:646-665.

Prairie View A&M University Office of Institutional Research. Prairie View A&M University Enrollment Statistics, Fall 2018. http://www.pvamu.edu/ir/wp-content/uploads/sites/98/Fall-2018.pdf.

_____. Spring 2018. *Prairie View A&M University Fast Facts, Spring 2018.*

Shino, Enrijeta and Daniel A. Smith. 2019. "Mobilizing the Youth Vote? Early Voting on College Campuses in Florida." Paper prepared for presentation at the State Politics and Policy Conference, University of Maryland, May 30- June 1, 2019.

Stein, Robert M. Charles Stewart III, Christopher Mann and others. 2019. "Waiting to vote in the 2016 Presidential Election: Evidence from a multi-jurisdiction Study," *Political Research Quarterly.* DOI: 10.1177/1065912919832374

Stein, Robert M. and Greg Vonnahme 2008 "Engaging the unengaged voter: Voter centers and voter turnout," *Journal of Politics*.70:487-497.

17 | P a g e

Stein, Robert M. and Greg Vonnahme. 2011. "Voting at non-precinct polling places: A review and research agenda," *Election Law Journal*, 10:307-11

Stein. Robert M. and Greg Vonnahme 2012 "The effect of election day vote centers on voter participation," *Election Law Journal*, 11:291-301.

Walker, Hannah L, Michael C. Herron, Daniel A. Smith. 2018. Early Voting Changes and Voter Turnout: North Carolina in the 2016 General Election. *Political Behavior* https://doi.org/10.1007/s11109-018-9473-5

U.S. Bureau of the Census. 2010. *Geography Program* https://www.census.gov/programs-surveys/geography.html

**18 |** P a g e

I reserve the right to continue to supplement my declarations in light of additional facts, testimony and/or materials that may come to light.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Executed on: _____July 1,_____, 2019

**Robert M. Stein, PhD**

# EXHIBIT A

| | | | | | |
|---|---|---|---|---|---|
| **WEEK ONE (INCLUDES SUNDAY)** | | | | | |
| | **Prairie View** 54% 18-20 VAP[1] 80% Black CVAP 7.6% white CVAP | **Waller** 7% 18-20 VAP 11% Black CVAP[2] 72% white CVAP | **Hempstead** 8% 18-20 VAP 66% Black CVAP 20% white CVAP | **Katy** 6% 18-20 VAP 7.7% Black CVAP[3] 80% white CVAP | **Brookshire** 7% 18-20 VAP 55% Black CVAP 23% white CVAP |
| **Mon. Oct. 22** | | Waller ISD 8am-5pm (9 hours) | Co. Courthouse 8am-5pm (9 hours) | Katy VFW 8am-5pm (9 hours) | Co. Library 8am-5pm (9 hours) |
| **Tues. Oct. 23** | | Waller ISD 8am-5pm (9 hours) | Co. Courthouse 8am-5pm (9 hours) | Katy VFW 8am-5pm (9 hours) | Co. Library 8am-5pm (9 hours) |
| **Wed. Oct. 24** | | Waller ISD 8am-5pm (9 hours) | Co. Courthouse 8am-5pm (9 hours) | Katy VFW 8am-5pm (9 hours) | Co. Library 8am-5pm (9 hours) |
| **Thurs. Oct. 25** | | Waller ISD 8am-5pm (9 hours) | Co. Courthouse 8am-5pm (9 hours) | | Co. Library 8am-5pm (9 hours) |
| | | Fieldstore Bldg 8am-5pm (9 hours) | Monaville Bldg. 8am-5pm (9 hours) | | |
| **Fri. Oct. 26** | | Waller ISD 8am-5pm (9 hours) | Co. Courthouse 8am-5pm (9 hours) | | Co. Library 8am-5pm (9 hours) |
| | | Fieldstore Bldg 8am-5pm (9 hours) | Monaville Bldg. 8am-5pm (9 hours) | | |
| **Sat. Oct. 27** | | Waller ISD 9am-2pm (5 hours) | Co. Courthouse 9am-2pm (5 hours) | | Co. Library 9am-2pm (5 hours) |
| | | Fieldstore Bldg 9am-2pm (5 hours) | Monaville Bldg. 9am-2pm (5 hours) | | |
| **Sun. Oct. 28** | PV City Hall 12pm-5pm (5 hours) | | Co. Courthouse 12pm-5pm (5 hours) | | Co. Library 12am-5pm (5 hours) |
| **TOTAL HOURS** | 5 hours 0 hours | 73 hours | 78 hours | 27 hours | 55 hours |

\*For Prairie View, hours in green were added post-litigation, and hours in red are pre-litigation.

---

[1] VAP means "voting-age population" aged 18 through 20, which is based on 2010 Census data.

[2] As described in the Declaration of William S. Cooper, post-2010 population data is not available for the cities of Waller and Katy. Accordingly, the "citizen voting-age population" is based on disaggregated estimated based on Waller County split block groups.

[3] Ibid.

| WEEK TWO | | | | | |
|---|---|---|---|---|---|
| | **Prairie View** 54% 18-20 VAP 80% Black CVAP 7.6% white CVAP | **Waller** 7% 18-20 VAP 19% Black CVAP 69% white CVAP | **Hempstead** 8% 18-20 VAP 66% Black CVAP 20% white CVAP | **Katy** 6% 18-20 VAP 3.5% Black CVAP 77% white CVAP | **Brookshire** 7% 18-20 VAP 55% Black CVAP 23% white CVAP |
| **Mon.** **Oct. 29** | MSC at PVAMU 7am-7pm (12 hours) (8am-5pm) (9 hours) | Waller ISD 8am-5pm (9 hours) | Co. Courthouse 8am-5pm (9 hours) | | Co. Library 8am-5pm (9 hours) |
| **Tues.** **Oct. 30** | MSC at PVAMU 7am-7pm (12 hours) (8am-5pm) (9 hours) | Waller ISD 8am-5pm (9 hours) | Co. Courthouse 8am-5pm (9 hours) | | Co. Library 8am-5pm (9 hours) |
| **Wed.** **Oct. 31** | MSC at PVAMU 7am-7pm (12 hours) (8am-5pm) (9 hours) | Waller ISD 8am-5pm (9 hours) | Co. Courthouse 8am-5pm (9 hours) | | Co. Library 8am-5pm (9 hours) |
| **Thurs.** **Nov. 1** | Community Ctr. 7am-7pm (12 hours) | Waller ISD 7am-7pm (12 hours) | Co. Courthouse 7am-7pm (12 hours) | | Co. Library 7am-7pm (12 hours) |
| **Fri.** **Nov. 2** | Community Ctr. 7am-7pm (12 hours) | Waller ISD 7am-7pm (12 hours) | Co. Courthouse 7am-7pm (12 hours) | | Co. Library 7am-7pm (12 hours) |
| **TOTAL HOURS** | 60 hours 51 hours | 51 hours | 51 hours | 0 hours | 51 hours |

*For Prairie View, hours in green were added post-litigation, and hours in red are pre-litigation.

# APPENDIX

CURRICULUM VITAE
May, 2019

ROBERT M. STEIN
Lena Gohlman Fox Professor of Political Science
Rice University
Houston, Texas 77251
713-348-2795
Email: Stein@rice.edu

Place of birth:
New York, N.Y.

Married, two children

## Education

B.A., Ohio Wesleyan University, Delaware, Ohio, 1972.

M.A., University of Wisconsin-Milwaukee, Milw., Wisc., 1974

Ph.D., University of Wisconsin-Milwaukee, Milw.,Wisc., 1977

## Fields of Specialization

Elections and election administration, Federalism and intergovernmental relations, state and local government, urban politics and public policy.

## Teaching Positions

Lena Gohlman Fox Professor of Political Science, 1996

Fellow, James A. Baker III Institute for Public Policy, 2006

Professor, Department of Political Science, Rice University, 1989-1996.

Visiting Associate Professor and research scientist, Workshop in Political Theory-Public Policy and Department of Political Science, Indiana University, 1987-1988.

Associate Professor, Department of Political Science, Rice University, 1983-1989.

Assistant Professor, Department of Political Science, Rice University, 1979-1983.

Assistant Professor, University of Georgia, 1977-1978.

Robert M. Stein                                                                                    Page 2
Department of Political Science

## Administrative positions

Faculty Director, Center for Civic Engagement, Rice University 2007- present

Dean, School of Social Sciences, Rice University, 1996 - 2006

Interim Dean, School of Social Sciences, Rice University, 1995 - 1996

Chair, Department of Political Science, Rice University, 1994 - 1995

Director, Policy Studies Program (undergraduate major), Rice University, 1987- 1995

Director, Graduate Studies, Department of Political Science, Rice University, 1987- 1991.

Chair, Department of Political Science, Rice University, 1984-86

Director, Rice Institute of Policy Analysis Public Opinion Poll, 1983-present.

Political analyst, KHOU-TV, Houston, Tx. 1983- present

## Fellowships, awards, and offices

Outstanding reviewer award, Political Research Quarterly 2010.

Best paper award on Federalism and Intergovernmental Relations for "Inter-Local Cooperation and the Distribution of Federal Grants," by The section on Federalism and Intergovernmental Relations, American Political Science Association, 2004 (with Kenneth Bickers)

President, Urban Politics Subsection, American Political Science Association, 1999-2000.

Recipient, George R. Brown Award for Superior Teaching, Rice University, 1998.

President, Southwestern Political Science Association, 1998.

Recipient, Outstanding Mentor of Women in Political Science Award, Women's Caucus for Political Science, American Political Science Association, 1996.

Special book award from the Urban Politics and Policy Section of the American Political Science Association for, Urban Alternatives: Private and Public Markets in the Provision of Local Services, 1991.

Research fellowship, Indiana University, Workshop in Political Theory and Public Policy, 1987-1988.

Recipient, George R. Brown Award for Superior Teaching, Rice University, 1987.

Fellowship, U.S. Advisory Commission on Intergovernmental Relations, 1978-1979.

## Research Grants and Contracts

Election Day Vote Centers in Harris County, Texas. Funded by the Arnold Foundation, May 2019 – December 2020, $100,000.

Robert M. Stein
Department of Political Science

Hurricane Harvey: Longitudinal Survey, Funded by the National Science Foundation, January 2018 – December 2021, SBER1760292, $200,000. Co-PI

Urban Flooding: Identifying where it floods and evaluating remedies. May 2018-September 2019. Kinder Institute, Ken Kennedy Institute and Office or Research, Rice University, $74,450 Co-PI

2016 City of Houston Citizen Survey, September 2016-January 2017, City of Houston, $23,500

Vote by mail, September 2014-September 2015, Pew Charitable Trusts, $48,000.

Saturday Run-off Election Exit Poll Survey, City of Houston, October-November, 2013. $4,000.

Prioritizing and selecting bridge management actions for heightened truck loads and natural hazards in light of funding allocation patterns, National Science Foundation, September 2012 - August, 2015. co-PI ($1.2 million)

Phase 2 Development and enhancement of online storm risk calculator tool for public usage , City of Houston, Office of Public Safety and Homeland Security, November, 2012 - June 2013. co-PI ($189,000)

NetSE: Large Urban-Scale Polymorphic Wireless Networks: Community-Driven Assessment, Design and Access, National Science Foundation, September 2010-2013, co-PI ($1.9 million)

Development and enhancement of online storm risk calculator tool for public usage , City of Houston, Office of Public Safety and Homeland Security, January, 2011 - June 2011. co-PI ($309,000)

Increasing turnout among the less engaged: A study of Election Day vote centers, Pew Charitable Trusts, September, 2007 – May, 2009, PI ($260,000)

Independent Response of Complex Urban Infrastructures Subjected to Multiple Hazards, National Science Foundation, October 2007 – October 2010, co-PI ($20,000)

Program evaluation, City of Houston, SAFEclear, traffic incident management program, July 2006-January 2008. PI ($20,000)

Program evaluation, City of Houston, SAFEclear, traffic incident management program, February 2005-December 2005. PI ($20,000)

Program Utilization Among Households Eligible for Head Start Enrollment, funded by the Harris County Department of Education, June, 2001. PI ($15,000)R

The Changing Structure of Federal Aid and the Politics of the Electoral Connection. Funded by the National Science Foundation 2001-2002. SES0095997 Co-PI, January 2001-January 2003. PI ($230,000)

Greater Harris County 9-1-1 Emergency Network Data Archive and Analysis January, 2000- January 2001. PI ($15,000)

Evaluation of Greater Harris County Emergency Network: Round II, funded by the Greater Harris. PI County Emergency Network, September, 1993 - January, 1994. ($5,000)

Evaluation of Greater Harris County 9-1-1 Emergency Network, funded by the Greater Harris County Emergency Network, January, 1992-July, 1993. PI ($5,000)

Selective Universalization of Domestic Public Policy. Funded by the National Science Foundation

(SES8921109) 1990-1992. PI ($185,000)

Contracting for Municipal Services.   Funded by the U.S. Advisory Commission on Intergovernmental Relations.
January, 1986-1990.PI

The Fiscal Austerity and Urban Innovation.  Funded by the U.S. Department of Housing and Urban Development.
September, 1983-1985. PI

Research Associate, Field Network Evaluation Study of the Reagan Domestic Program.  Princeton
Urban and Regional Center, Princeton University.  Funded by the Ford Foundation.  1982-1984. PI

Research Associate, Field Network Evaluation Study of the Community Development Block Grant:
Round 8.  Funded by the U.S. Department of Housing and Urban Development.  Summer, 1982. PI

The Structural Character of Federal Grants-in-Aid.  Funded by the U.S. Department of Housing and Urban
Development.  1982-83. PI

The Allocation of Federal Grants-in-Aid.  Funded by the U.S. Advisory Commission on Intergovernmental
Relations.  1979-1981. PI

The Allocation of State-Local Aid:  An Examination of Within State Variation.  Funded by the U.S.
Advisory Commission on Intergovernmental Relations.  1979-1981. PI

**Editorial Positions**

editorial board member, _Journal of Election Technology and Systems_, 2013-2016

editorial board member, _American Political Science Review_, 2001- 2007

    Executive Committee, American Politics, _American Political Science Review_, 2004-2007

editorial board member, _American Journal of Political Science_, 1994-1998

editorial board member, _Journal of Politics_, 1994-1998

editorial board member, _Social Science Quarterly_. 1993-present

editorial board member, _State and Local Government Review._ 1987-1992.

editorial board member, _Urban Affairs Review_ (formerly, _Urban Affairs Quarterly_) 1996- 2000.

referee, _American Political Science Review, American Politics Quarterly,  Journal of Urban Affairs, Urban Affairs
Quarterly, Publius_, National Science Foundation.

**Books**

Perpetuating the Pork Barrel: Policy Subsystems and American Democracy, Cambridge University Press, 1995,
with Kenneth N. Bickers.

Federal Domestic Outlays, 1983-1990. M.E. Sharp, 1991, with Kenneth N. Bickers

Urban Alternatives: Public and Private Markets in the Provision of Local Services,  Pittsburgh Press, 1990.

## Articles

"Waiting to vote in the 2016 Presidential Election: Evidence from a multi-jurisdiction Study," forthcoming, Political Research Quarterly.  With Charles Stewart, Christopher Mann and others.

"This Way Out," Scientific American., October 2018. Pp. 76-79. With Leonardo Duenas-Osorio and Devika Subramanian.

"Pedagogical Value of Polling-Place Observation by Students." PS: Political Science & Politics, 51:831-837 (October 2018). With Mann, Christopher B., Gayle A. Alberda, Nathaniel A. Birkhead, Yu Ouyang, Chloe Singer, Charles Stewart, Michael C. Herron, et al. https://doi.org/10.1017/S1049096518000550.

"Reducing the undervote with vote by mail," American Politics Research. 46(6):1039-1064 (September 2018). With Andrew Menger and Greg Vonnahme.

"Enlisting the public in facilitating election administration: A field experiment," Public Administration Review, 78(6):892-903 (December 2018), with Andrew Menger.

"Survey Experiments with Google Consumer Surveys: Promise and Pitfalls for Academic Research in Social Science."  Political Analysis 24(3):256-373 (September 2016), with Philip Santaso and Randolph Stevenson.

"Election Administration During National Disasters and Emergencies: Hurricane Sandy and the 2012 Election." Election Law Journal 14:1-8 (January 2016).

"The social and private benefits of preparing for natural disasters," International Journal of Mass Emergencies and Disasters. 32:459-483 (August 2014), with Birnur Buzcu-Guven, Leonardo Dueñas-Osorio, Devika Subramanian.

"Building and validating geographically refined hurricane wind risk models for residential structures." Natural Hazards Review,  15(3):1-10 (November 2014), with Devika Subramanian, Leonardo Dueñas-Osorio, Josue Salazar

"How risk perceptions influence evacuations from hurricanes and compliance with government directives," Policy Studies Journal, 41(2):319-341 (April 2013), with  Birnur Buzcu-Guven, Leonardo Dueñas-Osorio, Devika Subramanian, and David Kahle

"Early voting and campaign news coverage," Political Communication, 30:278-396 (April 2013), with Johanna Dunaway

"The effect of election day vote centers on voter participation," Election Law Journal, 11(4):291-301 (September 2012) with Greg Vonnahme.

"Where, when and how we vote: Does it matter?" Social Science Quarterly.93(3):693-712.. (September 2012) with Greg Vonnahme.

"Prospectus for the Future Administration of Elections," Baker Center Journal of Applied Public Policy 4(1):45-57. (Spring, 2012)

"Engineering-based hurricane risk estimates and comparison to perceived risks in storm-prone areas," Natural Hazards Review, 13(1):1-12 (Spring 2012). with Leonardo Duenas-Osorio, Devika Subramanian and Birnur Girnur.

"Voting at non-precinct polling places: A review and research agenda," Election Law Journal, 10:307-11 (October 2011)  with Greg Vonnahme.

Robert M. Stein
Department of Political Science

"Interface network models for complex urban infrastructure systems." Journal of Infrastructure Systems, 17(4): 138-150 (2011), with Winkler, J., L. Dueñas-Osorio, R. Stein, and D. Subramanian.

"Performance assessment of topological diverse power systems subjected to hurricane events," Reliability Engineering and System Safety, 95:323-336. (April 2010). with James Winkler, Leonardo Duenas-Osorio and Devika Subramanian.

"Who evacuates when hurricanes approach? The role of risk, information and location," Social Science Quarterly. 91:816-834.(September 2010). With Leonardo Duenas-Osorio and Devika Subramanian

"Crunching collisions," Roads and Bridges 13:2 (April 2009), with Robert Dahnke, Ben Stevenson, and Tim Lomax.

"Voting technology, election administration and voter performance," Election Law Journal, 7:123-135 (April 2008) with Greg Vonnahme, Michael Byrne and Daniel Wallach.

"Engaging the unengaged voter: Voter centers and voter turnout," Journal of Politics. 70:487-497 (April 2008) with Greg Vonnahme.

"Assessing the Micro-Foundations of the Tiebout Model," Urban Affairs Review, 42:57-80 (September 2006), with Kenneth Bickers and Lapo Salucci.

"Who is Held Responsible When Disaster Strikes? The Attribution of Responsibility for a Natural Disaster in an Urban Election," Journal of Urban Affairs, 28:43-54 (2006) with Kevin Arceneaux.

"Voting for Minority Candidates in Multi-Racial/Ethnic Communities," Urban Affairs Review, 41:157-181 (November 2005) with Stacy Ulbig and Stephanie Post.

"Inter-Local Cooperation and the Distribution of Federal Grant Awards," Journal of Politics, 66:800-22 (August 2004) with Kenneth Bickers.

"Language Choice, Residential Stability, and Voting among Latino-Americans," Social Science Quarterly, 84:412-24, (June 2003), with Martin Johnson and Robert Wrinkle.

"Public Support for Term Limits: Another Look at Conventional Thinking." Legislative Studies Quarterly, 27:459-480. (August 2002) with Martin Johnson and Stephanie Shirley Post.

"Contextual Data and the Study of Elections and Voting Behavior: Connecting Individuals to Environments." Electoral Studies, 21:63-77 (March 2002), with Martin Johnson, W. Phillips Shivley. Also appearing in The Future of Electoral Studies. Mark N. Franklin and Christopher Wlezien, eds. Oxford: Elsevier Press (2003).

"The Congressional Pork Barrel in a Republican Era," Journal of Politics, 62:1070-1086 (November, 2000) with Kenneth Bickers.

"State Economies, Regional Governance, and Urban-Suburban Economic Dependence," Urban Affairs Review, 36:46-60 (Spring, 2000) with Stephanie Shirley Post.

"Reconciling Context and Contact Effects on Racial Attitudes," Political Research Quarterly. 53:285-303 (June, 2000), with Stephanie Shirley Post and Allison Rinden.

"The Micro Foundations of the Tiebout Model," Urban Affairs Review 34:76-93 (September, 1998) with Kenneth Bickers.

Robert M. Stein                                                                   Page 7
Department of Political Science

"Early Voting," Public Opinion Quarterly. 62:57-70 (Spring, 1998).

"Voting Early, But Not Often," Social Science Quarterly 78:657-677 (September, 1997) with Patricia Garcia-Monet.

"Building Majority Coalitions for Sub-majority Benefit Distributions," Public Choice 91:229-249 (June, 1997). with Kenneth Bickers.

"The Electoral Dynamics of the Federal Pork Barrel," American Journal of Political Science, 40:1300-1326 (November, 1996) with Kenneth Bickers.

"Privatization and the Arrangement of City Services," Estudios De Economia, 23:323 (August, 1996)

"A Portfolio Theory of Policy Subsystems," Administration and Society, 26:158-184 (August, 1994). with Kenneth Bickers

"Congressional Elections and the Pork Barrel," Journal of Politics , 56:377-399 (November 1994)

"Explaining State Aid Allocations: Targeting Within Universalism," Social Science Quarterly, 75:524-540 (September, 1994) with Keith E. Hamm

"Universalism and the Electoral Connection:  A Test and Some Doubts," Political Research Quarterly, 47:295-318 (June, 1994)  with Kenneth N. Bickers.

"Response to Weingast's 'Reflections on Distributive Politics and Universalism,'" Political Research Quarterly: 47:329-334 (June, 1994) with Kenneth N. Bickers.

"Arranging City Services," Journal of Public Administration: Research and Theory 3:66-93 (January, 1993).

"Alternative Means of Delivering Municipal Services: 1982-1988,"  Intergovernmental Perspective. 19:27-30 (Winter, 1993).

"A Federalist Explanation of Municipal Elections," The Midsouth Political Science Journal. 13:211-229 (June, 1992) with Cheryl Young.

"The Budgetary Effects of Municipal Service Contracting:  A Principal-Agent Explanation," American Journal of Political Science. 34:471-502 (May, 1990).

"Economic Voting for Governor and U.S. Senator:  The Electoral Consequences of Federalism," Journal of Politics 52:29-54 (February, 1990).

"Market Maximization of Individual Preferences and Metropolitan Municipal Service Responsibility," Urban Affairs Quarterly 24:86-116 (September, 1989).

"A Comparative Analysis of the Targeting Capacity of State and Federal Intergovernmental Aid Allocations: 1977-1982," Social Science Quarterly 68:447-466 (Sept., 1987). With K. Hamm.

"Tiebout's Sorting Hypothesis," Urban Affairs Quarterly. 22:199-225 (Sept., 1987).

"Federal Aid and The Mobilization of Black Political Influence." Research in Urban Policy, 2:97-117.  (1986) with K. Hamm.

"The Fiscal Impact of U.S. Military Assistance Programs, 1967-1976." The Western Political Quarterly, 38:27-43 (March, 1985). with R. Stoll and M. Ishimatsu.

"Municipal Public Employment: An Examination of Intergovernmental Influences." American Journal of Political Science, 28:636-653 (November, 1984).

"State Regulation and the Political Consequences of Municipal Fiscal Stress." Publius, 14:41-54 (Spring, 1984).

"Implementation of Federal Policy: An Extension of the 'Differentiated Theory of Federalism'," Research in Urban Policy, 3:341-348 (1984)

"The Structural Character of Federal Aid: An Examination of Fiscal Impact," Research in Urban Economics, 4:167-186 (Fall, 1984).

"Trends and Prospects in State and Local Finance," Journal of Urban Economics, 14:224-241 (September, 1983) with P. Mieszkowski.

"An Analysis of Support for Tax Limitation Referenda," Public Choice, 40:187-194 (Winter, 1983) with K. Hamm and P. Freeman.

"The Political Economy of Municipal Functional Responsibility," Social Science Quarterly, 63:530-549 (September, 1982).

"The Effects of Reagan Domestic Budget Cuts: The Case of Houston," Texas Business Review, 13:11-18. (Oct.-Nov., 1982 ) with S.A. MacManus.

"The Targeting of State Aid: A Comparison of Grant Delivery Mechanisms," Urban Interest, 2:47-59 (Spring, 1981).

"The Allocation of Federal Aid Monies: The Synthesis of Demand-Side and Supply-Side Explanations," American Political Science Review, 75:334-343 (June, 1981).

"Functional Integration at the Substate Level: A Policy Perspective," Urban Affairs Quarterly, 16:211-233 (December, 1980).

"Federally Mandated Substate Regional Government: The Maintenance of Governmental Structures," Urban Interest, 1:74-82 (Spring, 1980).

"Federal Categorical Aid: Equalization and the Application Process," Western Political Quarterly, 32: 396-408 (December, 1979)

"The Electability of Women Candidates: The Effects of Sex Role Stereotyping, "Journal of Politics, 41:513-524 (May, 1979) With R. Hedlund, K. Hamm, and P. Freeman.

"Regional Planning Assistance: Its Distribution to Local Governments and its Relationship to Local Grant Getting," The Journal of the American Institute of Planners, 43:871-891 (July, 1977) With B. Hawkins.

**Chapters in edited volumes**

"Polling Place Quality," in Kathleen Hale and Bridgett A. King, eds., *The Future of Election Administration*. Palgrave.

"Help America Vote Act of 2002" in *Voting and Political Representation in America: Issues and Trends* Edited by Mark P. Jones. Forthcoming, 2019 Santa Barbara, CA: ABC-CLIO

"Convenience models of voting" in *Voting and Political Representation in America: Issues and Trends* Edited by Mark P. Jones Forthcoming, 2019 Santa Barbara, CA: ABC-CLIO

"Polling Place Practices,", in *Electoral Performance,* Charles Stewart III and Barry Burden, eds. Cambridge University Press, 2014:166-187. With Greg Vonnahme

"Early, Absentee, and Mail-in Voting," in *Handbook of American Elections and Political Behavior*, ed. Jan Leighley, Oxford University Press, 2010:182-199. with Greg Vonnahme.

"The Political Market for Intergovernmental Cooperation," in *Self-Organizing Federalism: Collaborative Mechanisms to Mitigate Institutional Collective Action Dilemmas,* eds., Richard C. Feiock and John T. Scholz. Cambridge University Press. 2010:161-178.. With Kenneth N. Bickers and Stephanie Post

"Local Services, Provision and Production," in Encyclopedia of Public Administration and Public Policy, New York, Marcel Dekker, 2003: 734-748.

"The Politics of Revenue and Spending Policies," in John Pelissero, ed. Cities, Politics,and Policy. Washington, D.C.: CQ Press. 2002:217-236.

"Implications for Citizen Participation," in Paul Schumacher and Burdette Loomis eds. Choosing a President The Electoral College and Beyond. New York, Catham House, 2002 with Paul Johnson, Daron Shaw and, Robert Weissberg. Pp. 125-142

"Devolution and the Challenge for Local Governance,", in Ronald E. Weber and Paul Brace, eds. Change and Continuity in American State and Local Politics New York, Catham House. 2000:21-33

"Contracting for Municipal Services," in P. Seidenstat, S. Hakim and G. Bowman eds. Privatization of the Justice System, McFarland and Co. Publishers. 1992: 82-107, with Delores Martin.

"Urban Public Policy Under Fiscal Stress: A Comparison of Spending and Employment Decisions," pp. 111-144, in Mark Gottdiner (ed.) Cities Under Fiscal Stress. Sage, 1986 with M. Neiman and E. Sinclair.

"The Texas Response to Reagan's New Federalism Programs: The Early Years," pp. 124-159 in, L. Bender and J. Stever, (eds.) Managing the New Federalism, Denver: Westview Press, 1986  with S.A. MacManus.

"Implementation of federal policy: An extension of the 'differentiated theory of federalism.' " pp. 341-348. in Terry Nichols Clark (ed). Research in Urban Policy Chicago: JAI Press, 1985

"Policy Implementation in the Federal Aid System: The Case of Grant Policy," pp. 125-155 in, G. Edwards (ed.) Public Policy Implementation, JAI Press, 1984.

"The Allocation of State Aid to Local Governments: An Examination of Interstate Variations," pp. 202-225. in, U.S. Advisory Commission on Intergovernmental Relations, The Federal Influence on State and Local Roles in the Federal System. U.S. Government Printing Office, 1982.

"The Impact of Federal Grant Programs on Municipal Functions: An Empirical Analysis," pp. 65-122 in, U.S. Advisory Commission on Intergovernmental Relations, The Federal Influence on State and Local Roles in the Federal System. U.S. Government Printing Office, 1981

Robert M. Stein                                                                                      Page 10
Department of Political Science

"The Impact of Socio-Economic Environment on Revenue Policies," pp. 133-172. in, R. Bingham, B. Hawkins, and F. Hebert, The Politics of Raising State and Local Revenues, Praeger, 1978 with R. Bingham, B. Hawkins, and R. Robertson.

"Grant Seeking and the Allocation of Federal Grant-in-Aid Monies: The Case of Southeastern Wisconsin," pp. 199-219 in, John P. Blair and Ronald S. Edari, (eds.), Milwaukee's Economy: Federal Programs, Local Resources and Community Action, Federal Reserve Bank of Chicago, 1978

"Substate Regionalism: Another View From the States," pp. 69-102 in, Charles Tyer (ed.) Substate Regionalism in the United States: Perspectives and Issues, University of South Carolina Press, 1978

## Recent papers, completed manuscripts, conference papers and invited presentations

"Vote fraud and errant voting," Invited presentation at Department of Political Science, University of Nebraska, Lincoln, NE. April 25, 2013.

"Polling place practices," Prepared for presentation at the Measure of Elections Conference, June 18-19, 2012, Massachusetts Institute of Technology, Boston, MA

"Where, when and how we vote: Does it matter?" presented at the Scottish National Election Commission, Strathclyde University, Glasgow, Scotland. November 12-15, 2010.

"The future of elections," presented at the *Future of Governance Conference*, Howard Baker Institute of Government, University of Tennessee, Knoxville, Tx. October 14-15, 2010.

"Cost of elections," Presented at the 2010 Meeting of the Midwest Political Science Association, Chicago, Ill. April 3-5, 2000 with Greg Vonnahme.

"Early voting and campaign news coverage," 2010 Meeting of the American Political Science Association, Washington, D.C., Sept 1-3.

"The cost of elections." Report prepared for the Pew Charitable Trusts, 2009. With Greg Vonnahme.

"The effects of early voting on congressional campaign expenditures." Presented at the 2009 Meeting of the Midwest Political Science Association, Chicago, Ill. April 13-15, 2000 With Marvin McNeese

"The effects of Election Day vote centers on voter experiences." Presented at the 2008 Meeting of the Midwest Political Science Association, Chicago, Ill. April 3-5, 2008. With Greg Vonnahme

Whither the Challenger: Congressional Elections in Metropolitan America, Presented at the 2005 Meetings of the American Political Science Association, Washington, D.C., September 1-3, with Kenneth Bickers.

Assessing the Micro-Foundations of the Tiebout Model Presented at the 2005 Meetings of the Midwest Political Science Meetings, Chicago, Ill. April 2-5, with Kenneth Bickers and Lapo Salucci.

Electoral Reform, Party Mobilization and Voter Turnout Presented at the 2004 Meetings of the Midwest Political Science Meetings, Chicago, Ill. April 21-23, with Jan Leighley, Chris Owens.

The Role of Candidates and Parties in Linking Electoral Reforms with Voter Participation. Presented at the 2003 Meetings of the Midwest Political Science Meetings, Chicago, Ill. April 21-23, with Jan Leighley, Chris Owens.

Voting for Minority Candidates in Multi-Racial/Ethnic Communities. Presented at the 2003 Meetings of the Midwest Political Science Meetings, Chicago, Ill. April 21-23, with Stacy Ulbig and Stephan Post.

The within congressional district electoral connection. Presented at the 2002 Meetings of the American Political Science Association, Boston, MA August 28-September 2, with Kenneth Bickers.

Who Will Vote? The Accessibility of Intention to Vote and Validated Behavior at the Ballot Box, Presented at the 2001 Meetings of the American Political Science Association, San Franciso, CA., August 28-September 2, with Martin Johnson

Contextual Explanations of Presidential Vote Choice, Presented at the 2001 Meeting of the Midwest Political Science Association, Chicago, Illinois, April 13-15, with W.Philps Shivley and Martin Johnson.

The Changing Structure of Federal Aid and the Politics of the Electoral Connection Coalitions. Presented at the 2000 Meetings of the American Political Science Association, Washington, D.C., September 1-4. With Kenneth Bickers.

Accessibility and Contextual Explanations of White Racial Attitudes. Presented at the 2000 Meetings of the American Political Science Association, Washington, D.C., September 1-4. With W.Philps Shivley and Martin Johnson

Information, Persuasion and Orphaned Voters. Presented at the 1999 Meeting of the American Political Science Association, Atlanta, GA., September 1-4. With Martin Johnson

The Federal Pork Barrel and the Formation of Intergovernmental Grant-Seeking Coalitions Presented at the 1999 Meeting of the American Political Science Association, Atlanta, GA., September 1-4. With Kenneth Bickers.

The Congressional Pork Barrel in a Republican Era. Presented at the 1999 Meeting of the Midwest Political Science Association, Chicago, Illinois, April 13-15. With Kenneth Bickers

The Local Public Goods Market: A Definition, Measure, and Test, Presented at the 1998 Meeting of the American Political Science Association, Boston, MA, Sept. 3-6 10-12. With Stephanie Shirley Post.

The Ties that Bind: Urban and Suburban Dependency. Presented at the 1998 Meeting of the Midwest Political Science Association, Chicago, Illinois, April 10-12. With Stephanie Shirley Post

**Professional Associations**

President, Urban Subsection, American Political Science Association, 1999-2000
President, Southwest Political Science Association, 1997-1998
Chair, Nominations committee, Southern Political Science Association, 1995
Nomination committee, Southern Political Science Association, 1993-94
Executive Council, Southwest Political Science Association, 1992-1994
Chair, nominations committee, 1993-94, Southwest Political Science Association.
Section Head, State and Local Government, 1993, Southern Political Science Association Meetings.
Section Head, State and Intergovernmental Relations, 1992 Midwest Political Science Association .
Executive Board, Urban Politics Section, American Political Science Association, 1990-1992
Executive Board, Southwestern Political Science Association, 1985-1991, 1993-1994
Program Chair, Southwestern Political Science Association Annual Meetings, 1983
Section Head, Intergovernmental Relations, Southern Political Science Association Meetings. 1983

**Ph. D. Thesis advisees**

Albert Ellis, Ph.D. 1989, Associate Professor (deceased), University of Texas, Corpus Christi
Stephanie Post, Ph.D. 1998, Director, Center for Civic Engagement, Rice University
Martin Johnson, Ph.D. 2002. Professor and Chair, University of California-Riverside
Gavin Dillingham, Ph.D. 2004. Research Scientist, Houston Advanced Research Center
Johanna Dunaway, Ph.D. 2006. Associate Professor, Louisiana State University
Gregory Vonnahme, Ph.D. 2009. Assistant Professor, University of Missouri-Kansas City
Marvin McNeese, Ph.D. 2015
Andrew Menger, Ph.D. expected  2017

**Teaching**

Urban Politics (undergraduate)
Public Policy (graduate and undergraduate)
Bureaucracy and Public Policy
Policy Implementation
Federalism
Political Behavior

Recent expert testimony

Expert Report in the case of Mark Wandering Medicine et al. v. Linda McCulloch et al. [voting rights case in the state of Montana] February-June, 2014.





Waller County Community Center – 21274 FM 1098 Loop

PVAMU Memorial Student Center – 155 L.W. Minor Street

Distance of 1,495.26 feet or 0.283 miles

Some on-campus housing facilities are farther from the Student Center than the Community Center is