PLAINTIFF'S EXHIBIT 33

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JAYLA ALLEN, DAMON JOHNSON, TREASURE SMITH, AND THE PANTHER PARTY, Plaintiffs,

VS. CIVIL ACTION NO.: 4:18-CV-3985

WALLER COUNTY TEXAS; THE WALLER COUNTY COMMISSIONERS COURT; JUDGE CARBETT "TREY" J. DUHON III, IN HIS OFFICIAL CAPACITY AS THE WALLER COUNTY JUDGE; AND CHRISTY A. EASON, IN HER OFFICIAL CAPACITY AS THE WALLER COUNTY ELECTIONS ADMINISTRATOR, Defendants.

*******************************************
ORAL DEPOSITION OF
JAYLA JENICE ALLEN
OCTOBER 11, 2019
*******************************************

ORAL DEPOSITION OF JAYLA JENICE ALLEN, produced as a witness at the instance of the Defendants and duly sworn, was taken in the above-styled and numbered cause on OCTOBER 11, 2019, from 9:57 a.m. to 3:01 p.m., before SHERRI SANTMAN FISHER, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the University Square Clubhouse, 502 Anne Preston Street, Prairie View, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

APPEARANCES

FOR THE PLAINTIFFS:

MS. LEAH ADEN
MR. JOHN CUSICK
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
40 Rector Street
Fifth Floor
New York, New York 10006-1738
212-965-7715/212-226-7592 (fax)
laden@naacpldf.org
jcusick@naacpldf.org

MS. JULIE GOODRICH HARRISON
NORTON ROSE FULBRIGHT US LLP
1301 McKinney
Suite 5100
Houston, Texas 77010-3095
713-651-5151/713-651-5246 (fax)
julie.harrison@nortonrosefulbright.com
(Not Present)

FOR THE DEFENDANTS:

MR. GUNNAR P. SEAQUIST
BICKERSTAFF HEATH DELGADO ACOSTA LLP
3711 South Mopac Expressway
Building 1, Suite 300
Austin, Texas 78746
512-472-8021/512-320-5638 (fax)
gseaquist@bickerstaff.com

MS. ELIZABETH DORSEY
WALLER COUNTY DISTRICT ATTORNEY'S OFFICE
645 12th Street
Hempstead, Texas 77445
979-826-7718/979-826-7722 (fax)
e.dorsey@wallercounty.us

ALSO PRESENT:

Steven Lance

Page 3

INDEX

| | PAGE |
|---|---|
| Appearances | 2 |
| Stipulations | 5 |
| Examination by Mr. Seaquist<br>9:57 a.m. - 11:25 a.m.<br>11:34 a.m. - 1:08 p.m.<br>1:15 p.m. - 1:41 p.m.<br>2:02 p.m. - 2:02 p.m. | 5 |
| Examination by Ms. Aden<br>2:02 p.m. - 2:50 p.m. | 168 |
| Examination by Mr. Seaquist<br>2:53 p.m. - 2:56 p.m. | 205 |
| Examination by Ms. Aden<br>2:56 p.m. - 3:01 p.m. | 208 |
| Changes and Corrections | 214 |
| Signature | 215 |
| Reporter's Certification | 216 |

EXHIBIT INDEX

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Plaintiff Jayla Allen's Responses and Objections to Defendant Waller County's First Set of Interrogatories | 16 |
| 2 | Prairie View A&M University Map | 17 |
| 3 | Facebook Post Dated December 13, 2017 | 34 |
| 4 | Course Schedule | 66 |
| 5 | Twitter Post Dated October 25, 2018 | 122 |
| 6 | Google Map | 136 |
| 7 | 2018 General Election Early Voting Locations | 143 |

Page 4

EXHIBIT INDEX (continued)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 8 | Twitter Posts | 152 |
| 9 | Twitter Post Dated November 4, 2018 | 156 |

(Witness sworn)
MR. SEAQUIST: Before we get started, we had conferred yesterday and agreed to waive the 30(b)(5) reading requirement. I assume that's still agreeable for today.
MS. ADEN: Yes.
MR. SEAQUIST: And we had also agreed at yesterday's depositions that form -- objection to form would preserve all objections to the form of the question. Can we have that agreement again today?
MS. ADEN: Yes.
JAYLA JENICE ALLEN,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. SEAQUIST:
Q. Good morning, Ms. Allen.
A. Good morning.
Q. My name is Gunnar Seaquist. And I think you and I met for the first time yesterday?
A. That is correct.
Q. Okay. Have you ever given a deposition before?
A. I have not.
Q. You understand that I represent the defendants in a lawsuit in which you are a plaintiff?
A. Yes, I do.

Q. And we are here to take your deposition in that case this morning.
A. Yes.
Q. Okay. Since you haven't given a deposition before, just a couple of ground rules. We obviously have a court reporter here today who's trying to take down everything that you and I say. In fact, she's required to write down anything that's said in the room while we're on the record.
So I'm going to ask you to please do your very best to let me ask my full question before you start your answer; and I, in turn, am going to do my very best to let you get your full answer out before I ask you another question so that we don't talk over each other. Okay?
A. Okay.
Q. Also, if at any point today I ask you a question that's unclear for any reason or that you don't understand what I'm asking you, can we have an agreement that you'll ask me to clarify it for you?
A. Most definitely.
Q. Okay. Thank you for that.
And can we also agree that if you do answer a question without asking me to clarify it that you understood it and gave the best answer you could?

A. Yes.
Q. Okay. I don't anticipate your deposition is going to go real long this morning, but it's not a marathon. If you need a break at any point, use the restroom, get up, stretch your legs, that's just fine. Let me know. We can do that. I would only ask that if there is a question on the table at the time that you answer that question first and then we can take a break. Okay?
A. Yes.
Q. All right. Also, since we are preserving a written record here today, nonverbal cues, you know, headshakes or nods, uh-huh and huh-uh, don't come out well on a written record. So I'd ask that you please answer out loud verbally; and if your answer is yes or no, please say yes or no as opposed to uh-huh or huh-uh. Okay?
A. Yes.
Q. And if for some reason I'm prompting you for those, I'm not trying to be rude. I'm just trying to get a good record.
A. I understand.
Q. Okay. Is there any reason that you would be unable today to understand my questions or answer them truthfully?

A. No.
Q. Okay. For example, you haven't taken any medications that would impair your ability to comprehend my questions this morning?
A. No.
Q. Are you prepared to proceed with the deposition at this point?
A. I am.
Q. You're represented by counsel here today?
A. That is correct.
Q. Okay. And we have in the room with us Ms. Leah Aden from the NAACP Legal Defense Fund, John Cusick also from the Legal Defense Fund, and Steven Lance from the Legal Defense Fund.
Have you had an opportunity to meet with your counsel before the deposition?
A. I have.
Q. Okay. I don't want to know what you talked about with them. That's privileged. But can you tell me about how long you met with them in anticipation of this deposition?
A. I can't say specifically. I can't remember the exact time frame.
Q. I understand.
When was the last time you met with

Page 9

counsel about the deposition?
A. Yesterday.
Q. Okay. Was that for more than an hour?
A. I would say so.
Q. Okay. Two hours?
A. I'm unsure exactly the amount of time.
Q. Okay. Close enough.
Other than having an opportunity to confer with your counsel, were you able to review any documents prior to the deposition today?
A. I was.
Q. Okay. What documents did you review to prepare for this deposition?
A. My -- the interrogatories, I believe. Yes. Those are all.
Q. And so we're clear, those are some questions that the defendants asked you to answer and that you provided some information to respond to.
A. That is correct.
Q. Okay. And in providing that information, you swore to the truth and accuracy of that information, correct?
A. That is correct.
Q. Okay. Other than your interrogatory responses, were there any other documents that you looked at?

Page 10

A. No.
Q. Did you bring any documents with you this morning to the deposition?
A. I did not.
Q. Did you make or did you prepare any notes in anticipation of the deposition this morning?
A. No.
Q. Let's start with a little bit of background.
Can you tell me, please, ma'am -- well, first of all, can you state your full name for the record?
A. Jayla Jenice Allen.
Q. And would you spell Jenice?
A. It's J-e-n-i-c-e.
Q. Thank you.
Are there any other names that you go by or have gone by?
A. No.
Q. Where were you born, please, ma'am?
A. I was born in Dallas, Texas.
Q. And what year?
A. 1999.
Q. Did you grow up in the Dallas area?
A. Yes, born and raised.
Q. Do you have any siblings?

Page 11

A. I have two.
Q. Brothers or sisters?
A. Sisters.
Q. And are they older than you?
A. Yes.
Q. Did either of your sisters precede you at Prairie View A&M?
A. They did.
Q. Both?
A. Both of them.
Q. What year did your sisters graduate, if you know?
A. The oldest graduated in 2006; and the middle child, she's currently here.
Q. Okay. What is her anticipated graduation year? Do you know?
A. 2019.
Q. What does your father do for a living?
A. He's a coach and behavior specialist with the Dallas Independent School District.
Q. Do you know how long he's been with the DISD?
A. Roughly a decade and a half.
Q. Okay. Is your -- what does your mom -- is your mom employed?
A. Yes.

Page 12

Q. What does she do for a living?
A. She is currently with the Dallas Housing Authority, a regional coordinator, I believe.
Q. Okay. Did both your parents go to college?
A. They did.
Q. Okay. Where did your dad go to college?
A. Prairie View.
Q. And do you know roughly what year he would have graduated?
A. In '87. '87.
Q. And your mom, did she also go to Prairie View?
A. She did.
Q. Did your parents meet at Prairie View?
A. They came together.
Q. And did she graduate around the same time?
A. In '86.
Q. Where did you attend high school?
A. John Horn High School, Mesquite, Texas.
Q. When did you -- when did your family move from Dallas to Mesquite?
A. Well, we -- let me clarify. We've always lived in Mesquite. We lived within the County of Dallas. A lot of people don't know where Mesquite is.
Q. Okay. I understand.
And what year did you graduate high

Page 13

school?
A. 2017.
Q. Are you currently enrolled as a student at Prairie View A&M?
A. I am.
Q. And what year are you?
A. Within my third year.
Q. And from a course credit hour perspective, are you a junior?
A. A senior.
Q. A senior. Ahead of the game.
Have you declared a major?
A. Yes.
Q. What major?
A. Political science.
Q. How did you come to choose Prairie View A&M?
A. I chose Prairie View because, for one, the school and what they offer and what they have to bring as in my major, but also, of course, being a legacy and my family gone here. I've kind of grown up on Prairie View's grounds without being a student. And so within my college search, Prairie View just became home and it was somewhere where I could grow for the next four years.
Q. Did you apply anywhere else or you knew Prairie

Page 14

View was it for you?
A. No, I applied to other schools.
Q. Okay. Other than your parents and your sisters, anybody else in your family that's attended Prairie View?
A. My grandfather, my cousins, my uncles, my aunts.
Q. In coming to Prairie View A&M -- throughout the deposition today I may say Prairie View A&M or I may say PVAMU. We understand those are the same things?
A. Most definitely.
Q. Did you receive any scholarship?
A. From the university itself or just in general?
Q. Let's start with the university.
A. Yes, I received one.
Q. One scholarship? And was that like a tuition scholarship?
A. I don't think it was necessarily granted towards a specific just tuition and fees or books or anything. It was like a general scholarship.
Q. And how was that -- I guess does it just -- is it just applied to your student account or do you actually --
A. Yeah. Yes.
Q. Other than from the university, did you get any

Page 15

other grants to come to school here?
A. Yes, I received other scholarships.
Q. Okay. What other scholarships have you received?
A. That's a long list. Numerous ones. I can't list them all.
Q. Are they all just applied to your student account or do any of those -- are any of those paid directly to you?
A. Most of them are paid to my student account.
Q. Okay. Do you pay any of your own tuition out of pocket?
A. No.
Q. Do your parents provide you any financial assistance to pay your tuition?
A. No.
Q. Any other family members provide you any financial assistance to pay tuition?
A. No.
Q. Are you married?
A. I'm not.
Q. Do you have any children?
A. No.
Q. Are you currently employed?
A. No, I am not.

Page 16

Q. So what year did you start here at Prairie View?
A. I started in 2017.
Q. And before coming in 2017, in your interrogatory responses, you say you were living at 2600 Hyacinth Drive in Mesquite?
A. That is correct.
Q. Is that your family home?
A. Yes.
Q. Okay. You moved to Prairie View in July of '17?
A. That is correct.
Q. And when you came here, where did you live when you first moved to Prairie View?
A. I lived in University College, Building 42.
Q. And the address for University College, if I'm correct, is given as 100 University Drive?
A. That's the general one. Yes, that is correct.
MR. SEAQUIST: I'm going to mark a couple of exhibits.
(Exhibit No. 1 marked)
Q. (BY MR. SEAQUIST) Ms. Allen, I've marked and handed you Exhibit 1 to your deposition. Do you recognize Exhibit 1?
A. I do.

Page 17

Q. And what does this appear to you to be?
A. The first set of interrogatories.
Q. Okay. So this is what we were talking about earlier in the responses to the interrogatories that you provided, correct?
A. That is correct.
Q. If you look at page -- the last page of Exhibit 1, you see a verification page there?
A. That is correct.
Q. There is a signature above a signature line that says Jayla Allen. Do you see that?
A. Yes.
Q. Can you confirm that that is your signature?
A. That is my signature.
Q. Okay. And you remember signing this verification?
A. I do.
Q. Okay. Let me show you one other exhibit.
(Exhibit No. 2 marked)
Q. (BY MR. SEAQUIST) I'll hand you what I have marked as Exhibit 2.
A. Thank you.
Q. Do you recognize Exhibit 2, Ms. Allen?
A. I do.
Q. Have you seen this before?

Page 18

A. I have.
Q. And what does it appear to you to be?
A. A map of my university.
Q. A map of Prairie View A&M?
A. Yes, that is correct.
Q. And does this fairly and accurately depict the Prairie View A&M campus?
A. It does.
Q. Okay. On the right side of this map, there's a legend that's numbered which corresponds to numbered buildings on the map; is that right?
A. Yes.
Q. If I look in that legend -- and I'll apologize. It's not the cleanest copy. But if I look at No. 7, it says University College?
A. Yes.
Q. And that is where you lived when you first came to campus; is that correct?
A. That is correct.
Q. And if you see Building 7 here on the map --
A. Uh-huh.
Q. -- that fairly and accurately depicts the location of University College?
A. Yes.
Q. And is that a dormitory or apartment style

Page 19

housing?
A. Dormitory.
Q. Did you live at the University College for the entire 2017-2018 school year?
A. I did.
Q. Was the cost of that housing covered by your scholarships?
A. It was.
Q. Did you have a meal plan for the 2017-2018 school year?
A. I did.
Q. And was the meal plan covered by your scholarships?
A. It was.
Q. Where did that meal plan allow you to eat on campus?
A. In the MSC, which is the Memorial Center -- Student Memorial Center on campus, also anywhere else on campus that took our meal plan.
Q. Okay. In addition to your scholarships, did you receive any financial assistance in 2017-2018 for living expenses, spending money, those kinds of things?
A. From --
Q. From your family or anyone?
A. I might have. I can't say specifically.

Page 20

Q. Okay. You don't -- you didn't get any kind of a regular stipend or anything?
A. Oh, no.
Q. During the -- during the 2017-2018 school year did you ever go back home to Mesquite on weekends?
A. I'm sure.
Q. And if you did go back, how would you have gotten there?
A. A family member.
Q. Did you have a car on campus in 2017-2018?
A. For the first year, no, I did not.
Q. When you first got to campus in 2017, you said you got here, I think, in July. Is that right?
A. That is correct.
Q. Now, school didn't start until when?
A. Late August.
Q. What were you doing in Prairie View in the time between July when you got here and when school began?
A. I was in a summer bridge program.
Q. And can you tell me just kind of what that is?
A. A summer bridge program is a program that allows incoming freshmen to come in and do a program that allows them to take classes while also under -- undergo different activities on campus, including just getting accustomed to campus, different meetings and

Page 21

seminars with certain students and organizations on campus.
Q. Is part of that process sort of an orientation to orient new students to the campus?
A. No, that is separate.
Q. That's separate. Does that -- does that take place over the summer bridge or does that take place closer to school starting? The orientation.
A. The orientation -- new student orientation takes place actually in the semester before. Some do take place over the summer, but those are rather later dates.
Q. When you were here in the bridge program, for example, did you get an explanation of where things were around campus?
A. Yes.
Q. And did you get an explanation of, you know, where certain services and amenities might be located in Prairie View?
A. Yes, for the most part.
Q. Were you given -- well, let me ask you this. When you came to Prairie View, were you given any information about how to register to vote in Waller County?
A. Not when I first arrived, no.

Page 22

Q. So not as part of the bridge program?
A. No. That was never included from my understanding or my knowledge.
Q. When did you -- or how did you learn ultimately how to register to vote -- let me ask you another question first.
Had you ever registered to vote in Dallas County?
A. I had not.
Q. So you registered to vote for the first time in Waller County.
A. That is correct.
Q. How did you learn how to register to vote in Waller County?
A. Through a mutual -- a classmate, I guess you would say.
Q. And how did you come to learn from this classmate how to register to vote?
A. She was deputized in registering people to vote and I needed to register to vote.
Q. So she had taken the deputy registrar training?
A. That is correct.
Q. And you understand that training is provided by the county elections office?
A. I'm aware.

Page 23

Q. And so the county elections office sends -- either Christy Eason or someone from the office comes out to Prairie View to conduct deputy registrar training?
A. That is correct.
Q. And so your friend who had been deputized through this system told you about how to register for -- to be a voter in Waller County.
A. Yes, my classmate did.
Q. And how did you actually go about the process of registering?
A. Just meeting on campus in a mutual location, which is probably like in one of our classrooms or outside, and doing the application process.
Q. Did you -- when you say you went to a meeting, did you go to an actual voter registration event?
A. No. I went with her. She was speaking with us -- well, she spoke with some of our classmates on registering to vote; and at a time that worked for both of us, we met and did the application.
Q. So your friend had voter registration cards with her?
A. My classmate did.
Q. Your classmate.
A. Uh-huh.

Page 24

Q. And you filled out your voter registration card. Did you mail it yourself?
A. No.
Q. She mailed it in for you?
A. Yes.
Q. Do you remember roughly in 2017 when it was that you registered to vote?
A. It was in the fall semester. I'm not exactly sure of the date and time.
Q. Would it have been before the 2017 -- or would it have been in time to vote in the 2017 November election?
A. No.
Q. In filling out your registration card, did you use the 100 University address?
A. I believe so.
Q. And was that what your classmate told you to use or that's just -- you knew what your address at the dormitory was so that's why you used it?
A. I'm not sure if it was just from my knowledge or her telling me. It was awhile ago.
Q. Okay. And did you receive a card confirming your registration in the mail?
A. I did.
Q. Did you have any difficulties registering to

vote?
A. No.
Q. Do you know what voting precinct you lived in when you were on -- when you were living on campus at the University College?
A. I did.
Q. What precinct was it?
A. 309.
Q. All right. So you told me that you were 18 at the time of the November election, but you had -- well, let me ask you. Were you 18 at the time?
A. I was.
Q. Okay. But you did not get registered prior to the November 2017 election.
A. I did not.
Q. And so you didn't vote in that election.
A. I did not.
Q. Do you remember the subject of the 2017 November election?
A. Not -- not to speak on, no.
Q. Do you remember there being at some point in time a jail bond election?
A. Yes.
Q. Okay. And so you didn't vote in that election. Did you participate or attend in any election-related

events leading up to the jail bond election?
A. I'm sure. I can't speak on the exact ones or what dates or where they might have been that I was engaged on.
Q. Can you tell me generally what kind of activities you remember participating in as it relates to the jail bond election?
A. I think just like general meetings or having conversations among the student body with those informing us on the election that was coming up; and of course, the big talk was the jail bond.
Q. What did you understand the jail bond election to be?
A. That it was time -- that a voting -- that it was time to vote, there was an election, and that one of the things that was being talked about or being voted on was the jail bond.
Q. And did you have an understanding of what the jail bond would do?
A. Yes.
Q. And what was that understanding?
A. The bond was going to be spent to build a new jail within the county.
Q. And did you -- was there discussion on the Prairie View campus that you were a part of or heard as

to where that new jail would be constructed?
A. Yes.
Q. And where was that?
A. I can't remember exactly.
Q. Did you participate in any voter registration drives in advance of the 2017 November election?
A. No.
Q. Did you campaign in any way for or against the jail bond?
A. I can't say that I did or didn't necessarily.
Q. Your interrogatories say that you were -- or -- well, are you currently a member of the PVAMU Panther Party?
A. I am.
Q. When did you first sign up as a member?
A. 2018.
Q. So at the time of this jail bond election, you were not a member of The Panther Party.
A. No.
Q. Do you remember specifically attending any Panther Party events or activities leading up to the jail bond election?
A. No.
Q. Did you attend any meetings of the -- if I say the Waller County Commissioners Court, you know the body

I'm talking about?
A. Yes.
Q. Did you attend any meetings of the Waller County Commissioners Court in the fall of 2017 leading up to the jail bond election?
A. I did not.
Q. Did you talk to or otherwise communicate -- and by that, I mean e-mail, text -- with any officials or employees of Waller County in advance of the 2017 jail bond election?
A. I did not.
Q. Did you advocate in any way for voting locations as it relates to the November 2017 election?
A. Not to my knowledge.
Q. What about -- same question. Did you advocate in any way for voting hours as it related to the 2017 jail bond election?
A. No.
Q. Understanding that you did not vote in the 2017 election yourself, did you ever go to a polling location, for example, when someone else went to vote?
A. For 2017?
Q. For 2017.
A. No.
Q. Were you aware of any voting difficulties at

Prairie View for students casting their ballots in that 2017 jail bond election?

A. I wouldn't necessarily say for twenty -- that specific voting time, but I knew that there had been times where there has been difficulties for students voting.

Q. Okay. So previously there have been issues, but you're not aware of anything specifically as it relates to 2017.

A. I can't speak specifically on 2017. No, I cannot.

Q. Okay. Tell me generally what you understood the earlier difficulties to be as it relates to students being able to cast a ballot.

A. Difficulties with the address, difficulties with students being able to vote on campus, also them having a central location on campus. And for the most part, that sums it up.

Q. Okay. What -- according to your interrogatories, the first election that you voted in was the primary in March of 2018. Is that right?

A. Yes, that sounds correct.

Q. And did you vote in the Democrat or the Republican primary?

A. Democratic.

Q. Now, in fact, it looks like in December of 2017 you were actually chosen as the Democratic precinct chair for your precinct, which was 309. Is that right?

A. That is correct.

Q. And 309 is the precinct that covers the Prairie View A&M campus?

A. That is correct.

Q. How did you come to be elected the precinct chair?

A. Well, formally I filled out an application through the County. But I was actually looking to get more involved on campus with voting, looking at the bond election, the voting bond election, and getting a chance to become more civically engaged and engage the students on campus.

Q. So when you came to Prairie View, did you have a preexisting understanding of how the voting precinct system worked?

A. I didn't have great knowledge of it.

Q. How did you come to learn that there was a Democratic chair for the precinct and that that was a position that you could apply for?

A. One was my classmate, the same person who registered me to vote, and also the Democratic club within Waller County.

Q. Are you a member of the Democratic club in Waller County?

A. Yes. I hadn't filled out any prior information for them, so --

Q. The classmate that helped you to register, was -- I keep saying it's a she. Am I correct that it was a she?

A. Yes, it is. You are correct. She is a she.

Q. Okay. Was she affiliated with any groups or organizations?

A. Many. I can't name them all.

Q. Was she a member of the Waller County Democratic Club?

A. I can't say that she was or she wasn't.

Q. When she was there discussing registration with you and, I assume, your other classmates --

A. Uh-huh.

Q. -- was she there in her capacity as a representative of any of those other -- of any organization?

A. No. She was just a student. We actually had class together.

Q. Okay.

A. So it wasn't a formal meeting that was held. It was more so just a conversation that was started.

Q. And so this classmate later informed you that there was a precinct chair that the Democratic party -- that there was a Democratic party precinct chair for 309 and that you could apply for that position.

A. She did, as well as the club, a representative from the club.

Q. And did the classmate actually encourage you to apply for that position?

A. I can't say that she did or she didn't.

Q. Do you know whether the Democratic club of Waller County encouraged you to apply for that position?

A. I can't say that they did or didn't.

Q. Do you remember when you filled out the application to be the Democratic precinct chair?

A. I remember.

Q. When was that?

A. I can't speak on the exact date. I know it was within, of course, the November, December time frame.

Q. So after the 2017 election you filled out the application.

A. That is correct.

Q. And how -- what is your understanding of how the Democratic precinct chair is chosen?

A. From my understanding, if there is a -- if there's more than one person running, then you go off as

Page 33

an election. If not, then you have the opportunity to be appointed the position.
Q. At the time you applied, was anybody else running?
A. From my understanding, there was, or there was going to be.
Q. Do you know whether there was an election for your -- the position that you ultimately assumed?
A. From my understanding, there was not.
Q. So your understanding is that you were appointed in that role.
A. That is correct.
Q. Do you have an understanding as to who made that appointment?
A. Rosa Harris.
Q. Which person from the Democratic club of Waller County was the one who discussed the precinct chair position for you?
A. Rosa Harris.
Q. How did you first meet Ms. Harris?
A. My first time meeting her was at that time of completing my application.
Q. So -- but was she part of the club that encouraged -- or that gave you the information about how to apply?

Page 34

A. Yes, she was a part of the club.
Q. Okay. I guess my question is: Had you met her at any point before going to the Democratic party club meeting?
A. I had not.
Q. And at that time Ms. Harris had given you that information about the precinct chair position, she was the chair of the Democratic party for Waller County, correct?
A. I believe so, yes.
MR. SEAQUIST: I'm going to mark Exhibit 3.
(Exhibit No. 3 marked)
Q. (BY MR. SEAQUIST) Do you recognize what I've marked as Exhibit 3?
A. I do.
Q. And who is Darrell Allen?
A. My father.
Q. Okay. So this appears to be a tweet from your dad announcing your election as the precinct chair; is that correct?
A. It is -- it's a Facebook post.
Q. Oh, it's a Facebook post.
A. That is correct.
Q. Okay. In your dad's post, he says "For the

Page 35

first time the university is being represented in the county's top Democratic governing body, the Waller County Democratic Executive Committee."
Do you see that?
A. I do.
Q. Do you agree with that statement?
A. Yes.
Q. And is it true that you were the first Prairie View student who served as a precinct chair?
A. That is correct.
Q. And did you believe, in your role as the Democratic precinct chair, that your responsibility was to represent all of the university students?
A. Yes. I would say yes.
Q. Do you -- well, I assume you identify as a Democrat.
A. I do.
Q. Are you a member of the Democratic party?
A. Yes.
Q. You told me that you at least attended some Waller County Democratic Club meetings. Are you officially a member of that club?
A. I believe, as a precinct chair, I was; but I didn't necessarily take out membership outside of my role of precinct chair.

Page 36

Q. Okay. Is there a Waller County Democratic party organization?
A. Outside of the club?
Q. Yes.
A. Not that I know of.
Q. Okay.
A. Or affiliated with.
Q. In your dad's Facebook post, he also includes a quote from Rosa Patlan Harris. Do you know where that quote initially appeared? It looks like he took that from somewhere.
A. Yes. It was through an e-mail or message sent from Rosa herself.
Q. Do you know to whom?
A. To me.
Q. To you.
So it says "'Ms. Allen's enthusiasm, level headedness, knowledge, persistence, and family history with PVAMU makes her an asset to our committee. I am looking forward to working with her' said Democratic Party County Chair, Rosa Patlan Harris."
That sounds kind of more like a public announcement or press release. Do you know? Was there a press release about your --
A. I don't believe that there was ever a formal

Page 37

one or not.
Q. Okay. And did you understand, in your role as the precinct chair, that you would, in fact, be working with Ms. Harris?
A. Yes.
Q. Tell me, once you -- well, what was -- I apologize.
How long were you -- was your term as the precinct chair for 309?
A. I believe it was two years.
Q. Two years.
A. Or it is two years.
Q. So you are still, as we sit here today, currently the precinct chair for Precinct 309?
A. Yes. My two-year term would have been -- well, will be December 11th, 2019.
Q. What activities do you conduct as part of your role as the precinct chair in 309?
A. Voter registration, voter registration workshops, one-on-one registration, education amongst the student body, participate in any civic engagements or political meetings, activities, or partner with other organizations around those subjects in getting our student body engaged.
Q. As a precinct chair, you have a place on the

Page 38

Waller County Democratic executive committee; is that right?
A. That is correct.
Q. How often does that committee meet?
A. I believe at least once a month or every other month.
Q. And have you attended all of those meetings?
A. I have not attended all of them, no.
Q. Where do they meet?
A. I believe the headquarters of Waller County. I know that it has changed before.
Q. And what takes place at those meetings?
A. An agenda speaking on what's coming up, what they're trying to do, fundraisers. I haven't attended very many of those meetings due to lack of transportation, working.
Q. Is there an opportunity for the precinct chair -- well, are all of the Democratic precinct chairs on that committee?
A. I can't say that they are or they aren't.
Q. Do you know whether there are other chairs of other precincts that also attend those meetings?
A. I can't say that they do or they don't.
Q. For the meetings that you've been to, how many people have attended them?

Page 39

A. Anywhere roughly between 10 to 15.
Q. And have any of the other attendees identified themselves to you?
A. They have, I'm sure.
Q. And have any of them introduced themselves to you as a precinct chair?
A. Not from my knowledge.
Q. Does Ms. Harris run the meetings?
A. Not -- no, not solely.
Q. Who runs the meetings?
A. Usually -- it depends. It wasn't -- from the meetings that I have attended, it was never just one person. It was actually multiple people. And I'm guessing that it's from -- or from my knowledge, it's due to the different parts that everyone has in whether it's fundraising, what's on the agenda, bringing up specific things within the meeting.
Q. So when there are agenda items in the meeting, certain individuals will be responsible for a particular item; is that true?
A. Yes.
Q. Is there also general discussion among all the attendees about the particular agenda items?
A. I would say that there is.
Q. So there's an opportunity for input from all

Page 40

the attendees on any given agenda item?
A. Yes.
Q. Do you remember who you supported in the Democratic primary in 2018?
A. No, I do not.
Q. Were you a Beto O'Rourke supporter?
A. I can't say that I was or that I wasn't.
Q. Did you do any campaigning for a candidate in the 2018 primary?
A. No, I did not.
Q. And I mean that not just in statewide races but local races, too.
A. No. I refrained from necessarily campaigning for anyone as precinct chair.
Q. I understand.
A. But I did attend events for different candidates and people who were running.
Q. Okay. And you testified a little while ago that your responsibility as a precinct chair included doing voter registration drives. Did you participate in voter registration drives for the 2018 primary?
A. I did.
Q. Did you feel those were fairly successful?
A. I did.
Q. Okay. Did you participate in any informational

Page 41

sessions about the primary election?
A. I'm sure.
Q. Do you remember attending, for example, any candidate forums?
A. Yes.
Q. Do you remember who -- which candidates were present at those forums?
A. No.
Q. When you go to a candidate forum, you -- let me back up for a second.
So you're the Democratic precinct chair for Waller County -- or excuse me, for Precinct 309.
A. That is correct.
Q. You are a member of The Panther Party.
A. That is correct.
Q. And I think I saw that you were also -- participated in the Student Government Association?
A. Yes.
Q. When did you begin your Student Government Association participation?
A. 2018, fall.
Q. Okay. So at the time of the primary in 2018, which would have been the spring, you had not yet joined the Student Government Association.
A. That is correct.

Page 42

Q. At that time you were the precinct chair. Had you already joined The Panther Party at that point?
A. No.
Q. Do you remember --
A. It was -- I can't remember specifically the, like, month when I joined.
Q. Okay. When there is a candidate forum, for example, for the March primary in 2018 on campus, is that hosted by any singular group?
A. I can't say that it was or that it wasn't. I don't remember.
Q. Okay. Do you know if sometimes groups work in cooperation to host an event like that?
A. Yes.
Q. Do you remember if you participated in any of the get out the vote activities for the March 2018 primary?
A. I did.
Q. And what type of activity -- get out the vote functions were there that you participated in?
A. I can't remember exactly. But there was different meetings, I'm pretty sure, like one-on-one conversations with peers and colleagues. I can't really say exactly. That was awhile ago.
Q. I understand that. And by the way, today I'm

Page 43

just trying to get, you know, your best recollection of what you know right now.
A. Thank you.
Q. My assumption is what you know right now is what you'll know at trial. So this is my opportunity to ask you questions so that we know kind of what your trial testimony will be. Okay?
A. Okay.
Q. You had said a couple of times -- you used the phrase "101". What were you talking about there?
A. Just as in if I'm walking from class, I see a peer, a student, and we have a one-on-one conversation and it might include any of those things. That's more so one-on-one that I would speak on.
Q. So 101, is that kind of a reference to -- oh, one-on-one. I apologize. I was hearing 101 and you were saying one-on-one.
A. I apologize.
(Discussion off the record)
Q. (BY MR. SEAQUIST) Are you familiar with a voter-only party?
A. I am.
Q. The evidence in this case has suggested there was a voter-only party in April of 2018 after the primary.

Page 44

A. That is correct.
Q. Do you remember -- did you attend that party?
A. I did not.
Q. Did you attend any meeting -- any meetings -- let me start over.
Did you attend any Panther Party events or activities in advance of the 2018 primary?
A. I probably did. I can't say that -- which events or meetings exactly.
Q. Can you tell me generally the types of events The Panther Party would participate in in advance of an election?
A. I would say anything that involves civic engagement, voter registration, voter education, anything to engage the students in civic engagement or political activity.
Q. Did you attend any meetings of the Waller County Commissioners Court in advance of the 2018 primary?
A. I did not.
Q. Did you talk to or otherwise communicate, again, text, e-mail, with any officials or employees of Waller County in advance of the 2018 primary?
A. Those of the Commissioners Court or just Waller County officials?

Page 45

Q. Let's start with the Commissioners Court.
A. No, I did not.
Q. All right. What about the election administrator, Christy Eason?
A. No, I -- no.
Q. Is there -- well, let me ask it maybe the other way around, which is: Were there any officials of Waller County that you remember talking to about the 2018 primary?
A. I can't say that I do remember.
Q. Do you know who Judge Marian Jackson is?
A. I do.
Q. She was a candidate in the 2018 election, correct?
A. Yes.
Q. Was she running for reelection?
A. I believe so.
Q. Do you remember whether she had a primary opponent?
A. I can't say that I do or I don't.
Q. Do you remember having any conversations with Judge Jackson in advance of the 2018 primary?
A. No, I don't remember if I had or if I hadn't.
Q. Other than the people that we have discussed, you don't remember talking to anybody with Waller County

Page 46

as it relates to the 2018 primary.
A. If I had, I don't remember.
Q. Did you advocate in any way for additional voting locations for the 2018 primary?
A. I did not.
Q. Did you advocate in any way for additional voting hours in the 2018 primary?
A. I did not.
Q. Did you attend the Democratic executive committee meetings leading up to the 2018 primary?
A. I don't remember if I did.
Q. Do you recall whether voting hours and locations were discussed at the -- any of the meetings that you attended for the Waller County executive committee -- or the Democratic executive committee before the March '18 primary?
A. No.
Q. And that's a no, you don't recall?
A. Yes, that is correct.
Q. You understand that the primaries are actually run by the particular political parties, correct?
A. Yes.
Q. And so in terms of the proposed hours for voting, that's something that would be proposed by the Democratic party chair.

Page 47

A. At a meeting, are you asking?
Q. Well, let's say just, first of all, in general and then we'll talk about how it might take place.
A. That is correct.
Q. Do you know -- does that occur at a meeting?
A. No, not -- not that I've heard of or have been in attendance to hear.
Q. Okay. Is it possible that that has occurred at a meeting in which you were not in attendance?
A. I highly doubt it.
Q. Do you know one way or the other, though?
A. I'm sorry. Can you repeat the question?
Q. Yes.
Do you know one way or the other for sure?
A. No.
Q. Okay. Now, you did vote in the 2018 primary?
A. Yes.
Q. And your interrogatories say that you voted at the Memorial Student Center at Prairie View A&M.
A. That is correct.
Q. Do you remember whether you voted early or on the primary election day?
A. I do not remember exactly.
Q. Do you remember roughly what time of the day you cast a ballot in the March 2018 primary?

Page 48

A. I do not.
Q. Do you remember how you got to the student center to cast your ballot?
A. Yes.
Q. How would you have gotten there?
A. I walked.
Q. Do you remember -- and I know it's been awhile, so just tell me. Do you remember, for the March primary, where you walked from to cast your ballot?
A. I believe class.
Q. Do you know what class you had immediately before you cast your ballot?
A. No.
Q. Do you remember how long it took you to vote in the March 2018 primary?
A. I can't say exactly, no.
Q. Do you remember it being a long time?
A. I don't remember or recall. I'm sure I was waiting.
Q. I guess my question is: It doesn't stick out in your mind as we sit here today as being any of a long -- a very long wait.
A. Not personally, no. Other students might have.
Q. Okay. You personally didn't have -- did you have any difficulty casting your ballot?

Page 49

A. I did not.
Q. Was there any issue with your registration in the primary?
A. No, not for that one.
Q. Did any other students express to you in your role as -- well, let me ask you this. As the 309 precinct chair, what -- what were your responsibilities in terms of the actual conduct of voting?
A. Can you rephrase the question?
Q. Certainly.
Were you expected to be present in the polling location at the time of voting?
A. That was not my -- those were not my expectations; and if they were, they were never expressed to me.
Q. Okay. Did you attend to monitor in any way early voting for the 2018 primary?
A. No, I did not.
Q. What about on election day? Did you monitor voting at all?
A. No, I did not.
Q. In your role as the precinct chair for 309, did anyone voice any complaints or concerns about difficulties voting in the 2018 primary?
A. They did.

Page 50

Q. And what concerns did you hear?
A. Problems with their address, registration being valid, and actually being able to vote during that election, also students who live off campus being able to vote.
Q. Okay. Okay. So the problems with the address, what is your understanding of what the problems with addressing were taking place as it relates to the 2018 primary election?
A. One of them, speaking on the students that lived off campus and being in different precincts, that was one. Also, with students who did live on campus, I think that was the first time I heard about the difference from using like 100 and 700 University Drive. So it was different for when other students versus other students coming and having different ones on their -- for their registration.
Q. Okay. So as the Democratic precinct chair for 309, do you have an understanding as to whether you are required to vote in the precinct in which you are registered for early voting?
A. Can you repeat the question?
Q. Yes. Maybe I can say it an easier way.
For early voting, you're allowed to vote in any precinct, correct?

Page 51

A. That is correct.
Q. So in terms of your actual precinct assignment, that's really only important as it relates to election day voting, correct?
A. I wouldn't agree.
Q. Okay. In terms of being able to vote, whether you're assigned to Precinct 309 or 310, for early voting, you can vote at either, correct?
A. That is correct.
Q. So on election day, if you are assigned to 310, then you're required to vote in 310, correct?
A. That is correct.
Q. For students who live off of campus --
A. Uh-huh.
Q. -- do you know what precinct they live in?
A. It depends where they live and how the line is drawn into what precinct they live in.
Q. If they live in Prairie View and they are not on campus, would you agree with me that they are generally going to live in Precinct 310?
A. For the most part, yes.
Q. And so if you're an off-campus student and you live in Precinct 310, you can vote on campus during early voting, but you'd have to vote in the 310 precinct on election day, correct?

Page 52

A. That is correct.
Q. If you live on campus, you can vote on -- in 309 on early voting or on election day, correct?
A. That is correct.
Q. All right. Now, there was some confusion. You mentioned the 100 versus 700 address issue.
A. Uh-huh. That was the first problem with addresses.
Q. If you were registered using the -- well, let me back up.
There is not mail delivery to individual residences on campus, correct?
A. No, there is not.
Q. There is a central mailroom where all the students' mail goes.
A. That is correct.
Q. And when a student gets mail, they get some kind of a notification and then they themselves go and pick up their mail.
A. That is correct.
Q. All right. So as in the dorm that you lived in, dorms are assigned a university address, right?
A. That is correct.
Q. And 100 University Avenue is a -- one of the university addresses, correct?

Page 53

A. Yes.
Q. And the other one is 700 University Avenue; is that right?
A. Well, now we know that it's not.
Q. Okay. 100 University Avenue is for sure on campus, correct?
A. Yes.
Q. And so if you are a Prairie View student and you registered to vote using the 100 University Avenue, you didn't have any registration problems, correct?
A. I personally didn't, but I can't speak to the other students who might have or might not have had under that address.
Q. Okay. However, as you just said, it turns out that 700 University Avenue, from a geocoding perspective, actually falls offside -- outside of the campus border, correct?
A. It does.
Q. And that actually maps to a location that's south of here in the City of Prairie View.
A. I believe so. I can't say necessarily my knowledge of direction, where it is.
Q. Okay. So the problem with the addressing, just so we're clear for the record, was that if you were a student who registered using that 700 University Avenue

Page 54

address --
A. Uh-huh.
Q. I'm sorry. University Drive. I think I said University Avenue a couple of times.
A. I understood.
Q. 700 University Drive.
Then, on a map, that would actually place you off campus in the City of Prairie View, correct?
A. That is correct.
Q. And therefore in Precinct 310, not Precinct 309.
A. That is correct.
Q. And so while that wouldn't interfere with your ability to vote early, if a student who was registered in Precinct 310 came and tried to vote at the student center in 309 on election day --
A. Uh-huh.
Q. -- they would have to be told to go to Precinct 310.
A. That is correct.
Q. Okay. And so when we talk about the difficulties due to the addressing situation, that's what we're talking about, right?
A. That would be one of them, yes.
Q. Okay. Are there any other difficulties

Page 55

surrounding the addressing issue that you're aware of?
A. No.
Q. Are you aware of -- scratch that.
You also mentioned a registration being valid.
A. Yes.
Q. Are you aware of anyone whose registration was deemed invalid or canceled based on this addressing issue?
A. Yes.
Q. Who is that?
A. I don't have names to give; but I do know that there was students, as a collective, multiple ones, whose registration -- when they went to go vote, their registration was deemed invalid or they had not currently been registered technically due to the addresses.
Q. How did you come to learn that?
A. Talking to different students, meetings. It wasn't necessarily a specific meeting that was held because of it. It was just conversation amongst the students.
Q. Okay. Other than talking secondhand to students, any basis to conclude or do you have any other reason to believe that any registrations were canceled

Page 56

or deemed invalid?
A. No.
Q. And you can't tell me any particular student who told you that.
A. I can't give you any names. No, I cannot.
Q. And when you say you can't give any names, it's because you don't know the names, right?
A. I can't remember them, no.
Q. Okay. And so this was in regard to the March primary, correct?
A. That is correct.
Q. As the Democrat precinct chair for 309, when you heard about these addressing issues, did you take any steps to try to address them?
A. I spoke with -- well, yes. I eventually spoke with Mr. Jackson. But from my understanding, there was nothing necessarily that we really could change besides using 100 instead of 700.
Q. When you say "Mr. Jackson," who are you referring to?
A. Frank Jackson.
Q. And Frank Jackson, is he related to Marian Jackson, the JP?
A. He is.
Q. His --

Page 57

A. That's his wife.
Q. Okay. Did you make any effort to communicate with anybody at the county around the time of the March 2018 primary regarding the -- this addressing issue?
A. No, I personally did not. From my understanding, there's already been a conversation -- there was already conversations that had been started over the 100 and 700 University Drive.
Q. And what was your understanding of those conversations?
A. That -- just a clarification of using 100 and 700 for the most part, I would say.
Q. And you understood that there were conversations ongoing between whom?
A. Different student leaders, Mr. Jackson, not necessarily with the County, but just in general of the problem.
Q. So did you take a spring break trip in March of 2018?
A. I believe I took a trip home.
Q. You went home to Mesquite for spring break?
A. I think so, if I remember correctly.
Q. And at that time did you have a vehicle on campus?
A. I did not.

Page 58

Q. Did you get a ride home from your parents?
A. Yes, or a sister or cousin or someone maybe.
Q. Did you ever use any other means of transportation to get between Mesquite and Prairie View?
A. No.
Q. For example, a bus?
A. No.
Q. At the end of the 2018 school year, you say in your interrogatories that you moved out of the University College. Is that correct?
A. That is correct.
Q. And your interrogatories indicate that you lived overseas for a study abroad program for the summer?
A. That was for 2019.
Q. 2019?
A. Yes.
Q. What did you do during the summer of 2018?
A. I interned. I lived in Houston.
Q. Who did you intern for?
A. The university.
Q. Prairie View?
A. Yes.
Q. And when you lived in Houston, what type of housing were you living in?

Page 59

A. I lived with a relative.
Q. Okay. Was that a paid internship?
A. It was.
Q. What did you do as part of that internship?
A. I interned under the governmental relations department, so research, travel to Austin, shadowing, communicating with other HBCU's -- for the record, historically black colleges and universities -- and prepared voter registration drives amongst the student body that was here for the summer with summer bridge programs, office duties, various things.
Q. When did you get back to the City of Prairie View?
A. For clarification, are you asking when I moved back on campus?
Q. Yes, unless you were here in another capacity before that.
A. No. I believe I moved in in August. I'm sure I moved back in in August.
Q. And would that have been any particular point in August that you can remember?
A. No.
Q. Fair to say later in August?
A. Yes, I would say later, closer to when school started.

Page 60

Q. And your interrogatories say that beginning in the fall of 2018 -- or in August of 2018 when you moved in, you moved to 502 Anne Preston Street?
A. That is correct.
Q. And what housing unit is that?
A. That is University Square.
Q. University Square.
And we are sitting today at the University Square clubhouse; is that right?
A. That is correct.
Q. All right. So this building is part of the housing complex that you live in.
A. That is correct.
Q. Did you secure this space for us?
A. I did.
Q. Well, thank you for your help in that regard.
A. Oh, you're welcome.
Q. You still live at the University Square today?
A. That is correct.
Q. And if we look back at our map there, which is Exhibit 2, I believe the University Square, for purposes of the record, is Building 30 in the legend. Is that accurate?
A. Yes.
Q. And is it accurately portrayed on the map?

Page 61

A. Yes. This is small.
Q. Now, you say in your interrogatories that you did have access to a car, correct?
A. During what time period?
Q. Well, I guess you tell me. When did you get a car?
A. Fall of 2018.
Q. And did you purchase that car yourself?
A. No.
Q. How did you come by the car?
A. My parents.
Q. Is the vehicle titled and registered in your name?
A. My parents.
Q. Do you make any payments on the car?
A. No.
Q. Are you responsible for paying for gas yourself?
A. Yes.
Q. Do you receive any support for gasoline for the vehicle, a gas credit card, anything like that, from your family?
A. Not on a regular basis, no.
Q. So your car has been registered at PVAMU since the fall of 2018?

Page 62

A. With our parking management department, yes.
Q. Have you ever gotten a parking ticket on campus?
A. Yes.
Q. How many?
A. A couple. Maybe three, maybe four.
Q. So at least since the fall of 2018, you've been in possession of a vehicle on campus, correct?
A. That is correct.
Q. For the 2018 school year, did you have all the same scholarships and financial support that we had discussed before?
A. No.
Q. Okay. How did that change?
A. Some were just within your first year. Some were continuous. And then some were renewable, not all.
Q. Did you have to pay any of your own tuition for the 2018 school year?
A. No.
Q. Did you -- did your parents have to pay any of your tuition for the 2018 school year?
A. No.
Q. Did you have to pay any of the costs of your housing for the 2018 school year?
A. No.

Page 63

Q. Did your parents have to pay any of the costs for your housing for the 2018 school year?
A. No.
Q. Did you continue your meal plan for 2018?
A. Unfortunately, yes.
Q. Why is that unfortunate?
A. It's just it's mandatory if you live on campus due to students not having transportation means or the ability to go off campus and eat.
Q. So even if you do have transportation, if you live on campus, you're required to have the meal plan.
A. Yes.
Q. Is your -- I don't know if I asked you before. Is your meal plan covered by your scholarships or financial aid?
A. Yes, you did ask. And it is.
Q. Okay. Great.
Although you had the meal plan -- does the meal plan cover every meal?
A. Yes, it can. It varies what -- how many meals you eat.
Q. Do you also prepare any of your own meals in your apartment?
A. I do now.
Q. Okay. Where do you shop for groceries?

Page 64

A. Various places. In town for the most part, so Walmart, Brookshire Brothers, Kroger.
Q. Where is the Walmart?
A. It is in Hempstead. The closest one is in Hempstead. So is the Brookshire Brothers.
Q. Okay. And the Kroger? Where is the Kroger?
A. It's in Fairfield.
Q. I've heard there's an H-E-B around here. Do you ever go to the H-E-B?
A. I'm not a frequent shopper at H-E-B. I've been on separate occasions; but for the most part, I don't shop at H-E-B.
Q. Okay. During the 2018 school year did you ever go to any off-campus parties in the City of Prairie View?
A. Not that I remember.
Q. I've heard that sometimes students will have parties in a field around here. Are you familiar with those?
A. I've heard of them, yes. I've heard about them.
Q. Have you been to one?
A. I think I went to one before.
Q. How was the turnout at it?
A. I didn't have to go again.

Page 65

Q. Were there a lot of people there?
A. I guess there was a good -- I'm pretty sure there was a good amount, yeah. Yeah.
Q. In your opinion, are those parties pretty popular with students around here?
A. For some.
Q. Okay. I think that -- I haven't met a college that didn't like parties yet, so -- do you attend church in Prairie View?
A. I don't. I do attend church, but --
Q. Not in Prairie View, though?
A. No.
Q. That's fine.
Have you ever been to a Prairie View City Council meeting?
A. Yes.
Q. Did you go to any Prairie View City Council meetings in the 2018-2019 school year?
A. Yes.
Q. And how did you get to the city hall?
A. Either transportation of someone else and, if it was in fall of 2018, by my own transportation.
Q. Have you been to the Panther Hill Apartments?
A. I have before.
Q. Do you know the location or the distance from

Page 66

the Panther Hill Apartments to the Prairie View city hall?
A. Not in mileage or --
Q. Are they pretty close to each other?
A. I wouldn't necessarily say close, no.
Q. Okay. Have you ever gone from the Panther Hill Apartments to city hall?
A. Not directly.
Q. Let's talk about your schedule in 2018.
A. Okay.
MR. SEAQUIST: I'm going to mark Exhibit 4.
(Exhibit No. 4 marked)
Q. (BY MR. SEAQUIST) Ms. Allen, Exhibit 4 is Bates labeled Plaintiffs 148. And I will represent to you that this is what was produced to us by the plaintiffs and represented to us to be your class schedule for the fall of 2018.
A. That is correct.
Q. Is -- does this fairly and accurately depict the courses that you took in the fall of 2018?
A. That is correct.
Q. Okay. So this is helpful in terms of telling us what classes you took, but it doesn't actually have your schedule on it. So what I'd like to do is just

Page 67

kind of go through and find out when each of these classes met. Okay?
A. Okay. If I can remember all of them.
Q. The -- well, let me ask you this. If we get to one that you can't remember, is there a way that you could look that up?
A. I don't -- I don't know actually for the times. That is usually on your account for the semester.
Q. How did you come by this schedule that's Exhibit 4?
A. A transcript or -- yeah, like a -- like a brief transcript of your like previous classes. This is what they offer.
Q. Did you print this from your student account or something?
A. Yes, my student account. I apologize.
Q. That's all right.
Okay. Let's -- let's go through it and we'll see how we do.
A. Okay.
Q. The first class is Elementary Chinese?
A. Yes.
Q. And that's a three-hour course?
A. Yes.
Q. What days did that course meet on?

Page 68

A. If I remember correctly, it was three days a week, so I'm pretty sure Monday, Wednesday, and Friday. Actually, I'm sure of that.
Q. And what time of day was that class?
A. I don't remember necessarily the exact time. Maybe the first half of the day.
Q. A morning class?
A. Yes.
Q. Do you remember how long that class lasted?
A. No.
Q. If it's a three-hour class that meets three times a week, is it fair to assume it was probably about an hour long?
A. Yes.
Q. The next class is the Honors Colloquium II?
A. Yes.
Q. What does that class entail?
A. It's through honors college here at Prairie View -- the program. Excuse me. It was a specific class that we took, being in the program, within our first semester and more so of like a history class, I guess you would say.
Q. Okay. And also a three-hour class?
A. Yes.
Q. Do you remember what days this course met?

Page 69

A. Thursdays.
Q. Would it have been Thursdays only or Tuesdays and Thursdays?
A. Thursdays only.
Q. And do you remember what time that class met?
A. Yes. At five o'clock. At five o'clock to eight o'clock, sometimes longer.
Q. Okay. The next class is Introduction to Political Science?
A. Yes.
Q. A three-hour course?
A. Yes.
Q. What days did that course meet?
A. I don't remember.
Q. Do you remember whether it was two days a week or three days a week?
A. I don't, no.
Q. Do you remember roughly what time it met?
A. I believe the second half of the --
Q. An afternoon class?
A. Yes, I think so. I can't say specifically, but I believe so.
Q. The next class is Scope and Methods in Political Science?
A. Yes.

Page 70

Q. A three-hour class.
A. Yes.
Q. What days did that meet?
A. I'm not sure.
Q. Do you remember who your professor was?
A. I believe Mitchell, Dr. Mitchell, I believe.
Q. Let me go back to the one before, which was the Introduction to Political Science. Do you remember who your professor was in that one?
A. Yes. Tabitha Morton.
Q. Okay. So for Professor Mitchell's Scope and Methods in Political Science, you don't remember what days it met.
A. No, I do not. Excuse me.
Q. Do you remember what time of day that course was?
A. I would say midday, maybe afternoon.
Q. The next class is a Modern Political Theory?
A. That is correct.
Q. A three-hour course?
A. Yes.
Q. What days did that meet?
A. I don't remember.
Q. What time of day was it?
A. I believe this was a later class.

Page 71

Q. When you say "later," what do you mean?
A. After 2:00, 3:00.
Q. Who was the professor in that class?
A. I do not remember.
Q. Do you have -- do you keep a personal calendar?
A. I do.
Q. Would you have kept a personal calendar in the fall of 2018?
A. I would have.
Q. How do you keep it?
A. More so in a physical planner, writing in.
Q. Okay. Do you still have a copy of your calendar from 2018 for the fall?
A. I don't -- I'm not sure actually. It might either be back home or in the trash.
Q. Okay. You haven't looked for it at this point, though?
A. No.
Q. Do you keep an electronic calendar like in your phone or on the computer?
A. I do now.
Q. In the fall of 2018 did you do that?
A. I don't think it was more so of -- I think it was more so a physical copy.
Q. The last class is the Internship in Political

Page 72

Science.
A. Yes.
Q. And that's a six-hour course.
A. That is correct.
Q. What did that entail?
A. Being able to intern during my undergrad, but also the course work that came with it, so it was a one-on-one class.
Q. Did this relate to the internship you had done in Houston the previous summer?
A. Yes. It was continuous.
Q. Okay. So this was an internship that was ongoing.
Were you actually -- in the fall of 2018 did you actually go and intern anywhere or you were just completing course work?
A. I was -- I was still doing the duties of it, but I was no longer being paid for it, so therefore I was able to get the credit hours.
Q. And you said it was one-on-one?
A. Yes.
Q. Who did you meet with?
A. Nojeim.
THE REPORTER: I'm sorry?
THE WITNESS: Dr. Nojeim. Nojeim,

Page 73

N-o-j-i-e-m. I hope that's correct. I'm pretty sure it is.
Q. (BY MR. SEAQUIST) How often would you meet with Dr. Nojeim?
A. It varied. I had different assignments that were due. So there were different forms, going to his office, meeting with him, e-mails.
Q. So there was no set meeting schedule with Dr. Nojeim.
A. No, there was not.
Q. In the fall of 2018 do you remember, for your Monday, Wednesday, Friday schedule, roughly what time your classes started?
A. Oh, no. Morning, I'm sure. Not the exact time, no.
Q. What's the earliest class you've ever had?
A. 8:00 a.m.
Q. Okay. Do you know whether you had any 8:00 a.m. classes in the March of -- or in the fall of 2018?
A. If it wasn't 8:00, it was 9:00.
Q. And we talked about your Honors Colloquium which went to 8:00. Other than that, what was the latest class you had?
A. It was the -- excuse me. It was the Modern Political Theory. I believe that was the latest class

Page 74

I've had during that semester.
Q. Okay. And that was the one you told me you thought was around 2:00 to 3:00?
A. Yes.
Q. When you were -- do you generally remember having this schedule?
A. Yes.
Q. Okay. And do you remember having to transition, for example, from Chinese to your next class?
A. No, I do not.
Q. Do you remember where -- what building your Chinese class was located in?
A. Chinese was located in -- I do not remember.
Q. Okay. Do you remember whether you had a lunch break?
A. Yes.
Q. What's your typical practice for having lunch?
A. Going back to my room and eating something there.
Q. Okay. And so in the fall of 2018 that was your practice?
A. For the most part. Well, I really don't eat lunch. A lot of times I'm in between, so like going back and forth from class to meetings, anything I need

Page 75

to do one on one, any personal or being in different organizations, anything -- any activities or personal responsibilities that I needed to take care of.
Q. Do you also have other breaks in your schedule during the day where you're -- well, let's talk back to March of -- I mean, excuse me, the fall of 2018, if you can remember.
Were there breaks in your schedule, for example, in the morning when you would have an hour off where you could study or do other personal items if you needed to?
A. Yes.
Q. And was there typically an afternoon break in your schedule where you could do that?
A. I can't say that there was.
MS. ADEN: Gunnar, do you mind if we take a quick break now that -- if you're not as focused on this topic?
MR. SEAQUIST: Yeah.
(Recess from 11:25 a.m. to 11:34 a.m.)
Q. (BY MR. SEAQUIST) All right. Ms. Allen, we are back on the record after a break. Is there anything from your testimony before that we need to clear up before we move on?
A. No.

Page 76

Q. Okay.
A. Excuse me.
Q. I have that, too.
In addition to your class schedule, you've identified some other activities in your interrogatories that you were participating in in the fall of 2018.
A. Yes.
Q. I'd like to talk to you about those now, one of which was the Blackstone Pre-Law Society.
A. Yes, that is correct.
Q. Can you tell me about that?
A. Blackstone is an organization on campus that -- it's centered around pre-law students. It gives us some opportunities to network, make connections, speak with different organizations outside of our campus in different law schools, sometimes traveling to different places, also meetings, fundraisers, stuff like that.
Q. Are you -- is there any way to formally declare as a pre-law student?
A. No, there is not, not at Prairie View.
Q. But it sounds like your plan is to pursue a law degree.
A. That is correct.
Q. Okay. Was there a regular meeting time for the Blackstone Pre-Law Society?

A. Yes. And also, of course, then the different event times and things like that.
Q. When did you start participating or join the Blackstone Pre-Law Society?
A. I started participating, I believe, in spring of 2018. I didn't start going to like the meetings and participating until fall of 2018 as like a formal member.
Q. In the fall of 2018 when were the regular meetings held?
A. If I remember correctly, Monday.
Q. And what time on Mondays?
A. Either 5:00 or 6:00 or 7:00, some -- in the evening time.
Q. How long did they last?
A. It varied. I didn't attend every meeting if I might have had like work or other meetings or anything else. It was kind of hard to juggle time.
Q. Other than the weekly meeting, were there any other time commitments in connection with the Blackstone Pre-Law Society?
A. Not outside of their -- their activities or anything else that they had going on.
Q. When were their activities typically held? Was that something that they would do on weekends or --

A. No. More so just on the weekdays, but during the evenings. It just varies, like any other organization, the times.
Q. Okay. There wasn't any kind of a -- you didn't have to do any homework or, you know, course preparation type work for that?
A. No, I wouldn't say that I did.
Q. Did you get any school credit for the Blackstone Pre-Law Society?
A. No.
Q. It's just an extracurricular activity?
A. Yes, that is correct.
Q. You also indicated that you are a member of Ignite?
A. Yes.
Q. Tell me what that is, please.
A. Ignite is a national women's political organization. It focuses on preparing young women on college campuses, preparing for them to like take office or to engage like politically on campus.
Q. When did you join Ignite?
A. Formally I joined Ignite in fall of 2018; but like Blackstone, I participated or was -- well, no. I joined in fall of 2018.
Q. And what were -- well, is there a regular

meeting for Ignite?
A. There was. There was.
Q. And when did that take place? Or when was it scheduled in the fall of 2018?
A. I can't remember exactly. I would say around midweek.
Q. So it was a weekly meeting?
A. Or every other week. It depends. But I met with some of the members in the -- the vice-president and the president of the organization regularly.
Q. How long were the regular meetings?
A. Anywhere from -- I would say roughly around an hour.
Q. And when you would meet with the president and vice-president of the organization, were those regularly scheduled meetings or just they varied?
A. They varied, when we could. Usually they were weekly, though.
Q. And how long would those meetings last?
A. It depends.
Q. When did you tend to have those meetings?
A. When we could. Both the vice-president and president were very active student leaders on campus, so it was kind of like "Can you meet at this time? Can you meet at this time?" And when we could, we could -- we

would.
Q. Was there any course credit for your participation in that program?
A. No, there was not.
Q. Also just extracurricular?
A. Yes, that is correct.
Q. You also indicate that you were the chair of the Rock the Vote for the PVAMU Student Government Association.
A. That is correct.
Q. When did you assume that role?
A. Fall of 2018.
Q. And tell me about the Rock the Vote program.
A. Rock the Vote was a chair in the Student Government Association through the executive branch. So on top of weekly meetings, I met with my advisor and different members of SGA, Student Government Association. And, yeah, that was for the most part.
Q. And what was the goal of the Rock the Vote program?
A. The Rock the Vote chair, my primary duties were civic engagement, voting on campus, anything that involves it. Basically kind of already doing what I was doing, but bringing that to the Student Government Association.

Q. Did you conduct outreach to students as well through the Student Government Association?
A. That is correct.
Q. As part of that, did you, for example, encourage voter registration?
A. That is correct.
Q. Did you try to provide information on voting opportunities?
A. That is correct.
Q. Important to make sure students know when the available locations and hours are for voting?
A. That is correct.
Q. And so that's something that's part of the Student Government Association's mission generally.
A. I can't say that it is or that it isn't. I would say, in my position as Rock the Vote chair, that was a part of my personal duties for the organization.
Q. Okay. And did you, as part of the Rock the Vote, work towards organizing transportation for students to vote?
A. I did that as a collective, so that was with different organizations. That wasn't solely as my -- in my position as Rock the Vote chair.
Q. When you say "as a collective," what do you mean?

A. I'm a part of several -- I was a part of several organizations; and so when we -- when we organized transportation, it wasn't solely with the Student Government Association.
Q. Okay. But the -- your -- the Student Government Association cooperated in that process.
A. I would say I did.
Q. You did as part of your role as the Student Government Association.
A. Yes.
Q. Okay. Prior to the fall of 2018 had the Student Government Association -- had prior chairs of the Rock the Vote commission or -- Rock the Vote program? What's the best way to refer to that?
A. Or chair. Rock the Vote chair.
Q. Rock the Vote chair.
A. Uh-huh.
Q. Had prior Rock the Vote chairs worked to assist with providing transportation for Prairie View A&M voters?
A. I can't say that they have or they haven't.
Q. Do you know if the Student Government Association had previously worked to provide transportation for student voters?
A. I can't say that they have or they haven't.

Q. You just don't know one way or the other?
A. No. Not -- especially not as an organization. Members of the organization, I'm not sure.
Q. Well, let me make sure I understand your answer. You're not sure both as an organization or as members of the organization.
A. I'm pretty -- well, I would say that some members of the organization has provided transportation for voting, but I wouldn't -- I don't know if the association -- the government association has -- as a collective, has done that before.
Q. Okay. Were there regular meetings that you attended as the chair of the Rock the Vote?
A. Yes.
Q. When were those held?
A. Mondays or Tuesdays. And if there's any additional meetings, they would have been declared some other time during the week.
Q. And as the chair of Rock the Vote, did you just participate in the general Student Government Association meetings or were there specific Rock the Vote meetings?
A. No. It was the exclusive executive branch meetings within the Student Government Association.
Q. Okay. And you said those were Mondays or

Tuesdays?
A. That is correct.
Q. What time did they meet?
A. In the evening. I don't know the exact time.
Q. How long did those meetings typically last?
A. They could go on. So anywhere from an hour or two to three or so. It just depends what's on our agenda and anything that comes along during the meeting or any special topics.
Q. Did you get any credit, course credit, for being a member of the -- or being the chair of the Rock the Vote?
A. I did not.
Q. Solely an extracurricular activity.
A. That is correct.
Q. You say you started in that position in the fall of 2018. Are you still the chair of Rock the Vote?
A. No, I am not.
Q. When did your term in that position end?
A. It was a full year, so fall of 2018 to spring of 2019.
Q. I guess I should have asked that for the other ones.
Are you still a member of the Blackstone Pre-Law Society?

Page 85

A. Not as active, but I am still a member.
Q. When did you say your participation fell off in that?
A. I would say this semester.
Q. Are you still a member of Ignite?
A. Yes.
Q. And are you still active in Ignite?
A. Yes, very much so.
Q. Your interrogatory responses also state that you're a member of The Panther Party.
A. That is correct.
Q. And generally just tell us what the Prairie View Panther Party is.
A. The Panther Party focuses on community engagement, civic engagement, political activity, community service, engaging our students with what's happening on our campus and within the community of Prairie View.
Q. The panther is the Prairie View mascot. Yes?
A. That is correct.
Q. How did you come to learn of The Panther Party?
A. Joshua Muhammad --
Q. How did you meet Joshua Muhammad?
A. -- and Kirsten Budwine.
Q. Okay. How did you meet Joshua Muhammad?

Page 86

A. I met Joshua in the summer of 2018. I worked alongside with him on various projects.
Q. Was that as part of your internship?
A. It was, and outside of it.
Q. Was Mr. Muhammad also participating in that internship?
A. He was not.
Q. I didn't ask you. When you went to your internship -- or when you lived in Houston for your internship in the summer of 2018, did you have your vehicle by that point?
A. I did.
Q. So if you had to go to Austin, would you have driven yourself there?
A. No.
Q. How would you have gotten to Austin for events for your internship?
A. I would have rode with someone from the university or carpooled.
Q. During your first year when you didn't have a vehicle here, I think you testified your sister, your older sister, was already a student here, right?
A. That's correct.
Q. Did she have a vehicle on campus?
A. At that time, yes. She has not always.

Page 87

Q. So for the 2017 to 2018 school year, although you didn't have a vehicle, your sister did.
A. Yes.
Q. Would your sister give you rides if you needed them?
A. At times. She lives off campus, so our schedules had many conflicts.
Q. When did you officially join The Panther Party?
A. Fall of 2018.
Q. What were the -- what was the process for joining, if you remember?
A. An application. Very simple.
Q. Did you have to pay any dues?
A. I personally did not pay any dues coming in. I'm not sure if there were regular like normal dues for the members.
Q. Do you -- did you ever pay any dues to The Panther Party?
A. No.
Q. Did you ever make any financial donations to The Panther Party?
A. No, not directly.
Q. Did you hold any kind of a special position in The Panther Party?
A. Not formally.

Page 88

Q. Informally?
A. Yes.
Q. What was that?
A. I took on like political -- basically like the political activity chair. I'm not sure if that's the formal name of it. I can't remember. But it was informally. It wasn't a formal position designated for myself.
Q. We spoke to Mr. Muhammad as the representative of The Panther Party yesterday, and he had mentioned that there was a political engagement committee.
A. Yes.
Q. And that that political engagement committee had a chair.
A. Yes.
Q. Were you the chair of the political engagement committee?
A. I would say informally, yes.
Q. Was there a formal chair?
A. No, not -- I would believe that it would just have been me or someone else. But we all kind of helped out in that position with our engagement, so --
Q. Do you remember how many Panther -- how many members The Panther Party had in the fall of 2018?
A. No, I do not remember.

Page 89

Q. It's been suggested to us that there was approximately 20. Does that sound reasonable to you?
A. Yes, it does.
Q. Do you know, out of that 20, how many had their own vehicles?
A. No, I do not. No, I do not.
Q. Do you know, out of that 20, how many lived on campus?
A. No.
Q. Did some live off campus?
A. Yes.
Q. Your interrogatories say that you committed approximately an hour a week to The Panther Party during the fall 2018 semester.
A. Yes, I would say that.
Q. What did that hour consist of?
A. If it wasn't within a meeting, maybe it was one-on-one meetings or just preparing an activity or my role within the organization.
Q. Did The Panther Party in the fall of 2018 have regular meetings?
A. Yes.
Q. And how often did those meetings occur?
A. I can't say that I remember.
Q. Do you know whether it was weekly or less

Page 90

frequently than that?
A. It was weekly or every other week.
Q. And when The Panther Party met, what time generally did it meet?
A. I do not remember.
Q. Was it in the evening to your recollection?
A. It was in the evening, for the general body meeting, yes.
Q. When it comes to political engagement -- so my understanding from some of the materials in this case is that there are kind of three main goals of The Panther Party and they're broken down into community development, economic development, and political engagement. Do I have that right?
A. I would say yes.
Q. Okay. What activities does the political engagement arm of The Panther Party engage in?
A. Reminding that many students who are in this organization are in various organizations, so participating in different activities within like Ignite or the Student Government Association, so hosting voter registration on campus, meetings, voter education, or participating in any type of seminars or conferences surrounding political engagement off campus as well.
Q. Okay. Did you -- as part of your participation

Page 91

with The Panther Party, did you have any involvement with the organization's finances?
A. No.
Q. Were you responsible for spending Panther Party funds in any way?
A. No.
Q. Were you responsible for receiving donations in any way?
A. No.
Q. Did you ever monitor the bank account?
A. No.
Q. Were you ever at -- my understanding is that The Panther Party had a mailing address that was a P.O. box. Were you aware of that?
A. I might have been. I can't necessarily say.
Q. Were you ever asked to go pick up the mail from the post office?
A. No, I was not.
Q. Did you in the general -- in the fall of 2018 -- so that's in advance of the general election, November -- did you attend any voter registration drives --
A. Yes.
Q. -- hosted by -- I'm sorry.
A. I'm sorry.

Page 92

Q. That's all right. I paused. Let me start over.
Did you attend any voter registration drives hosted by The Panther Party?
A. I cannot remember if I did or if I did not.
Q. Okay. Do you recall specifically any other trainings that were hosted by The Panther Party in advance of the November 2018 election?
A. I believe there were some. I did not participate in them.
Q. What kind of trainings would The Panther Party typically hold in advance of an election?
A. I really can't speak on them, considering that I wasn't a part of them to give details.
Q. Okay. Do you know whether there were any get out the votes events hosted by The Panther Party in advance of the November 2018 election?
A. I'm not sure.
Q. Do you know whether there were any candidate forums hosted by The Panther Party in advance of the 2018 election?
A. I don't think so.
Q. Do you know whether The Panther Party supported any particular candidates in the 2018 November election?
A. No.

Page 93

Q. Do you know whether -- no, you don't know, or no, it did not?
A. No, I don't know; but I don't think they did.
Q. Do you know whether it supported any particular political party?
A. No, they did not.
Q. Do you have -- or do you use social media?
A. I do.
Q. What social media platforms do you have an account on?
A. I have one on Facebook, Twitter, and Snap. But I use my Twitter for more of the political platform here on campus in reaching our students.
Q. Did you have access to -- well, first, did The Panther Party have its own social media platforms?
A. Yes, it did.
Q. And what platforms does it have?
A. I know for sure that they have a Twitter and a Facebook account.
Q. As a member of The Panther Party, did you have access to its social media platforms?
A. No.
Q. So you never made any posts through the formal Panther Party accounts.
A. No, I did not.

Page 94

Q. Do you know who did?
A. No. I know, of course, Joshua Muhammad had access and maybe Kirsten Budwine. But I'm not sure we did have a social media chair and who else might have had access to those accounts.
Q. Who was the social media chair?
A. I'm not sure if they had one.
Q. So in theory, there was that position, but you're not sure if it was filled or not?
A. I know that that position has been in various organizations. They usually have one, especially in this day and age with social media being such a big platform. But I'm not sure if we had one within The Panther Party.
Q. Okay. In your social media platforms, do you follow The Panther Party on social media?
A. I do.
Q. What platforms do you follow The Panther Party on?
A. I know for sure I follow them on Twitter.
Q. Do you, on your personal social media platforms, follow any of the County's -- Waller County's social media?
A. No, I do not.
Q. Have you ever looked to see what social media

Page 95

platforms the County has available for disseminating information?
A. I believe I not necessarily have looked for one but might have come across one.
Q. So are you aware that the County has, for example, a Facebook account?
A. No.
Q. Are you aware that the County has a Twitter account or page?
A. Actually, I am aware that they have a Facebook account.
Q. But you don't know whether you follow it or not.
A. No, I do not.
Q. You don't follow it.
A. I don't.
Q. The same question for Twitter. Are you aware that they have a Twitter page?
A. I am not aware.
Q. And you're not aware of it or --
A. Or I was not aware. I was not aware.
Q. And being that you're not aware of it, I'm going to assume you don't follow it.
A. No, I do not.
Q. How many Twitter followers do you have?

Page 96

A. I don't know. Less than a thousand.
Q. Is it more than a few hundred?
A. I would say it's a few hundred.
Q. Okay. In your role as the precinct chair for 309, did other students follow you to get election information?
A. Yes.
Q. And in your role as the chair of Rock the Vote, did other students follow you to get information about elections?
A. Yes.
Q. Is it fair to say that in both of those roles you used your social media accounts to disseminate election and voter information?
A. On Twitter I did.
Q. Did you use your Twitter account to encourage voter registration?
A. Yes.
Q. Did you use your Twitter account to encourage -- or to get out the vote?
A. Yes.
Q. All right. Now, in the 2018 general election -- so we're talking about the fall of 2018.
A. Yes.
Q. You were still in your term as the Precinct 309

Page 97

chair?
A. Yes, that is correct.
Q. And you continued to serve on the Democratic executive committee for Waller County?
A. Yes, that is correct.
Q. Did the executive committee meet in the fall of 2018 leading up to the November election?
A. I'm sure they did.
Q. Did the executive committee meet over the summer of 2018?
A. They did.
Q. Now, you had a vehicle in the summer of 2018. Did you come back to attend any meetings of the executive committee?
A. I attended one.
Q. And when was that? Do you remember?
A. No, I do not.
Q. And what was addressed at that meeting?
A. I cannot remember.
Q. Do you remember whether at the meeting you came back for over the summer of 2018 there was any discussion of the upcoming November election?
A. There was not.
Q. How -- how often -- I think you told us earlier, but remind me. How often did the Democratic

Page 98

executive committee meet?
A. Once or twice a month. I'm not sure. I didn't attend a lot of the meetings.
Q. In September -- well, let's say in August of 2018 do you recall attending any executive committee meetings for the Democratic party of Waller County?
A. I don't remember. I know I attended one in the summer; so therefore, I'm not sure if that summer one was in like June, July, or August.
Q. Can you place it in context? For example, do you remember where you came from to go to the meeting?
A. Campus.
Q. Okay. So you were already on campus at the time of that meeting?
A. Yes, but the meeting was off campus.
Q. Understood.
But if you were on campus, it seems to me that the meeting would have either had to have been at the end of the spring of 2018 or the very beginning of the fall of '18. Is that right?
A. No. That was a meeting within the summer.
Q. So I guess my question is: You told us earlier in the summer of '18 you were living in Houston as part of the internship.
A. I was.

Page 99

Q. Okay. Did you come from Houston to go to the meeting?
A. No. I -- as I mentioned earlier, I was interning for the university, so I left after I would leave work, after my internship.
Q. Okay. So while you were interning at the university over the summer, you were living in Houston.
A. That is correct.
Q. Okay. So your internship was not in Houston. It was actually on the premises of the university.
A. Yes.
Q. So you were actually working in Prairie View throughout the whole summer.
A. Yes.
Q. And that's the summer of 2018.
A. That is correct.
Q. Okay. Thank you. I understand that better now.
Do you remember going to any executive committee meetings of the Waller County Democratic party in September of 2018 after school started back up?
A. No, I do not.
Q. Is it your belief that you did not attend any meetings in September?
A. That is correct.

Page 100

Q. What about in October?
A. No, I did not.
Q. What about in November?
A. Formally, I did not attend a meeting. I did have -- we did have -- we hosted meetings where some of the members came over and sat in within our meetings here on campus.
Q. And when in November was that? Was that before the election or after?
A. That was actually before the election, so maybe end of October and going into November. It was actually October, to be exact, the end of October.
Q. Okay. And you said "we hosted". Who hosted the meeting?
A. Various student leaders. There was no official title or organization that hosted the meeting.
Q. Okay. Where was the meeting held?
A. Senate chambers in the Student Memorial Center.
Q. And who came from the Democratic executive committee?
A. Various members. Denise Mattox, to be exact, and other members whose names I cannot remember.
Q. Was Rosa Harris there?
A. No, she was not.
Q. And what was the broader purpose of this

Page 101

meeting?
A. Getting basically what we were going to be able to -- what we were trying to do to get students after the Commissioners Court, so what we were going to be able to do in getting students to vote off campus since we didn't have early voting or all the days of early voting.
Q. So it's your recollection that this meeting would have taken place after the October 17th Commissioners Court meeting?
A. Yes. It was the same day.
Q. So that evening?
A. More so that afternoon.
Q. So this was not a formal meeting of the Democratic executive committee.
A. No, it was not.
Q. This was a student meeting where -- of various student groups where some members of the Democratic executive committee were present.
A. I wouldn't say that it was a student meeting because there were -- there were students present. There were members of the committee and the club that were there as well. And different administrators were there as well. So it was a collective group.
Q. Okay. When you say "the club," you mean the

Page 102

Democratic -- the Waller County Democratic Club?
A. That is correct.
Q. So there were members of the Waller County Democratic Club there.
A. That is correct.
Q. You said there were some employee -- or some university employees there?
A. Yes, that is correct.
Q. And who -- which university employees do you remember being there?
A. There were multiple, but specifically I remember Ms. Lowe and Mr. Jackson, Frank Jackson.
Q. Other than Denise Mattox, who do you remember from the Waller County Democratic Club that were there?
A. I do not remember their names. I know there were multiple people who were also there.
Q. Do you remember who called the meeting?
A. It was a collective more so of. Yeah. So --
Q. Was this meeting planned before the October 17th Commissioners Court meeting?
A. No, it was not.
Q. How did the meeting come together as you recall?
A. Basically getting the -- the ruling of the Commissioners Court and not getting the additional days,

Page 103

so therefore we decided that we were going to meet to discuss things moving forward.
Q. And so was the plan to have this meeting kind of formed in the hallway at the county courthouse or did you hear about it another way?
A. I would say -- I can't say, actually, because there was multiple conversations over the phone and I guess at the county courthouse.
Q. Okay. Can you tell me roughly how many people attended the meeting total?
A. A full table, so I would say at least 15 to 18, maybe even 20.
Q. And the discussion or the subject of the meeting was how to arrange transportation for voting the first week of early voting?
A. I wouldn't say directly that was the center of the conversation. We talked about the county executive and club and Rosa Harris' failure to communicate with us the days, also moving forward what we were going to be able to do, and the position that we were now being put in to communicate with our students on campus the voting days that we -- well, in the community.
Q. Okay. So other than that meeting in November -- or excuse me, in late October -- well, I guess October 17th was the day it took place. Is that

Page 104

right?
A. That is correct.
Q. Other than that meeting, in the fall of 2018, you did not attend any of the Democratic executive committee meetings.
A. No, I did not.
Q. In the fall of 2018 -- I guess over the summer when you were here in your internship --
A. Yes.
Q. -- going through the election of 2018 --
A. Yes.
Q. -- did you have any one-on-one discussions with Rosa Harris?
A. Yes. We spoke at different times. I can't necessarily say what date, what time, or what it was over. But for the most part they were like general conversations.
Q. So you were in communication with her, but you don't recall specifically kind of what the subjects of those discussions were.
A. Yes. I can say that they were very brief, general conversations, nothing in a specific matter.
Q. When you would communicate with Rosa Harris, how did you do that?
A. It could be either text message or not directly

but like a call-in from the -- from the line that they have, which is like a -- like a general -- Denise usually does them. They call out and have like a general list of topics that they talk about.

Q. So they would have like a conference call where everyone could call in on it?

A. Well, you wouldn't call in on it. Well, yes, I believe so.

Q. You said earlier text messages. Did you have Rosa Harris' cell phone number?

A. I did.

Q. And you recall having at least some text messages with her.

A. Yes.

Q. Did you have Denise Mattox's cell phone number?

A. I can't say that I did or that I didn't.

Q. Can you say whether you recall having any text messages with her?

A. In a general body group message, not a personal message.

Q. So there was a group text for members of the executive committee?

A. Yes. It -- it wasn't necessarily one -- just one group message. If there was something to go out that one of the members had, then they would send it

out.

Q. Do you still have any of your text messages with Rosa Harris?

A. No. My phone was stolen in November.

Q. Oh, man.

A. Yeah.

Q. Where did that happen?

A. The grocery store, the night -- the eve of Thanksgiving.

Q. Well, that's no fun.

A. At all.

Q. Okay. Did you communicate with Rosa Harris at all by e-mail?

A. Not a back-and-forth response. Maybe if she sent something out or sent out a collective message or e-mail through -- for the club or committee.

Q. When you got e-mails for the club or the committee, did those come to your student address or a personal e-mail address?

A. I believe my personal, but there wasn't very many e-mails, if any at all.

Q. Have you looked to see what e-mails you might have in relation to the committee or the club?

A. No, I have not.

Q. Other than the text messages and some brief

calls with Rosa Harris, any other communications that you had with her about the election, let's say, before the October 17th meeting?

A. No.

Q. What about Denise Mattox? Did you ever talk to her about the election before the October 17th meeting?

A. No.

Q. And that includes text messages, e-mails?

A. That is correct.

Q. Did you support any particular candidates in the 2018 election?

A. I can't say that I did or that I did not.

Q. Did you campaign for any candidates in the 2018 election?

A. No.

Q. Did you participate in any voter registration drives leading up to the 2018 election?

A. I did.

Q. And what do you recall about that?

A. Just various different voter registration drives, some as precinct chair, some within SGA, some with just multiple or various deputized students.

Q. Did you participate in any informational sessions about the election educating --

A. Not that I can -- I can't say that I did or I

did not.

Q. Okay. And I think I asked you, but -- well, scratch that.

Did you do any get out the vote activities?

A. Yes.

Q. And what do you remember about that?

A. I'm not -- I can't remember the specific events, but I know I did participate in it and that I was aware of the -- of activities of it.

Q. When I say "get out the vote activity," what does that mean in your mind?

A. It was almost -- I wouldn't necessarily say it was a campaign, but it was different activities that we did with getting out the actual vote. I know we had specific events that were titled or were centered around getting out the vote. I know we had it on a couple of posters and online.

Q. In your experience, are those types of activities things that happen on the Prairie View campus in advance of every election?

A. I can't say every election. I just remember specifically me participating in those events in the fall of 2018.

Q. Okay. You also participated in similar events

Page 109

in advance of the primary in 2018?
A. Yes.
Q. You also, I think, testified earlier that you participated in similar events in advance of the jail bond election in 2017.
A. I don't remember if I did testify that. I -- well, actually, you're right. I did. I apologize.
Q. Okay. So for you, it is important in advance of every election to try to encourage your fellow students to register.
A. Most definitely.
Q. And to try to encourage them to get out to vote?
A. That is correct.
Q. And to try to make sure they understand when the opportunities for them to vote are scheduled.
A. Yes.
Q. Okay. And that's true regardless of what the particular hours or days of voting are, right?
A. That is true.
Q. Okay. Do you think that that sentiment -- well, in your experience in working with other students on campus, do you think they share that belief, that it's important to encourage those activities in advance of elections here on campus?

Page 110

A. Yes.
Q. As the chair of the precinct -- as the Democratic chair of Precinct 309, were you aware of the process that Waller County uses to set early voting hours and locations?
A. Not at that time, no.
Q. Have you since come to learn of that process?
A. Yes.
Q. And do you understand that process to be that the elections administrator prepares a draft schedule and submits it to the party chairs for review and agreement?
A. Yes.
Q. And in this case, the party chair for the Republican party was David Luther?
A. Yes.
Q. Have you met Mr. Luther?
A. I have not.
Q. The party chair for the Democratic party was Rosa Harris?
A. Yes.
Q. And is it your understanding that both party chairs agreed to the draft that was proposed by Ms. Eason?
A. I was later made aware.

Page 111

Q. Okay. And you don't have any reason today to believe that that was not the case.
A. No.
Q. By the November '18 election, there had been two previous elections at Prairie View since you had come to school; is that right?
A. Yes.
Q. That had been the November 2017 election.
A. Yes.
Q. And the March primary in 2018.
A. Yes.
Q. Okay. From those elections, you knew that there was a schedule for voting and locations that would come out prior to the election.
A. Yes.
Q. With that knowledge, did you take any actions in either the summer or the early fall of 2018 to try to figure out what the early voting hours would be for the November election?
A. No, I did not. They were told to me.
Q. When were they told to you?
A. I do not remember exactly.
Q. Do you remember who told them to you?
A. No, I do not.
Q. Have you ever gone to the Waller County

Page 112

Commissioners Court website?
A. I can't say that I have or that I haven't.
Q. Are you generally aware that Waller County posts notice of the Commissioners Court meeting that it's going to hold?
A. Yes. I was later made aware of that. I can't say exactly when I found that out.
Q. And you can't tell me exactly when you learned of the early voting -- the initial early voting schedule for November of 2018?
A. Actually, I can. It was when I was first made aware that we didn't have the day -- the exact days, so a couple of weeks before, a week before.
Q. A couple of weeks before the October 17th meeting?
A. Before the -- yeah, before Commissioners Court.
Q. Okay.
A. Maybe a week before.
Q. And -- but you don't specifically remember how you first saw that, the hours.
A. It was different from seeing the hours on the schedule and then being notified that we didn't have the same amount of hours as the rest of the county.
Q. Okay. When did you first see the hours on a schedule?

Page 113

A. I can't say specifically.
Q. Do you remember what format or publication you saw that in?
A. No.
Q. When did you first learn -- well, so was it two weeks before the October 17th meeting when you first learned that the hours in Prairie View were not the same as other areas?
A. I believe -- I would say it was a week.
Q. A week.
A. A week.
Q. And how did you come to that knowledge?
A. A group message that was sent out from Judge Jackson.
Q. And what did that group message say?
A. It was asking us if we were aware that we had been given less days than the rest of the county.
Q. When you first saw the schedule, before you knew the context, the broader context --
A. It was all around the same time. If not after looking at the schedule, after finding out the days were -- the specific days.
Q. Okay. So if I understood you correctly earlier, I think what you said was a little different, so I just want to make sure --

Page 114

A. Okay.
Q. -- I'm understanding you correctly because when you first were testifying about this, I understood you to say that you had initially seen the schedule and then later came to find out that there was some difference in the hours between Prairie View and other areas in Waller County.
A. To clarify, I don't remember exactly when I saw that schedule.
Q. Okay. Do you remember, upon first laying eyes on the schedule for early voting in Prairie View, whether you had any immediate concerns?
A. I could not say that I -- no, I can't say that I did or that I did not, honestly.
Q. So you don't remember any specific.
A. No.
Q. When you first received the schedule for early voting, did you share that in any way?
A. On social media.
Q. Okay. Did you notify the Student Government Association?
A. Not necessarily directly.
Q. Okay. Did you -- I guess other than sharing it in social -- what specifically would you have shared in social media?

Page 115

A. The schedule or the actual dates or something like that.
Q. And in doing that, would you have written out your own message or would you have shared the schedule that was posted by the County?
A. Either one or both. I can't say I necessarily remember.
Q. You had said there was a group message from Judge Jackson.
A. Uh-huh.
Q. What -- who else was a part of that group message?
A. Different -- Rosa Harris, Denise Mattox, and other members of the club and the committee or within the county. A lot of the numbers -- most of the numbers I didn't have.
Q. What was the medium, I guess, for lack of a better word, that that group message came through?
A. I'm sorry?
Q. Yeah, bad way to ask that.
Was the group message a text?
A. Yes, it was a text message.
Q. A group text.
And Rosa Harris, Denise Mattox. You said other members of the Waller Democratic County Club?

Page 116

A. I believe so.
Q. Were there other students on it?
A. I can't remember. I don't -- I'm not sure.
Q. Were there other student groups on it?
A. I don't think so.
Q. So this was a message, to your recollection, that you received in your role as the precinct chair more than as a student.
A. I believe so, yes.
Q. All right. When you got the message from Judge Jackson, what -- what did you do in response?
A. I spoke -- I believe I sent out my personal message to other student leaders, asking if they knew about it, if it was true, if they've heard anything about it, and then, of course, now having clarification that it was true, what we could do, what are our next steps, what is there to be done.
Q. Okay. What were your specific concerns about the early voting schedule initially adopted by the County?
A. I mean, I guess my original and only was why we didn't have the same amount of days and if we can get the same amount of days and why it changed.
Q. Why it changed from what?
A. From before.

Page 117

Also, I would say the students being within the City of Prairie View and not being notified of this before, also me being precinct chair and not being notified of it before.
Q. So Ms. Harris never notified you of what the proposed schedule would be?
A. No.
Q. Do you know whether the proposed schedule was ever discussed at any of the Democratic executive committee meetings in September?
A. From my understanding, it was not ever discussed in a meeting.
Q. Okay. Do you know that for sure?
A. I'm almost positive.
Q. What's the basis for that understanding?
A. Speaking in the meeting after Commissioners Court.
Q. And who did you speak to in the meeting after Commissioners Court?
A. Those who were present. So Denise Mattox, of course, was present, and the other members who I do not know their names.
Q. Is Frank Jackson on the Democratic executive committee?
A. Not to my knowledge, but I can't say that he is

Page 118

or that he isn't.
Q. Was he on the group text from Judge Jackson?
A. I don't think so. I don't remember seeing his name.
Q. At the time of that text, was there any follow-up conversation, responses to Judge Jackson's text message?
A. There were responses. I can't say what they were. I don't, you know, have the phone with the messages anymore, so I wasn't able to refer back.
Q. Okay. And you don't remember specifically what all was said?
A. No, I do not.
Q. So your concern was that the days and hours were not the same as other parts of the county; is that right?
A. That is correct.
Q. Did you know that Prairie View actually got more days and hours than some other areas in the county?
A. That is correct. Well, I later found out.
Q. Okay. Is it your contention that voting -- early voting the first week is somehow more effective or advantageous than early voting the second week?
A. I would say that it gives students the opportunity throughout their busy schedules to give them

Page 119

time to vote within the first or second week.
Q. Okay. So you're saying that, you know, additional time, but my question is a little different than that, which is: Is there anything about a day of voting on the first week versus a day of voting on the second week that distinguishes the two?
A. No, I wouldn't.
Q. Okay. Once you learned -- once you received Judge Mattox's text --
A. It was Judge Jackson, to clarify.
Q. I apologize. Judge Jackson. I'm sorry.
A. Okay.
Q. Did you make any efforts to contact Christy Eason, the Waller County election administrator?
A. No, I did not.
Q. Did you speak to Ms. Eason at all during the fall of 2018 other than at the Commissioners Court meeting?
A. No, I did not. No, I did not.
Q. After receiving Judge Jackson's text, did you make any effort to contact Trey Duhon, the county judge?
A. No.
Q. Do you know who Jeron Barnett is?
A. I do.
Q. Who is he?

Page 120

A. He's one of the members on the Commissioners Court.
Q. Is he specifically the Commissioner who represents the area of Prairie View?
A. Yes, from my understanding.
Q. Did you, after receiving Judge Jackson's text, make any efforts to contact the Prairie View Commissioner, Commissioner Barnett?
A. I did not, no.
Q. Is there somebody you know who did?
A. I know that other students spoke with different officials. I can't say exactly who those officials were. But I know there was some type of contact between officials and other student leaders, whether it was Kirsten Budwine or Kendric Jones or Xante Wallace.
Q. Okay. But you can't specifically say who talked to who?
A. No, I cannot.
Q. Or what was said?
A. Yes, that is correct.
Q. After receiving -- let me ask you, was Rosa Harris copied on Judge Jackson's text?
A. Yes, she was.
Q. Did she respond in any way to the text message?
A. I don't remember if she did or she didn't.

Page 121

Q. After receiving Judge Jackson's text, did you make any efforts to contact Rosa Harris?
A. I didn't, no.
Q. You spoke at the -- did you speak at the meeting on October 17th?
A. I direct -- no, not directly.
Q. You were present at it, though.
A. I was.
Q. Did you have any conversations with any of the Commissioners before or after the meeting or on a break?
A. No, I did not.
Q. Did you have any discussions with Christy Eason while you were at the courthouse for that Commissioners Court meeting?
A. I believe there was a general, maybe a few words, but not a one-on-one or a direct conversation that we had.
Q. Okay. So after the Commissioners Court meeting, you had the meeting that afternoon.
A. Uh-huh. I left Commissioners Court early. I had class. And then once I got out of class, I went to the meeting. We held the meeting.
Q. And the meeting happened sometime in the afternoon. Do you remember the exact time?
A. No, I do not.

Page 122

Q. Ultimately, there were -- the university did arrange for some transportation to the Waller County Courthouse in Hempstead for early voting the first week, correct?
A. That is correct.
Well, I wouldn't necessarily say the university itself. I would say the students of the university and Dr. Simmons personally. But as a collective out of their budget, I'm not sure.
MR. SEAQUIST: I'm going to mark Exhibit 5.
(Exhibit No. 5 marked)
Q. (BY MR. SEAQUIST) Have you seen Exhibit 5 before?
A. I have.
Q. What do you recognize this to be?
A. This is "Get on the bus. PullUp to the" -- "#PullUp To The Polls," organized by some of us student leaders, some of those who were in that meeting at the Commissioners Court. This exactly was Dr. Simmons' charter bus that she had rented out of her own pocket from my understanding.
Q. All right. Who told you that Dr. Simmons paid for this out of her own pocket?
A. It was a general conversation. I don't have

Page 123

anything in writing.
Q. Who was the general conversation with?
A. The same student leaders who were organizing the event.
Q. Okay. Of those student leaders, were they all members of The Panther Party?
A. No.
Q. There were other groups involved as well?
A. There was other, yes.
Q. And in fact, do you -- can you say for sure whether Dr. Simmons versus the university paid for this?
A. I'm almost positive that Dr. Simmons paid for the charter bus out of pocket. It was --
Q. Do you know --
A. -- to my knowledge that she did.
Q. Do you know whether she was ever reimbursed by the university for that?
A. No.
Q. Okay. So there was a bus chartered. Was it a big bus like the one pictured here?
A. Yes.
Q. And it went to the courthouse -- it looks like there were three trips to the courthouse in Waller -- or in Hempstead on Friday, twenty -- Friday, October 26th, 2018.

Page 124

A. That is correct.
Q. Did you ride on any of those trips?
A. No, I did not.
Q. Did you see the bus when it came to campus?
A. I remember seeing the bus. I believe I was preparing to go out of town that day, so I don't --
Q. And do you remember why you were going out of town?
A. Yes. I was participating in a conference.
Q. What kind of conference?
A. A Public Service Institute. I was a Bush fellow.
Q. And where were you going?
A. College Station.
Q. And how long was that conference to last?
A. All weekend.
Q. So you were coming back Sunday night?
A. Yes, but I ended up coming back earlier.
Q. When did you end up coming back?
A. The next morning, afternoon.
Q. So Saturday?
A. Yes. Yes.
Q. Okay. Do you know how many students used this bus to go to the courthouse in Hempstead to vote?
A. No.

Page 125

Q. Did you see students getting on the bus?
A. No.
Q. Have you talked to any students who used the bus service to go vote in Hempstead?
A. I believe I talked to -- I've talked to several students who did as a collective. I can't name any of them or say how many. I didn't have much participation with the exact day of get on the bus, considering that I was preparing for my conference.
Q. Okay. In terms of the process to actually charter this bus, did you play any role in that?
A. In -- no. No, no, no.
Q. Do you know who actually called up the bus company to rent the bus?
A. No, I do not.
Q. Do you know who researched what bus companies were available, those kinds of things?
A. No, I do not.
Q. Were there any other members of The Panther Party present at that afternoon meeting on the 17th?
A. Kirsten Budwine, Joshua Muhammad, and other students who I just cannot name their names.
Q. But that was not an official Panther Party meeting, correct?
A. No, not at all.

Page 126

Q. Did you also volunteer to drive students to vote at the courthouse in Hempstead during the first week of early voting?
A. I did.
Q. Do you know how many students you took?
A. I do not.
Q. Do you know how many trips you made?
A. I do not.
Q. Was it more than one?
A. I cannot say. I don't remember. I participated in a lot of the organizing of it. I know that for sure. But I can't speak on anything further.
Q. When you say "the organizing of it" --
A. Yes.
Q. -- what do you mean by that?
A. Any meetings, conference calls, group messages, or text messages where we specifically came up with the idea when the idea originated, how we were going to format it, getting students to participate, to sign up, volunteer, go through the process of putting their name on the list to be able to drive them, what times they could do it, when they would pick them up, how many somebody could take in their car, all those details.
Q. Okay. Other than the meeting we've talked about on the afternoon of the 17th --

Page 127

A. Yes.
Q. -- what meetings did you attend where the organization of trips to the courthouse were discussed?
A. There were various meetings. I know of different ones. I can't say specifically the times and the dates of those; but within the next week we met several times, whether it was in the SGA chambers, in the Student Memorial Center, within the Student Government Association office, the student -- another student organization -- well, no, I'm sorry, another office where Mrs. Lowe's office is located.
Q. Okay. You've talked about Mrs. Lowe a couple of times. Who is she?
A. Ms. Lowe is -- she's involved in the student engagement department office.
Q. Is she a university employee?
A. Yes, that is correct.
Q. I saw some documentation with a student named Maydrian Lowe. I don't suppose -- are they related?
A. There's no relation.
Q. No relation. Okay.
So the meetings that you just described, those weren't specifically Panther Party meetings, correct?
A. That is correct.

Page 128

Q. Did you personally attend each of those meetings?
A. Yes. And I'm sure there's some other meetings that I might not have been able to attend.
Q. Did you participate in obtaining the list or soliciting people to volunteer to drive students?
A. Yes.
Q. Okay. What did you do to do that?
A. We posted on social media where students could go. Their contact person was Mrs. Lowe if they had any questions or -- or wondering like where they could go, who could do it, what did you need to be able to or qualify to participate.
Q. How many students ultimately signed up to drive?
A. I can't say exactly. I know there were multiple, over 10.
Q. Over 10?
And were those just Panther Party members or other students as well?
A. There were other students, various students.
Q. Was there -- were you involved in coming up with a specific schedule for when people would drive?
A. No.
Q. Who did that to your knowledge?

Page 129

A. It was more so of the students bringing forth what times they could volunteer. It wasn't necessarily a time that any of us student leaders or organizers said "This is the time you have to take them."
Q. Okay. So individuals came up with their own schedule for when they could do that.
A. Uh-huh. They volunteered what time they had within their schedules.
Q. Did you -- do you know ultimately how many people drove other students?
A. No, I do not.
Q. Do you know how many other people got rides to vote?
A. No, I do not.
Q. Do you know how many trips were made?
A. No, I do not.
Q. Did you -- and you don't remember specifically how many trips you made, right?
A. No.
Q. Was it -- do you remember specifically anybody you drove?
A. I know one personally; but besides that, I can't speak on any names of any other students.
Q. Okay. Do you remember how many people you had in your car when you went to the courthouse?

Page 130

A. I know I had one for sure the first time.
Q. Was that your sister?
A. No. No.
Q. So as far as you know, you had one.
A. Yes.
Q. Did you pay for your own gas for that?
A. Yes.
Q. Were you ever reimbursed for the gas expense?
A. No, I was not.
Q. Do you know how many miles you drove?
A. No, I do not.
Q. Other than the October two thousand -- or the October 17th, 2018 meeting, did you attend any other meetings of the Waller County Commissioners Court in advance of the 2018 election?
A. No, I did not.
Q. Were you there for the October 24th, 2018 meeting?
A. 24th? No, I was not.
Q. All right. Now, you saw the initial hours that the Commissioners Court had adopted for early voting on the Prairie View campus?
A. That is correct.
Q. And you saw that the Court had originally scheduled early voting from 8:00 to 5:00 on Monday

Page 131

through Wednesday, which was the October 29th through the 31st?
A. That is correct.
Q. And that was at the Memorial Student Center?
A. That is correct.
Q. And the Commissioners Court had also provided early voting from 7:00 a.m. to 7:00 p.m. in the Waller County Community Center on Thursday, November 1st, and Friday, November 2nd?
A. That is correct.
Q. You say in your interrogatories that you have never been to the Waller County Community Center.
A. That is correct.
Q. Is that still true today?
A. That is correct.
Q. Do you know where the Waller County Community Center is?
A. Yes.
Q. When did you first learn where the Waller County Community Center is?
A. I can't say exactly.
Q. Did you know where the Waller County Community Center was prior to the November election?
A. Yes, I believe so.
Q. Do you know where the post office is?

Page 132

A. Yes.
Q. Had you ever been to the post office to mail something?
A. Yes.
Q. And you had testified earlier that there is a central mailroom here at the university.
A. That is correct.
Q. Is it still common for students to -- well, if you need to mail out a package, is that something that the mailroom here handles?
A. I'm actually not sure. I know I can't buy stamps there.
Q. So if students need to buy stamps, is it common for them to go to the post office there?
A. Yes.
Q. And the post office is just on the edge of the campus.
A. Yes.
Q. Where did you -- you did vote in the 2018 general election, correct?
A. Yes.
Q. And where did you vote?
A. In the early -- during early voting?
Q. Did you vote during early voting?
A. I did.

Page 133

Q. Okay. Where during early voting did you vote?
A. Off campus at the courthouse.
Q. Why did you choose to vote at the courthouse?
A. Just to clarify, we are talking about the midterm election.
Q. Yes, ma'am.
A. Yes.
Q. November of 2018.
A. Yes. Okay. And can you repeat your last question?
Q. Why did you choose to vote at the courthouse?
A. So I could participate in early voting.
Q. You understood that there were early voting days at the Memorial Student Center, correct?
A. Well, yeah, for the following week of those three days.
Q. Okay. Could you have voted at the Memorial Student Center during those days if you had chosen to?
A. I can't say that I could have due to personal schedule.
Q. You had testified earlier that there were breaks in your schedule?
A. Yes, there was breaks in my schedule. During those breaks I could have had -- well, I had multiple obligations due to my various involvements in work and

Page 134

other things, so I can't necessarily say that I did have the exact time to go and vote during those three specific days of early voting.
Q. Can you say that you had any particular conflict that would have kept you from voting during those three days?
A. I can say potentially I did.
Q. I understand potentially. My question is definitively.
A. I can't say that I did or that I did not.
Q. Okay. Did you have any problems casting your ballot at the courthouse?
A. Yes.
Q. What problems?
A. I was -- a change of address, which prolonged -- well, there was a line and then it prolonged me being able to vote and then having to take the time to change my address, which was an additional -- not necessarily a ballot, but application.
Q. Okay. So we're talking about the November 2018 election.
A. Yes, that is correct.
Q. And you filled out a change of address form?
A. Yes.
Q. That is because you had moved from your

Page 135

original address on campus to a new residence?
A. Yes and no. From my understanding, before, when we were registering other students and when we registered ourselves to be able to vote within the County of Waller, we were using a general 100 University Drive address. By that time, then we had moved to -- or we were instructed to use the specific addresses of our housing complexes.
Q. Okay. Did you understand that instruction was intended as a fix to the registration confusion issues that were caused by the 100 versus 700 registration?
A. Yes, it was -- it was one of them for the time being there was.
Q. How long did it take you to fill out that registration card?
A. A couple of minutes, a few minutes.
Q. Okay. And how long was the wait to vote at the Waller County Courthouse?
A. I can't say specifically the amount of the minutes, but it was a few.
Q. Okay. All told, how long would you say you were at the courthouse to vote?
A. 10 -- 10 minutes or so.
Q. Did you complete the change of address form before or after you cast your ballot?

Page 136

A. I believe it was after.
Q. Okay. You testified that you had been to the post office in Waller County?
A. That is correct.
MR. SEAQUIST: I'm marking Exhibit 6.
(Exhibit No. 6 marked)
Q. (BY MR. SEAQUIST) I'll hand you what I've marked as Exhibit 6.
A. Thank you.
Q. I'll represent to you, Ms. Allen, that Exhibit 6 is a Google satellite image that I've printed.
A. That is correct.
Q. Do you recognize any of the features in the picture here?
A. Yes.
Q. What do you see that you recognize?
A. The entire campus.
Q. Okay.
A. Or a section of the campus.
Q. Do you see the football stadium?
A. I do.
Q. And that is the football stadium for Prairie View A&M?
A. That is correct.
Q. And does that help you orient what we're

Page 137

looking at here?
A. Yes.
Q. Does this image fairly and accurately depict the portion of the campus that's displayed there?
A. Yes.
Q. Do you see the Postal Service?
A. I do.
Q. Is it accurately reflected in this drawing -- or in this image?
A. Yes.
Q. Now, are you aware that there is a sidewalk from campus that leads to the post office parking lot?
A. I am now aware.
Q. Do you see it in the image there?
A. Yes, I can see it.
MS. ADEN: Objection. Are you representing that there is a sidewalk or are you asking her does she know if there's a sidewalk?
MR. SEAQUIST: Well, she says she saw it, so --
MS. ADEN: But before you asked her is she aware that there's a sidewalk. So are you representing to her that there is a sidewalk?
MR. SEAQUIST: Well, I will represent to her that there is a sidewalk, but my question was

Page 138

whether she was aware of it.
MS. ADEN: But it assumes a fact that is not in evidence or that has not been made yet by her.
MR. SEAQUIST: Is that an objection to form?
MS. ADEN: That is an objection to form.
MR. SEAQUIST: Duly noted.
Q. (BY MR. SEAQUIST) In looking at Exhibit 5 --
A. Exhibit 6?
Q. 6. Sorry.
You just testified that you see the sidewalk that runs from campus to the post office parking lot, correct?
A. That is correct.
Q. Were you aware that that sidewalk existed prior to looking at this image?
A. I can't say that I did or I did not.
Q. Okay. Had you ever walked to the post office from campus?
A. No.
Q. In looking at this image, are you able to identify the location of the Waller County Community Center?
A. Yes.
Q. And can you describe it for me?

Page 139

A. Next to the post office.
Q. Okay. Will you circle it with this black marker?
A. (Witness complied).
Q. Thank you.
A. Here you go.
Q. Okay. Are you familiar with the Hobart Taylor Hall?
A. Yes.
Q. Have you ever had classes in the Hobart Taylor Hall?
A. Excuse me. I apologize.
Q. That's all right.
A. Summer of 2019 I did.
Q. Is it pretty standard for Prairie View students at some point during their time here to have a class in the Hobart Taylor Hall?
A. I can't say that there is or there isn't.
Q. Okay. Now, PVAMU operates a series of shuttles, correct?
A. Yes, for off-campus students.
Q. Okay. Is there also a campus loop shuttle that goes around the campus?
A. I heard that there was one. I haven't physically seen it or been able to use it.

Page 140

Q. Okay. You've never ridden it?
A. No. I don't even think it's in service.
Q. Have you ever actually looked into what the bus schedules are or the shuttle schedules are?
A. No, I have not.
Q. As a student on campus, do you need the shuttle service to get from one side of the campus to the other?
A. No, I do not.
Q. Is that something you would just walk to do?
A. To get to which location?
Q. Just to get around campus.
A. Yes. If it's within distance, yes.
Q. Do you ever drive to get from one place on campus to another?
A. Yes.
Q. Okay. Where would you drive from?
A. To -- from my location of University Square to anywhere that's within a far distance.
Q. For example?
A. So for example, the post office.
Q. Okay. Do you ever go to football games?
A. No.
Q. Do you ever go to the athletic complex?
A. No.
Q. When you went to class at Hobart Taylor Hall in

Case 4:18-cv-03985 Document 73-2 Filed on 01/24/20 in TXSD Page 178 of 677

the summer of 2019, did you drive there?
A. I did.
Q. When you go -- are there any other locations that you would drive to that are on campus?
A. Yes, the Panther Plaza.
Q. Okay. Did you ever walk to the Hobart Taylor Hall?
A. No.
Q. When you -- well, scratch that.
Are you aware of any student groups that have held events at the community center?
A. No, I am not.
Q. You're not a member of the sorority here, right?
A. That is correct.
Q. Do you have any reason to dispute that the sorority has used the community center for events?
A. No.
Q. Do you know anyone who voted at the community center in the fall of 2018?
A. No, I do not.
Q. Did you ever post any social media messages informing students of their ability to go vote at the community center?
A. It was on the general schedule, so -- and I did

post that and repost it, so it would have been on there.
Q. Okay. After the conclusion of early voting at the Memorial Center, the Memorial Student Center, after Wednesday, did you ever send out any social media messages encouraging students to -- who hadn't voted yet to go over to the community center?
A. I reposted the schedule.
Q. Is that a no?
A. No, I wouldn't say that's a no.
Q. Okay. My question is: After the Wednesday of early -- of the second week of early voting, did you specifically send out any social media messages encouraging people or reminding people that they could still go vote at the community center?
A. I would say that I did, considering that I posted and reposted a schedule that detailed the places and when they could vote during that time of that election.
Q. Other than just posting the general schedule, did you send any messages specifically reminding students that they could still vote at the community center?
A. I can't say that I did or that I did not.
Q. Okay. Now, are you also aware that on October 2014 the Waller County Commissioners Court added

additional early voting hours in the City of Prairie View?
A. Yes.
Q. October 24th, not the 14th. Is that right?
A. Yes.
(Discussion off the record)
Q. (BY MR. SEAQUIST) Ms. Allen, let me correct my misstatement in my last question.
My question is: Are you aware that on October 24th, 2018, the Waller County Commissioners Court extended the early voting hours in the City of Prairie View?
A. Yes.
Q. Okay.
A. And I also knew what you meant or I heard -- I thought I --
Q. Okay. Thank you.
(Exhibit No. 7 marked)
Q. (BY MR. SEAQUIST) I've handed you what I've marked as Exhibit 11.
A. Yes.
Q. No, it's not. It's 7.
A. I'm sorry. Exhibit 7.
Q. Sorry.
Exhibit 7 -- have you seen Exhibit 7

before?
A. Yes.
Q. And do you recognize this to be the extended early voting schedule?
A. Extended?
Q. Yes. And by extended, I mean it reflects the increased hours added by the Waller County Commissioners Court on October 24th.
A. For Prairie View A&M University Memorial Center?
Q. Well, yes, among other places, which we'll go through.
My question is: Just in looking at this extended -- or this schedule, have you seen it before?
A. Yes, I have seen this schedule.
Q. Okay.
MS. ADEN: And you also said October 24th. I think you meant 29th.
MR. SEAQUIST: No. That one, I meant 24th.
MS. ADEN: Sorry. Okay.
MR. SEAQUIST: I can trip myself up well enough without you trying to help me out.
Q. (BY MR. SEAQUIST) In the extended hours, the Commissioners Court extended the hours at the Memorial

Page 145

Student Center on Monday through Wednesday from 8:00 to 5:00 to 7:00 to 7:00, correct?
A. That is correct.
Q. And the Commissioners Court also added Sunday voting before the second week of early voting at the Prairie View city hall; is that right?
A. Yes, off campus.
Q. Okay. When these extended hours came out, did you share them on social media?
A. I'm sure I did.
Q. On Monday through Wednesday, when early voting was taking place at the Memorial Student Center, as the precinct chair there, did you go and observe?
A. No, not -- no.
Q. Did you -- just being at the -- were you at the student center at any point during those three days?
A. I might have. I can't say specifically if I was or if I wasn't.
Q. Okay. And did you see the early voting area?
A. I might have. I -- I can't say directly that I did.
Q. Okay. Did you talk to anybody about their experience voting early on campus at the Memorial Student Center?
A. I believe I did.

Page 146

Q. Okay. Did anybody express any difficulties to you casting a ballot early at the Memorial Student Center?
A. I'm unsure.
Q. Not that you recall?
A. Yes. Well, no, I'm unsure.
Q. What are you unsure about?
A. If I had conversations with students about difficulties.
Q. Sitting here today, you can't tell us any reports of difficulties that you received from other Prairie View students about voting early in the Memorial Student Center?
A. For those three days? No, I cannot. The only thing I will say was just the repeated address -- change of address forms. But besides that, I cannot.
Q. Okay. And again, to vote early at the Memorial Student Center, it didn't matter where you were registered, right?
A. That is correct.
Q. And was it your understanding in the fall of 2018 leading up to the election that the County had announced that you would be able to vote in 309 regardless of where you were registered?
A. On election day or early voting?

Page 147

Q. Both.
A. No, I can't say that I did or that I did not.
Q. Okay. Do you know whether there was a statement by the Secretary of State saying that students would be able to vote in 309?
A. Yes.
Q. And that statement said that they would be able to vote in 309 regardless of where they were registered as long as they were registered in Waller County, right?
A. I can't necessarily recall exactly the statement. I do remember a statement and what it said. I'm pretty sure I read through it at that time, but that was a year ago, and I remember posting about it.
Q. Okay. Do you also remember the County announcing that students would not be required to fill out a change of -- a change of residence form before they cast their ballot?
A. I do remember.
Q. Are you aware of any issues with long lines during early voting at the Memorial Student Center in the 2018 general election?
A. I can't say that I -- I can't say yes or no.
Q. Are you aware that the County doubled the number of controlling -- controllers for voting machines at the student center?

Page 148

A. I knew of an increase. I can't say an exact number or how many.
Q. Are you aware that the student center had the greatest number of voting machines of any precinct?
A. Yes, due to the amount of students those machines were for versus the other populations within the county and in those cities and in those precincts.
MR. SEAQUIST: I'm going to object, nonresponsive, after "Yes".
Q. (BY MR. SEAQUIST) You say in your interrogatory responses, specifically in response to No. 8, that you had to rearrange your limited schedule to vote.
A. That is correct.
Q. What specifically did you have to rearrange to cast a ballot?
A. I can't remember exactly. As mentioned, with the various obligations and class schedules at that time, I did; and then also partaking in trying to organize and engage the students, I did.
Q. Did you have to miss class to go -- did you miss class to go vote?
A. I don't think I did, no.
After this set of questions, can I use the restroom?
MR. SEAQUIST: You can do it now.

Page 149

(Recess from 1:08 p.m. to 1:15 p.m.)
Q. (BY MR. SEAQUIST) Okay. We left off -- we've had a break. Is there anything you need to correct from your testimony before?
A. No.
Q. We were talking about how you rearranged your schedule to vote. And you had talked about, voting at the hours provided at the Memorial Student Center, you might have had to rearrange some of the activities that you had there.
A. That is correct.
Q. And did you have to rearrange your activities to go vote at the courthouse?
A. I might have.
Q. Okay. And would it have taken you longer to rearrange your activities -- excuse me.
Would you have had to rearrange a larger period of time to go vote at the courthouse or at the Memorial Student Center?
A. The courthouse.
Q. But ultimately, you chose to go vote at the courthouse.
A. Yes.
Q. You also stated in your response that you incurred the travel costs, including time spent and

Page 150

funds spent on gas, going to vote. Is that right?
A. Yes.
Q. Now, you wouldn't have incurred those costs if you had elected to vote at the student center, right?
A. I would have, because I would have still participated in helping other students.
Q. Okay. Those costs were not necessary for you to cast a ballot, though, right?
A. Not individually, no.
Q. Do you have any reason to believe that voters in Hockley, for example, didn't have to incur travel time or fuel costs if they wanted to go cast an early ballot?
A. I'm not sure on Hockley.
Q. Is it fair to say that other voters in the county would have had to rearrange their schedule to go cast an early ballot?
A. They might have.
Q. Is it fair to say that other voters in the county might have had to drive to go cast a ballot?
A. Yeah, if they don't live on a college campus.
Q. In fact, is it fair to say that Prairie View A&M is really the only location in Waller County where people have the opportunity to vote right where they lived, ate their meals, took their courses, et cetera?

Page 151

A. I would say it's the only college campus in Waller County that houses 9,000 students that use a central location to go vote, who all don't have a car to go and travel to vote off campus of where they live or within their community.
MR. SEAQUIST: Objection, nonresponsive.
Q. (BY MR. SEAQUIST) My question is: Can you think of any other -- are you aware of any other voting location in Waller County where people were able to go vote right at the area where they lived?
A. No.
Q. As the elected Democratic precinct chair, do you see it as your responsibility to try to mobilize voters and get them to the polls?
A. I would say I took on that position or that -- I would say that I took on that duty. I wouldn't necessarily say that it was within my duties.
Q. On election day, I understand there was a Parade of Voters.
A. Yes.
Q. Did you participate in that?
A. I did.
Q. Did you march?
A. I did. Also the organizers spent time on a tractor.

Page 152

Q. What were you doing on a tractor?
A. Speaking, handing out water, engaging the students, just -- we were just there.
Q. Where did the tractor come from?
A. I'm not sure.
Q. Do you know who secured the tractor?
A. No, I do not.
Q. Did you ride on the tractor?
A. I did.
Q. Was it like a tractor with a trailer behind it?
A. Well, yeah. It was more like the -- we were on the trailer. Let me specify. We were on the trailer.
Q. So like a flatbed.
A. Yeah.
Q. Okay. Did you -- did the organizers of the march mark off the course for where the walk would go?
A. No.
Q. There was a planned --
A. Or I didn't. If they did, then I wasn't aware of it.
Q. There was a planned route for the march, though; is that right?
A. Yes.
(Exhibit No. 8 marked)
Q. (BY MR. SEAQUIST) I'm going to hand you what I

have marked as Exhibit 8.
A. Thank you.
Q. Do you recognize Exhibit 8?
A. I do.
Q. And what is Exhibit 8?
A. A tweet from Maia Young, M-a-i-a.
Q. And this is a tweet that you retweeted?
A. This is correct.
Q. And this is announcing the Parade of Voters to take place on November 6th?
A. That is correct.
Q. And did the -- there's a flyer that you retweeted here, too, correct?
A. The Parade of Voters, yes, that is correct.
Q. Do you know who created that flyer?
A. No.
Q. Okay. It specifies that the -- the parade would depart from the UC courtyard at 10:00 a.m.
A. That is correct.
Q. Did you understand that this was going to be a walkout?
A. A walkout of where?
Q. Do you know what a walkout is or have you heard that term before?
A. I've heard of the term, I mean, in a general

sense.
Q. So a plan where students would walk out of class to participate in the march.
A. Yes.
Q. Okay. And was there some way that there was -- well, it says "Listen for the air horns at 9:50".
A. Uh-huh.
Q. Is it your understanding that that was going to signal the start or to gather for the march?
A. I can't say that I do or I didn't -- I did or I didn't, considering there's classes all over campus and we were right there in that location, pointing at the University College.
Q. I understand.
Did you miss any classes to participate in the march?
A. I don't think so.
Q. It says that the parade would depart from the UC courtyard?
A. That is correct.
Q. And you just told us it's across the street here. That's also the courtyard of where you initially lived when you first moved to campus, right?
A. That is correct.
Q. Is that where everybody did, in fact, meet up?

A. Others joined along.
Q. Okay.
A. Some of us met there and started there.
Q. How many people would you say started the march?
A. I don't have a number, but it was plenty of students.
Q. Okay. Do you remember the route you took?
A. For the most part.
Q. Do you see on Exhibit 8 there is a partial map there marking a route?
A. Yeah. It's not very clear, but I do see the picture.
Q. Okay. And here, the beginning of the -- does it look to you that the beginning of the route that's marked on this map on Exhibit 8 is the University View?
A. That is correct.
Q. Did you march from -- starting from the University College courtyard to the University View?
A. No, we did not.
Q. Okay. Where did you all end up going?
A. Just to the MSC, the Student Memorial Center.
Q. Okay. What route did you take to get to the Memorial Center?
A. From my understanding, it looks as though it

was just in the circle that's on the map.
MR. SEAQUIST: Okay. Let's do this. I'm going to mark Exhibit 9.
(Exhibit No. 9 marked)
MS. ADEN: Can I have one, Gunnar?
MR. SEAQUIST: This would have been -- yeah. I'm sorry.
MS. ADEN: Thank you.
Q. (BY MR. SEAQUIST) Okay. Exhibit 9 is a slightly better, though still not perfect, copy of the parade flyer that we looked at; is that right?
A. Yes, without the map.
Q. Without the map, correct.
And at the bottom of the flyer does it outline the parade route?
A. When you say "outline" --
Q. Or does it describe?
A. I wouldn't -- this is really small.
Okay. Yes, it does. It's listed on there.
Q. Okay. And so it says UC courtyard.
A. Yes, that is correct.
Q. And then it says the View.
A. That is correct.
Q. But your testimony is you don't think that the

Page 157

parade actually went to the View.
A. No, I'm -- I'm testifying that we didn't.
Q. Okay.
A. Not that I think. I'm sure.
Q. Okay. The next -- it's not clearly written there; but if you looked at this on a computer, it's pretty clear that it says Phase III. Do you know where Phase III is?
A. Yes, that's correct.
Q. And was that part of the route?
A. Yes, we passed Phase III.
Q. All right. And then Phase I and II? Do you know what that building is?
A. Yes. Yes, I know where Phase I and II is.
Q. And was that on the route? Did you all go by that?
A. I believe so.
Q. Okay. And then it says the athletic complex. What does the athletic complex mean to you?
A. The athletic complex is what is -- I guess you would say the gym, the rec center, also the stadium, but not more so the stadium. It's right by the -- well, it's not right by it, but it's near the MSC. But we really crossed over in our route.
Q. Okay. And then you went to the MSC, correct?

Page 158

A. Yes. We went in front of the MSC.
Q. Wound up at the MSC?
Let me hand you this marker. And if you look back at Exhibit 2, which was the map we had --
A. That is correct.
Q. It's the one underneath that.
If you would, I'd like you to draw me your recollection of the route. So starting at the UC courtyard --
A. UC courtyard is 30, correct?
Q. I believe the UC courtyard is actually 7.
A. Okay. 7?
MS. ADEN: 7 is University College.
MR. SEAQUIST: Yeah, University College courtyard.
MS. ADEN: Okay.
THE WITNESS: Okay.
Q. (BY MR. SEAQUIST) Okay. Which way did you guys leave to go -- or leave from the University courtyard? By "you guys," I mean the march on November 6th.
A. This way (indicating).
Q. All right. And the next stop -- you did not go to the View, you testified. The next stop would have been Phase III?
A. Actually, we stopped right in front of

Page 159

University Square.
Q. Okay.
A. And that's right here (indicating).
Q. Okay. Where did you go next?
A. We just went around -- what is 39?
MS. ADEN: Transportation center?
THE WITNESS: The transportation center. Where's JJ, juvenile justice? I cannot see anything on this map.
Q. (BY MR. SEAQUIST) Juvenile justice and psychology appears to be 49.
A. 49? Okay. 49, 49, 49. That's juvenile justice. Okay.
Yeah. Okay. So I believe we continued -- yeah. Okay.
Q. Okay. And do you know how then you would have gotten to Phase I and Phase II after that?
A. What's No. 53? The gym, the old gym. 52 is university --
THE REPORTER: I'm sorry. He coughed. I couldn't hear you.
THE WITNESS: I was calling out the numbers, 51 and 52. And I believe the -- we maybe went this way. Where is the MSC? What number is the MSC? 58.

Page 160

Q. (BY MR. SEAQUIST) Now, did you go -- the next thing on the list is the athletic complex. Did you go to the athletic complex?
A. We pass -- I believe we passed the athletic complex.
Q. Okay. Well, draw the route that you recall going.
A. Okay. This part, I don't remember exactly where. Yeah. No, I don't exactly remember.
Q. Okay.
A. But I know we ended up in front of 58. I don't remember what street, what turns to -- in getting in front of the MSC.
Q. Okay. So at the time this march took place, you had already voted early at the Hempstead courthouse, correct?
A. That's correct.
Q. And there had already been three days of early voting on campus in Prairie View from 7:00 to 7:00, correct?
A. That is correct.
Q. And there had already been two full days of early voting from 7:00 to 7:00 at the Waller County Community Center, correct?
A. That is correct.

Q. And on the day of this march, election day, there was election day voting going on from 7:00 to 7:00 at the Memorial Student Center.
A. That is correct.
Q. And so was part of the plan for this march to end up at the Memorial Student Center so that anybody who hadn't voted yet could then, at the conclusion of the march, go in and vote?
A. That is correct.
Q. Okay. Do you know or did anybody look at, in mapping out the parade route, what the distance of that would be?
A. I can't say yes or no.
Q. Was the parade well attended in your opinion?
A. Yes.
Q. If we look at -- look back to Exhibit 8. On the following pages there are some pictures.
A. That is correct.
Q. Do you recognize those to be pictures of the march in progress?
A. I wouldn't say in progress. This is a -- this is a picture of us in front of the Student Memorial Center.
Q. Okay. The next page.
A. Yes.

Q. Okay. Is that a picture of the march in progress?
A. Yes, this is different pictures at various points. Two of these pictures are at the Student Memorial Center. One is on the panther. One is way after, it looks as though.
Q. What makes you say it looks way after?
A. There's no one behind Xante Wallace.
Q. That's the picture in the top right?
A. That is correct.
Q. And Mr. Wallace is a council member for the City of Prairie View?
A. That is correct.
Q. In the top left picture -- this is the third page of the exhibit we're talking about. It's Bates labeled Plaintiffs 112. Do you recognize the gentleman walking in the top left corner?
A. Yes, I do.
Q. Who is that?
A. Mike Siegel.
Q. And who was Mr. Siegel?
A. He is a -- well, at the time he was running for the 10th Congressional seat.
Q. Okay. So a House of Representatives candidate?
A. Yes.

Q. The photo immediately below Mr. Siegel, do you recognize that individual?
A. Yes.
Q. Who is that?
A. Nev, Nev, some --
Q. Do you know --
A. -- person that's famous or --
Q. Do you know --
A. -- was famous.
Q. Sorry.
Do you know the source of his acclaim?
A. No.
Q. Do you know why he was on campus that day?
A. Not at all. No one knew that he was coming. He just kind of showed up when we started marching.
Q. The picture in the bottom right, do you -- can you identify where that was taken?
A. That's the panther. That is in front of the Student Memorial Center.
Q. All right. The next page, 114.
A. Yes.
Q. And this is a picture you retweeted?
A. Yes.
Q. Yeah. Does this show, again, the march in progress?

A. This is -- yes.
Q. Okay. Ms. Allen, as a plaintiff in this lawsuit, is it your contention that the Waller County Commissioners Court adopted the early voting schedule for the twenty-one eighteen general election to intentionally discriminate against African-Americans in Waller County?
A. Can you repeat the question?
Q. Yes.
As a plaintiff in this lawsuit -- and you are a named plaintiff.
A. Yes, that is correct.
Q. Is it your contention that the Waller County Commissioners Court adopted the early voting schedule for the 2018 general election to intentionally discriminate against African-American voters in Waller County?
A. Yes.
Q. What is the basis for that contention?
A. For one, the history of Prairie View A&M University students. It's not all of Waller County. It's particularly the students and the African-American residents of this county. And for a long time there has been an ongoing issue of voter suppression within this county with its black residents or African-American

Page 165

residents who attend Prairie View A&M University.

And in those -- in my opinion, and in the facts of history, it has been seen that different -- different acts by county officials within the County of Waller has -- has put -- or has suggested different things. But also, in the main state, I will say that it was voter suppression amongst African-Americans, particularly the students of Prairie View.

Q. Other than the history that you have just talked about, is there any basis -- any other basis for your contention that this Waller County Commissioners Court acted intentionally to discriminate against African-American voters in early voting in 2018?

A. I would also say going to Commissioners Court and asking for more days or more hours that we were once again denied, so --

Q. Okay. Other than that, is there any other basis?

A. No.

Q. Are there any individual statements that you have heard with your own ears or that have been reported to you by any Waller County official that you can point me to that would suggest Waller County was trying to intentionally discriminate through the adoption of early voting hours in 2018?

Page 166

A. I couldn't say that I have or that I have not.

Q. As a plaintiff in this lawsuit, is it your contention that the Waller County Commissioners Court adopted the early voting schedule for the 2018 general election to intentionally discriminate against young voters in Waller County?

A. Yes.

Q. Okay. What are the bases for that contention?

A. The same ones I stated earlier, in being that the students of Prairie View A&M University, as in your question, young voters -- we are the young voters. We are really the only young voters of Waller County, considering that Waller County is a primarily older resident county besides the University of Prairie View.

Q. Okay. Other than what you have testified to in response to my first question and what you've just added, are there any other bases for your belief that the early voting schedule was intentionally adopt -- was adopted to intentionally discriminate against younger voters?

A. No.

Q. Have you ever filed any lawsuits besides this one?

A. No, I have not.

Q. Okay. Have you ever been a defendant in any

Page 167

lawsuits?

A. No, I have not.

MR. SEAQUIST: Can we take two minutes?

MS. ADEN: Yeah. Can we actually turn that into like a 10-minute break so we can get our redirect together since it looks like you're near the end?

MR. SEAQUIST: Yes.

(Recess from 1:41 p.m. to 2:02 p.m.)

Q. (BY MR. SEAQUIST) All right, Ms. Allen. Have you understood the questions that I've asked you today?

A. Yes, I have.

Q. And if you didn't -- if there's a question I asked that you didn't understand, did you ask me to clarify it?

A. Yes.

Q. And was I able to do so to your satisfaction?

A. Yes.

Q. Okay. Have I been courteous to you in the deposition today?

A. Yes.

MR. SEAQUIST: All right. I thank you for your time.

And I will pass the witness.

MS. ADEN: All right.

Page 168

EXAMINATION

BY MS. ADEN:

Q. Ms. Allen, I have a few questions for you.

A. Okay.

Q. Okay. Because I'm asking you questions but we're still being transcribed, can you just make sure to speak up? And I know you might turn to me, so --

A. Okay.

Q. -- think about that we're still being recorded.

A. Yes.

Q. Okay. So, Ms. Allen, you testified earlier in the day that you have several family members who are PVAMU alum. Is that accurate?

A. That is correct.

Q. Okay. Based upon that, did you learn anything about voting discrimination that they or other PVAMU students have experienced while attending this school?

MR. SEAQUIST: Form.

THE WITNESS: Yes, I -- yes, I have. My parents went to school in the '80's, and at that time there was a series of redistricting and different lines being drawn within the county that had a direct impact on them in voting locations.

Also, my older sister was here during the time where a -- where there was another march and

Page 169

another encounter of legal action that had to take place considering their early -- early voting and voting was being threatened within the county, again, as Prairie View A&M University students.
Q. (BY MS. ADEN) Are you familiar with the Prairie View nine?
A. I am.
Q. And is that something that you learned about through your family or as through being a student at Prairie View AMU?
A. Yes. I actually learned it through my family first before I even was a student at Prairie View. My sister was here during that time.
Q. And what is your understanding of what the Prairie View nine are or meant?
A. That they were another group of students that took legal action against the voter suppression in Waller County.
Q. And so you're describing voting discrimination that occurred in the 1980's?
A. The 1980's and the 1990's and in the early 2000's.
Q. And do you situate what -- the role or the work that you're doing in this lawsuit to be part of that history of racial discrimination in voting that Prairie

Page 170

View students encountered?
MR. SEAQUIST: Form, leading.
THE WITNESS: Yes. I would say it's continuous.
Q. (BY MS. ADEN) You testified about the many scholarships that you receive. And your family must be super proud of you.
Do you have any sense, based upon all of the work that you described on campus that you do, of what type of financial support, or not, other students may receive?
MR. SEAQUIST: Object to the form.
Q. (BY MS. ADEN) You can go ahead.
A. Thank you.
A lot of students are drowning in debt to even attend the university. A lot of them don't have the financial means for cars or other extra activities outside of paying for school. One of my closest friends is $40,000 in debt.
And with that being so, I mean, even as the university, we have plenty of students who are struggling financially. A lot of them still have scholarships but don't have enough to cover the cost of school let alone a vehicle or anything else outside of the cost.

Page 171

Q. Now, you testified also that students -- there are certain students that have to be on a meal plan. Is that accurate?
A. That is correct.
Q. And you testified, I think -- you said something in passing like because of transportation. Is that accurate?
A. Yes.
MR. SEAQUIST: Form.
Q. (BY MS. ADEN) What did you mean by that?
A. With -- with students being on -- living on campus, you having a meal plan ensures that you will -- you have the access to food, considering that not all students -- a great majority of students don't have a car or can't afford a car and don't have transportation off of campus to get food anywhere else.
So having a meal plan ensures that you have at least a couple of options on campus to ensure that students are having access to eating, considering that there are so many students who undergo financial troubles as well as transportation means.
Q. Has the university done anything to ensure that students can eat?
A. Yes. We -- due to the number of students who have financial troubles and lack of access to food off

Page 172

of campus or the funds to get the food off of campus, we've recently opened a food pantry that is free and open to all students without basically -- not in secret, but also in a way that is not embarrassing to the students who are in financial troubles or don't have the means. And the food pantry is open to all students, so therefore everyone has access to food.
Q. What's your understanding of public transportation in Prairie View?
A. There is none.
Q. And you have personally never taken public transportation in Prairie View?
A. No.
Q. Okay. You testified about your work with The Panther Party including one of the buckets of community engagement. Is that accurate?
A. That is correct.
Q. Can you describe briefly what type of community engagement work they do or you do in conjunction with The Panther Party?
A. Political, economic, and community development. A lot of it is looking at the City of Prairie View within Waller County and seeing the live -- a lot of people that are living in poverty. And because of that, it -- the economic development of it is to really make

Page 173

students aware and then also continuing to -- continuing to engage them within the community in ways that they can provide economic development and how they can also, as students, in -- after they graduate, within the City of Prairie View.
Q. You testified that you had gotten tickets when you've parked on campus. Is that accurate?
A. That is correct.
Q. Okay. Do you think that getting a ticket or more on campus should be an impediment to students having early voting at the Memorial Student Center?
MR. SEAQUIST: Object to the form.
THE WITNESS: No.
Q. (BY MS. ADEN) Why not?
A. Because that is another -- that's another economic burden, first off, on students, but also discouraging.
Q. What's discouraging?
A. A ticket for a student anywhere, being on college -- being on a college campus and already paying for college and we're all broke college students.
Q. And so say tickets were something that's possible were you to have to vote at the Memorial Student Center. Do you think that there's anything that can be done to resolve that to ensure that voting can

Page 174

continue at the Memorial Student Center?
MR. SEAQUIST: Form.
THE WITNESS: Yes.
Q. (BY MS. ADEN) Like what?
A. Well, first, a conversation with our parking management department and also being -- having access to a center or a polling location where it is in walking distance so therefore students don't have to drive.
Q. Say that people off campus want to use the early voting site at the Memorial Student Center. Have you seen other public events take place at the Memorial Student Center?
A. Yes, several. That's one of our most used locations for student events that involve the community as well.
Q. And when you've been to those -- and you yourself have been to those types of events?
A. Yes.
Q. Public events?
A. Several.
Q. And when you've been to those events, have you seen hundreds of people use the Memorial Student Center?
MR. SEAQUIST: Object to the form.
THE WITNESS: Yes.
Q. (BY MS. ADEN) Have you seen a thousand or so or

Page 175

more people use the student center?
MR. SEAQUIST: Object to form.
THE WITNESS: Yes.
Q. (BY MS. ADEN) And for what type of events? Can you describe a few?
A. Anything -- political forums. The last -- one of the ones during that time frame was the Beto O'Rourke debate -- well, no, not debate, but forum. We had many come from really all within the community and it was sold out for like -- well, it wasn't sold out because we didn't have to purchase tickets, but we did have limited seating in tickets. But many people came from the community.
But that's something that often happens with our center, the Student Memorial Center. Plenty of people from the campus come out, but also the community.
Q. Okay. And you mentioned your work in the community of Prairie View through The Panther Party. Have you ever heard complaints from Prairie View community residents about coming to the Memorial Student Center?
A. No, I never have heard a complaint.
Q. Okay. Just speaking very quickly again about your Panther Party work, why -- you testified to a bucket -- the political engagement bucket of The Panther

Page 176

Party work. That political engagement, does that include voting?
A. Yes.
Q. And why is it important to your life and that of Panther Party members and other PVAM students to have access to the right to vote?
MR. SEAQUIST: Form.
THE WITNESS: I believe that it's important and crucial that students have a say not as just students but as residents of a county and of a city where they -- where they live and where they contribute. It's important to have accurate representation but also a say in those who are representing you, no matter where you live or how long you live there.
Q. (BY MS. ADEN) And that's Federal representation?
A. That's local, State, Federal. That's at every level that someone can vote in.
Q. Now, you testified about your awareness of the jail bond issue during the fall 2017 election season. Is that accurate?
A. That's correct.
Q. What do you remember about that issue?
A. It was one of the greatest issues here on our campus and within the city and the community of Prairie

Page 177

View. It was actually one of the reasons why I actually got involved and became precinct chair.

A little bit prior to the jail bond issue we had the incident of Sandra Bland. And that was a direct impact to the students in seeing even on the -- on the same University Drive that's now Sandra Bland Parkway that you take to come into the school, we saw that we needed a -- not only a direct impact on who's representing us when these issues arise in the county and the city that we live in, but also more incidents with young people of color being arrested or having police brutality within the county.

Q. Why does that matter --

MR. SEAQUIST: Object to the responsiveness.

Q. (BY MS. ADEN) Why does that matter to Prairie View students on this campus?

MR. SEAQUIST: Object to the form.

THE WITNESS: We're a campus -- we're a historically black college and university campus where you have nothing but a great mix of students of color. And in our time of having a great arise of police brutality and a problem with community policing, a jail also -- a bigger jail with housing -- being able to house more people within so close of our university, I

Page 178

would say that it's crucial that we had a say in that as well.

Q. (BY MS. ADEN) I'm going to change to another subject briefly, which is your testimony about the addressing issue.

You testified that it was resolved for the 2018 general election. Is that accurate?

A. Correct.

Q. Do you know whether that -- the resolution is considered a permanent resolution?

A. No, it is not. And Mr. Jackson, along with Xante Wallace -- Councilman Xante Wallace and Councilman Kendric Jones is a -- that's an ongoing problem that is still trying to be resolved. That was a momentarily solution that came down from the Secretary of State after us bringing it up once again.

Q. So you expect it to happen in future elections?

MR. SEAQUIST: Form.

THE WITNESS: I hope so, yes.

Q. (BY MS. ADEN) You hope or you expect?

A. I expect.

MR. SEAQUIST: Form.

Q. (BY MS. ADEN) You testified that -- again, back to some of your work with The Panther Party, that you're not necessarily responsible for The Panther Party's

Page 179

finances. Is that accurate?

A. That is correct.

Q. But in your role in The Panther Party, do you have a general sense of how much money the party has?

A. I would say that we have very little, considering that the bulk of a student body organization who gets no funding -- or if we do get any funding, it's very limited and very little. An organization full of college students, who are broke college students and have no money, I would say that our finances are limited.

MR. SEAQUIST: Object to the responsiveness.

Q. (BY MS. ADEN) You testified about the charter bus on October 26. Do you recall that?

A. Yes.

Q. Okay. And you mentioned that the PVAMU president was affiliated with getting that bus; is that correct?

A. That's correct.

Q. And that's Ms. Simmons, Dr. Simmons.

A. Yes.

Q. Okay. Even though she was involved in getting the bus and you were adamant that she paid for it personally --

Page 180

A. That is correct.

Q. -- was -- did you still associate The Panther Party with the efforts to get students to know about the bus, get on the bus, and take it to vote?

MR. SEAQUIST: Form.

THE WITNESS: Yes, that is correct. From my understanding, there were several students who actually were present while the time frames of them going and getting on the bus and coming back and forth. But also before, they were one of the ones that leaded in the efforts to organizing getting on the bus.

Q. (BY MS. ADEN) Panther Party members.

A. That is correct.

Q. You testified about your work around the fall 2018 election season organizing transportation and other issues to ensure that students could vote. Is that accurate?

A. That is correct.

Q. Okay. In organizing students' access to voting, did you interact with any volunteers?

A. Yes. There were -- there were different -- excuse me. There were different volunteers from within the County of Waller, the City of Prairie View, but also some as far as Houston who were able to donate their time to come and transport students.

Page 181

Q. What do you think about the fact that you needed volunteers -- you and the other PVAM students needed volunteers to be able to vote during the fall of 2018 election? What's your opinion about that?
MR. SEAQUIST: Object to the form.
THE WITNESS: Well, first, the opinion and the fact is if we had multiple days, more days, of early voting on campus, we wouldn't have needed that. But it's almost -- it's almost a little embarrassing and also it's a little slap in the face that we even had to take out our own time, but also to gain the support of other communities as far as Harris County and the City of Houston to come and take students to vote off of campus.
Q. (BY MS. ADEN) And back to the bus that took students off to vote on October 26th, that was the Friday of the first week of early voting. Is that accurate?
A. That is correct.
Q. Okay. Why would students want to vote during the first week of early voting?
MR. SEAQUIST: Object to the form.
THE WITNESS: Well, it's -- first off, it's a midterm election. It's one of -- I mean, we see everyone voting within the nation, not even just the

Page 182

state and our county but within the nation. And being able to vote early, I mean, it's -- other times, whether you have schedule conflicts or time conflicts, it ensures you that you will be able to cast your ballot within a time before maybe any other problems or conflicts occur.
Q. (BY MS. ADEN) You testified -- well, to that, is there something about voting back to back -- over back-to-back days on campus that could make it difficult for students to vote?
MR. SEAQUIST: Object to the form.
MS. ADEN: Strike that. I'm going to ask it another way.
Q. (BY MS. ADEN) So you're aware -- you testified to advertising to other students the on-campus and other voting opportunities during the fall 2018 election season.
A. That is correct.
Q. And those included the three days that were on campus Monday through Wednesday during the second week.
A. That is correct.
Q. Despite there being those days of early voting on campus, is there something about having three back-to-back days on campus that could make it difficult for students to participate even in those?

Page 183

MR. SEAQUIST: Form.
THE WITNESS: Yes, that it limits the students back to back if you have only a certain -- you only have a certain amount of days; but also, with it being so close together, it limits the students -- the time frame of them being able to go and vote. It limits their access as well.
Q. (BY MS. ADEN) You testified to your work as a Democratic party precinct chair. Is that -- or a -- what's the position? A -- a deputy -- a Democratic deputy registrar. Is that correct?
A. Registrar, yes.
MR. SEAQUIST: Form.
THE WITNESS: That is correct.
Q. (BY MS. ADEN) In that role, did anyone from -- did any of the -- any county officials ever reach out to you affirmatively about the 2018 early voting schedule?
A. No.
Q. Does that include any member of the Commissioners Court?
A. That is correct.
Q. And that includes Ms. Eason.
A. That is correct.
Q. And you interact with Ms. Eason in your capacity as a deputy voter registrar. Is that accurate?

Page 184

A. That is correct.
MR. SEAQUIST: Form.
Q. (BY MS. ADEN) Prior to -- I think you testified to -- a week before the October 17th meeting, had you ever seen the early voting schedule in writing?
A. No.
Q. And that's even though you were in the Prairie View area in the summer of 2018?
A. That is correct.
Q. And that includes you didn't see a schedule in August of 2018?
MR. SEAQUIST: Leading.
THE WITNESS: That also is correct.
Q. (BY MS. ADEN) And did you see a schedule in September of 2018?
A. No.
Q. Have you ever seen a member of the Commissioners Court come onto campus?
A. No.
Q. Have you ever seen a chair of the Republican party come on campus?
A. No.
Q. And you testified to knowing that David Luther is the current chair of the Republican party.
A. That is correct.

Page 185

Q. And you've seen him before.
A. No, I have not.
Q. Did anyone ever tell you, whether in your role as the voter -- deputy voter registrar, that it was your job to be the liaison between Prairie View students and the Commissioners Court?
A. No.
Q. That it was your job to be the liaison between Prairie View students and the Commissioners Court with respect to the early voting schedule?
A. No.
Q. You testified to receiving a text from -- a group text from Ms. Rosa Harris and you believe it went to other Democratic club members. Is that accurate?
MR. SEAQUIST: Form.
THE WITNESS: That's correct.
Q. (BY MS. ADEN) And you testified that you would have known who some of the people receiving the texts were because their -- strike that.
How would you know whether you -- how would you know specifically who would have received that text?
A. With having their number.
Q. Meaning that their number would be saved in your phone and so their name would then pop up on your

Page 186

phone?
A. That is correct.
Q. Okay. And as far as you recall, you don't ever -- you don't remember someone like Joshua Muhammad receiving that text.
A. No.
Q. Or Mr. Frank Jackson.
A. No.
Q. And just to be clear about your role as the Democratic precinct chair, you testified to having conversations on several occasions with Ms. Rosa Harris. Is that accurate?
A. That is correct.
Q. And those are conversations between August and November 2018.
A. That is correct.
Q. And during any of those conversations did Ms. Harris ever ask you for your opinion about setting the early voting schedule for the 2018 election?
A. No, she did not.
Q. And that would be true of the Republican party chair?
A. That is correct.
Q. Did anyone ever tell you what the process was -- strike that.

Page 187

Since being a student at Prairie View in 2017, has anyone from the county government ever explained to you the process for setting the early voting schedule?
A. No.
Q. Have you ever seen that in writing since being a student at Prairie View?
A. No, I have not.
Q. Since becoming a Democratic party chair in 2018 --
A. That is correct.
Q. -- has anyone ever explained to you the process for setting the early voting schedule for elections?
A. No, they have not.
Q. Has anyone -- have you ever seen a policy setting the process for setting the early voting schedule?
MR. SEAQUIST: Leading.
THE WITNESS: No, I have not.
Q. (BY MS. ADEN) You testified about your role as the Democratic precinct chair for 309. In keeping with that line of discussion, do you know whether all Prairie View AMU students consider themselves to be affiliated with the Democratic party?
MR. SEAQUIST: Object to form.

Page 188

THE WITNESS: No.
Q. (BY MS. ADEN) No, you know them to be; no, you do not know them to be?
A. No, I do not know them to be.
Q. Affiliated with the --
A. Affiliated with the Democratic party.
Q. Okay. Just to make that clear, do you know whether all PVAM students affiliate themselves with the Democratic party?
MR. SEAQUIST: Object to the form.
THE WITNESS: No, all of them don't.
Q. (BY MS. ADEN) And how do you know that?
A. Because of conversations with them.
Q. You testified to being at the October 17th Commissioners Court meeting?
A. That is correct.
Q. And I do recognize that you testified that you had to leave early. Is that accurate?
A. That is correct.
Q. And you had to leave early because you had to go back to class.
A. That is correct.
Q. And you testified that the class was in the afternoon? Is that accurate?
A. That is correct.

Page 189

Q. So what time was the Commissioners Court meeting?
A. In the morning, within the morning.
Q. What's your opinion about how accessible having a Commissioners Court meeting in the morning would be to other Prairie View AMU students?
MR. SEAQUIST: Form.
THE WITNESS: Well, of course, it's limited because of transportation means of students being able to get there. But also it's not really at a time that a lot of students can go because of classes.
Q. (BY MS. ADEN) And during the time that you were present at the October 17th Commissioners Court meeting, was there testimony related to early voting?
A. Yes.
Q. Do you recall whether there was testimony from members of the public about why they wanted early voting?
A. Yes.
Q. Do you remember generally what some of the reasons for -- what that testimony encompassed?
MR. SEAQUIST: Form.
THE WITNESS: Access, multiple days and opportunities for them to be able to vote at different times due to their schedules or conflicts that they

Page 190

might have had during the days that were given.
Q. (BY MS. ADEN) And just to be clear, this is testimony urging on-campus early voting for the fall 2018 election.
MR. SEAQUIST: Leading.
THE WITNESS: That is correct.
Q. (BY MS. ADEN) Do you recall hearing Commissioner Court -- Commissioners Court members proposing additional early voting days?
A. No.
Q. Do you recall hearing reasons why the Commissioners Court would not add or change the early voting schedule?
A. Directly? It was too late, they stated, and that they couldn't go back and change things, although they did later on after -- after we did Commissioners Court and us taking on the challenge of getting more days within the lawsuit. But before then, they would not afford us more days and -- yeah.
Q. So what did you think about the fact that they said or that you heard them say that they couldn't add more days and then the fact that they ultimately seemed to be able to change the schedule after this lawsuit? What did you think about that?
MR. SEAQUIST: Object to the form.

Page 191

THE WITNESS: First, it was a slap in the face, considering that, as students, we were already denied the fact of them sharing the information or the process of us picking or having a say or even a notice in the number of days that we were given to vote on our own campus. But once we become -- once we came before them and stated the issue and a resolution to fixing the problem, they denied it. And then after us joining a lawsuit, then magically we were granted more days.
That's a -- that's more so of a slap in the face to have student leaders who not only want to vote and to have early voting but to have students on this campus that want to vote and for them to deny it -- once we came before them in a way that was respectful and with a sincere -- with us going before them and asking them in a way that was -- in my opinion, it was in a way that was most sincere and with the best interest not at -- of us, but of the whole campus and the entire student body, and for them to deny it and then to go back and add the days, it shows, for one, that it was possible for them to do it the week before and for them to add the days and that they didn't want to and more so of they -- it shows that, in the history, that they've done things where they have had the ability to change it and they haven't.

Page 192

MR. SEAQUIST: Object to the responsiveness.
Q. (BY MS. ADEN) And when you said that they added days, none of those days were added to days on campus at the Memorial Student Center.
MR. SEAQUIST: Form.
THE WITNESS: That is correct.
Q. (BY MS. ADEN) During that Commissioners Court meeting did you ever hear anyone raise an issue about the security -- the purported security of voting at the Memorial Student Center?
A. No.
Q. What do you think about whether or not the -- well, strike that.
You testified -- I mean, you've been testifying at length about the 2018 early voting schedule. Do you have an opinion about whether Prairie View A&MU students use early voting more than voting on election day?
MR. SEAQUIST: Object to the form.
THE WITNESS: Yes. A lot of the people I know and the students that I engage in partake in early voting; and for those of them who might not have, it also gives them the opportunity to take in -- to be able to go vote on the days before election day.

Q. (BY MS. ADEN) You also testified to your awareness generally that there were a good amount of machines provided at the Memorial Student Center during the early voting season. Is that accurate?
A. That is correct.
Q. Did you -- do you have an opinion about why that amount of machines was provided by the County to the student center?
MR. SEAQUIST: Form.
THE WITNESS: For -- yes, due to the amount of people, residents, that were voting in that specific precinct. With having an overwhelming amount of students that are residents of the county being able to -- or that being their polling location to vote, it all -- it just makes sense for us to have more, considering the -- the polls were being for more of a population, a bigger population.
Q. (BY MS. ADEN) So more machines, more expectation that there's going to be voters there.
MR. SEAQUIST: Object to leading, form.
THE WITNESS: Correct.
Q. (BY MS. ADEN) Including voters who may come from off of the Prairie View campus?
MR. SEAQUIST: Object to leading, form.
THE WITNESS: That is correct.

Q. (BY MS. ADEN) I'm skipping around a little bit and I apologize. But you testified to your work organizing and taking at least one person to vote off campus during the 2018 early voting schedule. Is that accurate?
A. That is correct.
Q. Okay. When you were organizing and taking someone off the campus to vote, were you telling them who to vote for?
A. No.
Q. Were you telling them to vote for a Democratic party affiliated candidate?
A. No.
Q. Were you telling them to vote for a Republican party affiliated candidate?
A. No.
Q. Did you care how they voted?
A. No.
Q. Why did you want them to vote?
A. For one, I wanted them to vote because that is a direct impact on those who represent us. So how we use our vote -- our voice, wherever we live, is a direct impact in voting. And also it gives them the opportunity to see who represents them, who -- who has their interest at heart.

Q. I'm getting to the end. And I apologize for skipping around.
So back to the Commissioners Court meeting on October 17th, you talked about some of the things that you heard while you were at the meeting. Did you -- do you recall hearing any students or any members of the public talk about voting at the Waller County Community Center?
A. No.
Q. Okay. And you testified that you yourself have not been to the Waller County Community Center.
A. That is correct.
Q. Are you aware of whether other PVAMU students use the Waller County Community Center?
A. No.
Q. Are you aware of how many students use the post office?
A. No.
Q. Do you have an opinion about whether in this modern age students tend to go to the post office?
MR. SEAQUIST: Form.
THE WITNESS: Very few.
Q. (BY MS. ADEN) Mailing letters or packages, is that a common activity for you or other students?
MR. SEAQUIST: Form.

THE WITNESS: No.
Q. (BY MS. ADEN) Okay. When students want to communicate with their parents, how do they communicate with them?
MR. SEAQUIST: Object to the form.
THE WITNESS: They text them --
Q. (BY MS. ADEN) Or do they --
A. -- or call them.
Q. How often would you guess a student mails a letter or package from the post office?
MR. SEAQUIST: Object to the form.
THE WITNESS: Very rare.
Q. (BY MS. ADEN) And over your -- since being on campus since 2017, tell me, how many times have you been to the post office?
A. Once or twice.
Q. How many times have you been to the Memorial Student Center?
A. Oh, gosh. Hundreds, thousands of times.
Q. And is that -- excuse me.
A. That's a central location on campus. So you go there to eat. You go there for meetings. You go there to socialize. You go there to purchase things like your books from the bookstore. You go there for the student engagement office. You go there for the Student

Government Association office. You go there to purchase personal items. You go there to get your ID. If you have any problems with your accounts, that's where you would go. It's a central location for a number of things for all students who live on campus.

MR. SEAQUIST: Object to the responsiveness.

Q. (BY MS. ADEN) I'm going to turn your attention back to Exhibit 6 with Mister -- which Mr. Seaquist showed you. It's a Google map of the Waller County Community Center.

You testified that there may -- you testified, I believe, that there was a sidewalk that might run between the Hobart -- from the Hobart Taylor Hall or near it beside the parking lot?

A. Yes.

Q. Have you, in fact, seen that sidewalk before?

A. No, I have not.

Q. Have you driven by the Waller County post office -- or I'm sorry. Strike that.

Have you driven by the community center and the post office?

A. I have.

Q. And are you aware whether there's a sidewalk that runs in front of them?

A. There isn't. It's -- the post office and the center sits off of State Loop 1098; so therefore, it is a street and a -- well, a highway actually. There is no sidewalk.

MR. SEAQUIST: Object to the responsiveness.

Q. (BY MS. ADEN) And looking at the map, does it reflect that the Waller County Community Center -- strike that.

Looking at Exhibit 6, is there a red bubble to the right of the United States Postal Service?

A. That is correct.

Q. And does it indicate that that's where the Waller County Community Center is?

A. That is correct.

Q. And is that, in fact, where the Waller County Community Center is?

A. No, it is not.

Q. Looking at this exhibit, there is a parking lot between the Hobart Taylor Hall and the post office. Is that accurate?

A. That is correct.

Q. Are you aware of whether -- have you ever walked in that parking lot?

A. No, I have not.

Q. Okay. Strike that. Or not strike that, but -- yes. Okay.

You testified earlier that -- well, correct me if I'm wrong. Did you testify earlier to -- strike that.

You testified earlier that you walk on campus.

A. That is correct.

Q. Do you tend to walk on sidewalks when you walk on campus?

A. Yes. We don't walk on the grass here, so --

Q. Why don't --

MR. SEAQUIST: Object to the responsiveness.

THE WITNESS: Yes, I walk on the sidewalks. We don't walk on the grass here.

MR. SEAQUIST: Object to the responsiveness.

Q. (BY MS. ADEN) Why do you not walk on the grass?

MR. SEAQUIST: Object to the form.

THE WITNESS: We don't walk on the grass at Prairie View because of the history of Prairie View. Prairie View, before it was a college campus, it's -- it was an old plantation. So out of respect for our ancestors and it being a plantation, we don't walk on

the grass. It's sacred.

Q. (BY MS. ADEN) So if students were asked to walk on grass to go vote, how would you feel about that?

MR. SEAQUIST: Form.

THE WITNESS: That's -- that's beyond disrespectful, considering that, for one, we are a historically black college and university filled with minority students that sits on an old plantation where many of our ancestors didn't have any rights, let alone a right to vote. And for us to go and walk on it to go vote is beyond disrespectful and insulting to us as students and as people of color.

Q. (BY MS. ADEN) Now, looking back at Exhibit 6, how would you feel were you asked to go from the Hobart Taylor Hall and walk through the parking lot to then access the community center?

MR. SEAQUIST: Form.

Q. (BY MS. ADEN) How would you feel if that was the path that you were required to take to get to a voting site were one not provided on campus?

MR. SEAQUIST: Object to the form.

THE WITNESS: For one, that's a safety hazard. It's a parking lot. People are parking their cars. They're driving in and out of it. And you're asking hundreds -- thousands of students to walk through

Page 201

it to get to a center to vote when there is somewhere closer for them to vote.

Q. (BY MS. ADEN) And based upon this map, there doesn't appear to be a sidewalk that would take them from Hobart Taylor Hall, across the parking lot, and then to either the post office or the community center.

MR. SEAQUIST: Object to the form.

THE WITNESS: That is correct.

Q. (BY MS. ADEN) You testified earlier that you can't think of another area in Waller County where voters could vote where they live. Is that accurate?

A. That is correct.

Q. What makes that necessary for Prairie View students?

MR. SEAQUIST: Object to the form.

THE WITNESS: Considering this is where we live and that multiple students don't have access to transportation and/or cars to travel anywhere to go and vote.

Q. (BY MS. ADEN) You testified that you were handing out waters during the Parade of Voters. Do you recall that?

A. That is correct.

Q. Why were you doing that?

A. Because it's hot and we were sweating and

Page 202

having to walk an excessive amount around the campus.

Q. And you considered the parade route to be excessive walking?

A. Yes. Many students, if not all students, would not walk that amount every day to get to and from their everyday buildings.

MR. SEAQUIST: Object to the responsiveness.

Q. (BY MS. ADEN) You testified that you have plans to be a lawyer. Is that accurate?

A. That is correct.

Q. What type of lawyer?

A. Civil rights.

Q. How come?

A. Well, for one, I knew I wanted to get involved in law; but for two, doing work such as this and seeing the need and the -- and my desire to bring forth change to my communities and for those who look like me and to fight for the injustices that are happening every day in this country and that have for decades and centuries for those that look like me.

Q. Are there non-black students who attend Prairie View?

A. Oh, yeah, there's plenty. Yes, there's plenty.

Q. Why did you think -- you testified -- I mean,

Page 203

you're here today because we filed a lawsuit and you're a plaintiff. Is that accurate?

A. That is correct.

Q. Why did you feel the need to file a lawsuit?

A. I don't see a reason why I wouldn't have joined the lawsuit, considering that it was a chance for me to further my activism in getting students on campus engaged in fighting for our rights on campus, but also in this nation.

So joining the lawsuit gave me the opportunity to stand up and to speak out on the injustices that are going on, but also on this campus and in this town, that has been going on for decades.

Q. And how does it make you feel as a Prairie View student and resident of Waller County that the County is expending your tax dollars -- strike that.

How do you feel as a Prairie View student and a resident of Waller County that the City -- that the County is defending -- strike that.

How does it make you feel as a student of Prairie View and a resident of Waller County that the county officials are defending this lawsuit and standing in the way of your having on-campus early voting?

MR. SEAQUIST: Form and leading.

THE WITNESS: I feel as though it is

Page 204

excluding us, as it always has, as students and also as residents of this county. We spend money here. We're paying to go to college. So we pay taxes, yet we are being excluded in those who represent us and being able to elect those who represent us.

And although there aren't -- although we were given days to vote, it's limiting our access to being able to vote and having a number of days as though the rest of the county is getting as well.

MR. SEAQUIST: Object to the responsiveness.

Q. (BY MS. ADEN) And do you think that county officials could be doing more for Prairie View students?

A. I believe they could do a lot more, not just in granting us a fair amount -- an equal amount of days of early voting or voting. But the relationship between the County is nonexistent. We don't see them. We don't have a -- we don't have conversations with them. We have no engagement within the county officials, Democratic or Republican. They don't come on campus. We have no direct communication with them. We have no direct representation of them at all.

Q. And that includes even in your capacity as a party precinct chair?

A. That is correct.

Page 205

MR. SEAQUIST: Leading.
Q. (BY MS. ADEN) And does that include -- when you're talking about county officials, does that include Commissioner Barnett?
A. That is correct.
Q. And even though he represents Precinct 3 which includes Prairie View University.
A. That is correct.
MS. ADEN: Can we take less than one minute to just make sure we have nothing else?
MR. SEAQUIST: You may.
(Recess from 2:50 p.m. to 2:53 p.m.)
MS. ADEN: Plaintiffs do -- well, strike that.
I don't have any more questions.
EXAMINATION
BY MR. SEAQUIST:
Q. Okay. Let me ask you a few questions.
You had testified earlier about your objections to walking on the grass on campus.
A. That is correct.
Q. Is that limited to grass on campus?
A. That's all the grass with -- I'm sorry. That's all grass on campus.
Q. Okay. But I guess my question is: Is it your

Page 206

position just in your day-to-day life that you won't walk on grass anywhere or is that just on the university campus?
A. The university.
Q. Okay. You had testified about the relationship between the university and the County.
A. Yes.
Q. Are you aware of the ongoing discussions that have taken place in regard to the registration issue between officials of the county and officials of the university?
A. I am aware of one meeting.
Q. Okay. Could there be other meetings that you don't know about?
A. I highly doubt it. Considering just as though there was that one and I heard of it, I would have had the opportunity to hear of the others if they were ever present.
Q. Well, you said -- you said you highly doubt it, just as though there was that one. My question is: If the -- the County and the university could be having meetings without you being aware of it, correct?
A. They could.
Q. Okay. And are you aware of ongoing discussions that have been taking place between the County and the

Page 207

university administration in terms of voting locations?
A. I know of one.
Q. What one do you know of?
A. The one that happened most recently.
Q. Okay. And do you know whether there could have been more than that that you're unaware of?
A. There could have been.
Q. Okay. We've talked a little bit about deputy voting training -- or deputy voting registrar training; is that right?
A. That is correct.
Q. Christy Eason performs that training?
A. Yes, for the most part.
Q. And she comes to campus to train on how to become a deputy registrar?
A. That is correct.
Q. Do you know how many times she's done that this year already?
A. A couple.
Q. Okay. Did she do that in the 2018 year or in the fall of 2018?
A. Yes. Well, I'm -- I believe so, yes.
Q. Okay. You understand that the Commissioner Court meetings of Waller County are open to the public?
A. Yes.

Page 208

MR. SEAQUIST: And that's all I have. Thank you.
MS. ADEN: I have re-redirect.
MR. SEAQUIST: Okay.
EXAMINATION
BY MS. ADEN:
Q. We've been talking about grass.
A. Yes.
Q. Okay. When you go to Houston, do you walk on grass?
A. Yes.
Q. Is there -- why is walking on grass at this particular university significant to you?
MR. SEAQUIST: Object to the form.
THE WITNESS: Because of the history and the respect and it being sacred to us students of color on a historically black college and university and of our ancestors who were once on this old plantation.
Q. (BY MS. ADEN) And are you knowingly walking on grass where enslaved people could be buried in some other part of the country, including Houston?
MR. SEAQUIST: Object to the form.
THE WITNESS: That is correct.
Q. (BY MS. ADEN) You are knowingly or you are not knowingly?

Page 209

MR. SEAQUIST: Form.
THE WITNESS: Not knowingly.
Q. (BY MS. ADEN) And are you aware of whether or not the land that was once a plantation where people are enslaved -- does that end at the boundaries of this campus?
A. That is correct.
Q. It does or does not end there?
A. It does.
Q. It does end at the boundaries of this campus?
A. Yes.
Q. So are you aware whether or not there were other plantations in Waller County outside of the plantation that may not have been -- or strike that.
Are you aware of whether or not there are plantations that -- strike that.
Do you know for sure whether or not the -- a former plan -- strike that.
Do you know whether or not the Waller County Community Center is housed on top of grounds that could have been a former slave plantation?
MR. SEAQUIST: Form.
THE WITNESS: Yes, that's correct.
Q. (BY MS. ADEN) That it could?
A. That it could.

Page 210

MR. SEAQUIST: Form.
Q. (BY MS. ADEN) Please explain what you're trying to say, that it could --
A. That it --
MR. SEAQUIST: I'm going to object to the form.
Go ahead.
THE WITNESS: That the -- the center could be part of the old plantation, the formal plantation -- former. Excuse me.
Q. (BY MS. ADEN) You talked about the recent meeting related to the new legislation regarding early voting. Is that accurate?
MR. SEAQUIST: Object to form.
THE WITNESS: That is correct.
Q. (BY MS. ADEN) And what is your understanding of the new legislation?
A. That -- can you reask that question?
Q. What is your understanding of the new -- strike that.
You testified to being at a recent meeting where -- with campus university officials?
A. Uh-huh.
Q. Yes?
A. That is correct.

Page 211

Q. And did -- was voting a topic of that conversation?
A. That is correct.
Q. And what's your understanding about what was discussed?
A. The new legislation piece on early voting, but also the voting centers that are trying to be established.
Q. And what's your understanding about that issue?
A. That it places voting at the center, at the -- at the Waller County Community Center.
Q. And what's your reaction to a proposal that would create -- strike that.
Are there any other locations beyond the Waller County Community Center that are being proposed, suggested for future early voting locations?
MR. SEAQUIST: Object to the form.
THE WITNESS: I do believe so.
Q. (BY MS. ADEN) In Waller County?
A. Yes.
Q. In Prairie View.
A. Yes.
Q. Okay. What's -- which ones are those?
A. If I remember correctly, it's city hall and -- no. Just city hall, I believe, and the courthouse.

Page 212

Q. So is the Memorial Student Center being considered a location for future voting in Waller County?
MR. SEAQUIST: Object to the form.
THE WITNESS: No, it is not.
Q. (BY MS. ADEN) And what is your opinion about that?
MR. SEAQUIST: Form.
THE WITNESS: That it's the -- it takes away from the students having access to being able to vote.
Q. (BY MS. ADEN) And do you think it will diminish student participation in voting in Waller County?
MR. SEAQUIST: Object to form.
THE WITNESS: Drastically.
Q. (BY MS. ADEN) Not to beat a dead horse, but are you aware that the Waller County Community Center is on land that used to be part of Prairie View AMU's campus?
A. That is correct.
Q. Okay. And does that mean that the Waller County Community Center used to be part of the plantation?
MR. SEAQUIST: Object to form.
THE WITNESS: That is correct.
MS. ADEN: No other questions.

Page 213

MR. SEAQUIST: We will reserve ours for trial.

(Proceedings concluded at 3:01 p.m.)

Page 214

CHANGES AND CORRECTIONS

WITNESS NAME: DATE OF DEPOSITION:
JAYLA JENICE ALLEN OCTOBER 11, 2019

PAGE LINE CHANGE REASON

______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________

Page 215

I, JAYLA JENICE ALLEN, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

___________________________________
JAYLA JENICE ALLEN

THE STATE OF __________)
COUNTY OF _____________)

Before me, ___________________________, on this day personally appeared JAYLA JENICE ALLEN, known to me (or proved to me under oath or through ___________________________) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of ________________________, __________.

_______________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF___________________
COMMISSION EXPIRES:____________

Page 216

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JAYLA ALLEN, DAMON )
JOHNSON, TREASURE SMITH, )
AND THE PANTHER PARTY, )
Plaintiffs, )
)
VS. ) CIVIL ACTION NO.:
) 4:18-CV-3985
WALLER COUNTY TEXAS; THE )
WALLER COUNTY )
COMMISSIONERS COURT; )
JUDGE CARBETT "TREY" J. )
DUHON III, IN HIS )
OFFICIAL CAPACITY AS THE )
WALLER COUNTY JUDGE; AND )
CHRISTY A. EASON, IN HER )
OFFICIAL CAPACITY AS THE )
WALLER COUNTY ELECTIONS )
ADMINISTRATOR, )
Defendants. )

*******************************
REPORTER'S CERTIFICATION
ORAL DEPOSITION OF JAYLA JENICE ALLEN
OCTOBER 11, 2019
*******************************

I, SHERRI SANTMAN FISHER, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, JAYLA JENICE ALLEN, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

Page 55 (Pages 217-217)

Jayla Allen, et al. vs. Waller County Texas, et al.
Jayla Jenice Allen - 10/11/2019

Page 217

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

__X__ was requested by the deponent or a party before the completion of the deposition and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

_____ was not requested by the deponent or a party before the completion of the deposition.

That the amount of time used by each party at the deposition is as follows:

MS. LEAH ADEN.....0 Hours, 53 Minutes
MR. GUNNAR P. SEAQUIST.....3 Hours, 32 Minutes

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 20th of October, 2019.

______________________________
SHERRI SANTMAN FISHER, Texas CSR 2336
CSR Expiration Date: 12/31/19
COOLEY REPORTING, Firm No. 702
8407 Fathom Circle, Unit B
Austin, Texas 78750
512-743-5867/512-410-3012

512-743-5867 Cooley Reporting 512-410-3012 (fax)
Jcooleycsr@gmail.com