Case 4:18-cv-03985 Document 73-2 Filed on 01/24/20 in TXSD Page 218 of 677

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 1 (Pages 1-4)

**PLAINTIFF'S EXHIBIT 34**

## Page 1

```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
                    HOUSTON DIVISION

JAYLA ALLEN, DAMON           )
JOHNSON, TREASURE SMITH,     )
AND THE PANTHER PARTY,       )
     Plaintiffs,             )
                             )
VS.                          ) CIVIL ACTION NO.:
                             ) 4:18-CV-3985
WALLER COUNTY TEXAS; THE     )
WALLER COUNTY                )
COMMISSIONERS COURT;         )
JUDGE CARBETT "TREY" J.      )
DUHON III, IN HIS            )
OFFICIAL CAPACITY AS THE     )
WALLER COUNTY JUDGE; AND     )
CHRISTY A. EASON, IN HER     )
OFFICIAL CAPACITY AS THE     )
WALLER COUNTY ELECTIONS      )
ADMINISTRATOR,               )
     Defendants.             )

*******************************************
              ORAL DEPOSITION OF
           DAMON RICHARD JOHNSON, JR.
                OCTOBER 11, 2019
*******************************************
```

     ORAL DEPOSITION OF DAMON RICHARD JOHNSON, JR., produced as a witness at the instance of the Defendants and duly sworn, was taken in the above-styled and numbered cause on OCTOBER 11, 2019, from 4:07 p.m. to 5:35 p.m., before SHERRI SANTMAN FISHER, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the University Square Clubhouse, 502 Anne Preston Street, Prairie View, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 2

                    APPEARANCES

FOR THE PLAINTIFFS:
     MS. LEAH ADEN
     MR. JOHN CUSICK
     NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
     40 Rector Street
     Fifth Floor
     New York, New York 10006-1738
     212-965-7715/212-226-7592 (fax)
     laden@naacpldf.org
     jcusick@naacpldf.org

     MS. JULIE GOODRICH HARRISON
     NORTON ROSE FULBRIGHT US LLP
     1301 McKinney
     Suite 5100
     Houston, Texas 77010-3095
     713-651-5151/713-651-5246 (fax)
     julie.harrison@nortonrosefulbright.com
     (Not Present)

FOR THE DEFENDANTS:
     MR. GUNNAR P. SEAQUIST
     BICKERSTAFF HEATH DELGADO ACOSTA LLP
     3711 South Mopac Expressway
     Building 1, Suite 300
     Austin, Texas 78746
     512-472-8021/512-320-5638 (fax)
     gseaquist@bickerstaff.com

     MS. ELIZABETH DORSEY
     WALLER COUNTY DISTRICT ATTORNEY'S OFFICE
     645 12th Street
     Hempstead, Texas 77445
     979-826-7718/979-826-7722 (fax)
     e.dorsey@wallercounty.us

ALSO PRESENT:
     Steven Lance

## Page 3

                    INDEX
                                          PAGE
Appearances                                 2

Examination by Mr. Seaquist                 4
  4:07 p.m. - 5:12 p.m.
  5:25 p.m. - 5:26 p.m.

Examination by Mr. Cusick                  58
  5:26 p.m. - 5:35 p.m.
Changes and Corrections                    68
Signature                                  69
Reporter's Certification                   70

                EXHIBIT INDEX

NO.   DESCRIPTION                         PAGE
1  Plaintiff Damon Johnson's Response and  13
   Objections to Defendant Waller County's
   First Set of Interrogatories

2  Google Map                              17

3  Course Schedule                         36

## Page 4

1    DAMON RICHARD JOHNSON, JR.,
having been first duly sworn, testified as follows:
                    EXAMINATION
BY MR. SEAQUIST:
    Q.  Good afternoon, Mr. Johnson.  My name is Gunnar Seaquist.  You and I met just before this deposition, correct?
    A.  Correct.
    Q.  I hadn't met you before then?
    A.  No.
    Q.  Can you tell us your full name for the record, please?
    A.  Damon Richard Johnson, Jr.
    Q.  Okay.  And, Mr. Johnson, have you ever given a deposition before?
    A.  No.
    Q.  All right.  A few ground rules.  The court reporter talked us through some of this before we started.  But she is obviously trying to take down everything that you and I say today.  So if you'll do your very best to let me finish my question before you start to answer and I'll do my very best to let you finish your answer before I ask my next question so that we can not talk over each other.  Okay?
    A.  Understood.

Case 4:18-cv-03985 Document 73-2 Filed on 01/24/20 in TXSD Page 219 of 677

Page 2 (Pages 5-8)

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 5

1  Q. Also, we're starting a little late; and without
2  talking fast, I'm going to try to move quickly through
3  this deposition. But if you need a break at any point,
4  just let me know. We can take a break. I will ask that
5  if there's a question on the table at the time that you
6  go ahead and answer my question and then we can take a
7  break. Okay?
8  A. Okay. Okay.
9  Q. Also, for purposes of our record, head nods,
10 headshakes don't come out on the record. So if you
11 answer in that way, I'll ask you -- I'll prompt you to
12 answer verbally.
13      Also, uh-huhs, huh-uhs don't come out on
14 the record very well; and so if you use those, I'll try
15 to remember to prompt you to say yes or no. If I do
16 that, I'm not trying to be rude. I'm just trying to get
17 a good record. Okay?
18 A. Okay.
19 Q. We're getting a little late in the day today,
20 so I am sure that at some point in this deposition I
21 will ask you a question that is for some reason unclear.
22 If you don't understand any of my questions that I ask
23 you today, will you let me know that so I can clarify it
24 for you?
25 A. Yes.

Page 6

1  Q. All right. And can we have an agreement that
2  if you don't ask me to clarify a question and you go
3  ahead and answer it that you understood it and gave the
4  best answer you could?
5  A. Yes.
6  Q. All right. Is there any reason you wouldn't be
7  able to answer questions fully and truthfully today?
8  A. No.
9  Q. For example, you're not taking any kind of
10 medications that would interfere with your ability to
11 understand my questions?
12 A. No.
13 Q. Okay. Are you ready to proceed with your
14 deposition at this time?
15 A. Yes, sir.
16 Q. What have you done to prepare for the
17 deposition this afternoon?
18 A. I met with my legal team.
19 Q. Okay. And by your legal team, we have here
20 today John Cusick with the NAACP Legal Defense Fund. We
21 also -- although she's not in the room right now, I
22 expect we will have Leah Aden with the NAACP Legal
23 Defense Fund. And we have Steven Lance with the NAACP
24 Legal Defense Fund.
25      When you say you met with your legal team,

Page 7

1  are those the individuals you're referring to?
2  A. Correct.
3  Q. Any other lawyers that you met with before the
4  deposition today?
5  A. No.
6  Q. All right. I don't know -- I don't want to
7  know the subject of what you discussed with your
8  counsel, but can you tell me roughly how many times and
9  for how long you met with counsel in anticipation of
10 this deposition?
11 A. Two phone calls and an in-person meeting.
12 Q. Roughly how long were those phone calls?
13 A. An hour or so.
14 Q. Okay. And how long was the in-person meeting?
15 A. An hour and a half.
16 Q. And was that today or yesterday?
17 A. Yesterday.
18 Q. Other than your counsel, have you discussed
19 this deposition with anyone else?
20 A. No.
21 Q. Did you review any documents or other materials
22 before this deposition?
23 A. Yes.
24 Q. What did you look at?
25 A. The notice. I think that's what it's called.

Page 8

1  Q. Okay. Anything else?
2  A. I don't know the actual terms or --
3  Q. Okay. Did you look at some questions that you
4  had answered for us in this case?
5  A. No.
6  Q. Okay. Any other documents that you can
7  specifically think of that you've looked at?
8  A. No.
9  Q. All right. Did you bring any documents with
10 you to the deposition today?
11 A. No.
12 Q. Did you prepare any notes --
13 A. No.
14 Q. -- or other written materials in advance of the
15 deposition today?
16 A. No.
17 Q. All right. I'd like to ask you just a few
18 questions about your background and then we'll get into
19 the substance of the case. Okay?
20 A. Okay.
21 Q. Can you tell me what year you were born, sir?
22 A. 1999.
23 Q. And where were you born?
24 A. Harris County, Houston, Texas.
25 Q. Where did you grow up?

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 220 of 677
Page 3 (Pages 9 to 12)

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 9

1  A. Westbury. It's in southwest Houston.
2  Q. And is Westbury in Harris County as well?
3  A. Yes.
4  Q. Do you have any brothers or sisters?
5  A. Yes.
6  Q. How many?
7  A. Three siblings.
8  Q. Did any of your siblings go to Prairie View A&M
9  before you?
10 A. Me and my sister got here at the same time.
11 Q. Are you and your sister the same age?
12 A. No. She's a year older than me.
13 Q. What does your father do for a living, sir?
14 A. I have no idea.
15 Q. Okay. What about your mom?
16 A. She's a data analyst for United Healthcare.
17 Q. Where did you attend high school?
18 A. George Ranch High School.
19 Q. What was the last word?
20 A. High school.
21 Q. George --
22 A. Ranch.
23 Q. Ranch.
24    What year did you graduate?
25 A. 2017.

Page 10

1  Q. And you are currently a student at Prairie View
2  A&M?
3  A. Yes, sir.
4  Q. Have you declared a major?
5  A. Yes.
6  Q. What is your major, sir?
7  A. Architecture.
8  Q. What year did you start at Prairie View?
9  A. 2018.
10 Q. Does that make you a sophomore this year?
11 A. Yes.
12 Q. How did you come to choose Prairie View for
13 college?
14 A. I have friends that go here.
15 Q. And had those friends started before you?
16 A. Yes.
17 Q. Did you apply to any other schools?
18 A. Yes.
19 Q. Was your mom a Prairie View alum?
20 A. No.
21 Q. Other than your sister, anybody else in your
22 family come to Prairie View before you?
23 A. My aunt.
24 Q. Did your aunt graduate from Prairie View?
25 A. Yes.

Page 11

1  Q. Do you know roughly what year that would have
2  been?
3  A. No.
4  Q. Do you know roughly how old your aunt is?
5  A. No.
6  Q. Do you know if she's your mom's older sister or
7  younger sister?
8  A. Older sister.
9  Q. Do you know how old your mom is?
10 A. No.
11    MS. ADEN: And he's not allowed to say.
12    MR. SEAQUIST: That's right. We could
13 make that subject to a protective order.
14 Q. (BY MR. SEAQUIST) Okay. Did your mom go to
15 college?
16 A. Yes.
17 Q. Where did she go?
18 A. She went to school online.
19 Q. Other than your sister and your aunt, has
20 anyone else in your family ever lived in Waller County?
21 A. No.
22 Q. Did you receive a scholarship or any financial
23 aid towards your attendance at Prairie View?
24 A. I receive financial aid.
25 Q. Is that from the university or from like a

Page 12

1  grant program?
2  A. It's Federal financial aid. Yeah.
3  Q. Is there any part of your tuition that you're
4  responsible for personally?
5  A. Yes.
6  Q. And do you pay that yourself?
7  A. My mom and I, yeah.
8  Q. You receive some assistance from your mom?
9  A. Yeah.
10 Q. Are you married?
11 A. No.
12 Q. Do you have any children?
13 A. No.
14 Q. You are currently employed at the moment?
15 A. Yes.
16 Q. And you work at the Subway?
17 A. Yes.
18 Q. How long have you been at Subway, sir?
19 A. I started this semester, so like a month now, a
20 month and a half.
21 Q. So in the fall of 2019?
22 A. Yeah.
23 Q. Were you employed in Prairie View prior to
24 that?
25 A. No. No.

Case 4:18-cv-03985 Document 73-2 Filed on 01/24/20 in TXSD Page 221 of 677

Page 4 (Pages 13 to 16)

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 13

1  Q. Nowhere else you've worked in Prairie View?
2  A. In --
3  Q. Like in your freshman year?
4  A. I was a voluntary RST for volunteer hours.
5  Q. Volunteer --
6  A. Hours. RST.
7  Q. What does RST stand for?
8  A. I don't know exactly what it stands for, but
9  it's the monitor of who comes in and out of the
10 building.
11 Q. Oh, okay. Before -- let's see here. Let's
12 just do this.
13    MR. SEAQUIST: Okay. I'm going to mark
14 Exhibit 1 to Mr. Johnson's deposition.
15    (Exhibit No. 1 marked)
16 Q. (BY MR. SEAQUIST) I'm going to hand you what I
17 have marked as Exhibit 1, sir.
18    Mr. Johnson, do you remember being asked
19 to respond to some discovery questions as part of this
20 lawsuit?
21 A. Yes.
22 Q. And did you provide information in response to
23 those questions?
24 A. Can you clarify?
25 Q. Yes.

Page 14

1     In looking at Exhibit 1, is this a
2  document that you've seen before, sir?
3  A. Yes.
4  Q. And this document contains your answers to the
5  questions that the defendants in this case propounded on
6  you or asked you.
7  A. Yes.
8  Q. If we look at the last page of Exhibit 1, it
9  says "Verification" at the top. Do you see that?
10 A. Uh-huh.
11 Q. And do you see where there's a signature above
12 the name Damon Johnson?
13 A. Yes.
14 Q. Can you confirm that that is your signature?
15 A. Yes.
16 Q. All right. So this is your -- you swearing to
17 the truth and accuracy of the answers in the written
18 responses.
19 A. Yes.
20 Q. I notice, sir, that this affidavit was executed
21 in the County of Fort Bend.
22 A. Yes.
23 Q. Did you -- and this was done August 7th of
24 2019. Were you living in Fort Bend County over the
25 summer?

Page 15

1  A. Yeah. During the summer I live with my mom.
2  Q. Okay. And what is -- let's see. I think in
3  here you indicated that the address you lived at before
4  coming to Prairie View is 6410 Brazos Meadow Lane?
5  A. Yes.
6  Q. And is that your mom's address?
7  A. Yes.
8  Q. Okay. So that is in Fort Bend County?
9  A. Yes.
10 Q. And it indicates here the address -- or the
11 city is given as Richland. Is that right?
12 A. Richmond.
13 Q. Richmond.
14 A. Yeah.
15 Q. That's what I thought.
16    Okay. And that's where you live in the
17 summer since you've been coming to Prairie View.
18 A. Yeah. And also during breaks, like winter
19 break, spring break.
20 Q. Okay. And also where you lived immediately
21 prior to coming to school.
22 A. Yeah.
23 Q. Okay. I think in your interrogatories you
24 indicated that you moved to Prairie View in September of
25 2017.

Page 16

1  A. Yes.
2  Q. Is that right?
3     MS. ADEN: Do you want to refer him to a
4  particular number if you're looking at one, Gunnar?
5     MR. SEAQUIST: I sure can.
6  Q. (BY MR. SEAQUIST) I am looking at Interrogatory
7  No. 3. And this is the interrogatory that asks you to
8  identify where you have lived. It's on page five.
9     And in your response, you say, beginning
10 in September 2017, you moved into 706 Thompson Drive in
11 Prairie View. Is that correct?
12 A. 2017?
13 Q. Are we off a year?
14 A. Yeah. It was -- it was more January 2018.
15 Q. Okay. Did you start school in the spring
16 semester of '18?
17 A. Yes.
18 Q. And the first residence you lived on here on --
19 lived at here on campus was 706 -- scratch that. Let me
20 start over on that question.
21    The first residence you lived in in
22 Prairie View was at 706 Thompson Drive.
23 A. Yes.
24 Q. Now, that's off campus, correct?
25 A. Yes.

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 222 of 677
Page 5   (Pages 17 to 20)

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 17

1   Q.  Is that a rental house?
2   A.  Yes.
3       MR. SEAQUIST:  I'm going to mark Exhibit
4   2.
5       (Exhibit No. 2 marked)
6   Q.  (BY MR. SEAQUIST) Mr. Johnson, Exhibit 2, I'll
7   represent to you, is a Google satellite map that I
8   printed off of Google.
9       In looking at this map, are you able to
10  identify any familiar landmarks?
11  A.  Yes.
12  Q.  For example, are you able to make out the
13  location of the Prairie View A&M campus?
14  A.  Yes.
15  Q.  And you'll see kind of in the middle -- maybe
16  middle right-hand bottom corner, there is a red balloon
17  that says -- with 706 Thompson Drive written beside it.
18  A.  Yes.
19  Q.  Does that accurately reflect where your house
20  is?
21  A.  Yes.
22  Q.  Okay.  And does this map fairly and accurately
23  depict the area displayed in it?
24  A.  Yes.
25  Q.  And is this a rental house?

Page 18

1   A.  Yes.
2   Q.  And so you lived there from two thousand
3   eight -- from January of 2018 through May of 2018?
4   A.  Yes.
5   Q.  And then you went back home to your mom's house
6   in Richmond over the summer?
7   A.  Yes.
8   Q.  Did you live with anybody else at the 706
9   Thompson address?
10  A.  Yes.  I lived with my sister.
11  Q.  What is the rental cost of the house?
12  A.  500 a month per room.
13  Q.  Do you -- does any of your grant assistance
14  cover your housing costs?
15  A.  No.
16  Q.  Does your mom pay for any portion of your
17  housing?
18  A.  Yes.
19  Q.  On coming to campus in January of 2018, did you
20  purchase a meal plan?
21  A.  Yes.
22  Q.  And how many meals does that meal plan cover?
23  A.  It all depends on the meal plan you get.
24  There's -- I had the 10 meals.
25  Q.  So that's 10 a week?

Page 19

1   A.  Yeah.
2   Q.  And you can use them any time?
3   A.  Yeah.
4   Q.  Where does that plan enable you to eat on
5   campus?
6   A.  The Panther Plaza, the MSC, and the Zone.
7   Q.  And did you use all of those facilities?
8   A.  Yes.
9   Q.  Did your financial assistance cover any portion
10  of your meal plan?
11  A.  Yes.
12  Q.  Did you -- were you responsible for any of the
13  cost of your meals?
14  A.  No.
15  Q.  During your first year at Prairie View -- well,
16  I guess the first half of the year, from January to May,
17  did you ever go back home to Richmond on the weekends?
18  A.  Sometimes.  Like if my friends went home, then
19  I would ride with them.
20  Q.  Okay.  So if you did go home, you'd get a ride
21  with somebody else?
22  A.  Yeah.
23  Q.  And get a ride back?
24  A.  Yeah.
25  Q.  Had you ever been registered to vote before

Page 20

1   coming to Prairie View?
2   A.  No.
3   Q.  When did you turn 18?
4   A.  2017, in March.
5   Q.  Okay.  When you first got to campus in January
6   of 2018, were you given any information about how to
7   register to vote as a Prairie View A&M student?
8   A.  Can you clarify?
9   Q.  Sure.
10      Did anyone talk to you when you got to
11  campus about what you would need to do to register to
12  vote in Waller County?
13  A.  Yes.
14  Q.  How did you get that information, sir?
15  A.  They did voter registration drives in the MSC.
16  Q.  Who -- do you remember who put on the voter
17  registration drive?
18  A.  No.
19  Q.  Do you remember when you went to the voter
20  registration drive?
21  A.  Not exactly, no.
22  Q.  If you didn't turn 18 until -- what day in
23  March did you turn 18?
24  A.  15th.
25  Q.  I'm sorry?

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 223 of 677

Page 6   (Pages 21 to 24)

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 21

1  A.  15th.
2  Q.  Is it fair to say that you would have
3  registered after you turned 18?
4  A.  Yes.
5  Q.  So for the voter registration drive, you think
6  that was sometime after March 15th?
7  A.  Well, I was 18 in 2018.
8  Q.  Okay.  But after March 15th of 2018?
9  A.  I have no idea.
10 Q.  Okay.  How did you first register to vote here
11 in Waller County?
12 A.  Through the voter registration drive in the
13 MSC.
14 Q.  Did the -- at the voter registration drive at
15 the MSC, did they have voter registration cards
16 available for you?
17 A.  Can you explain?
18 Q.  Yes, sir.
19     Well, let me ask you a question first and
20 then we'll follow up.
21 A.  Okay.
22 Q.  To register -- what is your understanding of
23 how you register to vote?
24 A.  They asked for specific -- like my driver's
25 license, I think Social Security card, and proof of

Page 22

1  residency or something, or my address.  It was like a
2  little form that I filled out.
3  Q.  Okay.  That little form I filled out -- or that
4  you filled out, was that at the voter registration
5  drive?
6  A.  Yes.
7  Q.  And did you register or fill out that form
8  using your 706 Thompson address?
9  A.  Yes.
10 Q.  All right.  Once you filled out that form, what
11 happened with it?
12 A.  I gave it back and --
13 Q.  Okay.  Is it your understanding that someone at
14 the voter registration drive then turned that in to the
15 County for you?
16 A.  I guess.
17 Q.  Do you not know one way or the other?
18 A.  No, I don't.
19 Q.  Okay.  Did you subsequently receive a card in
20 the mail confirming that you had been registered to
21 vote?
22 A.  No.
23 Q.  After you turned in that card, did you have
24 any -- well, let me ask it this way.  At that voter
25 registration drive did you have any problems getting

Page 23

1  registered to vote?
2  A.  No.
3  Q.  Do you know what voting precinct you lived in
4  based on your address of 706 Thompson?
5  A.  No.
6  Q.  If I say Precinct 310, does that ring a bell?
7  A.  No.
8  Q.  If we look at Exhibit 1, on page five at the
9  bottom, this is Interrogatory No. 4.  Interrogatory
10 No. 4 asks you to state the jurisdictions in which you
11 had registered to vote.  And at the bottom of the page,
12 your answer says "To the best of Plaintiff's knowledge
13 and recollection, Plaintiff first registered to vote in
14 Waller County in 2017."
15     I think what you have just told me in your
16 testimony is that actually you didn't register to vote
17 until March of 2018.  Is that correct?
18 A.  I registered to vote in 2018.  I don't know
19 what month it was.
20 Q.  But you know you didn't turn 18 until March of
21 2018.
22 A.  I turned 18 in March 2017.
23 Q.  Okay.  All right.  You turned 18 in March 2017,
24 registered to vote sometime in 2018, but you're not sure
25 when.

Page 24

1  A.  Right.
2  Q.  But you are sure that you did not come to
3  Prairie View until January of 2018.
4  A.  Right.
5  Q.  Got it.
6     So whenever in 2018 you did register, it
7  would have been after January.
8  A.  It could have been in January.
9  Q.  Okay.  But not -- not before you came here
10 obviously.
11 A.  Yeah, not before I came here.
12 Q.  Okay.  If we look then at Interrogatory
13 No. 5 -- and this is a question that asks you to
14 identify the elections that you have voted in since
15 turning 18.  And do you see, on page six, Interrogatory
16 No. 5?
17 A.  Uh-huh.
18 Q.  In looking at your answer, it says "To the best
19 of Plaintiff's knowledge and recollection, Plaintiff
20 voted in four elections".  And the first one it says is
21 the 2017 November general election.
22     Am I correct that you were not in Prairie
23 View in November of 2017?
24 A.  Correct.
25 Q.  Okay.  So that needs to be corrected to strike

Case 4:18-cv-03985 Document 73-2 Filed on 01/24/20 in TXSD Page 224 of 677

Page 7 (Pages 25-28)

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 25

1 that as an election that you voted in, correct?
2   A.  Correct.  Yeah.  Sorry.
3   Q.  No problem.
4       So just for the record, you did not vote
5 in the November 2017 election in Prairie View.
6   A.  Right.
7   Q.  All right.  Do you -- now, after coming to
8 Prairie View in January, your interrogatories do
9 indicate that you voted in the primary election in March
10 of 2018.
11  A.  Correct.
12  Q.  Do you remember that primary election?
13  A.  Not exactly, no.
14  Q.  Do you know whether you voted in the Democrat
15 or Republican primary?
16  A.  I don't know.
17  Q.  For example, in the Democrat primary, one of
18 the candidates would have been Beto O'Rourke.  Is that
19 an election you would have voted in?
20  A.  Did I vote in that election?  Yeah.
21  Q.  And let me just be clear.  I don't want to
22 mislead you.  There was a general election that Beto was
23 a candidate in, but I'm talking about the Democratic
24 primary where the purpose of the election was to choose
25 the candidates who would run on the Democratic ticket.

Page 26

1 Do you remember voting in the Democratic primary?
2   A.  I don't know.
3   Q.  Okay.  But you are fairly confident that you
4 voted in a primary in March of 2018.
5   A.  Yes.
6   Q.  Okay.  Do you identify as a Democrat?
7   A.  No.
8   Q.  Are you a member of the Democratic party?
9   A.  No.
10  Q.  Are you affiliated with any local Democratic
11 party groups?
12  A.  No.
13  Q.  For example, the Waller County Democratic
14 party?
15  A.  No.
16  Q.  The Waller County Democratic Club?
17  A.  No.
18  Q.  Any student Democratic organizations?
19  A.  No.
20  Q.  Have you ever met the local chair of the
21 Democratic party, Rosa Patlan Harris?
22  A.  No.
23  Q.  When I say that name, Rosa Patlan Harris, does
24 it ring any bells for you?
25  A.  No.

Page 27

1   Q.  Did you campaign for any candidates in the 2018
2 primary?
3   A.  No.
4   Q.  You testified that you had at least attended
5 one voter registration drive in the spring of 2018,
6 correct?
7   A.  Correct.
8   Q.  That's when you got registered.
9   A.  Yes.
10  Q.  Did you attend or participate in any other
11 election-related events leading up to the 2018 primary?
12  A.  Can you explain?
13  Q.  Sure.
14      Did you, for example, attend a candidate
15 forum?
16  A.  No.
17  Q.  Did you participate in any get out the vote
18 events?
19  A.  Get out to vote events?
20  Q.  Uh-huh.
21  A.  Can you specify?
22  Q.  Yeah.
23      Do you recall going to any meetings the
24 purpose of which was to encourage students to go vote?
25 And this is specifically for the time in March of 2018.

Page 28

1   A.  No.
2   Q.  Are you familiar with a voter-only party?
3   A.  No.
4   Q.  You -- are you a member of The Panther Party on
5 campus?
6   A.  No.
7   Q.  Have you ever been a member of The Panther
8 Party?
9   A.  No.
10  Q.  Do you know what I mean when I say The Panther
11 Party?
12  A.  No.
13  Q.  Did you -- do you know -- if I say the Waller
14 County Commissioners Court, do you know what I'm talking
15 about?
16  A.  No.
17  Q.  Have you ever been to any meetings at the
18 county courthouse in Hempstead?
19  A.  No.
20  Q.  Have you ever been to the county courthouse in
21 Hempstead?
22  A.  No.
23  Q.  Have you ever -- have you ever talked to or
24 otherwise communicated with any officials or employees
25 of Waller County?

Case 4:18-cv-03985 Document 73-2 Filed on 01/24/20 in TXSD Page 225 of 677

Page 8 (Pages 29 to 32)

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 29

1  A. Can you specify?
2  Q. Let's say -- any members of the Commissioners
3  Court?
4  A. No.
5  Q. The elections administrator?
6  A. No.
7  Q. Okay. So in the time of the March primary in
8  March of 2018, did you have any communications with
9  anybody who worked for the County?
10 A. No.
11 Q. Did you advocate in any way for additional
12 voting locations in Waller County for the 2018 primary
13 election?
14 A. Can you specify?
15 Q. Yeah.
16    Did you participate in any events? Did
17 you talk to anyone, undertake any activities to try to
18 get more early voting locations for the 2018 primary?
19 A. No.
20 Q. All right. Did you advocate in any way for
21 additional voting hours in Waller County in the 2018
22 primary?
23 A. No.
24 Q. You've testified that you voted in the 2018
25 primary, though, correct?

Page 30

1  A. Correct.
2  Q. And that would have been in March?
3  A. Whenever it was, yeah.
4  Q. Okay. Your interrogatory answers say that you
5  voted at the Memorial Student Center --
6  A. Yes.
7  Q. -- on campus.
8  A. Yes.
9  Q. Do you remember whether you voted during early
10 voting or on primary election day?
11 A. I think it was early voting.
12 Q. Do you remember about what time you voted?
13 A. Not exactly, no.
14 Q. Can you remember whether it was in the morning
15 or the afternoon?
16 A. I have no idea.
17 Q. Do you remember how you got to the student
18 center to vote?
19 A. I walked.
20 Q. Do you remember where you were coming from at
21 the time?
22 A. Probably class.
23 Q. Do you remember how long it took you to vote
24 for the 2018 primary?
25 A. No, not exactly.

Page 31

1  Q. Is there anything that sticks out in your mind
2  about it as having taken a particularly long time?
3  A. No.
4  Q. Do you remember having any difficulties casting
5  your ballot early?
6  A. No.
7  Q. Did you go anywhere for spring break in March
8  of 2018?
9  A. I went home.
10 Q. And did you catch a ride with somebody?
11 A. Yeah.
12 Q. You lived back in Richmond over the summer of
13 2018?
14 A. Yes.
15    2018? I think I was in a summer school
16 program for the month of June.
17 Q. Okay.
18 A. But in July, yeah, I was at home.
19 Q. When you were here in June, were you still at
20 the 706 Thompson address?
21 A. No. I was on a bridge program and they paid
22 for housing on campus.
23 Q. Where did you live when you were on campus?
24 A. The UC, or University College.
25 Q. And was that bridge program covered by your

Page 32

1  financial aid?
2  A. No.
3  Q. Was that something you were responsible for
4  paying for?
5  A. Yeah.
6  Q. Did you receive any assistance doing that?
7  A. Yeah.
8  Q. Who gave you assistance?
9  A. It was through the math department.
10 Q. Okay. After June, though, you moved back to
11 Richmond with your mom for the rest of the summer?
12 A. Yes.
13 Q. And your interrogatory responses indicate that
14 when school started back up, you moved back into the
15 house at 706 Thompson?
16 A. Yes.
17 Q. Do you remember when you returned to Prairie
18 View from Richmond?
19 A. Sometime in August.
20 Q. Late August?
21 A. Yeah, around the time school started.
22 Q. You don't remember being here like weeks early
23 or anything?
24 A. Huh-uh. No.
25 Q. There you go.

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 226 of 677

Page 9 (Pages 33 to 36)

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 33

1  A. Sorry.
2  Q. No, you're good.
3      Your interrogatories indicate that you
4  have not had a car since being at Prairie View?
5  A. Correct.
6  Q. Have you had -- or any other personal
7  transportation?
8  A. No.
9  Q. Do you have a driver's license?
10 A. I do now.
11 Q. When did you get it?
12 A. A month ago.
13 Q. Okay. Had you ever had a driver's license
14 before that?
15 A. No.
16 Q. Do you have a car now?
17 A. I do now, yeah.
18 Q. And did you get the car a month ago as well?
19 A. Yeah. I got the car two days after I got my
20 driver's license.
21 Q. Did you have a bicycle at any time since you've
22 been at Prairie View?
23 A. It was stolen the first day I got here.
24 Q. Oh, you're kidding.
25 A. No, I'm not.

Page 34

1  Q. Did your sister have a car when she -- or your
2  first year here?
3  A. No.
4  Q. So the first day when you came in January 2018,
5  they stole your bicycle?
6  A. Yes.
7      MS. ADEN: Correction. For the record, he
8  didn't say "they". He just said it was stolen.
9      MR. SEAQUIST: Okay. Correct. It was
10 stolen.
11 Q. (BY MR. SEAQUIST) All right. Did you receive
12 financial tuition assistance for the 2018 school -- or
13 for the new school year in 2018?
14 A. Yes. I apply for financial aid every year.
15 Q. And did you continue your meal plan in the next
16 school year?
17 A. Yes.
18 Q. In addition to your meal plan, do you prepare
19 any meals at your house?
20 A. Sometimes, yeah.
21 Q. Where do you shop for groceries?
22 A. There's a Walmart up the street.
23 Q. Okay. How far is the Walmart from your house?
24 A. Like 10 minutes.
25 Q. Is that 10 minutes walking or by car?

Page 35

1  A. Car.
2  Q. And how did you get to the Walmart?
3  A. When my friends needed groceries, I would just
4  ask, "Hey, can I ride with you to get some groceries?"
5  Q. Did your friends charge you anything for doing
6  that?
7  A. We've been friends since like sixth grade, so
8  no, not really.
9  Q. Cool.
10     During the 2018 school year -- is there a
11 movie theater around Prairie View?
12 A. Not that I know of.
13 Q. Did you ever go see any movies since you've
14 been here?
15 A. Yeah. My friends and I went to Cypress to see
16 the Avengers movie awhile back.
17 Q. Was that at the drive-in?
18 A. It wasn't a drive-in. I think it was Studio
19 Movie Grill.
20 Q. And so you got a ride with friends to do that?
21 A. Yeah.
22 Q. How do you get to campus from your address at
23 706 Thompson?
24 A. I walk.
25 Q. Okay. Let's talk for a minute about your

Page 36

1  school schedule in 2018.
2      (Exhibit No. 3 marked)
3  Q. (BY MR. SEAQUIST) I'll hand you what I've
4  marked as Exhibit 3. Do you recognize -- Exhibit 3, for
5  the record, is Bates labeled Plaintiffs 000004.
6      Do you recognize this document, sir?
7  A. Yes.
8  Q. And what does this look like to you?
9  A. My schedule for 2018, fall semester.
10 Q. And does this schedule fairly and accurately
11 depict the class schedule that you had at that time?
12 A. Yes.
13 Q. And this would be from when classes started in
14 late August or September of 2018 all the way through
15 finals in December of 2018, correct?
16 A. Yes.
17 Q. Now, Exhibit 4 contains a single page and shows
18 your whole classes -- or excuse me, your classes for the
19 whole week?
20 A. Yes.
21 Q. All right. On Monday, Wednesday, and Friday,
22 your earliest class was Chemistry from 9:00 to 9:50?
23 A. Yes.
24 Q. And your latest class, at least on Monday and
25 Wednesday, actually ended at 5:20.

Case 4:18-cv-03985 Document 73-2 Filed on 01/24/20 in TXSD Page 227 of 677

Page 10 (Pages 37 to 40)

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 37

1   A. Yes.
2   Q. And your latest class on Fridays ended at 1:50?
3   A. Yes.
4   Q. Now, your earliest class on Tuesday starts at
5  two o'clock?
6   A. Yes.
7   Q. And the earliest class Thursday starts at three
8  o'clock.
9   A. Yes.
10  Q. On Monday, Wednesday, and Friday, you had a
11 break from 9:50 to 11:00?
12  A. Yes.
13  Q. And what did you use that break for?
14  A. Homework and to eat.
15  Q. You also had, it looks like, a lunch break from
16 around 11:50 to 1:00 Monday, Wednesday, Fridays?
17  A. Yes.
18  Q. And did you use that break -- what did you use
19 that break for?
20  A. Homework and eat.
21  Q. You also had a break, it looks like, in your
22 Monday, Wednesday, Friday -- well, in your Monday,
23 Wednesday schedule from 1:50 to 3:30.
24  A. Yes.
25  Q. And on Friday you were just done by 1:50.

Page 38

1   A. Yes.
2   Q. What did you -- on Monday and Wednesday what
3  did you use your 1:50 to 3:00 p.m. break?
4   A. I would have a meeting with PVCA.
5   Q. What is PVCA?
6   A. PV Consulting Association.
7   Q. And what is that, sir?
8   A. It's -- it's a business-based organization to
9  help the smaller businesses and organizations on campus
10 consulting-wise. So we help them with -- if they had a
11 product, we help them improve their product, improve
12 sales, gain customers, et cetera.
13  Q. Okay. And how long was that meeting?
14  A. It always varied.
15  Q. What time did it start? Do you know?
16  A. It started at 2:00.
17  Q. Two o'clock.
18     Okay. On Tuesday you didn't start school
19 until 2:00?
20  A. Correct.
21  Q. What did you do before two o'clock?
22  A. Catch up on homework, eat. And then Tuesday is
23 when we had -- is when PVCA had our E board meetings.
24  Q. And when were the E board meetings?
25  A. They were -- we would have to try to find a

Page 39

1  time where everybody on the E board could meet up.
2   Q. So it would --
3   A. Yeah.
4   Q. It varied?
5   A. Yeah, it varied.
6   Q. Okay. On Thursday, when you didn't start class
7  until 3:00, what did you do until 3:00?
8   A. I would usually be in the library because I was
9  doing more homework and -- yeah, and eating.
10  Q. On Tuesday what time would you come to campus
11 usually?
12  A. 11:00.
13  Q. What about on Thursday?
14  A. Thursday? 11:00.
15  Q. And again, you would walk to school?
16  A. Yes.
17  Q. You indicate in your interrogatory responses
18 that you were a member of the speech and debate team?
19  A. Yes.
20  Q. What does that entail?
21  A. Practices, and competitions on Friday,
22 Saturday, and Sundays.
23  Q. When were your practices?
24  A. Thursdays.
25  Q. What time?

Page 40

1   A. 6:00.
2   Q. Were you on speech and debate at the same time
3  as Treasure Smith?
4   A. Yes.
5   Q. Ms. Smith told us in her deposition yesterday
6  that, the Friday competitions, the team would leave
7  sometime relatively early Friday morning?
8   A. There was two groups for speech and debate. So
9  the speech would -- the speech would entail POI's and
10 more artistic forms of speech and debate, and then
11 debate was the more informational. So it would vary
12 depending on the group you were in.
13  Q. Okay. What time -- when you were in the
14 competition, what time did you typically leave campus on
15 Friday?
16  A. We left a little bit later. I don't know --
17 remember exactly what time.
18  Q. Was it after lunch?
19  A. Yeah, it was around after lunch.
20  Q. Okay. And did you have to miss class to go to
21 speech and debate competitions?
22  A. My speech and debate teacher was my Comm
23 teacher, so I wouldn't really miss class.
24  Q. And if it went well, the competition could last
25 through the weekend?

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 228 of 677

Page 11 (Pages 41 to 44)

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 41

1   A.  Yes.
2   Q.  But was it always done by Sunday?
3   A.  Sunday evening, yeah.
4   Q.  Okay.  It didn't roll over into Monday.
5   A.  No.
6   Q.  What is -- is there a season for speech and
7  debate competitions?
8   A.  They're pretty much year-round.  Yeah.
9   Q.  How long are the Thursday -- well, at this
10  time, in March -- or excuse me, in the fall of 2018, how
11  long were the speech and debate practices?
12   A.  They would vary depending on how we were
13  flowing with the material we had.
14   Q.  Did you get any college credit for
15  participating in speech and debate?
16   A.  No.
17   Q.  Just an extracurricular activity?
18   A.  Yes.
19   Q.  You told me a little bit about the PV
20  Consulting Association.  When did you first join that?
21   A.  When I first got here, so in spring of 2018.
22   Q.  How did you come to find out about that group?
23   A.  My friend that I met in sixth grade was on the
24  E board and he told me about it.  It seemed like a good
25  idea.  I went to a few meetings and got involved.

Page 42

1   Q.  And I think your interrogatories say you were
2  actually a board member?
3   A.  Yes.
4   Q.  Was that a member of the E board?
5   A.  Yes.
6   Q.  And what did the E board do in relation to the
7  PV Consulting Association?
8   A.  Well, we organize meetings.  We organize events
9  and fundraisers.
10   Q.  Did any of the meetings or events or activities
11  of the PVCA relate to voting?
12   A.  No.
13   Q.  Or political engagement?
14   A.  No.
15   Q.  And do you get college credit for being on the
16  PVCA?
17   A.  No.
18   Q.  Just extracurricular?
19   A.  Yes.
20   Q.  You indicate that you were the freshman coach
21  for the step-off competition?
22   A.  Yes.
23   Q.  Tell me what step-off is.
24   A.  So the University College, they are all
25  separated by buildings.  And the buildings would pick a

Page 43

1  coach.  The coach would help make material and run
2  practices for certain buildings.
3   Q.  So you said the practices were separated into
4  different buildings?
5   A.  Yes.
6   Q.  Did different buildings have different step-off
7  teams?
8   A.  Yes.
9   Q.  And is step-off like dance?
10   A.  In a way, yeah.
11   Q.  Okay.  Are there competitions -- are the
12  competitions between the buildings?
13   A.  Yes.
14   Q.  Do the teams also compete outside of Prairie
15  View A&M?
16   A.  No.
17   Q.  Is there a particular season for the step-off
18  events?
19   A.  It's usually spring.
20   Q.  And did you get any college credit for that?
21   A.  No.
22   Q.  Just extracurricular?
23   A.  Yes.
24   Q.  And you said you committed about four to six
25  hours per week?

Page 44

1   A.  Yes.
2   Q.  And again, that would be in the spring.
3   A.  Well, we made material during the fall, yeah.
4   Q.  Did you practice -- was there a set practice
5  schedule during the fall?
6   A.  No.
7   Q.  When you say "made material," what does that
8  mean?
9   A.  The coaches would get together and we'd come up
10  with steps, strolls, and try to find a place to
11  practice.
12   Q.  Where did you all practice?
13   A.  All over.
14   Q.  You also say you were the freshman coach for
15  the stroll-off competition?
16   A.  Yes.
17   Q.  Was that sort of part of the same thing as the
18  step-off?  Is it step-off and stroll-off or are they two
19  different things?
20   A.  They're two different things.
21   Q.  Are they different teams and everything?
22   A.  Yeah.
23   Q.  And so you did both?
24   A.  Yes.
25   Q.  Are the -- okay.  What did you do as part of

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 229 of 677

Page 12 (Pages 45-48)

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 45

1  your duties for the freshman coach of the stroll-off
2  competition?
3     A.  It was similar to the duties of the coach of
4  the step team except we weren't making steps.  We were
5  making strolls.
6     Q.  Okay.  I've got to plead ignorance.  What's the
7  difference between steps and strolls?
8     A.  So I mean, they're both rhythmic-based.  A
9  stroll is more of a fluid body motion and a step is more
10 precision and steps.
11    Q.  Okay.
12    A.  Yeah.
13    Q.  And what kind of a time commitment -- again,
14 you said -- in your interrogatories, you listed that you
15 spent around four to six hours a week on the stroll-off
16 coaching.  What did you do during that four to six
17 hours?
18    A.  Practiced the strolls, cleaned up the material,
19 tried to work the theme of the stroll-off into our
20 strolls.
21    Q.  Was there -- were there set meetings for the
22 stroll-off competition in the fall of 2018?
23    A.  No.  We would just wait until everybody was out
24 of class.
25    Q.  And was there a specific practice area?

Page 46

1     A.  No.
2     Q.  Just wherever you guys could find space?
3     A.  Yeah.
4     Q.  Is that something you practice indoors, like in
5  a room at the university, or outdoors?
6     A.  We would try to find a room; but if we couldn't
7  find a room, we would practice outdoors.
8     Q.  What kind of areas outdoors did you guys
9  practice in?
10    A.  The basketball courts over there.  We practiced
11 in the -- the courtyard over there.  We practiced in the
12 parking lot.
13    Q.  Okay.  So your interrogatory responses, I
14 believe -- and I am looking at your response to No. 13,
15 which starts kind of at the bottom of page nine of
16 Exhibit 1 and goes over to the top of the next page.
17        On the bottom of page nine, it says
18 "Member, Panther Party"; but I think you testified today
19 that, in fact, you were not actually a member of The
20 Panther Party.
21    A.  Correct.
22    Q.  Okay.  So that's something that needs to be
23 corrected.
24        I'd like to ask you some questions now
25 about the 2018 election in November.

Page 47

1     A.  Okay.
2     Q.  Okay?  Did you support any particular
3  candidates in that election?
4     A.  No.
5     Q.  Did you campaign for any candidates in that
6  election?
7     A.  No.
8     Q.  Did you attend any voter registration drives in
9  advance of that election?
10    A.  No.
11    Q.  Any candidate forums or other voting-related
12 activities?
13    A.  Can you specify?
14    Q.  Well, let's take it one by one.
15        Did you attend a candidate forum?
16    A.  No.
17    Q.  Did you go to any informational meetings about
18 voting in the 2018 election?
19    A.  No.
20    Q.  Any events you can think of that you went to in
21 the fall of 2018 in which the subject was voting or the
22 2018 election?
23    A.  They did a watch party for the election, so we
24 got -- we went to the bowling alley, bowled, and watched
25 the election on TV.  They had a chalk event right in

Page 48

1  front of the MSC where they wrote "Get out and vote" and
2  then they just had all the students sign the sidewalk.
3     Q.  When you said "they had a watch party," who
4  were you referring to?
5     A.  It was Alpha Phi Alpha Fraternity,
6  Incorporated, and Alpha Kappa Alpha Sorority,
7  Incorporated.
8     Q.  And am I correct that there's one fraternity
9  and one sorority on campus?
10    A.  There are multiple fraternities and sororities
11 on campus.
12    Q.  Are there?  Okay.
13    A.  Yeah.
14    Q.  The watch party was at the bowling alley?
15    A.  Yes.
16    Q.  Where's the bowling alley?
17    A.  It's on campus, like right here (indicating).
18    Q.  Okay.
19    A.  The Panther Plaza is the bowling alley.
20    Q.  And did you walk to that event?
21    A.  Yes.
22    Q.  You also had -- and that election watch party
23 would have been kind of the night of election day.
24    A.  Yes.
25    Q.  You also testified that there was an event

Case 4:18-cv-03985 Document 73-2 Filed on 01/24/20 in TXSD Page 23 of 67

Page 13 (Pages 49-52)

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 49

1 where -- the chalk party -- or the chalk event?
2  A. Yes.
3  Q. Where would -- where did that take place?
4  A. In front of the MSC.
5  Q. Okay. And did you sign your name in chalk?
6  A. Yes.
7  Q. Where -- when was that? Do you remember?
8  A. I don't know exactly when it was.
9  Q. Was is on election day as well?
10  A. No.
11  Q. Before that?
12  A. Yeah.
13  Q. Do you have any understanding about how early
14 voting locations and hours are chosen in the State of
15 Texas?
16  A. No.
17  Q. Do you have any understanding about how Waller
18 County does that specifically?
19  A. No.
20  Q. Were you following the process for the
21 selection of early voting hours and locations in the
22 fall of 2018?
23  A. Can you specify?
24  Q. Yeah.
25      When you came back to school after being

Page 50

1 back in Richmond over the summer, were you trying to
2 find out about when early voting and voting would be for
3 the November election?
4  A. No.
5  Q. Do you use social media?
6  A. Yes.
7  Q. What social media platforms do you use?
8  A. Twitter, Instagram sometimes, Snapchat.
9  Q. Are you a Twitter follower of the Prairie View
10 Panther Party?
11  A. No.
12  Q. Are you a Twitter follower of Jayla Allen?
13  A. No.
14  Q. Are you a Twitter follower of Waller County?
15  A. No.
16  Q. The same questions -- for any of those
17 individuals, do you follow them -- or entities, do you
18 follow them on Facebook?
19  A. No.
20  Q. That was a no?
21  A. No. Yeah. Sorry.
22  Q. That's all right.
23     Did you do anything in the fall of 2018 to
24 figure out when voting would be available on campus?
25  A. No.

Page 51

1  Q. How did you -- when it came time to vote in the
2 November 2018 election, how did you find out when you
3 could go do that?
4  A. Word of mouth. I was in the SGA, so I knew
5 some students who would know, and they just kind of
6 talked about it.
7  Q. You said the SJ?
8  A. Yes.
9  Q. What does that stand for?
10  A. Student Government Association.
11  Q. Oh, SGA. I'm sorry.
12     And what do you remember members of the
13 SGA telling you about when voting would be available?
14  A. They just told us that it would be -- I don't
15 remember exactly what they said. They just told us the
16 days that we had to vote and where we could vote or when
17 voting was available at the MSC.
18  Q. When they told you that, did you have any
19 particular concerns about when that -- when the voting
20 was available?
21  A. Yeah, because I think they told us we had like
22 three days in the MSC and I was -- I didn't know if I
23 would be able to go and vote or not.
24  Q. Other than that, did you have any concerns
25 about the early voting schedule?

Page 52

1  A. No.
2  Q. After learning of the early voting schedule in
3 the fall of 2018, did you try to talk to any other
4 students about it?
5  A. I told my friends when they could go vote at
6 the MSC.
7  Q. You tried to spread the word on when voting was
8 available?
9  A. Yeah.
10  Q. When you talked to the SGA, do you remember
11 them telling you that there would also be early voting
12 available at the Waller County Community Center?
13  A. I don't know.
14  Q. Did you attend any meetings of the Waller
15 County Commissioners Court in the fall of 2018?
16  A. No.
17  Q. Is there anything that you did in the fall of
18 2018 to try to seek more early voting hours?
19  A. No.
20  Q. Did you, in the fall of 2018, ever talk to any
21 Waller County officials or employees about voting
22 locations or hours?
23  A. No.
24  Q. Do you know where the Waller County Community
25 Center is?

Case 4:18-cv-03985 Document 73-2 Filed on 01/24/20 in TXSD Page 231 of 677

Page 14 (Pages 53-56)

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 53

1   A.  No.
2   Q.  Do you know where the post office is?
3   A.  No.
4   Q.  How do you get around campus when you're here?
5   A.  I walk.
6   Q.  Are you aware that there is -- that the
7  university operates a shuttle that has a campus loop?
8   A.  Yes, I'm aware.
9   Q.  Have you ever ridden that shuttle?
10  A.  I rode the shuttle one time and I was trying to
11 get from the MSC to the bowling alley and I could have
12 walked there faster.
13  Q.  So after that, you just walked?
14  A.  Yeah.
15  Q.  Did you ultimately find time to vote at the
16 Memorial Student Center --
17  A.  Yes.
18  Q.  -- in the 2018 November election?
19  A.  Yes.
20  Q.  Do you remember whether you voted early or on
21 election day?
22  A.  Early.
23  Q.  Do you remember what day you voted?
24  A.  No.  I think it was the last day.
25  Q.  So Wednesday?

Page 54

1   A.  Yes.
2   Q.  Do you remember how long it took you to vote?
3   A.  Not exactly.
4   Q.  Do you remember it being a long time?
5   A.  No, but I remember skipping lunch to do it.
6   Q.  Was there a line to vote when you went?
7   A.  Yes.
8   Q.  How long was the line?
9   A.  I have no idea.
10  Q.  Was it more than 10 minutes?
11  A.  The wait --
12  Q.  Yeah.
13  A.  -- in line?
14  Q.  Yes.
15  A.  Yeah.
16  Q.  But you don't know how long it was?
17  A.  No.
18  Q.  Did you have any problems casting a ballot?
19  A.  No.
20  Q.  Were you aware of a parade held on campus on
21 election day in 2018?
22  A.  Yes.
23  Q.  Did you participate?
24  A.  No, but I did like catch it towards the end
25 like as it went into the MSC.

Page 55

1   Q.  Where did you catch it?  Do you remember?
2   A.  Not exactly, no.
3   Q.  At the time of that parade, you had already
4  voted, correct?
5   A.  Yes.
6   Q.  And -- well, I tell you what.  What did you do
7  once you joined up with the parade?
8   A.  Walked.
9   Q.  And it wound up -- do you remember how far you
10 walked?
11  A.  Huh-uh.
12  Q.  Do you remember --
13  A.  No, I don't remember.  Sorry.
14  Q.  You're doing a good job.  That was me talking
15 over you.
16      Do you remember how long of a time period
17 you walked?
18  A.  No.
19  Q.  The parade ended at the Memorial Student
20 Center?
21  A.  Yes.
22  Q.  And did you hang around at the Memorial Student
23 Center for a while after that?
24  A.  Yeah, I went to get something to eat.
25  Q.  And what was -- were there any events held

Page 56

1  after the conclusion of the parade at the Memorial
2  Student Center?
3   A.  Not that I know of.
4   Q.  Mr. Johnson, how did you come to join this
5  lawsuit, sir?
6   A.  I heard from my friend, Antonious Brown, about
7  the lawsuit.  He put me in contact with -- I don't
8  remember the name.  And I made a phone call.
9   Q.  How long have you known Mr. Brown?
10  A.  We met during speech and debate.  I've known
11 him for a few months now.
12  Q.  Did Mr. Brown at some point run for a spot on
13 the Prairie View City Council?
14  A.  No.
15  Q.  Did he run for another government position than
16 City Council?
17  A.  No.
18  Q.  Have you ever been to the Prairie View city
19 hall?
20  A.  No.
21  Q.  As a plaintiff in this lawsuit, Mr. Johnson, is
22 it your contention that the Waller County Commissioners
23 Court adopted the early voting schedule for 2018 to
24 intentionally discriminate against African-American
25 voters?

Case 4:18-cv-03985 Document 73-2 Filed on 01/24/20 in TXSD Page 232 of 677

Page 15 (Pages 57 to 60)

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 57

1  A.  I don't know if that was the intention, but it
2  does raise some red flags because Prairie View is a
3  pretty populous school and for this general area and the
4  fact that we had less days than certain areas in Waller
5  County is suspicious.
6  Q.  Okay.  Let me ask you this.  Is it your
7  contention in this lawsuit that the Waller County
8  Commissioners Court adopted the early voting schedule in
9  2018 to intentionally discriminate against young voters?
10  A.  It might not have been the intention; but
11  Prairie View's median age is around 22, which is a lot
12  younger than the general area; so it does seem
13  suspicious.
14      MR. SEAQUIST:  Okay.  Let's take a
15  five-minute break.
16      (Recess from 5:12 p.m. to 5:25 p.m.)
17  Q.  (BY MR. SEAQUIST) Mr. Johnson, have you
18  understood the questions I've asked you today?
19  A.  Yes.
20  Q.  And have you answered them to the very best of
21  your ability?
22  A.  Yes.
23  Q.  Have I been courteous to you in the deposition
24  today?
25  A.  Yes.

Page 58

1      MR. SEAQUIST:  I appreciate your time.
2      And I'll pass the witness.
3      THE WITNESS:  Okay.
4          EXAMINATION
5  BY MR. CUSICK:
6  Q.  Hi, Mr. Johnson.
7  A.  How are you doing?
8  Q.  So I'm going to ask you a few questions right
9  now as part of redirect.
10  A.  Okay.
11  Q.  And so in 2018 how did you get around?
12  A.  I walked.
13  Q.  You testified earlier that you had taken the
14  shuttle bus once.  Why did you only take it once?
15  A.  Because it actually doesn't pick me up from my
16  house.  I had to walk to the Panther Quarters.  And it's
17  pretty inconsistent.  Like my friend who did take the
18  shuttle bus because he lived in Panther Hill, he -- he
19  would miss it a lot because it sometimes would come
20  early.  And then he would also try to find a different
21  route because sometimes it would be late.  So it would
22  just -- it just doesn't have a good reputation on the
23  campus.
24  Q.  And if you don't catch the shuttle bus at a
25  stop, can you get onto it while it's going -- during a

Page 59

1  trip?
2  A.  Oh, no.  She will close the doors and drive
3  past you.
4  Q.  And you testified earlier that you generally --
5  I forget the -- on some of the days get to -- you got to
6  class in the fall of 2018 around 11:00 a.m.  Does the
7  weather at all affect when you get -- you leave and go
8  to and from?
9  A.  Definitely.  Because if it's raining and it's
10  cold, I'm not going to class or I'm going to be late.
11  If it's too hot, I'll just -- you know, just try to
12  power through that one.  But through the rain and when
13  it's too cold, huh-uh.
14  Q.  And is there any other public transportation
15  that you know of?  Or is there any public transportation
16  in Prairie View?
17  A.  Not --
18      MR. SEAQUIST:  Form.
19      You can still answer.
20  Q.  (BY MR. CUSICK) You can go ahead and answer.
21  A.  Not that I know of, no.
22  Q.  What about Waller County?
23      MR. SEAQUIST:  Form.
24      THE WITNESS:  Not that I know of.
25  Q.  (BY MR. CUSICK) And you mentioned earlier that

Page 60

1  you couldn't pick up -- you can't flag down the Prairie
2  View A&M shuttle bus?
3  A.  No, you can't.
4  Q.  Did you have any -- did you ever try to flag it
5  down when it was en route?
6  A.  Yes.  Actually, she drove past my house and she
7  was on her way to the Panther Quarters.  And I saw her
8  and I kind of like put my hand out and she just kind of
9  kept driving.  Like we looked at each other and she just
10  kept driving.
11  Q.  And you testified earlier that for the fall of
12  the -- the 2018 fall semester that you volunteered as an
13  RST?
14  A.  Yes.
15  Q.  And how many hours a week did you spend on
16  that?
17  A.  RST?  Probably eight to 10 hours.
18  Q.  And in that same fall 2018 semester were you
19  involved in any other clubs or extracurricular
20  activities than the ones that Mr. Seaquist asked you
21  about earlier?
22  A.  Yes.  I was a member of SGA, Melanin, AIChE.
23  And I think those were the only other extracurricular
24  activities.
25  Q.  And so you mentioned that you were part of the

Case 4:18-cv-03985  Document 73-2  Filed on 01/24/20 in TXSD  Page 233 of 677
Page 16 (Pages 61 to 64)
Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 61

1  SGA, which is the Student Government Association. And
2  what was your position or role in the SGA?
3      A.  I was the senator for auxiliary services.
4      Q.  And how many hours a week do you spend in that
5  role?
6      A.  Two to four.
7      Q.  You mentioned that you were also in Melanin?
8      A.  Yes.
9      Q.  And what was your role in that group?
10     A.  I was just a general body member. So meetings
11 were probably like 30 minutes to an hour and then I
12 would attend events that Melanin hosted.
13     Q.  And what is that group?
14     A.  It just -- it's more of a social organization
15 to promote the melanin or the different shades of
16 melanin that are on this campus. It's more of a black
17 empowerment thing.
18     Q.  And then I am forgetting the third group or
19 organization. You said ACINA?
20     A.  AIChE.
21     Q.  AIChE?
22     A.  Yeah. It's the American Institution For
23 Chemical Engineers.
24     Q.  And did you have a specific role in that?
25     A.  There wasn't a specific role, but they did

Page 62

1  offer a scholarship for the person who could attend the
2  most AIChE events, so I was really trying to get the
3  scholarship.
4      Q.  And how many hours a week, again, in that
5  semester did you --
6      A.  General body meetings were -- they hosted one
7  every week, so an hour. And then they do random events,
8  like volunteer hours for like picking up trash, or they
9  would host events like conferences.
10     Q.  And so based on the activities you discussed
11 before with Mr. Seaquist and the ones you just discussed
12 now, adding up all of those hours, how many hours a week
13 do you think you spent on all those activities?
14     A.  Do you have a calculator? It was -- it was a
15 lot. I don't know exactly how many hours it was, but it
16 was a lot.
17     Q.  Would you consider that you had a busy
18 schedule?
19     A.  A very busy schedule, yeah.
20     Q.  And then why did you take breaks for homework
21 and eating?
22     A.  I took breaks for homework and eating because
23 eating is sustainable -- I mean, is substantial to live,
24 and homework because academic probation is not a very
25 fun place to be. And my mom like put -- invested a lot

Page 63

1  of time in me like when I was young and it was only her
2  and there was four of us. So she always put in time
3  because we weren't really like the most financially
4  strong family.
5          But she just put in a bunch of time, so it
6  was like -- and the only thing that she wanted back from
7  us was our degrees. So like she wanted us to finish
8  because she never got to go to college. She went to
9  school online. And my dad didn't finish. So all she
10 wanted was a degree. So I told her I would give it to
11 her.
12         MR. SEAQUIST: Object to the
13 responsiveness.
14     Q.  (BY MR. CUSICK) And has she invested a lot of
15 money into you?
16         MR. SEAQUIST: Form.
17         THE WITNESS: Yeah. Children are some of
18 the most expensive things, she said, and college is not
19 cheap.
20     Q.  (BY MR. CUSICK) And so you mentioned earlier
21 that during breaks you were primarily doing homework or
22 eating at those times. Was that because you -- the
23 other times throughout your day you were working on
24 extracurricular activities?
25         MR. SEAQUIST: Object to leading.

Page 64

1          THE WITNESS: Yeah. There was class,
2  extracurricular activities. So, yeah, I would take
3  breaks to eat and do homework when I could.
4      Q.  (BY MR. CUSICK) And then so I want to talk in
5  the last set of questions about the early voting
6  schedule in the fall of 2018.
7      A.  Uh-huh.
8      Q.  So you testified earlier that you heard from
9  the Student Government Association or while you were
10 there that there were only three days of early voting
11 initially?
12     A.  Right.
13     Q.  And then you also testified that you had
14 concerns when you first heard about that?
15     A.  Yes.
16     Q.  Why is that?
17     A.  I had concerns because, one, my schedule is
18 pretty busy, so I didn't think I would have the time to
19 go vote.
20         And then two, three days on PV's campus,
21 it's -- the population of our campus has grown like the
22 past three years, so the fact that the number of people
23 that are in this area that are able to vote are limited
24 to the amount of time they have to vote. With a busy
25 schedule, being college students, it's a -- it just was

Case 4:18-cv-03985 Document 73-2 Filed on 01/24/20 in TXSD Page 234 of 677

Page 17 (Pages 65 to 68)

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 65

1 concerning. So I mean, that's -- that's pretty much it
2 on that.
3   Q. And what's your basis for why the population
4 has grown here?
5   A. I don't know why it's growing. But I mean,
6 the -- the campus life is pretty fun; so I mean, people
7 come for that. The amount of opportunities that we have
8 after graduation are fairly high because of the alums.
9 And it's just an overall -- it's a good student life
10 here; so I mean, I guess that's why people want to come
11 to Prairie View.
12   Q. And you testified just before that it has
13 grown?
14   A. Yes.
15   Q. What's the basis for why it -- how you know it
16 has grown?
17   A. So originally my class -- well, the class
18 before me, class of 2016 that came in as freshmen,
19 they -- they accepted roughly 5,000 students. The class
20 of 2017, my class, was 8,000. And the class of 2018 was
21 10,000. So I mean, those just -- yeah.
22   Q. And do you think that Prairie View A&M students
23 and Prairie View residents got a fair amount of early
24 voting in light of the size?
25      MR. SEAQUIST: Form.

Page 66

1      THE WITNESS: No, they haven't, because --
2 from prior knowledge that I have obtained from people
3 that I know, the population of Prairie View makes up
4 roughly 22 to 25 percent of the population of this area;
5 so us having limited voting, knowing how much we can
6 sway certain elections, is -- is -- it's kind of off.
7      MR. SEAQUIST: Object to the
8 responsiveness.
9   Q. (BY MR. CUSICK) And have you heard from any
10 public officials about the size that it's grown?
11   A. Yeah. I got this knowledge from a City
12 Councilman, Xante Wallace.
13   Q. And then so you testified before that you had
14 to skip lunch to vote --
15   A. Yes.
16   Q. -- when you voted in the 2018 --
17   A. Yes.
18   Q. -- general election? Do you think that was
19 fair?
20      MR. SEAQUIST: Form.
21      THE WITNESS: No. I feel like I shouldn't
22 have to skip lunch to go vote.
23      MR. CUSICK: I think that's all the
24 questions from me.
25      Back to you.

Page 67

1      MR. SEAQUIST: I'd just like to thank you
2 again for your time, sir. Have a nice weekend.
3      THE WITNESS: Yes, sir. You, too.
4      (Proceedings concluded at 5:35 p.m.)

Page 68

1      CHANGES AND CORRECTIONS
2 WITNESS NAME:        DATE OF DEPOSITION:
3 DAMON RICHARD JOHNSON, JR.    OCTOBER 11, 2019
4 PAGE   LINE   CHANGE       REASON
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Case 4:18-cv-03985 Document 73-2 Filed on 01/24/20 in TXSD Page 235 of 677

Page 18 (Pages 69-71)

Jayla Allen, et al. vs. Waller County Texas, et al.
Damon Richard Johnson Jr. - 10/11/2019

Page 69

1    I, DAMON RICHARD JOHNSON, JR., have read the
2  foregoing deposition and hereby affix my signature that
3  same is true and correct, except as noted above.
4
5
       _____
6        DAMON RICHARD JOHNSON, JR.
7
8
9  THE STATE OF _____)
10 COUNTY OF _____)
11
12    Before me, _____, on this
13 day personally appeared DAMON RICHARD JOHNSON, JR.,
14 known to me (or proved to me under oath or through
15 _____) (description of identity
16 card or other document)) to be the person whose name is
17 subscribed to the foregoing instrument and acknowledged
18 to me that they executed the same for the purposes and
19 consideration therein expressed.
20    Given under my hand and seal of office this
21 _____ day of _____, _____.
22
23
       _____
24       NOTARY PUBLIC IN AND FOR
         THE STATE OF_____
25       COMMISSION EXPIRES:_____

Page 71

1     I further certify that pursuant to FRCP Rule
2  30(f)(1) that the signature of the deponent:
3     __X__ was requested by the deponent or a party
4  before the completion of the deposition and returned
5  within 30 days from date of receipt of the transcript.
6  If returned, the attached Changes and Signature Page
7  contains any changes and the reasons therefor;
8     _____ was not requested by the deponent or a party
9  before the completion of the deposition.
10    That the amount of time used by each party at the
11 deposition is as follows:
12 MR. JOHN CUSICK.....0 Hours, 9 Minutes
13 MR. GUNNAR P. SEAQUIST.....1 Hour, 6 Minutes
14    I further certify that I am neither counsel for,
15 related to, nor employed by any of the parties or
16 attorneys in the action in which this proceeding was
17 taken, and further that I am not financially or
18 otherwise interested in the outcome of the action.
19    Certified to by me this 20th of October, 2019.
20
21
22    _____
      SHERRI SANTMAN FISHER, Texas CSR 2336
      CSR Expiration Date:  12/31/19
23    COOLEY REPORTING, Firm No. 702
      8407 Fathom Circle, Unit B
24    Austin, Texas 78750
      512-743-5867/512-410-3012
25

Page 70

1       IN THE UNITED STATES DISTRICT COURT
2       FOR THE SOUTHERN DISTRICT OF TEXAS
3              HOUSTON DIVISION
4  JAYLA ALLEN, DAMON      )
   JOHNSON, TREASURE SMITH, )
5  AND THE PANTHER PARTY,   )
      Plaintiffs,           )
6                           )
   VS.                      ) CIVIL ACTION NO.:
7                           ) 4:18-CV-3985
   WALLER COUNTY TEXAS; THE )
8  WALLER COUNTY            )
   COMMISSIONERS COURT;     )
9  JUDGE CARBETT "TREY" J.  )
   DUHON III, IN HIS        )
10 OFFICIAL CAPACITY AS THE )
   WALLER COUNTY JUDGE; AND )
11 CHRISTY A. EASON, IN HER )
   OFFICIAL CAPACITY AS THE )
12 WALLER COUNTY ELECTIONS  )
   ADMINISTRATOR,           )
13    Defendants.            )
14 ******************************
15     REPORTER'S CERTIFICATION
16   ORAL DEPOSITION OF DAMON RICHARD JOHNSON, JR.
17          OCTOBER 11, 2019
18 ******************************
19   I, SHERRI SANTMAN FISHER, Certified Shorthand
20 Reporter in and for the State of Texas, hereby certify
21 to the following:
22   That the witness, DAMON RICHARD JOHNSON, JR., was
23 duly sworn by the officer and that the transcript of the
24 oral deposition is a true record of the testimony given
25 by the witness;