

PLAINTIFF'S
EXHIBIT

**36**

# EXHIBIT 6

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 1        FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  HOUSTON DIVISION

 3 JAYLA ALLEN, DAMON          )
   JOHNSON, TREASURE SMITH,    )
 4 AND THE PANTHER PARTY,      )
       Plaintiffs,             )
 5                             )
   VS.                         ) CIVIL ACTION NO.:
 6                             ) 4:18-CV-3985
   WALLER COUNTY TEXAS; THE    )
 7 WALLER COUNTY               )
   COMMISSIONERS COURT;        )
 8 JUDGE CARBETT "TREY" J.     )
   DUHON III, IN HIS           )
 9 OFFICIAL CAPACITY AS THE    )
   WALLER COUNTY JUDGE; AND    )
10 CHRISTY A. EASON, IN HER    )
   OFFICIAL CAPACITY AS THE    )
11 WALLER COUNTY ELECTIONS     )
   ADMINISTRATOR,              )
12     Defendants.             )

13 *****************************************
14              ORAL DEPOSITION OF
                JOSHUA JAMIL MUHAMMAD
15               OCTOBER 10, 2019
   *****************************************
16
17     ORAL DEPOSITION OF JOSHUA JAMIL MUHAMMAD,
18 produced as a witness at the instance of the Defendants,
19 and duly sworn, was taken in the above-styled and
20 numbered cause on OCTOBER 10, 2019, from 9:10 a.m. to
21 1:40 p.m., before SHERRI SANTMAN FISHER, Certified
22 Shorthand Reporter in and for the State of Texas,
23 reported by machine shorthand, at the University Square
24 Clubhouse, 502 Anne Preston Street, Prairie View, Texas,
25 pursuant to the Federal Rules of Civil Procedure and the
   provisions stated on the record or attached hereto.
```

## Page 2

```
 1              APPEARANCES
 2
 3 FOR THE PLAINTIFFS:
 4   MS. LEAH ADEN
     MR. JOHN CUSICK
 5   NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
     40 Rector Street
 6   Fifth Floor
     New York, New York 10006-1738
 7   212-965-7715/212-226-7592 (fax)
     laden@naacpldf.org
 8   jcusick@naacpldf.org
 9   MS. JULIE GOODRICH HARRISON
     NORTON ROSE FULBRIGHT US LLP
10   1301 McKinney
     Suite 5100
11   Houston, Texas 77010-3095
     713-651-5151/713-651-5246 (fax)
12   julie.harrison@nortonrosefulbright.com
13
   FOR THE DEFENDANTS:
14
     MR. GUNNAR P. SEAQUIST
15   BICKERSTAFF HEATH DELGADO ACOSTA LLP
     3711 South Mopac Expressway
16   Building 1, Suite 300
     Austin, Texas 78746
17   512-472-8021/512-320-5638 (fax)
     gseaquist@bickerstaff.com
18
     MS. ELIZABETH DORSEY
19   WALLER COUNTY DISTRICT ATTORNEY'S OFFICE
     645 12th Street
20   Hempstead, Texas 77445
     979-826-7718/979-826-7722 (fax)
21   e.dorsey@wallercounty.us
22
23 ALSO PRESENT:
24   Steven Lance
25
```

## Page 3

```
 1                   INDEX
                               PAGE
 2
   Appearances                   2
 3
   Stipulations                  5
 4
   Examination by Mr. Seaquist        5
 5    9:10 a.m. - 10:23 a.m.
      10:30 a.m. - 11:13 a.m.
 6    11:23 a.m. - 1:02 p.m.
      1:11 p.m. - 1:11 p.m.
 7
   Examination by Ms. Aden       172
 8    1:12 p.m. - 1:40 p.m.
 9 Changes and Corrections       201
10 Signature                     202
11 Reporter's Certification      203
12
             EXHIBIT INDEX
13
   NO.   DESCRIPTION           PAGE
14
15 1 Defendants' First Amended Rule 30(B)(6)  11
     Notice of Intention to Take the
16   Deposition of Plaintiff, The Panther
     Party
17 2 Plaintiff The Panther Party's Response  15
     and Objections to Defendant Waller
18   County's First Set of Interrogatories
19 3 Certificate of Filing of The Panther    16
     Party
20
21 4 The Panther Party Constitution and      18
     Bylaws
22 5 Notice Dated 03-28-2017 to Panther      19
     Party
23
24 6 Twitter Post Dated November 4, 2018     77
25 7 Twitter Post Dated August 19, 2018      82
```

## Page 4

```
 1        EXHIBIT INDEX (continued)
 2 NO.   DESCRIPTION           PAGE
 3 8 Twitter Post Dated October 9, 2018      89
 4 9 Screenshot Dated October 12, 2018      101
 5 10 Twitter Post Dated October 26, 2018   107
 6 11 Twitter Posts                         117
 7 12 Google Map                            131
 8 13 PVAMU Transportation Schedule         136
 9 14 2018 General Election Early Voting     152
      Locations
10
11 15 Twitter Posts                         155
12
13 16 Twitter Posts                         161
14
15 17 Prairie View A&M University Map        162
```

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 5

1         JOSHUA JAMIL MUHAMMAD,
2 having been first duly sworn, testified as follows:
3             EXAMINATION
4 BY MR. SEAQUIST:
5    Q.  Good morning, Mr. Muhammad.  My name is Gunnar
6 Seaquist.
7    A.  Uh-huh.
8    Q.  And I don't think you and I have met before
9 today.  Is that correct?
10    A.  No, sir, but pleasure to meet you.
11    Q.  Nice to meet you as well.  Thank you for your
12 time this morning.
13       MR. SEAQUIST:  Before we launch into it,
14 counsel for plaintiffs and defendants have conferred
15 prior to the deposition and agree to waive the reading
16 requirements of Federal Rule 30(b)(5).
17       Counsel, have I stated that correctly?
18       MS. ADEN:  That's correct.
19    Q.  (BY MR. SEAQUIST) Mr. Muhammad, will you give
20 us your full name for the record, please, sir?
21    A.  Joshua Jamil Muhammad.
22    Q.  Okay.
23    A.  Muhammad, M-u-h-a-m-m-a-d.
24    Q.  Thank you.
25       Are there any other names you go by?

Page 6

1    A.  Perkins, as a last name.
2    Q.  Okay.  I assume by that that your name at birth
3 was Joshua Perkins?
4    A.  Yeah, you can say that.
5    Q.  Okay.  And at some point you changed it to
6 Joshua Muhammad.
7    A.  Yes, religious reasons.
8    Q.  Understood.
9       At what point did you make that change,
10 sir?
11    A.  Well, my parents' name, when they became
12 Muslims, were Perkins; and so I was always technically
13 born with the name Muhammad.
14    Q.  Okay.  Thank you for explaining that.
15       But in terms of going by the name
16 Muhammad, at what age did you start going by the name
17 Muhammad?  Or have you always?
18    A.  I always went by the name Muhammad.
19    Q.  Understood.  Thank you, sir.
20       What's your current address, please?
21    A.  3106 Trail Lake Drive, Houston, Texas 77045.
22    Q.  And you are represented here today by counsel
23 for the NAACP Legal Defense Fund, Ms. Leah Aden,
24 correct?
25    A.  Yes.  And also Norton as well, too.

Page 7

1    Q.  Okay.  And we'll get to them.  Julie Harrison
2 is here from Norton Rose Fulbright?
3    A.  Yes.
4       MR. SEAQUIST:  Is that what it is now?
5       MS. HARRISON:  That's right, yeah.
6    Q.  (BY MR. SEAQUIST) Okay.  And Mr. John Cusick
7 from the NAACP Legal Defense Fund is also here, correct?
8    A.  Correct.
9    Q.  Okay.  Have you ever given a deposition before?
10    A.  No, sir.
11    Q.  All right.  A couple of ground rules.  First of
12 all, as you can tell, we've got our court reporter here.
13 She's trying to take down our conversation this morning.
14 So both you and I have to try not to talk over each
15 other.  Okay?
16    A.  Correct.  Understood.
17    Q.  So if you will -- I'm already doing it.  But if
18 you will, do your best to let me finish my question
19 before you give your answer and I'm going to do my very
20 best to let you answer the question fully before I ask
21 my next one so we're not talking over each other.  Okay?
22    A.  Understood.
23    Q.  Also, this is not a marathon.  If you need a
24 break at any time, let me know.  I'm happy to
25 accommodate you.  I would just ask that if there's a

Page 8

1 question on the table, you answer that one before we
2 take a break.  Okay?
3    A.  Makes sense.
4    Q.  If for any reason -- and I'm sure it will
5 happen at some point today -- I ask you a question
6 that's unclear, can I have your agreement that you'll
7 let me know that it's unclear or you don't understand
8 it?
9    A.  I will.
10    Q.  All right.  And if you'll do that, I'm happy to
11 rephrase it for you and make it clear.  But if you do
12 answer one of my questions, can we have an agreement
13 that you understood it and gave your very best answer?
14    A.  Yes, sir.
15    Q.  All right.  Thank you.
16       If at any point during the deposition
17 today you remember, you know, some information later on
18 to an earlier question or if there's something you need
19 to clarify, you're welcome to do that.  Just let me
20 know.  Okay?
21    A.  Yes, sir.
22    Q.  Also, for purposes of the record, a lot of
23 times when we are in conversation, we'll use nonverbal
24 cues, headshakes, head nods, or uh-huh and huh-uh.
25    A.  Uh-huh.

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 9

1  Q.  Today, just for purposes of the record, I'm
2  going to really need you to answer out loud and also to
3  say, you know, yes or no.  So if I prod you for that,
4  I'm not trying to be rude.  I'm just trying to get a
5  good record.  Okay?
6  A.  Makes sense.
7  Q.  Okay.  Is there any reason today that you'd be
8  unable to understand and truthfully answer my questions?
9  A.  No, sir.
10  Q.  Okay.  For example, you're not taking any
11  medications that would impair your ability to understand
12  or answer my questions?
13  A.  No, sir.
14  Q.  Okay.  Now, we've identified your counsel who
15  are here today.  Have you had an opportunity to meet
16  with them in advance of the deposition?
17  A.  Yes, I have.
18  Q.  Okay.  I don't want to know what you talked
19  about, but can you tell me how long you met with counsel
20  prior to this deposition?
21  A.  There was a meeting yesterday, probably an hour
22  or two.
23  Q.  Okay.
24  A.  And then a conference call, previous conference
25  calls, probably about less than an hour, 30 minutes to

Page 10

1  an hour.
2  Q.  Okay.  And in that meeting yesterday, was that
3  with the counsel that are here today?
4  A.  Yes.
5  Q.  Have you done anything else to prepare for this
6  deposition today?
7  A.  Looked over discoveries.  I also met with --
8  met with my counsel and met with members of The Panther
9  Party, who I'm here representing.
10  Q.  Did you -- you said you looked over the
11  discovery.  What discovery did you look at?
12  A.  The discovery that was requested from the
13  defense that I had to answer questions for.
14  Q.  Okay.  Did you bring any documents to your
15  deposition today?
16  A.  Yes.
17  Q.  What documents have you brought with you today?
18  A.  The discovery and -- yeah, the discovery and
19  some other questions that you all -- some items that you
20  all provided, the plaintiff -- the defense provided.
21  Q.  Okay.  Thank you.
22       Did you prepare any documents in
23  preparation for your deposition today?
24  A.  No.  Just looked it over, took some notes,
25  personal notes.

Page 11

1  Q.  You understand that you are here today to
2  testify as a designated representative of The Panther
3  Party?
4  A.  Yes.
5  Q.  And The Panther Party is a named plaintiff in
6  this lawsuit.
7  A.  Yes.
8  Q.  I'm going to mark --
9       (Exhibit No. 1 marked)
10  Q.  (BY MR. SEAQUIST) I'll hand you what I have
11  marked as Exhibit 1.
12       All right.  Exhibit 1 is the first amended
13  Rule 30(b)(6) notice of deposition for the deposition
14  this morning.  I think this is one of the documents that
15  you referenced as having reviewed prior to the
16  deposition.  Is that correct?
17  A.  Correct.
18  Q.  Okay.  And if we look at page four of Exhibit
19  1, there is a list of topics on which you've been
20  designated to testify today.  Do you see that?
21  A.  Yes.
22  Q.  Have you had an opportunity to review that
23  list?
24  A.  Yes.
25  Q.  And are you prepared today to testify on those

Page 12

1  topics?
2  A.  Yes.
3  Q.  We're here taking the corporate rep deposition
4  for The Panther Party today, but I'd like to get a
5  little background information on you first, if I could.
6       What year were you born, sir?
7  A.  I was born in 1990.
8  Q.  Okay.  And where were you born?
9  A.  Houston, Texas.
10  Q.  Did you grow up in Houston?
11  A.  Yes, sir.
12  Q.  What area of Houston did you grow up in?
13  A.  The south side.
14  Q.  Where did you attend high school?
15  A.  Bellaire High School.
16  Q.  What year did you graduate?
17  A.  2009.
18  Q.  Are you currently a student at Prairie View
19  A&M?
20  A.  No, sir.  I graduated December 2018.
21  Q.  Congratulations.
22  A.  Thank you.
23  Q.  You graduated 12 of '18.  What year did you
24  start Prairie View A&M, sir?
25  A.  Two thousand either fourteen or fifteen.

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 13

1    Q.  And did you attend Prairie View A&M
2  continuously during that period?
3    A.  Yes.
4    Q.  Until you graduated?
5    A.  Yes, sir.
6    Q.  What was your major?
7    A.  Electrical engineering.
8    Q.  How did you come to choose Prairie View as a
9  university?
10   A.  My mother went here.  And that's -- when I
11 switched my major to electrical engineering, I figured
12 they had one of the best engineering programs,
13 especially as an HBC, which is a historically black
14 college or university.
15   Q.  Had you gone to any universities or colleges
16 prior to coming to Prairie View?
17   A.  Houston Community College.  I got accepted into
18 the University of Houston but didn't go.
19   Q.  You mentioned that your mother was a PVAMU
20 alum?
21   A.  Yes.
22   Q.  Do you know what year she graduated?
23   A.  No.
24   Q.  Do you know roughly how old she is?
25   A.  Whatever -- she was born in 1961, so whatever

Page 14

1  that gets you.
2        MS. ADEN:  And, Gunnar, just for the
3  record, some of this, I'm not sure if that's outside of
4  the scope of his coming in his capacity as the 30(b)(6)
5  representative of the party.  But I'll give you some
6  leeway to see where it goes, but I just wanted to put
7  that on the record.
8        MR. SEAQUIST:  Okay.  I appreciate that.
9  I'm not going to go very deep into this.
10   Q.  (BY MR. SEAQUIST)  Any other members of your
11 family who were PVAMU alums?
12   A.  Some uncles, cousins.
13   Q.  When you were a student here, were you involved
14 in the Student Government Association?
15   A.  Yes, sir.
16   Q.  In what role, sir?
17   A.  I was a parliamentarian, senator, sat on the
18 executive board.
19   Q.  Okay.
20        All right.  You are here today as a
21 representative of The Panther Party.  My understanding
22 from the discovery is you are a cofounder of The Panther
23 Party --
24   A.  Correct.
25   Q.  -- at Prairie View A&M.

Page 15

1    A.  Correct.
2    Q.  Who is the other cofounder?
3    A.  Ervin Bryant.
4    Q.  Do you know?  Is Mr. Bryant still a student at
5  Prairie View A&M?
6    A.  I believe so.
7    Q.  And you -- or the plaintiffs in this case have
8  answered some interrogatory requests by the defendants
9  as it relates to The Panther Party.
10       (Exhibit No. 2 marked)
11   Q.  (BY MR. SEAQUIST)  I'm going to hand you what
12 I've marked as Exhibit 2.  And do you recognize Exhibit
13 2, sir?
14   A.  It looks like every other document, but I think
15 I do recognize it.
16   Q.  Do you recall -- and I don't want the substance
17 of the conversation, but do you recall being asked to
18 provide information to respond to the questions in that
19 document?
20   A.  Yes.
21   Q.  All right.  And did you, in fact, do so?
22   A.  Yes.
23   Q.  And were the answers you provided in response
24 to the interrogatories there true and correct?
25   A.  Yes.

Page 16

1    Q.  Okay.  When was The Panther Party formed?
2    A.  Officially?
3    Q.  Yes, please.
4    A.  It was formed in 2017, spring of 2017.
5    Q.  And what led you and Mr. Bryant to found The
6  Panther Party?
7    A.  It came after -- in 2015, after the Sandra
8  Bland incident.  Informally, it was a group of students
9  under the name The Panther Party working in that -- in
10 that regard.  And then the goal -- the scope expanded
11 into the interests of Prairie View as a whole.  And so
12 we decided we needed a platform to engage in that -- in
13 those interests and thus was born The Panther Party.
14   Q.  Okay.  How would you describe The Panther Party
15 as a group?
16   A.  You can call it a -- it's multifaceted.  You
17 can call it a quasi-political organization, call it a
18 community development organization.  We also do economic
19 development.
20       (Exhibit No. 3 marked)
21   Q.  (BY MR. SEAQUIST)  I'm handing you what I've
22 marked as Exhibit 3 to the deposition today.  Do you
23 recognize Exhibit 3, sir?
24   A.  Yes, sir.
25   Q.  Okay.  This is a document that was produced by

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 17

1  the plaintiffs to the defense in discovery.  It is a
2  certificate of filing of The Panther Party.  Is this
3  Exhibit 3 a true and correct copy of the certificate of
4  filing for The Panther Party?
5      A.  Yes, it looks correct.
6      Q.  And this indicates that the -- at least the
7  certificate of filing was dated and effective March 28,
8  27.  Do you see that?
9      A.  Yes, sir.
10     Q.  I'm sorry.  2017.
11     A.  Yeah.
12     Q.  And that's consistent with what you told us in
13  terms of the period of founding, correct?
14     A.  Spring 2017, correct.
15     Q.  Okay.  And so this document indicates that The
16  Panther Party is a domestic nonprofit corporation.  Is
17  that your understanding?
18     A.  Yes, sir.
19     Q.  Now, The Panther Party -- well, the plaintiffs
20  have also produced to us a document entitled "The
21  Panther Party Constitution and Bylaws".  Are you
22  familiar with that document?
23     A.  Yes, sir.
24     Q.  How did this -- how did the bylaws and
25  constitution come to be adopted?

---

Page 18

1      A.  Originally we wrote them when we first started
2  The Panther Party as initially a student organization.
3  Then there were probably some amendments in between
4  there in them.
5      Q.  Okay.
6          (Exhibit No. 4 marked)
7          (Discussion off the record)
8          MR. SEAQUIST:  All right.  Back on the
9  record.
10     Q.  (BY MR. SEAQUIST) We have marked Exhibit 4.
11  Have you seen the document that is Exhibit 4 before?
12     A.  Yes, sir.
13     Q.  Okay.  What is this document, sir?
14     A.  The Panther Party constitution and bylaws for
15  the student organization.
16     Q.  And you had mentioned earlier that there might
17  have been a prior version of this document?
18     A.  Yes, sir.
19     Q.  What date was -- does this document indicate it
20  was adopted?
21     A.  It was adopted March 28, 2018.  It was ratified
22  April 18, 2018.
23     Q.  To your knowledge, would this have been the
24  constitution and bylaws in effect after April 18th of
25  2018?

---

Page 19

1      A.  Yes, sir.
2      Q.  Are you aware of any other amendments or --
3  well, are you aware of any amendments to this document
4  since that time?
5      A.  No, sir.
6          MR. SEAQUIST:  I'm going to mark Exhibit
7  5.
8          (Exhibit No. 5 marked)
9      Q.  (BY MR. SEAQUIST) Mr. Muhammad, Exhibit 5,
10  which is plaintiffs -- Bates labeled Plaintiffs 324 to
11  326, is another document that was produced to us by the
12  plaintiffs.  It is a -- well, let me ask you.  Do you
13  recognize this document, sir?
14     A.  Yes.
15     Q.  And what is it?
16     A.  It's the -- it's a letter from the IRS with the
17  tax ID number.
18     Q.  Is this a true and correct copy of the IRS
19  notification to The Panther Party of its tax ID number?
20     A.  It looks official.
21     Q.  Okay.  The address here is Panther Party care
22  of Joshua Perkins.  Do you see that?
23     A.  Yes.
24     Q.  But that would be you, Mr. Muhammad?
25     A.  Yes.

---

Page 20

1      Q.  Okay.  And the address there is P.O. Box 2348,
2  Prairie View, Texas 77446?
3      A.  Correct.
4      Q.  Is that the mailing address for The Panther
5  Party?
6      A.  It was switched.  It's not the current mailing
7  address.
8      Q.  When was it switched, sir?
9      A.  I couldn't tell you.
10     Q.  Okay.  Did you initially establish this
11  address?
12     A.  Yes, sir.
13     Q.  And where is this P.O. box located?
14     A.  It's a post office.
15     Q.  Is that the post office at the edge of the
16  Prairie View campus?
17     A.  Yes, sir.
18     Q.  I'd like to talk for a minute about the
19  leadership structure of The Panther Party.
20          Your interrogatory responses indicate that
21  there is a president, vice-president, secretary, and
22  treasurer position.  Is that correct?
23     A.  Correct.
24     Q.  Are there any other leadership or officer
25  roles?

---

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 21

1    A.  For the registration for the State, as a
2  nonprofit, there is a board of directors, mainly for
3  oversight; and then for the actual student organization,
4  which most of the activity is ran through, there is
5  committee chairs.
6    Q.  How many people are on the board of directors?
7    A.  Three.
8    Q.  Let me ask you, now that you have graduated, do
9  you still consider yourself a member of The Panther
10  Party?
11    A.  Alumni member, but more so just for oversight
12  when it comes to being on the board of directors.
13    Q.  And that's my next question.  Are you still on
14  the board of directors?
15    A.  Yes.
16    Q.  And what's your formal title on the board?
17    A.  It's not necessarily a formal title, but just
18  one of the board of directors.  You can call it chairman
19  of the board.
20    Q.  Do you consider yourself the chairman of the
21  board of directors?
22    A.  Acting, yes.
23    Q.  And then there are two other board members?
24    A.  Yes.
25    Q.  Are any of the other board members named

Page 22

1  plaintiffs in this lawsuit?
2    A.  No.
3    Q.  Are the other board members current Prairie
4  View students?
5    A.  Yes.
6    Q.  So you're the only alumni board member.
7    A.  Correct.
8    Q.  How are board members chosen?
9    A.  Mainly with a vote of the board pretty much.
10  That's basically it.  There's different ways, but that's
11  mainly.
12    Q.  So the board elects its own members.  The
13  members don't -- excuse me.
14        The board elects its own members.  The
15  members of The Panther Party don't elect the board
16  members directly.
17    A.  Not necessarily, no.
18    Q.  Help me understand your answer.
19    A.  So I mean, you can have it to where -- it's
20  been the same since like the founding of it.  It's been
21  the same board members, because you had to have three
22  just to make a nonprofit corporation.  So there wasn't a
23  lot of formalities in establishing that.  The only thing
24  you needed was a -- pretty much a two-thirds vote.  But
25  then also the -- the body has a say-so, but they mainly

Page 23

1  elect the -- the E board of the student organization.
2    Q.  You said E board.  What do you mean?
3    A.  So a student organization at Prairie View.
4  There will be two components of The Panther Party.
5  There's the nonprofit corporation.  Then there's the
6  actual student organization.  So that's actually
7  registered on the campus at Prairie View.
8    Q.  Registered with whom?
9    A.  Student engagement, the university.
10    Q.  So it's actually registered as a student group
11  with the university.
12    A.  Yes.
13    Q.  Okay.  And does the board of directors for the
14  nonprofit oversee the student organization as well?
15    A.  There is some oversight.  It's more so there
16  for formality sake to be registered as a nonprofit
17  corporation.
18    Q.  Okay.  You mentioned, I think, a minute ago,
19  but I just want to make sure I understood you correctly,
20  that the board of directors for the nonprofit
21  corporation has been the same since its formation.
22    A.  Yeah.  There was like one change.
23    Q.  Okay.  What was -- when was that change?
24    A.  Probably last year.  I'm not sure of the exact
25  date.

Page 24

1    Q.  Okay.  But you've been on the board of
2  directors the whole time.
3    A.  Yes.
4    Q.  In the interrogatory responses you list the
5  current president as a Mr. Burton?
6    A.  Yes.
7    Q.  Can you tell me how to pronounce his first
8  name?
9    A.  Tajaun Burton.
10    Q.  When did he become the president of The Panther
11  Party?
12    A.  He started his term this semester.
13    Q.  "This semester" being fall of 2019?
14    A.  Yes.
15    Q.  Is he the president both of the nonprofit and
16  the student organization or is the president more one
17  organization or the other?
18    A.  President is mainly for the student
19  organization.
20    Q.  Prior to Mr. Burton, who was the president?
21    A.  A lady by -- an alumni by the name of Nia
22  Scott.
23    Q.  And do you know how long Ms. Scott's term was
24  or the dates for which she was the president?
25    A.  Only a semester.

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 25

1    Q.   So spring of --
2    A.   Twenty --
3    Q.   -- '19?
4    A.   I guess that would be right.  Was -- yes,
5  spring of 2019, correct.
6    Q.   Before Ms. Scott, who was the president?
7    A.   Ervin Bryant.
8    Q.   And what was his term, if you know, sir?
9    A.   He was fall of 2018.
10   Q.   Is it typical that a president only serves one
11 semester?
12   A.   No.  There was some administrative changes
13 happening in The Panther Party.
14   Q.   What were those?
15   A.   Some people were leaving, graduating, so we had
16 to shuffle some things around.  Some people just were --
17 as students, we got too busy, so --
18   Q.   So prior to Mr. Bryant who was the president?
19   A.   I was the president.
20   Q.   And how long were you the president?
21   A.   From the -- a full year, from fall -- whatever
22 the year was before that.  So that would be fall two --
23 no.  Spring -- no.  Fall 2017, I believe, to spring
24 2018.  I think that was it.
25   Q.   The current vice-president indicated in your

---

Page 26

1  interrogatory responses is a Mr. Maydrian Lowe?
2    A.   He was, but it's changed.  He also got too
3  busy.  He was the -- he was supposed to start his term
4  this semester, but he had a lot of other positions that
5  he was a part of, so we switched our vice-president.
6    Q.   So he started in the fall of '19, but it's been
7  switched since.
8    A.   Yes.
9    Q.   Okay.  Can you walk me back on the
10 vice-president -- who was the vice-president before
11 Mr. Lowe?
12   A.   Before Mr. Lowe, I believe Tajaun was the
13 vice-president and then he became the president.  Before
14 him, Antonious Brown was the vice-president.  And then
15 before him, Ervin Bryant was the vice-president.
16   Q.   So Mr. Bryant was the vice-president -- was
17 your vice-president, so to speak.
18   A.   Yes, correct.
19   Q.   And what were the dates that Mr. Bryant was the
20 vice-president?
21   A.   Same dates I was the president.
22   Q.   Okay.  So that's fall -- or spring of '17
23 through spring of '18.
24   A.   Yes, I believe that's correct.
25   Q.   And then after that, Mr. Brown -- do you know

---

Page 27

1  how long Mr. Brown was the vice-president?
2    A.   He was there for a semester as well, too.
3  Before he was vice-president, he served as a committee
4  chair.
5    Q.   Which committee was he the chair of?
6    A.   Political engagement.
7    Q.   We'll talk some more about the committee
8  structure in a little bit.
9         In your interrogatory responses, you've
10 indicated that there's a secretary position but that it
11 is empty at the moment.  Is that still the case?
12   A.   Yes.
13   Q.   Has there ever been a secretary?
14   A.   Yes.
15   Q.   When was that?
16   A.   In every year prior to this one.
17   Q.   Okay.  What is the role of the secretary?
18   A.   Meeting minutes, keep track of documentation,
19 the generic role of a secretary.
20   Q.   Other than meeting minutes, what type of
21 documents does The Panther Party maintain?
22   A.   Meeting minutes, meeting agendas, some of the
23 documents that I provided when it comes to constitution
24 and bylaws, those mainly documents.
25         THE REPORTER:  I'm sorry?

---

Page 28

1         THE WITNESS:  Some of the documents I
2  provided when it comes to constitution and bylaws, I
3  guess just generic organizational documents.
4    Q.   (BY MR. SEAQUIST) Do you maintain copies of
5  materials that the organization has had printed or
6  prepared in the past?
7    A.   Yes.  Flyers, if -- I believe that would be, to
8  more clarify in answer to your question.
9    Q.   So if there's some sort of an informative --
10 information flyer or other document, that's something
11 that The Panther Party would keep a copy of?
12   A.   Copy as in, if it's used on our social media,
13 it might not be.  It may be in a folder somewhere.  But
14 if there is a flyer, we would probably post it on social
15 media.
16   Q.   Does the -- how does The Panther Party store
17 its documents?
18   A.   We have a Dropbox.
19   Q.   Is there any physical cabinet space or filing
20 system?
21   A.   There's probably some loose papers somewhere
22 around somewhere; but outside of that, we try to keep
23 everything digitized.  It makes it easier for us to get
24 to it.
25   Q.   Sure.

---

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 29

1          Who was the secretary in the fall of 2018,
2  if you know?
3      A.  I cannot remember.
4      Q.  That's something we could figure out if we
5  needed to?
6      A.  Probably so.
7      Q.  Your interrogatory responses also indicate that
8  there is a treasurer position but it is unfilled at the
9  moment as well.  Is that true?
10     A.  Correct.
11     Q.  Has it been filled -- has there previously been
12 a treasurer?
13     A.  Yes.
14     Q.  When was the last time -- or when has there
15 been a treasurer?
16     A.  There was one last year.
17     Q.  So in the 2018 to 2019 year there was a
18 treasurer?
19     A.  Yes.
20     Q.  Was there a treasurer in the 2017 to 2018 year?
21     A.  Correct.
22     Q.  Was that the same person?
23     A.  I don't think it was the same person.
24     Q.  Do you know who the treasurer was for 2018 to
25 2019?

---

Page 30

1      A.  I believe it was -- his name is Isaiah Hubbard.
2      Q.  And what is the role of the treasurer?
3      A.  Look over and maintain financial documents,
4  accounts payable, accounts receivable.
5      Q.  Your interrogatory responses indicated that The
6  Panther Party has a bank account.
7      A.  Yes.
8      Q.  Is that in the name of the nonprofit
9  corporation or the student organization?
10     A.  It's the same name.
11     Q.  What bank do you use?
12     A.  It's called Azlo.
13     Q.  Could you spell that for me?
14     A.  A-z-l-o.
15     Q.  Is that an online institution or is there a
16 branch around here?
17     A.  It's mainly online.  I know it's backed up, I
18 believe, by BBVA; but it's mainly online.
19     Q.  Do you know if there's a BBVA branch here in
20 Prairie View?
21     A.  No, I don't know.  I don't know if there is
22 one.
23     Q.  To your knowledge, does The Panther Party ever
24 have to go do physical banking at a branch?
25     A.  Not really.  We try to not really take a lot of

---

Page 31

1  cash, so mainly digitized -- digital currencies.  Well,
2  not digital currency.  That's bitcoin.  But we mainly
3  keep everything online.
4      Q.  Who in the organization is responsible for
5  approving expenditures?
6      A.  It's a combination of the E board mainly and
7  then our advisors look over it as well, too.  We have
8  student -- faculty advisors on campus.
9      Q.  Who -- let's start when it was founded.  Who
10 was the faculty advisor -- well, let me ask you this.
11 When did you first -- when did the organization first
12 get a faculty advisor?
13     A.  It had to have been in 2018.
14     Q.  Who was that person?
15     A.  It was Steve Ransom.
16     Q.  And what is Mister or perhaps Doctor -- I don't
17 know -- Ransom's position with the university?
18     A.  He's not a -- he just got a promotion, so
19 congrats to him.  But I think he's the VP of something.
20 They have a lot of vice-presidents at Prairie View, so
21 I'm not sure.
22     Q.  So is he an administrator and not a faculty
23 member?
24     A.  Yeah, he's an administrator.
25     Q.  Okay.  Since Steve Ransom, have there been any

---

Page 32

1  other faculty member advisors -- or excuse me,
2  university employee advisors?
3      A.  The advisor for this year is Mr. Jackson, Frank
4  Jackson.  I believe he's governmental affairs.
5      Q.  And did Mr. Jackson just assume the role of
6  faculty -- or of university advisor for The Panther
7  Party this year?
8      A.  Formally, yes.
9      Q.  In the fall of 2018 was the advisor still
10 Mr. Ransom?
11     A.  Yes.
12     Q.  Other than that advisor position that
13 Mr. Ransom held and that Mr. Jackson currently holds,
14 are there any other positions within The Panther Party
15 that are held by Prairie View employees?
16     A.  No.
17     Q.  Is the -- you mentioned that the student
18 organization had to be registered with the school; is
19 that correct?
20     A.  Yes.
21     Q.  Does it receive any financial support from the
22 school?
23     A.  You can apply for financial support.
24     Q.  Has that happened?
25     A.  Yes.

---

512-743-5867        Cooley Reporting        512-410-3012 (fax)
Jcooleycsr@gmail.com

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 33

1  Q.  And has the school awarded The Panther Party
2  any financial support to your knowledge?
3  A.  I believe so.
4  Q.  Do you remember what the circumstances of that
5  were?
6  A.  I know it's probably for an event.  So mainly
7  student organizations will apply for funding from SGA.
8  I'm not -- I'm not actually sure which event it was, but
9  I'm pretty sure we got money from SGA for something.
10  Q.  And when the organization is going to apply for
11  funding from the SGA or from another branch of the
12  school, who oversees that or coordinates that process?
13  A.  The E board.
14  Q.  And when the school awards some piece of
15  funding, it's -- is it typically for just a specific
16  event or purpose?
17  A.  Mainly, yes.
18  Q.  So funds earmarked for something.
19  Q.  What do you -- can you clarify that?
20  Q.  Yes.
21      The university doesn't just give The
22  Panther Party funds just to use in any way it sees fit.
23  A.  No.
24  Q.  Is that fair?
25  A.  No, sir, they don't give us funds that way.

Page 34

1  Q.  So when they give you funds, it's because
2  you've applied for it with a stated purpose and they've
3  approved that and given you the funds to use for that
4  reason.
5  A.  Correct.
6  Q.  Your interrogatories say that in the fall of
7  2018 The Panther Party had approximately 20 members.  Is
8  that correct?
9  A.  Yes.
10  Q.  Does The Panther Party maintain a membership
11  list?
12  A.  Yes, we maintain a -- we maintain membership
13  lists.
14  Q.  Okay.  What type of information is contained on
15  that list?
16  A.  Mainly just names and e-mails.
17  Q.  Do you gather addresses?
18  A.  Not really, no.
19  Q.  Do you indicate in any way whether the
20  particular member lives on campus versus off campus?
21  A.  No.
22  Q.  Do you gather information or indicate in any
23  way in your membership list whether a member is a
24  registered voter?
25  A.  No.

Page 35

1  Q.  Do you know what the current -- well, let me
2  ask it this way.  Is the current membership number about
3  the same, around 20?  Has it grown?
4  A.  The semester just started, so it's -- I'm not
5  sure right now, but that's something I'll have to check.
6  Q.  Okay.  Is there a lot of variability year to
7  year in terms of the membership numbers?
8  A.  Yes, based on people graduating, if they paid
9  their dues.  And then you have people still being
10  associated with the Panther Party, but they may not be
11  technically a member.
12  Q.  Are there any other alumni members?
13  A.  Not necessarily members, but alumni who were
14  once members who are still associated with The Panther
15  Party.
16  Q.  What do you mean by associated with it?
17  A.  I mean there's a GroupMe.  So they're still in
18  the GroupMe.  We don't kick them out.  But they don't
19  necessarily have the full rights of a student member
20  because they're not students anymore and they're not
21  here, so --
22  Q.  You said a GroupMe.  Can you tell me what that
23  is?
24  A.  GroupMe is a communication app, like a chat
25  room of sorts.  It's used mainly for organizations or

Page 36

1  classes.
2  Q.  And so that's something that all current
3  members have access to?
4  A.  Yes.
5  Q.  And former members have access -- or have
6  access to it as well.
7  A.  Yes.
8  Q.  All right.  So of those 20 members, that
9  includes you, correct?
10  A.  Yes.
11  Q.  Mr. Bryant?
12  A.  Are you talking about currently or are you
13  talking about in the past?
14  Q.  Well, do you consider yourself a current member
15  or no?
16  A.  Not necessarily.
17  Q.  Okay.
18  A.  Not a student member.
19  Q.  Let me ask it this way.  Are each of the named
20  plaintiffs in the lawsuit -- and that is, Jayla Allen,
21  Treasure Smith, and Damon Johnson -- are they current
22  members of The Panther Party?
23  A.  Treasure was a -- is a former member.  Jayla is
24  still associated.  We haven't collected dues yet, so I
25  guess there's not a -- they're not members yet.  Damon

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 37

1    Johnson, I haven't -- I'm not sure about him.
2        Q.   Okay.  So other than those folks, though, so
3    I'm clear, although there may be some alumni who are
4    associated with or still have access to the GroupMe, as
5    far as the actual membership, you have to be a current
6    Prairie View student.
7        A.   Yes.
8        Q.   You indicated in your interrogatory responses
9    the application process to join The Panther Party was to
10   attend an entrance meeting.  Is that right?
11       A.   Interest meeting.
12       Q.   Interest?
13       A.   Yeah, interest meeting, or a general body
14   meeting.  It doesn't have to necessarily be an interest
15   meeting.
16       Q.   So just one of the -- the general meetings of
17   the organization.
18       A.   Yes.
19       Q.   You come to a meeting.
20            Okay.  After that, it says you can sign up
21   by giving a student -- the student can sign up by giving
22   their name and e-mail address.  Is that right?
23       A.   Correct, mainly.
24       Q.   And then you mentioned a moment ago that there
25   are dues.  In your interrogatory responses, you said

Page 38

1    that there's a 10-dollar annual fee for members.
2        A.   It may be annual or semesterly.  It can change
3    by year.  I believe it was annual when I was president.
4    I think it might have changed to semesterly the year
5    after.
6        Q.   But you haven't always collected that fee; is
7    that right?
8        A.   No.  Sometimes we waive them.
9        Q.   Do you know whether you collect -- whether The
10   Panther Party collected the membership fee in 2017 to
11   2018?
12       A.   I'm not sure.
13       Q.   Do you know what the total amount of dues
14   collected by The Panther Party in 2017 to 2018 would be?
15       A.   I wouldn't know that right now.
16       Q.   Okay.  I think you indicated in your
17   interrogatory responses that The Panther Party waived
18   the membership fee in 2018 to 2019.  Is that correct?
19       A.   Yes, I believe that was the year we waived --
20   the semester we waived it.
21       Q.   So to your knowledge, The Panther Party
22   collected no dues in 2017 to '18.
23       A.   For -- it was a semester.
24       Q.   I'm sorry.  2018 to 2019.  It was -- the dues
25   were waived for one semester?

Page 39

1        A.   I believe it was just a semester.
2        Q.   Do you remember which semester that was?
3        A.   Maybe fall 2018 going into 2019.
4        Q.   And do you know whether The Panther Party has
5    collected dues in the current year?  That would be
6    either the spring of 2019 or the fall of 2019.
7        A.   I don't believe we've collected in fall 2019.
8        Q.   Do you know about the spring?
9        A.   No, I don't think we collected dues in the
10   spring.
11       Q.   Do you know whether there's a plan to
12   collect -- never mind.
13            You mentioned in the interrogatories, I
14   think, that The Panther Party also received some
15   donations.  Is that right?
16       A.   Yes.
17       Q.   Can you tell me how much in donations The
18   Panther Party received in 2017 to 2018?
19       A.   I guess it would be -- the main donation, I
20   believe, would be one from Mike Siegel of $200.
21       Q.   Other than that one, can you think of any other
22   donations?
23       A.   It might have been like -- we do community
24   service events, so sometimes they'll give us like five
25   dollars, 10 dollars, whatever have you, but I'm not sure

Page 40

1    of just the total right now.
2        Q.   Who at The Panther Party is responsible for
3    keeping track of donations that have been made?
4        A.   It would be the treasurer for whatever that
5    term was.
6        Q.   And Mr. Siegel, from your interrogatories, I
7    believe, made that donation of $200 in the fall of 2018.
8    Is that correct?
9        A.   Yes, I believe that's correct.
10       Q.   You say in your interrogatory responses that
11   that donation was for the specific purpose of conducting
12   voter registration.  Is that right?
13       A.   Correct.
14       Q.   Who is Mike Siegel?
15       A.   He was a candidate for, I believe, District 10
16   in Texas.  I think it was District 10.
17       Q.   House of Representatives candidate?
18       A.   Yeah, I believe so.
19       Q.   Do you know whether he was a Republican or
20   Democrat?
21       A.   I believe he was a Democrat.
22       Q.   Do you know whether that person -- that
23   donation was from him personally or from his campaign?
24       A.   I would believe it was from the campaign.
25       Q.   And so just to be clear for the record,

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 41

1 Mr. Siegel was a candidate for the 2018 general
2 election.
3     A.  Yes.
4     Q.  Now, your interrogatory responses state that
5 The Panther Party did, in fact, spend that $200 to
6 purchase food as part of a freshman voter registration
7 event.  Is that right?
8     A.  Yes, sir.
9     Q.  Did you use all the donation for voter
10 registration?
11    A.  Yes, sir.
12    Q.  And to be clear, can you tell me any other
13 donations that The Panther Party received in advance of
14 the 2018 election?
15    A.  That's the only one that comes to mind.
16    Q.  Do you know what the balance of The Panther
17 Party bank account was at the beginning of the school
18 year in September of 2018?
19    A.  No.  In the bank account?
20    Q.  Yes, sir.
21    A.  I don't remember off the top, but it's probably
22 really close to zero.
23    Q.  Is that typical that you guys don't maintain
24 much in the bank account?
25    A.  Yes.

Page 42

1     Q.  Does The Panther Party maintain banking
2 statements for the account?
3     A.  Yeah, electronically.  The bank provides them.
4     Q.  Okay.  Do you know -- you told us a little bit
5 earlier about how the university can at times contribute
6 funding to The Panther Party.  Do you know whether
7 Prairie View A&M or the A&M System awarded any funds to
8 The Panther Party in the fall of 2018 for the --
9     A.  No.  I think -- outside of SGA, I don't think
10 we got any funding.
11    Q.  Okay.  Do you remember what the SGA funding was
12 for?
13    A.  I think we collabbed on an event.
14    Q.  Do you know what event that was?
15    A.  It was, I believe, a voters party.
16    Q.  Was that the voters party -- how many voters
17 parties has The Panther Party held?  Do you know?
18    A.  Two.
19    Q.  And when were they?
20    A.  One was in 2018 and I believe one was in two
21 thousand -- either spring 2018 or fall 2017.
22    Q.  Was there one -- it looked like, from the
23 interrogatory responses, one was in April of '18.  Does
24 that sound right?
25    A.  That sounds correct.

Page 43

1     Q.  So following the 2018 primary.
2     A.  Yes, 2018 primary.  I think also it would be --
3 the local city elections were around that same time.
4     Q.  And then the other one you think was in 2017?
5     A.  Well, no.  It was -- if one was in April of
6 2018, then the other one was in spring -- no, fall of
7 2018.
8     Q.  Okay.  After the general election as well.
9     A.  Yes.
10    Q.  And what is a voter party?
11    A.  Just a party to galvanize around voting.
12    Q.  And it's specifically for people who can show
13 that they voted in one of the elections?
14    A.  Well, it was originally that way, but I believe
15 there was like some legal discrepancy, so we opened it
16 up to everybody because I think it was -- we couldn't do
17 that or something.
18    Q.  That wasn't a gotcha question, by the way.
19    A.  Yeah.
20    Q.  Other than the donation from Mr. Siegel and the
21 money for the voter party from the SGA, any other
22 donations of any kind that The Panther Party would have
23 received in advance of the 2018 general election?
24    A.  Outside of maybe some -- well, we collect dues.
25 So maybe outside of me coming out of my pocket for like

Page 44

1 some miscellaneous things, that's about it.
2     Q.  When you pay for things out of your pocket, are
3 you reimbursed --
4     A.  No.
5     Q.  -- by the organization?
6     A.  No, not for the most part.
7     Q.  If I wanted to know -- excuse me --
8 specifically, you know, each of the donations and/or
9 income for The Panther Party, what would be the best
10 source for me to get that information?
11    A.  It would either be -- we have a few transaction
12 platforms.  So either it would be -- the bank account
13 will show a statement based off of like a deposit.  It
14 would be CashOut, PayPal.  Depending on how they pay,
15 you can find a receipt or a transaction record for
16 something.
17    Q.  Okay.  And the same question, but just so we're
18 clear, if I wanted to know each of the expenditures that
19 The Panther Party made, for example, in advance of the
20 2018 general election, what would be the best source for
21 me to look at for that?
22    A.  It would be the same ones.
23    Q.  Okay.  So I mean, obviously you've been
24 designated here to testify today on financial activities
25 of The Panther Party, but that's not something that

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 45

1  you're going to remember every transaction, right?
2      A.  Correct.
3      Q.  As I understand it -- and maybe you can explain
4  it to me better.  But The Panther Party essentially has
5  three mission areas; is that right?
6      A.  Correct.
7      Q.  And it looks like those are community
8  development, economic development, and political
9  engagement.
10     A.  Correct.
11     Q.  And you have talked a couple of times about
12  committees.  From reading your discovery, it appears to
13  me that there is an executive committee for each of
14  those areas.  Is that right?
15     A.  There's a committee chair.  There may be a
16  co-chair if they choose one.
17     Q.  Okay.  So let me -- help me just understand a
18  little better the committee structure of The Panther
19  Party.
20          Is it one committee that has chairs from
21  each of those areas or are there separate committees
22  within --
23     A.  There's -- there's separate committees with a
24  chair for each committee.
25     Q.  Okay.  And in addition to the chair, how many

---

Page 46

1  members sit on those committees?
2      A.  It just depends.  Anybody can join a committee.
3      Q.  Do you know generally kind of a number that the
4  committees will have?
5      A.  Somewhere between maybe five to 10.
6      Q.  Is it fair to say that the issues that we're
7  discussing in this case, voter registration, voter
8  drives, outreach, voting activities, fall under the
9  political engagement component of The Panther Party's
10  activities?
11     A.  Political engagement and community development.
12     Q.  So economic development -- the economic --
13  economic development activities of The Panther Party
14  don't really relate to what we're here talking about
15  today.
16     A.  I mean, there would be some overlap, but I
17  think the main primary ones would be political
18  engagement and community development.
19     Q.  Does The Panther Party have regular meetings?
20     A.  Yes.
21     Q.  How often?
22     A.  Depending on whatever the E board that year
23  wants to do their meetings.  It might be weekly,
24  biweekly.  There may be a weekly -- biweekly general
25  body meeting and then the off weeks would be E board

---

Page 47

1  meetings.  It just depends.
2      Q.  Do you -- does the organization keep a record
3  of the meetings that it's held?
4      A.  We have some meeting minutes and agendas.  Some
5  meetings were informal.  Some meetings were formal.
6      Q.  What about past calendars that show when
7  meetings were held even if they were informal?
8      A.  Probably maybe a Google calendar or it may be
9  like in the GroupMe.  You can set a meeting date.  So it
10  just depends.  It could be word of mouth.
11     Q.  So although The Panther Party meets regularly,
12  is it fair to say that it can be variable as to when
13  those meetings actually occur?
14     A.  Yes, because it might be a week like midterms.
15  There won't be a meeting then.
16     Q.  Do you guys meet over the summer?
17     A.  We'll have -- like the E board have some
18  conversations over the summer, but there won't
19  necessarily be a general body meeting because the
20  students aren't here.
21     Q.  Do you know roughly how many meetings The
22  Panther Party will have over the course of a semester?
23     A.  Course of a semester?  Maybe 10.
24     Q.  Your interrogatory responses say that there's
25  no set meeting place.  Is that right?

---

Page 48

1      A.  Correct.
2      Q.  So as a time for a meeting comes up, you guys
3  just look around to locate a room to use?
4      A.  We probably have a room we usually go to.  Like
5  right now we meet in the business building; but if that
6  room is taken, then we'll find -- we'll find somewhere
7  else.
8      Q.  Who do you work with at the university to
9  schedule a room?
10     A.  Sometimes we just go to a room, an open room.
11  Sometimes we'll actually go through what's called PVPaw
12  Link, which is the platform by which -- under student
13  engagement, by which you actually book a room.  We'll
14  mainly do that for larger events that we need to
15  solidify a room for.
16     Q.  Are the meetings always held on campus?
17     A.  I would say yes, generally.
18     Q.  Can you think of a time where you ever met off
19  campus?
20     A.  We maybe met at somebody's house.
21     Q.  Do you remember an occasion where that
22  occurred?
23     A.  Not off the top of the head.  But I mean, I'm
24  pretty sure it may have happened.
25     Q.  How is the agenda for the meeting set?

---

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 49

1    A.  Usually the president will get with the
2  secretary and they'll look at the old business -- well,
3  the new -- the old and new business from the last
4  meeting and bring it over and then add any from anybody
5  that had any recommendations to add to the agenda and
6  then that would be pretty much it.
7    Q.  How do you provide notice of the meetings to
8  the members?
9    A.  Mainly GroupMe.
10    Q.  What's the typical attendance in terms of
11  numbers for a general meeting?
12    A.  Probably somewhere between 10 to 20.
13    Q.  How long does a general meeting typically last?
14    A.  If I'm over, I try to have my meetings less
15  than an hour because I don't like long meetings.
16    Q.  Do the executive committees or the area
17  committees that we had talked about previously -- do
18  they have their own separate meetings?
19    A.  Yes.  E board has their own separate meetings.
20    Q.  Does, for example, the political engagement
21  committee have its own separate meetings?
22    A.  Informally they'll probably meet with their
23  committee.  Sometimes we'll have it to where during the
24  general body meeting the first half will be general body
25  business and then we'll have breakout sessions for the

Page 50

1  committees.
2    Q.  Do you know how many people there were on the
3  political engagement committee in the fall of 2018?
4    A.  Probably somewhere between five and 10.
5    Q.  Were you or any of the other named plaintiffs
6  in the suit on the political engagement committee in the
7  fall of '18?
8    A.  I believe I was on the political engagement
9  committee.  Was I president that year?  I was -- I was
10  on the political engagement committee.  Jayla Allen may
11  have been on the political engagement committee.
12    Q.  To your recollection, Treasure Smith was not?
13    A.  She may have been on the political engagement
14  committee.
15    Q.  Do you know one way or the other?
16    A.  No.  Because you can -- you can fluctuate
17  between committees, so it's not something that's just
18  set in stone.  Once you get added to the GroupMe for
19  that committee, you're pretty much like all on the
20  committee now.
21    Q.  In terms of the activities of the organization,
22  are those effectively planned and operated by the
23  committees?
24    A.  Yeah, most of the activity is through the
25  committees.  And then the president is mostly the

Page 51

1  facilitator of everything.
2    Q.  For example, if The Panther Party, you know,
3  wants to hold a voter registration event, can you walk
4  me through how that would take place?
5    A.  It would be one of two ways.  Anybody can
6  recommend a voter registration event.  And then based
7  off what type of an event it is -- so if it's voter
8  registration, that's a political engagement deal, so we
9  would delegate it to that committee.  But it would be a
10  whole organizational decision for the most part, but it
11  would be spearheaded by the political engagement
12  committee.
13    Q.  Okay.  Who would be responsible for planning
14  the event?
15    A.  Pretty much for that it would be the political
16  engagement chair with the collaboration of the E board
17  to make sure you book the room or book the environment
18  at the time, whatever else you need.
19    Q.  Who was the political engagement chair at the
20  time of the 2018 election?
21    A.  The 2018 election political engagement chair,
22  it may have been Maydrian at that time.  I believe it
23  may have been Maydrian.
24    Q.  That's Maydrian Lowe?
25    A.  No, no, no.  I'll go back.  It wasn't Maydrian.

Page 52

1  It was -- it was filled by Antonious Brown.  He was the
2  VP, but he was also acting political engagement chair.
3  I think Maydrian came later.
4    Q.  When The Panther Party or the political
5  engagement committee holds an event such as a voter
6  registration event, are members assigned to be there to
7  participate in it?
8    A.  They're encouraged.
9    Q.  Okay.  Is it on a voluntary basis?
10    A.  Yeah.
11    Q.  So there's no requirement, for example, for
12  purposes of maintaining membership, that you attend an
13  event.
14    A.  Not necessarily.
15    Q.  What do you -- what do you mean "not
16  necessarily"?
17    A.  There's no like set rule that if you don't come
18  to an event, we're going to kick you out.
19    Q.  Okay.  Has anybody ever been dismissed, I
20  guess, from the organization based on nonparticipation?
21    A.  No.
22    Q.  You were the president in November of 2017?
23    A.  I believe that's correct.
24    Q.  There was an election in November of 2017; is
25  that right?

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 53

1    A.  Yes.
2    Q.  Do you happen to remember the subject of that
3  election?
4    A.  No.
5    Q.  If I told you there was a constitutional
6  amendment election for the State constitution, does that
7  ring any bells?
8    A.  That sounds like it may ring a bell.
9    Q.  Okay.  There was also a bond election in
10  November of 2017.  Do you remember that?
11    A.  I remember the bond election.
12    Q.  I believe it was a jail bond election?
13    A.  Yes.
14    Q.  All right.  What political engagement
15  activities, if any, did The Panther Party undertake in
16  relation to that 2017 general election?
17    A.  I remember we went to spread some information.
18  We did a forum on campus about it.  I believe some
19  students went to a meeting about it for more information
20  in that same semester.
21    Q.  The forum that you did, was that in conjunction
22  with some other student groups?
23    A.  Yes.
24    Q.  Was that something that The Panther Party paid
25  for?

Page 54

1    A.  No.
2    Q.  Did any of The Panther Party members present at
3  that forum to your recollection?
4    A.  We might -- I think I might have spoke at it or
5  did some introductories, things like that.
6    Q.  You said you thought -- what was the purpose of
7  that forum?
8    A.  Educational.
9    Q.  Who attend -- who was it presented to?
10    A.  Student body, community members, pretty much
11  open to the public, anybody who was interested.
12    Q.  Where was it held?
13    A.  It was on campus in the Juvenile Justice
14  Building.
15    Q.  And you said that you also thought that some of
16  your members may have gone to a meeting to get more
17  information?
18    A.  Yes.
19    Q.  What meeting are you referring to?
20    A.  It was an informational about the bail bond --
21  not the bail bond.  The bond.
22    Q.  The jail bond?
23    A.  The jail bond.
24    Q.  Who was presenting or putting on that meeting,
25  if you recall?

Page 55

1    A.  Waller County officials.  I believe Judge Trey
2  Duhon was there and some other people, maybe Jeron
3  Barnett, Commissioner Barnett.
4    Q.  Do you remember whether in 2017 The Panther
5  Party did any voter registration events for the November
6  2017 election?
7    A.  I believe we did.  We always -- if there's a
8  voting election around, we probably did a voter
9  registration event.
10    Q.  Okay.  And when The Panther Party does a voter
11  registration event, that's something wherein you'll
12  apply for funds from the university?
13    A.  No.  We probably don't need funds.  It will
14  probably be between just people volunteering their time.
15  It may be a collaboration with another organization.
16  But pretty much we don't really come out of pocket for
17  those things.  We don't have to, unless we're buying
18  food or something, but we don't do that all the time.
19    Q.  Is it fair to say that you only buy food when
20  you've gotten a donation to cover it?
21    A.  No.  Sometimes we buy food if we just have some
22  money and we want to have some food there to attract
23  students because, you know, we like to eat.
24    Q.  I remember that.
25    A.  Yes.

Page 56

1        MS. ADEN:  Universal.
2        MR. SEAQUIST:  That's right.
3    Q.  (BY MR. SEAQUIST) Are you doing okay?
4    A.  I'm good.
5    Q.  Okay.  In conducting voter registration events,
6  you talked a little bit about it in terms of Panther
7  Party members volunteering; but what specifically does
8  The Panther Party do at its voter registration events?
9  What does that look like?
10    A.  We'll get a table, post up somewhere, have the
11  forms that we get from Waller County and, you know, get
12  people to fill them out.  We'll get deputized before
13  that.  Members will get deputized before that so they
14  can be the ones to register people.
15    Q.  How do your members get deputized?
16    A.  Waller County has hosted different deputizing
17  events on campus.
18    Q.  And do you know generally who presents those
19  events?
20    A.  No.  I mean, it would be the -- somebody in the
21  elections office, but it would be different people.
22    Q.  Do you -- does The Panther Party work in
23  connection with any other groups when it provides voter
24  registration events?
25    A.  Yes.

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 57

1    Q.  And who are those?
2    A.  There's a lot of them.  The SGA, the NAACP.
3  There's a lot.
4    Q.  Do you also work with the county elections
5  office?
6    A.  Yes.
7    Q.  Do you know the current election -- do you know
8  who the current elections administrator is?
9    A.  Is it Christy Eason?
10   Q.  Yes.  Do you know Ms. Eason?
11   A.  Not personally.  I've had two conversations
12  with her.
13   Q.  Have you personally attended any of the -- of
14  Ms. Eason's presentations for training deputy
15  registrars?
16   A.  I've attended some.  I don't know if she was
17  the one that was over it.  But I've been to one for the
18  elections office.
19   Q.  Has the County consistently sent someone from
20  the elections office out to Prairie View to conduct
21  registration training?
22   A.  Yes, mainly based -- either they will come or
23  based off our request.
24   Q.  And to your knowledge, members of The Panther
25  Party have taken that deputy registrar training.

---

Page 58

1    A.  Yes.
2    Q.  Other than the registration drive and the forum
3  we discussed, did The Panther Party engage in any other
4  political engagement activities for the 2017 jail bond
5  election?
6    A.  No.  Voter registration, community forums,
7  general information.  That's pretty much the main things
8  we do.
9    Q.  When you say "general information," how does
10  The Panther Party disseminate general information?
11   A.  Social media, GroupMe, flyers, mouth to -- what
12  is it?  Mouth -- mouth -- what am I saying?  Mouth to --
13        MS. ADEN:  Word of?
14        THE WITNESS:  Word of mouth.
15        MS. ADEN:  Sorry.
16        MR. SEAQUIST:  That's all right.  Team
17  effort.
18        MS. ADEN:  That one I knew.
19        THE WITNESS:  I'm thinking of something
20  else.
21   Q.  (BY MR. SEAQUIST) To your recollection, did you
22  or -- well, as a representative of The Panther Party,
23  did you or any other members of The Panther Party attend
24  any meetings of the Waller County Commissioners Court in
25  advance of the November 2017 election?

---

Page 59

1    A.  I may have been to one or a few.  I'm not
2  totally sure of the exact one.  I think I've been there
3  before, though.
4    Q.  Okay.  Do you remember specifically going as it
5  relates to the November 2017 election?
6    A.  No.  I think I -- it might have just been a
7  general meeting about something else and I just wanted
8  to be informed.
9    Q.  Okay.  How often -- well, how many
10  Commissioners Court meetings would you say you've been
11  to?
12   A.  Me personally?  It would be less than a
13  handful.  As an organization, I know members of the
14  organization have been there.
15   Q.  And the Commissioners Court meets at the county
16  courthouse, correct?
17   A.  Yes.
18   Q.  In Hempstead?
19        When you were a student on campus, did you
20  have a vehicle?
21   A.  I did.
22   Q.  Do you know -- well, did The Panther Party talk
23  to or otherwise communicate with any officials or
24  employees of Waller County in advance of the 2017
25  election?

---

Page 60

1    A.  Say that again.
2    Q.  Sure.
3        Did The Panther Party -- and again, I'm
4  asking you as the representative -- have any formal
5  communications with any employees or officials of Waller
6  County?
7    A.  What do you mean by formal?  What do you mean
8  by that?
9    Q.  Well, on behalf of the organization.
10   A.  I believe so.
11   Q.  Okay.  What do you remember about that?
12   A.  I mean, I believe we probably reached out to
13  Christy Eason.  We probably talked to some of the
14  Commissioners.
15   Q.  About the 2017 election?
16   A.  2017 election?
17   Q.  Yeah.
18   A.  That's kind of far back.  I really don't
19  remember if there was any specific -- the specific
20  conversation.  But I'm pretty sure we're always in the
21  loop somehow, so --
22   Q.  Okay.  To your recollection -- well, let me ask
23  you this.  Do you know whether The Panther Party
24  advocated for any additional voting locations in Waller
25  County for the November 2017 election?

---

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 61

1   A.  I believe that issue came up.  I'm not sure.
2  It probably wasn't the same issue that was in the last
3  election.  But I believe the issue did came up and we
4  did want early voting.  I believe we might have had it.
5   Q.  Okay.  You don't remember any particular issues
6  around early voting as it related to the 2017 election.
7   A.  Not any particular issues, but I will say that
8  pretty much every election there's always an issue
9  around voting, access to voting, especially on campus.
10  So I believe -- there was -- there was something -- I'm
11  just not sure what it was at this time -- in 2017.
12   Q.  Do you -- have you met the local chair of the
13  Waller County Democratic party, Rosa Harris?
14   A.  Yeah, I've had a few conversations with her.
15   Q.  What conversations were those?
16   A.  I believe we had a conversation about doing
17  some forums at Prairie View.  That's pretty much it.  I
18  haven't had a lot of conversations with her.
19   Q.  You said some forums?
20   A.  Yeah, like candidate forums.
21   Q.  Oh, forums.
22   A.  Yeah, forums.
23   Q.  Okay.  And so that would have been
24  conversations with Ms. Harris in her role as the
25  Democratic party chair in terms of scheduling or

---

Page 62

1  organizing candidates to come speak at Prairie View?
2   A.  Yes.
3   Q.  How -- what is your practice -- well, what is
4  The Panther Party's practice in terms of how it learns
5  of what the voting schedule is going to be?
6   A.  We might check online, word of mouth, different
7  avenues.
8   Q.  Once The Panther Party learns of the voting
9  schedule, do you post those hours on social media?
10   A.  Yes.
11   Q.  Any other ways that you disseminate that
12  information?
13   A.  Word of mouth, GroupMe, maybe post up flyers.
14   Q.  Do you -- where do you have your flyers
15  printed?
16   A.  On -- on campus, the library, different --
17  different printers on campus.
18   Q.  Is it -- is that something that The Panther
19  Party does in advance of every election?
20   A.  We've used that before.
21   Q.  So that's a typical activity that The Panther
22  Party would engage in?
23   A.  To some extent.  If we don't have to use
24  flyers, we might just use social media.
25   Q.  When you say a printer on campus, so you don't

---

Page 63

1  have to go to a print shop or anything.  You can just
2  use the facility resources available to the students
3  here?
4   A.  Yeah.  We still pay for them off of our -- our
5  tuition.  We have like a set cost that we can use up to.
6   Q.  Do you know what that is?
7   A.  I couldn't tell you off the top.
8   Q.  Is there -- does the university issue some kind
9  of a copy card or an identifier number or something that
10  you have to punch in when you're going to print
11  something?
12   A.  You swipe your student ID.
13   Q.  Okay.  So it's tracked through your student ID?
14   A.  Yes.
15   Q.  And your tuition includes a certain amount of
16  copying costs?
17   A.  Yes.
18   Q.  What happens if you exceed that amount?
19   A.  Then you can't print anymore or you may -- I've
20  never had to do it, but I think you -- you probably can
21  add more onto there; but once you exceed that amount,
22  you're pretty much done for the semester.
23   Q.  Okay.  So it's not like they send you a bill or
24  anything.  It just cuts off; and then if you want more,
25  you have to take some action.

---

Page 64

1   A.  Technically, you prepay for it.
2      MR. SEAQUIST:  Let's take a quick break.
3      THE WITNESS:  Cool.
4      (Recess from 10:23 a.m. to 10:30 a.m.)
5   Q.  (BY MR. SEAQUIST) Okay.  Mr. Muhammad, we are
6  back on the record after a short break.  Is there
7  anything in the testimony so far that we need to go back
8  and readdress or are we good to go?
9   A.  No, I'm -- well, one thing.  I remember you
10  asked me about my transportation.  I just wanted to make
11  it clear that I'm speaking as a representative of The
12  Panther Party; so even though like I had transportation,
13  other people didn't, because that was more like a
14  personal direct question.  I think that was outside of
15  me as representative of The Panther Party.
16   Q.  I understand.  So you had a car personally.
17  Obviously The Panther Party doesn't own its own
18  commercial vehicles or anything.
19   A.  Correct.
20   Q.  Okay.  Anything else?
21   A.  No.  I just wanted to -- that's the only thing
22  I can think of.
23   Q.  I want to clear up a couple of things just so
24  the record is clear.
25      You said -- a few times in the deposition

---

Page 65

1 you've referred to the E board. The E board, if I
2 understand correctly, is the board of directors for the
3 nonprofit?
4    A.   No.
5    Q.   Okay. Tell me who the E board is.
6    A.   The E board is the executive board for mainly
7 the student organization. The board of directors is
8 more there for formality sake, but the E board actually
9 governs the -- the activity of The Panther Party.
10   Q.   Okay. Is the board -- is the E board the
11 same -- is the makeup of the E board the same as the
12 board of directors for the nonprofit?
13   A.   No. E board would just be three board of
14 directors.
15   Q.   Okay. And again, the board of directors is you
16 and who else?
17   A.   Board of directors, I believe, listed with the
18 State would be me. Ervin Bryant is on there. And I
19 believe Dominique Roy, who's a member of The Panther
20 Party, is on the -- is on the board of directors or
21 listed as a board of director.
22   Q.   And the last name was --
23   A.   Roy, R-o-w -- R-o-y.
24   Q.   Okay. And those are the same members as the E
25 board; is that right?

Page 66

1    A.   Well, Ervin Bryant was a member of The Panther
2 Party and then Dominique Roy is a current member of The
3 Panther Party.
4    Q.   Okay. But I guess just so it's clear -- and
5 I've probably made this more complicated than it needs
6 to be. I just want to make sure that the people who are
7 on the E board are the same as the board of directors
8 for the nonprofit.
9    A.   Some are. No, it's not.
10   Q.   Okay.
11   A.   So like Tajaun isn't on the board of directors.
12 He's not listed as a board of director of The Panther
13 Party.
14   Q.   Okay. But he is as the president on the E
15 board?
16   A.   He is the president of the E board.
17   Q.   I got you. Okay. Thank you for that.
18   A.   No problem.
19   Q.   We had also -- in your testimony earlier, you
20 had talked about an informational meeting that some
21 students had gone -- or some members of The Panther
22 Party had gone to in regard to the jail bond. Do you
23 remember that testimony?
24   A.   Yes.
25   Q.   Did you personally attend that meeting?

Page 67

1    A.   Yes.
2    Q.   Okay. Where was that meeting?
3    A.   It was at the Waller County Community Center.
4    Q.   And what other members of The Panther Party
5 attended that meeting to your recollection?
6    A.   It may have been Kirsten Budwine, who was a
7 community development chair at that time, but she was
8 also in SGA, so they were there in more than one
9 capacity. I believe Ervin Bryant was there, Antonious
10 Brown. There may have been some other members. But
11 like I said, they were there as The Panther Party but
12 also in other capacities, too.
13   Q.   Okay. Do you remember how you got to the
14 meeting?
15   A.   I drove to the meeting.
16   Q.   Did anybody else, to your recollection, get
17 there in a manner other than driving?
18   A.   I believe everybody drove.
19   Q.   Okay. Did you vote in the 2017 general
20 election, the jail bond election?
21   A.   I believe I did.
22   Q.   Do you know whether you voted early or on
23 election day?
24   A.   I believe I voted early.
25   Q.   Did you have any problems casting a ballot in

Page 68

1 that election?
2    A.   I wouldn't say so, me personally, no.
3    Q.   Okay. Were you aware of any members of The
4 Panther Party that had any difficulties casting a ballot
5 in the 2017 jail bond election?
6    A.   I mean, there's always an issue. I couldn't
7 just pick a direct one. But there's always something
8 every year.
9    Q.   But you can't specify any particular difficulty
10 that anybody had voting in the 2017 election?
11   A.   It would be things in regards to how to file --
12 how to register, like the address. We have a very funny
13 address issue when it comes to our zip code. That would
14 be something that may have came up. I'm not sure of the
15 schedule for early voting that year. But it's some --
16 some of those -- those are some of the issues that may
17 come up or come up usually every year to different
18 levels.
19   Q.   But you don't know specifically whether those
20 were particular -- or whether those came up in regard to
21 the 2017 election.
22   A.   No.
23   Q.   Okay.
24        All right. Did you vote in the 2018
25 primary?

Page 69

1  A.  Yes.
2  Q.  And was that -- did you vote in the Democrat or
3  the Republican primary?
4  A.  I believe I voted in the Democratic.
5  Q.  Do you identify as a Democrat?
6  A.  No.
7  Q.  Are you a member of the Democratic party?
8  A.  No.
9  Q.  Are you affiliated with any local Democratic
10  party groups?
11  A.  When you say "affiliated," what do you mean?
12  Q.  Well, do you attend the meetings of any local
13  Democratic party groups?
14  A.  No.
15  Q.  Have you donated to any local Democratic party
16  groups?
17  A.  No.
18  Q.  All right.  Have you worked with any local
19  Democratic party groups to hold or host events?
20  A.  Yes.  I believe I talked about earlier where we
21  had forums on campus, but it wasn't a Democratic event.
22  It was nonpartisan.
23  Q.  Okay.  So I guess my question then is:  Are
24  there any local Democratic party groups that The Panther
25  Party has worked with in terms of holding events, if you

Page 70

1  know?
2  A.  Like a Democratic event?
3  Q.  Uh-huh.
4  A.  No.  We're nonpartisan.
5  Q.  Is there a student Democratic group on campus?
6  A.  I believe so.
7  Q.  Have you worked with any of those groups in
8  holding voter registration drives, get out the vote
9  events, anything like that?
10  A.  Yes.  We probably -- I think we collabbed with
11  Young Democrats.  I think that's what they're called.
12  Q.  Did The Panther Party support any particular
13  candidates in the 2018 primary?
14  A.  No.  We don't endorse candidates.
15  Q.  Did The Panther Party campaign?
16  A.  No, we don't -- campaign for a candidate?  No.
17  Q.  For a candidate in the 2018 primary.
18  A.  No.
19  Q.  What political engagement activities did The
20  Panther Party undertake in relation to the 2018 primary
21  election?
22  A.  Voter registration and education forums.
23  Q.  So the voter registration event, is that the
24  same thing as we talked about earlier where you'll get a
25  table and have registration forms available?

Page 71

1  A.  Yeah, it's pretty much the same.
2  Q.  You had said -- well, you mentioned a forum.
3  Do you remember specifically holding a forum in advance
4  of the 2018 primary?
5  A.  I believe we did.  I'm not sure for what
6  office, but I believe we did hold a forum.
7  Q.  Okay.  So can you tell me the nature of that
8  forum at all?
9  A.  Some candidates came down to talk about their
10  agenda or platform.
11  Q.  And is that something that The Panther Party
12  did on its own?
13  A.  No.  That was a collaboration.  Usually -- I'm
14  not sure which one, but usually it's a collaboration
15  between maybe SGA.  Maybe juvenile justice will host it.
16  It just depends.  Juvenile justice does something called
17  the Gavel Series and we usually help out with the Gavel
18  Series and that -- like the forum was following that.
19  So it would be one of those.  We did multiple of those,
20  especially in my tenure here at Prairie View.
21  Q.  When you say you'll help out or The Panther
22  Party will help out, what do you mean by helping out?
23  A.  Cohost, help get students there, help -- yeah,
24  pretty much.
25  Q.  So publicize it essentially?

Page 72

1  A.  Publicize it and cohost it.
2  Q.  Okay.  The -- again, the forum is not something
3  that The Panther Party would make a financial
4  contribution to.
5  A.  No.
6  Q.  You talked a little bit about education.  In
7  regard to the 2018 primary, did The Panther Party hold
8  any education events or activities that were separate
9  from either the forum we discussed or like the voter
10  registration events that we discussed?
11  A.  I would say yes, there would have been some,
12  but it's probably just more just spreading general
13  information.
14  Q.  And when you say "spreading general
15  information," you're talking about social media posts?
16  A.  Yeah, social media posts, again, word of mouth,
17  having conversations in the GroupMe about what's going
18  on.
19  Q.  So not necessarily a formal physical meeting.
20  A.  Not necessarily, no.
21  Q.  And then we mentioned that The Panther Party
22  hosted the voter-only party in April of 2018.
23  A.  Uh-huh.
24  Q.  Do you remember attending any meetings of the
25  Waller County Commissioners Court in advance of the 2018

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 73

1 primary?
2    A.  Not off the top, no.
3    Q.  Do you know if any other Panther Party members
4 did?
5    A.  I wouldn't be able to say that.
6    Q.  Do you know whether The Panther Party -- well,
7 do it this way.  Did you talk to or otherwise
8 communicate with any officials or employees of Waller
9 County in advance of the 2018 primary?
10    A.  I believe I did talk to them, talk to at least
11 one official.  I don't know who it was, though.  But I
12 mean, I'm pretty sure I talked to somebody.
13    Q.  Okay.  And what was the substance of that
14 discussion?
15    A.  I don't know.
16    Q.  You can't say specifically what it was about?
17    A.  No.  I don't know.  It was awhile ago.  I talk
18 to people in Waller County all the time.
19    Q.  Okay.  And by "people in Waller County," do you
20 mean, you know, members of the Waller County government?
21    A.  Everybody from the Commissioners Court down to
22 constables I've had some manner of conversation with.
23    Q.  Okay.
24    A.  I know I talked to Sheriff Smith at the bond
25 information over at Waller County Community Center.  I

Page 74

1 talked to -- Judge Duhon was there, so I know I had
2 conversations there.  But I mean, that's pretty much
3 anything I can think of specifically.
4    Q.  To your knowledge, do other -- have other
5 members of The Panther Party also engaged in
6 conversations about their concerns and interests with
7 members of the Waller County government?
8    A.  Yes.  We do that a lot.
9    Q.  Do you remember any -- or did The Panther Party
10 engage in any specific advocacy as it related to early
11 voting in the 2018 primary?
12    A.  Yes.
13    Q.  What do you recall The Panther Party doing in
14 regard to early voting for the 2018 primary?
15    A.  Get out the vote drives.  I believe the voters
16 party was a part of that.  We have -- pretty much
17 letting people know what the voting schedule is for that
18 primary.
19    Q.  Did The Panther Party, to your recollection,
20 have or express any concerns about the early voting
21 schedule for the 2018 primary?
22    A.  I would say we did.
23    Q.  Okay.  What were those concerns?
24    A.  I'm not sure totally, but I'm pretty sure it
25 was either we wanted the schedule -- it was making sure

Page 75

1 we had enough days on the schedule once we got the
2 schedule, making sure it was fair compared to different
3 schedules across Waller County.
4    Q.  And did you go to any Commissioners Court
5 meetings to advocate for additional hours?
6    A.  No, not in that --
7    Q.  And we're talking about the primary.
8    A.  Yeah, not at the primary.
9    Q.  Okay.  And you testified earlier that you had
10 voted in the primary.  Did you vote early or on election
11 day of the primary?
12    A.  I believe I voted early in the primary.
13    Q.  And where did you cast your ballot, sir?
14    A.  I believe it was at the university.
15    Q.  The student center?
16    A.  Yes.
17    Q.  I know it's been a little while; but for the
18 2018 primary, can you remember what time of day you
19 voted?
20    A.  Sometime between 7:00 and 7:00, so --
21    Q.  Okay.  Do you remember how you got to the
22 polling location?
23    A.  It was on campus.  I probably walked.  Well, I
24 drove to campus and then I probably walked to the MSC
25 from wherever I was on campus.

Page 76

1    Q.  In 2018 were you living on campus?
2    A.  No.  I only lived on campus in summer of 2018.
3    Q.  So for the fall of twenty -- well, for the
4 spring of 2018 you were living off campus?
5    A.  Correct.
6    Q.  How far?
7    A.  About a mile, on the other side of 290, across
8 the street from Dollar General.
9    Q.  Was that a house?
10    A.  Yes.
11    Q.  Do you remember how long it took you to vote in
12 the 2018 primary?
13    A.  I don't think it was that long in the 2018
14 primary.
15    Q.  You don't remember any particular problems with
16 lines or anything like that?
17    A.  Not for that primary.
18    Q.  Did The Panther Party support any particular
19 candidates in the 2018 November election?
20    A.  No.  We don't support candidates.
21    Q.  Did you support -- did The Panther Party
22 support a particular party?
23    A.  No.  We supported The Panther Party.
24        MR. SEAQUIST:  I'm going to mark Exhibit
25 6.

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 77

1        (Exhibit No. 6 marked)
2    Q.  (BY MR. SEAQUIST) Do you recognize what I've
3 handed you to be Exhibit 6?
4    A.  Yes.
5    Q.  The Panther Party has a Twitter account; is
6 that correct?
7    A.  Correct.
8    Q.  And on occasion, The Panther Party will retweet
9 tweets from other students?
10   A.  Yes.
11   Q.  And this is a tweet that The Panther Party has
12 retweeted?
13   A.  Yes.
14   Q.  And it's from Maydrian Lowe?
15   A.  Yes.
16   Q.  And Maydrian Lowe is also a member of The
17 Panther Party, correct?
18   A.  Yes.
19   Q.  And in the 2018 election, was he the
20 vice-president at that point of the E board?
21   A.  In the 2018 election?
22   Q.  Yes, the general.
23   A.  No.
24   Q.  Was he in any other leadership role at that
25 time?

Page 78

1    A.  He may have been -- he may have just been on a
2 committee.
3    Q.  Okay.  Do you know whether he was on the
4 political engagement committee?
5    A.  I believe he was on the political engagement
6 committee.
7    Q.  And so Mr. Lowe here is saying "When people ask
8 us about the 2018 election, let's tell them about what
9 we did to elect Democrats up and down the ballot,"
10 correct?
11   A.  Yes.
12   Q.  And The Panther Party retweeted that message?
13   A.  We did.  We retweeted it to support mainly the
14 Parade of Voters.
15   Q.  But you retweeted the entire message, correct?
16   A.  You can't retweet part of a message, so yes.
17   Q.  Is this Parade of Voters -- is that a flyer
18 that The Panther Party created?
19   A.  No, we didn't create this flyer.
20   Q.  Do you know who did?
21   A.  By the looks of it, it's black and gold, so I
22 would say the fraternity Alpha Phi Alpha had something
23 to do with it, but there's no organization on here.
24   Q.  And would this flyer have been sent out to The
25 Panther Party?

Page 79

1    A.  What do you mean sent out to us?  We probably
2 came across it, probably shared it in our GroupMe.
3    Q.  Okay.  And so it would have been possible for
4 The Panther Party just to share the flyer by itself,
5 correct?
6    A.  It would have been possible.
7    Q.  Other than Twitter, what social media apps does
8 The Panther Party use, if any?
9    A.  Instagram.  We have a Facebook, but mostly
10 Instagram is -- Facebook is an older demographic, so
11 mainly Instagram and Twitter.
12   Q.  Do you know how many Twitter followers The
13 Panther Party has?
14   A.  I'd have to look at it.  I think it's somewhere
15 between two and three hundred.
16   Q.  Do you know how many Instagram followers The
17 Panther Party --
18   A.  Probably in the same ballpark.
19   Q.  And how does The Panther Party use social
20 media?
21   A.  We post messages, post flyers, tweet.  We tweet
22 things we find interesting.
23   Q.  So notice of events?
24   A.  Yes.
25   Q.  Do you use it to notify your followers of

Page 80

1 voting hours?
2    A.  Yes.
3    Q.  Is it fair to say The Panther Party wants its
4 members and followers to be informed as possible
5 about the opportunity for them to cast a ballot?
6    A.  I would say so, yes.
7    Q.  Do you -- The Panther Party, through those
8 social media accounts, do you follow any of the County's
9 social media?
10   A.  We may.
11   Q.  Do you know whether you follow the Facebook
12 page?
13   A.  I wouldn't know off the top.
14   Q.  What about the Twitter account?
15   A.  I wouldn't know off the top.
16   Q.  To your knowledge, has The Panther Party ever
17 retweeted or reposted any of the County's social media
18 posts in regard to an election?
19   A.  Their posts?
20   Q.  Uh-huh.
21   A.  I mean, if they were on Twitter and we came
22 across it, we may have; but I don't know how active they
23 are on Twitter.
24   Q.  For example, when the County puts out social
25 media posts with voting hours, is that something that

Page 81

1 The Panther Party has ever reshared to its members?
2    A.  Probably so, in some capacity.
3    Q.  Do you know whether that happened in the 2018
4 general election?
5    A.  No, I don't know if that happened or not.
6    Q.  I had asked you earlier if The Panther Party
7 met over the summer and you said the E board might have
8 some discussions over the summer.  Is that fair?
9    A.  Yes.
10    Q.  Did you -- I think you just testified you lived
11 in Prairie View over the summer?
12    A.  I lived in Prairie View one summer, for two
13 thousand -- summer of 2018.
14    Q.  Were you taking classes over the summer or were
15 you just living here?
16    A.  I took classes and lived here.
17    Q.  To your knowledge, were there any other members
18 of The Panther Party who stayed in Prairie View over the
19 summer to take summer classes in the summer of 2018?
20    A.  Summer of 2018?  I believe there were.
21    Q.  It's not uncommon for Prairie View A&M students
22 to take summer classes, right?
23    A.  It's not uncommon.
24    Q.  When does The Panther Party officially start
25 meeting again for the new school year?

Page 82

1    A.  Officially we start after the 12th class day.
2 That's when you can technically start having meetings.
3    Q.  The 12th class day?
4    A.  Yeah, 12th class day of each semester.
5    Q.  Does The Panther Party wait until after the
6 12th class day to disseminate information through social
7 media?
8    A.  No.
9    Q.  That's something that The Panther Party does
10 all along, correct?
11    A.  Yes.
12        MR. SEAQUIST:  I'm going to mark Exhibit
13 7.
14        (Exhibit No. 7 marked)
15    Q.  (BY MR. SEAQUIST) Mr. Muhammad, do you
16 recognize what I've shown you as Exhibit 7 to your
17 deposition?
18    A.  It looks like a tweet from our Twitter account.
19    Q.  Okay.  And what does this tweet -- can you read
20 the tweet into the record, please?
21    A.  The tweet says, from The Panther Party, "The
22 Panther Party would like to welcome #PV20" -- #PV22 to
23 campus.  Let's get engaged!  #TheHill is in your hands!
24 #MPVGA," which stands for Make Prairie View Great Again.
25    Q.  Is Make Prairie View Great Again a slogan

Page 83

1 adopted by the -- or created by Panther Party?
2    A.  It was a campaign, correct.
3    Q.  What was the origin of that campaign?
4    A.  The origin of the campaign was started between
5 me and Ervin Bryant.  Well, we were the president and
6 vice-president.  When you say -- by "origin," how in
7 depth do you mean, the origin of it?
8    Q.  Just -- yes.  What -- was there a particular
9 initiative, I guess, that that campaign came -- or that
10 slogan came out of?
11    A.  So Trump during that time had MAGA, Make
12 America Great Again, so we remixed it to fit Prairie
13 View, Make Prairie View Great Again.  But it was really
14 about recapturing elements of Prairie View's history,
15 about which it had a lot of success in independence in
16 our hundred and I believe -- is it fifty now?
17 Hundred -- or forty-year history.  So really just
18 recapture elements of our history that we believe were
19 great.
20    Q.  Okay.  Was it typical of The Panther Party to
21 send kind of a welcome back tweet or message to incoming
22 students to encourage them to get engaged?
23    A.  If we think about it, yes.
24    Q.  Now, in 2018 were you a senior?
25    A.  Probably super senior maybe.

Page 84

1    Q.  Nothing wrong with that.
2        You had been on campus since roughly 2014?
3    A.  Yes.
4    Q.  So you had been through several election cycles
5 in Prairie View at that point.
6    A.  Yes.
7    Q.  Okay.  And you were aware that the Waller
8 County Commissioners Court was responsible for setting
9 early and election day polling locations and times,
10 right?
11    A.  No, not since -- since I've been here, no.
12    Q.  Are you aware of any other way those times have
13 been set since you've been here?
14    A.  I mean, I really didn't know that until
15 probably these last two years.  When I first got here, I
16 wasn't aware of the structure of the meeting with the
17 chairs of the parties and going over it.  I wasn't aware
18 of that.
19    Q.  When did you become aware of that?  You said in
20 the last two years?
21    A.  I probably had some awareness of it, but really
22 formally aware of it actually in 2018.
23    Q.  Okay.  At what point in 2018?
24    A.  The full process, when I went to the
25 Commissioners Court meeting.  Before then, I just knew

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 85

1  it came some way somehow from Waller County.
2     Q.  Had you ever, prior to the Commissioners Court
3  process in the fall of 2018, tried to contact anybody at
4  the County to ask how hours and locations for polling
5  locations were decided?
6     A.  I would say no, it's not just a question that
7  had came to me.
8     Q.  But as of 2018, the Prairie -- you were aware
9  of the process for setting early voting hours and
10 locations, correct?
11    A.  October of 2018.
12    Q.  Okay.  This year, in the fall of 2019 -- or the
13 summer of 2019, when students were coming back, did The
14 Panther Party send out any social media messages
15 welcoming them back to your knowledge?
16    A.  I don't know.  I'd have to check.
17    Q.  Do you know whether The Panther Party sent out
18 any social media messages encouraging students to get
19 involved in the process for determining times and
20 locations for the election coming up?
21    A.  No.  We just really started getting back active
22 for the school year.
23    Q.  You testified, though, that you now know or
24 knew in at least October of 2018 that the County
25 elections administrator, which was Christy Eason,

---

Page 86

1  confers with the party chairs over the voting schedule?
2     A.  Yes.
3     Q.  And then the party chairs agree on a schedule?
4     A.  That sounds about right.
5     Q.  And then that's presented to the Commissioners
6  Court for approval.
7     A.  That sounds about right.
8     Q.  Do you make it a habit, either personally or in
9  your position as the chairman of the board of The
10 Panther Party, to follow the public notices of the
11 Waller County Commissioners Court meetings?
12    A.  Keep track of it.  I know it's probably like --
13 I think it was like in the middle of the week at like
14 nine o'clock, so I think I know the general time.  But
15 any information I come across, I do my best to try to
16 disseminate it and keep people informed in some way,
17 shape, or form.
18    Q.  Okay.  You're aware that the Waller County
19 Commissioners Court posts notice in advance of each of
20 its meetings, correct?
21    A.  Yes.
22    Q.  And you're aware that that notice and the
23 agenda for the meeting is posted online on the County's
24 website?
25    A.  Yeah.  I think that they have to do that.

---

Page 87

1     Q.  Do you remember how you first learned what the
2  early voting locations and hours initially approved for
3  the November 2018 election were?
4     A.  I don't know how -- probably by word of mouth.
5  I don't know who first told me, but I know it was a
6  conversation that started up throughout multiple people.
7     Q.  Do you remember when in the fall of 2018 that
8  information came?
9     A.  Probably late September, early October.
10    Q.  When you learned of those early voting hours
11 and locations that had been approved by the County
12 Commissioners Court, did The Panther Party notify the
13 student body of that?
14    A.  Yes.
15    Q.  How so?
16    A.  Word of mouth, social media, different
17 platforms.
18    Q.  Okay.  I have looked through -- well, let me
19 back up.
20       You, on behalf of The Panther Party, or
21 The Panther Party has provided some social media
22 information in response to the discovery requests in
23 this case; is that correct?
24    A.  Uh-huh.
25    Q.  Were you the one who gathered that information?

---

Page 88

1     A.  I was.
2     Q.  What --
3     A.  Or me and my legal team.  We gave them -- they
4  knew my -- it's a public Twitter account, so --
5     Q.  Okay.  Do you -- have you produced all of the
6  social media posts from The Panther Party in relation to
7  the 2018 election?
8     A.  No.
9     Q.  Okay.  Because I was going to say, I've looked
10 through the production set and I don't see any posts
11 from The Panther Party sharing the early voting location
12 hours and locations approved by the County Commissioners
13 Court.  But it's your recollection that there would be
14 something like that?
15    A.  It may be on the Panther Party.  It may be on
16 mine.  It may be in a GroupMe.  There's a lot of
17 different avenues for communication.
18    Q.  Is it fair to say you don't know for sure one
19 way or the other right now?
20    A.  No.  I know we shared it, though, in some way,
21 somehow.
22       And may you say -- you say you didn't see
23 any communication based off early voting in 2018?
24    Q.  I did not see any social media posts from The
25 Panther Party which included or shared the early voting

---

Page 89

1 schedule from the County Commissioners Court.
2     A.  So to my recollection, I know when we started
3 doing the -- when we started transporting students to
4 the polls, there was an initiative called Roll to the
5 Polls; and there was, I believe, some information there.
6 But it was something I would have to go look up, but I
7 believe there is something on there.
8     Q.  Maybe that's something counsel and you can look
9 at.  And if there are some posts that I'm just missing
10 or that weren't included, those can be supplemented.  I
11 know we both have some supplementing to do.  So --
12         MR. SEAQUIST:  I'm going to mark Exhibit
13 8.
14         (Exhibit No. 8 marked)
15     Q.  (BY MR. SEAQUIST) Mr. Muhammad, do you
16 recognize what I've handed you as Exhibit 8?
17     A.  Yes.
18     Q.  And is this a retweet by The Panther Party?
19     A.  That's what it says on here.
20     Q.  And the date is October 9th, 2018?
21     A.  Correct.
22     Q.  What is the PV Panther?
23     A.  It's the campus newspaper.
24     Q.  So this is a retweet by The Panther Party
25 sharing an article from the campus newspaper; is that

Page 90

1 correct?
2     A.  Yes.
3     Q.  All right.  Do you remember this article?
4     A.  I do remember it vague -- not the full article.
5 I do remember it.  I think I read it or about it.
6     Q.  Is it fair to say -- and I'm just
7 summarizing -- but that the article generally focuses on
8 the registration issues involving university addresses?
9     A.  I didn't write it, but I would have to read it
10 again.  This is October of 2018.
11     Q.  Okay.  Would you have read it before you
12 tweeted it?
13     A.  I probably would have looked over it, if I'm
14 the one that retweeted it.
15     Q.  Who controls The Panther Party's social media
16 accounts?
17     A.  There's multiple people.  Like the E board
18 would have access.  I would have access.  It just
19 depends.  I'm not responsible for every tweet or retweet
20 of The Panther Party.
21     Q.  On the last page of this article --
22     A.  Is this the page that says "Here is a list of
23 acceptable forms of ID"?
24     Q.  Yes.
25         Below that, it says "Early Voting will be

Page 91

1 available" -- "will be in the Willie A. Tempton,"
2 T-e-m-p-t-o-n, "Memorial Student Center October 29th
3 through the 31st 8:00 to 5:00 p.m."
4     A.  Yes, that's what it says here.
5     Q.  Okay.  So this is October 9th.  At least at
6 this time it was generally -- the information regarding
7 the early voting hours at the student center was
8 generally available; is that true?
9     A.  Yes.
10     Q.  And I think you testified that you might have
11 even known about the early voting hours earlier in
12 September, correct?
13     A.  Around that time, yes.
14     Q.  All right.  But --
15     A.  Late September, early October.
16     Q.  Okay.  In this tweet, I don't see anywhere
17 where The Panther Party expressed any concerns about the
18 early voting times.  Do you?
19     A.  It's not necessarily -- you can't really
20 express concerns on a retweet.
21     Q.  You can't add a message on a retweet?
22     A.  You can, but not on a retweet like this.
23     Q.  Okay.  Well, in looking through the production
24 materials, I don't see, I guess, really prior to the
25 October 17th meeting, any social media from The Panther

Page 92

1 Party expressing any concerns or reservations about the
2 early voting times.
3         Do you know whether The Panther Party did
4 send out any tweets or social media posts expressing
5 concerns about the early voting schedule that was
6 adopted?
7     A.  Directly from The Panther Party's Twitter
8 account?  We may or may not.  I can't recall every tweet
9 or retweet.  But I know there were concerns,
10 word-of-mouth concerns, talking to people.  I know we
11 had some conversations via phone with Christy Eason.  So
12 there were different avenues by which we did express
13 concerns that were just -- that weren't social media.
14     Q.  Were you involved in the discussions with
15 Christy Eason?
16     A.  I was on some.  I talked to her via phone, I
17 think also in person maybe once.
18     Q.  And do you remember when The Panther Party
19 first expressed concerns to Christy Eason about the
20 early voting schedule?
21     A.  Yeah, somewhere around -- sometime around -- in
22 October, before the Commission -- last Commissioners
23 Court meeting.
24     Q.  Okay.  Now, this article The Panther Party
25 retweeted was specifically addressing an issue involving

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 93

1 registration based on university addresses.
2   A.  Yes.
3   Q.  What is your understanding of what that issue
4 was?
5   A.  So my understanding is that students were
6 initially given -- I believe by Waller County officials,
7 given an address either of 100 University Drive or 700
8 University Drive because it makes it easier because
9 there's a lot of student housing on campus, so they
10 usually choose the main one for the university, but that
11 was based off some map that was incorrect.  It was
12 actually somewhere off campus.
13       So there was a potential -- potentially
14 their registration could have been null and void, so
15 this was pretty much trying to correct that and help
16 students actually be able to get the right address and
17 change it, if need be, or figure out something with the
18 elections office by which they can make sure they have
19 the right registration -- address on their registration.
20   Q.  Okay.  There -- mail is not delivered to
21 individual student residences on campus, correct?
22   A.  Not delivered directly?
23   Q.  Right.
24   A.  There's a mail center on campus that students
25 get mail from.

---

Page 94

1   Q.  So there's a central mail center where mail is
2 delivered for students.
3   A.  Yes.
4   Q.  And then it's up to students to go to that mail
5 center to pick up their own mail.
6   A.  Or you may have your own P.O. box.  But that's
7 pretty much the -- there's -- there's no home delivery,
8 I don't think, in Prairie View at all.
9   Q.  Okay.  So students were using either 100
10 University, which is the main road that goes into the
11 university here, correct?
12   A.  Yes.  It's now called -- Sandra Bland Parkway
13 is another name for it.
14   Q.  But that changed -- do you know when that
15 change was made?
16   A.  It had to be probably 2016, maybe 2017.
17   Q.  Okay.  Do people still refer to it as
18 University Drive, though?
19   A.  It just depends.  They do both.  I think Google
20 says Sandra Bland Parkway.  If you've been here for a
21 minute, you might just say University Drive.
22   Q.  But if I say University Drive, you know what
23 road I'm talking about.
24   A.  Yes.
25   Q.  So students were using, on their voter

---

Page 95

1 registration cards, an address -- a geographical address
2 of either 100 or 700 University; is that right?
3   A.  I believe so, yes.
4   Q.  And is it your understanding that if you happen
5 to use 700 University, based on GIS or geocoding, that
6 location was actually off of campus?
7   A.  I believe that was the issue that came up, yes.
8   Q.  Okay.  And perhaps more importantly than being
9 off of campus, it's actually in another voting precinct.
10   A.  Yes.  I think it was -- I think we're in 309.
11 I think it may have been 310.
12   Q.  So the voting precinct 309, to your
13 understanding, is the Prairie View campus.
14   A.  Yes, for the most part.
15   Q.  And then 310 is south of campus in the City of
16 Prairie View.
17   A.  Yes.
18   Q.  Okay.  Now, the problem was, for people who
19 used that 700 University Drive address, if they were to
20 come to vote in the 309 precinct on election day, they
21 weren't registered to vote there, correct?
22   A.  Yes, that happens all the -- I believe maybe to
23 city hall.
24       MS. ADEN:  I'm going to object.  We didn't
25 discuss this at the beginning that we could do

---

Page 96

1 objections as to form and deal with everything later.
2 I'd like to stipulate that we'll -- plaintiffs are
3 agreeable to that.  And I just wanted to note for the
4 record some objections to these leading questions.
5       You are providing a lot of information to
6 Mr. Muhammad in the form of a narrative followed by a
7 yes or no question.  And I'm going to object to these
8 questions being leading.  But --
9       THE WITNESS:  Can I go to the restroom?
10       MS. ADEN:  Mr. Muhammad, you can --
11       MR. SEAQUIST:  Absolutely.  We'll take a
12 break.  Wait one second.
13       And I will agree with counsel that
14 objection, form, will suffice to the form of the
15 question.
16       MS. ADEN:  Okay.  And do you want him to
17 answer the question that you were beginning -- I don't
18 think you've -- we can look at the record, but do you
19 want him to finish anything before we break for a
20 restroom break?
21       MR. SEAQUIST:  I thought he answered it.
22       THE WITNESS:  I think it was just about
23 the precinct.
24       MR. SEAQUIST:  So we'll take a break.
25       MS. ADEN:  Okay.

---

Page 97

1    THE WITNESS:  Cool.
2        MR. SEAQUIST:  I'll clean it up on the
3  other end.
4        (Recess from 11:13 a.m. to 11:23 a.m.)
5    Q.  (BY MR. SEAQUIST)  Okay.  We're back from our
6  second break.  Anything we need to go back and clean up?
7    A.  I want to reiterate that -- we talked about
8  were there any information or notification disseminated
9  about the early voting schedule, that there were
10  different posts that were part of flyers when we were
11  transporting students to the polls that showed the early
12  voting schedules as a part of those flyers and posts.
13    Q.  Those posts would have come out around the time
14  that voting had started, correct?
15    A.  Before voting had started.  It was before early
16  voting.
17    Q.  Okay.  I guess my question is:  Do you recall a
18  social media post by The Panther Party, at the time it
19  found out about the early voting hours, just posting the
20  early voting schedule?
21    A.  Just a tweet like that in and of itself, like
22  bare bones, just the early voting schedule?  I would say
23  no, because those posts really don't catch people's
24  attention.
25    Q.  Okay.  Before we -- was that the only thing you

Page 98

1  wanted to clear up?
2    A.  Yes.
3    Q.  Okay.  Thank you for that.
4        Before we took a break, we were talking
5  about the voter registration issue.
6    A.  Uh-huh.
7    Q.  And I think that you had agreed with me that
8  for students who used 700 University as their address,
9  the result of that was that they ended up being
10  registered in Precinct 310.
11    A.  That's what we were told.
12    Q.  So in early voting, do you have an
13  understanding as to whether you have to vote in the
14  precinct in which you are registered?
15    A.  In early voting, I believe you can vote
16  anywhere in the county.
17    Q.  Okay.  So as far as this address issue, it
18  would really only relate to election day voting,
19  correct?
20    A.  The address issue was on election day voting,
21  but also there was speculation that it could null and
22  void the whole registration as a whole for students.
23  Those are some other issues that came up in discussion.
24    Q.  Okay.  What was the reason for the
25  speculation -- well, scratch that.

Page 99

1        What did you hear in terms of why this
2  issue would actually void a voter registration?
3    A.  It's not voting fraud per se, but it's not --
4  it's incorrect information.  Like if you put you live
5  somewhere that you don't actually live, whether you
6  got -- whether that wasn't your knowledge at the time,
7  you thought it was a correct address, you pretty much
8  put something that -- you put a place that you didn't
9  actually live.
10    Q.  That was a concern that people had?
11    A.  Yes.
12    Q.  All right.  Are you aware of anyone whose
13  registration was actually canceled or declared null and
14  void based on this issue?
15    A.  So we did things to address the issue; and
16  based off of that, we had some conversations with the
17  election office and they took some steps to mitigate
18  that issue.
19        MR. SEAQUIST:  Okay.  I'm going to object,
20  nonresponsive.
21    Q.  (BY MR. SEAQUIST)  I appreciate that, but my
22  question -- I want to talk to you about that, but my
23  question first is:  Are you aware, as a representative
24  of The Panther Party, of anyone whose voter registration
25  was either canceled or declared null and void because of

Page 100

1  this issue?
2    A.  No, I hope not.
3    Q.  All right.  Now, you were telling me that when
4  the issue became known, you engaged in some discussions
5  with folks at the County?
6    A.  Yes.
7    Q.  And tell me about that.
8    A.  So we had conversations with Christy Eason
9  about it pretty much -- well, first we were trying --
10  once we found out about it, before we started
11  disseminating information, we started actually talking
12  to people, getting background information, because it's
13  always like he-say/she-say, so we wanted to make sure
14  before we started sending information that we actually
15  knew what was going on.
16        So we talked to Christy Eason about it.
17  We talked to some of our advisors about it just to get
18  the background information before we actually made a
19  move to announce it and help rectify it.
20    Q.  Okay.  And did Christy Eason have a
21  recommendation as to how to address the problem?
22    A.  I don't think it was -- I believe she had some
23  recommendations.  I think one of the recommendations
24  that was finalized on it through our different
25  conversations was that they would pretty much have an

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 101

1  address form change at the -- after the students voted,
2  or whoever voted, if they had the wrong address.
3      Q.  And was there some concern among some in the
4  Prairie View community about having to have a change of
5  address form?
6      A.  Yes.
7      Q.  And what was that?
8      A.  I don't know a specific concern, but there's
9  always concerns around voting.
10     Q.  But you don't remember any specific concerns in
11 regard to the change of address form.
12     A.  Pretty much it's the ones I already iterated,
13 that, you know, it was null and void, their voter
14 registration.  Then there's concerns about actually
15 once -- once that solution was brought, actually getting
16 it to where you alert students in time where they know
17 what's going on.
18         MR. SEAQUIST:  I'm going to mark Exhibit
19 9.
20         (Exhibit No. 9 marked)
21     Q.  (BY MR. SEAQUIST) Before we get to Exhibit 9,
22 can you tell me specifically where the concern came from
23 with regard to the voiding of registrations?  Do you
24 remember who first raised that?
25     A.  No, I don't remember who first raised it.

Page 102

1      Q.  Do you remember specifically who expressed that
2  concern to you, if anyone?
3      A.  No, I don't remember who first raised it to me.
4      Q.  I'll represent to you, sir, that Exhibit 9 is a
5  retweet by Jayla Allen of a message from the Texas
6  Secretary of State.
7      A.  It's not a retweet.  It's a -- I think she
8  shared a screenshot.
9      Q.  Okay.  Had you seen this message before?
10     A.  No.  I don't remember this message.
11     Q.  And by "this message," I mean have you seen the
12 official statement from the Texas Secretary of State
13 before?
14     A.  I've -- I believe I have.
15     Q.  Okay.  And the statement says "It has been
16 communicated and confirmed that the Waller County plan
17 ensures, as it was always intended to do, that all
18 students residing on campus who are registered to vote
19 in the county will be able to cast their ballots at the
20 Precinct 309 polling location on campus, and that no
21 students will be impeded, hampered, or otherwise delayed
22 in exercising their constitutional right to cast a
23 ballot in the upcoming General Election."
24     A.  That's what it says.
25     Q.  All right.  And then it goes on to say "No

Page 103

1  change of address form or statement of residence will be
2  required prior to voting."
3         Do you see that?
4      A.  Yes.
5      Q.  And so is it your understanding that
6  Ms. Eason's plan -- based on Ms. Eason's plan,
7  ultimately, any student who was registered to vote in
8  Waller County, whether it was in 309 or 310, could cast
9  a ballot on election day in 309?
10     A.  Based off this from the Texas Secretary of
11 State, that's what it says.
12     Q.  And was that your experience?
13     A.  I early voted, so I guess it really didn't
14 matter.
15     Q.  Okay.  I understand.
16         You also understood -- or did The Panther
17 Party also understand that voters who were affected by
18 this issue would not be required to submit a change of
19 address form prior to voting in the 2018 general
20 election?
21     A.  I do understand that.  I would say that there
22 might have been some influence by us bringing up the
23 issue that got it clarified, so -- but I think I do
24 understand that.
25     Q.  And so as we sit here today, are you, as the

Page 104

1  representative of The Panther Party, aware of any
2  student who was told they could not vote in Precinct 309
3  on election day because of this addressing issue?
4      A.  No, I'm not aware off the top, so I hope they
5  didn't -- I hope the issue was rectified.
6      Q.  And -- okay.  When did The Panther Party first
7  become concerned about the initial early voting schedule
8  approved by the County?
9      A.  When did we first initially become concerned?
10     Q.  Uh-huh.
11     A.  So as an organization, probably in October
12 sometime.
13     Q.  And what were the immediate concerns of The
14 Panther Party about the schedule that was adopted?
15     A.  The immediate concerns were that we didn't have
16 any voting days the first week, only through the second
17 week.  And then compared to other places in Waller
18 County -- compared to other places in Waller County, we
19 felt that it wasn't fair, our number of voting days,
20 when it came to our voting bloc, the size of it, the
21 demographic, and other elements.
22         MS. ADEN:  Off the record for a moment.
23         (Discussion off the record)
24         MS. ADEN:  Back on the record?
25         MR. SEAQUIST:  Yes.

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 105

1    Q.  (BY MR. SEAQUIST) So you had expressed a -- one
2   of the concerns The Panther Party had with regard to the
3   initial early voting schedule which you just told us
4   about was that Prairie View was not slated for early
5   voting in the first week of the early voting period; is
6   that right?
7    A.  Correct.
8    Q.  All right.  Is it true that some other areas
9   were not slated for early voting in the second week of
10  early voting?
11   A.  Probably so.  I would have to look at the
12  voting schedule to refresh my memory.
13       You mean other areas of Waller County or
14  other areas in Prairie View?
15   Q.  Other areas of Waller County.
16   A.  I would -- yeah, probably so.  I don't know.  I
17  would have to look at the voting schedule again.
18   Q.  You also said there was a concern in terms of
19  the number and days of -- or of -- number of hours and
20  days in early voting in Prairie View in comparison to
21  some other areas of Waller County.
22   A.  Yes.
23   Q.  All right.  Is it true that Prairie View
24  received more days and hours in early voting than some
25  hours -- excuse me, than some other areas of Waller

Page 106

1   County?
2    A.  Probably so.
3    Q.  Okay.  And then also received less than some
4   others?
5    A.  Yes.
6    Q.  Okay.  Why did The Panther Party believe that
7   voting the first week was superior to early voting the
8   second week?
9    A.  I don't think we ever said it was superior.
10   Q.  So there's no particular advantage to first
11  week over second week as far as The Panther Party is
12  concerned.
13   A.  We wanted first and second week.
14   Q.  So it was not that one was better than the
15  other.  It was that you wanted both.
16   A.  Yes.
17   Q.  Understood.
18       Prairie View's homecoming began the first
19  week of early voting, correct?
20   A.  Correct.
21   Q.  I think you had talked earlier about -- well,
22  for students who did want to vote early the first week,
23  there was a bus to take students to vote in Hempstead,
24  correct?
25   A.  Yes.  We helped put that together.

Page 107

1        MR. SEAQUIST:  I'm going to mark Exhibit
2   10.
3        (Exhibit No. 10 marked)
4    Q.  (BY MR. SEAQUIST) Do you recognize Exhibit 10?
5    A.  Yes.  I made the flyer.
6    Q.  You made this flyer?
7    A.  Yes.
8    Q.  And how did you make this flyer?
9    A.  Either Photoshop or Canva.
10   Q.  Did you use a university computer?
11   A.  I wouldn't be able to remember.  I had my own
12  personal computer, but I could have used a university
13  computer.
14   Q.  Did you print paper copies of this flyer or
15  just distribute it on social media?
16   A.  Probably both.
17   Q.  Do you know how many paper copies you would
18  have made?
19   A.  I wouldn't be able to remember that.
20   Q.  Do you know for sure that you even made paper
21  copies?
22   A.  I'm pretty sure I made paper copies.
23   Q.  Can you -- okay.  But you don't know, if you
24  did, how many that would have been?
25   A.  No.

Page 108

1    Q.  Okay.  And The Panther Party retweeted this
2   post from Kirsten.
3    A.  Kirsten.
4    Q.  Kirsten.  I'm sorry.
5    A.  She's going to get mad at you if you call her
6   Kirsten.
7    Q.  Oh, I'm not going to do it again.
8        Is Kirsten a member of The Panther Party?
9    A.  She graduated, so -- but she was when she was
10  here.
11   Q.  At the time of the post?
12   A.  Yes.
13   Q.  Okay.  When it says "Get on the" -- well, it
14  says "Get on the bus" and it says "9AM, 12PM, and 3PM";
15  is that right?
16   A.  Yes.
17   Q.  And so this means that on Friday, October 26th,
18  of 2018, there was bus service from campus, I guess in
19  front of the Baby Dome.  Where is the Baby Dome?
20   A.  The Baby Dome is right next to the MSC, the
21  football stadium.
22   Q.  At the football stadium?
23   A.  It's by the football stadium.
24   Q.  So there was bus service leaving from the Baby
25  Dome at 9:00 a.m., 12:00 p.m., and 3:00 p.m. to the

Page 109

1 courthouse in Hempstead?
2    A.  Yes.
3    Q.  When you say "Get on the bus," is it -- was it
4 a literal bus?
5    A.  It was a literal bus.
6    Q.  Did it look like the picture here?
7    A.  It wasn't red.
8    Q.  Okay.  But it was a big bus of that size.
9    A.  Correct.
10    Q.  Who chartered that bus?
11    A.  I believe the university.
12        Are you talking about like the company or
13 who got the --
14    Q.  Who hired the bus service?
15    A.  I believe one of -- one of the Prairie View
16 departments helped us get it.
17    Q.  Did The Panther Party spend any financial
18 resources paying for this bus?
19    A.  Probably when it came to -- we printed out
20 flyers.  But outside of financial resources, you had
21 just, you know, energy.  Like I had to -- I had to make
22 the flyer.  That took time.
23        MR. SEAQUIST:  I'm going to object,
24 nonresponsive.
25    Q.  (BY MR. SEAQUIST) My question is just did The

Page 110

1 Panther Party contribute any financial resources to the
2 bus.
3    A.  So actual just direct physical money?  So
4 printing would be -- if we prepaid for printing and then
5 we print it out to get these flyers printed, that would
6 be financial resources.  But I would have to look back
7 and see if we actually spent money on anything else.
8 But we didn't make -- buy the bus.  We advertised for
9 the bus.  I think that's your question.
10    Q.  That is my question.
11    A.  Okay.
12        MR. SEAQUIST:  Objection, nonresponsive.
13    Q.  (BY MR. SEAQUIST) I'm going to ask one more
14 time just so it's clear in the record.  Okay?
15    A.  To get the bus, no, we didn't pay for the bus
16 in any way, shape, or form.
17    Q.  Perfect.  Thank you.
18        Who made the request -- it's your
19 recollection that Prairie View A&M paid for the bus,
20 correct?
21    A.  Yes.
22    Q.  Who made the request to Prairie View A&M for
23 the bus to be chartered?
24    A.  Members of The Panther Party, just students in
25 general, concerned faculty, staff, administrators.  It

Page 111

1 was a team effort.
2    Q.  Did The Panther Party have to take any
3 administrative action for the chartering of the bus?
4 And by that, I mean, for example, did you have to fill
5 out a form for the university to request the bus?
6    A.  No.  We told the university what we were trying
7 to do and they helped us get it.  As an actual official
8 form, I don't believe we had to fill out anything.
9    Q.  Okay.  How did you tell the university?
10    A.  We told somebody in the student engagement
11 office that we were working with.  And then I'm not sure
12 which department actually paid for the bus.  It might
13 have been the president's office.  But they figured out
14 a channel to get it done.
15    Q.  And when you say you told someone in the
16 student engagement office, was that in a phone call?
17 Was it a face-to-face conversation?  Did you send an
18 e-mail?  How did you have that conversation?
19    A.  There was a lot of face-to-face conversations.
20    Q.  Was it the university or the students who chose
21 the date that the bus would go?
22    A.  It was -- when you say the university, what do
23 you mean?  There's a lot of --
24    Q.  Maybe a better way to ask that question is:
25 Who made the decision as to when this bus would run?

Page 112

1    A.  So I guess the final decision had to come
2 through the university because they paid for it; but the
3 students had a lot of input, especially since I made the
4 flyer.
5    Q.  And did you specifically request bus service on
6 this Friday?
7    A.  It was -- did I specifically myself?
8    Q.  Panther Party.
9    A.  It was a conversation with multiple people.  I
10 don't know if it was just me that brought it up
11 initially.
12    Q.  Was there a consensus that Friday would be a
13 good day to have this bus service?
14    A.  Yes.  I think Friday may have been one of the
15 only days during the -- I think Friday was one of the
16 only days that we had off campus before the second week.
17 I'm thinking about the schedule, if I'm looking at the
18 schedule right.
19    Q.  Do you know how many students were transported
20 by the bus to vote?
21    A.  No.
22    Q.  Did you ride on that bus?
23    A.  I think I had drove -- I didn't ride on the
24 bus.  I think -- no, I didn't ride on the bus myself.  I
25 helped students get on the bus, though.

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 113

1  Q.  Do you know how long the bus trip took
2  roundtrip to go to Hempstead to take the students to
3  vote and then bring them back?
4  A.  No.  I'd have to speculate.
5  Q.  Have you talked to anybody who rode the bus to
6  go vote at the county courthouse on Friday, October 26?
7  A.  I met some people when they were getting off
8  the bus.
9  Q.  Did they tell you anything about the
10 experience?
11 A.  I don't think they really had any problems
12 other than they just -- probably just it was an
13 inconvenience to go off campus.
14 Q.  It's The Panthers Party -- excuse me.
15       It's The Panther Party's allegation in
16 this case that it was forced to divert its modest
17 organizational and financial resources to assisting
18 Prairie View student voters by hosting trainings,
19 organizing group transportation to early voting
20 locations, and conducting other educational and
21 organizing activities to assist PVAMU student voters.
22       That's out of the complaint in this case.
23 Do you agree with that statement as the contention of
24 The Panther Party in this case?
25 A.  Yes, that we had to go above and beyond,

---

Page 114

1  outside of what we normally do modestly, to help voters.
2  Q.  It is The Panther Party's core mission, at
3  least in terms of political engagement, to educate and
4  assist students with voting, right?
5  A.  That is our core mission, part of it.
6  Q.  Okay.  I looked on the web -- The Panther Party
7  has a website, correct?
8  A.  Yes.
9  Q.  Do you know what the domain name for that is?
10 A.  Pantherparty1876.org.
11 Q.  Okay.  On the website, it says the political
12 engagement committee seeks to promote the political
13 interests of Prairie View and to increase political
14 involvement through voter education, voter registration,
15 advocacy, and more.
16 A.  Yes.
17 Q.  You're familiar with that statement on the
18 website?
19 A.  Yeah, I probably wrote it.
20 Q.  All right.  It's a good statement.
21 A.  Thank you.
22 Q.  And you agree with it.
23 A.  Yes.
24 Q.  Okay.
25 A.  Hopefully.

---

Page 115

1  Q.  So as a general matter, the use of The Panther
2  Party's resources for trainings and organizing students
3  to vote is the mission of The Panther Party, right?
4  A.  Yeah.  To our ability, correct.
5  Q.  Okay.  What trainings did The Panther Party
6  host in advance of the 2018 election?
7  A.  We probably collaborated on some deputy
8  trainings.  That's pretty much it.  Just helping give
9  student -- giving students general information on how to
10 vote.
11 Q.  And when you -- okay.  Let's take those
12 separately.
13       Collaborated on deputy trainings, that's
14 training to be a deputy voter registrar?
15 A.  Yes.
16 Q.  And so that's essentially training to assist in
17 voter registration.
18 A.  Correct.
19 Q.  Okay.  That's something that The Panther Party
20 had done in prior elections, too, correct?
21 A.  Yes, we helped out with different trainings.
22 Q.  Okay.  Is it fair to say that The Panther Party
23 participates in voter registration activities regardless
24 of what the particular voting schedule is?
25 A.  Is it fair to say that we participate in

---

Page 116

1  voter -- say it again.
2  Q.  Yeah.
3       The Panther Party conducts voter
4  registration activities regardless of what the election
5  schedule is, right?
6  A.  Yes.
7  Q.  Okay.  You also said you give general
8  information on how to vote.
9  A.  Uh-huh.
10 Q.  What type of information do you provide in
11 that?
12 A.  Where to vote, times to vote.
13 Q.  And is that information provided through social
14 media posts?
15 A.  Yes, and other avenues.
16 Q.  Other avenues being the word of mouth that
17 you've talked to us about previously?
18 A.  Word of mouth, GroupMe.
19 Q.  Any other ways in which you disseminate that
20 information?
21 A.  No, I think that covers most of the bases.
22 Q.  Okay.  Is it also true that regardless of what
23 the locations and hours are, The Panther Party is going
24 to try to disseminate information about those hours and
25 locations to students?

---

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 117

1    A.  Yeah, we'll try.
2         (Exhibit No. 11 marked)
3    Q.  (BY MR. SEAQUIST) I marked Exhibit 10.  I'm
4  sorry.  11.
5         Mr. Muhammad, do you recognize what I've
6  handed you as Deposition Exhibit 11?
7    A.  Yes.
8    Q.  Okay.  Exhibit 11 is three different tweets
9  from The Panther Party.  Let's go through them quickly.
10        The first, which is Plaintiffs 227 Bates
11  label, is a post that says "TPP" -- does that stand for
12  The Panther Party?
13   A.  Yes.
14   Q.  "Getting students registered to vote today at
15  the involvement fair".
16   A.  Yes.
17   Q.  And this was in August 29th of 2018?
18   A.  That's what it says.
19   Q.  Okay.  And so what is an involvement affair --
20  excuse me, the involvement fair?
21   A.  It's like an open house for organizations.
22   Q.  And so is this event specifically hosted by The
23  Panther Party?
24   A.  No.  It's hosted by the office of student
25  engagement.

---

Page 118

1    Q.  All right.  Is it financed by The Panther Party
2  in any way?
3    A.  No.
4    Q.  Okay.
5    A.  Other than our table.
6    Q.  Does The Panther Party own the table?
7    A.  No.  The material on the table.
8    Q.  I see.  Okay.
9         All right.  So The Panther Party did
10  conduct voter registration in August 29th of 2018.
11   A.  Yes.
12   Q.  And that was before the County Commissioners
13  Court had actually adopted the early voting hours at
14  that point, correct?
15   A.  I don't know the exact date when they adopted
16  early voting hours.
17   Q.  Fair enough.
18        The next page, which is Plaintiffs
19  000179 --
20   A.  Yes.  It's in small print at the bottom.  I see
21  it.
22   Q.  This is a tweet from The Panther Party
23  advertising the voter deputy registrar training,
24  correct?
25   A.  Yes.

---

Page 119

1    Q.  Okay.  And so was this registrar training that
2  was put on by the County or by The Panther Party?
3    A.  I believe this was the County.
4    Q.  Okay.  The third page, Plaintiffs 245, what is
5  this page, sir?
6    A.  It's a flyer advertising voter registration at
7  the University Courtyard, which is right across the
8  street from us, mainly targeting freshmen.
9    Q.  Okay.  And this event was October 4th, 2018?
10   A.  Yes.
11   Q.  And it says here free food will be provided.
12   A.  Yes.
13   Q.  Was this the event that was paid for by
14  Mr. Siegel's donation?
15   A.  I believe so.
16   Q.  Did The Panther Party spend any additional
17  money beyond Siegel's donation on this voter
18  registration event?
19   A.  Yes.
20   Q.  What was that?
21   A.  I believe we paid for a deejay.  That's about
22  all I can think of.
23   Q.  And again, this event was to register new
24  voters.
25   A.  Correct.

---

Page 120

1    Q.  Okay.  Is this similar to events that The
2  Panther Party had held in past elections?
3    A.  Yes.  It's not too out of the ordinary.
4    Q.  The Panther Party's interrogatories say that it
5  created and paid for materials to address confusion and
6  conduct outreach about how to vote in the 2018
7  elections, including the early voting schedule.
8    A.  Yes.
9    Q.  Do you see that?
10        What materials did The Panther Party pay
11  to have created?
12   A.  Flyers mainly, handouts.
13        MS. ADEN:  Can you direct us to what rog
14  you're looking at, please?
15        MR. SEAQUIST:  No. 11.
16   Q.  (BY MR. SEAQUIST) In the next interrogatory,
17  No. 12, it actually says that you, Mr. Muhammad, paid
18  for those materials out of your pocket and that they
19  cost 50 to 100 dollars.  Is that right?
20   A.  Yes.
21   Q.  So when you say in your interrogatories that
22  The Panther Party paid to have materials created, what
23  you really mean is that you personally paid for those
24  materials; is that true?
25   A.  Yeah.  It would be like a donation to The

---

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 121

1  Panther Party for the use of The Panther Party.
2      Q.  But you didn't actually donate any money.  You
3  just paid out of your own pocket for some materials to
4  be printed; is that correct?
5      A.  Yes.
6      Q.  And you didn't receive any reimbursement for
7  those materials from The Panther Party.
8      A.  I didn't ask for it.
9      Q.  Okay.  Finally, in identifying the way that The
10  Panther Party had to divert its organizational
11  resources, you say that members volunteered their time
12  and other resources, including cars and gas money, to
13  drive students to off-polling campus -- excuse me, to
14  off-campus polling locations during the first week of
15  early voting.
16      A.  Yes.
17      Q.  How many students volunteered their cars to
18  drive students to the polls the first week?
19      A.  I don't have an exact number.
20      Q.  How many trips did each of those students make?
21      A.  I don't have an exact number.
22      Q.  Do you know overall how many trips were made to
23  the Waller County Courthouse?
24      A.  No.
25      Q.  Do you know how many students members of The

Page 122

1  Panther Party drove to the polls?
2      A.  No.
3      Q.  When you say that volunteers drove students,
4  where did they take them to?
5      A.  There were probably two locations.  One was in
6  Waller, the City of Waller -- City of Waller; and one
7  was in Hempstead at the courthouse.  But I think the
8  primary location was the courthouse.
9      Q.  Did The Panther Party, the organization, expend
10  any funds reimbursing those students for gas money?
11      A.  No.
12      Q.  Or the use of the -- did The Panther Party
13  reimburse them in any way for the use of their cars?
14      A.  No.  I don't know how you reimburse somebody
15  for the use of their cars.
16      Q.  Well, for example, by paying like a mileage
17  rate.
18      A.  No.
19      Q.  So the individuals who drove students to the
20  polls, whether at the courthouse in Hempstead or in the
21  City of Waller, volunteered their own time and
22  resources; is that correct?
23      A.  Yes.
24      Q.  But The Panther Party itself didn't use any of
25  its own resources, right?

Page 123

1      A.  Depending on how you define our own resources.
2      Q.  Well, it didn't use any of its own financial
3  resources.
4      A.  If you mean that we swiped our own personal
5  debit card, then no.
6      Q.  Was there any scheduled training or activities
7  that The Panther Party canceled or was unable to offer
8  because they had volunteers driving students to the
9  polls?
10      A.  I would say yes.  Probably --
11      Q.  What --
12      A.  We probably had some events that we wanted to
13  do; but instead of doing those events, there would
14  probably have just been a regular getting them to the
15  polls because, at MSC, we switched it up and had
16  actually to drive them to the polls.  So it changed the
17  logistics of what we wanted to do.
18      Q.  Okay.  So if I understand your testimony, what
19  you're saying is that typically you would have focused
20  on getting people to the MSC; but because of the early
21  voting schedule, you focused on getting people to the
22  courthouse in Hempstead.
23      A.  Yes.
24      Q.  Okay.  If there was no voting at the MSC in the
25  first week, there wouldn't have been any reason to try

Page 124

1  to get people there then, correct?
2      A.  I would say that.  There was no voting there
3  the first week -- if there was no voting -- if there was
4  voting, you mean, at Prairie View the first week?
5      Q.  No.  My question for you, sir, is:  Because
6  there was no voting at Prairie View the first week of
7  early voting, there would have been no reason to try to
8  direct people to the MSC to vote that week.
9      A.  Because there was no voting, then there would
10  be no reason to direct them to the MSC, correct.
11      Q.  How many members of The Panther Party own
12  vehicles?
13      A.  I don't know.
14      Q.  Would you say it's a majority?
15      A.  I wouldn't say -- it depends.  I wouldn't say
16  it's the majority.
17      Q.  And let me make my question clear, which is I
18  am referring specifically to the time that we're talking
19  about, which is at the time of the 2018 general
20  election.
21      A.  Yeah, I wouldn't know how many owned vehicles.
22      Q.  Okay.  So while a few members of The Panther
23  Party might have been using their own personal vehicles
24  to take students to vote off campus, the majority of The
25  Panther Party members would not have been doing that,

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

**Page 125**

1  correct?
2      A.  I would say I would assume so.
3      Q.  Those members who were not driving students off
4  campus to vote were still available to engage in other
5  activities on behalf of The Panther Party, correct?
6      A.  Either they were driving.  They were helping to
7  promote.  There's different logistics.  Like myself, I
8  have a car, but I would spend a lot of time -- because
9  also people came from Houston to help drive students
10  that were -- to help get students to the polls.
11          So even when I wasn't driving my car and
12  transporting students, I was on the phone coordinating
13  logistics and drivers and helping them meet students to
14  get them there.
15      Q.  Who came from Houston?
16      A.  Different people.
17      Q.  Students of the university or --
18      A.  Different people.  Both.  And in -- both.
19  Students, nonstudents.
20      Q.  Let me go back to -- my original question was:
21  Did you have -- did The Panther Party cancel any
22  scheduled events?
23      A.  Any scheduled events in stone?  Like it was an
24  event that we were -- that's a broad question.
25      Q.  My question -- well, for example, did you --

---

**Page 126**

1  the week before -- well, the first week of early voting,
2  were there any scheduled Panther Party events that had
3  to be canceled?
4      A.  There were prospective events; but even if
5  there weren't any prospective events, we pretty much
6  shut all those conversations down in order to focus on
7  transporting students to the polls.
8      Q.  What prospective events were there?
9      A.  There was different events in regards to -- I
10  mean, that was homecoming week, so different events in
11  regards to homecoming, just whatever.  There's a lot.
12      Q.  Can you tell me what you mean by events in
13  regard to homecoming?
14      A.  Homecoming is an event in itself, so it was
15  everything from things going throughout the day to
16  actually things at night.
17      Q.  So part of the homecoming activities?
18      A.  Yes.
19      Q.  What homecoming activities does The Panther
20  Party typically put on?
21      A.  There's nothing in particular.  If somebody's
22  got some ideas, we'll put something in place; but it's
23  not necessarily a set event every homecoming.
24      Q.  Any other prospective events that you can think
25  of?

---

**Page 127**

1      A.  No.
2      Q.  You state in your interrogatory responses, in
3  regard to the volunteers driving students to the
4  courthouse, that those students would have otherwise
5  been unable to cast a vote because of their other
6  obligations, for example, class schedules, work
7  obligations, and lack of access to transportation.
8          Do you remember making that statement?
9      A.  Say it again.
10      Q.  Sure.
11          There is a statement in the interrogatory
12  responses --
13          MS. ADEN:  Can you tell us what number?
14          MR. SEAQUIST:  Yeah.  Let me pull it up.
15          MS. ADEN:  It's No. 2.
16      Q.  (BY MR. SEAQUIST) This is also on -- it's
17  Exhibit 2, Interrogatory No. 11.  And I'm looking at the
18  top of page 11.
19          You say, in regard to the students who
20  were driven off campus to vote, "These students would
21  have been" -- "would have otherwise been unable to cast
22  a vote because of their other obligations (for example,
23  class schedules, work obligations) and lack of access to
24  transportation."
25          Do you see that?

---

**Page 128**

1      A.  Yes.
2      Q.  All right.  Do you recall making that
3  statement?
4      A.  Probably so, in between me and my legal team.
5      Q.  All right.  But you understand that in the
6  initial plan the Commissioners Court scheduled early
7  voting from Monday, October 29th, through Wednesday,
8  October 31st of 2018, from 8:00 a.m. to 5:00 p.m. each
9  day --
10      A.  Uh-huh.
11      Q.  -- at the Memorial Student Center, correct?
12      A.  Yes.
13      Q.  Now, students don't need access to
14  transportation to vote at the student center, correct?
15      A.  They don't need access.  They probably can
16  walk.
17      Q.  Okay.  So can you identify any individual
18  students who would have been otherwise unable to vote
19  during those times at the student center because of
20  their other obligations?
21      A.  I know some students -- not a name, but I know
22  some students had went out of town just in the hustle
23  and bustle of being a student.  I don't know if that
24  week was midterms week.  I think it may have been after
25  or before homecoming that week.  But there was a lot of

---

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 129

1 things that were going on that those -- just those three
2 days didn't give a lot of opportunity and actually
3 hindered a lot of students from being able to vote.
4    Q. Okay. But you can't tell me anyone in
5 particular that was actually hindered in their ability
6 to vote.
7    A. Not an exact name, no.
8    Q. You said people being out of town?
9    A. Uh-huh.
10    Q. That was not -- school was in session on that
11 Monday through Wednesday, correct?
12    A. Correct.
13    Q. In the initial plan the Commissioners Court
14 also provided voting from 7:00 a.m. to 7:00 p.m. in the
15 Waller County Community Center on Thursday, November
16 1st, and Friday, November 2nd, correct?
17    A. Say it again. Thursday, November 1st, and
18 Friday, November 2nd?
19    Q. Yes.
20    A. I believe that's right, if that's what they
21 said.
22    Q. Okay. And so that Thursday and Friday are the
23 days immediately following the Monday through Wednesday
24 voting at the Memorial Student Center, correct?
25    A. That sounds like it coincides.

---

Page 130

1    Q. Yeah.
2        Did The Panther Party ever publicize the
3 early voting hours at the Waller County Community
4 Center?
5    A. I believe we shared it. I don't know if it's
6 somewhere on the Twitter, but I believe we shared it.
7    Q. Okay. In looking through the social media --
8 well, in looking through the documents produced, I
9 didn't see any reference to the voting at the community
10 center. But it's your recollection that there would be
11 some notification from The Panther Party to let students
12 know that they could vote at the community center.
13    A. Yeah. Twitter isn't our only means of
14 communication.
15    Q. Okay. Because it would be important for them
16 to know that that was an option to them, right?
17    A. It would be important.
18    Q. Okay. And you testified earlier that you've
19 been to the Waller County Community Center.
20    A. I have, yes.
21    Q. You testified earlier that The Panther Party
22 has a P.O. -- or at least at the time -- had a
23 P.O. box at the post office.
24    A. Correct.
25    Q. And that's right next-door to the community

---

Page 131

1 center, correct?
2    A. Yes, but not everybody goes and checks the
3 mail.
4    Q. Who does at The Panther Party check the mail?
5    A. Probably me or whoever has -- if I give the key
6 to somebody.
7    Q. And when you go to get the mail, how do you get
8 to go get the mail?
9    A. I may drive. Yeah.
10    Q. Have you ever walked over to the post office?
11    A. No.
12        (Exhibit No. 12 marked)
13        MR. SEAQUIST: I've marked Exhibit 12.
14    Q. (BY MR. SEAQUIST) Mr. Muhammad, I will
15 represent to you that Exhibit 12 is a Google satellite
16 map.
17    A. Uh-huh.
18    Q. In the center of the map -- well, let me ask
19 you. Do you recognize the picture displayed here to be
20 a portion of the Prairie View A&M campus?
21    A. Yes.
22    Q. You see the football stadium there?
23    A. Yes.
24    Q. All right. And do you see in the map where it
25 is labeled the United States Postal Service?

---

Page 132

1    A. Yes.
2    Q. Is that the post office where The Panther
3 Party's mailbox is?
4    A. Yes.
5    Q. All right. And there's a little red arrow
6 there and in blue writing it says Waller County
7 Community Center. Do you see that?
8    A. Yes.
9    Q. That's actually not the community center, is
10 it?
11    A. No.
12    Q. All right. What -- can you identify in this
13 picture the building that is the community center?
14    A. It has a white roof, right next to the post
15 office.
16    Q. To the left in the picture?
17    A. Yes, to the left.
18    Q. Okay. Does this image fairly and accurately
19 depict the portion of the campus shown on the map?
20    A. Yeah, I think Google got it right.
21    Q. All right. With the exception of the label of
22 the community center?
23    A. Yeah, outside of that.
24    Q. Now, there is a sidewalk that leads from campus
25 to the post office parking lot, correct?

---

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 133

1    A.  I'm not sure how far that sidewalk extends.
2    Q.  Can you see a sidewalk in the image there?
3    A.  I think I see something that looks like a
4  sidewalk, but I'm not sure if it's interrupted by grass
5  or not.
6    Q.  Okay.  And it goes, from campus, kind of across
7  the street from the Hobart Taylor Hall there.  Do you
8  see that?
9    A.  No.  I'm not sure what you're referring to
10  exactly.
11    Q.  Do you see the Hobart Taylor Hall?
12    A.  I see Hobart Taylor Hall.
13    Q.  And there's a street that runs immediately in
14  front of Hobart Taylor, correct?
15    A.  In front of Hobart Taylor?  Does it say
16  T.R. Solomon?  Or behind Hobart Taylor?  It's on --
17    Q.  I'm sorry.  You're right.  Behind Hobart
18  Taylor, there's a street that runs immediately behind
19  Hobart Taylor.
20    A.  That's connecting two parking lots?
21    Q.  Yes.
22    A.  Yes.
23    Q.  Okay.  On the -- and then across that street
24  there's a large field.
25    A.  Yes.

Page 134

1    Q.  On the left side of the field, do you see a
2  sidewalk that runs down along the parking lot toward the
3  post office?
4    A.  I'm not sure if that's a sidewalk.  It could
5  just be a man-made sidewalk, just grass that was --
6    Q.  Do you know one way or the other whether
7  there's a sidewalk right there?
8    A.  No, not off the top.
9    Q.  Okay.  Have you had classes -- or when you were
10  at Prairie View A&M, did you have classes in Hobart
11  Hall?
12    A.  Yeah.  I didn't like going to them.
13    Q.  Is it a common place for students to have
14  classes?
15    A.  No, not really.  It depends what your major is.
16    Q.  Okay.  Your major was engineering?
17    A.  Yes.
18    Q.  What classes did you have in Hobart Hall?
19    A.  I had an engineering class there, which was out
20  of the normal because we have an engineering building.
21  But depending on the scheduling then, if there's no
22  other spots left, they might throw us in Hobart.
23    Q.  Why didn't you like going to Hobart?
24    A.  It's really far.
25    Q.  Far from what?

Page 135

1    A.  Far from the center of campus, so not in this
2  picture.  The MSC is across a field, and then if you're
3  on campus -- say I'm in the engineering building which
4  is on -- on the side of campus we're on right now.  A
5  walk to Hobart is pretty extensive.
6    Q.  Okay.  Did you petition the university to try
7  to have your engineering class moved closer to the
8  center of campus?
9    A.  I mean, we can ask; but sometimes, if they
10  don't have any spots, then they won't do it.
11    Q.  Well, my question was did you ask.
12    A.  Yes, sometimes we did ask.  We try to get
13  buildings -- we try to get rooms switched around.  We'll
14  ask our teacher to see if they can move it.
15    Q.  PVAMU operates a shuttle, correct?
16    A.  Yes.
17    Q.  And have you ever ridden that shuttle?
18    A.  One time I twisted my ankle, so I couldn't
19  really drive.
20    Q.  There are several different shuttle routes; is
21  that right?
22    A.  Yes.
23    Q.  One of them, though, is a campus loop.  It just
24  goes around the campus?
25    A.  I believe so.

Page 136

1    Q.  When you're riding that shuttle, does it only
2  stop at scheduled stops or can you just ask the driver
3  to get out kind of wherever you want to along the route?
4    A.  I think it's only scheduled stops.
5    Q.  Do you know for sure one way or the other?
6    A.  No.  The campus shuttle, it's not as consistent
7  as we would like it to be, so I try to stay away from it
8  as much as I can, especially since I have a car.  But I
9  don't know -- I know -- I think it's just scheduled
10  stops.
11    Q.  Do you know whether the shuttle has a stop at
12  that parking lot behind the post office?
13    A.  If the shuttle has a stop in the parking lot
14  behind the post office?
15    Q.  Yes.
16    A.  No.  I think it may stop in front of Hobart
17  maybe or at the corner somewhere.
18        MR. SEAQUIST:  I'm going to mark Exhibit
19  13.
20        (Exhibit No. 13 marked)
21    Q.  (BY MR. SEAQUIST) Mr. Muhammad, I'll represent
22  to you that Exhibit 13 is a bus schedule that was
23  produced to us by plaintiffs.  It is Bates labeled
24  Plaintiffs 00329.
25    A.  Uh-huh.

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 137

1    Q.  And behind that are copies of the routes which
2  are labeled Plaintiffs 330 through 337.
3          And if you would, I would like to look at
4  at the page that is labeled Plaintiffs 333.
5    A.  Uh-huh.
6    Q.  Do you see at the top left-hand of the page
7  there this is labeled the Panther Loop route?
8    A.  Yes.
9    Q.  And do you have an understanding as to what
10  that is?
11    A.  I guess it's a loop around campus.
12    Q.  Okay.  And do you see that on that route the
13  stops are indicated in white circles?
14    A.  Yes.
15    Q.  And then the route is outlined in purple
16  highlighting?
17    A.  Yes.
18    Q.  Do you see a white circle in the parking lot to
19  the right of the bottom edge of the football stadium
20  there?
21    A.  I do see a white circle there.
22    Q.  Okay.  Do you think that is a stop at the
23  parking lot behind the post office?
24    A.  It looks close enough.
25    Q.  Now, if we look back at the first page of this

---

Page 138

1  exhibit, which is page 329 --
2          MS. ADEN:  Can I stop you there?  Because
3  doesn't it look like on that purple line north of the
4  circle that it says Solomon, which is the road behind
5  that Mr. Muhammad pointed out?  Do you see that?
6          MR. SEAQUIST:  It certainly does say
7  Solomon, but my recollection of the testimony -- and
8  Mr. Muhammad can certainly clarify -- is that the
9  T.R. Solomon is the road that runs in front of Hobart
10  Taylor Hall.
11    Q.  (BY MR. SEAQUIST) Is that correct, sir?
12    A.  Yes.
13    Q.  Okay.  And so if we look at 333, the bus route,
14  there is a portion of the route where the shuttle comes
15  down below T.R. Solomon, it looks like along the side of
16  the Hobart Hall there, and then drops off at that
17  parking lot.  Does that appear to be correct to you?
18    A.  I'm not sure what the actual dropoff is or
19  how -- I don't know if this is to scale or how long the
20  actual route is right there.  So I wouldn't be able to
21  tell you where it drops off at.
22    Q.  Okay.  Is it fair from the depiction here that
23  the stop, however, is below T.R. Solomon?
24    A.  When you say "below," you mean going south
25  of -- I guess that's south of T.R. Solomon?

---

Page 139

1    Q.  I assume that is south, although there's not an
2  indicator for north here, so I'm saying "below" just in
3  case.  But it looks south on the map.  Assuming north is
4  at the top of the map, then, yes, south.
5    A.  It looks south.
6    Q.  Okay.  Now, if we look back on the first page,
7  near the top left-hand corner it says "Route, On Campus
8  Loop".  Do you see that?
9    A.  No.
10    Q.  If I point right here --
11    A.  Oh, okay.
12    Q.  "On Campus Loop"?
13    A.  Uh-huh.
14    Q.  And it says -- well, the purple -- on the
15  on-campus loop, it says it departs the MSC, correct?
16    A.  Uh-huh.
17    Q.  And then it goes around campus.  Is that your
18  understanding?
19    A.  Based off what this says on this paper.
20    Q.  Okay.  So this says it runs every 15 minutes.
21    A.  Based off what it says on this paper.
22    Q.  All right.  You said you had ridden the shuttle
23  once?
24    A.  Yes.
25    Q.  Okay.  And in your experience -- well, do you

---

Page 140

1  remember how long you had to wait for the shuttle?
2    A.  I mean, if I happened just to catch it at the
3  right time, then I wouldn't have to wait at all.
4    Q.  Okay.  But do you remember specifically?
5    A.  No.  That's something that's hard to remember.
6    Q.  Okay.  Are you aware that student groups hold
7  events at the Waller County Community Center?
8    A.  Probably so.
9    Q.  Do you know anyone who voted at the community
10  center?
11    A.  No.
12    Q.  Did The Panther Party organize any
13  transportation for students to go vote at the community
14  center?
15    A.  I believe -- not -- I don't think we did.  I
16  think we tried to take advantage of the days before the
17  community center.
18    Q.  So you didn't feel like it was necessary to try
19  to arrange transportation for students to go vote at the
20  community center on that Thursday or Friday.
21    A.  Not necessarily necessary, but we had done a
22  lot already before that.  So we only had so much
23  resources to focus on.  We already did like probably, I
24  think, four days up to that point.
25    Q.  Were you present at the October 17th, 2018

---

Page 141

1  Commissioners Court meeting?
2      A.  Yes.  I think I'm on video.
3      Q.  Okay.  Other than that meeting, had you
4  attended any other Commissioner Courts -- Commissioners
5  Court meetings in the fall of 2018?
6      A.  No, not in the fall of 2018.
7      Q.  You testified a minute ago that you were on
8  video at the Commissioners Court meeting?
9      A.  Uh-huh.
10     Q.  Have you watched that video since?
11     A.  No.  I don't like hearing my voice on tape.
12     Q.  So that's a no?
13     A.  That's a no.
14     Q.  But you did speak at the meeting.
15     A.  Yes.
16     Q.  And when you spoke, do you remember whether you
17  identified yourself as a representative of The Panther
18  Party?
19     A.  I probably mentioned it.
20     Q.  Do you know one way or the other?
21     A.  No.
22     Q.  Before -- well, let's say other than attending
23  that meeting, during the fall of 2018 did you talk to or
24  otherwise communicate with -- directly with any
25  officials or employees of Waller County about voting

Page 142

1  locations or hours?
2      A.  Yes, Christy Eason.
3      Q.  Okay.  Can you tell me -- how many times did
4  you talk to Christy Eason about voting locations and
5  hours in the fall of '18?
6      A.  I don't know.
7      Q.  Could it have only been once?
8      A.  It was more than once.  It was more than just
9  me.
10     Q.  When you say it was more than just you, was it
11  like a conference call?
12     A.  I remember one time it was me and Kirsten was
13  on a call with her.  I know other people had probably
14  called and spoke to her as well.  So it was more than
15  just me as an individual reaching out.
16     Q.  Okay.  And so that was a communication on the
17  phone, correct?
18     A.  Yes.  We may have -- all of us talked to her
19  when she came -- I believe she came for a deputy
20  registrar.  We talked to her there as well, too.  But I
21  don't remember the full nature of the conversation.
22     Q.  In the phone call what -- what's -- what do you
23  remember to be the substance of the call that you and
24  Kirsten had with Ms. Eason?
25     A.  Expressing concerns about the -- the voting

Page 143

1  hours that we had and days, seeing if we could get more.
2  And then pretty much the end to that conversation was
3  that it would be -- the final decision was by the
4  Commissioners Court, which is how we -- led us to going
5  to the Commissioners Court meeting on the 17th, I
6  believe, of October of 2018.
7      Q.  Do you remember whose phone you called from?
8      A.  No.
9      Q.  Do you remember where you were when you made
10  that call?
11     A.  I probably was at work.  I worked on campus in
12  the juvenile justice.
13     Q.  Was that a call you would have made from a
14  phone at the juvenile justice area or --
15     A.  It's a cell phone.
16     Q.  Cell phone?
17         What was your cell phone number at the
18  time?
19     A.  It's been the same for -- I think since high
20  school.  So 832 --
21         MS. ADEN:  I'm going to object because he
22  is a party in this action as a representative and,
23  before then, as an individual plaintiff and he could be
24  contacted through counsel.  I don't think it's relevant
25  or necessary for you to have access to his personal cell

Page 144

1  number.
2          MR. SEAQUIST:  I understand.  I will tell
3  you the reason I am asking for his cell number is not to
4  contact him directly, but to check it against the county
5  phone records.
6          MS. ADEN:  Okay.  Go ahead and answer.
7          THE WITNESS:  (832) 398-2088.  I have do
8  not disturb, so it's okay.
9          MR. SEAQUIST:  I assure you --
10         MS. ADEN:  He's not thinking of --
11         MR. SEAQUIST:  I assure you -- I won't
12  take that personally.
13     Q.  (BY MR. SEAQUIST)  Okay.  Thank you for that,
14  sir.
15         Okay.  Other than that one call with
16  Ms. Eason, do you remember specifically any other calls
17  that you were a party to with Ms. Eason?
18     A.  No, not off the top.
19     Q.  Okay.  Did you ever talk to Trey Duhon, the
20  county judge?
21     A.  I believe I had a conversation with him.
22     Q.  And where did that conversation take place?
23     A.  It could have been at the -- I know we spoke to
24  him at the Commissioners meeting.  We probably spoke to
25  him before then.  I know he was on campus once or twice

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 145

1  and I seen him, so it was when I ran across him.
2      Q.  So with Mister -- or with Judge Duhon, that was
3  not a phone conversation.  That would have been an
4  in-person conversation?
5      A.  I believe so.
6      Q.  And do you remember the nature or substance of
7  that conversation?
8      A.  No.
9      Q.  Did you ever talk to -- do you know who Jeron
10  Barnett is?
11      A.  Yes.
12      Q.  And he is the County Commissioner for Precinct
13  3?
14      A.  Uh-huh.
15      Q.  And County Precinct 3 encompasses the
16  university of Prairie View, right?
17      A.  Yes.
18      Q.  And have you ever talked to Commissioner
19  Barnett about the early voting locations or hours in the
20  fall of 2018?
21      A.  I remember at the Commissioners Court, when he
22  voted down on adding more hours, I gave him a piece of
23  my mind.
24      Q.  And when did you do that, sir?
25      A.  It was after the meeting.

Page 146

1      Q.  And where was that conversation?
2      A.  Well, it was after the meeting and I addressed
3  the Commissioners Court, so he was included in that as
4  well, too.  But it was at Commissioners Court.
5      Q.  So this was not during a time when you were
6  signed up to speak.  This was after that?
7      A.  So I addressed him.  I addressed the whole
8  Commissioners Court.  So he was on the -- of course, on
9  the panel.  And then after, I spoke to him directly.
10      Q.  Okay.  I guess that second piece is the part
11  that I'm trying to nail down.
12          When you spoke to him directly afterwards,
13  where was he and where were you?
14      A.  We were still in the Commissioners Court.  It
15  was probably, I think, a break maybe.
16      Q.  Okay.  So he was down off the dais and you were
17  in the gallery or where?
18      A.  Yes.  And we were pretty much talking to the
19  Commissioners at that time that we could get ahold of.
20      Q.  Okay.  And at that time you addressed
21  Commissioner Barnett.  And what -- you said you gave him
22  a piece of your mind, but what did you tell him?
23      A.  I expressed my displeasure with his down vote
24  and also his reasoning for his down vote for not
25  approving more days.

Page 147

1      Q.  Anything else you told him at that time?
2      A.  I don't remember.  But that was pretty much the
3  gist of the conversation was my displeasure.
4      Q.  After that conversation have you had any
5  further discussions with Commissioner Barnett about the
6  early voting hours?
7      A.  I wouldn't say directly, but I know pretty much
8  after that we -- since that was like the last
9  Commissioners meeting, then we focused more so on what
10  we could do to pretty much rectify what -- the decision
11  they made and get students out to vote.
12          MR. SEAQUIST:  Objection, nonresponsive.
13      Q.  (BY MR. SEAQUIST) My question is just whether
14  you had any other conversations directly with
15  Commissioner Barnett.
16      A.  So a direct answer, I think, was in that
17  question; but I would say I don't believe so.
18      Q.  Perfect.  Thank you.
19          Other than at that Commissioners Court
20  meeting, have you talked to any other County
21  Commissioners about the early voting schedule in Prairie
22  View in 2018?
23      A.  I believe outside of my Commissioner Barnett,
24  maybe Judge Duhon.  I may have said something to some of
25  the other people that were on the County Commissioners

Page 148

1  Court, but I focused on them two because those are the
2  main two that represent my precinct.
3      Q.  So no specific conversations with the other
4  Commissioners that you can recall.
5      A.  No.
6      Q.  You testified earlier, I think, that you know
7  the local chair of the Democratic party, Ms. Rosa
8  Harris?
9      A.  Yes.
10      Q.  Did you talk to Rosa Harris about the early
11  voting hours and locations in Prairie View during the
12  fall of 2018?
13      A.  Yes.  I also -- I expressed displeasure towards
14  her, too, after that at the Commissioners Court meeting.
15      Q.  And you understood that as the local Democratic
16  party chair, Ms. Harris had approved the early voting
17  schedule adopted by the Commissioners Court, correct?
18      A.  She approved, yeah, for the -- for the
19  precinct, but she doesn't necessarily represent me as a
20  Democrat.
21      Q.  Do you -- are you a member of any third party?
22      A.  No.  I would be independent.  I'm independent.
23      Q.  Have you ever supported a third party
24  candidate?
25      A.  Have I ever supported a third party candidate?

512-743-5867        Cooley Reporting      512-410-3012 (fax)
Jcooleycsr@gmail.com

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 149

1 Probably so.  But I really don't focus on parties that
2 much, more so just what are my interests.  And if those
3 interests align with -- if that party aligns with my
4 interests, then I may throw my vote in that election.
5     Q.  So if I were to ask you if you could identify
6 any independent candidate, that is, one who is not
7 affiliated with either the Republican or the Democratic
8 parties, that you had supported in a past election,
9 could you tell me anybody?
10     MS. ADEN:  Objection.  And so you're
11 asking him in his individual capacity for this, for
12 these responses?
13     MR. SEAQUIST:  Yes.
14     MS. ADEN:  And where on the list of topics
15 does this fall under?
16     MR. SEAQUIST:  Well, I think that it goes
17 to -- I mean, obviously we're talking about the chairman
18 of the board of the organization here and so I think
19 that his -- in particular, I'm following up on his
20 comment that Ms. Patlan didn't represent him as a
21 Democrat.
22     MS. ADEN:  I'm going to object, for the
23 record, that I don't think this falls within the scope
24 of the deposition topics.
25     But you can, of course, answer to the best

Page 150

1 of your ability.
2     THE WITNESS:  Ask the question again.
3     Q.  (BY MR. SEAQUIST) My question is whether or not
4 you could identify for me any candidate who was not
5 associated with either the -- any independent candidate
6 who was not associated with either the Republican or
7 Democratic party that you have supported.
8     A.  When you say support, what do you mean?
9     Q.  Favored as a candidate.
10     A.  So I'm more so objective.  So I may agree
11 with -- I may not support a person fully, but I might
12 support some things they said.  That doesn't mean I'm
13 going to vote for them, though, just because they
14 tickled my ears.
15     Q.  Okay.
16     A.  So I couldn't just say that no, I didn't.  Like
17 Bernie is an independent; but he's, I think, running on
18 the Democratic ticket.  Some things he says I'm cool
19 with.  I know it's like -- I think it's called like
20 the -- it's like the green party or something like that.
21 I heard some things they said that I was cool with, but
22 that doesn't mean I'm just going to go out and vote for
23 them or that I'm rocking with them fully.
24     Q.  Okay.  Did you drive yourself to the courthouse
25 on October 17th?

Page 151

1     A.  I believe I did.
2     Q.  Did you take any other students with you?
3     A.  Some may have carpooled with me.
4     Q.  You were also at the courthouse on October
5 24th, 2018, correct?
6     A.  I don't know.  Was I?  I'm not sure.
7     Q.  That was the day that the Commissioners Court
8 met and expanded the voting hours.
9     A.  I might have been there.
10     Q.  Do you remember talking to Christy Eason when
11 you were there that day?
12     A.  No.  It was -- I know I talked to her.  I don't
13 know whether it was on the 17th or the 24th.
14     Q.  You are aware, though, that the County
15 Commissioners Court did add additional early voting
16 hours and an extra location in the City of Prairie View,
17 right?
18     A.  I am aware probably because we put pressure on
19 them.
20     MR. SEAQUIST:  I'm going to object to
21 nonresponsive.
22     Q.  (BY MR. SEAQUIST) I wasn't -- my question is
23 just whether you're aware of it.
24     A.  I'm aware.
25     MR. SEAQUIST:  Okay.  I'm marking Exhibit

Page 152

1 14.
2     (Exhibit No. 14 marked)
3     Q.  (BY MR. SEAQUIST) Mr. Muhammad, do you
4 recognize what I've handed you as Exhibit 14 today?
5     A.  It looks like the -- the updated voting
6 location schedule probably after the 24th.  It looks
7 like it's the one after the 24th.
8     Q.  The 24th of October?
9     A.  Yes.
10     Q.  And that's in 2018?
11     A.  Yes.
12     Q.  And so this is something you've seen before?
13     A.  It looks familiar.
14     Q.  When the County put this out after the 24th of
15 October, do you know whether The Panther Party
16 disseminated it through social media or otherwise?
17     A.  I know we shared it.  I don't know if it was
18 through social media, though.
19     Q.  Okay.  The change extended the hours at the MSC
20 on Monday through Wednesday which were originally from
21 8:00 to 5:00.  This changed it to 7:00 a.m. to 7:00
22 p.m., correct?
23     A.  I believe that was the change.
24     Q.  Okay.  Also added Sunday voting on October 28th
25 at the Prairie View city hall?

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 153

1    A.  Yes, that's what it says here.
2    Q.  Have you ever voted in a city election in the
3  City of Prairie View?
4    A.  I have.
5    Q.  And where do they hold those elections
6  typically?
7    A.  It can be either at city hall or on campus.
8    Q.  Have you voted at the city hall before?
9    A.  I believe I have.
10   Q.  Have you ever been to the Panther Hill
11 apartment complex?
12   A.  Yes.
13   Q.  Do you know how far the Prairie View city hall
14 is from the Panther Hill Apartments?
15   A.  I don't know exact location -- exact distance.
16   Q.  Where did you end up voting in the November 28
17 election?
18   A.  Where did I end up voting in the November 28th
19 election?
20   Q.  The general election, yes, sir.
21   A.  I believe I voted at the Waller County
22 Courthouse.
23   Q.  Actually, let me ask you a question.  Were you
24 registered to vote in Waller County in 2018?
25   A.  Yes.

Page 154

1    Q.  And it's your recollection that you voted at
2  the courthouse?
3    A.  Correct.
4    Q.  What day did you -- do you remember what day
5  you voted?
6    A.  I voted in October for the November election.
7    Q.  During early voting?
8    A.  Yes.  It was about October or early November
9  because I think early -- early voting went into early
10 November.  The 2nd, I believe, was when it stopped.
11   Q.  Do you -- when you register to vote, do you
12 register under the name Muhammad or Perkins?
13   A.  I register under the name Perkins.
14   Q.  Okay.
15   A.  But I hate using that name.
16   Q.  Is that -- is Perkins the name on your driver's
17 license?
18   A.  Yes.
19   Q.  When you got to the courthouse to vote early,
20 did you have any difficulties casting a ballot?
21   A.  There might have been a slight line, but that
22 was pretty much it.
23   Q.  When you say "a slight line," do you know about
24 how long it took you?
25   A.  No.  Maybe a maximum of 30 minutes.

Page 155

1    Q.  Do you know what the typical lines were for
2  early voting at the MSC?
3    A.  The typical lines for early voting?
4    Q.  Yeah.
5    A.  It depends.  There was a really long line --
6  are you talking about just during November 2018 or just
7  in general?
8    Q.  No, sir.  I'm talking about just the November
9  2018 election.
10   A.  No, I couldn't tell you off the top.
11       (Exhibit No. 15 marked)
12   Q.  (BY MR. SEAQUIST) I'll hand you what I've --
13 I've marked Exhibit 15.  I will hand it to you.  Exhibit
14 15 is two tweets that were retweeted by The Panther
15 Party.
16   A.  Uh-huh.
17   Q.  Do you see that?
18   A.  Yes.
19   Q.  The first one says -- it's a picture of a
20 person holding an "I voted" sticker.
21   A.  Uh-huh.
22   Q.  And it says "Only took 5 minutes go vote pv".
23       And do you see the date and time of that
24 post?
25   A.  October 31st.

Page 156

1    Q.  Okay.  On the second page, it's another Panther
2  Party retweet that says "I VOTED.  Now y'all go do the
3  same!!  It takes less than 5 minutes".
4        Do you see the date on that one?
5    A.  Yes.
6    Q.  October 29th, 2018, correct?
7    A.  Yes.
8    Q.  Okay.  Do you have any reason to dispute that
9  the average voting time at the MSC during early voting
10 was five minutes or less?
11   A.  I don't have any -- that's speculation.  I
12 mean, I didn't sit there with a --
13   Q.  My question is:  Do you have any reason to
14 dispute it?
15   A.  I have no reason to --
16       MS. ADEN:  I'm sorry.  I'm going to
17 object.  Can you -- to the question, because you said
18 the average voting time.  Aren't these documents that
19 you're showing just talking about like two moments in
20 time that people are talking about?  So where is the
21 average coming from?
22       MR. SEAQUIST:  Well, I'm not -- I'm asking
23 Mr. Muhammad about his knowledge.
24       MS. ADEN:  About the average voting time.
25       MR. SEAQUIST:  These are two examples.

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 157

1    MS. ADEN:  And you're asking him for his
2  opinion about the average voting time.
3    MR. SEAQUIST:  That, I am.
4    MS. ADEN:  Okay.
5    THE WITNESS:  I have no reason to confirm
6  or deny that statement.
7    Q.  (BY MR. SEAQUIST)  Okay.  Did you have anybody
8  tell you in relation to early voting at the 2018 general
9  election that there were any kind of long lines for
10  voting?
11    A.  Not that I can think of.
12    Q.  Okay.  In terms of the 20 members of The
13  Panther Party, you know, around the 2018 general
14  election -- and I understand that's approximate, but
15  it's the number that's been given in the
16  interrogatories.  Is it fair to say that -- is it fair
17  to say that the members may have different socioeconomic
18  circumstances?
19    A.  Yes.
20    Q.  For example, some of the members may have a
21  vehicle while others do not, correct?
22    A.  Yes.
23    Q.  And some members of The Panther Party may have
24  different access to financial resources than others,
25  right?

Page 158

1    A.  Yes.
2    Q.  Some may be better off than others are.
3    A.  Correct.
4    Q.  Some members of The Panther Party may live on
5  campus.  Others may not.
6    A.  Yes.
7    Q.  Some may even live outside of Prairie View; is
8  that true?
9    A.  Yes.
10    Q.  Some members of The Panther Party may have been
11  registered to vote in Waller County for the 2018
12  election and some may not have been, correct?
13    A.  Some.  I don't know exactly what "some" means,
14  but if it's more than one, yeah.
15    Q.  To your knowledge, do you know whether all of
16  the members of The Panther Party who registered and are
17  able to vote choose to vote early in the 2018 general
18  election?
19    A.  To my knowledge, I don't know if everybody
20  voted early, no.
21    Q.  So some members may choose to vote early
22  because it's more convenient and others may choose to
23  vote on election day; is that correct?
24    A.  That's an individual prerogative, so --
25    Q.  Okay.  On election day am I correct that there

Page 159

1  was a Parade of Voters or a march of some sort?
2    A.  I believe that was on election day.
3    Q.  And that was a march on campus?
4    A.  Yes.
5    Q.  Did The Panther Party participate in organizing
6  that march?
7    A.  Yes.
8    Q.  How did that march come about?
9    A.  Somebody said they wanted to do a march.  I
10  don't know who first said it.  And then we said "That's
11  a cool idea.  Let's do it."  And we put it together and
12  we did it.
13    Q.  And what specifically was The Panther Party's
14  role in organizing the march?
15    A.  Just pretty much helping with the logistics as
16  much as we could and helping promote it.
17    Q.  Did The Panther Party play a role in choosing
18  the route of the march?
19    A.  I don't know if we had much input on that.
20    Q.  To your recollection, did the members of The
21  Panther Party participate or walk in the march?
22    A.  Yes.  A few of our members actually spoke at
23  the ending rally.
24    Q.  Okay.  And where did the ending -- where did it
25  end up?

Page 160

1    A.  In front of the MSC.
2    Q.  In front of the MSC?
3    And the march started at 10 o'clock on
4  election day, November the 6th, in 2018?
5    A.  I don't know.
6    Q.  Was it a walkout march?
7    A.  What does a walkout march mean?
8    Q.  Where students leave class to go participate in
9  the march?
10    A.  That was an individual prerogative.
11    Q.  Was there supposed to be an air horn blown at
12  the time it was starting so that students could come out
13  and join the march?
14    A.  I don't know.  They knew where to meet us at.
15    Q.  Okay.  Can we look back -- or will you look
16  back with me at Exhibit 6?
17    A.  Uh-huh.
18    Q.  This is the flyer for the Parade of Voters on
19  November 6th, correct?
20    A.  Correct.
21    Q.  And this was retweeted by The Panther Party?
22    A.  Yes.
23    Q.  At the bottom of this -- and I will apologize.
24  It's not the clearest of writing.  But does this flyer
25  identify the parade route?

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 161

1    A.  Yes.
2    Q.  Can you make out the --
3    A.  It identifies the departure.
4    Q.  Okay.  Can you -- below that, do you see where
5  it says "Parade Route"?
6    A.  Oh, yes, I see that.
7    Q.  Can you identify what the route of the parade
8  was?
9    A.  It looks like it says UC courtyard, the View,
10  Phase I, Phase -- I don't know -- Phase something and
11  the athletic complex and MSC.
12        MR. SEAQUIST:  Okay.  Now I'm going to
13  mark 16.
14        (Exhibit No. 16 marked)
15    Q.  (BY MR. SEAQUIST) Okay.  16 is a tweet that was
16  retweeted by Jayla Allen.  And you know who Jayla Allen
17  is, correct?
18    A.  Yes.
19    Q.  A member of The Panther Party?
20    A.  Amongst other things.
21    Q.  A plaintiff in the lawsuit?
22    A.  Yes, amongst other things.
23    Q.  Okay.  So on the half part of this, this shows
24  the Parade of Voters and then on the right side it shows
25  the parade route.  Do you see that?

---

Page 162

1    A.  Yes.
2    Q.  Did you march in this parade?
3    A.  I participated.  I walked a bit, rode on a --
4  there was a little trailer.
5    Q.  I'm sorry.  I didn't hear the last part.
6    A.  There was a trailer also, so I -- I
7  participated in the -- in the parade, yes.
8    Q.  Okay.  And so this says it's going to depart
9  from the UC courtyard.  What is the UC?
10    A.  The UC is University College.  It's where
11  freshmen stay for the most part.
12    Q.  And is that the building that's directly across
13  the street from where we're sitting right now?
14    A.  Yes.
15    Q.  And where is the courtyard at the UC?
16    A.  In the middle of the UC.
17        MR. SEAQUIST:  I'm going to mark Exhibit
18  17.
19        (Exhibit No. 17 marked)
20    Q.  (BY MR. SEAQUIST) Do you recognize what I've
21  handed you as Exhibit 17?
22    A.  It looks like a map of my alma mater.
23    Q.  All right.  You know it well, correct?
24    A.  Yes.
25    Q.  All right.  Can you identify the UC on this

---

Page 163

1  map?
2    A.  Not -- I'll have to look at it for a minute.
3  It may be --
4    Q.  I'll give you a hint that it's Building 7.
5    A.  Yeah, Building 7.  I can see it.
6    Q.  All right.  So if we look at our parade route,
7  it says the route is the UC courtyard to the View.  Do
8  you know where the View is?
9    A.  It's 17, I believe.
10    Q.  So I think 15 is University View.
11    A.  The View is -- I believe it's on -- oh, yeah,
12  it's 15.
13    Q.  Okay.  Will you draw me the route that the
14  students took from the UC courtyard to the View?
15    A.  I don't believe they actually walked to the
16  View.
17    Q.  Where do you recall the route going?
18    A.  I think we just came -- met at the corner right
19  here in front of Parking Lot 40 and 41.  Or at least I
20  didn't walk to the View because I didn't see a need to
21  go back and come double trip myself.
22    Q.  Okay.  So did you start at the courtyard?
23    A.  I started at the courtyard and then met at the
24  corner of Anne Preston and Norris Street.
25    Q.  Okay.  Will you start from the courtyard and

---

Page 164

1  map the route to Anne Preston and Norris Street?
2    A.  I guess that would be here, right there.
3    Q.  Okay.  And then the next building -- it's hard
4  to read on here, but I will represent to you -- and if
5  you look at Exhibit 6, it looks to me like it actually
6  says Phase III.  Do you know what the Phase III building
7  is?
8    A.  Phase III, I believe, is Building 28.
9    Q.  Okay.  Can you draw the route from where you
10  left off to Phase III?
11    A.  Yeah.  We didn't actually go into Phase III.
12  We kind of just went around Phase III.  But it's around
13  there.
14    Q.  Okay.  Next on the Exhibit 6 route, I believe,
15  was Phase I and II.
16    A.  Uh-huh.
17    Q.  Do you know where those buildings are?
18    A.  It might be -- I think this is Phase I and II
19  over here -- 52.
20    Q.  Okay.  Can you trace the route from Phase III
21  to Phase I and II?
22    A.  I think we went this way.  I may have took a
23  shortcut, though.
24    Q.  And when you say you could have taken a
25  shortcut, there are some areas on campus where you can

---

Page 165

1 cut through either, you know, a grassy area, a pavilion,
2 something like that, without following sidewalks or
3 roads, correct?
4     A. Yeah. But don't walk on the grass, though.
5 You get in trouble.
6     Q. Okay. All right. From Phase I and II, the
7 next stop on the route was the athletic complex. Do you
8 know where the athletic complex is on that map?
9     A. I think it was -- which way did we take? We
10 may have took this way.
11     Q. Okay. And then you ended up at the student
12 center. So can you close the route to the student
13 center?
14     A. (Witness complied).
15     Q. Okay. Looking at the black line that you've
16 just drawn, does that fairly and accurately depict the
17 route of the march on November 6, 2018?
18     A. It might have been one -- I'm not sure which
19 route we took from Phase I and II to the student center.
20 There are two ways to do it. I'm not sure off the top
21 which way we took. There's two streets to get there, so
22 a long way and a shorter way.
23     Q. Okay. Show me the short -- show me the other
24 way. Use a squiggly line or just dots. That's perfect.
25     A. I think --

Page 166

1     Q. And so you're not entirely sure which of those
2 two routes you took, but it was one or the other.
3     A. Correct.
4     Q. Okay. Overall do you know how -- the distance
5 of the march?
6     A. No.
7     Q. The march was well attended, correct?
8     A. Yeah. It was hot out there, too.
9     Q. If you look -- only in Texas is it hot in
10 November.
11         If we look back --
12         MS. ADEN: And I like the sun, so for the
13 next depo I'm willing to switch positions.
14     Q. (BY MR. SEAQUIST) If we look back at -- I
15 believe this was Exhibit 16. Behind the flyer are just
16 some pictures that were produced by the plaintiffs. If
17 you look at Plaintiffs 110, do you recognize that as
18 showing the start of the march there?
19     A. No. That's the end of the march.
20     Q. The end of the march. Okay.
21         Page 112, the next page, shows people
22 marching, correct?
23     A. Yes.
24     Q. The top left, is that Mike Siegel? Who's --
25     A. Mike Siegel, yeah, that's him.

Page 167

1     Q. So Siegel was there marching?
2     A. Yeah, he came.
3     Q. Below him, is that Nev Schulman?
4     A. I think -- people were excited to see him. I
5 really don't know who he is, to be honest with you.
6     Q. Do you know -- is he the -- on a show called --
7 MTV show called Catfish? Have you heard of that show?
8     A. I think that's what they said. I don't watch
9 it. So I believe that's what I heard.
10     Q. The top right-hand, who is that?
11     A. Xante.
12     Q. And he is a member of the City View -- or
13 excuse me, the Prairie View City Council?
14     A. He's a councilman, student, different --
15 different things, different titles.
16     Q. Okay. And the next page, again, Mr. Schulman
17 in front of marchers?
18     A. NAACP.
19     Q. Okay. What NAACP -- is this just a local
20 chapter of the NAACP?
21     A. Yes. The Prairie View -- the student
22 organization.
23     Q. Okay. Okay. On the last page there's a tweet
24 from Jayla Allen and this is just an ABC News story.
25 The caption is "Prairie View A&M students walked out of

Page 168

1 class and marched".
2         Do you know whether that's accurate?
3     A. No, I don't. I don't know how many students
4 actually walked out of class. That's pretty much
5 something that ABC decided to report. I don't know who
6 they talked to.
7     Q. Is it fair to say that not all news reports are
8 accurate?
9     A. Yes, it's fair to say that.
10     Q. As a plaintiff in this lawsuit, is it your
11 contention -- or is it The Panther Party's contention,
12 excuse me, that the Waller County Commissioners -- the
13 Waller County Commissioners Court adopted the early
14 voting schedule for the 2018 general election to
15 intentionally discriminate against African-American
16 voters?
17     A. I would say that it's my contention that they
18 didn't do enough to make sure that it was -- it was the
19 best environment for voting, especially after we
20 expressed discontent with the current voting schedule.
21     Q. Okay. But it's not your contention that the
22 Commissioners Court was intentionally discriminating
23 against African-American voters in the county?
24         MS. ADEN: I'm going to object to the
25 question because intentional discrimination is a

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 169

1 question of law and he is not a lawyer. So to the
2 extent you're asking him for a legal conclusion about
3 the nature of the claims, he can't answer that question.
4          MR. SEAQUIST: Okay. I think we have an
5 agreement that objection, form, is sufficient. So
6 that's okay. You're objecting to the form of the
7 question.
8     Q. (BY MR. SEAQUIST) But my question is -- and I
9 think you still answer it unless you instruct him not
10 to -- which is: Is it your contention in this lawsuit
11 that the Waller County Commissioners Court was
12 intentionally discriminating against African-Americans?
13     A. Is it my contention that they were
14 intentionally -- what do you mean by intentional
15 discrimination? Like they say, "Oh, they're black. We
16 don't want them to vote"? Is that what you're asking
17 me?
18     Q. Do you believe that the Waller County
19 Commissioners Court adopted the early voting schedule
20 for the intentional purpose of abridging
21 African-Americans' votes in Waller County?
22     A. That would be me speculating their mind-set.
23 But people in The Panther Party do believe that and have
24 those feelings.
25     Q. Are there any statements by any Waller County

---

Page 170

1 official that you can point me to that would suggest
2 that the Commissioners Court was intentionally trying to
3 discriminate against African-American voters in Prairie
4 View?
5     A. If you're asking if there's a statement out
6 there that says "I don't like black people," I haven't
7 came across that.
8     Q. Well, it wouldn't have to be that. I'm just
9 asking if there's any -- this is my chance to understand
10 and learn about your contentions.
11          So are there any statements by any of the
12 Commissioners Court that you felt were suggestive of
13 intentional discrimination against African-Americans?
14     A. When I went to the Commissioners Court on
15 October 17th, some of the Commissioners gave us a very
16 hard time. In my personal opinion and in some other
17 people's opinion, the way they communicated and
18 expressed our petition, they gave us a very hard time.
19 So we believe that it could have been -- there could
20 have been a lot of things why they did that, but it's
21 something that really displeased us.
22     Q. Okay. And when you say they gave you a hard
23 time, you're talking about comments that they would have
24 made as part of the public meeting that would be
25 reflected on the recording that was made.

---

Page 171

1     A. Yes.
2     Q. Okay. Anything outside of that public meeting,
3 any statements that you're aware of that people have
4 told you, anything like that?
5     A. I don't hang around with them like that, so I
6 don't know what they say in their personal
7 conversations.
8     Q. I need to ask you the same question as it
9 relates to intentional discrimination on the basis of
10 age; but if your answer is the same, you can just say
11 that.
12          But my question is: You know, as a
13 plaintiff in this lawsuit, is it your contention that
14 the Waller County Commissioners Court adopted the early
15 voting schedule to intentionally discriminate against
16 young voters?
17     A. So speaking of just the Commissioners Court, I
18 wouldn't say I've heard that directly, especially at the
19 Commissioners meeting. I would add that I have heard
20 different entities express how they don't believe that
21 the students should be defined as residents. So that's
22 been some things I've heard in the past.
23     Q. Okay. What entities have said that?
24     A. Community members, whether in Waller -- Waller
25 County is pretty broad, so -- but I've heard those

---

Page 172

1 conversations.
2     Q. Okay. Have you ever been a party to a lawsuit
3 besides this one?
4     A. No.
5          MR. SEAQUIST: Can we take a short break?
6          MS. ADEN: Sure.
7          (Recess from 1:02 p.m. to 1:11 p.m.)
8          MR. SEAQUIST: Okay. Back on the record.
9     Q. (BY MR. SEAQUIST) Mr. Muhammad, I'd like to
10 thank you for your time. Have you understood all my
11 questions today?
12     A. Yes, for the most part. I can't think of
13 anything that I didn't understand.
14     Q. Okay. Have you given the best answers you can?
15     A. Yes.
16     Q. All right. Have I been courteous to you today?
17     A. Yes, you have.
18          MR. SEAQUIST: Okay. Well, thank you very
19 much for your time.
20          And I'll pass the witness.
21          MS. ADEN: We do have some brief redirect
22 and -- hopefully brief.
23          EXAMINATION
24 BY MS. ADEN:
25     Q. Mr. Muhammad, you testified that some Prairie

---

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 173

1  View AMU students, including Panther Party members, vote
2  early and others vote on election day.  Is that
3  accurate?
4      A.  Yes.
5      Q.  Do you have an opinion about whether PVAM
6  students, including Panther Party members, tend to use
7  early voting more than election day voting?
8      A.  I mean, since there's more opportunity in early
9  voting, then they'll use early voting.  But it just
10  depends.  But early voting issues --
11      Q.  You spoke about your personal access to a car.
12      A.  Uh-huh.
13      Q.  Can you tell me about what transportation
14  access Panther Party members have?
15          MR. SEAQUIST:  Form.
16          THE WITNESS:  I mean, they have their
17  feet.  They might have carpool.  Some of them have cars.
18  The shuttle maybe, depending on where they're going.
19  But, you know, it just depends.  There's variations.
20      Q.  (BY MS. ADEN) So there individual members
21  who do not own cars?
22      A.  Yes.
23      Q.  And is that consistent with your understanding
24  of other Prairie View AMU students?
25          MR. SEAQUIST:  Object, leading.

---

Page 174

1          THE WITNESS:  Yes, it is consistent.
2      Q.  (BY MS. ADEN) You talked about some of the
3  resources that The Panther Party expended in the fall
4  2018 election season.  Can you explain whether the
5  resources you expended were typical?
6      A.  Typical of --
7          MR. SEAQUIST:  Form.
8          THE WITNESS:  -- our normal resources?
9      Q.  (BY MS. ADEN) That's correct.
10      A.  No.  They were more than we usually have to do,
11  especially when there's a get out the vote drive.
12      Q.  Why?
13      A.  Because we had to coordinate taking students
14  off campus, transportation.
15      Q.  And that was because of the early voting
16  schedule.
17      A.  Yes.
18      Q.  You were asked earlier about whether Panther
19  Party members used their personal debit cards to pay for
20  things related to the 2018 early voting season.
21      A.  Yes.
22      Q.  Okay.  Why would Panther Party members have to
23  use their own personal debit cards rather than the
24  resources of The Panther Party to carry out activities
25  related to the fall 2018 early voting schedule?

---

Page 175

1      A.  The Panther Party in and of itself doesn't have
2  a lot of money.
3      Q.  And you testified that Panther Party members
4  use their energy -- used their energy to work on behalf
5  of the party --
6      A.  Uh-huh.
7      Q.  -- Panther Party with respect to the 2018 early
8  voting season.
9      A.  Yes.
10      Q.  Why -- what did you mean by energy?
11      A.  Whether it was helping carpool, whether it's
12  helping promote what was going on, whether it was
13  helping just get out information.  Different avenues,
14  they're using their energy and their time.
15      Q.  And is that energy and time that they could
16  have been use -- that they could have used for something
17  else?
18          MR. SEAQUIST:  Form.
19          THE WITNESS:  Yes.
20      Q.  (BY MS. ADEN) Like studying?
21      A.  Like studying, self-care, whatever.
22      Q.  Going to classes?
23      A.  Yes.
24      Q.  Engaging in extracurricular activities?
25          MR. SEAQUIST:  Form.

---

Page 176

1          THE WITNESS:  Correct.
2      Q.  (BY MS. ADEN) Working?
3      A.  Working, yes, correct.
4          MR. SEAQUIST:  Form.
5      Q.  (BY MS. ADEN) Why did you help put a bus
6  together to go to Hempstead?
7      A.  Because of the early voting schedule.  We
8  didn't feel it was adequate, so we tried to rectify that
9  with getting a bus to go take students to vote.
10      Q.  And what do you mean by adequate?
11      A.  We feel we didn't have enough days.
12      Q.  And does that include days during the first
13  week of early voting?
14          MR. SEAQUIST:  Leading.
15          THE WITNESS:  Yes.
16      Q.  (BY MS. ADEN) Was gas expended by Panther Party
17  leaders and members to drive people off campus?
18      A.  Yes.  I was one of them.
19      Q.  Okay.  And you said that you consider the time
20  and gas money that you and other Panther Party leaders
21  and members used to drive students to the polls was a
22  donation to The Panther Party.  Is that accurate?
23          MR. SEAQUIST:  Leading.
24          THE WITNESS:  Yes.
25      Q.  (BY MS. ADEN) Okay.  And did other members --

---

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 177

1  as far as you're aware, did those members who donated
2  time and gas -- did they consider those to be donations
3  to The Panther Party?
4          MR. SEAQUIST:  Form, leading.
5          THE WITNESS:  Yes.
6      Q.  (BY MS. ADEN) And when you drove people, which
7  you mentioned doing, driving people off campus to vote,
8  did you consider that an action -- a donation being made
9  to The Panther Party?
10         MR. SEAQUIST:  Leading.
11         THE WITNESS:  Yes.
12     Q.  (BY MS. ADEN) And did you consider that to be
13  an action that you were doing in your capacity as a
14  leader with The Panther Party?
15         MR. SEAQUIST:  Leading.
16         THE WITNESS:  Yes.
17     Q.  (BY MS. ADEN) When you and other -- okay.
18  Strike that.
19         You mentioned that you used -- you and
20  other students used university printing to print out
21  flyers and other materials associated with the 2018
22  early voting election season.  Is that accurate?
23     A.  Yes.
24     Q.  When you used the student printing accounts,
25  you yourself or other members of The Panther Party, did

Page 178

1  you consider that to be something you were doing on
2  behalf of The Panther Party?
3          MR. SEAQUIST:  Form.
4          THE WITNESS:  Yes.
5      Q.  (BY MS. ADEN) Okay.  You didn't have exact
6  number -- it's accurate that you didn't have exact
7  numbers of how many volunteers or rides or voters that
8  were taken off campus to vote in the 2018 elections.  Is
9  that accurate?
10     A.  Correct.
11     Q.  Okay.  Would you say that there were 20 or more
12  volunteers who helped get voters off campus to vote in
13  the 2018 elections?
14         MR. SEAQUIST:  Form.
15         THE WITNESS:  That may be a good
16  guesstimate.
17     Q.  (BY MS. ADEN) Would you say that there were 20
18  rides or more that were provided to take voters off
19  campus to vote in the 2018 election season?
20         MR. SEAQUIST:  Form.
21         THE WITNESS:  Yes.
22     Q.  (BY MS. ADEN) Would you agree that at least 20
23  voters or more were taken off campus to vote during the
24  early voting season in the 2018 election season?
25         MR. SEAQUIST:  Form.

Page 179

1          THE WITNESS:  Yes.
2      Q.  (BY MS. ADEN) You talked several times, I
3  think, during your testimony today about there always
4  being an issue with voting with respect to Prairie View
5  students.  What did you mean?
6      A.  Ever since -- for decades, when it comes to --
7  well, I mean, for over a century, but for decades we had
8  protests about voting.  There's the -- it's always been
9  like felt there was voting discrimination over past
10  years.  There's the zip code issue.  There's always like
11  different issues that comes that we feel hinder us from
12  voting or making it hard for us to vote.
13     Q.  How aware are Panther Party members, and the
14  student body more generally, of that history of voting
15  discrimination?
16         MR. SEAQUIST:  Form.
17         THE WITNESS:  Panther Party members are
18  very aware.  Student body, to different degrees.  Of
19  course, if you're a freshman on campus, you have to get
20  re-acclimated.  So it's like every year you might have
21  four to five thousand new freshmen that are now learning
22  the history of Prairie View.  So it's different degrees.
23     Q.  (BY MS. ADEN) Those four or five thousand
24  students who enter the school each year, would they know
25  about when and how the Commissioners Court sets the

Page 180

1  early voting schedule?
2          MR. SEAQUIST:  Form.
3          THE WITNESS:  No, not -- not off -- not at
4  the beginning.  They have to learn it.  Hopefully
5  somebody tells them in their matriculation as a student
6  through Prairie View or they find out some way.
7      Q.  (BY MS. ADEN) Would they know about that in
8  August of the fall semester as a freshman?
9          MR. SEAQUIST:  Form.
10         THE WITNESS:  No.
11     Q.  (BY MS. ADEN) Would they know about that in
12  early September of the fall semester of their freshman
13  year?
14         MR. SEAQUIST:  Form.
15         THE WITNESS:  No, they wouldn't know about
16  that.
17     Q.  (BY MS. ADEN) You testified -- just going back
18  to the resources that were expended to get students to
19  vote off campus during the 2018 early voting season, you
20  testified about people that came from Houston to help
21  people vote.  Why was that?
22     A.  They --
23         MR. SEAQUIST:  Form.
24         THE WITNESS:  They felt there was a cause
25  that was -- they felt we were being discriminated

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 181

1  against and it was a cause they wanted to lend their
2  hand and their resources, so they came from Houston and
3  different areas to come help us get to the polls.
4       Q.  (BY MS. ADEN) And was that because of the
5  amount of early voting that Prairie View students had
6  access to on campus?
7            MR. SEAQUIST:  Form.
8            THE WITNESS:  Yes.
9       Q.  (BY MS. ADEN) And was that because of the
10 access to transportation that was a barrier to students
11 voting off campus?
12           MR. SEAQUIST:  Leading and form.
13           THE WITNESS:  Yes.
14      Q.  (BY MS. ADEN) Why would students be out of
15 town -- I think you testified that some students would
16 be out of town Monday through Wednesday around 10-29,
17 10-31 of the fall 2018 semester. Is that accurate?
18      A.  Yes.
19      Q.  Why would they be out of town?
20      A.  They have different reasons.  Some people just
21 choose to go home.  There's multiple reasons people may
22 want to go out of town or just not may be on campus.
23      Q.  Are there student activities that take people
24 off campus during the academic semester?
25      A.  Yes.  Sometimes you have a university trip that

Page 182

1  will take people off campus out of state.
2       Q.  You testified that you have been to the Waller
3  County Community Center.  What is your opinion about
4  whether Panther Party or other PVAMU students use the
5  Waller County Community Center?
6       A.  It's not a place we frequent.
7       Q.  And is that something that you or PV -- or
8  Panther Party members communicated to Commissioner --
9  members of the Commissioners Court?
10      A.  Yes, I believe it was mentioned -- communicated
11 to the members of the Commissioners Court.
12      Q.  And does that include during the fall 2018
13 season before -- during the fall 2018 election season?
14           MR. SEAQUIST:  Leading.
15           THE WITNESS:  Yes.
16      Q.  (BY MS. ADEN) Did that include during the
17 Commissioners Court meeting that you testified at on
18 October 17th, 2018?
19           MR. SEAQUIST:  Form and leading.
20           THE WITNESS:  Yeah, I think we -- I know
21 just overall we advocated for the MSC.  And anything
22 else recommended outside the MSC, like whether it was
23 the city hall or at the community center, wasn't really
24 advantageous for us.
25      Q.  (BY MS. ADEN) Briefly describe why the MSC is

Page 183

1  the place that students want to participate in voting.
2            MR. SEAQUIST:  Object to the form.
3            THE WITNESS:  It's called the Memorial
4  Student Center.  It's probably the place most students
5  frequent throughout the day.  It's also a place we're
6  used to voting.  Most times during an election we're
7  used to voting being at the MSC, so it's something that
8  we became used to.  But it's the center of student life
9  at Prairie View.
10      Q.  (BY MS. ADEN) And why do students frequent it?
11 Why is it the center of life?
12           MR. SEAQUIST:  Form.
13           THE WITNESS:  People eat there.  A lot of
14 events happen there.  Just it's a student center.
15      Q.  (BY MS. ADEN) Do you have an opinion about the
16 size of parking at the Waller County Community Center as
17 compared to in or around the Memorial Student Center?
18      A.  There's more parking at -- on Prairie View in
19 general.  There's bigger parking lots in front of the
20 student center.  I think in front of the Waller County
21 Community Center there's a pretty small parking lot.
22 Actually, it's smaller than the post office right next
23 to it.
24      Q.  And how would you consider the actual interior
25 occupancy space of the Waller County Community Center as

Page 184

1  compared to voting at the Memorial Student Center?
2            MR. SEAQUIST:  Form.
3            THE WITNESS:  It pales in comparison.  The
4  MSC is definitely larger than the Waller County
5  Community Center.
6       Q.  (BY MS. ADEN) And say that the Waller County
7  Community Center -- strike that.
8            You testified to your awareness that
9  during the early voting election season any voter --
10 registered voter in Waller County can testify -- can,
11 excuse me, vote at any of the early voting sites.  Is
12 that correct?
13      A.  During early voting, yes.
14      Q.  Okay.  And so assuming that anyone in Waller
15 County is going to come to the Waller County Community
16 Center to vote, do -- do you have an opinion about
17 whether or not the Waller County Community Center is a
18 sufficient place to welcome both Prairie View students
19 and non-Prairie View students to vote as compared to the
20 Memorial Student Center?
21           MR. SEAQUIST:  Form.
22           THE WITNESS:  Maybe repeat the question.
23      Q.  (BY MS. ADEN) Yeah.  It's a really bad
24 question.
25      A.  Yeah.

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 185

1    Q.  What is your opinion about the capacity of the
2  Waller County Community Center to welcome voters from
3  Prairie View's campus and off of it as compared to the
4  Memorial Student Center?
5          MR. SEAQUIST:  Form.
6          THE WITNESS:  So the Memorial Student
7  Center in all regards, whether it's parking, whether
8  it's capacity, whether it's knowing where it is, being
9  used to it because a lot of people frequent it, when you
10 say the MSC, people automatically understand what you're
11 talking about.
12         If I say Waller County Community Center, I
13 may have to jog their memory.  I might have to say "It's
14 right next to the post office."  I don't have to do that
15 with the MSC.  So the Waller County Community Center, in
16 pretty much all regards across the board, is a
17 better place for people to frequent whether they're on
18 campus or off campus.
19   Q.  (BY MS. ADEN) And you mentioned jogging the
20 memory of folks.  Is that students whose memory you have
21 to jog about where the Waller County Community Center
22 is?
23   A.  Yeah.  Probably if I walked outside right now
24 and talked to somebody about the Waller County Community
25 Center, they probably wouldn't know.

Page 186

1    Q.  And are you aware through your work with The
2  Panther Party or your time as a student here how it --
3  does the -- does the Memorial Student Center host public
4  events at it?
5    A.  Yes.
6    Q.  Would you consider that to be a frequent event?
7          MR. SEAQUIST:  Form.
8          THE WITNESS:  Does the -- does the MSC
9  hold frequent events?
10   Q.  (BY MS. ADEN) That are open to the public?
11   A.  Yes.
12   Q.  You testified, I believe, about your
13 understanding of the campus shuttle.  And I believe you
14 said that it was not consistent.  What do you mean by
15 that?
16   A.  I mean just over my years here, I know
17 sometimes like you might have two shuttles.  Sometimes
18 we have more or sometimes the route changed.  It's just
19 the -- it's not the most advantageous transportation.  I
20 mean, you use it if you have to; but if you have a
21 different way to get somewhere, then you probably won't
22 want to use the campus shuttle.
23   Q.  And what have you heard -- or what is your
24 awareness about Panther Party members' opinion about the
25 shuttle?

Page 187

1          MR. SEAQUIST:  Form.
2          THE WITNESS:  They really don't like the
3  shuttle, to be honest with you.  It's just not a good
4  avenue of this -- I guess you could call it a makeshift
5  public transportation.
6    Q.  (BY MS. ADEN) Do the shuttle -- does the
7  shuttle come when it -- the schedule says it's going to
8  come?
9    A.  No, not all the time.
10   Q.  And does the shuttle -- well, strike that.
11   A.  I would say that if there's -- if you have an
12 opportunity not to use the shuttle, you will take that
13 opportunity.
14         MR. SEAQUIST:  Objection, nonresponsive.
15   Q.  (BY MS. ADEN) And have you -- with respect to
16 your last answer, is that your understanding of the
17 opinion of Panther Party members?
18         MR. SEAQUIST:  Form.
19         THE WITNESS:  Yeah.  I would say I hear
20 that a lot.
21   Q.  (BY MS. ADEN) You also -- I'm just jumping back
22 to something you said.  You talked about the public
23 events that are held at the Memorial Student Center.
24 Have you been to those public events?
25   A.  Yes.

Page 188

1    Q.  Have you been to public events where hundreds
2  of people have accessed the Memorial Student Center for
3  a public event?
4    A.  Yes.
5    Q.  Have you been to a public event where thousands
6  of people have accessed the Memorial Student Center for
7  an event?
8          MR. SEAQUIST:  Form.
9          THE WITNESS:  I don't know the capacity of
10 the MSC, but I would say -- I don't know about
11 thousands, but I would say it would probably hit a
12 thousand.
13   Q.  (BY MS. ADEN) Okay.  I'm getting to the end.
14         You mentioned speaking to Rosa Harris, the
15 chair of the Democratic party, on -- on occasion.  Is
16 that accurate?
17   A.  Yes.
18   Q.  Okay.  Have you ever spoken to -- do you know
19 who the Republican party chair is?
20   A.  Not off the top.  I think I've run across him,
21 but I don't know his name.
22   Q.  Have you ever spoken to him?
23   A.  I can't say that I really have.
24   Q.  Have you ever seen him on campus?
25   A.  No, I wouldn't be able to say that.

Page 189

1    Q.  When you've spoken to the Democratic party
2  chair, who initiates those communications?
3    A.  The Democratic party chair.
4    Q.  So you yourself or any member of The Panther
5  Party, have you -- are you aware of whether you have
6  affirmatively reached out to the party chair?
7    A.  No, I couldn't say that we've reached out and
8  initiated conversations.
9    Q.  You testified that she doesn't represent you as
10  a Democrat.  Do you have an opinion about whether she
11  represents other Panther Party members or PVAMU students
12  as Democrats?
13       MR. SEAQUIST:  Form.
14       THE WITNESS:  It's a diverse body.  So if
15  some students are Democrats, then they probably want
16  that party.  But like I said, The Panther Party
17  represents the permanent interests of Prairie View.  So
18  there could be -- you might find some permanent
19  interests that are on the conservative side.  There
20  could be some on the liberal side.  But she doesn't just
21  speak for the student body of Prairie View.
22    Q.  (BY MS. ADEN) And that's true of the Republican
23  party chair as well?
24    A.  Yes.
25    Q.  And are you -- have you ever communicated that

Page 190

1  opinion or an opinion similar to that to the
2  Commissioners Court?
3    A.  I know we said it at -- we said it at
4  Commissioners Court, and then I told Rosa Harris
5  directly after Commissioners Court.
6    Q.  And when you talk about at the Commissioners
7  Court, when you mention that, you're talking about at
8  the October 17th meeting?
9    A.  Yes.
10    Q.  You talked about The Panther Party not being
11  able to officially meet until after the 12th class day.
12    A.  Uh-huh.
13    Q.  Are you aware of when the Commissioners Court
14  sets the early voting schedule?
15    A.  I'm not aware.  I think -- I think it was
16  sometime in August maybe, but I'm not fully aware.
17    Q.  And would setting the schedule in late August
18  or early September allow Panther Party members -- not
19  just first-year Panther Party student members, but
20  Panther Party members or leaders, to weigh in on the
21  setting of the schedule?
22       MR. SEAQUIST:  Form.
23       THE WITNESS:  So I would say no because,
24  first of all, you're -- it's over the summer, so you're
25  not even -- you're not on campus yet.  And then when you

Page 191

1  get here, there's a lot going on.  You're pretty busy
2  getting settled for another year of school.  So it's
3  pretty -- there's a lot going on as students in the
4  first and second weeks in the -- in the end of August --
5  in the beginning of September, end of August, there's a
6  lot going on.
7    Q.  (BY MS. ADEN) You testified about speaking to
8  Elections Administrator Eason about the 2018 schedule in
9  late September, early October.  Is that accurate?
10    A.  Yes.
11    Q.  Okay.  Did The Panther Party request more early
12  voting days during that conversation?
13    A.  Yes.
14    Q.  And what was Ms. Eason's response?
15    A.  Ms. Eason -- she was actually favorable of the
16  request and she was seeing how -- she said that it was
17  possible to figure out the resources and logistics for
18  it, so she didn't see any problem with it.  It was just
19  figuring out the logistics.
20    Q.  And when you participated in the October 17th
21  meeting, did Ms. Eason recommend expansion of early
22  voting on campus during that meeting?
23    A.  Yes.
24    Q.  Was that successful?
25    A.  No.  The petition from her and also -- her

Page 192

1  recommendation and also the -- our petition was denied
2  by -- by Commissioners Court.
3    Q.  And what were some of the reasons that you
4  heard for denying the expansion of early voting on
5  campus?
6       MR. SEAQUIST:  Form.
7       THE WITNESS:  To be honest, it was a lot
8  of -- it sounded like a lot of BS.  But it was --
9  somebody brought up something about Pine Island.  We
10  didn't see how that was relevant.  I really didn't see
11  any reason why they couldn't do it, to be honest with
12  you, other than they just didn't want to do it.
13    Q.  (BY MS. ADEN) Why do you think they didn't want
14  to do it?
15       MR. SEAQUIST:  Form.
16       THE WITNESS:  I would say they didn't want
17  to do it was because -- there's a few reasons.  I think
18  they were -- in a sense, they made it a -- it was like a
19  Democrat versus Republican thing.  And -- but we came
20  there to clear it up and say, "No, we're not here even
21  speaking on that.  We're here advocating for students."
22  That kind of went over their heads.
23       And then I guess they -- I really don't
24  know why they didn't want to do it.  Just me personally,
25  I didn't see a reason why they wouldn't do it.  It

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

---

Page 193

1  seemed like something -- especially after the
2  recommendation from Christy Eason, saying that she could
3  do it because she was the one pretty much that would
4  have knowledge of what the election office could do.
5  And after she gave that reason, like any reason that
6  they have -- that they had was just kind of, okay,
7  you're only -- you're only the election office.  They
8  could do it.  So now why are you saying no?
9          MR. SEAQUIST:  Objection, nonresponsive.
10     Q.  (BY MS. ADEN) You testified about speaking to
11  Commissioner Barnett at the October 17th meeting, both
12  during the meeting and afterwards.  And what did he say
13  back to you?
14     A.  Probably a lot of political answers, but
15  nothing that really -- really addressed our -- our
16  displeasure.  I pretty much just told him that we were
17  displeased with his decision and we thought the reasons
18  that he gave on Commissioners Court were a bunch of BS.
19     Q.  And outside of just -- well, you mentioned
20  speaking to county officials about concerns and
21  interests that The Panther Party has.  Who were -- who
22  were those officials?
23     A.  The elections commissioner, people on the
24  Commissioners Court, Trey Duhon.  That's pretty much
25  the -- the general -- the general game.

---

Page 194

1     Q.  And you spoke to them about voting issues?
2     A.  Yes.
3     Q.  Have you spoken with them about community
4  development issues?
5     A.  Yes.
6     Q.  Have you spoken to them about economic
7  development issues?
8     A.  Yes.
9     Q.  And those would be issues consistent with the
10  mission of The Panther Party.
11     A.  Yes.
12     Q.  And can you tell me briefly what some of the
13  issues that you have raised with them were?
14     A.  We had conversations about the bail bond.  I
15  know we've spoken with Commissioner Barnett about some
16  community development issues when he came here, just
17  seeing different ways how we can partner and he as a
18  representative can get some things going.
19          So I mean, it's a -- it's a wide array of
20  things.  But there's been a lot of conversations or a
21  few conversations about different things outside of just
22  voting.
23     Q.  And how would you say they have responded to
24  the concerns and issues that you have raised?
25          MR. SEAQUIST:  Object to the form.

---

Page 195

1          THE WITNESS:  How would I say they've
2  responded to it?  I mean, they necessarily didn't shut
3  them down, but I guess as a -- as a politician, you want
4  to seem interested anyway, so I couldn't -- I guess they
5  would sound interested.
6     Q.  (BY MS. ADEN) Have they acted on any of the
7  concerns or issues that you have raised?
8          MR. SEAQUIST:  Form.
9          THE WITNESS:  I would say that -- I would
10  answer it this way.  For the most part we really only
11  feel as students that we only see elected officials
12  during voting season and we don't see them a lot after
13  that.  So they don't really have a lot of time to
14  interact and actually put things in place because we
15  don't see them unless it's time to get our vote.
16     Q.  (BY MS. ADEN) And that's both parties?
17     A.  Yes, both parties.
18     Q.  You testified that members spoke at the Parade
19  of Voters on -- in the lead-up to the -- or during the
20  fall 2018 election season.  What did you hear them say?
21     A.  Pretty much we felt Waller County was
22  discriminating against us and making it hard for us to
23  vote and that we needed to do all we can to overcome it
24  and not allow it to just set us back or not just take it
25  lying down.  There was pretty much a lot of motivational

---

Page 196

1  speeches and rallying going on, protest type speeches.
2     Q.  And do you see the decision to -- strike that.
3          Do you view -- does The Panther Party view
4  the adoption and maintenance of the early voting
5  schedule in the fall of 2018 to be part of the history
6  of discrimination that Prairie View students have
7  experienced?
8          MR. SEAQUIST:  Form, leading.
9          THE WITNESS:  Yes.
10     Q.  (BY MS. ADEN) And does that history of
11  discrimination include discrimination in the last 10
12  years?
13     A.  Yes.
14     Q.  In the last 20 years?
15     A.  Yes.
16     Q.  In the last 30 years?
17     A.  In the last 150 years.
18     Q.  You testified about the route that students
19  marched as part of the Parade of Voters.  Do you have an
20  opinion about whether Prairie View A&M students,
21  including Panther Party members, should have to march to
22  vote?
23          MR. SEAQUIST:  Form.
24          THE WITNESS:  No.
25          Oh, do I have an opinion?  Yes, I have an

---

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 197

1 opinion.  They shouldn't have to march to vote.
2     Q.  (BY MS. ADEN) Why not?
3     A.  Because if you're marching to vote, it should
4 be something that's made easier.  The reason we were
5 marching to vote was to overcome an obstacle and to
6 rally people around overcoming that obstacle because we
7 felt that obstacles were put in our path by Waller
8 County.
9     Q.  And even though you overcame that obstacle, you
10 and other members, by actually being able to cast a
11 ballot, do you still think it's discrimination that you
12 had to overcome obstacles to vote?
13         MR. SEAQUIST:  Leading, form.
14         THE WITNESS:  Do I think it's
15 discrimination that I had to come -- yes, I think it's
16 discriminatory that I have to overcome obstacles even
17 though we overcame then.
18     Q.  (BY MS. ADEN) You testified that you get in
19 trouble for walking on the grass.  Is that accurate?
20     A.  Yes.
21     Q.  Can you explain what you mean?
22     A.  It's more so just a culture.  We want to -- we
23 take pride in our grass.  And then we also have this --
24 whether it's true or not, that it was built on a slave
25 cemetery or whatever have you.  But we try to encourage

Page 198

1 people not to walk on our grass just to respect Prairie
2 View as a whole.
3     Q.  So you mentioned slavery and enslavement.  What
4 do you mean by that?
5     A.  Prairie View was a slave plantation called --
6 well, Prairie View itself was a slave plantation called
7 Alta Vista.  Actually the whole Waller County -- and I
8 have a mentor that can go more in depth into the history
9 of Prairie View.
10         But the whole Waller County was -- used to
11 be owned by a man named Edwin Gross.  Actually Waller
12 is, I think, either his nephew or whatever have you.
13 But from Prairie View, Hempstead, pretty much the whole
14 area was a large slave plantation and then Alta Vista
15 was just a section of the larger slave plantation.
16     Q.  Related to slavery, are you aware of whether
17 lynchings have occurred in Waller County?
18     A.  Yeah.  I think Waller County actually had one
19 of the highest rates of lynchings maybe in Texas or the
20 nation.  But Waller County has been known for lynchings.
21     Q.  Finally, or I think close to finally, you
22 mentioned hating using the last name Perkins.
23     A.  Yes.
24     Q.  Why is that?
25     A.  As a -- as a Muslim, when I joined -- became a

Page 199

1 Muslim, it's -- we take what's called a holy name or a
2 name of our culture because when we came over here as
3 slaves, we had names of culture; but because we were
4 owned by people with the last names like Perkins, that
5 means I was owned by somebody with the last name Perkins
6 and they gave us that name to denote us as property.
7         If somebody else -- a white person's name
8 was Perkins, it's an English name.  That means they came
9 from England.  My people didn't come from England.  So I
10 reject those names because it's not the name of my
11 people.  It's the name of people who enslaved my people
12 and said "I own you, so I'm going to give you my name."
13         Like you own a -- you name a dog because
14 you own it.  They named us because they owned us.  But
15 as a free man, I reject that, so I use a name of
16 culture.  When we came over here, either we were
17 Muslims --
18         (Interruption by the reporter)
19         THE WITNESS:  So when we came over here,
20 either we were Muslims or we had African names of
21 African culture and so we want to take those names back
22 instead of using the names that were given to us by our
23 former slave masters.
24     Q.  (BY MS. ADEN) And even though slavery was
25 legally outlawed some time ago, that history still

Page 200

1 resonates with you today?
2     A.  Yes, the fact that I still have to have Perkins
3 on my ID.
4         MS. ADEN:  I think that's it.  Thank you.
5         THE WITNESS:  Thank you.
6         MR. SEAQUIST:  We will reserve the rest of
7 our questions for trial.
8         (Proceedings concluded at 1:40 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Jayla Allen, et al. vs. Waller County Texas, et al.
Joshua Jamil Muhammad - 10/10/2019

Page 201

CHANGES AND CORRECTIONS
1
2   WITNESS NAME:              DATE OF DEPOSITION:
3   JOSHUA JAMIL MUHAMMAD         OCTOBER 10, 2019
4   PAGE  LINE  CHANGE       REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 202

1        I, JOSHUA JAMIL MUHAMMAD, have read the
2   foregoing deposition and hereby affix my signature that
3   same is true and correct, except as noted above.
4
5        _____
6            JOSHUA JAMIL MUHAMMAD
7
8
9   THE STATE OF _____)
10  COUNTY OF _____)
11
12       Before me, _____, on this
13  day personally appeared JOSHUA JAMIL MUHAMMAD, known to
14  me (or proved to me under oath or through
15  _____) (description of identity
16  card or other document)) to be the person whose name is
17  subscribed to the foregoing instrument and acknowledged
18  to me that they executed the same for the purposes and
19  consideration therein expressed.
20       Given under my hand and seal of office this
21  _____ day of _____, _____.
22
23
24       _____
            NOTARY PUBLIC IN AND FOR
25          THE STATE OF_____
            COMMISSION EXPIRES:_____

Page 203

1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE SOUTHERN DISTRICT OF TEXAS
3              HOUSTON DIVISION
4   JAYLA ALLEN, DAMON        )
    JOHNSON, TREASURE SMITH,  )
5   AND THE PANTHER PARTY,    )
         Plaintiffs,          )
6                             )
    VS.                       ) CIVIL ACTION NO.:
7                             ) 4:18-CV-3985
    WALLER COUNTY TEXAS; THE  )
8   WALLER COUNTY             )
    COMMISSIONERS COURT;      )
9   JUDGE CARBETT "TREY" J.   )
    DUHON III, IN HIS         )
10  OFFICIAL CAPACITY AS THE  )
    WALLER COUNTY JUDGE; AND  )
11  CHRISTY A. EASON, IN HER  )
    OFFICIAL CAPACITY AS THE  )
12  WALLER COUNTY ELECTIONS    )
    ADMINISTRATOR,            )
13       Defendants.          )
14  ********************************
15         REPORTER'S CERTIFICATION
16  ORAL DEPOSITION OF JOSHUA JAMIL MUHAMMAD
17            OCTOBER 10, 2019
18  ********************************
19       I, SHERRI SANTMAN FISHER, Certified Shorthand
20  Reporter in and for the State of Texas, hereby certify
21  to the following:
22       That the witness, JOSHUA JAMIL MUHAMMAD, was duly
23  sworn by the officer and that the transcript of the oral
24  deposition is a true record of the testimony given by
25  the witness;

Page 204

1        I further certify that pursuant to FRCP Rule
2   30(f)(1) that the signature of the deponent:
3        __X__ was requested by the deponent or a party
4   before the completion of the deposition and returned
5   within 30 days from date of receipt of the transcript.
6   If returned, the attached Changes and Signature Page
7   contains any changes and the reasons therefor;
8        _____ was not requested by the deponent or a party
9   before the completion of the deposition.
10       That the amount of time used by each party at the
11  deposition is as follows:
12  MS. LEAH ADEN.....0 Hours, 28 Minutes
13  MR. GUNNAR P. SEAQUIST.....3 Hours, 36 Minutes
14       I further certify that I am neither counsel for,
15  related to, nor employed by any of the parties or
16  attorneys in the action in which this proceeding was
17  taken, and further that I am not financially or
18  otherwise interested in the outcome of the action.
19       Certified to by me this 20th of October, 2019.
20
21       _____
22       SHERRI SANTMAN FISHER, Texas CSR 2336
         CSR Expiration Date: 12/31/19
23       COOLEY REPORTING, Firm No. 702
         8407 Fathom Circle, Unit B
24       Austin, Texas 78750
         512-743-5867/512-410-3012
25

512-743-5867        Cooley Reporting        512-410-3012 (fax)
                  Jcooleycsr@gmail.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **JAYLA ALLEN, DAMON JOHNSON,** | § | |
| **TREASURE SMITH, and THE PANTHER** | § | |
| **PARTY,** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **V.** | § | |
| | § | |
| | § | **Civil Action No. 4:18-CV-3985** |
| **WALLER COUNTY TEXAS; THE** | § | |
| **WALLER COUNTY COMMISSIONERS** | § | |
| **COURT; JUDGE CARBETT "TREY" J.** | § | |
| **DUHON III, in his official capacity as the** | § | |
| **Waller County Judge; and CHRISTY A.** | § | |
| **EASON, in her official capacity as the** | § | |
| **Waller County Elections Administrator,** | § | |
| *Defendants.* | § | |

EXHIBIT 1
WIT: Muhammad
DATE: 12-12-19
Sherri S. Fisher, CSR

---

**DEFENDANTS' FIRST AMENDED RULE 30(B)(6) NOTICE OF INTENTION**
**TO TAKE THE DEPOSITION OF PLAINTIFF, THE PANTHER PARTY**

---

TO:   Plaintiffs Jayla Allen, Damon Johnson, Treasure Smith, and the Panther Party, by and
through their counsel of record:

Leah C. Aden, Deuel Ross, Kristen A. Johnson, John S. Cusick, NAACP LEGAL
DEFENSE AND EDUCATIONAL FUND, INC., 40 Rector Street, 5th Floor, New York,
New York 10006, Phone: (212) 965-2200, Fax: (212) 226-7592, laden@naacpldf.org,
dross@naacpldf.org, kjohnson@naacpldf.org, jcusick@naacpldf.org

Catherine Meza, NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC., 700
14th Street NW, Suite 600, Washington, DC 20005, Phone: (202) 682-1300, Fax: (212)
226-7592, cmeza@naacpldf.org

Adam T. Schramek, NORTON ROSE FULBRIGHT US LLP, 98 San Jacinto Boulevard,
Suite 1100, Austin, Texas 78701-4255, Telephone: (512) 474-5201, Facsimile: (512)
536-4598, adam.schramek@nortonrosefulbright.com

Julie Goodrich Harrison, Nicole Lynn, NORTON ROSE FULBRIGHT US LLP, 1301
McKinney Street, Suite 5100, Houston, Texas 77010, Telephone: (713) 651-5151,
Facsimile:      (713)      651-5246,      julie.harrison@nortonrosefulbright.com,
nicole.lynn@nortonrosefulbright.com

William F. Calve, NORTON ROSE FULBRIGHT US LLP, 300 Convent Street, Suite 2100, San Antonio, Texas 78205-3792, Telephone: (210) 270-7132, Facsimile: (210) 270-7205, william.calve@nortonrosefulbright.com

Please take notice that Defendants, Waller County, Texas, the Waller County Commissioners Court, Judge Carbett "Trey" J. Duhon III, in his official capacity as the Waller County Judge, and Christy A. Eason, in her official capacity as the Waller County Elections Administrator ("Defendants"), in the above-titled and numbered cause, by and through their attorneys of record, will take the oral deposition of the Panther Party ("Plaintiff"), on Thursday, October 10, 2019, beginning at 9:00 a.m. Central Time, at University Square (Clubhouse), Prairie View A&M University, 512 Anne Preston Street, Prairie View, TX 77445.

The deposition shall be taken before a court reporter, will be recorded stenographically, and continued from day to day until completed.  All parties are invited to attend and propound such questions to the witness as may be appropriate under the Federal Rules of Civil Procedure.

The deposition will be taken pursuant to Federal Rule of Civil Procedure 30(b)(6) and will cover the topics identified on Exhibit A to this notice, which is incorporated herein. Plaintiff, must designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, to testify regarding the topics set forth in Exhibit A; Plaintiff may also set out the matters on which each person designated will testify. Whomever Plaintiff designates to testify must be prepared to testify regarding information known or reasonably available to Plaintiff.

Respectfully submitted,

BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 South MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
512-472-8021 (Telephone)
512-320-5638 (Facsimile)

2

By:     */s/ Gunnar P. Seaquist*

Gunnar P. Seaquist
Texas State Bar No. 24043358
Southern District No: 1140733
gseaquist@bickerstaff.com
C. Robert Heath
Texas State Bar No. 09347500
Southern District No. 13381
bheath@bickerstaff.com

**ATTORNEYS FOR ALL DEFENDANTS**

## CERTIFICATE OF SERVICE

This is to certify that on October 3, 2019, a true and correct copy of the foregoing document was served on all counsel of record via email.

*/s/ Gunnar P. Seaquist*

Gunnar P. Seaquist

**Exhibit A**

1. The causes of action asserted by Plaintiff against Defendants in this lawsuit, as well as any underlying facts alleged by Plaintiff in its live pleading.

2. The factual bases supporting Plaintiff's claims against Defendants.

3. Plaintiff's organizational records, including but not limited to Plaintiff's formation documents, bylaws, membership lists, financial records, operational records, and records of regularly conducted activities.

4. Plaintiff's responses to written discovery propounded in this case.

5. Plaintiff's formation and history of the organization.

6. Plaintiff's organizational structure and operations.

7. The composition of Plaintiff's membership, and requirements and procedures for membership.

8. The schedule, nature, agendas, and content of Plaintiff's meetings.

9. The organizational activities of Plaintiff, including but not limited to education, activism, or advocacy by, or on behalf of, Plaintiff.

10. Plaintiff's communications, including but not limited to communications with Waller County and its officials, employees, agents, or representatives, as well as Plaintiff's communication with Prairie View A&M and its officials, employees, agents, or representatives, and Plaintiff's communications with its members or other students or alumni of Prairie View A&M, and Plaintiff's communications with the City of Prairie View and its officials, employees, agents, or representatives.

11. Any trainings, events, educational meetings, or other activities by Plaintiff.

12. Plaintiff's actions and activities, if any, in connection with any elections in Waller County or elsewhere.

13. Plaintiff's actions and activities, if any, in connection with early voting in Waller County or elsewhere.

14. Plaintiff's financial records and activities, including but not limited to assets, liabilities, cash flows, expenditures, fundraising, and tax status.

15. Plaintiff's social media activities, or other marketing, promotional, or informational activities.



EXHIBIT   2
WIT: Muhammad
DATE:  10-10-19
Sherri S. Fisher, CSR

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JAYLA ALLEN, DAMON JOHNSON, | § | |
| RAUL SANCHEZ, TREASURE SMITH, | § | |
| and THE PANTHER PARTY, | § | |
| *Plaintiffs*, | § | |
| | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 4:18-CV-3985 |
| WALLER COUNTY TEXAS; THE | § | |
| WALLER COUNTY COMMISSIONERS | § | |
| COURT; JUDGE CARBETT "TREY" J. | § | |
| DUHON III, in his official capacity as the | § | |
| Waller County Judge; and CHRISTY A. | § | |
| EASON, in her official capacity as the | § | |
| Waller County Elections Administrator, | § | |
| *Defendants*. | § | |

---

### PLAINTIFF THE PANTHER PARTY'S REPONSE AND OBJECTIONS
### TO DEFENDANT WALLER COUNTY'S
### FIRST SET OF INTERROGATORIES

---

Plaintiff the Panther Party ("Plaintiff") responds to Defendants' First Set of Interrogatories

(the "Interrogatories") as follows:

### GENERAL OBJECTIONS

1.     Plaintiff objects to the Interrogatories to the extent that they seek information

protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege.

If any privileged documents are inadvertently produced, Plaintiff maintains its right to claim the

privilege as to those documents and does not waive its right to claim that privilege as to any other

documents.

2.     Plaintiff objects to the Interrogatories to the extent that they are overly broad, unduly

burdensome, vague, ambiguous, irrelevant, not reasonably calculated to lead to the discovery of

admissible evidence, and/or unlimited in time or scope.

3.     Plaintiff objects to the Interrogatories to the extent that they seek documents or information that is not currently in its possession, custody, or control.

4.     Plaintiff objects to the Interrogatories to the extent that they call for documents or information that are already in Defendant Waller County's or other Defendants' possession, custody, or control, or are otherwise publicly available to Defendants.

5.     Plaintiff objects to the Interrogatories to the extent that they impose any requirements or discovery obligations other than those specified in the Federal Rules of Civil Procedure the Scheduling Order, and/or related agreements.

6.     Plaintiff objects to the Interrogatories to the extent that they seek expert information that is not discoverable from Plaintiff individually under the Federal Rules of Civil Procedure.

7.     Plaintiff objects to the Interrogatories to the extent that they seek confidential, proprietary business information, and/or information protected by any privacy and/or confidentiality laws, provisions, and/or regulations. If any confidential or proprietary information is produced without an appropriate designation, Plaintiff reserves the right to designate any information as confidential.

8.     Plaintiff objects to Defendants' Definitions and Instructions to the extent that they request documents or information that would be protected from discovery by the attorney-client privilege, attorney work product doctrine, and/or any other applicable privilege.

9.     Plaintiff objects to Defendants' definitions of "documents," "communication," and "identify" as being vague, ambiguous, unduly overbroad, and confusing.

10.    Plaintiff objects to the extent that any of the Interrogatories seek information that is protected by the right to freely associate under the First Amendment, is confidential, or otherwise is protected, or is neither relevant nor reasonably calculated to lead to the discovery of admissible

2

evidence in this action.

11.    Plaintiff has attempted in good faith to fully answer Defendants' Interrogatories. The answers are based on information currently available after a reasonable search. Pursuant to Federal Rule 26, Plaintiff reserves the right to alter or supplement its responses as additional documents become available and in light of facts not now known, the relevance to the subject matter or the relationship to admissible evidence of which has not yet been ascertained but may subsequently be discovered.

12.    By answering these Interrogatories, Plaintiff does not concede the relevance or materiality of the information requested, nor of the subject matter to which the interrogatory refers. Rather, the responses are made expressly subject to, and without in any way waiving or intending to waive any question or objection as to the competency, relevancy, privilege, or admissibility as evidence, of any of the matters referred to in the responses.

13.    Plaintiff incorporates herein by reference each of the above objections into each response set forth below, and all the responses below are subject to the foregoing "General Objections." These General Objections will not necessarily be repeated or referred to in the responses to the individual Interrogatories. The presence or absence of specific reference to one or more of the General Objections is not at any point intended to waive, withdraw, or abandon any of the General Objections.

## RESPONSE TO INTERROGATORIES

### INTERROGATORY NO. 1

Identify each person who participated in any way in answering this first set of interrogatories, or supplied any documents or information used in answering these interrogatories.

### ANSWER TO NO. 1

Plaintiff objects to Interrogatory No. 1 to the extent that it seeks information that is neither relevant to the issues in this dispute nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to Interrogatory No. 1 to the extent it falls outside the scope of this litigation and imposes obligations on Plaintiff in excess of those set forth in the Federal Rules of Civil Procedure and the Local Rules of the U.S. District Court for the Southern District of Texas. In addition, Plaintiff objects to Interrogatory No. 1 to the extent that it seeks the disclosure of information protected by any privilege or immunity, including attorney-client privilege, attorney work product protection, common interest privilege, or any other privilege, immunity, principle, doctrine, or rule of confidentiality. If any protected information or material is disclosed, such disclosure is not intentional and shall not be deemed a waiver of any privilege or protection.

Subject to and without waiving Plaintiff's foregoing general and specific objections, Plaintiff identifies the following individuals: Joshua Mohammed, in his capacity as Chairman of Board of the Panther Party and as a founding member of the Panther Party; Plaintiff's counsel.

### INTERROGATORY NO. 2

Identify all persons or entities that Plaintiff believes have documents, information, or other materials relevant to this suit, and identify the documents, information, or other materials they possess.

### ANSWER TO NO. 2

Plaintiff objects to Interrogatory No. 2 to the extent that it seeks to impose obligations on Plaintiff in excess of those set forth in the Federal Rules of Civil Procedure and the Local Rules of the U.S. District Court for the Southern District of Texas. Plaintiff further objects to this Interrogatory as unreasonable and unduly burdensome to the extent it seeks the identity of all individuals who may have knowledge about the facts alleged in Plaintiffs' Complaint. Plaintiff further objects to Interrogatory No. 2 because it is not time limited to any reasonable time period and thus is vague, ambiguous, overly broad, and unduly burdensome given the lengthy history of voting discrimination and early voting issues in Waller County.

In addition, Plaintiff objects to Interrogatory No. 2 to the extent that it seeks information protected from disclosure by any privilege or immunity, including attorney-client privilege, attorney work product protection, common interest privilege, or any other privilege, immunity,

principle, doctrine, or rule of confidentiality. If any protected information or material is disclosed, such disclosure is not intentional and shall not be deemed a waiver of any privilege or protection.

Subject to and without waiving Plaintiff's foregoing general and specific objections, Plaintiff responds that information responsive to Interrogatory No. 2 will be provided in Plaintiffs' First Supplement to Their Initial Disclosures, which Plaintiff's counsel will disclose to Defendants.

## INTERROGATORY NO. 3

Please describe the organization of the Panther Party, including the identity of its founders, the leadership structure and persons occupying the positions of leadership, and the number of current members.

## ANSWER TO NO. 3

Plaintiff objects to Interrogatory No. 3 to the extent that it seeks information on Plaintiff's individual members, the compelled disclosure of which "is likely to affect adversely the ability of [Plaintiff] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from [Plaintiff] and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." *NAACP v. State of Alabama ex rel. Patterson*, 357 U.S. 449, 462-63 (1958). Plaintiff further objects to Interrogatory No. 3 to the extent it requires the disclosure of protected material, including but not limited to confidential information or any information implicating privacy interests.

Subject to and without waiving Plaintiff's foregoing general and specific objections, Plaintiff responds that the Panther Party was founded in 2017 by two Prairie View A&M ("PVAMU") undergraduate students, Joshua Mohammed and Ervin Bryant. Plaintiff's leadership structure includes four officers: President, Tajuan Burton; Vice-President, Maydrian Lowe; Secretary, to be filled in the fall of 2019; and Treasurer; to be filled in the fall of 2019. Based on the 2018-2019 school year, there are approximately twenty active members.

## INTERROGATORY NO. 4

Please identify any office or meeting space owned, leased, or used by the organization of the Panther Party from January 1, 2015 through the present.

## ANSWER TO NO. 4

Plaintiff objects to Interrogatory No. 4 to the extent that it seeks to impose obligations on Plaintiff in excess of those set forth in the Federal Rules of Civil Procedure and the Local Rules of the U.S. District Court for the Southern District of Texas. Plaintiff further objects to this Interrogatory to the extent that it seeks information that is neither relevant to the issues in this dispute nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving Plaintiff's foregoing general and specific objections, Plaintiff responds that it does not own or lease any office or meeting space and has not done so since its founding in 2017. Moreover, Plaintiff does not have a specific designated room for its office either on or off of the PVAMU campus. Instead, Plaintiff uses various available, student-designated meeting rooms on the PVAMU campus to hold meetings.

## INTERROGATORY NO. 5

Please describe the process for joining the Panther Party, including the application or membership process, the requirements for participation or membership, any fees, dues, or other financial contributions required or suggested to join the Panther Party.

## ANSWER TO NO. 5

Plaintiff objects to Interrogatory No. 5 to the extent that it seeks to impose obligations on Plaintiff in excess of those set forth in the Federal Rules of Civil Procedure and the Local Rules of the U.S. District Court for the Southern District of Texas. Additionally, Plaintiff objects to Interrogatory No. 5 because it is vague, ambiguous, overly broad, and unduly burdensome. Plaintiff further objects to Interrogatory No. 5 because it is not limited to any reasonable time period and thus is vague, ambiguous, overly broad, and unduly burdensome. Plaintiff also objects to Interrogatory No. 5 because it is neither relevant to the issues in this dispute nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving Plaintiff's foregoing general and specific objections, Plaintiff responds that the process for joining the Panther Party includes two steps: (1) attend an entrance meeting; and (2) after that meeting, sign up for the club by providing the student's name and email address. Initially, during the 2017-2018 school year, Plaintiff required a $10 annual membership fee, but it waived that fee for all members during the 2018-19 school year.

Aside from being a PVAMU undergraduate, graduate, or former student, there are no other participation requirements. In addition to attending meetings, members can join one of three committees: (1) the community development committee, (2) the economic development committee, and (3) the political engagement committee.

## INTERROGATORY NO. 6

Please identify any and all records, including membership records and records of activities, kept by the Panther Party.

## ANSWER TO NO. 6

Plaintiff objects to Interrogatory No. 6 to the extent that it seeks to impose obligations on Plaintiff in excess of those set forth in the Federal Rules of Civil Procedure and the Local Rules

of the U.S. District Court for the Southern District of Texas. Plaintiff further objects to this Interrogatory as unreasonable and unduly burdensome to the extent it seeks the identity of any individual who may have knowledge about the facts alleged in Plaintiff's Complaint. Plaintiff further objects to Interrogatory No. 6 because it is not time limited to any reasonable time period and thus is vague, ambiguous, overly broad, and unduly burdensome given the lengthy history of voting discrimination and early voting issues in Waller County.

Additionally, Plaintiff objects to Interrogatory No. 6 to the extent that it seeks documents or information protected from disclosure by any privilege or immunity, including attorney-client privilege, attorney work product protection, common interest privilege, or any other privilege, immunity, principle, doctrine, or rule of confidentiality. If any protected information or material is disclosed, such disclosure is not intentional and shall not be deemed a waiver of any privilege or protection.

Plaintiff further objects to Interrogatory No. 6 to the extent that it seeks information on Plaintiff's individual members, the compelled disclosure of which "is likely to affect adversely the ability of [Plaintiff] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from [Plaintiff] and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." *NAACP v. State of Alabama ex rel. Patterson*, 357 U.S. 449, 462-63 (1958). Plaintiff further objects to Interrogatory No. 6 to the extent it requires the disclosure of protected material, including but not limited to confidential information or any information implicating privacy interests.

Subject to and without waiving Plaintiff's foregoing general and specific objections, Plaintiff responds that the organization maintains records of its formation and organization, membership records, financial records, meeting minutes, and social media or other public releases, postings and responses.

## INTERROGATORY NO. 7

Please identify any and all sources of revenue or funding of the Panther Party.

## ANSWER TO NO. 7

Plaintiff objects to Interrogatory No. 7 to the extent that it seeks to impose obligations on Plaintiff in excess of those set forth in the Federal Rules of Civil Procedure and the Local Rules of the U.S. District Court for the Southern District of Texas. Additionally, Plaintiff objects to Interrogatory No. 7 because the Request is vague, ambiguous, overly broad, and unduly burdensome. Plaintiff further objects to Interrogatory No. 7 because it is not limited to any reasonable time period and thus is vague, ambiguous, overly broad, and unduly burdensome. Plaintiff also objects to Interrogatory No. 7 because it is neither relevant to the issues in this dispute nor reasonably calculated to lead to the discovery of admissible evidence.

In addition, Plaintiff objects to Interrogatory No. 7 to the extent that it seeks documents

or information protected from disclosure by any privilege or immunity, including common interest privilege, or any other privilege, immunity, principle, doctrine, or rule of confidentiality. If any protected information or material is disclosed, such disclosure is not intentional and shall not be deemed a waiver of any privilege or protection.

Subject to and without waiving Plaintiff's foregoing general and specific objections, Plaintiff responds that it does not receive an annual budget from PVAMU. Instead, it must apply to PVAMU for discretionary funding on a case-by-case basis. During the 2017-2018 school year, Plaintiff relied on membership dues of $10 per person. During the 2018-2019 school year, Plaintiff did not rely on any membership dues because it waived the annual fee for all members. In addition, Plaintiff raises funds through events and, on rare occasions, through donations. Otherwise, Plaintiff's members offset costs by volunteering their time, energy, and skills.

## INTERROGATORY NO. 8

Please identify any banking or other accounts held by or for the benefit of the Panther Party.

## ANSWER TO NO. 8

Plaintiff objects to Interrogatory No. 8 to the extent that it seeks to impose obligations on Plaintiff in excess of those set forth in the Federal Rules of Civil Procedure and the Local Rules of the U.S. District Court for the Southern District of Texas. Additionally, Plaintiff objects to Interrogatory No. 8 because the Interrogatory is vague, ambiguous, overly broad, and unduly burdensome. Plaintiff further objects to Interrogatory No. 8 because it is not limited to any reasonable time period and thus is vague, ambiguous, overly broad, and unduly burdensome. Plaintiff also objects to Interrogatory No. 8 because it is neither relevant to the issues in this dispute nor reasonably calculated to lead to the discovery of admissible evidence.

In addition, Plaintiff objects to Interrogatory No. 8 to the extent that it seeks documents or information protected from disclosure by any privilege or immunity, including common interest privilege or any other privilege, immunity, principle, doctrine, or rule of confidentiality. If any protected information or material is disclosed, such disclosure is not intentional and shall not be deemed a waiver of any privilege or protection.

Subject to and without waiving Plaintiff's foregoing general and specific objections, Plaintiff responds that it has a single back account.

## INTERROGATORY NO. 9

Please identify the members of the Panther Party, including name, age, address, and telephone number, from January 1, 2017 through the present.

**ANSWER TO NO. 9**

Plaintiff objects to Interrogatory No. 9 and will not be responding in full to this Interrogatory because it seeks Plaintiff's membership list, the compelled disclosure of which would "abridge the rights of its . . . members to engage in lawful association in support of their common beliefs," which is protected by the First Amendment to the U.S. Constitution. *NAACP v. State of Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958); *see id.* at 462-63 (holding "that compelled disclosure of [a civil rights association's] membership is likely to affect adversely the ability of [the association] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the [a]ssociation and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure."). Plaintiff further objects to Interrogatory No. 9 to the extent it requires the disclosure of protected material, including but not limited to confidential information or any information implicating privacy interests.

Subject to and without waiving Plaintiff's foregoing general and specific objections, Plaintiff responds that Joshua Mohammed, who serves as Chairman of the Board, is a founding and current member of organizational Plaintiff. Moreover, Jayla Allen, Damon Johnson, and Treasure Smith are individual Plaintiffs in this action and current or former members of the Panther Party. Those individuals can be contacted through Plaintiffs' counsel. Finally, consistent with the response to Interrogatory No. 3, based on the 2018-2019 school year, there are approximately twenty active members in the Panther Party.


**INTERROGATORY NO. 10**

Other than assisting students in voting, as alleged in Paragraph 17 of Plaintiffs' First Amended Complaint, please describe in detail the activities of the Panther Party.

**ANSWER TO NO. 10**

Plaintiff objects to Interrogatory No. 10 to the extent that it seeks to impose obligations on Plaintiff in excess of those set forth in the Federal Rules of Civil Procedure and the Local Rules of the U.S. District Court for the Southern District of Texas. Plaintiff further objects to this Interrogatory as vague, ambiguous, overly broad, and unduly burdensome.

Subject to and without waiving Plaintiff's foregoing general and specific objections, Plaintiff responds that its mission statement is to serve the PVAMU community and community members in the city of Prairie View and to address the social, political, economic, and historical landscape of PVAMU, the Texas A&M Collegiate System, and Waller County. Central to this mission, Plaintiff's members may join the Community Development, Economic Development, and/or Political Engagement Committees. The Community Development's focus is to improve the standard of life of the Prairie View community by working to make the city and the campus a safe and decent place to live for residents and students. Students in the committee go out into the committee weekly with a volunteer program called "Picking Up the Pieces" to build bridges between PVAMU and the city. This provides an opportunity for members to connect with other

PVAMU students, as well City of Prairie View residents. The Economic Development Committee works to promote the growth of business and entrepreneurship in Prairie View and works with students, city residents, and officials to provide resources for business development on multiple levels. The Political Engagement Committee, among other activities, conducts voter education and voter registration drives on campus at PVAMU. For example, in April of 2018, this Committee hosted a voters-only party to encourage students to participate in the city, county, and primary elections.

## INTERROGATORY NO. 11

Please state each way in which the Panther Party "diverted its modest organizational…resources to assisting PVAMU student voters by hosting trainings, organizing group transportation to early voting locations and conducting other educational and organizing activities…," as alleged in paragraph 17 of Plaintiffs' First Amended Complaint. Your answer should identify each training, educational, transportation and organizing activities conducted by The Panther Party in anticipation of the general election, and how those activities differed or diverted from the Panther Party's normal activities.

## ANSWER TO NO. 11

Plaintiff objects to Interrogatory No. 11 to the extent that it seeks to impose obligations on Plaintiff in excess of those set forth in the Federal Rules of Civil Procedure and the Local Rules of the U.S. District Court for the Southern District of Texas. Plaintiff further objects to Interrogatory No. 11 because it is not limited to any reasonable time period and thus is vague, ambiguous, overly broad, and unduly burdensome.

In addition, Plaintiff objects to Interrogatory No. 11 to the extent that it seeks documents, records, or information protected from disclosure by any privilege or immunity, including attorney-client privilege, attorney work product protection, common interest privilege, or any other privilege, immunity, principle, doctrine, or rule of confidentiality. If any protected information or material is disclosed, such disclosure is not intentional and shall not be deemed a waiver of any privilege or protection.

Subject to and without waiving Plaintiff's foregoing general and specific objections, Plaintiff responds that since its founding in 2017 and consistent with its organizational mission, it regularly engages in general voter registration and voter education activities, including voter registration drives and candidate forums. In addition, due to recent confusion about the validity of voter registrations based on continuing issues surrounding rural zip codes in Waller County, Plaintiff engaged with students and aided in efforts to resolve these concerns prior to or on election days.

In the 2018 general election, however, Plaintiff had to divert resources away from these regular activities to address the complete absence of early voting on campus during the first week of early voting and the limited amount of early voting on PVAMU's campus during the second week. Consequently, Plaintiff's members volunteered their time and other resources (for example,

cars, gas money) to drive students to off-campus polling locations during the first week of early voting. These students would have otherwise been unable to cast a vote because of their other obligations (for example, class schedules, work obligations) and lack of access to transportation.

Plaintiff's members also conducted meetings, answered inquiries (for example, about when and where to vote), and created and paid for materials to be printed to address confusion and to conduct outreach about how to vote in the 2018 elections, including the early voting schedule, which changed after this lawsuit was filed.

Plaintiff's executive board also managed and coordinated logistics around how to vote and how to use early voting on top of its general activities, including educating first-time voters and providing resources for how and where to vote.

## INTERROGATORY NO. 12

Please state each way in which the Panther Party "diverted its modest financial...resources to assisting PVAMU student voters by hosting trainings, organizing group transportation to early voting locations and conducting other educational and organizing activities...," as alleged in paragraph 17 of Plaintiffs' First Amended Complaint. Your answer should identify each financial expenditure or payment by the Panther Party in regard to the general election, including to whom the expenditure was made, the method of payment (i.e., cash, check, credit card, etc...), as well as how those expenditures or payments differed or diverted from the Panther Party's use of its financial resources.

## ANSWER TO NO. 12

Plaintiff objects to Interrogatory No. 12 to the extent that it seeks to impose obligations on Plaintiff in excess of those set forth in the Federal Rules of Civil Procedure and the Local Rules of the U.S. District Court for the Southern District of Texas. Plaintiff further objects to Interrogatory No. 12 because it is not limited to any reasonable time period and thus is vague, ambiguous, overly broad, and unduly burdensome.

In addition, Plaintiff objects to Interrogatory No. 12 to the extent that it seeks documents, records of financial transactions, or information protected from disclosure by any privilege or immunity, or rule of confidentiality. If any protected information or material is disclosed, such disclosure is not intentional and shall not be deemed a waiver of any privilege or protection.

Subject to and without waiving Plaintiff's foregoing general and specific objections, Plaintiff responds that since its founding in 2017 and consistent with its organizational mission, it regularly engages in general voter registration and voter education activities, including voter registration drives and candidate forums. As explained in Interrogatory No. 7, it does so on a limited budget – without significant (or any) membership dues, without consistent funding from PVAMU, and without support from any national organization.

In the 2018 general election, however, Plaintiff had to divert its already limited resources

away from these regular activities to address the complete absence of early voting on campus during the first week of early voting and the limited amount of early voting on PVAMU's campus during the second week. In the face of its regular activities and class and/or work obligations, organizational leaders and members testified before the commission hearings on October 17, 2018 to urge on-campus early voting.

Moreover, Plaintiff's members volunteered their time and other resources (for example, cars, gas money) to drive students to off-campus polling locations during the first week of early voting for students who would have otherwise been unable to cast a vote because of their other obligations (for example, class schedules, work obligations) and lack of access to transportation. Volunteers drove student voters off-campus on, for example six days. Volunteers, like individual Plaintiff Allen, used their own cars, paid for gas out-of-pocket, and rearranged their schedules and other obligations. Defendant Commissioners Court heard testimony (for example, at the October 17, 2018 hearing at 93:24) that students have limited funds and paying for gas is a significant expenditure for them, as it is for organizational Plaintiff and its members.

Plaintiff's members also conducted meetings, answered inquiries, and created and paid for materials to address confusion and conduct outreach about how to vote in the 2018 elections, including the early voting schedule. Because of the organizational Plaintiff's limited funds, Joshua Mohammed, for example, paid between $50-$100 to print materials out-of-pocket.

These efforts also forced Plaintiff's executive board team to expend time to manage and coordinate logistics around how to vote and use early voting that were not part of general activities, including educating first-time voters and providing resources for how and where to vote.

## INTERROGATORY NO. 13

Please identify any items, funds, or services that were donated to assist the Panther Party in its efforts related to the 2018 election.

## ANSWER TO NO. 13

Plaintiff objects to Interrogatory No. 13 in that such undefined terms as "items," "services," and "donated" are vague, ambiguous, overly broad, and unduly burdensome. Plaintiff further objects to the extent that Interrogatory No. 13 seeks to impose obligations on Plaintiff in excess of those set forth in the Federal Rules of Civil Procedure and the Local Rules of the U.S. District Court for the Southern District of Texas.  Plaintiff further objects that this Interrogatory is in part duplicative of Interrogatories Nos. 11 and 12.

Subject to and without waiving Plaintiff's foregoing general and specific objections, Plaintiff further respond that it received a single $200 donation from Mike Siegel to conduct non-partisan voter registration in 2018. Plaintiff used this money to purchase food as part of a freshman voter registration event.

**INTERROGATORY NO. 14**

If any members of the Panther Party experienced any difficulties or impediments to early voting during the 2018 general election, please identify  the member(s) and describe those difficulties or impediments in detail.

**ANSWER TO NO. 14**

Plaintiff objects to Interrogatory No. 14 because it is worded to require a legal conclusion and is predicated on legal definitions, conclusions, and arguments. Plaintiff also objects to this Interrogatory to the extent that it mischaracterizes Plaintiffs' claim in this lawsuit as being about difficulties or impediments to early voting during the 2018 general election. To the extent that the Interrogatory seeks factual information, Plaintiff objects to Interrogatory No. 14 as it is a premature interrogatory request that seeks a comprehensive identification of relevant facts before the close of discovery. *See* FED. R. CIV. P. 33(a)(2); *Wallace v. GEO Grp., Inc.*, No. 2:12-cv-2745, 2013 WL 6490320, at *3 (W.D. La. Dec. 10, 2013). Plaintiff also objects to Interrogatory No. 14 as it is unreasonably duplicative of Plaintiffs' expert-witness reports of Mr. Cooper, Dr. Flores, Dr. Joseph, and Dr. Stein, as well as information in Plaintiffs' First Amended Complaint (ECF No. 49), Plaintiffs' Motion and Memorandum of Law in Opposition to Defendants' Motion to Dismiss (ECF No. 53), which address this request and are currently in Defendants' possession.

Plaintiff further objects to Interrogatory No. 14 because it seeks the identities of its members, the compelled disclosure of which would "abridge the rights of its . . . members to engage in lawful association in support of their common beliefs," which is protected by the First Amendment to the U.S. Constitution. *NAACP v. State of Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958); *see id.* at 462-63 (holding "that compelled disclosure of [a civil rights association's] membership is likely to affect adversely the ability of [the association] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the [a]ssociation and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure."). Plaintiff further objects to Interrogatory No. 14 to the extent it requires the disclosure of protected material, including but not limited to confidential information or any information implicating privacy interests.

Subject to and without waiving Plaintiff's foregoing general and specific objections, Plaintiff responds that current or former members of organizational Plaintiff are identified in Interrogatory No. 9; these current or former members also are individual Plaintiffs in this lawsuit and have provided individual responses to the information sought through this Interrogatory No. 14 in their respective responses to Defendants' first interrogatories. Former or current members of organizational Plaintiff also provided testimony at commissioners court hearings (for example, on October 17, 2018) about their concerns with Defendants' early voting plans.

**INTERROGATORY NO. 15**

Please state with specificity each factual basis for your contention that your right to vote

was abridged or denied as a result of the early voting schedule in Waller County for the 2018 general election.

## ANSWER TO NO. 15

Plaintiff objects to Interrogatory No. 15 because it is worded to require a legal conclusion and is predicated on legal definitions, conclusions, and arguments. Plaintiff also objects to this Interrogatory because organizational Plaintiff does not have an individual right to vote. Plaintiff further objects to the extent this is a premature interrogatory request that seeks a comprehensive identification of relevant facts before the close of discovery. *See* FED. R. CIV. P. 33(a)(2); *Wallace v. GEO Grp.*, Inc., No. 2:12-cv-2745, 2013 WL 6490320, at *3 (W.D. La. Dec. 10, 2013). Plaintiff also objects to Interrogatory No. 15 to the extent that it is unreasonably duplicative of the Plaintiffs' expert-witness reports by Mr. Cooper, Dr. Flores, Dr. Joseph, and Dr. Stein, as well as information in Plaintiffs' First Amended Complaint (ECF No. 49) and Plaintiffs' Motion and Memorandum of Law in Opposition to Defendants' Motion to Dismiss (ECF No. 53), which address this request and are currently in Defendants' possession.

## INTERROGATORY NO. 16

Please state with specificity each factual basis for your contention that there was a lack of adequate early voting in the City of Prairie View and/or PVAMU during the 2018 general election.

## ANSWER TO NO. 16

Plaintiff objects to Interrogatory No. 16 to the extent that it mischaracterizes Plaintiffs' claim in this lawsuit as being about the adequacy of early voting in the City of Prairie View and/or PVAMU during the 2018 general election. Plaintiff also objects to Interrogatory No. 16 insofar as it seeks documents or information, such as the County's early voting plans for the November 2018 general election, which are already in Defendants' possession. For the same reason, Plaintiff objects to Interrogatory No. 16 insofar as it seeks documents or information that are obtainable from some other source that is less burdensome or less expensive. Plaintiff also objects to Interrogatory No. 10 as it is unreasonably duplicative of Plaintiffs' expert-witness reports of Mr. Cooper, Dr. Flores, Dr. Joseph, and/or Dr. Stein, as well as Plaintiffs' First Amended Complaint (ECF No. 49) and Plaintiffs' Motion and Memorandum of Law in Opposition to Defendants' Motion to Dismiss (ECF No. 53), which address this question and are currently in Defendants' possession.

## INTERROGATORY NO. 17

If you contend that early voting hours during the first week of early voting provide a greater opportunity to cast a ballot than early voting hours the second week, please state with specificity each factual basis for that contention.

**ANSWER TO NO. 17**

Plaintiff objects to Interrogatory No. 17 because it erroneously sets forth a contention that Plaintiff has not advanced in this case.

Subject to and without waiving Plaintiff's foregoing general and specific objections, Plaintiff responds that its answers are included in Plaintiffs' First Amended Complaint (ECF No. 49) and Plaintiffs' Motion and Memorandum of Law in Opposition to Defendants' Motion to Dismiss (ECF No. 53). Plaintiff's response is further supported by expert-witness reports of Mr. Cooper, Dr. Stein, Dr. Joseph, and/or Dr. Flores and the resources cited therein.

Moreover, Plaintiff responds that commissioners court meetings (for example, on October 17, 2018) are already in Defendants' possession, including testimony from Joshua Mohammed, other PVAMU current and former students, and other advocates urging additional early voting on-campus in 2018, including at least one day of early voting on campus during the first week and their reasons for this demand.

**INTERROGATORY NO. 18**

Please describe any activities or efforts the Panther Party undertook to advocate or petition for a greater number of early voting hours, prior to joining this lawsuit. Your answer should include, but is not limited to, identifying any communications by or on behalf of the Panther Party with officials, employees, or representatives of Waller County or PVAMU regarding early voting in Prairie View, by specifying with whom you had such communications, the manner of communication (i.e., in-person, phone call, email, text message, etc…), the approximate date and time of each communication, and the substance of each communication.

**ANSWER TO NO. 18**

Plaintiff objects to Request No. 18 because it is not limited to any reasonable time period and thus is vague, ambiguous, overly broad, and unduly burdensome. Plaintiff further objects to the extent that it seeks information already in the possession, custody, or control of Defendant Waller County and its officials, employees, or representatives.

Subject to and without waiving Plaintiff's foregoing general and specific objections, Plaintiff responds that commissioners court meetings (for example, October 17, 2018) are already in the possession of Defendants, including testimony from current or former Panther Party leaders and members, like Joshua Mohammed, urging additional early voting on-campus in 2018, including at least one day of early voting on campus during the first week and their reasons for this demand.

In addition, Plaintiff participated in community education and civic engagement meetings on campus to discuss strategies to advocate for a great number of early voting hours.

## INTERROGATORY NO. 19

If you contend that the Waller County Community Center is inaccessible to Panther Party members, please state with specificity each of your factual bases for that contention.

## ANSWER TO NO. 19

Plaintiff objects to Interrogatory No. 19 because it erroneously sets forth a contention that Plaintiff has not advanced in this case and/or mischaracterizes Plaintiffs' contention about the Waller County Community Center as a site for early voting for PVAMU students. Plaintiff also objects to Interrogatory No. 19 as it is unreasonably duplicative of the expert-witness reports of Mr. Cooper, Dr. Stein, Dr. Joseph, and/or Dr. Flores and or commissioners court hearing minutes (for example, for October 17, 2018), which address this question and are currently in the possession of Defendants. Specifically, commissioners court meetings (for example, October 17, 2018) already in Defendants' possession, including testimony from current or former Panther Party leaders and members, like Joshua Mohammed, urging additional early voting on-campus in 2018, including at least one day of early voting on campus during the first week and their reasons for this demand.

Respectfully submitted on July 29, 2019,

**Of Counsel:**

*/s/ Leah C. Aden*

Leah C. Aden*
Deuel Ross*
Kristen A. Johnson*
John S. Cusick*
**NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.**
40 Rector Street, 5th Floor
New York, New York 10006
Phone: (212) 965-2200
Fax: (212) 226-7592
laden@naacpldf.org
dross@naacpldf.org
kjohnson@naacpldf.org
jcusick@naacpldf.org

Catherine Meza*
**NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.**
700 14th Street NW, Suite 600
Washington, DC 20005
Phone: (202) 682-1300
Fax: (212) 226-7592
cmeza@naacpldf.org

*Pro Hac Vice*

Adam T. Schramek (SDTX 31913)
State Bar No. 24033045
Attorney-in-Charge
**NORTON ROSE FULBRIGHT US LLP**
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone: (512) 474-5201
Facsimile: (512) 536-4598
adam.schramek@nortonrosefulbright.com

Julie Goodrich Harrison (SDTX 3017799)
  State Bar No. 24092434
Nicole Lynn (SDTX 3041738)
  State Bar No. 24095526
**NORTON ROSE FULBRIGHT US LLP**
1301 McKinney Street, Suite 5100
Houston, Texas 77010
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
julie.harrison@nortonrosefulbright.com
nicole.lynn@nortonrosefulbright.com

William F. Calve (SDTX 3206298)
  State Bar No. 24096505
**NORTON ROSE FULBRIGHT US LLP**
300 Convent Street, Suite 2100
San Antonio, Texas 78205-3792
Telephone: (210) 270-7132
Facsimile: (210) 270-7205
william.calve@nortonrosefulbright.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

This is to certify that on July 29, 2019, I electronically sent a true and correct copy of the foregoing document to all counsel of record in this case.

*/s/ Leah C. Aden*
Leah C. Aden

## VERIFICATION

STATE OF TEXAS                    §

COUNTY OF __FORT BEND__           §
                                  §

     **BEFORE ME**, the undersigned, on this date personally appeared Joshua Muhammad

(Perkins) as a representative on behalf of the Panther Party, known to me to be the person

whose name is subscribed below, who states, upon oath, that the statements made in the

foregoing instrument are within his personal knowledge as a representative on behalf of the

Panther Party and are true and correct to the best of his knowledge, information, and belief. The

Panther Party reserves the right to make changes to the Responses if at any time it appears that

an error or omission has been made therein or if additional or more accurate information

becomes available.



Joshua Muhammad (Perkins)
as a Representative on behalf of the Panther Party


SWORN TO AND SUBSCRIBED BEFORE ME this 29th day of __JULY__

2019, to certify which witness my hand and seal of office.

ANAS K BUTT
NOTARY PUBLIC STATE OF TEXAS
MY COMM. EXP. 05/16/2022
NOTARY ID 13157327-8

Notary Public in and for the State of Texas



EXHIBIT 6
WIT: Muhammed
DATE: 10-10-19
Sherri S. Fisher, CSR

⇄ The Panther Party Retweeted



**Lowe**
@Maydrianlowe

When people ask us about the 2018 election, let's tell them about what we did to elect Democrats up and down the ballot. We get one extra hour today. Let's use it to knock on doors and call up our neighbors to make sure they have a march to the polls. It will make a difference-KH



3:07 PM · Nov 4, 2018 · Twitter for iPhone

**8** Retweets   **7** Likes

**PLS000311**

EXHIBIT _____ 8
WIT: _Muhammad_
DATE: 10-10-19
Sherri S. Fisher, CSR



The Panther Party Retweeted

**PV Panther**
@PVPantherOnline

# Setting the Record Straight: How Students Can Vote on Campus |



Setting the Record Straight: How Students Can Vote on Campus - PV Panther ...
Throughout the years, Prairie View A&M University students have faced
injustices and obstacles when it comes to being able to vote within Waller ...
🔗 pvpanthernews.com

7:33 PM · Oct 9, 2018 · Twitter for iPhone

**45** Retweets   **40** Likes

PLS000252

Case 4:18-cv-03985 Document 73-2 Filed on 01/24/20 in TXSD Page 375 of 677

News

⚡ **Trending**

# Setting the Record Straight: How Students Can Vote on Campus

Setting the record straight on what is needed to vote on campus.



**Daric Cottingham** ✉ · October 9, 2018 💬 0 🔥 5,009

Throughout the years, Prairie View A&M University students have faced injustices and obstacles when it comes to being able to vote within Waller county. The most recent plight against students' right to vote was a rumor that students would be turned away from voting. To keep students informed with the correct information, I was able to reach out to the Elections Administrator for Waller County, Christy Eason.

**Knowing the Issue**

While speaking with Christy Eason, she was able to clarify the misunderstanding of placing some students in the wrong precinct. In 2016, many students were registered to vote and informed to use the 700 University Drive address if they lived in the campus dorms. However, it is now known that this address is an actual residential address for the City of Prairie View which holds a different precinct, 310. The Prairie View A&M University campus precinct is 309. Knowing the difference between physical and mailing addresses can help prevent this type of issue when registering to vote. A mailing address is an address at which a person or business receive letters or packages, which

Case 4:18-cv-03985   Document 73-2   Filed on 01/24/20 in TXSD   Page 376 of 677

can be different from the place where they work or live. Knowing these exact addresses makes registering to vote a smoother process.

These precincts determine voting locations, those under 309 can vote on campus while others in 310 have a voting location at Prairie View City Hall. During the recent Primary Elections, this discrepancy was found. Eason stated, "In the Primary election we had found that some of the students were registered in precinct 309, which is the university's precinct. But then some of them were also registered in 310 which is the city's voting block."

**Finding the Solution**



*Eason then went to the drawing board to find a solution, "We have to find a way to get all of those registered in precinct 310 back to 309."*

Eason then went to the drawing board to find a solution, "We have to find a way to get all of those registered in precinct 310 back to 309. " Anyone with 700 University Drive as their physical address will be allowed to vote, "no one will be turned away," Eason reassured.  Students with 700 University Drive as their address will need to fill out an address change form at the voting polls. This address change form will place students in the correct precinct for the campus, 309. Students who will be newly registering to vote are encouraged to use the correct physical address for their respective dorm on campus.





**Here is a list of the acceptable forms of photo ID:**

- Texas Driver License issued by the Texas Department of
  Public Safety (DPS)
- Texas Election Identification Certificate issued by DPS
- Texas Personal Identification Card issued by DPS
- Texas Handgun License issued by DPS
- United States Military Identification Card containing the
  person's photograph
- United States Citizenship Certificate containing the
  person's photograph
- United States Passport (book or card)

Students can check their voter registration status here.


Early Voting will be in the Willie A. Tempton Memorial Student
Center October 29th – 31st 8am-5pm

Election Day will be  in the Willie A. Tempton Memorial Student
Center November 6th 7 am – 7 pm



EXHIBIT 9
WIT: Muhammad
DATE: 10-10-19
Sherri S. Fisher, CSR



**Jayla Allen**
October 12, 2018

Official statement from Texas Secretary of State! #PVAMU #Vote



*It has been communicated and confirmed that the Waller County plan ensures, as it was always intended to do, that all students residing on campus who are registered to vote in the county will be able to cast their ballots at the Precinct 309 polling location on campus, and that no students will be impeded, hampered, or otherwise delayed in exercising their constitutional right to cast a ballot in the upcoming General Election. No change of address form or statement of residence will be required prior to voting. After students vote, they will be able to update their address for future elections.*



20                                    3 Comments 2 Shares

**PLS000017**

Google Maps Waller County Community Center



Imagery ©2019 Google, Imagery ©2019 Houston-Galveston Area Council, Maxar Technologies, Texas General Land Office, U.S. Geological Survey, USDA Farm Service Agency, Map data 100 ft
©2019

EXHIBIT 12
WIT: Mulhearn
DATE: 10-10-19
Sherri S. Fisher, CSR



**PVAMU Transportation Office Hours**
Monday – Friday 8:00 AM – 5:00 PM
Phone: **936-261-1140**   **For Special**
**Assistance Please Contact: 936-261-3585**

# PVAMU TRANSPORTATION SCHEDULE
## www.trackthepanther.com

| On Campus Loop | Runs every | | 15 minutes |
| --- | --- | --- | --- |
| Monday - Friday | Depart (MSC) | | Last Run (MSC) |

PURPLE runs every 30 min from the MSC
GOLD runs once an hour from the MSC

### First Departure from MSC @ 7:00 am / Last Departure from the MSC @ 5:00 pm



| Off Campus PURPLE route | MSC (Leave) | Pine Island | Brookside/ Panther Hill | University Trails | Creekside | MSC (Arrive) | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| A Mon.-Fri. | :00 | :12 | :15 | :17 | :19 | :22 | | |
| B Mon.-Fri. | :30 | :42 | :45 | :47 | :49 | :52 | | |

### First Departure from MSC @ 7:00 am / Last Departure from the MSC @ 6:00 pm

| Off Campus (GOLD) route | MSC (Leave) | The Ranch | Empty Eye II | Empty Eye I | Valero | Dollar General | Echols & University | Panther Quarters | Panther Plaza | Architecture Bld. | MSC (Arrive) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| A Mon.-Fri. | :00 | :14 | :24 | :26 | :27 | :28 | :29 | :30 | :32 | :34 | :38 |

### NorthWest Campus Route

| NorthWest GREEN Campus | MSC (Leave) | NorthWest | MSC (Arrive) |
| --- | --- | --- | --- |
| A Mon.-Thurs | 4:30 pm | 5:15 pm | 6:30 pm |
| B Mon.-Thurs | 8:15 pm | 9:00 pm | 9:45 pm |

## Stop at Cypress made by Request

### First Departure from MSC @ 6:00 pm / Last Departure from the MSC @ 9:00 pm

| Black Route | MSC (Leave) | Brookside/ Panther Hill | Pine Island | The Ranch | MSC (Arrive) |
| --- | --- | --- | --- | --- | --- |
| Mon.-Thurs. | :00 | :09 | :12 | :24 | :38 |
| Sat. | 7:00 8:00 1:00 2:00 | 7:09 8:09 1:09 2:09 | 7:12 8:12 1:12 2:12 | 7:24 8:24 1:24 2:24 | 7:38 8:38 1:38 2:38 |

PLS000329

EXHIBIT 13
WIT: _____
DATE: 6-10-19
Sherri S. Fisher, CSR



PRAIRIE VIEW A&M

All routes.

PLS 000330

Purple A route.



PLS 00033

Purple B route.



PLS 000332

Panther Loop route.



PLS000333

Cypress Loop route.



Gold route.



PLS 000335

Blue route.



PLS000336

Black route.



PLS000337

| 2018 GENERAL ELECTION WALLER COUNTY AND ROYAL ISD | EARLY VOTING LOCATIONS | |
|---|---|---|
| DURING EARLY VOTING ALL PRECINCTS AND ENTITIES CAN VOTE AT ANY LOCATION | | |
| **WEEK ONE** | | |
| MONDAY – FRIDAY<br>October 22 – 26, 2018<br>SATURDAY<br>October 27, 2018<br>SUNDAY<br>October 28, 2018 | Waller County Courthouse<br>836 Austin St, Hempstead, Tx | 8am – 5pm<br><br>9am – 2pm<br><br>12pm -5pm |
| MONDAY – FRIDAY<br>October 22 – 26, 2018<br>SATURDAY<br>October 27, 2018 | Waller ISD Admin Bldg.<br>2214 Waller St., Waller, Tx | 8am – 5pm<br><br>9am – 2pm |
| MONDAY – FRIDAY<br>October 22 – 26, 2018<br>SATURDAY<br>October 27, 2018<br>SUNDAY<br>October 28, 2018 | Waller Co Library Brookshire<br>3815 6th St., Brookshire, Tx | 8am – 5pm<br><br>9am – 2pm<br><br>12pm – 5pm |
| THURSDAY – FRIDAY<br>October 25 – 26, 2018<br>SATURDAY<br>October 27, 2018 | Fieldstore County Bldg., JP 2<br>27388 Fieldstore Rd., Waller,<br>Tx | 8am – 5pm<br><br>9am – 2pm |
| THURSDAY – FRIDAY<br>October 25 – 26, 2018<br>SATURDAY<br>October 27, 2018 | Monaville County Bldg., JP 3<br>12620 FM 1887, Hempstead,<br>Tx | 8am – 5pm<br><br>9am – 2pm |
| MONDAY – WEDNESDAY<br>October 22 – 24, 2018 | Katy VFW<br>2606 George Bush Dr., Katy, Tx | 8am – 5pm |
| SUNDAY<br>October 28, 2018 | Prairie View City Hall | 12pm – 5pm |
| **WEEK TWO** | | |
| MONDAY – WEDNESDAY<br>October 29 – 31, 2018<br>THURSDAY - FRIDAY<br>November 1 – 2, 2018 | Waller Co Courthouse<br>836 Austin St, Hempstead, Tx | 8am – 5pm<br><br>7am – 7pm |
| MONDAY – WEDNESDAY<br>October 29 – 31, 2018<br>THURSDAY - FRIDAY<br>November 1 – 2, 2018 | Waller ISD Admin Bldg.<br>2214 Waller St., Waller, Tx | 8am – 5pm<br><br>7am – 7pm |
| MONDAY – WEDNESDAY<br>October 29 – 31, 2018<br>THURSDAY - FRIDAY<br>November 1 – 2, 2018 | Waller Co Library Brookshire<br>3815 6th St., Brookshire, Tx | 8am – 5pm<br><br>7am – 7pm |
| MONDAY – WEDNESDAY<br>October 29 – 31, 2018 | Memorial Student Center<br>PVAMU , Prairie View, Tx | 7am – 7pm |
| THURSDAY – FRIDAY<br>November 1 – 2, 2018 | WC Community Center – PV<br>FM 1098, Prairie View, Tx | 7am – 7pm |

EXHIBIT  14
WIT: Muhammad
DATE:  10-10-19
Sherri S. Fisher, CSR

DEFENDANTS000158

EXHIBIT ___15___
WIT: _Muhammad_
DATE: _10-10-19_
Sherri S. Fisher, CSR

t⏉  The Panther Party Retweeted



**HD**
@_darroo

Only took 5 minutes go vote pv



11:09 AM · Oct 31, 2018 · Twitter for iPhone

**30** Retweets   **61** Likes

The Panther Party Retweeted

Tuh! Its Bethany
@itsbethanyy

I VOTED ✅ Now y'all go do the same!! It takes less than 5 minutes

12:19 PM · Oct 29, 2018 from Prairie View, TX · Twitter for iPhone

4 Retweets   13 Likes

PLS000289

