1

**PLAINTIFF'S EXHIBIT**

**39**
_____

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE SOUTHERN DISTRICT OF TEXAS

 3                       HOUSTON DIVISION

 4   JAYLA ALLEN, DAMON JOHNSON,

 5   TREASURE SMITH, and THE PANTHER

 6   PARTY,

 7              Plaintiffs,

 8   vs.                              Civil Case No.

 9   WALLER COUNTY, TEXAS; THE WALLER   4:18-cv-3985

10   COUNTY COMMISSIONERS COURT;

11   JUDGE CARBETT "TREY" J. DUHON, III

12   in his official capacity as the

13   Waller County Judge; CHRISTY A.

14   EASON, in her official capacity

15   as the Waller County Elections

16   Administrator,

17              Defendants.

18   _____/

19              The deposition of JAMES G. GIMPEL, Ph.D.,

20   was held on Thursday, December 12, 2019, commencing at

21   10:01 a.m., at the Law Offices of Littler Mendelson,

22   P.C., 815 Connecticut Avenue, N.W., Suite 400,

23   Washington, D.C., before Steven Poulakos, Notary

24   Public.

25   REPORTED BY:  Steven Poulakos, RPR
```

2

1   APPEARANCES:

2

3       ON BEHALF OF THE PLAINTIFFS:

4       GUNNAR P. SEAQUIST, ESQUIRE

5           Bickerstaff Heath Delgado Acosta, LLP

6           3711 S. MoPac Expressway

7           Building One

8           Suite 300

9           Austin, Texas  78746

10           Telephone:  512.472.8021

11           Email:  gseaquist@bickerstaff.com

12

13       ON BEHALF OF THE DEFENDANTS:

14       LEAH ADEN, ESQUIRE

15       JOHN CUSICK, ESQUIRE

16       STEVEN LANCE, ESQUIRE

17           NAACP Legal Defense and Educational Fund

18           40 Rector Street

19           5th Floor

20           New York, New York  10006

21           Telephone:  212.965.7715

22           Email:  laden@naacpldf.org

23

24

25

3

1                              **INDEX**

2              Deposition of JAMES G. GIMPEL, Ph.D.

3                        December 12, 2019

4    Examination by:                                    Page

5    Ms. Aden                                             4

6

7    Exhibit No.                                       Marked

8    Exhibit 1      Notice of deposition                 13

9    Exhibit 2      Defendants' disclosure of expert     25

10                  report

11   Exhibit 3      Decision and order on motion for     64

12                  preliminary injunction

13   Exhibit 4      An opinion                           77

14   Exhibit 5      An article entitled, political      211

15                  participation and the accessibility

16                  of the ballot box by Gimpel and

17                  Shupnick

18   Exhibit 6      An article                          214

19   Exhibit 7      Declaration of William S. Cooper    224

20   Exhibit 8      Expert rebuttal report of Robert    240

21                  Stein, Ph.D.

22

23

24

25

4

1                 P R O C E E D I N G S

2                         - - -

3

4  Whereupon,

5                 JAMES G. GIMPEL, Ph.D.,

6  as a witness, having been first duly sworn to tell the

7  truth, the whole truth, and nothing but the truth, was

8  examined and testified as follows:

9                 EXAMINATION BY MS. ADEN

10      Q       Good morning.

11      A       Good morning.

12      Q       I am Leah Aden.  I'm an attorney with the

13  NAACP Legal Defense and Educational Fund, one of the

14  counsel representing the plaintiffs in Allen versus

15  Waller County.

16              Can you please state your full name for the

17  record?

18      A       James Gimpel, and yes.

19      Q       And you are a doctor?

20      A       Professor at the University of Maryland.

21              MS. ADEN:  Before we get too engulfed in

22  today's questions, in previous depositions, the parties

23  have been stipulating that all objections except as to

24  the form of the question will be waived and

25  additionally we have been stipulating to the

1    requirements under the federal rules of 30(b)5 which

2    will allow us to skip over some of the things that

3    might distract us from the meat on the questioning

4    today.  And I wanted to direct that to counsel whether

5    or not you will be agreeable to waiving those today?

6              MR. SEAQUIST:  We are agreeable to waiving

7    the 30(b)5 requirements.  Let me just clarify.  I think

8    the agreement has been that an objection to form is

9    sufficient to preserve any objections to the question.

10              MS. ADEN:  Yes, that's correct.

11              MR. SEAQUIST:  Okay.  Yes, we agree to

12    that.

13    BY MS. ADEN:

14       Q    I believe that you're familiar with

15    depositions and deposition rules, but I wanted to go

16    over very briefly some ground rules so that we make

17    sure we're operating on the same playing field today.

18              I'm going to be asking you questions today

19    about the facts and your opinions related to this

20    lawsuit and you have been sworn into oath; is that

21    correct?

22       A    Um-hmm.

23       Q    Which means that you have sworn to answer

24    questions today with the same duty to answer questions

25    truthfully as if you were before a judge in a

**James Gimpel, Ph.D. - December 12, 2019**

6

1    courtroom; is that correct?

2         A       Yes.

3         Q       And the court reporter, Mr. Poulakos, is

4    transcribing this deposition.  So with that in mind, it

5    will be great if both of us try to speak up and speak

6    audibly and refrain from nodding as much as possible,

7    but answering audibly on the record.

8                 Does that make sense?

9         A       Yes.

10        Q       I may have to remind myself or you from

11   time to time.

12        A       Yes.

13        Q       But let's at least start out thinking that

14   way.  Additionally it's very easy to nod your head in

15   agreement, but, again, we need all affirmations or

16   opposition to anything to be stated audibly on the

17   record.

18                Is that agreeable?

19        A       Yes.

20        Q       I'm going to ask that you do not guess or

21   assume when answering, that you state what you know.

22                Does that make sense?

23        A       Yes.

24        Q       If I don't ask a question clearly or you

25   don't understand my question, please feel free to let

1    me know and I will try to rephrase.

2            Is that agreeable?

3        A     Yes.

4        Q     We talked about objections briefly and for

5    the most part, it's going to be you and me talking.

6    From time to time, there may be objections.  Unless

7    you're specifically instructed not to answer a question

8    from your counsel, I'm going to ask a question and the

9    objection can be stated for the record.  And then again

10   unless you're specifically asked not to answer a

11   question, please do try to answer.

12           Is that agreeable?

13       A     Yes.

14       Q     Is there any reason why you would be unable

15   to answer or understand any of my questions today?

16       A     No.

17       Q     Are you taking any medications that might

18   impair your ability to answer or understand any

19   questions today?

20       A     No.

21       Q     Have you had any alcoholic beverages in the

22   last 12 hours?

23       A     No.

24           MR. SEAQUIST:  Try to speak up a little.

25   BY MS. ADEN:

James Gimpel, Ph.D. - December 12, 2019

8

1      Q      At any time you need to take a break,
2   please allow me to finish answering my question.  You
3   answer that question and then we can take a break.  And
4   just let me know if you would like one.
5              Does that make sense?
6      A      Okay.  Yes.
7      Q      Any questions so far?
8      A      No.
9      Q      Have you been deposed before?
10     A      Yes.
11     Q      How many times?
12     A      Five.
13     Q      And were those all in a professional
14   capacity?
15     A      Yes.
16     Q      Have you ever been deposed in a personal
17   capacity?
18     A      No.
19     Q      When were you most recently deposed?
20     A      I want to say July of 2019.
21     Q      What type of case was that?
22     A      That was the second round of litigation
23   associated with Whitford V Gill, a redistricting case
24   in Wisconsin.
25     Q      What was your role in that case?

9

1    A       Just I wrote an expert report representing

2    work.  I was employed by the attorneys representing the

3    state legislature of Wisconsin.

4    Q       Have you testified at trial in that case?

5    You mentioned it was your second round.  Have you

6    testified at trial?

7    A       That case ultimately did not go to trial.

8    Q       Did you testify at any hearings related to

9    that case?

10   A       No.

11   Q       Were you qualified as an expert in that

12   case?

13   A       By a judge.  That didn't happen.  We didn't

14   actually get into court where that could happen.

15   Q       So you did -- more or less the contribution

16   to the case was doing the deposition and writing a

17   report?

18   A       In reverse order.  So I wrote a report and

19   I wrote a second report and then came the deposition.

20   And I said July, but I think I need to back that up.

21   I'm pretty sure it was June.

22   Q       But still of this year?

23   A       Yes, of 2019.

24   Q       And before that, when you were last

25   deposed?

1      A      Well, let's see.  There was a -- do you
2   mind if I consult?  Do I have a CV?
3      Q      Let's get to that.  So as of now --
4      A      Yeah.  I'm trying to remember.  There were
5   some cases where we got that far and other cases where
6   we didn't.  There was one case where there wasn't a
7   deposition involved.  There was a Pennsylvania case and
8   then Pennsylvania -- in the State of Pennsylvania, they
9   don't do depositions.  So it's not as easy to answer as
10  right off the top of my head as I'd like it to be.
11     Q      I'm going to show you your CV in a bit and
12  maybe that will help jog your memory.
13     A      There was a deposition in the North
14  Carolina case, but I don't think that was the most
15  recent one.  There was a deposition in the North
16  Carolina redistricting case, the Rucho case.
17     Q      R-U-C-H-O; is that correct?
18     A      Yes, R-U-C-H-O.
19     Q      You mentioned Wisconsin.  You mentioned
20  North Carolina.  You mentioned Pennsylvania.  Was that
21  also a redistricting case?
22     A      Yes.  And I don't quite understand the
23  legal procedures and rules, but in neither the Agre
24  case or the League of Women Voters case were any
25  depositions taken.

**James Gimpel, Ph.D. - December 12, 2019**

11

1     Q     So the Agre?

2     A     Agre is A-G-R-E.

3     Q     And is that the Pennsylvania case that you

4  were working on?

5     A     That is a Pennsylvania federal

6  redistricting case and then there was League of Women

7  Voters versus Commonwealth which was the state level

8  Pennsylvania redistricting case.  So those two cases

9  were moving through on parallel courses at two levels

10  of the court system and in neither case were

11  depositions taken.  My understanding was that that had

12  something to do with Pennsylvania.

13     Q     And then in North Carolina, were you

14  deposed in that case?

15     A     Yes.  That was the Rucho case.  So that

16  would go back to 2017.

17     Q     Then do you recall being deposed in any

18  other cases outside of Pennsylvania, North Carolina,

19  and Wisconsin?

20     A     I want to say there was another one in

21  there, but maybe my CV would refresh me on that.

22     Q     Yes.

23     A     I believe there was another one in there

24  where a deposition was taken.  So I want to say the

25  answer to your question is yes, but I think looking at

12

1   my CV could help me recall exactly.

2        Q        Perfect.  So we'll definitely get to that

3   and dive in.  One other thing is if at any time you

4   answer a question at a moment and then you later recall

5   that you want to supplement or correct --

6        A        Correct the record.

7        Q        -- happy for you to do that as well.

8        A        Okay.

9        Q        So we'll dive down into this a little bit

10  more.  Have you ever been a party to a lawsuit of any

11  kind?

12       A        No.

13       Q        Not in a professional capacity?

14       A        No.

15       Q        And not in a personal capacity?

16       A        No.

17       Q        With respect to today's deposition, how did

18  you learn about it?

19       A        Learn about the case?

20       Q        Learn about the deposition.  How did you

21  learn that it was happening?

22       A        Counsel, Mr. Seaquist, informed me of the

23  deposition by phone several weeks ago.

24       Q        I'm going to show you what I am marking as

25  Exhibit 1, plaintiffs' notice of deposition of

13

1    Dr. James G. Gimpel, and hand that to Dr. Gimpel and

2    also hand a copy to his counsel.

3             (Gimpel Exhibit 1 was marked for purposes

4    of identification.)

5    BY MS. ADEN:

6        Q      And you can take a few moments to look at

7    this.  I'm not going to ask you many questions about

8    it, but do you recognize this document?

9        A      I probably received this by email.  So I

10   get a lot of things via email.  So I'll say this.  I

11   vaguely recall this appearing in my email.  I think the

12   concern at that time was for time and date of this

13   event, this deposition.  So I probably didn't read it

14   in great detail.

15       Q      Okay.  What did you do to prepare for

16   today's deposition?

17       A      Well, I reviewed the report that I had

18   submitted back in September.  I prepared some notes and

19   I guess what you might call some highlights of the

20   report and shared them with Mr. Seaquist.  There were a

21   couple of phone calls with Mr. Seaquist about

22   highlights of the report and how the deposition would

23   proceed.

24             We also -- Mr. Seaquist and I had

25   discussions yesterday for about two hours I would say

**James Gimpel, Ph.D. - December 12, 2019**

14

1   from 1:00 p.m. to about 3:00 p.m. here in the hotel

2   about highlights of the report and likely questions

3   that might come up during the deposition.

4         Q      Was anyone else present besides you and Mr.

5   Seaquist?

6         A      No.

7         Q      On any of the calls that you had with Mr.

8   Seaquist, was anyone else present?

9         A      No.

10        Q      And you said you talked a couple of -- you

11  had a couple of phone calls with Mr. Seaquist.  About

12  less than five, more than five?

13        A      Two I would say.  When I emailed him some

14  notes and points, I did copy Mr. Heath, but I didn't

15  talk or communicate with Mr. Heath in email or by phone

16  or in person.  I just copied him.

17        Q      And Mr. Heath is?

18        A      Co-counsel of -- I guess colleague,

19  co-counsel of Mr. Seaquist.

20        Q      Did you -- outside of your report and the

21  notes that you mentioned, did you review any other

22  documents in preparation for today's deposition?

23        A      Well, I was sent the second reports of

24  Professor Flores and Professor Stein several weeks ago.

25  Those were sent to me when they were completed.  So I

15

1    read through those and in the notes and points that I

2    shared with Mr. Seaquist, I shared some of my thoughts

3    about --

4              MR. SEAQUIST:  Jim, she's not asking you

5    about your conversations with me.  Those are

6    privileged.  So she's asking you what you reviewed.

7              THE WITNESS:  Okay.  So those were the --

8    BY MS. ADEN:

9        Q    To prepare for today's deposition, you

10   reviewed your report and you agree that you only

11   submitted one report in this case so far?

12       A    Yes.

13       Q    And then you reviewed supplemental or

14   second reports of Dr. Flores and Dr. Stein?

15       A    Correct.

16       Q    Did you review anything else?

17       A    No.

18       Q    And the -- any documents -- did you bring

19   any with you today?

20       A    I --

21       Q    You could just tell me.

22       A    Yes.  I have -- the most convenient form

23   that I could bring them in was in a flash drive which

24   I'd rather not give up entirely, but if you could just

25   copy the files from -- on to one of the laptops, that

**James Gimpel, Ph.D. - December 12, 2019**

16

1   would be fine.

2       Q      Can you generally tell me what -- what's in

3   that flash drive?

4       A      Well, it would be copies of my report, a

5   lot of the tables and figures therein.  There are some

6   data files associated with my research for my report.

7   You know, there are some -- in various formats.  So

8   there's some Excel files.  There are some SPSS files.

9   That is a statistical program that's very commonly used

10  and then some GIS files.  So these are all files that

11  are associated with the writing of the report.

12      Q      Your original report?

13      A      My original report.

14      Q      Do you know whether or not those underlying

15  files were disclosed to us through your plaintiffs'

16  counsel?

17      A      Some of them were as I understand it back

18  in September, you know, the ones that were associated

19  with the filing of the report.  So there will be some

20  duplication there, but other files were not sent at

21  that time.  So they will be new now.

22      Q      So have you created reports or data sets

23  subsequent to your original report that are related to

24  this case?

25      A      No.

**James Gimpel, Ph.D. - December 12, 2019**

17

1      Q      Did you discuss today's deposition with
2  anyone else besides Mr. Seaquist and Mr. Heath?
3      A      No.
4      Q      When did you first learn about this
5  lawsuit?
6      A      Pretty sure the first time I heard about it
7  was when Mr. Seaquist called me about the middle of
8  July of 2019, probably the third week of July and
9  described the rough outline of the case.
10     Q      And have you discussed this lawsuit with
11 anyone besides Mr. Seaquist or any of his co-counsel or
12 colleagues?
13     A      No.  I've only interacted with Mr. Seaquist
14 and Mr. Heath.
15     Q      When were you retained in this case?
16     A      Approximately third week of July.
17     Q      And that was by Mr. Seaquist?
18     A      Yes.
19     Q      And do you have a copy of that retainer?
20     A      I probably do.  That I did not include with
21 the material on the flash drive, but I do have a copy
22 of it.
23     Q      And is it correct that your rate of
24 compensation in this case is $300?
25     A      Yes.

1      Q      Is that a flat rate for all of your work on

2  the case?

3      A      $300 an hour, yes.

4      Q      Do you know how much you have billed so

5  far?

6      A      I can estimate the number of hours.  Maybe

7  130.

8      Q      A hundred and thirty thousand?

9      A      No, 130 hours.

10     Q      And when is the last time you billed that

11 set of hours or that estimate of hours?

12     A      It would have been when the final report

13 was handed in in early September, so it might have been

14 around September 7th or 9th.

15     Q      Do you expect to supplement or do you

16 expect to bill for another set of hours?

17     A      So far, the only thing that I would bill

18 for would be the hours maybe yesterday and today.  And

19 I have no other hours to bill for in between and I

20 don't know if there will be any hours going forward.  I

21 don't know the answer to that.  Right now there are no

22 plans to write a second report or a supplementary

23 report.

24     Q      Now --

25     A      So the answer is I don't know.  I don't

19

1   know at this time whether there will be any more hours.

2   As far as I know, yesterday and today is the sum total.

3        Q        So you mentioned earlier also that you

4   reviewed the second reports of Dr. Flores and Dr.

5   Stein.  Do you expect to bill for the time you spent

6   reviewing those?

7        A        Yeah.  I suppose so.  I suppose that when I

8   send in a bill for yesterday and today, there will be

9   probably an hour that I'll bill associated with the

10  review of those materials.

11       Q        And the phone calls you had with Mr.

12  Seaquist and Mr. Heath before yesterday and/or today,

13  do you expect to bill for those?

14       A        Well, these were not long calls, but

15  perhaps 30 minutes.  That's what I would ballpark it

16  at.

17       Q        Is the rate that you charged in this case

18  consistent with the rate that you charged for the

19  approximately five other depositions that you recall

20  participating in?

21       A        Yes.  It's been the same.  I believe it's

22  been the same since 2017.  I did a case way back in

23  2012 at the California state level and I might have

24  charged 250 an hour for that, but I'd have to review.

25  I'm not entirely certain, so --

20

1     Q      I'm going to turn to another subject which
2   is your background qualifications and employment
3   history.  Can you briefly describe your educational
4   background since high school?
5     A      Okay.  So undergraduate degree was
6   completed at Iowa Drake University in Des Moines and
7   then from there, I went to the University of Toronto
8   for advanced training in political science, took a
9   master's degree there.  Then from there, I went to the
10  University of Chicago and completed my Ph.D. there
11  focusing on American politics, elections, voting, the
12  subjects that I've worked on throughout my career.
13    Q      And what would you consider your areas of
14  specialization?
15    A      So voting, elections, political geography.
16  I've written some on public opinion, immigration.  So
17  those are political behavior, political geography,
18  elections, voting, political participation.  That goes
19  with voting.
20    Q      What about geographic information systems,
21  does that term ring familiar to you?
22    A      Sure.  I didn't do that so much in graduate
23  school.  I picked that up mostly as a faculty member
24  because it's somewhat new.  I mean, it's developed
25  largely in the last 30 years particularly in the social

1   sciences.

2           So, yes, that's something I've been

3   studying and also teaching for probably 15 years now.

4   Well, I've been studying it for probably 20, but I've

5   been teaching courses in that area now for about 15

6   years.

7       Q       Your knowledge of election law, voting,

8   political participation, does that extend to federal

9   election law or would you say it extends also to state

10  election law?

11      A       I know some about state election law, but,

12  of course, states vary.  And so, you know, I would not

13  have an off the top of the head familiarity with every

14  state.  When I go into my classes and teach about

15  elections and election law, I mainly focus on federal

16  elections because I don't have to cover the patch work

17  of all 50 states.

18          It's just easier for me to talk about

19  federal election law and then suggest to the students

20  some places they would go, for instance, to learn about

21  maybe state campaign finance rules that might be

22  germane to a particular state or placement of polling

23  places, whether a state has an early voting option,

24  these kind of questions.

25      Q       So tell me where you're currently employed.

James Gimpel, Ph.D. - December 12, 2019

22

1      A       The University of Maryland College Park.

2      Q       And what is the current title that you

3  hold?

4      A       Professor.

5      Q       And is this in the political science

6  department?

7      A       It's called government, but it's the same

8  thing.  And that particular university, it's called the

9  department of government, but it's political science.

10     Q       And is this a full-time professorship?

11     A       Yes.

12     Q       How long have you been employed there?

13     A       Twenty-eight years.

14     Q       Have you ever been employed at another

15  academic institution?

16     A       Part-time at George Washington University.

17  I taught as an adjunct part-time.  That's all.

18     Q       And that was simultaneous with also

19  teaching at Maryland?

20     A       It was just before.

21     Q       So this was earlier in your career?

22     A       Yes, quite early.

23     Q       So besides teaching at GW and the

24  University of Maryland, those are the two academic

25  institutions you've been associated with?

23

1       A       Yes.

2       Q       And is it fair to say -- strike that.

3               Do you have any professional appointments?

4       A       Like can you say more about what you mean?

5       Q       Meaning to any boards, to any associations.

6       A       I was a past editor of a journal, so I

7    think I'm kind of ex officio as an editorial board

8    member for that academic journal.  American Politics

9    Research it's called.  But I'm not the editor anymore.

10   I stepped out in 2011.

11      Q       Are you a member of any other associations?

12      A       Well, just kind of the standard academic

13   associations like the American Political Science

14   Association.  The ones that professional political

15   scientists would belong to.  There's also one that

16   covers the midwest simply called the Midwest Political

17   Science Association.

18      Q       Has your work been published?

19      A       Yes.

20      Q       And about how many publications would you

21   say?

22      A       Well, in peer reviewed journals, I would

23   ballpark it at about 50 and then there are other

24   publications in non-peer reviewed outlets.  So that

25   would be like magazine or a non-refereed journal or

24

1   someone's edited book, a collection of chapters.  It's

2   not the same peer review process.  So there's some

3   publications there, perhaps 12, 13.  And then an

4   assortment of other publications that would be again

5   like magazine articles, book reviews, op eds, a few of

6   those.

7        Q       With your academic appointment, are you

8   required to do any publishing or writing?

9        A       Well, yes.  At a place like the University

10  of Maryland, it's considered research one institution.

11  And so there is -- understanding that if you're hired

12  there, you need to be producing research and that's

13  because the teaching load is not as heavy there as it

14  would be at a small college.  So I should be using that

15  time to do something, right, that I'm not teaching,

16  using that time that I'm not teaching to be producing

17  research.  So that's the understanding.

18       Q       Correct me for my ignorance of academia.

19  Does your professorship mean that you're a tenured

20  professor?

21       A       Yes.  I was tenured initially in 2000, the

22  year 2000.  I started in '92.  I was tenured in 2000.

23       Q       You mentioned your CV before and we're

24  going to get to that now.

25       A       Okay.

James Gimpel, Ph.D. - December 12, 2019

25

1      Q       I'm going to mark as Exhibit 2 a document

2   titled defendants' disclosure of expert report and I'm

3   going to hand that to Dr. Gimpel and also share a copy

4   with his counsel.

5               (Gimpel Exhibit 2 was marked for purposes

6   of identification.)

7   BY MS. ADEN:

8      Q       Do you recognize this document?

9      A       This looks like the report that I sent in

10  in September, yes.

11     Q       So if you look at it, the first page says

12  defendants' disclosure of expert report, is that

13  correct, that it's titled?

14     A       Yes.

15     Q       And on the third page, and these are

16  double-sided pages, there is a section one entitled

17  designation of expert.  Do you see that?  It's the

18  third page.

19     A       Yes.  Yes.

20     Q       And then there's a section two which is

21  titled expert report and resumes?

22     A       Right.

23     Q       And then there's an Exhibit 1 to this

24  packet.  Does that encompass your CV?

25     A       Yes.

26

1     Q    And then attached to this packet, there's

2  an Exhibit 2 and that encompasses the report that

3  you've been referencing that you disclosed in September

4  of 2019; is that correct?

5     A    Yes.

6     Q    So I want to focus you on the CV portions

7  of it which are between -- behind Exhibit 1.

8     A    Okay.

9     Q    Does this CV accurately represent and

10  summarize your professional background?

11     A    Yes.

12     Q    Are there any updates to it since you

13  provided it?

14     A    Yes.  There's a new paper that recently

15  came out in a non-peer reviewed journal.  So it would

16  not be on page 2.  It would belong probably on page 6.

17  So it will go on the top of page 6 as a non-peer

18  reviewed journal, a paper on opinion on immigration.

19     Q    Do you mind telling me briefly what is the

20  difference between peer reviewed and non-peer reviewed

21  work?

22     A    Sure.  I think the peer reviewed

23  publications are sent through the blind review process

24  to a panel of researchers who are considered peers,

25  right, by virtue of their training and expertise.  And

27

1    these peers review the submission and make

2    recommendations for publication or rejection first of

3    all.  And then if they think that it is suitable for

4    publication in the journal, that is they don't just out

5    of hand reject it, then they make suggestions for how

6    to revise it and those suggestions can be quite

7    extensive or less extensive depending on their

8    judgment.

9              So that's the big difference between the

10   peer review process and the non-peer review.  The

11   non-peer review papers are accepted maybe with the

12   editor looking at it, you know, or the book author

13   taking a look through it and perhaps requesting some

14   changes, but sometimes not.  Sometimes there's just a

15   round of copy editing and so it isn't as rigorous a

16   process.  You're expected at a place like the

17   University of Maryland or at major research

18   institutions to primarily produce papers in peer

19   reviewed journals.

20             If you publish work in other outlets,

21   that's acceptable.  It won't count against you, but the

22   peer reviewed journals are really where it counts for

23   promotion and tenure.

24        Q    For purposes of your -- strike that.

25             You mentioned also doing a specialization

1    in immigration and writing on immigration.  Can you

2    briefly summarize what that means?

3         A        Sure.  Sure.  So a couple of strains of

4    research.  One is public opinion about immigration.

5    There was a book that I wrote with a co-author in 1999

6    on -- called the Congressional Politics of Immigration

7    Reform and that dealt with immigration policy in

8    Congress as it was unfolding at that time.  So the book

9    is dated now.

10             But inside there, there was a chapter on

11   public opinion about immigration.  And I've sort of

12   taken that chapter and kind of followed public opinion

13   trends and patterns on the immigration issues, so legal

14   and illegal, and so that's one strand.  It's just where

15   is the public on questions of immigration control,

16   restriction, border security, common issues of this

17   kind that come up in this debate.

18             Then the second strand is probably about

19   2002.  The Republicans in town, you know, were talking

20   about -- a lot of the consultants in particular were

21   talking about how they thought with appropriate

22   attention and care they could realign the Hispanic vote

23   and in large the Republican vote share among Hispanic

24   population.  And I had some doubts about that based on

25   my training.

29

1          My understanding of how durable party

2     identification can be and how difficult it is to

3     persuade people to change their mind and partly that's

4     because people are not that attentive.  And so I wrote

5     a couple of initial papers where I sort of challenged

6     that kind of consultant orthodoxy saying, you know,

7     this population is not going to be so easy to change.

8     Putting out a few Spanish language ads is not going to

9     do it.

10          And, you know, changing a few of your

11     immigration policy positions, sorry, you know, that's

12     not going to realign this population either because in

13     many ways party identification is like an identity.

14     Party identification is -- I mean, there are -- I got

15     to nuance that a little bit because there are a sizable

16     number of people who don't have any party

17     identification at all.

18          But for those who do, you know, this is not

19     an opinion that's going to whimsically change from one

20     day to the next, you know, opinion about a political

21     party or who should run the country.  That's not going

22     to change from one day to the next.  These are pretty

23     well anchored viewpoints more akin to identity than

24     they are to your favorite flavor ice cream.

25          So my point in the series of papers was

30

1    directed to -- well, anyone who was reading don't

2    believe these consultants who think that by sending out

3    a mailer in Spanish or by getting the candidate to

4    speak a few Spanish words that all of these Latinos are

5    going to suddenly rush across the aisle and start

6    voting Republican.

7              That's been the thrust of the number of

8    papers that I've written since 2002 because, you know,

9    with every new election, I look at the data and I see

10   that, you know, Hispanic population is about where it

11   was the last time, right, and that's completely

12   consistent with the history of political science on

13   this subject that, you know, when you look at

14   population trends for just about any group, you know,

15   there's partisanship.  There are expressed opinions

16   when they answer surveys.  They don't change that much.

17   There's very little fluctuation.  It's much more

18   durable and static than it is fluctuating.

19             So partly this was -- I'm rambling on here

20   just so you can understand.  There is a tension between

21   the way political science looks at political behavior

22   and the knowledge that we've accumulated and the

23   consultant community, okay, and there's a longstanding

24   tension between the two.  And, you know, partly these

25   papers have been an effort, you know, a shot across the

1   bow of the consultant community saying this is a con

2   job.  You're selling these politicians on services and

3   outreach techniques that are ultimately going to fail.

4        Q       Have you looked at the role of race or

5   racism or racial campaign appeals in influencing

6   people's allegiance to political parties?

7                MR. SEAQUIST:  Object to form.

8                THE WITNESS:  I'm somewhat familiar with

9   that.  I've not addressed that directly myself, but I'm

10  somewhat familiar with that research.

11  BY MS. ADEN:

12       Q       Have you looked at whether race would

13  influence Hispanic voters towards joining or not

14  joining the Republican party?

15               MR. SEAQUIST:  Object to form.

16               THE WITNESS:  There are a couple of

17  instances in California.  There's not a lot of research

18  on the subject, but there are a couple of papers

19  written about California elections where fielding a

20  Latino candidate as a Republican didn't make a

21  difference.

22               There was a particular paper from a

23  professor at Menlo College who was looking at some

24  Southern California races at this specific question.

25  And so, you know, I think there's room to question, you

32

1    know, whether someone like Marco Rubio is going to

2    attract vastly more Latinos than another candidate

3    would.  So I think there's room to doubt.

4    BY MS. ADEN:

5       Q      You mentioned your belief that party

6    identification is -- doesn't fluctuate so much, is more

7    durable.  Are you familiar with the history of black

8    voter allegiance with the former Republican party prior

9    to the 1960s?

10      A      Yes.  I am aware that that transition

11   occurred.  The transition in black voter allegiance

12   mainly occurred between the thirties and the sixties is

13   my understanding.  I think the new deal was very

14   influential in moving some black voters into the

15   Democratic party from the Republican side.

16      Q      Are you aware of any other motivations that

17   might have influenced that shift?

18      A      Well, I think in 1964, there was some

19   realignment that everyone's pretty familiar with.  When

20   Lyndon Johnson campaigned pretty hard on civil rights

21   and Barry Goldwater came out and took a -- well, not

22   exactly an opposing position, but we'll say he took

23   more of a go-slow kind of states' rights approach to

24   the subject and, you know, I think that that election

25   everybody understands to be pretty pivotal in that

33

1    history.

2              But these are gradual.  These are gradual

3    over time trends and, you know, you can't -- I think

4    it's misleading when consultants come to candidates and

5    say, hey, we've got an outreach technique that's going

6    to bring a massive number of people over from one day

7    to the next.  That's just fundamentally misleading and

8    I think that's where the tension is say between the

9    consultant class which, you know, has an economic

10   interest in vending campaign services, okay, and

11   political scientists who see public opinion and

12   political behavior as much stickier as a product of

13   much lower changes, gradual changes.

14       Q     You also mentioned that there's a sizable

15   number of people who don't have party affiliation?

16       A     This is true.

17       Q     Are those people persuadable to one party

18   or another in your opinion?

19       A     I think they are.  The -- here's the

20   paradox.  It's a pretty familiar paradox.  I don't know

21   if that's exactly the right word, but here's the

22   problem.  The people who are not firm party identifiers

23   tend to have less interest in politics and elections

24   and a large number of them are nonvoters.  They don't

25   vote at all, okay, or they're very irregular voters.

34

1          And so this is kind of a problem that

2    campaigns tend to face is that there are large blocks

3    in the electorate whose views are decided before the

4    campaign starts.  These folks know how they're going to

5    vote before the convention in a presidential year.  But

6    then the remaining say 30 percent, these folks are less

7    interested in politics and government and some are

8    nonvoters.  Some of them are very irregular voters and

9    campaigns have to figure out how to reach them.

10          And that's challenging precisely because

11   they don't have a lot of interest.  They are

12   inattentive, and this is more precisely what the

13   campaign to persuade people really face is can you come

14   up with, you know, outreach techniques or tools

15   directed toward people who aren't paying very much

16   attention or paying very intermittent attention.  And

17   that's very challenging and so, you know, campaigns,

18   you know, have two fundamental tasks.

19          You know, one is to persuade, but the other

20   one is to mobilize, to mobilize voters they know to be

21   faithful.  So, you know, a campaign is always trying to

22   figure out the appropriate balance between those two.

23   I think mobilization tends to be easier.  There's a lot

24   of persuasion we don't really understand yet in the

25   field.  That's my sense.

35

1       Q       So as -- from your experience, do you think
2    that this is a jurisdiction specific question or do you
3    think that these are principles that apply regardless
4    of what community or jurisdiction you're looking at?
5       A       Yeah, there's some variation.  It's a
6    really, really interesting question.  And there's
7    probably some disagreement about it within the field
8    because there are people who think, you know, these
9    rules of political behavior affiliation opinion
10   formation, you know, are pretty general across the
11   nation.  And then there are others who say, well, wait
12   a second.  There's some substantial variability from
13   place to place as you move around the country.
14              Traditionally I've favored the view that
15   there's substantial variability as you move from place
16   to place, that, you know, that there are local context
17   and settings, okay, that can make a difference.  So,
18   you know, that's the position that I take, but there's
19   some writing that suggests, for instance, that that
20   local variability is fading or that it's exaggerated.
21   So there's some disagreement in the field about that.
22      Q       I can tell this is a subject you love, but
23   I'm going to try to get back to this case.
24      A       Sorry.  You can get me rambling on.
25              MR. SEAQUIST:  Before you do, I know we

36

1    haven't been going that long, but I've had too many

2    cups of coffee.  Can we take a break?

3              MS. ADEN:  That's fine.

4              (There was a brief recess taken.)

5    BY MS. ADEN:

6        Q     So before the break, we had been looking

7    very briefly -- strike that.

8              Before the break, we had introduced your CV

9    and started looking at it briefly.

10       A     Right.

11       Q     I want to return to that and ask whether or

12   not in any of your work as an expert witness or

13   academic generally have you ever reached a conclusion

14   that touches upon the issues that you explored in this

15   case?

16             MR. SEAQUIST:  Form.

17             THE WITNESS:  I have.  There are a couple

18   of papers that touch on locations of voting sites and

19   the question of turnout and early voting.  So those go

20   back to -- those go back a ways more than ten years,

21   but there are a number of papers that touch on that

22   subject, yes.

23   BY MS. ADEN:

24       Q     Do you mind looking at your CV and using

25   this blue pen and walking me through those marking each

37

1    one with a blue -- an X where you think it touches upon

2    those topics that you just identified?

3        A     Okay.  So there's a 2003 paper indicated as

4    item 35 in the list called -- it's a 2003 paper item on

5    the CV number 35 political participation and the

6    accessibility of the ballot box.

7              And then there are two other papers, 2005

8    item 31, distance turnout and the convenience of

9    voting, and item 30, 2006 location, knowledge, and time

10   pressures in the spacial structure of convenience

11   voting.  So those would be the three that would be most

12   germane to questions of early voting, siting of polling

13   places.

14       Q     And your work as an expert witness or as an

15   academic generally, have you reached a conclusion that

16   you believe is inconsistent with any of your findings

17   in this case?

18       A     I would say no.  I would say that -- that

19   there really is no -- really is no contribution.  So I

20   don't think that the conclusions I reached in this case

21   contradict what's in the papers that I've written.

22       Q     And limiting it to those three that you

23   identified on your CV, 30, 31, and 35?

24       A     Yes.

25       Q     Have any of your publications reported,

38

1    commented on, or used race data?

2                MR. SEAQUIST:  Form.

3                THE WITNESS:  Well, yes.

4    BY MS. ADEN:

5        Q      Do you mind -- first of all, before we do

6    any markings related to the race data, could you circle

7    with a blue pen items 30 through 31 and 35?

8        A      Yes.  (Witness complying.)

9        Q      And then maybe with this yellow

10   highlighter, do you mind walking through your CV and

11   marking the publications -- you can even just mark the

12   numbers in the highlighting where you believe that you

13   reported, commented on, or used race data?

14       A      Well, bear in mind that race is a pretty

15   standard control variable or a social science variable

16   in political research.  So when you ask me to do that,

17   I would say it's going to be present in most of these

18   articles.  You know, it might not be the main focus of

19   the paper, but it is often included as a control

20   variable because we know that political behavior and

21   public opinion does differ by race.  So --

22       Q      How about we do it this way?  What about

23   you telling me the articles in here -- step back.  So

24   what -- is it accurate that you -- to say that you

25   believe that every article except for -- and you can

39

1   point out the ones that don't meet this criteria.

2   Every article in here uses race data except for the

3   ones that you may go on to tell me?

4        A       A lot of them do.  I will certainly say

5   that.  You know, even if race is not necessarily the

6   main thrust or point or focus of the paper when you're

7   trying to explain an outcome like, for instance,

8   participation or like opinion on a policy, there are

9   very frequently racial differences that are going to

10  matter.  So you need to account for those in any

11  complete model of that behavior or that opinion.

12          So, you know, race is going to be present

13  in a lot of the published social scientific work even

14  if race is not the main point or thrust of the author's

15  work or a major part of the argument.  We could go

16  through some issues of some current political science

17  journals and there's going to be a lot of racial data

18  included and that would be true of a lot of my papers.

19       Q       So let me ask you this.

20       A       It's a tricky or a difficult question to

21  answer.

22       Q       So if someone, though -- if that is true

23  and race is underlying if I'm interpreting what you're

24  saying correctly most of the work, would you expect to

25  see the word black or African-American or Hispanic or

40

1  Asian American identified in the narrative or in the

2  text of that article?

3       A       That's a good point.  I've never given it a

4  lot of thought.  So this is kind of coming off the top

5  of my head, but I think you're right.  If I were really

6  searching for papers where the focus or the thrust was

7  race, I would look in the title and I would look in the

8  abstract.  I think that's a good point.

9               I will tell you that probably the most

10  recent paper that I've written where race is very

11  central is the 2019 paper by myself, item number 3.  I

12  can highlight that in yellow.

13      Q       Okay.

14      A       By myself and James Glen who my co-author

15  is black and that's right out there.  It's in the title

16  and it has to do with who gives campaign contributions

17  and the impact of race.

18              You know, I can go through probably with

19  some time and, you know, say, you know, okay, race

20  plays a little more predominant role here and it's just

21  kind of a control variable here.

22      Q       But in that article, that is an example of

23  an article where your focus was on looking at in

24  particular the racial impact on a particular group?

25      A       Behavior, right.

41

1      Q      And that was the focus of the research?

2      A      Sure, absolutely.

3      Q      And that's a distinct question than whether

4   or not race is underlying in a more general way the

5   data?

6      A      I think that's a fair way to describe the

7   difference.  There is -- there are papers in which race

8   is included, but it's not the main thrust of the

9   article.  And then there are papers where, you know,

10  talking about racial conflict or race relations is the

11  main point of the article.  So, you know -- but, you

12  know, if you just ask a very general question about did

13  you use race data, that's going to appear in many, many

14  social science papers.

15     Q      What about age, the impact of a particular

16  policy practice, voting practice, election law on age,

17  is that something that also runs through every or most

18  analyses in this area or is it something that can also

19  be specifically focused on and highlighted?

20     A      You know, I have maybe one paper that deals

21  specifically with age, the 2004 paper, item number 34,

22  turnout and the local age distribution where age is a

23  major focus of that particular paper, but not as often

24  as race, but age will commonly be included, you know,

25  as an explanatory variable, you know, even though it's

42

1   not the main focus of the author's paper.  Okay.

2              They will want to include -- they will

3   note, for example, oh, you know, there are likely to be

4   generational differences and opinion here and I need to

5   account for those even though the thrust of my paper is

6   to focus on, you know, some other aspect.  Okay.  I do

7   need to at least account for the differences between

8   say elderly people and younger people.

9       Q       And what about socioeconomic indicators or

10  disparity?  If you wanted to look at, for example, how

11  a particular law impacted people of lower socioeconomic

12  backgrounds or different educational attainments, is

13  that something that similarly runs through most

14  analyses, but may be a particular focus of a piece of a

15  work?

16      A       I think that's true.  I think that's true,

17  and there are -- with socioeconomic status, education,

18  there seem to be some really interesting changes and

19  there's where the local variations can also make a

20  difference.  It seems like there are place to place

21  differences in the way socioeconomic status operates.

22             One very handy example here is that in the

23  State of Maryland, we have very, very affluent people

24  who are entrenched Democratic identifiers.  And in a

25  lot of states, more affluent people would be Republican

1  identifiers.  But as -- and this is also changing,

2  right, with some changes that seem to be happening as

3  populism grips the Republican party.  More and more

4  affluent people seem to be turning to the Democratic

5  side, lower and moderate income people.  At least

6  whites tend to be turning toward the Republican side.

7  So there are some changes, but the answer to your

8  question is, yes, these variables are included and

9  important perhaps because these changes are occurring.

10      Q      So would it be fair to say that you know

11  how to analyze voting practices that impact different

12  racial groups?

13      A      I think I'm qualified to do that.

14      Q      Would it be fair to say that you know how

15  to analyze different voting practices that impact

16  different age groups?

17      A      Yes.

18      Q      And would it be fair to say that you know

19  how to analyze different voting practices that impact

20  people of different socioeconomic status?

21      A      I think it's statuses, yes.

22      Q      If you were hired in a lawsuit alleging

23  racial discrimination against black voters, would you

24  be able to specifically analyze the impact of that

25  challenge law or practice on black voters?

44

1            MR. SEAQUIST:  Form.

2            THE WITNESS:  Well, yes.  Obviously this

3    presumes that the data are available for this purpose.

4    BY MS. ADEN:

5        Q     So if a complaint alleges racial

6    discrimination, do you think it would be appropriate to

7    look at the impact of that challenge practice on

8    different racial groups?

9        A     Yes.

10        Q     Similarly if a case alleged age

11    discrimination, do you think it would be appropriate

12    for an expert to look at how that particular practice

13    has a differential impact on different age groups?

14        A     That makes sense that that would be

15    something you would want to do.

16        Q     Again, assuming the data was available?

17        A     Right.

18        Q     Similarly if a lawsuit was alleging that a

19    voting practice had a differential impact on people

20    whether they were poor or had more economic resources,

21    it would be appropriate to look at those indicators to

22    analyze its impact?

23        A     Yes.

24        Q     Have you looked at the complaint in this

25    lawsuit?

**James Gimpel, Ph.D. - December 12, 2019**

45

1      A       It's been some time ago.  I haven't looked

2    at it recently, but I did read it in July when it was

3    sent to me.

4      Q       And what do you understand the lawsuit to

5    allege?

6      A       Well, my understanding is that the students

7    at Prairie View A&M, a historically black institution,

8    are complaining that Waller County did not allocate

9    polling places and particularly early voting sites and

10   hours evenly or equitably across the county.

11     Q       Do you think this lawsuit has something to

12   do with racial impact?

13     A       Well, I gather that that's what the

14   complaint lays out.  I mean, I could see that that was

15   the claim that was being made that, you know, Prairie

16   View is somehow being treated differently because the

17   student body is black.  So I gather that that -- I

18   mean, that was a conclusion I drew from reading the

19   complaint.

20     Q       Is it also your understanding that the City

21   of Prairie View may be treated differently because of

22   the population of black people within that area of the

23   county?

24     A       I gather that from my study of the terrain

25   and the distribution of the population that -- that the

46

1  population and the town of Prairie View is heavily

2  African-American as well as the campus itself, yes.

3      Q      And did you after reading the complaint

4  have an understanding of whether or not the complaint

5  alleged age discrimination?

6      A      Well, I saw that claim being made in the

7  report -- in the original complaint that there was

8  something about the concentration of 18 to 24-year-olds

9  on the campus that made that population stand out, you

10  know, in the county.

11      Q      And did you have an understanding after

12  reading the complaint that there was an allegation that

13  the combination of Prairie View students being black

14  and 18 to 20-year-olds or young voters that that was a

15  basis for an allegation of discrimination as well?

16      A      I understood that to be the case from

17  reading the complaint, yes.

18      Q      Had you ever looked at those issues before

19  in any of the works that are identified in your CV?

20          MR. SEAQUIST:  Form.

21          THE WITNESS:  I -- first it's pretty

22  well-known that there are turnout deficits among

23  certain subgroups and it's pretty well-known in the

24  literature that turnout is low among black voters and

25  turnout is also low among young voters.  And there are

47

1    reasons set forth for that in the political science

2    literature.  It's pretty well-known and widely accepted

3    that that's the case.

4              And that's one of those things that

5    probably isn't going to vary a whole lot across

6    locations.  It might some.  It might be some

7    variability, but particularly with age, it seems like

8    because people are not in the habit of voting when they

9    turn 18, 19, 20.  It takes them a while to develop

10   regular participation habits.

11   BY MS. ADEN:

12       Q     Did you test whether or not that general

13   acceptance commonly known belief about low turnout

14   amongst black voters or youth voters was true in Waller

15   County in particular?

16       A     I believe my report suggests that certainly

17   in the precincts, you know, in the Prairie View area

18   and I know on the rebuttal reports, they took offense

19   at me using that description of the Prairie View area,

20   but I think you understand what I mean by that as the

21   Prairie View campus, but also the town of Prairie View

22   and that's what I mean by the Prairie View area that

23   they took offense to in the rebuttal reports.  And I

24   take offense to their offense.

25              But anyway, the point is that, you know, in

48

1    those couple of precincts that we know to be majority

2    African-American, there are turnout deficits, you know,

3    over time compared to other locations around the county

4    and other locations in Texas.

5         Q      You mention that there tend to be various

6    reasons for that.  What are the reasons that you're

7    referring to?

8         A      Well, you know, so there's a -- that's one

9    where I can ramble a while.

10        Q      If you could give me like the top three

11   reasons.

12        A      For young people, there's a question again

13   of not being habituated to voting and it's also lack of

14   knowledge and inexperience.  So those are really

15   important.  I think for African-Americans, there are

16   some significant issues, you know, going to their

17   feelings of efficacy, whether they can trust the

18   system, whether they believe the system works for them.

19   And I think there are questions about knowledge levels.

20              Part of what has to be sorted out when you

21   look at African-American political participation is

22   again socioeconomic status because, you know, there are

23   a lot of African-Americans who are lower income.  So is

24   that black or is that they're low income or lack of

25   education?  And I think the truth is that when you

49

1    control for SES, you know, black voters who are middle

2    class vote about the same rate as white voters, that

3    the deficits that we see most severe in the black

4    population are places where the black population also

5    happens to be pretty poor, you know, and lower incomes.

6    Those would be like inner city locations, also places

7    like the Mississippi Delta, locations where the black

8    population is especially low income and lacking in

9    education.

10          Where those other deficits are not present

11   like, for example, out in suburban Maryland, I think

12   the turnout rates among black voters in Montgomery

13   County, for instance, or Howard or Anne Arundel are

14   pretty high and comparable.

15          Q    So does that suggest that there is -- it

16   goes back to your point about local -- the context

17   matters, jurisdictions matter?

18          A    I think so.  I think that that's fair.  I

19   think that that's fair.  There is some variability

20   across context and how these populations participate

21   and there are some other things.  There's a line of

22   research in political science that suggest that having

23   black office holders can make a difference and I think

24   that goes back to the other point if you see black

25   office holders elected on a regular basis, it might

50

1    encourage you to vote or to participate or to

2    contribute because you can see a member of your own

3    race occasionally get elected.

4                So this plays into the creation, for

5    example, and rationale behind the majority minority

6    districts in certain places, and, you know, I believe

7    it goes back to the nineties.  You know, there was a

8    literature in political science that looked at the

9    participation levels of cities where there were black

10   mayors, you know, like Tom Bradley, for instance, and

11   saw that black participation rates were augmented in

12   areas where there were black office holders.

13               So there's something to that, but that I

14   think probably goes back to the point I made five

15   minutes ago about efficacy being an issue and the idea

16   that you can trust the system, that the system might

17   work for you, that if you were to petition the

18   government, you know, would it respond.  Is there

19   someone like me who actually holds office, someone who

20   would listen to me, this kind of thing.

21       Q       When we started out, you mentioned having

22   looked at the reports of Dr. Flores and Dr. Stein?

23       A       Um-hmm.

24       Q       Did you review the reports of Dr. Joseph or

25   the report of Dr. Joseph in this case?

51

1        A        I read over his report.  Again, it's been

2    some time.

3        Q        What about Mr. Cooper?

4        A        I also read that report.

5        Q        One report or more than one?

6        A        I read the report I was sent.  If there was

7    a second report, it was not sent to me.

8        Q        So the first one, though, was a while back?

9        A        Yes.  This would have been back in July.

10        Q        We're going to drill down on some of what

11    you said in a bit, but to just close the loop on your

12    CV for a moment, are you a member of any community

13    groups?

14        A        I attend a church.  I attend a church.  I'm

15    also a level 2 certified field hockey coach.  So, you

16    know, I got a -- I even make a little money at that,

17    not major, but it's not on my CV, so --

18        Q        In Maryland, are you required as -- when

19    you register to vote to identify your party

20    affiliation?

21        A        Yes, we do.

22        Q        And did you identify your party

23    affiliation?  Let me step back.  Are you registered to

24    vote?

25        A        Yes, I'm registered to vote.

52

1       Q       Did you identify your party?

2       A       Yes.

3       Q       What is your party?

4       A       I'm registered as a Republican.  I grew up

5   originally in Nebraska and a county that was probably

6   about 65/35 red blue, so 65 red, 35 blue, Republican

7   and Democrat.  So it's pretty common for people to grow

8   up in an environment like that, a small town to absorb

9   those values pretty early on.

10          And, again, I think it's, you know, I would

11  say my students ask me this.  It's more of an identity

12  than an opinion.  A lot of people as they're

13  politically socialized growing up kind of absorb it

14  like a religion and it's not even all that policy

15  relevant.  It's not like you consider all of these

16  public policies and sort of weigh them in the balance,

17  okay, and then decide.  There's some people who might

18  view it that way, but that's not what our empirical

19  research shows.  Empirical research shows you sort of

20  absorb it from your family and your environment.

21      Q       So you agree that there's literature that

22  suggests that learning to vote early, as early as

23  possible has an impact on your -- how you sustain

24  political participation throughout your life?

25              MR. SEAQUIST:  Object to the form.

53

1          THE WITNESS:  I think that there's

2   literature that supports that.  I mean, it's modeling,

3   right.  It's modeling.  It's imitation.  So you grew up

4   in an area where people express particular opinions.

5   You're more likely to adopt those opinions.  If they

6   engage in certain behaviors, you're likely to engage in

7   those behaviors yourself.  It's sort of parent to child

8   transmission of values that a human development

9   specialist can tell you about in great detail.

10  BY MS. ADEN:

11      Q      And that includes political participation?

12      A      I think so, yes.

13      Q      Did you look at whether in Texas you --

14  when you register to vote, you are required to identify

15  your party affiliation?

16      A      You're not.  You're not.

17      Q      And so in Waller County, for example, when

18  you register to vote, you may or may not identify your

19  party affiliation; is that correct?

20      A      I actually don't think that it appears on

21  the voter file.

22      Q      Let's go back a little bit.  We're going to

23  be moving in and out of topics this afternoon, but

24  let's go back just briefly to your work as an expert in

25  some of the federal voting rights cases that you

54

1    mentioned.

2         A     Okay.

3         Q     You mentioned being deposed in about five

4    cases and you mentioned Wisconsin, Pennsylvania,

5    California, and North Carolina.  Have you worked in

6    Texas besides this case?

7         A     No.

8         Q     Now, you talked about the Pennsylvania and

9    Wisconsin and North Carolina cases being redistricting

10   cases; is that correct?

11        A     Yes.

12        Q     Is it accurate to say that those are

13   redistricting cases that are challenging what is

14   referred to as partisan gerrymandering?

15        A     That's what those are about, yes.  That's

16   the core issue.

17        Q     Besides those three states, have you done

18   work on any other partisan gerrymandering cases?

19        A     No.

20        Q     What was the party affiliation of the

21   individual -- let me step back.

22              I believe you mentioned that you were

23   retained by the state in at least one of those cases.

24   Can you tell me in the Pennsylvania, Wisconsin, and

25   North Carolina cases who specifically retained you, the

55

1  plaintiffs or the defendants?

2       A       Okay.  So in the North Carolina case, Rucho

3  is a member of -- Mr. Rucho is a member of the state

4  senate and that was in Republican hands.  So the answer

5  to your question is it was the Republican senate that

6  was party to that case in North Carolina.

7       Q       And that person was being sued?

8       A       Yes.

9       Q       So it was a defendant?  You were being

10 retained by the defendant?

11      A       Yes.

12      Q       Okay.

13      A       In Agre V Wolf -- I'm looking at page 10 of

14 the CV.

15      Q       Okay.

16      A       Agre V Wolf, Wolf is the Democratic

17 governor and Agre is a citizen.  And I was retained by

18 the State of Pennsylvania as represented by Governor

19 Wolf.

20      Q       And that's Pennsylvania?

21      A       Yes.

22      Q       And then Wisconsin?

23      A       Then the other case in Pennsylvania was

24 League of Women Voters versus Commonwealth of

25 Pennsylvania and I believe both the governor and the

56

1    legislature are parties to that case on the defendant

2    side.  And then in Wisconsin, yes.  Wisconsin -- I'm

3    confusing them and I believe that they're both

4    citizens.  And one is obviously challenging the drawing

5    of the districts and the other one is defending those.

6        Q      You were hired on behalf of the state there

7    as well?

8        A      The state legislature.

9        Q      And the state legislature --

10       A      Republican.

11       Q      And the Pennsylvania legislature is also

12   Republican or majority Republican?

13       A      Yes.  The governor not, but, yes, the state

14   legislature, yes.

15       Q      So besides -- tell me a little bit more

16   about the Baber versus Dunlap case, what the nature of

17   that case was --

18       A      Right.  So --

19       Q      -- and who retained you.

20       A      This didn't really get to a trial.  This

21   was -- I was retained as an expert on a hearing for a

22   preliminary injunction.  And this was approximately a

23   year ago and Baber is a citizen and seeking to void the

24   state's adoption and use of ranked-choice voting.  And

25   Dunlap is the defendant, the secretary of state, who in

57

1   his role as secretary of state administers elections in

2   Maine.  So the hearing was before a judge and so I did

3   testify in court about a year ago in that case before

4   the judge in this hearing.

5        Q      And you were hired on behalf of Dunlap, the

6   secretary of state?

7        A      No.  This would be the citizen, Baber.

8   Baber was trying to overturn ranked-choice voting as it

9   was adopted in the State of Maine.

10       Q      And the California case --

11       A      This is a very interesting local case.

12  Really weren't partisan sides since local governments

13  are nonpartisan, but it involved the question of

14  whether city counselors or aldermen or city counselors

15  in the City of Palmdale should be elected on an at

16  large basis as was the present practice at the time or

17  whether they should be elected on a district by

18  district basis.  So this was a redistricting case of a

19  different kind about the manner in which City

20  Councilmen should be elected in the City of Palmdale.

21       Q      And what was your role in that case?

22       A      I defended the City of Palmdale in my

23  report suggesting that -- the essence of my report is,

24  and I'm sure it's online somewhere, the essence of my

25  report is that at this point in the state's development

58

1    and history, the Latino population is so large and so

2    well embedded in the state throughout that, you know,

3    whether there were at large elections or district based

4    elections did not really make any difference to Latino

5    representation.

6                Now, if we were looking at the case in 1953

7    rather than in 2013, you know, it might be a different

8    story, but, you know, the State of California is a very

9    large, you know, many multigenerational Latino

10   population by now.

11               So you can see that regardless of whether

12   cities in the state, and I have tables on this, elect

13   on the basis of at large elections or district

14   elections, you have the same Latino representation on

15   the council.

16        Q     Did you look at race or age data in

17   providing your opinions in that case?

18        A     I don't think I looked at anything related

19   to age, but I believe race was important and so I did

20   look at race.

21        Q     Would you have had to look at age data in

22   order to determine the voting age population in that

23   case?

24        A     Okay.  Sure.  I gather that that's kind of

25   an understood denominator for lots of calculations, you

59

1    know, the voting age population.  So, okay.  If you

2    mean age in that sense, yes, then that would be there.

3        Q      What about socioeconomic indicators, did

4    you have to look at those to form an opinion in that

5    case such as poverty rates, access to education, or

6    educational attainment, access to housing or

7    employment?

8        A      Right.  Not so much there because when

9    you're down to the town or municipal level and you're

10   looking at areas, you know, within the town -- the size

11   of Palmdale, it's not Los Angeles.  Palmdale is not a

12   very big town.  There isn't a great deal of variation

13   in those indicators from location to location.

14       Q      Okay.  So you mentioned depositions.  It

15   seems like you took depositions in five of your six

16   cases.  Is that fair to say?

17       A      No.  I have to --

18       Q      So you did not take depositions in all of

19   your cases?

20       A      No.  I have to go back and --

21              MR. SEAQUIST:  One at a time.

22              THE WITNESS:  I have to go back.  I have to

23   go back and say that there was a deposition in the

24   California case.  There's a deposition in the Rucho

25   case.  There was not in Agre V Wolf.  There was not in

**James Gimpel, Ph.D. - December 12, 2019**

60

1   League of Women Voters, not in Baber V Dunlap.  There

2   was in Whitford V Gill.  So there were three, not five.

3   BY MS. ADEN:

4        Q      And in each of those cases, you submitted

5   expert reports?

6        A      In each of those cases, there's an expert

7   report.

8        Q      And in each of these cases, you testified

9   in court whether at a preliminary injunction hearing or

10  trial?

11       A      So the answer is no.  In the Common Cause

12  versus Rucho case, that did go to trial, but they did

13  not call me as a witness.  In Agre V Wolf, I did

14  testify, but then that same month in League of Women

15  Voters versus Commonwealth of Pennsylvania, they did

16  not call me.  Yes, I did testify in Baber V Dunlap and

17  Whitford V Gill that never went to trial.

18       Q      What about the California case?

19       A      Yes, I testified at trial there.

20       Q      Have you ever been retained by a plaintiff

21  who is a racial minority and/or by a group that

22  represents racial minorities?

23       A      No.

24       Q      Have you ever served as an expert on behalf

25  of plaintiffs alleging racial discrimination?

61

1     A      No.

2     Q      Would it be fair to say that the California

3   case involving the California Voting Rights Act is the

4   only case where you served on the -- on behalf of a

5   party in a case alleging racial discrimination?  Let me

6   strike that.

7            Is the California case the only case that

8   you've been involved in alleging racial discrimination?

9     A      Yes.

10    Q      And in that case --

11    A      Well, I need to back up for a second

12  because, you know, there's ambiguity about whether the

13  Hispanic or Latino population is a race.  I mean, you

14  know, bear in mind that there's some ambiguity about

15  that.  So, you know, ethnic discrimination, perhaps.

16  It's not quite the same as race and you know why that

17  is, of course.  Everyone does who has some exposure to

18  social science research.  We know that Hispanic people

19  can be of any race.  And so ethnic discrimination, I

20  guess, is what was at stake as a claim in that case.

21  It's not quite the same as racial discrimination.

22    Q      Fair.

23    A      Maybe it's splitting hairs.

24    Q      So the answer is either depending upon

25  whether or not you consider people of Hispanic or

62

1      Latino descent a racial group, the answer is either

2      zero or one?

3           A       Yes.

4           Q       And in that case, you were however

5      appearing as an expert on behalf of the governmental

6      entity, not that racial ethnic group?

7           A       Yes.

8           Q       Is it fair to say that you've never

9      testified in a case where you found evidence of racial

10     discrimination?

11          A       I have not.

12          Q       And similarly you've never testified in a

13     case where you have found racial disparities in the

14     racial impact of a challenge practice?

15                  MR. SEAQUIST:  Form.

16     BY MS. ADEN:

17          Q       I can re-ask it.

18          A       I have not.  I have not.

19          Q       To be clear, you have not testified in a

20     case where you --

21          A       Where I have found --

22          Q       -- have formed an opinion or found racial

23     impact?

24          A       Right.  I would say the answer is yes.

25          Q       In any of the cases where you have served

63

1    as an expert that we've discussed or any others, have

2    any of them found that you were not qualified to serve

3    as an expert witness?

4          A      No.

5          Q      Did any of the cases in which we've

6    discussed or others reject your reports, your expert

7    report?

8          A      No.

9          Q      In any of the cases that we've discussed or

10   any others reject your testimony?

11         A      No.  If you're trying to ask more pointedly

12   why I wasn't called in a couple of these, I think it

13   went to the time allotted and the number of witnesses

14   they had.  That's the only explanation the attorneys

15   ever gave me.  That's all I can tell you.  They're

16   given a small amount of time and sometimes they have

17   more witnesses than they can put forth and so maybe

18   some people get bounced out.  That's all I can tell you

19   about that.

20         Q      When I asked about whether or not any court

21   has rejected your testimony, that's in whole or in

22   part.  So are you aware whether a court has in whole or

23   in part rejected any of your testimony?

24         A      No.  I can't say that I've gone back and

25   thoroughly digested all of the opinions once they're

64

1    issued, right, but to my knowledge, the answer is no.

2         Q      I'm going to show you what I am marking as

3    Exhibit 3 which is the decision and order on motion for

4    preliminary injunction in the Baber versus Dunlap and

5    this is document 64 in Case Number 1:18-CV-456-LEW.

6    And I'm handing a copy of that to Dr. Gimpel and a copy

7    to his counsel.

8              (Gimpel Exhibit 3 was marked for purposes

9    of identification.)

10   BY MS. ADEN:

11        Q      And you talked about before testifying at

12   the preliminary injunction in this case pretty

13   recently, right, in the past year or so?

14        A      Probably about a year.

15        Q      Have you seen this document before?

16        A      It's possible that the attorney that was

17   retaining me sent this to me and that I saw it, but I

18   can't say that I remember reading it.  You know, by

19   this point, it was clear that the Court had gone in a

20   different direction and that they weren't going to

21   grant the injunction, so, you know, I sort of moved on.

22        Q      I'd love to turn your attention to page 14

23   of this document.

24        A      Yes.

25        Q      And I have taken the liberty because it is

65

1    a 30-page document to highlight some sentences on page

2    14 that I would like for you to read into the record.

3    Do you mind beginning with plaintiffs contend that and

4    reading aloud?

5         A       You want me to read?

6         Q       The highlighted section, yes.

7         A       "The plaintiffs contend that ranked-choice

8    voting -- that's RCV -- is too exotic to fit within the

9    meaning of article 1.  Plaintiffs argue that over 100

10   years of widespread acceptance of plurality elections

11   should not be undone by new ideas concerning the manner

12   of holding elections.

13             "Plaintiffs attempt to prove the point

14   through scholarly debate about the disadvantages of

15   RCV.  In my view, these arguments are policy

16   considerations that the people and their

17   representatives should weigh and assess when devising

18   the best manner for holding elections.

19             "It is precisely why I find Dr. Gimpel's

20   testimony to be unpersuasive in its entirety, at least

21   as bearing on problems of constitutional magnitude."

22        Q       Do you recall reading this language before?

23        A       I don't recall reading this specific

24   language, but, I mean, I got the gist of it.  I mean,

25   believe me, we got the point when he announced that he

66

1    was going the other direction on this, and, you know,

2    quite honestly counsel and I had discussed this as

3    being pretty much a long shot.

4              You know, it's very difficult for courts to

5    set aside the way states and localities decide to run

6    their elections.  This particular judge, I believe, was

7    a Trump appointee and I think courts regardless of the

8    partisanship of the jurists involved have a very hard

9    time justifying overturning or changing the way a state

10   or locality would choose to run its elections.  So I

11   can't say that we were particularly surprised.

12       Q    Do you have any reason to disagree with

13   this court's treatment of your opinion in this case?

14              MR. SEAQUIST:  Form.

15              THE WITNESS:  Well, I mean, I obviously

16   disagree in this particular case.  I stand by my

17   opinion like I said.  To say that I'm not surprised

18   that it went the way it did is not to say I was wrong.

19   I think that the people in Maine maybe not immediately

20   but will live to regret ranked-choice voting and it

21   might take a while, you know, for them to ultimately

22   turn back to the more traditional option, but when they

23   get one of these very strange or unusual outcomes,

24   there will be an outcry for change as there was in

25   Vermont and they switched back.

1    BY MS. ADEN:

2         Q      Regardless of whether or not you stand by

3    your opinion, the Court is it fair to say disagreed

4    with your opinion?

5         A      Oh, sure, yes.  That's fair.

6         Q      I would turn -- ask you to turn very

7    quickly to page 26 of this document and there is

8    another sentence that is highlighted in yellow.  If you

9    could read that aloud into the record.

10        A      "There was no evidence produced to support

11   the argument other than the conclusory testimony of Dr.

12   Gimpel which I have summarized and discount entirely."

13        Q      Why do you recall did the Court say that

14   your testimony was, quote, conclusory?

15              MR. SEAQUIST:  Form.

16              THE WITNESS:  I'm not quite sure I know how

17   that word is being used there.

18   BY MS. ADEN:

19        Q      Do you have an understanding of what it

20   means to testify in a, quote, conclusory manner?

21        A      I don't think that I quite understand the

22   meaning of the word as it's used in this context.

23        Q      Do you have an opinion about whether or not

24   the -- you agree with the Court's conclusion that your

25   testimony was conclusory?

68

1      A      Well, I don't quite know what he means,

2   what the judge means by that term.  So I don't have an

3   opinion on it.

4      Q      And finally if you could turn to page 27,

5   the next page.  There are two groups of sentences

6   highlighted.  If we could take them in two different

7   turns, the first beginning with -- the first full

8   paragraph that begins with further, do you mind reading

9   those highlighted sentences aloud?

10     A      "Further I'm not persuaded by Dr. Gimpel's

11  testimony which attributes an error in virtue in the

12  force simplicity of two-party access to the ballot

13  thereby making easier the voters' choice.  He testified

14  to what he perceived as a troubling reality that Maine

15  has a low threshold for nonparty candidates to gain

16  access to the ballot.

17             "It ceases as I understand it is that by

18  allowing for choices among several non-major party

19  candidates, voter turnout is likely to be comprised of

20  greater percentage of low information voters which

21  apparently makes more likely these voters are

22  cognitively unable to fill out and RCV ballot.

23             "In addition to being cynical, these

24  conclusions are not grounded in anything approaching

25  reliable standard that may be informative of the

69

1    constitutional questions."

2         Q       So do you have or -- strike that.

3              Do you agree with the assessment of your

4    testimony and expert opinions by the Court?

5         A       No.  No.  I obviously don't agree, but you

6    know what do you do, right?  He didn't find -- he

7    didn't find the case we sent forward persuasive.  I

8    think, you know, one of the problems here is that this

9    case was very difficult from the standpoint of the

10   challenge, the Court challenge being filed immediately

11   after the November 6th election, the attorney not

12   taking the case up until about the third week of

13   November just before the Thanksgiving holiday and the

14   hearing taking place about the second week of December,

15   right?

16              So, you know, the amount of time to prepare

17   here, you know, was very truncated, very short and you

18   prepare the best case you can on the timetable that

19   you're given, right, and we prepared a reasonable case

20   based upon the two-and-a-half weeks really that we had

21   to pull it together.  And, I mean, you can look at that

22   report, you know, for yourself.  It's probably online

23   somewhere.  And I think given the two-and-a-half weeks

24   we had to consider this pretty complicated question, we

25   did the best job we could and it's very clear that, you

1    know, it was not persuasive.  I think that that's

2    obvious from any reading here.  The amount of time that

3    we had to prepare was very short, very brief.

4        Q     Do you have any thoughts about why the

5    judge however called your conclusions, quote, cynical?

6             MR. SEAQUIST:  Form.

7             THE WITNESS:  Well, I think he in this

8    particular -- I'm not sure, but I'll speculate that he

9    thinks that the very common finding, you know, in

10   survey research that, you know, there is a very large

11   cadre of less motivated and less interested voters.  He

12   finds that fact to be offensive in some way, but, you

13   know, it's not really my conclusion, right, but there's

14   a large component of the electorate that is less

15   interested and less motivated and less informed.

16            You know, there are 50 years of political

17   behavior research showing that there is a distribution

18   of information in the electorate with a very large

19   share of the voters who are not as motivated, not as

20   interested, not as informed.  That's -- you know, if he

21   wants to talk that fact cynical or offensive, that's

22   fine, but he happens to be, you know, wrong if he's

23   going to deny the reality of that very large block and

24   you know something.  This is something where the

25   campaign consulting community and the political

1   behavior social science community completely agree.

2   BY MS. ADEN:

3       Q       But if you are a low information voter in

4   past practice, does that mean you don't have a right to

5   cast your ballot to change the system that's in place?

6       A       I think what the -- what's at stake here,

7   you know, was the complexity of the ranked-choice

8   voting ballot and the idea here was that -- that there

9   are a large share of people who actually did wind up

10  voting incorrectly because they did not understand the

11  ballot, okay, and some of those votes were disqualified

12  and tossed out because they filled out the ballot

13  incorrectly.

14          And what the attorney was trying to show is

15  that the votes that were tossed out because of spoilage

16  could have easily made up the margin between

17  Mr. Baldwin and the winner of the election, the

18  declared winner of the election.

19      Q       Is part of your analysis, though, that low

20  information voters can't understand how to effectuate

21  ranked-choice voting?

22      A       I think that there's very good evidence to

23  quote Governor Brown from California that ranked-choice

24  voting is too complex.  It's just too complex and there

25  are voters who will not vote as a result of it and

72

1    voters whose ballots with be spoiled and that, you

2    know, we have an obligation to make the ballot easy to

3    understand.

4        Q       Who is we?

5        A       We, I think, as citizens and as election

6    administration people concerned with election

7    administration in carrying out elections and then

8    citizens, you know, we should make our ballot simple to

9    understand and not make it overly complex and this was

10   the thrust that -- of our argument.

11       Q       Were your conclusions, in fact, quote,

12   grounded in a reliable standard, end quote?

13       A       Well, I'm not quite sure what that means.

14   Look, if we had had more time, we could have

15   commissioned a survey of Maine voters and, you know,

16   shown that, for instance, according to one of the

17   newspapers, 25 percent of the Maine voting population

18   complained about ranked-choice voting.

19               Now, the other side said, see, only

20   25 percent, only 25 percent.  That's a trivial share,

21   but how many people would have complained about simple

22   plurality voting.  So by that standard, 25 percent is a

23   huge amount.  One out of every four people in Maine

24   thought ranked-choice voting was confusing, but a

25   simple plurality voting, not a problem.  That was the

73

1   issue that they ignored here.

2        Q       Ultimately would you say that the Court

3   would have come out differently with respect to how he

4   treated your opinions if you had more time?  Is that

5   the thrust?

6        A       I think that was huge, but, you know, it's

7   the case with all of these cases I've ever worked on.

8   It's like particularly on the defense side.  You're

9   given two weeks to respond when the other side has had

10  like five months.  It's constantly a challenge.  This

11  was especially bad because I guess we were the -- in

12  this case on the complaint's side and not given really

13  any time.

14       Q       And finally on this same page, can you read

15  the last sentence of that first full paragraph that's

16  highlighted in yellow to his credit?

17       A       "Dr. Gimpel can see that he's not discussed

18  the RCV experience with a single Maine voter, but would

19  like to conduct such a study."  Sure.  It would

20  absolutely be very valuable and, you know something, in

21  a few years, you know, we will see if people are still

22  enamored with ranked-choice voting that it's still

23  75/25.  So let's see.

24              "In the meantime, I simply am unable to

25  credit his testimony in any way on the constitutional

74

1    issues before the Court."

2            So, look, as I said going in, we knew this

3    was a long shot.  I don't think it's easy to get courts

4    to step in and tell states and localities how to run

5    their elections.  I don't think that's an easy thing to

6    do at all.

7        Q    So just to be clear for the record, the two

8    sentences because you did put some of your own opinion

9    into reading those last two sentences, I just want to

10   be clear for the record, the last two sentences read:

11   "To his credit, Dr. Gimpel conceded that he had not

12   discussed the RCV experience with a single Maine voter,

13   but would like to conduct such a study.  In the

14   meantime, I simply am unable to credit his testimony

15   any way on the constitutional issues before the Court."

16       A    Right.

17       Q    And that's on page 27 of this opinion?

18       A    Yes.

19       Q    Outside of the time issue, did anything

20   about what the Court said in its opinion about your

21   analysis cause you to rethink the questions that you

22   were asked or the methodology that you employed in this

23   case?

24       A    No.  Ranked-choice voting is still a mess

25   and that's why it won't be adopted in most places.

75

1     Q       One last question to that.  The Court
2   seemed to indicate that you would have talked to a
3   Maine voter if you had had the opportunity to do so.
4   Is that part of the methodology?
5     A       But the first question I asked the attorney
6   when he retained me is do we have a survey of Maine
7   voters on the recent election.  Do we have a survey.
8   And he said no.  Okay.  And so I said, well, you know,
9   have any of the newspapers in Maine conducted a survey
10  on it and he said no.  Okay.
11            So, you know, when I'm sitting there in the
12  hearing, the fourth question that comes out of the
13  mouth of the defense attorney is, oh, well, we have
14  this survey from the Bangor newspaper that shows, you
15  know, the 75/25 margin.  Well, you know, I'd like to
16  have known about that in advance, but I can tell you
17  that 25 percent complaining about the ballot form is a
18  huge number.  It's very alarming.  Okay.  So they read
19  that as being a trivial number.  I read it exactly the
20  reverse because if they would have stayed with the same
21  ballot that they had always used, the one that's
22  familiar to every citizen, nobody would have complained
23  when they asked that question.
24    Q       And so the survey would have been a part of
25  the methodology that you would have done had you had

76

1    more time?

2         A       Yes.

3         Q       We can move on from this document and I

4    want to --

5                 MR. SEAQUIST:  I'm sorry to interrupt.  If

6    we are shifting gears, it's about noon right now.  I

7    don't know if you guys want to take a lunch break.

8                 MS. ADEN:  Can I do about five or ten more

9    minutes and then -- so I don't need a lunch break, but

10   if the witness does, we're happy to take a break.  But

11   I wanted to finish one line of questioning that may

12   take five to ten minutes and then we can decide what to

13   do.

14                MR. SEAQUIST:  Okay.

15   BY MS. ADEN:

16        Q       So I'm going to mark as Exhibit 4 a opinion

17   in Agre -- is that the correct way to pronounce that

18   case?

19        A       Agre, I think, but, you know, I'll know

20   what you're talking about.

21        Q       Agre versus Wolf.  That's A-G-R-E versus

22   Wolf, W-O-L-F.  It is cited as 284 F.Supp 3d 951.  It's

23   a 2018 decision.  I'm handing a copy of that to Dr.

24   Gimpel and another copy to his counsel.

25                (Gimpel Exhibit 4 was marked for purposes

**James Gimpel, Ph.D. - December 12, 2019**

77

1   of identification.)

2   BY MS. ADEN:

3       Q       This is a very long court opinion.  I'm not

4   going to ask you about everything in it because it's

5   quite extensive.  This was a opinion I just mentioned

6   that was entered in the last year, so you're pretty

7   familiar with it?

8       A       You know, again, this was probably sent to

9   me post trial and I did not read it.

10      Q       So you haven't seen this decision?

11      A       I haven't read through it, no.  So I'll be

12  as surprised as I was by the last one.

13      Q       I want to direct your attention to page 55

14  of this packet.  Again, it's quite long.  I think all

15  total there are 107 pages in it, but if you could turn

16  to page 55.  I've again highlighted some information

17  that I'd like you to read aloud into the record.  It

18  begins with as to defendants.

19      A       Can I ask who is writing here?

20      Q       Yes.  So this is the dissenting opinion by

21  Judge Baylson.

22              Do you recall that?

23      A       Okay.  It was 2 to 1, as I recall.  "So as

24  to defendants' expert, Professor James Gimpel, he also

25  brought to the Court significant expertise in

78

1   districting practices, significant publications and

2   prior experience testifying as an expert.  Nonetheless,

3   his criticism of the plaintiffs' factual evidence and

4   particularly his testimony regarding Ms. Hanna and Mr.

5   McGlone has failed to persuade me that the weight which

6   I ascribe to those witnesses should be changed.

7   Professor Gimpel was very general in a lot of his

8   answers.

9         "Further, as the recorded testimony will

10  show, but the written testimony will not, he raised his

11  voice and started shouting on a number of occasions

12  when his conclusions were under attack during cross

13  examination.  This is highly unusual behavior by an

14  experienced expert, and warrants the Court's giving low

15  weight to all of his testimony."  Okay.  Okay.

16     Q     So do you agree with Judge Baylson's

17  overall assessment of your testimony and credibility?

18          MR. SEAQUIST:  Form.

19          THE WITNESS:  No.

20  BY MS. ADEN:

21     Q     Why not?

22     A     Because I don't think I was particularly

23  general and, you know, if I, you know, raised my voice

24  a couple of times, it was mainly for emphasis and, you

25  know, probably displayed some measure of enthusiasm,

79

1   but I didn't think that -- you know, I don't know.  You

2   know, I don't know if it was unusual or not.  People

3   have different styles, I guess.

4        Q       So you -- is it fair to say you don't agree

5   with Judge Baylson's assessment that you repeatedly

6   shouted while testifying and that's highly unusual

7   behavior by an experienced expert?

8        A       I don't think so.  I have a loud voice and,

9   you know, there are a couple of times when I emphasized

10  a couple of points in response to cross examination or

11  maybe even direct, you know, when I had a couple of

12  points I wanted to emphasize, you know, but did the

13  others complain about it.  You've got one guy here,

14  right?  Did the other two complain about it?  Is there

15  anything in there about that?

16       Q       The other two judges?

17       A       Yeah.  Did they complain about it?

18       Q       I'm only aware of this Judge Baylson

19  highlighting your testimony and decorum.

20       A       Okay.  The other two didn't have a problem

21  with it, I guess.

22       Q       Do you know who appointed Judge Baylson?

23       A       I have no idea.

24       Q       Would it surprise you if he was appointed

25  by former President George Bush?

James Gimpel, Ph.D. - December 12, 2019

80

1       A       Which George Bush?

2       Q       George W. Bush.

3       A       Okay.  No, I had no idea.

4       Q       So between what the Court said in the

5   Dunlap case and in this case, is your opinion that

6   those judges were wrong and you were right with respect

7   to your testimony?

8       A       Yes.

9       Q       And is it your opinion --

10      A       The Court actually agreed with me in the

11  Agre case, agreed with my position against Judge

12  Baylson.

13      Q       The majority opinion?

14      A       The majority opinion was against Judge

15  Baylson.

16      Q       But you are notwithstanding saying that you

17  disagree with the judge in the Dunlap case who I think

18  you indicated was a Trump appointee and in this case,

19  you are disagreeing with Judge Baylson who is a

20  dissenting judge appointed by George W. Bush?

21              MR. SEAQUIST:  Object to form.

22              THE WITNESS:  I can certainly understand

23  why a Court would be extremely reluctant to tell states

24  and localities how to run their elections.  By the way,

25  that's what's partly going on in this case.  Okay?  So

1    I can certainly understand why in Maine there would be

2    reluctance by a jurist to say, hey, you know, scrap

3    this election system that was subject to popular

4    referendum and go back to the old way.  I can certainly

5    understand the decision.  I still think it was the

6    wrong decision.

7    BY MS. ADEN:

8        Q      Is that true of Federal Courts only or also

9    of state courts?

10               MR. SEAQUIST:  Object to the form.

11   BY MS. ADEN:

12       Q      Let me strike that and rephrase it.  Is it

13   your opinion that states are reluctant to change their

14   election laws when Federal Courts get involved or

15   federal and state courts?

16               MR. SEAQUIST:  Object to the form.

17               THE WITNESS:  I don't quite understand the

18   question exactly, but what I am saying --

19               MR. SEAQUIST:  If you don't understand, let

20   her clarify.

21   BY MS. ADEN:

22       Q      Let me try to rephrase.

23       A      Okay.

24       Q      Is it your opinion that states are

25   reluctant to change their election laws when Federal

1    Courts gets involved?

2                    MR. SEAQUIST:  Object to the form.

3                    THE WITNESS:  No, I would not say that.  My

4    point is that judges and the Courts in general are

5    reluctant to force states and localities to change the

6    way they run their elections.

7    BY MS. ADEN:

8        Q      Is that federal judges that you're

9    referring to?

10       A      I have not made a detailed study of

11   decisions on this at the state level, but I would say

12   probably judges in general federal and state, you know,

13   are reluctant to step in and tell states and localities

14   how to run their elections.

15       Q      Is that true whether or not judges are

16   appointed as compared to elected?

17       A      This is a question that's excellent and

18   someone in political science should answer it.  I don't

19   know the answer.

20       Q      And is that true of judges -- so correct me

21   if I'm wrong.  Help me understand.  If voters go to the

22   ballot to change their election law, is it your

23   position that that should be respected in all instances

24   or that courts have a role or don't have a role in

25   ensuring that those initiatives notwithstanding comply

83

1   with the law?

2        A        Right.  So I can understand why in Baber V

3   Dunlap the judge ruled the way he did.  I can

4   understand that.  I think courts in general are very

5   reluctant to step in and tell states and localities how

6   to run their elections.  They don't believe that it's

7   within the providence of their expertise to do that.

8              As for my own opinion, sure.  I mean, I

9   think there may be some cases, you know, where very

10  possibly states, localities may make a wrong decision.

11  So you can't say never, right.  You can't say never,

12  that there's never ever a circumstance where, you know,

13  a state or a locality does something that they should

14  not do.

15             But I do understand that courts in general

16  take the position that they're not going to routinely

17  step in and meddle with the decisions that states and

18  localities make on how they run their elections.

19       Q        When states are running elections that have

20  racially discriminatory results, should courts step in?

21                 MR. SEAQUIST:  Form.

22  BY MS. ADEN:

23       Q        Courts or judges.

24                 MR. SEAQUIST:  Form.

25                 THE WITNESS:  That's a really general

84

1  question.  I'm just not prepared to answer such a

2  general question.  I need -- you need to look at

3  particular circumstances sort of like in this Maine

4  case.

5  BY MS. ADEN:

6      Q      Do you need to look at the impact of a

7  particular law on different racial groups to answer

8  that question?

9      A      I think that that evidence would be

10  germane.

11      Q      Similar with respect to age discrimination,

12  do you think that courts or judges should step in to

13  state election laws when there is age discrimination

14  occurring?

15          MR. SEAQUIST:  Object to the form.

16          THE WITNESS:  You know, I think that

17  there's -- that that evidence, you know, should be

18  considered alongside all the rest.  I mean, there's --

19  that's germane.

20  BY MS. ADEN:

21      Q      By that evidence, you're referring to

22  disparities in how a law might impact different age

23  groups?

24      A      Sure.  In all of these cases, there are

25  multiple things going on and particularly in the social

1    science research, people are not, for instance, simply

2    members of one identity group, right.  They have both

3    an age and a gender and a race and a socioeconomic

4    status and these other characteristics.  So it's --

5    these are very involved inquiries.

6        Q      Is it your understanding that if a voting

7    practice has a multiple reason -- strike that.

8               Is it your understanding that if a voting

9    practice has various reasons for -- strike that.

10              Is it your understanding that if a voting

11   practice has various results -- results on people

12   different of age groups or people with different

13   political identities that -- strike that.

14              I'm going to get back to this.

15       A      Okay.

16       Q      What other cases besides this case are you

17   currently working on?

18       A      I don't know if I'm currently working on

19   any cases.  I recently wrote a report in a North

20   Carolina case relating to voter ID, but after I filed

21   the report, I have not heard anything since.

22       Q      Is that a state case or a federal case?

23       A      That's a federal case.

24       Q      And is that -- who has retained you to

25   author the report?

86

1      A      Well, the firm is Cooper V Ellis -- no.
2  Cooper and Ellis.
3      Q      It's a law firm?
4      A      Yes.  I was thinking about names of court
5  cases.
6      Q      Do you know --
7      A      So I think that they -- I think that they
8  represent the state legislature of North Carolina or
9  the North Carolina state government.
10     Q      Are you aware of whether North Carolina's
11 photo ID law has been challenged previously?
12     A      Yes.  There have been a number of
13 challenges to it.
14     Q      Do you know whether or not those cases have
15 alleged racial discrimination?
16     A      I think that's the core claim.
17     Q      And do you know whether your report has
18 been filed publicly in that case or disclosed publicly?
19     A      You know, I think it probably has.  I think
20 it probably has.  You know, like I said, I file these
21 reports and then I don't hear from the attorneys and I
22 tend to move on to other things.
23     Q      We hear that often.
24            MS. ADEN:  I'm getting to the end of this.
25            MR. SEAQUIST:  Can I clarify one point?

1   When you say file a report, can you explain what you

2   mean because to the lawyers sitting around the table,

3   file means something very different?

4   BY MS. ADEN:

5        Q     Did you disclose it only to the attorneys?

6        A     I sent it back to them.  I don't know what

7   they've done with it.

8              MR. SEAQUIST:  There you go.

9   BY MS. ADEN:

10       Q     Okay.

11       A     So I don't know the answer.

12       Q     Do you know whether you're at liberty to

13   say if the cases involving racial discrimination, are

14   you opining on whether or not that law has racial

15   impact?

16       A     Yes, that's part of the complaint.  So I

17   need to address that.

18       Q     And are you -- have you opined on whether

19   or not that law has a racial impact?

20       A     Yes.  And the evidence that I was able to

21   muster suggested no impact.

22       Q     Have you ever served as a fact witness in a

23   voting case, so not as an expert, but as a fact witness

24   if you know what that means?

25       A     Yeah, maybe you can say more about what

1   that means.

2        Q       Someone who is not being asked to offer an

3   opinion in an expert capacity, but based upon just like

4   a general lay witness just like any other person, they

5   don't have a particular expertise, but they're offering

6   facts that are not based upon particular

7   qualifications, particular expertise, particular

8   analysis.

9        A       No, I've never been involved in that.

10       Q       Okay.  So that is that question and then --

11               MS. ADEN:  Can we go off the record for a

12   second?

13               (A discussion was held off the record.)

14               (Recessed at 12:13 p.m. for lunch.)

15

16

17

18

19

20

21

22

23

24

25

89

1            A F T E R N O O N   S E S S I O N

2                (Reconvened at 12:54 p.m.)

3   BY MS. ADEN:

4        Q       Are you ready to proceed, Dr. Gimpel?

5        A       Yes.

6        Q       So we are going to turn to another subject

7   which is to delve more deeply into this case and try to

8   move us through the afternoon.

9                Prior to working on this case, had you

10  spent time in Waller County?

11       A       No.

12       Q       And since being involved in this case, have

13  you been to Waller County?

14       A       I have not been.

15       Q       Have you met any of the plaintiffs in this

16  litigation and by plaintiffs, I'm referring to Jayla

17  Allen, J-A-Y-L-A and Allen with an E, A-L-L-E-N,

18  Treasure Smith, Damon Johnson or the Panther Party, the

19  other representative Joshua Muhammad and Muhammad is

20  spelled M-U-H-A-M-M-A-D?

21       A       I have not.

22       Q       Have you previously met any of the

23  defendants in this litigation and by defendants, I'm

24  referring to Judge Trey Duhon who is being sued in his

25  official capacity as the judge of the Commissioner's

1    Court of Waller County, elections administrator Christy

2    Eason, E-A-S-O-N, V Waller County?  Have you --

3        A      So Christy Eason I have communicated with

4    by telephone two times.

5        Q      About this case?

6        A      Yes, about the case.

7        Q      What was the nature of those conversations?

8        A      Those conversations simply went to

9    assistance with data collection.

10       Q      Meaning questions you had about data that

11   you needed or data that you had received?

12       A      Some of both actually.  So there were

13   questions about data that I was asking them to gather

14   and also questions about the data that they had

15   provided.

16       Q      About how long were each of those

17   conversations?

18       A      Fifteen minutes each.

19       Q      And did you share the documentation between

20   you directly and Ms. Eason?

21       A      Yes.

22       Q      And vice versa?

23       A      Yes.  She sent some documents and

24   information relating to placement of polling sites.

25       Q      And did you use that information to form

91

1    the opinions in your report?

2        A       Yes.

3        Q       And that was information that was separate

4    and apart from any of the information relied upon

5    explicitly or is underlying information in the expert

6    reports of plaintiffs' experts?

7        A       Well, I can tell you specifically that the

8    bulk of the communication was about the assembling of

9    the history of polling place siting that I discuss in

10   my report in passing, but was also included in a

11   separate file that my understanding was sent to the

12   plaintiffs, you know, with my report, you know, as a

13   relevant appendix.

14              So, you know, there was an effort to try to

15   go back through the record and identify the past

16   polling site placements some distance in time, you

17   know, into the late nineties, I think.

18       Q       And besides that topic, what other topic

19   did you talk about?

20       A       That -- that was the -- that was the

21   subject that I recall discussing.

22       Q       And then Judge Duhon, you haven't talk to

23   him?

24       A       No.

25       Q       What about any current or former members of

92

1    Waller County Commissioner's Court as far as you're

2    aware?

3         A       No.

4         Q       Have you spoken to any residents of Waller

5    County?

6         A       No.

7         Q       So I'm going to turn your attention back to

8    what I believe is Exhibit 2 which is the bundle of

9    documents that includes your CV but also your report as

10   an attachment.  Do you have that?  So you have talked

11   about you produced one report in this case; is that

12   correct?

13        A       Yes.

14        Q       So I want to make sure that we're on the

15   same page about the scope of your work in this case.

16   If you turn to page 1 of it, it reads under the topic

17   focus of research and overview on July 15, I was asked

18   by the defendants in this case to evaluate the

19   plaintiffs' claims and respond to expert reports

20   presented by the plaintiffs on Waller County election

21   officials siting of early voting locations and

22   allocation of early voting hours for the 2018 election.

23               Is that accurate?

24        A       Yes.

25        Q       Is that the only work that you were asked

93

1    to do in this case?

2        A      Yes.

3        Q      In that sentence, you refer to expert

4    reports presented by the plaintiffs.  Which expert

5    reports were you specifically asked to respond to?

6        A      I was sent reports by Joseph and Cooper and

7    Stein and Flores.  So I think in -- I don't think I was

8    given any -- recall any specific direction.  You know,

9    I gathered that the idea was to have the expert decide

10   which direction they should take based on their reading

11   and it was based on my reading that I focused primarily

12   on the reports of Flores and Stein.  Those are the --

13   those are the ones that I read most carefully.

14              You know, I didn't inquire about other

15   experts, but, you know, I probably made the assumption

16   that there might be other experts involved in the case

17   and, you know, that possibly there was some kind of

18   division of labor as is commonly the case.  So I

19   decided to focus on Stein and Flores.

20       Q      So is it fair to say that while you

21   reviewed the -- and at this point, this is July 15.

22   You were asked to do this.  So at this point, you were

23   only looking at the initial reports of experts; is that

24   accurate?

25       A      Yes.

94

1      Q       And at that point while you may have

2    reviewed the reports of Joseph and Cooper, the initial

3    reports of theirs, you -- in your mind, you were only

4    responding in your -- the report that we're about to

5    look at in detail to Flores's and Stein's specific

6    report?

7      A       Well, I thought that's where my expertise

8    was most pertinent I suppose you could say, that I had

9    pertinent expert that could bear on questions raised

10   and issues raised in those reports.

11     Q       The issue -- here you write in the same

12   paragraph in your expert report that in addition to

13   evaluating the plaintiffs' claims and responding to the

14   expert reports -- strike that.

15             On this page, it says that your task was to

16   evaluate the plaintiffs' claims and respond to expert

17   reports presented by the plaintiffs on Waller County

18   election officials siting of early voting locations and

19   allocation of early voting hours for the 2018 election.

20   So were there specific questions you were being asked

21   to do or what did you understand was your task?  What

22   did you understand was your task?

23     A       My task was to, you know, collect available

24   evidence on placement of Waller County's voting

25   locations and the county's patterns of election day and

95

1    early voting turnout in those locations to evaluate

2    whether these claims in the reports were correct that

3    there was some kind inequity or unfairness in the way

4    that the hours and locations had been distributed for

5    2018 across the county.

6        Q       And did you understand that to evaluate any

7    quality in the distribution of these sites or early

8    voting generally that that meant that you had to

9    evaluate turnout?

10       A       I think turnout is pretty important here.

11   You know, first of all, the whole point of early voting

12   as a reform is as an instrument for augmenting and

13   elevating turnout by allowing people who are

14   disadvantaged or handicapped by having voting just on a

15   single day, having them provided with an option to vote

16   at a time that is more convenient or also at a place

17   perhaps that's more convenient.

18              So I think that the turnout question is

19   quite important, you know, as the whole object, right,

20   and it's certainly an important measure that the county

21   relies on, you know, for evaluating where these sites

22   should be placed.  You have to have some measure of

23   demand and, you know, turnout is, you know, a very

24   reliable, you know, measure of how much a particular

25   site or location is utilized.  So, yes, I think the

96

1    question of turnout I think has to be central to the

2    whole assessment of impact.

3         Q      Is that central requirement in your

4    estimation required by law, required by the research?

5    What requires that?

6         A      Well, first of all, I gathered that, you

7    know, one of the points, you know, of holding an

8    election is to get people out to vote and, you know,

9    it's all about -- election is all about people going to

10   the polls to express their political preference to

11   elect someone.

12               So if there are differences, you know, in

13   the propensity to turnout, those should be taken note

14   of, you know, across a region or place.  And as I said,

15   it seems to me that, you know, assessment of, you know,

16   turnout, you know, across the county and variations of

17   the turnout is core, you know, to the whole inquiry and

18   to the claims that are being made.

19        Q      Are there other reasons for early voting

20   besides providing an opportunity for people with

21   disabilities or I can't remember what the other reason

22   that you stated, but are there other reasons besides

23   the two that you articulated for early voting?

24        A      Well, I think that we could go back and

25   look at the legislative record in the states that have

97

1   adopted these measures and see, you know, what is said

2   in the debates to justify these measures, but it's

3   certainly plausible that someone could say even for

4   people who vote regularly, we think that confining them

5   just to one day is taxing.

6          And so, you know, even if these -- even if

7   there are regular voters, you know, who -- whose

8   behavior would not change much through the addition of

9   early voting, it's -- it might be an argument to, you

10  know, give them the convenience or the option of it.

11         So I think that that's probably an argument

12  that's made in favor of early voting that is, you know,

13  someone who has a constituency that turns out at high

14  rates, what would their justification be for having

15  early voting?  Well, you can imagine them saying, well,

16  my voters are also inconvenienced even though they

17  might have a history or propensity to turn out on

18  election day, this is kind of taxing and difficult for

19  some of them.  And so if we're going with early voting,

20  let's extend it to everybody.  So --

21     Q     Have you heard that early voting can help

22  reduce long lines that may form on election day?

23     A     I think that that's probably plausible.  It

24  must be the case that whenever you add sites that it's

25  going to reduce the burden on any particular site, you

98

1    know, probably also as you add machines, right.  So,

2    you know, there are some things that could be done

3    along those lines to reduce the wait time, if there is

4    a wait time.

5         Q     Have you heard that early voting provides

6    an opportunity for people who have limited hours to

7    vote during a workday to have flexibility when they go

8    to vote?

9         A     I gather that that's a reason.  You know, I

10   can gather that there are people in many walks of life

11   who, you know, again feel maybe inconvenienced or taxed

12   by having it only on one day, you know, on a Tuesday.

13   So, you know, they might appreciate having the

14   opportunity to vote on a different day.

15        Q     Do you subscribe to the belief that people

16   have the right to vote just as much as they have the

17   right not to vote?

18        A     Well, I believe it's a -- abstention is a

19   choice.  There are some people who as a protest

20   abstain.  I have not written any papers on that, but

21   there's probably some literature on that.  So we don't

22   have compulsory voting in the United States.  I think

23   there might be a couple of western democracies,

24   possibly Australia where it's compulsory.  So we don't

25   have a tradition of compulsory voting in the United

99

1    States.

2            And I don't know of any states or

3    localities that have moved in that direction.  So I

4    gather that, you know, the predominant culture in

5    American political history is to allow people to choose

6    to abstain if they want to.

7        Q     So can people abstain from voting and there

8    be thus lower turnout and at the same time there be

9    inequality of opportunity and access to early voting?

10       A     It's a difficult question.  You know,

11   there's -- it's very possible that you can have low

12   turnout in a location for various reasons and one of

13   those reasons could be people deliberately choosing not

14   to vote.  They're just not interested or if they're not

15   interested, if that's not it, they might actually be,

16   you know, hostile to the regime in some sense and

17   abstaining out of protest.  There could be a variety of

18   reasons for not voting.

19       Q     Can turnout be impacted by weather?

20       A     Yes.

21       Q     Access to transportation?

22       A     Yes.

23       Q     An employer who doesn't provide you time

24   off to go and vote?

25       A     That could be an impediment.

100

1      Q      Would you agree that there's a myriad of

2  reasons that go into turnout?

3      A      Yes, I think that's true.

4      Q      So have you worked with any of the experts

5  whose reports you reviewed in this case?  So that would

6  be Mr. Cooper, Dr. Stein, Dr. Flores, or Dr. Joseph.

7      A      No.

8      Q      And in the course of --

9      A      Work, can you tell me what you mean by work

10  with?

11      Q      Have you co-authored any reports with them?

12  Have you served on a case as an expert where they have

13  also served as an expert?

14      A      No.  I have a glimmer of a memory of

15  briefly being on a dissertation committee that

16  Professor Stein also served on, but it was rather

17  shortly lived and I'm not sure the student ever

18  finished.  So that was all I remember.  So I didn't

19  want that to escape notice.

20      Q      You mentioned you had -- I'm going to come

21  back to that.

22             I'm going to turn to your methodology for

23  ascertaining the answers to the question that you were

24  asked to provide in this case, but to clarify just to

25  make it very plain for me, you were sent those four

1  expert reports and you weren't given a particular

2  question to ask.  Your job was to based upon your

3  experience come up with how you would respond to one or

4  more of those expert reports.  Is that a fair --

5        A      Right.  I think that's right.  Sometimes --

6  I mean, I can't get into counsel's head as to what he

7  was thinking, you know, but I think that it's pretty

8  common for, you know, teams of attorneys to handle

9  their experts differently.  So there's variation.

10              I haven't done that much expert witness

11  testimony, but I've done enough to know that each team

12  is a little bit different in the way that they manage

13  or handle their experts, right.  And so, you know, some

14  will have, you know, maybe more pointed suggestions

15  again as how they've divided the labor among the

16  various experts they have working for them.  Others,

17  you know, maybe don't have particularly poignant advice

18  or questions.  They're like read the reports and let's

19  see what kind of outline you come up with.

20              And, you know, so there are various ways,

21  right, that legal teams handle or manage their experts

22  and I think my mandate was to read the reports and come

23  up with an outline as to how I might respond, how I

24  might assess these questions, and, you know, that's

25  what I returned to counsel.

1       Q        So in your report, there are different

2    subject headings throughout the report and I'm going to

3    go through each of them.  There are about seven of them

4    as far as I know.  I'll tell you which page numbers

5    they're on, so you can turn to them as I read them.

6    And I guess I would like for you to tell me whether

7    there was a specific question that you set out to

8    answer in each of those sections.

9       A        Okay.

10      Q        So the first is were you asked to answer a

11   question about turnout motivation and convenience which

12   is -- begins a discussion on page 2 of your report?

13      A        I don't think I was explicitly asked, but

14   here's the issue there, that in the history of the

15   literature on political participation, there has been a

16   longstanding, long running debate about the role of

17   voters' motivation or impetus to vote and the role of

18   convenience factors, things like early voting and

19   convenience voting reforms and increased hours and so

20   forth.  This is central to the history of the political

21   science literature, this very debate, and so it seemed

22   like that was a no brainer to me.

23              Here we are talking about convenience

24   voting and, you know, we might want to ask just how

25   much convenience voting really matters, right, because

1    in the end, convenience voting trivially contributes to

2    turnout or not at all.  Then why have it?  It kind of

3    reduces the argument, undercuts the argument for

4    convenience voting if we implement it.

5              And over the course of a number of years,

6    turnout doesn't change because then all you do is you

7    have these kind of subsidiary arguments, well, at least

8    we're making it easier for the people who do vote.

9    Okay.  Maybe that's an argument, but that's less

10   compelling than the hope, right, that by extending

11   convenience voting, we're actually going to increase

12   turnout by 8, 12, 15 points.

13             The motor voter law, right, that was

14   adopted what, in the nineties, the great hope for the

15   proponents of motor voter -- you know, Ray Wolfinger

16   out at UC Berkeley, his great hope was that adopting

17   motor voter as a convenience where we could finally

18   register at the DMV, we would see the registration

19   rolls flooded with new voters and we'd see a revolution

20   in the level of turnout as a result.  And sadly for him

21   because that was his life long goal and sadly for the

22   rest of the people that were with him in that hope,

23   that didn't happen.

24             It didn't happen and it doesn't mean that

25   maybe we should do away with convenience voting, but

104

1  of -- you know, a registration of the DMV, but it does

2  take away quite a bit of the argument.  It just didn't

3  have the impact that we thought it was going to have

4  and it was very disappointing.

5      Q      Is it fair to say that the devil is in the

6  details, so there's a different question about whether

7  or not you offer access to opportunities to register to

8  vote and it's a separate question about where you offer

9  those opportunities?  So is it possible that

10  establishing registration opportunities at the DMV site

11  was that may be a failure which is different than

12  establishing opportunities to register where people are

13  whether that is at social services, whether that's at

14  public schools, whether that's at libraries?  Aren't

15  those two separate questions?

16      A      Again, here is where people have wound up

17  on the convenience side of this very different because

18  time and time again what we've found is that you can

19  free up access, okay, and extend some of these

20  opportunities and the motivation just isn't there.

21  Okay.

22              This is, you know, I think germane to the

23  front part of the report.  We see that there are people

24  who live, you know, very close, you know, to an

25  election day or an early voting site and still don't

1  turn out.  Okay?  And this is like a convenience voting

2  reform that is for naught.  And it shows that there's

3  something else going on, that people are not voting --

4  sorry.  People are not abstaining or failing to show up

5  because it's inconvenient.  My goodness, it's across

6  the street, you know.  It couldn't be easier.

7           They're not voting because there are

8  motivational issues, you know, related to maybe their

9  information or maybe the ineffectiveness of campaigns

10  to reach them, you know, or some other, you know,

11  motivational force, you know, that would drive them to

12  the polls.  And political science has now decided that

13  it isn't even a question anymore really.

14           The evidence is so heavily on the side of

15  motivation.  Motivation can make a 10, 12, 15 point

16  difference.  Convenience not even close, not even

17  close.  This -- folks, this is settled.  This isn't

18  even a question anymore.

19    Q     Is it possible that people skip over a

20  polling site that is across the street to access a

21  polling site where they work?

22    A     It's certainly possible that, you know,

23  someone who is motivated to vote will choose among

24  available sites, but the motivation needs to be there.

25  That's the critical thing.  And Adam Berinsky's work at

1  MIT is like so clear on this that when you weigh the

2  two, there's no question that it's motivation that

3  matters.  Okay.

4            You can make all of these reforms you want

5  to.  Okay.  You can do same day registration like some

6  states are doing.  You can go the way Oregon has done

7  and go with mail in voting and, folks, it doesn't help.

8  It doesn't appreciably help.  Why is that?  Why is

9  that?  It's because abstention is not the result of

10  inconvenience.  Okay.  Abstention is the result of

11  again lack of interest, you know, possibly weak

12  campaigns that aren't motivating people, some

13  motivational factor related to the individual or that

14  person's environment, okay, and so, you know --

15        Q      How do you define motivation?

16        A      Motivation is really associated with having

17  interest, you know, and the desired will to actually go

18  and cast a ballot.

19        Q      Did you do a systematic analysis of

20  motivation in the context of Waller County?

21        A      Well, I think that there are only -- there

22  are only a couple of things that you can conclude,

23  right.  I mean, if you take a look at the surgeon

24  decline figure one, okay, across this sea saw of

25  turnout levels, okay, you know, we have substantially

1    the same polling locations and hours and yet we have

2    vary jagged peaks and troughs, steep peaks and troughs

3    in the level of turnout.  So that itself casts a lot of

4    doubt on any convenience related explanations.

5            If election after election after election

6    we have substantially the same level of convenience and

7    yet the turnout fluctuations are up and down by 10 and

8    20, 30 points, folks, no social scientist in their

9    right mind could conclude that convenience is making a

10   difference there.  No one would say that.  It's just

11   false to -- the clear evidence presented by the facts.

12       Q     I want to get back to that and there are a

13   lot of things to unpack in a couple of things you said.

14   Going back to the questions you were asked, there was

15   another section of your report that's labeled proximity

16   to polling places and total turnout in 2016 and 2018.

17   That's on page 9.  Was there a specific question that

18   you were seeking to answer in that section?

19       A     Again, here's the question, right.  If

20   distance makes a difference, right, if distance makes a

21   difference, then the places -- sorry -- the people that

22   live closest to the polling places, okay, should have

23   higher levels of turnout.  Okay.  If distance is a

24   critical factor, right, then if you live across the

25   street on average from a polling place, you should vote

108

1   at a higher rate than someone who lives 5 or 6 or 8

2   miles distance.  Okay.  That's the simple comparison

3   that's being made here.  And we do it at different

4   distance ranges, the quarter mile, the half mile, and

5   the one mile.

6           So the question we're addressing here is,

7   you know, if distance actually is a critical factor

8   with respect to turnout in Waller County, then the

9   people that live further away, okay, ought to be

10  showing lower levels of turnout and the people that

11  live closer should be showing higher levels of turnout

12  and that's not the pattern.

13  Q     Who told you that distance was a critical

14  factor?

15          MR. SEAQUIST:  Form.

16          THE WITNESS:  Well, the idea was that in

17  the report, you know, there was a lot of attention

18  called to the fact that certain voters on the Prairie

19  View campus lived certain distances from -- and the

20  Stein report was especially pronounced in this respect

21  and emphatic that certain voters living certain

22  distances from the polling places disadvantaged them in

23  some way and the clear implication of that report was

24  that that distance was clearly an issue or problem for

25  them.

109

1   BY MS. ADEN:

2      Q      Was that at all related to transportation

3   access?

4      A      That might have been one possible cause.

5      Q      On page 14 of your report, there's a

6   section called proximity and early voting.  Are you --

7   is that any different, that analysis any different than

8   the one that you began on page 9?

9      A      Well, sure.  Here the issue is not so much

10  turnout itself, but the actual use of early voting as a

11  mechanism to cast your ballot.

12     Q      And then on page 20, you look at Waller

13  County alongside other communities.  What were you

14  trying to answer in that section?

15     A      This is pretty interesting, you know.  One

16  of the first questions I had was so what is the

17  administrative culture in Texas among county officials?

18  What is the administrative culture like because these

19  county officials don't operate in a vacuum as if

20  they're only within their own county.  They are part of

21  larger associations and groupings that communicate with

22  each other.  So what is the administrative culture in

23  Texas?  How is it that county election officials in

24  general, people like Christy Eason treat the college

25  campuses in their midst?  What is the common practice

110

1    and the administrative culture of the state?

2              These are election administrators we are

3    talking about here.  They're charged with organizing

4    and situating these polling place sites.  That's a big

5    responsibility and they're supposed to do it in

6    conscientious way making them accessible to the entire

7    population of the county.

8              That is again operated within a community.

9    They make these decisions and operate within a

10   community of administrative practice.  So the whole

11   idea here is let's find counties that have college

12   campuses around the state of various sizes, but the

13   counties are, I don't know, within proximity to the

14   size of Waller and are not like -- as you know, Texas

15   law treats the large counties separately and distinctly

16   from smaller counties.  Actually different rules apply

17   in Texas law in the administration of elections.  So

18   that was one thing.

19             The second consideration was, well, some of

20   these locations are going to have huge budgets for

21   operating their elections.  You know, we can't really

22   compare Waller to Harris.  We can't really compare

23   Waller to Travis.  We can't really compare Waller to

24   Dallas.  These are completely different operations in

25   terms of their scale and the amount of money they have

111

1  to work with.

2          So what we're dealing with here is a search

3  for some locations that might be similar to Waller with

4  respect to the, you know, amount that they have to work

5  with and size of the population they have to serve and

6  the fact that they also happen by the way to have a

7  campus in their midst, right.

8          So the campus in their midst was an

9  important consideration.  There are 254 counties in

10  Texas.  We could have found some that were probably

11  exactly 51,000 or closer, but they wouldn't have had a

12  college in their midst.

13          So what is the administrative practice

14  statewide?  What have the habits been with respect to

15  these college campuses?  And that was really the

16  question we were trying to address or I was trying to

17  address here.

18      Q      Did you do an analysis of budgets among

19  these various counties that you examined when you --

20      A      Yes.

21      Q      -- did your analysis?

22      A      So I queried a couple of counties as well

23  as Waller about the cost associated with running an

24  election and -- but that analysis was not completed.

25  So I started into that analysis, but was unable to

112

1   complete it.  The clock was ticking and this involved,

2   you know, going to county clerks and asking for some

3   pretty detailed information.  So it was just a little

4   bit too heavy of a lift.

5       Q     So you're not opining on the resources that

6   Waller County has as compared to other counties in this

7   analysis?

8       A     My suggestion is that counties about the

9   same size would be similarly resourced.  That's my

10  suggestion.  Now, look, we have Randall in here on

11  table 6 on page 21 which is quite a bit larger, more

12  than double the size.

13            So we would expect Randall to have more

14  money to run the elections, yes.  Tom Green is also

15  larger.  And, again, you're also trying to find places

16  that have college campuses and so, you know, I'm open

17  to suggestions, right.  I'm open to suggestions as to

18  what the comparable locations should be, but we're

19  trying to get -- the question is, you know, what is the

20  standard or customary administrative practice across

21  Texas counties of similar size who also have college

22  campuses.  That's exactly why these places were

23  selected and why I didn't choose like Denton or Harris

24  or Travis.

25      Q     Did you find there was a standard practice

113

1    amongst all of these counties?

2         A       You know, one thing is for sure is that

3    there's a pretty standard practice of not placing

4    polling places on college campuses and Waller County is

5    kind of out there alone in doing so.  You know, there

6    were a couple of cases I think I found in Marshall,

7    Texas that the authorities there placed a campus.  It

8    was a -- Wiley College placed a site there at that

9    location.  It's a very small college.

10                So, you know, but I think the -- if there

11   was a standard practice, it was not to actually place a

12   polling place, either election day polling place or an

13   early voting site on the college campus.

14        Q       So there's -- on page 28, you have another

15   section placement and movement of sites in Waller

16   County across time?

17        A       Yes.

18        Q       What question were you trying to answer

19   there?

20        A       So here, you know, I think, you know,

21   Mr. Flores in -- Dr. Flores in particular was concerned

22   about the county's history and so my effort was to try

23   to plunge into that history as vigorously as I could to

24   see where the sites had been placed and what the recent

25   history of early voting in the county had been.  So,

114

1  you know, that was a response to his criticisms, you

2  know, on the recent history of the Waller County

3  Commissioner's Court.

4           There was also some suggestion, I believe,

5  in the Joseph report -- I'm a little foggy on it right

6  now, but there was some suggestion in the Joseph report

7  that the Waller community center, the site known as the

8  Waller community center was somehow unfamiliar or

9  unusual as a site for purposes of Prairie View A&M

10  voting.

11           And my understanding after having read the

12  research and gathered the data is that that location is

13  not only not unusual, it's been a very customary

14  location going back quite some distance in time.  It's

15  true that, you know, one of the buildings that was at

16  that location was torn down and a new building erected

17  and, you know, the name apparently has changed, but

18  it's the same location.  It's a customer polling site.

19  It's familiar to residents.  It's been used repeatedly

20  as far back as the 2000 general election.  So the idea

21  that this variously named location is somehow a problem

22  or unusual or an irregular site, that's just false to

23  the facts.

24      Q      And then there's a section on page 32

25  allocation of early voting sites based on demand.  What

115

1  were you trying to do in this section?

2      A      Here what we're trying to do is use some

3  GIS software tools to do some actual location

4  allocation analysis.  So this is a GIS tool that's

5  developed to assist in the siting of facilities.  And,

6  you know, common applications include a police and fire

7  stations, other kinds of public facilities.  It could

8  be clinics, hospitals.  It could be parks and

9  recreation related.  A whole range of public facilities

10  can be sited optimally according to the population

11  settlement of the location.

12           And, you know, the software makes these

13  calculations based again on minimizing the distance

14  between the number of facilities to be located and the

15  locations where the residents actually live.

16           So, you know, in order to conduct this

17  analysis, you have to go to the demand points, okay,

18  which would be the voters, okay, the voters in the

19  county and then you have to decide how many sides you

20  want to allocate, okay, and, you know, that could be

21  eight or it could be 10 or it could be 12 or four or

22  one, so -- and then the other bit of information that

23  is very helpful, you know, to have, of course, is

24  the -- the candidate sites that actually meet the

25  criteria for being a polling place, either an early

1   voting polling place or an election day polling place.

2              And, of course, this is specified in Texas

3   law.  Unlike in California, you can't actually put a

4   polling place in someone's garage which I understand is

5   the case there.  You know, there are actually

6   facilities -- there are actually facilities that --

7   facility requirements.  One of them is parking

8   actually.  That's not trivial.  There has to be

9   adequate parking.  There has to be spaces for the

10  machines, spaces for the people to stand and wait in

11  line out in the weather, room, right, and, of course,

12  if things need to be plugged in, you need a number of

13  electrical outlets.  It's a reasonably detailed list of

14  things that you need for a candidate site.

15       Q     And then the final section, I believe, is

16  do hours of early voting influence turnout and this is

17  on page 40.

18       A     Yes.

19       Q     And if you haven't already addressed what

20  question you were answering here, can you briefly

21  describe what you were trying to do here?

22       A     Sure.  You know, again, the object being,

23  you know, augmenting participation.  The idea is, you

24  know, hey, across a span of time where we have

25  observations, you know, can we show, you know, that

117

1    hours of early voting as they move up actually increase

2    the level of participation, level of turnout.  And, you

3    know, the figures in this section show that isn't the

4    case, that there's no relationship between the total

5    number of voting hours and the voters that turn out.

6              So, you know, it's -- it seems to me again

7    to go back to the point I make at the beginning of the

8    report as shown in so much of the political science

9    evidence to date and that is this is not convenience.

10   You know, this is really a motivational, you know,

11   issue here.  It's also once again possible that, you

12   know, there's an absence of campaign outreach and there

13   are some defects in the political system in a state

14   that might make for say a lack of political competitive

15   elections and again a failure of political parties or

16   political candidates to do the outreach to motivate

17   people.

18             But there are other explanations, you know,

19   for turnout than the number of hours.  And this is

20   shown by the fact that as the number of hours varied

21   across these plots and I think number of hours vary in

22   the locations across these plots, the line for turnout

23   is just really flat.  And I think I mention in here

24   that it's kind of -- it's kind of particularly

25   interesting I would say.

1          Case in point that, you know, over in
2    Hempstead, you know, by virtue of the fact that the
3    county headquarters is there, you got these very
4    generous early voting hours and it isn't doing anything
5    for turnout, right.  So, you know, I mean, they're in
6    Hempstead by virtue of the fact that the county
7    headquarters is there and that place has to be opened,
8    right, by law.  And you have other sites that are in
9    that location.  I don't remember how many now.  You
10   don't have any elevation in turnout.
11          So even in a place like Hempstead, you
12   reach the ceiling on motivation and added convenience
13   ain't going to do anything.  It doesn't do anything and
14   this is like so plain, right, and it's plain in the
15   literature, right, that you can only do so much
16   convenience wise, okay, and then it depends on people,
17   right, and how interested they are.  And so, you know,
18   that's why you got all these people who are living
19   right across the street who aren't going to show up,
20   right.  You know, convenience will only get you so far.
21   Q     So I'm going to ask you briefly.  So you
22   mention that you have some way to measure demand for
23   early voting and you said turnout was one measure.
24   A     Yes.  Well, it's one of the more reliable
25   ones and the -- what else do you have as an

1    administrator of an election system than the past

2    turnout records and the past early voting records to go

3    by.  You look across the locations in the recent

4    elections and you say, wow, we have a lot of demand for

5    early voting here, you know, both in the on year and

6    the off year.  And we have very little demand for early

7    voting over here.  You know, it's pretty clear, okay,

8    that, you know, we need to meet this demand and, you

9    know, this is for very straightforward reasons, right.

10   You mentioned them a few minutes ago.

11            There's concern about lines and so, you

12   know, if there are people in one part of the county who

13   are showing up in droves and you don't have adequate

14   resources, they might have to stand in line.  So you

15   look at past patterns of turnout and early vote use as

16   a guide to the future.  Is it always a perfect guide,

17   no.  I say in the report, of course, it isn't a perfect

18   guide.

19            And we know that in particularly hotly

20   contested elections that pop up unpredicted and, you

21   know, in retrospect you sort of wish maybe you'd

22   allocated things a little differently.  That's a pretty

23   normal human reaction, isn't it, to uncertainty?  You

24   have to make the decision on allocating the resources

25   in like August and September and lo and behold, the

120

1    race takes an especially hot turn in October and

2    November and a lot more people wind up showing up than

3    were true in the past.

4              So there -- the past is not a perfect

5    predictor of the future.  Once again, that's the best

6    guide you've got.  I don't know what other guide you'd

7    use.  I'm open to suggestions, okay, but these are

8    administrators here trying to make these decisions, you

9    know, with limited resources and limited information

10   and what do you expect them to do?

11             Of course, they're going to look back at

12   the past patterns of turnout and early vote use as a

13   guide to the future and, you know, hope that the future

14   isn't like super weird or unusual.  But, again, they're

15   making a good faith effort here.

16        Q     Is the total number of early votes cast at

17   each early voting location also a good measure of

18   demand?

19        A     I think that total number of early votes

20   cast -- well, sure, I think that that's relevant.

21        Q     What about the proportion of votes at each

22   precinct that were early votes cast, is that a good

23   measure of demand?

24        A     I suppose so because that would suggest

25   that -- that lots of people avail themselves of the

121

1    early voting option even if they could well have voted

2    on election day.  They want to actually utilize the

3    option to vote early.

4         Q      Do you know what precinct 309 is?

5         A      Yes.

6         Q      Which precinct is that?

7         A      That's the one that Prairie View A&M is

8    located.

9         Q      Do you know any reason to dispute that

10   precinct 309 was the highest precinct under either of

11   the metrics that you just -- we just discussed whether

12   that be total number of early votes cast or the

13   proportion of early votes cast during early voting?

14             MR. SEAQUIST:  Which election, counsel?

15             MS. ADEN:  In November of 2018.

16             THE WITNESS:  I don't have any reason right

17   now to contest that.  You know, let me remind you, and

18   the report is very clear about this, there are places

19   where there were lots of early votes cast that got no

20   early voting locations and no early voting hours at

21   all.  That's relevant.  The reports by the plaintiffs

22   here completely ignore the locations around the county

23   where there was demand, but absolutely no sites, okay,

24   and, you know, this is like half of the evidence they

25   just waved away completely unjustifiably.

122

1          I don't know why they did that except to
2    bias the case they're making.  But, again, you know,
3    this is, you know, disservice, you know, to the science
4    of this research to ignore half of the relevant cases
5    and say, oh, we're not going to consider the places
6    that got no sites at all, the places that got no hours
7    at all, but there was demand in those locations and
8    they got nothing.
9    BY MS. ADEN:
10         Q      Did those sites serve 18 to 20-year-olds?
11         A      I bet a lot of them did.
12         Q      Do you know whether they served 18 to
13   20-year-olds?
14         A      We can look on the voter file and we can
15   determine how many 18 to 20-year-olds are on there.
16         Q      But you haven't opined on that?
17         A      I don't have the data at hand on that.
18         Q      Do those precincts serve black registered
19   voters?
20         A      There might be some of them that do, but,
21   of course, black and voters and 18 to 24-year-old
22   voters or 18 to 20, either one, are not the only voters
23   whose demand counts and not to an administrator.  Why
24   would we only count the demand for the people in
25   precinct 309?  And maybe that's really why we're here

123

1   and what this dispute is about.  It could well be.

2   This is really the central question why the two sides

3   are so far apart.

4            There is no reason that the administrators

5   in Waller County should count only the demand of 18 to

6   20-year-olds or the black voters.  There's no reason

7   that an -- by the way, it's contrary to the culture,

8   you know, of administrating elections for them to think

9   that only the demand of 18 to 20-year-olds or only the

10  demand of black voters should matter.

11           And so there are other voters in the

12  county, okay, across the county, the north and the

13  south and various places, okay, they have no sites at

14  all and their demand doesn't count.

15       Q     Do you know what the 26th amendment is?

16       A     How equal is that?

17       Q     Do you know what is 26th amendment is?

18       A     Go ahead.

19       Q     Do you know what it is?

20       A     Off the top of my head, go ahead.  No, I

21  don't know off the top of my head.  I don't remember

22  them in order.

23           MR. SEAQUIST:  Let her ask her whole

24  question and then you can give an answer to the extent

25  you have one.

James Gimpel, Ph.D. - December 12, 2019

124

1   BY MS. ADEN:

2        Q      Do you know whether the 26th amendment

3   applies to all voters in Waller County?

4        A      I don't know the answer.  As I said, I

5   don't have the amendments memorized.  I'm not a

6   constitutional lawyer.

7        Q      What about the 14th and 15th amendment, do

8   you know what those amendments apply for?

9        A      I know that those amendments are relevant

10  to voting rights.

11       Q      Do they -- are they relevant to racial

12  discrimination?

13       A      I gather that they are.  Certainly the

14  Court has said so.

15       Q      Do they apply to all voters in Waller

16  County?

17       A      I would -- I imagine that they do.

18       Q      Do you know what section 2 of the Voting

19  Rights Act is?

20       A      No.  Go ahead.  I'm not a constitutional

21  lawyer.  That's not my specialty and that is not my

22  expertise.

23       Q      So what did you understand then to be the

24  central dispute in this case then?

25       A      I think clearly there's a problem here and

125

1    the one side thinking that for some reason

2    administration of elections should only serve, you

3    know, a single precinct and its voters when that's not

4    the practice.  You know, administers have to serve

5    everyone in the county and they have to serve them

6    equitably and fairly.  They can't just serve one set of

7    voters regardless of their age or their race.

8              Isn't that what, you know, the tradition of

9    equity and law is all about is that you treat people

10   equally?  I guess maybe that's where the two sides are

11   really far apart because one side is saying election

12   administration needs to serve all voters in the county

13   fairly and the other side seems to be saying, no, we

14   should only really be serving the folks in 309.

15   Q       Where did you see that claim?

16   A       Well, that seems to be what you're

17   suggesting.

18   Q       Where do you see that?  Can you point me to

19   something that says that the county is only -- that

20   we're asking -- the plaintiffs are only asking --

21   A       You're making a --

22   Q       Can I finish my question?

23   A       Okay.

24   Q       That the counties are only being -- are

25   being asked to serve only one precinct, precinct 309,

1   where is that?

2        A       You're making a discrimination claim that

3   somehow 309 has been treated unfairly.  Okay.  And I'm

4   saying that that's -- that that can't be supported by

5   the facts.  It's not been treated unfairly.

6        Q       Do you have -- have you reviewed any

7   evidence in this case that suggests that voters in

8   other precincts of Waller County have requested more

9   early voting opportunities particularly around the

10  November 2018 election?

11       A       We have their early voting turnout records.

12       Q       So the only evidence that you have in

13  support of that other precincts in Waller County

14  requested specifically to the Commissioner's Court more

15  early voting was turnout results?

16       A       We have early voting patterns and for those

17  locations.  They're on the voter file.

18       Q       Could demand for early voting also come

19  from people articulating at Commissioner's Court's

20  meetings or to Ms. Eason that they want and desire more

21  early voting?

22               MR. SEAQUIST:  Form.

23               THE WITNESS:  The nice thing about actually

24  looking at the past results, okay, is that you actually

25  get a sense for the demand among a substantial number,

1    right, a substantial number, a large number, you know,

2    of voters.  Okay.  You know, I think it does matter.

3    People's participation in the Commissioner's Court

4    meetings makes a difference.  I think it does matter,

5    but, you know, three or four people showing up, you

6    know, and demanding something is not necessarily the

7    best indication of demand.  It's one indicator and I

8    think that participation, you know, does matter and,

9    you know, it's important that people show up and that's

10   why the meetings are public.

11   BY MS. ADEN:

12       Q      And it's your position in this case that

13   only three or four people showed up to Commissioner's

14   Court's meetings to ask for more early voting around

15   the November 2018 election?

16       A      I didn't look at the minutes, you know, to

17   specifically see what attendance was at the meetings,

18   but I think that, you know, there are variety of

19   indicators, you know, of demand.  I think the best one

20   is the one that shows very -- the previous years as a

21   guide to the future interest, that previous years is a

22   guide to the future interest in early voting.

23       Q      And -- but you concede that you reviewed

24   the reports of Dr. Flores and Dr. Joseph, that's

25   correct?

128

1        A       I don't know if I concede that.  I think I
2    admitted that I reviewed them.  I don't consider that a
3    concession.  I thought they were interesting.
4        Q       Would you agree that those reports reported
5    on what happened, who spoke at not only the October
6    Commissioner's Court meetings in advance, but previous
7    Commissioner's Court's meetings and previous demands
8    for early voting in Waller County?
9                MR. SEAQUIST:  Form.
10               THE WITNESS:  I recall there was
11   discussion of -- now that you mention it, I recall
12   there was a discussion of that in the Joseph report and
13   in the Flores report.  I do recall there being a
14   discussion of that.
15   BY MS. ADEN:
16       Q       Do you have any reason to dispute that in
17   2018 precinct 309 had the highest number of early votes
18   cast of all 20 precincts of Waller County?
19       A       I don't.  I don't have reason to dispute
20   that fact right now.  What I have reason to dispute and
21   this should be clear from what I said about 20 minutes
22   ago is that it would not have been easy for anyone no
23   matter how much foresight they had to anticipate what
24   happened in 2018 with the incredible increase in
25   turnout and surge that we saw there.  Okay.

129

1          And so there is a context in which these
2  administrative decisions are made.  Okay.  And, you
3  know, they don't have perfect foresight.  They don't
4  have perfect information.  They're making these
5  administrative decisions faced with a lot of
6  uncertainty.  I don't know.  I haven't talked to any of
7  the Commissioner's Court members, but, you know, maybe
8  in retrospect looking back, they'd say, you know, there
9  are a number of places we should have changed the
10  hours.
11          I don't know the answer to that, you know,
12  but you don't have the luxury -- what I'm trying to say
13  is you don't have the luxury of knowing what future
14  demand is.  You only have the limited information of
15  what's happened in the past, right, and the past does
16  tend to be pretty sticky.
17          Look, how -- I guess I need to do this
18  analysis next.  How many -- over the last 30 years, how
19  many hotly contested statewide elections have we seen
20  in the State of Texas of the kind that we saw with Cruz
21  versus O'Rourke?  How many over the last 30 years hotly
22  contested statewide elections have we seen like that?
23  I don't think you'll see very many.
24          Most of the elections in Texas, statewide
25  elections recently have been pretty one-sided affairs.

130

1    So, you know, what do you want these people to do, look

2    into a crystal ball and be able to perfectly see the

3    future and, you know, what turnout is going to be?  It

4    seems just really burdensome and unreasonable.

5    BY MS. ADEN:

6         Q     If you don't have any reason to dispute

7    that figure about 2018 and the precincts cast at 309,

8    would that be a basis for reflecting that there's a

9    demand in precinct 309 for early voting?

10        A     I think so.  Look, going forward, what are

11   we going to see in 2020?  I suspect, you know, that

12   this will be taken down, you know, that this will be

13   something that is noted, right, and, you know, we'll

14   see, but I think that we need to look at this, you

15   know, again in 2020 and see what decisions are made.

16             MR. SEAQUIST:  Counsel, we've been going a

17   little over an hour since our last break.  Can I ask

18   for a break when we get to it?

19             MS. ADEN:  Yes.  I'll be in a stopping

20   point in a second.

21             MR. SEAQUIST:  Okay.

22   BY MS. ADEN:

23        Q     In 2016, do you have any reason to dispute

24   that precinct 309 was the fourth highest out of all 20

25   precincts to cast early voting votes?

131

1      A      Yes.  I'd like to look at the others,

2   right.  You know, I'd like to look at all 20 of them,

3   right, and see, you know, what those figures look like.

4   So --

5      Q      If in 2016 and then in 2018 precinct 309

6   performed in terms of early voting which you have

7   conceded seems to be the case or you have no basis to

8   dispute that those -- that that precinct performed in

9   2016 and 2018 in terms of casting early voting, do you

10  have any basis to dispute that?

11              MR. SEAQUIST:  Form.

12              THE WITNESS:  Like I said, at this point, I

13  sort of reserve the right to change my view, you know,

14  but I'd need to look at the figures.

15  BY MS. ADEN:

16     Q      But if you have no basis to dispute that at

17  this time, do you think there's anything -- strike

18  that.

19              If you have no basis to dispute those --

20  that data point from 2016 and 2018, nothing about that

21  suggests that there's demand for early vote in precinct

22  309?

23              MR. SEAQUIST:  Form.

24              THE WITNESS:  As I said, I think that

25  there's -- that that's a relevant consideration.  I've

132

1    suggested that demand as measured by the early voting

2    use and turnout, you know, is a gauge.  I suspect,

3    right, that there is probably some inclination to see

4    if this is a real trend or aberration, right, and we

5    don't know exactly what 2014 looked like with respect

6    to this.  It would certainly add weight to have, you

7    know -- this kind of evidence, you know, would add

8    weight to the case for it.

9    BY MS. ADEN:

10        Q       Sorry to interrupt you.  You surveyed

11   between the 1990s and the present where early voting

12   was sited in Waller County in your report, correct?

13        A       Yes.  This was with the help of the Waller

14   County officials that kind of helped me kind of pull

15   this information together.  That's in the middle part

16   of the report.

17        Q       Ms. Eason in particular?

18        A       Yes.  She had a couple of staff.

19        Q       So you're aware then that before 2016,

20   there was no early voting at precinct 309 -- strike

21   that.

22                You're aware that there was no early voting

23   at the memorial student center before 2016?

24        A       So, yeah, I guess that's right.  It was

25   located in other -- it was located in other areas --

133

1        Q       So --

2        A       -- other places.

3        Q       So you have no basis to dispute that in

4    November 2016 or prior to November 2016 the Waller

5    County Commissioner's Court had the capacity to look at

6    the 2016 early voting use on -- at the memorial student

7    center at Prairie View; is that correct?

8                MR. SEAQUIST:  Object to the form.

9                THE WITNESS:  That's something they could

10   have looked at.

11   BY MS. ADEN:

12       Q       In 2018, they had the capacity based upon

13   the data of 2018, they had the capacity to consider

14   what happened in 2016 and 2018 as they look to placing

15   early voting sites in future elections; is that

16   correct?

17       A       I think they have that.  That's something

18   that would be a consideration certainly for me if I

19   were making the decision.

20       Q       You testified about turnout.  Are you

21   suggesting that turnout caused problems at early voting

22   sites in the November 2018 election?

23       A       I don't think so.  I don't think I

24   suggested that.

25       Q       If not, why then is turnout an issue here?

134

1      A      Well, I think turnout is important because,

2   again, it goes back to the issue of whether the degree

3   of inconvenience is something that should be factored

4   in.  I mean, if people are voting at very high rates,

5   you know, then it suggests to me that the impediments

6   are weak at best, that the impediments are -- the

7   impediments argument or the inconvenience argument is

8   pretty weak.

9              People are highly motivated.  Back to

10  convenience and motivation is how far are we going to

11  go on these convenience reforms, right, before we learn

12  what the limitations are.  Are we going to actually,

13  for instance, go around and canvas people and solicit

14  their votes door to door?  That doesn't even require a

15  stamp or a walk to the post box to drop your ballot in.

16             So we go around and canvas people in their

17  votes and somehow record them on some kind of app to

18  take the convenience issues out of it.  And the sad

19  thing is do that and you're going to learn there's

20  still people who don't have an interest, right, and are

21  not motivated to vote, right.  So how about this?  How

22  about actually paying people?  You know, that would --

23  you know, might motivate them.

24             But I guess what I'm saying is, you know,

25  these convenience measures can go further and further

135

1    and further, but as Adam Berinsky has shown in his

2    research and the field largely agrees the convenience

3    arguments are limited because the main reason for

4    nonparticipation is motivation.  It's not

5    inconvenience, right.  And so, you know, you see how

6    turnout in some of these locations and, you know, kind

7    of undercuts this notion that, you know, inconvenience

8    an issue.

9         Q     I think we'll turn to motivation after the

10   break, but I wanted to ask one final question which is

11   assuming turnout matters and I'm not conceding that it

12   necessarily does, doesn't the trend suggest a rising

13   turnout in precinct 309?

14              MR. SEAQUIST:  Form.

15              THE WITNESS:  I'm not --

16   BY MS. ADEN:

17        Q     Please answer yes or no and tell me the

18   expansion if possible.

19        A     No, I'm not sure there's a trend there yet.

20   That's my question.  I'm not sure that we can see a

21   trend.  I definitely -- I do agree that '16 and '18 are

22   relevant considerations, '14 not so good, but -- you

23   know, but I think, you know, it's -- you know, that

24   that -- so the answer is no, I'm not sure that a trend

25   has appeared.

**James Gimpel, Ph.D. - December 12, 2019**

136

1          You know, we have to see just how

2     idiosyncratic 2018 was and it would be a shame to

3     discover, right, that 2018 turned out to be a very

4     strange aberration, okay, and that 2020 drops back to

5     really low levels or 2022, you know, conventionally low

6     levels and these places have gone largely unutilized

7     while there are other places in the county that have

8     gotten none.

9          Q     But 2014, there was no voting at the

10    memorial student center; is that correct?  2014.

11         A     I'm not sure what I -- okay.  So that's the

12    election day.  Early voting locations were at the

13    alumni building and at the Episcopal Church.

14         Q     Not at the memorial student center?

15         A     Right.

16         Q     And the field of social science that would

17    be accepted by your peers, what would constitute a

18    trend?

19         A     Well, that's a good question.  There are

20    probably some people within the field that would

21    quarrel with me about, you know, the two elections

22    being a trend, but, you know, maybe three, five.  You

23    know, here's the issue.  We have off year elections and

24    we have on year elections.  And what I mean by that is

25    we have elections that are high stimulus on a

137

1  presidential year and then typically low stimulus

2  elections on the off year.

3          So if we got to another midterm, okay, and

4  saw, you know, the kind of record busting turnout, you

5  know, that we saw with the O'Rourke, Cruz race, that

6  would definitely be something to take notice of.  My

7  prediction would be that if that's the kind of turnout

8  we're looking at as a kind of new norm for Texas, then

9  probably a lot of election administrators will be

10  looking to expand voting in a lot of locations.

11          I mean, in other words, across the board,

12  there will be a reassessment, right, of opportunities

13  to vote and the burden is placed on particular

14  locations.  And the evenness, you know, if there's

15  another midterm that breaks all records in the way the

16  2018 did, that strikes me as pretty noteworthy.

17      Q      And next year is a 2020 presidential

18  election.  Would you consider that a high stimulus

19  election?

20      A      That's a high stimulus election, so we can

21  expect turnout to be pretty high.  If you can look at

22  the differences in the -- in figure one, you know, we

23  could expect it to be up in the 50s again.

24      Q      And high for precinct 309?

25          MR. SEAQUIST:  Form.

1           THE WITNESS:  I would suspect so.  That's

2    next in here.

3    BY MS. ADEN:

4        Q      So finally you agree that the only two

5    November elections conducted with early voting on

6    campus at precinct 309 show high demand for early

7    voting?

8        A      I didn't look at the numbers.  I took your

9    word for it.

10       Q      Assuming those numbers are correct, you can

11   agree that --

12       A      They seem to show high demand for early

13   voting.

14              MS. ADEN:  I think we can take a break.

15              (There was a brief recess taken.)

16   BY MS. ADEN:

17       Q      Based on the conversation that we were

18   having before the break about the use of rates of early

19   voting by precinct 309 which encompasses Prairie View's

20   campus, would you still stand by the position that

21   those voters are highly motivated voters in Waller

22   County?

23       A      I think that it's fair to judge the Prairie

24   View students in the same way that college students and

25   young people and much of the rest of the country are

1    judged and that is of being marginal attentiveness and

2    motivation.  The fact that there was a surge in turnout

3    in 2018, unusually high surge in turnout in 2018 does

4    not mean that somehow this population has changed.

5              You know, there is a body of social

6    scientific evidence about young voters and that is they

7    tend to be lower in interest and lower in turnout

8    partly because they haven't established the habit of

9    voting at their young age.  And, of course, a lot of

10   them aren't even registered to vote in the first place.

11             In addition, there's some other things that

12   burden the turnout of people, you know, in the 18 to

13   even 29 age bracket.  And one of them is their high

14   mobility.  You're getting your career started and

15   you're changing addresses a lot.  Sometimes that will

16   tax registration and turnout for, you know, much of

17   that population unless the motivation is there, you

18   know, to overcome the challenges that, you know, come

19   with, you know, changing addresses and having to

20   reregister and moving around.

21             So, you know, I think there are very good

22   reasons actually for suspecting that the future in that

23   precinct will look like most of the past and that, you

24   know, look more like, you know, maybe the turnout level

25   that we see in 2014 and 2010 and 2006 and 2002 as

140

1   opposed to this very unusually high turnout level we

2   saw in 2018.

3        Q      And 2016?

4        A      Well, I have --

5        Q      Not turnout.  By rate of usage, rate of

6   usage, so assuming my definition of rate of usage in

7   2016 and 2018.

8        A      Of early voting, okay.  Yeah, it wasn't --

9   2016, it was actually compared to other presidential

10  elections recently.  Turnout was not especially high

11  overall.

12       Q      So not looking at turnout, but looking at

13  rate of usage which is a different measure, right, so

14  when you're talking about turnout, you're looking at --

15  let's just be clear you're looking at the amount of

16  registered voters who cast a ballot?

17       A      Yes.

18       Q      Whether it be early voting or on election

19  day?

20       A      Yes.

21       Q      And when I'm talking about use of early

22  voting, I'm talking about the rate of votes cast during

23  that period, time period and --

24       A      I get that.

25       Q      And based upon my definition of the usage

1    of early voting and your acknowledgments at least that

2    you don't have data to dispute what occurred in 2016

3    and 2018, I guess my question to you is based upon my

4    definition on the use of early voting, would you

5    therefore say that Prairie View students are not

6    motivated voters?

7        A        They were certainly motivated in 2018

8    and -- and voted in impressively high numbers compared

9    to past midterms.  I mean, this is patently clear in my

10   own data.  So they managed interestingly enough, you

11   know, to, you know, overcome, you know, whatever issues

12   of inconvenience might have been present there.

13          But it seems to suggest that if you do have

14   a hotly contested election and the parties really are

15   involved in mobilizing people in every corner of the

16   state, but that is really the best way to overcome

17   these turnout deficits.

18          You know, it's not so much by manipulating

19   hours or polling places or anything of that sort that,

20   you know, the story of 2018, you know -- and even

21   Professor Stein admits that people got out and voted in

22   high numbers.  The story of 2018 seems to suggest to me

23   that, you know, motivation totally trumps convenience,

24   you know, and we had a lot of people who were very

25   motivated in 2018 in Waller County and other places in

142

1   Texas because all kinds of records for midterm

2   elections were shattered.  So you have regularly

3   contested elections.  You nominate someone who is a

4   real contender and it's going to make a difference to

5   getting people out to vote.

6        Q      Is it possible for someone to be harmed in

7   voting but still overcome the harm and vote in your

8   opinion?

9        A      I don't know.

10       Q      Is there research on that point, do you

11  know?

12       A      I don't know.

13       Q      Is it possible for someone to be negatively

14  impacted in voting but not outwardly denied the right

15  to vote?

16       A      Well, so I suppose that it has to be true

17  that some people, you know, are required to make more

18  effort than others that that must be the case.  You

19  know, we know, for instance, that people have different

20  work a day schedules and some are long distance

21  commuters and have to drive into Houston and others are

22  working right near where they live.

23             So election day turnout for the long

24  distance commuter has to be more of an effort than for

25  the person who can bike to work talking about bicycles.

143

1   So it must be the case that some people are required to
2   make more effort that that is -- seems obvious to me.
3       Q     Is it possible for Waller County to impact
4   black voters without totally denying them early voting?
5              MR. SEAQUIST:  Form.
6              THE WITNESS:  Well, I don't know.
7   BY MS. ADEN:
8       Q     Is it possible for Waller County to harm
9   black student voters without totally denying them early
10  voting?
11      A     I don't know the answer to that either.
12      Q     Is it possible for Waller County to harm
13  black student voters without totally denying them early
14  voting on Prairie View's campus?
15      A     Again, some of this seems to wander from
16  the scope of my report, but I guess what I would say is
17  that it's reasonable for county officials in Waller
18  County or anywhere else to expect voters to make some
19  effort to cast their vote.
20             We again haven't gone to the point where
21  we've extended the convenience argument to the point
22  where we're actually hiring people like we do in the
23  U.S. Census to go door to door with an app to record
24  people's vote so they don't have to leave their house.
25  So we haven't gotten to that point.  So, you know, it

144

1    seems obvious to me that administrative officials

2    nationwide have a reasonable expectation that voters

3    make some effort.

4         Q      I just want to close the loop on something

5    that we started talking about and I think you answered

6    this question in different pieces, but I just want to

7    be clear for the record.  We went through your report

8    and I pointed out different subheadings within your

9    report and you talked to me a little bit about what

10   questions you were seeking to answer.  And a few of

11   them I think you told me how you went about answering

12   the question, but I just want to be clear and maybe you

13   can do it very briefly and just describe what

14   analytical --

15        A      I apologize.  I have not excelled at that.

16        Q      I'm a talker too.  But what analytical

17   model you used to answer the questions that you sought

18   to address in your report.

19        A      I don't exactly know what you mean by

20   analytical model.

21        Q      Can I do something differently which is

22   when -- on page 2, you were talking about motivation

23   and convenience.  I think you referenced looking at the

24   history of literature.  Is that -- looking at the

25   literature and applying it to the facts that you

1    thought were present, is that how you went about trying

2    to answer this question about motivation and

3    convenience?

4         A      Well, sure, that was a large part of it.

5    There is a literature about convenience and motivation

6    and that's very germane to these discussions since

7    we're talking about convenience reforms.

8         Q      And then on page 9 and 14 where you're

9    talking about proximity in different respects, how did

10   you test that?  How did you go about --

11        A      So in the flash drive that I have that I

12   need to be reminded to give you, there are files that

13   contain information about which voters live within a

14   quarter mile, half mile, and one mile radius of each of

15   the election day and early voting sites.  And there is

16   the designation of voters that live outside those

17   ranges.

18             So these tables in this section of the

19   reports that you just referenced like pages 15 and 16

20   and so forth simply reflect the percentage of voters

21   that turn out to vote, either turn out at all or turn

22   out in early voting according to the distance from the

23   site.

24        Q      In those intervals?

25        A      Yes.  So there are files that should

146

1    indicate that.

2        Q       And then looking at the -- is that true of

3    also 14 or similar?  That's just what you were

4    describing?

5        A       Yes.

6        Q       On page 20 when you're looking at Waller

7    County alongside other communities, how are you -- what

8    is your test for that?  What is your model of testing

9    that?

10       A       This was very much in the dirt kind of

11   research in the sense that you can't do 30,000 feet.

12   You've got to actually call up these places and get the

13   information from them.  So one of -- first of all --

14   and there are files on this too.  First of all, I found

15   the list -- I think Mr. Flores indicates this.  I found

16   the list of the universities in Texas and where they

17   were located and found the counties that were, you

18   know, roughly similar size range of Waller and the

19   counties that also had universities plus a couple of

20   others that I wanted to check out like the one in

21   Marshall, for instance.  And I think I even have some

22   information about Grambling State in Louisiana.

23              But the goal here, you know, was simply to

24   go county by county and, you know, look at the polling

25   sites for 2018 and, you know, exactly place them.  And

147

1   largely what I did here talking about being in the

2   weeds is use Google maps to look at these particular

3   counties and where these polling places were, how close

4   they were and so forth.

5              So, you know, this was very tedious, you

6   know, kind of like I said down in the dirt kind of

7   research going case-by-case and it would have been time

8   permitting useful to do other locations too, all the

9   HBCUs.  Why not?  Let's look at all the HBCUs that was

10  on the list, not something that was practically

11  manageable given the time limits.

12      Q      On the placement and movement of sites in

13  the Waller County across time on page 28, is it fair to

14  say that that was -- your analysis was tested by

15  talking to Ms. Eason and recounting placement --

16      A      What I had to do is I -- I was not really

17  in a position to access their archives because, you

18  know, even though the counties made great strides in

19  its technical sophistication, the truth is that you go

20  back in most counties in Texas very far and you're

21  talking about paper records, right, in boxes.  And

22  these could be, you know, stored in kind of obscure

23  places, out of the way places.

24             So I wasn't in a position to look through

25  that myself.  I had to rely on them to report to me on

148

1   these placements.  And as I said, I think there's an

2   Excel file, substantial Excel file that was sent in

3   connection with these reports that details the results

4   of that research.

5        Q     And then on 32 with the allocation of early

6   voting sites based on demand, you talked about the GIS

7   work that you did?

8        A     Yes.

9        Q     Is that more or less --

10       A     This is a GIS, yes, location allocation

11  model that's used.  And, again, these models are used

12  to site a wide range of public facilities.  It's not

13  just something that you would use only for precinct

14  polling sites, but it's commonly used for emergency

15  medical service, for instance, and police and so forth.

16       Q     And then the last section page 40, do hours

17  of early voting influence turnout, how was your test

18  for this?

19       A     These are -- this is regression analysis,

20  regression analysis, linear regression in the case of

21  the scattered plots and just straightforward multiple

22  linear aggression for table 7, table 8.  This is going

23  to be maybe unfamiliar as a research tool in the legal

24  community, but in social science research, it's a

25  pretty common tool that's widely recognized and used.

**James Gimpel, Ph.D. - December 12, 2019**

1    Q       Did you base the various tests that you

2    just identified on one of the plaintiffs' expert's

3    reports in particular, one or more?

4    A       I would say not.  As I told you probably

5    more than an hour ago, I think my emphasis was more on

6    Professor Stein and Professor Flores and less on Joseph

7    and Cooper, but I'm not sure I can give you

8    particularly good reason for that.  Just seemed like

9    those reports were within -- I think I told you,

10   testified earlier in the day that the issues raised in

11   those reports seemed within the scope of my expertise

12   to respond to.  And, you know, I'm not like a historian

13   of race.  So me going back and having something to say

14   about Waller County in the 1950s, it's just not my

15   area.

16   Q       But you talked about Waller County in the

17   1990s?

18   A       Yes, that's a little more recent, but I

19   just -- I didn't have any resources to be able to study

20   what happened to Waller County or with Waller County,

21   you know, in these previous time periods which I think

22   everyone acknowledges were troubled, right.  Even the

23   Commissioner's Court, Mr. Duhon, you know, admits that,

24   you know, there's historical legacy that no one is

25   proud of.  And I think Mr. Joseph made quite a bit of

150

1  this.

2       Q     And you're not a historian, a trained

3  historian?

4       A     No.  I mean, like archival records in

5  Waller County, I'd probably need to be in Texas at the

6  very least, so --

7       Q     And did you -- with respect to Stein and

8  Flores in particular, were there -- did you go about

9  testing any of their analyses and coming up with

10 different results?  Did you set about doing that?

11            MR. SEAQUIST:  Form.

12            THE WITNESS:  Well, you know, I think the

13 whole question about hours is directly tested in the

14 back of the report that the hours across locations

15 don't seem to influence turnout and so I think that

16 that certainly goes to the argument about hours.

17 BY MS. ADEN:

18      Q     Hours in --

19      A     Differences in hours.

20      Q     Let's talk to you about your findings on

21 page 48 if you can flip to that.  It says that on the

22 first sentence of that page under summary of

23 conclusions and summary, this report has used data and

24 evidence to show that Waller County's recent decisions

25 about to allocate early voting sites and how many hours

1   to devote them have not been unfair to the Prairie View

2   community in precincts 309 and 310 or in any way

3   abridged the rights of those voters to participate in

4   the political process.

5               Is that one of your findings?

6       A     Yes.  And I think that the 2018 election

7   and the extraordinarily high turnout suggests that

8   there is motivation to vote from the stimulus of a

9   competitive race.  You know, turnout is going to be

10  really high.  People are going to be exercising their

11  right to vote.

12              You know, the previous elections where, you

13  know, turnout doesn't look anything like 2018 suggests

14  to me that, you know, the interest was just really low

15  because it's not like the differences in the

16  convenience factors were that great.  So, you know, if

17  people are interested and stimulated by a close

18  election, they're going to get out to vote in 309 and

19  they did and good for them.

20      Q     So to be clear, your position is that

21  Prairie View students voting has fluctuated or been as

22  high as it was in 2018 not due to early voting

23  allocation but because of the type of elections, the

24  candidates that were on the ballot?

25      A     I think that has a lot to do with it.  I

1  think that there's certain resources that and interest

2  that people bring to the political process, right, but,

3  you know, there's also the stimulus of particularly

4  engaging an effective campaign and we know, for

5  instance, that in statewide elections in Texas, the

6  campaigns have often been one sided.  And typically in

7  recent years, they've been one sided in the Republican

8  direction.

9            And so what's remarkable and impressive

10  about 2018 is that we had a very well financed, well

11  funded incredible Democratic candidate nominated who

12  wound up mobilizing unbelievable numbers of people

13  compared to the past.  It's a remarkable feat and he

14  came within a very close range of taking out the

15  incumbent.  It was only a couple of percentage points.

16            It was a very impressive showing and, you

17  know, there's a reason why people -- I guess each

18  presidential campaign hasn't gone so well and there's a

19  reason why people are talking about Beto O'Rourke as

20  having a future.  I think he does have a future.

21      Q      Do Prairie View students only vote for

22  candidates who belong to the Democratic party?

23      A      I think that the evidence from, you know,

24  surveys of African-Americans both in Texas and

25  elsewhere suggest a pretty heavy Democratic leaning,

153

1    not exclusively, though.  I wouldn't say that it's

2    entirely one sided, but it is -- all of our evidence

3    suggests that it's, you know, like 85/15, 90/10.  It's

4    pretty one sided.

5        Q        But you didn't test that with respect to

6    Prairie View student --

7        A        I don't actually have a survey of the

8    Prairie View students and there are specific political

9    preferences and, of course, who you voted for is not

10   revealed on the voter file.

11       Q        And you saw the expert reports of Dr.

12   Flores in particular who recounted testimony by some

13   Prairie View students and other community members

14   saying they were not affiliated with any of the major

15   political parties.  Do you recall seeing that?

16       A        Right.  Like on most college campuses,

17   there's significant independent and third-party

18   presence.

19       Q        That's commonly known?

20       A        I think among young people, there's an

21   attraction to third parties and to independent

22   candidates again in part because their preferences have

23   not been fully and completely formed.  You know,

24   it's -- the political socialization is looked at as a

25   developmental process through adolescence, early

154

1  adulthood.

2          And so I guess human development is kind of

3  a subfield of psychology.  And this is where political

4  scientists borrow their understanding of political

5  socialization.  The idea is that as you move through

6  adolescence and/or adulthood, you form up and

7  crystalize clear opinions as you go.

8     Q     The next sentence on page 48 reads:  "It is

9  questionable from examining turnout in 2018 that living

10  close to a polling place or to an early voting site is

11  especially relevant to participation in the first

12  place."

13          Is that another of your findings?

14     A     Yes.  And that's particularly germane to --

15  I was a little surprised.  You know, I thought that,

16  you know, maybe it'd at least be even, but the actual

17  data show that the people living close vote less than

18  the people living further away.  And we could probe for

19  why that is, but at least what it shows as a minimum is

20  that, you know, there hasn't been a positive

21  association between distance and turnout.

22     Q     And is another one of your findings that

23  there's some evidence that those living further away

24  from an early voting site are more likely to vote early

25  suggesting that these votes may be especially

155

1    appreciative of the convenience of casting a ballot on

2    a day other than election day?

3        A       I think that that's right.  There is a

4    table in there that suggests that the turnout in early

5    voting was higher among those who live further away.

6        Q       And then do you also conclude that there is

7    no basis or find -- strike that.

8              Do you also find that there is no basis to

9    conclude that the distance faced by voters in Prairie

10   View are more burdensome than those faced by the

11   majority of other voters in Waller County?

12       A       I gather that that's true that the

13   distances are not greater, that there is a

14   concentration of sites and locations in the couple of

15   precincts there in Prairie View that actually make the

16   voting sites pretty accessible to the population.

17       Q       And is another one of your findings that

18   the students at Prairie View A&M are almost unique

19   among Waller County voters in the fact that they have

20   early and election day polling places very close to the

21   campus where they spend a significant part of their

22   time?

23       A       Yes, that's true.  That's what I concluded.

24       Q       And is another one of your findings in that

25   next paragraph that Waller County is unique among Texas

156

1    counties of its size in providing a polling place on a

2    college campus?

3         A      Almost unique.  I did indicate, right, that

4    my research found that, you know, in Marshall, Texas,

5    there is a polling place on the campus of Wiley I

6    believe it is which is an HBCU, but, you know, I would

7    say it's almost unique.

8         Q      So you're qualifying that statement to say

9    almost unique and not unique?

10        A      Yes.

11        Q      And then there is another sentence.  Is it

12   also your position, and this is a finding I think that

13   runs between page 48 and 49, that officials allocate

14   sites based on historical tradition, familiarity, and

15   demand?

16        A      That's what they have to go on, yes.  It's

17   what they have to go on.  They have to use what's in

18   front of them, you know, and what's in front of them

19   is, you know, the past practice as well as the -- you

20   know, these practices can change as the demand

21   fluctuates.  I think that's clear.

22        Q      And almost finally would you agree that one

23   of your findings on page 49 is that there was no

24   discrimination against the, quote, Prairie View area?

25        A      I would say I didn't find any

157

1    discrimination in the placement of the polling sites

2    there.

3        Q       And it's your finding that some sites have

4    more early voting and some have less in Waller County?

5        A       Yes.  Yes, that's true.

6        Q       And it's your position that the county has

7    to consider, quote, everyone?

8        A       I think the county needs to consider

9    everyone.  I believe that they think of it that way,

10   right.  I mean, in some ways, it doesn't matter too

11   much what I think.  As administrators of elections,

12   they think of their obligation as to the entire county.

13       Q       How do you know that?

14       A       Well, just based on my understanding, past

15   understanding of election administration.

16       Q       But you didn't review any Commissioner's

17   Court's meeting minutes is my understanding?

18       A       I might have looked at the minutes, but I

19   don't have something that I can point to at hand.

20       Q       You don't have a policy that says that

21   Waller County officials have to consider everyone

22   necessarily?

23       A       I don't have something I can point to in

24   hand on that, no.

25       Q       And one of your other findings is that

158

1    there's no evidence that early voting has an impact on
2    turnout; is that correct?
3         A       This is again a disappointment to a lot of
4    the early voting proponents and reformers along these
5    lines, but, yes, that is the case in more places than
6    Waller County that what is happening in Waller County
7    and many other locations is that early voting is simply
8    making voters who would have turned out on election day
9    cast their votes early.
10             So there's no real augmentation and turnout
11   in the end.  It's just kind of a redistribution of
12   election day voters to the early voting period, but no
13   net increase and that's -- it's -- again, it comes back
14   to the, you know, the limits of convenience.
15             You know, you have to get people out by
16   motivating them with a stimulating campaign or some
17   aggressive outreach and just simply making the act more
18   convenient is going to be very limited.
19        Q       And that finding on turnout again is based
20   on your definition of turnout as measured by the amount
21   or percentage of votes actually cast?
22        A       Yes.
23        Q       Not how they are used whether through early
24   voting or through election day?
25        A       Right.

159

1      Q      And that's also true regardless of whether
2  people vote by absentee ballot or by some other means
3  besides election day or early voting?
4             MR. SEAQUIST:  Form.
5             THE WITNESS:  Yes.  I didn't address
6  particularly the use of absentee votes in the report,
7  but it would -- that particular reform has been very
8  limited in its capacity to elevate turnout.
9  BY MS. ADEN:
10     Q      Do you know what a cross sectional analysis
11  is?
12     A      Yes.
13     Q      What is it?
14     A      So you have a single point in time, you
15  know, where you're looking at a cross section of
16  voters.  So the variation is across say your units of
17  analysis.  Could be voters.  I guess that's what we're
18  talking about here, but they're at one point in time in
19  a particular election.
20     Q      So you're looking at one voter and how they
21  experience voting at a --
22     A      That's a group of voters at one particular
23  time, you know, on one particular election.
24     Q      Okay.  We talked before that there are many
25  reasons why a group of voters may vote at one

160

1    particular time, is that correct, many reasons?

2         A       Yeah, that's true.

3         Q       More than ten reasons?

4         A       I'm not sure.  But, again, there's a

5    political science literature on political

6    participation.  It goes back quite some distance, but,

7    yes, I would maybe say there's many -- ten reasons out

8    there.

9         Q       Do you know what a time series panel study

10   is?

11        A       Yes.

12        Q       What is it?

13        A       So that's where you would have your units

14   of analysis across, you know, multiple periods of time.

15   So instead of just having a single cross section of

16   voters, you would have multiple cross sections of

17   voters, but the panel component requires that you also

18   look at the very same people.  So that's an additional

19   requirement for the panel study in particular.  You

20   can't just look at, for instance, Waller County in

21   2014, '16, '18, '20, '22, '24.  You would have to look

22   at the very same Waller County voters across each of

23   those individual election years.

24        Q       Would you agree that this method, this time

25   series panel study would have allowed you to measure

161

1    whether any changes over time to early voting in Waller

2    County, that is whether it increased, decreased, stayed

3    the same, how that impacted turnout under your

4    definition of turnout?

5         A       Yes.  These are important designs and they

6    may not be especially practical under the circumstances

7    of time and resources, but these are -- these would be

8    very useful tools to deploy.

9         Q       And you did not deploy that analysis here?

10        A       There's no panel study.  Once again, this

11   was something that probably any social scientist would

12   consider, but, you know, you have to judge what it is

13   you can accomplish in the amount of time that you're

14   given.  So you can't do everything.

15        Q       So is this like the Maine ranked-choice

16   voting case where you were given a little amount of

17   time to --

18        A       Better than that.  We had a little more

19   leeway than, you know, than two-and-a-half weeks.  And

20   the other thing, of course, is that -- about this case

21   is that this subject matter is a little more

22   conventional in the sense that it comes up more often

23   and it's subject to a much greater study, you know,

24   when you get into something like ranked-choice voting

25   while there's very little to go on.

162

1    Q      It's new.  It's an emerging practice.  And
2    I appreciate that you recognize the limitations of the
3    time series panel study.  I guess my question about
4    that is that even though there's limitations to that
5    study which those in your field use, would you agree
6    there's a way to account for the fact that students,
7    for example, graduate over time, right?  So you can
8    only follow one student for ostensibly four years
9    assuming they're in college for four years, but is
10   there a way that those in your field might address
11   that?  So, for example, imputing someone in for someone
12   who has graduated out in order to try to model what
13   their behavior might be over time?
14       A      Well, I'm not sure about imputation, but I
15   think what I would do is I would try to track them, and
16   this is getting easier to do, track them as they
17   relocate.  It's possible now to find people who have
18   relocated from one location to another.  Of course,
19   they have to reregister.
20              But when you see someone who leaves Prairie
21   View and goes back to Houston or goes back to go
22   wherever they're from, east Texas, it's possible to
23   follow them up by finding them at their new location,
24   okay, and, you know, looking at their voting record and
25   seeing, for instance, what their, you know, vote habits

163

1    are in the new location.

2              So, you know, this is becoming possible.

3    One thing that secretaries of state and state boards of

4    elections are doing is including a ID code that will

5    travel with the voter when they move which is

6    incredibly helpful because that will facilitate a

7    match.  If they move from Prairie View to Tyler, we can

8    find them there because they're coded with the same ID

9    code.

10             Short of that, what we can do is match them

11   by first name, last name and month, day and year of

12   birth because even though there might be lots of Jayla

13   Allens out there, there probably aren't many Jayla

14   Allens who are born May 8, 2003, or May 8, 1998.  And

15   so even if we don't have an ID code, if we have a first

16   and last name and a birthday, we can find her providing

17   that she reregisters.

18       Q     That would answer a different question than

19   how that particular voter responded to changes in a

20   particular jurisdiction and the choices that particular

21   jurisdiction made in terms of providing early voting?

22       A     Yes.  That's tough.  I hear you on the

23   term, right.  I know there's churn in any college age

24   population for the reasons we mentioned, getting their

25   careers off the ground and moving around.  It's -- it's

164

1    very difficult to study that over time.

2        Q       And similarly -- and now I'm trying to

3    connect a lot of pieces that we talked about today and

4    maybe that will move us along.  In your report, you do

5    walk through what you learn from Ms. Eason and about

6    how the choices at Waller County has made in terms of

7    early voting between the nineties and the present.

8    That's what we've discussed today.

9            And you've reported that it hasn't changed

10   much.  Is that a fair assessment?

11       A       I don't think it has.  There's a lot of

12   continuity in where the sites are located and the

13   tendency to try to find suitable locations in proximity

14   to the campus.  If not right on the campus -- even the

15   ones that are located off campus like the church, for

16   instance, I've looked at where that is.  I even did

17   some research on where the -- one of the sites was torn

18   down.  And I did some research on just where that was

19   located.  And it was off campus, but about half a

20   block.

21           And so the county authorities I can see are

22   being mindful of the available sites in the Prairie

23   View area and placing those sites within pretty close

24   proximity to the campus.  And as I said, it was

25   very common to me as -- sorry.  I'm getting tired, but

165

1    it was very commonly the case that when I looked at the

2    other counties, the nearest site was often a couple of

3    blocks or a quarter of mile or, you know, a couple of

4    thousand feet from the border of campus whether it's

5    the south border, the east border, the north border

6    kind of thing.

7              So based on that, it would seem reasonable

8    for Waller County officials to choose something like

9    the church or a couple of these other sites.  One was

10   the alumni center.  The alumni center is still there or

11   this site that has since been turned into something

12   else.

13        Q    Is that the Waller County community center

14   that you're referring to?

15        A    The Waller County community center, that

16   was one where an old building was torn down and the new

17   building put up, but they use the same place.

18        Q    The Templeton center?

19        A    No.  I think that's the -- more the student

20   union.  No.  There's another location that was off

21   campus, but like maybe a half block, you know, down the

22   street.

23        Q    St. Francis of Assisi?

24        A    Maybe I didn't mention it, but -- well, so

25   it's possible that I didn't mention it, but there

166

1    was -- yes, this site called the Newman Center, this is

2    it.

3            Q       What page are you on?

4            A       This is on page 28.   The Newman Center was

5    once the Catholic student center near campus and I say

6    near campus because the nearest I can discern this

7    location was where I indicate, Thompson Drive and FM

8    1098.   And from what I was able to discern, this

9    building maybe hasn't been torn down, but it has been

10   abandoned or it's not used anymore for purposes of

11   being a student gathering place.   But it was used as an

12   election day polling place, you know, very early on.

13   So we're going back into the nineties here.   That goes

14   back a ways.

15           Q       So if early voting hasn't changed that much

16   in Waller County since 2002 which I believe is what you

17   reported in your report on page 5, how do we know then

18   whether changes to early voting have impacted turnout?

19   How can we study that?

20           A       I think here's the thing.   You know, to

21   establish, you know, causality, you know, X needs to

22   come before Y, you know, X needs to change, Y needs to

23   change and then you have to rule out alternative

24   explanations.   So those are the three necessary

25   conditions to establish causality.

1          The problem with all cross sectional

2    research is that it's sort of hard to establish the

3    temporal priority, the X coming before the Y since you

4    have observations that are in a similar point in time

5    and you're not watching them unfold over time.  So, you

6    know, about the best you can do with cross sectional

7    research is, you know, at least see if there's a

8    relationship, you know.  Is there a covariance between

9    X and Y.  X has to change and Y has to change.  So if X

10   goes up, Y goes down or if Y goes up, X goes down.

11         So that's the minimum necessary condition,

12   not sufficient, but it needs to be there.  And if

13   that's not there, then you can be sure the causality is

14   out the window.  So if any of these necessary

15   conditions aren't met, you can toss causality out the

16   window.

17         And in the case of my findings on the

18   hours, you know, this is exactly the problem is that

19   the hours here in 2018, it's true you're only dealing

20   with cross sectional variation, but there isn't really

21   even any covariance to speak of.  As you move up in

22   early voting hours, in fact, the turnout of registered

23   voters actually drops.

24         It's really flat and statistically

25   insignificant, you know, in figure 4 on page 44, but

1    you don't even have the necessary, you know, variation,

2    the minimum necessary variation X and Y to establish

3    any causal claim.  So it's much more serious, much more

4    serious than just not having time series.  You don't

5    even have relationship between the X and Y variables

6    here to speak of.  So --

7         Q     Is it possible that since early voting has

8    been the same more or less since 2002 that it may not

9    have been sufficient to increase it?

10        A     I think that that's always plausible,

11   right, because, you know, there are some research

12   studies out there that suggest that, you know, a great

13   multiplication of early voting sites, you know, can

14   make, you know, at least a marginal difference.  And

15   Professor Stein cites a couple of studies along these

16   lines, but I think always the question from an

17   administrative standpoint is, okay, but what's

18   practical?  I mean, what can be practically managed?

19              We have a finding here from a study carried

20   out in Minnesota, one of the studies that he cites that

21   shows that if you greatly multiply, you know, the

22   number of sites, you can get a tiny impact in a

23   positive direction on turnout, but the number of sites

24   that you'd have to add is -- it's ludicrously

25   impractical from an administrative resource standpoint.

1          I mean, I just don't see how the county
2     could go from say, you know, eight sites, you know, to
3     36 sites, you know, over the course of an election, you
4     know, without some kind of major infusion of support
5     from the state or from the federal government or
6     somewhere.
7          Q     But given the rates of usage of early
8     voting at the memorial student center, it's possible it
9     could provide more access to voting hours at that
10    location and the rates of early voting could continue
11    to grow?  Is that possible?
12         A     Well, I've said, you know, several times
13    here that it seems like there is a test, right, and,
14    you know, it would not be reasonable for me to sit here
15    and say that an addition would be never in the cards,
16    never appropriate.  There has to be a test and what
17    I've suggested is I don't believe that test has been
18    met with just the one election which seems to be really
19    high stimulus election and which I've also said that
20    county officials really have no way of anticipating,
21    you know, from where they stood, you know, in
22    September.  So --
23         Q     Okay.  You -- we talked about the several
24    reasons for the low youth voter turnout and on your
25    report, you talk about habit of voting, the change of

170

1    address frequently, the failure to experience

2    politically competitive campaigns, poor socialization

3    from family background to parent resources.  My

4    question is whether you've analyzed those reasons as it

5    relates to Prairie View students.  Yes or no and tell

6    me why.

7         A       No.  And I didn't have a survey to draw on

8    that would include a lot of those details.  You don't

9    on the voter file have unfortunately a lot of those

10   details you'd like to have.

11        Q       How did you consider turnout as you define

12   it during early voting by different racial groups in

13   Waller County?

14        A       Well, we don't have race on the voter file

15   in Texas.  There are some southern states where we do

16   have race on the voter file.  It's not the case in

17   Texas.  So about the best you can do is sort of the way

18   the other experts went about it and that is take a look

19   at the, you know, proportions or concentrations of

20   African-American voters in the particular areas of the

21   county where they settled.

22               So there's no question that there are

23   African-American voters probably scattered throughout

24   Waller County and there are white voters that probably

25   live in and among the African-American concentrations

171

1  in Prairie View, but about the best you can do is look

2  at kind of the underlying population concentrations.

3  Undoubtedly the Prairie View student population is not

4  a hundred percent black.  It's largely black, but, you

5  know, there may be some Asian and Latino and white

6  students among them.

7          So too with the town Prairie View, we can

8  see from census data that it's largely a majority

9  black, but, you know, they could probably be captured

10  in that voting population of any analysis some nonblack

11  voters as well as some older voters.

12      Q      But you don't dispute that the method to

13  impute and understand racial turnout by different

14  racial groups that was employed by Dr. Stein, for

15  example?  Yes or no and then tell me why.

16      A      No.  I think he was using reasonable means.

17  You'll notice in my report, you know, I don't, you

18  know, like do anything like contest him line-by-line.

19      Q      Okay.  That's fair.

20      A      So, I mean, I didn't have, you know, major

21  objections to what he was doing along those lines,

22  along those lines.

23      Q      And is the method that he used, would you

24  agree that that is what others in your profession used

25  when -- in a case like Texas, the voter files do not

172

1    provide the race data?

2        A       He's trying to make some reasonable

3    guesses, right, and I think that there are only a

4    couple ways that you can do that.  And so acknowledging

5    that there's error with those tools, I think that

6    they're reasonable.  I just think that you have to be

7    appropriately circumspect about the limitations which

8    that all gets figured into like a peer review journal

9    article.

10       Q       How did you consider the turnout during

11   early voting according to your definition of turnout by

12   different age groups in Waller County?

13       A       I didn't focus too much on the question of

14   age.  So that's really outside of my report.

15       Q       How did you consider how students -- strike

16   that.

17               Did you consider how students use the

18   memorial student center in a different way than they

19   may use other early voting sites in Waller County?

20               MR. SEAQUIST:  Form.

21               THE WITNESS:  How did I use it?  Well, no.

22   BY MS. ADEN:

23       Q       For example, how did you consider that the

24   memorial student center is used for work, study, food,

25   the center of life for Prairie View students?

1      A       Well, it strikes me as a reasonable place

2   for an election day site, you know, given how much

3   activity goes on there.  You know, like other student

4   centers on other campuses, it's a meeting place and,

5   you know, it's not always located specifically at the

6   center of campus, but sometimes known as the campus

7   center.

8      Q       When you say reasonable place for an

9   election day site, that also means early voting?

10     A       Early voting site, yes.

11     Q       So while it may not be where students live

12  or as close to where they may live, do you agree that

13  it's where they spend a lot of their time?

14     A       Yes.

15     Q       You also identify inconvenient parking and

16  space for voting machines, election judges, and to

17  accommodate voters as potential issues of voting at the

18  memorial student center on page 12 of your report.  Do

19  you recall that?

20     A       Yes.  And I do recall that and there are

21  apparently reports from members of the community in

22  particular who wind up voting at that location, that

23  it's in some ways not the most convenient or optimal

24  location for them.  In other words, 309, the site is

25  not only serving the students that reside on the

174

1  campus, but there is a scattering of residents in 309

2  that also vote there.

3          And there are some reservations expressed

4  by citizens and I'm not sure if this is in the minutes,

5  but anyway, there are reservations expressed by people

6  in 309 who are not actually on the campus to having to

7  go to the student center as their voting place.

8      Q     Did you physically view any reports of

9  these concerns?

10     A     I didn't see any reports.  So some of this

11  was discussed in the presence of counsel and so --

12     Q     So you -- did you systemically analyze or

13  systematically analyze each of these issues

14  individually or collectively with respect to the

15  memorial student center, that is issues with parking,

16  issues with election judges, and space for machines?

17  Did you systematically analyze whether those issues, in

18  fact, were impacting --

19     A     No.

20     Q     Okay.

21     A     No.  And the information about the people

22  in the community expressing reservations about the

23  inconveniences of having to go on campus are entirely

24  anecdotal, but anecdotes happen to be important as

25  we've said earlier.  And they mount up and people begin

1    to take note of them.

2        Q      As an expert, how many of these anecdotes

3    are you aware exist?

4        A      Well, I know there were a couple of people

5    who were actually named, so I don't think they were

6    made up out of whole cloth.  And discussions about this

7    issue, there was actually citizens whose names were

8    mentioned.  And it was like in a John Doe kind of way.

9    They had specific names of people who voiced complaints

10   about having to go on campus and vote at this

11   particular site.

12       Q      How many citizens?

13       A      I believe I remember at least two who were

14   named.

15       Q      What were their names?

16       A      I don't recall now.

17       Q      Were one of the names Barnett?  Is that

18   familiar to you?

19       A      It's not, no.  I don't recall.

20       Q      Do you know whether those same complaints

21   have been made at other early voting sites in Waller

22   County?

23              MR. SEAQUIST:  Form.

24              THE WITNESS:  I don't know.

25   BY MS. ADEN:

1          Q        Have you looked into them?

2          A        No.

3          Q        Have you done an assessment about whether

4     those same complaints or issues might be present at the

5     Waller County community center?

6                   MR. SEAQUIST:   Form.

7                   THE WITNESS:   I have not looked at that.

8     BY MS. ADEN:

9          Q        Do you know what the capacity of

10    individuals who are allowed to be inside of the Waller

11    County community center at any given time is?

12         A        I don't know that.   I don't know the total

13    capacity.

14         Q        Do you have any reason to believe that the

15    capacity is bigger than at the memorial student center?

16         A        I would suspect that it would be smaller,

17    but I don't know.

18         Q        You comment that one of the purposes of

19    early voting is to provide voting outside of Tuesday

20    election day because of obstacles that voters may face

21    on the actual election day.   Is it possible that

22    cramming early voting in one site from Monday through

23    Wednesday could create an obstacle for students who

24    have to be away for school activities on those three

25    days?

1       A       I mean, that's possible.  I think that
2   again the question is compared to who or to what.  And
3   I guess that's always the question is what kind of
4   opportunity is being provided here compared to
5   opportunities elsewhere.  And as I said, it seemed to
6   me that in my review of this body of evidence that the
7   students at Prairie View are being provided with the
8   opportunity.  You know, not every particular time and
9   place will be convenient for any one individual person,
10  but, you know, there's still a range of options and
11  alternatives.
12      Q       I'm going to be skipping around a little
13  bit, so I apologize in advance.
14              In your field of expertise or what you're
15  aware of more generally in political science, is it
16  possible to project turnout in elections?
17      A       Again, it's a pretty complicated question.
18  Individual turnout, yes.  You know, we can look, for
19  example, and see that, you know, in a voter file if a
20  person has turned out in, you know, eight or nine of
21  the last ten elections, they're going to have higher
22  chance of turning out at the next one than someone who
23  has turned out only two or three of the last ten
24  elections.
25              So that's pretty obvious and consultants

178

1    and political scientists use this methodology.  They

2    look at a number of past elections and then forecast

3    who will be a high frequency voter and who won't.

4         Q      Where do you mention race in your report?

5         A      Off the top of my head, I don't know.  I

6    mean, I don't know if it's in there.

7         Q      Where --

8         A      I don't know.

9         Q      Do you believe it's mentioned at all?

10        A      Again, I don't know.  Off the top of my

11   head, I'd have to go through and comb through.

12        Q      And you told me that you didn't look at age

13   in this case; is that correct?

14               MR. SEAQUIST:  Form.

15               THE WITNESS:  No.

16   BY MS. ADEN:

17        Q      And at the beginning of this deposition, we

18   looked at, in fact, a peer reviewed piece where you, in

19   fact, looked in particular at how racial groups,

20   particular racial groups responded to campaigning or

21   campaign finance; is that correct?

22        A      Yes.  There's a recent paper that looks at,

23   you know, whether living proximate to a population of

24   color might trigger campaign contributions because

25   there's a very old theory of threat, you know, racial

1    threat.

2         Q      Okay.  We're moving.  I'm going to turn to

3    a different subject.  Is that okay or does anyone need

4    a break?

5               MR. SEAQUIST:  Let's go.

6    BY MS. ADEN:

7         Q      What about you, Dr. Gimpel?

8         A      We're okay.

9         Q      You're the most important besides our

10   trusted reporter.

11        A      Is there a horizon soon?

12        Q      There is horizons.  There's always hope.

13   That's the profession we're in.

14               MR. SEAQUIST:  Famous last words.

15               MS. ADEN:  I'm moving.

16   BY MS. ADEN:

17        Q      So you compare Waller County's early voting

18   operations with other counties.  There are eight of

19   them; is that correct?

20        A      I can look at the table here.

21        Q      Around page 20 or so.

22        A      Yes.

23        Q      So eight counties?

24        A      Um-hmm.

25        Q      And you talked about why you selected

180

1   your -- these counties.  In particular, they're

2   comparable according to you comparableness in size and

3   having medium size colleges within them on page 20; is

4   that accurate?

5       A    Yes.

6       Q    Was there any other methodology that you

7   used to identify these institutions?

8       A    Not particularly, no.  These -- again, I

9   looked at the list of the public institutions primarily

10  and from the Texas State Board of Education, I believe

11  that data came from, and looked at enrollment and I

12  looked also then at the county population size.

13      Q    Did you consider how those campuses may be

14  different from each other or different from Prairie

15  View's campus?

16      A    I was hoping that they were.  We would want

17  a variation because the point is to examine the

18  administrative culture here, right, you know, of

19  election administrators across the state.  We wouldn't

20  want them to be all the same.  We would want there to

21  be variability because if we see largely the same

22  response in reaction to variation, we know that we have

23  a habit or a real practice here that's entrenched.

24           And what I found in these locations is

25  there are no voting sites on the campus and a lot of

1    times the voting sites are some distance away, right.

2    And so I think we want actually variability in them and

3    their nature because if the response is uniform to that

4    variability, we actually do a have a standard practice

5    here going on.

6        Q       Did you look at the demographics of each of

7    these counties?

8        A       No.  I am aware generally of the

9    variability and some of this was discussed also with

10   counsel.

11       Q       Did you look at the demographics of the

12   institutions that you identified within these counties?

13       A       Yes.  I'm aware.  Again, just because I

14   don't report on it or I don't include it in the table

15   doesn't mean that I wasn't aware of it.  You know, the

16   table that Professor Flores added in his supplemental

17   report was not news to me.  I wasn't born yesterday.

18   It was clear to me from the very beginning that the

19   counties hosting these campuses and the campuses

20   themselves were variable.

21               That was precisely the point.  You don't

22   want them to be all the same because, you know, that

23   way, you can see that there is a standard practice here

24   and it's not to place a polling site on the campus.

25       Q       So you were aware of the race and age

182

1   demographics of both the counties and the universities

2   before you included them into this report?

3        A      Sure, absolutely.

4        Q      But did you not report them?

5        A      No, they weren't reported.  No.

6        Q      I apologize.  Did you have something else

7   to say?

8        A      No.  Go ahead.

9        Q      Did you not think that was relevant to a

10  case that is alleging racial and age discrimination?

11       A      I think the point here is to show that

12  Prairie View A&M is to some extent alone in its habit

13  or practice going back some distance now of, you know,

14  providing any kind of voting site election day or early

15  on the campus of Prairie View A&M, that Waller County

16  is not among the counties that have the standard

17  practice of denying these sites to these campuses, but

18  is actually out there by itself in providing locations.

19  I think that's something that needs to be considered.

20       Q      I'll get to that.  With respect to

21  socioeconomic indicators like poverty rates or vehicle

22  ownership for these counties, did you examine that

23  before or after you provided this report?

24       A      No.  Students at these places, you know,

25  are -- these are public institutions and these are

1  students who are probably not especially affluent.

2  We're not talking about private schools here.  These

3  campuses draw, you know, on, you know, middle income

4  and lower middle income populations from largely across

5  the State in Texas.  And I don't think that it's going

6  to make a huge amount of difference, you know, some of

7  these, you know, these findings.

8          For one thing we're talking about walking

9  distance at Prairie View for goodness sakes.  Arguably

10  in some of these very large campuses like Sam Houston

11  State, you could say that there is a real distance

12  issue.  And there are some others that are kind of

13  scattered and spread out, but Prairie View we're

14  talking about very short distances.  So I don't see how

15  commuting could be relevant at all or car ownership.

16      Q      So you haven't been to Waller County,

17  correct?  You stated that you haven't?

18      A      No, I have not.

19      Q      So you haven't walked the campus?

20      A      No.

21      Q      And you haven't seen whether there are

22  sidewalks on the campus or not?

23      A      No, I have not -- I have not actually been

24  on the campus.

25      Q      And you don't know whether or not accessing

184

1    buildings or all the -- strike that.

2              And you don't have any indication from

3    personal knowledge or otherwise of whether or not

4    walking is something that can be easily done by people

5    with disabilities or with a broken foot or anything

6    like that?  You have no comment on that or have not

7    analyzed that?

8              MR. SEAQUIST:  Form.

9              THE WITNESS:  I have not analyzed that.

10   That's going to be from potential consideration just

11   about everywhere.

12   BY MS. ADEN:

13       Q     With respect to vehicle ownership, would

14   that be relevant depending on whether a school is a

15   commuter school or whether or not students again

16   primarily live and study and work in one place?

17       A     I think that would be worth considering if

18   I were an administrator and were trying to figure out

19   where to place sites.  You know, that might be a

20   consideration.

21       Q     Did you look at the percentage of students

22   at the institutions in the eight counties that you

23   looked at that were registered to vote in those

24   counties where the institutions were located?

25       A     I don't have that information.  I did not

1    have that handy.  Useful piece of information.

2    Couldn't find it and I don't believe it's there.

3        Q       For all you know, the institutions you

4    choose could be places where every single student who

5    attends them is registered to vote outside of the

6    county or in a different state?

7        A       Well, it's probably the case, right, that

8    it's a mix and, you know, some of these places are

9    drawing students from very close by and others from

10   further away.  That would be the case as in most

11   college campuses.

12           The question is what comparisons are you

13   going to use?  The question is what comparisons would

14   you use?  What comparisons are relevant?  And, you

15   know, I'm saying that there's an administrative

16   practice here of not placing sites on college campuses.

17   It's clearly established and a precedent on these other

18   campuses.  And Prairie View actually stands out in

19   great relief compared to these others.

20       Q       But you thought it was relevant to look at

21   the percentage of registered voters in Waller County

22   including on the Prairie View's campus who turned out

23   to vote.  So my question is:  Why wasn't the percentage

24   of registered student voters in the counties where you

25   looked at part of your consideration in making a

186

1    comparison in this case?

2         A      I think those are relevant considerations.

3    That's something that certainly could be done, you

4    know, in a supplemental report.  The -- you know,

5    again, I think you're right.  I think there are

6    questions about, you know, exactly where people live

7    relative to some of these campuses.  So in some cases,

8    it might be a little easier than others.

9               Again, the simple point here is that there

10   is an administrative practice among the class of

11   counties in Texas similar to Waller County that differ

12   substantially from Waller County's practice.  And that

13   is none of these places regardless of what they look

14   like or what their complexion is provide locations on

15   campus.  That is a plain fact, okay, and Waller is very

16   distinctive in that respect.

17        Q      You've mentioned that Wiley does have on

18   campus voting; is that correct?

19        A      There is that one exception and up in

20   Marshall.

21        Q      What about Texas Southern?

22        A      So Texas Southern is in Houston and my

23   impression was that there wasn't a site on campus, that

24   it was some distance way.  The nearest site was some

25   distance away.

187

1      Q      Texas Southern is an historically black
2   institution?
3      A      Yes.
4      Q      Would it surprise you if I told you that a
5   substantial number of Prairie View students are
6   registered to vote in Waller County?
7              MR. SEAQUIST:  Form.
8              THE WITNESS:  That would not surprise me.
9   BY MS. ADEN:
10     Q      Did you look at in your view of these eight
11  counties in the -- strike that.
12             In your review of these eight counties and
13  the schools within them, did you do an analysis of the
14  frequency that students at those schools use early
15  voting as compared to election day voting?
16     A      No.
17     Q      Would it have made sense to you to do a
18  comparison -- strike that.
19             Given your acknowledgment and the many
20  discussions that we've had today about the high
21  frequency of use of early voting by Prairie View
22  students, do you think it would have made sense to do
23  an analysis of the frequency of their use of early
24  voting as compared to other students in other -- in at
25  least the counties that you analyzed or in other parts

188

1    of the state?

2                    MR. SEAQUIST:  Object to the form.

3                    THE WITNESS:  Relevant consideration, I

4    think.  You know, the truth is that the O'Rourke, Cruz

5    race as I understand it elevated turnout and interest

6    pretty uniformly across the entire state, you know,

7    certainly not just in Prairie View.  So my expectation

8    would be that in these other locations, we would see

9    somewhat of a surge as well.

10                   You know, I don't think that it's only -- I

11   don't think it's only the Prairie View students in

12   other words who were stimulated to extraordinarily high

13   numbers, you know, by the interest in this particular

14   election.

15   BY MS. ADEN:

16        Q       So you keep mentioning this 2018 election.

17   I guess my question is -- and I'm not conceding that I

18   accept this point that students are only motivated to

19   vote when there's a candidate like Beto O'Rourke or

20   someone on the ballot particularly since not everyone

21   voted for Beto O'Rourke.  But what about someone like

22   President Obama in 2018 and 2012, one would think

23   assuming that people do want to elect candidates who

24   look like them and who they identify with that those

25   would have been other elections that would have

189

1   motivated Prairie View students to vote and, in fact,

2   they did.  But according to your analysis, the county

3   still didn't change its voting practices.  They've been

4   practice stagnant over that time.  Explain to me how

5   all of that makes sense.

6                   MR. SEAQUIST:  Form.

7                   THE WITNESS:  First of all, part of what's

8   driving people to the polls in a competitive election

9   is an augmented or increased sense that their vote

10  could count or be decisive.  And so in the Obama

11  election of 2008 or the reelection of 2012, we do see

12  increased turnout, you know, because it's a high

13  stimulus election.

14                  Still, you know, we do know that Texas as

15  far as presidential elections go is not an especially

16  competitive state.  So it may well be, right, that a

17  presidential election in a lopsidedly red state even

18  though the presidential election itself is competitive

19  nationwide, if it's not competitive in a particular

20  state, you know, people might reason, you know, maybe

21  it's not going to count.  You know, he's either going

22  to get reelected without me or he's going to go down

23  without me, but my vote isn't going to make a

24  difference as to how Texas goes in the presidential

25  election.

1    BY MS. ADEN:

2        Q      If I represent to you because I'm looking

3    at the November 4th, 2008, election returns from Waller

4    County and I'm looking at precinct 309, I'll represent

5    to you that early voting's ballots cast, there were

6    about 1,772 cast early at the precinct 309 and which

7    would have served Prairie View students even if it

8    wasn't located on campus, would you agree?

9        A      Yes, 309.  Yes.

10       Q      And then on election day, only 798 cast

11   ballots.  Even though early voting wasn't on campus,

12   doesn't it once again reflect these data available to

13   Waller County officials that those same student body

14   was using early voting at double the rate that they

15   were on election day?

16             MR. SEAQUIST:  Object to form.

17             THE WITNESS:  Well, it seems like early

18   voting opportunities were available and that they used

19   them.

20   BY MS. ADEN:

21       Q      Is it reasonable that those numbers could

22   have increased if they had access to on campus early

23   voting?

24       A      That's I think the real question, you know,

25   and I don't think the evidence is there for that.  I

191

1    don't think the evidence is there for that, you know,

2    because so many people who would have been election day

3    voters are early voters, right.  Early voting just

4    cannibalizes election day voting.  That's pretty much

5    what the evidence would suggest.

6          Q      What about if I represented that there was

7    a similar trend in 2012 with precinct 309 voters using

8    early voting rates at a substantially high number as

9    compared to election day votes?

10         A      Again, it suggests that they've been

11   provided with the opportunity to vote early and they're

12   using it.  So --

13         Q      But you don't know one way or the other

14   whether if changes to early voting allocation have been

15   made whether those numbers would increase or not?

16         A      Again, I think that's what's open to doubt.

17         Q      So you mentioned reviewing the expert

18   reports of Bill Cooper and you're aware that he

19   reported a lot of demographic information in his

20   report?

21         A      I vaguely recall his report.

22         Q      And you don't have any basis to dispute

23   then that 51 percent -- strike that.

24                You don't have any basis to dispute that

25   51.6 percent of the citizen voting age population in

192

1    Waller County is white while 32.1 percent of the

2    citizen voting age population is black?  So basically

3    51 to 32 CVAP that are white to CVAP black.  Do you

4    have any basis to dispute that?

5         A     I don't dispute it.

6         Q     Do you have any basis to dispute that

7    7.6 percent of the CVAP in Prairie View is white while

8    80 percent of the CVAP is black?  That's Prairie View

9    in particular?

10        A     Of the town of Prairie View.

11        Q     Of the City of Prairie View, 70 to

12   80 percent white to black.

13        A     Right.  I don't dispute that.

14        Q     Do you have any basis to dispute that

15   according to the census, the 2010 census, the

16   percentage of 18 to 20-year-olds in Prairie View is

17   about 54.33 percent and the percentage of 18 to

18   20-year-olds in Waller County overall is 13.59 percent?

19   So that's 54 to 13 18 to 20 in Prairie View as compared

20   to 18 to 20 in Waller county.  No basis?

21        A     I don't have a basis for disputing that.

22        Q     Do you have any basis to dispute that the

23   Prairie View student body is large enough to constitute

24   more than 27 percent of the Waller County's voting age

25   population?

James Gimpel, Ph.D. - December 12, 2019

193

1        A        No, I don't have any basis.

2        Q        Would you consider that an insignificant

3   population in the county?

4        A        You said 27?

5        Q        Twenty-seven percent.

6        A        It's a substantial population.

7        Q        It's over a quarter of the size of the

8   county?

9        A        Yes, it's a substantial population.

10       Q        How long has Prairie View been in

11  existence, do you know?

12       A        I don't know the answer to that.  I recall

13  reading that information.  I just don't recall it off

14  the top of my head.

15       Q        Do you have any basis to dispute that it's

16  been in Waller County since at least 1876?

17       A        That seems perfectly reasonable and

18  plausible.

19       Q        Do any of the eight counties and the

20  universities within them that you considered have

21  demographics similar to Waller County's as it relates

22  to the City of Prairie View or the Prairie View A&M

23  campus?

24                MR. SEAQUIST:  Form.

25                THE WITNESS:  I think the answer is no and

**James Gimpel, Ph.D. - December 12, 2019**

194

1    that's exactly what makes Waller County's decision so

2    remarkable that Waller County would actually do this,

3    put sites available and on campus.  It makes it

4    incredibly remarkable that they would be up front on

5    this like this.  You know, it's amazing because you're

6    right.  You know, none of the other places do and it

7    makes Waller County really stand out.

8    BY MS. ADEN:

9         Q     Do you --

10        A     In fact, in the face of the population

11   composition that you just cited, it makes it stand out

12   even more.

13        Q     So the disparity -- strike that.

14              You have no reason to dispute that some of

15   the counties that you compared Waller County to have

16   less than 5 percent of black residents according to Dr.

17   Flores?

18        A     I think that could well be right.  But,

19   again, I didn't choose them because they were going to

20   match up on the basis of their ethnic or racial

21   composition.  That wasn't the point.

22        Q     And that's also because you didn't consider

23   race in your analyses in this expert report?

24              MR. SEAQUIST:  Form.

25              THE WITNESS:  Well, you know, when we're

1    talking about -- think about this.  You've said this

2    yourself a couple of times, probably more than a couple

3    of times.  When we're talking about the Prairie View

4    A&M campus and we're talking about the town of Prairie

5    View, the very numbers you just gave me two minutes ago

6    suggest that we're talking about a largely

7    African-American population.  So that seems to me we're

8    talking about race.

9    BY MS. ADEN:

10        Q     You didn't report those numbers in your

11   report?

12        A     Not the particular numbers that you

13   indicated.

14        Q     They're underlined, but they're not --

15        A     There's a lot of information here about

16   those particular precincts.  And the fact that we are

17   talking about the racial composition of those precincts

18   points directly to discussion of race.  So, you know,

19   it's maybe kind of an indirect kind of evidence that we

20   use to talk about race here in looking at the precincts

21   and their composition, but the experts on the other

22   side do the very same thing.

23            You know, they're reasoning about race

24   using aggregate data as well.  They're using deploying

25   aggregate data throughout their reports and the reason

196

1    for that is simple.  We don't have race on the voter

2    file.  We have to make inferences.

3        Q      Would you agree that none of the colleges

4    and universities within these eight counties that you

5    looked at were historically black colleges or

6    universities?

7        A      In table 6, that's true.

8        Q      In fact, none of the schools have more than

9    18.5 percent black student population according to Dr.

10   Flores?

11       A      Okay.

12       Q      And you have no reason to dispute that

13   82 percent of Prairie View students are black according

14   to Mr. Cooper and other experts in this case?

15       A      I don't have any reason, no, to dispute

16   that.

17       Q      Were any of the Texas colleges in the eight

18   counties that you claim were comparable in size and

19   HBCU situated amidst a majority white county?

20       A      No.  Again, it makes Waller County all the

21   more stunning.  It's amazing.

22       Q      But the answer is no, but it makes -- in

23   your estimation, it makes --

24       A      It makes Waller County all the more

25   stunning.

**James Gimpel, Ph.D. - December 12, 2019**

197

```
1        Q       I understand.  And, for example, you have
2    no -- strike that.
3                You also have no reason to dispute that
4    Waller County's black population is roughly 24 percent?
5        A       It seems, you know, like a reasonable
6    estimate.  I don't have any reason to dispute that.
7        Q       And that Prairie View's student body is
8    about 82 percent black?
9        A       Okay.
10       Q       Consistent with your estimation
11   overwhelmingly black but not entirely black?
12       A       Okay.
13       Q       So no other Texas county college of the
14   eight counties in the colleges within them that you
15   looked at had that gap between --
16       A       Yes.
17       Q       Were any of the Texas colleges or
18   universities in the eight counties that you considered
19   an HBCU situated amidst a majority white and older
20   population?
21       A       I don't know the answer to that.  It's --
22   some of these are pretty rural, you know.  So -- but I
23   don't know the answer, but since some of these are
24   pretty rural, one might imagine that.
25       Q       But you don't know?
```

1      A      I don't know.

2      Q      You have no reason to dispute that the

3  Prairie View student body consists roughly of 82 black

4  students; is that correct?

5              MR. SEAQUIST:  Say that again.

6              THE WITNESS:  Eighty two percent?

7  BY MS. ADEN:

8      Q      You have no reason to dispute that the

9  Prairie View student body consists roughly of

10  82 percent black students?

11              MR. SEAQUIST:  Okay.  You said 82 black

12  students the first time.

13              MS. ADEN:  I'm also moving.

14              MR. SEAQUIST:  I'm no demographer, but --

15  BY MS. ADEN:

16      Q      No college you identified as a comparator

17  has more than 18.5 percent black students; is that

18  correct?

19      A      I think you asked me that already and I

20  don't have any reason to dispute that.

21      Q      You talk about Prairie View being an

22  outlier in terms of providing this early voting on

23  campus or election day early voting.  What about UT

24  Austin?

25      A      I think there's some very large campuses

1    that, you know, have moved forward.  Again, you know,

2    the larger campuses and indeed the larger counties are

3    governed by -- the larger counties are governed by

4    different rules than Texas state law and, you know,

5    they're subject to rather different pressures in Texas

6    state law and requirements.  In general, they're more

7    constrained I would say.

8              They aren't given as much leeway and

9    flexibility that the counties and so I guess I'm not

10   surprised that given their populations and

11   circumstances, you know, in places as big as Austin,

12   you know, and Travis County that, you know, there would

13   be locations, you know, placed on the campus.

14        Q    Is that true also of UT San Antonio?

15        A    Good question.  I didn't get around to

16   looking at every single campus.  I know that the north

17   Texas campus in Denton has taken steps now to move in

18   the direction of providing polling places on campus.

19   You know, it seems to be something that is emerging

20   perhaps and maybe we will see, you know, the rest of

21   these locations eventually catch up with Waller, but I

22   think it's very notable that Waller is on the leading

23   edge.

24        Q    What about San Antonio Community College?

25        A    I don't know the answer to that.  I didn't

1   look at the community colleges.

2        Q        Briefly we talked about your walk through

3   Waller County's adoption of early voting and to the

4   present and you talk about how unique it is and how

5   they are a leader.  But you reviewed Dr. Joseph's

6   report; is that accurate?

7        A        Yes.

8        Q        And you reviewed Dr. Flores's report which

9   incorporated some of Dr. Joseph's analysis; is that

10  correct?

11       A        Yes.

12       Q        Why didn't you acknowledge anywhere in your

13  report at minimum that there have been a fight to get

14  early voting in Prairie View and on Prairie View's

15  campus during at least some of that time?

16                MR. SEAQUIST:  Object to the form.

17                THE WITNESS:  Well, I mean, would we

18  characterize it as a fight?  I'm not sure that I would

19  characterize it as a fight.  The -- there was pretty

20  vigorous discussion, you know, as would -- one would

21  expect, you know, on any controversial subject coming

22  before a county board like this, but in the end, the

23  commissioners complied with the request and there were

24  instances in the past where requests were made and

25  Waller County responded affirmatively.

1          So it's not as if the history in Waller

2    County is uniformly ugly.  It seems like in recent

3    times in particular, there is an effort, you know, to

4    accommodate the campus and its population.  And, you

5    know, there were instances in the past where requests

6    were made and indeed they were granted.  More hours,

7    for instance, or site change, so forth.

8          So, you know, you know, I think that there

9    are a lot of residents in the county now, you know, who

10   have moved in who have no ancestral connection to the

11   slavery period.  You know, there are people present in

12   the county now, you know, who don't really know

13   anything about the past circumstances.

14         There are no doubt some longstanding

15   residents who have multiple generations in the place,

16   you know, and, you know, have more of a connection to

17   that history, but with more and more people moving in

18   from up on the Montgomery border in the north part of

19   the county and the south part of the county, you have

20   more and more people who are moving in who don't have

21   any knowledge of the past and don't have any

22   inclination to see it -- see that past continue or to

23   have it entrenched.

24         So I don't think that the constituency that

25   Professor Joseph and Professor Flores point to that

James Gimpel, Ph.D. - December 12, 2019

202

1  existed in 1950 or existed in 1870 is the same

2  constituency that you have in Waller County today.

3  These are not the same people.  And it seems quite

4  unfair and unreasonable to tar them, you know, these

5  new residents with, you know, the guilt, you know, of

6  this past that, you know, they have no tie to.

7  BY MS. ADEN:

8      Q      And the past is slavery?

9      A      Well, we know, for instance, that, you

10 know, there was a slave plantation, you know, in Waller

11 County.  You know, there's no question about that.  I

12 don't think that the two sides are at odds on that one

13 question.

14     Q      It's Prairie View campus?

15     A      Yes, it was situated there.

16     Q      And there are other plantations around

17 Prairie View's campus that also were enslaved people?

18     A      I don't think the two sides are far apart

19 on that at all.

20     Q      The only discrimination that is relevant or

21 could be a relevant consideration is slavery or 1950?

22     A      No.  What I'm suggesting is is that the

23 practices of -- the practices of 1850 or the practices

24 of 1950 don't automatically indict the Court of

25 Commissioners or the election administrators today.  I

1    just don't think that that's a case you can sustain.

2    No one would believe that.

3        Q       Are you aware that in 2015 the

4    commissioners proposed going from 8 to 2 early voting

5    locations, none of which would have been on Prairie

6    View's campus or on the City of Prairie View?

7        A       I was not aware of that, but in 2015, we

8    know that turnout drops considerably.  And so, you

9    know, the odd year -- these kind of odd year elections

10   2015, you know, have such low turnout, you know,

11   compared to the -- even the midterm election that

12   they're going to be considering, you know, a move like

13   that, you know, just in light of the demand.  That can

14   be entirely explained by the drop in demand.

15       Q       Very, very quickly, what is your basis for

16   these conclusions, these statements about guilt and

17   tarring and indictment?  What's your basis for knowing

18   about that?

19               MR. SEAQUIST:  Object to form.

20               THE WITNESS:  The Flores report and the

21   Joseph report do all of that.  Very clear implication

22   of the Flores report is that these past practices

23   completely indict the people that live there today.

24   There is a clear implication and it's clearly what he

25   believes.

204

1  BY MS. ADEN:

2      Q      And the only way that you can be

3  responsible for discrimination is if you had a direct

4  connection to slavery or lived in the 1950s?

5      A      Well, here is the issue.  You know, how do

6  we -- you know, this is a philosophical issue, way

7  outside of my report.  And it's -- you know, it goes to

8  individual moral responsibility, okay, individual moral

9  responsibility.  And, you know, I don't think that any

10  court would convict someone of discrimination on the

11  basis of what someone did who happened to live in their

12  house a hundred years ago, right.  This isn't even

13  talking about a relative now.

14          We have a home that's stood for a hundred

15  years.  People have moved in and people have moved out.

16  So you're telling me that a court is going to convict a

17  resident of that house for some act of discrimination

18  committed by a resident from a hundred years previous

19  who wasn't even a relative.  That's just pathetic.  No

20  court would buy that, you know.  And even if the person

21  was an ancestor, they probably wouldn't go along with

22  that.  I think, you know, this again is way outside of

23  my report.

24      Q      One last question on this.  Did you look at

25  with respect to any of the eight counties that you

1    examined whether or not they have a capable history of

2    documented voting discrimination by Federal Courts, the

3    Department of Justice, historians and otherwise as

4    compared to black students at Prairie View and Waller

5    County?

6              MR. SEAQUIST:  Object to the form.

7              THE WITNESS:  No.

8              MS. ADEN:  Let's take a break.

9              (There was a brief recess taken.)

10   BY MS. ADEN:

11       Q     Dr. Gimpel, would you say that in any of

12   the eight counties that you looked at -- strike that.

13              Dr. Gimpel, would you say that any of the

14   eight counties that you looked at has a comparable

15   history of voting discrimination against black student

16   voters as Waller County?

17              MR. SEAQUIST:  Object to the form.

18              THE WITNESS:  I don't know the answer to

19   that, but none of these are HBCUs obviously at least in

20   table 6.  So now up in Marshall, you know, or places

21   like Tyler or in Houston with Texas Southern, those are

22   all mentioned in the report and, you know, there may be

23   issues there.  But, you know, these in table 6, no, I

24   don't know the answer.

25   BY MS. ADEN:

1      Q      Okay.  Do you know about public

2  transportation options in the eight counties that you

3  examined?

4      A      I don't know.

5      Q      Did you factor transportation access to

6  early voting in the eight counties that you considered?

7      A      My main concern --

8      Q      Yes or no and then tell me what you mean.

9      A      No.  My main concern was was there a site

10  on campus and how close were the proximate sites off

11  campus.

12      Q      In looking at the siting of early voting

13  locations in relation to registered voters on page 40

14  of your report -- I'm skipping around and this is

15  because I've cut, so I apologize.  I'll try to do

16  better.  On page 40, you are reporting about the early

17  voting locations in relation to registered voters.  And

18  my question is whether or not you accounted for other

19  factors like differences racially and age or otherwise

20  in registered voter populations in so doing.

21      A      Like with respect to figure 3 on page 40?

22      Q      Yes.

23      A      No.  This is just bivariant relationship.

24  We're doing a precinct analysis here and so the amount

25  of additional data going to some of these other

1    variables is limited.

2        Q      Also on page 40, you contend that

3    historical tradition familiarity demand and a

4    combination of these factors impact early voting

5    decisions.  That's accurate?

6        A      Yes.

7        Q      What did you mean by historical tradition?

8        A      I just mean the past practice, you know,

9    that -- for all of us in everything we do.  You know,

10   our present and our future isn't born by our past.  So

11   that's kind of a no brainer.  And we shouldn't be

12   surprised that when administrators make decisions like

13   this just as they do with, for instance, spending and

14   budget decisions, appropriations and so forth, you

15   know, their guide is what they did last time and so --

16       Q      If a jurisdiction has a history of limiting

17   early voting sites to a particular community baked into

18   their past practice, could that impact decisions about

19   future placement of sites?

20       A      Sure.  I think it does.  I think it does.

21   And I just indicated to you with the answer to the

22   previous question that that plays a role.

23       Q      What did you mean by familiarity?

24       A      Well, I think I mean familiarity not that

25   the administrators know the sites, but that the sites

208

1    be familiar to the underlying populations.  I think

2    this is why it's -- schools are very popular as

3    precinct site locations, why firehouses are often used.

4    These are like community landmarks and they're familiar

5    as landmarks.

6                 And people may not even need like a number

7    address when you say Longfellow Elementary School or

8    the, you know, Pattison Fire Department.  People will

9    know exactly where that location is.  So that's what I

10   mean by familiarity.

11        Q      And you don't have any basis to dispute

12   that Prairie View students including plaintiffs are

13   familiar with the memorial student center?

14        A      I think it's pretty obvious they would be

15   familiar with that I would think.

16        Q      And you have no reason to dispute that

17   students are not familiar with the Waller County

18   community center?

19                 MR. SEAQUIST:  Object to the form.

20                 THE WITNESS:  So that's -- I think that

21   that's a location that is probably quite familiar.  It

22   may not have the familiarity of the campus center, the

23   memorial student center, but there are going to be

24   other sites in proximity, you know, of that area that

25   will be familiar to people and certainly not obscure.

209

1    They'll be known.  I mean, the church is probably
2    well-known.  People will know where that church is and
3    have probably driven by it many, many times.
4    BY MS. ADEN:
5         Q       What's your basis for your position, your
6    contention that the community center is familiar to
7    Prairie View students?
8         A       Well, its proximity and past history that I
9    recounted actually in the report talking about how
10   frequently that location has been used in the past.
11        Q       But you didn't ask any students in relation
12   to this case?
13        A       No.
14        Q       And you didn't review the October 17th
15   Commissioner's Court meeting minutes?
16        A       I can't recall that.  I don't have a
17   photographic memory, so I don't recall that off the top
18   of my head.
19        Q       You don't have any basis to dispute in Dr.
20   Flores's report him recounting -- strike that.
21               You don't have any basis to dispute in our
22   amended complaint or original complaint and in Dr.
23   Flores's initial report him recounting statements at
24   least during the October 17th Commissioner's Court
25   meeting that students were not familiar with the

210

1    community center in part because they don't get mail

2    there as it's next door to the post office or go there

3    for any other sort of public events?

4              MR. SEAQUIST:  Object to the form.

5              THE WITNESS:  So I don't know.  I know that

6    the -- in part this community center is selected

7    because, you know, there are voters living off campus

8    who vote at this site and, you know, who have

9    apparently complained that the student union site is

10   not the ideal site for them if they had a choice.

11             So bear in mind that administrators are

12   trying to balance input from a variety of sources.  So

13   when they're making these selections, they're trying to

14   balance input, you know, and demand from a variety of

15   sources.  There may be people in the community who have

16   become quite familiar with the location of the Waller

17   community center and quite like voting there.

18   BY MS. ADEN:

19       Q     I'm going to show you what's being marked

20   as Exhibit 5 which is an article entitled, Political

21   Participation and the Accessibility of the ballot box

22   by you and Shupnick?

23       A     Yes, Shupnick.

24             (Gimpel Exhibit 5 was marked for purposes

25   of identification.)

211

1    BY MS. ADEN:

2        Q      I'm handing you a copy as well as a copy to

3    Mr. Seaquist.

4        A      Okay.

5        Q      And this once again I've highlighted some

6    language for ease of reference.  This is a 2003 article

7    that's on your CV that we discussed or at least you

8    pointed out earlier today?

9        A      Yes.  I'm very familiar with it or familiar

10   enough.  It's been a while.

11       Q      I'm going to ask you to turn to page 3 of

12   this document which I believe is actually 473 of the

13   journal piece which runs between 471 and 488, but page

14   3 of the actual printout that we have.  Do you recall

15   citing Dr. Stein's work on the impact of siting voting

16   at nontraditional locations like supermarkets as having

17   a positive impact on voting?

18       A      Yes, I think that makes sense.  I think

19   that there's at least one paper by -- maybe more than

20   one that I've cited by him.

21       Q      And do you recall on this page at the very

22   top of 473 making a statement that we believe there are

23   good reasons to believe that accessibility may make a

24   significant difference --

25       A      Yes.

James Gimpel, Ph.D. - December 12, 2019

212

1      Q      -- to turnout?

2      A      Yes.

3      Q      Is accessibility here defined as -- how are

4  you defining accessibility here?

5      A      In this case, it's pretty narrowly the

6  distance.  This is the first time I think in a journal

7  that this question was addressed and we looked at at

8  least for the locations that we were able to collect

9  data for in Maryland.

10     Q      And on page 1 of this same document I think

11  consistent with page 3, you make a similar statement

12  that you find that accessibility does make a

13  significant difference in turnout?

14     A      Yes.

15     Q      You also report -- I'm sorry to be jumping

16  around back and forth -- on page 3 that at least in the

17  first full paragraph on that page, you report that if

18  polling places were more accessible at least some of

19  those voters of marginal interest in motivation would

20  turn out to vote upon realizing that they might not

21  have to fight the usual meddlesome obstacles on their

22  way?

23     A      Sure.

24     Q      You don't dispute that?

25     A      No.  That's there.  I wrote it.

213

1     Q      And you further report on page 5 which is
2  475 of this article and the last sentence of the
3  paragraph right above the section that begins the
4  concept of accessibility, quote, some lack private
5  transportation.  Others have inordinately long
6  commutes.  Some live in severely congested areas and
7  others have physical handicaps.  For all of these
8  citizens increasingly the accessibility of polling
9  locations may enable them to fulfill their civic
10  obligation.
11     A      Right.  That's, you know, what we're
12  positing.  That's what we're trying to test.  We're
13  pointing to the fact that, you know, people do have
14  these limitations and live very busy lives.
15     Q      In this study, you recognize generally that
16  socioeconomic status, age, education levels could be
17  useful factors in a voting analysis?
18     A      Yes.
19     Q      Do you have any reason to dispute these
20  theories that use of data today?
21     A      No.
22     Q      I'm going to turn to another article that
23  you wrote and mark that as Exhibit 6.
24            (Gimpel Exhibit 6 was marked for purposes
25  of identification.)

214

1    BY MS. ADEN:

2         Q      This is another article cited in your CV

3    distance turnout and the convenience of voting from

4    2005.  I'm handing you a copy and also to Mr. Seaquist.

5    And I'm going to ask you to look at page 8 of that

6    article which is page 537 of it.  There's one sentence

7    highlighted on that page age is included because it is

8    well-known that older voters participate more and are

9    more likely to use convenience voting methods than our

10   younger voters.

11        A      Yes.

12        Q      Is that true in Waller County?

13        A      I didn't carry out exactly the same

14   analysis in Waller County.  So I can't -- I can't say

15   exactly what's true of Waller County.  I can say that

16   in general the reason why older voters might be

17   inclined to use early voting more is because it's

18   something that they're familiar with, you know, because

19   they have been in the habit of voting for a long time.

20   They might be more aware of the option in many places

21   to vote early, but I don't know if that's the case

22   specifically in Waller County.

23        Q      Because you didn't look at it?

24        A      I didn't see -- I didn't do that analysis.

25        Q      On this page 537, for example, in the next

1    paragraph which isn't highlighted unfortunately, but

2    also on the next page 538 and on page 542, is it fair

3    to say that in this article you specifically reference

4    socioeconomic status?

5         A      Yes.

6         Q      Can you explain to me -- strike that.

7                In addition to socioeconomic status, is it

8    also true in this article that you considered age?

9         A      Yes, age.

10        Q      Can you explain to me why you so

11   affirmatively identify socioeconomic status, age, and

12   discuss them so explicitly and directly in the last two

13   articles that we pointed out?  What made it necessary

14   to do so there and not in the report that you provided

15   in this case?

16        A      Well, what's -- I think the -- I'm trying

17   to remember because it was some time ago.  I think the

18   main issue seemed to me was, you know, can we look

19   specifically at this question of convenience in Waller

20   County, okay, and assess whether it's doing everything

21   that plaintiffs think that it's doing.  Okay.

22               And so, you know, the report that I wrote

23   focuses more narrowly on the issue of distance because,

24   you know, that's very specifically the question of --

25   and hours, distance and hours because I wasn't really

216

1   being called upon to account for, you know, precinct

2   voting, absentee voting, early voting and nonvoting.  I

3   was tasked as I understood it to focus more

4   specifically on the question of access.

5            You know, these papers here, you know,

6   you're trying to do something more ambitious which is

7   to, you know, explain across large multiple county

8   jurisdictions in one case and entire states in another

9   what's going on with respect to turnout and these

10  different forms.

11           So the task in producing a piece of

12  research for a peer reviewed journal is rather

13  different than, you know, what you're being tasked to

14  do more narrowly for a report.  I don't see a

15  contradiction between what I've written in the report

16  and what appears in these two papers.

17           There are a couple of things to note.

18  First of all, these are about particular locations, one

19  in Maryland and the one in -- mainly in Nevada,

20  although I think in a second paper, we also look at New

21  Mexico.  So there's that.  But there's also this other

22  point that I made eight times, and I'll be brief, that

23  convenience can matter to a point.  Okay.  Convenience

24  can matter to a point.

25           It's just that, you know, compared to the

217

1  motivational factors, it's much smaller, okay, and, you

2  know, this is exactly, you know, where Adam Berinsky

3  went with his very authoritative work in comparing

4  these two, that the kind of bump up that you can

5  possibly get from convenience voting reforms is modest

6  like on the order that we find here, a couple of

7  points.  Okay.

8              It's -- on the other hand, when you look at

9  things like election factors and interest and

10  motivation variables, those results on turnout are much

11  greater.  Don Green and Alan Gerber, for instance, in

12  their experimental research have found that campaign

13  canvasing in an area can boost turnout by 12 points.

14  That's extraordinary the impact that a campaign can

15  have.  Nothing we have seen in any of the convenience

16  voting literature comes even close to that.

17              So, you know, there isn't a contradiction.

18  What convenience reforms can do is quite limited and,

19  you know, will often disappoint compared to the impact

20  of election outreach and motivation.

21      Q      But just for a couple clarification points

22  because I think this is all crystalizing for me.  So

23  convenience in your mind is distance; is that accurate?

24      A      It could be distance.  It could be also the

25  extension, you know, of hours as indicated in the

218

1    report or some combination of the two.

2        Q       If I --

3        A       I am looking specifically at travel costs.

4    By the way, if I were to redo these papers, the

5    technology and the data for redoing them is much better

6    now.  And, in fact, other scholars have come along and

7    written better papers than these since then, since

8    these were written because we make progress in the

9    field.  And so there's some advances that have been

10   made, but I don't think there's a necessary

11   contradiction.

12              Are there some places where convenience can

13   get you a couple of points bump?  Yeah.  I don't think

14   anybody is denying that and that's suggested in these

15   papers, but you can't expect convenience to get you

16   very much.  And in a lot of places, it's not going to

17   get you anywhere.  And I was suggesting in Waller

18   County it's not helping and that's because the

19   fundamental obstacle in Waller County in particular is

20   not a convenience obstacle.

21              The other point that I would make, by the

22   way, going to what's written here is that there are a

23   variety of inconveniences that people face that are

24   mentioned, you know, that will affect people other than

25   those living in the -- on the Prairie View campus and

219

1    the immediate vicinity.  You know, we have many as they

2    say here long distance commuters in the county, people

3    where the distance between work and home is long and

4    burdensome.  They're fighting traffic.

5               There are a variety of things that burden

6    other voters in the county that merit considering them,

7    you know, and their demand for early voting as well.

8    So I think there's also that point that is relevant to

9    the discussion.

10        Q    But can convenience also be defined as

11   siting an early voting location according to Dr. Stein

12   in a nontraditional place like a student center or a

13   supermarket where people actually go to vote?

14        A    I didn't address the mobile voting sites

15   and I know that's an area of interest that he has.  And

16   I don't think anyone here on this side of the table --

17   I've never heard in any of our discussions anyone

18   voicing opposition to the deployment of mobile voting

19   sites.

20              I don't exactly know where Texas is on

21   this.  I understand there might be some new legislation

22   being considered in the State of Texas on the subject,

23   but I was not really asked to provide an opinion on

24   moving sites around or putting them in a kind of

25   construction trailer type of operation and moving them

220

1  around.

2      Q      I guess I meant differently that

3  convenience could also be defined as for Prairie View

4  students or people in Prairie View siting a location in

5  a place that they actually use, not necessarily related

6  to distance to where they live, but here where they

7  work, where they socialize, where they eat.  Isn't that

8  another way to define convenience?

9      A      I think that's reasonable.  I think that

10  would be a reasonable consideration.

11      Q      And couldn't motivation -- you have a

12  definition of motivation, but couldn't motivation also

13  be defined as where people have demanded it, asked for

14  it because of their high rates of use?

15      A      I think we revisited that.  I'm sorry.  I

16  think we're revisiting that question.  It's come up

17  before.  And I think that this is why the meetings are

18  public and, you know, I gathered that, you know, when

19  these requests are made, you know, of the county

20  commissioners, it's their duty as elected officials to

21  give that some consideration.

22          And I don't think that they've uniformly

23  been negative, you know, in considering these requests.

24  I don't think the record shows that they've turned down

25  every request and there might be some discussion and

221

1   debate, you know, maybe some resistance, but that's

2   politics for goodness sake.  And people do have to kind

3   of accustom themselves to ideas and it takes a while

4   for that to sink in and for people to be persuaded that

5   this is the right thing to do.

6           So, anyway, I guess what I'm saying is I

7   don't read the record as being as uniformly hostile to

8   Prairie View A&M as apparently the plaintiffs do.

9       Q       But in light of the record that you know,

10  though, are you aware whether the demand according to

11  how I'm defining the demand request has been made by

12  other members of the community in the places where you

13  said, for example, they got nothing or they got less

14  than Prairie View or have you known the record to

15  reflect that community members from there have

16  requested, demanded it from Commissioner's Court?

17      A       You have people from Katy, for instance,

18  show up?

19      Q       Yes.

20      A       And the answer is I don't know the answer

21  to that and I don't know whose actually shown up at the

22  meetings.

23      Q       With respect to this literature, you also

24  said something about, you know, the type of analysis

25  you did here wasn't one that you were asked to do in

1   this case; is that correct?

2        A       Well, you know, I wasn't tasked to explain,

3   to come out with a full blown sort of model of turnout

4   with all of the effects.  I mean, partly, you know, you

5   are dealing with social science problem of small

6   numeracy.  There are only 20 precincts in the county

7   and going back, there are fewer, but there are I don't

8   think ever more.  So that kind of limits -- that kind

9   of limits what you can do, you know, from a more

10  orthodox social science viewpoint.

11       Q       My understanding is you came up with your

12  own research design.

13       A       That's true.  What I'm saying is that it's

14  always a process of negotiation.  You come back with an

15  outline and, you know, you get some feedback from the

16  legal team.  And they're like, okay, let's try this and

17  then there's this point.  I'm sure you're familiar with

18  this.  And you sort of work out, you know, what is

19  feasible in terms of data collection and analysis.

20              I think from a social science standpoint,

21  there is a limitation of only having 20 precincts, so

22  it's hard to include a full blown account of all the

23  various factors, you know.  We have ten of them perhaps

24  say when you only have 20 precincts.  That actually

25  creates problems.

223

1       Q       You also said that, you know, to

2   distinguish these two studies that you did that they

3   were a part of a local jurisdiction; is that accurate?

4   Did you focus in on the very particular place?

5       A       I'm saying that there's going to be

6   variability in these effects as you move from location

7   to location.  So, you know, the kind of positive --

8   modest positive impact that you get in one location

9   might not be replicated in another.  I do think that by

10   now however we have a mounting number of these studies

11   that suggest that the effect of the convenience forms

12   is always very limited.  It's rather small kind of on

13   the order of these papers.

14              And, you know, that compared to other

15   factors, you know, convenience is very limited and

16   that's because as I said for about the tenth time you

17   can have somebody coming to your door and asking you to

18   vote on an app and there are a certain number of people

19   that are not going to go along.  They're just not

20   interested.  And that's about as convenient as it can

21   get and that's -- I don't know how you get around that.

22       Q       You looked at Mr. Cooper's original report.

23   Quickly -- I'm going to show it to you very quickly

24   page 12 of Mr. Cooper's report as Exhibit 7.

25              (Gimpel Exhibit 7 was marked for purposes

224

1   of identification.)

2   BY MS. ADEN:

3       Q       This is his initial report.  I'll hand you

4   a copy and Mr. Seaquist a copy.

5               On page 12, if you can go there under

6   mobility, Mr. Cooper reports that of employed persons

7   16 and over, 81 percent of anglo residents drive to

8   work alone compared to 74.4 percent of black residents

9   and 79.7 percent of Latino residents.  By contrast, 23

10  percent of black residents in Waller County as compared

11  to only 12.6 percent of anglo residents commute to work

12  by walking, biking, or via carpool, i.e., that is

13  riding in another person's vehicle, taxi, or public

14  transit.  Do you have any basis to dispute those

15  numbers?

16      A       No, I don't have any basis.

17      Q       On page 14 of that same report if you go

18  further.

19      A       Okay.

20      Q       Under mobility again, it says in Prairie

21  View of employed persons 16 and over, 46.8 percent of

22  unemployed black residents drive to work alone compared

23  to 81 percent of employed anglo residents countywide.

24  Do you have any reason to dispute that?

25      A       No.

225

1       Q       On the bullet -- in the bullet below, it

2  reads in Prairie View, 46.5 percent of employed black

3  people commute to work by walking, biking, or via

4  carpool, that is riding in another person's vehicle or

5  taxi compared to 12.6 percent of employed anglo people

6  countywide.  Any reason to dispute that?

7       A       No.

8       Q       In light of the statements that you made in

9  your publications about transportation access and how

10  it relates to access to early voting, why did you not

11  consider that here?

12      A       Well, I think first of all we're talking

13  about distances.  I did consider the issue of distance,

14  okay, and I drew buffers that were very, very small.

15  Okay.  You know, a quarter mile is a little more than a

16  thousand feet, okay, and, you know, we still don't have

17  very high turnout within the people living that short

18  of distance.  Okay.  A half mile is not very far

19  either.

20              So I am considering distance.  That's what

21  those buffers are all about.  And what I'm seeing in

22  Waller County is that the people who are living further

23  away are the ones that are actually doing the voting.

24  So it seems to me like this distance argument in the

25  case of Waller County is really specious because we

226

1  have all of these people as I said living within a

2  stone's throw of a precinct site and they're still not

3  showing up to vote.

4      Q      How did you consider with these numbers

5  that were reported transportation of Prairie View

6  students were they to have to access the county

7  courthouse or another precinct off campus, did you do

8  an analysis of how their vehicle ownership or access to

9  vehicle ownership may impact their access to voting

10  under your definition or mine in light of your earlier

11  research?

12      A      Well, does -- so part of the reason why I

13  chose a quarter mile buffer is because transportation

14  shouldn't really be an issue there.  Transportation for

15  goodness sake ought to be an issue for people who maybe

16  have to travel, you know, a mile or more, but when

17  we're talking about a thousand feet, slightly more, you

18  know, or maybe 2,000 feet, you know, are we really

19  talking about something that's going to appreciably

20  change with the availability of a car?

21              These are very short distances we're

22  talking about here.  These are very walkable distances

23  particularly by able bodied young people.  It's strange

24  credulity for me to do -- to think, okay, that, you

25  know, having a car is going to make a difference for a

227

1   distance of three blocks or four blocks.

2        Q       Okay.

3        A       I would say further with respect to this

4   mobility question, we have no information in this

5   district about how far these people are traveling.

6   That's the kind of distance that I talked about in this

7   paper.  You know, if you are carpooling with someone

8   and your commute is 3 miles, okay, that's -- that's

9   still very, very different than driving alone and

10  having an hour or more to drive into Houston.

11              So without knowing something about the

12  actual distance being traversed, I don't think that

13  these figures that are cited in this report are very

14  informative at all.

15       Q       By buffer zones, you were talking about the

16  buffer zones you created to do your two articles?

17       A       No.  I was talking about in the report the

18  radii.

19       Q       You talked about reading Dr. Flores's

20  initial and rebuttal reports.  I'm going to skip around

21  so I can move this along.  Will you be opining on Dr.

22  Flores's reports or the information and expert opinions

23  presented if we go to trial in this case?

24       A       You know, I have no idea.  We have no -- we

25  have engaged in no discussion of that on the legal

228

1    team.  Trial seems at this point a long way off.  So

2    the answer is I don't know.

3         Q      Do you recall that Dr. Flores's report

4    draws on the Arlington Heights framework and senate

5    factors?  Does that sound familiar to you?

6         A      I remember that in the rebuttal report,

7    there's a section on that.

8         Q      Are you familiar with the Arlington Heights

9    factors?

10        A      I'm not and I didn't address that in --

11   well, I didn't intend to address that here or anywhere

12   else.  It's not been discussed.  Put it that way.

13        Q      Are you familiar with the senate factors

14   that he discussed in his report?

15        A      I'm not.

16        Q      So between the Arlington Heights factors

17   and senate factors that Dr. Flores discussed in his

18   report, you are not providing a specific opinion on

19   those one way or the other?

20        A      Not at this point.  Not at this time.

21        Q      So just to be clear, you did not do an

22   analysis of the impact of access as we define access,

23   not turnout, but access in terms of the rates of use of

24   early voting on black voters in Waller County?

25              MR. SEAQUIST:  I'm going to object to form.

229

1   How do you define access?

2               MS. ADEN:  Rates, usage, the rates of the

3   use of early voting.

4               MR. SEAQUIST:  You're saying just so it's

5   clear for the witness the proportion of early voting as

6   to election day voting?

7               MS. ADEN:  Yes.

8               MR. SEAQUIST:  Okay.

9               THE WITNESS:  I think that part of what

10  separates the sides are the varied definitions that

11  we're talking about here.

12              So I'm suggesting that turnout is essential

13  consideration, you know, when we're considering

14  convenience measures and I gather that that's different

15  on -- as far as plaintiffs are concerned.

16  BY MS. ADEN:

17      Q    So I'm going to ask my question again.  So

18  based upon Dr. Stein's analysis of access which you

19  agree is different than your definition of access; is

20  that correct?

21      A    I think I -- I think so.  I think so.

22  Things are beginning to break down here.

23      Q    We're tired.

24      A    I think things are beginning to break down.

25  The questions are confusing to me and I'm less and less

230

1    confident that I can answer coherently.

2       Q     We're getting to the end.  I have about

3    three to four more pages and these will be hopefully

4    yes or no answers.

5             I'm defining access in the following

6    questions as Dr. Stein did which is the proportion of

7    votes cast for early voting as compared to election day

8    voting.  So based upon that definition, you are not

9    providing an analysis of the impact of access on

10   early -- of access to early voting on black voters in

11   Waller County?

12            MR. SEAQUIST:  Object to the form and just

13   state for the record that defendant don't concede that

14   that's the way Dr. Stein defined access.

15            MS. ADEN:  Give me one second.

16   BY MS. ADEN:

17      Q     I'm going to skip that question for a

18   second.  You did not do an analysis of the history of

19   voting discrimination in Waller County?

20      A     Well, what is that?  So I've covered a lot

21   of ground on the history of the administrative

22   practices of the county as regards the population of

23   these precincts that both sides agree are heavily

24   African-American.  So I don't know what that is.  I

25   don't know what you're talking about.  So I'm saying

231

1   things are breaking down here.  You are becoming less

2   coherent or perception is.  I'm just not grasping where

3   you're heading.

4        Q      We can either take a break or --

5        A      We want to get this done.

6               MR. SEAQUIST:  Hold on.

7   BY MS. ADEN:

8        Q      So one thing the record should reflect is

9   that under the federal rules as far as I understand it,

10  we have seven hours to conduct a deposition.  Are we

11  operating on the same page?

12       A      Bring it, but I did not understand that

13  question.  I didn't get it at all.

14       Q      When we started the deposition, I made

15  clear that if there becomes a time when I ask a

16  question that is confusing because I'm human just like

17  you and you don't understand the question that you can

18  ask me to rephrase.  Is that fair?

19       A      Yes.  We're having a lot of those right

20  about now.

21       Q      And if you would like me to rephrase, you

22  could ask me to do that; is that correct?

23       A      Correct.

24       Q      If you need a break, you could also ask me

25  to do that.

232

1      A       No breaks.  Let's do it.

2      Q       Do you recall reading in Dr. Flores's

3  report him commenting on the existence of racially

4  polarized voting in Waller County?

5      A       I don't recall that specifically.

6      Q       So does that mean that you are not opining

7  one way or the other on the existence of racially

8  polarized voting in Waller County?

9      A       No.  You denied the existence of racially

10  polarized voting a few minutes ago when you indicated

11  that not all African-Americans there probably vote

12  Democratic.

13     Q       What is your definition of racially

14  polarized voting then?

15     A       It's the notion that the population of one

16  race votes heavily for one party and the population of

17  the other race votes heavily for the other, but you

18  indicated earlier today that you didn't think that that

19  was true.

20     Q       So if I dispute that definition of racially

21  polarized voting because I don't think that's accurate,

22  then maybe that is also a cause for breakdown, but the

23  point is you are not forming an opinion on racially

24  polarized voting in this case?

25     A       I wasn't asked to address that.  That might

233

1   be germane to redistricting, but that doesn't seem

2   germane here.

3        Q      Dr. Flores recounts a sequence of events

4   that led up to the decision and the adoption of an

5   early voting schedule for the 2018 election.  Do you

6   recall reviewing that?

7        A      There was an early schedule and then some

8   changes.

9        Q      Are you opining one way or the other on the

10  record of the sequence of events that Dr. Flores

11  reported in his report?

12       A      No.

13       Q      Dr. Flores reported on the record of

14  discrimination in education, employment -- strike that.

15             Dr. Flores and Mr. Cooper reported

16  disparities in education access, employment, and other

17  socioeconomic indicators in their reports.  Do you

18  recall that?

19       A      Yes.

20       Q      Are you --

21       A      We just looked at some for goodness sake,

22  right.

23       Q      Are you in any way disputing the

24  disparities that are reflected in their reports?

25       A      No.

234

1      Q      Dr. Flores reports on the extent to which

2   black people have been elected to public office on a

3   countywide basis in Waller County.  Do you remember

4   reviewing that?

5      A      No.

6      Q      Are you providing an opinion on the extent

7   to which black people have been elected to public

8   office on a countywide basis in Waller County?

9      A      No, no opinion.

10      Q      Dr. Flores reported on the issue of -- I'm

11   going to shorthand use rule addressing, the use of or

12   the issue that has come up with how students' addresses

13   when they register to vote have been used and how it

14   impacts voting and other issues in Prairie View.  Are

15   you generally familiar with what I'm talking about in

16   referring to it as rule addressing issues?

17      A      Yes.

18             MR. SEAQUIST:  Object to the form.

19   BY MS. ADEN:

20      Q      Did you analyze that issue in your report?

21      A      No.

22      Q      And are you forming an opinion or otherwise

23   disputing Dr. Flores's reporting of that issue in his

24   report?

25             MR. SEAQUIST:  Form.

235

1          THE WITNESS:  Well, first of all, I don't

2     recall exactly what he said about it, but first of all,

3     it was the county that discovered that issue and has

4     been working to rectify it.

5     BY MS. ADEN:

6          Q       How do you know that?

7          A       Because this was relayed to me as

8     information shared with counsel.

9          Q       And are you -- have you included that

10    dispute in the report that you disclosed to plaintiffs?

11         A       Well, clearly not.  It's not in there.

12         Q       So are you --

13         A       So, no.  The answer is no.

14         Q       So are you intending to offer an opinion

15    about that if we go to trial?

16         A       If I'm asked, I will.

17         Q       What is the basis of your opinion?  What

18    are you disputing?  What information are you providing?

19    And I'm asking that --

20         A       I will --

21         Q       Let me finish my question.  I'm asking that

22    because we are entitled to know -- the point of this

23    deposition is what you might say at trial.  So to the

24    extent you haven't reported it or commented upon it on

25    your report, we would like to discuss it now so we know

**James Gimpel, Ph.D. - December 12, 2019**

236

1    what you might say later.

2        A      I'm informed that -- that the county

3    discovered this issue providing we're even talking

4    about the same thing and that it has been working to

5    rectify it, taking a pretty proactive action to make

6    the adjustments to ensure that people are addressed in

7    their correct precinct.

8        Q      Dr. Flores provides an opinion about the

9    actual and contemporaneous rationales advanced by

10   Waller County officials in adopting and maintaining the

11   November early voting plan and whether they were

12   tenuous or pre-textual.  Are you forming an -- strike

13   that.

14             Dr. Flores provides an opinion about the

15   actual and contemporaneous rationales advanced by

16   Waller County officials in adopting and maintaining the

17   November early voting plan and whether they were

18   tenuous or pre-textual.  Do you recall reviewing that

19   in his report?

20       A      I don't.

21       Q      So you are not providing an opinion on

22   those alleged tenuous or pre-textual reasons for the

23   adoption and maintenance of the early voting plan?

24             MR. SEAQUIST:  Form.

25             THE WITNESS:  No.

237

1  BY MS. ADEN:

2      Q      Generally with respect to Dr. Joseph's

3  report, we already established that you're not a

4  historian.  Do you -- can you either -- either -- with

5  respect to Dr. Flores's report, do you wish to contest

6  the accuracy of anything in his report?

7              MR. SEAQUIST:  Form.

8              THE WITNESS:  That's a very broad question.

9  I will say I don't know.  Certainly I'll reserve the

10 right to contest the accuracy of things in his report.

11 I absolutely will, but it was a substantial report, so

12 there's a lot there.

13 BY MS. ADEN:

14     Q      You had that report available to you at the

15 time you provided the report in this case?

16     A      Yes.

17     Q      So if there were factual inaccuracies in

18 that report, you had the opportunity to identity them

19 in the report that you disclosed to plaintiffs?

20     A      Okay.

21     Q      Yes or no?

22     A      Well, you just suggested that that was

23 true.

24     Q      I'm asking you a question which is that you

25 had Dr. Joseph's report available to you before you

238

1  provided -- disclosed the report --

2      A      Well, I didn't address --

3      Q      Excuse me.  Let me finish my question.

4      A      Okay.

5      Q      My question is two part.  You had Dr.

6  Flores's report before you disclosed your report to us?

7      A      Wait a second.  First you're talking about

8  Flores and then you switched to Joseph.

9      Q      Thank you for correcting me.

10     A      You are very incoherent at this point.

11     Q      And you're being very rude to me and I'm

12 trying to be respectful.

13            MR. SEAQUIST:  Can we take a minute?  Is

14 that okay, counsel?

15            MS. ADEN:  That's fine with me.

16            MR. SEAQUIST:  Let's take a quick couple of

17 minutes.

18            (There was a brief recess taken.)

19 BY MS. ADEN:

20     Q      Before you stepped out, I wanted to

21 clear -- make clear for the record that you had

22 Dr. Joseph's report available to you before you

23 disclosed your report in this case?

24     A      Yes.

25     Q      And having seen it, are you -- you

239

1    therefore had the opportunity to contest the accuracy

2    of representations that he made in that report; is that

3    correct?

4        A     Yes.

5        Q     And are you disputing the accuracy of

6    anything that he has represented in that report?

7              MR. SEAQUIST:  Object to form.

8              THE WITNESS:  Not in my report.

9    BY MS. ADEN:

10       Q     Where do you expect to dispute the accuracy

11   of it if we are to go to trial?

12       A     I don't know.  Trial seems a long way off.

13       Q     At this time, do you have any basis to

14   dispute the accuracy of any of the representations that

15   he made in his report?

16             MR. SEAQUIST:  Object to the form.

17             THE WITNESS:  At this point, I don't.

18   BY MS. ADEN:

19       Q     Similarly you had Mr. Cooper's at least

20   initial report available to you at the time that you

21   provided your report?

22       A     Yes.

23       Q     And you had the opportunity to correct any

24   inaccuracies that he would have made in that report in

25   providing your report in this case; is that correct?

240

1      A      Yes.

2      Q      And with respect to his supplemental

3  report, let's just to be clear, you did not receive

4  that; is that accurate?

5      A      I don't recall receiving that report.

6      Q      So at this time, you have no basis because

7  you haven't seen his report to dispute anything with

8  respect to it?

9      A      No.

10            (Gimpel Exhibit 8 was marked for purposes

11  of identification.)

12  BY MS. ADEN:

13      Q      So for Exhibit 8, I'm going to hand you Dr.

14  Stein's expert rebuttal report and share a copy with

15  Mr. Seaquist as well.

16            MR. SEAQUIST:  Thank you.

17  BY MS. ADEN:

18      Q      I'm going to ask you to look at page 3 of

19  Dr. Stein's rebuttal report and read the paragraph

20  starting with but Professor Gimpel.

21      A      "But Professor Gimpel is mistaken.  In this

22  case, the relevant issue is not whether early voting is

23  a wise policy, but whether Waller County has

24  discriminated against legally protected classes of

25  voters in the way it provides access to early voting

241

1  opportunities.

2          "What is relevant is not whether the

3  county's early voting schedule caused more or fewer

4  people to vote early, but whether the opportunity to

5  vote early was equally accessible to black and white

6  voters and young or older voters.  Turnout dispute

7  about access misses the mark.  The approach that

8  Professor Gimpel takes would be like trying to defend a

9  preschool that refuses to admit black students by

10  arguing that preschool does not have a measurable

11  impact on later academic success.  The issue is access,

12  not outcomes."

13     Q     Based upon that paragraph, do you think

14  it's fair to say at the end of the day that you and Dr.

15  Stein are responding to different questions with your

16  reports?

17     A     Well, we certainly view the measures

18  differently, you know, and the concepts differently.  I

19  think that that must be true.  That must be true.

20     Q     And in the next paragraph, I'm going to

21  read it.  It -- this rebuttal report of Dr. Stein, it

22  reads:  "It appears that Professor Gimpel has

23  incorrectly assumed that the plaintiffs' claims are

24  that they were prevented from voting because of how

25  Waller County operated early voting.  This assumption

242

1   is a critical misconception that inappropriately

2   prompts Professor Gimpel to focus on voter turnout

3   which is irrelevant to the plaintiffs' claims, legal

4   theory, or expert reports.

5           "As such, Professor Gimpel's analysis of

6   the relationship between opportunities to vote early

7   and voter turnout ignores the heart of plaintiffs'

8   claims that they did not have equal access to the

9   opportunity to vote early as compared to other

10  residents in Waller County during the 2018 general

11  election.

12          "Access is not limited to only the

13  placement of an early voting location.  Access also

14  includes the number of days and hours at the location.

15  These concerns underscore significant limitation with

16  Professor Gimpel's analysis."

17          Do you understand Dr. Stein's criticism of

18  your report in this paragraph or the other?

19       A     Well, he's trying to say that, you know,

20  that a turnout doesn't matter and, you know, I think

21  the whole point of access to early voting is to promote

22  turnout.  And so I think that there's, you know, just a

23  very fundamental difference there.

24       Q     Despite having that fundamental difference,

25  based upon having reviewed Dr. Stein's initial report

243

1  and his rebuttal report, do you have -- what's your
2  basis for disagreeing if at all with his ultimate
3  conclusion that Waller County's early voting plan for
4  2018 disproportionately impacted voters age 18 through
5  20, black voters age 18 to 20, and black voters in
6  Prairie View?
7            MR. SEAQUIST:  Object to the form.
8            THE WITNESS:  Well, once again, there were
9  places in Waller County that got no hours and that got
10 no sites and still had demand for early voting based on
11 rates of early voting.  And, you know, the fact that
12 Waller County got sites and hours should not be
13 neglected and ignored to the exclusion of the evidence
14 showing that other locations in the county received no
15 hours and no sites either on election day or in the
16 early voting period at all.
17 BY MS. ADEN:
18     Q      Exhibit 7 is a separate document, Dr.
19 Gimpel, that I provided to you which is Mr. Cooper's
20 report.
21     A      Um-hmm.
22     Q      Would you agree that within that report,
23 Mr. Cooper relies upon census and ACS data?
24     A      Yes.
25     Q      Is that appropriate data or -- strike that.

244

1              Do you have any basis to dispute or

2    question the use of his census and ACS data?

3       A       No, I don't think so.  The ACS data have

4    error, you know.  The ACS data are estimates and

5    there's a five-year survey and a three-year survey, a

6    one-year survey.  It looks like he's using mostly ACS

7    data from a five year, '13 to '17.  So, you know,

8    there's error around these estimates that, you know, is

9    not reported in the tables.

10             Having said that, I don't particularly have

11   a problem with the way it's presented.  He probably

12   lopped the error off because it cluttered up the

13   tables.  So, you know, I will say for the record that,

14   you know, the ACS is a survey and so, you know, some of

15   these estimates have pretty substantial errors around

16   them that go unreported, but I would also say that for

17   the sake of a clean presentation, it's not surprising

18   that he left those errors out.

19      Q       Do you consider yourself a professional

20   demographer?

21      A       It's not really my field.  Demography is a

22   branch of sociology.  I have worked with a lot of

23   demographic data, but that I'm not a -- no, I would say

24   I'm not a professional demographer.

25      Q       Has any court ever qualified you as an

1   expert on demography or mapping?

2        A      I don't know the answer to that.  I'm not

3   quite sure what the answer to that is.  I don't know

4   what the courts have said as far as qualifications go.

5        Q      Do you think you're qualified to evaluate

6   demographer or map maker -- strike that.

7               Do you think you're qualified to evaluate a

8   demographer, an expert demographer's methodology and

9   conclusions?

10       A      Yes.

11       Q      Based upon?

12       A      Well, I've done quite a bit of work in the

13  area.  I'm not a professional demographer, but I've

14  certainly worked with a lot of demographic data and

15  continue to do so.  And I actually published in

16  sociology journals.

17       Q      You testified earlier that the literature

18  generally shows that there is no evidence that early

19  voting increases turnout, correct?

20       A      Yes.

21       Q      And that conclusion is also in your report,

22  correct?

23       A      Yes.

24       Q      So you write in your report on page 45

25  that, quote:  "There is no basis in the evidence to

246

1   conclude that allocating additional hours of early

2   voted in Prairie View would have a substantial effect

3   on turnout."

4       A       That's correct.

5       Q       So is it fair to say that according to your

6   testimony today and your report that there is no causal

7   relationship between greater access to early voting and

8   higher turnout?

9       A       In these particular data, I'm suggesting

10  that there's lack of evidence of any association

11  between the two.  And that's death to causality, right.

12  Once again, there are three conditions.  One of them is

13  as X changes, Y has to change.  So, you know, if you

14  don't have that, if there's no co-variation, you're not

15  going to find causality even if the other conditions

16  are present, right.

17              So I think that that's really the problem,

18  you know, with the relationship between hours and

19  turnout is that it's flat.  And, you know, we can see

20  that in the plot where we have precincts like 101 with

21  ample hours that are turning out at around 50 percent,

22  okay, and there are precincts like 207 with no hours at

23  all that are turning out at about the same level.

24      Q       Is it fair to say -- strike that.

25              Is it fair to say that if a specific group

247

1  of voters has high access to early voting, it doesn't

2  automatically follow that they will have high turnout?

3       A       I think that that's true.  You can provide

4  a lot of access to early voting and not push turnout

5  up.  I think that's one of the problems that's

6  indicting these convenience reforms as ineffective is

7  the people who vote on election day are being

8  convenienced by now voting in the early voting period,

9  but it's not doing anything to push turnout up which,

10 of course, is the original intent.

11             That's the original intent of adopting

12 these convenience reforms just like motor voter is to

13 produce, you know, more active and participatory

14 electorate.  And often that's not happening very

15 frequently in tests like the ones here.  You can find,

16 you know, in some cases and in some elections modest

17 bump up, but it has to do with there being this

18 ceiling, you know, on the effects of convenience and

19 ultimately there are going to be people who can have

20 all the conveniences in the world at their doorstep and

21 they're just not interested and mobilized to vote.

22      Q       To that point, if a specific group of

23 voters has low access to early voting, it doesn't

24 automatically follow that they will have low turnout?

25             MR. SEAQUIST:  Form.

248

1           THE WITNESS:  It doesn't necessarily mean

2      that because there is that election day option and we

3      actually know, right, of states that have either been

4      very slow to adopt early voting or not adopt it at all

5      and there are places in those states that have very

6      high turnout.

7      BY MS. ADEN:

8           Q      So putting that together, if in a given

9      election a group of voters has low turnout based on

10     your testimony in the literature you cite, we can't

11     necessarily conclude that those voters had low access

12     to early voting; isn't that accurate?

13          A      I think the two are independent in the way

14     that I just described.

15          Q      And similarly if a group of voters has high

16     turnout in a given election, you can't necessarily

17     conclude that those voters had high access to early

18     voting, correct?

19          A      Well, clearly you can't because as I said,

20     there are many states that were slow to adopt early

21     voting or don't have it at all and their turnout is

22     high.

23          Q      If Prairie View students were given greater

24     access to early voting based upon your testimony today,

25     we can't automatically conclude that they would have

1    lower turnout; is that right?

2               MR. SEAQUIST:  Form.

3               THE WITNESS:  Either way, we're not sure

4    that the turnout would be lower or higher.

5    BY MS. ADEN:

6        Q    So flipping that, if Prairie View voters

7    were given less access to early voting based upon your

8    testimony, we can't conclude that they would have lower

9    turnout?

10       A    Not necessarily.  It's sufficiently

11   independent relationship that, you know, we have these

12   election day -- you know, we have -- we have these --

13   this election day option still.  That's not been taken

14   away.

15       Q    So wrapping this all up and I'm winding

16   down, in a different election, if Prairie View voters

17   had high turnout just based upon that data point, we

18   don't necessarily know if they had high or low access

19   to early voting in that election; is that correct?

20               MR. SEAQUIST:  Form.

21               THE WITNESS:  Sure, right.  And we don't go

22   back far enough in these reports in this with respect

23   in any of the reports, but you could go back.  Early

24   voting is relatively recent phenomenon in the history

25   of Texas.  It started in the early and mid-nineties.

250

1  So naturally we can go back before the period of early

2  voting if we had the data and see that across the

3  Waller County precincts, we had high turnout and low

4  turnout for all of the various reasons we've discussed

5  today in a period where early voting didn't exist,

6  right.  So early voting is separate from -- is

7  independent of, you know, the question of

8  participation.

9  BY MS. ADEN:

10      Q      Based upon the fact that there's not a

11  causal relationship that you can demonstrate, how can

12  we conclude that high turnout is evidence of high early

13  voting access?

14      A      I don't think that you can because as I

15  said, there are all these other reasons that we've

16  discussed throughout the day that drive participation.

17  And many of them are interested in mobilization and

18  campaign related and have nothing to do with

19  convenience.  And, in fact, that's what I'm saying

20  happened in Prairie View A&M in 2018.

21      Q      So for this matter then, if early voting

22  doesn't affect turnout or we can't link the causal

23  relationship to them, how can you tell us that turnout

24  has anything to do with the adequacy of early voting in

25  Waller County?

251

1       A       Because what you can show is that there's
2   no relationship, right, that there's no relationship
3   between availability of hours and the level of turnout,
4   that there's no relationship at all.  And so when
5   there's no relationship at all, that's death to the
6   causality.  Remember, folks, these three things are
7   necessary.  Okay.  They're not sufficient, but they're
8   necessary.  They're necessary conditions, right.
9   They're necessary.  Okay.
10              So the correlation has to be there either
11  inverse or positive, okay, or it's death to causality,
12  okay, because that second condition isn't met.  And
13  that's what we've got here.  We've got, you know,
14  levels of turnout that range all over the place with
15  all kinds of hours none and some.
16      Q       You read plaintiffs' complaint, yes or no?
17      A       Yes.
18      Q       And in your report on the first page, it
19  says that you were hired to evaluate plaintiffs' claims
20  and respond to expert reports presented by the
21  plaintiffs?
22      A       Yes.
23      Q       If you didn't analyze the impact of the
24  early voting plan in terms of age or race explicitly,
25  how could you have possibly, quote, evaluated the

252

1    plaintiffs' claims?

2         A       Because what we're dealing with as we've

3    said a number of times throughout the day when you're

4    looking at Prairie View and you're looking at Prairie

5    View A&M, you are largely talking about race.  And the

6    plaintiffs understand that in their reports.  And we

7    certainly understand it over on our side.  Those things

8    wind up being proxies for race particularly in the

9    absence of more detailed information.  It's present in

10   their plaintiffs' report and it's present in our

11   reports.

12        Q       So by Prairie View A&M area, does that mean

13   race?

14        A       That largely means race for very good

15   reason.  The statistics you yourself cited.  You gave

16   me the data actually from one of the reports about the

17   composition of 309 and 310, the precincts in that area.

18   So that's race.

19        Q       So Prairie View area which you describe as

20   the Prairie View campus and the City of Prairie View?

21        A       Yes.

22        Q       In your mind, the definition is race?

23               MR. SEAQUIST:  Form.

24               THE WITNESS:  That's -- that's the lens

25   that we have and that's central to the complaint.  And

253

1  that's well understood by both the plaintiffs and their

2  experts and on this side that that's really a

3  discussion about race.

4  BY MS. ADEN:

5      Q     Is that a scientific definition?

6      A     That's the definition that's being used by

7  all sides in this.

8      Q     Is that a definition based upon -- strike

9  that.

10           Why then in the other articles that you put

11  out into the universe as peer reviewed publications do

12  you go about then specifically and directly identifying

13  socioeconomic status, age, race and studying those in

14  an explicit manner and here you use the term Prairie

15  View area to talk about black human beings?

16           MR. SEAQUIST:  Form.

17           THE WITNESS:  You know, it's -- the actual

18  approaches aren't that different.  You know, when you

19  take a look at what we're looking at in political

20  participation and accessibility of the ballot box,

21  we're not looking at anything other than precincts.  We

22  don't have individuals here.  These are precincts.

23  Okay.

24           And so when I look at a race and

25  socioeconomic status and measure those, I'm measuring

1   them exactly the same way as we do in the Waller County

2   report.  These are -- when we talk about black

3   precincts, we are talking about preponderance or

4   percentage black.  When we're measuring income, we're

5   looking at, you know, median income figure or, you

6   know, the percentage that might be above a certain

7   threshold.  These are precincts.

8          Same thing actually -- well, no.  Here --

9   well, here is slightly different.  Here we actually are

10  using the Clark County voter file, but, again, we have

11  the disadvantage of the Clark County voter file not

12  providing race and economic information actually on the

13  file.  So what do we do?  We actually substitute in for

14  race and economic composition.  We actually substitute

15  in the census track share, okay, where they live, okay,

16  which is a second best.

17         But, you know, if you don't have individual

18  level information on race or income or the percent

19  moving from a different state or the percent who are in

20  college, if you don't actually have individual level

21  information on that, you're stuck using aggregate data.

22  We use that here and we use that in the Waller County

23  report.

24  BY MS. ADEN:

25     Q    And Dr. Stein uses that as well?

255

1      A      The -- for instance, throughout the Cooper

2   report, you know, we're relying on -- well, maybe not

3   so much the Cooper report.  This is actual individual

4   survey level data.  But when we rely on a lot of the

5   census information in the reports, a lot of times we

6   are drawing on aggregates.

7            So this would be like a track level, block

8   groups.  I saw block groups in several of the reports

9   which is the next level down and precincts which would

10  be slightly more granular.  It's possible to use ZIP

11  codes which are probably between like a precinct and a

12  block group, you know, in terms of size.  You know,

13  that's unfortunate, I suppose, but we don't have

14  individual level on the voter file, you know, going to

15  race and socioeconomic status and that's a limitation.

16     Q      Excuse me.  I'm sorry.  We do have it with

17  respect to age, though?  We can determine age?

18     A      We do.

19     Q      And so it was possible -- it's possible to

20  differentiate between within your definition of the

21  Prairie View area, the difference between people who

22  are 18 to 20 versus not 18 to 20 in the Prairie View

23  area?

24     A      But once --

25     Q      Yes or no?

256

1    A      Yes.  And those data are -- the age

2   variables and birth date is available on the Texas

3   voter file, but I don't think, you know, that anybody's

4   disputing the preponderance or the high percentage of

5   18 to 24 or 18 to 20-year-olds in 309.  I don't think

6   anyone is really disputing that.  That's a college

7   campus for goodness sake.  What else are we going to

8   find there?  We're not going to find 85-year-olds.

9           I don't think anybody is disputing that,

10  right.  We know that this is going to be a location in

11  a county where there's a very large share of 18 to 24

12  or 18 to 20-year-olds.  I don't see any way of

13  challenging that or any purpose for challenging that.

14   Q      And there's no basis for inversely

15  disputing the age range for the other residents in

16  Waller County outside of the Prairie View area as

17  you've defined it?

18   A      The mean age would have to be larger

19  because we have such a concentration of young people on

20  the Prairie View campus.  It would almost have to be

21  older, you know.  As you get into the rest of the

22  county, you've got family age people and more of a mix.

23           MS. ADEN:  I don't have any other

24  questions.

25           MR. SEAQUIST:  We will reserve the right to

James Gimpel, Ph.D. - December 12, 2019

257

1    read and sign.  Please, if you'll direct that to my

2    attention.  Defendants will reserve their questions for

3    the time of trial.

4                    (Deposition was concluded at 5:48 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

258

1              CERTIFICATE OF DEPONENT

2          I hereby certify that I have read and

3     examined the foregoing transcript, and the same is a

4     true and accurate record of the testimony given by me.

5

6          Any additions or corrections that I feel

7     are necessary will be made on the Errata Sheet.

8

9

10                   _____

11                   James G. Gimpel, Ph.D.

12

13

14                   _____

15                   Date

16

17    (If needed, make additional copies of the Errata Sheet

18    on the next page or use a blank piece of paper.)

19

20

21

22

23

24

25

259

1                        ERRATA SHEET

2    Case:  Jayla Allen, et al. v. Waller County, et al.

3    Witness:  James G. Gimpel, Ph.D.      Date:  12/12/2019

4    PAGE/LINE              SHOULD READ        REASON FOR CHANGE

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

260

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2              I, Steven Poulakos, registered

3    Professional Reporter, the officer before whom the

4    foregoing proceedings were taken, do hereby certify

5    that the foregoing transcript is a true and correct

6    record of the proceedings; that said proceedings were

7    taken by me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am neither

9    counsel for, related to, nor employed by any of the

10   parties to this case and have no interest, financial or

11   otherwise, in its outcome.

12             IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 31st day of

14   December 2019.

15   My commission expires:

16   May 31, 2021

17

18

19

20   --------------------------

21   NOTARY PUBLIC IN AND FOR

22   THE DISTRICT OF COLUMBIA

23

24

25

**$**

**$300 (2)**
  17:24;18:3

**A**

**A&M (12)**
  45:7;114:9;121:7;155:18;
  182:12,15;193:22;195:4;
  221:8;250:20;252:5,12

**abandoned (1)**
  166:10

**aberration (2)**
  132:4;136:4

**ability (1)**
  7:18

**able (7)**
  43:24;87:20;130:2;
  149:19;166:8;212:8;226:23

**about (250)**
  5:19;7:4;12:18,19,20;
  13:7,21,25;14:1,2,11;15:3,
  5;17:4,6,7;20:20;21:5,11,
  14,18,20;23:4,20,23;28:4,
  11,18,20,21,24;29:20;
  30:10,14;31:19;35:7,21;
  38:22,22;41:10,12,15;42:9;
  46:8;47:13;48:19;49:2,16;
  50:15;51:3;52:6;53:9;54:3,
  8,15;56:16;57:3,19;59:3;
  60:18;61:12,14;63:19,20;
  64:11,14;65:14;67:23;
  69:12,14;70:4;72:18,21;
  74:20,20;75:16,17;76:6,8,
  20;77:4;79:13,14,15,17;
  86:4;87:25;90:5,6,10,13,14,
  16;91:8,19,25;92:11,15;
  93:14;94:4;96:9,9;102:3,11,

16,23;104:6,8;110:3;
111:23;112:8;113:22;
119:11;120:21;121:18;
123:1;124:7;125:9;126:23;
128:21;130:7;131:20;
133:20;134:21,22;136:21;
138:18;139:6;140:14,21,22;
142:25;144:5,9,11,22;
145:1,2,5,7,9,10,13;146:22;
147:1,21;148:6;149:14,16;
150:8,10,13,16,20,25;
152:10,19;159:18;161:20;
162:3,14;164:3,5,19;167:6;
169:23,25;170:17,18;171:1;
172:7;174:21,22;175:6,10;
176:3;179:7,25;183:2,8,14;
184:11;186:6,21;187:20;
188:21;190:6;191:6;
192:17;195:1,1,3,4,6,8,15,
17,20,23;197:8;198:21,23;
199:24;200:2,4;201:13;
202:11;203:16,18;204:13;
206:1,16;207:18;209:9;
216:18;221:24;223:16,20;
225:9,13,21;226:17,19,22;
227:5,6,11,15,17,19;
229:11;230:2,25;231:20;
234:15;235:2,15;236:4,8,
14;238:7;241:7;246:23;
252:5,16;253:3,12,15;
254:2,3

**above (2)**
  213:3;254:6

**abridged (1)**
  151:3

**absence (2)**
  117:12;252:9

**absentee (3)**
  159:2,6;216:2

**absolutely (5)**

41:2;73:20;121:23;182:3;
237:11

**absorb (3)**
  52:8,13,20

**abstain (3)**
  98:20;99:6,7

**abstaining (2)**
  99:17;105:4

**abstention (3)**
  98:18;106:9,10

**abstract (1)**
  40:8

**academia (1)**
  24:18

**academic (8)**
  22:15,24;23:8,12;24:7;
  36:13;37:15;241:11

**accept (1)**
  188:18

**acceptable (1)**
  27:21

**acceptance (2)**
  47:13;65:10

**accepted (3)**
  27:11;47:2;136:17

**access (48)**
  59:5,6;68:12,16;99:9,21;
  104:7,19;105:20;109:3;
  147:17;169:9;190:22;
  206:5;216:4;225:9,10;
  226:6,8,9;228:22,22,23;
  229:1,18,19;230:5,9,10,14;
  233:16;240:25;241:7,11;
  242:8,12,13,21;246:7;
  247:1,4,23;248:11,17,24;
  249:7,18;250:13

**accessibility (9)**
  37:6;210:21;211:23;
  212:3,4,12;213:4,8;253:20

**accessible (4)**

110:6;155:16;212:18;
241:5

**accessing (1)**
  183:25

**accommodate (2)**
  173:17;201:4

**accomplish (1)**
  161:13

**according (13)**
  72:16;115:10;145:22;
  172:11;180:2;189:2;
  192:15;194:16;196:9,13;
  219:11;221:10;246:5

**account (6)**
  39:10;42:5,7;162:6;
  216:1;222:22

**accounted (1)**
  206:18

**accumulated (1)**
  30:22

**accuracy (6)**
  237:6,10;239:1,5,10,14

**accurate (13)**
  38:24;54:12;92:23;93:24;
  180:4;200:6;207:5;217:23;
  223:3;232:21;240:4;
  248:12;258:4

**accurately (1)**
  26:9

**accustom (1)**
  221:3

**acknowledge (1)**
  200:12

**acknowledges (1)**
  149:22

**acknowledging (1)**
  172:4

**acknowledgment (1)**
  187:19

**acknowledgments (1)**

141:1

**across (32)**
30:5,25;35:10;45:10;
47:5;49:20;95:5;96:14,16;
105:5,20;106:24;107:24;
112:20;113:16;116:24;
117:21,22;118:19;119:3;
123:12;137:11;147:13;
150:14;159:16;160:14,22;
180:19;183:4;188:6;216:7;
250:2

**ACS (6)**
243:23;244:2,3,4,6,14

**Act (4)**
61:3;124:19;158:17;
204:17

**action (1)**
236:5

**active (1)**
247:13

**activities (1)**
176:24

**activity (1)**
173:3

**actual (10)**
109:10;115:3;154:16;
176:21;211:14;227:12;
236:9,15;253:17;255:3

**actually (57)**
9:14;50:19;53:20;71:9;
80:10;90:12;99:15;103:11;
106:17;108:7;110:16;
113:11;115:15,24;116:3,5,
6,8;117:1;121:2;126:23,24;
134:12,22;139:22;140:9;
143:22;146:12;153:7;
155:15;158:21;167:23;
174:6;175:5,7;181:2,4;
182:18;183:23;185:18;
194:2;209:9;211:12;

219:13;220:5;221:21;
222:24;225:23;245:15;
248:3;252:16;254:8,9,12,
13,14,20

**Adam (3)**
105:25;135:1;217:2

**add (5)**
97:24;98:1;132:6,7;
168:24

**added (2)**
118:12;181:16

**addition (6)**
68:23;94:12;97:8;139:11;
169:15;215:7

**additional (4)**
160:18;206:25;246:1;
258:17

**additionally (2)**
4:25;6:14

**additions (1)**
258:6

**address (13)**
87:17;111:16,17;144:18;
159:5;162:10;170:1;208:7;
219:14;228:10,11;232:25;
238:2

**addressed (4)**
31:9;116:19;212:7;236:6

**addresses (3)**
139:15,19;234:12

**addressing (3)**
108:6;234:11,16

**ADEN (109)**
4:9,12,21;5:10,13;7:25;
13:5;15:8;25:7;31:11;32:4;
36:3,5,23;38:4;44:4;47:11;
53:10;60:3;62:16;64:10;
67:1,18;71:2;76:8,15;77:2;
78:20;81:7,11,21;82:7;
83:22;84:5,20;86:24;87:4,

9;88:11;89:3;109:1;121:15;
122:9;124:1;127:11;
128:15;130:5,19,22;131:15;
132:9;133:11;135:16;
138:3,14,16;143:7;150:17;
159:9;172:22;175:25;
176:8;178:16;179:6,15,16;
184:12;187:9;188:15;
190:1,20;194:8;195:9;
198:7,13,15;202:7;204:1;
205:8,10,25;209:4;210:18;
211:1;214:1;224:2;229:2,7,
16;230:15,16;231:7;
234:19;235:5;237:1,13;
238:15,19;239:9,18;240:12,
17;243:17;248:7;249:5;
250:9;253:4;254:24;256:23

**adequacy (1)**
250:24

**adequate (2)**
116:9;119:13

**adjunct (1)**
22:17

**adjustments (1)**
236:6

**administers (2)**
57:1;125:4

**administrating (1)**
123:8

**administration (6)**
72:6,7;110:17;125:2,12;
157:15

**administrative (16)**
109:17,18,22;110:1,10;
111:13;112:20;129:2,5;
144:1;168:17,25;180:18;
185:15;186:10;230:21

**administrator (4)**
90:1;119:1;122:23;
184:18

**administrators (10)**
110:2;120:8;123:4;137:9;
157:11;180:19;202:25;
207:12,25;210:11

**admit (1)**
241:9

**admits (2)**
141:21;149:23

**admitted (1)**
128:2

**adolescence (2)**
153:25;154:6

**adopt (4)**
53:5;248:4,4,20

**adopted (4)**
57:9;74:25;97:1;103:14

**adopting (4)**
103:16;236:10,16;247:11

**adoption (4)**
56:24;200:3;233:4;
236:23

**ads (1)**
29:8

**adulthood (2)**
154:1,6

**advance (3)**
75:16;128:6;177:13

**advanced (3)**
20:8;236:9,15

**advances (1)**
218:9

**advice (1)**
101:17

**affairs (1)**
129:25

**affect (2)**
218:24;250:22

**affiliated (1)**
153:14

**affiliation (7)**

33:15;35:9;51:20,23;
53:15,19;54:20

**affirmations (1)**
6:15

**affirmatively (2)**
200:25;215:11

**affluent (4)**
42:23,25;43:4;183:1

**African-American (9)**
39:25;46:2;48:2,21;
170:20,23,25;195:7;230:24

**African-Americans (4)**
48:15,23;152:24;232:11

**after (9)**
46:3,11;69:11;85:20;
107:5,5;114:11;135:9;
182:23

**afternoon (2)**
53:23;89:8

**again (61)**
6:15;7:9;24:4;44:16;
48:12,22;51:1;52:10;77:8,
14,16;98:11;101:15;104:16,
18;106:11;107:19;110:8;
112:15;115:13;116:22;
117:6,11,15;120:5,14;
122:2;130:15;134:2;
137:23;143:15,20;148:11;
153:22;158:3,13,19;160:4;
161:10;177:2,17;178:10;
180:8;181:13;184:15;
186:5,9;190:12;191:10,16;
194:19;196:20;198:5;
199:1;204:22;211:5;
224:20;229:17;243:8;
246:12;254:10

**against (7)**
27:21;43:23;80:11,14;
156:24;205:15;240:24

**age (50)**

41:15,16,21,22,22,24;
43:16;44:10,13;46:5;47:7;
58:16,19,21,22;59:1,2;
84:11,13,22;85:3,12;125:7;
139:9,13;163:23;172:12,14;
178:12;181:25;182:10;
191:25;192:2,24;206:19;
213:16;214:7;215:8,9,11;
243:4,5;251:24;253:13;
255:17,17;256:1,15,18,22

**aggregate (3)**
195:24,25;254:21

**aggregates (1)**
255:6

**aggression (1)**
148:22

**aggressive (1)**
158:17

**ago (13)**
12:23;14:24;45:1;50:15;
56:23;57:3;119:10;128:22;
149:5;195:5;204:12;
215:17;232:10

**Agre (12)**
10:23;11:1,2;55:13,16,
17;59:25;60:13;76:17,19,
21;80:11

**A-G-R-E (2)**
11:2;76:21

**agree (24)**
5:11;15:10;52:21;67:24;
69:3,5;71:1;78:16;79:4;
100:1;128:4;135:21;138:4,
11;156:22;160:24;162:5;
171:24;173:12;190:8;
196:3;229:19;230:23;
243:22

**agreeable (5)**
5:5,6;6:18;7:2,12

**agreed (2)**

80:10,11

**agreement (2)**
5:8;6:15

**agrees (1)**
135:2

**ahead (4)**
123:18,20;124:20;182:8

**ain't (1)**
118:13

**aisle (1)**
30:5

**akin (1)**
29:23

**Alan (1)**
217:11

**alarming (1)**
75:18

**alcoholic (1)**
7:21

**aldermen (1)**
57:14

**allegation (2)**
46:12,15

**allege (1)**
45:5

**alleged (4)**
44:10;46:5;86:15;236:22

**alleges (1)**
44:5

**allegiance (3)**
31:6;32:8,11

**alleging (6)**
43:22;44:18;60:25;61:5,
8;182:10

**Allen (3)**
4:14;89:17,17

**A-L-L-E-N (1)**
89:17

**Allens (2)**
163:13,14

**allocate (4)**
45:8;115:20;150:25;
156:13

**allocated (1)**
119:22

**allocating (2)**
119:24;246:1

**allocation (8)**
92:22;94:19;114:25;
115:4;148:5,10;151:23;
191:14

**allotted (1)**
63:13

**allow (3)**
5:2;8:2;99:5

**allowed (2)**
160:25;176:10

**allowing (2)**
68:18;95:13

**almost (6)**
155:18;156:3,7,9,22;
256:20

**alone (5)**
113:5;182:12;224:8,22;
227:9

**along (10)**
98:3;158:4;164:4;168:15;
171:21,22;204:21;218:6;
223:19;227:21

**alongside (3)**
84:18;109:13;146:7

**aloud (4)**
65:4;67:9;68:9;77:17

**already (3)**
116:19;198:19;237:3

**also (80)**
10:21;13:2,24;19:3;21:3,
9;22:18;23:15;25:3;27:25;
33:14;41:17,18;42:19;43:1;
45:20;46:25;47:21;48:13;

49:4,6;51:4,15;56:11;
77:24;81:8;90:14;91:10;
92:9;95:16;97:16;98:1;
100:13,16;111:6;112:14,15,
21;114:4;117:11;120:17;
126:18;146:3,19;152:3;
155:6,8;156:12;159:1;
160:17;169:19;173:9,15;
174:2;180:12;181:9;
194:22;197:3;198:13;
199:14;202:17;207:2;
212:15;214:4;215:2,8;
216:20,21;217:24;219:8,10;
220:3,12;221:23;223:1;
231:24;232:22;242:13;
244:16;245:21

**alternative (1)**
166:23

**alternatives (1)**
177:11

**although (1)**
216:20

**alumni (3)**
136:13;165:10,10

**always (10)**
34:21;75:21;119:16;
168:10,16;173:5;177:3;
179:12;222:14;223:12

**amazing (2)**
194:5;196:21

**ambiguity (2)**
61:12,14

**ambitious (1)**
216:6

**amended (1)**
209:22

**amendment (4)**
123:15,17;124:2,7

**amendments (3)**
124:5,8,9

**American (5)**
20:11;23:8,13;40:1;99:5

**amidst (2)**
196:19;197:19

**among (19)**
28:23;46:22,24,25;49:12;
68:18;101:15;105:23;
109:17;111:18;126:25;
153:20;155:5,19,25;170:25;
171:6;182:16;186:10

**amongst (2)**
47:14;113:1

**amount (12)**
63:16;69:16;70:2;72:23;
110:25;111:4;140:15;
158:20;161:13,16;183:6;
206:24

**ample (1)**
246:21

**analyses (4)**
41:18;42:14;150:9;
194:23

**analysis (38)**
71:19;74:21;88:8;106:19;
109:7;111:18,21,24,25;
112:7;115:4,17;129:18;
147:14;148:19,20;159:10,
17;160:14;161:9;171:10;
187:13,23;189:2;200:9;
206:24;213:17;214:14,24;
221:24;222:19;226:8;
228:22;229:18;230:9,18;
242:5,16

**analytical (3)**
144:14,16,20

**analyze (10)**
43:11,15,19,24;44:22;
174:12,13,17;234:20;
251:23

**analyzed (4)**

170:4;184:7,9;187:25

**ancestor (1)**
204:21

**ancestral (1)**
201:10

**anchored (1)**
29:23

**and/or (3)**
19:12;60:21;154:6

**anecdotal (1)**
174:24

**anecdotes (2)**
174:24;175:2

**Angeles (1)**
59:11

**anglo (4)**
224:7,11,23;225:5

**Anne (1)**
49:13

**announced (1)**
65:25

**another (29)**
11:20,23;18:16;20:1;
22:14;32:2;33:18;67:8;
76:24;89:6;107:15;113:14;
137:3,15;154:13,22;155:17,
24;156:11;162:18;165:20;
213:22;214:2;216:8;220:8;
223:9;224:13;225:4;226:7

**answer (58)**
5:23,24;7:7,10,11,15,18;
8:3;10:9;11:25;12:4;18:21,
25;30:16;39:21;43:7;55:4;
60:11;61:24;62:1,24;64:1;
82:18,19;84:1,7;87:11;
102:8,10;107:18;109:14;
113:18;123:24;124:4;
129:11;135:17,24;143:11;
144:10,17;145:2;163:18;
193:12,25;196:22;197:21,

23;199:25;205:18,24;
207:21;221:20,20;228:2;
230:1;235:13;245:2,3

**answered (1)**
144:5

**answering (5)**
6:7,21;8:2;116:20;144:11

**answers (3)**
78:8;100:23;230:4

**anticipate (1)**
128:23

**anticipating (1)**
169:20

**Antonio (2)**
199:14,24

**anybody (2)**
218:14;256:9

**anybody's (1)**
256:3

**anymore (4)**
23:9;105:13,18;166:10

**anyone (10)**
14:4,8;17:2,11;30:1;
128:22;179:3;219:16,17;
256:6

**anything (22)**
6:16;15:16;58:18;68:24;
74:19;79:15;85:21;118:4,
13,13;131:17;141:19;
151:13;171:18;184:5;
201:13;237:6;239:6;240:7;
247:9;250:24;253:21

**anyway (3)**
47:25;174:5;221:6

**anywhere (4)**
143:18;200:12;218:17;
228:11

**apart (4)**
91:4;123:3;125:11;
202:18

**apologize (4)**
144:15;177:13;182:6;
206:15

**app (3)**
134:17;143:23;223:18

**apparently (5)**
68:21;114:17;173:21;
210:9;221:8

**appeals (1)**
31:5

**appear (1)**
41:13

**appeared (1)**
135:25

**appearing (2)**
13:11;62:5

**appears (3)**
53:20;216:16;241:22

**appendix (1)**
91:13

**applications (1)**
115:6

**applies (1)**
124:3

**apply (4)**
35:3;110:16;124:8,15

**applying (1)**
144:25

**appointed (4)**
79:22,24;80:20;82:16

**appointee (2)**
66:7;80:18

**appointment (1)**
24:7

**appointments (1)**
23:3

**appreciably (2)**
106:8;226:19

**appreciate (2)**
98:13;162:2

**appreciative (1)**
155:1

**approach (2)**
32:23;241:7

**approaches (1)**
253:18

**approaching (1)**
68:24

**appropriate (7)**
28:21;34:22;44:6,11,21;
169:16;243:25

**appropriately (1)**
172:7

**appropriations (1)**
207:14

**Approximately (3)**
17:16;19:19;56:22

**archival (1)**
150:4

**archives (1)**
147:17

**area (21)**
21:5;41:18;45:22;47:17,
19,22;53:4;149:15;156:24;
164:23;208:24;217:13;
219:15;245:13;252:12,17,
19;253:15;255:21,23;
256:16

**areas (6)**
20:13;50:12;59:10;
132:25;170:20;213:6

**aren't (9)**
34:15;104:14;106:12;
118:19;139:10;163:13;
167:15;199:8;253:18

**Arguably (1)**
183:9

**argue (1)**
65:9

**arguing (1)**

241:10

**argument (14)**
39:15;67:11;72:10;97:9,
11;103:3,3,9;104:2;134:7,7;
143:21;150:16;225:24

**arguments (3)**
65:15;103:7;135:3

**Arlington (3)**
228:4,8,16

**around (25)**
18:14;35:13;48:3;87:2;
110:12;121:22;126:9;
127:14;134:13,16;139:20;
163:25;177:12;179:21;
199:15;202:16;206:14;
212:16;219:24;220:1;
223:21;227:20;244:8,15;
246:21

**article (17)**
38:25;39:2;40:2,22,23;
41:9,11;65:9;172:9;210:20;
211:6;213:2,22;214:2,6;
215:3,8

**articles (6)**
24:5;38:18,23;215:13;
227:16;253:10

**articulated (1)**
96:23

**articulating (1)**
126:19

**Arundel (1)**
49:13

**ascertaining (1)**
100:23

**ascribe (1)**
78:6

**Asian (2)**
40:1;171:5

**aside (1)**
66:5

**asked (22)**
7:10;63:20;74:22;75:5,
23;88:2;92:17,25;93:5,22;
94:20;100:24;102:10,13;
107:14;125:25;198:19;
219:23;220:13;221:25;
232:25;235:16

**asking (11)**
5:18;15:4,6;90:13;112:2;
125:20,20;223:17;235:19,
21;237:24

**aspect (1)**
42:6

**assembling (1)**
91:8

**assess (3)**
65:17;101:24;215:20

**assessment (7)**
69:3;78:17;79:5;96:2,15;
164:10;176:3

**Assisi (1)**
165:23

**assist (1)**
115:5

**assistance (1)**
90:9

**associated (8)**
8:23;16:6,11,18;19:9;
22:25;106:16;111:23

**Association (4)**
23:14,17;154:21;246:10

**associations (4)**
23:5,11,13;109:21

**assortment (1)**
24:4

**assume (1)**
6:21

**assumed (1)**
241:23

**assuming (6)**

44:16;135:11;138:10;
140:6;162:9;188:23

**assumption (2)**
93:15;241:25

**attached (1)**
26:1

**attachment (1)**
92:10

**attack (1)**
78:12

**attainment (1)**
59:6

**attainments (1)**
42:12

**attempt (1)**
65:13

**attend (2)**
51:14,14

**attendance (1)**
127:17

**attends (1)**
185:5

**attention (8)**
28:22;34:16,16;64:22;
77:13;92:7;108:17;257:2

**attentive (1)**
29:4

**attentiveness (1)**
139:1

**attorney (6)**
4:12;64:16;69:11;71:14;
75:5,13

**attorneys (5)**
9:2;63:14;86:21;87:5;
101:8

**attract (1)**
32:2

**attraction (1)**
153:21

**attributes (1)**

68:11

**audibly (3)**
6:6,7,16

**augmentation (1)**
158:10

**augmented (2)**
50:11;189:9

**augmenting (2)**
95:12;116:23

**August (1)**
119:25

**Austin (2)**
198:24;199:11

**Australia (1)**
98:24

**author (2)**
27:12;85:25

**authoritative (1)**
217:3

**authorities (2)**
113:7;164:21

**author's (2)**
39:14;42:1

**automatically (4)**
202:24;247:2,24;248:25

**avail (1)**
120:25

**availability (2)**
226:20;251:3

**available (13)**
44:3,16;94:23;105:24;
164:22;190:12,18;194:3;
237:14,25;238:22;239:20;
256:2

**average (1)**
107:25

**aware (19)**
32:10,16;63:22;79:18;
86:10;92:2;132:19,22;
175:3;177:15;181:8,13,15,

25;191:18;203:3,7;214:20;
221:10

**away (13)**
103:25;104:2;108:9;
121:25;154:18,23;155:5;
176:24;181:1;185:10;
186:25;225:23;249:14

## B

**Baber (8)**
56:16,23;57:7,8;60:1,16;
64:4;83:2

**back (59)**
9:20;11:16;13:18;16:17;
19:22;35:23;36:20,20;
38:23;49:16,24;50:7,14;
51:8,9,23;53:22,24;54:21;
59:20,22,23;61:11;63:24;
66:22,25;81:4;85:14;87:6;
91:15;92:7;96:24;100:21;
107:12,14;114:14,20;117:7;
120:11;129:8;134:2,9;
136:4;147:20;149:13;
150:14;158:13;160:6;
162:21,21;166:13,14;
182:13;212:16;222:7,14;
249:22,23;250:1

**background (4)**
20:2,4;26:10;170:3

**backgrounds (1)**
42:12

**bad (1)**
73:11

**baked (1)**
207:17

**balance (4)**
34:22;52:16;210:12,14

**Baldwin (1)**
71:17

**ball (1)**
130:2

**ballot (23)**
37:6;68:12,16,22;71:5,8,
11,12;72:2,8;75:17,21;
82:22;106:18;109:11;
134:15;140:16;151:24;
155:1;159:2;188:20;
210:21;253:20

**ballots (3)**
72:1;190:5,11

**ballpark (2)**
19:15;23:23

**Bangor (1)**
75:14

**Barnett (1)**
175:17

**Barry (1)**
32:21

**base (1)**
149:1

**based (31)**
28:24;58:3;69:20;88:3,6;
93:10,11;101:2;114:25;
115:13;133:12;138:17;
140:25;141:3;148:6;
156:14;157:14;158:19;
165:7;229:18;230:8;
241:13;242:25;243:10;
245:11;248:9,24;249:7,17;
250:10;253:8

**basically (1)**
192:2

**basis (42)**
46:15;49:25;57:16,18;
58:13;130:8;131:7,10,16,
19;133:3;155:7,8;191:22,
24;192:4,6,14,20,21,22;
193:1,15;194:20;203:15,17;
204:11;208:11;209:5,19,21;

224:14,16;234:3,8;235:17;
239:13;240:6;243:2;244:1;
245:25;256:14

**Baylson (6)**
77:21;79:18,22;80:12,15,
19

**Baylson's (2)**
78:16;79:5

**bear (4)**
38:14;61:14;94:9;210:11

**bearing (1)**
65:21

**because (95)**
20:24;21:16;24:13;29:4,
12,15;30:8;34:10;35:8;
38:20;43:9;45:16,21;47:8;
48:22;50:2;59:8;61:12;
64:25;71:10,12,15;73:11;
74:8;75:20;77:4;78:22;
87:2;102:25;103:6,21;
104:17;105:5,7;106:9;
109:18;120:24;125:11;
134:1;135:3;139:8;142:1;
147:17;151:15,23;153:22;
163:6,8,12;166:6;168:11;
176:20;178:24;180:17,21;
181:3,13,22;189:12;190:2;
191:2;194:5,19,22;206:15;
210:1,7;214:7,17,18,23;
215:17,23,25;217:22;218:8,
18;220:14;223:16;225:25;
226:13;231:16;232:21;
235:7,22;240:6;241:24;
244:12;248:2,19;250:14;
251:1,12;252:2;256:19

**become (1)**
210:16

**becomes (1)**
231:15

**becoming (2)**

163:2;231:1

**been (90)**
4:6,23,25;5:8,20;8:9,16;
12:10;18:12,13;19:21,22;
21:2,4,5;22:12,14,25;23:18;
26:3;30:7,25;36:1,6;45:1;
51:1,9;60:20;61:8;75:24;
86:11,12,18;88:9;89:13,14;
95:4;102:15;109:4;111:14;
113:24,25;114:13,19;126:3,
5;128:22;129:25;130:16;
141:12;147:7;151:1,21;
152:6,7;153:23;154:20;
159:7;165:11;166:9,9;
168:8,9;169:17;175:21;
183:16,23;188:25;189:3;
191:2,10,14;193:10,16;
200:13;203:5;209:10;
211:10;214:19;218:9;
220:23;221:11;228:12;
234:2,7,13;235:4;236:4;
248:3;249:13

**Before (38)**
4:21;5:25;8:9;9:24;
19:12;22:20;24:23;34:3,5;
35:25;36:6,8;38:5;46:18;
57:2,3;64:11,15;65:22;
69:13;74:1,15;132:19,23;
134:11;138:18;159:24;
166:22;167:3;182:2,23;
200:22;220:17;237:25;
238:6,20,22;250:1

**began (1)**
109:8

**begin (1)**
174:25

**beginning (7)**
65:3;68:7;117:7;178:17;
181:18;229:22,24

**begins (4)**

68:8;77:18;102:12;213:3

**behalf (5)**
56:6;57:5;60:24;61:4;
62:5

**behavior (13)**
20:17;30:21;33:12;35:9;
38:20;39:11;40:25;70:17;
71:1;78:13;79:7;97:8;
162:13

**behaviors (2)**
53:6,7

**behind (2)**
26:7;50:5

**behold (1)**
119:25

**being (47)**
11:17;45:15,16;46:6,13;
48:13;50:15;54:3,9;55:7,9;
66:3;67:17;68:23;69:10;
75:19;88:2;89:12,24;94:20;
96:18;100:15;108:3;
115:25;116:22;125:24,25;
128:13;136:22;139:1;
147:1;164:22;166:11;
177:4,7;198:21;210:19;
216:1,13;219:22;221:7;
227:12;238:11;247:7,17;
252:8;253:6

**beings (1)**
253:15

**belief (3)**
32:5;47:13;98:15

**believe (34)**
5:14;11:23;19:21;30:2;
37:16;38:12,25;47:16;
48:18;50:6;54:22;55:25;
56:3;58:19;65:25;66:6;
83:6;92:8;98:18;114:4;
116:15;156:6;157:9;
166:16;169:17;175:13;

176:14;178:9;180:10;
185:2;203:2;211:12,22,23

**believes (1)**
203:25

**belong (3)**
23:15;26:16;152:22

**below (1)**
225:1

**Berinsky (2)**
135:1;217:2

**Berinsky's (1)**
105:25

**Berkeley (1)**
103:16

**besides (13)**
14:4;17:2,11;22:23;54:6,
17;56:15;85:16;91:18;
96:20,22;159:3;179:9

**best (12)**
65:18;69:18,25;120:5;
127:7,19;134:6;141:16;
167:6;170:17;171:1;254:16

**bet (1)**
122:11

**Beto (3)**
152:19;188:19,21

**Better (4)**
161:18;206:16;218:5,7

**between (34)**
18:19;26:7,20;27:9;
30:20,24;32:12;33:8;34:22;
42:7;71:16;80:4;90:19;
115:14;117:4;132:11;
154:21;156:13;164:7;
167:8;168:5;197:15;
211:13;216:15;219:3;
228:16;242:6;246:7,11,18;
251:3;255:11,20,21

**beverages (1)**
7:21

**bias (1)**
122:2

**bicycles (1)**
142:25

**big (4)**
27:9;59:12;110:4;199:11

**bigger (1)**
176:15

**bike (1)**
142:25

**biking (2)**
224:12;225:3

**bill (8)**
18:16,17,19;19:5,8,9,13;
191:18

**billed (2)**
18:4,10

**birth (2)**
163:12;256:2

**birthday (1)**
163:16

**bit (15)**
10:11;12:9;29:15;51:11;
53:22;56:15;101:12;104:2;
112:4,11;115:22;144:9;
149:25;177:13;245:12

**bivariant (1)**
206:23

**black (68)**
32:7,11,14;39:25;40:15;
43:23,25;45:7,17,22;46:13,
24;47:14;48:24;49:1,3,4,7,
12,23,24;50:9,11,12;
122:18,21;123:6,10;143:4,
9,13;171:4,4,9;187:1;192:2,
3,8,12;194:16;196:5,9,13;
197:4,8,11,11;198:3,10,11,
17;205:4,15;224:8,10,22;
225:2;228:24;230:10;
234:2,7;241:5,9;243:5,5;

**blank (1)**
258:18

**blind (1)**
26:23

**block (6)**
70:23;164:20;165:21;
255:7,8,12

**blocks (4)**
34:2;165:3;227:1,1

**blown (2)**
222:3,22

**blue (5)**
36:25;37:1;38:7;52:6,6

**board (4)**
23:7;137:11;180:10;
200:22

**boards (2)**
23:5;163:3

**bodied (1)**
226:23

**body (8)**
45:17;139:5;177:6;
190:13;192:23;197:7;
198:3,9

**book (5)**
24:1,5;27:12;28:5,8

**boost (1)**
217:13

**border (6)**
28:16;165:4,5,5,5;201:18

**born (3)**
163:14;181:17;207:10

**borrow (1)**
154:4

**both (10)**
6:5;55:25;56:3;85:2;
90:12;119:5;152:24;182:1;
230:23;253:1

**bounced (1)**

**bow (1)**
31:1

**box (4)**
37:6;134:15;210:21;
253:20

**boxes (1)**
147:21

**bracket (1)**
139:13

**Bradley (1)**
50:10

**brainer (2)**
102:22;207:11

**branch (1)**
244:22

**break (19)**
8:1,3;36:2,6,8;76:7,9,10;
130:17,18;135:10;138:14,
18;179:4;205:8;229:22,24;
231:4,24

**breakdown (1)**
232:22

**breaking (1)**
231:1

**breaks (2)**
137:15;232:1

**brief (6)**
36:4;70:3;138:15;205:9;
216:22;238:18

**briefly (13)**
5:16;7:4;20:3;26:19;
28:2;36:7,9;53:24;100:15;
116:20;118:21;144:13;
200:2

**bring (5)**
15:18,23;33:6;152:2;
231:12

**broad (1)**
237:8

**broken (1)**
184:5

**brought (1)**
77:25

**Brown (1)**
71:23

**budget (1)**
207:14

**budgets (2)**
110:20;111:18

**buffer (3)**
226:13;227:15,16

**buffers (2)**
225:14,21

**building (5)**
114:16;136:13;165:16,
17;166:9

**buildings (2)**
114:15;184:1

**bulk (1)**
91:8

**bullet (2)**
225:1,1

**bump (3)**
217:4;218:13;247:17

**bundle (1)**
92:8

**burden (4)**
97:25;137:13;139:12;
219:5

**burdensome (3)**
130:4;155:10;219:4

**Bush (4)**
79:25;80:1,2,20

**busting (1)**
137:4

**busy (1)**
213:14

**buy (1)**
204:20

**63:18**

# C

**cadre (1)**
70:11

**calculations (2)**
58:25;115:13

**California (14)**
19:23;31:17,19,24;54:5;
57:10;58:8;59:24;60:18;
61:2,3,7;71:23;116:3

**call (4)**
13:19;60:13,16;146:12

**called (13)**
17:7;22:7,8;23:9,16;28:6;
37:4;63:12;70:5;108:18;
109:6;166:1;216:1

**calls (5)**
13:21;14:7,11;19:11,14

**came (6)**
9:19;26:15;32:21;152:14;
180:11;222:11

**campaign (17)**
21:21;31:5;33:10;34:4,
13,21;40:16;70:25;117:12;
152:4,18;158:16;178:21,24;
217:12,14;250:18

**campaigned (1)**
32:20

**campaigning (1)**
178:20

**campaigns (7)**
34:2,9,17;105:9;106:12;
152:6;170:2

**campus (65)**
46:2,9;47:21;108:19;
111:7,8;113:7,13;138:6,20;
143:14;155:21;156:2,5;
164:14,14,15,19,24;165:4,
21;166:5,6;173:6,6;174:1,6,

23;175:10;180:15,25;
181:24;182:15;183:19,22,
24;185:22;186:15,18,23;
190:8,11,22;193:23;194:3;
195:4;198:23;199:13,16,17,
18;200:15;201:4;202:14,
17;203:6;206:10,11;
208:22;210:7;218:25;
226:7;252:20;256:7,20

**campuses (20)**
109:25;110:12;111:15;
112:16,22;113:4;153:16;
173:4;180:13;181:19,19;
182:17;183:3,10;185:11,16,
18;186:7;198:25;199:2

**Can (151)**
4:16;7:9;8:3;13:6;16:2;
18:6;20:3;23:4;27:6;28:1;
29:2;30:20;34:13;35:17,22,
24;36:2;38:11,25;40:12,18;
41:18;42:19;48:9,17;49:23;
50:2,16;53:9;54:24;58:11;
61:19;62:17;63:15,17,18;
69:18,21;73:14,17;75:16;
76:3,8,12;77:19;80:22;81:1,
4;83:2,3;86:25;87:1,25;
88:11;91:7;97:15,21;98:10;
99:7,11,19;100:9;102:5;
104:18;105:15;106:4,5,6,
22;115:10;116:20,25;
118:15;122:14,14;123:24;
125:18,22;130:17;134:25;
135:20;137:20,21;138:10,
14;142:25;144:13,21;
149:7;150:21;156:20;
157:19,23;161:13;162:7;
163:7,10,16;164:21;166:6,
19;167:6,13,15;168:13,18,
22;170:17;171:1,7;172:4;
177:18;179:20;181:23;

184:4;203:1,13;204:2;
214:15;215:6,10,18;216:23,
24;217:4,13,14,18;218:12;
219:10;222:9;223:17,20;
224:5;227:21;230:1;231:4,
17;237:4;238:13;246:19;
247:3,15,19;250:1,11,11,14,
23;251:1;255:17

**candidate (7)**
30:3;31:20;32:2;115:24;
116:14;152:11;188:19

**candidates (8)**
33:4;68:15,19;117:16;
151:24;152:22;153:22;
188:23

**cannibalizes (1)**
191:4

**can't (28)**
33:3;63:24;64:18;66:11;
71:20;83:11,11;96:21;
101:6;110:21,22,23;116:3;
125:6;126:4;146:11;
160:20;161:14;209:16;
214:14,14;218:15;248:10,
16,19,25;249:8;250:22

**canvas (2)**
134:13,16

**canvasing (1)**
217:13

**capable (1)**
205:1

**capacity (13)**
8:14,17;12:13,15;88:3;
89:25;133:5,12,13;159:8;
176:9,13,15

**captured (1)**
171:9

**car (3)**
183:15;226:20,25

**cards (1)**

169:15

**care (1)**
28:22

**career (3)**
20:12;22:21;139:14

**careers (1)**
163:25

**carefully (1)**
93:13

**Carolina (13)**
10:14,16,20;11:13,18;
54:5,9,25;55:2,6;85:20;
86:8,9

**Carolina's (1)**
86:10

**carpool (2)**
224:12;225:4

**carpooling (1)**
227:7

**carried (1)**
168:19

**carry (1)**
214:13

**carrying (1)**
72:7

**case (151)**
8:21,23,25;9:4,7,9,12,16;
10:6,7,14,16,16,21,24,24;
11:3,6,8,10,14,15;12:19;
15:11;16:24;17:9,15,24;
18:2;19:17,22;35:23;36:15;
37:17,20;44:10;46:16;47:3;
50:25;54:6;55:2,6,23;56:1,
16,17;57:3,10,11,18,21;
58:6,17,23;59:5,24,25;
60:12,18;61:3,4,5,7,7,10,20;
62:4,9,13,20;64:5,12;66:13,
16;69:7,9,12,18,19;73:7,12;
74:23;76:18;80:5,5,11,17,
18,25;84:4;85:16,20,22,22,

23;86:18;87:23;89:7,9,12;
90:5,6;92:11,15,18;93:1,16,
18;97:24;100:5,12,24;
116:5;117:4;118:1;122:2;
124:24;126:7;127:12;
131:7;132:8;142:18;143:1;
148:20;158:5;161:16,20;
165:1;167:17;170:16;
171:25;178:13;182:10;
185:7,10;186:1;196:14;
203:1;209:12;212:5;
214:21;215:15;216:8;
222:1;225:25;227:23;
232:24;237:15;238:23;
239:25;240:22

**case-by-case (1)**
147:7

**cases (32)**
10:5,5;11:8,18;53:25;
54:4,9,10,13,18,23,25;
59:16,19;60:4,6,8;62:25;
63:5,9;73:7;83:9;84:24;
85:16,19;86:5,14;87:13;
113:6;122:4;186:7;247:16

**cast (21)**
71:5;106:18;109:11;
120:16,20,22;121:12,13,19;
128:18;130:7,25;140:16,22;
143:19;158:9,21;190:5,6,
10;230:7

**casting (2)**
131:9;155:1

**casts (1)**
107:3

**catch (1)**
199:21

**Catholic (1)**
166:5

**causal (4)**
168:3;246:6;250:11,22

**causality (8)**
166:21,25;167:13,15;
246:11,15;251:6,11

**Cause (4)**
60:11;74:21;109:4;
232:22

**caused (2)**
133:21;241:3

**ceases (1)**
68:17

**ceiling (2)**
118:12;247:18

**Census (8)**
143:23;171:8;192:15,15;
243:23;244:2;254:15;255:5

**center (35)**
114:7,8;132:23;133:7;
136:10,14;165:10,10,13,15,
18;166:1,4,5;169:8;172:18,
24,25;173:6,7,18;174:7,15;
176:5,11,15;208:13,18,22,
23;209:6;210:1,6,17;219:12

**centers (1)**
173:4

**central (7)**
40:11;96:1,3;102:20;
123:2;124:24;252:25

**certain (11)**
19:25;46:23;50:6;53:6;
108:18,19,21,21;152:1;
223:18;254:6

**certainly (20)**
39:4;47:16;80:22;81:1,4;
95:20;97:3;105:22;124:13;
132:6;133:18;141:7;
150:16;186:3;188:7;
208:25;237:9;241:17;
245:14;252:7

**CERTIFICATE (1)**
258:1

**certified (1)**
51:15

**certify (1)**
258:2

**challenge (6)**
43:25;44:7;62:14;69:10,
10;73:10

**challenged (2)**
29:5;86:11

**challenges (2)**
86:13;139:18

**challenging (6)**
34:10,17;54:13;56:4;
256:13,13

**chance (1)**
177:22

**change (24)**
29:3,7,19,22;30:16;
66:24;71:5;81:13,25;82:5,
22;97:8;103:6;131:13;
156:20;166:22,23;167:9,9;
169:25;189:3;201:7;
226:20;246:13

**changed (6)**
78:6;114:17;129:9;139:4;
164:9;166:15

**changes (13)**
27:14;33:13,13;42:18;
43:2,7,9;161:1;163:19;
166:18;191:14;233:8;
246:13

**changing (5)**
29:10;43:1;66:9;139:15,
19

**chapter (2)**
28:10,12

**chapters (1)**
24:1

**characteristics (1)**
85:4

**characterize (2)**
200:18,19

**charged (4)**
19:17,18,24;110:3

**check (1)**
146:20

**Chicago (1)**
20:10

**child (1)**
53:7

**choice (3)**
68:13;98:19;210:10

**choices (3)**
68:18;163:20;164:6

**choose (7)**
66:10;99:5;105:23;
112:23;165:8;185:4;194:19

**choosing (1)**
99:13

**chose (1)**
226:13

**Christy (3)**
90:1,3;109:24

**church (7)**
51:14,14;136:13;164:15;
165:9;209:1,2

**churn (1)**
163:23

**circle (1)**
38:6

**circumspect (1)**
172:7

**circumstance (1)**
83:12

**circumstances (4)**
84:3;161:6;199:11;
201:13

**cite (1)**
248:10

**cited (6)**

76:22;194:11;211:20;
214:2;227:13;252:15

**cites (2)**
168:15,20

**cities (2)**
50:9;58:12

**citing (1)**
211:15

**citizen (6)**
55:17;56:23;57:7;75:22;
191:25;192:2

**citizens (7)**
56:4;72:5,8;174:4;175:7,
12;213:8

**City (12)**
45:20;49:6;57:14,14,15,
19,20,22;192:11;193:22;
203:6;252:20

**civic (1)**
213:9

**civil (1)**
32:20

**claim (8)**
45:15;46:6;61:20;86:16;
125:15;126:2;168:3;196:18

**claims (10)**
92:19;94:13,16;95:2;
96:18;241:23;242:3,8;
251:19;252:1

**clarification (1)**
217:21

**clarify (4)**
5:7;81:20;86:25;100:24

**Clark (2)**
254:10,11

**class (3)**
33:9;49:2;186:10

**classes (2)**
21:14;240:24

**clean (1)**

244:17

**clear (27)**
62:19;64:19;69:25;74:7,
10;106:1;107:11;108:23;
119:7;121:18;128:21;
140:15;141:9;144:7,12;
151:20;154:7;156:21;
181:18;203:21,24;228:21;
229:5;231:15;238:21,21;
240:3

**clearly (7)**
6:24;108:24;124:25;
185:17;203:24;235:11;
248:19

**clerks (1)**
112:2

**clinics (1)**
115:8

**clock (1)**
112:1

**close (16)**
51:11;104:24;105:16,17;
144:4;147:3;151:17;
152:14;154:10,17;155:20;
164:23;173:12;185:9;
206:10;217:16

**closer (2)**
108:11;111:11

**closest (1)**
107:22

**cloth (1)**
175:6

**cluttered (1)**
244:12

**coach (1)**
51:15

**co-author (2)**
28:5;40:14

**co-authored (1)**
100:11

**Co-counsel (3)**
14:18,19;17:11

**code (3)**
163:4,9,15

**coded (1)**
163:8

**codes (1)**
255:11

**coffee (1)**
36:2

**cognitively (1)**
68:22

**coherent (1)**
231:2

**coherently (1)**
230:1

**colleague (1)**
14:18

**colleagues (1)**
17:12

**collect (2)**
94:23;212:8

**collection (3)**
24:1;90:9;222:19

**collectively (1)**
174:14

**College (25)**
22:1;24:14;31:23;109:24;
110:11;111:12,15;112:16,
21;113:4,8,9,13;138:24;
153:16;156:2;162:9;
163:23;185:11,16;197:13;
198:16;199:24;254:20;
256:6

**colleges (7)**
180:3;196:3,5,17;197:14,
17;200:1

**color (1)**
178:24

**comb (1)**

178:11

**combination (3)**
46:13;207:4;218:1

**come (17)**
14:3;28:17;33:4;34:13;
73:3;100:20;101:3,19,22;
126:18;139:18;166:22;
218:6;220:16;222:3,14;
234:12

**comes (4)**
75:12;158:13;161:22;
217:16

**coming (5)**
40:4;150:9;167:3;200:21;
223:17

**comment (2)**
176:18;184:6

**commented (3)**
38:1,13;235:24

**commenting (1)**
232:3

**commissioned (1)**
72:15

**commissioners (4)**
200:23;202:25;203:4;
220:20

**Commissioner's (16)**
89:25;92:1;114:3;126:14,
19;127:3,13;128:6,7;129:7;
133:5;149:23;157:16;
209:15,24;221:16

**committed (1)**
204:18

**committee (1)**
100:15

**common (9)**
28:16;52:7;60:11;70:9;
101:8;109:25;115:6;
148:25;164:25

**commonly (7)**

16:9;41:24;47:13;93:18;
148:14;153:19;165:1

**Commonwealth (3)**
11:7;55:24;60:15

**communicate (2)**
14:15;109:21

**communicated (1)**
90:3

**communication (1)**
91:8

**communities (2)**
109:13;146:7

**community (31)**
30:23;31:1;35:4;51:12;
70:25;71:1;110:8,10;114:7,
8;148:24;151:2;153:13;
165:13,15;173:21;174:22;
176:5,11;199:24;200:1;
207:17;208:4,18;209:6;
210:1,6,15,17;221:12,15

**commute (3)**
224:11;225:3;227:8

**commuter (2)**
142:24;184:15

**commuters (2)**
142:21;219:2

**commutes (1)**
213:6

**commuting (1)**
183:15

**comparable (5)**
49:14;112:18;180:2;
196:18;205:14

**comparableness (1)**
180:2

**comparator (1)**
198:16

**compare (4)**
110:22,22,23;179:17

**compared (25)**

48:3;82:16;112:6;140:9;
141:8;152:13;177:2,4;
185:19;187:15,24;191:9;
192:19;194:15;203:11;
205:4;216:25;217:19;
223:14;224:8,10,22;225:5;
230:7;242:9

**comparing (1)**
217:3

**comparison (3)**
108:2;186:1;187:18

**comparisons (3)**
185:12,13,14

**compelling (1)**
103:10

**compensation (1)**
17:24

**competitive (7)**
117:14;151:9;170:2;
189:8,16,18,19

**complain (3)**
79:13,14,17

**complained (4)**
72:18,21;75:22;210:9

**complaining (2)**
45:8;75:17

**complaint (14)**
44:5,24;45:14,19;46:3,4,
7,12,17;87:16;209:22,22;
251:16;252:25

**complaints (3)**
175:9,20;176:4

**complaint's (1)**
73:12

**complete (2)**
39:11;112:1

**completed (4)**
14:25;20:6,10;111:24

**completely (7)**
30:11;71:1;110:24;

121:22,25;153:23;203:23

**complex (3)**
71:24,24;72:9

**complexion (1)**
186:14

**complexity (1)**
71:7

**complicated (2)**
69:24;177:17

**complied (1)**
200:23

**comply (1)**
82:25

**complying (1)**
38:8

**component (2)**
70:14;160:17

**composition (6)**
194:11,21;195:17,21;
252:17;254:14

**comprised (1)**
68:19

**compulsory (3)**
98:22,24,25

**con (1)**
31:1

**concede (3)**
127:23;128:1;230:13

**conceded (2)**
74:11;131:7

**conceding (2)**
135:11;188:17

**concentration (3)**
46:8;155:14;256:19

**concentrations (3)**
170:19,25;171:2

**concept (1)**
213:4

**concepts (1)**
241:18

**concern (4)**
13:12;119:11;206:7,9

**concerned (3)**
72:6;113:21;229:15

**concerning (1)**
65:11

**concerns (2)**
174:9;242:15

**concession (1)**
128:3

**conclude (10)**
106:22;107:9;155:6,9;
246:1;248:11,17,25;249:8;
250:12

**concluded (2)**
155:23;257:4

**conclusion (7)**
36:13;37:15;45:18;67:24;
70:13;243:3;245:21

**conclusions (8)**
37:20;68:24;70:5;72:11;
78:12;150:23;203:16;245:9

**conclusory (4)**
67:11,14,20,25

**condition (2)**
167:11;251:12

**conditions (5)**
166:25;167:15;246:12,
15;251:8

**conduct (4)**
73:19;74:13;115:16;
231:10

**conducted (2)**
75:9;138:5

**confident (1)**
230:1

**confining (1)**
97:4

**conflict (1)**
41:10

**confusing (4)**
56:3;72:24;229:25;
231:16
**congested (1)**
213:6
**Congress (1)**
28:8
**Congressional (1)**
28:6
**connect (1)**
164:3
**connection (4)**
148:3;201:10,16;204:4
**conscientious (1)**
110:6
**consider (24)**
20:13;52:15;61:25;69:24;
122:5;128:2;133:13;
137:18;157:7,8,21;161:12;
170:11;172:10,15,17,23;
180:13;193:2;194:22;
225:11,13;226:4;244:19
**considerably (1)**
203:8
**consideration (12)**
110:19;111:9;131:25;
133:18;184:10,20;185:25;
188:3;202:21;220:10,21;
229:13
**considerations (3)**
65:16;135:22;186:2
**considered (9)**
24:10;26:24;84:18;
182:19;193:20;197:18;
206:6;215:8;219:22
**considering (6)**
184:17;203:12;219:6;
220:23;225:20;229:13
**consistent (4)**
19:18;30:12;197:10;

212:11
**consists (2)**
198:3,9
**constantly (1)**
73:10
**constituency (3)**
97:13;201:24;202:2
**constitute (2)**
136:17;192:23
**constitutional (6)**
65:21;69:1;73:25;74:15;
124:6,20
**constrained (1)**
199:7
**construction (1)**
219:25
**consult (1)**
10:2
**consultant (4)**
29:6;30:23;31:1;33:9
**consultants (4)**
28:20;30:2;33:4;177:25
**consulting (1)**
70:25
**contain (1)**
145:13
**contemporaneous (2)**
236:9,15
**contend (3)**
65:3,7;207:2
**contender (1)**
142:4
**contention (1)**
209:6
**contest (5)**
121:17;171:18;237:5,10;
239:1
**contested (5)**
119:20;129:19,22;
141:14;142:3

**context (6)**
35:16;49:16,20;67:22;
106:20;129:1
**continue (3)**
169:10;201:22;245:15
**continuity (1)**
164:12
**contradict (1)**
37:21
**contradiction (3)**
216:15;217:17;218:11
**contrary (1)**
123:7
**contrast (1)**
224:9
**contribute (1)**
50:2
**contributes (1)**
103:1
**contribution (2)**
9:15;37:19
**contributions (2)**
40:16;178:24
**control (5)**
28:15;38:15,19;40:21;
49:1
**controversial (1)**
200:21
**convenience (59)**
37:8,10;97:10;102:11,18,
19,23,25;103:1,4,11,17,25;
104:17;105:1,16;107:4,6,9;
117:9;118:12,16,20;134:10,
11,18,25;135:2;141:23;
143:21;144:23;145:3,5,7;
151:16;155:1;158:14;
214:3,9;215:19;216:23,23;
217:5,15,18,23;218:12,15,
20;219:10;220:3,8;223:11,
15;229:14;247:6,12,18;

250:19
**convenienced (1)**
247:8
**conveniences (1)**
247:20
**convenient (7)**
15:22;95:16,17;158:18;
173:23;177:9;223:20
**convention (1)**
34:5
**conventional (1)**
161:22
**conventionally (1)**
136:5
**conversation (1)**
138:17
**conversations (4)**
15:5;90:7,8,17
**convict (2)**
204:10,16
**Cooper (14)**
51:3;86:1,2;93:6;94:2;
100:6;149:7;191:18;
196:14;224:6;233:15;
243:23;255:1,3
**Cooper's (4)**
223:22,24;239:19;243:19
**copied (1)**
14:16
**copies (2)**
16:4;258:17
**copy (17)**
13:2;14:14;15:25;17:19,
21;25:3;27:15;64:6,6;
76:23,24;211:2,2;214:4;
224:4,4;240:14
**core (3)**
54:16;86:16;96:17
**corner (1)**
141:15

**correct (46)**
5:10,21;6:1;10:17;12:5,6;
15:15;17:23;24:18;25:13;
26:4;53:19;54:10;76:17;
82:20;92:12;95:2;127:25;
132:12;133:7,16;136:10;
138:10;158:2;160:1;
178:13,21;179:19;183:17;
186:18;198:4,18;200:10;
222:1;229:20;231:22,23;
236:7;239:3,23,25;245:19,
22;246:4;248:18;249:19

**correcting (1)**
238:9

**corrections (1)**
258:6

**correctly (1)**
39:24

**correlation (1)**
251:10

**cost (1)**
111:23

**costs (1)**
218:3

**could (64)**
9:14;12:1;15:21,23,24;
28:22;38:6;39:15;45:14;
48:10;67:9;68:4,6;69:25;
71:16;72:14;77:15;94:8,9;
96:24;97:3;98:2;99:13,17,
25;103:17;107:9;111:10;
113:23;115:7,8,20,21,21;
121:1;123:1;126:18;133:9;
137:23;147:22;154:18;
159:17;169:2,9,10;171:9;
176:23;183:11,15;185:4;
186:3;189:10;190:21;
194:18;202:21;207:18;
213:16;217:24,24;220:3;
231:22,24;249:23;251:25

**couldn't (4)**
105:6;185:2;220:11,12

**council (1)**
58:15

**Councilmen (1)**
57:20

**counsel (17)**
4:14;5:4;7:8;12:22;13:2;
16:16;25:4;64:7;66:2;
76:24;101:25;121:14;
130:16;174:11;181:10;
235:8;238:14

**counselors (2)**
57:14,14

**counsel's (1)**
101:6

**count (6)**
27:21;122:24;123:5,14;
189:10,21

**counties (49)**
110:11,13,15,16;111:9,
19,22;112:6,8,21;113:1;
125:24;146:17,19;147:3,18,
20;156:1;165:2;179:18,23;
180:1;181:7,12,19;182:1,
16,22;184:22,24;185:24;
186:11;187:11,12,25;
193:19;194:15;196:4,18;
197:14,18;199:2,3,9;
204:25;205:12,14;206:2,6

**country (3)**
29:21;35:13;138:25

**counts (2)**
27:22;122:23

**County (180)**
4:15;45:8,10,23;46:10;
47:15;48:3;49:13;52:5;
53:17;89:10,13;90:1,2;92:1,
5,20;94:17;95:5,20;96:16;
106:20;108:8;109:13,17,19,

20,23;110:7;112:2,6;113:4,
16,25;114:2;115:19;118:3,
6;119:12;121:22;123:5,12,
12;124:3,16;125:5,12,19;
126:8,13;128:8,18;132:12,
14;133:5;136:7;138:22;
141:25;143:3,8,12,17,18;
146:7,24,24;147:13;149:14,
16,20,20;150:5;155:11,19,
25;157:4,6,8,12,21;158:6,6;
160:20,22;161:2;164:6,21;
165:8,13,15;166:16;169:1,
20;170:13,21,24;172:12,19;
175:22;176:5,11;180:12;
182:15;183:16;185:6,21;
186:11;187:6;189:2;190:4,
13;192:1,18,20;193:3,8,16;
194:2,7,15;196:19,20,24;
197:13;199:12;200:22,25;
201:2,9,12,19,19;202:2,11;
205:5,16;208:17;214:12,14,
15,22;215:20;216:7;218:18,
19;219:2,6;220:19;222:6;
224:10;225:22,25;226:6;
228:24;230:11,19,22;232:4,
8;234:3,8;235:3;236:2,10,
16;240:23;241:25;242:10;
243:9,12,14;250:3,25;
254:1,10,11,22;256:11,16,
22

**County's (13)**
94:24,25;113:22;150:24;
179:17;186:12;192:24;
193:21;194:1;197:4;200:3;
241:3;243:3

**countywide (4)**
224:23;225:6;234:3,8

**couple (36)**
13:21;14:10,11;28:3;
29:5;31:16,18;36:17;48:1;

20,23;110:7;112:2,6;113:4,
16,25;114:2;115:19;118:3,
6;119:12;121:22;123:5,12,
12;124:3,16;125:5,12,19;
126:8,13;128:8,18;132:12,
14;133:5;136:7;138:22;
141:25;143:3,8,12,17,18;
146:7,24,24;147:13;149:14,
16,20,20;150:5;155:11,19,
25;157:4,6,8,12,21;158:6,6;
160:20,22;161:2;164:6,21;
165:8,13,15;166:16;169:1,
20;170:13,21,24;172:12,19;
175:22;176:5,11;180:12;
182:15;183:16;185:6,21;
186:11;187:6;189:2;190:4,
13;192:1,18,20;193:3,8,16;
194:2,7,15;196:19,20,24;
197:13;199:12;200:22,25;
201:2,9,12,19,19;202:2,11;
205:5,16;208:17;214:12,14,
15,22;215:20;216:7;218:18,
19;219:2,6;220:19;222:6;
224:10;225:22,25;226:6;
228:24;230:11,19,22;232:4,
8;234:3,8;235:3;236:2,10,
16;240:23;241:25;242:10;
243:9,12,14;250:3,25;
254:1,10,11,22;256:11,16,
22

63:12;78:24;79:9,10,11;
98:23;106:22;107:13;
111:22;113:6;132:18;
146:19;152:15;155:14;
165:2,3,9;168:15;172:4;
175:4;195:2,2;216:17;
217:6,21;218:13;238:16

**course (16)**
21:12;61:17;100:8;103:5;
115:23;116:2,11;119:17;
120:11;122:21;139:9;
153:9;161:20;162:18;
169:3;247:10

**courses (2)**
11:9;21:5

**court (41)**
6:3;9:14;11:10;57:3;
60:9;63:20,22;64:19;67:3,
13;69:4,10;73:2;74:1,15,20;
75:1;77:3,25;80:4,10,23;
86:4;90:1;92:1;114:3;
124:14;126:14;127:3;
128:6;129:7;133:5;149:23;
202:24;204:10,16,20;
209:15,24;221:16;244:25

**courthouse (1)**
226:7

**courtroom (1)**
6:1

**courts (17)**
66:4,7;74:3;81:8,9,14,15;
82:1,4,24;83:4,15,20,23;
84:12;205:2;245:4

**court's (7)**
66:13;67:24;78:14;
126:19;127:14;128:7;
157:17

**covariance (2)**
167:8,21

**co-variation (1)**

246:14

**cover (1)**
21:16

**covered (1)**
230:20

**covers (1)**
23:16

**cramming (1)**
176:22

**cream (1)**
29:24

**create (1)**
176:23

**created (2)**
16:22;227:16

**creates (1)**
222:25

**creation (1)**
50:4

**credibility (1)**
78:17

**credit (4)**
73:16,25;74:11,14

**credulity (1)**
226:24

**criteria (2)**
39:1;115:25

**critical (5)**
105:25;107:24;108:7,13;
242:1

**criticism (2)**
78:3;242:17

**criticisms (1)**
114:1

**cross (9)**
78:12;79:10;159:10,15;
160:15,16;167:1,6,20

**Cruz (3)**
129:20;137:5;188:4

**crystal (1)**

130:2

**crystalize (1)**
154:7

**crystalizing (1)**
217:22

**culture (7)**
99:4;109:17,18,22;110:1;
123:7;180:18

**cups (1)**
36:2

**current (3)**
22:2;39:16;91:25

**currently (3)**
21:25;85:17,18

**customary (2)**
112:20;114:13

**customer (1)**
114:18

**cut (1)**
206:15

**CV (20)**
10:2,11;11:21;12:1;
24:23;25:24;26:6,9;36:8,
24;37:5,23;38:10;46:19;
51:12,17;55:14;92:9;211:7;
214:2

**CVAP (4)**
192:3,7,8

**cynical (3)**
68:23;70:5,21

**D**

**Dallas (1)**
110:24

**Damon (1)**
89:18

**data (53)**
16:6,22;30:9;38:1,6,13;
39:2,17;41:5,13;44:3,16;

58:16,21;90:9,10,11,13,14;
114:12;122:17;131:20;
133:13;141:2,10;150:23;
154:17;171:8;172:1;
180:11;190:12;195:24,25;
206:25;212:9;213:20;
218:5;222:19;243:23,25;
244:2,3,4,7,23;245:14;
246:9;249:17;250:2;
252:16;254:21;255:4;256:1

**date (4)**
13:12;117:9;256:2;
258:15

**dated (1)**
28:9

**day (52)**
29:20,22;33:6;94:25;
95:15;97:5,18,22;98:12,14;
104:25;106:5;113:12;
116:1;121:2;136:12;
140:19;142:20,23;145:15;
149:10;155:2,2,20;158:8,
12,24;159:3;163:11;
166:12;173:2,9;176:20,21;
182:14;187:15;190:10,15;
191:2,4,9;198:23;229:6;
230:7;241:14;243:15;
247:7;248:2;249:12,13;
250:16;252:3

**days (2)**
176:25;242:14

**deal (2)**
32:13;59:12

**dealing (4)**
111:2;167:19;222:5;
252:2

**deals (1)**
41:20

**dealt (1)**
28:7

**death (3)**
246:11;251:5,11

**debate (5)**
28:17;65:14;102:16,21;
221:1

**debates (1)**
97:2

**December (1)**
69:14

**decide (5)**
52:17;66:5;76:12;93:9;
115:19

**decided (3)**
34:3;93:19;105:12

**decision (10)**
64:3;76:23;77:10;81:5,6;
83:10;119:24;133:19;
194:1;233:4

**decisions (12)**
82:11;83:17;110:9;120:8;
129:2,5;130:15;150:24;
207:5,12,14,18

**decisive (1)**
189:10

**declared (1)**
71:18

**decline (1)**
106:24

**decorum (1)**
79:19

**decreased (1)**
161:2

**deeply (1)**
89:7

**defects (1)**
117:13

**defend (1)**
241:8

**defendant (5)**
55:9,10;56:1,25;230:13

**defendants (6)**
55:1;77:18;89:23,23;
92:18;257:2
**defendants' (3)**
25:2,12;77:24
**defended (1)**
57:22
**defending (1)**
56:5
**Defense (3)**
4:13;73:8;75:13
**deficits (5)**
46:22;48:2;49:3,10;
141:17
**define (5)**
106:15;170:11;220:8;
228:22;229:1
**defined (6)**
212:3;219:10;220:3,13;
230:14;256:17
**defining (3)**
212:4;221:11;230:5
**definitely (3)**
12:2;135:21;137:6
**definition (17)**
140:6,25;141:4;158:20;
161:4;172:11;220:12;
226:10;229:19;230:8;
232:13,20;252:22;253:5,6,
8;255:20
**definitions (1)**
229:10
**degree (3)**
20:5,9;134:2
**deliberately (1)**
99:13
**Delta (1)**
49:7
**delve (1)**
89:7

**demand (38)**
95:23;114:25;115:17;
118:22;119:4,6,8;120:18,
23;121:23;122:7,23,24;
123:5,9,10,14;126:18,25;
127:7,19;129:14;130:9;
131:21;132:1;138:6,12;
148:6;156:15,20;203:13,14;
207:3;210:14;219:7;
221:10,11;243:10
**demanded (2)**
220:13;221:16
**demanding (1)**
127:6
**demands (1)**
128:7
**democracies (1)**
98:23
**Democrat (1)**
52:7
**Democratic (8)**
32:15;42:24;43:4;55:16;
152:11,22,25;232:12
**demographer (6)**
198:14;244:20,24;245:6,
8,13
**demographer's (1)**
245:8
**demographic (3)**
191:19;244:23;245:14
**demographics (4)**
181:6,11;182:1;193:21
**Demography (2)**
244:21;245:1
**demonstrate (1)**
250:11
**denied (2)**
142:14;232:9
**denominator (1)**
58:25

**Denton (2)**
112:23;199:17
**deny (1)**
70:23
**denying (5)**
143:4,9,13;182:17;
218:14
**department (4)**
22:6,9;205:3;208:8
**depending (3)**
27:7;61:24;184:14
**depends (1)**
118:16
**deploy (2)**
161:8,9
**deploying (1)**
195:24
**deployment (1)**
219:18
**DEPONENT (1)**
258:1
**deposed (7)**
8:9,16,19;9:25;11:14,17;
54:3
**deposition (26)**
5:15;6:4;9:16,19;10:7,13,
15;11:24;12:17,20,23,25;
13:13,16,22;14:3,22;15:9;
17:1;59:23,24;178:17;
231:10,14;235:23;257:4
**depositions (9)**
4:22;5:15;10:9,25;11:11;
19:19;59:14,15,18
**Des (1)**
20:6
**descent (1)**
62:1
**describe (5)**
20:3;41:6;116:21;144:13;
252:19

**described (2)**
17:9;248:14
**describing (1)**
146:4
**description (1)**
47:19
**design (1)**
222:12
**designation (2)**
25:17;145:16
**designs (1)**
161:5
**desire (1)**
126:20
**desired (1)**
106:17
**Despite (1)**
242:24
**detail (3)**
13:14;53:9;94:5
**detailed (4)**
82:10;112:3;116:13;
252:9
**details (4)**
104:6;148:3;170:8,10
**determine (3)**
58:22;122:15;255:17
**develop (1)**
47:9
**developed (2)**
20:24;115:5
**development (3)**
53:8;57:25;154:2
**developmental (1)**
153:25
**devil (1)**
104:5
**devising (1)**
65:17
**devote (1)**

151:1

**didn't (53)**
9:13,13;10:6;13:13;
14:14;20:22;31:20;56:20;
69:6,7;79:1,20;93:14;
100:18;103:23,24;104:2;
112:23;127:16;138:8;
149:19;153:5;156:25;
157:16;159:5;165:24,25;
170:7;171:20;172:13;
174:10;178:12;189:3;
194:19,22;195:10;199:15,
25;200:12;209:11,14;
214:13,23,24,24;219:14;
228:10,11;231:13;232:18;
238:2;250:5;251:23

**differ (2)**
38:21;186:11

**difference (23)**
26:20;27:9;31:21;35:17;
41:7;42:20;49:23;58:4;
105:16;107:10,20,21;127:4;
142:4;168:14;183:6;
189:24;211:24;212:13;
226:25;242:23,24;255:21

**differences (9)**
39:9;42:4,7,21;96:12;
137:22;150:19;151:15;
206:19

**different (56)**
42:12;43:11,15,16,19,20;
44:8,13;57:19;58:7;64:20;
68:6;79:3;84:7,22;85:12,
12;87:3;98:14;101:12;
102:1;104:6,11,17;108:3;
109:7,7;110:16,24;140:13;
142:19;144:6,8;145:9;
150:10;163:18;170:12;
171:13;172:12,18;179:3;
180:14,14;185:6;199:4,5;

216:10,13;227:9;229:14,19;
241:15;249:16;253:18;
254:9,19

**differential (2)**
44:13,19

**differentiate (1)**
255:20

**differently (9)**
45:16,21;73:3;101:9;
119:22;144:21;220:2;
241:18,18

**difficult (7)**
29:2;39:20;66:4;69:9;
97:18;99:10;164:1

**digested (1)**
63:25

**direct (5)**
5:4;77:13;79:11;204:3;
257:1

**directed (2)**
30:1;34:15

**direction (8)**
64:20;66:1;93:8,10;99:3;
152:8;168:23;199:18

**directly (6)**
31:9;90:20;150:13;
195:18;215:12;253:12

**dirt (2)**
146:10;147:6

**disabilities (2)**
96:21;184:5

**disadvantage (1)**
254:11

**disadvantaged (2)**
95:14;108:22

**disadvantages (1)**
65:14

**disagree (3)**
66:12,16;80:17

**disagreed (1)**

67:3

**disagreeing (2)**
80:19;243:2

**disagreement (2)**
35:7,21

**disappoint (1)**
217:19

**disappointing (1)**
104:4

**disappointment (1)**
158:3

**discern (2)**
166:6,8

**disclose (1)**
87:5

**disclosed (8)**
16:15;26:3;86:18;235:10;
237:19;238:1,6,23

**disclosure (2)**
25:2,12

**discount (1)**
67:12

**discover (1)**
136:3

**discovered (2)**
235:3;236:3

**discriminated (1)**
240:24

**discrimination (29)**
43:23;44:6,11;46:5,15;
60:25;61:5,8,15,19,21;
62:10;84:11,13;86:15;
87:13;124:12;126:2;
156:24;157:1;182:10;
202:20;204:3,10,17;205:2,
15;230:19;233:14

**discriminatory (1)**
83:20

**discuss (4)**
17:1;91:9;215:12;235:25

**discussed (17)**
17:10;63:1,6,9;66:2;
73:17;74:12;121:11;164:8;
174:11;181:9;211:7;
228:12,14,17;250:4,16

**discussing (1)**
91:21

**discussion (11)**
88:13;102:12;128:11,12,
14;195:18;200:20;219:9;
220:25;227:25;253:3

**discussions (5)**
13:25;145:6;175:6;
187:20;219:17

**disparities (4)**
62:13;84:22;233:16,24

**disparity (2)**
42:10;194:13

**displayed (1)**
78:25

**disproportionately (1)**
243:4

**dispute (48)**
121:9;123:1;124:24;
128:16,19,20;130:6,23;
131:8,10,16,19;133:3;
141:2;171:12;191:22,24;
192:4,5,6,13,14,22;193:15;
194:14;196:12,15;197:3,6;
198:2,8,20;208:11,16;
209:19,21;212:24;213:19;
224:14,24;225:6;232:20;
235:10;239:10,14;240:7;
241:6;244:1

**disputing (9)**
192:21;233:23;234:23;
235:18;239:5;256:4,6,9,15

**disqualified (1)**
71:11

**dissenting (2)**

77:20;80:20

**dissertation (1)**
100:15

**disservice (1)**
122:3

**distance (40)**
37:8;91:16;107:20,20,23;
108:2,4,7,13,24;114:14;
115:13;142:20,24;145:22;
154:21;155:9;160:6;181:1;
182:13;183:9,11;186:24,25;
212:6;214:3;215:23,25;
217:23,24;219:2,3;220:6;
225:13,18,20,24;227:1,6,12

**distances (7)**
108:19,22;155:13;
183:14;225:13;226:21,22

**distinct (1)**
41:3

**distinctive (1)**
186:16

**distinctly (1)**
110:15

**distinguish (1)**
223:2

**distract (1)**
5:3

**distributed (1)**
95:4

**distribution (4)**
41:22;45:25;70:17;95:7

**district (5)**
57:17,18;58:3,13;227:5

**districting (1)**
78:1

**districts (2)**
50:6;56:5

**dive (2)**
12:3,9

**divided (1)**

101:15

**division (1)**
93:18

**DMV (3)**
103:18;104:1,10

**doctor (1)**
4:19

**document (12)**
13:8;25:1,8;64:5,15,23;
65:1;67:7;76:3;211:12;
212:10;243:18

**documentation (1)**
90:19

**documented (1)**
205:2

**documents (4)**
14:22;15:18;90:23;92:9

**Doe (1)**
175:8

**doesn't (20)**
32:6;99:23;103:6,24;
106:7,8;118:13;123:14;
134:14;135:12;151:13;
157:10;181:15;190:12;
233:1;242:20;247:1,23;
248:1;250:22

**doing (14)**
9:16;27:25;106:6;113:5;
118:4;150:10;163:4;
171:21;206:20,24;215:20,
21;225:23;247:9

**Don (1)**
217:11

**done (12)**
54:17;75:25;87:7;98:2;
101:10,11;106:6;176:3;
184:4;186:3;231:5;245:12

**don't (215)**
6:24,25;10:9,14,22;18:20,
21,25,25;21:16;27:4;29:16;

30:1,16;33:15,20,24;34:11,
24;37:20;39:1;53:20;58:18;
65:23;67:21;68:1,2;69:5;
71:4;74:3,5;76:7,9;78:22;
79:1,2,4,8;81:17,19;82:18,
24;83:6;85:18;86:21;87:6,
11;88:5;93:7;98:21,24;
99:2;101:17;102:13;
104:25;109:19;110:13;
118:9,10;119:13;120:6;
121:16;122:1,17;123:21,21;
124:4,5;128:1,2,19,19;
129:3,3,6,11,12,13,23;
130:6;132:5;133:23,23;
134:20;141:2;142:9,12;
143:6,11,24;144:19;150:15;
153:7;157:19,20,23;163:15;
164:11;168:1,4;169:1,17;
170:8,14;171:12,17;175:5,
16,19,24;176:12,12,17;
178:5,6,8,10;181:14,14,21;
183:5,14,25;184:2,25;
185:2;188:10,11;190:25;
191:1,13,22,24;192:5,13,
21;193:1,12,13;196:1,15;
197:6,21,23,25;198:1,20;
199:25;201:12,20,21,24;
202:12,18,24;203:1;204:9;
205:18,24;206:4;208:11;
209:16,17,19,21;210:1,5;
212:24;214:21;216:14;
218:10,13;219:16,20;
220:22,24;221:7,20,21;
222:7;223:21;224:16;
225:16;227:12;228:2;
230:13,24,25;231:17;232:5,
21;235:1;236:20;237:9;
239:12,17;240:5;244:3,10;
245:2,3;246:14;248:21;
249:18,21;250:14;253:22;

254:17,20;255:13;256:3,5,
9,12,23

**door (6)**
134:14,14;143:23,23;
210:2;223:17

**doorstep (1)**
247:20

**double (2)**
112:12;190:14

**double-sided (1)**
25:16

**doubt (4)**
32:3;107:4;191:16;
201:14

**doubts (1)**
28:24

**down (20)**
12:9;51:10;59:9;107:7;
114:16;130:12;147:6;
164:18;165:16,21;166:9;
167:10,10;189:22;220:24;
229:22,24;231:1;249:16;
255:9

**Dr (69)**
13:1,1;15:14,14;19:4,4;
25:3;50:22,22,24,25;64:6;
65:19;67:11;68:10;73:17;
74:11;76:23;89:4;100:6,6,
6;113:21;127:24,24;
153:11;171:14;179:7;
194:16;196:9;200:5,8,9;
205:11,13;209:19,22;
211:15;219:11;227:19,21;
228:3,17;229:18;230:6,14;
232:2;233:3,10,13,15;
234:1,10,23;236:8,14;
237:2,5,25;238:5,22;
240:13,19;241:14,21;
242:17,25;243:18;254:25

**Drake (1)**

20:6

**draw (2)**
170:7;183:3

**drawing (3)**
56:4;185:9;255:6

**draws (1)**
228:4

**drew (2)**
45:18;225:14

**drill (1)**
51:10

**drive (11)**
15:23;16:3;17:21;105:11;
142:21;145:11;166:7;
224:7,22;227:10;250:16

**driven (1)**
209:3

**driving (2)**
189:8;227:9

**drop (2)**
134:15;203:14

**drops (3)**
136:4;167:23;203:8

**droves (1)**
119:13

**due (1)**
151:22

**Duhon (3)**
89:24;91:22;149:23

**duly (1)**
4:6

**Dunlap (9)**
56:16,25;57:5;60:1,16;
64:4;80:5,17;83:3

**duplication (1)**
16:20

**durable (3)**
29:1;30:18;32:7

**during (10)**
14:3;78:12;98:7;121:13;

140:22;170:12;172:10;
200:15;209:24;242:10

**duty (2)**
5:24;220:20

**E**

**each (18)**
36:25;60:4,6,8;90:16,18;
101:11;102:3,8;109:22;
120:17,21;145:14;152:17;
160:22;174:13;180:14;
181:6

**earlier (8)**
19:3;22:21;149:10;
174:25;211:8;226:10;
232:18;245:17

**early (208)**
18:13;21:23;22:22;36:19;
37:12;45:9;52:9,22,22;
92:21,22;94:18,19;95:1,7,
11;96:19,23;97:9,12,15,19,
21;98:5;99:9;102:18;
104:25;109:6,10;113:13,25;
114:25;115:25;116:16;
117:1;118:4,23;119:2,5,6,
15;120:12,16,17,19,22;
121:1,3,12,13,13,19,20,20;
126:9,11,15,16,18,21;
127:14,22;128:8,17;130:9,
25;131:6,9,21;132:1,11,20,
22;133:6,15,21;136:12;
138:5,6,12,18;140:8,18,21;
141:1,4;143:4,9,13;145:15,
22;148:5,17;150:25;
151:22;153:25;154:10,24,
24;155:4,20;157:4;158:1,4,
7,9,12,23;159:3;161:1;
163:21;164:7;166:12,15,18;
167:22;168:7,13;169:7,10;

170:12;172:11,19;173:9,10;
175:21;176:19,22;179:17;
182:14;187:14,21,23;190:5,
6,11,14,17,22;191:3,3,8,11,
14;198:22,23;200:3,14;
203:4;206:6,12,16;207:4,
17;214:17,21;216:2;219:7,
11;225:10;228:24;229:3,5;
230:7,10,10;233:5,7;
236:11,17,23;240:22,25;
241:3,4,5,25;242:6,9,13,21;
243:3,10,11,16;245:18;
246:1,7;247:1,4,8,23;248:4,
12,17,20,24;249:7,19,23,25;
250:1,5,6,12,21,24;251:24

**ease (1)**
211:6

**easier (7)**
21:18;34:23;68:13;103:8;
105:6;162:16;186:8

**easily (2)**
71:16;184:4

**Eason (8)**
90:2,3,20;109:24;126:20;
132:17;147:15;164:5

**E-A-S-O-N (1)**
90:2

**east (2)**
162:22;165:5

**easy (7)**
6:14;10:9;29:7;72:2;74:3,
5;128:22

**eat (1)**
220:7

**economic (4)**
33:9;44:20;254:12,14

**edge (1)**
199:23

**edited (1)**
24:1

**editing (1)**
27:15

**editor (3)**
23:6,9;27:12

**editorial (1)**
23:7

**eds (1)**
24:5

**education (8)**
42:17;48:25;49:9;59:5;
180:10;213:16;233:14,16

**Educational (4)**
4:13;20:3;42:12;59:6

**effect (2)**
223:11;246:2

**effective (1)**
152:4

**effects (3)**
222:4;223:6;247:18

**effectuate (1)**
71:20

**efficacy (2)**
48:17;50:15

**effort (10)**
30:25;91:14;113:22;
120:15;142:18,24;143:2,19;
144:3;201:3

**eight (19)**
115:21;169:2;177:20;
179:18,23;184:22;187:10,
12;193:19;196:4,17;197:14,
18;204:25;205:12,14;206:2,
6;216:22

**Eighty (1)**
198:6

**either (18)**
29:12;61:24;62:1;113:12;
115:25;121:10;122:22;
143:11;145:21;189:21;
225:19;231:4;237:4,4;

243:15;248:3;249:3;251:10

**elderly (1)**
42:8

**elect (3)**
58:12;96:11;188:23

**elected (9)**
49:25;50:3;57:15,17,20;
82:16;220:20;234:2,7

**election (112)**
21:7,9,10,11,15,19;30:9;
32:24;41:16;69:11;71:17,
18;72:5,6;75:7;81:3,14,25;
82:22;84:13;92:20,22;
94:18,19,25;96:8,9;97:18,
22;104:25;107:5,5,5;
109:23;110:2;111:24;
113:12;114:20;116:1;
119:1;121:2,14;125:11;
126:10;127:15;133:22;
136:12;137:9,18,19,20;
140:18;141:14;142:23;
145:15;151:6,18;155:2,20;
157:15;158:8,12,24;159:3,
19,23;160:23;166:12;169:3,
18,19;173:2,9,16;174:16;
176:20,21;180:19;182:14;
187:15;188:14,16;189:8,11,
13,17,18,25;190:3,10,15;
191:2,4,9;198:23;202:25;
203:11;217:9,20;229:6;
230:7;233:5;242:11;
243:15;247:7;248:2,9,16;
249:12,13,16,19

**elections (61)**
20:11,15,18;21:15,16;
31:19;33:23;57:1;58:3,4,13,
14;65:10,12,18;66:6,10;
72:7;74:5;80:24;82:6,14;
83:6,18,19;90:1;110:17,21;
112:14;117:15;119:4,20;

123:8;125:2;129:19,22,24,
25;133:15;136:21,23,24,25;
137:2;138:5;140:10;142:2,
3;151:12,23;152:5;157:11;
163:4;177:16,21,24;178:2;
188:25;189:15;203:9;
247:16

**electorate (4)**
34:3;70:14,18;247:14

**electrical (1)**
116:13

**Elementary (1)**
208:7

**elevate (1)**
159:8

**elevated (1)**
188:5

**elevating (1)**
95:13

**elevation (1)**
118:10

**Ellis (2)**
86:1,2

**else (11)**
14:4,8;15:16;17:2;105:3;
118:25;143:18;165:12;
182:6;228:12;256:7

**elsewhere (2)**
152:25;177:5

**email (4)**
13:9,10,11;14:15

**emailed (1)**
14:13

**embedded (1)**
58:2

**emergency (1)**
148:14

**emerging (2)**
162:1;199:19

**emphasis (2)**

78:24;149:5

**emphasize (1)**
79:12

**emphasized (1)**
79:9

**emphatic (1)**
108:21

**empirical (2)**
52:18,19

**employed (11)**
9:2;21:25;22:12,14;
74:22;171:14;224:6,21,23;
225:2,5

**employer (1)**
99:23

**employment (4)**
20:2;59:7;233:14,16

**enable (1)**
213:9

**enamored (1)**
73:22

**encompass (1)**
25:24

**encompasses (2)**
26:2;138:19

**encourage (1)**
50:1

**end (7)**
72:12;86:24;103:1;
158:11;200:22;230:2;
241:14

**engage (2)**
53:6,6

**engaged (1)**
227:25

**engaging (1)**
152:4

**engulfed (1)**
4:21

**enough (5)**

101:11;141:10;192:23;
211:10;249:22

**enrollment (1)**
180:11

**enslaved (1)**
202:17

**ensure (1)**
236:6

**ensuring (1)**
82:25

**entered (1)**
77:6

**enthusiasm (1)**
78:25

**entire (4)**
110:6;157:12;188:6;
216:8

**entirely (7)**
15:24;19:25;67:12;153:2;
174:23;197:11;203:14

**entirety (1)**
65:20

**entitled (3)**
25:16;210:20;235:22

**entity (1)**
62:6

**entrenched (3)**
42:24;180:23;201:23

**environment (3)**
52:8,20;106:14

**Episcopal (1)**
136:13

**equal (2)**
123:16;242:8

**equally (2)**
125:10;241:5

**equitably (2)**
45:10;125:6

**equity (1)**
125:9

**erected (1)**
114:16

**Errata (2)**
258:7,17

**error (5)**
68:11;172:5;244:4,8,12

**errors (2)**
244:15,18

**escape (1)**
100:19

**especially (10)**
49:8;73:11;108:20;120:1;
140:10;154:11,25;161:6;
183:1;189:15

**essence (2)**
57:23,24

**essential (1)**
229:12

**establish (4)**
166:21,25;167:2;168:2

**established (3)**
139:8;185:17;237:3

**establishing (2)**
104:10,12

**estimate (3)**
18:6,11;197:6

**estimates (3)**
244:4,8,15

**estimation (3)**
96:4;196:23;197:10

**ethnic (4)**
61:15,19;62:6;194:20

**evaluate (8)**
92:18;94:16;95:1,6,9;
245:5,7;251:19

**evaluated (1)**
251:25

**evaluating (2)**
94:13;95:21

**even (46)**

38:11;39:5,13;41:25;
42:5;51:16;52:14;79:11;
97:3,6,6,16;105:13,16,16,
18;118:11;121:1;134:14;
139:10,13;141:20;146:21;
147:18;149:22;154:16;
162:4;163:12,15;164:14,16;
167:21;168:1,5;189:17;
190:7,11;194:12;203:11;
204:12,19,20;208:6;217:16;
236:3;246:15

**evenly (1)**
45:10

**evenness (1)**
137:14

**event (1)**
13:13

**events (3)**
210:3;233:3,10

**eventually (1)**
199:21

**ever (14)**
8:16;12:10;22:14;36:13;
46:18;60:20,24;63:15;73:7;
83:12;87:22;100:17;222:8;
244:25

**every (12)**
21:13;30:9;38:25;39:2;
41:17;72:23;75:22;141:15;
177:8;185:4;199:16;220:25

**everybody (2)**
32:25;97:20

**Everyone (7)**
61:17;125:5;149:22;
157:7,9,21;188:20

**everyone's (1)**
32:19

**everything (4)**
77:4;161:14;207:9;
215:20

**everywhere (1)**
184:11

**evidence (32)**
62:9;67:10;71:22;78:3;
84:9,17,21;87:20;94:24;
105:14;107:11;117:9;
121:24;126:7,12;132:7;
139:6;150:24;152:23;
153:2;154:23;158:1;177:6;
190:25;191:1,5;195:19;
243:13;245:18,25;246:10;
250:12

**ex (1)**
23:7

**exactly (20)**
12:1;32:22;33:21;75:19;
81:18;111:11;112:22;
132:5;144:19;146:25;
167:18;186:6;194:1;208:9;
214:13,15;217:2;219:20;
235:2;254:1

**exaggerated (1)**
35:20

**EXAMINATION (3)**
4:9;78:13;79:10

**examine (2)**
180:17;182:22

**examined (5)**
4:8;111:19;205:1;206:3;
258:3

**examining (1)**
154:9

**example (15)**
40:22;42:3,10,22;49:11;
50:5;53:17;162:7,11;
171:15;172:23;177:19;
197:1;214:25;221:13

**Excel (3)**
16:8;148:2,2

**excelled (1)**

144:15

**excellent (1)**
82:17

**except (4)**
4:23;38:25;39:2;122:1

**exception (1)**
186:19

**exclusion (1)**
243:13

**exclusively (1)**
153:1

**Excuse (2)**
238:3;255:16

**exercising (1)**
151:10

**Exhibit (21)**
12:25;13:3;25:1,5,23;
26:2,7;64:3,8;76:16,25;
92:8;210:20,24;213:23,24;
223:24,25;240:10,13;
243:18

**exist (2)**
175:3;250:5

**existed (2)**
202:1,1

**existence (4)**
193:11;232:3,7,9

**exotic (1)**
65:8

**expand (1)**
137:10

**expansion (1)**
135:18

**expect (13)**
18:15,16;19:5,13;39:24;
112:13;120:10;137:21,23;
143:18;200:21;218:15;
239:10

**expectation (2)**
144:2;188:7

**expected (1)**
27:16

**experience (7)**
35:1;73:18;74:12;78:2;
101:3;159:21;170:1

**experienced (2)**
78:14;79:7

**experimental (1)**
217:12

**expert (49)**
9:1,11;25:2,12,17,21;
36:12;37:14;44:12;53:24;
56:21;60:5,6,24;62:5;63:1,
3,6;69:4;77:24;78:2,14;
79:7;87:23;88:3;91:5;
92:19;93:3,4,9;94:9,12,14,
16;100:12,13;101:1,4,10;
153:11;175:2;191:17;
194:23;227:22;240:14;
242:4;245:1,8;251:20

**expertise (9)**
26:25;77:25;83:7;88:5,7;
94:7;124:22;149:11;177:14

**experts (13)**
91:6;93:15,16,23;100:4;
101:9,13,16,21;170:18;
195:21;196:14;253:2

**expert's (1)**
149:2

**explain (7)**
39:7;87:1;189:4;215:6,
10;216:7;222:2

**explained (1)**
203:14

**explanation (1)**
63:14

**explanations (3)**
107:4;117:18;166:24

**explanatory (1)**
41:25

**explicit (1)**
253:14

**explicitly (4)**
91:5;102:13;215:12;
251:24

**explored (1)**
36:14

**exposure (1)**
61:17

**express (2)**
53:4;96:10

**expressed (3)**
30:15;174:3,5

**expressing (1)**
174:22

**extend (3)**
21:8;97:20;104:19

**extended (1)**
143:21

**extending (1)**
103:10

**extends (1)**
21:9

**extension (1)**
217:25

**extensive (3)**
27:7,7;77:5

**extent (5)**
123:24;182:12;234:1,6;
235:24

**extraordinarily (2)**
151:7;188:12

**extraordinary (1)**
217:14

**extremely (1)**
80:23

**F**

**face (5)**

34:2,13;176:20;194:10;
218:23

**faced (3)**
129:5;155:9,10

**facilitate (1)**
163:6

**facilities (7)**
115:5,7,9,14;116:6,6;
148:12

**facility (1)**
116:7

**fact (28)**
70:12,21;72:11;87:22,23;
108:18;111:6;117:20;
118:2,6;128:20;139:2;
155:19;162:6;167:22;
174:18;178:18,19;186:15;
189:1;194:10;195:16;
196:8;213:13;218:6;
243:11;250:10,19

**factor (5)**
106:13;107:24;108:7,14;
206:5

**factored (1)**
134:3

**factors (14)**
102:18;151:16;206:19;
207:4;213:17;217:1,9;
222:23;223:15;228:5,9,13,
16,17

**facts (6)**
5:19;88:6;107:11;114:23;
126:5;144:25

**factual (2)**
78:3;237:17

**faculty (1)**
20:23

**fading (1)**
35:20

**fail (1)**

31:3

**failed (1)**
78:5

**failing (1)**
105:4

**failure (3)**
104:11;117:15;170:1

**fair (27)**
23:2;41:6;43:10,14,18;
49:18,19;59:16;61:2,22;
62:8;67:3,5;79:4;93:20;
101:4;104:5;138:23;
147:13;164:10;171:19;
215:2;231:18;241:14;
246:5,24,25

**fairly (2)**
125:6,13

**faith (1)**
120:15

**faithful (1)**
34:21

**false (2)**
107:11;114:22

**familiar (29)**
5:14;20:21;31:8,10;32:7,
19;33:20;75:22;77:7;
114:19;175:18;208:1,4,13,
15,17,21,25;209:6,25;
210:16;211:9,9;214:18;
222:17;228:5,8,13;234:15

**familiarity (7)**
21:13;156:14;207:3,23,
24;208:10,22

**family (3)**
52:20;170:3;256:22

**Famous (1)**
179:14

**far (22)**
8:7;10:5;15:11;18:5,17;
19:2;92:1;102:4;114:20;

118:20;123:3;125:11;
134:10;147:20;189:15;
202:18;225:18;227:5;
229:15;231:9;245:4;249:22

**favor (1)**
97:12

**favored (1)**
35:14

**favorite (1)**
29:24

**feasible (1)**
222:19

**feat (1)**
152:13

**federal (17)**
5:1;11:5;21:8,15,19;
53:25;81:8,14,15,25;82:8,
12;85:22,23;169:5;205:2;
231:9

**feedback (1)**
222:15

**feel (3)**
6:25;98:11;258:6

**feelings (1)**
48:17

**feet (5)**
146:11;165:4;225:16;
226:17,18

**few (9)**
13:6;24:5;29:8,10;30:4;
73:21;119:10;144:10;
232:10

**fewer (2)**
222:7;241:3

**field (13)**
5:17;34:25;35:7,21;
51:15;135:2;136:16,20;
162:5,10;177:14;218:9;
244:21

**fielding (1)**

31:19

**Fifteen (1)**
90:18

**fight (4)**
200:13,18,19;212:21

**fighting (1)**
219:4

**figure (9)**
34:9,22;106:24;130:7;
137:22;167:25;184:18;
206:21;254:5

**figured (1)**
172:8

**figures (5)**
16:5;117:3;131:3,14;
227:13

**file (20)**
53:21;86:20;87:1,3;
91:11;122:14;126:17;
148:2,2;153:10;170:9,14,
16;177:19;196:2;254:10,11,
13;255:14;256:3

**filed (3)**
69:10;85:20;86:18

**files (12)**
15:25;16:6,8,8,10,10,15,
20;145:12,25;146:14;
171:25

**filing (1)**
16:19

**fill (1)**
68:22

**filled (1)**
71:12

**final (3)**
18:12;116:15;135:10

**finally (5)**
68:4;73:14;103:17;138:4;
156:22

**finance (2)**

21:21;178:21

**financed (1)**
152:10

**find (20)**
65:19;69:6,7;110:11;
112:15,25;155:7,8;156:25;
162:17;163:8,16;164:13;
185:2;212:12;217:6;
246:15;247:15;256:8,8

**finding (6)**
70:9;156:12;157:3;
158:19;162:23;168:19

**findings (11)**
37:16;150:20;151:5;
154:13,22;155:17,24;
156:23;157:25;167:17;
183:7

**finds (1)**
70:12

**fine (4)**
16:1;36:3;70:22;238:15

**finish (5)**
8:2;76:11;125:22;235:21;
238:3

**finished (1)**
100:18

**fire (2)**
115:6;208:8

**firehouses (1)**
208:3

**firm (3)**
33:22;86:1,3

**first (33)**
4:6;17:4,6;25:11;27:2;
38:5;46:21;51:8;68:7,7;
73:15;75:5;95:11;96:6;
102:10;109:16;139:10;
146:13,14;150:22;154:11;
163:11,15;189:7;198:12;
212:6,17;216:18;225:12;

235:1,2;238:7;251:18

**fit (1)**
65:8

**Five (13)**
8:12;14:12,12;19:19;
50:14;54:3;59:15;60:2;
73:10;76:8,12;136:22;
244:7

**five-year (1)**
244:5

**flash (4)**
15:23;16:3;17:21;145:11

**flat (4)**
18:1;117:23;167:24;
246:19

**flavor (1)**
29:24

**flexibility (2)**
98:7;199:9

**flip (1)**
150:21

**flipping (1)**
249:6

**flooded (1)**
103:19

**Flores (32)**
14:24;15:14;19:4;50:22;
93:7,12,19;100:6;113:21,
21;127:24;128:13;146:15;
149:6;150:8;153:12;
181:16;194:17;196:10;
201:25;203:20,22;228:17;
233:3,10,13,15;234:1,10;
236:8,14;238:8

**Flores's (11)**
94:5;200:8;209:20,23;
227:19,22;228:3;232:2;
234:23;237:5;238:6

**fluctuate (1)**
32:6

**fluctuated (1)**
151:21

**fluctuates (1)**
156:21

**fluctuating (1)**
30:18

**fluctuation (1)**
30:17

**fluctuations (1)**
107:7

**FM (1)**
166:7

**focus (17)**
21:15;26:6;38:18;39:6;
40:6,23;41:1,23;42:1,6,14;
92:17;93:19;172:13;216:3;
223:4;242:2

**focused (2)**
41:19;93:11

**focuses (1)**
215:23

**focusing (1)**
20:11

**foggy (1)**
114:5

**folks (7)**
34:4,6;105:17;106:7;
107:8;125:14;251:6

**follow (4)**
162:8,23;247:2,24

**followed (1)**
28:12

**following (1)**
230:5

**follows (1)**
4:8

**food (1)**
172:24

**foot (1)**
184:5

**force (3)**
68:12;82:5;105:11

**forecast (1)**
178:2

**foregoing (1)**
258:3

**foresight (2)**
128:23;129:3

**form (69)**
4:24;5:8;15:22;31:7,15;
36:16;38:2;44:1;46:20;
52:25;59:4;62:15;66:14;
67:15;70:6;75:17;78:18;
80:21;81:10,16;82:2;83:21,
24;84:15;90:25;97:22;
108:15;126:22;128:9;
131:11,23;133:8;135:14;
137:25;143:5;150:11;
154:6;159:4;172:20;
175:23;176:6;178:14;
184:8;187:7;188:2;189:6;
190:16;193:24;194:24;
200:16;203:19;205:6,17;
208:19;210:4;228:25;
230:12;234:18,25;236:24;
237:7;239:7,16;243:7;
247:25;249:2,20;252:23;
253:16

**formation (1)**
35:10

**formats (1)**
16:7

**formed (2)**
62:22;153:23

**former (3)**
32:8;79:25;91:25

**forming (3)**
232:23;234:22;236:12

**forms (2)**
216:10;223:11

**forth (9)**
47:1;63:17;102:20;
145:20;147:4;148:15;
201:7;207:14;212:16

**forward (4)**
18:20;69:7;130:10;199:1

**found (14)**
62:9,13,21,22;63:2;
104:18;111:10;113:6;
146:14,15,17;156:4;180:24;
217:12

**four (9)**
72:23;100:25;115:21;
127:5,13;162:8,9;227:1;
230:3

**fourth (2)**
75:12;130:24

**framework (1)**
228:4

**Francis (1)**
165:23

**free (2)**
6:25;104:19

**frequency (4)**
178:3;187:14,21,23

**frequently (4)**
39:9;170:1;209:10;
247:15

**from (92)**
5:3;6:6,10;7:6,8;14:1;
15:25;20:7,9;29:19,22;
31:22;32:15;33:6;35:1,12,
15;45:18,24;46:16;52:20;
59:13;69:9;70:2;71:23;
75:14;76:3;86:21;91:4;
99:7;107:25;108:19,22;
110:16;126:19;128:21;
131:20;143:15;145:22;
146:13;151:8;152:23;
154:9,24;162:18,22;163:7;

164:5;165:4;166:8;168:16,
19,25;169:2,5,5,21;170:3;
171:8;173:21;176:22;
180:10,11,14,14;181:18;
183:4;184:2,10;185:9,9;
186:12;190:3;201:18;
203:4;204:18;210:12,14;
214:3;217:5;221:15,16,17;
222:9,15,20;223:6;241:24;
244:7;250:6;252:16;254:19

**front (4)**
104:23;156:18,18;194:4

**FSupp (1)**
76:22

**fulfill (1)**
213:9

**full (6)**
4:16;68:7;73:15;212:17;
222:3,22

**full-time (1)**
22:10

**fully (1)**
153:23

**Fund (1)**
4:13

**fundamental (4)**
34:18;218:19;242:23,24

**fundamentally (1)**
33:7

**funded (1)**
152:11

**further (15)**
68:8,10;78:9;108:9;
134:25,25;135:1;154:18,23;
155:5;185:10;213:1;
224:18;225:22;227:3

**future (14)**
119:16;120:5,13,13;
127:21,22;129:13;130:3;
133:15;139:22;152:20,20,

207:10,19

# G

**gain (1)**
68:15
**gap (1)**
197:15
**garage (1)**
116:4
**gather (11)**
45:13,17,24;58:24;90:13;
98:9,10;99:4;124:13;
155:12;229:14
**gathered (4)**
93:9;96:6;114:12;220:18
**gathering (1)**
166:11
**gauge (1)**
132:2
**gave (3)**
63:15;195:5;252:15
**gears (1)**
76:6
**gender (1)**
85:3
**general (18)**
35:10;41:4,12;47:12;
78:7,23;82:4,12;83:4,15,25;
84:2;88:4;109:24;114:20;
199:6;214:16;242:10
**generally (10)**
16:2;36:13;37:15;95:8;
177:15;181:8;213:15;
234:15;237:2;245:18
**generational (1)**
42:4
**generations (1)**
201:15
**generous (1)**

118:4
**geographic (1)**
20:20
**geography (2)**
20:15,17
**George (5)**
22:16;79:25;80:1,2,20
**Gerber (1)**
217:11
**germane (9)**
21:22;37:12;84:10,19;
104:22;145:6;154:14;
233:1,2
**gerrymandering (2)**
54:14,18
**gets (2)**
82:1;172:8
**getting (8)**
30:3;86:24;139:14;142:5;
162:16;163:24;164:25;
230:2
**Gill (3)**
8:23;60:2,17
**GIMPEL (31)**
4:5,18;13:1,1,3;25:3,5;
64:6,8;67:12;73:17;74:11;
76:24,25;77:24;78:7;89:4;
179:7;205:11,13;210:24;
213:24;223:25;240:10,20,
21;241:8,22;242:2;243:19;
258:11
**Gimpel's (4)**
65:19;68:10;242:5,16
**GIS (5)**
16:10;115:3,4;148:6,10
**gist (1)**
65:24
**give (8)**
15:24;48:10;97:10;
123:24;145:12;149:7;

220:21;230:15
**given (22)**
40:3;63:16;69:19,23;
73:9,12;93:8;101:1;147:11;
161:14,16;169:7;173:2;
176:11;187:19;199:8,10;
248:8,16,23;249:7;258:4
**gives (1)**
40:16
**giving (1)**
78:14
**Glen (1)**
40:14
**glimmer (1)**
100:14
**goal (2)**
103:21;146:23
**goes (18)**
20:18;49:16,24;50:7,14;
134:2;150:16;160:6;
162:21,21;166:13;167:10,
10,10,10;173:3;189:24;
204:7
**going (125)**
5:18;6:20;7:5,8;10:11;
12:24;13:7;18:20;20:1;
24:24;25:1,3;29:7,8,12,19,
21;30:5;31:3;32:1;33:5;
34:4;35:23;36:1;38:17;
39:9,12,17;41:13;47:5;
48:16;51:10;53:22;64:2,20;
66:1;70:23;74:2;76:16;
77:4;80:25;83:16;84:25;
85:14;89:6;92:7;96:9;
97:19,25;100:20,22;102:2;
103:11;104:3;105:3;
107:14;110:20;112:2;
114:14;118:13,19,21;
120:11;122:5;130:3,10,11,
16;134:10,12,19;142:4;

147:7;148:22;149:13;
151:9,10,18;158:18;166:13;
177:12,21;179:2;181:5;
182:13;183:5;184:10;
185:13;189:21,21,22,23;
194:19;203:4,12;204:16;
206:25;208:23;210:19;
211:11;213:22;214:5;
216:9;218:16,22;222:7;
223:5,19,23;226:19,25;
227:20;228:25;229:17;
230:17;234:11;240:13,18;
241:20;246:15;247:19;
255:14;256:7,8,10
**Goldwater (1)**
32:21
**gone (5)**
63:24;64:19;136:6;
143:20;152:18
**Good (16)**
4:10,11;40:3,8;71:22;
120:15,17,22;135:22;
136:19;139:21;149:8;
151:19;199:15;211:23;
252:14
**goodness (6)**
105:5;183:9;221:2;
226:15;233:21;256:7
**Google (1)**
147:2
**go-slow (1)**
32:23
**gotten (2)**
136:8;143:25
**governed (2)**
199:3,3
**government (6)**
22:7,9;34:7;50:18;86:9;
169:5
**governmental (1)**

62:5

**governments (1)**
57:12

**governor (5)**
55:17,18,25;56:13;71:23

**gradual (3)**
33:2,2,13

**graduate (2)**
20:22;162:7

**graduated (1)**
162:12

**Grambling (1)**
146:22

**grant (1)**
64:21

**granted (1)**
201:6

**granular (1)**
255:10

**grasping (1)**
231:2

**great (10)**
6:5;13:14;53:9;59:12;
103:14,16;147:18;151:16;
168:12;185:19

**greater (6)**
68:20;155:13;161:23;
217:11;246:7;248:23

**greatly (1)**
168:21

**Green (2)**
112:14;217:11

**grew (2)**
52:4;53:3

**grips (1)**
43:3

**ground (3)**
5:16;163:25;230:21

**grounded (2)**
68:24;72:12

**group (13)**
30:14;40:24;60:21;62:1,
6;85:2;159:22,25;246:25;
247:22;248:9,15;255:12

**groupings (1)**
109:21

**groups (16)**
43:12,16;44:8,13;51:13;
68:5;84:7,23;85:12;170:12;
171:14;172:12;178:19,20;
255:8,8

**grow (2)**
52:7;169:11

**growing (1)**
52:13

**guess (23)**
6:20;13:19;14:18;61:20;
73:11;79:3,21;102:6;
125:10;129:17;132:24;
134:24;141:3;143:16;
152:17;154:2;159:17;
162:3;177:3;188:17;199:9;
220:2;221:6

**guesses (1)**
172:3

**guide (9)**
119:16,16,18;120:6,6,13;
127:21,22;207:15

**guilt (2)**
202:5;203:16

**guy (1)**
79:13

**guys (1)**
76:7

**GW (1)**
22:23

## H

**habit (6)**

47:8;139:8;169:25;
180:23;182:12;214:19

**habits (3)**
47:10;111:14;162:25

**habituated (1)**
48:13

**hairs (1)**
61:23

**half (7)**
108:4;121:24;122:4;
145:14;164:19;165:21;
225:18

**hand (10)**
13:1,2;25:3;27:5;122:17;
157:19,24;217:8;224:3;
240:13

**handed (1)**
18:13

**handicapped (1)**
95:14

**handicaps (1)**
213:7

**handing (4)**
64:6;76:23;211:2;214:4

**handle (3)**
101:8,13,21

**hands (1)**
55:4

**handy (2)**
42:22;185:1

**Hanna (1)**
78:4

**happen (6)**
9:13,14;103:23,24;111:6;
174:24

**happened (7)**
128:5,24;129:15;133:14;
149:20;204:11;250:20

**happening (4)**
12:21;43:2;158:6;247:14

**happens (2)**
49:5;70:22

**happy (2)**
12:7;76:10

**hard (4)**
32:20;66:8;167:2;222:22

**harm (3)**
142:7;143:8,12

**harmed (1)**
142:6

**Harris (2)**
110:22;112:23

**having (29)**
4:6;49:22;50:21;95:14,
15;97:14;98:12,13;106:16;
114:11;138:18;139:19;
149:13;152:20;160:15;
168:4;174:6,23;175:10;
180:3;211:16;222:21;
226:25;227:10;231:19;
238:25;242:24,25;244:10

**HBCU (3)**
156:6;196:19;197:19

**HBCUs (3)**
147:9,9;205:19

**head (11)**
6:14;10:10;21:13;40:5;
101:6;123:20,21;178:5,11;
193:14;209:18

**heading (1)**
231:3

**headings (1)**
102:2

**headquarters (2)**
118:3,7

**hear (3)**
86:21,23;163:22

**heard (5)**
17:6;85:21;97:21;98:5;
219:17

**hearing (6)**
56:21;57:2,4;60:9;69:14;
75:12

**hearings (1)**
9:8

**heart (1)**
242:7

**Heath (6)**
14:14,15,17;17:2,14;
19:12

**heavily (5)**
46:1;105:14;230:23;
232:16,17

**heavy (3)**
24:13;112:4;152:25

**Heights (3)**
228:4,8,16

**held (1)**
88:13

**help (7)**
10:12;12:1;82:21;97:21;
106:7,8;132:13

**helped (1)**
132:14

**helpful (2)**
115:23;163:6

**helping (1)**
218:18

**Hempstead (3)**
118:2,6,11

**hereby (1)**
258:2

**here's (6)**
33:19,21;102:14;107:19;
136:23;166:20

**hey (3)**
33:5;81:2;116:24

**high (40)**
20:4;49:14;97:13;134:4;
136:25;137:18,20,21,24;

138:6,12;139:3,13;140:1,
10;141:8,22;151:7,10,22;
169:19;178:3;187:20;
188:12;189:12;191:8;
220:14;225:17;247:1,2;
248:6,15,17,22;249:17,18;
250:3,12,12;256:4

**higher (7)**
107:23;108:1,11;155:5;
177:21;246:8;249:4

**highest (3)**
121:10;128:17;130:24

**highlight (2)**
40:12;65:1

**highlighted (10)**
41:19;65:6;67:8;68:6,9;
73:16;77:16;211:5;214:7;
215:1

**highlighter (1)**
38:10

**highlighting (2)**
38:12;79:19

**highlights (3)**
13:19,22;14:2

**highly (4)**
78:13;79:6;134:9;138:21

**hired (5)**
24:11;43:22;56:6;57:5;
251:19

**hiring (1)**
143:22

**Hispanic (8)**
28:22,23;30:10;31:13;
39:25;61:13,18,25

**historian (4)**
149:12;150:2,3;237:4

**historians (1)**
205:3

**historical (4)**
149:24;156:14;207:3,7

**historically (3)**
45:7;187:1;196:5

**history (24)**
20:3;30:12;32:7;33:1;
58:1;91:9;97:17;99:5;
102:14,20;113:22,23,25;
114:2;144:24;201:1,17;
205:1,15;207:16;209:8;
230:18,21;249:24

**hockey (1)**
51:15

**hold (2)**
22:3;231:6

**holders (3)**
49:23,25;50:12

**holding (3)**
65:12,18;96:7

**holds (1)**
50:19

**holiday (1)**
69:13

**home (2)**
204:14;219:3

**honestly (1)**
66:2

**hope (6)**
103:10,14,16,22;120:13;
179:12

**hopefully (1)**
230:3

**hoping (1)**
180:16

**horizon (1)**
179:11

**horizons (1)**
179:12

**hospitals (1)**
115:8

**hostile (2)**
99:16;221:7

**hosting (1)**
181:19

**hot (1)**
120:1

**hotel (1)**
14:1

**hotly (4)**
119:19;129:19,21;141:14

**hour (6)**
18:3;19:9,24;130:17;
149:5;227:10

**hours (55)**
7:22;12:13;25;18:6,9,11,11,
16,18,19,20;19:1;45:10;
92:22;94:19;95:4;98:6;
102:19;107:1;116:16;
117:1,5,19,20,21;118:4;
121:20;122:6;129:10;
141:19;148:16;150:13,14,
16,18,19,25;167:18,19,22;
169:9;201:6;215:25,25;
217:25;231:10;242:14;
243:9,12,15;246:1,18,21,
22;251:3,15

**house (3)**
143:24;204:12,17

**housing (1)**
59:6

**Houston (6)**
142:21;162:21;183:10;
186:22;205:21;227:10

**Howard (1)**
49:13

**however (3)**
62:4;70:5;223:10

**huge (5)**
72:23;73:6;75:18;110:20;
183:6

**human (5)**
53:8;119:23;154:2;

231:16;253:15

**hundred (5)**
18:8;171:4;204:12,14,18

# I

**ice (1)**
29:24
**ID (5)**
85:20;86:11;163:4,8,15
**idea (11)**
50:15;71:8;79:23;80:3;
93:9;108:16;110:11;
114:20;116:23;154:5;
227:24
**ideal (1)**
210:10
**ideas (2)**
65:11;221:3
**identification (13)**
13:4;25:6;29:2,13,14,17;
32:6;64:9;77:1;210:25;
213:25;224:1;240:11
**identified (7)**
37:2,23;40:1;46:19;
149:2;181:12;198:16
**identifiers (3)**
33:22;42:24;43:1
**identify (10)**
51:19,22;52:1;53:14,18;
91:15;173:15;180:7;
188:24;215:11
**identifying (1)**
253:12
**identities (1)**
85:13
**identity (5)**
29:13,23;52:11;85:2;
237:18
**idiosyncratic (1)**

136:2
**ie (1)**
224:12
**ignorance (1)**
24:18
**ignore (2)**
121:22;122:4
**ignored (2)**
73:1;243:13
**ignores (1)**
242:7
**illegal (1)**
28:14
**imagine (3)**
97:15;124:17;197:24
**imitation (1)**
53:3
**immediate (1)**
219:1
**immediately (2)**
66:19;69:10
**immigration (11)**
20:16;26:18;28:1,1,4,6,7,
11,13,15;29:11
**impact (37)**
40:17,24;41:15;43:11,15,
19,24;44:7,13,19,22;45:12;
52:23;62:14,23;84:6,22;
87:15,19,21;96:2;104:3;
143:3;158:1;168:22;207:4,
18;211:15,17;217:14,19;
223:8;226:9;228:22;230:9;
241:11;251:23
**impacted (6)**
42:11;99:19;142:14;
161:3;166:18;243:4
**impacting (1)**
174:18
**impacts (1)**
234:14

**impair (1)**
7:18
**impediment (1)**
99:25
**impediments (3)**
134:5,6,7
**impetus (1)**
102:17
**implement (1)**
103:4
**implication (3)**
108:23;203:21,24
**important (12)**
43:9;48:15;58:19;95:10,
19,20;111:9;127:9;134:1;
161:5;174:24;179:9
**impractical (1)**
168:25
**impression (1)**
186:23
**impressive (2)**
152:9,16
**impressively (1)**
141:8
**imputation (1)**
162:14
**impute (1)**
171:13
**imputing (1)**
162:11
**inaccuracies (2)**
237:17;239:24
**inappropriately (1)**
242:1
**inattentive (1)**
34:12
**inclination (2)**
132:3;201:22
**inclined (1)**
214:17

**include (6)**
17:20;42:2;115:6;170:8;
181:14;222:22
**included (9)**
38:19;39:18;41:8,24;
43:8;91:10;182:2;214:7;
235:9
**includes (3)**
53:11;92:9;242:14
**including (3)**
163:4;185:22;208:12
**incoherent (1)**
238:10
**income (9)**
43:5;48:23,24;49:8;
183:3,4;254:4,5,18
**incomes (1)**
49:5
**inconsistent (1)**
37:16
**inconvenience (6)**
106:10;134:3,7;135:5,7;
141:12
**inconvenienced (2)**
97:16;98:11
**inconveniences (2)**
174:23;218:23
**inconvenient (2)**
105:5;173:15
**incorporated (1)**
200:9
**incorrectly (3)**
71:10,13;241:23
**increase (6)**
103:11;117:1;128:24;
158:13;168:9;191:15
**increased (5)**
102:19;161:2;189:9,12;
190:22
**increases (1)**

245:19

**increasingly (1)**
213:8

**incredible (2)**
128:24;152:11

**incredibly (2)**
163:6;194:4

**incumbent (1)**
152:15

**indeed (2)**
199:2;201:6

**independent (5)**
153:17,21;248:13;
249:11;250:7

**indicate (4)**
75:2;146:1;156:3;166:7

**indicated (7)**
37:3;80:18;195:13;
207:21;217:25;232:10,18

**indicates (1)**
146:15

**indication (2)**
127:7;184:2

**indicator (1)**
127:7

**indicators (7)**
42:9;44:21;59:3,13;
127:19;182:21;233:17

**indict (2)**
202:24;203:23

**indicting (1)**
247:6

**indictment (1)**
203:17

**indirect (1)**
195:19

**individual (11)**
54:21;106:13;160:23;
177:9,18;204:8,8;254:17,
20;255:3,14

**individually (1)**
174:14

**individuals (2)**
176:10;253:22

**ineffective (1)**
247:6

**ineffectiveness (1)**
105:9

**inequality (1)**
99:9

**inequity (1)**
95:3

**inexperience (1)**
48:14

**inferences (1)**
196:2

**influence (4)**
31:13;116:16;148:17;
150:15

**influenced (1)**
32:17

**influencing (1)**
31:5

**influential (1)**
32:14

**information (36)**
20:20;68:20;70:18;71:3,
20;77:16;90:24,25;91:3,4,5;
105:9;112:3;115:22;120:9;
129:4,14;132:15;145:13;
146:13,22;174:21;184:25;
185:1;191:19;193:13;
195:15;227:4,22;235:8,18;
252:9;254:12,18,21;255:5

**informative (2)**
68:25;227:14

**informed (4)**
12:22;70:15,20;236:2

**infusion (1)**
169:4

**initial (8)**
29:5;93:23;94:2;209:23;
224:3;227:20;239:20;
242:25

**initially (1)**
24:21

**initiatives (1)**
82:25

**injunction (5)**
56:22;60:9;64:4,12,21

**inner (1)**
49:6

**inordinately (1)**
213:5

**input (2)**
210:12,14

**inquire (1)**
93:14

**inquiries (1)**
85:5

**inquiry (1)**
96:17

**inside (2)**
28:10;176:10

**insignificant (2)**
167:25;193:2

**instance (21)**
21:20;35:19;39:7;49:13;
50:10;72:16;85:1;134:13;
142:19;146:21;148:15;
152:5;160:20;162:25;
164:16;201:7;202:9;
207:13;217:11;221:17;
255:1

**instances (4)**
31:17;82:23;200:24;
201:5

**instead (1)**
160:15

**institution (4)**

22:15;24:10;45:7;187:2

**institutions (9)**
22:25;27:18;180:7,9;
181:12;182:25;184:22,24;
185:3

**instructed (1)**
7:7

**instrument (1)**
95:12

**intend (1)**
228:11

**intending (1)**
235:14

**intent (2)**
247:10,11

**interacted (1)**
17:13

**interest (16)**
33:10,23;34:11;106:11,
17;127:21,22;134:20;
139:7;151:14;152:1;188:5,
13;212:19;217:9;219:15

**interested (11)**
34:7;70:11,15,20;99:14,
15;118:17;151:17;223:20;
247:21;250:17

**interesting (6)**
35:6;42:18;57:11;109:15;
117:25;128:3

**interestingly (1)**
141:10

**intermittent (1)**
34:16

**interpreting (1)**
39:23

**interrupt (2)**
76:5;132:10

**intervals (1)**
145:24

**into (28)**

Allen v.
Waller County, Texas

James Gimpel, Ph.D.
December 12, 2019

5:20;9:14;12:9;21:14;
32:14;50:4;65:2;67:9;74:9;
77:17;89:7;91:17;100:2;
101:6;111:25;113:23;
130:2;142:21;161:24;
165:11;166:13;172:8;
176:1;182:2;207:17;
227:10;253:11;256:21

**introduced (1)**
36:8

**inverse (1)**
251:11

**inversely (1)**
256:14

**involved (12)**
10:7;57:13;61:8;66:8;
81:14;82:1;85:5;88:9;
89:12;93:16;112:1;141:15

**involving (2)**
61:3;87:13

**Iowa (1)**
20:6

**irregular (3)**
33:25;34:8;114:22

**irrelevant (1)**
242:3

**issue (30)**
50:15;54:16;73:1;74:19;
94:11;102:14;108:24;
109:9;117:11;133:25;
134:2;135:8;136:23;175:7;
183:12;204:5,6;215:18,23;
225:13;226:14,15;234:10,
12,20,23;235:3;236:3;
240:22;241:11

**issued (1)**
64:1

**issues (22)**
28:13,16;36:14;39:16;
46:18;48:16;74:1,15;94:10;

105:8;134:18;141:11;
149:10;173:17;174:13,15,
16,17;176:4;205:23;234:14,
16

**item (6)**
37:4,4,8,9;40:11;41:21

**items (1)**
38:7

**itself (5)**
46:2;107:3;109:10;
182:18;189:18

## J

**jagged (1)**
107:2

**JAMES (6)**
4:5,18;13:1;40:14;77:24;
258:11

**Jayla (3)**
89:16;163:12,13

**J-A-Y-L-A (1)**
89:17

**Jim (1)**
15:4

**job (3)**
31:2;69:25;101:2

**jog (1)**
10:12

**John (1)**
175:8

**Johnson (2)**
32:20;89:18

**joining (2)**
31:13,14

**Joseph (14)**
50:24,25;93:6;94:2;
100:6;114:5,6;127:24;
128:12;149:6,25;201:25;
203:21;238:8

**Joseph's (5)**
200:5,9;237:2,25;238:22

**Joshua (1)**
89:19

**journal (10)**
23:6,8,25;26:15,18;27:4;
172:8;211:13;212:6;216:12

**journals (5)**
23:22;27:19,22;39:17;
245:16

**judge (23)**
5:25;9:13;57:2,4;66:6;
68:2;70:5;77:21;78:16;
79:5,18,22;80:11,14,17,19,
20;83:3;89:24,25;91:22;
138:23;161:12

**judged (1)**
139:1

**judges (11)**
79:16;80:6;82:4,8,12,15,
20;83:23;84:12;173:16;
174:16

**judgment (1)**
27:8

**July (9)**
8:20;9:20;17:8,8,16;45:2;
51:9;92:17;93:21

**jumping (1)**
212:15

**June (1)**
9:21

**jurisdiction (6)**
35:2,4;163:20,21;207:16;
223:3

**jurisdictions (2)**
49:17;216:8

**jurist (1)**
81:2

**jurists (1)**
66:8

**just (101)**
5:7;8:4;9:1;14:16;15:21,
24;21:18;22:20;23:12;27:4,
14;28:14;30:14,20;33:7;
37:2;38:11;40:20;41:12;
51:11;53:24;69:13;71:24;
74:7,9;77:5;84:1;88:3,4;
95:14;97:5;98:16;99:14;
100:24;102:24;104:2,20;
107:10;112:3;114:22;
117:23;121:11,11,25;125:6;
130:4;136:1;140:15;144:4,
6,12,13;145:19;146:3;
148:13,21;149:2,8,14,19;
151:14;157:14;158:11,17;
160:15,20;164:18;168:4;
169:1,18;172:6;181:13;
184:10;188:7;191:3;
193:13;194:11;195:5;
203:1,13;204:19;206:23;
207:8,13,21;216:25;217:21;
223:19;228:21;229:4;
230:12;231:2,16;233:21;
237:22;240:3;242:22;
247:12,21;248:14;249:17

**Justice (1)**
205:3

**justification (1)**
97:14

**justify (1)**
97:2

**justifying (1)**
66:9

## K

**Katy (1)**
221:17

**keep (1)**
188:16

**kind (58)**

12:11;21:24;23:7,12;
28:12,17;29:6;32:23;34:1;
40:4,21;50:20;52:13;57:19;
58:24;93:17;95:3;97:18;
101:19;103:2,7;113:5;
117:24,24;129:20;132:7,14,
14;134:17;135:6;137:4,7,8;
146:10;147:6,6,22;154:2;
158:11;165:6;169:4;171:2;
175:8;177:3;182:14;
183:12;195:19,19;203:9;
207:11;217:4;219:24;
221:2;222:8,8;223:7,12;
227:6

**kinds (3)**

115:7;142:1;251:15

**knew (1)**

74:2

**know (672)**

6:21;7:1;8:4;16:7,14,18;
18:4,20,21,25;19:1,2;21:11,
12;27:12;28:19;29:6,10,11,
18,20;30:8,10,13,14,24,25;
31:25;32:1,24;33:3,9,20;
34:4,14,17,18,19,20,21;
35:8,10,16,18,25;38:18,20;
39:5,12;40:18,19,19;41:9,
11,12,20,24,25;42:3,6;
43:10,14,18;45:15;46:10;
47:17,18,25;48:1,2,8,16,22;
49:1,5;50:6,7,10,18;51:16;
52:10;58:2,7,8,9;59:1,10;
61:12,14,15,16,18;64:18,
21;66:1,4,21;67:16;68:1;
69:6,8,16,17,22;70:1,9,10,
13,16,20,22,24;71:7;72:2,8,
15;73:6,20,21;75:8,11,15,
15;76:7,19,19;77:8;78:23,
23,25;79:1,1,2,2,9,11,12,22;

81:2;82:12,19;83:9,12;
84:16,17;85:18;86:6,14,17,
19,20;87:6,11,12,24;91:12,
12,14,17;93:8,14,15,17;
94:23;95:11,19,21,23,23,
24;96:7,7,8,12,14,15,15,16,
17;97:1,6,7,10,12;98:1,2,9,
11,12,13;99:2,4,10,16;
101:7,8,11,13,14,17,20,24;
102:4,24;103:15;104:1,22,
24,24;105:6,8,10,10,11,22;
106:11,14,17,25;108:7,17;
109:15;110:13,14,21;111:4;
112:2,16,19;113:2,5,10,20,
20;114:1,2,15,17;115:6,12,
16,20,23;116:5,22,23,24,25,
25;117:3,6,10,10,12,18;
118:1,2,5,17,20;119:5,7,8,9,
12,19,21;120:6,9,13;121:4,
9,17,24;122:1,2,3,3,12;
123:8,15,17,19,21;124:2,4,
8,9,18;125:3,4,8;127:1,2,5,
6,8,9,16,18,19;128:1;129:3,
6,7,8,11,11;130:1,3,11,12,
13,15;131:2,3,13;132:2,5,7,
7;134:5,22,23,24;135:5,6,7,
23,23,23;136:1,5,21,22,23;
137:4,5,14,22;139:5,12,16,
18,18,19,21,24,24;141:11,
11,11,18,20,20,23,24;142:9,
11,12,17,19,19;143:6,11,25;
144:19;146:18,23,24,25;
147:5,6,18,22;149:12,21,23,
24;150:12;151:9,12,13,14,
16;152:3,4,17,23;153:3,23;
154:15,16,20;156:4,6,18,19,
20;157:13;158:14,15;
159:10,15,23;160:9,14;
161:12,19,23;162:24,25;
163:2,23;165:3,21;166:12,

17,20,21,21,22;167:6,7,8,
18,25;168:1,11,12,13,14,21;
169:2,2,3,4,12,14,21,21;
170:19;171:5,9,17,18,20;
173:2,3,5;175:4,20,24;
176:9,12,12,17;177:8,10,18,
19,20;178:5,6,8,10,23,25;
180:18,22;181:15,22;
182:13,24;183:3,3,6,7,25;
184:19;185:3,8,15;186:4,4,
6;188:4,6,10,13;189:12,14,
14,20,20,21;190:24;191:1,
13;193:11,12;194:5,6,25;
195:18,23;197:5,21,22,23,
25;198:1;199:1,1,4,11,12,
12,13,16,19,20,25;200:20,
21;201:3,5,8,8,9,11,12,12,
16,16;202:4,5,5,6,9,10,10,
11;203:8,9,10,10,12,13;
204:5,6,7,9,20,22;205:18,
20,22,23,24;206:1,4;207:8,
9,15,25;208:8,9,24;209:2;
210:5,5,7,8,14;213:11,13;
214:18,21;215:18,22,24;
216:1,5,5,7,13,25;217:2,2,
17,19,25;218:24;219:1,7,
15,20;220:18,18,19,23;
221:1,9,20,21,24;222:2,4,9,
15,18,23;223:1,7,14,15,21;
225:15,16;226:16,18,18,25;
227:7,24;228:2;229:13;
230:24,25;235:6,22,25;
237:9;239:12;241:18;
242:19,20,22;243:11;244:4,
7,8,13,14,14;245:2,3;
246:13,18,19;247:13,16,18;
248:3;249:11,12,18;250:7;
251:13;253:17,18;254:5,6,
17;255:2,12,12,14;256:3,
10,21

**knowing (3)**

129:13;203:17;227:11

**knowledge (8)**

21:7;30:22;37:9;48:14,
19;64:1;184:3;201:21

**known (7)**

47:13;75:16;114:7;
153:19;173:6;209:1;221:14

# L

**labeled (1)**

107:15

**labor (2)**

93:18;101:15

**lack (6)**

48:13,24;106:11;117:14;
213:4;246:10

**lacking (1)**

49:8

**landmarks (2)**

208:4,5

**language (4)**

29:8;65:22,24;211:6

**laptops (1)**

15:25

**large (21)**

28:23;33:24;34:2;57:16;
58:1,3,9,13;70:10,14,18,23;
71:9;110:15;127:1;145:4;
183:10;192:23;198:25;
216:7;256:11

**largely (11)**

20:25;135:2;136:6;147:1;
171:4,8;180:21;183:4;
195:6;252:5,14

**larger (7)**

109:21;112:11,15;199:2,
2,3;256:18

**last (24)**

7:22;9:24;18:10;20:25;
30:11;73:15;74:9,10;75:1;
77:6,12;129:18,21;130:17;
148:16;163:11,16;177:21,
23;179:14;204:24;207:15;
213:2;215:12

**late (1)**
91:17

**later (3)**
12:4;236:1;241:11

**Latino (9)**
31:20;58:1,4,9,14;61:13;
62:1;171:5;224:9

**Latinos (2)**
30:4;32:2

**law (26)**
21:7,9,10,11,15,19;41:16;
42:11;43:25;82:22;83:1;
84:7,22;86:3,11;87:14,19;
96:4;103:13;110:15,17;
116:3;118:8;125:9;199:4,6

**laws (3)**
81:14,25;84:13

**lawsuit (9)**
5:20;12:10;17:5,10;
43:22;44:18,25;45:4,11

**lawyer (2)**
124:6,21

**lawyers (1)**
87:2

**lay (1)**
88:4

**lays (1)**
45:14

**leader (1)**
200:5

**leading (1)**
199:22

**League (5)**
10:24;11:6;55:24;60:1,14

**Leah (1)**
4:12

**leaning (1)**
152:25

**learn (9)**
12:18,19,20,21;17:4;
21:20;134:11,19;164:5

**learning (1)**
52:22

**least (24)**
6:13;42:7;43:5;54:23;
65:20;103:7;141:1;150:6;
154:16,19;167:7;168:14;
175:13;187:25;193:16;
200:15;205:19;209:24;
211:7,19;212:8,16,18;
239:19

**leave (1)**
143:24

**leaves (1)**
162:20

**led (1)**
233:4

**leeway (2)**
161:19;199:8

**left (1)**
244:18

**legacy (1)**
149:24

**Legal (8)**
4:13;10:23;28:13;101:21;
148:23;222:16;227:25;
242:3

**legally (1)**
240:24

**legislation (1)**
219:21

**legislative (1)**
96:25

**legislature (7)**

9:3;56:1,8,9,11,14;86:8

**lens (1)**
252:24

**less (22)**
9:15;14:12;27:7;33:23;
34:6;70:11,11,14,15,15;
103:9;148:9;149:6;154:17;
157:4;168:8;194:16;
221:13;229:25,25;231:1;
249:7

**level (20)**
11:7;19:23;51:15;59:9;
82:11;103:20;107:3,6;
117:2,2;139:24;140:1;
246:23;251:3;254:18,20;
255:4,7,9,14

**levels (11)**
11:9;48:19;50:9;106:25;
107:23;108:10,11;136:5,6;
213:16;251:14

**liberty (2)**
64:25;87:12

**libraries (1)**
104:14

**life (4)**
52:24;98:10;103:21;
172:25

**lift (1)**
112:4

**light (4)**
203:13;221:9;225:8;
226:10

**likely (8)**
14:2;42:3;53:5,6;68:19,
21;154:24;214:9

**limitation (3)**
222:21;242:15;255:15

**limitations (5)**
134:12;162:2,4;172:7;
213:14

**limited (12)**
98:6;120:9,9;129:14;
135:3;158:18;159:8;207:1;
217:18;223:12,15;242:12

**limiting (2)**
37:22;207:16

**limits (4)**
147:11;158:14;222:8,9

**line (5)**
49:21;76:11;116:11;
117:22;119:14

**linear (2)**
148:20,22

**line-by-line (1)**
171:18

**lines (7)**
97:22;98:3;119:11;158:5;
168:16;171:21,22

**link (1)**
250:22

**list (6)**
37:4;116:13;146:15,16;
147:10;180:9

**listen (1)**
50:20

**literature (17)**
46:24;47:2;50:8;52:21;
53:2;98:21;102:15,21;
118:15;144:24,25;145:5;
160:5;217:16;221:23;
245:17;248:10

**litigation (3)**
8:22;89:16,23

**little (24)**
7:24;12:9;29:15;30:17;
40:20;51:16;53:22;56:15;
101:12;112:3;114:5;119:6,
22;130:17;144:9;149:18;
154:15;161:16,18,21,25;
177:12;186:8;225:15

**live (22)**
66:20;104:24;107:22,24;
108:9,11;115:15;142:22;
145:13,16;155:5;170:25;
173:11,12;184:16;186:6;
203:23;204:11;213:6,14;
220:6;254:15

**lived (3)**
100:17;108:19;204:4

**lives (2)**
108:1;213:14

**living (12)**
108:21;118:18;154:9,17,
18,23;178:23;210:7;
218:25;225:17,22;226:1

**lo (1)**
119:25

**load (1)**
24:13

**local (8)**
35:16,20;41:22;42:19;
49:16;57:11,12;223:3

**localities (9)**
66:5;74:4;80:24;82:5,13;
83:5,10,18;99:3

**locality (2)**
66:10;83:13

**located (11)**
115:14;121:8;132:25,25;
146:17;164:12,15,19;173:5;
184:24;190:8

**location (36)**
37:9;59:13,13;95:25;
99:12;113:9;114:12,14,16,
18,21;115:3,11;118:9;
120:17;148:10;162:18,23;
163:1;165:20;166:7;
169:10;173:22,24;208:9,21;
209:10;210:16;219:11;
220:4;223:6,7,8;242:13,14;

**256:10**

**locations (46)**
36:18;47:6;48:3,4;49:6,7;
92:21;94:18,25;95:1,4;
107:1;110:20;111:3;
112:18;115:15;117:22;
119:3;121:20,22;122:7;
126:17;135:6;136:12;
137:10,14;147:8;150:14;
155:14;158:7;164:13;
180:24;182:18;186:14;
188:8;199:13,21;203:5;
206:13,17;208:3;211:16;
212:8;213:9;216:18;243:14

**long (20)**
19:14;22:12;36:1;66:3;
74:3;77:3,14;90:16;97:22;
102:16;103:21;142:20,23;
193:10;213:5;214:19;
219:2,3;228:1;239:12

**Longfellow (1)**
208:7

**longstanding (3)**
30:23;102:16;201:14

**look (77)**
13:6;25:11;27:13;30:9,
13;40:7,7;42:10;44:7,12,21;
48:21;53:13;58:16,20,21;
59:4;69:21;72:14;74:2;
84:2,6;94:5;96:25;106:23;
109:12;112:10;119:3,15;
120:11;122:14;127:16;
129:17;130:1,10,14;131:1,
2,3,14;133:5,14;137:21;
138:8;139:23,24;146:24;
147:2,9,24;151:13;160:18,
20,21;170:18;171:1;
177:18;178:2,12;179:20;
181:6,11;184:21;185:20;
186:13;187:10;188:24;

**200:1;204:24;214:5,23;**
215:18;216:20;217:8;
240:18;253:19,24

**looked (30)**
31:4;12;44:24;45:1;
46:18;50:8,22;58:18;132:5;
133:10;153:24;157:18;
164:16;165:1;176:1,7;
178:18,19;180:9,11,12;
184:23;185:25;196:5;
197:15;205:12,14;212:7;
223:22;233:21

**looking (38)**
11:25;27:12;31:23;35:4;
36:6,9,24;40:23;55:13;
58:6;59:10;93:23;126:24;
129:8;137:8,10;140:12,12,
14,15;144:23,24;146:2,6;
159:15,20;162:24;190:2,4;
195:20;199:16;206:12;
218:3;252:4,4;253:19,21;
254:5

**looks (4)**
25:9;30:21;178:22;244:6

**loop (2)**
51:11;144:4

**lopped (1)**
244:12

**lopsidedly (1)**
189:17

**Los (1)**
59:11

**lot (48)**
13:10;16:5;28:20;31:17;
34:11,23;39:4,13,17,18;
40:4;42:25;47:5;48:23;
52:12;78:7;107:3,13;
108:17;119:4;120:2;
122:11;129:5;137:9,10;
139:9,15;141:24;151:25;

**158:3;164:3,11;170:8,9;**
173:13;180:25;191:19;
195:15;201:9;218:16;
230:20;231:19;237:12;
244:22;245:14;247:4;
255:4,5

**lots (4)**
58:25;120:25;121:19;
163:12

**loud (1)**
79:8

**Louisiana (1)**
146:22

**love (2)**
35:22;64:22

**low (23)**
46:24;25;47:13;48:24;
49:8;68:15,20;71:3,19;
78:14;99:11;136:5,5;137:1;
151:14;169:24;203:10;
247:23,24;248:9,11;249:18;
250:3

**lower (13)**
33:13;42:11;43:5;48:23;
49:5;99:8;108:10;139:7,7;
183:4;249:1,4,8

**ludicrously (1)**
168:24

**lunch (3)**
76:7,9;88:14

**luxury (2)**
129:12,13

**Lyndon (1)**
32:20

## M

**machines (4)**
98:1;116:10;173:16;
174:16

**made (34)**
45:15;46:6,9;50:14;
71:16;82:10;93:15;96:18;
97:12;108:3;129:2;130:15;
147:18;149:25;163:21;
164:6;175:6,21;187:17,22;
191:15;200:24;201:6;
215:13;216:22;218:10;
220:19;221:11;225:8;
231:14;239:2,15,24;258:7

**magazine (2)**
23:25;24:5

**magnitude (1)**
65:21

**mail (2)**
106:7;210:1

**mailer (1)**
30:3

**main (10)**
38:18;39:6,14;41:8,11;
42:1;135:3;206:7,9;215:18

**Maine (15)**
57:2,9;66:19;68:14;
72:15,17,23;73:18;74:12;
75:3,6,9;81:1;84:3;161:15

**mainly (4)**
21:15;32:12;78:24;
216:19

**maintaining (2)**
236:10,16

**maintenance (1)**
236:23

**major (7)**
27:17;39:15;41:23;51:17;
153:14;169:4;171:20

**majority (9)**
48:1;50:5;56:12;80:13,
14;155:11;171:8;196:19;
197:19

**make (47)**

5:16;6:8,22;8:5;27:1,5;
31:20;35:17;42:19;49:23;
51:16;58:4;72:2,8,9;83:10,
18;92:14;100:25;105:15;
106:4;110:9;117:7,14;
119:24;120:8;142:4,17;
143:2,18;144:3;155:15;
168:14;172:2;183:6;
189:23;196:2;207:12;
211:23;212:11,12;218:8,21;
226:25;236:5;238:21;
258:17

**map (1)**
245:6

**mapping (1)**
245:1

**maps (1)**
147:2

**Marco (1)**
32:1

**margin (2)**
71:16;75:15

**marginal (3)**
139:1;168:14;212:19

**mark (5)**
25:1;38:11;76:16;213:23;
241:7

**marked (9)**
13:3;25:5;64:8;76:25;
210:19,24;213:24;223:25;
240:10

**marking (4)**
12:24;36:25;38:11;64:2

**markings (1)**
38:6

**Marshall (5)**
113:6;146:21;156:4;
186:20;205:20

**Maryland (11)**
4:20;22:1,19,24;24:10;
27:17;42:23;49:11;51:18;
212:9;216:19

**massive (1)**
33:6

**master's (1)**

98:10;115:19;118:9;
122:15;129:18,19,21,23;
150:25;158:7;159:24;
160:1,7;163:13;175:2,12;
187:19;191:2;209:3,3;
214:20;219:1;248:20;
250:17

**map (1)**
245:6

**mapping (1)**
245:1

**maps (1)**
147:2

**Marco (1)**
32:1

**margin (2)**
71:16;75:15

**marginal (3)**
139:1;168:14;212:19

**mark (5)**
25:1;38:11;76:16;213:23;
241:7

**marked (9)**
13:3;25:5;64:8;76:25;
210:19,24;213:24;223:25;
240:10

**marking (4)**
12:24;36:25;38:11;64:2

**markings (1)**
38:6

**Marshall (5)**
113:6;146:21;156:4;
186:20;205:20

**Maryland (11)**
4:20;22:1,19,24;24:10;
27:17;42:23;49:11;51:18;
212:9;216:19

**massive (1)**
33:6

**master's (1)**

20:9

**match (3)**
163:7,10;194:20

**material (1)**
17:21

**materials (1)**
19:10

**matter (13)**
39:10;49:17;123:10;
127:2,4,8;128:23;157:10;
161:21;216:23,24;242:20;
250:21

**matters (4)**
49:17;102:25;106:3;
135:11

**may (34)**
6:10;7:6;39:3;42:14;
45:21;53:18,18;68:25;
76:11;83:9,10;94:1;97:22;
104:11;154:25;159:25;
161:6;163:14,14;168:8;
171:5;172:19;173:11,12;
176:20;180:13;189:16;
205:22;208:6,22;210:15;
211:23;213:9;226:9

**maybe (43)**
10:12;11:21;18:6,18;
21:21;27:11;38:9;41:20;
61:23;63:17;66:19;79:11;
87:25;98:11;101:14,17;
103:9,25;105:8,9;119:21;
122:25;125:10;129:7;
136:22;139:24;144:12;
148:23;154:16;160:7;
164:4;165:21,24;166:9;
189:20;195:19;199:20;
211:19;221:1;226:15,18;
232:22;255:2

**mayors (1)**
50:10

**McGlone (1)**

78:5

**mean (51)**

20:24;23:4;24:19;29:14;
45:14,18;47:20,22;53:2;
59:2;61:13;65:24,24;66:15;
69:21;71:4;83:8;84:18;
87:2;100:9;101:6;103:24;
106:23;118:5;134:4;
136:24;137:11;139:4;
141:9;144:19;150:4;
157:10;168:18;169:1;
171:20;177:1;178:6;
181:15;200:17;206:8;
207:7,8,23,24;208:10;
209:1;222:4;232:6;248:1;
252:12;256:18

**Meaning (4)**

23:5;65:9;67:22;90:10

**means (13)**

5:23;28:2;67:20;68:1,2;
72:13;87:3,24;88:1;159:2;
171:16;173:9;252:14

**meant (2)**

95:8;220:2

**meantime (2)**

73:24;74:14

**measurable (1)**

241:10

**measure (11)**

78:25;95:20,22,24;
118:22,23;120:17,23;
140:13;160:25;253:25

**measured (2)**

132:1;158:20

**measures (5)**

97:1,2;134:25;229:14;
241:17

**measuring (2)**

253:25;254:4

**meat (1)**

5:3

**mechanism (1)**

109:11

**meddle (1)**

83:17

**meddlesome (1)**

212:21

**median (1)**

254:5

**medical (1)**

148:15

**medications (1)**

7:17

**medium (1)**

180:3

**meet (3)**

39:1;115:24;119:8

**meeting (4)**

157:17;173:4;209:15,25

**meetings (9)**

126:20;127:4,10,14,17;
128:6,7;220:17;221:22

**member (7)**

20:23;23:8,11;50:2;
51:12;55:3,3

**members (7)**

85:2;91:25;129:7;153:13;
173:21;221:12,15

**memorial (12)**

132:23;133:6;136:10,14;
169:8;172:18,24;173:18;
174:15;176:15;208:13,23

**memorized (1)**

124:5

**memory (3)**

10:12;100:14;209:17

**Menlo (1)**

31:23

**mention (7)**

48:5;117:23;118:22;
128:11;165:24,25;178:4

**mentioned (26)**

9:5;10:19,19,20;14:21;
19:3;24:23;27:25;32:5;
33:14;50:21;54:1,3,4,22;
59:14;77:5;100:20;119:10;
163:24;175:8;178:9;
186:17;191:17;205:22;
218:24

**mentioning (1)**

188:16

**merit (1)**

219:6

**mess (1)**

74:24

**met (5)**

89:15,22;167:15;169:18;
251:12

**method (3)**

160:24;171:12,23

**methodology (7)**

74:22;75:4,25;100:22;
178:1;180:6;245:8

**methods (1)**

214:9

**metrics (1)**

121:11

**Mexico (1)**

216:21

**middle (5)**

17:7;49:1;132:15;183:3,4

**mid-nineties (1)**

249:25

**midst (4)**

109:25;111:7,8,12

**midterm (4)**

137:3,15;142:1;203:11

**midterms (1)**

141:9

**midwest (2)**

23:16,16

**might (53)**

5:3;7:17;13:19;14:3;
18:13;19:23;21:21;32:17;
38:18;47:6,6;49:25;50:16;
52:17;58:7;66:21;84:22;
93:16;97:9,17;98:13,23;
99:15;101:23,24;102:24;
109:4;111:3;117:14;
119:14;122:20;134:23;
141:12;157:18;162:10,13;
163:12;176:4;178:24;
184:19;186:8;189:20;
197:24;212:20;214:16,20;
219:21;220:25;223:9;
232:25;235:23;236:1;254:6

**mile (11)**

108:4,4,5;145:14,14,14;
165:3;225:15,18;226:13,16

**miles (2)**

108:2;227:8

**mind (16)**

6:4;10:2;26:19;29:3;
36:24;38:5,10,14;61:14;
65:3;68:8;94:3;107:9;
210:11;217:23;252:22

**mindful (1)**

164:22

**mine (1)**

226:10

**minimizing (1)**

115:13

**minimum (4)**

154:19;167:11;168:2;
200:13

**Minnesota (1)**

168:20

**minorities (1)**

60:22

Allen v.
Waller County, Texas

James Gimpel, Ph.D.
December 12, 2019

**minority (2)**
50:5;60:21
**minute (1)**
238:13
**minutes (15)**
19:15;50:15;76:9,12;
90:18;119:10;127:16;
128:21;157:17,18;174:4;
195:5;209:15;232:10;
238:17
**misconception (1)**
242:1
**misleading (2)**
33:4,7
**misses (1)**
241:7
**Mississippi (1)**
49:7
**mistaken (1)**
240:21
**MIT (1)**
106:1
**mix (2)**
185:8;256:22
**mobile (2)**
219:14,18
**mobility (4)**
139:14;224:6,20;227:4
**mobilization (2)**
34:23;250:17
**mobilize (2)**
34:20,20
**mobilized (1)**
247:21
**mobilizing (2)**
141:15;152:12
**model (7)**
39:11;144:17,20;146:8;
148:11;162:12;222:3
**modeling (2)**

53:2,3
**models (1)**
148:11
**moderate (1)**
43:5
**modest (3)**
217:5;223:8;247:16
**Moines (1)**
20:6
**moment (2)**
12:4;51:12
**moments (1)**
13:6
**Monday (1)**
176:22
**money (3)**
51:16;110:25;112:14
**Montgomery (2)**
49:12;201:18
**month (2)**
60:14;163:11
**months (1)**
73:10
**moral (2)**
204:8,8
**more (104)**
9:15;12:10;14:12;19:1;
23:4;29:23;30:17;32:2,6,
23;34:12;36:20;40:20;41:4;
42:25;43:3,3;44:20;51:5;
52:11;53:5;56:15;63:11,17;
66:22;68:21;72:14;73:4;
76:1,8;87:25;89:7;95:16,
17;101:4,14;112:11,13;
118:24;120:2;126:8,14,20;
127:14;139:24;142:17,24;
143:2;148:9;149:3,5,5,18;
154:24;155:10;157:4;
158:5,17;160:3;161:18,21,
22;165:19;168:3,3,8;169:9;

177:15;192:24;194:12;
195:2;196:8,21,24;198:17;
199:6;201:6,16,17,20,
20;211:19;212:18;214:8,9,
17,20;215:23;216:3,6,14;
222:8,9;225:15;226:16,17;
227:10;230:3;241:3;
247:13;252:9;255:10;
256:22
**morning (2)**
4:10,11
**most (21)**
7:5;8:19;10:14;15:22;
37:11;38:17;39:24;40:9;
41:17;42:13;49:3;74:25;
93:13;94:8;129:24;139:23;
147:20;153:16;173:23;
179:9;185:10
**mostly (2)**
20:23;244:6
**motion (1)**
64:3
**motivate (2)**
117:16;134:23
**motivated (12)**
70:11,15,19;105:23;
134:9,21;138:21;141:6,7,
25;188:18;189:1
**motivating (2)**
106:12;158:16
**motivation (27)**
102:11,17;104:20;
105:15,15,24;106:2,15,16,
20;118:12;134:10;135:4,9;
139:2,17;141:23;144:22;
145:2,5;151:8;212:19;
217:10,20;220:11,12,12
**motivational (5)**
105:8,11;106:13;117:10;
217:1

**motivations (1)**
32:16
**motor (4)**
103:13,15,17;247:12
**mount (1)**
174:25
**mounting (1)**
223:10
**mouth (1)**
75:13
**move (15)**
35:13,15;76:3;86:22;
89:8;117:1;154:5;163:5,7;
164:4;167:21;199:17;
203:12;223:6;227:21
**moved (6)**
64:21;99:3;199:1;201:10;
204:15,15
**movement (2)**
113:15;147:12
**moving (13)**
11:9;32:14;53:23;139:20;
163:25;179:2,15;198:13;
201:17,20;219:24,25;
254:19
**much (39)**
6:6;18:4;20:22;30:16,17;
32:6;33:12,13;34:15;59:8;
66:3;95:24;97:8;98:16;
101:10;102:25;109:9;
117:8;118:15;128:23;
138:25;139:16;141:18;
146:10;157:11;161:23;
164:10;166:15;168:3,3,
172:13;173:2;191:4;199:8;
217:1,10;218:5,16;255:3
**Muhammad (2)**
89:19,19
**M-U-H-A-M-M-A-D (1)**
89:20

**multigenerational (1)**
58:9

**multiple (7)**
84:25;85:7;148:21;
160:14,16;201:15;216:7

**multiplication (1)**
168:13

**multiply (1)**
168:21

**municipal (1)**
59:9

**must (5)**
97:24;142:18;143:1;
241:19,19

**muster (1)**
87:21

**myriad (1)**
100:1

**myself (5)**
6:10;31:9;40:11,14;
147:25

**N**

**NAACP (1)**
4:13

**name (5)**
4:16;114:17;163:11,11,
16

**named (3)**
114:21;175:5,14

**names (5)**
86:4;175:7,9,15,17

**narrative (1)**
40:1

**narrowly (3)**
212:5;215:23;216:14

**nation (1)**
35:11

**nationwide (2)**

144:2;189:19

**naturally (1)**
250:1

**nature (3)**
56:16;90:7;181:3

**naught (1)**
105:2

**near (3)**
142:22;166:5,6

**nearest (3)**
165:2;166:6;186:24

**Nebraska (1)**
52:5

**necessarily (10)**
39:5;127:6;135:12;
157:22;220:5;248:1,11,16;
249:10,18

**necessary (12)**
166:24;167:11,14;168:1,
2;215:13;218:10;251:7,8,8,
9;258:7

**need (25)**
6:15;8:1;9:20;24:12;
39:10;42:4,7;61:11;76:9;
84:2,2,6;87:17;116:12,12,
14;119:8;129:17;130:14;
131:14;145:12;150:5;
179:3;208:6;231:24

**needed (2)**
90:11;258:17

**needs (8)**
105:24;125:12;157:8;
166:21,22,22;167:12;
182:19

**negative (1)**
220:23

**negatively (1)**
142:13

**neglected (1)**
243:13

**negotiation (1)**
222:14

**neither (2)**
10:23;11:10

**net (1)**
158:13

**Nevada (1)**
216:19

**never (11)**
40:3;60:17;62:8,12;
83:11,11,12;88:9;169:15,
16;219:17

**new (16)**
16:21;20:24;26:14;30:9;
32:13;65:11;103:19;
114:16;137:8;162:1,23;
163:1;165:16;202:5;
216:20;219:21

**Newman (2)**
166:1,4

**news (1)**
181:17

**newspaper (1)**
75:14

**newspapers (2)**
72:17;75:9

**next (16)**
29:20,22;33:7;68:5;
129:18;137:17;138:2;
154:8;155:25;177:22;
210:2;214:25;215:2;
241:20;255:9;258:18

**nice (1)**
126:23

**nine (1)**
177:20

**nineties (5)**
50:7;91:17;103:14;164:7;
166:13

**nobody (1)**

75:22

**nod (1)**
6:14

**nodding (1)**
6:6

**nominate (1)**
142:3

**nominated (1)**
152:11

**nonblack (1)**
171:10

**none (8)**
136:8;186:13;194:6;
196:3,8;203:5;205:19;
251:15

**Nonetheless (1)**
78:2

**non-major (1)**
68:18

**nonparticipation (1)**
135:4

**nonpartisan (1)**
57:13

**nonparty (1)**
68:15

**non-peer (6)**
23:24;26:15,17,20;27:10,
11

**non-refereed (1)**
23:25

**nontraditional (2)**
211:16;219:12

**nonvoters (2)**
33:24;34:8

**nonvoting (1)**
216:2

**noon (1)**
76:6

**norm (1)**
137:8

**normal (1)**
119:23

**North (18)**
10:13,15,20;11:13,18;
54:5,9,25;55:2,6;85:19;
86:8,9,10;123:12;165:5;
199:16;201:18

**notable (1)**
199:22

**note (4)**
42:3;96:13;175:1;216:17

**noted (1)**
130:13

**notes (4)**
13:18;14:14,21;15:1

**noteworthy (1)**
137:16

**nothing (6)**
4:7;122:8;131:20;217:15;
221:13;250:18

**notice (4)**
12:25;100:19;137:6;
171:17

**notion (2)**
135:7;232:15

**notwithstanding (2)**
80:16;82:25

**November (13)**
69:11,13;120:2;121:15;
126:10;127:15;133:4,4,22;
138:5;190:3;236:11,17

**nuance (1)**
29:15

**number (41)**
18:6;29:16;30:7;33:6,15,
24;36:21;37:5;40:11;41:21;
63:13;64:5;75:18,19;78:11;
86:12;103:5;115:14;
116:12;117:5,19,20,21;
120:16,19;121:12;126:25;

127:1,1;128:17;129:9;
168:22,23;178:2;187:5;
191:8;208:6;223:10,18;
242:14;252:3

**numbers (15)**
38:12;102:4;138:8,10;
141:8,22;152:12;188:13;
190:21;191:15;195:5,10,12;
224:15;226:4

**numeracy (1)**
222:6

---

# O

**oath (1)**
5:20

**Obama (2)**
188:22;189:10

**Object (25)**
31:7,15;52:25;80:21;
81:10,16;82:2;84:15;95:19;
116:22;133:8;188:2;
190:16;200:16;203:19;
205:6,17;208:19;210:4;
228:25;230:12;234:18;
239:7,16;243:7

**objection (2)**
5:8;7:9

**objections (5)**
4:23;5:9;7:4,6;171:21

**obligation (3)**
72:2;157:12;213:10

**obscure (2)**
147:22;208:25

**observations (2)**
116:25;167:4

**obstacle (3)**
176:23;218:19,20

**obstacles (2)**
176:20;212:21

**obvious (5)**
70:2;143:2;144:1;177:25;
208:14

**Obviously (5)**
44:2;56:4;66:15;69:5;
205:19

**occasionally (1)**
50:3

**occasions (1)**
78:11

**occurred (3)**
32:11,12;141:2

**occurring (2)**
43:9;84:14

**October (4)**
120:1;128:5;209:14,24

**odd (2)**
203:9,9

**odds (1)**
202:12

**off (25)**
10:10;21:13;40:4;88:11,
13;99:24;119:6;123:20,21;
136:23;137:2;163:25;
164:15,19;165:20;178:5,10;
193:13;206:10;209:17;
210:7;226:7;228:1;239:12;
244:12

**offense (4)**
47:18,23,24,24

**offensive (2)**
70:12,21

**offer (4)**
88:2;104:7,8;235:14

**offering (1)**
88:5

**office (7)**
49:23,25;50:12,19;210:2;
234:2,8

**official (1)**

89:25

**officials (16)**
92:21;94:18;109:17,19,
23;132:14;143:17;144:1;
156:13;157:21;165:8;
169:20;190:13;220:20;
236:10,16

**officio (1)**
23:7

**often (9)**
38:19;41:23;86:23;152:6;
161:22;165:2;208:3;
217:19;247:14

**oh (4)**
42:3;67:5;75:13;122:5

**Okay (118)**
5:11;8:6;12:8;13:15;
15:7;20:5;24:25;26:8;
30:23;33:10,25;35:17;37:3;
40:13,19;42:1,6;52:17;
54:2;55:2,12,15;58:24;59:1,
14;71:11;75:8,10,18;76:14;
77:23;78:15,15;79:20;80:3,
25;81:23;85:15;87:10;
88:10;102:9;103:9;104:19,
21;105:1;106:3,5,10,14,24,
25;107:22,23;108:2,9;
115:17,18,20;118:16;119:7;
120:7;121:23;123:12,13;
125:23;126:3,24;127:2;
128:25;129:2;130:21;
136:4,11;137:3;140:8;
159:24;162:24;168:17;
169:23;171:19;174:20;
179:2,3,8;186:15;196:11;
197:9,12;198:11;204:8;
206:1;211:4;215:20,21;
216:23;217:1,7;222:16;
224:19;225:14,15,16,18;
226:24;227:2,8;229:8;

237:20;238:4,14;246:22;
251:7,9,11,12;253:23;
254:15,15

**old (3)**
81:4;165:16;178:25

**older (6)**
171:11;197:19;214:8,16;
241:6;256:21

**on (367)**
5:3,17;6:7,16;11:4,9,21;
14:7;15:25;17:21;18:1;
20:11,12,16;21:15;25:15;
26:6,16,16,17,18,18;27:7;
28:1,6,10,13,15,24;30:12,
19;31:2,18;32:20;35:24;
36:18,21;37:4,23;38:1,13;
39:3,8;40:23,24;41:16,19;
42:6;43:25;44:7,13,19;
46:9;47:18;49:25;51:10,11,
17;52:9,23;53:20;54:18;
56:1,6,21;57:5,15,17;58:12,
13,14;60:24;61:4,4;62:5;
64:3,21;65:1,21;66:1;68:3;
69:18;73:7,8,12,14,25;
74:15,17;75:7,10;76:3;
78:11;80:25;82:11;83:18;
84:7,25;85:11,17,18;86:22;
87:14,18;89:9;92:14,17,20;
93:10,11,12,19;94:9,15,17,
24;95:14,21;97:17,22,25;
98:12,12,14,20,21;100:12,
15,16;102:5,12,15;104:17;
105:3,14;106:1;107:4,17,
25;108:18;109:5,8,12;
112:5,10,11;113:4,13,14;
114:2,5,24,25;115:13;
116:17;118:12,16;119:5,24;
121:2;122:14,15,16,17;
126:17;128:5;133:6;
134:11,17;136:24,25;137:2,

13;138:5,17;140:18;141:4;
142:10;143:14;144:4,22;
145:8;146:6,14;147:10,12,
13,25,25;148:5,6;149:2,5,6;
150:20,21;151:24;153:10,
16;154:8;155:1;156:1,5,14,
16,17,23;157:14,24;158:1,
8,19,20;159:23;160:5;
161:25;163:22;164:14,17,
18;165:7;166:3,4,12,17;
167:17,25;168:23;169:24;
170:7,9,14,16;172:13;
173:3,4,18,25;174:6,23;
175:10;176:21,24;180:3,25;
181:5,14,24;182:15;183:3,
22,24;184:6,14;185:16,17,
22;186:14,17,23;188:20;
190:8,10,11,15,22;194:3,4,
20;195:21;196:1;198:22;
199:13,18,22;200:14,21;
201:18;202:12,19;203:5,6;
204:10,24;206:10,13,16,21;
207:2;211:7,15,17,21;
212:10,16,17,21;213:1;
214:7,25;215:2,2,23;216:4,
9;217:6,8,10;218:25;
219:16,20,22,23;223:4,12,
18;224:5,17;225:1;227:21,
25;228:4,7,18,24;229:15;
230:9,10,21;231:6,11;
232:3,7,23;233:9,13;234:1,
2,6,8,10;235:24;236:21;
241:11;242:2;243:10,15;
245:1,24;246:3;247:7,18;
248:9;251:18;252:7;253:2;
254:12,18,21;255:2,4,6,14;
256:2,19;258:7,18

**once (10)**
63:25;117:11;120:5;
161:10;166:5;190:12;

211:5;243:8;246:12;255:24

**one (139)**
4:13;8:4;10:6,15;11:20,
23;12:3;15:11,25;23:15;
24:10;25:16;28:4,14;29:19,
22;33:6,17;34:19,20;37:1;
41:20;42:22;47:4;48:8;
51:5,5,8;54:23;56:4,5;
59:21;62:2;66:23;69:8;
72:16,23;75:1,21;76:11;
77:12;79:13;85:2;86:25;
92:11;96:7;97:5;98:12;
99:12;101:3;106:24;
107:10;108:5;109:4,8,15;
110:18;113:2;114:15;
115:22;116:7;118:23,24;
119:12;121:7;122:22;
123:25;125:1,6,11,25;
127:7,19,20;135:10;137:22;
139:13;145:14;146:13,20;
149:2,3,24;151:5;152:6,7;
153:2,4;154:22;155:17,24;
156:22;157:25;159:18,20,
22,23,25;162:8,18;163:3;
164:17;165:9,16;168:20;
169:18;175:17;176:18,22;
177:9,22;183:8;184:16;
186:19;188:22;191:13;
197:24;200:20;202:12;
203:2;204:24;211:19,20;
214:6;216:8,18,19;221:25;
223:8;228:19;230:15;
231:8;232:7,15,16;233:9;
246:12;247:5;252:16

**ones (9)**
16:18;23:14;39:1,3;
93:13;118:25;164:15;
225:23;247:15

**one-sided (1)**
129:25

**one-year (1)**
244:6

**online (2)**
57:24;69:22

**only (56)**
15:10;17:13;18:17;61:4,
7;63:14;72:19,20;79:18;
81:8;87:5;92:25;93:23;
94:3;98:12;106:21,22;
109:20;114:13;118:15,20;
122:22,24;123:5,9,9;125:2,
14,19,20,24,25;126:12;
127:13;128:5;129:14;
138:4;148:13;152:15,21;
162:8;167:19;172:3;
173:25;177:23;188:10,11,
18;190:10;202:20;204:2;
222:6,21,24;224:11;242:12

**op (1)**
24:5

**open (4)**
112:16,17;120:7;191:16

**opened (1)**
118:7

**operate (2)**
109:19;110:9

**operated (2)**
110:8;241:25

**operates (1)**
42:21

**operating (3)**
5:17;110:21;231:11

**operation (1)**
219:25

**operations (2)**
110:24;179:18

**opined (2)**
87:18;122:16

**opining (5)**
87:14;112:5;227:21;

232:6;233:9

**opinion (50)**
20:16;26:18;28:4,11,12;
29:19,20;33:11,18;35:9;
38:21;39:8,11;42:4;52:12;
59:4;62:22;66:13,17;67:3,4,
23;68:3;74:8,17,20;76:16;
77:3,5,20;80:5,9,13,14;
81:13,24;83:8;88:3;142:8;
219:23;228:18;232:23;
234:6,9,22;235:14,17;
236:8,14,21

**opinions (11)**
5:19;30:15;53:4,5;58:17;
63:25;69:4;73:4;91:1;
154:7;227:22

**opportunities (11)**
104:7,9,10,12,20;126:9;
137:12;177:5;190:18;
241:1;242:6

**opportunity (13)**
75:3;96:20;98:6,14;99:9;
177:4,8;191:11;237:18;
239:1,23;241:4;242:9

**opposed (1)**
140:1

**opposing (1)**
32:22

**opposition (2)**
6:16;219:18

**optimal (1)**
173:23

**optimally (1)**
115:10

**option (9)**
21:23;66:22;95:15;97:10;
121:1,3;214:20;248:2;
249:13

**options (2)**
177:10;206:2

**order (8)**
9:18;58:22;64:3;115:16;
123:22;162:12;217:6;
223:13

**Oregon (1)**
106:6

**organizing (1)**
110:3

**original (8)**
16:12,13,23;46:7;209:22;
223:22;247:10,11

**originally (1)**
52:5

**O'Rourke (6)**
129:21;137:5;152:19;
188:4,19,21

**orthodox (1)**
222:10

**orthodoxy (1)**
29:6

**ostensibly (1)**
162:8

**other (123)**
10:5;11:18;12:3;14:21;
16:20;18:19;19:19;23:11,
23;24:4;27:20;32:16;34:19;
37:7;42:6;48:3,4;49:10,21,
24;54:18;55:23;56:5;66:1;
67:11;72:19;73:9;79:14,16,
20;85:4,16;86:22;88:4;
89:19;91:18;93:14,16;
96:19,21,22;105:10;109:13,
22;112:6;115:7,22;117:18;
118:8;120:6;123:11;
125:13;126:8,13;132:25,25;
133:2;136:7;137:11;
139:11;140:9;141:25;
146:7;147:8;153:13;155:2,
11;157:25;158:7;159:2;
161:20;165:2,9;170:18;

172:19;173:3,4,24;175:21;
179:18;180:6,14;185:17;
187:24,24,25;188:8,12,25;
191:13;194:6;195:21;
196:14;197:13;202:16;
206:18,25;208:24;210:3;
216:21;217:8;218:6,21,24;
219:6;221:12;223:14;
228:19;232:7,17,17;233:9,
16;234:14;242:9,18;
243:14;246:15;250:15;
253:10,21;256:15,23

**others (17)**
35:11;63:1,6,10;79:13;
101:16;131:1;142:18,21;
146:20;171:24;183:12;
185:9;19;186:8;213:5,7

**otherwise (4)**
184:3;205:3;206:19;
234:22

**ought (2)**
108:9;226:15

**out (82)**
6:13;23:10;26:15;27:4;
29:8;30:2;32:21;34:9,22;
39:1;40:15;45:14;46:9;
48:20;49:11;50:21;53:23;
63:18;68:22;71:12,12,15;
72:7,23;73:3;75:12;96:8;
97:13,17;99:17;102:7;
103:16;105:1;113:5;
116:11;117:5;130:24;
134:18;136:3;141:21;
142:5;144:8;145:21,21,22;
146:20;147:23;151:18;
152:14;158:8,15;160:7;
162:12;163:13;166:23;
167:14,15;168:12,20;175:6;
177:20,22,23;182:18;
183:13;184:18;185:18,22;

194:7,11;204:15;211:8;
212:20;214:13;215:13;
222:3,18;238:20;244:18;
246:21,23;253:11

**outcome (1)**
39:7

**outcomes (2)**
66:23;241:12

**outcry (1)**
66:24

**outlets (3)**
23:24;27:20;116:13

**outlier (1)**
198:22

**outline (4)**
17:9;101:19,23;222:15

**outreach (7)**
31:3;33:5;34:14;117:12,
16;158:17;217:20

**outside (10)**
11:18;14:20;74:19;
145:16;172:14;176:19;
185:5;204:7,22;256:16

**outwardly (1)**
142:14

**over (26)**
5:2,16;33:3,6;48:3;51:1;
65:9;103:5;105:19;118:1;
119:7;129:18,21;130:17;
161:1;162:7,13;164:1;
167:5;169:3;189:4;193:7;
224:7,21;251:14;252:7

**overall (3)**
78:17;140:11;192:18

**overcome (4)**
139:18;141:11,16;142:7

**overly (1)**
72:9

**overturn (1)**
57:8

**overturning (1)**
66:9

**overview (1)**
92:17

**overwhelmingly (1)**
197:11

**own (6)**
50:2;74:8;83:8;109:20;
141:10;222:12

**ownership (5)**
182:22;183:15;184:13;
226:8,9

## P

**packet (3)**
25:24;26:1;77:14

**page (72)**
25:11,15,18;26:16,16,17;
55:13;64:22;65:1;67:7;
68:4,5;73:14;74:17;77:13,
16;92:15,16;94:15;102:4,
12;107:17;109:5,8,12;
112:11;113:14;114:24;
116:17;144:22;145:8;
146:6;147:13;148:16;
150:21,22;154:8;156:13,23;
166:3,4,17;167:25;173:18;
179:21;180:3;206:13,16,21;
207:2;211:11,13,21;212:10,
11,16,17;213:1;214:5,6,7,
25;215:2,2;223:24;224:5,
17;231:11;240:18;245:24;
251:18;258:18

**pages (4)**
25:16;77:15;145:19;
230:3

**Palmdale (5)**
57:15,20,22;59:11,11

**panel (7)**

26:24;160:9,17,19,25;
161:10;162:3

**Panther (1)**
89:18

**paper (20)**
26:14,18;31:22;37:3,4;
38:19;39:6;40:10,11;41:20,
21,23;42:1,5;147:21;
178:22;211:19;216:20;
227:7;258:18

**papers (23)**
27:11,18;29:5,25;30:8,
25;31:18;36:18,21;37:7,21;
39:18;40:6;41:7,9,14;
98:20;216:5,16;218:4,7,15;
223:13

**paradox (2)**
33:20,20

**paragraph (11)**
68:8;73:15;94:12;155:25;
212:17;213:3;215:1;
240:19;241:13,20;242:18

**parallel (1)**
11:9

**parent (2)**
53:7;170:3

**Park (1)**
22:1

**parking (4)**
116:7,9;173:15;174:15

**parks (1)**
115:8

**part (26)**
7:5;39:15;48:20;63:22,
23;71:19;75:4,24;87:16;
104:23;109:20;119:12;
132:15;145:4;153:22;
155:21;185:25;189:7;
201:18,19;210:1,6;223:3;
226:12;229:9;238:5

**participate (4)**
49:20;50:1;151:3;214:8

**participating (1)**
19:20

**participation (21)**
20:18;21:8;37:5;39:8;
47:10;48:21;50:9,11;52:24;
53:11;102:15;116:23;
117:2;127:3,8;154:11;
160:6;210:21;250:8,16;
253:20

**participatory (1)**
247:13

**particular (59)**
21:22;22:8;28:20;31:22;
40:24,24;41:15,23;42:11,
14;44:12;47:15;53:4;66:6,
16;70:8;84:3,7;88:5,6,7,7;
95:24;97:25;101:1;113:21;
132:17;137:13;147:2;
149:3;150:8;153:12;159:7,
19,22,23;160:1,19;163:19,
20,20;170:20;173:22;
175:11;177:8;178:19,20;
180:1;188:13;189:19;
192:9;195:12,16;201:3;
207:17;216:18;218:19;
223:4;246:9

**particularly (21)**
20:25;45:9;47:7;66:11;
73:8;78:4,22;84:25;101:17;
117:24;119:19;126:9;
149:8;152:3;154:14;159:6;
180:8;188:20;226:23;
244:10;252:8

**parties (7)**
4:22;31:6;56:1;117:15;
141:14;153:15,21

**partisan (3)**
54:14,18;57:12

**partisanship (2)**
30:15;66:8

**partly (6)**
29:3;30:19,24;80:25;
139:8;222:4

**parts (1)**
187:25

**Part-time (2)**
22:16,17

**party (27)**
12:10;29:1,13,14,16,21;
31:14;32:5,8,15;33:15,17,
22;43:3;51:19,22;52:1,3;
53:15,19;54:20;55:6;61:5;
68:18;89:18;152:22;232:16

**passing (1)**
91:10

**past (32)**
23:6;64:13;71:4;91:15;
119:1,2,15;120:3,4,12;
126:24;129:15,15;139:23;
141:9;152:13;156:19;
157:14;178:2;200:24;
201:5,13,21,22;202:6,8;
203:22;207:8,10,18;209:8,
10

**patch (1)**
21:16

**patently (1)**
141:9

**pathetic (1)**
204:19

**pattern (1)**
108:12

**patterns (5)**
28:13;94:25;119:15;
120:12;126:16

**Pattison (1)**
208:8

**paying (3)**

34:15,16;134:22

**peaks (2)**
107:2,2

**peer (11)**
23:22;24:2;26:20,22;
27:10,18,22;172:8;178:18;
216:12;253:11

**peers (3)**
26:24;27:1;136:17

**pen (2)**
36:25;38:7

**Pennsylvania (18)**
10:7,8,8,20;11:3,5,8,12,
18;54:4,8,24;55:18,20,23,
25;56:11;60:15

**people (161)**
29:3,4,16;33:6,15,17,22;
34:13,15;35:8;42:8,8,11,23,
25;43:4,5,20;44:19;45:22;
47:8;48:12;52:7,12,17;
53:4;61:18,25;63:18;65:16;
66:19;71:9;72:6,21,23;
73:21;79:2;85:1,11,12;
95:13;96:8,9,20;97:4;98:6,
10,15,19;99:5,7,13;103:8,
22;104:12,16,23;105:3,4,
19;106:12;107:21;108:9,
10;109:24;116:10;117:17;
118:16,18;119:12;120:2,25;
122:24;125:9;126:19;
127:5,9,13;130:1;134:4,9,
13,16,20,22;136:20;138:25;
139:12;141:15,21,24;142:5,
17,19;143:1,22;151:10,17;
152:2,12,17,19;153:20;
154:17,18;158:15;159:2;
160:18;162:17;174:5,21,25;
175:4,9;184:4;186:6;
188:23;189:8,20;191:2;
201:11,17,20;202:3,17;

203:23;204:15,15;208:6,8,
25;209:2;210:15;213:13;
218:23,24;219:2,13;220:4,
13;221:2,4,17;223:18;
225:3,5,17,22;226:1,15,23;
227:5;234:2,7;236:6;241:4;
247:7,19;255:21;256:19,22

**people's (3)**
31:6;127:3;143:24

**perceived (1)**
68:14

**percent (37)**
34:6;72:17,20,20,22;
75:17;171:4;191:23,25;
192:1,7,8,12,17,18,24;
193:5;194:16;196:9,13;
197:4,8;198:6,10,17;224:7,
8,9,10,11,21,23;225:2,5;
246:21;254:18,19

**percentage (12)**
68:20;145:20;152:15;
158:21;184:21;185:21,23;
192:16,17;254:4,6;256:4

**perception (1)**
231:2

**Perfect (6)**
12:2;119:16,17;120:4;
129:3,4

**perfectly (2)**
130:2;193:17

**performed (2)**
131:6,8

**perhaps (8)**
19:15;24:3;27:13;43:9;
61:15;95:17;199:20;222:23

**period (8)**
140:23,23;158:12;
201:11;243:16;247:8;
250:1,5

**periods (2)**

149:21;160:14

**permitting (1)**
147:8

**person (7)**
14:16;55:7;88:4;142:25;
177:9,20;204:20

**personal (3)**
8:16;12:15;184:3

**persons (2)**
224:6,21

**person's (3)**
106:14;224:13;225:4

**persuadable (1)**
33:17

**persuade (4)**
29:3;34:13,19;78:5

**persuaded (2)**
68:10;221:4

**persuasion (1)**
34:24

**persuasive (2)**
69:7;70:1

**pertinent (2)**
94:8,9

**petition (1)**
50:17

**PhD (3)**
4:5;20:10;258:11

**phenomenon (1)**
249:24

**philosophical (1)**
204:6

**phone (5)**
12:23;13:21;14:11,15;
19:11

**photo (1)**
86:11

**photographic (1)**
209:17

**physical (1)**

213:7

**physically (1)**
174:8

**picked (1)**
20:23

**piece (6)**
42:14;178:18;185:1;
211:13;216:11;258:18

**pieces (2)**
144:6;164:3

**pivotal (1)**
32:25

**place (46)**
24:9;27:16;35:13,13,15,
16;42:20,20;69:14;71:5;
91:9;95:16;96:14;107:25;
110:4;113:11,12,12;115:25;
116:1,1,4;118:7,11;139:10;
146:25;154:10,12;156:1,5;
165:17;166:11,12;173:1,4,
8;174:7;177:9;181:24;
184:16,19;201:15;219:12;
220:5;223:4;251:14

**placed (6)**
95:22;113:7,8,24;137:13;
199:13

**placement (9)**
21:22;90:24;94:24;
113:15;147:12,15;157:1;
207:19;242:13

**placements (2)**
91:16;148:1

**places (46)**
21:20,23;37:13;45:9;
49:4,6;50:6;74:25;107:16,
21,22;108:22;112:15,22;
113:4;121:18;122:5,6;
123:13;129:9;133:2;136:6,
7;141:19,25;146:12;147:3,
23,23;155:20;158:5;

182:24;185:4,8;186:13;
194:6;199:11,18;205:20;
212:18;214:20;218:12,16;
221:12;243:9;248:5

**placing (4)**
113:3;133:14;164:23;
185:16

**plain (4)**
100:25;118:14,14;186:15

**plaintiff (1)**
60:20

**plaintiffs (24)**
4:14;55:1;60:25;65:3,7,9,
13;89:15,16;91:12;92:20;
93:4;94:17;121:21;125:20;
208:12;215:21;221:8;
229:15;235:10;237:19;
251:21;252:6;253:1

**plaintiffs' (15)**
12:25;16:15;78:3;91:6;
92:19;94:13,16;149:2;
241:23;242:3,7;251:16,19;
252:1,10

**plan (5)**
236:11,17,23;243:3;
251:24

**plans (1)**
18:22

**plantation (1)**
202:10

**plantations (1)**
202:16

**plausible (4)**
97:3,23;168:10;193:18

**playing (1)**
5:17

**plays (3)**
40:20;50:4;207:22

**please (6)**
4:16;6:25;7:11;8:2;

135:17;257:1

**plot (1)**
246:20

**plots (3)**
117:21,22;148:21

**plugged (1)**
116:12

**plunge (1)**
113:23

**plurality (3)**
65:10;72:22,25

**plus (1)**
146:19

**pm (5)**
14:1,1;88:14;89:2;257:4

**poignant (1)**
101:17

**point (59)**
29:25;39:1,6,14;40:3,8;
41:11;47:25;49:16,24;
50:14;57:25;64:19;65:13,
25;82:4;86:25;93:21,22;
94:1;95:11;105:15;117:7;
118:1;125:18;130:20;
131:12,20;142:10;143:20,
21,25;157:19,23;159:14,18;
167:4;180:17;181:21;
182:11;186:9;188:18;
194:21;201:25;216:22,23,
24;218:21;219:8;222:17;
228:1,20;232:23;235:22;
238:10;239:17;242:21;
247:22;249:17

**pointed (4)**
101:14;144:8;211:8;
215:13

**pointedly (1)**
63:11

**pointing (1)**
213:13

**points (14)**
14:14;15:1;79:10,12;
96:7;103:12;107:8;115:17;
152:15;195:18;217:7,13,21;
218:13

**polarized (6)**
232:4,8,10,14,21,24

**police (2)**
115:6;148:15

**policies (1)**
52:16

**policy (8)**
28:7;29:11;39:8;41:16;
52:14;65:15;157:20;240:23

**political (56)**
20:8,15,17,17,18;21:8;
22:5,9;23:13,14,16;29:20;
30:12,21,21;31:6;33:11,12;
35:9;37:5;38:16,20;39:16;
47:1;48:21;49:22;50:8;
52:24;53:11;70:16,25;
82:18;85:13;96:10;99:5;
102:15,20;105:12;117:8,13,
14,15,16;151:4;152:2;
153:8,15,24;154:3,4;160:5,
5;177:15;178:1;210:20;
253:19

**politically (2)**
52:13;170:2

**politicians (1)**
31:2

**politics (6)**
20:11;23:8;28:6;33:23;
34:7;221:2

**polling (36)**
21:22;37:12;45:9;90:24;
91:9,16;105:20,21;107:1,
16,22,25;108:22;110:4;
113:4,12,12;114:18;115:25;
116:1,1,4;141:19;146:24;

147:3;148:14;154:10;
155:20;156:1,5;157:1;
166:12;181:24;199:18;
212:18;213:8

**polls (3)**
96:10;105:12;189:8

**poor (3)**
44:20;49:5;170:2

**pop (1)**
119:20

**popular (2)**
81:3;208:2

**population (45)**
28:24;29:7,12;30:10,14;
45:22,25;46:1,9;49:4,4,8;
58:1,10,22;59:1;61:13;
72:17;110:7;111:5;115:10;
139:4,17;155:16;163:24;
171:2,3,10;178:23;180:12;
191:25;192:2,25;193:3,6,9;
194:10;195:7;196:9;197:4,
20;201:4;230:22;232:15,16

**populations (5)**
49:20;183:4;199:10;
206:20;208:1

**populism (1)**
43:3

**portions (1)**
26:6

**positing (1)**
213:12

**position (13)**
32:22;35:18;80:11;82:23;
83:16;127:12;138:20;
147:17,24;151:20;156:12;
157:6;209:5

**positions (1)**
29:11

**positive (6)**
154:20;168:23;211:17;

223:7,8;251:11

**possible (28)**
6:6;52:23;64:16;99:11;
104:9;105:19,22;109:4;
117:11;135:18;142:6,13;
143:3,8,12;162:17,22;
163:2;165:25;168:7;169:8,
11;176:21;177:1,16;255:10,
19,19

**possibly (6)**
83:10;93:17;98:24;
106:11;217:5;251:25

**post (3)**
77:9;134:15;210:2

**potential (2)**
173:17;184:10

**Poulakos (1)**
6:3

**poverty (2)**
59:5;182:21

**practical (2)**
161:6;168:18

**practically (2)**
147:10;168:18

**practice (33)**
41:16,16;43:25;44:7,12,
19;57:16;62:14;71:4;85:7,
9,11;109:25;110:10;
111:13;112:20,25;113:3,11;
125:4;156:19;162:1;
180:23;181:4,23;182:13,17;
185:16;186:10,12;189:4;
207:8,18

**practices (11)**
43:11,15,19;78:1;156:20;
189:3;202:23,23,23;203:22;
230:22

**Prairie (102)**
45:7,15,21;46:1,13;47:17,
19,21,21,22;108:18;114:9;

121:7;133:7;138:19,23;
141:5;143:14;151:1,21;
152:21;153:6,8,13;155:9,
15,18;156:24;162:20;
163:7;164:22;170:5;171:1,
3,7;172:25;177:7;180:14;
182:12,15;183:9,13;185:18,
22;187:5,21;188:7,11;
189:1;190:7;192:7,8,10,11,
16,19,23;193:10,22,22;
195:3,4;196:13;197:7;
198:3,9,21;200:14,14;
202:14,17;203:5,6;205:4;
208:12;209:7;218:25;
220:3,4;221:8,14;224:20;
225:2;226:5;234:14;243:6;
246:2;248:23;249:6,16;
250:20;252:4,4,12,19,20,
20;253:14;255:21,22;
256:16,20

**precedent (1)**
185:17

**precinct (32)**
120:22;121:4,6,10,10;
122:25;125:3,25,25;128:17;
130:9,24;131:5,8,21;
132:20;135:13;137:24;
138:6,19;139:23;148:13;
190:4,6;191:7;206:24;
208:3;216:1;226:2,7;236:7;
255:11

**precincts (26)**
47:17;48:1;122:18;126:8,
13;128:18;130:7,25;151:2;
155:15;195:16,17,20;222:6,
21,24;230:23;246:20,22;
250:3;252:17;253:21,22;
254:3,7;255:9

**precisely (4)**
34:10,12;65:19;181:21

**prediction (1)**
137:7

**predictor (1)**
120:5

**predominant (2)**
40:20;99:4

**preference (1)**
96:10

**preferences (2)**
153:9,22

**preliminary (4)**
56:22;60:9;64:4,12

**preparation (1)**
14:22

**prepare (5)**
13:15;15:9;69:16,18;70:3

**prepared (3)**
13:18;69:19;84:1

**preponderance (2)**
254:3;256:4

**preschool (2)**
241:9,10

**presence (2)**
153:18;174:11

**present (17)**
14:4,8;38:17;39:12;
49:10;57:16;132:11;
141:12;145:1;164:7;176:4;
200:4;201:11;207:10;
246:16;252:9,10

**presentation (1)**
244:17

**presented (7)**
92:20;93:4;94:17;107:11;
227:23;244:11;251:20

**preserve (1)**
5:9

**President (2)**
79:25;188:22

**presidential (9)**

34:5;137:1,17;140:9;
152:18;189:15,17,18,24

**pressures (2)**
37:10;199:5

**presumes (1)**
44:3

**pre-textual (3)**
236:12,18,22

**pretty (48)**
9:21;17:6;29:22;32:19,
20,25;33:20;35:10;38:14;
46:21,23;47:2;49:5,14;52:7,
9;64:12;66:3;69:24;77:6;
95:10;101:7;109:15;112:3;
113:3;119:7,22;129:16,25;
134:8;137:16,21;148:25;
152:25;153:4;155:16;
164:23;177:17,25;188:6;
191:4;197:22,24;200:19;
208:14;212:5;236:5;244:15

**prevented (1)**
241:24

**previous (9)**
4:22;127:20,21;128:6,7;
149:21;151:12;204:18;
207:22

**previously (2)**
86:11;89:22

**primarily (4)**
27:18;93:11;180:9;
184:16

**principles (1)**
35:3

**printout (1)**
211:14

**prior (4)**
32:8;78:2;89:9;133:4

**priority (1)**
167:3

**private (2)**

183:2;213:4

**privileged (1)**
15:6

**proactive (1)**
236:5

**probably (48)**
13:9,13;17:8,20;19:9;
21:3,4;26:16;28:18;35:7;
40:9,18;47:5;50:14;52:5;
64:14;69:22;77:8;78:25;
82:12;86:19,20;93:15;
97:11,23;98:1,21;111:10;
132:3;136:20;137:9;149:4;
150:5;161:11;163:13;
170:23,24;171:9;183:1;
185:7;195:2;204:21;
208:21;209:1,3;232:11;
244:11;255:11

**probe (1)**
154:18

**problem (12)**
33:22;34:1;72:25;79:20;
108:24;114:21;124:25;
167:1,18;222:5;244:11;
246:17

**problems (5)**
65:21;69:8;133:21;
222:25;247:5

**procedures (1)**
10:23

**proceed (2)**
13:23;89:4

**process (8)**
24:2;26:23;27:10,16;
151:4;152:2;153:25;222:14

**produce (2)**
27:18;247:13

**produced (2)**
67:10;92:11

**producing (3)**

24:12,16;216:11

**product (1)**
33:12

**profession (2)**
171:24;179:13

**professional (8)**
8:13;12:13;23:3,14;
26:10;244:19,24;245:13

**Professor (23)**
4:20;14:24,24;22:4;
24:20;31:23;77:24;78:7;
100:16;141:21;149:6,6;
168:15;181:16;201:25,25;
240:20,21;241:8,22;242:2,
5,16

**professorship (2)**
22:10;24:19

**program (1)**
16:9

**progress (1)**
218:8

**project (1)**
177:16

**promote (1)**
242:21

**promotion (1)**
27:23

**prompts (1)**
242:2

**pronounce (1)**
76:17

**pronounced (1)**
108:20

**propensity (2)**
96:13;97:17

**proponents (2)**
103:15;158:4

**proportion (4)**
120:21;121:13;229:5;
230:6

**proportions (1)**
170:19

**proposed (1)**
203:4

**protected (1)**
240:24

**protest (2)**
98:19;99:17

**proud (1)**
149:25

**prove (1)**
65:13

**provide (8)**
99:23;100:24;169:9;
172:1;176:19;186:14;
219:23;247:3

**provided (12)**
26:13;90:15;95:15;177:4,
7;182:23;191:11;215:14;
237:15;238:1;239:21;
243:19

**providence (1)**
83:7

**provides (4)**
98:5;236:8,14;240:25

**providing (17)**
58:17;96:20;156:1;
163:16,21;182:14,18;
198:22;199:18;228:18;
230:9;234:6;235:18;236:3,
21;239:25;254:12

**proxies (1)**
252:8

**proximate (2)**
178:23;206:10

**proximity (8)**
107:15;109:6;110:13;
145:9;164:13,24;208:24;
209:8

**psychology (1)**

154:3

**public (21)**
20:16;28:4,11,12,15;
33:11;38:21;52:16;104:14;
115:7,9;127:10;148:12;
180:9;182:25;206:1;210:3;
220:18;224:13;234:2,7

**publication (2)**
27:2,4

**publications (10)**
23:20,24;24:3,4;26:23;
37:25;38:11;78:1;225:9;
253:11

**publicly (2)**
86:18,18

**publish (1)**
27:20

**published (3)**
23:18;39:13;245:15

**publishing (1)**
24:8

**pull (2)**
69:21;132:14

**purpose (2)**
44:3;256:13

**purposes (12)**
13:3;25:5;27:24;64:8;
76:25;114:9;166:10;
176:18;210:24;213:24;
223:25;240:10

**push (2)**
247:4,9

**put (7)**
63:17;74:8;116:3;165:17;
194:3;228:12;253:10

**Putting (3)**
29:8;219:24;248:8

# Q

**qualifications (3)**
20:2;88:7;245:4
**qualified (6)**
9:11;43:13;63:2;244:25;
245:5,7
**qualifying (1)**
156:8
**quality (1)**
95:7
**quarrel (1)**
136:21
**quarter (6)**
108:4;145:14;165:3;
193:7;225:15;226:13
**queried (1)**
111:22
**question (102)**
4:24;5:9;6:24,25;7:7,8,
11;8:2,3;11:25;12:4;31:24,
25;35:2,6;36:19;39:20;
41:3,12;43:8;48:12;55:5;
57:13;69:24;75:1,5,12,23;
81:18;82:17;84:1,2,8;
88:10;95:18;96:1;99:10;
100:23;101:2;102:7,11;
104:6,8;105:13,18;106:2;
107:17,19;108:6;111:16;
112:19;113:18;116:20;
123:2,24;125:22;135:10,20;
136:19;141:3;144:6,12;
145:2;150:13;162:3;
163:18;168:16;170:4,22;
172:13;177:2,3,17;185:12,
13,23;188:17;190:24;
199:15;202:11,13;204:24;
206:18;207:22;212:7;
215:19,24;216:4;220:16;
227:4;229:17;230:17;
231:13,16,17;235:21;237:8,
24;238:3,5;244:2;250:7

**questionable (1)**
154:9
**questioning (2)**
5:3;76:11
**questions (33)**
4:22;5:18,24,24;7:15,19;
8:7;13:7;14:2;21:24;28:15;
37:12;48:19;69:1;74:21;
90:10,13,14;94:9,20;
101:18,24;104:15;107:14;
109:16;144:10,17;186:6;
229:25;230:6;241:15;
256:24;257:2
**quick (1)**
238:16
**quickly (4)**
67:7;203:15;223:23,23
**quite (26)**
10:22;22:22;27:6;61:16,
21;66:2;67:16,21;68:1;
72:13;77:5,14;81:17;95:19;
104:2;112:11;114:14;
149:25;160:6;202:3;
208:21;210:16,17;217:18;
245:3,12
**quote (11)**
67:14,20;70:5;71:23;
72:11,12;156:24;157:7;
213:4;245:25;251:25

## R

**race (62)**
31:4,12;38:1,6,13,14,21;
39:2,5,12,14,23;40:7,10,17,
19;41:4,7,10,13,24;50:3;
58:16,19,20;61:13,16,19;
85:3;120:1;125:7;137:5;
149:13;151:9;170:14,16;
172:1;178:4;181:25;188:5;

194:23;195:8,18,20,23;
196:1;232:16,17;251:24;
252:5,8,13,14,18,22;253:3,
13,24;254:12,14,18;255:15
**races (1)**
31:24
**racial (37)**
31:5;39:9,17;40:24;
41:10;43:12,23;44:5,8;
45:12;60:21,22,25;61:5,8,
21;62:1,6,9,13,14,22;84:7;
86:15;87:13,14,19;124:11;
170:12;171:13,14;178:19,
20,25;182:10;194:20;
195:17
**racially (8)**
83:20;206:19;232:3,7,9,
13,20,23
**racism (1)**
31:5
**radii (1)**
227:18
**radius (1)**
145:14
**raised (5)**
78:10,23;94:9,10;149:10
**ramble (1)**
48:9
**rambling (2)**
30:19;35:24
**Randall (2)**
112:10,13
**range (7)**
115:9;146:18;148:12;
152:14;177:10;251:14;
256:15
**ranges (2)**
108:4;145:17
**ranked-choice (13)**
56:24;57:8;65:7;66:20;

71:7,21,23;72:18,24;73:22;
74:24;161:15,24
**rate (12)**
17:23;18:1;19:17,18;
49:2;108:1;140:5,5,6,13,22;
190:14
**rates (15)**
49:12;50:11;59:5;97:14;
134:4;138:18;169:7,10;
182:21;191:8;220:14;
228:23;229:2,2;243:11
**rather (6)**
15:24;58:7;100:16;199:5;
216:12;223:12
**rationale (1)**
50:5
**rationales (2)**
236:9,15
**Ray (1)**
103:15
**RCV (5)**
65:8,15;68:22;73:18;
74:12
**reach (3)**
34:9;105:10;118:12
**reached (3)**
36:13;37:15,20
**reaction (2)**
119:23;180:22
**read (27)**
13:13;15:1;45:2;51:1,4,6;
65:2,5;67:9;73:14;74:10;
75:18,19;77:9,11,17;93:13;
101:18,22;102:5;114:11;
221:7;240:19;241:21;
251:16;257:1;258:2
**reading (17)**
30:1;45:18;46:3,12,17;
64:18;65:4,22,23;68:8;
70:2;74:9;93:10,11;193:13;

Allen v.
Waller County, Texas

James Gimpel, Ph.D.
December 12, 2019

227:19;232:2

**reads (4)**
92:16;154:8;225:2;
241:22

**ready (1)**
89:4

**real (6)**
132:4;142:4;158:10;
180:23;183:11;190:24

**realign (2)**
28:22;29:12

**realignment (1)**
32:19

**reality (2)**
68:14;70:23

**realizing (1)**
212:20

**really (53)**
27:22;34:13,24;35:6,6;
37:19,19;40:5;42:18;48:14;
56:20;57:12;58:4;69:20;
70:13;73:12;83:25;102:25;
105:13;106:16;110:21,22,
23;111:15;117:10,23;
122:25;123:2;125:11,14;
130:4;136:5;141:14,16;
147:16;151:10,14;167:20,
24;169:18,20;172:14;
194:7;201:12;215:25;
219:23;225:25;226:14,18;
244:21;246:17;253:2;256:6

**re-ask (1)**
62:17

**reason (37)**
7:14;66:12;85:7;96:21;
98:9;121:9,16;123:4,6;
125:1;128:16,19,20;130:6,
23;135:3;149:8;152:17,19;
176:14;189:20;194:14;
195:25;196:12,15;197:3,6;

198:2,8,20;208:16;213:19;
214:16;224:24;225:6;
226:12;252:15

**reasonable (15)**
69:19;143:17;144:2;
165:7;169:14;171:16;
172:2,6;173:1,8;190:21;
193:17;197:5;220:9,10

**reasonably (1)**
116:13

**reasoning (1)**
195:23

**reasons (24)**
47:1;48:6,6,11;85:9;
96:19,22;99:12,13,18;
100:2;119:9;139:22;
159:25;160:1,3,7;163:24;
169:24;170:4;211:23;
236:22;250:4,15

**reassessment (1)**
137:12

**rebuttal (8)**
47:18,23;227:20;228:6;
240:14,19;241:21;243:1

**recall (35)**
11:17;12:1,4;13:11;
19:19;65:22,23;67:13;
77:22,23;91:21;93:8;
128:10,11,13;153:15;
173:19,20;175:16,19;
191:21;193:12,13;209:16,
17;211:14,21;228:3;232:2,
5;233:6,18;235:2;236:18;
240:5

**receive (1)**
240:3

**received (3)**
13:9;90:11;243:14

**receiving (1)**
240:5

**recent (12)**
10:15;40:10;75:7;113:24;
114:2;119:3;149:18;
150:24;152:7;178:22;
201:2;249:24

**recently (7)**
8:19;26:14;45:2;64:13;
85:19;129:25;140:10

**recess (4)**
36:4;138:15;205:9;
238:18

**Recessed (1)**
88:14

**recognize (4)**
13:8;25:8;162:2;213:15

**recognized (1)**
148:25

**recommendations (1)**
27:2

**Reconvened (1)**
89:2

**record (30)**
4:17;6:7,17;7:9;12:6;
65:2;67:9;74:7,10;77:17;
88:11,13;91:15;96:25;
134:17;137:4;143:23;
144:7;162:24;220:24;
221:7,9,14;230:13;231:8;
233:10,13;238:21;244:13;
258:4

**recorded (1)**
78:9

**records (7)**
119:2,2;126:11;137:15;
142:1;147:21;150:4

**recounted (2)**
153:12;209:9

**recounting (3)**
147:15;209:20,23

**recounts (1)**

233:3

**recreation (1)**
115:9

**rectify (2)**
235:4;236:5

**red (3)**
52:6,6;189:17

**redistribution (1)**
158:11

**redistricting (9)**
8:23;10:16,21;11:6,8;
54:9,13;57:18;233:1

**redo (1)**
218:4

**redoing (1)**
218:5

**reduce (3)**
97:22,25;98:3

**reduces (1)**
103:3

**reelected (1)**
189:22

**reelection (1)**
189:11

**refer (1)**
93:3

**reference (2)**
211:6;215:3

**referenced (2)**
144:23;145:19

**referencing (1)**
26:3

**referendum (1)**
81:4

**referred (1)**
54:14

**referring (7)**
48:7;82:9;84:21;89:16,
24;165:14;234:16

**reflect (4)**

145:20;190:12;221:15;
231:8

**reflected (1)**
233:24

**reflecting (1)**
130:8

**Reform (4)**
28:7;95:12;105:2;159:7

**reformers (1)**
158:4

**reforms (8)**
102:19;106:4;134:11;
145:7;217:5,18;247:6,12

**refrain (1)**
6:6

**refresh (1)**
11:21

**refuses (1)**
241:9

**regarding (1)**
78:4

**regardless (7)**
35:3;58:11;66:7;67:2;
125:7;159:1;186:13

**regards (1)**
230:22

**regime (1)**
99:16

**region (1)**
96:14

**register (7)**
51:19;53:14,18;103:18;
104:7,12;234:13

**registered (15)**
51:23,25;52:4;122:18;
139:10;140:16;167:22;
184:23;185:5,21,24;187:6;
206:13,17,20

**registration (5)**
103:18;104:1,10;106:5;

139:16

**regression (3)**
148:19,20,20

**regret (1)**
66:20

**regular (3)**
47:10;49:25;97:7

**regularly (2)**
97:4;142:2

**reject (3)**
27:5;63:6,10

**rejected (2)**
63:21,23

**rejection (1)**
27:2

**related (12)**
5:19;9:8;16:23;38:6;
58:18;105:8;106:13;107:4;
109:2;115:9;220:5;250:18

**relates (3)**
170:5;193:21;225:10

**relating (2)**
85:20;90:24

**relation (3)**
206:13,17;209:11

**relations (1)**
41:10

**relationship (14)**
117:4;167:8;168:5;
206:23;242:6;246:7,18;
249:11;250:11,23;251:2,2,
4,5

**relative (3)**
186:7;204:13,19

**relatively (1)**
249:24

**relayed (1)**
235:7

**relevant (22)**
52:15;91:13;120:20;

121:21;122:4;124:9,11;
131:25;135:22;154:11;
182:9;183:15;184:14;
185:14,20;186:2;188:3;
202:20,21;219:8;240:22;
241:2

**reliable (4)**
68:25;72:12;95:24;
118:24

**relied (1)**
91:4

**relief (1)**
185:19

**relies (2)**
95:21;243:23

**religion (1)**
52:14

**relocate (1)**
162:17

**relocated (1)**
162:18

**reluctance (1)**
81:2

**reluctant (6)**
80:23;81:13,25;82:5,13;
83:5

**rely (2)**
147:25;255:4

**relying (1)**
255:2

**remaining (1)**
34:6

**remarkable (4)**
152:9,13;194:2,4

**remember (11)**
10:4;64:18;96:21;100:18;
118:9;123:21;175:13;
215:17;228:6;234:3;251:6

**remind (2)**
6:10;121:17

**reminded (1)**
145:12

**repeatedly (2)**
79:5;114:19

**rephrase (5)**
7:1;81:12,22;231:18,21

**replicated (1)**
223:9

**report (178)**
9:1,17,18,19;13:17,20,22;
14:2,20;15:10,11;16:4,6,11,
12,13,19,23;18:12,22,23;
25:2,9,12,21;26:2;46:7;
47:16;50:25;51:1,4,5,6,7;
57:23,23,25;60:7;63:7;
69:22;85:19,21,25;86:17;
87:1;91:1,10,12;92:9,11;
94:4,6,12;102:1,2,12;
104:23;107:15;108:17,20,
23;109:5;114:5,6;117:8;
119:17;121:18;128:12,13;
132:12,16;143:16;144:7,9,
18;147:25;150:14,23;
159:6;164:4;166:17;
169:25;171:17;172:14;
173:18;178:4;181:14,17;
182:2,4,23;186:4;191:20,
21;194:23;195:10,11;200:6,
8,13;203:20,21,22;204:7,
23;205:22;206:14;209:9,20,
23;212:15,17;213:1;215:14,
22;216:14,15;218:1;223:22,
24;224:3,17;227:13,17;
228:3,6,14,18;232:3;
233:11;234:20,24;235:10,
25;236:19;237:3,5,6,10,11,
14,15,18,19,25;238:1,6,6,
22,23;239:2,6,8,15,20,21,
24,25;240:3,5,7,14,19;
241:21;242:18,25;243:1,20,

22;245:21,24;246:6;
251:18;252:10;254:2,23;
255:2,3

**reported (14)**
37:25;38:13;128:4;164:9;
166:17;182:5;191:19;
226:5;233:11,13,15;234:10;
235:24;244:9

**reporter (2)**
6:3;179:10

**reporting (2)**
206:16;234:23

**reports (60)**
14:23;15:14;16:22;19:4;
47:18,23;50:22,24;60:5;
63:6;86:21;91:6;92:19;
93:4,5,6,12,23;94:2,3,10,14,
17;95:2;100:5,11;101:1,4,
18,22;121:21;127:24;
128:4;145:19;148:3;149:3,
9,11;153:11;173:21;174:8,
10;191:18;195:25;224:6;
227:20,22;233:17,24;234:1;
241:16;242:4;249:22,23;
251:20;252:6,11,16;255:5,8

**represent (4)**
26:9;86:8;190:2,4

**representation (2)**
58:5,14

**representations (2)**
239:2,14

**representative (1)**
89:19

**representatives (1)**
65:17

**represented (3)**
55:18;191:6;239:6

**representing (3)**
4:14;9:1,2

**represents (1)**

60:22

**Republican (17)**
28:23;30:6;31:14,20;
32:8,15;42:25;43:3,6;52:4,
6;55:4,5;56:10,12,12;152:7

**Republicans (1)**
28:19

**request (3)**
200:23;220:25;221:11

**requested (3)**
126:8,14;221:16

**requesting (1)**
27:13

**requests (4)**
200:24;201:5;220:19,23

**require (1)**
134:14

**required (7)**
24:8;51:18;53:14;96:4,4;
142:17;143:1

**requirement (2)**
96:3;160:19

**requirements (4)**
5:1,7;116:7;199:6

**requires (2)**
96:5;160:17

**reregister (2)**
139:20;162:19

**reregisters (1)**
163:17

**research (39)**
16:6;23:9;24:10,12,17;
27:17;28:4;31:10,17;38:16;
41:1;49:22;52:19,19;61:18;
70:10,17;85:1;92:17;96:4;
114:12;122:4;135:2;
142:10;146:11;147:7;
148:4,23,24;156:4;164:17,
18;167:2,7;168:11;216:12;
217:12;222:12;226:11

**researchers (1)**
26:24

**reservations (3)**
174:3,5,22

**reserve (4)**
131:13;237:9;256:25;
257:2

**reside (1)**
173:25

**resident (2)**
204:17,18

**residents (17)**
92:4;114:19;115:15;
174:1;194:16;201:9,15;
202:5;224:7,8,9,10,11,22,
23;242:10;256:15

**resistance (1)**
221:1

**resource (1)**
168:25

**resourced (1)**
112:9

**resources (9)**
44:20;112:5;119:14,24;
120:9;149:19;152:1;161:7;
170:3

**respect (26)**
12:17;73:3;80:6;84:11;
108:8,20;111:4,14;132:5;
150:7;153:5;174:14;
182:20;184:13;186:16;
204:25;206:21;216:9;
221:23;227:3;237:2,5;
240:2,8;249:22;255:17

**respected (1)**
82:23

**respectful (1)**
238:12

**respects (1)**
145:9

**respond (9)**
50:18;73:9;92:19;93:5;
94:16;101:3,23;149:12;
251:20

**responded (3)**
163:19;178:20;200:25

**responding (3)**
94:4,13;241:15

**response (4)**
79:10;114:1;180:22;
181:3

**responsibility (3)**
110:5;204:8,9

**responsible (1)**
204:3

**rest (5)**
84:18;103:22;138:25;
199:20;256:21

**restriction (1)**
28:16

**result (4)**
71:25;103:20;106:9,10

**results (8)**
83:20;85:11,11;126:15,
24;148:3;150:10;217:10

**resumes (1)**
25:21

**retained (10)**
17:15;54:23,25;55:10,17;
56:19,21;60:20;75:6;85:24

**retainer (1)**
17:19

**retaining (1)**
64:17

**rethink (1)**
74:21

**retrospect (2)**
119:21;129:8

**return (1)**
36:11

**returned (1)**
101:25

**returns (1)**
190:3

**revealed (1)**
153:10

**reverse (2)**
9:18;75:20

**review (16)**
14:21;15:16;19:10,24;
24:2;26:23;27:1,10,10,11;
50:24;157:16;172:8;177:6;
187:12;209:14

**reviewed (26)**
13:17;15:6,10,13;19:4;
23:22,24;26:15,18,20,20,
22;27:19,22;93:21;94:2;
100:5;126:6;127:23;128:2;
178:18;200:5,8;216:12;
242:25;253:11

**reviewing (5)**
19:6;191:17;233:6;234:4;
236:18

**reviews (1)**
24:5

**revise (1)**
27:6

**revisited (1)**
220:15

**revisiting (1)**
220:16

**revolution (1)**
103:19

**riding (2)**
224:13;225:4

**right (121)**
10:10;18:21;24:15;25:22;
26:25;30:11;33:21;36:10;
40:5,15,25;43:2;44:17;
53:3;56:18;59:8;62:24;

64:1,13;69:6,15,19;70:13;
71:4;74:16;76:6;79:14;
80:6;83:2,11;85:2;95:19;
98:1,16,17;101:5,5,13,21;
102:25;103:10,13;106:23;
107:9,19,20,24;111:7;
112:17;114:5;116:11;
118:5,8,14,15,17,19,20;
119:9;121:16;127:1;
128:20;129:15;130:13;
131:2,3,13;132:3,4,24;
134:11,20,21;135:5;136:3,
15;137:12;140:13;142:14,
22;147:21;149:22;151:11;
152:2;153:16;155:3;156:3;
157:10;158:25;162:7;
163:23;164:14;168:11;
169:13;172:3;180:18;
181:1;185:7;186:5;189:16;
191:3;192:13;194:6,18;
204:12;213:3,11;221:5;
231:19;233:22;237:10;
246:11,16;248:3;249:1,21;
250:6;251:2,8;256:10,25

**rights (7)**
32:20,23;53:25;61:3;
124:10,19;151:3

**rigorous (1)**
27:15

**ring (1)**
20:21

**rising (1)**
135:12

**role (10)**
8:25;31:4;40:20;57:1,21;
82:24,24;102:16,17;207:22

**rolls (1)**
103:19

**room (3)**
31:25;32:3;116:11

**rough (1)**
17:9

**roughly (4)**
146:18;197:4;198:3,9

**round (3)**
8:22;9:5;27:15

**routinely (1)**
83:16

**Rubio (1)**
32:1

**Rucho (6)**
10:16;11:15;55:2,3;
59:24;60:12

**R-U-C-H-O (2)**
10:17,18

**rude (1)**
238:11

**rule (3)**
166:23;234:11,16

**ruled (1)**
83:3

**rules (9)**
5:1,15,16;10:23;21:21;
35:9;110:16;199:4;231:9

**run (10)**
29:21;66:5,10;74:4;
80:24;82:6,14;83:6,18;
112:14

**running (3)**
83:19;102:16;111:23

**runs (4)**
41:17;42:13;156:13;
211:13

**rural (2)**
197:22,24

**rush (1)**
30:5

**S**

**sad (1)**
134:18

**sadly (2)**
103:20,21

**sake (5)**
221:2;226:15;233:21;
244:17;256:7

**sakes (1)**
183:9

**Sam (1)**
183:10

**same (46)**
5:17,24;19:21,22;22:7;
24:2;49:2;58:14;60:14;
61:16,21;73:14;75:20;
92:15;94:11;99:8;106:5;
107:1,6;112:9;114:18;
138:24;160:18,22;161:3;
163:8;165:17;168:8;
175:20;176:4;180:20,21;
181:22;190:13;195:22;
202:1,3;212:10;214:13;
224:17;231:11;236:4;
246:23;254:1,8;258:3

**San (2)**
199:14,24

**saw (11)**
46:6;50:11;64:17;106:24;
128:25;129:20;137:4,5;
140:2;153:11;255:8

**saying (18)**
29:6;31:1;39:24;80:16;
81:18;97:15;125:11,13;
126:4;134:24;153:14;
185:15;221:6;222:13;
223:5;229:4;230:25;250:19

**scale (1)**
110:25

**scattered (3)**
148:21;170:23;183:13

**scattering (1)**
174:1

**schedule (3)**
233:5,7;241:3

**schedules (1)**
142:20

**scholarly (1)**
65:14

**scholars (1)**
218:6

**school (6)**
20:4,23;176:24;184:14,
15;208:7

**schools (6)**
104:14;183:2;187:13,14;
196:8;208:2

**science (28)**
20:8;22:5,9;23:13,17;
30:12,21;38:15;39:16;
41:14;47:1;49:22;50:8;
61:18;71:1;82:18;85:1;
102:21;105:12;117:8;
122:3;136:16;148:24;
160:5;177:15;222:5,10,20

**sciences (1)**
21:1

**scientific (3)**
39:13;139:6;253:5

**scientist (2)**
107:8;161:11

**scientists (4)**
23:15;33:11;154:4;178:1

**scope (3)**
92:15;143:16;149:11

**scrap (1)**
81:2

**sea (1)**
106:24

**SEAQUIST (107)**
5:6,11;7:24;12:22;13:20,

21,24;14:5,8,11,19;15:2,4;
17:2,7,11,13,17;19:12;31:7,
15;35:25;36:16;38:2;44:1;
46:20;52:25;59:21;62:15;
66:14;67:15;70:6;76:5,14;
78:18;80:21;81:10,16,19;
82:2;83:21,24;84:15;86:25;
87:8;108:15;121:14;
123:23;126:22;128:9;
130:16,21;131:11,23;133:8;
135:14;137:25;143:5;
150:11;159:4;172:20;
175:23;176:6;178:14;
179:5,14;184:8;187:7;
188:2;189:6;190:16;
193:24;194:24;198:5,11,14;
200:16;203:19;205:6,17;
208:19;210:4;211:3;214:4;
224:4;228:25;229:4,8;
230:12;231:6;234:18,25;
236:24;237:7;238:13,16;
239:7,16;240:15,16;243:7;
247:25;249:2,20;252:23;
253:16;256:25

**search (1)**
111:2

**searching (1)**
40:6

**second (21)**
8:22;9:5,19;14:23;15:14;
18:22;19:4;28:18;35:12;
51:7;61:11;69:14;88:12;
110:19;130:20;216:20;
230:15,18;238:7;251:12;
254:16

**secretaries (1)**
163:3

**secretary (3)**
56:25;57:1,6

**section (19)**

25:16,20;65:6;107:15,18;
109:6,14;113:15;114:24;
115:1;116:15;117:3;
124:18;145:18;148:16;
159:15;160:15;213:3;228:7

**sectional (4)**
159:10;167:1,6,20

**sections (2)**
102:8;160:16

**security (1)**
28:16

**seeing (3)**
153:15;162:25;225:21

**seeking (3)**
56:23;107:18;144:10

**seem (7)**
42:18;43:2,4;138:12;
150:15;165:7;233:1

**seemed (6)**
75:2;102:21;149:8,11;
177:5;215:18

**seems (26)**
42:20;47:7;59:15;96:15;
117:6;125:13,16;130:4;
131:7;141:13,22;143:2,15;
144:1;169:13,18;190:17;
193:17;195:7;197:5;
199:19;201:2;202:3;
225:24;228:1;239:12

**selected (3)**
112:23;179:25;210:6

**selections (1)**
210:13

**selling (1)**
31:2

**senate (5)**
55:4,5;228:4,13,17

**send (1)**
19:8

**sending (1)**

30:2

**sense (15)**
6:8,22;8:5;34:25;44:14;
59:2;99:16;126:25;146:11;
161:22;187:17,22;189:5,9;
211:18

**sent (17)**
14:23,25;16:20;25:9;
26:23;45:3;51:6,7;64:17;
69:7;77:8;87:6;90:23;
91:11;93:6;100:25;148:2

**sentence (8)**
67:8;73:15;93:3;150:22;
154:8;156:11;213:2;214:6

**sentences (6)**
65:1;68:5,9;74:8,9,10

**separate (6)**
91:3,11;104:8,15;243:18;
250:6

**separately (1)**
110:15

**separates (1)**
229:10

**September (8)**
13:18;16:18;18:13,14;
25:10;26:3;119:25;169:22

**sequence (2)**
233:3,10

**series (5)**
29:25;160:9,25;162:3;
168:4

**serious (2)**
168:3,4

**serve (10)**
63:2;111:5;122:10,18;
125:2,4,5,6,12,25

**served (9)**
60:24;61:4;62:25;87:22;
100:12,13,16;122:12;190:7

**service (1)**

148:15

**services (3)**
31:2;33:10;104:13

**serving (2)**
125:14;173:25

**SES (1)**
49:1

**set (7)**
18:11,16;47:1;66:5;
102:7;125:6;150:10

**sets (1)**
16:22

**settings (1)**
35:17

**settled (2)**
105:17;170:21

**settlement (1)**
115:11

**seven (2)**
102:3;231:10

**several (6)**
12:23;14:24;68:18;
169:12,23;255:8

**severe (1)**
49:3

**severely (1)**
213:6

**shame (1)**
136:2

**share (9)**
25:3;28:23;70:19;71:9;
72:20;90:19;240:14;
254:15;256:11

**shared (4)**
13:20;15:2,2;235:8

**shattered (1)**
142:2

**Sheet (2)**
258:7,17

**shift (1)**

32:17

**shifting (1)**
76:6

**short (6)**
69:17;70:3;163:10;
183:14;225:17;226:21

**shorthand (1)**
234:11

**shortly (1)**
100:17

**shot (3)**
30:25;66:3;74:3

**shouted (1)**
79:6

**shouting (1)**
78:11

**show (19)**
10:11;12:24;64:2;71:14;
78:10;105:4;116:25;117:3;
118:19;127:9;138:6,12;
150:24;154:17;182:11;
210:19;221:18;223:23;
251:1

**showed (1)**
127:13

**showing (9)**
70:17;108:10,11;119:13;
120:2;127:5;152:16;226:3;
243:14

**shown (5)**
72:16;117:8,20;135:1;
221:21

**shows (9)**
52:19,19;75:14;105:2;
127:20;154:19;168:21;
220:24;245:18

**Shupnick (2)**
210:22,23

**side (17)**
32:15;43:5,6;56:2;72:19;

73:8,9,12;104:17;105:14;
125:1,11,13;195:22;219:16;
252:7;253:2

**sided (4)**
152:6,7;153:2,4

**sides (9)**
57:12;115:19;123:2;
125:10;202:12,18;229:10;
230:23;253:7

**sidewalks (1)**
183:22

**sign (1)**
257:1

**significant (8)**
48:16;77:25;78:1;153:17;
155:21;211:24;212:13;
242:15

**Similar (10)**
84:11;111:3;112:21;
146:3,18;167:4;186:11;
191:7;193:21;212:11

**similarly (8)**
42:13;44:10,18;62:12;
112:9;164:2;239:19;248:15

**simple (6)**
72:8,21,25;108:2;186:9;
196:1

**simplicity (1)**
68:12

**simply (9)**
23:16;73:24;74:14;85:1;
90:8;145:20;146:23;158:7,
17

**simultaneous (1)**
22:18

**single (8)**
73:18;74:12;95:15;125:3;
159:14;160:15;185:4;
199:16

**sink (1)**

221:4

**sit (1)**
169:14

**site (38)**
91:16;95:25;97:25;
104:10,25;105:20,21;113:8,
13;114:7,9,18,22;116:14;
145:23;148:12;154:10,24;
165:2,11;166:1;173:2,9,10,
24;175:11;176:22;181:24;
182:14;186:23,24;201:7;
206:9;208:3;210:8,9,10;
226:2

**sited (2)**
115:10;132:12

**sites (60)**
36:18;45:9;90:24;95:7,
21;97:24;105:24;110:4;
113:15,24;114:25;115:24;
118:8;121:23;122:6,10;
123:13;133:15,22;145:15;
146:25;147:12;148:6,14;
150:25;155:14,16;156:14;
157:1,3;164:12,17,22,23;
165:9;168:13,22,23;169:2,
3;172:19;175:21;180:25;
181:1;182:17;184:19;
185:16;194:3;206:10;
207:17,19,25,25;208:24;
219:14,19,24;243:10,12,15

**siting (9)**
37:12;91:9;92:21;94:18;
115:5;206:12;211:15;
219:11;220:4

**sitting (2)**
75:11;87:2

**situated (3)**
196:19;197:19;202:15

**situating (1)**
110:4

Allen v.
Waller County, Texas

James Gimpel, Ph.D.
December 12, 2019

**six (1)**
59:15
**sixties (1)**
32:12
**sizable (2)**
29:15;33:14
**size (14)**
59:10;110:14;111:5;
112:9,12,21;146:18;156:1;
180:2,3,12;193:7;196:18;
255:12
**sizes (1)**
110:12
**skip (4)**
5:2;105:19;227:20;
230:17
**skipping (2)**
177:12;206:14
**slave (1)**
202:10
**slavery (4)**
201:11;202:8,21;204:4
**slightly (3)**
226:17;254:9;255:10
**slow (2)**
248:4,20
**small (7)**
24:14;52:8;63:16;113:9;
222:5;223:12;225:14
**smaller (3)**
110:16;176:16;217:1
**Smith (1)**
89:18
**social (16)**
20:25;38:15;39:13;41:14;
61:18;71:1;84:25;104:13;
107:8;136:16;139:5;
148:24;161:11;222:5,10,20
**socialization (3)**
153:24;154:5;170:2

**socialize (1)**
220:7
**socialized (1)**
52:13
**socioeconomic (17)**
42:9,11,17,21;43:20;
48:22;59:3;85:3;182:21;
213:16;215:4,7,11;233:17;
253:13,25;255:15
**sociology (2)**
244:22;245:16
**software (2)**
115:3,12
**solicit (1)**
134:13
**somebody (1)**
223:17
**somehow (6)**
45:16;114:8,21;126:3;
134:17;139:4
**someone (23)**
32:1;39:22;50:19,19;
82:18;88:2;96:11;97:3,13;
105:23;108:1;142:3,6,13;
162:11,11,20;177:22;
188:20,21;204:10,11;227:7
**someone's (2)**
24:1;116:4
**something (44)**
11:12;21:2;24:15;41:17,
18;42:13;44:15;45:11;46:8;
50:13;70:24,24;73:20;
83:13;87:3;105:3;125:19;
127:6;130:13;133:9,17;
134:3;137:6;144:4,21;
147:10;148:13;149:13;
157:19,23;161:11,24;165:8,
11;182:6,19;184:4;186:3;
199:19;214:18;216:6;
221:24;226:19;227:11

**sometimes (6)**
27:14,14;63:16;101:5;
139:15;173:6
**somewhat (4)**
20:24;31:8,10;188:9
**somewhere (3)**
57:24;69:23;169:6
**soon (1)**
179:11
**sophistication (1)**
147:19
**sorry (10)**
29:11;35:24;76:5;105:4;
107:21;132:10;164:25;
212:15;220:15;255:16
**sort (15)**
28:11;29:5;52:16,19;
53:7;64:21;84:3;119:21;
131:13;141:19;167:2;
170:17;210:3;222:3,18
**sorted (1)**
48:20
**sought (1)**
144:17
**sound (1)**
228:5
**sources (2)**
210:12,15
**south (3)**
123:13;165:5;201:19
**Southern (6)**
31:24;170:15;186:21,22;
187:1;205:21
**space (2)**
173:16;174:16
**spaces (2)**
116:9,10
**spacial (1)**
37:10
**span (1)**

**116:24**
**Spanish (3)**
29:8;30:3,4
**speak (6)**
6:5,5;7:24;30:4;167:21;
168:6
**specialist (1)**
53:9
**specialization (2)**
20:14;27:25
**specialty (1)**
124:21
**specific (13)**
31:24;35:2;65:23;93:8;
94:5,20;102:7;107:17;
153:8;175:9;228:18;
246:25;247:22
**specifically (19)**
7:7,10;41:19,21;43:24;
54:25;91:7;93:5;126:14;
127:17;173:5;214:22;
215:3,19,24;216:4;218:3;
232:5;253:12
**specified (1)**
116:2
**specious (1)**
225:25
**speculate (1)**
70:8
**spelled (1)**
89:20
**spend (2)**
155:21;173:13
**spending (1)**
207:13
**spent (2)**
19:5;89:10
**splitting (1)**
61:23
**spoilage (1)**

Allen v.
Waller County, Texas

James Gimpel, Ph.D.
December 12, 2019

71:15

**spoiled (1)**
72:1

**spoke (1)**
128:5

**spoken (1)**
92:4

**spread (1)**
183:13

**SPSS (1)**
16:8

**St (1)**
165:23

**staff (1)**
132:18

**stagnant (1)**
189:4

**stake (2)**
61:20;71:6

**stamp (1)**
134:15

**stand (8)**
46:9;66:16;67:2;116:10;
119:14;138:20;194:7,11

**standard (12)**
23:12;38:15;68:25;72:12,
22;112:20,25;113:3,11;
181:4,23;182:16

**standpoint (4)**
69:9;168:17,25;222:20

**stands (1)**
185:18

**start (2)**
6:13;30:5

**started (9)**
24:22;36:9;50:21;78:11;
111:25;139:14;144:5;
231:14;249:25

**starting (1)**
240:20

**starts (1)**
34:4

**state (61)**
4:16;6:21;9:3;10:8;11:7;
19:23;21:9,11,14,21,22,23;
42:23;54:23;55:3,18;56:6,8,
9,13,25;57:1,6,9;58:2,8,12;
66:9;81:9,15;82:11,12;
83:13;84:13;85:22;86:8,9;
110:1,12;117:13;129:20;
141:16;146:22;163:3,3;
169:5;180:10,19;183:5,11;
185:6;188:1,6;189:16,17,
20;199:4,6;219:22;230:13;
254:19

**stated (4)**
6:16;7:9;96:22;183:17

**statement (3)**
156:8;211:22;212:11

**statements (3)**
203:16;209:23;225:8

**states (25)**
21:12,17;42:25;54:17;
66:5;74:4;80:23;81:13,24;
82:5,13;83:5,10,17,19;
96:25;98:22;99:1,2;106:6;
170:15;216:8;248:3,5,20

**states' (1)**
32:23

**state's (2)**
56:24;57:25

**statewide (5)**
111:14;129:19,22,24;
152:5

**static (1)**
30:18

**stations (1)**
115:7

**statistical (1)**
16:9

**statistically (1)**
167:24

**statistics (1)**
252:15

**status (12)**
42:17,21;43:20;48:22;
85:4;213:16;215:4,7,11;
253:13,25;255:15

**statuses (1)**
43:21

**stayed (2)**
75:20;161:2

**steep (1)**
107:2

**Stein (21)**
14:24;15:14;19:5;50:22;
93:7,12,19;100:6,16;
108:20;141:21;149:6;
150:7;168:15;171:14;
219:11;230:6,14;241:15,21;
254:25

**Stein's (7)**
94:5;211:15;229:18;
240:14,19;242:17,25

**step (9)**
38:23;51:23;54:21;74:4;
82:13;83:5,17,20;84:12

**stepped (2)**
23:10;238:20

**steps (1)**
199:17

**stickier (1)**
33:12

**sticky (1)**
129:16

**still (18)**
9:22;73:21,22;74:24;
81:5;104:25;134:20;
138:20;142:7;165:10;
177:10;189:3,14;225:16;

226:2;227:9;243:10;249:13

**stimulated (2)**
151:17;188:12

**stimulating (1)**
158:16

**stimulus (8)**
136:25;137:1,18,20;
151:8;152:3;169:19;189:13

**stipulating (2)**
4:23,25

**stone's (1)**
226:2

**stood (2)**
169:21;204:14

**stopping (1)**
130:19

**stored (1)**
147:22

**story (3)**
58:8;141:20,22

**straightforward (2)**
119:9;148:21

**strains (1)**
28:3

**strand (2)**
28:14,18

**strange (3)**
66:23;136:4;226:23

**street (5)**
105:6,20;107:25;118:19;
165:22

**strides (1)**
147:18

**strike (29)**
23:2;27:24;36:7;61:6;
69:2;81:12;85:7,9,13;
94:14;131:17;132:20;
155:7;172:15;184:1;
187:11,18;191:23;194:13;
197:2;205:12;209:20;

215:6;233:14;236:12;
243:25;245:6;246:24;253:8

**strikes (2)**
137:16;173:1

**structure (1)**
37:10

**stuck (1)**
254:21

**student (35)**
45:17;100:17;132:23;
133:6;136:10,14;143:9,13;
153:6;162:8;165:19;166:5,
11;169:8;171:3;172:18,24;
173:3,18;174:7,15;176:15;
185:4,24;190:13;192:23;
196:9;197:7;198:3,9;
205:15;208:13,23;210:9;
219:12

**students (50)**
21:19;45:6;46:13;52:11;
138:24,24;141:5;151:21;
152:21;153:8,13;155:18;
162:6;170:5;171:6;172:15,
17,25;173:11,25;176:23;
177:7;182:24;183:1;
184:15,21;185:9;187:5,14,
22,24;188:11,18;189:1;
190:7;196:13;198:4,10,12,
17;205:4;208:12,17;209:7,
11,25;220:4;226:6;241:9;
248:23

**students' (1)**
234:12

**studies (5)**
168:12,15,20;223:2,10

**study (18)**
45:24;73:19;74:13;82:10;
149:19;160:9,19,25;161:10,
23;162:3,5;164:1;166:19;
168:19;172:24;184:16;

213:15

**studying (3)**
21:3,4;253:13

**stunning (2)**
196:21,25

**styles (1)**
79:3

**subfield (1)**
154:3

**subgroups (1)**
46:23

**subheadings (1)**
144:8

**subject (16)**
20:1;30:13;31:18;32:24;
35:22;36:22;81:3;89:6;
91:21;102:2;161:21,23;
179:3;199:5;200:21;219:22

**subjects (1)**
20:12

**submission (1)**
27:1

**submitted (3)**
13:18;15:11;60:4

**subscribe (1)**
98:15

**subsequent (1)**
16:23

**subsidiary (1)**
103:7

**substantial (11)**
35:12,15;126:25;127:1;
148:2;187:5;193:6,9;
237:11;244:15;246:2

**substantially (4)**
106:25;107:6;186:12;
191:8

**substitute (2)**
254:13,14

**suburban (1)**

49:11

**success (1)**
241:11

**suddenly (1)**
30:5

**sued (2)**
55:7;89:24

**sufficient (4)**
5:9;167:12;168:9;251:7

**sufficiently (1)**
249:10

**suggest (12)**
21:19;49:15,22;120:24;
135:12;141:13,22;152:25;
168:12;191:5;195:6;223:11

**suggested (6)**
87:21;132:1;133:24;
169:17;218:14;237:22

**suggesting (8)**
57:23;125:17;133:21;
154:25;202:22;218:17;
229:12;246:9

**suggestion (4)**
112:8,10;114:4,6

**suggestions (6)**
27:5,6;101:14;112:17,17;
120:7

**suggests (11)**
35:19;47:16;52:22;126:7;
131:21;134:5;151:7,13;
153:3;155:4;191:10

**suitable (2)**
27:3;164:13

**sum (1)**
19:2

**summarize (2)**
26:10;28:2

**summarized (1)**
67:12

**summary (2)**

150:22,23

**super (1)**
120:14

**supermarket (1)**
219:13

**supermarkets (1)**
211:16

**supplement (2)**
12:5;18:15

**supplemental (4)**
15:13;181:16;186:4;
240:2

**supplementary (1)**
18:22

**support (3)**
67:10;126:13;169:4

**supported (1)**
126:4

**supports (1)**
53:2

**suppose (6)**
19:7,7;94:8;120:24;
142:16;255:13

**supposed (1)**
110:5

**sure (41)**
5:17;9:21;17:6;20:22;
26:22;28:3,3;41:2;57:24;
58:24;67:5,16;70:8;72:13;
73:19;83:8;84:24;92:14;
100:17;109:9;113:2;
116:22;120:20;135:19,20,
24;136:11;145:4;149:7;
160:4;162:14;167:13;
174:4;182:3;200:18;
207:20;212:23;222:17;
245:3;249:3,21

**surge (4)**
128:25;139:2,3;188:9

**surgeon (1)**

106:23

**surprise (3)**
79:24;187:4,8

**surprised (6)**
66:11,17;77:12;154:15;
199:10;207:12

**surprising (1)**
244:17

**survey (14)**
70:10;72:15;75:6,7,9,14,
24;153:7;170:7;244:5,5,6,
14;255:4

**surveyed (1)**
132:10

**surveys (2)**
30:16;152:24

**suspect (4)**
130:11;132:2;138:1;
176:16

**suspecting (1)**
139:22

**sustain (2)**
52:23;203:1

**switched (2)**
66:25;238:8

**sworn (3)**
4:6;5:20,23

**system (9)**
11:10;48:18,18;50:16,16;
71:5;81:3;117:13;119:1

**systematic (1)**
106:19

**systematically (2)**
174:13,17

**systemically (1)**
174:12

**systems (1)**
20:20

## T

**table (12)**
87:2;112:11;148:22,22;
155:4;179:20;181:14,16;
196:7;205:20,23;219:16

**tables (5)**
16:5;58:12;145:18;244:9,
13

**taking (6)**
7:17;27:13;69:12,14;
152:14;236:5

**talk (12)**
14:15;21:18;70:21;91:19,
22;150:20;169:25;195:20;
198:21;200:4;253:15;254:2

**talked (17)**
7:4;14:10;54:8;64:11;
75:2;92:10;129:6;144:9;
148:6;149:16;159:24;
164:3;169:23;179:25;
200:2;227:6,19

**talker (1)**
144:16

**talking (44)**
7:5;28:19,21;41:10;
76:20;102:23;110:3;
140:14,21,22;142:25;144:5,
22;145:7,9;147:1,15,21;
152:19;159:18;183:2,8,14;
195:1,3,4,6,8,17;204:13;
209:9;225:12;226:17,19,22;
227:15,17;229:11;230:25;
234:15;236:3;238:7;252:5;
254:3

**tar (1)**
202:4

**tarring (1)**
203:17

**task (5)**
94:15,21,22,23;216:11

**tasked (3)**
216:3,13;222:2

**tasks (1)**
34:18

**taught (1)**
22:17

**tax (1)**
139:16

**taxed (1)**
98:11

**taxi (2)**
224:13;225:5

**taxing (2)**
97:5,18

**teach (1)**
21:14

**teaching (7)**
21:3,5;22:19,23;24:13,15,
16

**team (3)**
101:11;222:16;228:1

**teams (2)**
101:8,21

**technical (1)**
147:19

**technique (1)**
33:5

**techniques (2)**
31:3;34:14

**technology (1)**
218:5

**tedious (1)**
147:5

**telephone (1)**
90:4

**telling (3)**
26:19;38:23;204:16

**Templeton (1)**

165:18

**temporal (1)**
167:3

**ten (8)**
36:20;76:8,12;160:3,7;
177:21,23;222:23

**tend (7)**
33:23;34:2;43:6;48:5;
86:22;129:16;139:7

**tendency (1)**
164:13

**tends (1)**
34:23

**tension (3)**
30:20,24;33:8

**tenth (1)**
223:16

**tenuous (3)**
236:12,18,22

**tenure (1)**
27:23

**tenured (3)**
24:19,21,22

**term (4)**
20:21;68:2;163:23;
253:14

**terms (10)**
110:25;131:6,9;163:21;
164:6;198:22;222:19;
228:23;251:24;255:12

**terrain (1)**
45:24

**test (9)**
47:12;145:10;146:8;
148:17;153:5;169:13,16,17;
213:12

**tested (2)**
147:14;150:13

**testified (12)**
4:8;9:4,6;60:8,19;62:9,

12,19;68:13;133:20;
149:10;245:17

**testify (5)**
9:8;57:3;60:14,16;67:20

**testifying (3)**
64:11;78:2;79:6

**testimony (25)**
63:10,21,23;65:20;67:11,
14,25;68:11;69:4;73:25;
74:14;78:4,9,10,15,17;
79:19;80:7;101:11;153:12;
246:6;248:10,24;249:8;
258:4

**testing (2)**
146:8;150:9

**tests (2)**
149:1;247:15

**Texas (45)**
48:4;53:13;54:6;109:17,
23;110:14,17;111:10;
112:21;113:7;116:2;
129:20,24;137:8;142:1;
146:16;147:20;150:5;
152:5,24;155:25;156:4;
162:22;170:15,17;171:25;
180:10;183:5;186:11,21,22;
187:1;189:14,24;196:17;
197:13,17;199:4,5,17;
205:21;219:20,22;249:25;
256:2

**text (1)**
40:2

**Thanksgiving (1)**
69:13

**theirs (1)**
94:3

**themselves (3)**
120:25;181:20;221:3

**theories (1)**
213:20

**theory (2)**
178:25;242:4

**thereby (1)**
68:13

**therefore (2)**
141:5;239:1

**therein (1)**
16:5

**thing (20)**
12:3;18:17;22:8;50:20;
74:5;105:25;110:18;113:2;
126:23;134:19;161:20;
163:3;165:6;166:20;183:8;
195:22;221:5;231:8;236:4;
254:8

**things (24)**
5:2;13:10;47:4;49:21;
84:25;86:22;98:2;102:18;
106:22;107:13,13;116:12,
14;119:22;139:11;216:17;
217:9;219:5;229:22,24;
231:1;237:10;251:6;252:7

**think (250)**
5:7;9:20;10:14;11:25;
13:11;23:7;26:22;27:3;
30:2;31:25;32:3,13,18,24;
33:3,8,19;34:23;35:1,3,8;
37:1,20;40:5,8;41:6;42:16,
16;43:13,21;44:6,11;45:11;
47:20;48:15,19,25;49:11,
18,18,19,23;50:14;52:10;
53:1,12,20;58:18;63:12;
66:7,19;67:21;69:8,23;70:1,
7;71:6,22;72:5;73:6;74:3,5;
76:19;77:14;78:22;79:1,8;
80:17;81:5;83:4,9;84:9,12,
16;86:7,7,16,19,19;91:17;
93:7,7;95:10,18,25;96:1,24;
97:4,11,23;98:22;100:3;
101:5,7,22;102:13;104:22;

106:21;113:6,10,20;117:21,
23;120:19,20;123:8;
124:25;127:2,4,8,18,19;
128:1;129:23;130:10,14;
131:17,24;133:17,23,23;
134:1;135:9,23;138:14,23;
139:21;144:5,11,23;146:15,
21;148:1;149:5,9,21,25;
150:12,15;151:6,25;152:1,
20,23;153:20;155:3;156:12,
21;157:8,9,11,12;162:15;
164:11;165:19;166:20;
168:10,16;171:16;172:3,5,
6;175:5;177:1;181:2;182:9,
11,19;183:5;184:17;186:2,
5,5;187:22;188:4,10,11,22;
190:24,25;191:1,16;193:25;
194:18;195:1;198:19,25;
199:22;201:8,24;202:12,18;
203:1;204:9,22;207:20,20,
24;208:1,14,15,20;211:18,
18;212:6,10;215:16,17,21;
216:20;217:22;218:10,13;
219:8,16;220:9,9,15,16,17,
22,24;222:8,20;223:9;
225:12;226:24;227:12;
229:9,21,21,21,24;232:18,
21;241:13,19;242:20,22;
244:3;245:5,7;246:17;
247:3,5;248:13;250:14;
256:3,5,9

**thinking (4)**
6:13;86:4;101:7;125:1

**thinks (1)**
70:9

**third (6)**
17:8,16;25:15,18;69:12;
153:21

**third-party (1)**
153:17

**thirties (1)**
32:12

**thirty (1)**
18:8

**Thompson (1)**
166:7

**thoroughly (1)**
63:25

**those (130)**
5:5;8:13;11:8;14:25;15:1,
5,7;16:14;19:6,10,13;20:17;
22:24;24:6;27:6;29:18;
33:17;34:22;36:19,20,25;
37:2,11,22;39:10;42:5;
44:21;46:18;47:4;48:1,14;
49:6,10;52:9;53:5,7;54:12,
15,17,23;56:5;59:4,13;60:4,
6;68:9;71:11;74:9;78:6;
80:6;82:25;86:14;90:7,8,
16;93:12,13;94:10;95:1;
96:13;98:3;99:13;100:25;
101:4;102:8;104:9,15;
122:7,10,18;124:8,9;
126:16;128:4;131:3,8,19;
138:10,21;145:16,24;149:9,
11;151:3;154:23;155:5,10;
160:23;162:5,10;164:23;
166:24;170:4,8,9;171:21,
22;172:5;174:17;175:20;
176:4,24;180:13;184:23;
186:2;187:14;188:24;
190:13,21;191:15;195:10,
16,17;205:21;212:19;
217:10;218:25;224:14;
225:21;228:19;231:19;
236:22;244:18;248:5,11,17;
252:7;253:13,25;256:1

**though (14)**
39:22;41:25;42:5;51:8;
71:19;97:16;147:18;153:1;

162:4;163:12;189:18;
190:11;221:10;255:17

**thought (9)**
28:21;40:4;72:24;94:7;
104:3;128:3;145:1;154:15;
185:20

**thoughts (2)**
15:2;70:4

**thousand (4)**
18:8;165:4;225:16;
226:17

**threat (2)**
178:25;179:1

**three (15)**
37:11,22;48:10;54:17;
60:2;127:5,13;136:22;
166:24;176:24;177:23;
227:1;230:3;246:12;251:6

**three-year (1)**
244:5

**threshold (2)**
68:15;254:7

**through (30)**
11:9;15:1;16:15;26:23;
27:13;36:25;38:7,10;39:16;
40:18;41:17;42:13;65:14;
77:11;89:8;91:15;97:8;
102:3;144:7;147:24;
153:25;154:5;158:23,24;
164:5;176:22;178:11,11;
200:2;243:4

**throughout (9)**
20:12;52:24;58:2;102:2;
170:23;195:25;250:16;
252:3;255:1

**throw (1)**
226:2

**thrust (8)**
30:7;39:6,14;40:6;41:8;
42:5;72:10;73:5

**thus (1)**
99:8

**ticking (1)**
112:1

**tie (1)**
202:6

**times (13)**
8:11;78:24;79:9;90:4;
169:12;181:1;195:2,3;
201:3;209:3;216:22;252:3;
255:5

**timetable (1)**
69:18

**tiny (1)**
168:22

**tired (2)**
164:25;229:23

**title (3)**
22:2;40:7,15

**titled (3)**
25:2,13,21

**today (24)**
5:4,5,17,18,24;7:15,19;
15:19;18:18;19:2,8,12;
164:3,8;187:20;202:2,25;
203:23;211:8;213:20;
232:18;246:6;248:24;250:5

**today's (6)**
4:22;12:17;13:16;14:22;
15:9;17:1

**together (3)**
69:21;132:15;248:8

**told (6)**
108:13;144:11;149:4,9;
178:12;187:4

**Tom (2)**
50:10;112:14

**took (7)**
20:8;32:21,22;47:18,23;
59:15;138:8

**tool (3)**
115:4;148:23,25

**tools (4)**
34:14;115:3;161:8;172:5

**top (12)**
10:10;21:13;26:17;40:4;
48:10;123:20,21;178:5,10;
193:14;209:17;211:22

**topic (3)**
91:18,18;92:16

**topics (2)**
37:2;53:23

**torn (4)**
114:16;164:17;165:16;
166:9

**Toronto (1)**
20:7

**toss (1)**
167:15

**tossed (2)**
71:12,15

**total (8)**
19:2;77:15;107:16;117:4;
120:16,19;121:12;176:12

**totally (4)**
141:23;143:4,9,13

**touch (2)**
36:18,21

**touches (2)**
36:14;37:1

**tough (1)**
163:22

**toward (2)**
34:15;43:6

**towards (1)**
31:13

**town (10)**
28:19;46:1;47:21;52:8;
59:9,10,12;171:7;192:10;
195:4

**track (4)**
162:15,16;254:15;255:7

**tradition (5)**
98:25;125:8;156:14;
207:3,7

**traditional (1)**
66:22

**Traditionally (1)**
35:14

**traffic (1)**
219:4

**trailer (1)**
219:25

**trained (1)**
150:2

**training (3)**
20:8;26:25;28:25

**transcribing (1)**
6:4

**transcript (1)**
258:3

**transit (1)**
224:14

**transition (2)**
32:10,11

**transmission (1)**
53:8

**transportation (9)**
99:21;109:2;206:2,5;
213:5;225:9;226:5,13,14

**travel (3)**
163:5;218:3;226:16

**traveling (1)**
227:5

**traversed (1)**
227:12

**Travis (3)**
110:23;112:24;199:12

**Treasure (1)**
89:18

**treat (2)**
109:24;125:9

**treated (5)**
45:16,21;73:4;126:3,5

**treatment (1)**
66:13

**treats (1)**
110:15

**trend (8)**
132:4;135:12,19,21,24;
136:18,22;191:7

**trends (3)**
28:13;30:14;33:3

**Trey (1)**
89:24

**trial (16)**
9:4,6,7;56:20;60:10,12,
17,19;77:9;227:23;228:1;
235:15,23;239:11,12;257:3

**tricky (1)**
39:20

**trigger (1)**
178:24

**trivial (3)**
72:20;75:19;116:8

**trivially (1)**
103:1

**troubled (1)**
149:22

**troubling (1)**
68:14

**troughs (2)**
107:2,2

**true (32)**
33:16;39:18,22;42:16,16;
47:14;81:8;82:15,20;100:3;
114:15;120:3;142:16;
146:2;155:12,23;157:5;
159:1;160:2;167:19;196:7;
199:14;214:12,15;215:8;

222:13;232:19;237:23;
241:19,19;247:3;258:4

**Trump (2)**
66:7;80:18

**trumps (1)**
141:23

**truncated (1)**
69:17

**trust (2)**
48:17;50:16

**trusted (1)**
179:10

**truth (6)**
4:7,7,7;48:25;147:19;
188:4

**truthfully (1)**
5:25

**try (14)**
6:5;7:1,11,24;35:23;
81:22;89:7;91:14;113:22;
162:12,15;164:13;206:15;
222:16

**trying (29)**
10:4;34:21;39:7;57:8;
63:11;71:14;109:14;
111:16,16;112:15,19;
113:18;115:1,2;116:21;
120:8;129:12;145:1;164:2;
172:2;184:18;210:12,13;
213:12;215:16;216:6;
238:12;241:8;242:19

**Tuesday (2)**
98:12;176:19

**turn (25)**
20:1;47:9;64:22;66:22;
67:6,6;68:4;77:15;89:6;
92:7,16;97:17;100:22;
102:5;105:1;117:5;120:1;
135:9;145:21,21,21;179:2;
211:11;212:20;213:22

**turned (7)**
136:3;158:8;165:11;
177:20,23;185:22;220:24

**turning (5)**
43:4,6;177:22;246:21,23

**turnout (143)**
36:19;37:8;41:22;46:22,
24,25;47:13;48:2;49:12;
68:19;95:1,9,10,13,18,23;
96:1,13,16,17;99:8,12,19;
100:2;102:11;103:2,6,12,
20;106:25;107:3,7,16,23;
108:8,10,11;109:10;116:16;
117:2,19,22;118:5,10,23;
119:2,15;120:12;126:11,15;
128:25;130:3;132:2;
133:20,21,25;134:1;135:6,
11,13;137:4,7,21;139:2,3,7,
12,16,24;140:1,5,10,12,14;
141:17;142:23;148:17;
150:15;151:7,9,13;154:9,
21;155:4;158:2,10,19,20;
159:8;161:3,4;166:18;
167:22;168:23;169:24;
170:11;171:13;172:10,11;
177:16,18;188:5;189:12;
203:8,10;212:1,13;214:3;
216:9;217:10,13;222:3;
225:17;228:23;229:12;
241:6;242:2,7,20,22;
245:19;246:3,8,19;247:2,4,
9,24;248:6,9,16,21;249:1,4,
9,17;250:3,4,12,22,23;
251:3,14

**turns (2)**
68:7;97:13

**Twenty-eight (1)**
22:13

**Twenty-seven (1)**
193:5

**two (42)**
11:8,9;13:25;14:13;
22:24;25:20;30:24;34:18,
22;37:7;68:5,6;73:9;74:7,9,
10;79:14,16,20;90:4;96:23;
104:15;106:2;123:2;
125:10;136:21;138:4;
175:13;177:23;195:5;
198:6;202:12,18;215:12;
216:16;217:4;218:1;223:2;
227:16;238:5;246:11;
248:13

**two-and-a-half (3)**
69:20,23;161:19

**two-party (1)**
68:12

**Tyler (2)**
163:7;205:21

**type (4)**
8:21;151:23;219:25;
221:24

**typically (2)**
137:1;152:6

# U

**UC (1)**
103:16

**ugly (1)**
201:2

**ultimate (1)**
243:2

**ultimately (5)**
9:7;31:3;66:21;73:2;
247:19

**Um-hmm (4)**
5:22;50:23;179:24;
243:21

**unable (5)**
7:14;68:22;73:24;74:14;

111:25

**unbelievable (1)**
152:12

**uncertainty (2)**
119:23;129:6

**under (11)**
5:1;78:12;92:16;121:10;
150:22;161:3,6;224:5,20;
226:10;231:9

**undercuts (2)**
103:3;135:7

**undergraduate (1)**
20:5

**underlined (1)**
195:14

**underlying (6)**
16:14;39:23;41:4;91:5;
171:2;208:1

**underscore (1)**
242:15

**understand (39)**
6:25;7:15,18;10:22;
16:17;30:20;34:24;45:4;
47:20;67:21;68:17;71:10,
20;72:3,9;80:22;81:1,5,17,
19;82:21;83:2,4,15;94:21,
22;95:6;116:4;124:23;
171:13;188:5;197:1;
219:21;231:9,12,17;242:17;
252:6,7

**understanding (20)**
11:11;24:11,17;29:1;
32:13;45:6,20;46:4,11;
67:19;85:6,8,10;91:11;
114:11;154:4;157:14,15,17;
222:11

**understands (1)**
32:25

**understood (4)**
46:16;58:25;216:3;253:1

**undone (1)**
65:11

**Undoubtedly (1)**
171:3

**unemployed (1)**
224:22

**unfair (2)**
151:1;202:4

**unfairly (2)**
126:3,5

**unfairness (1)**
95:3

**unfamiliar (2)**
114:8;148:23

**unfold (1)**
167:5

**unfolding (1)**
28:8

**unfortunate (1)**
255:13

**unfortunately (2)**
170:9;215:1

**uniform (1)**
181:3

**uniformly (4)**
188:6;201:2;220:22;
221:7

**union (2)**
165:20;210:9

**unique (7)**
155:18,25;156:3,7,9,9;
200:4

**United (2)**
98:22,25

**units (2)**
159:16;160:13

**universe (1)**
253:11

**universities (7)**
146:16,19;182:1;193:20;

196:4,6;197:18

**University (10)**
4:20;20:6,7,10;22:1,8,16,
24;24:9;27:17

**unjustifiably (1)**
121:25

**Unless (3)**
7:6,10;139:17

**Unlike (1)**
116:3

**unpack (1)**
107:13

**unpersuasive (1)**
65:20

**unpredicted (1)**
119:20

**unreasonable (2)**
130:4;202:4

**unreported (1)**
244:16

**until (1)**
69:12

**unusual (8)**
66:23;78:13;79:2,6;
114:9,13,22;120:14

**unusually (2)**
139:3;140:1

**unutilized (1)**
136:6

**up (66)**
6:5;7:24;9:20;14:3;
15:24;20:23;28:17;34:14;
52:4,8,13;53:3;61:11;
69:12;71:9,16;101:3,19,23;
104:16,19;105:4;107:7;
117:1;118:19;119:13,20;
120:2,2;127:5,9,13;137:23;
146:12;150:9;152:12;
154:6;161:22;162:23;
165:17;167:10,10,21;

173:22;174:25;175:6;
186:19;194:4,20;199:21;
201:18;205:20;217:4;
220:16;221:18,21;222:11;
226:3;233:4;234:12;
244:12;247:5,9,17;249:15;
252:8

**updates (1)**
26:12

**upon (25)**
36:14;37:1;61:24;69:20;
88:3,6;91:4;101:2;133:12;
140:25;141:3;212:20;
216:1;229:18;230:8;
235:24;241:13;242:25;
243:23;245:11;248:24;
249:7,17;250:10;253:8

**usage (7)**
140:5,6,6,13,25;169:7;
229:2

**use (44)**
41:13;56:24;90:25;
109:10;115:2;119:15;
120:7,12;132:2;133:6;
138:18;140:21;141:4;
147:2;148:13;156:17;
159:6;162:5;165:17;
172:17,19,21;178:1;185:13,
14;187:14,21,23;195:20;
213:20;214:9,17;220:5,14;
228:23;229:3;234:11,11;
244:2;253:14;254:22,22;
255:10;258:18

**used (25)**
16:9;38:1,13;67:17,22;
75:21;114:19;144:17;
148:11,11,14,25;150:23;
158:23;166:10,11;171:23,
24;172:24;180:7;190:18;
208:3;209:10;234:13;253:6

**useful (4)**
147:8;161:8;185:1;
213:17

**uses (2)**
39:2;254:25

**using (13)**
24:14,16;36:24;47:19;
171:16;190:14;191:7,12;
195:24,24;244:6;254:10,21

**usual (1)**
212:21

**UT (2)**
198:23;199:14

**utilize (1)**
121:2

**utilized (1)**
95:25

## V

**vacuum (1)**
109:19

**vaguely (2)**
13:11;191:21

**valuable (1)**
73:20

**values (2)**
52:9;53:8

**variability (10)**
35:12,15,20;47:7;49:19;
180:21;181:2,4,9;223:6

**variable (6)**
38:15,15,20;40:21;41:25;
181:20

**variables (5)**
43:8;168:5;207:1;217:10;
256:2

**variation (9)**
35:5;59:12;101:9;159:16;
167:20;168:1,2;180:17,22

**variations (2)**
42:19;96:16

**varied (2)**
117:20;229:10

**variety (6)**
99:17;127:18;210:12,14;
218:23;219:5

**various (13)**
16:7;48:5;85:9,11;99:12;
101:16,20;110:12;111:19;
123:13;149:1;222:23;250:4

**variously (1)**
114:21

**vary (4)**
21:12;47:5;107:2;117:21

**vastly (1)**
32:2

**vehicle (6)**
182:21;184:13;224:13;
225:4;226:8,9

**vending (1)**
33:10

**Vermont (1)**
66:25

**versa (1)**
90:22

**versus (11)**
4:14;11:7;55:24;56:16;
60:12,15;64:4;76:21,21;
129:21;255:22

**via (3)**
13:10;224:12;225:3

**vice (1)**
90:22

**vicinity (1)**
219:1

**view (101)**
35:14;45:7,16,21;46:1,
13;47:17,19,21,21,22;
52:18;65:15;108:19;114:9;

121:7;131:13;133:7;
138:24;141:5;151:1,21;
152:21;153:6,8,13;155:10,
15,18;156:24;162:21;
163:7;164:23;170:5;171:1,
3,7;172:25;174:8;177:7;
182:12,15;183:9,13;185:18;
187:5,10,21;188:7,11;
189:1;190:7;192:7,8,10,11,
16,19,23;193:10,22,22;
195:3,5;196:13;198:3,9,21;
200:14;202:14;203:6;
205:4;208:12;209:7;
218:25;220:3,4;221:8,14;
224:21;225:2;226:5;
234:14;241:17;243:6;
246:2;248:23;249:6,16;
250:20;252:4,5,12,19,20,
20;253:15;255:21,22;
256:16,20

**viewpoint (1)**
222:10

**viewpoints (1)**
29:23

**views (1)**
34:3

**View's (8)**
138:19;143:14;180:15;
185:22;197:7;200:14;
202:17;203:6

**vigorous (1)**
200:20

**vigorously (1)**
113:23

**virtue (4)**
26:25;68:11;118:2,6

**voice (3)**
78:11,23;79:8

**voiced (1)**
175:9

**voicing (1)**
219:18

**void (1)**
56:23

**vote (75)**
28:22,23;33:25;34:5;
49:2;50:1;51:19,24,25;
52:22;53:14,18;71:25;
95:15;96:8;97:4;98:7,8,14,
16,17;99:14,24;102:17;
103:8;104:8;105:23;
107:25;119:15;120:12;
121:3;131:21;134:21;
137:13;139:10;142:5,7,15;
143:19,24;145:21;151:8,11,
18;152:21;154:17,24;159:2,
25;162:25;174:2;175:10;
184:23;185:5,23;187:6;
188:19;189:1,9,23;191:11;
210:8;212:20;214:21;
219:13;223:18;226:3;
232:11;234:13;241:4,5;
242:6,9;247:7,21

**voted (6)**
121:1;141:8,21;153:9;
188:21;246:2

**voter (34)**
32:8,11;53:21;68:19;
71:3;73:18;74:12;75:3;
85:20;103:13,15,17;122:14;
126:17;153:10;159:20;
163:5,19;169:24;170:9,14,
16;171:25;177:19;178:3;
196:1;206:20;242:2,7;
247:12;254:10,11;255:14;
256:3

**Voters (116)**
10:24;11:7;31:13;32:14;
33:25;34:8,20;43:23,25;
46:14,24,25;47:14,14;49:1,

2,12;55:24;60:1,15;68:20,
21;70:11,19;71:20,25;72:1,
15;75:7;82:21;97:7,16;
103:19;108:18,21;115:18,
18;117:5;122:19,21,22,22;
123:6,10,11;124:3,15;
125:3,7,12;126:7;127:2;
138:21,21;139:6;140:16;
141:6;143:4,9,13,18;144:2;
145:13,16,20;151:3;155:9,
11,19;158:8,12;159:16,17,
22,25;160:16,17,22;167:23;
170:20,23,24;171:11,11;
173:17;176:20;185:21,24;
191:3,3,7;205:16;206:13,
17;210:7;212:19;214:8,10,
16;219:6;228:24;230:10;
240:25;241:6,6;243:4,5,5;
247:1,23;248:9,11,15,17;
249:6,16

**voters' (2)**
68:13;102:17

**votes (22)**
71:11,15;120:16,19,21,
22;121:12,13,19;128:17;
130:25;134:14,17;140:22;
154:25;158:9,21;159:6;
191:9;230:7;232:16,17

**voting (292)**
20:11,15,18,19;21:7,23;
30:6;36:18,19;37:9,11,12;
41:16;43:11,15,19;44:19;
45:9;47:8;48:13;53:25;
56:24;57:8;58:22;59:1;
61:3;65:8;66:20;71:8,10,21,
24;72:17,18,22,24,25;
73:22;74:24;85:6,8,10;
87:23;92:21,22;94:18,19,
24;95:1,8,11,14;96:19,23;
97:9,12,15,19,21;98:5,22,

25;99:7,9,18;102:18,19,24,
25;103:1,4,11,25;104:25;
105:1,3,7;106:7;109:6,10;
113:13,25;114:10,25;116:1,
16;117:1,5;118:4,23;119:2,
5,7;120:17;121:1,13,20,20;
124:10,18;126:9,11,15,16,
18,21;127:14,22;128:8;
130:9,25;131:6,9;132:1,11,
20,22;133:6,15,21;134:4;
136:9,12;137:10;138:5,7,
13,19;139:9;140:8,18,22;
141:1,4;142:7,14;143:4,10,
14;145:15,22;148:6,17;
150:25;151:21,22;154:10,
24;155:5,16;157:4;158:1,4,
7,12,24;159:3,21;161:1,16,
24;162:24;163:21;164:7;
166:15,18;167:22;168:7,13;
169:8,9,10,25;170:12;
171:10;172:11,19;173:9,10,
16,17,22;174:7;175:21;
176:19,19,22;179:17;
180:25;181:1;182:14;
186:18;187:15,15,21,24;
189:3;190:11,14,18,23;
191:3,4,8,14,25;192:2,24;
198:22,23;200:3,14;203:4;
205:2,15;206:6,12,17;
207:4,17;210:17;211:15,17;
213:17;214:3,9,17,19;
216:2,2,2;217:5,16;219:7,
11,14,18;225:10,23;226:9;
228:24;229:3,5,6;230:7,8,
10,19;232:4,8,10,14,21,24;
233:5;234:14;236:11,17,23;
240:22,25;241:3,24,25;
242:13,21;243:3,10,11,16;
245:19;246:7;247:1,4,8,8,
23;248:4,12,18,21,24;

249:7,19,24;250:2,5,6,13,
21,24;251:24

**voting's (1)**
190:5

# W

**wait (5)**
35:11;98:3,4;116:10;
238:7

**waived (1)**
4:24

**waiving (2)**
5:5,6

**walk (3)**
134:15;164:5;200:2

**walkable (1)**
226:22

**walked (1)**
183:19

**walking (6)**
36:25;38:10;183:8;184:4;
224:12;225:3

**walks (1)**
98:10

**Waller (139)**
4:15;45:8;47:14;53:17;
89:10,13;90:1,2;92:1,4,20;
94:17,24;106:20;108:8;
109:12;110:14,22,23,23;
111:3,23;112:6;113:4,15;
114:2,7,8;123:5;124:3,15;
126:8,13;128:8,18;132:12,
13;133:4;138:21;141:25;
143:3,8,12,17;146:6,18;
147:13;149:14,16,20,20;
150:5,24;155:11,19,25;
157:4,21;158:6,6;160:20,
22;161:1;164:6;165:8,13,
15;166:16;170:13,24;

172:12,19;175:21;176:5,10;
179:17;182:15;183:16;
185:21;186:11,12,15;187:6;
190:3,13;192:1,18,20,24;
193:16,21;194:1,2,7,15;
196:20,24;197:4;199:21,22;
200:3,25;201:1;202:2,10;
205:4,16;208:17;210:16;
214:12,14,15,22;215:19;
218:17,19;224:10;225:22,
25;228:24;230:11,19;232:4,
8;234:3,8;236:10,16;
240:23;241:25;242:10;
243:3,9,12;250:3,25;254:1,
22;256:16

**wander (1)**
143:15

**wanted (8)**
5:4,15;42:10;76:11;
79:12;135:10;146:20;
238:20

**wants (1)**
70:21

**warrants (1)**
78:14

**Washington (1)**
22:16

**watching (1)**
167:5

**waved (1)**
121:25

**way (63)**
6:14;19:22;30:21;38:22;
41:4,6;42:21;52:18;66:5,9,
18;70:12;73:25;74:15;
76:17;80:24;81:4;82:6;
83:3;95:3;101:12;106:6;
108:23;110:6;111:6;
118:22;123:7;137:15;
138:24;141:16;147:23;

Allen v.
Waller County, Texas

James Gimpel, Ph.D.
December 12, 2019

151:2;157:9;162:6,10;
169:20;170:17;172:18;
175:8;181:23;186:24;
191:13;204:2,6,22;212:22;
218:4,22;220:8;228:1,12,
19;230:14;232:7;233:9,23;
239:12;240:25;244:11;
248:13;249:3;254:1;256:12

**ways (7)**
29:13;36:20;101:20;
157:10;166:14;172:4;
173:23

**weak (3)**
106:11;134:6,8

**weather (2)**
99:19;116:11

**Wednesday (1)**
176:23

**weeds (1)**
147:2

**week (4)**
17:8,16;69:12,14

**weeks (6)**
12:23;14:24;69:20,23;
73:9;161:19

**weigh (3)**
52:16;65:17;106:1

**weight (4)**
78:5,15;132:6,8

**weird (1)**
120:14

**well-known (5)**
46:22,23;47:2;209:2;
214:8

**weren't (4)**
57:12;64:20;101:1;182:5

**western (1)**
98:23

**whatever (1)**
141:11

**what's (19)**
16:2;37:21;71:6;80:25;
129:15;152:9;156:17,18;
168:17;189:7;191:16;
203:17;209:5;210:19;
214:15;215:16;216:9;
218:22;243:1

**whenever (1)**
97:24

**Whereupon (1)**
4:4

**wherever (1)**
162:22

**whether (71)**
5:4;16:14;19:1;21:23;
31:12;32:1;36:11;41:3;
44:20;46:4;47:12;48:17,18;
53:13;57:14,17;58:3,11;
60:9;61:12,25;63:20,22;
67:2,23;82:15;86:10,14,17;
87:12,14,18;95:2;102:6;
104:6,13,13,14;121:11;
122:12;124:2;134:2;
140:18;158:23;159:1;
161:1,2;165:4;166:18;
170:4;174:17;175:20;
176:3;178:23;183:21,25;
184:3,14,15;191:14,15;
205:1;206:18;215:20;
221:10;236:11,17;240:22,
23;241:2,4

**whimsically (1)**
29:19

**white (10)**
49:2;170:24;171:5;192:1,
3,7,12;196:19;197:19;241:5

**whites (1)**
43:6

**Whitford (3)**
8:23;60:2,17

**whole (14)**
4:7;47:5;63:21,22;95:11,
19;96:2,17;110:10;115:9;
123:23;150:13;175:6;
242:21

**whose (7)**
34:3;72:1;97:7;100:5;
122:23;175:7;221:21

**wide (1)**
148:12

**widely (2)**
47:2;148:25

**widespread (1)**
65:10

**Wiley (3)**
113:8;156:5;186:17

**wind (4)**
71:9;120:2;173:22;252:8

**winding (1)**
249:15

**window (2)**
167:14,16

**winner (2)**
71:17,18

**Wisconsin (10)**
8:24;9:3;10:19;11:19;
54:4,9,24;55:22;56:2,2

**wise (2)**
118:16;240:23

**wish (2)**
119:21;237:5

**within (26)**
35:7;45:22;59:10;65:8;
83:7;109:20;110:8,9,13;
136:20;144:8;145:13;
149:9,11;152:14;164:23;
180:3;181:12;187:13;
193:20;196:4;197:14;
225:17;226:1;243:22;
255:20

**without (7)**
143:4,9,13;169:4;189:22,
23;227:11

**witness (72)**
4:6;15:7;31:8,16;36:12,
17;37:14;38:3,8;44:2;
46:21;53:1;59:22;60:13;
63:3;66:15;67:16;70:7;
76:10;78:19;80:22;81:17;
82:3;83:25;84:16;87:22,23;
88:4;101:10;108:16;
121:16;126:23;128:10;
131:12,24;133:9;135:15;
138:1;143:6;150:12;159:5;
172:21;175:24;176:7;
178:15;184:9;187:8;188:3;
189:7;190:17;193:25;
194:25;198:6;200:17;
203:20;205:7,18;208:20;
210:5;229:5,9;235:1;
236:25;237:8;239:8,17;
243:8;248:1;249:3,21;
252:24;253:17

**witnesses (3)**
63:13,17;78:6

**Wolf (8)**
55:13,16,16,19;59:25;
60:13;76:21,22

**W-O-L-F (1)**
76:22

**Wolfinger (1)**
103:15

**Women (5)**
10:24;11:6;55:24;60:1,14

**word (5)**
33:21;39:25;67:17,22;
138:9

**words (5)**
30:4;137:11;173:24;
179:14;188:12

**work (38)**
9:2;18:1;21:16;23:18;
26:21;27:20;36:12;37:14;
39:13,15,24;42:15;50:17;
53:24;54:18;92:15,25;
100:9,9;105:21,25;111:1,4;
142:20,25;148:7;172:24;
184:16;211:15;217:3;
219:3;220:7;222:18;224:8,
11,22;225:3;245:12

**workday (1)**
98:7

**worked (6)**
20:12;54:5;73:7;100:4;
244:22;245:14

**working (8)**
11:4;85:17,18;89:9;
101:16;142:22;235:4;236:4

**works (2)**
46:19;48:18

**world (1)**
247:20

**worth (1)**
184:17

**wound (2)**
104:16;152:12

**wow (1)**
119:4

**wrapping (1)**
249:15

**write (3)**
18:22;94:11;245:24

**writing (6)**
9:16;16:11;24:8;28:1;
35:19;77:19

**written (11)**
20:16;30:8;31:19;37:21;
40:10;78:10;98:20;216:15;
218:7,8,22

**wrong (6)**

66:18;70:22;80:6;81:6;
82:21;83:10

**wrote (9)**
9:1,18,19;28:5;29:4;
85:19;212:25;213:23;
215:22

## Y

**year (19)**
9:22;24:22;34:5;56:23;
57:3;64:13,14;77:6;119:5,
6;136:23,24;137:1,2,17;
163:11;203:9,9;244:7

**years (20)**
20:25;21:3,6;22:13;
36:20;65:10;70:16;73:21;
103:5;127:20,21;129:18,21;
152:7;160:23;162:8,9;
204:12,15,18

**yellow (4)**
38:9;40:12;67:8;73:16

**yesterday (6)**
13:25;18:18;19:2,8,12;
181:17

**young (10)**
46:14,25;48:12;138:25;
139:6,9;153:20;226:23;
241:6;256:19

**younger (2)**
42:8;214:10

**yourself (5)**
53:7;69:22;195:2;244:19;
252:15

**youth (2)**
47:14;169:24

## Z

**zero (1)**

62:2

**ZIP (1)**
255:10

**zones (2)**
227:15,16

## 1

**1 (8)**
12:25;13:3;25:23;26:7;
65:9;77:23;92:16;212:10

**1,772 (1)**
190:6

**1:00 (1)**
14:1

**1:18-CV-456-LEW (1)**
64:5

**10 (4)**
55:13;105:15;107:7;
115:21

**100 (1)**
65:9

**101 (1)**
246:20

**107 (1)**
77:15

**1098 (1)**
166:8

**12 (9)**
7:22;24:3;103:12;105:15;
115:21;173:18;217:13;
223:24;224:5

**12.6 (2)**
224:11;225:5

**12:13 (1)**
88:14

**12:54 (1)**
89:2

**13 (3)**
24:3;192:19;244:7

**13.59 (1)**
192:18

**130 (2)**
18:7,9

**14 (7)**
64:22;65:2;109:5;135:22;
145:8;146:3;224:17

**14th (1)**
124:7

**15 (7)**
21:3,5;92:17;93:21;
103:12;105:15;145:19

**15th (1)**
124:7

**16 (5)**
135:21;145:19;160:21;
224:7,21

**17 (1)**
244:7

**17th (2)**
209:14,24

**18 (25)**
46:8,14;47:9;122:10,12,
15,21,22;123:5,9;135:21;
139:12;160:21;192:16,17,
19,20;243:4,5;255:22,22;
256:5,5,11,12

**18.5 (2)**
196:9;198:17

**1850 (1)**
202:23

**1870 (1)**
202:1

**1876 (1)**
193:16

**19 (1)**
47:9

**1950 (3)**
202:1,21,24

**1950s (2)**

149:14;204:4

**1953 (1)**
58:6

**1960s (1)**
32:9

**1964 (1)**
32:18

**1990s (2)**
132:11;149:17

**1998 (1)**
163:14

**1999 (1)**
28:5

---

## 2

**2 (11)**
25:1,5;26:2,16;51:15;
77:23;92:8;102:12;124:18;
144:22;203:4

**2,000 (1)**
226:18

**20 (22)**
21:4;47:9;107:8;109:12;
122:22;128:18,21;130:24;
131:2;146:6;160:21;
179:21;180:3;192:19,20;
222:6,21,24;243:5,5;
255:22,22

**2000 (4)**
24:21,22,22;114:20

**2002 (5)**
28:19;30:8;139:25;
166:16;168:8

**2003 (4)**
37:3,4;163:14;211:6

**2004 (1)**
41:21

**2005 (2)**
37:7;214:4

**2006 (2)**
37:9;139:25

**2008 (2)**
189:11;190:3

**2010 (2)**
139:25;192:15

**2011 (1)**
23:10

**2012 (4)**
19:23;188:22;189:11;
191:7

**2013 (1)**
58:7

**2014 (5)**
132:5;136:9,10;139:25;
160:21

**2015 (3)**
203:3,7,10

**2016 (15)**
107:16;130:23;131:5,9,
20;132:19,23;133:4,4,6,14;
140:3,7,9;141:2

**2017 (2)**
11:16;19:22

**2018 (43)**
76:23;92:22;94:19;95:5;
107:16;121:15;126:10;
127:15;128:17,24;130:7;
131:5,9,20;133:12,13,14,
22;136:2,3;137:16;139:3,3;
140:2,7;141:3,7,20,22,25;
146:25;151:6,13,22;152:10;
154:9;167:19;188:16,22;
233:5;242:10;243:4;250:20

**2019 (5)**
8:20;9:23;17:8;26:4;
40:11

**2020 (4)**
130:11,15;136:4;137:17

**2022 (1)**

136:5

**207 (1)**
246:22

**20-year-olds (10)**
46:14;122:10,13,15;
123:6,9;192:16,18;256:5,12

**21 (1)**
112:11

**22 (1)**
160:21

**23 (1)**
224:9

**24 (4)**
160:21;197:4;256:5,11

**24-year-old (1)**
122:21

**24-year-olds (1)**
46:8

**25 (5)**
72:17,20,20,22;75:17

**250 (1)**
19:24

**254 (1)**
111:9

**26 (1)**
67:7

**26th (3)**
123:15,17;124:2

**27 (4)**
68:4;74:17;192:24;193:4

**28 (3)**
113:14;147:13;166:4

**284 (1)**
76:22

**29 (1)**
139:13

---

## 3

**3 (10)**

40:11;64:3,8;206:21;
211:11,14;212:11,16;227:8;
240:18

**3:00 (1)**
14:1

**30 (9)**
19:15;20:25;34:6;37:9,
23;38:7;107:8;129:18,21

**30,000 (1)**
146:11

**309 (28)**
121:4,10;122:25;125:14,
25;126:3;128:17;130:7,9,
24;131:5,22;132:20;
135:13;137:24;138:6,19;
151:2,18;173:24;174:1,6;
190:4,6,9;191:7;252:17;
256:5

**30b5 (2)**
5:1,7

**30-page (1)**
65:1

**31 (3)**
37:8,23;38:7

**310 (2)**
151:2;252:17

**32 (3)**
114:24;148:5;192:3

**32.1 (1)**
192:1

**34 (1)**
41:21

**35 (5)**
37:4,5,23;38:7;52:6

**36 (1)**
169:3

**3d (1)**
76:22

## 4

**4 (3)**
76:16,25;167:25
**40 (6)**
116:17;148:16;206:13,
16,21;207:2
**44 (1)**
167:25
**45 (1)**
245:24
**46.5 (1)**
225:2
**46.8 (1)**
224:21
**471 (1)**
211:13
**473 (2)**
211:12,22
**475 (1)**
213:2
**48 (3)**
150:21;154:8;156:13
**488 (1)**
211:13
**49 (2)**
156:13,23
**4th (1)**
190:3

## 5

**5 (6)**
108:1;166:17;194:16;
210:20,24;213:1
**5:48 (1)**
257:4
**50 (4)**
21:17;23:23;70:16;

246:21
**50s (1)**
137:23
**51 (2)**
191:23;192:3
**51,000 (1)**
111:11
**51.6 (1)**
191:25
**537 (2)**
214:6,25
**538 (1)**
215:2
**54 (1)**
192:19
**54.33 (1)**
192:17
**542 (1)**
215:2
**55 (2)**
77:13,16

## 6

**6 (9)**
26:16,17;108:1;112:11;
196:7;205:20,23;213:23,24
**64 (1)**
64:5
**65 (1)**
52:6
**65/35 (1)**
52:6
**6th (1)**
69:11

## 7

**7 (4)**
148:22;223:24,25;243:18

**7.6 (1)**
192:7
**70 (1)**
192:11
**74.4 (1)**
224:8
**75/25 (2)**
73:23;75:15
**79.7 (1)**
224:9
**798 (1)**
190:10
**7th (1)**
18:14

## 8

**8 (9)**
103:12;108:1;148:22;
163:14,14;203:4;214:5;
240:10,13
**80 (2)**
192:8,12
**81 (2)**
224:7,23
**82 (5)**
196:13;197:8;198:3,10,
11
**85/15 (1)**
153:3
**85-year-olds (1)**
256:8

## 9

**9 (3)**
107:17;109:8;145:8
**90/10 (1)**
153:3
**92 (1)**

24:22
**951 (1)**
76:22
**9th (1)**
18:14