PLAINTIFF'S EXHIBIT 40

376 F.Supp.3d 125
United States District Court, D. Maine.

Brett **BABER**, et al., Plaintiffs
v.
Matthew **DUNLAP**, et al., Defendants

NO. 1:18-CV-465-LEW
|
Signed 12/13/**2018**

**Synopsis**
**Background:** Congressional candidate and voters brought action against Secretary of State, alleging that Ranked-Choice Voting Act was unconstitutional and violated the Voting Rights Act. Candidate and voters moved for preliminary and permanent injunctive relief.

**Holdings:** The United States District Court for the District of Maine, Lance E. Walker, J., held that:

[1] ranked-choice voting did not exceed State's constitutional authority to prescribe times, places, and manner of elections;

[2] ranked-choice voting did not violate candidate's rights under Equal Protection Clause;

[3] ranked-choice voting did not violate due process;

[4] ranked-choice voting did not violate First Amendment.

Motions denied.

West Headnotes (21)

[1]  **Election Law**  ⟶  Conduct of Election
States, in exercising their Article I authority, are not required to conduct local and national elections in the same manner. U.S. Const. art. 1, § 4, cl. 1.

[2]  **Election Law**  ⟶  Acts requiring preclearance

The Voting Rights Act subjects certain states to preclearance oversight when they enforce a new voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting. Voting Rights Act of 1965 § 5, 52 U.S.C.A. § 10304.

[3]  **United States**  ⟶  Relation to state law; preemption

The First Article of the Constitution, in effect, assigns to the People of the several States the authority to choose their representatives to the national Congress, and directs that the States shall prescribe the times, places, and manner by which representatives are chosen. U.S. Const. art. 1, § 4, cl. 1.

1 Cases that cite this headnote

[4]  **States**  ⟶  Public officers and employees; elections
**United States**  ⟶  Relation to state law; preemption

Though Congress has the power to regulate state elections, if there be no overruling action by the Congress then suitable regulations may be provided by the Legislature of the state upon the same subject. U.S. Const. art. 1, § 4, cl. 1.

1 Cases that cite this headnote

[5]  **States**  ⟶  Public officers and employees; elections
**United States**  ⟶  Relation to state law; preemption

The power of Congress over the "Times, Places and Manner" of congressional elections is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith. U.S. Const. art. 1, § 4, cl. 1.

[6]  **Election Law**  ⟶  Mode of voting in general

**Election Law** ⚷ Number of votes necessary to choice

**United States** ⚷ Relation to state law; preemption

Ranked-choice voting, which required majority of voters instead of just plurality of voters to win congressional race, did not exceed State's constitutional authority to prescribe times, places, and manner by which representative was chosen; constitution did not set forth comprehensive mandate for running federal elections or dictate plurality standard, and Constitution did not determine whether ranked-choice voting was better method for holding elections. U.S. Const. art. 1, § 2, cl. 1; U.S. Const. art. 1, § 4, cl. 1; 21-A Me. Rev. Stat. § 723-A.

[7] **Civil Rights** ⚷ Substantive or procedural rights

Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. 42 U.S.C.A. § 1983.

[8] **Constitutional Law** ⚷ Elections, Voting, and Political Rights

When it comes to voting rights, the bedrock principle of the Equal Protection Clause is that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction. U.S. Const. Amend. 14.

[9] **Constitutional Law** ⚷ Conduct of Elections

A state violates the Equal Protection Clause where a manner of election is enacted that impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters. U.S. Const. Amend. 14.

[10] **Constitutional Law** ⚷ Conduct of Elections
**Election Law** ⚷ Mode of voting in general

**Election Law** ⚷ Number of votes necessary to choice

Ranked-choice voting, which required majority of voters instead of just plurality of voters to win congressional race, did not violate candidate's rights under Equal Protection Clause, where candidate's votes did not receive less weight, ranked-choice voting was designed with aim of providing just framework within which diverse political groups in society could fairly compete, and ranked-choice voting was not enacted with purpose of assisting one particular group in its struggle with its political opponents. U.S. Const. Amend. 14; 21-A Me. Rev. Stat. § 723-A.

[11] **Election Law** ⚷ Discrimination; Voting Rights Act

**Election Law** ⚷ Dilution of voting power in general

The vote cast by each voter must have equal weight; no vote should be disadvantaged or diluted because of the voter's membership in a demographic group or another arbitrary factor.

[12] **Election Law** ⚷ Mode of voting in general

"One person, one vote" does not stand in opposition to ranked balloting, so long as all electors are treated equally at the ballot.

[13] **Election Law** ⚷ Number of votes necessary to choice

There is nothing inherently improper about an election that requires a contestant to achieve victory by a majority.

[14] **Election Law** ⚷ Time for holding election

It is not unconstitutional for an election to be determined in more than one round, provided that the official election takes place on federal election day.

[15]  **Constitutional Law**  Voters, candidates, and elections

**Election Law**  Mode of voting in general

**Election Law**  Number of votes necessary to choice

Ranked-choice voting, which required majority of voters instead of just plurality of voters to win congressional race, did not violate due process, despite contention that significant segment of voting public could not comprehend voting system sufficiently to cast a meaningful vote; even though there were several thousand voters that cast invalid overvotes or undervotes, it was plausible that those voters were making political expression or protest votes, and voting system was not so opaque and bewildering that it deprived class of citizens of fundamental right to vote. U.S. Const. Amend. 14; 21-A Me. Rev. Stat. § 723-A.

[16]  **Constitutional Law**  Arbitrariness

The Due Process Clause prohibits governmental activity that is arbitrary or purposeless. U.S. Const. Amend. 14.

[17]  **Civil Rights**  Due process of law and equal protection

**Constitutional Law**  Voters, candidates, and elections

If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

[18]  **Constitutional Law**  Ballots and ballot access

The Constitution does not require an easy ballot.

[19]  **Constitutional Law**  Elections, voting, or ballot access in general

**Election Law**  Mode of voting in general

**Election Law**  Number of votes necessary to choice

Ranked-choice voting, which required majority of voters instead of just plurality of voters to win congressional race, did not violate First Amendment, despite certain voters' contention that system gave other voters disproportionate expression; voting system was product of a citizens' initiative and was motivated by desire to enable third-party and non-party candidates to participate in political process without producing spoiler effect, which actually encouraged First Amendment expression, without discriminating against any voter based on viewpoint, faction, or other invalid criteria, and there was no burden on voters' First Amendment right to express themselves in election. U.S. Const. Amend. 1; 21-A Me. Rev. Stat. § 723-A.

1 Cases that cite this headnote

[20]  **Constitutional Law**  Voting rights and suffrage in general

Under the First Amendment, nondiscriminatory regulations that burden the right of individuals to vote must be weighed against the precise interests put forward by the State as justifications for the burden imposed by its rule. U.S. Const. Amend. 1.

[21]  **Constitutional Law**  Elections in general

The Ranked-Choice Voting Act is not subject to strict scrutiny under the First Amendment. U.S. Const. Amend. 1; 21-A Me. Rev. Stat. § 723-A.

**Attorneys and Law Firms**

**\*128** Joshua A. Tardy, Irwin Tardy & Morris, Newport, ME, Andrew G. Woodson, Eric Wang, Pro Hac Vice, Lee E. Goodman, Wiley Rein LLP, Washington, DC, Joshua A. Randlett, Rudman & Winchell, Bangor, ME, for Plaintiffs.

Phyllis Gardiner, Thomas A. Knowlton, Office of the Attorney General Six State House Station, Augusta, ME,

Patrick N. Strawbridge, Consovoy McCarthy Park PLLC, Boston, MA, for Defendants.

## DECISION AND ORDER ON MOTION FOR PRELIMINARY INJUNCTION

Lance E. Walker, U.S. District Judge

Although the Court scheduled the hearing on December 5, **2018** to address Plaintiffs' Motion for Preliminary Injunction, the parties agreed that the question of injunctive relief should be consolidated with a final ruling on the merits of the action. Therefore, pursuant to Rule 65(a)(2), this Decision and Order will be accompanied by a final judgment in favor of Defendants.

**Background**

 **[1]**   On November 6, **2018**, the State of Maine held a general election at which races for federal office were governed by Maine's "Act to Establish Ranked-Choice Voting" ("RCV Act").[1] This new manner of holding federal elections[2] is the product of a popular initiative, the history of which has been set forth previously and is not repeated here.[3] *See, e.g.,* **\*129** *Maine Republican Party v.* ***Dunlap****,* 324 F.Supp.3d 202, 204–06 (D. Me. **2018**); *Maine Senate v. Sec'y of State,* 183 A.3d 749 (Me. **2018**); *Opinion of the Justices,* 162 A.3d 188 (Me. 2017). Under the RCV system employed in Maine, when there are three or more candidates on the ballot, a candidate cannot be declared the winner of the election following tabulation of the votes without securing a majority of the ballots validly cast (i.e., excluding ballots invalidated due to overvotes (marking more than one candidate at the same level of ranking) or undervotes (failing to rank a candidate) ). 21-A M.R.S. § 723-A.

Plaintiffs, Brett **Baber**, Terry Hamm-Morris, Mary Hartt, and Bruce Poliquin, are residents of Maine's Second Congressional District. Plaintiffs participated in Maine's November 6, **2018**, general election, at which each cast a vote for Bruce Poliquin to continue serving as Representative of the Second Congressional District in the United States House of Representatives. They maintain that the RCV Act is unconstitutional, both facially and as applied, and that it violates the Voting Rights Act. They maintain that the ballot form and instructions were too confusing and that the manner by which Defendant **Dunlap** tabulated the votes diluted the votes cast by Poliquin supporters and otherwise disenfranchised too many Maine voters to withstand scrutiny.

The ballot for the Second District house race provided a choice among four candidates, a space to enter a write-in candidate, and a manner by which to rank the candidates, in the following form:

| Rep. to Congress District 2 | 1st Choice | 2nd Choice | 3rd Choice | 4th Choice | 5th Choice |
|---|---|---|---|---|---|
| Bond, Tiffany L.<br>Portland<br>Independent | ○ | ○ | ○ | ○ | ○ |
| Golden, Jared F.<br>Lewiston<br>Democratic | ○ | ○ | ○ | ○ | ○ |
| Hoar, William R.S.<br>Southwest Harbor<br>Independent | ○ | ○ | ○ | ○ | ○ |
| Poliquin, Bruce<br>Oakland<br>Republican | ○ | ○ | ○ | ○ | ○ |
| Write-in | ○ | ○ | ○ | ○ | ○ |

The ballot included the following instructions:

 **\*130**  **Instructions to Voters**

...

To rank your candidate choices, fill in the oval:

• In the 1st column for your 1st choice candidate.

• In the 2nd column for your 2nd choice candidate, and so on.

Continue until you have ranked as many or as few candidates as you like.

Fill in no more than one oval for each candidate or column.

...

Plaintiffs each filled in the circle for Bruce Poliquin shown in the first-choice column of the ballot. They did not fill in any other circles. Many other voters took the same approach. Some voters expressed equivalent support for Mr. Poliquin, but filled in the Poliquin circle in every column of the ballot. These voters, in other words, elected not to rank any candidate other than their preferred candidate. Other voters expressed their support for the other candidates in the same fashion. Many other voters chose to rank every candidate. In all, given five potential candidates and five columns, there were 120 different orders in which to rank the candidates, assuming one nominated a write-in and then went on to rank every candidate. There were several other ways in which one might

respond to the ballot. For example, 5,582 voters submitted their ballots without filling in any circles.

Following the election, Defendant Dunlap oversaw a process in which his office gathered the ballots and tabulated the election results. On November 7, Defendant Dunlap announced that, based on the tabulation of all "first choice" votes, no contestant in the race achieved victory by a majority. The results of the initial tabulation were as follows:

| Candidate | Votes |
| --- | --- |
| Bruce Poliquin | 134,184 |
| Jared Golden | 132,013 |
| Tiffany Bond | 16,552 |
| William Hoar | 6,875 |
| TOTALS | 289,624 [4] |

[**Editor's Note:** The preceding image contains the reference for footnote [4]].

 **\*131**  Pursuant to the RCV Act, because no candidate achieved a majority, Defendant Dunlap was required to conduct a further tabulation of the votes. Because it was mathematically impossible for Ms. Bond or Mr. Hoar to be elected, Defendant Dunlap performed a "batch elimination" of those candidates. *Id.* § 723-A(1)(A). He then reviewed the ballots in which the eliminated candidates were named as first choice, to determine if those ballots indicated a preference between the remaining two candidates, Mr. Poliquin and Mr. Golden. If so, then those ballots were redistributed accordingly.[5] On November 26, 2018, Defendant Dunlap published and certified a final tabulation of the votes. The results were as follows:

| Candidate | Votes | Percentage |
| --- | --- | --- |
| Jared Golden | 142,440 | 50.62% |
| Bruce Poliquin | 138,931 | 49.38% |
| TOTALS | 281,371 [6] | 100% |

[**Editor's Note:** The preceding image contains the reference for footnote [6]].

Because the Secretary of State certified Jared Golden as the winner of the RCV election, Plaintiff Bruce Poliquin requested a recount pursuant to 21-A M.R.S. § 737-A. The recount is under way at this time.

The matter came on for hearing on December 5, 2018. Before hearing oral argument, the Court permitted Plaintiffs to call to the witness stand Dr. James G. Gimpel, Ph.D., a professor at the University of Maryland – College Park. Among other areas of expertise, Dr. Gimpel is well studied in the area of voter behavior. Dr. Gimpel testified that alternative systems for conducting elections, such as RCV, are generally considered by their proponents to be "systems to enhance participation." According to Dr. Gimpel, interest in these systems is growing and, undoubtedly, will lead to more litigation like the litigation now before this Court. Dr. Gimpel has formed the opinion that RCV (or "instant runoff") systems do not offer advantages over a plurality system, or over a majority system that resolves close elections by means of an actual run-off. The primary flaw he sees in RCV is that, unlike ordinary elections and ordinary runoffs, voters are required to make predictions about who will be left standing following an initial tabulation of the votes. **\*132** While Dr. Gimpel concedes that many voters have sufficient information to make reliable predictions, he believes that a portion of the voting public has insufficient interest and information to make a meaningful assessment about likely outcomes. In his view, RCV is "flat out unfair to the uninformed voter." He also maintains that the instructions Defendant Dunlap provided with the ballot leave such voters "clueless."

Dr. Gimpel contends that the data of voting behavior for this election (i.e., the ballots in this election) reinforce his opinion. He observes that thousands of voters cast ballots that were invalid, and that the most logical inference is that those voters guessed wrong due to an information deficit. Dr. Gimpel presumes that the voters in this category are predominantly independent voters, meaning they have no party affiliation. By his reasoning, independent voters such as Ms. Bond and Mr. Hoar's supporters are, on average, less informed on the issues.[7] According to Dr. Gimpel, this information deficit is demonstrated by the fact that many of the voters who identified Ms. Bond or Mr. Hoar as their first choice neglected to rank another candidate. In his view, this is proof that they believed Ms. Bond or Mr. Hoar would be victorious. He finds

it hard to believe that voters would "drop out like this" if they were presented with a simple choice between a Republican candidate and a Democratic candidate.[8] On the other hand, he also testified that independent voters, on average, are not as likely to turn out for elections in the first place.[9]

On cross examination, Dr. Gimpel testified that he did not interview or consider any interviews or studies of actual Maine voters, but that, remarkably, he would like to develop a survey to evaluate what voters were thinking. When asked to articulate why the ballot and the voting instructions were confusing, Dr. Gimpel testified that the worst thing about the ballot and instructions is what was omitted from the instructions. In particular, Dr. Gimpel suggested the instructions should have explained the various ways in which a vote could be invalidated. Dr. Gimpel was asked to evaluate Plaintiffs' contention that RCV is flawed because it fails to produce "monotonic" results.[10] Dr. Gimpel testified that **\*133** he did not detect a monotonicity problem in this particular election. Finally, Dr. Gimpel opined that when one considers Plaintiffs individually, the reasonable conclusion is that they were not disenfranchised by RCV, but rather were full participants in the election.[11]

**Discussion**

**A. Voting Rights Act**

 **[2]**   In addition to their constitutional challenges to the RCV Act, Plaintiffs allege that the Act deprived them of rights protected under the Voting Rights Act. The Voting Rights Act subjects certain states to "preclearance" oversight when they enforce a new "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." *Presley v. Etowah Cty. Comm'n*, 502 U.S. 491, 494, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992) (quoting 52 U.S.C. § 10304). Additionally, individuals can bring suit to prevent "any State or political subdivision" from imposing any electoral practice "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) [concerning language minority groups]." 52 U.S.C. § 10301(a). "The Voting Rights Act 'implemented Congress' firm intention to rid the country of racial discrimination in voting.' " *Hathorn v. Lovorn*, 457 U.S. 255, 268, 102 S.Ct. 2421, 72 L.Ed.2d 824 (1982) (quoting *Allen v. State Board of Elections*, 393 U.S. 544, 548, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) ). Plaintiffs have not alleged facts or otherwise shown that the Voting Rights Act has any application to this case.[12]

**B. U.S. Constitution, Article I**

Article I, section 2, clause 1 of the Constitution provides, in relevant part, as follows: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States...." Furthermore, Article I, section 4, clause 1, provides: "The Times, Places and Manner of holding Elections **\*134** for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." Concerning section 4, clause 1, the Supreme Court has explained:

> It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.... All this is comprised in the subject of "times, places and manner of holding elections," and involves lawmaking in its essential features and most important aspect.

*Smiley v. Holm*, 285 U.S. 355, 366, 52 S.Ct. 397, 76 L.Ed. 795 (1932). *See also Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8, 133 S.Ct. 2247, 186 L.Ed.2d 239 (2013).

 **[3]**   **[4]**   **[5]**   The First Article of the Constitution, in effect, assigns to the People of the several States the authority to choose their representatives to the national Congress, and directs that the States shall prescribe the times, places, and manner by which representative are chosen. Though Congress has the power to regulate state elections, "if there be no overruling action by the Congress" then suitable regulations "may be provided by the Legislature of the state upon the same subject." *Smiley,* 285 U.S. at 367, 52 S.Ct. 397.[13] This is one example of the ingenious manner by which the framers divided sovereignty between the federal and state governments.

**[6]** Plaintiffs argue that the force of history calls for the Court to interpret Article I as requiring a plurality or "first-past-the-post" standard for deciding election results. There is no textual support for this argument and a great deal of historical support to undermine it. As a practical observation, it is curious that states which still utilize a majority standard have managed to escape constitutional scrutiny under Article I. The American experiment in republican–representative government neither began nor ended with ratification of the Constitution. The values that informed Article I not only inspired the Revolution, but also continued a purposeful evolution in our national experiment in representative government. It is clear from The Federalist Papers and other public debates leading up to the ratification of the Constitution that federalism was its intellectual lodestar and was to act as a bulwark against the perceived threat of centralized political authority by allowing for political tolerance. Therefore, the powers delegated by the Constitution to **\*135** the federal government were few and defined.

The delegates to the Continental Congress debated vigorously the wording of Article I.[14] When one considers the origins and objectives of our Constitution, and the principles of federalism that informed its text and structure, it is no accident that Article I does not set forth a comprehensive mandate for running federal elections, let alone dictate the plurality standard.

In the early days of the Republic, paper ballots were a new and welcome innovation in some states, and the secret ballot had not gained general acceptance. *John Doe No. 1 v. Reed,* 561 U.S. 186, 225, 130 S.Ct. 2811, 177 L.Ed.2d 493 (2010) (Scalia, J., concurring). Only a subset of adult males were entitled to vote. There was no uniform election day. As the nation evolved, so too did the manner by which states conducted elections. Many states gravitated toward plurality systems. Others aspired to a majority and were willing to assume the burden of a run-off election to obtain that result. Gradually, the suffrage was expanded to unpropertied men, to women, and to minorities. In time, non-party candidates gained access to the ballot. Many of these changes were marked by considerable social upheaval, and many long-settled expectations were gradually, if not precipitously, undone by changes in popular sentiments.

Whether RCV is a better method for holding elections is not a question for which the Constitution holds the answer. By design, the freedoms and burdens of self-governance leave normative questions of policy to be worked out in the public square and answered at the ballot box. To the extent that the Plaintiffs call into question the wisdom of using RCV, they are free to do so but for the reasons that I have indicated previously and upon which I elaborate presently, such criticism falls short of constitutional impropriety. A majority of Maine voters have rejected that criticism and Article I does not empower this Court to second guess the considered judgment of the polity on the basis of the tautological observation that RCV may suffer from problems, as all voting systems do. The proper question for the Court is whether RCV voting is incompatible with the text of Article I by giving the language its plain and ordinary meaning. *D.C. v. Heller,* 554 U.S. 570, 576, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (quoting *United States v. Sprague,* 282 U.S. 716, 731, 51 S.Ct. 220, 75 L.Ed. 640 (1931) ("The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.") ).

**\*136** Article I is perfectly silent as to a prescribed method by which the States must elect their representatives. Plaintiffs urge that I must fill this void because section 2, as they put it, "must mean something." This position is premised on the dubious notion that the framers could not have intended to reserve for the States so much freedom as to choose how they elect their representatives to the Congress. This is a peculiar argument for Plaintiffs to make and one which is deeply belied by the extensive historical record leading to the adoption of the Constitution. The argument also is faulty insofar as it assumes that section 2 cannot be reconciled or comprehended without grafting onto its plain language a mandate for states to employ a plurality standard of conducting elections. The framers knew how to distinguish between plurality and majority voting, and did so in other contexts in the Constitution, which leads to the sensible conclusion that they purposefully did not do so in Article I, section 2. Plaintiffs' argument also overlooks the profound influence of federalism on the development and ratification of the Constitution, which is evident in its text and structure.

Exercising the power vested in them by Article I, "[t]he people, in several States, functioning as the lawmaking body for the purpose at hand, have used the initiative to install a host of regulations governing the 'Times, Places and Manner' of holding federal elections," *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,* ––– U.S. ––––, 135 S.Ct. 2652, 2676, 192 L.Ed.2d 704 (2015), and the people of Maine are no exception.[15] Plaintiffs contend that RCV is too

exotic to fit within the meaning of Article I. Plaintiffs argue that over 100 years of wide-spread acceptance of plurality elections should not be undone by new ideas concerning the manner of holding elections. Plaintiffs attempt to prove the point through scholarly debate about the disadvantages of RCV. In my view, these arguments are policy considerations that the people and their representatives should weigh and assess when devising the best manner for holding elections. It is precisely why I find Dr. Gimpel's testimony to be unpersuasive in its entirety, at least as bearing on problems of constitutional magnitude. I have no doubt that Dr. Gimpel will contribute his enthusiasm and ability to the development of this area of political science and voter behavior to develop conclusions based on rigorous methodology, study, debate, and time. For now, given the authority vested in the People of Maine under Article I, section 2 to choose their representatives, and given the authority vested in the People and the State under Article I, section 4 to determine the manner by which representatives are elected, I fail to see how Article I lends support to Plaintiffs' cause to have a federal court invalidate the results of Maine's second district house race.[16]

 **\*137** Plaintiffs' appeal to historical practices of plurality voting is not, standing alone, enough to elevate their policy criticism of RCV to a constitutional crisis. First, there are historical antecedents for majority and plurality standards in American politics, including in New England.[17] Second, a positivist characterization of the plurality standard that Maine has used for over 100 years does not lead to the ineluctable conclusion that any deviation from the practice is unconstitutional.

In the final analysis, RCV is not invalidated by Article I because there is no textual support for such a result and because it is not inherently inconsistent with our Nation's republican values. In fact, the opposite is true. In discussing the dangers of political factions to a "wellconstructed Union," James Madison made some observations that are worth considering when evaluating the bona fides of ranked-choice voting.

> Extend the sphere, and you take in a greater variety of parties and interests; you make it less probable that a majority [and under plurality, a minority] of the whole will have a common motive to invade the rights of other citizens; or if such a common motive exists, it will be more difficult for all who feel it to discover their own strength, and to act in unison with each other. Besides other impediments, it may be remarked that [faction] is always checked by distrust in proportion to the number whose concurrence is necessary.

The Federalist No. 10.[18]

Madison's concern for a political system that checked the power of factions is as timely today as it was in the Eighteenth Century. Maine's RCV Act reflects the view of a majority of the voting public in Maine that their interests may be better **\*138** represented by the candidate who achieves the greatest support among those who cast votes, than by the candidate who is first "past the post" in a plurality election dominated by two major parties. By requiring the concurrence of more than a plurality of voters, the People of Maine have not exceeded the authority vested in them under Article I, sections 2 and 4, and they have not violated any regulation issued by Congress under section 4.

### C. Fourteenth Amendment

 **[7]** Although I find that the RCV Act is not incompatible with Article I, I must still consider whether Defendant **Dunlap's** implementation of RCV in the November 6, **2018** election deprived Plaintiffs of individual rights protected by the Fourteenth Amendment. These claims arise under the federal civil rights statute, which states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, ....

42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Plaintiffs contend Defendant **Dunlap's** application of RCV to the Second District house race deprived them of rights guaranteed under the Fourteenth Amendment's Equal Protection Clause and Due Process Clause, and under the First Amendment, which is incorporated into the substantive protection the Fourteenth Amendment extends to citizens in their dealings with the state governments.[19]

#### 1. Equal Protection

**[8]** **[9]** When it comes to voting rights, the bedrock principle of the Equal Protection Clause is that "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). A state violates the Clause where a manner of election is enacted that "impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters." *Johnson v. De Grandy*, 512 U.S. 997, 1007, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (internal quotations omitted) (applying Section 2 of the Voting Rights Act); *see also Hunter v. Erickson*, 393 U.S. 385, 391, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969) (equal protection affords all citizens the right to "vote, on an equal basis with others"). Most of what the Supreme Court has said on the topic of equal protection in the election context has related to concerns over balancing majority and minority interests, and much of that language is germane to the issue of whether the will of the People can be expressed through a ranked-choice election process that seeks to understand what, exactly, is the majority will. For example:

> ***139** Logically, in a society ostensibly grounded on representative government, it would seem reasonable that a majority of the people of a State could elect a majority of that State's legislators. To conclude differently, and to sanction minority control of state legislative bodies, would appear to deny majority rights in a way that far surpasses any possible denial of minority rights that might otherwise be thought to result. Since legislatures are responsible for enacting laws by which all citizens are to be governed, they should be bodies which are collectively responsive to the popular will. And the concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged. With respect to the allocation of legislative representation, all voters, as citizens of a State, stand in the same relation regardless of where they live. Any suggested criteria for the differentiation of citizens are insufficient to justify any discrimination, as to the weight of their votes, unless relevant to the permissible purposes of legislative apportionment. Since the achiev[ement] of fair and effective representation for all citizens is concededly the basic aim of legislative apportionment, we conclude that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators.

*Reynolds v. Sims*, 377 U.S. 533, 565–66, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

**[10]** Citing *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), Plaintiffs maintain that the RCV Act will deprive them of equal protection under the law.[20] They recite:

> The Fourteenth Amendment's guarantee of equal protection of the laws means that a "State may not, by [ ] arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 [21 S.Ct. 525, 148 L.Ed.2d 388] (2000) (citing *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 665 [86 S.Ct. 1079, 16 L.Ed.2d 169] (1966) ). "The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." *Id.* at 107 [121 S.Ct. 525] (quoting *Moore v. Ogilvie*, 394 U.S. 814, 819 [89 S.Ct. 1493, 23 L.Ed.2d 1] (1969) (brackets omitted) ).

Motion for Preliminary Injunction at 14.

**[11]** The "one person, one vote" principle is well established in the law. In *Gray v. Sanders*, 372 U.S. 368, 374, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), the Supreme Court declared as unlawful a state election system that weighed rural votes more heavily that urban votes, and votes from the smallest rural counties more heavily than those from the larger rural counties. *Id.* at 379, 83 S.Ct. 801. While the *Gray* Court recognized the one person, one vote concept, its point was that "equality of voting power" must be preserved. *Id.* at 381, 83 S.Ct. 801. In other words, the vote cast by each voter must have equal weight; no vote should be disadvantaged (or "diluted") because of the voter's membership in a demographic group or another arbitrary factor. *See also* ***140** *Moore*, 394 U.S. at 816, 89 S.Ct. 1493 ("The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government.").

**[12]** In *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the Court invalidated a system of electing congressional representatives where congressional districts were of markedly different populations, such that one district's representative would represent two-to-three times as many people as another district's representative. The Court explained:

> Soon after the Constitution was adopted, James Wilson of Pennsylvania, by then an Associate Justice of this Court, gave a series of lectures at Philadelphia in which, drawing on his experience as one of the most active members of the Constitutional Convention, he said:

'(A)ll elections ought to be equal. Elections are equal, when a given number of citizens, in one part of the state, choose as many representatives, as are chosen by the same number of citizens, in any other part of the state. In this manner, the proportion of the representatives and of the constituents will remain invariably the same.'

It is in the light of such history that we must construe Art. I, s 2, of the Constitution, which, carrying out the ideas of Madison and those of like views, provides that Representatives shall be chosen 'by the People of the several States' and shall be 'apportioned among the several States * * * according to their respective Numbers.' It is not surprising that our Court has held that this Article gives persons qualified to vote a constitutional right to vote and to have their votes counted.... Not only can this right to vote not be denied outright, it cannot, consistently with Article I, be destroyed by alteration of ballots.... No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right. In urging the people to adopt the Constitution, Madison said in No. 57 of The Federalist:

'Who are to be the electors of the Federal Representatives? Not the rich more than the poor; not the learned more than the ignorant; not the haughty heirs of distinguished names, more than the humble sons of obscure and unpropitious fortune. The electors are to be the great body of the people of the United States. * * *'

Readers surely could have fairly taken this to mean, 'one person, one vote.' Cf. *Gray v. Sanders*, 372 U.S. 368, 381 [83 S.Ct. 801].

*Wesberry*, **376** U.S. at 17–18, 84 S.Ct. 526 (some citations omitted). To the list provided by Madison, one might add, not the party-enrolled more than the unenrolled. The point is that "one person, one vote" does not stand in opposition to ranked balloting, so long as all electors are treated equally at the ballot. See *Hadley v. Jr. Coll. Dist. of Metro. Kansas City*, 397 U.S. 50, 56, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) ("[A]s a general rule, whenever a state or local government decides to select persons by popular election ..., the Equal Protection Clause ... requires that each qualified voter must be given an equal opportunity to participate in that election, and ... each district must be established [so] that equal numbers of voters can vote for proportionally equal numbers of officials.").

Plaintiffs insist that their votes received less weight. However, Plaintiffs have not demonstrated that their votes received less **\*141** weight. They understood that a majority victory was the standard to avoid a second round of ballot counting. At round one of the RCV election, they cast votes of equal weight, but their candidate failed to achieve a majority victory. At round two, votes cast for the two trailing candidates were reviewed to see whether they expressed a preference for the remaining, viable contestants. Defendant **Dunlap** distributed those votes that were earmarked to either Plaintiff Poliquin or Intervenor Golden. Plaintiffs' votes were not rendered irrelevant or diluted by this process. They remained and were counted.[21] Presumably for this reason, Plaintiffs' expert, Dr. Gimpel, testified that Plaintiffs participated fully in the election.

**[13] [14]** Plaintiffs go on to allege that there is something insidious about a majority vote standard. In their amended complaint, they allege:

While most states use a single-ballot, plurality system to elect candidates for federal office, a minority of states – mostly in the South – have required candidates to win a run-off election if they do not exceed 50% of the votes cast on the initial ballot. *See, e.g.*, Nat'l Conference of State Legislatures, *Primary Runoffs*, at http://www.ncsl.org/research/elections-and-campaigns/primary-runoffs.aspx (last accessed Nov. 12, **2018**). Observers have noted that the "runoff system is a vestige of a time when white Democrats controlled Southern politics[ ] and manipulated election rules to make sure they stayed in power." Reid Wilson, *Runoff Elections a Relic of the Democratic South*, Wash. Post, June 4, 2014.

Am. Complaint ¶ 61. Contrary to Plaintiffs' allegation, there is nothing inherently improper about an election that requires a contestant to achieve victory by a majority.[22] *E.g., Fortson v. Morris*, 385 U.S. 231, 234, 87 S.Ct. 446, 17 L.Ed.2d 330 (1966); **\*142** *Bond v. Fortson*, 334 F.Supp. 1192 (1971), aff'd 404 U.S. 930, 92 S.Ct. 272, 30 L.Ed.2d 244 (1971); cf. *Gutierrez v. Ada*, 528 U.S. 250, 120 S.Ct. 740, 145 L.Ed.2d 747 (2000) (considering 48 U.S.C. §§ 1421 et seq., in which Congress prescribed the majority standard and run-offs when needed in gubernatorial races in the territory of Guam); 48 U.S.C. § 1712 (specifying that delegates to Congress from Guam and the Virgin Islands must be elected by a majority of the votes cast); 48 U.S.C. §§ 1732, 1752 (permitting

the legislatures of American Samoa and Northern Mariana Islands to establish primary elections for the election of a delegate to Congress, in which case the delegate "shall be elected by a majority of votes cast in any subsequent general election...."). Nor is it unconstitutional for an election to be determined in more than one round, provided that the official election takes place on federal election day. *Foster v. Love*, 522 U.S. 67, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997) (invaliding Louisiana open-primary because it provided the opportunity to fill congressional seats prior to election day).[23]

Maine has devised a manner of holding elections that seeks to realize the perceived benefits of a majority candidate, while avoiding the shortcomings of a run-off election.[24] The Supreme Court has observed that a state may well voice the "need to assure that the winner of an election 'is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections.' " *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) (discussing ballot access claims) (quoting *Bullock v. Carter*, 405 U.S. 134, 145, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) ). Has Maine not, in fact, done exactly that? Maine's two congressional districts are geographically large, and the political views of its citizens are diverse. A majority of Maine's voters have expressed their interest in a manner of election that gives voice to these varied perspectives, while also permitting representation by those candidates most voters regard as the best of the practical alternatives. Through RCV, as applied to the Second District house race, majority rights have been advanced, and no minority rights have been burdened unduly, if at all.[25] In short, **\*143** Maine has "attempted to allocate governmental power on the basis of a[ ] general principle" and has devised a manner of voting that is solicitous of the majority interest without imposing undue burden on any particular voter. *Hunter*, 393 U.S. at 395, 89 S.Ct. 557. Because RCV is "designed with the aim of providing a just framework within which the diverse political groups in our society may fairly compete and [was] not enacted with the purpose of assisting one particular group in its struggle with its political opponents," it does not violate the Equal Protection Clause.[26] *Id.* at 393, 89 S.Ct. 557.

### 2. Due Process

 **[15]** Plaintiffs argue that RCV is susceptible to producing arbitrary or irrational election results. In particular, they maintain that a significant segment of the voting public cannot comprehend RCV sufficiently to cast a meaningful vote.[27] Plaintiffs do not contend, however, that they are members of the allegedly disadvantaged class. They have not, therefore, demonstrated that RCV deprived them of due process in violation of § 1983. Nevertheless, I will consider the argument.

 **[16]** **[17]** The Due Process Clause prohibits governmental activity that is "arbitrary" or "purposeless." *Bell v. Wolfish*, 441 U.S. 520, 584 n.15, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citing inter alia *Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230). Moreover, "[i]f the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order." *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978). The crux of Plaintiffs' argument is that the ballot returns reflect that several thousand voters were disenfranchised during tabulation because they cast invalid overvotes or undervotes. Plaintiffs propose that these ballots likely were cast by those voters with the least amount of interest and/or access to reliable information.

To put it generously, Plaintiffs have not demonstrated persuasively that the inferences that they draw from the ballot data are more likely true than false. That is, **\*144** Plaintiffs contend that the ballot was too confusing for the average voter of Maine's Second Congressional District to understand, as evidenced by those ballots in which the voter did not select either Mr. Golden or Mr. Poliquin as their down-ballot choices. There was no evidence produced to support that argument other than the conclusory testimony of Dr. Gimpel, which I have summarized and discount entirely. It is at least equally plausible that these ballots represent the political expression of the quixotic voter, who has equal right to be heard at the ballot box. In every election there are protest votes, whether by voting for a preferred, non-viable candidate, or by expressing a "none-of-the-above" vote. Plaintiffs have not shown that a similar volume of votes are not also invalidated in plurality elections or in run-off elections when there is a substantial number of voters who do not participate. The fortuity that some voters did not "guess correctly," as Plaintiffs put it, as to the run-off candidates is not evidence of voter confusion or disenfranchisement. It is just as likely evidence that approximately 8,000 voters did not want to vote for either Mr. Golden or Mr. Poliquin regardless of whether they believed they would be the run-off candidates. An expression of political preference that does not, even under RCV, favor either one of the two major-party candidates is not evidence of voter confusion. To the contrary,

it may as likely be evidence of voter clarity and conviction, which is no doubt what lead to the passage of the RCV Act in the first instance.

Further, I am not persuaded by Dr. Gimpel's testimony which attributes inherent virtue in the forced simplicity of two-party access to the ballot, thereby making easier the voters' choice. He testified to what he perceived as a troubling reality that Maine has a low threshold for non-party candidates to gain access to the ballot. His thesis, as I understand it, is that by allowing for choices among several non-major-party candidates, voter turnout is likely to be comprised of a greater percentage of low-information voters, which apparently makes more likely that those voters are cognitively unable to fill out a RCV ballot. In addition to being cynical, these conclusions are not grounded in anything approaching a reliable standard that may be informative of the constitutional questions. They are instead provocative reactions to a new system of selecting representatives to Congress, and such reactions often are the byproduct of change. Dr. Gimpel's testimony left me with the impression of a panel debate among political scientists in a nascent field of study. To his credit, Dr. Gimpel conceded that he has not discussed the RCV experience with a single Maine voter but would like to conduct such a study. In the meantime, I simply am unable to credit his testimony any weight on the constitutional issues before the Court.

[18] Additionally, Plaintiffs have not demonstrated that the Due Process Clause imposes a lowest-common-denominator standard on the exercise of the suffrage. The Constitution does not require an easy ballot. *Griffin v. Roupas*, 385 F.3d 1128, 1133 (7th Cir. 2004). In a Nation founded on the principles of republican–representative government, nothing is to be gained from an electoral system that caters to the uninterested and uninformed. The RCV system implemented in Maine is not so opaque and bewildering that it deprives a class of citizens of the fundamental right to vote. In fact, I find the form of the ballot and the associated instructions more than adequate to apprise the voter of how to express preferences among the candidates. Finally, I am not persuaded that it is unduly burdensome for voters to educate themselves about the candidates in order **\*145** to determine the best way to rank their preferences.

### 3. First Amendment via Fourteenth Amendment

[19] "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Williams v. Rhodes*, 393 U.S. 23, 31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (quoting *Wesberry*, 376 U.S. at 17, 84 S.Ct. 526). At oral argument, Plaintiffs emphasized that the First Amendment entitles them to express their support for their candidate. They feel that Maine is giving other voters disproportionate expression.

[20] [21] The Supreme Court's first amendment jurisprudence teaches that nondiscriminatory regulations that "burden" the right of individuals to vote must be weighed against the "precise interests put forward by the State as justifications for the burden imposed by its rule." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) ). That interest must be "sufficiently weighty to justify" whatever burden befalls Plaintiffs. *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 288–89, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992) ).[28] As Judge Levy of this Court observed in an earlier challenge to the RCV Act, as applied to primary elections, "the ... position that Maine's adoption of a ranked-choice primary ballot should be subject to strict scrutiny would, contrary to the warning in *Clingman*, interfere with the State's ability "to run efficient and equitable elections," and thus "compel federal courts to rewrite state electoral codes." " *Dunlap*, 324 F.Supp.3d at 210 (quoting *Clingman v. Beaver*, 544 U.S. 581, 593, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005) ). I agree with his assessment that the RCV Act is not subject to strict scrutiny under the First Amendment, and this assessment is especially sturdy in the context of a general election.

As I indicated in my order denying Plaintiffs' request for a temporary restraining order, there is no dispute that the RCV Act—itself the product of a citizens' initiative involving a great deal of first amendment expression—was motivated by a desire to enable third-party and non-party candidates to participate in the political process, and to enable their supporters to express support, without producing the spoiler effect. In this way, the RCV Act actually encourages First Amendment expression, without discriminating against any voter based on viewpoint, faction or other invalid criteria. Moreover, a search for what exactly the burden is that Plaintiffs want lifted is not a fruitful exercise. I fail to see how Plaintiffs' first amendment right to express themselves in this election were undercut in any fashion by the RCV Act. They expressed their preference for Bruce Poliquin and none other, and their votes were counted.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction and request for permanent injunctive relief are *146 denied. The Clerk is directed to enter judgment in favor of Defendants.

**So Ordered.**

**All Citations**

376 F.Supp.3d 125

Footnotes

1  At the November election, the RCV Act also applied to the First Congressional District house race and senate race, but Senator Angus King and Representative Chellie Pingree obtained sufficient first choice votes to win a majority. The parties have not asserted any facts concerning the other congressional races in support of their respective positions in this case.

2  In 2017, the Maine Supreme Judicial Court determined that the RCV Act, 21-A M.R.S. § 723-A, cannot be used in Maine's State Senate, House, and Governor's races, because the Maine Constitution, in Art. IV, pt. 1, § 5, Art. IV, pt. 2, § 4, and Art. V, pt. 1, § 3, expressly requires plurality voting. *Opinion of the Justices,* 162 A.3d 188, 209–11 (Me. 2017). The States, in exercising their Article I authority, are not required to conduct local and national elections in the same manner. *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,* ––– U.S. ––––, 135 S.Ct. 2652, 2674 n.25, 192 L.Ed.2d 704 (2015) ("A State may choose to regulate state and national elections differently, which is its prerogative under the [Elections] Clause.").

3  The fact that an election is conducted in accordance with the will of the people, as expressed through a popular initiative, is not inherently objectionable, for "the invention of the initiative was in full harmony with the Constitution's conception of the people as the font of governmental power." *Arizona Indep. Redistricting Comm'n,* 135 S.Ct. at 2674. "As Madison put it: 'The genius of republican liberty seems to demand ... not only that all power should be derived from the people, but that those intrusted with it should be kept in dependence on the people.' " *Id.* at 2674–75 (quoting The Federalist No. 37, 223). In *Arizona Indep. Redistricting Comm'n*, the Supreme Court divided, 5–4, over a dispute related to the significance of the Seventeenth Amendment, which superseded Article I, section 3 by making it the law of the land that senators be elected directly by the people, rather than by state legislatures. The case presented an unusual claim asserted by the Arizona State Legislature concerning who had the ultimate authority within Arizona to determine the manner of drawing congressional districts (the People by popular initiative, or the Legislature if it disagreed), and whether the answer should turn on state law. Those issues are not litigated in this case.

4  *See* **Dunlap** Ex. F-2, ECF No. 44-3. In the initial tabulation process, Defendant **Dunlap** eliminated, or "exhausted" 6,453 votes as invalid because the ballots contained overvotes or undervotes. The exhausted ballots amounted to 2.28% of the ballots cast. "Overvote" means a circumstance in which a voter has ranked more than one candidate at the same ranking, while "undervote" means a voter has not indicated a preferred candidate at the applicable ranking. The majority of the exhausted ballots reflected undervotes. The exhausted ballots were not included to establish the mathematical denominator for achieving a majority victory.

5  If the ballot left two sequential rankings blank before naming either Golden or Poliquin, it was exhausted, or invalidated. 21-A M.R.S. § 723-A(1)(D).

6  *See* **Dunlap** Ex. F-2, ECF No. 44-3. In the course of the second round of tabulation, Defendant **Dunlap** exhausted an additional 8,253 ballots. These exhausted ballots were not considered part of the total for purposes of calculating a majority, similar to the first-choice tabulation process. Combined with those ballots exhausted in the first-choice tabulation, a total of 14,706 ballots were exhausted, or 4.97% of all ballots cast. Of these, some 5,582 voters left the ballot entirely blank. *See* Dr. James G. Gimpel, Ph.D. **Supp**. Disclosure, Ex. A, ECF No. 51. Additionally, 3,957 voters indicated that Ms. Bond was their first choice, and they did not rank any other candidates. *Id.*, row 12. Some 1,939 Hoar supporters similarly failed to rank any alternative. *Id.*, row 25.

7  On the other hand, Dr. Gimpel testified that most independent voters "pretty consistently" lean toward either the Republican Party or Democratic Party, and that "every researcher in Maine" knows this.

8  Dr. Gimpel's perspective, in my view, is built on the debatable premise that a two-party system has some intrinsic merit because it simplifies the choices that are presented to voters. In his sworn report, Dr. Gimpel asserts: "The great advantage of a two-party system with plurality voting is that participation and choice are straightforward and not burdensome." ECF No. 37 at 11. Presumably, Dr. Gimpel understands that a significant cohort of the electorate welcome alternatives. In any case, this is thin soup upon which to fortify a constitutional challenge to RCV.

9   In his sworn report, Dr. Gimpel notes that "several dozen voters" failed to rank a first choice, but went on to rank second and subsequent choices. *Id.* The Court is not persuaded that voter error is unique to RCV ballots, or that such mistakes by several dozen voters warrants an inference that the instructions were inadequate.

10  Plaintiffs have not adequately demonstrated the significance of their monotonic argument and will limit its assessment of this theory to this footnote. What I understand is that it is sometimes possible in a ranked-choice voting system to harm one's preferred candidate by ranking them higher on the ballot, and to assist them by ranking them second or lower on the ballot. In other words, it is statistically possible in some instant run-off elections that the winner is a person most voters do not prefer, which is referred to as a non-monotonic result. The 2009 mayoral election in Burlington, Vermont, is often cited as an example. Sworn Expert Report of James G. Gimpel, Ph.D., at 14. I am concerned, of course, with the November 2018 election, not with any and all statistical permutations that academics can conceive. As concerns the November election, Dr. Gimpel testified that the Second District house race did not involve a monotonicity problem. Moreover, Plaintiffs have not provided any evidence suggesting that the RCV Act is likely to produce this result in a statewide general election for federal office given the realities of modern electoral politics and the abundance of information that is generally available in advance of such an election. In short, I do not believe the desirability of a monotonic election result provides a justiciable standard for Plaintiffs to sustain a facial challenge. Nor do I find that the statistical possibility of a non-monotonic election proves that RCV does not provide a meaningful bulwark against the spoiler problem that can arise from third-party and non-party participation in elections, which is generally understood to be a primary feature of RCV systems. *See id.* at 15.

11  Plaintiffs have provided additional expert opinion evidence through the Sworn Expert Report of Jason Sorens, Ph.D., ECF No. 4. The record also includes an affidavit concerning the conduct of elections in Maine. Decl. of Dep. Sec'y of State Julie L. Flynn, ECF No. 24. Although the information these witnesses provided is not recounted herein, the affidavits have been very informative and helpful to the review of this case.

12  Plaintiffs cited 52 U.S.C. § 10307, which provides that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote." Am. Complaint ¶¶ 6, 58. The facts, as alleged, do not involve any effort by Defendants or anyone else invested with state-delegated authority to deny Plaintiffs their right to vote or refuse to tabulate their vote.

13  "The power of Congress over the 'Times, Places and Manner' of congressional elections 'is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith.' " *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 9, 133 S.Ct. 2247, 186 L.Ed.2d 239 (2013) (quoting *Ex parte Siebold*, 100 U.S. 371, 392, 25 L.Ed. 717 (1880) ). While Congress has legislated in the area of voting standards, most notably through the Voting Rights Act and amendments, 52 U.S.C. §§ 10301 *et seq.*, and the Help America Vote Act, 52 U.S.C. §§ 20901 *et seq.*, it has not precluded ranked-choice methods. I am unaware of any precedent in which the House of Representatives addressed a similar contest in the context of the Federal Contested Elections Act, 2 U.S.C. §§ 381–396.

14  There was significant debate over the Time, Place and Manner Clause during the first Continental Congress. Some Anti-Federalists voiced the concern that a faction in Congress would eventually regulate the manner of holding elections in an undemocratic fashion, such as by establishing a plurality standard nationwide. Robert G. Natelson, *The Original Scope of the Congressional Power to Regulate Elections*, 13 U. Pa. J. Const. L. 1, 29 & nn. 123–128 (2010) (describing concerns of Anti-Federalists, including the "Federal Farmer"). "[D]uring the ratification debates, proponents of the Constitution noted: '[T]he power over the manner only enables them to determine how these electors shall elect—whether by ballot, or by vote, or by any other way.' " *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (5–4 decision) (quoting 4 Debates on the Adoption of the Federal Constitution 71 (J. Elliot ed. 1863) (Steele statement at North Carolina ratifying convention) ). In any event, certainly the delegates to the Continental Congress declined to dictate either a majority or plurality standard, or preclude state variation in election procedure, for good cause. Natelson, *supra*, at 38–40 & nn. 183, 189.

15  Hearkening to pronouncements on popular sovereignty that predated the founding of our Nation, the Supreme Court observed that governmental power is derived from the consent of the people, as reflected succinctly in the Preamble of our Constitution, which begins, "We the People." *Arizona Indep. Redistricting Comm'n*, 135 S.Ct. at 2675. Thus, "the true principle of a republic is, that the people should choose whom they please to govern them." *Id.* (quoting *Powell v. McCormack*, 395 U.S. 486, 540–541, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (quoting 2 Debates on the Adoption of the Federal Constitution 257 (J. Elliot ed. 1876) ) ).

16    I am concerned that Plaintiffs' Article I challenge may present a nonjusticiable political question. *See, e.g.*, *Vieth v. Jubelirer*, 541 U.S. 267, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (recognizing the difficulty in articulating justiciable standards for resolving a claim of unlawful political gerrymandering). However, because Plaintiffs' Fourteenth Amendment claims raise justiciable issues related to Plaintiffs' individual rights, *Gray v. Sanders*, 372 U.S. 368, 374, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), the Court sees no advantage in attempting to address a justiciability question solely with respect to Plaintiffs' Article I challenge, especially where the parties have not pressed the issue. However, the Court is perplexed as to what standard it would fashion to assess the constitutionality of RCV other than the standards it will address in the context of Plaintiffs' Fourteenth Amendment claims. Assuming the Article I claim is justiciable, I find that RCV does not exceed the State's authority under Article I for the reasons outlined herein.

17    In 1784, Matthew Griswold became Governor of Connecticut after obtaining a plurality of the votes cast, but not because he won by plurality. Instead, he ascended to the seat because the Connecticut assembly was empowered to decide the winner in the absence of a majority popular vote. This manner of election occurred five times in Connecticut in the 1780s, and on three of the five occasions, the declared winner was not the candidate with the most votes. Similarly, in 1785, James Bowdoin became the governor of Massachusetts after winning a plurality, but only because he received the vote of the Massachusetts legislature. Also in 1785, in a field of four candidates, George Atkinson won a plurality of the popular vote in the race for New Hampshire's governorship, but the New Hampshire Legislature gave the seat to runner-up John Langdon, as was its right in the absence of a majority victory. In 1787, in a reversal of fortunes, John Langdon won a plurality of the popular vote, but the New Hampshire Legislature this time gave the seat to another runner-up, John Sullivan. *See* Robert J. Dinkin, *Voting in Revolutionary America, A Study of the Elections in the Original Thirteen States, 1776–1789*, 20–24, 105, 109 (1982).

18    In discussing faction, Madison spoke of "unjust or dishonorable purposes" where I have revised the quotation. To be sure, I do not regard any of the parties to be motivated by unjust or dishonorable purposes. The point, rather, is that a manner of election that requires a contestant for representative office to win over minority factions, when the contestant has not achieved an outright majority, is not inherently destructive to the virtues of a republican form of government and may, in fact, promote them.

19    The Fourteenth Amendment provides:
> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. Am. XIV, § 1.

20    In *Bush v. Gore*, the Supreme Court observed that there is a need for a consistent standard for assessing ballots and that it presents an unacceptable scenario when those who review ballots on behalf of a state apply varied standards for interpreting voter intent. 531 U.S. 98, 105, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (describing varied interpretations of the significance of dimpled chads versus chads dislodge enough to permit light to show through). The record in this case does not reveal the application of inconsistent standards.

21    Other courts that have evaluated an equal protection challenge to ranked choice / instant run-off elections have agreed that ranked ballots do not dilute unranked ballots because an unranked ballot that supports a leading candidate continues to have equal weight in the subsequent round(s) of balloting. *Dudum v. Arntz*, 640 F.3d 1098, 1112 (2011) ("Each ballot is counted as no more than one vote at each tabulation step, whether representing the voters' first-choice candidate or the voters' second-or third-choice candidate, and each vote attributed to a candidate ... is afforded the same mathematical weight in the election."); *Minnesota Voters Alliance v. City of Minneapolis*, 766 N.W.2d 683, 690 (2009) ("[I]t is only because votes for continuing candidates are carried forward and combined with subsequent-choice votes of voters for eliminated candidates that any candidate can eventually win."); *McSweeney v. City of Cambridge*, 422 Mass. 648, 665 N.E.2d 11, 16 (1996) ("Even a special election may be said to disenfranchise the prior voters to some extent in favor of those voting in the later one.").

22    There is an indication in the congressional record associated with the Voting Rights Act that some states adopted a majority standard for certain offices to prevent black citizens from obtaining victories under a plurality system. *Presley v. Etowah Cty. Comm'n*, 502 U.S. 491, 520 & n.20, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992) (Stevens, J., dissenting) (describing "white resistance to progress in black registration"). The Supreme Court has affirmed a district court order that required a city to remove a majority-vote requirement where the new requirement coincided with consolidation and annexation of neighboring political subdivisions in a manner that adversely impacted minority voting strength. *City of Port Arthur v. United States*, 459 U.S. 159, 167, 103 S.Ct. 530, 74 L.Ed.2d 334 (1982); *City of Rome v. United States*, 446 U.S. 156, 183, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980). The fact that "eliminating [a] majority-vote requirement" can be

"an understandable adjustment" to prevent dilution of a minority's voting power, *Port Arthur*, 459 U.S. at 167, 103 S.Ct. 530, does not call into disrepute all majority-vote requirements. Nothing in the record suggests that any discriminatory purposes or effects are at play here.

23  In *Foster*, the Supreme Court noted that "a State may hold a congressional election on a day other than the uniform federal election day when such an election is necessitated 'by a failure to elect at the time prescribed by law,'" as occurs in states that require a majority winner and provide for run-off elections. 522 U.S. at 72 n.3, 118 S.Ct. 464. The Court did not rule on the issue, but cited Eleventh Circuit precedent that upheld an election result secured after federal election day through a run-off election. *Id.* (citing *Public Citizen, Inc. v. Miller*, 813 F.Supp. 821 (N.D. Ga.) ), *aff'd*, 992 F.2d 1548 (11th Cir. 1993) (upholding under 2 U.S.C. § 8 a run-off election that was held after federal election day, because in the initial election on federal election day no candidate received the majority vote that was as required by Georgia law).

24  Run-off elections are expensive and impose a significant burden on municipal and state officers. Run-off elections also impose an appreciable burden on the voting public, as is reflected by the fact that run-off elections commonly involve a significant drop-off in public participation, as conceded by Dr. Gimpel.

25  I can conceive of RCV election results that might raise legitimate equal protection concerns, particularly if votes for one non-viable candidate were not distributed yet votes for another such candidate were. Based on this case, however, it appears that the administrative machinery that informs application of RCV in Maine calls for batch eliminations in which votes for all candidates who cannot mathematically win are redistributed. If a case should ever arise in which votes for a non-viable candidate are not redistributed, no doubt this Court or a Maine court would be able to iron out any error and provide appropriate relief. Thus, to the extent Plaintiffs advance a facial challenge to Maine's RCV Act, I consider the challenge overly abstract in the context of this litigation, and conclude it is better for a future court to handle any such claim based "on specific facts which present the issues with clarity, and not on the basis of theoretical impacts." *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 51 (1st Cir. 1998). *See also Sabri v. United States*, 541 U.S. 600, 608–09, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004) ("Although passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks. Facial adjudication carries too much promise of 'premature interpretatio[n] of statutes' on the basis of factually barebones records.") (quoting *United States v. Raines*, 362 U.S. 17, 22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960) ); *but see Moore v. Ogilvie*, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969) ("But while the 1968 election is over, the burden ... remains and controls future elections, as long as Illinois maintains her present system.... The problem is therefore capable of repetition, yet evading review.... The need for its resolution thus reflects a continuing controversy in the federal state area where our 'one man, one vote' decisions have thrust." (citation omitted) ).

26  Citing *Hunter*, the Supreme Court has observed that "the political majority may generally restructure the political process to place obstacles in the path of everyone seeking to secure the benefits of governmental action." *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) (5–4 decision) (invalidating race-specific state bussing directive).

27  Similar arguments were once advanced by those who sought to deny the vote to women and minorities.

28  *See also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) ("Lesser burdens ... trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." (quotations omitted) ).

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.