PLAINTIFF'S
EXHIBIT

**42**

Page 1

1            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                     HOUSTON DIVISION
3    JAYLA ALLEN, DAMON          )
     JOHNSON, TREASURE SMITH,    )
4    and THE PANTHER PARTY,      )
     Plaintiffs,                 )
5                                )
     vs.                         ) CASE NO. 4:18-cv-3985
6                                )
     WALLER COUNTY, TEXAS; THE   )
7    WALLER COUNTY               )
     COMMISSIONERS COURT; JUDGE  )
8    CARBETT "TREY" J. DUHON     )
     III; in his official       )
9    capacity as the Waller      )
     County Judge; CHRISTY A.    )
10   EASON, in her official      )
     capacity as the Waller      )
11   County Elections            )
     Administrator,              )
12   Defendants.                 )
13
14                    ORAL DEPOSITION
15                    CHRISTY A. EASON
16                 September 26, 2019
17
18        ORAL DEPOSITION OF CHRISTY A. EASON, produced as
19   a witness at the instance of the Plaintiffs and duly
20   sworn, was taken in the above-styled and numbered
21   cause on the 26th day of September, 2019, from
22   10:56 a.m. to 5:06 p.m., before Vickie G.
23   Hildebrandt, Certified Shorthand Reporter in and for
24   the State of Texas, reported by computerized
25   stenotype machine at the Waller County Courthouse,

Page 2

1  836 Austin Street, Hempstead, Texas, pursuant to the
2  Federal Rules of Civil Procedure and the provisions
3  stated on the record or attached hereto.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1            APPEARANCES
2
3  FOR PLAINTIFFS:
4     John S. Cusick, Esq.
       Leah Aden, Esq.
5     Steven Lance, Esq.
       NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
6     40 Rector Street, 5th Floor
       New York, New York  10006
7     Telephone: 212.965.2269
       E-mail: jcusick@naacpldf.org
8          laden@naacpldf.org
            slance@naacpldf.org
9
10  FOR DEFENDANTS:
11     Gunnar P. Seaquist, Esq.
        BICKERSTAFF HEATH DELGADO ACOSTA LLP
12     3711 MoPac Expressway Building One, Suite 300
        Austin, Texas  78746
13     Telephone: 512.320.5638
        E-mail: gseaquist@bickerstaff.com
14
15  FOR DEFENDANTS:
16     Elizabeth Dorsey, Esq.
        WALLER COUNTY DISTRICT ATTORNEY'S OFFICE
17     645 12th Street
        Hempstead, Texas  77445
18     Telephone: 979.826.7718
        E-mail: e.dorsey@wallercounty.us
19
20  ALSO PRESENT:
21     Carbett "Trey" J. Duhon III
22
23
24
25

Page 4

1                  INDEX
2                            PAGE
3  CHRISTY A. EASON
4  Examination by Mr. Cusick ........................6
5
6               EXHIBITS
7
8  EXHIBIT       DESCRIPTION            PAGE
9  Exhibit 1    Deposition Notice        11
10 Exhibit 2    H.B. No. 1888 Act        103
11 Exhibit 3    Expert Report of Henry Flores,   105
                 Ph.D.
12
      Exhibit 4    Bates DEFENDANTS000131 - Early   116
13               Voting and Election Day Polling
                  Places, 2018 General Election,
14               November 6, 2018
15 Exhibit 5    Verity Equipment Assignment      118
                  2018 General Election
16
      Exhibit 6    Defendant Christy A. Eason's     131
17               First Supplemental Response and
                  Objections to Plaintiffs' First
18               Set of Interrogatories
19 Exhibit 7    DEFENDANTS000158 - Early Voting   147
                  Locations
20
      Exhibit 8    Bates DEFENDANTS001070-001074 -   157
21               Minutes of the Waller County
                  Commissioners Court Regular
22               Session, Wednesday, October 17,
                  2018
23
      Exhibit 9    Waller County Commissioners      157
24               Court Transcript October 17,
                  2018
25

Page 5

1
2  Exhibit 10   Bates DEFENDANTS001077 -         189
      Minutes of the Waller County
3               Commissioners Court Emergency
                 Session, Wednesday, October 24,
4               2018
5  Exhibit 11   Waller County Commissioners      189
      Court Transcript October 24,
6               2018
7  Exhibit 12   2018 Joint Primary Election      213
      Services Contract with the
8               County Elections Officer, State
                 of Texas, County of Waller
9
      Exhibit 13   Bates DEFENDANTS001255-001257 -  216
10               January 7 and 8, 2018 E-mail
                  Chain
11
      Exhibit 14   Bates DEFENDANTS001202-001203 -  219
12               March 2018 E-mail Chain
13 Exhibit 15   Bates DEFENDANTS001254-001260 -  223
      October 2017 E-mail Chain
14
      Exhibit 16   Waller County Commissioners      229
15               Court Transcript October 11,
                  2017
16
      Exhibit 17   Bates DEFENDANTS000786-000794 -  232
17               Minutes of the Waller County
                  Commissioners Court Special
18               Session, Monday, December 15,
                  2014
19
      Exhibit 18   Bates DEFENDANTS000800-000802 -  233
20               Waller County Elections Office
                  Report, February 4, 2015
21
      Exhibit 19   Bates DEFENDANTS000879-000880 -  234
22               Commissioners Court Report:
                  Elections Office April 15, 2015
23
      Exhibit 20   January 26, 2016 E-mail to       234
24               Jeron Barnett and Trey Duhon
                  from Dan Teed
25

2 (Pages 2 - 5)

Page 6

1           CHRISTY A. EASON,
2 having been first duly sworn, testified as follows:
3               EXAMINATION
4    Q.   (BY MR. CUSICK) Good afternoon, Ms. Eason.
5    A.   Good afternoon.
6    Q.   My name is John Cusick.
7    A.   Good morning.
8    Q.   Good morning.  Sorry, still another hour.
9         I'm an attorney with the NAACP Legal
10 and Educational Fund.  I, along with my colleagues,
11 co-counsel here, represent Jayla Allen, Treasure
12 Smith, Damon Johnson and The Panther Party in this
13 case, but before going any further, I just want to
14 take a moment to have everyone go around who is an
15 attorney and wishes to make an appearance on record
16 today.
17         MS. ADEN:  I'm Leah Aden, also with
18 the Plaintiffs' counsel group.
19         MR. LANCE:  I'm Steven Lance, with the
20 Plaintiffs' counsel group.
21         MR. SEAQUIST:  Good morning.  Gunnar
22 Seaquist, here on behalf of Defendants.
23         MS. DORSEY:  Elizabeth Dorsey on
24 behalf of Defendants.
25         MR. DUHON:  Trey Duhon, county judge

Page 7

1 Waller County, here on behalf of the County.
2    Q.   (BY MR. CUSICK) And as I believe you know,
3 the plaintiffs are challenging the discriminatory
4 early voting opportunities during the 2018 election
5 under the Voting Rights Act of 1965 and the U.S.
6 Constitution.
7         Can you please state and spell your
8 name for the record.
9         MR. SEAQUIST:  Object to the
10 characterization.
11    A.   Christy, C-H-R-I-S-T-Y, Eason, E-A-S-O-N.
12    Q.   (BY MR. CUSICK) And have you gone by any
13 other names?
14    A.   No.
15    Q.   And your maiden name?
16    A.   Andricks, A-N-D-R-I-C-K-S.
17    Q.   And what is your official position with the
18 County?
19    A.   Elections administrator.
20    Q.   And have you been deposed before?
21    A.   No.
22    Q.   Great.
23         So I'm going to talk a little bit
24 about some ground rules about today, about the
25 deposition so we're on the same page, so you just

Page 8

1 heard that you are sworn under oath.
2         Do you understand for the purposes
3 that you must testify truthfully and completely as
4 possible as if you were in front of a judge in a
5 courtroom?
6    A.   Yes.
7    Q.   Do you understand that the court reporter is
8 transcribing this deposition?
9    A.   Yes.
10    Q.   And if you would like to take a break at any
11 moment, just let us know.  The only thing I ask is that
12 if we're in the middle of a question, if you could just
13 finish answering the question and then we can take the
14 break afterwards.
15    A.   Okay.
16    Q.   Of course, this is a deposition, so I will be
17 asking you questions.  It's important you wait until I
18 finish my question before you start answering and I'll
19 do the same where I won't ask you any question before
20 your -- your answer is complete.
21    A.   Okay.
22    Q.   It's also important for the Court, for
23 transition purposes, that you answer verbally.  This
24 will allow the court reporter to make sure everything is
25 accurately transcribed.

Page 9

1    A.   Okay.
2    Q.   You understand that?
3    A.   Yes.
4    Q.   If you don't ask a question -- if you don't
5 have -- if you don't understand a question that I ask,
6 feel free to let me know so I can try to rephrase.
7 Unless you say otherwise, I will assume you understand
8 the question.
9    A.   Okay.
10    Q.   Is there any reason you may not be able to
11 answer my questions truthfully or completely today?
12    A.   No, there's not.
13    Q.   Are you taking any type of drug or medication
14 that might affect your ability to understand the
15 questions that I'm asking?
16    A.   No, I'm not.
17    Q.   And then are you represented by counsel today?
18    A.   Yes, I am.
19    Q.   And who is your counsel?
20    A.   Mr. --
21         MR. SEAQUIST:  Seaquist.
22    A.   -- Seaquist.  I was going to say Sechrist,
23 but it's Seaquist.
24         MS. ADEN:  For the record -- sorry to
25 interrupt.  Judge Duhon mentioned that he was here on

3 (Pages 6 - 9)

Page 10

1 behalf of the County, not as an attorney representing
2 the County, but as a party in the litigation?
3          MR. SEAQUIST:  That's correct.
4          MS. ADEN:  Okay.
5          MR. DUHON:  I am an attorney,
6 though -- just --
7          MS. ADEN:  Yes.
8          MR. SEAQUIST:  But not counsel of
9 record in the case.
10         MS. ADEN:  I hope the judge of the
11 County is indeed a lawyer.  Thank you.
12   Q.   (BY MR. CUSICK) And so generally today in
13 the deposition, you, me and the court reporter will
14 be talking.  Your attorney might make an objection.
15 You still need to answer the question unless he
16 instructs otherwise for you not to.
17   A.  Okay.
18   Q.  Do you have any questions for me so far?
19   A.  No.
20         MR. CUSICK:  Then I'd like to just say
21 for the record that all objections except as to form
22 of the question and the responsiveness of the answer
23 will be reserved until the time of the use of the
24 deposition.
25         Is that agreeable?

Page 11

1          MR. SEAQUIST:  That's fair.
2          Do you want to just use "Objection,
3 form" for all form objections or specify specific
4 form objections?
5          MS. DORSEY:  Objection, form.
6          MR. CUSICK:  Objection, form.
7          MR. SEAQUIST:  Okay.  Sounds good.
8   Q.  (BY MR. CUSICK) And, Ms. Eason, would you
9 also want to be able to read and sign the deposition?
10  A.  Please.
11  Q.  Great.
12         And so, first question I have is, how
13 did you learn about today's deposition?
14  A.  I was notified by counsel.
15         (Exhibit No. 1 marked.)
16         MR. CUSICK:  And then I'm introducing
17 as Exhibit 1 plaintiffs' amended notice of defendant
18 election administrator Christy Eason, which I'm
19 marking as Eason Exhibit 1.
20         Handing a copy to -- handing a copy to
21 Ms. Eason, one to her counsel.
22  Q.  (BY MR. CUSICK) And do you recognize this
23 document, Ms. Eason?
24  A.  Yes.
25  Q.  And this is how you learned about today's

Page 12

1 deposition?
2   A.  Yes.
3   Q.  And did you do anything to prepare for today's
4 deposition?
5   A.  Yes.
6   Q.  And what -- did you review any documents?
7   A.  I reviewed the documents that I had in my
8 possession and I also visited with our counsel.
9   Q.  And what documents would those be in your
10 possession?
11  A.  Those would have been the interrogatories
12 that I received as my response interrogatories, as
13 well as Judge Duhon's, as well.
14  Q.  And any other documents aside from the two
15 answers to the interrogatories?
16  A.  Yes.  I did -- I reviewed our expert report
17 as well as the experts' reports from the
18 defendants -- or from the plaintiffs, rather.
19  Q.  And those were the four sets of documents?
20  A.  Correct.
21  Q.  Did you bring any other documents with you
22 aside from those?
23  A.  No, no, that's all that I had.  I have those
24 two documents.
25  Q.  And then you mentioned you met with your

Page 13

1 counsel today.  Now, without telling me the substance,
2 were there any other lawyers or anyone else present
3 during that meeting?
4   A.  There were just my counsel as well as
5 Ms. Dorsey, as well.
6   Q.  And those were the only two individuals?
7   A.  Correct.
8   Q.  And did you talk to anyone else aside from
9 those two individuals about today's deposition?
10  A.  No, I did not.
11  Q.  I know, before, you said you had not been
12 deposed before; is that correct?
13  A.  Correct.
14  Q.  Have you ever been a party in a case?
15  A.  Yes, I have.
16  Q.  And what was that, the nature?
17  A.  Are you asking a case as far as a case
18 regarding my position as elections administrator?
19  Q.  Yeah, let's go -- first in your official
20 capacity as election administrator.
21  A.  Yes, I have, years ago when I served as
22 elections administrator.
23  Q.  And do you remember the year, roughly, that the
24 case was filed?
25  A.  Oh, it was probably approximately

4 (Pages 10 - 13)

Page 14

1 20-some-odd years ago, 22 years ago. Probably in the
2 '90s.
3    Q.   In the '90s?
4    A.   Yes.
5    Q.   And what type of case was that?
6    A.   It was an actual -- a case on election
7 procedures, as well, although it did not go to court
8 and I also did not -- it was dismissed before we did
9 depositions.
10    Q.   And so you mentioned it was about election
11 procedures?
12    A.   Correct.
13    Q.   Were you the defendant in that case?
14    A.   Yes, I was.
15    Q.   And do you remember the nature of the claims,
16 generally?
17    A.   It was -- I was actually a defendant in my
18 official capacity as election administrator.  It was
19 a case towards the Commissioners Court at that time.
20 Honestly, I don't remember exactly what the actual
21 charge was or the actual suit was about.
22    Q.   Do you remember if it was filed by Ann Davis?
23    A.   Yes, I do.
24    Q.   And what was Ann Davis' role at that time?
25    A.   And Davis was the Republican Party chairman.

Page 15

1    Q.   And so that was filed on behalf of the
2 Republican Party?
3    A.   I believe so.  I believe it was.
4    Q.   Waller County Republican Party?
5    A.   Yes, I believe so.
6    Q.   And then was the other -- was Steve York a
7 party in that case, as well?
8    A.   I do remember his name now that you've said
9 that in the case.  I'm not sure, I don't remember
10 exactly what his -- his actual role in that was.
11    Q.   I know this is a long time ago.
12    A.   It was a very long time ago.
13    Q.   Do you generally remember how the case arose?
14    A.   I do not.
15    Q.   And so is it -- do you remember if there were
16 any other parties aside from Ms. Davis and Mr. York?
17    A.   As far as -- as far as defendants or
18 plaintiffs?
19    Q.   Defendants.
20    A.   I believe it was just brought upon by the
21 Republican Party, I believe, at that time.
22    Q.   And do you remember maybe not the nature of the
23 claims, but just the allegations that were brought
24 against you --
25    A.   I sure don't.

Page 16

1    Q.   -- or your office?
2    A.   I sure -- I sure don't.
3    Q.   Did it involve Prairie View A&M students?  And
4 I'll use that as shorthand for --
5    A.   I don't believe it did, not the one that I
6 was involved in with Ann Davis.
7    Q.   Okay.
8    A.   Or I don't remember if it did.
9    Q.   And you said that it was -- it did not go to
10 trial?
11    A.   No.
12    Q.   Was it resolved before?
13    A.   It was either resolved or it was dismissed,
14 but we never -- I never gave a -- a deposition or it
15 never went to trial.
16    Q.   And aside from that case in your official
17 capacity, were there any other lawsuits as a party that
18 you were involved in?
19    A.   Not that I can remember, no.
20    Q.   What about your personal capacity?
21    A.   I believe that in that lawsuit, it was in my
22 official capacity, but I believe I was represented in
23 my personal capacity, as well, although I don't
24 believe it went -- it went any further.
25    Q.   And do you remember, did any county officials

Page 17

1 represent the plaintiffs in that case?
2    A.   Meaning?
3    Q.   Like, would the Waller County district attorney
4 or another office, were they at all involved in that
5 case?
6    A.   I would be -- I really don't remember.
7    Q.   Sure.
8         And were there -- were there any
9 allegations of discrimination that were brought?
10    A.   Not that I remember.
11    Q.   And you mentioned that you were election
12 administrator at that time?
13    A.   Correct.
14    Q.   When were you first -- were you elected or
15 appointed to that position?
16    A.   I was appointed.
17    Q.   And when were you first appointed?
18    A.   I was appointed in -- let's see.  I left in
19 1999 and I had been in the office for 12 years, so
20 we're looking at -- what would that make it?
21    Q.   '80 something?
22    A.   '89, possibly.
23    Q.   And who from the -- is it a county appointment?
24    A.   Yes, it's a commission, an election
25 commission that does appointments.  It consists of

5 (Pages 14 - 17)

Page 18

1 your county judge, your county clerk, the tax
2 assessor and both party chairmen.
3     Q. And is it term limited or did you decide to
4 leave on your own?
5     A. I left on my own.
6     Q. So let's talk a little bit more about this
7 case.
8         Do you understand why you're here
9 today in the deposition?
10     A. Yes, I do.
11     Q. And do you know any of the defendants in this
12 lawsuit?
13     A. No, I do not.
14     Q. Have you -- have you spoken to any of the
15 individual plaintiffs in this case at some point in the
16 past couple of years?
17     A. No, I did not, not that I know of.
18     Q. So you didn't -- you haven't had conversations,
19 even not about this lawsuit, but in general with Jayla
20 Allen?
21     A. No, not that I knew that that's who she was.
22     Q. What about Damon Johnson?
23     A. Not that I --
24     Q. Treasure Smith?
25     A. No.

Page 19

1     Q. And The Panther Party, which is the student
2 organization?
3     A. No.
4     Q. And when did you first learn about this
5 lawsuit?
6     A. During the end of 2018, right after the
7 primary -- I mean after the general election.
8     Q. From your understanding, do you know why the
9 plaintiffs brought this lawsuit against Waller County,
10 the Commissioners Court and then you in your official
11 capacity as --
12     MR. SEAQUIST: Form.
13     A. I only know what was actually listed as the
14 reasoning in their paperwork.
15     Q. (BY MR. CUSICK) And do you have any
16 opinions about the lawsuit?
17     MR. SEAQUIST: Form.
18     A. No.
19     Q. (BY MR. CUSICK) Have you discussed the
20 lawsuit with anyone?
21     A. In casual talking.
22     Q. Anyone that is currently sitting on the Waller
23 County Commissioners Court?
24     A. No.
25     Q. So you haven't discussed it with Judge Duhon?

Page 20

1     A. Not at all.
2     Q. Commissioner Amsler, John Amsler?
3     A. Not at all.
4     Q. Commissioner Walter Smith?
5     A. Not at all.
6     Q. Commissioner Jeron Barnett?
7     A. Not at all.
8     Q. And Commissioner Justin Beckendorff?
9     A. Not at all.
10     Q. Any former judges, who I believe Russell
11 Klecka, if I'm pronouncing that correctly?
12     A. No.
13     Q. What about any of the Waller County partisan
14 chairs, so, for example, the Waller County Democratic
15 chair Rosa Harris?
16     A. No.
17     Q. The Republican Party chair --
18     A. No.
19     Q. -- David Luther?
20     A. No.
21     Q. I believe you mentioned Ann Davis was the
22 former --
23     A. Correct.
24     Q. -- chair.
25     Have you spoken to her at all about

Page 21

1 this case?
2     A. Not in years.
3     MR. SEAQUIST: You're doing a pretty
4 good job, but make sure you let him get his whole
5 question out before you answer.
6     THE WITNESS: Thank you. Thank you.
7     Q. (BY MR. CUSICK) What about the -- from what
8 I understand, who is the former county election
9 administrator?
10     A. Before me?
11     Q. Yes.
12     A. Dan Teed.
13     Q. And have you spoken to him at all about this
14 case?
15     A. No.
16     Q. And I know that we just discussed before the
17 individual Prairie View A&M students in this case.
18     Have you spoken with any other
19 students about this lawsuit?
20     A. No.
21     Q. And then have you read the complaint in this
22 case as well as the amended complaint?
23     A. Correct. I have.
24     Q. And when was that?
25     A. When I actually received the paperwork,

6 (Pages 18 - 21)

Page 22

1 month and a half ago, month ago.
2    Q.   And so you're generally familiar with the
3 allegations --
4    A.   Yes.
5    Q.   -- in the complaint?
6    A.   Yes.
7    Q.   And what do you understand them to be?
8         MR. SEAQUIST:   Form.
9    A.   The allegations that I understand that was
10 written in the actual lawsuit was the indication that
11 there were not enough early voting hours on the
12 campus of Prairie View A&M University.
13    Q.   (BY MR. CUSICK) Any other?
14    A.   No.
15    Q.   I'd just like to briefly discuss a little bit
16 about your background and employment history.  I know we
17 touched on it earlier.
18         What's your place of birth?
19    A.   Bellville, Texas.
20    Q.   And where do you currently live, city-wise?
21 You don't have to give me your address.
22    A.   Brenham, Texas.
23    Q.   And how long have you lived there?
24    A.   21 years.
25    Q.   You'll have to excuse me.  Is that in Waller

Page 23

1 County?
2    A.   Washington County.
3    Q.   Have you ever lived in Waller County?
4    A.   I have.
5    Q.   And when was that?
6    A.   I grew up in Waller County.
7    Q.   Did you go to high school in Waller County?
8    A.   I did.
9    Q.   And then after you graduated, were you -- did
10 you remain in Waller County for some time or --
11    A.   I went to school, then I came back and lived
12 in Waller County for a short period of time when I
13 was the election administrator before.
14    Q.   Oh, it's different?
15    A.   Yes.
16    Q.   And just briefly, you mentioned you went to
17 school.  If you could just -- where did you go to
18 school?
19    A.   I went to the Bradford School of Business in
20 Houston.
21    Q.   And so we spoke a little bit about the first
22 time you were election administrator, and so in this --
23 in this next most recent appointment, when were you
24 first appointed?
25    A.   In March of 2017.

Page 24

1    Q.   And that, too, was also an appointment, same
2 process as the first time?
3    A.   Correct.
4    Q.   And in between the first time you were election
5 administrator and this current time, what other
6 employment positions did you hold?
7    A.   I went to work with Hart InterCivic as a
8 sales rep in government sales, and then I also worked
9 for AT&T corporate as a corporate representative in
10 sales.
11    Q.   And those are the two --
12    A.   Yes.
13    Q.   -- in between?
14         Are you involved in any community
15 groups in Waller County?
16    A.   In Waller County, no.
17    Q.   What about in Washington County?
18    A.   Yes, I am.
19    Q.   And what groups?
20    A.   I am in the process of working with CASA, in
21 the application process now.  My children are
22 involved in all types of sports, type of community
23 activities, as well as our church, with the local
24 Maifest, with our local Adam's Angels.
25    Q.   And you said CASA?

Page 25

1    A.   Uh-huh.
2    Q.   Is that an acronym for --
3    A.   Yes, Court Appointed Special Advocate.
4    Q.   And how long have you been --
5    A.   I'm in the process -- I'm in the application
6 process of that now.
7    Q.   And before you moved in Washington County, were
8 you registered to vote in Waller County when you were
9 eligible?
10    A.   Yes, I was.
11    Q.   And are you currently registered in Washington
12 County?
13    A.   I am.
14    Q.   And so I'm going to briefly turn now just to
15 talk a little bit about your experience as election
16 administrator.
17         I guess, generally for now, just kind
18 of what are the responsibilities that the election
19 administrator holds?
20    A.   The election administrator is a -- a chief
21 election officer in Waller County, also the voter
22 registrar in Waller County, as well.
23    Q.   As so as the voter registrar, what are some
24 general duties that you undertake?
25    A.   I'm also the custodian for all the

7 (Pages 22 - 25)

Page 26

1  registered voters in the county, the registrations,
2  as well.
3      Q.   And could you provide some specific examples of
4  the services as the chief election administrator?
5      A.   Correct.
6           I hold all Waller County elections.
7  Also, I contract with all entities in Waller County
8  to handle their elections, as well.
9      Q.   And so in this work, in holding all of these,
10  who do you most directly work with in Waller County
11  outside of your office for employees or other agencies?
12      A.   Within the employees of my own office?
13      Q.   Sorry, employees in other parts of Waller
14  County's government.
15      A.   I -- I work with, of course, the county
16  judge's office and Commissioners Court, as they are
17  the authority over my office.  I also work with the
18  election commission at some point, they're my direct
19  supervisors, and then I also work with the party
20  chairman, both party chairmen, when I contract to
21  hold the primary elections for them, and then any
22  other mayors or city secretaries or any other
23  superintendents of any other entities that I contract
24  to hold their elections with.
25      Q.   And so, in addition, I know you mentioned some

Page 27

1  of the Waller County positions, you mentioned the party
2  chairs.
3           Are there any partnerships with the
4  public or other organizations, too, in your role that
5  you work with?
6      A.   No.
7      Q.   And I'm just trying to understand, do your
8  responsibilities change when it's the primary versus the
9  general election?
10      A.   No, they don't.  I still do the same.  I
11  just contract to hold that election for the
12  primaries, so I go through a contract with the party
13  chairman to do that.  As far as a county-wide
14  election, there is no contract.  The County actually
15  holds the election.
16      Q.   And so you mentioned a contract for the
17  primaries?
18      A.   Correct.
19      Q.   Is that a contract between both parties and
20  Waller County?
21      A.   Correct.  It's an option for them to do
22  both.  Both party chairmen and Waller County choose
23  to contract with Waller County, so it is a joint
24  election, as well.
25      Q.   And so for the March 2018, I think, primaries,

Page 28

1  it was a joint contract between the Republican chair --
2  or the Republican Party and the Democratic Party?
3      A.   Correct.
4      Q.   And then I understand, too, that there are
5  sometimes special elections.  Do your responsibilities
6  change versus, again, a general election or --
7      A.   My only responsibilities that would change
8  would be the contract.
9      Q.   And you mentioned before that the Commissioners
10  Court is a direct authority over your capacity as
11  election administrator?
12      A.   Not over my position, but over my office.
13      Q.   Over your office.
14           And so what types of activities do you
15  need to run by them before you can move forward with
16  some of the duties that you need to?
17      A.   Commissioners Court has -- we have to have
18  Commissioners Court approval for anything that has to
19  do with the general election.  That means a
20  county-held election.  They would actually approve
21  our voting location.  They approve the election
22  judges and alternate judges and clerks that are
23  actually submitted by the party chairman.  They
24  actually approve the polling locations, which ones we
25  use.  As far as they approve all expenses that has to

Page 29

1  do with the general election.  They approve all
2  overtime, all work of my county employees during a
3  general election, and they also -- I'm sorry, and
4  they also approve the contracts when I contract with
5  the parties, as well.
6      Q.   And so for the county-wide general elections,
7  you mentioned that they approve expenses.  Now, do they
8  give you -- approve an initial budget or -- for each
9  different allocation?
10      A.   I have a budget that I prepare yearly.  It
11  is my actual office budget.
12      Q.   And for decisions on how to spend those funds,
13  do you have to go back and seek approval for -- let's
14  say you decide to hire 14 poll workers versus ten, or is
15  that within your power?
16      A.   That is within my discretion, to hire poll
17  workers within my budget.
18      Q.   And what about how many machines that are
19  allocated in an election?
20      A.   As far as -- the Commissioners Court does
21  not approve how many machines I allocate.  I do that
22  myself.
23      Q.   How about hours at polling locations?
24      A.   Yes.
25      Q.   That's within your responsibility?

8 (Pages 26 - 29)

1   A.   The Commissioners Court approved that and
2   the order of the election.
3   Q.   And are there instances where you need to seek
4   additional funds outside of the initial budget that's
5   approved?
6   A.   I have not had to.
7   Q.   And the Commissioners Court also approves the
8   contract once it's finalized?
9        MR. SEAQUIST:  Form.
10  A.   They do not approve the actual contract.
11  They actually approve the permission for me to
12  contract.
13  Q.   (BY MR. CUSICK) And in terms of -- I know
14  we discussed expenses, hours, hiring workers.  Are
15  those the same responsibilities that are within your
16  approval for the primary, as well?
17  A.   It is in -- it is my responsibility to do
18  that, but I do that with the agreement of the party
19  chair for which party I contract with.  We agree
20  together on how many workers they use, et cetera.
21  Q.   And machine allocation, is that also
22  collaboration with the party chairs?
23  A.   No, not with the party chairs.  I do that
24  myself.
25  Q.   And the hours?

1   A.   It's with the party chairs, as well.
2   Q.   I know we discussed on certain parts, I assume
3   that pertains to early voting, but generally, what are
4   your responsibilities in terms of early voting for a
5   general election?
6   A.   In a general election, I am the early voting
7   clerk, so I am the main -- my office is the main hub
8   for early voting.  I conduct all early voting by
9   mail.  I actually allocate all early voting locations
10  and oversee all branch early voting locations, as
11  well.
12  Q.   And I know the terminology changes, so for
13  branch locations, is -- how many permanent branch
14  locations are there for early voting?
15  A.   We have one -- we have one permanent
16  location, which is our main early voting location.
17  That's here in Hempstead at the county seat.  All
18  others are branch locations, temporary at that time.
19  Of course, it's changed now, but it was at that time.
20  Q.   We can talk about that in a -- and so for --
21  before the recent change, which we can talk about, are
22  you in charge of determining what temporary branch
23  locations are for early voting in general elections?
24       MR. SEAQUIST:  Form.
25  A.   I am not in charge of selecting those

1   locations.  I -- we use locations that have usually
2   been used in the past.  Then in a general election,
3   both party chairmen are given an opportunity to look
4   at those lists and approve them, and then those lists
5   are turned over to the Commissioners Court to approve
6   the locations.
7   Q.   (BY MR. CUSICK) And is that the same
8   process also for determining temporary locations for
9   the primary?
10  A.   No.  The primary -- the primary elections
11  are basically set and agreed upon by the party
12  chairmen and myself.
13  Q.   Once that agreement is set or -- or once that's
14  set, do you submit it to the Commissioners Court or is
15  it just kept internally?
16  A.   It always goes through Commissioners Court
17  to be on record, but it is not actually approved by
18  them.
19  Q.   And I know we spoke about the locations for the
20  general election for early voting.
21       Who is in charge of allocating hours
22  at polling locations?  Again, before the recent
23  change, so I guess in 2018, who would be responsible
24  for determining those hours?
25  A.   It would be my office with -- after there's

1   set agreement from the party chairmen, then they're
2   put through Commissioners Court to be voted upon.
3   Q.   And when you say "set agreement," do you
4   initially propose a list or do the party chairs come up
5   with the list first?
6   A.   We usually propose a list, a lot of what is
7   based on past elections or where the -- where the
8   need might be.
9   Q.   And since you've been election administrator,
10  this -- since 2017 until each primary that you've
11  oversaw in general election, have the party chairs
12  always been involved in that process?
13  A.   In the primaries, always.  In the general
14  election, yes, as well.
15  Q.   And was that the same process during your first
16  term, from '89 till '98?
17  A.   Yes.
18  Q.   The party chairs were setting --
19  A.   Yes.
20  Q.   And when you lived in Waller County, did you
21  participate in any of the county -- either the
22  Democratic or the Republican Party committees at all?
23  A.   No.
24  Q.   Do the -- does the Republican county party
25  chair, either the Democrat or the Republican, at all

9 (Pages 30 - 33)

Page 34

1 interact with the Washington County Democratic or
2 Republican chair?
3          MR. SEAQUIST:  Form.
4     A.   Not that I know of.
5     Q.   (BY MR. CUSICK) And are there any new
6 responsibilities that you've had to take on since
7 your first time as county election administrator
8 until the second time?
9     A.   Only where the laws have changed.
10    Q.   And so you've grown up in Waller County and
11 have been working in government.  I just want to ask,
12 what's your understanding of the history of voting for
13 Prairie View A&M students in Waller County?
14          MR. SEAQUIST:  Object to the form.
15    A.   I am not -- I am not familiar with the past
16 that has happened here, only what I've heard through
17 news stories or on the Internet.
18    Q.   (BY MR. CUSICK) And you mentioned you're
19 not familiar with the past.  Does that mean since you
20 were in high school, anything before high school?
21    A.   No, none before high school.
22    Q.   From what you understand, have Prairie View A&M
23 students experienced any issues trying to exercise their
24 right to vote since the 1980s?
25          MR. SEAQUIST:  Object to the form.

Page 35

1     A.   Can you ask that question again?
2     Q.   (BY MR. CUSICK) Sure.
3          Have Prairie View A&M students, to
4 your understanding, experienced any issues trying to
5 exercise their right to vote since the 1980s?
6          MR. SEAQUIST:  Object to the form.
7     A.   From what I've been told, yes.
8     Q.   (BY MR. CUSICK) And you mentioned that you
9 were told.  Was that through newspapers or personal
10 conversations with people?
11    A.   All of the above.
12    Q.   So news articles?
13    A.   Conversation, Internet.
14    Q.   Any government officials in Waller County --
15 you don't have to say their names, but conversations
16 about this with other Waller County --
17    A.   Yes.
18    Q.   Has it come up at all during official meetings
19 during your first term?
20    A.   No.
21    Q.   So there were no discussions -- I guess I'll
22 use 1988 just as rough-hand for now to '98 -- about
23 issues with Prairie View A&M students having their
24 voting rights exercised?
25          MR. SEAQUIST:  Object to the form.

Page 36

1     A.   No.
2     Q.   (BY MR. CUSICK) And no official meetings
3 was it brought up from March 2017 --
4     A.   Correct.
5     Q.   -- until today?
6          MR. SEAQUIST:  Same objection.
7     A.   Correct.
8     Q.   (BY MR. CUSICK) Have you been -- since
9 March of 2017, have you been in public forums where
10 it's been brought up?
11    A.   No.
12    Q.   Have you been to any events at Prairie View A&M
13 where it's been brought up?
14    A.   No.
15    Q.   Have you been to any courtroom proceedings
16 where it's been brought up?
17    A.   Only in Commissioners Court when the public
18 from Prairie View spoke.
19    Q.   And are you referencing meetings this past
20 October?
21    A.   Correct.
22    Q.   And so that was the only public forum where
23 it's been brought up that you were present?
24    A.   Correct.
25    Q.   Do you -- in your capacity as election

Page 37

1 administrator, do you outreach to Prairie View A&M students
2 to set the schedule for early voting?
3     A.   No.
4     Q.   And so for 2018, you wouldn't have interacted
5 with any Prairie View A&M students to ask them
6 preferences for hours or locations?
7     A.   No, not as far as hours.
8     Q.   And so based on the news articles, the
9 conversations, the articles you mentioned on the
10 Internet, what are some of the examples of voting issues
11 that students have faced that you recall?
12          MR. SEAQUIST:  Form.
13    A.   That I was told?
14    Q.   (BY MR. CUSICK) Correct.
15    A.   Or that I have experienced personally?
16    Q.   I guess, let's first go with what you were
17 told.
18    A.   What I had been told about questionnaires
19 being made to be filled out in the past, about
20 residency on the campus versus residency within the
21 county, about possible discrimination as far as
22 voting.
23    Q.   Any others for what you were told?
24    A.   That's about it.
25    Q.   And so for the issue with questionnaires, we

10 (Pages 34 - 37)

Page 38

1 can talk about that for a moment. Who conveyed that
2 information to you?
3    A. I don't remember.
4    Q. And what issues with the questionnaires or what
5 was the issue with the questionnaires?
6    A. I don't know what was on the questionnaire.
7    Q. You mentioned residency on campus versus the
8 county?
9    A. Correct.
10   Q. And do you remember who conveyed that
11 information to you?
12   A. No.
13   Q. And generally, what was the issue with that
14 with students exercising their right to vote in that
15 situation?
16        MR. SEAQUIST: Object to the form.
17   A. Being able to use a university address as a
18 permanent residence address in Waller County.
19   Q. (BY MR. CUSICK) And was that the issue that
20 people did not want them to use that permanent
21 address in Waller County?
22        MR. SEAQUIST: Object to the form.
23   A. I don't know.
24   Q. (BY MR. CUSICK) And then the third bucket that
25 you mentioned was possible discrimination. Was that --

Page 39

1 do you remember who conveyed that information to you?
2   A. No.
3   Q. Was that discrimination based on race?
4   A. No, based on residency.
5   Q. What about on age?
6   A. No.
7   Q. And so you haven't had any conversations of
8 issues of students experiencing racial discrimination on
9 campus?
10        MR. SEAQUIST: Object to the form.
11   A. Have I had any conversations with
12 students --
13   Q. (BY MR. CUSICK) Yes.
14   A. -- as far as racial discrimination? No.
15   Q. What about with other members of Waller County?
16   A. Members of Waller County?
17   Q. Residents.
18        MR. SEAQUIST: Object to the form.
19   A. Could you ask that again?
20   Q. (BY MR. CUSICK) Have you had any conversations
21 with Waller County residents about racial discrimination
22 against students?
23   A. No.
24   Q. And then -- so before, you mentioned you were
25 told some of these three buckets, and then you also

Page 40

1 mentioned that from personal experience, that you've
2 heard stories about students experiencing issues of
3 exercising their right to vote?
4        MR. SEAQUIST: Object to the form.
5   A. No.
6   Q. (BY MR. CUSICK) I'm sorry if I -- maybe I
7 misunderstood you.
8      Did you say you personally experienced
9 something relating to students exercising their right
10 to vote on campus?
11   A. No, I didn't say that.
12   Q. So it's only stuff that's been told to you?
13   A. Correct.
14   Q. And we spoke a little bit about students, and I
15 know that we talked about hours.
16      In 2018, for the primary, did you talk
17 to any students about locations for early voting?
18   A. No.
19   Q. What about for the general election?
20   A. No.
21   Q. Is that also true for the 2017 primary?
22   A. Correct.
23   Q. And is that also true for the 2017 -- is it a
24 bond election?
25   A. That was the general election --

Page 41

1   Q. General election is the bond.
2   A. -- 2017.
3   Q. And so you did not speak to students before --
4 in --
5   A. No.
6   Q. And do you remember any of the news articles
7 that you read that specified issues with voting on
8 campus?
9   A. Yes.
10   Q. Do you remember the outlets?
11   A. The Washington Post, The Dallas News, CNN,
12 MSNBC.
13   Q. And are those recent stories from 2018?
14   A. Correct.
15   Q. Any from 2019?
16   A. Yes.
17   Q. Did you read any stories about issues with
18 students voting on campus in 2017?
19   A. No.
20   Q. And you mentioned a Washington Post article?
21   A. Yes.
22   Q. Is that a recent article?
23   A. Yes.
24   Q. And a CNN article?
25   A. Not recent.

11 (Pages 38 - 41)

Page 42

1  Q.  For the CNN article, did you discuss that with
2  any members of your office?
3  A.  I'm sure I did.
4  Q.  Do you remember the nature of the article?
5  A.  Probably the addressing issue that was going
6  on in the general election.
7  Q.  And for the 2018 general election, do you
8  remember any articles you read outside of the rural
9  addressing issue about any issues students were
10 experiencing on campus trying to vote?
11 A.  Yes.
12 Q.  And was that the MSNBC article?
13 A.  It wasn't an article, it was on television.
14 Q.  Television.
15    Do you remember what station?
16 A.  No.
17 Q.  And about the -- what you watched on the news,
18 did you have conversations about that segment with
19 members in your office?
20 A.  Yes.
21 Q.  Do you remember what the segment was about?
22 A.  It was with Congress -- a candidate for -- a
23 state representative candidate, I think is what he
24 was running for, and was speaking about -- the issues
25 that were going on at Prairie View -- it was his

Page 43

1  opinion were going on at Prairie View.
2  Q.  And were those issues related to
3  discrimination?
4     MR. SEAQUIST:  Form.
5  A.  No.
6  Q.  (BY MR. CUSICK) What were the issues?
7  A.  Addressing.
8  Q.  And what is your understanding of the
9  addressing issue?
10 A.  Are you asking what --
11 Q.  I can rephrase.
12 A.  Could you?
13 Q.  Yes, not a problem.
14    So you mentioned that there was an
15 issue with addressing for students?
16 A.  Correct.
17 Q.  What was the -- what were the -- what was the
18 issue with that?
19 A.  A generic address that was given to students
20 that was not on campus.
21 Q.  And why would that be an issue?
22 A.  It was placing them in the wrong precinct.
23 Q.  And so that was brought to your attention for
24 the general election in 2018?
25 A.  No.  I found that issue myself in 2018, in

Page 44

1  the spring.
2  Q.  So before the --
3  A.  Before the election.
4  Q.  And was that the first time -- can we say the
5  rural addressing issue, shorthand, was brought to -- let
6  me rephrase.  Strike that.
7     Did students or other Waller County
8  residents ever mention this before 2018?
9     MR. SEAQUIST:  Form.
10 A.  Not to me.
11 Q.  (BY MR. CUSICK) Prior to your appointment,
12 did you have any conversations with the former
13 election administrator about ongoing issues in the
14 county, Dan Teed?
15 A.  I contacted him about the addressing issue.
16 Q.  And why did you contact him?
17 A.  To ask who issued that generic address to
18 the campus.
19 Q.  And did he know who did?
20 A.  Yes.
21 Q.  And?
22 A.  It would have been, just from what he told
23 me himself, the post office and members --
24 representatives from Prairie View A&M University.
25 Q.  And were there any issues with this rural

Page 45

1  addressing issue when he was election administrator,
2  from your conversation with him?
3  A.  Let me ask you a question.  I'm thinking
4  maybe we're talking about two things.  I'm talking
5  about the issue with the generic addressing.  You're
6  saying rural addressing.  There is some -- are we
7  talking about the same --
8  Q.  Yes.  I'll say -- let me rephrase.
9     For the addressing issue.
10 A.  For the addressing issue.  Okay.
11    Now, what was your question again?
12 Q.  During that conversation, did he mention that
13 there were any issues with -- while he was election
14 administrator with people going to different precincts?
15 A.  He did not realize that there was an issue.
16 Q.  And so you mentioned that people -- or
17 students, mainly, were being assigned to the -- a
18 different polling place than where they were supposed to
19 vote?
20 A.  Yes, based on that address they were given.
21 Q.  And do you remember the month you found out
22 about this issue?  You said early spring?
23 A.  I started investigating it in the early
24 spring right after the primary, right after the
25 primary election, so it was probably in April.  By

12 (Pages 42 - 45)

Page 46

1 the time I had found the issue, it was into the
2 summer.
3         And your question was what, when did I
4 do what?
5   Q.   Just the month.
6   A.   The summer, yes, that I knew that it was a
7 problem.
8   Q.   Verified it?
9   A.   Yes, in the summer.
10   Q.   And what prompted you -- I guess, how did you
11 come across that issue after the primary?
12   A.   We were discussing issues with long lines --
13   Q.   Okay.
14   A.   -- on the campus, and I was looking for ways
15 to remedy that and I came across the addressing
16 issue.
17   Q.   And so you confirmed or verified that this was
18 an issue sometime in the summer, and then what were the
19 steps that you took to resolve it?
20   A.   I -- there was -- the students didn't come
21 back to -- they were on their summer break.  They did
22 not come back until August, so I had to wait until
23 August for them to get back to start having voter
24 registration drives, change of address drives, to get
25 them to actually give their correct addresses on

Page 47

1 campus to correct those.
2   Q.   And so to resolve this issue, were you
3 conducting any of the voter registration drives on
4 campus?
5   A.   Yes, I did -- I did all of the ones that
6 were out there to correct this issue.  I also did
7 several classes of volunteer deputy registrars where
8 they would go out and help me as far as sorority,
9 student government council, spoke with several
10 representatives from the university and we were in
11 the process of correcting the address.
12   Q.   And when was the issue -- the addressing issue
13 resolved?
14   A.   It never was completely resolved.  It's --
15 it's an ongoing -- everyone that had the 700
16 University address has not been corrected due to them
17 not filling out a form.
18   Q.   We can touch base about the reason why in a
19 moment.
20         Then for the 2018 election, was there
21 some type of cure or solution to address it for
22 students voting in that election?
23   A.   Yes.
24   Q.   And what was that?
25   A.   They were to vote -- on election day, they

Page 48

1 could vote -- go to either precinct.  They would be
2 allowed to vote, and then they were to fill out the
3 change of address form afterward.
4   Q.   And is this the -- you mentioned it's not been
5 fixed yet?
6   A.   Correct.
7   Q.   Is this the same solution for ongoing -- for
8 upcoming elections that's going to be in place, where
9 they can vote at either precinct?
10   A.   No.
11   Q.   And why is that?
12   A.   Because anyone that has that 700 -- excuse
13 me -- University address will be able to fill out a
14 change of address form at that time, but they must
15 vote in their precinct that's actually registered to
16 them or actually given to them.
17   Q.   And so when they fill out the registration
18 form, they're assigned to a precinct?
19   A.   Uh-huh.
20   Q.   And it is -- when they're assigned to that
21 precinct, is that correct based on the 700 address?
22   A.   Not if that is the address that it's based
23 on, no.
24   Q.   So how do you convey that information that
25 they're being assigned to the wrong precinct?

Page 49

1   A.   How do I convey?
2   Q.   Or how are they put on notice that the precinct
3 they're being assigned to is not the one they should be
4 voting at?
5   A.   What they will do is now, they will have
6 a -- be on what's called a suspense list, with an "S"
7 beside their name, on the list of registered voters,
8 so when they go vote, the election judge will ask
9 them based on that "S," do you live at this address,
10 and they'll say no, and they're actually made to fill
11 out a change of address form with their current
12 address.
13   Q.   So let's say that a student goes to the
14 wrong -- or the assigned precinct that's incorrect.
15   A.   Correct.
16   Q.   They go to vote.
17   A.   Correct.
18   Q.   It's flagged that they have an "S," you said?
19   A.   Correct.
20   Q.   Suspense?
21   A.   Correct.
22   Q.   And so they cast -- they go to vote, they get
23 this flag, and then before they cast out a ballot, they
24 fill out a change of address form, and then do they have
25 to cast a regular ballot or a provisional ballot?

13 (Pages 46 - 49)

Page 50

1    A.   They can cast a regular ballot.
2    Q.   And so once they complete the change of form
3  address [as spoken], then moving forward --
4    A.   That is what gives them the right to cast a
5  regular ballot, is filling out that form.
6    Q.   And once the change of address form is
7  completed, then they're able to vote at that precinct?
8    A.   Yes.
9    Q.   Were there any issues during the 2018 election
10 where people were put on this suspense list and were not
11 able to cast a ballot?
12   A.   No.
13   Q.   And so do they have -- once they fill out the
14 change of address form, they don't have to submit any
15 additional change of address form in the next election?
16   A.   Correct.
17   Q.   And so it's permanently changed?
18   A.   Correct.
19   Q.   And when was the issue or -- for this -- I know
20 you mentioned before students could vote at either
21 precinct.
22        Do you remember the date when this was
23 announced to students?
24   A.   That they could vote at either precinct?
25   Q.   Yes.

Page 51

1    A.   That would be done -- it was during early
2  voting, I believe.
3    Q.   Sometime in October?
4    A.   It was announced through the Secretary of
5  State, correct.
6    Q.   And did you work with students to come up with
7  that solution?
8    A.   With what solution?
9    Q.   That they could vote at either precinct.
10   A.   That was a -- that was a -- that was made by
11 the Secretary -- that decision was made by the
12 Secretary of State's office.
13   Q.   So it had no -- were any Waller County
14 administrators, yourself or any of the Commissioners
15 Court involved with the Secretary of State in that
16 solution?
17   A.   We did --
18        MR. SEAQUIST:   Form.
19   A.   We had a discussion with the Secretary of
20 State.  The Secretary of -- let me rephrase that.
21        This -- the issue that the
22 Secretary -- or that the Secretary of State made
23 there was the second piece of advice that we had been
24 given from them.  They overruled the first piece that
25 they gave us, if that makes sense.

Page 52

1    Q.   (BY MR. CUSICK) And what was the first
2  piece they gave you?
3    A.   By law, by election law, you should fill out
4  an actual change of address form before you vote.
5  The Secretary of State's office changed it at the end
6  that they could vote first, fill out the form second.
7    Q.   And when was that initial -- or when did you
8  receive that?
9    A.   That was during early voting.
10   Q.   So was that also in October at some point?
11   A.   Correct.
12   Q.   And was it -- did you agree with that -- with
13 that --
14   A.   Correct.
15   Q.   -- with that recommendation --
16   A.   Yes.
17   Q.   -- or proposal?
18   A.   Yes.
19   Q.   You thought that would resolve the --
20   A.   Yes, yes.
21        MR. SEAQUIST:   Let him finish.
22        THE WITNESS:   Sorry.
23   Q.   (BY MR. CUSICK) And then so you received
24 that, you say it was a recommendation, or how would
25 you characterize it?

Page 53

1    A.   Yes.
2    Q.   Recommendation.
3        And then what prompted the second
4  recommendation by the Secretary of State's office?
5        MR. SEAQUIST:   Form.
6    A.   There were complaints from students and
7  candidates that were campaigning on the campus that
8  that was impeding the students voting, having to fill
9  the form out beforehand.
10   Q.   (BY MR. CUSICK) And why -- from your
11 understanding of these complaints, why was that
12 impeding their right to vote for the students?
13        MR. SEAQUIST:   Object to the form.
14   A.   What they -- what the students and the
15 candidates felt was the reason that it impeded it, it
16 was because that it was intimidation to have to fill
17 that out before they were able to vote.
18   Q.   (BY MR. CUSICK) Was that the only complaint,
19 was that it was a form of intimidation?
20        MR. SEAQUIST:   Form.
21   A.   Correct.
22   Q.   (BY MR. CUSICK) And you did not receive the
23 first recommendation from the Secretary of State,
24 following that students fill out a change of address
25 form before they voted.  Did your office intend to issue

14 (Pages 50 - 53)

1 any guidance about this issue to students?
2             MR. SEAQUIST:  Form.
3     A.  Guidance as far as?
4     Q.  (BY MR. CUSICK) What they should do if
5 they're assigned to the wrong polling --
6     A.  We had been doing that up until weeks before
7 the election when we started dealing with the
8 addressing issue.
9     Q.  And what type of outreach did you conduct?
10    A.  What I had told you earlier, the classes as
11 far as volunteer deputy registrars.  We met with
12 several sororities.  We met with the Student
13 Government Association.  They were all aware of the
14 issue and were passing along the information, and we
15 did that, as well, when we did our voter registration
16 drives.
17    Q.  So that began as soon as the students were back
18 on campus?
19    A.  That began in August.
20    Q.  And so you mentioned -- we touched base -- we
21 discussed before that this is an ongoing issue; is that
22 a correct characterization?
23            MR. SEAQUIST:  Form.
24    Q.  (BY MR. CUSICK) Or it hasn't been resolved?
25    A.  Completely correct.

1     Q.  And why is that?
2     A.  All of the students that did not change
3 their address when they voted.
4     Q.  And what would be the issue with that, they
5 would -- strike that.
6             Would those students still be assigned
7 to the incorrect polling precinct?
8     A.  Correct, based on their address.
9     Q.  I know I mentioned before the rural addressing.
10 Is there only one addressing issue that's at issue?
11    A.  That is, yes.
12    Q.  And how many students are assigned with -- to
13 the 700 address?
14    A.  I can't tell you exactly because some of
15 them have been already corrected, so I don't know
16 what the number is now.
17    Q.  Do you have a sense of how many students are
18 still incorrectly assigned to the polling precinct?
19    A.  To the wrong precinct?
20    Q.  Yeah.
21    A.  After we have gone and fixed them, probably
22 no more than 150, possibly.
23    Q.  And do you have any plans for this upcoming
24 election to continue to conduct outreach to addresses?
25    A.  I have already done that.  Just day before

1 yesterday, I had a voter registration drive on
2 campus.  Next week, I have two volunteer deputy
3 registrar classes set.  Every other Wednesday, we're
4 going to their hump day facility or their -- their --
5 and having voter registration drives there, and that
6 will be through the election.
7     Q.  And you initially -- or what first prompted you
8 to look into this issue?  You mentioned there were long
9 lines in the primary?
10    A.  No, there were long lines in the 2016
11 election.
12    Q.  2016 election.
13            And there were long lines at all
14 precincts or voting locations for early voting?
15    A.  That was before I was here so I'm not aware,
16 but I do know there were at that precinct.
17    Q.  And when was the -- this issue conveyed to
18 you -- or strike that.
19            You mentioned that there were long
20 lines in 2016.  Who mentioned or relayed that
21 information to you?
22    A.  No one in particular.  It was just a
23 consensus of everyone talking about things that had
24 happened in the election.
25    Q.  And so based on this consensus, were there long

1 lines at any early voting locations in Prairie View?
2             MR. SEAQUIST:  Form.
3     A.  When?
4     Q.  (BY MR. CUSICK) For 2016.
5     A.  I don't know.
6     Q.  What's your understanding of the history of
7 having a polling place on campus at Prairie View A&M
8 University?
9     A.  That there was a location, then there was
10 not a location due to remodeling and some issue --
11 building issues on campus.  Then the early voting
12 location was put back on campus several years back.
13    Q.  Do you remember when the first time Prairie
14 View A&M had an early voting location on campus?
15    A.  I don't remember the exact date, but they
16 had it closed for a while before it was taken off.
17    Q.  Was it during your first time as election
18 administrator from 1988 --
19    A.  Yes.
20    Q.  -- to 1998?
21    A.  Yes, they had one.
22    Q.  Was that every year?
23    A.  Are you asking me early voting or election
24 day?
25    Q.  Early voting.

15 (Pages 54 - 57)

Page 58

1    A.  I don't remember in early voting.
2    Q.  And for the general election, from 1988 to
3  1998, they had an on-campus --
4    A.  On election day, yes.
5    Q.  And so you mentioned it was -- early voting was
6  brought back onto campus?
7    A.  Correct.
8    Q.  And what year was that?
9    A.  I believe 2016, possibly.
10   Q.  And I know while the university is a big
11  campus, for the 2016 early voting location on campus,
12  what location was that?
13        MR. SEAQUIST:  Form.
14   A.  I don't know, I wasn't here, without
15  looking.
16   Q.  (BY MR. CUSICK) What about on election day
17  during your first time as election administrator?
18   A.  On campus.
19   Q.  And where on campus?
20   A.  At the student center.
21   Q.  The Memorial Student Center?
22   A.  Yes.  I think it was possibly called
23  something different, but it was at the student
24  center.
25   Q.  I just want to briefly go back to a portion of

Page 59

1  the deposition we were talking about before about issues
2  that students faced for exercising the right to vote on
3  campus.
4        Is your understanding, has there
5  ever been any racial discrimination against Prairie
6  View A&M students in Waller County?
7        MR. SEAQUIST:  Object to the form.
8    A.  Is it my understanding or I have heard or --
9    Q.  (BY MR. CUSICK) First, your understanding.
10   A.  Not personally.
11   Q.  But you've heard?
12   A.  Yes.
13   Q.  And who have you heard that from?
14   A.  Just the same, through news and articles and
15  industry.
16   Q.  And do you know any examples or -- what are
17  some examples that you heard?
18   A.  As far as racial discrimination?
19   Q.  Yes.
20   A.  I haven't heard examples of actually what
21  was done.  I have heard there were marches and
22  protests because they felt as if they were racially
23  discriminated against.
24   Q.  And do you remember when the marches and
25  protests you were talking about happened?

Page 60

1    A.  I don't.  They were when I was -- after I
2  had left.
3    Q.  And so that would be?
4    A.  I left in 1999.
5    Q.  And are there any more recent examples of
6  racial discrimination that you've heard --
7    A.  Not -- no.
8    Q.  -- since you've come back to Waller County?
9    A.  No.
10   Q.  And before you left, in your first time as
11  election administrator, did on-campus voting during the
12  general election remain on campus or was it taken away
13  after your --
14   A.  After I left?
15   Q.  Correct.
16   A.  It is my understanding it was taken away,
17  but it was due to the building being taken down and
18  remodeled.
19   Q.  The Memorial -- or whatever that student center
20  was called before?
21   A.  Correct.
22   Q.  And then after that was completed, from your
23  understanding, was it brought back to campus?
24   A.  Yes.
25   Q.  Do you remember the year?

Page 61

1    A.  That what?
2    Q.  It was brought back.
3    A.  I think 2016, 2015, right in there.
4    Q.  So from 1999 to 2015, it wasn't at Memorial
5  Student Center?
6    A.  No, it was there.  No, it was there.  I'm
7  not sure long it was taken down, but it was there
8  during that time.
9    Q.  And I think -- you have to excuse me because I
10  might misremember.
11        For the 2016 early voting on campus,
12  you don't recall where the location was?
13   A.  No.  I wasn't here again.  Without looking
14  at a list.
15   Q.  Sure.
16        And so in your current tenure as
17  election administrator, have there been any
18  disagreements among Waller County residents about
19  early voting?
20        MR. SEAQUIST:  Form.
21   A.  Yes.
22   Q.  (BY MR. CUSICK) What are some of those
23  disagreements?
24   A.  Are you --
25        MR. SEAQUIST:  Form.

16 (Pages 58 - 61)

1    A.   Are you speaking of the -- between Prairie
2   View students, are you speaking of Waller County as a
3   whole?
4    Q.   We can talk first about students.
5        Were there disagreements that students
6   had about early voting?
7    A.   Of where the location -- where it's located
8   at.
9    Q.   And did that happen -- were you election
10  administrator for the 2017 primary or did that --
11   A.   No.   There wasn't a primary in 2017.
12   Q.   Oh, okay.
13       Were those issues with early voting
14  that you mentioned, were those expressed during the
15  2017 general election?
16   A.   No.
17   Q.   So students didn't express any concerns --
18   A.   No.
19   Q.   -- about early voting on campus?
20   A.   No.
21   Q.   What about for the 2018 primary?
22   A.   No, because it was already there.
23   Q.   And do you remember the location where it was
24  for the 2018 primary?
25   A.   Student center.

1    Q.   And were there any disagreements about early
2   voting on campus in the general election for 2018?
3    A.   Yes.
4    Q.   And what were some of those disagreements?
5        MR. SEAQUIST:  Form.
6    A.   They're the disagreements in this lawsuit.
7    Q.   (BY MR. CUSICK) And how would you
8   characterize those disagreements?
9        MR. SEAQUIST:  Form.
10   A.   From what is in this lawsuit, telling us
11  they were not getting the ample amount of hours on
12  the university as in early voting and at the right
13  time.
14   Q.   (BY MR. CUSICK) Any others?
15   A.   No.
16   Q.   Were there any issues that were raised about
17  discrimination?
18   A.   No.
19       MR. SEAQUIST:  Form.
20   Q.   (BY MR. CUSICK) And then I know before
21  March of 2017, you are not election administrator,
22  but did the previous election administrator,
23  Mr. Teed, discuss any issues with on-campus voting of
24  students?
25   A.   Not with me.

1    Q.   And I know initially we just had focus on
2   students.  Now we'll talk a little bit broader about the
3   Waller County community outside of the student
4   population.
5        Did Waller County residents express
6   any concerns about early voting --
7    A.   No.
8    Q.   -- in 2017?
9    A.   No.
10   Q.   2018?
11   A.   No.
12   Q.   For the primary?
13   A.   No.
14   Q.   For the general election?
15   A.   No.
16   Q.   Did either of the party chairs express any
17  concerns about early voting on campus to you for the
18  2017 general election?
19   A.   No.
20   Q.   For the 2018 primary?
21   A.   No.
22   Q.   And for the 2018 general election?
23   A.   Not until afterwards.
24   Q.   And when you mention afterwards, after the
25  schedule was set?

1    A.   Correct.
2    Q.   And were there any disagreements about early
3   voting locations from students during your first time as
4   election administrator?
5    A.   No.
6    Q.   Or hours?
7    A.   No.
8    Q.   Is it fair to say that disagreements about
9   early voting allocation keep coming up in Waller County?
10       MR. SEAQUIST:  Form.
11   A.   It -- can you repeat that or rephrase that?
12   Q.   (BY MR. CUSICK) Is it fair to say that
13  students have continued to have disagreements about
14  early voting on campus in Waller County?
15       MR. SEAQUIST:  Object to the form.
16   A.   Yes.
17   Q.   (BY MR. CUSICK) And why is that, to your
18  understanding?
19   A.   Due to location and times at that location.
20   Q.   And these disagreements are from complaints by
21  Prairie View A&M students to you?
22       MR. SEAQUIST:  Objection to form.
23   A.   No.
24   Q.   (BY MR. CUSICK) How do you -- how do you
25  become aware about the disagreements, then?

17 (Pages 62 - 65)

Page 66

1    A.  I've had no complaints given to me
2  personally by any students as far as hours and
3  locations.
4    Q.  Have you read any newspaper articles where
5  students have made complaints about it?
6    A.  I've read newspaper articles where they've
7  discussed their complaints about the hours and
8  locations.
9    Q.  So even if they're not directly addressed to
10  you, you're aware that there are complaints by Prairie
11  View A&M students?
12    A.  Correct, and articles after this lawsuit was
13  filed.
14    Q.  And none before this lawsuit?
15    A.  Not -- no.
16    Q.  And knowing that there are these issues that
17  students are making complaints about, do you conduct any
18  outreach to understand or resolve them?
19    A.  Been conducting outreach.
20    Q.  And have you met with any students to resolve
21  the complaints?
22      MR. SEAQUIST:  Form.
23    A.  I meet with them, the Student Government
24  Association, as well as the sororities and the
25  fraternities there.

Page 67

1    Q.  (BY MR. CUSICK) And during these meetings,
2  do you discuss early voting locations?
3    A.  No.
4    Q.  Do you discuss early voting hour allocation?
5    A.  No.
6    Q.  Aside from the student government, the
7  fraternities and the sororities, are there any other
8  groups that you meet or work with?
9    A.  No.
10    Q.  Do you speak at all with any students
11  individually outside of these three groups?
12    A.  No.
13    Q.  And for the 2017 school year, we'll say from
14  September to May, do you remember who the student
15  government president was?
16    A.  No.  It was -- it was a guy.  There's a
17  female that's the president now.  I believe her name
18  is Princess.
19    Q.  And so what about from September 2017 until --
20  or, I guess, who -- who was the student council
21  president during the 2018 general election?
22    A.  I'm not sure if he was the president, but
23  I've met with Jamar Barnes.  He's usually the one
24  that sets it up, or a lot of times, their professor
25  sets it up, as well.

Page 68

1    Q.  And Mr. Barnes is a student?
2    A.  Yes.
3    Q.  Current student?
4    A.  Uh-huh.
5    Q.  You mention you meet with a professor?
6    A.  Sometimes their professor will call and set
7  it up.
8    Q.  Is that like a faculty adviser --
9    A.  Correct.
10    Q.  -- to the student government?
11    A.  Uh-huh.
12    Q.  And so you mentioned sororities and
13  fraternities.  What sororities do you meet with?
14    A.  The Alphas, the Kappas.  I met with them
15  just several weeks ago on a Saturday about the
16  election procedures.
17    Q.  And did you meet with the same sororities in
18  advance of the 2018 election?
19    A.  Yes.  I do --
20    Q.  Every year?
21    A.  -- every election.
22    Q.  And what about what fraternities?
23    A.  The Kappas -- or the Alphas.  I'm sorry.
24  They're the Alphas.  The others are the Kappas.
25    Q.  And so earlier -- earlier in the deposition,

Page 69

1  you mentioned complaints about an October meeting at the
2  Commissioners Court?
3    A.  Correct.
4    Q.  Do you regularly attend Commissioners Court
5  meetings?
6    A.  If I have something on the agenda, I do, or
7  that I know that will need a discussion.
8    Q.  Does that mean that only if you're speaking or
9  something might come up where you need to give advice,
10  you attend?
11    A.  Uh-huh.  Correct.
12      MR. SEAQUIST:  Mr. Cusick, we've been
13  going for a little over an hour.  When you get to a
14  spot that's convenient to take a break, I'd ask that
15  we take a quick break.
16      MR. CUSICK:  Sure.  Ten minutes?
17      MR. SEAQUIST:  Sure.
18    Q.  (BY MR. CUSICK) Is that okay with you?
19    A.  That's fine.
20    Q.  And so my apologies.  I went to a commuter
21  school.
22      The Alphas and the Kappas are
23  fraternities?
24    A.  A fraternity and a sorority, I think.
25  Whichever one.  The Alphas and the -- I don't know.

18 (Pages 66 - 69)

Page 70

1 The girl and the boy one.
2    Q.  Gotcha.
3         Could it be the Deltas?
4    A.  Yes.
5    Q.  The AKAs?
6    A.  Yes, yes.  You're right.
7    Q.  Do you know how long Prairie View A&M has
8 existed as an institution in Waller County?
9    A.  I don't.
10    Q.  Would you consider Prairie View A&M students as
11 one of the largest voting groups in Waller County?
12    A.  One of the largest.  Not the largest.
13    Q.  And what would be the largest?
14    A.  You're speaking of people that actually --
15 those that actually vote, or are you speaking of just
16 registered voters count?
17    Q.  Let's say registered voters first.
18    A.  The count?  No, they're probably third.
19    Q.  And then people who actually vote?
20    A.  No, they're -- they're way down the list.
21 I'm not exactly sure percentage-wise.
22    Q.  So would you say that Prairie View A&M
23 students -- strike that.
24         Do Prairie View A&M students use early
25 voting at a high rate?

Page 71

1         MR. SEAQUIST:  Form.
2    A.  Since I've been here, it was a -- yeah, high
3 in this last election.
4    Q.  (BY MR. CUSICK) In the 2018 general
5 election?
6    A.  Uh-huh.
7    Q.  And why do you think that is?
8         MR. SEAQUIST:  Form.
9    A.  I don't know.  I don't know.  Possibly it
10 was a -- they were voting for -- they had a candidate
11 there that they were supporting that was on campus.
12    Q.  (BY MR. CUSICK) What about for the 2018
13 primaries?
14    A.  I don't remember.  I don't remember how high
15 it was that they voted.
16    Q.  And so you mentioned before that Prairie View
17 A&M students for registered voters are the third
18 biggest?
19    A.  Yes.
20    Q.  What's the first biggest?
21    A.  Precinct 206 and 207, it's going to be your
22 Fields Store precinct in Waller.
23    Q.  And then 309 is Prairie View A&M?
24    A.  Correct.
25    Q.  And then I know I asked the question before

Page 72

1 about when Waller County [as spoken] was founded as an
2 institution.  Would it surprise you that it was 1876?
3         MR. SEAQUIST:  Object to the form.
4         You said Waller County, but I assume
5 you meant Prairie View A&M?
6         MR. CUSICK:  Yes, thank you.
7    A.  Does it surprise me, no.
8    Q.  (BY MR. CUSICK) And why is that?
9    A.  Why doesn't it surprise me?
10    Q.  Do they have a big presence in the community?
11    A.  The Prairie View --
12    Q.  The university.
13         MR. SEAQUIST:  Form.
14    A.  Meaning in the entire county?
15         Not that I know of, no.
16         MR. CUSICK:  I think -- off the
17 record.
18         MR. SEAQUIST:  Take a break?
19         (Recess taken.)
20    Q.  (BY MR. CUSICK) Hello again.
21    A.  Hello again.
22    Q.  Just want to follow up on a quick thread that
23 we were discussing before.
24         You had mentioned that you met with
25 the SGA, sororities and fraternities during each

Page 73

1 election cycle?
2    A.  Uh-huh.
3    Q.  And during the 2017 election cycle, when you
4 met with the Student Government Association, did you
5 discuss allocation of early voting on campus?
6    A.  No.
7    Q.  I'm sorry.  Does that include location and
8 hours?
9    A.  Yes.
10    Q.  What about with the -- any of the sororities
11 for 2017?
12    A.  No.
13    Q.  With the -- any of the fraternities?
14    A.  No.
15    Q.  And did any of these discussions during the
16 2018 -- or strike that.
17         You mentioned you met with them in
18 2018, as well?
19    A.  Yes.
20    Q.  And that was for the primary in addition to the
21 general election?
22    A.  Yes.
23    Q.  And was there any discussion during the meeting
24 with the Student Government Association about allocation
25 of hours or locations for the --

19 (Pages 70 - 73)

Page 74

1   A.  No.
2   Q.  -- primary?
3   A.  No.
4   Q.  Sororities?
5   A.  No.
6   Q.  And the fraternities?
7   A.  No.
8   Q.  And then the same question for the 2018 general
9  election?
10  A.  No.
11  Q.  For each of the Student Government
12 Associations?
13  A.  No.
14  Q.  The sororities?
15  A.  No.
16  Q.  The Deltas?
17  A.  No.
18  Q.  Or fraternities.
19      What was the general conversation with
20 the student government about in any of those years?
21  A.  Voter registration mostly, changes of
22 address for the addressing problem that we were
23 having, volunteer deputy registrars, that is,
24 actually deputizing students that could go out and
25 register others to vote and accept their applications

Page 75

1 back.
2   Q.  And anything else?
3   A.  No.
4   Q.  And then so earlier you mentioned you've read
5 materials relating to this lawsuit.
6       Have you read any of the expert
7 reports that plaintiffs disclosed to you through
8 counsel?
9   A.  Yes.
10  Q.  Did you read Dr. Joseph Pinyell's expert
11 report?
12  A.  I don't recall his name, but if it was one
13 of them, I did, yes.
14  Q.  And so we mentioned, spoke a little bit earlier
15 about the history of voting rights --
16  A.  Yes.
17  Q.  -- on Prairie View A&M's campus.
18      Are you aware or from your
19 recollection with reading his report that there was a
20 case involving discrimination against students that
21 went up to the Supreme Court?
22  A.  Yes.
23  Q.  During your time as election administrator the
24 first time, are you aware that there were threats of
25 prosecution for students who voted?

Page 76

1   A.  That is what I read.
2   Q.  But you were election administrator at that
3 time?
4   A.  No.
5   Q.  There were no threats of prosecution in the
6 1990s for students who voted?
7       MR. SEAQUIST:  Form.
8   A.  Not -- not that -- not that I remember.
9   Q.  (BY MR. CUSICK) Were there any instances of
10 the federal government's involvement, the Department
11 of Justice, conducting an investigation during your
12 first --
13  A.  No.
14      MR. SEAQUIST:  Form.
15  A.  When I left.
16      MR. SEAQUIST:  Object to the form.
17  Q.  (BY MR. CUSICK) When you started or when
18 you were appointed in 2017, were there any ongoing
19 obligations under federal court relating to voter
20 discrimination?
21  A.  No.
22      MR. SEAQUIST:  Object to the form.
23  Q.  (BY MR. CUSICK) Are you aware of any from
24 the -- from the -- from Dan Teed prior to your start?
25  A.  Correct.  Yes.

Page 77

1   Q.  And what was that?
2   A.  I do know that they had a -- a volunteer
3 deputy registrar program that they had a schedule
4 that they had to present on campus, but I do
5 believe -- or I know that this had already been
6 listed when I became election administrator in 2017.
7   Q.  And I know you're referring to a consent order?
8   A.  I believe so, yes.
9   Q.  And was that from the Department of Justice?
10      MR. SEAQUIST:  Form.
11  A.  I believe so.
12  Q.  (BY MR. CUSICK) Or was the Department of
13 Justice overseeing that consent order?
14      MR. SEAQUIST:  Form.
15  A.  I believe so.
16  Q.  (BY MR. CUSICK) I want to talk now a little
17 bit about transportation on campus for Prairie View
18 A&M students.
19      Is it your impression that -- what is
20 your impression of the vehicle ownership rate of
21 Prairie View A&M students?
22  A.  I have no -- absolutely no idea.
23  Q.  Do you have any sense how many students have
24 access to a car on campus?
25  A.  No, I don't.

20 (Pages 74 - 77)

Page 78

1    Q.   If students don't have access to a car, what
2  other alternative modes of transportation are available
3  for students to take?
4         MR. SEAQUIST:  Form.
5    A.  I don't know.  I have seen shuttles there,
6  but I don't know what other mode they have.
7    Q.   (BY MR. CUSICK) Is there any -- is the
8  shuttle considered public transportation?
9         MR. SEAQUIST:  Form.
10   A.  I don't know.
11   Q.   (BY MR. CUSICK) Is there any public
12 transportation in Waller County?
13        MR. SEAQUIST:  Form.
14   A.  I don't know.
15   Q.   (BY MR. CUSICK) You mentioned there was a
16 shuttle service.  Is that --
17   A.  Yes.
18   Q.  Do you know if that's private or public?
19   A.  I don't know.  I've seen Prairie View A&M
20 University written on the bus.
21   Q.  And for the Prairie View A&M shuttle service,
22 we'll say, do you know how extensive that route is?
23   A.  I don't.
24   Q.  Do you know if it just is on campus?
25   A.  I don't.

Page 79

1    Q.   So you wouldn't know if it comes to the
2  courthouse as a route?
3    A.  I don't know.
4    Q.  Does Waller County operate any public trains?
5    A.  No.
6    Q.  Public buses?
7    A.  Not that I know of.
8    Q.  Is there a bike share program?  I don't know if
9  Houston -- a bike share program that's available to
10 Waller County residents similar to what other cities in
11 Texas use?
12   A.  I don't know.
13   Q.  Is Waller County walkable, generally?
14        MR. SEAQUIST:  Form.
15   A.  I guess it depends on where you're walking
16 to.
17   Q.   (BY MR. CUSICK) That's true.
18        Let's go with Prairie View.  Is
19 Prairie View walkable?
20        MR. SEAQUIST:  Form.
21   A.  Yes.  In my opinion, yes.
22   Q.   (BY MR. CUSICK) And is that because there
23 are sidewalks throughout the city?
24   A.  Yes, there are sidewalks.
25   Q.  And it's walkable because there are accessible

Page 80

1  paths to get to different locations throughout the city?
2         MR. SEAQUIST:  Form.
3    A.  Are you -- on campus, there are paths and
4  sidewalks.
5    Q.   (BY MR. CUSICK) Are you familiar with the
6  St. Francis of Assisi Church in Prairie View?
7    A.  Yes.
8    Q.  Do you remember if that was the location in
9  2016 for early voting on campus?
10   A.  I don't remember.  I know it was used.  I
11 don't know what election it was for.
12   Q.  Do you know if walking from, let's say, the
13 Memorial Student Center as a general point in Prairie
14 View, that it was walkable from that point to the
15 church?
16   A.  Yes.
17   Q.  Is that because there's sidewalks?
18        MR. SEAQUIST:  Form.
19   A.  There's sidewalks.
20   Q.   (BY MR. CUSICK) The entire length?
21   A.  I don't know.
22   Q.  Do you have to cross any streets?
23   A.  I think so.
24   Q.  Do you have to cross any highways?
25        MR. SEAQUIST:  Form.

Page 81

1    A.  I don't know.
2    Q.   (BY MR. CUSICK) Have you ever walked from
3  the Memorial Student Center to the church?
4    A.  No.
5    Q.  During election, let's say it's early voting
6  day, for example, do you -- are you required to visit
7  different locations?
8    A.  I do.
9    Q.  And is the same for the general election?
10   A.  I do.
11   Q.  And how do you get from location to location?
12   A.  I drive my car.
13   Q.  And does anyone else -- or how many people work
14 within your office as election administrator?
15   A.  There's four.
16   Q.  Four?
17        And are they similarly going from
18 location to location, let's say, during an early
19 voting day?
20   A.  No.
21   Q.  Just you?
22   A.  And I don't every day.  I go and check on
23 them periodically.
24   Q.  And when you're going to check, what are you
25 reviewing when you're at the locations?

21 (Pages 78 - 81)

Page 82

1    A.  If I'm taking them supplies that they're
2  running out of, I will make sure their distance
3  markers are where they should be.
4    Q.  Like the 100-foot mark?
5    A.  Correct.
6         Basically checking with the judges to
7  make sure their equipment is running smoothly, if
8  they're having any problems or if they need anything
9  from my office.
10    Q.  And if there are issues that are -- that
11  happen, do you document those?
12    A.  Yes.
13    Q.  And in addition to the -- hopefully I didn't
14  miss any -- the supplies, issues with the distance, the
15  election judge, is that the title?
16    A.  Correct.  Uh-huh.
17    Q.  Do you also take into consideration if there
18  are long lines?
19    A.  Yes.
20    Q.  Voting machine malfunctions?
21    A.  Yes.
22    Q.  Any complaints about someone being turned away,
23  not --
24    A.  Yes.
25    Q.  -- allowed to vote?

Page 83

1         In 2018, did you go to any locations,
2  I guess in the Precinct 309, where students discussed
3  issues with voting based on the addressing issue with
4  you directly?
5    A.  When I went to the locations, did any
6  students?
7    Q.  Yeah.
8         Did you have any interaction with
9  students during the 2018 where you would have
10  documented complaints?
11    A.  No complaints, no.
12    Q.  Any issues that were raised with you?
13    A.  If some students saw me, they might have
14  asked me a question about the election, but no
15  complaints, no.
16    Q.  Does the election judge document problems or
17  issues during each day?
18    A.  Yes.  They have paperwork that they have to
19  fill out.
20    Q.  And those -- that paperwork is stored in your
21  office?
22    A.  Correct.
23    Q.  So you're the custodian of that?
24    A.  Correct.
25    Q.  Were there -- any issues that arose during the

Page 84

1  2018 general election, were those disclosed through
2  discovery?
3    A.  Repeat that.  Were they disclosed?
4    Q.  I can -- I can -- so you mentioned that you're
5  the custodian if -- for any documented reports from an
6  election judge of issues that arise at a polling
7  location, and so 2018, for the general election, do you
8  have any reports that you have about -- about issues
9  or --
10    A.  No.  Those are not -- they're not reports as
11  far as complaints.  They're paperwork that they have
12  to fill out as far as at the end of the period, was
13  the machine still running properly, were there lines
14  left.  That type of paperwork that they file.  It's
15  their normal paperwork.  It's not a report in
16  addition to what they do every day and have to turn
17  in.
18    Q.  And are these, say, paperwork --
19    A.  Correct.
20    Q.  -- was this paperwork disclosed to plaintiffs?
21    A.  No.
22         MR. SEAQUIST:  I'm not sure that that
23  was responsive to the request, but if you want to
24  point it out to me, I'd be happy to look at it.  I
25  don't remember seeing those.

Page 85

1         THE WITNESS:  No, it wasn't.
2         MR. CUSICK:  Okay.  We'll follow up.
3         MR. SEAQUIST:  Sounds good.
4    Q.  (BY MR. CUSICK) So I have a question about
5  the occupancy for how many voters at one time can be
6  in a specific facility or location.
7    A.  Uh-huh.
8    Q.  And do you know offhand how many can for the
9  community center in Prairie View City?
10    A.  How many people can -- I don't know what the
11  occupancy is, but it's a large building.  It's just
12  as much -- it's a large open building, so --
13    Q.  What about for the Memorial Student Center?
14    A.  No.  The Memorial Student Center, the
15  polling booths or voting booths are set up behind the
16  chairs in the auditorium, so it's just a strip along
17  the back of the auditorium in the entryway.
18    Q.  And then, so we've spoken a little bit earlier
19  about how early voting and election day schedules are
20  devised briefly, but I want to try to get a little
21  better sense of how this happens, and so could you walk
22  me through an election plan schedule in general, how
23  it's first developed for the general election until it's
24  produced through public notice?
25    A.  Meaning an early voting schedule or an

22 (Pages 82 - 85)

Page 86

1  election day polling location schedule?

2  Q.  Let's do early voting locations first.

3  A.  Early voting locations is based on usually

4  the locations that have been used in the past.  Like

5  I said before, the county seat is always remaining

6  early voting location, which will always be open.

7        Our county is stretched out.  As you

8  know, the shape of our county is very long.  There's

9  four cities within the county.  The larger cities,

10  which is Hempstead, Prairie View, Waller and

11  Brookshire, you try to set locations in those larger

12  areas to accommodate those people.

13        In the middle of Waller County, it's a

14  very rural area, stretches out.  Of course, the

15  population is not there that it is in the city, so

16  you sometimes put a location there, but you don't

17  need a location there for the entire period of early

18  voting just due to the population and the voter

19  turnout.

20        Based on their past voter turnout as

21  well as how many are registered that even possibly

22  did not vote but that could vote, we use that as a

23  marker on where to open an early voting location.

24        We also try to put the same amount in

25  each commissioner precinct, as well.  There are four

Page 87

1  commissioner precincts in Waller County, and based on

2  the election of what the election is -- for example,

3  we have an election in November.  It's only a

4  constitutional amendment election.  Of course, it

5  won't bring out the voters that a presidential

6  election would bring.  Therefore, you don't open --

7  we wouldn't open as many early voting locations as we

8  would in a more busy election.  Basically that is how

9  the early voting locations are comprised.

10        And in Prairie View, as that being one

11  of my hubs and one of my cities in our county, I have

12  to -- since there has been the request you have early

13  voting locations in the city as well as on campus, I

14  take that hub and I split it into two and divide the

15  times, or try to divide the times equally between the

16  two, whereas, Waller or Hempstead or Brookshire

17  doesn't have any other larger entity to divide it

18  with, so they therefore would get the whole amount of

19  time.

20  Q.  And so you mentioned some of the criteria that

21  you consider in drafting an initial plan, and then who

22  next sees that plan?

23  A.  After I do the plan is where I think it

24  should be, I submit it to the party chairmen for them

25  to look at.  Based on their recommendation, a lot of

Page 88

1  times they might look over it and say, why don't we

2  tweak this, why don't we tweak that, move this, move

3  that.  We make those changes then.  They approve

4  those changes, and then it's sent to Commissioners

5  Court for final approval.

6  Q.  And so --

7  A.  And that is in a general election.

8  Q.  And so after input from the chairs, chairs of

9  either party, there's no additional input from any other

10  Waller County residents?

11  A.  No.

12  Q.  And no other input from Waller County -- strike

13  that.

14        No input from the Secretary of State's

15  office?

16  A.  No.

17  Q.  As you're in the first phase of developing an

18  initial plan, do you seek any input from the

19  Commissioners Court, then, on questions?

20  A.  No.

21  Q.  So the first time the Commissioners Court is

22  seeing a proposed schedule is the first time they're

23  weighing in on it?

24  A.  Correct.

25  Q.  And this was the same process that's been in

Page 89

1  place in 2017 --

2  A.  Correct.

3  Q.  -- '18?

4        And I know you mentioned before that

5  funding is initially approved by the Commissioners

6  Court for the general allotment that your office has

7  for an election?

8  A.  Correct.

9  Q.  Is that source of the funding County?  Is

10  that -- does that come from the County, the source of

11  the funding?

12  A.  Yes.

13  Q.  And who decides how much funding your office

14  receives?

15  A.  I, as the department head, submit a budget

16  request yearly.  The budget committee oversees that

17  request and makes recommendations on my budget, and

18  that goes for approval through the Commissioners

19  Court.

20  Q.  Is your initial recommendation for a budget --

21  strike that.

22        For 2017, was your initial

23  recommendation for a budget approved before any -- or

24  were there changes that were made?

25  A.  There's always changes.

23 (Pages 86 - 89)

Page 90

1    Q.   Yes.  I guess generally, are the changes to
2  decrease the amount that you're requesting?
3    A.   The changes were still adequate enough for
4  me to -- to -- to have -- they were still adequate
5  enough for me to run my office.
6    Q.   And from the fiscal year 2017 compared to the
7  2018 year, was there any change in the amount of funding
8  that was approved?
9    A.   In an elections office, there's always a
10 change every other year.  You have a gubernatorial or
11 a Presidential election, then you have an off
12 election year.  Every other year we mail mass cards
13 out to everyone in the county, so one year you might
14 have a lower budget, the next year you have a high
15 budget, but -- so it changes as far as that aspect
16 goes but other than that, no.
17   Q.   So for the 2018 election, with it being a
18 midterm, would it be accurate to say you had a higher
19 budget than in 2017?
20   A.   Yes.  Correct.
21   Q.   Do you know offhand how much funding is
22 allocated -- strike that.
23        Is the amount of money allocated for
24 the specific type of election, like general, primary,
25 or is it just one big funding source?

Page 91

1    A.   It's one funding source, but you have to
2  remember the County doesn't fund a primary election.
3  The parties fund the primary election.
4    Q.   So the funding is only for, like, a November or
5  county-wide?
6    A.   The County funds early voting in a primary
7  election but not the actual election cost of election
8  day.
9    Q.   Does anyone else in your office participate in
10 the budget process?
11   A.   I have one girl, of course, in my office
12 that's more of our office manager.  She definitely
13 has input as far as the office supply amount that we
14 use, printing amount, things like that, but
15 initially -- or after that, I actually put the
16 numbers together and submit my budget.
17   Q.   Is there anyone else outside of your office and
18 outside of the Commissioners Court that you consult with
19 for a budget?
20   A.   No.
21   Q.   Would it be accurate to say that in your role
22 as election administrator, you're the person in the
23 Waller County government who has the most familiarity
24 with the needs for an election?
25        MR. SEAQUIST:  Form.

Page 92

1    Q.   (BY MR. CUSICK)  For the funding needs to --
2    A.   For the funding, correct.  What is needed,
3  yes.
4    Q.   You spoke earlier about machine allocation in
5  an election and you said that that's within your purview
6  for assigning or allocating in early voting as well as
7  the general?
8    A.   Correct.
9    Q.   And how is that decision made or what -- strike
10 that.
11        What criteria do you take into
12 consideration?
13   A.   I take into consideration the -- what
14 election it is that we're actually in, whether it's
15 an off election such as a constitutional amendment
16 election or if it's a general election.  Of course,
17 I'd use more machines because the turnout would be
18 greater.  Anytime, for example, in Prairie View, on
19 campus, if there were longer lines, I did what I
20 could to make -- remedy that situation by using more
21 machines, and also, actually, in that actual
22 precinct, we did double machines, so we actually had
23 two polling locations open in that one precinct.
24        Other places may have a low turnout.
25 They may only need three machines, whereas some that

Page 93

1  have a very high turnout such as in the Fields Store
2  area or the main locations, especially in early
3  voting, like here at the courthouse, or in Prairie
4  View, they would need more machines.
5    Q.   Talking a little bit about machines during
6  early voting cycle, are they generally kept in one
7  location or do you rely on using the same machine at
8  multiple locations, potentially?
9    A.   During early voting?
10   Q.   Yes.
11   A.   You try to use the same machines at each
12 location simply because once you use a machine during
13 early voting, by Texas election law, you can't use
14 that same machine on election day so, therefore, when
15 you allocate your machines in early voting, you have
16 to move them around in a way that you're not having
17 to pull from your reserve that you use on election
18 day so, therefore, when I open a precinct or a box,
19 for example, the Prairie View box, those machines
20 have to be used consistently right after another,
21 meaning that I could not use three days open, for
22 example, at the campus box and use those machines,
23 then take those machines and move them to a Hempstead
24 box and then go back to Prairie View again.  They
25 have to remain in those same -- in those same areas.

24 (Pages 90 - 93)

1          So by the Prairie View precinct where
2   I have to split them and move them from location to
3   location, I have to set the schedule where they're
4   right behind each other so that I can move machines
5   from one place to the next.  If I did not do that,
6   then I would have to open each location with its own
7   set of machines and, therefore, we wouldn't have
8   enough to -- from our reserve to pull from to be able
9   to do that.  Of course, the more early voting
10  locations that you open up, that means the less
11  machines that you have that you can use on election
12  day.
13      Q.   And you mentioned reserves.
14          How many are -- how many machines are
15  set aside as reserves in the early voting cycle?
16          MR. SEAQUIST:  Form.
17      A.   This last election -- of course, it's going
18  to be different in every election.  This last
19  election, we started with ten in reserve, and at the
20  time, we added to -- one box, which was the Hempstead
21  box.  We added machines to this box, as well, so by
22  the time that it was over, I think we had three left.
23      Q.   (BY MR. CUSICK) And when you're factoring
24  in those decisions to the reserve boxes, could those
25  be used as part of the general election?

1      A.   If they have not been opened, if the seals
2   have not been broken, they have not been opened in
3   early voting.
4      Q.   And what -- what would -- what would -- why
5   would you go into your reserves?
6      A.   The reserves that I have set back for
7   election day --
8      Q.   Yes.
9      A.   -- I mean, for early voting?
10     Q.   Correct.
11     A.   For example, this past one, the 2018
12  election, we had our main early voting here in
13  Hempstead.  I think I had -- initially, we had set
14  six machines, I believe, for this location.  The
15  lines started getting long.  We were having an influx
16  of people who were waiting outside so we needed to
17  add more machines so I went to my reserve, pulled
18  enough machines to add to this to make their line
19  shorter and to get people in and out quicker.
20     Q.   And are the machines moved that day or do the
21  machines open up the reserve machines for the -- that
22  next day?
23     A.   No, our -- in this past election, I did it
24  right away.  I brought them in right away.
25     Q.   Because of your familiarity with the machines,

1   would it be accurate to say that as election
2   administrator, you would be the person in county
3   government, Waller County government, who is most
4   familiar with the County's voting equipment inventory?
5      A.   Myself and the auditor.
6      Q.   And the auditor purviews the machines after
7   elections?
8      A.   No, I just meant my inventory of how many we
9   have there.
10     Q.   Do you remember how many machines were in use
11  for 2018 for the early voting cycle?
12     A.   I don't without -- I did not -- not adding
13  them together.  I -- I think it was probably in some
14  of our discovery, but I don't have it right here in
15  front of me.
16     Q.   Did Precinct 309 have the highest rate of early
17  voting for the primary in 2019?
18     A.   No.
19          As far as machines or votes?
20     Q.   For votes.
21          MR. SEAQUIST:  Form.
22     A.   No.
23     Q.   (BY MR. CUSICK) What about for the general
24  in 2018?
25     A.   No.

1      Q.   You mentioned before some of the criteria for
2   determining allocation of early voting precinct, for
3   locations.
4          Is there a set policy for determining
5   where polling places are going to be selected in your
6   office?
7      A.   Is there a procedure on where they will be
8   located?
9      Q.   Or policy that you use as guidance for making
10  these determinations?
11     A.   That's what we discussed earlier about
12  the -- the past turnout, what election it is, how
13  many are registered to vote there.
14     Q.   And then I know we've spoken a lot about early
15  voting.
16          Would it also be fair to say in your
17  role as election administrator, that you're the
18  person within the Waller County government with the
19  greatest familiarity with the early voting logistics?
20          MR. SEAQUIST:  Form.
21     A.   As far as statistic and the records, what I
22  have on record, yes.
23     Q.   (BY MR. CUSICK) I'm sorry, maybe I --
24  for -- what about for logistic purposes?
25          MR. SEAQUIST:  Form.

25 (Pages 94 - 97)

Page 98

1   A.  Yes.
2   Q.  (BY MR. CUSICK) If there are disagreements
3  in the process for early voting in the second step
4  when you're talking with the party chairs, if there
5  are disagreements, how are those disagreements
6  resolved for determining a location of an early vote
7  location?
8   A.  Well, if it can't be -- I've never had that
9  instance that we have not been able to resolve them
10  within -- within ourselves.
11   Q.  And then under the policy, though, if there --
12  if there was a disagreement, who would be the ultimate
13  decider to resolve that disagreement?  Would that be
14  you?
15   A.  I would go ahead -- because as you remember,
16  it's not law that -- that I even have to ask the
17  party chairman for a recommendation, although I
18  always do.  If they did not agree, I would recommend
19  my recommendation and then it would go through
20  Commissioners Court and they would decide which way
21  to go.  Of course, at a Commissioners Court meeting,
22  the party chair could stand up and -- and make
23  that -- give their -- why they didn't want that
24  there.
25   Q.  And you mentioned it's not law.  From 19 --

Page 99

1  during your first tenure, did you also consult party
2  chairs in determining --
3   A.  Yes, I have always consulted the party
4  chair.
5   Q.  Did -- was that process initiated by you or --
6   A.  No.
7   Q.  -- was that the previous practice?
8   A.  It's been done, yes.
9   Q.  Do you know the reason why?
10   A.  Well, basically the law states that the
11  party chair, even in a general election, submit a
12  list of workers that they want to work as election
13  workers in the election, so they do get that.  They
14  get that courtesy, which is law.  They get that
15  courtesy with that, so it's just for them to be able
16  to have the same courtesy in selecting some of the
17  early voting locations and the times that would work
18  best for their voters.  You try to work with both
19  parties to be fair and equal with them.
20   Q.  And that was -- from your understanding, was
21  that the same process during the previous administrator,
22  Mr. Teed?
23   A.  I believe so, yes.
24   Q.  So if somebody is not affiliated with either
25  party, why not reach out -- if it's not law, why not

Page 100

1  reach out to other community groups for input into this
2  process?
3   A.  Simply because, you know, Waller County is
4  made up of mainly Democratic and Republican parties.
5  We don't have an Independent, an active Independent
6  party here.  We don't have an active -- any other --
7  the Green Party, a Libertarian Party, anything like
8  this.
9      Anytime you look at your primary
10  election results, Waller County is divided into those
11  two parties.  It's only natural to reach out to them
12  for their opinions on -- on where to put the
13  locations.
14   Q.  And in your capacity, just during your current
15  tenure, have you attended any public forums where people
16  expressed concerns about non-party affiliated interests
17  being represented my the county party chairs in this
18  process?
19   A.  Have I been to any forums outside of the
20  county?
21   Q.  No, within the county.  I can clarify.
22      So for people who are not affiliated
23  with either party, have you attended or are you aware
24  of any concerns that have been expressed that their
25  interests are not represented in this process by a

Page 101

1  party chair?
2   A.  The only thing -- the only time that that
3  has been brought up was in a Commissioners Court
4  meeting, in a discussion when one of the students
5  asked why the Democratic chairman was representing --
6  or was making that decision for -- for them, that
7  what would happen if they were not a Democrat, that
8  they may have been from another party.
9   Q.  Would it surprise you if one of the
10  commissioners made a statement saying that many students
11  are not affiliated with either party?
12      MR. SEAQUIST:  Form.
13   A.  Would I be surprised if a commissioner
14  said --
15   Q.  (BY MR. CUSICK) That many students at
16  Prairie View A&M are not affiliated with either
17  party?
18   A.  I wouldn't be surprised, but I didn't hear
19  one that said that.
20   Q.  Do you have a sense of how many students on
21  campus are not affiliated with either party?
22   A.  No.
23   Q.  Having heard during the October 17th
24  meeting -- is that the one you're referencing?
25   A.  Correct.

26 (Pages 98 - 101)

1   Q.   Having heard students, Prairie View A&M
2   students, mention that their interests were not heard,
3   did you follow up with any of those students?
4   A.   Not -- not after that, no.
5   Q.   What about for the upcoming 2019 primary
6   election?
7   A.   We haven't -- oh, on 2019?
8   Q.   Yeah.
9   A.   I'm sorry.  There wasn't a primary in 2019.
10  Q.   What about for this 2019, have you done any
11  outreach for non-party affiliated, not only students but
12  residents of Waller County?
13  A.   Coming up in the next primary, we haven't
14  begun the process yet.
15  Q.   Have to bear with me just so I can get the nuts
16  and bolts.
17  A.   That's okay.
18  Q.   Is it the same process for selecting -- same
19  steps, where it goes first you have an initial plan,
20  County, the Republican/Democratic Party chairs weigh in,
21  then it goes to the Commissioners Court for also
22  locations and hours on election day?
23  A.   On election day, it's a little bit
24  different.  On election day in a county election,
25  county polling locations are already set.  They're

1   the same.  By law, you have to set a polling location
2   in each precinct, so those don't change on election
3   day.  They stay the same always, unless -- excuse me,
4   unless there's a reason to move them.
5        (Exhibit No. 2 marked.)
6        MR. CUSICK:  I'm going to introduce as
7   Exhibit 2 -- unfortunately, it printed out on this
8   longer paper -- as HB1888, which we briefly discussed
9   before, and this will be marked as Eason Exhibit 2.
10       I'm handing a copy to Ms. Eason, one
11  to her county -- or counsel, sorry.
12  Q.   (BY MR. CUSICK) I know we talked before, and I
13  understand that the landscape recently changed through
14  this bill which went into effect in September of this
15  year, I think, September 1st?
16  A.   Correct.
17  Q.   So with that said, though, I'm not going to
18  focus on this document right now.
19       I'd like to talk a little bit more
20  about the process in 2018.
21       Is it fair to say that neither party
22  chair would have veto power over an early voting
23  schedule that was submitted to the Commissioners
24  Court?
25  A.   Correct.

1   Q.   And there's no policy in place.  I know you
2   mentioned it's not in law to involve them, but there's
3   no policy in place in how to solicit their input?
4   A.   No, not on the early voting locations.
5   Q.   Are you -- do you know if that's the practice
6   in other counties, to involve either the Republican or
7   Democratic Party chairs?
8   A.   I wouldn't know offhand.
9   Q.   And in this process, why is it important to
10  involve the county chairs?
11  A.   Like I said, Waller County is represented by
12  the Democratic and Republican parties here.  We do
13  that in a good faith effort to give both of them
14  equal representation throughout the county, as I feel
15  it should be.
16  Q.   And then for the 2018 general election, do you
17  remember when the early voting information for locations
18  was first made public?
19  A.   September, possibly.  I don't have the date
20  right here with me.
21  Q.   And when it's made public, is that because it's
22  presented at a Commissioners Court meeting or does the
23  Commissioners Court first review it and then vote on it?
24  A.   No, they do not review it first.  They vote
25  on it when they review it.

1   Q.   Do you remember the date for when early voting
2   locations are approved for the 2018 general election?
3   A.   I don't remember the exact date, no.
4   Q.   Would they be approved in September?
5        MR. SEAQUIST:  Form.
6   A.   I don't remember what date it was.  It
7   possibly could be.
8        (Exhibit No. 3 marked.)
9        MR. CUSICK:  I'm introducing into the
10  record exhibit Eason Exhibit 3 which is a document
11  entitled "Expert Report of Dr. Henry Flores."
12       Handing a copy to Ms. Eason, one to
13  her counsel.
14  Q.   (BY MR. CUSICK) Ms. Eason, do you recognize
15  this document?
16  A.   Yes.
17  Q.   And I know earlier you mentioned you read
18  this -- read this report?
19  A.   Yes.
20  Q.   And I want to first turn our attention to Page
21  14, beginning with the first paragraph on that page that
22  begins with, "Specifically."
23       And then do you mind reading that
24  first paragraph into the record?
25  A.   Myself?

27 (Pages 102 - 105)

Page 106

1    Q.   Yes.
2    A.   "As a result, it appears that the" --
3    Q.   Sorry.  I'm sorry to interrupt.  On Page 14,
4  the first paragraph.
5    A.   I'm on 14.
6    Q.   Oh, sorry.  Starting with, "Specifically," the
7  first full paragraph.
8    A.   "Specifically on August 22, 2018, four
9  members in attendance at a regularly scheduled
10  meeting of the five-member Waller County
11  Commissioners Court unanimously approved only the
12  early voting locations for the 2018 general election.
13  During the public comment portion of the
14  August 22nd meeting, a member of the public
15  Dr. Denise Mattox, informed the commissioners that
16  she had reviewed the proposed list of locations to be
17  approved at the meeting and noticed with concern that
18  it doesn't have the times.  She further stated, 'I
19  guess you'll do that at a later date.  Hopefully I
20  can have input in that.'  However, she said, because
21  the commissioners had not yet publicized or discussed
22  the proposed hours and dates of early voting, that
23  there was not enough information to have input on the
24  early voting, which is what she was mostly concerned
25  about."

Page 107

1    Q.   And so from this representation, do you have
2  any reason to disagree that the August 22, 2018
3  Commissioners Court meeting was when the locations were
4  first --
5    A.   Correct.
6         MR. SEAQUIST:  Object to the form.
7    Q.   (BY MR. CUSICK)  And so it was on
8  August 22nd, 2018, and so you, prior to this
9  meeting, conducted outreach to the party chairs?
10    A.   Correct.
11    Q.   And you, yourself, obviously conducted your
12  own --
13    A.   Correct.
14    Q.   -- analysis?
15    A.   Uh-huh.
16    Q.   When do students generally come onto campus at
17  the beginning of a school year?
18    A.   At the end of August.
19    Q.   And so in developing this plan, would you even
20  have the ability or would the chairs even have access to
21  students before that August date for input?
22    A.   I don't know if they have access to them or
23  not, but there are certain deadlines by law that you
24  have to -- to do your notice, order your elections.
25    Q.   Do you think it would be beneficial for it to

Page 108

1  start later in the cycle so party chairs might be able
2  to speak to students on campus?
3         MR. SEAQUIST:  Object to the form.
4    A.   Do I believe what should start later?
5    Q.   (BY MR. CUSICK)  The process for determining
6  early voting locations.
7         MR. SEAQUIST:  Same objection.
8    A.   No.  Like I said, there's -- there's certain
9  deadlines that we have to meet in order to do this.
10    Q.   (BY MR. CUSICK)  And when you say "we," is
11  that your office?
12    A.   The -- everyone.
13    Q.   The county?
14    A.   The state of -- anyone that's -- that's
15  actually making early voting locations in the state.
16    Q.   And what are those deadlines?
17    A.   I don't have it in front of me what the
18  deadline was.
19    Q.   So it would be a deadline for setting
20  locations?
21    A.   There -- yes.  There's a deadline you have
22  to have the locations set in order to order the
23  election.
24    Q.   Is the election ordered after the locations are
25  set --

Page 109

1    A.   Yes.
2    Q.   -- or before?
3    A.   It has to be after.
4    Q.   So for --
5    A.   Because in the order of election, it states
6  the locations.
7    Q.   And for ordering a county-wide election, that
8  comes through the Commissioners Court?
9    A.   Correct.
10    Q.   And then if you could continue on that page in
11  the last full paragraph where it begins, "Ms. Christy
12  Eason" --
13    A.   Uh-huh.
14    Q.   -- and then to the end of the -- to the end of
15  that paragraph, which carries over to 15, if you'd just
16  mind reading that into the record.
17    A.   "Ms. Christy Eason, Waller County elections
18  administrator, was not in attendance.  However,
19  County Judge Duhon read an E-mail from Ms. Eason
20  stating that early voting -- early voting dates and
21  times in each voting polling location will be set
22  at -- after our training on the equipment.  Judge
23  Duhon then recounted a subsequent telephone
24  conversation he claimed to have had in which he asked
25  Ms. Eason if the party chairmen, if everybody was on

28 (Pages 106 - 109)

Page 110

1 the same page, in agreement with the schedule.  She
2 said they were.  Prior to the vote, Commissioner
3 Beckendorff confirmed that right now, we're just
4 voting on the location and the times, I guess, will
5 be discussed at a later date."
6      Q.   And do you recall that telephone
7 conversation --
8      A.   Yes.
9      Q.   -- with Judge Duhon?
10     A.   Yes.
11     Q.   Is that an accurate --
12     A.   Yes.
13     Q.   -- characterization of the content?
14     A.   Yes.
15     Q.   And then in that paragraph, too, Judge Duhon
16 read into the record an E-mail from you; is that
17 correct?
18          MR. SEAQUIST:  Form.
19     A.   I don't know.  Did it say that?
20     Q.   (BY MR. CUSICK) Yeah, it's --
21     A.   Yes.
22     Q.   -- the last line.
23     A.   Yes.
24     Q.   And do you recall sending that E-mail --
25     A.   Yes.

Page 111

1      Q.   -- to Judge Duhon?
2      A.   I always send an E-mail with -- I always
3 send an E-mail along with a court -- an item to be
4 placed on Commissioners Court.
5      Q.   And when you mention -- or when it's mentioned
6 that Judge Duhon mentioning that party chairs need to be
7 on the same page or in agreement with the schedule --
8      A.   Uh-huh.
9      Q.   -- does that mean they're --
10     A.   They have agreed, correct.
11     Q.   And at that time, was there a -- at that time
12 in the process, had you started discussions about early
13 voting hours?
14     A.   Yes, and they would be followed up on the
15 order of election, which came next to the
16 Commissioners Court.
17     Q.   And so if a Waller County resident was a -- not
18 affiliated with either party but they wanted to get some
19 input either into the location or the hours, is there
20 any mechanism for them to do that?
21          MR. SEAQUIST:  Form.
22     A.   No.
23     Q.   (BY MR. CUSICK) Either for location or
24 hours?
25     A.   No, other than attending Commissioners Court

Page 112

1 on the day that it was presented.
2      Q.   Do you have any concerns that presenting the
3 schedule for the first time publicly doesn't give
4 community members a chance to fully assess the impact of
5 the locations on their voting right?
6          MR. SEAQUIST:  Form.
7      A.   The actual location -- I mean, the actual
8 item that was on the agenda had been placed on the
9 agenda and it had been public record.  The agenda had
10 been posted, so they were aware that it would be
11 discussed in Commissioners Court.
12     Q.   (BY MR. CUSICK) And how many days -- I'm
13 sure this is regulated by state law.  How many days
14 in advance is an agenda posted?
15     A.   I don't know on a Commissioners Court
16 agenda.  I know it's always posted on a Friday.  We
17 have Commissioners Court on Wednesday, so --
18     Q.   And so during the Commissioners Court meeting
19 when you're discussing either location or hours for
20 early voting, do you go over the criteria and all the
21 background information that went into the process so
22 people who are attending it have a full understanding of
23 what factors were taken into consideration?
24     A.   No, not in Commissioners Court.
25     Q.   So how would -- what would be the process,

Page 113

1 then, for somebody in attendance to ask questions about
2 that process?  Do they direct them to you?
3      A.   They would direct them to the Commissioners
4 Court.
5      Q.   And then the Commissioners Court would ask you
6 to address it?
7      A.   Yes.
8      Q.   And is the process you outlined before about
9 your involvement in the beginning and the party chair,
10 is that publicly known to folks that that's the
11 process --
12          MR. SEAQUIST:  Form.
13     Q.   (BY MR. CUSICK) -- for --
14     A.   Is it publicly known such as how?
15     Q.   So let's say, for example, that students for
16 the first time are coming onto campus in August.
17 They're interested in voting, they show up to a
18 Commissioners Court meeting.  Would those students know
19 even the background about this to even inquire about how
20 the procedure is followed?
21          MR. SEAQUIST:  Object to the form.
22     A.   No, I'm sure not, not unless they ask that
23 day in Commissioners Court.
24     Q.   (BY MR. CUSICK) Do you think there's any
25 benefit to providing notice to incoming students who

29 (Pages 110 - 113)

Page 114

1 either -- strike that.
2          Do you think there's a benefit to
3 provide this background information to people
4 attending that hearing so they understand even the
5 types of questions they might want to ask?
6          MR. SEAQUIST:  Object to form.
7     A.  It could be.
8     Q.  (BY MR. CUSICK) Could it be beneficial?
9     A.  It could be.
10    Q.  Have you ever considered sharing that prior to
11 disclosing the first -- for the first time an early
12 voting schedule?
13          MR. SEAQUIST:  Form.
14    A.  I have not.  No, I have not.
15    Q.  (BY MR. CUSICK) Have students expressed
16 concerns about the lack of transparency with the
17 process for setting the early vote schedule?
18    A.  Never to me.
19    Q.  What about in a public setting that you were in
20 attendance at?
21    A.  The one Commissioners Court meeting.
22    Q.  So just that October 17, 2018 meeting?
23    A.  Yes.
24    Q.  When it's presented to the Commissioners Court,
25 for example, on August 22nd, 2018, it's presented and

Page 115

1 voted on that same day or is the vote -- or is it voted
2 and presented that same day?
3    A.  Yes.
4    Q.  And so people who are attending only have the
5 duration of the meeting to provide input before it's
6 voted on?
7    A.  They can provide input that day, but they
8 would have known about it from the agenda being
9 posted days prior.
10    Q.  And is there any mechanism for people who can't
11 attend the hearing to provide input?
12    A.  I don't know.
13    Q.  Do you have any concerns that people who might
14 not be able to attend but want to comment or provide
15 input, that there should be a mechanism?
16    A.  I don't know how -- how that works with
17 Commissioners Court.
18    Q.  And so on the agenda that's posted before a
19 Commissioners Court meeting, does that include the early
20 vote schedule as an attachment?
21    A.  Yes.
22    Q.  And that's posted -- is that -- for the 2018,
23 that was posted on the Commissioners Court website?
24    A.  On the website with their backup documents.
25          (Exhibit No. 4 marked.)

Page 116

1          MR. CUSICK:  I'm marking as Exhibit 4
2 the 2018 general election, November 6, 2018, early
3 voting and election day polling places schedule as
4 Bates stamped Defendant 000131.  Handing a copy to
5 Ms. Eason, for counsel.
6    Q.  (BY MR. CUSICK) Do you recognize Exhibit 4,
7 Ms. Eason?
8    A.  I do.
9    Q.  Does this reflect the early voting locations
10 accurately for the November 2018 elections that were
11 approved at the Commissioners Court?
12    A.  Yes.
13    Q.  And earlier you read in Dr. Flores' report a
14 mention about Dr. Denise Mattox asking for input into
15 the hours for early voting locations.  Did she have any
16 input?
17    A.  Into the hours, no.
18    Q.  And why not?
19          MR. SEAQUIST:  Form.
20    A.  I don't know why not.  She never came to ask
21 me.
22    Q.  (BY MR. CUSICK) And now we'll talk a little
23 bit more about the -- talk a little bit more about
24 the hours and days for early voting in the 2018
25 general election.

Page 117

1          Under the same process, are you -- you
2 made the initial determination for the initial
3 proposal before sending it to the chairs?
4    A.  Yes.
5    Q.  And when does this process generally take
6 place, is it after the locations are set?
7    A.  Repeat that?
8    Q.  My apologies.
9          When you begin your initial plan for
10 hours at early voting locations, is that after the
11 locations have been approved or is that -- is it an
12 ongoing process?
13    A.  It's just an ongoing -- an ongoing process.
14    Q.  And do you remember when this process began for
15 the 2018 general election?
16    A.  It began during the time -- if this was
17 submitted on August the 22nd, I think you said --
18    Q.  Yes.
19    A.  -- then this would -- during -- during the
20 times that the times were being considered during
21 that period.
22    Q.  And are you the first person that drafts the
23 actual plan or -- to send to the county chairs?
24    A.  Yes.
25    Q.  And for the 2018 general election, was there

30 (Pages 114 - 117)

1 anyone else in your office before it was sent to the
2 county chairs that participated in the development?
3    A.   We all do in our office.  We all sit down in
4 a team meeting and discuss the turnout prior and so
5 forth.
6    Q.   And I believe we have this for the record, but
7 the Republican Party county chair in 2018 I believe
8 still is David Luther?
9    A.   Yes.
10    Q.   And the same for the Democratic Party chair in
11 2018, it currently is Ms. Rosa Harris?
12    A.   Yes.
13         (Exhibit No. 5 marked.)
14         MR. CUSICK:  I'm going to introduce as
15 Eason Exhibit 5, handing a copy to Ms. Eason.  This
16 document is entitled the "Verity Equipment Assignment
17 for the 2018 General Election."
18         Handing a copy to her counsel.
19    Q.   (BY MR. CUSICK) Are you familiar with
20 Exhibit 5, Ms. Eason?
21    A.   Yes.
22    Q.   Did this document originate from your office?
23    A.   Yes.
24    Q.   And can you explain the purpose for this
25 document, why -- why you generated this document?

1    A.   Yes.  This is my equipment assignments.
2         MR. CUSICK:  Off the record.
3         (Recess taken.)
4    Q.   (BY MR. CUSICK) So just before we went off
5 the record, I had introduced Eason Exhibit 5, which
6 is the Verity Equipment Assignment 2018 General
7 Election document, and I believe you mentioned you
8 recognized the document, Ms. Eason?
9    A.   Yes, uh-huh.
10    Q.   And you also mentioned this originated from
11 your office?
12    A.   Yes.
13    Q.   Can you briefly explain what the purpose of
14 this document is?
15    A.   Yes.  This is actually equipment assignment
16 that we initially assign machines to locations.
17    Q.   And for my ease of reference, on the top of
18 that, there's that box in white.  Can you explain what
19 each of those terms mean for "Controls," "Access,"
20 "Touch," and then "Access Used for Backup"?
21    A.   Right.
22         31 controllers.  Your controller is
23 your actual -- your box that you run the -- the
24 machines off of.  Your controller is where you pull
25 the voter up.  It's the main control box that runs

1 the rest of your machines.
2         Your access are your handicap
3 accessible units, and your touch are your normal
4 election day units.  However, both of them can be --
5 your access can be used as a touch, as well, so those
6 means those are the actual units that you vote on,
7 the ones that you actually touch the screen to vote
8 on.
9         The controllers are the ones that
10 actually just control the units, so, for example, you
11 have to have one controller per five touch machines.
12 If you wanted to use more machines, you'd have to use
13 another controller with five touch machines.
14    Q.   And then "Access"?
15    A.   And then we had -- your access are your
16 handicap accessible.  There are also regular touch
17 machines.  You can still vote on them, a regular
18 voter can still vote on them; however, they are
19 handicap accessible, too, so they have your
20 earphones, they have your touch and -- I mean your
21 sip and -- you know, your puff and sip or whatever
22 you call that little straw, has that on there, so
23 they are handicap accessible, as well, so they do two
24 things.
25    Q.   And then the touch are the machines, as well?

1    A.   Uh-huh.
2    Q.   And then the same for --
3    A.   So the access and your touch, actually you
4 could add those two together because that's how much
5 units you have that you could actually vote on,
6 correct.
7    Q.   And the same for the last category, "Access
8 Used for Backup"?
9    A.   Yes, at that time, uh-huh.
10    Q.   And then in the third box that's in blue, do
11 you mind reading into the record the equipment
12 assignments in the first column beginning with, "After
13 early voting," so -- beginning with, "The courthouse,"
14 just the names.
15    A.   In early voting, I'm sorry.  You want it in
16 early voting?
17    Q.   Yeah, under "Equipment Assignment" and then
18 below.
19    A.   Correct.
20         On courthouse, there was one
21 controller, three access and six touch.
22    Q.   You could -- sorry, my -- I don't want to
23 interrupt.  You can just read the equipment assignments,
24 just the -- just the names of the spots, so courthouse,
25 WISD admin.

31 (Pages 118 - 121)

Page 122

1    A.  Oh, yeah.
2         Courthouse, WISD admin building, the
3  Brookshire Library, Katy VFW, JP3 and 2, which is
4  Fields Store and Monaville, PVAMU student center, the
5  community center and then City Hall in Prairie View.
6    Q.  And these are all the early voting locations --
7    A.  Correct.
8    Q.  -- for 2018 general?
9    A.  Correct.
10   Q.  And then the other three columns entitled
11  "Control" or "Access" and "Touch" --
12   A.  Correct.
13   Q.  -- those are the types of machines that are
14  there?
15   A.  Correct.
16   Q.  And so as you mentioned before, the reason that
17  the Prairie View A&M student center has two controllers
18  is because there are ten machines?
19   A.  Correct.
20   Q.  So they needed five for each?
21   A.  So actually, they could -- there was two
22  polls open.  They could vote in either line, so there
23  actually was -- we could have two lines running at
24  the same time.
25   Q.  And for the touch screen assignments, in the

Page 123

1  last column, the Prairie View A&M student center had the
2  most touch screen equipment?
3    A.  Correct.  Correct.
4    Q.  And along with the county courthouse, in
5  access --
6    A.  Correct.
7    Q.  -- it also had the highest?
8    A.  Correct.
9         Access, usually you give one access,
10  usually, to each precinct, but we have more access --
11  and like I said, they can be used as touch, as well,
12  so, for example, Prairie View A&M student center,
13  they had seven touch.  It says three access, so,
14  really, we have one designated for -- we have one
15  designated for, actually, handicapped or accessible,
16  and then the other two we used as touch because we
17  had more access than we had -- so we could use them
18  for that.
19   Q.  Gotcha.
20         And so if I'm reading this chart
21  correctly, and just looking at access and touch, more
22  machines for early voting were assigned to the
23  Prairie View A&M campus than any other location?
24   A.  Correct.
25   Q.  Including the courthouse?

Page 124

1    A.  Correct.
2    Q.  And why would that be?
3    A.  Why were they?
4    Q.  Yeah.
5         Why would the -- why would Prairie
6  View A&M have more machines assigned than other
7  locations?
8    A.  Well, first of all, because I did that to
9  avoid lines at -- the location is in the student
10  center, which is in the hub of their -- the very
11  middle of their eating, their lunchroom, their
12  cafeteria.  Sometimes it gets really heavy right
13  there so there were more there so the lines wouldn't
14  be as long, and then there was also so they could
15  have two lines going, as well, so they could have two
16  different -- two different polling locations so it
17  would move a lot smoother.
18   Q.  And the long lines would be a result of people
19  trying to vote?
20   A.  Well, yeah, the long lines would be for
21  that, and we anticipated -- at that time, that's when
22  the campaigns were out at the campus, as well, so we
23  knew that there would be heavy early voting there,
24  you know, at that time, so that's why those were put
25  that way, to help accommodate their lines.

Page 125

1    Q.  And you mentioned that there are campaigns
2  during those -- those hours and days.  Were there any --
3  were there similar types of campaigns during the
4  courthouse hours and days?
5    A.  Not like there were out there.  The actual
6  candidates were out at the campus.
7    Q.  Now, turning to the orange table, this is the
8  assignment for election day?
9    A.  Correct.
10   Q.  And under the second column for 309, 309
11  precinct has the highest amount of registered voters; is
12  that accurate?
13   A.  Well, you got to -- I don't know if you're
14  familiar with the registered voters and suspense?
15   Q.  You mentioned that before, that people could --
16   A.  Actually, what registered voters is is how
17  many people are actually registered to vote in that
18  precinct.  There's 4,834 registered voters there, but
19  that includes their suspense voters, so that means --
20  and they have, like, 1,200 suspense voters, so that
21  means those 1,200 are actually -- they're sitting in
22  limbo.  They're -- they're -- if they don't fix that,
23  that means that they will be canceled the next time
24  we do a purge.
25         So actually, if you took that amount

32 (Pages 122 - 125)

Page 126

1  off, there's only going to be 3,000 and whatever
2  that's going to be that would be that would be active voters, and
3  all of the precincts are like that right now.
4      Those -- those numbers right there, they actually --
5  all of them have their suspense voters in those, as
6  well, and the reason you do that on machine
7  allocation is because actually, 4,800 people could
8  show up there.  Even if they're on suspense, as long
9  as they change their address, they could vote, so
10 there's the potential of that actually being -- it's
11 just a number you use to go off of when you -- when
12 you allocate machines so you know that you'll have
13 enough.
14     Q.  And in Precinct 207, there are also likely
15 suspended voters in that, as well?
16     A.  Yes, but you got to realize, too, though, in
17 206 and 07, there's only, like, 200 suspense voters.
18 There's not near -- I mean, there's not near what
19 there is out in the Prairie View box.
20     Q.  Do you know why that -- that would be that 309
21 has so many suspense --
22     A.  Well, it's because of the students leaving
23 and -- well, a lot of them are from the addressing
24 issues, the 700 University.
25     Q.  A majority of the 1,200?

Page 127

1      A.  Yeah, a lot of them are from --
2          MR. SEAQUIST:  Object to the form.
3          Go ahead.
4      A.  A lot of them are from that, and then the
5  others are those that have moved away already and
6  their cards have been returned because they don't
7  live there any longer and so they're on the suspense
8  list, so that means come at the end of the year when
9  we do a purge, they'll actually be canceled.
10     Q.  (BY MR. CUSICK) And do you have an idea how
11 many of that -- I think you mentioned 1,200, roughly?
12     A.  Yes, there's right at 1,200.
13     Q.  Do you remember how many of them -- how many of
14 that is due to the addressing issue?
15     A.  Probably about 300 of those, still.  Now,
16 there was a larger amount, but we -- we corrected a
17 lot of them.
18     Q.  So even if you take into account the 1,200,
19 let's assume that we include that all, 309 would still
20 be one -- either one -- first or second for the highest
21 number of registered voters?
22     A.  It's actually third, from now, when you do
23 the numbers right.  I did a list the other day.
24 You've got to remember, this is in 2018 numbers, so
25 since then, these have been people have been

Page 128

1  canceled, people have been added back on.  It's a
2  working number all the time, so this is, what, ten
3  months ago or 11 months ago that that was the numbers
4  at that time.
5      Q.  But in 2018 --
6      A.  Yes.
7      Q.  -- this would be the highest?
8      A.  Uh-huh.
9      Q.  And then generally, also depending on when you
10 run the numbers, do you see a big -- do many -- strike
11 that.
12        For Precinct 309, do you see a higher
13 number of new voters registering at the beginning of
14 the school year when you're conducting outreach and
15 registering voters?
16     A.  A lot of times you do, but a lot of times
17 you do a lot -- you do see -- you do see new
18 registration, but at the same time, you see a lot
19 of -- they'll fill them out and they're already
20 registered, so basically it just serves as a change
21 form.
22        Like, if someone might -- for example,
23 I was there day before yesterday.  We were
24 registering voters.  Someone registered -- they
25 filled out a new registration but really, they had

Page 129

1  been there last year, so when I went in to process
2  it, it basically just acts as a change of address
3  form, not a new registration -- new registrant.
4      Q.  That's helpful.
5          And so this would have been the --
6  this sheet would have been the most up-to-date as
7  of --
8      A.  As of that time when I -- as of that time
9  when I allocated my equipment.
10     Q.  And do you remember roughly, is that allocation
11 September, October?
12     A.  I don't remember when I did it.
13     Q.  And I'm going to turn to the -- I'm going to
14 turn to the columns "Access" and "Touch."
15        Is it accurate again on these columns
16 that 309 had the most machines on election day?
17     A.  Correct.
18     Q.  And can you explain why it would have that --
19 the most numbers?
20     A.  The reason we had the high amount on that
21 election day is because there was a -- actually, I
22 added those in towards the end on 309, at the end of
23 early voting.  I wasn't intending on giving them that
24 many, but they had a march, if you remember.  I don't
25 remember if you remember, but they had a march out on

33 (Pages 126 - 129)

Page 130

1  campus and they were all coming back to the polling
2  place to vote so I expected a large turnout and I
3  added machines at the end to be able to accommodate
4  that, which they ended up not having but we did have
5  the machines available.
6      Q.   And would these machines have been pulled from
7  reserves or would these have been set aside?
8      A.   No, I had those in reserve.
9      Q.   And before the start of early voting in 2018
10  for this general election, do you remember how many
11  machines you had in reserve, roughly?
12     A.   I don't.  I usually kept about ten back.  I
13  did use some.  I added to the courthouse in early
14  voting, and then that left me, I thought, three, but
15  it shows up here now I had two left, so I would say
16  ten, probably, is what I had --
17     Q.   Before?
18     A.   -- before.
19     Q.   And then do you remember how many machines you
20  added to 309 from those reserves?
21     A.   I know I added another controller because I
22  only had one.  I was only going to use one line, so
23  looks like I probably added four.
24     Q.   And then you mentioned you had two at the end
25  after everything was accounted for?

Page 131

1      A.   Yeah, I had two used for backup.
2      Q.   And then the other four machines that would
3  have been sent out, those were all to the -- do you
4  remember what precinct those went to?
5      A.   Those four, they went to 309 on election
6  day.
7      Q.   Gotcha.
8          And did those machines remain on
9  Precinct 309 for the ones that were assigned at the
10  Memorial Student Center during early voting, those
11  remained at the same location for election day, they
12  weren't moved?
13     A.   No, you can't use the same ones.
14     Q.   Oh, you mentioned that.
15     A.   You have to tear down and reset, so after
16  early voting is complete, all of the machines that
17  are used in early voting come back.  They're sealed.
18  They come back to the office.
19         (Exhibit No. 6 marked.)
20         MR. CUSICK:  Entering into the
21  Exhibit -- entering into the record exhibit entitled
22  "Defendant Christy Eason's First Supplemental
23  Response and Objections to Plaintiffs' First Set of
24  Interrogatories" as Exhibit 6.
25         I'm handing a copy to Ms. Eason, one

Page 132

1  to counsel.
2      Q.   (BY MR. CUSICK) Do you recognize this exhibit,
3  Ms. Eason?
4      A.   I do.
5      Q.   For the record, could you turn to Page 5 and
6  then just read into the record, beginning with the
7  second full sentence starting with, "Subject," and then
8  reading -- reading those seven factors, criteria?
9      A.   "Subject to the foregoing assertation of
10  privilege and preserving the same, the following
11  factors are considered in the proposal of early
12  voting locations and hours:
13         "The population of registered voters
14  in the polling precinct, including the numbers of the
15  voters registered whose registration is in suspense.
16         "Historical turnout in the precinct.
17         "No. 3, how heavily contested the
18  election is as demonstrated by how many opposed races
19  are on the ballot.
20         "4, number and availability of pole
21  workers.
22         "5, time required to train poll
23  workers.
24         "6. Number of controller and voting
25  units, their distribution across polling locations

Page 133

1  and their distribution between early voting and
2  election day voting.
3         "And 7, accessibility, ease of use,
4  parking and security for various locations.  There is
5  a preference for county-owned and controlled
6  locations because the County is able to control
7  access and security to the building.  Locations that
8  are not county-owned frequently present issues
9  because the County has to rely on a third party to
10  let election workers into the polling location and to
11  lock up after voting."
12     Q.   Give you a minute after reading that.
13         So for these seven factors, who
14  originally created these seven factors?
15     A.   These aren't -- factors aren't -- these
16  aren't drawn on a board.  This what is we use every
17  single time.  Basically, this is a -- kind of like I
18  told you before, some of the things that we consider
19  when we choose early voting locations.  Some of these
20  are the same that -- most of these are the same that
21  we talked about earlier.
22     Q.   And so is this -- are these seven policies
23  written anywhere in -- in your offices?
24     A.   No, no.
25     Q.   And so when you have your discussions

34 (Pages 130 - 133)

Page 134

1 internally with your staff, are they all aware of these
2 seven factors?
3    A.   Yes.  This is something that we consider
4 every time.
5    Q.   And were they considered for any early voting
6 locations or hours 2017?
7    A.   Yes.  They're considered in every election
8 that we do early voting locations.
9    Q.   And were these factors the -- did the former
10 election administrator, Mr. Teed, use these same seven
11 factors?
12    A.   I don't know.
13    Q.   So would it be fair to say that this list was
14 compiled since you've been in office?
15          MR. SEAQUIST:  Form.
16    A.   It's not really a compiled list.  It's just
17 things that I consider.
18    Q.   (BY MR. CUSICK) Are any of these required
19 by state law?
20    A.   No.
21    Q.   And these aren't reflected in any county
22 guidance documents?
23    A.   No.
24          I do go back.  Some of these are -- I
25 mean, accessibility, of course, that's going to be --

Page 135

1 I mean, your normal -- your accessibility, things
2 that are required by election law, of course, you're
3 taking into consideration.
4    Q.   And then, of course, you know, earlier you
5 mentioned a high turnout and a large turnout in Precinct
6 309.  Does expected turnout factor into early voting
7 hours?
8    A.   Does what?  I'm sorry.
9    Q.   Does expected turnout?
10    A.   Expected turnout?
11    Q.   Yes.
12    A.   Yeah, I do consider some of that, yes, I do.
13    Q.   Are there any factors that you rely on more
14 than others or are they all given equal weight?
15    A.   Try to give them equal weight.
16    Q.   And so given some of the comments before about
17 the number of registered voters in Precinct 309, the
18 march and other issues that you were -- you had
19 mentioned, why wouldn't more early voting hours be
20 expected at the Memorial Student Center based on that
21 factor?
22          MR. SEAQUIST:  Object to the form.
23    A.   Why wouldn't early voting hours -- can you
24 repeat that?
25    Q.   (BY MR. CUSICK) Based on the -- the

Page 136

1 expected turnout, the amount of registered voters
2 that you mentioned before about expecting a lot of
3 turnout in Precinct 309, why wouldn't that counsel to
4 add more hours at the Memorial Student Center than
5 were allocated under the initial plan in the 2018
6 general election?
7          MR. SEAQUIST:  Object to the form.
8    A.   First of all, you have to remember that we
9 split the two Prairie View boxes, as well, so there
10 were given hours to that community.  It was given at
11 the community center, at the City Hall and at the
12 campus, so we have three, actually, locations that
13 you can add together.  They were given hours.
14          They also were given double polling
15 locations in that one precinct, as well, to cover
16 that -- to cover that.  You look back at the past and
17 they had not had that heavy turnout there that
18 they -- some of the other precincts and some of the
19 other areas that did have.
20    Q.   (BY MR. CUSICK) I note you mentioned that
21 these are some of the factors you consider.  Is this
22 based on any best practices or guidance from other
23 counties?
24          MR. SEAQUIST:  Form.
25    A.   It's just the best practices that I can -- I

Page 137

1 have in Christy's office.
2    Q.   (BY MR. CUSICK) Do you ever consult other
3 election administrators in other counties with
4 similar large student populations?
5    A.   Yes.  We have a list serve and we -- matter
6 of fact, I contacted several counties about the kind
7 of early voting that they open up in college towns.
8    Q.   And do you know if any of those towns had
9 similar issues with black students trying to vote?
10    A.   With black students?
11          MR. SEAQUIST:  Object to the form.
12          Go ahead.
13    A.   Black students, no.  We've never discussed
14 the race issue of it.
15    Q.   (BY MR. CUSICK) And in addition, I know
16 that accessibility under Factor 7 likely falls under
17 some state regulation?
18    A.   It does.
19    Q.   Are there any other, outside of this list,
20 requirements that you rely on that are required by state
21 law when you're considering?
22    A.   Well, there are certain -- you have to look
23 at the building.  Like I said, it has to be handicap
24 accessible.  There has to be ease and use of parking.
25 Parking has to be able to -- not only because it's an

35 (Pages 134 - 137)

Page 138

1 early voting.  Anyone can vote at that location, so
2 the actual location has to be accessible to any and
3 all citizens that can come there to vote.
4       Another thing is accessibility to the
5 building.  Early voting, in order to keep it open the
6 entire amount of early voting would be keeping a
7 building open for two and a half weeks, so wherever
8 you have that location, you have to have that
9 building completely secured for two and a half weeks,
10 and that means that after it closes, the polls close
11 during the day, nothing can go on in there during the
12 night because the machines are there and have to be
13 secured.
14       You also have to think about ease into
15 the building and out of the building, do you have to
16 have someone meet you there every morning to let you
17 in, are you going to have access to keys.  There's a
18 lot of things to be considered as far as public
19 buildings when you -- as far as not county-owned
20 buildings, is that I'm saying.  That is why we like
21 to use a lot of county-owned buildings is because we
22 do have access to those.
23   Q.   And then if we go -- I know we briefly
24 discussed this in Factor 1, and based on the list as
25 Exhibit 5, Precinct 309 had the highest number of

Page 139

1 registered voters at the time you were designating
2 precincts, and so in the polling precinct, polling place
3 for that precinct was the Memorial Student Center,
4 correct?
5   A.   Uh-huh.
6       MR. SEAQUIST:  Object to form.
7   Q.   (BY MR. CUSICK) And why wouldn't it --
8 based on Factor 1, more hours be allocated to the
9 Memorial Student Center?
10   A.   The student center population -- I mean,
11 registration is like I said before.  4,834 was the
12 total number but based on 1,200 suspense voters, you
13 have to take in effect that made them very much equal
14 to a lot of the other polling locations.  Once you
15 take that down -- and I don't have it with me, but
16 the suspense list county-wide, they have more in one
17 precinct than the rest of the county has all put
18 together so, therefore, you take -- you take in
19 consideration those 1,200 registered voters that are
20 on the suspense list.
21   Q.   But some of those students on the suspense list
22 were on the list for no -- for nothing that they did, it
23 was because of the addressing issue?
24   A.   Correct.
25   Q.   So wouldn't you be concerned that people who

Page 140

1 want to vote, but for nothing of their own fault, are on
2 a suspension list, would then be factored against them
3 for how many hours they get on campus?
4   A.   I believe that -- I believe that you take in
5 consideration the 1,200 voters.  Even if you took 200
6 off of that that were on the suspense list due to the
7 addressing issue, you still have 1,000 voters that
8 are on the suspense list.  If those cards -- or those
9 active registrations are in limbo, then they probably
10 will not be there to vote so, therefore, once you
11 make that -- take that off, they are the same amount
12 of registered voters compared to every other actual
13 precinct in our county.  It doesn't make them that
14 much higher.
15   Q.   Putting aside -- and we can turn to Exhibit 5
16 for a moment.
17       If you don't -- let's assume that you
18 even don't take out any of the suspended voters in
19 207 and you take out the full 1,200 in Precinct 309.
20 Is it accurate to say that Precinct 309 still has
21 1,000 more registered voters than any of the other
22 precincts?
23       MR. SEAQUIST:  Form.
24   A.   No.
25   Q.   (BY MR. CUSICK) It's not accurate to say

Page 141

1 that?
2   A.   No.  If you take 48, that would leave you 37
3 to 34.  We're talking several hundred difference
4 between 207 and 309.
5   Q.   Putting aside 207.
6   A.   Oh, putting aside 207?
7   Q.   Yes.  Let's assume that.  Let's assume that
8 there's, as you mentioned, 1,200, so that puts you at,
9 like, 36 for Precinct 309?
10   A.   And then we also look down at 418.  I'm
11 sorry.
12   Q.   And so would it still be accurate, though, to
13 say that even if you compared 418 and 309, that the
14 3,600 is 1,000 more than the 25?
15   A.   It could be, yes.
16   Q.   And, again, this is not taking into
17 consideration people on the suspense list --
18   A.   Yes.
19   Q.   -- for any of the other precincts?
20   A.   Yes.
21   Q.   And then, again, aside from 207, just for the
22 court reporter, Precinct 309 has, with the suspended
23 people, 1,200.  Still has 1,000 more than any other
24 precinct?
25       MR. SEAQUIST:  Form.

36 (Pages 138 - 141)

Page 142

1   Q.   (BY MR. CUSICK) Sorry.  Has more than any
2   other of the precincts listed in this chart?
3   A.   Yes, it does.
4   Q.   Are any of these factors ever discounted or not
5   factored into a decision?
6   A.   Not when I make them.
7   Q.   And so Factors, let's say, 4 and 5, which the 4
8   relates to number and availability of poll workers and
9   time required to train poll workers, how would that go
10  into a consideration for allocation?
11  A.   As far as allocation, it's not so much
12  about -- its not where to put it but when to put it.
13  There is only an availability of so many poll
14  workers.
15          Of course, Waller County has eight --
16  nine after you added City Hall, nine early voting
17  locations open.  To be able to man that many early
18  voting locations is a lot of poll workers, a lot of
19  trained poll workers that need to be trained.  You
20  have to be able to train those to put those in those
21  locations.
22          A lot of these were -- if they were
23  added at the last minute, some of the workers
24  can't -- don't have enough time to be trained, so I
25  need to make sure that every allocation I make for an

Page 143

1   early voting location, that I have the personnel to
2   cover that.  Of course, we wouldn't open 12 early
3   voting locations with the amount of election workers
4   that I have right now because I wouldn't have anyone
5   to man those.
6   Q.   And so in Factor 3 indicates how heavily
7   contested the election is as demonstrated by how many
8   opposed races are on the ballot.  How did that factor go
9   into your consideration when it's constitutional
10  amendments to the county as opposed to races?
11  A.   Constitutional amendment elections are just
12  that.  It's a -- basically it's a low turnout
13  election.  A lot of times I do contract with other
14  entities and I do have other entity elections that
15  run my ballot, so I have to take into consideration
16  what part of the county, they might only have a
17  constitutional amendment election.  However, you
18  might go to another precinct, they may have a city
19  council race on theirs, as well, so, of course,
20  they're going to have more turnout than it would on
21  one that was just a constitutional amendment
22  election, so that's why you have to take into
23  consideration who is on the ballot and what precincts
24  that they're on the ballot in.
25  Q.   And so for a heavily contested county-wide,

Page 144

1   let's say in 2017, the jail bond --
2   A.   Okay.
3   Q.   -- do you take into consideration if specific
4   cities or residents in certain portions of the county
5   are more heavily engaged and expected to turn out for a
6   specific constitutional amendment?
7   A.   I don't so much look at the constitutional
8   amendments as I do our local races.
9          In the bond election in 2017 -- and I
10  don't have the list with me -- if you'll look, I
11  contracted, as well, I believe, with four other
12  entities, so not only did we have the bond, we also
13  had four other hot-contested races that were on that
14  weren't county-wide.  They only affected a certain
15  part of the county.
16  Q.   What happens if two -- what happens if two of
17  these factors conflict with each other?
18          Let's say, there's a high
19  number of registered voters but you don't expect
20  turnout in that precinct.
21  A.   What would I do as far as?
22  Q.   Well, how would they be -- I guess, how would
23  you resolve a conflict where one weighs for more early
24  voting hours whereas the other might -- might serve to
25  discount that criteria?

Page 145

1   A.   Okay.  Well, for example, if there is a --
2   if they do conflict each other, I have high
3   registered voters in one precinct but there's no one
4   running there that's going to bring out a big
5   turnout, for example, but I have another precinct
6   that -- I'm confusing myself here -- they have a high
7   number of registered voters but I don't expect a
8   large turnout there.  You're asking would I put a
9   location there or would I not put a location there?
10  Q.   Mainly just what would you do when two
11  conflict, just using -- I was using 1 and 2 as an
12  example, but, you know, you can feel free to use another
13  set of criteria.
14  A.   I guess I would have to see if that
15  constituted moving that early voting location to
16  another place that would be more used on election day
17  by registered voters than those that were in highly
18  contested areas.  I would put that location in a spot
19  that it was better utilized for that specific
20  election.
21  Q.   And so for Factor 2 of historical turnout in a
22  precinct, do you at all take into consideration how
23  alleged discrimination in previous elections might
24  underestimate the turnout in a precinct?
25          MR. SEAQUIST:  Object to the form.

37 (Pages 142 - 145)

Page 146

1   A.  No, I don't, not really.  I look at those --
2   for example, Precincts 206 and 207, they are high
3   turnout precincts.  They will turn out high whether
4   it is a constitutional amendment only or if it is a
5   fully contested county-wide ballot.  They are two
6   precincts that historically, every single election,
7   will turn out with a high, high percentage.  Those
8   are boxes that I know are going to have that turnout.
9        So as far as historical, yes, in those
10  boxes especially I look at that.  It would be foolish
11  of me not to look at that and maybe not put a box
12  there and then they would have lines and they would
13  have the problems at those polling locations that I
14  could have taken care of just by putting an early
15  voting box there.  It would be foolish of me not to
16  look at how heavily they always vote, not just in one
17  election.
18  Q.   (BY MR. CUSICK) And Precinct 206, that is
19  located in which city?
20  A.   It's not.  It's a rural area.  It's in
21  Fields Store.
22  Q.   Fields Store.
23        And 207?
24  A.   Correct, is in Fields Store.
25  Q.   And do you take into consideration turnout by

Page 147

1   early voting versus election day, depending on the
2   precinct?
3   A.   I do sometimes.  As far as -- do you mean as
4   far as establishing an early voting location?
5   Q.   Correct.
6   A.   No.
7        Do I consider election day in that,
8   no.
9   Q.   Then are you aware that for Precinct 309 in the
10  2018 general election, more than 80 percent of the
11  ballots cast at that precinct were during early voting?
12  A.   Yes.
13  Q.   And do you know if that was the highest
14  frequency of early voting use in the county?
15  A.   I believe it was.
16       MR. SEAQUIST:  Form.
17       (Exhibit No. 7 marked.)
18       MR. CUSICK:  So I'm just going to turn
19  to Exhibit 7 which is titled "2018 General Election
20  Early Voting Locations."  I believe this was the
21  final product that was produced, Defendants Bates
22  stamp 000158 as Exhibit 7.
23       Handing a copy to Ms. Eason, one to
24  her counsel.
25  Q.   (BY MR. CUSICK) Do you recognize this exhibit?

Page 148

1   A.   Yes.
2   Q.   And were these the early voting hours that were
3   initially presented to the Commissioners Court --
4   A.   Yes.
5   Q.   -- for them to approve?
6   A.   Uh-huh.
7   Q.   Do you remember when they were presented?
8   A.   No.
9   Q.   Do you -- were you present at that
10  Commissioners Court meeting, whenever it was?
11  A.   I don't remember if I was or not.
12  Q.   Do you -- might be helpful.
13       Do you remember any discussion at a
14  Commissioners Court meeting about these being
15  proposed?
16       MR. SEAQUIST:  Form.
17  A.   No.
18  Q.   (BY MR. CUSICK) And then --
19  A.   Actually, I think these were actually
20  submitted in the order of election.
21  Q.   In the what?
22  A.   In the order of election, when they ordered
23  the election.
24  Q.   At the same time?
25  A.   Yes.

Page 149

1   Q.   And then if you bear with me for a moment, turn
2   back to Exhibit 5.  Sorry, no, that should be Exhibit 6,
3   the interrogatories, and then if you turn to Page 3 in
4   Response No. 1, in the last sentence of that -- of
5   that -- of where the response is, beginning with, "Both
6   party chairs," do you mind reading that into the record?
7   A.   "After the filing of this lawsuit, the
8   Commissioners Court called a meeting on
9   October 24th, at which it voted to extend early
10  voting hours in Prairie View.  To ensure an orderly
11  election and avoid the risk of undue interruption and
12  as a show of good faith to the plaintiffs and the
13  Prairie View community, or PVAMU community, the
14  Commissioners Court voted to extend the hours on
15  three previously scheduled days for early voting at
16  the Memorial Student Center from 7:00 to 7:00" --
17  Q.   Sorry.  Sorry.  My apologies if I gave the
18  wrong one.  It's the first paragraph where it says
19  "Response" on Page 3 and then just that last sentence,
20  "Meeting with both parties."
21  A.   Up at the top?
22  Q.   Where it says "Response."
23  A.   Uh-huh.
24  Q.   That last -- the second -- second full
25  paragraph, the last sentence.

38 (Pages 146 - 149)

Page 150

1   A.  "Both party chairs"?
2   Q.  Yes.  Correct.
3   A.  "Both party chairs approved the revised
4  proposal which was then adopted, approved by
5  Commissioners Court on September 5th as part of a
6  comprehensive order calling the general election."
7   Q.  And is that statement accurate for how the
8  hours were adopted and approved?
9   A.  Yes, in the order of election.  This is not
10 the order of election.
11   Q.  And what do you mean by "the order of
12 election"?
13   A.  There is an order of election.
14   Q.  And so what did the process look like for
15 adopting and approving through the order of election?
16   A.  What did it look like?
17   Q.  Like, what happened for this submission?
18   A.  In the order -- it was in the order -- when
19 they ordered the election, it was approved, and it
20 was approved by Commissioners Court.
21   Q.  When they order the election, do they first
22 discuss that as an agenda item or do they just --
23   A.  It is an agenda item.
24   Q.  Agenda item?
25   A.  Uh-huh.

Page 151

1   Q.  So they would have discussed the order along
2  with this -- along with the --
3   A.  It was in the --
4       MR. SEAQUIST:  Object to the form.
5   A.  It was within the order.
6   Q.  (BY MR. CUSICK) Within the order.
7       And on -- assuming that the date here
8  of September 5th, students would have only been a
9  couple of weeks into the fall semester at that point?
10      MR. SEAQUIST:  Form.
11   A.  I suppose.  I think they came back in
12 August, at the end of August.
13   Q.  (BY MR. CUSICK) I know we discussed earlier
14 about students coming onto campus for the first time.
15      How are they made aware about these --
16 about Commissioners Court meetings taking place?
17   A.  They would have to be aware just like
18 everyone else would be.  Look in the Commissioners
19 Court website -- I mean, in the County's website
20 under the agenda.
21   Q.  So you don't conduct any outreach to make them
22 aware that elections they might be voting in, that the
23 decisions about the schedule and the hours are being
24 discussed at these meetings?
25   A.  At the Commissioners Court meetings, no.

Page 152

1   Q.  Do you think there's any benefit to conducting
2  that outreach to ensure that --
3   A.  I don't post -- I don't --
4       MR. SEAQUIST:  Form.
5   A.  -- post the items on the Commissioners -- or
6  on the agenda.  That is done through the county
7  judge's office.
8   Q.  (BY MR. CUSICK) And so the September 5th
9  proposal, that would -- you mentioned that would
10 include the order?
11   A.  If that's what this says.  It was a part of
12 the order.  You will have to look on the -- I'm
13 not -- I don't have it in front of me which day the
14 order of election was actually approved.
15   Q.  And then if you could turn back to Exhibit 3,
16 which is the Dr. Flores report.  If you could turn to
17 Page 17, and then if you go to the first full paragraph.
18 Bear with me, might be easier to pull out.  This
19 sentence beginning in the middle, "During the
20 September."
21   A.  "During the September 5th meeting, Judge
22 Duhon indeed made a motion, which was approved, to
23 order the general election on November 6.  However,
24 there was no discussion or even identification of
25 early voting hours or dates during that motion or

Page 153

1  approval process."
2   Q.  Thank you.
3       Do you have any basis to object to the
4  factual accuracy of this description?
5       MR. SEAQUIST:  Object to the form.
6   A.  No.  The hours and dates were in the order
7  of election, the form that he approved.
8   Q.  (BY MR. CUSICK) Were you at the
9  September 5th meeting?
10   A.  I don't remember.
11   Q.  Would you have had to have been there, though,
12 to answer any questions during public comment?
13   A.  During public -- no, I don't -- I don't
14 remember.  I may have been there.  I don't remember.
15   Q.  And have you seen the order that was issued?
16   A.  Yes.  I issued it.  I mean, I -- I made --
17 or I made the order.
18   Q.  For the Commissioners Court to approve?
19   A.  Correct.
20   Q.  And then that was disclosed at the same time at
21 this --
22   A.  Correct.
23   Q.  -- September 5th meeting?
24   A.  Yes, if that's what it says, that it was
25 approved on.

39 (Pages 150 - 153)

Page 154

1  Q.  And do you remember how many days in advance
2  that the agenda -- strike that.
3      Was the proposed order public --
4  publicly presented on the Commissioners Court website
5  before the Commissioners Court meeting on
6  September 5th?
7  A.  It always is on the -- when they post the
8  agenda, it's always in the backup documents.
9  Q.  And then how would you characterize the
10  response from the public when they learned about the
11  hours and dates that were approved at each early voting
12  location?
13      MR. SEAQUIST:  Object to the form.
14  A.  I had no response from the public.
15  Q.  (BY MR. CUSICK) During the entire month of
16  October?
17  A.  Not to me, no.
18  Q.  Even if they weren't directly to you, were you
19  aware of any that were made either through
20  conversations --
21  A.  Only in Commissioners Court meetings.
22  Q.  So the October 17th was the first time that
23  there were any issues with the early voting --
24  A.  Correct.
25  Q.  -- locations and hours?

Page 155

1  A.  Correct.
2  Q.  How would you characterize the response from
3  Prairie View A&M students about the hours and locations
4  during this October 17th meeting?
5      MR. SEAQUIST:  Object to the form.
6  A.  They thought that they should have more --
7  or they were upset that they were approved and
8  thought they should have more.
9  Q.  (BY MR. CUSICK) At that meeting, you came
10  with a proposal to actually increase the number of
11  hours at the Memorial Student Center?
12  A.  Correct.
13  Q.  How did you make that determination prior to
14  the meeting?
15  A.  How did I make the -- prior to the meeting
16  to extend the hours?
17  Q.  Well, backtrack.
18      At the October 17th meeting, you
19  provided a recommendation to the Commissioners Court
20  that there should be early voting at the Memorial
21  Student Center Monday, Tuesday, Wednesday of the
22  first week.
23  A.  Okay.
24  Q.  That was an initial recommendation?
25  A.  Uh-huh.

Page 156

1  Q.  Why did you make that recommendation?
2  A.  That's what I was trying to look, was there
3  a meeting before that?  I don't -- was October 17th
4  the first meeting we had?  There was, like, three
5  right in a row.
6  Q.  Yeah.  That was -- October 17th was the
7  first --
8  A.  The very --
9  Q.  -- the first major one where there were public
10  comments.
11      MR. SEAQUIST:  Object to the form.
12  A.  Okay.  When I made the recommendation to add
13  the hours, we had discussed it before in some --
14  there was some reason for me to know that they would
15  like more hours.  I don't remember what it was
16  without -- I'm kind of mixed up on my dates.
17  Q.  (BY MR. CUSICK) No, it might be easier to
18  go to something that hopefully will provide a little
19  more -- and so this is just for ease of reference.
20  This is the Eason exhibit --
21  A.  It looks like October 10th.  That's how I
22  knew about it.  That's when I proposed the additional
23  hours on the Sunday.
24  Q.  So there were students at that meeting that
25  expressed concerns?

Page 157

1  A.  Correct.
2  Q.  And why did you make that proposal?
3  A.  Because I knew that there were -- they were
4  upset about the --
5      MR. SEAQUIST:  Hang on one second.
6  I'm going to ask you to read that more carefully.
7  Trying to preserve a clear record here.  I
8  don't -- can we take a break?
9      MR. CUSICK:  Sure.  Off the record for
10  a moment.
11      (Recess taken.)
12      (Exhibit No. 8 marked.)
13      MR. CUSICK:  So I want to introduce a
14  new exhibit, 8, Eason Exhibit 8, the Waller County
15  Commissioners Court regular session meeting minutes
16  from October 17, 2018, Bates-stamped Defendant 001070
17  through Defendants 001074, which was produced by
18  counsel.
19      Handing a copy to Ms. Eason, handing a
20  copy to her counsel.
21      MR. SEAQUIST:  Counsel, do you mind if
22  I move your sticker over here?
23      (Exhibit No. 9 marked.)
24      MR. CUSICK:  Then I'm also introducing
25  into the record Exhibit 9, which is a partial

40 (Pages 154 - 157)

Page 158

1 transcript of that 10-17 meeting entitled "Partial
2 Transcript of 10-17-2017 Waller County Commissioners
3 Court," which I'm marking as Eason Exhibit 9.
4         I'm handing a copy to Ms. Eason and a
5 copy to her counsel, and just for the record, this is
6 a transcript of the relevant portion of the
7 October 17th meeting that we discussed that were
8 prepared by our staff.
9         MR. SEAQUIST:  By plaintiffs' counsel
10 staff?
11        MR. CUSICK:  Yes.
12        MR. SEAQUIST:  Okay.  Thank you.
13 Q.   (BY MR. CUSICK)  And so I guess, first,
14 Ms. Eason, do you -- you mentioned before you recall
15 the October 17th meeting?
16 A.   Uh-huh.  Yes.
17 Q.   Do you remember the substance of the proposal
18 you presented at that meeting?
19 A.   No, not exactly.
20 Q.   Do you mind turning to Page 1 of Exhibit 9 and
21 reading aloud?  It begins at the time stamp 41.
22 A.   Gotcha.
23 Q.   And then starting with -- I think it's the
24 second full sentence, "First off."
25 A.   Okay.  "First off, I want you to know that

Page 159

1 my recommendation today, after looking through my
2 schedule, is merely upon equal representation --
3 equal representation of the voters in Waller County.
4 If you look through the county, you're going to look
5 at four hubs.  I would consider the four hubs.
6 Waller County, it's going to be your Waller area,
7 your Hempstead area, your Prairie View area and your
8 Brookshire area.  In looking through the schedule for
9 early voting, the first week, you're correct, there
10 is no early voting in Prairie View."
11        I don't know what that is, something.
12 Q.   I'll represent that that's a -- potentially a
13 name that was presented.
14 A.   Okay.  "And I could sit -- I could sit and
15 tell you a multitude of reasons why that was
16 considered that way, from homecoming to several
17 different reasons.  However, when you do look at the
18 schedule, there is not equal representation there."
19 Q.   I'll stop you there for a moment.
20        Do you recall making this statement?
21 A.   Uh-huh.  Yes I do.
22 Q.   And what did you mean by there is not equal
23 representation when you're proposing adding early voting
24 days during the first week at the Memorial Student
25 Center?

Page 160

1 A.   Out of all the early voting centers or all
2 the early voting locations that we had, none of them
3 were the same.  There was not equal representation in
4 each one of those.
5         Your Brookshire -- however many hours
6 you had in Brookshire is not the same hours as that
7 you had in the -- in the Prairie View box.  The
8 Monaville box is not the same as you had in the
9 Waller box.  That's what I meant that -- none of them
10 were equal representation.
11        So by asking for the exact same hours
12 in all of them, I just wanted to make the point that
13 none of them had the exact same hours and dates.
14 Q.   So if you turn to Page 2 of the transcript, in
15 the last -- or in the past full sentence at the bottom
16 of the page, it begins with, "So," the sentence, "So in
17 an effort."
18 A.   "So in an effort to make the hubs equally,
19 I'm going to propose today that we have early voting
20 at the Memorial Center on campus that Monday and
21 Tuesday of the first week, on that Wednesday to have
22 it at University Square and Thursday and Friday to
23 have it City Hall.
24 Q.   And then so based on what you initially said
25 about equal representation, why did you then propose

Page 161

1 extending early voting hours at the Memorial Student
2 Center?
3 A.   Okay.  We're going to go back to what you
4 asked me while ago when I had my dates messed up.
5         On the 10th, when we went back into
6 Commissioners Court, if you'll look on my answers
7 here, on the 10th, when I -- this was due to a
8 petition is the reason that we went back into October
9 the 10th into Commissioners Court and added that.
10 That is why I added that Sunday, was I was petitioned
11 to do that.
12        When I went into court on the 17th,
13 which is this here, and I had asked to add those,
14 between the 10th and the 17th, I was approached by
15 someone about adding early voting into that area.
16 That is where I got the proposal to bring to you
17 on -- or bring to Commissioners Court on the 17th.
18 Q.   And on the 10-10-28 [as spoken] meeting, you
19 were only extending early voting at the Waller County
20 courthouse?
21        MR. SEAQUIST:  Form.
22 A.   On the 18th?
23 Q.   (BY MR. CUSICK)  The 10-10.
24        MR. SEAQUIST:  The Sunday vote.
25 A.   That was due to a petition.  I was

41 (Pages 158 - 161)

Page 162

1  petitioned for Sunday hours.
2     Q.   (BY MR. CUSICK) Who were you petitioned by?
3     A.   A signature, a petition signature.  I had 15
4  signatures that I was petitioned to add those hours.
5  That is why I came back in and added those on that
6  date.
7          Then in between time, from that date
8  until when I came back the 17th, I had a public
9  member come and ask me about possibly adding hours to
10 Prairie View for that first week.  That is when I
11 brought those back on the 17th.
12    Q.   So then you state, "In an effort to make the
13 hubs equally, I'm going to propose today that we have
14 early voting at the Memorial Student Center on campus
15 that Monday and Tuesday of that first week, on that
16 Wednesday to have it at the University Square, and then
17 on that Thursday and Friday, to have it at City Hall in
18 Prairie View"?
19    A.   Correct.
20    Q.   And so it was your determination that this
21 proposal would make the hubs equal?
22    A.   Yes.
23    Q.   Did you think Prairie View A&M students were
24 treated equally or unequally under the initially adopted
25 plan --

Page 163

1          MR. SEAQUIST:  Object to the form.
2     Q.   (BY MR. CUSICK) -- as compared to the one
3  that you were proposing here for recommendation?
4          MR. SEAQUIST:  Object to the form.
5          You can go ahead.
6     A.   No, I think they were treated equally.
7     Q.   (BY MR. CUSICK) But you were making this
8  recommendation in an effort to make the hubs equally?
9     A.   I thought they were equal -- I thought that
10 they were treated equally on campus, and the reason
11 being is because there were three early voting
12 locations in that area.  I split that hub in two.  If
13 I had not done that, the whole amount would have been
14 at one location.
15    Q.   For the petition on 10-10, would we be able to
16 get a copy of that?
17    A.   Sure, or --
18    Q.   And then you mentioned that you were approached
19 in between 10-10 and then making this recommendation?
20    A.   Uh-huh.
21    Q.   Who was that by?
22    A.   Duane Charleston.
23    Q.   And Duane Charleston is a resident of Waller
24 County?
25    A.   Uh-huh.

Page 164

1     Q.   On Page 1 of the -- the transcript, you
2  mention, "Now, my job as election" -- sorry, it's the
3  middle of the page, beginning with the sentence, "Now."
4     A.   First page?  Yes.
5     Q.   "Now, my job as election administrator is to
6  ensure that the public has confidence in our election
7  process."
8          Do you recall that statement?
9     A.   Yes.
10    Q.   Were you concerned that the initial proposal
11 might undermine the public confidence that it has in the
12 election process?
13    A.   No.
14    Q.   So why did you make the proposal to add early
15 voting at the Memorial Student Center here?  Was it just
16 based on speaking with Mr. Charleston?
17    A.   No, I -- no.  It was based on speaking with
18 him about what he felt that the community and Prairie
19 View A&M University felt about it not being fair.
20         You do have to remember, this was
21 switched by -- my schedule did have them on the first
22 week of early voting.  That was something that
23 they -- that the Prairie View students, they didn't
24 like because they did not have access to early voting
25 that first week.  It was during the first week when I

Page 165

1  was asked to change that due to homecoming.
2     Q.   Did you speak to any students who mentioned the
3  concerns about homecoming?
4     A.   No, not the students, I did not.
5     Q.   Who communicated that concern to you?
6     A.   I was asked to do that by the Democratic
7  Party chairman.
8     Q.   And who would that have been?
9     A.   Rosa Harris.
10    Q.   Does Rosa Harris have any official connection
11 to Prairie View A&M?
12    A.   Not that I know of.
13    Q.   Is she seen by your office as an appropriate
14 representative for Prairie View A&M?
15         MR. SEAQUIST:  Objection, form.
16    A.   She's the Democratic Party chairman.
17    Q.   (BY MR. CUSICK) By your office, is she seen
18 as an appropriate representative for the Prairie View
19 A&M students?
20         MR. SEAQUIST:  Object to the form.
21    A.   I just believe that -- I mean, she was the
22 Democratic Party chairman and that is what she asked
23 of the schedule.
24    Q.   (BY MR. CUSICK) Did you only rely on her
25 representation for students at Prairie View A&M, or did

42 (Pages 162 - 165)

Page 166

1 you also consult the Republican chair?
2   A.  Both.
3   Q.  And did he make -- is it Mr. Luther?
4   A.  Uh-huh.
5   Q.  Did he make any representations about
6 homecoming on Prairie View A&M campus?
7   A.  No, not at all.
8   Q.  Did Ms. Harris represent that she had spoken to
9 students who relayed this concern?
10   A.  Yes.
11   Q.  Do you consider Prairie View A&M to be a
12 Democratic Party institution?
13          MR. SEAQUIST:  Object to the form.
14   A.  I -- neither one way or the other, no.
15   Q.  (BY MR. CUSICK) So we discussed before at
16 this meeting that there were students who did not
17 identify with either political party.  Did that
18 undermine your confidence in Ms. Harris'
19 representation that she would have acted in their
20 interest?
21   A.  Her decision was made before this meeting
22 that I -- that someone had -- had questioned that.
23   Q.  And upon hearing from the students during the
24 meeting, though, did you share a concern that Ms. Harris
25 might not actually reflect the views of unaffiliated

Page 167

1 Prairie View A&M students?
2   A.  Somewhat.
3   Q.  What about even affiliated with a party,
4 Prairie View A&M students, do you think she reflected
5 those views?
6   A.  I don't know.
7   Q.  Aside from Ms. Harris, did anybody directly
8 from the university come to speak with you about the
9 homecoming issue?
10   A.  No.
11   Q.  How did Ms. Harris explain the homecoming issue
12 in terms of it not being good for voting?
13   A.  She stated that the community center -- that
14 everyone would be parked around the community center
15 and -- I mean the student center, that people could
16 not get in and out of the student center to vote,
17 that it would be crowded, that alumni would be on
18 campus, that it just wouldn't be a good time for
19 people to have -- to vote.  It would be better the
20 next week.
21   Q.  Do you think that theory makes sense?
22          MR. SEAQUIST:  Form.
23   A.  I don't know.  I've never been on campus
24 during homecoming.
25   Q.  (BY MR. CUSICK) Do you understand generally

Page 168

1 the aspects of homecoming that take place -- or
2 strike that.
3          Do you understand what activities take
4 place during homecoming on campus?
5   A.  Do I understand?  Not on what goes on at
6 Prairie View campus, no.
7   Q.  Were you solely relying on her representation
8 of homecoming at Prairie View A&M in making this
9 determination for moving it from the first to the second
10 week?
11   A.  I did it at her request.
12   Q.  In the past, in other elections, you'd worked
13 with Prairie View A&M officials to reserve parking
14 spots -- is that correct -- for --
15   A.  Yes.
16   Q.  -- voting?
17          Why wouldn't that have been a solution
18 to overcome the homecoming issue?
19   A.  I don't know.
20   Q.  Did you propose that as a solution to her when
21 she --
22   A.  No.
23   Q.  Did you ask any follow-up questions?
24   A.  I don't remember.
25   Q.  Was Ms. Harris' request in writing?

Page 169

1   A.  No.
2   Q.  Was this during a meeting?
3   A.  During a meeting in my office.
4   Q.  In person?
5   A.  Yes.
6   Q.  And was homecoming the only reason that you
7 relied on for moving it from the first week to the
8 second week?
9   A.  Yes.
10   Q.  Did the County -- did the County possess
11 sufficient equipment to provide more early voting at the
12 Prairie View A&M campus based on your proposal to add
13 hours during the first week?
14   A.  Did I have the equipment to do it?
15   Q.  Yes.
16   A.  Yes.  Like I said before, it wouldn't be
17 additional equipment, it would be the same equipment
18 rolled into the next week.
19   Q.  Continued on.
20          And so why do you think it was
21 important to make the recommendation on 10-17 to have
22 additional hours set Monday, Tuesday, Wednesday at
23 the Memorial Student Center and then at the
24 University Square on Thursday?
25   A.  Because I felt that in good faith and in an

43 (Pages 166 - 169)

Page 170

1  effort to reach out to the campus, that we could do
2  that.
3      Q.   And does Mr. Charleston -- sorry.
4      A.   Go ahead.
5      Q.   No, no.  Please finish.
6      A.   That's it.
7      Q.   Does Mr. Charleston have any affiliation with
8  Prairie View A&M?
9      A.   No.
10     Q.   So in this effort, as you mentioned, to -- for
11 good faith, did you contact any Prairie View A&M
12 officials about --
13     A.   No.
14     Q.   During your conversation with Ms. Harris, did
15 she discuss when homecoming ends, what days?
16     A.   I don't remember if she -- I don't remember
17 if she -- if she did.
18     Q.   Do you know if it begins on the first Friday of
19 that week?
20     A.   I -- she -- I believe it was homecoming week
21 there.
22     Q.   So does it begin, let's --
23     A.   I don't know.
24     Q.   So when you made this recommendation to the
25 Commissioners Court, it was your determination that you

Page 171

1  had enough resources, based on keeping those -- those
2  machines on campus for the first week and the second,
3  that it would be sufficient to add hours for early
4  voting?
5          MR. SEAQUIST:  Form.
6      A.   Yes.
7      Q.   (BY MR. CUSICK) And how many days initially
8  before it was switched from the first to second week
9  did you anticipate having early voting on campus?
10 Would it have been -- let me strike that for a
11 moment.
12         Under your initial plan before
13 speaking with Ms. Harris, how many days of early
14 voting did you initially propose at the Memorial
15 Student Center before it was submitted to the party
16 chairs?
17     A.   I don't -- I don't remember exactly, but I
18 knew it -- me having to go back, it flowed in
19 together.  If I'm not mistaken, I believe it started,
20 like, on that Wednesday in the middle of the week and
21 flowed through the weekend and then it added
22 community center at the beginning of the next week.
23     Q.   So it would have started Wednesday, went
24 through that weekend?
25     A.   Through that, and then ended that next week

Page 172

1  in the community center.
2      Q.   And why do you think it was beneficial to have
3  that many days for on-campus voting before you --
4      A.   It was the same amount of days.
5      Q.   So it would have been --
6      A.   I just flopped them.  It was three days, so
7  it would have been Wednesday, Thursday, Friday.
8      Q.   No weekend voting on campus?
9      A.   Right.
10         And then Monday, Tuesday.
11     Q.   During this meeting, did you also call for
12 parity within and standardization for the early voting
13 schedule?
14     A.   Repeat that, please.
15     Q.   Did you call for some sort of standardization
16 for how the early voting schedule is created?
17     A.   Correct.
18     Q.   And why did you make that recommendation?
19     A.   I made that so that in the future, not would
20 it only be a benefit to Waller County but to the
21 Prairie View community and every other community in
22 Waller County to have a standardized early voting
23 where you would know every election what early voting
24 locations would be open and we would not have to go
25 through this process every election.

Page 173

1      Q.   And you say "this process."  Does that mean
2  dealing with disagreement about early voting?
3      A.   That and -- yes, just the procedure as far
4  as selecting the places.
5      Q.   And then if you turn, again, to the same
6  exhibit, on Page 3.
7          MR. CUSICK:  Off the record for a
8  moment.
9          (Brief recess.)
10         MR. CUSICK:  I'm sorry.  Back on the
11 record.
12     Q.   (BY MR. CUSICK) And so at the top of that
13 page, the second full sentence that begins with, "I
14 would like to see," and it says you mentioned, "I would
15 like to see, and like you've said this, it seems to be
16 every election we have the same type of problem with
17 early voting."
18         MR. SEAQUIST:  Object to the form.
19         Counsel, I don't think that's what it
20 says.
21     Q.   (BY MR. CUSICK) Do you mind reading that
22 sentence?
23     A.   "I would like to see, and like you said
24 this, it seems to be every election we have some type
25 of problem with early voting."

44 (Pages 170 - 173)

Page 174

1  Q.  And so when you say "some type" -- "some type
2  of problem with early voting," what did you mean by that
3  statement?
4  A.  The process of picking early voting
5  locations is the problem, the going through the party
6  chairmen and going through the Commissioners Court.
7  There's always a problem with the procedures that we
8  use, is what I meant.
9  Q.  But you used this process during your first
10  tenure from 1988 to 1998?
11  A.  Somewhat, yes.
12  Q.  And before you -- did you indicate earlier that
13  there were any problems with the party -- reliance on
14  the party chairs during that time?
15  A.  I don't remember.
16  Q.  Were there any issues with party chairs from
17  that time going through this process?
18  A.  Not at -- not at that time.
19  Q.  What about in 2017?
20  A.  We didn't have a -- it was just a
21  constitutional amendment election.
22  Q.  But did you go through the party chairs for
23  that?
24  A.  No, not on a constitutional amendment
25  election.

Page 175

1  Q.  But what about the primary in 2018?
2  A.  They do that theirselves, so they pretty
3  much get a choice in that.
4  Q.  So the only instance of the process issue was
5  in this past general 2018 election?
6  A.  Yes, and I was basing it on what I -- what
7  had been done in the past as far as, you know, what I
8  had been told had been gone in the past about not
9  being able to come to an agreement on early voting
10  locations.
11  Q.  In this same statement, though, it says that it
12  seems to be every election we have the same type of
13  problem?
14  A.  Right, and not just -- and I didn't mean
15  Prairie View, I mean the whole county.  It wasn't
16  just a Prairie View issue, it was a whole early
17  voting issue throughout the whole county.
18  Q.  And so people represented that they had issues
19  with the county chairs' involvement in determining --
20  A.  No, I'm just talking about the times and the
21  locations.  We have so many rural areas in our
22  county, I don't know where to put those boxes and
23  when to put them there.
24  Q.  And whom were you told by outside of your
25  personal experience in 2018 about the issues in every

Page 176

1  election about this process?
2  MR. SEAQUIST:  Form.
3  A.  Well, of course, I'd heard about the 2016
4  election through the long lines and early voting
5  issues which they had had.
6  I mean, in setting things for 2018, I
7  looked back at 2016 records in order to make some of
8  the recommendations, so I did know the things that
9  had gone on in 2016.
10  Q.  Did you know that prior to the 2018 primary?
11  Did I know what?
12  A.  About the issues that arose in 2016?
13  A.  As far as the lines and so forth, yes.
14  Q.  The things you just mentioned with --
15  A.  Yes.  That is the reason I found the
16  addressing issue.
17  Q.  Let me reset.
18  We were just discussing about the
19  issue with early voting schedule and having the
20  chairs in that process?
21  A.  Correct.
22  Q.  You were aware of those issues in advance of
23  the 2018 primary about using the chairs in the
24  process --
25  MR. SEAQUIST:  Objection.

Page 177

1  Q.  (BY MR. CUSICK) -- setting the early voting
2  schedules?
3  MR. SEAQUIST:  Object to the form.
4  A.  We've always used the chairs.
5  Q.  (BY MR. CUSICK) So here again, it says that we
6  have the same type of problem in every election.
7  MR. SEAQUIST:  Objection.
8  Counsel, I've got to correct you
9  again.  It does not say "the same type of problem."
10  Q.  (BY MR. CUSICK) Some type of problem.
11  Sorry.
12  MR. SEAQUIST:  Thank you.
13  Q.  (BY MR. CUSICK) "We have some type of
14  problem with early voting."
15  And then you mentioned that one of the
16  reasons you made the recommendations for
17  standardization was because the process and reliance
18  on the party chairs partially?
19  A.  Okay.  What I'm saying is and what it says
20  here is we have -- and he's right -- some type of
21  problem.  I'm not saying we have the exact same
22  problem every single election, but there's always a
23  problem with early voting, whether it be how many
24  locations to open, where to put the locations, the
25  party chairman agreeing on it, changing their mind

45 (Pages 174 - 177)

Page 178

1 after it's already approved.  There's always some
2 type of problem setting the early voting locations.
3    Q.   And so in -- on the same page, I think it's two
4 sentences below and it begins, "And you're exactly
5 right."
6    A.   Uh-huh.
7          "We do need to get community members
8 from every part of the county."
9          Is that what you're talking about?
10   Q.   Yes.  Do you mind reading that sentence?
11   A.   Uh-huh.
12         "Not only Prairie View, but from
13 Brookshire, from Waller, from Hempstead, everyone sit
14 down and do what's best for the areas in our county."
15   Q.   And then the last sentence?
16   A.   "And do a type of early voting schedule --
17 and do some type of standard early voting schedule
18 that we can depend on for each election."
19   Q.   And so here, do you recall making this
20 statement?
21   A.   Yes.
22   Q.   And why is it important to get community
23 members involved in this process?
24         MR. SEAQUIST:  Form.
25   A.   So that each area of our county can be

Page 179

1 represented.
2    Q.   (BY MR. CUSICK) And then so was there --
3 with this understanding, was there anything
4 preventing you from reaching out to community members
5 to get them involved in August of 2018 or September
6 of 2018?
7    A.   No.
8    Q.   Was it your plan before these issues were
9 discussed at the 10-17 meeting to move towards
10 standardization?
11   A.   Yes.
12   Q.   Do you recall whether any Prairie View A&M
13 students testified at the October 17th meeting?
14   A.   Yes.
15         MR. SEAQUIST:  Object to the form.
16   Q.   (BY MR. CUSICK) And to the best of your
17 recollection, do you remember what they were
18 advocating for?
19   A.   Early voting locations the first week of
20 early voting.
21   Q.   From your recollection, did any of the
22 community members who testified at that 10-17 meeting
23 oppose adding hours to on-campus voting?
24         MR. SEAQUIST:  Object to the form.
25   A.   I don't remember.

Page 180

1    Q.   (BY MR. CUSICK) And for the Prairie View
2 A&M students, were they advocating for early voting
3 on campus?
4    A.   Correct.
5    Q.   And what did the Commissioners Court decide
6 with respect to this proposal for adding at the Memorial
7 Student Center during the first week, what did they --
8 what did they decide to do with your recommendation?
9          MR. SEAQUIST:  Object to the form.
10   A.   The -- the one we were just talking about?
11   Q.   (BY MR. CUSICK) Yeah, the one you made for
12 the early voting at the Memorial Center on campus for
13 Monday, Tuesday.
14         MR. SEAQUIST:  Same form objection.
15   A.   There was no action taken.
16   Q.   (BY MR. CUSICK) Do you think it was the
17 right decision by the Commissioners Court to take no
18 action?
19         MR. SEAQUIST:  Object to the form.
20   A.   I can't tell you what -- I don't know.
21   Q.   (BY MR. CUSICK) When you're making
22 recommendations to the Commissioners Court for adding
23 hours, is it your determination that that's in the
24 best interest of Waller County?
25         MR. SEAQUIST:  Form.

Page 181

1    A.   If that's what I made, yes.
2    Q.   (BY MR. CUSICK) And so by adopting your
3 proposal, it would be beneficial to Waller County?
4          MR. SEAQUIST:  Object to the form.
5    A.   I believe it would have been beneficial to
6 the situation that they were dealing with.
7    Q.   (BY MR. CUSICK) And the situation in this
8 case was adding early voting on campus during the
9 first week at the Memorial Student Center?
10   A.   Right.
11   Q.   And would it be fair to characterize that it
12 would have been responsive to the concerns that were --
13 students testified at the October 17th meeting?
14         MR. SEAQUIST:  Objection, form.
15   A.   No.
16   Q.   (BY MR. CUSICK) So adding early voting
17 hours on campus during the first week would not have
18 addressed those concerns?
19   A.   It might have addressed some of them but not
20 all of them.
21   Q.   What other concerns were they raising aside
22 from more hours on campus?
23   A.   Okay.  I guess I misunderstood you.  I'm
24 thinking that for the reasons -- I don't agree with
25 the reasons they were saying that they weren't given

46 (Pages 178 - 181)

Page 182

1 early voting the first week, is what I'm saying.
2    Q.   Do you agree, though, that their advocacy,
3 regardless of what the issue was why they didn't have
4 it, by adopting your proposal, that would have resolved
5 at least having it during the first week?
6         MR. SEAQUIST:  Object to the form.
7    A.   No.
8    Q.   (BY MR. CUSICK) So you think they were
9 asking for additional advocacy beyond early voting on
10 campus?
11    A.   You're asking by putting it there, would it
12 have solved the problems that they were saying that
13 they were having -- why we didn't put it there.  It
14 wouldn't have solved those problems, no.
15    Q.   But for the immediate election, it would have
16 solved their concern?
17         Earlier you testified that they were
18 asking for more early voting on campus for the 2018
19 general election.
20    A.   Correct.
21    Q.   And in your proposal, you add two additional
22 days at the Memorial Student Center, one at the
23 University Square.  Do you think that recommendation was
24 responsive to those concerns of -- of simply just asking
25 for on-campus early voting --

Page 183

1    A.   Yes.
2    Q.   -- during the first week?
3    A.   Yes.
4    Q.   Were there other proposals to add hours and
5 days at other locations that are considered during this
6 meeting?
7    A.   I believe they were -- I believe one of the
8 commissioners had mentioned them, yes.  Actually, I
9 think two commissioners had mentioned other hours.
10    Q.   Could it have been for Monaville?
11    A.   Monaville and one down in Pattison, I
12 believe.
13    Q.   Do you remember which commissioner made the
14 inquiry or suggestion to add Monaville?
15    A.   Possibly Commissioner Barnett, I believe.
16    Q.   And -- sorry.  I didn't catch the second
17 recommendation.  What was the other?
18    A.   I believe in Pattison, I believe it was
19 maybe Beckendorff.
20    Q.   And then turning back to Exhibit 3, which is
21 the Dr. Flores report.
22    A.   Uh-huh.
23    Q.   If you could turn to Page 25, and then
24 beginning with the second paragraph, beginning at,
25 "After the commissioners had rejected."

Page 184

1    A.   Uh-huh.
2    Q.   If you could read down until the second-to-last
3 sentence into the record.
4    A.   "After the commissioners had rejected the
5 proposed modifications suggested by elections
6 administrator Ms. Eason, Judge Duhon then proposed an
7 alternative plan that would have provided three
8 additional days of early voting during the first week
9 at the Waller County Community Center in the City of
10 Prairie View, while extending the hours of early
11 voting in Monaville by three hours each day the first
12 week of early voting.  During the exchange with
13 Commissioner Beckendorff, Ms. Eason confirmed that
14 the County's existing inventory of voting machines
15 was adequate to support such change.
16         "Commissioner Beckendorff:  Do you
17 have the equipment to do that?
18         "Ms. Eason:  Yes, I can do that.
19         "Beckendorff:  You can add another
20 location for the first week?
21         "Ms. Eason:  Yes, because I can move
22 it down there to the next week.
23         "However, Judge Duhon's proposal did
24 not receive a second."
25    Q.   And so here, your representation to the

Page 185

1 community [as spoken] court is based on your appraisal
2 that there were sufficient resources for your
3 recommendation?
4    A.   Correct, as long as I could, as I said, move
5 them from one location to the other.
6    Q.   And then the first full paragraph, beginning on
7 that page, 25, where it says, "Referring to Commissioner
8 Barnett's objection," do you mind reading those two?
9    A.   "Referring to Commissioner Barnett's
10 objection to the proposal because it did not add
11 early voting days in Monaville.  Ms. Eason stated,
12 'Can I be very honest with you, Mr. Barnett?
13 Monaville does just not vote that heavy there, I
14 mean, not for five days.'"
15    Q.   Do you have any basis to object to the factual
16 accuracy of that representation you made?
17    A.   No.
18    Q.   Do you recall proposals or what is -- strike
19 that.
20         Was Commissioner Barnett the only one
21 to propose adding early voting in Monaville?
22    A.   In Monaville?
23    Q.   Correct.
24    A.   That I remember.  I mean, as far as I
25 remember.

47 (Pages 182 - 185)

Page 186

1    Q.   Do you remember -- why would -- do you remember
2    why the -- strike that.
3         Why do you think the commissioners
4    wanted to add voting in Monaville?
5    A.   I don't know.
6    Q.   Were any of the proposals, either yours or
7    either of the two from the commissioners, adopted by the
8    Commissioners Court at the end of this meeting?
9    A.   No.
10        MR. SEAQUIST:  Object to form.
11   Q.   (BY MR. CUSICK) But subsequently, after
12   this lawsuit that we're here for the deposition
13   today, the Commissioners Court did end up adding
14   early voting in Prairie View; is that correct?
15   A.   I think they extended the hours.  They
16   didn't add days, they extended the hours and added a
17   day in City Hall.
18   Q.   And can you --
19   A.   Or Sunday afternoon in City Hall.
20   Q.   Do you remember when this change was made?
21   A.   No.
22   Q.   And so at that time, when they were making this
23   determination, were you consulted at all about the
24   logistics of adding more hours at -- or strike that.
25        Were you consulted at all during this

Page 187

1    process?
2         MR. SEAQUIST:  I'm going to instruct
3    the witness not the answer on the basis of executive
4    session as well as attorney work product, attorney
5    privilege.
6    Q.   (BY MR. CUSICK) Without going into the
7    context, were you present at the executive session on
8    October 24th, 2018 during the Commissioners Court
9    meeting?
10   A.   Yes.
11   Q.   And again, without going into the context, were
12   you consulted during that meeting in the executive
13   session?
14        MR. SEAQUIST:  Again, if you're going
15   to ask the question that way, I'm going to instruct
16   the witness not to answer as to what took place in
17   executive session.
18   Q.   (BY MR. CUSICK) Were you there during the
19   entire executive session?
20   A.   Yes.
21   Q.   Based on the additional hours that were adopted
22   by the Commissioners Court in that modified plan as
23   compared to the one you proposed about adding early
24   voting on the first week of campus, do you think the
25   changes that were adopted on October 24th were still

Page 188

1    responsive to Prairie View A&M students' concerns?
2         MR. SEAQUIST:  Form.
3    A.   Yes.
4    Q.   (BY MR. CUSICK) And so even though they did
5    not get any early voting on campus during the first
6    week, it was still responsive to those claims that
7    they had advocated for?
8    A.   Yes.
9    Q.   And why is that?
10   A.   As far as adding the additional hours?  They
11   wanted more time to be able to vote.  They wanted
12   more hours to be able to vote and they were given
13   more hours to vote, as well as the City of Prairie
14   View was also given extra time to vote, as well.
15   Q.   Did anybody advocate just for more hours during
16   the second week at the October 17th meeting?
17        MR. SEAQUIST:  Form.
18   A.   Did they -- did they advocate for more
19   hours?
20   Q.   (BY MR. CUSICK) Just more hours, even if it
21   wasn't during the first week?
22   A.   Yes, actually, they did.  I think someone
23   asked -- basically he just -- I don't know exactly
24   where it is, but, yes, I believe they did.
25        (Exhibit No. 10 marked.)

Page 189

1         MR. CUSICK:  I'm just adding into the
2    record as Eason Exhibit 10, this is the minutes from
3    the October 24th Waller County Commissioners Court
4    emergency session.
5         Giving a copy to Ms. Eason, one to her
6    counsel.  It's also for identification Bates stamped
7    001077 through 001078.
8         (Exhibit No. 11 marked.)
9         MR. CUSICK:  So this is Exhibit 11.
10   This is a similar partial transcript of the
11   10-24-2018 meeting during public agenda items.
12   Waller County Commissioners Court transcript,
13   10-24-2018.
14        Handing a copy to Ms. Eason, one to
15   her counsel.
16   Q.   (BY MR. CUSICK) And do you mind reading on
17   Page 2 of that transcript, in the middle, it's a comment
18   by Judge Duhon.  It says -- beginning, "The current
19   court," and reading that sentence and the second one.
20   A.   "The current court has a record of actively
21   engaging with Prairie View A&M community and its
22   students, including placing a polling location for
23   students on campus, and did so prior to any threat of
24   federal intervention.  We have analyzed our resources
25   in attempt to extend additional hours and times and

48 (Pages 186 - 189)

1 have done so, but also citizens of Waller County must
2 be accommodated with the limited resources of a small
3 county."
4        Keep going?
5    Q.  No, it's okay.
6        And so based on Judge Duhon's public
7 statement here on 10-24, the only feasible or
8 possible were extending additional hours based on
9 resources at the Memorial Student Center for those
10 Monday, Tuesday and Wednesday of the second week?
11        MR. SEAQUIST:  Object to the form.
12    Q.  (BY MR. CUSICK) And so earlier you
13 testified that on October 17, 2018, that you had the
14 resources to extend early voting on campus at the
15 Memorial Student Center for at least that Monday and
16 Tuesday and the resources were in place.  Then on
17 10-24, Judge Duhon makes this public statement that
18 based on those -- the same resources, that the
19 extension of early voting on campus during the second
20 week was based on the resources available, so I'm
21 wondering what changed from the first week to the
22 second week based on your determination?
23        MR. SEAQUIST:  Object to the form.
24    A.  I -- I don't know what -- I can't tell you
25 what he meant by that.

1    Q.  (BY MR. CUSICK) So if you -- you can't tell
2 me what he meant by that, would that mean that the
3 10-17 statement -- public statement that you made
4 would still be accurate by 10-24?
5        MR. SEAQUIST:  Object to the form.
6    A.  The statements I made were correct.
7    Q.  (BY MR. CUSICK) Would they have still been
8 correct by 10-24 -- or accurate by 10-24?
9    A.  Yes.
10    Q.  I'm sorry?
11    A.  Yes.
12    Q.  I'm going to turn back to the transcript which
13 is Exhibit 9, and then on Page 3, the last full sentence
14 that begins, "Then, when we went."  This is a statement
15 by Judge Duhon.  Do you mind reading that sentence to
16 the bottom?
17    A.  "Then, when we went -- then, when we went,
18 September 22nd, this Court approved the schedule
19 and at the time, we had the locations, the time.
20 There was no discussion, there was nobody that showed
21 up, nobody gave any comment at all.  Now, I know that
22 when we looked at the locations, I made it clear
23 because this is now the third year in a row we have
24 approved the voting schedule and then had people come
25 back after the fact and said, I don't like that, I

1 don't like this, and the voting schedule -- the prior
2 voting schedule was approved, was it approved by
3 party chairs?"
4    Q.  Would this September 22nd meeting, this would
5 have been a Saturday?  Would that have been -- would
6 that have been accurate?
7        MR. SEAQUIST:  Object to the form?
8    A.  I've never met on a Saturday.
9    Q.  (BY MR. CUSICK) Could Judge Duhon potentially
10 have meant August 22nd?
11    A.  I don't know what he meant, but I'm assuming
12 yes.
13    Q.  And then on Page 4 of that next page,
14 Commissioner Amsler -- sorry, this is actually Judge
15 Duhon at the 5005 mark.  If you can read the third
16 sentence, beginning with, "I want you to -- I want
17 know."
18    A.  "I want you to know this is a process, and
19 that process is the chairs work together.  They're
20 supposed to communicate with their candidates to go
21 over these early voting schedules and make sure that
22 everyone is okay with these schedules."
23    Q.  Thank you.
24        And so here, Judge Duhon represents
25 that they communicate with the candidates.  Do they

1 also communicate with non-candidates?
2    A.  I don't know who they communicate with.
3    Q.  Do you think it's important to know who the
4 commissioners are communicating with when you're
5 receiving feedback from them?
6        MR. SEAQUIST:  Form.
7    A.  The commissioners are communicating or the
8 chairs?
9    Q.  (BY MR. CUSICK) I'm sorry, the county
10 chairs.
11    A.  I don't know if the -- this is Judge Duhon's
12 opinion of what the chairs do.  I don't know -- I
13 don't know anything about that.
14    Q.  And then on Pages 7 and 8 -- sorry, on Page 8,
15 right here, it's towards the bottom, about four lines up
16 from Commissioner Barnett's, "Outside the campus," the
17 sentence begins, "So there's eight days."  This is Judge
18 Duhon.  Do you mind reading that sentence, those two
19 sentences?
20    A.  On 7 or 8?
21    Q.  Sorry, just on Page 8, right here.  "So there's
22 eight days."
23    A.  "So there's eight days.  I do think there is
24 an inequity because you have -- you look at the other
25 precincts at their primary polls and there's 11 days,

49 (Pages 190 - 193)

Page 194

1  okay?  How do you put those on campus?  Where the --
2  because I've heard from folks this week that what's
3  being lost in translations, too, is the citizens of
4  Prairie View."
5      Q.   And so here, what did you make of Judge Duhon's
6  statement that there's -- "I think there is inequity"?
7          MR. SEAQUIST:  Object to the form.
8      A.   By looking at what was on paper, but what he
9  said, and I do agree, what we did lose in that or
10  what was lost in that is what was important to the
11  citizens of Prairie View, as well.  It wasn't just
12  the students, we had to think about the citizens of
13  Prairie View and their voting, as well.
14      Q.   (BY MR. CUSICK) Did any of them testify
15  during the 10-17 meeting?
16          MR. SEAQUIST:  Form.
17      A.   I don't -- I don't recall.
18      Q.   (BY MR. CUSICK) Did you do any outreach to
19  assess the impact on non-students who are also
20  residents of Prairie View?
21      A.   I've had many residents from Prairie View
22  come to my office about having to go on campus to
23  vote.
24      Q.   About -- I'm sorry?
25      A.   About having to go on campus to vote.

Page 195

1      Q.   Are the students citizens of Prairie View?
2      A.   Yes.
3      Q.   Then on Page -- beginning on Page 8, on the
4  last -- the last sentence, going over to Page 9, do you
5  mind reading that sentence and then the first sentence
6  on Page 9?
7      A.   "And I do think -- I do think that will
8  cause confusion because people are going to go --
9  well, wait a minute.  Wednesday of the first week you
10  can go to University Square at Prairie View, and then
11  if it's Thursday, you go to City Hall, but if it's
12  next Thursday, you go to Waller Community Center, and
13  if it's Monday or Tuesday, you're at the campus."
14      Q.   And so here is Judge Duhon -- are those
15  statements about the proposal that you recommended at
16  this -- at this hearing?
17      A.   I don't know.  I don't know.
18      Q.   I'm sorry, it might be helpful if you go up to
19  the next page.  I think it begins with, "Now, with all
20  that in mind, I'm looking at this and I appreciate --
21  Christy, I appreciate your recommendations."
22      A.   "Outside of the campus, and, you know,
23  unless they go to Monaville or they go on campus,
24  they have two days of early voting in the City of
25  Prairie View.  Now, with all of that in mind, I'm

Page 196

1  looking at this and I appreciate your
2  recommendations.  I'm a little concerned if we go
3  with these recommendations, we're going to have four
4  different early voting locations in Precinct 3.  I
5  think it will cause confusion for people to go."
6      Q.   So Commissioner -- sorry, strike that.
7          Judge Duhon, is -- is he speaking
8  about your proposal here about causing confusion?
9      A.   It looks like it, yes.
10      Q.   And then in addition to that, on Page 13 --
11  actually, strike that.
12          What did you make of Judge Duhon's
13  comment that your proposal would cause confusion?
14          MR. SEAQUIST:  Object to the form.
15      A.   I think he believed that it would cause
16  confusion because there were so many different places
17  to go.
18      Q.   (BY MR. CUSICK) And is it your
19  understanding that it would -- would it have caused
20  confusion?
21      A.   It could have.
22      Q.   But you wouldn't have made a recommendation
23  that would have caused confusion?
24          MR. SEAQUIST:  Form.
25      A.   At that point, we were already about to

Page 197

1  start early voting.  We had to put it there in order
2  for my machines to work like they would.
3      Q.   And so when you made this recommendation on
4  10-17, you did not have any concerns that if the
5  Commissioners Court adopted the proposal, it would cause
6  confusion?
7      A.   No.
8      Q.   And then similarly, on Page 13 at the top, the
9  time stamp is 7531, do you mind just reading
10  Commissioner Beckendorff's statement?
11      A.   "If today's like these, if we change it" --
12  wait.
13          "If today's like this, if we change it
14  now, I agree with you, Judge, it's going to be more
15  confusing about, okay, we're changing these dates,
16  we're adding these dates, we're doing this and making
17  it harder.  We're giving in to the political games
18  that are being played."
19      Q.   Do you think your recommendation, if adopted by
20  the -- the Commissioners Court, would have made it
21  more -- would have made it harder to vote?
22          MR. SEAQUIST:  Form.
23      A.   No, not harder to vote, no.
24      Q.   (BY MR. CUSICK) And could you have, in
25  theory, kept those machines at the Memorial Student

50 (Pages 194 - 197)

Page 198

1 Center during the entire week after Monday and
2 Tuesday and kept them on the campus grounds through
3 the entire first week?
4     A.  Yes.
5     Q.  If you turn to Page 9 and 10, beginning on Page
6 9, the statement by Commissioner Barnett.  If you give
7 me one second.  Do you mind reading -- do you mind
8 reading that paragraph just until the last sentence
9 where it says, "The chairs won't"?
10    A.  After that, that was --
11    Q.  Sorry.  Beginning at, "Thank you," and then
12 reading --
13    A.  "Thank you for -- thank you, Judge.  My
14 thing is this, going to where I feel is one of the
15 root -- to the root of this thing is going back to
16 the party chairs.  You know this court, we don't get
17 a say in selecting any of that.  When it comes to us,
18 it's already selected.  We do ask a question to the
19 chairs if it's agreeable with them, if it's agreeable
20 with those individuals that they represent, and then
21 once we get that answer, we decide, we do our vote,
22 and 99-9/10 percent of the time, we vote according to
23 what we feel that the voting population being
24 represented through the chairs wants.  Now" --
25    Q.  Sorry.

Page 199

1         So here, Commissioner Barnett says,
2 "We don't get a say in selecting any of that,"
3 referring to the schedule.  Is that an accurate
4 statement, that the Commissioners Court doesn't get
5 any say in selecting, I guess, hours or locations of
6 early voting?
7     A.  They vote on it, yes or no, to approve or
8 disapprove.
9     Q.  When they say it's already selected when it
10 comes to them --
11    A.  I -- go ahead.
12    Q.  -- do they have any input to push back and
13 change it when they're -- when it's being presented to
14 them in public forum?
15    A.  Yes.
16    Q.  So they do have a say?
17    A.  Yes.
18    Q.  And then Page 12, at the second time stamp,
19 7442, there is a -- do you mind reading the portion by
20 Commissioner Amsler?
21    A.  "This is beginning to sound like a broken
22 record.  Ever since I've been on this Court, when it
23 comes to election time, this same issue comes up
24 every time.  People are inferring -- inferring that
25 we are trying to disenfranchise a block of voters.

Page 200

1 We're not trying to disenfranchise anybody."
2     Q.  What did you make of his statement saying that,
3 "When it comes election time, this same issue comes up
4 every time"?
5         MR. SEAQUIST:  Object to the form.
6     A.  I don't know what issue he's specifically
7 talking about.
8     Q.  (BY MR. CUSICK) Do you mind -- you -- you
9 can read -- do you mind reading to yourself the --
10 Commissioner Beckendorff's paragraph above, and that
11 might be helpful.
12    A.  Okay.  And your question?
13    Q.  Do you know what he's referring to by "this
14 same issue comes up every time"?
15        MR. SEAQUIST:  Object to the form.
16    A.  About --
17    Q.  (BY MR. CUSICK) I guess in relation --
18    A.  -- everyone wanting -- about everyone
19 wanting an early voting location in a different -- or
20 an early voting spot in a different location.
21    Q.  No, in relation to his next sentence where he
22 says, "People are inferring that we're trying to
23 disenfranchise a block of voters.  We're trying to" --
24 just, I guess, that first portion of that sentence.
25 Would he be referring to "block of voters" as the

Page 201

1 Prairie View A&M students?
2         MR. SEAQUIST:  Object to the form.
3     A.  I don't know.
4     Q.  (BY MR. CUSICK) Have you heard any -- or
5 strike that.
6         Have you represented that people have
7 inferred that the Commissioners Court has tried to
8 disenfranchise any blocks of voters in Waller County?
9     A.  No.
10    Q.  And so that would include Prairie View A&M
11 students?
12    A.  Correct.
13    Q.  Was the Democratic chair, Rosa Harris, in
14 attendance at this meeting on 10-17?
15    A.  No.
16    Q.  Do you know why she wasn't in attendance?
17    A.  No, I don't.
18    Q.  I want to turn your attention to Page 16.  If
19 you could read from time stamp 8318 all the way down to
20 8359 where Kendric Jones says, "That's a no in my
21 standpoint," from beginning with Judge Duhon to Kendric
22 Jones.
23    A.  "Thank you.  Yes, ma'am.  Good morning.  My
24 name" -- that's where?
25    Q.  Oh, no.  Sorry.  Page 16, where it says, "As a

51 (Pages 198 - 201)

Page 202

1 student and as a student leader."
2   A.   "As a student leader -- and as a student
3 leader, I'd like your opinion if you think -- if you
4 think if, by adding days at the community center
5 which is next to the post office, is an -- is that
6 accessible to students?
7            "Kendric:  As we brought this up last
8 time, what's accessible to you guys is not accessible
9 to us.  Being that the MSC is our local point on
10 campus, students get more mail sent to our local
11 mail -- students get more mail sent to our local mail
12 than we have on campus rather than the Postal
13 Service, which is right next to the community center.
14            "Judge Duhon:  So that is a yes or no?
15            "Kendric Jones:  That is a no in my
16 standpoint."
17   Q.   And so what is your -- what is your impression
18 from Mr. Jones' representation here about what students
19 would want if hours were added to the community center?
20            MR. SEAQUIST:  Object to form.
21   A.   They would want them right there where they
22 could easily access them.
23   Q.   (BY MR. CUSICK) And when you say "right
24 there," that's not the community center?
25   A.   No.  Right.  They would want them right

Page 203

1 there where they didn't have to -- to -- to travel
2 and need to go to a location.
3   Q.   At the -- is that the Memorial Student Center?
4   A.   They wanted it in the Memorial Student
5 Center and the -- not to have to walk to the
6 community center.
7   Q.   And Judge Duhon asked, "Is that accessible to
8 students, the community center?"
9   A.   Correct.
10   Q.   And Mr. Jones represents, "That's a no in my
11 standpoint"?
12   A.   Correct.
13   Q.   And so based on this representation, would you
14 be concerned that the community center isn't accessible
15 to students?
16            MR. SEAQUIST:  Form.
17   A.   No.  I think it's -- no, that's not what I
18 would -- would say.
19   Q.   (BY MR. CUSICK) Have you walked to the
20 community center before on campus?
21   A.   Yes.
22   Q.   There's a footpath?
23   A.   No, I didn't walk the footpath.  I walked
24 across the way, through the parking lot and across
25 the way.

Page 204

1   Q.   So you go through a parking lot?
2   A.   I went through the stadium parking lot,
3 right up to the back of the community center.
4   Q.   And do you go over -- go on any roads --
5   A.   No.
6   Q.   -- after you go through the parking lot?
7   A.   No.
8   Q.   Is it grass?
9   A.   Yes.
10   Q.   But no sidewalks?
11   A.   There were some sidewalks and some not.
12   Q.   And then I know we discussed a little bit
13 earlier about students being represented by the party
14 chairs.
15            Do you mind turning to Page 17?
16   A.   Uh-huh.
17   Q.   And then it's 80 -- time stamped 8637.
18            Do you mind reading Ms. Budwine's
19 comments?
20   A.   Uh-huh.
21            "Okay.  So students and student
22 leaders in here will know from now on to check our
23 party chair.  Like, I'm not with the
24 Democratic/Republican fight.  It's about fairness and
25 the students.  You can keep in touch with the

Page 205

1 election to watch our agendas, when it gets posted on
2 the agendas."
3   Q.   And so here, would it -- how did you interpret
4 that, it's, "I'm not with the Democratic/Republican
5 fight, it's about fairness and the students"?
6            MR. SEAQUIST:  Object to the form.
7   A.   I think that she's talking about it's not a
8 fight between Democrats and Republicans, that she
9 was -- and that she wasn't want to get into that
10 battle.
11   Q.   (BY MR. CUSICK) And so would it be fair to
12 say that it transcends any of the partisan concerns
13 that were expressed at this meeting?
14            MR. SEAQUIST:  Object to the form.
15   A.   What she stated it was -- that was not,
16 rather.
17   Q.   (BY MR. CUSICK) And then if you turn to
18 Pages 20 to 22, if you could read beginning on Page
19 20, time stamp 9324, Antonius Brown, and then ending
20 with, "Democrat or Republican" on Page 21.
21   A.   Starting with Antonius Brown?
22   Q.   Yeah, where it says, "Thank you," right here on
23 Page 20, time stamp 9324.
24   A.   Okay.  Gotcha.
25            "Thank you.  So it was said earlier

52 (Pages 202 - 205)

Page 206

1 that this sounds like a broken record, and my drill
2 sergeant always tell me if I continue to do something
3 over and over again, then that's not getting it right
4 and I'm insane because I haven't fixed the process.
5 I think the problem we're having here is the process
6 with early voting is selected because I think the
7 fact that the party chair is the one who has a voice
8 in this and that I'm not registered under any party
9 and I'm a student, I don't really think -- I don't
10 really think -- even I love Ms. Mattox, that's an
11 auntie, I don't think she represents my voice when it
12 comes to choosing where early voting is at because
13 I'm not registered as a Democrat or Republican."
14      Q.   And here, did you -- what did you make of -- of
15 this -- of his -- of Mr. Brown's statements here?
16           MR. SEAQUIST:  Form.
17      A.   What did I -- I'm saying that -- I'm
18 thinking that he's saying that he's not registered as
19 a Democrat or a Republican, although we don't
20 register as that in Texas.  However, I'm thinking
21 he's saying that he doesn't want to be recognized by
22 either party.
23      Q.   (BY MR. CUSICK) And so having heard that,
24 were you concerned at all that someone that didn't
25 register for either and also expressed concerns that

Page 207

1 neither party chair represented their views, that
2 there was any way for him to have input in the
3 process for early voting schedule?
4      A.   No.
5      Q.   Why not?
6      A.   Well, first of all, you don't register as a
7 Democrat or Republican.  That's a false statement,
8 but as far as did I believe that he could have looked
9 on the agenda, just like everyone else, he knew that
10 Court was there that day and he could have come and
11 represented theirselves, just like everyone else did,
12 is what I'm trying to say.
13           I'm not -- what I'm saying is that in
14 order to contact each student out on that campus,
15 what representative do you go to?  What he is stating
16 here is that the Democrat or the Republican Party
17 shouldn't represent where he chooses his early
18 voting.
19      Q.   And so in the process that nobody but the party
20 chair for the Republican and the Democrat has input into
21 the process, his concern that he has no mechanism to
22 influence that initial process, that didn't raise any
23 concerns for you?
24           MR. SEAQUIST:  Form.
25      A.   It did, because I feel that that is the way

Page 208

1 he feels, that he felt that he should -- if he was
2 not recognized by the Democrat or Republican party,
3 that he had no say.  I do, yes.
4      Q.   (BY MR. CUSICK) So he had no say?
5      A.   I felt that that's what he felt, that he had
6 no say.
7      Q.   And so if a student is not registered with a
8 party, they have to wait until the schedule is presented
9 to the Commissioners Court, which Commissioner Barnett
10 said is accepted 99 percent of the time, and that's the
11 first instance in which they have any way to influence
12 or add input into the process?
13           MR. SEAQUIST:  Form.
14      A.   Yes.
15      Q.   (BY MR. CUSICK) And so if a -- a student or
16 two came up and expressed concerns like he did, but
17 let's say it happened on August 22nd --
18      A.   Correct.
19      Q.   -- how would those concerns be relayed if the
20 Commissioners Court is voting on the early schedule, is
21 voting at that same meeting to approve or not approve?
22      A.   How would they express concern?
23      Q.   How would their concern actually be factored in
24 by you if you've already presented the schedule to the
25 Commissioners Court?

Page 209

1      A.   I would advise them to speak in
2 Commissioners Court during the public comments
3 section.
4           And are you asking me what I would
5 have done if I -- it had not been submitted yet?
6      Q.   Yes, if it had not been submitted yet.
7      A.   If I had several that had come to me, I
8 would have taken that into consideration.
9      Q.   And did any of these -- these are multiple
10 students who are saying this on record.  Did that prompt
11 you to reconsider after the 10-17 meeting?
12           MR. SEAQUIST:  Form.
13      A.   I don't remember if it did or not.
14      Q.   (BY MR. CUSICK) And then on Page --
15 Page 22, if you look at 9535 time stamp, Judge Duhon,
16 if you just want to read this -- the middle portion
17 where it begins -- where it begins, "I mean, there's
18 one after another."
19      A.   Uh-huh.
20      Q.   Page 22.  I'm sorry.
21      A.   Yeah, I'm on 22.  I'm just -- Judge Duhon is
22 saying it?
23      Q.   Yeah.  I think it would begin where it says, "I
24 mean, there's one after another."
25      A.   "I mean, there's one after another.  I think

53 (Pages 206 - 209)

Page 210

1  it's a true statement to say there's a lot of
2  students who do not identify as Democrat or
3  Republican.  They consider theirselves to be
4  independent.  They don't consider themselves just to
5  do what a party tells them to do.  They're going to
6  vote their minds, okay?"
7      Q.  Thank you.
8          And so here -- and here, having heard
9  this statement, would you consider reaching out to
10  the student government president --
11      A.  I already have.
12      Q.  -- as --
13      A.  I already have, yes.
14      Q.  Would you represent that you -- before, you
15  indicated who -- or asked the question, who would I
16  reach out that would be representative of students on
17  campus, not with either party.  Had you ever considered
18  adding the student government body president in addition
19  to the party chairs in that second stage of creating
20  early voting schedules?
21          MR. SEAQUIST:  Form.
22      A.  I have since then.
23      Q.  (BY MR. CUSICK)  So as of today, the
24  president is part of the -- the student government
25  president is part of the process for determining

Page 211

1  early voting locations?
2      A.  Well, not -- because we haven't done it yet.
3  It hasn't been set up yet because it's not until next
4  year.
5      Q.  Would the president of the school be a
6  representative to reach out to in addition to the party
7  chairs?
8      A.  We've reached out to the president of the
9  school.
10      Q.  And did you have any conversations with the
11  president of the school during the 2018 election --
12      A.  No.
13      Q.  -- in developing --
14      A.  No.
15      Q.  -- the early voting schedule?
16      A.  No.
17      Q.  And none with the student government president?
18      A.  No, not about early voting.
19      Q.  And turn to Page 26.  The time stamp is 10558.
20  It's a statement by Commissioner Amsler, and this is
21  during the discussion about early voting again.
22          Do you mind reading that sentence?
23      A.  It says, "Taking on an air of chaos and
24  pandemonium."
25      Q.  Did you feel the discussion at that point

Page 212

1  during the 10-17-2018 meeting was taking on an air of
2  chaos and pandemonium?
3      A.  No.
4      Q.  And then after this next question, we can take
5  a break, if that's okay.
6          For Exhibit 3, which is back to the
7  Dr. Flores report, and then on Page 33, do you mind
8  reading the first full paragraph that makes the
9  representation -- well, I'll represent here that this
10  is in reference to the October 24th, 2018 meeting,
11  and then the first paragraph, that, "Mr. Luther then
12  stated."
13      A.  "Mr. Luther then stated that the students
14  did not care for the interest of other citizens of
15  Waller County and urged the commissioners to consider
16  the long-lasting implications of allowing yourself to
17  be blackmailed by the federal courts, allow yourself
18  to be used by the Democrats, to be blackmailed by the
19  Democratic Party as they use the courts to get what
20  they want.  He went on to say students only care
21  about one thing, their commodity, their vote.  No
22  commissioners openly rejected or expressed any
23  disagreement with what Mr. Luther argued."
24      Q.  And in this statement, do you agree with his
25  comments here about what students were interested in

Page 213

1  when they were advocating for --
2      A.  No.
3      Q.  -- early voting?
4      A.  No.
5      Q.  And then similarly, on Page 34, do you mind
6  reading the paragraph beginning with, "Mr. Luther went
7  on"?
8      A.  "Mr. Luther went on, 'And why do they want
9  voting in the student center, because every student
10  has to pass through the center and they're easy
11  pickings for the political vultures out there.'
12          "In so speaking, Mr. Luther apparently
13  intended to communicate that the commissioners should
14  take care not to provide voting in a location that
15  was so easily accessible by young black Democratic
16  voters."
17      Q.  That's good.
18          Do you agree with that statement
19  that -- that students wanted it because they're easy
20  pickings for political vultures out there?
21      A.  No.
22          MR. CUSICK:  Off the record.
23          (Recess taken.)
24          (Exhibit No. 12 marked.)
25      Q.  (BY MR. CUSICK)  Ms. Eason, earlier you

54 (Pages 210 - 213)

Page 214

1 testified that the same procedures were in place --
2 or you talked a little bit about the procedures in
3 place for the 2018 primary election for determining
4 early voting hours, and I want to introduce in as
5 Exhibit 12 an E-mail exchange between you and Judge
6 Duhon, and this also included as part of these
7 attachments an unsigned contract, but for the
8 purposes of this exhibit, mainly the last page I want
9 to turn your attention to.
10        MR. CUSICK:  Handing a copy to
11 Ms. Eason, to her counsel.
12    Q.   (BY MR. CUSICK) Do you recognize Exhibit 12 --
13 or Exhibit 12?  You can take a moment to read through
14 it, though.
15    A.   Uh-huh.
16        Okay.
17    Q.   And so on the last page, unfortunately the
18 Bates stamp is cut off, but it's 001399.  This is an
19 E-mail sent by you to Judge Duhon on January 23, 2018.
20        Do you mind reading the body of that
21 E-mail?
22    A.   Uh-huh.
23        "Final schedule approved by David
24 Luther, Liz and Elton and I believe Rosa.  I've
25 covered every part of the county adequately.  I will

Page 215

1 put on next week's agenda."
2    Q.   And for David Luther here, representing the
3 Republican Party chair; is that correct?
4    A.   Yes.
5    Q.   And then who is -- who is Liz?
6    A.   Liz.  This Liz.
7    Q.   And so -- and then Elton refers to -- is it
8 Matt?
9    A.   Uh-huh.
10    Q.   And then -- so here at the end of the sentence,
11 you say, "I believe Rosa Harris"?
12    A.   Uh-huh.
13    Q.   And that's the Democratic Party chair.
14        Could you explain why you said, "I
15 believe Rosa Harris"?
16    A.   I don't know without going back and
17 seeing -- I mean, this was over a year ago or -- I
18 don't know without having to go back and look through
19 it.
20    Q.   Could someone reading this statement might
21 infer that Ms. Harris' agreement was not necessary to
22 submit the plan to be final before the vote?
23        MR. SEAQUIST:  Object to the form.
24    A.   No.
25    Q.   (BY MR. CUSICK) And so anytime you receive

Page 216

1 approval from the party chairs, do you receive that
2 in written form?
3    A.   Let me read this first.
4    Q.   Sure.
5        Actually, I can introduce -- let me
6 introduce the next exhibit because I think
7 potentially the way that they were produced, part of
8 the chain with Ms. Harris and you might provide a
9 little bit more background.
10    A.   Okay.
11        (Exhibit No. 13 marked.)
12        MR. CUSICK:  So this is Eason
13 Exhibit 13, which is an E-mail correspondence, among
14 others, between Ms. Harris on January 7th, 2018,
15 which was forwarded by Ms. Eason to Judge Duhon on
16 January 8, Bates stamped 001255 through 001257.
17        I'm providing the exhibit to
18 Ms. Eason, one to her counsel.
19    Q.   (BY MR. CUSICK) And if you want to just take a
20 moment to review these pages.
21    A.   Looks like the same one, except for the
22 back.
23    Q.   Yeah, just an easier way to digest the two
24 together.
25        And so in the first page here, it

Page 217

1 says, "This E-mail contradicts her text message"?
2    A.   Uh-huh.
3    Q.   And so did you produce communications between
4 you and Ms. Harris as the one referenced here through
5 discovery?
6    A.   I don't know -- I don't know what this is.
7 This is the in -- I don't know what it is.  Did I
8 produce it in discovery?  No, I don't believe so.
9    Q.   Did you have text -- do you have text message
10 conversations with Ms. Harris about any of the early
11 voting scheduling?
12    A.   From this last -- from when, here?
13    Q.   From 2018.
14    A.   Yes.
15    Q.   From either the primary or the --
16    A.   Yes -- no, not the primary.  I mean, I'm
17 sure I do, but from the 2018, yes, general, yes, and
18 it is not in the discovery.
19    Q.   And do you mind reading the second sentence?
20    A.   "In the text which was sent after the
21 E-mail, she stated she doesn't know what she is
22 signing and that she has gotten no documents.
23 However, this E-mail starts off by stating, 'I have
24 not felt well enough to go over the contract.'"
25    Q.   And so from your recollection in the 2018

55 (Pages 214 - 217)

Page 218

1 primary, in the contract between you and the Democratic
2 and Republican chairs, did Ms. Harris sign that
3 contract?
4    A.   Well, I don't know without looking -- going
5 and seeing.
6    Q.   Would a signed contract have been produced
7 through discovery?
8    A.   No.  We didn't do anything for a primary
9 election.
10    Q.   So there was no contract in place?
11    A.   No.  We didn't provide -- I didn't provide
12 any documents for the primary election, is what I'm
13 saying.
14    Q.   Oh, gotcha.
15    A.   And for -- I guarantee you her contract is
16 signed for the primary.
17    Q.   And what was the nature of your conversations
18 with Ms. Harris during the 2018 general election?
19    A.   Such as?
20    Q.   Did she have similar concerns about not
21 receiving documents, putting aside -- did she express
22 any concerns about the general election schedule to you?
23         MR. SEAQUIST:  Form.
24    A.   No, she approved it.
25    Q.   (BY MR. CUSICK) She approved the general

Page 219

1 election primary -- or, sorry, strike that -- the
2 general election --
3    A.   Early voting location.
4    Q.   -- 2018?
5    A.   Yes.
6    Q.   And for the 2018 general election, did she
7 provide you -- was there a contract between the party
8 chairs and you for the 2018?
9    A.   I don't have a contract in a general
10 election.  That's a county election.
11    Q.   And for her approval of the early voting
12 schedule in the general election, was that through text?
13    A.   No, I believe we did it in my office.
14 However, I do have a text that states that she knew
15 when it went through Court.
16    Q.   When it went up to the Court?
17    A.   Yes.
18    Q.   So the only -- the only agreement was verbally
19 in your office?
20    A.   Correct, as well as it was with the
21 Republican chair.
22    Q.   No written?
23    A.   No.
24         (Exhibit No. 14 marked.)
25    Q.   (BY MR. CUSICK) And then I'm submitting as

Page 220

1 Exhibit 14.  This is an E-mail exchange between you
2 and Mr. Garrett Nemec on March 5th, 2018 which was
3 provided by defendants through discovery, Bates
4 stamped 001202 through 0012003.
5         MR. CUSICK:  Handing a copy to
6 Ms. Eason, to her counsel.
7    Q.   (BY MR. CUSICK) Do you recognize this?
8    A.   Yes.
9    Q.   And is this an E-mail you sent?
10    A.   It looks like it.
11    Q.   And you also received one from Mr. Nemec?
12    A.   Yes.
13    Q.   And so on the second page, do you mind reading
14 your response after it begins with, "I do apologize"?
15    A.   "I do apologize for the inconvenience
16 encountered while early voting on Prairie View
17 campus.  I, myself, have been to the student center
18 and I've seen their parking situation firsthand.
19 However, I would never have expected -- I would never
20 have expected all handicap accessible parking spots
21 would be occupied.  Lesson learned.  We will
22 communicate our needs to reserve parking spaces for
23 voters in future elections.  I do not believe that
24 this was a situation of officers targeting voters.  I
25 do, however, agree that more parking places should be

Page 221

1 available for disabled drivers.  I've made contact
2 with Mr. Torres, director of parking, and he agrees
3 that your citation should and will be disregarded.
4 Please stop by the information center at the entrance
5 of the campus with your voting ticket and it will be
6 promptly dismissed."
7    Q.   And then do you mind reading Mr. Nemec on the
8 first page, his E-mail beginning with, "Thank you for
9 your quick attention"?
10    A.   "Thank you for your quick attention to your
11 E-mail.  I called the number on the parking link and
12 talked with Ms. Darby.  She was very polite and
13 sympathetic to my complaint about the ticket.  She
14 asked for the number," such-and-such, "and told me
15 the ticket would be canceled.  If you still want me
16 to stop by, just let me know.  If I would have talked
17 to her first, I would not have sent the E-mail to the
18 judge and commissioner."
19    Q.   And then, last, just your E-mail that begins
20 with the -- first one, "No, all is good"?  On the first
21 page, sorry.
22    A.   "No, all is good.  An officer is meeting in
23 the morning to mark off a few places for voter
24 parking.  He will do that during the next election
25 for early voting.  Once again, I apologize for your

56 (Pages 218 - 221)

Page 222

1 inconvenience."
2    Q.   And so here you mention that -- references
3 about marking off places for voter parking on the
4 campus?
5    A.   Uh-huh.
6    Q.   And so did you do that in advance of the 2018
7 general election?
8    A.   Yes.
9    Q.   And then I want to turn back to Exhibit --
10 Exhibit 12.  This is the E-mail correspondence, and then
11 starting from the back, this E-mail exchange between you
12 and Ms. -- you and Ms. Harris.
13    A.   Uh-huh.
14    Q.   And then do you mind reading the first two full
15 sentences from Ms. Harris?
16    A.   "I have not felt well enough to go over the
17 entire contract between parties and contracting
18 officer completely.  Although I do have some
19 questions, I do not want a repeat of the fiasco of
20 last election where I was blamed for a decision I was
21 not given an opportunity to make."
22    Q.   Do you know -- do you know what she was --
23    A.   That wasn't my election.  That was before I
24 was here.
25    Q.   For 2017?

Page 223

1    A.   Yes.  Well, 2017, we didn't have -- it was a
2 general -- it was just a bond election.
3    Q.   And do you know what she was referring to by
4 the last election?
5    A.   No.
6    Q.   Could that have referred to the issue about the
7 constitutional amendment referring to the bond for
8 building a jail?
9         MR. SEAQUIST:  Form.
10    Q.   (BY MR. CUSICK)  The fiasco?
11    A.   I -- for the bond?  I don't know.
12    Q.   Was there any early voting on campus for that
13 election in 2017, general?
14    A.   I don't know if there was or not.
15         Do you have a schedule?
16    Q.   I can get one.
17         (Exhibit No. 15 marked.)
18         MR. CUSICK:  Introducing into the
19 record Exhibit 15, Eason Exhibit 15.
20         Hand a copy to Ms. Eason, one to her
21 attorney.
22    Q.   (BY MR. CUSICK)  This is an E-mail
23 correspondence again in 2017 between you and Ms. Harris.
24 Take a moment to review.
25    A.   Correct.

Page 224

1    Q.   And then if you turn to the second page, the
2 E-mail dated October 3rd, 2017 from Ms. Harris.
3         Do you mind reading that into the
4 record?
5    A.   Which one is it?
6    Q.   Beginning, "Not good enough."
7    A.   "Not good enough, Christy.  The citizens of
8 Prairie View have transportation, most students
9 don't.  Walking from one end of the campus to the
10 other is time-consuming, plus signing in and voting.
11 We've done this battle to death and frankly, I'm
12 tired of it.  The students fought and won this
13 battle.  The 309 is the largest poll in Waller
14 County.  How can you justify not having an early
15 voting poll at the MSC?  Things have changed.  We're
16 not going back to those days, not without a fight.
17 Adding the bond election and having voter drives at
18 Prairie View, then telling the students no poll is
19 wrong on so many levels.  We need a poll in Fields
20 Store, Katy, PV and MSC.  I may have been given the
21 wrong information, but I was told Katy has a school
22 election.  Are you handling that?  If so, more reason
23 for Katy to have a poll."
24    Q.   And so what was the circumstances in which you
25 received this E-mail from Ms. Harris?

Page 225

1    A.   This was -- let me read it.
2    Q.   Sure.
3    A.   If I believe right, it was this -- hang on.
4         Here, here's my E-mail.
5         "Ms. Harris, thank you for E-mailing.
6 On August 9th, I sent the list of early voting
7 locations, time, election day polling place locations
8 to you for your approval.  You were in agreement with
9 the exception of an early voting ballot board clerk.
10 It may need to be changed at a later date.  The lists
11 were approved in Commissioners Court on
12 August 16th."
13         Then she comes back on October the 3rd
14 and wants to change them.
15    Q.   And do you mind reading the E-mail on the first
16 page dated October 2nd at 11:00 a.m. from Ms. Harris?
17    A.   Yes.
18         "Ms. Eason, after assessing the early
19 voting schedule and the effect it will have on early
20 voting, I strongly recommend early voting polls be
21 open one week in Fields Store, one in Turlington, one
22 in Prairie View, one at the university.  It is a fact
23 the constitutional amendment election are generally
24 low interest and low turnout.  You add a hot issue
25 such as a bond for a new jail and voters take a

57 (Pages 222 - 225)

Page 226

1 personal interest.  It involves our tax money.  The
2 last thing we would want the voters to feel is we are
3 obstructing and denying them the right to vote by
4 making them travel miles to vote early.  Past
5 elections have shown a large number of voters to
6 prefer.  I believe the office has the funds to add a
7 few more polls."  [as read]
8     Q.   Why would the issue of a bond for a new jail be
9 a hot issue?
10         MR. SEAQUIST:  Form.
11     A.   That is her opinion.
12     Q.   (BY MR. CUSICK) Did you think that --
13 strike that.
14         After the bond was added as a ballot,
15 was there more interest in Waller County in terms of
16 voting and civic engagement around that?
17         MR. SEAQUIST:  Form.
18     A.   The bond was on the ballot when she approved
19 the locations on August the 9th.
20     Q.   (BY MR. CUSICK) So at the time on
21 August 16th, the bond for the jail was, in fact, at
22 the time on the ballot?
23     A.   Yes.
24     Q.   And in Prairie View, has there been organizing
25 around the death of Sandra Bland?

Page 227

1         MR. SEAQUIST:  Form.
2     A.   I'm sorry?
3     Q.   (BY MR. CUSICK) For the death of Sandra
4 Bland in Waller County, has there been organizing on
5 campus around that issue?
6         MR. SEAQUIST:  Form.
7     A.   I don't know.
8     Q.   (BY MR. CUSICK) Do you know who Sandra
9 Bland is?
10     A.   Yes.
11     Q.   And so have students on campus held events for
12 advocacy around reforms for the jail in Waller County?
13     A.   Not that I know of, they haven't, but you
14 remember, I wasn't here then.
15     Q.   In 2017, in March --
16     A.   No.
17     Q.   -- was when you first started?
18     A.   Yes.
19         Since I've been here, no.
20     Q.   And so prior to that, I guess, in anticipation
21 of this 2017 election, were you aware that students
22 might be interested or take a personal interest, as
23 Ms. Harris expresses, about the issue of a new jail in
24 Waller County?
25     A.   No.

Page 228

1     Q.   And would -- would -- on August 16th, would
2 students be in school at that point or on campus to --
3 would students be on campus on August 16th to
4 participate in the -- to attend the Commissioners Court
5 meeting where it was approved on August 16th?
6     A.   I don't know --
7         MR. SEAQUIST:  Object to the form.
8     A.   I don't know when they started school, but
9 August 9th is when she approved it.
10     Q.   (BY MR. CUSICK) And then so in your E-mail,
11 you say the lists were approved in the Commissioners
12 Court on August 16th --
13     A.   Okay.
14     Q.   -- and so if -- if it's -- if we look at the
15 schedule of Prairie View when classes first started, how
16 would students have participated in this initial first
17 meeting if classes weren't even scheduled at that
18 particular time on August 16th?
19         MR. SEAQUIST:  Form.
20     A.   If they weren't in school, they wouldn't
21 have.
22     Q.   (BY MR. CUSICK) So do you have any concerns
23 that since students weren't even on campus,
24 potentially, assuming that classes haven't started,
25 would you have been concerned that they wouldn't have

Page 229

1 had any opportunity for input into the early voting
2 locations that were approved on August 16th?
3     A.   What I would probably look at first is find
4 out when the deadlines were for that I had to submit
5 those by law.
6     Q.   If that had to precede --
7     A.   If that had to do with it, yes.
8     Q.   And do those generally change per year, like --
9     A.   No, but as you can see, even this past
10 election, all this has happened right at the same
11 time of the year so the deadlines are in -- in that
12 time frame.
13         (Exhibit No. 16 marked.)
14         MR. CUSICK:  And then here is a
15 transcript as Exhibit 16 from the October 11th,
16 10-11-2017, Eason Exhibit 27 [as spoken].
17         I'm handing a copy to Ms. Eason, one
18 to her attorney.
19     Q.   (BY MR. CUSICK) And so this is a partial
20 transcript of the October 11th, 2017 Commissioners
21 Court meeting.
22         On Page 3, Dr. Denise Mattox speaks,
23 and at the bottom, do you mind reading where it
24 begins, "So speaking of that, I noticed that"?
25     A.   "We were back to where we were with early

58 (Pages 226 - 229)

Page 230

1 voting in the very few places in Waller County, and I
2 spoke to elections administrator Christy Eason. I
3 know she's planning on making some changes today, but
4 what I didn't see were changes for Prairie View A&M
5 University. I want to say that anybody can fix
6 polling places. Anyone can do that."
7    Q. And then do you remember whether Ms. Mattox --
8 or Dr. Mattox, do you remember your conversations with
9 Ms. Mattox that she's referring to here?
10    A. Back to 2017, no, I don't.
11    Q. And then on the next page, on Page 4, if you
12 read from, "So what we have at Prairie View A&M."
13        Oh, sorry. Out loud for the record.
14    A. Well, I have to find it first.
15    Q. Right here, the first sentence, "So what," for
16 Page 4.
17    A. "So what we have at Prairie View is a
18 population of people, the highest density population
19 in Waller County, I mean, density-wise, and then
20 also, this is a walkability -- this is a walkability
21 issue because you have to get a permit, a 50-dollar
22 ticket. This place was not designated for vehicles,
23 it's designed for walking, so when you put a polling
24 place for a group, that population, it has to be
25 walkable. It has to be walkable and available to

Page 231

1 use, so that's why we use the student center. I
2 don't see that" --
3    Q. Sorry, just at the -- at the bottom where it
4 says, "Because I can tell you."
5    A. "I have walked every inch of the jail. Most
6 people were non-white, especially non-white black,
7 and the highest density of the non-white black
8 population is at Prairie View A&M University, so they
9 really need to have" -- oh, stop?
10    Q. And then -- yeah.
11        And then do you agree that Prairie
12 View is a high density -- Prairie View A&M has a high
13 density population?
14        MR. SEAQUIST: Form.
15    A. Of black, they're --
16    Q. (BY MR. CUSICK) Non-white population?
17    A. Correct.
18    Q. Does it have a high density population for
19 people between the ages of 18 and 20?
20    A. Yes. They're in college.
21    Q. And then I'm going to turn -- and I know this
22 was before your time as election administrator, but do
23 you know from your office perspective, for the 2016
24 general election, did Mr. Teed rely on a similar system
25 for the criteria that you used for determining early

Page 232

1 voting opportunities for hours and locations?
2    A. Yes.
3        MR. SEAQUIST: Form.
4    A. Yes, from what I have looked back, yes.
5    Q. (BY MR. CUSICK) Prior to when you and
6 Mr. -- or as Mr. Teed was transitioning out, did you
7 have a discussion about issues that he faced or
8 issues with voting that should be on your radar when
9 you took over in 2017?
10    A. No.
11    Q. Did he share any documents about ongoing issues
12 in the county with you?
13    A. With Mr. Teed?
14    Q. Mr. Teed with you, as an election administrator
15 for your office --
16    A. No.
17    Q. -- that you should be aware of?
18    A. No, not unless he did it -- left -- not
19 unless he left paperwork in the office.
20        (Exhibit No. 17 marked.)
21        MR. CUSICK: This is Exhibit -- Eason
22 Exhibit 17. It's December 15th, 2014 Waller County
23 Commissioners Court special session, and then it
24 includes an attachment entitled "Waller County
25 Election Office Report" that was put together by

Page 233

1 Mr. Teed.
2        Handing a copy to Ms. Eason, one to
3 her counsel.
4    Q. (BY MR. CUSICK) And if you just want to take a
5 moment to review.
6        You have not seen this document in
7 your capacity --
8    A. No.
9    Q. -- as election administrator?
10    A. No, no, never seen this.
11        (Exhibit No. 18 marked.)
12        MR. CUSICK: And I'm marking as
13 Exhibit 18 the Waller County election office report
14 prepared by Mr. Teed for February 4, 2015.
15        Handing a copy to Ms. Eason, handing a
16 copy to her counsel.
17    Q. (BY MR. CUSICK) And have you seen this
18 document before?
19    A. No.
20    Q. And if you look at C1 on the first page of
21 this --
22    A. Uh-huh.
23    Q. -- it says, "Problems resulting from a past
24 perception of secrecy and insufficient accountability.
25 We are striving to create a culture of helpfulness and

59 (Pages 230 - 233)

Page 234

1  transparency in the election office"?
2  A.  Uh-huh.
3  Q.  Was that goal ever relayed to you prior to your
4  appointment or as you were transitioning to take over?
5  A.  With -- by Mr. Teed?
6  Q.  Yes.
7  A.  No.  I've never met him.
8      Oh, well, he dropped in the office one
9  day, other than that, but --
10     (Exhibit No. 19 marked.)
11     MR. CUSICK:  Just for the record
12  purposes, this is Exhibit 19, Commissioners Court
13  report, elections office for 4-15-2015 as Eason
14  Exhibit 19.
15     I'm handing a copy to Ms. Eason,
16  handing a copy to her counsel.
17  Q.  (BY MR. CUSICK) Have you seen this document
18  before, Ms. Eason?
19  A.  No.
20     (Exhibit No. 20 marked.)
21     MR. CUSICK:  And then I'm entering
22  Exhibit 20.  This is an E-mail exchange from Mr. Teed
23  to Mr. Barnett and Judge Duhon about three locations
24  possible for early voting for an analysis that he
25  conducted.

Page 235

1      Handing a copy to Ms. Eason, to her
2  counsel.
3  Q.  (BY MR. CUSICK) Have you seen this document
4  before?
5  A.  (Shakes head.)
6  Q.  Have you had a moment to review this?
7  A.  Yes.
8  Q.  And so you said you haven't seen this document
9  before?
10  A.  No.
11  Q.  But do you mind reading Mr. Teed's initial
12  E-mail on the first page into the record?
13  A.  "Commissioner Barnett, here's the attachment
14  referenced in the earlier E-mail regarding campus
15  locations.  I provided an analysis from the elections
16  office regarding each location.  I was not aware of
17  the Hobart Building being an option so that one is
18  not sufficiently researched.  At this point, I should
19  be able to provide more information by the end of
20  today."
21  Q.  And then, so, if you turn to the next page, do
22  you mind reading the first sentence?
23  A.  "The student center is first preference of
24  the University and the senior adults polled from the
25  Prairie View area."

Page 236

1  Q.  And in the fourth box in the second column,
2  Mr. Teed includes accessibility to students as a factor
3  that was considered; is that accurate?
4  A.  Yes.
5  Q.  In the other couple of columns, does Mr. Teed
6  express concerns that are expressed by the Commissioners
7  Court?
8  A.  Looks like it.  I guess.
9  Q.  And so there's a concern about maintaining
10  order -- or in the last box of the second page, about
11  maintaining order, policing the space for campaigning?
12  A.  Uh-huh.
13  Q.  And then -- and then his -- can you read what
14  his solution to that is on the -- in the next box?
15  A.  "Simply not a problem.  Courthouses and
16  schools across the state have common access, and
17  students and politicians are present but not
18  campaigning in sight of voters.  The University is
19  offering a security presence to support our poll
20  workers if needed, but overall, the students are
21  especially well" --
22  Q.  And then in the second box up here --
23  A.  -- "behaved."  Well behaved.
24  Q.  Sorry.
25     And then in the second box here, it

Page 237

1  says, "The distance to walk for elderly and
2  handicapped," and then do you mind reading his
3  evaluation --
4  A.  "Distance," that?
5  Q.  Yes.
6  A.  "Distance not too bad.  Moving to the
7  auditorium makes it within 200 feet of parking.
8  Student assistance is available.  Student is
9  available for elderly and seating is available for
10  elderly and other voters who are waiting.
11  St. Francis is available and closer to elderly voters
12  than the university is.  Ballots by mail are
13  available and building is ADA accessible."
14  Q.  And then could you read what the second choice
15  was?
16  A.  The Criminal Justice Center.
17  Q.  And did Mr. Teed, based on your review, conduct
18  a similar -- consider similar factors when -- based on
19  your review?
20  A.  It looks like he did.
21  Q.  And then what about the third choice -- or I
22  believe it's the Panther --
23  A.  Panther Plaza.
24  Q.  Yes.
25     Do you have any reason to dispute

60 (Pages 234 - 237)

1 these findings from Mr. Teed?
2           MR. SEAQUIST:  Object to the form.
3      A.  Yes.  I don't agree with them.
4      Q.  (BY MR. CUSICK) Have you conducted your own
5 analysis like this?
6      A.  Yes, as far as on the student center.
7      Q.  You conducted an analysis only of the student
8 center?
9      A.  The one that we were working -- I mean, not
10 a formal analysis like this, but, yes, some of the
11 problems that we've had at the student center.
12      Q.  Did you consider the same factors that he did?
13      A.  Yes, and more.
14      Q.  And is that in writing?
15      A.  No.
16      Q.  So the only record of the analysis you
17 conducted --
18      A.  I didn't present it with anyone.  I'm just
19 saying I disagree with -- personally I disagree with
20 some of this.  On some of this, he didn't mention as
21 far as the security of the entire student center for
22 two and a half weeks, that now they're not able to
23 provide us.  Maybe for election day, yes, I do agree,
24 but maybe not for early voting.
25      Q.  In your official capacity as election

1 administrator, you disagree with --
2      A.  As having this as an early voting location
3 for two and a half weeks, yes.
4      Q.  When you say "two and a half weeks," is that
5 under the new 1888, or would this be different for 2018?
6      A.  Well, anytime when they had suggested or
7 requested that early voting be there for two and a
8 half weeks, even now, it's not a good location to
9 have that.  I don't agree with it for them.  For what
10 he maybe considered it for at this time, possibly so.
11 For what we would need now or what we needed in
12 November 2018, no, I don't agree with that.
13      Q.  But you did propose early voting on the campus
14 for both the first and second week.  Even if they
15 weren't adopted, you did propose that to the
16 Commissioners Court?
17      A.  Yes, because that is our actual polling
18 location there now.
19      Q.  And so did you share your analysis with anyone
20 else?
21      A.  No.
22      Q.  And so here, Mr. Teed mentions how he conducted
23 follow-up with the concerns you identified.  Have you
24 followed up with Prairie View A&M officials?
25      A.  Yes.

1      Q.  And what was the -- strike that.
2           You -- when did you conduct your
3 analysis?
4      A.  My analysis?
5           MR. SEAQUIST:  Form.
6      A.  I conduct it every time I have an election
7 there.  It's not -- it's -- I've had instances in
8 this past election that security has been broken in
9 this polling location.  I do not agree that it's a
10 good polling location because it is not secured after
11 the polls close.
12      Q.  (BY MR. CUSICK) And did you share these
13 concerns in writing with any Prairie View A&M
14 officials?
15      A.  No, not in writing.
16      Q.  Did you share this with any other county
17 officials in writing?
18      A.  I have shared nothing in writing about this.
19 This is the locations that we're using right now.
20 When they get ready to change, yes, I will.
21      Q.  And can the security issue at Prairie View A&M
22 be fixed?
23      A.  From the meeting that I had last week with
24 the president, probably not.
25      Q.  And was security an issue in 2018 during the

1 general election?
2      A.  Yes, it was.
3      Q.  And what was the nature of that concern?
4      A.  That the -- the rooms were not being secured
5 after the polls closed.  It was in an auditorium, and
6 the stages and everything to the auditorium were
7 still being used after the polls closed.
8      Q.  And so how did you first become aware of that
9 issue?
10      A.  The election inspector was sitting in on
11 election day and witnessed it.
12      Q.  And so did you bring that to the attention of
13 Prairie View A&M?
14      A.  Yes, I did.
15      Q.  And did they give you assurances that it would
16 be fixed?
17      A.  No.  They said that they would make sure
18 that they were closed during that time and that --
19 during that election, but nothing forward, anything
20 forward.
21      Q.  So for the rest of that election, they assured
22 you that there wouldn't be any security issues?
23      A.  Yes.
24      Q.  And did any issues happen after that?
25      A.  Not that I know of.

61 (Pages 238 - 241)

Page 242

1   Q.   And then so moving forward, did they make that
2   same assurance in the future election?
3   A.   No.  It was something that we would have to
4   discuss the next time we used it as a polling
5   location.
6   Q.   So in the one instance of this issue, you
7   resolved it with Prairie View A&M?
8   A.   Uh-huh.
9   Q.   And then since then, there haven't been any
10  more issues?
11          MR. SEAQUIST:  Form.
12  Q.   (BY MR. CUSICK) Or during now --
13  A.   I haven't had an election there since.
14  Q.   And so the sole reason for not keeping it at
15  the Memorial Student Center being an ideal place is
16  because you're concerned that Prairie View A&M won't
17  keep that promise to address that issue about election
18  security?
19          MR. SEAQUIST:  Form.
20  A.   No.  I've had a discussion with Prairie View
21  administrators since then and they have also
22  concurred that it is not a good location.
23  Q.   (BY MR. CUSICK) So Prairie View A&M said
24  that the Memorial Student Center is not a good
25  location --

Page 243

1   A.   Correct.
2   Q.   -- on campus?
3          And who is the --
4   A.   Dr. Simmons, the president.
5   Q.   Was there anyone else on campus -- or in that
6   meeting?
7   A.   Yes, there was probably eight of us in the
8   meeting.
9   Q.   Do you remember the names or titles of the
10  other people in that meeting?
11  A.   Judge Duhon, Frank Jackson, President
12  Simmons, and then several other members, as well.
13  I'm not saying -- I'm just saying that I don't agree
14  with his analysis of this polling location.  I'm not
15  saying anything, you know, bad about it.  I'm just
16  saying that it's not a location that can be secured
17  for two and a half weeks.
18  Q.   And if --
19  A.   And it's just stating to move it in another
20  location, not to --
21  Q.   If -- if some way there was assurances and you
22  felt comfortable that it would be secured, are there any
23  other reasons then to disagree with his analysis?
24          MR. SEAQUIST:  Object to the form.
25  A.   I just don't agree with his analysis of it.

Page 244

1   Q.   (BY MR. CUSICK) All portions of it?
2   A.   No, there's some of it is -- some of it's
3   okay, but to me, the security of the -- the voting
4   machines is the most important, and I know firsthand
5   we don't have it there.
6   Q.   Do you know if this was an issue in 2016 when
7   it was on campus?
8   A.   I do not know.
9   Q.   Was this an issue when you were -- strike that.
10          I might be misremembering, but was
11  there early voting on campus during your first tenure
12  as election administrator?
13  A.   I don't remember if there was early voting
14  there.  There was always an election spot.  I don't
15  know if there was early voting there or not, though.
16  Q.   So like Mr. Teed, did you survey other
17  locations on campus?
18  A.   I haven't looked for another polling place.
19  This was just the observations that I had in my last
20  election.  I haven't aggressively gone out looking
21  for others, so I've had no reason to analyze any
22  other locations.  I'm just reporting on what I found
23  out this last election on this location.
24  Q.   And you mentioned that you're on a list serve
25  or that you had reached out to other election

Page 245

1   administrators in other counties?
2   A.   Correct, as far as those that have polling
3   locations on campuses.
4   Q.   And do you know if any of those election
5   administrators had similar issues about election
6   security?
7   A.   I don't -- I don't know.
8   Q.   Did they secure it for election day on campus?
9   Do you have any concerns about securing it for a single
10  day, election security?
11  A.   No, because we're there all day and they
12  actually -- we take the -- the equipment is shut down
13  for the day and it's moved and taken with us.
14  Q.   So it's off campus at the end of the --
15  A.   Yes.
16  Q.   -- when the polls close?
17  A.   Yes.
18  Q.   I'm going to --
19  A.   And I guess what I'm trying to say is, I
20  guess, more so it's the room that's a bad location.
21  It's not so much it's --
22  Q.   Are there any other rooms in the MSC?
23          When you say "the room," is that the
24  auditorium?
25  A.   I don't know.  Oh, I'm sorry?

62 (Pages 242 - 245)

Page 246

1   Q.   When you say "the room," you said -- I'm sorry.
2   Do you want to repeat what you just said about the room?
3   A.   No.  The room is, yes, it's the auditorium.
4   Q.   Are there any other places --
5   A.   I don't know.
6   Q.   -- during your conversation this past -- do you
7   remember -- was it this week, you said?
8   A.   Week before last.
9   Q.   Did that come up about solutions?
10  A.   (Shakes head.)
11       MS. ADEN:  And I just want to
12  interrupt for the record.
13       So we've had a really great day and
14  this has gone smoothly, but if counsel is sending any
15  notes or giving any notes to the witness, I would
16  want to note for the record that we would object to
17  that and that the testimony needs to be Ms. Eason's
18  testimony and her testimony only.
19       MR. SEAQUIST:  Okay.  Counsel, I did
20  send a note.  It just said, "Wait for a question."
21       MS. ADEN:  Okay.  Thank you.  We
22  appreciate that, which you have been instructing her
23  to do all day, so I appreciate it.  Thank you.
24  Q.   (BY MR. CUSICK) Then I just want to talk a
25  little bit about in the last segment just about the

Page 247

1  history of early voting on campus, and I know we
2  briefly touched it at the top.
3       When did your office first bring early
4  voting to the MSC on campus?
5  A.   I don't -- I'm thinking 2016, 2015.
6       Bringing it back to campus, correct?
7  Q.   Yes.
8       Do you think early voting should be
9  offered on campus?
10 A.   Yes.
11 Q.   And why is that?
12 A.   I believe students should have access to
13 early voting on campus.
14 Q.   And what are some of the reasons why?
15 A.   I believe that it is their right to vote.
16 They should have it close to them and -- and just
17 like every other early voting location and like any
18 other citizen of the county.
19 Q.   Does transportation at all factor into this?
20 A.   Some.  Somewhat.  I don't know what the
21 transportation situation is on campus.
22 Q.   Would it be fair to say that the Prairie View
23 is the center of life -- strike that.
24       Would it be fair to say that Prairie
25 View A&M is one center of life in Prairie View?

Page 248

1       MR. SEAQUIST:  Object to the form.
2  A.   One of them, I'm sure.
3  Q.   (BY MR. CUSICK) And did -- from the 10-17
4  meeting, did students raise, as part of the reason
5  for early voting on campus, that it was central to
6  student life?
7  A.   Yes.
8  Q.   And did students raise transportation concerns
9  during that October 27th meeting, as well?
10 A.   Yes.
11 Q.   17th, sorry.
12       And have you been to any events on the
13 Prairie View A&M campus this past year aside from
14 what you do as voter registration?
15 A.   No.
16 Q.   Did you in 2018 --
17 A.   No.
18 Q.   -- aside from voter registration?
19 A.   No.
20 Q.   Are you aware of any events that Prairie View
21 A&M hosts on campus for civic engagement?
22       MR. SEAQUIST:  Form.
23 A.   No.
24 Q.   (BY MR. CUSICK) Do you know if the MSC --
25 do you know of any events that are public at the MSC

Page 249

1  this year?
2  A.   I don't know.
3  Q.   And so before, we referenced Mr. Jones'
4  testimony where he said that the Waller County Community
5  Center is not accessible to students, in his opinion.
6  A.   To whom?  I'm sorry.
7  Q.   Mr. Kendric Jones.
8  A.   Oh, yes.
9  Q.   Have you heard similar concerns that the Waller
10 County Community Center is not accessible for students?
11 A.   I've heard that, yes.
12 Q.   Is it an area that is frequented by students on
13 a daily basis?
14       MR. SEAQUIST:  Object to the form.
15 A.   I don't know.
16 Q.   (BY MR. CUSICK) Is it central to campus?
17 A.   It's on campus, yes.
18 Q.   You mentioned that you walked from
19 the Commissioners -- from the community center to the
20 Memorial Student Center before?
21 A.   Yes.
22 Q.   That was this year?
23 A.   Yes, that was this year.
24 Q.   Have students indicated to you where they want
25 early voting on campus?

63 (Pages 246 - 249)

Page 250

1   A.   No.
2   Q.   Have students ever indicated that they don't
3   know where the community center is?
4   A.   Not to me, they haven't.
5   Q.   And before, you mentioned that the community
6   center is on campus?
7   A.   Yes.
8   Q.   How do you make that determination?
9   A.   The community center is on the edge of the
10  campus on land that was given to the County by the
11  school.
12  Q.   And so are the boundary lines -- that's based
13  on Prairie View A&M's boundary lines, that it considers
14  it on campus?
15  A.   I don't know what -- I don't know what
16  boundary lines it's considered on.
17  Q.   So it's your position in your capacity as
18  election administrator it's on campus?
19  A.   It is on land that was given by the -- I
20  don't know if it's officially on campus, but it
21  was on -- it's on land that was donated by the -- by
22  the University to build the community center.
23  Q.   Have they donated other land in that area?
24  A.   I don't know.
25  Q.   If they didn't donate the land, would it still

Page 251

1   be considered on campus?
2   A.   I don't know.
3   Q.   Is it centrally located like the Memorial
4   Student Center?
5   A.   No, it's on the other -- well, no, it's on
6   the edge of campus.
7        MR. CUSICK:   Off record for a moment.
8        (Recess taken.)
9   Q.   (BY MR. CUSICK) Thank you, Ms. Eason.
10  We'll follow-up with your counsel.  I know that we
11  had discussed one item to reach out about, which we
12  can't remember right now, and then --
13       MR. SEAQUIST:   I've got notes on it,
14  as well, so we can --
15  Q.   (BY MR. CUSICK) And then any of the text
16  messages we referenced, but we appreciate it.  Thank
17  you.
18       MR. CUSICK:   Pass the witness.
19       MR. SEAQUIST:   All right.  Now it's
20  our turn to take a fiver.  We'll come back and check
21  back with you.
22       (Recess taken.)
23       MR. SEAQUIST:   We'll reserve our
24  questions till time of trial.
25       (Proceedings concluded at 5:06 p.m.)

Page 252

1   I declare under penalty of perjury that the
2   foregoing is true and correct.
3
4
5             CHRISTY A. EASON
6
7
8   SUBSCRIBED AND SWORN TO BEFORE ME, the
9   undersigned authority, by the witness, CHRISTY A.
10  EASON, on this the    day of         , 20   .
11
12
13
14            NOTARY PUBLIC IN AND FOR
15            THE STATE OF
16
17  My Commission Expires:
18
19
20
21
22
23
24
25

Page 253

1  STATE OF TEXAS
2  COUNTY OF HARRIS
3
4        REPORTER'S CERTIFICATE
5      ORAL DEPOSITION OF CHRISTY A. EASON
6           September 26, 2019
7
8   I, the undersigned Certified Shorthand Reporter
9  in and for the State of Texas, certify that the facts
10 stated in the foregoing pages are true and correct.
11   I further certify that I am neither attorney or
12 counsel for, related to, nor employed by any parties
13 to the action in which this testimony is taken and,
14 further, that I am not a relative or employee of any
15 counsel employed by the parties hereto or financially
16 interested in the action.
17   SUBSCRIBED AND SWORN TO under my hand and seal
18 of office on this the 8th day of October, 2019.
19
20
21
22   Vickie G. Hildebrandt, CSR
     Texas CSR 1363
23   Expiration:  12/31/19
     Veritext Legal Solutions
24   Firm Registration No. 571
     300 Throckmorton, Suite 1600
25   Fort Worth, Texas  76102
     817-336-3042

64 (Pages 250 - 253)

Page 254

1  Gunnar P. Seaquist, Esq.
2  gseaquist@bickerstaff.com
3          October 8, 2019
4  RE: Allen, Jayla, Et Al v. Waller County, Texas, Et Al
5     9/26/2019, Christy A. Eason (#3560111)
6    The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  CS-NY@Veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22
23        Yours,
24
25        Veritext Legal Solutions

Page 256

1   Allen, Jayla, Et Al v. Waller County, Texas, Et Al
2   Christy A. Eason (#3560111)
3        ACKNOWLEDGEMENT OF DEPONENT
4     I, Christy A. Eason, do hereby declare that I
5   have read the foregoing transcript, I have made any
6   corrections, additions, or changes I deemed necessary as
7   noted above to be appended hereto, and that the same is
8   a true, correct and complete transcript of the testimony
9   given by me.
10
11  _____  _____
12  Christy A. Eason            Date
13  *If notary is required
14
15       SUBSCRIBED AND SWORN TO BEFORE ME THIS
16
17  _____ DAY OF _____, 20___.
18
19
20
21
22
23  _____
24
25  NOTARY PUBLIC

Page 255

1  Allen, Jayla, Et Al v. Waller County, Texas, Et Al
2  Christy A. Eason (#3560111)
3        E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24
25  Christy A. Eason            Date

65 (Pages 254 - 256)