PLAINTIFF'S
EXHIBIT

**43**

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION
 3      JAYLA ALLEN, DAMON          )
        JOHNSON, TREASURE SMITH,    )
 4      and THE PANTHER PARTY       )
                                    )
 5                    Plaintiffs,   )
                                    )
 6      v.                          ) Civil Case No.
                                    ) 4:18-cv-3985
 7      WALLER COUNTY, TEXAS; THE   )
        WALLER COUNTY               )
 8      COMMISSIONERS COURT;        )
        JUDGE CARBETT "TREY" J.     )
 9      DUHON III, in his           )
        official capacity as the    )
10      Waller County Judge;        )
        CHRISTY A. EASON, in her    )
11      official capacity as the    )
        Waller County Elections     )
12      Administrator,              )
                                    )
13                    Defendants.   )
14
15
16      **********************************************************
17                     ORAL DEPOSITION OF
18            JUDGE CARBETT "TREY" J. DUHON, III
19                    September 27, 2019
20                        Volume 1
21      **********************************************************
22
23
24
25
```

Page 2

```
 1        ORAL AND VIDEOTAPED DEPOSITION OF JUDGE
 2  CARBETT "TREY" J. DUHON, III, produced as a witness at
 3  the instance of the Plaintiffs, and duly sworn, was
 4  taken in the above-styled and numbered cause on the 27th
 5  day of September, 2019, from 1:08 p.m. to 6:48 p.m.,
 6  before Abigail Guerra, CSR, in and for the State of
 7  Texas, reported by machine shorthand, at the offices of
 8  Waller County Judge, 836 Austin Street, Suite 201,
 9  Hempstead, Texas, pursuant to the Federal Rules of Civil
10  Procedure and the provisions stated on the record or
11  attached hereto.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                     INDEX
 2
 3   Appearances.....................................   3
 4   JUDGE CARBETT "TREY" J. DUHON, III
 5     Examination by Ms. Aden......................   7
 6   Signature and Changes..........................  251
 7   Reporter's Certificate.........................  253
 8
 9
10                    EXHIBITS
11   NO.       DESCRIPTION               PAGE
12   Exhibit 1   Plaintiff Second Amended Notice of   13
13               Deposition of Defendant County
14               Judge Carbett "Trey" J. Duhon, III
15   Exhibit 2   Veasey v. Perry Case Site         74
16   Exhibit 3   Letter Dated July 25, 2013        83
17   Exhibit 4   Google Maps Printout              88
18   Exhibit 5   Expert Report of Robert Stein,    91
19               Ph.D.
20   Exhibit 6   Expert Report of Peniel Joseph,
21               Ph.D.
22   Exhibit 7   Email                            115
23               Bates Nos. DEFENDANTS001422 to
24               1425
25   .................................................
```

Page 3

```
 1       A P P E A R A N C E S
 2
    FOR THE PLAINTIFFS:
 3
    Ms. Leah Aden
 4  Mr. John Cusick
    Mr. Steven Lance
 5  DEPUTY DIRECTOR OF LITIGATION
    40 Rector Street
 6  Fifth Floor
    New York, New York 10006
 7  Phone:  (212) 965-7715
    Email:  Laden@naacpldf.org
 8          Jcusick@naacpldf.org
            Slance@naacpldf.org
 9
10  FOR THE DEFENDANTS:
11  Mr. Gunnar P. Seaquist
    BICKERSTAFF HEATH DELGADO ACOSTA LLP
12  3711 S. MoPac Expressway
    Building One
13  Suite 300
    Austin, Texas 78746
14  Phone:  (512) 472-8021
    Email: Gseaquist@bickerstaff.com
15
          - and -
16
    Ms. Elizabeth Dorsey
17  WALLER COUNTY DISTRICT ATTORNEY'S OFFICE
    645 12th Street
18  Hempstead, Texas 77445
    Phone:  (979) 826-7718
19  Email: E.dorsey@wallercounty.us
20
21
22
23
24
25
```

Page 5

```
 1             EXHIBITS (cont'd)
 2   .................................................
 3   NO.       DESCRIPTION...................... PAGE
 4   Exhibit 8    Waller County Commissioners Court   125
 5                Transcript 1/20/2016
 6   Exhibit 9    Waller County Commissioners Court   129
 7                Transcript 1/27/2016
 8   Exhibit 10   Appendices for the Waller County    131
 9                Comprehensive Strategic Plan
10   Exhibit 11   Letter                             135
11                Bates Nos. DEFENDANTS001476 to
12                1477
13   Exhibit 12   Email                              143
14                Bates Nos. DEFENDANTS001481 to
15                1486
16   Exhibit 13   Email                              151
17   Exhibit 14   Waller County Commissioners Court   157
18                Transcripts 10/11/2017
19   Exhibit 15   Expert Report of Henry Flores,     176
20                Ph.D.
21   Exhibit 16   Polling Places                     180
22                Bates Nos. DEFENDANT000131
23   Exhibit 17   Defendant Judge Trey Duhon's       182
                  Response and Objections to
24                Plaintiffs's First Set of
                  Interrogatories
                  .................................................
25
```

2 (Pages 2 - 5)

Page 6

1          EXHIBITS (cont'd)

2     ..................................................

3   NO.          DESCRIPTION........................ PAGE

4   Exhibit 18   Waller County Commissioner's Court   193

5          Transcript 10/17/2018

6   Exhibit 19   Waller County Commissioners's   229

7          Court Public Comments Transcript

8          10/24/2018

9   Exhibit 20   Washington Post Article          238

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1          THE CERTIFIED STENOGRAPHER:  Today is

2   September 27, 2019.  It is 1:08 p.m.  We are here today

3   at Waller County Courthouse at 836 Austin Street, Suite

4   201, in the matter of Jayla Allen, Damon Johnson,

5   Treasure Smith, and The Panther Party versus Waller

6   County, Texas; The Waller County Commissioners Court;

7   Judge Carbett "Trey" J. Duhon, III, in his official

8   capacity as the Waller County Judge, Christy A. Eason,

9   in her official capacity as the Waller County Election

10  Administrator.

11          Will counsel please state their appearances

12  for the record.

13          MS. ADEN:  Yes.

14          I am Leah Aden, counsel for plaintiffs.

15          MR. LANCE:  Steven Lance, plaintiffs.

16          MR. CUSICK:  Counsel for plaintiffs.

17          MR. SEAQUIST:  Gunnar Seaquist, counsel for

18  defense.

19          MS DORSEY:  Elizabeth Dorsey, counsel for

20  defense.

21          JUDGE CARBETT "TREY" J. DUHON, III,

22  having been first duly sworn, testified as follows:

23          DIRECT EXAMINATION

24  BY MS. ADEN:

25      Q.  Good afternoon, Judge Duhon.

Page 8

1      A.  Good afternoon.

2      Q.  I am Leah Aden.  I am Leah Aden.  I an attorney

3   with the NAACP Legal Defense Aid and Educational Fund.

4   As you well know, I represent the plaintiffs and --

5          MS. ADEN:  Remind me of your name one more

6   time.

7          THE CERTIFIED STENOGRAPHER:  Abby.

8      Q.  (BY MS. ADEN)  Abby -- Ms. Abby just read all

9   the names of the plaintiffs, but I'll repeat them just

10  to be clear.  Jayla Allen, Treasure Smith, Damon

11  Johnson, and the Panther Party.

12          As I believe you know, plaintiffs are

13  challenging what they assert to be the discriminatory

14  distribution of early voting opportunities in Waller

15  County during the 2018 general election and were doing

16  some under the Voting Rights Act and the Federal

17  Constitution.

18          Can you please state and spell your full

19  name for the record?

20      A.  My full name is Carbett, C-A-R-B E-T-T, Joseph

21  Duhon the third; and I've commonly gone by "Trey."

22      Q.  As does my nephew.

23      A.  Right.

24      Q.  And what is your official position?

25      A.  I am the county judge Waller County.

Page 9

1      Q.  And in that position, you are a lawyer; is that

2   correct?

3      A.  It's not required for the position, but I am

4   25 years about.

5      Q.  And you, as an attorney, are you licensed to

6   practice here in Texas?

7      A.  I am.

8      Q.  Okay.  Anywhere else?

9      A.  No.

10     Q.  In your role as county judge, you serve as a

11  magistrate judge?

12     A.  I do have some judicial duties.  I do

13  magistrations of the jail every Wednesday.  And the

14  first weekend of every month, I also have an uncontested

15  probate docket; and then I'm also on call for

16  evidentiary warrants and blood warrants.

17     Q.  Okay.  And how long have you served -- well,

18  I'll get to that actually.

19          So you're likely very familiar with the

20  deposition process --

21     A.  I am.

22     Q.  -- and many of the rules, but I want to make

23  sure we're on the same page about how we're going to

24  conduct this deposition and ask you as -- you know, some

25  depositions general facts related to the lawsuit.  I'm

3 (Pages 6 - 9)

Page 10

1  going to go over the ground rules, which is that you
2  were sworn under oath, and so you understand that for
3  purposes of this deposition, you are testifying as if
4  you were in a court of law?
5      A.  (Moving head up and down.)
6      Q.  And that means that you are obliged to testify
7  truthfully and as completely as possible.
8          Do you understand that?
9      A.  I do.
10     Q.  Okay.  And Ms. Abby is our court reporter.
11  She's transcribing our deposition.
12         Do you understand that?
13     A.  I do.
14     Q.  If at any time you want to take a break, please
15  let me know.  I would ask that you let me finish asking
16  any questions if I'm in the process of doing that, and
17  you answer before we take a break.
18         Does that make sense?
19     A.  That's agreeable.
20     Q.  Okay.  I'm going to be primarily the person
21  talking over the course of this deposition, but from
22  time to time your attorney may object to something.  And
23  unless specifically instructed not to answer, you are
24  obliged to answer to the best of your abilities.
25         Do you understand that?

Page 11

1      A.  I do.
2      Q.  Okay.  Because this is being transcribed -- and
3  we're doing great so far -- it's great if you let me ask
4  my question fully before answering, and I will also try
5  not to stumble over you and ask you the next question
6  before you finished fully responding.
7          Does that make sense?
8      A.  It does.
9      Q.  Okay.  You are not obliged to guess or assume
10  anything when you're answering a question.  I'm asking
11  you to state only what you know and what you believe to
12  be true within your knowledge in your official
13  capacities or potentially in your personal capacities to
14  the extent it's relevant.
15         Is that agreeable?
16     A.  Yes.
17     Q.  Okay.  And I am more than happy to clarify
18  something if there is a question that I ask or a line of
19  questioning that is unclear to you.
20         Hopefully, that's agreeable as well?
21     A.  It is.
22     Q.  Okay.  Any reason why today you may not be able
23  to answer my questions truthfully and completely?
24     A.  No.
25     Q.  And you today are represented by Mr. Seaquist;

Page 12

1  is that correct?
2      A.  That's correct.
3      Q.  And are you represented by anyone else?
4      A.  Well, we have Liz Dorsey, who is assistant DA
5  for Waller County.
6      Q.  Any questions for me so far?
7      A.  No.
8          MR. SEAQUIST:  Can I make a couple of
9  things for the record?
10         MS. ADEN:  Sure.
11         MR. SEAQUIST:  First is, we will read and
12  sign on the deposition.
13         MS. ADEN:  Perfect.
14         MR. SEAQUIST:  And the other is yesterday
15  we had an agreement that "objection.  Form" was
16  sufficient for all objections to the form of the
17  question.
18         Can we have that same agreement today?
19         MS. ADEN:  I would love to have that.
20         MR. SEAQUIST:  Perfect.
21         MS. ADEN:  Is that agreeable?  Yes.
22         MR. SEAQUIST:  That is.
23         MS. ADEN:  Okay.
24     Q.  (BY MS. ADEN)  Okay.  How did you learn about
25  today's deposition, Judge?

Page 13

1      A.  I think I was notified by Ms. Dorsey or
2  Mr. Seaquist.
3      Q.  Okay.  I'm going to show you a document that's
4  titled, Plaintiff Second Amended Notice of Deposition of
5  Defendant County Judge Carbett "Trey" J. Duhon, III; and
6  hand that to you?
7          MS. ADEN:  May I have some exhibit
8  stickers, please.
9          And hand to you for you to review, and I
10  will also provide a copy to counsel.  I'll add a sticker
11  for Exhibit 1 in a moment.
12         (Exhibit 1 marked.)
13     Q.  (BY MS. ADEN)  Have you seen this document
14  before?
15         Do you recognize it?
16     A.  Yes.
17     Q.  Okay.  And is that one of the ways that you
18  learned about today's deposition?
19     A.  Yes.
20     Q.  Did you do anything to prepare for today's
21  deposition?
22     A.  Other than meeting and having discussions with
23  counsel, I did go back and review the video from the
24  Commissioners Court meeting of that -- I think was held
25  on October 17th.

4 (Pages 10 - 13)

Page 14

1    Q.  Okay.  Did you review any other videos besides
2  the Commissioners Court meeting on the 17th?
3    A.  No.
4    Q.  Okay.  And did you review any of the documents
5  related to this case in preparation of today?
6    A.  Not specifically in relation to today, no.
7    Q.  Okay.  And you mentioned meeting with counsel.
8  Which counsel?
9    A.  Mr. Seaquist and Ms. Dorsey.
10    Q.  Okay.  And did you meet on just one occasion,
11  or did you meet on multiple occasions?
12    A.  We met on one occasion.
13    Q.  Okay.
14    A.  And today.  So, I mean, prior to the deposition
15  today.
16    Q.  Okay.  And did you bring any documents with you
17  today?
18    A.  I don't have any on me --
19    Q.  Okay.
20    A.  -- as far as -- no.
21    Q.  For the record, it's also the case that you sat
22  in for part of Ms. Eason's deposition yesterday; is that
23  correct?
24    A.  That's correct.
25    Q.  Okay.  And outside of talking to Mr. Seaquist

Page 15

1  and Ms. Dorsey about today's deposition, did you discuss
2  it with anyone else?
3    A.  My wife.
4    Q.  And I take it by the nature of it, she wanted
5  to know where you were going to be, but not -- did you
6  talk about the substance of the deposition with her?
7    A.  Not to any detail, no.
8    Q.  Okay.  Other than this case, have you ever been
9  a party named as a plaintiff or a defendant in a lawsuit
10  of any kind whether in your personal or professional
11  capacity?
12    A.  Well, yes.  I mean, now, that I've been county
13  judge, I've been named in a number of lawsuits.  I can't
14  even think -- I don't know how many to be honest.
15    Q.  Okay.
16    A.  Prior to county judge, I've probably been named
17  as a defendant in one or two lawsuits usually, in my
18  capacity as, like, a trustee on a deed of trust or
19  something like that.  I've never been sued just
20  individually for anything I personally did.
21    Q.  And with respect to -- any of -- one or two
22  lawsuits prior to being a county judge or the -- we
23  don't know the number of lawsuits since becoming a
24  judge.
25        Have any of them related to claims of

Page 16

1  racial discrimination?
2    A.  No.
3    Q.  Have any of them --
4    A.  I maybe guess Sandra Bland, but there might
5  have been race discrimination claims in the case of
6  Sandra Bland.  That was a lawsuit.  But other than that,
7  no.
8    Q.  With respect to Ms. Bland, you were a county
9  judge during the time where the incident giving rise to
10  her arrest and her death.  You were a county judge
11  during that time?
12    A.  That's correct.
13    Q.  And were you a judge of any proceedings related
14  to her arrest or her death?
15    A.  No, I was not.
16    Q.  And can you tell me a little bit about the
17  lawsuit that you belive that arose from her death that
18  you might have been in an official capacity?
19    A.  It was a wrongful -- I mean, I think -- the
20  gist of the lawsuit was a wrongful-death lawsuit related
21  to her suicide in the Waller County Jail after she was
22  arrested.
23    Q.  Has it been officially declared that it was a
24  suicide?
25    A.  Yes.

Page 17

1    Q.  By whom?
2    A.  The entities who have investigated it.  I
3  believe the Texas rangers.
4    Q.  And outside of that lawsuit, have there been
5  any lawsuits that have involved voting relating issues
6  whether it is for districting, whether it is for
7  election qualifications to vote?  Anything voting
8  related?
9        MR. SEAQUIST:  Form.
10    A.  I don't think there's been any other lawsuits
11  to that effect.
12    Q.  (BY MS. ADEN)  Any involving questions of
13  legislative intent?
14        MR. SEAQUIST:  Form.
15    A.  Any lawsuits regarding legislative intent?
16  Yes.
17    Q.  (BY MS. ADEN)  Can you tell me a little bit
18  about what's jogging your memory with respect to that?
19    A.  We're currently involved in an enforcement
20  action with the Attorney General's office in Austin,
21  Texas over the interpretation of a penal code statute
22  that has to do with guns the courthouse.  And one of the
23  issues in that particular lawsuit is legislative intent
24  behind the statute itself.
25    Q.  And if this is something you can answer,

5 (Pages 14 - 17)

Page 18

1 because it's public record, has the County taken a
2 position about whether legislative intent is -- strike
3 that.
4        Without revealing anything that's
5 nonpublic, has the County taken a position on whether or
6 not Texas' -- the legislative proceedings are subject to
7 public disclosure?
8        MR. SEAQUIST:  Form.
9 A.  I'm sorry.  I don't understand the question.
10 Q.  (MS. ADEN)  I'll try again.
11 A.  Okay.
12 Q.  With respect to that lawsuit --
13 A.  Okay.
14 Q.  -- has this county taken a position on whether
15 or not the proceedings that gave rise to the penal code
16 or whatever is at issue --
17 A.  Okay.
18 Q.  -- are subject to -- are part of the public
19 record or not subject to legislative privilege?
20        MR. SEAQUIST:  Object to the form.
21 A.  Whether an issue in that case --
22 Q.  (BY MS. ADEN)  -- I'll just ask another way.
23 A.  -- is not subject to legislative privilege.
24 Q.  Is legislative privilege an issue in that case?
25 Has any one of the parties raised that publicly?

Page 19

1 A.  Not that I know of, no.
2 Q.  There you go.  Okay.
3        Other than today, have you ever been
4 deposed, whether or not, in your personal or
5 professional capacity?
6 A.  I've been deposed, yes.
7 Q.  About how many times do you think?
8 A.  I gave my deposition in the gun case that I
9 just referenced.  There was a lawsuit over a will
10 contest over a will I drafted, and I think my deposition
11 might have been taken in that case.  That was many years
12 ago.
13 Q.  And the gun proceeding is ongoing?
14 A.  That's correct.
15 Q.  Okay.  Were you deposed in the context of the
16 Sandra Bland lawsuit?
17 A.  I don't think so.  I can't recall, but I don't
18 think I was, no.
19 Q.  Okay.  Did you ever testify in court related to
20 that lawsuit?
21 A.  No.  Not in court.
22 Q.  Okay.
23 A.  It was settled.
24 Q.  Have you ever testified in court before in your
25 personal or professional capacity?

Page 20

1 A.  On that will-contest lawsuit, I did testify in
2 court.
3 Q.  And is that the only time you can remember
4 doing that?
5 A.  Yes.
6 Q.  Do you know who the other defendants in this
7 lawsuit are?
8 A.  In this lawsuit?
9 Q.  Yes.
10 A.  I mean, other than myself Ms. Eason, the
11 Commissioners Court, and the County itself.  That's the
12 only defendants I'm aware of.
13 Q.  Okay.  And do you understand that you and
14 Ms. Eason are being sued solely in your official
15 capacities?
16 A.  That's correct.
17 Q.  Okay.  And do you know what that means to be
18 sued in your official capacity?
19 A.  I do.
20 Q.  What do you think it means?
21 A.  It means I'm not -- I'm being sued as the
22 county judge of Waller County, not in my individual
23 capacity.
24 Q.  Okay.  And so does that also mean that the
25 allegations being made against the specific positions at

Page 21

1 issue, not anyone in particular?
2 A.  Correct.
3        MR. SEAQUIST:  Form.
4 Q.  (BY MS. ADEN)  Okay.  When did you first learn
5 about this lawsuit?
6 A.  Right after it was filed.  It was in the media.
7 Q.  And have you specifically discussed this
8 lawsuit with anyone?
9 A.  I mean, you know, with various -- with the
10 commissioners in executive session, which I know we
11 can't go into that, and with legal counsel.  And, of
12 course, there's probably general discussions that
13 have been had with variation individuals.  Not really
14 going into details just the fact that there's, you know,
15 a lawsuit.
16 Q.  And with respect to your conversations with
17 other commissioners, have you had any non- -- have you
18 had any conversations with them that are outside of
19 the -- outside of an executive session?
20 A.  There might have been a couple of conversations
21 and probably more along the lines of, you know, them
22 asking what the status might be in the lawsuit.
23 Q.  And do you remember any particular
24 commissioners in particular who you had those types of
25 conversations with?

6 (Pages 18 - 21)

Page 22

1     A. I don't remember any specifics, no.
2     Q. Have you spoken with any former judges of the
3  Commissioners Court about this lawsuit?
4     A. No.
5     Q. Russell Klecka?
6     A. Well, you said former judges. He was a not a
7  former judge.
8     Q. Former commissioner.
9     A. He was a former commissioner.
10    Q. I'm sorry. I apologize. Former commissioner.
11    A. There maybe a conversation. Again, just like
12 the other commissioners that may -- honestly, I didn't
13 have a lot of conversations with Commissioner Klecka.
14 And since he's left, I haven't spoken to him. So, no.
15    Q. And just to be clear, any other former judges
16 who served as one of the members of the Commissioners
17 courts. Have you talked to them?
18    A. No.
19    Q. What about any current or former
20 representatives of either of the political parties, the
21 Republican -- Waller County Republican party or Waller
22 County Democratic party?
23    A. I have not had any conversations with Rosa
24 Harris.
25        As far as David Luther, I'm sure there's

Page 23

1  been some conversations.
2        But, again, as far as specifics of those
3  conversations other than it being a topical conversation
4  on what the status of the lawsuit is, no.
5     Q. Have those been in any public settings, public
6  meetings, meetings of the County Republican party?
7     A. No.
8     Q. What about Ann Davis?
9     A. I have not really -- other than seeing her at a
10 few events here and there, I've really had no
11 conversations with her since she left as Republican
12 chair.
13    Q. And have you had any conversations with current
14 or former election administrators?
15    A. No.
16    Q. Not -- that includes Ms. Eason?
17    A. I've had conversations with Ms. Eason about the
18 lawsuit, and we're also still working together right now
19 to -- on voting centers in Waller County and working
20 with university administration and officials regarding
21 voting on campus.
22    Q. Okay. Have you discussed this lawsuit with Dan
23 Teed?
24    A. No.
25    Q. Do you know how Mr. Teed -- why Mr. Teed left?

Page 24

1  Was no longer reappointed to be the election
2  administrator?
3     A. Dan Teed told me he was leaving for health
4  reasons.
5     Q. And that was in 2016?
6     A. Yeah. Probably some time in that time period.
7     Q. Have you talked to any current or former Prarie
8  View A&M students? You just talked about having some
9  meetings. Have you talked to any former or current
10 Prairie View A-- -- Prairie View A&M University students?
11       I'm going to, for shorthand throughout this
12 deposition, say PVAMU or Prarie View AMU?
13       Do you understand what I mean by that?
14    A. I do.
15    Q. Okay. Have you had any conversations with them
16 about this lawsuit in particular?
17    A. Probably the one that I would have substantive
18 conversations is Kendric Jones.
19    Q. And Mr. Jones is on the city council as well;
20 is that correct?
21    A. At this time, yes.
22    Q. Okay. And have you talked -- spoken with any
23 other city council members about this lawsuit?
24    A. Specifically about this lawsuit, I don't think
25 so.

Page 25

1     Q. Have you talked to any Prarie View AMU
2  administrators or officials about this lawsuit?
3     A. Ruth Simmons.
4     Q. And she is the current president of the
5  University?
6     A. She is.
7     Q. Okay. And can you tell me a little bit about
8  your conversations with President Simmons?
9     A. The conversations I had with Dr. Simmons -- the
10 first conversation I had with her was, when all of this
11 happened and people were upset about not having the
12 early voting the first week of early voting, it kind of
13 started, I guess, a spiral, if you want look at it that
14 way, in terms of people not being happy about the first
15 week early voting, and then I guess they -- then they
16 were not happy about the schedule.
17       And at the same time, we had been working
18 on the zip code issue, and I was a little upset that the
19 University at that time had kind of taken a very, kind
20 of, hands-off approach. They weren't being very vocal.
21       And I was upset with University -- we had
22 been working -- Christie Eason specifically had been
23 working with the University on the zip code issues for
24 months. And so I was a little upset with the fact that
25 the University was not being more forthright with people

7 (Pages 22 - 25)

1 that we had been, in fact, working with the University
2 for quite some time.
3         And I had a conversation with her in which
4 I said, I really would appreciate it if y'all would at
5 least acknowledge the fact that the County has been
6 working with y'all on these issue.
7     Q.  And on these issues, are you talking
8 specifically about the zip code, or are you talking
9 about something more broad?
10     A.  At that time, it was more or less about the zip
11 code issue because that was the biggest issue that we
12 had had.  Plus, we had had some long lines on campus.
13 And so we had also worked the University to, you know,
14 make sure the location was good and to -- and we had
15 already committed prior to all of this to double the
16 number of machines at the University.
17     Q.  When did you commit to doubling the amount of
18 machines?
19     A.  That was done -- I don't recall a specific
20 date, but I remember talking to Christie some time
21 between primary and the general election, in which I
22 said -- I made it very clear to her I'd to see us
23 increase the number of machines on campus to reduce the
24 wait time for the students.
25     Q.  And was any of that on the record?

1     A.  No.
2     Q.  And the long lines that you were referring to
3 are in reference to what elections?
4     A.  I believe 2016 presidential elections.  You
5 know, there were long waits at the University.  I seem
6 to think that there might have also been some long lines
7 during the primary.  Because it was right after that
8 that Christie ascertained or determined after looking
9 into it, that part of the problem was the registrations
10 and the zip codes.
11     Q.  So can you -- well, I'm going to ask you one
12 question, and then I'd love for you to explain to me
13 more what those issues are that you keep referencing.
14         Would you consider Ms. Eason the primary
15 liaison between the County and the University?
16     A.  Yes.  She's the election administrator.
17     Q.  And --
18     A.  In terms of elections.
19     Q.  In terms of elections?
20     A.  Yes.
21     Q.  Okay.
22     A.  I work with the University on a number of
23 frequent things, but not necessarily -- when it comes to
24 elections, she the primary liaison.
25     Q.  Is that anywhere in writing?  Is that a policy?

1 Have you made that formal?  Have you publicized to the
2 University that if you were issues Ms. Eason is the
3 person to go to?
4         MR. SEAQUIST:  Form.
5     A.  I don't know if that's ever been publicized.
6 That's just -- that's her job.
7     Q.  (BY MS. ADEN)  And she knows that?
8     A.  She does.
9     Q.  And that has been articulated to her in writing
10 or in the public proceeding?
11     A.  I think she understood the job duties when she
12 came in, especially given the fact that she's served in
13 that position prior.
14     Q.  Okay.  You mentioned frequently working with
15 the University on different things.
16         Can you tell me a little bit about what
17 you're referencing?
18     A.  Gosh.  Right after I became judge, one of the
19 first -- one of the initiatives that I had was for
20 Waller County to put together a comprehensive strategic
21 plan for the County.  Not being from Waller County, I
22 grew up in Fort Bend, and I knew the only way for a
23 county to accommodate some of the growth that we were
24 expecting was to do a lot of strategic planning.  So one
25 of the things I wanted to do was put together a

1 comprehensive strategic plan.  And so we worked with
2 Commissioner Barnett, Precinct 3 Commissioner.  We
3 engaged wit University Department of Agriculture and
4 Human Sciences, and they were an instrumental part of
5 helping us put together the beginnings of the Waller
6 County Comprehensive Strategic plan.  That was one
7 thing, and just that one thing was months and months of
8 meetings, engagement, being on campus.  At one point I
9 joked that I should have a parking pass because I was on
10 campus almost on a weekly basis.
11     Q.  What's the time frame of this?
12     A.  This was from when I became judge in 2015 until
13 we rolled out the plan, which was in 2017.  So that's
14 one initiative.
15     Q.  Okay.
16     A.  I worked with Dr. Simmons predecessor
17 Dr. Wright.  I met with him frequently regarding an
18 initiative we had called Communities That Care.  This
19 was an initiative that I was hoping had -- if it would
20 have gotten going, would have enabled a lot more
21 engagement between the County and the University and
22 especially the students to help with collaborative
23 approaches to issues we have in our community, such as
24 at-risk youth.  And I worked with the Dr. Wright and met
25 with him quite frequently on that initiative and some of

8 (Pages 26 - 29)

Page 30

1  his administrative folks.
2         Our district attorney has worked frequently
3  with the School of Criminal Science regarding various
4  different initiatives regarding like our Pretrial
5  Diversion program.
6         I frequently have gone on campus and spoke
7  at a number of different functions to Student
8  Government, Outreach, our Waller County Economic
9  Development partnership.  Frequently, we would have
10 meetings on campus at the Memorial Student Center.
11     Q.  So are you familiar with the Memorial Student
12 Center?
13     A.  I am.
14     Q.  Okay.  Now, you mentioned that the County's
15 expecting growth.  Do you know what that looks like in
16 terms of the racial demographics of the county?
17     A.  I'm going to have to ask you to be more
18 specific on your question.
19     Q.  Meaning, is -- do you know what the expected
20 growth rate of the black community is in Waller County?
21     A.  I don't know the specific growth rates of the
22 ethic groups.  All I know is Waller County is one of the
23 fastest growing counties in the State of Texas.
24     Q.  And do you know where that population that's
25 coming into the county is residing?

Page 31

1      A.  Along on the south end, along I- 10.  We also
2  have a great deal of growth in the northeast corner.
3  Prarie View is another area that is experiencing a lot
4  of growth and construction.  Those areas specifically
5  along 290.
6      Q.  So going back to the zip code issue that you
7  addressed.  Can you explain to me what you are
8  referencing?  What is the zip code issues?
9      A.  The zip codes have always been a problem in
10 Waller County, not just in Prairie View, but also in
11 Patterson.  Basically the U.S. mail system of using zip
12 codes for mail delivery has not always worked well with
13 other platforms like GPS.  So -- and it's been an
14 ongoing problem.  It's a problem for emergency services.
15 It's also been a problem for the cities of Prairie View
16 and Patterson when it comes to their taxes.
17        In a nutshell, basically, if you live in
18 Prairie View and you live east of 1098, your mail is --
19 if you get mail at your home, it's delivered out of the
20 Waller post office.  If you live west of 1098, your mail
21 is delivered out of the Hempstead post office.  The only
22 way you can have a mailing address with a Prairie View
23 address if is you have a post office box at the Prairie
24 View post office there in town.
25        They do not do any mail delivery out of

Page 32

1  that post office.  The carriers all come out of
2  Hempstead and Waller.  This causes all kinds of issues
3  and confusion when you put in an address.  And you put
4  it in as Prairie View, on GPS, it would not always come
5  back as -- you know, the location it would show you
6  would not be accurate.
7         It would cause problems for the cities
8  whenever they were collecting their sales taxes from
9  their comptrollers' office.
10        So this has been an ongoing issue.  It
11 becomes a problem for emergency services.  For life
12 flight, for example.  If life flight is going to come
13 into places like Patterson or Prairie View, they have to
14 have designated landing zones because they can't go to a
15 specific address.  So this has been ongoing for quite
16 awhile.
17        In fact before I was judge -- I'm kind of
18 rambling now.  I know I'm not supposed to.  But before I
19 was county judge --
20     Q.  I did ask an open-ended question.
21     A.  You did ask an open-ended question.
22        There was -- I was involved in an
23 organization called Citizens for a Better Waller County,
24 and we also have subregional planning commission here in
25 Waller County, the Waller County Subregional Planning

Page 33

1  Commission, which is comprised of the county and all of
2  the municipalities and some citizen members.
3         We tried the engage to U.S. Postal Service
4  to sit down and try to work through these issues.  This
5  was back in around '08.  And at that time, the Postal
6  Service just wasn't cooperative at all.
7      Q.  Could the Commissioners Court issue a
8  proclamation, a resolution, some document that sends a
9  very strong signal to the U.S. Post Office that this
10 needs to be addressed?
11        MR. SEAQUIST:  Object to form.
12     A.  Could we issue a proclamation?  Yes, we can
13 issue proclamations.
14     Q.  (BY MS. ADEN)  Have you?
15     A.  No.
16     Q.  Okay.  And your mentioned the sales tax coming
17 up.
18        Has Prairie View been impacted by the sales
19 tax issue?
20     A.  I've been told by the past mayors that it was a
21 problem for them.
22     Q.  And does that include Mr. Jackson, Frank
23 Jackson?
24     A.  I think so, yes.
25        He would have been the mayor at the time

9 (Pages 30 - 33)

Page 34

1 period that we were trying to work with the Postal
2 Service.
3     Q.  Okay.  And you also mentioned that volunteer
4 services are impacted.  Does that mean that in Prairie
5 View emergency services have been impacted by this as
6 well?
7     A.  They can be impacted by the zip code because of
8 the problems with the GPS.  Now, whether or not that's
9 still a problem today, I don't know 100 percent, but it
10 was a problem back in '08 and '09.
11     Q.  My understanding is that Prarie View has a
12 volunteer fire department?
13     A.  That's correct.
14     Q.  Does the Commissioners Court have any influence
15 over that?
16     A.  No.
17     Q.  Okay.
18     A.  Their volunteer fire department works under the
19 emergency services district.
20     Q.  Okay.
21     A.  Which is a count- -- it's pretty much a
22 county-wide emergency district.  So it's a separate
23 political entity.
24     Q.  So you raised a number of issues that have
25 stemmed out of this addressing issue.  Has it also

Page 35

1 impacted voting by Prairie View A&M students?
2     MR. SEAQUIST:  Form.
3     A.  Because of the zip code issue and the fact that
4 students don't get mail delivery to their dorms or their
5 apartments on campus, it has proven challenging to make
6 sure students register correctly on campus.  This was an
7 issue Dan Teed was dealing with when I became county
8 judge.
9     Q.  (BY MS. ADEN)  And do you have any basis to
10 believe that that issue has contributed to the long
11 lines that you referenced in 2016?
12     A.  Correct.
13     Q.  And do you know -- I think you intimated that
14 this issue hasn't been address; is that correct?
15     MR. SEAQUIST:  Form.
16     A.  That it hadn't?
17     Q.  (BY MS. ADEN)  Hasn't been addressed?
18     A.  As far as voting, I believe it has been
19 addressed at this point.
20     Q.  In what way?
21     A.  Well, when we saw the long lines and it's 2016
22 and then we installed them and then they, again,
23 happened during the primary in '18, Christie Eason was
24 the first one that looked into the issue; and she was
25 the one that determined the reason why we were having

Page 36

1 those long lines is that people were showing up to vote;
2 and they were finding out for the first time that they
3 were not in 309.  They were, in fact, at 310; and it had
4 to do with the address that they were using to register.
5     Q.  309, is that the Memorial Student Center?
6     A.  It's the campus.
7     Q.  It's the campus.
8     And that is a precinct?
9     A.  That is correct.
10     Q.  And 310, what is that reference?
11     A.  It's the city of Prarie View.  That's not on
12 the campus.
13     Q.  And would that be the City Hall?  Would that be
14 the...
15     A.  In the past, that's been, like, on election
16 day, when you're required to go to your specific
17 precinct poll, yes.  City Hall would go the poll for
18 310; whereas, on 309, it would be on campus.
19     Q.  Okay.  You mentioned that it's a problem for
20 mail.  Do you know where mail is delivered for students,
21 where they receive their mail?
22     A.  If you reside on campus, you mail -- my
23 understanding is all the mail goes to the mail center,
24 which is, I believe, at the Memorial Student Center.
25     Q.  Okay.

Page 37

1     A.  And then the students are notified by email
2 that they have mail, and they have to go pick it up.
3     Q.  Okay.
4     A.  Ands just so we're clear, when Dan Teed was
5 working on this issue, it was more a problem with the
6 registrations and the cards getting delivered to the
7 students.  Because if a card doesn't make it into the
8 hands of the students and it comes back to the elections
9 office, it automatically triggers them to be put on a
10 list.  That then, if they don't vote within two years,
11 it's my understanding they could be dropped off the
12 roll.
13     Q.  So --
14     A.  So we want to make sure that students get their
15 cards, and that's why Dan Teed had worked with
16 University officials to make sure we are doing the best
17 job we can so students get their registrations.
18     Q.  And is that list the suspense list?  Does that
19 sound familiar to you?
20     A.  I believe that's correct.  I think that's what
21 it's called.
22     Q.  And if you remain on the suspense list for a
23 certain amount of time, the county can initiate
24 proceedings to purge you from the rolls?
25     A.  I don't think the county initiates the

10 (Pages 34 - 37)

Page 38

1  proceedings. I think we're required by law. If you're
2  on a suspense list after two years and you haven't
3  voted, you are then taken off the rolls; but I don't
4  think it's our option.
5      Q. And you mentioned there have been steps to
6  resolve this.
7      A. Right.
8      Q. Do you know if it's completely resolved?
9      A. So when Dan Teed was working with issue working
10  with University officials and the postal service, and I
11  think he even worked with students groups, the solution
12  that we came upon was to allow the students to use the
13  University address, which was either 700 or 100
14  University for their -- as their physical address.
15      What we found -- what Christie Eason later
16  found is, when they did that, that placed them -- that
17  actually physically -- don't ask me why. It might be
18  the zip code issue as far as I know -- but the
19  University address is not on campus. It is actually off
20  of campus, and that then places that individual in
21  Precinct 310.
22      So the solution that I believe Christie's
23  Eason has worked out is that students use their physical
24  address, which is their dorm or their apartment, which
25  can be different from their mailing address where they

Page 39

1  get their registration card; and they can even use
2  Prarie View. They can put Prairie View. It doesn't
3  matter if they put Waller or Hempstead. But as long as
4  they have a physical address that allows us to pinpoint
5  their location on campus on 309, then they'll be
6  correctly registered to 309.
7      Q. Could all of this be resolved if Prarie View
8  was assigned its own zip code?
9      MR. SEAQUIST: Form.
10      A. I don't know --
11      Q. (BY MS. ADEN) Okay.
12      A. -- to be honest.
13      Q. Have you read the complaint or amended
14  complaint in this lawsuit?
15      A. At one point in time I did, yes.
16      Q. And would you say you're generally familiar
17  with the allegations?
18      A. Yes.
19      Q. And what do you understand them to be?
20      A. My understanding is there's two different
21  components to the claim. One is an intentional
22  discrimination claim. The other is a -- is the fact
23  what the amount of early voting on campus was not equal
24  to some of the other polling locations that we have.
25      Q. And with respect to the intentional

Page 40

1  discrimination claim, do you know upon what basis that
2  is?
3      A. Yes.
4      Q. Is it because of race? Age?
5      A. Yeah. So it would be --
6      Q. Disability?
7      A. I think it would be based on race. I don't
8  know if they're -- I don't recall if there's an attempt
9  to try to classify students as a special group or not,
10  but it's definitely -- there's definitely a racial
11  component to it, to the claims.
12      Q. Are you familiar with 26 amendment?
13      A. As much as anybody else would be, yes.
14      Q. And what's your understanding of it to provide?
15      MR. SEAQUIST: Form.
16      A. The right -- I think the 26 is guaranteeing the
17  right to vote regardless of race. I don't know how
18  the -- I don't know the exact language of the amendment.
19      Q. (BY MS. ADEN) Okay. So you mentioned before
20  that you grew up in Fort Bend, I believe. Is that --
21      A. I grew up in Sugar Land.
22      Q. And that means you were born there as well?
23      A. No, I was not born there.
24      Q. Where were you born?
25      A. I was born in California.

Page 41

1      Q. Which part of California?
2      A. Bakersfield.
3      Q. And when did you move to Texas?
4      A. We moved to Texas when I was about four years
5  old. So probably about three or four. So, I guess,
6  1972.
7      Q. And where do you currently live?
8      A. At this particular moment, I live in Cypress.
9      Q. Okay. And how long have you lived in Waller
10  County?
11      A. Since '05.
12      Q. Okay. Can you sort of bridge for me the
13  relocated {sic}? You moved to Texas. Where you have
14  lived between when you moved here and where you
15  currently live, the different places?
16      A. Okay. When we first moved to Texas, I lived in
17  Tyler, Texas when I was three or four years old. We
18  moved to The Meadows, which is in Fort Bend County when
19  I was five. We lived in The Meadows until junior high
20  when we moved to Sugar Mill, which is a neighborhood in
21  Sugar Land. That was from sixth grade. And then
22  basically from then on, I lived in Sugar Land.
23      And then did undergrad at Texas A&M. Lived
24  in College Station. Moved back to Fort Bend County as I
25  attended law school at University of Houston, and lived

11 (Pages 38 - 41)

Page 42

1  in Fort Bend County till '05 when I moved to Waller
2  County.
3      Q.  Were you seen as an outsider when you moved
4  here?
5      A.  Yes.
6          MR. SEAQUIST:  Form.
7      Q.  (BY MS. ADEN)  Do you still think you're
8  considered an outsider?
9      A.  No.
10     Q.  Why not?
11     A.  Well, it's an open-ended question, so just
12  remember.
13         When I first moved to Waller County, when I
14  first poured foundation for the home, we found out our
15  house was in the middle of the Trans-Texas Corridor,
16  which was a proposed super highway that they were going
17  to be running through Waller County.  At that point, I
18  got very involved with some community groups.  Became
19  one of the leaders of the groups, and we fought the
20  Trans-Texas Corridor.  Successfully, I might add.  And
21  then took on a number of other issues in Waller County.
22         So because of my work in those areas -- and
23  then also I was involved in Tri-County wildfires, I
24  don't -- there's very few people that would view me now
25  as an outsider when it comes to Waller County.

Page 43

1      Q.  When you were working on this Trans-Texas
2  Corridor, were there any claims that would impact black
3  neighborhoods that are resided by a significant amount
4  or majority of black residents?
5      A.  I believe one of the things that we were not
6  happy about is the fact it was going to divide the
7  county into two.  It was literally going to split the
8  county in half.  And being that Waller County is a
9  majority-minority county, that means it would impact
10  some minority groups.
11     Q.  When did Waller County become a
12  majority-minority county?
13     A.  I don't know.
14     Q.  What do you mean by majority minority?
15     A.  I mean, when you look at the minority groups
16  and the demographics of Waller County and you don't
17  include Hispanics as being white, we are majority
18  minority.
19     Q.  By how much?
20     A.  I want to say, gosh, the last time I looked at
21  the numbers, it was somewhere between -- you know,
22  around 55 percent, somewhere around there as far as
23  minority groups versus white.
24     Q.  And is that true -- do you know the voting age
25  population, people 18 or older?

Page 44

1      A.  I don't know.  I never -- I've never looked at
2  the demographics from voting age.  I've always just
3  looked at the demographics.
4      Q.  Total population?
5      A.  That's correct.
6      Q.  So that means you have not looked at what the
7  citizen -- do you know the citizen population numbers in
8  Waller County?
9      A.  Roughly, yes.
10     Q.  What are they?
11     A.  Right now, we're probably somewhere in the
12  neighborhood of about 53- to 54,000.
13     Q.  Out of the total?
14     A.  The population of Waller County.
15     Q.  Which is?
16     A.  That --
17     Q.  Oh, the 53 is the total?
18     A.  That's correct.
19     Q.  Do you know what amount of that is the citizen
20  population?
21     A.  I'm not sure I understand --
22         MR. SEAQUIST:  U.S. citizen?
23     Q.  (BY MS. ADEN)  U.S. citizens.
24     A.  Oh, U.S. citizens?
25         MR. SEAQUIST:  If you know.

Page 45

1      A.  I don't know.
2      Q.  (BY MS. ADEN)  So you mentioned going to law
3  school beyond your law school degree.  Do you have any
4  other higher education degrees?
5      A.  Other than law school, no.
6      Q.  Okay.  Is it accurate to say that most of the
7  education institutions that you've attended have been
8  historically, majority white?
9      A.  I don't know.  I would probably say Texas A&M,
10  you could say that.  I have no -- University of Houston,
11  I would be surprised to hear that.
12     Q.  Are any of them considered historically black
13  universities?
14     A.  I don't think so.
15     Q.  Do you know whether Prairie View AMU is
16  considered an historically black university?
17     A.  It is.
18     Q.  What is your understanding of historically
19  black university, which I may shorthand refer to as an
20  "HBCU."  What is your understanding of what that means?
21     A.  My understanding of historically black
22  university or college is these would be institutions
23  that were originally and were founded and instituted
24  specifically as universities for a minority group or
25  minority individuals.

12 (Pages 42 - 45)

Page 46

1   So, for example, when Prarie View was
2   founded in 1876 at the same time as Texas A&M, it was --
3   and it's gone -- the name has changed several times, but
4   I believe back then it was the University or College of
5   Colored People --
6   Q.  Okay.
7   A.  -- or something like that.  So it was
8   established as an university for blacks.
9   Q.  And after -- you had mentioned 1876.  Is that
10  after the Civil War?
11  A.  I believe so, yes.
12  Q.  Okay.  Do you have any basis to dispute that
13  Prarie View University is one of the oldest institutions
14  in Waller County?
15  A.  No.  It's one of the oldest institutions in the
16  state of Texas.
17  Q.  Would it be fair to say that the Prairie View
18  community is one of the most educated communities in
19  Waller County?
20  A.  Can you repeat the question?
21  Q.  Would it be fair to say that the Prairie View
22  community is one of the most educated communities in
23  Waller County?
24  A.  I would think that that is a true statement.
25  Q.  Do you know of any other institutions that are

Page 47

1   as old as Prarie View that exist in Waller County?
2   A.  No.  None that I can think of.
3   Q.  Can you remind, if you mentioned this already,
4   when you were first -- your position as a Waller County
5   judge is an elected position?
6   A.  Correct.
7   Q.  And when were you first located?
8   A.  I was elected in 2014.
9   Q.  And when did you take your position?
10  A.  January 1, 2015.
11  Q.  And were you -- have you since been reelected
12  to that position?
13  A.  I have.
14  Q.  When was your most recent election?
15  A.  In January -- excuse me.
16      I was reelected in 2018 and took -- and my
17  second term January 1, 2019.
18  Q.  Did you have any opposition during your first
19  election?
20  A.  I did.
21  Q.  How many opponents?
22  A.  I had one opponent in the primary, and I had
23  one opponent in the general.
24  Q.  Are the primaries party affiliated?
25  A.  Yes.

Page 48

1   Q.  And which party were you affiliated with at
2   that time?
3   A.  Republican.
4   Q.  Have you since -- well, let me step back.
5       You are registered to vote?
6   A.  Yes.
7   Q.  How long have you been registered to vote?
8   A.  Since I turned 18.
9   Q.  And you are registered to vote at your current
10  address in Cypress?
11  A.  Right now, I'm registered to vote.  We just
12  sold our house.  We lived in Willow Creek Farms on the
13  south end of the county.  So I would imagine that's
14  where my registration currently sits.  We just recently
15  moved.
16  Q.  Where do you vote?
17  A.  Precinct 418.  Unless it's early voting, in
18  which a lot of times, I'll vote right here at the
19  courthouse.
20  Q.  Is that because it's convenient?
21  A.  Because I'm here, yes.
22  Q.  Were you ever registered to vote anywhere else?
23  A.  At what time?
24  Q.  Since you've been registered.
25  A.  Fort Bend County.  I think just Fort Bend

Page 49

1   County.  I mean, I've been there since I was 18.  That's
2   the only other place since Waller County.
3   Q.  Did you reregister when you went to school?
4   A.  No.  I kept my registered in Fort Bend County,
5   and I would come home and vote.
6   Q.  Have you voted in every election that you have
7   eligible to vote in since you've been 18?
8   A.  I would not say that I have voted in every
9   election, but I have voted in almost every election.
10  Q.  Do you have an opinion about whether or not
11  people such as yourself have a right both to vote and
12  not to vote?
13      MR. SEAQUIST:  Form.
14  A.  I guess I'm going to ask what you mean.
15  "People like yourself"?
16  Q.  (BY MS. ADEN)  You mentioned that you hadn't
17  voted in every election?
18  A.  Right.
19  Q.  So do you think you have a right to both vote
20  in elections and right to not both in elections?
21  A.  Sure.  I guess so.  People can do whatever they
22  want to do.  I wouldn't disagree with that.
23  Q.  Okay.  Your opponent, when you ran in the
24  primary, what was the race of that person?
25  A.  Stan Kitzman.  I believe he's white.

13 (Pages 46 - 49)

Page 50

1  Q. Is Kitzman related to the former DA Kitzman?
2  A. I believe that's his son.
3  Q. And you were successful?
4  A. I was.
5  Q. And when you faced off in the general election,
6  how many opponents did you have then?
7  A. I had one in the general election.
8  Q. And what was the race of candidate?
9  A. I believe she's Hispanic.
10  Q. And who was that?
11  A. Sylvia Cedillo.
12  Q. Do you have a recollection of what the vote
13  tally was?
14  A. I think roughly it was a 2-to-1 margin.
15  Q. Your position as county judge is elected at
16  large. And by at large, I'm meaning that all voters who
17  are registered and eligible to vote in that
18  election have the opportunity -- all those are -- excuse
19  me -- all people who are registered and eligible to vote
20  in the county have the opportunity to cast a ballot for
21  that seat; is that your understanding of at-large
22  voting?
23  A. That's correct. It is a county-wide position.
24  Q. County-wide position is shorter way of
25  describing it.

Page 51

1       And when you ran for reelection in 2018,
2  did you have any opponents?
3  A. Yes.
4  Q. In the primary?
5  A. Yes.
6  Q. How many?
7  A. Two.
8  Q. And were you affiliated still with the
9  Republican party?
10  A. Yes.
11  Q. And did more than one person advance out of the
12  primary, or were you the person who -- the only person
13  who advanced out of the primary?
14  A. I was the only person. I won the primary
15  outright.
16  Q. And when you squared off at the general
17  election, how many opponents did you face?
18  A. One.
19  Q. And what was the race of that person?
20  A. She was black.
21  Q. And do you have a sense of what the vote tally
22  was in that?
23  A. I think it was still roughly 2-to-1.
24  Q. Are you aware of whether a black person has
25  ever been elected to be Waller County judge?

Page 52

1  A. I don't know. I'm -- the judges -- I mean, I
2  know of the last couple of decades there has not been a
3  black county judge?
4  Q. And that is even though this, according to you,
5  a majority-minority county?
6  A. Correct.
7  Q. How old is the county judge position? Do you
8  know how long its been around?
9  A. Well, I'm a constitutional county judge. So
10  whenever the Texas Constitution was created.
11  Q. Do you think that's a couple hundred years?
12  A. I believe so. At least.
13  Q. Have you always been affiliated with the
14  Republican party to the extent you've designated as
15  much?
16  A. The only positions I've ever held as county
17  judge, and that's the only time I've ever been
18  affiliated with a party, so, yes.
19  Q. When you register to vote, do you have to
20  identify your affiliation here in Texas?
21  A. I think if you vote in the primary you can
22  either vote in the Republican or Democratic primary.
23  You can't vote in both.
24  Q. Okay. What is your -- do you receive a salary
25  as a Waller County judge?

Page 53

1  A. Yes, I do.
2  Q. And what is that?
3  A. It's about 85- -- well, it's around -- just a
4  little over $80,000 a year.
5  Q. Do you receive any salary for being the
6  magistrate or have any other positions that you have?
7  A. There is a stipend for the other judicial
8  duties, and that's about 25,000 a year.
9  Q. And excuse me if I'm misremembering, you
10  mentioned also being -- that you are a lawyer, and do
11  you still have a practice outside of these two jobs?
12  A. I do.
13  Q. Okay. Are those the $80,000, the 25,000
14  stipend, and whatever you make in your private practice,
15  are those your main sources -- are those your source of
16  income?
17  A. Yes.
18  Q. Okay. With respect to you government
19  positions, would you agree that your salaries are paid
20  for by all taxpaying residents in the County including
21  Prarie View A&M students?
22       MR. SEAQUIST: Form.
23  A. Correct. Yes.
24  Q. (BY MS. ADEN) So would it be fair to say that
25  you work for Prarie View A&M students?

14 (Pages 50 - 53)

Page 54

1    A. I work for everyone in the County.
2    Q. Okay. Even those who may not have voted for
3 you?
4    A. Even those who may not have voted for me.
5    Q. Okay. And you mentioned -- so this was --
6 you've only run for a county judge. So you have not
7 held any other elected positions?
8    A. No.
9    Q. In your current position, are you considered
10 one of the five members of the County Commissioners
11 Court?
12    A. Correct.
13    Q. Okay. Can you briefly describe your employment
14 history since graduating from law school up through when
15 you first ran for county judge?
16    A. Out of law school, I went to a law firm in
17 Sugar Land called Love and huh baa check, worked for
18 them a couple of years. One of the partners there,
19 Kenneth Love then started his own -- broke off and
20 started his own practice, Love & Associates. I then
21 went to work for '96, '97, until 2005 when I left Love &
22 basically from '96, '97, until 2005 when I left Love &
23 Associates. And then I opened my own practice in Waller
24 under the law offices of Trey Duhon.
25    Q. And what type of law do you practice?

Page 55

1    A. Kind of a general practice probably an emphasis
2 on real estate, will, transactional work, general
3 litigation. Never been really big on the family side or
4 criminal law but pretty much everything else.
5    Q. Have you ever had any civil rights cases?
6    A. No.
7    Q. Would you agree that the largest concentration
8 of black 18- to 20-year-old people who reside in Waller
9 County is in Prarie View?
10    A. Can you repeat the question?
11    Q. Would you agree that the largest concentration
12 of black 18- to 21-year-old people who reside in Waller
13 County is in Prarie View?
14    A. I would not disagree with that.
15    Q. Beside -- can you name all of the black-elected
16 officials currently in Waller County?
17       MR. SEAQUIST: Form.
18    A. Currently, we have Commissioner Jeron Barnett,
19 Precinct 3. We have Marian Jackson, who is the JP
20 Precinct 3. We have Herschel Smith, who is the
21 constable in Precinct 3. I believe that's it.
22    Q. (BY MS. ADEN) Well, you mentioned Precinct 3
23 and both of those positions.
24       What is the general demographics of
25 Precinct 3?

Page 56

1    A. The general demographics?
2    Q. Racial demographics.
3    A. Majority black.
4    Q. Are there any black county-wide elected
5 officials?
6    A. No.
7    Q. Are you aware of any black county-elected
8 officials in the history of this county?
9    A. I don't -- am I aware of any? No. But it's
10 possible. I know -- I know Waller County had a black
11 state representative at one time.
12    Q. Who was that?
13    A. I can't recall his name off the top of my head.
14    Q. And was the entirety of Waller County eligible
15 to vote for that state representative?
16    A. I don't know. That was way before my time.
17    Q. So all of the black-elected officials that are
18 currently serving are elected from a subset of voters
19 who are majority black who reside -- excuse me.
20       All of the elected officials that are
21 currently serving ing are elected in subdistricts or are
22 elected by a subset of voters in the county?
23    A. They're all Precinct 3 officials. So when you
24 say a subset, I mean, it's Precinct 3, which is a
25 division -- a subdivision of Waller County.

Page 57

1    Q. That is majority black?
2    A. Yes.
3    Q. Okay. I'd like to turn now to a new topic.
4       THE CERTIFIED STENOGRAPHER: Can we take a
5 break before you move to your next topic?
6       MS. ADEN: Sure.
7       (A break was taken from 2:05 p.m. to
8       2:13 p.m.)
9    Q. (BY MS. ADEN) So I'm going to turn to your
10 experience as Waller County's judge.
11    A. Okay.
12    Q. What are your responsibilities as county judge?
13    A. My primary -- my number one responsibility is
14 preparation of the county budget. Outside of that, on a
15 day-to-day basis, it's overseeing the administrative
16 framework of the county, making sure services are
17 delivered, working with department heads, making sure
18 that everything works as planned on a daily basis in
19 terms of the things that the county does.
20    Q. What are some of the services that the county
21 delivers?
22    A. Oh, gosh. Okay.
23       Elections. We conduct elections. We have
24 the tax collectors office which collects taxes. We have
25 the road-and-bridge department, which maintains all the

15 (Pages 54 - 57)

Page 58

1  roads and bridges on county roads throughout the county.
2  We have the Waller County Sheriff's Department, which is
3  law enforcement. We have all the constables, which also
4  serve process and also provide law enforcement. We have
5  justice-of-the-peace offices, which, you know,
6  administer small claims courts. We have the court
7  system, county court at law and our district court. We
8  have the county clerk's office, which is the registrar
9  for all public -- for mostly public records in Waller
10  County. We have the district clerk, which serves the
11  506. That's more or less all the different services
12  that are provided by the county.
13      Oh, we have the environmental department,
14  which oversees septic systems. Our road-and-bridge also
15  administrators floodplain for flood insurance purposes.
16  It's --
17  Q. That's a lot.
18  A. Yeah, it's quite a bit.
19  Q. Are the sheriff -- is the sheriff and constable
20  and the tax collector, are those elected positions?
21  A. Yes, they're all elected positions.
22  Q. And are you aware of -- are they elected
23  county-wide?
24      A. The constable is a precinct position. We have
25  four of those, four constables, one for each precinct.

Page 59

1  The tax assessor and the sheriff are county-wide.
2  Q. Are you aware of whether there's ever been a
3  black tax collector?
4      A. I don't -- not to my knowledge, but I don't
5  know.
6  Q. What about a sheriff?
7  A. Same answer.
8  Q. And of the constables precincts, are any of
9  them majority black precincts?
10  A. Other than Precinct 3? Well, Precinct 4 here
11  in Hempstead. I don't know. I know Precinct 4 is
12  majority -- excuse me -- I'm saying Precinct 1, which is
13  here in Hempstead, and I believe Precinct 1 is a
14  majority black precinct, I believe.
15  Q. Okay. Has Precinct 3 elected a black constable
16  before?
17  A. Precinct 3?
18  Q. Uh-huh.
19  A. Well, yes. Herschel Smith is black, and I
20  believe his predecessor was black.
21  Q. Has Precinct 1 elected a black constable?
22      A. I don't know. I know the current Constable Bo
23  Hanshaw is not black.
24  Q. Within the courthouse, has anyone ever made
25  public allegations at any commissioners courts meetings

Page 60

1  about the insufficient diversity of the courthouse
2  staff?
3      MR. SEAQUIST: Object to the form.
4  A. Not to my knowledge, no.
5  Q. (BY MS. ADEN) Does the courthouse have an
6  analysis or study of the number of black employees that
7  work here?
8  A. I don't believe there is an analysis, no.
9  Q. Given your role, do you have -- you mentioned
10  doing -- a big source of your job is working with the
11  county's budget?
12  A. Correct.
13  Q. Do you -- what -- do you have the authority to
14  approve the budget?
15  A. Not by myself, no.
16  Q. You do it in conjunction with whom?
17  A. The commissioners court. It takes at least the
18  majority or -- the commissioners court has to approve
19  the budget. I just prepare it.
20  Q. And given your role approving -- in preparing
21  the budget and having a voice in its approval --
22  A. Uh-huh.
23  Q. -- do you think you have a good sense of the
24  county's tax base?
25  A. Yes.

Page 61

1  Q. And its sources of revenue?
2  A. Yes.
3  Q. And would -- do you have any basis to dispute
4  that Prarie View AMU, its students, faculties, employees
5  significantly contribute to the economy of Waller
6  County?
7      MR. SEAQUIST: Object to the form.
8  A. I would say that th property owners in Prarie
9  View definitely because our own source of revenue is
10  property taxes.
11  Q. (BY MS. ADEN) Okay.
12  A. I don't believe that the University being a
13  state institution pays property taxes.
14  Q. Does the county benefit from the students
15  coming here and shopping and buying gas and eating at
16  restaurants and so forth?
17  A. The county does not receive sales tax. So,
18  whereas, the City of Prarie View probably benefits from
19  that. It doesn't have much of an impact as far as
20  county revenue. Nevertheless, it has a general impact
21  on the community as a whole, which is good for the
22  county.
23  Q. What are your responsibilities as county judge
24  that relate specifically to elections or voting?
25  A. Specifically to elections or voting, obviously

16 (Pages 58 - 61)

1  to the extent that the elections office is part of the
2  county budget, I would oversee that budget and the
3  preparation of it.  And then, of course, we vote to
4  approve to order the elections and to set the schedules
5  for the election.
6      Q.  Now, with respect to overseeing the budget,
7  once the budget is set, are there certain things that
8  have to come back to the commissioners court approve if
9  the budget -- someone needs more money to carry out an
10  election or not or is -- well -- strike that.
11          Is there any discretionary authority that
12  someone like Ms. Eason may have to carry out her job as
13  an elections officials?
14      A.  So once the budget is approved, there are line
15  items within each budget.  So, for example, elections
16  office will have line items for a number of different
17  types of expenditures -- so for the elections
18  themselves, for the equipment, for staff salary.  So as
19  long as she's within her line items, that's within her
20  discretion to spend that money as she sees fit.  If at
21  any point in time, she needs to move money from one line
22  item to another to cover either a shortage or an overage
23  or whatever, then she has to come to commissioners court
24  to transfer those funds.
25      Q.  Since you've been in office, has Ms. Eason

1  requested more money be transferred from either other
2  line item to help pay for machines or election-related
3  personnel?
4      A.  You know, line item transfers is a standard
5  part of all budgets.  I mean, we frequently have line
6  item transfers from all department heads.  I would think
7  Ms. Eason would probably be no different.  I'm sure
8  there have been some.  I can that Ms. Eason in
9  comparison to her predecessor Dan Teed, she has far less
10  line item transfers than Dan Teed did.
11          The only other item -- in that regard, the
12  only other big -- you know, two years ago, we purchased
13  all new voting machines, and that had to come out of
14  reserves.  So that was a pretty big purchase at the
15  time, and that required approval of the court.
16      Q.  Were all the machines replaced for use or were
17  they...
18      A.  No.  We replaced all voting machines in Waller
19  County with the best and newest state-of-the-art
20  machines.
21      Q.  That was not state mandated?
22      A.  It's not state mandated, but, I mean, Waller
23  County like a lot of other counties has machines that,
24  you know -- you remember the "hanging Chad" controversy?
25      Q.  Right.  In Florida?

1      A.  Right.
2          That's when Texas went to digital voting
3  machines.  So everybody has the same machines, and now
4  you have a lot of voting machines out there that are --
5  you can't even update them because they were running on
6  Windows 2000, which is no longer a current operating
7  system that doesn't receive updates anymore.  So
8  everybody is having this issue right now.  So we took
9  the initiative to get brand-new machines, but it was not
10  mandated by the statement.  We were ahead of the curve.
11      Q.  And your -- these are the Hart machines?
12      A.  The Verity Hart machines, correct.
13      Q.  Okay.  In your elections-related work, who do
14  you consider -- who do you most directly work with?
15      A.  With elections?
16      Q.  With elections.
17      A.  Christie Eason.
18      Q.  Okay.  What about other county commissioners?
19      A.  I mean, to the extent that -- yeah, to some
20  extent.  But, usually, more times than not, that's right
21  here during the court during the meetings.
22      Q.  Okay.  And that is to set the order and call
23  the election?  Schedule the election?
24      A.  Or discuss any other issues that can arise.
25      Q.  Okay.  What about the Democratic and Republican

1  party chairs?  Do you work with them in your
2  election-related duties?
3      A.  As far as like the actual elections themselves
4  and coming up with the schedules, no, I do not work with
5  the chairs.  I mean, obviously, I work with David Luther
6  being a Republican.  I worked with David Luther as far
7  as the general party, but not specifically in terms of
8  the elections themselves.
9      Q.  Are you funded by the Waller County Republican
10  party?
11      A.  I think my first election, I did receive some
12  money from the Waller County Republican party.  The last
13  election, I don't recall if I received anything from
14  them off the top of my head.
15      Q.  Did they redirect your money to another
16  candidate for your position?
17      A.  No.
18      Q.  Okay.  Do you work with Prarie View city
19  officials in your election-related duties?
20      A.  As far as election, generally, no.  I can tell
21  you in this -- in the 2018 election, when we were
22  looking at possibly adding an early voting site at the
23  Prarie View City Hall, I did contact David -- okay.  I
24  just vapor locked on his last name.  The mayor of Prarie
25  View.

17 (Pages 62 - 65)

Page 66

1   Q.  Okay.
2   A.  I can't think of his name at this moment.
3   Q.  Allen?
4   A.  David Allen.  Sorry.  I know David very well.
5   So I don't know why I forgot his last name.
6   Q.  And you've mentioned adding a day to City Hall.
7   Was that the day -- are you referencing the day that was
8   added after this lawsuit was filed?
9   A.  I think that's -- yes.
10   Q.  Okay.  Would you -- you mentioned that Ms.- --
11   well, do you work with Prarie View AMU -- do you work
12   with Prarie View AMU -- do you work with Prarie View
13   students in the course of carrying out your
14   election-related duties?
15   A.  You know, other than my relationship with
16   Kendric Jones -- I mean, I deal with a lot of Prarie
17   View AMU students on a variety of issues.  I wouldn't
18   say they're specifically on my oversight or anything
19   having to do with election duties.  I know there's been
20   times where I had conversations with Kendric regarding
21   the elections, but I guess you -- I guess, in a way, you
22   could say that was in my role as county judge.
23   Q.  Has he come to you, or you come to him to talk
24   about things?
25   A.  Both.

Page 67

1   Q.  And what are some of the topics?
2   A.  Like when the lawsuit got filed, Kendric
3   reached out to me because he wanted to know the county
4   side of the story.  So I told him.
5   Q.  Did Mr. Jones participate in any of the
6   commissioners courts meetings related to the elections?
7   A.  I believe he did speak.  There might have been
8   one of the meetings that I think he did speak at.
9   Q.  And do you recall whether he was urging more
10   early voting at those meeting on Prarie View's campus?
11   A.  I'll be honest.  I can't -- sitting here right
12   now, I can't recall specifically what he was probably
13   asking for.  He's always been an advocate for the
14   students and for Prarie View.
15   Q.  What about Prarie View AMU administrators?  Do
16   you have a relationship with them in terms of your
17   election-related duties?
18   A.  As far as administrators, I've generally dealt
19   with the president of the university, Dr. Simmons.
20   Q.  Okay.  Not the SGA president?  The student
21   government association president?
22   A.  Well, we did have a meeting a few weeks ago
23   with Dr. Simmons, and I believe her name is Princess and
24   I think she's the current SGA president.  She was in
25   that meeting.  That was the first time I worked with

Page 68

1   her.
2   Q.  Just to be clear, outside of the rule -- or --
3   strike that.
4       Outside of the addressing issue that we
5   talked about at the beginning, are there any other
6   voting-related issues that you've done specific work
7   with Prarie View AMU students, administrators, student
8   representatives?
9   A.  Other than the registration and zip codes, no.
10   Q.  Okay.  Do you regularly attend any meetings,
11   social club meetings?  Strike that.
12       Are you a member of any social groups?
13   A.  Social groups?
14   Q.  The Masons?  A church group?  Any civic groups?
15   A.  No.
16   Q.  Do your responsibilities change or stay the
17   same for primary election as compared to general
18   elections?
19   A.  I think they're the same.
20   Q.  Okay.  Do your -- what are your
21   responsibilities as a county judge with respect to early
22   voting?
23   A.  Well, I don't know.  I would say with respect
24   to county judge, I would say generally we have a duty,
25   the county has a duty, to make sure everybody has access

Page 69

1   and is able to exercise the right to vote; and it's our
2   job to make sure that's provided.
3   Q.  And what does access mean to you?
4   A.  It means the ability to exercise your right to
5   vote, and that means having a location that you can vote
6   to cast your vote.
7   Q.  Is location related to your transportation
8   access?
9   A.  It can be.
10   Q.  Is location related to your work access, your
11   work schedule?
12   A.  It can.
13   Q.  Is transportation related to convenience?  I'm
14   sorry.
15       Is access related to convenience?
16   A.  Is access related to convenience?  I don't
17   know.  I mean, I think it -- obviously, if it's more
18   convenient, it's easier, but that doesn't necessarily
19   mean you don't have access.  So I'm not so sure I would
20   agree that convenience equals access, but it can.
21       But -- you know, if it's more convenient, I
22   think it might make it easier for people to exercise
23   their right to vote.
24   Q.  How did you learn what the specific
25   responsibilities of the county judge were with respect

18 (Pages 66 - 69)

Page 70

1  to your election-related duties?
2      A.  How did I learn about those duties?
3      Q.  Yeah.
4          Was there a manual, a policy, a guide?  Did
5  you do a training?  Did you learn what you were supposed
6  to do?
7      A.  Well, generally, when you're I'm sorry.  I
8  didn't mean to talk over you.
9          When you're elected county judge, one of
10  the first things you do is you go to judge school, which
11  is Texas Association of counties, I think in connection
12  with Texas Tech University puts on a school to basically
13  educate judges on all of their different roles and
14  responsibilities, not just judicial, but also
15  administrative.  It's basically where you learn all the
16  different ways you can be sued if you don't do your job.
17      Q.  And were you trained at all about early voting
18  specifically?
19      A.  I don't recall if early voting was specifically
20  addressed in that training.  That was five years ago
21  that I attended, but I can't remember if that was
22  specifically talked about or not.
23      Q.  And you don't have to, like, re-up the
24  training?  Now, that you're reelected, you don't have to
25  go through another training?

Page 71

1      A.  No.  We do have continuing education
2  requirements.  Any elected official, especially
3  commissioner court or county judge, we do have
4  continuing education requirement that we do have to
5  meet.  Generally those are met by going to different
6  conferences where they have classes, and generally
7  that's to update people on the law.
8          So, for example, in some of those seminars,
9  they can talk about updates to the election code, and
10  those would be discussed and those would be the times
11  that we would learn about the things we have to keep up
12  with.
13      Q.  Did you have any conversations with the former
14  county election judge before your coming into office?
15      A.  The county election judge?
16      Q.  Former --
17      A.  County judge.
18      Q.  Sorry.
19          Did you have any conversations with a
20  former county judge about your election-related duties
21  before coming into office?
22      A.  No, I did not.
23      Q.  Or after?
24      A.  No.
25      Q.  Okay.  I want to turn to a new topic, which is

Page 72

1  the history of voting at Prarie View AMU.
2      A.  Okay.
3      Q.  What is your understanding of the history of
4  voting by Prarie View AMU students?
5          MR. SEAQUIST:  Form.
6      A.  What is my understanding about the history?
7      Q.  (BY MS. ADEN)  Yes.
8          So I will ask another question.  Has that
9  history involved legal challenges?
10      A.  I'm aware that there have been legal challenges
11  and difficulties regarding the students voting, yes.
12      Q.  How have you become aware of them?
13      A.  Through articles, through media pieces, you
14  know, historical research.  Just learning about the
15  history of Waller County, and specifically what's going
16  on in Prarie View and on campus.
17      Q.  Do you think it's fair to say that when you
18  read a newspaper article about voting and Prarie View
19  students that generally the articles talk about the
20  history, the challenges that have come along with it?
21          MR. SEAQUIST:  Form.
22      A.  Generally, most of the articles I have read do
23  into the history, yes.
24      Q.  (BY MS. ADEN)  Has that history involved legal
25  settlements?

Page 73

1      A.  I would believe so, yes.
2      Q.  Do you recall whether there was a settlement
3  with the District Attorney Kitzman at some point, the
4  former District Attorney Kitzman?
5      A.  I mean, obviously, that was at a time period I
6  wasn't in Waller County, much less the county judge.  I
7  believe there was a resolution to that conflict.
8  Whether it was a settlement or how it actually got
9  resolved, I don't know the specifics.
10      Q.  Okay.  Are you aware of whether there had been
11  objections by the Federal Department of Justice to
12  Waller County with respect to its voting operations?
13      A.  Yes.
14      Q.  And having read articles in media pieces,
15  you're aware generally that there's been a lot of
16  national, state, and media attention to the experience
17  of Prarie View students voting?
18          MR. SEAQUIST:  Objection.  Form.
19      A.  Yes.
20      Q.  (BY MS. ADEN)  I'm going to show you right now
21  a printout of a 2014 Southern District of Texas decision
22  in "Veasey vs. Perry," case challenging Texas' photo ID
23  law of 2011.  It is reported that 71 F. Supp. 3D 627.
24          MS. ADEN:  I'm marking it as Duhon
25  Exhibit 2, and Mr. Duhon has already received it and so

19 (Pages 70 - 73)

Page 74

1  has his counsel.
2          (Exhibit 2 marked.)
3      Q.  (BY MS. ADEN)  And just generally, have you
4  read this decision before?
5      A.  No.
6      Q.  Are you aware of this decision?
7      A.  Not specifically, no.
8      Q.  Are you aware that Texas was challenged in a
9  lawsuit related to its 2011 photo ID law?
10      A.  I'm aware there's a photo ID law.  I'm aware
11  there was a challenge to the photo ID law.  I'm not
12  aware that this was specifically that challenge, but
13  that's what I was aware of.
14      Q.  Okay.  And for full transparency, the legal
15  defense firm where I work, we were counsel in that case
16  and represented Prairie View students in it.
17      A.  Okay.
18      Q.  I want to direct your attention to Page 635.
19  The numbers are in the top, right-hand corner, and I
20  would love to direct your attention to the left column,
21  the last bullet, and ask you to read aloud the sentence
22  beginning, "Within 1971..."
23      A.  (As read):  "In 1971, after the 26th Amendment
24  extended the vote to those 18 years old and older,
25  Waller County which was home to Prarie View A&M

Page 75

1  University, PVAMU, a historically black university,
2  became troubled with race issues.  Waller County's tax
3  assessor and voter registrar prohibited students from
4  voting unless they or their families owned property in
5  the county.  This practice was ended in a three-judge
6  court in 1979."
7      Q.  Just going to stop you.  Are you -- what's
8  being recited here -- well, first, does that paragraph
9  illuminate what the 26 amendment provides?
10      A.  Yes, it does.
11      Q.  And, second, is this general history recited in
12  this paragraph something that you were more or less
13  familiar with?
14      A.  More or less, yes.
15      Q.  Can you read the next bullet, please.
16      A.  (As read):  "In 1992, a county prosecutor
17  indicted PVAMU students for illegally voting, but
18  dropped the charges after receiving a protest from the
19  DOJ."
20      Q.  And, similarly, are you generally aware of
21  that, what is being recounted in this bullet?
22      A.  Yes.
23      Q.  Okay.  Can you read the next one?
24      A.  (As read):  "In 2003, a PVAMU student ran for
25  the commissioners court.  The local district attorney

Page 76

1  and county attorney threatened to prosecute students for
2  voter fraud for not meeting the old domicile test.
3  These threatened prosecutions were enjoined.  The Waller
4  County then reduced early voting hours, which was
5  particularly harmful to students because the election
6  day was during their Spring Break.  After the NAACP
7  filed suit, Waller County reversed the changes to
8  earlier voting, and the student narrowly won the
9  election."
10      Q.  And based upon what you just read, were you
11  generally familiar with this history?
12      A.  Yes.
13      Q.  And were you aware specifically of this history
14  related to reductions in early voting?
15      A.  You know, I knew Oliver.  I think this was
16  involving Oliver Kitzman, if I'm not mistaken, and I
17  knew about the old domicile rule.  I'm not sure I was
18  aware that there had been an attempt by Waller County to
19  reduce early voting hours.
20      Q.  According to this court?
21      A.  According to what I just read.
22      Q.  And reading with the next bullet beginning
23  with, "In 2007..."
24      A.  (As read):  "In 2007, during then Senator
25  Barack Obama's campaign for president, Waller County

Page 77

1  made a number of voting changes without seeking
2  preclearance.  The county rejected incomplete voter
3  registrations and required volunteer deputy registrars,
4  VDRs, to personally find and notify the voters of the
5  rejection.  The county also limited the number of new
6  registrations any VDR could submit; thus, limiting the
7  success of voter registration drives.  These practice
8  were eventually prohibited by a consent decree."
9      Q.  And having read that bullet, were you aware of
10  what this court is reciting happened around
11  the 2007/2008 elections?
12      A.  Vaguely, yes.
13      Q.  Okay.  Before 1971, could black people 18 to 21
14  year old or otherwise participate politically in Texas?
15      A.  Prior to 1971?
16      Q.  Uh-huh.
17      A.  The question is 18 --
18      Q.  Black people, whether they were 18 or 21 --
19      A.  18 to 21 --
20      Q.  Black people, could they participate
21  politically prior to 1971 in Texas?
22          MR. SEAQUIST:  1971?
23          MS. ADEN:  1971.
24          MR. SEAQUIST:  Okay.
25          MS. ADEN:  It would be true of 1871.  1971.

20 (Pages 74 - 77)

Page 78

1    A. I guess, given the fact that's when the 26
2  amendment was passed, I would probably say from --
3  well, 18 years older --
4         MR. SEAQUIST:  I'm going to object to the
5  form.
6    Q. (BY MS. ADEN)  I'll reask.
7         Before 1971, could black people, regardless
8  of their age, participate politically in Texas?
9         MR. SEAQUIST:  Form.
10   A. Yes.
11   Q. (BY MS. ADEN)  How?
12   A. By voting.
13   Q. Could black people register to vote and vote in
14  Texas without being subject to a grandfather clause?
15        MR. SEAQUIST:  Form.
16   A. I don't know -- what do you mean by grandfather
17  clause?
18   Q. (BY MS. ADEN)  Are you aware what property
19  requirements are required to voted?
20   A. Yes.
21   Q. So before 1971, were black people in Texas
22  subject to a requirement that they owned property?
23        MR. SEAQUIST:  Form.
24   A. I don't know.
25   Q. (BY MS. ADEN)  Were black people before 1971

Page 79

1  subject to a requirement that they pass a literacy test
2  to vote?
3    A. I don't know the answer to that question.
4    Q. Were you taught of this -- was any of this
5  history recounted to you in any of the educational
6  institutions that you've attended, whether through
7  primary school, college, or law school?
8    A. I can't recall.
9    Q. In your constitutional law classes in law
10  school, were you -- did you read any cases about the
11  unconstitutionality of literacy tests, grandfather
12  clauses, property requirements?
13   A. I have no doubt that I've read cases in
14  constitutional law, but the specifics of those cases at
15  this time -- I attended law school 25-plus years ago, so
16  it would be difficult for me to recall specifics.
17   Q. In any of the county commission meetings that
18  you've attended since being in office, has anyone talked
19  about the history of black people voting in Texas prior
20  to 1970?
21   A. In any of our meetings?
22   Q. Yes.
23   A. Has anyone specifically talked about practices?
24   Q. Grandfather clauses, literacy tests, residency
25  requirements.

Page 80

1         MR. SEAQUIST:  Object to form.
2    A. In terms of prior and 1971 specifically, I
3  don't recall anybody making a specific comment.  I know
4  there have been comments made during court meetings
5  regarding the difficulties faced by students in the
6  past.
7    Q. (BY MS. ADEN)  And beyond students, have people
8  -- older, for example, black residents, older former
9  alum of PVAMU, have they ever come and said something
10  akin to, there was a time when I couldn't vote; my
11  grandmother and grandfather could not vote because of a
12  literacy test, a grandfather clause, or property
13  requirement.  Something like that?
14   A. In a commissioners court meeting?
15   Q. Yes.
16   A. I don't recall any Prarie View AMU alumni ever
17  making that kind of statement in a commissioners court
18  meeting.
19   Q. Any older, black resident of Prarie View or
20  Waller County more generally?
21   A. I don't recall anybody specific making that
22  statement.  I'm not saying that somebody could have, but
23  I don't remember that specific statement.
24   Q. Okay.  What is your understanding of the record
25  of accessing a polling place at a site on campus at

Page 81

1  Prarie View for election day?  So what is your
2  understanding of the history of getting an on-campus,
3  election-day site?
4    A. To the extent of the history that I'm aware of,
5  was that there had been election-day poll on campus
6  prior to the Memorial Student Center being rebuilt or
7  they did a reconstruction.  After that reconstruction
8  was done, I believe, the poll at some point was returned
9  to the campus.  That was prior to me becoming judge.
10  That's the extent of the history that I'm aware of.
11   Q. Do you have a general sense of this time frame?
12  Like when the Center was rebuilt and reopened?
13   A. I know it was all prior to 2015, 2014.
14   Q. When you were first elected?
15   A. Yes.
16        Because I campaigned in the Memorial
17  Student Center for the first time I ran.  So Memorial
18  Center had definitely been completed by then.  So it
19  would have been prior to that.
20   Q. Did you campaign at the Student Center the
21  second time?
22   A. No, I did not.
23   Q. Was there a reason why not?
24   A. No.  It was reelection.  So there were a lot of
25  things I did the first time around that I didn't do the

21 (Pages 78 - 81)

Page 82

1 second time around. At that point I was county judge,
2 and I had a lot more responsibility.
3   Q. The first time around when you campaigned
4 there, did you do so because you believed that students
5 there could be potential voters for you?
6   A. Oh, absolutely. I would not say that every
7 student at Prairie View AMU votes democrat. In fact, I
8 think a lot of them think independently.
9   Q. So would you agree then that party chairs are
10 not necessarily representative of all students at Prarie
11 View?
12     MR. SEAQUIST: Object to the form.
13   A. I mean, the party chairs are not
14 representative? I mean, there's some folks that don't
15 identify with a party. So I would say that's probably
16 not an incorrect statement.
17   Q. (BY MS. ADEN) Okay.
18   A. But that is our process.
19   Q. We'll get to that.
20     Going forward, can we agree that by -- when
21 I reference on campus, I am referring an on-campus
22 voting site, I'm referring to something that's within
23 the boundaries of the campus, and generally the Student
24 Center, but not something off campus, not something
25 buttressing it, adjacent to it, not off the grounds of

Page 83

1 it, but within the grounds of the campus?
2   A. I guess so. I guess my question would be, what
3 do you identify as the boundaries?
4   Q. The -- structures of the school currently
5 controls?
6   A. Okay. Okay.
7   Q. We'll see if that works.
8   A. Okay.
9     (Exhibit 3 marked.)
10   MS. ADEN: Okay. I would like to turn to
11 the third exhibit, which is a letter dated July 25,
12 2013, from Priscilla Barbour to County Judge Glenn
13 Beckendorff. I'm marking it as Duhon Exhibit 3 and
14 handing to Judge Duhon and also to Mr. Seaquist.
15   Q. (BY MS. ADEN) Are you familiar -- do you want
16 take a moment?
17   A. Yes, please. Because I don't believe I've ever
18 seen this document.
19   Q. Okay.
20   A. Okay.
21   Q. Okay. So having taken a few seconds to just
22 review it, are you familiar with this letter?
23   A. No.
24   Q. Okay. Would you agree that this letter is from
25 Ms. Barbour about -- she identifies herself on the

Page 84

1 second page as the Student Government Association
2 president.
3   A. Okay.
4   Q. And it has Prairie View's letterhead on it?
5   A. Okay.
6   Q. And that she's writing it to County Judge Glenn
7 Beckendorf, your predecessor; is that correct?
8   A. Yes. That's what it purports to show, yes.
9   Q. Okay. And on Page 2, there are a number of
10 people cc'd on it.
11     Would you agree that two people cc'd, John
12 Amsler and Jeron Barnett, are two current commissioners?
13   A. Correct.
14   Q. So they would -- no.
15     It's fair to believe that they were -- may
16 have an awareness of this letter? May have an awareness
17 of this letter?
18   A. I have no idea.
19   Q. Okay. Do you mind reading for the record out
20 loud the first paragraph that begins with "My name
21 is...."
22   A. (As read): "My name is Priscilla Barbour, and
23 I'm the president of the Prairie View A&M University
24 Student Government Association. I'm writing on behalf
25 of the 8,425 students enrolled at the university. We

Page 85

1 request a polling location be placed at the Memorial
2 Student Center located on the campus at Prairie View A&M
3 University.
4     This is incumbent to the Waller County
5 administration, as we find the lack of a voting location
6 on campus violates Section 2 of the Voting Rights Act
7 for the following reasons: Students have to walk over a
8 mile from housing areas to vote at the nearest
9 location."
10   Q. Okay. Remind me again. Do you know
11 Ms. Barbour?
12   A. No, I do not.
13   Q. Okay. And having read this, what was she
14 asking for essentially?
15     MR. SEAQUIST: Form.
16   A. It looks like she's asking for a polling
17 location to be placed at the Memorial Student Center.
18   Q. (BY MS. ADEN) And what's the date of this?
19   A. July 25, 2015.
20   Q. Okay. And what, according to her, is one of
21 the reasons why she is seeking a polling place on
22 campus?
23   A. It's because the lack of -- she states, the
24 lack of a polling location violates Section 2 of the
25 Voting Rights Act.

22 (Pages 82 - 85)

Page 86

1    Q.  For what reason specifically?
2    A.  Because students have to walk over a mile from
3  housing areas to vote at the nearest location.
4    Q.  Hypothetically, if Prarie View students don't
5  vote at the Student Center going forward, would you have
6  any reason to dispute that some students would also have
7  to walk over one mile from housing areas to vote at
8  the -- at a potential polling site?
9         MR. SEAQUIST:  Object to the form.
10   A.  Would I -- can you repeat?
11   Q.  (BY MS. ADEN)  Yes.
12        So this is an hypothetical.
13   A.  Sure.
14   Q.  If Prarie View AMU student don't vote at the
15  Student Center going forward --
16   A.  Right.
17   Q.  -- would you have any reason to dispute that
18  some students would also have to walk over a mile from
19  housing areas to vote at the next -- at the next closest
20  poll location?
21        MR. SEAQUIST:  Object to form.
22   A.  Yes, I would dispute that.
23   Q.  (BY MS. ADEN)  On what basis?
24   A.  Because you're not telling me where the
25  location -- the polling location -- if it's not the MSC,

Page 87

1  then where would it be located?
2    Q.  Say, it's at the community center.  Do you know
3  where that is located?
4    A.  I do.
5    Q.  Do you know where the Panther Hill Apartments
6  are located?
7    A.  I do.
8    Q.  Do you know what the average travel time would
9  be to walk from the Panther Apartments to the community
10  center?
11        MR. SEAQUIST:  Form.
12   A.  From the Panther Apartments?
13   Q.  (BY MS. ADEN)  Yes.
14   A.  To the community center?
15   Q.  Yes.
16   A.  Now, when you -- and I may be mistaken.  Are we
17  talking about the Panther Apartment that are located
18  east of the university of the entrance to the campus?
19  There's some apartments?
20   Q.  Well, let's step back.
21        Would you agree -- or do you know whether
22  some Prarie View student live at the Panther Hill
23  Apartments?
24   A.  Do I know?
25   Q.  Yes.

Page 88

1    A.  I don't know for a fact, but I would assume
2  that some do, yes.
3    Q.  Okay.  So I'm going introduce as Exhibit 4, a
4  -- what I represent to be a Google Maps, showing what
5  Google Maps estimates to be the walking distance from
6  the Panther Hill Apartments to the Waller County
7  Community Center.
8         (Exhibit 4 marked.)
9    A.  Okay.
10   Q.  (BY MS. ADEN)  This is what Google Maps
11  projects to be the route and what Google Maps projects
12  to be the distance in walking.
13        Have you ever yourself typed in this route
14  to see what it might say?
15   A.  No.
16   Q.  Okay.  And what is the estimated time at least
17  according to Google Maps?
18   A.  45 minutes.
19   Q.  So assuming Prarie View students don't vote at
20  their student center going forward and assuming that
21  some Prairie View student live at the Panther Hill
22  Apartments --
23   A.  Right.
24   Q.  -- and the next closest location is the
25  community center --

Page 89

1    A.  Right.
2    Q.  -- do you have any reason to dispute that
3  students here would have to walk over a mile to vote?
4         MR. SEAQUIST:  Object to the form.
5    A.  I would not dispute that they have to walk over
6  a mile, but it would still be a less distance than the
7  Memorial Student Center.
8    Q.  (BY MS. ADEN)  From their --
9    A.  From Panther Hill Apartments.
10        The Waller County Community Center is
11  closer to Panther Hill Apartments than the Memorial
12  Student Center.  And if they're walking.  It's more
13  convenient for them --
14   Q.  Repeat that.  I'm sorry.
15   A.  -- if they're walking.
16        I'm placing an X roughly with the Memorial
17  Student Center is.  So obviously the community center is
18  much closer to Panther Hill than the Memorial Student
19  Center.
20   Q.  Now, one question.  Do you know whether or not
21  there is a shuttle that goes from this apartment complex
22  to this community center?
23   A.  To the community center, I'm not aware of a
24  shuttle.
25   Q.  Do you know also whether or not the community

23 (Pages 86 - 89)

Page 90

1  center is something that students regularly access?
2        MR. SEAQUIST:  Form.
3     A.  Yes, they do.
4     Q.  (BY MS. ADEN)  For what purposes?
5     A.  Well, to understand, the Waller County
6  Community Center is on land dedicated to the county by
7  the university for the purposes of building a community
8  center for the use of the university, the students, the
9  community, and the county.  So frequently, our community
10  center is utilized by student groups for a variety of
11  functions.
12     Q.  What student groups?
13     A.  Fraternities and sororities have used it during
14  homecoming.  We've had community meetings there.  We
15  had -- what was it?  I think we did strategic plan
16  meetings there where there were students that attended.
17     Q.  What is the maximum capacity of the community
18  center?
19     A.  Several hundred.
20     Q.  Do you know what the maximum capacity of the
21  Memorial Student Center is?
22     A.  You mean the building as a whole?  That's
23  probably much higher.  I don't know specifically.
24     Q.  Do you know whether students frequent the
25  community center on a daily basis for any needs?

Page 91

1        MR. SEAQUIST:  Form.
2     A.  I don't think so.
3     Q.  (BY MS. ADEN)  According to this Google Maps,
4  what is the distance, the mileage, that it projects from
5  the Panther Hill Apartments to the community center?
6     A.  I guess utilizing the routes identified on here
7  that it takes 2.2 miles it shows.
8     Q.  Okay.  So let's turn back to Exhibit 3, which
9  is the letter from Priscilla Barbour.
10     A.  Okay.
11     Q.  Okay.  Actually, let me ask you one other
12  question quickly.  I'm going to show you and mark what
13  is Exhibit 5, which is the expert report of Dr. Robert
14  Stein in this case, and I should not have done that.
15        Have you seen this before?
16        (Exhibit 5 marked.)
17     A.  I believe that I received a copy of it, but I
18  have not reviewed it in detail.
19     Q.  (BY MS. ADEN)  Okay.  Do you mind turning to
20  Page 7?
21     A.  Okay.
22     Q.  Okay.  And I would like you to take a moment to
23  read what is on Page 7 between -- under B-2 for a
24  moment.
25     A.  "Several researchers" --

Page 92

1     Q.  Oh, you can read it to yourself.
2     A.  Oh, I'm sorry.
3     Q.  And then I'll ask you to read something out
4  loud.
5     A.  Okay.
6     Q.  Okay.  So can you read the second paragraph of
7  the bottom of the page that runs onto Page 8, beginning
8  with, "The closest early voting site..."
9     A.  (As read):  "The closest early voting location
10  to the PVAMU campus apart from the on-campus early
11  voting location at the Memorial Student Center, was the
12  off-campus early voting location at the Waller County
13  Community Center; however, the community center is
14  located to the south of the campus, PVAMU campus, 1.4 to
15  1.6 miles away from the two, large student residential
16  housing facilities on the PVAMU campus, i.e., University
17  Square located at 502 Anne Preston Street and University
18  College located at 505 Anne Preston Street.  This
19  distance is five to six times further than the minimum
20  distance beyond which Cantoni observed reduced voter
21  turnout."
22     Q.  Would you agree that it seems that Dr. Stein is
23  referring to a context around the 2018 election
24  schedule.  This paragraph suggests that the next closest
25  on-campus early voting location is at the Waller County

Page 93

1  Community Center.
2        Would you agree that he's referencing the
3  2018 elections?
4        MR. SEAQUIST:  Object to the form.
5     A.  I suppose that's what he's -- I don't really
6  know, but I'm guessing that's what he's referencing.
7     Q.  (BY MS. ADEN)  And are you familiar with these
8  two residential housing facilities, the University
9  Square and University College?
10     A.  Yes.
11     Q.  Have you gone inside of them?  Personally
12  visited them?
13     A.  I've never -- I've driven by them, but I've
14  never been inside the residential areas.
15     Q.  Do you have any reason to dispute his findings
16  that the distance from the community center to the
17  campus is more than one mile away?
18        MR. SEAQUIST:  Object to the form.
19     A.  I find that incredibly surprising.
20     Q.  (BY MS. ADEN)  What is your basis for that?
21     A.  Because I've been on the campus many times.
22  I've walked the campus many times.  I know where some of
23  these residential areas are.
24        I don't know how he arrived at these
25  numbers, but I don't -- I'm not sure that I would agree

24 (Pages 90 - 93)

Page 94

1 that it's this distance at all. That's just my
2 impression.
3         I don't know if he's looking at road routes
4 from a walking perspective. I can't imagine that's even
5 close to being correct.
6     Q. Is it important to have roads to walk on to get
7 somewhere?
8         MR. SEAQUIST: Form.
9     A. It's important to have roads. It's nice to
10 have sidewalks. I mean, the campus has sidewalks
11 everywhere.
12     Q. Is there a sidewalk that goes directly from the
13 campus to the community center?
14     A. You have sidewalks that go from the Memorial
15 Student Center all the way down towards the -- towards
16 the stadium. Once you're at the stadium, there's
17 parking lots that bring you right up to the back of the
18 community center. There is a small sidewalk that gets
19 you to the post office which is adjacent to the
20 community center.
21         There is not with a sidewalk specifically
22 from the back of the parking lot that's adjacent to the
23 community center to the back of the community center,
24 but that is going to be installed in the very near
25 future. We've been working on that for quite some time

Page 95

1 now.
2     Q. Is there a fence that separates the community
3 center -- the back of the community center from the
4 parking lot?
5     A. I think there's a corner. It's kind of -- it's
6 where the back of the post office is, there's a corner,
7 and there's a wire. There's some post that are maybe
8 two feet high and have a low wire. There's no -- so, I
9 mean -- that you can step over -- that anyone can step
10 over unless, I guess, you're in a wheelchair.
11         So when -- and that's just right there at
12 the corner. Along the back of the community center,
13 there's no fence that I'm aware of. So -- and it's --
14 the fence that is there, I don't know if I'd call that a
15 fence. It's more of a boundary -- a boundary wire, I
16 guess.
17     Q. And does -- well, let me ask you a couple of
18 questions about that. Is it fair to expect someone who
19 is disabled to cross over a fence in order to access
20 that building?
21     A. No.
22         MR. SEAQUIST: Objection. Form.
23     A. No.
24     Q. (BY MS. ADEN) Is it fair --
25     A. That's why we need to put in the sidewalk.

Page 96

1     Q. And is it fair for even a non-disabled person
2 to have to cross over a fence in order to access a
3 building?
4         MR. SEAQUIST: Object to the form.
5     A. I guess it depends on the height of the fence.
6 If you're talking about something that can be stepped
7 over easily, it's not a major impediment, if you're
8 talking about a fence somebody has to climb, I would
9 agree that would be a major impediment.
10     Q. Do you think -- stepping back.
11         Are you aware of whether there is a shuttle
12 that goes from the housing complexes that Dr. Stein has
13 identified to the Memorial Student Center on campus?
14     A. I know the campus has shuttles. I know the
15 universities has shuttles. As far as where those
16 shuttles go specifically on campus, I don't know.
17     Q. Assuming there is a shuttle that goes from
18 those residential houses to the community center, do you
19 think that that is a much -- would you agree that it is
20 much more reasonable for -- okay. Let me step back.
21         Assuming there's voting at the Memorial
22 Student Center and assuming that there are students that
23 live at these residential houses and there's a shuttle
24 that takes them from those houses to Memorial Student
25 Center, does it seem much more reasonable that they

Page 97

1 would want to vote at the Memorial Student Center than
2 have to go from wherever they live, whether it's
3 residential housing or it's the student center, and have
4 to walk, whether it's on unpaved or non-paved roads,
5 whether it's having to walk through a parking lot,
6 whether it's having to walk over or figure out a way
7 around a fence. Which one seems like a much more
8 reasonable experience that people would want to have
9 with voting?
10         MR. SEAQUIST: Form.
11     A. I guess to answer your question, I mean, it's
12 not unreasonable to want it to be as easy as humanly
13 possible.
14     Q. (BY MS. ADEN) Is it a question of easy? I
15 mean, frankly, walking through a parking lot, going
16 around a fence, if you can go around it, if you don't
17 have a wheelchair or something, to a place that may or
18 may not have sidewalk accessibility, is it even a
19 question about which one is easy as much as which one is
20 acceptable when you want to try to vote and exercise
21 your fundamental right?
22         MR. SEAQUIST: Form.
23     A. You know, I guess it depends on your
24 perspective. I mean, when you look at the vast majority
25 of voters in Waller County, most of them do not have the

25 (Pages 94 - 97)

Page 98

1  ability to walk to their poll. Whether it's with a
2  shuttle bus or it's a short walk from the MSC, most
3  other voters have to actually do more than that to get
4  to their poll. That's the majority of county.
5     Q. (BY MS. ADEN) Do most other voters in the
6  county have cars?
7        MR. SEAQUIST: Form.
8     A. I would think that the majority of people have
9  vehicles, but not everyone does.
10    Q. (BY MS. ADEN) Are you aware whether a majority
11 of Prarie View students have vehicles?
12       MR. SEAQUIST: Form.
13    A. I don't know what the percentage is of students
14 that have vehicles versus don't.
15    Q. (BY MS. ADEN) Have you sat on a commissioners
16 court meeting, and people have told you that Prairie
17 View students do not have vehicles?
18    A. I have heard some students say that some
19 students don't have vehicles.
20    Q. And your position as a county judge, what
21 public transportation does the county have?
22    A. We have the Colorado Valley Transit Authority.
23    Q. And --
24    A. That we provide funding to.
25    Q. And what areas does that serve?

Page 99

1     A. It serves the entire county. They have regular
2  routes that they -- they do where they go from
3  Brookshire to Hempstead, Prarie View, possibly Waller;
4  and they also provide shuttle service on demand. So if
5  you need to get somewhere, you can call them, and
6  they'll come and pick you up.
7     Q. So they will come to the housing facility at a
8  scheduled time. The student housing -- and take someone
9  from the student housing to anywhere they want to go?
10    A. That's my understanding.
11    Q. And is there a fee associated with this?
12    A. Not as far as the residents pay. We have funding
13 that we provide to Colorado Transit Valley for that
14 service.
15    Q. Do you know whether the Transit Valley
16 advertises to student that they have on-demand
17 transportation system that can take them anywhere,
18 anytime that they need to go?
19    A. I don't know if they advertise that or it.
20    Q. Is it realistic to assume -- Mr. Barbour
21 estimates that there are 8,000- -- 402,000 -- 8,425
22 student enrolled in 2013. Assuming 10 percent of them
23 do not have cars, and that's an assumption, do you think
24 it's fair for them to rely upon the California Valley
25 Transit Authority to get where they need to go on a

Page 100

1  daily basis?
2        MR. SEAQUIST: Objection. Form.
3     A. It's the Colorado Valley Transit Authority, not
4  California.
5     Q. (BY MS. ADEN) Colorado.
6     A. Is it fair for them to rely on that to get them
7  to where they need to go?
8     Q. Uh-huh.
9     A. I don't see where it's unfair. I mean, if they
10 wanted to make use of that, they could obviously.
11       You know, one of the things I've had
12 discussions with Dr. Simmons is making sure no matter
13 where the poll is located on campus that the students
14 have transportation and shuttles to get to that
15 location.
16    Q. Have you yourself used this system?
17    A. I've ridden on their busses before.
18    Q. So you've called them?
19    A. Well, I've never done it, not on call. I've
20 been on their busses where they've transported us from
21 point A to point B.
22    Q. So they're on-call routes. They're regular
23 routes. Do you know that those service the Prarie View
24 city?
25    A. The best of my recollection the last time they

Page 101

1  gave a presentation to commissioners court, they do have
2  a route that includes a stop in Prarie View.
3     Q. Does --
4     A. Now, where it is specifically, if it's on the
5  campus or if it's in the city of Prairie View, I don't
6  know.
7     Q. Okay. Let's quickly -- I would like to just
8  look back at this letter one time and have you read
9  Paragraph 2, "Waller County has previously..."
10    A. (As read): "Waller County has previously
11 denied polling locations on campus; however, the city of
12 Prarie View has made an effort to accommodate the
13 student body. Lastly, the county claims that the
14 Memorial Student Center is unfitting to facilitate an
15 election; however, the current location is less
16 accommodating seeing that for the national election,
17 students had to stand in a line that stretched to one of
18 the busiest roads in the area."
19    Q. Do you know what busy roads she might be
20 referring to?
21       MR. SEAQUIST: Form.
22    A. You know, I -- this is 2013. So I'm not sure
23 off-campus polling location she's referring to because
24 it seems to me at that point in time the Waller County
25 Community Center had been torn down. But if she was

26 (Pages 98 - 101)

Page 102

1  referring to the community center or St. Francis Assisi,
2  which is across F.M. 1098, that would more than likely
3  be the road she was referring to, which would be F.M.
4  1098.
5      Q. (BY MS. ADEN) Does this paragraph also suggest
6  that separate and apart from the 2016 lines that you
7  referenced earlier that students also had experience
8  with standing in lines in 2013?
9      A. That's what the letter says.
10     Q. And do you have any basis to dispute it?
11     A. No, I don't.
12     Q. Okay. The last -- the third paragraph from the
13  end that begins with the, "Prarie View A&M Student
14  Government Association...," can you also read that one?
15     A. (As read): "The Prarie View A&M Student
16  Government Association request that Waller County comply
17  with the aforementioned provisions no later than
18  October 1, 2013. This measure will allow time to ensure
19  that students are aware of the easier access for casting
20  their vote in the upcoming November election. Access is
21  a problem at present for students for the following
22  reasons: One, many students do not have access to
23  transportation; therefore, there are required to walk
24  over a mile to vote. Two, also, it has been an issue
25  for students with physical impairments to vote if they

Page 103

1  do not have transportation. Three, lastly, students
2  have been faced with extensive wait period that
3  unfortunately prevented them from voting due to time
4  conflicts with classes."
5      Q. Whether or not you agree with these assertions,
6  would you agree that the county judge, the position that
7  you hold, has been on notice about concerns about
8  Prairie View student-voter access to on-campus voting
9  since at least 2013?
10     MR. SEAQUIST: Object to the form.
11     A. I mean, based -- again, I have a letter in
12  front of me that's addressed to Glenn Beckendorff.
13  Assuming that he received it, and I would say that my
14  office would have been on notice of this 2013; but I
15  have no way of knowing whether this letter has ever been
16  received or not.
17     Q. (BY MS. ADEN) And would that also be true of
18  at least two of the sitting commissioners, assuming that
19  they received it, that they, too, would have been on
20  notice of these concerns about the need for on-campus
21  early voting?
22     MR. SEAQUIST: Object to the form.
23     A. Assuming that they received this, yes.
24     MS. ADEN: Okay. I'm going to turn to the
25  next exhibit, which is Exhibit 6, which is a report of

Page 104

1  Dr. Peniel Joseph. I'm handing that to Judge Duhon and
2  his counsel, an extra one.
3      (Exhibit 6 marked.)
4      Q. (BY MS. ADEN) This is a big report. But just
5  based upon the title of it, and I'm representing that
6  this is an expert report of Dr. Joseph that plaintiff's
7  disclosed to defendants.
8      Do you recognize this document?
9      A. I'm sure I received a copy of it. I have not
10  reviewed it.
11     Q. Would you, but notwithstanding, please turn to
12  Page 31 -- I'm sorry -- 30 of the report.
13     A. Okay.
14     Q. Okay. And can you begin by reading into the
15  record the paragraph that begins, "That same year..."?
16     A. (As read): "That same year PVAMU students
17  achieved a great victory in their long fight for voting
18  rights when the Waller County Commissioners Court
19  approved a polling site on campus at the Memorial
20  Student Center, a focal point of this lawsuit.
21  Priscilla Barber, PVAMU Student Government president,
22  expressed conflicting feelings upon hearing the news. A
23  decision, her letter, to the election commissions helped
24  to precipitate."
25     Q. Can you --

Page 105

1      A. (As read): 'I didn't know if I wanted to jump
2  up for joy or cry,' said Barber. 'This has been a long
3  journey.' One that continues until this day. Despite
4  PVAMU students representing 8300 of the county's 43,205
5  residents, the school did not achieve an on-campus
6  polling location until 2013. This victory proved
7  bittersweet. As PVAMU president George C. Wright
8  stated, 'I found it a little frustrating, though, that
9  our students have had to work so long on something like
10  this.' What Senator Leahy called the 'Prarie View AMU
11  Disenfranchisement Playbook' continues."
12     Q. Do you have any basis to refute the assertion
13  that it has taken a long time for Waller County to
14  approve a polling place on campus at Prairie View?
15     MR. SEAQUIST: Form.
16     A. I don't have anything to dispute that, no.
17     Q. (BY MS. ADEN) Do you know of any other single
18  county in Waller County -- any other single location in
19  Waller County that is home to as many voting-age
20  residents as Prarie View?
21     MR. SEAQUIST: Form.
22     A. Say your question one more time.
23     Q. (BY MS. ADEN) Do you know any other single
24  location in Waller County that is home to as many
25  voting-age residents as Prarie View?

27 (Pages 102 - 105)

Page 106

1        MR. SEAQUIST:  Form.
2        A.  Any other areas home as to voting-age residents
3  as Prarie View A&M?  I don't.  I guess, the answer to
4  that question is, I don't know if the Katy area has as
5  many voting-age residents as Prarie View A&M.  I would
6  imagine it is comparable.  Hempstead would be close.
7            Again, I don't know how the exact numbers
8  pan out.  Voting age, I mean, that would be everybody
9  above 18.  So Brookshire has a significant population.
10  Waller -- I mean, our major metropolitan areas.
11        Q.  (BY MS. ADEN)  Is all of Katy inside Waller
12  County?
13        A.  No.  Katy sits in three counties -- Harris,
14  Fort Bend, and Waller.
15        Q.  Do you disagree with the assertion by Dr.
16  Joseph that the history of voting discrimination
17  directed at Prairie View AMU students continues to the
18  present day?
19        A.  Do I disagree with that?
20        Q.  Yes.
21        A.  Yes, I would disagree with that.
22        Q.  What's your basis for disagreeing?
23        MR. SEAQUIST:  Form.
24        A.  I can tell you -- this is in 2013.  Every since
25  I became county judge, I think we have a very firm

Page 107

1  record of expanding voting rights at Prarie View A&M.
2        Q.  (BY MS. ADEN)  2What is that firm record?
3        A.  In terms of what we've done?
4        Q.  Uh-huh.
5        A.  We brought early voting to campus in 2016.
6        Q.  Has that been a steady road since it's been to
7  campus?
8        A.  Has it been a steady road?
9        Q.  Of improvement, of greater access to voting
10  since its been on campus?
11        A.  Well, it's more access to voting than was there
12  before.  So it's a step.
13            I mean, we're a small county.  We're
14  growing very fast.  We still, as any other county in our
15  position, we're always dealing with limited resources.
16  So as we grow, it will improve, but it was a significant
17  step in the right direction, and it opened it up and
18  made it more accessible to the students.
19            Because bottom line, the students have
20  every right to vote, and it is our job to make sure that
21  that's provided to them.  Just the same as every other
22  resident in Waller County.
23        Q.  Is it your position that students at Prarie
24  View are the same as every other resident in Waller
25  County?

Page 108

1        A.  Well, are you saying I should treat them
2  differently than any other resident?
3        Q.  Meaning, given what we've talked about or some
4  of the history that we've recounted.  Do they have any
5  special -- is there any special context, any special
6  experience, that they have had in this county that means
7  that decisions should be -- that should be accounted for
8  when decisions are made that impact them?
9        MR. SEAQUIST:  Form.
10        Q.  (BY MS. ADEN)  Should we forget -- I'll say
11  it -- strike it.
12            Should me not acknowledge, not consider the
13  experience that they've had voting when making decisions
14  that impact their voting rights --
15        MR. SEAQUIST:  Object to the form.
16        Q.  (BY MS. ADEN)  -- in your official capacity?
17        MR. SEAQUIST:  Same objection.
18        A.  Perceptions are everything, okay.  Feelings are
19  never wrong.  So when people perceive that they been
20  slighted in the past, I think you obviously need to take
21  that into consideration, but the law has to be followed.
22            We have 43 -- excuse me -- 53,000
23  residents, and we have to make sure every single one of
24  those residents has the ability to get to a poll and
25  cast their vote, including the students.  I don't think

Page 109

1  the students get special, preferential treatment that
2  makes them more important than other residents.  I think
3  we have to treat everybody the same and fairly and
4  equally under the law.
5        Q.  (BY MS. ADEN)  Okay.  Based upon the federal
6  court finding that we read earlier in the  Veasey case,
7  is it just experiences or beliefs or perception that
8  guides the opinions of Prarie View students about their
9  place in this community?
10        MR. SEAQUIST:  Form.
11        A.  You know, it's -- that's -- it's an interesting
12  question because -- and I'm not trying to be difficult.
13  I'm trying to -- the students at Prarie View A&M are not
14  the ones that experienced the discrimination that
15  occurred in all of these instances.  Some of them --
16        Q.  (BY MS. ADEN)  Could they be children of them?
17        MR. SEAQUIST:  Object to the form.
18        Q.  (BY MS. ADEN)  Could they be related to people?
19  Could they learn about it when they come on campus?
20        A.  They could be.
21        Q.  And you only experience discrimination
22  directly?  That's the only way that you can experience
23  discrimination in the United States?
24        MR. SEAQUIST:  Object to the form.
25        A.  I don't -- I think discrimination can probably

28 (Pages 106 - 109)

Page 110

1  be experienced in a number of different ways, not just
2  direct.
3         But I'm just saying their experiences, I
4  think your original question was about their
5  experiences.  Some of these students weren't alive when
6  some of these things happened.  Now, could they be
7  related to people and -- but, again, those accounts are
8  being passed down to them by other individuals, so
9  perceptions come into play.
10        Because I can tell you there are
11  perceptions of Waller County today, that are not
12  accurate.  This Waller County today is not the Waller
13  County that's represented in these court cases.
14     Q.  (BY MS. ADEN)  Do you think students feel that
15  way after Sandra Bland, a Prairie View alum, died in
16  custody in Waller County?
17        MR. SEAQUIST:  Object to the form.
18     A.  I think there are some Prarie View AMU students
19  that have feelings towards Waller County that are driven
20  by a number of things, the least of them that is the
21  truth or the facts.
22     Q.  (BY MS. ADEN)  Do you think the fact that they
23  -- students like them have been prosecuted by the
24  district attorney of this county in the 1990s is --
25  guides their perception about how the county feels about

Page 111

1  them?
2        MR. SEAQUIST:  Object to the form.
3     A.  It can definitely -- the fact that that
4  occurred can definitely guide a person's perception,
5  yes.
6     Q.  (BY MS. ADEN)  So according to you, but you can
7  correct me if I'm wrong, voting discrimination stopped
8  in 2013?
9        MR. SEAQUIST:  Form.
10     A.  I can -- discrimination -- okay.  Say it again.
11     Q.  (BY MS. ADEN)  Is it your position that
12  discrimination -- voting discrimination in Waller County
13  ended in 2013?
14        MR. SEAQUIST:  Object to the form.
15     A.  I can say that voter discrimination has not
16  occurred in Waller County since 2015.
17     Q.  (BY MS. ADEN)  What happened between 2013 and
18  2015?
19     A.  I became the county judge.
20     Q.  And the sole basis for your position is, you're
21  becoming the county judge?
22        MR. SEAQUIST:  Form.
23     A.  Since 2015, it has been every bit my intention
24  to make sure that students have the right to vote.  So
25  in 2016, we brought early voting to campus, and we have

Page 112

1  made every effort to make sure that they have access to
2  that poll.
3     Q.  (BY MS. ADEN)  And your main liaison to
4  students is Ms. Eason?
5     A.  That's correct.
6     Q.  Okay.  I'm going to turn to a new topic, which
7  is, well, a related topic actually.  It's the history of
8  how early voting specifically came to Prarie View, some
9  of which you have started talking about.
10     A.  Okay.
11     Q.  Would you have agree that there would have
12  demands to have early voting specifically on Prarie
13  View's campus repeatedly?
14     A.  I don't know.  That's a very broad question.  I
15  mean, that there have been demands?  I know
16  Ms. Barbour -- well, no.  She was asking for a polling
17  location.
18        So far as early voting, I don't know.  I
19  know -- I mean, I can --
20        MR. SEAQUIST:  While you're looking for
21  your next question there, can we take a break?
22        MS. ADEN:  Of course.
23     Q.  (BY MS. ADEN)  What was your answer to that
24  question "I don't know"?
25     A.  Yeah.  Repeat your question one more time.

Page 113

1     Q.  Can we agree that there have been demands to
2  have early voting on Prarie View's campus repeatedly?
3     A.  As to early voting, I'm not aware.
4        MS. ADEN:  Okay.
5        (A break was taken from 3:26 p.m. to
6        3:38 p.m.)
7     Q.  (BY MS. ADEN)  Okay.  So we were looking at the
8  Google Maps, and you pointed out that the Panther Hill
9  Apartments were closer to the community center than to
10  the student center on campus.
11     A.  Correct.
12     Q.  Similarly, you testified that you sometimes
13  vote at this courthouse, even though you are assigned to
14  Precinct 418; is that correct?
15     A.  It's correct.
16     Q.  And would it be fair that students who live in
17  Panther Hill Apartments, too, might want to vote at the
18  community center because it's where they work, where
19  they study, in the same way that you have a preference
20  for voting at at the courthouse because it is where you
21  are working and spending your time?
22        MR. SEAQUIST:  Form.
23     A.  Yeah.  I mean, it's -- that's possible.
24     Q.  (BY MS. ADEN)  And I -- just for the record, I
25  might have confused the names, and so I was talking

29 (Pages 110 - 113)

Page 114

1 about Panther Hill in relation to the community center
2 versus Panther Hill in relation to the Memorial Student
3 Center; and similarly you voting here at the courthouse
4 as compared to Precinct 418.
5     A. I mean, again, given your question, assuming
6 that they study at the Memorial Student Center or that
7 they go to the Memorial Student Center, then, yes, it
8 could be a possibility.
9     Q. Have you heard during your time on the
10 commissioners court that the Memorial Student Center is
11 the center of life for students?
12     A. I mean, it's the Memorial Student Center, so I
13 imagine it is a hub activity.
14     Q. Okay.  So you mentioned that in 2016 when
15 you -- since you've been in office, you've been an
16 advocate for Prarie View students; is that correct?
17     A. Not just the students, but for Waller County in
18 general.  All of Waller County, not just Republicans but
19 everyone.
20     Q. And when you have campaigned in your first or
21 second or, you know, second campaign, have you ever
22 stated anything publicly that says, I support the voting
23 rights of Prarie View students.  I support their right
24 to early voting.  Something along those lines?
25     A. I would imagine that it's possible that a

Page 115

1 statement like that has been made in the past.
2     Q. In a public setting?
3     A. In a public setting, I would think so.  I think
4 when we expanded the voting -- I believe when we
5 expanded the early voting to location to campus, I think
6 when we did so in commissioners court, that would have
7 been something that there could have been a statement.
8 Again, I'd have to go back to the video and look; but,
9 again, it's possible that there could have been a
10 statement made that we're committed to ensuring that
11 students are able to vote.
12          (Exhibit 7 marked.)
13     Q. (BY MS. ADEN)  So I'm going to show you what I
14 am marking as Duhon Exhibit 7, which is an email and
15 attached letter to you Judge Duhon and Dan Teed from J.
16 Gerald Herbert of the Campaign Legal Center.  This
17 letter -- could you tell me or confirm that it's dated
18 December 22, 2015?
19     A. That's what it's purports to show, yes.
20     Q. Okay.  And this letter was provided by
21 defendants during discovery and has been Bates-stamped
22 Defendants01422, and it goes through 01425.
23          Do you recognize these documents?
24     A. Okay.
25     Q. Okay.  Judge Duhon, did you receive this

Page 116

1 letter?
2     A. I don't recall specifically receiving it, but I
3 may have.
4     Q. But it's directed to you?
5     A. I'm on the "to."
6     Q. Along with Dan Teed, who was Ms. Eason's
7 predecessor?
8     A. He's not specifically listed.
9     Q. He's underneath you.  Do you see -- I'm sorry.
10 Can you turn the page over?  And there's a logo, The
11 Campaign Center letterhead.
12     A. Yes, the letter is addressed to Ms. Dan Teed,
13 but when you look at the distribution list, Dan Teed's
14 not specifically referenced.  Now, he may -- there's an
15 email here vote "@wallercounty.us."  That may have been
16 an email that would have gone to Dan Teed, but I don't
17 know for sure.
18     Q. This email was sent to your email address?
19     A. That is my email address,
20 "t.duhon@wallercounty.us."
21     Q. And does it also look like other commissioners
22 at that time, both some of whom are continuing to serve
23 on the commissioners court were also emailed this
24 letter?
25     A. Correct.

Page 117

1     Q. Okay.  Do you mind going ahead to read the
2 first paragraph of the letter on Bates-stamped 1423,
3 which begins, "We have been contacted..."?
4     A. (As read):  "We have been contacted by voters
5 in Waller County concerned about the county's recent
6 decision to reduce the number of early voting locations
7 in Waller County from eight locations, position
8 throughout the county to two locations in Precinct 1 and
9 4 only."
10     Q. You can stop there.
11          It says that there was a decision by the
12 county to reduce it.  Do you know whether there had been
13 a vote at that point on the reduction?
14     A. I can't recall if we had voted at that point or
15 not.  I know that the -- at that point in time, I do
16 recall the party chairs, which was a gentleman by -- the
17 Democratic chair was a gentleman by the name of Ben
18 Tibbs, and the Republican chair, which I think at that
19 time was probably Wallace Koenning, had come up with
20 this idea of simplifying early voting instead of having
21 it, you know, where you have different satellite
22 locations on different days and times; and they had
23 presented that.
24          But the timing -- the date of this letter
25 is odd, though, but I'm not saying that it's not

30 (Pages 114 - 117)

Page 118

1 possible.
2    Q. Could it have been --
3    A. I just don't recall.
4    Q. Could it have been for the upcoming primary?
5    A. Well, the primary would have been in March. It
6 seems odd that we would have been setting locations as
7 early as December, but that seems strange to me.
8    Q. Is there a set time when locations are set for
9 primaries generally?
10    A. Let me think for a second. Usually, it's --
11 well, it's usually two or three months prior to the
12 election. So this might have been -- that might have
13 the time period.
14    Q. Is there a general time frame by which
15 locations are set for generals?
16    A. For elections, not just general elections. But
17 for generals, I would say it's generally we usually
18 order the election and set the location anywhere from
19 two to three months prior to the election.
20    Q. And is that statutorily required?
21    A. There are deadlines that have to be met, so we
22 always make sure it's done before the deadline.
23    Q. Can you go ahead read the second paragraph,
24 "Our understanding..."?
25    A. (as read): "Our understanding is that the

Page 119

1 county conducted it's last elections using eight early
2 voting sites. Two of these early voting sites, one on
3 campus at Prarie View A&M University, a historically
4 black university, and one within the city of Prarie View
5 are located within Precinct 3, which is the only county
6 commissioner precinct where African-American voters
7 comprise a substantial majority. As a result of the
8 county's decision to reduce the number of early voting
9 locations from eight to two, there will no longer be any
10 early voting locations in Precinct 3."
11    Q. Okay. And can you go ahead and just read the last
12 -- the paragraph underneath that?
13    A. (As read): "The decision to eliminate early
14 voting locations in Prarie View and on the campus of
15 Prarie View A&M University will have an adverse impact
16 on black voters in Precinct 3. The two remaining early
17 voting location, one near the county courthouse in
18 Hempstead and one in Brookshire, are far less convenient
19 to voters in Precinct 3.
20       Requiring Precinct 3 voters to travel to
21 one of these location in order to vote early will unduly
22 burden their right to vote. Brookshire is located along
23 I-10 on the south side of the county. Approximately
24 25 miles from Prarie View, the county courthouse in
25 Hempstead is over five miles from Prarie View.

Page 120

1       It is our understanding that it is not
2 accessible via public transit. This location is
3 especially inconvenient for students on the A&M campus,
4 many of whom who lack access to transportation."
5    Q. Okay. And, finally, if you could just read
6 into the record on Page 2 of the letter, the second
7 paragraph that begins "With early voting...."
8    A. (As read): "Early voting is an important tool
9 for accessing the franchise for voters in Waller County.
10 For example, it is our understanding that approximately
11 40 percent of the county's voters cast ballots at early
12 voting locations in the November 2015 election. Members
13 of the community inform us that this is the typical in
14 Waller County. In particular, members of the community
15 have informed us that African-American voters in
16 Precinct 3 also regularly take advantage of early voting
17 opportunities."
18    Q. Okay. Just on that last paragraph alone, do
19 you have any reason to dispute that, for lack of a
20 better way of expressing it, that early voting is the
21 main time frame when people vote in Waller County?
22       MR. SEAQUIST: Object to the form.
23    A. I think that a lot of people take advantage of
24 early voting.
25    Q. And do you --

Page 121

1    A. Not just African Americans but all
2 demographics.
3    Q. And do you know whether it's fair to say that
4 Prarie View students in particular take advantage of
5 early voting at a rate that's outsized to election day
6 voting?
7       MR. SEAQUIST: Object to the form.
8    A. I don't know if the rate to which they use
9 early voting is any different than the population at
10 large. I don't know.
11    Q. (BY MS. ADEN) Have you ever looked at that?
12    A. I -- not to my recollection.
13    Q. Okay. Is the characterization of the status of
14 early voting locations accurate as according to this --
15 accurate at the time of this letter, or do you have any
16 basis to dispute their characterization of what's
17 happening to the amount of early voting?
18    A. The -- as far as they're being early-voting
19 sites around that time period, I don't have anything to
20 dispute that.
21    Q. And to dispute that it went from eight to two
22 according to a decision by the commissioners court.
23       MR. SEAQUIST: Form.
24    A. I think they're -- yeah.
25       When it was presented, again, following our

31 (Pages 118 - 121)

Page 122

1  process where the precinct chairs -- you know, this was
2  an idea by the precinct chairs, and it was voted on by
3  the commissioners court, but it was subsequently
4  rescinded.
5      Q. (BY MS. ADEN) Did you vote on it?
6      A. I'm sure -- I'm sure that I voted. Which way I
7  voted? I'm not sure. I can tell you, I wasn't a fan of
8  the plan.
9      Q. Even though you weren't a fan of the plan,
10  would it surprise you that you did vote it for it, to
11  reduce them from eight to two?
12      A. I mean, as long as the process was -- if that's
13  the process that the chairs were following, I may have
14  voted for it. But I can tell you at the time, I
15  definitely questioned it, and I wanted to make sure is
16  this what the party chairs had agreed on this and that
17  the parties had been involved in the process in terms of
18  the stakeholders.
19      Q. Is there a chair for unaffiliated voters who
20  you consult, who you rely upon?
21      A. No, there's not a chair for unaffiliated
22  voters.
23      Q. And you admit that Prairie View students -- all
24  Prarie View students are not necessarily affiliated with
25  a party chair?

Page 123

1          MR. SEAQUIST: Form.
2      A. I didn't say all. I just say some students.
3      Q. (BY MS. ADEN) So who is their representative
4  in these decision make processes?
5      A. I think in this process, it'd probably be
6  incumbent upon them to represent themselves.
7      Q. Is it Ms. Eason's responsibility?
8      A. I think it's Ms. Eason's responsibility to work
9  with the chairs to put the schedule together and to
10  allocate our resources. I'm still going to say it's
11  each individual's responsibility. If they don't
12  affiliate with a party, then they have every right to
13  make sure they participate in the process.
14      Q. And participate in the process could also mean
15  speaking their peace at a commissioners court meeting?
16      A. Absolutely.
17      Q. You earlier said that Ms. Eason, though, was
18  responsible, even though it might not be written, her
19  job requires her to have a relationship with the
20  university; is that correct?
21      A. Well, I mean, if there's going to be polling
22  location of the university early voting or voting day,
23  she has to work with university officials, so, yes.
24      Q. So in the context of this letter, though, there
25  was going to be no precinct on Prarie View's campus; is

Page 124

1  that correct?
2      A. That's correct.
3      Q. And no precinct anywhere in Prairie View under
4  this plan; is that correct?
5      A. Under that plan, yes.
6      Q. Would agree that this letter is at least
7  another occasion where someone has raised transportation
8  access as a reason for why Prarie View students need
9  on-campus voting?
10          MR. SEAQUIST: Form.
11      A. It is referenced in the letter, yes.
12      Q. (BY MS. ADEN) And is that the first letter
13  that you've seen today that has raised transportation
14  access as a reason for why people want on-campus voting?
15          MR. SEAQUIST: Form.
16      A. It's the -- it is not the only letter I've
17  seen. It is the first letter that was addressed to me.
18      Q. (BY MS. ADEN) Do you think the ability to
19  access -- well -- I'm going to show you -- we did this
20  yesterday, and, hopefully, you'll continue to work with
21  me. I'm going to show you some transcriptions of
22  commissioners courts meetings that we, the legal counsel
23  staff, has transcribed or members of our team has
24  transcribed rather than having to pull up the videos.
25          I am going to mark as Exhibit 8, Waller

Page 125

1  County Commissioners Court transcript from January 20,
2  2016 and hand that to Judge Duhon as well as Mr.
3  Seaquist?
4          MR. SEAQUIST: And, counsel, I'm just going
5  to make, for the record, an objection to these
6  unofficial transcripts that were made by your staff and
7  are not actually sworn. Just to be clear for the
8  record, the defendants are not conceding the accuracy of
9  these transcripts.
10          MS. ADEN: Okay.
11          (Exhibit 8 marked.)
12      Q. (BY MS. ADEN) So I wanted to direct your
13  attention to -- well, we are asserting that you were --
14  well, do you recall being present at the January 20,
15  2016, commissioners court meeting?
16      A. This shows that I was present. So I have had a
17  lot of commissioners court meetings. So without this
18  document, I couldn't specifically tell you, but this
19  purports to show that I was there.
20      Q. Okay. So I'm going direct your attention on
21  Page 1 to the very last section of the bottom, which is
22  a transcription of some statements by Denise Mattox at
23  the commissioner courts meeting, and I wanted you to
24  read into the record the sentence that begins, "I just
25  wanted to let you know...."

32 (Pages 122 - 125)

Page 126

1    A.   Okay.  How far?  Do you keep reading it?
2    Q.   Until the -- right here.  The last word,
3  "transportation."
4    A.   Okay.
5       (As read):  "I just wanted to let you know
6  that I have thought about this, and it is really" -- "it
7  really is the correct thing to do because what you have
8  is essentially a rural county, and you have a really
9  condensed population.  The most condensed population
10  that's in this rural area.  They define the word
11  'insular.'  They are isolated.  Everything has to be
12  brought to them -- their laundry, their entertainment.
13  We really don't have anything in way of public
14  transportation."
15    Q.   Okay.  Can I have you skip over to Page 2 and
16  read into the record, the sentence being with "so," and
17  ending with "meals."  It's the second sentence to the
18  right, "so..."
19    A.   Okay.  All the way down to meals?
20    Q.   Yes, please.  Sorry.
21    A.   (As read):  "So we have to bring everything to
22  them.  So that's why I'm saying the voting needs to be
23  on campus, not near campus, and also you're looking at
24  the population in Texas with the least amount of
25  finances and a lot of them do not have cars.  I mean, if

Page 127

1  you just say a mile away, you know, it's just three
2  quarters of a mile away.  It's a very long way when you
3  don't have a car and you're on a limited time frame and
4  you get started early and things like that.  So that's
5  why I'm saying there are a lot of reasons, not just
6  because it's the right thing to do, but because it's the
7  logical thing to do to put the voting on campus.
8       And also the place where they usually have
9  it is in the Memorial Student Center, the MSC.  So we
10  would like to, I think it would be better since it's
11  where they have to get their meals.  They buy their meal
12  packets at the beginning of the year.  So they all go
13  there.  That's a very convenient place to put the voting
14  because they have to go there for their meals."
15    Q.   Okay.  Having been present at that meeting, do
16  you have any recollection of disputing on the record
17  anything that Ms. Mattox testified to or stated just
18  then?
19    A.   No.  I don't recall disputing anything she
20  said, but you have to keep in mind she made that during
21  public comment.
22    Q.   And what does that mean?
23    A.   When you have public comment and they are there
24  and they are making statements things that aren't on the
25  agenda, all we can do is listen to the comments.  We

Page 128

1  can't respond to them.
2    Q.   Okay.
3    A.   So if I had had any reason to dispute, I would
4  not have been able to do so under this format.
5    Q.   And that's always been true for the public
6  comment section for the time you've been on the
7  commission?
8    A.   That's correct.
9    Q.   Would you admit, then, that based upon this
10  transcript and our representation that it transcribes
11  the proceedings, that you were on notice for -- on
12  another occasion that transportation access was a reason
13  why people were advocating for on-campus voting?
14       MR. SEAQUIST:  Object to the form.
15    A.   I would knowledge that was Ms. Mattox's
16  statement.
17    Q.   (BY MS. ADEN)  So I want to ask you a question
18  about whether -- do you think that the ability to
19  access -- I'm going to do -- okay.
20       I'm going to show you another
21  transcription, marking it as Exhibit 9 of our staff's
22  meeting records from the county commissioners court from
23  January 27, 2016.
24       MR. SEAQUIST:  Counsel, I assume they are
25  going to be a few of these?  Can you just grant me --

Page 129

1  have a running objection necessarily --
2       MS. ADEN:  Absolutely.
3       MR. SEAQUIST:  -- in the deposition --
4       MS. ADEN:  I understand.
5       MR. SEAQUIST:  -- but just understand that
6  my previous objection applies to all unofficial
7  transcripts.
8       MS. ADEN:  I understand.
9       MR. SEAQUIST:  Thank you.
10       (Exhibit 9 marked.)
11    Q.   (BY MS. ADEN)  Okay.  I would like to direct
12  your attention to Page 3.  Towards the bottom around the
13  ten-minute mark, there is some statements by Mr. David
14  Allen.
15    A.   Uh-huh.
16    Q.   Would this be the mayor of Prarie View?
17    A.   He's now the mayor, yes.
18    Q.   Now, the mayor.  At the time he was not mayor?
19    A.   I don't recall if he was mayor at that point in
20  time or not.
21    Q.   Okay.
22    A.   I don't know exactly when he was elected.
23    Q.   Do you mind looking at this sentence -- one,
24  two, three, four, five, six.  It's the seventh sentence
25  on the bottom.  It begins with "most students."

33 (Pages 126 - 129)

Page 130

1 A. Okay.

2 Q. And reading that sentence out loud. Just that

3 one sentence.

4 A. Okay.

5 (As read): "Most students do not have

6 cars. So that's why the MSC and the campus voting is so

7 important."

8 Q. So do you mind skipping down -- skipping over

9 the next sentence -- well -- strike that.

10 Based upon this representation of what

11 Mr. Allen said at the 2016 meeting -- well, let me step

12 back.

13 Were you -- according to this transcript,

14 were you present at this meeting on January 27, 2016?

15 A. According to the transcript, I was present,

16 yes.

17 Q. Would you agree this was another occasion where

18 a totally different person that we have been talking

19 about from, Mr. Allen, has raised transportation access

20 as a reason why on-campus student voting is important?

21 A. I would acknowledge that he is making that

22 statement, yes.

23 Q. There's a sentence towards the end, the third

24 sentence from the bottom that says, "They're" -- sorry

25 -- strike that.

Page 131

1 There's a sentence third from the bottom

2 that begins, (as read): "Prarie View A&M University has

3 a budget of just over 500 million. They're the largest

4 employer in this county."

5 Do you have any reason to dispute

6 Mr. Allen's representation of the university's being the

7 largest employer in the county?

8 A. I don't.

9 Q. Okay. Can I show you what I am going to mark

10 as Exhibit 10, Duhon Exhibit 10. This is a documents

11 called Appendices -- okay. Well, it's frankly a very

12 long document, so I've only printed the first 40 page of

13 a document that I'm marking as Exhibit 10, the

14 Appendices for the Waller County Comprehensive Strategic

15 Plan, prepared for Waller County, Texas, and I'm handing

16 that to Judge Duhon and counsel.

17 Okay. And I would love to have you flip

18 through it, which you're doing. Again, it's only --

19 it's a very long -- it's like a 200-page document, so I

20 only printed out the 40 pages that are relevant to the

21 questions I'm going to ask you.

22 (Exhibit 10 marked.)

23 A. This is a strategic plan that we put together

24 in conjunction with College of Agriculture and Human

25 Sciences at Prarie View A&M.

Page 132

1 Q. (BY MS. ADEN) And you referenced this earlier,

2 I believe?

3 A. Uh-huh.

4 Q. Okay. So you're familiar with this?

5 A. Uh-huh.

6 Q. Okay. Can you turn to the executive summary on

7 Page 3? It's actually the actual document Page 3, not

8 the number of pages in.

9 A. Okay.

10 Q. Okay. Do you mind looking at the sentence

11 that -- the first sentence of the third paragraph and

12 reading aloud what it says beginning with "roughly..."?

13 A. The first sentence?

14 Q. Yes.

15 A. (As read): "Roughly 19 percent of people in

16 Waller County are living under poverty."

17 Q. Can you keep going?

18 A. (As read): "Of those in poverty, the city of

19 Prairie View has the most due to the student population

20 of PVAMU."

21 Q. That's all I wanted you to read from that page.

22 Do you have any basis to dispute that that

23 reality continues to exist?

24 MR. SEAQUIST: Form.

25 A. I don't have any information to me today that

Page 133

1 disputes that.

2 Q. (BY MS. ADEN) Did any information today that

3 disputes that number of Waller County people who are

4 living impoverished, the most the student population of

5 Prarie View has changed in any significant way? Gone

6 up? Gone down?

7 A. I would say generally student population of

8 Prarie View A&M has gone up.

9 Q. Do you think that -- well, what's the date of

10 this report?

11 A. I mean, generally, it was rolled out in 2017,

12 July.

13 Q. Okay. So you would concede that these are

14 pretty recent numbers?

15 A. Yeah, within the last two years.

16 Q. Okay. Do you --

17 A. A little over.

18 Q. -- mind turning to Page 14 of this report?

19 A. Okay.

20 Q. And going back to something that, I think, we

21 were talking about earlier, do you mind reading the

22 sentence that begins -- it's the second full -- third

23 full sentence, "Waller County also has a large

24 population..."?

25 A. You said also. I don't see also there.

34 (Pages 130 - 133)

Page 134

```
1    Q.  Sorry.
2    A.  "Waller County has the largest population"?
3    Q.  Hold on.  Sorry.  One second.  Oh --
4    A.  I see --
5    Q.  The second sentence --
6    A.  I see --
7    Q.  The second sentence, "Waller County."
8    A.  Second sentence.
9    Q.  Yes, second sentence.
10   A.  Or third sentence, I should say, correct?
11   Q.  Can you read the second sentence, "Waller
12  County has the largest population..."?
13   A.  Okay.  (As read):  "Waller County has the
14  largest population of recent high school graduates, 20
15  to 24 year olds, compared to surrounding counties likely
16  due to the presence of PVAMU."
17   Q.  Okay.  Do you have any reason to dispute the
18  voracity of that assertion?
19   A.  No.  Not all.
20   Q.  Okay.  Do you know who this plan was shared
21  with?  Like did all the county commissioners get it?  Do
22  you know who got it?
23   A.  It was put on our website.  It was published on
24  the economic development partnership website.  It was
25  approved in commissioners court and was available to
```

Page 135

```
1  anyone and everyone.
2    Q.  Okay.  So that means it's fair to say that in
3  the Waller County community, people have access to data
4  that makes clear that a substantial percentage of the
5  impoverished population in Waller County student voters
6  at Prairie View?
7    A.  That they have access to it, yes.
8        (Exhibit 11 marked.)
9    Q.  (BY MS. ADEN)  Okay.  I'm going to mark as
10  Exhibit 11, a letter from January 21, 2016, that is from
11  Jacolahn Dudley, president of the Student Government
12  Association; Marcus Washington, vice president of
13  Student Government Association; Maduforo Eze, the vice
14  president governmental relations, Student Government
15  Association.  It's directed to elected officials,
16  community leaders, university administration, and
17  concerned citizens.  The subject is Early voting on the
18  campus of Prarie View A&M University.
19        If you flip it over, because I was reading
20  on the backside, there is an email that seems to attach
21  to this letter from January 22, 2016.  It has been
22  Bates-stamped Defendants001475 to 1476.  Sorry.  That
23  was a terrible read-in.
24        Judge, would you acknowledge -- would you
25  agree that on the 1745 page in the list of emails is
```

Page 136

```
1  sent to, one of them was yours?
2    A.  Yes.
3    Q.  Does it also appear that over members of the
4  commissioners court at that time some of whom currently
5  continued to serve were also copied on this letter?
6    A.  Yes.
7    Q.  Okay.  Turning to the backside of it -- well,
8  are you familiar with this document?
9    A.  Vaguely, yes.
10   Q.  Are you familiar with the subject matter of it?
11       MR. SEAQUIST:  Form.
12   A.  Yes.
13   Q.  (BY MS. ADEN)  Okay.  Can you -- for the
14  record, go ahead and read this sentence from the top.
15  "This letter comes to you on behalf of...."
16   A.  (As read):  "This letter comes to you on behalf
17  of the concerned student body of Prairie View A&M
18  University.  On January 20, 2016, Waller County
19  Commissioners Court decided to table the approval or
20  disapproval of having two days of early voting on our
21  campus on Tuesday, February 23rd, and Wednesday,
22  February 24th, from 12:00 to 8:00 p.m.  The main reasons
23  being that they believe that, one, the Memorial Student
24  Center isn't suitable for disable individuals to enter
25  even if the voting is held on the first floor.  Two,
```

Page 137

```
1  they aren't assured that parking will be available to
2  voters on this day.  Three, they think individuals will
3  continue to campaign in the voting areas, which is a
4  violation; and, four, they also believe that the area
5  will be too chaotic to have voting in this even though
6  voting has been held here numerous times before and has
7  never experienced an uncontrolled environment."
8    Q.  Okay.  Can you just ahead and read the second
9  paragraph?
10   A.  (As read):  "We, as students and registered
11  voters, find the Memorial Student Center to very
12  accessible.  Though, if not accessible to some, an
13  alternate location has been put in position for those
14  individuals.  The St. Francis Episcopal Church in Prarie
15  View, that will be open an additional two days, which
16  will accessible to any other community voters.  This
17  topic at the commissioners court meeting called a
18  lengthy debate, which led this piece of the agenda to be
19  tabled."
20   Q.  And as a general matter, what is the request of
21  the students per this letter?
22       MR. SEAQUIST:  Form.
23   A.  It look likes they were requesting -- it looks
24  like they asks us to make sure they get early voting
25  back on campus and in the Memorial Student Center.
```

35 (Pages 134 - 137)

Page 138

1    Q. (BY MS. ADEN)  Okay.  Do you know whether with
2  respect to this decision making around the -- in 2016 or
3  any other, there was a -- any formal analysis conducted
4  of the reasons for or against having on-campus student
5  voting?
6    A.  For or against?  You know, I never -- my
7  recollection, it was never an issue of whether or not to
8  have on campus voting.  It was specifically where was it
9  going to be conducted and making sure it was done.
10      You have to remember early voting is open
11  to everyone, including members of the community in
12  Prarie View.  So the concern was always making sure that
13  is was a location, not only convenient to the students,
14  but convenient to the members of the community.  So, to
15  me, that's what the debate was always about, finding a
16  suitable location that everyone could access.
17    Q.  So according to this letter -- well, do you
18  have any basis to question the accuracy of the statement
19  of Prairie View students that students and registered
20  voters find the Memorial Center {sic} to be very
21  accessible?
22      MR. SEAQUIST:  Form.
23    A.  Students and what?
24    Q. (BY MS. ADEN)  Do you have any basis to dispute
25  the accuracy of the statement that Prarie View students

Page 139

1  and registered voters find the Memorial Student Center
2  to be very accessible?
3      MR. SEAQUIST:  Form.
4    A.  I mean, I guess I would have to disagree with
5  that to some extent.
6      Because registered voters, if you're
7  talking about members of the community, we've had
8  concerns from members of the community that the MSC is
9  not convenient for them to vote.
10    Q. (BY MS. ADEN)  So is it a question -- is this
11  prior to 2017?  2019?  Is it a question of either MSC or
12  no place in Prarie View, or is it -- there an
13  opportunity for both places in Prarie View or more than
14  one place in Prarie View?
15    A.  Again, within the context of the resources that
16  we have.  So that's why sometimes we try to have it on
17  campus and then other day says we try to have it at the
18  community center.  So it's just trying to make sure we
19  accommodate everyone.  We want to accommodate students,
20  but we also want to make sure we don't disregard our
21  elderly folks and/or handicapped individuals who live in
22  the community in Prarie View that also have to be able
23  access those polls.
24    Q.  Now, you said you've gone to the campus many
25  times; is that correct?

Page 140

1    A.  Correct.
2    Q.  Have you had any problems accessing the campus?
3    A.  I have not had problems accessing the campus,
4  but I'm a very healthy male adult.  I don't have
5  mobility problems.
6    Q.  Do you know whether the Memorial Student Center
7  is ADA compliant?
8    A.  I have no doubt that it is ADA compliant.  That
9  does not mean it's easy, but it's probably --
10    Q.  Then what makes it uneasy then?
11    A.  Well, if you look at it -- if you pull up to
12  the Memorial Student Center parking lot and you look at
13  the building, the building is elevated.  It's kind of
14  sitting on a hill.
15      So just to get to a first floor, there's a
16  number of ramps that have to be negotiated.  Now, those
17  ramps, I'm sure probably meet ADA requirements, but I
18  can still see the perspective from an elderly person
19  with a walker.  It's a lot of steps that have to be
20  taken in order to get into MSC.  So I can appreciate
21  that.
22    Q.  Do you think people have problems accessing
23  this county courthouse?
24    A.  Oh, yes.  I think people absolutely have
25  problems with this courthouse.  It was built in the 50s

Page 141

1  when ADA requirements were probably not even much of a
2  consideration.
3    Q.  And do you continue to have voting
4  opportunities here?
5    A.  We do have voting now.  Yes, we have a poll
6  here, yes.
7    Q.  The people that you've talked to -- so you said
8  you haven't had concerns.  You're able body to get on
9  campus.  The people who are elderly or have had
10  otherwise had problems getting on campus, have they
11  documented their complaints to you in writing?
12    A.  I don't believe that I've ever received any
13  written complaints.  I think most the complaints have
14  probably come through -- come to the elections office.
15  I would imagine most of those were phone calls.  If
16  there was any documentation, then that would be
17  something that Christie Eason would have.  I don't think
18  I ever received, to my recollection, a written complaint
19  regarding the MSC.
20    Q.  Have you ever committed to writing any verbal
21  complaints that you have received about accessing the
22  student center?
23    A.  I have I ever committed to writing verbal
24  complaints?
25    Q.  (Moving head up and down.)

36 (Pages 138 - 141)

1    A. No, I have not.

2    Q. Have you been aware of people showing up to

3 commissioner court meetings and questioning the

4 accessibility of the Memorial Student Center?

5    A. Not specifically.

6    Q. Have you at the same time today, just based

7 upon what we've talked about, heard testimony from

8 several meetings people indicating that the Memorial

9 Student Center is accessible to voters, registered

10 voters in this county who happen to be Prarie View

11 students?

12       MR. SEAQUIST: Form.

13    A. Yeah, I've heard people say that the MSC is

14 accessible to students, yes.

15    Q. (BY MS. ADEN) Only students?

16    A. Well, I mean, you have, like, this document, or

17 you have people that -- like, for example, student

18 citizens and the like, but I can't say that these

19 individuals that signed this document speak for the

20 people that live in Prarie View.

21    Q. Okay. Thank you.

22       So I'm going to show you -- it's late.

23 Sorry, guys. I know everybody's tired.

24       Okay. I'm going to mark as Exhibit 12.

25    A. By the way, the lights will shut off on 5:00.

1 Just so you know.

2    Q. Really?

3    A. Just kidding.

4    Q. So I would love to get through today so we

5 don't have to come back.

6    A. No, I understand.

7    Q. I'm marking as Exhibit 12, an email and

8 attached document from -- sorry, sorry -- from

9 January 26, 2016. It has been Bates-stamped defendants,

10 1481 to 1486. It lists as a subject in the email, Three

11 locations possibilities.

12       Do you want take a minute to look at it?

13       (Exhibit 12 marked.)

14    A. No. I'm good.

15    Q. (BY MS. ADEN) Do you acknowledge, Judge, that

16 in the email that it identifies you as one of the

17 recipients of this email?

18    A. Yes.

19    Q. Okay. And it is from Dan Teed, the former

20 elections administrator?

21    A. Correct.

22    Q. Do you mind reading -- are you familiar with

23 this document?

24    A. Yes.

25    Q. So you do remember receiving it?

1    A. Yeah. I believe I did receive this back in

2 January of '16.

3    Q. Okay. Why does this stand out as something

4 that you remember receiving it?

5    A. Well, in looking at it, I mean, Dan -- this is

6 something that I can imagine that Dan would have done.

7    Q. For the record, can you turn to what has been

8 marked -- turn to 1481, the first page, and read aloud

9 the text of the cover beginning with, "Commissioner

10 Barnett...."

11    A. (As read): "Commissioner Barnett, here is the

12 attachment referenced in the earlier email regarding

13 on-campus locations. I have provided an analysis from

14 the elections office regarding each location. I was not

15 aware of the Hobart building being an option, so that

16 one is not sufficiently researched at this point. I

17 should be able to provide more information by the end of

18 today. Dan Teed, Waller county elections

19 administrator."

20    Q. What's your understanding of the subject matter

21 of this document?

22    A. Well, again, I believe there was some concern

23 when we were looking at the early-voting location on

24 campus, and there being some concern whether it was an

25 ideal location, not just for students, but for members

1 of the public. I think it was tabled with the

2 understanding that Mr. Teed would conduct some

3 additional research into the issue, and this is probably

4 the result of that research.

5    Q. And what's the general time frame of this

6 again?

7    A. It's dated January 26, 2016.

8    Q. Okay. And then can you -- turn to 1482, the

9 second page, and read into the record the sentence that

10 begins with, "The student." It's on the top -- at the

11 top above the chart.

12    A. (As read): "The student center auditorium is

13 the first preference of the university and the senior

14 adults poll from the Prairie View area."

15    Q. And is that a reference to the Memorial Student

16 Center?

17    A. I would assume so, yes.

18    Q. Okay. Looking at this chart, does it look like

19 Mr. Teed -- is it your understanding that Mr. Teed did a

20 survey of someone or some groups of people in order to

21 arrive at the conclusion in this chart?

22    A. That's what it appears to be from what he's

23 stating.

24    Q. Would you agree that he looks like he looked at

25 several things like parking availability, access to

37 (Pages 142 - 145)

Page 146

1 handicapped spot, accessibility to students,
2 accessibility or -- sorry -- distance to walk for
3 elderly, handicapped people, whether campaigning would
4 be a cause of concern in this space.
5         Had he look at several factors?
6 A. Yes.
7 Q. Okay. And does it say on the third column to
8 the right, the third row -- one, two, three -- the
9 fourth row down, does it indicate how many students used
10 the MSC? Third column, fourth row down.
11 A. What page?
12 Q. 1482.
13 A. Third column, fourth row down.
14 Q. Would you have any reason to dispute here that
15 it reflects the thousands --
16 A. I'm sorry.
17 Q. -- thousand of students use MSC, at least
18 according to what he's reporting?
19 A. No, I don't dispute that.
20 Q. Does it reflect that -- well, I'll point to
21 some things.
22         Do you have any reason to dispute that it
23 reflects that there are seating for voters who may be
24 waiting?
25 A. I don't dispute that.

Page 147

1 Q. That it is considered accessible to students?
2 A. No. Don't dispute that.
3 Q. That the building is ADA compliant?
4 A. Okay. Yes.
5 Q. That there may be some distance to walk for the
6 elderly, handicap, which is what I think you were
7 referencing earlier?
8 A. That's correct.
9 Q. And does he reach the conclusion, though, in
10 the next column to the right that the distance is not
11 too bad?
12 A. That's his conclusion.
13 Q. And then above it, he does acknowledge also
14 curbside voting could be available?
15 A. He acknowledges that, yes.
16 Q. Okay. Does he acknowledge that campaigning,
17 you know, is an issue. But to the next paragraph to the
18 right, this is an issue all over the country with
19 student, with courthouses, with places -- similar places
20 where people may conduct voting?
21 A. That's his conclusion, yes.
22 Q. Okay. And on the second page, 1483, does it
23 reflect his conclusion that this location, the MSC --
24 the student auditorium would be ideal for student
25 voting, and it is okay for the Prairie View community.

Page 148

1         Does that seem accurate?
2 A. Yes. But okay community for the Prairie View,
3 if early voting is also open at St. Francis.
4 Q. Meaning another location off campus?
5 A. Right.
6 Q. That people may be able to access?
7 A. As long as reserved parking, security, and
8 assistance is provided.
9 Q. So at least as of this time and maybe going
10 forward, on-campus early voting is an option so long as
11 there's another option outside of campus?
12 A. Right. And I think that's -- yes.
13 Q. Is it your position that if there is no other
14 option outside of on-campus voting that -- strike that.
15         I'm going to move on and come back to that.
16         Okay. Are you aware -- I'm going to go
17 through some community events that have taken place on
18 Prarie View's campus. I just want to get a sense of
19 whether or not you've been to them or have any reason to
20 dispute that they've taken place there?
21 A. Okay.
22 Q. Were you aware that there was an event on
23 resilience at the student center on September 27th, that
24 was free and open to the public?
25 A. An event on resilience?

Page 149

1 Q. Yeah.
2 A. On September 27th of...
3 Q. This year.
4 A. I'm not aware of that.
5 Q. Okay. Are you aware that Navy Visibility Day
6 was held at the student center on April 9, 2019, that
7 was open to the public?
8 A. Not aware of that.
9 Q. And you didn't attend, I take it?
10 A. No.
11 Q. Are you aware that the student center hosted an
12 annual minister's conference that, hosted every year in
13 February annually, that draws ministers of all
14 denominations from across the state of Texas.
15         Are you aware of that?
16 A. It seems like somebody had mentioned a
17 minister's conference to me or something of that nature,
18 but I don't remember any specifics.
19 Q. And are you aware that there is a summer
20 concert series open to the public that is held on
21 Prairie View's campus every July and August?
22 A. Yes.
23 Q. Have you ever attended it?
24 A. I have not attended it.
25 Q. Okay. Have you attended any social events on

38 (Pages 146 - 149)

Page 150

1  Prarie View's campus?
2      A.  Yes.
3      Q.  Football games?
4      A.  Yes.
5      Q.  What other types of social events?
6      A.  Let's see.  I have attended -- let's see --
7  football games.  I have been to a variety of functions.
8          Dr. Wright had a function.  I remember
9  there was a function in the auditorium one time.  Like I
10 said, we've had EDP meetings on campus.
11         I've had a number of meetings with you,
12 know, administrators for different -- all the different
13 activities I related earlier.  There've been openings,
14 grand openings, ribbon cuttings for various buildings.
15 I was on campus for Dr. Simmons' invocation.  I was on
16 stage for that.
17     Q.  For events specifically held at the student
18 center, have you been to those social event, big events,
19 public events at the student center?
20     A.  Yes.
21         I remember attending a musical.  Can't tell
22 you what the musical was.  I remember it was really
23 good.  We were really impressed with the quality of the
24 performance.  It was very impressive.
25     Q.  Were --

Page 151

1      A.  And I believe that was at the Moore Dance
2  Center.
3      Q.  Hundreds of people attended?
4      A.  I would think, yeah, there was hundreds of
5  people there.
6      Q.  Okay.  I am going to move on and have you look
7  at Exhibit 13, which is an email chain Bates-stamped
8  Defendants 1355 to 1360.  It is an email dated -- well,
9  an email chain with various dates in 2017.
10         Do you want to take a minute the skim
11 through this?
12         (Exhibit 13 marked.)
13     A.  Yeah.  Let me look through it.  Okay.
14     Q.  Okay.  Looking at Page 1355, which is the cover
15 email of the email chain, the first email identified
16 from 10/3/2017, do you acknowledge that it was emailed
17 to you at your county address?
18     A.  Yes.
19     Q.  And does it also appear that other
20 commissioners, some of whom continue to serve are also
21 copied on that email?
22     A.  Correct.
23     Q.  And is this email from Rosa Harris, the
24 Democratic party chair?
25     A.  It purports to be that, yes.

Page 152

1      Q.  Okay.  I want to have you read into the record
2  the email language beginning with, "Not good enough,
3  Christie," on 1355.
4      A.  (As read):  "Not good enough, Christie.  The
5  citizens of Prairie View have transportation.  More
6  students don't.  Walking from one end of the campus to
7  the other is time consuming, plus signing in and voting.
8  We've already done this battle to death, and, frankly,
9  I'm tired of it.  The students fought and won this
10 battle.
11         The 309 poll is the largest poll in Waller
12 County.  How can you not justify not having an
13 early-voting poll in the MSC?  Things have changed,
14 Christie, and we are not going to back to those days,
15 not without a fight.
16         Adding the jail bond and having voter
17 drives at PVAMU, then telling the students no poll in
18 the MSC is so wrong on so many levels.  We need a poll
19 in Fields Store, Katy, and MSC.
20         I may have been given the wrong
21 information, but I was told Katy ISD has a school
22 election at the same time.  Are you handling that?  If
23 so, more reason to have a Katy poll.  Thank you."
24     Q.  Stopping there, would you agree that in October
25 2017, it was dispute about where to place the polling

Page 153

1  precinct -- the polling place for Precinct 309 -- for
2  Precinct 309?
3          MR. SEAQUIST:  Form.
4      A.  I mean, Rosa Harris had an issue with the
5  early-voting locations, I believe.
6      Q.  (BY MS. ADEN)  Okay.  And, once again, do you
7  acknowledge that this is another person, someone we
8  actually haven't heard from, yet, who is raising
9  transportation as a reason why there's a need for
10 on-campus student voting?
11     A.  I would acknowledge that she references that,
12 yes.
13     Q.  Okay.  Do you have, again, any reason to
14 dispute her belief that most students don't have
15 transportation?
16         MR. SEAQUIST:  Object to the form.
17     A.  I don't agree with the statement that most
18 students don't have transportation.
19     Q.  (BY MS. ADEN)  Based on what?
20     A.  I mean, when I -- I'll just -- when somebody
21 uses the word "most," that implies to me more than
22 50 percent.  Being that a lot of students commute to
23 Prarie View A&m, I would think that more than 51 percent
24 of students probably have cars, but it's just
25 subjective.  It's my opinion.

39 (Pages 150 - 153)

Page 154

1    Q. So it's not based upon any data?
2    A. No. I've never seen any data one way or the
3  other.
4    Q. Do you any reason to dispute that there are
5  individual plaintiffs that brought this case who do not
6  have their own vehicles?
7    A. I don't have any information to dispute that.
8    Q. Okay. Have you -- given the fact that you've
9  heard that there's a lack of transportation or -- given
10  that there has been allegations contingent where
11  transportation is an issue for student voters, has the
12  commissioners court ever gone about doing an analysis of
13  whether that is, in fact, a problem?
14    A. Not to my recollection.
15    Q. Even though you acknowledge that the county has
16  done a comprehensive strategic plan that has looked at
17  the needs, the demographics and other things related to
18  the population in Waller County?
19    A. Correct.
20    Q. Okay. Okay. Actually, I wanted to turn your
21  attention to the last page, Defendant's 1360. Can you
22  read the last sentence of the first paragraph on that
23  page?
24    A. (As read): "You add a hot issue, such as a
25  bond for a new jail to the ballot, and voters takes a

Page 155

1  new interest. It involves our tax money and personal
2  freedom."
3    Q. And then that -- the next two sentence.
4    A. (As read): "The last thing we would want the
5  voters to feel is we are obstructing and denying them
6  the right to vote by making them travel miles to vote
7  early. Past elections have shown a large number of
8  voters prefer to vote early."
9    Q. So just from that statement, do you think --
10  any reason to dispute that a large number of voters in
11  Waller County prefer to vote early?
12    A. Again, she's making that statement. I do think
13  a lot of people do vote early.
14    Q. Do you have access --
15    A. I cannot tell you what most voters prefer. I
16  prefer voting early.
17    Q. Do you have access to data about the rates of
18  early voting as compared to election day voting in
19  Waller County?
20    A. Yes.
21    Q. Can you just -- you had a chance to skim
22  through this email chain and you looked through this
23  last page. What's happening here? Like what's the
24  issue?
25    MR. SEAQUIST: Form.

Page 156

1    A. Again, I believe what was going on at this time
2  is you had an election. It was an off-year election.
3  So generally you had constitutional amendments. We did
4  have a referendum for a justice center.
5    And I think generally, obviously, in
6  non-off-years, I would call them, in other words,
7  election years that don't involve general elections.
8  The turnout is typically much, much lower. So we,
9  again, have to allocate our resources to make sure we
10  have, you know, that we put polls according to where
11  people are -- you know, where people vote.
12    And because of the low turnout, we
13  typically go with a smaller number of early-voting
14  locations because you have to staff them. And a lot of
15  times, you don't want to end up with a early-voting
16  location every year, have the expense and staff and then
17  nobody shows up and uses that location.
18    Q. (BY MS. ADEN) And was Ms. Harris raising that
19  there was a reason why, even though this is an off-year
20  election, there might be interest by Prarie View
21  students in this election?
22    A. Yes, she raises that issue, yes.
23    Q. What's the reason why she thought that there
24  might be interest in this election by Prarie View
25  students?

Page 157

1    MR. SEAQUIST: Object to the form.
2    Q. (BY MS. ADEN) On that page you just read,
3  there's something about a bond for a new jail.
4    A. Right.
5    (As read): "You add a hot someone, such as
6  a bond for a new jail to the ballot, and voters take a
7  personal interest."
8    I can't sit here and tell you whether or
9  not that applies to the students or not. I mean, I
10  think for a bond issue, it definitely gets the interest
11  of most of the property tax property owners because they
12  pay property taxes. I don't necessarily know if it
13  would be of interest to students or not.
14    Q. Okay. I'm going to show you another
15  transcript.
16    MS. ADEN: I understand the continuing
17  objection.
18    MR. SEAQUIST: Thank you, counsel.
19    (Exhibit 14 marked.)
20    Q. (BY MS. ADEN) It's being marked as Exhibit 14,
21  Waller County Commissioners Court transcript. I just
22  did that by accident, and counsel -- copy to counsel.
23    This is commissioner court transcripts that
24  our staff prepared from October 11, 2017. It's somewhat
25  long. So I wanted to direct your attention to Page 4

40 (Pages 154 - 157)

Page 158

1 and then on Page 5, if I may, and have you read into
2 "because," which is towards the end of that page,
3 through "jail issue," and note that this is a statement
4 being made by Dr. Denise Mattox -- not Ms.- -- by
5 Dr. Mattox, as reflected on Page 3, and she has a long
6 statement.  And so, on Page 4, with the sentence
7 "because," do you mind reading that?
8    A.  How far do you want me to go?
9    Q.  To the word "jail issue," which is here.
10   A.  Okay.
11       (As read):  "Because what we did, when we
12 first set up the early voting was we didn't realize that
13 people" -- "we didn't realize.  We forgot that the jail
14 issue was going to be on there, and that specifically
15 effects the students at Prarie View A&M University
16 because of the way we incarcerate people in the United
17 States.
18       Because I can tell you having walked every
19 inch of the jail yesterday, most of those people were
20 nonwhite, especially nonwhite black, and the highest
21 density of the nonwhite black population in Waller
22 County is at Prarie View A&M University.  So they need"
23 -- "they really need to have access to the poll so they
24 can vote on the jail issue."
25   Q.  And that's okay.  Right there.

Page 159

1    A.  Okay.  There you go.
2    Q.  What's your understanding about what Ms. Mattox
3 is trying to communicate?  Well, frankly, going back --
4 I'm sorry.  I have to make this clear.  On first page
5 one, does it reflect our understanding that you were
6 present at this meeting?
7    A.  That's what it purports to reflect.
8    Q.  Do you remember this meeting?
9    A.  Again, in a very vague context.  It's one of
10 hundreds of meetings that I've been at.
11   Q.  Okay.  And what's your sense of what Ms. Mattox
12 is trying to communicate to you and other commissioners
13 here?
14       MR. SEAQUIST:  Form.
15   A.  Well, she's trying to make the statement that
16 because most of the people incarcerated in the jail are
17 black that Prarie View A&M students would have an
18 interest in the jail bond issue because she was, in
19 fact, was an advocate against the jail bond.
20   Q.  (BY MS. ADEN)  Was this jail bond issue -- did
21 it come up around the time when the death of Sandra
22 Bland was still being talked about publicly?
23   A.  I mean, it was -- the jail bond started long
24 before Sandra Bland.  We've needed a jail for quite some
25 time.

Page 160

1    Q.  In your position as doing the county judge and
2 doing the magistrate roles, do you have a sense of the
3 demographics of the incarcerated population here in the
4 county?
5    A.  I have a sense, yes.
6    Q.  What is your sense?
7    A.  We -- I think that if you look at our county
8 jail, I think it roughly reflects the demographics in
9 the county.
10   Q.  But you said earlier, you thought it was
11 slightly majority minority?
12   A.  Correct.
13   Q.  Do you believe --
14   A.  There's a large number of blacks incarcerated,
15 a large number of Hispanics, and then whites behind
16 that.
17   Q.  Why do you think that it is?
18       MR. SEAQUIST:  Form.
19   A.  Because it -- I think -- because it reflects
20 the -- that's the people -- the demographic of the
21 county.
22   Q.  (BY MS. ADEN)  So everywhere across the -- so
23 the demographics of an incarcerated population should
24 reflect proportionally the demographics of a
25 jurisdiction?

Page 161

1       MR. SEAQUIST:  Form.
2    A.  I didn't say it either should or shouldn't.  I
3 just think Waller County is roughly approximate, but
4 that's just a subjective opinion.
5    Q.  (BY MS. ADEN)  Okay.  And do you have any
6 reason or do you have any belief, any understanding, any
7 opinion, about why Ms. Mattox thinks that Prairie View
8 students would care about the jail bond issue and want
9 to vote on it?
10       MR. SEAQUIST:  Form.
11   A.  Can you repeat the question.
12   Q.  (BY MS. ADEN)  Do you have any understanding or
13 opinion of why Ms. Mattox things Prarie View students
14 would want to vote on this jail bond issue?
15       MR. SEAQUIST:  Object to the form.
16   A.  I think it's very clear from what's she's
17 stating as to the reasons why, but I can't speak for
18 her.
19   Q.  (BY MS. ADEN)  Turning to the next page,
20 Page 5, there is a sentence also by Dr. Mattox that
21 begins, "the only thing."  Can you read that sentence
22 through the end of "Memorial Student Center"?
23   A.  Okay.
24       (As read):  "The only thing that is really
25 going to bring people out is going to be that jail

41 (Pages 158 - 161)

Page 162

1  issue, and it's really going to bring young, nonwhite
2  people out because they are the most mistreated by the
3  way we incarcerate in the United States.  I urge you to
4  make sure we put early voting back in the Memorial
5  Student Center."
6       Q.  Do you know whether Sandra Bland was an
7  employee of Prarie View University?
8       A.  My understanding that -- my understanding of
9  one of the reasons that she had returned to Prarie View
10  is that she had a temporary position --
11      Q.  Okay.
12      A.  -- at the university.
13      Q.  And, also, do you have any opinion about
14  whether black students might have -- want to have a
15  say-so, a vote, in issues involving jails because of the
16  way that criminal justice may or may not impact their
17  lives?
18           MR. SEAQUIST:  Object to the form.
19      A.  You're going to have to repeat the question.
20      Q.  (BY MS. ADEN)  Do you think Prarie View
21  students, who are -- attend a historically black
22  university, who are -- it's a majority black school --
23  may care, want to vote on a bond issue because they have
24  an opinion about how the criminal justice system
25  functions?

Page 163

1           MR. SEAQUIST:  Object to the form.
2       A.  I mean, I would guess somebody could want to
3  vote because they have an opinion, yes.
4       Q.  (BY MS. ADEN)  Okay.  And is voting a way to
5  express your opinions about how issues that impact your
6  life?
7       A.  Yes.
8       Q.  Okay.  Let me find it.  So in the way that
9  Ms. Mattox or others are expressing of you about who
10  makes up the criminal justice system, just going back to
11  this county in this courthouse, do the -- does the
12  employee population of this courthouse roughly reflect
13  the demographics of this county?
14      A.  I don't know the answer to that question.
15      Q.  Do you have confidence that it does?
16           MR. SEAQUIST:  Form.
17      A.  I don't know.
18      Q.  (BY MS. ADEN)  Okay.
19           MS. ADEN:  I feel like if you give me no
20  more than the next hour, we can get through the rest of
21  this.
22           MR. SEAQUIST:  Granted.
23      Q.  (BY MS. ADEN)  So I'm going to turn to the
24  topic, which is understanding more about the process
25  that led to the setting of locations and hours and dates

Page 164

1  for the 2018 general election.
2       A.  Okay.
3       Q.  And I do understand that the legal landscape
4  may have changed this year.  So I'm only talking about
5  the process that was in place before this year and
6  specifically HB 1888.
7       A.  Okay.
8       Q.  And you started -- I think you've given me some
9  indication of how this works before.  But just for
10  clarity, what is the general process for allocating
11  hours and days of early-voting locations in Waller
12  County?
13      A.  So Christie Eason, our election administrator,
14  or whoever the election administrator is, puts together
15  a schedule of locations and hours, and then she does
16  that in conjunction with the party chairman.  And once
17  everybody can agree, then those locations and times are
18  then submitted to commissioners of court for approval.
19  Those items are then posted for a public meeting and
20  noticed.
21           And then after, we then have a public
22  meeting, in which anybody can come and give comment, and
23  then we vote to either approve or disapprove or whatever
24  the case may be those voting locations and times.
25      Q.  So is your understanding of the process that

Page 165

1  locations, dates, and times are all considered together?
2       A.  Not always.  I think there's been times where
3  we've looked at locations, but we still weren't -- the
4  times weren't finalized yet because she's still waiting
5  to hear back from the different entities.
6           You have to understand, we don't have own
7  the Memorial Student Center.  We don't own a lot of the
8  locations where some of the poll are located in -- in
9  Waller ISD, Igloo.  So a lot of times she has to
10  coordinate with those entities.  So sometimes she may
11  say, we may have a preliminary.  I know there's been
12  once or twice where we looked at the preliminary
13  locations, and then time -- you know, the following week
14  we would then have the time, and typically it would all
15  be approved together.
16      Q.  And your understanding of the process is that
17  she comes up with her proposal, is talking to the party
18  chairs.  Once everyone is on board, it comes to you all.
19  You publicize it, and then you vote on it?  You
20  publicize it.  People have an opportunity to weigh in,
21  and then you approve it?
22      A.  Sure.  Correct.
23      Q.  Okay.  Given the timing of when all of this
24  happened, you said two to three months before the
25  election, does the timing of when all of this is taking

42 (Pages 162 - 165)

Page 166

1  place, does it lend itself to making sure that all
2  members of the community including Prarie View students
3  have the opportunity to participate in these public
4  discussions?
5           MR. SEAQUIST:  Object to the form.
6      A.  Sure.  Yes.
7      Q.  (BY MS. ADEN)  Okay.  Regardless of the time of
8  the year?
9           MR. SEAQUIST:  Form.
10     A.  Yes.
11     Q.  (BY MS. ADEN)  Okay.  And, again, because
12  Ms. Eason is working with the party chairs, you
13  acknowledge there's already a gap in the ability of
14  someone who's unaffiliated to have necessarily a
15  representative consult with Ms. Eason to come up with
16  these recommendations?
17     A.  Again, I think what my testimony was is that,
18  although they may not feel they're represented by the
19  party chairs, they have every ability to be a part of
20  the process and to come to the process and the
21  locations.  So even if they may not be -- they can be
22  independent, but they can still participate.
23     Q.  But that's only after the plan has been
24  designed with Ms. Eason and the two party chairs?
25           MR. SEAQUIST:  Form.

Page 167

1      Q.  (BY MS. ADEN)  They're the step after all
2  that's been done?  Is there a way before then for the
3  public to be involved in that process?
4      A.  I think, if anybody wanted to communicate or
5  work with Christie or elections administrator, I don't
6  see any reason why an elections administrator would not
7  take in whatever comments or concerns they have into
8  consideration in the process when she's working on them.
9      Q.  But the onus is on them to come to her to say,
10  I want to be part of the process?
11     A.  Sure.
12     Q.  The commissioners court doesn't take the
13  position that there's any obligation of them to come and
14  get outreach from particular segments of the community
15  as part of that process initially?
16     A.  No.  I don't believe -- again, as far as our
17  process is concerned, I think I've outlined the basic
18  process.  Now, whether or not Christie engages with any
19  other groups outside of that, you would have to ask
20  Christie Eason.
21           But as far as the county engaging, no.  We
22  do not go out to every specific individual group or
23  organization.  I think it would be very difficult to do
24  that for every election.
25     Q.  But she seeks out the opinion of the party

Page 168

1  chairs?
2      A.  They're a part of the process, yes.
3      Q.  Is that an official government -- is the
4  Republican chair an official member of the Waller County
5  government?
6      A.  Is the -- say again.  Which chair?
7      Q.  The Republican.
8      A.  The Republican chair a member of Waller County,
9  no.
10     Q.  The Democratic chair --
11     A.  No.
12     Q.  -- an official member of the government?
13     A.  No.
14           But you have to remember, like, for
15  example, the primaries, those belong to the parties.
16     Q.  The non-primaries?  That general that just
17  happened in 2018 --
18     A.  Right.
19     Q.  -- are they officially a part of the government
20  during that general elections?
21     A.  Are they officially part of the government?
22  No.
23     Q.  But there are two entities that Ms. Eason
24  affirmatively reaches out to?
25     A.  That's correct.

Page 169

1      Q.  And there's no one else that she affirmatively
2  reaches out to that you're aware of?
3           MR. SEAQUIST:  Form.
4      A.  That I'm aware of, but you'd have to ask
5  Ms. Eason.
6      Q.  (BY MS. ADEN)  Okay.  Do you think that's
7  reasonable given all of the testimony that you have
8  heard in your position as county judge since you've been
9  in office?  Do you think its reasonable -- strike that.
10          Do you think it's reasonable to only rely
11  upon the party chairs to do affirmative outreach, given
12  all the testimony that has been presented to
13  commissioners court about the need for students and
14  others to have a voice in the process?
15           MR. SEAQUIST:  Object to the form.
16     A.  Now, we're talking in regards to 2018, correct?
17     Q.  (BY MS. ADEN)  Uh-huh.
18     A.  I think -- based on the way Christie Eason has
19  gone about doing this process, I think all of the
20  information that you've referenced is all taken into
21  consideration when makes those decisions.
22     Q.  Okay.
23     A.  In addition to working with the party chairs.
24  It's not done in a vacuum.  So the fact that there's
25  been these calls for early voting, that's reflected in

43 (Pages 166 - 169)

Page 170

1  the fact that we had an early-voting schedule putting
2  early voting on campus.
3       But we also -- we always have to balance it
4  with the other needs in Precinct 3, not only the city of
5  Prarie View but Monaville.  We're always trying to make
6  sure we give everybody equal access.
7       Q.  How many people live in Monaville?
8       A.  As far as the actual -- Monaville isn't even an
9  incorporated city.  So as far as Monaville is concerned,
10  probably a few hundred.  But then if you start, kind of
11  getting, drawing demographic circles, there's quite a
12  few people that live in that area.  I don't know the
13  specific number.
14      Q.  What are the racial demographics of Monaville?
15      A.  I don't know specifically.
16      Q.  What are the age demographics of Monaville?
17      A.  I don't know specifically.
18      Q.  Is there a university of black student voters
19  in Monaville?
20      A.  No.
21      Q.  You mentioned that early voting is run by the
22  county in non-county places in other parts of the
23  county?
24      A.  And just so you're -- just so we're clear,
25  Monaville is where the other poll is located.  But

Page 171

1  Precinct 3 is a large precinct geographically.  So when
2  you refer to Monaville, it's not just about that area.
3  That's about all the other voters in Precinct 3 that
4  don't necessarily use Prarie View or the MSC as their
5  poll.  Monaville is the one location they can go to use
6  as their poll if they're going to vote.  Again, early
7  voting, you can go to any poll anywhere in county.
8       Q.  Do a lot of people come to Memorial Student
9  Center to do early voting?
10      MR. SEAQUIST:  Form.
11      A.  I think a lot of people do go to the Memorial
12  Student Center, yes.
13      Q.  (BY MS. ADEN)  And have you done an analysis of
14  the use of early voting at all the places where the
15  county has offered it?
16      A.  Okay.
17      Q.  An official analysis?
18      MR. SEAQUIST:  Form.
19      A.  I have done an analysis prior to becoming
20  county judge on voter turnouts in certain precincts, but
21  it was mostly in Precinct 2.
22      Q.  (BY MS. ADEN)  Why Precinct 2?
23      A.  Because there an election prior to my election
24  in which the commissioners race in Precinct 2, I thought
25  it was -- they had a huge turnout on election day, and I

Page 172

1  thought that was very odd.  The numbers didn't make
2  sense to me.  My background is economics.  So I actually
3  went and did a breakdown of early voting versus day- --
4  voting day in Precinct 2, and it was just an analysis I
5  did myself.
6       Q.  And most of the voting was done in during early
7  voting in Precinct 2?  That's was what you would have
8  expected?
9       A.  What it was really odd is that on election day,
10  there was enormous turnout on election day in Precinct 2
11  and it was far -- there were certain polls where the
12  turnout much higher statistically than the ratios seen
13  in other subprecincts than Precinct 2, which indicated
14  to me that something else was going on that was getting
15  people to the polls.
16      Q.  Okay.  But since you've been county judge, no
17  --
18      A.  No.
19      Q.  -- official --
20      A.  No --
21      Q.  -- of the use of early voting --
22      MR. SEAQUIST:  Go ahead.
23      THE CERTIFIED STENOGRAPHER:  Yes.
24      Q.  (BY MS. ADEN)  -- the use of early voting in
25  different precincts throughout the county?

Page 173

1       MR. SEAQUIST:  Object to the form.
2       A.  No.
3       Q.  (BY MS. ADEN)  Okay.
4       A.  No.
5       Q.  Okay.
6       Do you know what happened in the process
7  that you understand to take place when party chairs
8  disagree with the proposal?  Who wins out?
9       A.  No, I don't.
10      Q.  Do you know if there -- sorry.
11      A.  I would think that any discord or conflict
12  would be worked out prior to that schedule being
13  presented to us.  Because one of the most important
14  things to me when I approve that schedule, is that party
15  chairs have come to an agreement, and they've engaged
16  with their stakeholders.
17      Q.  Do you do -- require that the party chairs
18  represent to Ms. Eason or represent to the commissioners
19  court that they have consulted with their constituents?
20      A.  Yes.
21      Q.  And who are the constituents -- who is the
22  representative that serves the Prarie View constituents?
23      MR. SEAQUIST:  Form.
24      A.  Well, for Prarie View, I would think that given
25  the numbers I've seen, maybe a large percentage of them

44 (Pages 170 - 173)

Page 174

1  are Democrat, and then some percentage less than that is
2  Republican.  So both the Democratic and Republican
3  chair.
4       Q.  (BY MS. ADEN)  Do you know whether the
5  Republican chair has done and conducted any outreach at
6  any point in time to the student voters there about
7  where they want to vote?
8       A.  I know there's been outreach.  As far as
9  specifics, I don't know what David Luther has done.  But
10  I know -- I believe there's been outreach on campus, but
11  I don't know anything specifically.
12       Q.  So it's -- okay.
13            Okay.  Can you walk me now that you tell me
14  generally what the process is, specifically how the
15  process -- what the process was for the ordering and
16  setting of the schedule of the general elections in
17  2018?
18            MR. SEAQUIST:  Form.
19       A.  Best of my recollection, it would have been
20  late August, maybe very early September that we would
21  have taken up the issue.  This would -- so up to this
22  point, Christie would have worked with the chairman,
23  come up with a schedule, present it to the court, and we
24  would have then had a notice meeting, and voted to adopt
25  the schedule.

Page 175

1            I seem to recall specifically that there
2  was one early meeting.  Again, it's going to be
3  August/September time frame.  I'm not 100 percent sure
4  exact dates, where we had the meeting, but we didn't
5  have the times yet; and I think there might have been a
6  concern expressed by Denise Mattox about that, if I
7  recall correctly.  And then at the next meeting, we had
8  the times.  This is all publicly noticed meeting, and we
9  voted to approve, and there was no public comment at
10  all.
11       Q.  (BY MS. ADEN)  If this -- just going back to
12  late August/early September, do you have any sense of
13  how many weeks into the school year that would be for
14  Prarie View students?
15       A.  I would imagine they typically start up around
16  that time, August/September, but I don't know
17  specifically --
18       Q.  And for first --
19       A.  -- in '18.
20       Q.  Sorry.
21            For first- or second- year students, how do
22  they know this process is happening in August and
23  September, that you're setting the schedule around this
24  time?  How do they know this is happening?
25       A.  They go to our website and look at our calendar

Page 176

1  and see the public notices and the materials that have
2  been posted.
3       Q.  But nothing -- the county doesn't do
4  affirmatively to let them know, hey, we're setting
5  schedules.  We know you've guys have had issues with
6  early voting in the past.  You may want to be a part of
7  the process.
8            That's not happening?
9            MR. SEAQUIST:  Form.
10       A.  No.
11            (Exhibit 15 marked.)
12       Q.  (BY MS. ADEN)  I'm going to share with you a
13  document marked Exhibit 15, which is the expert report
14  of Dr. Henry Flores which plaintiffs disclosed to
15  defendants.
16            Do you recognize this report?
17       A.  Again, I think I'm sure I received a copy of
18  it, but I not reviewed it.
19       Q.  Okay.  Having not reviewed it, I'm going to
20  direct you to some specific pages of the document.  The
21  first is Page 14 of the document, and I would love for
22  you to read the paragraph beginning with "specifically"
23  into the record out loud.
24       A.  That whole paragraph?
25       Q.  Yes, please.

Page 177

1       A.  (As read):  "Specifically on August 22nd, 2018,
2  the four members in attendance at a regularly scheduled
3  meeting attendance of the five-member Waller County
4  Commissioners Court unanimously approved only the
5  early-voting location for the November 2018 general
6  election.  During the public comment portion of the
7  August 22nd meeting, a member of the public, Dr. Denise
8  Mattox, informed the commissioners that she had reviewed
9  proposed list of locations to be approved at the meeting
10  and noted with the concern, it doesn't have the
11  early-voting times.  She further stated, I guess you'll
12  do that at a later and, hopefully, I can have some input
13  into that; however, she said, because the commissioners
14  have not yet publicized or discussed the proposed hours
15  and dates of early voting, there was at that time not
16  enough information to have input about the early voting,
17  which is what she was most concerned about."
18       Q.  Okay.  Do you mind going ahead and reading just
19  the next two paragraphs into the record?
20       A.  (As read):  "Precinct 4 Commissioner Justin
21  Beckendorff stated, on this, it says 7:00 a.m. to 7:00
22  p.m., but County Judge Carbett Duhon corrected him,
23  explaining that these times referred only to the voting
24  hours on election day.  It doesn't have the early-voting
25  times, Judge Duhon stated.  Judge Duhon then confirmed

45 (Pages 174 - 177)

Page 178

1  the commissioners were just voting on locations
2  according to the agenda item.
3      Ms. Christie Eason, Waller   County's
4  election administrator, was not in attendance; however,
5  County Judge Duhon read into the record an email from
6  Ms. Eason stating that 'early-voting dates and times in
7  each early-voting polling location will be set after our
8  training on the new equipment.' Judge Duhon then
9  recounted a subsequent telephone conversation he claimed
10  to have had with Ms. Eason in which he had asked
11  Ms. Eason, 'If the party chairs, if everybody was on the
12  same page and agreement with the schedule, and she said
13  they were.'
14      Prior to the vote, Commissioner Beckendorff
15  confirmed, 'Right now, we're just voting on the
16  locations, and the times, I guess, will be discussed at
17  a later date.'"
18      Q.  Okay.  Do you have any basis to dispute this
19  recitation of what happened on October {sic} 22nd by
20  Dr. Flores?
21      MR. SEAQUIST:  Object to form.
22      A.  No.
23      Q.  (BY MS. ADEN)  And is this describing generally
24  the process that you sometimes happens where locations
25  are set first and then later dates and times are

Page 179

1  determined?
2      A.  Correct.
3      Q.  Okay.  Is this also -- can you explain what you
4  meant when you asked Ms. Eason if the party chairs were
5  "on the same page and in agreement with the schedule"?
6      A.  What's your question again?
7      Q.  Basically, what did you mean by that if that
8  was an accurate reflection of what you said to her?
9      A.  Just as you've outlined in these issues, we've
10  had -- it seems to become a regular occurrence now.
11  When we go to approve locations, then somebody comes up
12  after the fact with an issue or objection to those
13  locations.  We've tried to always adhere to the process.
14  It seems like there are -- continues to be a breakdown.
15  So, again, I was trying to emphasize is everybody on the
16  same page.
17      Q.  If there continues to be a breakdown, how do
18  you think you would go about fixing it, the process?
19      A.  Replace the Democratic chair perhaps.
20      Q.  And it's only the Democratic chair who's
21  responsible?
22      A.  It seems to be a part of the problem sometimes
23  that she agrees, and then she changes her mind later.
24      Q.  Even if she is replaced, isn't the segment of
25  people that say neither of these people represent me?

Page 180

1      A.  Like I said earlier, there's always going to be
2  some people that probably don't feel they're represented
3  by either party chair, but they have just as much access
4  to the process to participate in the process as anyone
5  else in the county.  So regardless, they should
6  participate if they feel that strongly about it.
7      (Exhibit 16 marked.)
8      Q.  (BY MS. ADEN)  Okay.  I'm going to mark as
9  Exhibit 16 and share with you the 2018 general election,
10  November 6, 2018.
11      A.  Are we done with this report?
12      Q.  For -- we're going to go back to it, so you
13  mind as well keep it close.  It's a document that
14  defendant provided, 000131.  It's a one pager.
15      Does this look familiar to you?
16      A.  Yes.
17      Q.  Okay.  And does this reflect the polling places
18  that have been agreed to at this time August 22nd,
19  meeting?
20      A.  Yes.
21      Q.  Okay.  And what were the approved early-voting
22  locations in Prarie View?
23      A.  PVAMU Memorial Student Center and the Waller
24  County Community Center in Prarie View.
25      Q.  Okay.  Is this also the case that the Prarie

Page 181

1  View City Hall was another location?
2      A.  That was added later.
3      Q.  Okay.
4      A.  The City Hall -- let me look on here real
5  quick.  City Hall is listed on here as an election-day
6  poll.  But in terms of early voting, that was added
7  after the lawsuit was filed.
8      Q.  And the two -- but the two set at as of the
9  August 22nd date were the student center and the
10  community center?
11      A.  Correct.
12      Q.  Okay.  Did -- at this -- we just read that
13  Ms. Mattox wanted to publicize the proposed voting dates
14  and times before they were finalize so she could have
15  some input.
16      Did the county ultimately end up doing
17  that?
18      MR. SEAQUIST:  Form.
19      A.  Yes.
20      Q.  (BY MS. ADEN)  Okay.  Do you know when they
21  ended up doing that?
22      A.  It would have been noticed prior to the meeting
23  like we do on every other meeting.  So our meetings
24  generally get noticed on -- by the Friday prior to the
25  meeting, and the information in the documents would have

46 (Pages 178 - 181)

Page 182

1 been posted on our website at that time.
2     Q. Okay. Can I show you what I am marking as
3 Exhibit 18?
4         THE CERTIFIED STENOGRAPHER: Is that 17 or
5 18?
6     MS. ADEN: Thank you.
7     MR. SEAQUIST: That would be 17.
8     THE WITNESS: This is 16.
9     MS. ADEN: Are you sure? Because what was
10 on Flores' report?
11     MR. SEAQUIST: It should be 16.
12     MS. ADEN: Okay. Thank you.
13         (Exhibit 17 marked.)
14     Q. (BY MS. ADEN) I am giving you Defendant Judge
15 Trey Duhon's First Set of Objections to Plaintiffs'
16 First Set of Interrogatories.
17         Okay. I would like you focus on Page 5,
18 and read out loud into the record the seven-numbered
19 sentences that are supposed to be the following factors
20 are considered in the proposal of early-voting positions
21 and hours.
22     A. Starting with number one?
23     Q. Yes, please.
24     A. (As read): "One, the population of registered
25 voters in the polling precinct, including the number of

Page 183

1 those voters whose registration is in "suspension."
2 Two, historical turnout in the Precinct 3, how heavily
3 contested the election is as demonstrated by how many
4 opposed races are on the ballot. Four, number and
5 availability of poll workers. Five, time required to
6 train workers. Six, number of controller and voting
7 units, their distribution across polling locations, and
8 their distribution between early voting and election-day
9 voting. Seven, accessibility, ease of use, parking, and
10 security for various locations. There's a preference
11 for county-owned and/or controlled locations because the
12 county is able to control access and security to the
13 building.
14         Locations that are not county owned
15 frequently present issues because the county has to rely
16 on a third party to let election workers into the
17 polling location and to lock up after voting."
18     Q. Okay. Who originally -- you've listed these as
19 factors that are considered in the proposal of
20 early-voting locations and hours.
21         Did you come up with these?
22     A. This was done in conjunction with our attorneys
23 and with Christie Eason.
24     Q. So these were not written in a policy that you
25 took from prior to having to respond to these

Page 184

1 interrogatories?
2     A. Not that I'm aware of. As far as a written
3 policy, no.
4     Q. So who else has access to these factors besides
5 you and Ms. Eason?
6         MR. SEAQUIST: Form.
7     A. I don't know.
8     Q. (BY MS. ADEN) Do other commissioners have
9 access to these factors?
10     A. Yes.
11     Q. How?
12     A. Well, I mean, they're listed in the lawsuit and
13 response to interrogatories. So I would imagine any of
14 the commissioners want access or want to review this,
15 they would be able to do that.
16     Q. So did you give these to them? Have you
17 provided them to them?
18     A. Not to my knowledge. I have not personally,
19 no.
20     Q. And were these available to other commissioners
21 in 2018 during the general election?
22     A. I don't know. I mean, these are all the
23 factors that generally go into the process, and I think
24 we're all -- I mean, reading these, although they're not
25 in the policy, I think everybody would agree, even my

Page 185

1 commissioners, that these are the issues and items that
2 we look at for all of our polling locations.
3     Q. Are these available to the public?
4         MR. SEAQUIST: Form.
5     A. I don't know.
6     Q. (BY MS. ADEN) Are these available to Prarie
7 View students?
8         MR. SEAQUIST: Form.
9     A. You know, that's a -- I don't know the answer
10 to the question. I mean, the question -- you know, is
11 it possible that Ms. Eason has had presentations or
12 discussions with students where she's talked about how
13 these things go into the process, that's possible, but
14 you would have to ask Ms. Eason. I have not provided
15 these items to any Prarie View students.
16     Q. (BY MS. ADEN) Are these factors based upon
17 some analysis that you or Ms. Eason or someone else has
18 done?
19     A. No. Not anything that I've done. You'd have
20 to ask Ms. Eason as far as her perspective.
21     Q. Are these factors based upon an analysis of
22 best practices in Texas?
23         MR. SEAQUIST: Form.
24     A. I don't know.
25     Q. (BY MS. ADEN) Are these best practices -- are

47 (Pages 182 - 185)

1  these factors -- are these factors based upon an
2  analysis of how to set early-voting proposals in
3  communities comparable to Waller County?
4        MR. SEAQUIST:  Form.
5     A.  Again, I don't know.  I would rely on Christie
6  Eason for that, for best practices.
7     Q.  (BY MS. ADEN)  Were these factors discussed at
8  any of commissioners courts meetings when the 2018
9  election schedule was set?
10       MR. SEAQUIST:  Form.
11    A.  I'm sure in one way or another, there's
12 different things in here that were probably discussed
13 during our process -- their locations, the distribution,
14 the use of controlling, you know, the units,
15 accessibility, county owned, versus -- yes, I would
16 think all of those could have been topics that were
17 discussed at that point in time.
18    Q.  (BY MS. ADEN)  But this document and this
19 articulation in writing of these factors was not
20 available to the public prior to when it was disclosed
21 to plaintiffs on June 10th of 2019?
22    A.  I don't know.  I have not provided this list to
23 anyone else outside.  I can't speak for Christie Eason.
24    Q.  Can you affirm whether or not these same
25 factors have been used in other elections prior to the

1  fall of 2018 election cycle?
2     A.  I would say, yes.  These are all the factors
3  we've always considered.
4     Q.  Whose responsibility is it to apply these
5  factors?
6     A.  Christie Eason with our oversight.  The final
7  approval is up to us, but Christie Eason is the one that
8  performs the analysis in determining the schedule and
9  working in conjunction with the party chairs.
10    Q.  Can you give to me or explain to me if these
11 factors were in some way or another considered in
12 setting the 2018 general election schedule?  Can you
13 explain to me how factor one, the population of
14 registered voters in the polling precinct, including the
15 number of those voters whose registration is in
16 "suspension"?  Can you tell me how this factor was
17 considered in setting this schedule?
18    A.  Sure.
19       Well, the schedule itself, it went into our
20 decision.  Definitely number one played a part in our
21 decision to double the number of machines.  To, in
22 effect, to have two polls on the campus.  So in that
23 way, even though the schedule was one poll, we had
24 double number of machine there, and that was due to the
25 number of registered voters that were campus.

1     Q.  Because it's high?
2     A.  Because it's high.  We don't want anybody to
3  wait.
4     Q.  Are you aware that the Precinct 309 has the
5  largest number of registered voters -- had the largest
6  number of registered voters in Waller County in 2018?
7        MR. SEAQUIST:  Form.
8     A.  The largest number of registered voters.  Was I
9  aware of that?  No.
10    Q.  (BY MS. ADEN)  I appreciate that you worked to
11 provide more machines to the Precinct 309 in light of
12 the population of registered voters and their use of
13 early voting.  Connect for me how that consideration was
14 not applied and -- connect -- well, explain to me why,
15 in addition to providing more precincts, another
16 consideration wasn't increasing the number of
17 early-voting days at the Memorial Student Center.
18       MR. SEAQUIST:  Object to the form.
19    A.  Because Precinct 3, unlike all of our other
20 precincts, has some very unique qualities to it.
21 Precinct 1 and 2 and 4, you have Hempstead.  You have
22 Waller.  You have Brookshire, and then you have -- you
23 might have a satellite location in an outlying area to
24 serve the remainder of that precinct.  Precinct 1, you
25 have just courthouse.

1        When it comes to allocating our resources
2  in Precinct 3, we have a different dynamic entirely.
3  You have the university.  You have the city of Prarie
4  View, and then you have the rest of the precinct, which
5  includes the Monaville poll.
6        So in looking at all the numbers, we want
7  to make sure we distribute the machines in a way that
8  gives everyone within that precinct equal access to the
9  poll, to vote --
10    Q.  But --
11    A.  -- both on campus and off campus for the folks
12 in Prarie View and then also for the folks that live in
13 the outlying area of Monaville or Precinct 3 in the
14 rural areas.
15    Q.  But you -- in the 2018 election, are you saying
16 that machines were equally applied to the polling
17 places?
18    A.  No.  I'm saying that with the machines we have,
19 we're trying to make sure we put them -- we're having to
20 distribute them in a different way than we can
21 distribute them in the different precincts because you
22 have different dynamics at work.  You have the campus
23 and the city of Prarie View and then you have Monaville.
24       So we're still trying to make sure
25 everybody has access.  And if you look at the meetings,

48 (Pages 186 - 189)

Page 190

1  it's all a matter of trying to allocate those resources
2  to the best of our ability. So it's not just -- it's
3  making people have access. It's not always making sure
4  the days are completely equal. Because you might have a
5  certain number of days in Precinct 1, but it's not
6  apples to apple because Precinct 1 you only have one
7  location period. You don't have a satellite location.
8  So it's just in Precinct 3, we're trying to do the best
9  we can with the numbers with that.
10         You know, as we go forward and we add
11  equipment and we add manpower and stuff, then certainly
12  the number of days could conceivably be increased.
13     Q. My understanding is that -- from Ms. Eason's
14  testimony yesterday and you can correct me if I'm wrong,
15  keeping a machine at one place is ideal because -- and
16  you have to keep a machine -- the same machine at early
17  voting, then can't keep it on election day?
18     A. Correct.
19     Q. And so keeping where it is makes sense.
20         Could you foresee providing less machines
21  at Prarie View, but then keeping fewer ones and adding
22  more days on campus? Is that another alternative to
23  just stacking more machines over the course of more
24  finite amount of days?
25         MR. SEAQUIST: Object to the form.

Page 191

1     A. I mean, conceivably you could use less
2  machines, and, then, therefore, have more days; but I
3  want to make sure that when people are voting. You
4  know, long lines -- I think as you pointed out somewhere
5  in this material, long lines can be a deterrent. And
6  our goal, especially from '16 and '17 coming into the
7  general election, was we wanted to reduce the wait for
8  students on campus.
9     Q. (BY MS. ADEN) In part, because they're
10  experiencing increased lines because of an addressing
11  issue that hasn't been resolved?
12         MR. SEAQUIST: Form.
13     A. Correct. But that was -- it was resolved.
14  That was taken care of prior to the general election in
15  '18.
16     Q. (BY MS. ADEN) It was resolved as a temporary
17  fix, but it's going to keep coming up for voters who
18  continued to be assigned in the same way that has been
19  fixed; is that right?
20     A. Well, I don't know. If I'm sure Ms. Eason
21  would be a better person to ask than I would. But my
22  understanding is, you know, now, that people can be
23  correctly instructed on exactly how to do their voter
24  registration with their physical location and using a
25  good mailing address, it should not be an issue -- as

Page 192

1  much as an issue going forward. Now, if somebody still
2  uses the university address, I suppose that could be a
3  problem. I -- again, Ms. Eason would be the best person
4  to ask.
5         But, thankfully, the Secretary of State --
6  we worked with the Secretary of State in '18 to achieve
7  a resolution, again, following their instructions for
8  people that showed up in 309 or 310 regardless were
9  allowed to vote and were not sent to the other location.
10  Hopefully, as we educate folks and do the voter
11  registration drives, this will not be as much of a
12  problem in future elections. If we go to vote centers,
13  it totally takes that out of play completely because
14  precincts won't matter at all.
15     Q. Addressing the addressing issue, though, that
16  was not without a demand to address it, right? Students
17  making an issue about it as well?
18         MR. SEAQUIST: Form.
19     A. No. You know what? I believe that the problem
20  that the students saw from the students' perspective is
21  that they had long lines. I don't think the students
22  specifically, as a group, said, hey, this is a problem.
23  I think that problem was really discovered by Ms. Eason,
24  and she proactively, with my knowledge, started working
25  with university officials very early. I'm talking right

Page 193

1  after the primary in 2018, working with university
2  officials to address this issue all the way up until the
3  general election.
4     Q. (BY MS. ADEN) Okay. I'm going to show you
5  what I'm marking as the Waller Commissioner Court
6  transcript from October 17, 2018. This is our staff's
7  transcription of the October 17th, 2018, meeting.
8         MS. ADEN: I understand the continuing
9  objection.
10         MR. SEAQUIST: Thank you, counsel.
11         (Exhibit 18 marked.)
12     Q. (BY MS. ADEN) This is a long document. So I'm
13  going to direct you to very specific things and try to
14  move this along.
15         If you could just turn to Page 3 of the
16  transcript --
17     A. Okay.
18     Q. -- there are some -- it says that you spoke
19  around the 47-minute mark, 48-minute mark. Could you go
20  ahead and read the sentence that begins with "we
21  approved" all the way through "at all." It's the second
22  second.
23     A. Okay.
24         (As read):  "We approved the early-voting
25  scheduled back on September 22nd. We actually approved

49 (Pages 190 - 193)

Page 194

1 locations prior to that. Then we approved the actual
2 schedule to be posted. When we approved the locations
3 the first time, the only individual that spoke at that
4 time was Dr. Mattox, who said, we didn't have the times
5 at that point, okay.
6 Then when we went September 22nd, this
7 court approved the schedule. And at that time, we had
8 the locations, the times. There was no discussion.
9 There was nobody that showed up. Nobody gave any
10 comment at all."
11 Q. Okay. Do you recall making this statement?
12 A. Yes.
13 Q. Does it accurately describe the process?
14 A. Yes.
15 MR. SEAQUIST: Form.
16 Q. (BY MS. ADEN) Are you aware that
17 September 22nd is a Saturday?
18 A. Oh, then no. I mean, actually, yes. I think
19 counsel pointed that out. So that was definitely
20 misspoke. I misspoke when I said September 22nd because
21 we don't meet on Saturdays.
22 Q. So it's possible -- I mean, I think that you
23 were referring to August 22nd --
24 A. That's possible.
25 Q. -- because there are meeting minutes from that

Page 195

1 date where the locations were set that we've looked at?
2 A. That's correct.
3 Q. Okay. So just explain to me -- on August 22nd
4 you set the locations. When is the next date by which
5 you set hours and dates?
6 A. I can't recall off the top of my head. I know
7 it was within a few weeks of August 22nd.
8 Q. Why don't you go back to your interrogatory
9 responses, which is Exhibit 18 I believe. And if you
10 turn to -- 17. Exhibit 17. I'm so sorry. I really hope
11 so.
12 And if you turn to Page 3, you can take a
13 moment to read your response. I just want to get on the
14 same page so we can understand what happened.
15 A. Okay. September 5th.
16 Q. Okay. So if you can read out loud the last
17 sentence of the first paragraph on Page 3 under
18 "response."
19 A. (As read): "Both party chairs approved the
20 revised proposal, which was then adopted, approved by
21 commissioners court September 5, 2018, as part of a
22 comprehensive order calling the general election.
23 Q. Okay. And is that statement accurate?
24 A. Yes.
25 Q. So what happened between August 22nd and

Page 196

1 September 5th in terms of setting the early-voting
2 schedule?
3 A. The times were added.
4 Q. And who was consulted?
5 A. Times and dates.
6 Q. Times and dates.
7 Who was consulted during that time?
8 A. Again, I would imagine we were consistent with
9 our process of the election administrator working with
10 the party chairs, which it states both party chairs
11 approved the revised proposal, and then submitting that
12 schedule to commissioners court.
13 Q. And the only way you know that that happened is
14 because that's how the process is supposed to happen?
15 A. Well, that is -- I mean.
16 MR. SEAQUIST: Form.
17 A. Yes. Yes.
18 Q. (BY MS. ADEN) But you have no independent
19 verification from anyone that that's actually what
20 happened?
21 MR. SEAQUIST: Object to the form.
22 A. No. I mean, I would imagine if we approved it
23 on September 5th, I'm sure I would have had a
24 conversation with Christie prior to me approving it.
25 That everything had been set and the chairs were on all

Page 197

1 on the same page and we were ready to go.
2 Q. (BY MS. ADEN) And you're saying it's between
3 August 27th and 9/5 that the public had an opportunity
4 to weigh in about the -- not the locations. They had
5 already been set. It was between 8/22 and 9/5. That is
6 the period of time when the public was supposed to
7 weighed in on the dates and times?
8 A. Right.
9 Because on this September 5th meeting, that
10 would have been noticed the Friday prior, and the
11 proposed comprehensive order calling the general
12 election would have been posted on the website.
13 Q. And if people didn't speak up by 9/5, they have
14 waived their ability to participate in the setting of
15 dates and times around the general 2018 election?
16 MR. SEAQUIST: Object to the form.
17 A. I would not say that.
18 Q. (BY MS. ADEN) What would you say?
19 A. I would say it makes it much, much more
20 difficult because -- to come back after the fact --
21 because you have to remember, ballots have to be
22 printed. Locations have to be staffed. Machines have
23 to be allocated. So once we approve the schedules, we
24 have to start working towards that. Christie has to
25 program the ballots. That takes time.

50 (Pages 194 - 197)

1    So when somebody comes in after the fact
2  and objects and then we make a change, it can just -- it
3  can impose a hardship on Christie and her staff and make
4  it a lot harder.  It happened for several -- the two or
5  three years prior to this, that's what happened.
6    Q.  But in the context of this litigation, would
7  you agree that changes were made well after
8  September 5th?
9    A.  The change -- once this was passed, we did not
10  make any changes.  Well, I made a motion, but it didn't
11  pass.  But actual changes were not made until after this
12  lawsuit was filed.
13    Q.  So it was possible to make changes?  Do you
14  know what date those changes were made?
15    A.  October 24th.  It's a special meeting of
16  commissioners court.  October 24, 2018.
17    Q.  So up to -- actually, was early voting already
18  under way at that time?
19    A.  I -- I think it was, yes.
20    Q.  So either early voting was underway or soon to
21  be taking place because the election would have been --
22  the actual election day would have been November, early
23  November?
24    A.  Correct.
25    Q.  So it was feasible -- it is feasible -- even if

1  it's not preferred, it is feasible to make election
2  changes as late as late October?
3    MR. SEAQUIST:  Form.
4    A.  It is possible, yes.
5    Q.  (BY MS. ADEN)  Can I also direct your attention
6  to Page 3 back to your interrogatories, just so that the
7  record's clear?  In the second paragraph, under
8  response, it looks like there was a meeting of the
9  commissioners court on October 10th?
10    A.  Uh-huh.
11    Q.  Do you recall that there was some changes made
12  to the early-voting schedule then?
13    A.  Yes.
14    Q.  Not involving -- my understanding is it didn't
15  involve any changes related to Prarie View or Prarie
16  View's campus, but there were changes made?
17    A.  Right.
18    I believe -- there was something -- if you
19  receive a petition for Sunday voting, then I believe
20  you're obligated to provide Sunday voting, and I believe
21  in this case somebody had petitioned for Sunday voting.
22  So we had to go in and add that.
23    Q.  So a petition requires you to do it, but
24  otherwise you're not required to do Sunday early voting?
25    A.  Not unless somebody has requested it.

1    Q.  Do you know in the black community that Sunday
2  voting is often referred to as "souls to the polls"?
3    A.  I've never heard that before.
4    Q.  Okay.  So October 22nd locations are decided.
5  9/5 dates and times are set.  They're approved.  There's
6  no public discussion; is that accurate?
7    A.  Correct.  There was no -- nobody gave any
8  public comment.
9    Q.  And then there are two changes that are made on
10  October 10th and then on October 24th?
11    A.  Correct.
12    Q.  Okay.  So there are two occasions in this past
13  general election where changes were made after the order
14  and setting of the schedule was voted on?
15    A.  Correct.
16    Q.  Okay.  We are getting very, very close.
17    So I just want to turn to back to this
18  transcript from the 10/27.  You indicated you made a
19  proposal I would like to talk about very briefly and
20  also some of the comments that were made at the meeting
21  just to make sure we're all on the same page.
22    A.  Okay.
23    Q.  How would you -- before we get there, how would
24  you generally characterize the response from the public
25  when they learned what the hours and dates were going to

1  be at each early-voting location.  And by the public, I
2  want to talk to specifically talk to people in Prarie
3  View and the school.  What was the general reaction?
4    A.  Okay.  So, generally, I don't think even
5  really, even all the way up until early voting began, my
6  recollection was there wasn't a lot of problems or
7  issues with the schedule.  It wasn't until early voting
8  started, and the students realized they did not have any
9  early voting the first week of early voting on campus.
10  That then started a brouhaha or people were getting
11  upset about that.  And then that's when it was after
12  that, that people then took issue with the schedule.  So
13  we were already into early voting when people started
14  expressing their issues with the schedule.
15    Q.  Do you think they had an expectation that they
16  were going to have early voting during that first week?
17    MR. SEAQUIST:  Object to the form.
18    A.  I can't speak to what their expectations were.
19  I know we were originally going to have early voting the
20  first week.
21    Q.  (BY MS. ADEN)  And what happened?
22    A.  Apparently, my understanding is that the
23  original schedule had early voting on campus the first
24  week, and then the Democratic chair expressed some
25  concerns and wanted it moved to the second week because

51 (Pages 198 - 201)

Page 202

1  the first week was going to conflict with homecoming at
2  Prarie View A&M.
3      Q.  And do you have any written documentation from
4  anyone that homecoming was a conflict during the first
5  week?
6      A.  I don't think I have any documentation,
7  personally, no.
8      Q.  Okay.  And do you have --
9      A.  That's just what I was told.
10     Q.  By who?
11     A.  Christie Eason.
12     Q.  And do you have any sense of who told her about
13  the homecoming thing?  Was it Ms. Harris?
14     A.  It was Rosa Harris.
15     Q.  And do you know anyone else who raised the
16  homecoming issue?
17     A.  Not that I'm aware of.
18     Q.  And because she was the Democratic chair, she
19  was supposed to speak to what Prarie View students would
20  have found acceptable with the early-voting schedule?
21         MR. SEAQUIST:  Object to the form.
22     A.  Again, I wouldn't say she speaks for all of
23  Prarie View A&M students, but...
24     Q.  (BY MS. ADEN)  The Democratic ones?
25     A.  The Democratic ones.

Page 203

1      Q.  And what if she's wrong?
2      A.  Okay.  I'm not sure I understanding your
3  question.
4      Q.  If she doesn't speak for them -- or what if
5  she's wrong in her representation about them?  There's
6  no other check to find out what they, students, want.
7      A.  Well, I would hope if they're Democratic
8  students that they disagree with Ms. Harris and her
9  characterization of it being a problem that they would
10  come forward and let us at the time we're adopting the
11  schedule.
12     Q.  How would they know that she's represented that
13  homecoming was an issue if this process is happening
14  between August 22nd and 9/5?  The only people seem to be
15  consulting during all of this is Ms. Eason and these two
16  chairs.  How in the world are they supposed to know that
17  someone's representing to the world, to decision makers
18  who represent them, that homecoming is an obstacle for
19  early voting?  How would they know?
20         MR. SEAQUIST:  Object to the form.
21     A.  They may not know specifically why it was moved
22  from the first to the second week, but I would think any
23  of those individuals could look at the schedule that we
24  adopted on the 5h, and then look at it and say, why is
25  there not any voting the first week of early voting on

Page 204

1  campus?  And then register that concern or objection
2  with us as a body, and then we could have addressed it
3  at that point in time.  So I don't know why anybody
4  would know the reasons why, but they had every
5  opportunity to know that early voting was on the second
6  week, not the first week.
7      Q.  (BY MS. ADEN)  Isn't that what students did
8  when they found out what the schedule was?  They voiced
9  their concerns?
10     A.  Well, but they didn't find out -- I guess they
11  didn't look at the schedule until after early voting had
12  begun, and they were upset that they didn't have early
13  veto the first week because of the Beto/Cruz race.
14     Q.  It was a big election?
15     A.  It ended up being much bigger than anybody
16  anticipated.
17     Q.  And they saw other people in other parts of
18  Texas going ahead to vote, and they did not have that
19  opportunity?
20         MR. SEAQUIST:  Object to the form.
21     A.  Not on campus.
22     Q.  (BY MS. ADEN)  Not on campus?
23     A.  Not on campus.
24     Q.  That's correct.
25         So looking -- one quick clarification for

Page 205

1  the record.  So when this meeting, 10/17, do you know
2  whether or not early voting had started by 10/17?  So we
3  have the schedule.
4      A.  I don't think so.
5      Q.  Okay.  And so I just wanted to clarify for the
6  record that it is actually not the -- well, the 10/17
7  meeting we're about to address is when some of the
8  complaints were made about the schedule --
9      A.  Correct.
10     Q.  -- between an actual before --
11     A.  Before --
12         THE CERTIFIED STENOGRAPHER:  Finish your
13  question.
14     A.  You can finish your question.
15     Q.  (BY MS. ADEN)  -- were actually before the
16  early voting schedule?
17     A.  Right.
18         So I think it would been the week or so
19  prior to early voting that people were raising the
20  issues.
21     Q.  Okay.
22         Okay.  Let's get through this quickly.
23  Turning to Page 1, there is a paragraph that reads
24  "first off," and it goes through "there."  Do you mind
25  reading "it is supposedly our representation of

52 (Pages 202 - 205)

Page 206

1 continuing objections of statements that we are
2 documenting from Ms. Eason during the commissioners
3 court October 17, 2018, meeting." If you could read
4 from "first off" through "there."
5    A. (As read): "First off, I want you to know that
6 my recommendation today after looking through the
7 schedule is merely upon equal representation, equal
8 representation of the voters in Waller County. If you
9 look through the county, you're going to look at four
10 hubs that I would consider the hubs of Waller County.
11 It's going to be Waller area, Hempstead area, your
12 Prairie View area and your Brookshire. And looking
13 through the schedule for early voting, you're correct.
14 There is no early voting in Prarie View.
15        Dirk and I could sit and tell you a
16 multitude of reasons why that was considered that way
17 from homecoming to several different reasons. However,
18 when you look at the schedule, there is not equal
19 representation there."
20    Q. Okay. Further down on that same page, can you
21 read aloud the highlighted text which begins, "and
22 that" -- "and with that being said we have to give
23 them..."?
24    A. (As read): "And with that being said, we have
25 to give them equal representation, not only the

Page 207

1 students, but all of the citizens of that Prarie View
2 area as well."
3    Q. Okay. Do you recall hearing those statements
4 from Ms. Eason?
5    A. Yes.
6    Q. And how did you react to her presentation?
7    A. I mean I understood what -- I think I
8 understood what she was saying. The number of days was
9 not equal.
10    Q. Okay. And then I'm going to ask you to turn to
11 Page 8, which continues some comments that you begin to
12 make around the 58-minute mark of the meeting. If you
13 look on seven, it shows that you started on the 58-mark
14 of Page 8. So on Page 7.
15    A. So you're on 7?
16    Q. Well, I want you to see this is the beginning
17 of your remarks.
18    A. Okay.
19    Q. And then I'm turning -- asking you to turn to
20 Page 8 and asking you to look at this "so when"
21 paragraph that's about a middle of the way through there
22 and read through "okay."
23    A. So when to okay? Where is okay?
24    Q. Right here.
25    A. Got you.

Page 208

1        (As read): "So when we design this, the
2 main point is it fair? Is it fair to everyone? Because
3 I want the students to have equal access, but it also
4 means they don't get more voting than every other
5 resident in the county gets, or, you know, we have to
6 give them equal access. So when I looked at the
7 precincts, I broke it down, and I looked at, okay,
8 Precinct 1 you have one early voting poll. It is the
9 courthouse, okay. In Precinct 2, you have the Waller
10 ISD building. And then for three days, you have Fields
11 Store, which is the far northeast corner. Precinct 4,
12 you've got the Brookshire library, and then you have
13 three days in Katy. Then we get to Precinct 3 and
14 you've got three days at Prarie View. You got two days
15 at the Waller County Community Center. You got three
16 days in Monaville. So there's eight days, and I do
17 think there's an inequity."
18        Do I keep going?
19    Q. Just to "okay."
20    A. (As read): "Because you have -- "you look at
21 the other precincts at the primary polls, and there 11
22 days, okay."
23    Q. So what did you mean when you said there was
24 inequity?
25    A. The number of day says is not equal.

Page 209

1    Q. And do you know whether Ms. Eason made a
2 recommendation to change the plan that had been approved
3 at that time?
4    A. I believe she did.
5    Q. Would you agree that given her role as an
6 election administrator what she recommended would have
7 been what she believed to be feasible in terms of the
8 county's resources?
9        MR. SEAQUIST: Object to the form.
10    A. You would have to ask Ms. Eason, but I believe
11 she would take that into -- I would hope she would take
12 that into consideration when she makes her
13 recommendations.
14    Q. (BY MS. ADEN) And do you find that when you --
15 as a general matter, when she makes
16 representations/recommendation, that you are accepting
17 that she's looked at the resources?
18    A. Can you repeat it one more time?
19    Q. Do you, as a general matter, when Ms. Eason's
20 making recommendations, you have an expectation that
21 she's looked at resources?
22    A. I would say that that is correct.
23    Q. Okay. And what did the commissioners court
24 decide to do with respect to Ms. Eason's proposal at
25 that meeting? Did they adopt it?

53 (Pages 206 - 209)

Page 210

1     A.  They did not.
2     Q.  Okay.  During that same meeting, were there
3  other proposals to add hours and days at other locations
4  that were considered?
5     A.  I believe there was, yes.
6     Q.  Do you recall any of them specifically?
7     A.  I believe I made a motion.
8     Q.  Okay.  Let's look at Page 25 of Dr. Flores'
9  report, which is Exhibit 15 and --
10     A.  What page?
11     Q.  Page 25.  I'm sorry.  And it's of Exhibit 15,
12  Dr. Flores' report.
13        And there is a paragraph in the middle that
14  begins, "after the commissioners."  If you could read
15  that to the end of the page, that would be ideal.
16     A.  Starting with "after the commissioners"?
17     Q.  Yes, please.
18     A.  (As read):  "After the commissioners had
19  rejected the proposed modifications suggested by the
20  elections administrators, Ms. Eason, Judge Duhon then
21  proposed an alternative plan that would provide three
22  additional days of early voting during the first week at
23  the Waller County Community Center in the city of Prairie
24  View, while extending the hours of early voting in
25  Monaville by three hours during the first week of early

Page 211

1  voting.  During an exchange with Commissioner
2  Beckendorf, Ms. Eason confirmed that the counties
3  existing inventory voting machines was adequate to
4  support such a change.
5        Commissioner Beckendorff:  Do you have the
6  equipment to do that?
7        Ms Eason:  Yeah, I can do that.
8        Commissioner Beckendorff:  You can add
9  another location the first week?
10        Ms Eason:  Yeah.  Because I can move it
11  from there down to the next week.
12        However, Judge Duhon's proposal did not
13  receive a second."
14     Q.  Okay.  Do you recall that exchange between
15  Ms. Eason and Commissioner Beckendorf?
16     A.  Yes.
17     Q.  And would you agree that as Ms. Eason, as the
18  election administrator, is the person most likely to
19  know what is or isn't feasible with the county's
20  election equipment?
21     A.  I would agree.
22     Q.  And would you accept her recommendations as to
23  whether a given change or recommendation was feasible?
24     A.  Yes.
25     Q.  So at the time of the October 17th meeting, it

Page 212

1  would have been feasible to add early voting at Prarie
2  View during the first week?
3     A.  It was feasible, yes.
4     Q.  And what did the commissioners do with your
5  proposal?
6     A.  I didn't receive a second, so they didn't.
7     Q.  And do you recall whether students testified at
8  this meeting?
9        MR. SEAQUIST:  Object to the form.
10     Q.  (BY MS. ADEN)  Prairie View students testified
11  AT THE October 17, 2018, meeting.
12        MR. SEAQUIST:  Same objection.
13     A.  I believe there were.  I believe we did have
14  students at that meeting, yes.
15     Q.  (BY MS. ADEN)  Okay.  We're going to quickly
16  talk about a few of them.  If you turn to the bottom of
17  the Page 15 of the --
18     A.  -- transcript.
19     Q.  Transcript, which is Exhibit 15.
20     A.  What page?
21     Q.  Page 15.
22     A.  Okay.
23     Q.  Okay.  At the very bottom, we're referencing
24  statements you made at -- around the 83-minute mark of
25  that meeting.  If you can begin with "Kendric."

Page 213

1     A.  (As read):  "Carbett Duhon:  Kendric, can I ask
2  you a question?
3        Kendrick Jones:  Uh-huh."
4     Q.  And keep going please to --
5     A.  (As read):  "Carbett Duhon" --
6     Q.  Thank you.
7     A.  -- "as a student" -- "as a student and as a
8  student leader, I'd like your opinion if you think by
9  adding days at the community center, which is next to
10  the post office, is that accessible to students?
11        Kendric Jones:  As we brought this up last
12  time, what's accessible to you guys is not actually
13  accessible to us, being that the MSC is our local point
14  on campus.  Students get more mail sent to our local
15  mail that we have on campus rather than the postal
16  service, which is right next door to the community
17  center.
18        Carbett Duhon:  So is that a 'yes' or a
19  'no'?
20        Kendric Jones:  That's no in my standpoint.
21        Carbett Duhon:  All right.  Thank you.
22     Q.  And, Judge Duhon, you've mentioned Mr. Jones
23  before.  It seems you respect his opinion; is that
24  accurate?
25     A.  Yes.  We actually have a very good

54 (Pages 210 - 213)

Page 214

1 relationship.
2 Q. Okay. So he's referencing this issue of
3 accessibility of early voting to Prarie View students;
4 is that accurate?
5 MR. SEAQUIST: Form.
6 A. That's what it purports, yes.
7 Q. (BY MS. ADEN) Okay. And so by this meeting on
8 10/17, you had heard this issue come up before,
9 accessibility to early voting?
10 A. Correct.
11 Q. And do you have any basis to dispute Mr. Jones
12 assertions that the Memorial Student Center, rather than
13 the community center, is the focal point of campus life?
14 MR. SEAQUIST: Form.
15 A. Yes. For students, yes.
16 Q. (BY MS. ADEN) Okay. And that's because -- one
17 of the reasons that he indicates is that students get
18 their mail, which I believe you also indicated was the
19 case -- you believe that they gave them more on campus
20 at the student center?
21 A. Correct.
22 Q. Okay. Why did you propose additional early
23 voting at community center rather in light hearing this
24 rather than at the student center, given statements by
25 Mr. Jones and other people at this meeting?

Page 215

1 A. Because I'm concerned with the entirety of the
2 community. Because I'm trying to -- I proposed -- I
3 made a proposal that would not only enable students to
4 have additional voting, but would also enable the
5 accessible or just as accessible to members of the
6 Prarie View community.
7 Q. Okay.
8 A. So I believe the community center, which,
9 again, if you look at the history of the community
10 center and why we have that community center, this is
11 the very essence of the purpose in which the community
12 center was created. It's to bring the community
13 together.
14 It's a county-controlled facility, we
15 control. We can secure that facility after hours, which
16 always continues to be an issue at the Memorial Student
17 Center, by the way.
18 And I thought for all those reasons, that
19 was why it was a good solution to add a few at the
20 center, which would serve the entirety of the community,
21 the campus and the city.
22 Q. Wasn't the community center where early voting
23 was going to be already on Thursday and Friday?
24 A. Of next week, yes.
25 Q. So you're going to start out with the community

Page 216

1 center with the machines there, move them to the
2 Memorial Student Center, or keep them there? You're
3 going to -- and secure them and then come back to the
4 community center; is that what's happening?
5 A. You'd have to ask Christie Eason as far as what
6 machines would have to be moved. I was just -- she
7 obviously was telling me we had the machines to do that.
8 Q. She also told you what machines to add to
9 Memorial Student Center?
10 A. Correct.
11 Q. And you mentioned earlier that there are other
12 "non-county controlled, election early0voting" sites; is
13 that correct?
14 A. Correct.
15 Q. Are you concerned about security at those
16 places?
17 A. We are always concerned about security at all
18 of our locations.
19 Q. And have you removed any voting from those
20 places in light of security concerns?
21 A. Not to date because those locations continue --
22 in the locations that we have other than them the MSC,
23 we have found that we are able to secure those machines
24 after hours with nobody having access to those machines.
25 Memorial Student Center that proves to not be the case.

Page 217

1 Q. Do you know whether there's another location in
2 the Memorial Student Center where you can put the
3 machines way and feel more secure about them, assuming
4 that's a legitimate concern?
5 A. All I can tell you is we have asked repeatedly
6 for a secured location. In fact, with my meeting with
7 Dr. Ruth, I expressed to her, we just have to have a
8 location. In fact, if we're doing a voting center and
9 it's in the Memorial Student Center, it's has to be a
10 location that can secured for two-and-a-half weeks.
11 Q. Did you put that concern about security on the
12 record during any of the times where you have been
13 serving as the county judge?
14 A. I specifically don't know. I'd have to go back
15 and review all the times that this issue has come up,
16 but I know it's been -- I know security has always been
17 expressed on the -- I can tell you, for example, on the
18 record, which we're doing right now, even with the
19 general election in 2018 being in the auditorium, it
20 wasn't until during the process that we realized there
21 were people going into the auditorium through other
22 doors that showed us that was not a secured location.
23 Q. But you can fix that? Is that something you
24 think you can fix?
25 A. I don't know if that's in my control. That's

55 (Pages 214 - 217)

Page 218

1   the university. That's their --
2   Q. But have you tried to -- sorry.
3   A. Well, that's what we're trying to do right now.
4   Q. And if you can fix it, does that take that as a
5   reason to move it from the Memorial Student Center off
6   the table?
7   A. That could be a reason. That would be a good
8   factor, yes, a secured position.
9   Q. Okay. Quickly turning to Dr. Flores' report.
10      THE CERTIFIED STENOGRAPHER: I'm going to
11  need to take a break.
12      MS. ADEN: Okay.
13      (A break was taken from 5:54 p.m. to
14      6:03 p.m.)
15  Q. (BY MS. ADEN) I'm looking back at Dr. Flores'
16  report, which is a number that --
17  A. 15.
18  Q. 15. Thank you very much.
19      And if you could just turn to Page No. 26
20  at the top of it.
21  A. Okay.
22  Q. Okay. And if you could read the sentence that
23  begins, "at other points during the October 17
24  meeting..."
25  A. (As read): "At other points during the

Page 219

1   October 17th meeting several commissioners made informal
2   proposals that were not put to a vote that would have
3   revised to supplemented the days and hours of early
4   voting at various locations in the county.
5       For example, Commissioner Beckendorff
6   proposed moving three days of early voting at the
7   Memorial Student Center at PVAMU's campus from the
8   second week to the first week. Judge Duhon proposed
9   adding three additional days of early voting during the
10  first in Monaville so early voting would be available
11  there throughout the week.
12      Judge Duhon, Commissioner Beckendorff, and
13  Ms. Eason discussed extending the hours of early voting
14  in Monaville, Katy, and Fields Store from 9 hours each
15  day to 12 each day. Ms. Eason once again indicated that
16  Monaville's population was too small to necessitate five
17  days of early voting.
18      Once again, Ms. Eason, the elections
19  administrator, made the commissioners aware that the
20  county did have sufficient resources to add additional
21  days of early voting in Monaville or another location,
22  if the days were executive so we could use the same
23  machine.
24  Q. Okay. Do you have any basis to object to the
25  accuracy of what Dr. Flores is recounting about this

Page 220

1   exchange on the 27th?
2       MR. SEAQUIST: Form.
3   A. I don't -- no, I don't dispute that.
4   Q. (BY MS. ADEN) And do you --
5   A. I don't dispute that those things are --
6   happened.
7   Q. And do you recall the proposals to add
8   additional early-voting days in Monaville?
9   A. Yes.
10  Q. And do you recall that Ms. Eason's response was
11  that there weren't enough voters there to justify such
12  an addition?
13  A. I believe I recall that, yes.
14  Q. And she would be in the best -- she would be in
15  the best position to make that determination?
16  A. Yes.
17  Q. Why were you interested in offering more early
18  voting in Monaville?
19  A. You know, I honestly, I think I proposed that
20  because I know Commissioner Barnett. It was something
21  Commissioner Barnett was very adamant about. I kind of
22  personally didn't see the logic in it. But if we're
23  trying to increase the early voting throughout the
24  precinct, you know, it was an option.
25      I mean, I think -- you know, like I said,

Page 221

1   it was a discussion. I didn't make a motion, but I
2   think that would have been the reason probably why I
3   would have done that because   Commissioner Barnett
4   was pretty adamant about it.
5   Q. And if you could have added more days to
6   Monaville, that also means, at least as of October 27th,
7   commissioners court was considering adding early-voting
8   days to the student center, considered it a possibility?
9       MR. SEAQUIST: Form. You mean
10  October 17th.
11  Q. (BY MS. ADEN) October 17th.
12  A. That we considered that?
13  Q. Yes.
14  A. Yes.
15  Q. And it was feasible?
16  A. Yes, it was feasible.
17  Q. Okay. And then subsequent to this our lawsuit
18  was filed; is that your understanding of what took place
19  after --
20  A. Yes.
21  Q. -- the October 17th meeting?
22  A. Yes.
23  Q. And did the commissioners court end up adding
24  any more early voting in Prairie View -- the city of
25  Prairie View?

56 (Pages 218 - 221)

1     A.  Yes.  We added -- we added voting at the City
2  Hall.
3     Q.  Did you increase any days on campus --
4     A.  I think we -- yeah, we increased the hours.
5        THE CERTIFIED STENOGRAPHER:  "Did you
6  increase any days on..."?
7        THE WITNESS:  I'm sorry.
8     Q.  (BY MS. ADEN)  -- on campus at the student
9  center?
10     A.  We increased the number of hours.
11     Q.  But did you ultimately add any early-voting
12  days during the first week of early voting on
13  October 24th on campus?
14     A.  I don't believe we did.  I don't think so.
15     Q.  One quick question about the 9/5 date.  Had --
16  on 9/5 when you voted on the hours and dates, had
17  students been aware -- had students come to that meeting
18  and voiced a desire to have more early voting, including
19  during the first week, and an assurance had been given
20  by the university that those machines could have -- the
21  machines at the student center could have been locked
22  up?  Would there be any impediment to having first week
23  early voting at that time?
24        MR. SEAQUIST:  Form.
25     A.  Okay.  It seems like you --

1     Q.  (BY MS. ADEN)  Yes.
2     A.  -- asked multiple parts to that question.
3     Q.  Not a great question at all.
4     A.  Can you do it again?
5     Q.  Had -- on September 5th, which is when you all
6  approved dates and times and ordered an election, and my
7  understanding there was no discussion.  There was no
8  public discussion during that time.  No one came to talk
9  about it?
10     A.  Right.
11     Q.  And you voted on it and approved the schedule?
12     A.  Correct.
13     Q.  Okay.  Had students come to that meeting, and
14  said, I want some early voting during the first week,
15  and there had been a representation by the university or
16  someone else that the machines could be locked up in a
17  secured place, assuming that's an issue that's
18  happening, would there have been any impediment to
19  adding early voting on campus?
20        MR. SEAQUIST:  Form.
21     A.  So you're saying if someone had come to the
22  meeting --
23     Q.  Uh-huh.
24     A.  -- and if the university had done that, would
25  there be any impediment?  I'm trying to think of all the

1  different things.  I don't know.  I mean, we -- Christie
2  Eason said we had the equipment.  Again, security would
3  have to be a major concern.  I don't know if it really
4  addresses the accessibility by the folks in the city of
5  Prarie View.  I mean, could it have been done?  It could
6  have.
7        I think it also raises the issue of, you
8  know, whether or not homecoming was still going to be a
9  problem or not since that had been raised previously.  I
10  guess somebody would have to assure us there was no
11  conflict or issue with that, but it could have been
12  physically done.
13     Q.  (BY MS. ADEN)  Do you an understanding of when
14  homecoming begins on campus?
15     A.  No.  I mean, I generally know how homecomings
16  work for everybody else, and I went to Texas A&M where
17  every game is a homecoming game.
18     Q.  But generally people start coming on campus
19  Thursday, Friday, Saturday, Sunday?
20     A.  Yeah, it's usually -- at least a long weekend.
21  A lot of alumni come back, and there's all kinds of
22  activities, you know, functions going on.  From what
23  I've been told, I have not been on campus during
24  homecoming at Prairie View, but I've been it's packed.
25  There's people everywhere.

1     Q.  But that Monday, Tuesday, and Wednesday, for
2  example, the first week, the beginning of it, I imagine
3  people are still working people, and there's some people
4  coming in that direction; but could that have been a
5  possibility to have early voting the first few days of
6  the first week?
7        MR. SEAQUIST:  Form.
8     A.  Yeah, it could have been a possibility.  I
9  mean, like I said, we originally wanted -- we're going
10  to have voting the first week.
11     Q.  (BY MS. ADEN)  And, similarly, do you think
12  some alum of Prairie View live in and around -- live in
13  Prairie View, and live in and around the university?  Do
14  you know?
15     A.  I don't know specifically.  I would guess that
16  some alumni might live in that area.
17     Q.  Could they have used that homecoming weekend as
18  an opportunity to vote at the student center?
19        MR. SEAQUIST:  Object to the form.
20     A.  I guess if they -- to vote at the Memorial
21  Student Center?  I suppose, I mean.  But if they live in
22  the community, they also have the community center, but
23  it's hard -- I mean, it's hard to say why somebody does
24  what they do.  I don't know.
25     Q.  And do you have an understanding of whether or

57 (Pages 222 - 225)

Page 226

1  not there had been marches and other sort of things on
2  voting on Prarie View's campus in the past?
3      A. Yeah, there have been.
4      Q. Sorry.
5          Could you see that voting could be an
6  activity that Prarie View students might engage in even
7  when homecoming is happening.
8          MR. SEAQUIST: Form.
9      A. Yeah. I suppose.
10     Q. (BY MS. ADEN) On this 10/17 meeting minutes on
11  Page 22, there's just a few statements that I wanted to
12  -- oh, I am very close, okay. On Page 22, there is a --
13  at the very top, it's reflecting that you gave some
14  remarks around the 95-minute mark of this 10/17 meting.
15  It says -- if you could begin reading with, "well" and
16  go all the way through with "minds," which is about
17  here, that would be ideal. It's a little bit long.
18     A. Okay.
19         "Carbett Duhon: Well, and I know we've met
20  before Mr. Brown, and I appreciate your comments. And
21  let me say this: I do think a lot of folks, when you
22  get politics, you say, you know, you go Precinct 3,
23  that's a Democratic precinct. You know, the rest of the
24  precincts of Waller County are Republican. And I
25  honestly believe and I've talked to a lot of students

Page 227

1  and I've had a conversations with a lot of students
2  because the County works with the university on a number
3  of different levels and has in the past and will
4  continue to do so in the future. I've worked with Frank
5  Jackson's wife Mary Jackson, who's one of our JP judges.
6  She has students interns. We do events. You know, we
7  went and took a tour of Harris County facilities and we
8  worked with agriculture department on our strategic
9  planning. I mean, there's one after another, and I
10  think it's a true statement to say that there's a lot of
11  students who do not identify as a Democratic or
12  Republican. They consider themselves to be independent.
13  They don't consider themselves to do just what a party
14  tells them to do. They're going to vote their minds."
15     Q. Okay. So you -- do you have question the
16  voracity of that statement that you made?
17     A. No. I made that statement, so I don't question
18  the veracity of it.
19     Q. And you stand by that statement?
20     A. Yes.
21     Q. Okay. The chair of the Republican party, you
22  mention is David Luther?
23     A. That's correct.
24     Q. And he was chair at the time of the 2018
25  general election?

Page 228

1      A. I believe so, yes.
2      Q. Do you know whether Mr. Luther has ever asked
3  the county to provide more for early-voting
4  opportunities for Prarie View students?
5      A. You know, he and I have had discussions. I
6  mean, as far -- in a public setting or court, I don't
7  recall specifically, but he and I have had conversations
8  about expanding voting on campus, and I don't -- I don't
9  believe he has any issue with it.
10     Q. But has he specific --
11     A. I don't --
12     Q. Sorry to cut you off.
13     A. Go ahead.
14     Q. Has he specifically, since you've been on the
15  commissioners court, has he specifically advanced a
16  proposal like the proposals that were advanced during
17  the 10/17 meeting? Has he ever come with a proposal
18  that would provide early voting on campus for Prarie
19  View students?
20     A. In 2018?
21     Q. Or any time --
22     A. Or any time.
23     Q. -- that you're aware of.
24     A. Nothing specific that I can recall.
25     Q. Do you know how long he's been chair?

Page 229

1      A. David has been chair -- I want to say he was
2  there in '18. So that's going on a year. About maybe a
3  year and a half to two years, give or take.
4      Q. Okay. And then I wanted to just get you to
5  respond to some statements that he made at the 10/24
6  meeting. I'm going to mark as Exhibit 19 -- yes -- some
7  transcripts that we prepared of the 10/24 meeting and
8  direct you to Page 2. And if you note that on Page 1,
9  it says around the two-minute mark that the Republican
10  party chair David Luther begins to give remarks.
11         (Exhibit 19 marked.)
12     A. All right.
13     Q. On Page 2, we're going to cut into his remarks,
14  and I would love for you to read. And were you present
15  at this meeting, the October 24, 2018, meeting?
16     A. Yes, I believe I was.
17     Q. And if you could read into the record, the
18  statement that begins with "and" and that frankly ends
19  with "thank you."
20     A. Let me see.
21     Q. "And those students."
22     A. Okay. And you want me to go to where?
23     Q. Sorry. (Indicating.)
24     A. Wow. Okay.
25         (As read): "And those students aren't

Page 230

1 being -- they're not -- they don't -- these people don't
2 care about them. They only care about the commodity
3 that they bring to the table, which is their one
4 commodity, their vote. And why do they have to have it
5 on the student center? Because every student in college
6 has to go through that student center. So they're easy
7 pickings for those vultures out there. Those political
8 vultures how there deciding how to drive them into that
9 polling place so they will pull that lever. That one
10 click, one vote. Press that one party vote.
11       And don't let them tell you that those
12 students are independents. They very well may be
13 independents. But when they're driven into that polling
14 place, they're cajoled; they're entreated; they're
15 desperately engaged to pull that one lever, to push that
16 one button.
17       And that's what this is about. It's about
18 Democrat politics, Democrat relevance, and Democrat
19 influence in the county politics. It's not about race.
20 It's not about disenfranchisement, and I disavow
21 everything in that lawsuit. And I hope that you guys,
22 when you decide this matter, that you will either look
23 to defend this lawsuit and defend the people of this
24 county, not just the students of Prarie View. And,
25 also, if you make a compromise, make a compromise that's

Page 231

1 fair for everyone. Thank you."
2    Q.  Okay.  Do you remember Mr. Luther making these
3 statements?
4    A.  Vaguely.
5    Q.  And do you agree with them?
6       MR. SEAQUIST:  Object to the form.
7    A.  You know, I understand -- I think I understand
8 what he's saying to the extent that there are some
9 people that prey on the students; that try to drive the
10 students to vote a certain way using fear as a tactic.
11 I believe that's kind of what he's saying here. That
12 that's what this is about. That this is all about the
13 Democrats to exercise and keep their relevance in this
14 way.
15       I mean, I don't know if necessarily think
16 that every student is going to necessarily do what
17 somebody tells them to do. I think they have their own
18 minds, and they can vote their own minds.
19    Q.  (BY MS. ADEN)  Who are these specific people
20 who are driving student voters to the Democratic party?
21 Are there specific people you have in mind?
22    A.  The ones that I believe that use fear as a
23 tactic would be Rosa Harris and Denise Mattox. Those
24 are the ones I specifically know. It seems like they're
25 involved when it comes to contacting the media or

Page 232

1 getting the media involved over issues that they, in
2 fact, created themselves.
3    Q.  Now, the media has been involved in Prarie View
4 for many years, right?
5    A.  Uh-huh.
6    Q.  There've been many stories about Prairie View.
7 Do you think that stories preceded Ms. Harris or
8 Ms. Mattox being in the county or being involved in
9 Democratic politics?
10    A.  Well, I would just -- I mean, are you asking
11 whether the media existed prior to Ms. Harris and
12 Ms. Mattox being involved in county politics, yes, you
13 are correct. But I think in regards to some of the
14 recent events, you know, to approve and be okay with the
15 schedule and then when the schedule gets challenged to
16 act like you had nothing to do with it and then to go so
17 far as to activate the media and then use that to stir
18 up the students to get them to go out to pull -- push
19 the button for a straight-ticket vote, I think that's
20 --I think it's a despicable tactic.
21    Q.  Have students, though, been advocating for
22 themselves decades related to their right to vote in
23 Waller County?
24    A.  Oh, no. I think students are very capable of
25 advocating for themselves.

Page 233

1    Q.  Separate and apart from any particular party?
2    A.  Sure.
3    Q.  And if -- you said that the demographics of the
4 county are changing, but it's -- right now you project
5 it's majority minority, are you suggesting that the
6 Democrats are taking over?
7    A.  No.
8       You know, look, I've told -- if this county
9 -- if the demographics of this county change and we get
10 a lot of folks that vote Democrat and they come in and
11 they vote Democrat and that results in a change of
12 leadership, then that's the will of the people.
13    Q.  Has this county also -- wasn't it a previously
14 Democratic majority county in the 80s and 90s; is that
15 your understanding?
16    A.  I think the vast majority of the counties in
17 Texas were Democrat. Majority. You know, these were
18 Southern Democrats.
19    Q.  Is there a reason? Do you know why black
20 people might have made an exodus from the Democratic --
21 Southern Democratic party? Are there specific things
22 that happened?
23       MR. SEAQUIST:  Object to the form.
24    A.  I don't know.
25    Q.  (BY MS. ADEN)  Okay. Now, when all of this was

59 (Pages 230 - 233)

1 taking place in 2018, you were running for elected
2 office; is that correct?
3     A. In '18? That was the general election, yes.
4     Q. And your opponent was Ms. Mattox?
5     A. Correct.
6     Q. And you have a role, a decision; you have power
7 over setting the election schedule; is that correct?
8     A. Correct.
9     Q. During an election that you, yourself, are
10 involved in?
11     A. Correct.
12     Q. Do you see that as a conflict of interest?
13     A. No. I mean, that's just -- that's part of the
14 process. I actually do very well with Prarie View. So
15 I really don't have a problem with students voting
16 because I know a lot of students vote me.
17     Q. How do you know that?
18     A. I talk to the students. They talk to me. They
19 tell me they voted for me after they come out of the
20 poll. If you actually go around and break down the
21 numbers, you can see the crossover votes for me.
22     Q. Do you think providing them more early voting
23 might be a way to have more participation and perhaps
24 have more vote for you?
25     MR. SEAQUIST: Object to the form.

1     A. It could, but the primary thing is to respect
2 the process. So I also want people to respect the
3 process and I think that's what this court has tried to
4 do and we've tried to emphasize respecting the process.
5     We have a process. I mean, we continue to
6 work to this day, despite this lawsuit. I'd be working
7 on this even -- Dan Teed and I started looking at voting
8 centers before this lawsuit ever came about. We were
9 starting to look at voting centers to make it easier for
10 people to vote across the county and in Prarie View, and
11 that's something we were doing without being pushed or
12 prodded or anything else; and we're going to continue to
13 do that.
14     I mean, our meeting with Dr. Ruth was
15 precisely that. Was to, you know, try to see if we can
16 get voting centers where set schedules and these kind of
17 issues don't come up any longer.
18     Q. (BY MS. ADEN) Could clarify just specifically
19 what parts of Mr. Luther's statements you agree with and
20 disagree with?
21     A. Some of the statements -- I mean, I'll be
22 honest. Some of the statements I don't understand
23 because this is -- this is a transcribed -- this is a
24 transcription of him saying something. So, for example,
25 he started "and those students aren't being -- they're

1 not -- they don't -- these people don't care about
2 them." I don't even know what that means.
3     Q. Okay.
4     A. So that I don't know.
5     "They only care about the commodity they
6 bring to the table, which is their one commodity, their
7 vote." I don't know if I would agree with that -- if
8 they, by "they" he means the students, they have a --
9 they do have a vote, but I don't know they just -- I
10 don't know. That's a difficult statement to say whether
11 I agree or disagree with it.
12     "Why do they have it at the student center?
13 Because every student in college has to go through the
14 student center because easy pickings for those vultures
15 out there, those political vultures, who are standing
16 out there to decide how to drive them into that polling
17 place so they will pull the lever." Again, why do
18 they -- I'm not sure who they have -- it says, "they
19 have to have it on the student center." So I don't, you
20 know, know about this statement, who he's referring to.
21     "Because everything student in college has
22 to go through student center." Yes, that is -- I think
23 most of them do.
24     "So they're easy pickings for the vultures
25 out there, those political vultures, who are standing

1 there deciding..." I don't know if I would they are easy
2 pickings. I think they're independent, and they're --
3 you know, the students of Prarie View A&m are some of
4 the brightest students in the state of Texas. So
5 probably don't necessarily agree with that.
6     "That one click/one vote. Press the one
7 party vote, and don't let them tell you that those
8 students are independents." Again, I'm not sure who
9 he's referring to in how he makes them -- who -- "let
10 them tell you that those students are independents." I
11 don't understand who he's referring to there.
12     They may very well be independents. I
13 agree.
14     "And when they're driven into that polling
15 place, they're cajoled; they're entreated; they're
16 disparately engaged to pull that one lever, to push that
17 one button." Well, that's called a campaign. Yes,
18 people want you to vote a certain way.
19     "And that's what this is about. It's about
20 Democrat politics." You could probably take out
21 Democrat, and I would agree with that. It's politics.
22     "Democrat relevance and Democrat influence
23 in the politics. It's not about race. It's not about
24 disenfranchisement, and I disavow everything in that
25 lawsuit. And I hope that you guys, when you decide this

Page 238

1  matter, that you will defend the people of this county,
2  not just the students of Prarie View. And, also, if you
3  make a compromise, you make a compromise that's fair for
4  everyone. Thank you." I don't have problem with end of
5  his statement.
6      Q. Did you ever express agreement or disagreement
7  with anything that he said when he made these comments?
8      A. I don't believe -- if this was public comments,
9  I could not express anything to it.
10     Q. Okay. Final exhibit is bringing us into the
11  present. It should be Exhibit 20.
12         MS. ADEN: And I will have to borrow one of
13  yours when you get to a break. Thank you.
14         THE CERTIFIED STENOGRAPHER: Uh-huh.
15         (Exhibit 20 marked.)
16     Q. (BY MS. ADEN) Are you familiar the Washington
17  Post story "In rural Texas, black students' fight for
18  voting access conjures a painful past" by Amy Gardner
19  from September 24, 2019?
20     A. Yes.
21     Q. Do you recall speaking with THE CERTIFIED
22  STENOGRAPHER for this story?
23     A. Yes.
24     Q. Okay. And if I could direct you to the
25  comments that are attributed to you, which is on the

Page 239

1  second-to-last page. These are double-sided pages?
2      A. I think I have multiple copies.
3      Q. Well, that's by accident. I'm sorry.
4      A. Okay.
5      Q. And --
6      A. Next-to-last page.
7      Q. And on the top of the last page, there should
8  be a sentence that reads, "still, Duhon."
9      A. Uh-huh.
10     Q. Do you mind reading that sentence and the next
11  one?
12     A. (As read): "Still Duhon acknowledged that some
13  of the counties still view Prarie View students as a
14  political threat."
15         THE CERTIFIED STENOGRAPHER: Read it again.
16         THE WITNESS: Was that too fast?
17         MS. ADEN: We're all winding down, and
18  that's what happens.
19     A. (As read): "Still Duhon acknowledged that some
20  of the counties still view Prarie View students as a
21  political threat."
22         Do you want me to keep going?
23     Q. Yes, please.
24     A. (As read): "I think there's always been this
25  fear that if all the students voted and they voted in a

Page 240

1  certain, they could take over the county," he said.
2      Q. What did you mean when you said, you ran for
3  office -- take it back.
4         I would like to ask: Did you make these
5  statements?
6      A. Yes.
7      Q. Okay. And what did you mean by "take over the
8  county"?
9      A. What I meant was that there's some people, not
10  all, that have a fear that if the students all vote
11  Democrat, then the county would go completely Democrat.
12     Q. Who do you think holds that fear?
13         MR. SEAQUIST: Form.
14     A. This is just -- you know, this is -- it's a
15  very small group of -- you know, specifically, I just
16  had conversations with people here and there, and that's
17  a fear that has existed in the past and is getting
18  smaller all the time, but that is a fear. It's not my
19  fear, just so we're clear, at all. But that is just a
20  sum fear as something that can happen if all the
21  students turned out, and they all voted Democrat. Then
22  the county would become a Democrat county.
23     Q. (BY MS. ADEN) Does it include Mr. Luther?
24     A. No. I wouldn't say that David would be counted
25  in that.

Page 241

1      Q. Despite having read statements from the 10/24
2  meeting just now?
3      A. Yes. You know, because, again, I don't think
4  that's a fear of his. He was stating that certain
5  people prey upon the students and try to get them to
6  vote a certain way. You know, I'll be honest. David
7  and I have had conversations that neither of us have the
8  fear, and we've expressed that to each other.
9      Q. Has any of that been on public record?
10     A. Not that I'm aware of, no.
11     Q. Okay. Do you think it's a fair that's held by
12  any of the sitting county commissioners?
13     A. I don't know. You'd have to ask them.
14     Q. Is it a fair that is held by members of the --
15  any of the political leadership in the county?
16         MR. SEAQUIST: Form.
17     A. Political leadership? I'm trying to -- I guess
18  I'm trying to understand what you mean by political
19  leadership. Within the party?
20     Q. (BY MS. ADEN) Within the party, within any of
21  the elected offices that we talked about earlier.
22         MR. SEAQUIST: Form.
23     A. Maybe some -- there might be a few older folks,
24  you know. And by older, probably people that are over
25  80 years old; but, again, small number of people.

61 (Pages 238 - 241)

Page 242

1    Q. (BY MS. ADEN)  What did you mean by "take over
2    the county specifically"?
3    A. A change in leadership.
4    Q. Political leadership?
5    A. Correct.
6    Q. Okay.  And then if you turn to the page before
7    that is down here, there is a paragraph that reads, "the
8    49 year old who grew up in adjacent Fort Bend County,
9    moved to Waller in 2005 to set up a private law
10   practice.  Elected in 2014 to lead the counties
11   governing board.  Duhon said he ran for office 'to get
12   Waller County out of the dark ages."
13   A. Uh-huh.
14   Q. Is that an accurate attribution to you?
15   A. Yes.
16   Q. And what did you mean by "get Waller County out
17   of the dark ages"?
18   A. Waller County, you know, one of the issues that
19   Waller County has always had being a rural county is
20   that it's always had a perspective of a rural county.
21   It's been a small county.  A lot of your leadership has
22   been, you know, local farmer or the local banker or, you
23   know -- they never really had to do a lot strategic
24   planning.  They never really had to think about
25   accommodating massive amounts of growth or economic

Page 243

1    development or dealing with high-speed rail or dealing
2    with the Trans-Texas corridor or all of the issues we
3    deal with today being adjacent to the largest
4    metropolitan county in the state of Texas.  So in a lot
5    of ways, they've always done things the way they've done
6    them.  And going forward, we have to change that.  So it
7    has been my intention of -- like the strategic plan is a
8    perfect example.  We have to start planning.  A failure
9    to plan is a plan to fail.  I think Benjamin Franklin
10   said that.  I'm not 100 -- I'm pretty sure.
11   Q. I've heard it before.  That's good.
12   A. Anyway, so that's what I mean by getting out of
13   the dark ages.  We have to move the count forward and do
14   things in this county different than the way they've
15   been done in the past.
16   Q. Does that include moving beyond racial
17   discrimination?
18   A. It can, yes.
19   Q. And racial discrimination in voting?
20   A. Yes.
21   Q. And do you think other members of the
22   commissioners court share your goal?
23   MR. SEAQUIST:  Form.
24   A. You probably would have to ask them
25   specifically, but I would think that the members of this

Page 244

1    court share my -- my thought, my feelings, yes.
2    Q. (BY MS. ADEN)  Do you think it's -- for an
3    institution like Prarie View that you knew has been in
4    here since 1876, do you think it's fair to expect them
5    to have to wait for others to keep up or to move forward
6    in order for them to get their voting rights?
7    MR. SEAQUIST:  Form.
8    A. Did we establish that it's been here since
9    1876?
10   Q. (BY MS. ADEN)  Well, you said it was.
11   A. Oh, I did?
12   Q. Yeah.  You admit that, so...
13   A. Okay.  So repeat your question.  I'm sorry.
14   Q. It's an institution that's been here since
15   1876.
16   A. Right.
17   Q. I think it says it when you drive up to the
18   campus.
19   A. Correct.  It was created at the same time Texas
20   A&M was created.
21   Q. And it's been around.  So do you think, if
22   other people are behind and they're living in the dark
23   ages, do you think it's fair -- and that includes racial
24   discrimination.  Do you think it's fair for the
25   university to continue to wait for those people to keep

Page 245

1    up?
2    MR. SEAQUIST:  Object to the form.
3    Q. (BY MS. ADEN)  To get it together?
4    MR. SEAQUIST:  Same objection.
5    Q. (BY MS. ADEN)  Strike that.  I don't even know
6    what answer I want you to give to that, sir.  If you
7    have an answer, that would be great.  Otherwise, strike
8    it.
9    MR. SEAQUIST:  Well, now, I don't know what
10   the question is.  Start over, if you can.
11   A. All I can tell you is that we work every day to
12   do that, to improve the situation.
13   Q. (BY MS. ADEN)  Okay.
14   A. Contrary to some people's beliefs.
15   Q. Do you think that providing on-campus early
16   voting could be one way for the commissioners court who
17   does -- and for you specifically who represents everyone
18   or has voted and has the capability to be voted by
19   everyone -- do you think responding to the demands for
20   early voting that have consistently been made, not just
21   this year, but in the past --
22   A. Right.
23   Q. -- would be one way to show the Prarie View
24   community that this county is moving beyond its -- the
25   dark ages?

62 (Pages 242 - 245)

1    A. My answer is yes, and we have done that.
2    Q. And is that complete?
3    A. No. It is -- it is never complete. We always
4  have to -- as we move forward and we can grow as a
5  county, we can add machines. We can, you know,
6  hopefully branch out. Maybe have more voting centers.
7  But it is always our goal to move forward, move the ball
8  forward. So we -- I think if you look at what we've
9  done since I became county judge, I think we absolutely
10 beyond a doubt have demonstrated that commitment to the
11 citizens of Prarie View and to the students.
12   Q. Do you recall during the October 17th meeting
13 that either Mr. Jones or Zante {phonetic} Wallace or
14 Joshua Mohammed, they asked just for one day? They
15 asked for one day of early voting. Do you recall that?
16   A. I remember -- I remember more students.
17   Q. One more day.
18   A. I do remember one of the students making that
19 plea is.
20   Q. Do you think if the commissioners court had
21 voted for just one day, that would have an olive branch
22 that could have shown that the county is moving past
23 this history?
24        MR. SEAQUIST: Form.
25   A. I guess, if you're asking me how that would be

1  perceived by others, I would -- if the county had voted
2  to do that, I would hope that people would perceive it
3  that way. Because if that's what the response was, yes.
4    Q. (BY MS. ADEN) That's what they asked for, and
5  that's what the response would have granted what the
6  request was?
7    A. Correct.
8    Q. Okay.
9        MS. ADEN: Can we just have 30 seconds to
10 step out to see if there's any last question?
11       MR. SEAQUIST: Sure.
12       (A break was taken from 6:41 p.m. to
13        6:42 p.m.)
14   Q. (BY MS. ADEN) Judge, I just have one last
15 question if we could go back on the record. Just to
16 clarify, you have no recollection of the security of the
17 machines being a point of concern that was put on the
18 record between August 22nd and October 24th?
19   A. Okay. So you're asking whether or not --
20   Q. You have any recollection --
21   A. -- recollection of the security of the machines
22 being put on -- a concern about the security of the
23 machines being put on the record between August 22nd and
24 September -- I'm sorry. September what?
25   Q. Sorry.

1    Between September 20- -- strike that.
2  We'll try one more time.
3        Do you have any recollection of the
4  security of the machines that would be housed at Prarie
5  View during early voting at the student center, that
6  concern being put on the record in a commissioners court
7  meeting or any of the --
8    A. Right.
9    Q. -- public documents that are associated with
10 it --
11   A. Okay.
12   Q. -- between August 22nd when you guys are
13 determining locations and October 24th which was the
14 last meeting when you made the changes to the early
15 voting after the lawsuit? Was the question of security
16 ever on the record as far as you know?
17   A. The answer to that question is no because we
18 were under the impression that our machine were going to
19 be contained in a secured place. So there was not a
20 concern, because we understood that those machines would
21 be secured and locked. It tuned out later that was not
22 true.
23   Q. And who has the documentation in writing that
24 security was an issue during the 2018 elections?
25       MR. SEAQUIST: Form.

1    A. My understanding is that Christie Eason was in
2  the poll after hours with possibly an election auditor
3  or somebody like that maybe in Secretary of State, and
4  that's when they discovered that there were people on
5  the stage rehearsing and obviously that room was not
6  secured.
7    Q. (BY MS. ADEN) And you have no indicia that
8  that -- something like that is not happening at any of
9  the other polling places that are county controlled that
10 had early voting in 2018?
11       MR. SEAQUIST: Object to the form.
12   A. I'm not aware of that happening at any other
13 location, no.
14   Q. (BY MS. ADEN) And do you what date that was
15 where Ms. Eason saw this?
16   A. No. You would have to ask Ms. Eason
17 specifically. I don't know the specific date.
18   Q. But that --
19   A. You said one question, by the way.
20   Q. But that decision -- but that knowledge was not
21 knowledge that you had between October -- August 22nd
22 and October 24th?
23       MR. SEAQUIST: Form.
24   A. No, that is correct.
25   Q. That is my last question.

63 (Pages 246 - 249)

Page 250

1    A.  Okay.

2        MR. SEAQUIST:  We'll reserved until time of

3    trial, and we will read and sign, please.

4        THE CERTIFIED STENOGRAPHER:  Since this is

5    Federal, do you have any other stipulations you want to

6    put on the record?

7        MS. ADEN:  Not that I know of, no.

8        MR. SEAQUIST:  Abby, do you need me to sign

9    anything?

10       THE CERTIFIED STENOGRAPHER:  Did you want

11   to order?

12       MR. SEAQUIST:  Yeah, we do.

13       THE CERTIFIED STENOGRAPHER:  No.  I'll just

14   put it on the record.

15       (Proceedings concluded at 6:48 p.m.)

16

17

18

19

20

21

22

23

24

25

Page 251

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2              HOUSTON DIVISION

3    JAYLA ALLEN, DAMON        )
     JOHNSON, TREASURE SMITH,  )
4    and THE PANTHER PARTY     )
                               )
5        Plaintiffs,           )
                               )
6    v.                        )  Civil Case No.
                               )  4:18-cv-3985
7    WALLER COUNTY, TEXAS; THE )
     WALLER COUNTY             )
8    COMMISSIONERS COURT;      )
     JUDGE CARBETT "TREY" J.   )
9    DUHON III, in his         )
     official capacity as the  )
10   Waller County Judge;      )
     CHRISTY A. EASON, in her  )
11   official capacity as the  )
     Waller County Elections   )
12   Administrator,            )
                               )
13       Defendants.           )

14

15       REPORTER'S CERTIFICATION
16   DEPOSITION OF JUDGE CARBETT "TREY" J. DUHON, III
17          September 27, 2019
18       That the deposition transcript was delivered
19   to Ms. Leah Aden.
20       That a copy of this certificate was served on
21   all parties and the witness shown herein on
22   _____.
23       I further certify that pursuant to FRCP
24   Rule 30(f)(1) that the signature of the deponent:
25       _____ was requested by the deponent or a party

Page 252

1    before the completion of the deposition and that

2    signature is to be before any notary public and returned

3    within 30 days from date of receipt of the transcript.

4        If returned, the attached Changes and

5    Signature Page contains any changes and the reasons

6    therefore:

7        _____ was not requested by the deponent or a

8    party before the completion of the deposition.

9        I certify that I am neither counsel for,

10   related to, nor employed by any of the parties or

11   attorneys in the action in which this proceeding was

12   taken, and further that I am not financially or

13   otherwise interested in the outcome of the action.

14       Certified to by me this 9th day of October,

15   2019.

16

17

18

19

20       _____
         ABIGAIL GUERRA, Texas CSR 9059

21       Expiration Date:  12/31/19
         VERITEXT LEGAL SOLUTIONS

22       Firm Registration No. 571
         300 Throckmorton Street

23       Suite 1600
         Fort Worth, Texas 76102

24       Phone:  (817) 336-3042

25

Page 253

1    COUNTY OF _____    )
     STATE OF TEXAS         )

2

3        I hereby certify that the witness was notified

4    on_____, that the witness has 30 days or

5    (_____days per agreement of counsel) after being

6    notified by the officer that the transcript is available

7    for review by the witness and if there are changes in

8    the form or substance to be made, then the witness shall

9    sign a statement reciting such changes and the reasons

10   given by the witness for making them;

11       That the witness' signature was/was not returned as

12   of _____.

13       Subscribed and sworn to on this, the _____

14   day of _____, 2019.

15

16

17

18

19       _____
         ABIGAIL GUERRA, Texas CSR 9059

20       Expiration Date:  12/31/19
         VERITEXT LEGAL SOLUTIONS

21       Firm Registration No. 571
         300 Throckmorton Street

22       Suite 1600
         Fort Worth, Texas 76102

23       Phone:  (817) 336-3042

24

25

64 (Pages 250 - 253)

Page 254

1  GUNNAR P. SEAQUIST, ESQ.

2  gseaquist@bickerstaff.com

3          October 9, 2019

4  RE:   Allen, Jayla, Et Al v. Waller County, Texas, Et Al

5      9/27/2019, Judge Carbett "Trey" J. Duhon, III (#3560125)

6     The above-referenced transcript is available for

7  review.

8     Within the applicable timeframe, the witness should

9  read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12     The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  cs-ny@veritext.com

16

17  Return completed errata within 30 days from

18  receipt of testimony.

19   If the witness fails to do so within the time

20  allotted, the transcript may be used as if signed.

21

22       Yours,

23       Veritext Legal Solutions

24

25

Page 256

1  Allen, Jayla, Et Al v. Waller County, Texas, Et Al

2  Judge Carbett "Trey" J. Duhon, III

3       ACKNOWLEDGEMENT OF DEPONENT

4  I, Judge Carbett "Trey" J. Duhon, III, do hereby declare

5  that I have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____     _____

12  Judge Carbett "Trey" J. Duhon, III       Date

13  *If notary is required

14       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15  _____ DAY OF _____, 20___.

16

17

18       _____

19       NOTARY PUBLIC

20

21

22

23

24

25

Page 255

1  Allen, Jayla, Et Al v. Waller County, Texas, Et Al

2  Judge Carbett "Trey" J. Duhon, III (#3560125)

3       E R R A T A  S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____  _____

24  Judge Carbett "Trey" J. Duhon, III       Date

25

65 (Pages 254 - 256)