PLAINTIFF'S
EXHIBIT

156

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

JAYLA ALLEN, et al.,

PLAINTIFFS

v.                          Civil Case No. 4:18-cv-3985

WALLER COUNTY, et al.,

DEFENDANTS

EXPERT REPORT
OF
Henry Flores, Ph.D.

ON BEHALF OF PLAINTIFFS
JAYLA ALLEN, DAMON JOHNSON, RAUL SANCHEZ, TREASURE SMITH, AND
THE PANTHER PARTY

# TABLE OF CONTENTS

**I.**   **Statement of Purpose**

**II.**   **Evidence and Methodology**

**III.**   **Qualifications**

**IV.**   *Arlington Heights*

  **A.** Discriminatory Impact
  **B.** Historical Background of Discrimination
  **C.** Sequence of Events
  **D.** Procedural or Substantive Deviations
  **E.** Contemporaneous Viewpoints Expressed by the Decision-Makers

**V.**   **Senate Factors**

**Factor 1**: The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process

**Factor 2**: The extent to which voting in the elections of the state or political subdivision is racially polarized

**Factor 5**: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process

**Factor 7**: The extent to which members of the minority group have been elected to public office in the jurisdiction

**Factor 8**: Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group

**Factor 9**: Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous

**Summary of Senate Factors**

**VI.**   **Conclusions**

**Appendix**

2

## I.    Statement of Purpose

Plaintiffs in this matter have asked me to consider whether Waller County officials intentionally discriminated against Black and Latinx voters in Prairie View, particularly students at Prairie View A&M University ("PVAMU"), through Waller County's actions in adopting and maintaining an early voting plan for the November 2018 election.[1] I also have been asked to consider whether certain factors, identified by Congress, considered in a "totality of circumstances" analysis under Section 2 of the Voting Rights Act ("Section 2"), interacted with social and historical factors to have the purpose or effect of causing an inequality of political opportunity, particularly with respect to Waller County's early voting plans for the November 2018 election, for Black and Latinx voters in Prairie View.

I am being compensated in the amount of $150 per hour and reasonable expenses for my services. Attached, as an **Appendix,** is a copy of my curriculum vitae, which includes a list of cases in which I have provided written or oral testimony.

## II.    Evidence and Methodology

This report draws upon sources standard in historical and scientific analysis, including: public documents from the Waller County website, such as video recordings of Commissioners Court hearings from January 2018 through May 2019, as well as the Texas Legislative Counsel's Redistricting website and the Texas Secretary of State's website; other government documents; and newspaper and journalistic articles. Additionally, I reviewed demographic information of Waller County and the cities of Waller, Prairie View, Hempstead, Brookshire, Monaville, Igloo, and Hockley, as well as other smaller communities within the county. I also reviewed election

---

[1] "Black" and "African-American" are used interchangeably herein. Both refer to people who identify as Black only or Black in combination with other racial groups, including Black-Hispanic. "Latinx" and "Hispanic" are used interchangeably herein. Both refer to people who identify as Latinx or Hispanic only.

returns for the county for the years 2016 and 2018, court opinions, briefs, memoranda, and correspondence from this case, scholarly articles, and books on the topics of my research.

In assessing intentional discrimination, this report follows the methodological guidelines set forth in the United States Supreme Court's opinion in *Village of Arlington Heights v. Metropolitan Housing Development Corp*., 429 U.S. 252 (1977), which are similar to procedures followed by historians in making such assessments. In *Arlington Heights*, the Court focused on five distinct factors that are relevant to ascertaining intentional discrimination: (1) discriminatory impact, (2) historical background of discrimination, (3) the sequence of events leading up to the decision, (4) procedural or substantive deviations from the normal decision-making process, and (5) contemporaneous viewpoints expressed by the decision-makers. I analyzed the latter three of those factors: the sequence of events leading up to the decision, procedural or substantive deviations from the normal decision-making process, and contemporaneous viewpoints expressed by the decision-makers. I also reviewed, considered, and incorporated into this report the analyses by other experts for Plaintiffs related to discriminatory impact and the historical background of discrimination. The report uses these factors methodologically only to assess intentional discrimination in Waller County's decision to adopt and maintain the November 2018 early voting plan, not to reach any legal conclusions.

Regarding Section 2's results test, this report will consider, as part of the "totality of circumstances," certain relevant Senate factors, as discussed in *Thornburg v. Gingles*, 478 U.S. 30 (1986). I analyzed the following factors: the responsiveness of Waller County officials to the specific needs of PVAMU students specifically and Prairie View residents generally, and whether the rationales advanced by Waller County for its November 2018 early voting plan are tenuous. I reviewed, considered, and incorporated into this report the analyses by other experts for Plaintiffs

4

related to the history of official discrimination in Texas generally and Waller County specifically. I also considered the extent to which Black people in Waller County continue to bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process.

## III.    Qualifications

This analysis draws on my extensive experience in voting rights litigation and expertise in political history, political analysis, and historical and statistical methodology.

I am the principal and owner of FloreStat, LLC, a consulting firm. I am also the Distinguished University Research Professor Emeritus of St. Mary's University, where I have been employed for over 35 years.

I have worked as a consultant or expert witness for both plaintiffs and defendants in more than 40 voting and civil rights cases, including several Texas voting rights and reapportionment cases, where I have prepared expert reports, testified in depositions or hearings, or consulted on issues including the history of voting discrimination in Texas; the "totality of the circumstances" inquiry under Section 2 of the Voting Rights Act, including racially polarized voting and other Senate Factors; and the discriminatory racial intent motivating a specific action or series of official actions. Recently, the Southern District of Texas cited my testimony in *Lopez v. Abbott*, a judicial redistricting case, regarding the State of Texas's history of official racial discrimination in voting as part of the court's findings related to the "totality of the circumstances." 339 F. Supp. 3d 589, 611 (S.D. Tex. 2018). I have also performed work for a defendant in a voting rights case in *Arizona Minority Coal. for Fair Redistricting v. Arizona Indep. Redistricting Comm'n*, No. 2002-004380, 2003 WL 25550388 (Ariz. Super. Nov. 10, 2003).

5

### A. Discriminatory Impact

As discussed in greater detail in the expert report of plaintiffs' expert Dr. Robert Stein, it appears that Waller County's November 2018 early voting plan disproportionately impacted voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View.

As documented in the declaration of plaintiffs' expert William S. Cooper, Prairie View is the only city in Waller County where the majority of voting-age residents are both Black and aged 18 through 20. No other Waller County city or area has more than 8% of voters that are aged 18 through 20. According to the U.S. Bureau of Census' 2010 Census, 54% of the Prairie View voting-age population ("VAP") is 18, 19, or 20 years old. In Waller County as a whole (including Prairie View), a total of 13.6% of the VAP is aged 18 through 20. Further, the City of Prairie View has the highest Voting Age Population ("VAP") in Waller County.

In addition, PVAMU students used early voting at one of the highest rates in Waller County. According to Dr. Stein's expert, during the 2018 election, a greater percentage of PVAMU student voters voted early than non-PVAMU student voters in Waller County (81%, 10% more than voters who were not PVAMU students). Moreover, for the 2018 election, Dr. Stein also found that early voters who live in Waller County neighborhoods that are majority-Black comprised 72% of the early votes cast at the PVAMU Student Center, 47% cast at the Waller County Community Center (located in the City of Prairie View, adjacent to the southmost portions of the PVAMU campus), and 47% cast at Prairie View City Hall

This use of early voting likely stems from a combination of factors, including, but not limited to, the unique lack of transportation and disadvantaged socioeconomic circumstances that Black voters experience in Waller County.[2] Based on the American Community Survey ("ACS")

---

[2] These socioeconomic disparities are detailed in Mr. Cooper's report and also discussed under Senate Factor 5 in this report.

five-year estimates cited in William Cooper's declaration, Black Prairie View voters are also more likely to commute to work by walking, biking, or via carpool (i.e., riding in another person's vehicle), taxicab, or public transit as compared to white Waller County voters. As documented in Dr. Peniel Joseph's expert report, Waller County officials have been aware of the disparities in transportation access that negatively impact PVAMU students' ability to vote off-campus since at least 2008, when these disparities were raised in a federal lawsuit.[3] Along the same lines, Black Waller County voters are more likely to have lived below the poverty line in the last 12 months, as well as lack health insurance, as compared to white Waller County voters. As such, Black voters, particularly those who live in Prairie View, rely on access to early voting.

Despite these realities, including dependence on and frequency rate of early voting, combined with community members' repeated demands for early voting, including on-campus at PVAMU, as detailed below, the County provided Black voters in Prairie View significantly fewer early voting days and hours as compared to white and/or older voters in Waller County, as Dr. Stein's expert report documents.[4] Waller County's decision to offer fewer hours and days of operation of early voting locations in the City of Prairie View—which has the largest concentration of Black voters and Black voters aged 18 through 20 in the County—created a discriminatory impact, which was foreseeable. Moreover, as Dr. Joseph described in greater detail in his report, this decision must be viewed within a wider and contemporaneous voting rights context of an

---

[3] Report of Dr. Joseph at pages 24 through 25; *see also* "The Walk of Political Engagement at PVAMU," *PVAMU* (March 31, 2017) (retrieved from: https://www.pvamu.edu/1876/2017/03/31/the-walk-of-political-engagement-at-pvamu/). In addition, students also protested the County's proposed placement of early voting locations in 2016 due to their inaccessibility to students, who disproportionately lacked access to private vehicles as compared to other voters in Waller County. *See* Samantha Lachman, "Voter Suppression Is Happening Everywhere. This Institute Is Trying To Stop It," *Huffington Post*, March 18, 2016 (retrieved from: https://www.huffpost.com/entry/voting-rights-institute_n_56eb145ae4b03a640a69fe56).
[4] Report of Dr. Stein at page 15 and Exhibit A.

ongoing record of Texas and Waller County, specifically, discriminating against PVAMU students with regard to their right to vote.

### B. Historical Background of Discrimination

Waller County, specifically, and Texas, generally, has a long, intense, and judicially-recognized history of discriminating against Black voters. Over decades, and continuing to the present, the County has repeatedly denied or abridged their right to vote. This undisputed history, which has directly impacted the opportunity for Black people in Waller County to participate fully in the political process and elect candidates of their choice, is detailed in the expert report of Dr. Peniel Joseph. I reviewed this history and incorporate it by reference into this report.

This history shows a repeated and continuous pattern of attempts by Waller County officials to curtail, suppress, and disenfranchise Black voters, especially PVAMU students. Prior to the enfranchisement of Americans over 18 years old in 1971, Waller County had almost no Black voters. Since then, officials have employed practices like restrictive or unnecessary voter registration, property requirements and selective prosecutions, and voter and candidate challenges that have discriminated against PVAMU students and other Black voters in Waller County.

While the modern era of voter suppression against PVAMU dates back to 1971, recent examples underscore Waller County's "stubborn persistence" to disenfranchise Black PVAMU students. Beginning in 1971, the Waller County Tax Assessor-Collector responsible for registering voters denied 45 PVAMU students' registration based on their failure to respond appropriately to the then-residency requirements. The Supreme Court struck down these requirements in 1979.[5]

Then, in 1992, Waller County charged and indicted, by a grand jury, 19 PVAMU students with "illegally voting." The students had not received their voter registration cards in the mail, but

---

[5] *Symm v United States,* 439 U.S. 1105 (1979).

8

were subsequently allowed to vote after signing affidavits attesting that they were registered to vote. They were then charged with illegal voting. The charges were dropped after intervention by the U.S. Department of Justice.

In 2003, the Waller County District Attorney publicly threatened again to prosecute PVAMU students if they attempted to register without proving that they qualified under his definition of domicile, even though requiring students to meet a higher burden than other county voters to establish residency had long been ruled unconstitutional by the U.S. Supreme Court. This threat ran counter to settled law from the Supreme Court's 1979 decision and prompted PVAMU students to sue Waller County to prevent the District Attorney from making such threats and to file a second lawsuit in Houston federal court to block county officials from restricting early voting days. In court, PVAMU argued that the District Attorney's actions violated the Fourteenth and Fifteenth Amendments to the U.S. Constitution and the Voting Rights Act. Only in response to the litigation—and after the Texas Secretary of State, the Texas Attorney General's Office, and the U.S. Department of Justice intervened—did Waller County District Attorney decline to take further prosecutorial action. Ultimately, the U.S. District Court for the Southern District of Texas in Houston approved a settlement agreement and order in the federal lawsuit in which the Waller County District Attorney acknowledged that his actions and statements wrongly and unconstitutionally "left the impression that students in Waller County should not enjoy the same presumption of domicile for voting purposes as nonstudent residents of the County."[6]

In February 2004, PVAMU students filed a lawsuit against Waller County seeking to expand their access to early voting after Waller County reduced the number of days of voting at a

---

[6] Consent Order at 11, *Prairie View Chapter of NAACP v. Kitzman*, No. 4:04-cv-00459 (S.D. Tex. Feb. 24, 2004), ECF No. 11.

City of Prairie View early voting location from two to one, claiming that there were not enough voters to justify more than one site.[7]

In 2007, the U.S. District Court for the Southern District of Texas in Houston was called upon once again to oversee a federal lawsuit regarding Waller County's violation of federal voting rights statutes. This time, the U.S. Department of Justice under then-President George W. Bush had filed suit arguing that Waller County was in violation of Section 5 of the Voting Rights Act (VRA). Waller County had implemented new voter registration procedures that negatively—and selectively—impacted PVAMU students, without obtaining Section 5 preclearance.[8] This time, the Southern District of Texas in Houston entered a consent decree in which Waller County admitted that its actions violated both Section 5 of the Voting Rights Act and Title I of the Civil Rights Act of 1964.[9]

In 2008, Waller County entered into a consent decree with the U.S. Department of Justice to ensure that the County would halt registration practices that had not been precleared, as required under law through Section 5 of the Voting Rights Act.

PVAMU students have had to constantly protest and fight to gain access to an on-campus voting site. In 2008, PVAMU students organized a demonstration to obtain an early voting site on campus to participate in the General Election. Despite the PVAMU campus's large and growing voter population, discussed in more detail in this report and Mr. Cooper's report, the County continued to refuse for five more years to allow an early voting site on campus. Only in 2013, after appeals from the PVAMU president, the president of the PVAMU Student Government Association, the Texas Secretary of State, and True the Vote, a national group focused on voter

---

[7] "Prairie View Students File another Voting Rights Suit," February 16, 2004, https://www.myplainview.com/news/article/Prairie-View-students-file-another-voting-rights-8814873.php.
[8] Consent Decree at 3, *United States v. Waller Cty.*, No. 4:08-cv-03022 (S.D. Tex. Oct. 17, 2008), ECF No. 8.
[9] Ibid. at 4-5.

fraud, did Waller County finally relent and provide early voting on the PVAMU campus. Following the change, PVAMU continued to organize to ensure the use of that site as recently as 2016 and, as evident by this case, 2018.

As documented in Dr. Joseph's report, federal courts have found that some discriminatory voting laws and practices in Texas have been a response to demographic change in the state, which some elected officials apparently see as a threat to their ability to win elections. In 2016, for example, a full panel of judges of the Fifth Circuit Court of Appeals affirmed the Texas district court's ruling that the Texas voter ID law was racially discriminatory. The *en banc* federal appellate court observed that the restrictive voter ID bill was passed "in the wake of a 'seismic demographic shift,' as minority populations rapidly increased in Texas, such that . . . the party currently in power [wa]s 'facing a declining voter base and c[ould] gain partisan advantage' through a strict voter ID law."[10] The historical background of this demographic shift and the state's response to it provided credible evidence that discriminatory intent motivated the voter ID law.

As Dr. Joseph discusses, the same kind of response to demographic changes can also be observed in this case. As documented in the declaration of plaintiffs' expert, William S. Cooper, the proportion of Waller County's citizen voting-age population ("CVAP") that consists of Black citizens of voting age has increased by more than two percentage points since the 2010 Census, while the non-Hispanic white or "Anglo" proportion of Waller County's CVAP has decreased by more than two percentage points. Waller County officials appear to have responded to this increase in Black residents' relative voting strength by seeking to make it more difficult for Black voters and Black PVAMU students to vote.

---

[10] *Veasey v. Abbott*, 830 F.3d 216, 241 (5th Cir. 2016) (en banc).

It is clear from this extensive list of occurrences that there is a pattern of Waller County acting to discriminate against the students at PVAMU in their attempts at obtaining their voting rights. This well-understood and judicially recognized history of extensive and ongoing efforts to suppress PVAMU students' voting informs and provides context for the Commissioners Court actions surrounding the early voting schedule for the 2018 November election.

### C. Sequence of Events

_Process of Adoption of the Original (Pre-Filing of the Present Litigation) Early Voting Plan_

The sequence of events leading to the adoption and maintenance of the original early voting plan for the 2018 general election began on August 22, 2018. This coincided with when PVAMU students were just returning to campus for the Fall 2018 semester.[11] The students were not consulted during this early and essential part of the process, nor was it convenient for the students to participate because at this time they were just returning to campus for the beginning of the Fall semester. Moreover, as discussed in more detail below, the Commissioners Court's actions with respect to approving the early voting hours appear to have been taken outside of the public hearing process, so that public participation by PVAMU students—and by anyone other than two partisan officials—was limited, if not effectively impossible. The Commissioners also appear to have made no attempts to consult with PVAMU students in the development of the plan; in fact, their actions suggest an inappropriate tendency to shield their deliberations from public scrutiny until the last minute.

These actions were taken by the Commissioners Court despite being aware of the predictable pressures experienced by students at the beginning of the school year, such as moving

---

[11]According to PVAMU's website, an event titled "Fall 2018 Move-in" was scheduled for August 19, 2018. Prairie View A&M University, http://www.pvamu.edu/event/fall-2018-move-in/. The first day of classes was August 27, 2018.

into dormitories, participating in academic advising processes, and scheduling and enrolling in classes. Although no doubt aware that these typical student activities made it difficult for students to advocate for a fair early voting plan in August and September, the county exacerbated that difficulty by approving the days and hours of early voting in a closed and unpublicized process that barred PVAMU students from having a voice in the formation of the plan.[12] The predictable coincidence of the early voting plan's non-public development and approval with the arrival of students to campus was likely particularly deleterious to first-year students, who were newly registered to vote and unfamiliar with their new surroundings. The students, new and returning, did not have time to inform themselves of the process—even as they were simultaneously kept out of the conversation by the county government officials during the planning for early voting.

Waller County officials could have accommodated these well-known inconveniences to PVAMU students but chose not to do so. Waller County officials should have provided opportunities for PVAMU students to learn about the early voting plans, as legitimate residents who were eligible to vote and participate in county affairs, such as the decisions surrounding the scheduling of the early voting hours and locations. For example, the Commissioners could have participated in PVAMU's "back-to-school" or registration activities, distributing literature to campus representatives about the process by which the Commissioners Court planned to develop and approve early voting plans, actively soliciting input from students, or even taking the minimal and common-sense step of publicizing the dates on which they planned to approve early voting hours and days. Based on my review of the record, however, the county took none of these actions.

---

[12] Ultimately, as the report of plaintiffs' expert, Dr. Stein, documents, which also is discussed more below, the county appears to have taken advantage of that closed and unpublicized process to develop an early voting schedule that specifically and disproportionately denied PVAMU students' access to voting opportunities.

13

As a result, it appears that the students' interests were not simply ignored but actively avoided by Waller County officials during the planning process.

Specifically, on August 22, 2018, the four members in attendance at a regularly scheduled meeting of the five-member Waller County Commissioners Court unanimously approved only the early voting <u>locations</u> for the November 2018 General Election.[13] During the public comment portion of the August 22 meeting, a member of the public, Dr. Denise Mattox, informed the Commissioners that she had reviewed the proposed list of locations to be approved at the meeting and noted with concern "that it doesn't have the early voting <u>times</u>."[14] She further stated: "I guess you'll do that at a later date, and hopefully I can have some input into that."[15] However, she said, because the Commissioners had not yet publicized or discussed the proposed hours and dates of early voting, there was at that time "not enough information to have input on the early voting, which is what [she was] mostly concerned about."[16]

Precinct 4 Commissioner Justin Beckendorff then stated: "On this it says 7 a.m. to 7 p.m."[17] But County Judge Carbett Duhon corrected him, explaining that those times referred only to the voting hours on Election Day. "It doesn't have the early voting times," Judge Duhon stated.[18] Judge Duhon then confirmed that the Commissioners were "just voting on locations, according to the agenda item."[19]

Ms. Christy Eason, Waller County's elections administrator, was not in attendance; however, County Judge Duhon read into the record an email from Ms. Eason stating that "[e]arly

---

[13] *See* Waller County, Tex., *August 22, 2018 Commissioners Court* at 3:51, http://wallercountytx.swagit.com/play/08222018-816.
[14] Ibid. at 21:55 (emphasis added).
[15] Ibid. at 22:09.
[16] Ibid. at 22:36.
[17] Ibid. at 22:48.
[18] Ibid. at 22:54.
[19] Ibid. at 23:01.

voting <u>dates</u> and <u>times</u> in each early voting polling location will be set after our training on the new equipment."[20] Judge Duhon then recounted a subsequent telephone conversation he claimed to have had with Ms. Eason in which he had asked Ms. Eason "if the party chairs, if everybody was on the same page, in agreement with the schedule, and she said they were."[21] Prior to the vote, Commissioner Beckendorff confirmed that "right now we're just voting on the locations, and the times, I guess, will be discussed at a later date."[22]

The discussion of proposed <u>hours</u> or <u>dates</u> for early voting for the November 2018 election does not appear in any public records I reviewed. Additionally, based on the records I reviewed, the date on which <u>hours</u> or <u>dates</u> of early voting would ultimately be considered or approved by the Commissioners Court was not made public in advance.

At that time, before the Commissioners Court's change in composition following the November 2018 election, the five members of the Commissioners Court included: County Judge Carbett "Trey" Duhon III, Precinct 1 Commissioner John A. Amsler, Precinct 2 Commissioner Russell Klecka, Precinct 3 Commissioner Jeron Barnett, and Precinct 4 Commissioner Justin Beckendorff.

At the time of the early voting deliberations, all five members of the Commissioners Court were Republican.[23] Four of the five members of the Commissioners Court were white. The fifth

---

[20] Ibid. at 2:58.
[21] Ibid. at 3:20.
[22] Ibid. at 3:32.
[23] *See* Waller County, Tex., *Cumulative Report – Official* at 6 (Mar. 11, 2014, 10:11 AM), http://www.co.waller.tx.us/page/open/1265/0/03.04.2014%20Primary%20Cumulative%20-%20Rep (County Judge Duhon running as Republican); Waller County, Tex., *Republican Party Canvass Report – Total Votes – Official* at 23 (Mar. 9, 2016, 3:27 PM), http://www.co.waller.tx.us/page/open/1260/0/03.01.2016%20Primary%20Canvass%20-%20Rep (Prec. 1 Comm'r Amsler running as Republican); Waller County, Tex., *Cumulative Report – Official* at 6 (Mar.11, 2014, 10:11AM), http://www.co.waller.tx.us/page/open/1265/0/03.04.2014%20Primary%20Cumulative%20-%20Rep (Prec. 2 Comm'r Klecka running as Republican); Republican Party of Tex., *Chairman Dickey's Update – 3.19.2018*, (Mar. 19, 2018), https://www.texasgop.org/8292-2/ (announcing Prec. 3 Comm'r Barnett's switch to Republican Party in early 2018); Waller County, Tex., *Cumulative Report – Official* at 7 (Mar. 11, 2014, 10:11

15

member, Mr. Jeron Barnett, is Black and was elected from a district in which the majority of citizen voting-age people are Black. Mr. Barnett switched from the Democratic Party to the Republican Party in March 2018 and was not in attendance at the August 22, 2018 meeting.

Subsequently, at some point in late August or early September 2018, but apparently not during a public meeting, the Commissioners Court approved an early voting plan based upon a proposal by chairs of the Democratic and Republic parties. Each of the two major political parties in Waller County had a local chair. David W. Luther, who is white, was the Republican Chair. Rosa Harris, who is Latina, was the Democratic chair.

In the October 17, 2018 Commissioners Court meeting, Judge Duhon stated that the Commissioners had "approved the early voting schedule back on September 22."[24] He then reiterated this point, stating that, on "September 22nd, this court approved the schedule and at that time we had the locations, the times," and further indicating that "[t]here was no discussion, there was nobody that showed up, nobody gave any comment at all."[25] Later in the same meeting, in response to a question from a PVAMU student, Judge Duhon stated that the early voting schedule was "usually approved about a month ahead of the early voting."[26] The student then asked Judge Duhon: "So around, like, September 22nd?"[27] Judge Duhon responded in the affirmative, thus seeming to state for the second time that the early voting hours and dates were approved on September 22, 2018.

---

AM), http://www.co.waller.tx.us/page/open/1265/0/03.04.2014%20Primary%20Cumulative%20-%20Rep (Prec. 4 Comm'r Beckendorff running as Republican).

[24] *See* Waller County, Tex., *October 17, 2018 Commissioners Court* at 47:54, http://wallercountytx.swagit.com/play/10172018-1225.

[25] Ibid.

[26] Ibid. at 86:32.

[27] Ibid. at 86:37.

16

But Judge Duhon's repeated insistence during the October 17 meeting that the early voting plan was approved on September 22 is contradicted by the public record and his own later statements. September 22, 2018 was a Saturday, and there is no record of a Commissioners Court meeting on that date. More recently, in response to an interrogatory in this lawsuit, Judge Duhon stated that the early voting <u>hours</u> and <u>dates</u> were "approved/adopted by Commissioners Court on September 5, 2018 as part of a comprehensive order calling the eneral election."[28] However, my review of the meeting agenda, minutes, and video for the September 5, 2018 Commissioners Court meeting substantiates only part of this statement. During the September 5 meeting, Judge Duhon indeed made a motion, which was approved, to order the General Election on November 6, 2018. However, there was no discussion or even identification of early voting <u>hours</u> or <u>dates</u> during that motion or approval process.[29]

The meeting agenda,[30] minutes,[31] and agenda backup[32] for the September 5 meeting also fail to identify the proposed <u>hours</u> or <u>dates</u> of early voting that the Commissioners would purportedly be approving in that meeting. Additionally, a review of previous Waller County Commissioners Court hearings did not reveal any public hearings on proposed early voting <u>hours</u> or <u>dates</u> from Ms. Eason or from the party chairs, or any public discussion or dissemination of any proposed early voting <u>hours</u> or <u>dates</u>. Nor did any meetings held after September 5 but before October 17, 2018 reflect such a consideration. Thus, the date and process by which the original

---

[28] *Defendant Judge Trey Duhon's Response and Objections to Plaintiffs' First Set of Interrogatories* at 3 (provided by Plaintiffs' attorneys).

[29] *See* Waller County, Tex., *September 5, 2018 Commissioners Court,* http://wallercountytx.swagit.com/play/09052018-654.

[30] *See* Notice of Meeting of Commissioners Court of Waller County, Texas, Wednesday September 5, 2018, http://www.co.waller.tx.us/upload/template/0461/docs/2018CC/Agenda%20090518.pdf

[31] *See* Minutes, Waller County Commissioners Court Regular Session — September 5, 2018, http://www.co.waller.tx.us/page/download/431/0/09.05.18 Regular.pdf.

[32] *See* Agenda Backup, Waller County Commissioners Court Regular Session (Sept. 5, 2018), http://www.co.waller.tx.us/upload/template/0461/docs/2018CC/Number%20Backup%20090518.pdf

early voting <u>hours</u> and <u>dates</u> were considered and approved is not substantiated in the public record.[33]

Based on these circumstances, my opinion is that the procedural sequence of events by which the early voting plan for the November 2018 General Election was developed and adopted was insufficiently open and transparent. Based on a review of Dr. Stein's report, in addition to my conversation with the Bexar County Elections Administrator, it also appears that this process was inconsistent with and departed from best practices.

*Substantive Effect of the Original Early Voting Plan*

At some point after the Original Early Voting Plan was adopted through the non-transparent and irregular process described above, it was posted on the Waller County website with <u>dates</u>, <u>locations</u>, and <u>times</u> identified for both weeks of early voting.[34]

Texas provides up to two weeks of early voting. Tex. Elec. Code § 85.001(a). Generally, the last day of early voting must be the Friday before the Tuesday General Election Day. *Ibid.*

In Waller County, during the first week of the two-week early voting period in 2018, there were no early voting sites or opportunities anywhere in Prairie View. Only three days of early voting (Monday-Wednesday, from 8:00 a.m. to 5:00 p.m.) were scheduled to take place at the on-campus polling site at PVAMU Memorial Student Center during the second week of early voting for a total of 27 hours, under the early voting plan that the Commissioners developed and approved

---

[33] During the September 19, 2018 meeting, the Commissioners Court unanimously approved a notice of general election. Again, there was no discussion or identification of the <u>hours</u> or <u>days</u> during the meeting. Waller County, Tex., *September 19, 2018 Commissioners Court*, http://wallercountytx.swagit.com/play/09192018-1049. During the October 10, 2018 meeting, Christy Eason requested a motion, which was approved, to add "additional hours to the early voting hours that you've already approved" in Brookshire and at the Waller courthouse. Waller County, Tex., *October 10, 2018 Commissioners Court*, http://wallercountytx.swagit.com/play/10102018-554g. Based on this comment, the county's early voting hours were already approved by at least October 10, 2018. But none of the meetings from August 22, 2018 to October 10, 2018 included discussion or agenda items related to approving early voting <u>hours</u>.

[34] Waller County Elections, October 2018, http://www.co.waller.tx.us/page/Elections.Calendar?date=10-22-2018.

without public input in August and September of 2018. Based on publicly available documents and the information provided by the Defendants during this litigation, these hours and days were approved without any consultation with the students at PVAMU.

In this original plan, the Commissioners also scheduled only two days of early voting at the Prairie View Community Center for a total of 24 hours, also exclusively in the second week of early voting. Prairie View A&M University is 83% Black among its student body,[35] while the City of Prairie View is 90.21% Black with a voting-age population of 91.99% Black.[36] Initially, the Commissioners did not allocate any early voting hours for any Prairie View polling location during the first week of early voting. Additionally, the Commissioners initially did not allocate any evening or weekend early voting hours allotted to any location in Prairie View—on or off PVAMU's campus—between the first and second weeks of early voting.

This contrasts with the early voting hours and days scheduled for the City of Waller, which has a majority white voting-age population (VAP) and where less than 8% of the VAP is under the age of 21.[37] The Commissioners allocated two early voting locations to the City of Waller. The first location, Waller Independent School District, had six days of early voting for a total of 50 hours, while the second location, Fieldstone, had three days for a total of 23 hours. Both locations in Waller had Saturday early voting hours, as well. During the second week, the Commissioners provided Waller with five days of early voting, totaling 51 hours, including two days of extended evening hours up until 7:00 p.m. As a result, the Commissioners afforded the City of Waller voters eleven days of early voting, for a grand total of 124 hours, between Waller ISD and the Fieldstore

---

[35] Prairie View A&M University Enrollment Snapshots: Fall 2018 at 6 (last visited June 29, 2019), http://www.pvamu.edu/ir/wp-content/uploads/sites/98/FA18_Enrollment-Snapshots.pdf.
[36] Declaration of William S. Cooper at pages 6 and 7.
[37] Ibid. at pages 7 and 9.

voting locations. Below is a summary of the total number of early voting hours per week for each

early voting location in Waller County during the 2018 general glection under the initial plan.[38]

| 2018 General Election Early Voting Hours and Locations | | | |
|---|---|---|---|
| | Week 1 | Week 2 | Total |
| **Waller County Court House (Hempstead)** | 55 | 51 | 106 |
| **Waller ISD (Waller)** | 50 | 51 | 101 |
| **Waller County Library (Brookshire)** | 55 | 51 | 106 |
| **Fieldstore (Waller)** | 23 | 0 | 23 |
| **JP # 3 Monaville** | 23 | 0 | 23 |
| **Katy VFW** | 27 | 0 | 27 |
| **PVAMU Memorial Student Center** | 0 | 27 | 27 |
| **Waller County Community Center (Prairie View)** | 0 | 24 | 24 |

**SOURCE:** ECF Document No. 49

As the data in the above table demonstrate, under the initial early voting plan, the

Commissioners provided PVAMU and the Waller County Community Center, which is located

off-campus of PVAMU in Prairie View, with far fewer hours and hours only during the second

week of early voting as compared to what they provided in other urban areas of Waller County

like Waller and Brookshire. Notably, as discussed in Dr. Stein's expert report, Precinct 309, the

PVAMU campus voting precinct is home to the largest number of registered voters of any precinct

in Waller County.[39] As a result, it does not appear that the number of early voting hours allocated

to PVAMU specifically and Prairie View City generally are on equitable footing with other areas

of Waller County.

---

[38] *See* Report of Dr. Stein at Exhibit A.
[39] Report of Dr. Stein at page 10.

*Proposed but Unsuccessful Modification of the Original Early Voting Plan on October 17, 2018*

Apparently in response to this stark disparity, the agenda for the Commissioners Court's October 17, 2018 hearing included discussion of modifications to the early voting plan proposed by the county's election administrator, Christy Eason. During the October 17, 2018 hearing, several Black persons, students, community leaders, and elected members of the Prairie View City Council testified and objected to the proposed early voting plan. The testimony, referenced in more detail below, noted the disparate treatment in the plan and the negative impact on the PVAMU students.

During discussion of the corresponding agenda item during the October 17 Commissioners Court meeting, Election Administrator Christy Eason proposed changes to the early voting hours. Ms. Eason began her presentation noting that she was proposing her changes to the early voting schedule because she had determined that the original early voting schedule did not provide "equal representation" to the PVAMU students.[40] As a result, Ms. Eason proposed adding additional days of early voting at the student center on the PVAMU campus and Prairie View City Hall during the first week. She also proposed extending the voting hours from 8:00 a.m. to 5:00 p.m. to 7:00 a.m. to 7:00 p.m. During the presentation of her proposal, Ms. Eason noted that the "hubs" of Waller County were Prairie View, Waller, Brookshire, and Hempstead, and that *only* Prairie View lacked early voting on every day of the early voting period. "[W]e have to give them equal representation," Ms. Eason stated. Judge Duhon similarly agreed that "we have to give [students] equal access."[41] So, according to Ms. Eason, it was in the spirit of equal representation that Prairie View should have the same number of early voting hours as the other three hubs (i.e., Waller,

---

[40] *See* Waller County Tex., *October 17, 2018, Commissioners Court,* http://wallercountytx.swagit.com/play/10172018-1225 at 41:18.
[41] Ibid. at 58:32.

Brookshire, and Hempstead). Ms. Eason concluded her remarks by stating that she felt the process for choosing hours and locations needed to be standardized and be more inclusive so that citizens from every part of the county could have a voice in the process. Standardization, she expressed, would avoid the last-minute chaos surrounding the decision.

After hearing Ms. Eason's proposal, Judge Duhon acknowledged: "I do think there is an inequity" with respect to the limited number of early voting days and hours provided to Prairie View under the Original Early Voting Plan.[42]

Precinct 1 Commissioner John Amsler noted in commentary that the conversation about unfairness to PVAMU students was "beginning to sound like a broken record." "Ever since I've been on this court," he added, "when it comes to election time, *this same issue comes up every time*."[43]

Dr. Denise Mattox, an African American pediatrician and a former candidate for public office, who testified at the October 17 meeting referenced above, requested that the Commissioners Court grant PVAMU students additional early voting hours, noting that "*every year*" she had "*ask[ed] that the students of Prairie View be allowed parity*" with respect to early voting on campus. She noted that other universities, such as the University of Texas at Austin and Texas A&M University, have early voting for their students on campus for the entire early voting period and said that she could not understand why the PVAMU students were treated differently. Dr. Mattox also pointed out that Prairie View was one of the "metropolitan" areas of Waller County yet only had a limited number of early voting hours, while the other three "metro" areas—likely

---

[42] Ibid. at 60:52.
[43] Ibid. at 74:45 (emphasis added).

those also referenced above by Ms. Eason—had early voting every day of the period. This did not appear to be fair, she said.[44]

Five Prairie View A&M University students, who are Black, also presented their testimony on October 17. Mr. Kendric Jones, the Student Government Association President and a member of the Prairie View City Council, requested that early voting be established on campus, even if only for one or two days during the first week. Mr. Jones said: "I feel like we should have the same right … to be able to [vote] within our County."[45] Judge Duhon asked him if adding several days at the Waller County Community Center was acceptable to students; in response, Mr. Jones explained that students did not frequently visit the post office next to the community center because they received their mail on campus.[46] As a result, Mr. Jones said, offering early voting at the community center would not be an effective substitute for early voting at the on-campus Memorial Student Center, which, in contrast to the community center, was a center of campus life for PVAMU students.

Mr. Jones was followed by Ms. Kirsten Budwine, a certified student voter registrar, who pointed out that the issue of not placing sufficient number of hours of early voting on the PVAMU campus is a recurring issue that occurred "last year [and] the year before."

Ms. Budwine was followed by Mr. Xante' Wallace, a PVAMU graduate student and elected Prairie View City Council member, who substantiated Ms. Budwine's statement of the recurring problem of not having enough early voting hours for the student body.[47] According to Mr. Wallace, "for it to be zero days on the first week of Early Voting after all of the issues we've had over the years and decades, that should never even become an issue … And I feel like this is a grave

---

[44] Ibid. at 77:06 (emphasis added).
[45] Ibid. at 82:10.
[46] Ibid. at 83:32.
[47] Ibid. at 88:46.

injustice that we have zero days." He also spoke in support of Ms. Eason's recommendations for amending the early voting hours.

Mr. Joshua Muhammad, then a PVAMU student, urged the Commissioners to provide early voting on-campus during the first week.[48]

Mr. Antonious Brown, another PVAMU student and an employee of the United States Army, testified that there were approximately 3,000 potential registered voters on the campus who were members of the Waller County community and would not be served if the early voting hours on the campus were not expanded. He urged the Commissioners to consult with a PVAMU representative when deciding on an early voting schedule, rather than relying on party chairs who do not represent students like him who are not affiliated with a political party.[49] Mr. Brown also echoed the sentiment of Mr. Jones that PVAMU students desired on-campus voting because "that's how student life just works. I mean, most of them are young, they don't have cars…so like having gas…it's a long time they have to scrape enough money to go do that."[50]

Finally, Ms. Shari Griswold, a white woman, pointed out that it was apparent that the process through which early voting hours and locations was chosen was broken and needed to be repaired to standardize it and avoid the chaos surrounding the selection of dates and hours. She also spoke in support of Ms. Eason's proposal. Ms. Griswold stated that she "would strongly recommend to the Commissioners and to the Judge that you acknowledge and honor what our own Elections Administrator has requested."[51]

After hearing these comments, Judge Duhon asked if there were three votes among the Commissioners in support of Ms. Eason's proposal and he was met by silence from Commissioner

---

[48] Ibid. at 92:42.
[49] Ibid. at 93:37.
[50] Ibid. at 93:24.
[51] Ibid. at 99:25.

Klecka and refusals from Commissioners Barnett, Amsler, and Beckendorff. Commissioner Barnett stated that he would not support Ms. Easons's proposal to add days of early voting in Prairie View unless additional days were also provided to Monaville.[52] Commissioner Amsler said that he "vote[d] nay."[53] Commissioner Beckendorff said simply: "No."[54]

Referring to Commissioner Barnett's objection to the proposal because it did not add early voting days in Monaville, Ms. Eason stated: "Can I be very honest with you? Mr. Barnett, Monaville just does not vote that heavy there, I mean not for five days."[55]

After the Commissioners had rejected the proposed modifications suggested by the Elections Administrator, Ms. Eason, Judge Duhon then proposed an alternative plan that would have provided three additional days of early voting during the first week at the Waller County Community Center in the City of Prairie View, while extending the hours of early voting in Monaville by three hours each day during the first week of early voting. During an exchange with Commissioner Beckendorff, Ms. Eason confirmed that the county's existing inventory of voting machines was adequate to support such a change:

> Commissioner Beckendorff: "Do you have the equipment to do that?"
>
> Ms. Eason: "Yeah, I can do that."
>
> Commissioner Beckendorff: "You can add another location the first week?"
>
> Ms. Eason: "Yeah, because I can move it from there down to the next week."[56]

However, Judge Duhon's proposal did not receive a second.

---

[52] Ibid. at 101:37.
[53] Ibid. at 101:40.
[54] Ibid. at 101:42.
[55] Ibid. at 103:09.
[56] Ibid. at 107:04.

At other points during the October 17 meeting, several Commissioners made informal proposals that were not put to a vote but would have revised or supplemented the days and hours of early voting at various locations in the county. For example, Commissioner Beckendorff proposed moving three days of early voting at the Memorial Student Center on PVAMU's campus from the second week to the first week.[57] Judge Duhon proposed adding three additional days of early voting during the first week in Monaville, so that early voting would be available there throughout the first week.[58] Judge Duhon, Commissioner Beckendorff, and Ms. Eason discussed extending the hours of early voting in Monaville, Katy, and Fieldstore from nine hours each day to twelve each day.[59] Ms. Eason once again indicated that Monaville's population was too small to necessitate five days of early voting.[60] Once again, Ms. Eason, the Elections Administrator, made the Commissioners aware that the county *did* have sufficient resources to add additional days of early voting at Monaville or another location, if the days were consecutive "so we can use the same machine."[61]

Ultimately, however, Commissioner Amsler moved to not modify the original early voting schedule and his motion was passed 3-2 with County Judge Duhon and Commissioner Barnett being voted down by Commissioners Beckendorff, Amsler, and Smith.

On October 22, 2018, Plaintiffs' filed this lawsuit.

---

[57] Ibid. at 105:24 (Commissioner Beckendorff: "Why can't we just, if they want voting at the MSC, why can't we just put the original back MSC the first week? And make it simple? The first week is the MSC, and the second week it's at the Community Center. That was the original plan.").
[58] Ibid. at 104:07 (Judge Duhon: "Could we add Monday, Tuesday, Wednesday of the first week in Monaville? And so Monaville would be the entire week?").
[59] Ibid. at 104:17-105:23.
[60] Ibid. at 103:09.
[61] Ibid. at 103:45-104:06.

*Waller County's Modified (Post-Filing of the Present Litigation) Early Voting Plan*

On October 24, 2018, explicitly in response to the filing of the present lawsuit, the Commissioners Court held an emergency meeting that covered two issues. The first was to announce this lawsuit, *Allen, et al. v. Waller County, et al.,* and the second was to pass a motion amending the early voting hours. The meeting opened with Judge Duhon announcing that the Commissioners Court was going to adjourn into Executive Session to discuss a possible settlement to the lawsuit. After the court returned several hours later, Judge Duhon announced that no settlement had been reached. Judge Duhon then announced a motion extending the early voting hours at PVAMU by one hour in the morning and two hours in the evening, so that the amended hours would be 7:00 a.m. to 7:00 p.m. (rather than 8:00 a.m. to 5:00 p.m.) on Monday through Wednesday of the second week of early voting, and adding Sunday afternoon voting at Prairie View City Hall, from 12:00 p.m. to 5:00 p.m. The motion passed unanimously with one Commissioner absent (Commissioner Klecka) and no discussion. Although the meeting apparently occupied much of the workday, the public portions of the proceedings lasted just a few minutes. Judge Duhon then read a statement in response to the lawsuit, which is discussed in more detail below.

### D. Procedural or Substantive Deviations from the Normal Procedural Sequence

A review of all Commissioners Court hearings where the early voting process for the November 2018 elections in Waller County was discussed did not reveal any insight into how the hours and locations were chosen. The record only revealed the Commissioners Court's initial refusal to modify the early voting plan to provide "equal representation" on October 17, and then the Commissioners Courts' contradictory action of unanimously approving the modified schedule on October 24, together with the testimonies at those meetings that have been discussed above.

This lack of transparency and public input is a substantive and procedural departure from the normal procedural sequences employed in other Texas counties. For instance, if any decision regarding the early voting schedule was made behind closed doors or at an unannounced executive session, this chosen process would seem to run afoul of the State's open meeting law. *See* Tex. Gov't Code Ann. §§ 551.001-40.

In addition, the October 17, 2018 Commissioners Court meeting included several procedural departures. For example, Dr. Denise Mattox, a Black woman referenced above, pointed out to the Commissioners that every year the Commissioners are forced to amend the early voting or election day schedules to allow equal access to the PVAMU students. She further pointed out that the Commissioners, in the recent past, had only acted after the United States Department of Justice or actions in the federal courts intervened to force the County officials to amend early voting dates, hours, and locations and election day locations. At that same meeting, Election Administrator Eason pointed out that the County needed to standardize the process for choosing early voting hours and locations and the deliberative process leading to these decisions.

Similarly, Ms. Eason pointed out that the PVAMU students require equal representation in both the process and outcome of the early voting decisions. After acknowledging Election Administrator Eason's statement on the record that the proposed early voting plan was "not equal representation" for PVAMU students, the Commissioners Court refused to amend the plan in line with Ms. Eason's suggestions. Members of the Commissioners Court refused to provide a second for any proposal to adjust or amend the original early voting hours as proposed by Judge Duhon, Commissioner Barnett, or Elections Administrator Eason on October 17, 2018.

Also, during the October 17 hearing, the Waller County Commissioners Court did not officially resolve or commit themselves to creating a standardized decisional process, ignoring

Elections Administrator Eason's recommendation and PVAMU students' requests to determine early voting hours and locations to accommodate the PVAMU student body specifically and the Prairie View community generally.

These statements suggest that Waller County regularly disparately treats PVAMU students as compared to other Waller County residents, as standardized early voting practices are available to the county, as Election Administrator Eason and residents seem to believe and request; yet, the County in 2018 decided to reject standardization. Regardless, based on my review, the current process lacks transparency and opportunity for meaningful public participation before a decision is made, which likely accounts, in part, for the inequality.

The Waller County Commissioners Court heard appeals by several PVAMU students and one Prairie View community member, Ms. Griswold, to repair the decisional process ensuring "equity" or "parity" with regard to the opportunity to participate in both the decisional process for the determination of early voting hours and for the allocation of early voting opportunities. Several of the students supported Election Administrator Eason's proposal to amend the original early voting schedule; yet the Commissioners refused to entertain the proposal and, in the end of that meeting, voted to not amend the schedule. There was no discussion concerning a revision to the decisional process for determining early voting hours and locations. This, on its face, is an example of the lack of responsiveness by the Commissioners to the concerns of a large segment of the Waller County community, the students at PVAMU, that is discussed in more detail below.

During the October 17 meeting, the Commissioners Court failed to modify the November early voting hours and dates after a great deal of debate with one Commissioner, Mr. Amsler, noting that the existing process had already been completed and a decision had already been reached. Mr. Amsler stated that he did not feel it appropriate that students complained after the

decision was made and at such a late hour.[62] Mr. Amsler responded as if students earlier had been provided a role in the decision-making process—a position at odds with the fact that decisions were made behind closed doors in August and September, as demonstrated above. Commissioner Amsler stated that students were provided the opportunity to speak earlier in the process, yet they did not provide input. But this is not accurate. Based on a review of all earlier Commissioner Courts' video transcripts after August 22, 2018, there is no evidence that any public discussions of early voting hours occurred. Instead, it appears that only the political parties were consulted in any decisions concerning early voting. The Commissioners' statements during the October 17, 2018 meeting suggest that the political parties were the sole or primary architects of the early voting plan. For example, Precinct 3 Commissioner Jeron Barnett indicated in commentary in the October 17, 2018 meeting that the Commissioners Court was not meaningfully involved in the process of determining early voting hours or dates. "Going to where I feel is one of the roots of this thing is going back to the Party Chairs," he said.[63] He further commented: "You know, this Court, we don't get a say in selecting any of that—when it comes to us, it's already been selected."[64] Precinct 1 Commissioner John Amsler similarly stated: "We have a process that we've already been through. Both committee chairmen of both parties agreed on this schedule weeks ago! They brought it to us, we approved it."[65] Later, in response to a comment by Dr. Denise Mattox, whom he suggested was a member of the Democratic Party, Commissioner Barnett stated: "We didn't make these choices, you all made these choices."[66]

---

[62] County Judge Duhon expressed a similar contention. Waller County, Tex., *October 17, 2018 Commissioners Court* at 47:55, http://wallercountytx.swagit.com/play/10172018-1225.
[63] Ibid. at 64:32.
[64] Ibid.
[65] Ibid. at 75:02.
[66] Ibid. at 79:32.

However, PVAMU student Kirsten Budwine informed the Commissioners that: "I'm not with the Democratic-Republican fight; it's about fairness and the students."[67] Similarly, PVAMU student Antonious Brown commented: "I am not registered under any party, and I am a student . . . ." The party chairs did not represent him, Mr. Brown explained, "because I'm not registered as a Democrat or a Republican."[68] In response to these comments, Judge Duhon stated: "I think it's a true statement to say that there's a lot of students who do not identify as a Democrat or a Republican. They consider themselves to be Independent."[69] As a result, at one point, Judge Duhon indicated to Ms. Eason specifically that it would be advisable "moving forward . . . in addition to the Party Chairs, to have someone from the University who also is a part of the process when we go about setting the Early Voting schedule."[70]

Moreover, the only reference to early voting on the public record was when the Commissioners voted for locations only, without identifying, discussing, or approving hours on August 22, 2018. As stated above, Judge Duhon made it clear during that meeting that the Commissioners Court would vote on the hours at a later date, after staff received training on the new machines recently purchased by the county. No opportunity for PVAMU students to have participated in the Commissioners Court's deliberations prior to the adoption of the Original Early Voting Plan is reflected in the public record. Judge Duhon also acknowledged that there was no opportunity for students to participate in those deliberations when he, Judge Duhon, mentioned during the October 17 meeting that, "moving forward . . . maybe it is a good idea, in addition to

---

[67] Ibid. at 86:37.
[68] Ibid. at 93:45.
[69] Ibid. at 96:26.
[70] Ibid.

31

the party chairs, to have someone from the university who also is a part of the process when we go about setting the early voting schedule."[71]

Judge Duhon also conceded that he had heard even from candidates for public office from the Democratic Party that they had not been consulted by their party chair. Initially, Judge Duhon stated: "This is a process, and that process is the Chairs work together, they are supposed to communicate with their candidates, to go over these Early Voting schedules and make sure that everybody is okay with those schedules."[72] But seconds later, he acknowledged that he was aware that the process did not function properly. "Now, I've talked to some folks and some Democratic candidates that said that did not happen—that they did not get the opportunity from their Party Chair," he said. However, he added, "That's between them and their Party Chair, okay?"[73]

Further, Commissioner Amsler suggested that the October 17 meeting was too late in time for the early voting plan to be modified, stating: "It's a little bit late in the game to be coming back and wanting to change at this point in time."[74] However, this date was in fact not prohibitively late in the Commissioners' own estimations, as was demonstrated the following week when the Commissioners Court made modifications to the early voting schedule at the October 24 emergency meeting after this lawsuit was filed with the unanimous approval of all present Commissioners.

During the regularly scheduled Commissioners Court meeting of October 24 (prior to the emergency meeting held later in the day), the only reference to the early voting issue was made during the public comment section of the meeting, during which any interested member of the public was able to make public comments in front of the Commissioners and before the regularly

---

[71] Ibid. at 96:51.
[72] Ibid. at 50:05.
[73] Ibid.
[74] Ibid. at 49:49.

scheduled agenda items were discussed. The only person making a comment during the regularly scheduled October 24 meeting was Mr. David Luther who, as mentioned above, is white and serves as chair of the Waller County Republican Party. Mr. Luther argued that the lawsuit was about the students' interests only; he claimed that, in speaking against the students' interests, he was going to speak on behalf of all other Waller County residents. Mr. Luther was emphatic in declaring that he opposed the lawsuit and alleged that the lawsuit had nothing to do with denying the votes of PVAMU students. He alleged that a local Democratic politician who was intent on running against Commissioner Barnett was using the students. Mr. Luther stated, while pointing at Commissioner Barnett, that "they have their sights on you, because they hold you, they are going to hold you responsible." He was not clear as to what Commissioner Barnett was responsible for. Neither Commissioner Barnett nor any other Commissioner openly rejected or expressed any disagreement with what Mr. Luther argued.

Mr. Luther then stated that the students did not care for the interests of the other residents of Waller County and urged the Commissioners to consider the "long lasting implications of allowing yourselves to be black-mailed by the federal courts, allow yourselves to be used by the Democrats, to be black-mailed by the Democratic Party as they use the courts to get what they want." He went on to say students only care about one thing: "their commodity, their vote." No Commissioner openly rejected or expressed any disagreement with what Mr. Luther argued.

The subtext of Mr. Luther's outburst was clearly that the students, by virtue of being young and/or Black and/or Democrats, were outsiders and represented a threat to what he apparently perceived as interests shared by himself and the predominantly white, older, and Republican Commissioners Court, a demographic that also reflects the majority of residents in Waller County. In so doing, Mr. Luther also misrepresented the students' political party affiliation, having been

33

present at the October 17 meeting when students, who spoke before the Commissioners (and Judge Duhon himself), clearly indicated that many students were independents and not affiliated with any party in the October 17 meeting.[75] No Commissioner openly rejected what Mr. Luther argued regarding the students' party affiliation or corrected his misrepresentation of it.

Mr. Luther went on: "And why do they want voting in the student center? *Because every student has to pass through the center*. And, they're easy pickins for the political vultures out there."[76] In so speaking, Mr. Luther apparently intended to communicate that the Commissioners should take care not to provide voting in a location that was easily accessible by young, Black, and/or Democratic voters. Instead, he suggested, the Commissioners should do their best to prevent PVAMU students, most of whom are Black and young, from voting. No Commissioner openly rejected or expressed any disagreement with Mr. Luther's contentions.

Mr. Luther then said that "vultures" would "drive them [Black PVAMU students] into the voting place."[77] "When driven into the polling place," he continued, the predominantly young, Black student voters at PVAMU, would "push one button."[78] "And that's what this is about," Mr. Luther alleged, "It's about Democrat politics, Democrat relevance, and Democrat influence in this county. It's not about race, it's not about disenfranchisement, and I disavow everything in this lawsuit."[79] Mr. Luther concluded his comments by urging the Commissioners to fight the lawsuit and show that Waller County is "not racist or vote suppressors."[80] None of the Commissioners openly rejected or expressed any disagreement with any of the comments made by Mr. Luther.

---

[75] *See* Waller County Tex., *Commissioners Court Meeting, October 17, 2018* at 96:26, http://wallercountytx.swagit.com/play/10172018-1225.
[76] *See* Waller County Tex., *Commissioners Court Meeting, October 24, 2018* at 6:39, http://wallercountytx.swagit.com/play/10242018-1459 (emphasis added).
[77] Ibid.
[78] Ibid.
[79] Ibid. at 7:18.
[80] Ibid. at 5:25.

34

At the October 24, 2018 <u>emergency</u> meeting later the same day, there was no public discussion over the hours or days for early voting. During this meeting, after initially stating that there was a possible settlement agreement, four of the Commissioners spent several hours in executive session only to return and abruptly announced that "there is no settlement."[81] The present Commissioners then unanimously modified the early voting plan, even though early voting was already under way and despite their statements only one week prior that it was too late, unfair to Waller County voters, or too resource-intensive to modify the plan. Mr. Amsler was among the members of the Commissioners Court in attendance who voted in favor of the modified early voting plan, despite his particularly emphatic assertions one week before (referenced above) that he would <u>not</u> do so.[82]

After voting to modify the early voting plan, Judge Duhon made several notable statements, including that: the Commissioners had been "open and transparent in setting the Early Voting locations and times throughout the County"; the "current Court has a record of actively engaging the [PVAMU] community and its students, including placing a polling location for students on campus"; that the early voting plan is a consequence of the County having "analyzed [its] resources" in light of "the limited resources of a small county"; and PVAMU students had somehow failed to "timely participate" in the process for adopting early voting in 2018.[83] However, for the reasons detailed above, the process for adopting the early voting plan dates and times for 2018 was anything but "open and transparent." The ongoing record reflects PVAMU students fought for early voting on campus and won it in 2013, after which the County attempted

---

[81] *See* Waller County, Tex., *October 24, 2018 Special Commissioners Court* at 1:56, http://wallercountytx.swagit.com/play/10242018-1502.

[82] *See* Waller County, Tex., *October 17, 2018 Commissioners Court Meeting* at 75:02, http://wallercountytx.swagit.com/play/10172018-1225.

[83] *See* Waller County, Tex., *October 24, 2018 Special Commissioners Court* at 2:55, http://wallercountytx.swagit.com/play/10242018-1502.

35

to limit its use in 2016 and 2018 or resolve the addressing system, discussed in more detail below. Moreover, the Commissioners did not invoke the County's limited resources when they proposed adding days of early voting to Monaville, despite the very low population of registered voters in that area of the County.[84] Finally, as detailed above, the early voting schedule was developed and adopted outside of public view, and, furthermore, at a time when students were just arriving on campus in Fall 2018. Once PVAMU students became aware of the plan in mid-October 2018, they voiced strenuous objections to the plan, yet the Commissioners did not change their decision.

At the conclusion of the October 24 meeting, the Commissioners still had not modified the early voting plan for November to include any additional days of voting on campus-at PVAMU. Following the filing of this lawsuit, the Commissioners added one day of weekend voting in Prairie View and additional hours (from 8:00 a.m. – 5:00 p.m. to 7:00 a.m. – 7:00 p.m.) to early voting days already scheduled on-campus at PVAMU.

Overall, as Dr. Stein's report documents, PVAMU students and Prairie View voters were still provided fewer hours and less opportunity to participate in the early voting process than voters in other areas of Waller County.

## IV. Senate Factors

In a report that accompanied the 1982 renewal of the Voting Rights Act, the Senate Committee on the Judiciary set forth several "Senate factors" for federal trial courts to consider in assessing whether, under the totality of circumstances, an electoral system interacts with social and historical conditions to cause inequality in the political process.[85]

---

[84] *See* Waller County, Tex., *October 17, 2018 Commissioner's Court Meeting* at 101:43, 103:09, http://wallercountytx.swagit.com/play/10172018-1225 (Ms. Eason explaining that in "the last election even in the Primary, [Monaville] went days [when] they voted 18.").

[85] These Senate factors are: (1) the extent of any history of official discrimination related to voting in the County; (2) the extent to which voting is racially polarized; (3) the extent to which Waller County uses voting practices or procedures that may enhance the opportunity for discrimination; (4) if there is a candidate slating process,

36

Here, an examination of these factors demonstrates that Waller County's original and modified 2018 early voting plans interact with these factors to weaken the ability of Black voters to participate equally in the political process. The analysis of these factors also provides additional context for the finding that Waller adopted and maintained the 2018 early voting plan for a discriminatory purpose. Accordingly, I find that Senate factors 1, 2, 5, 7, and 9 weigh in plaintiffs' favor.

**Factor 1**: **The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process.**

As documented in greater detail in the expert report of Dr. Joseph, Waller County, specifically, and Texas, generally, has an extensive history of discrimination against Black people that affects their ability to participate in the democratic process in Waller County. Although this extensive history in Waller County dates back decades, it is persistent and ongoing through 2018. For these reasons, it is clear from this extensive list of occurrences that there is a systemic pattern of Waller County acting to discriminate against the students at PVAMU to prevent them from obtaining and exercising their voting rights. As discussed below, this pattern on the part of Waller County interacts with other social and historical factors to inhibit Black and Latinx students from voting in that jurisdiction.

---

whether the members of the minority group have been denied access to that process; (5) the extent to which minority voters bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Gingles*, 478 U.S. at 43- 45 (internal citation omitted).

**Factor 2: The extent to which voting in the elections of the state or political subdivision is racially polarized.**

Texas possesses an extensive record of court-documented racially polarized voting.

In *LULAC Council No. 4434 v. Clements*,[86] the court found that, in every county under consideration, all elections were racially polarized as evidenced by the statistical analyses offered by the plaintiff's experts.

In *Vera v. Richards*,[87] the court found that "elections in the areas in which the state created majority-minority districts are characterized by racially polarized voting" and agreed with the opinion of the plaintiff's expert who "concluded that Anglos usually bloc voted against African-American candidates."[88]

In *LULAC v. Perry*,[89] the U.S. Supreme court noted that "[t]he District Court had found "racially polarized voting" in south and west Texas, and indeed "throughout the State."

In 2014, the Fifth Circuit Court of Appeals in *Veasey v. Perry*[90] noted that "[t]he district court . . . conclud[ed] that racially polarized voting exists throughout Texas."

In 2016, the Fifth Circuit reiterated the degree and extensiveness of racially polarized voting in Texas in their opinion in *Veasey v Abbott*,[91] stating that "the Supreme Court has previously acknowledged the existence of racially polarized voting in Texas, and that in other litigation, Texas has conceded that racially polarized voting exists in 252 of its 254 counties." The Fifth Circuit observed that "[t]he State did not contest these findings before the district court."

---

[86] 986 F.2d 728 (5th Cir) (1993).
[87] 861 F. Supp. 1304 (S.D. Tex. 1994) (1996).
[88] Ibid. at 1329, 1330.
[89] 548 U.S. 399, 427 (2006).
[90] 71 F. Supp. 3d 627, 637 (S.D. Tex. 2014).
[91] 830 F. Supp. 3d 216 (5th Cir. 2016) (en banc).

In 2017, the Western District of Texas found "the existence of racially polarized voting throughout Texas" when it rendered its decision in *Perez v Abbott.*[92]

In short, federal courts at all levels, from at least 1993 through the present, have noted that racially polarized voting exists throughout the State of Texas and in all regions of the state. One opinion even noted that racially polarized voting exists in 252 of the 254 counties of the state.

**Factor 5: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process.**

The history of discrimination against Black people in Texas, generally, and Waller, specifically, extends beyond voting rights to virtually every aspect of economic and social life in the State. As detailed in Mr. Cooper's expert report, Black voters in Prairie View face socioeconomic hurdles due to the effects of discrimination that make reaching early voting locations in other cities more difficult than for white voters or other older voters in neighboring cities.

As previously noted, Prairie View A&M University is the only university in Waller County. Founded in 1876, PVAMU is the second-oldest institution of higher learning in the State. Further, PVAMU is a historically Black university with approximately 9,516 full- and part-time students based on enrollment data from Fall 2018.[93] Roughly 83% of PVAMU students identify as Black.

The PVAMU campus is located entirely in Prairie View. According to the 2010 Census, the total population of the City of Prairie View is 5,576, of whom 90.2% (5,030) are Black and 2.6% (147) are Anglo. Prairie View has a VAP of 5,168, of whom 91.9% (4,754) are Black.

---

[92] 253 F. Supp. 3d 864 (W.D. Tex. 2017).
[93] Prairie View A&M University Enrollment Snapshots: Fall 2018 at 2 (last visited June 29, 2019), http://www.pvamu.edu/ir/wp-content/uploads/sites/98/FA18_Enrollment-Snapshots.pdf.

Moreover, based on U.S. Census Bureau's 2013-2017 American Community Survey ("ACS") five-year estimates, the Waller County Black Citizen Voting Age Population is 32.1%, Anglo CVAP is 51.6%, and Latinx CVAP is 14.1%. And 80% of Prairie View's citizen voting-age population is Black, and 54.3% of Prairie View's voting-age population ("VAP") is aged 18 through 20. As compared to other cities in Waller County, Prairie View is the only city where the majority of voters are both Black *and* students.

The historical and ongoing racial discrimination, which is described in Dr. Joseph's report in more detail, are substantially demonstrated in the deficient socioeconomic position of Black Prairie View voters in Waller County. According to the data provided by Mr. Cooper, in Prairie View, the majority Black and majority student population also more likely to be poor and face other socioeconomic barriers that white voters or other voters in the County do not face, including, but not limited to, income, poverty, unemployment, education, dependence on government assistance, home ownership, and the availability of vehicles. For example, in Prairie View, 32.1% of Black workers, as compared to 15.76% of white workers, are in service occupations. Black workers in service occupations are likely to be working for an hourly wage and are less likely to be able to take off from work to vote early during weekday business hours.

Moreover, 58.3% of the Black population in Prairie View lived below the poverty line in the last 12 months, as compared to 7.3% of the countywide white population; the median household income for Black residents was $21,179, as compared to $74,132 for countywide white residents; 19.2% of the Black population between 16-64 years of age were unemployed, as compared to 4.1% of the countywide white population; and 17.9% of the Black population over 25 years old had less than a high school diploma, compared to 9.3% of the countywide white population.

Along the same lines, Black people in Prairie View, including PVAMU students, disproportionately lack access to transportation as compared to white people. For example, 23.2% of Black people in Waller County, as compared to only 12.6% of white people, commute to work by walking, biking, or via carpool, taxi, or public transit.

The following is an overview of key and selected socioeconomic indicators of socioeconomic disparities in Waller County.

| Comparison of Selected Socioeconomic Indicators: Waller County & Prairie View Residents | | | | |
|---|---|---|---|---|
| **Indicator** | | **Waller County** | | **Prairie View** |
| | | **Black** | **White, non-Hispanic** | **Black** |
| **Econ.** | Lived in Poverty in Past 12 Months | 26.7% | 5.8% | 31.3% |
| | Median Family Income in Past 12 Months | $51,345 | $90,746 | $31,071 |
| | Unemployed (age 16-64) | 18.0% | 4.1% | 19.2% |
| **Education** | Less than High School Diploma (age 25+) | 18.3% | 9.3% | 17.9% |
| | High School Grad. or Equivalent (age 25+) | 39.1% | 30.5% | 16.9% |
| | Some College or Assoc. Degree (age 25+) | 27.5% | 34.0% | 32.0% |
| **Transportation (16+ employed)** | Drive Alone in Vehicle | 74.4% | 81.0% | 46.8% |
| | Walk, Carpool, Taxi, Public Bus, or Other | 23.0% | 12.6% | 46.5% |
| | - Walk to Work | 8.5% | 2.0% | 26.7% |
| | - Carpool to Work | 11.5% | 8.1% | 14.2% |
| | - Taxi, Motorcycle, Bicycle, or Related Means | 2.6% | 1.0% | 5.6% |

These socioeconomic disadvantages for Black voters in Prairie View adversely enhance the impact of their inability to effectively participate in the political process in Waller County.

41

**Factor 7: The extent to which members of the minority group have been elected to public office in the jurisdiction.**

The Senate Report noted that, in addition to the existence of racially polarized voting, the lack of Black representatives in the challenged jurisdiction (here, Waller County) is one of the two most significant factors that a federal court should consider in evaluating whether Black voters have less opportunity than other voters to participate in the political process in violation of Section 2.

Racially polarized voting is well established and judicially recognized in Waller County, as discussed above. As the above discussion shows, Black candidates have had very little electoral success in elections contested at the countywide level in Waller County. Historically, it has been rare for a Black representative to be elected from Waller County as a whole (or from any portion of the county that is not majority-minority). Presently, there are none.

No Black candidate has been elected to the U.S. House of Representatives from U.S. Congressional District 10, in which Waller County is situated, since the district's creation in 1883. Further, based on publicly available records and information provided by a local contact via plaintiffs' attorneys, only one Black candidate has been elected to a countywide office in Waller County since the Reconstruction period ended in the 19th century.

**Factor 8: Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.**

As discussed above, the members of the Waller County Commissioners Court, a supermajority of whom are white, have been unresponsive to the particularized needs of Black PVAMU students, including in the adoption and maintenance of the early voting plans for the November 2018 elections.

The County also has been unresponsive to other issues impacting Black PVAMU students and other Black voters in Prairie View. Specifically, the County Commissioners have failed to address the continuing issues that confront residents of the City of Prairie View, where PVAMU students live. People who reside in Prairie View are disadvantaged—particularly in voting and registration—by the county's overreliance on the U.S. Postal Service's rural addressing system for uses that are unrelated to the delivery of mail.

The Waller County Commissioners Court has been made aware of the problems caused by the County's reliance on the U.S. Postal Service's rural addressing system that affect the students residing on the PVAMU campus and off-campus in the City of Prairie View.[94] These problems manifest themselves with particular severity, as some Waller County officials have acknowledged, during elections—including by creating long lines and making the use of absentee ballots, which depend on reliable mail delivery, effectively unavailable for PVAMU students due to mail delivery issues.[95] As a result, PVAMU students without access to personal transportation are still more dependent on on-campus early voting.

The County Elections Administrator, Ms. Eason, conducted research into this matter and raised with the Commissioners Court that this addressing issue led to the unequal treatment of PVAMU students.[96] The Commissioners have recently provided only a temporary "fix" to the

---

[94] *See*, *e.g.*, Waller County, Tex., *October 17, 2018 Commissioners Court* at 58:26, http://wallercountytx.swagit.com/play/10172018-1225; Waller County, Tex., *September 26, 2018 Commissioners Court* at 24:19-73:14, http://wallercountytx.swagit.com/play/10172018-1225; Dug Begley, *Prairie View Asking State to Stamp Out Zip Code Snub*, *Houston Chronicle* (Apr. 8, 2013), https://www.houstonchronicle.com/news/houston-texas/houston/article/Prairie-View-asking-state-to-stamp-out-ZIP-code-4419286.php.
[95] *See* Waller County Tex., *October 17, 2018 Commissioners Court Hearing* at 54:00, 55:07, 58:26, http://wallercountytx.swagit.com/play/10172018-1225.
[96] *See* Waller County Tex., *September 26, 2018 Commissioners Court Hearing*, Item 16: "Elections," at 0:30. http://wallercountytx.swagit.com/play/09262018-675.

registration issues, even though the Elections Administrator pointed out that a permanent solution was necessary.[97] The Commissioners did not entertain this latter recommendation.

Additionally, the County has failed to adequately address the internal issues surrounding the death in the county jail of Ms. Sandra Bland, a PVAMU alumna, as discussed in the report of Dr. Joseph. For example, in 2016, Ms. Bland's family reached a settlement with Waller County, which called for several changes to the jail's procedures, including using automated electronic sensors to ensure timely cell checks.[98] Yet the jail still has frequently failed to meet certain standards for frequency of observation of prisoners, a similar deficiency identified in Ms. Bland's death.[99]

**Factor 9: Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.**

As discussed above, the rationales advanced for adopting, maintaining, and modestly improving the November 2018 early voting plan were tenuous, changing, and ultimately largely contradicted by the Commissioners' own actions in adopting revisions to the early voting plan on October 24, one week after arguing that it was too late to do so. They also show a lack of good faith and an irrationality that is inappropriate for government action, insofar as the Commissioners cited arbitrary and shifting rationales while failing to make an effort to address the concerns of PVAMU students who requested parity and equity during the early voting planning process.

---

[97] *See* Waller County Tex., *October 10, 2018 Commissioners Court Hearing* at 78:18, http://wallercountytx.swagit.com/play/10102018-554; Waller County Tex., *October 17, 2018 Commissioners Court Hearing* at 47:45, 50:05, 80:27, http://wallercountytx.swagit.com/play/10172018-1225.
[98] "Sandra Bland's Family Settles for $1.9 Million in Wrongful Death Suit," September 15, 2016, https://www.cnn.com/2016/09/15/us/sandra-bland-wrongful-death-settlement/index.html.
[99] "Inmate's Death at Waller County Jail Follows Inspection Raising Issues Similar to Sandra Bland Case," January, 30, 2019, https://www.chron.com/news/houston-texas/houston/article/Inmate-s-death-in-Waller-County-jail-follows-13575534.php.

Although the Commissioners made some modest improvements to the early voting plan for 2018, they did so only after a lawsuit was filed—and, in fact, the speed and unanimity with which they made these modifications suggest a preexisting awareness and acknowledgement that the plan was strikingly unfair to PVAMU students before modification. The Commissioners Court did not make an attempt to undertake any steps in pursuing permanent changes to the process—or making the process more inclusive of stakeholders such as PVAMU student voters—even after the Elections Administrator, Ms. Eason, recommended that they do so. The unfairness of the 2018 early voting plans to Prairie View students and the Prairie View community reveal the tenuous manner in which the Waller County Commissioners reached their decision concerning early voting for the 2018 General Election.

For example, during the October 17, 2018 meeting, Commissioner Amsler suggested that it was already too late to change the early voting schedule: "These decisions have already been made," he said. "It's a little bit late in the game to be coming back and wanting to change at this point in time."[100] Similarly, Commissioner Beckendorff stated: "if we change it now . . . it's going to be more confusing."[101] Also, during the October 17 meeting, Judge Duhon suggested that the County's limited resources made it difficult to propose changes to the early voting plan.[102]

However, as discussed above, Ms. Eason, Commissioner Beckendorff, and Judge Duhon all proposed changes during the October 17 meeting. In response to one of these proposals, Ms. Eason, the Elections Administrator, made the Commissioners aware that the county *did* have sufficient resources to add additional days of early voting.[103] And the following week, at the

---

[100]   *See* Waller County Tex., October 17, 2018 Commissioners Court Hearing at 49:49, http://wallercountytx.swagit.com/play/10172018-1225.
[101] Ibid. at 75:31.
[102] Ibid. at 101:43.
[103] Ibid. at 103:45-104:06.

Commissioners Court's October 24 emergency meeting, the Commissioners unanimously modified the early voting schedule to include an additional day at the Prairie View City Hall and extended hours at the PVAMU campus on a motion by Judge Duhon.

Several Commissioners also suggested during the October 17 meeting that the process by which Waller County's early voting plan was developed with input only from the party chairs was appropriate and should not be disturbed, either because it was bipartisan and thus supposedly representative of two interest groups or because it provided an adequate opportunity for members of the public to participate in the deliberative process before the decision was made. For example, Commissioner Amsler stated that he planned to vote against Ms. Eason's proposed modifications because "both committee chairmen of both parties agreed on this schedule weeks ago."[104] And Judge Duhon expressed discontent that objections were not raised in an alleged meeting that purportedly took place on September 22, 2018—a Saturday—and which included "no discussion" and during which "nobody showed up" and "nobody gave any comment at all."[105] But based on the sequence of events of the early voting plan's adoption described above, both of these justifications are tenuous and contradicted by the record.

First, with respect to the irregular process in which the political party chairs determined the early voting schedule, the Commissioners heard testimony making clear that neither party chair had consulted with students, many of whom, as Judge Duhon acknowledged, were not members of any political party. In addition, based on my knowledge of the electoral practices of other Texas counties, it does not appear to be a common practice for counties to outsource the development of early voting plans to private individuals representing nongovernmental, partisan interests. I am similarly unaware of any other county that develops or approves its early voting plans behind

---

[104] Ibid. 75:02.
[105] Ibid. at 48:28.

46

closed doors, avoiding public input from voters such as PVAMU students. This process indeed appears to be ineffective and "broken," as several witnesses at the October 17 meeting represented to the Commissioners Court. In my expert opinion, it is tenuous to rely on such an irrational and dysfunctional process as a justification to refuse to make requested changes to an early voting plan in the interest of fairness.

Second, as discussed above, it appears from the public record that the process by which the early voting plan was adopted was closed to the public and offered no opportunity for anyone to participate other than Ms. Eason, the county's two partisan officials, and the Commissioners themselves. Thus, if Judge Duhon was correct in stating "[t]here was no discussion, there was nobody that showed up, [and] nobody gave any comment at all" when the Commissioners approved or adopted the early voting plan, that appears to be explainable by the fact that (1) no notice or opportunity to participate in these deliberations was provided to members the public, and/or that (2) the hours and days in the Original Early Voting Plan were never discussed, debated, or disclosed in a public meeting prior to the plan's adoption by the Commissioners Court.

Another tenuous justification advanced by various Commissioners during the October 17, 2018 meeting for refusing to provide early voting on PVAMU's campus during the first week of early voting was that the Democratic Party chair had asked that there be no early voting that week because of PVAMU's homecoming activities. This justification is unsupported by the record because, as discussed above, the Commissioners were aware that the Democratic Party chair does not represent and did not consult with PVAMU or its students and that many students are members of no political party. Moreover, logically, the Homecoming week on PVAMU's campus would be an opportune time for on-campus voting because many students and members of the Prairie View community are already on campus. This logical conclusion is also supported by the record before

the Commissioners Court and the record in this lawsuit. At the October 17, 2018 Waller County Commissioners Court meeting, PVAMU students Xante' Wallace[106] and Joshua Muhammad[107] both asked the Commissioners Court to provide early voting during the first week when homecoming would take place.[108]

In addition, ECF No. 17-4 on the Court's docket in this lawsuit provides further evidence that the Homecoming justification was tenuous. That document is a declaration by Frank Jackson, an administrator at PVAMU. In this filing, Mr. Jackson states that "the assertion that students would be discouraged from early voting if the scheduled early voting days on campus coincided with homecoming week is inaccurate."[109] He further states: "Indeed, homecoming week is an ideal time for early voting. Alumni, for example, would encourage students to exercise their right to vote. Moreover, the concentration of students near the Memorial Student Center would provide ample opportunities for students to cast a ballot."[110] The document filed on this Court's docket as ECF No. 17-2, a declaration by Valerie Gibson, an administrative assistant at PVAMU, also casts doubt on the Commissioners' justifications regarding a supposed conflict between homecoming and early voting. Ms. Gibson states emphatically that "[t]he facilities at the Memorial Student Center at PVAMU would be available and could easily accommodate increases to early voting days and hours on any day from Monday, October 22 through Friday, November 2."[111]

An additional argument mentioned by Elections Administrator Eason and Commissioner Barnett during the October 17 meeting as a justification for limiting the availability of early voting on the PVAMU campus was that voting on campus is not comfortable or convenient for non-

---

[106] See ibid. at 88:46.
[107] See ibid. at 92:42
[108] See ibid. at 87:28, 92:31.
[109] Declaration of Frank Jackson, ECF No. 17-4, at 4, *Allen v. Waller County*, 4:18-cv-3985 (S.D. Tex.).
[110] Ibid.
[111] Declaration of Valerie Gibson, ECF No. 17-2 , at 2, *Allen v. Waller County*, 4:18-cv-3985 (S.D. Tex.).

48

student members of the Prairie View community due to a lack of parking or other concerns. This justification is demonstrated as tenuous by, among other sources, the record in the current litigation. In the declaration filed as ECF No. 17-4 on this lawsuit's docket, Mr. Frank Jackson of PVAMU explained in Paragraphs 13-15 specifically why Ms. Eason and Commissioner Barnett were incorrect:

> 13. At the October 17 public hearing, one or more Commissioners also indicated in my presence that residents of Monaville and non-student residents of Prairie View would not feel comfortable traveling to the PVAMU campus to vote, or that they would not find our parking and other facilities adequate for their needs. Based on my personal and professional knowledge and experience, these suggestions mischaracterize the nature of the relationship between the PVAMU community and residents of Prairie View and do PVAMU a disservice. In fact, many of our students are involved with volunteering activities and internships in Prairie View. . . .

> 14. In addition, we at PVAMU pride ourselves on being welcoming hosts for our nonstudent visitors who come to PVAMU's campus to vote during early voting. We reserve a number of parking spots specifically for these voters and remind our students that these spots are not available. We also post signage pointing voters to the polling place, which is wheelchair-accessible.

> 15. In short, I respectfully disagree with the Commissioners' concern that non-student residents of Prairie View, Monaville, and other areas would be uncomfortable traveling to the PVAMU campus to vote, or that PVAMU is not prepared to accommodate them during early voting. In fact, we are prepared to accommodate all voters who are eligible to participate in early voting on campus, including during the homecoming week.[112]

**Conclusions: Expert Opinion**

Based on my analysis and informed by my experience, I have reached the following expert opinions:

The Waller County Commissioners Court acted with an intention to discriminate against the PVAMU student body and the majority-Black Prairie View community, of which PVAMU students are a part, when allocating the early voting hours for the 2018 General Election.

---

[112] Declaration of Frank Jackson, ECF No. 17-4, at 4-5, ¶¶ 13-15, *Allen v. Waller County*, 4:18-cv-3985 (S.D. Tex.).

49

The Waller County Commissioners Court discriminated against the Black student body of PVAMU, against young, college-age voters at PVAMU in general, and against the Black community of Prairie View, Texas.

These conclusions are based on an evaluation of the *Arlington Heights Factors* and Senate Factors as listed below:

(1) evidence that Defendants' decision bears more heavily on one group than another as identified in the table at Section IV(C) in this report (as demonstrated by the disparate burdens shown in Dr. Robert Stein's report);

(2) the historical background of the decision (as discussed in detail in Dr. Peniel Joseph's report) and outlined above in this report in Section IV, "Senate Factors";

(3) the specific sequence of events leading up to the decision (Outlined in Section IV(C) of this report);

(4) departures from the normal procedural sequence (Discussed in Section IV(D) of this report); and

(5) legislative history, including "contemporary statements by members of the decision-making body, minutes of its meetings, or reports" (Cited in Section IV(E) of this report).

In addition, these conclusions are based on the following:

- Complaints on the public record by the Prairie View community and PVAMU students specifically that Waller County has continuously failed to include them in determining the early voting hours for primary and general elections, and evidence that Waller County indeed failed to do so in 2018;

- Complaints on the public record that the Prairie View community and PVAMU students are continuously singled out for unfair treatment when it comes to

50

opportunities to vote, as exemplified most recently in the allocation of early voting opportunities in recent elections, and evidence that Waller County indeed did so in 2018;

- Waller County Commissioners Court's refusal to amend the early voting hours for the 2018 General Election after considering proposals to do so, and then making changes that were modest and inadequate only after being confronted by this lawsuit;

- Waller County Commissioners Court's reluctance and hostility to entertain various proposals during the October 17 meeting, including those coming from their own election administrator and from their own body, to amend or adjust the early voting hours and locations for the 2018 General Election; and

- That the early voting hour and location schedule as published by the Waller County Elections Administrator indicate that there is a disparate distribution of voting hours between those polling places in Waller, Hempstead, and Brookshire and PVAMU and Prairie View for the 2018 General Election.

I reserve the right to continue to supplement my declarations in light of additional facts, testimony, and/or materials that may come to light.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Executed on: July 1, 2019

Henry Flores

Henry Flores, PhD

# APPENDIX

**HENRY FLORES, Ph.D.**

**Distinguished University Research Professor Emeritus**
**Institute for Public Administration, Politics and Public Policy**
**and**
**Professor Emeritus, Political Science and International Relations**
**St. Mary's University**
(May, 2019)

| | |
|---|---|
| Address: | 3111 Alamo Creek Circle |
| | San Antonio, TX 78230 |
| | |
| Phone: | (210) 436-3214 (O) |
| | (210) 525-1330 (H) |
| | |
| Place of Birth: | San Antonio, TX |

## EDUCATION

B.A.; St. Mary's University; San Antonio, TX;
    May 1974.
    Major:  Political Science
    Minor:  English

M.A.; University of California, Santa Barbara; Santa Barbara, CA;
    December 1975.
    Major:  Political Science

Ph.D.; University of California, Santa Barbara; Santa Barbara, CA; December 1981.
    Major:  Political Science
    Examination Fields:    Public Administration,
                    American Politics,
                    Political Philosophy,
                    Multivariate Statistical Analysis.

## DISSERTATION

"The Politics of Urban Land Use Decisions Underlying Industrial Development in
    Los Angeles, California: An Exegesis of Systemic Weakness."

## AWARDS AND DISTINCTIONS

- Chancellor's Fellow, University of California at Santa Barbara, Santa Barbara, California, 1974 – 1977.
- Ford Foundation Dissertation Fellow, 1977 – 1979.
- "Best Paper in Chicano Politics," Western Political Science Association, 1986.
- Fulbright Fellow, Argentina, *La Universidad Católica de Buenos Aires,* 1992.
- Distinguished Faculty Award, St. Mary's University Alumni Association, 2000 – 2001.
- Civil Rights Lifetime Achievement Award, St. Mary's University, 2010.
- Distinguished University Research Professor Emeritus, 2018.

## PROFESSIONAL ASSOCIATIONS

Conference of Southern Graduate Schools, 2004 – 2013.

Texas Association of Graduate School Deans, 2004 – 2013, President, 2012-2013.

American Political Science Association - September 1975 - present.
> Chair, Dissertation Award Committee, Section on Race and Ethnicity, 2000-2001.
> Nominations Committee, Member, Section on Urban Politics, 1998-1999.
> Nominations Committee, member, Section of Representation and Electoral Systems, 1999-2000.
> Program Committee, Head, Section on Representation and Electoral Systems, 1997-1998.
> Committee for the Status of Latinos in the Profession - January 1994 - December 1996.
> Governing Council, Pi Sigma Alpha - September 1994 - August 1997.
> Editor, Urban Politics Section Newsletter - January 1996 – June 2000.
> Book Review Editor, Representation and Electoral Systems Newsletter, 2000-2002.
> Member, Byran O. Jackson Memorial Award Committee - 1996.
> Chair, Hallet Award Committee - 1996-1997.
> Member, Ralph Bunche Memorial Award Committee-2000, 2004.
> Member, Dissertation Award Committee-2000.
> Member, Committee on Best Book on Race-2014.

Southwestern Political Science Association - March 1985 - present.
> Executive Committee – March 2013 – present.
> Executive Committee - March 1986 - April 1988.
> Nominations Committee - March 1995 - April 1998. March 1999 – April 2002
> Section Head, Mass Political Behavior - March 1995 - February 1996

Western Political Science Association - March 1976 - present.
> Chair, Dissertation Award Committee, 1997-1998.
> Committee for the Status of Chicanos in the Profession - March 1984 - February 1987.
> Committee for Ethics in the Profession - March 1990 - February 1991.
> Executive Committee - March 1987 - February 1991.
> Pi Sigma Alpha Committee - March 1995 - February 1998.

Program Committee – 2002 – 2003.
Dissertation Award Committee – 2002 – 2003.
Best Paper Award Committee – 2003 - 2004.

Associate Editor, Urban Affairs Review, 1995-1998.
Associate Editor, American Review of Politics, 1996-Present.
Editorial Board, Texas Journal of Political Studies, 1996-1999.
Book Series Editor, Lexington Press, Rowman and Littlefield, *Latinos and American Politics,*
    2015-Present.

## COMMUNITY - PUBLIC SERVICE ACTIVITIES
Member, City of San Antonio, Charter Revision Commission, 2018-Present.
Member, City of San Antonio's Correct Count Census Committee, 2019.
Member, Board of Governors, Institute Mexican American Institute of Civil Rights, 2019.
Participant, National Committee for a 50 Year Blueprint for Chicanos, 2018-Present.
Member, Organizing Committee for the National High School Walkout Conference, 2019.
Presenter, Texas Gerrymandering and Voter Suppression, UTSA Social Work Advanced Policy
    Graduate Students, Our Lady of the Lake University, San Antonio, TX. Nov. 29, 2017.
Moderator, Gerrymandering: What's in the Secret Sauce?  On the Bar.  San Antonio Bar
    Association.  June, 2016.
Presenter, "Evolution of Voting Rights for Mexican Americans in South Texas," San Antonio
    Historical Association, San Antonio, Texas, September 27, 2016.
Panel Participant, "Implications of the Voter ID Law," League of Women Voters, San Antonio,
    Texas, September 20, 2016.
Presentation, *Camara de Comercia Argentino* (Argentine Chamber of Commerce),
    *"Camino a la Casa Blanca:  Hillary contra Trump y sus Implicancias,"*
    ("Path to the White House:  Hillary versus Trump Implications), June, 2016.
    Presentation in Spanish.
Presenter, 100th Birthday Symposium on Congressman Henry B. Gonzalez, 2016.
Convener/Moderator, 50th Anniversary Symposium on Voting Rights Act, "What is the Future
    Of the VRA," St. Mary's University School of Law, 2016
Presenter, 50th Anniversary Conference on Voting Rights Act, "Latinos, the Voting Rights Act
    And Political Engagement," 2015.
Presenter, "The New Latino Electorate of the United States in the 2012 Elections and Beyond,"
    *Consejo Argentino para las Relaciones Internacionales,* Buenos Aires, Argentina,
    March 23, 2011.
Testified, Joint House Committee:  Justice and Redistricting, State of Texas, McAllen, Texas,
    July 21, 2010.
Member, Board, Design Committee, University Heath Systems, Bexar County, San Antonio,
    Texas, 2009-2013.
Member, Board, The National Center for Behavioral Health Solutions, San Antonio, Texas,
    2008-2014.
Member, Correct Count Census Committee, Bexar County and San Antonio, Texas, 2009-
    2011 (Chairperson of Subcommittee on Under-Represented Communities).
Member, Westside Creeks Oversight Committee, San Antonio River Authority, 2008-2010.
Member, Westside Development Corporation, San Antonio, Texas, 2007-2011.

Member, Educational Affairs Advisory Committee, San Antonio Manufacturer's Association, 2006-2009.

Member, National Latino Advisory Committee, Nielsen Media Company, 2007 – 2013.

Member, St. Mary's University, Neighborhood Revitalization Committee, 2006 – 2014.

University Representative, City of San Antonio, Westside Development Corporation, 2006-2013.

Presenter, "The Latino Electorate, Poverty and Education," David and Lucille Packard Foundation, Sonoma, CA, 2006.

Presenter, "The VRA, Poverty, and Education," William C. Velasquez Institute, San Antonio, Texas, 2005.

Opinion Columnist, *La Prensa*, San Antonio, Texas, 2003 – 2007.

Commentary Writer, *NewsTaco,* online news service, 2007 – present.

Presenter, Stormont Lectures, Victoria College, Victoria, Texas, Feb. 2003, Feb. 2009.

Presenter, Latino Academy, Southwest Voter Registration and Education Project, San Antonio, TX, Aug. 9, 2002.

Presenter, US House Committee Hearings on Irregularities in the Voting Process, San Antonio, Texas. Apr. 2001.

Presenter, The Texas Forum on Civil Liberties and Civil Rights and The Hispanic Journal of Law and Policy of the University of Texas School of Law's Symposium "Drawing Line in the Sand: The Texas Latino Community and Redistricting 2001." Apr. 2001.

Presenter, Joint Senate-House Redistricting Committee, State of Texas, Apr. 2001.

Presenter, Texas Senate Redistricting Committee, Mar. 2001.

Presenter, Texas House Redistricting Committee, Mar. 2001.

Presenter, Redistricting Symposium, Willie C. Velasquez Institute, League of United Latin American Citizens, Mexican American Legal Defense and Educational Fund, and National Association of Latino Elected Officials, Feb. 2001, Austin, TX.

Presenter, Summit of the States, Center for Policy Alternatives, Dec. 2000, Washington, D.C.

Presenter, Latino Issues Conference, Willie C. Velasquez Institute, Nov. 2000, Menger Hotel, San Antonio, Texas.

Presenter, Latino Academy, Willie C. Velasquez Institute, Oct. 2000, Kerrville, TX.

Presenter, Willie C. Velasquez Institute Redistricting Conference, Aug. 2000, Houston, Texas.

Presenter, Southwest Voter Registration and Educational Project Conference, Feb. 2000, Palm Springs, CA.

Member, Henry B. Gonzalez Congressional Library Fundraising Committee, 1997.

Member, San Antonio/Bexar County, City/County Consolidation Committee, 1996. Chair, Subcommittee on Voting Rights.

Presenter, Hispanic Chamber of Commerce, 1995.

Member, Board of Directors, Hemispheric Institute for Public Service (HIPS), San Antonio, Texas, January 1988 - present.

Member, Advisory Committee, Mexican American Legal Defense and Educational Fund's (MALDEF) Leadership Development Program, 1987-1988.

## ACADEMIC ACTIVITIES

Professor Emeritus, May, 2018
Professor of Political Science, Departments of Political Science and International Relations,
  Fall, 2013 – May, 2018.
Distinguished University Research Professor, Institute for Public Administration, Politics
  and Public Policy, St. Mary's university, San Antonio, Texas, June 2013 – Present.
Sabbatical Leave, Fall-2013
Dean, Graduate School, June 2004 – May 2013.
Sabbatical Leave, Willie C. Velasquez Research Institute, San Antonio, TX, Fall – 2001.
Professor, Department of Political Science, St. Mary's University, Spring 1993 – May, 2018.
Acting Graduate Director, Masters in Public Administration, St. Mary's University, San
  Antonio, Texas, Fall, 1997.
Chair, Department of Political Science, St. Mary's University, San Antonio, Texas, June 1991 -
  May 1995, Acting Chair January – August 1998.
Fulbright Scholar, *Universidad Católica de Argentina,* Buenos Aires, Argentina, 1991 -1992.
Director, Graduate Program in Political Science, St. Mary's University, San
  Antonio, Texas, Fall 1989 - May 1991; January 1996 – May 1999; June 2003.
Director, Masters in Public Administration, St. Mary's University, San Antonio,
  Texas, Fall 1983 - May 1991; Fall 2000 – Spring 2004; Spring 2014 – May, 2018.
Associate Professor, Political Science, St. Mary's University, San Antonio, Texas,
  Spring 1986 – Spring, 1993.
Assistant Professor, Political Science, St. Mary's University, San Antonio, Texas, Fall
  1983 - Spring 1986.

## INTERNATIONAL RELATIONS

Fulbright Scholar, Argentina, *La Universidad de Mendoza, La Universidad de Empresas de
  Buenos Aires, y La Universidad Católica de Buenos Aires,* 1992.

Presentation, *La Camara Argentina de Comercio* (Argentine Chamber of Commerce),
  *"Camino a la Casa Blanca: Hillary contra Trump y sus Implicancias,"*
  ("Path to the White House: Hillary versus Trump Implications), June, 2016.
  Presentation in Spanish.

Presenter, "The New Latino Electorate of the United States in the 2012 Elections and Beyond,"
  *Consejo Argentino para las Relaciones Internacionales,* Buenos Aires, Argentina,
  March, 2011. Presentation in Spanish.

Presenter, "The Voting Rights of Latinos as a Violation of the Declaration of Human Rights,"
  *FORO Ecumenico,* Buenos Aires, March, 2013. Presentation in Spanish.

Presenter, "The US Latino Electorate: A Sleeping Giant," *Fundacíon Internacíonal Jorge
  Luis Borges,* Buenos Aires, March, 2013. Presentation in Spanish.

On behalf of St. Mary's I participated on the team to negotiate Memoranda of Understanding
with *Shanghai Lixin University of Commerce, Wuxi South Coast College, East China University
of Science and Technology* and *Shanghai University of Finance and Economics.* China.

On behalf of St. Mary's I led the team to negotiate Memoranda of Understanding with *Universidad Abierta Interamericana, Universidad Nacional de Tres de Febrero, FORO Ecuménico, Fundación Internacional Jorge Luis Borges,* and *IDEAR (Instituto de Estudios Argentinos en Politicas Publicas.* Argentina.

Currently negotiating a Memorandum of Agreement with *La Fundación Jóvenes por los Derechos Humanos* in Argentina.

## COURSES DESIGNED AND TAUGHT AT ST. MARY'S

Have designed and taught 20 different undergraduate courses during more than 30 years of teaching at St. Mary's.  Below are some of the graduate classes I have taught.

PA/PO 6300 – Political Science Research Methods (Graduate Statistics Seminar)
PA/PO 6301 - Public Administration (Graduate Seminar)
PO 6302      - Public Policy Analysis (Graduate Seminar)
PO 6302      - Political Economics (Graduate Seminar)
PA/PO 6303 - Urban Political Institutions and Processes (Graduate Seminar)
PO 6304      - Urban Politics (Graduate Seminar)
PA/PO 6305 - American Political Institutions (Graduate Seminar)
PO 6310 - Comparative Politics (Graduate Seminar)
PO 6352 - U.S. Latino Communities (Graduate Seminar)
PO 6353 - Urban Issues in the Americas (Graduate Seminar)
PA/PO 6354 – Campaign Management (Graduate Seminar)

## ACADEMIC SERVICE ACTIVITIES
Member, Search Committee Dean of School of Humanities and Social Sciences, 2016.
Member, Committee on Faculty Evaluations, 2013-Present.
Chair, Search Committee for VPAA, 2009-2010.
Chair, Search Committee for Director of Institutional Research, 2009-2010.
Representative of Independent Colleges and Universities of Texas (ICUT), The Texas
        Higher Education Coordinating Board, Advisory Council on Doctoral Education
        in the State of Texas, 2006 – 2013.
Member, Task Force on Mission and Identity, 2005.
Member, Academic Council, Fall 2004 – Present.
Member, St. Mary's Contingent to Marianist Universities Meetings,
        Chaminade University, Honolulu, Hawaii, June, 2003; University of Dayton,
        Dayton, OH, June, 2005; Chaminade University, Honolulu, Hawaii, June 2006;
        San Antonio, TX, June 2007.
Member, Search Committee, Vice President for Enrollment Management – 2003.
Advisor, Young Democrats [St. Mary's University Chapter]-2000 - 2002.
Advisor, LULAC (League of United Latin American Citizens [St. Mary's Student
        Chapter]-1999-2004.
Advisor, MEChA (Movemiento Estudientil Chicano de Aztlan)-1997-1998.
Member, University-Wide Strategic Planning Coordinating Committee, 1994 -1996.

Member, Strategic Planning Committee for Planning and Information Management,
  1994 - 1996.
Member, University Board of Trustees, Academic Affairs Subcommittee, 1993 -1995.
Chairperson, University Task Force on Scholarship and Change, 1994.
President, Faculty Senate, 1993 - 1995.
Member, Alumni Association Board of Trustees, Ex-Officio, 1993-1994, 1994 - 1995.
   Subcommittee on Strategic Planning.
   Subcommittee on Fund Raising.
   Subcommittee on Awards.
Member, Committee on Facilities Management, 1993 -1995.
Member, University Tenure Review Committee, Spring 1993.
Member, University Committee on Writing Evaluation, 1992 -1994.
Member, University Pre-Law Advisory Committee, 1991 -1992.
Chair, Academic Affairs Committee, Faculty Senate, 1988 -1989.
Member, Graduate Council, 1983 -1991; 2000 – Present.
Chair, Faculty Budgetary Committee, 1987 -1989.
Member, Committee on Graduate Education, 1987 -1989.
Member, Search Committee, Dean, School of Humanities and Social Sciences, 1986 -
  1987.
Member, Search Committee, Dean of Graduate School, 1985 - 1986.
Member, Humanities and Social Sciences Committee on Faculty Evaluations, 1987 -
  1988.
Member, Faculty Senate Committee for the Status of Faculty, 1985 - 1987.
Member, Honor's Council, 1984 –1987; 2000 - 2004.
Chair, Committee on the Philosophy of the Liberal Arts, 1983 -1984.
Member, President's Peace Commission, 1983 -1984.

## BOOKS

Racism, Latinos, and the Public Policy Process. (Lexington Books, 2019). Forthcoming
  June 15, 2019.

Latinos and the Voting Rights Act: The Search for Racial Purpose. (Lexington Books, 2015).

The Evolution of the Liberal Democratic State With a Case Study of Latinos in
  San Antonio,Texas. (Edwin Mellon Press, 2003).

Mexican Americans and the Law. Co-authored with Sonia Garcia, Roberto Juarez,
   and Rey Valencia. (University of Arizona Press, 2004).

## ARTICLES AND CHAPTERS IN BOOKS

"The Meaning of One-Person, One-Vote or Let's Split the Baby in Half: Evenwel v Abbott."
  Social Science Quarterly, (forthcoming Summer, 2019).

"Latinos in American Politics".  Encyclopedia of Immigration and Minority Studies.
        Sage Publications, (Spring, 2011).

 "The 2008 Texas Vote in a Transitional Election." Journal of South Texas Studies.
        2009.

"The 2004 WCVI National Latino Election Day Exit Poll."  William C. Velasquez
        Institute.  San Antonio, TX, 2004.

"Contemporary San Antonio Politics:  1900 – 2003." In San Antonio Politics.
        Edited by Richard Gambitta.  NY:  McGraw-Hill Publishing, Co, 2004.

"Are Latinos Becoming More Republican?"  Journal of South Texas Studies,
        Summer, 2003.

"Between a Rock and a Hard Place:  Texas Latinos and Redistricting 2001," The
        Texas Hispanic Journal of Law and Policy, Austin, TX:  The University of
        Texas School of Law, 2001.

"Political Rhetoric for the 1990s" in The '94 Election (Non) Voters Companion, edited
        by Dean Harris (Claremont, CA: 1996).

"Man A Mexican Doesn't Have A Chance:  An Assessment of Congressman Henry B.
         Gonzalez's Leadership," Texas Journal of Political Studies, (June, 1993).

"East Los Angeles:  A Field of Dreams" in City of Angels, edited by Gerry Riposa and
        Carolyn Dersch (Dubuque, IA:  Kendall/Hunt Publishing Co., 1992).

"The Texas Hispanic Voter:  Prospects and Trends," with Robert Brischetto in From
         Rhetoric to Reality:  Latino Politics in the 1988 Elections edited by Rodolfo De
        LaGarza and Louis De Sipio (San Francisco:  Westview Press, 1992).

"Deconstruction and Chicano Politics," in Latinos and Political Coalitions:  Political
         Empowerment for the 1990s, edited by Robert Villarreal and Norma Hernandez
        (New York:  Greenwood Press, 1991).

"The Selectivity of the Capitalist State:  Chicanos and Economic Development,"
         Western Political Quarterly, Summer, 1989.

"Structural Barriers to Chicano Empowerment," in Latino Empowerment: Progress,
         Problems, and Prospects, edited by Roberto Villarreal, Howard Neighbors and
         Norma Hernandez (New York:  Greenwood Press, 1988).

"La Ecología y medio Ambiente en la Zona Frontera del sur de Texas," Mexico - E.U.A.:
         Cooperación y Conflicto, Memoria del Foro Efctuado en Mexico, D.F.,
         Diciembre, 1986

"The Urban Land Use Decision making Process: An Exegesis of Systemic Weakness," <u>Proceedings of the National Association for Chicano Studies</u>, 1979.

"Some Different Thoughts Concerning *Machismo*," <u>Comadre</u>, Fall, 1978.

**Book Reviews**
Reviewed approximately 40 different volumes for various scholarly journals.

## RESEARCH AND WORK IN PROGRESS
Gathering preliminary data on "The Denial of Voting Rights in the United States as a Violation Of the Universal Declaration of Human Rights."
Beginning work on a coauthored volume concerning the Bail In provisions of Section 3 of the Voting Rights Act with Professors Dan McCool, University of Utah and Richard Engstrom, Duke University.
Gathering data for the official biography of Congressman Henry B. Gonzalez.

## PAPERS DELIVERED & SCHOLARLY PRESENTATIONS

"Bail In Under Section 3 of the Voting Rights Act:  The Case of Texas."  11th International Conference on Interdisciplinary Social Sciences," Hiroshima, Japan, July, 2017.

"Pockets of Discrimination:  The Voting Rights Act and the Role of 'Bail-In' After *Shelby v Holder."* March, 2016, Midwest Political Science Association, Chicago, IL.

"The Meaning of 'One-Person, One-Vote' or Let's Split the Baby in Half:  Some Preliminary Comments and Observations." January, 2016, Southern Political Science Association, San Juan, Puerto Rico.

"The Proof of Racism When Racism is Non-existent:  A Mixed Methods Approach to Public Policy Analysis." July 30 – August 1, 2013, 8th International Conference On Interdisciplinary Social Sciences, Charles University, Prague, Czech Republic.

"Invisible Racism in the Texas Voter ID Law." April, 2013, Midwest Political Science Annual Meeting, Chicago, IL.

"Wither Section 5 of the Voting Rights Act."  March, 2013, Western Political Science Association, Hollywood, CA.

"The Latino Electorate, The Electoral College, and Realigning Elections." June, 2010, Atiner Symposium, Athens, Greece.

"The Changing Face of the American Electorate and the Possible Effects on USA Immigration Policy."  April, 2010, Midwest Political Science Annual Meeting.  Chicago, IL.

"The Political Maturation of Latinos or What Needs to be Done to Get a Seat at the Table?:

Some Comments on a Much Larger Project." April, 2009, Midwest Political Science Annual Meeting.  Chicago, IL.

"Latino Public Opinion and Public Policy:  the 2006 Exit Polls."  September, 2006, American Political Science Association.  Philadelphia, PA.

"Latino Political Participation and Power:  2004 National Latino Exit Poll." April, 2006, Midwest Political Science Association.  Chicago, IL.

"Latino Political Participation and Power:  2004 National Latino Exit Poll." March 18, 2006.  Western Political Science Association.  Albuquerque, New Mexico.

"The Negative Legacies of the Voting Rights Act for the State of Texas." April 21-23, 2005.  Invited Paper.  Yale University.  Center for the Study of American Politics.  "Lessons From the Past, Prospects for the Future:  Honoring the Fortieth Anniversary of the Voting Rights Act of 1965."  New Haven, CN.

"Can Critical Realigning Elections Be Artificially Constructed:  A Case Study of the 2001 - 2004 Texas Redistricting Debacle." 2004, Western Political Science Association, Portland, OR.

"Some Methodological Barriers to be Overcome Attempting to Utilize Census Data in Longitudinal Studies." 2004. Midwest Political Science Annual Meeting, Chicago, 2004.

Mayor Ed Garza of San Antonio, TX:  A Cisneros Legacy." 2001, Western Political Science Association, Long Beach, CA.

"Competitiveness and Electoral Systems:  Are Districted Elections More Competitive Than At-Large Systems?"  2000, The American Political Science Association, Washing, D.C.

"The Effects of Single Member Districts on Latino Political Participation or Is the Baby Being Thrown Out With the Bath Water?" 1999, The American Political Science Association, Atlanta, GA.

Roundtable on Morning Glories:  the Politics of Southwestern Cities by Amy Bridges, 1999, Western Political Science Association, Seattle, WA.

"Term Limits and the Voting Rights Act:  The Case of San Antonio, Texas," 1998, The American Political Science Association, Boston, MA.

"Voter Turnout and Majority-Minority Districts:  The Effect on Municipal Districts," 1997, The American Political Science Association, Washington, D.C.

" 'No Room!  No Room!'  They Cried Out When They Saw Alice Coming: The
        Recent Gerrymandering Decisions of the South," 1995, Southwestern Social
        Science Association, Dallas, TX.

Roundtable, "The Selma March and the Voting Rights Act After Thirty Years:  A
        Commemoration, Assessment of the Past, and Preview of the Future,"
        (Thematic Session), 1995, Southwestern Social Science Association, Dallas TX.

Roundtable, "An Assessment of Latino Political Influence in the Southwest," 1995,
        Southwestern Social Science Association, Dallas, TX.

"Chaos and the City," 1994, Western Political Science Association, Albuquerque, NM.

"The Voting Rights Act of 1965 and the Delivery of Municipal Services," 1993, Western
        Political Science Association, Pasadena, CA.

"The Voting Rights Act and the Equitable Distribution of Municipal Services," 1992,
        American Political Science Association, Chicago, IL.

"An Evolution of City Typologies," 1991, Western Political Science Association, Seattle,
        WA.

"Post Modernism and Chicano Politics," 1990, Western Political Science Association,
        Newport Beach, CA.

"Water Policy in South Central Texas:  An Impossible Dream," 1989, Southwestern
        Political Science Association, Little Rock, AK.

"Deconstruction and Chicano Politics," 1988, Southwestern Political Science
        Association, Houston, TX

"Growth and Justice in Local Politics:  The Issues for the Coming Decade," 1988,
        Western Political Science Association, San Francisco, CA.

"Playing Power Politics the American Way," 1987, Western Political Science
        Association, Anaheim, CA. Award for Best Paper on Chicano Politics.

"The Ecology and Environment of the South Texas Border Region," 1986, Mexico –
        E.U.A.:  Cooperación y Conflicto, Colegio Nacional de Ciencias Politicas y
        Administración Publica, A.C., Mexico City, D.F.

"Structural Barriers to Chicano Empowerment," 1986, Symposium on Chicano
        Empowerment, University of Texas at El Paso, El Paso, TX.

Panel Chair, "The Status of Hispanics in the United States in the 1980's" 1986,
        Southwestern Political Science Association, San Antonio, TX.

"The Cohesiveness of the Congressional Hispanic Caucus," 1985, <u>Southern Political Science Association</u>, Nashville, TN.

"The Cohesiveness and Representativeness of the Congressional Hispanic Caucus:  Some Preliminary Considerations," 1985, <u>Southwest Social Science Association</u>, Houston, TX.

"The Bourgeoisification of Chicano Youth:  What Is To Be Done?" 1984, <u>National Association of Chicano Studies</u>, Austin, TX.

"Chicanos and Politics in the 1980's," 1984, <u>Western Political Science Association</u>, Sacramento, CA.

"An Inherently Discriminatory Cobweb:  Some Considerations Concerning the American Political System," 1983, <u>National Association of Chicano Studies</u>, Ypsilanti, MI.

## <u>LITIGATION RESEARCH AND EXPERT LEGAL TESTIMONY</u>

<u>Leal and League of United Latin American Citizens v San Antonio River Authority</u> (SA-85-CA-2988/1986) - Racial Polarization, History of Racial Discrimination in San Antonio, TX. Testified in TRO hearing.

<u>Villarreal v Mosbacher</u>, 1992 - Racial Discrimination in Delivery of Food Stamps. Produced expert report and testified in deposition.

<u>Rodriguez and Reyes v Rocksprings Independent School District</u> (DR-89-CA-29) – Racial Polarization, History of Discrimination in Texas, 1991 - 1992. Produced expert report and testified in deposition.

<u>Gonzalez v Mission Hospital</u> (C-3566-88-B) - Age and Racial Discrimination in Employment, 1992.  Expert Report.

<u>Vinalay v Coca Cola Bottling Company of the Valley</u> - Age and Racial Discrimination in Employment, 1992. Expert Report.

Voting Rights Act, Sec. 2, submission on the part of Congressman Joe Barton, R-Ennis, TX before Honorable William Dunn, United States, Assistant Attorney General for Civil Rights, 1992.  Expert Report and testimony

<u>Terrazas v. Slagle</u>, 789 F. Supp. 828 (W.D. Tex. 1991) - 1990 Texas Reapportionment, Racial Polarization in Texas, 1992.  Expert report, deposition and trial testimony.

<u>Ruth Sanchez v Sears, Roebuck and Co.</u> (CA-M-91-110) - Gender and Racial Discrimination in Employment, 1992.  Expert report.

<u>LULAC and FOCUS v Midland Community College District</u> - Voting Rights, Racial Polarization, History of Discrimination in West Texas, 1993. Expert report

and deposition.

Norma Elizondo Garza v Texas Department of Human Services (CA-C-2679-89-C) – Gender Employment and Promotion Discrimination, 1993.  Expert report and testimony during mediation.

Willie J. Rollins, Ervin O. Grice and League of United Latin American Citizens, #188 v Fort Bend Independent School District, et al (CA-H-92-3399) – Racial Polarization and History of Discrimination in East Texas, 1993.  Expert witness deposition and trial testimony.

LULAC of Texas and Alfred Lucero v The State of Texas (L-93-26) - Voting Rights, Racial Polarization and the History of Racial Discrimination in Texas, 1993.  Preliminary expert report.

LULAC and Dr. Harold Jones v North East Independent School District - Voting Rights, Racial Polarization and the History of Racial Discrimination in San Antonio, Texas, 1993-1995.  Expert report, deposition and trial testimony.

Larencene Lespreance v Schreiner College (CA-SA-93-CA-1084) - Employment Discrimination, ADA, 1994.  Expert report.

LULAC v Northside Independent School District - Voting Rights, Racial Polarization and the History of Discrimination in Texas, 1994.  Expert report and deposition.

Guerra, et al v Celanese Corp, et al, C.A. No. C-80-115 (USDC, Southern District, Corpus Christi) Mireles et al v. Celanese Corp. et al, C.A. No. C-76-134 (USDC, Southern District, Corpus Christi) - Employment Discrimination. 1995 – 2000. Expert report.

Perez, et al v Pasadena Independent School District, et al C.A. No. H-92-3578 - Voting Rights, Racial Polarization, 1995 - 2001.  Expert report, deposition and trial testimony.

LULAC v Roscoe Independent School District - Voting Rights, Racial Polarization, 1995. Expert report, deposition and trial testimony.

Milwaukee Branch of NAACP, et al and Ramon Valdez v Governor Tommy Thompson, et al, and Wisconsin Association of Trial Judges, et al CA No. 94-C-1245 - Voting Rights and Racial Polarization, 1996.  Expert report.

Helen Dutmer v The City of San Antonio, TX CA No. SA-95-CA-764 – Voting Rights, Racial Polarization, and Term Limits for City Council Members, 1996. Expert report and deposition.

Efrain Gomez v Hygeia Dairy Company, CA No. C-95-447 - Age Discrimination, 1996.

Expert report and mediation testimony.

<u>Armando Longoria v Hygeia Dairy Company, CA No. 1994-CCL-00727-B</u>
Workman's Compensation, 1996.  Mediation scheduled for Oct 24, 1996.
Expert report and mediation testimony.

<u>Terry Stanford v Hygeia Dairy Company, CA 95-6035-C</u> - Workman's Compensation, 1996.
Expert report and mediation testimony.

<u>Blanchard v Pecos County Bank, CA P-96-CA-82</u> - Racial discrimination in
promotion, 1996-98.  Expert Report.

<u>Aguilar v Gonzalez</u> - Racial Polarization in elections State of New Mexico, 1996-97.
Expert report and testimony.

<u>Valero, et al v City of Kerrville, et al, CA No. SA-96-CA-413-FB</u>, 1997 - present –
Racial Polarization and Political Cohesiveness of African American and Hispanic
Voters In City of Kerrville.  Expert report and deposition.

<u>Harris v City of Houston</u> - Racial Polarization in City of Houston and Harris County
General and City Council Elections, 1996-97.  Expert report, deposition, TRO
Testimony.

<u>Sharyland LULAC and Mario Hernandez v Sharyland ISD</u>-Racial Polarization in school
district elections, 1997.  Expert report.

<u>Casarez v Val Verde County</u> - Racial Polarization in the use of Federal Post Card
Application Ballots, 1997.  Expert report, deposition, trial testimony.

<u>Garza v HCA Health Services of Texas, Inc. D/B/A HCA Grande Regional Hospital</u>-
Workmen's Compensation, 1997.  Expert report.

<u>Graham v City of San Antonio, Texas, and Robert Ojeda, Fire Chief</u> – Promotion
Discrimination, 1997.  Expert report and fact hearing testimony.

<u>Richard Reynosa, et al v Amarillo Independent School District, et al</u> – Racial Polarization
And Political Cohesiveness of African American and Hispanic Voters in Amarillo
ISD, 1998.  Expert report and deposition.

<u>Rothe Development Corp vs USDOD and USAF</u> – Minority Contracting, 1999.  Expert
report and deposition.

<u>Aguilar v Titan Tire Company</u> – Workmen's Compensation Retaliation, 2001.  Expert
report.

<u>Balderas, Roman, and Torres v State of Texas, et al</u>  (CA 6:010v158) – State Senate,

House and US Congressional Redistricting, 2001.  Consulting Expert.

State of Texas v Mr. Patrick McCarty (No. 01-03-2829) – Change of venue, race relations in South Texas, 2002.  Expert Report and hearing testimony.

NAACP, et al v Katherine Harris, Secretary of State of Florida, et al (01-01210-CIV-GOLD/SIMONTON) – Sec. 2, VRA, 2002.  Expert Reports and deposition testimony.

Arvizu , et al v Arizona Independent Redistricting Commission, et al. (CV2002-004380 anCV2002-004882) – Arizona US Congressional Redistricting Racial Polarization, 2002 – 2003.  Expert Reports, deposition and trial testimony.

Leyva, et al. v Republican Party of Bexar County, et al. – Sec. 5, Republican Party Primary Challenge, 2002.  Expert report and deposition testimony.

Latino Voting Rights Committee of Rhode Island, et al v Edward Inman III, Secretary of State, Rhode Island, et al. (CA No 02-296-T) – Sec. 2 Racial Polarized Voting, 2002 - 2003.  Consulting expert.

Rodriguez, et al, v Bexar County, Texas, et al, (CA SA-01-CA-1049 WWJ) – Sec. 2 Racial Polarized Voting, 2003.  Expert report, deposition and trial testimony.

G. I Forum, et al v Perry, - Sec 2, Racial Polarized Voting, 2003.  Expert report, deposition and trial testimony.

Texas Latino Redistricting Task Force, et al v. Perry, et al., 2011.  Expert report, deposition and trial testimony (discriminatory racial intent).

Texas v Holder, et al, 2012.  Expert report, direct testimony submitted during trial (discriminatory racial intent).

Gomez, et al v Commissioner of Department of State Health Services, State of Texas, et al, 2016. Expert report, direct testimony being prepared for trial (discriminatory racial intent).

La Union Del Pueblo Entero, Inc., et al v Greg Abbott, et al, 2017.  Expert report, direct testimony ("Totality of circumstances," Senate Factors).