PLAINTIFF'S
EXHIBIT

**157**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS

**JAYLA ALLEN, et al.,**

**PLAINTIFFS,**

**v.**                                    **Civil Case No. 4:18-cv-3985**

**WALLER COUNTY, et al.,**

**DEFENDANTS.**

**EXPERT REBUTTAL REPORT**
**OF**
**Henry Flores, Ph.D.**

**ON BEHALF OF PLAINTIFFS**
**JAYLA ALLEN, DAMON JOHNSON, TREASURE SMITH,**
**AND THE PANTHER PARTY**

1

# TABLE OF CONTENTS

**Introduction**

    **I.**    **General Observations and Comments on Dr. Gimpel's Report**

    **II.**    **Specific Comments on Dr. Gimpel's Report**

    **III.**    <u>**Arlington Heights**</u> **and Senate Factors**

    **IV.**    **Correcting and Contextualizing a Discussion in My Initial Report**

    **V.**    **Observations and Conclusions**

## Introduction

This report includes five sections.  The first provides general observations and comments on the Defendants' expert report by Dr. Gimpel.  The second addresses specific comments on Dr. Gimpel's methodology, observations, and conclusions.  The third section reiterates my initial findings under the <u>Arlington Heights</u> factors and the Senate Factors, and notes that Dr. Gimpel does not specifically address or seek to rebut any of these findings.  The fourth corrects a factual error in my initial report.  To conclude, the fifth section offers my own general observations and conclusions concerning Dr. Gimpel's report.

### I.   General Observations and Comments about Dr. Gimpel's Report

- Both distance analyses employed by Dr. Gimpel, based on proximity to actual voters and the location-allocation model, were inappropriately abstract in nature and failed to account for the unique demographics and economic and historical conditions of young and Black student voters aged 18-20 at Prairie View A&M University (PVAMU).

- Dr. Gimpel's conclusions concerning the purported benevolence of Waller County officials in allocating early voting <u>sites</u> to the PVAMU campus fail to recognize that these sites were not allocated until after students had protested, marched, risked retaliatory and pretextual prosecutions by Waller County officials, and petitioned the County to have a polling location sited on campus.

- To the extent that Dr. Gimpel credits Waller County for selecting the <u>Memorial Student Center</u> (MSC) on the PVAMU campus as an appropriate <u>location</u> for early voting, I agree that it is an excellent location, and that it should continue to be used. However, Dr. Gimpel fails to acknowledge, as Plaintiffs' Expert Report of Dr. Peniel Joseph makes clear, that it

3

was PVAMU students, not County officials, who first identified this location. PVAMU students struggled for years before the County consented to site a voting location there.

- Similarly, the <u>hours</u> at the PVAMU MSC on which Dr. Gimpel largely bases his analysis were extended in direct response to the filing of this lawsuit—as such, it is the students who deserve the credit for the final allocation of hours, not Waller County officials.

- Despite the failure to consider these factors in his analysis, Dr. Gimpel reaches an ultimate conclusion that PVAMU students were not disadvantaged by the administration of early voting in the 2018 November election.

## II.  Specific Comments on Dr. Gimpel's Report

***Comparison of PVAMU to Other Campuses***

Dr. Gimpel compared Waller County to eight other Texas counties, Table 6, p. 21, without any consideration of the differences, including in demographics, geographical locations, social conditions, or historical experiences, among the college or university campuses in these counties.

*Demographics and geographical locations*

The eight colleges and universities in Texas to which he compared PVAMU do not have comparable student demographic populations: that is, none are a historically Black or currently majority-Black university or college (HBCU); one is a Hispanic Serving Institution (HSI); and all of these Texas institutions have historically served different student-age groups and have unique missions.  None of these eight institutions also is a HBCU in Texas situated amid a largely white, non-student, older population.

The data in **Table 1** below depicts the general student demographics of each Texas campus represented by Dr. Gimpel in Table 6, p. 21 of his report. The data displayed in Table 1 below were taken from the Common Data Set for the Fall Semester, 2019, with the exception of Sam

4

Houston State University whose most recent report was dated Fall, 2015.  These data are also available on the Texas Higher Education Coordinating Board's website.  The race and ethnicity percentages represent the undergraduate enrollment figures only as these are not reported for the graduate population.  Total enrollment figures are for the combined undergraduate and graduate populations of each university.

**Table 1**
**Colleges and Universities Compared to PVAMU**

| Name of School | Fall 2018 Enrollment | % White | % Black | % Hispanic |
|---|---|---|---|---|
| Tarleton State University | 13,118 | 64.3 | 8 | 16.8 |
| Texas A & M Commerce | 12,072 | 46.9 | 20.1 | 16.8 |
| Texas A & M Kingsville | 8,541 | 14.5 | 5.2 | 74.3 |
| Stephen F. Austin | 13,058 | 58.5 | 15.4 | 19.1 |
| West Texas A & M | 10,030 | 56.7 | 5.3 | 27.4 |
| Angelo State | 10,242 | 50.4 | 5.8 | 36 |
| Univ. of Houston Victoria | 4,381 | 32 | 17 | 38 |
| Sam Houston State | 21,025 | 52.5 | 18.5 | 20.4 |
| PVAMU | 9,516 | 1.8 | 82.3 | 8.8 |

SOURCES:  Texas Higher Education Coordinating Board.  Data Center.  Common Data Sets from Offices of Institutional Research at Tarleton State University, Texas A & M Commerce, Texas A & M Kingsville, Stephen F. Austin, West Texas A&M University, Angelo State University, University of Houston, Victoria, Sam Houston State University, and Prairie View A&M University. Ethnicity data from Fall 2019 enrollment undergraduate enrollment figures.

As the data in Table 1 reveal, only two campuses are considered majority-minority schools: Texas A&M Kingsville, which is an HSI having an undergraduate student population that is more than 74% Hispanic; and PVAMU, a HBCU that has an undergraduate population that is more than 80% Black.  The demographics of both these institutions are markedly different from the remainder of the campuses in Table 1.  The other campuses in Table 1 are majority-white campuses with substantially smaller African American student populations.

Moreover, PVAMU also stands apart from the other institutions in Texas selected by Dr. Gimpel as purported comparators to PVAMU due to the notable difference between the demographics of PVAMU's student body and the demographics of the county where those students reside.  **Table 2** below contextualizes the data in Table 1 by comparing each institution's

5

demographics with the overall demographics of the counties where they are located, as recorded by the 2010 Census.

**Table 2**
**Colleges and Universities and County Demographics Compared to PVAMU**

| Name of School / *County* | Fall 2018 Enrollment / *2010 Pop.* | % White | % Black | % Hispanic |
|---|---|---|---|---|
| **Tarleton State University** | 13,118 | 64.3 | 8 | 16.8 |
| *Erath County* | *37,890* | *77.5* | *1.1* | *19.2* |
| **Texas A & M Commerce** | 12,072 | 46.9 | 20.1 | 16.8 |
| *Hunt County* | *86,129* | *74.8* | *8.1* | *13.6* |
| **Texas A & M Kingsville** | 8,541 | 14.5 | 5.2 | 74.3 |
| *Kleberg County* | *32,061* | *23.3* | *0.4* | *70.2* |
| **Stephen F. Austin** | 13,058 | 58.5 | 15.4 | 19.1 |
| *Nacogdoches County* | *64,524* | *61.5* | *17.9* | *17.6* |
| **West Texas A & M** | 10,030 | 56.7 | 5.3 | 27.4 |
| *Randall County* | *120,725* | *78.2* | *2.2* | *16.4* |
| **Angelo State** | 10,242 | 50.4 | 5.8 | 36 |
| *Tom Green County* | *110,224* | *57.9* | *3.6* | *35.7* |
| **Univ. of Houston Victoria** | 4,381 | 32 | 17 | 38 |
| *Victoria County* | *86,793* | *47.9* | *6.0* | *43.9* |
| **Sam Houston State** | 21,025 | 52.5 | 18.5 | 20.4 |
| *Walker County* | *67,861* | *58.5* | *22.2* | *16.8* |
| **PVAMU** | 9,516 | 1.8 | 82.3 | 8.8 |
| *Waller County* | *43,205* | *44.6* | *24.4* | *29.0* |

SOURCES: Texas Higher Education Coordinating Board. Data Center. Common Data Sets from Offices of Institutional Research at Tarleton State University, Texas A & M Commerce, Texas A & M Kingsville, Stephen F. Austin, West Texas A&M University, Angelo State University, University of Houston, Victoria, Sam Houston State University, and Prairie View A&M University. Ethnicity data from Fall 2019 enrollment undergraduate enrollment figures. County population and demographics from 2010 Census American Factfinder. For county populations, "White" means non-Hispanic white; "Black" means non-Hispanic Black, and "Hispanic" means Hispanic or Latino (of any race).

As the data in Table 2 reveal, none of the eight institutions selected by Dr. Gimpel as purported comparators to PVAMU show anything close to being comparable to the difference between PVAMU's campus and Waller County's demographics. Among PVAMU students, the predominant racial/ethnic identification is Black—82.3% of PVAMU students identify as Black. Meanwhile, in Waller County as a whole, only 24.4% of residents identify as Black. Thus, there is a difference of 57.9 percentage points between the proportion of Black students in PVAMU's student body and the proportion of Black residents in Waller County as a whole.

No other campus and county pairing described in Dr. Gimpel's analysis is comparable in this respect. Perhaps the closest analogue among Dr. Gimpel's purported comparator institutions is Texas A&M Commerce University (TAMCU), located in Hunt County.  Among TAMCU students, the predominant racial/ethnic identification is white—74.8% of TAMCU students identify as white.  In Hunt County as a whole, a somewhat smaller proportion of residents— 46.9%—identify as white. Thus, there is a difference of <u>27.9</u> percentage points between the proportion of white students in TAMCU's student body and the proportion of white residents in Hunt County as a whole.  However, this difference is less than half the difference described above at PVAMU.  More significantly, "white" is the most common racial/ethnic identification among Hunt County residents in general, as it is among TAMCU's students—meaning that the TAMCU campus's demographics track Hunt County's demographics much more closely than PVAMU's demographics track those of Waller County.

Indeed, only one of Dr. Gimpel's comparator institutions in Texas, University of Houston-Victoria (UHV), has a student body whose predominant racial/ethnic identification is not the same as the predominant racial/ethnic identification of the county where it is located—and the difference in that single case is only a matter of a few percentage points.  Among UHV students, the predominant racial/ethnic identification is Hispanic—38% of UHV students identify as Hispanic, as compared to 32% who identify as white. In Victoria County as a whole, a somewhat greater proportion of residents identify as white than Hispanic (47.9% identify as white, compared to 43.9% who identify as Hispanic).  However, this amounts to a difference of only 4.1 percentage points between the proportion of Hispanic students in UHV's student body and the proportion of Hispanic residents in Victoria County as a whole.  In this case, as in the other Texas institutions

that Dr. Gimpel selects, the UHV campus's demographics track Victoria County's demographics much more closely than PVAMU's demographics track Waller County's.

It is also worth noting that none of the Texas colleges or universities selected by Dr. Gimpel as purported comparator institutions to PVAMU has a student body consisting of more than 18.5% Black students. In fact, the average proportion of Black students at the eight Texas institutions identified by Dr. Gimpel is 11.9%. This means that the difference between the proportion of Black students at PVAMU (82.3%) and the average proportion of Black students at the Texas institutions discussed by Dr. Gimpel (11.9%) is a difference of over <u>70</u> percentage points. The issues in this case are hardly illuminated by such dissimilar comparisons.

In addition, the colleges and universities in Dr. Gimpel's Table 6 represent different higher educational systems and are located in different areas in Texas. Five of the universities are part of the Texas A&M system, one is part of the Texas Tech system, three are part of the Texas State University system, and one is part of the University of Houston system. Five of the ten are in what can be considered East Texas, one on the Mexican border, one in North Central Texas and two in West Texas.

Finally, the universities selected by Dr. Gimpel reflect another bias by the exclusion of a discussion of campuses in Texas where there have been polling places located for a number of years. He could have considered in his report universities such as the University of Texas, Austin, University of Texas, San Antonio, Austin and San Antonio Community College Districts, among others. County officials in the jurisdictions where these schools are located have offered early voting and election day polling sites to accommodate large groups of potential student voters. This exclusion leads one to a false conclusion that placing polling places on campus is a unique decision and not normally performed by Texas county officials.

8

In sum, it is not entirely clear why Gimpel selected these eight schools given the various key reasons why they are not comparable, particularly as relates to the differing demographics of these institutions. Dr. Gimpel also did not explain his methodology in choosing these universities or account for why they were appropriate comparators to PVAMU.

### PVAMU's Unique History

Each of the universities that Dr. Gimpel included in his report at Table 6 and that are in Table 1 of this rebuttal report also were founded in different years and for different missions. None have a persistent, documented history of voting discrimination directed at Black 18-20 year old students like at PVAMU.

Five of the universities were created between 1876 and 1917 as part of the normal school movement designed to train high school graduates as teachers to uplift the young people in the various outlying parts of the state.  Two of the universities selected by Dr. Gimpel, Angelo State and the University of Houston, Victoria, were not established until the latter part of the 20th century as community colleges.  Two more, Tarleton State and Stephen F. Austin, began as private institutions endowed by private individuals, becoming public later in their existences.

PVAMU is the *only* university established within the body of the state constitution—in Article 7 of the 1876 Texas State Constitution—as a university for "colored people" under the racially discriminatory segregation laws of the state during that historical era.  It was not until after World War II that its curriculum began to mirror that of the University of Texas.  It is now a comprehensive liberal arts university offering degrees at all levels from Bachelor to Doctoral.  It is nationally recognized as an HBCU by all measures and is even evaluated separately by US News and World Report when they release their annual academic rankings. US News evaluates PVAMU

against other HBCUs rather than against all other schools in the United States.  It is currently ranked 21 of 80 HBCUs by US New and World Report.

Further, none of the eight institutions that Dr. Gimpel selects have experienced the well-documented voting discrimination that PVAMU students have faced or, if any have, Dr. Gimpel has not acknowledged any of this history.  At PVAMU, the persistent attempts to enact discriminatory voting changes, combined with the ongoing racial disparities in access to basic necessities, see generally Plaintiffs' expert William Cooper's report, inform and shape students' experiences unlike the other institutions identified by Dr. Gimpel.  As detailed in Plaintiffs' expert Dr. Joseph's report (p. 12), Waller County is the most difficult county in Texas for Black college students to vote based on the extensive and ongoing efforts by Texas officials to curtail, suppress, and disenfranchise Black voters.

Between 1972 through 2018, Waller County officials have continuously attempted to thwart PVAMU students from voting to the extent that students have been charged with illegal registering, illegal voting, have been denied access to polling places, and more.  PVAMU students have petitioned the local government, marched, demonstrated, spoken before county government, and appealed to the state and national government for relief, often to no avail.  Finally, the students together with other residents of the City of Prairie View have filed several lawsuits to gain access to the vote.  With respect to the very topic of this lawsuit—access to early voting—Dr. Gimpel fails to consider the unique history of PVAMU students requesting, demanding, and advocating for polling places on campus when considering the manner in which Waller County officials determine the locations of early and election day polling places.  Regardless of how often Waller County has been admonished by the judicial system and other governments, or their actions illuminated in the media, they still persist in making it difficult for students at PVAMU to have

10

access to voting, including to a polling place.  This record of Waller County government's treatment of PVAMU students has become an essential element in PVAMU's identity, enshrined on its website, https://www.pvamu.edu/1876/2017/03/31/the-walk-of-political-engagement-at-pvamu/.

Dr. Gimpel fails to account for the particular history of PVAMU students in Waller County, discussed in detail in Dr. Joseph's report at Part B and incorporated into my initial report, even though he states "the placement of polling locations is not reducible to a mechanistic formula, *but must consider tradition, local history and changing electoral circumstances . . . .*" (p. 40) (emphasis added). This historical record cannot be detached from PVAMU, nor ignored or minimized when comparing it to various campuses as Dr. Gimpel has done.  Accordingly, for Dr. Gimpel to conclude that he can compare the on-campus political and social environment of PVAMU to the other schools in his Table 6—without actually doing such a comparison—is methodologically flawed.

In conclusion, a comparison of PVAMU to the other campuses in Table 6 of Dr. Gimpel's report is incomplete and, therefore, flawed without a consideration of the unique demographics of PVAMU and PVAMU in relation to Waller County, as well as the special circumstances of PVAMU students' struggles for the right to vote.  None of the other Texas institutions discussed by Dr. Gimpel have comparable demographics or a history of racial discrimination and student-led activism or, if any do, he failed to discuss this issue. Additionally, Dr. Gimpel did not explain his methodology in choosing the campuses in his Table 6.  Why no schools were chosen from other parts of Texas or with a comparable political history as PVAMU—if that exists—is never explained.  What campus characteristics that made those institutions comparable are not fully

explained. This failure on Dr. Gimpel's part contradicts his own above-mentioned cautionary statement.

### Proximity to Polling Places and Total Turnout

Dr. Gimpel's proximity analysis places the onus on voters rather than Waller County officials for not siting early voting locations on PVAMU's campus. This leads one to conclude incorrectly that it is the fault of the voters for not voting rather than the decisions of the officials for the lack of access to voting on PVAMU's campus. Thus, Dr. Gimpel fails to consider the role discrimination plays in the poll siting process.

His analysis is based on turnout rather than whether the opportunity of access is the point of contention. Lack of access and the county's continuous efforts to thwart access are the questions at hand. As a result, proximity to voters that participate is not a relevant issue to investigate in this matter.

Dr. Gimpel also appears to contradict himself in that he claims that "[m]otivation and interest are much larger barriers to voter turnout than convenience." (pp. 6-7). If this is so, why did he not define, operationalize, and measure these supposedly significant variables? Also, if his observation concerning motivation and interest is correct, then why did he perform his analysis in the manner that he did, without including either of these factors in his analytical model?

His admission in footnote 2, page 9, concerning the difficulty of geocoding addresses "that are post office boxes" may have resulted in his inability to thoroughly account for PVAMU students living and having to vote off-campus in Precinct 310 in the City of Prairie View. Relatedly, Dr. Gimpel also failed to consider the mis-registration of PVAMU students, detailed in my initial report and that of Dr. Joseph, who were forced—through no fault of their own—to vote in Precinct 310 although they lived in Precinct 309. And Dr. Gimpel's allusion to adequate parking

on campus is mitigated by the administration's offer to arrange for available parking for voters during elections.

Placing an early voting location at the Memorial Student Center allows PVAMU students more flexibility to vote given their complicated class, extracurricular, and daily movement schedules. Traditionally, on any college or university campus, the student center is just what its name implies: the center of student life on campus. As a result, placing a polling place on campus serves two purposes: it makes voting more accessible and it also creates an environment where students become socialized—i.e., motivated—to the importance of voting. This latter situation speaks to the factor Dr. Gimpel alludes to without defining or properly operationalizing, and which he suggests is missing among young voters: motivation. Young voters are more easily socialized to vote if voting appears to become a regular occurrence in their lives. By siting a polling place in the MSC, and providing that location adequate hours and days of early voting, Waller County would assist in the creation of young voters who are motivated to vote in future elections.

Dr. Gimpel's assumption (pp. 14-15) that "Motivated voters living a few blocks from a polling place may still appreciate the opportunity to cast their vote early, and acquire the habit of doing so, but all other things being equal, it is the voters further away from these sites that one would expect to cast more early ballots because they are more motivated by the need to overcome the costs of distance" is problematic for four reasons. First, young, Black, college-student voters— many of whom are exercising their right to vote for the first time in their lives—may not yet have acquired the habit of voting. So the extent to which Dr. Gimpel's nebulous and generic concept of "motivation" applies to these voters is unclear. Second, Dr. Gimpel provides no credible basis on which to believe that his assumption regarding motivated voters holds true for *any* voters, including older, white, or suburban voters. Third, he did not account for these assumptions in his

model, nor did he speak to them in his report.   Fourth, Dr. Gimpel fails entirely to consider the unique transportation difficulties university students have that were identified in several of Plaintiffs' expert reports.

Dr. Gimpel admits that "[d]ifferent voters face different inconveniences" but does not specify these differences nor does he include them in any of his models (p. 15).

## III. Arlington Heights and Senate Factors

In my initial report, I analyzed the factual background of Waller County's early voting schedule for the 2018 general election in light of the factors set forth by the United States Supreme Court as a methodological framework for assessing intentional discrimination in the case of Village of Arlington Heights v. Metropolitan Housing Development Corporation, 429 U.S. 252 (1977) (Flores Report pp. 6-36). I also discussed the Congressionally delineated Senate factors 1, 2, 5, 7, 8 and 9 that are a guide for federal courts to consider in assessing whether, under the totality of circumstances, an electoral system interacts with social and historical conditions to cause inequality in the political process in violation of Section 2 of the Voting Rights Act. On pages 49 and 50 of my Report, I stated the following two conclusions that were based upon my review of the evidence in light of these factors:

- First, that "[t]he Waller County Commissioners Court acted with an intention to discriminate against the PVAMU student body and the majority-Black Prairie View community, of which PVAMU students are a part, when allocating the early voting hours for the 2018 General Election";[1] and

---

[1] Expert Report of Henry Flores, Ph.D. ("Flores Report"), pp. 49.

14

- Second, that "[t]he Waller County Commissioners Court discriminated against the Black student body of PVAMU, against young, college-age voters at PVAMU in general, and against the Black community of Prairie View, Texas."[2]

In this section of my Rebuttal Report, here, I revisit my analysis and conclusions under each of the relevant <u>Arlington Heights</u> and Senate factors and evaluate the extent to which Dr. Gimpel's report addresses these factors or counters my conclusion that Waller County's adoption and maintenance of the November 2018 early voting plan was motivated by discriminatory intent. I conclude that Dr. Gimpel's report fails to meaningfully counter my opinion. Thus, even if Dr. Gimpel's claims were taken at face value—which, as detailed elsewhere in this report, they should not be—the facts, analysis, and conclusions presented by my report and those of the Plaintiffs' other experts would still point to intentional discrimination under the <u>Arlington Heights</u> framework and discriminatory results under the totality of circumstances.

**A. <u>Arlington Heights</u> Factors**

    1. <u>Discriminatory Impact</u>

My initial report, on pages 6-8, discusses the discriminatory impact of Waller County's November 2018 early voting plan on younger voters and voters of color. My conclusion, as stated in the report, is that "Waller County's November 2018 early voting plan disproportionately impacted voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View."[3] In reaching this conclusion, I rely in part on the analysis conducted by Plaintiffs' expert Dr. Robert Stein, who, in his own report, concludes that "Waller County's early voting plan for 2018 disproportionately impacted voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View because they were not afforded the same or similar opportunities

---

[2] <u>Ibid.</u>, p. 50.
[3] Flores Report, p. 6.

to vote early as other registered voters in the County."[4] Thus, my opinion relevant to the first Arlington Heights factor is that the 2018 early voting plan produced a discriminatory impact on Black voters, voters aged 18 through 20, and Black voters aged 18 through 20.

Dr. Gimpel's report does not seriously contest this conclusion; nor does it take any issue with the substance of Dr. Stein's analysis. In fact, Dr. Gimpel's report completely avoids the question of whether Black voters or young voters were provided unequal access to early voting under Waller County's 2018 early voting plan. Indeed, Dr. Gimpel takes this approach to such an extreme that he never even *mentions* Black voters or voters aged 18 through 20 anywhere in his report. Yet the early voting plan's differential impact on these identifiable groups of voters is the heart of the controversy in this lawsuit, and a relevant factor under the Arlington Heights analysis.

At the end of his report, Dr. Gimpel states flatly—without articulating any evidence or analysis that would support such a conclusion—that "[a] a study of the hours made available for early voting across the county shows no discrimination against the Prairie View area."[5] The "Prairie View area" is nowhere defined, however, and the report shows no indication that Dr. Gimpel actually conducted a "study" of the nature he describes. Nor would a study of "the Prairie View area," if it had been conducted, shed light on the relevant Arlington Heights factors, because discrimination against a geographic area is not what is being alleged in this lawsuit. Although he purports to disagree with the opinions offered by Dr. Stein and myself, Dr. Gimpel never actually rebuts our findings regarding the impact of the 2018 early voting plan on individual voters, and he does not engage in any analysis that takes into account a voter's race or age. Therefore, I reiterate the conclusion, supported by Dr. Stein's analysis, that Waller County's November 2018 early

---

[4] Stein Report, p. 14.
[5] Gimpel Report, p. 49.

voting plan produced a discriminatory impact on voters aged 18 through 20, Black voters aged 18 through 20, and Black voters in Prairie View.

2.  Historical Background of Discrimination

Pages 7-11 of my initial report, drawing on Dr. Peniel Joseph's historical discussion, consider the historical background of discrimination and how it informs my analysis of Waller County's actions in 2018. My report concludes that "there is a pattern of Waller County acting to discriminate against the students at PVAMU in their attempts at obtaining their voting rights," and that this history helps to explain the discriminatory early voting plan adopted and maintained by Waller County officials in 2018. As before, Dr. Gimpel does not challenge any of this history. Thus, this portion of my report—and the entirety of Dr. Joseph's report—are uncontested.

3.  Sequence of Events

My initial report discusses at length the sequence of events leading up to Waller County's decisions to adopt and substantially maintain its 2018 general election voting plan.[6] This portion of the report is the basis for my expert opinion "that the procedural sequence of events by which the early voting plan for the November 2018 General Election was developed and adopted was insufficiently open and transparent," and that the process "was inconsistent with and departed from best practices," and that both of these indications support a finding of intentional discrimination.[7] Dr. Gimpel does not challenge any aspect of these facts, or my expert opinion regarding the process's lack of transparency. Thus, this section of my report and the analysis therein presented are uncontested.

In addition, one additional factor has come to my attention as a result of Mr. William Cooper's supplemental declaration. My report, at pages 25-26 and 36, recounts the Commissioners

_____

[6] Flores Report, pp. 12-27.
[7] Ibid., p.18.

Court's peculiar interest in providing additional hours of early voting in Monaville, an unincorporated area in the southern portion of Commissioner Precinct 3 where the polling places for electoral precincts 311, 312, and 313 are often located. As my initial report explained, the interest in Monaville appeared irrational—and seemed to confuse the County's own elections administrator, Ms. Eason, during the October 17 Commissioners Court meeting—because Monaville and its surrounding areas are very small in population. However, Mr. Cooper's supplemental declaration points to a possible reason for the interest on the part of some commissioners for adding early voting hours in Monaville, and not in the City of Prairie View, which is served by electoral Precinct 310, or the PVAMU campus, which is served by electoral Precinct 309.

Notably, the voting-age populations (VAP) of electoral Precincts 309 and 310 are both majority-Black and include significantly higher numbers of voters aged 18 through 20. Precinct 309's VAP is 94% Black, and Precinct 310's VAP is 70% Black. By contrast, Precinct 311's VAP is only 11% Black. Precinct 312's VAP is only 3% Black. And Precinct 313's VAP is only 6% Black. The combined average percentage of Black residents among the voting-age residents of Precincts 309 and 310 is more than a supermajority: 87%. By contrast, the combined average percentage of Black residents among the voting-age residents of Precincts 311, 312, and 313 is only 6%.

Similar trends are revealed in the statistics on the age of voting-age residents reported by Mr. Cooper in these precincts. Among the voting-age residents of Precincts 309 and 310, a majority are aged 18 through 20 years old. People aged 18 through 20 make up 73% of Precinct 309's VAP and 15% of Precinct 310's VAP. By contrast, Precinct 311's VAP is only 5% 18- through 20-year-olds. Precinct 312's VAP is only 6% 18- through 20-year-olds. Precinct 313's VAP is only 6%

18- through 20-year-olds. The combined average percentage of residents aged 18 through 20 among the voting-age residents of Precincts 309 and 310 is a majority: 52%. By contrast, the combined average percentage of residents aged 18 through 20 among the voting-age residents of Precincts 311, 312, and 313 is only 6%.

 The stark demographic divides between Precincts 309 and 310 as compared to Precincts 311, 312, and 313, in my expert opinion, support a conclusion that discriminatory intent also motivated the commissioners' stated desire to provide additional voting hours for the predominantly white, older voters served by polling places in Monaville, either instead of or as a condition for providing additional voting hours for the predominantly Black, younger voters served by the MSC polling place on the PVAMU campus.

  4. Procedural or Substantive Deviations from the Normal Procedural Sequence

 Pages 26-37 of my initial report detail my findings and opinions regarding the many deviations from the normal procedural sequence that were present in Waller County's process of adopting and maintaining its 2018 general election early voting plan. Dr. Gimpel's report does not address my findings; nor does he attempt to argue that the County's process was functional, transparent, or rational. Thus, these portions of my report, and the analysis therein expressed, are uncontested.

 In addition, testimony during Defendant Elections Administrator Christy Eason's deposition bolsters my conclusions. As an initial point, Defendant Eason confirmed that there is no written policy memorializing the criteria used by her office to choose early voting hours and locations.[8] But even if the criteria was written and easily available to the public, Defendant Eason also conceded that Waller County does not take any affirmative steps to provide information to

---

[8] Eason Deposition Transcript, pp. 104:1-4, 133:12-24; 134:21-23 ("Eason Tr.").

residents about how the early voting schedule is initially considered and adopted or how the factors are weighed. These portions of her testimony reinforce the lack of transparency surrounding the creation of the early voting schedule.

## B. Senate Factors

1. Factor 1: The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process.

Page 37 of my initial report states my conclusion, supported by Dr. Peniel Joseph's historical account, that "Waller County, specifically, and Texas, generally, has an extensive history of discrimination against Black people that affects their ability to participate in the democratic process in Waller County."[9] As noted above, Dr. Gimpel does not contest any of this history. Thus, this opinion from my initial report—and the entirely of Dr. Joseph's report—are uncontested.

2. Factor 2: The extent to which voting in the elections of the state or political subdivision is racially polarized.

On pages 38-39, my initial report recites some of the numerous judicial findings to the effect that voting throughout Texas is racially polarized. Dr. Gimpel does not challenge any of these judicial findings or their factual bases. Thus, my conclusion that voting in Waller County is racially polarized is uncontested.

3. Factor 5: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process.

Pages 39-41 of my initial report adopt and contextualize the demographic information provided in the declaration and supplemental declaration of Plaintiffs' expert Mr. William Cooper. My conclusion under Senate Factor 7 is that "Black voters in Prairie View face socioeconomic hurdles due to the effects of discrimination that make reaching early voting locations in other cities

---

[9] Flores Report at 37.

20

more difficult than for white voters or other older voters in neighboring cities."[10] Dr. Gimpel, Defendants' sole expert witness, does not contest or address these disparities. Thus, these sections of my report—and the entirely of Mr. Cooper's initial declaration—are uncontested.

Moreover, Dr. Gimpel's analysis relies on a methodology that specifically ignores the effects of discrimination, as discussed previously. As one example, Dr. Gimpel's, relies on a location-analysis model to determine early voting sites based on demand.[11] Under this model, Dr. Gimpel treats "every voter equally as a point of demand," asserting that it "makes sense" and "avoids the complexity and controversy of weighing some handicaps more than others."[12] These choices mean that unrebutted burdens that PVAMU students have related to access to transportation or their lower socioeconomic status as compared to other Waller County residents that continue to effect Black Prairie View residents are completely ignored in Dr. Gimpel's analysis.

4. Factor 7: The extent to which members of the minority group have been elected to public office in the jurisdiction.

My initial report, at page 42, also considers the extent to which Black candidates in Waller County have been successful in attaining elected office. I conclude that, as a result of racially polarized voting by the county's larger white electorate, "Black candidates have had very little electoral success in elections contested at the countywide level in Waller County."[13] Dr. Gimpel leaves this well-documented fact uncontested.

---

[10] Flores Report, p. 39.
[11] Gimpel Report, pp. 32-40.
[12] Ibid., p. 39.
[13] Flores Report, p. 42.

5. <u>Factor 8: Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.</u>

Under Senate Factor 8, I conclude, in a discussion on pages 42-44 of my initial report, that "the members of the Waller County Commissioners Court . . . have been unresponsive to the particularized needs of Black PVAMU students, including in the adoption and maintenance of the early voting plan for the November 2018 election." Dr. Gimpel, Defendants' sole expert witness, does not contest my appraisal of Defendants' lack of responsiveness. Thus, this conclusion in my initial report and the corresponding discussion are unrebutted.

In addition, Defendant Eason's deposition testimony bolsters my conclusions:

- Waller County continues to be unresponsive to problems caused by the County's reliance on the U.S. Postal Service's rural addressing system that affect the students residing on the PVAMU campus and off-campus in the City of Prairie View.[14] Despite acknowledging the harms PVAMU students face, which may include being placed on a suspended voter list through no fault of their own, the County conceded that these issues were not resolved for the 2019 November elections and ongoing.[15] In fact, Waller County did not offer any solutions on Election Day for the November 2019 elections.[16]

- For the 2019 November election, Waller County did not provide any on-campus early voting location. Instead, the County chose the Waller County Community Center as an early voting location, which Plaintiffs and other PVAMU student have repeatedly declared is inaccessible to students.

- During the October 17, 2018 Commissioners Court meeting, and through this litigation, PVAMU students and some Plaintiffs expressed that they are not affiliated with the

---

[14] <u>Ibid.</u>, pp. 43-44.
[15] Eason Tr., pp. 43:21-22, 47:12-17, 49:2-12.
[16] <u>Ibid.</u>, p. 48:4-10.

Republican or Democratic Parties, and therefore are not adequately represented by either the Waller County Republican or Democratic chairs in the creation of the early voting schedule. With this awareness and expressed concerns, Defendant Eason has not taken *any* steps to follow up with PVAMU students on this issue or taken any affirmative steps to ensure unaffiliated voters in Waller County have input in the initial recommendation of early voting hours and location.[17] Indeed, Defendant Eason conceded that there is no mechanism for unaffiliated voters to provide input into the initial early voting schedule proposals.[18]

6. Factor 9: Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.

Finally, on pages 44-49, I analyze the tenuousness of the stated policy rationales claimed by Waller County to support their decisions to adopt and maintain the 2018 general election early voting plan. This portion of my initial report concludes that "the rationales advanced for adopting, maintaining, and modestly improving the November 2018 early voting plan were tenuous, changing, and ultimately largely contradicted by the Commissioners' own actions . . . ."[19] I further concluded that the rationales advanced in support of the County's early voting plan "show a lack of good faith and an irrationality that is inappropriate for government action, insofar as the Commissioners cited arbitrary and shifting rationales while failing to make an effort to address the concerns of PVAMU students who requested parity and equity during the early voting planning process."[20] Dr. Gimpel's report fails to address the commissioners' stated rationales for adopting and failing to substantially modify the allocation of early voting hours and days. Rather than

---

[17] Ibid., pp. 101:9-25, 102:1-12.
[18] Ibid., pp. 103:17-25, 104:1-4.
[19] Ibid., p. 44.
[20] Ibid.

defending the actual, contemporaneous justifications stated on the record by members of the Waller County Commissioners Court, Dr. Gimpel invokes platitudes, lacking in any analysis, such as that "[c]hoices have to be made, priorities set."[21] He appears to speculate that county officials in general may allocate early voting sites and hours "according to some combination of historical tradition, familiarity, and demand."[22] But nowhere does Dr. Gimpel's report express disagreement with my conclusion that the contemporaneous rationales *actually advanced* by Waller County for adopting, maintaining, and modestly improving their 2018 early voting plan were tenuous, inconsistent, contradictory, irrational and inappropriate insofar as they appear in certain instances to have been made in bad faith. As a result, the conclusions of my initial report at pages 44-49 are unrebutted.

   In addition, Defendant Eason, who reaffirmed that she has the most familiarity with setting the early voting schedule and the logistics for allocating hours and machine,[23] provided testimony that bolsters my conclusions:

- Defendant Eason admitted that PVAMU students use early voting at high rates, Precinct 309 had the most registered voters in 2018, and PVAMU students are one of the largest voting groups in Waller County.[24] These facts would, under the County's purported early voting schedule criteria, weigh in favor of providing more hours on campus.

- Defendant Eason admitted that past voter turnout is taken into consideration when choosing early voting hours and location for a general election, which, again, would weigh in favor of providing more hours on campus.[25]

---

[21] Gimpel Report, p. 49.
[22] Ibid., pp. 48-49.
[23] Eason Tr., pp. 95:25, 96:1-5, 97:16-22.
[24] Ibid., pp. 70:10-24, 71:1-7, 138:23-25, 139:1-20, 140:17-24, 141:12-24, 142:1-3.
[25] Ibid., pp. 86:20-23, 92:11-23, 93:1-4.

24

- Defendant Eason reaffirmed that her proposal during the October 17, 2018 Commissioners Court meeting to add early voting hours and days at the MSC was to make the voting locations equal and that it would be in the interests and beneficial to the County as a whole.[26] Yet Defendant Commissioners Court voted down this recommendation. During the discussion, a few commissioners contended that Defendant Eason's plan would cause voter confusion or make it harder for people to vote, which Defendant Eason rebutted by asserting she would not propose a plan that does either.[27]

Defendant Eason also rebutted a justification offered by Waller County in support of its decision to not expand the number of hours at the MSC. As background, based on her proposal, Defendant Eason reaffirmed, as she did during the October 17, 2018 Commissioners Court meeting, that she had the necessary resources to add early voting on campus during the first week of early voting.[28] A week later, on October 24, 2018, Judge Duhon read a statement, which in part, reads, "We have analyzed our resources in attempt to extend additional hours and times and done so . . . ."[29] Contrary to this assertion, however, Defendant Eason testified that the County still had the resources necessary to add early voting on campus during the first week, asserting that her same statements on October 17, 2018 were still correct on October 24, 2018.[30] This contrast with Defendant Duhon's public statements casts further doubt on the resource-based justifications offered by Waller County.

---

[26] Ibid., pp. 162:20-22, 180:21-24, 181:1-10.
[27] Ibid., pp. 195:14-25, 196:1-25, 197:1-7, 13-23.
[28] Ibid., pp. 169:10-15, 170:24-25, 171:1-6.
[29] Ibid., pp. 189:24-25, 190:1-4.
[30] Ibid., pp. 169:10-15, 170:24-25, 171:1-6, 190:6-22, 191:11-11.

## IV. Correcting and Contextualizing a Discussion in My Initial Report

In my initial report, I stated that "[t]he meeting agenda, minutes, and agenda backup for the September 5 meeting . . . fail to identify the proposed hours or dates of early voting that the Commissioners would purportedly be approving in that meeting."[31] As a result, I concluded that "the date and process by which the original early voting hours and dates were considered and approved is not substantiated in the public record."[32]

At the time my report was disclosed, these statements reflected my knowledge on the subject. However, on re-reviewing the relevant pages on Wallers County's website, I have identified a link that I had previously overlooked on the "Event Details" sub-page for the September 5, 2018 meeting on the Commissioners Court's Public Notices calendar. The link is titled "Item 8," which corresponds to the number of the agenda item for the September 5 meeting related to ordering the general election. By clicking on "Item 8," I was able at last to find a PDF of the proposed order for the general election, which included dates and hours for early voting. As a result, I wish to amend my initial recitation of the sequence of events to reflect the accuracy of Defendants' statement that the early voting hours and dates for the November 2018 election were indeed "approved/adopted by Commissioners Court on September 5, 2018 as part of a comprehensive order calling the general election."[33]

However, I reiterate my concerns with the transparency of the process by which those hours and dates were approved. I was able to access this posted proposal of early voting days and hours only by navigating to the Waller County homepage and then navigating to the Commissioners Court page, opening the Public Notices calendar, clicking on the date of the September 5 meeting,

---

[31] See Flores Report, p. 17.
[32] Ibid., p. 17-18.
[33] *Defendant Judge Trey Duhon's Response and Objections to Plaintiffs' First Set of Interrogatories*, p. 3 (provided by Plaintiffs' attorneys).

and then clicking on a link the title of which in no way made clear that it would include a proposal for hours or days or early voting. In other words, even knowing what I was looking for and where it should have been located, it was almost impossible for me to find the document. It remains true, as I stated in my initial report, that "there was no discussion or even identification of early voting hours or dates during [the September 5, 2018 meeting] motion or approval process."[34] It also remains true that "Judge Duhon's repeated insistence during the October 17 meeting that the early voting plan was approved on September 22 is contradicted by the public record and his own later statements."[35] It is perhaps indicative of the County's non-transparent process that even the Waller County Judge was at one point unable to discern when early voting hours had been offered for the Commissioners Court's consideration or approval. When notice of such an important deliberation fails to meaningfully reach the County Judge and can hardly be located by an academic such as myself, with more experience navigating local government websites than most, it strains credulity to imagine that the notice offered by the PDF at the "Item 8" link was somehow "reasonably calculated, under all the circumstances, to apprise interested parties [such as PVAMU students] of the pendency of [a significant decision affecting their right to vote] and afford them an opportunity to present their objections."[36]

Furthermore, I understand from the testimony of Judge Duhon in a deposition in this lawsuit, as relayed to me by Plaintiffs' counsel, that Waller County's general practice is to post agendas and agenda backup materials for Commissioners Court meetings on its website (in the labyrinthine location described above) on the Friday before a meeting is to take place—and these meetings generally are held on Wednesdays, as was the meeting on Wednesday, September 5,

---

[34] See Flores Report, p. 17.
[35] Ibid.
[36] See Mullane v. Central Hanover Bank & Trust Company, 339 U.S. 306, 314 (1950).

2018. This is even more troubling, given that Monday, September 3, 2018, was Labor Day. That means that most of the narrow time window during which this severely inadequate notice was available before the meeting was a holiday weekend, a time when students and indeed residents of any age are unlikely to spend their hours browsing a difficult-to-navigate municipal website in search of PDF documents they have no reason to know are there.

Similarly, as described above, Defendant Eason conceded that Waller County does not conduct any outreach to PVAMU students about early voting locations or hours.

Based on all of these considerations, I repeat and stand by my conclusion from the relevant portion of my initial report:

> [M]y opinion is that the procedural sequence of events by which the early voting plan for the November 2018 General Election was developed and adopted was insufficiently open and transparent. Based on a review of Dr. Stein's report, in addition to my conversation with the Bexar County Elections Administrator, it also appears that this process was inconsistent with and departed from best practices.[37]

**Observations and Conclusions**

Dr. Gimpel's methodology is flawed on at least three levels. The first is that his model places the onus on the voter's behavior. This ignores the discriminatory behavior of the Waller County officials which is the question at hand in this matter.

Secondly, Dr. Gimpel's methodology does not include or consider in any manner the social and political conditions surrounding the denial of voting access to PVAMU students. Essentially, he excludes the fact that the students have had to petition, demonstrate, march, and risk retaliation from county officials since 1972 for their right to have equal access to voting opportunities. The intensity of this history alone is an important mitigating circumstance and needs to be included in any analytical consideration.

---

[37] Ibid., p. 18.

The final major flaw in Dr. Gimpel's technique is the method, or lack thereof, in how he chose the campuses he compared to PVAMU.  He gave no explanation of why he selected his purported comparator institutions, other than a crude similarity of size; and, in fact, the selected institutions are different in key ways from PVAMU.

***

I reserve the right to continue to supplement my declarations in light of additional facts, testimony, and/or materials that may come to light.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Executed on: December 3, 2019

_____

**Henry Flores, PhD**

30