PLAINTIFF'S EXHIBIT 159

# Exhibit 5

Case 4:18-cv-03985 Document 125-159 Filed on 09/17/20 in TXSD Page 2 of 12
Case 4:18-cv-03985 Document 75-1 Filed on 02/14/20 in TXSD Page 207 of 752

1 | Page

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

JAYLA ALLEN, et al.,

      PLAINTIFFS

v.        Civil Case No. 4:18-cv-3985

WALLER COUNTY, et al.,

      DEFENDANTS

EXPERT REBUTTAL REPORT
OF
Robert Stein, Ph.D.

ON BEHALF OF PLAINTIFFS
JAYLA ALLEN, DAMON JOHNSON, TREASURE SMITH,
AND THE PANTHER PARTY

At the request of the Plaintiffs in JAYLA ALLEN, DAMON JOHNSON, TREASURE SMITH, and THE PANTHER PARTY v. WALLER COUNTY, TEXAS, *et al.*, I have analyzed Professor James Gimpel's expert witness report for the Defendants. My report is divided into three sections. The first section provides general comments about Dr. Gimpel's methodology, observations, and conclusions relating to turnout. The second section addresses concerns about Professor Gimpel's comparison of Prairie View A&M (PVAMU) to other campuses. The third section provides general comments about Professor Gimpel's methodology, observations, and conclusions relating to the allocation of early voting hours and sites.

> I. **Comments about Turnout in Dr. Gimpel's Report**

Professor Gimpel's expert report (pages 1-20; 41-47) alleges that the Plaintiffs were not disadvantaged by Waller County's administration of early voting in the 2018 general election because there is no evidence that Waller County's administration of the early vote schedule (focusing on placement and movement of precinct places) had an impact on early voting turnout. His empirical work in these sections of the report attempts to show that the variability in voter turnout is *not* attributed to the "availability and placement of polling sites in general and of early voting sites in particular." As one piece of supporting evidence, Dr. Gimpel argues that "this is evident by consideration of the plain fact that the county has used almost the same polling places . . . since 2002 (5)." Professor Gimpel then turns to the academic literature on the relationship between early voting and turnout, noting that the extant literature supports his findings about Waller County—in other words, that there is consensus that early voting generally, not just in Waller County, does not have a consistent or appreciable effect on voter turnout. Professor Gimpel apparently assumes that whether early voting increases or decreases turnout is relevant to the present dispute.

But Professor Gimpel is mistaken. In this case, the relevant issue is not whether early voting is a wise policy, but whether Waller County has discriminated against legally-protected classes of voters (i.e., Black voters and Black voters ages 18-20) in the way it provides access to early voting opportunities. What is relevant is not whether the County's early voting schedule caused more or fewer people to vote early, but whether the *opportunity to vote early* was equally accessible to Black and white voters and younger and older voters. Turnout, in a dispute about *access*, misses the mark. The approach that Professor Gimpel takes would be like trying to defend a preschool that refuses to admit Black students by arguing that preschool does not have a measurable impact on later academic success. The issue is access, not outcomes.

It appears that Professor Gimpel has incorrectly assumed that the Plaintiffs' claims are that they were *prevented from voting* because of how Waller County operated early voting. This assumption is a critical misconception that inappropriately prompts Professor Gimpel to focus on voter turnout, which is irrelevant to the Plaintiffs' claims, legal theory, or expert reports. As such, Professor Gimpel's analysis of the relationship between opportunities to vote early and voter turnout ignores the heart of Plaintiffs' claims: that they did not have *equal access to the opportunity to vote early* as compared to other residents in Waller County during the 2018 general election. Access is not limited to only the placement of an early voting location; access also includes the number of days and hours at that location. These concerns underscore a significant limitation with Professor Gimpel's analysis.

Still, even if Professor Gimpel's argument is accepted as the test for determining discriminatory intent and effect (i.e., that only an early voting plan that reduced turnout and completely prevented voters from participating could be discriminatory), his analysis of voter turnout does not examine voter turnout among voters who are Black, under the age of 21, or

Case 4:18-cv-03985 Document 125-159 Filed on 09/17/20 in TXSD Page 5 of 12
Case 4:18-cv-03985 Document 175-1 Filed on 02/14/20 in TXSD Page 210 of 752

4 | P a g e

students on the PVAMU campus—the very Plaintiffs in this case. Instead, Professor Gimpel addresses only an undefined geographical area—"the Prairie View area"—and seeks to prove that this "area" has not been disadvantaged.

Professor Gimpel's argument, in short, is that Waller County's administration of early voting in the 2018 election could not have disadvantaged the Plaintiffs if early voting had no effect on the likelihood that an eligible voter voted in the 2018 election. Notwithstanding the failure of this argument to respond to the Plaintiffs' actual claims (i.e., equal access to early voting should not be confused with actually voting), there might be another problem with Professor Gimpel's analysis. Cross-sectional (one year) analysis of voter turnout is a weak, if not inappropriate, method for determining the causal effect of early voting opportunities (days, hours, and locations of early voting) on the likelihood a person will vote. As Professor Gimpel points out, there are myriad reasons why persons vote or do not vote. His research design does not actually help to determine if early voting affects turnout. The best way to determine whether early voting has a causal effect on voter turnout is to study the same voters *over time*, before and after the adoption of early voting, or before and after changes in the administration of early voting (i.e., number of days, hours of early voting, and location of early voting sites). An analysis of the same voters over time allows us to best measure whether changes in early voting opportunities affect an individual voter's likelihood of voting, independent of other determinants of voting. This same design could be applied to subpopulations of voters, such as voters who are Black, under the age of 21, and PVAMU students.[1] A single election cannot be the basis for a causal determination as sweeping as Professor Gimpel seeks to make. In other words, even if we accept, as Professor Gimpel

---

[1] However, a time-series/panel study of voting among PVAMU students would also be problematic. We are only able to study the voting behavior of PVAMU students during their limited tenure at the University— i.e., four years.

Case 4:18-cv-03985 Document 125-159 Filed on 09/17/20 in TXSD Page 6 of 12
Case 4:18-cv-03985 Document 175-1 Filed on 02/14/20 in TXSD Page 221 of 752

5 | Page

proposes, that the Plaintiffs' claims are best tested by the relationship between early voting opportunities and voter participation, then his methodology for testing this relationship is inadequate and at best inconclusive.[2]

As noted above, Professor Gimpel suggests that Waller County has not significantly varied its early voting operations since first using early voting in 2002. This condition might explain the non-finding between early voting and turnout. It is difficult to demonstrate a relationship between two variables when one of those variables varies over time (i.e., turnout) and the other does not (i.e., early voting opportunities). However, there is an alternative explanation for this non-relationship, one that Professor Gimpel is not able to detect with his cross-sectional design. This alternative explanation suggests that early voting opportunities set in place since 2002 were not sufficient to increase turnout and that turnout remained largely if not exclusively a function of the 'surge/decline' factors mentioned in Professor Gimpel's report. Had other practices for early voting been adopted—for example, if the placement of early voting sites had more appropriately responded to demand—then voters, especially voters like PVAMU students who had a greater need for the increased access to the franchise that early voting can provide, might have responded with higher voter turnout. In fact, in 2018 as well as in previous elections, students on the PVAMU campus requested modifications to the number of early voting sites on campus. Had these requested changes been adopted, we might have been able to assess the effect of early voting on voter turnout among PVAMU students. This condition, however, cannot be detected with the cross-sectional research design used by Professor Gimpel, leaving the turnout effect of early voting in Waller inconclusive.

---

[2] The same methodology employed by Professor Gimpel in testing the relationship between turnout and early voting is widely used in published research on this topic.

Case 4:18-cv-03985 Document 125-1 Filed on 09/17/20 in TXSD Page 7 of 12
Case 4:18-cv-03985 Document 175-1 Filed on 02/14/20 in TXSD Page 212 of 752

6 | Page

To summarize, Professor Gimpel's report includes two fundamental flaws. First, he incorrectly asserts, and then bases his analysis upon, the proposition that voter turnout is the test to determine a discriminatory intent and effect in *access* to voting opportunities. Second, even if one were to accept Professor Gimpel's theory as the correct test, the cross-sectional research design actually employed by Professor Gimpel is inappropriate and incapable of yielding the result he purports to obtain for the reasons described above.

## II. Comments about Dr. Gimpel's Comparison Analysis

Section 2 of Professor Gimpel's expert report (pages 20-32) compares Waller County's early voting operations with those of purportedly comparable counties in Texas, i.e., 8 counties with similar population size and a medium-size college campus within the county. Professor Gimpel claims that his analysis shows that Waller County administered early voting in a manner that was similar and in several instances superior to these supposedly comparable counties. He further asserts that no other county in his sample located either an early voting or Election Day polling place on the campus of the colleges in their respective counties. Professor Gimpel also claims that he could not find any historically Black colleges or universities in Texas where early voting or Election Day polling places were located on those respective campuses.

For several reasons, as described below, Professor Gimpel's analysis does not appear to be relevant or germane to the Plaintiffs' claim:

- Professor Gimpel does not include any analysis of the number or proportion of students on each of the college campuses that are registered to vote in each county. This information is a key part of the Plaintiffs' claim that Waller County did not provide equal access to PVAMU students registered to vote in the county.

- His report does not include any analysis about whether students on any of these campuses complained about inadequate early voting opportunities on their campuses. As outlined in Dr. Joseph's expert report and Dr. Flores' initial and rebuttal expert reports for Plaintiffs, the unique history of voting discrimination and student activism to request, demand, and advocate for polling places on PVAMU's campus must be factored into any comparison.

- Professor Gimpel's report does not include any analysis of the number of registered voters under 21 years of age or who are Black in these counties, despite the fact that differential treatment on the basis of race and age is integral to the Plaintiffs' claims.

- Professor Gimpel's report does not include any analysis of the number, location, days, and hours of operation of early voting locations proximate to voters who are between the ages of 18 and 20 or who identify as Black in these counties.

- Professor Gimpel's report does not conduct the same analysis he conducted for Waller County for this sample of counties (i.e., he does not analyze whether early voting is related to voter turnout in those counties).

- Professor Gimpel's report does not assess whether students on any or all of these campuses have access to either private or public transportation to the polls, a condition not available to many PVAMU students.

The claim in this section of Professor Gimpel's report is that Waller County's administration of early voting in 2018 was equal or superior to that of other, supposedly comparable counties in Texas. This conclusion, however, is not convincing, since Professor Gimpel did not study early voting in these counties in the same manner that he did for Waller County and did not demonstrate that Waller County is comparable to those other selected counties.

### III. Comments about Dr. Gimpel's Analysis of Early Voting Sites and Hours

Section 3 of Professor Gimpel's report (pages 32-47) examines the access voters in Waller County had to early voting locations. This analysis claims to show that the county provided an equitable and efficient allocation of polling places, both in terms of their locations and of their days and hours of operation during the 2018 election. Using distance of early voting locations from the residences of registered voters in Waller County, Professor Gimpel concludes that there were no disparities by geographical area of the county. He also reaches this conclusion about days and hours of voting, but again, he limits his unit of comparison to geographical areas of the county rather than actual voters.

Professor Gimpel's core argument is that Waller County's administration of early voting in the 2018 general election had an insignificant effect on the likelihood that an eligible voter in Waller County voted in the 2018 election. He goes on to argue empirically that the location, hours, and days of operation of early voting in the 2018 Waller County election were unrelated to the likelihood a person voted. He further seeks to demonstrate that this condition is true for voters in Prairie View, which is confusing, since he does not address the racial or other demographics of voters in this geography.

Professor Gimpel's definition of what constitutes fair and convenient opportunities to vote early is narrower than what the literature suggests might be 'best practices' for the operation of early voting operations. The best practices supported by the literature include:

- Proximity to where a voter travels during the day, including work, shopping, and school.
- Availability of transportation, either private or public, to the polling location.
- Days and hours available/convenient to vote.
- Available travel time, in part a function of access to transportation.

Case 4:18-cv-03985 Document 125-15 Filed on 02/17/20 in TXSD Page 10 of 12
Case 4:18-cv-03985 Document 77-15 Filed on 02/24/20 in TXSD Page 225 of 752

9 | P a g e

In fact, Professor Gimpel has contributed to the literature on best practices for locating polling places and early voting locations. For example, in "Political Participation and the Accessibility of the Ballot Box," Professor Gimpel and J.E. Schuknecht recommend that "policymakers may want to investigate the placement of polling sites along public transit lines, making the precinct places available to those who do not have flexible transportation modes." (2003, p. 486). Yet Professor Gimpel limits his discussion of location solely to the proximity of polling locations to voters' residences and does not consider the above criteria, which I outline in my first report, and which Professor Gimpel's past research has acknowledged.

Still, even if we rely on Dr. Gimpel's limited list of historical tradition, familiarity, and demand, a combination of these factors would weigh in favor of increasing early voting opportunities on the PVAMU campus. As an initial point, there is always concern about historical tradition being used as a factor (i.e., using previous sites as a factor for future sites) because it would not take into consideration a historical "tradition" of discrimination, such as the history that is detailed in the report of Plaintiffs' expert Dr. Joseph. Indeed, as detailed in Dr. Joseph's report, there is a deep historical tradition of PVAMU students advocating for on-campus voting and challenging attempts by Waller County to restrict their right to vote. At best, deference to historical tradition could support on-campus voting with PVAMU's Memorial Student Center as a site. And, at worst, it would fail to take into consideration the history of discrimination and how that has impacted the limited availability of voting on-campus.

As for familiarity, as evident in Plaintiffs' claims, voting on-campus would be most familiar to PVAMU students. Moreover, based on representation of evidence submitted by Plaintiffs, PVAMU is a center of life in Prairie View, where public events often occur. According to Plaintiffs' claims in their filings, PVAMU students, including some Plaintiffs, said they were

**10 |** P a g e

unfamiliar with off-campus early voting sites like the Waller County Community Center or lacked transportation to this site and other off-campus early voting sites.

      Concerning demand, Precinct 309 includes the highest numbers of registered voters of any precinct in Waller County—and many of Precinct 309's registered voters are PVAMU students. As I found in my initial report, African American voters in Waller County in general voted in the 2018 general election at the early voting locations that had been provided the fewest hours and days of operation. Similarly, the PVAMU Memorial Student Center early voting location was among the sites that Waller County provided with the least early voting access (i.e., in terms of fewest hours, days, and weekend operations) of the early voting locations in the County, despite the facts that PVAMU students use early voting at higher rates than other voters in Waller County and that Precinct 309 has the highest number of registered voters of any precinct. These factors would thus suggest having an early voting location on the PVAMU campus with equal or greater hours to other sites.

Case 4:18-cv-03985 Document 125-15 Filed on 02/17/20 in TXSD Page 12 of 12
Case 4:18-cv-03985 Document 77-15 Filed on 02/24/20 in TXSD Page 217 of 752

11 | Page

\*\*\*

I reserve the right to continue to supplement my declarations in light of additional facts, testimony, and/or materials that may come to light.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Executed on: December 3, 2019

*Robert Stein* 12/3/19

Robert Stein, PhD