# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| DAMON JOHNSON, TREASURE SMITH, and THE PANTHER PARTY, <br><br> *Plaintiffs*, <br><br> v. <br><br> WALLER COUNTY, TEXAS; THE WALLER COUNTY COMMISSIONERS COURT; JUDGE CARBETT "TREY" J. DUHON III, in his official capacity as the Waller County Judge; CHRISTY A. EASON, in her official capacity as the Waller County Elections Administrator, <br><br> *Defendants*. | Civil Case No. 4:18-cv-03985-CRE |

## PLAINTIFFS' POST-TRIAL MEMORANDUM OF LAW

# TABLE OF CONTENTS

Table of Authorities.............................................................................................vi

Summary of the Argument ................................................................................. 1

Argument ........................................................................................................... 6

   I.     Waller County's 2018 Early Voting Plan Violated the U.S. Constitution's Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act (Discriminatory Purpose) ................................................................ 6

     A.    The U.S. Constitution and VRA Forbid Officials from Acting with a Discriminatory Purpose on the Basis of Race.................................... 6

     B.    Defendants' Adoption and Maintenance of the 2018 Early Voting Schedule Was, at Least in Part, Motivated by an Intent to Minimize Black Voters' Political Participation................................................ 12

       i.    The 2018 Early Voting Schedule Had a Discriminatory Impact on Black Prairie View Voters........................................................ 12

       ii.   Defendants Knew or Should Have Known the Foreseeable Racial Impact of the 2018 Early Voting Schedule .................... 23

       iii.  The Sequence of Events Reveals Defendants Failed to Adopt Ameliorative Changes to Lessen the 2018 Early Voting Schedule's Anticipated Discriminatory Impact .................... 26

       iv.  Defendants' Departures from the Ordinary Decision-making Process Reveal an Impermissible Motive................................ 32

       v.   Defendants Hid Their Effort to Suppress Black Political Participation Behind Tenuous Justifications.......................... 36

       vi.  Defendants' Contemporaneous and Coded Statements Reveal Unconstitutional Biases Against Black Voters .............. 41

       vii.  The 2018 Early Voting Schedule is a Continuation of Waller County's History of Voting Discrimination ................. 44

   II.    Waller County's 2018 Early Voting Schedule Violated the Twenty-Sixth Amendment........................................................................................ 52

     A.    The U.S. Constitution Forbids Officials from Acting with a Discriminatory Purpose on the Basis of Age ................................. 52

     B.    *Arlington Heights* is the Appropriate Standard to Analyze the Twenty-Sixth Amendment Claim in this Case ......................................... 52

C.     Defendants' Adoption and Maintenance of the 2018 Early Voting Schedule, at Least in Part, Was to Minimize the Political Participation of Students Aged 18-20............................................................................. 55

   i.     The 2018 Early Voting Schedule's Disproportionate Impact on PVAMU Student Voters .............................................................................. 56

   ii.    Defendants Knew the Early Voting Schedule Would Disproportionately Deny or Abridge PVAMU Student Voting Rights .................................... 60

   iii.   The Sequence of Events Also Reveals Defendants Failed to Lessen the Early Voting Plan's Known Discriminatory Impact ................................. 62

   iv.    Defendants' Departures from the Ordinary Decision-making Process Reveal an Impermissible Motive.................................................................. 64

   v.     Defendants Hid Their Effort to Suppress PVAMU Students' Political Participation Behind Tenuous Justifications................................................ 65

   vi.    Defendants' Contemporaneous and Coded Statements Reveal Unconstitutional Biases Against Student Voters ............................................ 67

   vii.   The Early Voting Schedule is a Continuation of Waller County's History of Voting Discrimination Against Young Voters.............................................. 69

III.   Waller County's 2018 Early Voting Schedule Discriminated on the Intersecting Bases of Race and Age in Violation of the Fourteenth, Fifteenth, and Twenty-Sixth Amendments......................................................... 70

  A.     The U.S. Constitution Forbids Officials from Acting with a Discriminatory Purpose on the Intersecting Bases of Age and Race.............. 70

  B.     *Arlington Heights* is the Appropriate Standard to Analyze the Intersecting Basis Claim in this Case............................................................. 71

  C.     The Adoption and Maintenance of the 2018 Early Voting Schedule, at Least in Part, Was to Minimize the Political Participation of Students on the Intersecting Bases of Age and Race.................................................... 72

   i.     The 2018 Early Voting Schedule Disproportionately Impacted Black PVAMU Student Voters ........................................................................ 72

   ii.    Defendants Knew the 2018 Early Voting Schedule Would Disproportionately Harm Black PVAMU Student Voters' Rights ................................. 73

   iii.   The Sequence of Events Also Reveals Defendants Failed to Lessen the 2018 Early Voting Schedule's Known Discriminatory Impact on Black PVAMU Students .............................................................................. 74

   iv.    Defendants' Departures from the Ordinary Decision-making Process Reveal an Impermissible Motive.................................................................. 76

v.   Defendants Hid Their Effort to Suppress Black PVAMU Students' Political Participation Behind Tenuous Justifications ..................................................... 76

vi.   Defendants' Contemporaneous and Coded Statements Reveal Unconstitutional Biases Against Black PVAMU Students ........................... 76

vii.   The Early Voting Schedule is a Continuation of Waller County's History of Voting Discrimination Against Black PVAMU Students ............................ 78

IV.   Waller County's 2018 Early Voting Schedule Violated Section 2 of the VRA (Discriminatory Results) ............................................................... 79

A.   Guiding Legal Standards ....................................................................... 79

B.   Under *Veasey*'s First Step, Defendants' 2018 Early Voting Plan Imposed a Discriminatory Burden on Black Voters in Prairie View ............. 86

C.   Under *Veasey*'s Second Step, the Early Voting Schedule's Burden is Caused by or Linked to Social and Historical Conditions that Produce Discrimination against Black Voters, Violating Section 2. ........................... 93

i.   The burden is caused by or linked to Waller County's history of official discrimination in voting, registration, and political participation under Senate Factor 1 ........................................................................................ 97

ii.   The burden is caused by or linked to racially polarized voting in Waller County under Senate Factor 2. ........................................................... 99

iii.   The burden is caused by or linked to the ongoing effects of state-sponsored discrimination in areas as education, employment and health, which hinder Black people's ability to participate effectively in the political process in Waller County under Senate Factor 5. ........................................................ 100

iv.   The burden is caused by or linked to Black candidates' lack of success in running for countywide offices in Waller County under Senate Factor 7. ... 102

v.   The 2018 early voting schedule's burden is caused by or linked to Waller County officials' lack of responsiveness to the particularized needs of Black residents under Senate Factor 8. .................................................... 104

vi.   The burden is caused by or linked to Waller County officials' reliance on tenuous policy rationales to justify their early voting schedule under Senate Factor 9 ........................................................................................ 106

V.   Plaintiffs Are Entitled to Their Requested Relief ............................................. 107

A.   This Court Has Broad Equitable Discretion to Order Each of Plaintiffs' Requested Remedies ........................................................................... 107

B.   HB 1888 Does Not Moot Plaintiffs' Claims ................................................ 112

C.   PVAMU is Neither a Necessary nor Indispensable Party to this Lawsuit ............................................................................................... 118

D.   Even if PVAMU Were Indispensable, Sovereign Immunity Is No Bar
     to Joinder .......................................................................................... 122

E.   This Court Needs to Reach Both Constitutional and Statutory Claims
     To Grant Plaintiffs' Requested Relief ........................................................ 124

CONCLUSION ................................................................................................. 126

CERTIFICATE OF SERVICE ......................................................................... 128

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*,
   851 F.3d 507 (5th Cir. 2017) ................................................................... 123

*Allen v. City of Evergreen*,
   No. 13-0107-CG-M, 2014 WL 12607819 (S.D. Ala. Jan. 13, 2014) ....................... 110

*Allen v. State Bd. of Elections*,
   393 U.S. 544 (1969) ................................................................................. 79

*Anderson v. Martin*,
   375 U.S. 399 (1964) .................................................................................. 9

*Antoine v. Winner Sch. Dist.*
   59-2, No. 06-cv-3007-CBK (D.S.D. Dec. 10, 2007) .................................... 109

*Bauer v. Texas*,
   341 F.3d 352 (5th Cir. 2003) .................................................................. 117

*Berry v. Sch. Dist. of Benton Harbor*,
   515 F. Supp. 344 (W.D. Mich. 1981), *aff'd and remanded*, 698 F.2d 813
   (6th Cir. 1983) ........................................................................................ 109

*Bethune-Hill v. Va. State Bd. of Elections*,
   137 S. Ct. 788 (2017) ............................................................................... 40

*Brown v. Bd. of Educ. of Topeka*,
   349 U.S. 294 (1955) .......................................................................... 108, 125

*Brown v. Board of Education*,
   347 U.S. 483 (1954) ............................................................................... 100

*Brown v. Dean*,
   555 F. Supp. 502 (D.R.I. 1982) .............................................................. 108

*Brown v. Post*,
   279 F. Supp. 60 (W.D. La. 1968) ............................................................... 7

*Campbell-Ewald Co. v. Gomez*,
   136 S. Ct. 663 (2016) ............................................................................ 117

*Charles H. Wesley Educ. Found., Inc. v. Cox,*
408 F. 3d 1349 (11th Cir. 2005) ............................................................ 87

*Chisom v. Roemer,*
501 U.S. 380 (1991) ............................................................... *passim*

*City of Arthur v. United States,*
459 U.S. 159 (1982) ............................................................ 9

*City of Austin v. Paxton,*
943 F.3d 993 (5th Cir. 2019) ............................................... 123

*City of Pleasant Grove v. United States,*
479 U.S. 462 (1987) .................................................. 9, 13, 56

*City of Richmond v. United States,*
422 U.S. 358 (1975) ....................................................... 12, 70

*City of Rome v. United States,*
446 U.S. 156 (1980) ............................................................ 95

*Dillard v. Crenshaw Cty.,*
649 F. Supp. 289 (M.D. Ala. 1986) ....................................... 9

*Evanston Ins. Co. v. Kinsale Ins. Co.,*
No. 7:17-CV-327, 2018 WL 4103031 (S.D. Tex. July 12, 2018) ............ 119

*Florida v. United States,*
885 F. Supp. 2d 299 (D.D.C. 2012) ...................................... 80

*Floyd v. City of New York,*
959 F.Supp.2d 668 (S.D.N.Y. 2013) .................................... 108

*Foster v. Chatman,*
136 S. Ct. 1737 (2016) ..................................................... 11

*Goodloe v. Madison Cty. Bd. of Election Comm'rs,*
610 F. Supp. 240 (S.D. Miss. 1985) ...................................... 7

*Griffin v. Cty. Sch. Bd. of Prince Edward Cty.,*
377 U.S. 218 (1964) ............................................................ 9

*Haitian Refugee Ctr. v. Smith,*
676 F.2d 1023 (5th Cir. 1982) ............................................ 107

*Harper v. Va. Bd. of Elections*,
383 U.S. 663 (1966) ................................................................. 8

*Honig v. Doe*,
484 U.S. 305 (1988) .............................................................. 117

*Houston Lawyers' Ass'n v. Att'y Gen. of Texas*,
501 U.S. 419 (1991) ................................................................ 82

*Hunter v. Underwood*,
471 U.S. 222 (1985) .......................................................... 11, 12

*Jefferies v. Harris Cty. Cmty. Action Ass'n*,
615 F.2d 1025 (5th Cir. 1980) ................................................. 71

*Johnson v. De Grandy*,
512 U.S. 997 (1994) ...................................................... 82, 94, 97

*Jones v. Jefferson Cty. Bd. of Educ.*,
No. 2:19-CV-01821-MHH, 2019 WL 7500528
(N.D. Ala. Dec. 16, 2019) ..................................................... 110

*Kelley v. Metro. Cty. Bd. Of Educ.*,
479 F. Supp. 120 (M.D. Tenn. 1979) ...................................... 109

*Kentucky v. Graham*,
473 U.S. 159 (1985) ................................................................ 49

*Kirksey v. Bd. of Supervisors*,
554 F.2d 139 (5th Cir. 1977) (en banc) .................................... 93

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
567 U.S. 298 (2012) .............................................................. 112

*Latham v. Chandler*,
406 F. Supp. 754 (N.D. Miss. 1976) ......................................... 70

*League of United Latin Am. Citizens Council No. 4434 v. Clements*,
986 F.2d 728 (5th Cir) (1993), *on reh'g*, 999 F.2d 831 (5th Cir. 1993). .................. 106

*League of United Latin Am. Citizens v. Perry*,
548 U.S. 399 (2006) ....................................................... *passim*

*League of Women Voters of Fla., Inc., v. Detzner*,
314 F. Supp. 3d 1205 (N.D. Fla. 2018) ..................................... 53

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ..............................................................*passim*

*Lemon v. Kurtzman*,
411 U.S. 192 (1973) ............................................... 107, 111, 125

*Luft v. Evers*,
963 F.3d 665 (7th Cir. 2020) ...................................................... 53

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988) ................................................................ 123

*Major v. Treen*,
574 F. Supp. 325 (E.D. La. 1983) .............................................. 93

*McMillan v. Escambia Cnty., Fl.*,
748 F.2d 1037 (5th Cir. 1984) ..................................................... 8

*Mich. State A. Philip Randolph Inst. v. Johnson*,
833 F.3d 656 (6th Cir. 2016) ...................................................... 87

*Miss. State Chapter, Operation PUSH v. Mabus*,
932 F.2d 400 (5th Cir. 1991) .................................................. 8, 81

*Miss. Univ. for Women v. Hogan*,
458 U.S. 718 (1982) .................................................................... 9

*Hood ex rel. Miss. v. City of Memphis*,
570 F.3d 625 (5th Cir. 2009) .................................................... 121

*Morse v. Republican Party of Va.*,
517 U.S. 186 (1996) .................................................................. 87

*N.C. State Conference of the NAACP v. McCrory*,
182 F. Supp. 3d 320 (M.D.N.C. 2016), *rev'd on other grounds*,
831 F.3d 204 (4th Cir. 2016) ...................................................... 53

*N.C. State Conference of NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) .............................................*passim*

*Nashville Student Org. Comm. v. Hargett*,
155 F.Supp.3d 749 (M.D. Tenn. 2015) .................................. 52, 53

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
557 U.S. 193 (2009) ................................................................ 111

*OCA-Greater Houston v. Texas*,
   867 F.3d 604 (5th Cir. 2017) ............................................................ 45, 122

*Ohio State Conference of N.A.A.C.P. v. Husted*,
   768 F.3d 524 (6th Cir. 2014), *vacated*, No. 14-3877,
   2014 WL 10384647 (6th Cir. Oct. 1, 2014)........................................... 84

*One Wis. Inst., Inc. v. Thomsen*,
   198 F. Supp. 3d 896 (W.D. Wis. 2016), *order enforced*,
   351 F. Supp. 3d 1160 (W.D. Wis. 2019) ................................................ 53

*Patino v. City of Pasadena*,
   230 F. Supp. 3d 667 (S.D. Tex. 2017) .......................................... 104, 124

*Patino v. City of Pasadena*,
   No. H-14-3241, 2017 WL 10242075 (S.D. Tex. Jan. 16, 2017) ...... 110, 111

*Perez v. Abbott*,
   253 F. Supp. 3d 864 (W.D. Tex. 2017)................................................... 11

*Perez v. Abbott*,
   390 F. Supp. 3d 803 (W.D. Tex. 2019).......................................... 110, 124

*Perez v. Perry*,
   26 F. Supp. 3d 612 (W.D. Tex. 2014)..................................................... 45

*Pulitzer-Polster v. Pulitzer*,
   784 F.2d 1305 (5th Cir. 1986) ..................................................... 121, 122

*Quern v. Jordan*,
   440 U.S. 332 (1979)............................................................................ 122

*Reno v. Bossier Par. Sch. Bd.*,
   520 U.S. 471 (1997)................................................................... 6, 13, 55

*Reno v. Condon*,
   528 U.S. 141 (2000).............................................................................. 10

*Rogers v. Lodge*,
   458 U.S. 613 (1982)....................................................................*passim*

*Spirit Lake Tribe v. Benson Cty.*,
   No. 2:10-cv-095, 2010 WL 4226614 (D.N.D. Oct. 21, 2010)................. 108

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
   402 U.S. 1 (1971)................................................................................ 107

*Texas Democratic Party v. Abbott,*
    978 F.3d 168 (5th Cir. 2020) ...................................................................... 3, 52

*Thornburg v. Gingles,*
    478 US 30 (1986) .................................................................................... *passim*

*Toney v. White,*
    488 F.2d 310 (5th Cir. 1973) (en banc) ................................................... 8

*Tyehimba v. City of Cincinnati,*
    No. C-1-99-317, 2001 WL 1842470 (S.D. Ohio May 3, 2001) ................ 109

*Underwood v. Hunter,*
    730 F.2d 614 (11th Cir. 1984) ................................................................ 80

*United States v. Brown,*
    561 F.3d 420 (5th Cir. 2009) ............................................................ *passim*

*United States v. Dallas County,*
    739 F.2d 1529 (11th Cir. 1984) ................................................... 81, 82, 87

*United States v. Marengo Cty. Comm'n,*
    731 F.2d 1546 (11th Cir. 1984) ........................................... 10, 81, 87, 93

*United States v. Palmer,*
    356 F.2d 951 (5th Cir. 1966) ................................................................ 108

*United States v. Schaffer,*
    600 F.2d 1120 (5th Cir. 1979) ............................................................... 61

*United States v. Texas,*
    445 F. Supp. 1245 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979) ............................................... 47, 53, 70

*United States v. Texas Ed. Agency,*
    564 F.2d 162 (5th Cir. 1977) ....................................................... 13, 23, 60

*United States v. Texas Ed. Agency,*
    600 F.2d 518 (5th Cir. 1979) ................................................................... 9

*Va. Office for Prot. and Advocacy v. Stewart,*
    563 U.S. 247 (2011) ............................................................................. 123

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) (en banc) ............................................. *passim*

*Veasey v. Abbott*,
    888 F.3d 792 (5th Cir. 2018) ...................................................................... 107

*Veasey v. Perry*,
    71 F. Supp. 3d 627 (S.D. Tex. 2014), *aff'd in part, vacated in part,*
    *remanded sub nom. Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *on*
    *reh'g en banc*, *and aff'd in part, vacated in part, rev'd in part Veasey v.*
    *Abbott*, 830 F.3d 216 (5th Cir. 2016)..................................... 20, 46, 93, 105

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)...............................................................................*passim*

*Walgren v. Howes*,
    482 F.2d 95 (1st Cir. 1973) ........................................................................ 70

*White v. Regester*,
    412 U.S. 755 (1973)................................................................................... 94

**Constitutional Provisions**

U.S. Const. amend. XIV ................................................................................ 6, 70

U.S. Const. amend. XV ................................................................................. 6, 70

U.S. Const. amend. XXVI ........................................................................... 51, 70

**Rules & Statutes**

52 U.S.C. § 10301(a).............................................................................. 7, 79, 124

52 U.S.C § 10301(b).............................................................................. 80, 94, 95

52 U.S.C. § 10302(c).................................................................................. 110, 124

Tex. Elec. Code § 85.064(b)............................................................................ 113

Tex. Elec. Code § 85.005 ................................................................................ 113

**Legislative Materials & Other Authorities**

S. Rep. No. 97-417 (1982), reprinted in 1982 U.S.C.C.A.N. 177..............................*passim*

**SUMMARY OF THE ARGUMENT**

Waller County officials evaded their constitutional and statutory obligations during the 2018 general election early voting cycle. They did so by allocating early voting access in a discriminatory manner that abridged the voting rights of Black, young voters, and Black student voters in Waller County. Defendants ignored repeated requests by Black voters—going back several election cycles before 2018—for fair, adequate, and accessible early voting opportunities in Waller County, namely at the Memorial Student Center ("MSC") on Prairie View A&M University's ("PVAMU") campus in the City of Prairie View (or "Prairie View"). Although Defendants publicly admitted the inequities in their 2018 early voting plan and that their process for establishing early voting was broken, they failed to lessen the foreseeable, discriminatory impact despite having the authority, community support, recommendations, and resources to do so. At the time, they defended their actions by offering pretextual and tenuous rationales that were uncorroborated and unsupported by the record in the fall of 2018. Their irrelevant, post-hoc justifications for their actions also are not based in fact. Because of these and the ongoing harms discussed below, student voters and Black voters, including Black student voters, in Waller County, who are concentrated in the majority-Black City of Prairie View, once again, seek validation of their constitutional and statutory rights through the federal courts.

No party disputes that the *Arlington Heights* framework is the appropriate standard for reviewing Plaintiffs' claims on the basis of race under the Fourteenth and Fifteenth Amendments of the U.S. Constitution and Section 2 of the Voting Rights Act ("Section

2"). *See* Defs.' Mot. for Summ. J., ECF 71 at 29.[1] Under *Arlington Heights*, the evidence at trial demonstrated that *a* discriminatory purpose motivated Defendants' decision to adopt and maintain their 2018 early voting schedule for the general election to discriminate against Black voters, the largest concentration of whom is in Prairie View. As community members protested at the time, and Defendants themselves admitted, the total hours of early voting access that Defendants allocated to Black voters in Prairie View—65, almost exclusively during the second of two weeks of early voting—are dwarfed by the more than 100 hours *each*, over both weeks, that Defendants provided to *individual locations* in cities like Waller, Brookshire, and Hempstead, which are home to far more white and older voters and dramatically fewer Black and young voters. As Plaintiffs' expert, Mr. Bill Cooper, shows through U.S. Census data, Prairie View is a majority-Black city in a county that is nowhere close to being majority-Black. No other area within Waller County, not Brookshire, not Hempstead and certainly not Waller or Katy, comes close to having as many Black voters as are concentrated in Prairie View and on the PVAMU campus in particular.

Nor can any party dispute, as of the filing of these post-trial briefings, that the Fifth Circuit has not articulated a clear standard for reviewing a claim of discrimination on the basis of age under the Twenty-Sixth Amendment. Plaintiffs have urged this Court to apply

---

[1]      References to page numbers in <u>docket entries</u> refer to ECF file-stamped page numbers. References to page numbers in <u>expert reports, filed as exhibits on the docket,</u> refer to page numbers in the footers or headers of those reports, as the ECF file-stamped page numbers are unreadable due to multiple filings on the docket.

the *Arlington Heights* framework to their Twenty-Sixth Amendment claim based on the facts in this case and the nature of their intentional age-based discrimination claim. Consistent with that, at summary judgment, Defendants recognized that "courts in other jurisdictions have applied the *Arlington Heights* analysis to such claims," *id.* at 34. Since then, the Fifth Circuit in *Texas Democratic Party v. Abbott*, has considered a Twenty-Sixth Amendment challenge in a case raising different allegations—a facial challenge premised on a suspect classification—and, thus far, declined to identify any standard of review for a Twenty-Sixth Amendment claim.

Here, Plaintiffs bring their Twenty-Sixth Amendment claim, contending that the evidence shows that Defendants *purposefully* created an inequity in early voting access to the detriment of the *only* concentrated group of 18- through 20-year-old voters in Waller County. Moreover, Defendants did so in full awareness of the high use, demonstrated demand, and, indeed, dependence on early voting among these young voters, students attending PVAMU. As Plaintiffs' expert, Dr. Robert Stein, found, 81% of student voters at PVAMU who voted in 2018 did so via early voting (as compared to 71% of Waller County voters overall), and over 75% of PVAMU-student early voters cast their ballots at the on campus MSC. Analyzing the County's own data, Dr. Stein identified a trend: the three early voting locations most used by Black voters, voters aged 18 through 20, and PVAMU student voters, were provided far fewer hours than the locations that served the most white, older, voters.

Defendants' lone expert, Dr. James Gimpel, did not contest these findings—indeed, he could not. Dr. Gimpel chose not to examine race or age as a factor, even though this is

a case about race and age and Dr. Stein's data was available to him. Indeed, Dr. Gimpel acknowledged that under various measures of use (i.e., the total number of early votes cast per precinct or the proportion of early votes out of all votes cast), Waller County's own data from the November 2016 general and March 2018 primary elections put Defendants on notice going into the November 2018 general election that PVAMU's predominantly Black, disproportionately younger electorate had high, if not the *highest*, demand for early voting of any group of voters in the County. In addition, as the evidence shows, Black student voters at PVAMU were the only group of voters who specifically came to Commissioners Court, explained in detail why they depend on early voting and face barriers to accessing it off campus, and requested more early voting to access their fundamental right to vote in a historic election.

As explained below, on campus early voting is often the only option for student voters seeking to exercise the franchise in Waller County, given the unique socioeconomic and transportation barriers they face; their busy and often-inflexible school, work, and activities schedules; the nature of student life at a residential campus in a rural county; the history of discrimination that continues to shape their lives; and PVAMU students' long fight for voting access in the County where the university has been since 1876. Given these realities, *Arlington Heights* remains applicable as the governing standard here.

The *Arlington Heights* framework is also the appropriate lens for this Court to review Plaintiffs' claim that Defendants purposefully discriminated against Black student voters at PVAMU on the intersecting bases of age and race. Black PVAMU students are the majority of Prairie View's electorate and one of the largest voting groups in Waller

County. Both before and after the Voting Rights Act of 1965 enforced the Fourteenth and Fifteenth Amendments and prohibited racial discrimination in voting—and even after the U.S. Supreme Court, in a case arising in Waller County, ensured that students could register and vote where they go to school under the Twenty-Sixth Amendment—Waller County has attempted stratagem after stratagem to abridge PVAMU students' access to the ballot box and opportunities for meaningful political participation. The November 2018 early voting schedule is one recent incarnation of that stratagem, designed to limit access to voting for Black students who lack socioeconomic resources, including transportation to travel off campus to vote.

Defendants' actions have produced distinct constitutional violations that can be remedied individually or in combination and are not dependent on one another. Their discrimination against PVAMU students—the only concentrated group of young, Black voters in the County—sounds in the Fourteenth, Fifteenth, and Twenty-Sixth Amendments because it violates the right to be free from official racial discrimination, to be free from abridgement or denial of voting rights on the basis of race, and the right to be free from such abridgement or denial on the basis of age. *See Veasey v. Abbott*, 830 F.3d 216, 265 (5th Cir. 2016) (en banc) (recognizing that differing constitutional claims must be reached unless "the rights and remedies are intertwined").

Finally, as discussed in Plaintiffs' supplemental briefing, ECF 100, following the Court's denial of Defendants' summary judgment motion on all counts, *see* ECF 104, and for other reasons explained herein, Plaintiffs' claims are not moot because of Texas's implementation of House Bill ("H.B.") 1888 of 2019. Regardless of that bill's provisions,

Defendants retain substantial discretion that allows them to discriminate in setting early voting schedules, including in the placement of early voting locations. They have exercised that discretion in recent elections—in fact, *all* post-2018 elections—to perpetuate constitutional and statutory voting-rights harms to Plaintiffs by denying on campus early voting at PVAMU and continuing to employ a broken, non-transparent, and non-inclusive process for setting early voting schedules. Going forward, nothing in HB 1888 or elsewhere in Texas law bars Defendants from budgeting and preparing to rectify these harms by providing early voting at the MSC. Indeed, as Defendants' expert Dr. Gimpel testified, there is a growing trend nationwide to provide more early voting on campus. Plaintiffs' Proposed Findings of Fact ("Pls.' FoF") ¶ 484. And as Mr. Frank Jackson testified: "Let the children vote. Everybody should be voting all over this county. Get them voting boxes back," including on PVAMU's campus. Pls.' FoF ¶ 495.

## ARGUMENT

I. **Waller County's 2018 Early Voting Plan Violated the U.S. Constitution's Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act (Discriminatory Purpose)**

### A. The U.S. Constitution and VRA Forbid Officials from Acting with a Discriminatory Purpose on the Basis of Race

The Fourteenth and Fifteenth Amendments to the Constitution prohibit voting practices enacted or maintained with a racially discriminatory purpose. U.S. Const. amend. XIV; U.S. Const. amend. XV; *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481-82 (1997) ("*Reno*"); *Rogers v. Lodge*, 458 U.S. 613, 617, 625 (1982) ("*Rogers*"); *see also Veasey*, 830 F.3d at 231.

Section 2 of the VRA prohibits any "standard, practice, or procedure" from being "imposed or applied . . . in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Congress enacted the VRA "for the broad remedial purpose of ridding the county of racial discrimination in voting." *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (internal citations and quotation marks omitted) ("*Chisom*"). Section 2 is also violated if a challenged law or practice is shown to have been adopted with a racially discriminatory purpose. *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) ("*Brown*"). Episodic practices, such as the use of the initial or modified early voting plans, constitute a "practice" under Section 2. *Brown*, 561 F.3d at 432; *see also Goodloe v. Madison Cty. Bd. of Election Comm'rs*, 610 F. Supp. 240, 243 (S.D. Miss. 1985) ("Section 2 on its face is broad enough to cover practices which are not permanent structures of the electoral system but nevertheless operate to dilute or diminish the vote of blacks."); *Brown v. Post*, 279 F. Supp. 60, 64-65 (W.D. La. 1968) (holding that electoral officials violated Section 2 by soliciting absentee ballots from white voters without making the same opportunity available to Black voters). As discussed *infra*, Section 2's prohibition on practices with a racially discriminatory purpose is in addition to and apart from its prohibition on practices with discriminatory results.

Evidence that voters have been totally prevented from voting (for example, evidence of a reduction in turnout) is not required to establish vote abridgment. *Veasey*, 830 F.3d at 259-60. Courts should take care not to "conflate[] abridgement and denial," each of which

is explicitly—and separately—prohibited by the text of the Constitution and Section 2. *Id.* at 260 n.58; *see id.* at 253 (citing U.S. Const. amend. XV; 52 U.S.C. § 10301(a)).

If governmental officials provide early voting, the Constitution requires them to do so in a nondiscriminatory manner. *See*, *e.g.*, *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966); *Miss. State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400, 405 (5th Cir. 1991) (affirming that limitations on satellite voter registration burdened Black registrants in violation of Section 2 even though there is no constitutional right to satellite voting); *Toney v. White*, 488 F.2d 310, 311-12 (5th Cir. 1973) (en banc) (affirming that the disproportionate purging of Black voters from the absentee voter rolls violated Section 2 even though there is no constitutional right to absentee voting). An early voting plan "conceived or operated as [a] purposeful device[] to further racial discrimination," therefore, violates the Fourteenth and Fifteenth Amendments and Section 2. *Rogers*, 458 U.S. at 617 (internal quotations omitted).

In analyzing whether a government action was motivated by a discriminatory purpose under the Fourteenth and Fifteenth Amendments, as well as Section 2, courts apply the framework articulated in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-268 (1977) ("*Arlington Heights*"); *McMillan v. Escambia Cnty., Fl.*, 748 F.2d 1037, 1046 (5th Cir. 1984) ("Congress intended that fulfilling *either* the more restrictive intent test or the results test would be sufficient to show a violation of section 2.") (emphasis in original). *Arlington Heights* specifies that "an important starting point" for assessing discriminatory purpose is "the impact of the official action"—that is, "whether it bears more heavily on one race than another." *Id.* at 266 (quotation marks

omitted). Additional evidentiary sources include, but are not limited to: (1) historical background of the decision; (2) the specific sequence of events leading up to the challenged decision; (3) departures from the normal procedural sequence, as well as substantive departures; (4) legislative or administrative history, including contemporary statements; (5) foreseeability of discriminatory impact; (6) knowledge of discriminatory impact; and (7) the availability of less discriminatory alternatives. *Veasey*, 830 F.3d at 231; *United States v. Texas Ed. Agency*, 600 F.2d 518, 528-29 (5th Cir. 1979); *Arlington Heights*, 429 U.S. at 268.

Concerning racially discriminatory impact, requiring a threshold minimum number of impacted voters or a specific degree of impact "is unquestionably wrong." *Chisom*, 501 U.S. at 409 (Scalia, J. dissenting). Any amount of discriminatory impact—even, for example, to one Black voter—is sufficient to show that an intentionally discriminatory law violates the Constitution. *See*, *e.g.*, *City of Pleasant Grove v. United States*, 479 U.S. 462, 471-72 n.11 (1987) ("*Pleasant Grove*"); *City of Arthur v. United States*, 459 U.S. 159, 168 (1982); *Anderson v. Martin*, 375 U.S. 399, 403-04 (1964); *Dillard v. Crenshaw Cty.*, 649 F. Supp. 289, 297 (M.D. Ala. 1986); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 438-40 (2006) ("*LULAC*") ("Even if [the challenged plan's] disproportionality were deemed insubstantial, that consideration would not overcome the other evidence of vote dilution," including evidence that bore "the mark of intentional discrimination"); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 723 n.8 (1982) (a single-sex school had a disparate impact where the plaintiff's sole burden was the "inconvenience" of traveling to a nearby coed school); *Griffin v. Cty. Sch. Bd. of Prince*

*Edward Cty.*, 377 U.S. 218, 230-31 (1964) (enjoining the closure of all schools because such closing was intended to discriminate).

As discussed in more detail below, a constitutional challenge to an intentionally discriminatory law thus requires a lesser showing of discriminatory impact than is required under the discriminatory results standard of Section 2. *See N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 231 n.8 (4th Cir. 2016) ("*McCrory*") (explaining that "plaintiffs must make a greater showing of disproportionate impact" under Section 2 than under the Constitution, and that requiring a "more onerous impact showing" for constitutional claims would be inappropriate because it "would eliminate the distinction between discriminatory results claims . . . and discriminatory intent claims"); *see also Reno v. Condon*, 528 U.S. 141, 332 n.1 (2000) (stating that "it may sometimes be" easier to prove intent than effect). Thus, proving impact sufficient to satisfy Section 2's discriminatory results standard is not a prerequisite for establishing a discriminatory intent claim; instead, "evidence that a voting device was intended to discriminate is circumstantial evidence that the device has a discriminatory result." *Compare United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984) ("*Marengo*"), *with* Defs' Memo of Law, ECF 117 at 2 ("Similarly, the fact that Fourteenth and Fifteenth Amendment claims require the same proof of discriminatory effect as a section 2 claim plus the additional proof of discriminatory intent, means that unless a plaintiff can establish a section 2 violation, he or she cannot prevail on the constitutional claim.") (citations omitted).

To prevail on a claim of racially discriminatory purpose at trial, the evidence must demonstrate that discriminatory purpose was *a* motivating factor for the government

action. Plaintiffs "do[] not have to prove that racial discrimination was a 'dominant' or 'primary' motive, only that it was a motive." *Arlington Heights*, 429 U.S. at 265-66; *Brown*, 561 F.2d at 433. Nor does discriminatory purpose require a showing of ill-will or animus toward minorities. *Arlington Heights*, 429 U.S. at 265-66; *Perez v. Abbott*, 253 F. Supp. 3d 864, 948 (W.D. Tex. 2017).

An intent to disadvantage minority citizens to gain a perceived political or partisan benefit also qualifies as discriminatory intent. *See LULAC*, 548 U.S. at 440 (stating that taking away a political opportunity just as minority voters were about to exercise it "bears the mark of intentional discrimination"); *Hunter v. Underwood*, 471 U.S. 222, 233 (1985) (finding intentional discrimination where a state enacted a law to harm Black and poor white voters for partisan purposes) ("*Hunter*"); *McCrory*, 831 F.3d at 226-27 (similar).

Discriminatory purpose may be proved by direct or circumstantial evidence. *Rogers*, 458 U.S. at 618. As the Fifth Circuit has recognized, "[t]o require direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions." *Veasey*, 830 F.3d at 235-36. An approach that required overt statements of discriminatory purpose "would ignore the reality that neutral reasons can and do mask racial intent." *Id.* at 236.

Courts consider the strength, quality, and quantity of the evidence and the reasonableness of the inferences that can be drawn from the evidence. Courts must consider "all of the circumstances that bear upon the issue of [discriminatory intent]," *Foster v. Chatman*, 136 S. Ct. 1737, 1748 (2016), "including the normal inferences to be drawn from

the foreseeability of defendant's actions," *Brown*, 561 F.3d at 433. Expert evidence is also highly relevant. *See Hunter*, 471 U.S. at 229-30 (relying on experts to find discriminatory intent). And all evidence must not be viewed in isolation; it must instead be part of the "circumstantial totality of evidence." *Veasey*, 830 F.3d at 237.

Official actions motivated by a discriminatory purpose have "no legitimacy at all under our Constitution." *City of Richmond v. United States*, 422 U.S. 358, 378-79 (1975). Once racial discrimination is shown to have been a motivating factor behind the enactment of a challenged practice, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Veasey*, 830 F.3d at 231 (quoting *Hunter*, 471 U.S. at 228).

## B. Defendants' Adoption and Maintenance of the 2018 Early Voting Schedule Was, at Least in Part, Motivated by an Intent to Minimize Black Voters' Political Participation

Plaintiffs' evidence under the *Arlington Heights* framework established that the 2018 early voting schedule was motivated, at least in part, by an intent to minimize the opportunity of Black voters to participate in the political process in violation of the Fourteenth and Fifteenth Amendments and Section 2.

### i. The 2018 Early Voting Schedule Had a Discriminatory Impact on Black Prairie View Voters

Evaluating the discriminatory impact of Defendants' early voting schedule is an "important starting point" for this Court's intentional racial discrimination analysis. *Arlington Heights*, 429 U.S. at 266. "[T]he impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural

consequences of their actions." *Reno*, 520 U.S. at 487. As "objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor," impact can be "the most probative evidence of intent[.]" *United States v. Texas Ed. Agency*, 564 F.2d 162, 167, n.6 (5th Cir. 1977)("*Texas Ed. Agency I*").

For discriminatory impact under *Arlington Heights*, Plaintiffs need only show Defendants' actions "bear[] more heavily on" Black voters in Prairie View than other Waller County voters. *Arlington Heights*, 429 U.S. at 266. Plaintiffs do not need to show a positive effect on the actual incidence of voting—that is, turnout reduction. Instead, a finding that Defendants' early voting schedule "abridge[d]" Plaintiffs' voting rights, resulting in a racial disparity in early voting *access*, "falls comfortably within" the definition of abridgement. *Veasey*, 830 F.3d at 260. "Showing disproportionate impact, even if not overwhelming impact, suffices to establish one of the circumstances evidencing discriminatory intent." *McCrory*, 831 F. 3d at 231 (4th Cir. 2016). And any amount of discriminatory impact—even, for example, to one Black voter—is sufficient to show that an intentionally discriminatory law violates the Constitution and has long been recognized in voting cases. *See*, *e.g.*, *Pleasant Grove*, 479 U.S. at 471-72 n.11. Thus, to the Court's first question at closing, *see* Day 12 Tr., 102:7-16, in the context of evaluating Plaintiffs' constitutional claims, this Court can focus its inquiry on the burdens imposed on *Black voters in Prairie View*.

Here, there is abundant and uncontested evidence in the record—which Plaintiffs' presented at trial—that the 2018 early voting plan disproportionately impacted and harmed Black voters in Prairie View. With a 91.99% Black voting-age population ("VAP"), Prairie

View has the largest concentration of Black voters in Waller County. Pls.' FoF ¶ 97. Black PVAMU students are one of the largest voting groups in Prairie View and Waller County, *Id*. ¶ 271, as well as a group of voters that is especially reliant on early voting access, Pls.' *Id*. ¶¶ 318-22. In fact, Precinct 309, which is the PVAMU campus precinct, had 4,834 registered voters as of November 6, 2018, which was the largest population of registered voters out of any County precinct and over 1,400 more registered voters than the second-largest precinct. *Id*. ¶¶ 105, 271, 314. And in 2018, Prairie View's three early voting sites were used by Black voters at rates more than twice as high as any other early voting location in Waller County. *Id*. ¶ 345; Pls.' Ex. 158, Stein Rep. at 11. At the on-campus MSC, Dr. Stein's analysis revealed that Black voters accounted for 72% of all early votes cast in November 2018. Pls.' FoF ¶ 345. At both the Waller County Community Center ("WCCC") and Prairie View City Hall, Black voters accounted for 47% of all early votes cast in that fall election. *Id*. Outside of Prairie View, there was *no* location where Black voters accounted for more than 22% of early votes. *Id.*; *see also* Pls.' Ex. 158, Stein Rep. at 11.

Yet, as Dr. Stein testified, Defendants provided at these three Prairie View early voting locations, which served the most Black voters of any locations in Waller County, "distinctively and universally lower" hours than they gave to the early voting locations that served the most white voters. Pls.' FoF ¶ 347. Thus, as Dr. Stein concluded and testified, the result of Defendants' 2018 early voting plans "was to deny . . . Black voters in Prairie View equal or even similar access to early voting opportunities afforded other registered voters in Waller County." *Id*. ¶¶ 340, 344-352.

Plaintiffs' expert, Dr. Henry Flores, reported and testified that Defendants had information in their possession sufficient to be aware that these locations would primarily serve Black voters, given Prairie View's demographics. *Id.* ¶ 340; Pls.' Ex. 156, Flores Rep. at 7. As Mr. Cooper reported, Prairie View is unique among cities or populated areas in Waller County in that its VAP is overwhelmingly Black. Pls.' Ex. 153, Cooper Decl. at 9 ¶ 31 and fig. 6; Pls.' FoF ¶ 337. Among the residents of Prairie View who are at least 18 years old and thus old enough to vote, 92% are Black. Pls.' Ex. 153, Cooper Decl. at 7; Pls.' FoF ¶ 337.

Even after Defendants modestly amended their plan, following the filing of this lawsuit and request for temporary restraining order, Black voters had *no* early voting access in Prairie View during the first week, Monday through Friday, and only part of the day on Sunday. Pls.' FoF ¶¶ 329-32. By contrast, cities like Waller, with a majority-white VAP, had as many as double the number of hours—totaling more than 124 hours as compared to 65 hours in Prairie View—and enjoyed early voting during the full two weeks of early voting. *Id.* ¶¶ 218, 334-35. Along the same lines, the Waller County Courthouse and Waller Independent School District ("ISD") early voting locations had 106 and 101 hours over two weeks, respectively, whereas the MSC on PVAMU's campus in Precinct 309 had only 36 hours during just the second week. *Id.* ¶ 257.

| 2018 General Election Early Voting Hours and Locations | | | |
|---|---|---|---|
| | Week 1 | Week 2 | Total |
| **Waller County Court House (Hempstead)** | 55 | 51 | 106 |
| **Waller ISD (Waller)** | 50 | 51 | 101 |
| **Waller County Library (Brookshire)** | 55 | 51 | 106 |
| **Fieldstore (Waller)** | 23 | 0 | 23 |
| **JP # 3 Monaville** | 23 | 0 | 23 |
| **Katy VFW** | 27 | 0 | 27 |
| **PVAMU Memorial Student Center** | 0 | 27 (+9) | ~~27~~ 36 |
| **Waller County Community Center (Prairie View)** | 0 | 24 | 24 |
| **Prairie View City Hall** | 0 | 5 | 5 |

Pls.' Ex. 156, Flores Rep. at 20 (based in part on the chart included in Plaintiffs'
Amended Complaint, ECF 49 at 12).[2]

Dr. Stein testified Defendants' plan forced Black voters in Prairie View to "cast
their ballots at early polling locations with the fewest hours and days of operation." Pls.'
Ex. 158, Stein Rep. at 11; Pls.' FoF ¶ 346.

Plaintiffs' experts' unrebutted trial testimony also established Defendants' early
voting plan interacted with socioeconomic and transportation disadvantages that bear more
heavily on Black voters in Prairie View. Pls.' FoF ¶¶ 348-51. These voters face higher rates

---

[2]     The red text reflects the modifications that Defendant Commissioners Court
made to the initial early voting plan after Plaintiffs filed this lawsuit, as discussed in further
detail herein.

of experiencing poverty and transportation barriers than white voters in Waller County. *Id.* ¶¶ 114-39. Waller County has no regular public transportation, and Black residents disproportionately lack access to private transportation. *Id.* ¶¶ 129-34, 126, 325, 373, 454; Pls.' Ex. 153, Cooper Decl. at 14. As of November 2018, Plaintiff Treasure Smith was among those lacking access to transportation. Pls.' FoF ¶ 11. She has relied on the PVAMU shuttle bus, but as illustrated through trial testimony, this shuttle bus has limited stops, is considered unreliable, and only goes to the MSC but not any other early voting location in Prairie View or elsewhere in Waller County. *Id.* ¶¶ 11, 454.

Black voters' limited mobility and transportation barriers has made traveling to early voting locations outside of Prairie View or off campus during limited time windows uniquely difficult for them. *Id.* ¶¶ 21, 124-25, 132-34, 448-54; Pls.' Ex. 156, Flores Rep.at 39-41; Pls.' Ex. 158, Stein Rep. at 10-15; *see also Veasey*, 830 F.3d at 258-60 (recounting evidence credited by the district court and not challenged on appeal about socioeconomic disadvantages hindering the ability of racial minority voters to effectively participate in the political process as compared to white voters). Without public or private transportation, Black voters in Prairie View had limited early voting access when Defendants provided only five hours of early voting during the first week in November 2018.

As one attempt to address the transportation and voting access concerns, Plaintiff The Panther Party ("TPP") expended resources from its regular activities to address the complete absence of early voting on campus during the first week of early voting and the limited number of early voting on campus during the second week. Pls.' FoF ¶ 22. TPP created and then spearheaded a "Pull Up to the Polls" campaign. Through these efforts,

TPP members, among other activities, coordinated and publicized ride-sharing from campus to off campus early voting locations during the first week and a charter bus, which provided rides to Black voters who lacked transportation to travel to early voting locations during the first week of early voting, when there was no voting anywhere in Prairie View. *Id.*; Pls.' Ex. 164, TPP Twitter Feed (PLS000272). In addition, TPP held meetings, conducted outreach, and paid for materials to provide information to Prairie View voters. working with PVAMU to publicize and coordinate a charter bus. Pls.' FoF ¶ 22. For all these reasons and those discussed herein, Plaintiffs' evidence thus reveals why limiting or restricting early voting access disproportionately impacts Black voters' ability to vote. Pls.' *Id.* ¶¶ 114-42, 324-26, 340-41, 348-51.

Black voters' reliance on early voting access is also confirmed by Defendants' data. Black voters in Prairie View are more dependent on early voting and use it at higher rates than white voters in Waller County. *Id.* ¶¶ 320-21. For example, in the fall 2018 election, Defendants' data shows that the MSC in Precinct 309—where the VAP is 94% Black— had not only the highest *total number of early votes cast* of any precinct, but also the highest *rate of early votes cast per hour*, and the highest *early voting usage rate* (that is, early votes as a proportion of all votes cast by any means). *Id.* ¶¶ 273, 319-20, 322-333, 338, 394. Dr. Stein's analysis and testimony revealed, further, that the rate of early voting usage at the MSC during the March 2018 primary—ahead of the November election—was already significantly higher than the countywide rate. *Id.* ¶ 319. Countywide, 42% of all votes cast in the 2018 primary were early votes. *Id.* But at the MSC in Precinct 309, <u>64%</u> of all votes cast were early votes. *Id.* These early voting usage-rates, as Dr. Stein testified, "should

have clearly been an indication to the . . . election administrator that demand for in-person early voting [at] the Prairie View Memorial Student Center, Precinct 309, was far in excess of what it would be countywide[.]" *Id.* "On the Prairie View A&M campus," Dr. Stein concluded, "voting *is* voting in person early." Pls.' FoF ¶ 321.

Defendants' only expert, Dr. Gimpel, agreed with Dr. Stein that Waller County's 2016 and 2018 usage-rates for early voting in Prairie View show high demand for early voting. Pls.' FoF ¶ 273. Consistent with 2016, Defendants anticipated high usage of early voting in Prairie View in the fall 2018 general election and allocated the MSC more voting machines than any other early voting location in the County. *Id.* ¶¶ 170, 273, 278; Pls' Ex. 16. As of November 2018, Precinct 309 was also by far the most populous voting precinct in Waller County, with 4,834 registered voters—meaning that Precinct 309 is home to nearly 1,400 more registered voters than the County's next-most populous precinct. Pls.' FoF ¶ 105; *see also* Pls' Ex. 16 (showing that several precincts in Waller County are home to fewer than 1,400 registered voters *in total*); Day 2 Tr., 175:15-176:21 (Dr. Stein testifying, with regard to PVAMU students' high voter-registration numbers and demonstrated demand for early voting across range of metrics, "This was information that was known to the clerk, and yet, given that high demand, they cut the hours.").

Significantly, Defendants also conceded the early voting plan created a discriminatory impact. Pls.' FoF ¶¶ 223-30. During the October 17 Commissioners Court meeting, Defendants Duhon and Eason admitted the early voting plan did "not [provide] equal representation" and created "an inequity" for Prairie View voters as compared to voters in cities like Waller that had eleven early voting days. Pls.' FoF ¶¶ 223, 230.

In response to Plaintiffs' factual and expert evidence, Defendants have offered two primary counter-argument—both of which fail. *First*, through Defendants' expert, Dr. Gimpel, they contend Black voters did not experience a burden because the early voting plan did not decrease turnout in Prairie View. *See* Pls.' Ex. 161, Gimpel Rep. at 1-20, 41-47. But, as Dr. Gimpel admitted, turnout, which in his measure includes both absentee and Election Day voting as well as early voting, is subject to influence by a myriad of factors, from weather to employment or transportation access. Day 8 Tr., 167:4-10; 153:12-154:6. But the Fifth Circuit has rejected the argument that showing reduced turnout is necessary to establish a vote-abridgment claim, *Veasey*, 830 F.3d at 260, and Defendants' expert even conceded at trial that turnout cannot support any inference about whether voters had *equal access* to early voting hours and locations, Pls.' FoF ¶¶ 386-87; Pls.' Ex. 39. Thus, as Plaintiffs' expert, Dr. Stein explained, the relevant question in this case is not whether early voting increases turnout—instead, the question under Plaintiffs' constitutional and Section 2 claims is "whether the *opportunity to vote early* was equally accessible to Black and white voters and younger and older voters." Pls.' FoF ¶ 383. "Turnout, in a dispute about *access*, misses the mark." *Id.*; *see also* Pls.' Ex. 159, Stein Rebuttal Rep. at 3; *see* Day 2 Tr., 181:2-182:23; Day 8 Tr., 263:4-19.

Additionally, the burdens that the 2018 early voting schedule created for Black voters "may not be rebutted under Section 2 by positing that this unequal opportunity may be overcome if individuals devote sufficient resources to the task or by positing that the unequal opportunity is somehow a product of individual 'choice.'" *Veasey v. Perry*, 71 F. Supp. 3d 627, 693 n.497 (S.D. Tex. 2014), *aff'd in part, vacated in part, remanded sub*

*nom. Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *on reh'g en banc*, 830 F.3d 216 (5th Cir. 2016), *and aff'd in part, vacated in part, rev'd in part*, 830 F.3d 216 (5th Cir. 2016) (citing *Teague v. Attala Cty.*, 92 F.3d 283, 293-95 (5th Cir. 1996)); *see also Kirksey v. Bd. of Supervisors*, 554 F.2d 139, 145, 150 (5th Cir. 1977) (en banc); *Marengo*, 731 F.2d at 1568-69; *Major v. Treen*, 574 F. Supp. 325, 351 n.31 (E.D. La. 1983)); *McCrory*, 831 F.3d at 233 ("Nor does preference lead African Americans to disproportionately lack acceptable photo ID.").

*Second*, Defendants claim that Plaintiffs' case is only about disparate hours or inconvenience. Defs.' Mot. for Summ. J., ECF 73 at 13-14; Defs.' Mem. of Law, ECF 117 at 5. This characterization, however, is inaccurate and inconsistent with Plaintiffs' briefings and largely uncontested expert and fact evidence establishing discriminatory impact under the controlling Supreme Court and Fifth Circuit precedent that guides this Court's analysis. As Dr. Stein found and testified about, the result of early voting plan "was to deny . . . Black voters in Prairie View equal or similar access to early voting opportunities afforded other registered voters in Waller County." Pls.' Ex. 158, Stein Rep. at 13; Pls.' FoF ¶ 349 (Dr. Stein testifying that "one would be hard-pressed to think of another way in which to remove or to lessen accessibility to in-person early voting than the way in which the Waller County election administrator . . . did in the 2018 election."). This is so, as Drs. Flores and Stein found and testified, because the limited early voting access interacted with socioeconomic and transportation disparities among the predominantly Black Prairie View residents that created and aggravated burdens that uniquely reduced their ability to effectively participate in the political process. Pls.' FoF ¶¶ 341-52; *infra* Section I(B)(ii).

Defendants' sole expert analysis, for example, failed to account for Black Prairie View resident's unique demographics, economic, and historical conditions when assessing the impact of Defendants' 2018 early voting schedule on Black voters in Prairie View. Flores Rebuttal Rep., Pls.' Ex. 157 at 3; Pls.' FoF ¶¶ 361-80. Prairie View is unlike the rest of Waller County in many significant ways. For Black PVAMU students, many of them lack access to private and have no access to public transportation in a County Defendants acknowledge "would be challenging" and "difficult" to travel "without a car." Pls.' FoF ¶¶ 131. Even for students who may have access to car, gas money presents a significant barrier to traveling off campus to vote. *Id.* ¶ 132. Transportation concerns are compounded by socioeconomic disparities that Black Prairie View residents experience to participate in the political process. *Id.* ¶¶ 121, 136, 141, 324-25, 351. These factors, along with others, underscore why voting on-campus is so critical for students, as well as why the MSC is the center of life for students and other non-student Prairie View residents. *Id.* ¶¶ 351, 372. Simply put, Black Prairie View residents experience burdens associated with distance and travel differently than white Waller County residents. So, as Defendants' expert testified, "distance is not necessarily a barrier to access when it comes to voting" for people who drive long distances each day. *Id.* ¶ 370. But for Black Prairie View residents, especially for Black PVAMU students, distance both operates and impacts them different than white Waller County residents. *Id.* ¶ 373.

In line with Defendants' expert's testimony and research, the evidence at trial showed how distance functions differently with respect to voting accessibility for Plaintiffs and other PVAMU students and Prairie View residents. *See e.g.*, *Id.* ¶¶ 372-73. Yet

regarding discriminatory impact or burden, Defendants' expert did not analyze the racial impact in this case, even though he: admitted that he knows how to analyze voting practices that impact different racial group based on his prior work; agreed it would be appropriate to look at the impact of a challenged practice on different racial groups in a case, as here alleging racial discrimination; and was aware of Plaintiffs' racial discrimination claims before disclosing his only report in this case. *Id.* ¶ 374.

For reasons herein and below, Plaintiffs' unrebutted evidence shows Defendants' early voting plan interacted with historical and social conditions that disproportionately impacted Black voters in Prairie View, the largest concentration of Black voters in Waller County.

> ii. *Defendants Knew or Should Have Known the Foreseeable Racial Impact of the 2018 Early Voting Schedule*

Along with other evidence under *Arlington Heights*, "discriminatory intent may be inferred from the fact that [] acts had foreseeable discriminatory consequences." *Tex. Ed. Agency I*, 564 F.2d at 168; *see Brown*, 561 F.3d at 433 ("To find discriminatory intent, direct or indirect circumstantial evidence, including the normal inferences to be *drawn from the foreseeability of defendant's actions may be considered*.") (emphasis added and internal quotation marks omitted). The record and trial evidence have shown Defendants knew or should have known that adopting and maintaining the early voting plan would disproportionately impact and harm Black voters. Pls.' FoF ¶ 340. Yet they ignored these well-documented concerns and the repeated warnings, both before and during 2018, that the schedule they adopted and maintained would interact with the documented

socioeconomic and other disadvantages faced by Black voters in Prairie View. *See Veasey*, 830 F.3d at 261-62.

The record is replete with evidence establishing Defendants knew limiting early voting opportunities in Prairie View, including on PVAMU's campus, would disproportionately impact Black voters. As early as 2008 and repeatedly throughout the years leading up to 2018 in multiple public fora, Black voters warned Waller County Commissioners Court members and other officials about how cuts and restrictions to early voting access in Prairie View would negatively impact their ability to vote and, for some who lack any transportation, make it impossible. Pls.' FoF ¶¶ 159-84. (detailing multiple demands and requests by Prairie View residents for early voting access in Prairie View); *Id*. ¶¶ 48-53, 55-79 (outlining how Black Prairie View residents have challenged discriminatory barriers, including restrictions on early voting access, to vote in Waller County). As one recent example in 2015, the Campaign Legal Center wrote to oppose cuts to early voting locations in Prairie View, explaining how these cuts would make early voting access difficult for Black residents who lacks access to public and private transportation. Pls' Ex. 71, 12/22/15 Ltr. from Campaign Legal Center (DEFENDANTS001422-1425); *infra* Section II(c)(ii). These same concerns were repeatedly raised by Prairie View residents during the October 17, 2018 Commissioners Court meeting. *Infra* Section I(B)(iii). Defendants therefore understood how restrictions to early voting access in Prairie View would disproportionately impact Black voters before they adopted the 2018 early voting plan.

Moreover, as of 2018, Defendants knew (1) most Waller County residents rely on early voting access; (2) Black voters in Prairie View are among the highest users of early voting in the County; (3) Prairie View has the largest concentration of Black voters in the County; and (4) Black PVAMU student voters in Prairie View are one of the largest voting groups in the County. Pls.' FoF ¶¶ 307-52. And, based on Census and other information, Defendants knew Black voters experience unique socioeconomic and transportation hurdles, which compounds the discriminatory harms. *Id*. ¶¶ 114, 121-42, 159-70, 177-78. Black residents, for example, are socioeconomically disadvantaged, as compared to white people in both Prairie View and Waller County overall, in poverty rates, income, employment rates, transportation access, and educational attainment. *Id*. ¶¶ 114-42. Almost 47% of employed Black residents in Prairie View, for example, commute to work by walking, biking, or via carpool—that is, riding in another person's vehicle—or taxi, compared to 12.6% of employed white residents countywide, who are far more likely to commute alone in their own vehicles. Pls.' Ex. 153, Cooper Decl. at 14.

All of these facts, whether individually or in combination, illuminate why limitations and restrictions on early voting access in Prairie View would make it significantly harder for Black voters to participate politically, which Black voters warned Defendants about directly during the October 17 Commissioners Court meeting. Any discussion about the early voting schedule could, therefore, not be detached from how these known racial disparities, socioeconomic hardships, and transportation burdens, would foreseeably interact with such a schedule. As discussed *infra,* Defendants have refused to respond to these well-documented concerns about early voting access by proposing to or

succeeding in limiting it ever since Black voters in Prairie View initially obtained it. When contextualized within Waller County's history, this evidence supports the conclusion that Waller County intended this discriminatory impact.

      *iii.*  *The Sequence of Events Reveals Defendants Failed to Adopt Ameliorative Changes to Lessen the 2018 Early Voting Schedule's Anticipated Discriminatory Impact*

"The specific sequence of events leading up to" the passage of the 2018 early voting plan "also may shed some light on the decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267. It is also probative of intent when officials and decision-makers failed to adopt changes that would have ameliorated an expected discriminatory impact—particularly where, as here, they did so without providing answers or while offering tenuous justifications. *Veasey*, 830 F. 3d. at 240-41, 263.

At some point before August 22, 2018, Defendant Elections Administrator Eason created a proposed early voting plan. Pls.' FoF ¶ 193. This would have been when PVAMU students were just returning to campus for the fall semester. *Id*. ¶ 185. Defendant Eason then exclusively shared the proposal with the Waller County Democratic and Republican chairs for input and agreement. *Id*. ¶ 193. Neither the party chairs nor Defendant Eason sought input from Waller County residents or other Waller County officials like Prairie View city councilmembers, even though Defendant Eason contends doing so would have been beneficial. *Id*. ¶¶ 193-200, 423.

After input from the party chairs in late August 2018, Defendant Eason shared the proposal with Defendant Commissioners Court for final approval for the first time. *Id*. ¶¶ 193-200. On September 5, 2018, Defendant Commissioners Court unanimously approved

the recommended early voting plan with no discussion or comment from any commissioner. *Id.* ¶¶ 207-213; *see also* Pls.' Ex. 126, 10/17/18 Video of Commissioners Court, ECF 73-2 (Commissioner Barnett explaining that Defendants adopt the proposal 99% of the time). Indeed, by the time a plan is presented in Commissioners Court, it has already been substantively approved by the relevant decisionmakers. *Id.* ¶¶ 193, 198, 202, 207-11.

Then on October 10, 2018, Defendant Commissioners Court approved a partial change to the early voting plan after Defendant Eason proposed additional early voting locations at the Waller County Courthouse in the City of Waller and at the Brookshire Library in the City of Brookshire *Id.* ¶ 220. Under this plan, Black voters in Prairie View were not afforded the same or similar opportunities as compared to white Waller County voters. *Id.* ¶ 350. As compared to other locations with more than 100 hours each, the early voting locations in Prairie View were provided, in total, only 51 hours of early voting under this original plan. There was no early voting anywhere in Prairie View during the first week. Twenty-seven of the total hours of early voting in Prairie View were spread over three days at the MSC. *Id.* ¶ 105. The remaining 24 hours were at the off campus at the WCCC in Precinct 310. *Id.*

After Prairie View residents learned about the early voting schedule, they began organizing and sharing their concerns. TPP members, for example, shared their concerns about the early voting schedule with members and non-member students, including other student groups and administrators. *Id.* ¶ 23. They also directly raised concerns with Defendant Eason in mid-October, including participating in multiple calls and offering

recommendations for more early voting access on campus during the first week. *Id.* Likewise, PVAMU's President, Dr. Ruth Simmons, raised concerns about PVAMU students not having early voting during the first week with Defendant Duhon before the October 17, 2018 Commissioners Court meeting. *Id.* ¶ 224. And Defendant Duhon testified to his awareness of concerns raised through his Waller County Judge official social media pages. *Id.* ¶ 225.

Because of these community concerns about the inequities with the early voting plan, Defendants added an agenda item to their October 17, 2018 meeting to discussion modifications proposed by Defendant Eason. *Id.* ¶ 223. Based on that agenda item, any attendee who came to that meeting would reasonably have expected that the Commissioners planned to modify the schedule. Defendant Eason began the discussion about modifications by explaining that she was proposing changes to the early voting schedule because she admitted the original plan did not provide "equal representation" to PVAMU students, Black voters in Prairie View. *Id.* ¶ 226. She proposed adding additional early voting days at the MSC on PVAMU's campus, explaining "we have to give [Prairie View] equal representation" as compared to other hubs of Waller County like Waller, Brookshire, and Hempstead. *Id.* ¶¶ 227-29; Pls.' Ex. 126. Defendant Duhon agreed that Prairie View had unequal early voting access under the early voting plan, stating: "So when I looked at the precincts . . . I do think there is an inequity." Pls.' FoF ¶ 230.

Following these admissions about the early voting schedule's inequities, several Black Prairie View residents and elected officials, as well as Black PVAMU students, objected to the early voting plan, warned about its discriminatory impact and harms on

Black voters, and either supported Defendant Eason's recommendation or offered additional proposals for adding early voting access in Prairie View. *Id*. ¶¶ 233-41. As just one example, Mr. Kendric Jones, who in 2018 was the PVAMU Student Government Association President and a Prairie View City Council member, requested that Prairie View voters be provided "the same right . . . to be able to [vote]" as other Waller County voters. *Id*. ¶ 211.

The public discussion also revealed concerns about the lack of transparency surrounding the initial development and subsequent approval of the early voting plan. *Id*. ¶¶ 240-41. Defendants agreed their process had consistently resulted in reoccurring early voting allocation problems, which "begs the question" whether reliance on the party chairs reflects Waller County residents' needs. *Id*. ¶ 232. Prairie View voters, especially PVAMU students, repeatedly warned Defendants that the party chairs do not adequately represent them. *Id*. ¶¶ 240, 291, 418. Defendant Duhon acknowledged that there is a significant number of students who are not affiliated with the political parties. *Id*. ¶¶ 252, 410. Ms. Shari Griswold, a white Waller County voter, pointed out that the process for setting the early voting plan was broken and needed to be repaired to avoid chaos surrounding the selection of dates and hours. *Id*. ¶ 241.

Following this discussion, several Commissioners also proposed informal plans to add early voting access in Prairie View and elsewhere. *Id*. ¶¶ 244-45. In response to questions about feasibility, Defendant Eason repeatedly affirmed that Defendants had the resources to implement her plan, *id*. ¶¶ 245, 289, 298 ("Commissioner Beckendorff

testifying that Defendant Eason "doesn't propose anything that we [Commissioners Court] cannot do."), which was in the best interest of all Waller County voters, *id.* ¶ 230.

Moreover, as described above, Waller County's data, which Defendants had access to and purportedly relied on for setting the early voting schedule, established (1) most Waller County residents rely on early voting access; (2) Black voters in Prairie View are among the highest users of early voting in the County; and (3) Prairie View has the largest concentration of Black voters in the County. *Id.* ¶¶ 307-52. And based on Waller County data, and testimony from members of the public, Defendants were repeatedly warned how the early voting plan would interact with socioeconomic and transportation barriers that would disadvantage Black Prairie View voters. *Id.* ¶ 233.

Taken together, the trial evidence supports the following facts and inferences:

(1) The process surrounding the development and adoption of the early voting plan was non-transparent;

(2) Defendants knew about the early voting plan's foreseeable racial impact on Black voters;

(3) Defendants admitted the early voting plan created inequities and did not provide Prairie View voters with equal representation;

(4) Defendant Eason, who is best positioned to opine on the feasibility of a plan, recommended adding early voting access in Prairie View to address the inequities and unequal representation;

(5) Black residents proposed and supported recommendations to add early voting access in Prairie View;

(6) Defendants had the resources to adopt Defendant Eason's recommendation and other proposals;

(7) Black residents repeatedly warned Defendants that failing to adopt changes to the early voting plan would disproportionately impact Black voters in Prairie View; and

(8) It was not prohibitive to make election changes in late October 2018.

*Id.* ¶¶ 244-45, 298.

Yet Defendants failed to take any action on October 17, despite the public notice, discussed above, indicating that they would at that meeting. As discussed in detail below, at that meeting, Defendants offered many and shifting pretextual rationales to reject the various proposals to modify the schedule and, instead, maintained the early voting plan. *Infra* Section I(B)(v).

One week later, on October 24, 2018, in response to this lawsuit, Defendants held an emergency meeting to consider settlement and, once again, discussed amending the early voting schedule. During this meeting, Defendants had another opportunity to amend the early voting schedule to lessen the discriminatory impact. As Defendant Eason conceded, Defendants still had the resources to add more early voting access in Prairie View on an equal basis with other cities, Pls.' FoF ¶¶ 244-45, 289, 296, and as mentioned above, such changes would not have been prohibitive, *Id.* ¶ 298. Instead, Defendants provided modest changes to extend early voting hours at the MSC without any additional days. *Id.* ¶¶ 256-57. These changes were not responsive to Defendant Eason's and Black voters' requests who, as described above, recommended or requested more early voting access on campus during the first week of early voting. *Id.* ¶¶ 227, 233-241. Black voters in Prairie View had only a single day of early voting access during the end of the first week for five hours on a Sunday. *Id.* ¶¶ 256-57. And under the modified early voting plan, Black

voters in Prairie View were still provided significantly less early voting access overall than white voters in other areas of Waller County. *Id*. ¶ 328.

This sequence of events leading to the adoption and maintenance of the 2018 early voting schedule establishes that Defendants had the authority, capacity, community support, time, and resources to expand early voting opportunities in Prairie View, thereby mitigating the plan's known discriminatory impact on Black voters. But on at least two occasions, including based on the recommendation of the County's election administrator, Defendants failed to adopt recommendations that would have ameliorated the racially discriminatory impact. *Id*. ¶¶ 246, 257-58.

### iv. Defendants' Departures from the Ordinary Decision-making Process Reveal an Impermissible Motive

A "legislative or administrative history may be highly relevant" to assessing a discriminatory purpose. *Arlington Heights*, 429 U.S. at 268. In addition, "[s]ubstantive departures too may be relevant, particularly if the factors usually considered important by the decisionmakers strongly favor a decision contrary to the one reached." *Id.* at 267. The record and additional evidence at trial will show how Defendants substantively departed from the ordinary decision-making process of consulting their self-proclaimed guidelines to adopt and maintain the early voting plan, supporting an inference of discrimination.

The uncontested facts here would have supported more early voting access in Prairie View under Defendants' purported guidelines, if those guidelines existed before this litigation and they were applied in a non-discriminatory manner. Pls.' FoF ¶¶ 271, 273, 278, 279. Although Defendant Eason has no written policy memorializing the early voting

plan criteria—meaning the public lacks access to any written criteria—and only reduced any criteria the County purports to use to writing during this litigation, the factors she purports to use concerning the total registered voters in a polling precinct, historical turnout, demand, and accessibility—all weighed in favor of adding more early voting access in Prairie View in fall 2018. *Id.*

Black voters in Prairie View are the largest concentration of registered voters in Waller County and are a group of voters that are especially reliant on early voting *Id.* ¶¶ 271, 321-22. In fact, Precinct 309, the PVAMU campus precinct in Prairie View, had 4,834 registered voters of November 6, 2018—the largest population of registered voters of any County precinct and approximately 1,400 more registered voters than the second-largest precinct. *Id.* ¶ 314. Defendants anticipated high turnout from Black voters in Prairie View given their high usage in past elections and that they allocated the most voting machines to the MSC in Prairie View in fall 2018. *Id.* ¶¶ 273, 300-01, 396. As discussed *infra*, Defendants were aware of the demand for early voting by Black voters in Prairie View given the socioeconomic and transportation hurdles making voting difficult for Black voters and voting off campus difficult—if not impossible—for Black PVAMU student voters in Prairie View. *Id.* ¶ 351.

Defendants' expert offered a narrower definition of early voting-allocation best practices than the County—historical tradition, familiarity, and demand. *Id.* ¶¶ 280-81. But even under this narrower list, which does not align with factors Defendants claim to have considered during consideration of the fall 2018 early voting schedule, more early voting access in Prairie View would have been appropriate. *Id.* Significantly, relying on historical

tradition—that is, using previous sites as a factor for future sites—can carry over a historical "tradition" of discriminating in the allocation of early voting. Stein Rebuttal Rep., ECF 77-1 at 9. Notwithstanding, there is a deep historical tradition of Prairie View voters, especially Black PVAMU students, advocating for on campus early voting and challenging attempts to restrict their voting rights. *See, e.g.*, Pls.' FoF ¶¶ 54-79. Concerning familiarity, the sites considered for additional early voting access, particularly the MSC, would have been familiar to Black voters in Prairie View, as those sites had been used in past elections, either during early voting since the primary elections in 2016 or on Election Day since 2013, were in use during early voting in 2018 (although in a limited manner), and are frequently used for other public events and for municipal elections. *See, e.g.*, Stein Rebuttal Rep., ECF 77-1 at 9-10; Pls.' FoF ¶ 175. For demand, as discussed above, Black Prairie View voters are among the most reliant on early voting: Precinct 309 (the MSC) has the highest number of registered in the County, and Defendants anticipated high turnout from these voters. Pls.' FoF ¶¶ 273, 300-01, 314, 396. Based on a review of Commissioners Court meeting minutes, the only residents consistently and repeatedly demanding more early voting in Waller County are Black voters in Prairie View. Stein Rebuttal Rep., ECF 77-1 at 10.

During trial, Defendants also admitted to departing from their purported guidelines. Defendant Eason, for example, has repeatedly asserted all factors are given equal weight. Pls.' FoF ¶ 191. At trial, however, she changed position by admitting some factors "are given more weight than others." *Id.* She also disclosed for the first time that she applies different criteria to different early voting locations. *Id.* ¶ 192. And Defendant Eason also

testified to an entirely new factor: "historical placement of locations." *Id.* ¶ 191. This new factor, Defendant claimed, is the first thing she considers when developing an early voting schedule. Pls.' *Id.*

Still, even if Defendants did not depart from their own guidelines—which they did—adhering to same procedures as prior years is not dispositive. ECF 81 at 4. As described *supra*, Defendants' process for creating early voting plans is broken and designed to be non-transparent. Moreover, heavily relying on early voting criteria like historical turnout risks perpetuation of past unfairness. Pls.' Ex. 158, Stein Rep. at 13. Waller County therefore "need not break its own rules to engage in unusual procedures" or outcomes, *McCrory*, 831 F.3d at 228. As described herein, Defendants' strict adherence to their broken, non-inclusive, and non-transparent process guarantees predictable inequities from continues reliance.

Defendants departed from ordinary decision-making processes and their guidelines to adopt and then maintain the early voting plan for the fall 2018 election. To do so, they ignored "factors usually considered important" by Defendants that would "strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 267. Multiple departures, as occurred here, first during the plan's adoption and then during the October 17 and 24 meetings, are even more indicative of discriminatory intent because they constitute "a series of official actions taken for invidious purposes." *Id*. These departures enabled Defendants to design, adopt, and maintain an early voting plan that was an effective way to limit Black voters' ability to participate. Pls.' Ex. 158, Stein Rep. at 13.

*v. Defendants Hid Their Effort to Suppress Black Political Participation*
   *Behind Tenuous Justifications*

Another factor probative of discriminatory intent under *Arlington Heights* is the tenuousness of Defendants' policy interests for adopting the maintaining the early voting schedule. The disconnect between the early voting plan and the policy justifications Defendants claimed for adopting and maintaining it further supports an inference of an impermissible motive. Proffering "seemingly neutral reason[s]" cannot mask a racially discriminatory purpose. *Veasey*, 830 F.3d at 236. Defendants' many shifting rationales are probative of discriminatory intent because they "fail to correspond in any meaningful way" to the facts actually relevant to the adoption and maintenance of the 2018 early voting schedule. *Id.* at 263.

*First*, Defendants attempted to justify the early voting plan because on campus early voting during the first week purportedly conflicted with PVAMU's homecoming in fall 2018. Pls.' FoF ¶ 283. But homecoming would not have prevented Defendants from selecting another location for early voting access in Prairie View during the first week, as they eventually did under the modified plan by allocating five hours at the Prairie View City Hall on Sunday during the first week. *Id.* ¶ 289. Moreover, during the October 17 meeting, PVAMU students explained the purported conflict with homecoming was an inaccurate representation. *Id.* ¶ 284-85. The opposite was—and remains—true: homecoming is ideal for early voting because many students and non-students from Prairie View are on campus and promoting civic engagement. *Id.* ¶ 284. But again, neither Defendants nor the chairs consulted any Prairie View residents, PVAMU students and

administrators, or Prairie View elected officials to set the early voting plan. *See Id.* ¶¶ 193, 198-99. Moreover, as discussed *supra*, Defendant Eason's recommendation would have added more early voting in Prairie View during the first week.

*Second*, without homecoming as a legitimate concern justifying the denial of early voting during the first week, Defendants then attempted to justify the early voting plan as purportedly reflecting a deliberative process because officials from the two major parties proposed it. But even Defendant Duhon admitted and other Commissioners heard at the October 17 meeting that many Black PVAMU students—who comprise the largest group of registered voters in Prairie View—do not affiliate with either party. *See, e.g.*, *Id.* ¶ 291. Defendants' expert does not contest Plaintiffs' factual and expert evidence establishing that the process for adopting and maintaining the early voting plan was non-transparent and departed from Defendants' purported guidelines. *Id.* ¶¶ 191-92, 264, 269. Defendants Duhon and Eason admitted the process produced inequities and led to recurring problems every election. *Id.* ¶¶ 226, 230, 232.

*Third*, Defendants hypothesized that the "community," particularly senior citizens, disliked going on campus and parking was difficult. These claims are baseless and unsupported. *Id.* ¶¶ 175, 177, 275-76, 291, 293-94. As just one example, concerning parking, Defendant Eason worked with PVAMU to secure reserved parking spots during elections, as Defendants had done for previous elections. *Id.* ¶¶ 275, 291. Moreover, PVAMU officials and students created an infrastructure to ensure student volunteers were available to assist people walking from the reserved parking spots to inside of the MSC. *Id.* ¶¶ 177-78, 275, 291. Defendants have only offered a single parking ticket issued at the

MSC during the March 2018 primary election as the evidence for purported parking concerns, but PVAMU officials quickly resolved the ticket, and no other concerns were reported for elections in 2018. *Id.* ¶ 306. Even if there were parking-related concerns— which there were not—PVAMU officials and students made repeated assurances that any concern could be resolved and offered plans and resources to further demonstrate their commitment to minimizing any parking-related issues for early voting on campus during the 2018 general election. *Id.* ¶¶ 303, 306.

*Fourth*, Defendants claimed October 17 was too late to change the plan. *Id.* ¶ 298. But that, too, is easily revealed as pretextual. These purported feasibility concerns did not prevent Defendants, including several Commissioners, from proposing changes to the early voting plan during the October 17 meeting. *Id.* In fact, the opposite was true; Defendants had the resources to add more early voting opportunities. *Id.* Defendant Eason, who, as the Elections Administrator, is best positioned to opine on feasibility, repeatedly reaffirmed that Defendants had the resources to adopt her recommendation. *Id.* (Commissioner Beckendorff testifying that Defendant Eason "doesn't propose anything that we [Commissioners Court] cannot do".) Nor did the purported feasibility concerns prevent Defendants from actually—though insufficiently—*changing* the plan a week later on October 24—*during* early voting. *Id.* ¶ 298-99.

*Fifth*, and relatedly, by October 24, Defendants claimed that they did not have the resources to add more early voting opportunities on campus. But Defendant Eason contradicted this claim, explaining that Defendants still had sufficient resources to add on

campus early voting opportunities and in fact Defendants Duhon and Eason proposed additional early voting. *Id.* ¶ 245.

*Sixth*, during the October 17 meeting, Defendant Duhon asked Mr. Jones, who was then the PVAMU's SGA President and a Prairie View City Council member, whether adding additional early voting access at the WCCC was accessible to PVAMU students. Pls.' Ex. 126. In response, Mr. Jones stated that change would not be an effective substitute for early voting access on campus in Prairie View. Pls.' FoF ¶ 236. The WCCC, Mr. Jones explained, was not accessible to or frequently visited by PVAMU students. *Id.* By contrast, the MSC is a center of campus life for PVAMU students. *Id.* ¶¶ 172-73, 236. This common understanding is confirmed by other evidence and trial testimony. *Id.* ¶ 236. It has also been confirmed by an campus early voting location analysis conducted by former Elections Administrator Dan Teed. *Id.* ¶ 177; Pls.' Ex. 80, 1/26/16 Email (DEFENDANTS001481-1486). Based on Mr. Teed's findings, "[t]housands of students use the MSC, especially around lunch time, and it is within easy walking distance" for PVAMU students. Pls.' Ex. 80, 1/26/16 Email at DEFENDANTS001482.

*Seventh*, Commissioner Beckendorff hypothesized during Defendant Eason's proposal that to provide equitable early voting would "be more confusing." Pls.' FoF ¶ 298. But that claim is unsupported by the record because Waller County residents and Defendant Eason on October 17 repeatedly requested more early voting access in Prairie View. *Id.* ¶¶ 233-41. Relying on Defendant Duhon's reasoning, Commissioner Beckendorff rejected Defendant Eason's proposed changes to the early voting plan because, according to him, adopting it would *make it harder to vote*. *Id.* ¶ 298. Yet again, however, that claim is

unsupported by the Waller County residents who requested more early voting on campus, as well as by Defendant Eason's on-the-record statements. *Id.* ¶¶ 233-41, 298.

*After* the filing of this lawsuit, Defendants raised another uncorroborated and unsupported justification to defend inequitable early voting in 2018: "historical turnout within a county." Defs.' Mot. for Summ. J., ECF 73 at 10. The historical-turnout-within-a-county rationale should be rejected as a "*post hoc* justification[]" because Defendants never advanced that as "the actual consideration[]" before the November 2018 election. *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017). And as the Fifth Circuit has explained, *post hoc* justifications are "routinely disregard[ed] as unreliable" and given "little weight," if any. *Veasey*, 830 F.3d at 234. Regardless, as discussed *supra*, Dr. Flores testified "historical turnout" was another factor supporting more on campus early voting. Pls.' FoF ¶¶ 300-01. Unable to directly rebut this conclusion, Defendants inaccurately claimed Dr. Stein conceded the early voting plan "aligned with historical turnout." Defs.' Mot. for Summ. J., ECF 73 at 21. Describing possible explanations for his findings, Dr. Stein never points to historical turnout as a legitimate or actual justification for the 2018 plan. Pls.' Ex. 158, Stein Rep. at 12-13.

Any purported "security concern" should also be rejected as a *post hoc* justification never advanced by Defendants during consideration of the 2018 early voting schedule. *Bethune-Hill*, 137 S. Ct. at 799. Defendants admitted security was not a justification offered to adopt and maintain the early voting plan before October 24. Pls.' FoF ¶¶ 274, 302; Pls.' Ex. 126; Pls.' FoF ¶ 302 (Defendant Eason testifying that she would not make a recommendation for an early voting location is the machines could not be secured at that

location). The record also demonstrates that there was no indication that the voting machines were in danger of being tampered with, or indeed, that they were *capable* of being tampered with. *Id.*; *see also* Pls. Ex. 76, 1/19/16 Email Chain (DEFENDANTS001457) (former Waller County Elections Administrator Dan Teed writing "[t]he elections equipment itself, when properly used, is secure against tampering, and has 2 or 3 safety nets in place for almost every conceivable form that tampering could take"). And Defendants entered into agreements with PVAMU in 2016 and 2018 to host early voting at the MSC, Pls.' FoF ¶¶ 181; Pls.' Exs. 1 and 2 (PLS000341-342); (PLS000343-345).

The "many rationales" that "shifted as they were challenged or disproven" by Waller County data and public comments are probative of a racially discriminatory purpose. *Veasey*, 830 F.3d at 240-41. As the record shows and Plaintiffs' trial evidence further bolsters, once these justifications are properly disregarded as pretextual and tenuous, only one rationale remains: Defendants adopted the 2018 early voting plan, because of, and not simply in spite of, its racially discriminatory impact on Black Prairie View voters.

> vi. *Defendants' Contemporaneous and Coded Statements Reveal Unconstitutional Biases Against Black Voters*

Admissions by defendants and other decision-makers that a challenged action has a discriminatory impact are powerful evidence of discrimination. *Id.* at 236-37 (explaining proponents' admissions that a challenged decision had a disparate impact were strong evidence of discrimination). As detailed above, while considering the early voting plan,

Defendants repeatedly acknowledged and admitted the plan's discriminatory impact on Black voters. Pls.' FoF ¶¶ 226-30 (admissions with inequity and unequal representation). Defendant Duhon admitted Defendants' duty to "give [PVAMU students] equal access." *Id.* ¶ 228.

In addition, during the October 17 meeting, former Commissioner Barnett stated that he would not support Defendant Eason's proposal to add days of early voting in Prairie View unless additional days were also provided to Monaville, an incorporated area of Precinct 3, where the population—unlike in Prairie View—is predominantly older and white. *Id.* ¶¶ 104-06, 242. In response to Commissioner Barnett's objection to the proposal because it did not add early voting days during the first week in Monaville, Defendant Eason stated: "Can I be very honest with you? Mr. Barnett, Monaville just does not vote that heavy there, I mean not for five days." *Id.* ¶ 243.

Defendant Duhon then also sought to increase early voting hours in Monaville. *Id.* ¶¶ 244-45. After Defendant Commissioners Court rejected Defendant Eason's proposed modifications, Defendant Duhon proposed an alternative plan that would have provided three additional days of early voting during the first week at the WCCC in Prairie View, while extending the hours of early voting in Monaville by three hours each day during the first week of early voting. *Id.* ¶ 244. However, Defendant Duhon's proposal did not receive a second. *Id.* Defendant Duhon then proposed adding three additional days of early voting during the first week in Monaville, so that early voting would be available there throughout the first week. *Id.* ¶ 245. But Defendant Eason once again indicated that Monaville's population was too small to necessitate five days of early voting. *Id.* Former Commissioner

Barnett's statements favoring the fewer voters who live in or near Monaville—and are predominately white—over the far greater number of voters in Prairie View and on the PVAMU campus—and are predominantly Black—further supports an inference that a motivating factor for the early voting plan's passage was to discriminate against Black voters to the benefit of white voters.

Defendants also conceded the process for developing the early voting plan was not inclusive and led to recurring breakdowns. During the October 17 meeting, Commissioner Amsler asserted that concerns about a lack of equitable early voting access in Prairie View "come[] up every time," *Id.* ¶ 231; Pls.' Ex. 156, Flores Rep. at 22, and Defendant Duhon characterized the regular disagreements about inequitable early voting in Prairie View as reflecting reoccurring issues, problems, and objections by community members. Pls.' FoF ¶ 232. Defendant Eason acknowledged these concerns, and during the meeting, she recommended the need to develop an inclusive process for setting the early voting plan. *Id.* ¶¶ 229, 403, 406. Seeking input from voters throughout Waller County, Eason explained, would benefit Waller County. *Id.* More concretely for Defendant Eason, an inclusive process would stop the reoccurring problems that always occur through Defendants' sole reliance on the party chairs to develop the early voting schedule. *Id.* ¶ 406. Defendants also have experience consulting with community members about voting changes and researching the impact of proposed changes, as they were required to do under the VRA before the 2013 U.S. Supreme Court decision, *Shelby County, Alabama v. Holder*. *Id.* ¶ 487. After the filing of this lawsuit and intermittently during portions of 2019, Defendants attempted to seek some limited input from Prairie View community members regarding

the development of an early voting schedule for the March 2020 primary. Dfs.' Ex. 40. And as discussed *infra* and *supra*, equity and transparency are repeated concerns that Black Waller County residents have raised and continue to persist.

Coded statements that suggest or reveal unconstitutional biases can also be probative as strong evidence of discrimination. *Brown*, 561 F.3d at 433-34. As discussed in detail below, public statements during the October 24 meeting by Republican Party Chair David Luther, who Defendants admittedly rely upon to set the early voting schedule, reveal unconstitutional bias against Black voters, *see* Pls.' FoF ¶¶ 250-55, which Dr. Flores characterized as having "racial undertones" and serving as a "dog whistle," *see id.* ¶ 250. As the Republican Party chair, Chair Luther has been entrusted by Waller County as a decision-maker for setting the early voting plan each year, a plan that is approved by him and the Democratic Party Chair and adopted "ninety-nine and nine-tenths percent of the time" by Defendant Commissioners Court. Pls.' Ex. 126.

> ### vii. *The 2018 Early Voting Schedule is a Continuation of Waller County's History of Voting Discrimination*

As Defendants agree, a decision's historical background is relevant to showing discriminatory intent. *Arlington Heights*, 429 U.S. at 267; *see also* Mem. Order Den. Mot. for Summ. J., ECF 104 at 11 (explaining that the parties must be ready to address Waller County's history and how it is taken into account in the present). Defendants have failed to meaningfully contest—let alone rebut—Plaintiffs' expert and factual evidence establishing how the early voting plain is a continuation of Waller County's judicially recognized history of discrimination against Black Prairie View voters. *See Rogers*, 458

U.S. at 625-26. Defendants' sole expert is not a historian. Pls.' FoF ¶ 361. Neither Dr. Gimpel's report nor testimony respond to or rebut Dr. Joseph's account of Waller County's history of ongoing racial discrimination in voting. *Id.*; *see also id.* (this Court indicating that there did not appear to be "anything in [Dr. Gimpel's report] about Waller County history of discrimination where Dr. Gimpel makes conclusions there or pushes back on conclusions reached by Dr. Flores and [plaintiffs'] other experts.").

The unrebutted evidence establishes the early voting plan builds upon Texas's history, generally, and Waller County's history, specifically, of voting-related discrimination. Texas's history of discrimination in voting is well-documented. *See LULAC*, 548 U.S. at 439-40; *see also* Defs.' Memo of Law, ECF 117 at 9 (Defendants admitting that they "do not deny" Waller County's history "involving student electoral participation."). Even in recent years, Texas's repeated use of discriminatory voting schemes has necessitated federal intervention. *See, e.g.*, *OCA-Greater Houston v. Texas*, 867 F.3d 604, 615 (5th Cir. 2017) (holding illegal restrictions on voter assistance as violative of Section 208 of the VRA); *Veasey*, 830 F.3d at 264-65 (holding Texas's voter photo ID requirement, which disallowed IDs held by Black Texans like student and federal and state employee IDs, had racially discriminatory results); *Perez v. Perry*, 26 F. Supp. 3d 612, 614 (W.D. Tex. 2014) (three-judge court) (noting that an interim plan was adopted to address concerns that Texas's redistricting plans violated the Constitution and Section 2 of the VRA).

Because of this history, Waller County and the State of Texas were subject to preclearance under Section 5 of the VRA from 1975 until 2013. Between 1982 and 2013,

the U.S. Department of Justice objected to dozens of proposed voting changes in Texas, including three objections against Waller County with one such objection coming as recently as 2002. Pls.' FoF ¶¶ 53, 63-64, 71.

Among Texas counties, Waller County stands out for its particularly shameful history of discrimination against Black voters in Prairie View. *See*, *e.g.*, *Id.* ¶¶ 63, Pls. Ex. 183. In 2014, this Court singled out Waller County's abhorrent history of discrimination from 1971-2008 as an example of Texas's overall "penchant for discrimination" and "a recalcitrance that has persisted over generations despite the repeated intervention of the federal government":

> In 1971, after the 26th Amendment extended the vote to those 18 years old and older, Waller County which was home to Prairie View A & M University (PVAMU), a historically Black university, became troubled with race issues. Waller County's tax assessor and voter registrar prohibited students from voting unless they or their families owned property in the county. This practice was ended by a three-judge court in 1979.
>
> In 1992, a county prosecutor indicted PVAMU students for illegally voting, but dropped the charges after receiving a protest from the DOJ.
>
> In 2003, a PVAMU student ran for the commissioner's court. The local district attorney and county attorney threatened to prosecute students for voter fraud — for not meeting the old domicile test. These threatened prosecutions were enjoined, but Waller County then reduced early voting hours, which was particularly harmful to students because the election day was during their spring break. After the NAACP filed suit, Waller County reversed the changes to early voting and the student narrowly won the election.
>
> In 2007-08, during then Senator Barack Obama's campaign for president, Waller County made several voting changes without seeking preclearance. The county rejected "incomplete" voter registrations and required volunteer deputy registrars (VDRs) to personally find and notify the voters of the rejection. The county also limited the number of new registrations any VDR

could submit, thus limiting the success of voter registration drives. These practices were eventually prohibited by a consent decree.

*Veasey*, 71 F. Supp. 3d at 635-36.

Despite constitutional and federal statutory protections, Black Prairie View voters were unable to vote in the 1972 presidential elections and the 1974 midterm elections following legal challenges on behalf of Black PVAMU students. Pls.' FoF ¶¶ 65-67; Pls.' Ex. 155, Joseph Rep. at 16. Then, for the 1976 presidential election, only 27 out of 738 eligible PVAMU students who attempted to register to vote were allowed to register, after filling out a questionnaire not required for students who attended the predominantly white University of Texas campus. Pls.' Ex. 155, Joseph Rep. at 16. In 1979, the U.S. Supreme Court upheld a three-judge panel's ruling that Waller County's residency requirement for PVAMU students violated the Twenty-Sixth Amendment. *United States v. Texas*, 445 F. Supp. 1245, 1257 (S.D. Tex. 1978) (three-judge court), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979).

While Black Prairie View voters endured onerous registration requirements, Waller County also sought to dilute Black Prairie View voters' political strength through redistricting efforts. Pls.' Ex. 91; Pls.' Ex. 130-1, Transcription of Letter from J. Stanley Pottinger, Assistant Attorney General, Civil Rights Division, U.S. Dept. of Justice, to Hayden Burns, Attorney, Butler, Binion, Rice, Cook & Knapp Attorneys at Law (July 27, 1976), ECF 17-12 (objecting to Waller County's request for preclearance to implement a redistricting plan of commissioner and justice precincts and election precincts because Waller County could not show the plan had the purpose or effect of not abridging the right

to vote of Black Waller County voters). With federal intervention again by the DOJ, Black Prairie View residents were finally represented in one Commissioners Court precinct by 1990. Pls.' Ex. 155, Joseph Rep. at 17.

Notwithstanding, Waller County's voter suppression efforts continued, as its tactics shifted to engaging in voter intimidation. In 1992, for example, nineteen Black PVAMU students faced prosecution in Waller County for purportedly voting illegally; these prosecutions were dropped following federal intervention by the DOJ. Pls.' Ex. 155, Joseph Rep. at 17. Waller County officials continued to engage in voter intimidation directed against PVAMU students as recently as the 2000s. In 2003, the Waller County District Attorney threatened to prosecute PVAMU student voters who did not meet his definition of being a Waller County resident. Pls.' FoF ¶ 72; Pls.' Ex. 155, Joseph Rep. at 19, which directly contravened *Symm*. Faced with the reasonable threat of prosecution and a potential criminal conviction that could result in a ten-year prison sentence or $10,000 fine, Dr. Brian Rowland, who was a PVAMU student at the time, testified how neither he nor other students he knew felt excited or motivated to register and/or vote. Pls.' FoF ¶ 72. At that time in 2003, PVAMU students comprised 20% of the VAP in the County. *Id.*; Pls.' Ex. 155, Joseph Rep. at 20. Dr. Rowland testified how neither the Precinct 3 Commissioner at the time nor other County officials refused to speak out against the threatened prosecution and were unresponsive to requests from PVAMU students for help. Pls.' FoF ¶ 72. Ultimately, the Texas Attorney General blocked the Waller County District Attorney's threatened prosecution. Pls.' Ex. 155, Joseph Rep. at 21.

Four years later during the 2008 presidential election, Waller County replaced voter intimidation with a proposal to cut early voting locations down from six to one, meaning the sole early voting polling location would force Black Prairie View residents to travel as many as 5 miles away. Pls.' FoF ¶ 75; Pls.' Exs. 129, 135-37, 147-49 (collecting news articles). Only after the filing of a lawsuit, organizing by Black Prairie View residents, and intense pressure from Prairie View officials, did Waller County reverse course and open three additional early voting locations, with one located closer to campus. Pls.' Ex. 155, Joseph Rep. at 24-25. Also in 2008, the DOJ announced a consent decree with Waller County officials who agreed to halt "implementation of the unprecleared registration practices, reprocess those applications which were wrongly rejected and initiate voter registration programs" at PVAMU." Pls.' Ex. 155, Joseph Rep. at 26.

In the fall of 2015, Waller County officials returned to their longstanding practice of seeking to limit voting opportunities for Black Prairie View residents. For the 2016 primaries, Waller County intended to cut the number of early voting locations in Waller County from eight to two, neither of which would be in the same precinct as Prairie View or walking distance of PVAMU. Pls.' FoF ¶ 78; Pls.' Ex. 155, Joseph Rep. at 31. Consistent with similar years, the plan was approved by the Waller County Democratic and Republican party chairs. Dfs.' Ex. 30. The threat of litigation and massive organizing by Black Prairie View residents, however, ultimately persuaded Defendants to reverse the proposed changes. Pls.' Ex. 155, Joseph Rep. at 31-32; Pls.' FoF ¶ 173.

Defendants' have attempted to bypass this uncontested record by offering two arguments—both of which fail on the law and facts. *First*, Defendants claim that "there is

no evidence of intentional discrimination by the *current* Defendants." Defs.' Mot. for Summ. J., ECF 73 at 20 (emphasis added); Defs. Memo. of Law, ECF 117 at 9. But Defendants are sued in their official capacities; their personal responsibility for historical discrimination is irrelevant. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Discriminatory intent focuses on the legislative body's motivations, not any single official or named defendant, and considers the jurisdiction's historical discrimination. *Veasey*, 830 F.3d at 231-32. And the evidence of past and more recent history is particularly relevant to supporting an inference of present-day intentional discrimination, where, as here, "the evidence shows that discriminatory practices were commonly utilized, that they were abandoned when enjoined by courts or made illegal by civil rights legislation, and that they were replaced by laws and practices which, though neutral on their face, serve to maintain the status quo." *Rogers*, 458 U.S. at 625.

*Second*, for only summary judgment briefing, Defendants have identified only a single act—having begun to provide on campus early voting for the 2016 primary—to attempt to distance themselves from the uncontested evidence of historical discrimination in Waller County. *Compare* Defs.' Mot. for Summ. J., ECF 73 at 20, *with* Defs Memo. of Law at 9. But Defendants ignore that "these sites were not allocated until *after* students had protested, marched, risked retaliation and prosecutions by Waller County officials, and petitioned the County to have a polling site on campus." Pls.' Ex. 155, Joseph Rep. at 31-32; Pls.' Ex. 157, Flores Rebuttal Rep. at 3. Moreover, Defendants have refused to provide any early voting on campus in Prairie View in any election following the 2018 general

election. Pls.' FoF ¶¶ 469-473. And, as this case demonstrates, once it provided early voting to the MSC, Defendants did so in a discriminatory manner based on race and age.

The record of history here is clear: Waller County has undertaken to eliminate and minimize Black political power in Prairie View over decades using various strategies. Pls.' Ex. 155, Joseph Rep. at 18. When Waller County was forced to abandon specific methods of racially discriminatory voter suppression because they were "enjoined by courts or made illegal by civil rights legislation" or other interventions, County officials recalibrated and replaced those tactics with new tactics of voter suppression that are "neutral on their face" but "serve to maintain the status quo." *Rogers*, 458 U.S. at 625. This history cannot be detached from Waller County's adoption and maintenance of the 2018 early voting schedule. It informs and contextualizes how the plan is a continuation of the well-established and judicially recognized history of racial discrimination against Black voters in Waller County.

\* \* \*

In sum, the evidence demonstrates that Defendants' 2018 early voting plan was adopted and maintained with a racially discriminatory purpose, and Defendants adopted this legislation because of, and not simply in spite of, its discriminatory impact on Black voters. Defendants have failed to show the early voting plan would have been enacted without racial discrimination as *a* motivating factor.

## II.    Waller County's 2018 Early Voting Schedule Violated the Twenty-Sixth Amendment

### A. The U.S. Constitution Forbids Officials from Acting with a Discriminatory Purpose on the Basis of Age

The Twenty-Sixth Amendment to the U.S. Constitution forbids the denial or abridgment of the right to vote because of a person's status as a voter between 18 through 20 years old. U.S. Const. amend. XXVI.

### B. *Arlington Heights* is the Appropriate Standard to Analyze the Twenty-Sixth Amendment Claim in this Case

"[T]here is no controlling caselaw" from the U.S. Supreme Court "regarding the proper interpretation of the Twenty-Sixth Amendment or the standard to be used in deciding claims for Twenty-Sixth Amendment violations based on an alleged abridgment or denial of the right to vote." *Nashville Student Org. Comm. v. Hargett*, 155 F.Supp.3d 749, 757 (M.D. Tenn. 2015).

In *Texas Democratic Party v. Abbott*, the Fifth Circuit recently considered a Twenty-Sixth Amendment claim in a facial challenge involving the right of voters under 65 years old to use absentee voting for elections during the pandemic. 978 F.3d 168, 196 (5th Cir. 2020). While declining to identify any standard of review for a Twenty-Sixth Amendment claim, the appellate court held that "abridg[ment]" in the context of the Twenty-Sixth Amendment does not occur "unless the challenged law creates a barrier to voting that makes it more difficult for the challenger to exercise her right to vote relative to the *status quo*, or *unless* the *status quo* itself is unconstitutional. Thus, conferring a

privilege on one category of voters does not alone violate the Twenty-Sixth Amendment." 978 F. 3d at 192 (emphasis added); *see also id*. at 191.[3]

Here, by contrast, Waller County has conferred an eligibility to early vote not on one category of voters but on all registered voters. And when, as here, a jurisdiction has targeted young voters for disfavored treatment in its allocation of early voting, even though state law makes early voting available to all registered voters, regardless of age, the jurisdiction's discriminatory allocation of early voting opportunities is clearly invalid. *See Texas*, 445 F. Supp. at 1262. And, if a law is facially neutral, *Arlington Heights* is the appropriate framework to assess whether the law is nonetheless discriminatorily targeted at young voters. *See League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1221 (N.D. Fla. 2018); *see One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 926 (W.D. Wis. 2016), *order enforced*, 351 F. Supp. 3d 1160 (W.D. Wis. 2019), and *aff'd in part*, *vacated in part*, *rev'd in part sub nom. Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020); *N.C. State Conference of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 322 (M.D.N.C. 2016) (explaining that *Arlington Heights* would apply if plaintiffs' theory under the

---

[3] In this October 2020 opinion, the Fifth Circuit vacated an earlier September 2020 decision in *Tex. Democratic Party*, which had analyzed the plaintiffs' Twenty-Sixth Amendment as-applied claim in that case, alleging defendants' actions burdened the right of people below the age of 65 to vote solely based on their age, under rational basis review. 978 F.3d at 174. In that most recent October 2020 opinion, the Fifth Circuit expressly declined to determine, even in dicta, the proper standard for the plaintiffs' age-based discrimination claim. *Id*. at 184, 194.

Twenty-Sixth Amendment encompasses a discriminatory purpose claim), *rev'd on other grounds*, 831 F.3d at 204.

Not every effort by a state to provide accommodations to older youngers is likely to be subject to heightened scrutiny standards. Other cases, for example, have applied the *Anderson-Burdick* framework, but only in different contexts. *See*, *e.g.*, *Nashville Student Org. Comm.*, 155 F. Supp. 3d at 757-58 (applying the *Anderson-Burdick* framework to analyze whether a change to a voter-ID law imposed a burden on students' right to vote under the Twenty-Sixth Amendment).

Plaintiffs have alleged that Defendants' 2018 early voting plan was adopted and maintained with an intent to discriminate against the only concentrated group of voters aged 18 through 20 years old in Waller County, who attend PVAMU. Accordingly, based on the record, Plaintiffs' briefings, and caselaw governing intentional discrimination claims in the voting context, *Arlington Heights* is the appropriate standard to assess Plaintiffs' intentional discrimination claim under the Twenty-Sixth Amendment in this case. In cases alleging intentional age discrimination, *Arlington Heights* provides the appropriate framework to evaluate "such circumstantial and direct evidence of intent as may be available" in order to "[d]etermin[e] whether invidious discriminatory purpose was a motivating factor[.]" *Id.* at 266. Plaintiffs incorporate by reference here the foregoing discussion of the *Arlington Heights* legal framework from Section I(A).

### C. Defendants' Adoption and Maintenance of the 2018 Early Voting Schedule, at Least in Part, Was to Minimize the Political Participation of Students Aged 18-20

As of this filing, Defendants have not meaningfully contested—let alone rebutted—any of Plaintiffs' evidence in support of their intentional discrimination under the Twenty-Sixth Amendment. Defendants have previously offered only a single conclusory defense: Plaintiffs' "Twenty-Sixth Amendment claims would still fall . . . as with their claim of intentional race discrimination" because "Plaintiffs have failed to establish intentional discrimination on the basis of age." Defs.' Mot. for Summ. J., ECF 73 at 22.

But, as explained below, Plaintiffs' evidence establishes the early voting plan was motivated, at least in part, by an intent to minimize the opportunity of the only concentrated group of student voters, who attend PVAMU, to participate in the political process in violation of the Twenty-Sixth Amendment. Defendants were aware of, and then targeted, the only concentrated groups of 18- to 20-year-old voters in Waller County, a group that Defendants' witnesses have described as nonpermanent and non-land-owning residents. Pls.' FoF ¶ 293, by providing them significantly less voting access for the 2018 general election. This severe limitation harmed PVAMU students because it restricted their lifeline to voter participation: on campus early voting. Defendants made this choice, as well as failed to mitigate the harms through multiple opportunities, in the face of the history of age-based discrimination directed as PVAMU students, PVAMU students' known demand and reliance on early voting, PVAMU students' limited access to public and private transportation, and PVAMU students' socioeconomic status that is significantly lower than other populations in Waller County.

*i. The 2018 Early Voting Schedule's Disproportionate Impact on PVAMU Student Voters*

As discussed above, under the *Arlington Heights* framework, evaluating the discriminatory impact of Defendants' early voting plan on voters aged 18 through 20 years old is an "important starting point" for this Court's intentional age discrimination analysis. *Arlington Heights*, 429 U.S. at 266. "[T]he impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Bossier Parish Sch. Bd.*, 520 U.S. at 487.

Here, as discussed *supra*, Defendants' early voting plan provided far fewer hours and days of early voting to locations in Prairie View, including the location at the MSC on PVAMU's campus, than other areas in the county with older populations. The MSC—where 61% of early voters aged 18 through 20 cast their ballots, Pls.' Ex. 158, Stein Rep. at 11—received only 36 hours of early voting, as compared to three other locations in Waller County that received over 100 hours each, *id.* at 15. The unequal allocation of early voting hours "b[ore] more heavily on" PVAMU-student voters aged 18 through 20 ("young voters") for several reason, *see Arlington Heights*, 429 U.S. at 266, and any amount of discriminatory impact—even, for example, to one student—is sufficient to show that an intentionally discriminatory law violates the Constitution, *see e.g.*, *Pleasant Grove*, 479 U.S. at 471-72 n.11.

*First*, Prairie View is demographically unique in Waller County because it has a predominantly young VAP, with more than 9,000 enrolled students. Pls.' FoF ¶¶ 94, 99; Pls.' Ex. 153, Cooper Decl. at 9; *see also* FoF ¶ 360 (Mr. Jones testifying that 18-year-old

56

voters are still developing their knowledge about the political process); *id.* (Mr. Jackson testifying many PVAMU students come to campus as first-time voters). Among residents of Prairie View who are at least 18 years old and thus old enough to vote, 54% are aged 18 through 20. *Id.* No other city in Waller County has an 18-to-20-year-old population that is more than 8% of its overall VAP. *Id.* And Precinct 309, centered on the PVAMU campus in Prairie View, stands apart in this respect. Among voting-age residents of Precinct 309, 73% are aged 18 through 20. Pls.' FoF ¶ 338; Suppl. Pls.' Ex. 154, Cooper Suppl. Decl. at 4, fig. 3. By contrast, in Precinct 310, which contains most of the off campus areas of Prairie View, only 15% of the VAP is aged 18 through 20. Pls.' FoF ¶ 339. Elsewhere in the county, voters aged 18 through 20 make up only a small fraction of the VAP. *Id.* ¶ 106.

*Second*, PVAMU student voters are also uniquely socioeconomically disadvantaged as compared to other residents of Waller County—and as compared to other residents of Prairie View. *Id.* ¶¶ 114, 136-39, 324-26. Ms. Jayla Allen, an alumna member of organizational Plaintiff, TPP, and Ms. Priscilla Barbour, an alumna and former PVAMU SGA President, testified that many students depend completely on financial aid and scholarships and that the University's on campus food pantry is necessary because many students are lower income, experience food insecurity, and lack transportation off campus. *Id.* ¶¶ 136-38; *see also id.* ¶ 138 (Mr. Frank Jackson, a PVAMU administrator, alumnus, and former Prairie View mayor, testifying that a "large percent . . . somewhere in the 90s, are on some form of financial aid," and the "need for the food pantry" that PVAMU provides has "increased in recent years"); *Id.* ¶ 137 (Plaintiff Smith testifying about receiving government funds to cover food costs during the semester). Ms. Barbour testified

about the need for PVAMU to operate a food pantry for students because "[n]ot all students had meal plans, and if they did, they may have only had the minimum meal plan that was required to live on campus because they couldn't afford additional meal plans." *Id*. Defendant Duhon acknowledged that Waller County's Comprehensive Plan from 2017, which states "the city of Prairie View has the most [living under poverty] due to the student population." *Id*. ¶ 139. And Dr. Gimpel did not dispute any aspect of the demographic and socioeconomic data reported by Mr. Cooper. *Id*. ¶ 362.

*Third*, the daily life and access to transportation of PVAMU student voters differs markedly from that of other residents of Waller County. *Id*. ¶¶ 130-32, 134, 161, 170, 172, 174, 182, 324-26, 373. PVAMU students lack access to vehicles, and there are no public transportation options operated by the County for PVAMU students. *Id.* Plaintiffs Mr. Damon Johnson and Ms. Smith, for example, did not own or have access to cars as of 2018. *Id*. ¶¶ 5, 11. Mr. Johnson walked to school, and Ms. Smith relied on the PVAMU shuttle. *Id*. ¶¶ 11, 372 (Plaintiff Johnson testifying his primary mode of transportation was "[his] two legs."). Both had busy schedules of on campus activities, jobs, and classes, including travel for extracurricular activities in university-provided transportation that departed from campus. *Id*. ¶¶ 5-6, 9-10. Like Plaintiffs Johnson and Smith, as described in detail above, members of TPP also did not own cars or have access to transportation. *Id*. ¶¶ 21-23. The lack of access to public and private transportation reveals why TPP and PVAMU, including President Simmons, had to undertake so many steps and devote significant resources to expand access to early voting opportunities, including transporting PVAMU student voters

two to six miles away off campus so that they could vote during the first week of early voting in 2018. *Id.*

By contrast, because of the nature of Waller County, Defendant Duhon testified that traveling around the county without a car "would be challenging" and "difficult." *Id*. ¶ 131. Unlike PVAMU students, many Waller County residents drive long distances daily. Commissioner Beckendorff and former Commissioner Barnett testified they drive anywhere from 50 to 70 miles on "a typical day." *Id*. ¶ 129. Likewise, Defendant Duhon testified he drives around 100 miles a day. *Id.* For them, as well as the many other Waller County residents who drive daily, Defendants' expert conceded "for people who drive long distances every day, distance is not necessarily a barrier to access when it comes to voting" because "[i]t's certainly something [those people] become acclimated to." *Compare id*. ¶ 370, *with id*. ¶ 225 (Defendant Duhon publicly stating in October 2018 that "telling a student they have to vote at Prairie View City Hall Instead of the Memorial Student Center 2 miles away is an impediment to voting."); *see also id*. ¶ 373 (Dr. Stein explaining how white wealthier, and older voters who own private vehicles will experience distance differently than "people of color and lower socioeconomic status who might not have access to private vehicles."). Reflecting the reality that most residents of Waller County must drive significant distances to go about their lives, the census block groups located in Waller County are rated in the two lowest categories, by the U.S. Environmental Protection Agency's National Walkability Index, as less walkable than the national average.

As a result of these disparities and the unique nature of student life, contrasted with the car-dependent daily routines of other residents in Waller County, young voters at

PVAMU are uniquely dependent on early voting to access the franchise. *Id.* ¶ 321 (Dr. Stein concluding that "voting *is* voting in person early" on "the Prairie View A&M campus") (emphasis added); *see* Pls.' Ex. 158, Stein Rep. at 12; FoF ¶¶ 6-7, 10-11. Dr. Stein found, accordingly, that 81% of PVAMU students who voted in 2018 did so via early voting (as compared to 71% of Waller County voters overall), and that over 75% of PVAMU-student early voters cast their ballots at the on campus MSC. *Id.* Outside of Prairie View, there was *no* early voting location where young voters made up more than 3% early voters overall. *Id.* at 15.

In light of these facts, Defendants' decision to grant only 36 hours of early voting to the MSC—and only 65 hours of early voting to the City of Prairie View overall— imposed a discriminatory impact on young voters.

> ii. *Defendants Knew the Early Voting Schedule Would Disproportionately Deny or Abridge PVAMU Student Voting Rights*

Discriminatory intent may also be inferred, under *Arlington Heights*, "from the fact that [] acts had foreseeable discriminatory consequences." *Tex. Ed. Agency I*, 564 F.2d at 168. As discussed above, the record is replete with evidence supporting the conclusion that Defendants knew or should have known that limiting early voting opportunities in Prairie View, and especially on campus at PVAMU, would disproportionately impact young voters. Pls.' FoF ¶¶ 172, 182, 233-41, 450. Defendants knew that the on campus voting precinct, Precinct 309, was home to the largest population of registered voters in the county at the time of the 2018 election. *Id.* ¶ 271; Pls.' Ex. 158, Stein Rep. at 10. And Defendants also knew PVAMU student voters are among the highest users of early voting. *Id.* Aware

of this high demand, they also anticipated high turnout from PVAMU student voters during early voting, including with the allocation of the most machines for the 2018 general election to the MSC. Pls.' FoF ¶¶ 172, 273; Pls.' 16 Verity Equipment.

Further, Defendants knew PVAMU students experience unique socioeconomic and transportation hurdles, which compounded the discriminatory harms, as compared to other Waller County and Prairie View residents. Pls.' FoF ¶¶ 130-32, 134, 161, 170, 172, 174, 182, 324-26, 373. For years before the 2018 early voting plan was approved, PVAMU students and others—including then-Mayor David Allen of Prairie View, who testified at trial—have notified Defendants that PVAMU students lack transportation to access off campus voting opportunities. *Id.* ¶¶ 161-62; Pls.' Ex. 94, 7/25/13 Barbour Ltr. (PVAMU SGA President Priscilla Barbour warning Waller County officials in 2013 that without an on-campus polling place "[s]tudents have to walk over a mile from housing areas to vote at the nearest location"); FoF ¶ 170; Pls.' Ex. 71, 12/22/15 Ltr. From CLC (DEFENDANTS001422-1425) (civil rights organization expressing concern in a 2015 letter to Defendant Duhon that an off campus early voting site would be inaccessible "for students on the A&M campus, many of whom lack access to transportation"); FoF ¶¶ 172, 174, 180-81; Dfs.' Ex. 33 (then-Mayor Allen stating to Defendants at a January 27, 2016 Commissioners Court meeting that "most students do not have cars" and "that's why the MSC and the campus voting is so important.").

For these reasons and others herein, Defendants were aware that limiting early voting on campus meant limiting voting for younger PVAMU student voters. During trial, Defendants repeatedly affirmed awareness and knowledge of data and statements outlining

how reducing early voting would disproportionately impact PVAMU student voters. Yet they were indifferent to those facts. *See, e.g.*, FoF ¶¶ 81, 172, 177, 180, 182, 271; Pls.' Ex. 126. Such deliberate indifference, especially here where discriminatory impact concerns are well-documented and longstanding, is the equivalent of knowledge. *See United States v. Schaffer*, 600 F.2d 1120, 1122 (5th Cir. 1979) ("[D]eliberate ignorance is the equivalent of knowledge.").

### iii. The Sequence of Events Also Reveals Defendants Failed to Lessen the Early Voting Plan's Known Discriminatory Impact

"The specific sequence of events leading up to" the adoption, maintenance, and amendment of the 2018 early voting plan also "may shed some light on a decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267. Further, it is probative of discriminatory intent when officials and decision-makers failed to adopt changes that would have ameliorated an expected discriminatory impact, particularly where, as here, they did so without providing answers or while offering tenuous justifications. *Veasey*, 830 F. 3d at 241, 263.

Taken together, the evidence at trial supports the following facts and inferences, as discussed in detail above. As of mid-October 2018:

(1) The process surrounding the development and adoption of the early voting plan was non-transparent and unrepresentative for PVAMU student voters, including that Defendants: initially began developing the plan when students were not yet or had just arrived on campus; met exclusively during the day, when PVAMU students are in class or at work; did not engage in any affirmative outreach to PVAMU students, including new voters, to explain how an early voting plan was adopted; and knew that many PVAMU students are not represented by either political party chairs because they are unaffiliated. Pls.' FoF ¶¶ 215, 262, 353, 369.; s*ee also* Pls.' Ex. 156, Flores Rep. at 12-13, 25;

(2) Defendants knew about the early voting plan's foreseeable impact on PVAMU student voters, *see, e.g.*, Pls.' FoF ¶ 340;

(3) Defendants admitted the early voting created inequities and did not provide PVAMU student voters with equal representation, *Id*. ¶¶ 226, 230;

(4) Defendants acknowledged and were warned how the early voting plan would make early voting difficult for PVAMU student voters who disproportionately lack access to transportation, *see, e.g.*, *id*. ¶¶ 180, 182-83;

(5) Defendant Eason, who is best positioned to opine on the feasibility of a plan, recommended adding early voting access in Prairie View to address the inequities and unequal representation of PVAMU student voters, *id*. ¶¶ 226-230, 298-98;

(6) PVAMU student voters proposed and supported recommendations to add early voting access in Prairie View, *id*. ¶¶ 233, 235-41;

(7) Defendants had the resources to adopt Defendant Eason's recommendation and other proposals, *id*. ¶ 245;

(8) PVAMU students repeatedly warned Defendants that failing to adopt changes to the early voting plan would disproportionately impact student voters, Pls.' FoF ¶ 233; Pls.' Ex. 126, and;

(9) It is not prohibitive to make election changes as late as October, Pls.' FoF ¶ 298.

This sequence of events leading to the adoption, maintenance and modest amendment of the early voting plan, described in more detail above, shows Defendants had the authority, capacity, community support, and resources to expand early voting opportunities on the PVAMU campus and thereby mitigate the plan's known discriminatory impact on young voters before its initial adoption and then again on October 17. But Defendants failed to adopt any of the proposals that would have ameliorated these discriminatory impacts, citing various tenuous justifications, before ultimately contradicting themselves by adopting

modest changes to the plan on October 24, after early voting had started. *Id*. ¶¶ 246-47, 256-58.

    *iv.*   *Defendants' Departures from the Ordinary Decision-making Process Reveal an Impermissible Motive*

As discussed above in the context of Plaintiffs' Fourteenth and Fifteenth Amendment claim, Defendants' "[s]ubstantive departures" from an ordinary decision-making progress are also relevant in assessing intentional age discrimination, particularly because "the factors usually considered important by the decisionmakers strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 267. Plaintiffs incorporate by reference the foregoing discussion in Section I(B)(iv), explaining that Defendants' criteria for determining early voting allocation, if applied in a non-discriminatory manner, weighed in favor of more, not less early voting access on campus at MSC, given that: young voters at PVAMU are one of the largest concentrations of registered voters countywide; Precinct 309, the PVAMU campus precinct in Prairie View, had the highest number of registered voters as of November 6, 2018; young voters use early voting at high rates and Defendants expected high turnout from PVAMU students; younger voters demanded more early voting access on campus; and the MSC is accessible to them because it is where they eat, study, work, engage in extracurricular activities, and pass through on their way to class, in light of their unique socioeconomic and transportation realities that either individually or combined make traveling to off campus early voting locations difficult, and for some, impossible.

Under *Arlington Heights*, the many shifting rationales Defendants advanced in support of adopting, maintaining, and insufficiently amending their 2018 early voting plan are probative of discriminatory intent because they "fail to correspond in any meaningful way" to the relevant facts. *Arlington Heights*, 429 U.S. at 263. These tenuous justifications are set forth in detail *supra* Section I(B)(v), and Plaintiffs incorporate that discussion by reference.

Of particular relevance to discrimination against PVAMU student voters on the basis of age are the tenuous claim that the homecoming week was inappropriate for voting, *supra*, and the unfounded claim that the off campus WCCC was an adequate substitute for sufficient voting on campus. This justification fails for two primary reasons.

*First*, the WCCC was provided only 24 hours of early voting, scheduled exclusively on two days at the end of the second week of early voting. Pls.' Ex. 12; Pls.' Ex. 156, Flores Rep. at 19; Pls.' Ex. 158, Stein Rep. at 15; Pls.' FoF ¶¶ 216, 295, 332, 334. According to Dr. Stein's analysis, indeed, all three early voting locations in Prairie View, including the WCCC, were underserved as compared to locations in other cities with older populations. Pls.' Ex. 158, Stein Rep. at 11-13 ; Pls.' FoF ¶¶ 328-50.

*Second*, the WCCC is distant enough from large on campus dormitories to significantly deter voting, largely unknown to PVAMU students, not in fact utilized by students for voting, and situated on a highway in a location where the PVAMU shuttle does not stop. *See, e.g.*, Pls.' FoF ¶ 266; Pls.' Ex. 158, Stein Rep. at 7-8; Pls.' Ex. 160, Errata to

Stein Rep. at 1-2 (Dr. Stein reporting and testifying that the distance from two large on campus student housing facilities to the WCCC is approximately four times the minimum distance beyond which a deterrent effect on voting has been observed, especially when other accessibility factors, such as sufficient hours and effective communication of voting schedules are not met); Pls.' Ex. 157, Flores Rebuttal Rep. at 22 (Dr. Flores reporting that "Plaintiffs and other PVAMU students have repeatedly declared" that the WCCC "is inaccessible to students"); Pls.' FoF ¶ 135 (former SGA president Priscilla Barbour and Plaintiff Smith testifying that the PVAMU shuttle provides routes to the MSC but no routes with stops at the WCCC); *id.* ¶¶ 7, 13, 165, 237 (testimony from various witnesses showing that students do not frequent the WCCC); Day 4 Tr., 192:9-10 (Plaintiff Smith testifying that she does not know anyone who has ever voted at the WCCC); *id.* ¶ 236 (Prairie View City Councilmember and former SGA president Kendric Jones testifying that the WCCC is not an effective substitute for on campus early voting at the MSC, because students rarely go to the WCCC); Day 2 Tr., 290:11-14 (Prairie View City Councilmember Xanté Wallace testifying that he has never voted at the WCCC and does not "think it should be a voting site because it's not at the epicenter of community life"); Pls.' Ex. 158, Stein Rep. at 12, 15 tbl.1 (Dr. Stein reporting that 76% of PVAMU-student early voters cast their ballots at the MSC, and that only 5% of early voters at the WCCC were aged 18-20, as compared to 28% at the MSC); Day 2 Tr., 157:22-158:15 (Dr. Stein testifying that early voters aged 18 through 20 and early voters identifiable as PVAMU students voted "almost exclusively" at the MSC); Pls.' FoF ¶¶ 11, 135, 454 (Organizational plaintiff members Ms. Allen, Joshua Muhammad, and Plaintiff Ms. Smith testifying that the PVAMU shuttle has limited stops

and is unreliable); *Id*. ¶¶ 163 (Organizational plaintiff member Ms. Allen and former SGA president Priscilla Barbour testifying that the WCCC sits on State Loop 1098, a "highway"); *Id*. ¶¶ 7, 13 (Plaintiffs Smith and Johnson testifying that they have never been to the WCCC and do not know where it is); JPTO Fact Admissions ¶¶ 2-3 (same); *see also* Pls.' FoF ¶ 368.

Indeed, testimony at trial showed that the WCCC is even further from student housing areas than Hobart Taylor, the campus building known among students as "Hobart, Texas," due to its distance from where they live on campus. Pls.' FoF ¶ 164. The MSC, by contrast, is the center of student life, and an anchor for the broader Prairie View community in Waller County. It is the campus hub where students come through at least once a day, where the PVAMU shuttle stops, and where members of the broader community come to attend public events, eat at Waller County's only Chick-fil-A, and park their car to visit Prairie View's only gym and swimming pool, both located on the campus Rec Center, right next door to the MSC. *Id*. ¶ 172, 174, 294.

All these reasons, in addition to those discussed *supra*, Section I(B)(v), underscore the tenuousness of Defendants' justifications for denying equal early voting opportunities for young voters on the PVAMU campus.

      *vi. Defendants' Contemporaneous and Coded Statements Reveal Unconstitutional Biases Against Student Voters*

As discussed *supra* Section I(B)(vi), Defendants' statements seeking to differentiate between PVAMU student voters and "the community," supports a finding that intent to discriminate against young voters on the PVAMU campus was a motivating factor for the

2018 early voting plan's adoption and maintenance. David W. Luther, the Chair of the Republican Party of Waller County and a decisionmaker in the development of the 2018 early voting plan made several coded statements during a Defendant Commissioners Court hearing on October 24, 2018 that reveal bias against young voters. *Id.* ¶¶ 250-55. Specifically, Mr. Luther:

    (1) Claimed that PVAMU students' advocacy for equal early voting hours was an attempt to set "their sights" on Commissioner Barnett;

    (2) Asserted that PVAMU students did not care for other residents of Waller County;

    (3) Claimed that any changes to the early voting plan would mean Defendants were allowing themselves to be "blackmailed by the federal courts" and Democratic Party;

    (4) Contended that students only care about "their commodity, their vote"; and

    (5) Claimed that PVAMU students were "easy pickins for the political vultures out there."

Pls.' Ex. 156, Flores Rep. at 33-35; *see* Pls.' FoF ¶¶ 250-55. As described above, Defendants' witnesses have described PVAMU students as nonpermanent and non-land-owning residents, Pls.' FoF ¶ 293, which harkens back on the same derogatory language used to subject PVAMU students to burdensome and discriminatory barriers to register to vote and vote. And Plaintiffs also incorporate by reference the discussion of such statements *infra* Section III(B)(vi).

In addition, former Commissioner Barnett's refusal to provide more early voting on campus unless hours were also added in Monaville—an unincorporated, sparsely populated area within Precinct 3 where, unlike in Prairie View or on the PVAMU campus, the

population is predominantly older—further support indicate discriminatory purpose on the intersecting base of age and races. *Supra* Sections I(B)(vi); Pls.' FoF ¶¶ 104-06, 242-45.

      *vii.   The Early Voting Schedule is a Continuation of Waller County's History of Voting Discrimination Against Young Voters*

For the reasons set forth *supra* Section I(B)(vii), which Plaintiffs incorporate herein by reference, Waller County's ongoing record of discriminating against student voters at PVAMU also supports a finding that the early voting schedule was adopted as a continuation of that history and with the intent to diminish young voters' ability to participate effectively in the political process in Waller County. *See, e.g.*, Pls.' FoF ¶ 84 (Dr. Joseph testifying how "[w]hen one policy effort to neutralize Black voting power failed" in Waller County, "another one quickly replaced it."). While the tactics may have evolved, the same discriminatory purpose underlying those actions remains the same: a fear that students, largely Black students, will participate, mobilize, and turnout in elections to win countywide and local offices. *Id*. ¶ 72 (Dr. Joseph describing how voter suppression tactics have continued as PVAMU students have become a substantial "voting block that could impact the balance of power within Waller County, with some of them even deciding to run for . . . local office within Waller County."). Indeed, Defendant Duhon testified about some older residents having precisely that fear. *Id*. ¶ 85 (Defendant Duhon publicly stating "I think there's always been this fear that if all the students voted and they voted in a certain [way], they could take over the county.").

Plaintiffs have also introduced evidence that Defendants' predecessors in office have attempted to abridge student voters by moving local election dates from April to

August, which would "have the effect of conducting the election during a period when most . . . [PVAMU] student voters [we]re away from the area on summer school vacation." *See* Pls.' Ex. 92 at 3; *see also* ECF 130; ECF 130-2.[4]

## III. Waller County's 2018 Early Voting Schedule Discriminated on the Intersecting Bases of Race and Age in Violation of the Fourteenth, Fifteenth, and Twenty-Sixth Amendments

### A. The U.S. Constitution Forbids Officials from Acting with a Discriminatory Purpose on the Intersecting Bases of Age and Race

Black PVAMU students represent two protected classes that the U.S. Constitution and the Supreme Court have granted strong constitutional protections. *See*, *e.g.*, *City of Richmond*, 422 U.S. at 378-79 (race); *Texas*, 445 F. Supp at 1246 (age). The Fourteenth and Fifteenth Amendments forbid denial or abridgment of voting rights because of race or ethnicity. U.S. Const. amend. XIV; U.S. Const. amend. XV; *see also Veasey*, 830 F.3d at 253. The Twenty-Sixth Amendment forbids the denial or abridgment of the right to vote because of a person's status as a voter younger than 21. U.S. Const. amend. XXVI. The Twenty-Sixth Amendment has "particular relevance for the college youth who comprise approximately 50 percent of all who were enfranchised by this amendment." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973).

---

[4] Based on this Court's minute order from the September 22, 2020 status conference, "Exhibits 91 and 92 were admitted, and the parties were ordered to file proposed transcriptions of those exhibits." The parties submitted the transcriptions for Pls.' Exs. 91 and 92, accompanied by a notice of supplemental authority, as ECF 130, ECF 130-1, and ECF 130-2.

Taken together, these Amendments prohibit discrimination against Black students on the intersecting bases of age and race. The Fourteenth, Fifteenth, and Twenty-Sixth Amendments have been read together to prohibit discrimination that is unique to Black student voters. *See*, *e.g.*, *Texas*, 445 F. Supp. at 1257, 1261 (holding Waller County officials violated the Fourteenth, Fifteenth, and Twenty-Sixth Amendments in imposing special requirements on Black students at PVAMU, even where those requirements did not affect Black non-students); *Latham v. Chandler*, 406 F. Supp. 754 (N.D. Miss. 1976) (preliminarily enjoining, under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments, practices that treated registration applications tendered by Black students at a historically Black college differently from applications tendered by non-students of any race). Unconstitutional discrimination against Black students can therefore exist even in the absence of discrimination against Black non-students. *Cf. Jefferies v. Harris Cty. Cmty. Action Ass'n*, 615 F.2d 1025, 1033-34 (5th Cir. 1980).

**B. *Arlington Heights* is the Appropriate Standard to Analyze the Intersecting Basis Claim in this Case**

Based on the record and evidence here, Plaintiffs' briefings, and caselaw governing intentional discrimination claims in the voting context, *Arlington Heights* provides also the appropriate standard to assess Plaintiffs' claims that Defendants targeted them by limiting their access to early voting on the intersecting bases of age and race under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments in this case. Plaintiffs also incorporate by reference here the discussion of the *Arlington Heights* legal framework from Section I(A).

### C. The Adoption and Maintenance of the 2018 Early Voting Schedule, at Least in Part, Was to Minimize the Political Participation of Students on the Intersecting Bases of Age and Race

#### i. The 2018 Early Voting Schedule Disproportionately Impacted Black PVAMU Student Voters

Sections I(B)(i) and II(C)(i) *supra*, which Plaintiffs incorporate herein by reference, document and contextualize the disproportionate impact imposed by Waller County's early voting plan against both Black voters in Prairie View and young voters aged 18 through 20 in Waller County. *See also* Pls.' Ex. 158, Stein Rep. at 11-12 (Dr. Stein reporting that the early voting locations that disproportionately served Black voters and young voters were provided "with the fewest hours and days of operation"). Black student voters at PVAMU—both due to their race and their age—face unique burdens related to intersecting patterns of discrimination that aggravate their inability to participate in the political process by traveling off campus to vote. *See* Pls.' FoF ¶¶ 130-39; Pls.' Ex. 153, Cooper Decl. at 15 ¶¶ 37-40 (Mr. Cooper reporting that the annual "per capita income for Black dorm students [at PVAMU] is $3,562" and that PVAMU students in particular are "extremely socioeconomically disadvantaged, as compared to Anglo residents countywide"); *see also* Day 5 Tr., 238:17-23 (Mr. Cooper adding context to this statistic by explaining that "the per capita income for African Americans state wide is significantly lower than the per capita income for Anglos in Waller County," which suggests that PVAMU's predominantly Black student body receives less financial support from family-members than is available to white college students in Texas, including white college students whose families live in Waller County).

As both predominantly young and Black voters, PVAMU students are simultaneously members of two protected classes which Waller County officials, for decades, have sought to suppress as a perceived threat to their power. Pls.' FoF ¶¶ 60-85. This ongoing history of discrimination continues to produce unequal socioeconomic outcomes and "life changes during their tenure on campus and long after they have graduated." Pls.' Ex. 155, Joseph Rep. at 38. It is also an essential lens for understanding contemporary socioeconomic and political realities in Waller County for Black PVAMU students. *Id.* ¶¶ 85, 251 (Defendant Duhon describing a fear among older, white Waller County residents that students voting at high numbers "could take over the county"); *id.* ¶¶ 375-77 (Defendants' expert Dr. Gimpel explaining that white people who live near large Black communities are more racially prejudiced than other white people, because "group size is threatening" and because they "fear the potential political power that accrues with numbers"—and that these effects are more pronounced in areas that, like Waller County, "could be described as racially diverse, but featuring segregated communities," and where, as in Waller County, there were formerly plantations that enslaved Black people). For all of these reasons, the abridging effects of the 2018 early voting fell most heavily on the class of Prairie View voters who were both young and Black.

> ii. *Defendants Knew the 2018 Early Voting Schedule Would Disproportionately Harm Black PVAMU Student Voters' Rights*

The unique socioeconomic and transportation barriers faced by Black students, as set forth in Sections I(B)(ii) and II(C)(ii), *supra*, which Plaintiffs incorporate herein by reference, were both foreseeable, based on Defendants' own data, and well-documented in

past testimony and correspondence from Black PVAMU students to Waller County officials, including Defendants. *See* Pls.' FoF ¶¶ 121-40, 161-162, 170, 172, 177, 180, 182-184; Pls.' Ex. 94. This evidence further supports a finding of discriminatory intent on the intersecting bases of race and age.

### iii. The Sequence of Events Also Reveals Defendants Failed to Lessen the 2018 Early Voting Schedule's Known Discriminatory Impact on Black PVAMU Students

The "specific sequence of events leading up to" the adoption, maintenance, and amendment of the 2018 early voting plan also "may shed some light on a decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267. Further, it is probative of discriminatory intent when officials and decision-makers failed to adopt changes that would have ameliorated an expected disparate impact—particularly where, as here, they did so without providing answers or while offering tenuous justifications. *Veasey*, 830 F. 3d at 241, 263.

Plaintiffs incorporate by reference the foregoing discussion in Section I(B)(iii), *supra*, explaining how Defendants failed to lessen known discriminatory impacts as well as the facts that were available to Defendants as of mid-October 2018 and the inferences that can be drawn from them. This sequence of events described previously shows Defendants had the authority, capacity, community support, and resources to expand early voting opportunities on in Prairie View, generally, and PVAMU's campus, specifically, thereby mitigating the plan's known discriminatory impact before its initial adoption and then again on October 17, 2018. But Defendants failed to adopt any of the proposals that would have ameliorated these discriminatory impacts, citing various tenuous and

pretextual justifications, before ultimately contradicting themselves by adopting modest changes to the plan on October 24, after early voting had started. Pls.' FoF ¶¶ 256-57.

As discussed above, Section I(B)(iii), Defendants met exclusively during the day, when Black PVAMU students are in class and/or at work, Pls.' FoF ¶ 427, did not engage in any affirmative outreach to Black PVAMU students, including new voters, to explain how an early voting plan was adopted, and relied on the party to set the early voting plan, *see e.g.*, *id.* ¶¶ 193, 420-423, knowing that many Black PVAMU students are not represented by either chair of the parties, *see, e.g.*, *id.* ¶¶ 240, 288, 407-10, 412, 418-19.

Even if the party chairs sought adequate input from local politicians and community members—which they did not—public comments made clear that such a process was insufficient, particularly for Black PVAMU students who are unaffiliated. *Id.* ¶¶ 199, 237, 240, 407-11, 420. Plaintiffs, like those students, are seeking to vindicate their rights as Black student voters, not to protect the interests of the Waller County Republican or Democratic parties. As the Fifth Circuit has acknowledged, "'it does not matter who is in charge of State politics or the political parties in power in Texas, whether they're Republicans, Democrats[,] or Martians, every time that African-Americans have, in fact, been perceived to be increasing their ability to vote and participate in the process there has been State legislation to either deny them the vote or at least dilute the vote or make it much more difficult for them to participate on an equal basis as Whites in the State of Texas.'" *Veasey*, 830 F. 3d at 241, n.30 (quoting plaintiffs' expert testimony in that case).

*iv. Defendants' Departures from the Ordinary Decision-making Process Reveal an Impermissible Motive*

Plaintiffs also incorporate by reference the foregoing discussion in Section I(B)(iv), explaining how whether applying Defendants' early voting allocation criteria, PVAMU students' demonstrated demand for early voting and their expert's narrower definition of early voting allocation best practices, each supported providing more—not less-early voting access in Prairie View, generally, and on campus at the MSC, specifically.

*v. Defendants Hid Their Effort to Suppress Black PVAMU Students' Political Participation Behind Tenuous Justifications*

Under *Arlington Heights*, the many shifting rationales Defendants advanced in support of adopting, maintaining, and insufficiently amending their early voting plan are probative of discriminatory intent because they "fail to correspond in any meaningful way" to the relevant facts. *Veasey*, 830 F.3d at 263. These tenuous justifications are set forth in detail *supra* Section I(B)(v), and Plaintiffs incorporate that discussion by reference.

*vi. Defendants' Contemporaneous and Coded Statements Reveal Unconstitutional Biases Against Black PVAMU Students*

As set forth above in Sections I(B)(vi) and II(C)(vi), Defendants' statements seeking to differentiate between Black PVAMU student voters and "the community," support a finding that intent to discriminate against Black PVAMU students was a motivating factor for the 2018 early voting plan's adoption and maintenance. *See* Pls.' FoF ¶ 293 (Defendants' witness, then-Prairie View Mayor, David Allen, alleging that older, "permanent residents" of Waller County are uncomfortable voting on campus because some male PVAMU students wear "saggy pants"); *id.* (Ms. Maia Young testifying that the

former mayor's characterizations of PVAMU students "made us feel as if we weren't his constituents whatsoever").

In addition, former Commissioner Barnett's refusal to provide more early voting on campus unless hours were also added in Monaville—an unincorporated, sparsely populated area within Precinct 3 where, unlike in Prairie View or on the PVAMU campus, the population is predominantly white and older—further support an inference of discriminatory purpose on the intersecting bases of age and race. *See also supra* Sections I(B)(vi), II(C)(vi); Pls.' FoF ¶¶ 104-06, 242-45.

As a decisionmaker in the development of the early voting plan, Chair Luther's many coded statements are revealing of discriminatory biases. *See supra* Sections I(B)(vi) and II(C)(vi). Chair Luther repeatedly declared PVAMU students, the majority of whom are Black, will vote as Democrats, tapping into unfounded assumptions that were directly refuted by Black PVAMU students during the October 17 meeting that Chair Luther attended. While pointing at Commissioner Barnett, who at the time and as of trial is a Republican, he exclaimed "they have their sights on you, because they hold you, they are going to hold you responsible." Pls.' FoF ¶ 251; Pls.' Ex. 156, Flores Rep. at 33. Adding early voting on campus, Chair Luther declared, would mean "every student has to pass through the [MSC]," thereby implying having access to early voting. Pls.' Ex 156, Flores Rep. at 33. According to Chair Luther, these equitable early voting changes for Black PVAMU students would also allow Defendants "to be used by the Democrats, to be black-mailed by the Democratic," as well as "black-mailed by the federal courts." Pls.' FoF ¶ 254; Pls.' Ex 156, Flores Rep. at 33. And to support these claims, Chair Luther harkened

back to discriminatory stereotypes that Black PVAMU students are not part of the "community" and did not care about other Waller County residents. Pls.' Ex 156, Flores Rep. at 33; *see also* Pls.' FoF ¶ 86 (PVAMU alumna Ms. Barbour testifying that she and other PVAMU-student members "didn't feel comfortable going out into . . . some of the whiter neighborhoods" beyond the City of Prairie View to conduct voter registration because those areas were not "always welcoming to Prairie View students").

When situated within Waller County's history of discrimination against Black PVAMU student voters, Chair Luther's subtext is clear: by virtue of being young and Black—a combination he assumed meant affiliation with the Democratic party—Black PVAMU students were outsiders and represented a threat to the perceived interests as shared by Chair Luther and the predominantly white, older population that he purported to represent. Pls.' Ex 156, Flores Rep. at 33. Or, to put it a different way, as Defendant Duhon asserted: "I think there's always been this fear that if all the students voted and they voted in a certain [way], they could take over the county." Pls.' FoF ¶ 85.

> ### vii. *The Early Voting Schedule is a Continuation of Waller County's History of Voting Discrimination Against Black PVAMU Students*

For the reasons set forth above in Sections I(B)(vii) and II(C)(vii), which Plaintiffs incorporate herein by reference, Waller County's ongoing record of discriminating against PVAMU Black student voters—both due to their race and their age—also supports a finding that the early voting plan was adopted as a continuation of that history. No other university in Texas has a comparable history of such intersectional discrimination by county or state officials. *See* Pls.' FoF ¶¶ 110-13. "Simply put," as Dr. Joseph explains,

"Waller County is the most difficult county in Texas for African American college students to vote." Pls.' Ex. 155, Joseph Rep. at 12; *see also* Pls.' FoF ¶¶ 375-77 (Defendants' expert Dr. Gimpel explaining that white people who live near large Black communities are more racially prejudiced than other white people, because "group size is threatening" and because they "fear the potential political power that accrues with numbers"—and that these effects are more pronounced in areas that, like Waller County, "could be described as racially diverse, but featuring segregated communities," and where, as in Waller County, there were formerly plantations that enslaved Black people).

IV. **Waller County's 2018 Early Voting Schedule Violated Section 2 of the VRA (Discriminatory Results)**

   A. **Guiding Legal Standards**

In addition to prohibiting decisions motivated by a racially discriminatory purpose, Section 2 prohibits Defendants from imposing, applying, or maintaining any "qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a); *Chisom*, 501 U.S. at 394 n.21 (citation omitted) (to prevail on a Section 2 claim, Plaintiffs can "either prove [discriminatory] intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process"); *see also Brown*, 561 F. 3d at 432 (quoting *McMillan,* 748 F.2d at 1046) ("Congress intended that fulfilling *either* the more restrictive intent test or the results test would be sufficient to show a violation of section 2.") (emphasis in original).

Section 2 covers "vote denial" claims involving challenges to practices that deny or abridge the rights of Black voters to participate in the political process on an equal basis with other voters. *Veasey*, 830 F.3d at 244. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and [nonblack] voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47.

Section 2 "was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race." *Allen v. State Bd. of Elections*, 393 U.S. 544, 565 (1969). As "the major statutory prohibition of all voting rights discrimination," Section 2 prohibits not only "permanent structural barriers," but also episodic practices or schemes that "result in the denial of access to any phase of the electoral process for minority group members." S. Rep. No. 97-417, at 30 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 207.[5] Section 2's coverage "extends beyond formal or official bars to registering and voting" and applies not only to elections as a whole but, rather, to each and "any phase" of "the political processes leading to nomination and election[.]" *Id.* A violation of Section 2 is established whenever, based on the totality of circumstances, one or more phases in these "political processes . . . are not equally open to participation by members of [a racial, ethnic, or language minority group] in that its members have less

---

[5] The Supreme Court in *Gingles* recognized this Senate Judiciary Committee Report ("Senate Report") as the "authoritative source for legislative intent" on the Voting Rights Act. *Gingles*, 478 U.S. at 43 n.7.

opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.;* 52 U.S.C § 10301(b).

The VRA was enacted to reach laws through which states would "resort to facially neutral 'tests that took advantage of differing social conditions. Property tests, literacy tests, residence requirements, the poll tax, and disqualification for conviction of certain crimes all fell into this category.'" *Underwood v. Hunter*, 730 F.2d 614, 619 (11th Cir. 1984) (citation omitted).

Differential treatment is unnecessary for a prohibited discriminatory "result." Uniform laws of general application, such as an undue limitation on the hours of registration or voting, can have a discriminatory result by affording minority voters less "opportunity" to participate in the process. *Cf. Florida v. United States*, 885 F. Supp. 2d 299, 329 (D.D.C. 2012) (in a Section 5 case under the VRA, likening a reduction in early voting, which was disproportionately used by Black voters, to the closing of polling places in predominantly Black neighborhoods). The "results" test may be violated even when the same procedures are applied to all persons. *See*, *e.g*., *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244-47 (4th Cir. 2014) ("*LWVNC*") (Section 2 applied to the elimination and reduction of certain voting tools, including early voting week, that applied to all voters); *Operation Push*, 932 F.2d at 412 (dual registration requirement for all registrants). "[E]ven a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process." *Marengo*, 731 F.2d at 1567-71 (citation omitted). When facially neutral procedures "interact[] with social and historical

conditions" to disproportionately burden voters of color, then the "result" is voting discrimination within the meaning of Section 2. *Gingles*, 478 U.S. at 47.

In *Marengo*, the court held that a registrar's short office hours and inconvenient location had a discriminatory effect because these procedures "made it harder for unregistered voters, more of whom are black than white, to register. By meeting only in [the county seat, the registrar] was less accessible to eligible rural voters, who were more black than white." 731 F.2d at 1570. It did not matter that all voters had the same procedural opportunities to vote, because those procedures disproportionately burdened Black voters. *Id*.

In *United States v. Dallas County*, the court again expressly rejected a district court's finding that "inconvenient location and hours of registration" were "reasonable and . . . affected blacks and whites equally." 739 F.2d 1529, 1538 (11th Cir. 1984) ("*Dallas*") (citations omitted). Rather, this Court explained that, "[w]hile being open during the day may seem reasonable on first consideration, the evidence indicate[d] that such hours are inconvenient to those who work, especially those who work in the rural areas of the county." *Id*. Such burdens had a discriminatory effect, even where there was "substantial equality in voter registration of blacks and whites." *Id*. at 1537; *see also Houston Lawyers' Ass'n v. Att'y Gen. of Texas*, 501 U.S. 419, 427 (1991) (explaining that "closing the polls at noon" throughout a jurisdiction could violate Section 2 if it resulted in "an abridgement of a racial minority's opportunity to vote and to elect representatives of their choice"); *Chisom*, 501 U.S. at 408 (Scalia, J., dissenting) (recognizing that Section 2 could be

violated if "a county permitted voter registration for only three hours one day a week, and that made it more difficult for blacks to register than whites").

The Supreme Court has instructed, citing the Senate Judiciary Committee Report accompanying the 1982 amendments to Section 2, "that the question whether the political processes are *equally open* depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." *Gingles*, 478 U.S. at 45 (citation and internal quotation marks omitted) (emphasis added). Equality of opportunity is not equal outcomes or proportionality. *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994) ("*De Grandy*").

Accordingly, Supreme Court and Fifth Circuit precedent requires courts to consider nine factors set forth in the Senate Report as part of the "searching practical evaluation" that Section 2 demands. *Veasey*, 830 F.3d at 257 (quoting *Gingles*, 478 U.S. at 45); *see also id.* at 253-54 (approving of a district court's findings that "rest on far more than a statistical disparity"). These "Senate Factors" (also referred to in *Veasey* as "*Gingles* factors*") are:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction . . . ;

[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]

[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles*, 478 U.S. at 36-37 (citation omitted).

When, as here, a vote-denial or vote-abridgement claim is based on Section 2's discriminatory results standard, courts in the Fifth Circuit apply a two-part test set forth in *Veasey*, 830 F.3d at 244. *First*, "[t]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id. Second*, "[t]hat burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Id.*

*Veasey* expressly adopted this two-part test as it was set forth in *LWVNC*, 769 F.3d at 240, and *Ohio State Conference of N.A.A.C.P. v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014), *vacated*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014)). *Veasey*, 830 F.3d at 244 ("We now adopt the two-part framework employed by the Fourth and Sixth Circuits to evaluate Section 2 'results claims.'") (citing *LWVNC*, 769 F.3d at 240, and *Husted*, 768 F.3d at 554). Both cases whose framework *Veasey* adopted hold that "the totality of the circumstances," including relevant Senate Factors, should be considered not only in the test's second part, but also in its *first* part, to assess the nature of the burden imposed. *LWVNC*, 769 F.3d at 240 ("In assessing both elements, courts should consider 'the totality of circumstances.'"); *Husted*, 768 F.3d at 554 (same); *accord Veasey*, 830 F.3d at 244; *id.* at 245 n.35.

Nor may this Court decline to reach the test's second prong. *Veasey* instructs courts to consider Senate Factors under "both elements of the two-part test," *Veasey*, 830 F.3d at 245 n.35, and expressly rejected an alternative to the two-part test in which the first element would act as gatekeeper for the second, *id.* at 311 (Jones, J., dissenting) (such a test "fundamentally differs" from the standard adopted). As this Court has observed, "[e]vidence regarding [the Senate Factors] is material and will also be necessary at trial. The Fifth Circuit has quite plainly determined that these factors must be analyzed towards a proper decision." Mem. Order Den. Mot. for Summ. J., ECF 104 at 10. Defendants' invitation to abandon *Veasey*'s controlling standards for out-of-circuit alternatives must be rejected—as it was at summary judgment. *See id.*

Under these standards, Plaintiffs established at trial that Defendants' early voting plan for the 2018 general election imposed a burden and abridgment of the right to vote of Black voters in Prairie View by providing far fewer hours at the only locations that disproportionately served Black voters. *See supra* Section I(B)(i). Moreover, Plaintiffs showed clearly—through expert reports and testimony by Plaintiffs' experts Drs. Joseph, Stein, and Flores, and Mr. Cooper, as well as testimony from Organizational Plaintiff members Jayla Allen and Joshua Muhammad, Plaintiffs Damon Johnson and Treasure Smith, fact witnesses Ms. Priscilla Barbour, Mr. Frank D. Jackson, and others—that this burden on Plaintiffs' voting rights is "a product of current or historical conditions of discrimination such that it violates Section 2." *See Gingles*, 478 U.S. at 44-45.

### B. Under *Veasey*'s First Step, Defendants' 2018 Early Voting Plan Imposed a Discriminatory Burden on Black Voters in Prairie View.

The first element in *Veasey*'s framework analyzes statistical evidence, demographics, and relevant Senate Factors to determine "the nature of the burden imposed and whether it creates a disparate effect" on Black voters in Prairie View. *Veasey*, 830 F.3d at 244. The Section 2 inquiry is "an intensely local appraisal" that must be conducted "in the light of past and present reality." *Gingles*, 478 U.S. at 78 (quoting *White v. Regester*, 412 U.S. 755, 769-770 (1973)). Accordingly, this Court's evaluation of "the *nature* of the burden imposed" under the *Veasey* test's first prong should consider not only the disparity in access established by Dr. Stein, but also, *inter alia*, Waller County's history of state-sponsored discrimination in voting and registration and the continuing effects of that history in the form of socioeconomic disparities and inequities in transportation,

educational attainment, and unemployment outcomes, as reported at a statistical level by Mr. Cooper and contextualized by testimony from past and present PVAMU students and other Prairie View voters and by Drs. Joseph, Flores, and Stein, as well as the particularized experience of voting and access to the political process for Black voters in Prairie View as compared to white voters elsewhere in Waller County—all of which interacted with the 2018 early voting plan to prevent Black votes in Prairie View from participating in the political process on an equal basis with white voters elsewhere in Waller County.

In addition, this Court should take care not to "conflate[] abridgement and denial," each of which is explicitly—and independently—prohibited by Section 2. *Veasey*, 830 F.3d at 260 n.58; *id.* at 253 (citing U.S. Const. amend. XV; 52 U.S.C. § 10301(a)). Evidence of vote *denial* is not required to establish vote *abridgment*. Federal law prohibits all manner of discrimination, not solely laws that "prevent" minorities from voting: "nothing in Section 2 requires a showing that voters cannot register or vote under any circumstance." *LWVNC*, 769 F.3d at 243. And "[a]ny abridgment of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the outcome of an election." *Chisom*, 501 U.S. at 397. Therefore, policies that do not prevent people from voting, but that make voting harder for minorities to participate in the political process, may "abridge" their rights. *McCrory*, 831 F.3d at 233; *see*, *e.g.*, *Morse v. Republican Party of Va.*, 517 U.S. 186, 191, 206-07 (1996) (payment of a fee even where it could be waived); *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 666 (6th Cir. 2016) (abolition of straight-ticket voting); *Marengo*, 731 F.2d at 1570 (time and place of registration and lack of Black poll officials); *Dallas*, 739 F.2d at 1538 (same); *cf.*

*also Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F. 3d 1349, 1352 (11th Cir. 2005) ("A plaintiff need not have the franchise wholly denied to suffer injury.").

A finding that Defendants' 2018 early voting schedule "abridges" the right to vote "falls comfortably within" this schema. *Veasey*, 830 F.3d at 260. This is true even if some voters could overcome the burdens imposed by the schedule. As the Fifth Circuit has observed, "in previous times, some people paid the poll tax or passed the literacy test and therefore voted, but their rights were still abridged." *Id.*, 830 F.3d at 260 n.58.

As described above, Dr. Stein's expert report and testimony demonstrating the disproportionate impact of the decision and the disparate treatment of Prairie View as compared to other non-majority-Black cities in the County offer sufficient evidence to meet the first element of the Section 2 vote-denial analysis, because the early voting plan burdened Black voters in Prairie View by denying them an equal opportunity to participate in the early voting phase of the political process in 2018 in Waller County and elect representatives of their choice. *Supra* Section I(B)(i).

As Dr. Stein reported and testified, the three early voting locations in Prairie View— the MSC, the WCCC, and the Prairie View City Hall—were disproportionately used by Black voters during the 2018 general election. At the MSC, Black voters accounted for 72% of all early votes cast. Pls.' FoF ¶ 345. At both the WCCC and Prairie View City Hall, Black voters accounted for 47% of all early votes cast. *Id.* Outside of Prairie View, there was no location where Black voters accounted for more than 22% of early votes. *Id.*; *see also* Pls.' Ex. 158, Stein Rep. at 11.

Dr. Flores reported and testified that Defendants had information in their possession sufficient to be aware that these locations would primarily serve Black voters, given Prairie View's demographics. Pls.' FoF ¶ 340; Pls.' Ex. 156, Flores Rep. at 7. As Mr. Cooper reported, Prairie View is unique among cities or populated areas in Waller County in that its VAP is overwhelmingly Black. Pls.' Ex. 153, Cooper Decl. at 9 ¶ 31 and fig. 6; Pls.' FoF ¶ 337. Among the residents of Prairie View who are at least 18 years old and thus old enough to vote, 92% are Black. Pls.' Ex. 153, Cooper Decl. at 7; Pls.' FoF ¶ 337.

Mr. Cooper also explained that the on campus Precinct 309, which relies on the MSC as its early voting location and is located entirely within Prairie View, stands in especially sharp contrast to the rest of Waller County. Pls.' Ex. 154, Cooper Suppl. Decl. at 3. Among the residents of Precinct 309 who are at least 18 years old and thus old enough to vote, 94% are Black. *Id.* at fig. 2; Pls.' FoF ¶ 338.

By way of comparison, in Precinct 310, located off campus in the City of Prairie View, the VAP is 74% Black. *Id.* Outside of Prairie View, no other city or area in Waller County has a VAP that is more than 41% Black. Pls.' Ex. 153, Cooper Decl. at 7 fig. 4; Pls.' FoF ¶ 339.

As discussed above in Section I(B)(i), Defendants provided the three Prairie View locations a total of 65 hours of early voting under the modified early voting plan. Pls.' FoF ¶¶ 330, 334; Pls.' Ex. 158, Stein Rep. at 15; Pls.' Ex. 12. That is, during the first week, five hours were added in the eleventh hour on Sunday at the Prairie View City Hall in Precinct 310; of the 60 hours provided to Prairie View locations in the second week, thirty-six were allocated over three days at the MSC in Precinct 309; and the remaining 24 were allocated

over two days at the off campus WCCC in Precinct 310. Pls.' Ex. ¶ 334. By contrast, as Dr. Stein reported: "Both Waller ISD Administrative Building and the Brookshire Library had over 100 hours of operation during early voting. They were followed by Waller County Court House, with 96 hours of operation." Pls.' Ex. ¶ 335; Pls.' Ex. 158, Stein Rep. at 11-12. Thus, single locations in Waller, Brookshire, and Hempstead received more hours of early voting than all three Prairie View locations combined. *See* Pls.' Ex. 158, Stein Rep. at 14; Pls.' FoF ¶ 336. Indeed, as Commissioner Barnett acknowledged at trial, Dr. Stein's analysis showed that Precinct 3 overall—which includes Prairie View and is Waller County's sole majority-Black precinct—also received significantly fewer hours of early voting than *any* other commissioner precinct. Pls.' FoF ¶ 336; *see also generally* Pls.' Ex. 12.

After geocoding the residence address and Census block of every voter in Waller County, as well as the early voting locations offered in the 2018 general election, Dr. Stein arrived at a reliable ascertainment of each voter's race and relative access to early voting. Pls.' FoF ¶¶ 312--50; Pls.' Ex. 158, Stein Rep. at 2-4.

Analyzing this data regarding race and relative access to early voting, Dr. Stein reached the following expert opinion and observation: "When we look at where Black voters in Waller County voted early in the 2018 election, we observe that they cast their ballots at early polling locations with the fewest hours and days of operation." Ex. 158, Stein Rep. at 11. As Dr. Stein testified, the hours provided at the three early locations that served the most Black voters—all of which were located in Prairie View—"were

distinctively and universally lower" than the hours provided at the early voting locations that served the most white voters. Pls.' FoF ¶ 347.

As a result, as Dr. Stein concluded and testified, the result of Defendants' 2018 early voting plans "was to deny . . . Black voters in Prairie View equal or even similar access to early voting opportunities afforded other registered voters in Waller County." *Id*. ¶¶ 344-348. Thus, the early voting plan's effect, as Dr. Stein reported and testified, "was to deny voters aged 18 through 20, Black voters aged 18 [through] 20, and Black voters in Prairie View equal or even similar access to early voting opportunities afforded other registered voters in Waller County." *Id*. ¶ 348.

As discussed above, Defendants have sought to avoid liability under Section 2 in part by arguing—tenuously—that the WCCC is an adequate early voting location for Black voters in Prairie View. This is inaccurate, as discussed above in Sections I(B)(v) and II(C)(v). However, for purposes of determining Defendants' liability under Section 2 (or the Constitution) for their actions in the 2018 election, the adequacy of the WCCC is wholly irrelevant: whether it was a good location or a bad one, the WCCC was provided *only* 24 hours of early voting during the end of the second week of early voting. Pls.' FoF ¶¶ 216, 334; Ex. 158, Stein Rep. at 15; JPTO Fact Admissions ¶¶ 72, 75. Thus, voters who sought to vote at the WCCC were burdened similarly to voters who sought to vote at the MSC; *see also* Day 10 Tr., 24:25-25:9. According to Dr. Stein's analysis, all three early voting locations in Prairie View, including the WCCC, were disproportionately used by Black voters at rates far beyond any other early voting locations in the County—and all three were underserved as compared to locations in other cities with larger white populations

and fewer Black voters, imposing a discriminatory burden or abridgement on all Black voters in Prairie View. Pls.' FoF ¶¶ 328-50; Pls.' Ex. 158, Stein Rep. at 12-13.

Nor should this Court credit Defendants' attempts to use the purportedly fairer treatment of some Black voters elsewhere in Waller County to escape liability for their discriminatory actions against Black voters in Prairie View. The rights of some Black voters under Section 2 cannot be "traded off against the rights of other members of the same minority class." *LULAC*, 548 U.S. at 436. Moreover, no other city or populated area in Waller County has a comparable history or demographic makeup to that of Prairie View. *See* Pls.' Opp'n to Defs.' Mot. for Summ. J., ECF 77 at 24. Further, as the Fourth Circuit explained in a case the *Veasey* court relied on, plaintiffs in a Section 2 case need not establish that *all* Black voters in a given jurisdiction are harmed: "what matters for purposes of Section 2 is not how many minority voters are being denied equal electoral opportunities but simply that 'any' minority voter is being denied equal electoral opportunities." *LWVNC*, 769 F.3d at 244 (quoting 52 U.S.C. § 10301(a)). Thus, to the Court's first question at closing, *see* Day 12 Tr., 102:7-16, in the context of Plaintiff's Section 2 claims, the discriminatory-impact inquiry should focus on the burdens imposed on *Black voters in Prairie View*.

Here, the 2018 early voting plan, as certain defendants admit, Pls.' FoF ¶¶ 225-27, 230, harmed Black voters in Prairie View, including at PVAMU, *id.* ¶¶ 340-50. The 2018 early voting plan's discriminatory impact, as Drs. Flores and Stein reported and testified, was caused by and linked to by historical and contemporary socioeconomic disparities among the predominantly Black residents of Prairie View, including PVAMU students,

that reduced their ability to effectively participate in the political process in Waller County, increase their reliance on early voting, and aggravate the severity of the burden or abridgement inflicted by a denial of equal access to early voting. *Id.* ¶ 351; Pls.' Ex. 155, Flores Rep. at 6-8, 41; Pls.' Ex. 158, Stein Rep. at 12; Pls. Ex. 153, Cooper Decl. at B1-B29.

In addition, the early voting plan's impact must be understood within Waller County's well-documented history of discrimination against PVAMU students with regard to their right to vote. *See, e.g.*, Pls.' FoF ¶¶ 59-85; Pls.' Ex. 155, Joseph Rep. at 12-38; Pls.' Ex. 155, Flores Rep. at 7-8.

For these reasons, Plaintiffs established at trial that Defendants' decisions to limit access to early voting imposed a significant burden or abridgement on the ability of Black voters in Prairie View to participate in the political process on an equal basis with white voters elsewhere in Waller County. This showing satisfies *Veasey*'s first prong.

### C. Under *Veasey*'s Second Step, the Early Voting Schedule's Burden is Caused by or Linked to Social and Historical Conditions that Produce Discrimination against Black Voters, Violating Section 2.

Under *Veasey*'s second step, this Court should analyze Plaintiffs' evidence under the Senate Factors to determine whether, under the totality of the circumstances, the abridgement of Plaintiffs' voting rights "is linked to social and historical conditions of discrimination such that the abridgement has occurred 'on account of race.'" *Veasey*, 830 F.3d at 253. These factors are non-exhaustive, and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id*. at 246 (quoting *Gingles*, 478 U.S. at 45). "The Fifth Circuit has quite plainly

determined that these factors must be analyzed towards a proper decision." Mem. Order Den. Mot. for Summ. J., ECF 104 at 10.

Among other Senate Factors, Senate Factor 5 (*i.e.*, socioeconomic disparities) shows why the burdens that the 2018 early voting schedule created for Black voters "may not be rebutted under Section 2 by positing that this unequal opportunity may be overcome if individuals devote sufficient resources to the task or by positing that the unequal opportunity is somehow a product of individual 'choice.'" *Veasey*, 71 F. Supp. 3d at 693 n.497 (internal citation omitted); *see also Kirksey*, 554 F.2d at 145, 150; *Marengo*, 731 F.2d at 1568-69; *Major*, 574 F. Supp. at 351 n.31; *McCrory*, 831 F.3d at 233 ("Nor does preference lead African Americans to disproportionately lack acceptable photo ID.").

Just as a plaintiff cannot establish liability merely by pointing to statistical disparities in voting practices, so, too, a defendant cannot escape liability merely by pointing to the availability of *alternative voting practices*, such as Election Day voting as compared to early voting here. To be sure, no voting practice exists in isolation. A jurisdiction therefore cannot avoid liability for the discriminatory denial of equal access in one phase of the political process, such as during early voting, merely because another phase of its political process is more equally open. The entire political process—and "*any phase*" within that process—must be "equally open" to voters of all races. 52 U.S.C. § 10301(b); S. Rep. No. 97-417, at 30 (emphasis added). If a government discriminatorily denies voters of one race equal access to early voting, it is no salve to claim that, in the aggregate, the overall political process is open enough for the disadvantaged voters. And courts should consider the challenged practice's interaction with other election laws as part

of the totality-of-circumstances inquiry—because other laws, while "neither in themselves improper nor invidious," may "enhance[] the opportunity for racial discrimination" resulting from the challenged practice. *Regester*, 412 U.S. at 766; *see* S. Rep. No. 97-417, at 30 n.120 (affirming that "Section 2, as amended, adopts the functional view of 'political process', used in [*Regester*]").

This standard does not categorically prevent states from "eliminat[ing] a [voting] method some prefer" if the resulting processes remain equally open, nor does it force states to "adopt" a new voting method that "members of one race would prefer" if the status quo already provides equal opportunity. Section 2 does not mandate "maximiz[ing]" minority voters' opportunities. *De Grandy*, 512 U.S. at 1017. Instead, when considering the availability of alternative methods, courts must undertake an "'intensely local appraisal of the design and impact' of the contested electoral mechanisms," including whether socioeconomic disparities, the unavailability of private or public transportation, and other aspects of the totality of circumstances in the jurisdiction enhance the law or practice's discriminatory effects and deprive protected voters of an equal opportunity to participate in the political process. *Gingles*, 478 U.S. at 79. And courts must bear in mind that deliberate elimination of a voting practice known to be used disproportionately by minority voters creates exactly the "risk of purposeful discrimination" that Congress warns against. *City of Rome v. United States*, 446 U.S. 156, 177 (1980); *cf. LULAC*, 548 U.S. at 440.

Thus, to the Court's final two questions at closing, *see* Day 12 Tr., 104:11-22; *id.* at 107:10-108:1, this Court's Section 2 analysis should be "an intensely local appraisal," conducted "in the light of past and present reality," and should assess whether Defendants'

2018 early voting plan, by denying Black voters equal access to early voting, rendered one or more phases of the political process in Waller County "not equally open to participation by [Black voters in Prairie View] in that [such voters] ha[d] less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Gingles*, 478 U.S. at 78; 52 U.S.C. § 10301(b).

First, in this case, that inquiry should focus on the early voting phase. *See* Day 12 Tr., 104:11-22. Guided by the evidence at trial under the Senate Factors as to the particularities, history, and context of the political process in Waller County, this Court should evaluate access to early voting as a critical phase in "the political processes leading to nomination or election . . . ." 52 U.S.C. § 10301(b); *see* S. Rep. No. 97-417, at 30 (explaining that, as "the major statutory prohibition of all voting rights discrimination," Section 2 "prohibits practices, which . . . result in the denial of equal access to *any phase* of the electoral process for minority group members.") (emphasis added).

Second, in considering whether Waller County's political processes in 2018 were "not equally open to participation by" Black voters in Prairie View, in that Black voters in Prairie View had "less opportunity . . . to participate in the political process and to elect representatives of their choice," s*ee* Day 12 Tr., 107:10-108:1, this Court should follow the Supreme Court's guidance that "[a]ny abridgment of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the outcome of an election." *Chisom*, 501 U.S. at 397. As here, evidence that Defendants' plan interacted with social and historical conditions to "abridge" Plaintiffs' voting rights, resulting in an inequality in early voting access along racial lines, "falls

comfortably within this definition." *Veasey*, 830 F.3d at 260; *see also LWVNC.*, 769 F.3d at 243 ("[N]othing in Section 2 requires a showing that voters cannot register or vote under any circumstance. Instead, it requires 'that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.'"); Pls.' Ex. 159, Stein Rebuttal Rep. at 3 (Dr. Stein explaining that the issue in this case is "whether Waller County has discriminated against legally-protected classes of voters . . . in the way it provides access to early voting opportunities," and, therefore, that discussing "[t]urnout, in a dispute about *access*, misses the mark").

Thus, in applying Section 2's language about equality of opportunity, this Court should focus not on whether Defendants' 2018 early voting plan changed electoral *outcomes*, either by altering election results or by depressing turnout—but, instead, on whether the early voting plan denied Black voters in Prairie View *equal access to the opportunity to vote early* in the fall 2018 election in Waller County. *See De Grandy*, 512 U.S. at 1000. The answer depends "upon a searching practical evaluation of the past and present reality," *Gingles*, 478 U.S. at 45, and on evaluation of the totality of circumstances through Plaintiffs' evidence under the Senate Factors, *Veasey*, 830 F.3d at 257.

> i. *The burden is caused by or linked to Waller County's history of official discrimination in voting, registration, and political participation under Senate Factor 1.*

Senate Factor 1, "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process," is an important component

of the totality-of-circumstances analysis. *Gingles*, 478 U.S. at 36-37. History matters in voting cases, the Supreme Court has explained, because the "accumulation of discrimination" within a state or political subdivision acts as a barrier to effective participation by Black voters in the electoral process. *Id.* at 44 n.9. Moreover, "voting practices and procedures that have discriminatory results perpetuate the effects of past purposeful discrimination." *Id.*

As discussed above, Plaintiffs have demonstrated, through unrebutted evidence, that there is a long, shameful, and continuing history of official discrimination in voting in Waller County and in the State of Texas overall. Plaintiffs' expert, Dr. Joseph, details this continuing history in his expert report. Pls.' Ex. 155, Joseph Rep. at 1-39; Pls.' FoF ¶¶ 43-86. Plaintiffs incorporate herein by reference the discussion of official racial discrimination in voting, both in Waller County and in Texas overall, as set forth in Section I(B)(vii) above.

Under Section 2, in addition to the recent examples cited by Dr. Joseph, "regardless of the distance of time, [past discriminatory] practices still must be candidly acknowledged and taken into account in the present." Mem. Order Den. Mot. for Summ. J., ECF 104 at 11; *see Veasey*, 830 F. 3d at 257 & n. 53 (holding that "even long-ago acts of official discrimination give context to the analysis" and "cannot be ignored in the discriminatory effect analysis, because even these seemingly remote instances of State-sponsored discrimination continue to produce socioeconomic conditions" that are relevant both to assessing burden and to analyzing Senate Factor 5).

In their trial testimony, the report and testimony of their sole expert, and their representations before this Court, Defendants have not disputed the history of official discrimination in Texas or in Waller County. Mem. Order Den. Mot. for Summ. J., ECF 104 at 13; *see also* Day 8 Tr., 209:6-211:24.

Accordingly, Senate Factor 1 weighs in Plaintiffs' favor.

> ii. *The burden is caused by or linked to racially polarized voting in Waller County under Senate Factor 2.*

Senate Factor 2, racially polarized voting, is probative under the totality of the circumstances as an element of identifying discriminatory results because "[v]oting along racial lines," where it is present, "allows those elected to ignore [B]lack interests without fear of political consequences." *Rogers*, 458 U.S. at 623.

Plaintiffs' expert Dr. Flores has cited several recent court decisions finding racially polarized voting throughout Texas, including in Waller County. *See* Pls.' Ex. 156, Flores Rep. at 38-39 (citing *League of United Latin Am. Citizens Council No. 4434 v. Clements*, 986 F.2d 728 (5th Cir) (1993), *on reh'g*, 999 F.2d 831 (5th Cir. 1993); *Vera v. Richards*, 861 F. Supp. 1304, 1329-30 (S.D. Tex. 1994); *LULAC*, 548 U.S. at 427 (2006); *Veasey*, 71 F. Supp. 3d at 637; *Perez v Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017)); Pls.' FoF ¶¶ 143-50. Plaintiffs have also introduced evidence that the U.S. Department of Justice found racially polarized voting in Waller County as of 2002. Pls.' Ex. 93 at 3 ("Our statistical analysis . . . shows that white voters [in Waller County] do not provide significant support to candidates sponsored by the minority community, and that interracial elections are closely contested.").

Here, the presence of racially polarized voting also interacts with the perception and reality of demographic change in Waller County to animate concerns among white, older residents and decision-makers that Black student voters "could take over the county." *See* Pls.' FoF ¶ 85; Pls.' Ex. 155, Joseph Rep. at 29; Pls.' Ex. 156, Flores Rep. at 11; Pls.' Ex. 153, Cooper Decl. at 8-9 Fig. 5 & ¶ 28.

Accordingly, Senate Factor 2 weighs in Plaintiffs' favor.

> iii. *The burden is caused by or linked to the ongoing effects of state-sponsored discrimination in areas as education, employment and health, which hinder Black people's ability to participate effectively in the political process in Waller County under Senate Factor 5.*

As part of the "searching practical evaluation of the 'past and present reality'" that Section 2 demands, the Supreme Court has held that courts should consider "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 45. In *Gingles*, the Supreme Court explained that a central purpose of Section 2's results test was "to eradicate inequalities in political opportunities that exist due to the vestigial effects of past purposeful discrimination." *Id.* at 69. Where Black voters "suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes," such effects impede political participation on an equal basis with white voters and may interact with voting laws or practices to produce discriminatory results. *Id.*

In *Veasey*, the Fifth Circuit noted that Texas maintained segregated schools well after *Brown v. Board of Education*, 347 U.S. 483 (1954)—and affirmed the district court's

finding that "past State-sponsored employment discrimination and Texas's maintenance of a 'separate but equal' education system both contributed to the unequal outcomes that presently exist" for white and Black people throughout the state. 830 F.3d at 259. One trial witness, Mr. Jackson, testified to attending racially segregated schools in Luling, Texas. Day 3 Tr., 84:1-5.

Here, Census data reported by Mr. Cooper and contextualized by Plaintiffs' experts Drs. Flores and Joseph, as well as testimony from other witnesses, established that PVAMU students and other Black residents of Prairie View—as a direct result of past state-sponsored and other discrimination—face economic, educational, and transportation, and other socioeconomic disadvantages that adversely impact their ability to participate in the political process at higher rates than white voters in Waller County overall. Pls.' FoF ¶¶ 114-42; *see also* Day 5 Tr., 236:23-237:10. As one example, despite the presence of PVAMU, an HBCU, as the only university in Waller County, there are significant disparities in educational attainment between Black people in Prairie View and white people in Waller County. Among residents over 25 years old, 17.9% of Black people in Prairie View have less than a high school diploma, as compared to only 9.3% of white people countywide. Pls.' FoF ¶ 127.

At trial, Dr. Flores and Dr. Joseph testified that these continuing socioeconomic disadvantages for Black residents of Prairie View and Black PVAMU students are directly caused by a longstanding and ongoing history of racial discrimination both in Waller County and in Texas overall, as detailed by Dr. Joseph. *Id.* ¶ 114. Dr. Flores's report and testimony, combined with Dr. Stein's analysis of voting behavior in the 2018 general

election in Waller County and his testimony, also established that these continuing effects of past discrimination adversely impact the ability of PVAMU students and other Black voters in Prairie View "to effectively participate in the political process in Waller County." Pls.' Ex. 156, Flores Rep. at 41.

Accordingly, Senate Factor 5 weighs in Plaintiffs' favor.

> iv. *The burden is caused by or linked to Black candidates' lack of success in running for countywide offices in Waller County under Senate Factor 7.*

Supreme Court and Fifth Circuit precedent and the Senate Report all instruct that a lack of success on the part of Black candidates, or other candidates of color, in running for office in a jurisdiction is probative of discriminatory results under Section 2. *Gingles*, 478 U.S. at 75; *Veasey*, 830 F.3d at 261; S. Rep. No. 97-417, at 29 n.115 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 207 n.115) ("The fact that no members of a minority group have been elected to office over an extended period of time is probative.").

"The extent to which minority candidates are elected to public office also contextualizes the degree to which vestiges of discrimination continue to reduce minority participation in the political process." *Veasey*, 830 F.3d at 261. Nonetheless, "proof that some minority candidates have been elected does not foreclose a § 2 claim." *Gingles*, 478 U.S. at 75.

Historically, it has been exceedingly rare for a Black candidate for elected office to be successful in Waller County as a whole—or in any portion of the county that is not majority-Black. Pls.' FoF ¶ 151; Day 5 Tr., 125:15-126:6; Pls.' Ex. 156, Flores Rep. at 42. Only one Black candidate has been elected to a countywide office in Waller County since

the Reconstruction period in the late 19th century. Pls.' FoF ¶ 157; Pls.' Ex. 156, Flores Rep. at 42; Day 5 Tr., 125:24-126:6; Day 9 Tr., 214:8-13.

Presently, there are no Black elected officials in any positions in Waller County government that are elected countywide. Pls.' FoF ¶ 152; JPTO Fact Admissions ¶ 54; Day 9 Tr., 212:23-213:4. Nor are there any Black elected officials from any portion of Waller County other than Precinct 3. Pls.' FoF ¶ 153; Pls.' Ex. 156, Flores Rep. at 42; Day 9 Tr., 215:9-15. No Black candidate has been elected to the U.S. House of Representatives from U.S. Congressional District 10, in which Waller County is situated, since the district's creation in 1883. Pls.' FoF ¶ 154; Pls.' Ex. 156, Flores Rep. at 42; Day 9 Tr., 215:6-8. Former Precinct 3 Commissioner Jeron Barnett testified that he knew of no Black congressperson who has ever represented Waller County. Pls.' FoF ¶ 155; Day 9 Tr., 215:2-8.

Former Commissioner Barnett, who is Black, was an unsuccessful candidate for the countywide position of Waller County Sheriff in 2004 and 2008, before running for the office he held at trial from a majority-Black district. Pls.' FoF ¶ 156; JPTO Fact Admissions ¶ 55; Pls.' Ex. 131; Pls.' Ex. 134; Day 9 Tr., 215:18-25. His electoral defeat in 2008 was despite support, at that time, from PVAMU student voters and significant qualifications for the role, including having, as of the 2008 election, 22 years of law enforcement experience and 18 years of residency in Waller County. Day 9 Tr., 217:9-16, 219:5-17, 220:5-11. If Former Commissioner Barnett had won his 2004 or 2008 elections, he would have been the first Black sheriff in Waller County's history. Day 9 Tr., 216:9-12, 218:20-25.

Black candidates for countywide office—like Defendant Barnett on both occasions—have been uniformly defeated in recent elections. FoF ¶ 158. In 2016, despite support from Black voters and PVAMU students, another Black candidate for Waller County Sheriff, attempting, like Defendant Barnett, to become the first Black candidate in Waller County's history, was defeated by a white candidate. *Id.*; Day Tr., 213:13-22. In 2018, a Black candidate for Waller County Judge, Dr. Denise Mattox, was defeated by Defendant Duhon, who is white. FoF ¶ 158; Day 10 Tr., 196:21-25; Day 9 Tr., 213:8-12, 213:17-22.

Accordingly, Senate Factor 7 weighs in Plaintiffs' favor.

> v. *The 2018 early voting schedule's burden is caused by or linked to Waller County officials' lack of responsiveness to the particularized needs of Black residents under Senate Factor 8.*

The Supreme Court has instructed that "evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group" is also probative under Section 2's totality-of-the-circumstances analysis for discriminatory results. *Gingles*, 478 U.S. at 45.

Here, Plaintiffs have established that the majority-white Defendant Waller County Commissioners Court has been unresponsive to the particularized needs of Black Prairie View residents, including in adopting, maintaining, and superficially modifying the 2018 general election early voting plan through a non-transparent and non-inclusive process and refusing to amend that process despite requests from Black voters. Pls.' FoF ¶¶ 400-46. For example, Defendants were unresponsive to public comments from Black PVAMU students and other Black Prairie View voters who objected to the initial early voting plan

as discriminatory. Pls.' Ex. 156, Flores Rep. at 21-24; *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 717 (S.D. Tex. 2017) ("Ignoring clear and supported objections about the racially disparate impact of a proposed law is probative of a lack of responsiveness to minority concerns."); *Veasey*, 830 F.3d at 261-62 (holding that a decision-making body's rejection of requests to ameliorate a disparate impact "supports a conclusion of lack of responsiveness."). Instead, Defendants have misdirected requests for more early voting access in Precinct 3 by presenting a false choice—that is, Defendant have represented to Prairie View voters that they can only choose one early voting location in Precinct 3 for any future elections due to constraints caused by HB 1888. But Defendants conceded they can budget for more early voting locations than one per precinct, which Defendants testified would be beneficial to voters. Pls.' FoF ¶ 483. As Ms. Barbour explained:

> Whether they are there for four years or 40 years, they deserve equal access to the polls. It should not be a battle every time that they request it, and the Prairie View students are equally a part of the community as any others, and I think, when we have this conversation about whether the community or students should have access is a false choice, and I don't think that it's the county's job to determine who deserves access to the polls and whose level of, I guess, residency qualifies them for equal access to the polls. All Waller County residents deserve equal access.

*Id.* ¶ 160.

Waller County has also been unresponsive to concerns about the County's reliance on the United States Postal Service's rural addressing system to assign addresses based on ZIP Code, which impacts Black Prairie View residents both during elections and at other times and puts them at risk for being placed on a suspense list or purged from voter registration rolls. Pls.' Ex. 156, Flores Rep. at 43; Pls.' FoF ¶¶ 428-38, 446. In addition, this Court has held that a jurisdiction such as Waller County's "long history of state-

mandated discrimination" is itself a "strong indicator[] of a significant lack of responsiveness to the needs of . . . minority voters." *Veasey*, 71 F. Supp. 3d at 698. Here, Waller County's history of official discrimination against Black people in Prairie View, *supra* Section I(B)(vii), is uncontested.

Accordingly, Senate Factor 8 weighs in Plaintiffs' favor.

> vi. *The burden is caused by or linked to Waller County officials' reliance on tenuous policy rationales to justify their early voting schedule under Senate Factor 9.*

The Supreme Court and the Fifth Circuit have held that the presence of a tenuous policy underlying an early voting plan or other electoral practice, Senate Factor 9, can also be probative in identifying discriminatory results of. *See Gingles*, 478 U.S. at 45; *see also Veasey*, 830 F.3d at 262. As the Fifth Circuit explained in *Veasey*, "a tenuous fit between the expressed policy and the provisions of the law bolsters the conclusion that minorities are not able to equally participate in the political process," because, without past or present discrimination, "a law not meaningfully related to its expressed purpose would be abandoned or ameliorated to avoid imposing a disparate impact, given the preexisting socioeconomic and political disadvantages caused by past and present discrimination." *Veasey*, 830 F.3d at 262-63. A tenuous justification also "may indicate that the policy is unfair" to Black voters. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 753 (5th Cir.), *on reh'g*, 999 F.2d 831 (5th Cir. 1993).

Tenuousness, thus, is probative both of discriminatory intent under the *Arlington Heights* framework and of discriminatory results under the Senate Factors. *Id.*, 986 F.2d at 753; *see supra* Section I(B)(v). That is so because "evidence that a voting device was

intended to discriminate is [also] circumstantial evidence that the device has a discriminatory result." *Marengo*, 731 F.2d 1546, 1571 (11th Cir. 1984).

Here, as set forth fully above, *supra* Section I(B)(v), Dr. Flores's analysis and the record before this Court show that the policy rationales advanced by Defendants for adopting and maintaining the early voting plan for the 2018 general election were "tenuous, changing, and ultimately largely contradicted by the Commissioners' own actions in adopting revisions to the early voting plan on October 24, one week after arguing that it was too late to do so." Pls.' Ex. 156, Flores Rep. at 44. Moreover, as Dr. Flores's report and testimony established, Defendants' policy tenuous rationales "also show a lack of good faith and an irrationality that is inappropriate for government action, insofar as the Commissioners cited arbitrary and shifting rationales while failing to make an effort to address the concerns of PVAMU students who requested parity and equity during the early voting planning process." *Id.*; Pls.' FoF ¶¶ 282-306; *see also id.* ¶¶ 177-79, 181.

Accordingly, Senate Factor 9 weighs in Plaintiffs' favor as well.

## V. Plaintiffs Are Entitled to Their Requested Relief

### A. This Court Has Broad Equitable Discretion to Order Each of Plaintiffs' Requested Remedies

Remedies for violations of voting rights are governed by traditional equitable standards. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971); *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1041 (5th Cir. 1982). When, as here, "a right and violation have been shown, the scope of the district court's equitable powers to remedy *past wrongs* is broad, for breadth and flexibility are inherent in equitable remedies." *Swann*,

402 U.S. at 15 (emphasis added). This Court thus has broad, flexible discretion when shaping equitable remedies for constitutional and statutory voting rights violations. *Id.*; *Brown*, 561 F.3d at 435.

To exercise this discretion, this Court should "eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding that those interests have constitutional roots." *Lemon v. Kurtzman*, 411 U.S. 192, 201 (1973) (plurality opinion). Although not unlimited, *see Veasey v. Abbott*, 888 F.3d 792, 800 (5th Cir. 2018), a federal court's powers in equity are "characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Brown v. Bd. of Educ. of Topeka,* 349 U.S. 294, 300 (1955). In application, the remedy must be tailored to fit the nature and extent of the particular constitutional or statutory violation. *Id.*

Applying these principles, this Court's equitable powers extend to remedial orders governing polling location placement. *See*, *e.g.*, *United States v. Palmer*, 356 F.2d 951, 952-53 (5th Cir. 1966) (enjoining a jurisdiction from closing voting registration offices where a disproportionate number of Black voters remained unregistered as a result of past discriminatory practices); *Brown v. Dean*, 555 F. Supp. 502, 506 (D.R.I. 1982) (requiring election officials to designate a particular location as a polling place); *Spirit Lake Tribe v. Benson Cty.*, No. 2:10-cv-095, 2010 WL 4226614, at *6 (D.N.D. Oct. 21, 2010) (same).

Plaintiffs' request for relief in the form of an order enjoining Defendants to select at least one early voting location on PVAMU's campus is limited and narrowly tailored. Since the preparations for the March 2020 primary in January of 2020, Defendants have

made it their practice to offer only one early voting location in each of Waller County's four commissioner precincts, with the WCCC being Defendants' chosen site for Precinct 3 (which includes Prairie View). FoF ¶¶ 469, 474-78; *see also id.* ¶¶ 471-473. But, for the reasons discussed above about Defendants' departures from their own criteria, designating an on-campus early voting location instead of the off-campus WCCC would cause no undue interference; indeed, doing so aligns with early Defendants' own criteria.

This Court's equitable powers also extend to remedial orders requiring community input in actions such as setting an early voting plan. *See Floyd v. City of New York*, 959 F. Supp. 2d 668, 686 (S.D.N.Y. 2013) (ordering remedial community input as a "vital part of a sustainable remedy" to remedy plaintiffs' harm); *Tyehimba v. City of Cincinnati*, No. C-1-99-317, 2001 WL 1842470, at *1 (S.D. Ohio May 3, 2001) (same); *Berry v. Sch. Dist. of Benton Harbor*, 515 F. Supp. 344, 379-80 (W.D. Mich. 1981), *aff'd and remanded*, 698 F.2d 813 (6th Cir. 1983) (ordering the appointment of a twenty-one person committee comprising administrators, teachers, parents, and students to create a new code of student discipline for districts undergoing desegregation to prevent arbitrary enforcement); *Kelley v. Metro. Cty. Bd. Of Educ.*, 479 F. Supp. 120, 123 (M.D. Tenn. 1979) (explaining that "input from the many well-motivated, thoughtful citizens of the community [] should be sought and received" to resolve the problem of school desegregation); *see also Consent Decree* at ¶¶ 30-34, *Antoine v. Winner Sch. Dist.* 59-2, No. 06-cv-3007-CBK (D.S.D. Dec. 10, 2007) ECF 64 (entering a consent decree that included the creation of a committee comprising Native American community members and school officials to review disciplinary incidents every quarter for racial disparities).

Here, ordering Defendants to ensure that at least one PVAMU student representative is involved in the process for setting an early voting schedule is also limited and narrowly tailored. Defendants have acknowledged and repeatedly reaffirmed that seeking input from Waller County residents is critical to fostering transparency and resolving the recurring issues that arise when Defendants set the early voting plan. Pls.' FoF ¶¶ 207, 212 Defendants' admissions and recommendations mitigate any concerns that this remedy would create undue interference with the development of the early voting schedule. *Id.* ¶¶ 225-28, 305 (Defendant supporting on-campus early voting under various conditions).

Further, this Court may order Plaintiffs' requested prophylactic relief through the bail-in provision of Section 3 of the VRA. Am. Compl., ECF 49 at 28. Section 3(c) authorizes courts to order prophylactic relief by imposing preclearance remedies for constitutional violations. 52 U.S.C. § 10302(c); *see, e.g.*, *Perez v. Abbott*, 390 F. Supp. 3d 803, 807 (W.D. Tex. 2019). Consistent with courts' broad equitable powers, courts have applied Section 3's provisions to local jurisdictions. This Court's remedy, for example, required Pasadena, Texas, to comply with a six-year preclearance review until 2023 to protect Latino voters and prevent the city from intentionally diluting their voting power. *Patino v. City of Pasadena*, No. H-14-3241, 2017 WL 10242075, at *2-3, n.4 (S.D. Tex. Jan. 16, 2017); *see also Jones v. Jefferson Cty. Bd. of Educ.*, No. 2:19-CV-01821-MHH, 2019 WL 7500528, at *5 (N.D. Ala. Dec. 16, 2019) (entering a consent decree that included Section 3(c) relief, requiring preclearance for changes to voting standards, practices, or procedures to the method of election for the Jefferson County Board of Education and other changes until December 31, 2020); *Allen v. City of Evergreen*, No. 13-0107-CG-M, 2014

WL 12607819, at *2 (S.D. Ala. Jan. 13, 2014) (entering a consent decree that included Section 3(c) relief, requiring preclearance for changes to the city's method of election for city council elections and standards for determining voter eligibility until December 21, 2020).

Based on the record and the evidence presented at trial, bail-in relief is both appropriate and necessary. As preclearance is a form of "equitable relief," 52 U.S.C. § 10302(c), this Court has broad flexibility to craft a preclearance remedy for specific, proven constitutional violations. Rather than "suspending all changes to [the county's] election law," *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009), this Court can interpret Section 3(c) to require preclearance for only certain changes to election practices or procedures in Waller County, such as the development and adoption of early voting plans. Placing Waller County under Section 3's preclearance requirement for a time period is necessary to prevent Defendants from enacting discriminatory voting changes relating to early voting procedures. Because the relief is narrowly tailored and designed to specifically remedy constitutional violation, bail-in relief is also appropriate "without extending so far as to punish the [County] with excessive federal oversight." *Patino*, 2017 WL 10242075, at *2 n.4. This Court, therefore, has the authority to grant this relief under its equitable powers.

For the reasons above, Plaintiffs' requested relief is fair, necessary, and workable because it is limited and narrowly tailored to prevent recurrence of the constitutional and statutory violations. *See Lemon*, 411 U.S. at 200. As a result, this Court has the authority to: (1) issue a declaratory judgment on all of Plaintiffs' claims, which serves a prophylactic

function; (2) order Defendants to select at least one early voting location on PVAMU's campus, which for elections in 2021 should be the MSC, especially with many students likely returning to campus full-time for the first time since the early months of the COVID-19 pandemic, and to accommodate necessary COVID-related precautions; (3) order Defendants to ensure that at least one PVAMU student representative and/or other PVAMU official is involved in the process for setting an early voting schedule; and (4) order prophylactic relief through Section 3(c) of the VRA.

## B. HB 1888 Does Not Moot Plaintiffs' Claims

Plaintiffs incorporate by reference here the discussion of the legal framework for assessing mootness from the Proposed Conclusions of Law. Conclusions of Law Section V(B). Based on this framework, Defendants' claim at the summary judgment stage that HB 1888 moots Plaintiffs' requested relief, *see* ECF 73 at 22-23, is easily defeated. Defendants misperceive both the nature of mootness and Plaintiffs' requested relief. A case becomes "moot only when it is impossible for a court to grant . . . any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012). There are no mootness concerns here, because HB 1888 does not fully address Plaintiffs' claims. Three points highlight this.

*First*, injunctive relief requiring Defendants to establish early voting locations that are accessible to Plaintiffs remains necessary. Defendants concede that HB 1888's narrow scope merely establishes the *minimum* number of hours and requires uniformity at early voting locations on weekdays only *after* such locations have been selected. Pls.' FoF ¶¶ 466-67; *see also* Defs.' Mot. for Summ. J., ECF 73 at 22-23. HB 1888 does not provide

any guidance or constraint about the substantive criteria or processes that counties should use to select their early voting locations. Pls.' FoF ¶ 467. Under HB 1888, Defendants thus retain the same unfettered discretion to set early voting locations discriminatorily as they did in the fall of 2018. *Id*. ¶¶ 4-68.

Defendants also retain significant discretion with respect to the allocation of early voting hours, despite Defendants' misleading representations to the contrary. *Compare* Defs.' Pre-trial Mem. of Law, ECF 109-1, at 6 ("Due to changes in the law, hours of early voting are now uniform throughout the county."), *and id.* at 8 ("Of course, the issue of disparate numbers of hours is not an issue going forward, as state law now provides that temporary branch polling places—the category of polling place that includes the early voting sites in Prairie View—be open the same days as the main early voting polling place and remain open for a minimum number of hours each day."), *with* Day 7 Tr., 179:18-21 (Defendant Eason conceding that Defendants retain discretion whether to provide early voting at a temporary branch location on Saturdays and Sundays); *see also* Tex. Elec. Code. § 85.064(b) (setting a minimum, but not a maximum, number of hours of early voting for temporary branch polling places and, by reference to Tex. Elec. Code § 85.005, imposing this requirement of *weekdays only* during the early voting period); Pls.' FoF ¶¶ 463-68.

Defendants have exercised this discretion by repeatedly ignoring and being unresponsive to Black PVAMU students' concerns about the need for adequate and nondiscriminatory early voting access, including students' requests for early voting at on campus locations such as the MSC. *Supra* Section IV(C)(v). Based on Plaintiffs' factual and expert evidence, Black PVAMU students face unique socioeconomic disadvantages

and lack access to transportation as compared to white, older voters elsewhere in Waller County. Pls.' FoF ¶¶ 5-6, 9-12, 19-21, 121-40; Pls.' Ex. 153, Cooper Decl. at 12-15; *supra* Section IV(C)(iii). These disadvantages make traveling to early voting locations off campus, like the WCCC (which, as above, was also denied adequate hours in 2018) or other locations even further from campus, uniquely difficult for Black PVAMU student voters and Black voters in the City of Prairie View. Day 5 Tr. 236:23-237:10; Pls.' FoF ¶¶ 5-6, 9-12, 19-21, 121-40, 448-55; Pls.' Ex. 155, Joseph Rep. at 37-39; Pls.' Ex. 158, Stein Rep. at 10-15 . Defendants have been aware of these well-documented barriers for years. *See, e.g.*, Pls.' Ex. 155, Joseph Rep. at 31-32; Pls. Ex. 156, Flores Rep. at 7.

Yet Defendants failed to address these concerns and mitigate the discriminatory allocation of early voting access—despite having enough resources to provide additional early voting on campus at the MSC for the fall 2018 general election. Pls.' FoF ¶¶ 245, 289, 296, 299; *see also id.* ¶ 23. As discussed *supra*, Defendants have attempted to conceal their discriminatory actions by offering tenuous, shifting, and unsubstantiated rationales. Defendants, and have relied on these pretextual justifications to deny any proposed changes that would have addressed the lack of equitable early voting access for Black voters in Prairie View, young students in Prairie View, and Black PVAMU student voters as compared to what was provided to white, older voters elsewhere in Waller County. *See supra* Sections I(B)(v); II(c)(v); III(c)(v); IV(c)(vi).

And Defendants have carried forward their discrimination against Black PVAMU students and other Black voters in every election since the November 2018 election. Pls.' FoF ¶¶ 469-78. Following HB 1888's enactment in September 2019, Defendants have

refused to provide on campus early voting in any election in Waller County, including for the November 2019 general, March 2020 primary, July 2020 primary runoff, and November 2020 general elections. *Id.* ¶¶ 469-73. Defendants acknowledge that nothing in HB 1888 prevents them from budgeting and preparing to provide early voting on campus at the MSC, along with, if desired, the Prairie View City Hall, which is the choice of some senior citizen voters in Prairie View. *See id.* ¶¶ 165, 478; Day 3 Tr., 27:14-28:5 (Kendric Jones testifying that the City of Prairie View holds early voting in non-consolidated city elections at the MSC and the Prairie View City Hall—and never at the WCCC). Yet Defendants have refused to do so. Pls.' FoF ¶¶ 469-78.

*Second*, Plaintiffs seek a declaratory judgment that Defendants violated Plaintiffs' constitutional and statutory rights by allocating early voting access in a discriminatory manner for the fall 2018 general election. Defendants Duhon and Eason admitted that their schedule did not provide "equal representation" and created "an inequity." *Id.* ¶¶ 226-27, 230. A declaratory judgment here serves as a prophylactic remedy against future discrimination because it is an important factor in the adjudication of future discrimination claims. *LULAC*, 548 U.S. at 426 (identifying "the history of voting-related discrimination in the State" as one potential factor that a plaintiff may show in the totality of circumstances analysis to prove a Section 2 claim).

*Third*, HB 1888 is silent about the process for developing an early voting schedule, including selecting early voting locations. Pls.' FoF ¶ 467. Defendants admit that they solely rely on the Waller County Democratic and Republican Party chairs—an uncommon practice not required by Texas election law—for establishing their early voting plans, and

that the party chairs are given exclusive access to provide input and review in a non-public process before the plan is submitted to Defendant Commissioners Court for approval. *See, e.g.*, *id*. ¶¶ 193, 196-97, 199, 204. This process is broken, non-transparent, and unresponsive to the needs of all Waller County residents, including the protected classes of young, Black student voters, and other Black voters. *Id*. ¶¶ 241, 292, 401-27. As Plaintiffs' factual and expert evidence establishes: (1) Defendant Eason and the party chairs do not solicit input, although they could, from Waller County residents (apart from the party chairs themselves), *Id*. ¶¶ 193, 199, 416, 418, 420; (2) Defendant Eason and the party chairs create the schedule before students are on campus to participate in the selection process, *Id*. ¶¶ 185-87, 193, 198-211; and (3) Defendant Duhon admitted that "a lot of students" were unrepresented by party officials because they "do not identify as a Democrat or a Republican," *id*. ¶ 410; *supra* Section IV(C)(v).

Despite these concerns being repeatedly raised in public fora with Defendants since at least 2015, Defendants refused to consult with PVAMU students and other Waller County residents in the development of their early voting plans in November 2018. *See, e.g.*, Pls.' FoF ¶¶ 199, 202, 240, 420. And they have refused to commit to a process to consistently consult with PVAMU students and other Waller County residents despite acknowledging that doing so would be more inclusive and would address recurring problems, and demonstrating their ability to do so, including when they were required to prior to 2013 under federal preclearance and when they felt compelled to after Plaintiffs filed this lawsuit. *Id*. ¶¶ 413-14, 418, 420-423, 474-77, 485-87. Defendants have also refused to act to engage the community irrespective of Waller County's past election data

that they claim to rely on, which shows that PVAMU students (a) rely on early voting and use it at high rates, and (b) account for a third of Waller County's registered voters and live in the most populous precinct. *Supra* Sections I(B)(i), I(B)(ii), I(B(iv). These failures begin to explain why Commissioner Amsler publicly stated that a conversation about PVAMU being treated unfairly "comes up every time" during preparation for elections, Pls.' FoF ¶ 231, and why Defendant Eason publicly recommended a more standardized and inclusive process that enables residents throughout the County to participate and give input that is meaningfully considered, *id*. ¶ 229. Defendants continue to rely on this broken process for setting early voting schedules rather than work transparently with Plaintiffs and other PVAMU students to establish nondiscriminatory plans. *Id*. ¶¶ 418, 420-423.

Plaintiffs requested relief is necessary to remedy these longstanding and ongoing harms. Without declaratory and injunctive relief, Plaintiffs continue to face a substantial—and predictable—likelihood of continued harm because Defendants have shown themselves to be capable of repeatedly setting discriminatory early voting schedules, including locations, and evading any meaningful review through reliance on a broken process under which they persistently fail to select an early voting location on campus. *Honig v. Doe*, 484 U.S. 305, 318 (1988) (holding that claims are not moot if a defendant's actions are "capable of repetition, yet evading review"); *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003) ("To obtain equitable relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future.").

For these reasons, Plaintiffs have live, concrete interests in obtaining relief from Defendants' constitutional and statutory violations, none of which are fully addressed by

HB 1888. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) ("As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.") (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)). And Plaintiffs' requested relief is necessary to address discriminatory harms, provide prophylactic relief, and prevent Defendants from adopting and maintaining early voting plans that perpetuate discrimination against Black voters in Prairie View, young voters in Prairie View, and Black PVAMU student voters.

### C. PVAMU is Neither a Necessary nor Indispensable Party to this Lawsuit

Plaintiffs incorporate by reference here the discussion of the legal framework for assessing joinder from the Proposed Conclusion of Law. Conclusions of Law Section V(C). In their filings at the summary-judgment stage, Defendants claimed that injunctive relief ordering an early voting location on campus against existing Defendants would be insufficient. Defs.' Suppl. Br. in Supp. of Mot. for Summ. J., ECF 101 at 6-7. Because PVAMU controls its property and facilities, Defendants contended PVAMU is an indispensable party for any relief concerning on campus early voting and must be joined. *Id.*

But Defendants failed to carry their burden to prove that PVAMU is a necessary— let alone indispensable—party to this case. Under the first step of the joinder analysis, they did not meet even the initial burden of providing that PVAMU is a necessary party for this Court to order on campus early voting. Defendants claimed this Court cannot issue relief over the siting of a future early voting location because Defendants do not control PVAMU's property and facilities. *Id.* But that is a non sequitur for two reasons.

*First*, Dr. Flores explained that the County has held early voting at several sites that it does not control, including in fall 2018, such as the Katy Veterans of Foreign Wars Post and the Waller Independent School District Administrative Building. Pls.' FoF ¶ 277. There is no nondiscriminatory reason for Defendants to subject proposed early voting facilities on the PVAMU campus to a more demanding standard than other early voting facilities.

*Second*, Defendants introduced no evidence suggesting that PVAMU would refuse to host early voting without a court order. They hypothesized the absence of PVAMU as a party to this litigation would impair "its property interests" and do not provide any supporting evidence. Defs.' Suppl. Br. in Supp. of Mot. for Summ. J., ECF 101 at 7. But this Court has rejected such "theoretical impact" as "not sufficient to render a party necessary under Rule 19(a)." *Evanston Ins. Co. v. Kinsale Ins. Co.*, No. 7:17-CV-327, 2018 WL 4103031, at *8 (S.D. Tex. July 12, 2018).

In contrast to Defendants' erroneous claims, PVAMU administrators and students, for years and throughout this litigation, have consistently advocated to host an on campus early voting site. *See, e.g.*, Pls.' FoF ¶¶ 178-79, 275, 490-92, 494-95. Moreover, as trial evidence and testimony from Defendant Eason and other witnesses established, the on campus MSC has consistently served as an election day voting location in several elections, including in 2019 and 2020, and as an early voting location for Waller County elections in 2016 and 2018; moreover, the MSC has also consistently served as an early voting location in City of Prairie View elections. *Id.* ¶¶ 165, 169, 305; Day 3 Tr., 27:14-28:21; Pls.' Ex. 13; Pls.' Ex. 14; Day 7 Tr., 77:10-22, 119:7-120:7, 149:15-17. PVAMU has willingly

entered into licensee agreements with Waller County for the MSC to serve as an early voting location; PVAMU staff, as docket entries ECF 17-2, ECF 17-4, and ECF 77-1 reflect, submitted declarations in 2018 and 2019 welcoming an on campus early voting location for those years and beyond; and the testimony of Mr. Frank Jackson at trial made clear that PVAMU is eager to host early voting and will do whatever is necessary to host it—including but not limited to PVAMU's president, Dr. Simmons, offering to buy the County additional voting machines out of her own pocket; students and administrators reserving parking for voting and providing escorts for community members; PVAMU promptly throwing out a parking ticket mistakenly given to a voter; and student and faculty leaders meeting with Defendants and their predecessors in office to consider locations on campus that are accessible to students and non-student voters. *See, e.g.*, Pls.' FoF ¶¶ 178-79, 224, 275, 490-92, 494-95. Moreover, PVAMU continues voluntarily to work with the City of Prairie View to hold early voting on campus at the MSC in city elections, and with Defendants to hold Election Day voting on campus at the MSC on for federal, state, and county elections. *Id.* ¶¶ 165, 169, 305; Day 3 Tr., 27:14-21; Pls.' Ex. 13; Pls.' Ex. 14; Day 7 Tr., 77:10-22, 119:7-16, 149:15-17. Simply put, there is no indication PVAMU is now unwilling and unable to provide expanded early voting opportunities on campus. Nor is there a risk that PVAMU would not comply with an order from this Court granting Plaintiffs' requested relief. *See, e.g.*, Pls.' FoF ¶¶ 179, 181. Through the existing evidentiary record and evidence at trial, PVAMU has thus shown that it is willing and able to comply with an order by this Court to locate an early voting site on campus for the full voting period under Texas law.

Under Rule 19(a), Defendants have therefore not carried their burden to demonstrate that PVAMU is a necessary party for this Court to order on campus early voting, because (1) this Court can grant complete relief among existing parties, (2) PVAMU's property rights will not be impaired or impeded by order requiring Defendants to an early voting location on campus, and (3) neither PVAMU nor Defendants would be subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because PVAMU is willing and able to host on campus early voting. *See Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1310 (5th Cir. 1986). This Court, therefore, need not engage in the second step of the Rule 19 analysis, under which courts assess four factors to determine the indispensability of necessary parties. *See Hood ex rel. Miss. v. City of Memphis*, 570 F.3d 625, 628-29 (5th Cir. 2009).

Even so, if this Court considers PVAMU a necessary party, Defendants have failed to show that any of the four factors in Rule 19(b) support their claim that PVAMU is an indispensable party for injunctive relief requiring early voting on campus. Under Rule 19(b)'s first factor, PVAMU would not suffer any prejudice because PVAMU has repeatedly confirmed it is willing and able to provide expanded early voting opportunities both in past elections and going forward. *See* Pls.' FoF ¶¶ 178-79, 275, 490-92, 494-95. Because PVAMU would not suffer any prejudice, as discussed above, there is no need to consider reducing or eliminating prejudice under the second factor. Under the third factor, complete relief to remedy Defendants' constitutional and statutory violations can be accorded without PVAMU, because, as discussed above, PVAMU has shown its willingness to provide early voting on campus and to follow all election laws, and thus will

voluntarily comply with an order from the Court. Defendants' claimed remedial inadequacy is therefore without basis. As for the fourth factor in the Rule 19(b) analysis, Plaintiffs will not have an adequate remedy for the lack of an on campus early voting location if this Court dismisses the present action for non-joinder.

Thus, PVAMU is neither a necessary nor an indispensable party for requiring on campus early voting. PVAMU's non-joinder tracks Rule 19's purpose because this case "can be fairly and completely disposed of" with existing parties. *Pulitzer*, 784 F.2d at 1308. But if this Court decides PVAMU is indispensable, dismissing any of Plaintiffs' claims is not warranted. Instead, this Court can join PVAMU's President in her official capacity.

### D. Even if PVAMU Were Indispensable, Sovereign Immunity Is No Bar to Joinder

Plaintiffs incorporate by reference here the discussion of the legal framework for assessing sovereign immunity from the Proposed Conclusions of Law. Conclusions of Law Section V(D). Before trial, Defendants asserted that joining PVAMU, if necessary, would not be feasible because PVAMU is an entity of the state and, therefore, it "possesses immunity under the Eleventh Amendment." Defs.' Suppl. Br. in Supp. of Mot. for Summ. J., ECF 101 at 9. But that argument deviates from binding precedent.

The Fifth Circuit has held that Congress's passage of the VRA "validly abrogated state sovereign immunity." *OCA-Greater Houston*, 867 F.3d at 614. The Fifth Circuit rejected a sovereign immunity defense proffered by Texas and state elections officials, holding that "[s]overeign immunity has no role to play" in a VRA suit seeking declaratory

and injunctive relief. *Id.* Here, at minimum, precedent establishes that Texas and its sub-jurisdictions are not immune from suit under the VRA.

Moreover, all four of Plaintiffs' claims fit squarely within the *Ex parte Young* exception to Eleventh Amendment sovereign immunity, which allows a federal court to "enjoin state officials to conform their future conduct to the requirements of federal law." *Quern v. Jordan*, 440 U.S. 332, 337 (1979). Under the *Ex parte Young* exception, a party may "sue a state official, in his [or her] official capacity," when the official has "some connection to the state law's enforcement." *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 515, 517 (5th Cir. 2017) (internal quotation marks omitted). The official's connection to the challenged law's enforcement need not be direct. *City of Austin v. Paxton*, 943 F.3d 993, 1001 (5th Cir. 2019). Here, injunctive relief requiring Defendants to provide on campus early voting would remedy "an ongoing violation of federal law" that is "properly characterized as prospective." *Va. Office for Prot. and Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted). And this Court could find that PVAMU has "some connection" on this injunctive relief because it has control over on campus locations, such as the MSC, that are suitable for early voting. Thus, if PVAMU is deemed an indispensable party, this Court should not dismiss the lawsuit. Instead, it should join PVAMU's President in her official capacity, as a state official and a party not immune from suit under *Ex parte Young*.

## E. This Court Needs to Reach Both Constitutional and Statutory Claims To Grant Plaintiffs' Requested Relief

As this Court has noted, federal courts generally "shouldn't decide a constitutional question if some other ground exists upon which to dispose of the case." Mem. Order Den. Mot. for Summ. J., ECF 104 at 20-21 (citing *Veasey*, 830 F.3d at 265). However, in cases when prevailing on a constitutional claim would entitle plaintiffs "to relief beyond that to which they were entitled on their statutory claims," it is both necessary and appropriate for courts to reach constitutional questions. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445-46 (1988). The present litigation is such a case for two reasons.

*First*, a ruling only on Plaintiffs' Section 2 claims would not entitle them to the full relief necessary. Plaintiffs seek relief in the form of a declaratory judgment that Defendants intentionally discriminated against PVAMU students and other Prairie View voters not only on the basis of race, as Black voters, but also on the basis of age, as young voters who are predominantly aged 18, 19, or 20. Am. Compl., ECF 49 at 28 ¶ 101(a). The VRA does not provide a vehicle for this relief in full because, unlike the Twenty-Sixth Amendment, it does not protect against intentional discrimination against young voters on the basis of age. *See* 52 U.S.C § 10301(a); *Perez*, 390 F. Supp. 3d at 814.

Nor would a ruling in Plaintiffs' favor under Section 2 alone satisfy the statutory prerequisite for Section 3(c) bail-in, another form of relief sought by Plaintiffs. *See* 52 U.S.C. § 10302(c) (conditioning bail-in on "violations of the fourteenth or fifteenth amendment"). Because a finding of a constitutional violation is necessary for Section 3(c) relief, this Court should reach Plaintiffs' intentional discrimination claims based on race

and the intersecting bases of age and race. A court cannot "avoid ruling on [a] discriminatory intent claim [if] . . . the remedy to which Plaintiffs would be entitled for a discriminatory intent violation is potentially broader than the remedy the district court may fashion for the discriminatory impact violation." *Veasey*, 830 F.3d at 230 n.11; *see also Patino*, 230 F. Supp. 3d at 718-19. Because a finding of discriminatory results under Section 2 cannot provide this prophylactic remedy, the Court should address Plaintiffs' discriminatory intent claims.

*Second*, unlike in *Veasey*, the rights and remedies at issue would not be intertwined based on this Court's favorable ruling on only Plaintiffs' intentional age or racial discrimination claims. Under the *Arlington Heights* framework, the record and Plaintiffs' trial evidence establishes multiple intentional discrimination violations under the Constitution. *Supra* Sections I-III. A declaratory judgment of intentional discrimination on the basis of race or the intersecting bases of age and race is necessary to remedy the longstanding and ongoing discriminatory harms. Declaratory relief is particularly necessary for Plaintiffs' intentional discrimination claim under the intersecting bases of age and race given the unique pattern of discrimination that Defendants have exacted on Plaintiffs and others similarly situated for decades. Without it, this Court's equitable powers may be limited in shaping fair and workable remedies that address the practical and unique realities that Black PVAMU students face. *See Lemon*, 411 U.S. at 200; *Brown v. Board of Ed.*, 349 U.S. at 300; *supra* Section I(B)(vii).

## CONCLUSION

For the foregoing reasons, based on the evidence presented at trial, Plaintiffs respectfully request that the Court enter final judgment in their favor and against Defendants on all claims.

Respectfully submitted on March 29, 2021,

**Of Counsel:**

/s/ Leah C. Aden
Leah C. Aden*
Deuel Ross*
Kristen A. Johnson*
John S. Cusick*
Steven C. Lance*
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Phone: (212) 965-2200
Fax: (212) 226-7592
laden@naacpldf.org
dross@naacpldf.org
kjohnson@naacpldf.org
jcusick@naacpldf.org
slance@naacpldf.org

Catherine Meza*
NAACP LEGAL DEFENSE AND
    EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
Phone: (202) 682-1300
Fax: (212) 226-7592
cmeza@naacpldf.org

Adam T. Schramek (SDTX 31913)
State Bar No. 24033045
Attorney-in-Charge
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone: (512) 474-5201
Facsimile: (512) 536-4598
adam.schramek@nortonrosefulbright.com

Julie Goodrich Harrison (SDTX 3017799)
 State Bar No. 24092434
Nicole Lynn (SDTX 3041738)
 State Bar No. 24095526
Tyler E. Ames (SDTX 3486420)
 State Bar No. 24116028
NORTON ROSE FULBRIGHT US LLP
1301 McKinney Street, Suite 5100
Houston, Texas 77010
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
julie.harrison@nortonrosefulbright.com
nicole.lynn@nortonrosefulbright.com
tyler.ames@nortonrosefulbright.com

*Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2021, I served a true and correct copy of the foregoing document via electronic notice by the CM/ECF system on all counsel or parties of record.

*/s/ Leah Aden*
Leah C. Aden

*Counsel for Plaintiffs*