**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| DAMON JOHNSON, TREASURE SMITH, and THE PANTHER PARTY, <br><br> *Plaintiffs,* <br><br> v. <br><br> WALLER COUNTY, TEXAS; *et al.*, <br><br> *Defendants.* | <br><br><br><br><br> Civil Action No. 4:18-cv-3985-CRE |

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

C. ROBERT HEATH
Texas State Bar No. 09347500
Southern District No. 13381
*bheath@bickerstaff.com*

GUNNAR P. SEAQUIST
Texas State Bar No. 24043358
Southern District No: 1140733
*gseaquist@bickerstaff.com*

BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile: (512) 320-5638

**ATTORNEYS FOR DEFENDANTS**

# TABLE OF CONTENTS

Table of Contents..................................................................................................... i

Table of Authorities ............................................................................................... iii

I. Findings of Fact ..................................................................................................... 1

Waller County Government ..................................................................................... 1

Demographics of Waller County ............................................................................. 2

In-Person Early Voting ............................................................................................ 5

Early Voting in Waller County ................................................................................ 8

    A. Process for Setting the Schedule ...................................................................... 8

    B. History of Siting................................................................................................ 12

        i.   Election Day .............................................................................................. 12

        ii.  Early Voting ............................................................................................... 13

    C.  The Commissioners Court returns voting to the PVAMU Campus ................. 17

    D.  Comparison to Similar Counties ...................................................................... 19

Adoption of 2018 General Election Schedule ........................................................... 20

Historical Usage ....................................................................................................... 28

The Waller County Community Center is Familiar and Accessible ........................... 29

Voting Equipment ..................................................................................................... 32

Rumors and Misinformation Regarding Voter Registration...................................... 34

Reconsideration of Early Voting Hours at October 17, 2018 Commissioners Court Meeting ......................................................................................................... 36

The Lawsuit and Extended Voting Hours.................................................................. 40

The Adoption of H.B. 1888 in 2019 ......................................................................... 41

The early voting schedule for the 2018 general election did not disparately burden minority voters. ............................................................................................ 44

Intentional Discrimination ........................................................................................ 62

II. Conclusions of Law ........................................................................................................... 64

    Section 2 of the Voting Rights Act ............................................................................. 64

    Intentional Discrimination in Violation of Section 2 or the Fourteenth and Fifteenth Amendments to the United States Constitution ........................................... 67

    Twenty-Sixth Amendment Claim ............................................................................... 70

    Intersecting Claims under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments ................................................................................................................. 75

Relief ..................................................................................................................................... 75

Certificate of Service ........................................................................................................... 76

# TABLE OF AUTHORITIES

**Cases**

*City of Mobile v. Bolden*,
 466 U.S. 55 (1980) (plurality opinion) ...................................................... 67

*Fusilier v. Landry*,
 963 F.3d 447 (5th Cir. 2020*)* ............................................................ 69, 70

*Jordan v. City of Greenwood, Miss.*,
 711 F.2d 667 (5th Cir. 1983) ................................................................ 68

*Lee v Virginia State Board of Elections*,
 843 F3d 592 (4th Cir 2016) ................................................................. 66

*North Carolina State Conference of the NAACP v. Raymond*,
 981 F.3d 295 (4th Cir. 2020) ............................................................... 49

*Ohio Democratic Party v. Husted,* 834 F.3d 620, 638 (6th Cir. 2016) ............................. 66

*Shelby County v. Holder*,
 570 U.S. 529 (2013)...................................................................... 49, 51

*Texas Democratic Party v. Abbott*,
 978 F.3d 168 (5th Cir. 2020) (Texas Democratic Party II) ................................*passim*

*Thornburg v. Gingles*,
 478 U.S. 30 (1986)......................................................................... 67

*Tully v. Okeson*,
 977 F.3d 608 (7th Cir. 2020) ............................................................... 71

*United States v. State of Tex.*,
 445 F. Supp. 1245 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United
 States*, 439 U.S. 1105 (1979) .............................................................. 50

*Veasey v. Abbott*,
 830 F.3d 216 (5th Cir. 2016) .........................................................*passim*

*Veasey v. Perry*,
 71 F.Supp.3d 627 (S.D. Tex. 2014), *aff'd in part, vacated in part, and
 rev'd in part, Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) ................. 49, 50, 65, 66

*Village of Arlington Heights v. Metro. Housing Devel. Corp.*,
429 U.S. 252 (1977) ............................................................................ 70, 74

*White v. Regester*,
412 U.S. 755 (1973) ................................................................................... 67

**Statutes**

52 U.S.C. § 10301(a) ................................................................................ 64

52 U.S.C. § 10301(b) ................................................................................ 64

52 U.S.C. § 10302(c) ................................................................................ 68

Tex. Elec. Code § 3.005(c) ........................................................................ 10

Tex. Elec. Code § 4.003 ............................................................................. 11

Tex. Elec. Code § 31.031 ............................................................................. 1

Tex. Elec. Code § 31.032 ........................................................................ 1, 10

Tex. Elec. Code § 31.043 ......................................................................... 2, 7

Tex. Elec. Code § 85.001 ............................................................................. 7

Tex. Elec. Code § 85.002 ............................................................................. 7

Tex. Elec. Code § 85.003 ............................................................................. 8

Tex. Elec. Code § 85.006 ............................................................................. 7

Tex. Elec. Code § 85.009 ........................................................................... 10

Tex. Elec. Code § 85.062 (a) ....................................................................... 7

Tex. Elec. Code § 85.064(b) ....................................................................... 42

Tex. Elec. Code § 85.065 ............................................................................. 8

Tex. Elec. Code § 85.066(a) ........................................................................ 8

Tex. Elec. Code § 86.065(b) ........................................................................ 8

## I. FINDINGS OF FACT

### Waller County Government

1. Waller County, Texas is a Texas political subdivision that acts legislatively through the majority vote of its Commissioners Court. (Parties Proposed Stipulations of Fact ("Joint Stipulations"), Dkt 109-1, p. 5, ¶¶ 8-9).

2. The Waller County Commissioners Court consists of four County Commissioners, each elected from one of the four precincts within the County and the County Judge, who is elected at large from within the County. *Id.*

3. At the time of the events surrounding the 2018 general election made the basis of this case, the County Judge was, and to this date remains, the Honorable Carbett "Trey" Duhon, III. The County Commissioners for Waller County were, John Amsler (Precinct 1), Walter E. Smith (Precinct 2), Jeron Barnett (Precinct 3),[1] and Justin Beckendorff (Precinct 4). *Id.*; *see also* Pls' Ex. 156, Report of H. Flores, at p. 15.

4. Waller County has also created the position of a County Elections Administrator, as permitted by state law. Tex. Elec. Code § 31.031; *see also* Tr., Vol. 6, 227:7-11. The County Elections Administrator is appointed by the county election commission, which, as a matter of state law, consists of the county judge, the county clerk, the county tax assessor-collector, and the county chair of each political party

---

[1] Commissioner Barnett has since been replaced by Commissioner Kendric Jones as the Commissioner of Precinct 3.

that made nominations in the last general election (for Waller County, the Democratic and Republican party chairs). *Id.* at § 31.032; Tr. Vol. 10, 90:16-20.

5.  The Elections Administrator performs the duties and functions of the voter registrar, and for elections run by the County, fulfills the duties and responsibilities traditionally assigned to the County Clerk, including, among other things, preparing a proposed schedule of polling locations and times for approval by the Commissioners Court, hiring and training poll workers, allocating voting equipment to ensure adequate coverage for all polling locations, overseeing the conduct of the election, and overseeing the canvassing of election results. Tex. Elec. Code § 31.043; Tr. Vol. 6, 228:4-9.

6.  The current Waller County Elections Administrator, Christy Eason, initially served in that role from 1989-1999, when she left to enter the private sector. *Id.* at 227:7-228:3. Ms. Eason was re-appointed to the position of Elections Administrator in or around March of 2017 and has remained in that position since. *Id.*

### Demographics of Waller County

7.  Waller County sits on the northwest border of Harris County and within 55 miles of the City of Houston. Dkt. 49, Pls' Amended Complaint, ¶ 22.

8.  As of the 2010 Census, Waller County had a total population of 43,205, of whom 44.6% (19,260) are Anglo (non-Hispanic white) residents, 24.4% (10,537) are Black, and 29% (12,536) are Latinx (Hispanic people of any race). Waller County's voting age population ("VAP") is 32,549, of whom 26.8% (8,737) are Black voters,

47.48% (15,455) are Anglo voters, and 23.8% (7,755) are Latinx voters. Pls'
Amended Complaint, ¶ 24; Pls' Ex. 153, p. 5, Figure 1.

9.    Since the last of this decennial census, Waller County has experienced significant
      growth, increasing approximately 9,921 persons (22.96%) from 43,205 in 2010 to a
      2018 estimate of 53,126. Pls' Ex. 153, p. 5, ¶ 22; *see also* Vol. 10. 83:15-84:3.This
      growth has occurred across all racial and ethnic categories, but growth among
      minority populations has been slightly greater than Anglo growth. Pls' Ex. 153, p.
      5. This is largely fueled by growth in the Latino population, as indeed, the estimated
      population of individuals who identify as Single Race Black, Non-Hispanic Black,
      and Any Part Black have each decreased as a percentage of the overall population
      in Waller County according to 2018 estimates. Pls' Ex. 153, p. 5, Figure 1.  Overall,
      the Non-Hispanic Black population is growing slower than the population of the
      County as a whole. Tr. Vol. 5, 226:11-22.

10.   According to the U.S. Census Bureau's 2011-2015 American Community Survey
      ("ACS") five-year estimates, the Citizen Voting Age Populations ("CVAP") of the
      cities in Waller County are as follows:

      a.    Hempstead: CVAP is 3,810, and is 65.4% (2,492) Black, 28.9% (1,099)
            Anglo, and 12.5% (474) Latinx.

      b.    Brookshire: CVAP is 2,702 and is 50.9% (1,376) Black, 28.5% (769) Anglo,
            and 19.7% (533) Latinx.

      c.    Waller: CVAP is 1,433, and is 18.9% (271) Black, 69% (989) Anglo, and
            10.7% (153) Latinx.

d.    Katy: CVAP is 10,515, and is 3.5% (364) Black, 77.1% (8,102) Anglo, and 16.3% (1,712) Latinx.

e.    Prairie View: CVAP is 5,524 and the CVAP is 79%.

Joint Stipulations, Dkt. 109-1, ¶ 36.

11.    The demographic trends also show that the percentage of Black CVAP is decreasing in Prairie View and increasing in Brookshire, Hempstead, and Pattison. In a comparison between the 2008-2012 and 2013-2017 Special Tabulations of the ACS prepared by the Census Bureau, Plaintiff's hired demographer, William S. Cooper, found that the percentage of Non-Hispanic Black CVAP in Prairie View had decreased by 6.6%, while the percentage of Non-Hispanic Black CVAP had increased in the other cities as follows: Brookshire (6.2%). Hempstead (13.3%), Pattison (3.5%). Pls' Ex. 153, p. 8, Figure 5. Conversely, the percentage of Non-Hispanic White CVAP has increased in the City of Prairie View and Brookshire and decreased in the cities of Hempstead and Pattison. *Id.*

12.    Although Cooper reports various socioeconomic statistics for the City of Prairie View, he testified at trial that those figures are not reported for students who live in on-campus housing. Tr. Vol. 5, 237:12-25. According to the 2010 Census, there were 3,191 students living in the dormitories. Pls' Ex. 153, p. 15. While Cooper does report census data for per capita income for dorm students, that statistic may not accurately represent the financial circumstances of students as it does not include income generated from outside of Waller county such as support from

parents. Tr. Vol. 5, 238:11-19. Further, while Cooper reports that of the Black dorm students are employed, 48% walked to work, meaning more than half had access to another means of transportation. Pls' Ex. 153, p. 15. Indeed, Cooper's analysis shows that 46.8% of African Americans in Prairie View over the age of 18 drove to work in their own car or truck and that another 14.2% carpooled. *Id.* at p. B-5.

13.     Cooper's data further shows that 33.2% of residents in Prairie View have attained a bachelor's degree or higher, whereas only 26.2% of Anglo residents, both in Prairie View and in Waller County as a whole, have attained a bachelor's degree or higher. *Id.* at p. B-8.

## In-Person Early Voting

14.     In-person early voting, sometimes referred to as in-person absentee voting, is a form of convenience voting, whereby registered voters can cast their ballot in person at a polling location before election day. Tr. Vol. 8, 74:18-23; Tr. Vol. 2, 199:5-6.

15.     The experts in this case agree that the scientific research suggests that convenience voting, such as in-person early voting, is primarily used by voters who would have voted on election day in the first place, not those who would not have voted at all. Tr., Vol. 2, 199:7-23; Vol. 8, 75:16-23; P's 161, p. 6. Thus, the experts agree that early voting has not been shown to increase voter turnout. *Id.,* Vol. 2, 199:7-23; Vol. 8, 76:6-11. In fact, research on the subject reveals the anomalous result that the introduction of in-person early voting has actually reduced overall turnout by

eliminating the incentive for parties and campaigns to mobilize voters on election day. *Id.*; *see also* Vol. 8, 76:12-77:3.

16.    Further, Plaintiffs' political science expert, Bob Stein, expressly stated that he was offering no opinion on whether early voting played any role on the actual incidence of voting in either Prairie View or Waller County. Tr. Vol. 4, 200:4-18.

17.    Neither the United States Constitution nor any other federal law requires a state to offer early voting, and at least six states—Connecticut, Kentucky, Mississippi, Missouri, New Hampshire, and South Carolina—currently do not offer pre-election day in-person voting options. *National Conference of State Legislatures, State Laws Governing Early Voting*, https://www.ncsl.org/research/elections-and-campaigns/early-voting-in-state-elections.aspx.

18.    For those states that do offer in -person early voting, the period for voting, including the days and times on which the state offers early voting, varies widely. Indeed, the period for early voting in different states ranges from 4 to 45 days. *Id.* Furthermore, while some states specify the hours and days for early voting, many leave that determination to election officials. *Id.* Others specify hours and days for in-person early voting at a permanent early voting location but allow local election authorities the discretion to offer early voting at temporary polling locations and to set the days and hours at those locations based on local need and resources. *Id.* At the time of the 2018 election made the basis of this lawsuit, and prior to the passage of Texas H.B. 1888 in 2019, Texas fell into this latter category.

19.     The Texas Election Code only requires early voting to be held at one location in each county, known as the Main Early Voting Polling Place (MEVPP). Tex. Elec. Code §§ 81.001 and 85.002. In a county such as Waller, in which the county clerk is the early voting clerk—although in Waller County the election duties of the county clerk have been transferred to Eason as the Elections Administrator—the Main Early Voting Place may be located in any room selected by the clerk that houses the county clerk's main business office. Tex. Elec. Code § 85.002(b); *see also* § 31.043. However, if a county commissioners court determines that the location of the polling place in that building is impracticable, the court may designate a different location in the city in which the clerk's office is located, as near as is practicable to the clerk's business office. *Id.* at § 85.002(b).

20.     In Texas, the period for in-person early voting for a general election begins on the 17th day before election day and continues through the 4th day before election day. Tex. Elec. Code § 85.001. In a county with a population of less than 100,000, in-person early voting at the MEVPP must be conducted on the weekdays of the early voting period and during the regular hours of the main business office of the county clerk (or elections administrator). *Id.* In addition to the required weekday voting, an authority ordering an election also has discretion to conduct voting at the MEVPP on one or more Saturdays or Sundays during the early voting period. The ordering authority also has discretion to determine the times for the conduct of weekend voting, if any. *Id.* at 85.006.

21.     In addition to the MEVPP, the Texas Election Code grants the county commissioners court the discretion to establish "Temporary Branch Polling Places" (TBPPs). Tex. Elec. Code § 85.062 (a). Although the statute has since been amended, at the time of events made the basis of this suit, a county with a population of less than 100,000, such as Waller, could conduct early voting at a TBPP on any one or more days and during any hours of the period for early voting by personal appearance. *Id*. at § 85.065 (a) and (b). Prior to 2019, the Election Code also explicitly stated that "the schedules for conducting voting are not required to be uniform among the temporary branch polling places." *Id*. at § 85.065(c). Subject to exceptions not applicable here, eligible voters from anywhere in the county wishing to vote early in person may do so at the MEVPP or at any TBPP within the county. *Id*. at §§ 85.003 and 85.066(a)

**Early Voting in Waller County**

**A.     Process for Setting the Schedule**

22.     Under the Texas Election Code, the county commissioners court is the body charged with setting the locations and hours of operation for early in-person voting in elections held or run by the County. Tex. Elec. Code 86.065(b).

23.     As the governing body responsible for serving all voters in Waller County, the Commissioners Court must allocate its limited resources, including voting machines, poll workers, and election officials, in a manner that provides every voter

in Waller County the opportunity to cast an early ballot should they want to do so. Tr. Vol. 10, 84:19-86:11.

24.    Waller County generally has used the same practice for setting the early voting locations and schedule in the County since the 1990s. Tr. Vol. 6, 242:7-243:14; Vol. 10, 88:5-89:11; Vol. 9, 169:22-170:171:18; Vol. 9, 15:23-16:24; Vol. 2, 239:5-9; P's Ex. 161, p. 28.

25.    The Elections Administrator coordinates with the local chairs for the Democratic and Republican parties—the two active political parties in Waller County—to propose a schedule for adoption and approval by the Waller County Commissioners Court. *Id.*

26.    As Elections Administrator, Christy Eason prepares a plan based on locations and hours used in past elections, as well as her evaluation of local voting needs based on various factors, including historical usage, the number of registered voters in an area, the competitiveness of a particular election, the number and availability of poll workers and the time it takes to train them, the availability of voting machines and equipment, and the accessibility and ease of use of a given location. Tr. Vol. 6, 242:7-15; 252:11-261:19. As Plaintiffs' retained expert Dr. Stein testified, these are typical factors that counties consider in setting early voting schedules. Tr. Vol. 2, 2398:25-239:4.

27.    The County has a preference for county-owned and/or controlled locations because the County is able to control access and security to the building. Vol. 6, 260:7-24. Locations that are not County-owned frequently present issues because the County

has to rely on a third party to let election workers into the polling location and to lock up after voting. *See e.g.,* Tr. Vol. 7, 54:7-57:8.

28. Eason then reviews her proposal with the party chairs who propose any necessary changes. Tr. Vol. 6, 242:16-25; 245:2-28.

29. Texas law actively contemplates the participation of local party chairs in the county election process in a variety of ways. Tr. Vol. 6, 243:7-245:1. For example, as found above, the county chair of each political party that made nominations in the most recent general election is a statutory member of the county election commission, which, among other things, appoints the elections administrator. Tex. Elec. Code § 31.032; Tr. Vol. 10, 90:16-20. The Election Code also requires a county's elections administrator to select election officials for each early voting polling place from a list submitted by the county chair of each political party that holds a primary in the county. Tex. Elec. Code § 85.009.

30. In Waller County, the only political parties that nominate candidates or hold primary elections are the Republican and Democratic parties. Tr. Vol. 6, 243:15-25; Vol. 10, 91:3-5. The Court therefore finds as a matter of fact that it is reasonable, and consistent with state law, for the County Elections Administrator to consult with local Democratic and Republican party chairs in setting voting schedules.

31. Once necessary changes have been made and the plan is agreed to by the party chairs, Eason submits the agreed schedule to the Commissioners Court for approval at a public meeting. Tr. Vol. 6, 242:7-243:14; Vol. 10, 88:5-89:11; Vol. 9, 169:22-170:171:18; Vol. 9, 15:23-16:24. In advance of the meeting, both the agenda and

relevant schedules are posted in accordance with the Texas Open Meetings Act. Tr. Vol. 6, 251:7-19.

32. Texas law requires entities holding elections to call the election at least seventy-eight days before a uniform election date. Tex. Election Code 3.005(c). The Texas Secretary of State further recommends that the order calling the election contain the branch early voting polling places and the hours and date for early voting. Tr. Vol. 6, 249:12-25; *see also* Pls' Ex.166 at pp. 11-12. There are also posting and notice requirements for calling an election, both for the County, and for the other political subdivisions for which Eason conducts elections. Tex. Elec. Code 4.003; Tr. Vol. 6, 248:15-249:2. To meet these deadlines and recommendation, Eason works on the election schedule during the summer months before the November election. This allows her to call the election in an orderly fashion and gives the other political subdivisions for which she conducts elections ample time to post their legally required notices. Tr. Vol. 6, 247:9-250:20. Eason gave uncontroverted testimony that the timeframes in which the County has set its election schedules have remained the same for the time she has been there. *Id.* at 250:21-24. And Frank Jackson confirmed from his experience as a former Waller County Commissioner that the timing of Eason's schedule was consistent with the County's practices. Tr. Vol. 62:23. Eason further testified, unrebutted, that, based on her knowledge as the Elections Administrator, the timeframe used by Waller County to set its elections is generally consistent with other counties throughout the state. *Id.* 250:21-251:4.

**B.** **History of Siting**

**i. Election Day**

33.  Waller County has a longstanding practice of placing election day polling sites on and near the Prairie View A&M campus, which dates at least to the early 1990s. Pls' Ex. 163, pp. 28-32; Ds' Ex. 3, Dkt. 136-1; Tr. Vol 11, 183:5-8. The former Prairie View A&M Student Center (which was demolished and rebuilt into the Tempton Memorial Student Center, completed in 2003) was used as an election day site in the general elections of 1994, 1996 and 1998, for the PVAMU precinct, which was then Precinct 12. *Id.* at 28; *see also* Tr. 3, 88:4-89:20. A site called The Newman Center, once the Catholic student center, across the street from Owens Road, which bounds the south side of campus, was also used as an election day polling place during this period for the current precinct 310, which was then Precinct 15. Pls' Ex. 163, pp. 28; Ds' Ex. 3, Dkt. 136-1.

34.  From 2000 through 2012, the County provided an election day site for Precinct 309 in the former Smith, Coleman, & Kemp Community center, which sits on the site of the present day Waller County Community Center. *Id.*; *see also* Tr. Vol. 4, 21:5-8). For the same period in Precinct 310, the County held election day voting at either the Newman Center, the Community Center, the PVAMU National Alumni Association (148 FM 1098), or the Prairie View City Hall. Pls' Ex. 163, pp. 28-32; Ds' Ex. 3, Dkt. 136-1.

35.  In July of 2013, then PVAMUS Student Government Association (SGA) President Priscilla Barbour wrote a letter to then Waller County Judge Glenn Beckendorff requesting an on campus polling location. Pls' Ex. 94; Tr. Vol. 2, 45:6-21. Along with several other officials, Ms. Barbour copied Defendant Jeron Barnett, who was the Waller County Commissioner for Precinct 3, the precinct covering Prairie View. *Id.* Barnett responded. *Id.* He reached out to Barbour via phone to inform her that he and the then Waller County Elections Administrator, Robyn German, had received Ms. Barbour's correspondence. Tr. Vol. 2, 45:16-21.

36.  Commissioner Barnett then scheduled a meeting with Ms. Barbour, Elections Administrator German, and Frank Jackson at a local Denny's restaurant to discuss Barbour's concerns. Tr. Vol. 2, 87:13-88:3; Vol. 9, 171:23-172:14. Barnett was supportive of Barbour's request and, in turn, contacted County Judge Beckendorff to request he put the placement of a polling location at PVAMU on the Waller County Commissioners Court's Agenda. Tr. Vol. 2, 88:5-11; Vol. 9, 172:18-173:2. Judge Beckendorff did so, and the Commissioners Court approved an election day polling location on the PVAMU campus at the PVAMU Memorial Student Center (MSC). Tr. Vol. 2, 88:8-20; Vol. 9, 172:24-173:3. Since that time, the County has continuously maintained an election day polling location at the MSC for county-held elections, and there had been no effort to remove that poll. Tr. Vol. 9, 173:3-9; Vol. 10, 97:10-25; Vol. 9, 19:16-20:4.

**ii.    Early Voting**

37.     For early voting, Waller County initially offered only one location at the Waller County Elections Office in Hempstead. Pls' Ex. 163, p. 29; Ds' Ex. 3, Dkt. 136. The move from this one central early polling place to two occurred with the 1994 general election. *Id.* The second location was opened in the southern end of the county at the Waller County Tax Office Annex in Brookshire. *Id.* Early voting continued through the 2000 election at just two sites, one in Hempstead and the other in Brookshire, with the exception of 1998, in which the County also offered one day of early voting in Prairie View at the then student center, and one day of early voting in Fields Store at the Justice of the Peace No. 2 Annex. *Id.*

38.     Beginning in 2002, when early voting moved beyond just two sites, an early voting location was made available at the edge of the PVAMU campus at the Smith, Coleman and Kemp Community Center. Pls' Ex. 163, pp. 28-32; Ds' Ex. 3, Dkt. 136-1; Tr. Vol. 4, 21:14-17. Brookshire and the MEVPP in Hempstead received the most hours, with Katy and Fields Store receiving the fewest, 7 hours each. Prairie View, by contrast, received two seven-hour days for a total of 14 hours over a Thursday and a Friday. Pls' Ex. 163, at p. 29; Ds' Ex. 3, Dkt. 136-1. Importantly, other growing parts of the County received no nearby early voting locations, and certainly none as near to their residences as those situated in Prairie View are to the people who reside there. *Id.*

39.     Thereafter, in each general election from 2004 through 2012, Waller County sited early voting in the City of Prairie View at the Smith, Coleman, and Kemp Community Center. Pls' Ex. 163, at pp. 29-30; Ds' Ex. 3, Dkt. 136-1; Tr. Vol. 4,

21:14-17. For 2014, the old Community Center was demolished so that the County could construct the new $1.2 million Waller County Community Center, which was finished in 2016. Tr. Vol. 10, 121:14-19. Accordingly, for the general election in 2014, the County sited early voting at the Prairie View Alumni Building and across F.M. 1098 from PVAMU at the St. Frances Episcopal Church. Pls' Ex 163, at p 30; Ds' Ex. 3, Dkt. 136-1.

40. The Waller County Commissioners Court met on December 16, 2015 to set the election schedule for the March 2016 primary. Ds' Ex. 87; Tr Vol. 10, 100:4-102:11. Prior to that meeting, Waller County had not sited early voting at the MSC. Ds' Ex. 3, Dkt. 136-1; Tr. Vol. 9, 175:2-5; Vol 10, 130:22-131:10. Rather, the early voting proposal for the March primary by Dan Teed, the current elections administrator, sited early voting in Prairie View at the Prairie View City Hall. Ds' Ex. 87, pp. 4, 8. Teed's proposed schedule also included several other temporary branch locations, with varying hours, throughout the County, including in Hockley and Fields Store in Commissioner Precinct 2, Monaville in Commissioner Precinct 3, and Brookshire and Katy in Commissioner Precinct 4.

41. At that meeting, however, the Democratic and Republican Party Chairs, respectively Ben Tibbs and Wallace Koenig, made a presentation to the Court in which they stated that their agreed proposal to hold early voting at two locations only—in the North and South of the County at Hempstead and Brookshire—for the entire early voting period. Ds' Ex. 30, 55:42-1:04:17. Koenig spoke first and stated rationale for this plan was that, rather than varied locations, days, and hours, the Chairs' plan

would provide a simple, less confusing schedule. *Id.* He noted that his side was expecting very large turnout because of all the Republicans in the 2016 primary field. Tibbs followed and said he agreed it would be good to have fewer locations because people still complained that they did not know where to go vote. *Id.* While Teed expressed concerns about the distance voters in Precinct 2 in the northeast corner of the County would have to travel, he nevertheless assured the Commissioners Court that the proposal was legal. *Id*; *see also* 1:19:40-1:20:11. Based on the apparent agreement of the parties, the Commissioners Court passed their proposal. *Id;* 1:10:30-1:26:00. No one spoke in objection to the adopted plan. *Id.*

42. The next day, however, Teed emailed Judge Duhon informing him that "upon the emailed request of the Democratic Party Chair, I have submitted an agenda item for the court to reconsider the early voting locations and hours. Ds' Ex. 24. Teed stated that he intended to resubmit his original proposal from the night before. *Id.* In response, Duhon placed the item on the agenda for the Commissioners Court's next meeting on December 23, 2015. Tr. Vol. 10, 112:2-16; *see also* Ds' Ex. 8. The court took up Teed's proposal on December 23rd and voted unanimously to approve it with an amendment from Jeron Barnett, moving the location in Prairie View to the "St. Francis Episcopal Church [Tr. Vol. 10, 113:25-114:3], if no permission the Panther Plaza [*Id.*, 114:4-8], if no permission then Prairie View City Hall." Ds' Ex.8, p. 4.

**C.  The Commissioners Court returns voting to the PVAMU Campus**

43.   Shortly after the December 23, 2015 meeting, the Waller County Democratic Club President, Dr. Denise Mattox, emailed Teed to request an early voting poll on the PVAMU campus. Pls' Ex. 73. Teed responded favorably, "if the law can be followed and if the hurdles regarding elderly or walking distance limited people can be overcome." *Id.* at p. 1. Teed contacted Duhon who again put the request on the agenda for the next Commissioners Court meeting on January 20, 2016. Tr. Vol. 10, 114:25-115:13, 117:17-118:7; Ds' Ex. 88.

44.   At that meeting, while there was consensus about the placement of an early voting location on campus, there was concern about whether the MSC was the appropriate location. Tr. Vol. 10, 119:2-23; Vol. 9, 180:1-12.  In particular, there were concerns about whether the building was accessible for the non-student residents of the City who tended to be older. At least one such resident addressed the Court and stated that he felt the walk from the parking lot and up the ramps into the MSC was an impediment. Ds' 32, 10:35, *et. seq.* The Commissioners had heard similar complaints from others. Tr. Vol. 10, 119:2-23; Vol. 9, 177:15-21. 179:5-13. Additionally, there were concerns about parking at the MSC. Ds' 26; Tr. Vol. 9, 42:5-20. Notably, at this time, the Waller County Community Center was still being rebuilt and was not an option for early voting at this time, however, some did suggest the Panther Plaza on campus as a possible alternative. Ds' 32, 10:35, *et. seq.*; Tr.

Vol. 9, 179:16-19; Vol 10, 123:2-11. Accordingly, the meeting was tabled to obtain additional information about other locations. D's 32; Tr. Vol 10, 122:14-25.

45.     After the meeting, Commissioner Barnett emailed PVAMU employee Alisha Lowe, to assure her that "I and my colleagues are for early having early voting on the PVAMU campus and that will happen! I just want to ensure that since seniors, handicapped and others who may have difficulty to physical impairment can get to the polling spot as safely as possible. Ds' Ex. 29. Barnett asked Lowe to examine the Panther Plaza. *Id.*; Tr. Vol 9, 182:1-Ultimately, Teed did an analysis of various locations on the campus and concluded that the MSC would be an acceptable location, as long as there was also voting for non-students at the St. Francis Church. Ps' Ex. 80. In addition, the University made assurances that it would secure reserve adequate parking, provide assistance for elderly voters, and provide a secure location for early voting. Tr. Vol. 9, 43:2-24; Vol. 10, 124:20-128:24.

46.     Although some of the Commissioners still had concerns about the suitability of the MSC, the Court unanimously approved early voting on campus at the MSC at the next Commissioners Court meeting on January 27, 2016. Ds' Ex. 89; Tr. Vol. 10, 130:22-25. In doing so, Defendants Duhon, Barnett, and Beckendorff were members of the first Wallers County Commissioners Court to site early voting on the campus. *Id.* at 131:2-10. In particular, for the March primary in 2016, the County sited two days for a total of 19 hours at the MSC, as well as an additional 18 hours over two days at the St. Francis Episcopal Church. Ds' Ex. 89. The County also

extended the same hours in the 2016 general election. Ds' Ex. 3, Dkt. 136-1, pp. 15-16; Tr. Vol. 10, 132:8-19.

**D.     Comparison to Similar Counties**

47.     Waller County's consistent placement of a temporary branch polling location at or close to PVAMU also favorably distinguishes it from almost every other comparably-sized county with a university. Ps' Ex. 161, pp. 20-28; Tr. Vol. 8, 87-101. The following chart prepared by Defendants' expert reflects the comparable counties in Texas:

| Comparison of Similarly Sized Counties with College Campuses in Texas | | | |
|---|---|---|---|
| County | Population Est. 2017 | College Campus | Enrollment |
| Erath | 41,969 | Tarleton State | 13,011 |
| Hunt | 93,872 | Texas A&M Commerce | 13,065 |
| Kleberg | 31,088 | Texas A&M Kingsville | 8,682 |
| Nacogdoches | 65,580 | Stephen F. Austin | 12,614 |
| Randall | 134,442 | West Texas A&M | 10,169 |
| Tom Green | 118,019 | Angelo State | 10,362 |
| Victoria | 92,082 | University of Houston-Victoria | 4,427 |
| Walker | 72,245 | Sam Houston State | 20,398 |
| Waller | 51,307 | Prairie View A&M | 9,431 |
| Sources: Texas State Data Center for population estimates, Texas Higher Education Coordinating Board for enrollment information | | | |

48.     Without question, policies vary widely at local discretion. However, none of the counties listed in the foregoing table, except Waller, places an election day precinct polling site on a college campus, much less an early voting site. There is no common

tradition or practice in Texas among mid-sized counties of placing precinct polling places directly on a college campus in the way that Waller County has for PVAMU. Ps' Ex. 161, pp. 20-28; Tr. Vol. 8, 87-101.

49. Likewise, none of the off-campus early voting locations offered by the other counties in the table were as close to the college campus as the Waller County Community Center is to PVAMU. Even much larger counties in Texas did not place early voting as close to college campuses as Waller County did. For example, in 2018, the nearest early voting location to Texas Southern University, which is also a Historically Black University, has a higher enrollment than PVAMU, and is located in the much larger Harris County, the nearest early voting location was more than three miles away from campus. Rather Waller County stands out in its history of providing early voting opportunities either directly on or very close to the PVAMU campus. Ps' Ex. 161, pp. 20-28; Tr. Vol. 8, 87-101.

**Adoption of 2018 General Election Schedule**

50. For the general election in 2018, Eason submitted the agreed early voting locations for approval by the Commissioners Court at its public meeting on August 22, 2018. Joint Stipulations, p. 18, p. ¶¶ 60, 64, 67; Tr. Vol 6, 270:9-272:9. The proposed locations and hours were consistent with the election schedule from the 2018 primary. *Id.*; Tr. Vol. 7, 12:23-25. The meeting agenda, including the adoption of voting locations, was publicly posted on the County's website at least three days in advance of the meeting. Joint Stipulations p. 19, ¶ 67; Tr. Vol. 272:7-9. Eason notified the Commissioners Court by email in advance that the locations were to be

approved on August 22nd, but that the dates and times of early voting would be finalized after the Elections Office completed training on its new voting equipment. Ds' Ex. 34, 2:21, *et seq.*; Tr. Vol. 272:7-273:10. Defendant Duhon, the County Judge, added for the record that he had spoken to Eason that morning and asked her if the party chairs were on the same page and in agreement and that she informed him that they were. *Id.*

51. When Eason initially conceived the 2018 schedule in included early voting at the MSC during the first week of the early voting period. Tr. Vol. 6, 261:20-262:10, 267:25-268:9. However, the Democratic Party Chair asked to move early voting at PVAMU to the second week due to her concern of potential conflicts with homecoming, which coincided with the first week of early voting. *Id.*

52. Eason made that change and the revised schedule was agreed to by both party chairs. Tr. Vol 6, 268:12-13. The agreed schedule was formally approved at the next Commissioners Court meeting on September 5, 2018, as part of the comprehensive order calling the election. Ds' Ex. 20; Tr. Vol. 6, 275:4-25. Once again, both the agenda for the meeting and the election order were publicly posted prior to the meeting. *Id.*; Joint Stipulation, p. 19, ¶ 68. Although the adoption of the order setting the election schedule was a posted agenda item, no one attended the public meeting to oppose or otherwise express concerns about the proposed schedule. Joint Stipulation p. 19, ¶ 69; Ds' Ex. 35; Tr. Vol. 10, 142:11-143:9. As the schedule was agreed, and there appeared to be no opposition, the item passed unanimously without further discussion. *Id.*

53. The schedule adopted by the Waller County Commissioners Court on September 5, 2018 was the following:

| 2018 GENERAL ELECTION WALLER COUNTY AND ROYAL ISD | EARLY VOTING LOCATIONS | |
|---|---|---|
| **DURING EARLY VOTING ALL PRECINCTS AND ENTITIES CAN VOTE AT ANY LOCATION** | | |
| **WEEK ONE** | | |
| MONDAY – FRIDAY October 22 – 26, 2018 | Waller County Courthouse 836 Austin St, Hempstead, Tx | 8am – 5pm |
| SATURDAY October 27, 2018 | | 9am – 2pm |
| SUNDAY October 28, 2018 | | 12pm – 5 pm |
| MONDAY – FRIDAY October 22 – 26, 2018 | Waller ISD Admin Bldg 2214 Waller St., Waller, Tx | 8am – 5pm |
| SATURDAY October 27, 2018 | | 9am – 2pm |
| MONDAY – FRIDAY October 22 – 26, 2018 | Waller Co Library Brookshire 3815 6th St., Brookshire, Tx | 8am – 5pm |
| SATURDAY October 27, 2018 | | 9am – 2pm |
| SUNDAY October 28, 2018 | | 12pm – 5 pm |
| THURSDAY – FRIDAY October 25 – 26, 2018 | Fieldstore County Bldg, JP 2 27388 Fieldstore Rd., Waller, Tx | 8am – 5pm |
| SATURDAY October 27, 2018 | | 9am – 2pm |
| THURSDAY – FRIDAY October 25 – 26, 2018 | Monaville County Bldg., JP 3 12620 FM 1887, Hempstead, Tx | 8am – 5pm |
| SATURDAY October 27, 2018 | | 9am – 2pm |
| MONDAY – WEDNESDAY October 22 – 24, 2018 | Katy VFW 6206 George Bush Dr., Katy, Tx | 8am – 5pm |
| **WEEK TWO** | | |
| MONDAY – WEDNESDAY October 29 – 31, 2018 | Waller Co Courthouse 836 Austin St, Hempstead, Tx | 8am – 5pm |
| THURSDAY - FRIDAY November 1 – 2, 2018 | | 7am – 7pm |
| MONDAY – WEDNESDAY October 29 – 31, 2018 | Waller ISD Admin Bldg 2214 Waller St., Waller, Tx | 8am – 5pm |
| THURSDAY - FRIDAY November 1 – 2, 2018 | | 7am – 7pm |
| MONDAY – WEDNESDAY October 29 – 31, 2018 | Waller Co Library Brookshire 3815 6th St., Brookshire, Tx | 8am – 5pm |
| THURSDAY - FRIDAY November 1 – 2, 2018 | | 7am – 7pm |
| MONDAY – WEDNESDAY October 29 – 31, 2018 | Memorial Student Center PVAMU , Prairie View, Tx | 8am – 5pm |
| THURSDAY – FRIDAY November 1 – 2, 2018 | WC Community Center – PV FM 1098, Prairie View, Tx | 7am – 7pm |

Ds' Ex. 20.

54. Although it would appear from the schedule that the cities of Hempstead and Waller had two polling locations, that is not the case. The city designations in the foregoing table are based on the U.S. Postal Service's zip postal code for the particular polling location and is not necessarily reflective of the actual geographic location of the polling location.

55. For example, although Fields Store is located in a zip code assigned by the USPS to the City of Waller, it is actually an unincorporated area located several miles away. Tr. Vol. 10, 156:21-157, Vol. 6, 235:4-24. Indeed, the Fields Store early voting location at 27388 Fields Store Rd. is approximately 8 miles away from the Waller ISD Administration Building, the polling place in the City of Waller. *Id.*

56. Similarly, although Monaville is within the zip code for Hempstead, it is an unincorporated town approximately in Commissioner Precinct 3 in Waller County. Tr. Vol. 9, 223:7-9.

57. Under the plan adopted by Waller County on September 5, 2018, the breakdown among the various polling locations by City and CVAP[2] majority, was as follows:

| Polling Place | City (by zip code) | Week 1 Hours | Week 2 Hours | Total Early Voting Hours | CVAP Majority |
|---|---|---|---|---|---|
| Courthouse | Hempstead | 55 | 51 | 106 | BCVAP |
| Waller ISD Admin Bldg. | Waller | 50 | 51 | 101 | WCVAP |

[2] CVAP stands for Citizen Voting Age Population, with the prefix "W" or "B" referencing white or Black CVAP.

| | | | | | |
|---|---|---|---|---|---|
| Brookshire Library | Brookshire | 55 | 51 | 106 | BCVAP |
| Fields Store County Bldg. | Unincorporated | 23 | 0 | 23 | WCVAP |
| Monaville County Bldg. | Unincorporated | 23 | 0 | 23 | WVAP |
| Katy VFW | Katy | 27 | 0 | 27 | WCVAP |
| MSC | Prairie View | 0 | 27 | 27 | BCVAP |
| Community Center | Prairie View | 0 | 24 | 24 | BCVAP |

Ds' Ex. 20; *see also*, Joint Stipulations, p. 11, ¶¶ 36, 48-49.

58.     The plan initially adopted by the Waller County Commissioners Court was facially

neutral as to both race and age, allocating the greatest number of early voting hours

to Hempstead and Brookshire, which both have a Black-majority CVAP. *Id.* Prairie

View had fewer total early voting hours than Waller, Hempstead, and Brookshire,

but was allocated a greater number of hours than Fields Store, Monaville, and Katy,

which are Anglo-majority areas. *Id.*

59.     The adopted locations were consistent with Waller County's historical placement of

polling locations and the County's efforts to provide early voting opportunities

throughout the County. Ds' Ex 3, Dkt. 136-1; Tr. Vol. 6, 262:11-14; 271:7-19.

60.     The other towns and rural areas in Waller County received no nearby early voting

locations at all and voters from those areas who wanted to vote early in person had

to travel to one of the other polling locations to do so. Tr. Vol. 9, 14:7-15:12; 168:5-169:6; Vol 6, 232:15-233:7, 237:4-8; 238:23-239:241:5.

61. The following is a true and correct map of the voting precincts with election day polling locations in Waller County, which was prepared by Defendants' expert, Dr. James Gimpel:



Ps' 161, p. 10.

62.  While each precinct has a designated polling location on election day, the same is not true of early voting, where the County's resources, including poll workers, locations, and voting machines, limit the number of locations at which the County is able to provide early voting. Therefore, the County has to allocate early voting locations in a manner that not only serves the particular precinct in which the polling location is located, but the surrounding precincts, as well.  For example, the courthouse in Hempstead does not only serve voters living in Precinct 101 where the Courthouse is located, but also serves as the closest early voting location for many voters in precincts, 102, 103, and 105, as well. The early voting location in Waller is the closest early voting location for many voters in precincts 208, 206, and 207. And the early polling location in Brookshire is the closest early voting location for many voters in precincts 415, 417, 414, and 313. Tr. Vol. 9, 14:7-15:12; 168:5-169:6; Vol 6, 232:15-233:7, 237:4-8; 238:23-239:241:5.

63.  Furthermore, as is evident from the map above, the election precincts in Waller County vary greatly in geographic area that they cover. The largest, Precinct 206, which is the Fields Store location, covers 61 square miles while the smallest, Precinct 419 in Katy, covers only one square mile. Ps' Ex. 161, p. 6. Precinct 309 in Prairie View covers less than three square miles in total area. *Id.* Thus, voters in Prairie View faced strikingly shorter distances to the polls than voters in other areas of the County. In fact, the average distance to a polling location for voters in Precinct 309 was less than half a mile. Tr. Vol. 8, 111:2-11.

64.     Unlike student voters in Precinct 309 on the Prairie View A&M campus, who primarily live on or near the college campus, most voters in Waller County, especially those in rural areas, have to travel longer distances to vote, both on election day and in particular to reach the closest early voting location. Tr. Vol. 9, 14:7-15:12; 168:5-169:6; Vol 6, 232:15-233:7, 237:4-8; 238:23-239:241:5. Indeed, voters in other parts of the county were required to travel *an average* of six or seven miles to reach the nearest voting location. Tr. Vol. 8, 111:12-21.

65.     By contrast, voters at PVAMU were able to cast a ballot on, or immediately adjacent to, the campus where they live, eat, study, socialize, and otherwise spend the majority of their time. No other group of voters in Waller County had such proximate and ready access to an early voting polling location. Tr. Vol. 8, 111:22-112:8, Vol. 5, 145:10-20; Vol. 7, 12:2-13; Vol. 7, 249; Vol. 9, 48:24-50:13.

66.     The initial schedule adopted by the Waller County Commissioners Court did not reduce or eliminate early voting hours or locations in Prairie View from past elections. Ds' Ex. 3, Dkt. 136-1; Ps' Ex. 161, p 31. Rather, even as initially adopted, the County's early voting schedule for the 2016 general election actually expanded the number of early voting hours in Prairie View from previous elections. *Id.*

67.     The early voting schedule adopted by the Commissioners Court reasonably allocated early voting opportunities throughout the County, including to voters in Prairie View. Tr. Vol 9, 57:16-58:10; 190:6-191:18; Vol. 10, 139:22-141:5.

**Historical Usage**

68.     The 2018 early voting schedule initially adopted by the Commissioners Court was also consistent with historical early voting usage in Waller County, one of the factors considered by Elections Administrator Eason in proposing the schedule. Tr. Vol. 8, 102:8-104:12; Vol. 2, 236:15-237; Vol 6, 234:1-11. 237:12-18; 238:2-5, 241; 6-10.

69.     While the number of registered voters is one valid criterium considered by the County, historical turnout can be a better measure for the appropriate location and days and operation for early voting, because it better reflects the number of voters a polling location will have to serve effectively. Tr. Vol. 8, 118:21-119:8; Tr. Vol. 6, 254:21-255:25, This allows the County to account for the anticipated demand at each location and provide adequate capacity to prevent long lines and wait times that can frustrate voter participation. *Id.*

70.     Although the number of registered voters in Precinct 309 is relatively high, voter turnout in that precinct is consistently low. Indeed, low voter turnout is a consistent trend across younger, college-age voters, and is not limited to students at Prairie View. Ps' 161, p. 7; Tr. Vol. 246:11-14. Although Plaintiffs seek to sidestep low voter turnout by relying on the percentage of early voting out of total votes, Defendants' expert Dr. Gimpel explained the fallacy of that methodology. Tr. Vol. 8, 118:21-119:8. Here, Plaintiffs' expert's own data shows that the number of early voters at the MSC in 2018 was less than in Brookshire, Waller, or Hempstead. Ps' 158, Table 1. It was reasonable for the County to allocate early voting resources based on the number of people it

expected to show up to vote, rather than the historical proportion of early votes cast of a smaller number of total votes.

71.    Moreover, the evidence suggests that the overall number of registered voters in Precinct 309 is inflated by students who have graduated and moved away from Prairie View but have not yet dropped of the registration rolls, a process that can take two years. Tr. Vol. 6, 16-15. As a college, where a significant portion of the student population either graduates or transfers each year, PVAMU, and Precinct 309, have the highest number of suspense voters of any precinct in the County. Tr. Vol. 7, 2-18.

72.    Accordingly, the allocation of early voting in the County's 2018 general election schedule was reasonable in light of past voter demand and anticipated turnout.

### The Waller County Community Center is Familiar and Accessible

73.    The use of the Waller County Community Center was also consistent with the County's past election practices. Ps' Ex. 161, pp. 28-32; Vol. 11, 166:21-25.

74.    The use of the Community Center, and its location, as a polling location dates back to at least 2002, and the Community Center is a familiar polling location for residents of Prairie View, both students and non-students alike. Tr. Vol. 4, 20-24; Vol. 2, 18; 23; Vol. 6, 161.

75.    The location of the current Waller County Community Center, formerly the Smith, Coleman, and Kemp Community Center, at 21274 FM 1098 Loop, was formerly a part of the PVAMU campus. Further, the building was specifically donated to the

County by the Texas A&M University System to be used as a joint community center between the County, the University, and the City of Prairie View.

76. The property and former building were dedicated to the County by the Texas A&M University System for the purpose of maintaining a community facility for joint use by members of the university and the non-university residents of the City of Prairie View. Tr. Vol 10, 120:24-122:13; Vol. 4, p. 25:24-26:4.

77. PVAMU students, and student and alumni groups, regularly use the Waller County Community Center to hold events. Tr. Vol. 11, 124:21-129:1. Ds' Ex 51 and 52; *See also* Vol. 2, p. 72; Vol. 2, 72:11-14.

78. The Waller County Community Center is also used for joint events and outreach to the Prairie View community as a whole. For example, in 2017, the County held a forum on an upcoming bond election to fund the construction of the new county jail at the Waller County Community Center. That forum was well-attended by PVAMU students, including former Plaintiff Jayla Allen, and Joshua Muhammad, representative of Plaintiff, the Panther Party. Tr. Vol. 6, 91:19-23.

79. The Waller County Community Center is located on the edge of the PVAMU campus and immediately next door to the Prairie View Post office. Tr. Vol. 1, 101:24-102:12; Vol. 4, 23:9-24:16; While many students receive mail on campus, students, including former Plaintiff Jayla Allen, still use the post office for other services such as purchasing stamps. *Id.*; *see also* Ps' 164; Vol. 7, 238:3-10.

80.     For newly arriving students or others who may not be immediately familiar with the location of the Waller County Community Center, its location is readily ascertainable by asking one or making a simple search on a cell phone. Tr. Vol. 4, 202:7-14

81.     The Waller County Community Center is also readily accessible from the PVAMU campus. It is less than a seven-minute walk from the front of the Memorial Student Center. Tr. Vol. 4, 4:2-8. In 2018, the County put in a sidewalk directly from the Hobart Taylor parking lot to the back of the Waller County Community Center. Tr. Vol. 4, 8-9; Vol. 10, 187:14-24. Prior to 2018, however, the Waller County Community Center was still accessible on foot from the PVAMU campus via a sidewalk that runs through the parking lot for the Hobart Taylor Hall and campus to the federal post office on the edge of campus and crossing a small median or sidewalk along the shoulder between the post office and the Waller County Community Center. Tr. Vol. 4, 9:14-18, 11:20-12:2; *see also* Vol. 4, 23:9-24:16.

82.     There is also a history of PVAMU students accessing the rear of the WCCC (prior to the installation of the sidewalk in 2018) by walking along the grass and crossing a small wire barrier.  Tr. Vol. 2, 93:1-5, 113:19-114:5. Students would do this not only individually, but as part of a stroll to the poll in which a group of students would walk to the Waller County Community Center to vote. Tr. Vol. 21:10-22. The students would start at Phase 3 housing on the north side of campus, and walk around the campus to each of the housing units before making their way to the Waller County Community Center. *Id.*

83. The PVAMU campus free shuttle, which runs a loop around the campus, also has a stop in the Hobart Taylor parking lot next to the sidewalk running to the post office and will drop off and pickup students at that location. Tr. Vol. 4, 8:7-8; 28:23-29:13.

84. Additionally, in the elections following 2018, the County confirmed with PVAMU that it would operate a shuttle during voting to take students from campus directly to the Waller County Community Center to vote. Tr. Vol. 10, 187:3-13, 262:7-14.

**Voting Equipment**

85. In arriving at the initial schedule for the 2018 general election, the County reasonably allocated its resources to make early voting available to all voters in the County, including voters at PVAMU and in the City of Prairie View.

86. In the 2018 general election, the County had a total of 31 controllers, 81 Touch Screen tablets, and 38 Access machines. Ds' Ex.6; Tr. Vol. 6, 19-20:13. The Access machine is a disabled-accessible unit, the touch machine the touchscreen unit used for voting, and the controller is the hub of the machine that holds the brains of the system. *Id.*

87. Texas law mandates that a voting machine used in early voting must be sealed at the completion of early voting and may not be re-used on election day. Tr. Vol. 11, 7-21; Vol. 6, 259:4-13. Thus, in allocating resources for early voting, the County must ensure an adequate reserve of fresh machines to cover each of its 19 election day precincts. Additionally, as machines sometimes malfunction, the County has to reserve a certain number of machines as backup to replace machines that are not functioning.

88. In allocating voting machines for the 2018 general election, Elections Administrator Christy Eason allocated 10 Verity Controllers, 31 Verity Touch Screen tablets, and 14 Verity Access units for use in early voting. She allocated 20 Verity Controllers, 50 Verity Touch Screen tablets, and 21 Verity Access units for election day. Ds' Ex. 6. That left a reserve of 1 Verity Controller, and 3 Verity Access units as backups to replace any malfunctioning machines. *Id.*

89. The following table reflects the allocation of early voting machines for early voting in the 2018 general election:

| Equipment Assignment | Controller | Access | Touch |
|---|---|---|---|
| Early Voting | | | |
| Courthouse | 1 | 3 | 6 |
| WISD Admin | 1 | 1 | 3 |
| Brookshire Library | 1 | 1 | 4 |
| Katy VFW | 1 | 1 | 3 |
| JP 3 | 1 | 1 | 2 |
| JP 2 | 1 | 1 | 3 |
| PVAMU Student Ctr | 2 | 3 | 7 |
| PV Community Center | 1 | 1 | 2 |
| PV City Hall | 1 | 2 | 1 |
| | 10 | 14 | 31 |

90. The County specifically allocated 2 Verity Controllers and the greatest number of Verity Touch Screen tablets (7) to the polling location at the Memorial Student Center on the Prairie View A&M University Campus. The effect of these additional machines is that the polling location was able to run two voting lines, effectively operating as two separate polls, to ensure shorter waiting times and an easier voting experience. Tr. Vol. 6, 276:14-21.

## Rumors and Misinformation Regarding Voter Registration

91. Although the Waller County Commissioners Court adopted the early voting schedule for the 2018 election on September 5, 2018, no one expressed any complaints or concerns about that schedule until the middle of October. Tr. Vol. 10, 142:17-143:9; Vol. 7, 11:13-12:1. Around that time, however, rumors began circulating that voter registration applications were being thrown away *Id.*; *see also*, Tr. Vol. 7, 21:17-20. These rumors were completely false. *Id.*

92. In fact, after the March 2018 primary, Eason had discovered an inadvertent error that had been unknowingly causing confusion as to the correct election day precinct for PVAMU students living on the campus. What Eason discovered is that students had been filling out their voter registration forms with one of two general campus addresses, either 100 University Drive or 700 University Drive. At the root of the problem, Eason discovered, was that 700 University Drive tracked to an address off campus in the County's GPS/GIS software. As a result, although they lived on campus in voting precinct 309, students using the 700 University Drive address were registered in precinct 310, the off-campus precinct for the City of Prairie View. Tr. Vol. 7, 22:5-19.

93. Eason contacted the Texas Secretary of State's Office, who suggested the County have pollworkers ask voters if their address was their correct physical address and if it was not, ask them to fill out a change of address form prior to voting. Tr. Vol. 7, 29:4-24. Eason met with her volunteer deputy registrar groups to inform them about the solution and to instruct them on how to register on campus voters in the

future by using the physical address of their campus housing. *Id.* 30:4-14. In October of 2018, however, rumors began circulating that the County was attempting to disenfranchise PVAMU students by following the Secretary of State's advice and asking them to fill out a change of address form. Tr. Vol. 10, 153:16-154:3. The County then went back to the Secretary of State for guidance and was told it could allow students to vote at either precinct 309 or 310 without first requesting a change of ownership form, which it had no problem doing. *Id.*

94. As part of this process, County officials met with the Texas Secretary of State's Office and issued a joint press release informing students of the County's Efforts. Ds' Ex.50. The County also issued a separate press release, in which it again made clear that anyone registered using either the 100 or 700 University Address would be allowed to vote in either Precinct 309 or 310. Ds' Ex. 53. In that press release, the County further notified students that anyone wanting to avoid lines or confusion can vote early at any early voting location, and informed them of the dates and times of early voting both at the MSC and the WCCC. The County further included a map showing students the location and short distance of the WCCC. *Id.*

95. It was only after the circulation of false information regarding the County's supposed attempts to impede voting through the use of a change of address form, that concerns arose regarding the voting schedule that had been adopted on September 5, 2018. Tr. Vol. 10, 154:4-7.

96. Notably, although Frank Jackson and others have testified about a "zip code" issue, that issue has nothing to do with voting in Waller County. As Ms. Eason made clear,

a zip code is unrelated to the precinct in which a voter—student or otherwise—is registered to vote. Tr. Vol. 7, 22:20-23:7. Nor is the zip code on the mailing address on a registration card determinative. Rather, the card contains both a mailing address and a physical address for purposes of voting. Moreover, each registration card clearly lists on its face the precinct in which the voter is registered. *Id.* at 23:8-24-26:15; *see also* Ds' Ex. 85.

## Reconsideration of Early Voting Hours
## at October 17, 2018 Commissioners Court Meeting

97.  After the resolution of the addressing issue, Eason was approached by Waller County resident DeWayne Charleston in regard to concerns about early voting at PVAMU. Tr. Vol. 42:3-8. Charleston indicated that he had spoken with Frank Jackson and other people on the PVAMU campus and that they were concerned about the absence of early voting days on campus during the first week of early voting. *Id.* at 42:9-19. Charleston requested the County add early voting locations in some of the student dormitory areas as well as the MSC. *Id.* at 42:20-22. Responding to Charleston's request, Eason notified Judge Duhon and asked that he put the early voting hours on the agenda for the next Commissioners Court meeting, which was October 17, 2018. *Id.* at 42:23-43:9.

98.  At the meeting, Eason presented the schedule that was requested of her by Charleston. Tr. Vol. 7, 43:21-44:8; Ds' Ex 38, Item 5. That proposal recommended extension of voting during the first week of Monday and Tuesday at the Memorial Student Center, Wednesday at the University Square, and Thursday and Friday at

City Hall. Ds' Ex. 38, Item 5, 05:50-06:30. Plaintiffs attempt to seize on Eason's comments that the County has to give Prairie View "equal representation" to show that Eason believed the schedule denied equal opportunity to vote. But as Eason ably explained her comment was intended only to reflect that Prairie View, like Fields Store, Monaville, and Katy, received fewer total early voting hours than Hempstead, Brookshire, and Waller. Tr. Vol. 7, 44:9-15. To the extent there was any question, Eason clarified that she did not feel like the 2018 schedule presented any inequality of opportunity to participate in the election for Prairie View voters because, unlike any demographic in the County, Prairie View had two polling locations within short walking distance. *Id.* at 45:15-47:8.

99.    In evaluating the proposal, Duhon stated his concern that Eason's proposal was confusing because it created four different polling places in the City of Prairie View over the two-week early voting period. Ds' Ex 38, Item 5, 22:20-24:25. He suggested instead adding three days of voting the first week at the Waller County Community Center. *Id.* Again, Plaintiffs seek to make much of the fact that Duhon commented that there was an "inequity" in the number of hours, but Duhon explained that he, too, was only acknowledging that the number of hours were different in the schedule. Tr. Vol. 10, 155:10-20. Duhon did not feel that voters in Prairie view lacked access to a polling location or unequal opportunity to vote in comparison to other voters throughout the county who lacked such proximate access to a polling location. *Id.* at 155:21-158:5; 158:23-159:4.

100. Commissioner Barnett, the county commissioner for Precinct 3, which includes Prairie View, expressed his concern that citizens of Prairie View who were not PVAMU students did not want to vote on campus and that additional hours at the student center was unfair to them. (Ds' Ex. 38, Item 5, at 25:30-27:18). Further, Barnett commented that if the Commissioners Court was going to add additional days, it should do so for Monaville, which had less early voting than Prairie View. (Id. at 27:20-29:15).

101. Whether the Plaintiffs agree with that concerns or not, the record is replete with examples of citizens expressing those concerns, even going back to previous elections. Tr. Vol. 10, 119:2-23; Vol. 9, 177:15-21. 179:5-13. Additionally, there were well-established concerns about parking at the MSC Tr. Vol. 9, 42:5-20; Doc. 49, ¶ 50; Ds' Ex. 38, Item 5 at 25:30-27:18 and 4:28-4:57, (in which Defendant Eason explains, with audible crowd agreement, that it is difficult to find a parking spot and get around on campus); Vol. 4, 80:7-24. The Mayor of Prairie View even testified at trial that the City and other citizen groups schedule events in the MSC at times when students are not there and active because of parking concerns. Tr. Vol. 7, 231:1-232:2. Barnett, of course, was not saying that any of these issues were absolute impediments to *any* voting at the MSC, but they are certainly legitimate considerations for whether he felt it appropriate to add hours there as opposed to the Waller County Community Center.

102. Commissioner Beckendorff expressed his opinion that there was no way to enact an early voting schedule that was equally fair to everyone. (Ex. 38, Item 5 at 32:50-

34:22. In particular, he pointed to other communities, such as Hockley, that had no early voting locations at all, and Katy, which had only three days of early voting. *Id.* At trial, Beckendorff also explained his belief that under the 2018 schedule any PVAMU voter who wanted to cast a ballot had multiple opportunities to do so. Tr. Vol. 9, 48:24-51:17.

103.   Commissioner Amsler stressed his belief that there was a process in place and that the Court had already approved a schedule that had been agreed to by the party chairs. Ds' Ex. 38, Item 5, 34:45-35:5. Plaintiffs attempt to undercut Amsler's efforts at adherence to the County's process by pointing out that the County subsequently did add hours after the lawsuit was filed. However, the County's later efforts to avoid costly and disruptive litigation through a show of good faith to the Plaintiffs are not evidence that Amsler's concerns were unfounded on October 17th.

104.   As at all meetings of the Commissioners Court, there was an opportunity for public input, and around ten speakers made comments to the Commissioners Court. Of these, some spoke for 'parity' for students at PVAMU and 'consistency throughout the County.'" (Doc. 49, ¶ 43). One woman went further and opined that she wanted PVAMU students to be allowed to vote every single day [of early voting] at the [Memorial Student Center] on campus. (Doc. 49, ¶ 45). Others stated that they wanted early voting in Prairie View during the first week. (Doc. 49, ¶ 47).

105.   Several speakers also recognized and thanked Ms. Eason for her efforts at outreach and responsiveness to PVAMU students on behalf of the County. For example, PVAMU student Kirsten Budwyne specifically acknowledged Ms. Eason's efforts

in working with PVAMU to resolve an addressing issue that had resulted in some students being registered in the wrong precinct for election day voting. (Ex. 38, Item 5, 44:30-44:45:08). She noted that the media was wrongly trying to make Eason out to be a bad person. DeWayne Charleston stated that Christy Eason had done more for Waller County than the U.S Supreme Court in the *Symm* case. Ds' Ex. 38, Public Comment, 6:12, *et seq.*

106. After a lengthy discussion of potential changes to the Initial Plan, there was no consensus on a single set of changes that would satisfactorily allocate additional hours, not just to Prairie View, but to other communities such as Monaville and Katy, and the Commissioners Court did not change the schedule. Ds' Ex. 38, Item 5, 1:00:00-1:10:00). While that outcome may have disappointed some, the Court doesn't agree on, or grant, every request that comes before it. Tr. Vol. 10, 50:21-25; *see also* 159:5-162:19.

### The Lawsuit and Extended Voting Hours

107. Plaintiffs filed this lawsuit until October 22, 2018, after early voting had already begun and approximately two-weeks before the November election. (Doc. 49, ¶ 35). To ensure an orderly election and avoid the risk of undue interruption, and as a show of good faith to the Plaintiffs and the PVAMU community, the Commissioners Court called a special meeting at which it voted to extend early voting hours in Prairie View. Pls' Ex. 128, Item 2). The Court extended the hours on the three previously-scheduled days at the MSC to 7:00 a.m. to 7:00 p.m. The Court also added early voting at the Prairie View City Hall on Sunday, October 28, 2018, from

12:00 p.m. to 5:00 p.m. (the "Extended Plan"). Under the Extended Plan, early

voting hours changed to the following:

| Polling Place | City | Week 1 Hours | Week 2 Hours | Total Early Voting Hours | CVAP Majority |
|---|---|---|---|---|---|
| Courthouse | Hempstead | 55 | 51 | 106 | BCVAP |
| Waller ISD Admin Bldg. | Waller | 50 | 51 | 101 | WCVAP |
| Brookshire Library | Brookshire | 55 | 51 | 106 | BCVAP |
| Fields Store County Bldg. | Unincorporated | 23 | 0 | 23 | WCVAP |
| Monaville County Bldg. | Unincorporated | 23 | 0 | 23 | WVAP |
| Katy VFW | Katy | 27 | 0 | 27 | WCVAP |
| MSC | Prairie View | 0 | 36 | 36 | BCVAP |
| Community Center | Prairie View | 0 | 24 | 24 | BCVAP |
| City Hall | Prairie View | 0 | 5 | 5 | BCVAP |

108. This change brought the combined early voting hours in Prairie View for the

November general election to 65, more than Fields Store, Monaville, or Katy.

*Compare*, Ds' Ex. 20.

### The Adoption of H.B. 1888 in 2019

109. House Bill 1888 ("H.B. 1888") from Texas's 86th Legislative Session, effective on

September 1, 2019, now largely dictates the hours required for early voting at

temporary branch polling locations throughout the State. Specifically, H.B. 1888 amended section 85.064(b) of the Texas Election Code to require a county like Waller, which has more than 1,000 registered voters, to hold early voting at each temporary branch polling place on each day of the early voting period for at least eight hours per day.

110. Against the backdrop of this bill, Defendants Duhon and Eason, throughout 2019 and into 2020, worked to engage with PVAMU and some of its students to identify a good polling location to serve both the University and the City. PVAMU president Ruth Simmons tasked Vice-President Dr. Timothy Sams with assembling a university taskforce, including students, to arrive at a recommendation. Tr. Vol. 7, 68:16-69:9; Vol. 11. That process near the end of 2019 when the University provided the County with its task force recommendations, in particular that the University believed that the Welcome Center was the best location for early voting on campus. Tr. Vol. 10, 175:9-14; *see also* Ds' Ex. 90, p. 17.

111. Defendants also became ensnared in a dispute between the University and some members of the City when they were invited to a meeting with the University and representatives of the City of Prairie View. The meeting was attended by the City of Prairie View through its' Mayor, a councilwoman Wendy Williams, and a group of older citizens. Tr. Vol. 7, 236:20-240:20. The City representatives became upset when they were told by Dr. Sams the meeting was only to discuss student concerns, not citizen input into a voting location that might balance the need of both groups. *Id.* at 240:21-242:14. This led the Mayor of Prairie View, David Allen, to write a

letters to Defendant Duhon, expressing his and other city residents' preference for early voting, going forward under HB 1888, to be sited at the WCCC, not the MSC. Ds' Ex. 90, pp. 19-20.

112. Then on January 15, 2020, the County had a meeting to consider early voting locations for the 2020 primary. Ds' Ex. 90. At that meeting, Defendant Eason gave a financial presentation of her analysis of the costs to the County of maintaining all of the early voting locations it has used in the previous election, but keeping them open for the duration of early voting as mandated by HB 1888. *Id.* at pp. 10-16. Under Eason's analysis, maintaining each of the earlier locations for the first two weeks would have required both the purchase additional voting machines and increased labor costs. Some of these costs would recur in subsequent elections such as in a runoff or in the general election. *Id.* The alternative was to have only one early voting location in each precinct for the entirety of the early voting period. *Id.* Eason recommended this second option. *Id; See also*, Ds' Ex. 40, Regular Session 8.

113. Notably, during the hearing, Mayor Allen, along with other residents of Prairie View, each expressed their belief that the MSC was not accessible for seniors from the City of Prairie View. Ds' Ex. 40, Regular Session 8, 57:17, *et seq.; see also* 1:02:24, *et seq.*. They stated that they had seen students walking throughout the City and believed that the students from PVAMU could conveniently access the WCCC. Accordingly, their request was for early voting at the WCCC. *Id.*

114. Consistent with this mandate, in each election since the 2018 general election, Waller County has established four early voting locations—one for each of its

County Commissioner Precincts—including one at the Waller Community Center. Tr. Vol. 7, 76:22-78:15. Each of these temporary branch locations offers uniform days and hours of early voting, consisting of eight hours of early voting for each day of the early voting period, except for the last two days in which there are twelve (12) hours of early voting. *Id.*

**The early voting schedule for the 2018 general election
did not disparately burden minority voters.**

115. The preponderance of the evidence does not show that the County's 2018 early voting plan, whether as originally adopted or as later expanded, resulted in any abridgment or denial of Black voters or young voters either in Waller County as a whole or in Prairie View.

116. Under the County's plan, the greatest number of early voting hours went to Hempstead and Brookshire, both of which are Black-majority CVAP areas.

117. Prairie View received three extended (7 a.m. to 7 p.m.) days of early voting on campus at the Memorial Student Center and two days of extended voting within the campus's original footprint at the Waller County Community Center. That allocation amounts to more 12-hour voting days than any other polling location in Waller County.

118. No other group of voters in Waller County had the same level of concentrated access to an early voting polling location so close and readily accessible to their residence or place of work.

119. Plaintiffs offered no evidence to show that they faced any greater burdens in casting an early ballot than other voters in Waller County.

120. Rather, the Plaintiffs' claim to burden distills only to the fact that PVAMU had fewer days and hours than the Cities of Brooshire, Hempstead and Waller (though it had more than Katy, Fields Store, or Monaville). But as Plaintiffs' retained expert Dr. Robert Stein testified, it is reasonable to take differences among voters into account when setting an election schedule. Tr. Vol. 4, 152:21-153:3. Here, unlike any other voters in the County, students at PVAMU are uniquely situated in close proximity to both the MSC and the WCCC.

121. In contrast to other voters in Waller County who have to travel greater distances and expend greater time, the evidence shows that the average distance to the polls for a voter in Precinct 309 is less than half a mile. Tr. Vol. 8, 111:8-13. Furthermore, the evidence in this case shows that PVAMU students, those that live both on and off campus, go to the MSC almost everyday, often multiple times a day. Tr. Vol. 1, 76:19-77:5; Vol. 2, 28:15-17. Thus, by siting early voting at the MSC, the County afforded each of the Plaintiffs multiple opportunities throughout the day to cast a ballot while going about their routine business. The County is entitled to take the unique circumstances of the Students proximity to the MSC and WCC into account in allocating early voting hours.

122. Indeed, the evidence in this case shows that the County's allocation was adequate and afforded each of the Plaintiffs an equal opportunity to cast a ballot if they wanted to do so. Each of the remaining Plaintiffs, Treasure Smith and Damon

Johnson, testified that they were able to cast a ballot at the MSC without incident and in just a few matters time. Tr. Vol. 4, 196:4-8; 168:1-8. And while Jayla Allen and Joshua Muhammad testified that they voluntarily elected to vote at the Courthouse in Hempstead, neither offered testimony or evidence that they could not, aside from mild inconvenience, avail themselves of the voting opportunities provided by the County at the MSC or WCCC. Tr. Vol. 1, 116:17-117:18.

123. Likewise, while Allen, Muhammad, and others testified that they offered rides to classmates to vote off campus during the first week, there is no evidence to suggest that those rides were necessary for any student to have had an opportunity to vote. To the contrary, any student without a ride would have been able to vote at the MSC or WCCC, where transportation is not required.

124. As Plaintiffs' counsel conceded, Tr. Vol. 2, 220:22-221:10, there is also no evidence in this case of long lines, voter confusion, intimidation, or that any PVAMU voter was actually impeded—again, beyond the inconvenience or disappointment of waiting until on-campus voting began—in their ability to cast a ballot. Rather, the evidence is that each of the Plaintiffs and witnesses was able to cast a ballot without difficulty after waiting only five to ten minutes.

125. Plaintiffs' expert, Dr. Stein, also fails to establish any concrete or tangible burden on the Plaintiffs' right to vote. First, according to Dr. Stein, the best practice in the literature for establishing a distance to a polling location is to site a polling location between .25 and .5 miles from a focal point of a population's activities. Tr. Vol. 2, 207:14-18. By siting voting at the MSC and less than seven minutes away at the

WCCC, the County has done that. Stein has no evidence to suggest that voters in Prairie View had to travel any farther than voters in other parts of the County. *Id.* at 209:10-15.

126. Moreover, although Stein speculates that "there might have been some voters who might otherwise have voted under a different schedule" he admits he has no evidence to support his opinion. *Id.* 220:3-13; 219:13-17. Ultimately, Stein's analysis merely states the obvious: the population of an HBCU is mostly African American, and mostly younger than other non-college areas in the County. Tr. Vol. 8, 125:3-10. What he does not, and cannot, do is show that those young, Black voters are actionably burdened in their ability to vote in comparison to other voters throughout the County.

127. As Dr. Gimpel testified, Stein's data does not show excess demand, it shows a group of voters who were mobilized and had the opportunity to vote. *Id.* at 125:19-25. The County made it easy for them to do so, not just by siting convenient voting access nearby, but by doubling the equipment allowing two voting lines to move voters through quickly. Thus, while Stein points to what he deems a high number of voters per hour as a sign of demand, he admits that could simply be a consequence of the added machines. Tr. Vol. 2, 224:5-25. And while he "suspects" and "presumes" that if there were more hours there "might" be more people who were not in line at all, he admits that he has "no knowledge" that is actually the case. *Id.* 225:23-226:1.

128. In fact, Gimpel's analysis shows it is not. As Gimpel found in analyzing the 2018 election, there was no relationship in Waller County between the number of early

voting hours in a given location and whether someone comes out to vote. Pls' Ex. 161, pp. 40-44; *see also* Tr. Vol. 8, 113:15-117:10. Thus, in 2016, when the County first sited early voting on the Prairie View Campus, actually dropped significantly. *Id.*at p.4, Figure 2; Tr. Vol. 8, 266:2-21. That is because in looking at either the hours at the MSC or the WCCC in the 2018 general election, the opportunity to vote was there for PVAMU students. The question of whether a particular voter took that opportunity, as Dr. Gimpel opines comes down to mobilization and motivation. Tr. Vol. 8, 77:4-12.

129. Here, the evidence shows that students working for particular campaigns were waiting at the student center and "pushing people" into the polls. Tr. Vol. 6, 184:25-185:5, 213:2-18. In fact, Maia Young testified that she was so focused pushing students into the polls at the MSC that she herself didn't have time to vote until election day. *Id.* at 213:13-25. Notably, Stein did no analysis of whether the so-called demand he observed was in fact related to the schedule, or whether it was the result of aggressive and rigorous mobilization efforts at the MSC; he was unable to say one way or the other. Tr. Vol. 2, 240:21-25. Nevertheless, notwithstanding active get out the vote efforts and Stein's perceived high demand for early voting, Plaintiff has produced no evidence to show that the voting hours in Prairie View were insufficient to give them an equal opportunity to vote.

130. Thus, the Court finds that Plaintiffs have failed to show a discriminatory burden on them as members of a protected class resulting in their having less opportunity than

other members of the electorate to participate in the political process and to elect representatives of their choice.

131. As the Plaintiffs have failed to establish a discriminatory burden under the first prong of the Fifth Circuit's test for abridgement claims under Section 2 of the Voting Rights Act, the Court need not reach the second step at which it uses the Senate Report factors to analyze whether that burden is caused by or linked to social and historical conditions producing discrimination against members of the protected class such that the burden is on account of race. Nevertheless, the Court makes the following factors with respect to the Senate Factors:

*The extent of any history of official discrimination*
*that affected the right of the group to participate in the political process.*

132. The Court acknowledges the findings of historical instances of discrimination against PVAMU students in Waller County by the District Court for the Southern District of Texas in *Veasey v. Perry*, 71 F.Supp.3d 627, 635-36 (S.D. Tex. 2014), *aff'd in part, vacated in part, and rev'd in part, Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016), but the probative value of those events, which occurred 12-49 years ago, is minimal in evaluating the actions of the current Waller County Commissioners Court in adopting the early voting schedule in 2018. *Veasey,* 830 F.3d at 232, *citing, McCleskey v. Kemp,* 481 U.S. 279, 298 n. 20 (1987); *see also, Shelby County v. Holder,* 570 U.S. 529, 535, 556 (2013); *North Carolina State Conference of the NAACP v. Raymond*, 981 F.3d 295, 299 (4th Cir. 2020)( ["a] legislature's past acts

do not condemn the acts of a later legislature, which we much presume acts in good faith.").

133. Moreover, although the Plaintiffs, like the court in *Perry*, place great emphasis on the three-judge panel's decision in *United States v. State of Tex.*, 445 F. Supp. 1245, 1252 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979), the Court notes that case involved the actions of the independently elected Tax Assessor/Collector and *ex officio* registrar of Waller County, who was not under the control of the County's governing body. The panel took care to note that there was no evidence that the Waller County Commissioners had "in any degree participated" in *Symm's* actions. Thus, the court specifically denied relief against the Commissioners Court. For that reason, the Court finds that the condemnable actions of Symm as an independently elected official, in addition to being remote in time, are not probative of the actions of the current County Commissioners Court.

134. For the same reasons, the Court finds Plaintiffs' evidence of threats of prosecution by the separately elected Waller County District Court in 1992 and 1998 is also of limited evidentiary value in showing discrimination that affects the ability of Black voters to participate in the political process in Waller County today. Not only is it temporally attenuated, but the actions of an elected official that are not subject to the control of the County Commissioners Court simply are not evidence of discrimination by the County that would abridge the rights of current voters in Prairie View to participate in the political process in Waller County.

135.    Plaintiffs also point to an objection by the United States Department of Justice to a proposed redistricting in Waller County in 2002. Notably, Waller County responded to that objection, explaining that its actions did not violate the Voting Rights Act, because the County's redistricting plan was measured against an inaccurate digital map. Ds' Ex. 83. Moreover, this too, is remote in time and involved an objection on the basis of retrogression under Section 5 of the Voting Rights Act. Retrogression is not the legal standard under Section 2 of the Voting Rights Act, and Section 5 is no longer applicable to the State of Texas or Waller County after the Supreme Court's decision in *Shelby County v. Holder,* 570 U.S. 529, 535, 556 (2013). The Court finds the DOJ's objection, made eighteen years ago and under a different legal standard that no longer applies, and particularly in light of Waller County's response, is not probative of the issues before it in this case.

136.    The Plaintiffs also point to a consent decree between Waller County and the Department of Justice in 2008. Dkt. 41. Although more recent, the consent decree is still 12 years old and it, too, turns on the requirements and standards under Section 5 and other provisions of the Voting Rights Act, not a claim of vote abridgment under Section 2. Moreover, as the consent decree reflects, Waller County conceded the error of its separately-elected Tax Assessor and Registrar in implementing the challenged practices and negotiated in good faith to resolve the matter with DOJ.

137.    The most contemporaneous allegation is that, in 2016, the Waller County Commissioners Court initially approved a recommendation by the local party chairs to reduce the number of early voting locations in Waller County from eight to two,

one on each end of the County. *See, ¶¶* 40-46, *supra.* However, Plaintiffs produced no evidence to suggest that such action was in any way imbued with discriminatory intent against Black voters in Waller County or Prairie View. Rather, the proposed plan eliminated early voting locations throughout the County, including the location in the City of Waller. *Id.* Furthermore, when concerns were expressed about the negative impact of the proposed changes on all voters of the County, the current Commissioners Court responded swiftly by restoring the abandoned locations and adding, for the first time, an early voting poll at the Memorial Student Center. *Id.* The Court therefore finds that the Commissioners Court's actions in regard to the 2016 primary do not evidence discrimination against voters in Prairie View, but instead demonstrate the County's responsiveness to voters as a whole.

138. The Court finds that the Plaintiffs' evidence does not demonstrate instances of reasonably contemporaneous official discrimination affecting the rights Black voters in Waller County or Prairie View to participate in the political process.

139. The Court finds this factor is either neutral or does not support a finding of a violation of Section 2 of the Voting Rights Act.

*The extent of racially polarized voting*

140. The Court finds that Plaintiffs have not offered sufficient, competent evidence to show racially polarized voting in Waller County. Plaintiffs' expert, Henry Flores, did not conduct any analysis of racial polarization in any elections pertinent to this case. Rather, Flores simply relied on the finding of racially polarized voting in the Fifth Circuit's decision in *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016). However,

that finding, from 2016, is insufficient to establish a current finding of racially polarized voting in Waller County.

141. Furthermore, the Court finds that racially polarized voting, while relevant in analyzing the effect and existence of alleged voter dilution, is not probative in determining whether an individual's right to vote has been denied or abridged. *See e.g., Veasey*, 830 F.3d at 273 (noting that some of the Senate Factors may have less relevance in a vote denial case and omitting this second factor from a list of the Senate Factors that aid in such cases) (concurring, Higginson, J. and Costa, J.).

142. The Court finds this factor is either neutral or does not support a finding of a violation of Section 2 of the Voting Rights Act.

*The extent of the use of practices that enhance*
*the opportunity for discrimination against the minority group*

143. Plaintiffs have neither alleged nor offered evidence to show the use by Defendants of practices that enhance the opportunity for discrimination against minority voters in Waller County or Prairie View.

144. The Court finds this factor does not support a finding of a violation of Section 2 of the Voting Rights Act.

*The existence of any slating process in which*
*minority group members were denied participation*

145. Plaintiffs have neither alleged nor offered evidence to show the existence of any slating process in Waller County in which minority group members were denied participation.

146. Furthermore, the Court finds that the existence of a slating process, while relevant in analyzing the effect and existence of alleged voter dilution, is not probative in determining whether an individual's right to vote has been denied or abridged in a case involving the availability of early voting. *See e.g., Veasey*, 830 F.3d at 273 (noting that some of the Senate Factors may have less relevance in a vote denial case and omitting this second factor from a list of the Senate Factors that aid in such cases) (concurring, Higginson, J. and Costa, J.).

147. The Court finds this factor does not support a finding of a violation of Section 2 of the Voting Rights Act.

*The extent that members of the minority group bear the effects of discrimination in areas such as education, employment, and health that hinders their ability to participate in the political process*

148. The Court finds that Plaintiffs have failed to show that Plaintiffs or other voters at PVAMU bear the affects of discrimination in areas such as education, employment, and health that hinders their ability to participate in the political process.

149. First, the suggestion that PVAMU voters bear the effects of discrimination in areas such as education, is belied by the fact that they are college students, currently working toward a four-year degree. Consequently, while Plaintiffs' demographic expert draws on the American Communities Survey 5-year estimates for 2013 through 2017, the educational estimates for that category are limited to data for individuals who are 25 years or older only. Pls' Ex. 153, B-8. Even so, the data offered by Cooper demonstrates that Black residents in Prairie View are actually more likely to have obtained a four-year college degree than are Anglo voters in

Waller County. Pls' Ex. 153, at B-8. As such, Plaintiffs have not shown that Black voters in Prairie View bear the effects of discrimination in the area of education.

150. The Court further finds that Plaintiffs have failed to allege or offer evidence to show that Black PVAMU voters bear the effects of discrimination in the area of health. While Cooper does report some statistics for disability, Cooper's figures show African Americans in Prairie View have a substantially lower rate of disability than Waller County Anglos, generally. Pls' Ex. 153, B-28.

151. Plaintiffs do offer some evidence to show disparities in employment, income, and homeownership, but such disparities are not necessarily surprising in the context of a college town, where a significant portion of the residents are focusing on attaining education, rather than joining the full-time workforce or working towards purchasing a home.

152. Further, Plaintiffs offer no evidence to show that socioeconomic status, education, or health hindered their ability to cast an early ballot during the early voting hours allotted by the County. The evidence instead establishes Plaintiffs were able to vote early at either the Memorial Student Center or the Waller County Community Center, or on election day at the Memorial Student Center, at no greater distance, expense, or exertion than any other voter in the County.

153. The Court finds this factor does not support a finding of a violation of Section 2 of the Voting Rights Act.

*Whether campaigns have been characterized by racial appeals*

154. Plaintiffs have neither alleged nor offered evidence to show campaigns in Waller County have been characterized by racial appeals.

155. Furthermore, the Court finds that campaigns characterized by racial appeals, while relevant in analyzing the effect and existence of alleged voter dilution, is not probative in determining whether an individual's right to vote has been denied or abridged in a case involving the availability of early voting. *See e.g., Veasey*, 830 F.3d at 273 (noting that some of the Senate Factors may have less relevance in a vote denial case and omitting this sixth factor from a list of the Senate Factors that aid in such cases) (concurring, Higginson, J. and Costa, J.).

156. The Court finds this factor does not support a finding of a violation of Section 2 of the Voting Rights Act.

*The extent to which minority candidates*
*have been elected to office in the jurisdiction*

157. The court finds that the extent to which minority candidates have been elected to office in the jurisdiction, while relevant in analyzing the effect and existence of alleged voter dilution, is not probative in determining whether an individual's right to vote has been denied or abridged in a case involving the availability of early voting in a specific election. *See e.g., Veasey*, 830 F.3d at 273 (noting that some of the Senate Factors may have less relevance in a vote denial case and omitting this seventh factor from a list of the Senate Factors that aid in such cases) (concurring, Higginson, J. and Costa, J.).

158. The Court finds this factor does not support a finding of a violation of Section 2 of the Voting Rights Act.

*Whether there is a lack of responsiveness
to the needs of the members of the group*

159. The Court finds that the extent to which a governmental body has been responsive to the needs of the members of a protected group, while relevant in analyzing the effect and existence of alleged voter dilution, is not probative in determining whether an individual's right to vote has been denied or abridged. *See e.g., Veasey*, 830 F.3d at 273 (noting that some of the Senate Factors may have less relevance in a vote denial case and omitting this eighth factor from a list of the Senate Factors that aid in such cases) (concurring, Higginson, J. and Costa, J.).

160. Nevertheless, the Court finds that the evidence establishes that Defendants have been responsive to PVAMU students, both generally and in terms of early voting.

161. As found herein, while the precise locations and times have varied, Waller County has had a practice of locating both early voting and election day voting close to, or directly on, the PVAMU campus since at least 2002. *See ¶¶ 33-36, supra.* That practice stands out in comparison to comparable counties with similarly-sized universities, which have not historically had a practice of placing polling locations as close to college campuses as has Waller. Moreover, the evidence shows that the Commissioners Court was responsive to Priscilla Barbour's request for on campus election day poll in 2013, and to the subsequent requests for an early voting location at the MSC in 2016. Waller County continues to maintain an election day precinct

at the MSC; and maintains early voting at the Waller County Community Center, less than a seven-minute walk from the middle of campus.

162. For the 2018 general election, the County also allocated twice as many voting machines for the polling location in Prairie View to prevent long lines and waiting times and to ensure an easy voting experience for PVAMU students. Tr. Vol. 6, 276:14-21.

163. Elections Administrator Christy Eason conducts regular outreach, including Voter Deputy Registrar trainings, at PVAMU. Her efforts have resulted in public compliments and expressions of gratitude from PVAMU students and other residents of Prairie View.

164. County Judge Trey Duhon routinely meets with PVAMU officials to collaborate with the University and strengthen the relationship between PVAMU and the County.

165. Eason and the County's elections office have also worked to resolve addressing issue to ensure PVAMU student who registered incorrectly are nevertheless able to exercise the franchise. *Id.*

166. Further, as testified to by Frank Jackson, the County assisted in working with the City and Texas Department of Transportation Sandra Bland Boulevard in Prairie View. Tr. Vol. 4, 143:2-18. As Jackson put it, "we have worked together…[w]e're going to continue to work together to get stuff done."

167. The Court finds that Defendants have been responsive to the needs of PVAMU students and this factor does not support a finding of a violation of Section 2 of the Voting Rights Act.

*Whether the policy underlying the challenged practice is tenuous.*

168. The Court finds that the County's adoption of the early voting schedule was based on legitimate, non-discriminatory factors.

169. As a threshold matter, Plaintiffs' expert opined that the factors used by the County were legitimate factors of the type typically employed by counties in setting early voting schedules Tr. Vol. 2, 238:15-20. Christy Eason testified that in forming a schedule she will often incorporate what has worked in the past, Tr. Vol. 6, 253:6-11, and Stein does not dispute that the County has remained consistent in its process and selection of voting sites. Vol. 2, 239:5-9.

170. Next, Eason testified that she considered historical turnout. Here, Stein allows for the possibility that the County's schedule simply aligns with where past turnout was, i.e., where the county anticipates people will vote, though he hasn't actually looked at past turnout. *Id.* at 236:15-237:4. Stein's real complaint about the County's allocation of hours, it appears, is that he feels the number of registered voters would dictate greater hours. However, Stein doesn't take into account the number of surrounding registered voters dependent on the other rural locations. *Id.* at 245:17-246:1. Likewise, Stein fails to consider registered voters in the context of historical turnout, which, as Eason testified, is the relevant measure for hiring enough pollworkers and allocating sufficient machines. *See also*, Tr. Vol. 2, 255:8-25; Vol.

8, 119:3-8. Stein is not critical of any of the application of any other criteria used by the County.

171.    Further, although Plaintiffs challenge the County's reliance on the local chairs of the Republican and Democratic party in setting the early voting schedule, the Court finds that reliance to be reasonable. The evidence establishes that the Republican and Democratic parties are the two active political parties in Waller County, and the only two parties that have nominated candidates through a primary system. Texas law specifically incorporates the input of the local party chairs in both the submission of poll workers and serving on the election commission that appoints the county elections administrator. Given the central role of these chairs in the political process, it is not tenuous for Waller County to involve them in the selection of early voting hours and locations, as well.

172.    While not every PVAMU student may identify with a particular party, the evidence shows the parties are sufficiently representative. In fact, former Plaintiff Jayla Allen was herself the democratic chair for Precinct 309. Tr. Vol. 1, 57:6-60:1. She testified that she saw her role as a representative of all Prairie View students, regardless of political affiliation. *Id.* Likewise, Kendric Jones, who ran as a democrat for the County Commissioner seat in Precinct 3 indicated that he represented all constituents regardless of partisan affiliation. Tr. Vol. 3, 41:3-44:7. Furthermore, the evidence in this case is that it was Dr. Denise Mattox—the Waller County Democratic Club President—not a PVAMU student who initially requested the placement of early voting at the MSC in 2016. Ds' 26. Accordingly, while the local

major party chairs may not align perfectly with the students, there is no evidence to suggest the Chairs are not, at least, generally representative of most voters in the County such that it would be reasonable to seek their input in setting election schedules. Those students who are dissatisfied with the Chair-approved plans are still free to go to the Commissioners Court to voice their own input.

173. Further, there is no evidence in this case that either the Democratic or Republican county chair intended the 2018 election schedule to deny or abridge the ability of Prairie View voters, as indeed, the schedule specifically allocated voting at both the Memorial Student Center and the Waller County Community Center.

174. The Court also finds that the County's allocation of early voting hours was consistent with the County's stated purpose to allocate its resources in a manner to provide early voting opportunities throughout the County, which is not a tenuous justification.

175. The Court finds that the policies underlying Defendants' adoption of the 2018 early voting schedule are not tenuous, and this factor does not support a finding of a violation of Section 2 of the Voting Rights Act.

176. Based on the foregoing, the Court finds that the application of the Senate Factors does not demonstrate that Plaintiffs were subjected to any burden on their right to vote that was caused by, or linked to, social and historical conditions producing discrimination against members of the protected class such that the burden was on account of race.

## Intentional Discrimination

177. There is no direct evidence of an intent to discriminate or abridge Plaintiffs' right to vote.

178. The circumstantial evidence advanced by Plaintiffs does not support a conclusion of discriminatory intent.

179. The Court finds that the early voting schedule adopted by the County did not result in an adverse disparate impact to PVAMU voters, but instead provided those voters with the benefit, unique among all other groups of voters in the County, of having early voting provided at and immediately adjacent to the campus where they conduct both their school and social activities.

180. The County adopted the early voting schedule for the 2018 general election in a public meeting, for which the agenda and schedule were duly published in accordance with Texas law.

181. There is no evidence that the County did not depart procedurally from its normal decision-making process or the process it has previously used to adopt early voting schedules. Indeed, of Plaintiffs' retained experts, Dr. Stein agrees that the County followed its prior process, and Dr. Flores testified that he did not review prior processes and therefore could not opine. Tr. Vol. 5, 168:8-11.

182. The early voting schedule for the 2018 general election was not a substantive departure from past schedules and did not eliminate or reduce any early voting location or hours in Prairie View. In fact, the 2018 early voting schedule was an expansion from past elections and provided the greatest number of days and hours

of early voting in the City of Prairie View to date. Rather, the only deviation Flores could identify was when the County *increased* hours after the lawsuit was filed. Tr. Vol. 170:14-171:2. However, as stated previously, attempting to respond to and address pending litigation in conjunction with an ongoing election is not a substantive departure by the County, but a forced reaction to a independent legal proceeding by a third party.

183.    As explained herein, none of the contemporaneous viewpoints or statements by the members of the Commissioners Court at the time of the adoption of the 2018 early voting schedule or at the subsequent meeting on October 10, 2017 were indicative of discrimination on the basis of either race or age.

184.    Plaintiffs rely solely on the statements by Defendants Duhon and Eason that the original schedule in 2018 was not "equal representation" or that there was "an inequity' in the early voting opportunities available to Prairie View as compared to other cities like Waller that get eleven days of early voting." But both Eason and Duhon testified these statements were only meant to recognize that Prairie View, like Fields Store, Monaville, and Katy, received fewer total early voting hours than Hempstead, Brookshire, and Waller. The Court finds that these statements, of themselves, do not suggest that either Eason or Duhon believed that the schedule had the effect of discriminating on the basis of age or race, much less that it was chosen *because* of such an effect.

185. Even so, the individual statements are of little probative value to the motivation of the other four commissioners necessary to reach a majority vote by the Commissioners Court.

186. The Court finds that Plaintiffs have not offered evidence sufficient to overcome the presumption of good faith accorded to government officials and have not proven the intent to discriminate on the basis of either race or age by any of the Defendants.

## II.    CONCLUSIONS OF LAW

### Section 2 of the Voting Rights Act

187. Section 2 forbids application of a standard, practice, or procedure in a manner that results in a denial or abridgement of the right to vote on account of race or color. 52 U.S.C. § 10301(a).

188. A violation is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b).

189.  In the Fifth Circuit there is a two-part framework to be used to evaluate a section 2 claim:

[1] The challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, and

[2] That burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*Veasey,* 830 F.3d at 244.

190. In evaluating the second prong of the *Veasey* framework, the Court reviews the Senate Report or *Gingles* factors, including:

1) the extent of any history of official discrimination that affected the right of the group to participate in the political process,

2) the extent of racially polarized voting,

3) the extent of the use of practices that enhance the opportunity for discrimination against the minority group,

4) the existence of any slating process in which minority group members were denied participation,

5) the extent that members of the minority group bear the effects of discrimination in areas such as education, employment, and health that hinders their ability to participate in the political process,

6) whether campaigns have been characterized by racial appeals,

7) the extent to which minority candidates have been elected to office in the jurisdiction,

8) whether there is a lack of responsiveness to the needs of the members of the group, and

9) whether the policy underlying the challenged practice is tenuous.

*Veasey,* 830 F.3d at 345-46.

191.   But if the first element of the two-part analytical framework is not established there is no need to address the second, which entails consideration of the nine Senate Report factors.  *Veasey,* 830 F.3d at 245 (explaining how the second part of the analysis is to determine if there is a causal link between social and historical conditions and the disparate burden and suggesting that the analysis is unnecessary if there is no disparate burden); *Ohio Democratic Party v. Husted,* 834 F.3d 620, 638 (6th Cir. 2016); *Lee,* 843 F.3d 592, 600 (4th Cir. 2016).

192.   A discriminatory burden is not shown when a voting practice results in a mere disparity of convenience. *Lee v Virginia State Board of Elections*, 843 F3d 592, 600–601 (4th Cir 2016).

193.    Here, the Court concludes as a matter of law that the early voting schedule adopted by Defendants in advance of the 2018 general election did not impose a discriminatory burden on Black PVAMU voters, such that those the voters had less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

194.   Although the Court need go no further, the Court further concludes as a matter of law that even if Plaintiffs had satisfied the first prong of *Veasey* by demonstrating a burden resulting in Plaintiffs having less opportunity to participate in the electoral process than other voters in Waller County, which they have not, that Plaintiffs have nevertheless failed to establish that such burden was by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

195.     Therefore the Court concludes that Plaintiffs have failed to prove their claims under

Section 2 of the Voting Rights Act and that Defendants are entitled to judgment on

the same.

### Intentional Discrimination in Violation of Section 2 or the Fourteenth and Fifteenth Amendments to the United States Constitution

196.     Even after the passage of the Voting Rights Act in 1965 early cases challenging

voting practices tended to focus on constitutional claims.  *See, e.g., White v.*

*Regester,* 412 U.S. 755, 783 (1973).  Indeed, the Supreme Court indicated that there

was no effective difference between Section 2 and the Fifteenth Amendment, and

since the Plaintiffs had made a constitutional claim, the Section 2 claim was

essentially extraneous.  *City of Mobile v. Bolden,* 466 U.S. 55, 60-61 (1980)

(plurality opinion). In that opinion, the Supreme Court held that the Voting Rights

claims asserted under the Fourteenth and Fifteenth Amendments required proof of

both denial or abridgement of the right to vote *and* discriminatory purpose.  *City of*

*Mobile,* 466 U.S. at 62, 66.  In 1982, Congress amended Section 2 of the Voting

Rights Act in order to give the section added viability and to make it clear that the

statutory claim could be established on a showing of discriminatory effect alone

without the necessity of proving discriminatory purpose.  *Thornburg v. Gingles,* 478

U.S. 30,35 (1986); S.Rep. No. 97-417, 97th Cong. 2nd Sess. 2 (1982), U.S. CODE

CONG. & ADMIN. NEWS 1982, pp. 177, 179.

197.     Because a Section 2 claim requires proof of only one of the two elements of a

constitutional claim, actions now are typically brought under Section 2 rather than

the Constitution.  The exception is where, as here, a plaintiff also seeks relief under the bail-in provision found at Section 3 of the Voting Rights Act, 52, U.S.C. § 10302(c), since that section expressly requires proof of a violation of either the Fourteenth or Fifteenth Amendment.

198.    Similarly, the fact that Fourteenth and Fifteenth Amendment claims require the same proof of discriminatory effect as a Section 2 claim plus the additional proof of discriminatory intent, means that unless a plaintiff can establish a Section 2 violation, he or she cannot prevail on the constitutional claim.  *See, e.g., Veasey v. Abbott,* 830 F.3d 216, 265 (5th Cir. 2016) (en banc) (declining to reach Fourteenth and Fifteenth Amendment claims when the case was effectively decided under section 2), *Jordan v. City of Greenwood, Miss.,* 711 F.2d 667, 669 (5th Cir. 1983). As found above, the Plaintiffs have failed to prove a discriminatory effect under Section 2.  They have therefore failed to prove the first of the two elements of their Fourteenth and Fifteenth Amendment claims, and those claims necessarily fail, as well.

199.    Even so, Plaintiffs have also failed as a matter of law to prove that Defendants intentionally adopted the 2018 early voting schedule with the intent to harm Black voters and have therefore failed to prove intentional discrimination in violation of the Fourteenth and Fifteenth Amendments.

200.    As noted, to establish a claim under the Fourteenth or Fifteenth Amendment it is necessary to prove that the challenged practice or procedure was adopted with a discriminatory purpose.  The alleged discriminatory intent, though, "implies more

than intent as volition or intent as awareness of consequences . . .. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020*), quoting, Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279 (1979). Put another way, the plaintiffs must show that racial discrimination was a substantial or motivating factor behind enactment of the challenged practice. *Veasey*, 830 F.3d at 231.

201. In determining whether a decision was made with discriminatory intent, five non-exhaustive factors offer guidance to the courts: (1) the discriminatory impact of the official action, (2) the historical background of the decision, (3) the specific sequence of events leading up to the challenged action, (4) substantive and procedural departures from the normal-decision-making process, and (5) contemporaneous viewpoints expressed by the decisionmakers. *Fusilier,* 963 F.3d at 463*, citing, Village of Arlington Heights v. Metro. Housing Devel. Corp.,* 429 U.S. 252, 266-68 (1977).

202. However, as the Fifth Circuit has recently reiterated, "[p]roving the motivation behind official action" is "a problematic undertaking," *Fusilier* 963 F.3d at 464. Direct evidence of discriminatory intent must be prioritized over circumstantial evidence, and the analysis should start with the presumption that legislative officials acted in good faith. *Id.* ("the Supreme Court has long cautioned against the quick attribution of improper motives, which would interfere" with a legislative official's rightful independence and ability to function."). Thus, in overturning the finding of

intentional discrimination in *Fusilier*, the Fifth Circuit hewed to the Supreme Court's admonishment not to overemphasize statements from individual legislators. *Id.* at 466. As the Fifth Circuit opined, even if suspect, such statements are not necessarily what motivates others to act (or not act) and are therefore entitled to little probative value. *Id*.

203.    In this case, in analyzing the evidence under the *Arlington Heights* factors, and for the reasons set out in the foregoing factual findings, the Court concludes that Plaintiffs have failed to prove their claims of intentional discrimination on the basis of race in violation of Section 2 of the Voting Rights Act or the Fourteenth or Fifteenth Amendment.

**Twenty-Sixth Amendment Claim**

204.    In a decision released the day before the final oral arguments at the close of the trial, the Fifth Circuit clarified the standard for adjudicating Twenty-Sixth Amendment claims. *Texas Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020) (Texas Democratic Party II).    The circuit court held that, in this context, denial or abridgement of the right to vote is measured against the nature of the right as it existed at the time of the adoption of the Amendment.

205.    In analyzing the issue, the Fifth Circuit employed a two-part analysis in *Texas Democratic Party II*.    The Twenty-Sixth Amendment prohibits denial or abridgement "of the right of citizens of the United States who are eighteen years of age or older to vote . . . on account of age." 978 F.3d at 184. The court first asked what, at the time the Amendment was proposed and ratified in 1971, was

encompassed within the right to vote. *Id.* at 185. Since the issue in *Texas Democratic Party* II was whether persons under the age of 65 had a right under the Amendment to vote absentee by mail, the question the court posed was whether absentee voting was part of the right to vote protected by the Amendment. After examining a contemporaneous Supreme Court opinion, federal legislation enacted near the time of the Amendment, and the practices of the states, it concluded that in 1971 absentee voting was generally permitted for persons who would be outside the jurisdiction on election day but was otherwise unavailable. Or, as the court said, "the right to vote in 1971 did not include a right to vote by mail. In-person voting was the rule, absentee voting the exception." *Texas Democratic Party II*, 978 F.3d at 188. That contemporaneous meaning established the baseline for measuring what the right protected by the Amendment was and whether it had been denied or abridged. *Id.*, at 185, 187-88; *see also, Tully v. Okeson*, 977 F.3d 608, 613-14 (7th Cir. 2020).

206. *Texas Democratic Party II* easily determined that there had been no denial of the right to vote. The plaintiffs there were not prohibited from voting—i.e., denied the right to vote—but instead were unable to use a particular method of voting—voting by absentee, mail-in ballot. In this case, there is similarly no denial of the right to vote but, at most, an inability to utilize a specific method of voting—in person, no excuse, early voting—at the particular times and location the plaintiffs would prefer. Not only was there no denial of the right to vote, but, as is discussed in paragraph 208, in person early voting was a method of voting that was not encompassed within

the right to vote at the time of the Amendment's adoption. *Texas Democratic Party II,* 978 F.3d. at 188. Under the *Texas Democratic Party II* reasoning, there can be no denial of the right to vote here.

207. Even if one adopts a more expansive view of the scope of the right to vote, it was not abridged when the Fifth Circuit standard is applied to the facts of this case.

208. The central question in this case is whether the three full days of in-person early voting at the Memorial Student Center ("MSC"), combined with the two full days for early voting at the Waller County Community Center ("WCCC") a seven-minute walk away, constituted an abridgement. To replicate the *Texas Democratic Party II* Twenty-Sixth Amendment analysis, the Court first would need to determine if the right to vote protected by that Amendment extends to no-excuse, in-person, early voting. While in-person early voting is relatively common today, the first state to offer no-excuse, in-person, early voting was Texas, and that did not begin until 1987, more than a decade after the adoption of the Twenty-Sixth Amendment. TIME MAGAZINE, *This Is How Early Voting Became a Thing,* Oct. 25, 2016 (updated on Nov. 6, 2020), https://time.com/4539862/early-voting-history-first-states/, last accessed March 22, 2021; Acts 1987, 70th Legis., R.S., ch. 472, § 19 (quoted section 82.006) (now codified as Tex. Elec. Code § 82.005); O. Douglas Weeks, HANDBOOK OF TEXAS, *Election Laws,* http://www.thsaonline.org/handbook/entries/election-laws, last accessed March 21, 2021. Since the issue in this case relates to the timing and geographical location of in-person, early voting—a means of voting that did not exist to any great extent, if

at all, at the time of the adoption and ratification of the Twenty-Sixth Amendment—it cannot be a part of the right to vote protected by that Amendment. *Texas Democratic Paraty II*, 978 F.3d at 189 ("The Amendment, though, is a prohibition against adopting rules based on age that deny or abridge the rights voters already have.").

209. If, as appears to be the case under the court's analysis, the baseline is defined by the right to vote that existed in 1971—i.e., a right that did not include in-person early voting—then the adoption of an early voting schedule or location that the plaintiffs assert is less favorable to 18-20 years old voters cannot constitute a violation of the Twenty-Sixth Amendment.

210. While the Fifth Circuit opinion in *Texas Democratic Party II* clearly establishes the baseline as of the date of the adoption and ratification of the Twenty-Sixth Amendment, even if the Court adopts a broader interpretation and applies it to the procedure in place prior to the one challenged in the litigation, there still is no violation. The plaintiffs challenge the location and hours for early voting in the 2018 general election, contending that there should have been more early voting at the MSC. In 2018, there were 36 hours of early voting at the MSC. In the preceding November general election in 2016, there were 18 hours at that location.

211. In determining if there was an abridgement of the right to vote, the Fifth Circuit concluded in *Texas Democratic Party* II that"

> we hold that an election law abridges a person's right to vote for the purposes of the Twenty-Sixth Amendment only if it makes voting more difficult for that person than it was before the law was enacted

or enforced. . . . Abridgement of the right to vote applies to laws that place a barrier or prerequisite to voting, or otherwise make it more difficult to vote, relative to the baseline.

*Texas Democratic Party II*, 978 F.3d at 190-191.

212.   Plaintiffs' Twenty-Sixth Amendment claim necessarily fails under this standard as Defendants' 2018 election schedule doubled the number of hours and provided extra machines and a controller allowing two lines to process voters more quickly. Moreover, while in the 2016 general election there were additional early voting hours at the St. Frances Episcopal Church, in 2018 the County provided even an even greater number of hours at the Waller County Community Center, which is even closer to campus. Defendants' 2018 schedule, therefore, made voting easier, not more difficult, for voters in Prairie View and cannot amount to an abridgement under the holding in Texas Democratic Party II. Id.

213.   Here, the early voting schedule adopted by the County provided Plaintiffs and younger voters in Prairie View ample opportunity to vote early or on election day. That additional days or hours may have yielded added convenience is insufficient to sustain a claim under the Fourteenth Amendment. The Court concludes that Plaintiffs have failed to show that the early voting schedule adopted by the County for the 2018 general election lacked a rational relationship to the County's legitimate interest in allocating its limited voting resources to serve all voters throughout the County. Rather, the Court finds that County has established a legitimate interest in administering early voting throughout the County and that the 2018 plan was rationally related to that interest.

214. Alternatively, the Court concludes that the Plaintiffs' claims for intentional discrimination fail under the *Arlington Heights* analysis based for the same reasons as its claims for intentional discrimination on the basis of race: the evidence shows that Defendants did not adopt the early voting schedule as a mechanism to deny them the ability to vote.

## **Intersecting Claims under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments**
.

215. The plaintiffs also raise a hybrid claim involving "the intersecting bases of age and race." However, the Plaintiffs have not identified any court that has recognized such a claim, and the Court declines to do so here. As Plaintiffs are unable to prove a violation under the Fourteenth, Fifteenth, or Twenty-Sixth Amendment individually, they may not amalgamate those amendments to try to create a new claim.

## **Relief**

216. Because the Court has found for Defendant on all claims asserted by Plaintiffs herein, it denies Plaintiffs' requested relief and orders that Plaintiffs take nothing by their claims.

Respectfully submitted,

C. ROBERT HEATH
Texas State Bar No. 09347500
Southern District No. 13381
*bheath@bickerstaff.com*

By:  */s/ Gunnar P. Seaquist*
GUNNAR P. SEAQUIST
Texas State Bar No. 24043358

Southern District No: 1140733
*gseaquist@bickerstaff.com*

BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile: (512) 320-5638

**ATTORNEYS FOR DEFENDANTS**

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that on March 30, 2021, a true and correct copy of the foregoing document was served on all counsel of record via the electronic case filing system of the United States District Court for the Southern District of Texas.

*/s/ Gunnar P. Seaquist*
Gunnar P. Seaquist