# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

JAYLA ALLEN, DAMON JOHNSON,   §
TREASURE SMITH, and THE   §
PANTHER PARTY,   §
     *Plaintiffs*,   §
  §
v.   §
  §   **Civil Action No. 4:18-CV-3985**
WALLER COUNTY, TEXAS; THE   §
WALLER COUNTY   §
COMMISSIONERS COURT; JUDGE   §
CARBETT "TREY" J. DUHON III, in   §
his official capacity as the Waller County   §
Judge; and CHRISTY A. EASON, in her   §
official capacity as the Waller County   §
Elections Administrator,   §
     *Defendants*.   §

## DEFENDANTS' SUPPLEMENTAL BRIEF ON THE APPLICABILITY OF THE UNITED STATES SUPREME COURT'S DECISION IN *BRNOVICH V. DEMOCRATIC NATIONAL CONVENTION*

C. ROBERT HEATH
Texas State Bar No. 09347500
Southern District No. 13381
*bheath@bickerstaff.com*
GUNNAR P. SEAQUIST
Texas State Bar No. 24043358
Southern District No: 1140733
*gseaquist@bickerstaff.com*

BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8081
Facsimile: (512) 320-5638

**ATTORNEYS FOR DEFENDANTS**

# TABLE OF CONTENTS

Table of Contents......................................................................................................ii

Table of Authorities................................................................................................iii

I.      *Brnovich* applies to rules governing the time, manner, and place of voting such as the early voting schedule challenged in this case ........................................ 1

II.     *Brnovich* clarifies the meaning of "equally open" in the context of VRA §2.......... 2

III.    The other considerations for the totality of the circumstances analysis identified in *Brnovich* also support judgement in favor of Defendants on Plaintiffs' VRA §2 claims. ....................................................................................... 5

    1.      The size of the burden imposed by a challenged voting rule is highly relevant. ........................................................................................................ 5

    2.      The degree to which a voting rule departs from standard practice when §2 was amended in 1982 is a relevant consideration. ................................... 8

    3.      The size of any disparities in a rule's impact on members of different racial or ethnic groups is also an important factor to consider. .................. 10

    4.      Courts must consider the opportunities provided by a State's entire system of voting when assessing the burden imposed by a challenged provision. ................................................................................................... 13

    5.      The strength of the state interests served by a challenged voting rule is also an important factor that must be taken into account. ....................... 14

Certificate of Word Count ........................................................................................ 17

Certificate of Service ................................................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) ........................................................................... 9, 14

*Brnovich v. Democratic National Convention*,
    141 S. Ct. 2321, 209 L.Ed.2d 6 (2021) ............................................ *passim*

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ................................................................................ 14

*Crawford v. Marion County Election Bd.*,
    553 U.S. 181 (2008) .................................................................................. 7

*Frank v. Walker*,
    768 F.3d 744 (7th Cir. 2014) .................................................................... 6

*Lee v. Virginia State Bd. of Elections*,
    843 F.3d 592 (4th Cir. 2016) ............................................................... 6, 10

*Tashjian v. Republican Party of Connecticut*,
    479 U.S. 208 (1986) ................................................................................ 15

*Texas Democratic Party v. Abbott*,
    961 F.3d 389 (5th Cir. 2020) .................................................................... 6

**Statutes**

52 U.S.C. § 10301 ......................................................................................... 2

TEX. ELEC. CODE §§ 81.001 and 85.002 ....................................................... 8

TEX. ELEC. CODE § 82.001, *et seq.* ............................................................. 13

TEX. ELEC. CODE § 82.005 ............................................................................ 8

Voting Rights Act Section 2 ................................................................. *passim*

TO THE HONORABLE CHARLES R. ESKRIDGE, III:

As the Supreme Court's first opinion applying Section 2 of the Voting Rights Act ("VRA §2") to practices and procedures governing the "time, place or manner" of voting, *Brnovich v. Democratic National Convention*, 141 S. Ct. 2321, 209 L.Ed.2d 6 (2021), necessarily controls Plaintiffs' §2 abridgment challenge to Waller County's early voting schedule in the 2018 general election. The central tenet of *Brnovich* is the same one Defendants have pressed from the outset of this case—proving unlawful abridgment under VRA §2 requires more than a showing of mere disparate impact or inconvenience. Indeed, the majority emphatically rejected the "radical project" of using VRA §2 to invalidate facially neutral voting practices based solely on some disparity of impact on a protected group—the exact project undertaken by the plaintiffs here. *Brnovich* holds instead that plaintiffs must show that a challenged rule amounts to a significant burden that seriously hinders voting. And although the Court declined to announce a bright-line test for such impediments, each of the guideposts identified by the majority for analyzing whether voting is equally open under VRA §2 vindicates Defendants' position in this suit and supports a finding in their favor.

I.     ***Brnovich* applies to rules governing the time, manner, and place of voting such as the early voting schedule challenged in this case.**

*Brnovich* controls the VRA §2 abridgment analysis in this case. Like the plaintiffs in *Brnovich*, the PVAMU student plaintiffs here offer no evidence that the challenged voting practice—the County's 2018 election schedule—impeded, or made voting significantly more difficult, for any Black voter in Waller County. They contend instead

that the allocation of fewer overall early voting hours at the polling locations in Prairie View than those in Hempstead (majority Black-CVAP), Brookshire (majority Black-CVAP), and Waller (majority Anglo-CVAP) resulted in a disparate impact to PVAMU students because the Prairie View polls were disproportionately used by young, Black voters. Plaintiffs do not dispute that Prairie View received more early voting hours than Anglo-majority Katy, Fields Store, and Monaville, but maintain that they were uniquely and adversely affected due to "historical and contemporary socioeconomic disparities" and further urge that this ostensible impact must be understood within the "history of discrimination against PVAMU students." Dkt. 176, 92-93. Consequently, the question here is the same one addressed in *Brnovich*: does an alleged disparate impact result in the political processes not being equally open, such that a violation of VRA §2 is established. *Brnovich* therefore supplies both the proper analytical framework and result in this case.

## II. *Brnovich* clarifies the meaning of "equally open" in the context of VRA §2.

Under the plain language of VRA §2, a violation is established when:

"…based on the totality of the circumstances it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens…in that its members have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice." 52 U.S.C. § 10301.

Throughout this case, the fundamental dispute has been whether Black voters in Prairie View had less opportunity to participate in the 2018 election, simply because the schedule allocated fewer overall early voting hours there than in Hempstead, Brookshire, and Waller. Thus, at the close of trial, this Court rightly noted that the VRA does not call for "identical opportunity" and observed that it would be helpful to have a higher court

opinion that actually unpacked the meaning of "equal opportunity," in VRA §2. Tr. Final Arguments, Oct. *Brnovich* provides that clarification.

Starting with the statutory text, the Supreme Court held that the most relevant definition of the term "open," as used in § 2, is "without restrictions as to who may participate" or "requiring no special status, identification or permit for entry or participation." *Brnovich*, 141 S. Ct. at 2337. Moreover, the Supreme Court explained that equal openness and equal opportunity "are not separate requirements," but instead that equal opportunity helps to inform the meaning of equal openness. *Id.* at 2337-38. Equal opportunity, in the majority's view, is "a combination of circumstances, time, and place suitable or favorable for a particular activity or action." *Id.* at 2338. And, because section 2 requires consideration of totality of the circumstances, any circumstance that has a logical bearing on whether voting is equally open and affords equal opportunity may be considered. *Id.*

Under these definitions, Waller County's electoral processes for the 2018 general election were equally open to Black PVAMU voters in that they had an equal opportunity to participate in the election and elect representatives of their choice. There is no dispute, for example, that, other than the basic eligibility requirements set by state law, Defendants offered early voting without any restriction as to who may participate. Eligible voters of any race could cast an early ballot at any of the County's polling locations, without any special status, identification (besides the requisite identification mandated for all Texas voters), or permit. Furthermore, *Brnovich* dispenses with Plaintiffs' argument that the mere difference in total hours or day of early voting between areas with differing demographic

majorities equates to unequal opportunity under VRA § 2. To the contrary, the majority's accepted definition confirms Defendants' contention that "equal opportunity" must be evaluated in conjunction with the unique circumstances of PVAMU students having five extended-hour days of early voting (and an Election Day poll) at, or within a short walking distance of the heart of the campus.

On that point, the evidence is plain. PVAMU voters had a particularly favorable opportunity to cast their ballot in the 2018 election. As Dr. Flores admitted at trial, the early voting provided by the County at the Memorial Student Center (MSC) was more convenient to PVAMU students than were other locations to non-PVAMU voters in the County. Tr. Vol. 5, 145:10-20. That is because PVAMU students, those that live on and off campus, go to the MSC almost every day, often multiple times a day as a matter of course, whereas almost all other voters in the County had to make a special trip to reach a polling location. *See id.,* 143:1-18; *see also* Tr. Vol. 1, 76:19-77:5; Vol. 2, 28:15-17.  Even the seven-minute walk to vote at the Waller County Community Center ("WCCC") on the edge of campus was a shorter trip for PVAMU students than other voters throughout the County who had to travel, on average, six or seven miles to reach the nearest voting location. Vol. 4, 4:2-8; Tr. Vol. 8, 111:12-21. Thus, the County's allocation of early voting in extremely-close proximity to the densely concentrated voting population at PVAMU, particularly when coupled with the additional voting machines allocated to the MSC and WCCC, made it possible for more students to cast an early ballot in a shorter period of time. Under the definition in *Brnovich,* this combination of circumstances, time, and placement affords equal—and indeed greater—opportunity for Plaintiffs to cast their ballot

as voters in Hempstead, Brookshire, and Waller who had to make a special trip and, on average, travel significantly farther, requiring more time to vote.

III. **The other considerations for the totality the circumstances analysis identified in *Brnovich* also support judgement in favor of Defendants on Plaintiffs' VRA §2 claims.**

In addition to specifying the meaning of equal openness and opportunity under VRA §2, *Brnovich* also clarified, as a matter of first impression in a time, manner, and place of voting case, the important considerations in evaluating those concepts under the "totality of the circumstances." Notably, although Plaintiffs rely heavily on the *Gingles* or "Senate" factors that grew out of and were designed for use in vote dilution cases, *Brnovich* holds those factors are of limited value in a time, manner, and place of voting case. As the Court explained, the only relevance of the Senate factors in this context is "to show that minority group members suffered discrimination in the past and that the effects of that discrimination persist," but that even then, "their relevance is much less direct." *Brnovich*, 141 S. Ct. at 2340. Rather, the majority gave a list of five non-exhaustive considerations from which it determined—without any mention of the Senate factors—that the challenged regulations did not violate VRA §2. Each of these considerations directly supports Defendants' position in this case.

1. **The size of the burden imposed by a challenged voting rule is highly relevant.**

Defendants have argued throughout this case that while Plaintiffs are not required to show an absolute denial of the right to vote, they *are required* to show some meaningful burden that makes it harder for them to vote in comparison to others outside of their

protected class. *See e.g.,* Dkt. 82 at 4. *Brnovich* confirms Defendants' position by holding that "[t]he concepts of 'open[ness]' and 'opportunity' connote the absence of obstacles and burdens that block or seriously hinder voting, and therefore the size of the burden imposed by a voting rule is important." *Brnovich*, 141 S. Ct. at 2338; *accord Frank v. Walker*, 768 F.3d 744, 749 (7th Cir. 2014) (holding that the plaintiffs failed to show that Indiana's photo ID requirement was "an obstacle to a significant number of persons who would otherwise cast ballots."). As the Supreme Court observed, "every voting rule imposes a burden of some sort." *Brnovich*, 141 S. Ct. at 2338 (citing *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 198 (2008)). Consequently, "a voting system that is 'equally open' and furnishes 'equal opportunity' must tolerate the usual burdens of voting." *Id.* "Mere inconvenience cannot be enough to demonstrate a violation of §2." *Brnovich*, 141 S. Ct. at 2338; *see also Lee v. Virginia State Bd. of Elections*, 843 F.3d 592, 600–01 (4th Cir. 2016) ("Every decision that a State makes in regulating its elections will, inevitably, result in somewhat more inconvenience for some voters than for others. For example, every polling place will, by necessity, be located closer to some voters than to others"); *see also, Texas Democratic Party v. Abbott,* 961 F.3d 389, 404 (5th Cir. 2020) (holding there is no constitutional violation merely because some groups find voting to be less convenient for them than it is for others).

The evidence in this case negates any suggestion that the County's 2018 election schedule blocked or seriously hindered Plaintiffs' or any Prairie View voter's ability to cast an early ballot. Rather, the evidence establishes that the County made early voting available to all eligible voters for the entire early voting period in Hempstead, Brookshire, and

Waller. Indeed, both Jayla Allen and Joshua Muhammad testified that they elected to vote at the courthouse in Hempstead and were able to do so without difficulty. Tr. Vol. 1, 115:17-119:2; Vol. 6, 101:13-21. And for PVAMU voters like Plaintiffs Treasure Smith and Damon Johnson who lacked means of transportation, or who simply found it inconvenient to travel to one of these nearby locations, the County allocated five full days of early voting—more 7:00 a.m. to 7:00 p.m. early voting days than any other location in Waller County—between the MSC and the WCCC. D's Ex. 3 at pp. 17-18; Tr. Vol. 4, 196:4-8; 168:1-8.

Thus, the only burden identified by any witness in this case was having to arrange their schedule to vote within the allotted time. But finding a time to vote when the polls are open is precisely the type of usual voting burden that the Supreme Court dismisses as insufficient to support a §2 violation. *Brnovich*, 141 S. Ct. at 2338; *see also Crawford v. Marion County Election Bd.*, 553 U.S. 181, 198 (2008). At most, Plaintiffs may argue that the County's 2018 schedule made early voting more convenient for some Anglo voters in Hempstead, Brookshire, and Waller than some Black voters in Prairie View, but *Brnovich* makes clear that disparate inconvenience is not enough. *Id.* And as explained above, any ostensible inconvenience to PVAMU voters owing to fewer total hours or days of early voting is more than mitigated by the fact that students were able to cast a ballot in the course of their normal daily routine coupled with the County's allocation of additional controllers and voting machines to facilitate fast and easy voting. Therefore, under the totality of the circumstances, the 2018 election schedule simply did not present the type of

serious hindrance to voting *Brnovich* indicates is necessary to show unequal openness to opportunity under VRA §2.

2. **The degree to which a voting rule departs from standard practice when §2 was amended in 1982 is a relevant consideration.**

The Supreme Court further opined in *Brnovich* that "because every voting rule imposes a burden of some sort, it is useful to have benchmarks with which the burdens imposed by a challenged rule can be compared." 141 S. Ct. 2338-39. As the Court recounted, "in 1982 States typically required nearly all voters to cast their ballots in person on election day and allowed only narrow tightly defined categories of voters to cast absentee ballots." *Id.* That statement is true for Texas, which did not offer no-excuse, in-person, early voting until 1987.[1] Then, as now, Texas law required smaller counties such as Waller to conduct early voting only at the Main Early Polling Place where the County Clerk's office was housed. Tex. Elec. Code §§ 81.001 and 85.002. Thus, even as of 2018, some smaller Texas counties held early voting at only one location. *See e.g.,* Expert Report of J. Gimpel, P's Ex. 161, p. 22 (Kleburg County), p. 25 (Walker County).[2] The decision of whether a county the size of Waller will hold in-person early voting at temporary branch

---

[1] *See* Gronke & Galanes-Rosenbaum, America Votes! 261, 267-69 (B. Griffith, ed. 2008); *see also* TIME MAGAZINE, *This Is How Early Voting Became a Thing,* Oct. 25, 2016 (updated on Nov. 6, 2020), https://time.com/4539862/early-voting-history-first-states/, last accessed March 22, 2021; Acts 1987, 70th Legis., R.S., ch. 472, § 19 (quoted section 82.006) (now codified as TEX. ELEC. CODE § 82.005); O. Douglas Weeks, HANDBOOK OF TEXAS, *Election Laws,* https://www.tshaonline.org/handbook/entries/election-laws , last accessed July 28, 2021.

[2] *See also, e.g.,* Navarro County, http://www.co.navarro.tx.us/upload/page/4292/docs/Elections/2020/VR%20NOVEMBER%203 %20Early%20Voting%20Info%20200814.pdf ;

locations beyond the Main Early Voting Place has been a discretionary one. Acts 1985, 69th Leg., Ch. 211 § 1, eff. Jan. 1, 1986.

There is therefore no basis to conclude that Defendants' 2018 early voting schedule departed from any benchmark practice in 1982, when no-excuse early voting was not even available. And even as opportunities for in-person early voting have expanded over time, Defendants have not found, and Plaintiffs have not identified, any precedent establishing a standard practice or means of allocation for early voting schedules. To the contrary, the courts have recognized the interests of states and localities to regulate the election process to ensure that it is fair and orderly. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). Thus, whether early voting is offered at all and the time, place, and manner in which it is offered when available varies widely from state to state and, at least in Texas, from county to county.[3] This ability of states and local governments to self-regulate the procedure for their elections bears the long pedigree and widespread use of the types *Brnovich* determined Congress did not intend to uproot through the amendment of VRA §2. *Brnovich*, 141 S. Ct. at 2339. Rather, as the majority held, it was the dissent's position— echoed by Plaintiffs' here—that marked a departure from the benchmark, explaining that "…the Voting Rights Act exemplifies our country's commitment to democracy, but there is nothing democratic about the dissent's attempt to bring about a wholesale transfer of the authority to set voting rules from the States to the federal court." *Id.* at 2343.

---

[3] *See e.g.,* National Conference of State Legislatures, State Laws Governing Early Voting. *https://www.ncsl.org/research/elections-and-campaigns/early-voting-in-state-elections.aspx*;*see also* Expert Report of J. Gimpel, P's Ex. 161, p. 20-28.

### 3. The size of any disparities in a rule's impact on members of different racial or ethnic groups is also an important factor to consider.

At its core, the Supreme Court's opinion in *Brnovich* is a repudiation of the contention that some disparate impact is enough to show unequal openness or opportunity to establish a violation of VRA §2. *Brnovich*, 141 S. Ct. at 2341-43. That repudiation tolls the bell for Plaintiffs' section 2 claim, which hinges entirely on their contention that, notwithstanding the fact that many Anglo-majority areas in the County received fewer early voting hours or none at all, the 2018 election schedule nevertheless disparately impacted Black PVAMU voters due to their socioeconomic status and relative lack of transportation. But as the Supreme Court explained, "differences in employment, wealth, and education may make it virtually impossible for a State to devise rules that do not have some disparate impact." *Id.* at 2343. This is particularly true in the siting and allocation of early voting hours, where every location will necessarily be located closer to some voters than to others and different voting hours will often be more convenient for one group than another. *See Lee*, 843 F.3d at 600–01. Accordingly, here, as in *Brnovich*, the mere fact that there is some disparity in impact on a particular group does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote; it is the magnitude of the disparity that matters. *Brnovich*, 141 S. Ct. at 2339. The *Brnovich* majority further stressed that assessing the size of a disparity requires a meaningful comparison. *Id.* And in making that comparison, the Supreme Court cautioned against the artificial magnification of what are "at bottom very small differences." *Id.*

Moreover, while Plaintiffs seek to make much out of the difference in the total number of early voting hours among different locations in the County, the proper inquiry under *Brnovich* is the size of the disparity of an electoral process's *impact* on a particular group. *Brnovich*, 141 S. Ct. at 2339 A comparison of the alleged disparities here to those arising from the challenged rules in *Brnovich* is instructive. For example, in regard to Arizona's out-of-precinct policy, the evidence in *Brnovich* showed that protected minorities who voted on election day cast out-of-precinct ballots at a rate slightly higher than that of non-minority voters, such that minority voters in Arizona faced a greater risk of having their ballots not counted. *Id.* at 2344-45. While the Supreme Court ultimately found the size of this disparity to be too small to support the conclusion that Arizona's political processes were not equally open, there was at least some evidence of a disparity that seriously hindered voting, if only for a minute fraction of minority voters. *Id.* Plaintiffs in this case fail to make even *that* showing.

The challenge to Arizona's third-party ballot collection similarly illustrates the absence of a significant disparate impact here. Arizona's HB 2023 *eliminated* the ability of third-party ballot collectors to assist voters in casting their ballot by mail. Evidence in *Brnovich* showed that minorities were more likely than non-minorities to return their early ballots with the assistance of third-party ballot collectors. *Brnovich*, 141 S. Ct. at 2346-2347. The record failed to show how much more, so the Supreme Court could not determine whether the elimination of that voting practice resulted in unequal opportunity. The record did show, however, that most voters in rural Native American communities did not have home mail delivery and often had to travel as much as an hour to get to a mailbox.

*Id.* at 2370 (Kagan, J., dissenting). If Arizona's restriction, which wholly eliminated a means of voting disproportionately used by minority voters causing many of them to have travel an hour to cast a ballot, did not amount to a cognizable disparate burden, it is difficult to imagine how the relatively minor, if any, inconvenience at issue in this suit could trigger § 2 liability.

In fact, Plaintiffs here have a much weaker case than did the plaintiffs in *Brnovich,* because the County actually *expanded* early voting hours at PVAMU and doubled the number of controllers and voting machines at the MSC and WCCC making it easier for Plaintiffs and other PVAMU students to vote. Ds' Ex. 3, Dkt. 136-1; Ps' Ex. 161, p 31; *see also* Tr. Vol. 6, 276:14-21. Each of these locations was accessible on foot, so any alleged disparity in vehicle ownership or socioeconomic status are of no practical significance. *See Brnovich,* 141 S. Ct. at 2343 n.17 (citing Federal Judicial Center, Reference Manual at 252 ("Significant differences…are not evidence that [what is at work] is legally or practically important.")). Additionally, a bare comparison between the number of early voting hours at PVAMU and the number of hours in Hempstead, Brookshire, and Waller is also not a meaningful one in accordance with *Brnovich* because it fails to account for the unique proximity and access on-campus voting provides to a student population. Ignoring these fundamental distinctions "artificially magnifie[s]" the modest, if any, impact of the differences in overall days and hours of early voting in the 2018 schedule. *Id.* at 2339. This is borne out by the fact that Plaintiffs failed to offer any evidence that, even with fewer overall hours, the burdens they faced in voting on campus at the MSC or the nearby Community Center were any greater than those made by other voters in the County, who

faced the greater challenge of allocating time to vote away from their daily activities. *Id.* at 2347, n. 19 (noting the absence of any evidence of the extent to which the alleged disparity "would make it 'significantly more difficult' for Native Americans to vote.").

4. **Courts must consider the opportunities provided by a State's entire system of voting when assessing the burden imposed by a challenged provision.**

The consideration of other opportunities for voting also indicates that the political process in Waller County was equally open to PVAMU voters in the 2018 election. Although Plaintiffs in this suit focus solely on early voting, *Brnovich* holds that where a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means. In addition to making early voting available to PVAMU students, either on campus or at any other location throughout the County, Waller County also placed an election day polling location at the MSC on the PVAMU campus.[4] D's Ex. 3; Tr. Vo1. 1, 115:24-116:1. Thus, on election day, as in early voting, PVAMU students were uniquely able to cast their ballot during their normal school day without making a special trip.

That was particularly true in 2018, when, to resolve any concerns of students being registered in the wrong precinct due to addressing confusion, Defendants secured the agreement of the Texas Secretary of State to allow voters from either Prairie View precinct to vote on campus at the MSC on election day. Tr. Vol. 7, 33:12-20. In fact, PVAMU students routinely organize a voter march on campus on election day that routes around the

---

[4] Students with a qualifying disability or who would otherwise be out of the county on election day are also eligible to vote absentee by mail. TEX. ELEC. CODE § 82.001, *et seq.*

outer loop of campus and terminates at the Memorial Student Center, at which point any student that has not yet cast their ballot may go inside and vote. In this case, witness Maia Young testified that although she was present at the MSC during on campus early voting for the 2018 election, rather than cast an early ballot, she chose to spend her time pushing other students to the polls because she knew she could simply cast her ballot at the MSC on election day. Tr. Vol. 6, 213:2-18. Ms. Young testified that when she voted at the MSC after the march on election day she waited in line for only ten minutes. *Id.* at 214:19-22. So even for the hypothetical PVAMU voter who felt themselves too busy or unable to rearrange their schedule to vote early on campus at the MSC or WCCC, the electoral processes in Waller County were still equally open to them by virtue of on-campus voting on election day.

### 5. The strength of the state interests served by a challenged voting rule is also an important factor that must be taken into account.

Finally, because every voting rule imposes a burden of some sort, *Brnovich* counsels that, in determining whether a rule goes too far, it is important to consider the reason for the rule. *Brnovich*, 141 S. Ct. at 2339-40. As the majority puts it: "Rules that are supported by strong state interests are less likely to violate § 2." *Id.* This is true regardless of whether a chosen policy is absolutely necessary or whether a less restrictive means might adequately serve the State's objectives. *Id.* at 2340-41 and 2345-46.

Here, the State of Texas and Waller County have a compelling interest in having their local officials—not the federal courts—run their elections. *Celebrezze*, 460 U.S. at 788; *see also Burdick v. Takushi*, 504 U.S. 428, 433 (1992) ("[A]s a practical matter, there

must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process") (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)); *see also Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217 (1986) ("the Constitution grants to the States a broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices."). These decisions are intensely local, involving questions of the most efficient use of resources, satisfaction of constituent needs, and at times—as demonstrated in this case by Mayor Allen's testimony and the various viewpoints expressed in the commissioners court videos in evidence—managing conflicting local preferences among different groups. *See e.g.,* Tr. Vol. 7, 239:10-240:1.

Plaintiffs attempt to subordinate the State's and Waller County's well-recognized interest in determining the time, manner, and place of its elections to the desire of PVAMU students and administrators to have more early voting in the MSC. But *Brnovich* makes clear that these fundamental state and local decisions may not be judicially overridden simply because of an allegedly disparate effect on a protected class. *Brnovich*, 141 S. Ct. at 2443. Here, although the hours and days of voting differed throughout the County, the evidence at trial showed that the three twelve-hour days allocated at the MSC and two twelve-hour days at the WCCC during the 2018 election provided no less opportunity to PVAMU voters than to other voters in the County. Wait times for voting at these locations were between 5 and 10 minutes, Tr. Vol. 6, 104:7-25, there were no long lines or other administrative burdens, *Id.* at 105:9-16, and no voters were left in line at the time polls

closed. *Id.* at 106:6-18. Indeed, there is no evidence beyond pure speculation that any PVAMU voter who wanted to cast a ballot was not able to do so in the time allocated by the County. Moreover, by allocating hours at the MSC, WCCC, and at the Prairie View City Hall, the County was able to allocate convenient voting both for PVAMU students and for those non-student voters in Prairie View who found it difficult to go onto the campus to vote. Consequently, not a single non-PVAMU voter in Prairie View joined this case as a plaintiff or testified at trial that they felt the County's 2018 schedule denied them the opportunity to vote.

Given these facts, and in light of the County's interest in scheduling voting in a manner that best serves all voters in Waller County, any modest disparity in convenience to PVAMU students from having fewer overall days and hours for voting under the 2018 schedule fails to establish a violation of VRA §2. *See Brnovich*, 141 S. Ct. at 2346 ("In light of the modest burdens allegedly imposed by Arizona's out-of-precinct policy, the small size of its disparate impact, and the State's justification, we conclude the rule does not violate § 2 of the VRA").

Respectfully submitted,

C. ROBERT HEATH
Texas State Bar No. 09347500
Southern District No. 13381
*bheath@bickerstaff.com*

By:    */s/ Gunnar P. Seaquist*
GUNNAR P. SEAQUIST
Texas State Bar No. 24043358
Southern District No: 1140733
*gseaquist@bickerstaff.com*

BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile: (512) 320-5638

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF WORD COUNT

Pursuant to S.D. Tex., Hon. Charles R. Eskridge III, Court Procedures, Rule 18, I certify that this Supplemental Memorandum of Law has been prepared in a conventional typeface no smaller than 13-point for text and 12-point for footnotes. I also certify that this Supplemental Memorandum of Law complies with the word count limitations contained in Rule 18, because, excluding the case caption, table of contents, table of authorities, signature block, and certificates, it contains 4,593 words. I relied on the computer-generated word count of Microsoft Word 2013, which is the software used to prepare this document.

*/s/ Gunnar P. Seaquist*
Gunnar P. Seaquist

## **CERTIFICATE OF SERVICE**

This is to certify that on July 30, 2021, a true and correct copy of the foregoing document was served on all counsel of record via the electronic case filing system of the United States District Court for the Southern District of Texas.

*/s/ Gunnar P. Seaquist*
Gunnar P. Seaquist