# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| DAMON JOHNSON, TREASURE SMITH, and THE PANTHER PARTY,<br><br>    *Plaintiffs,*<br><br>v.<br><br>WALLER COUNTY, TEXAS; THE WALLER COUNTY COMMISSIONERS COURT; JUDGE CARBETT "TREY" J. DUHON III, in his official capacity as the Waller County Judge; and CHRISTY A. EASON, in her official capacity as the Waller County Elections Administrator,<br><br>    *Defendants.* | Civil Action No. 4:18-cv-3985 |

## PLAINTIFFS' SUPPLEMENTAL BRIEFING ON
### *BRNOVICH V. DEMOCRATIC NATIONAL COMMITTEE*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

PLAINTIFFS' SUPPLEMENTAL BRIEFING ON *BRNOVICH V. DEMOCRATIC NATIONAL COMMITTEE* ................................................................................... 1

    I.   *Brnovich* Is Relevant Only To Plaintiffs' Discriminatory Results And Discriminatory Purpose Claims ................................................................. 2

    II.  Plaintiffs Have Demonstrated Discriminatory Results And Discriminatory Purpose Violations in Light of *Brnovich* ......................... 3

        A. Section 2 Discriminatory Results ............................................................. 3

        B. Discriminatory Purpose Under The Fourteenth And Fifteenth Amendments ......................................................................................... 26

        C. Discriminatory Purpose Under The Fourteenth, Fifteenth, And Twenty-Sixth Amendments .................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Waller Cty.*,
  472 F. Supp. 3d 351 (S.D. Tex. 2020) .......................................................... 4

*Arlington Heights v. Metropolitan Housing Corp.*,
  429 U.S. 252 (1977) .............................................................. 27, 28, 29

*Bethune-Hill v. Va. State Bd. of Elections*,
  137 S. Ct. 788 (2017) .................................................................... 24, 30

*Brnovich v. Democratic National Committee*,
  141 S. Ct. 2321 (2021) ........................................................... *passim*

*Chisom v. Roemer*,
  501 U.S. 380 (1991) ....................................................................... 25

*Harper v. Va. Bd. of Elections*,
  383 U.S. 663 (1966) ....................................................................... 25

*Hunter v. Underwood*,
  471 U.S. 222 (1985) ....................................................................... 30

*Kona Technology Corp. v. Southern Pacific Transp. Co.*,
  225 F.3d 595 (5th Cir. 2000) ........................................................... 30

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006) ....................................................................... 30

*Miss. State Chapter, Operation Push v. Allain*,
  674 F. Supp. 1245 (N.D. Miss. 1987), *aff'd sub nom. Miss. State
  Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991) ....................... 6

*N.C. State Conference of NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) ........................................................... 30

*Rogers v. Lodge*,
  458 U.S. 613 (1982) ............................................................... 8, 26, 28

*South Carolina v. Katzenbach*,
  383 U.S. 301(1966) ....................................................................... 25

*Texas Democratic Party v. Abbott*,
  978 F.3d 168 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1124 (2021) ........................... 20

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ............................................................................... *passim*

*United States v. Texas Ed. Agency*,
  600 F.2d 518 (5th Cir. 1979) .................................................................... 27

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) (en banc) ............................................. *passim*

**Federal Statutes**

52 U.S.C. § 10301 ................................................................................... 3

52 U.S.C. § 10301(a) ............................................................................ 14

52 U.S.C. § 10301(b) ......................................................................... 5, 7

**State Statutes**

Tex. Elec. Code § 82.002 ..................................................................... 20

Tex. Elec. Code § 82.003 ..................................................................... 20

Tex. Elec. Code § 82.004 ..................................................................... 20

**Other Authorities**

S. Rep. No. 97-417 (1982) .................................................................... 25

## PLAINTIFFS' SUPPLEMENTAL BRIEFING ON
## *BRNOVICH V. DEMOCRATIC NATIONAL COMMITTEE*

On July 1, 2021, the U.S. Supreme Court issued its decision in *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021). The Court's primary holding relates to racially discriminatory results claims under Section 2 of the Voting Rights Act ("Section 2"). After considering the post-trial factual record in that case, the Supreme Court found that the district court did not clearly err in finding that two provisions of Arizona election law did not violate Section 2, thus reversing the *en banc* Ninth Circuit Court of Appeals. *Brnovich*, 141 S. Ct. at 2343–44. In so holding, the Court set forth new, additional circumstances that may be relevant for assessing discriminatory results claims under Section 2. *Id.* at 2338–41. Further, the Court found that the district court did not clearly err in finding that one of the laws at issue was not enacted with a discriminatory purpose in violation of Section 2 and the Fifteenth Amendment, again reversing the *en banc* Ninth Circuit's finding to the contrary. And the Court affirmed the long-standing approach of assessing discriminatory purpose claims under the *Arlington Heights* framework. *Id.* at 2349.

The next day, this Court issued an order inviting the parties to submit further briefing on the applicability and pertinence of *Brnovich* to this case, having conducted a twelve-day trial between September and October 2020. ECF 182.[1] *First*, *Brnovich* does not affect Plaintiffs' discriminatory purpose claim on the basis of age under the Twenty-Sixth

---

[1] References to page numbers in docket entries refer to ECF file-stamped page numbers.

Amendment since *Brnovich* did not involve that claim. *Second*, *Brnovich* does not alter the fundamental legal standards or statutory text that continue to apply to Plaintiffs' other three claims, establishing a discriminatory results violation under Section 2, a discriminatory purpose violation under Section 2 and the Fourteenth and Fifteenth Amendments, and a discriminatory purpose violation on the intersecting bases of race and age under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments. Nor does *Brnovich* detract from or cast doubt on the weight of Plaintiffs' post-trial evidence establishing those statutory and constitutional violations on the basis of race. *See* Pls.' Post-Trial Memo. of Law, ECF 176 ("Pls.' MOL").

**I.** **_Brnovich_ Is Relevant Only To Plaintiffs' Discriminatory Results And Discriminatory Purpose Claims**

Plaintiffs raise multiple claims for relief under Section 2 and the U.S. Constitution: (1) Section 2 and the Fourteenth and Fifteenth Amendments (discriminatory purpose based on race); (2) Section 2 (racially discriminatory results); (3) Fourteenth, Fifteenth, and Twenty-Sixth Amendments (discriminatory purpose on the intersecting bases of race and age); and (4) Twenty Sixth Amendment (discriminatory purpose based on age)., Amended Complaint, ECF 49 at ¶¶ 85–100. *Brnovich* relates exclusively to the first three claims insofar as it does not disturb longstanding precedent holding that *Arlington Heights* is the appropriate standard for assessing those intent-based claims. *Brnovich*, 141 S. Ct. at 2349.

## II. Plaintiffs Have Demonstrated Discriminatory Results And Discriminatory Purpose Violations in Light of *Brnovich*

### A. Section 2 Discriminatory Results

As *Brnovich* confirmed, "Section 2 of the Voting Rights Act provides vital protection against discriminatory voting rules." 141 S. Ct. at 2343. Section 2 prohibits any voting standard, practice, or rule that "results in the denial or abridgment of the right to vote . . . on account of race," which occurs when, "based on the totality of circumstances, it is shown that political processes . . . are not equally open to participation" by voters of color, "in that [such voters] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301. And the Court in *Brnovich* reaffirmed that Section 2 "applies to a broad range of voting rules, practices, and procedures; that an 'abridgement' of the right to vote under § 2 does not require outright denial of the right; that § 2 does not demand proof of discriminatory purpose; and that a 'facially neutral' law or practice may violate that provision." *Brnovich*, 141 S. Ct. at 2341.

In *Brnovich*, the Court considered its "first § 2 time, place, or manner case." *Id.* at 2337. That is, the Court considered its first vote-denial, as compared to vote-dilution, case. The Court expressly declined to "announce a test to govern all VRA § 2 claims," including the vote-denial claims it considered there. *Id.* at 2336. Instead, to inform the "totality of circumstances" analysis Section 2 requires, the Court identified "certain guideposts" or "important circumstances" that, in addition to the existing congressionally delineated Senate Factors for assessing the totality of circumstances, may be probative of vote-denial

claims. *Id.* at 2336; *see also id.* at 2342. Those new guideposts are: (1) the size of the burden, (2) departures from voting procedures in 1982, (3) the size of the disparate impact of the burden, (4) the state's entire system of voting, and (5) the state's interests in a challenged action or provision. *Id.* at 2338–40. The Court made clear, however, that these "guideposts" were "not . . . an exhaustive list" of the relevant totality of circumstances in a Section 2 case. *Id.* at 2338. Instead, the Court confirmed that "*any circumstance* that has a logical bearing on whether voting is 'equally open' and affords 'equal opportunity' may be considered." *Id.* at 2338 (emphasis added). And the Court also reaffirmed that existing Senate Factors such as a past record of racial discrimination (Senate Factor 1) and the persistent socio-economic effects of that discrimination (Senate Factor 5) may continue to be relevant to the totality of circumstances analysis in each case. *Id.* at 2340.

Because the Court in *Brnovich* "decline[d] . . . to announce a [new] test" for Section 2 vote-denial claims, *id.* at 2336, the Fifth Circuit's two-part test adopted in *Veasey* remains the proper standard for this Court to apply when assessing Plaintiffs' Section 2 discriminatory results claim. *See Veasey v. Abbott*, 830 F.3d 216, 244–50 (5th Cir. 2016) (en banc); *Allen v. Waller Cty.*, 472 F. Supp. 3d 351, 358–59 (S.D. Tex. 2020) (discussing *Veasey*). In applying *Veasey*'s two-part test, *Brnovich* underscores that a court may consider "any circumstance that has a logical bearing on whether voting is 'equally open' and affords 'equal opportunity'" for Black and other voters of color as compared to white voters, including the applicability of relevant Senate Factors, the *Brnovich* Court's "guideposts," and other pertinent circumstances. *Brnovich*, 141 S. Ct. at 2338. As in *Veasey*, the Court in *Brnovich* observed that certain factors originating in the vote-dilution

context may not apply or have less direct relevance in a vote-denial case. *Id.* at 2340; *Veasey*, 830 F.3d at 246 ("Not every factor will be relevant in every case."). In *Brnovich*, as one example, the Supreme Court did not consider its newly enunciated "guidepost" of whether the early-ballot-collection restriction deviated from practices in 1982 in its totality of circumstances analysis of that statute. *See Brnovich*, 141 S. Ct. at 2347–48.

Consistent with other Supreme Court and Fifth Circuit precedent, after *Brnovich*, a Section 2 analysis remains a fact-dependent, "multi-factor analysis, under which no one factor has determinative weight." *Veasey*, 830 F.3d at 246; *see Brnovich*, 141 S. Ct. at 2348; *Thornburg v. Gingles*, 478 U.S. 30, 45 (1986). And, as the Fifth Circuit recognized in *Veasey*, the Senate Factors "are not exclusive, and 'there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.'" *Veasey*, 830 F.3d. at 246 (quoting *Gingles*, 478 U.S. at 45). Similarly, as noted, the Court in *Brnovich* expressly denied that its "guideposts" were "an exhaustive list" of appropriate considerations. *Brnovich*, 141 S. Ct. at 2338. *Brnovich* thus confirms what Section 2's text already makes plain: that the entire landscape surrounding a challenged voting law is relevant, and that districts courts should therefore consider "any circumstance that has a logical bearing on whether voting" in the jurisdiction at issue "is 'equally open' and affords equal 'opportunity'" for "participation by members of a class of citizens protected by [the Voting Rights Act]." *Id.* at 2337, 2338; 52 U.S.C. § 10301(b). Following *Brnovich*, any Section 2 analysis remains "an intensely local appraisal" and inherently context specific. *See Gingles*, 478 U.S. at 78.

Indeed, courts have regularly found Section 2 violations based on evidence under only a relevant subset of the possible factors that courts may consider under the totality of the circumstances. *See*, *e.g.*, *Veasey*, 830 F.3d at 216, 256 (affirming a district court's finding that Texas enacted a photo ID law with discriminatory effects based on court's analysis of the relevant Senate factors of past electoral discrimination (Senate Factor 1), racially polarized voting (Senate Factor 2), racial discrimination in employment and education (Senate Factor 5), and use of racial appeals in elections (Senate Factor 6)); *Miss. State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245, 1268 (N.D. Miss. 1987) (holding that Mississippi's dual registration requirement constituted vote denial in violation of Section 2 after discarding as irrelevant five Senate factors and finding that plaintiffs' evidence satisfied four Senate factors relevant to the case), *aff'd sub nom. Miss. State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991).

Under *Veasey* and *Brnovich*, Section 2's flexible "totality of circumstances" standard allows this Court to consider Senate Factors, *Brnovich* guideposts, and other relevant circumstances adduced at trial, applying only those that pertain to the case and assessing their relevance and weight. *See e.g.*, *Brnovich*, 141 S. Ct. at 2340; *Veasey*, 830 F.3d at 246. The essential question for Section 2 liability, under *Brnovich*, remains unchanged: whether a challenged voting law or practice "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black [and other voters of color] and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47; *Veasey*, 830 F.3d at 306 (quoting *Gingles*); *Brnovich*, 141 S. Ct. at 2359 (quoting *Gingles*). To answer this question, a district court must conduct "a searching practical evaluation of

the 'past and present reality,'" *Gingles*, 478 U.S. at 45, and determine whether the political processes "are not equally open" for participation by voters of color "in that [such voters] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," 52 U.S.C. § 10301(b).

To make this assessment here, circumstances with logical bearing on the Section 2 analysis include evidence under: Senate Factor 1 about the history and ongoing record of official discrimination in voting, of which the 2018 early voting restrictions are apart, by Texas and Waller County officials, directed at Black citizens, including PVAMU students and other Prairie View voters, as are Plaintiffs in this case, Pls.' MOL at 97–98; Senate Factor 2 about racially polarized voting, which provides context for the Black voting block in Prairie View and PVAMU specifically that white voters continue to attempt to minimize, including by imposing the 2018 early voting restrictions, *id.* at 98–99; Senate Factor 5 about the continuing effects of that discrimination experienced by Black voters in Prairie View, such as in access to transportation, that makes restrictions on early voting opportunities particularly harmful for Black voters in Prairie View, *id.* at 102–04; Senate Factor 7 about the lack of success of Black candidates in Waller County running for countywide office, which provides context for how the existing structures fail to afford Black voters access to their preferred representation, *id.* at 102–04; Senate Factor 8 about, how under the existing structures, Waller County officials' fail to respond to the particularized needs of Black residents, including PVAMU students and other Prairie View residents, and their ongoing demand for representational and electoral equality, including through access to early voting, *id.* at 104–06, which, as the Supreme Court has explained,

7

"increases the likelihood that the political process was not equally open to [Black voters]," *Rogers v. Lodge*, 458 U.S. 613, 625 (1982); and Senate Factor 9 about Waller County's reliance on tenuous justifications for the 2018 early voting schedule—rationales that the post-trial record reflect are unsubstantiated and rebutted by Black voters in Waller County. *See e.g.*, *Brnovich*, 141 S. Ct. at 2340 (affirming that Senate Factors 1, 2, 5, 7 remain relevant to the totality of circumstances analysis in vote-denial cases); *Veasey*, 830 F.3d at 265 (affirming the district court's proper reliance on Senate Factors 8 and 9 as part of the Fifth Circuit's totality of circumstances analysis). And nothing in *Brnovich* detracts from Plaintiffs' evidence at trial, including Plaintiffs' experts' findings, establishing that Waller County's 2018 early voting schedule interacted with these various conditions in the totality of circumstances to create a severe inequality of access to the political process along racial lines, significantly burdening Black voters in Prairie View.

Through these circumstances and other components of the totality of circumstances, Plaintiffs have proven a Section 2 violation. Assessing Plaintiffs' evidence under the additional, relevant *Brnovich* guideposts also confirms this result.

**Size of the burden.** In *Brnovich*, the Court considered the size of the burden that Arizona's out-of-precinct rule and ballot-collection laws created for racial minority voters. 141 S. Ct. at 2343–44, 2346. Concerning the out-of-precinct rule, the Court determined that identifying "one's polling place and then travel[ing] there to vote does not exceed the 'usual burdens of voting,'" even if the rule disparately impacts minority voters. *Id.* at 2344. The Court also explained that that law's burdens were further reduced by Arizona officials' affirmative efforts to ensure voters showed up at the correctly assigned polling location on

Election Day. *Id.* For the ballot-collection law, the Court also concluded that the size of the burdens "fall squarely within the heartland of the 'usual burdens of voting.'" *Id.* at 2346.

Importantly, both laws challenged in *Brnovich* were state-level election statutes that "govern[ed] how ballots are collected and counted," according to the Court, providing the same opportunities to all Arizona voters and operating uniformly across the state. *Id.* at 2330. Indeed, in *Brnovich*, for the first time, the Court was called upon to decide a Section 2 dispute arising from "the equal application of a facially neutral rule specifying the time, place, or manner of voting." *Id.* at 2333.

This case is different. Here, unlike in *Brnovich*, Plaintiffs challenge an early voting schedule that, as Defendants agree, did not operate uniformly throughout Waller County or provide the same opportunities for all Waller County voters. *See* Defs.' Proposed Findings of Fact and Conclusions of Law ("Defs.' FoF-CoL"), ECF 178 at ¶¶ 98–99 (Defendants conceding after trial that "Prairie View, like Fields Store, Monaville, and Katy, received fewer total early voting hours than Hempstead, Brookshire, and Waller," and that "there was an 'inequity' in the number of hours"). The essence of Plaintiffs' pending case under Section 2 is that Defendants singled out voters in Prairie View, where most of Waller County's Black voting-age population resides, for discriminatory treatment, denying Prairie View's unique concentration of Black voters an equal opportunity "to participate in the political process and to elect representatives of their choice"—in violation of Section 2. *Brnovich*, 141 S. Ct. at 2337 (quoting 52 U.S.C. § 10301(b) and explaining that this language is "[w]hat § 2(b) means by voting that is not 'equally open'").

At trial, Plaintiffs' expert and fact witnesses showed that the unequal opportunities created by the 2018 early voting schedule are fundamentally different than the "unremarkable burdens" created by the laws of general applicability considered in *Brnovich. Id.* at 2344. Here, Defendants' early voting schedule severely burdened Black voters in Prairie View, including Black PVAMU students. Proposed Post-Trial Conclusions of Law ("Pls.' FoF"), ECF 175 at ¶¶ 273, 300–01, 307–99; *see also id.* ¶ 161. These burdens denied Black voters in Prairie View—where, as discussed below, most of Waller County's Black voting-age residents live—equal ability to vote early, harms that were further heightened because of their reliance on early voting as a means of accessing the franchise. *Id.* As Plaintiffs' expert Dr. Stein testified, "one would be hard-pressed to think of another way in which to remove or to lessen accessibility to in-person early voting than the way in which the Waller County election administrator . . . did in the 2018 election." *Id.* ¶ 349; *see infra* (discussing Mr. Cooper's declaration, Pls.' Ex. 153, ECF 125-153 at ¶¶ 25–26 & fig. 4, which shows that Prairie View is home to 4,627 of Waller County's 9,038 Black residents of voting age, or 52.6% of the County's overall Black voting-age population). This is so because of the uncontested evidence that Black voters' limited early voting access interacted with socioeconomic and transportation disparities to create and aggravate burdens that uniquely reduced their ability to effectively participate in the political process. Pls.' FoF ¶¶ 341–52. Interacting with these circumstances and other persistent effects of Waller County's history of discrimination, the early voting schedule "block[ed] or seriously hinder[ed] voting" for Prairie View's predominantly Black

electorate throughout the early voting period. *Brnovich*, 141 S. Ct. at 2338; *see* Pls.' FoF ¶¶ 307–99.

These barriers to the franchise were particularly severe during the first week of the early voting period. For the first six days of early voting, as voters elsewhere in Waller County cast their ballots at in-person early voting locations, there was zero ability to vote early on the PVAMU campus or anywhere else in Prairie View—the city where a majority of Waller County's Black residents of voting age live. Pls.' FoF ¶¶ 214–16, 257, 329–32; Pls.' Ex. 153, Cooper Decl. ¶¶ 25–26 & fig. 4. And during the second week, Prairie View voters were provided limited hours—far fewer than other populous areas of Waller County with a higher proportion of white voters—that fell short of Prairie View voters' demonstrated reliance on and demand for early voting. Pls.' FoF ¶¶ 273, 300–01, 313–35, 390–99. Former Precinct 3 Commissioner Jeron Barnett and former Prairie View Mayor David Allen acknowledged that the 65 hours of early voting Defendants provided, in total, to Prairie View's predominantly Black voters, who are also the majority of Waller County's eligible Black voting population overall, was significantly less than the 96, 101, or 106 hours Defendants provided at single locations in cities such as Hempstead, Waller, or Brookshire, respectively, in which a lower proportion and number of the eligible voting population is Black. *Id.* ¶ 335. Waller County's refusal to provide equitable or even adequate early voting hours in Prairie View thus produced both a severe burden and, as discussed below, a substantial racial disparity in access to the franchise for Waller County voters.

Dr. Stein contextualized the nature of the discriminatory burden during trial. Black voters in Prairie View, he testified, are more dependent on early voting and use it at higher rates than white voters in Waller County. *Id.* ¶¶ 320–21. In the fall 2018 election, for example, Defendants' data shows that the Memorial Student Center ("MSC") in Precinct 309—where the voting-age population ("VAP") is 94% Black—had not only the highest total number of early votes cast of any precinct, but also the highest rate of early votes cast per hour, and the highest early voting usage rate—that is, early votes as a proportion of all votes cast by any means. *Id*. ¶¶ 273, 319–20, 322–33, 338, 394. Dr. Stein's analysis and testimony further revealed that the rate of early voting usage at the MSC during the March 2018 primary—ahead of the November election—was already significantly higher than the countywide rate. *Id*. ¶ 319. Countywide, 42% of all votes cast in the 2018 primary were early votes. *Id.* But at the MSC in Precinct 309, 64% of all votes cast were early votes. *Id.* These early voting usage rates, as Dr. Stein testified, "should have clearly been an indication to the . . . election administrator that demand for in-person early voting [at] the Prairie View Memorial Student Center, Precinct 309, was far in excess of what it would be countywide[.]" *Id.* "On the Prairie View A&M campus," Dr. Stein concluded, "voting *is* voting in person early." *Id.* ¶ 321.

Plaintiffs' experts' unrebutted testimony also established that this burden fell with particular severity on Black student voters at PVAMU who lacked transportation to access early voting locations off campus, including Plaintiffs Damon Johnson, Treasure Smith and members of Plaintiff The Panther Party. *Id.* ¶¶ 5, 11–12, 21, 266, 348–51; *see* Pls.' Ex. 160, ECF 125-160, Stein Errata Decl. These voters and other Black voters in Prairie View,

who make up a majority of Waller County's overall Black VAP, experience higher rates of poverty and transportation barriers than white voters in Waller County. Pls.' FoF ¶¶ 114–39. Waller County has no regular public transportation, and Black residents disproportionately lack access to private transportation. *Id.* ¶¶ 129–34, 126, 325, 373, 454; Pls.' Ex. 153, Cooper Decl. at 14. As of November 2018, Plaintiff Treasure Smith, for example, relied on the PVAMU shuttle bus, but as illustrated through her testimony, this shuttle bus had limited stops, was considered unreliable, and served the MSC, but *no* other early voting location in Prairie View or elsewhere in Waller County. Pls.' FoF ¶¶ 11, 454.

Black voters' limited mobility and transportation barriers made it uniquely difficult for them to travel to early voting locations outside of Prairie View, where most Black voting-age residents of Waller County live, or for Black PVAMU student voters to travel off-campus during limited time windows. *Id.* ¶¶ 21, 124–25, 132–34, 448–54; *see* Pls.' Ex. 153, Cooper Decl. Pls.' ¶¶ 25–26 & fig. 4. Without public or private transportation, Black voters were severely burdened in their access to the franchise, particularly during the first week, when, after Plaintiffs filed this lawsuit, Defendants provided only five hours of (off-campus) early voting in Prairie View. Indeed, Defendant Duhon recognized this burden, publicly declaring in October 2018 that "telling a student they have to vote . . . 2 miles away" from campus "is an impediment to voting." Pls.' FoF ¶ 225; *see also* Pls.' Ex. 158, ECF 125-158, Stein Rep. at 7 (explaining that, based on the literature review, a 0.25-mile increase in the distance to a polling place reduces the number of ballots cast by 2%-5% in certain elections); *see also* Pls.' Ex. 160, Stein Errata Decl. ¶¶ 3–5 (Dr. Stein observing that the WCCC, the closest off-campus early voting location, is located "1 to 1.1 miles

away from two large student residential housing facilities on the PVAMU campus . . . .

This distance is approximately four times further than the minimum distance beyond which

Cantoni observed reduced voter turnout."). Plaintiffs' evidence thus reveals why limiting

or restricting early voting access disproportionately and severely impacts Black voters'

ability to vote. Pls. FoF ¶¶ 114–42, 324–26, 340–41, 348–51.

Yet Defendants enacted and then maintained an early voting schedule that restricted

early voting access and created discriminatory burdens, "result[ing] in a denial or

abridgement of the right . . . to vote on account of race or color" for Black voters in Prairie

View—who are a majority of Waller County's eligible Black electorate *Id*. 52 U.S.C. §

10301(a); Pls.' Ex. 153, Cooper Decl. Pls.' ¶¶ 25–26 & fig. 4; Pls.' FoF ¶¶ 317–26; *see*

*Brnovich*, 141 S. Ct. at 2341 (reiterating that "an 'abridgement' of the right to vote under

§ 2 does not require outright denial of the right"). Defendants' refusal to provide equitable

voting hours in Prairie View far exceeded "the usual burdens of voting" discussed in

*Brnovich*, because it targeted the primary means of voting that Black voters have

demonstrably relied on and denied them any access to that means of voting for a significant

part of the early voting period. Defendants' expert, Dr. Gimpel, acknowledged that

"transportation access is one of the considerations" when assessing the burdens involved

in voting. Pls.' FoF ¶ 368. Indeed, Dr. Gimpel specifically recognized that "transportation

could be an issue for people at certain distances and . . . with perhaps certain physical

conductions" and "who maybe have to travel, you know, a mile or more," as well as that

"there could be some students situated in the far northeast corner of the [PVAMU] campus

. . . [who] would travel that distance" of two miles roundtrip from student housing to the

WCCC. *Id.* On the six days when they was *no* early voting anywhere in Prairie View—and on the nine days when there was *no* early voting on the PVAMU campus—Prairie View voters, who were disproportionately unable to travel off-campus or out of the city, were completely barred from voting. By contrast, as discussed below, voters in cities with more white voters and fewer Black voters, including the cities of Waller, Brookshire, and Hempstead, enjoyed access to voting opportunities on all 12 days of the early voting period.

Moreover, as Defendants knew in 2018, (1) most Waller County residents rely on early voting access; (2) Black voters in Prairie View are among the highest users of early voting in the County; (3) Prairie View has the largest concentration of Black voters in the County; and (4) Black PVAMU student voters in Prairie View are one of the largest voting groups in the County. *Id.*¶¶ 307–52. Census data and other information, undisputed by Defendants, shows that Black voters in Prairie View experience unique socioeconomic and transportation hurdles, which compound the discriminatory harms. *Id.* ¶¶ 114, 12–42, 159–70, 177–78. Black residents, for example, are socioeconomically disadvantaged, as compared to white people in both Prairie View and Waller County overall, in poverty rates, income, employment rates, transportation access, and educational attainment. *Id.* ¶¶ 114–42. Almost 47% of employed Black residents in Prairie View, for example, commute to work by walking, biking, or via carpool—that is, riding in another person's vehicle—or taxi, compared to 12.6% of employed white residents countywide, who are far more likely to commute alone in their own vehicles. Pls.' Ex. 153, Cooper Decl. at 14. All of these facts illuminate why limitations and restrictions on early voting access in Prairie View imposed a severe burden on the ability of Black voters to participate politically.

Significantly, as discussed below, the discriminatory impact created by the 2018 early voting schedule was substantial enough that two Defendants acknowledged it contemporaneous with their enactment of the schedule. Pls.' FoF ¶¶ 223–30.

**Size of the disparity.** For this *Brnovich* "guidepost," the Supreme Court assessed the size of any disparity created by Arizona's out-of-precinct rule and ballot-collection law, *Brnovich*, 141 S. Ct. at 2344–47, as, according to the Court, "[t]he size of any disparity matters." *Id.* at 2339. And there the Court rejected plaintiffs' evidence attempting to show racial disparities. The Court found it persuasive that the "racial disparity in burdens allegedly caused by the out-of-precinct policy is small in absolute terms," explaining that it only impacted either a little over 1% or less than 1% of certain racial minority voter groups. *Id.* at 2344–45. For the ballot-collection restriction, the Court determined that the record did not provide "concrete evidence" showing a racial disparity because the plaintiffs "were unable to provide statistical evidence." *Id.* at 2346–47.

By contrast here, there is abundant and uncontested quantitative and qualitative evidence in the record that the 2018 early voting schedule produced a substantial disparity along racial lines, disproportionately denying Black voters an equal opportunity to participate in the political process in Waller County. *See*, *e.g.*, Pls.' FoF ¶¶ 307–99. Defendants created this disparity in voting access through their discriminatory allocation and maintenance of early voting hours and locations in Prairie View, where Waller County's Black voters are overwhelmingly concentrated. *Id.* ¶¶ 337–40. With a 91.99% Black VAP, Prairie View's high concentration of Black voters makes it unique in Waller County. *Id.* ¶ 97.

Indeed, as Census data reported by Mr. Cooper shows, the Prairie View is home to a clear majority of Waller County's Black voting-age population. Pls.' Ex. 153, Cooper Decl. ¶¶ 25–26 & fig. 4. As of the 2010 Census, Waller County overall was home to 9,038 Black residents of voting age. *Id.* More than half of these Black voting-age residents—4,627 out of 9,038, or 52.6%—lived in Prairie View. *Id.*

Prairie View is also home to the vast majority of Waller County's Black voting-age residents who are under 21. *Id.* ¶¶ 31–32 & fig. 6. As of the 2010 Census, Waller County overall was home to 2,954 Black residents who were aged 18, 19, or 20. *Id.* Approximately *nine tenths* of these young, Black, voting-age residents—2,628 out of 2,954, or 89%—lived in Prairie View. *Id.*

In addition, Black PVAMU students are one of the largest voting groups in Prairie View or Waller County, Pls.' FoF ¶ 271, as well as a group of voters that is especially reliant on early voting access, *id.* ¶¶ 318–22. Precinct 309, where the PVAMU campus is located, had 4,834 registered voters as of November 6, 2018, which was the largest population of registered voters out of any County precinct and over 1,400 more registered voters than the second-largest precinct. *Id.* ¶¶ 105, 271, 314.

And in 2018, as Dr. Stein's analysis of Defendants' records demonstrated, Prairie View's three early voting sites were used by Black voters at rates more than twice as high as any other early voting location in Waller County. *Id.* ¶ 345. At the on-campus MSC, Dr. Stein's analysis revealed that Black voters accounted for 72% of all early votes cast in November 2018. *Id.* ¶ 345. At both the off-campus Waller County Community Center ("WCCC") and Prairie View City Hall, Black voters accounted for 47% of all early votes

cast in that fall election. *Id*. Outside of Prairie View, there was *no* location where Black voters accounted for more than 22% of early votes. *Id.*

Yet, as Dr. Stein testified, Defendants provided "distinctively and universally lower" hours at these three Prairie View early voting locations, which served the highest number and proportion of Black voters of any locations in Waller County—and were *the only locations in the city where most of Waller County's Black voting-age residents live*—than they provided to the early voting locations that served the most white voters. *Id*. ¶ 347; *see* Pls.' Ex. 153, Cooper Decl. ¶¶ 25–26 & fig. 4. And early voters at the MSC, where the proportion of Black was the highest in the county, "were treated extremely . . . unequally to their counterparts in all other polling locations." Pls.' FoF ¶¶ 345, 347.

Defendants' schedule thus forced Black voters in Waller County, most of whom lived in Prairie View, to "cast their ballots at early polling locations with the fewest hours and days of operation." Pls.' Ex. 158, Stein Rep. at 11; Pls.' Ex. 153, Cooper Decl. ¶¶ 25–26; Pls.' FoF ¶ 346. Defendants' decision to provide fewer hours and days of early voting at the three locations most used by Black and younger voters, as Dr. Stein reported and testified, produced a substantial racial disparity that "den[ied] . . .Black voters in Prairie View equal or even similar access to early voting opportunities afforded other registered voters in Waller County." Pls.' FoF ¶ 348.

Reviewing the striking and foreseeable disparity in access to early voting the schedule produced, Dr. Stein concluded: "If the County had intended to make it more difficult for Black and younger voters in Prairie View to access early voting than other voters in Waller County, . . . designing an early voting plan similar to the one they designed

for the 2018 election would have been an effective way to do so." *Id.* ¶ 349. And Defendants' expert Dr. Gimpel did not analyze a racial impact in this case, even though he admitted that he knows how to do so and that it would be appropriate in a case like this were there are allegations of racial discrimination. *Id.* ¶ 374.

**Entire system of voting.** The Court in *Brnovich* explained that district courts must consider other available voting options when assessing any burden experienced under the challenged law. *Brnovich*, 141 S. Ct. at 2349. In *Brnovich*, the Court determined that Arizona's voting system as a whole, compared to any burdens imposed by the specific challenged laws, weighed against finding a Section 2 violation. *Id.* at 2344, 2346. Based on the availability of different voting options, the Court determined that the out-of-precinct rule created only "modest" burdens. Central to this conclusion was the fact that "[a]ny voter can request an early ballot without excuse" and mail that ballot back or drop it off at a polling place for a period that extends for nearly a month. *Id.* at 2344. For the early-ballot-collection law, the Court determined that traveling to an assigned polling location falls within the usual burden of voting, and it found it persuasive that a voter also has a statutory right under Arizona law to authorize a proxy to drop off an early voting ballot if the voter is unable to do so. *Id.* at 2346.

In Waller County, for the November 2018 general election, voters could have cast their ballots: early either by mail, *if* eligible; in person at an early voting location, *if* early voting was available at an accessible location; or in person on Election Day. When assessing these options under the totality of circumstances and this *Brnovich* "guidepost," Black voters in Prairie View were not afforded an equal opportunity to participate in the

political process. As Defendants Duhon and Eason conceded, Waller County's early voting days and hours produced "an inequity" and did not provide "equal representation" Pls.' MOL at 115. Nothing in *Brnovich* changes this Court's assessment of Plaintiffs' evidence establishing the severe discriminatory burdens.

Indeed, voting by mail was not an option for most voters in Prairie View, which stands apart in Waller County because of its voting-age residents, who are overwhelmingly Black and are also mostly under the age of 21. Pls.' FoF ¶ 337. Unlike in Arizona, voting by mail is not available to every voter in Waller County or Texas. *Compare Brnovich*, 141 S. Ct. at 2344, *with Texas Democratic Party v. Abbott*, 978 F.3d 168, 174 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1124, (2021). Texas law only permits early voting by mail for voters who "(1) anticipate being absent from their county of residence; (2) are sick or disabled; (3) are 65 years of age or older; or (4) are confined to jail." *Abbott*, 978 F.3d at 172 (citing Tex. Elec. Code §§ 82.001–82.004). Because of these limited categories, "in-person voting is the rule" and "[e]arly voting by mail is the exception" in Texas. *Id.* And the availability of this exceptional means of voting for some Waller County voters— disproportionately *not* including members of Prairie View's predominantly Black and young electorate—does not mitigate or diminish the burdens that Black voters experienced because of the 2018 early voting schedule.

Nor does the availability of in-person voting on Election Day. Waller County voters in general cast a larger share of votes through early voting than is typical among voters in other Texas counties. *See*, *e.g.*, Pls.' FoF ¶ 320. And any guidance from the Court in *Brnovich* about comparing Election Day voting options does not change the calculation

here. As discussed above, vote by mail is an exception in Texas, and early voting in person is only available about half the number of days as provided for in Arizona, Defs.' FoF ¶ 20. During this shorter early voting window in Texas, as discussed above and below in greater detail, Waller County provided the fewest number of days and hours to Black voters. And because vote-by-mail is an exception in Texas, the Court's assessment of Arizona's early-ballot-collection restriction has limited applicability here. *See Brnovich*, 141 S. Ct. at 2346–47 (describing the ways an Arizona voter who receives an early ballot can submit it, including by going to a voting center on election day and "skip[ing] the line of voters waiting to vote in person.").

Instead, as former Precinct 3 Commissioner Barnett explained, "early voting is the mechanism used by many" Waller County voters. *See, e.g.,* Pls.' FoF ¶ 320. But Black voters rely more on early voting and use it at higher rates than white voters in Waller County. Pls.' MOL at 18. As Defendants' expert conceded, November 2018 general election data reflects that Black student voters at Precinct 309 on PVAMU's campus had both the highest total number of early votes cast and the highest rates of early voting usage. Pls.' FoF ¶ 394. This is so because of the unique and undisputed economic and historical conditions that Black voters face in Waller County, including disproportionately lacking access to private and public transportation. Pls' MOL at 16–17. In other words, distance functions differently for voting accessibility for Black voters in Waller County. *Id.* at 22–23. For eligible Black PVAMU student voters, for example, transportation barriers and the unique nature of student life mean that on-campus early voting is often the only means of access to the franchise. *Id.* at 14–17, 46–48, 56–60, 89–90. Unlike PVAMU students, many

members of Waller County's older, disproportionately white electorate—including Defendants Duhon and Beckendorff—own cars and drive long distances as part of their daily routines. Pls.' FoF ¶¶ 129–31; *see id.* ¶ 370–73; Pls.' MOL at 47. So, as Defendants' expert testified, "distance is not necessarily a barrier to access when it comes to voting" for people whose lives resemble Defendants.' Pls.' FoF ¶ 370. But for Black Prairie View residents, including PVAMU students, distance can be a severe burden to voting. *Id.* ¶ 371–73; Pls.' MOL at 65-66. Defendants were aware and forewarned that any limitations to early voting access in Prairie View, where most of the County's Black electorate resides, would disproportionately harm Black voters. *See*, *e.g.*, *id.* at 23–26.

Yet, as Dr. Stein's uncontested findings make clear, Black voters were forced to cast their ballots at early voting locations with the fewest hours and days of operation during the 2018 general election. *Id.* at 90. Black voters had no early voting access in Prairie View during the first week, Monday through Saturday, and only part of the day off-campus on Sunday. By contrast, as one example, cities like Waller, with a majority-white voting-age population, had as many as double the number of hours—totaling more than 124 hours as compared to 65 hours in Prairie View—and enjoyed early voting during the full two weeks of early voting. *Id.* at 15. Precinct 3 voters—Waller County's sole majority-Black precinct—also received far fewer hours of early voting than any other commissioner precinct. *Id.* at 90.

The limited prospect of qualifying for the exceptional vote by mail option or voting in person on Election Day do not mitigate these harms or equalize these substantial disparities in access to the primary means of voting in Waller County—early voting.

Instead, these relevant considerations under the totality of circumstances underscore why equitable early voting access was critical for Black voters to exercise their political power. Because Defendants denied equal access to the primary means of voting in Prairie View, where most of Waller County's Black voting-age residents live, the 2018 early voting schedule imposed severe burdens for Black voters to participate in the political process on an equal basis with white voters elsewhere in Waller County. *See*, *e.g.*, *id.* at 86–93.

**State interest.** In *Brnovich*, the Court explained that "the strength of the state interests served by a challenged voting rule is also an important factor" that should be considered in the totality of circumstances. *Brnovich*, 141 S. Ct. at 2339–40. And, before *Brnovich*, the Supreme Court and Fifth Circuit had already established that the presence of a tenuous policy underlying an early voting plan or other electoral practice, which courts consider under Senate Factor 9, can be probative in identifying discriminatory results. *See Gingles*, 478 U.S. at 45; *see also Veasey*, 830 F.3d at 262.

As an initial matter, the state interests considered in *Brnovich* serve a fundamentally different goal than those considered here. Arizona offered justifications that purportedly supported the general applicability of its state-level statutes governing out-of-precinct and early-voting-ballot laws. *Brnovich*, 141 S. Ct. at 2345, 2348. Here, however, Defendants have offered justifications—albeit tenuous—that purportedly support the discretionary allocation of early voting access to the detriment of some, but not all voters, in the 2018 general election in Waller County—which, as described in detail above and at trial, *see* Pls.' FoF ¶¶ 307–99, severely burdened and abridged voting access for a majority of Waller County's Black voters, who are concentrated in Prairie View.

Here, moreover, Defendants did not offer any of the "legitimate state interest[s]" that the *Brnovich* Court considered. *See Brnovich*, 141 S. Ct. at 2340, 2345–46 (discussing state interests offered by defendants for Arizona's out-of-precinct rule); *id.* at 2347 (explaining state interests offered by defendants for Arizona's ballot-collection law). Instead, Defendants have offered various and shifting rationales, which are probative of discriminatory results because they "fail to correspond in any meaningful way" to the facts relevant to the adoption and maintenance of the 2018 early voting schedule. *Veasey*, 830 F.3d at 263; Pls.' MOL at 36–41, 106–07. And if Defendants now raise purported concerns about fraud or any other interests considered in *Brnovich*, these would be *post hoc* justifications that are "routinely disregard[ed] as unreliable" and deserving of "little weight," if any. Pls.' MOL at 40–41; *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017); *accord Veasey*, 830 F.3d at 234.

In short, the record shows that Defendants have not advanced a legitimate state interest—let alone a "strong state interest[]"—for their adoption and maintenance of the 2018 early voting schedule. *See Brnovich*, 141 S. Ct. at 2340. Instead, they hid their actions behind tenuous justifications. Pls.' MOL at 36–41, 106–07.

**1982 standard practices.** In *Brnovich*, the Court explained that "the degree to which a voting rule departs from what was standard practice" in 1982 may be a relevant consideration for assessing the totality of circumstances. *Brnovich*, 141 S. Ct. at 2338–39. But in this case, comparing the 2018 early voting schedule to voting practices in 1982 has no "logical bearing on whether voting is 'equally open'" for Waller County's white and Black residents in the present. *Brnovich*, 141 S. Ct. at 2338. All parties agree that early

voting is now a critical method for voting in Waller County. And Defendants have not sought to eliminate that practice writ large; nor do they have the power to do so, because it is required under Texas law. Defs.' FoF-CoL ¶ 19.

Equally important, a state or jurisdiction cannot create or implement a new opportunity for voting in a manner that severely disfavors a protected class of voters. Pls.' MOL at 8. The Court in *Brnovich* affirmed that "blatant direct impediments to voting" can be challenged under Section 2 whether or not they existed in 1982. *Brnovich*, 141 S. Ct. at 2342 n.15 (citing footnote 22 of the Senate Report). Blatant direct impediments to voting include "changing the location of polling places and insistence on retaining inconvenient voting and registration hours." S. Rep. No. 97-417 at , 239 n.22 (1982).[2] And if governmental officials, including Defendants, provide early voting, the Constitution and the Voting Rights Act ("VRA"), which enforces the Fifteenth Amendment,[3] require them to do so in a nondiscriminatory manner. Pls.' MOL at 8; *see*, *e.g.*, *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966). That principle under the Constitution and the VRA also applies regardless of whether early voting options were available to Waller County voters in 1982.

---

[2]     The Supreme Court in *Gingles* recognized this Senate Judiciary Committee Report Senate Report as the "the authoritative source for legislative intent" on the Voting Rights Act. *Gingles*, 478 U.S. at 43 n.7.
[3]     *Chisom v. Roemer*, 501 U.S. 380, 383 (1991); *South Carolina v. Katzenbach*, 383 U.S. 301, 327, 337 (1966).

* * *

For all these reasons, under the Fifth Circuit's two-part test in *Veasey*, Plaintiffs' evidence has proven a Section 2 violation under the totality of circumstances based on the relevant Senate Factors, *Brnovich* guideposts, or any combinations of these and other relevant circumstances.

## B. Discriminatory Purpose Under The Fourteenth And Fifteenth Amendments

While the primary holding in *Brnovich* relates to Section 2 discriminatory results claims, the Court also upheld the district court's finding that one Arizona law at issue was not enacted with discriminatory intent in violation of Section 2 and the Fifteenth Amendment. As discussed above, the Court did so under a clear error standard of review that required substantial deference to the district court's evaluation of the evidentiary record. *Brnovich*, 141 S. Ct. at 2349; *see also id.* ("If the district court's view of the evidence is plausible in light of the entire record, an appellate court may not reverse even if it is convinced that it would have weighed the evidence differently in the first instance."); *Rogers*, 458 U.S. at 623 (holding "that the same clearly-erroneous standard applies to the trial court's finding in this case [as to the ultimate issue of discriminatory intent], as well as to the court's subsidiary findings of fact."); *Veasey*, 830 F.3d at 230 ("Legislative motivation or intent is a paradigmatic fact question.") (quoting *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000)).

Based on the *Brnovich* trial record, the Court determined that the district court did not commit clear error in finding that the early-ballot-collection law was not enacted for a

discriminatory purpose. *Brnovich*, 141 S. Ct. at 2349. That district court finding, according to the Court, "had ample support in the record." *Id.* The Court also rejected a "cat's paw" theory of demonstrating a discriminatory purpose in that case, *id.* at 2350, but Plaintiffs do not rely on that theory for proving their discriminatory purpose claims.

In crediting the findings of the trial court, the *Brnovich* Court did not alter the test for assessing discriminatory purpose claims in any way. Instead, the Court reaffirmed "the familiar approach outlined in *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 266–268 (1977)" for assessing such claims. *Brnovich*, 141 S. Ct. at 2349.[4]

This is precisely the approach Plaintiffs have followed in presenting and proving their discriminatory purpose claim here under the Fourteenth and Fifteenth Amendments and Section 2. Because a discriminatory purpose may hide behind seemingly neutral statements or actions, courts examine whether the *Arlington Heights* factors support an "inference of invidious purpose." *Arlington Heights*, 429 U.S. at 270. Under the *Arlington Height* framework, Plaintiffs' evidence established that Waller County's 2018 early voting schedule was adopted and maintained, at least in part, for a racially discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments and Section 2. *See*, *e.g.*, Pls.'

---

[4] The *Arlington Heights* factors are: (1) the impact of official action; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged decision; (4) procedural and substantive departures; and (5) the legislative and administrative history, including contemporary statements. ECF 109-4, Parties' Agreed Applicable Propositions of Law ¶ 4; *Arlington Heights*, 429 U.S. at 266–68. Courts in the Fifth Circuit also consider: (5) foreseeability of discriminatory impact; (6) knowledge of discriminatory impact; and (7) the availability of less discriminatory alternatives. *Id.; Veasey*, 830 F.3d at 235–36; *United States v. Texas Ed. Agency*, 600 F.2d 518, 528–29 (5th Cir. 1979).

MOL at 12–26 (discriminatory impact on Black voters that was also known and reasonably foreseeable); *id.* at 32–36 (sequences of events leading to the adoption and maintenance of the 2018 early voting schedule and Defendants' failure to adopt ameliorative changes to lessen the discriminatory impact); *id.* at 32–36 (departures from the ordinary decision-making processes); *id.* at 48–53 (tenuousness justifications); *id.* at 41–44 (contemporary statements and admissions by Defendants); *id.* at 45–51 (Waller County's long, well-documented and judicially recognized history and ongoing record of voting discrimination). Despite *Brnovich*'s limited applicability to Plaintiffs' discriminatory intent evidence, Defendants may attempt to rely on dicta in *Brnovich* to offer interpretations that are inconsistent with both that decision and other binding precedent.

*First*, Plaintiffs do not need to show that *each* member of Defendant Commissioners Court was motivated by a discriminatory purpose. *See Rogers*, 458 U.S. at 626 (affirming the district court's holding that the overall state legislature acted with discriminatory intent in maintaining at-large elections in Burke County, Georgia, where, in doing so, "the legislature defer[red] to the[] wishes [of]" the legislators representing Burke County, thus effectuating those particular representatives' discriminatory intent); *Arlington Heights*, 429 U.S. at 268 (explaining that "contemporary statements by [some] members of the decisionmaking body" are probative of the intent with which the overall body acted); *see also Veasey*, 830 F.3d at 233 (explaining that identifying the intent of "a smaller body" such as Defendant Commissioners Court is proportionally easier than "identify[ing] the intent of an entire state legislature"). Plaintiffs' evidence here, as discussed above, is that Defendant Commissioners Court approved a discriminatory allocation of early voting

hours and days that severely and foreseeably burdened Black voters in Prairie View, who are the majority of Waller County's Black voting-age residents. Defendants then substantially maintained that schedule's discriminatory allocation on two occasions—*after* hearing detailed explanations from Black voters in Prairie View about the transportation, work, and other obligations that made off-campus and Election Day voting inaccessible for them, and *after* two Defendants publicly acknowledged the schedule's inequities and the lack of equal voting opportunities it provided. These decisions were made in the context of decades-long efforts by Defendant Waller County and Defendants' predecessors in office, using a myriad of stratagems, to burden, deny, or abridge the fundamental right to vote for Black voters in Waller County, most of whom, as discussed, live in Prairie View.

*Second*, Plaintiffs do not need to identify explicitly racist statements or other direct evidence to establish a discriminatory purpose. *Veasey*, 830 F.3d at 235–36. To require direct evidence otherwise "would essentially give legislat[ive bodies] free rein to racially discriminate so long as they do not overly state discrimination as their purpose . . . ." *Id.* And contemporaneous statements by legislative decisionmakers, including the above-mentioned admissions in this case, and other forms of circumstantial evidence remain relevant in an *Arlington Heights* analysis. Pls.' FoF ¶ 6; *see* Pls.' MOL at 41–44 (explaining admissions by Defendants Duhon and Eason and other coded statements).

*Third*, in contrast to *Brnovich*, Defendants have not raised any partisan motivations in this case. *Compare Brnovich*, 141 S. Ct. at 2349 (suggesting that partisan intent may not always be the same as racial motives)*, with* Pls.' MOL at 36–41 (describing the justifications Defendants offered to adopt and maintain the 2018 early voting schedule);

29

*see also Arlington Heights*, 429 U.S. at 265–66 (explaining that plaintiffs are not required "to prove that the challenged action rested *solely* on racially discriminatory purposes" when there is evidence "that a discriminatory purpose has been *a* motivating factor in the decision.") (emphasis added); *Veasey*, 830 F.3d at 230 (explaining that "racial discrimination need only be one purpose, and not even a primary purpose, of an official action for a violation to occur.") (citation, brackets, and internal quotation marks omitted). If raised now, a claim of partisan intent would not recuperate the constitutionality of an action motivated in part by a racially discriminatory purpose; in addition, partisan intent, if raised now, would be yet another *post hoc* justification that is "unreliable" and deserving of "little weight," if any. Pls.' MOL at 40; *Bethune-Hill*, 137 S. Ct. at 799; *accord Veasey*, 830 F.3d at 234. Regardless, an intent to disadvantage racial minority citizens to gain a perceived political or partisan benefit may also qualify as impermissible discriminatory intent. Pls.' MOL at 11; *see League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006); *Hunter v. Underwood*, 471 U.S. 222, 233 (1985); *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 226–27 (4th Cir. 2016). For these reasons, this Court should reject any of these misguided interpretations, if raised, because they find no support in *Brnovich* or other precedent.

Finally, this Court should also reject any interpretation that Defendants may offer questioning whether Section 2 provides a private right of action. To begin, Defendants waived this argument by failing to raise it in the Parties' Joint Proposed Pretrial Order, ECF 109, which governs the issues and evidence presented at trial. *Kona Technology Corp. v. Southern Pacific Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000) (explaining that a claim

or issue not raised in a joint pretrial order is waived). And the *Brnovich* concurrence discussing whether a statute provides a right of action does not implicate subject-matter jurisdiction and is thus waived if, as here, it is not raised at the appropriate juncture. *See Brnovich*, 141 S. Ct. at 2350. Moreover, even if this argument were properly before this Court, it would be meritless, because the Fifth Circuit has recognized a private right of action under Section 2. *See, e.g.*, *Veasey*, 831 F.3d at 272.

## C. Discriminatory Purpose Under The Fourteenth, Fifteenth, And Twenty-Sixth Amendments

As described above, *Brnovich* does not alter the *Arlington Heights* framework. Indeed, *Brnovich* affirms the framework for assessing racial discrimination claims. Based on the record and evidence presented at trial, Plaintiffs' briefings, and caselaw governing intentional discrimination claims in the voting context, *Arlington Heights* also provides the appropriate standard to assess Plaintiffs' claim that Defendants singled them out by limiting their access to early voting on the intersecting bases of race and age in violation of the Fourteenth, Fifteenth, and Twenty-Sixth Amendments. And under *Arlington Heights*, Plaintiffs have offered ample evidence at trial establishing a constitutional violation on the intersecting bases of race and age. Pls.' MOL at 70–78.

Respectfully submitted on July 30, 2021,

*/s/ Leah C. Aden*

Leah C. Aden*                                Adam T. Schramek (SDTX 31913)
John S. Cusick*                               State Bar No. 24033045
Steven C. Lance*                            Attorney-in-Charge
**NAACP LEGAL DEFENSE AND**        **NORTON ROSE FULBRIGHT US LLP**
   **EDUCATIONAL FUND, INC.**       98 San Jacinto Boulevard, Suite 1100
40 Rector Street, 5th Floor           Austin, Texas 78701-4255
New York, New York 10006              Telephone: (512) 474-5201
Phone: (212) 965-2200                 Facsimile: (512) 536-4598
Fax: (212) 226-7592                   adam.schramek@nortonrosefulbright.com
laden@naacpldf.org
jcusick@naacpldf.org                  Julie Goodrich Harrison (SDTX 3017799)
slance@naacpldf.org                   State Bar No. 24092434
                                      1301 McKinney Street, Suite 5100 Houston,
                                      Texas 77010 Telephone: (713) 651-5151
*Pro Hac Vice*                        Fax: (713) 651-5246
                                      julie.harrison@nortonrosefulbright.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2021, I served a true and correct copy of the foregoing document via electronic notice by the CM/ECF system on all counsel or parties of record.

*/s/ Leah Aden*
Leah C. Aden

*Counsel for Plaintiffs*