United States District Court
Southern District of Texas

**ENTERED**

March 24, 2022

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DAMON JOHNSON, *et al*, | § | CIVIL ACTION NO. |
| Plaintiffs, | § | 4:18-cv-03985 |
| | § | |
| | § | |
| vs. | § | JUDGE CHARLES ESKRIDGE |
| | § | |
| | § | |
| WALLER COUNTY, *et al*, | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs are students and a student and alumni organization at Prairie View A&M University, which is the oldest historically Black university (and second-oldest public university) in the State of Texas. Defendants are Waller County and several of its county officials and entities.

Plaintiffs allege that Waller County allocated fewer hours of early voting during the 2018 general election cycle to PVAMU than to several other surrounding areas. They also complain that the allocated hours were set only during the second week of the early voting period, with none in the first. Plaintiffs assert that this violated their rights under the Voting Rights Act, as well as under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments of the United States Constitution.

Defendants moved for summary judgment after the conclusion of discovery, generally asserting that no discriminatory intent or effect underlay decisions as to early voting locations and times. That motion was denied. See *Allen v Waller County*, 472 F Supp 3d 351 (SD Tex 2020). The case then proceeded to bench trial, to which these findings of fact and conclusions of law now relate.

Waller County—or more precisely, certain persons and officials acting within it—has at times manifested racial animus and discrimination in a manner curtailing (or attempting to curtail) the voting rights of students at PVAMU. For example, in 1971, the Waller County Tax Assessor (who also served as the voting registrar) prohibited students from voting unless they or their families owned property in Waller County, which practice the United States Supreme Court ultimately curtailed. In 1992, the Waller County District Attorney indicted PVAMU students on allegations of illegal voting, with those charges dropped only upon protest by the United States Department of Justice. And in 2003, although charges were never brought, a subsequent Waller County District Attorney made statements reasonably perceived as threats to prosecute students for voter fraud, again on the basis of a putative domicile test.

Not surprisingly, this history now manifests itself in the form of heightened suspicion and vigilance by today's PVAMU students. This is unfortunate, at least in this instance. And that's because a full view of the record—including testimony by several former and current PVAMU students, several Waller County officials (including two Commissioners, the County Judge, and the Elections Administrator), and the current and a former mayor of Prairie View, along with review of a number of videotapes of Waller County Commissioners Court proceedings—actually shows what appears to be genuine respect between current and recently graduated PVAMU students and chief policymakers for Waller County and Prairie View.

Regardless, the question at hand is whether the year 2018 should be added to the above list. And the answer is, it shouldn't. The record discloses an objective and reasonable basis for decisions made in the selection of early voting locations and the allocation of hours—such as the marshaling of limited electoral resources, prior locations and hours implemented without dispute, and historical usage and voter turnout—that in no way indicate prohibited animus or discriminatory intent. And indeed,

the challenged actions were taken at the specific request of (or recommendation by) persons whose views can't credibly be said to be adverse to PVAMU students on any basis.

Simply put, the areas in and around Prairie View, including PVAMU, were allocated ample hours at convenient polling places during the early voting period of the 2018 general election. Looking at the record from a number of different angles demonstrates why this is so.

*The evidence doesn't establish a concern as to the quantity of hours devoted overall to the areas in and around Prairie View.* This is true for at least the following reasons. *First,* the early voting plan and allocated hours were jointly agreed to by the local Democratic and Republican party chairs. *Second,* the two precincts in Waller County with the most allocated hours were majority-Black districts. *Third,* the hours allocated to Prairie View were less than those allocated to larger population centers, but more than those allocated to smaller population centers. *Fourth,* the hours allocated to Prairie View reflected an increase from those allocated during the 2016 election cycle. *And fifth,* no evidence suggests that long lines existed in the voting precincts serving the areas in and around Prairie View or that anyone who wanted to vote early there couldn't do so.

*The evidence also doesn't establish any concern about the number of hours allocated to the Memorial Student Center for on-campus early voting.* This, too, is true for a number of reasons. *First,* no other county of comparable size in Texas with a college campus allocates any hours to on-campus early voting. *Second,* the early voting hours allocated to the MSC reflected a near two-fold increase from those allocated during the 2016 election cycle. *Third,* on-campus hours were scheduled only during the second week of the early voting period at the request of the Democratic party chair specifically to avoid congestion and access concerns associated with PVAMU homecoming activities during the first week of that period. *Fourth,* the convenience of hours at the MSC far surpassed the convenience of hours at any other polling place in Waller County, with it being a campus location visited frequently

by students every school day. *And fifth,* again, no evidence suggests that long lines existed at the MSC or that students who wanted to vote early there couldn't do so.

*Nor does the evidence establish any concern as to the further hours allocated to the Prairie View area at the Waller County Community Center immediately adjacent to PVAMU.* This is again true for a number of reasons. *First,* the WCCC is the one and only designated community center in Waller County, sitting on land within the original footprint of PVAMU as previously ceded to Waller County for the very purpose of establishing a community center. *Second,* the WCCC is convenient to students, it being less than a seven-minute walk from the MSC, while also having an adjacent drop-off point serviced by a free, on-campus shuttle. *Third,* the WCCC is itself closer to the MSC than a similar early voting site designated for the 2016 election cycle. *Fourth,* the hours allocated to the WCCC reflected an increase from those allocated to the similar early voting site designated during the 2016 election cycle. *And fifth,* local political representatives responsible to the communities in and around Prairie View—being the Mayor of Prairie View and the Waller County Commissioner—advocated for the allocation of additional hours to the WCCC to better accommodate the Black elderly population in that area.

As a matter of law, and for further reasons specified below, the Court concludes that Plaintiffs have failed to prove their claims of (i) a racially discriminatory effect in violation of Section 2 of the Voting Rights Act; (ii) intentional race discrimination in violation of the Fourteenth and Fifteenth Amendments, as implemented by Section 2 of the Voting Rights Act and 42 USC § 1983; (iii) intentional discrimination on the basis of age in violation of the Twenty-Sixth Amendment, as implemented by 42 USC § 1983; and (iv) intentional discrimination against them as a specific class of Black voters in Waller County aged eighteen to twenty. Defendants are instead entitled to judgment on these claims.

While not entirely beyond the purview of these findings, it's perhaps naively optimistic in these times to commend to the parties that just a bit more open communication between them might help allay future suspicions should they arise, thus avoiding protracted and difficult litigation such as this. Regardless, it bears emphasis again in this preface that no other comparably sized county in Texas places a precinct polling place for early voting directly on, or immediately adjacent to, a college campus in the way that Waller County has for PVAMU for approximately two decades. If they are of the mind to do so, the students at PVAMU can draw considerable satisfaction from the fact that their determined pursuit for recognition of their voting rights was the likely catalyst to this singular accomplishment. But at the same time, it's a matter of great credit to Waller County. And if desired to be seen in such light by both sides, it hopefully signals a continued path for the future between these parties that allows mistakes of the past, even as they will always be remembered, to continue to recede into just that—the past.

# Contents

**Findings of Fact** ..................................................**9**

1.   Parties ............................................9

2.   Procedural history ..........................10

3.   Trial...............................................11

    a.   Plaintiffs' case ........................11

    b.   Defendants' case .....................15

    c.   Site inspection.........................17

4.   Prairie View A&M University........................19

5.   Waller County government............................20

6.   Waller County demographics........................22

7.   Instances of racial discrimination in voting in Texas and Waller County ..............24

8.   In-person early voting in Texas .....................29

9.   Voting in Waller County ...............................33

    a.   Process for setting the voting schedule...33

    b.   History of voting locations......................37

       i.   For voting on election day................37

       ii.   For early voting prior to 2016...........39

       iii.   For early voting in 2016...................40

    c.   Comparison to similar Texas counties....45

10.   Adoption of the early voting schedule for the 2018 general election ................................48

11.   Usage of early voting in Waller County ........56

12.   The Waller County Community Center as a voting location ............................................58

13.   Voting equipment in Waller County.............62

14.   Rumors of voter suppression on the PVAMU campus in advance of the 2018 general election ..........................63

15.   Further consideration of the early voting schedule for the 2018 general election ..........66

16. This lawsuit and amendment of the early voting schedule .............................................. 73

17. Adoption of House Bill 1888 in 2019 ............ 75

**Conclusions of Law** ...............................................**78**

1. Racially discriminatory effect in violation of Section 2 of the Voting Rights Act ............ 79

    a. Discriminatory burden ............................ 81

        i. Size of burden imposed by challenged voting rule ....................... 82

        ii. Degree of deviation from standard voting rules in 1982 .......................... 88

        iii. Size of racially disparate impact of voting rule ........................................... 89

        iv. Other opportunities provided by state's overall voting system ............. 91

        v. Strength of state interests served by challenged voting rule ................. 91

        vi. Conclusion as to burden .................... 92

    b. Social and historical discriminatory conditions .................................................. 92

        i. Extent of history of official discrimination that affected the right of minority group to participate in political process .......... 95

        ii. Extent of racially polarized voting . 103

        iii. Extent of use of practices that enhance opportunity for discrimination against minority group ....... 103

        iv. Existence of slating process in which minority group members were denied participation ............... 104

        v. Extent to which members of minority group bear effects of

discrimination in areas that
hinder their ability to participate
in political process ............................ 104

vi.   Whether campaigns have been
characterized by racial appeals ...... 106

vii.  Extent to which minority
candidates have been elected
to office in jurisdiction..................... 106

viii. Whether there is lack of
responsiveness to needs of
members of minority group............. 108

ix.   Whether policy underlying
challenged practice is tenuous........ 109

x.    Conclusion as to conditions............. 113

c.    Conclusion............................................... 113

2.   Intentional racial discrimination in vio-
lation of Section 2 of the Voting Rights Act
and the Fourteenth and Fifteenth Amend-
ments to the United States Constitution .... 114

3.   Age discrimination in violation of the
Twenty-Sixth Amendment to the
United States Constitution ........................... 119

4.   Hybrid claim under the Fourteenth,
Fifteenth, and Twenty-Sixth Amend-
ments to the United States Constitution .... 124

5.   Relief ................................................................ 127

**Conclusion .........................................................127**

Rule 52(a)(1) of the Federal Rules of Civil Procedure provides, "In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." As to factual findings, this "exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness." *Century Marine Inc v United States*, 153 F3d 225, 231 (5th Cir 1998), quoting *Burma Navigation Corp v Reliant Seahorse M/V*, 99 F3d 652, 656 (5th Cir 1996). The rule is instead satisfied where the findings present the reviewer with "a clear understanding of the basis for the decision." Ibid.

To the extent that any factual finding reflects or is better understood as a legal conclusion, it is also deemed a conclusion of law. Likewise, to the extent that any legal conclusion reflects or is better understood as a factual finding, it is also deemed a finding of fact.

## FINDINGS OF FACT

### 1. Parties

1. Plaintiffs are Damon Johnson, Treasure Smith, and The Panther Party. Jayla Allen, Joshua Muhammad, and Raul Sanchez were also plaintiffs but have since voluntarily withdrawn.[1]

2. Damon Johnson is an undergraduate student at PVAMU and a Waller County resident. He relocated to live with his family in Fort Bend County due to the Covid-19 pandemic but plans to reenroll at PVAMU when able.

3. Treasure Smith was an undergraduate student at PVAMU and a Waller County resident until her graduation in December 2020. She continues to reside in Waller County.

4. The Panther Party is a student and alumni organization at PVAMU dedicated to addressing social,

---

[1] See Dkts 43, 60, and 79.

9

political, economic, and historical issues related to PVAMU and the city of Prairie View.

5. Jayla Allen was an undergraduate student at PVAMU and a Waller County resident until her graduation in December 2019.

6. Joshua Muhammad was an undergraduate student at PVAMU and a Waller County resident until his graduation in December 2018.

7. Raul Sanchez was an undergraduate student at PVAMU and a Waller County resident until his graduation in 2021.

8. Defendants are Waller County, the Waller County Commissioners Court, Christy Eason, and Carbett Duhon.

9. Waller County is a political subdivision of the State of Texas.

10. The Waller County Commissioners Court is the governing body for Waller County. The five-member Commissioners Court includes the Waller County Judge, who is elected at-large (that is, countywide), and four Commissioners, who are elected from four single-member districts.

11. Christy Eason is sued in her capacity as the Waller County Elections Administrator and Chief Elections Official.

12. Carbett "Trey" Duhon is the Waller County Judge, sued in that capacity and as a representative member of the Waller County Commissioners Court.

## 2. Procedural history

13. Plaintiffs filed their original complaint in October 2018. As amended, it asserts that the early voting schedule for the 2018 general election set by the Waller County Commissioners Court was discriminatory on the basis of race and age, and that Defendants' related actions violated the Fourteenth, Fifteenth, and Twenty-Sixth Amendments

to the United States Constitution and Section 2 of the Voting Rights Act.[2]

14. Defendants moved to dismiss Plaintiffs' complaint pursuant to Rule 12(b)(6) in May 2019.[3] Defendants also moved for summary judgment after the close of discovery.[4] The motion to dismiss was denied and hearing set on the motion for summary judgment.[5] The motion for summary judgment was later denied, given the complexity of the factual analysis necessary and the many disputes between the parties in that regard. See *Allen v Waller County*, 472 F Supp 3d 351, 366 (SD Tex 2020).

### 3. Trial

15. Bench trial of this matter commenced on September 28, 2020, amid the COVID-19 pandemic. As such, trial proceeded remotely by way of videoconference. Evidence and testimony were received over twelve days, and trial concluded on October 15, 2020.

16. The parties attended post-trial mediation in November 2020, but they were unable to reach a settlement.[6] After several requested extensions, the parties filed proposed findings of fact and conclusions of law at the end of March 2021.[7]

### a. Plaintiffs' case

17. *First*, Plaintiffs called Jayla Allen. She attended PVAMU from Summer 2017 to Fall 2019, when she graduated with a political science degree. While at PVAMU, Allen was a member of The Panther Party and participated in multiple activities in which she assisted with voter registration and education for on-campus

---

[2]   See generally Dkt 49.

[3]   See Dkt 51.

[4]   See Dkt 73.

[5]   See Dkt 85.

[6]   See Dkt 154.

[7]   See Dkts 175 (for Plaintiffs) and 178 (for Defendants).

students. She testified to her belief of the importance of early voting at PVAMU and the convenience of voting at the Memorial Student Center (or *MSC*). She also testified to her understanding of the assignment of zip codes to PVAMU students, transportation difficulties in Prairie View and Waller County in general, and the inconvenience of voting at the Waller County Courthouse.[8]

18. *Second*, Plaintiffs called Dr Peniel Joseph as an expert witness. Dr Joseph has a PhD in American history and specializes in African American history and other related fields. He testified regarding his report which "looked at the history of efforts to secure voting rights in Waller County and the history of efforts by PVAMU students to secure and exercise their voting rights in Waller County."[9] He also explained his findings about the history of racial discrimination with respect to voting in Waller County and its specific impact on Black PVAMU students and Prairie View voters.[10]

19. *Third,* Plaintiffs called Priscilla Barbour. She attended PVAMU from Summer 2010 to Spring 2014, when she graduated with a political science degree. Barbour was a member of multiple student organizations while at PVAMU, including the Student Government Association and Texas League of Young Voters. She testified to her involvement in seeking an on-campus polling place at the MSC. She also discussed her understanding of the difficulties PVAMU students face in getting to the polling place located at the Waller County Community Center (or *WCCC*).[11]

---

[8]   See Dkt 161 at 47:5–130:21 (1 Tr, J Allen testimony).

[9]   Dkt 161 at 141:16 (1 Tr, Joseph testimony); see also Dkt 125-155 (PX 155, Joseph report).

[10]   See Dkt 161 at 131:24–247:6 (1 Tr, Joseph testimony).

[11]   See Dkt 162 at 6:9–120:24 (2 Tr, Barbour testimony).

20. *Fourth*, Plaintiffs called Dr Robert Stein as an expert witness. Dr Stein has a PhD from the University of Wisconsin at Milwaukee, with specialty in public policy, elections and voting behavior, and urban politics. He explained his expert report in which he found that Black voters and voters under the age of twenty-one had inequitable access to in-person early voting during the 2018 midterm congressional election in Waller County. He discussed his understanding of the limited public transportation options in Waller County to polling places, and the disproportionately heavy use of the MSC as a voting location by Black voters and voters under the age of twenty-one. He also responded to the report of Dr James Gimpel, Defendants' expert.[12]

21. *Fifth*, Plaintiffs called Xante Wallace, a member of the Prairie View City Council. Wallace attended PVAMU as an undergraduate student from 2014 to 2018 and currently attends PVAMU as a graduate student. He testified on his efforts to address an issue related to PVAMU student zip codes. He also testified on his interactions with the Waller County Commissioners Court and his advocacy on the subject of early voting.[13]

22. *Sixth*, Plaintiffs called Kendrick Jones. He's also a Prairie View councilmember, as well as a former president of the PVAMU Student Government Association. He testified on student voting in Waller County and his understanding of the unfairness of the polling selection process and inconvenience of the WCCC as a polling place for PVAMU students. He additionally testified to the importance of the MSC to student life generally.[14]

23. *Seventh,* Plaintiffs called Frank Jackson. Jackson is the current Prairie View fire chief and a former mayor of

---

[12]   See Dkt 162 at 121:21–257:11 (2 Tr, Stein testimony).

[13]   See Dkt 162 at 258:13–308:5 (2 Tr, Wallace testimony).

[14]   See Dkt 163 at 7:3–78:10 (3 Tr, Jones testimony).

Prairie View, councilmember, and Waller County commissioner. Jackson testified to his understanding of the history of race relations in Texas generally and in Prairie View in particular. He also testified to his disagreement with the decisions of the Waller County Commissioners Court relating to the early voting schedule at issue.[15]

24. *Eighth,* Plaintiffs called Damon Johnson. Johnson is a PVAMU student and a member of the Student Government Association. He testified to his experience with on-campus early voting, focusing on scheduling and transportation issues in particular. He also testified to his use of and familiarity with the MSC.[16]

25. *Ninth*, Plaintiffs called Treasure Smith. Smith is also a PVAMU student and a member of The Panther Party. She testified to her experience with early voting, including scheduling and transportation issues. She also testified to her belief that the WCCC was unfamiliar to students and an inconvenient polling place.[17]

26. *Tenth*, Plaintiffs called Dr Henry Flores as an expert witness. Dr Flores is a professor, author, social scientist, and statistician at St Mary's University in San Antonio, Texas. He testified to his understanding of the *Arlington Heights* and *Gingles* legal frameworks and their application to the decisions of the Waller County Commissioners Court with respect to the early voting schedule.[18]

---

[15] See Dkt 163 at 80:2–179:8 (3 Tr, Jackson testimony) and Dkt 164 at 13:17–144:16 (4 Tr, Jackson testimony); see also Dkt 171 at 166:3–187:5 (11 Tr, Jackson testimony).

[16] See Dkt 164 at 145:25–172:19 (4 Tr, Johnson testimony).

[17] See Dkt 164 at 174:15–209:4 (4 Tr, Smith testimony).

[18] See Dkt 165 at 5:13–207:18 (5 Tr, Flores testimony).

27. *Eleventh*, Plaintiffs called William Cooper as an expert witness. Cooper is a demographics consultant who provides analysis on population and census data. He testified on demographic and socioeconomic data that he gathered on Waller County and its application to the legal issues here.[19]

28. *Twelfth*, Plaintiffs called Joshua Muhammad. He graduated from PVAMU in Fall 2018 with an electrical engineering degree. He is founder of The Panther Party and the current chairman of its board. He testified on the activities and principles of The Panther Party, as well as its involvement in local-government issues.[20]

29. *Thirteenth*, Plaintiffs called Dr Brian Roland. Dr Roland is a member of the Prairie View City Council and state officer for the Texas NAACP, as well as a former PVAMU student. He testified to his understanding of historical disputes between PVAMU students and Waller County on voting issues, including several prior lawsuits in that respect.[21]

30. *Fourteenth,* Plaintiffs called Maia Young. Young is a recent PVAMU graduate with a political science degree and a former member of The Panther Party. She testified on purported conflicts between PVAMU students and the Waller County Commissioners Court. She also testified on efforts by student organizations to mobilize students to vote.[22]

### b.  Defendants' case

31. *First,* Defendants called Christy Eason, the Waller County Elections Administrator and Chief Elections

---

[19] See Dkt 165 at 211:25–250:13 (5 Tr, Cooper testimony).

[20] See Dkt 166 at 5:17–117:15 (6 Tr, Muhammad testimony).

[21] See Dkt 166 at 119:1–179:17 (6 Tr, Roland testimony).

[22] See Dkt 166 at 181:12–220:23 (6 Tr, Young testimony).

Official. She testified on her role in preparing the Waller County voting schedule and to her interactions with members of the public in that respect. She also testified on events concerning the 2018 primary and general elections that are the subject of this lawsuit, along with her involvement in that respect.[23]

32. *Second,* Defendants called David Allen, current mayor of Prairie View and a PVAMU graduate. He testified to his belief about the relative accessibility of the WCCC and the MSC for use in elections. He also testified to his understanding of citizens' concerns in that same respect, as well as to his interactions with Waller County officials regarding the election schedule.[24]

33. *Third,* Defendants called Dr James Gimpel as an expert witness. Dr Gimpel has a PhD in political science from the University of Chicago and is currently employed as a tenured professor at the University of Maryland. He testified to his analysis of the Waller County voting schedule, with comparison to similar Texas counties. His analysis and testimony focused on the effect of early voting hours and locations on overall voting access.[25]

34. *Fourth*, Defendants called Justin Beckendorff, the current Waller County Commissioner for Precinct 4. He testified on his role in the election scheduling process, as well as to his involvement in the debate and decision on the early voting schedule at issue here.[26]

---

[23] See Dkt 166 at 227:4–283:21 (6 Tr, Eason testimony) and Dkt 167 at 8:25–223:15 (7 Tr, Eason testimony).

[24] See Dkt 167 at 225:7–295:6 (7 Tr, D Allen testimony) and Dkt 168 at 5:10–61:15 (8 Tr, D Allen testimony).

[25] See Dkt 168 at 63:19–270:15 (8 Tr, Gimpel testimony).

[26] See Dkt 169 at 6:4–157:2 (9 Tr, Beckendorff testimony).

35. *Fifth*, Defendants called Jeron Barnett, the current Waller County Commissioner for Precinct 3. He also testified on his role in the election scheduling process and to his involvement in the debate and decision on the early voting schedule at issue here. And specifically, he testified to his understanding of the accessibility concerns of several citizens regarding voting at the MSC.[27]

36. *Sixth*, Defendants called Carbett "Trey" Duhon, the current Waller County Judge. He testified to his knowledge of Waller County in general and his experience in local government. He also testified to his interactions with Eason in setting the voting schedule and disagreements they had with members of the public, including PVAMU students. He further testified to his understanding of the fairness of the voting schedule and motivation for his actions in debating and setting the schedule.[28]

### c.  Site inspection

37. The Court and representatives of the parties visited the PVAMU campus during trial on the morning of Thursday, October 1, 2020. The parties had previously submitted a proposed itinerary.[29]

38. The Court prepared the following annotated map to show the route walked while on campus.[30] The annotations identify several campus buildings and other items pointed out by the parties during the site inspection, as well as those buildings and items the parties requested to be listed.

---

[27]   See Dkt 169 at 158:15–273:16 (9 Tr, Barnett testimony) and Dkt 170 at 8:5–74:16 (10 Tr, Barnett testimony).

[28]   See Dkt 170 at 76:13–267:8 (10 Tr, Duhon testimony) and Dkt 171 at 5:5–165:6 (11 Tr, Duhon testimony).

[29]   See Dkt 131 (joint proposed itinerary); see also Dkt 164 at 4:10–13:1 (4 Tr, site visit record).

[30]   See Dkt 137-1 (PVAMU map).

**Figure 1.**



39. The PVAMU campus is without question well maintained, with nicely paved sidewalks throughout all areas traversed. The time required to walk to and from various points on the campus are relevant to the parties' legal arguments and were noted on the record.[31] The following times are particularly pertinent:

- o *8 minutes, 10 seconds:* Phase 3 Housing to Freshman Housing;

- o *8 minutes, 5 seconds:* Freshman Housing to the MSC;

- o *16 minutes, 15 seconds:* Total time from Phase 3 Housing to the MSC;

- o *2 minutes, 15 seconds:* The MSC to Hobart Taylor Hall (an academic and performing arts building between the MSC and the WCCC);

- o *4 minutes, 35 seconds:* Hobart Taylor Hall to the WCCC; and

- o *6 minutes, 50 seconds:* Total time from the MSC to the WCCC.

40. Phase 3 Housing was the chosen starting point because it's the farthest on-campus housing location to both the MSC and the WCCC. Of note, the distance from the MSC to the Panther Plaza is farther than the distance from the MSC to the WCCC. Hobart Taylor Hall and the WCCC are both visible from the back of the MSC, with a large parking lot and field separating the buildings.

### 4. Prairie View A&M University

41. The city of Prairie View is located roughly fifty miles northwest of the City of Houston, along Texas State Highway 290. The PVAMU campus is located directly north of the highway, off the University Drive exit.

42. PVAMU has a proud history, including being the second-oldest public university in the State of Texas. The campus itself is centered on a large hill within Waller County, with various paths and classrooms built around

---

[31]   See Dkt 164 at 4:10–13:1 (4 Tr, site visit record).

19

the slopes. Essentially rectangular in shape, it comprises roughly 1,440 acres.

43. Visitors enter by University Drive, which proceeds toward the John B. Coleman Library, generally located at the center of the campus and surrounded by broad lawns. Immediately surrounding the library are freshman housing and various classrooms and other school buildings, all connected by walkways bordered by many tall trees providing shade.

44. South of the library is the MSC, inside of which there are study areas, offices for student organizations, and a food court featuring the only Chick-fil-A restaurant in town. West of the MSC are the athletic fields. Athletics are a particular aspect of school pride. PVAMU sponsors a number of varsity sports, including men's and women's basketball, track, cross country, and golf; women's soccer, softball, tennis, volleyball, and bowling; and men's football and baseball.

45. Finally, a large walkway follows the outer campus border, passing such features as the University Welcome Center and the Panther Plaza—a student center offering restaurants and other amenities. There are also several student housing complexes within the southeastern, western, and northern boundaries.

### 5. Waller County government

46. Waller County, Texas is a political subdivision of Texas that acts legislatively through the majority vote of its Commissioners Court.[32]

47. The Waller County Commissioners Court consists of the County Judge (elected at large) and four County Commissioners (each elected from one of four precincts).[33]

48. At the time of the 2018 general election and related events, the Waller County Judge was (and to this date remains) Trey Duhon. The County Commissioners for Waller County were John Amsler (Precinct 1), Russell

---

[32]   See Dkt 109-1 at ¶¶ 8–9 (joint stipulations of fact).

[33]   Ibid.

Klecka (Precinct 2), Jeron Barnett (Precinct 3), and Justin Beckendorff (Precinct 4).[34] Commissioner Barnett has since been replaced by Commissioner Kendrick Jones as the Commissioner of Precinct 3.

49. Waller County also created the position of County Elections Administrator, as permitted by state law.[35] This position is appointed by the County Election Commission, which as a matter of state law consists of the County Judge, the County Clerk, the County Tax Assessor-Collector, and the county chair of each political party that made nominations in the last general election.[36] For Waller County, the latter category meant the local Democratic and Republican party chairs.

50. Under Texas law, the elections administrator performs the duties and functions of the voter registrar. For elections run by a county, the elections administrator fulfills the duties and responsibilities traditionally assigned to the county clerk, including (among other things) preparing a proposed schedule of polling places and times for approval by the county commissioners court, hiring and training poll workers, allocating voting equipment to ensure adequate coverage for all polling places, and overseeing the conduct of the election and the canvassing of election results.[37]

51. As noted above, Christy Eason is the current Waller County Elections Administrator. She also served in that role from 1989 to 1999. Following a stint in the private sector, she again assumed that position in or around March 2017, where she remains.[38]

---

[34]   See Dkt 125-156 at 16 (PX 156, Flores report).

[35]   Tex Elec Code § 31.031(a); see also Dkt 166 at 227:11–228:22 (6 Tr, Eason testimony).

[36]   Tex Elec Code § 31.031(c) & (d); see also Dkt 170 at 90:14–25 (10 Tr, Duhon testimony).

[37]   Tex Elec Code § 31.043; see also Dkt 166 at 228:4–15 (6 Tr, Eason testimony).

[38]   Dkt 166 at 227:11–228:3 (6 Tr, Eason testimony).

### 6.  Waller County demographics

52. Waller County sits on the northwest border of Harris County and within fifty-five miles of the City of Houston.

53.  As of the 2010 US Census, Waller County had a total population of 43,205, of whom 44.6% (19,260) are Anglo (non-Hispanic White), 24.4% (10,537) are Black, and 29% (12,536) are Latino (Hispanic residents of any race). Waller County's voting age population is 32,549, of whom 47.48% (15,455) are Anglo, 26.8% (8,737) are Black, and 23.8% (7,755) are Latino.[39]

54.  Since that decennial census, Waller County has experienced significant population growth, increasing by approximately 9,921 residents (22.96%) from 43,205 in 2010 to a 2018 estimate of 53,126.[40] This growth occurred across all racial and ethnic categories, but growth among minority populations has been slightly greater than in the Anglo population.[41]

55.  According to the US Census Bureau's 2011–2015 American Community Survey five-year estimates, the citizen voting age populations (or *CVAP*) of larger cities in Waller County are as follows:

> o   *Hempstead:* 3,810, consisting of 65.4% (2,492) Black, 28.9% (1,099) Anglo, and 12.5% (474) Latino;
>
> o   *Brookshire:* 2,702, consisting of 50.9% (1,376) Black, 28.5% (769) Anglo, and 19.7% (533) Latino;

---

[39]   Dkt 49 at ¶ 24 (amended complaint); see also Dkt 125-153 at 6 (PX 153, Cooper declaration). The term *Anglo* is used in certain filings in a manner that appears substantially to mean *White*.

[40]   See Dkt 125-153 at 6–7 (PX 153, Cooper declaration).

[41]   See id at 6.

- o *Waller:* 1,433, consisting of 18.9% (271) Black, 69% (989) Anglo, and 10.7% (153) Latino;

- o *Katy:* 10,515, consisting of 3.5% (364) Black, 77.1% (8,102) Anglo, and 16.3% (1,712) Latino; and

- o *Prairie View:* 5,524, consisting of 79% (4,364) Black, with other percentages not specified in the record.[42]

56. Demographic trends suggest that the percentage of Black CVAP is decreasing in Prairie View and increasing in Brookshire and Hempstead. William Cooper (as Plaintiffs' expert demographer) compared the 2008–2012 and 2013–2017 Special Tabulations of the American Community Survey prepared by the US Census Bureau. He found that the percentage of Non-Hispanic Black CVAP in Prairie View decreased by 6.6%, while the percentage of Non-Hispanic Black CVAP increased in the other cities as follows: Brookshire (6.2%), Hempstead (13.3%), and Pattison (3.5%).[43] By contrast, the percentage of Non-Hispanic White CVAP increased in the cities of Prairie View and Brookshire and decreased in the cities of Hempstead and Pattison.[44]

57. Cooper's testimony also generally establishes that—as compared to White residents both in Prairie View and Waller County overall—Black residents of Prairie View are socioeconomically disadvantaged by reference to poverty rates, income, employment rates, transportation access, and educational attainment.[45] But Cooper also testified that those figures aren't reported for students who

---

[42]   Dkt 109-1 at ¶ 36 (joint stipulations of fact).

[43]   Dkt 125-153 at 9 (PX 153, Cooper declaration).

[44]   Ibid.

[45]   See Dkt 165 at 215:25–223:1 (5 Tr, Cooper testimony) and Dkt 125-153 at 13–17 (PX 153, Cooper declaration); see also Dkt 109-1 at ¶ 47 (joint stipulations of fact).

23

live in on-campus housing at PVAMU.[46] According to the 2010 US Census, there were 3,191 students living in those dormitories.[47] While Cooper does report census data for per capita income for dorm students, that statistic may not accurately represent the financial circumstances of students as it doesn't include income generated outside of Waller County (such as parental support).[48] Cooper also reports that of the Black dorm students who are employed, 48% walked to work, which means that more than half had access to another means of transportation.[49] His analysis shows that 46.8% of Black residents in Prairie View over the age of sixteen drove to work in their own vehicle and that another 11.5% carpooled.[50]

58. Cooper's data further shows that 33.2% of Black residents in Prairie View (and 15% in Waller County as a whole) have attained a bachelor's degree or higher. By comparison, only 16% of Anglo residents in Prairie View (and 26.2% in Waller County as a whole) have attained a bachelor's degree or higher.[51]

### 7. Instances of racial discrimination in voting in Texas and Waller County

59. Ultimate determination of disparate burden or intentional discrimination on minority voters requires detailed consideration of pertinent facts under specific legal standards. For example, see *Brnovich v Democratic National Committee*, 141 S Ct 2321 (2021) (requiring review of five factors set out as to discriminatory burden), *Thornburg v Gingles*, 478 US 30 (1986) (requiring review of nine factors set out as to social and historical voting-related discriminatory conditions), and *Village of Arlington Heights v Metropolitan Housing Development Corp*, 429 US

---

[46]   Dkt 165 at 237:12–238:6 (5 Tr, Cooper testimony).

[47]   Dkt 125-153 at 16 (PX 153, Cooper declaration).

[48]   Dkt 165 at 238:11–23 (5 Tr, Cooper testimony).

[49]   Dkt 125-153 at 16 (PX 153, Cooper declaration).

[50]   Id at 14–16 & 129.

[51]   Id at 13–14, 39 & 134.

252 (1977) (requiring review of five factors set out as to racially discriminatory intent).

60.  One of those factors considers "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Veasey v Abbott*, 830 F3d 216, 245 (5th Cir 2016), citing *Gingles*, 478 US at 36–37, in turn citing S Rep No 97-417 at 28–29 (1982). The parties submitted detailed admissions of fact on this factor.[52] It is adopted here in full as follows:

### Historical Discrimination in Texas

> After the end of the enslavement of Black Americans following the Civil War in the late 1800s, for much of the 20th century, Black Americans were denied the equal opportunity to vote in Texas through the "white primary" system and other policies and practices that unconstitutionally prevented Black Americans from participating in the franchise.

> Texas's history of racial discrimination in voting is documented and judicially recognized, including by this Court.

> One of the relatively early examples of Texas's history of racial discrimination in voting is the 1923 Terrell Law. The 1923 Terrell Law explicitly forbade Black Americans from participating in voting in the Democratic Primary at a time when Texas stood out as virtually a one-party state. In *Nixon v Herndon*, 273 US 536 (1927), the US Supreme Court ruled against the Terrell Act and the

---

[52]  See Dkt 109-1 at ¶¶ 20–34 (joint stipulations of fact).

constitutionality of the white primary system. *Id.*

The Supreme Court's decision in *Smith v Allwright*, 321 US 649 (1944), began the process of eliminating the white primary. But further obstacles—from poll taxes to violent intimidation—still existed that prevented most Black citizens from exercising their right to vote.

Since the passage of the Voting Rights Act ("VRA") in 1965, Texas and some local officials have adopted and maintained forms of voter suppression.

Between 1975—when Texas and its sub-jurisdictions came to be required to preclear all voting changes with the US Department of Justice or three-judge federal court in DC—and 2006, when Congress most recently reauthorized the VRA, the Department of Justice issued 201 objections to proposed Texas election changes under Section 5 of the VRA.

Some of the state's redistricting plans have been found to be discriminatory because they resulted in Black voters having less opportunity to participate in elections and elect candidates of their choice. A three-judge federal court found that "in every decade since 1970 Texas has passed one or more redistricting plans after the [decennial] census that have been declared either unconstitutional or violations of the VRA."

Following the 2010 Census, Texas failed to gain approval to enact state house and congressional redistricting plans under Section 5 of the VRA, requiring the State—with guidance from the US

Supreme Court in *Perry v Perez*, 656 US
388 (2012)—to implement remedial plans
to address the voting discrimination.

On June 25, 2013, the US Supreme
Court issued a decision, *Shelby County v
Holder*, 570 US 529 (2013), which
invalidated Section 4 of the VRA and thus
ended Texas's obligations under Section 5
of the VRA, the provision that had required
Texas and its sub-jurisdictions to preclear
all voting changes with the federal
government since 1975. Thereafter, on
June 25, 2018, the US Supreme Court in
*Abbott v Perez*, 138 S Ct 2309 (2018)
affirmed a federal three-judge court's
decision that found the Texas Legislature
racially gerrymandered a Latino-majority
State House district in Fort Worth. *Id.*

### Historical Discrimination in Waller County

The majority-Black city of Prairie View
and Texas's oldest historically Black
university, PVAMU, are located in Waller
County, Texas. The City of Prairie View
stands on parts of the former Alta Vista
plantation that enslaved Black people,
operated by Colonel Jared Ellison Kirby, a
direct descendent of Jared Ellison Groce,
one of the original 300 settlers in what
became the state of Texas.

Between 1971 and 1979, the Waller
County tax assessor-collector and voting
registrar, Leroy Symm, imposed residency
requirements on PVAMU students to
prevent them from registering and voting if
they could not prove they planned to reside
in Waller County after graduation. In 1976,
after [*sic*] the Waller County tax assessor-
collector and voting registrar required

PVAMU students to complete a questionnaire—not required by students attending the predominantly white University of Texas—to register to vote.

Thus, even after the passage of the VRA of 1965, the Waller County tax assessor-collector and voting registrar erected barriers to registering that prevented nearly all PVAMU students from voting in the 1972 presidential elections, the 1974 midterm elections, and the bicentennial election of 1976. A three-judge federal district court, in a ruling that was summarily affirmed by the Supreme Court, held that the tax assessor-collector and voting registrar applied an unconstitutional presumption of non-residency on the students and improperly denied Black PVAMU students the right to vote on that basis. *United States v Texas,* 445 F Supp 1245, 1262 (SD Tex 1978) (three-judge court), *aff'd sub nom Symm v United States,* 439 US 1105 (1979).

In 1992, the Waller County District Attorney indicted and attempted to prosecute PVAMU students for "illegally voting."

In 2003, then-Waller County District Attorney Oliver Kitzman, who was not involved in the prior attempted prose-cutions in 1992, was understood to have threatened to prosecute PVAMU students who did not meet his definition of being a Waller County resident, which directly contravened *Symm v United States*, 439 US 1105 (1979). Kitzman denied the allegations but acknowledged in hindsight that some PVAMU students could reasonably perceive that his statements

were threatening. At that time, PVAMU students comprised twenty percent of the voting-age population in Waller County.

Defendant Duhon testified to his general awareness of the historical allegations of voting discrimination directed at Black Waller County voters, including Black PVAMU students.

61. Plaintiffs reference and argue in their post-trial submissions other alleged incidents in 1990, 2002, 2006, 2008, and 2015.[53] Defendants don't stipulate to these, as they have to those above. These other events are specified—and additional findings made—where pertinent in the Conclusions of Law.

62. Likewise, other factors under *Brnovich*, *Gingles*, and *Village of Arlington Heights* are best understood in relation to the analysis under the legal standards themselves. Further findings of fact are thus specified in the Conclusions of Law as necessary below.

### 8. In-person early voting in Texas

63. In-person early voting (sometimes referred to as in-person absentee voting) is a form of convenience voting whereby registered voters can cast their ballot in person at a polling place before election day.[54]

64. The experts in this case agree that scientific research suggests that *convenience voting*—such as in-person early voting—is primarily used by voters who would have voted on election day in the first instance, as opposed to those who wouldn't have voted at all.[55] Thus, the experts

---

[53] See Dkt 175 at ¶¶ 68 (as to 1990), 71 (as to 2002), 74 (as to 2006), 75–77 (as to 2008) & 78–79 (as to 2015) (Plaintiffs' findings of fact).

[54] Dkt 168 at 74:13–75:6 (8 Tr, Gimpel testimony); Dkt 162 at 199:1–9 (2 Tr, Stein testimony).

[55] Dkt 162 at 199:10–200:3 (2 Tr, Stein testimony); Dkt 125-159 at 3–7 (PX 159, Stein report); Dkt 168

agree that early voting hasn't been shown to increase voter turnout.[56] In fact, research on the subject reveals the anomalous result that the introduction of in-person early voting has actually reduced overall turnout by eliminating the incentive for parties and campaigns to mobilize voters on election day.[57]

65. Plaintiffs largely ignore this, stressing instead the percentage of votes cast by early voting.[58] Dr Robert Stein (as Plaintiffs' political science expert) also expressly stated that he offered no opinion as to whether early voting played any role on the actual incidence of voting in either Prairie View or in Waller County as a whole.[59]

66. Neither the United States Constitution nor any other federal law requires a state to offer early voting. And as of the time of trial, at least six states—Connecticut, Kentucky, Mississippi, Missouri, New Hampshire, and South Carolina—didn't offer pre-election day in-person voting options.[60]

---

at 75:16–76:11 (8 Tr, Gimpel testimony); Dkt 124-1 at 24–74 (DX 2, Gimpel report).

[56]   Dkt 162 at 199:10–23 (2 Tr, Stein testimony); Dkt 168 at 76:6–77:3 (8 Tr, Gimpel testimony) and Dkt 124-1 at 24–74 (DX 2, Gimpel report).

[57]   Dkt 162 at 199:10–23 (2 Tr, Stein testimony); see also Dkt 168 at 76:12–77:3 (8 Tr, Gimpel testimony).

[58]   Dkt 175 at ¶ 318 (Plaintiffs' findings of fact), citing Dkt 125-18 (PX 18, 03/06/2018 Waller County Democratic Primary Canvas Report) and Dkt 125-19 (PX 19, 03/06/2018 Waller County Republican Primary Canvas Report).

[59]   Dkt 162 at 200:4–19 (2 Tr, Stein testimony).

[60]   See National Conference of State Legislatures, *State Laws Governing Early Voting*, as available at https://www.ncsl.org/research/elections-and-campaigns/early-voting-in-state-elections.aspx. Defendants cited to this link in their post-trial proposed findings of fact at a

67. For those states that do offer in-person early voting, the structure of such voting varies widely. Indeed, the period for early voting in different states ranges from three to forty-six days.[61] And although most states specify the hours and days for early voting, some leave that determination to election officials.[62] Others specify hours and days for in-person early voting at a permanent early voting place, while allowing local election authorities the discretion to offer early voting at temporary polling places and to set the days and hours at those places based on local need and resources.[63] Texas fell into this latter category at the time of the 2018 general election made the basis of this lawsuit.

68. The Texas Election Code only requires that in-person early voting be held at one location in each county. This is known as *the main early voting polling place*.[64] In a county in which the county clerk is also what's known as *the early voting clerk*, the main early voting polling place may be located in any room selected by the clerk that houses the county clerk's main business office.[65] This pertains to the situation in Waller County in 2018, where the election duties of the county clerk were permissibly transferred to Eason as the Elections Administrator.[66]

69. In Texas, the period for in-person early voting for a general election begins on the seventeenth day before election day and continues through the fourth day before

---

time when it showed Kentucky as being a state not offering pre-election-day in-person voting options. See also Dkt 178 at ¶ 17.

[61]   Ibid.

[62]   Ibid.

[63]   Ibid.

[64]   See Tex Elec Code §§ 81.001 & 85.002(a).

[65]   See Tex Elec Code § 85.002(b); see also Tex Elec Code § 31.043(3).

[66]   See above at ¶ 49.

election day.[67] In a county in which the county clerk is the early voting clerk, in-person early voting at the main early voting polling place must be conducted on each weekday of the early voting period.[68] In addition to the required weekday voting, the early voting clerk (or, as here, Eason as the Elections Administrator) has discretion to order voting at the main early voting polling place on one or more Saturdays or Sundays during the early voting period. He or she also has discretion to determine the times for weekend voting, if any.[69]

70.   In addition to the main early voting polling place, the Texas Election Code grants county commissioners courts the discretion to establish one or more of what's known as a *temporary branch polling place*.[70] At the time of the events at issue, and even with subsequent amendment, a county with a population of less than 100,000—such as Waller County—could conduct early voting at a temporary branch polling place on any days and during any hours of the period for early voting by personal appearance.[71] The Texas Election Code also states that "the schedules for conducting voting are not required to be uniform among the temporary branch polling places."[72] Subject to exceptions not applicable here, eligible voters from anywhere in the county wishing to vote early and in person may do so at the main early voting polling place or at any temporary branch polling place within the county.[73]

---

[67]   See Tex Elec Code § 85.001.

[68]   See Tex Elec Code § 85.005(a).

[69]   See Tex Elec Code § 85.006; see also Tex Elec Code § 85.007.

[70]   See Tex Elec Code § 85.062(a)(1).

[71]   See Tex Elec Code § 85.065(a) & (b).

[72]   See Tex Elec Code § 85.065(d).

[73]   See Tex Elec Code §§ 85.003 & 85.066(a).

### 9.   Voting in Waller County

#### a.   Process for setting the voting schedule

71. Under the Texas Election Code, the county commissioners court is the body charged with setting the locations and hours of operation for early in-person voting in elections held or run by a particular county.[74]

72. The Waller County Commissioners Court is the governing body responsible for serving all voters in Waller County. As such, it must allocate available resources (including voting machines, poll workers, and election officials) in a manner that provides every voter in Waller County the opportunity to cast an early ballot should they want to do so.[75]

73. Waller County has generally used the same practice for setting the early voting places and schedule since the 1990s.[76]

74. The Elections Administrator coordinates with the local chairs for the two active political parties in Waller County—the Democratic and Republican parties—to propose a schedule for adoption and approval by the Waller County Commissioners Court.[77]

75. Texas law actively contemplates the participation of local party chairs in the county election process in a variety of ways.[78] For example, as found above, the county chair of each political party that made nominations in the most recent general election is a statutory member of the

---

[74]   See Tex Elec Code § 85.002(c).

[75]   Dkt 170 at 84:19–86:11 (10 Tr, Duhon testimony).

[76]   Dkt 166 at 242:7–243:14 (6 Tr, Eason testimony); Dkt 170 at 88:1–89:11 (10 Tr, Duhon testimony); Dkt 169 at 169:12–171:18 (9 Tr, Barnett testimony); Dkt 169 at 15:13–16:14 (9 Tr, Beckendork testimony); Dkt 162 at 239:5–9 (2 Tr, Stein testimony); Dkt 124-1 at 51 (DX 2, Gimpel report).

[77]   Dkt 166 at 242:7–243:25 (6 Tr, Eason testimony).

[78]   Id at 244:1–245:1.

county election commission, which, among other things, appoints the elections administrator.[79] The Election Code also requires the elections administrator of each county to select election officials for each early voting polling place from a list submitted by the county chair of each political party that holds a primary election in the county.[80]

76. The only political parties in Waller County that nominate candidates or hold primary elections are the Republican and Democratic parties.[81] It's thus expressly found that it's both reasonable and consistent with Texas state law for Eason, as the Elections Administrator for Waller County, to consult with local Democratic and Republican party chairs in setting voting schedules.

77. Beyond coordination with the local party chairs, Eason prepares a plan based on locations and hours used in past elections, as well as her evaluation of local voting needs based on various factors that include historical usage, the number of registered voters in an area, the competitiveness of a particular election, the number and availability of poll workers and the time it takes to train them, the availability of voting machines and equipment, and the accessibility and ease of use of a given location.[82]

78. Eason then reviews her proposal with the local party chairs who propose any necessary changes.[83]

79. Eason is without question competent to prepare initial voting plans according to these factors. Plaintiffs contend that she prepared the initial recommendation

---

[79]   Tex Elec Code § 31.032(a); see also Dkt 170 at 90:6–23 (10 Tr, Duhon testimony).

[80]   Tex Elec Code § 85.009.

[81]   Dkt 166 at 243:15–25 (6 Tr, Eason testimony); Dkt 170 at 91:1–11 (10 Tr, Duhon testimony).

[82]   Dkt 166 at 242:7–15 & 252:11–261:19 (6 Tr, Eason testimony).

[83]   Id at 242:16–25 & 245:2–18.

without disclosing the pertinent criteria.[84] Even so, Dr Robert Stein (as Plaintiffs' voting and elections expert) testified that the above criteria are typical factors that counties consider in setting early voting schedules.[85]

80. Of note, Waller County has a preference for county-owned and/or controlled locations because it's then able to control access and security to the building.[86] Locations that aren't county-owned frequently present issues because Waller County must then rely on a third party to grant election workers access to the polling place and to lock up after voting.[87] And indeed, this was corroborated by testimony concerning incidents during the 2018 primary and general elections when voting took place in the auditorium of the MSC. On one occasion, voting equipment was moved by non-voting personnel into the hallway. On another, the auditorium was inadvertently left unlocked, with PVAMU students then using it as a rehearsal space for a performance.[88] Nothing about that compromised the integrity of the election, and Defendants worked with PVAMU to resolve the issue.[89]

81. Once necessary changes have been made and the plan is agreed to by the local party chairs, Eason submits the agreed schedule to the Waller County Commissioners Court for approval at a public meeting.[90] In advance of that

---

[84]   See Dkt 176 at 44–47 (Plaintiffs' post-trial brief).

[85]   Dkt 162 at 238:15–239:4 (2 Tr, Stein testimony).

[86]   Dkt 166 at 260:2–24 (6 Tr, Eason testimony); see also Dkt 178 at ¶ 27 (Defendants' findings of fact) and accompanying citations.

[87]   For example, see Dkt 167 at 54:13–55:18 (7 Tr, Eason testimony).

[88]   Id at 55:22–58:9.

[89]   Dkt 163 at 146:16–147:9 (3 Tr, Jackson testimony); Dkt 167 at 58:10–13 (7 Tr, Eason testimony).

[90]   Dkt 166 at 242:7–246:16 (6 Tr, Eason testimony); Dkt 170 at 88:1–89:11 (10 Tr, Duhon testimony); Dkt 169

meeting, both the agenda and relevant schedules are posted in accordance with the Texas Open Meetings Act.[91]

82. Texas law requires entities holding elections to order the election at least seventy-eight days before a uniform election date.[92] The Texas Secretary of State further recommends that the notice of election contain the branch early voting polling places and the hours and dates for early voting.[93] There are also posting and notice requirements for ordering an election, both for Waller County and for the other political subdivisions for which Eason conducts elections.[94] To meet these deadlines and the Secretary's recommendation, Eason works on the election schedule during the summer months before the November election. This allows her to order the election in an orderly fashion and gives the other political subdivisions for which she conducts elections ample time to post their legally required notices.[95] Eason gave uncontroverted testimony that the timeframes in which Waller County has set its election schedules have remained the same for the time that she has been the Elections Administrator.[96] And Frank Jackson confirmed from his experience as a former Waller County Commissioner that the timing of Eason's schedule was consistent with Waller

---

at 169:18–171:18 (9 Tr, Barnett testimony); Dkt 169 15:13–17:14 (9 Tr, Beckendorff testimony).

[91]   Dkt 166 at 251:5–18 (6 Tr, Eason testimony); Tex Gov Code §§ 551.002 & 551.041

[92]   Tex Elec Code § 3.005(c).

[93]   Dkt 166 at 249:18–250:8 (6 Tr, Eason testimony); see also Dkt 125-166 at 3 (PX 166, 11/06/2018 Texas Secretary of State Election Law Calendar).

[94]   Tex Elec Code § 4.003; Dkt 166 at 248:15–249:11 (6 Tr, Eason testimony).

[95]   Dkt 166 at 246:17–247:13 & 249:12–250:20 (6 Tr, Eason testimony).

[96]   Id at 250:21–24.

County's practices.[97] Eason gave further unrebutted testimony that, based on her knowledge as the Elections Administrator, the timeframe used by Waller County to set its elections is generally consistent with other counties throughout the state.[98]

### b. History of voting locations
#### i. For voting on election day

83. Waller County has a longstanding practice dating at least to the early 1990s of placing election day polling places on and near the PVAMU campus.[99] For example, the former PVAMU Student Center (which was demolished and rebuilt into the current MSC, completed in 2003) was used as an election day site in the general elections of 1994, 1996, and 1998 for what's now the current Precinct 309.[100] And a site called the Newman Center (which was once the Catholic student center) across the street from Owens Road (which bounds the south side of campus) was used as an election day polling place during this same period for what's now the current Precinct 310.[101]

84. From 2000 through 2012, Waller County provided an election day polling place for Precinct 309 at the location of the present-day WCCC, which was formerly the Smith, Coleman & Kemp Community Center (or *SCKCC*).[102] For the same period in Precinct 310, Waller County held election day voting at either the Newman Center, the

---

[97] Dkt 164 at 62:17–23 (4 Tr, Jackson testimony).

[98] Dkt 166 at 250:25–251:4 (6 Tr, Eason testimony).

[99] Dkt 136-1 (DX 3, Waller County polling history); Dkt 171 at 181:23–183:8 (11 Tr, Jackson testimony).

[100] Dkt 163 at 87:19–89:20 (3 Tr, Jackson testimony); Dkt 164 at 20:20–21:4 (4 Tr, Jackson testimony); Dkt 136-1 at 2–5 (DX 3, Waller County polling history).

[101] Dkt 136-1 at 2–5 (DX 3, Waller County polling history).

[102] Id at 6–13; see also Dkt 164 at 21:5– 17 (4 Tr, Jackson testimony).

SCKCC, the PVAMU National Alumni Association, or the Prairie View City Hall.[103]

85.  In July of 2013, Priscilla Barbour, who at that time was the PVAMU Student Government Association president, wrote a letter to then-Waller County Judge Glenn Beckendorff requesting an on-campus polling place.[104] Barbour copied several officials along with Defendant Jeron Barnett, who was then (and at the time of trial) the Waller County Commissioner for Precinct 3 covering Prairie View.[105] Commissioner Barnett responded.[106] He reached out to Barbour by phone to inform her that he and then-Elections Administrator Robyn German received her correspondence.[107]

86.  Commissioner Barnett then scheduled a meeting with Barbour, German, and Frank Jackson at a local Denny's restaurant to discuss Barbour's request.[108] Commissioner Barnett was supportive of Barbour's request, and he in turn contacted County Judge Beckendorff to request that he put the location of a polling place at PVAMU on the agenda of the Waller County Commissioners Court.[109] County Judge Beckendorff did so, and the Waller County Commissioners Court approved an

---

[103]  Dkt 136-1 at 6–13 (DX 3, Waller County polling history).

[104]  Dkt 125-94 (PX 94, Barbour letter to Beckendorff); Dkt 162 at 45:6–15 (2 Tr, Barbour testimony).

[105]  Dkt 125-94 (PX 94, Barbour letter to Beckendorff); Dkt 162 at 45:11–15 (2 Tr, Barbour testimony).

[106]  Dkt 162 at 45:16–19 (2 Tr, Barbour testimony).

[107]  Id at 45:16–21.

[108]  Id at 87:13–87:25; Dkt 169 at 171:23–172:14 (9 Tr, Barnett testimony).

[109]  Dkt 162 at 88:5–11 (2 Tr, Barbour testimony); Dkt 169 at 172:15–23 (9 Tr, Barnett testimony).

election day polling place on the PVAMU campus at the MSC.[110]

87. Since that time, Waller County has continuously maintained an election day polling place at the MSC for county-held elections, and there has been no effort to remove that location.[111]

### ii.  For early voting prior to 2016

88. Waller County originally offered the Waller County Elections Office in Hempstead as the only location for early voting.[112] The move from this single, central early voting site to two sites occurred with the 1994 general election.[113] The second location was opened in the southern end of Waller County at the Waller County Tax Office Annex in Brookshire.[114] Early voting continued through the 2000 election at these two sites, with one exception. Waller County in 1998 also offered one day of early voting at PVAMU in the former student center, and one day of early voting in Fields Store at the Justice of the Peace No 2 Annex.[115]

89. Waller County added more early voting sites in 2002. An early voting place was that year made available at the edge of the PVAMU campus at the site of the present-day WCCC, which at that time was the SCKCC.[116] Brookshire and the main early voting polling place in Hempstead received the most hours (with thirty and

---

[110]  Dkt 162 at 88:12–91:23 (2 Tr, Barbour testimony); Dkt 169 at 172:24–173:2 (9 Tr, Barnett testimony).

[111]  Dkt 169 at 19:16–20:4 (9 Tr, Beckendorff testimony); Dkt 169 at 173:3–9 (9 Tr, Barnett testimony); Dkt 170 at 97:10–25 (10 Tr, Duhon testimony).

[112]  Dkt 136-1 (DX 3, Waller County polling history).

[113]  Id at 1–3.

[114]  Ibid.

[115]  Id at 1–7.

[116]  Id at 7–18; see also Dkt 164 at 21:9–22:5 (4 Tr, Jackson testimony).

ninety-nine hours, respectively), with Katy and Fields Store receiving the fewest (with seven hours each). By contrast, Prairie View received two seven-hour days, for a total of fourteen hours.[117] Importantly, other growing parts of Waller County received no nearby early voting places, and certainly none as near to their residences as those situated in Prairie View are to the people who reside there.[118]

90.  In each general election from 2004 through 2012, Waller County sited early voting in Prairie View at the SCKCC.[119] After the 2012 election, the SCKCC was demolished so that Waller County could construct the new $1.2 million WCCC, which was finished in 2016.[120] And so for the general election in 2014, Waller County sited early voting at the Prairie View Alumni Building and at the St Francis Episcopal Church.[121] While relatively close to the WCCC, that church is located a bit farther from PVAMU, being across FM 1098 at its southern boundary.

### iii. For early voting in 2016

91. The Waller County Commissioners Court met on December 16, 2015, to set the election schedule for the March 2016 primary.[122] Prior to that meeting, Waller County hadn't sited early voting at the MSC.[123] And the

---

[117]  Dkt 136-1 at 7–18 (DX 3, Waller County polling history).

[118]  Id at 7–8; see also Dkt 166 at 163:5–15 (6 Tr, Roland testimony).

[119]  Dkt 136-1 (DX 3, Waller County polling history); see also Dkt 164 at 21:19–17 (4 Tr, Jackson testimony).

[120]  Dkt 170 at 120:24–121:19 (10 Tr, Duhon testimony).

[121]  Dkt 136-1 at 15–16 (DX 3, Waller County polling history).

[122]  Dkt 170 at 100:4–102:3 (10 Tr, Duhon testimony); Dkt 143-1 (DX 87, 12/16/2015 agenda).

[123]  Dkt 136-1 at 1–16 (DX 3, Waller County polling

early voting proposal by then-Elections Administrator Dan Teed for the March primary sited early voting in Prairie View at the Prairie View City Hall.[124] Teed's proposed schedule also included several other temporary branch locations with varying hours throughout Waller County, including in Hockley and Fields Store in Commissioner Precinct 2, Monaville in Commissioner Precinct 3, and Brookshire and Katy in Commissioner Precinct 4.[125]

92.   The local Democratic and Republican party chairs at the time were Ben Tibbs and Wallace Koenig, respectively. They attended the December 16th meeting and presented their agreed proposal to hold early voting at only two locations for the entire early voting period—in the north and south of Waller County at Hempstead and Brookshire.[126] Koenig spoke first and stated that their rationale was to provide a simple, less confusing schedule, rather than varied locations, days, and hours.[127] He noted that Republicans were expecting very large turnout because of the many candidates competing in the 2016 presidential primary. Tibbs followed and stated agreement that it would be good to have fewer locations because people still complained that they didn't know where to vote.[128] Teed expressed concerns about the distance that voters in Precinct 2 in the northeast corner of Waller County would have to travel, but he nevertheless assured the Waller County Commissioners Court that the proposal

---

history); see also Dkt 169 at 175:2–5 (9 Tr, Barnett testimony); Dkt 170 at 130:16–131:10 (10 Tr, Duhon testimony).

[124]   Dkt 143-1 at 4 & 8 (DX 87, 12/16/2015 agenda).

[125]   Ibid.

[126]   Dkt 124-1 at 178, timestamp 0:55:42–0:59:37 (DX 30, 12/16/2015 Commissioners Court—Hearing).

[127]   Id at timestamp 0:59:38–1:01:40.

[128]   Id at timestamp 1:01:41–1:02:58.

was legal.[129] No one spoke in objection to that plan.[130] The Waller County Commissioners Court then passed the proposal by Tibbs and Koenig based on their apparent agreement.[131]

93.  Teed then emailed County Judge Duhon the next day, informing him that "upon the emailed request of the Democratic Party Chair, I have submitted an agenda item for the court to reconsider the early voting locations and hours."[132] Teed stated that he intended to resubmit his original proposal from the night before.[133] In response, County Judge Duhon placed the item on the agenda for the next meeting of the Waller County Commissioners Court on December 23, 2015.[134] It there took up Teed's proposal and voted unanimously to approve it with an amendment from Commissioner Barnett, moving the location in Prairie View to the "St. Francis Episcopal Church, if no permission the Panther Plaza, if no permission then Prairie View City Hall."[135]

94. Dr Denise Mattox was at that time the Waller County Democratic Club President. Shortly after the December 23, 2015 meeting, she emailed Teed to request that an early voting place be sited on the PVAMU campus.[136] Teed responded that he was amenable to this siting "if the law can be followed and if the hurdles

---

[129] Id at timestamp 1:03:02–1:04:15 & 1:18:54–1:20:11.

[130] Id at timestamp 1:25:11–1:25:41.

[131] Id at timestamp 0:55:42–1:04:17; see also id at timestamp 1:10:30–1:26:00.

[132] Dkt 124-1 at 164 (DX 24, Teed/Duhon email).

[133] Ibid.

[134] Dkt 170 at 111:24–112:16 (10 Tr, Duhon testimony).

[135] Id at 113:9–17; Dkt 124-1 at 87–92 (DX 8, 12/23/2015 minutes).

[136] Dkt 124-1 at 167–69 (DX 26, Teed/Mattox email).

regarding elderly or walking distance limited people can be overcome."[137] Teed contacted County Judge Duhon, who again put the request on the agenda for the next meeting of the Waller County Commissioners Court on January 20, 2016.[138]

95. There was consensus at that meeting about the placement of an early voting place on campus. But there was also concern about whether the MSC was the appropriate location.[139] In particular, concerns were raised about whether the building was accessible for the non-student residents of Prairie View, who tended to be older. At least one such resident addressed the Waller County Commissioners Court and stated that he felt the walk from the parking lot and up the ramps into the MSC was an impediment.[140] The Commissioners heard similar complaints from others.[141]

96. Additional concerns were stated about parking at the MSC.[142] Notably, the WCCC at this time was still being built and wasn't an option for early voting, although some did suggest the Panther Plaza on campus as a possible

---

[137]   Ibid.

[138]   Dkt 170 at 114:18–115:13 & 117:17–118:7 (10 Tr, Duhon testimony); Dkt 143-2 (DX 88, 01/20/2016 agenda).

[139]   Dkt 170 at 119:2–20 (10 Tr, Duhon testimony); Dkt 169 at 180:1–12 (9 Tr, Barnett testimony).

[140]   Dkt 170 at 119:2–20 (10 Tr, Duhon testimony); Dkt 124-1 at 180, timestamp 0:09:45–0:15:07 (DX 32, 01/20/2016 Commissioners Court—Hearing).

[141]   Dkt 170 at 119:2–20 (10 Tr, Duhon testimony); Dkt 169 at 176:22–179:13 (9 Tr, Barnett testimony); Dkt 124-1 at 167–69 (DX 26, Teed/Mattox email); but see Dkt 169 at 175:6–176:21 (6 Tr, Barnett testimony, not specifically recollecting public comment about accessibility concerns at MSC as of January 2016).

[142]   Dkt 170 at 119:2–20 (10 Tr, Duhon testimony); Dkt 169 at 42:5–20 (9 Tr, Beckendorff testimony).

alternative.[143] Accordingly, the issue was tabled to obtain additional information about other locations.[144]

97. Commissioner Barnett emailed PVAMU employee Alisha Lowe after the meeting, stating, "I and my colleagues are for having early voting on the PVAMU campus and that will happen! I just want to ensure that since [*sic*] seniors, handicapped and others who may have difficulty due to age or physical impairment can get to the polling spot as safely as possible."[145] Commissioner Barnett asked Lowe to examine the Panther Plaza.[146]

98. Ultimately, Teed did an analysis of various locations on the campus and concluded that the MSC would be an acceptable location so long as there was also voting for non-students at the St Francis Episcopal Church.[147] In addition, PVAMU made assurances that it would reserve adequate parking, provide assistance for elderly voters, and provide a secure location for early voting.[148]

99. The next meeting of the Waller County Commissioners Court occurred on January 27, 2016. It unanimously approved early voting on campus at the MSC despite some of the Commissioners still having concerns about its suitability.[149] In particular, for the March

---

[143] Dkt 124-1 at 180, timestamp 0:12:04–0:12:17 (DX 32, 01/20/2016 Commissioners Court—Hearing); Dkt 169 at 179:9–19 (9 Tr, Barnett testimony); Dkt 170 at 123:2–124:4 (10 Tr, Duhon testimony).

[144] Dkt 124-1 at 80, timestamp 1:41:33–1:41:46 (DX 32, 01/20/2016 Commissioners Court—Hearing); Dkt 170 at 122:14–25 (10 Tr, Duhon testimony).

[145] Dkt 124-1 at 177 (DX 29, Barnett/Lowe email).

[146] Ibid; see also Dkt 169 at 182:12–19 (9 Tr, Barnett testimony).

[147] Dkt 125-80 (PX 80, Teed PVAMU location analysis).

[148] Dkt 169 at 43:2–24 (9 Tr, Beckendorff testimony).

[149] Dkt 170 at 130:22–25 (10 Tr, Duhon testimony); see

primary in 2016, Waller County sited two days for a total of nineteen hours at the MSC, and an additional eighteen hours over two days at the St Francis Episcopal Church.[150]

100. Members of this first Waller County Commissioners Court to site early voting on campus at PVAMU included current County Judge Duhon and Commissioners Barnett and Beckendorff.[151]

101. Waller County also extended the same locations and hours to the general election.[152] And so, for early voting during the general election in November 2016, Waller County again sited two days for a total of eighteen hours at the MSC, and an additional eighteen hours over two days at the St Francis Episcopal Church.[153]

### c. Comparison to similar Texas counties

102. The recent and consistent placement by Waller County of a temporary branch polling place at or close to PVAMU also favorably distinguishes it from many other comparably sized counties in Texas with a college campus.[154] The following chart prepared by Dr James Gimpel (as Defendants' elections and voting expert) reflects comparable counties in Texas.[155]

---

also Dkt 124-1 at 98–104 (DX 10, 01/27/2016 minutes).

[150] Dkt 124-1 at 98 (DX 10, 01/27/2016 minutes).

[151] Dkt 170 at 130:22–131:10 (10 Tr, Duhon testimony).

[152] Dkt 136-1 at 15–16 (DX 3, Waller County polling history); Dkt 170 at 132:8–19 (10 Tr, Duhon testimony).

[153] Dkt 136-1 at 15–16 (DX 3, Waller County polling history).

[154] Dkt 124-1 at 43–51 (DX 2, Gimpel report); Dkt 168 at 87:11–101:22 (8 Tr, Gimpel testimony).

[155] Dkt 124-1 at 44 (DX 2, Gimpel report).

**Table 1.**

| Comparison of Similarly Sized Counties with College Campuses in Texas[156] | | | |
|---|---|---|---|
| **County** | **2017 Population** | **College** | **Students** |
| Erath | 41,969 | Tarleton State Univ | 13,011 |
| Hunt | 93,872 | Texas A&M Univ—Commerce | 13,065 |
| Kleberg | 31,088 | Texas A&M Univ—Kingsville | 8,682 |
| Nacogdoches | 65,580 | Stephen F. Austin State Univ | 12,614 |
| Randall | 134,442 | West Texas A&M Univ | 10,169 |
| Tom Green | 118,019 | Angelo State Univ | 10,362 |
| Victoria | 92,082 | Univ of Houston—Victoria | 4,427 |
| Walker | 72,245 | Sam Houston State Univ | 20,398 |
| Waller | 51,307 | Prairie View A&M Univ | 9,431 |

---

[156]  See Dkt 124-1 at 44 (Gimpel report, Table 6), citing Texas State Data Center for population estimates and Texas Higher Education Coordinating Board for enrollment information.

103.   Plaintiffs correctly note that none of the above colleges or universities have comparable student demographic populations—that is, none is a historically Black or currently majority-Black university or college, and none is situated amid a largely White, non-student, older population in Texas.[157] Another point of clarification is that this comparison doesn't consider socioeconomic indicators such as poverty rates or vehicle ownership and public or private access to transportation; the rates at which students at the comparator schools are registered to vote in those counties; and the frequency at which student voters at those schools use early voting as compared to election day voting.[158]

104.   Even so, there's no question that policies do vary widely at local discretion. And except for Waller County, none of the counties listed in Table 1 place an election day precinct polling place on a college or university campus—much less an early voting site. Quite simply, there's no common tradition or practice in Texas among mid-sized counties of placing precinct polling places directly on a campus in the way that Waller County has for PVAMU.[159]

105.   Likewise, none of the off-campus early voting places offered by the other counties in Table 1 were as close to the college campus as the WCCC is to PVAMU. Even much larger counties in Texas didn't place early voting as close to college campuses as Waller County did. For example, Texas Southern University is a historically Black university, has a higher enrollment than PVAMU, and is located in the much larger Harris County. But in 2018, the

---

[157]   Dkt 165 at 128:20–130:6 (5 Tr, Flores testimony); Dkt 125-157 at 4–9 (PX 157, Flores rebuttal report); see also Dkt 168 at 87:11–13, 91:11–13 & 191:18–197:15 (8 Tr, Gimpel testimony).

[158]   Dkt 168 at 197:16–199:11 (8 Tr, Gimpel testimony).

[159]   Id at 87:11–101:18; see also Dkt 124-1 at 44 (DX 2, Gimpel report).

nearest early voting place was more than three miles away from campus.[160]

106.  Waller County thus stands out in its history of providing early voting opportunities either directly on or very close to the PVAMU campus.[161]

### 10. Adoption of the early voting schedule for the 2018 general election

107.  The Waller County Commissioners Court held a public meeting on August 22, 2018. As Elections Administrator, Eason notified the Commissioners in advance by email that the early voting places for the 2018 general election were to be approved at that meeting, but that the dates and times for voting would be finalized after the Elections Office completed training on its new voting equipment.[162] The meeting agenda (including the adoption of voting locations) was itself publicly posted on the Waller County website at least three days in advance of the meeting.[163]

108.  At the August 22nd meeting, Eason submitted for approval the early voting places and days for the 2018 general election.[164] The proposed locations were consistent with the election schedule from the 2018 primary.[165] This included three days of early voting at the MSC during the first week and two days of early voting at the WCCC during the second week. County Judge Duhon testified that he spoke to Eason that morning and asked her if the local

---

[160]  Dkt 168 at 99:20–100:4 (8 Tr, Gimpel testimony); Dkt 124-1 at 48 (DX 2, Gimpel report).

[161]  Dkt 168 at 92:20–101:22 (8 Tr, Gimpel testimony); see also Dkt 124-1 at 50–51 (DX 2, Gimpel report).

[162]  Dkt 124-1 at 133–36 (DX 16, 08/22/2018 agenda); Dkt 166 at 272:7–274:25 (6 Tr, Eason testimony).

[163]  Dkt 109-1 at ¶ 67 (joint stipulations of fact); Dkt 166 at 272:7–9 (6 Tr, Eason testimony).

[164]  Dkt 109-1 at ¶¶ 60 & 64 (joint stipulations of fact); see also Dkt 125-114 (PX 114, 08/22/2018 minutes); Dkt 166 at 272:7–9 (6 Tr, Eason testimony).

[165]  Dkt 167 at 12:10–25 (7 Tr, Eason testimony).

party chairs were on the same page and in agreement. Eason informed him that they were.[166]

109. When Eason initially conceived the schedule for the 2018 general election, it included early voting at the MSC during the first week of the early voting period, along with additional hours at the WCCC during the second week.[167] But the local chair of the Democratic party asked at the August 22nd meeting to move the on-campus early voting days at the MSC into the second week. This was due to concern of potential conflicts with crowds and parking during the PVAMU homecoming, which coincided with the first week of early voting.[168] Eason made that change, and the local chairs of the Democratic and Republican parties agreed to the revised schedule.[169]

110. The Waller County Commissioners Court took up this revised schedule again at its next public meeting on September 5, 2018, as part of the comprehensive order setting the election.[170] Both the agenda for the meeting and the election order were once again publicly posted prior to the meeting.[171] No one attended the meeting to oppose or otherwise express concern about the proposed schedule.[172] The item passed unanimously without discussion, given the absence of opposition and the agreement of the local

---

[166] Dkt 124-1 at 182, timestamp 0:03:10–0:03:29 (DX 34, 08/22/2018 Commissioners Court—Hearing); see also Dkt 167 at 133:3–134:17 (7 Tr, Eason testimony).

[167] Dkt 166 at 261:20–23 (6 Tr, Eason testimony).

[168] Id at 267:24–268:13.

[169] Ibid.

[170] Dkt 124-1 at 153–58 (DX 18, 09/05/2018 agenda); Dkt 166 at 282:25–283:14 (6 Tr, Eason testimony).

[171] Dkt 166 at 283:23–284:10 (6 Tr, record of stipulation of fact); Dkt 109-1 at ¶ 68 (joint stipulations of fact).

[172] Dkt 109-1 at ¶ 69 (joint stipulations of fact); Dkt 170 at 142:11–16 (10 Tr, Duhon testimony); see also Dkt 124-1 at 138–41 (DX 17, 09/05/2018 minutes).

Democratic and Republican party chairs to the schedule.[173]

111. The schedule adopted by the Waller County Commissioners Court was as follows:[174]

**Figure 2.**

| 2018 GENERAL ELECTION WALLER COUNTY AND ROYAL ISD | EARLY VOTING LOCATIONS | |
|---|---|---|
| DURING EARLY VOTING ALL PRECINCTS AND ENTITIES CAN VOTE AT ANY LOCATION | | |
| **WEEK ONE** | | |
| MONDAY – FRIDAY October 22 – 26, 2018 | Waller County Courthouse 836 Austin St, Hempstead, Tx | 8am – 5pm |
| SATURDAY October 27, 2018 | | 9am – 2pm |
| SUNDAY October 28, 2018 | | 12pm – 5 pm |
| MONDAY – FRIDAY October 22 – 26, 2018 | Waller ISD Admin Bldg 2214 Waller St., Waller, Tx | 8am – 5pm |
| SATURDAY October 27, 2018 | | 9am – 2pm |
| MONDAY – FRIDAY October 22 – 26, 2018 | Waller Co Library Brookshire 3815 6th St., Brookshire, Tx | 8am – 5pm |
| SATURDAY October 27, 2018 | | 9am – 2pm |
| SUNDAY October 28, 2018 | | 12pm – 5 pm |
| THURSDAY – FRIDAY October 25 – 26, 2018 | Fieldstore County Bldg, JP 2 27388 Fieldstore Rd., Waller, Tx | 8am – 5pm |
| SATURDAY October 27, 2018 | | 9am – 2pm |
| THURSDAY – FRIDAY October 25 – 26, 2018 | Monaville County Bldg., JP 3 12620 FM 1887, Hempstead, Tx | 8am – 5pm |
| SATURDAY October 27, 2018 | | 9am – 2pm |
| MONDAY – WEDNESDAY October 22 – 24, 2018 | Katy VFW 6206 George Bush Dr., Katy, Tx | 8am – 5pm |
| **WEEK TWO** | | |
| MONDAY – WEDNESDAY October 29 – 31, 2018 | Waller Co Courthouse 836 Austin St, Hempstead, Tx | 8am – 5pm |
| THURSDAY - FRIDAY November 1 – 2, 2018 | | 7am – 7pm |
| MONDAY – WEDNESDAY October 29 – 31, 2018 | Waller ISD Admin Bldg 2214 Waller St., Waller, Tx | 8am – 5pm |
| THURSDAY - FRIDAY November 1 – 2, 2018 | | 7am – 7pm |
| MONDAY – WEDNESDAY October 29 – 31, 2018 | Waller Co Library Brookshire 3815 6th St., Brookshire, Tx | 8am – 5pm |
| THURSDAY - FRIDAY November 1 – 2, 2018 | | 7am – 7pm |
| MONDAY – WEDNESDAY October 29 – 31, 2018 | Memorial Student Center PVAMU , Prairie View, Tx | 8am – 5pm |
| THURSDAY – FRIDAY November 1 – 2, 2018 | WC Community Center – PV FM 1098, Prairie View, Tx | 7am – 7pm |

[173] Dkt 109-1 at ¶ 69 (joint stipulations of fact).

[174] Dkt 124-1 at 163 (DX 23, November 2018 schedule).

112. To be clear, the cities of Hempstead and Waller didn't have two polling places, as it may appear. The city designations in the above figure are based on the zip code for the particular polling place as set by the US Postal Service, which isn't necessarily reflective of the actual geographic location of the polling place.

113. For example, Fields Store is located in a zip code assigned by the USPS to the City of Waller, while actually being an unincorporated area located several miles away.[175] Indeed, the Fields Store early voting place at 27588 Fields Store Road is approximately eight miles away from the Waller ISD Administration Building, the polling place in the City of Waller.[176] Similarly, although Monaville is within the zip code for Hempstead, it's an unincorporated town largely within Commissioner Precinct 3.[177]

114. Under the plan adopted by Waller County on September 5, 2018, the breakdown among the various early voting polling places by city and CVAP majority was as follows:

---

[175] Dkt 170 at 156:21–157:7 (10 Tr, Duhon testimony); Dkt 166 at 235:4–236:10 (6 Tr, Eason testimony).

[176] Dkt 170 at 156:21–157:7 (10 Tr, Duhon testimony); Dkt 166 at 235:4–236:10 (6 Tr, Eason testimony).

[177] Dkt 169 at 223:7–11 (9 Tr, Barnett testimony).

**Table 2.**

| Waller County Voting Plan as adopted on September 5, 2018[178] | | | | | |
|---|---|---|---|---|---|
| **Polling Place** | City | Hours, Week 1 | Hours, Week 2 | Early Voting Hours, Total | CVAP Majority |
| Waller County Courthouse | Hempstead | 55 | 51 | 106 | Black |
| Waller ISD Admin Bldg | Waller | 50 | 51 | 101 | White |
| Brookshire Library | Brookshire | 55 | 51 | 106 | Black |
| Fields Store County Bldg | Unincorporated | 23 | 0 | 23 | White |
| Monaville County Bldg | Unincorporated | 23 | 0 | 23 | White |
| Katy VFW | Katy | 27 | 0 | 27 | White |
| MSC | Prairie View | 0 | 27 | 27 | Black |
| WCCC | Prairie View | 0 | 24 | 24 | Black |

---

[178] Data derived from Dkt 124-1 at 157 (DX 20, 09/05/2018 agenda); see also Dkt 109-1 at ¶ 71–74 (joint stipulations of fact).

115. This plan as adopted by the Waller County Commissioners Court appears facially neutral as to both race and age. It allocated the greatest number of early voting hours to Hempstead and Brookshire, both of which have a majority-Black CVAP. And by comparison to majority-White CVAP areas, the Prairie View area had more total early voting hours than Katy and the unincorporated areas serviced by Fields Store and Monaville. Waller was the only majority-White CVAP area to exceed Prairie View's early voting hours.

116. The adopted locations were also consistent with historical placement of polling places and hours. In fact, the initial schedule adopted by the Waller County Commissioners Court didn't reduce or eliminate early voting hours or locations in Prairie View from past elections.[179] Rather, even as initially adopted, Waller County's early voting schedule for the 2018 general election actually expanded the number of early voting hours in Prairie View from previous elections.[180]

117. As to locations, they conformed to efforts by Waller County to provide early voting opportunities throughout its jurisdiction.[181] And plainly, many other towns and rural areas in Waller County received no nearby early voting places at all. Voters from those areas who wanted to vote early and in person had to travel to one of the other polling places to do so.[182]

118. Review of only the sites for voting on election day itself best simplifies comprehension of the relative

---

[179] Dkt 136-1 (DX 3, Waller County polling history); Dkt 124-1 at 42 (DX 2, Gimpel report).

[180] Dkt 136-1 (DX 3, Waller County polling history); Dkt 124-1 at 42 (DX 2, Gimpel report).

[181] Dkt 169 at 57:1–58:11 (9 Tr, Beckendorff testimony); Dkt 169 at 19:6–12 (9 Tr, Barnett testimony).

[182] Dkt 169 at 14:24–15:12 (9 Tr, Beckendorff testimony); Dkt 169 at 190:21–191:18 (9 Tr, Barnett testimony); Dkt 170 at 139:22–141:2 (10 Tr, Duhon testimony).

distances involved in the rural areas of Waller County. The
following is a true and correct map of the voting precincts
with election day polling places in Waller County, prepared
by Dr James Gimpel (as Defendants' elections and voting
expert):[183]

**Figure 3.**



---

[183]  Dkt 124-1 at 33 (DX 2, Gimpel report).

119.  Unlike on election day, each precinct doesn't have a single designated early voting location. But available electoral resources (including poll workers, suitable locations, and voting machines) limit the number of available sites at which Waller County can provide early voting. This means that it must allocate early voting locations in a manner that not only serves the particular precinct in which the polling place is located, but also the surrounding precincts as well. For example, the Waller County Courthouse in Hempstead doesn't only serve voters living in Precinct 101 where the courthouse is located. It also serves as the closest early voting location for many voters in Precincts 102, 103, and 105. Likewise, the early voting location in Waller is the closest one for many voters in Precincts 208, 206, and 207. And the early voting location in Brookshire is the closest one for many voters in Precincts 313, 414, 415, and 417.[184]

120.  The map above also makes clear that the election precincts in Waller County vary greatly in terms of geographic area covered. The largest is Precinct 206 (serviced by the Fields Store location), which covers sixty-one square miles. The smallest is Precinct 419 (serviced by the Katy location), which covers only one square mile.[185]

121.  By comparison, Precinct 309 in Prairie View covers less than three square miles.[186] This means that voters in Prairie View faced markedly shorter distances to early voting locations than many voters in other parts of Waller County. Indeed, the average distance to a polling place for voters in Precinct 309 was less than half a mile.[187]

122.  It's also of note that PVAMU student voters in Precinct 309 primarily live on or near the university. They

---

[184]  Dkt 169 at 14:7–15:12 & 168:5–169:6 (9 Tr, Beckendorff testimony); Dkt 166 at 232:15–241:24 (6 Tr, Eason testimony).

[185]  Dkt 124-1 at 33 (DX 2, Gimpel report).

[186]  Ibid.

[187]  Ibid; see also Dkt 168 at 111:8–11 (8 Tr, Gimpel testimony).

were thus able to cast a ballot on (or immediately adjacent to) the campus where they live, eat, study, socialize, and otherwise spend the majority of their time. No other group of voters in Waller County had such proximate and ready access to an early voting location.[188] By contrast, most voters in Waller County—especially those in rural areas—have to travel longer distances to vote, both on election day and in particular to reach the closest early voting place.[189] Indeed, voters outside of Precincts 309 and 310 were required to travel an average of six or seven miles to reach the nearest voting location.[190]

123.   The early voting schedule adopted by the Waller County Commissioners Court reasonably allocated early voting opportunities throughout Waller County, including to voters in Prairie View.[191]

### 11.  Usage of early voting in Waller County

124.   One of the factors considered by Eason as the Waller County Elections Administrator in proposing the early voting schedule for the 2018 general election was historical early voting usage in Waller County. The 2018 early voting schedule initially adopted by the Waller County Commissioners Court was consistent with such usage.[192]

125.   The number of registered voters is itself a valid metric towards allocation of early voting locations and hours. But historical turnout can be a better measure for the

---

[188]   Dkt 168 at 111:22–112:8 (8 Tr, Gimpel testimony); Dkt 165 at 144:17–145:20 (5 Tr, Flores testimony); Dkt 167 at 249:6–18 (7 Tr, D Allen testimony); Dkt 169 at 190:12–191:18 (9 Tr, Barnett testimony).

[189]   Dkt 169 at 14:7–15:12 & 168:5–169:6 (9 Tr, Beckendorff testimony); Dkt 166 at 232:15–241:5 (6 Tr, Eason testimony).

[190]   Dkt 168 at 111:12–21 (8 Tr, Gimpel testimony).

[191]   Dkt 169 at 57:16–58:10 (9 Tr, Beckendorff testimony); Dkt 169 at 190:6–12 (9 Tr, Barnett testimony); Dkt 170 at 139:22–140:9 (10 Tr, Duhon testimony).

[192]   Dkt 168 at 102:4–104:12 (8 Tr, Gimpel testimony); Dkt 162 at 236:15–237:17 (2 Tr, Stein testimony).

appropriate locations, days, and operations for early voting because it better reflects the number of voters a polling place will have to serve effectively.[193] In other words, it helps predict the anticipated demand at each location, allowing Waller County to provide adequate capacity to prevent long lines and wait times that can frustrate voter participation.

126.  For instance, the number of registered voters in Precinct 309 is relatively high, but voter turnout in that precinct is consistently low. Low voter turnout isn't simply limited to students at PVAMU. It's in fact a consistent trend across younger, college-age voters.[194] Plaintiffs highlight the overall issue of low voter turnout by relying on the percentage of early voting out of total votes. Dr James Gimpel (as Defendants' elections and voting expert) explained the fallacy of that methodology.[195] The data from Dr Robert Stein (as Plaintiffs' expert on this topic) shows that the number of early voters at the MSC in 2018 was less than in Brookshire, Waller, and Hempstead.[196] It was thus reasonable for Waller County to allocate early voting resources based on the number of people it expected to show up to vote, as opposed to the historical proportion of early votes cast of a smaller number of total votes.

127. The evidence also suggests that the overall number of registered voters in Precinct 309 is inflated by students who have graduated and moved away from Prairie View but haven't yet dropped off the registration rolls—a process that can take two years.[197] PVAMU is, of course, a university from which a significant portion of the student population either graduates or transfers each year. As such, Precinct 309 has the highest number of suspense voters of

---

[193]  Dkt 168 at 118:21–122:7 (8 Tr, Gimpel testimony); Dkt 166 at 254:19–255:25 (6 Tr, Eason testimony).

[194]  Dkt 125-158 at 8 (PX 158, Stein report); Dkt 162 at 246:11–14 (2 Tr, Stein testimony).

[195]  Dkt 168 at 118:21–119:8 (8 Tr, Gimpel testimony).

[196]  Dkt 125-158 at 15 (PX 158, Stein report).

[197]  Dkt 166 at 253:12–254:18 (6 Tr, Eason testimony).

any precinct in Waller County.[198]

128.   All of this means that the allocation of early voting hours and locations in the 2018 general election schedule for Waller County was reasonable in light of past voter demand and anticipated voter turnout.

### 12.  The Waller County Community Center as a voting location

129.   Use of the WCCC was also consistent with past election practices of Waller County.[199]

130.   The use of the community center as a polling place (in both its older and more recent iterations on the same plot of land) dates to at least 2002. This makes it a familiar polling place for residents of Prairie View.[200]

131.   It's likewise accessible. The location of the current WCCC (as well as the former SCKCC) is 21274 FM 1098 Loop. The Texas A&M University System originally donated the property and building to Waller County for joint use by members of the university and non-university residents of Prairie View.[201] Its inherent nature, then, is to be convenient and available to each of these constituencies.

132.   The plot of land upon which the WCCC sits was formerly a part of the PVAMU campus. And as can be seen from the map above at Figure 1, that land is within a perimeter road bounding PVAMU. In real terms, this means that it's no more difficult to walk to the WCCC than it is to walk to any other area on the outer bounds of the campus perimeter. For instance, many of the sports fields and student housing on the west side of campus are adjacent to the perimeter in a manner similar to the WCCC on the south side—with relative distance to the MSC being approximately the same.

---

[198]   Dkt 167 at 121:5–18 (7 Tr, Eason testimony).

[199]   Dkt 171 at 166:21–167:3 (11 Tr, Jackson testimony).

[200]   Dkt 164 at 20:25–22:5 (4 Tr, Jackson testimony); see also Dkt 136-1 (DX 3, Waller County polling history).

[201]   Dkt 170 at 121:20–122:10 (10 Tr, Duhon testimony).

133. PVAMU students—along with student and alumni groups—regularly use the WCCC to hold events.[202] The WCCC is also used for joint events and outreach to the entire Prairie View community. For example, Waller County held a forum at the WCCC in 2017 on an upcoming bond election to fund the construction of the new county jail. That forum was well-attended by PVAMU students, including Jayla Allen (a former Plaintiff in this action) and Joshua Muhammad (a representative of Plaintiff The Panther Party).[203]

134. It's possible that newly arriving students or others may not be immediately familiar with the location of the WCCC. But its location is readily ascertainable upon inquiry and by simple Google search.[204] In fact, the WCCC is also located immediately next door to the US Post Office in Prairie View.[205] Many students receive mail on campus. But students, including former Plaintiff Jayla Allen, use the post office for other services such as purchasing stamps.[206]

135. The WCCC is also easily accessible from the PVAMU campus. It's less than a seven-minute walk from the front of the MSC.[207] Waller County in 2018 laid a sidewalk directly from the Hobart Taylor Hall parking lot to the back of the WCCC.[208] But even prior to 2018, the WCCC was accessible on foot from the PVAMU campus via a sidewalk that runs through the Hobart Taylor Hall parking lot to the US Post Office on the edge of campus. Once there, students

---

[202]   Dkt 171 at 124:21–23 (11 Tr, Duhon testimony); see also Dkt 124-5 (DX 52, 2018 WCCC rental forms); Dkt 124-4 (DX 51, 2017 WCCC rental forms).

[203]   Dkt 166 at 91:10–23 (6 Tr, Muhammad testimony).

[204]   Dkt 164 at 202:7–14 (4 Tr, Smith testimony).

[205]   Dkt 161 at 102:4–9 (1 Tr, J Allen testimony); Dkt 164 at 23:9–24:16 (4 Tr, Jackson testimony).

[206]   Dkt 161 at 100:21–102:3 (1 Tr, J Allen testimony).

[207]   Dkt 164 at 8:2–8 (4 Tr, site visit record).

[208]   Id at 8:19–9:2; Dkt 170 at 187:14–24 (10 Tr, Duhon testimony).

simply need to cross a small median to arrive at the WCCC.[209]

136. There's also a history of PVAMU students accessing the rear of the WCCC (prior to the installation of the sidewalk in 2018) by walking along the grass and stepping over a low wire boundary marker that varies in height between twelve and twenty inches.[210] Students would do this not only individually, but as part of what's known as a *stroll to the poll* in which a group of students would walk to the WCCC to vote.[211] The students would start at Phase 3 housing on the north side of campus, walk around campus to each of the housing units, and then make their way to the WCCC.[212]

137. Additionally, PVAMU offers a free shuttle, which runs a loop around the campus. This includes a stop in the Hobart Taylor Hall parking lot next to the sidewalk that leads to the post office. As such, students can be dropped off and picked up quite close to the WCCC.[213]

138. Plaintiffs note that most students don't own cars, arguing that siting a polling place for early voting at the MSC is pivotal to overcome students' inability to travel long distances.[214] Prairie View Mayor David Allen stated as much at a meeting of the Waller County Commissioners Court on January 27, 2016, observing that "most students do not have cars" and "that's why the MSC and the campus voting is so important."[215] But three facts ameliorate any

---

[209]   Dkt 164 at 21:22–22:23 (4 Tr, Jackson testimony).

[210]   Dkt 162 at 93:1–5 & 113:19–114:5 (2 Tr, Barbour testimony).

[211]   Id at 18:11–19:20.

[212]   Ibid.

[213]   Dkt 164 at 8:2–8 (4 Tr, site visit record); 28:9–29:21 (4 Tr, Jackson testimony).

[214]   See Dkt 175 at ¶ 180 (Plaintiffs' findings of fact) and accompanying citations.

[215]   See ibid; see also Dkt 168 at 35:14–23 (8 Tr, D Allen testimony).

such concern. First, hours were devoted to early voting at the MSC during the second week of early voting. Second, the MSC is less than a seven-minute walk from the WCCC, while other points on campus are without question a longer walk to the MSC. And third, a free campus shuttle is available to take students to a point adjacent to the WCCC.

139.  Also consider again the map in Figure 1. The WCCC is actually as close or closer to the MSC than either the Track and Field Complex or the Panther Plaza to the southwest and east sides of campus, respectively. It simply isn't plausible to contend that the WCCC is any more difficult to reach than either of those places, which are easily, readily, and frequently accessed by PVAMU students.

140.  Plaintiffs submitted a letter sent by the Texas Secretary of State to the Waller County Commissioners Court in the context of the 2018 general election.[216] The Secretary there encouraged Waller County to expand on-campus voting hours. It again bears emphasis that hours were devoted during the second week of early voting in 2018 to both the MSC and the WCCC. And more important, as just noted, it's illusory to maintain a distinction of geographic meaning between the MSC as *on campus* and the WCCC as *off campus*. It has already been observed that the land upon which the WCCC sits was originally part of the PVAMU campus. The WCCC remains within the perimeter road that bounds the south side of campus. That the Texas A&M University System dedicated the land to Waller County to build the original community center doesn't make it any less geographically proximate to the campus. And it's in no way clear (to the extent even pertinent to analysis here) that the Secretary of State would express dissatisfaction with allocation of voting hours to the WCCC as opposed to the MSC, or indeed, that the Secretary's own analysis would differentiate between the two.

---

[216]  Dkt 125-96 (PX 96, Secretary of State and Waller Counter Commissioners Court correspondence).

### 13. Voting equipment in Waller County

141. Resource allocation was another significant consideration when arriving at the initial schedule for early voting during the 2018 general election. After all, Waller County had to serve not only PVAMU students, but also the entire population throughout its jurisdiction.

142. Resources devoted to voting aren't boundless. Waller County had a total of eighty-one touchscreen tablets, thirty-eight access machines, and thirty-one controllers available during the 2018 general election.[217] A *touchscreen tablet* is the individual unit used for voting, with an *access unit* being one accessible to the disabled. A *controller* is the hub of the machine into which the touchscreen tablets and access units connect to provide data.[218]

143. Texas law mandates that a voting machine used in early voting be sealed at the completion of early voting and not used again on election day.[219] This necessarily means that, when allocating resources for early voting, Waller County must ensure an adequate reserve of fresh machines to cover each of its nineteen election day precincts. And machines sometimes malfunction. This further means that Waller County must set aside a certain number of machines as backups to replace any that malfunction.[220]

144. As the Elections Administrator for Waller County, Eason was responsible for the allocation of voting resources for the 2018 general election. For election day voting, she allocated fifty touchscreen tablets, twenty-one access units, and twenty controllers (with three access units, and one controller in reserve for any malfunctioning units). More pertinent here, for early voting she allocated thirty-one

---

[217] See Dkt 124-1 at 79 (DX 6, equipment assignment).

[218] Dkt 166 at 275:24–276:13 (6 Tr, Eason testimony).

[219] Dkt 171 at 51:1–53:5 (11 Tr, Duhon testimony); Dkt 166 at 259:1–13 (6 Tr, Eason testimony).

[220] Dkt 166 at 259:1–13 (6 Tr, Eason testimony).

touchscreen tablets, fourteen access units, and ten controllers as follows:[221]

**Figure 4.**

| Equipment Assignment | Controller | Access | Touch |
|---|---|---|---|
| Early Voting | | | |
| Courthouse | 1 | 3 | 6 |
| WISD Admin | 1 | 1 | 3 |
| Brookshire Library | 1 | 1 | 4 |
| Katy VFW | 1 | 1 | 3 |
| JP 3 | 1 | 1 | 2 |
| JP 2 | 1 | 1 | 3 |
| PVAMU Student Ctr | 2 | 3 | 7 |
| PV Community Center | 1 | 1 | 2 |
| PV City Hall | 1 | 2 | 1 |
| | 10 | 14 | 31 |

145. This reflects that Waller County allocated the greatest number of touchscreen tablets (being seven) to the MSC early voting polling place. The MSC is also the only polling place to which Waller County dedicated two controllers, which meant that two separate voting lines could run at the MSC—effectively allowing it to operate as two separate polling places, thus doubling capacity. This would ensure shorter waiting times and an easier voting experience.[222]

### 14. Rumors of voter suppression on the PVAMU campus in advance of the 2018 general election

146. As found above, the Waller County Commissioners Court adopted the early voting schedule for the 2018 general election on September 5, 2018. There was no expression of complaints or concerns about that schedule until the middle of October.[223] Rumors at that

---

[221]   Dkt 124-1 at 79 (DX 6, equipment assignment).

[222]   Dkt 166 at 276:14–23 (6 Tr, Eason testimony).

[223]   Dkt 170 at 141:6–11 (10 Tr, Duhon testimony); Dkt 167 at 11:23–12:1 (7 Tr, Eason testimony).

time began circulating that Waller County was attempting to impede voter registration by throwing applications away and/or improperly using change-of-address forms.

147.   The former suggestion—as to applications being thrown away—was unverified and eventually found to be without basis.[224] The latter suggestion—as to use of change-of-address forms—is discussed next. But in any event, it was only after such rumors circulated that concern arose regarding the as-adopted voting schedule.[225]

148.   The concern animating both rumors traces back to the March 2018 primary and relates to the fact that two voting precincts are dedicated to the PVAMU campus and adjacent areas in and near Prairie View. Precinct 309 is the voting precinct centered on PVAMU, thereby encompassing those students living on campus.[226] Precinct 310 is comprised exclusively of residents living in and near Prairie View but outside the PVAMU campus.[227] Students had been completing their voter registration forms with one of two general campus addresses—100 University Drive or 700 University Drive. As the Elections Administrator, Eason discovered that the 700 University Drive address tracked to an *off-campus* address in the GPS/GIS software used by Waller County. And so, *on-campus* students using the 700 University Drive address were being registered to vote in Precinct 310. This error unknowingly caused confusion with respect to the correct election-day precinct for PVAMU students living on campus.[228]

149.   Eason contacted the Office of the Texas Secretary of State about this discrepancy. The Secretary suggested that Waller County have poll workers ask voters if the address on their voter registration card was their correct

---

[224] Dkt 170 at 142:17–144:16 (10 Tr, Duhon testimony); Dkt 167 at 21:10–20 (7 Tr, Eason testimony).

[225] Dkt 170 at 153:2–154:7 (Tr 10, Duhon testimony).

[226] See Dkt 109-1 at ¶ 49 (joint stipulations of fact).

[227] Ibid.

[228] Dkt 167 at 22:3–16 (7 Tr, Eason testimony).

physical address—and if it wasn't, ask them to complete a change-of-address form prior to voting.[229] Eason met with her volunteer deputy registrars to inform them of the solution and to instruct them on how to register on-campus voters in the future by using their housing's physical address.[230]

150.   This ultimately led to rumors in October 2018 that Waller County was using change-of-address forms in an attempt to disenfranchise PVAMU students.[231] Waller County then returned to the Office of the Secretary of State for guidance and was informed that it could allow students to vote at either Precinct 309 or Precinct 310 without requesting completion of a change-of-address form. Waller County expressed no concern about that solution.[232]

151.   As part of this process, Waller County issued a joint press release with the Secretary of State's office on October 12, 2018, informing PVAMU students of the above efforts.[233] Waller County also issued a separate press release that same day to make clear that it would allow anyone registered using either address on University Drive to vote in either Precinct 309 or Precinct 310.[234] That press release also notified students that anyone wanting to avoid lines or confusion could vote early at any early voting polling place, while also informing them of the dates and times for early voting at both the MSC and the WCCC. It also included a map showing the location of the WCCC and its relation to the MSC.[235]

---

[229]   Id at 29:1–17.

[230]   Id at 29:25–30:14.

[231]   Dkt 170 at 153:2–154:3 (10 Tr, Duhon testimony).

[232]   Ibid.

[233]   Dkt 124-3 at 21–23 (DX 50, joint press release of Secretary of State and Waller County).

[234]   Dkt 124-6 at 1–4 (DX 53, Waller County press release).

[235]   Ibid; Dkt 124-54 (DX 54, MSC to WCCC map).

65

152.   It should be noted that Frank Jackson and others testified about a "zip code" issue. Plaintiffs never made clear what the exact issue was or why it presented any concern as to early voting during the 2018 general election. Regardless, Eason established that zip codes are unrelated to the precinct in which Waller County registers any voter—student or otherwise.[236] Nor is the zip code on the mailing address on a registration card determinative. And each registration card explicitly lists on its face the precinct in which the voter is registered.[237] As such, any putative issue regarding the zip codes in and around Prairie View has nothing to do with the claims at issue in this case as to early voting in Waller County during the 2018 general election.

### 15.   Further consideration of the early voting schedule for the 2018 general election

153.   Shortly before voting began, a Waller County resident named DeWayne Charleston approached Eason in her capacity as Elections Administrator about the schedule for early voting at PVAMU.[238] Charleston stated that Frank Jackson and others on the PVAMU campus were concerned about the absence of on-campus voting days during the first week of early voting.[239] Charleston requested that Waller County add early voting places in some of the student dormitory areas as well as the MSC. Eason testified that in response she notified County Judge Duhon and asked that he make this an agenda item for the next meeting of the Waller County Commissioners Court on October 17, 2018.

154.   Eason at that meeting presented the schedule requested by Charleston.[240] That proposal recommended

---

[236]   Dkt 167 at 22:17–23:7 (7 Tr, Eason testimony).

[237]   Id at 23:8–24:7; see also Dkt 136-3 (DX 85, Precinct 309 sample voter registration card).

[238]   Dkt 167 at 42:3–10 (7 Tr, Eason testimony).

[239]   Id at 42:11–25.

[240]   Id at 43:1–44:3; see also Dkt 124-18 at 142–45

extension of early voting during the first week to Monday and Tuesday at the MSC, Wednesday at the University Square, and Thursday and Friday at City Hall.[241]

155.   Eason commented during her presentation that "there was not equal representation in the original schedule."[242] Plaintiffs contend that Eason's comment as to *equal representation* means that she believed the as-adopted schedule denied PVAMU on-campus students an equal opportunity to vote. To the contrary, Eason explained that her comment was intended only as a factual observation that the areas in and around Prairie View—like the areas in and around Fields Store, Monaville, and Katy—received fewer total hours for early voting than Hempstead, Brookshire, and Waller.[243] She also clarified that she didn't believe that the 2018 general election schedule presented voters in Prairie View any greater burden or any inequality of opportunity to participate in the election because those voters (including those on the PVAMU campus) had two polling places within short walking distance, unlike any other demographic in Waller County.[244]

156.   County Judge Duhon stated his own concern at the meeting that the new proposal by Eason was confusing because it created four different polling places in and around Prairie View over the two-week early voting period.[245] But in line with her, he also stated, "I do think there is an inequity."[246] He suggested instead that Waller

(DX 18, 10/17/2018 agenda); Dkt 124-19 at 146–50 (DX 19, 10/17/2018 minutes).

[241]   Dkt 124-1 at 186, timestamp 0:06:02–0:06:15 (DX 38, 10/17/2018 Commissioners Court—Item 5).

[242]   Id at timestamp 0:01:27–0:02:13; see also Dkt 167 at 44:9–47:21 (7 Tr, Eason testimony).

[243]   Id at 44:9–15.

[244]   Id at 45:15–47:21.

[245]   Dkt 124-1 at 186, timestamp 0:22:17–0:22:53 (DX 38, 10/17/2018 Commissioners Court—Item 5).

[246]   Id at timestamp 0:21:40–50.

County simply add three days of early voting during the first week to the WCCC, a plan he thought would be "fair and equitable."[247] And he likewise testified at trial that he only meant with his *inequity* comment to acknowledge the disparity in number of overall hours in the schedule as between some precincts.[248] He further testified that he didn't believe that voters in and around Prairie View lacked access to a polling place or faced any unequal opportunity or greater burden to vote, where other voters throughout Waller County lacked such proximate access to a polling place.[249]

157. These comments by Eason and Duhon aren't perfect in isolation, but they mustn't be shorn of context. And consideration of the meeting as a whole supports their testimony that their concern was simply with the objective difference in *the number of hours* between the smaller communities within Waller County and their larger counterparts, without regard to or comment upon *the actual opportunity* afforded to various geographic groups under the adopted schedule. Those relative numbers don't necessarily mean that voters in the smaller precincts had less opportunity to vote. And specifically, as to the polling places devoted to areas in and around Prairie View, they afforded readily proximate access to the voters in Precincts 309 and 310, especially as compared to the great distances required of many or most voters in other precincts.

158. Other aspects of the record undermine any perception of discrimination or animus directed at PVAMU students. To the extent citizens expressed concerns about on-campus voting at PVAMU, those comments touched on perceptions of ease-of-access to the MSC. Such concerns even went back to previous elections.[250] Likewise in the record are well-established concerns about parking at

---

[247] Id at timestamp 0:22:54–0:23:54.

[248] Dkt 170 at 155:10–156:3 (10 Tr, Duhon testimony).

[249] Id at 156:4–159:4.

[250] Id at 119:2–23; Dkt 169 at 177:15–183:5 (9 Tr, Barnett testimony).

the MSC.[251] For instance, David Allen, as the Mayor of Prairie View, testified at trial that the municipality and other citizen groups schedule events at the MSC at times when students aren't expected to be there because of parking difficulties.[252]

159.  With pertinence to this point, Jeron Barnett spoke at the October 17th meeting as the Waller County Commissioner for Precinct 3. His precinct includes the areas in and around Prairie View, including PVAMU. He expressed concern that voters in the Prairie View area who were *not* PVAMU students did *not* want to vote on campus, thus making additional hours at the MSC or elsewhere on campus unfair to them.[253] By this, he of course wasn't saying that impediments were such that *no* voting should occur *at all* at the MSC. Rather, he was simply of the view that legitimate considerations impacted whether it was appropriate to allocate additional hours there as opposed to the WCCC. And further, he commented that if additional days were going to be added, the Waller County Commissioners Court should do so for Monaville, which had fewer early voting hours than Prairie View.[254]

160.  That last comment about also adding additional days elsewhere was in accord with opinions expressed at that meeting by Justin Beckendorff, the Waller County Commissioner for Precinct 4. He stated that there was no way to enact an early voting schedule that was equally fair

---

[251]  Dkt 169 at 42:5–20 (9 Tr, Beckendorff testimony); Dkt 49 at ¶ 50 (amended complaint); Dkt 164 at 81:6–86:12 (4 Tr, Jackson testimony); Dkt 124-1 at 186, timestamp 0:04:28–0:04:56 (DX 38, 10/17/2018 Commissioners Court—Item 5) (audible crowd agreement as Eason explains difficulty of finding parking spot and getting around on campus).

[252]  Dkt 167 at 231:1–232:3 (7 Tr, D Allen testimony).

[253]  Dkt 124-1 at 186, timestamp 0:25:04–0:27:37 (DX 38, 10/17/2018 Commissioners Court—Item 5).

[254]  Id at timestamp 0:27:38–0:29:15.

in a numeric sense to everyone.[255] He pointed in particular to other communities in Waller County such as Pattison and Pine Island (having no polling places at all) and Katy (having only three days of early voting).[256] Commissioner Beckendorff also testified to his belief that any PVAMU voter who wanted to cast a ballot had multiple opportunities to do so under the 2018 schedule.[257]

161. The Commissioners discussed at length the suggested, potential changes to the previously adopted plan. There was no consensus on a single set of changes that would allocate additional hours in a manner satisfactory to all communities, including Prairie View, Monaville, Katy, and others.[258]

162. Approximately ten Prairie View residents (including several PVAMU students) spoke during the public comment period on this agenda item in opposition to the previously adopted schedule.[259] One woman advocated for "parity with the other students in Texas" for students at PVAMU and consistency throughout every metropolitan area precinct in the County.[260] And she opined that PVAMU students should "be allowed to vote in the MSC every single day of early voting."[261] Others stated that they wanted early voting at the MSC during the first week.[262]

---

[255] Id at timestamp 0:32:50–0:33:02.

[256] Id at timestamp 0:33:04–0:33:33.

[257] Dkt 169 at 48:24–50:25 (9 Tr, Beckendorff testimony); see also Dkt 124-1 at 186, timestamp 0:33:34–0:33:45 (DX 38, 10/17/2018 Commissioners Court—Item 5).

[258] Dkt 124-1 at 186, timestamp 1:01:50–1:08:56 (DX 38, 10/17/2018 Commissioners Court—Item 5).

[259] Id at timestamp 0:36:40–0:55:30.

[260] Id at timestamp 0:36:40–0:37:29; see also Dkt 49 at ¶ 43 (amended complaint).

[261] Dkt 124-1 at 186, timestamp 0:36:40–0:36:53 (DX 38, 10/17/2018 Commissioners Court—Item 5); see also Dkt 49 at ¶ 45 (amended complaint).

[262] Dkt 49 at ¶ 47 (amended complaint).

163. On the other hand, several of these speakers specifically recognized and thanked Eason for her efforts as Elections Administrator at outreach and for her responsiveness to PVAMU students. For example, PVAMU student Kirsten Budwyne acknowledged Eason's efforts in working with PVAMU to resolve the campus-address issue discussed above.[263] Budwyne also noted that the media was wrongly trying to make Eason out to be a bad person. DeWayne Charleston stated that Eason had done more for Waller County than did the United States Supreme Court in the 1970s in the PVAMU-related case *Symm v United States*, 439 US 1105 (1979), discussed elsewhere below.[264]

164. John Amsler, as the Waller County Commissioner for Precinct 1, stated earlier in the meeting that the Waller County Commissioners Court had in place a process for these decisions; that such process had been observed when approving the schedule previously; and that the as-approved schedule was itself agreed to by the local Democratic and Republican party chairs.[265] Following the public comments, he moved to make no change to the early voting schedule. That motion was adopted, and the Commissioners ultimately determined to take no action to modify the schedule.[266]

165. The Waller County Commissioners Court doesn't agree on—or grant—every request that comes before it.[267] But that said, the agenda item listing this issue for the October 17th meeting stated, "ELECTIONS: Discuss and

---

[263] Dkt 124-1 at 186, timestamp 0:44:30–0:45:08 (DX 38, 10/17/2018 Commissioners Court—Item 5).

[264] Dkt 124-1 at 186, timestamp 0:06:56–0:09:37 (DX 38, 10/17/2018 Commissioners Court—Public Comment).

[265] Dkt 124-1 at 186, timestamp 0:34:44–0:35:52 (DX 38, 10/17/2018 Commissioners Court—Item 5).

[266] Id at timestamp 1:08:59–1:09:30; Dkt 124-19 at 147 (DX 19, 10/17/2018 minutes).

[267] Dkt 170 at 62:20–63:21 (10 Tr, Barnett testimony) and Dkt 170 at 162:10–19 (10 Tr, Duhon testimony).

take action to approve additional early voting locations at Prairie View A&M University."[268] Review of the agenda as a whole (and other agendas in the record) establishes that such wording is typical phrasing to list an item for *consideration* at a meeting.[269] But as phrased, those reading the agenda would quite naturally expect that *some action* would be taken *to approve additional early voting locations at PVAMU.* Instead, after considerable discussion, the vote was to take no action.

166.   This unintentional lack of precision in an agenda listing doesn't of itself establish a violation supporting any of Plaintiffs' claims. But it's understandable why PVAMU students in attendance and on campus were surprised by and dissatisfied with the result—which also likely contributed to the later initiation of this litigation.

167.   But what's also understandable here is why the Waller County Commissioners Court would hold to its originally adopted schedule. That schedule had been previously discussed and adopted at public meetings on August 22nd and September 5th, which apparently no Plaintiff or any PVAMU student attended.[270] And so no one there commented or stated any opposition of the kind raised later. Instead, over six weeks passed without concern until October 19th—a mere three days before commencement of voting. Hewing to a decision that had been in place for over six weeks isn't surprising when early voting was to commence the next week. This is especially true where the late raising of concerns as to the areas in and around Prairie View brought into view related concerns of hours and access among a number of other, more rural communities.

---

268   Dkt 124-1 at 143 (DX 18, 10/17/2018 agenda).

269   For example, see Dkt 124-1 at 134–36 (DX 16, 08/22/2018 agenda); Dkt 124-1 at 153–56 (DX 20, 09/05/2018 agenda); Dkt 124-1 at 151–52 (DX 19, 10/24/2018 agenda).

270   See above at ¶¶ 107–10.

### 16. This lawsuit and amendment of the early voting schedule

168.   Early voting commenced in Waller County on October 22, 2018. Plaintiffs filed this lawsuit that same day.[271] And election day on November 3rd wasn't far off.

169.   The Waller County Commissioners Court called a special meeting on October 24, 2018, in response to the lawsuit. It there voted to extend early voting hours in and around Prairie View.[272] The hours on the three days previously scheduled for the MSC were extended to 7:00 AM to 7:00 PM. Hours for early voting were also added for the Prairie View City Hall on Sunday, October 28, 2018, from 12:00 PM to 5:00 PM.[273]

170.   Ultimately, early voting hours for Waller County during the 2018 general election were as follows:

---

[271]   See Dkt 1 (original complaint).

[272]   Dkt 124-1 at 187, timestamp 0:00:02–0:00:031 (DX 39, 10/17/2018 Emergency Commissioners Court— Executive Session 3); Dkt 124-1 at 187, timestamp 0:00:01– 0:01:18 (DX 39, 10/17/2018 Emergency Commissioners Court—Executive Session 6).

[273]   Dkt 124-1 at 187, timestamp 0:00:01–0:00:45 (DX 39, 10/17/2018 Emergency Commissioners Court— Executive Session 5); see also Dkt 124-1 at 163 (DX 23, 2018 general election extended schedule).

**Table 3.**

| Waller County Voting Plan as modified on October 24, 2018[274] | | | | | |
|---|---|---|---|---|---|
| **Polling Place** | City | Hours, Week 1 | Hours, Week 2 | Total Hours | CVAP Majority |
| Waller County Courthouse | Hempstead | 55 | 51 | 106 | Black |
| Waller ISD Admin Bldg | Waller | 50 | 51 | 101 | White |
| Brookshire Library | Brookshire | 55 | 51 | 106 | Black |
| Fields Store County Bldg | Unincorporated | 23 | 0 | 23 | White |
| Monaville County Bldg | Unincorporated | 23 | 0 | 23 | White |
| Katy VFW | Katy | 27 | 0 | 27 | White |
| MSC | Prairie View | 0 | 36 | 36 | Black |
| WCCC | Prairie View | 0 | 24 | 24 | Black |
| Prairie View City Hall | Prairie View | 0 | 5 | 5 | Black |

---

[274]  Data derived from Dkt 124-1 at 157 (DX 20, 09/05/2018 agenda); see also Dkt 109-1 at ¶¶ 71–75 (joint stipulations of fact).

74

171.   The areas in and around Prairie View—at the MSC, WCCC, and City Hall—thus had a combined total of sixty-five hours for early voting. And of the three polling places with more allocated hours than the combined Prairie View area, two of them (Hempstead and Brookshire) are also majority-Black CVAP areas. And further, the Prairie View area had more allocated hours than three of the four majority-White CVAP areas. As implemented, then, it is difficult to look at this array of hours and in any way discern an intention or effect of disadvantaging Black voters in Waller County.

172.   With respect to this final schedule, it also mustn't be forgotten that any voter can vote at any designated location during the early voting period. And Waller County provided for voting on election day itself on campus at PVAMU at the MSC.[275]

### 17.   Adoption of House Bill 1888 in 2019

173.   House Bill 1888 was enacted during the 86th Texas Legislative Session and made effective on September 1, 2019. It largely dictates the hours required for early voting at temporary branch polling places throughout the State of Texas. Specifically, it amended section 85.064(b) of the Texas Election Code to require a county with more than one thousand registered voters (such as Waller County) to hold early voting at each temporary branch polling place on each day of the early voting period for at least eight hours per day. It also requires that a county with a population of more than 100,000 (meaning one larger than Waller County) conduct early in-person voting at each temporary branch polling place for at least eight hours each day that section 85.005 requires voting at the main early voting place.[276]

174.   To be clear, no issue is before this Court as to the 2020 general election or any other election in Waller County subsequent to the 2018 general election.

---

[275]   See above at ¶¶ 83–87.

[276]   See Dkt 143-4 at 5–9 (DX 90, 01/15/2020 agenda, including HB 1888 requirements).

Implementation of HB 1888 within Waller County thus isn't subject to dispute here. But certain evidence submitted at trial as to this later law does inform consideration of claims asserted in this action.

175. County Judge Duhon testified credibly as to his outreach efforts on the PVAMU campus to build a relationship of trust and respect with the students, along with his attention to concerns raised during the 2018 election cycle.[277] Indeed, he and Elections Administrator Eason worked throughout 2019 and into 2020 to engage with PVAMU and some of its students to identify an agreeable polling place to serve both PVAMU and Prairie View as a whole in light of HB 1888. PVAMU president Ruth Simmons charged Vice President Dr Timothy Sams with assembling a task force at PVAMU (including students) to arrive at a recommendation.[278] The task force recommended the PVAMU Welcome Center—not the MSC—as the best location for on-campus early voting.[279]

176. Defendants also found themselves in the midst of another dispute when attending a meeting in mid-December 2019 between PVAMU and representatives of Prairie View. Attending the meeting for the city itself was Mayor David Allen, Wendy Williams (a city council member), and a group of older Prairie View citizens.[280] These individuals became upset when Dr Sams informed them that the meeting was only to discuss student concerns—not citizen input into a voting location that might also balance the needs of the elderly population in

---

[277] Dkt 170 at 149:17–152:9 (10 Tr, Duhon testimony).

[278] Dkt 167 at 68:16–69:17 (7 Tr, Eason testimony); Dkt 170 at 166:22–168:6 (10 Tr, Duhon testimony).

[279] Dkt 167 at 242:7–14 (7 Tr, Eason testimony); Dkt 170 at 174:17–175:14 (10 Tr, Duhon testimony); see also Dkt 143-4 at 17 (DX 90, 01/15/2020 agenda).

[280] Dkt 167 at 236:20–240:20 (7 Tr, D Allen testimony).

Prairie View.[281] This led Mayor Allen to write letters to County Judge Duhon to express his preference and those of other city residents for early voting going forward under HB 1888 to be sited at the WCCC, not the MSC.[282]

177.   The Waller County Commissioners Court then held a meeting on January 15, 2020, to consider early voting locations for the 2020 primary.[283] Eason there gave a financial presentation concerning her analysis of the costs to Waller County under two scenarios. One option was to maintain all of the early voting locations used in the previous election, while keeping them open for the entire duration of early voting as mandated by HB 1888.[284] Eason's analysis shows that maintaining each of those locations for the mandated hours would have required both the purchase of additional voting machines and increased labor costs.[285] The other option was simply to have a single early voting location in each of its County Commissioner Precincts (being four in total) for the entirety of the early voting period. Eason recommended this latter option.[286]

178.   Mayor Allen and other residents of Prairie View attended that meeting. Each expressed belief that the MSC wasn't easily accessible during early voting hours for seniors from the areas in and around the city itself.[287] They instead requested that early voting be sited at the WCCC. They also noted that they had seen students walking throughout Prairie View, leading them to believe that

---

[281]   Id at 240:21–242:4.

[282]   Id at 242:20–243:8; see also Dkt 143-4 at 19–20 (DX 90, 01/15/2020 agenda).

[283]   Dkt 143-4 (DX 90, 01/15/2020 agenda).

[284]   Id at 5–13.

[285]   Ibid.

[286]   Id at 13–16; see also Dkt 167 at 76:22–77:6 (7 Tr, Eason testimony).

[287]   For example, see Dkt 167 at 243:9–249:5 (7 Tr, D Allen testimony).

PVAMU students could conveniently access the WCCC.[288]

179.   The Waller County Commissioners Court then voted to establish four early voting places—one for each of its County Commissioner Precincts—including one at the WCCC.[289] These have been the sites for both early and election day voting in each election since the 2018 general election. Each of these temporary branch locations offer uniform days and hours of early voting, consisting of eight hours of voting each day during the early voting period, except for the last two days in which there are twelve hours of early voting.[290]

## CONCLUSIONS OF LAW

Plaintiffs assert four causes of action. They allege that the conduct of Defendants:

- o   *First,* caused a racially discriminatory effect in violation of Section 2 of the Voting Rights Act;

- o   *Second*, constitutes intentional discrimination on the basis of race in violation of the Fourteenth and Fifteenth Amendments, as implemented by Section 2 of the Voting Rights Act and 42 USC § 1983;

- o   *Third*, constitutes intentional discrimination on the basis of age in violation of the Twenty-Sixth Amendment as implemented by Section 1983; and

- o   *Fourth*, constitutes intentional discrimination against Black voters aged eighteen to twenty in violation of a right intersecting the Fourteenth, Fifteenth, and Twenty-Sixth Amendments when read together.

---

[288]   Dkt 167 at 216:24–217:6 (7 Tr, Eason testimony); Dkt 167 at 229:17–230:8 (7 Tr, D Allen testimony).

[289]   Dkt 167 at 76:22–78:15 (7 Tr, Eason testimony).

[290]   Ibid; see also Dkt 136-1 at 17–18 (Dx 3, Waller County polling history).

This Court detailed pertinent standards applicable to each of these claims in its order denying summary judgment. See 472 F Supp 3d at 358–66. Two intervening decisions now supplement that discussion. The Supreme Court in *Brnovich v Democratic National Committee* further addressed standards applicable to claims under Section 2 of the Voting Rights Act. 141 S Ct 2321 (2021). And the Fifth Circuit in *Texas Democratic Party v Abbott* addressed standards applicable to age-discrimination claims under the Twenty-Sixth Amendment. 978 F3d 168 (5th Cir 2020) (*Texas Democratic Party II*). Standards articulated in these cases are of course controlling and will be incorporated where applicable.

### 1. Racially discriminatory effect in violation of Section 2 of the Voting Rights Act

Plaintiffs bring a claim for discriminatory effect on Black student voters due to the failure by Waller County to provide adequate on-campus early voting during the 2018 general election. The exact boundary between their first and second causes of action as pleaded isn't clear.[291] But it's been understood that Plaintiffs assert a claim for violation of their rights under the Fifteenth Amendment as enforced by Section 2 of the Voting Rights Act.

The Fifteenth Amendment was ratified in the wake of the Civil War amidst the struggles of Reconstruction to fully guarantee voting rights to newly freed slaves. Section 1 provides, "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." Section 2 expressly vested Congress with "power to enforce this article by appropriate legislation." It did so by passage of the Voting Rights Act of 1964. See *Veasey v Abbott*, 830 F3d 216, 243 (5th Cir 2016).

Section 2 of the Voting Rights Act is codified at 52 USC § 10301. It protects against the discriminatory effect of a policy on a protected class of voters as follows:

---

[291] See Dkt 49 at ¶¶ 85–91 (amended complaint).

79

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

The Fifth Circuit observed in *Veasey v Abbott* that a showing of discriminatory intent quite obviously isn't required to show discriminatory effect. 830 F3d at 243, citing *Thornburg v Gingles*, 478 US 30, 35 (1986). It instead adopted a two-part test by which to evaluate a claim of discriminatory effect:

- o *First*, "[t]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class

have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice"; and

o *Second*, "[t]hat burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class."

830 F3d at 244, quoting *League of Women Voters of North Carolina v North Carolina*, 769 F3d 224, 240 (4th Cir 2014) (quotation marks omitted).

These inquiries are addressed in turn.

### a. Discriminatory burden

In its recent landmark decision of *Brnovich v Democratic National Committee*, the United States Supreme Court explained that "equal openness" is the "touchstone" under Section 2 of the Voting Rights Act. 141 S Ct at 2338. And whether the voting process is equally open is decided based on the totality of the circumstances. That is, "any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered." Ibid.

The Supreme Court there also specifically identified several "important circumstances" that should be considered. Ibid. These are:

o *First,* the size of the burden imposed by a challenged voting rule;

o *Second,* the degree to which a voting rule departs from what was standard practice when Section 2 was amended in 1982;

o *Third,* the size of any disparities in a rule's impact on members of different racial or ethnic groups;

o *Fourth,* the opportunities provided by a State's entire system of voting; and

o *Fifth,* the strength of the state interests served by a challenged voting rule.

81

Id at 2338–39.

By these lights, the preponderance of the evidence here doesn't show that the early voting schedule adopted by Waller County for the 2018 general election—whether in its original iteration or as later amended and expanded—resulted in any abridgment or denial of the ability of Black citizens to vote in Waller County as a whole, in and around the city of Prairie View, or on campus at PVAMU itself.

### i. Size of burden imposed by challenged voting rule

The Supreme Court in *Brnovich* stated, "There is a difference between openness and opportunity, on the one hand, and the absence of inconvenience, on the other." 141 S Ct at 2338 n 11. "Mere inconvenience," it noted, "cannot be enough to demonstrate a violation of § 2." Id at 2338. And it further observed that "the concept of a voting system that is 'equally open' and that furnishes an equal 'opportunity' to cast a ballot must tolerate the 'usual burdens of voting'" because "every voting rule imposes a burden of some sort." Ibid, quoting *Crawford v Marion County Election Board*, 553 US 181, 198 (2008).

At best, Plaintiffs establish a mere inconvenience imposed on PVAMU students with respect to the early voting schedule for the 2018 general election. In reality, it's rather doubtful that the early voting locations and hours provided by Waller County to PVAMU students can be understood as creating any incremental inconvenience at all. Plaintiffs certainly offered no credible evidence to show that they faced any greater burdens than other voters in Waller County. Indeed, no other group of voters had the same level of concentrated access to early voting at locations so close to their residence or place of work. For unlike any other voters in Waller County, students at PVAMU were within walking distance of two early voting polling places—the MSC and the WCCC—that were open for a combined sixty hours.

It's simply a fact that—far from making it more difficult for voters in and around Prairie View—the early voting schedule for the 2018 general election actually made

voting in Prairie View easier. And this is true whether the focus is on the Prairie View area generally or PVAMU specifically.

Consider first the early voting hours at the MSC. Waller County provided thirty-six hours during the Monday, Tuesday, and Wednesday of the second week. By contrast, the MSC had eighteen hours at that location in the preceding 2016 general election. This means that the challenged schedule actually *doubled* the number of hours at the MSC, while also providing additional machines and an additional controller—thereby allowing two lines by which to process voters more quickly.[292]

Next consider the early voting hours at the WCCC. That location itself is less than a seven-minute walk from the MSC. In a word, it's *convenient* to PVAMU, if for no other reason than that other points on campus frequented by students are without question longer walks from the MSC. And so it's quite meaningful that Waller County provided another twenty-four hours of early voting there on the Thursday and Friday of the second week.[293] By contrast, in the preceding 2016 general election, eighteen additional hours over two days were provided at the St Francis Episcopal Church, across the road from the WCCC (which wasn't at the time complete).[294] Again, this means that the challenged schedule *increased* the relative hours at the site adjacent to the PVAMU campus, while also siting it marginally closer—and indeed, within the original footprint of the campus itself.

Consider finally early voting hours at the Prairie View City Hall. Waller County provided for five hours there on one day at the beginning of the second week of early

---

[292]  See above at ¶¶ 99–101; see also above at Table 3 and Figure 4; compare Dkt 125-6 (PX 6, 2016 general election early voting locations and hours) with above at Figure 2.

[293]  See above at Table 3.

[294]  See above at ¶¶ 99–101.

voting.[295] Given that there's no relative correlation to the preceding 2016 general election, this is simply an overall increase. True, that location isn't as geographically convenient to PVAMU as either the MSC or the WCCC. But it was certainly more convenient to students than some other locations were to their nearest voters. Regardless, it can't be said that additional hours at the Prairie View City Hall somehow *increased* inconvenience. To the contrary, providing an alternative location to voters in other areas in and around Prairie View potentially relieved at least some congestion that might have otherwise built up at the MSC and the WCCC.

Plaintiffs emphasize that, when determining whether to add additional hours of early voting in and around Prairie View, the Waller County Commissioners Court expressly chose to site those hours at the WCCC—instead of at the MSC as requested by PVAMU students. Among others, they point to testimony of Xante Wallace, in which he said that the WCCC shouldn't be a voting site because "it's not at the epicenter of community life."[296] But determination of a supposed *epicenter* isn't the relevant standard. That is, Waller County needn't maximize voting convenience in some ephemeral sense as to some—which can necessarily only come from a marginal inconvenience imposed on others—in order to avoid violation of the Voting Rights Act. Rather, Waller County must simply refrain from imposing a discriminatory burden. And the record on that score is clear that the Waller County Commissioners Court was focused on determining the most convenient location for *all* voters in and around Prairie View. And it simply must be noted that the WCCC draws its acronym from the one and only community center located in Waller County.

---

[295]   See above at ¶ 169.

[296]   Dkt 162 at 209:13–16 (2 Tr, Wallace testimony); see also Dkt 175 at ¶ 236 (Plaintiffs' findings of fact) and accompanying citations.

Plaintiffs' claim to burden essentially distills only to the fact that PVAMU had fewer early voting days and hours than the cities of Brookshire, Hempstead, and Waller. But that itself ignores the fact that Brookshire and Waller—like Prairie View—are also majority-Black voting populations.[297] It also ignores the fact that PVAMU in and of itself had more hours than Katy, Fields Store, and Monaville—each of which is a majority-White voting population.

Dr Robert Stein (as Plaintiffs' elections and voting expert) also testified that it's reasonable to take differences among voters into account when setting an election schedule.[298] And the evidence shows that the average distance to the polls for a voter in Precinct 309 (at PVAMU) is less than half a mile, in contrast to other voters in Waller County who had to travel far greater distances and expend much more time.[299]

Waller County is plainly entitled to take into account the unique circumstances of the proximity of PVAMU students to the MSC and WCCC when allocating early voting hours. And the evidence shows that PVAMU students—whether living on or off campus—go to the MSC almost every day, often multiple times a day.[300] By siting early voting at both the MSC and the WCCC, Waller County in fact afforded Plaintiffs multiple opportunities throughout those days to cast a ballot while going about their routine daily business.

Moreover, Dr Stein didn't establish any concrete or tangible burden on Plaintiffs' right to vote. According to Dr Stein, the best practice for establishing distance to a polling place is to site it between 0.25 and 0.5 miles from a

---

[297]   See above at Table 3.

[298]   Dkt 162 at 152:20–153:12 (2 Tr, Stein testimony).

[299]   For example, see Dkt 168 at 111:8–113:4 (Gimpel testimony).

[300]   Dkt 161 at 76:17–77:9 (1 Tr, J Allen testimony); Dkt 162 at 28:11–20 (2 Tr, Barbour testimony).

focal point of a population's activities.[301] By siting voting at both the MSC (on campus) and at the WCCC (less than a seven-minute walk from the MSC), Waller County has done just that. More importantly, Dr Stein offered no evidence suggesting that voters in Prairie View had to travel any farther during early voting than voters in other parts of Waller County.[302]

While Dr Stein elsewhere speculates that "there might have been some voters who might otherwise have voted" under a different schedule, he acknowledges having no evidence to support that observation.[303] And even if *some voters* might have voted under different circumstances, Dr Stein fails to show—and doesn't purport to show by his opinion, if such speculation can even properly be called an expert opinion—that the Black PVAMU student voters are actionably burdened in their ability to vote in comparison to other voters throughout Waller County.

Dr James Gimpel (as Defendants' elections and voting expert) testified that Dr Stein's data doesn't show excess demand. Rather, it shows a group of voters who were mobilized and had the opportunity to vote.[304] And Waller County made it easy for them to do so. This isn't simply because it sited convenient polling places at the MSC, but also because it provided double the equipment there to allow two voting lines to move voters through quickly. The hours devoted immediately adjacent to PVAMU at the WCCC also matter. So while Dr Stein points to what he deems a high number of voters per hour as a sign of demand, he admits that could simply be a consequence of the added machines.[305] To the extent he testified that he "suspects" and "presumes" that *if* there were more early voting hours, there "might" *then* be more people who

---

[301] Dkt 162 at 207:14–18 (2 Tr, Stein testimony).

[302] Id at 209:10–15.

[303] Id at 219:13–220:13.

[304] Dkt 168 at 125:19–25 (8 Tr, Gimpel testimony).

[305] Dkt 162 at 224:5–225:1 (2 Tr, Stein testimony).

weren't in line at all, he also admitted that he has "no knowledge" that such would actually be the case.[306]

Dr Stein criticizes Dr Gimpel for focusing on turnout this way: "What is relevant is not whether the County's early voting schedule caused more or fewer people to vote early, but whether the *opportunity* to *vote early* was equally accessible to Black and White voters and younger and older voters. Turnout, in a dispute about *access*, misses the mark."[307]

But it's that distinction—treating putative opportunity as utterly distinct from objective turnout—that actually appears to miss the mark here for at least two reasons. First, the fact of large turnout is itself obviously probative of access and opportunity. True, large turnout can exist even in the face of less access. But high turnout as an *objective* matter is at the very least supportive of adequate access. Second, it bears emphasis that the raw number of early voting hours is but one component of the right to exercise the franchise. Where one precinct has fewer early voting hours than some others—but more early voting hours than others—it simply can't be said that mere comparison to precincts with higher hours *ipso facto* establishes a discriminatory burden. For that would not allow for variance in hours between precincts at all, where distance, size of voting population, and other factors all must be considered to understand any actual burden (and disparity) that might exist.

It also can't be denied that the hours dedicated to early voting at the MSC and the WCCC provided PVAMU students a clear opportunity to vote in the 2018 general election. Dr Gimpel thus observed, quite sensibly, that the question of whether a particular PVAMU voter took that opportunity came down to mobilization and motivation.[308] And the evidence shows that students working for

---

[306]   Id at 225:4–226:10.

[307]   Dkt 125-159 at 4 (PX 159, Stein rebuttal report) (emphasis in original).

[308]   Dkt 168 at 77:4–78:22 (8 Tr, Gimpel testimony).

particular campaigns were waiting at the MSC and "pushing people" into the polls.[309] Indeed, Maia Young testified that she was so focused on getting students into the polls at the MSC that she herself didn't have time to vote until election day.[310]

Dr Stein notably didn't analyze whether the putative demand he observed was somehow related to the schedule as opposed to the result of rigorous (and admirable) mobilization efforts at the MSC—and so was unable to offer an opinion as to cause in that respect.[311] And in any event, notwithstanding active *get out to vote* efforts and Dr Stein's perceived high demand for early voting, Plaintiffs produced no evidence to show that hours dedicated to early voting in the areas in and around Prairie View were insufficient to give those voters anything other than an equal opportunity to vote. In short, nothing in the record suggests that meaningful waiting times accrued or that any student was turned away from early voting at either the MSC or the WCCC.

This circumstance doesn't support Plaintiffs' claim.

### ii. Degree of deviation from standard voting rules in 1982

Neither party presented much by way of evidence as to the type or prevalence of early voting as of 1982 because *Brnovich* came down after trial in this matter concluded. But it's notable that the Supreme Court specifically noted there that "it is relevant that in 1982 States typically required nearly all voters to cast their ballots in person on election day and allowed only narrow and tightly defined categories of voters to cast absentee ballots." 141 S Ct at 2339. Discussion above likewise makes clear that even today there's no standard means by which the various states have permitted early voting. The timing, hours, and

---

309   Dkt 166 at 213:4–15 (6 Tr, Young testimony).

310   Id at 213:16–214:9.

311   Dkt 162 at 240:17–242:8 (2 Tr, Stein testimony).

locations of such voting varies by state, with a handful still offering no in-person early voting options at all.[312]

No deviation from any supposed norm in 1982 is apparent here. This circumstance doesn't support Plaintiffs' claim.

### iii. Size of racially disparate impact of voting rule

The Supreme Court in *Brnovich* cautioned, "To the extent that minority and non-minority groups differ with respect to employment, wealth, and education, even neutral regulations, no matter how crafted, may well result in some predictable disparities in rates of voting and noncompliance with voting rules." 141 S Ct at 2339. "What are at bottom very small differences," it then observed, "should not be artificially magnified." Ibid.

Even with that observation in mind, nothing in the record credibly suggests that the voting schedule implemented by Waller County during the 2018 general election placed any racially disparate impact upon Black voters in Waller County (or any segment among them). With respect to Waller County as a whole, the voting schedule devoted the greatest number of early voting hours to Hempstead and Brookshire, both of which are Black-majority CVAP areas. With respect to the area in and around Prairie View (and including PVAMU), it received three days with extended hours of early voting (7:00 AM to 7:00 PM) on campus at the MSC, along with two further days of extended hours within the original campus footprint at the WCCC. That allocation amounts to more twelve-hour voting days than any other polling place in Waller County. Also available were five hours at the Prairie View City Hall, with ease of access at least comparable to—and likely better than—the convenience of locations afforded by the closest polling places to other voters elsewhere in Waller County.[313]

---

[312] See above at ¶¶ 66 & 67.

[313] See above at Table 3 and Figure 3.

The evidence presented in this case also shows that Waller County's allocation of polling places and hours was adequate and afforded an equal opportunity to any PVAMU student (including Plaintiffs) to cast a ballot if they wanted to do so. For example, Treasure Smith and Damon Johnson testified that they were each able to cast a ballot at the MSC without incident and in just a few minutes.[314] Jayla Allen and Joshua Muhammad testified that they voluntarily elected to vote at the Waller County Courthouse in Hempstead. But neither offered evidence that they couldn't avail themselves of the voting opportunities provided by Waller County at the MSC or WCCC (aside from any purported mild inconvenience such as those addressed above).[315]

Allen, Muhammad, and others did testify that they offered rides to classmates to vote off campus during the first week of early voting. But none of the evidence offered suggests that those rides were necessary for any student to have had an opportunity to vote. In any event, and quite to the contrary, any student without a ride would have been able to vote at the MSC or WCCC, transport to which either isn't required or is provided by free campus shuttle bus.

Likewise, Plaintiffs' counsel conceded that there's no evidence in this case of "excess demand" at the MSC or WCCC in the form of long lines or anyone being turned away at the end of the day.[316] Nor is there any evidence of actual voter confusion or intimidation—much less that any PVAMU voter was actually impeded in their ability to cast a ballot (aside from any putative inconvenience or disappointment from having to wait for on-campus early voting to begin during the second week). The evidence is instead to the contrary, establishing that Plaintiffs and

---

[314] Dkt 164 at 196:4–8 (4 Tr, Smith testimony); Dkt 164 at 168:1–8 (4 Tr, Johnson testimony).

[315] Dkt 161 at 118:15–119:2 (1 Tr, J Allen testimony); Dkt 166 at 77:10–78:2 (6 Tr, Muhammad testimony).

[316] Dkt 162 at 220:22–221:10 (questioning by Court).

each of their witnesses was able to cast a ballot without difficulty after waiting only five to ten minutes.

This circumstance doesn't support Plaintiffs' claim.

### iv. Other opportunities provided by state's overall voting system

The Supreme Court in *Brnovich* noted that the opportunities presented by the state's overall voting system is pertinent because of Section 2(b)'s "reference to the collective concept of a State's 'political processes' and its 'political process' as a whole." 141 S Ct at 2339. It thus reasoned that "where a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means." Ibid.

As detailed above, *any* voter in Waller County could vote early and in person during the hours established for *any* polling place. This means that PVAMU voters weren't limited to the hours set for the MSC or the WCCC. They could instead vote early at any other location—just like every other Waller County voter. Likewise, these early voting hours were also cumulative to the hours available on election day itself. And it must also be remembered in that respect that the MSC had its own polling place open and available on election day.[317]

This circumstance doesn't support Plaintiffs' claim.

### v. Strength of state interests served by challenged voting rule

The Supreme Court in *Brnovich* stated, "Rules that are supported by strong state interests are less likely to violate § 2." 141 S Ct at 2340.

The interests asserted by Waller County in setting the hours and locations for early voting during the 2018 general election are summarized above. These include devotion of limited voting machines and equipment among an array of population centers, with attention to historical usage and statistics; the number and availability of trained

---

[317] See above at ¶¶ 70, 86 & 87.

poll workers; the accessibility and ease of access of potential polling places; and election-related security concerns.[318]

Nothing suggests that such interests aren't legitimate. Indeed, they seem to be a matter of common sense. More important, no evidence suggests that such asserted interests were pretextual. To the contrary, Waller County has established a legitimate interest in administering and facilitating early voting throughout the entirety of its jurisdiction, and the early voting schedule adopted for the 2018 general election was rationally related to that interest. On the other hand, Plaintiffs have failed to show that such schedule lacked a rational relationship to Waller County's legitimate interest in allocating its limited voting resources to serve all voters within its jurisdiction.

This circumstance doesn't support Plaintiffs' claim.

### vi. Conclusion as to burden

Based upon analysis of the five *Brnovich* circumstances, the early voting schedule adopted by Waller County in advance of the 2018 general election as a matter of law didn't impose a discriminatory burden on Black voters at PVAMU such that those voters had less opportunity than other voters in Waller County to participate in the political process and to elect representatives of their choice.

As such, Plaintiffs fail to satisfy the first part of the analysis required by *Veasey*.

### b. Social and historical discriminatory conditions

The above finding under the first part of the Fifth Circuit's test for abridgement claims under Section 2 of the Voting Rights Act obviates the need to address the second part of that test. Even so, given the importance of the claims at issue here and the likelihood of appeal, sound

---

[318] See above at ¶¶ 73–82 (Waller County general process) & 107–10 (Waller County process as to 2018 general election).

judicial husbandry warrants determination as to whether any putative burden was caused by or linked to social and historical conditions producing discrimination against members of the protected class such that the burden is on account of race.

The second *Veasey* prong in this respect requires a district court to examine several factors set out by the Supreme Court in *Thornburg v Gingles*, 478 US 30 (1986), which aid in analyzing whether the burden imposed was caused by or is linked to social and historical discriminatory conditions. These include:

- o *First,* the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

- o *Second,* the extent to which voting in the elections of the state or political subdivision is racially polarized;

- o *Third,* the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

- o *Fourth,* if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

- o *Fifth,* the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process;

- o *Sixth,* whether political campaigns have been characterized by overt or subtle racial appeals;

o   *Seventh,* the extent to which members of the minority group have been elected to public office in the jurisdiction;

o   *Eighth,* whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

o   *Ninth,* whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Veasey*, 830 F3d at 245–46, citing *Gingles*, 478 US at 36–37, in turn citing S Rep No 97-417 at 28–29 (1982).

The Fifth Circuit notes, "These factors provide salient guidance from Congress and the Supreme Court on how to examine the current effects of past and current discrimination and how those effects interact with a challenged law." *Veasey*, 830 F3d at 246. The factors aren't exclusive; none are dispositive; not every factor is relevant in every case; and there is no requirement that any particular number (or even a majority of them) point one way or the other. Ibid. In short, these factors simply suggest a framework for evidence to be presented at trial which is likely to aid a court's later consideration towards legal conclusions.

The Supreme Court in *Brnovich* further explained that some factors "are less helpful" in a case—like this one— "involving a challenge to a facially neutral time, place, or manner voting rule." 141 S Ct at 2340. It specifically noted that the relevance of the second, third, fourth, sixth, and seventh factors "is much less direct" in such cases, though the factors shouldn't be disregarded altogether. Ibid. This is so largely because "the *Gingles* or 'Senate' factors grew out of and were designed for use in vote-dilution cases," meaning that some of the *Gingles* factors are "plainly inapplicable." Ibid. Judges Higginson and Costa made similar observations when concurring with the Fifth Circuit's opinion of *Veasey v Abbott*. See 830 F3d at 273.

94

### i. Extent of history of official discrimination that affected the right of minority group to participate in political process

Prior findings establish historical instances in Waller County of discrimination against PVAMU students. Of recent prominence, the Fifth Circuit in *Veasey v Perry* observed:

> For example, in a state with 254 counties, we do not find the reprehensible actions of county officials in one county (Waller County) to make voting more difficult for minorities to be probative of the intent of legislators in the Texas Legislature, which consists of representatives and senators from across a geographically vast, highly populous, and very diverse state.

830 F3d at 232.

That statement refers to findings by Judge Nelva Gonzalez Ramos in four paragraphs within an overall opinion exceeding eighty pages in length, as to events in Waller County in 1971, 1992, 2003, and 2008. 71 F Supp 3d at 635–36. In context, *Veasey* addressed overall the claim that the 2011 voter identification law in Texas violated the Voting Rights Act. This means that the findings of facts and conclusions of law entered by Judge Ramos addressed a law generally applicable in Texas, without derivation from or application to Waller County. See *Veasey v Perry*, 71 F Supp 3d 627 (SD Tex 2014), aff'd in part, vacated in part, and rev'd in part, sub nom, *Veasey v Abbott*, 830 F3d 216 (5th Cir 2016). In short, conduct in or by Waller County wasn't specifically at issue.

Still, this Court denied summary judgment and set this matter for trial in large measure so that the parties might be fully heard on those concerns—with observation that "regardless of the distance of time, these practices still must be candidly acknowledged and taken into account in the present." 472 F Supp 3d at 361.

The parties in their joint admissions of fact review the instances outlined by Judge Ramos as to 1971, 1992, 2003, and 2008, as quoted above within paragraph 60 regarding historical discrimination in Texas and Waller County. Beyond this, Plaintiffs in their proposed findings of fact also reference other alleged instances in 1990, 2002, 2006, and 2015 to which Defendants don't stipulate.[319]

Each is addressed in turn. Certain ones (2002, 2006, and 2015) aren't sufficiently substantiated as to warrant consideration. Others (1990 and 2008) are substantiated but don't appear to present instances of pertinent historical concern. Still others (1971, 1992, and 2003) are both substantiated and concerning. But lacking throughout is linkage between any of these historical instances and conduct at issue in this action by any of the Defendants or (more generally) the Waller County Commissioners Court as the governing body of Waller County.

This isn't to say that the substantiated instances haven't shaped and sensitized this Court's review of the evidence and the concerns of the parties. They have, as those instances both illuminate the background and provide useful context. It's simply to say that any requisite connection to animus or discrimination on the part of the Waller County Commissioners Court can't reasonably be seen at present from these aspects of history.

*As to 1971,* recounted above at paragraph 60, it involved literal prohibition of the right of PVAMU students to vote if they or their families didn't own property in Waller County. That is of considerable concern and was rightly condemned by a three-judge panel in 1978. *United States v Texas*, 445 F Supp 1245, 1252 (SD Tex 1978), aff'd sub nom, *Symm v United States*, 439 US 1105 (1979). But it must be noted that such action was taken by the independently elected tax assessor/collector and *ex officio* registrar of Waller County. The panel recognized that the offending official wasn't under the control of the Waller County Commissioners Court, and no evidence suggested

---

[319]   See above at ¶ 61.

96

that it (as Waller County's governing body) had "in any degree participated" in the pertinent actions. *United States v Texas*, 445 F Supp at 1253. The panel also specifically denied relief against the Waller County Commissioners Court. Id at 1262.

*As to 1990,* Plaintiffs note that until that time, Waller County divided the area in and around Prairie View (including PVAMU) into a number of commissioner precincts, thus preventing that area's majority-Black population from electing a candidate of their choice to the Waller County Commissioners Court.[320] But that was expressly corrected in 1991. Plaintiffs thus quote this passage: "The purpose of uniting Prairie View in 1991 was to remedy dilution that had resulted from the earlier fracturing of Prairie View's largely African-American population."[321] This change presumably came on the initiative, vote, and approval of the Waller County Commissioners Court. Regardless, it speaks well to the *correction* of an issue of concern, rendering its historical antecedent less probative.

*As to 1992,* recounted above at paragraph 60, it is likewise concerning that the Waller County District Attorney indicted PVAMU students for alleged illegal voting, which charges were dropped upon protest by the Department of Justice.[322] But very little by way of factual explanation is in the record on this event. And lacking again is any suggestion of connection to the Waller County Commissioners Court as Waller County's governing body. And so again, beyond specification that this event did occur and does provide some context, Plaintiffs don't otherwise establish connection to present actions by the Waller County Commissioners Court or any Defendant.

---

[320] See Dkt 175 at ¶ 68 (Plaintiffs' findings of fact) and accompanying citations.

[321] See ibid, quoting Dkt 124-6 at 143 (DX 83, Waller County response to DOJ).

[322] See also Dkt 175 at ¶¶ 69 & 70 (Plaintiffs' findings of fact) and accompanying citations.

*As to 2002,* the Department of Justice objected to a proposed redistricting plan by Waller County, citing census data and statistical analyses indicating that the plan seemed designed to undermine the effectiveness of minority voters.[323] The challenge itself involved a redistricting plan that hadn't been precleared under Section 5 of the Voting Rights Act, which is itself no longer applicable to the State of Texas or Waller County after the Supreme Court's decision in *Shelby County v Holder*, 570 US 529, 535, 556 (2013). In any event, Waller County confessed error at having proceeded with an election on a redistricting plan that wasn't precleared, while also responding that its actions didn't otherwise violate the Voting Rights Act in part because the redistricting plan was measured against an inaccurate digital map.[324] The ultimate resolution of this instance wasn't made clear at trial or in the parties' filings. Regardless, it pertains to issues presenting a different sort of legal challenge pursuant to Section 5 of the Voting Rights Act, which standard no longer applies.

*As to 2003,* this is referenced above at paragraph 60. It's concerning to the extent that a Waller County District Attorney was understood—in a letter to the editor of the *Waller Times*—to have threatened to prosecute PVAMU students who didn't meet his definition of being a Waller County resident.[325] Such a threat would be anti-democratic of its very nature, conceivably chilling the motivation of students to register and vote. But far less of an established

---

[323]  See Dkt 175 at ¶ 71 & n 6 (Plaintiffs' findings of fact), citing Dkt 130 (notice of Plaintiffs' proposed transcriptions as to PX 91 & PX 92), Dkt 130-1 (PX 91, 07/27/1976 DOJ letter to Waller County Commissioners Court), and Dkt 130-2 (PX 92, 03/10/1978 DOJ letter to Waller County Commissioners Court).

[324]  Dkt 124-6 at 139–29 (DX 83, Waller County response to DOJ).

[325]  See Dkt 175 at ¶ 72 (Plaintiffs' findings of fact) and accompanying citations.

record exists on this as compared even to the similar allegations from 1992. And again, lacking is any suggestion of connection to the Waller County Commissioners Court as Waller County's governing body. Beyond specification that this event did occur and does provide some context, Plaintiffs don't otherwise establish connection to present actions by the Waller County Commissioners Court or any Defendant.

*As to 2006,* Plaintiffs note that a massive voter registration drive was successful in increasing new voter applications for the 2004 national election after the above instance of 2003. They assert that there were then more voter challenges in 2006 to successive efforts to register Black voters in Waller County, including at PVAMU.[326] But specification of details is lacking, and there isn't any indication of a legal challenge—much less its resolution. As such, this lacks probative value.

*As to 2008,* Plaintiffs allege that Waller County attempted to reduce early voting locations from six to one, and only located three additional sites (with one closer to PVAMU) after the filing of a lawsuit.[327] Defendants don't stipulate to this. But even assuming it's sufficiently established, limiting early voting sites to a single location would on its face appear to treat all citizens equally—even if making it equally inconvenient to a great majority of voters. Regardless, Plaintiffs acknowledge that the Waller County Commissioners Court ultimately sited a polling place close to PVAMU. No adverse legal determination appears to have been made in this regard.

*Also as to 2008,* Waller County made a number of voting changes without seeking preclearance. These pertained to implementation of "unprecleared registration practices." Waller County entered a consent decree with the Department of Justice prohibiting these practices.[328] Like that in 2002, the consent decree turns on the

---

[326] See id at ¶ 74 and accompanying citations.

[327] See id at ¶ 75 and accompanying citations.

[328] See id at ¶ 76 and accompanying citations.

requirements and standards under Section 5 of the Voting Rights Act. It also reflects that the governing body of Waller County conceded the error of its separately elected Tax Assessor and Registrar in implementing the challenged practices and negotiated in good faith to resolve the matter with the DOJ. Although more recent, it simply isn't probative of the issues in this case.

*As to 2015,* for the 2016 primary election, the Waller County Commissioners Court initially approved a recommendation by the local Democratic and Republican party chairs to reduce the number of early voting places from eight to two, with one at each end of Waller County.[329] While Plaintiffs reference this fact, no evidence suggests that such action was in any way imbued with discriminatory intent against Black voters in Waller County generally or Prairie View specifically. To the contrary, the proposed plan eliminated early voting places throughout Waller County—including the location in the city of Waller itself. Regardless, when concerns were expressed about the negative impact of the proposed changes on all voters, the Waller County Commissioners Court responded by not only restoring the abandoned locations, but also adding an early voting polling place at the MSC for the first time.[330] This example is thus both the most recent and the most factually analogous. And when considered on the whole as to the ultimate result, it certainly doesn't evidence discrimination against Black voters in and around Prairie View. It's instead actually an event that favors Defendants.

As noted by the Fourth Circuit, "A legislature's past acts do not condemn the acts of a later legislature, which we must presume acts in good faith." *North Carolina State Conference of the NAACP v Raymond*, 981 F3d 295, 298 (4th Cir 2020); see also *Shelby County,* 570 US at 535, 556; *Veasey,* 830 F3d at 232, citing *McCleskey v Kemp,* 481 US 279, 298 n 20 (1987). And this Court does accord Waller

---

[329]   See above at ¶¶ 91 & 92.

[330]   See above at ¶¶ 93–99.

County that presumption of good faith at the outset, which Plaintiffs haven't overcome.

But even beyond that observation, other reasons affirmatively suggest that the above events have little probative value as to actions of the current Waller County Commissioners Court in adopting the early voting schedule for the 2018 general election. One is that the schedule as originally adopted was supported by the local Democratic and Republican party chairs in Waller County. It's meaningful—and these days, perhaps unusual—that the two political parties between them representing an overwhelming majority of voters in Waller County discerned no cause of concern in the early voting schedule.

Another is that the schedule that ultimately went forward was also supported by both David Allen (as Mayor of Prairie View) and Jeron Barnett (as Waller County Commissioner for Precinct 3, which serves Prairie View). While in no way dispositive, it's again meaningful on the margin that these political officials—who are themselves Black and who were elected to represent the interests of constituents in majority-Black areas of Waller County— didn't object to the voting schedule at issue.

Also important is the fact that current representatives of the Waller County Commissioners Court made clear their awareness of this past history, their lack of prior participation in it, and their disavowal of it. For example, County Judge Duhon testified that he was born in Louisiana, moved to Texas with his family as a child, and only moved to Waller County as of 2005, making him obviously unrelated to any such historical events.[331] He also testified to his general awareness of the historical allegations above, and to the fact that he has publicly stated that the Waller County Commissioners Court doesn't have a good history in the voting rights arena. But this simply informs his other testimony as to outreach on the PVAMU campus to build a relationship of trust and

---

[331]   Dkt 170 at 77:5–18 (10 Tr, Duhon testimony).

respect with the students, along with his attention to the concerns raised during the 2018 election cycle.[332]

Commissioner Beckendorff testified to other points in this regard from the perspective of a lifelong resident. He explained that he was familiar with Waller County's past transgressions, that he didn't participate in or condone those actions, and that all he could do—and did attempt to do—was his best to increase voting accessibility to all citizens going forward.[333] And he made this resonant point when so testifying:

> We learn from the history, but we don't live in the past. We live in today. History has the luxury of being hindsight's 20/20, and so we try and, you know, do better. I don't think anybody that's listening right now can say that, hey, hindsight's not 20/20.
>
> You live and you learn by your mistakes, and you make better decisions. I try to do that in my everyday life. Am I perfect? Absolutely not, but I try to do better. And, again, the decisions we've made, I think, have tried to increase accessibility to all citizens.[334]

This factor pertains to historical instances of official discrimination. History of its nature addresses facts already written in the past. Those facts can't now be rewritten, and so this factor won't ever be one viewed in favor of Waller County. The established instances of discriminatory animus or conduct aren't to be minimized, and indeed, they have informed consideration of the evidence pertinent to the subject of this lawsuit.

---

[332]   See above at ¶ 175.

[333]   Dkt 169 at 147:15–149:14 (9 Tr, Beckendorff testimony).

[334]   Id at 148:12–21.

Still, this factor isn't intended as some free-floating condemnation of all subsequent conduct by a political governing body. It's meant to inform consideration of particular conduct by particular defendants in particular lawsuits. And as applied here to Defendants and their conduct under scrutiny, this factor is ultimately neutral as to any finding of a violation of Section 2 of the Voting Rights Act. Plaintiffs' evidence simply doesn't connect any historical instances of official discrimination with reasonably contemporaneous official discrimination affecting the right of Black voters in Waller County or Prairie View to participate in the political process.

### ii. Extent of racially polarized voting

This factor is one stated by the Supreme Court to be of lesser probative value when the issue at hand (as here) concerns a facially neutral time, place, or manner voting rule, rather than the existence and effect of alleged vote dilution. See *Brnovich*, 141 S Ct at 2340. In any event, Dr Henry Flores (as Plaintiffs' statistician) didn't conduct any analysis of racial polarization in any elections pertinent to this case. He instead simply relied on the finding of racially polarized voting in the Fifth Circuit's decision in *Veasey v Abbott*.[335] But that finding addressed Texas as a whole, without any specific finding as to Waller County. See 830 F3d at 258. It simply isn't sufficient to support a current finding of racially polarized voting specific to Waller County in 2018. As such, Plaintiffs haven't offered sufficient evidence to show racially polarized voting in Waller County.

This factor doesn't support a finding of a violation of Section 2 of the Voting Rights Act.

### iii. Extent of use of practices that enhance opportunity for discrimination against minority group

This factor is another stated by the Supreme Court to be of lesser probative value when the issue at hand (as here) concerns a facially neutral time, place, or manner voting

---

[335] Dkt 125-156 at 39–40 (PX 159, Flores report).

rule, rather than the existence and effect of alleged vote dilution. See *Brnovich*, 141 S Ct at 2340. Indeed, Plaintiffs have neither alleged nor offered evidence to show the use by Defendants of practices that enhance the opportunity for discrimination against Black citizens in Waller County or the areas in and around Prairie View.

This factor doesn't support a finding of a violation of Section 2 of the Voting Rights Act.

### iv. Existence of slating process in which minority group members were denied participation

Like the prior two factors, this factor is another stated by the Supreme Court to be of lesser probative value when the issue at hand (as here) concerns a facially neutral time, place, or manner voting rule, rather than the existence and effect of alleged vote dilution. See *Brnovich*, 141 S Ct at 2340. And Plaintiffs have neither alleged nor offered evidence to show the existence of any slating process in Waller County in which Black citizens were denied participation.

This factor doesn't support a finding of a violation of Section 2 of the Voting Rights Act.

### v. Extent to which members of minority group bear effects of discrimination in areas that hinder their ability to participate in political process

William Cooper (as Plaintiffs' expert demographer) testified and provided certain census data generally establishing that—as compared to White residents both in Prairie View and in Waller County overall—Black residents of Prairie View are socioeconomically disadvantaged by reference to poverty rates, income, employment rates, transportation access, and educational attainment.[336] But that level of generality isn't particularly helpful to present analysis, where the concern must be

---

[336]   See above at ¶¶ 57 & 58.

measured as to a particular group of putatively affected voters—here, essentially being Black PVAMU students. And in that respect, Cooper conceded that his comparative figures were drawn from reported data that didn't include students who live in on-campus housing at PVAMU.[337]

Even as reported, the data doesn't show discriminatory effects that are meaningful in this context. Consider education as one important benchmark. To the extent contention exists that PVAMU voters bear the effects of discrimination in education, it's belied by the very fact that they are college students, currently and admirably working toward a four-year degree at a premiere public university in Texas. Likewise, it's not surprising that the data shows that 33.2% of Black residents in Prairie View have attained a bachelor's degree or higher. By comparison, only 26.2% of Anglo residents (both in Prairie View and in Waller County as a whole) have attained a bachelor's degree or higher.[338]

Plaintiffs also failed to offer sufficient evidence to show that Black PVAMU voters bear the effects of discrimination in the area of health. To the extent Cooper reported some disability statistics, those figures (like those for education) tend to show that Black residents in Prairie View have a substantially lower rate of disability than White residents in Waller County generally.[339]

Plaintiffs did offer some evidence to show disparities in employment, income, and homeownership in and around Prairie View. But indication of disparities in that respect again isn't necessarily surprising in the context of a college town, where a significant portion of the residents are focusing on obtaining education, rather than joining the full-time workforce or working towards purchasing a home. And even to the extent Cooper reported data for *per capita* income of PVAMU dorm students, that statistic may not accurately represent the financial circumstances of

---

[337] Dkt 165 at 237:12–238:6 (5 Tr, Cooper testimony); see also Dkt 125-153 at 16 (PX 153, Cooper declaration).

[338] See above at ¶ 58.

[339] Dkt 125-153 at 111 (PX 153, Cooper declaration).

students, as it doesn't include income generated outside of Waller County such as parental support.[340]

The foregoing itself belies the most important aspect of this inquiry. These metrics aren't important in and of themselves. They are important to the extent it's shown that discriminatory effects in education, employment, health, and the like have *hindered* a minority's ability to participate in the political process. And beyond raw statistics, Plaintiffs offered no evidence showing that Plaintiffs or PVAMU students generally were hindered in their ability to cast a ballot during the early voting hours allotted by Waller County for the 2018 general election. The evidence instead establishes the opposite. Simply put, they were able to vote early at either the MSC or the WCCC (or on election day at the MSC) at no greater distance, expense, or exertion than any other voter in Waller County.

This factor doesn't support a finding of a violation of Section 2 of the Voting Rights Act.

### vi. Whether campaigns have been characterized by racial appeals

This factor is another stated by the Supreme Court to be of lesser probative value when the issue at hand (as here) concerns a facially neutral time, place, or manner voting rule, rather than the existence and effect of alleged vote dilution. See *Brnovich*, 141 S Ct at 2340. And again, Plaintiffs have neither alleged nor offered evidence to show that campaigns in Waller County have been characterized by racial appeals.

This factor doesn't support a finding of a violation of Section 2 of the Voting Rights Act.

### vii. Extent to which minority candi- dates have been elected to office in jurisdiction

This factor is one further stated by the Supreme Court to be of lesser probative value when the issue at hand (as here) concerns a facially neutral time, place, or manner

---

[340] See above at ¶ 57.

voting rule, rather than the existence and effect of alleged vote dilution. See *Brnovich*, 141 S Ct at 2340. And nothing suggests particular concern about this factor in the context of the particular claim at issue here.

Black candidates have rarely been elected to countywide office in Waller County, and no Black elected officials were in countywide positions at the time of trial.[341] On the other hand, a number of elected Black officials representing the areas in and around Prairie View testified at trial. These included Jeron Barnett, the Commissioner of Precinct 3 at the time of trial; David Allen, then Mayor of Prairie View; Frank Jackson, a former mayor of Prairie View; and Xante Wallace and Kendrick Jones, former PVAMU students and then-current members of the Prairie View City Council. Of note, Kendrick Jones was himself elected Commissioner of Precinct 3 in the 2020 election, shortly after trial concluded. This establishes quite clearly that election of Black candidates isn't a concern in the areas in and around Prairie View.

Beyond that fact, an underlying concern is whether minority voices are heard in a meaningful way during pertinent political decisions, versus being shut out of the process altogether. Of the above elected officials, it's thus notable that Jeron Barnett participated as Commissioner for Precinct 3 and voted on the 2018 general election schedule adopted by the Waller County Commissioners Court. When he voted in favor of those schedules, he cast that vote as an elected representative of the area in and around Prairie View, including PVAMU. Other individuals within his same minority affiliation aren't required to agree with that vote, and indeed they're entitled to be dissatisfied with it even to the point of bringing this litigation. But it simply can't be said that the minority's viewpoint was excluded from the process. Far from it. Instead, what occurred appears to be what's true across the

---

[341]  See Dkt 175 at ¶¶ 151 & 152 (Plaintiffs' findings of fact) and accompanying citations; Dkt 109-1 at ¶ 54 (joint stipulations of fact).

political spectrum—reasonable minds disagreed about the best solution to a particular problem. That doesn't mean prohibited racial animus is in evidence.

This factor doesn't support a finding of a violation of Section 2 of the Voting Rights Act.

### viii. Whether there is lack of responsiveness to needs of members of minority group

The evidence establishes that Defendants have been responsive to PVAMU students, both generally and in terms of voting.

Waller County has now a twenty-year practice (since 2002) of locating both early voting and election day voting close to—or directly on—the PVAMU campus.[342] The precise locations and times have varied. But the practice stands out in comparison to comparably sized counties with a college campus, which haven't historically had a practice of siting polling locations as close to college or university campuses as has Waller County. The evidence further shows that the Waller County Commissioners Court was responsive to the request by Priscilla Barbour for a polling place on campus for election day in 2013, and to subsequent requests for an early voting place at the MSC in 2016.[343] Even under HB 1888, Waller County continues to maintain an election day precinct at the MSC, while maintaining early voting at the WCCC, which is less than a seven-minute walk from the MSC.[344]

Comparison between the 2016 and 2018 general elections is particularly pertinent. Waller County hadn't sited early voting at the MSC prior to 2016. Upon request, and after much discussion, the Waller County Commissioners Court unanimously approved early voting on campus at the MSC for the 2016 general election, with

---

[342] See above at ¶¶ 83–101.

[343] See above at ¶¶ 85–87 & 99–101.

[344] See above at ¶¶ 179.

a total of nineteen hours over two days.[345] Waller County then doubled the hours for early voting at the MSC for the 2018 general election, with thirty-six hours over three days—thus avoiding long lines and waiting times and ensuring an easy voting experience for PVAMU students.[346]

As the Elections Administrator for Waller County, Eason and her elections office team also worked diligently in advance of the 2018 election to resolve the on-campus address issue to ensure PVAMU students who registered incorrectly were nevertheless able to exercise the franchise.[347] Testimony additionally established that County Judge Duhon routinely meets with PVAMU officials to collaborate with the University and strengthen the relationship between PVAMU and Waller County.[348] Eason further testified to conducting regular outreach at PVAMU, including Voter Deputy Registrar trainings. Her efforts have resulted in public compliments and expressions of gratitude from PVAMU students and other residents of Prairie View.[349]

This factor doesn't support a finding of a violation of Section 2 of the Voting Rights Act.

### ix. Whether policy underlying challenged practice is tenuous

The evidence establishes that the reasons articulated in support of adoption of the early voting schedule for the 2018 general election aren't tenuous. To the contrary, the adoption of that schedule was based on legitimate, non-discriminatory factors. These include the input of local party chairs; consideration of locations and hours used in past elections; and evaluation of local voting needs based

---

[345]  See above at ¶¶ 94–99.

[346]  See above at ¶ 169; see also above at Table 3 and Figure 4.

[347]  See above at ¶¶ 146–52.

[348]  See above at ¶¶ 175.

[349]  See above at ¶¶ 163.

on historical usage, the number of registered voters in an area, the competitiveness of a particular election, the number and availability of poll workers and the time it takes to train them, the availability of voting machines and equipment, and the accessibility and ease of use of a given location.[350]

Eason testified that, as the Elections Administrator for Waller County, she will often incorporate what has worked in the past when forming a new schedule.[351] Dr Robert Stein (as Plaintiffs' elections and voting expert) doesn't dispute that Waller County has remained consistent in its process for selection of voting sites.[352] And he further opined that the factors used by Waller County were legitimate and of the type typically employed by counties in setting early voting schedules.[353]

As noted, Eason considered historical turnout when developing the early voting schedule. On this point, Dr Stein allows for the possibility that Waller County's schedule simply aligns with where past turnout occurred, though he hasn't actually looked at past turnout.[354] His real complaint about the allocation of hours by Waller County appears to be that he believes that the number of registered voters would dictate greater hours. But he doesn't take into account the number of registered voters in rural areas of precincts surrounding Precinct 309 that might also use the polling place at the MSC.[355] He likewise fails to consider registered voters in the context of historical turnout. And Eason testified that past turnout is the relevant measure for hiring enough poll-workers and allocating sufficient equipment.[356]

---

[350]   See above at ¶¶ 73–78.

[351]   See above at ¶ 77.

[352]   Dkt 162 at 239:5–9 (2 Tr, Stein testimony).

[353]   See above at ¶ 79.

[354]   See above at ¶ 65.

[355]   Dkt 162 at 245:17–246:10 (2 Tr, Stein testimony).

[356]   Dkt 166 at 254:19–255:25 (6 Tr, Eason testimony).

A repeating objection by Plaintiffs is that Waller County officials never shared with members of the public the criteria used to develop voting schedules—and in particular with members of the student government or school representatives of PVAMU.[357] That does appear to be true— the criteria for developing the initial voting schedule wasn't disclosed in advance. But Plaintiffs cite nothing requiring such disclosure. Neither do they cite to such question or request being raised at any public meeting where the schedule was discussed, much less that the Waller County Commissioners Court refused to respond. On the other hand, the proposed schedule was itself disclosed in advance of the August 22nd and September 5th meetings, with ample opportunity for public note and comment.[358] The record thus in no way supports argument that PVAMU students lacked an opportunity to object to the schedule or to suggest revisions once proposed. Rather, the record establishes that none attended (or at least none objected) at those formative meetings.

Plaintiffs also challenge Waller County's reliance on the local Democratic and Republican party chairs in setting the early voting schedule. The evidence establishes that the Democratic and Republican parties are the two active political parties in Waller County—meaning they are the only two that have nominated candidates through a primary system. And Texas law specifically incorporates the input of local party chairs in serving as statutory members of the county election commission that itself appoints the county elections administrator.[359] It's in no way tenuous for Waller County to involve these chairs in the selection of early voting hours and locations given their central role in the political process.

True, not every PVAMU student may identify with either the Democratic or Republican party. But the

---

[357] For example, see Dkt 162 at 79:5–10 (2 Tr, Barbour testimony).

[358] See above at ¶¶ 107–10.

[359] See above at ¶¶ 74–76.

evidence shows that these parties are (not surprisingly) broadly representative of the concerns of local voters. For example, former Plaintiff Jayla Allen was herself the Democratic party chair for Precinct 309.[360] She testified that she saw her role as a representative of all Prairie View students, regardless of political affiliation.[361] Another example is Kendric Jones, who ran as a Democrat for the Waller County Commissioner seat in Precinct 3. He and other students testified that everyone should be properly represented and able to exercise the franchise regardless of party affiliation.[362] And importantly, the evidence in this case establishes that it wasn't a PVAMU student who initially requested the placement of early voting at the MSC in 2016. It was instead Dr Denise Mattox, who was at that time the Waller County Democratic Club President.[363]

As such, there's no evidence suggesting that the local Democratic and Republican party chairs aren't at least generally representative of most voters in Waller County. Beyond this, Plaintiffs presented no evidence that either party failed to represent and serve the interests of Black voters in Waller County. There's likewise no evidence that either local party chair intended the schedule for the 2018 general election to deny or abridge the ability of Prairie View residents to vote. Indeed, the schedule specifically allocated voting at both the MSC and the WCCC. And regardless, any students dissatisfied with the chair-approved plans remained free to provide their own input to the Waller County Commissioners Court.

In sum, the policies underlying adoption by Waller County of the early voting schedule for the 2018 general election aren't tenuous. This factor doesn't support a finding of a violation of Section 2 of the Voting Rights Act.

---

[360]  Dkt 161 at 57:2–60:1 (1 Tr, J Allen testimony).

[361]  Ibid.

[362]  Dkt 163 at 32:2–17 (3 Tr, Jones testimony); see also Dkt 166 at 50:7–18 (6 Tr, Young testimony).

[363]  See above at ¶ 94.

### x. Conclusion as to conditions

It's been determined above that the early voting schedule adopted by Waller County in advance of the 2018 general election imposed no discriminatory burden on Black students at PVAMU. Based upon analysis of the nine *Gingles* factors, to the extent that any marginal burden could be perceived here, it wasn't caused by or linked to social and historical conditions that have previously produced (or currently produce) discrimination against Black voters as a protected class.

As such, Plaintiffs fail to satisfy the second part of the analysis required by *Veasey*.

### c. Conclusion

The Fifth Circuit in *Veasey* bounded its adoption of this overall two-part framework—and the attendant analysis of the *Gingles* factors—with cautionary language about use of this test in relation to facially neutral election laws. It stated in preface:

> To prove that a law has a discriminatory effect under Section 2, Plaintiffs must show not only that the challenged law imposes a burden on minorities, but also that "a certain electoral law, practice, or structure interacts with social and historical conditions to *cause* an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."

830 F3d at 243–44 (emphasis in original), quoting *Gingles*, 478 US at 47. It likewise noted the argument that "all manner of neutral election laws may be struck down" under this two-part framework. *Veasey*, 830 F3d at 246. Although it rejected that concern, it stated, "Use of the two-factor test and the *Gingles* factors limits Section 2 challenges to those that *properly link* the effects of past and current discrimination with the racially disparate effects of the challenged law." Ibid (emphasis added).

As instructed by the Fifth Circuit, this admonition has been kept firmly in mind when considering the evidence at trial so that the test isn't itself "dangerously limitless in application." Id at 247.

The Court concludes as a matter of law that Plaintiffs have failed to prove their claim of a racially discriminatory effect in violation of Section 2 of the Voting Rights Act. Defendants are entitled to judgment on this claim.

### 2. Intentional racial discrimination in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the United States Constitution

Aspects of the first cause of action and the entirety of the second state a claim for intentional discrimination to abridge the voting rights of Plaintiffs on account of their race through adoption of the early voting schedule for the 2018 general election. Plaintiffs assert a violation under the Fourteenth and Fifteenth Amendments, as implemented by both Section 2 of the Voting Rights Act and 42 USC § 1983.[364]

Section 2 of the Voting Rights Act covers claims asserting discriminatory purpose. See 52 USC § 10301; see also *Veasey*, 830 F3d at 229. The Fifth Circuit follows the test for violation of the Equal Protection Clause of the Fourteenth Amendment as stated by the Supreme Court in *Village of Arlington Heights v Metropolitan Housing Development Corp*, 429 US 252 (1977). See *Veasey*, 830 F3d at 230; see also *Overton v City of Austin*, 871 F2d 529, 540 (5th Cir 1989, *per curiam*). As such, "the rights and remedies are intertwined" insofar as Plaintiffs assert a claim based on discriminatory purpose under both Section 1983 and Section 2 of the Voting Rights Act. *Veasey*, 830 F3d at 265; see also *Ketchum v Byrne*, 740 F2d 1398, 1408–10 (7th Cir 1984).

The test under *Arlington Heights* examines five nonexclusive factors:

---

[364]   See Dkt 49 at ¶¶ 88–91 (amended complaint).

- o *First,* historical background of the decision;
- o *Second,* specific sequence of events leading up to the decision;
- o *Third,* departures from the normal procedural sequence;
- o *Fourth,* substantive departures; and
- o *Fifth,* legislative history, especially where there are contemporary statements by members of the decision-making body.

*Overton*, 871 F2d at 540, citing *Arlington Heights*, 429 US at 267–68.

A plaintiff alleging discriminatory intent by a state's legislature must first overcome the "legislative presumption of good faith"—a presumption that isn't "changed by a finding of past discrimination." *Perez*, 138 S Ct at 2324–25. And the Supreme Court holds that intentional discrimination isn't shown simply because a policy disproportionately affects members of a certain race. *Rogers v Lodge*, 458 US 613, 618 (1982), citing *Arlington Heights*, 429 US at 265. Instead, as the Fifth Circuit observes, "Legislators' awareness of a disparate impact on a protected group is not enough: the law must be passed *because of* that disparate impact." *Veasey*, 830 F3d at 231 (emphasis in original), citing *Personnel Administrator of Massachusetts v Feeney*, 442 US 256, 279 (1979); see also *Rogers*, 458 US at 618 (discriminatory intent must itself be shown).

As with a claim of discriminatory effect, this of necessity is a fact-intensive inquiry. The Fifth Circuit holds, "Under this intent-based approach, racial discrimination need only be one purpose, and not even a primary purpose, of an official act for a violation to occur." *Fusilier v Landry*, 963 F3d 447, 463 (5th Cir 2020) (quotation marks and citation omitted). Still, the Supreme Court has described this inquiry into the motivation behind official action as both "a problematic undertaking" and "a hazardous matter." *Hunter v Underwood*, 471 US 222, 228 (1985), citing *Rogers*, 458 US at 613, and *United States v*

*O'Brien*, 391 US 367, 383 (1968), respectively. And Plaintiffs "bear the burden to show that racial discrimination was a *substantial* or *motivating* factor behind enactment of the law; if they meet that burden, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Veasey*, 830 F3d at 231 (cleaned up, with emphasis added), quoting *Hunter*, 471 US at 228.

As already addressed, the early voting schedule ultimately adopted by Waller County didn't result in any adverse or disparate impact to voting rights of PVAMU student voters. That schedule actually provided them with a benefit quite unique among all other groups of voters in Waller County—that of having early voting provided both on and immediately adjacent to the location where they live, attend school, and regularly conduct daily activities.

The circumstantial evidence advanced by Plaintiffs doesn't support a contrary conclusion of discriminatory intent.

*As to the historical background of the decision.* The experience of Waller County as to early voting practices is summarized above, including as implemented in Prairie View and on campus at PVAMU.[365] Nothing there is discernible as discriminatory intent to abridge the ability of students at PVAMU to vote during the 2018 early voting period. It instead reflects increasing access and hours over the years.

*As to the specific sequence of events leading up to the decision.* Also addressed above in great detail are all aspects of the decisions by the Waller County Commissioners Court with respect to early voting during the 2018 general election.[366] The overall impression is one of a county legislative body doing its utmost to be responsive to the needs and concerns of voters within its jurisdiction. Nothing of a racially discriminatory purpose

---

[365] See above at ¶¶ 88–101.

[366] See above at ¶¶ 107–23 & 153–72.

can be seen in the sequence of events leading to the ultimate adoption of the early voting schedule.

Two points merit special attention. First, the schedule as originally proposed and adopted was one jointly agreed to by the local Democratic and Republican party chairs—with changes made to focus early voting on campus at PVAMU during the second week specifically to avoid concerns over crowds and parking associated with the PVAMU homecoming during the first week.[367] Second, the schedule as ultimately implemented was favored by both the Mayor of Prairie View and the Commissioner elected from that precinct.[368] As previously noted, the race of those elected officials isn't dispositive. But it's at least supporting, credible evidence that the decisions being made—even if of concern to students at PVAMU—weren't rankly targeting them by race.

*As to any departures from the normal procedural sequence.* Waller County adopted the early voting schedule for the 2018 general election during public meetings, for which the agenda and schedule were duly published in accordance with Texas law.[369] There's no evidence that Waller County departed procedurally from its normal decision-making process or the process it previously used to adopt early voting schedules. Indeed, Dr Robert Stein (as Plaintiffs' elections and voting expert) agreed that Waller County followed its prior process. And Dr Henry Flores (as Plaintiffs' statistician) testified that he didn't review prior processes and so couldn't offer an opinion in that regard.[370]

*As to substantive departures.* Neither was the early voting schedule for the 2018 general election a substantive departure from past schedules. It also didn't eliminate or reduce any early voting location or hours in or around

---

[367]   See above at ¶¶ 107 & 108.

[368]   See above at ¶¶ 158 & 159.

[369]   See above at ¶¶ 107–10.

[370]   Dkt 162 at 239:5–9 (2 Tr, Stein testimony); Dkt 165 at 167:23–168:11 (5 Tr, Flores testimony).

Prairie View. To the contrary, that schedule was an expansion from past elections, providing the greatest number of days and hours of early voting in the Prairie View area to date.[371] Indeed, the only deviation Dr Flores could identify was when Waller County further *increased* hours after the lawsuit was filed.[372] And responding to and addressing litigation commenced in the midst of an ongoing election isn't fairly characterized as a substantive departure by Waller County. Rather, it's a unique reaction attempting to ameliorate concerns stated in an independent legal proceeding instituted by a third party.

*As to legislative history and contemporary statements by members of the decision-making body.* As addressed above, no statement by any member of the Waller County Commissioners Court either when the early voting schedule for the 2018 general election was adopted on September 5th or at the subsequent meeting on October 17th were indicative of discrimination on the basis of race (or age).[373]

Plaintiffs rely solely on excerpts of two statements— one by Elections Administrator Eason that the original schedule in 2018 wasn't "equal representation," and another by County Judge Duhon that there was "an inequity" in the original schedule.[374] But context is important. And each credibly testified that these statements were only meant to recognize that the areas in and around Prairie View—like Fields Store, Monaville, and Katy—received fewer total early voting hours than Hempstead, Brookshire, and Waller. These statements don't of themselves suggest that either County Judge Duhon or Elections Administrator Eason believed that voters in and around Prairie View lacked access to a polling place or faced any unequal opportunity or greater burden to vote, or that the adopted schedule had the effect of

---

[371] See above at ¶¶ 114–16.

[372] Dkt 125-156 at 18–19 (PX 156, Flores report).

[373] See above at ¶¶ 107–10 & 153–69.

[374] See above at ¶¶ 155–57.

discriminating on the basis of race (or age)—much less that it was chosen *because of* such an effect.[375]

These individual statements are also of little to no probative value with regard to the motivation of the other four commissioners necessary to reach a majority vote by the Waller County Commissioners Court.

The Court concludes as a matter of law that Plaintiffs have failed to prove their claim of intentional race discrimination in violation of the Fourteenth and Fifteenth Amendments, as implemented by Section 2 of the Voting Rights Act and 42 USC § 1983. Defendants are entitled to judgment on this claim.

### 3. Age discrimination in violation of the Twenty-Sixth Amendment to the United States Constitution

The third cause of action asserts a claim for violation of the Twenty-Sixth Amendment under 42 USC § 1983. Plaintiffs allege in their amended complaint that the limitation of early voting on campus at PVAMU neither served nor was rationally related to any compelling state interest, and that as such Defendants intentionally discriminated against Plaintiffs based on their age.[376]

Determination of voter eligibility is largely a matter devoted to state or local control under the United States Constitution as originally proposed and ratified. For instance, Section 4 of Article I gives Congress the power to regulate the "Times, Places and Manner of holding Elections"—but not the power to fix qualifications for voting in elections. And so, a series of amendments have steadily recognized specific voting rights while at the same time allocating federal legislative power to ensure protection of those rights. For example, see US Const Amend XV, § 2 (congressional power to enforce prohibition against abridgement or denial of voting rights on account of race); US Const Amend XIX, § 2 (congressional power to

---

[375]   Ibid.

[376]   See Dkt 49 at ¶¶ 92–96 (amended complaint).

enforce prohibition against abridgement or denial of voting rights on account of sex); US Const Amend XXVI, § 2 (congressional power to enforce prohibition against abridgement or denial of voting rights to those eighteen years or older on account of age).

Federal law in the midst of the Vietnam War set the age for the military draft at eighteen, while some states required citizens to be twenty-one or older to vote. Congress sought to correct this disconnect by lowering the voting age to eighteen with passage of Title III of the Voting Rights Act of 1970. But a plurality of the Supreme Court in *Oregon v Mitchell* held this to exceed congressional legislative power. 400 US 112, 118 (1970).

The Twenty-Sixth Amendment provided the necessary grant of federal legislative power with relative speed, being both sent to the states for ratification and becoming effective in 1971. Section 1 states, "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." Section 2 expressly vested Congress with "power to enforce this article by appropriate legislation."

The Twenty-Sixth Amendment has received nowhere near the amount of judicial attention as other voting-rights causes of action. Indeed, only one Supreme Court case applies it. But that happens to be another action involving PVAMU decided shortly after ratification of the amendment, being *Symm v United States*, 439 US 1105 (1979).

*Symm v United States* marked the culmination of several different, but related, cases brought by PVAMU students beginning in 1972 to vindicate their right to vote. The cases challenged a Texas voting registration requirement that prohibited college dormitory residents from voting unless they could overcome a statutory presumption of nonresidency. PVAMU students lost their challenges in *Ballas v Symm,* 351 F Supp 876 (SD Tex 1972), aff'd, 494 F2d 1167 (5th Cir 1974), and *Wilson v Symm*, 341 F Supp 8 (SD Tex 1972). But in another case

120

brought by students at North Texas State University, the Fifth Circuit subsequently held the Texas presumption unconstitutional under the Fourteenth Amendment as unnecessary to promote any compelling state interest—without addressing the Twenty-Sixth Amendment. See *Whatley v Clark*, 482 F2d 1230, 1234 (5th Cir 1973). Even so, the state voting registrar for the area including PVAMU required students (but not other Waller County residents) to complete a questionnaire establishing intent to remain in Waller County after graduation. The Department of Justice then brought an action wherein a three-judge district court panel held this to violate the Twenty-Sixth Amendment as enforced by Title III of the Voting Rights Act. *United States v Texas*, 445 F Supp 1245, 1257 (SD Tex 1978). Direct appeal was taken to the Supreme Court, which simply and summarily affirmed under the name *Symm v United States*.

This Court's prior order on summary judgment discusses the handful of lower court cases addressing the Twenty-Sixth Amendment. See 472 F Supp 3d at 363–64. That discussion is largely superseded by a decision of the Fifth Circuit handed down on the day before final arguments at the close of trial in this matter.

In *Texas Democratic Party II*, the Fifth Circuit announced the standard for adjudicating claims under the Twenty-Sixth Amendment. It observed that the Twenty-Sixth Amendment must be understood as "a prohibition against adopting rules based on age that deny or abridge the rights voters already have." 978 F3d at 189. This means that denial or abridgement of the right to vote on the basis of age must be measured against the nature of the right as it existed at the time the Amendment was proposed and ratified in 1971. Specifically, the Fifth Circuit held that "an election law abridges a person's right to vote for the purposes of the Twenty-Sixth Amendment only if it makes voting *more difficult* for that person than it was before the law was enacted or enforced." *Texas Democratic Party II*, 978 F3d at 190–91 (emphasis in original). It further stated, "Abridgement of the right to vote applies to laws that place

a barrier or prerequisite to voting, or otherwise make it more difficult to vote, relative to the baseline." Id at 191.

*Texas Democratic Party II* arose in the context of the COVID-19 pandemic, with the issue being whether persons under the age of sixty-five had a right to vote absentee by mail. Underlying Texas law had long provided voters aged sixty-five years and older with the option to vote by mail. 978 F3d at 174, citing Texas Election Code § 82.002. The Fifth Circuit thus addressed whether absentee voting was part of the right to vote protected at the time that the Twenty-Sixth Amendment was proposed and ratified in 1971. It surveyed contemporaneous Supreme Court opinions, federal legislation enacted near the time of the Amendment, and practices of the several states. It observed that absentee voting in 1971 was generally permitted for persons who would be outside the jurisdiction on election day but was otherwise unavailable. It also specifically concluded that "the right to vote in 1971 did not include a right to vote by mail. In-person voting was the rule, absentee voting the exception." *Texas Democratic Party II*, 978 F3d at 188.

That contemporaneous meaning established the baseline for measuring what the right protected by the Amendment was and whether it had been denied or abridged. Id at 185, 187–88; see also *Tully v Okeson*, 977 F3d 608, 613–14 (7th Cir 2020). The Fifth Circuit then readily determined that there had been no violation of the Twenty-Sixth Amendment for the very reason that the plaintiffs there weren't denied the right to vote or prohibited from voting. They were instead only unable to use a particular method of voting—voting by absentee, mail-in ballot. *Texas Democratic Party II*, 978 F3d at 194.

Parallel considerations between that case and this one necessarily lead to the same conclusion. Provision for in-person early voting is relatively common today. But even so, the structure of such voting varies widely, with a number of states still offering no such means.[377] It simply

---

[377]   See above at ¶¶ 66 & 67.

can't be said, then, that the right to vote in 1971 included a right to vote early. In-person voting on election day was instead the general rule, with other methods of voting in advance being an exception of varying availability and implementation. This means that adoption by Waller County of the schedule and locations for early voting in the 2018 general election—as asserted by Plaintiffs to be less favorable to PVAMU students between the ages of eighteen and twenty—can't be said to have denied or abridged their right to vote under the Twenty-Sixth Amendment. Cf *Texas Democratic Party II*, 978 F3d at 185, citing *McDonald v Board of Election Commissioners of Chicago*, 394 US 802, 807 (1969) (observing that *McDonald* didn't involve "right to vote," but rather, "a claimed right to receive absentee ballots").

In fact, the complaint by Plaintiffs here isn't in essence about any outright denial or prohibition of the right of PVAMU students to vote during the 2018 general election. The claim instead boils down to arguments over relative convenience for early voting as to particular locations and hours established by Waller County. Those assertions of inconvenience have been thoroughly addressed above with respect to the claim of discriminatory burden as to race under Section 2 of the Voting Rights Act. Those observations pertain equally when considering the assertion as paired with one of age. They won't be reiterated at length, but it again bears mention that Waller County provided three full days of in-person early voting at the MSC, along with another two full days of in-person early voting a seven-minute walk away from the MSC at the WCCC. And further, any voter in Waller County could vote early during the hours set at any polling place during the early voting period, while also having the option simply to vote on election day at their assigned polling place.

To the extent that Plaintiffs complain about the particular times and locations they would have preferred, that is insufficient to establish denial of the right to vote under the Twenty-Sixth Amendment per the reasoning of *Texas Democratic Party II*.

The Court concludes as a matter of law that Plaintiffs have failed to prove their claim of intentional discrimination on the basis of age in violation of the Twenty-Sixth Amendment, as implemented by 42 USC § 1983. Defendants are entitled to judgment on this claim.

### 4. Hybrid claim under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments to the United States Constitution

The fourth cause of action asserts a claim for intent to discriminate against the specific class of Black voters in Waller County aged eighteen to twenty. Plaintiffs assert what they characterize as a blended right protected under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments read together.[378] The claim was permitted to proceed past summary judgment for evidentiary development at trial. But that came with admonition to Plaintiffs to "brief the legal aspects of this claim more concretely" and "pay particular attention to developing facts—along with rights and remedies—that distinguish this hybrid claim from each of its constituent components." 472 F Supp 3d at 366.

Plaintiffs in their post-trial briefing sensibly observe that Black students between the ages of eighteen and twenty-one are within two "protected classes" under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments.[379] That's unquestionably true. But what that really means is that the full protection of those Amendments is available to Black PVAMU students to address discrimination against them on the basis of either their race or age.

Yet Plaintiffs argue beyond those individual protections, stating, "Taken together, these Amendments prohibit discrimination against Black students on the intersecting bases of age and race."[380] What continues to elude specification is what this actually means. What is it

---

[378] See Dkt 49 at ¶¶ 97–100 (amended complaint).

[379] Dkt 175 at ¶ 24 (Plaintiffs' conclusions of law).

[380] Id at ¶ 25; see also Dkt 49 at ¶ 98 (amended complaint).

about those classes taken together that either creates a distinct, protected class or permits a situation that avoids redress under clearly established constitutional norms? Plaintiffs don't say.

Precedent supporting such a claim is thin. Plaintiffs cite the same two legal citations addressed by this Court's prior order, being *United States v Texas*, 445 F Supp 1245 (SD Tex 1978), aff'd sub nom *Symm v United States*, 439 US 1105 (1979), and *Latham v Chandler*, 406 F Supp 754 (ND Miss 1976). They additionally cite *Jefferies v Harris County Community Action Association*, 615 F2d 1025, 1033–34 (5th Cir 1980).[381] None of these go so far as to recognize the hybrid constitutional claim sponsored here by Plaintiffs.

As for *United States v Texas*, the Supreme Court summarily affirmed the decision of the Southern District of Texas in *Symm v United States*. See 439 US 1105 (1979). The three-judge panel below found the complained-of conduct to violate the Twenty-Sixth Amendment without addressing the Fifteenth Amendment in its analysis. See 445 F Supp at 1253–59. The court in one of the earlier related cases, *Wilson v Symm*, commented that "this is not a racial discrimination case. It is a student voting case," with the fact that the plaintiffs were Black being "no more than a fortuitous consequence of the fact that the only aggregation of college students in Waller County happens to be at Prairie View." 341 F Supp at 13.

As for *Latham v Chandler*, the Northern District of Mississippi addressed whether attorney fees could be recovered in a class action brought to ensure equal treatment of voter registration applications by Black students attending Mississippi Valley State University. 406 F Supp at 754. The action did proceed on claims under the First, Fourteenth, Fifteenth, and Twenty-Sixth Amendments. But the opinion by the district court doesn't address whether this involved a hybrid constitutional claim of the sort alleged here. Id at 755. Regardless, the

---

[381] See Dkt 175 at ¶ 25 (Plaintiffs' conclusions of law).

defendants sought no appeal, instead immediately complying with the district court's preliminary injunction mandating equal treatment.

As for *Jefferies v Harris County Community Action Association*, the Fifth Circuit there noted only that where a plaintiff brings claims of discrimination based on membership to multiple protected classes, the district court must address such claims as to each class. 615 F 2d at 1032. That doesn't involve amalgamating Amendments to discern new or differentiated rights. Rather, it instructs that analysis proceed rigorously under each particular Amendment.

Beyond this, Plaintiffs marshal no record evidence of discrimination against them on this putatively intersecting basis. They instead argue, "Unconstitutional discrimination against Black students can therefore exist even in the absence of discrimination of Black non-students."[382] But that simply concedes that any such discrimination is by virtue of them as *students* (or more pertinently, on the basis of their age). It would thus be redressable, if at all, under standards applicable to the Twenty-Sixth Amendment—with nothing suggesting that such claim should suddenly be subject to stricter standards under the Fourteenth and Fifteenth Amendments.

This Court's observation prior to trial remains:

> Plaintiffs thus largely seek recognition of a new constitutional claim of uncertain dimensions and standards. Yet it is difficult to conceive of a hybrid action combining the Fourteenth, Fifteenth, and Twenty-Sixth Amendments where independent action under each wouldn't redress the grievance. For instance, if Waller County didn't discriminate against *all* student voters but only against *Black* student voters, a claim would clearly sound under the Fifteenth Amendment. Likewise,

---

[382] Id at ¶ 25.

> if Waller County didn't discriminate against *all* Black voters but only against Black *student* voters, a claim would clearly sound under the Twenty-Sixth Amendment.

472 F Supp 3d at 365–66.

The hybrid claim at issue thus doesn't assert violation of a cognizable, independent right as pleaded and factually supported here by Plaintiffs. As addressed at length above, they haven't proven any violation of their rights under the Fourteenth, Fifteenth, or Twenty-Sixth Amendments when considered individually. And their post-trial briefing doesn't credibly establish that some amalgamation of intersecting rights either exists or—perhaps more importantly—reveals any concern regarding some aspect of discrimination unaccounted for by those Amendments.

The Court concludes as a matter of law that Plaintiffs have failed to prove their claim for intentional discrimination against them as a specific class of Black voters in Waller County aged eighteen to twenty. Defendants are entitled to judgment on this claim.

## 5. Relief

The Court has above found for Defendant on all claims asserted by Plaintiffs. As such, Plaintiffs' requested relief will be denied, with order that Plaintiffs take nothing by their claims.

## CONCLUSION

The Court finds that Plaintiffs haven't established that the early voting schedule adopted and implemented by Waller Counter during the 2018 general election was unconstitutional. As a matter of law, and for the reasons specified above, Plaintiffs have failed to prove their claims of (i) a racially discriminatory effect in violation of Section 2 of the Voting Rights Act; (ii) intentional race discrimination in violation of the Fourteenth and Fifteenth Amendments, as implemented by Section 2 of the Voting Rights Act and 42 USC § 1983; (iii) intentional discrimination on the basis of age in violation of the

127

Twenty-Sixth Amendment, as implemented by 42 USC § 1983; and (iv) intentional discrimination against them as a specific class of Black voters in Waller County aged eighteen to twenty.

Defendants are entitled to JUDGMENT that Plaintiffs take nothing by their claims.

SO ORDERED.

Signed on March 24, 2022, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge

128